IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **JOSEPH KIESEL,** | ) | |
| Plaintiff, | ) ) ) | CASE NO.: _____ |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| **DELTA AIR LINES, INC.,** and **DELTA MATERIAL SERVICES, LLC,** | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff **Joseph Kiesel** ("Plaintiff" or "Kiesel") files this complaint for relief and damages against Defendant **Delta Air Lines, Inc.** ("Delta") and **Delta Material Services, LLC** ("DMS"), a wholly owned subsidiary of Delta, (collectively referred to as "Defendants") Plaintiff relies on the following allegations and causes of action:

## NATURE OF THE ACTION

1. This employment discrimination action against Delta Air Lines, Inc. and Delta Material Services, LLC, arises under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C.A. § 794(a). Plaintiff

1

alleges that he was terminated by Defendants, who constitute a single employer, in retaliation for exercising his statutory rights under the ADA and the Rehabilitation Act and that he was denied a reasonable accommodation of temporary remote work. He seeks back pay; front pay; lost benefits, including the cost of health insurance; compensatory damages for mental anguish and emotional distress; punitive damages to the extent allowed by law; and his attorneys' fees and costs of litigation.

## **THE PARTIES**

2. Plaintiff is a citizen of the United States who, during all times relevant to this cause of action, was employed by DMS, a wholly owned subsidiary of Delta.

3. Plaintiff is an individual with a physical impairment that substantially limits one or more major life activities, as defined by the ADA. 42 U.S.C.A. § 12102(1)(A).

4. Delta is a covered entity under Title I of the ADA and as a federal contractor receiving federal financial assistance it is also subject to suit under the Rehabilitation Act. 42 U.S.C.A. § 12101 *et seq.*, as incorporated by 29 U.S.C.A. § 794(d).

5. DMS and Delta function as an single employer, or integrated enterprise, in the following manner: (a) they share a common corporate management structure; (b) their operations are functionally interrelated, in that DMS is a sole provider of used material parts to Delta and a sole distributor of used material from the Delta fleet; (c) Delta maintains centralized control of DMS' labor relations policies, including human resources and leave management; (d) Delta maintains financial control and ownership of its subsidiary, DMS.

## SUBJECT MATTER JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

7. Venue is proper in this Court, as Defendants' corporate headquarters are located in this judicial district and division.

## PERSONAL JURISDICTION

8. Delta may be served with proper process through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners GA., 30092.

9. DMS may be served with proper process through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners GA., 30092.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10. On August 27, 2021, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") against DMS, alleging discrimination under the ADA. *See* Ex. A. Plaintiff's right-to-sue letter was issued to him on October 7, 2022, and this lawsuit is initiated prior to his statutory deadline of 90 days.

**FACTUAL ALLEGATIONS**

11. Delta is one of the largest aircraft carriers in the world, operating over 5,400 daily flights in over 50 countries.

12. Delta operates several programs or activities that receive federal financial assistance. The company contracts to provide discounted services for travelers employed by the federal government. Delta is a part of the Defense Department's Civil Reserve Air Fleet and provides maintenance services for U.S. military aircraft.

13. Kiesel was hired by Delta's subsidiary DMS in August 2019 as a project manager for financial analysis. His principal duties consisted of developing and modeling financial trends in the airline industry for internal Delta customers, but beginning in the summer of 2020, due to staffing reductions, Kiesel was also assigned to performed some finance related tasks for another Delta subsidiary, Delta Flight Products.

14. After the onset of the global COVID-19 pandemic in March 2020, Delta transitioned the vast majority of its corporate team, including employees of its subsidiaries like DMS, to remote work as a safety imperative in order to limit the risk of spreading the virus.

15. In April 2021, as the first COVID vaccines were made available to the adult U.S. population, Delta announced its intentions to restore in-office operations for its headquarters and the corporate units of its subsidiaries.

16. In Delta's internal discussions and in many of its public statements, the company framed its reopening decision not as a business necessity but as a public relations gesture meant to boost consumer confidence in the viability of a post-pandemic normalcy.

17. By mid-summer 2021, there were disturbing signs that the COVID threat was reviving: The pace of vaccination lagged well behind the goals public health experts had envisioned, and various mutations of the virus were emerging in the United States.

18. In Georgia, in June 2021, barely half of the adult population had received a COVID vaccine, substantially behind the national benchmark of 70% targeted by the Centers for Disease Control ("CDC") as a national goal. *See* "The

American South Could See a Summer Covid Surge as Vaccinations Lag," *New York Times*, June 7, 2021.

19. Given the persistent threat from the coronavirus, many of the country's Fortune 500 corporations put on hold their plans to resume in-office work. Numerous companies that insisted on reopening chose to adopt mandatory vaccination policies for their workforces.

20. Delta was conspicuous among the Fortune 500 for its determination in the summer of 2021 to proceed with reopening its offices while simultaneously resisting vaccine mandates for its personnel. Delta would eventually become the last major American airline to impose vaccine mandates, and only then for new hires, despite an array of advice from policy makers and the scientific community urging earlier action.

21. Delta's commitment to reopening without a vaccine mandate was disconcerting for Kiesel, who has type I diabetes. Kiesel's condition as a person with diabetes, which makes him immunocompromised, has been recognized by the CDC as a high-risk factor for major complications or a dire outcome from COVID, as at one point, nearly 40 percent of persons hospitalized with severe COVID complications had diabetes as an underlying medical condition. [Diabetes and COVID-19 | CDC](Diabetes and COVID-19 | CDC).

22. In late June and early July 2021, Kiesel and his primary physician submitted documentation to Defendants' human resources ("HR") team in support of a request for a three-month accommodation to continue working remotely. Kiesel and his physician based the three-month timetable on projections from public health authorities that the spike in COVID variants would abate by the fall.

23. The limited three-month accommodation Kiesel requested would have had the effect of maintaining his 16-month remote status for a finite period of time: since Defendants' transition to remote status, Kiesel's work had been performed seamlessly with no interruptions in service or outputs.

24. As confirmation of Kiesel's capacity to perform productively while on remote status, his primary supervisor gave Kiesel a positive, highly complimentary review in the summer of 2021.

25. While Delta perceived an optic value in its corporate teams returning to the office, the essential operations of DMS' financial analysis department were prototypical examples of work susceptible to being handled remotely: Kiesel's team relied heavily on data-sharing features and cloud storage, and the department since August 2021 has continued to conduct much of its interactive work on virtual platforms like Microsoft Teams.

26. During the time Kiesel's accommodation requests were pending, the HR team's communications with him were sporadic. On several occasions, Kiesel pointed out the accommodations paperwork that Defendants provided were tailored for restrictions related to a physical injury but received no meaningful guidance on how to adapt the format to address the risk of exposure to a deadly virus.

27. On Friday, July 30, 2021, DMS communicated to its corporate team that the upcoming Monday, August 2, had been designated as the date of in-office return. To Kiesel's knowledge, this was the first time DMS adopted a specific return-to-office date.

28. In late July 2021, a senior HR manager, Michelle Frost, provided Kiesel notice that his accommodation request had been rejected, and in an email on July 30, 2021, Frost informed Kiesel that either he was to report to work on Monday, August 2, 2021, or the company "would need to move for a review for continued employment."

29. Kiesel responded in an email in the early evening of July 30 that he wished to engage in an interactive process, as ADA regulations require, and offered an immediate modification of his initial request, specifically a three-week remote extension to facilitate continuing dialogue.

30. Kiesel did not receive a response to his July 30 request regarding an interactive process.

31. In late July, after learning that his accommodation request would be rejected, Kiesel submitted a voluntary leave of absence ("VLOA") application but was told by his manager, Brittany Makany, that "due to resource constraints," applications were temporarily unavailable; however, Defendants' internal message boards continued to tout the availability of its VLOA program during the very same week that Kiesel's application was ignored.

32. On August 2, Delta's Chief Health Officer Dr. Henry Ting convened a call with senior-level employees in which Dr. Ting directly addressed emerging evidence that vaccinated persons were contracting COVID-19 and that the effectiveness of vaccines remained a matter of scientific uncertainty.

33. During the call, Dr. Ting observed that persons with immunocompromised conditions "should be very careful and do what they did in December/January 2020," a reference to the time frame before vaccines began to be introduced to the U.S. population.

34. Kiesel learned from colleagues about Dr. Ting's comments during the call and reached out to Dr. Ting by email on August 2 to inquire if, in his view, immunocompromised persons "should still be working from home at this time."

Dr. Ting responded in writing, "Yes-this is an option and can be discuss[ed] with that person's supervisor."

35. On August 9, 2021, Kiesel was informed by Makany that he had the option of immediately resigning or being terminated.

36. At no point after the submission of Kiesel's accommodations paperwork in late June and early July 2021 did Delta engage him in an interactive dialogue to explore the range of accommodation options. The sole communication of substance between Defendants and Kiesel was his HR manager's late July communications denying his accommodation outright.

37. Defendants' refusal to accommodate or engage in an interactive process was not only at odds with advice provided to Kiesel by Delta's Chief Public Health Officer but inconsistent with different departments within Delta's corporate infrastructure. In the same time frame in which Kiesel's accommodation was rejected, a managing director in the marketing department informed her team that given the surge in new COVID variants, the return-to-work timeline would be delayed a month to Labor Day and that in the interim, employees should make choices regarding in-office work that were "what you are most comfortable with."

38. The resignation or termination threat presented to Kiesel deviated from standard disciplinary policies and procedures maintained by Delta and its

10

subsidiaries. Defendants; protocol for discipline typically features a schedule of written write-ups and warnings followed by suspension, culminating in termination. Kiesel received none of the routine disciplinary measures Delta entities normally applied prior to an involuntary separation.

39. Kiesel declined the ultimatum to resign and was terminated by Defendants on or about August 9, 2021.

40. DMS and Delta acted as a single employer with respect to the denial of Kiesel's requested accommodation and his subsequent termination, in that the two entities functioned at all relevant times as an integrated enterprise with a shared ownership and corporate management structure.

https://www.linkedin.com/company/delta-material-services-llc;

https://deltatechops.com/material-services/

## COUNT I

**(Retaliation under the Americans with Disabilities Act, 42 U.S.C.A. § 12203(a), and the Rehabilitation Act, 29 U.S.C.A. § 794)[1]**

**(against both defendants)**

41. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

---

[1] The standards used in an employment discrimination action to determine whether the Rehabilitation Act and the ADA have been violated are identical. 29 U.S.C.A. § 794(d).

42. Defendant Delta and its subsidiary DMS, who operated as a single employer at all times relevant to this complaint, are covered employers under Title I of the ADA.

43. Defendant Delta engages in a program or activity that receives federal financial assistance as defined by Section 504 of the Rehabilitation Act.

44. Section 504 of the Rehabilitation Act mandates that "no otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.A. § 794(a).

45. The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of disability in regard to the discharge of said employee, or the terms, conditions, and privileges of employment. 42 U.S.C.A. § 12112(a).

46. Plaintiff had a physical impairment in that his status as a person with type I diabetes made him an immunocompromised individual who, at all times relevant to this complaint, was at heightened risk of contracting a life-threatening disease, COVID-19, or suffering severe illness from the virus.

47. During the time frame alleged in this complaint, Plaintiff's immunocompromised condition substantially limited one or more of his major life activities, i.e., the ability to safely work in a congregant business setting.

48. Plaintiff engaged in protected activity under the ADA and the Rehabilitation Act in that he exercised his statutory rights by requesting reasonable accommodations that would have limited Plaintiff's risk of serious illness from COVID-19.

49. Defendants retaliated against Plaintiff by terminating him because he engaged in protected activity under the ADA and the Rehabilitation Act.

50. Defendants' retaliatory conduct has inflicted various damages on Plaintiff, including but not limited to (1) loss of back pay, front pay, and benefits, including health insurance and accumulation of retirement contributions, and (2) compensatory damages related to mental anguish, emotional distress, humiliation, embarrassment, and reputational stigma. Plaintiff has also been made to bear the costs of litigation and attorneys' fees.

51. Defendants' unlawful conduct was undertaken willfully, with deliberate indifference to Plaintiff's right to be free from retaliation for exercising his statutory rights and opposing discrimination based on disability.

## COUNT II

**(Failure to accommodate under the Americans with Disabilities Act, 42 U.S.C.A. § 12112 *et seq.*, and the Rehabilitation Act, 29 U.S.C.A. § 794)**

**(against both defendants)**

52. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

53. Plaintiff at all times relevant to this complaint was an individual with a disability, i.e., his status as a person with type I diabetes made him immunocompromised, which substantially limited his ability to safely work in a congregant business setting.

54. Defendants, who operated as a single employer, failed to provide reasonable accommodations to Plaintiff, who it knew had a disability and who could have performed the essential functions of his job with said accommodations.

55. Defendants did not demonstrate that Plaintiff's requested accommodations would impose an undue hardship on the operations of its business.

56. Defendants failed to engage in an interactive process regarding accommodating Plaintiff's disability.

57. Defendants' failure to provide reasonable accommodations to Plaintiff and its failure to engage in an interactive process regarding said accommodations constitutes unlawful discrimination under the ADA and the Rehabilitation Act.

58. Defendants' unlawful discrimination based on Plaintiff's disability has inflicted various damages on Plaintiff, including but not limited to (1) loss of back pay, front pay, and benefits, including health insurance and accumulation of retirement contributions; and (2) compensatory damages related to mental anguish, emotional distress, humiliation, embarrassment, and reputational stigma. Plaintiff has also been made to bear the costs of litigation and attorneys' fees.

59. Defendants' unlawful conduct was undertaken willfully, with deliberate indifference to Plaintiff's right to be free from discrimination based on his disability.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits, including the costs of lost benefits, including health insurance, accrued sick leave, and accumulated retirement contributions;

B. Compensatory and punitive damages to the extent allowed by law;

C. Attorneys' fees and costs of litigation;

D. Prejudgment and post-judgment interest at the highest lawful rate;

E. Such other equitable and monetary relief as the Court deems just and proper, including full reinstatement to his prior position with Defendant.

Respectfully submitted on the 3rd day of January, 2023.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis[2]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
adavis@hkm.com
Direct: 205-881-0935

*s/Jermaine Walker*
Jermaine "Jay" Walker
GA Bar No. 142044
3355 Lenox Rd. NE, Suite 705
Atlanta, GA 30326
jwalker@hkm.com
Direct: 404-301-4020

---

[2] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Davis is licensed in the state of Alabama and the District of Columbia.