# EXHIBIT "B"

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**19-C-06796-S4**
**10/19/2022 10:11 AM**
TIANA P. GARNER, CLERK

Case 1:23-mi-99999-UNA   Document 28-3   Filed 01/04/23   Page 2 of 566

1  IN THE STATE COURT FOR THE COUNTY OF GWINNETT

2  STATE OF GEORGIA

3

4

FLOOD BROTHERS RESTORATION, LLC,)
5                               )
        Plaintiff,              )        CIVIL CASE
6  -vs-                         )        FILE NO: 19-C-6796-S4
                                )
7  UNIVERSAL PROPERTY AND CASUALTY )
   INSURANCE,                   )        **CERTIFIED TRANSCRIPT**
8                               )        **VOLUME ONE**
        Defendants.             )
9  _____

10          Transcript of the Jury Trial before the

11            Honorable Ronda Colvin Leary, held at the

12        Gwinnett County Justice and Administration Center,

13          April 25th, 2022 through April 27th, 2022.

14  _____

15  APPEARANCES OF COUNSEL:

16  For the Plaintiff:      Carlton Rouse
                            Attorney at Law
17
    For the Defendant:      Michael Bagley
18                          Attorneys at Law

19

20

21
                    KRISTINA K. STEFFEY, CCR, B-2014
22                     Certified Court Reporter
                          P.O. Box 491713
23                   Lawrenceville, Georgia  30049
                          (404) 316-0381
24

25

1      **I-N-D-E-X  T-O  P-R-O-C-E-E-D-I-N-G-S**

                                                              PAGE
2
       PRETRIAL MOTIONS . . . . . . . . . . . . . . . . . . 1
3      OATH TO SELECTED TRIAL JURY . . . . . . . . . . . . 27
       PRELIMINARY JURY INSTRUCTIONS . . . . . . . . . . . 28
4      OPENING ARGUMENT, PLAINTIFF . . . . . . . . . . . . 34
       OPENING ARGUMENT, DEFENSE . . . . . . . . . . . . . 44
5      MOTION FOR DIRECTED VERDICT . . . . . . . . . . . . 207
       CHARGE CONFERENCE . . . . . . . . . . . . . . . . . 295
6      MOTION FOR DIRECTED VERDICT, ATTORNEY'S FEES. . . . . 296
       CLOSING ARGUMENT, PLAINTIFF . . . . . . . . . . . . 355, 389
7      CLOSING ARGUMENT, DEFENSE . . . . . . . . . . . . . 368
       CHARGE OF THE COURT . . . . . . . . . . . . . . . . 398
8      QUESTIONS OF THE JURY . . . . . . . . . . . . . . . 406
       VERDICT OF THE JURY . . . . . . . . . . . . . . . . 408
9      CHARGE CONFERENCE, SECOND PHASE. . . . . . . . . . . 411
       CHARGE OF THE COURT, SECOND PHASE. . . . . . . . . . 422
10     MOTION FOR DIRECT VERDICT, SECOND PHASE. . . . . . . 422
       VERDICT OF THE JURY, SECOND PHASE. . . . . . . . . . 423
11
       **EXAMINATION OF WITNESSES**
12
       BECKY FOWLER
13
       Direct Examination by Mr. Rouse. . . . . . . . . . . 55
14     Cross-Examination by Mr. Bagley. . . . . . . . . . . 70
15     RANDALL FOWLER

16
       Direct Examination by Mr. Rouse. . . . . . . . . . . 75
       Cross-Examination by Mr. Bagley. . . . . . . . . . . 177
17     Redirect Examination by Mr. Rouse. . . . . . . . . . 291
       Recross-Examination by Mr. Bagley. . . . . . . . . . 293
18
       SKYLAR FELDER
19
       Direct Examination by Mr. Bagley . . . . . . . . . . 216
20     Cross-Examination by Mr. Rouse . . . . . . . . . . . 244
       Redirect Examination by Mr. Bagley . . . . . . . . . 286
21
       CARLTON ROUSE
22
       Direct Examination . . . . . . . . . . . . . . . . . 416
23     Cross-Examination by Mr. Bagley. . . . . . . . . . . 418
       Redirect Examination . . . . . . . . . . . . . . . . 420
24

25

```
 1              I-N-D-E-X   T-O   E-X-H-I-B-I-T-S

 2      Plaintiff's
        Exhibits                Identified   Admitted
 3
        1 - Ins. Policy              96          97
 4      2 - Invoice                  66          68
        3 - Invoice                 103         133
 5      4 - Invoice                 101         103
        5 - Work Authorization       98         101
 6      6 - Direct Pay Authorization 98         101
        7 - Email                   132         134
 7      8 - Email                   134         135
        9 - Email                   136         145
 8      10- Email                   137         145
        11- Email                   139         145
 9      12- Email                   140         145
        13- Email                   141         145
10      14- Email                   143         145
        15- Email                   144         145
11      16- Email                   144         145
        17- Texts                   146         160
12      18- Letters                 163
        19- Letters                 163
13      20- Letters                 163
        32- Picture of Check        160         161
14      33- Email                   281         283
        34- Rouse Invoice           417         418
15

16
        DEFENDANT'S
17      EXHIBITS

18      2 - Letter                  237         289
        3 - Email                   238         289
19      4 - Letter                  239         289
        5 - Request for Admissions  213         289
20      6 - Email                   241         289
        9 - Policy                  218         289
21      10- F.B. Pay Authorization   72         289
        11- Invoice                 224         289
22
        COURT'S EXHIBIT NUMBER 1    406
23

24

25
```

1

*TRANSCRIPT LEGEND*

2

*(THE FOLLOWING TRANSCRIPT MAY CONTAIN QUOTED MATERIAL; SUCH MATERIAL IS REPRODUCED AS READ OR SPOKEN.)*

3

4

*(PROPER NAMES FOR WHICH CORRECT SPELLING COULD NOT BE VERIFIED ARE SPELLED PHONETICALLY IN THIS TRANSCRIPT.)*

5

*(IN THE FOLLOWING TRANSCRIPT, A DASH [--] IS USED TO INDICATE AN UNINTENTIONAL OR PURPOSEFUL INTERRUPTION IN A SENTENCE; AN*

6

*ELLIPSIS [....] IS USED TO INDICATE HALTING SPEECH OR AN UNFINISHED SENTENCE IN DIALOGUE OR AN OMISSION OF WORD[S] WHEN*

7

*READING WRITTEN MATERIAL; [SIC] IS USED TO INDICATE EXACTLY AS SAID.   UH-HUH IS USED TO INDICATE AN AFFIRMATIVE RESPONSE;*

8

*HUH-UH IS USED TO INDICATE A NEGATIVE RESPONSE.)*

9

*(IN THE FOLLOWING TRANSCRIPT, [UNINTELLIGIBLE/INAUDIBLE] MAY BE USED TO INDICATE WORDS OR PHRASES UTTERED IN TESTIMONY OR*

10

*DIALOGUE WHICH THE COURT REPORTER WAS EITHER UNABLE TO HEAR, TO UNDERSTAND, OR TO DECIPHER.)*

11

12

- - -

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          P-R-O-C-E-E-D-I-N-G-S
2              THE COURT:  Flood Brothers Restoration versus
3         Universal Property and Casual Insurance.
4              MR. BAGLEY:  Yes, ma'am.
5              THE COURT:  Okay.  Mr. Rouse, you are here for the
6         plaintiffs, and is it Bagley?
7              MR. BAGLEY:  Yes, ma'am, your Honor.
8              THE COURT:  Okay.  Michael Bagley.  All right,
9         counsels.  I hear that we have some motions this
10        morning.
11             MR. ROUSE:  I just had -- before Judge Iannazzone
12        previously, we discussed some of the motions in limine.
13        And I received the motions in limine that morning.  I
14        wanted to state that I did have objections to the motion
15        in limine one, two, and --
16             THE COURT:  You're looking at Defendant's Motion in
17        Limine?
18             MR. ROUSE:  Yes, your Honor.  One, two, four, and
19        five.  And if I could just briefly state my basis for
20        that.
21             THE COURT:  Okay.  Everything else, no objections to
22        anything else?
23             MR. ROUSE:  No objections.
24             THE COURT:  Okay.  Have you and counsel at least
25        talked about one, two, four, and five to see if you can
```

1    come to some kind of consensus or no?

2         MR. ROUSE:  Well, you know, based upon -- you know,

3    Mike is great.  We've talked before.  I know he's not

4    going to agree.

5         MR. BAGLEY:  Well, I think we haven't, your Honor.

6    But I think if on one and four, it deals with attorney's

7    fees.  And, of course, this is a -- the request for

8    attorney's fees in cases like this would normally be

9    bifurcated.  We'd have the main case first and then after

10   that, you would decide if we go to the second phase on

11   attorney's fees.  We obviously didn't intend the motion in

12   limine to apply if there's a second phase, and I think

13   that's probably what Carlton is getting at.

14        MR. ROUSE:  Yes, that's in part true, however, my

15   concern was I think because of the nature of this case,

16   for example, two, excuse me --

17        THE COURT:  Mr. Rouse, let's just go ahead.  We're

18   here, called for civil jury trial.  Flood Brothers

19   Restoration, LLC, plaintiff, versus Universal Property and

20   Casualty, Inc., defendant, Civil Action Number

21   19-C-06796-4.  We're here on motions in limine.  There's

22   some objections made by the plaintiff to defendant's one,

23   two, four, and five.

24        Thank you, counsel.  I just wanted to set the record

25   up.  Let's go ahead and talk about one.

1    MR. ROUSE:  Well, I agree with Mike that with respect

2    to attorney's fees, the issue is bifurcated.  The basis

3    for attorney's fees would be supply if the jury determines

4    that it is appropriate.  I do agree with that.

5        I think I may have misspoken.  It's one, four, and

6    five.  The reason that I objected to one was it's

7    essentially saying plaintiff should be barred from

8    introducing testimony of plaintiff's counsel.

9        You know, there was an issue earlier on in the motion

10   phase where there was a motion for summary judgment.  And

11   the issue was, well, plaintiff's attorney can't

12   participate.  He's barred because he's a witness in the

13   case.  I think this is intimating some of those very same

14   issues.

15       I think the problem that I have with the motion in

16   limine is I am not a witness in terms of having knowledge

17   of the basis for the claim or facts in the claim.  But I

18   am, I guess, technically a witness with respect to

19   settlement discussions.

20       If this argument was accepted by the Court, I think

21   it would create a slippery slope because every personal

22   injury case, every civil case, there's settlement

23   discussions.  And if a lawyer contacts a defendant

24   pretrial and there's settlement discussions and by some,

25   you know, interpretation of professional ethical rules,

1    that lawyer then becomes prevented from representing the

2    client, it just --

3         THE COURT:  Okay, counsel.  This may help me

4    understand better what your objection is.

5         Mr. Bagley, tell me what your motion is.

6         MR. BAGLEY:  Yes, ma'am.  Our motion is to make sure

7    that testimony complies with Georgia Rule of Professional

8    Conduct 3.7, which would prevent Mr. Rouse from being a

9    substantiative material witness -- you know, he can't step

10   from behind the podium to the witness stand.  Supreme

11   Court in adopting Rule 3.7 says that's not acceptable.

12        But what I thought he wanted to do was in the second

13   phase, if there is a second phase, to lay the foundation

14   for what his attorney's fees were.  I don't have an

15   objection to that.

16        THE COURT:  That's acceptable.

17        MR. BAGLEY:  I do have an objection to him being a

18   material substantiative witness on the substantiative

19   issues in the case.

20        THE COURT:  But, Mr. Rouse, that's not your

21   intention, is it?

22        MR. ROUSE:  That is not my intention.  I don't want

23   to take the witness stand.

24        THE COURT:  Okay.  Well, then defendant's number one

25   is not an issue then.  If we all understand -- and you can

1   testify and lay a foundation as it relates to your

2   attorney's fees if and when it gets to that phase.  You

3   understand that, right?

4        MR. ROUSE:  I do.

5        THE COURT:  You can testify to that.  You understand

6   that?

7        MR. ROUSE:  I do.  This is one issue.  In the

8   evidence, there's gonna be an ante litem letter that was

9   sent to the defendant where I had communications directly

10  with a representative of Universal and we discussed

11  whether -- they paid $18,000 and they failed to pay the

12  remaining, the full balance of what was owed, allegedly

13  owed.

14       So I think there will be some argument -- well, at

15  least there was an argument by Mike earlier saying, well,

16  if you take the position that you are negotiating with

17  Universal and Universal understood that it was a partial

18  payment, then you somehow become a witness and you have to

19  take the stand.  That was your position in the motion

20  phase.

21       MR. BAGLEY:  That's correct, your Honor.  And I have

22  told Mr. Rouse that all along.  And I didn't make the

23  rules, but I certainly try to abide by them.

24       3.7, which is adopted by the Supreme Court, says

25  counsel cannot be a witness on a substantiative issue.  I

1   thought we had gotten beyond that, and here's why, Judge.

2     The December 20 demand letter is gonna come into

3   evidence.  That's what triggered all the things.  There

4   are a series of emails after that going right up to the

5   payment of $18,000 between my client and Mr. Rouse that

6   are gonna come into evidence.

7     Now, I think where the line must be drawn is if there

8   is going to be extra evidence beyond that offered by

9   Mr. Rouse, he has become a --

10    THE COURT:  Well, we're not gonna get into the

11   minutia of the things.  I mean, you can testify that you

12   represented the person up to that point or whatever and

13   you can testify as relates to your attorney's fees, I

14   guess how much it costs in that representation.  But to

15   get into a whole other mini trial to testify as to what is

16   going on --

17     I understand your position, Mr. Bagley.  I understand

18   your position also.  I guess it just depends on, I may

19   just have to reserve ruling on that up until I see where

20   things are going.  But we're not having a mini trial

21   within a mini trial within a mini trial, but you can

22   definitely testify as relates, Mr. Rouse, to your

23   attorney's fees and lay a foundation for that.

24    MR. ROUSE:  Understood.  And I think with respect to

25   four, plaintiff should be barred from making any

1      statements or comments regarding requirement to pay

2      attorney's fees to counsel.

3          I'm not sure if the bifurcation, the process of

4      bifurcating prevents the plaintiff from acknowledging that

5      he incurred attorney's fees.  I think it prevents the

6      explanation for the basis of those fees, but attorney's

7      fees were pled in the complaint.

8          So the mere fact that plaintiff can testify that,

9      yes, I incurred attorney's fees trying to resolve this,

10     doesn't open the door to that 13-6-11 bifurcation issue.

11     I think if he went into the detail, like examination of an

12     invoice, yes.  But I think the mere fact of plaintiff

13     acknowledging that he has attorney's fees based upon

14     litigation, I don't think that's barred or should be

15     barred.

16         THE COURT:  Is that your intention, Mr. Bagley?

17         MR. BAGLEY:  Your Honor, we cited to the well-settled

18     case law in Georgia from the Court of Appeals that says a

19     plaintiff's obligation to pay attorney's fees is of no

20     concern to a jury in this phase, your Honor.  Otherwise,

21     they're basically getting two bites at the apple.

22         THE COURT:  You mean in the first phase?

23         MR. BAGLEY:  Yes.  Obviously, it's gonna come up in

24     the second phase.  I mean, that's just the nature of the

25     beast.  But I don't think -- the Court of Appeals has said

11

1  it's not admissible.  It's not relevant.

2       THE COURT:  Is that what you're thinking, Mr. Rouse?

3       MR. ROUSE:  No, I'm saying that I don't think the

4  ruling means or is applied to say you can't acknowledge

5  there's an expense related to attorney's fees or else.  I

6  mean, it wouldn't be in the complaint.  It wouldn't be in

7  the pretrial order.

8       If it's approved, the jury can understand that there

9  is a basis for a claim for attorney's fees, and then they

10  can decide as they, you know --

11       THE COURT:  So how would that come in?  I understand

12  there is a claim for it.  How would that come in in the

13  main phase as it relates to attorney's fees?  Would you

14  ask your client, did you have to --

15       Clearly, the jurors see two attorneys sitting here.

16  They know that the attorney's being paid somehow.  So are

17  you wanting to ask your client on the stand in the first

18  phase about -- tell me how you --

19       MR. ROUSE:  Well, given that there are a series of

20  prelitigation letters and those letters basically outline,

21  hey, if you do this, we can avoid expense that, you know,

22  won't be incurred by this company.  And I think just the

23  letters themselves just stating that there's an expense

24  isn't a violation of the technical means by which you

25  bifurcate the issue of 13-6-11 fees.  Obviously the jury

1     is going to determine whether there's a bonafide issue.

2     And if there isn't a bonafide issue, then they'll come

3     back and say yes, I think.

4          THE COURT:  Okay.  I just want to make sure I

5     understand it.  So basically, your point is you want to

6     have your client on the stand and ask him as relates to an

7     attorney's letter, did I not tell you that if it went

8     towards further litigation, that it's gonna cost ex-amount

9     of money?  Along those lines?

10         MR. ROUSE:  No, not that far.  Just to simply go

11    through the process of you had it.  You did work.  You had

12    an invoice.  You were trying to resolve it.  You couldn't

13    resolve it on your own, so again, you retained counsel to

14    help you and you incurred fees or expense associated with

15    that.

16         THE COURT:  Okay.  And that's the extent of it.

17    Mr. Bagley?

18         MR. BAGLEY:  Your Honor, the fact that he incurred

19    fees according to the Court of Appeals is irrelevant in

20    this phase.  And the reason is why would it be relevant

21    other than a sort of back door way of telling a jury, hey,

22    hey, there are more damages here than we've really been

23    able to talk about and there are attorney's fees.  Well,

24    we're gonna get to that in the next phase.

25         THE COURT:  So I see what Mr. Bagley is saying also.

13

1    Do you see that also, Mr. Rouse?  You are gonna get a bite

2    at the apple as it relates to attorney's fees.

3         MR. ROUSE:  I just don't think it's --

4         THE COURT:  Because why should we have two phases

5    then if you can do it in the main phase and then --

6         MR. ROUSE:  I agree with the Court.

7         THE COURT:  Are we asking for punitive damages also?

8         MR. ROUSE:  No.

9         THE COURT:  Okay.

10        MR. ROUSE:  I agree with the Court.  I just don't

11   feel as though mentioning or acknowledging there's an

12   expense is the same as putting forth a factual basis for

13   that expense.  I think it's just an acknowledgement.  It

14   acknowledges what's in the pretrial order and it

15   acknowledges what's in the complaint.  I don't think it's

16   forbidden to mention attorney's fees in the case in chief.

17        We're not offering evidence of attorney's fees.

18   We're just mentioning that there was an expense for

19   attorney's fees.

20        THE COURT:  Okay.  And your motion, Mr. Bagley, is it

21   is of no concern the jury what attorney's fees is required

22   to pay -- what plaintiff is required to pay to their

23   counsel.

24        MR. BAGLEY:  Yes, ma'am.  It's not relevant because

25   in this first phase, it's not an element of the damages or

1      any other remedy sought.  And so what it really is is the

2      back door way of telegraphing to the jury there are more

3      damages here than you know about and that's inappropriate.

4          I would also point out, Judge, that that second

5      demand letter in February of 2019, specifically references

6      a request for attorney's fees, and I don't believe it

7      would be admissible in the first phase either because it

8      does the same thing and even quantifies it.

9          THE COURT:  Because I've heard it done in the main

10     phase before also, Mr. Bagley, what is the second -- under

11     which statute are the attorney's fees being asked?

12         MR. ROUSE:  13-6-11.

13         THE COURT:  Okay.  I was looking for the consolidated

14     pretrial order in here.  Don't see it.  Did y'all submit

15     it?

16         MR. ROUSE:  We did.  We submitted that last time we

17     were here.

18         MR. BAGLEY:  I believe, your Honor, Judge Iannazzone

19     entered the pretrial.  I think I remember seeing a

20     computer notice of that.

21         THE COURT:  You may have.  I got it.  I got it,

22     Kelsea.

23         MR. BAGLEY:  Judge, by the way, my client was from

24     out of state and he landed this morning at 7:45 and he

25     should be here any moment.

1          THE COURT:  All right.  Mr. Rouse, on number four, I
2     don't -- Mr. Bagley, I hear your concern.  I don't think
3     there will be any harm and I do think it would be
4     allowable and admissible if Mr. Rouse just basically
5     touched on it.  Don't go into it.  I have to see your line
6     of questioning, Mr. Rouse.
7          MR. ROUSE:  I'm not gonna ask about the attorney's
8     fees, how they are paid, contingency, hourly, I'm not
9     going into any of that.  I'm just merely stating to the
10    Court that there was an effect, cause and effect, related
11    to non-payment and efforts to close out this account.
12    That's it.
13         THE COURT:  Basically, and you had to hire counsel?
14         MR. ROUSE:  Yes.
15         THE COURT:  I'll allow it.  So defendant's four is
16    noted, but I will allow that.  Then you have one left,
17    number five?
18         MR. ROUSE:  Yes, number five.  It says essentially
19    plaintiff should be barred from presenting evidence about
20    plaintiff's attempts to bring an action against Michelle
21    Jimenez and Michelle Jimenez's dismissal by the Court.
22         MR. BAGLEY:  That's number six.
23         THE COURT:  Yes.  It's defendant's motion in
24    limine --
25         MR. BAGLEY:  I think I have two fives.  It's the

1    second five, your Honor.  I apologize.  There are two

2    fives.

3          THE COURT:  Okay.  So which five is it?  The second

4    five?

5          MR. ROUSE:  The second five, yes.

6          THE COURT:  Okay.

7          MR. ROUSE:  The reason why I object to that is

8    because a part of this case is what Flood Brothers

9    Universal had to go through to close out this account.

10    And Universal took various positions during the case that

11    caused them to incur specific expenses associated with

12    trying to add Ms. Jimenez to the case.  And quite frankly,

13    they paid.  They paid $18,000, so they obviously knew they

14    had an obligation to pay it, but they took the position

15    that they wanted to have Ms. Jimenez a part of the case.

16    And we took efforts to find her, and my client incurred

17    over $3,000 just with respect to efforts trying to locate

18    Ms. Jimenez.  And Flood Brothers wouldn't have incurred

19    that but for Universal's position on the account.

20          THE COURT:  Okay.  Mr. Bagley?

21          MR. BAGLEY:  Your Honor, I'm not sure I understand

22    what Mr. Rouse is referring to.  The position we took was

23    we did not contract with Flood Brothers and that it was

24    our understanding that Michelle Jimenez was the one who

25    contracted with Flood Brothers.  And I believe the

1    discovery has borne that out not only in depositions, but

2    in requests for admissions.

3        We did not tell them you have to add her or anything

4    else.  We just said you contracted with her, not with us.

5    We have no control over her, no relationship with her

6    other than she was the named insured under the policy.

7    And I don't know of anything that would allow and make it

8    relevant to the jury that they had tried to pursue random

9    other people.  Again, this is another one of those back

10   door --

11       THE COURT:  Are you trying to bring in evidence about

12   Michelle Jimenez?  Are you trying to bring in evidence

13   about her?

14       MR. ROUSE:  Well, it's not about Michelle Jimenez at

15   all.  It's about the efforts and the expense that Flood

16   Brothers incurred as a result of trying to close out this

17   account.  She's not a random person.  She's an insured.

18   And the only reason why Universal paid is because Michelle

19   satisfied her premiums and they had a contractual

20   obligation to pay for her loss.

21       In the motion phase, we were before the Court and

22   we're satisfied with the theory that there is an oral

23   contract here.  I believe the evidence is clear about

24   that.

25       THE COURT:  Do you have Ms. Jimenez here?  Is she

1    going to be called as a witness?

2        MR. ROUSE:  No.  While we located her, we attempted

3    to add her, but we weren't allowed to add her, so I don't

4    have her as a witness.  I don't think she's relevant to

5    whether Universal should've paid or not.

6        The issue is just simply we took steps in the

7    litigation to serve -- because essentially in the second

8    phase, Mr. Bagley and Universal, they're gonna argue,

9    well -- if they award attorney's fees, they're gonna say,

10   well, there was no evidence about searching for Ms.

11   Jimenez, so all of that should be taken out.  There's no

12   basis for that in the case.

13       And that's the reason why I is object to that

14   particular motion in limine because part of my expenses on

15   my invoice, if it's allowed by the jury, it relates to all

16   the work related to closing this account.  Whether it's

17   finding Ms. Jimenez or other work, the ultimate issue is

18   Universal had an obligation to pay an account.  They

19   didn't pay it, and there was litigation.  And however that

20   litigation developed, it was caused as a result of

21   Universal's failure to satisfy an account.

22       THE COURT:  Mr. Bagley?

23       MR. BAGLEY:  Your Honor, I think I have a solution

24   here.  Again, I think this is really a second phase issue,

25   attorney's fees.  And what I hear Carlton saying is I want

1        to be able to argue that you owe me for the money I spent

2        trying to get her too.

3              THE COURT:  Right.

4              MR. BAGLEY:  And I think if you want to address that

5        now, we can, but I don't know that we really need to the

6        spend the time, hopefully.  We could address it if there

7        is a second phase because I have some case law -- a lot of

8        case law right on point that says you can't get attorney's

9        fees for pursing another party.  And I think that will be

10       a real simple solution to this.

11             But in the first phase, I don't even hear Mr. Rouse

12       saying he wants to bring it up in the first phase.  He's

13       talking about the second phase, right?

14             THE COURT:  I think he said first phase is what I'm

15       hearing.

16             MR. ROUSE:  And it's not necessarily pursing another

17       party.  It's getting evidence to --

18             THE COURT:  You're laying a foundation as to why you

19       are asking for this amount for attorney's fees in the

20       second phase.  Your position is, okay, Judge.  If we get

21       to that point, then I got to argue it to the jury.  Then

22       the jury is going to be sitting there thinking Mr. Bagley,

23       well, we didn't hear him --

24             MR. BAGLEY:  He will be offering evidence in the

25       second phase.

1              (Whereupon, crosstalk occured.)

2         MR. BAGLEY:  He'll be offering the same testimony,

3    the same evidence in the second phase that he would offer

4    in the first.  And it's sort of like the mentioning of

5    attorney's fees.  It's a way of telegraphing to the jury

6    I've got more expenses here than you know about.  When the

7    Court of Appeals has said under no condition is it

8    relevant the expenses incurred pursuing another party, and

9    that's exactly what this is.

10        THE COURT:  Yeah, but Mr. Bagley, also, when you are

11   presenting a case, it has to make sense to the jury if

12   Mr. Rouse is presenting it.  And then if you make it to

13   the second phase, all of a sudden, here's another

14   individual that pops up.

15        My question is or concern is how are they going to

16   relate it to the initial case or the main case -- and I

17   hear what you're saying also.  And it sounds like the bulk

18   of Mr. Rouse's attorney's fees is tied to them trying to

19   locate or find this Jimenez, about $3,000.

20        MR. ROUSE:  $3,000, there's a portion.  But the issue

21   for us isn't -- we're not trying to pursue -- we didn't

22   incur fees trying to pursue another party.  This is a

23   material witness that we were trying to locate to bolster

24   the evidence against Universal.  So I think the argument,

25   while I understand Mr. Bagley's --

1        THE COURT:  But could you not present that in the
2    second phase though?
3        MR. ROUSE:  I think it is logical when Flood Brothers
4    explains the months between September to December and then
5    December to the first part of 2019, 2018 -- 2019.  There
6    was a lot of activity trying to get evidence to basically
7    to proffer to Universal to make sure that they can close
8    out the account.
9        So I think it would be disjointed if the jury never
10   heard about efforts to pursue and notify Ms. Jimenez when
11   she's copied on some certain letters.  I mean, the fact
12   that he can't even mention the trial, it would seem to be
13   disjointed.
14       THE COURT:  Well, that was my concern.  Is this
15   something that y'all can talk about and come to an
16   agreement as relates --
17       MR. BAGLEY:  We can certainly try, your Honor.
18       THE COURT:  Or do you want me to make a decision?  If
19   I make a decision, one side is not gonna be happy.  I like
20   it when the parties can work together and come up with an
21   amicable resolution where it makes you halfway happy and
22   it makes you halfway happy.
23       MR. ROUSE:  I understand.
24       THE COURT:  So see if y'all can do that on number
25   five, so I won't have to make a decision.

1       MR. ROUSE:  Understood.  And one last issue, when we

2   left court previously, Judge Iannazzone basically gave us

3   notice either you can go forward today with the evidence

4   that you have because we had some text messages between

5   Ms. Jimenez and Flood Brothers.  And he said if you go

6   forward today, you don't get to use the text messages.

7       THE COURT:  Okay.

8       MR. ROUSE:  But we're gonna have a continuance so

9   that Universal can investigate those text messages and

10  then come back -- we have those text messages.  I just

11  want to make sure there's no issues with the proffer and

12  use of those text messages if there is another issue with

13  that.

14      MR. BAGLEY:  Your Honor, you may not remember this,

15  but the only time in my career there were two motions to

16  compel in this case that you granted.  And one of the

17  items in the motion to compel was text messages.

18      We never saw the text messages until we sat down here

19  in court in front of Judge Iannazzone.  Judge Iannazzone

20  as Mr. Rouse said gave us -- he said, I'm gonna give you

21  time to vet the texts.

22      THE COURT:  Right.

23      MR. BAGLEY:  We have tried to do that.  We have been

24  unable to contact her, but I think it really is

25  irrelevant.  Our objection would be the text messages, we

1     don't know about the foundation of them.  Only one party

2     can lay the foundation of who was involved.  And number

3     two, they are hearsay.  One party in the text message

4     says, I said this and the other party who's not in court,

5     she said that.  That's classic hearsay.  We believe that

6     they should be excluded for that reason.

7          THE COURT:  How are you gonna do that though, Mr.

8     Rouse, if the -- you got one party here; probably your

9     client.

10         MR. ROUSE:  Yeah, my client who received the text

11    messages is here.  And firstly, Judge Iannazzone actually

12    ruled that they were gonna be admissible, but that the

13    defense would get more time to vet them, but they were

14    going to be admitted.  That's what Judge Iannazzone has --

15    that was his ruling.

16         Then secondarily, you know, I argued before the Court

17    because I wanted to use it that day.  On the text message,

18    the number on the text message matches the number on the

19    insurance contract.

20         THE COURT:  If I had Judge Iannazzone sitting for me

21    and he sat for me and Judge Iannazzone made that ruling,

22    then I'm gonna honor what Judge Iannazzone did on my

23    behalf.

24         So if he did rule that way, Mr. Bagley -- and you got

25    a copy of -- was Mr. Bagley provided a copy of the text

24

1     messages?

2         MR. ROUSE:  Yes, he was.  And I have a copy right

3     here.

4         THE COURT:  Okay.

5         MR. BAGLEY:  Your Honor, I disagree with Mr. Rouse

6     that Judge Iannazzone said the evidence was admissible.

7     That is not what he ruled.  What he ruled was he wasn't

8     going to exclude it for any reason because it was not in

9     the pretrial order and it had not been produced in

10     response to two orders to compel.

11         What he ruled only was if you want to try to use

12     them, we're gonna give the defendant more time to vet

13     them.

14         THE COURT:  Right.

15         MR. BAGLEY:  And then they would be addressed under

16     the rules of evidence as rules of evidence always are.

17         I was not in a position to make arguments about the

18     evidence that I had just been presented that morning.  I

19     don't believe Judge Iannazzone even saw the text messages.

20         I know the essence of his ruling was, frankly, I

21     asked him just exclude the text messages, your Honor, and

22     let's proceed with the trial.  And he said, I'm not gonna

23     do that.  I'm gonna give you more time to vet them and

24     then we'll come back.  He didn't rule they were

25     admissible.  That was not a part of it.

1          MR. ROUSE:  I did not mean to misspeak that he made a

2     ruling that they were admissible.  I meant to say they

3     weren't excluded.  I agree with him.

4          THE COURT:  Okay.  Is that the only thing left was

5     the text messages?

6          MR. ROUSE:  Yes, your Honor.

7          MR. BAGLEY:  Yes, ma'am.

8          THE COURT:  You want them in.  You want them

9     excluded.

10          MR. BAGLEY:  Yes, ma'am.

11          THE COURT:  You want them excluded because you were

12     not able to locate Michelle Jimenez?

13          MR. BAGLEY:  And nobody can lay the foundation for

14     half of the participants in the text messages and that

15     half would be excluded by hearsay.

16          THE COURT:  How you gonna do that, Mr. Rouse?

17          MR. ROUSE:  It's not excluded from hearsay because

18     it's not admitted for the truth of the matter asserted.

19     It can be admitted for another purpose besides --

20          THE COURT:  What other purpose?

21          MR. ROUSE:  That there was a conversation that was

22     had between Flood Brothers and Michelle -- an ongoing

23     conversation between Michelle and --

24          THE COURT:  Let me see the text messages.

25          MR. ROUSE:  And the text messages themselves, it has

1    the number of Ms. Jimenez.  The text message talks about
2    the actual --
3         THE COURT:  Who's in blue and who's in white?
4         MR. ROUSE:  In blue is Mr. Fowler from Flood
5    Brothers, and then white is Michelle.  And in the text
6    messages, she's sending day-by-day -- well, rather, she's
7    receiving day-by-day pictures from the progress of the
8    work done on the property.
9         In one text message she sends a picture of a check
10   that Universal sent to her in a letter.  It just defies
11   logic that Universal could argue that this is not their
12   insured when the person is holding a picture of a check
13   that they sent to her.
14        I mean, I get the argument, but that's not a good
15   argument.  And it's clearly Michelle Jimenez.  The number
16   is the same as the number on the front of their insurance
17   agreement.  The insurance contract, I can present it to
18   the Court if the Court would like to see it.
19        THE COURT:  I see a number on here, but --
20        MR. ROUSE:  May I approach, Judge?
21        THE COURT:  Yes.
22        MR. ROUSE:  Right here under the policy it shows her
23   name and her number, right there.  So it's clear that that
24   is Michelle Jimenez communicating with Flood Brothers.
25   And I just think that Universal's argument that that's

1          questionable is just --

2                THE COURT:  Here you go, Mr. Rouse.

3                Mr. Bagley, anything else you want to say?

4                MR. BAGLEY:  Your Honor, even if it is Michelle

5          Jimenez, under the rules of evidence it doesn't matter.

6          She's not here, and all of these comments that are

7          attributed to her in the text messages would be

8          inadmissible hearsay.

9                THE COURT:  I'm gonna allow them.  Objection noted,

10         but I will allow those.

11               Anything else besides giving counsels an opportunity

12         to speak amongst yourselves about position number five to

13         see if y'all can come up with an agreement?  How many

14         jurors are we wanting?  Six or twelve?

15               MR. ROUSE:  Twelve.

16               THE COURT:  You want an alternate?

17               MR. ROUSE:  I think it's gonna be a quick case.

18               THE COURT:  How long do you think this case will

19         take?

20               MR. ROUSE:  I'm optimistic.  I think we can get it

21         done in a day.

22               THE COURT:  Once we get the jury picked -- if we can

23         get the jury picked, it typically will move pretty

24         smoothly.  But you think -- how many witnesses do you

25         have?

1          MR. ROUSE:  I have two witnesses.  A lot of evidence,
2     but two witnesses.  My client and his wife.
3          THE COURT:  Okay.  Mr. Bagley, how many do you have?
4          MR. BAGLEY: I should have only one.
5          THE COURT:  Your client?
6          MR. BAGLEY:  Yes, ma'am.
7          THE COURT:  Do you have a lot of evidence too?
8          MR. BAGLEY: I wouldn't say a lot of evidence, your
9     Honor.
10          THE COURT:  Of your a lot of evidence, have y'all
11     stipulated to any --
12          MR. ROUSE:  We have not stipulated per se, but when
13     we appeared previously, I provided Mr. Bagley a binder
14     with all the evidence that I intended on using.  They
15     weren't numbered and that's what's gonna take some time.
16          THE COURT:  No, no, no, you go ahead and number those
17     right now.  Put stickers on it.
18          MR. ROUSE:  Okay.  They have stickers.
19          THE COURT:  And let's go ahead and number it and keep
20     it moving smoothly.  If we can go ahead and get started,
21     it's 10:00 now.  There's a possibility that we could get
22     it done in a day, but if not, then you will run into
23     tomorrow realistically.  If we run into tomorrow, if y'all
24     don't want alternate, will you agree to proceed on 11?
25          MR. ROUSE:  I will.

1           MR. BAGLEY:  Yes, ma'am.

2           THE COURT:  Okay.  So we will have 12 and no

3      alternate.

4           MR. BAGLEY:  That's fine.  We would agree to six,

5      your Honor.

6           MR. ROUSE:  He's gracious, but I don't think I want

7      six.  Thank you though for that offer.

8           THE COURT:  Okay.  Six is a lot less to convince than

9      twelve.

10          MR. ROUSE:  Yes, yes.

11          THE COURT:  So I will give you a moment to talk with

12     Mr. Bagley.  You and Mr. Bagley talk about that last one,

13     and hopefully you can agree upon.  Go ahead and number

14     your exhibits, Mr. Rouse.

15          (Whereupon, a brief recess was held.)

16          THE COURT:  Did y'all have time to talk?

17          MR. ROUSE:  Yes, we came to an agreement.

18          THE COURT:  Okay.  Good.

19          (Whereupon, voir dire was held and a jury was

20     selected to hear the case.)

21          THE COURT:  All right, ladies and gentlemen.  So you

22     are the chosen ones.  I'm gonna release you for lunch, but

23     before I do so, I will swear you in and give you your oath

24     so I can release you for lunch.  And then we will come

25     back and begin.  Okay.  Please raise your right hand.

1     (Whereupon, the jury was duly sworn.)

2          THE COURT:  All right, ladies and gentlemen.  I will

3     release you.  I think the cafeteria downstairs is open,

4     but Ed, my bailiff, will let you know.

5          If for whatever reason you see any of the people here

6     in the courtroom and they don't speak to you or look at

7     you, don't be offended.  They are just prohibited from

8     communicating with you.  They may nod, but that will be

9     about the extent of it.

10         You don't know anything about the case.  Typically, I

11    will tell you not to talk about the case, but you don't

12    know anything yet about it.  So just enjoy your lunch,

13    come back, and we will pick the case up and be ready to go

14    from there.

15         Ed, I'm gonna give them an hour.  So add ten minutes

16    to them and give them time to get where they need to go.

17    Come back at 1:45.

18         (Whereupon, the jury was escorted out of the

19    courtroom.)

20         THE COURT:  Counsels, call go ahead and enjoy your

21    lunch.

22         (Whereupon, a lunch recess was held.)

23         THE COURT:  All right.  Are we ready, counsels?

24         MR. ROUSE:  Yes.

25         MR. BAGLEY:  Yes.

31

1          THE COURT:  Okay.  We're ready.

2          (Whereupon, the jury was escorted into the

3     courtroom.)

4          THE COURT:  All right, counsels.  You may be been

5     seated.  All right, ladies and gentlemen.  I hope everyone

6     enjoyed your lunch and had an enjoyable lunch, relaxed,

7     and we're ready to get it moving.

8          Before we get started, does anyone have any child

9     care issues you need to let me know about?  We'll probably

10    go until -- yes.

11         UNIDENTIFIED JUROR:  I have to pick my son up from

12    school before 6:00 p.m.

13         THE COURT:  Okay.  Thank you for letting me know.

14         All right.  Members of the jury, the case you are

15    about to try is styled Flood Brothers Restoration, LLC,

16    versus Universal Property and Casualty Insurance, Civil

17    Action Number 19-C-06796-4.

18         Under our legal system, it is my duty as the trial

19    Judge to determine the law applicable to this case and it

20    is your duty as the jury to determine the facts of the

21    case.  It is also your duty to apply the law to those

22    facts in reaching your verdict.

23         You determine the facts from the evidence which

24    consists of two things:  Testimony and exhibits.

25    Testimony are the statements that you will hear made under

1    oath from the witnesses.  Exhibits are documents, photos,

2    or other items that will be admitted into evidence.  You

3    will then have those exhibits with you in the jury room

4    for use during your deliberations.

5        I caution you that what the lawyers say during this

6    trial is not evidence.  Nothing they say in their opening

7    statements or their arguments or at any other time during

8    this trial is evidence.  Nor is anything I might do or say

9    evidence in this case.

10       I have no leaning in this case whatsoever.  My

11   interest in this case is to see that it is tried fairly

12   for both parties and to see that it is tried according to

13   the laws of the state of Georgia and according to the

14   Constitution of this state and of the United States.

15       You must consider this case as a lawsuit between

16   persons of equal worth and equal standing in the community

17   and between persons holding the same or similar positions

18   in life.  All persons stand equal before the law and all

19   persons are to be dealt with as equal in a court of

20   justice.

21       A business entity such as a corporation like Flood

22   Brothers Restoration and Universal Property and Casualty

23   Insurance is regarded as a person in this instance.

24       In a civil case such as this, the plaintiff has the

25   burden of proving his or her case.  The plaintiff must

33

1    prove his case by what is known as a preponderance of the

2    evidence.  The term preponderance means greater weight,

3    and as it is used here, preponderance of the evidence

4    means the greater weight of evidence upon the issues

5    involved.  The weight of the evidence need not be enough

6    to completely free the mind from a reasonable doubt;

7    however, to be a preponderance, the weight of the evidence

8    must be sufficient to incline a reasonable and impartial

9    mind to one side of the issue rather than the other.

10        The jury must determine the credibility or

11   believability of the witnesses.  Therefore, you must

12   determine which witness or witnesses you will believe and

13   which you will not believe if there are any whom you do

14   not believe.

15        In determining where the preponderance of the

16   evidence lies and the credibility of the witnesses, you

17   may consider all of the facts and circumstances of the

18   case; you may consider the witnesses' manner of

19   testifying; their intelligence; their means and

20   opportunity for knowing the facts about which they

21   testify; the nature of the facts about which they testify;

22   the probability or improbability of their testimony; their

23   interest or lack of interest in the outcome of the case;

24   and their personal credibility as it appears from the

25   trial.

1    It is your duty to determine what testimony is worthy

2    of belief and what testimony is not worthy of belief.  You

3    may believe or disbelieve all or any part of the testimony

4    of any witness.

5    You may consider the number of witnesses, but the

6    preponderance of evidence does not necessarily lie with

7    the party who has the greater number of witnesses.

8    The object of all legal investigation is the

9    discovery of truth and rules of evidence are designed with

10   that one prominent purpose in mind.

11   During the course of this trial, there may be

12   objections made by the lawyers and rulings made by the

13   Court.  These objections and rulings will involve the

14   technical rules of evidence and you should draw no

15   inference and make no assumptions from either the lawyer's

16   objections or the Court's ruling.

17   Evidence that is not admitted because of an objection

18   or other reasons shall not be considered by you.

19   The procedure used in a civil trial is generally as

20   follows:  First, the attorney for each side has the

21   opportunity to address you in what's called an opening

22   statement.  This opening statement itself is not evidence.

23   Remember that what the lawyers say is not evidence, but

24   rather a preview of what they expect the evidence to be.

25   Since the plaintiff has the burden of proof, the

1    plaintiff goes first.  Following the opening statements,

2    the plaintiff presents evidence, that is, the plaintiff

3    calls witnesses and introduces any exhibits.  The

4    defendant has the right to cross-examine these witnesses.

5        When the plaintiff has presented all of his or her

6    evidence, the plaintiff will rest his or her case.  The

7    defendant then has the opportunity to present his or her

8    case, which means that the defendant then calls witnesses

9    and introduces exhibits.  The plaintiff has the right to

10   cross-examine the defendant's witnesses.

11       After all of the evidence has been presented, the

12   attorneys have the opportunity to make what is called a

13   closing argument.  At that time, the attorneys will

14   attempt to point out to you certain parts of the evidence

15   that they think are favorable to their positions and try

16   to persuade you to decide the case in their favor.  Both

17   sides have the opportunity to make this closing argument.

18       Following the closing arguments, I will charge you

19   more specifically on the law directly applicable to this

20   case.  I will then ask you to retire to the jury room to

21   deliberate and reach your verdict.

22       Please remember during the course of this trial to

23   listen carefully to all of the evidence.  Do not jump to

24   conclusions before all the evidence is presented.  Also,

25   please remember that during the course of this trial it

1    would be improper for you to discuss this case with anyone

2    or to allow anyone to discuss the case with you or in your

3    presence or hearing.  You cannot discuss the case with

4    each other in the jury room or elsewhere before actual

5    deliberations begin, and then only in the presence of all

6    12 of you.

7         I have asked the bailiffs to provide you with pencils

8    and note pads for your use during trial.  You may take

9    notes, but you are not required to do so.  If you decide

10   to take notes, please remember that notetaking should not

11   divert you from paying full attention to the evidence and

12   evaluating witness credibility.  Your observation of the

13   witnesses during their testimony can be vital to your

14   determination of the believability of their testimony.

15        The notes that you take are for your use only and are

16   not to be shared with anyone until you begin deliberations

17   with your fellow jurors.  Notes are not evidence, only

18   memory aids and should not take precedence over your

19   recollection.

20        It is the duty of each juror to recall the evidence

21   and while you may consider another juror's notes to

22   refresh your memory, you should rely on your own

23   recollections of the proceedings.

24        Do not be influenced by the notes of other jurors

25   unless their notes help you in determining your own

1    independent recollections.  Notes are not entitled to any
2    greater weight than the recollection or impression of each
3    juror as to what the evidence may have been.

4         After the trial is over, the notes will be collected
5    and destroyed.

6         So I instruct you, ladies and gentlemen, that you
7    must decide this case for yourself solely on the testimony
8    you hear from the witness stand and the exhibits admitted
9    into evidence.  You may not visit any scenes depicted by
10   the evidence.  You may not utilize any books or documents
11   not in evidence during your deliberations.  You may not
12   read or listen to any accounts of the trial that might
13   appear on the news media.  You may not communicate with
14   anyone about the case on your cell phone through email,
15   Blackberry, iPhone, text messaging, Twitter, or any other
16   blog or website through any internet chat room or by way
17   of any other social networking website including Facebook,
18   Myspace, LinkedIn, or YouTube.

19        So, ladies and gentlemen, you may not discuss the
20   case with anyone including your fellow jurors until the
21   Court authorizes you to do so.

22        So this concludes the preliminary instructions and
23   now we're ready for the attorneys to give their opening
24   statements.

25        MR. ROUSE:  Thank you, your Honor.

1      Again, good afternoon, and thank you for your time
2      and attention to this case.

3      This case began quite some time ago.  Actually it
4      began in 2018.  I will give you a brief primer about what
5      this case is all about.

6      Flood Brothers Restoration is a family-owned business
7      here in Gwinnett.  It's owned by Randy Fowler and his
8      wife.  Flood Brothers Restoration provides water
9      mitigation services, so essentially they specialize in
10     removing water or handling damaged property when water is
11     an issue:  broken hole in your ceiling, busted pipe,
12     flooded interior of your home, you call Flood Brothers.

13     Now, the opposing party in this case is Universal
14     Property and Casualty Insurance.  So it's a former
15     insurance company.  That really doesn't matter much in the
16     substance of the case, and the only reason why Universal
17     by name is really important and unique is because you are
18     gonna hear evidence that Flood Brothers had a history with
19     Universal.

20     So specifically this case is about Flood Brothers --
21     well, providing a service to an insured; an insured of
22     Universal.  So someone that owned the home got insurance
23     with Universal.  Flood Brothers provided a service to them
24     when they had a water issue.

25     Now that contract began in September of 2018.  So

1    there was a water event where there was flooding in the
2    home of Michelle Jimenez.  That happened September 11th,
3    2018.  Flood Brothers became involved in the property a
4    few days later.  I believe it was the Friday, so it was
5    September 14th.

6         So Flood Brothers gets a call -- and you're gonna
7    hear evidence that Flood Brothers gets a call about a
8    massive water leak and they respond.  You are gonna hear
9    evidence that the routine practice of Flood Brothers is
10   just to go and meet with the homeowner and figure out how
11   they can assist.  You're gonna hear evidence that if the
12   job is bigger than normal -- which would be around $3,500
13   is a normal job.  That's what I expect the evidence to
14   show -- that Flood Brothers would go beyond merely
15   contacting the homeowner because they want to be assured
16   that this is going to be something that's gonna be
17   covered.

18        So on or about Friday or that Saturday, you are gonna
19   hear evidence that Randy Fowler with Flood Brothers not
20   only -- they already contacted Michelle Jimenez, signed
21   her up or she signed them up for work.  Then they
22   contacted Universal when they saw how big the job was.

23        So Universal first goes in, puts fans in, removes
24   some standing waters, things that would cause more damage
25   to sort of mitigate the damage the first time they were

1     there.  Contacted -- when they saw the size of the job,

2     they contacted Universal Insurance and Randy talks to

3     representatives with Universal and says, hey, this is the

4     size of the job.  This is what needs to be done.  Is this

5     a covered event?  Is this something that you're going to

6     pay?  And he received confirmation that yes, this is a

7     covered event.  Do the work.  You're gonna be fine.  Just

8     take lots of pictures.  That was the only condition that

9     Universal gave to Flood Brothers.

10         So a part of this case -- in voir dire, we talked

11    about contracts, oral contracts, written contracts.  The

12    contract that they had with Universal was an oral

13    contract.  I submit to you that you will hear evidence

14    that an oral contract was formed because Universal knew

15    what they wanted Flood Brothers to do.  Flood Brothers

16    knew what Universal wanted them to do.  In exchange for

17    providing that service, they agreed to their rate.

18         Now, when you see the detailed invoice that Flood

19    Brothers provided them, it wasn't two months later.  It

20    was contemporaneously with them completing the job.  After

21    Flood Brothers completes the job, they send the detailed

22    invoice that says this job costs $23,000.  That's how much

23    damage it is.  I will show you some pictures so you will

24    see the scope of this damage.  This is not someone spilled

25    a couple gallons of water.  This is extensive damage, so

1   $23,000.

2       After Flood Brothers completes their work, the

3   evidence will show that, again, they had a history with

4   Universal and they knew -- they expected that they would

5   be difficult paying.  And proof positive, history proof

6   positive in this instance, they had some difficulty

7   getting paid.  There was negotiations between Randy Fowler

8   and Universal and they said if you pay within ten days,

9   you don't have to pay the $23,000.  As a matter of fact,

10  the initial bill was $23,000.  The bill that was submitted

11  to Universal was $21,600.  Randy says to Universal, if you

12  pay the bill within ten days, you don't have to pay the

13  21.  Pay me the eighteen thousand, wrap it up, close it

14  up, move on to the next job.

15      You are not gonna -- you will hear Randy tell you

16  that he didn't get any complaints about the completion of

17  his work, so he completed the work in a timely fashion.

18  He did a thorough job.  There weren't any problems with

19  his work and it was routine and customary.  He used the

20  same software that other service providers in that field

21  used.

22      So everything was uniform, but yet he still had

23  problems getting paid.

24      Randy will tell you that he got a direct-pay

25  authorization from the homeowner, so Michelle Jimenez

1    signs over in the beginning an authorization for Universal

2    to pay him directly.  Michelle Jimenez signs a work

3    authorization saying, hey, you can do the work.

4        So if there was ever a question of Universal saying,

5    well, it's our insured that makes the decision, she said

6    do the work.  She said you can pay them directly.  Then

7    after that, Flood Brothers, to the best of their ability,

8    tried to work with Universal directly to update them.

9        You're gonna hear evidence -- we have over 30 pieces

10   of evidence -- specifically 32 pieces of evidence -- that

11   we're gonna introduce:  the contract, the variations of

12   the contract, the initial contract that shows all the work

13   that was done.  The contract that shows Flood Brothers

14   shave off money from the contract to further -- to

15   encourage the bill to be paid quicker.  You're gonna see

16   the bill where there was a discount for early payment.

17   You're going to see the work authorization, the direct-pay

18   authorization.

19       And when that bill was not paid -- October, November,

20   December -- you're gonna see emails from Randy where he's

21   discussing the payment issue with Universal.  You're gonna

22   see text messages from Randy where he's discussing

23   nonpayment with the homeowner.  You are gonna see text

24   messages where Randy says I gave them ten days and I was

25   gonna give them this three-thousand-plus discount.  They

1    didn't pay me within ten days.  It's not on the table

2    anymore.  I want my full bill.  You will see those text

3    messages from him.

4        But Universal knew -- you're gonna hear evidence that

5    Universal obviously knew they had Randy over a barrel

6    because they were the ones paying, so they took their

7    time.

8        Evidence is going to show that Randy said, you know

9    what?  Send Michelle Jimenez the check, $18,000 check.

10   Just keep my name on it so we can get this done.

11       They didn't send the check to Michelle Jimenez on

12   time or at least they didn't make sure that Randy got the

13   check so that he could adjust his accounts and move on.

14   If anything, they stalled.

15       So Randy had to communicate with Michelle about

16   payment.  Randy had to communicate with Universal about

17   payment.  And ultimately, Flood Brothers had to incur

18   costs associated with getting an attorney involved and

19   trying to work it out.

20       Ultimately, the bill of $18,000 was paid in January

21   of the next year.  But by the time the $18,000 was paid,

22   they still wanted a discount.  So one of the things about

23   this case -- and there are maybe three things in this

24   case -- but one of the things I want you to think about in

25   this case because this is a theme for all the evidence, is

1    you can't get an early payment discount if you don't pay

2    early.  Pretty simple.  Pretty simple, right?

3        So Universal -- I expect Universal is gonna come to

4    you and say, we did all we could.  We paid them 18.  They

5    agreed at one point to accept 18.  Why isn't it good now?

6        The evidence is gonna show that Flood Brothers is

7    gonna say, hey, it's not good now because just like the

8    contract, every insurance company is really great on

9    contracts.  If you have an early payment option and you

10   get a discount if you pay early, you've got to pay early.

11       The other big issue in this case is going to be,

12   well, there's paper and there's a contract with someone's

13   name on it.  This is Michelle Jimenez.  This doesn't say

14   Universal.  So we have an out.  We don't technically have

15   to pay you because we didn't have a contract with you.

16       But in Georgia, you're going to hear -- at the end of

17   all the evidence, the Judge is gonna charge you on

18   contracts.  And there's a way to make an oral contract and

19   there's a way to make a written contract.  And there was

20   an understanding -- the evidence is more than sufficient

21   to show that there was an understanding that Universal got

22   something for Flood Brothers providing that service to

23   their insured.  They benefited from it.  They even paid --

24   if they didn't have a contract, out of the goodness of

25   their heart, paid them $18,000 if they didn't have a

1     contract with them, but it just happened to be several

2     months late.

3         At the end of this case, you know, you're ultimately

4     gonna have -- I'll say it this way.  It's easy to have a

5     white hat and a black hat that you can say, hey, I'm the

6     one with the badge.  I'm the good guy.  There's another

7     black hat.  You can throw all your anger at that side.

8     Most cases aren't that drastic, right?

9         But ultimately, when you are talking about fairness,

10    this case is going to highlight fairness.  It's gonna

11    highlight local values.  It's gonna highlight the fact

12    that a small company that has struggles to stay

13    financially buoyant because of time because small

14    companies have to get paid, have to move business, have to

15    make payroll.  They don't have the luxury of waiting four

16    years to close out a complete account.  So whether that's

17    missing $18,000 or whether that's missing $3,000 that they

18    are entitled to, small businesses don't have the luxury of

19    waiting that long.  That's a theme that you're gonna hear

20    in this case.

21        The other theme, the third theme I would suggest is

22    certain things may be appropriate in Florida, but here,

23    the law gives us a basis for making a contract orally.  If

24    you look someone in the eye and you tell them to do

25    something and they do it, you should live up to your end

1    as well.

2        At the end of this case -- it's not dramatics.  It's

3    not a lot of fireworks.  At the end of this case, I'm

4    gonna come to you and I'm gonna say, look.  There's a

5    causal relationship between the decisions of claims from

6    Universal to stall and delay and those decisions had a

7    consequence on a small business here in Gwinnett.  Those

8    decisions caused Flood Brothers Restoration to make

9    decisions to resolve the case.

10       So there are levels.  There are consequences to each

11   delay.  Ultimately, at the end of this case, I'm gonna

12   submit the evidence and I'm gonna come to you at the end

13   and I'm gonna say there is absolutely no reason, there's

14   no basis for Universal not paying the entire bill.  Not

15   just 18, the entire bill.  There's no basis because they

16   saw the terms of this discount, but yet, they decided they

17   were gonna refuse to pay.

18       I would be interested to know at the conclusion of

19   this evidence if Universal had the money to pay Flood

20   Brothers all along, which we know they did, if Universal

21   knew that Flood Brothers completed the work, if Universal

22   staff went to the property and saw the extensive damage,

23   if Universal knew that there was a direct-pay

24   authorization or problems getting money to a service

25   provider that completed the work, I'd be interested to

1  know why 30 days?  Why 60 days?  Why 90 days?  Why four

2  years?

3       So at the end, I'm gonna ask for a verdict that fully

4  compensates my client for what they've been through.

5  Thank you.

6       THE COURT:  Thank you, Mr. Rouse.

7       Mr. Bagley?

8       MR. BAGLEY:  Thank you, your Honor.

9       Good afternoon, everyone.  I want to thank you again

10  for your service and the sacrifices you are making by

11  being here, and I know they're very significant.

12       As you heard the Judge say, what we say up here,

13  Mr. Rouse and I, is not evidence.  It's just what we hope

14  the evidence is gonna show.  And there are two sides to

15  every story.  I'm gonna tell you a little bit about our

16  side, and I would encourage you to be open-minded until

17  you hear our side of the case after the plaintiff presents

18  their case because there are reasons for everything in

19  this fight.

20       In presenting the case, I will commit to you that

21  we're gonna try to use as little of your time as possible

22  because of the nature of this matter and, quite frankly,

23  it's a matter that we need to expedite toward a conclusion

24  primarily for your commitment.

25       I want to point out that neither Universal nor our

1   insured, Ms. Jimenez, had ever taken the position that

2   Flood Brothers did not perform services that were entitled

3   to compensation.  That's never been an issue.  This is a

4   classic difference-of-opinion case.

5       This is not a discount case because it gets it

6   backwards.  Was the original bill reasonable and

7   justified?  That's the question that needs to be answered

8   before you get to any question of a discount.  And it

9   isn't a discount.  It was a difference of opinion.

10      And Mr. Skylar Felder, my client here from Universal,

11  attempted to resolve that as these things normally are

12  resolved by compromise.  And he thought he had compromised

13  it.  He thought he had reached a conclusion for a sum of

14  $18,000, which he thought was more than was actually due,

15  but he agreed to pay that to shut the thing down and to

16  avoid being here in front of fine people like you today to

17  resolve this dispute over $3,600.

18      The value of services rendered is often one where

19  there is a difference of opinion.  Reasonable people can

20  differ.  It's not that one side is bad and one side is

21  good.  You know, we all have different opinions about the

22  value of various services rendered.  And you will see

23  evidence from Flood Brothers that their own documents,

24  their own sales pitch to their clients captures that idea.

25  It acknowledges that idea that it's not all that clear

49

1      what the value of the services are.

2           Flood Brothers' work authorization, which you've

3      already heard referenced numerous times, has in it a

4      promise to their client -- in this case Michelle

5      Jimenez -- that our ultimate time and materials bill will

6      be in accordance with industry standards.  You will hear

7      about industry standards, the IICRC is something you will

8      hear about in the course of this.

9           You will see on that document prepared by Flood

10     Brothers that it said when they are trying to sign the

11     customer up, our bill will be reviewed and approved by

12     your insurance carrier.  And you will also hear evidence

13     about the fact that the bill was not in complete

14     compliance with IICRC, nor did Flood Brothers like it when

15     the amount of the bill was questioned and here we are.

16          This isn't an insurance claim really.  Flood Brothers

17     is not Universal's insured.  Flood Brothers is not

18     mentioned anywhere on the insurance policy and you didn't

19     hear anything from Mr. Rouse about that because they're

20     not making a claim as an insured under the property.  The

21     insured under this policy was Michelle Jimenez.  She was

22     the only named insured involved.

23          The incident started around September 11, 2018, and

24     of course, we all know what happened not too long after

25     that with COVID and the like, but a crack feed line, fresh

1    water going to a toilet, cracked and resulted in damage.

2         Michelle Jimenez, it's undisputed, hired Flood

3    Brothers.  She signed that form I just told you about

4    where it would be supported by IICRC standards and

5    reviewed and approved by her insurance company.  Universal

6    was not involved in that.  Universal had no control over

7    that.

8         It is true Universal was contacted to determine is

9    there coverage for this kind of thing, and you will

10   probably hear evidence, testimony that there was concern

11   over that because every insurance policy doesn't cover

12   this.  There are homeowner's policies that do not cover

13   water mitigation.  Obviously, you will hear evidence that

14   a water mitigator wanted to make sure if you had an

15   insurance policy that it would cover water mitigation.

16        You will also hear testimony that that doesn't mean

17   the insurance company writes a check for whatever the bill

18   says whether it's supported or not.  That means the

19   insurance company will review and approve as Flood

20   Brothers' own documents state.

21        Now after this cracked water line, there was damage.

22   There was clearly damage.  You're gonna see a lot of

23   photographs.

24        One thing that you will also hear is there was a

25   construction contractor hired by Michelle Jimenez who did

1    the construction work.  There was, you know, some

2    Sheetrock and that sort of thing that was done by a

3    construction contractor.

4        You will hear testimony that the construction

5    contractor was paid about $49,000 to do repairs to all the

6    damages that you've already heard about.

7        Flood Brothers' role was the mitigation of the water;

8    to get the water out of there.  That required something a

9    little different from is the Sheetrock replaced?  Is the

10   wall painted?  Is the door put back?  That requires

11   something and it has a special institution that does it

12   where they measure humidity, water levels, and all of

13   these things in these IICRC guidelines.  It's a subtle

14   thing and it requires more than just an assessment of,

15   well, is the wall repaired?  Is the ceiling repaired?  Is

16   the floor repaired?  It has to be a very scientific

17   assessment, is the water all removed from the residence?

18       You will hear testimony that when the $21,000 invoice

19   came in, Mr. Schuyler Felder was surprised at the amount

20   of the invoice.  He's handled thousands of these kinds of

21   cases.  And you will hear testimony that he said the

22   invoice came in; hit him as very high, about twice what he

23   expected, and he needed support for why it was so much.

24       And the discussion with Flood Brothers turned

25   immediately, as it frequently does in business, to let's

1    just compromise this.  And Mr. Felder thought he was doing

2    his insured the best he could do by resolving this issue

3    with Flood Brothers and he tried to compromise the issue

4    at $18,000.  And he thought he had comprised the issue.

5         Now you heard about this deadline, this ten-day

6    deadline.  You will see evidence that there really was no

7    deadline.  The offer to compromise for $18,000 was open

8    through January 11, 2019.  And there is no evidence that

9    Flood Brothers -- I mean, that Universal just did nothing

10   and waited until the last minute to pay.

11        The evidence you will hear is Universal was unable

12   under their contract to simply strike a check for $18,000.

13   Their contract is the insurance policy.  In the insurance

14   policy, it provided -- just like it provided coverage for

15   mitigation of water loss, it provided specifically we will

16   adjust every loss with you, the insured.

17        So unless Mr. Felder was going to just ignore the

18   insurance policy, he had to communicate with Michelle

19   Jimenez about the amount of the payment, the $18,000

20   adjustment.

21        And you know, the direct pay form, another form

22   you're gonna hear from Flood Brothers, contemplated that

23   too.  There was nothing -- no dastardly deed that you will

24   hear because the insurance company was trying to abide by

25   the policy and communicate with the insured, and Flood

1    Brothers own forms had that provision in there.  Flood

2    Brothers' direct pay form said you agree they can pay us

3    directly unless payment directly can't be made --

4        And there's only one situation you will hear about in

5    the evidence and that is when the policy says we will

6    adjust the claim with the insured and make the payment

7    that way.  That's what Mr. Felder did, tried to do.

8        There's another complication.  It isn't like

9    everybody was just sitting here waiting on the check to

10   fall.  You will hear this other complication and that is

11   the insured, Michelle Jimenez, had sold this property

12   basically on the day of the loss.  The closing was within

13   just 72 hours of the loss.  On September 14, 2018, she

14   sold it to Mr. Castata (phonetic).  You will hear evidence

15   of that.  And Ms. Jimenez moved completely away, somewhere

16   up north.

17       And so both Universal and Michelle Jimenez had never

18   denied that Flood Brothers was entitled to payment.  But

19   there is no evidence that they ever agreed that they were

20   supposed to get any number they put out there.  In fact,

21   the undisputed evidence is Michelle Jimenez, while she

22   just like Universal wanted to resolve the issue with Flood

23   Brothers, Michelle Jimenez never directed Universal to pay

24   the full amount of the bill.  Michelle Jimenez, according

25   to Mr. Fowler's previous sworn testimony, never told them

1    that she agreed to pay the full amount of the bill.

2         And what Universal did, what Mr. Felder did in this

3    situation being unable to communicate with Michelle

4    Jimenez about the amount that had been negotiated, you

5    will hear he did what they frequently do in these

6    situations.  He issued the check payable jointly; jointly

7    to Michelle Jimenez and Flood Brothers, $18,000.  He

8    thought Michelle Jimenez, if she was satisfied with the

9    work, satisfied with the number, would endorse the check,

10   give it to Flood Brothers.  Case over.

11        And, of course, as I said, Flood Brothers' own

12   direct-pay form contemplated that that sort of thing

13   happens all the time.

14        You flash forward to December 20 -- actually, after

15   December 20, closer to the end of the year, a letter comes

16   in from Flood Brothers' attorney, Mr. Rouse, dated

17   December 20, which says to avoid litigation, you need to

18   pay the $18,000.  Well, that was a surprise to Universal

19   that the case wasn't over.  It was a surprise that the

20   $18,000 hadn't already been delivered to Flood Brothers.

21   Universal did not know why it hadn't been turned over to

22   Flood Brothers, but they had this letter saying if you

23   make the payment before December 31 of $18,000, you will

24   avoid litigation.

25        January 1 comes -- now remember, they already issued

55

1    the check for $18,000, Universal had.  January 1 comes and

2    they get an email on New Year's Day saying the check still

3    hasn't been given to Flood Brothers.

4         The next business day, January 2, first day of the

5    year, Universal responded immediately and you will see

6    said, we'll stop pay the check and we'll reissue the

7    $18,000.  Then there was a clarification offered then that

8    you will see in emails date early, first week of January,

9    January 7th, stating the problem was that Ms. Jimenez

10   would not turn over the check.  She had sent a picture of

11   the check apparently to Mr. Fowler in her hand, the

12   $18,000, but she apparently would not give it to them.

13   She refused to release it.  Why?  Universal doesn't know.

14   It's unknown.

15        You will hear some evidence later on after this

16   lawsuit was filed and many questions are asked about why

17   didn't Michelle Jimenez want to sign this check over to

18   you, and the response was she wanted a kickback.  Well,

19   there's nothing mentioned about any kickback in any of the

20   demand letters or anywhere else, but that was their excuse

21   rather than maybe she didn't like the quality, maybe she

22   didn't like the amount or -- you know, we just don't know.

23        At any rate, another email was issued January 7 --

24   which you will see and you will have -- to Universal.  You

25   can avoid litigation if you pay $18,000 by January 11,

1    2019.

2         Mr. Felder in this whole situation with the

3    frustration of being unable to get the approval of the

4    specific amount of the insured being unable to get the

5    insured to sign over the check to give to Flood Brothers

6    made the decision that what was in the best interest of

7    his insured and Universal was to send the check payable

8    only to Flood Brothers, and he agreed to do that.

9         There was a problem.  All he had was a post office

10   box and the deadline established for this was January 11.

11   You will see emails where he said I'm concerned I can't

12   send this overnight to you.  I've got to send it U.S. mail

13   because all I have is a post box.  Would it be all right

14   if -- will this be acceptable if we mail the check today?

15   And he got a response that said, confirmed.  That's fine.

16   And that's what he did.

17        He sent the $18,000 check as requested on January 8.

18   The check was cashed.  And obviously, Mr. Felder will tell

19   you that he thought it was finally resolved.  It was over.

20        About six weeks later, they got another letter.  You

21   can avoid litigation for the fourth or fifth time if you

22   pay $3,600, the full amount of the invoice.  Of course,

23   Mr. Felder still didn't have any other information to

24   support the amount of the original bill; couldn't really

25   get in touch with his insured.  And within the next month,

1 a couple of weeks later, a lawsuit was filed with the

2 Magistrate Court here in Gwinnett County.  And here we are

3 requesting your assistance to resolve this dispute.

4  You will find that Universal is apologetic for taking

5 up your time.  You will see evidence they attempted to

6 resolve what was a very complicated situation with an

7 insured that became missing in action on property that had

8 been sold and checks that weren't being delivered as

9 requested.  And those things are not their fault.  They

10 did everything they could to try to resolve this in the

11 standard way these disputes are resolved in the industry

12 and that is by compromise.  They thought they had resolved

13 it by compromise.

14  And we believe when the evidence is all in, that --

15 and we will ask you to return a verdict that there is no

16 additional money due to Flood Brothers.  In fact, they've

17 already been paid more that the standard proof required by

18 their own work order forms would require.  Thank you very

19 much.

20  THE COURT:  Thank you, Mr. Bagley.

21  Mr. Rouse, call your first witness.

22  MR. ROUSE:  At this time Flood Brothers calls

23 Mrs. Fowler.

24        BECKY FOWLER,

25 being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROUSE:

Q.    Please state and spell your name for the jury.

A.    Becky Fowler, B-E-C-K-Y.

Q.    Okay.  Ms. Fowler, can you explain -- just introduce yourself.  How are you related to Flood Brothers Restoration?

A.    I am Randy's wife, and we own Flood Brothers Restoration.

Q.    How long have you owned that business?

A.    Since March of 2014.

Q.    And during that time, what services did Flood Brothers Restoration provide to your knowledge?

A.    We only provide water mitigation.

Q.    Okay.  What is your role within the company?

A.    The accountant.

Q.    And from 2014 -- strike that.  On or about fiscal year 2018 to the beginning of 2019, how many employees would you estimate were employed by Flood Brothers?

A.    We have two full-time employees and then we use temporary work force when the jobs need extra people.

Q.    What were the full-time employees doing as compared to the part-time or as-needed employees?

A.    So full-time employees are licensed or certified in water damage restoration, so they are the ones with the higher skill level.  And then we bring in temp workers that would

```
 1    assist that person under his guidance.
 2         Q.   Okay.  Now in terms of your role with the accounting
 3    of Flood Brothers, did you have an occasion to familiarize
 4    yourself with various insurers that you all had an occasion to
 5    work in conjunction with?
 6         A.   Yes.
 7         Q.   Can you describe that a little bit?
 8         A.   My relationship or whenever I would get involved --
 9         Q.   Yes.
10         A.   -- would be when they became problematic and didn't
11    pay.
12         Q.   Okay.  Now obviously, you're gonna have what you
13    attribute to be good insurance companies and those that might
14    not be as easy to work with?
15         A.   Yes.
16         Q.   Did Flood Brothers have any prior experience with
17    Universal?
18         A.   Yes.
19         Q.   Before September of 2018?
20         A.   Yes.  To my knowledge, we had -- and it came onto my
21    plate because we had problems getting paid timely.
22         Q.   Okay.  When you say problems getting paid, can you
23    give a description about what you can recall about those
24    challenges?
25              MR. BAGLEY:  Your Honor, I'm gonna interpose an
```

1          objection on facts surrounding a claim that's not subject
2          to litigation.
3               MR. ROUSE:  Your Honor, I will be brief.  I don't
4          want to give a rambling response, but in counsel's
5          opening, he mentioned how Universal had a pattern of
6          handling cases that were completely unrelated.  He used
7          that as an example in his opening, so this is merely in
8          response to that.
9               THE COURT:  Okay.  I'm gonna overrule your objection,
10         counsel.  I will allow the witness to testify as it
11         relates to her experience.
12    BY MR. ROUSE:
13         Q.   I will keep it brief.
14         A.   Say the question again.  I'm sorry.
15         Q.   If you could describe, you were talking about the
16    difficulty that you had with Universal and some of the prior
17    instances.  I asked you could you briefly describe what was
18    difficult.  What made those instances --
19         A.   Sure.  So once it gets to a point that we've agreed
20    to a price between us and whoever is on the other line of the
21    phone whether it's the desk adjuster, an outside third party,
22    depending on whoever the insurance company uses, say we get to
23    that point, then a check should be cut.  That's the
24    expectation.
25               So what would happen or why I would get involved is

1    because that process after the agreed-upon amount takes way too

2    long; months, way too long.  So that's when I kind of start the

3    time line.  For our past experiences with Universal, it was

4    always really, really lengthy process.

5         Q.   Okay.  Can you describe an instance where Flood

6    Brothers would start a job and you wouldn't have an idea of

7    what the ultimate costs would be?  Are there instances where

8    that would happen where you don't know the ultimate cost before

9    you start?

10        A.   I do believe so because it's emergency work.  So

11   damage can be hidden.  I know that the technicians have tools,

12   but until you start removing items or cutting walls, sometimes

13   it's hard to tell the extent of the damage, much like where

14   mold would grow.  On the outside it might be nothing, but then

15   once you open up the cavity, you would see much more damage.

16        So no, the technicians can only see what even a customer

17   can see.  The tools can help provide and say, okay.  It's

18   looking like this, but then once they start peeling back the

19   layers -- because our goal is to dry completely so there is no

20   future damage.

21        Q.   Okay.  So if you can recall in September of 2018,

22   when you all were retained by Ms. Jimenez to do water

23   mitigation and you learned that Universal was the insured on

24   that particular job, what if anything did you do or did you

25   discuss if you can recall?

1       A.   Okay.  So what I had discussed with my husband is

2   because of the amount of damage that you could visibly see --

3   because her claim was a really large claim in comparison.

4   Normally, our claims are closer to about $3,500 average.  Hers

5   ended up being over $20,000.  So because of that, one, we

6   didn't want to expose ourselves or the customer.  Hers was even

7   more so the case because she was also selling her house at the

8   exact same time all of this damage was going on.

9       So our goal was to make sure that our bill would be paid

10  by whoever would be responsible and then making sure that the

11  damage that we saw was covered by whoever was the responsible

12  party.

13      Q.   Okay.  Now during the contracting process, during the

14  piece where either Flood Brothers is being retained

15  specifically by Michelle Jimenez or having discussions with

16  Universal, were you directly involved in that in this case?

17      A.   No, no, I don't get directly involved in any of the

18  cases for that.  That's for the people on staff.

19      Q.   Understood.  As your role as an accountant for Flood

20  Brothers, can you describe to the jury what concerns you may

21  have had regarding your ability to reconcile open accounts,

22  accounts that are unpaid?

23      A.   Right.  So what happens is our expenses are having to

24  be paid immediately, especially when we have temp labor.  We

25  bring in either day laborers or people that rightfully so

1   expect to get paid the day that they do the job.  So we have
2   already out laid cash for that.
3       All of our expenses are already paid.  So we're basically
4   carrying this job or the expense of this job until the
5   insurance companies pay.  So we're out of pocket all of this
6   money until they decide to pay us.
7       Q.   In terms of your business, can you describe the
8   gravity or the seriousness of the time it takes to reconcile
9   accounts for the jury?
10      A.   So for this one in particular because it was so
11  large, yes, it took a lot of our cash reserves.  And if I
12  remember correctly, I think we had to infuse cash during this
13  time.
14      Q.   Okay.  Were you involved at all with respect to any
15  of the process post September or after work was completed on
16  the property?  Were you involved at all in the process of
17  trying to pursue or collect payment from Universal?
18      A.   Yes.  So I got directly involved when Randy received
19  a phone call from Universal.  I don't know if it's the
20  adjuster, but basically the person we would negotiate with for
21  lack of a better term.  And his question was like how do we get
22  this settled?  So he's got a bill.  He wants to get it off his
23  desk.  Their goal is to make it as affordable for the insurance
24  company as possible.
25      Randy and I then started to have conversations and we knew

1    that we were already dealing with Universal.  I didn't want

2    this to carry on for however long.  So we made the decision

3    together that we would offer an early-pay discount and we would

4    take $18,000 I believe if they paid within ten days.  That was

5    very clear.  And we put it in writing back to the guy.  I

6    helped Randy construct the email.

7         During that process, we reminded them multiple times this

8    is an early-pay discount.  It's expiring da-ta-da.  And then

9    even -- I think that was in October.  And then we had to get

10   counsel.

11        Q.   When you say get counsel, what do you mean?

12        A.   We had to hire an attorney to, in fact, get that

13   $18,000 and we still didn't get that until after the new year.

14        Q.   Okay.

15        A.   And let me just -- we were also very clear that now

16   the amount at that time in December I think when we got the

17   litigation, the letter we sent was that they owed the full

18   bill, and $18,000 was no longer acceptable.

19        Q.   Okay.  In terms of the actual paperwork that was

20   involved in setting up a new client, do you have any experience

21   in that step or that process?

22        A.   I know what they're supposed to do.

23        Q.   To your knowledge, what paperwork does Flood Brothers

24   normally obtain?

25        A.   There is a work authorization.

1          Q.    What does that do?

2          A.    That authorizes us to get on the premises and start

3     the work.  Basically be able to be in somebody else's house.

4     And then in this particular case, again, we got confirmation

5     from the insurance company before we started -- oh, my God.

6     What's the word?  Where we're ripping up carpet and --

7          Q.    Demolition?

8          A.    There you go.  Before we started demolition, we did

9     receive confirmation from Universal that there was coverage and

10    to proceed with the scope of work, yes, sir.

11         Q.    Okay.  Is there -- are you familiar with a direct-pay

12    authorization?

13         A.    Yes.

14         Q.    Can you describe what that is for the jury?

15         A.    Yes.  So on every job we get a direct-pay

16    authorization which basically says that the homeowner is

17    allowing their insurance company to pay us directly.  So

18    there's no need to send the check to the homeowner.  They can

19    send it to us.  The homeowner has authorized that.  In fact,

20    typically we send it as page one when we send it to the

21    insurance company so it's very apparent that we have received

22    that authorization from their insured; that it's okay to pay us

23    that way.

24         Q.    Okay.  Now you're familiar with the steps it took to

25    actually receive partial payment?

1        A.    Partial payment, correct.

2        Q.    And I'm talking about the $18,000 check; is that

3   correct?

4        A.    Uh-huh.

5        Q.    Can you describe your thoughts about having both the

6   insured Michelle Jimenez and Flood Brothers on that check even

7   after you had a direct-pay authorization?

8        A.    My thought is that when those checks get cut, then it

9   brings in a party that is not privy to discussions that were

10  made between us and the insurance company on their behalf.  And

11  in this particular case, she didn't want to give us the check.

12  And that happens.

13       Q.    Now do you have an opinion -- based on your

14  experience dealing with insurance companies, do you have an

15  opinion as to the position that an insurance company might take

16  to say I didn't have the ability to send the check directly to

17  Flood Brothers because you're not an insured?

18            MR. BAGLEY:  Your Honor, I'll interpose an objection.

19       The opinion of this witness has no material -- is not

20       material evidence.  It's not relevant.  It's just the

21       facts that we would elicit from her, not her opinion.

22            THE COURT:  Mr. Rouse.

23            MR. ROUSE:  My response is it's been an issue.  In

24       opening, counsel referenced what was typically done by

25       Universal with respect to their ability to pay and I'm

1        merely questioning the witness as to her experience, not

2        hypothetical, but real world experience with respect to

3        adjusting or reconciling claims with insurance companies

4        in the same fashion.

5            MR. BAGLEY:  There's only one insurance company in

6        this case, your Honor.  We don't have anything to do with

7        all these other insurance companies that we're talking

8        about.

9            THE COURT:  Okay.  Mr. Rouse, rephrase your

10       question.

11    BY MR. ROUSE:

12       Q.   Yes, your Honor.  Ms. Fowler, Universal's position in

13    this case is that they weren't able to send a check to Flood

14    Brothers directly because you weren't insured.  Based on your

15    experience, do you have an opinion on that position by

16    Universal?

17       A.   So what I will say is the check that we ultimately

18    got was from Universal made out to Flood Brothers directly,

19    sent to you as our attorney on our behalf because that's how we

20    were able to collect funds.

21       Q.   Do you remember the date?

22       A.   After the first of the year.

23       Q.   Do you have an opinion as to how Universal was able

24    to send you a check directly after the first of the year, but

25    not in September?

1     A.   Right, that would be conflicting information, yes.

2     Q.   Okay.

3     A.   I will say, I do believe the first check that was

4  sent to Michelle had her name on it and only us on it, but they

5  sent it directly to her.  So they are able to make the check

6  out directly to the contractors.

7     Q.   Okay.  Now another question I would have for you as

8  the accountant for Flood Brothers is the position at Universal

9  is that the $18,000 was a compromise that you made and you held

10  that compromise until January 15th.  What is your opinion as to

11  whether that was actually a compromise or if it ever was a

12  compromise, can you just explain what Flood Brother's position

13  would have been on that?

14     A.   Sure.  We offered a discount if we received funds

15  quickly because there's a benefit for us to receive funds

16  quickly.  After a certain time, I have paid everything so then

17  I can wait for full payment and that's what they were up

18  against.

19     They made no effort to pay during the early-pay discount.

20  They also did not even apply to our email, my husband's emails

21  when we were -- I think we even gave them another ten days

22  after that.  Like we were very gracious with this discount

23  period just hoping to not have to be here today, honestly.  We

24  were very gracious with that.  We received nothing back from

25  them on that.

1       Q.   Okay.

2       A.   It was clear on our side that it was a discount, not

3    a, let's say, settlement of a bill.

4       Q.   Okay.  By your estimation, the difference between the

5    bill that was submitted with the $18,000 prepaid discount, have

6    you reviewed the bill?

7       A.   I have seen it, yeah, because I needed to help my

8    husband put the line item that listed the discount on there.

9       Q.   Do you recall the exact amount of the discount?

10      A.   $2,100, somewhere in there.

11           MR. ROUSE:  May I approach?

12           THE COURT:  Yes.

13           MR. ROUSE:  May I have permission to move freely

14      throughout the courtroom?

15           THE COURT:  Yes, you do.

16   BY MR. ROUSE:

17      Q.   I hand you what's been marked as Plaintiff's Exhibit

18   2.  Can you tell me if you are familiar with what that is?

19      A.   Yes, I'm familiar with what these are.

20      Q.   What exactly are you looking at?

21      A.   This is our bill that gets sent to the insurance

22   company using Xactimate.

23      Q.   What is Xactimate?

24      A.   Xactimate is a pricing structure that insurance

25   companies actually use to say how much we should charge for a

1    job.  So we have chosen as a company to use the same software

2    in order to avoid back and forth.  They said that that's what

3    that particular service costs.  We said we agreed to that, and

4    they send you a bill with those same -- we don't adjust.  It

5    just is what it is.

6         Q.   So with respect to the work you perform, you don't

7    pick out of the sky a cost and put it in your invoice?

8         A.   No, we don't.

9         Q.   You are constrained to this Xactimate software?

10        A.   We choose to be, but yes, we are.  We choose to so we

11   can avoid going back and forth.  We like to see the insurance

12   companies as a partner with us, so our goal is to not have

13   somebody in the office arguing with insurance companies all day

14   long.  That's not our goal.  So we choose to do this rather

15   than time and materials.

16        Q.   Okay.  And can you flip to the back of that document?

17        A.   The scope?

18        Q.   Yes.  Does it appear to be accurate and complete to

19   the best of your recollection?

20        A.   This?

21        Q.   Well, just flip through the entire --

22        A.   Oh, yeah, yeah.  I'm more on the number side of

23   things.  I couldn't speak on the scope part, but yes, the

24   numbers side, yes, and then there is the discount listed there.

25   This is a settlement discount only valid if paid within ten

1  days.  It's very clear on this estimate.

2      Q.   What specifically is the settlement amount?

3      A.   The settlement amount was $18,000.  Is that what you

4  mean?

5      Q.   What was the discount?

6      A.   Oh, the discount.  I'm sorry.  It's $3,662.40.

7      Q.   Okay.  So if paid within ten days, they could have

8  saved $3,600?

9      A.   They certainly could have.

10          MR. ROUSE:  I'd like to move to admit Plaintiff's

11      Exhibit 2.

12          THE COURT:  Any objection?

13          MR. BAGLEY:  No objection, your Honor.

14          THE COURT:  Admitted without objection.

15  BY MR. ROUSE:

16      Q.   Okay.  Now with respect to the $3,600 discount that's

17  at issue since January -- well, actually since September, but

18  certainly after January 15th of the following year, that amount

19  is something that you still on behalf of Flood Brothers want to

20  pursue, correct?

21      A.   Yes.

22      Q.   Can you describe why that amount is significant for

23  you?  Why are you --

24      A.   Because we did the work.  I mean, we did the work.

25  We did the work.  We took care of the insured's home and got it

1   back to dry, which is our goal.

2       Q.   Why not just walk away and say write it off.  Forget

3   the $3,600?

4       A.   Well, why can't they just pay what is supposed to be

5   paid?  I mean, $3,600 is a lot of money to us.  So, I mean,

6   they did the work.  We did the work.  We're owed the money.

7       Q.   And speaking of doing the work, do you recall

8   conversations or letters or correspondences that you received

9   from Universal where they identified to you deficiencies in

10  your work?

11      A.   No.

12      Q.   Do you recall letters, communications, voicemails,

13  discussions with Universal where they identified to you that

14  you -- the bill that you submitted is over double the cost of a

15  normal job?

16      A.   No, no.  In fact, I do remember one of their people

17  coming out to the job five days in and them actually able to

18  physically see that the structures were still wet.  And we were

19  drying and they gave us a thumb's up and said all right.  Thank

20  you.  I do remember that, but no, I don't remember any

21  conversations that I would have been a part of.

22      Q.   Okay.  Have you ever been a party to any

23  conversations or have you ever received any communications from

24  the homeowner, Michelle Jimenez, stating that the job wasn't

25  complete or it was substandard?

```
 1        A.    No.
 2        Q.    Any at all?
 3        A.    No, not about the work we did, no.
 4              MR. ROUSE:  All right.  Nothing further.
 5              THE COURT:  Any cross?
 6                         CROSS-EXAMINATION
 7    MR. BAGLEY:
 8        Q.    Yes, ma'am.  Good afternoon, Ms. Fowler.
 9        A.    Hello.
10        Q.    We've never met.  I'm Mike Bagley, representing
11    Universal.  I just have a couple of questions.  I believe you
12    said earlier that Flood Brothers just does water mitigation?
13        A.    Yes, sir.
14              MR. BAGLEY:  I'm not making a call, your Honor.  I'm
15        adjusting my hearing aids.
16              THE COURT:  Okay.
17    BY MR. BAGLEY:
18        Q.    And you are aware that usually on the jobs where you
19    go, there are other contractors up there that do other things
20    like repair Sheetrock and paint and --
21        A.    Not while we're there, no, sir.
22        Q.    Well, you know that many times you dry it out and the
23    contractors come and fix it back up?
24        A.    Yes.
25        Q.    You mentioned before in your work authorization that
```

1    you get your clients to sign, there is a provision in there
2    that says -- that represents to the client that all bills will
3    be in accordance with industry standards?
4         A.   Uh-huh.
5         Q.   That would be the industry standard is the IICRC; is
6    that right?
7         A.   I believe so.
8         Q.   And you eluded to the fact that you've got two
9    employees that are certified?
10        A.   Uh-huh.
11        Q.   You are aware that that certification comes from the
12   IICRC?
13        A.   Yes.
14        Q.   Okay.  The day laborers are not certified, are they?
15        A.   No, sir.  Some are, some are not.  It just depends on
16   what we need for the work force that day.
17        Q.   Okay.  Do you prepare the bills or does your husband
18   or someone else actually prepare the bills?
19        A.   My husband does.
20        Q.   Okay.  Even the Xactimate?
21        A.   He does all the Xactimate.  He does the scoping, yes,
22   sir.
23        Q.   Are you aware of any communications with the new
24   homeowner out there, Mr. Casata (phonetic)?
25        A.   That bought the house?  No, sir.

1        Q.   Okay.  Have you ever seen Michelle Jimenez's
2   homeowner's insurance policy?
3        A.   No, sir.
4        Q.   Okay.  It will be marked as evidence in this case.
5   But your direct-pay authorization -- you know this, don't
6   you -- it says you're authorizing your insurance carrier to pay
7   us directly if that is permissible, and if not, include our
8   name on the check.  You remember that, don't you?
9        A.   I trust you.  I don't have it in front of me.
10            MR. BAGLEY:  Well, I could show it to you to refresh
11        your memory.
12            May I approach the witness, your Honor?
13            THE COURT:  Yes, you may.
14   BY MR. BAGLEY:
15        Q.   I'll show you a document labeled Defendant's Exhibit
16   Number 10 and ask you if you can identify that as the Flood
17   Brothers direct-pay authorization?
18        A.   Yes, sir.
19        Q.   And, in fact, that's the Flood Brothers direct-pay
20   authorization that Ms. Michelle Jimenez signed; is that
21   correct?
22        A.   Yes, it is.
23        Q.   Looks like she signed it on September 24.  Is that
24   the date there?
25        A.   Yes.

1      Q.   You see right above her signature is a paragraph that

2   starts in the event; do you see that?

3      A.   Yes, sir.

4      Q.   Can you read that for us?

5      A.   Sure.   It says in the event that direct payment is

6   not a possibility, please list Flood Brothers Restoration as an

7   endorsee on all payments.

8      Q.   By that, you know that means that the insured and

9   Flood Brothers would both be on the check?

10      A.   Yes, sir, I do know that.

11      Q.   And you're aware from your experience that there are

12   some insurance policies that say they have to adjust the claim

13   with their insured, right?   That's why you've got this in here?

14      A.   I can't speak to that.

15      Q.   You don't know the answer to that?

16      A.   No, sir.

17      Q.   You don't know why that provision is in there?

18      A.   I did not make this form.

19      Q.   Gotcha.   Gotcha.   You said you spoke to someone at

20   Universal and they wanted to know how to resolve your initial

21   invoice?

22      A.   My husband spoke with the adjuster and then him and I

23   before the response was made to the adjuster, yes.

24      Q.   Okay.   I got you.   So that wasn't you who spoke with

25   the adjuster?

1    A.   No.

2    Q.   Okay.  Did Ms. Jimenez ever tell you why she wouldn't

3    turn over the $18,000 check to you all?

4    A.   No.  The only response she gave to me was she would

5    send it when she got around to it.  That was the only response

6    that I'm aware of that I heard directly.

7    Q.   Did you all ever get the check payable jointly to

8    Michelle Jimenez and to Flood Brothers?

9    A.   No, I think both were to Flood Brothers directly.

10        MR. BAGLEY: Those are all the questions I have, your

11   Honor.  I will tender D-10.

12        THE COURT:  Counsel, are you tendering in D-10 now?

13        MR. BAGLEY: I can wait until later if you want me

14   to.

15        THE COURT:  Okay.  It's whatever you want.

16        Any re-direct?

17        MR. ROUSE:  No, your Honor.

18        THE COURT:  Any reason why Ms. Fowler could not step

19   down and be excused?

20        MR. BAGLEY:  No, your Honor.

21        THE COURT:  Counsel, can Ms. Fowler stay in the

22   courtroom?

23        MR. BAGLEY: If she's not gonna be called as a witness

24   anymore, your Honor, we don't have a problem with that.

25        MR. ROUSE:  She's excused, your Honor.

1          THE COURT:  All right, Ms. Fowler.  You are free to
2      remain in the courtroom or you may step outside.
3          Mr. Rouse, call your next witness.
4          MR. ROUSE:  Yes.  At this time, I call Randall Fowler
5      to the stand.
6                          RANDALL FOWLER,
7      being first duly sworn, was examined and testified as follows:
8                        DIRECT EXAMINATION
9      BY MR. ROUSE:
10         Q.   Please state and spell your name for the jury.
11         A.   My name is Randy Fowler, R-A-N-D-Y, Fowler.
12         Q.   Mr. Fowler, how are you involved with Flood Brothers
13     Restoration?
14         A.   I'm the owner.
15         Q.   Okay.  And you've heard your wife and you're married
16     to Mrs. Fowler that just testified, correct?
17         A.   Yes.
18         Q.   You heard your wife and she discussed how long Flood
19     Brothers has been in operations.  I won't belabor the point.
20     Can you tell me a little bit about water mitigation in general?
21     Like, how did you get into the water mitigation?
22         A.   By luck, I guess.  I had a friend that when the
23     plumbing went down in '07, '08, the market crashed.  And
24     somebody that I knew owned a different restoration company, so
25     I went there.

1      I worked somewhere for a couple of years and then my son

2   was born.  And then something happened at the place that I

3   didn't want to work there anymore, so we opened up Flood

4   Brothers.

5      Q.   Okay.  And you owned and operated that business for

6   how long?

7      A.   For over eight years, I think.

8           THE COURT REPORTER:  I'm sorry.  How many years?

9           THE WITNESS:  Over eight.

10  BY MR. ROUSE:

11     Q.   And how many employees, both full time and part time,

12  do you have?

13     A.   Generally we try to keep two full-time employees, two

14  part time, but it's -- some weeks you don't see them and some

15  weeks you see them too much.  I mean, it's feast or fathom.  So

16  I guess in 2017, whenever Atlanta froze and all the pipes

17  burst, you couldn't get enough people to work.  Whenever Dallas

18  froze, we went out there for a couple of weeks.  You can't get

19  enough people to work.

20     We go to some of the hurricanes and work.  It's just -- we

21  try to keep two and two, and then when the jobs are big,

22  there's companies that you can rent temp laborers from.  And if

23  it's mundane work that it's tearing out Sheetrock because

24  there's not really any skill involved or we're tearing out

25  floors, there's certain things everybody can do it, but it's

1    getting the bodies in there to do it at $15 or $20, $25 an

2    hour.

3        You have to get people to do it.  And if there is no one

4    to do it, you pay more, because the longer you leave wet

5    materials in, the worse the structures will get.

6        Q.   Understood.  So around September of 2018, do you

7    recall how many employees you had?

8        A.   I think two and two.

9        Q.   Okay.

10       A.   But the part time can be, hey, when I'm not working

11   at my other job, I will help you out if you need it, but

12   there's no set schedule.

13       Q.   In terms of the various positions within Flood

14   Brothers, for example, management, sales, demolition, 1099s,

15   what types of categories do you employee workers for?

16       A.   So there's me and my wife.  Generally, I don't really

17   take a paycheck.  It just depends on the month.  She doesn't

18   take a paycheck.  Our general manager will take one and then

19   our other full-time guy, whenever we have somebody, he will

20   take one.  Then the part time is just whenever big jobs come in

21   or if they are not working, we need machines cleaned or if they

22   just need money, we will get different people to come in and

23   help.

24       It's hard to get a consistent job.  You never know when

25   you are gonna get a call.  So it's really hard finding

1    employees to say, yeah, I want to work here, but I don't know

2    when I'm gonna work because you don't know when a flood is

3    gonna happen.  Like, you can't -- nobody that does this works

4    Monday through Friday 8:00 to 5:00 because the truth is most

5    floods we get are from 5:00 to 7:00 p.m. when people get home

6    from work.  They see their house is flooded.  That's when we go

7    to work or on the weekend because there's no schedule.  So it's

8    hard to hire people.

9        Q.   Okay.  Now describe your responsibilities within

10   Flood Brothers Restoration.

11       A.   Everything.

12       Q.   For example, taking in cases, communicating,

13   insurance claims, I mean --

14       A.   Yeah, advertising, communicating, writing the

15   estimates, getting the approvals, taking photos and just

16   checking on our GM to make sure he's doing the same thing.

17       If I'm gone a couple of days or if there's a couple of

18   days where I'm doing something else, I just check him, but he's

19   good.  I don't have to check him anymore.

20       Q.   Okay.  Can you describe in detail the services that

21   you provide to others through Flood Brothers Restoration?

22       A.   So now it's only water restoration and we'll do some

23   mold mitigation.  We don't like to.  It's a lot of labor.  We

24   don't do much of it.

25       We've stopped doing rebuilds.  At the time, we would do

1    small rebuilds.  If it was something that we could contract out
2    mostly, and it was rare.  We weren't doing very many because
3    most of the rebuilds, there's always a problem.  I've learned
4    roughly that ten percent of people you are gonna have a problem
5    with.  And if they don't wanna pay it, there's gonna be a
6    reason for them not to pay it.

7        And so all of those problems are on the rebuild side.  So
8    if you quit doing rebuilds, you quit that problem.

9        Q.   Gotcha.  What hazards are associated with water
10   mitigation flooding damage?

11       A.   It depends if the water sits.  If it's been a day,
12   there shouldn't be too many hazards.  I mean, if the basement
13   is full, you shouldn't go down there.  I  mean, you could get
14   electrocuted.

15       If the lights are full, don't go in there.  I mean, it can
16   be, but it's rare.  It's when you walk into a house that's been
17   sitting or if it's sewage.  If the sewage backs up and you
18   can't get out of the house, for some reason your insurance
19   company says no, or if it happens Friday at 5:00 p.m. and your
20   insurance company doesn't answer the phone until Monday at
21   8:00, you don't have anywhere to go.  You know, if you talk to
22   me, I will tell you and you will sign something that says I'm
23   gonna get sick if I stay here.  But this is just sewage.  It
24   can be bad.  We're up-front.

25       Q.   Okay.  Now you mentioned your prior work experience

1   briefly, but can you be specific as to plumbing or similar

2   services?  What types of things did you do previously that were

3   similar to your career in water mitigation?

4        A.   So I did new business plumbing for almost four years.

5   Whenever that tanked, all the builders -- I worked for a

6   plumber.  When all the builders went under, they owed so much

7   money that our plumber had to let almost everybody go.  So a

8   lot of the new business went under.

9        You know, when the market crashes and nobody is building

10  houses and all you do is build new houses, well, you have to

11  find something else to do.

12       So I went into water restoration for a little over two

13  years.  And I learned -- we learned what not to do and how not

14  to treat people.  So that's why we opened up.

15       Q.   Okay.  Now what certificates have you obtained that

16  are related to your industry, water mitigation?

17       A.   So there's the IICRC, there's the water restoration,

18  there's the fire, there's the smoke, the anti-microbial which

19  is mold, there's carpet cleaning.  So I guess just the five.

20  And then you get two more, you're a master water restorer.

21       Q.   Okay.  Are there any other continuing education

22  classes or things that you've taken that were related to water

23  mitigation?

24       A.   I take a couple every year for like continuing ed

25  credits.  So I did lead based paint, so I was a renovator.  So

1   if you're working in houses before 1970 and you disturb more

2   than ten square feet of lead based paint, there's different

3   things you can do.  You got to have it tested.  We're not -- we

4   don't do lead.  We don't do asbestos.  We refer that to some

5   company that only does that.

6        But if we only remove a foot, like one baseboard and it

7   does have lead, we're fine.  But if it's more than so many

8   square feet and we test it, they make little tests that you can

9   test on the spot.  And if a lot of them come up hot, we stop.

10  And then we'll refer that out to environmentalists.

11       Q.   Okay.  How much time is generally involved in the

12  process of water mitigation generally?

13       A.   As far as what?

14       Q.   As far as your typical job.  Or would it just always

15  vary?

16       A.   It a hundred percent varies because if it's --

17  somebody said their washing machine overflowed earlier.  So if

18  that happens, if you have vinyl flooring, vinyl flooring has to

19  come out because the water absorbs into the wood and it gets

20  underneath the vinyl.  If you don't remove it, that's where you

21  are gonna get mold.

22       So if it's vinyl or if it's engineered wood floor,

23  generally that can't be saved.  If it's tile or real wood, that

24  can be saved.  But if it's only six gallons or 12 gallons, it

25  might go a little bit out into the hallway and down below it.

1   So it's maybe a one cup below it, you know, a fan and a

2   dehumidifier, one or two upstairs two or three days.

3       Q.   Okay.  I assume based upon your training and

4   experience, is there a difference between porous material and

5   non-porous material?

6       A.   Yeah, some things dry at a different rate.  So you

7   can dry Sheetrock probably in a day-and-a-half, two days, just

8   depending.  Wood dries in a couple of days.  Almost everything

9   you can dry in a couple of days.

10      If you get that house hot enough, the hotter it is, the

11  faster it evaporates.  So if you're trying to dry and the

12  homeowner is there trying to keep the AC at 60 and you are

13  trying to heat things up so it evaporates, you're fighting.  So

14  my machines that produce heat and wind are fighting his AC, so

15  it's gonna take longer for it to dry.  I mean, it's all in the

16  IICRC.  They state it.

17      Non-porous materials when they get wet take longer.  So if

18  concrete gets wet and it stays wet, it's gonna take longer for

19  that to dry than a piece of wood, right?  And in a sill plate

20  around the house, your sill plates, which are the 2 x 4's that

21  lay on their side and they build walls on them, the middle of

22  that sill plate, that's gonna stay wet for days.  It takes

23  longer to dry that than almost anything in the house.  And

24  people that say every house can be dried in three days are

25  wrong.

1    I mean, I can -- the next loss I get, we can do a field

2    trip and I will prove that every house can't be dried in three

3    days.  Just because some people say they can, that's not true.

4    If a house floods and it's been wet, depending on the

5    materials, if you don't know what materials are wet, you can't

6    say it's been drying three days.  If your machines are working,

7    the rate of evaporation can only happen so fast.

8         Q.    Okay.  And speaking of machines, you're not using

9    just your eyes to test whether materials are completely dry, do

10   you?

11        A.    No.  I mean, anybody that -- so they have a thermal

12   camera which is I can look in the wall and it works on

13   Sheetrock, carpet, but mostly Sheetrock.  You can see if

14   anything is still wet.  It's going off the temperature, but any

15   thermal camera can go in here and see where there's no

16   insulation in the walls.  It will read different temperatures,

17   but it shows you a map.

18        We have moisture meters that we're penetrating and

19   non-penetrating.  So you can put it here and this would

20   probably read 16 to 18, maybe 14 percent, just depending on how

21   dense this is, and what it is, and how much humidity is in the

22   air.  And then they have penetrating that has needles that's

23   gonna go down in here into the wood and tell me what it really

24   is.

25        So penetrating or non-penetrating, they're different.  If

1    you are not doing penetrating into the sill plates, after three

2    days, you don't know if it's dry or not.

3        Q.    Okay.  Now fast forward.  Can you describe what

4    factors FBR has to be attended to or it has to be mindful of

5    when they are scheduling new jobs?

6        A.    Just how we feel about the homeowner.  We have to be

7    aware about that; where it is, who their insurance company is,

8    how long it's gonna take, what materials are used, how many

9    people we are gonna have to have.

10        Q.    The business that you're currently in and the jobs

11    you're currently operating?

12        A.    Yeah.  I mean, how many we have out.  I mean, there's

13    a lot of times -- or some of the times we'll have every piece

14    of machine out.  And so is it worth starting another job having

15    to rent machines versus just saying, hey, I can't.  Let me

16    refer you to somebody.  I can't do it.

17        Q.    Understood.  Speaking of which, how many jobs can FBR

18    handle at any given time?

19        A.    We've been up to seven, but it depends on how big the

20    jobs are.  So we did a giant warehouse in Griffin I think about

21    five years ago.  We had every piece of machinery we have on

22    that job for almost a week.  Back then, I think it was only

23    like 15 dehumidifiers and a hundred fans, but it was -- half

24    the size of this building flooded.  So every room had six fans.

25    Every room had a dehumidifier.

1          So you multiply that times five-to-seven days, your bill
2     is going to be giant.  We go off Xactimate.  We use those
3     prices so there's no -- every time there's a fight --
4          I don't like fighting with the insurance companies.
5     There's a lot of companies that use customer price lists.
6     Everybody knows there's companies that use custom price lists.
7     I don't use them because if you use a custom price list, they
8     don't adjust them down.  In the history of a custom price list,
9     they've never said, let me take this Xactimate and make it
10    lower.  Never.  They have always done it higher.
11         So if I stay on Xactimate, that means I don't have to
12    worry about I'm charging too much for this or that.
13         Q.   Okay.  When you said Xactimate, that is a protocol
14    that's established by insurance companies?
15         A.   Yes.  So all the major insurance companies use it.
16    What happens is they write all of their estimates through
17    Xactimate.  And a lot of insurance companies partner if you
18    will with different restoration companies.
19         So if you had an insurance company that may be State Farm.
20    Well, they may be contractually obligated to send out SERVPRO.
21    So there's deals that if you had a loss, it's not different
22    than your insurance adjuster on a vehicle.
23         Like you crash your vehicle, they say, hey, take it to
24    this shop.  It's the exact same, hey, you have water damage.
25    Let me send in these people.

1       The reason they do that is because they are doing it

2   cheaper.  It's not because they like them.  It's because

3   there's a break.  And so that cheaper rate millions of times a

4   year gets entered into Xactimate at a cheaper rate driving down

5   that price.  So I don't drive it up.  It's getting driven

6   down.

7       Q.   So if I understand you correctly, the software

8   Xactimate, industry standard software used to develop pricing?

9       A.   Yes.

10      Q.   Is that a correct statement?

11      A.   Well, it's not aligned -- it's the insurance

12  company's prices.

13      Q.   Okay.  That they will accept, typically accept?

14      A.   Typically accept, yeah.

15      Q.   And based on what you just told me -- I'm just trying

16  to summarize -- is if I understand you correctly, are you

17  saying that based upon that paradigm that's industry

18  established prices, that prices are controlled and go down over

19  time, not prices going up?

20      A.   I don't know that they go down, but if I put in my

21  price list for 2022 -- no, before this last little flux because

22  it actually has gone up the last six months because a piece of

23  wood has tripled, gas is double, so it is catching --

24          MR. BAGLEY:  Excuse me.  Your Honor, I'm sorry to

25      interrupt, but this doesn't seem to have -- how Xactimate

90

1          is formulated doesn't seem to have much relevance.  And I

2          would object to the relevance in using the jury's time for

3          this global discussion that we've got right now.

4              MR. ROUSE:  Specifically, I'm just gonna wrap it up

5          soon, but my point was directly related to the opening

6          statement about the inflated price and that the price

7          wasn't controlled or anywhere reasonable.

8              In fact, I think counsel argued that it was over

9          twice the reasonable price, and so that's why we're going

10          through this discussion.

11              MR. BAGLEY:  And I will stipulate that has nothing to

12          do with the criticisms of Xactimate, your Honor.  I never

13          said that and never implied that.  In fact, we will

14          stipulate Xactimate is the software to use.  We never

15          contested that.

16              THE COURT:  So what is your objection?

17              MR. BAGLEY:  Well, he's in a discussion globally

18          about nationwide how figures go into Xactimate and how

19          Xactimate is impact -- it's not even relevant.  There's no

20          dispute about that that this jury needs to sit through and

21          hear.  It's irrelevant.

22              THE COURT:  Okay.  I will allow the question, but

23          Mr. Rouse, rephrase it so that it applies to this.

24   BY MR. ROUSE:

25          Q.   Yes, your Honor.  Thank you for the explanation,

1   Mr. Fowler, but moving on, I want to talk about the business
2   challenges and economic challenges that you heard your wife
3   discuss about being a small business owner.
4        Can you talk about or explain to the jury what do you do
5   when you are taking a new case and how you adjust your
6   protocols based on the size of the job?
7        A.   I mean, it depends on --
8        Q.   I will be specific.  When you have a job that's
9   large, is there something unique that you do in terms of your
10  documentation versus a job that is small?
11       A.   Yeah, I mean we actually look at our reserves and
12  then we look at the homeowner.  We look at the insurance
13  company.  And there's been a couple of times where we've
14  referred it out.  But if I can get somebody -- like if the
15  owner has a good job that I'm not worried about or if we talk
16  about it, the homeowner is there and we sit down and talk,
17  that's a lot different than somebody that I never saw, that
18  we've never met.  That's one of the reasons I verified that
19  Saturday.
20       Q.   When you say verified, what do you mean by verified?
21       A.   When I called Saturday and spoke to -- it was a
22  female representative.  I didn't get a name.  When I --
23       Q.   Female representative of?
24       A.   Universal.
25       Q.   Okay.

1      A.   I didn't get her name.  It was probably 9:00 or

2   10:00.  I verified that the policy was in force.  I verified

3   that the policy covers this sort of water leak.  What needed to

4   be done to follow the steps, and they said as long as I take

5   pictures and take readings every day, there should not be an

6   issue.

7      Q.   If you did not have the verification with Universal

8   before you started the major work on your job, would you have

9   performed water mitigation on Michelle Jimenez's property?

10     A.   I wouldn't have done the demolition.  I would have

11  just extracted the water and set a couple of dehumidifiers

12  until we can verify it.

13     Q.   Again, I will just ask plainly.  Was your work on

14  Michelle Jimenez's property conditioned on the verification?

15     A.   Yeah.  I mean, I wouldn't have started it without it.

16     Q.   Okay.  And in terms of the verification that you

17  obtained, did you have any question in your mind that you

18  needed to give Universal anything new in terms of reporting or

19  paperwork outside of just documenting what you were doing?

20     A.   No.  When the adjuster came on the fifth day, he

21  didn't say anything.  I mean, he didn't say, hey, stop.  It's

22  dry.  When he was walking out, I was walking in and I said, did

23  you still see all the machines running?  He said, yes.  I said

24  did you still see some wet spots?  He said, just make sure you

25  take pictures and document it.

1    At no point did he say stop.  Like if he thought I was
2  done on the fifth day, most people would say, all right, buddy.
3  We'll see y'all on the next one.  Or are you pulling your
4  machines today?  Or anything other than just take readings and
5  pictures.  That wasn't said.
6    Q.   Okay.  When were you contacted by Michelle Jimenez
7  regarding the problem on her property?
8    A.   It's in the text messages.  Probably ten minutes
9  before the text message.
10    Q.   Okay.  And when you were contacted by Michelle, what
11  did she tell you was wrong with the property?
12    A.   She said that a friend went over to her house to grab
13  something and the house was flooded.
14    Q.   Okay.  Was there anything particular or peculiar that
15  stuck out to you about the job?
16    A.   Looking back, yeah.  I mean, there would be more
17  questions, but we don't -- if I do 150 jobs a year, I would say
18  I have done 1,500 jobs in my life, roughly, with water damage.
19  I would say none of those happened on closing, the day of
20  closing.  To me it's odd, but that's the day it was seen.
21    There's some pictures that leads me to believe it was not
22  that day.  It was one to two days prior.
23    Q.   Okay.  When you got to the property, what did you
24  observe?
25    A.   It was leaking.  I mean, everything was still

94

1    dripping.  I mean, it was a mess.

2        Q.   Okay.  How would you describe the damage?

3        A.   Probably the fourth worst I've ever seen.  So it

4    started on the top floor.  It flooded half of the top floor.

5    It went straight down to the kitchen and into the living room,

6    to the sitting room, to the dining room, to the hallway, all

7    those wood floors were done.  All the ceilings, most of them

8    were halfway off.  So almost the entire second floor was

9    damaged.  And then the basement, the entire basement was

10   damaged.  So it was three floors.

11       Q.   Okay.  Now prior to your September call with Ms.

12   Jimenez, did you have any prior experience with her?

13       A.   No.

14       Q.   Prior to your September call with Ms. Jimenez and

15   your direct contact with Universal, the claims department of

16   Universal, do you recall doing business with Universal before

17   then?

18       A.   When my wife said it, yes, but I can't tell you the

19   name.  There's only certain companies that -- she deals more on

20   the collecting side when there's a problem, but I couldn't tell

21   you a name.

22       Q.   As you described earlier about documenting your work

23   and taking pictures, doing testing, do you recall any adjuster

24   on behalf of Universal complaining to you about the quality of

25   work or the completeness of your work?

1    A.   They've never said why are you charging this?  Why

2    didn't you do this?  They never said that to me.  The adjuster

3    that was there the fifth day, he came here to court whenever we

4    came before.  He's not here today.

5    Q.   Okay.

6    A.   And Mr. Bagley knows whoever that was.  That

7    adjuster, that's who I met the fifth day and he did not tell me

8    to get my machines.  He did not tell me it was dry.

9    When I have come across different adjusters, we will talk.

10   Like it's not a hatred.  It's, hey, what's going on?  What's

11   your plan?  What are we doing?  That guy didn't say it.  All I

12   said was, did you see it was still wet?  He said, make sure you

13   have pictures and documentation.

14   Q.   And this is Charles you're referring to?  Do you

15   remember the name of the adjuster that you --

16   A.   I don't remember his name.  I remember what he looked

17   like.

18   Q.   Gotcha.  Can you describe what steps you took to

19   remove the water from Michelle Jimenez's property?

20   A.   The first night we just extracted.  We have an

21   extractor.  I don't know if the video -- I sent some videos,

22   those pictures show it, but it was a couple of inches high.  We

23   just extracted most of the water because it kept dripping.  We

24   set three dehumidifiers.  On something that wet, it will help,

25   but it's still -- it's not too effective, but you don't really

1    start too many multi-level jobs at 9:00 anyway.

2         Q.    Understood.  How many days did it take for you to

3    completely remove the water from the Jimenez's home?

4         A.    Seven.

5         Q.    Okay.  And the overall cost of the project, do you

6    recall the overall cost to FBR to do the job?

7         A.    23, 24, somewhere in there.

8         Q.    Okay.  Did you supply to Universal and to Michelle

9    Jimenez a detailed documentation of your work?

10        A.    Yes.

11        Q.    Did that include pictures and readings?

12        A.    Yeah.  So we try to do a time line whenever we do

13   these jobs, and so the pictures with our moisture meters show

14   the moisture content going down.  And so on day two, if it's 80

15   percent humidity, if this wood is 80 percent, on day four it's

16   60 percent, on day five it's 40, on day six it's 30, and then

17   the last day it's dry, to me, that means it took this many days

18   to dry.

19        Q.    Okay.  Can you describe the reasons why you submitted

20   the invoice for $21,000 to Universal?

21        A.    Just to -- I didn't want to be here.  And it's

22   whenever you submit jobs for excessive days, it's always a

23   problem.

24        As a company, the new people that we've brought in we're

25   gonna start getting different things signed, but up front,

emailing the adjuster every day or the insured every single day

that says, hey, this isn't dry.  It still needs to be here.

Hey, this isn't dry.  It still needs to be here.

On the fifth day when that guy was there, he knew it was

still wet and didn't tell us anything.  There's no difference

to me besides if I was emailing the same or meeting that guy,

it was still wet.  They still needed to be there.  If the guy

is not arguing my prices on the equipment, the only thing they

can argue is the days that they were there.

So if the pictures and the readings and their own adjuster

was there on the fifth day and I only charged for five days and

he didn't tell me to leave them, he didn't tell me to take

them, I don't understand what the issue is.

But the reason we didn't charge seven is because I don't

like fighting with insurance companies.  That's why we use

Xactimate.  I know a lot of companies that use custom price

lists.  That's when you fight with the insurance company.  We

don't use custom price list because I don't feel like haggling

over money.  I just don't feel like haggling.

Q.   I understand.  So you're saying you were there for

seven days.  You only billed five days.  And in the bill that

included just the five days of work, nixing the two actual

other days of work, that's the bill you included the early-pay

discount?

A.   Yeah, yeah.

1      Q.   So further reducing your bill?

2      A.   Right.

3      Q.   Okay.

4      A.   I mean, I could get a parade of people up here

5  stating they bill for more than Xactimate.  I mean, there's

6  several other big restoration companies that don't use

7  Xactimate.  There's several other companies that use Xactimate,

8  but bounce up their prices from Xactimate.  Xactimate is a

9  tool.  You don't have to use their prices.  Nobody goes below

10 those prices.  I stay at the prices.

11     So if you ask an adjuster, does anybody go less than

12 Xactimate that is not on a preferred vendor list, he will tell

13 you no.

14     Q.   Okay.  Did you receive any complaints or questions

15 about the appropriateness of your work from Michelle Jimenez?

16     A.   No.

17     Q.   Did you receive any complaints or questions about the

18 appropriateness of your work from Universal?

19     A.   No.

20     Q.   Okay.  Did Universal ever pay you within the ten-day

21 grace period to get the discount per your invoice?

22     A.   No.

23     Q.   When you extended that grace period, did Universal

24 ever pay you within the new grace period?

25     A.   No.

1    Q.   Counsel for Universal mentioned that there was a
2   compromise, a great compromise where you all sought to meet in
3   the middle at eighteen.  Was the $18,000 amount a compromise
4   that you engaged in with Universal after you completed the work
5   or was that a discount for early payment alone?

6    A.   It was to hurry up and get paid.

7    Q.   But after they failed to meet that early-pay
8   discount, that ten-day grace period for the early-pay discount,
9   did you ever have negotiations with Universal and say, you know
10  what?  I agree to the eighteen thousand as a compromise.

11   A.   No, there's some emails that once the first ten, I
12  tried it again and I think maybe twice just because -- we
13  wouldn't be here today if they knew how to pay in a timely
14  manner.  It was that reason that after you get strung so long
15  so many times, you just say I'm tired of it.  That's why I'm
16  here.  I'm tired of getting strung so long over stuff that
17  should've been done in a timely manner

18   Q.   Understood.  I hand you what's been marked as
19  Plaintiff's Exhibit 1.  Can you tell me what that document is?
20  Or can you review it, and then when you are done reviewing it,
21  just let me know.

22   A.   It's the insurance policy.

23   Q.   Whose insurance policy?

24   A.   Michelle Jimenez.

25   Q.   You obtained that policy in connection with this

1   lawsuit?

2        A.   Correct.

3             When you look to the front page of that document, do

4        you see Michelle Jimenez's name?  Actually, can you

5        mark --

6             MR. ROUSE:  Excuse me.  Move to admit Plaintiff's

7        Exhibit 1.

8             THE COURT:  Any objection?

9             MR. BAGLEY:  No objection.

10            THE COURT:  Admitted without objection.

11   BY MR. ROUSE:

12       Q.   Can you mark on this document or actually circle

13   where you see Michelle Jimenez as identified as an insured on

14   that?  Can you place an X by the telephone number for Michelle

15   Jimenez?  Is that the telephone number that you are familiar

16   with?

17       A.   Yes.

18       Q.   Communicating with Michelle Jimenez?

19       A.   Yes.

20       Q.   And did you have calls with Michelle Jimenez or did

21   you have text messages with Michelle Jimenez?

22       A.   Both.

23            MR. ROUSE:  Your Honor, may I publish?

24            THE COURT:  Yes.

25   BY MR. ROUSE:

1    Q.   Okay.   We discussed earlier bills.   Hand you what's
2    been premarked as Plaintiff's Exhibit 2.   Can you look at that
3    and tell me what that is?
4    A.   It's the bill for what we did.
5    Q.   When you say the bill for what you did, can you look
6    to the back of that bill and tell me what amount is on there?
7    A.   18.
8    Q.   And does that bill show -- is that bill a summary of
9    the five days or seven days?
10   A.   It's for five days and it shows the $3,662.40
11   settlement discount, valid if paid within ten days.
12   Q.   Okay.   Can you read out loud the clause where the
13   grace period is conditioned?   What does it specifically say?
14   A.   This is a settlement discount only valid if paid
15   within ten days.
16   Q.   Can you circle that provision?   That's on which page?
17   A.   The summary for dwelling.
18   Q.   Is that page ten?
19   A.   Yes.
20        MR. ROUSE:   Can you just circle the discount there.
21        Move to admit Plaintiff's Exhibit 2.
22        THE COURT:   I already have it marked as admitted.
23   BY MR. ROUSE:
24   Q.   That's true.   Can you look to what's been marked as
25   Plaintiff's Exhibit 3.   Excuse me, Plaintiff's Exhibit 5 and 6.

1    Can you tell me what those documents are?

2         A.   Those are the work authorization and the direct-pay

3    authorization.

4         Q.   Okay.  Now this direct-pay authorization, is that

5    what you were referencing earlier with respect to Michelle

6    Jimenez?

7         A.   Yes.

8         Q.   When was that direct-pay authorization signed?

9         A.   It says 9/24.

10        Q.   Is that what you recall?

11        A.   We sent her these the same day.

12        Q.   Okay.  Do you recall getting both of those back the

13   same day or getting them back separately?

14        A.   Usually we get them back the same day.

15        Q.   Okay.  The other document that you are referencing is

16   what?

17        A.   The work authorization.

18        Q.   What does that document do?

19        A.   Generally it just gives us permission to enter the

20   home.

21        Q.   Okay.  And you got permission to enter the home from

22   Michelle Jimenez?

23        A.   Yes.

24        Q.   What day was that signed?

25        A.   The 14th.

1        Q.    Okay.  Are those documents accurate and complete?

2        A.    Yeah.  I mean, it's an old form.  We've stopped using

3    that one.

4        Q.    Is that a form that is produced in -- as a function

5    of your business operation?

6        A.    Yeah, at the time this is the one we used.  Like I

7    said, we took the cost of repairs off.

8        Q.    Now, there was some to-do about this clause in your

9    work authorization that talked about the cost of repairs.  Can

10   you read that and tell me what that means?

11       A.    All right.  So it says charges for repairs will be

12   billed on a timely material basis calculated by industry

13   standards for the type of work performed.  If I'm billing a

14   time and material basis, I'm not billing through Xactimate.

15   Time and material is billed one way.  Xactimate is billed the

16   other.

17       A lot of rebuild contractors will bill time and material

18   because you make better margins doing in timing material than

19   you do through Xactimate.  So when we would do a rebuild, a

20   small rebuild, if we're dead.  We don't have anything else to

21   do, then some of the carpet ones or small drywall ones we would

22   do, we would bill time and material.  We would send it to the

23   insurance company.  If they approved it, then we would do it.

24       Q.    Was this a rebuild for Michelle Jimenez?

25       A.    No.  She knew we -- we've never done a big one.

104

1          MR. ROUSE:  Move to admit Plaintiff's Exhibit 5 and

2      6.

3          THE COURT:  What was P-5?

4          MR. ROUSE:  The work authorization.

5          THE COURT:  Okay.

6          MR. ROUSE:  6 is the direct-pay authorization.

7          THE COURT:  Mr. Bagley, any objection?

8          MR. BAGLEY:  No objection, your Honor.

9          THE COURT:  Admitted without objection.

10  BY MR. ROUSE:

11      Q.   I draw your attention to Plaintiff's Exhibit 4.  If

12  you look to the back on page ten on that document, what does

13  that document appear to be to you?

14      A.   This is if we were to bill for seven days.

15      Q.   Okay.  What amount did you actually incur for work on

16  the Jimenez property over seven days?  Can you see the amount?

17      A.   It would have been $23,386.90.

18      Q.   As you described earlier, you chose to reduce your

19  bill on your own?

20      A.   Correct.

21      Q.   Was that in conjunction with discussions with

22  Universal?

23      A.   No.  It was -- so if you bill for more than five

24  days, there's a lot of kickback.  If you show the need for all

25  the equipment to be in there for a certain amount of time,

1    there's not usually any kickback.  If they see that you've

2    already discounted it, usually it's hey, thanks.  You said you

3    were at seven and there's -- the bigger one has it.  It has all

4    the pictures in it stating why it was at seven.  Thanks for

5    doing that.

6        We don't need to go back and forth because they know on

7    the bigger losses there's bigger margins.  They know smaller

8    contractors want to hurry up and settle so you can get to the

9    next one.

10       If you have to sit and pay for -- I don't have dumpsters.

11   So if we rent dumpsters for $400 a piece, that's $800 out of

12   pocket and it's not, hey, you go ahead and pay us once you get

13   paid.  It's pay us now.  Temp labor, pay us now.  The spray

14   that we use, pay for it now.

15       I mean, all of this stuff is pay now, but hurry up and

16   wait and hope that they pay you.  And they know that, that's

17   why they want to bust it down.

18       Q.   Understood.  So this document, is it accurate and

19   complete to the best of your recollection?

20       A.   Yes.

21       Q.   And it is created as a function of your business

22   operation?

23       A.   Uh-huh.

24            MR. ROUSE:  All right.  Move to admit Plaintiff's

25       Exhibit 4.

1           THE COURT:  Any objection?

2           MR. BAGLEY:  No objection, your Honor.

3           THE COURT:  Admitted without objection.

4    BY MR. ROUSE:

5      Q.   And I hand you what's been marked Plaintiff's Exhibit

6    3.  Can you take a look at that?  Just flip through it and let

7    me know when you are ready.

8      A.   Looks like the one that you sent.

9      Q.   That is the one that we just spoke about previously?

10   Not the last invoice, but the previous one?

11     A.   It's the one for $2,662.40.

12     Q.   Okay.  What's the difference between that bill and

13   the bill that you are looking at now?

14     A.   The one I'm looking at is $21,662 and that one's

15   billing for five days of the equipment on the main floor and

16   the bottom floor.

17     Q.   Okay.

18     A.   I think three days on the top floor.

19     Q.   Okay.

20     A.   Three or four, I'm not sure.

21           (Whereupon, a pause in the proceedings was held.)

22           MR. ROUSE:  May I have about a two-minute break,

23       please?

24           THE COURT:  Okay.

25           (Whereupon, the jury was escorted out of the

1     courtroom and a brief recess was held.)

2          THE COURT:  Mr. Rouse, just know we're gonna get to a

3     good stopping point.  I think you said you had 32

4     exhibits, right?

5          MR. ROUSE:  Yes.

6          THE COURT:  Okay.  And that's fine.  That's fine.

7          MR. ROUSE:  Well, see the problem is this is gonna

8     take the most time because we're gonna go through a

9     detailed review of all the pictures.

10         THE COURT:  Like how long?  I don't want to interrupt

11    you.  Maybe we should just -- maybe it might be a good

12    time -- Mr. Bagley, what say you?  -- to pause it right

13    here versus getting into it.

14         MR. BAGLEY:  It sounded like we have some folks that

15    really need to get out of here at 5:00 and I wouldn't want

16    to disrupt Carlton.  I mean, if we've only got 15

17    minutes --

18         MR. ROUSE:  I agree.

19         THE COURT:  So let's just go ahead and we can release

20    the jurors for today and then we will come back and finish

21    you up tomorrow.  Okay.  So let's do that.  We'll do that.

22         Counsels, I'm gonna give y'all the jury charges.  Do

23    y'all want to wait to do the charge conference after you

24    rest or come in and try to do it in the morning before we

25    get started?

1            MR. ROUSE:  Whatever your pleasure is.

2            MR. BAGLEY:  This isn't very complicated.

3            THE COURT:  Okay.  So we don't even have to come in

4       early and do that.  We can wait until the end.

5            MR. BAGLEY:  I think that's fine.

6            THE COURT:  Okay.  Let's do that.  So Ed, are y'all

7       okay if I have the bailiff just release them for the day

8       and that way we don't have to bring them back in?

9            MR. BAGLEY:  Yes, your Honor.

10           MR. ROUSE:  Yes, your Honor.

11           THE COURT:  Okay.  If there's anybody that needs to

12      come back in, they can to get their items, but just let

13      them know that we're releasing them for the day.  It's a

14      good stopping point, and to be back at 9:00.

15           MR. BAGLEY:  Judge, we'll crank back up at 9:00?

16           THE COURT:  Yes.

17           (Whereupon, the jury trial concluded for the day.)

18           THE COURT:  Do we have everybody?

19           MR. VAZQUEZ:  We do.

20           THE COURT:  We're ready to go?  Okay.  Let's bring

21      the jury in.

22           (Whereupon, the jury was escorted into the

23      courtroom.)

24           THE COURT:  All right.  Good morning, ladies and

25      gentlemen.  Welcome back to Gwinnett State Court.

1      Counsels, you may be seated.

2      All right.  We're just gonna pick up where we left

3      off yesterday.  We left off with Mr. Rouse.

4  BY MR. ROUSE:

5      Q.  Mr. Fowler, you're still under oath.

6      A.  Okay.

7      Q.  When we left off yesterday, we were at Exhibit 6, the

8  direct-pay authorization.  And just to kind of get us back on

9  that same line of questioning, can you explain, again, the

10  steps you took to ensure that there wouldn't be a payment issue

11  when you took the Michelle Jimenez job?  What paperwork did you

12  think was necessary to share with Michelle and to share with

13  Universal to ensure that there weren't any payment related

14  issues?

15     A.  We got her to sign the work authorization and the

16  direct-pay authorization.  And then Saturday, before we really

17  started the demolition, I called and confirmed coverage and

18  made sure that they used Xactimate for the pricing.

19     Q.  Okay.  And once again, Xactimate, is that a

20  requirement for you to prepare invoices with respect to

21  insurance-related claims?

22     A.  It's not a requirement.  It just -- I can -- you can

23  either bill it time and material or you can do Xactimate.  And

24  if you use Xactimate, there's not back and forth with the

25  insurance company.

110

1        Q.   Okay.  When you -- the Friday I think you said you

2   immediately went to Michelle Jimenez's residence after you

3   received a call about water damage, correct?

4        A.   Correct.

5        Q.   And that Friday you took some immediate steps.  If

6   you could summarize what those steps were to address the water

7   issue?

8        A.   So we have an extractor, like a big water vacuum

9   cleaner, and we extracted all the water we could.  We set I

10  think it was three dehumidifiers and that way it won't -- it

11  will start drying it out, although it's not gonna work.  I

12  mean, you've got to get all the materials out, but if you

13  remove most of the water and then start the dehumidifiers the

14  next day, it will be easier.

15       Q.   Okay.  When you arrived on Saturday, could you see an

16  appreciable improvement with respect to the work and the

17  efforts that you took to mitigate the damage to the property?

18       A.   I mean, some of the floors, there wasn't standing

19  water.  But, I mean, like the basement that had -- the basement

20  was a mess.  I mean, it wasn't -- it just helps with the mold.

21  So if the RH stays in the 80s and 90s for a couple of days,

22  you'll start to see a big boom in the mold.

23       Q.   Okay.  And just for the benefit of the court

24  reporter, the record, and the jury, what does RH mean?

25       A.   Relative humidity.  Like when it rains outside, the

1    RH or the humidity level is really high.  In a building, if the
2    humidity is stuck in a building and it can't go outside, that's
3    why you get mold.  When people leave on vacation and have a
4    busted water pipe and they come home and their house is
5    flooded, it doesn't matter if it's raining outside.  It matters
6    what the RH is in the house.
7        So if it's trapped in there and it's 80 or 90 percent for
8    three or four days, you will get mold everywhere, on the
9    furniture, on the walls, the carpet.
10       Q.   When you have mold prevalent in an area, particularly
11   a residence, how would that compound the damage to that
12   property in terms of the usability of that property?
13       A.   I mean, you have to take out everything that has mold
14   on it.  A lot of things can't be cleaned.  You don't clean --
15   if it's surface mold, like mildew or something, something like
16   that can be cleaned.  But if it's green, black, brown, white,
17   all the rest of it has to come out.
18       And the reason we don't test for mold is because we have
19   to take it out.  So I don't care exactly what kind it is.  It
20   has to come out.  So if there is mold in there, it doesn't
21   matter to me that we test it or not because it has to come out.
22   It's wasting money.
23       Q.   Okay.  Now on the Saturday, your testimony was that
24   the damage was by far beyond what was a normal job, correct?
25       A.   Correct.

1     Q.   And I think your testimony was it was either the
2  worst or the second worst you'd ever seen?
3     A.   Yeah, that we've done.  I think probably now it's
4  been number three or four.
5     Q.   Okay.  In terms of the severe damage that you
6  appreciated or observed in the property, can you explain to the
7  jury what steps you took with Universal, what communications
8  did you have to make sure you were on the same page and had an
9  understanding?
10     A.   Well, we called them on Saturday.  They said the
11  policy was in force; that that policy covers a pipe breaking
12  water damage; that if I took pictures, documentation, which
13  generally means RH readings and readings of the floor --
14     So we have a moisture meter and we'll put it on the wall.
15  We'll take a picture of it to prove there's moisture in the
16  wall.  We'll put it on the floor.  The pictures that we have.
17  I mean, in that house, it was pretty evident where all the
18  water was.
19     But as the material is drying, you can put your hydrometer
20  on the ground that shows the RH level of a material.  And so as
21  it's drying, you taking pictures.
22     So like on this day it was 60.  Two days later it was 30
23  or 40.  The next day it was 20.  So as the moisture evaporates
24  from wood or carpet or whatever it is, you take pictures and
25  that proves that, (A), what you're doing is working, but the

1    moisture is coming out of the materials.

2         So it says, hey, I'm not gonna come in here and just drop

3    my machines for three weeks and try to get paid for it.  We try

4    to prove what we're doing and why, and it's impossible to go to

5    every single inch of a house and do that.  So generally you

6    pick some points in a house that, hey, this spot in this house

7    was holding water.

8         Some houses aren't level, so if you put a marble in the

9    house and wherever it rolls, that's the lowest spot of the

10   house.  So generally that's where we take our readings because

11   that's gonna hold the most water.

12        We'll put our moisture meter there and we'll take a

13   picture.  And then the next day we put it there and take a

14   picture.  So every day, that's where we are measuring the

15   moisture, and we do that in several rooms.

16        Q.   All right.  Now I want to draw your attention to

17   Plaintiff's Exhibit 4.  You should have it up there on the

18   podium.  If you could look to the back of that exhibit, can you

19   please refresh all of our recollection?  What was the actual

20   cost of the services that you provided to Universal?

21        A.   It was $23,386.

22        Q.   Okay.  $23,386?

23        A.   Yes.

24        Q.   Can you draw your attention to Plaintiff's Exhibit 3,

25   the detailed bill.  If you could look to the summary section

114

1    for the services provided.  I think it's page ten.

2        A.   It's $21,662.

3        Q.   So based on those numbers, you provided around close

4    to a 2-to-$3,000 discount from the actual work that you

5    performed to the bill that you submitted to Universal?

6        A.   Right.

7        Q.   Okay.  And again, can you refresh all of our

8    recollection?  What was the difference between the actual bill,

9    Plaintiff's Exhibit 4, and the detailed bill that was

10   submitted, Plaintiff's Exhibit 3?

11       A.   So we leave our machines in the house until it's dry.

12   Every day when we go back, we take the readings in the house.

13   I think there's a dry log.  I think you have that.  But in our

14   dry log, we take the readings.  We write everything down on the

15   hydrometer readings in the house in every room, but the

16   difference is five days versus seven days.

17       We had our machines in there for seven days and we billed

18   them for five days.  And anybody that says a house can be dried

19   in three days is wrong.

20       Q.   Okay.  Now with respect to the actual bill that was

21   submitted, the twenty-one six bill, is that the bill that

22   contained the $18,000 discount for early payment?

23       A.   That's correct.

24       Q.   Okay.  And so regarding the discount, the difference

25   between the discount and the reduced bill was how much money?

1       A.    $3662.

2       Q.    All right.  Now you discussed briefly this morning

3   that there were certain instructions that Universal expressed

4   to you as a condition for you to be able to resolve your bill,

5   correct?

6       A.    I mean, Saturday, they just said take, you know, a

7   lot of photos.  I had to do the sketch and the documentation.

8       Q.    Okay.  Now in Plaintiff's Exhibit 4, the detailed

9   bill that you have on the podium there, that includes roughly a

10  hundred, maybe eighty-to-a-hundred pictures?  Am I correct

11  about that?

12      A.    There's a lot.

13      Q.    There's a lot of pictures, we'll say that, correct?

14      A.    Correct.

15          MR. BAGLEY:  Carlton, I think you were referring to

16      Plaintiff's Exhibit 3.  Plaintiff's 3 had the pictures.

17  BY MR. ROUSE:

18      Q.    Thank you.  I appreciate that.  If I misspoke, I

19  intended to refer to 3, the actual detailed bill.

20      A.    Yeah, 3, roughly a hundred or so pictures.

21      Q.    Now, in terms of the pictures that you took, does

22  that bill include all the pictures you took or just select

23  pictures for the purposes of the bill?

24      A.    I mean, usually we try to take a couple extra

25  pictures in case we have some blurry ones, but I don't know

1    that there's any missing.

2         Q.    All right.  So at this point, I would like to walk

3    through all the pictures so that you can kind of identify what

4    was going on with the property.  I'm going to be referring to

5    the pictures in Exhibit 3.

6         So the first picture in the bill, what does that indicate?

7    Why did you take that picture?

8         A.    That's the mailbox.

9         Q.    Okay.  Identifying the property?

10        A.    Yes.

11        Q.    4410 Riders Ridge Trail?

12        A.    Yes.

13        Q.    Okay.

14        A.    That's the front of the house.

15        Q.    Okay.

16        A.    Those were the two dumpsters we rented.

17        Q.    Okay.  Were you referring to these dumpsters and

18   other items when you talked about the immediate cost that Flood

19   Brothers had to do this job?

20        A.    Yeah, we have to pay that the day they deliver those.

21        Q.    Okay.  What is this a picture of?

22        A.    I guess, the master bedroom upstairs.

23        Q.    What was going on here?  Just no damage?

24        A.    I think if you keep on flipping -- so the house was

25   basically empty because she sold it.  So if you keep flipping,

1    I think there's probably a thermal shot.  So a lot of the water
2    in the carpet, you can't really see it until you put a thermal
3    on it.  So if you look at the black line --
4        Q.    When you say black line, are you referring to --
5    could you point to what that is?
6        A.    This line right here (indicating).  So when you are
7    looking at the carpet, you can see the moistures -- I mean,
8    it's a weird pattern in there, but that's all wet.
9        Q.    Okay.
10       A.    So it's just the easiest way to see water in the
11   carpet.
12       Q.    Okay.  And here the same on the left-hand side of
13   the -- what do you call that device again?
14       A.    It's a thermal camera.
15       Q.    Okay.  So the left-hand side of the picture there,
16   the display, is showing moisture in that area?
17       A.    Yeah.  So the carpet and pad are wet.
18       Q.    Okay.  And there, what are you trying --
19       A.    I'm stepping on the carpet and pad and you can see
20   how much water is here.  Like when something is flooded and you
21   step on the carpet and pad, you can see the water where it's
22   bubbling up.  So that's how much water is there.
23       Q.    Okay.  What's going on here?
24       A.    That's up in the master.  We pulled the pad
25   underneath the carpet and we put holes -- we pulled the

1    baseboard and we put holes in the bottom of the wall.

2         Q.   Okay.  Fans are allowing air --

3         A.   They can get in the wall cavity.

4         Q.   Okay.  Gotcha.

5         A.   So when they do the repair, they got -- a lot of

6    people won't even fix those holes.  You can just put the

7    baseboard back up and you don't have to repaint the wall.

8         This is the same thing, just different area.

9         Q.   Okay.  Same?

10        A.   Yep.  You can see the water line on the wall,

11   actually.  This little line right here.  So that's where the

12   water soaked up in the wall.

13        Q.   And that would be by your approximation, looks like

14   it's two-to-three inches?

15        A.   Yeah, it's not very bad, but if you get it fast

16   enough, you don't have to cut it.

17        Q.   Okay.  What's going on here?

18        A.   It's just the dehumidifier and a couple of fans in

19   that room.

20        Q.   When I'm looking at the entrance area, the threshold

21   there from one room to the hall or bedroom, it looks like the

22   floor is discolored.  What is that exactly a picture of?  What

23   is it capturing?

24        A.   I think this is the master going into the master

25   bath.

119

1     Q.    Was there damage to the floor there?

2     A.    Yeah.  I mean, you'll get there.

3     Q.    Again, looks the same here.  In the bathroom, there

4  looks like there's damage to the floor?

5     A.    Yeah.  So that's the hallway outside of the master

6  bedroom and that's the guest bath right next to it that we took

7  the vinyl out of.

8     Q.    Okay.  And there's still some discoloration.  What is

9  that discoloration from?

10    A.    It's just water still everywhere.

11    Q.    Okay.

12    A.    That's just one of the closets upstairs.

13    Q.    And again, what looks to be pink is, I guess, showing

14  as a darker color on your picture there, the display?

15    A.    Yeah.  There's just moisture in the floor on the

16  carpet and the pad.

17    Q.    Okay.  Same there?

18    A.    Same.  You know, we took the pad out, took the

19  baseboard, and put holes.

20    Q.    Throughout the base?

21    A.    Yeah, it just depends if the water is going up the

22  Sheetrock or not.

23    Q.    Okay.  And I've noticed in many of the pictures you

24  have these devices, these big, black devices.  What exactly are

25  you using those for?

1          A.    It's a fan.  You're not gonna -- like dehumidifiers

2     alone won't dry a structure.  You have to -- air movement over

3     a surface is what causes evaporation.  So once you get

4     everything to start to evaporate, the dehumidifiers take the

5     evaporation, turn it into water and then it will pump it out.

6     But without the fans, you are not gonna get the evaporation,

7     and that's half of it.

8          Q.    Okay.

9          A.    Just the dehumidifiers, taking the evaporation out of

10    the air.

11         Q.    Okay.  What do we see here?

12         A.    So that's one of the moisture meters we use.  It's

13    just showing the wood content.  So the moisture on that part of

14    the wood is 21.8.

15         Q.    Is that a high reading or a low reading?

16         A.    Yeah, that's higher than we want wood.  You want 8 to

17    15, kind of depending on what and where.

18         Q.    Okay.

19         A.    17 is better.  I'm not sure where the dates are on

20    these, but on the ones that I send, they have date taken.  So

21    it's hard to -- I can't tell you the date because it's not on

22    here, but on these that I send, they all have dates on them.

23    So I can't tell you.  Usually we like it a little bit lower

24    than that, but --

25         Q.    Okay.

```
 1        A.    Just a bathroom toilet.  I can't -- that might be the
 2   master, so probably was the master.
 3        Q.    Again, master?
 4        A.    We had to take the vinyl out, the baseboards, the toe
 5   kicks.  We open that little wall next to the tub to make sure
 6   we got air underneath the tub.
 7        Q.    The baseboards are all taken off the tub area as well
 8   and the vinyl flooring is removed?
 9        A.    Yes.
10        Q.    Okay.
11        A.    Air movement.  So 18; you know, 13 is acceptable.
12        Q.    Okay.
13        A.    Just more air movement.
14        Q.    That is the living space?
15        A.    So that is the basement all the way at the bottom of
16   the house where -- there's the master and then the main floor
17   and then the basement.
18        Q.    When you came in and you saw -- this is exactly what
19   you saw or did you pull the tiles down?
20        A.    No, that is what it looked like.
21        Q.    So what caused the ties just to fall apart?
22        A.    The amount of water running over.  You know, it takes
23   a while for it to do that, for it to turn that many tiles into
24   mush.  I have never seen that happen in a day, but, you know, I
25   think there's probably a couple more pictures.
```

1        There's a couple of baseboards in here with some microbial

2    growth.  That doesn't happen in a day.

3        When mold is green, it goes from green to black and

4    there's a time period on that.  So if you ever walk into a

5    house and it has green mold, generally that means that the loss

6    happened a long time ago.  Now if it's black, that takes a

7    while to turn to black.  But this only had some green --

8        It will be in there, but the amount of mush from these

9    ceiling tiles, to me, that takes longer than a day.  And you

10   can see --

11       Q.   Is that the HVAC?

12       A.   That's one of the HVACs.  The water upstairs went

13   into that line, and it's -- I mean, it's pouring out.

14       Q.   Okay.  Normally that's fiberglass like inside there

15   or some sort of insulation?

16       A.   Yeah, so you can see the red insulation So much

17   water, just broke it.  I don't know if there is any better

18   pictures of it leaking.

19       Q.   And it's completely flat right there just laying

20   against the --

21       A.   There was a lot of water.  I mean, thousands of

22   gallons.

23       Q.   Okay.  And the brown discoloration there, looks like

24   the wall is discolored.  Is that water draining down or what

25   was that from?

1    A.    Yeah, I mean every wall down there was soaked.   The

2    thermal will come in in a little bit, but there's certain runs

3    you can, I mean, just running straight down.

4    Q.    Okay.

5    A.    You can see it here, here, here.   So here it was

6    steady dripping, here, here.   I mean, it was -- if you turn a

7    pipe on at your house and leave for a couple of days and come

8    back, this is what you would get.

9        That's after we removed the flooring, the ceiling, the

10   walls.   So we have to remove the outside walls when they get

11   wet because they contain insulation.   You can't leave wet

12   insulation in a wall.   It's not gonna dry.

13   Q.    So Flood Brothers basically took off the drywall to

14   dry the actual supports?

15   A.    Yeah, the studs.   So if you don't remove the drywall

16   and insulation stays in walls you get mold because insulation

17   is like a sponge.   You're not going to dry a sponge.

18   Q.    Okay.   And you talked earlier about the porous, the

19   ability for different surfaces, porous and non-porous surfaces

20   to dry.   Was the concrete wet down there?

21   A.    Yeah, the concrete, I mean, it was all soaked.   It

22   was running out the back door, so it was an

23   inch-to-an-inch-and-a-half tall, the water down there.   It

24   takes a while to pull the moisture out of concrete, to pull the

25   moisture from the sill plates.

1        So the sill plates are here.  There's a 2 x 4 laying on

2   its side.  It's impossible to dry this when it's sitting on

3   concrete with that much water on it in a couple of days.

4        Q.   Okay.

5        A.   The last class that I went to, they're preaching

6   longer and longer drying.  They want you to overload the house

7   with fans and then pull a couple out every day.  But the three

8   day drying is a myth on a complete loss.

9        On a small loss, all the time.  We can dry it in two days.

10  If it's one floor and you can dry it from top and bottom, you

11  can get in and out really quick.  But when it's thousands of

12  gallons in a house, the evaporation of that is gonna be slower

13  than a small little usual loss that we come on.

14       Q.   Okay.

15       A.   So this is moisture of the concrete.

16       Q.   We talked about the range earlier.  I think 55 is

17  higher than what we saw previously?

18       A.   Yeah, concrete you want in the 20s.  On this one, we

19  tried to -- so when you have a loss, you try to go to an

20  unaffected area and get a reading.  So if the unaffected area

21  is 25, you want your area to be 25.  If the unaffected area is

22  15, you want your area to be 15.  So you are getting -- you got

23  to establish what it should be.

24       Q.   Okay.

25       A.   It's just the moisture going down.  26 is good.  This

1    is just a bunch of -- it's axial and snail fans drying.  You

2    can see if you go back, like the waterline in there, so you can

3    see the different colors.  So with the water here, so, I mean,

4    it's real easy to tell.  You don't really want to pull your

5    machines until all of it looks like this because if you put

6    down pad and carpet on this, you're just gonna get mold.

7         Q.   Okay.  Is this the hallway with ceiling obliterated?

8         A.   Yeah.  There's so much -- it was so humid, a lot of

9    my shots are foggy.  But yeah, that's the ceiling next to the

10   other room.  All the wall ties fell.  You know, it was soaked.

11   It had dripped everywhere in that house.

12        Q.   Okay.

13        A.   So we had to remove the rest of the ceiling tiles,

14   take out the rest of the insulation in the roof or in the

15   ceiling because you can't leave that insulation.

16        Q.   Okay.

17        A.   Just dehumidifiers and fans.  Same.  That's -- so the

18   carpet down in the basement --

19        Q.   If you look to the door, the door looks like it's a

20   little swollen or protruding.

21        A.   All the doors, you can see where it swelled up here.

22   So once the water stays in here, it just soaks up.  And so all

23   these doors, all this trim had to be popped off.  And doors you

24   can't save unless it's a real wood door and nobody -- you know,

25   real wood nowadays is rare.  We can save real wood, but

1    everything is fake.  It's composite.  So if something composite
2    gets wet and swells --
3         And once you dry it out, it goes back down a little bit,
4    but it always shows.
5         So this is the main floor.  It's a dehumidifier on the
6    main floor.  I think that's the dining room.  That's what it
7    looked like when we walked in to the dining room.  We walked in
8    the front door and this is one of the rooms on the right.
9         Q.   Okay.  Let me go back.  It looks like the wall is
10   coming apart.  Is that the ceiling or is that actually damage
11   to the wall?
12        A.   Well, that's just ripping down the paint there's so
13   much water.  So it ripped the paint, I don't know, here.  I
14   mean, it's like that in a lot of rooms.
15        Q.   Okay.  Looks like there's some standing water there?
16        A.   Yep, yep, parts of the ceiling fell.  It was bad.
17   That's like the foyer or, I guess, the front door is here.
18   This is the foyer.  I mean, I think that's the other side of
19   the living room.  It's just showing the water in the ceiling.
20        Q.   Again, the darker area, not the yellow, but the
21   darker area is showing a lot of moisture?
22        A.   Yeah, so all the water builds up here and then drops.
23   So you can see this beam is here it looks like, so it's coming
24   to here.  And so you can see water from here over, that's what
25   it's showing.  It's easy way to show you there's still water up

127

1    there.

2         Q.    Okay.

3         A.    There's water coming down one of the walls.

4         Q.    All right.

5         A.    That's us just the first day doing extraction, trying

6    to get most of the water out.

7         Q.    Uh-huh.

8         A.    This is I think probably the next day.  This is

9    just -- this floor, they built a subfloor or an additional

10   subfloor on top of this subfloor and then they put this down.

11   So we had to remove a subfloor and then this wood floor to dry

12   it because they had -- this is the original subfloor.  This is

13   another subfloor because it looks like the house sank a little

14   bit or this wood floor didn't meet somewhere else.  They had to

15   put two layers of wood in this house or a lot in this room.

16        So if you have two pieces of wood, you're not gonna be

17   able to dry them.  It has to come out.

18        Q.    And that's just added labor for your crew?

19        A.    Right.  Yeah, they didn't use one or two nails.  They

20   used -- they got paid by the nail.  I don't know.

21        And then above this second layer, they put in Quikrete or

22   some sort of leveling concrete because they glued the wood on

23   top of it.  You can see the glue.  You can see here is

24   concrete, this gray at the bottom of it.  All here was leveling

25   concrete on top of two layers of floor.

1     Q.    Making it impossible to remove?

2     A.    It took a while.  It's not fast.  There you can see

3     the different layers of subfloor they put in everywhere and how

4     we had to take it out.

5         Like I said, if there's two layers of wood floors, it's

6     hard to dry.  You take the top layer out.

7         You can see where we cut the bottom.  We took out the

8     baseboard and cut the bottom of the walls.  And the reason for

9     cutting the walls is we can get air up in the chamber.  When I

10    say chamber, you see where the 2 x 4s are here and here and

11    here?  We want to be able to shoot air up and up these walls.

12    So if we can do that, if this is wet, we can dry it.

13    Q.    That's why those fans are angled at the bottom there?

14    A.    Well, that's what the axials are for.  So that's

15    drying really the floor and the bottom of the wall.  These are

16    drying the ceiling.  They work better because you can angle

17    them a little bit, but this one is drying like a part of a

18    ceiling somewhere.

19    Q.    Okay.

20    A.    So that's power panel we had to put in for the amount

21    of equipment we used.  It's called a spider box.  We run that

22    off of usually a dryer, but it's just the amount of fans and

23    equipment we had to use.

24    Q.    Just the other side of the room showing the wall

25    damage?

129

1       A.   Yeah, so that's in the dining room after we got one

2   of the -- the top layer of subfloor out.  And we just, you

3   know, you put your machines in and then you go back every day

4   to check them, make sure they are still running.  You move

5   them.  So you're drying different little areas every day, so

6   you point it in a different direction.

7       You go back every day.  You take moisture readings every

8   day.  You make sure what you're doing is working.  If it's not

9   working after two or three days, something is wrong.

10      So I think in the basement, somewhere you'll see where I

11  tried to dry some of the basement, but in the basement, one of

12  the basement walls they have a 2 x 4 on a side going through

13  the walls.  So my fans that are blowing up the walls aren't

14  drying the top, so one of these you'll see where I had to do

15  some more cutting.

16      I mean, we don't try to just waste money, so we try to do

17  it cheaper.  But after a couple of days if it's not drying, you

18  have to make it dry.  So you have to make more cuts.  You have

19  to adjust, so you will see it is somewhere in here.

20      Q.   What is this a picture of?

21      A.   This is a picture of -- I think that's probably in

22  the living room of one of the walls showing 99 percent or, I

23  guess, it says dining room, but I'm not sure what day it is.

24  But on here, it has all the dates like on my pictures, so when

25  we organize these pictures and you send them, you have a

130

1    day-by-day, room-by-room, day-by-day what happened.

2        That's just one of the walls in the dining room showing

3    moisture.  That's the wall in between the dining room and the

4    kitchen.  Whatever day that was, it was still showing 26

5    percent.

6        That's probably the day we left showing 4.9 percent.  You

7    know, you want drywall less than six or seven.

8        That was the front of the house like when you walked in

9    the door, a part that did not -- that didn't look like it got

10   wet.  So that whole level it was that and a little bit of

11   another room.

12       This is just showing water in the foyer.  Showing water

13   going up the walls about two feet.  You know, it's probably

14   going up about a foot or six inches.  That was one of the

15   rooms.  I think that's the living room.  You see where the

16   water starts bubbling here.  Once that happens, there's no --

17   on any engineered wood when it gets wet, you can't save it.

18       Q.    Okay.

19       A.    That's in front of the stairs on the main level, so

20   we had to take subfloor out and then it had leveling compound

21   everywhere in this house, like they built it on a hill.  I

22   mean, all the main floor was different and they put concrete

23   everywhere to level it out.  And so if you get it wet, I mean,

24   it's gonna take an extra week to dry through concrete or, I

25   mean, it has to come out.

1        Q.    Okay.

2        A.    That's what we walked into in the kitchen.

3        Q.    Just another angle of the kitchen?

4        A.    Yeah, I don't know how that 2 x 4 came down, but it

5   came down.  So you'll see a bunch of wet readings in the

6   kitchen ceiling.  All the cabinets,  I mean, all the Sheetrock

7   that fell, it fell over all the appliances.  It fell in the

8   cabinets.  That's just the ceiling in the kitchen showing the

9   subfloor above it, how wet it is.  It fell over the light.

10       Whatever I go in a house and I see a problem with the

11  appliances, I'll take a picture of it.  That way I don't get

12  blamed for it.

13       So this is when I walked in, that's what that kitchen -- I

14  can't tell if that's the fridge or dishwasher, but when we go

15  on a loss, I don't want to get blamed for denting something.

16  So if I get it the day we go in there and walk around, you're

17  not gonna blame us for denting whatever that is.

18       Q.    Okay.

19       A.    That's -- so there's -- I don't know.  That's the

20  kitchen cabinet below here, so here is the counter.  This is in

21  that backsplash showing how wet it is, how much water came down

22  that outside wall behind the kitchen cabinets.

23       Those are some kitchen cabinets that are -- you can see

24  the bottom of it is starting to bow.

25       Q.    Uh-huh.

1     A.   The same.  I mean, you can't -- this press board

2  stuff, you see where it's bowed up all the way down.  That

3  doesn't -- when you dry this, it doesn't go back in.  You can't

4  save it, so this pressed board top, you see the crack along

5  this front.  I mean, a lot of this stuff it looks good until it

6  gets wet.  And once it gets wet, it never looks the same.

7     So the countertops that are pressed wood, I think you will

8  see some more of these cabinets.  But once they get wet,

9  they're trashed.  I mean, here, they start cracking and they

10  start absorbing wood.  It's not like real wood.  Real wood, we

11  can save it, but pressed wood, once it starts to bubble and we

12  take the water out of it, it never drops back down.  So like

13  under a kitchen, a lot of times you will see pressed board and

14  it bubbles up.  That never unbubbles.  Well, when you make

15  cabinets out of it, it's just the same.

16     Q.   Right.  It looks like it's a little swollen on the

17  shelf?

18     A.   Right, it's going up and that will never drop back

19  down to where it was.  They got pressed wood here.  So when

20  you're looking in the cabinet, it's swelled up.  So even if we

21  take all the moisture out of here, it will drop about halfway

22  back down, but it's never gonna drop down, all the way to where

23  it was.  You can try to sand it and waste time --

24     We had to remove all the cabinets to get to the back wall.

25  If you don't get to the back wall, you can't get the

1  insulation.  But, I mean, it's all -- thousands of gallons of

2  water.

3      And that's getting the wood under the gas stove or the

4  oven.

5      Q.    Okay.

6      A.    There's just pictures as we go.  So this is where the

7  refrigerator was.  If you go back, you can see the refrigerator

8  is on the interior wall of the house.  Generally, you don't see

9  insulation on interior walls of a house.  There's no point.

10 People that do it maybe if you're building your own house and

11 you want it in your bathroom.

12     Q.    Or for sound?

13     A.    For sound in your bathroom, but when you build a

14 house, nobody -- it's rare people are putting insulation on the

15 inside wall of a house.

16     On the outside, it makes, you know, AC cooling and

17 heating, it makes sense.  But the inside it's a total waste of

18 money unless you have a theater system or you're doing your

19 kids room or something and you don't want to hear them.  So we

20 ran across things like this constantly.

21     Q.    But in this case, if you have insulation in an

22 interior wall of the house, wouldn't that act sort of like a

23 sponge just holding more water?

24     A.    Yeah.  So every place we saw that had insulation, we

25 had to cut higher or we had to get it out.  But when you start

1    your drying process, you don't think this is gonna be a house

2    with insulation in the interior walls.

3        Q.   So that's more labor, more time, more expense to you?

4        A.   Right.

5        Q.   Okay.

6        A.   So some of the cabinets didn't -- like that picture

7    is we've pretty much removed everything that we saw damaged.

8    All the cabinets got put in the garage because on an insurance

9    claim, we don't throw big ticket items away, so that would be a

10   kitchen cabinet because when you hear you're getting your

11   kitchen redone, you're thinking there's 20-or-$30,000.

12       So once you start looking at big prices, although the

13   pictures should be enough, we leave the cabinets so we don't

14   ever get in trouble.  But like all the cabinet doors and

15   countertops were trashed, but I think that one little section,

16   we didn't see any moisture that day so we left it.

17       Q.   Okay.

18       A.   That's just a different angle; dehumidifiers.  So

19   that's what the floor was reading.  It's in the pictures,

20   whatever day that was.

21       Q.   Yeah.

22       A.   That's the same room, so it will sit here and drop.

23   So 16, you know, I like it a little bit lower, but 16 we'll

24   take.  So that's the upstairs foyer, top floor.  You'll

25   probably see some water or something, I don't know.

135

1        Q.   All right.  So those are the pictures that you

2   included.  In your professional opinion, did you feel like

3   those pictures were sufficient to explain and justify the cost

4   associated with your invoice?

5        A.   Yeah.  And I never received a phone call about, hey,

6   what about this or this.  It was once we agreed on the

7   eighteen, you know, I thought we would get payment.  And I

8   tried to get payment.  We wouldn't be here today if I would

9   have gotten payment.  The problem is it took three months to

10  finally get paid.  And it would be awesome to know the answer

11  to that question, why it took so long to get paid.

12       Q.   Okay.  May I have permission --

13            THE COURT:  Yes.

14  BY MR. ROUSE:

15       Q.   Thank you.  I want to hand you what's previously been

16  marked as Plaintiff's Exhibit 7.

17            THE COURT:  Counsel, 3, those were -- it's in a book

18       form, but it's the pictures, right?

19            MR. ROUSE:  Yes.

20            THE COURT:  And I'm assuming, I didn't hear, you

21       haven't admitted them yet?

22            MR. ROUSE:  I think I admitted 3 yesterday.

23            THE COURT:  I didn't have it marked on mine.

24            MR. ROUSE:  Madame Court Reporter, did I admit 3

25       yesterday?

1          THE COURT REPORTER:  I can go back and look.

2          THE COURT:  Yeah, you didn't admit it.

3          MR. ROUSE:  Okay.  Move to admit Plaintiff's Exhibit

4     3 into evidence.

5          MR. BAGLEY:  We have no objection.

6          THE COURT:  Admitted without objection.

7    BY MR. ROUSE:

8      Q.   Okay.  I draw your attention to Plaintiff's Exhibit

9    7.  Can you look at that?

10     A.   Uh-huh.

11     Q.   What does that document show?

12     A.   So October the 2nd, it says:  From Charles Derry,

13   Please send the revised invoice of eighteen based on the

14   agreement for EMS services.

15        So that was at 11:30.  And then on the same day at 12:39,

16   Charles, as discussed on the phone, can you please send the

17   check to her and keep Flood Brothers Restoration, LLC, on the

18   check.

19     Q.   Okay.

20     A.   It looks like I talked to him the same day I sent

21   what he asked.

22     Q.   Okay.

23     A.   That was October the 2nd.

24          MR. ROUSE:  All right.  Move to admit Plaintiff's

25     Exhibit 7.

137

1           THE COURT:  Any objections?

2           MR. BAGLEY: No objection, your Honor.

3           THE COURT:  Admitted without objection.

4   BY MR. ROUSE:

5       Q.   All right.  I draw your attention to what's been

6   marked as Plaintiff's Exhibit 8.  What exactly is that?

7       A.   Looks like an email that I sent to Charles and

8   Michelle, and I copied -- one of our employees was Terry,

9   another one was Becky, and then another person, JF, at

10  Universal Property.  I'm not sure who that was.

11      So this was on November the 6th, so over a month by my

12  accounts when we agreed to the $18,000.  So over a month later

13  when we agreed on the price October the 2nd, 2018, this was a

14  discounted rate to get the claim closed.  Our original invoice

15  was only charging for five days of drying.  The adjuster for

16  your property was on site and noted the property still needed

17  equipment going into the fifth day, if not longer.  We had

18  equipment on site for seven days.

19      On the page containing the eighteen thousand total, you

20  will clearly see the following:  This is a settlement discount

21  only valid if paid within ten days.

22      It has now been 35 days from the date of the email.  It is

23  my understanding the check has not been approved or sent.  If

24  we do not receive payment available for immediate deposit in

25  our office by November 16th, the settlement discount will no

1   longer be accepted.  At the time, $21,000 will be due within

2   eight days.  We will remove any discounts and bill for the

3   entire time the equipment was at the property for seven days

4   with justifiable hygrometer readings, thermal pictures, and

5   other supporting documentation.  If payment is not received

6   within 60 days of being billed, legal action will be taken.

7   Regards.

8        Q.   Okay.  So I want to be clear -- well, and you're

9   personally familiar with this document?

10        A.   Yes.  So me and my wife, we wrote this before we

11  hired an attorney.

12             MR. ROUSE:  Okay.  Move to admit Plaintiff's Exhibit

13        8.

14             THE COURT:  Any objection?

15             MR. BAGLEY:  No objection, your Honor.

16             THE COURT:  Admitted without objection.

17  BY MR. ROUSE:

18        Q.   All right.  And specifically, Plaintiff's Exhibit 8,

19  you made clear that the settlement discount was no longer valid

20  because at that time it had been over 35 days or 30-something

21  days since you made the offer?

22        A.   Right.

23        Q.   You also clarified that you would still extend the

24  discount if they paid promptly?

25        A.   Right.

1       Q.   But they didn't?

2       A.   No.

3       Q.   And you clarified that if they didn't pay you, you

4   wanted the entire balance for what you actually did, the full

5   seven days, correct?

6       A.   Correct.

7            MR. ROUSE:  May I publish, Judge?

8            THE COURT:  Yes, you may.

9   BY MR. ROUSE:

10      Q.   Draw your attention to some other exhibits.  I will

11  draw the witness's attention to Exhibits 9 through 16, which

12  has previously been marked.  We'll go through them together.

13       I'm showing you what's been previously marked as

14  Plaintiff's Exhibit 9.  What do you recognize this document to

15  be?

16      A.   Looks like we were trying to get information, January

17  the 2nd, 2019, of who we needed to speak with.

18      Q.   Okay.  This is after you had to retain counsel?

19      A.   That's correct.  So it was -- I don't know where all

20  the documents are.  So the email from 10/2, that was agreed on

21  and then I emailed again 11, so in November, and then no

22  payment.  And so three months later, I hired an attorney.

23       So I'm writing -- and then this looks like an email.  I'm

24  writing to request an update on the above-referenced claim.  As

25  you are aware, your insured received insurance proceeds in the

1   amount of $18,000 that was issued to cover costs incurred by

2   Flood Brothers Restoration.  My firm sent a certified letter to

3   you and your insured related to this issue and provided a

4   reasonable amount of time to cure any issues pertaining to the

5   claim.

6       Accordingly, please confirm your position on this issue so

7   as to avoid time and expense associated with the presentation

8   of this issue in court.

9       Q.   Okay.  So you were copied on this through my office?

10      A.   Right.

11      Q.   You were copied on the progress of our attempts to

12  resolve this claim for you?

13      A.   Yeah.

14          MR. ROUSE:  Move to admit Plaintiff's Exhibit -- I

15      will reserve until all of them are identified.

16          THE COURT:  Okay.

17  BY MR. ROUSE:

18      Q.   I will hand you what's been premarked as Plaintiff's

19  Exhibit 10.

20      A.   So this looks like just an email from me to you.

21      Q.   Okay.

22      A.   Or the first one.

23      Q.   What's the date of that email?

24      A.   So on January the 2nd at 1:00, Mr. Rouse:  Is this

25  company -- if this company is aware their insured has a check,

1    why in the world would they cancel it and send them the same

2    one?  Is it for the correct amount then?  Thanks.

3         Q.   What were you referring to?

4         A.   So they sent their insured a check.  She had a check.

5    Universal turned around and canceled that same check and sends

6    her another one.  Not to us, they send her another one.  And

7    it's just --

8         So she had a check.  They canceled that check and sent her

9    the exact same check.  That's why I said why in the world would

10   they cancel it and send them the same one?

11        Q.   Okay.

12        A.   I believe you emailed Patrick, the check can be

13   forwarded to my office.  So that started, you know --

14        Q.   The conversation between you and I?

15        A.   You and I, yeah.

16        Q.   So the email that you received from my office with

17   Patrick from Universal, can you describe what that email to

18   your knowledge was about?

19        A.   At that point it was just about getting us the check.

20   Then she started, you know, we wanted the check sent to us.

21        Q.   What was your understanding of my communication with

22   Patrick that was shared with you?

23        A.   That we needed to get the check and that she wanted

24   to keep some of the money.

25        Q.   Okay.

1         A.    And why they couldn't send the check directly to us.

2         Q.    Okay.  Did you provide any instructions to Universal

3    by and through my office as to where to send checks?

4         A.    To my address.

5         Q.    Okay.

6         A.    Or to you, either one.

7         Q.    Okay.  What was the date of this communication?

8    What's the date of the email to your knowledge?

9         A.    So January the 2nd is the one that, you know, they

10   knew on January the 2nd to send it to us.

11        Q.    So they had two options.  As of January the 2nd, to

12   your knowledge, Universal had two options as to where they

13   could send a check?

14        A.    Right.

15        Q.    Can you identify what you understand as your address?

16        A.    Our address is 3874 Laurel Crest Drive in Snellville.

17        Q.    Okay.  Is that PO Box?

18        A.    No.

19        Q.    Okay.  Regular mail and-or certified mail, overnight

20   mail, any mail would get to you if sent to that address,

21   correct?

22        A.    It has.

23        Q.    Okay.  I hand you what's been premarked as

24   Plaintiff's Exhibit 11.  Do you recognize that?

25        A.    Looks like one of the emails between Patrick, us,

1    marketing, you, just another one of the emails because it's
2    requesting an update.  So that was the day before getting an
3    update on the claim.

4        We sent them a certified letter to you and your insured,
5    provided reasonable amount of time to cure any issues
6    pertaining to the claim to avoid any further time and expense
7    associated with the presentation of in court.

8        Q.   Okay.  And you reviewed those emails that were
9    forwarded to you?

10       A.   Yeah.

11       Q.   I hand you what's been marked as Plaintiff's Exhibit
12   12.  Can you identify what that is and the date?

13       A.   So the January 7th was one of the emails from you to
14   Universal, Skylar, me.

15       On January the 7th, per our conversation, I reiterate that
16   on the behalf of my client Flood Brother, LLC, I demand that
17   the immediate check of eighteen be sent to our office to cover
18   partial costs associated with the work performed of your
19   insured's damaged residential property.  I will provide you
20   additional time to demonstrate good faith to begin to provide
21   closure regarding this claim.

22       Ergo, you have until Friday at 5:00, January the 11th,
23   2019, to ensure that your check is received in my office.

24       Should you have any questions or concern, feel free to
25   contact me.

1    Q.   Okay.  Now, in terms of your understanding, you had

2    already communicated to Universal that the eighteen thousand

3    was a partial payment towards what they owed you, correct?

4    A.   After the beginning, yes.

5    Q.   Okay.

6    A.   We said eighteen, but after sometime in November, I

7    sent a couple of emails -- they have them -- that said, hey,

8    this was a discount.  And if you don't pay it, why should you

9    get the discount?

10   So I was upfront.  I don't know what else I could do.

11   Q.   Understood.  Handing you what's been marked as

12   Plaintiff's Exhibit 13.

13   A.   So it looks like an email between you and Skylar on

14   January the 8th.  As discussed yesterday, as you have a Post

15   Office Box mailing, I am unable to FedEx overnight payment.

16   Payment will be mailed via UPS, therefore, I cannot guarantee

17   delivery by your 11th deadline.  I assure you that payment will

18   leave my office today, and that payment is made out to Flood

19   Brothers directly as discussed.

20   I request that you allow time for delivery as I am unable

21   to guarantee delivery payment by the date.

22   Q.   Okay.  Now two questions:  In terms of the excuses by

23   Universal that they couldn't make out the check directly to

24   you, did you find it strange?  What was your opinion as to the

25   revelation now that they could send it to you -- send a check

145

1    to you with just your name on it and send it directly to you?

2         A.    Yeah.   So I sent the direct-pay authorization.   They

3    had it.   They had it the same day they got my bill.   In fact,

4    in the event that direct payment is not possible, please list

5    us on the check.

6         So I don't understand how it goes from it's not possible.

7    We can't do it, to well, if there is a problem we can do it.

8    The problem wasn't July the 8th.   Now it's not a problem.   It

9    was a problem three months ago.   Like I said, we wouldn't be

10   here.   It's frustrating that I'm here today three-and-a-half

11   years later because three-and-a-half months to get paid is just

12   -- it causes problems personally with my wife, it causes

13   problems, a lot of problems.   I just want people to do what's

14   right and it causes problems and they don't understand it.

15        Q.    Okay.

16        A.    It's just a problem.   We wouldn't be here.

17        Q.    At the time of that email, that communication, again,

18   you had previously clarified in November what your address was

19   and where you wanted it sent?

20        A.    Correct.

21        Q.    Which could have received, again, an overnight?

22        A.    Right.   We don't run the company out of my house, but

23   the billing goes out of my house.   We have an office that all

24   the machines are at, all the employees go to, all my trucks are

25   at.   But the billing is done from my house because no one needs

146

1    to come to -- never have -- we always go to people's houses.
2    So a client, I'll come to your house.
3          So a water restoration company, there's zero reason for
4    anybody to go there.  So that address is my personal house.
5    Nobody has ever came in eight years.  I mean, I come to you.
6    If there is ever a problem, I come out.
7          Q.   Okay.  I hand you what's been marked as Plaintiff's
8    Exhibit 14.
9          A.   So March the 7th at 7:54 a.m.  Looks like an email
10   between you and Skylar.
11         Please provide Universal's position, i.e., if you are
12   refusing to pay the repair costs or not.
13         Q.   Okay.
14         A.   I am at a loss as how to -- let's see.
15         Q.   Is that just an email regarding further efforts to
16   resolve the claim?
17         A.   Yeah, I'm at a loss as how to or why a credible
18   insurer would continue to skirt responsibility for a valid
19   invoice.
20         Q.   Okay.
21         A.   Then looks like below the 18 -- the eighteen thousand
22   figure was offered by Mr. Fowler if payment was in ten days
23   because of the significant delay in resolving invoice.
24         You know, there's claims being made.
25         Q.   Okay.  I hand you what's been marked as Plaintiff's

1  Exhibit 15.

2  A.   On March the 5th at 4:30.  It looks like from us to

3  Skylar, Michelle, us and you.  To whom it may concern:  Seven

4  days has lapsed without any acknowledgement or response on

5  behalf of Ms. Jimenez or Universal Property and Casualty.  As

6  you should be aware, this claim is governed by the contract law

7  principals.  As such, your continued breach and the associated

8  attorney's fees and costs have and will continue to go up,

9  otherwise, straight forward.  I ask that your immediate

10 attention to this matter to prevent this matter from becoming

11 more severe.

12 Q.   Gotcha.  And you were copied on this communications?

13 A.   I've gotten all of them.

14 Q.   Okay.  And lastly, I will refer your attention to

15 Plaintiff's Exhibit 16.  You don't have to read the exact

16 email, but is that a communication that you were copied in on?

17 A.   Yeah.  On the 15th, I mean all --

18 Q.   Just efforts to resolve the outstanding claim?

19 A.   Yeah.  My client has incurred time and expense.  This

20 should be avoided regarding the payment of the invoice.

21 Q.   Okay.  Understood.  Now all the emails that we

22 previously discussed were discussed either copied to you

23 directly or you had discussions with my office about those

24 communications, correct?

25 A.   Yeah.  I mean, over the three years, we've talked

1  about every single one.  But if you ask me in chronological

2  order, I can't --

3      Q.   There's been a lot of communications; is that fair to

4  say?

5      A.   Yes.

6      Q.   Okay.  Were the exhibits that were presented to you,

7  did they appear to be complete and accurate to the best of your

8  recollection?

9      A.   Yes.

10          MR. ROUSE:  Move to admit Plaintiff's Exhibit 9

11      through 15, Judge.

12          MR. BAGLEY:  No objection, your Honor.

13          THE COURT:  Okay.  9 through 16?

14          MR. ROUSE:  9 through 15.  Oh, excuse me.  9 through

15      16, Judge.  Thank you.

16          THE COURT:  Admitted without objection.

17          MR. ROUSE:  Yes.  May I publish them, your Honor?

18          THE COURT:  Yes, you may.

19  BY MR. ROUSE:

20      Q.   Okay.  Now Mr. Fowler, throughout the time that you

21  did the work and completed the work and submitted your bill,

22  you had direct communications with Ms. Jimenez, did you not?

23      A.   Yes.

24      Q.   I want to draw your attention to Plaintiff's Exhibit

25  1.  You see it up there?  The insurance contract?

149

1      A.    Uh-huh.

2      Q.    Again, at the top of Plaintiff's Exhibit 1, first

3 page, it identifies who the insured, i.e., Michelle Jimenez is,

4 correct?

5      A.    Correct.

6      Q.    And her phone number is on the top of that exhibit,

7 correct?

8      A.    Yes.

9      Q.    All right.  Now you just mentioned that throughout

10 this process, you had communications with Michelle directly?

11     A.    Correct.

12     Q.    Would that be including emails with Michelle?

13     A.    A couple, I think.  Not many emails.  It was mostly

14 text.

15     Q.    So you are aware of what Michelle's email is, right?

16     A.    Yes.

17     Q.    And you had calls with Michelle, correct?

18     A.    Yes.

19     Q.    Isn't it true that you had extensive text message

20 exchanges with Michelle?

21     A.    Yes.

22     Q.    I'm gonna draw your attention to Plaintiff's Exhibit

23 17.  This is a collection of a variety of text messages.  Can

24 you flip through that?  Just flip through it briefly and let me

25 know if you recognize it.

1          A.    So she gave me the code to get in the house on the

2     14th.

3          Q.    Well, before I ask you questions, I want you to flip

4     through it and see if you recognize anything.

5          A.    Okay.   It's our text messages back and forth.

6          Q.    Okay.   This is an obvious question, but do you recall

7     having these text messages with Michelle Jimenez?

8          A.    Yes.

9          Q.    And the text messages that we're discussing that

10    you've reviewed, is that with anyone with Flood Brothers or is

11    that directly with you?

12         A.    It's my cell phone.

13         Q.    Okay.   The number at the top of the first page, is

14    that your phone number?

15         A.    That's Michelle's.

16         Q.    Okay.   How do you know that's Michelle Jimenez's

17    phone number?

18         A.    She called me from that number.

19         Q.    You spoke to her?

20         A.    Yeah.

21         Q.    And you recognized her voice?

22         A.    Yes.

23         Q.    Okay.   After meeting her, I guess, telephonically?

24         A.    Well, she called at probably 2:00 or, I mean, 2:15,

25    somewhere around 2:00, and gave me the address.   Said she was

1   out of town.  So we got out there I would guess somewhere
2   around 2:30.
3       Q.   Now the number on the first page of this collection
4   of text messages, is that the same number as the number on the
5   insurance policy?
6       A.   Yes.
7       Q.   So logically, did you form an opinion as to who was
8   the author of those text messages that were sent to you?
9       A.   Yes.
10      Q.   What was your conclusion?
11      A.   That her name was Michelle.
12           MR. ROUSE:  Okay.  Move to admit the exhibits.  I
13      mean, the text messages.
14           THE COURT:  P-17?
15           MR. BAGLEY: No objection, your Honor.
16           THE COURT:  Admitted without objection.
17   BY MR. ROUSE:
18      Q.   Let's go through each one.  On the first page what
19   are you talking about with Michelle?
20      A.   She sent me or texted me her address and the code.
21   There was a lock box on the door, so the code to get in the
22   lock box.
23      Q.   Okay.
24      A.   And then she had called asking for photos, so I
25   started sending photos of the damages.  And then it was just

1  back and forth about we would be putting all the cabinets in

2  the garage.  Are you going to be pulling all of them out or --

3  all will need replace.  I think you have to.  Are the

4  appliances good?  I said, we won't test any appliances because

5  they're wet.  Your adjuster will send out an electrician when

6  they dry out to check them.  We have not made it to the rest of

7  the cabinets yet.  The insurance will pay to match them if they

8  are not damaged.

9      And then how much square feet, she's asking this -- looks

10  like -- the square footage of the floor that will have to be

11  replaced.  I said, I would know in a couple of hours.  She

12  asked for pictures of the basement.  I sent some pictures of

13  the basement.

14      Please start cleaning up.  And then looks like at around

15  4:30, I sent her a picture of the supply line that broke on the

16  upstairs master toilet.  Then I sent her a video of just

17  walking around and all the water damage.

18      Saturday the 9th, currently sending insurance pictures and

19  videos.  Was hoping you could send me everything you have.

20      Then later, please call me.  I need to be sure that you're

21  doing everything by the insurance standard.

22      I heard you're pulling floors.  I still have to have the

23  adjuster come out.  Please keep all the kitchen knobs.

24      Q.   That's her asking those, making those requests to

25  you?

1        A.    Correct.

2        Q.    Okay.

3        A.    Then I sent her some photos of just photos of the

4    cabinets being damaged.  More photos of the cabinets being

5    damaged.  Pictures of the basement demo and then -- this page

6    isn't numbered.

7        Midway through, the picture of the back of the baseboard

8    showing some microbial growth.  Usually I don't see this in a

9    day.  It takes a couple of days to actually start showing green

10   spots.  I said, this is the reason more things are coming out

11   than expected.

12       Then later on, she said do you have an estimate on how

13   much wood flooring I have to buy?  I said about 740 feet.  Can

14   you send me some pictures of the first floor?  I sent a bunch

15   of pictures.  The subfloor's good.  I said besides not being

16   level, they are fine.

17       Then on the 16th, which I guess is Sunday, how's it going?

18   Can we expect to dry out tomorrow?  I said, going good.  Master

19   will probably be dry tomorrow.  The main floor and basement are

20   not dry yet.  I sent an email about the contents in the garage.

21   We just need something in writing before we throw any of them

22   away.

23       So she had a bunch of junk in the garage.  Any time we

24   throw personal contents away, we get something signed stating

25   you are not going to come after us for whatever we throw away.

154

1    She had a bunch of stuff.  She had like a casket and a

2    bunch of Halloween decorations that we took.  We actually sold

3    some of them.  So usually when we sell stuff, we'll split it

4    with the homeowner and give it to the homeowner.  If it's trash

5    and they don't want it or if it's wet and we dry it out and can

6    use it, sometimes we will do that.  If we can sell it, that's

7    what we do.

8         Q.   Okay.

9         A.   Did you cut drywall in the master perhaps several

10   inches from the bottom?  Are we able to save the master carpet

11   or flooring?  Please send more pictures.  Didn't cut drywall

12   upstairs.  The water didn't soak up the walls.  Took off the

13   baseboards and put holes in the Sheetrock.  Carpet is good

14   upstairs.  Remove the pad.  I will send you some when I go back

15   tomorrow.

16        So you saved the carpet, but I need padding?  I said, yes.

17   The pad is what holds the water after seeing a little microbial

18   growth in the basement.  Need to speed up the drying process.

19   We removed the pad upstairs.

20        Q.   Now, with this next communication, I want you to

21   explain to the Court the importance of what you communicated to

22   Michelle about what was due.  So can you explain what you

23   communicated to her about what was owed to Flood Brothers

24   because of the timing of the payment?

25        A.   I'm not following you.

1      Q.   Just read that text message.

2      A.   It says, and to be clear, you should never say

3  anything to the adjuster about mold.  Microbial growth is

4  different.  When you say the word mold to an adjuster, they

5  start putting a different category that you may not have

6  coverage for.  Since I saw some microbial growth in the

7  basement, that leads me to believe the pipe broke a couple of

8  days prior to being noticed, probably two-to-three days.

9      Q.   Excuse me, that's a different page.  Just go to the

10  next page.

11      A.   You want me to elaborate on that?

12      Q.   Well, no, unless you want to.

13      A.   So your insurance policy, they have different limits.

14  They have a mold limit.  If you don't test it for mold, you

15  don't know it's mold.  If there's not black mold everywhere, if

16  it's some green surface mold that's on some baseboards, to

17  me -- and you don't test it, that's not putting it into the

18  mold category.

19      If you have a vacant house and you don't go there and it

20  leaks and there's a lot of mold, then yes, I agree.  That's

21  mold damage. But if there is a little bit of baseboard on some

22  green growth in one room in a basement, I don't believe that

23  should put it under a different deductible and different

24  coverages because we didn't test it.  Like I said, if we don't

25  test it, it needs to come out.

1      Q.   Okay.

2      A.   Then on the 17th, what's the outcome for today?  Is

3   it dry?  I would like to start repairs upstairs.  Then I said,

4   we will call shortly.  She wanted a referral from one of our

5   contractors.

6        The next day, any news?

7        Then on the 21st, I need the claim number so I can get

8   authorization to throw away the cabinets.  I got that.

9        And then on the 24th, she was on the phone with the

10  insurance.  They are waiting on my documents, on the 24th.

11     Q.   Okay.

12     A.   I think we finished was on the 21st, so I think we

13  pulled our machines on the 21st.  Usually on a big job, it

14  takes a couple of days, two-to-three days to get all the

15  information.

16     Q.   Uh-huh.

17     A.   So on the 24th, did you receive what you needed?  I

18  said, yeah.  When I get back to the shop, I will give it to you

19  later today.

20       And then at 9:50, sorry to text so late, however, I did

21  not receive your documents.  I sent to our reviewer this

22  afternoon.  I will call him shortly either way.  I'll send it

23  to you in the next hour.  So that was on the 24th.

24       And then on the looks like the 25th.  I'm not sure.

25     Q.   Yeah.

1        A.    Michelle, I spoke with Universal today.  They said

2   hopefully in two days they will be sending the mitigation check

3   to you.

4        So on the October 24th, they said hopefully in two days

5   they will be sending the mitigation check to you.  It will have

6   you, us and your mortgage listed on the check.  If you will

7   please call your mortgage company and see what their process is

8   for endorsing a check.  Thanks.  Then she asked for the claim

9   number.

10        November 5th, I said any news?  No, I have been checking

11   mail.  I will send an email in a few hours.

12        November 16th, any word from your adjuster?  Just sent an

13   email.  I'm sorry for it taking so long.  I said, I know it's

14   not your fault.  Thank you.

15        December the 3rd, Michelle, have they made any contact

16   with you concerning the payment for $21,667?

17        Q.    What date was that?

18        A.    December the 3rd.  I can send another email now.  I

19   asked if they could call me or if she could call them.  I just

20   sent an email.  Have you called them.  I said, they will not

21   talk to me anymore.  I'm not the policyholder.

22        Q.    So hold on right there for a second.  Earlier, I

23   think it was in December, I believe you communicated that they

24   were talking to you and they said they needed some information

25   from you?

1     A.   Yeah.  So September they would talk to me.  October

2  they talked to me.  And then at some point in November, I'm not

3  sure, they stopped.  I don't know how that happens.

4     Q.   So there was never a reason given to you why

5  Universal just stopped talking to you about paying you?

6     A.   Not at that time.  Once, sometime in December, once

7  we can get to there, but --

8     Q.   All right.  So go on.  What are the other text

9  messages?

10     A.   So November 16th, any word?  December the 3rd, what's

11  going on?  They will not talk to me.  I'm not the policyholder.

12  I can call, but after work.  Can you text me the phone number?

13     Q.   When you said, I can call, that's Michelle

14  communicating that to you?

15     A.   Yeah.  So I said, they will not talk to me.  I'm not

16  the policyholder they said.  She said, I can call, but after

17  work.  Can you tell me the phone number and I will call them

18  after 6:00?  So I texted her the phone number.  I said, the

19  last person I spoke with was Charles Derry at extension 6672.

20     Q.   Derry was an adjuster for Universal?

21     A.   Yeah, he was one of them.  You get bounced around to

22  three-or-four different people.  That's just what they do.

23     Q.   Okay.

24     A.   So on December 6th, hey, Michelle thanks for the last

25  email.  Did they answer you back about where the check was

1  going?  I'm assuming the check will be for $21,662.40 since
2  they did not meet the agreed-upon time frame.
3      Q.   What date was that?
4      A.   December the 6th.
5      Q.   So as of December, you're telling Michelle that there
6  was no prepayment discount because they didn't pay on time?
7      A.   Right.
8      Q.   So if you are telling Michelle that, obviously from
9  the email that you sent to Universal, Universal knew that as
10 well, correct?
11     A.   Correct.
12     Q.   Okay.
13     A.   So that was on the 6th.
14     Q.   Of December?
15     A.   December 6th.  And then on December the 16th, she
16 sent a text message with the picture of the check and said, I
17 can deposit it and wire you the money.  Can you call me when
18 you get a chance?
19     Q.   Okay.  Now this is where it gets interesting.  When
20 you called her --
21     A.   And that was at 12:00 in the afternoon on I believe a
22 Sunday.
23     Q.   Okay.  So when you called Michelle, the woman that
24 you don't know, you've never met before, what does she say?
25     A.   She said she wanted to deposit the money and take out

1    her deductible and wire me the rest.

2         Q.   And so --

3         A.   To that point, it's never been talked about.  It was,

4    hey, I'll send you I think it was fifteen-or-sixteen thousand.

5    I said no, that's not what we talked about.  We've never talked

6    about a deductible.  I'm not getting paid in full and I'm not

7    giving you a rebate.

8         Q.   So hold on.  At that point, you've already reduced

9    your bill because you worked for seven days on the property,

10   correct?

11        A.   Correct.

12        Q.   Your bill was actually $23,000.  You reduced the bill

13   to twenty-one, six?

14        A.   Correct.

15        Q.   Then you tried to give Universal, because you had a

16   history with them, an incentive to pay you early and resolve

17   it, so you said just pay me eighteen.  So you reduced your bill

18   by $3,600.  Now Michelle is telling you you got to pay me as

19   well and reduce your bill to 15?

20        A.   Right.

21        Q.   How did that make you feel?

22        A.   It's par for the course.  I mean, homeowners see a

23   big check and they just -- everybody assumes that it's just all

24   profit or what's 10 or 20 more percent off.  I mean, or some

25   people that do roofs, let me pay your deductible.  Let me give

1   you free siding, free gutters, free this.  So that story gets

2   out that that one roof paid for this.  Well, that doesn't mean

3   every roof has that much profit.  That doesn't mean that every

4   water damage has that much profit.

5        If you own all of your machines, all your dehumidifiers

6   and fans, yes, there's a profit, but there's forty grand worth

7   of equipment in that house.  It takes a lot of money to pay for

8   that, and you just see a big check and not know what all is

9   going into that check.

10       Q.   Understood.  All right.  So continue.

11       A.   So I said, I'm in church.  Please send me a photo of

12   the back.  Then she sent me a photo of the -- of what it came

13   in.  So it was a picture of the check and then like a piece of

14   paper from Universal of the property statement.  And then I

15   said, they backdated that and not the check.  What about the

16   check stub and the back of the check?

17       So if you look at the photo that got sent, it was dated

18   10/17.  And the check that came with it, I think -- we would

19   have to blow up one of these pictures, but the check that came

20   with it was in December.

21       Q.   Okay.  So what was unusual about that and why do you

22   think that was significant to Universal to backdate it?

23       A.   Like the letter that she received, it looks like she

24   sent me a picture on December the 16th, was dated 10/17 and the

25   check, I don't know if we have another picture of this check,

1   but that check is dated in December.

2       Q.   Okay.

3       A.   So why -- so this letter got printed October 17th and

4   sat on somebody's desk, I guess, and then they added the check

5   in December and then mailed it.  It doesn't make sense why

6   there's two months' difference.

7       Q.   Could a possible explanation be that they wanted to

8   try and prove that they're entitled to a prepayment discount in

9   December?

10      A.   I would guess.  That's why I said they backdated the

11  check.

12      Q.   Okay.

13      A.   Or they backdated that and not the check.  So one of

14  those checks is, you know -- she said back of the check doesn't

15  say anything.  On December 17th, can you endorse the check and

16  send that and a copy of your license?  So on December the 17th,

17  that's when she said still waiting on your response regarding

18  what we spoke about.

19      Q.   And what is she talking about there?

20      A.   She's wanting money.  She's essentially holding the

21  check hostage and I'm just -- it's three months now and now

22  she's wanting money.  Like there was no word prior to start,

23  during work, after work.  It wasn't until she got this check

24  for eighteen thousand that says I want something.  I know they

25  want this money.  Give me some.

1     Before whatever day it was, we've never spoken about any
2  sort of rebate, kickback or anything.  And I said, until we get
3  paid in full, we won't give you any rebate.  Once we get the
4  check, I will send them another invoice for the remaining
5  balance.
6     I mean, I was afraid if I didn't say something, we
7  wouldn't get the check at all.  So I still get amazed
8  sometimes.
9          MR. ROUSE:  Okay.  Move to admit Plaintiff's Exhibit
10         17.
11         THE COURT:  Any objection?
12         MR. BAGLEY:  No objection, your Honor.
13         THE COURT:  I thought that was already --
14         MR. ROUSE:  I did?  Okay.
15  BY MR. ROUSE:
16     Q.   May I draw your attention to Plaintiff's Exhibit 32.
17  Do you recognize that from the text messages you just saw?
18     A.   Yeah, so this is a check that she took a picture of
19  and sent.
20     Q.   Okay.  And you can see the date on the check?
21     A.   The date on the check is December 5th.
22     Q.   Okay.  The next page?
23     A.   The date on this letter, they have it date 10/17.
24     Q.   Okay.  And once again --
25     A.   Eighteen thousand.  So had they -- had this check

1    been there on October 17th, we wouldn't be here today.

2         Q.   And mind you, they had your address again to get you

3    this check?

4         A.   Correct.

5         Q.   And apparently they had the ability to send you the

6    check because they ultimately sent you a check with just you on

7    it, right?

8         A.   Right.

9              MR. ROUSE:  Move to admit Plaintiff's Exhibit 32.

10             MR. BAGLEY:  No objection.

11             THE COURT:  What exhibit is that, counsel?

12             MR. ROUSE:  32.

13             THE COURT:  Mr. Bagley, you said no objection?

14             MR. BAGLEY:  What was the number, your Honor?

15             MR. ROUSE:  32.  It's the picture of the check.

16             THE COURT:  So you are skipping from --

17             MR. ROUSE:  17 down to 32.

18             THE COURT:  Okay.

19             MR. BAGLEY:  No objection, your Honor.

20             THE COURT:  Admitted without objection.

21   BY MR. ROUSE:

22        Q.   Now, after you retained my firm to assist you in

23   resolving this open claim, you were copied on a number of

24   letters that were sent both to Michelle and to Universal,

25   correct?

1        A.    Correct.

2        Q.    In fact, you authorized my firm to communicate on

3    your behalf to both Universal and Michelle Jimenez, correct?

4        A.    Correct.

5             THE COURT:  Counsel, I'm gonna give the jurors about

6        5, 10 minutes to take a bathroom break.

7             (Whereupon, the jury was escorted out of the

8        courtroom.)

9             THE COURT:  All right, counsels.  Feel free also to

10        take yourselves a break.  I'm going to go get some coffee.

11             (Whereupon, a brief recess was held.)

12             THE COURT:  All right.  Y'all ready?  Okay.  Let's

13        bring them in.

14             (Whereupon, the jury was escorted into the

15        courtroom.)

16             THE COURT:  All right.  Counsels, you may be seated.

17             Mr. Rouse, you may continue.

18    BY MR. ROUSE:

19        Q.    Mr. Fowler, we were just discussing after you

20    retained my firm to assist you, this was in late December, you

21    were aware of several correspondences in addition to emails --

22    I mean, you were aware of several formal letters that were sent

23    out to Universal on your behalf, correct?

24        A.    Yes.

25        Q.    I hand you what's been previously marked as

1   Plaintiff's Exhibit 19, 18, and 20.  Without reading the

2   contents of the documents, can you look at the dates and

3   refresh your recollection as to whether you were copied on

4   formal correspondences on behalf of Flood Brothers to

5   Universal?

6       A.   The 20th, 15th, and the 27th, I believe.  We've

7   talked about every one of them.

8       Q.   All right.  With respect to the first one, what's the

9   date of this?

10      A.   December 20th.

11      Q.   As you skim the letter, without going into the

12  contents of the letter, are you familiar with communications

13  sent on your behalf to Universal?

14      A.   Yes.

15      Q.   On what date?

16      A.   December 20th.

17      Q.   If you move to Plaintiff's Exhibit 18, without

18  discussing the contents of the document, that letter is

19  directed to who?

20      A.   It's directed at me.

21      Q.   Okay.  And that was a communication that was directed

22  to you regarding the claim process -- claims resolution

23  process?

24      A.   Correct.

25      Q.   If you draw your attention to Plaintiff's Exhibit 20,

1    what was the date of that letter?

2        A.    February 27th.

3        Q.    Okay.  As you skim the letter without going into the

4    contents, are you familiar with a formal correspondence sent on

5    behalf of Flood Brothers to Universal regarding this claim?

6        A.    Yes.

7        Q.    Now Mr. Fowler, can you give the jury just an

8    estimation of how much time generally speaking was involved in

9    trying to resolve this apparent claim?

10           MR. BAGLEY: Your Honor, excuse me.  I'm going to pose

11       an objection.  I don't think that has any relevance to

12       anything the jury is going to address.

13           THE COURT:  Your objection is to the question, Mr.

14       Bagley?

15           MR. BAGLEY:  Yes, your Honor.  Asking how much time

16       has been involved in this whole process.  I don't think

17       there's any issue about that presented to the jury, and I

18       don't think we should take up the time in front of the

19       jury to generate that evidence.

20           MR. ROUSE:  I would like to rephrase the question.

21           THE COURT:  Rephrase the question, counsel.

22    BY MR. ROUSE:

23        Q.    Mr. Fowler, how much of your professional time did

24    you have to divert away from doing business on behalf of Flood

25    Brothers to attend to issues resolving the Jimenez claim?  When

1   I say claim, I mean payment issue.

2          MR. BAGLEY:  Your Honor, I'll interpose the same

3      objection.

4          THE COURT:  Noted.  Overruled.  I will allow him the

5      opportunity to answer, counsel.

6          THE WITNESS:  To get to today or to get to the check?

7   BY MR. ROUSE:

8      Q.   Both.

9      A.   Be hard -- if I were you, I'd have a -- I don't keep

10  every phone call and text message and email.  I don't have that

11  log.  I would guess until today a week because there's been a

12  couple of half days that we had to do depositions.  There's

13  been a day or two we had to come up here.  Just days out of

14  my -- that I lost, probably five days total.

15      I mean, it's just down to two-or-three depositions,

16  two-or-three times here, today, yesterday, and then that book

17  of emails.  I mean, I've read them, but you can't -- if you

18  asked me certain questions on them without reading them, I

19  wouldn't know.  There's a hundred of them.  And then all the

20  phone calls back and forth.

21      Q.   Okay.  And in terms of the value of your time, are

22  you paid by the hour?

23      A.   No.

24      Q.   How would you -- if you had to value your time by

25  some amount, how would you get to that amount?

1          MR. BAGLEY: Your Honor, I'm gonna object.  This is

2     not part of anything being presented to this jury.  It's

3     not a part of any damages, and it's irrelevant to spend

4     time on --

5          THE COURT:  Counsel, what say you?  It's not a part

6     of --

7          MR. ROUSE:  Well, he's asking for -- in our complaint

8     we asked for full relief.  We've codified or we've

9     specified special damages, which we're supposed to by law

10    state with certainty, but we've asked for general damages

11    which he can explain through his testimony.

12         THE COURT:  Counsel?

13         MR. BAGLEY:  Do we need to discuss this with you

14    directly, your Honor?

15         THE COURT:  If it's gonna go more into detail, then

16    it probably would be good to discuss it outside the

17    presence of the jury.

18          All right, ladies and gentlemen.

19          (Whereupon, the jury was escorted out of the

20    courtroom.)

21         THE COURT:  All right.  And pretty soon, I'm gonna

22    release them for lunch anyway.

23          But, Mr. Rouse, is this an item in your complaint as

24    relates to damages, as relates to the time, money or

25    anything that your client lost?

1          MR. ROUSE:  Yes.  I'm getting to the point of he's

2     estimated over the course of the litigation he spent

3     around a week of his time just trying to resolve the

4     claim.  And in addition to the value that we're seeking,

5     he also has time that he spent to get to that amount.  And

6     I don't have a specific dollar figure because he's not

7     paid by the hour, but I wanted to give the jury at least

8     some testimonial evidence because I can't just rely on my

9     argument at close.

10         THE COURT:  Are you asking for lost wages?

11         MR. ROUSE:  Lost wages.

12         THE COURT:  Okay.  Mr. Bagley?

13         MR. BAGLEY:  Your Honor, I think he's already let the

14    jury know that he spent time, but this was the subject of

15    actually two motions to compel that you granted because we

16    had to go back for a couple of depositions.  On a couple

17    of times, I asked about what are your damages, and the

18    response on one occasion that led it to being reconvened

19    was an instruction not to answer.  And then the next time

20    was, I can't calculate it.  And what we just heard, they

21    still don't have a number.

22         It can't be a part of breach of contract damages.

23    It's never been revealed in discovery and there's nothing

24    mentioned in the pretrial order about it.  So it's

25    irrelevant to go into evidence about all of these other

1     things that may be unfortunate and cost effective, but

2     they're not a part of damages that the jury is gonna be --

3          THE COURT:  Well, I think it's up to the jury.  I

4     think it's up to the jury to decide whether or not they

5     believe that there is monetary amount linked to his loss

6     of time.

7          If he's asking in his complaint for any element of

8     compensation for lost wages, time he has to spend, I don't

9     see where it's not relevant, counsel.

10         MR. BAGLEY:  This is a breach of contract case, your

11    Honor.  It's not a tort case.  It's not a personal injury

12    case.  There is nothing in any of the discovery about lost

13    wages, a value on it.

14         He's brought out the fact that he spent time on this,

15    but when I interposed my next objection was he asked him

16    about the value of it.

17         We had asked that question multiple times in

18    discovery and you granted our motion to compel ordering

19    them to get it to us, and the last response we got was we

20    don't have any numbers to share with you.  It would be

21    completely unfair for them to share numbers with the jury

22    today after that history.

23         THE COURT:  Mr. Rouse, what say you?  Do you have

24    numbers today?

25         MR. ROUSE:  You know, I don't have numbers, but in

1        response to Mr. Bagley, as I recall the objections during

2        our deposition, there was an issue.  The questions to

3        Mr. Fowler about his communications with Michelle Jimenez

4        and they teetered on almost insurance fraud because he was

5        suggesting that Mr. Fowler knew and was coming up with a

6        scheme to perpetuate money that he could split with

7        Michelle and that was the basis -- I wasn't clear on the

8        record for that, but that was the reason why I generally

9        objected because it potentially -- he was suggesting that

10       there was some criminal behavior.

11            And even today, I don't have a number, Judge.  There

12       wasn't as if --

13            What I'm trying to get to, not to belabor the point,

14       he doesn't have an hourly rate.  He works by the job.  But

15       I want to give at least some testimony that his -- that he

16       can't -- that he doesn't actually have an hourly rate so

17       that the jury can at least say that it's not just an

18       argument from an attorney, but there was testimony.

19            THE COURT:  Is it your trial or your strategy, trial

20       strategy, to just have your client testify to the amount

21       of time, effort, and energy that he exerted into this case

22       and getting to where we are?

23            MR. ROUSE:  Yes.

24            THE COURT:  I'm just trying to figure out what

25       your --

1       MR. ROUSE:  My point was, and I don't mean to be too

2  forward because I don't want to influence the witness's

3  testimony, but that follow-up question was just designed

4  to clarify that he doesn't have an hourly rate.  He

5  mentioned that he spent about a week resolving, you know,

6  engaged in litigation away from this business, but that he

7  doesn't have an hourly rate.  That was really it.

8       THE COURT:  Okay.  Mr. Bagley, you will have him on

9  cross.

10      MR. BAGLEY:  Your Honor, he's already gotten that

11  evidence out.  I objected.  You overruled me.

12      THE COURT:  Yes.

13      MR. BAGLEY:  And then he got that evidence out.  And

14  then the specific question was value, and I objected again

15  because this is something that we went over repeatedly in

16  discovery.  And he's indicated he's not --

17      THE COURT:  He doesn't have a value.

18      MR. ROUSE:  But he didn't clarify that he didn't have

19  a value.  That's what I was trying to get at.

20      MR. BAGLEY:  I think he clearly said --

21      THE COURT:  Do you want him to clarify that there's

22  no value, Mr. Bagley?  Do you want him to clarify it or --

23  he's already asked the question.  It's already been --

24      MR. BAGLEY: I think he's already answered it,

25  Judge.

1           THE COURT:  So when the jury comes back in, what's

2      your question?

3           MR. ROUSE:  My next question was do you have a means

4      of valuing the time that you testified that you spent

5      handling this claim?  And I expect he would say I don't

6      have -- because he mentioned I'm not an attorney, but he

7      didn't specify I don't have an hourly rate.  I don't do it

8      that way.  And that's what I was getting at.

9           That was my last question.  I wasn't going to follow

10     up on it.

11          MR. BAGLEY:  Your Honor, what I don't want to happen

12     is for him to ask that question and he says, yes, I've got

13     a number, which would be completely contrary to all the

14     discovery and the motions to compel in this case.

15          THE COURT:  I think, Mr. Fowler, he testified he

16     doesn't keep up with it.  He doesn't keep up with the

17     times.  He didn't even really know how long.  He estimated

18     that it would be about five days out of his life that he

19     spent on it.  I don't know if he's gonna come and say

20     there's a value you can put on it, Mr. Rouse.

21          THE WITNESS:  I will say zero.

22          MR. ROUSE:  You can't --

23          THE WITNESS:  Oh, okay.

24          THE COURT:  So that being said, there's no value.  Is

25     there even a reason for the question then, your last

1    question?

2         MR. ROUSE:  Well, I just wanted to clarify that

3    someone in his profession doesn't work, bill by the hour.

4         THE COURT:  Okay.  I think you already asked that

5    question.

6         MR. ROUSE:  I don't know if it was clear though for

7    the jury.  I thought it was a little murky because he kind

8    of answered and said I don't work like you, but he didn't

9    really answer for him.

10        THE COURT:  I think it's been answered unless it has

11   not, but based on --

12        MR. ROUSE:  I'll withdraw the question.

13        THE COURT:  Yeah, I think it's been answered,

14   Mr. Rouse.

15        MR. ROUSE:  I'll move on.

16        THE COURT:  Yes.

17        MR. BAGLEY:  Thank you.

18        THE COURT:  I think it's been answered.  So that

19   being said, you still have some exhibits.  I don't know if

20   you're going to introduce those.

21        MR. ROUSE:   No.  17 was the last one that I

22   introduced.

23        MR. BAGLEY:  You talked about 18, 19, and 20.  And in

24   our discussions before, he's not gonna tender 20 right

25   now.  That's a second phase document.  But I have no

1   objection to 18 and 19.

2        THE COURT:  So 18 and 19, and then you tendered 32.

3   I have it numbered all the way down to 32 because I know

4   you told me you had 32 exhibits.  So are you going to ask

5   to tender 18 and 19 so that I can --

6        MR. ROUSE:  No, not in the first phase, no.

7        MR. BAGLEY:  You're not going to tender those?  Okay.

8   18 and 19?

9        MR. ROUSE:  No.

10        THE COURT:  Or 20?

11        MR. ROUSE:  No.  I'm gonna wait.

12        THE COURT:  Okay.  And did y'all give -- Debra said

13   she didn't see y'all's proposed verdict form.  Did y'all

14   not submit proposed verdict forms?

15        MR. ROUSE:  I thought we put that in the pretrial

16   order.

17        THE COURT:  I have the pretrial, but if not, we will

18   have to work on that and make sure it's -- I'm looking at

19   it.

20        MR. ROUSE:  I thought the bottom we had the proposed

21   verdict would read as follows for each of our parts.

22        MR. BAGLEY:  I honestly don't recall, Judge.  I can

23   look at my file.

24        THE COURT:  Okay, then.  We'll have a chance to deal

25   with it.  No, it's not in the pretrial, but yes, that's

1          something then if there's going to be a second phase,

2          we've got to make sure the verdict form is right.

3               MR. ROUSE:  Yes, your Honor.

4               THE COURT:  Okay.  All right, counsels.  So you are

5          not gonna ask the question?

6               MR. ROUSE:  No.

7               THE COURT:  You're done with that question.  Okay,

8          counsel.  So your objection was granted, sustained.

9               MR. BAGLEY:  Thank you, ma'am.

10               Are we going to bring the jury back?

11               THE COURT:  Yes.

12               Mr. Rouse, how much longer are you going to have?

13               MR. ROUSE:  I think two more questions.

14               THE COURT:  Okay.  And then it's 12:00.  Mr. Bagley,

15          I'll send them to lunch.

16               MR. BAGLEY:  That makes sense, Judge.  And then I am

17          hopeful, I'm still hopeful we can wrap up our side -- I

18          think Carlton will be finished before lunch, and then I'm

19          hopeful we can -- well, the cross, he won't be finished

20          until my cross.

21               (Whereupon, an off-the-record discussion was held.)

22               THE COURT:  Okay.  We won't release them for lunch in

23          the next few minutes.  We'll bring them on back.

24               (Whereupon, the jury was escorted into the

25          courtroom.)

1          THE COURT:  All right, ladies and gentlemen.

2      Hopefully that movement helped stir you a bit.

3          Okay.  Go ahead, Mr. Rouse.

4  BY MR. ROUSE:

5      Q.   Mr. Fowler, in opening for Universal, Attorney Bagley

6  mentioned that there's no -- there was never any controversy

7  about you being entitled -- you being Flood Brothers -- being

8  entitled to payment.

9      In the context of that statement, how -- what were your

10  thoughts based upon the fact that you've seen some of their

11  pleadings, specifically pleadings to dismiss your case?

12      A.   It was upsetting.

13      Q.   Okay.  Is that statement consistent with the

14  pleadings that you've seen in this case in terms of Universal's

15  position or defense to your complaint?

16      A.   It just seems like it's -- the can has been kicked

17  down the road for months, for years, and it's one reason after

18  another, but...

19      Q.   Okay.  Ultimately, outside of receiving what you're

20  entitled to contractually, what would be the thing that you

21  want as an outcome from this case?

22      A.   I want to know what happened, why a payment takes so

23  long.  And when you are a big company, you don't care about --

24  you obviously don't care because the date that it was sent in,

25  I continued to call and they continued to just pawn me off to

1    somebody else and say, yeah, whatever.  Yeah, okay.  Yeah,
2    we'll get to it.  It went on for months.
3         And at some point enough is enough, and that's why I'm
4    here.  I mean, you can't continue to slow pay.  You can't
5    continue to put businesses -- I mean, there has to be some -- I
6    don't understand.
7         I could talk to Michelle.  She emailed me.  She emailed
8    them during this time.  So if there's any -- like we had to
9    talk to Michelle to okay the $18,000.  Well, she was still
10   emailing you at that time.  She was emailing me.  She was
11   talking to me on the phone.
12        So I don't understand the day that we agreed on it, the
13   day you got the email, how many approvals that needs from a
14   company and how many people have to sign off on it and how long
15   that takes.  If that takes three months, your business model is
16   wrong.  I mean, I don't understand what takes so long.
17        When you do that to people, you cause me a lot of
18   problems.  And, I mean, the small businesses, we don't just sit
19   on piles of money.  We don't have money just to shell out all
20   the time.  On this one, we paid money out of our money.  Like
21   out of my wife's job we used to pay employees.  And had you
22   paid in a month, two months, three months, it just --
23        I want to know why.  I want to know what happened.
24   Somebody has to know.  Like, hey, we got your bill, but we
25   don't care about it until you actually hire an attorney.

1   That's what I feel like, and it shouldn't be like that.

2             MR. ROUSE:  Understood.  No further questions.

3             THE COURT:  Thank you, counsel.  Cross?

4                       CROSS-EXAMINATION

5   BY MR. BAGLEY:

6        Q.   Thank you, your Honor.  Good morning Mr. Fowler.

7        A.   Morning.

8        Q.   You are not -- you often engage in situations where

9   homeowners and insurance companies want to get away with

10  spending as little as is reasonable; is that a fair statement?

11       A.   That's a fair statement.

12       Q.   And it's human nature that, of course, you at Flood

13  Brothers would like to make as much money as you could that's

14  reasonable; is that a fair statement?

15       A.   No, sir.

16       Q.   You don't like to make as much money as you can?

17       A.   That's an incorrect statement.

18       Q.   All right.  You're the president of Flood Brothers;

19  is that correct?

20       A.   I'm the owner, yes.

21       Q.   I mean, aren't you the president?

22       A.   I believe so.

23       Q.   Okay.  And one of the issues in this claim was this

24  discussion -- and you've gone over a lot of documents about

25  whether Flood Brothers' invoice and the dispute over it was

```
 1    settled, was compromised.  You're aware of that?
 2         A.   I am.
 3         Q.   All right.  And you are the decision-maker on behalf
 4    of Flood Brothers whether you settle a case or not?
 5         A.   That's correct.
 6         Q.   You decide when, how much to settle?
 7         A.   I mean, there's some other input, but most of the
 8    time yes.
 9         Q.   You know what the procedure is and how it's done
10    because you've done it before?
11         A.   As far as what?
12         Q.   Settling disputes?
13         A.   Right.
14         Q.   It's not an uncommon thing, is it?
15         A.   No.
16         Q.   In fact, you have testified your bills are being
17    disputed in at least eight other lawsuits as of last year, and
18    you were the one who was in charge of trying to resolve those?
19         A.   Yes.
20         Q.   Now you vest your attorney, Mr. Rouse, with authority
21    to settle cases on your behalf; is that correct?
22         A.   Yes, that's correct.
23         Q.   Okay.  And so when Mr. Rouse sends letters that say
24    if you pay a certain amount of money by a certain date -- be
25    that December 31, 2019, January 11, 2011 -- if you pay that in
```

1    order to avoid litigation, he is authorized to settle that
2    dispute on your behalf?
3         A.   On this case, yes.  Can we go back to the eight that
4    you said, sir?  You said was it eight court cases; is that
5    correct.
6         Q.   Yes, sir, I'm just reading from your deposition.
7         A.   Okay.  And in that deposition, it didn't say anything
8    about -- it wasn't a problem with the amount.  It was a problem
9    with them keeping the payment and not paying me, to be clear.
10        Q.   Thank you, sir.  Now you always contract with the
11   homeowner.  I think you have made that clear already; is that
12   correct?
13        A.   They are the ones that sign the contract.
14        Q.   Because they own the property --
15        A.   Correct.
16        -- and they're the ones responsible?  Okay.  And Ms.
17   Jimenez did that in this case with you?
18        A.   Correct.
19        Q.   I think you've already mentioned, you never really
20   have met Ms. Jimenez face to face?
21        A.   Correct.
22        Q.   She had already moved out of state?
23        A.   Correct.
24        Q.   You're aware that she had sold the house and I think
25   you said yesterday that this was a very unique situation.  You

1    never had one where the water damage that happened on the day
2    of the closing of the sale of the house; is that accurate?
3        A.    That's accurate.  We didn't know that until the
4    second or third day.
5        Q.    Were you engaged by the new owner, Mr. Casado, to do
6    anything?
7        A.    No.
8        Q.    Now you've gone over Plaintiff's 17.  Do you have
9    that in front of you there?
10       A.    No, sir.
11              MR. BAGLEY:  Your Honor, may I approach?
12              THE COURT:  Yes.
13   BY MR. BAGLEY:
14       Q.    I'm just gonna put the exhibits up here.  I'll direct
15   your attention to Plaintiff's Exhibit 17, which is the text
16   messages.  You said you hadn't met Ms. Jimenez face-to-face,
17   but you text messaged with her, correct?
18       A.    That's correct.
19       Q.    And you've already gone over this, and I'm not gonna
20   belabor a lot of it, but you mentioned on direct that in your
21   text of September 16, you pointed out to Ms. Jimenez that don't
22   say anything about mold, right?
23       A.    That's correct.
24       Q.    In the text.  And the reason was is because the
25   policy, some policies, are different in how they cover mold,

1  right?

2       A.   Yes.

3       Q.   I mean, you've already testified to this to a certain

4  degree.  There are special limits for mold; is that correct?

5       A.   Right, I didn't get it tested.  So the only way to

6  know for sure if something is mold is to get it tested.

7       Q.   Okay.  But you certainly didn't mention mold anywhere

8  in your documents that you submitted to Universal, did you?

9       A.   Because I didn't get it tested.

10      Q.   Right, but you agree with me.  You didn't mention

11 mold anywhere?

12      A.   That's correct.

13      Q.   Are you aware in this policy there is a special

14 $10,000 limit for mitigation and remediation of mold?

15      A.   No, I wasn't.  But it was, like I said before, four

16 baseboards.

17      Q.   Okay.  You also indicated in these texts with Ms.

18 Jimenez on October 24, you told her that she should anticipate

19 receiving a check payable to her, Flood Brothers, and her

20 mortgage company jointly, to all three of you.  Do you see

21 that?

22      A.   That's what I was told.

23      Q.   They paid on October 24?

24      A.   Yes, sir, I see it.

25      Q.   Okay.  That is a procedure you've done quite a number

1    of times before where you get a check paid jointly to several
2    other people including a mortgage company and everybody has to
3    sign off on it, right?
4         A.   Correct.
5         Q.   And that doesn't happen instantly, does it?
6         A.   It depends.  I mean, some insurance companies will
7    call the mortgage company and get it taken off.  Some of them
8    will go off of this document, but you're correct.  When it has
9    a -- when it's a three-party check, it does take a while.
10        Q.   And you know that later on it was figured out that
11   they did not need to put the mortgage company on the check,
12   right?
13        A.   I didn't know that it was figured out, but I know it
14   was done.
15        Q.   Without the mortgage company?
16        A.   Correct.
17        Q.   Because the mortgage company was out of the picture
18   from the sale of the property.  Are you aware of that?
19        A.   Yes, I am.
20        Q.   Okay.  And then you've got the picture of the check
21   made payable jointly to Flood Brothers and Ms. Jimenez, and you
22   talked a moment ago about how the check was dated.  I think you
23   said December 5 or 6, something like that?
24        A.   That's correct.
25        Q.   But Ms. Jimenez never sent you a picture of the check

1    until December 16; is that correct?

2          A.   That's correct.

3          Q.   And on December 16, she offered to deposit the check

4    and wire you the money?

5          A.   In that text message that's what it says.  That's not

6    what the phone call said.

7          Q.   Okay.  But you had a phone call with her?

8          A.   Yes.

9          Q.   And in the phone call, you discussed giving a portion

10   of the money to her?

11         A.   She discussed wanting money before she would release

12   any payment.

13         Q.   And you recall telling me that you told her, well,

14   we'll talk about that?

15         A.   Yeah, I said we could work something out so we could

16   get paid.

17         Q.   Okay.  Because when she told you on December 17,

18   2018, that she was waiting on your response regarding what we

19   spoke about, I'm assuming that's waiting on your response to

20   whether or not she should deposit the check and wire you the

21   money less whatever it was you had agreed to kick back to her;

22   is that right?

23         A.   There was never an agreement to give her money, to be

24   clear.

25         Q.   That's what you talked about was --

1    A.   I said we can discuss it.  Because it's illegal, we
2    don't do it.
3    Q.   I'll rephrase the question.  You discussed her
4    proposal that she deposit the money and wire you something
5    less, some money that she would keep, and you said we'll talk
6    about it; is that accurate?
7    A.   Yeah, but I never told her we would give her money.
8    Q.   But you never told her you wouldn't give her money,
9    did you?
10   A.   No, I guess I didn't say we will never give you
11   money, but I wanted the money.  So there's a lot bigger chance
12   that somebody would give you what they -- the eighteen
13   thousandIf you said we're never gonna give that, then it's
14   gonna be a problem.  If you say we can talk about it, then
15   there's a lot bigger chance of you getting the money
16   Q.   Understood.  But your text response to her, I'm
17   assuming, is consistent with your telephone conversation with
18   her.  And in your text response, you didn't say we will not
19   give you a kickback or a rebate, did you?
20   A.   That's correct.
21   Q.   What you said was you wouldn't give her a rebate
22   until you got paid in full?
23   A.   That's right.
24   Q.   And you also said once we get that check, we will
25   send them another invoice for more?

1          A.    For the remaining balance.

2          Q.    Meaning, you were gonna take that to give or

3     suggesting to Ms. Jimenez, you were gonna take that money and

4     use at least a portion of it to give a kickback?

5          A.    That's not what that says at all.

6          Q.    You didn't intend to lead her to believe that until

7     we get paid in full, we won't give any rebate.  Once we get the

8     check, I will send them another invoice for the remaining

9     balance.  You didn't intend to lead Ms. Jimenez to believe that

10    once you got more money, you would give her a kickback?

11         A.    That's not what that says.

12         Q.    So you deny that?  You didn't intend to lead her to

13    believe that?

14         A.    It says until we get paid in full, we won't give any

15    rebate.  Once we get the check, I will send them another

16    invoice for the remaining balance.

17         So it says until we get paid in full, we wouldn't talk

18    about any rebate.  Like the stuff that we sold, that's what we

19    would give her.

20         Q.    You intended to lead her to believe that if you got

21    paid in full, you would talk to her about giving her a check?

22         A.    That's correct, when we finally got paid.

23         Q.    Do you still intend to give her a kickback from any

24    additional money you might receive?

25         A.    I intend to give her about $300 or $400 from what

1   we've sold of her contents in the garage.

2       Q.   Okay.  Not a kickback, just money from contents sold

3   in the garage?

4       A.   Right, but I wouldn't say that.

5       Q.   Because you know that giving a kickback in situations

6   like this is wrong and you don't engage in that sort of thing?

7       A.   No.  That's why we sell the stuff in the garage or

8   when we can sell some of their contents.

9       Q.   Now you required Ms. Jimenez to sign the work

10  authorization and the direct-pay authorization?

11      A.   That's correct.

12      Q.   Universal did not sign any of that?

13      A.   That's correct.

14      Q.   And in it, you promised the customer that your

15  charges would be approved and reviewed by the insurance

16  company?

17      A.   It says cost of repairs.  So when we do a rebuild,

18  that's repairing the house.  If we demo a house, that's not

19  repairing it.  So when we demo a house, we go through

20  Xactimate.  When we repair it, it's time and material.

21      Q.   In this situation, this case -- you've already

22  testified about this, I believe, but just to be clear, the only

23  thing Flood Brothers did here was mitigation of the water

24  damage?

25      A.   That's correct.

1    Q.    There was another contractor out there, wasn't there,
2    who actually did the repairs and the Sheetrock replacement, the
3    floors and the painting and all of that, right?
4    A.    I have never seen it completed.  When we pull our
5    machines, it looks -- except it's dry.
6    Q.    Fair enough.  But you agree you had nothing to do
7    with the actual construction and repairs and remodeling and
8    painting and all that?
9    A.    Correct.
10   Q.    All you did was extract the water?
11   A.    And dry it.
12   Q.    Okay.  On your direct-pay authorization, which you've
13   already talked about, one of the things it says on there is in
14   the event direct payment is not possible, then you want the
15   check sent payable jointly at least?
16   A.    Correct.
17   Q.    You have that in there because you are familiar in
18   dealing with the industry that there are some insurance
19   policies where it's not possible for the insurance company to
20   pay you directly because the policy requires that the insurance
21   company adjust the claim directly with their named insured.
22   You're aware of that, aren't you?
23   A.    Yes.  The seven-or-eight lawsuits that I've won is
24   because they didn't follow this and put my name on the check.
25   The homeowner kept the money and didn't pay me.

1      Q.    In this particular case, you have the policy, but
2   have you ever reviewed the policy?
3      A.    No.  When I called, they said it was covered, so I
4   didn't review it.
5      Q.    Good.  You don't know if the policy requires that
6   they adjust property damage claims directly with their named
7   insured?  You don't know that here?
8      A.    That's correct.
9      Q.    We've got the policy.  We're gonna talk about that
10  later, but you're not aware of that sitting here today?
11     A.    That's correct.
12     Q.    And if that's what the policy said, that could
13  explain one reason why Universal had to wait on Michelle
14  Jimenez to approve the $18,000 settlement?
15     A.    I mean, she was still talking to me during that time.
16  She was still emailing during the time.  She didn't vanish.
17     Q.    Michelle Jimenez, you've already testified, never
18  approved full payment of the bill to you, correct?
19     A.    That's correct.
20     Q.    And are you aware that Michelle Jimenez never
21  approved the full payment of the amount of your $21,000 invoice
22  to Universal?
23     A.    Not until whenever she turned and started demanding
24  money, sometime in mid December, before that she was very vocal
25  with Universal.  But after that and after we said we're not

1     gonna give you -- we can talk about a rebate later, that's when

2     she quit talking with me.  But before that, there's emails

3     where she kept emailing Universal asking for a payment to be

4     released.

5          Q.   Sitting here today, you're not aware of how the

6     policy requirements dealing with the named insured change when

7     there's actually threat of or actual litigation, are you?

8          A.   No.

9          Q.   But you are aware there are policies that give the

10    insurance company the full authority to settle threats of

11    litigation without the approval of the insured?  You're aware

12    of that, aren't you?

13         A.   It makes sense, but I've never sat down and read

14    Universal's 40-something page policy to find out where that's

15    at.

16         Q.   You've already talked about contacting Universal for

17    verification of coverage and you did that, you've already

18    testified, because you're aware that there are some policies

19    that don't provide coverage for water mitigation, correct?

20         A.   Correct.

21         Q.   And you contacted Universal and confirmed that their

22    policy was one of those policies that did provide property

23    damage coverage for water mitigation; is that correct?

24         A.   Correct.

25         Q.   And you have submitted your bills and are seeking

1  payment under that coverage in the insurance policy for water
2  mitigation damage; is that correct?
3      A.   Yes.
4      Q.   And Universal did not promise you that they would pay
5  you whatever you wrote on an invoice when you got finished, did
6  they?
7      A.   No insurance company has ever promised me they would
8  pay whatever I put on an invoice.
9      Q.   Fair enough.  Now are your bills that you submit in
10 compliance with IICRC standards?
11     A.   The IICRC doesn't have anything to do with Xactimate
12 pricing.
13     Q.   Does your work comply with IICRC standards?
14     A.   Most of the time.
15     Q.   Have you ever made any errors when using Xactimate?
16     A.   I'm sure.
17     Q.   You submitted -- you only submitted two invoices to
18 Universal; is that correct?  One for $21,662.40, and then after
19 some discussion with them, you submitted the second one for
20 $18,000; is that correct?
21     A.   I believe so.
22     Q.   And the first invoice which was P-3 -- do you have
23 P-3 there?
24     A.   Yes, sir.
25     Q.   Oh, you got it?  Okay.  Do you see there's a date on

1    page two of P-3 at the bottom?

2         A.    9/24?

3         Q.    Yes, sir, right by where it says page two.

4         A.    Uh-huh.

5         Q.    There's a date there that says 9/24/2018?

6         A.    Yes, sir.

7         Q.    Is that the date that that document was prepared?

8         A.    I believe so.

9         Q.    That's how you do that?

10        A.    I mean, you can change that date, but generally

11   that's what that means.

12        Q.    Okay.  Because there was discussion about Plaintiff's

13   Exhibit 4, which was another invoice, and I believe you

14   testified already that you actually did not submit this invoice

15   to Universal; is that correct?  This is the $23,000 invoice?

16        A.    Yes, so the only difference is the amount of days of

17   the equipment running.

18        Q.    Okay.  Now at the bottom of P-4, what is the date

19   there?

20        A.    Looks like 6/2.

21        Q.    6/2/2021, right?

22        A.    So it was probably the last time I printed would be

23   my guess.

24        Q.    So this document is different from the other invoice?

25   The date changes every time you print it not the date that you

1    create it?

2         A.   If you adjusted it at all it can change or the date

3    that it's printed.  I mean, we can go through here line by line

4    and look, so none of main level changed.  I mean, I can go

5    through here pretty quick and tell you what changed, but the

6    number of days got changed, so we charge by the day that we're

7    out there.  So if our fans are out there for a week, we charge

8    seven days for that fan.

9         Q.   And I wanted to clarify that.  You talk about the

10   days you were out there, and what you mean by that I think, I

11   gathered from your testimony is you weren't out there eight

12   hours a day working on this thing.  You brought your equipment

13   out there and it stayed there until you took it back and you

14   would visit daily intermittently to take readings.  Is that an

15   accurate description?

16        A.   For two days we were out there.  I mean, we had to

17   bring in a lot of people to do that work.  And then after that,

18   no, it was only about an hour a day, well, maybe two at the

19   most.  But going around every fan and moving it, taking the

20   readings, taking the photos every day.

21        Q.   So when you say we were out there until September 21,

22   what you really meant is your equipment was still out there

23   until September 21; is that right?

24        A.   Yeah, so we would go back every day and take

25   readings.  The new homeowner messed with our machines a couple

1    of times, but yeah.  So for five of those days -- four of those

2    days, whatever it was -- Thursday, Wednesday, Tuesday,

3    Monday -- we would just go and monitor the machines and make

4    sure everything was running.

5         Q.   Your equipment, we saw pictures of them.  They are

6    fans and dehumidifiers.

7         A.   That's correct.

8         Q.   A lot of them you put everywhere just to get the H2o

9    up in the air and get it out; is that right?

10        A.   Correct.

11        Q.   According to IICRC standards, was this a Category 1

12    or Category 2 water loss?

13        A.   Upstairs was a 1.  I would argue that downstairs was

14    a 2.

15        Q.   Based upon what?  The mold?

16        A.   The microbial growth and the smell.

17        Q.   Okay.  So looking at your bill, you couldn't tell

18    this was a Category 2?

19        A.   A phone call could tell.

20        Q.   But my question is looking at your bill, you couldn't

21    tell if this was a Category 2 in your opinion; is that right?

22        A.   Yeah, I mean, you can't -- on the photos, you can't

23    tell if it's a 1, 2, or 3.

24        Q.   But that makes a difference in pricing under

25    Xactimate, doesn't it?

1      A.    Yes.  And the difference on a Category 2 versus a

2  Category 1 is less than ten percent.

3      Q.    What we're talking about there is Category 1 is

4  basically clean water in the structure?

5      A.    There's no such thing as clean water, but they say

6  Category 1 is not very harmful.  But any time water sits for

7  more than a day, it changes category.  So you are not gonna

8  bottle it up and drink it.  Like a fish tank would be Category

9  2.

10     So if you walk in a house and it smells like feet, that

11 didn't just happen.  It's been there for a couple of days.

12     Q.    So a Category 1 would be a very recent water leak?

13     A.    Generally, yes.

14     Q.    From -- not from a sewer line, but from a fresh water

15 line?

16     A.    Correct.

17     Q.    Okay.  And Category 2 would get into some other

18 things like mold and that sort of stuff?

19     A.    Mold generally puts it to 3, but a smell can push it

20 to 2.

21     Q.    Okay.  Parts of this were Category 1.  You think

22 parts may have been Category 2, but there's no way to discern

23 that from looking at your bill?

24     A.    That's correct.

25     Q.    Did you have a licensed HVAC contractor out there?

1       A.   I did not.

2       Q.   You had a charge for heat, vent, and air conditioning

3  on your bill.  Was that performed by you or one of your people?

4       A.   What page?  Do you know the page on that?

5       Q.   I'm sorry, sir.  I don't.

6       If you assume that it's on the bill, and it is.  We can

7  find it if we need to, but that's not the question.  Did you

8  have an invoice from a licensed HVAC contractor?

9       A.   I need to see what I wrote.  Like if I cut out a

10 bunch of vents or if we did anything -- let me find it on the

11 invoice.

12      Q.   There's a $150 charge in the basement/living room for

13 heating, vent, and air conditioning.

14      A.   Okay.  So there's no -- I couldn't find a line item

15 in Xactimate to bill for that, so if we removed all the vents

16 that were holding water and the box, that there's no -- if

17 there is no cost, then you put a cost down.

18      Q.   Right.  So that did not involve an HVAC technician?

19 It was your people that took it out?

20      A.   That's correct.  But that line item doesn't

21 specifically state heat, vent, and AC has to be a licensed HVAC

22 person.  It was removing all the lines.

23      Q.   And you also had a number of charges for Xactimate

24 units for detach and reset like the refrigerator, the range,

25 the dishwasher and that sort of thing; is that right?

1      A.   Yeah.  So I charged .5, which means when you remove

2  and reset and you charge .5, you are charging to remove it, not

3  reset it.

4      Q.   So that's how you dealt with that because just to be

5  clear, you didn't reset anything.  Somebody else did that.  All

6  you did was remove some of these things; is that right?

7      A.   That's correct.

8      Q.   The way you tried to deal with that was to take half

9  of the Xactimate charge?

10     A.   Well, I mean, we did the work.

11     Q.   I'm not arguing about that.  I'm just asking what

12  your methodology was.

13     A.   I mean, there's another line item in Xactimate that

14  pays more when you just remove it.  If you do the remove and

15  reset and charge it at .5 and get $16, there's another line

16  item, then you can charge more for.  I didn't charge more for

17  those.

18     Q.   You charged half?

19     A.   Right.

20     Q.   And you did not submit drying logs with readings for

21  the kitchen and dining room on September 18, 19, or 20, did

22  you?  And likewise, for the upper closet on the 19th and the

23  20th.

24     A.   I think I pulled the machines upstairs.  Yeah, I

25  mean, nobody before right now has asked me these questions.

1    So the house was flooded.  We have readings in the main

2    dining, the main kitchen, looks like 15, 16, 17.  If there is a

3    bigger one of these somewhere, I can read it.  There are

4    probably some readings missing, but there's photos in the

5    kitchen on those days.  And if you have a master kitchen right

6    here and you have the dining room right here  and you are

7    taking atmospheric readings, it's not gonna change if this is

8    open and you walk ten feet.

9    Q.   All right.  Where I'm really going with that, the

10   point is your type of work, water mitigation, unlike regular

11   construction work like painters, sheetrockers, roofers, is the

12   kind of thing where you can't just walk out and look around and

13   say, oh, yeah.  That's done.  You've got to actually do tests.

14   You talk about penetrating, non-penetrating, drying logs,

15   all of these things you have to do to measure the -- whether

16   the water is out or not.  Is that an accurate statement?

17   A.   Yes.

18   Q.   Okay.  Now after you first submitted the first

19   invoice for $21,262.40, you had a discussion with someone at

20   Universal and concluded they had some problems with paying the

21   bill immediately, correct?

22   A.   They wanted to deal.

23   Q.   Compromise?

24   A.   Right.

25   Q.   That's when you moved into discussions that resulted

1    in you offering to settle for $18,000, correct?

2         A.   Correct.

3         Q.   We have talked already about this discussion with Ms.

4    Jimenez in December about giving her a rebate or a kickback.

5    You never told anyone at Universal about that, did you?

6         A.   Not that I recall.  I believe that was three months

7    later.

8         Q.   And, in fact, that information about the kickback or

9    rebate didn't come out until after this lawsuit was filed --

10   right -- at your deposition?

11        A.   I believe so.

12        Q.   Now, you had previously said that the last reason

13   Universal gave you for not reissuing the $18,000 check after

14   the initial one that we've already seen photographs of, it was

15   your understanding their response was, well, we've already

16   issued that check; is that correct?

17        A.   I'm not sure I'm following.

18        Q.   You previously testified that the last reason that

19   you are aware of that Universal gave when they were requested

20   to reissue the $18,000 check was we've already issued that

21   check?

22        A.   I know in one of the emails that I sent Carlton that

23   said why are they reissuing a check, the exact same check.  So

24   I'm not following what you are saying.

25        Q.   It was your understanding that they agreed to stop

1   pay and reissue the $18,000 check payable to Ms. Jimenez and
2   you because they thought it had somehow been misplaced or
3   something, and they were just gonna replace it?
4        A.   Yeah, but at that time, they knew she had the check.
5   So it didn't make sense if they knew she had the check -- like,
6   they knew she had the check, so why after you know she has the
7   check void it and send another one after they knew she had the
8   check.
9        Q.   All right.  Now we've got an awful lot of emails and
10  items where communications were being made to Universal asking
11  them to make payment of $18,000.  And you're aware that in that
12  span of late 2018, their last response to those requests was
13  we've already issued that check.  You're aware of that, aren't
14  you?
15       A.   I mean, if we go through every email -- I just know
16  the one I sent to Carlton that I didn't understand why they
17  issued another check when they were aware of the check that
18  they had already written, that she had.
19       Q.   But you're aware that they were being told that there
20  were complaints that Flood Brothers had not gotten their
21  $18,000 check.  And in response to that, they said okay.  In
22  fact, the very next day, on January 2, they said, okay, we'll
23  reissue the check?
24       A.   Yeah, that's, I guess, in January, but I don't --
25  October, November, December, January.  I mean, it's...

1      Q.   And you're aware that when your representative told

2   Ms. Jimenez and Universal if you make payment of this $18,000

3   by December 31, it will avoid litigation.  You're aware of

4   that.  You already testified that you saw all of those

5   correspondence.

6      A.   Okay.

7      Q.   And then you're aware that on January 7th, your

8   representative told Universal that I'll provide you with

9   additional time to provide closure regarding this case if you

10   deliver $18,000 to my office by January 11.  And he attached

11   for the specific terms the December 20 letter from him saying

12   if you pay this money, you will avoid litigation.  You're aware

13   of that, aren't you?

14      A.   If that's what it says.  I mean, I guess --

15      Q.   I'm sorry.  I didn't mean to interrupt you.

16      A.   That's okay.  I mean, with all of the emails going

17   back and forth, I don't know how we're here, but how previous

18   emails said you have to pay this amount and then another email

19   said this amount.  I would have to look at that email

20   specifically to make sure.  But I thought he had said once we

21   get the eighteen, you would be responsible for the other 36.

22   I'm not sure about that exact email.

23      Q.   After the payment of the $18,000 directly to Flood

24   Brothers only, you cashed the check; is that correct?

25      A.   Deposited, yeah.

1      Q.   And you don't know whether or not the policy
2  provisions dealing with the settlement of threatened or actual
3  litigation are different in terms of the requirement of the
4  insurance company to adjust through the insured or not, do you?
5      A.   No.
6      Q.   And after you received the $18,000 check from
7  Universal and deposited it, your representative on February
8  27th sent another demand for the remainder of the
9  twenty-one-thousand-plus invoice.  You're aware of that?
10     A.   Uh-huh.
11     Q.   You're aware he used the exact same language, to
12  avoid litigation, pay this money by a certain date?
13     A.   Okay.
14     Q.   You're aware of that?
15     A.   I'm sure I got the email.
16     Q.   If Universal had done that, would there have been yet
17  another demand letter for more money and litigation?
18     A.   Mike, I can tell you we're here because it took three
19  months to get a check.
20          MR. BAGLEY: Those are all the questions I have, your
21     Honor.
22          THE COURT:  Thank you, counsel.  Any redirect?
23          MR. ROUSE:  No, I think we've covered the issues.
24          THE COURT:  Okay.  Any reason why Mr. Fowler cannot
25     step down?

```
 1          MR. ROUSE:  None, your Honor.

 2          THE COURT:  All right, Mr. Fowler.  You may step

 3     down.

 4          MR. ROUSE:  At this point, your Honor, the plaintiff

 5     rests.

 6          THE COURT:  All right, ladies and gentlemen.

 7     Plaintiff has rested its case.

 8          This might be a good point, counsels, it's almost

 9     12:00.  It may be a good point to just release -- are

10     y'all ready to have lunch?  Okay.  We'll go ahead and

11     release them for lunch.  We'll take care of any

12     housekeeping matters once I release them and then I will

13     release you for lunch also.

14          All right, ladies and gentlemen.  Please go and enjoy

15     your lunch, but remember what I said.  Don't discuss or

16     talk to each other about the case until I send you out to

17     begin your deliberations, okay.

18          All right.  I'll give them until ten after.

19          (Whereupon, the jury was escorted out of the

20     courtroom.)

21          THE COURT:  So I think it will be around 1:10 when

22     they come back.

23          But counsel, you've rested.  You'll pick up; put your

24     witness up.  We also need to -- if we're going to make it

25     flow continuously, we need to do our charge conference
```

```
 1      also; just trying to figure out where to put that in.  And
 2      also Debra and I need the proposed verdict form, so we
 3      need to take care of those two issues also.
 4          So what we can do is I'll have to give them another
 5      break after you finish and you rest and then we'll do
 6      that.
 7          But do y'all have a copy of the proposed verdict
 8      form?  Mr. Rouse, you got your lap top here.  Do you
 9      remember or do you have a copy of it?  I looked through
10      this file and I did not see it attached to anything.
11          MR. ROUSE:  Yeah, I've previously done it, but I can
12      go down to the law library and print one up.
13          THE COURT:  And then we can talk about it.  Y'all can
14      look at it and agree upon it because if it's gonna be a
15      bifurcated-type case, then we've got to have it where they
16      can check here if they move to the next phase.  Okay.
17          So that being said, how long do you think your case
18      is?  It's just your client.  I'm not putting any time
19      frame on it.  I'm just trying to get an idea.
20          MR. BAGLEY:  Sure.
21          THE COURT:  You think about an hour or two?
22          MR. BAGLEY:  I think my part will probably be a
23      little less than an hour.  I don't know how much time
24      Carlton is going to need.  It shouldn't be all that
25      long.
```

1          THE COURT:  Okay, then.  At this point, y'all go

2     ahead and relax yourselves and get some lunch.  And then

3     we will come back and pick it up from there.  Deputy

4     Franklin is going to lock the doors.

5          (Whereupon, a lunch recess was held.)

6          THE COURT:  Okay, counsel.  Were y'all able to get

7     anything?

8          MR. ROUSE:  I did.  Counsel was able to email it.  I

9     wish I had better luck with -- after lunch, I scurried

10    down to the law library and I printed off a form.  I was

11    rushing back by the time to start.

12         THE COURT:  Okay.

13         MR. ROUSE:  I had talked about this with opposing

14    counsel and this is my form.  It mirrors the top part:

15    We, the jury, find in favor of the defendant, and then

16    below it, and further find that defendant has not been

17    stubbornly litigious or caused plaintiff unnecessary

18    trouble and expense.

19         THE COURT:  Can you hear?

20         MR. ROUSE:  I went too fast, didn't I?

21         THE COURT REPORTER:  Yes.

22         MR. ROUSE:  Okay.  The verdict form reads:  We, the

23    jury, find in favor of --

24         THE COURT:  You've got to speak up, Carlton, because

25    Mr. Bagley can't hear you.  Just go to the mic.

1    MR. ROUSE:  Okay.  The first part reads:  We, the

2    jury, find in favor of, and then there's a box, and it

3    says the plaintiff, in the amount of -- and then there's

4    just a line.  And then below that, and, further find that,

5    colon, then there's a box, defendant has been stubbornly

6    litigious or caused plaintiff unnecessary trouble and

7    expense.

8         Then below that there's a box and it says:  We, the

9    jury, find in favor of the defendant.  Below that, and

10   further find, colon, Defendant has not been stubbornly

11   litigious or caused plaintiff unnecessary trouble and

12   expense.  Dated this, blank line, day of April, 2022,

13   foreperson.

14        THE COURT:  Counsel, have y'all looked at that and

15   agreed upon this?

16        MR. BAGLEY:  No, ma'am, we haven't agreed upon it.  I

17   sent an email to Ms. Martin because I was sitting in here

18   and didn't have a way to print it, with a sort of a sample

19   version that's a little bit different from Mr. Rouse's.

20        THE COURT:  Okay.  We'll print it out.  I'll have

21   Debra, she'll come in, and we'll go over it.  If there's

22   anything we need to tweak or change, we need to

23   incorporate something from here to yours or something

24   yours, we can do that.  But you emailed it to Ms. Kelsea

25   Martin?

1          MR. BAGLEY:  Yes, ma'am.  I emailed it just a few

2      minutes ago.  And I copied Mr. Rouse on it, but I don't

3      know that --

4          MR. ROUSE:  I've actually reviewed it.  I reviewed it

5      on my phone.  My concern is the more verbose a verdict

6      form becomes, I think it naturally favors the defense.  So

7      his talks about by a preponderance of the evidence, the

8      question and so on so forth, and I think it's overly

9      confusing, the questions.  Ultimately, it's either they

10     find for us or not and whether they were stubbornly

11     litigious or caused an undue burden and expense or not.

12         THE COURT:  Yeah, we'll take a look at it and we'll

13     decide.

14         MR. BAGLEY:  Your Honor, of course, we want to

15     preserve a motion for directed verdict and we just note

16     that you want to have more discussions about that after

17     the evidence closes.

18         THE COURT:  Okay.  You're making that motion on the

19     record because plaintiff has rested?

20         MR. BAGLEY:  Yes, ma'am.

21         THE COURT:  Okay.  So we'll let you do that, but I

22     was talking about this verdict form.  Let's do one thing

23     at a time.

24         We'll come back and we'll discuss the verdict form.

25         MR. BAGLEY:  One thing about the verdict form, if you

1    don't mind.  My concern with situations like Mr. Rouse's
2    proposed is it appears to the jury that if they're gonna
3    award damages, they have to find there was bad faith, and,
4    of course, we all know that's not the case.
5        They can award damages and still say this was a
6    bonafide dispute and there really was no bad faith.
7    That's how my proposal was drafted.  We can talk about
8    it.
9        THE COURT:  Yeah, we'll talk about it because what
10   I've seen when it's bifurcated, it will ask the question,
11   do you believe or has the jury found -- I see it more
12   often in punitive cases.  If they say yes that there's
13   punitive, then they check yes and then they'll go to a
14   second phase.
15       If they check no, then there's no need.  But we can
16   talk about all of that and structure it where the parties
17   can be in agreement with it.
18       MR. ROUSE:  Okay.
19       MR. BAGLEY:  Thank you, Judge.
20       THE COURT:  We'll talk about that.  So now for the
21   purpose of this proceeding, let's go ahead and set the
22   record up.  Plaintiff has rested its case in chief and so
23   I'll turn to Mr. Bagley.  Mr. Bagley, is there a motion?
24       MR. BAGLEY:  Yes, ma'am.  We make a motion for
25   directed verdict on the issue of contract.  And if you

1     want me to provide you with all the other evidence --

2          Your Honor, there's no legislative statutory law that

3     allows a plaintiff to sue an insurance company directly

4     unless it's their own carrier except in trucking cases.

5     This is a direct action and it's inappropriate.

6          They have alleged a contract, but what they have

7     alleged is that they are seeking recovery through the

8     insurance policy.  They are not an insured under the

9     insurance policy.  They have argued promissory estoppel,

10    detrimental reliance, and the law in Georgia is if you are

11    seeking money through a written contract, you cannot use

12    promissory estoppel as a basis for recovery.

13         And so we don't believe they have any contractual or

14    other legal right against Universal.  All of their rights

15    would be against Michelle Jimenez, who we all know is no

16    where to be found, but that's not our fault.  We would ask

17    that there be a directed verdict on that.

18         MR. ROUSE:  In response, that's not our theory.  Our

19    theory isn't that we're pursing against the written

20    contract.  In our response to a motion for summary

21    judgment, we made clear, this is a case where there was an

22    oral contract that was formed.

23         And we believe that we've satisfied the requirements

24    of proving an oral contract.  There certainly was a

25    meeting of the minds.  There certainly was consideration.

1    Certainly was performance; and so to the extent we are

2    pursing Universal, because they had a direct oral contract

3    with Flood Brothers Restoration and that contract was

4    fully fulfilled.

5        Furthermore, I think it's somewhat inconsistent to

6    say that there was no contract, yet, the evidence in the

7    case shows that they at least partially paid pursuant to

8    this alleged oral contract.  And in the defendant's

9    opening, Mr. Bagley mentioned, this is not a case where

10   we're contesting they had an obligation to pay.  We're

11   contesting how much we were supposed to pay.

12       So I just think it's kind of inconsistent to say on

13   the record to make an admission that the client had an

14   obligation to pay something, but this case is about what

15   that was, and then at the end say there was never any

16   obligation.

17       MR. BAGLEY:  Had an obligation to pay and adjust the

18   claims of our insured, your Honor.  Our insured had signed

19   on with the contract and hired Flood Brothers.  And

20   pursuant to that agreement, very common, Universal made

21   payment.

22       The problem here is this is a direct action against

23   Universal.  There are tons of case law that say there is

24   no direct action against a homeowner's insurance carrier

25   unless the person bringing the action is a named insured,

1     and they're simply not.  And the reason we're here is
2     because they have had so many problems tracking down Ms.
3     Jimenez.  That's not our fault.  I'm sure that if -- I
4     imagine that had they been able to serve her and bring
5     suit against her, we would not even have been in the case
6     because the law is very, very clear:  There is no direct
7     action against a homeowner's insurance policy.
8          In 42 years of doing this, I have never had a case
9     like this.  They just don't happen.
10         And so we would ask for a directed verdict on that
11    part.  What the evidence shows was they verified there was
12    coverage, and that's very true.  The coverage of the
13    policy we will tender, but the policy said we adjust
14    damages related to our homeowner's policy and there's
15    ample Court of Appeals and Supreme Court cases that say
16    that obligation is to the named insured and third parties
17    do not have a direct action against the carrier.
18         MR. ROUSE:  I stand on my argument.  There was a
19    direct communication between Universal and Flood Brothers.
20    This is before Flood Brothers started work on the
21    property.
22         THE COURT:  What do you say to that, Mr. Bagley?
23         MR. BAGLEY:  There was certainly communication,
24    Judge, and it's very clear and undisputed.  The
25    communication was to confirm there was a policy that

1    provided insurance coverage stated in the policy for

2    mitigation of water damages.  That was the truth.  That is

3    the truth today.  That's not disputed.

4        The named insured is Michelle Jimenez.  The policy

5    says we will adjust your losses with you, Michelle

6    Jimenez.

7        Now, there's been some question about why did you

8    shift up, you know, and all of a sudden you were able to

9    pay?  There's a liability provision of the policy that

10   says when there is a claim or threatened for -- the

11   carrier can resolve that dispute, and it doesn't say

12   anything about getting the insured's permission.  That

13   doesn't create a contractual right for anybody else.  It's

14   just how they adjust the claims.

15       We've already briefed this.  The evidence is they

16   verified there was coverage.  The evidence is also

17   undisputedly, they were making the claim through the

18   coverage provider in the policy.  And so either under an

19   oral contract or promissory estoppel, there is no legal

20   basis for pursing a named defendant insurance carrier in

21   the state of Georgia.  It's extremely well settled.  I

22   mean, it's not even close, your Honor.

23       MR. ROUSE:  This is not an auto case.  This is not an

24   injury case.  This is a case of an insurance company

25   independently contracting with a service provider to

1       provide a benefit.  It just so happens that this is a

2       perfect confluence where before Flood Brothers did any

3       work at all, Universal, without exception, without any

4       qualification, confirmed that they had a conversation with

5       Flood Brothers.

6            In that conversation, even at the motion for summary

7       judgment phase, we've argued that Flood Brothers and

8       Universal communicated.  They had a meeting of the minds

9       and they said, hey, this is the damages.  You've seen what

10      it is.  You have our permission to go and fix that damage.

11           I believe, and I think the evidence shows, that that

12      is sufficient to formulate an oral contract in Georgia.

13      This is not a situation --

14           The argument on behalf of Universal is two-fold.

15      They want to encourage Flood Brothers to argue that it's

16      really a claim against Michelle, so then they can argue

17      later, well, if it is a claim against Michelle and we are

18      liable, you can't pursue us for attorney's fees because

19      you're pursuing another party.  This is not that

20      situation.

21           And in large part in cases like this, there can be

22      multiple people that are liable technically for actions.

23      But in this case, Universal contracted with Flood Brothers

24      directly.  They came on the property, not only before they

25      started work -- they came on the property.  They observed

1     what they were doing.  They gave them the okay.  They gave

2     them specific instructions as to what to do to be

3     satisfied and paid when they completed the work.  They did

4     everything that they were supposed to do pursuant to an

5     oral contract with Universal.

6         When they completed the work, surprisingly, Universal

7     tried to fulfill what they believed to be a compromise, a

8     compromise because they knew they were obligated to pay.

9         And so while there may be a number of ways that

10    Universal can be liable, one being through a written

11    contract with their insured, and two, through an oral

12    contract that they actually created with a service

13    provider, the fact remains in this case, we're trying to

14    issue of whether there was an oral contract.  That's the

15    trial issue before the jury, not whether Michelle Jimenez

16    is liable.  That's a separate issue for another day.  And

17    the statute of limitations has not run on that claim.

18        But certainly for today, we're trying an oral

19    contract.  And I believe that the evidence is more than

20    sufficient to carry the burden.

21        THE COURT:  Mr. Bagley, I will give you the last --

22        MR. BAGLEY:  Yes, ma'am.  One thing that I should

23    point out, we served requests for admissions and Request

24    for Admission Number 5, and I will make it part of the

25    record to protect any record on appeal, Exhibit Number 5

1    -- I mean, Request for Admission Number 5, and I will read

2    it to you, Judge, but it essentially said -- and the

3    reason I point this out is it's been a bit difficult to

4    pin down what the exact theory is.

5        Request for Admissions Number 5:  Plaintiff performed

6    water mitigation services on the property after

7    contracting exclusively with the perceived owner of the

8    property, Michelle Jimenez.  Admitted.

9        That's very different from what we just heard, but it

10   is consistent with the evidence.  The evidence being that

11   Universal had a contractual obligation to provide

12   insurance coverage on Michelle Jimenez's property and they

13   did that.

14       When they were contacted by Flood Brothers because

15   Flood Brothers knew they had insurance, they confirmed,

16   yes, we have insurance.  And you heard the testimony that

17   Flood Brothers was keenly interested, is this the kind of

18   insurance that covers water mitigation?  There was no

19   question about, hey, do you want to hire us?  That's never

20   been alleged.

21       Is this the kind of insurance policy that covers

22   water mitigation?  Yes, it does.  Well, what do we need to

23   do through this insurance policy?  Take photographs,

24   submit your documentation.  That's what they would tell

25   everybody and anybody.  That doesn't form a contract with

1     them.  That tells them, yes, we have a contractual
2     obligation.  And if you want to submit a claim for water
3     damage, we'll certainly do it under this insurance
4     contract, and that's what they did.  That's what happened.
5     That's why they made the payment and that's why they
6     delayed making the payment because the contract required
7     them to adjust it with their insured, which they tried to
8     do, until there was a threat or actual litigation and then
9     they had the right to resolve it on their own decision,
10    which they did.
11         So we believe that directed verdict would be
12    appropriate because there's no way for Flood Brothers to
13    recover on a direct action against Universal.
14         Your Honor, and this doesn't need to go to the jury.
15    I don't know how you want to do this, but I would tender
16    the responses to the discovery as part of the record.
17         THE COURT:  Okay.  But it's not going to the jury?
18         MR. BAGLEY:  Well --
19         THE COURT:  The responses --
20         MR. BAGLEY:  I don't have a problem if it goes to the
21    jury.  I don't know -- it's more of a legal argument,
22    but --
23         THE COURT:  Yeah.  So if you want it to go along with
24    your motion, then I guess you would just give it to
25    Kristina, the court reporter, and she can mark it, I

1    guess, as part of an exhibit to your motion.

2            MR. BAGLEY:  Yes, ma'am, that would be great.

3            THE COURT:  You can do that.  Just hand it to

4    Kristina.

5            All right, counsels.  I've heard your arguments.  I

6    am going to go ahead and deny Mr. Bagley's motion for

7    directed verdict.  I'm gonna deny it.

8            Mr. Bagley, are you ready?

9            MR. BAGLEY:  Yes, ma'am.

10           THE COURT:  Bring in the jurors.

11           (Whereupon, the jury was escorted into the

12   courtroom.)

13           THE COURT:  All right, ladies and gentlemen.

14   Counsel, you may be seated.

15           Ladies and gentlemen, I hope you enjoyed your lunch.

16   So we are back.  We're gonna move right back to where we

17   left off.  When we left off, the plaintiff had rested its

18   case in chief.  Now, I'll turn to Mr. Bagley.

19           Mr. Bagley, call your first witness.

20           MR. BAGLEY:  Thank you, your Honor.  I call Skylar

21   Felder.

22           THE COURT:  Mr. Felder, come on up.

23                         SKYLAR FELDER,

24   being first duly sworn, was examined and testified as follows:

25                       DIRECT EXAMINATION

1    BY MR. BAGLEY:

2        Q.   All right, sir.  Would you please state your full

3    name.

4        A.   Skylar Felder.

5        Q.   And Mr. Felder, where are you employed?

6        A.   Universal Property Insurance.

7        Q.   What is your position there?

8        A.   I'm a claims supervisor.

9        Q.   And do you supervise claims in Georgia as well as

10   other states?

11       A.   Yeah, I supervise claims for 16, 17 different states.

12       Q.   How long have you been involved in handling insurance

13   claims?

14       A.   About seven years.

15       Q.   What sort of claims do you handle?

16       A.   A large variety of claims:  Hurricane claims, water

17   damage claims, smoke claims; property damages, maybe a car

18   accident, a car runs into a house, something like that.

19       Q.   Okay.  Have you had any licenses or certifications in

20   that regard?

21       A.   Yeah, I'm licensed, I believe, it's like 13-or-14

22   licenses.  My licenses are reciprocal in about three-or-four

23   different states.

24       Q.   Okay.  I'm going to -- where do you live?

25       A.   I live in West Palm Beach.

1    Q.   Florida?

2    A.   Yes.

3    Q.   You're a long way from home?

4    A.   Yes.

5    Q.   Let's go straight into this claim.  Do you recall

6    about when you first became involved in this claim?

7    A.   I want to say sometime towards the beginning.  There

8    was some issue with Ms. Jimenez selling the property, so there

9    was some confusion over coverage because it was right around

10   closing, so we were trying to determine if coverage existed.

11   Q.   All right, sir.  Was that regarding a September 14,

12   2018, reported water loss?

13   A.   Yes.

14   Q.   The one we're here about today?  Were you handling

15   that claim pursuant to an insurance policy?

16   A.   Yes.

17        MR. BAGLEY:  I'm gonna show you -- your Honor, may I

18        approach?

19        THE COURT:  Yes.

20   BY MR. BAGLEY:

21   Q.   I'm gonna show you a document labeled Defendant's

22   Exhibit Number 9 and ask you if you will, is that a true and

23   accurate copy of the policy that was issued to Ms. Jimenez?

24   A.   Yes.

25   Q.   All right.  What was the nature of the loss that was

222

1    reported to have occurred on September 14, 2018?

2         A.   I believe it was a toilet supply line.

3         Q.   And was it a home?

4         A.   Yes.

5         Q.   You've already eluded to this, but were there any

6    issues about ownership when the loss came in?

7         A.   Yeah, there were some issues at the beginning because

8    the property was being sold.  So we were trying to review the

9    policy of the insured that coverage existed at the very

10   beginning of the claim.

11        Q.   All right, sir.  And what was your role in adjusting

12   the claim?

13        A.   I was a supervisor at the time.

14        Q.   All right, sir.  You work with a team?

15        A.   Yes.

16        Q.   At that time, do you recall who was working with you?

17        A.   I know Charles Derry was working with me as well as I

18   think Jenny Fernandez was also on the file.  I can't remember

19   the exact examiner.

20        Q.   Okay.  Mr. Derry and Ms. Fernandez?

21        A.   Yes.

22        Q.   There may have been others?

23        A.   There may have been others.  I don't remember

24   exactly.

25        Q.   All right.  Do you have any experience or training in

1  handling water damage claims like this?

2      A.   Yes.

3      Q.   What -- can you tell us about that?

4      A.   Sure.  I've handled probably thousands of claims over

5  the course of my career in various states.

6      Q.   All right, sir.  Water damage is a fairly common loss

7  that occurs?

8      A.   Yeah, I would say it's probably the first or second

9  most common claim filed.

10     Q.   Have you ever been involved in a lawsuit against

11 Universal where a vendor, not the named insured, a vendor

12 disagreed with your adjustment?

13     A.   No.

14     Q.   Did you determine that the water damage loss from the

15 broken line on the toilet was a covered event under the policy?

16     A.   Yes, we did.

17     Q.   What damages would have been covered?

18     A.   Any of the assumed water damages as well as any other

19 services provided.

20     Q.   This policy provided coverage for water mitigation?

21     A.   Correct.

22     Q.   Are you aware of policies that do not provide

23 coverage for water mitigation?

24     A.   Yes.

25     Q.   But this policy was not one of those?  This one

```
 1    actually did provide coverage?

 2         A.    This one did provide coverage, correct.

 3         Q.    Did this policy provide coverage for mold?

 4         A.    Yes.

 5         Q.    Was it unlimited coverage?

 6         A.    No, there's a $10,000 limit.

 7         Q.    $10,000, meaning you would only cover damages up to

 8    $10,000?

 9         A.    Yes, $10,000 per occurrence.  I believe it's $20,000

10    per policy period.

11         Q.    All right, sir.  There was some repair and

12    construction and damage to Sheetrock and that sort of thing and

13    floors.  Was Flood Brothers involved in making those

14    construction repairs and replacing items?

15         A.    No.

16         Q.    What was your understanding of what Flood Brothers'

17    role was?

18         A.    Their job was to do any tear out or mitigation

19    services required.

20         Q.    Okay.  When you're in the process of adjusting a

21    claim with an insured, can you explain to us how you actually

22    do that?  In other words, what is the procedural protocol?  Do

23    you get a bill, issue a payment?  Do you talk to the insured?

24    How does that go?

25         A.    You know, there's obviously some communication with
```

1    the policyholder.  You know, we received documents from a field

2    inspection that takes place and we review that documentation to

3    determine coverage if coverage exists.  And then once we can

4    move past the point of coverage, then we will review any

5    estimates provided by that field adjuster, and then any

6    additional estimates we may get from a contractor after that to

7    review for any supplemental items that may or may not be

8    warranted.

9    Q.   Are you required by this policy to adjust claims

10    directly with the named insured?

11    A.   Yes, we are.

12    Q.   And if you can tell me, I'll show you Exhibit 9

13    again.  Can you tell me where that provision is?

14    A.   So it would be Item I, lost payment, we'll adjust all

15    losses with you.  And I believe the beginning of the policy

16    defines you as the policyholder.

17    Q.   Okay.  Does that obligation to deal with the insured

18    change after there is either threat or actual litigation

19    instituted?

20    A.   Yes.

21    Q.   Okay.  Can you tell me where that is?

22    A.   I'm sure that will be under Section II here.

23    Q.   Go to the next page there.  A(2)?

24    A.   I believe it's our duty to settle.  May investigate

25    and settle any claim or any suit that we decide is appropriate.

1      Q.   Okay.   Now this provision is different from the first
2   one, isn't it?
3      A.   Correct.
4      Q.   Because this one doesn't say anything about adjusting
5   with the insured, does it?
6      A.   No, it does not.
7      Q.   What it says here is we may investigate and settle
8   any claim or suit that we decide is appropriate?
9      A.   Correct.
10      Q.   That "we" is Universal?
11      A.   Correct.
12      Q.   The triggering event on that is when there is a claim
13   made for liability by a third party or a threat of litigation?
14      A.   Correct.
15      Q.   Do you have -- does Universal hire contractors for
16   insureds?
17      A.   No, we don't.
18      Q.   Did you have anything to do with hiring Flood
19   Brothers in this case?
20      A.   No.
21      Q.   Did Universal confirm to Flood Brothers that
22   Universal had this insurance coverage that provided coverage
23   for mitigation of water damage?
24      A.   I believe so.
25      Q.   That is, in fact, correct, isn't it?

1          A.   Yes, they do have coverage.

2          Q.   Did you, meaning Universal, sign any forms with Flood

3     Brothers hiring them to do this work?

4          A.   No.

5          Q.   Does Universal have any control over who the insured

6     hires?

7          A.   No.

8          Q.   Was Flood Brothers an insured under Ms. Jimenez's

9     policy?

10         A.   I'm sorry.  Can you repeat the question?

11         Q.   Was Flood Brothers an insured under Ms. Jimenez's

12    policy?

13         A.   No.

14         Q.   Have you ever worked with Flood Brothers on a claim?

15         A.   Not that I can recall.

16         Q.   Now Flood Brothers submitted an invoice to Universal;

17    is that correct?

18         A.   Yes, they did.

19         Q.   I'm gonna show you a document labeled Defendant's

20    Exhibit 11.  Take a look at that and tell us if that's the

21    invoice that Flood Brothers submitted to Universal.

22         A.   Yes, it is.

23         Q.   Was that the first invoice that Flood Brothers

24    submitted?

25         A.   Yes, this is the first one they submitted to us.

1        Q.    Okay.  That was in the amount of $21,662.40, I think?

2        A.    Yeah, that's correct.

3        Q.    Was Universal required to pay Flood Brothers whatever

4    amount of money they chose to charge?

5        A.    No.

6        Q.    How would you determine what amount of money you

7    would need to pay on behalf of your insured to coverage -- to

8    adjust the loss on behalf of your insured?

9        A.    We review the estimate, the line item submitted as

10   well as any support and other documentation to justify the line

11   item that's listed in their estimate.

12       Q.    Now in water mitigation situations, are there subtle

13   things that have to be analyzed that are -- that require a

14   little more data than say whether a wall has been repaired or

15   painted or a roof has been replaced?

16       A.    Sure.  Humidity, moisture readings, drying times, so

17   we can analyze the amount of time that's justified for a bill

18   like that when it's submitted.  I know as well as any photos,

19   especially if there's any tear out that goes on.  A lot of

20   times some of these companies just try to go by word of mouth.

21       Q.    All right.  When Universal received this first

22   invoice, did Universal simply cut a check?

23       A.    No.

24       Q.    Why did you not simply cut a check for the invoice?

25       A.    There were some issues with the estimate.

1      Q.   All right.  Was the amount in keeping with what you
2   normally see in a case like this?
3      A.   It's a fairly high estimate for mitigation service.
4      Q.   All right.  What did you anticipate the bill would
5   have been for a house this size?
6      A.   Probably around like seven, eight thousand.
7   Somewhere in there.
8      Q.   You heard Ms. Fowler testify yesterday that their
9   average bill runs about $3,500.  Is that consistent with your
10  experience?
11     A.   Yeah, generally speaking.
12     Q.   Was this an extremely large house?
13     A.   It seems fairly average I would say.
14     Q.   And the type of water intrusion, was that something
15  that was important or significant?
16     A.   I mean, it is important the type of water and the
17  amount of water obviously for how long it runs, but -- if that
18  answers your question.
19     Q.   Yes, sir.  Do you have situations in floods where the
20  water comes from like a flooded river or a sewer back up, that
21  sort of thing?
22     A.   Sure.
23     Q.   Does that create a different sort of problem related
24  to mitigating the damage?
25     A.   Yeah, there's certainly differences in the way you

1    mitigate different categories with water.  There's also limits

2    to the coverage for certain things like a flood, for instance,

3    or certain sewer back ups.

4         Q.   Are there industry guidelines that you rely on as a

5    a point of reference for determining what should and should not

6    be done?

7         A.   Sure, for mitigation service, you know, we follow the

8    IICRC guidelines.  We have staffed trained as well.  They are

9    licensed for IICRC.

10        Q.   Okay.  And that's the Institute of Inspection

11   Cleaning and Restoration?

12        A.   Correct.

13        Q.   Is that a large institution that establishes

14   guidelines?

15        A.   Yes, a nationwide institution.

16        Q.   Okay.  You said there was some issue with the

17   invoice.  Can you tell us what that was?

18        A.   Sure.  We had some issues where there were moisture

19   reading meters missing, as well as some question about the

20   amount of equipment he used in some of the rooms.  There was

21   also some question on some of the line items used for the

22   estimate itself, just in general.

23        Q.   All right, sir.  Now the daily moisture monitoring is

24   that important?

25        A.   Yes, it is, because it can establish a time line for

1    the amount of time the equipment needs to be in the property to
2    continue drying to meet drying guidelines.
3         Q.   Did you have any issue with the actual pricing in the
4    invoice itself?
5         A.   Yes, there were some issues with some of the pricing.
6         Q.   All right.  Now you've heard the testimony already
7    that they used Xactimate.  Did you have any problem with the
8    use of Xactimate?
9         A.   No.
10        Q.   Did you have any issue with whether or not they had
11   mistakes within their Xactimate numbers?
12        A.   Yes.
13        Q.   Okay.  How much were the total entries that you had
14   problems with related to their Xactimate in entries?
15        A.   I believe it was about $9,000.
16        Q.   All right.  Are you claiming that Flood Brothers
17   wrongly billed Ms. Jimenez over $9,000?
18        A.   Yes.
19        Q.   And you mean or was it just a mistake that you could
20   have gotten additional information on?
21        A.   We would have taken any additional information as we
22   do with any claim for any portion of any claim.  There were
23   certainly times where additional documentation can be submitted
24   to justify anything from additional cabinets that may be
25   required or something like this where they can justify

1   additional work that was presented by them.

2       Q.   All right.  Were there any problems with the number

3   of dehumidifiers as reflected on the bill?

4       A.   Yes.

5       Q.   Did you determine that there had been -- what was the

6   collective charge for that?

7       A.   Dehumidifiers, $1,975.

8       Q.   Okay.  And did you -- how did you verify whether or

9   not that was justified?  Was it -- were you in the drying log?

10      A.   Yes, sir, reviewing the drying logs as well as the

11  square footage for the rooms.

12      Q.   Did you determine there was an overcharge there based

13  upon the dehumidifiers?

14      A.   Yes.

15      Q.   Do you -- can you tell us what that number was?

16      A.   Which number is it you're looking for?

17      Q.   The overage for dehumidifiers.

18      A.   That was the overage for the dehumidifiers, the

19  $1,975.

20      Q.   Okay.  That was their total charge, right?

21      A.   No. --

22      Q.   That was the total charge on the bill?

23      A.   Oh, I'm sorry.  The overage is $1,145.

24      Q.   Okay.  Did you determine that the bill did not

25  justify all the air movers?

1          A.    Yes.

2          Q.    What was the collective total for those?

3          A.    $6,274.50.

4          Q.    And did you compare that to the drying log to see if

5     it was supported?

6          A.    Yes.

7          Q.    What did you determine to have been the unsupported

8     portion, the overage?

9          A.    $3,552.

10         Q.    Okay.  Did you -- was there any significance as to

11    what kind of water was involved in this?

12         A.    Yes.  Category 1 water is typically a clean water

13    from a clean plumbing line.  It's only you get like general tap

14    water.

15         Q.    Is there significance in the cost and the effort

16    required to mitigate that?

17         A.    Yes.

18         Q.    And what is the significance?

19         A.    You have to take additional precautions for hazards.

20    Obviously, sewage water, filthy water, you have to be much more

21    careful about it and take initial steps for cleaning as opposed

22    to clean water from the tap.

23         Q.    Did the Flood Brothers' bill identify whether this

24    was a Category 1 loss or otherwise?

25         A.    No.

1       Q.    And did you determine that there appeared to be some
2    unjustified costs because of that?
3       A.    Yes.
4       Q.    Tell us about that.
5       A.    Based on my notes, I believe it was related to the
6    carpet for the water extraction.  It was billed as Category 2.
7       Q.    And what was the cost associated with that?
8       A.    600 -- It was an overage of $259.49.
9       Q.    Okay.  Was there any charge on there for HVAC?
10      A.    Yes.
11      Q.    You heard Mr. Fowler's testimony about that this
12   morning.  Would it have been appropriate to have attached an
13   HVAC charge in this situation where there was no HVAC vendor?
14      A.    No. Typically for specialty services like HVAC and
15   electrical, we typically expect those to be completed by a
16   specialty service.
17      Q.    Was there a charge for anything related to a
18   generator?
19      A.    Yeah, we have a charge here for a power cable.
20      Q.    Are you aware of any generator on the premises during
21   the mitigation?
22      A.    No.
23      Q.    You heard the testimony this morning about the detach
24   and reset charges?
25      A.    Yes.

1      Q.    Where Mr. Fowler said he took the Xactimate amount

2  and simply divided it in half?

3      A.    Yes.

4      Q.    Is that the correct way to do that when you only

5  either detach or only reset?

6      A.    No.

7      Q.    Tell us how what would be the appropriate way to do

8  that.

9      A.    Typically when you use Xactimate for anything

10  detached or reset, you can choose one or the, so it's an

11  accurate charge for either service.

12      In this case, he combined both and then just divided it in

13  half.  So it's not as accurate.

14      Q.    Now when you were reviewing this, did you identify a

15  situation here where Flood Brothers had actually undercharged?

16      A.    Yes, regarding the refrigerator and the range.  They

17  undercharged themselves $9.50.

18      Q.    Okay.  That was an undercharge of $9.50?

19      A.    Correct.

20      Q.    Were there any overages related to the dishwasher or

21  anything else?

22      A.    Yeah, there were several overages including the

23  dishwasher, kitchen faucet, garbage disposal; P-trap which is

24  related to the plumbing.  These were several overages that we

25  found.

1          Q.   Were there labor minimums applied?

2          A.   Yes.

3          Q.   Tell us what labor minimums are.

4          A.   Typically a labor minimum would be applied for any

5    services that are provided that don't meet a certain threshold.

6    I want to say it's $500 in the system, in Xactimate.

7          Q.   In your preliminary review of the invoice, the

8    $662.40 invoice, what did you conclude was a total of overages?

9          A.   $2,786.04 just on pricing errors.

10         Q.   How much?

11         A.   This was $2,786.04 regarding overages.

12         Q.   Did you have other items that were questionable?

13         A.   Yeah, we had the dehumidifiers and the blowers as

14   well.

15         Q.   Oh, the ones we talked about at the first?

16         A.   Yes.

17         Q.   What was the total amount that was not documented

18   well enough for you?

19         A.   My math is short here, but I believe it was -- out of

20   the $2,786 on the overages and then I have the overages from

21   the dry logs for $4,697.  And then there was the undercharge of

22   $9.50.

23         Q.   Now, the overages from all of the equipment, what was

24   that?

25         A.   $4,697.

237

1    Q.   Okay.  So that sounds to me like about $8,483,
2    whatever the math is?
3    A.   That sounds about right.
4    Q.   Now, was this your final word on this?  Did you just
5    refuse to talk to Flood Brothers or do anything else?
6    A.   No, not from my recollection.
7    Q.   Okay.  Would you have accepted additional information
8    to potentially increase the preliminary adjustment?
9    A.   Yes, we would have.
10   Q.   And would that have been information that responded
11   to these things we just discussed that you thought were
12   shortcomings?
13   A.   I'm sorry?
14   Q.   Would that be information to respond to these things
15   you just told us about that you thought were shortcomings and
16   overcharges?
17   A.   Yeah, we would have accepted any items related to any
18   of the issues I just mentioned.
19   Q.   Was it ever Universal's position that Flood Brothers
20   wasn't entitled to anything?
21   A.   No.
22   Q.   What was Universal's position regarding Flood
23   Brothers' invoice after receipt in your analysis?
24   A.   That there were overcharges here and that we would
25   try to reach an amicable agreement with them.

1    Q.   Did you make Flood Brothers aware of that?

2    A.   Yes.

3    Q.   Did you then tell them line and verse all of these

4    various problems that you had with the bill?

5    A.   No, I believe we just tried to discuss with them

6    overall just saying, you know, we would be willing to try to

7    reach an agreement with them.

8    Q.   And by agreement, do you mean a compromise agreement?

9    A.   Correct.

10   Q.   Did that happen pretty quickly?

11   A.   From my recollection it did.

12   Q.   And did Flood Brothers seem to be amenable?

13   A.   Yeah, I believe we had a -- there were notes in the

14   file that there was an agreement between him and the examiner.

15   Q.   Did you believe you had reached an agreement with

16   them to compromise the bill at $18,000?

17   A.   That was my understanding.

18   Q.   So did you demand anymore information or talk about

19   any other inadequacies in the bill after this early

20   conversation where you compromised the bill?

21   A.   No, it was my understanding that it was resolved at

22   that point, so we moved on.

23   Q.   Would that agreement have resolved Flood Brothers's

24   claim against both Universal and your insured, Ms. Jimenez?

25   A.   Yes.

239

1    Q.    And did you cut a check immediately?

2    A.    No.

3    Q.    Could you have cut a check immediately under this

4    policy?

5    A.    No.

6    Q.    What did you need to do?

7    A.    We had to speak with the policyholder.

8    Q.    Were you ever able to get Ms. Jimenez's preapproval

9    of this deal, $18,000?

10    A.    No.

11    Q.    Was it your understanding that she wanted Flood

12    Brothers to be paid whatever the appropriate amount was?

13    A.    In general, that was my understanding.  Seemed like

14    she had moved on from the property, so she was trying to put

15    the entire claim behind her.

16    Q.    When you couldn't get her to approve the exact amount

17    of this compromised deal, what action did you take next?

18    A.    At that point, I believe we mailed payment out

19    including Flood Brothers on it.

20    Q.    Ms. Jimenez and Flood Brothers?

21    A.    Correct.

22    Q.    Is that a routine way to handle that kind of

23    situation?

24    A.    Yes.

25    Q.    Do you frequently even include on the check a

1    mortgage company?

2        A.   Yes.

3        Q.   Are you required to do that under the policy if there

4    is a mortgage company?

5        A.   Yes, we are.

6        Q.   Do you know why the mortgage company wasn't included

7    on this check?

8        A.   Mortgage company wasn't included because this was for

9    mitigation services.

10       Q.   All right.  After you issued this check for $18,000,

11   when did you first realize there was a problem and that there

12   was -- the payment, there was some problem with the payment?

13       A.   I believe I got an email from Mr. Rouse.

14       Q.   Let me show you a document labeled Exhibit Number 2,

15   and ask you to take a look at that and tell me if that's what

16   you were eluding to just now?

17       A.   I believe so.  There was a couple of communications,

18   so I believe this is the one.

19       Q.   Okay.  So sometime after this December 20, 2018,

20   letter from Mr. Rouse addressed to Ms. Jimenez and Universal;

21   is that correct?

22       A.   Yes.

23       Q.   And you remember receiving this letter in your file?

24       A.   Yes.

25       Q.   And before this letter came in, were you aware that

1    Ms. Jimenez was not turning over the letter -- I mean, the
2    check for $18,000 to Flood Brothers?
3         A.   No.
4         Q.   Did you know at that point in time back in 2018 or
5    '19, why Ms. Jimenez was not turning over the check?
6         A.   No.
7         Q.   Did you know if it could have been just misplaced or
8    some accident or have any idea why she was not turning over the
9    check?
10        A.   No.
11        Q.   So when this letter was received since you had
12   already issued the check for $18,000, did Universal issue
13   another check then?
14        A.   Yes.
15        Q.   That was later?
16        A.   Yes.
17        Q.   Okay.  Let's talk about that.  I'll show you Exhibits
18   3 and 4.
19             THE COURT:  Counsel, is this D or P exhibits?
20             MR. BAGLEY: D.  I'm sorry, your Honor.  Thank you.
21   BY MR. BAGLEY:
22        Q.   Okay.  Take a look at Defendant's Exhibit Number 3,
23   please.  Was that received by Universal?
24        A.   Yes.
25        Q.   Did that spell out what Universal could do so as to

1   avoid further time and expense associated with litigation?

2       A.   Yes.

3       Q.   And is this the first time you are aware of that

4   Mr. Rouse requested that the payment be made directly to Flood

5   Brothers only?

6       A.   Yes.

7       Q.   And what did you do in response to that request?

8       A.   Then I rushed myself to make sure that that payment

9   got out to Flood Brothers directly.

10      Q.   You accepted that offer?

11      A.   Yes.

12      Q.   Did you actually stop pay the earlier check and

13  reissue another check payable only to Flood Brothers?

14      A.   Yes, we did.

15      Q.   All right.  Let me ask you to take a look at D-4.

16  Did you receive that January 7 letter from Mr. Rouse?

17      A.   Yes, I did.

18      Q.   Did it provide you with additional time to pay the

19  $18,000?

20           MR. ROUSE:  Mr. Bagley?

21           (Whereupon, an off-the-record discussion was held

22       between counsel.

23  BY MR. BAGLEY:

24      Q.   Oh, I'm sorry.  That's not a letter.  It's an email,

25  right?

1      A.   Yes, this is an email.

2      Q.   Okay.  Did this provide you with additional time to

3   make the payment by January 11, 2019?

4      A.   Yes.

5      Q.   And it required that the check is received in his

6   office, Mr. Rouse's office?

7      A.   Correct.

8      Q.   Did you have a street address for Mr. Rouse's office?

9      A.   No, I did not.

10      Q.   What did you have?

11      A.   All I had was a P.O. Box.

12      Q.   Okay.  And this email also attached the earlier

13   December 20, 2018, letter for specifics, correct?

14      A.   Yes.

15      Q.   And that was the letter you've already testified to

16   was the one that said how you could avoid litigation; is that

17   right?

18      A.   Correct.

19      Q.   Did you ask Mr. Rouse whether you could simply mail

20   the check instead of overnighting since you didn't have

21   anything but a P.O. Box for him?

22      A.   Yes.

23      Q.   And he sent you an email confirming that?

24      A.   Yes.

25      Q.   That's already in plaintiff's exhibits.  Did you

1    issue the check that day?

2         A.    Yes.

3         Q.    And was the check cashed?

4         A.    Yes.

5         Q.    At that time in January when you had been given this

6    letter saying you had until January 11, 2019, to pay $18,000 to

7    Mr. Rouse to avoid litigation, did anyone on behalf of Flood

8    Brothers advise you that that would not avoid litigation?

9         A.    No.

10        Q.    Fact to the contrary, they said that would avoid

11   litigation, right?

12        A.    Correct.

13        Q.    Were you settling this case just for Universal or for

14   Universal and your insured Michelle Jimenez?

15        A.    Universal and Michelle Jimenez.

16        Q.    You know there's some reference to this that this was

17   just partial payment.  Was that something new?

18        A.    Settlement is a partial payment.

19        Q.    All right.  Had $18,000 been a partial payment since

20   the beginning?

21        A.    Yes.

22        Q.    Okay.  I'm gonna ask you to look at Defendant's 5 and

23   6.  Tell me if these are the emails that you referenced earlier

24   where you asked for permission to simply mail the check and

25   Mr. Rouse agreed.

1      A.    Yes.

2      Q.    The check was mailed and was the check cashed?

3      A.    Yes.

4      Q.    What did you do immediately after that to further

5  adjust the claim?

6      A.    I didn't think anything else was necessary.  I

7  thought the claim was settled at that point.

8      Q.    Okay.  When did you realize that you had not avoided

9  litigation as the letter said offer?

10     A.    I received a follow-up email from Mr. Rouse advising

11 that additional funds were required to settle the claim.

12     Q.    Did that make any sense to you?

13     A.    No, because I made that prior payment to avoid

14 litigation.

15     Q.    And the subsequent demand was in late February, early

16 March?

17     A.    Yes.

18     Q.    And did it also offer to avoid litigation if you made

19 another payment?

20     A.    Correct.

21     Q.    Did you attempt to figure out what was going on

22 whether Ms. Jimenez was somehow in the loop or something was

23 going on?

24     A.    I was under the impression we were settled.

25     Q.    And then lawsuit was filed shortly after that?

1          A.   Correct.

2          Q.   And that was -- the remainder was left up to the

3     lawyers?

4          A.   Correct.

5               MR. BAGLEY:   Okay.   Those are all of my questions,

6          your Honor.

7               THE COURT:   Okay.   Any cross?

8               MR. ROUSE:   Yes, your Honor.

9               THE COURT:   Mr. Bagley, you didn't admit anything?

10              MR. BAGLEY:   Yes, ma'am.   You want me just to admit

11         it all at once, I will.

12              THE COURT:   You can.

13              MR. BAGLEY:   Thank you, ma'am.

14                             CROSS-EXAMINATION

15    BY MR. ROUSE:

16         Q.   Good afternoon.

17         A.   Good afternoon.

18         Q.   Finally meeting in person.

19         A.   Yes.

20         Q.   First of all, I just want to establish you've been

21    selected by Universal as their designated representative to

22    speak on their behalf today, correct?

23         A.   Yes.

24         Q.   And so to the extent that you just testified,

25    everything that you said you were under oath, correct?

1        A.    Correct.

2        Q.    So to the best of your ability, everything was spot

3   on and accurate, right?

4        A.    As far as my knowledge.

5        Q.    Okay.  So, again, you're here on behalf of Universal

6   and from -- let's start from the beginning.

7        In terms of the loss, the damage to Ms. Jimenez's

8   property, were you involved in that loss directly as of

9   September 11th of 2018?

10        A.    It's tough to answer because I was sort of involved

11   in the beginning, but I don't handle every single portion of

12   that file.

13        Q.    Fair enough.  Well, let's just drill down a little

14   bit.  When you say sort of, how do you define sort of?

15        A.    Well, I'd supervised the people that were working on

16   that file.

17        Q.    So you were responsible for it?

18        A.    Correct.

19        Q.    So that means whatever happened, the buck falls with

20   you?

21        A.    Sure.

22        Q.    So whether or not people communicated well or not,

23   you were responsible for it, correct?

24        A.    Sure.

25        Q.    And in turn, Universal is responsible for you,

1    correct?

2        A.   Sure, yes.

3        Q.   All right.  When you started this case -- well, when

4    you started your testimony earlier, Mr. Bagley drew your

5    attention to the policy document?

6        A.   Yes.

7        Q.   And you mentioned -- I assume you've looked at this

8    document numerous times, right?

9        A.   Yes.

10       Q.   In preparation for today?

11       A.   Yes.

12       Q.   Was this a document that you reviewed before today?

13       A.   Yes.

14       Q.   And then also in your testimony earlier, you

15   discussed notes to your file?

16       A.   Yes.

17       Q.   Did you bring your file today?

18       A.   No, I didn't.

19       Q.   Okay.  Is there a reason why you didn't bring your

20   file?

21       A.   It's a digital file.

22       Q.   Okay.  But you said you made all these copious notes.

23   You didn't say copious, but you said you made a lot of notes;

24   is that fair to say?

25       A.   No.

1       Q.   Didn't you make contemporaneous notes as you are
2   handling and supervising this claim?
3       A.   I made notes in that file, but I couldn't speak to
4   how many notes were in there, how often I touched that file to
5   look at it directly.
6       Q.   Okay.  Off of what you can recall as a representative
7   of Universal, how many notes do you recall making in the file?
8       A.   I couldn't guess.
9       Q.   Give me a number.
10      A.   Maybe 20, 30.  I couldn't guess.  Like I say, there
11  may be notes in there from our communications or other notes I
12  have in there for my file review, but I couldn't say
13  specifically.
14      Q.   All right.  In your notes, did you happen to list or
15  do you happen to recall who all was involved in this claim to
16  repair or to mitigate the water damage to Ms. Jimenez's
17  property?
18      A.   The only people I remember recognizing was Flood
19  Brothers, if that's what you are asking.
20      Q.   Well, that's fair enough because Mr. Bagley did
21  mention that there was another service provider that
22  provided -- that repaired the house.  Are you familiar with
23  that?
24      A.   Yes, I know there was.  I couldn't tell you the name
25  off hand.

1          Q.   Okay.  Mr. Bagley I believe in opening mentioned the
2     cost of repair was in the $50,000 or upper 40s or $50,000.  Do
3     you remember that?
4          A.   Correct.
5          Q.   How did he get to that number?
6          A.   Based on the estimate from that contractor.
7          Q.   Who gave him the estimate of that contractor?
8          A.   I'm not aware of who it was that submitted that
9     estimate.
10          Q.   Did you review that estimate?
11          A.   Indirectly.
12          Q.   How do you mean indirectly?
13          A.   It was reviewed by an examiner and then was reviewed
14     by myself after that point to be submitted for approval.
15          Q.   So to approve the invoice of another service
16     provider?
17          A.   Yes.
18          Q.   Okay.  I thought your testimony was that you didn't
19     pay the subsequent service provider to repair the property?
20     That wasn't your testimony?
21          A.   I'm confused about the question.
22          Q.   I thought you just testified a moment ago that you
23     only paid Flood Brothers.  You weren't responsible for the
24     other provider?
25          A.   No, I would be responsible for the other provider as

1    well.  I must have been confused by your question.

2        Q.   That was Mr. Bagley's question.  So your testimony is

3    that Universal was responsible for both repairs and the payment

4    of the repairs and water mitigation?

5        A.   Yes.

6        Q.   Without question?

7        A.   Yes.  Well --

8        Q.   Okay.  What were you going to say?

9        A.   Now that -- I'm confused as far as what you're

10   asking.

11        Q.   Please, provide more detail.

12       A.   So yes, we would provide coverage for those items

13   without question to specific coverage itself, but any items

14   submitted for those coverages would be subject to our review

15   and consideration.

16       Q.   Okay.  When you say subject to review and

17   consideration, to me, I think of communication with someone who

18   is providing a service.  Is that what you think of when you say

19   subject to our review and consideration?

20       A.   I was just talking about our review process and the

21   documentation.

22       Q.   But when you are reviewing and you're in the process

23   of reviewing, you are going to communicate the ultimate

24   conclusion of your review to the person that provided the

25   service, wouldn't you?

1      A.    Generally we communicate with the policyholder.

2      Q.    But that's the whole purpose of a review is you're

3  gonna communicate with someone, right?

4      A.    Correct.

5      Q.    And you're gonna communicate that as an insurance

6  company, a large insurance company -- would you define

7  Universal as a large insurance company?

8      A.    I would say we're a regional insurance company.

9      Q.    About how much in premiums do you cover every year?

10     A.    I wouldn't know that.

11     Q.    How much in claims do you pay out every year?

12     A.    I wouldn't know that.

13     Q.    You don't know what you pay out, what's your

14  responsibility every year for claims?

15     A.    I don't.

16     Q.    But you are responsible for that?

17     A.    I am a supervisor which is responsible for the

18  examiners that review that documentation.

19     Q.    So you have no idea as a supervisor of claims for

20  this region, you have no idea how much in claims you've paid

21  out the last year?

22     A.    I wouldn't have that information off hand.

23     Q.    Give me a general understanding of how much you paid

24  out.

25          MR. BAGLEY: Your Honor, I'm gonna object to

1          relevance.  It has nothing to do that will assist the jury
2          in determination of the claim.
3                    THE COURT:  Counsel, what's your --
4                    MR. ROUSE:  With respect to this witness's competency
5          as a subject matter expert.  I think that's well within
6          his purview.  He mentioned that he supervised a team of
7          adjusters and he mentioned that he was in charge of this
8          region.  And he mentioned that he is the designated
9          representative of this insurance company.
10               I would think a basic question about losses, general
11          losses in the last year would be well within his realm of
12          competency.
13                    THE COURT:  Okay.  And I think, counsel, you asked
14          and his answer was he had no idea.  He didn't know.
15   BY MR. ROUSE:
16          Q.   Okay.  Mr. Felder, you said you reviewed the
17   contract, the insurance agreement, multiple times or at least
18   reviewed them before you came to court?
19          A.   Yes.
20          Q.   And there were two reasons why Mr. Bagley drew your
21   attention to the contract because, one, he said there's a duty
22   on the part of Universal to communicate with Michelle Jimenez
23   or an insured when adjusting a loss or making a loss payment,
24   right?
25          A.   Correct.

1    Q.   And if my memory serves me correctly, you were
2    looking at Section 1, Subsection I.  Do you have a copy of the
3    insurance policy up there?
4    A.   Yeah.  What's the page you're referencing?
5    Q.   I believe it's page 17.
6    A.   17 of 22.
7    Q.   17 of 37.  Excuse me, 15 of 22.  There's two page
8    numbers on the document.
9    A.   Yes.
10        (Whereupon, a pause in the proceedings was held.)
11   BY MR. ROUSE:
12    Q.   All right.  And the next page, I think it's Section 2
13   (a) liability coverages.  Under Coverage E, it says personal
14   liability.  If a claim is made or a suit is brought against an
15   insured, we will:  Pay up to our limits and provide a defense.
16   Our duty to settle or defend ends when our limit of liability
17   has been paid.
18        Okay.  So you said Section 2 gives you the authority to
19   adjust a claim on page 16 of 22.  Section 2, liability of
20   coverages.
21    A.   Section 2, which section?
22    Q.   It's under Part A Coverage E?
23    A.   Yep.
24    Q.   It says personal liability.  According to Mr. Bagley
25   and your testimony, Part A, 1 and 2, you used to reference your

1    justification that when there's a claim or a litigation, you

2    have additional powers to adjust or to handle a claim, pay a

3    claim, without the need to involve the insured?

4        A.   Yes, that's my understanding.

5        Q.   So when you read Subsection A, Coverage E on page 16,

6    point 1 and 2, can you tell me where in point 1 and 2 it says

7    that?  I mean, where does it specifically say if there is a

8    claim, we have the ability to adjust the claim without talking

9    to an insured.  Where does it say that?

10       A.   It says we may investigate under A, Section 2.  We

11   may investigate and settle any claim or suit that we decide is

12   appropriate.

13       Q.   Where do you see that?

14       A.   Letter A, page 16, letter A, Number 2, middle of the

15   paragraph.

16       Q.   We may investigate and settle any claim or suit that

17   we decide is appropriate.  But what I'm saying is where does it

18   is say that you don't have that right before the claim is made,

19   because logically, you're an insurance company.  You're gonna

20   investigate and settle claims whether there's a lawsuit or not,

21   right?  That's what the purpose of an insurance policy is all

22   about?

23       A.   Correct.

24       Q.   So that phrase doesn't mean that if there is a

25   lawsuit or if there is a claim you have more powers because you

1   already have the power to investigate and settle claims because

2   you're an insurance company, right?

3      A.   Yes.

4      Q.   Now, when you flip back to page 15 under loss

5   payment, Subsection I, right?

6      A.   Yes.

7      Q.   It says we will adjust all losses with you, right?

8      A.   Yes.

9      Q.   But it never says we cannot adjust all losses with a

10  service provider, does it?

11      A.   No, it just states that we will adjust them with the

12  policyholder.

13      Q.   Okay.  So when it says we will adjust, that means you

14  have to give the policyholder some notice of what you're doing

15  simply put, right?

16      A.   Yes.

17      Q.   So if you give a policyholder a claim number and you

18  tell them we're working on it, you are doing that with them

19  because they know about it, right?

20      A.   Partially.

21      Q.   What am I omitting that you disagree with?

22      A.   I just mean there are other steps to a claim other

23  than, obviously, providing a policyholder with a claim.

24      Q.   No, I get it.  I mean, obviously on the insurance

25  side, there's accounting.  You have to actually write the

checks.  You have to investigate, I get that.  But what I'm
saying is when this document says we will adjust it with you,
that simply means you are letting them know what's going on,
right?

A.   It also means that they have the authority for their
claim.

Q.   Does it say that you have the authority to refuse a
claim anywhere there?

A.   No, it just states that we will adjust the loss with
you, meaning you, the policyholder, saying that we'll adjust it
with them directly.

Q.   My question though is does it say that the
policyholder has the right to reject or veto a resolution of
any claim in that paragraph?

A.   No.

Q.   Okay.  And I assume since you are the designated
representative of Universal and you've reviewed this before
coming to court, you should be able to tell me anywhere in this
agreement where does it say that an insured has veto power to
reject the payment for any claim or any loss?

A.   It doesn't say I have the authority to reject.  It
does give them the opportunity for appraisal.

Q.   Okay.  But I asked where does it say they have the
ability to veto or reject Universal's payment of any claim?
That's my question.

1      A.   Let me find the section on appraisal here so I can

2   verify for myself.

3      Q.   Does an appraisal mean veto or does an appraisal mean

4   an assessment?

5      A.   As it states here in the appraisal section, if you

6   and we fail to agree on an amount of a loss.

7      Q.   Okay.  Well, that's a great point, but let me ask you

8   this.  What document can you provide to the court that shows

9   Michelle Jimenez disagreed with anything that Universal did in

10  terms of appraising?

11     A.   Sure.  We don't have any.

12     Q.   Because none exists, correct?

13     A.   Correct.

14     Q.   Okay.  And then furthermore, I think it's important

15  that we look to Subsection I, lost payment, because the last

16  sentence in that paragraph says losses will be payable and what

17  does it say?

18     A.   Loss will be payable 60 days after we receive your

19  proof of the loss.

20     Q.   Okay.  It's pretty important, right, because it's

21  saying as a company, you have a limited amount of time to pay

22  for losses when you get notice of it, right?

23     A.   If a proof of loss is received.

24     Q.   Right.  So if a proof of loss is received, you have a

25  limited amount of time, correct?

1          A.    Correct.

2          Q.    Okay.  And what's that amount of time?

3          A.    60 days.

4          Q.    And you're bound by that, right?

5          A.    Correct.

6          Q.    Because you have to do it for the benefit of your

7     insured, right?

8          A.    Correct.

9          Q.    I would presume that you have to do it for the

10    benefit of people that you may have communicated with that

11    perform work for you.  Stands to reason, right?

12         A.    The policy only states our relationship with the

13    policyholder.

14         Q.    Okay.  So if we're bound by what the policy -- let me

15    state it again.  The policy doesn't give the insured veto

16    power?

17         A.    No, but it does require us to consult them.

18         Q.    Right.  But you did consult Michelle Jimenez, didn't

19    you?

20         A.    Not to my recollection.  We couldn't get a hold of

21    her.

22         Q.    So you've never spoken to Michelle Jimenez?

23         A.    I'm not saying we've never spoken to Michelle

24    Jimenez.

25         Q.    Wouldn't speaking to Michelle fit in the definition

1     of consulting with her?

2          A.   Yes.

3          Q.   Okay.  And you heard -- you were in court and you

4     heard the extensive time that we spent going through the text

5     messages, correct?

6          A.   Yes.

7          Q.   And if you would like, it's Exhibit 17.  They should

8     be up there.  If you like, you can go through those text

9     messages on your own and we can take some time to review them

10    if you want.

11         If you want to go through it, you can, but there are

12    several text messages there where Michelle is communicating

13    with Mr. Fowler.  And she's giving him information about her

14    claim with Universal and she's talking about what she needed to

15    provide to Universal in terms of pictures and information about

16    the damage, correct?

17         A.   Yes.

18         Q.   There was an instance where she asked Mr. Fowler to

19    make sure that he preserves certain pieces of property like

20    cabinets and making sure that he handled appliances and whatnot

21    in a specific way.  Do you recall that?

22         A.   Yes.

23         Q.   So obviously then Michelle Jimenez spoke with maybe

24    not you, but someone that you supervise regarding the water

25    loss?

1          A.    To my recollection we weren't able to reach her on

2     several attempts.

3          Q.    Once again, Michelle Jimenez wouldn't have a claim

4     number unless she spoke with Universal, would she?

5          A.    No.

6          Q.    Okay.  And you reviewed this case file, so I assume

7     you're well familiar with the claim number in this case, right?

8          A.    Yes.

9          Q.    Okay.  About halfway through the text message list --

10    the gray is Michelle Jimenez and the blue is Mr. Fowler -- do

11    you see that right there?

12         A.    Yes.

13         Q.    What does that look like to you?

14         A.    The claim number for this claim.

15         Q.    Do you recognize that as being a claim number that

16    would be created in the ordinary course of business?

17         A.    Yes.

18         Q.    So that looks like one of Universal's claim numbers?

19         A.    Yes.

20         Q.    Okay.  This 1-800 number here, do you recognize what

21    that is?

22         A.    I believe that's our 1-800 number.

23         Q.    Okay.  Is that something that would be given to an

24    insured in the process of communicating with them about some

25    claim or some loss?

1      A.    Sure.  I mean, it's also available on our website and
2   other documentation that we provide.
3      Q.    Okay.  But claim numbers are not on the website,
4   right?
5      A.    No, they are not.
6      Q.    Okay.  That's something that comes directly from
7   people that work under your supervision, right?
8      A.    Either from me or customer service.
9      Q.    From Universal?
10     A.    Yes, from Universal.
11     Q.    So whether it's customer service or whether it's
12  claims, this policy, this contract with Michelle, governs
13  Universal as a whole.  It doesn't matter what department.  It
14  governs Universal, right?
15     A.    Correct.
16     Q.    So with respect to what you've seen today and what
17  you've heard, Universal communicated with Michelle about this
18  water mitigation project, right?
19     A.    We communicated with her.  I wouldn't say we had
20  communication with her regarding mitigation.
21     Q.    Okay.  And so it's your testimony that you haven't
22  had any communication with Michelle yourself?
23     A.    To my memory, I don't remember speaking with her.
24     Q.    Well, the text messages that I showed you just a
25  moment ago?

1          A.    Yes.

2          Q.    Do you recognize that phone number?

3          A.    Not off hand.

4          Q.    You don't -- well, look to the contract.  Does the

5     phone number match what's on the contract?

6          A.    Yes, it does.

7          Q.    Okay.  So based on those two things, do you have any

8     reasonable grounds to believe that that's not Michelle Jimenez?

9          A.    No.

10         Q.    Okay.  Do you recall ever speaking with Michelle

11    Jimenez?

12         A.    Personally, I don't remember speaking with Michelle

13    Jimenez.

14         Q.    Okay.  What about any other forms of communication?

15         A.    I don't remember communicating with her directly at

16    all.

17         Q.    Okay.  Not at all?

18         A.    In my capacity, no.

19         Q.    Okay.  So when the loss occurred, you mentioned

20    earlier you didn't recall -- you mentioned earlier that you

21    would have made notes about who worked on this water mitigation

22    project.  It would be in the file?

23         A.    There would be notes in the file.  If I had actions

24    in there, then I would have put those in there.

25         Q.    Okay.  Who's Danny Dobb?

1      A.   He was the field adjuster.

2      Q.   Okay.  And you're aware that Danny Dobb had direct

3   communications with Flood Brothers?

4      A.   Yes.

5      Q.   All right.  And so to what extent he communicated

6   with Flood Brothers, are you aware of what he told Flood

7   Brothers or what was told back to him?

8      A.   No, the only information that I'm aware of is the

9   testimony that I heard that they had some interaction on site.

10     Q.   Okay.  What about the phone call because there was

11  also testimony about Flood Brothers making a phone call with

12  Universal?

13     A.   I don't recall those notes in the file.

14     Q.   Okay.  You don't recall there being notes in the file

15  on that?

16     A.   I don't recall there being notes in the file on that.

17     Q.   Okay.  Charles Derry, who is he?

18     A.   He's a mitigation examiner.

19     Q.   Okay.  Do you recall his involvement in this water

20  mitigation project?

21     A.   I remember seeing a few notes from him.

22     Q.   Okay.  Hazel Luc, L-U-C, do you recall her

23  involvement in this project?

24     A.   I'm not familiar with who you're referencing.

25     Q.   Let's go to Exhibit 10.  Actually, Exhibit 9.

1       A.   I'm not familiar with her directly.

2       Q.   But where does she work within Universal?

3       A.   From what it says there it says marketing

4   administrator.

5       Q.   Okay.  So there are plenty of people that interact

6   with certain providers, insureds with respect to Universal and

7   trying to adjust projects like this water mitigation project,

8   right?  So it could be marketing?  It could be claims?  It

9   could be adjusters?

10      A.   Yes.

11      Q.   But based on what you've just seen, Hazel Luc was

12  also involved.  She received communication about this water

13  mitigation project.

14      A.   Yes, I saw a communication.

15      Q.   Okay.  There's a Patrick Chichester,

16  C-H-I-C-H-E-S-T-E-R?

17      A.   Yes.

18      Q.   What's his capacity?

19      A.   He also works in marketing.

20      Q.   He was involved in communications regarding this

21  water mitigation project, correct?

22      A.   Correct.

23      Q.   So on behalf of Universal insurance -- I'm not sure

24  if I said the name correctly.  On behalf of Universal Property

25  and Casualty, you're not able today under oath to dispel

1  communications that were made or that were alleged to be made

2  with Flood Brothers, are you?

3       A.   I'm confused about your question.

4       Q.   In your capacity as a representative for Universal,

5  you don't have evidence to dispute that Flood Brothers had a

6  conversation with representatives from Universal and they asked

7  Flood Brothers to do work on the subject property?

8            MR. BAGLEY:  Your Honor, I'm gonna object to the

9       question because it mischaracterizes the evidence.  The

10      record will reflect that the conversation verified

11      coverage, and I don't know where all the other stuff came

12      from.  I'll object to the premise of the question.

13           THE COURT:  Mr. Rouse, rephrase your question.

14 BY MR. ROUSE:

15      Q.   Okay.  In your capacity as an agent/representative of

16 Universal, you don't know what representatives of Universal

17 told Flood Brothers before they started work?

18      A.   No, I can't be everywhere listening to everyone.  If

19 it's not documented, I can't testify to it.

20      Q.   Right.  So if it's not documented, you can't testify

21 to it.  That's what you just said?

22      A.   Yes.

23      Q.   But didn't you just say that your communications with

24 Michelle weren't documented?  Isn't that what you just said?

25      A.   I was stating that we don't have communication

267

1  documented to verify that we were able to reach her.

2      Q.   Right.  You said you didn't document that.  You just

3  said that, right?

4      A.   Yes.

5      Q.   So what's different about you being able to testify

6  about that and the other subject?

7      A.   In my capacity for answering the other question was

8  simply to state that I don't have any confirmation that we

9  reached the policyholder.

10     Q.   But you said if it's not documented, you can't

11 testify to it?

12     A.   Correct, because I can't be everywhere listening to

13 everyone for hearsay conversations or otherwise.

14     Q.   So how do you know what communications were had with

15 Michelle on behalf of Universal if it's not documented as you

16 testified today?

17     A.   I can't.

18     Q.   Thank you.  And again, how do you know what Universal

19 representatives told Flood Brothers if it's not documented?

20     A.   I don't.

21     Q.   So the only thing that we can rely on is someone, a

22 witness with capacity, to recall those conversations, right?

23     A.   Correct.

24     Q.   Okay.  Now the next big thing you talked about was

25 your gripe was unjustified costs?

1      A.   Yes.

2      Q.   That's what you said.  Now with the help of

3   Mr. Bagley, you identified issues with Xactimate, right?

4      A.   Issues with the line items that were used from

5   Xactimate.

6      Q.   Okay.  You also had issues with the IICRC, correct?

7      A.   I don't have issues with the IICRC themselves if

8   that's what your question is.

9      Q.   Didn't you say that you had issues with the work

10  because it wasn't compliant with the IICRC?

11     A.   Yes, but I didn't have issues with the IICRC.

12     Q.   Okay.  Let me ask you this, you talked a little bit

13  about your experience as a certified or someone who's received

14  certification from IICRC.  Is that what you said?

15     A.   No.  I was licensed at one time, but --

16     Q.   You are not currently licensed?

17     A.   No.

18     Q.   When was the last time you were licensed?

19     A.   A few years ago.

20     Q.   A few years ago meaning 2018?

21     A.   I couldn't recall the exact year.

22     Q.   2019?

23     A.   I couldn't recall the exact year I was licensed.

24     Q.   So how many restoration or water mitigation projects

25  have you performed?

1     A.   Zero.

2     Q.   How many water mitigation projects have you

3 supervised?

4     A.   Zero.

5     Q.   How many water mitigation projects have you -- were

6 you over in 2018?

7     A.   Zero.

8     Q.   How many times did you go to the subject property and

9 review what work was done?

10     A.   I didn't.

11     Q.   So would that be zero as well?

12     A.   Yes.

13     Q.   So in your capacity as someone who's reviewing the

14 invoice, if you are not certified, you didn't go to the

15 property, how do you expect the jury to trust what you're

16 saying?

17     I'll withdraw the question.

18     Okay.  When you talk about Xactimate, with the help of

19 Mr. Bagley you had a discussion about Xactimate, is it your

20 contention today that Xactimate is a requirement to submit an

21 invoice for work done?

22     A.   No.

23     Q.   It's an aid, is it not?  It's a guide?

24     A.   It's one of several options.

25     Q.   Right.  So your bill, a service provider's bill can

1    be higher or lower than Xactimate offers, right?

2         A.   It can be submitted in various amounts based on

3    various softwares or otherwise.

4         Q.   Okay.  Then you made a point to say you had seven

5    years of experience?

6         A.   Yes.

7         Q.   Is that in just claims in general?

8         A.   Yes.

9         Q.   How much of those seven years were you actually

10   certified by IICRC?

11        A.   To my memory, I believe it was about two years.  Two

12   years I would say.

13        Q.   So before you said you couldn't remember when you

14   last had your certification.  It just came to you a few moments

15   ago?

16        A.   I don't remember the time frame.  I can remember the

17   amount of time I was certified for.

18        Q.   All right.  So when you speak to the policyholder,

19   you mentioned that -- well, the big theory --

20        At the start of this case, Mr. Bagley got up and he said

21   we don't have an issue with Flood Brothers being entitled to

22   payment.  Do you remember that?

23        A.   Yes.

24        Q.   And that is consistent with Universal's position on

25   that issue, right?

1          A.    Yes.

2          Q.    So as you've testified today, Universal does not have

3     any issue with respect to Flood Brothers being entitled to

4     payment for what they did?

5          A.    Correct.

6          Q.    You just dispute the amount that they're entitled to

7     be paid?

8          A.    Correct.

9          Q.    And Mr. Bagley stated that the $18,000 that you

10    paid -- and you testified it was a partial payment, right?

11         A.    It was a settlement payment.

12         Q.    Partial payment, right?

13         A.    Yes.

14         Q.    Right?

15         A.    Any settlement payment is a partial payment.

16         Q.    Okay.  Partial payment.  Okay.  Now do you recall off

17    the top of your head the date that you and I had communication?

18         A.    I don't.  I know I just had the emails up here,

19    but --

20         Q.    Take your time.  If you are looking at my emails, I

21    will help you out.  There's 7 through 16, and it might be right

22    below that letter there on your right, the top right corner of

23    the podium.  Excuse me, left corner.  I think they have emails

24    there.  So you might want to draw your attention to 7 through

25    16.

1           So the first email is October 2nd.  The next email is
2     November the 6th, and then it gets into January.  Can you just
3     recall what was the first time you received an email from me?
4           A.   I believe it's January the 8th.  These were in
5     backward order, so just making sure I've got the dates right.
6           Q.   You believe it was January the 8th?
7           A.   I believe January the 8th.
8           Q.   So the first email you recall is on the 7th?
9           A.   Between you and I from reviewing the documents that's
10    here, I'd say January the 7th.
11          Q.   Okay.  On January the 7th, there's a communication
12    between you and I at 6:00 p.m., around about?
13          A.   Yes.
14          Q.   And that email says right here -- take a look at that
15    part right there.
16          A.   Yep.
17          Q.   And it's demanding payment of the eighteen thousand
18    would you agree?
19          A.   Yes.
20          Q.   And it says right here to cover what?
21          A.   Partial costs.
22          Q.   Do you remember that?
23          A.   I do remember it.
24          Q.   Remember that communication?
25          A.   Yes.

1    Q.   In that communication, that's when there was a

2    deadline for January the 8th.  Do you remember that?  Excuse

3    me, January the 11th.

4    A.   Yes.

5    Q.   And so that was in reference to -- that communication

6    if you would -- let me rephrase.

7    You would agree this communication is about a partial

8    payment and that partial payment has a deadline of January the

9    11th based on the email?

10   A.   Yes.

11   Q.   Okay.  Now you're saying you interpreted that email

12   to mean that this whole case was resolved, right?  That's what

13   you're saying?

14   A.   Yes.

15   Q.   Okay.  I want to show you what was marked as

16   Plaintiff's Exhibit 11 and 12.  This is an email it says here

17   on January 1st.  This email was sent from me and it looks like

18   Patrick Chichester marketing and --

19            MR. BAGLEY:  Excuse me, Carlton.  What's the exhibit

20        number?

21            MR. ROUSE:  This is Exhibit 11.

22            MR. BAGLEY: P-11?

23   BY MR. ROUSE:

24   Q.   Yes.  So it looks like this is the first email where

25   we are talking about this partial payment of $18,000; would you

1   agree?

2        A.   Yes.

3        Q.   So somehow this email got to you and then you

4   communicated -- I'm not sure how you became involved, but

5   somehow you communicated about this $18,000 partial payment,

6   right?

7        A.   Right.

8        Q.   And you mentioned earlier on that check that you

9   sent -- actually no, this is not it.  It's another check.  You

10  confirmed that you were gonna mail out a payment on January the

11  8th.  Do you remember that?

12       A.   Yes.

13       Q.   Do you remember which email that was?

14       A.   I believe it's this one here.  Yes, this is my

15  response to you here regarding the end of email.

16       Q.   Okay.  So in response to -- on Plaintiff's Exhibit 13

17  in response to an email on January the 7th -- right -- you're

18  sending an email on the 8th saying that you would mail payment?

19       A.   Correct.

20       Q.   And when asked by Mr. Bagley, you said we responded

21  that we're gonna pay this amount and this was gonna cover

22  everything.  That was your understanding?

23       A.   Correct.

24       Q.   Okay.  Now when you look to --

25            MR. ROUSE:  Mr. Bagley, do you have an extra copy of

1        13?

2                MR. BAGLEY: Which one?

3                MR. ROUSE:  13.

4                MR. BAGLEY: Your 13.

5                MR. ROUSE:  Yes, sir.

6                THE WITNESS:  It's right here.

7    BY MR. ROUSE:

8        Q.   Perfect.  All right.  So on 13, there is an email --

9    excuse me.  On the 7th, there was an email confirming what the

10   payment was before you actually -- you said you were gonna send

11   the payment on the 8th; is that fair to say?  So if you look

12   here on January the 7th --

13       A.   Yes.

14       Q.   -- there was a confirmation email saying per our

15   conversation this afternoon -- I'm talking to you, Skylar

16   Felder -- per our conversation, I reiterate that, the amount of

17   $18,000 we sent to my office to cover partial costs associated

18   with the work performed?

19       A.   Yes.

20       Q.   Right?  And then with the confirmation from me on

21   behalf of Flood Brothers that that was a partial payment, you

22   said you would have the payment mailed on the 8th?

23       A.   Yes.

24       Q.   So the last time we communicated via email, you knew

25   that that was a partial payment and not a full compromise as

1    you testified to earlier, right?

2         A.    No.   To my understanding it was a partial payment

3    which would be associated with our previous compromise.

4         Q.    Okay.   And the email -- All right.   The email,

5    Exhibit 10, did Patrick Chichester, did he copy you and make

6    sure you were aware of communications related to this water

7    mitigation project?

8         A.    I think from the documents there wasn't anyone there

9    if that's what you are referencing.

10        Q.    Because, again, you know, we started communication, I

11   assume, because someone referred the communication to you,

12   right?

13        A.    I don't remember exactly how you and I touched base.

14        Q.    Okay.   But you supervised Chichester or at least the

15   process for which Chichester was communicating with my office?

16        A.    For our process, yes, but I don't supervise Mr.

17   Chichester.

18        Q.    Okay.   But in terms of the water mitigation project,

19   that was your responsibility?

20        A.    Correct.

21        Q.    So if he did communicate with you, he was forwarding

22   to you documents that were related to a project that you were

23   supervising?

24        A.    Correct.

25        Q.    Now there was an email on November the 6th, and it

277

1     looks like this was from Randy Fowler to Charles Derry.  You

2     testified earlier that you did directly supervise Mr. Derry,

3     correct?

4          A.   Yes.

5          Q.   Okay.  And Becky, did you supervise her as well?

6          A.   No.

7          Q.   Oh, excuse me, jf1109@universal.  Do you know who

8     that is?

9          A.   That may be Jane Fernandez, but I can't confirm

10    because her name isn't there that that's her email address or

11    that that was delivered.

12         Q.   Okay.  But based upon this email, you can see that

13    Charles Derry received this communication to Universal?

14         A.   Correct.

15         Q.   In this communication, Flood Brothers states that if

16    payment was not received, eighteen thousand was not received by

17    November 16th, the settlement discount would no longer be

18    accepted.  Do you see that?

19         A.   I do see that.

20         Q.   And so Flood Brothers communicated as late as

21    November the 6th that they'll give you another grace period of

22    November the 16th to pay the eighteen thousand and that would

23    be a compromise, right?

24         A.   Yes.

25         Q.   But it wasn't paid by that date, was it?

1        A.    No.

2        Q.    Now the loss was September 11th of 2018, right?

3        A.    Yes.

4        Q.    And it stands to reason that Universal got notice of

5    the loss September 11th, same day, right?

6        A.    I would have to check the loss service, but around

7    that time frame I can attest to.

8        Q.    Or at least a couple of days later because Universal

9    had adjusters on site, correct?

10        A.    Yes.

11        Q.    Okay.  So let's say for argument's sake it's

12    September 14th.  Let's just agree to that or can we agree to

13    that?

14        A.    I would say on or about September 11th.  That's what

15    I would agree to.

16        Q.    Okay.  So September, October, November 11th, 60 days,

17    right?

18        A.    Yes.

19        Q.    So if you agree that Universal got notice on

20    September 11th roundabout, then November 11th would be 60 days

21    which would be the deadline that Universal would have to pay

22    for the water damage, right?

23        A.    Are you referencing back to the policy?

24        Q.    Yes.

25        A.    Yes, but that would be in relation to a proof of loss

1  paperwork that we presented.  Proof of Loss is a form.  It
2  needs to be presented by the policyholder for us to be held to
3  that time frame.
4      Q.  What form -- do you have any of the internal policies
5  and procedures of Universal?
6      A.  I don't.
7      Q.  So you are saying now there's a form that Michelle
8  had to submit to you to prove that there was a loss?
9      A.  No, it's a common form called a proof of loss.  All
10  carriers have a proof of loss form.
11      Q.  When was one submitted in this case?
12      A.  I don't believe one was ever submitted.
13      Q.  Whose responsibility is it to submit proof of loss
14  form?
15      A.  The insured's.
16      Q.  Okay.  Where in the file do you have evidence today
17  that shows it was never submitted?
18      A.  I don't have anything to say that it wasn't with me
19  right this second.
20      Q.  All right.  Do you have anything to say that
21  Universal is not responsible to make payment if proof of loss
22  form is not provided?
23      A.  No.
24      Q.  Where does it say that in the insurance contract?
25      A.  Where does it say what in the insurance contract?

1      Q.    That Universal is not responsible for anything if  a

2  proof of loss form is not submitted.

3      A.    It's not in there.

4      Q.    Okay.  So if Universal received a final bill from

5  Flood Brothers, wouldn't it make sense that a proof of loss had

6  already been submitted because a claim number was presented and

7  created, right?

8      A.    No.  Because, again, proof of loss form is a general

9  form submitted for a claim.  It's generally submitted after a

10  claim is created.

11      Q.    Okay.  If there was no proof of loss form and you

12  needed that, now you are saying you needed that to make payment

13  to Flood Brothers?

14      A.    I'm not saying we needed that to make payment.  I'm

15  saying in relation to the time frame that you're referencing,

16  it would only come into play if a proof of loss form was

17  submitted by a policyholder.

18      Q.    Okay.  Let's draw your attention back to the contract

19  here.  And I want to draw your attention back to Subsection I.

20  It's right here in black and white.  This is the terms that you

21  have to follow, correct?  It's page 15.

22      A.    That's fine.  I'm just looking for my policy.

23      Q.    Gotcha.  Gotcha.

24      A.    Page 15?

25      Q.    Yes, sir, Subsection I.  Last sentence, loss will be

1  payable 60 days after we receive your proof of loss.
2          MR. BAGLEY:  You want to continue on the and you
3      stopped at.
4          THE WITNESS:  And reach an agreement with you.  There
5      is an entry of a final judgment or there is a filing of an
6      appraisal or both.
7  BY MR. ROUSE:
8      Q.   So when you have an or behind any sentence, that
9  means each one is conditional.  You can have this or that or
10  that?
11     A.   Correct.
12     Q.   So you could reach an agreement or there could be a
13  final judgment or there could be a filing of an appraisal along
14  with this with you?
15     A.   Correct.
16     Q.   All right.  So within 60 days, this contract does not
17  say only if form A, B, C is submitted, does it?
18     A.   No, it just states there --
19     Q.   Proof of loss?
20     A.   If a proof of loss is submitted.
21     Q.   All right.  When you received -- at the very latest
22  when you received the invoice from Flood Brothers, that showed
23  the loss because it showed the work that had been done, right?
24     A.   Yes.
25     Q.   So let's say, for example, the date of Flood

1    Brothers' invoice that was submitted, was payment made within
2    60 days of the invoice that they submitted to you?
3        A.   I'd have to reference the timeline.
4        Q.   Okay.  The invoice is Plaintiff's Exhibit 2 and 4.
5    And you can look to page ten of either document.  It shows --
6    mind you, Flood Brothers was only there for seven days?
7        A.   Okay.
8        Q.   So add ten days to the date of loss.  Was the
9    claim -- was the Flood Brothers' invoice paid within ten days
10   after then 60 days following that of the claim of the
11   submission of the invoice?
12       A.   No.
13       Q.   Okay.  So by any stretch, by any argument, Universal
14   did not pay the claim within 60 days after they got notice of
15   the expense to Flood Brothers, did they?
16       A.   No.
17       Q.   Okay.  You testified pretty extensively that
18   Universal's actions were conditioned on, hey, getting Michelle
19   to agree, right?  She had to agree to something?
20       A.   Correct.
21       Q.   That's what held it up, right?
22       A.   Correct.
23       Q.   Then you testified also that before December 20th,
24   you weren't even aware that the check wasn't submitted to Flood
25   Brothers, correct?

1          A.    Me personally, correct.

2          Q.    Whether you know or not, you are the supervisor so

3     you fall on the sword.  You are responsible no matter what,

4     right?

5          A.    Sure.

6          Q.    So if your underlings found out about it, you're

7     responsible for it just as they are, right, because you're

8     supervising?

9          A.    Sure.

10         Q.    So again, you are saying before December 20th, you

11    weren't aware that the check was not given to Flood Brothers.

12    What steps can you share with this jury, what safeguards did

13    you perform to make sure that you resolved Flood Brothers'

14    invoice?

15         A.    I'm confused regarding the question.

16         Q.    What steps would you ordinarily take as a supervisor

17    to make sure certain things are happening?  So in this case,

18    what steps did you take as a supervisor to make sure that the

19    check that was issued to Michelle Jimenez got to Flood

20    Brothers?

21         A.    The time frame --

22         Q.    Let's back up.  You would agree that a check was

23    submitted to Michelle Jimenez directly before December 20th?

24         A.    Correct.

25         Q.    She just didn't give it to Flood Brothers?

1        A.    Correct.

2        Q.    Then there was some issue, hey, we haven't gotten the

3   check.  And Universal said, we'll send another check to

4   Michelle Jimenez; remember that?

5        A.    Yes.

6        Q.    That happened before December 20th, did it not?

7        A.    Yes.

8        Q.    So whether you personally knew about that or not,

9   Universal knew before December 20th that the check did not make

10  it to Flood Brothers, correct?

11       A.    Correct.

12       Q.    Now, you testified a moment ago that you never had

13  any contact with Michelle Jimenez, right?

14       A.    To my memory?

15       Q.    Well, now you're qualifying.  You're under oath.

16       A.    I believe that's what I stated originally.

17       Q.    Okay.  I want to draw your attention to Plaintiff's

18  Exhibit 33.  Is your email listed here?

19       A.    Yes, it is.

20       Q.    So that's your email.  What's the date here?

21       A.    December 3rd.

22       Q.    And this email is from who?

23       A.    Michelle Jimenez.

24       Q.    What does the first line say?

25       A.    Any updates.

1       Q.    And then like a thousand question marks?

2       A.    Have not received a check for Flood Brothers.

3       Q.    Okay.   Then on November 16th of 2018, you had an

4    email from who?

5       A.    Michelle Jimenez.

6       Q.    To who?

7       A.    To me.

8       Q.    What does it say?

9       A.    Any news on the check for Flood Brothers?   Mr. Fowler

10   and his crew were on site within 30 minutes of my call.   Their

11   team worked fast and possibly saved your company thousands of

12   dollars due to the quick response.   The contractors have been

13   paid.

14      Q.    The what have been paid?

15      A.    The contractors have been paid when in reality, Flood

16   Brothers should have possibly been paid first.   Is there

17   anything I can do to help your company speed up the process?

18      Q.    Do you remember responding to that email?

19      A.    I don't.

20      Q.    Because the next email is her saying any updates,

21   right?

22      A.    Right.

23      Q.    So Michelle Jimenez communicated with you on November

24   the 16th and then again weeks later on December the 3rd based

25   on this email string, right?

1          A.   Correct.

2          Q.   Do you have any reason to dispute this?

3          A.   No.

4          Q.   Do you recall that email now?

5          A.   I don't recall, but if it's there, then that's what

6     it is.

7               MR. ROUSE:   Okay.  Move to admit Plaintiff's Exhibit

8          33.

9               THE COURT:   Any objection?

10              MR. BAGLEY:   No objection.

11              THE COURT:   Admitted without objection.

12              MR. ROUSE:   May I publish, your Honor.

13              THE COURT:   Yes, you may.

14    BY MR. ROUSE:

15         Q.   All right.  So now that you've refreshed your

16    recollection with an email that Michelle sent to you on

17    December the 16th and then, again, an updated email on December

18    the 6th, how do you explain your testimony that you didn't have

19    any contact with Michelle Jimenez before December 20th?

20         A.   Obviously, you have the documentation there to prove

21    that she had reached out to me then.

22         Q.   So then that testimony was not true, correct?

23         A.   Correct.

24         Q.   Okay.  Now in the beginning of this case, it was

25    Flood Brothers' position that -- excuse me, it was Universal's

1    position that Flood Brothers was entitled to payment, right?

2         A.   Correct.

3         Q.   And that's -- Mr. Bagley, he testified that that's

4    been your position, right?

5         A.   Yes.

6         Q.   Has that always been Universal's position that Flood

7    Brothers is entitled to payment?

8         A.   Yes.

9         Q.   Okay.  But it's just the amount that we dispute?

10        A.   Correct.

11        Q.   What dates can you specifically identify where you

12   communicated with Flood Brothers or my office and mentioned any

13   issues with Xactimate or miscoding or anything, over billing,

14   under billing, what communication did you make to communicate

15   that?

16        A.   I can't provide dates.

17        Q.   Because they never happened, right?

18        A.   To my knowledge.

19        Q.   So if you have a problem with the bill, wouldn't it

20   be logical to communicate that before you get to court?

21        A.   Yes.

22        Q.   But the first time Flood Brothers Restoration even

23   heard of an Xactimate issue or an over billing or under billing

24   issue is today in court, right?

25        A.   Correct.

1          Q.   Is that fair?  I'll withdraw the question.

2          Were you aware that Mr. Bagley and his firm submitted a

3     near 200-page motion for summary judgment based on dismissing

4     the complaint before against Flood Brothers before trial?

5          A.   No, I was not directly aware.

6          Q.   Were you aware of the answer in this case where

7     there's a litany of defenses disputing the complaint to

8     recovery entirely on behalf of Universal?

9          A.   No.

10         Q.   Were you aware that there was a counterclaim against

11    Flood Brothers basically suing them for $5,000?

12         A.   No.

13         Q.   What information -- without telling me or divulging

14    attorney-client communications, what information did you

15    provide to your attorneys that gave them any basis whatsoever

16    for calculating a $5,000 award against Flood Brothers?

17         A.   I'm sorry?

18         Q.   What information --

19         MR. BAGLEY: Your Honor, I'm gonna object to this.

20         It's not an issue before the Court.  That was dismissed

21         and is no longer involved and it's not an issue for the

22         jury.  It's irrelevant.

23         MR. ROUSE:  I don't think it was dismissed.

24         MR. BAGLEY:  It's not in the pretrial order.  It's

25         not an issue.

1          MR. ROUSE:  I'll withdraw the question.  Nothing

2      further, sir.

3          THE COURT:  Any redirect, Mr. Bagley?

4                      REDIRECT EXAMINATION

5  BY MR. BAGLEY:

6      Q.   Thank you, Judge.  Mr. Felder, the policy -- you've

7  talked a lot about the policy.  And up until the very end in

8  the loss payment provision, the requirement for payment also

9  required you to reach an agreement with the insured, didn't it?

10     A.   Correct.

11     Q.   And to do that, you needed to talk about the amount,

12 right?

13     A.   Correct.

14     Q.   One of the things we've been talking about for the

15 past several days is how neither Universal nor Michelle Jimenez

16 took the position that Flood Brothers wasn't entitled to

17 payment, correct?

18     A.   Correct.

19     Q.   And, of course, the issue that Mr. Rouse is talking

20 about with regard to the motions to dismiss is a legal issue

21 regarding direct actions against Universal.  You're aware of

22 that?

23     A.   Yes.

24     Q.   And the payments that you made on this claim were on

25 behalf of Michelle Jimenez, correct?

1      A.   Correct.

2      Q.   She was the one who undertook the contract; is that

3  right?

4      A.   Correct.

5      Q.   Now we have these emails that are Exhibit 33 where

6  she indicated to you that, you know, what's going on?  Is there

7  a check going?  You see that?

8      A.   Yes.

9      Q.   Did Michelle Jimenez or Flood Brothers Restoration

10  ever reveal to you that Michelle Jimenez wanted a kickback out

11  of the payment?

12     A.   No.

13     Q.   Of course, you were being questioned without the

14  benefit of your digital file.  Did you just forget about this

15  email?

16     A.   Yes.

17     Q.   Were you trying to conceal it?

18     A.   No.

19     Q.   Is there anything inconsistent in it about you saying

20  that Michelle Jimenez always wanted the bill paid to some

21  amount?

22     A.   No, there's no inconsistency with that.

23     Q.   Were you ever able to reach an agreement with her

24  regarding the amount payable to Flood Brothers?

25     A.   No.

1       Q.   The $18,000?

2       A.   No.

3       Q.   And then when the threat of a lawsuit came, it

4   shifted into a different part of the policy and you were able

5   to issue payment without her agreement?

6       A.   Correct.

7       Q.   Whether she wanted a part of the kickback or not?

8            MR. ROUSE:   Your Honor --

9            MR. BAGLEY:   I'll withdraw it.

10           MR. ROUSE:   And I have standing objection to leading.

11       I reserved objecting earlier.   Just didn't want to

12       interrupt.

13           THE COURT:   So noted for the record.

14           MR. BAGLEY:   That's all I have of this witness, your

15       Honor.

16           THE COURT:   Any recross?

17           MR. ROUSE:   I just have a conclusionary rebuttal

18       witness, but no re-cross.

19           THE COURT:   Okay.   Any reason why Mr. Felder cannot

20       step down?

21           MR. BAGLEY:   No, ma'am.

22           THE COURT:   Mr. Felder, you may step down.

23           MR. BAGLEY:   Your Honor, we will tender Exhibits D-2,

24       D-3, D-4, D-5, D-6, D-9, D-10, and D-11.

25           MR. ROUSE:   Not D-5?

1           MR. BAGLEY:  Yes, D-5.

2           MR. ROUSE:  So just D-1 through --

3           MR. BAGLEY:  No.  D-1 I'm not tendering because it's

4     already been tendered.  D-2 through D-6, D-9 through

5     D-11.

6           THE COURT:  Any objection?

7           MR. ROUSE:  No objection.

8           THE COURT:  So Mr. Bagley, I'm missing 7 and 8.  You

9     are not tendering 7 or 8?

10          MR. BAGLEY:  We are not tendering either 7 or 8, your

11    Honor.

12          THE COURT:  Nor 1 because 1 is admitted on

13    plaintiffs.

14          MR. BAGLEY:  Yes, ma'am.

15          THE COURT:  Okay.  Those items will be admitted

16    without objection.  Mr. Bagley, did you --

17          MR. BAGLEY:  Yes, ma'am, we rest.  After admission of

18    the evidence, we rest.

19          MR. ROUSE:  I just have a rebuttal witness.

20          THE COURT:  All right, counsel.  Anybody need to

21    stand up stretch and go to the restroom?  Okay.  Let's

22    take a quick ten-minute break.

23          (Whereupon, the jury was escorted out of the

24    courtroom.)

25          THE COURT:  All right, counsel I will release you to

1          take a break also.  I'm assuming your rebuttal witness is

2          gonna be --

3                MR. ROUSE:  Yes, Mr. Fowler.

4                THE COURT:  Let's take a break and then we'll come

5          back.  And also, counsels, I'm thinking once we do the

6          rebuttal witness, it's almost 3:30 now.  We will have to

7          deal with the charge conference and the verdict form.  I

8          suspect based on my interactions with you that's gonna

9          take minimum, minimum 30 minutes.  It may take an hour.

10               MR. ROUSE:  I think less.

11               THE COURT:  Okay.  I would disagree, but I think it's

12         going to take much longer to hash out and hammer out this

13         verdict form and to go through these jury charges.

14               I think you submitted your charges and you submitted

15         your charges, right?

16               MR. BAGLEY:  Yes, ma'am.

17               MR. ROUSE:  Yes.

18               THE COURT:  I'm sure there will be some arguments

19         about some of your requests.  So I realistically think

20         that we'll probably need to take minimally 30 minutes, if

21         not an hour at the most to go through all of these.  So

22         I'm trying to decide what to do.

23               I don't want to hold the jurors in here that long, so

24         I may release them.  Give us adequate amount of time and

25         go through it because the verdict form is very important.

1          And then Debra will have to put it all together and then

2          come back.  Once you do your closing, then I can go right

3          into the charges.

4               Okay.  So go ahead and take a ten-minute break or so.

5               (Whereupon, a brief recess was held.)

6               THE COURT:  Okay.  Let's bring them in.

7               (Whereupon, the jury was escorted into the

8          courtroom.)

9               THE COURT:  All right.  Counsels, you may be seated.

10         All right, ladies and gentlemen.  The defense has rested

11         its case in chief.  At this time, I think the plaintiff,

12         Mr. Rouse, has called -- is calling a rebuttal witness.

13              MR. ROUSE:  Just calling Mr. Fowler as a rebuttal

14         witness.

15              THE COURT:  Okay.

16                        FURTHER DIRECT EXAMINATION

17    BY MR. ROUSE:

18         Q.   Mr. Fowler, you are still under oath.  You heard the

19    testimony of Mr. Felder, Skylar Felder, a few moments ago,

20    correct?

21         A.   Yes.

22         Q.   In terms of the communication that you had with

23    Universal before you started work on the subject property, I

24    just wanted to clarify what communications you had.

25         So specifically, can you tell or specify to the Court what

1    communications did you have directly with Universal after you

2    had a signed agreement with Michelle Jimenez?

3         A.   When I called Saturday -- when we got there Friday,

4    it was already too late.  So Saturday morning, when I called,

5    it was a lady in claims.  I didn't write down the name.  But I

6    asked about the policy.  I made sure the policy was in force

7    and then I asked what steps they wanted us to do to make sure

8    we get paid.  They said they wanted pictures, make sure you

9    take a lot of pictures in every room, readings and, I mean, you

10   have to have it well documented.

11        Q.   Okay.  Did they make clear whether they wanted you to

12   do repairs or just water mitigation?

13        A.   No, they said don't start any repairs until an

14   adjuster comes out.

15        Q.   Okay.  So based on your communications directly with

16   Universal, they told you what they wanted you to do?

17        A.   Correct.

18        Q.   This is before you began water mitigation on this

19   property?

20        A.   Yeah, I mean --

21        Q.   Before you -- absent removing standing water on the

22   first day, before you started the water mitigation project?

23        A.   Correct.

24        Q.   Okay.  At any time did Universal tell you that they

25   did not want you to perform work after that call from

1    representatives with Universal?

2        A.    No.

3        Q.    At any point did you converse with representatives

4    from Universal while on site?

5        A.    Yes.

6        Q.    And did they communicate to you we don't want you to

7    continue working at our behest?

8        A.    No.

9        Q.    At any point before today before this litigation, did

10   Mr. Felder or anyone else with Universal communicate with you

11   problems about either over billing or under billing?

12       A.    No.

13       Q.    Did anyone on behalf of Universal communicate any

14   problems with Xactimate?

15       A.    No.

16             MR. ROUSE:   Nothing further.

17             THE COURT:   Okay.   Mr. Bagley?

18                    FURTHER CROSS-EXAMINATION

19   BY MR. BAGLEY:

20       Q.    Mr. Fowler, I'll just be real brief.   At one point

21   early on, you offer to settle or discount your invoice for

22   $18,000, right?

23       A.    That's correct.

24       Q.    And after that, there was no reason to exchange

25   anymore information or for you to provide anymore information,

1   was there?

2        A.    No.  I mean, if I would have gotten paid.

3              MR. BAGLEY:  Thank you, sir.

4              MR. ROUSE:  Nothing further.

5              THE COURT:  Any reason why he cannot step down?

6              MR. ROUSE:  No, ma'am.

7              THE COURT:  All right.  Mr. Rouse, anything further?

8              MR. ROUSE:  Nothing else on behalf of Flood Brothers.

9              THE COURT:  All right, ladies and gentlemen.  Both

10       the plaintiff and the defense have rested their case in

11       chief.  At this time, I'm gonna let you go back with the

12       bailiffs.  I need to take up some housekeeping rules.  I

13       suspect it's gonna take longer than I want to hold you

14       back there for.  And so I think this may be a good time to

15       release you.

16            I'm anticipating minimally 30 minutes, but more so an

17       hour for us to take care of what we need to take care of

18       before they give their closing statements.  I don't want

19       to hold you back there that long.

20            So I think it would be better to release.  You get

21       ahead of the traffic and get in place.  And then come back

22       tomorrow, and we will finish up the case tomorrow.

23            All right.  Be safe out there.  And once again, just

24       remember, don't talk to anyone about the case.

25            (Whereupon, the jury was escorted out of the

1    courtroom.)

2         THE COURT:  Okay, counsel.  I have my proposed

3    verdict form.

4         MR. BAGLEY:  Your Honor, I think maybe -- is there

5    any real reason our clients should stay here for this?

6    Would it be all right -- if we're not gonna offer anymore

7    evidence or anything like that.  If it's all right with

8    you --

9         THE COURT:  If there's no opposition, I don't have

10   any problem.

11        MR. BAGLEY:  Okay.  Could you give us a pause for

12   just a second?

13        THE COURT:  Yes, go ahead.

14        (Whereupon, a pause in the proceedings was held.)

15        MR. BAGLEY:  Judge, what would be your pleasure on

16   motion for directed verdict on the 13-6-11?

17        THE COURT:  I can't hear you.

18        MR. BAGLEY:  Oh, I'm sorry.  What would be your

19   pleasure on documenting a motion for directed verdict on

20   the attorney's fees issue, the 13-6-11 claim?

21        THE COURT:  You haven't made that motion.

22        MR. BAGLEY:  Well, we've rested now and I was gonna

23   make that motion.

24        THE COURT:  You want to make it now?

25        MR. BAGLEY:  It seems to me it would be logical to

1    make it before we decide on the verdict form.

2        THE COURT:  Yes.  So if there are any motions or

3    anything outstanding, now is the time.

4        MR. BAGLEY:  Okay.  Your Honor, we move for directed

5    verdict on the attorney's fees issue.  It's my

6    understanding that the motion is only under 13-6-11.

7        There's several legal basis, your Honor.  Under that

8    code section, if there is any bonafide controversy, mere

9    refusal to pay is not enough.  There are several cases

10   that say that.  *Rivers v. S. Auction, 351 Ga. App. 179*.

11   If there is a bonafide dispute regarding the damage

12   amount, there can be no discovery for 13-6-11.  That's

13   *Brown v. Baker, 197 Ga. App. 466*; and *Horton v. Dennis,*

14   *325 Ga. App. 212*.  And in --

15       There's also findings that if there is reasonable

16   ground to contest not whether they win or not, just if

17   there is a reason, there is no bad faith that can

18   formulate the basis of an award of attorney's fees under

19   13-6-11.

20       And so there are four-or-five bonafide disputes

21   starting from the existence of a contract -- which we

22   contend there was no oral agreement with Flood Brothers;

23   that our agreement was with the insured, and we were

24   honoring our agreement with the insured when we made the

25   payment to Flood Brothers.  There can be no promissory

1    estoppel because the claim is being made through a written

2    contract, plus there's no testimony that anything was

3    relied on other than the fact that there was insurance

4    coverage that provided water mitigation coverage.

5         There are the responses to discovery which admit that

6    there was a contract exclusively with Michelle Jimenez.

7    There is the dispute over the amount of damages where the

8    initial analysis was that the documented recovery would be

9    less than the amount claimed of even $18,000; and then

10   there's the issue of accord and satisfaction, the

11   settlement by compromise at eighteen.

12        So there are almost a half-a-dozen bonafide issues to

13   support the reason that additional money beyond the

14   $18,000 was not paid and we believe as a matter of law

15   that would mean that the attorney's fees issue should not

16   go to the jury and should be dismissed on directed

17   verdict.

18        THE COURT:  Thank you, Mr. Bagley.

19        Mr. Rouse?

20        MR. ROUSE:  The theory of this case is that Universal

21   created an oral contract based upon their direct

22   communications with Randy Fowler.  There has been no

23   evidence at all in this trial to dispute that

24   communication, to dispute that there was enough of a

25   meeting of the minds to create an oral contract, which is

1    recognized in Georgia.

2         The only witness on behalf of Universal was Skylar.

3    Skylar did not have any ability -- his own testimony, he

4    confirmed he did not have any ability to testify to any

5    matters that weren't documented.  He didn't bring his

6    file.  He didn't identify any documented record in the

7    file.  He confirmed that he was not familiar with any

8    discussions that were had between Universal and Flood

9    Brothers directly.

10        So if he's not able to dispute any of the

11   conversations and communications that were testified to,

12   conversations directly with Universal on behalf of Flood

13   Brothers, then there's no way that he can dispute the fact

14   that there was an oral contract.  Obviously, it's an issue

15   for the jury, but Universal didn't put forth any evidence

16   to dispute that there was an independent contract created.

17        Now, the request for admissions asked about written

18   agreements and the exclusive written agreement -- there

19   were two contracts here.  There's one with Michelle

20   Jimenez and there was an oral contract formed by virtue of

21   the official representatives of Universal with respect to

22   their direct communication with Flood Brothers.

23        This happened before Flood Brothers started work.

24   Flood Brothers had their specific request for how they

25   wanted the work done; i.e., they wanted no repairs to be

1    made.  They wanted water mitigation as the sole function

2    of the service, which was provided.  They wanted numerous

3    water readings or moisture readings done.  That was

4    completed.  They wanted copious pictures, confirmations

5    about the progress of the work.  There was over a hundred

6    pictures that were submitted with this invoice.

7         So while Georgia law allows for multiple theories

8    against multiple parties, there certainly is an argument

9    that there's a contractual claim, written contractual

10   claim with Michelle Jimenez, but there is also grounds for

11   an oral contract between representatives of Universal and

12   Flood Brothers with respect to their communications.

13        So with respect to the -- specifically with respect

14   to the 13-6-11 claim which is grounded in the oral

15   contract, what Flood Brothers has to show is that either

16   there was bad faith or that there was stubborn

17   litigiousness or that there was a situation that caused

18   them unnecessary trouble and expense.  We think that we've

19   done that.

20        The bonafide issue that Mr. Bagley just referenced he

21   mentioned that there were numerous bonafide issues with

22   respect to the amount that should been paid.  Right before

23   Mr. Felder got off the stand, he confirmed three things:

24   He confirmed he wasn't an expert in the area of the

25   subject matter in this case.  He confirmed he had never

1    done water mitigation work before.

2         So based on the fact that he wasn't certified in the

3    very area or in the very IICRC, the platform of the

4    governing -- the agency that provided the certification

5    for professionals in this area, based upon the fact that

6    he wasn't even certified, it stands to reason he's not

7    qualified to be the expert on whether something meets or

8    does not meet IICRC standards.  He doesn't even know what

9    those standards are.  He doesn't have any certifications

10   in that regard.

11        Mr. Felder confirmed that he had never done any water

12   mitigation projects themselves.  He hadn't supervised any

13   water mitigation projects and he confirmed that he never

14   even went out to the subject property to see for himself.

15        Based as on the fact that he did not bring the file,

16   he did not have one record, he could not identify any

17   specific record with respect to the problems, problems

18   related to the actual provision of service, he had nothing

19   to offer to the Court with respect to the argument, well,

20   the services were substandard.

21        Moreover, the argument that there was an over billing

22   or an under billing is also what was also not supported by

23   the evidence because for there to be a bonafide issue with

24   respect to a billing concern, there has to be some

25   communication of that issue.  It stands to reason that you

1    can't have a bonafide issue if you never even communicated

2    that issue before trial.

3         So today, Universal is saying, oh, we had a bonafide

4    issue.  We believe that you over billed or under billed,

5    but they never sent one communication -- well, Mr. Felder,

6    the only witness, confirmed that he had no knowledge of

7    any communication to Flood Brothers with respect to an

8    under billing or over billing issue at all.

9         So I don't think that they can legally satisfy any

10   burden of showing a bonafide issue if they can't even show

11   that they sent a correspondence asking for clarification,

12   disputing anything or making it clear that there were

13   problems with the certification of workers that provide a

14   service on site.

15        So for those reasons, I think that the three-step

16   process for recovery under 13-6-11 is satisfied, not

17   necessarily that there was bad faith, but the "or"

18   applies.  I think that there is ample ground for the jury

19   to find that there was stubborn litigiousness or that they

20   caused Flood Brothers undue trouble and expense.

21        THE COURT:  Thank you, counsel.

22        Hold on one second.  Did you have something from the

23   jury?

24        THE BAILIFF:  Yes, Juror Number 2, who sits here,

25   just approached and said that she didn't think she would

1     be able to come back tomorrow because she doesn't drive
2     and she has to take Uber and she's missed three days of
3     work and she can't afford it.
4          I told her that the Judge would have to make that
5     decision.  And so I'm representing what she represented to
6     me.
7          THE COURT:  Okay.  Counsel, we have an alternate.
8          MR. ROUSE:  I'm fine.
9          MR. BAGLEY:  We do have an alternate.
10         THE COURT:  Is she still here?
11         THE BAILIFF:  Yes, she's downstairs.
12         THE COURT:  Let her know that I'll excuse her.
13         Okay.  Mr. Bagley?
14         MR. BAGLEY:  Your Honor, I don't think you are
15    required to analyze the merits of each of these bonafide
16    controversies, and I'm not gonna rehash and respond to
17    everything that Carlton said because I don't think it's
18    necessary for this purpose because the law has a threshold
19    not whether the party that's being asked to pay the
20    attorney's fees is going to lose on those issues, but
21    whether there is a bonafide controversy.  And the way
22    that's measured is sort of the directed verdict standard
23    in reverse.
24         If there is no dispute, no justiciable controversy,
25    then there's no bonafide dispute.  If it wouldn't -- if

1    you wouldn't grant directed verdict, there's a bonafide
2    dispute.  In other words, the jury could rule there was no
3    contract.  There was no promissory estoppel.  They've been
4    paid everything they've already been entitled to.  There
5    was a settlement.  The jury could rule that way on any of
6    those things.  And, of course, they could rule the other
7    way, but that's the point.  That's the point of the law.
8    That's the threshold that has to be met to get beyond the
9    bonafide controversy criteria when the allegation is bad
10   faith.
11        Now I will point out one thing --
12        (Whereupon, crosstalk occured.)
13        MR. ROUSE:  -- bad faith.
14        MR. BAGLEY:  Well, it applies to the other criteria
15   too.  If there's a bonafide dispute, it defeats all of it.
16        And the law is very clear, and I've cited a bunch of
17   cases already for that, but one thing I will correct, and
18   I know Carlton didn't mean this intentionally, but he
19   misquoted the request to admit.  The request to admit was
20   not limited to written contracts.  The request to admit
21   was -- and it was admitted -- plaintiff performed water
22   mitigation services on the property after contracting
23   exclusively with perceived owner of the property, Michelle
24   Jimenez.
25        MR. ROUSE:  I didn't ask whether there was any

1    communication directly with Universal.  My question didn't
2    ask that, so it's not a zero sum question.
3         MR. BAGLEY:  It's a very blunt simple question.
4         MR. ROUSE:  That's true.
5         MR. BAGLEY:  They performed the services after a
6    contract exclusively with Michelle Jimenez.
7         Judge, I don't know how you can now argue, well, it's
8    our position they really contracted with somebody else.
9    That's totally inconsistent with the request to admit.
10        MR. ROUSE:  And our position was there were two
11   conversations:  There was one with Michelle and there was
12   one with Universal.
13        MR. BAGLEY: It should've been denied, Judge.  And the
14   response should've said denied.  They contracted also with
15   somebody else.
16        THE COURT:  Okay.  Hold on, counsel.  You're arguing
17   about two different things now.  Let me go ahead and I
18   will go ahead and make my ruling on defense's motion for
19   directed verdict as it relates to the attorney's fees.
20        Referring to statute 13-16-11, I am going to deny
21   defense's motion for directed verdict.  I didn't see the
22   defense put up any evidence that relates to damages that
23   they were contesting.  I didn't hear defense witness --
24   there was no expert.  There was no evidence whatsoever of
25   any controversial, any dispute as relates to the amounts

1       that you are saying.

2           So I don't think you carried your burden, Mr. Bagley.

3       The defense did admit that they knew they were gonna pay

4       or be obligated to pay.  They stated that there was a

5       claim to be paid.  The witness testified based on the

6       contract that it was paid within 60 days.  So I'm gonna

7       deny your motion for a directed verdict as relates to the

8       attorney's fees.

9           All right.  That being said, now Debra, what do you

10      have?

11          MS. SIEGEL:  I have a copy of the verdict form if you

12      want it.  Mr. Rouse's verdict form.

13          THE COURT:  Yes.  I have Plaintiff's Requests to

14      Charge.  Do we have Mr. Bagley's Requests to Charge?  I

15      didn't see it in the file.

16          MS. SIEGEL:  I don't know where it was, but those

17      were both on my desk this morning.

18          THE COURT:  Okay.  You should each have a copy of

19      each other's proposed verdict forms and mine.  So three

20      verdict forms.  And you should have a copy of the proposed

21      jury charges.  So four pieces of paper.

22          Okay.  Let's go ahead -- have y'all had enough time

23      to look at the jury charges?  I typically go through them

24      page by page.

25          MR. ROUSE:  Okay.

1    THE COURT:  That's the Court's proposal, the thinnest

2  one, and then you will each have your own proposed

3  Plaintiff's Requests and the Defendant's Requests.

4    Let's go through the Court's proposed jury charges

5  first and then you can let me know what you think I left

6  out and should be included or what I have on here should

7  be deleted.

8    MR. ROUSE:  Okay.  Your Honor, on .1, and the style

9  that goes out to the jury, I think I would be in favor of

10  removing Michelle Jimenez considering that she's not a

11  party to the case.  I know I included her name on my

12  verdict form, but I just thought about that.

13    THE COURT:  When I read the style to the jury I

14  didn't include Michelle Jimenez.

15    MR. ROUSE:  Right.

16    MR. BAGLEY:  That's correct.  You didn't.

17    THE COURT:  I was looking at the pretrial

18  consolidated order and it does not have Michelle on it.

19  Mr. Bagley, do you object to us removing Michelle?

20    MR. BAGLEY:  No objection.

21    THE COURT:  Okay.  We'll take out Michelle Jimenez.

22  Everybody is still on page one?  Still looking.  When you

23  have perused them, let me know.

24    MR. ROUSE:  I'm fine with page one.

25    THE COURT:  Okay.  Nothing else on page one except we

1        will take out Michelle Jimenez on slide one.

2             You think we can take out Number 10, expert

3        witnesses?

4             MR. ROUSE:  I would like to keep it in.  While I

5        didn't introduce -- I didn't formerly offer Mr. Fowler as

6        an expert, I do think he explained the nature of his

7        certifications and training and he mentioned the number of

8        cases he had worked on.  I do think that that would give

9        him a level of expertise that's above just a mere lay

10       witness.

11            THE COURT:  Mr. Bagley?

12            MR. BAGLEY: I'm fine with it, your Honor.

13            THE COURT:  Okay.  Anything on page two?

14            MR. ROUSE:  No, your Honor.

15            MR. BAGLEY:  I agree, your Honor.  No objection.

16            THE COURT:  Okay.  Page two is good.

17            And, counsels, if this is too much pressure, I can

18       step off.

19            MR. ROUSE:  No, I'm fine.

20            THE COURT:  Okay.  So we're looking at page three.

21            MR. ROUSE:  I submitted a special charge on oral

22       contracts and it is -- on page 11, I submitted a charge

23       about contracts.  It just has a second sentence all the

24       way to the end.  It just has a quotation from 13-1-5(b).

25       It talks about there's no requirement that a contract be

1    in writing.  A contract may be enforceable even though it

2    rests only --

3         THE COURT REPORTER:  Mr. Rouse, I'm sorry.  I can't

4    hear you.

5         MR. ROUSE:  I'm sorry.  I forgot.

6         It reads under -- it quotes 13-1-5.

7         THE COURT:  You're just talking about that last

8    sentence?

9         MR. ROUSE:  The last two sentences.  There is no

10   requirement that a contract be in writing.  A contract may

11   be enforceable even though it rests only in the words as

12   remembered by witnesses.  I would like to just add that to

13   20, somewhere in 20, just to kind of reaffirm that --

14        THE COURT:  Mr. Bagley, do you have a copy of his --

15        MR. BAGLEY:  Well, I had one, but I gave it to

16   Carlton because he didn't have his.

17        THE COURT:  Mr. Rouse is saying starting at there is

18   no requirement.  He wants to add those last two sentences.

19   What's your position on that?

20        MR. BAGLEY:  Yes, ma'am.  I don't have a problem with

21   that.

22        THE COURT:  Okay.

23        MS. SIEGEL:  I will add it to the back of 19.

24        THE COURT:  Yeah, that's what I thought too.  You

25   have a copy of Mr. Rouse's?

1          MS. SIEGEL:  I do.

2          THE COURT:  Okay.

3          MR. BAGLEY:  Your Honor, on page three, continuing

4     there under 22.  Are you gonna have a bifurcation and the

5     thing after 22 will be in the second phase charge?

6          THE COURT:  On slide 22, right?

7          MR. BAGLEY:  Yes, ma'am.

8          THE COURT:  Are you asking am I going to have a

9     bifurcation?

10         MR. BAGLEY:  Yes, ma'am.  Is that where the second

11    phase charges begin?  Because it talks about attorney's

12    fees and all of that --

13         THE COURT:  And stubbornly litigious.

14         MR. ROUSE:  I think that there has to be some

15    instruction for them to understand what it means on the

16    verdict form that either, yes, Universal has been

17    stubbornly litigious or not.  If they don't have any idea

18    what that is before they consider it, I don't see how they

19    can fairly weigh that issue.

20         THE COURT:  Mr. Bagley, what are your thoughts on

21    there after hearing that explanation because we are asking

22    them to answer that question on the verdict form?

23         MR. BAGLEY:  Well, the verdict form that you gave us

24    focuses on the bad faith issue because I thought from what

25    Mr. Rouse had said previously that was gonna be their

1    allegation.

2         MR. ROUSE:  I just said that bad faith --

3         MR. BAGLEY: I know.  I'm talking about previously

4    you've said bad faith.

5         MR. ROUSE:  I said it was stubbornly litigious or

6    unnecessary trouble and expense.

7         MR. BAGLEY:  Well, then we have to change that.

8         MR. ROUSE:  On the verdict form you mean?

9         MR. BAGLEY:  Yes.

10        THE COURT:  Change it to bad faith or stubbornly

11   litigious?

12        MR. BAGLEY: That language I was fine with that.  I

13   think I even suggested something like that because I

14   thought it was bad faith.  And now the claim is not bad

15   faith, and I'm assuming that's not gonna be argued in

16   closing.  You get back to the question of bonafide

17   controversy.  Was there a bonafide controversy?

18        THE COURT:  What I've heard, I always thought it was

19   stubborn and litigious.  That's what I gathered.

20        MR. BAGLEY:  I'm not debating that.  We had a

21   conversation with Mr. Rouse at the last trial where my

22   interpretation was he was riding on bad faith.  He's

23   corrected that, and I think we have to look at -- we'll

24   have to incorporate ideas of bonafide controversy, which

25   is the key in stubborn litigiousness, and --

1           THE COURT:  Slide 23 talks about forcing the
2      plaintiff to sue where no bonafide controversy exists.
3      Stubbornly litigious and causing unnecessary trouble and
4      expense refer to the defendant forcing the plaintiff to
5      sue where no bonafide controversy exists.
6           I think that will cover what it is that you are
7      wanting included in any one of the jury charges,
8      Mr. Bagley.
9           MR. BAGLEY:  And you would suggest giving that charge
10     in the first phase?
11          THE COURT:  Yes, because how would they answer the
12     question on the verdict --
13          MR. BAGLEY:  Oh, I understand.  I'm not arguing the
14     point.  I'm just asking for clarity on that.
15          THE COURT:  Yes, I was gonna give it in the first
16     phase.  And I guess if we came back to the second phase,
17     then what, you just re-read or do I even have to re-read?
18          MR. ROUSE:  In my experience, Judge, there is no
19     re-instruction at the second phase.  It's just I offer the
20     evidence and then they go back and retire.  If they find
21     that there has been either of the three -- bad faith or
22     stubbornly litigiousness or causing unnecessary trouble
23     and expense by virtue of me being a witness -- then they
24     either say yes or no.  I mean, that's been my experience.
25          MS. SIEGEL:  I don't know that you have done a bad

1    faith bifurcated trial at any point --

2         THE COURT:  But as relates to punitives?

3          MS. SIEGEL:  It would be similar to how you do

4    punitives in terms of separating the phases; not in terms

5    of arguments, but in terms of phasing it.  And I do

6    believe there's a short instruction the second time

7    around, but it may not be relevant here.  I don't know to

8    be honest.  Off the top of my head, I don't know.

9         MR. ROUSE:  I suppose if we got to that point it

10    would just be clarification on 13-6-11, and that would be

11    the only instruction.  This is what 13-6-11 is in the

12    three prongs of 13-6-11.

13        THE COURT:  Okay.  Mr. Bagley, were there any others

14    on page three?  Did those slides address your concerns?

15        MR. BAGLEY:  Yes, ma'am.  I think the one at slide 22

16    would be inappropriate in the first phase.  The one at

17    slide 23, if that is what we're now gonna put on the

18    verdict form, do you believe that there was stubborn

19    litigiousness, then I think the one at slide 23 may be

20    appropriate in phase one.

21        THE COURT:  So your position is 22 is not ripe yet or

22    should not be given?

23        MR. BAGLEY:  Yes, ma'am.

24        THE COURT:  Mr. Rouse?

25        MR. ROUSE:  I disagree.  I think as a part of

1　　contract damages, understanding what stubborn

2　　litigiousness is, it's not an independent theory of

3　　damages.  It's not an independent tort.  It sounds -- it's

4　　grounded in the statute.

5　　　　So if the jury doesn't know what 13-6-11 is, then

6　　just reading what stubborn litigiousness is in a vacuum I

7　　think might be confusing to the jury.  I think the way

8　　it's organized with 22 leading into 23, I think that is

9　　appropriate to give them a general overview of what

10　　13-6-11 is and what a bonafide controversy means, and then

11　　the three prongs.  And then they can decide whether that

12　　portion of the verdict form is satisfied or not based on

13　　what they've heard.

14　　　　THE COURT:  Yes.  Ultimately, we don't know what the

15　　jury will come back with.  The jury might come back and

16　　find all for the defendant.  I mean, we don't know.  But

17　　if it's on the verdict form, I would think that we would

18　　have some jury charge that could direct around guide them.

19　　　　MR. BAGLEY:  I think if the idea is the claim is for

20　　stubborn litigiousness, then we simply change what form

21　　you've got here and have the last question be do you find

22　　by a preponderance of the evidence that Universal Property

23　　and Casualty Insurance Company --

24　　　　THE COURT:  Mr. Bagley, you are going to have to

25　　speak up or I'm gonna have to give you the mic.

1          MR. BAGLEY:  Oh, I'm sorry.  Yes, ma'am.  I think

2     that you would change it to say do you find by a

3     preponderance of the evidence that Universal Property and

4     Casualty Insurance Company -- or that yeah, without any

5     bonafide controversy or dispute regarding any element of

6     the claim.  And I think you would also have to define for

7     them that the mere refusal to pay a claim does not satisfy

8     a bonafide dispute.

9          THE COURT:  So that would be a jury charge, right,

10    not on the verdict form?

11         MR. BAGLEY:  That would be on the jury charge, yes.

12    And on the form you would just say, do you find that

13    basically there was no bonafide controversy.

14         THE COURT:  Mr. Rouse, do you agree with that?

15         MR. ROUSE:  I don't agree with that.  I think what

16    should be done if there's a secondary charge if they

17    return a verdict on 13-6-11 and say, yes, we find that it

18    applies, then I think, I guess, tonight we submit our

19    version of what cases explain bonafide controversy,

20    stubborn litigiousness, unnecessary trouble and expense,

21    and we might submit specific instructions explaining that

22    in more detail.  But I think giving a general overview of

23    what's found in 22 and 23 is appropriate because --

24         THE COURT:  But let me ask you, are you also claiming

25    fraud or bad faith?

```
 1              MR. ROUSE:  I'm not.
 2              THE COURT:  So why not just have stubborn and
 3         litigious as the language, because on me -- and we can
 4         always tweak it, but on mine, I have acted with dishonest
 5         purpose.  Are  you saying they acted with dishonest
 6         purpose?
 7              MR. ROUSE:  I'm not.
 8              THE COURT:  Okay.  Sinister motive?
 9              MR. ROUSE:  I'm not.
10              THE COURT:  Or intentional wrongdoing?
11              MR. ROUSE:  No.
12              THE COURT:  Okay.  So why do we even have that?  We
13         can take that out.
14              MR. ROUSE:  There might be one juror that says --
15              THE COURT:  Mr. Rouse.  So we will take that out and
16         we will put --
17              MR. BAGLEY:  There's language in 23, your Honor.
18              MS. SIEGEL:  I was just gonna say there is language
19         in 23 just like Mr. Bagley said that addresses basically
20         what a bonafide controversy is, meaning no reasonable
21         grounds to contest a claim.
22              THE COURT:  Yes.
23              MS. SIEGEL:  Might be able to use some of that
24         language in the verdict form.
25              MR. BAGLEY:  I think you could do that.  I think that
```

1           would work even in the first phase.

2                THE COURT:  So we're on the same page, Debra?

3                MS. SIEGEL:  Yes.  And it would at least be

4           consistent for the jury because they're gonna hear the

5           same language in both phases.

6                THE COURT:  Yes.  Yes, Mr. Rouse.  Say something

7           along to what we're agreeing to now.

8                MR. ROUSE:  Yes.  I'm saying that when I looked at

9           22, 22 is an accurate recitation of 13-6-11.  It doesn't

10          talk about sinister motive.  It doesn't talk about any

11          intentionality in terms of lying, things of that sort.

12          But I think it is appropriate to say that if the defendant

13          has acted in bad faith or has been --

14               You're saying just on 22, just to remove acted if the

15          defendant has been stubbornly litigious or has caused the

16          plaintiff unnecessary trouble and expense for 22.  So

17          we're just removing after defendant has, then you are

18          saying been stubbornly litigious or has caused unnecessary

19          trouble and expense.  And you're gonna keep the rest of 22

20          there, just taking out acted in bad faith or, right?

21               THE COURT:  Yes.

22               MR. ROUSE:  You are saying just take out --

23               THE COURT:  Yes.  You're not claiming that.  That's

24          not one of your claims, but I think that was my

25          recommendation.

1          MR. ROUSE:  All right.  So we're keeping 22, just

2     taking out bad faith.  Okay.  I'm with that.

3          MR. BAGLEY:  I'm fine with that, Judge.  I would also

4     say that one of the keys on bonafide controversy -- and

5     maybe Debra has seen this in her exploration of the case

6     law -- is this idea that the mere refusal to pay a claim

7     is not -- does not mean there's no bonafide controversy or

8     amount to stubbornly litigiousness.  It doesn't equate

9     with it.  There's two different things.

10          The question is is there a bonafide controversy.  In

11     the instances that I have seen this -- and there may even

12     be a form charge on it, I don't know -- it says the mere

13     nonpayment of a claim does not mean --

14          THE COURT:  I have seen it a statute.

15          MS. SIEGEL:  I would have to go back and look at the

16     charges to be honest.  The pattern charges, I don't know

17     if it's in there or not.

18          MR. ROUSE:  If necessary, I think I would like -- I

19     could spend tonight looking up a case that goes into

20     detail about what a bonafide controversy is because I

21     think one of the issues in this case is there really a

22     bonafide controversy?  You've never communicated anything

23     to the other side.  You've never voiced --

24          THE COURT:  Well, I want to have all of this panned

25     out so that in the morning, we won't be in this same

321

1          position.  So I really want to have this panned out.
2               So Debra, on the verdict form, you've got that
3          changed on the verdict form?
4               MS. SIEGEL:  Yes.
5               THE COURT:  So I think we had hopped back on to slide
6          22 where Mr. Rouse had agreed to take out acted in bad
7          faith.
8               MR. ROUSE:  Yes, your Honor.
9               THE COURT:  Has acted in bad faith.  Mr. Bagley, do
10         you see what I'm talking about?
11              MR. BAGLEY:  Yes, your Honor.  I still believe that
12         22 belongs in the second phase.  Now 23, since we'll be
13         asking them, do you believe there was a bonafide
14         controversy, I think 23 fits in the first phase because
15         that's gonna fit with the judgment form they are gonna
16         have.
17              THE COURT:  Yes.
18              MR. BAGLEY:  But 22 goes that next step.  It goes
19         into the second phase, and I think that's gonna create the
20         wrong impression to the jury.  I don't think they need to
21         be given that until and unless we -- it's decided there is
22         a second phase.
23              MR. ROUSE:  I disagree for reasons previously
24         stated.
25              THE COURT:  I'll reserve on that.  Let me think about

1        that on 22, but 23 will go into the first phase.

2              Anything else on page 3?

3              MR. BAGLEY:  Not for me, your Honor.

4              MR. ROUSE:  No, your Honor.

5              THE COURT:  Page 4?

6              MR. BAGLEY: We've already discussed 23.

7              MR. ROUSE:  No, your Honor.

8              THE COURT:  I think page 4 is pretty standard.

9              MR. BAGLEY:  Yes, ma'am.

10           THE COURT:  As well as page 5.  So I reserved ruling

11       on 22.  We'll make that change on slide one.  We'll add in

12       those last two sentences on slide 19, and I reserve ruling

13       on 22 and will give you my decision.  Were there any other

14       ones, Mr. Rouse, in Plaintiff's Request to Charge?

15           MR. ROUSE:  No, your Honor.

16           THE COURT:  Mr. Bagley, Defendant's Requests to

17       Charge?

18           MR. BAGLEY:  Hold on, Judge.  I apologize, Judge.

19       Let me flip through here real quickly.  It's been awhile.

20           THE COURT:  Okay.  Debra will email you both counsels

21       the verdict form tonight, the revised verdict form

22       tonight.

23           MS. SIEGEL:  Just in case you want to address that

24       with the Judge in the morning.

25           THE COURT:  Mr. Rouse, are you trying to look up

```
 1        something?
 2             MR. ROUSE:  I was just reading the Court of Appeals'
 3        case on what the definition of bonafide controversy is and
 4        it's all in the inverse.  It's never -- it's in most of
 5        the cases -- this case reaffirmed what I've read.  It says
 6        if there is a bonafide controversy, whether it exists or
 7        not, is a question for the jury.  So it's kind of like,
 8        how do you define that?  But I want to find a case that
 9        gives me more.
10             THE COURT:  Yes, I'm sure.
11             MR. ROUSE:  So I may have something tomorrow.
12             THE COURT:  Email it to Debra tonight because in the
13        morning, we're going to get the ball rolling and we're not
14        gonna spend a lot of the time with motions.
15             MR. ROUSE:  Yes, your Honor.
16             THE COURT:  Yes, Mr. Bagley.
17             MR. BAGLEY:  Yes, ma'am.  The one thing that has
18        arisen is --
19             THE COURT:  Let's get -- do you have anything in
20        your --
21             MR. BAGLEY:  No, ma'am.  I think you have
22        incorporated several of those.  The one thing that has
23        emerged is this request for admissions issue.  I have seen
24        charges where the jury is told the parties admitted a
25        fact.  You are not authorized to make a finding
```

1      inconsistent with that.  And with your permission, I'll
2      send that in later on tonight if there is one.
3          THE COURT:  Email it to Debra.
4          So based on what I'm hearing, Mr. Bagley, your
5      argument depending on what you send Debra is going to be
6      if an admission has been made, then of course the person
7      can't come back and change your mind now.  You will use
8      that to argue in your closing.
9          MR. BAGLEY:  Yes, your Honor.
10         THE COURT:  Mr. Rouse, what say you because the
11     admission issue came up during a motion for directed
12     verdict which we heard outside the presence of the jury,
13     but what's your position on that so I'll know in advance?
14         MR. ROUSE:  My position is that the framing of the
15     request for admissions is important.  The way the request
16     for admissions were framed it did not say request to
17     admit.  There were no oral communications with Universal
18     that you argue constitutes an oral contract.
19         The request for admissions said, did you contract,
20     and that's in writing with Michelle Jimenez.  That is a
21     true statement.  We're bound to confirm that.  That
22     doesn't mean that there isn't an argument or grounds for
23     an oral contract, and that's what we've always said.  Even
24     the motion for summary judgment phase, it wasn't a new
25     revelation in court.

1          Flood Brothers has maintained the same position even

2     in response to a motion for summary judgment.  So the

3     request for admission did not relate to whether there was

4     an oral contract directly with Universal.  So that's our

5     position.

6          THE COURT:  Mr. Bagley, is that what you are saying

7     that it did relate?

8          MR. BAGLEY:  Yes, ma'am.  I read it and it doesn't

9     say anything about written.  It says you agree that you

10    contracted exclusively with Michelle Jimenez, and that was

11    admitted.  The word exclusively is pretty simple and

12    unambiguous.  And if that hadn't been accurate -- I mean,

13    there's no way you can reconcile a claim, oh, yeah, we

14    contracted with somebody else now after admitting a couple

15    of years ago and never changing it.  We contracted

16    exclusively to perform water mitigation work on this house

17    with Michelle Jimenez.  I don't see how you get around

18    that.

19         MR. ROUSE:  In his deposition in response to a motion

20    for summary judgment, throughout the entirety of this case

21    it's been maintained that there were communications

22    directly with Universal.  And those communications

23    constituted an oral contract.  That was the sole reason

24    for the motion for summary judgment.

25         So this is not a revelation that came about in trial.

1     THE COURT:  So now, Mr. Bagley, based on what I'm

2     hearing, your position is that Universal, your client,

3     didn't have an agreement with --

4     MR. BAGLEY:  That's correct.  And the thing that

5     keeps being conflated is Universal was obligated to adjust

6     the claim for damages and their obligation was to Michelle

7     Jimenez.  And we laid that as a request for admissions.

8     And we also had matching interrogatories that said, if you

9     disagree with this, tell us why.  Well, they didn't

10    disagree with it.  They agreed.  Flood Brothers agreed, we

11    contracted exclusively with Michelle Jimenez for the water

12    mitigation repair of her home.

13         This is all intertwined, Judge, with this idea of

14    direct action under the insurance policy, but to carve it

15    out and just make it very simple, for the argument to the

16    jury now to be, well, we actually contracted with

17    Universal.  That's totally inconsistent with the

18    admissions that have been in effect in this case

19    throughout the trial and after the evidence is closed.

20    They are still in effect.

21         I just think it's completely unfair now to be saying,

22    well, they've admitted something else, but we're going to

23    let them argue something else.

24    THE COURT:  But what about the communications and

25    emails with Universal, them talking to Universal?  What

1    about all of that?

2        MR. BAGLEY:  Of course, Judge, just talking to

3    somebody doesn't create a contract, especially if you're

4    talking to somebody that has a contract with somebody else

5    to perform some duty that you are somehow involved in.

6        THE COURT:  But didn't Mr. Skylar Felder, didn't he

7    say once litigation came into play -- I think you said

8    it -- it takes it to a whole other level?  And then

9    Universal then has the authority to make --

10       MR. BAGLEY:  To settle.  They have the authority to

11   settle a threatened litigation on behalf of the insured as

12   they see appropriate.  In other words, the insured had

13   vested Universal with authority to watch out for their

14   interest and to settle a claim whenever they needed to,

15   and that's what he did.  He thought, and that's been said

16   a hundred times, he thought he had settled the claim.

17       THE COURT:  So wouldn't it then be back on Universal

18   then because you're at that phase where he was talking

19   about settlements.  And then the eighteen thousand came up

20   that they were paying and he thought that it was a

21   settlement, but it really was a discounted amount that he

22   needed to pay within ten days.  Isn't that the oral?

23       MR. BAGLEY:  No, ma'am.  That wasn't regarding the

24   performance of the water litigation.  That was concluding

25   a threatened lawsuit.  And he made it very clear he was

1    doing that on behalf of the named insured and wipe

2    everything clean.

3        The admissions of record now are they contracted

4    exclusively with Michelle Jimenez.  Universal's role here

5    was they were Michelle Jimenez's insurance company and

6    that's it.  There's abundant case law in Georgia that says

7    that doesn't make them a contractor of third party.

8        And so the whole argument here about we had an oral

9    contract, if you get into all those other legal arguments,

10    you don't even need to.  We have an admission.  We have an

11    admission that they had a contract exclusively -- that's

12    the word -- exclusively with Michelle Jimenez to perform

13    water mitigation.

14        THE COURT:  Okay.  Mr. Rouse?

15        MR. ROUSE:  I'm not gonna belabor the point, but this

16    issue did not come up in trial.  It was heavily briefed at

17    the motion for summary judgment phase.  It was an issue

18    that came about in both of Mr. Fowler's depositions.  He's

19    clarified time and time again that he had individual

20    conversations with Universal before he started doing any

21    water mitigation.  He has clarified under oath that but

22    for Universal asking him to do water mitigation in a

23    particular way, which he met in the particular fashion

24    that was outlined to him, that he would not have started

25    the work.

329

1          The contract was formed orally, which you can do in

2     Georgia.  We've offered that theory exclusively in this

3     trial.  This is not some new revelation.  Case in point,

4     the theory on behalf of Universal that there was some

5     problem with the bill.  It's not something that we just

6     brought up in trial.

7          So actually, I think, the fact that this was argued

8     before this Court previously and the Court ruled against

9     Universal regarding their motion for summary judgment, I

10    think the decision would make it the law of the case where

11    the fact that there is an oral contract, I think that was

12    the ruling of the Court when the motion for summary

13    judgment was denied.

14         THE COURT:  All right.  I'm gonna reserve ruling on

15    that.  Let me look more into that, Mr. Bagley.  You will

16    have my decision in the morning.

17         MR. BAGLEY:  Thank you.

18         THE COURT:  What else did I take under advisement?

19         MS. SIEGEL:  You reserved ruling on Slide 22.

20         THE COURT:  Yeah, we'll take care of Slide 22.  And

21    your question was -- because I guess you wanted to know

22    how to proceed because it's admitted into the record under

23    your motion for directed verdict.  It's labeled Number 13.

24    I think D-13.

25         MR. BAGLEY:  Yes, ma'am.

1         THE COURT:  Okay.  And I understand your position,
2    Mr. Rouse.  It didn't come up in trial and it was also
3    mentioned in the motion for summary judgment.  So let me
4    look at it again and give you my ruling.
5         MR. BAGLEY:  Thank you, ma'am.
6         THE COURT:  All right, counsels.  Are there any other
7    housekeeping matters that we need to take care of before
8    we leave today?
9         MR. ROUSE:  No, your Honor.
10         THE COURT:  Okay.  Come in in the morning and they
11    should get this before lunchtime.
12         MS. BAGLEY:  9:00?
13         THE COURT:  Yes.
14         (Whereupon, the jury trial concluded for the day.)
15         THE COURT:  All right.  Let's go ahead and take care
16    of some housekeeping matters.
17         So you have the charges that we all looked at and
18    went over yesterday.  That's what you have in front of you
19    today, the ones that Debra went through and cleaned up and
20    made the changes on.
21         Mr. Rouse, I got your proposed jury verdict form.
22    Mr. Bagley, you've got Mr. Rouse's proposed jury verdict
23    form?
24         MR. BAGLEY:  Yes, ma'am.
25         THE COURT:  Okay.  So I'm gonna go with the verdict

1     form that the Court gave you yesterday.  I'm not gonna add

2     that.  I think you wanted me to add something in there

3     relating to the preponderance of the evidence.  I'm not

4     gonna add that.  I'm going to go with the verdict form I

5     gave you yesterday.

6          MR. ROUSE:  Your Honor, if I might, the reason why I

7     felt like a specific verdict form that asks specific

8     questions because I anticipate there's gonna be argument

9     about what we're actually trying.  In this particular

10    case, it's not just as simple as saying we find in favor

11    of Flood Brothers if, in fact, they find in that fashion.

12    The question is whether they found enough evidence for an

13    oral contract between Universal and Flood Brothers.

14         And the next question is whether they found enough

15    evidence that there was a failure to timely pay because I

16    think that leads into the question of whether there's a

17    bonafide issue.  And that's just based upon my subsequent

18    research on 13-6-11 issue.

19         I anticipate that if there is an adverse result,

20    there may be appellate work, and I think that would help

21    the appellate work to focus for the appellate filings to

22    be focused on what the actual finding of the jury was on

23    that particular day.

24         THE COURT:  Mr. Bagley?

25         MR. BAGLEY:  Yes, ma'am.  I have come to agree with

1    the simplicity of it and the reason is is because

2    Mr. Rouse made it very clear yesterday, and I'm sure he'll

3    make it clear to the jury --

4         THE COURT:  You agree with Mrs. Rouse's proposed

5    verdict form?

6         MR. BAGLEY:  No, ma'am.

7         THE COURT:  Oh, okay.

8         MR. BAGLEY:  His verdict form now is much more

9    verbose than it was to begin with, and that's why I said

10   I'm really in the camp of keep it simple.

11        You are gonna give charges on those things and Mr.

12   Rouse made it clear yesterday that the basis for their

13   claim is an alleged oral contract, and I don't know why

14   you need to keep reiterating that in the judgment form,

15   verdict form, so I would go with yours.

16        THE COURT:  If it was an apportionment case or

17   whatever, I can see splitting it, but I'm gonna go with

18   the Court's proposed verdict form, Mr. Rouse.

19        MR. ROUSE:  Might I make one more --

20        THE COURT:  Your objection and argument is noted for

21   the record for appeals' purposes if that's the way you

22   want to go, but yes, you can make another argument.

23        MR. ROUSE:  The verdict form that we have, at the

24   very bottom, it has the language of do you find by a

25   preponderance of the evidence, before the question that

1    basically is related to the attorney's fees.  I'm merely

2    asking that the verdict form be asked a specific question

3    as to what the plaintiff has to prove and include the

4    same --

5         THE COURT:  Well, I'm gonna give these jury

6    instructions anyway.  I'm gonna give the preponderance of

7    the evidence jury charge anyway.  And speaking of that,

8    that's a good segue to go into -- I need to make sure, is

9    bad faith in this case?  Are we arguing bad faith?  I know

10   yesterday I asked you and you said no, that you were going

11   on as related to the attorney's fees 13-6-11.  I think you

12   were going on stubborn and litigious.

13        MR. ROUSE:  Yes, your Honor.  Bad faith is not in the

14   case.

15        THE COURT:  Okay --

16        MR. ROUSE:  We're pursuing on stubborn litigiousness

17   and unnecessary trouble and expense.

18        THE COURT:  Okay.  So if that's the case, based on

19   case law that I'm reading, I don't know if you can get

20   attorney's fees based on the case law.  And I did -- I did

21   receive a copy of the cases that both counsel sent to

22   Debra, and it clearly says in a case where bad faith is

23   not at issue, attorney's fees are not authorized under

24   OCGA 13-6-11 if the evidence shows that a genuine dispute

25   exists whether of law or fact on liability or amount if

1    damages or any comparable issue.  Okay.

2    And then I read yours, the one you sent, Mr. Rouse, a

3    jury may award attorney's fees under OCGA 13-6-11 if there

4    is no bonafide controversy as to liability even if there

5    is a bonafide controversy as to the damages.

6    So my question is I'm trying to figure out according

7    to statute and case law whether or not if there is no bad

8    faith, can you argue for attorney's fees under OCGA

9    13-6-11.  That's what I'm trying to figure out according

10   to the cases that I see.

11   MR. ROUSE:  The case *Southern R. Co. v. Crowe* and

12   *Delta Airlines v. Isaacs*, they weren't reversed.  So it

13   appears that it's still good law.  And the issue in this

14   case is Universal is saying that number one, there is no

15   issue as to liability.  And number two, there was only an

16   issue as to the amount of an invoice.  And the case stands

17   for the proposition that if there's no controversy as to

18   liability -- obviously, we contest that there was a

19   controversy as to the amount of the bill also, so we

20   contest both liability and damages, but the case law seems

21   to stand for the proposition that if there's no

22   controversy as to liability and the only thing you're

23   contesting is --

24   THE COURT:  Mr. Rouse, you're gonna have to speak up

25   so I can hear you.  You have a soft-spoken voice, both you

1      and Mr. Bagley.

2           MR. ROUSE:  Okay.  The case law suggests that if

3      there is no controversy as to liability --

4           THE COURT:  Is there controversy as to liability,

5      Mr. Bagley?

6           MR. BAGLEY:  Not under the insurance policy, your

7      Honor.  That's actually been paid.  So under the insurance

8      policy.

9           Now, there are two contracts alleged.

10          THE COURT:  Bonafide controversies as to damages.

11          MR. BAGLEY:  Yes, ma'am.  But as Debra pointed out,

12     the bulk of the cases since then -- and the statutes been

13     changed since the 50s when that case he's referring to.

14     They all say -- have the language that you read, the quote

15     that says if there is no bad faith, then if there's any

16     controversy, liability, damages, or any other thing of

17     that nature, there can be no recovery of 13-6-11.  That

18     was --

19          I was trying to make that point yesterday or the day

20     before, whenever it was, in my motion for directed verdict

21     that there are clearly bonafide controversies here.  So if

22     the theory is stubborn litigiousness, then there's no --

23          In fact, the case law says there can't be evidence to

24     support an award under 13-6-11.

25          THE COURT:  Okay.  We're gonna look and see on

1      Mr. Rouse's case.  I want to look and see, was there bad

2      faith in your case that you quoted?

3           MR. ROUSE:  I don't believe there was bad faith in

4      the cases.  Obviously, it was late when I was doing this

5      research, but I don't believe there was bad faith in those

6      cases as an issue.  But again, I don't want to mislead the

7      Court in saying one thing that's not true.

8           THE COURT:  Right.  So if there wasn't bad faith in

9      your case, I don't know if that case helps you.  That's

10     what I'm saying.

11          MR. ROUSE:  If the Court would allow it, I could go

12     to the law library and pull the cases myself.

13          THE COURT:  What else did I have to look at, Debra?

14          MS. SIEGEL:  Each also sent you an additional charge

15     on admissions in judicio.

16          THE COURT:  Where is that?

17          MS. SIEGEL:  I think they are both on the first page

18     of what I gave you.

19          THE COURT:  All right.  Mr. Rouse sent the one

20     plaintiff Flood Brothers.

21          MS. SIEGEL:  No, that one came from Mr. Bagley.

22          THE COURT:  Okay.  That's the one where I said that I

23     would add once I looked at it.  And then where is --

24          Mr. Rouse wanted added statements made by parties'

25     counsel made in open court are binding on the party.  Such

1    admissions are admissions in judicio and are conclusive

2    with respect to the matter addressed.  And I think what I

3    decided to do was to add Mr. Bagley's request and add to

4    that Mr. Rouse's.  Is that what I finally came up with?

5        MS. SIEGEL:  Yes, I think that's what you said.

6        THE COURT:  Yes.  So I will add both of those.

7        MR. BAGLEY:  Where would that be, Judge?

8        THE COURT:  That would be after Number 9, so it would

9    be Number 10.  The numbers changed, so we will give you

10   the new version.  So that will be the new Number 10, I

11   think, because it would go right after circumstantial

12   evidence.  Slide Number 9, it would go there under

13   admissions.  So essentially I'm adding both.  So that's

14   dealt with as relates to the admissions charge.

15       MS. SIEGEL:  I think Mr. Bagley had another request.

16   It was above where you read about bad faith, attorney's

17   fees.  It was the one you looked at talking about refusal

18   to pay is not the same as stubborn litigiousness.  I don't

19   know if you looked at that one.  It's probably on the last

20   page of what I gave you.

21       THE COURT:  A mere refusal to pay, that's the one,

22   Mr. Bagley, you wanted to add?

23       MR. BAGLEY:  A mere refusal, yes, ma'am.

24       THE COURT:  I mean, that's a true statement.

25   Mr. Rouse, did you see this?

```
 1          MR. ROUSE:  I did.
 2          THE COURT:  Okay.  Any comments?
 3          MR. ROUSE:  No, your Honor.
 4          THE COURT:  Okay.  So add that one in there.  Where
 5     would that one go?
 6          MS. SIEGEL:  Well, that one needs to go into Slide 22
 7     or 23.
 8          THE COURT:  Okay.
 9          MR. BAGLEY:  If I could suggest something, your
10     Honor.
11          THE COURT:  Yes.
12          MR. BAGLEY:  You remember we had a discussion
13     yesterday about the order of 22 and 23.  If the attorney's
14     fees element stays in, then I don't think it would be
15     appropriate for 22 to be read in the first phase because
16     22 instructs the jury at the bottom, you should determine
17     from the evidence the attorney's fees.  And of course, in
18     the first phase, they haven't heard any evidence on the
19     amount of the attorney's fees.
20          So if the attorney's fees stays in, then I would say
21     22 should be moved below 23 or if not given in the first
22     phase.  And when we get a chance, I've got a -- I think I
23     gave this case before, but whenever you or Debra want it,
24     I've got a couple of cases that say a bonafide dispute
25     regarding damages amount -- if there's a bonafide dispute
```

1    regarding the damages amount only, there can be no

2    recovery under 13-6-11.  That's a 1990 case and then --

3         THE COURT:  If there's a bonafide dispute regarding

4    damages?

5         MR. BAGLEY:  Damages, there can be no recovery under

6    13-6-11.

7         THE COURT:  You mean for attorney's fees?

8         MR. BAGLEY:  Yes, ma'am.  There are multiple cases

9    that say that.  I think I gave those yesterday, but I

10   would be more than happy to give them to Debra if she

11   needs them.

12        MS. SIEGEL:  I'll take them from you.

13        THE COURT:  But that kind of covers -- I don't like

14   to just give a whole bunch of duplicates or similar jury

15   charges, but that kind of -- it doesn't cover the mere

16   refusal to pay.  It doesn't cover that, but we'll look at

17   it, Mr. Bagley.

18        MR. BAGLEY:  I was mentioning those cases primarily

19   for the purpose of your reconsideration of excluding the

20   attorney's fees.

21        THE COURT:  Okay.  Not to go into the jury charge?

22        MR. BAGLEY: Yes, ma'am.

23        THE COURT:  Okay.  You have the cites?  You gave them

24   to Debra?

25        MS. SIEGEL:  No, I will get them.

1          THE COURT:  Yeah, the only thing I want to look at is

2     Mr. Rouse's case.  Was there anything else, Debra?

3          MS. SIEGEL:  I think you covered all of what they

4     sent yesterday.

5          THE COURT:  Let's do this so it can help us stay

6     organized.  Debra, we'll go and get the jury charges with

7     those additions.  That will kind of help me get organized.

8     And then I know the only other issue I will be dealing

9     with is this attorney's fees.

10         Give me five minutes to step off and then we will

11    come back.

12         MR. BAGLEY:  Judge, could I have 15 seconds for one

13    housekeeping matter?

14         THE COURT:  Yes.

15         MR. BAGLEY:  This is sort of in line with what

16    Carlton has already done about making the record.  I just

17    wanted to document because we did this over two days and

18    talking about a lot of things, that we moved for directed

19    verdict and it was denied on the issues of contract,

20    direct action, promissory estoppel, settlement, and

21    13-6-11 attorney's fees.

22         THE COURT:  Yes.

23         MR. BAGLEY:  Okay.  Thank you, Judge.

24         MR. ROUSE:  I mean, I guess I should also say I

25    really wanted -- I think the appellate issue is gonna be

1          what the jury determine, what questions the jury

2          determines.  I feel it's incumbent upon me to reiterate

3          the prayer of the plaintiff that the question, at least

4          the discreet question that we're asking the jury to

5          determine on behalf of our case be placed in the verdict

6          form.  Even if the language of preponderance is not there,

7          we ask that the Court at least put the discreet

8          question -- because we're asking the jury, do you find an

9          oral contract between Universal and Flood Brothers on

10         September 25th, 2019, at the Riders Ridge property.

11              Then we're asking them, do you find that there was a

12         genuine dispute regarding or any valid dispute regarding

13         the timeliness or the amount of what was due to Flood

14         Brothers?  Those are the two questions.

15              I think leaving it very bland and generalized would

16         cause the Court of Appeals on appeal not to know what the

17         specific ruling was on the part of the jury if they find

18         in favor of Flood Brothers.  So I'm just merely asking

19         that we at least put the discreet questions that we're

20         submitting to the jury on behalf of our case.

21              Obviously, the question of whether there is a genuine

22         dispute as to liability or as to the amount of damages or

23         what's owed ultimately bonafide -- whether there's a

24         bonafide question is something that the jury has to

25         determine.  And we're not acquiescing or agreeing that

1    there's either a bonafide issue as to liability or a

2    bonafide issue as to what was to be paid.  We dispute all

3    of that.

4         So I think the argument that we're gonna make to the

5    jury is we don't think there was any grounds for either,

6    but it's up to them to figure out, do you believe there

7    was a bonafide controversy or not?

8         So I think the jury form being more discreet and

9    direct will assist the jury and also assist the Court of

10   Appeals because I'm sure there's gonna be an appeal on

11   this.

12        THE COURT:  Okay.  Lastly, before I go, do you want

13   to say anything, Mr. Bagley?

14        MR. BAGLEY:  Your Honor, we agree with the

15   streamline.  In my 40 years of experience, the more

16   verbose the verdict forms are, the more times the jury

17   comes back with questions.  And if Carlton is saying,

18   we're gonna dispute everything, you couldn't emphasize one

19   theory over several others in the verdict form.  So the

20   way you've got it and with the jury charges I think is the

21   way to go.

22        THE COURT:  Okay.  But even if you were to appeal and

23   even if I left it like it is, it still wouldn't prevent

24   you from appealing, Mr. Rouse, and you still could lay out

25   your reasons, couldn't you?

1    MR. ROUSE:  No, I know that, but the question for the
2    Court of Appeals is gonna be is there any evidence in
3    support of the finding of the jury.  If they just say, we
4    find in favor, it's not specific.  So then we open
5    everything, and then all of these questions as to were
6    they finding on the basis of this or on the basis of
7    that -- I think if the question that's on the jury form is
8    we find an oral contract, we find that there was no basis
9    for delay in paying what was owed, I think those two
10   questions, it focuses any review of this determination as
11   to whether there was any evidence in support of the jury
12   finding that.

13        So obviously, if it's open ended, you know, it's not
14   specific enough for the -- for it to be a powerful verdict
15   on appeal.

16        Ultimately, if they decide in our favor, I would like
17   for the jury verdict form to say what they're deciding in
18   our favor for, what that basis is because there has to be
19   some evidence in support of that.  And without that
20   specificity, the verdict is not gonna have as much weight
21   if you will.  It's gonna be easily thrown out because, oh,
22   we don't know what the jury was actually determining.

23        THE COURT:  All right, counsels.  Thank you.

24        (Whereupon, a brief recess was held.)

25        THE COURT:  Counsel, y'all received the updated jury

344

1    charges?

2            MR. ROUSE:  Yes, your Honor.

3            MR. BAGLEY:  Yes, ma'am.

4            THE COURT:  So on slide 23, I deleted that last

5    sentence I think that Mr. Bagley had an issue with.  It

6    was slide 22 I think.  I added slide 24.  I added that

7    language in there a mere refusal to pay a disputed claim

8    is not the equivalent of stubborn litigiousness.  I think

9    that was an email that Mr. Bagley sent, so I added that in

10   slide 24 as the last sentence.

11           Slide 25, I used Mr. Bagley's cases.  The cases are

12   going more along the lines of Mr. Bagley's cases are

13   going.  You're right, Mr. Rouse.  Your case was not

14   overturned or overruled or anything, but the other cases,

15   the newer cases are all going in that direction.  So I

16   used your slide 25.

17           Counsels, have y'all had a chance to look at it?

18           MR. ROUSE:  Yes, your Honor.

19           THE COURT:  Mr. Rouse, I looked at it and thought

20   about it.  I'm just going to keep the Court's jury

21   verdict.

22           MR. ROUSE:  Yes, ma'am.  Thank you.

23           THE COURT:  Debra will make us a new copy and bring

24   out the new ones.

25           MR. BAGLEY:  I have one question, your Honor.  And

1    obviously neither Mr. Rouse nor I have waived any of our

2    objections and directed verdicts.

3         THE COURT:  Yes.

4         MR. BAGLEY:  I'm curious, shouldn't we include a

5    statement in the charge that tells the jury you are not to

6    include any attorney's fees -- in the event you issue an

7    award in favor of the plaintiff, you are not to include

8    any attorney's fees or expenses at this time.  That would

9    be determined later.

10        What I'm afraid of is that the jury is going to be

11   sitting here going, wait a minute.  She said, you know.

12   We'll just add some money here to cover attorney's fees

13   even though there hasn't been any evidence presented on it

14   yet.

15        THE COURT:  What say you, Mr. Rouse?

16        MR. ROUSE:  I don't think it's necessary.  I think

17   it's fine the way it is.  I did have a similar issue,

18   however, on slide 10, but I can either address that now

19   or --

20        THE COURT:  On the admissions?

21        MR. ROUSE:  Yes, your Honor.

22        THE COURT:  Okay.  What are the issues?  We went over

23   admissions.  What are the issues?

24        MR. ROUSE:  We did.  We did.

25        THE COURT:  Hold on one second.

1              (Whereupon, a pause in the proceedings was held.)

2              MR. ROUSE:  It's just the way it's written, your

3         Honor.

4              THE COURT:  I'm gonna have to bring my jurors in.  I

5         have a judge's meeting at 12 noon that I will give the

6         jury a lunch at 12 noon.  So just FYI.

7              MR. BAGLEY: Judge, do you enforce any limits on

8         closing?

9              THE COURT:  No, unless it just becomes outrageous.  I

10        have not had to do that at all.  Usually people are pretty

11        good.

12             Mr. Rouse, go ahead.  On slide 10, admissions.  What

13        are you asking?

14             MR. ROUSE:  It says plaintiff, Flood Brothers, has

15        made an admission that they perform water mitigation

16        services.

17             THE COURT REPORTER:  I'm sorry, Mr. Rouse.  You've

18        got to speak up.

19             THE COURT:  You have to speak up.

20             MR. ROUSE:  It says that plaintiff, Flood Brothers,

21        has made an admission and I would like to interject in

22        filings or in earlier filings that they perform water

23        mitigation services on Jimenez's property if it's gonna be

24        included.  And then before the line where it starts

25        statements made by a party's counsel made in open court

347

1    are binding, I think it should read Universal has made

2    statements in open court that Flood Brothers is entitled

3    to payment.  Statements made by a party's counsel made in

4    open court are binding on a party.

5        On the one hand, the top part is talking about what

6    admissions were likely made by FBR, but then the second

7    part talks about -- was designed to talk about statements

8    made by Universal, but it doesn't mention Universal by

9    name in the actual instruction.

10       So I'm just -- I would like to have the second part

11   at least state that Universal has made statements

12   regarding Flood Brothers' entitlement to payment in open

13   court; statements made by counsel in open court are

14   binding on such a party.  Admissions --

15       THE COURT:  But wouldn't that be -- that would refer

16   to both counsels.  Statement made by a party's counsel:

17   plaintiff's party's counsel, defendant's party's counsel,

18   made in open court are binding on the party.

19       So what I'm hearing is your want the Court to say

20   statement made by Universal.

21       MR. ROUSE:  No, just that Universal has made

22   statements -- because it's saying that Flood Brothers made

23   admissions, but then Universal has made admissions in open

24   court.  And then, you know, just making it plain that

25   there have been two admissions or there's likely two

1          competing admissions here.

2                THE COURT:  Mr. Bagley, one at a time.  Let's address

3          this issue.

4                Mr. Bagley, do you have anything to say?

5                MR. BAGLEY: Yes, ma'am.  I'm not sure I understand

6          exactly what's being proposed, but it's pretty clear, I

7          mean, there are a lot of issues that are uncontroverted.

8          One of them is that Universal has said all along there was

9          coverage for mitigation work and they paid $18,000.

10               I mean, I don't know why we need to put that in the

11         jury charge because it's an undisputed fact.  We haven't

12         asked for a penny of it back, so all of that is true.

13         That's not a request for admissions that was served on a

14         party and responded to and admitted.

15               THE COURT:  The jurors sat here.  They heard the

16         witnesses up on the stand.  The jurors will ultimately be

17         the one to make the decision who they believe, if they

18         believe, who has credibility, who does not have

19         credibility.  These jury charges are a lot of jury charges

20         and I'm giving them.  By law I have to give them, but

21         ultimately the jurors were here.  They've heard the case,

22         the testimony.

23               I don't believe in making things more confusing than

24         necessary.  I don't believe in adding additional extra

25         language if it's not necessary.

1            I understand, Mr. Rouse, I hear where you're coming

2       from, but I think it's covered in here in facts admitted

3       by party.  So I'm not inclined to add that.

4            MR. ROUSE:  Thank you, your Honor.

5            THE COURT:  But your objection and request is noted

6       for the record.  Counsel?

7            MR. BAGLEY:  The only other point I brought up, your

8       Honor, was I think we may need to insert here on these

9       attorney's fees, if you are going to give that charge in

10      the first phase, that to tell the jury you are not to

11      include attorney's fees and expenses if you determine

12      there's an award of damages at this time because I'm

13      afraid the jury will look at that and having gotten that

14      charge and if they decide to award something, they say,

15      okay.  We're gonna give them $2,000 for this, but we're

16      gonna give them $2,000 for attorney's fees, for example.

17      And there's nothing in here that would tell us they have

18      done that.

19           THE COURT:  That's true.  There's no place for

20      attorney's fees on here because that would come in the

21      second phase if they check yes.

22           MR. BAGLEY:  All I'm saying is a simple statement.

23      In this phase of the trial, you are not to include any

24      attorney's fees or expenses.

25           THE COURT:  Mr. Rouse, you're saying you don't agree

1   with that statement.  What if they do give you attorney's

2   fees in the first phase?

3        MR. ROUSE:  Your Honor --

4        THE COURT:  And then they check yes and then they

5   come back and give you attorney's fees in the second

6   phase.

7        MR. ROUSE:  Your Honor, I mean, I think how the jury

8   calculates what's an appropriate amount of damages --

9        THE COURT:  What if it includes attorney's fees?

10  That's my question.  That's where we are at this case

11  because your case hinges on attorney's fees.  You're

12  asking for attorney's fees.  What if they lump it all in

13  if they award it for you?  What if they put it in there?

14       MR. ROUSE:  Well, I mean, the verdict form states do

15  you find -- you know, it talks about do you find by a

16  preponderance that Universal's been stubbornly litigious

17  or caused unnecessary trouble and expense.  We went over

18  this yesterday.  That is a threshold decision that needs

19  to be made before we introduce a basis for attorney's

20  fees.

21       THE COURT:  I understand that.  I understand that.

22  But my question is if they find for you, the plaintiff,

23  and award damages, damages can include the amount that

24  your client is saying that is still owed to him.  And if

25  they feel based on the testimony -- they know he hired an

```
 1      attorney -- what if they included it?  How would we know?
 2      Would we know?
 3           If they came back and awarded him $15,000, would we
 4      know?
 5           MR. ROUSE:  There may not be a way to know, but how
 6      would we know how they quantify damages in general?  It's
 7      up to the jury.
 8           THE COURT:  That's the whole issue.
 9           MR. ROUSE:  I don't know how to answer the question.
10      I just think that the instructions themselves go over
11      what's required for attorney's fees, to find attorney's
12      fees.  There's a question on the jury form that speaks to
13      that issue.
14           THE COURT:  I have had jury forms where I had
15      attorney's fees.  It was attorney's fees, it was damages,
16      and it was specified that way.
17           Here it's not.  It's just one lump sum.  And then
18      yes, they will be looking at and considering whether or
19      not attorney's fees will be the in the second phase, but
20      they don't know that yet.  They don't know that.  They
21      don't know that they'll have to come back and hear a
22      portion about attorney's fees if they check yes.  They
23      don't know that.
24           So I understand what Mr. Bagley is saying.
25           Debra, have you --
```

1          MS. SIEGEL:  The only other place we bifurcate like

2     this is in a punitives case, and I honestly don't recall.

3     I'd have to go back and look at what is said in the first

4     part of -- they clearly get some explanation of the

5     threshold that they have to meet and they have the same

6     type of yes-or-no question on the jury form.  What I don't

7     recall honestly is if there is any language about not

8     including them in this phase of the trial because the jury

9     is obviously unaware that there may be two phases of this

10     trial or a trial of punitives.  So I'd have to go back and

11     look.  I honestly don't recall.

12          THE COURT:  Yeah, I wouldn't know unless they award

13     you an amount higher than the actual damages, and then

14     they come back and they check yes.  And then you are

15     arguing to them attorney's fees, and in their mind,

16     they're thinking, we already deliberated.  We gave them

17     attorney's fees, and they may not give you attorney's

18     fees.

19          I don't know.  I'm just trying to prevent all of

20     this.  And I hear Mr. Bagley's position and I hear your

21     position.

22          My question is between both counsels, how do we come

23     to some resolution on, number one, I guess the jury

24     charges.  Should we include that in there?  Are you

25     objecting if we include that language in there, Mr. Rouse?

1      MR. ROUSE:  I don't know if that's in the pattern
2   instructions to say you shall not include attorney's fees
3   in the first part.  I think the pattern instructions,
4   that's what I would rely on, and I think that's what's
5   been included.  Writing a new line that gives further more
6   specific instruction on what they cannot or shall not
7   include, I don't think it's necessary.  And I would just
8   fall back to the pattern.
9      THE COURT:  Okay.  What was the line that you
10  proposed, Mr. Bagley?
11     MR. BAGLEY:  Yes, ma'am.  I would propose at 25, at
12  the end, to simply say you are not to include any
13  attorney's fees or expenses in your damages -- in the
14  event you decide to award damages, they are not to include
15  any attorney's fees or expenses at this time.
16     MR. ROUSE:  But right before that new sentence, it
17  says under 13-6-11, if evidence shows that a genuine
18  dispute exists whether in law or fact or liability or the
19  amount of damages, one comparable issue (inaudible),
20  attorney's fees are not authorized under this with
21  exception to these additional findings.
22     On the form it says, do you find by a preponderance
23  the same findings?  I just -- I think it's extra.  I think
24  the pattern gives them instructions on the attorney's
25  fees.  I get it.  I just don't want to overly weight the

1    instructions in favor of the defense, to be honest with
2    you.
3         THE COURT:  The same way I gave you my decision when
4    I told you I didn't want to give additional language when
5    you were asking.  I guess that's the logic, right?
6         MR. ROUSE:  I would love to have more detail on my
7    verdict form.  I would love to have that, but you know.
8         THE COURT:  All right, counsel.  I think at this
9    point I'm going to keep it the way it is, Mr. Bagley.  I'm
10   going to keep it the way it is.  It does say in slide 25,
11   attorney's fees are not authorized under OCGA -- I think
12   you wanted some language to say you are not to consider
13   attorney's fees at this time, which they are not.
14        I'm trying to see if we can add it in there.  Debra,
15   do you see a place where we can slip it -- I mean, that
16   would just have to be a whole --
17        MS. SIEGEL:  No.
18        THE COURT:  Slide 25, attorney's fees are not
19   authorized, okay.  But then they would have to make a
20   determination, but ...
21        MS. SIEGEL:  It could be at the end of 23 if you are
22   inclined to add it.
23        THE COURT:  Then I would be thinking as a juror,
24   well, why are you giving me instructions on attorney's
25   fees if it's not to be considered at this time?  That's

1    what I would be thinking as a juror.

2        MS. SIEGEL:  Or you could do it at slide 29 when you

3    explain the verdict form, which would require an

4    explanation of a verdict --

5        THE COURT:  Okay.

6        MS. SIEGEL:  -- ordinarily give, but some judges I

7    think go through the steps of the verdict form

8    specifically.  You could do it there.

9        THE COURT:  The Court has prepared a verdict form for

10   your use, and I could put in  there -- Mr. Rouse, I don't

11   know how you feel about -- I mean, we could put language

12   in there that say at this phase, I guess, attorney's fees

13   are not to be considered at this phase.

14       MR. BAGLEY:  Your Honor, you could add something like

15   attorney's fees are not considered at this phase.  If

16   appropriate, there will be a subsequent phase.

17       MR. ROUSE:  (Inaudible) I know we're trying to be

18   mindful of judicial economy.

19       THE COURT:  Yeah, but we need your input too.

20       MR. ROUSE:  I think the pattern is fine, but in the

21   interest of judicial economy in moving this forward, if

22   it's the Court's position that some instruction needs to

23   be made, I think that's an appropriate spot.  I also think

24   it would be terrific to add more detail to the verdict

25   form so that it bears both sides.

1          THE COURT:  Duly noted, counsel.

2          MR. ROUSE:  Thank you, Judge.

3          THE COURT:  Duly noted.

4          So Debra, I think just a short sentence after 29.

5          MS. SIEGEL:  Okay.  What would you like it to say?

6          THE COURT:  Attorney's fees at -- at this phase,

7    attorney's fees are not to be considered.  What did you

8    say, counsel?

9          MR. BAGLEY:  If appropriate, attorney's fees will be

10   considered in a subsequent phase, which is an accurate

11   statement.

12         THE COURT:  Is that your whole sentence?  If

13   appropriate, attorney's fees will be considered --

14         MR. BAGLEY:  Following your sentence which was

15   attorney's fees are not to be considered by you, the jury,

16   in this phase.  If appropriate, attorney's fees will be

17   considered in a subsequent phase.

18         MS. SIEGEL:  Other than my typo in slide 25, is this

19   now the only additional change?

20         THE COURT:  Yes.  Counsel, anything else?  I saw a

21   typo in 25.  I let Debra know that.  She was typing so

22   fast.  And then we'll add that language at the end of

23   slide 29.  I think that's a good place for it to go.

24         Okay.  Were there anything else that counsel saw?

25         MR. ROUSE:  No, your Honor.

1          THE COURT:  Notwithstanding your objections or

2     requests, anything else?  Any other typographical errors?

3     Anything else?

4          MR. BAGLEY:  No, your Honor.

5          MR. ROUSE:  No, ma'am.

6          THE COURT:  All right.  Our jurors are waiting

7     patiently.  All right, counsel.

8          MR. ROUSE:  We would like to open and close.

9          THE COURT:  I was just gonna ask you.

10          Mr. Bagley, anything?

11          MR. BAGLEY:  No, ma'am.

12          THE COURT:  Okay.  I'm gonna bring in the jurors.

13          (Whereupon, the jury was escorted into the

14     courtroom.)

15          THE COURT:  All right.  Good morning, ladies and

16     gentlemen.  Thank you so much for your patience.

17          Okay.  Well, the attorneys at this time, they're

18     gonna be making their closing arguments.  In making these

19     arguments, the attorneys will be commenting upon the

20     testimony and evidence which has been presented to you in

21     this case.  They will be recalling the evidence that has

22     been presented.

23          These final arguments are not to be construed by you

24     as evidence in this case or as instructions concerning the

25     law.  They are intended to help you better understand the

1    contentions of each side and the issues which you are to

2    decide.

3        So at this time, I'm gonna ask you to give the

4    attorneys your close attention.  After the closing

5    arguments have been concluded, I will give you

6    instructions concerning the law in which you are to apply

7    in this case.

8        The plaintiff has the option to open and close.  So

9    at this time, Mr. Rouse?

10       MR. ROUSE:  Thank, your Honor.  Good morning once

11   again, ladies and gentlemen of the jury.

12       All right.  I have the opportunity to open and to

13   close.  Basically, I just want to summarize what I believe

14   the evidence showed in this particular case.  I'm gonna

15   give a brief opening and then I will take my seat.

16   Opposing counsel, Mr. Bagley, is going to give his closing

17   arguments and then I will have an opportunity to come back

18   and complete the summary of what I believe the evidence

19   showed.

20       As I began this case -- first of all, thank you for

21   your time.  It took a lot longer than I expected and I

22   really hoped that we could finish this case in a day, but

23   realistically, with the amount of exhibits, it just wasn't

24   feasible.

25       But needless to say, thank you for your time and

1    attention.  I appreciate your focus and your energy in

2    working out the ultimate resolution in this case.

3         Flood Brothers Restoration had to be here today to

4    resolve a contract claim and that's exactly what this case

5    is about.  It's not a case against Michelle Jimenez.

6    She's not a named party.  This is not a tort case.  It's

7    not like an injury claim or anything like that.  This is a

8    contract action.

9         What we submit that the evidence showed was that

10   there was an oral contract made between Flood Brothers and

11   Universal on September 25th -- September 15th, regarding

12   their provision of services to mitigate the water damage

13   to the 4410 Riders Ridge property, Michelle Jimenez's

14   property.  And they completed that work.  They completed

15   that work in a timely fashion.  They completed the work

16   without any complaints.  They completed the work and

17   submitted an invoice.

18        Unfortunately, it took more than 70 days for that

19   invoice to be paid.  That is the issue.  We contend that

20   70 days -- and you saw the damage.  You saw the extensive

21   damage to the house.  Universal knew the extensive damage

22   to the house.  Michelle Jimenez knew the extensive damage

23   to the house.  The claims adjusters that went out to the

24   property knew the extensive damage to the house.

25        This was a huge, huge job.  Water was everywhere.

1    Damages were everywhere.  I believe the evidence and I
2    will submit to your recollection, but I believe the
3    evidence was the repair costs alone were over $50,000.
4        But Flood Brothers' work originally was $23,000.
5    They cut their bill to twenty-one thousand
6    six-hundred-and-some-odd dollars, and even beyond that,
7    they negotiated with Universal directly and said, okay.
8    If you pay within ten days, you can pay us $18,000.  It
9    was never paid within ten days.
10       There was even several grace periods extended by
11   Flood Brothers to Universal.  None of those grace periods
12   were met.
13       So when I started the case, I submitted to all of
14   you, that, you know, this case is about, hey, you know,
15   you don't get an early payment discount if you don't pay
16   early.  Pretty simple proposition.
17       In this case, you're gonna hear a lot about what I'm
18   required to prove as a plaintiff and the burden is all on
19   Flood Brothers.  There's no burden on Universal.  They
20   don't have to prove anything.  They just have to disprove
21   or combat what we've offered to you.
22       The burdens of proof.  Now you have high standards of
23   proof and I'm pretty sure you've all seen *CSI* and the T.V.
24   shows and we've heard beyond a reasonable doubt and the
25   burden of proof for criminal cases.  This is not that

1   case.

2         There is beyond a reasonable doubt.  There is clear

3   and convincing.  There is a preponderance of the evidence

4   where we are.  There's probable cause.  There's reasonable

5   suspicion.

6         By a preponderance of the evidence, this mid-line

7   burden is just the intermediate standard that says we need

8   to submit to you evidence that what we're saying is more

9   likely to happen than not.

10         If you are thinking about the scales of justice, if

11   we put a feather on this scale and it ever so slightly

12   militates or tips in our favor, we've satisfied our

13   burden.

14         If you are a sports fan, if we have the ball on the

15   50 yard line, if we move it a centimeter in the direction

16   of the goal, that is synonymous with meeting or

17   establishing our burden.

18         Now, again, I want to stress, this case is not about

19   the written contract.  I think it was Exhibit 1.  I'll go

20   through more of my exhibits in my final close, but it's

21   not about the written contract with Michelle Jimenez.

22   This case is about can there be an oral contract with

23   Universal and Flood Brothers.

24         And we submit to you and you will hear instructions

25   that in Georgia, you can have written contracts and you

1    can have oral contracts.  You just have to have an

2    agreement as to the subject matter of the contract.  You

3    have to have a fancy word called consideration that means

4    the benefit of the bargain.  That means, hey, what do you

5    get and what do I get?  Then you have to have mutual

6    assent.  So both parties have to act in accordance with

7    that agreement.

8         What we submit to you all is there was a subject

9    matter of the contract that was agreed upon because

10   Universal wanted Flood Brothers to provide water

11   mitigation services to an owner's property.  And as you

12   recall, Flood Brothers went and contracted with Michelle

13   Jimenez first.  We're not disputing that Michelle didn't

14   enter a contract, but we're saying that Universal entered

15   a contract too orally.  That's what we're saying and

16   that's what we're trying today.

17        Now, when -- if you recall, when flood Brothers went

18   out to the property, they just took up the standing water.

19   They didn't actually start the mitigation services.  They

20   removed all the standing water.  Remember the picture

21   where Randy took a picture of his shoe and there's bubbly

22   water coming around his shoe?  They cleaned up all of that

23   water that was permeating through that property.

24        The streams of water going down the walls and pouring

25   out the basement.  They stopped that so it wouldn't

1         utterly destroy the entire house.

2              But after they had an agreement with Universal,

3         that's when they began the mitigation project that

4         lasted -- again, the evidence is it lasted seven days.

5              Two, consideration:  What was in it for Universal?

6         What was in it for Flood Brothers?

7              Obviously, Flood Brothers was in it because we want

8         to be paid.  We want to pay our laborers.  We want to get

9         this account off and remove it.  We want to complete it.

10        They want payment.

11             What was in it for Universal?  The owner of the

12        property gets immediate service.  They wanted to make sure

13        Michelle Jimenez's property got cleaned up so it wasn't a

14        bigger loss.  That's what Universal had in the deal.

15             They also said, hey -- it wasn't as if they said,

16        hey, do it the way you want.  However, you do it, just

17        send us the bill.  They said, hey, if you're gonna do the

18        work, you have to do it by making a lot of readings for

19        the humidity moisture readings.  You have to document with

20        pictures.  We don't want you to do any repairs.  We want

21        you just to do water mitigation.  And we want you to send

22        us an invoice.

23             They gave them terms.  Adjusters that contracted with

24        Flood Brothers gave them specific terms.  Flood Brothers

25        complied with the terms.  They took the pictures.  They

1    made sure the documentation was there.

2         And lastly, the consideration for Flood Brothers was

3    getting prompt payment, but did that happen?  No, not for

4    70-plus days.

5         Mutual assent:  After talking with Jimenez -- again,

6    Universal mentioned, hey, for us to do anything, unless

7    there's a lawsuit, I mean, the insured has to give

8    his-or-her blessing.  They have to be involved.

9         Remember when Skylar Felder took the stand and he

10   said when he looked at this provision under Subsection I,

11   there has to be involvement by the insured?  Well, they

12   got that from Day One after talking with Michelle.  They

13   then next spoke with Flood Brothers reps and Flood

14   Brothers started work.

15        Universal checked on the work and they never told

16   Flood Brothers to stop.  So they went out there.  They

17   gave them specific instructions as to what to do, how to

18   do it.  They came out and checked and they never told

19   them, hey, we're not in agreement with what you're doing.

20   We don't have an agreement.  You don't have a contract

21   with us.

22        Flood Brothers completed the work in a timely fashion

23   and they completed the work with regard to quality.  How

24   do we know that?  Well, we know that in the inverse

25   because there's been no evidence submitted by Universal of

1     any complaint from Michelle Jimenez about anything.

2          This is a basic case, but a lot of this case is about

3     were they entitled to the invoice that they submitted?

4     Again, it was twenty-three originally.  It went down to

5     twenty-one six, and they agreed to eighteen if it was paid

6     within ten days.

7          Now Mr. Bagley, when he came up to you on the first

8     day of this trial, he said we've never -- and I took notes

9     and I rely on your recollections, but he said we've never

10    stated that they didn't perform.  We never stated that

11    they didn't perform a service and they weren't entitled to

12    payment or compensation.  That's what he said.  He said

13    what we believe is that their invoices were inflated and

14    that the work did not comply with industry standards.  And

15    he also blamed COVID.  I thought that was interesting.  He

16    blamed COVID for the reasons why he didn't pay within not

17    only Universal's internal procedures of 60 days, but the

18    agreed-upon ten-day period.  That's what he said.

19         So when I listen to the evidence that was submitted

20    by Universal, I didn't hear anyone take the stand, I

21    didn't see any admission of any evidence that talked about

22    or proved that Flood Brothers failed to comply with any

23    industry standards.

24         Now the testimony of Mr. Felder was, yeah, they

25    failed to comply.  But remember when I asked Mr. Felder on

366

1        the stand, I said are you even licensed by the IICRC?  He

2        said over the seven years of experience that he's been in

3        the business, he was licensed the first two years.  The

4        last five, he wasn't even licensed.

5            So the standards have changed.  Standards have been

6        updated.  How can you trust the testimony of Mr. Felder to

7        be the expert on --

8            Now mind you, this is who Universal determined to be

9        their representative.  They said as an insurance company,

10       we designate Mr. Felder as the expert to speak for us.

11       And Mr. Felder said, I'm in the position regionally that I

12       supervise all of this work and the buck stops with me.  So

13       whatever happens, I'm still responsible.

14           Universal is still responsible, right?  But today in

15       court throughout this week in court while Mr. Bagley said

16       they are going to present evidence to show you that the

17       invoice was inflated or that their work didn't comply --

18       Flood Brothers' work didn't comply with industry

19       standards, the revelation was Mr. Felder, the designated

20       representative, wasn't even licensed by the IICRC.

21           And when I asked him, and you may recall, I asked

22       him, how many of these jobs have you done yourself?  Zero.

23       I said how many jobs have you supervised yourself doing

24       this type of mitigation work?  Zero.

25           When I asked him about, okay, the issue of this bill

1    is problematic.  There were underpayments and

2    overpayments.  Obviously, the alleged overpayments

3    superceded or exceeded the underpayments coincidentally.

4    But I asked him, I said, well, you're talking about

5    Xactimate, but is Xactimate this software program, is that

6    a requirement to submit a bill?  He said no, but I'll

7    submit to your collective recollection as to what he said.

8    But he said this is just --

9        Just like Randy and Mrs. Fowler, they came and they

10   told you, you know, this is not a requirement.  This is

11   not a mandate that you use Xactimate and your prices have

12   to be what Xactimate says.  You're submitting a bill.

13       So for Universal to get up and have a trial, to

14   mandate that Flood Brothers take this issue to trial when,

15   number one, they don't have anyone on site.  They have no

16   records.  Mr. Felder did not identify any record of any

17   one of the adjusters that complained about the work.  He

18   did not have any record of any adjuster.  He didn't

19   introduce any evidence of any adjuster that said this is

20   out of line in terms of billing.  He just simply testified

21   without having any real connection or basis or knowledge

22   as to what he was testifying about.

23       That to me is not a bonafide issue.  It's not a

24   genuine issue.  If you are just saying, I disagree, but

25   you never offer someone who actually has the level of

1   expertise to educate or provide an educated reason why you

2   disagree, I just don't think that's genuine.  I don't

3   think that's a good faith basis to argue about anything.

4       And when you're talking about the timing issue

5   because of COVID, because of the lack of communication or

6   approval from Michelle Jimenez, that was the reason why I

7   couldn't pay you on time.

8       If it is revealed through the evidence as Skylar

9   said -- Mr. Felder, excuse me, said, I have never talked

10  to her.  Before December 20th, I had never talked to

11  Michelle Jimenez.  That was the reason why we couldn't get

12  this paid.  I asked him, you're under oath.  Is this your

13  recollection under oath?  He said yes.  A few minutes

14  later I showed him the email from December the 3rd where

15  Michelle Jimenez directly communicated and emailed him

16  twice saying, number one, Flood Brothers did a great job.

17  They saved you guys a lot of money.  They should've been

18  paid before the other contractors.

19      If that is not enough approval, what do you need?

20      There's text messages that I introduced where

21  Michelle Jimenez is confirming that -- I mean, it's clear

22  through the chronology of the text messages it's clear

23  that she's talking to Universal.

24      So, again, a part of this case is

25  three-thousand-six-hundred-some-odd dollars, you know, the

1   discount that wasn't paid.  The other part of this case is
2   Mr. Fowler and his wife having to spend -- he quoted a
3   week.  May have been more, may have been less, but he's
4   been harmed because he's had to spend time away from this
5   business.  He has a small business.  You know, working to
6   complete jobs.  Having to devote time to this is a
7   problem, and he should be compensated for the amount of
8   time that he's had to spend dealing with this.

9       And the defense that -- you know, Mr. Bagley is going
10  to come up and give -- he's an eloquent lawyer.  He's a
11  great lawyer.  And he's a nice person.  Mr. Felder's a
12  nice person.  We've had several great conversations.  Like
13  I said, these cases, it's easy to say I'm the white hat.
14  I have the badge.  And there's a black hat over there and
15  they're the bad people.  Life isn't that cut and dry.

16      These are good people in the courtroom.  This is not
17  about good and bad.  But the issue is if they are saying
18  they have a bonafide reason to dispute a bill, they have
19  to at least tell you or give you an expert witness or
20  offer a witness that has the expertise to criticize the
21  bill.  If they're gonna tell you that, hey, the reason why
22  we couldn't pay on time is because we didn't get
23  cooperation.  They can't have evidence that directly
24  contradicts that from text messages from their insured
25  that show that they had communications with them.  Or

1    emails that show, hey, we're checking up on you.  Did you

2    pay them yet?

3        That can't happen.  If it's a bonafide disagreement,

4    that can't happen.  I mean, that defies logic for him to

5    say I have a genuine bone to pick when you did have

6    communication from Michelle Jimenez.  I have a genuine

7    bone to pick, but yet your witness doesn't even do water

8    mitigation, yet they are gonna tell someone who this is

9    their business that they had too many fans or that they

10   had fans and dehumidifiers two days more than they should

11   have?  And they never went to the property?  How is that

12   logical?  How is that acceptable to be a bonafide issue to

13   force them to try to litigate the case for three years,

14   three-plus years?

15       The other thing is, and this is kind of a tangential

16   thing, you know, they're talking about, oh, I have this

17   good faith argument to make about our ability to pay on

18   time or the quality of the bill.  Folks, if someone never

19   communicates that there's a problem with the bill, how can

20   you say you have a good faith issue or a good faith bone

21   to pick if you never even emailed anyone about the bill?

22   There was no correspondence about Universal saying to

23   Flood Brothers, hey, you billed this wrong, or, hey, you

24   did this inappropriately.  Nothing.  So if you don't even

25   send a correspondence, how does that hold water?

371

1            But ultimately, I'm going to reserve closing because
2      I'd like to make some closing remarks with some of the
3      evidence, but I wonder if the one question that Mr. Fowler
4      had would be answered and he said, why did it take so
5      long?  Why does it take 70 days to pay out a bill when you
6      clearly have the ability to do so?  They're gonna say,
7      well, litigation changes everything.  They're gonna say
8      they didn't have the ability to write a check.  But they
9      ultimately wrote a check directly to Flood Brothers.
10           They want to tell you that they couldn't just take
11     Michelle off the check even though they had a direct pay
12     authorization and even though they ultimately did it
13     anyway.  I just don't think that's a genuine bonafide
14     dispute.  I think that is just kicking the can and just
15     trying to play the percentages that, well, probably won't
16     get resolved and who cares.
17           It had an extreme impact on this business, this
18     business owner.  And he deserves to know what was the
19     reason for all of this.  He deserves to know, but I don't
20     think we're ever gonna find out.  But I will close in a
21     few moments.  Thank you.
22           THE COURT:  Thank you, Mr. Rouse.  Mr. Bagley?
23           MR. BAGLEY:  Thank you, your Honor.
24           Good morning, folks.  Hopefully, we're down close to
25     the finish line here.  Let me bring my old-fashioned

1    electronic board here.  You know, this was not made by

2    Apple, I can assure you.

3         All right.  I want to thank you again.  I know you

4    are probably getting tired of hearing that while you are

5    dragging yourself down to the courthouse, but we all who

6    are involved in the system sincerely appreciate it because

7    it doesn't work without you.  We know that.  You're much

8    more important than we are.

9         I apologize to you for the fact that like lawyers

10   often do, we said, oh, this will take about a day.  Here

11   we are on Day Three.  We did our best to try to streamline

12   it.  As Mr. Rouse said, this is not a case -- you didn't

13   get a big entertaining people screaming at each other.

14   You know, there's no allegation of bad faith, intentional

15   acts, anything like that.

16        As I told you at the outset, this is a classic

17   dispute over value.  And you remember I asked Mr. Fowler

18   about that.  Don't you always run into a business where

19   your homeowner/client, insurance company want to spend as

20   little money as possible?  And, of course, you, as a

21   businessman, would like to make as much money as

22   reasonably possible?  And he agreed that the other people

23   want to spend as little as possible, but he disagreed that

24   he would like to make as much money as possible.  And God

25   bless him.  I think, you know, I think most other people

373

1        would prefer to make as much money as they could in most
2        situations.
3            But lawyers -- and the reason that all of this stuff
4        instead of one day took three, you know, we lawyers many
5        times get involved in distractions and misdirection.
6            I want to tell you an old, old story very quick about
7        distractions and misdirections.  And it involves a lawyer
8        named Margaret Stimpson (phonetic) who lived in New York.
9        And she met one time the president of the Chase Manhattan
10       Bank, David Rockefeller at the time.
11           They started talking.  And he asked her, well, you
12       must be doing real well in your law practice.  She said,
13       no.  Actually, I make bizarre bets.  He said, oh, really.
14       She said, yes, sir.  He said, well, give me an example.
15       What are you talking about?  She said, well, I tell you
16       what.  I will bet you by noon next Friday your posterior
17       will be the texture of finely tanned alligator hide.
18       Nobody is going to touch you or anything, but it'll turn
19       into alligator hide.
20           Rockefeller looked at her and said, well, okay.
21       We'll make it light on yourself.  She said, $5,000.  Okay.
22           They leave.  Days tick by.  Friday comes at noon.
23       Buzzer for Mr. Rockefeller's office.  Mr. Rockefeller, Ms.
24       Stimpson is here.  He says, okay.  Show her in.  She walks
25       in and she's got this really tall skinny guy with her with

374

1     a bald head.  And Rockefeller strides around the desk and

2     says, well, Ms. Stimpson, I'm sorry, but you've lost your

3     bet.  And she said, well, okay, Mr. Rockefeller, but, you

4     know, for $5,000, I'm entitled to examine.  And he said,

5     well, you know what?  I think you're right.  You are.

6         So he turns around as she strides across the room and

7     he drops his trousers down and she grasped his posterior

8     as the tall skinny guy just fell flat on the floor out

9     fainted.

10        Rockefeller is pulling his pants up and he says,

11    what's wrong with him?  She said, don't mind him.  I bet

12    him $50,000 that I'd have David Rockefeller by the bare

13    bottom on Friday.

14        Distraction and misdirection, and we get involved in

15    that in cases sometimes.  Distractions and misdirections

16    and things that are of no assistance to you in doing your

17    job.  And let me give you some examples of that.

18        You've heard -- a lot has been made of the denial of

19    the contract.  You know, the stack of documents put up

20    there and the effort to create the impression, well,

21    Mr. Bagley is talking out of both sides of his mouth.  He

22    said they didn't honor it.  They did honor it.  They filed

23    a counterclaim for fees on it and it's totally

24    inconsistent.

25        One thing forgot to be mentioned.  There are two

1   contracts at issue here.  There is an insurance policy and
2   I've just drawn -- I hope y'all can read my writing.  And
3   there's contract number two that Mr. Rouse has talked
4   about this morning this oral contract.  And it is real
5   clear and we have been very, very consistent, Universal
6   has never denied that this contract was valid and that
7   there was coverage for water mitigation.  And that a
8   properly submitted adjustment of the claim for  a
9   reasonable amount would be honored and, in fact, they
10  thought they had resolved that claim in making their
11  payment to Flood Brothers.

12      Now when the litigation was initiated, this idea of
13  another contract came up, another contract between
14  Universal directly and Flood Brothers directly.  And we
15  have never agreed to that.  We have always denied that.
16  But that contract doesn't have anything to do with the
17  $18,000 that Universal has already paid.  Universal has
18  never asked for a penny of that back.  They had a deal.  A
19  deal is a deal.  They settled it for $18,000.

20      Now this other contract, yes, they said the facts are
21  we didn't have another contract.  Your allegation that we
22  had another contract is wrong.

23      And you heard Mr. Fowler's testimony yesterday when
24  he was asked specifically that.  Who hired you?  Michelle
25  Jimenez.  Are you making your claim through her insurance

1        contract?  He said yes.

2             And that is also consistent with the charge you're

3        gonna hear that during the course of this litigation,

4        Flood Brothers admitted that they contracted exclusively

5        with Michelle Jimenez for the performance of water

6        mitigation.  They've admitted that.

7             Now, there's a disconnect going on here between the

8        evidence and the admissions and some of the arguments.

9        And I can't explain it, but I can tell you long before

10       today when we got the admission that the contract was

11       exclusively with Michelle Jimenez, we withdrew everything

12       about contract two.  That's not a part of this case.  I

13       brought that out the other day.  There's no counterclaim

14       here.  The counterclaim is not a part of this case and the

15       issue as we present it is the policy.  That's the

16       contract.  That's the contract that's still valid.

17            There has never been a request to return a penny of

18       the $18,000 already paid.  And this distraction and

19       misdirection on Mr. Felder's email with Ms. Jimenez.  You

20       know, in a flurry of a couple of hours on the stand, he is

21       asked do you remember this?  Do you remember that?  I

22       can't remember.  I can't remember.  I can't remember.

23            Well, when you saw the email, what did it say?  It

24       said exactly what Mr. Felder had said earlier.  Universal

25       and Ms. Jimenez both had always said Flood Brothers has a

1   valid claim under the policy; under the policy.  There was

2   nothing being concealed about this email from Michelle

3   Jimenez.  It said that same thing.  Hey, they got a claim.

4   She said they did good work.  They need to get paid.

5       But remember, there's one thing that's conspicuously

6   absent.  There's no amount.  There's no amount.

7       Now, when you're getting paid, it's not enough to

8   just say, hey, pay me.  The next question is how much?

9   There was no amount, and that's what Mr. Felder said they

10  could not get her to commit to, and I will talk about that

11  again in a minute because in this trial, some things have

12  come out that I think shed a lot of light on that.

13      So we ultimately streamline that and we discarded our

14  request for fees in another continuing effort to

15  streamline the litigation.

16      Now you heard some other things that really won't

17  help you too much.  There were maybe hours -- I don't

18  know -- of communications that Mr. Fowler had with

19  Universal.  And you heard a lot about that.  I don't know

20  why because -- and you heard all of these challenges to

21  Mr. Felder saying you can't refute that he talked to you

22  guys, and Mr. Felder said, I've never tried to refute it.

23  No, we admit he talked to us.

24      Mr. Fowler claims that he called on a Saturday

25  morning to speak with an unknown person, but what he

1    specified was discussed was do you have coverage?  Yes, we
2    have coverage.  That's the truth.  Is it the kind that
3    covers water mitigation?  Yes, it does cover water
4    mitigation.  That's true.  Well, what do I need to do to
5    submit a claim for water mitigation?  Obviously, and he
6    said this when I questioned him under the policy, submit a
7    claim, you need to document it.  You need to take
8    photographs, document it, that sort of thing.  Okay.

9         Well, Mr. Felder nor anyone else ever tried to refute
10   that because they don't.  They never denied it.  They paid
11   $18,000 based upon that under the policy.

12        Mr. Fowler also said Universal made no other
13   promises.  There wasn't a promise, hey, just send us any
14   bill and we'll pay it.  What business would say send me
15   any bill and I'll write you a check?  I don't care how
16   much it is.  I'll write you a check.  Mr. Fowler didn't
17   make that contention.

18        And I've touched on this before, that's kind of where
19   we are now though and I'll explain to you why.

20        Flood Brothers' ability to recover the adjusted
21   amount of water mitigation under the policy was never in
22   dispute.

23        Now, all these questions about delay -- and I know
24   Mr. Rouse didn't mean to misrepresent this.  I did mention
25   COVID.  I mentioned COVID in the context of this

1    litigation because everybody knows the courthouse was

2    closed for over a year.  COVID hadn't even happened in

3    2018.  I didn't suggest that COVID had anything to do with

4    how this claim was being handled before the litigation.

5    And I'm sure that was just a mistake.  All these questions

6    about delays, distractions and misdirection.

7        Remember this, one of the first things Mr. Fowler

8    said when he took the stand was I've never seen a case

9    like this where the house has been sold and closed on the

10    day of the water loss.  And the oddities about this claim

11    continue from there.

12        Ms. Jimenez had hit the road off to parts unknown.

13    She had sold the property.  You know, and then you hear

14    more distraction and misdirection.  How dare they put

15    joint payees on the check?  How dare they?  That was a

16    calculated thing to delay.

17        Well, then we got their text and Mr. Fowler is

18    telling the insured they're gonna issue a check and it's

19    gonna have not only you, but it's gonna have us and it's

20    gonna have your mortgage company on it.  And you heard

21    Mr. Felder say, that's the way it's done almost all the

22    time.  There's no secret about that.  There's no sinister

23    motive.  That's what's required under the terms of the

24    policy.

25        And then you've gotten into all of these questions

1    about the 60 days under the policy.  And, you know, we
2    lawyers sometimes we pick out what we like to read from a
3    document and then we stop where we want to stop.  You
4    remember I pointed out, and Mr. Felder was questioned
5    a long time about, this says you've got 60 days.  This
6    says you've got 60 days.  Did you pay it in 60 days?

7    What he got forgot, and you'll have the policy,
8    Exhibit 9.  And at page 15, what he forgot to do was the
9    very next phrase.  60 days when we get your proof of loss
10   and reach an agreement with you.

11   Now wait a minute?  Isn't that what Mr. Felder has
12   been saying all along?  Mr. Felder said, you know, in
13   handling these insurance policies I've got to abide by the
14   insurance policy because we make this promise to our
15   insureds that this is a policy and we're gonna abide by
16   this policy.  And the policy is very specific.  We adjust
17   the claim with the insured and we'll pay it within 60 days
18   after agreement with you.  And Mr. Felder said, I couldn't
19   get -- I knew she wanted it paid.  I knew she said it was
20   covered.  She didn't disagree with that.  I couldn't get
21   an agreement on the amount, and I'll get into that in a
22   little bit more.

23   Of course the facts change under the policy because
24   things change under that policy and you'll have it.  D-9,
25   page 16, when there's an allegation of litigation which

1     came in as you've seen in all of these records toward the

2     end of the year, and the policy then says, well, if there

3     is a claim against you, we then have the right to

4     negotiate the best deal for you we can get without

5     including it.  Standard provision.

6          So at that point in time which didn't occur until the

7     end of 2018, at that point in time, Mr. Felder was out of

8     the box that Ms. Jimenez had him in and that he could then

9     settle the claim, which is what he thought he did.

10          Now, this early discount idea, you know, that is

11    really a clever, clever way to convert a demand for

12    payment for services into what I was talking about before.

13    No business would agree to accept a demand for payment of

14    services that was open-ended.  Whatever bill you send me,

15    I'll pay it.

16          And think about it, because what we've got here is --

17    and this has been hammered over and over again.  Well,

18    they didn't meet the deadline.  They didn't meet the

19    deadline, so they got to pay this full bill.  Well, they

20    never agreed to the full bill.

21          What they're saying is, hey, because we told you

22    you'd save ten percent if -- I mean, save these $3,600 if

23    you pay within ten days, if they don't get around to

24    getting this person to sign it, the mortgage person to

25    sign it and all that, you know, and it's day 11, then

1     they've got to pay the whole bill.  And we don't have to

2     justify anything.  We don't have to justify anything

3     because they didn't meet the deadline and the ten percent,

4     the ten-day deadline.

5         That's pretty clever, isn't it?  That just converts a

6     bill to a pay on receipt, no-questions-asked kind of bill.

7     And that's what they're asking for this to be.  If you

8     don't meet our ten days, you gotta pay on receipt.  No

9     questions asked.  No support for the bill.  That's what's

10    been happening over and over and over again in this case.

11        I will remind you that the services performed were

12    mitigation only.  There is no doubt there was a lot of

13    damage there.  Mr. Rouse pointed out there's something

14    like 50 grand of damage done by another contractor.

15        So when you look at all of these photographs that we

16    sat for like an hour-and-a-half or something looking at

17    photographs, please don't think that Flood Brothers made

18    all of those repairs.  That's not a part of this case.

19    And Mr. Fowler was very clear about that.  All they did

20    was got the water out.

21        One of the biggest distractions and misdirections is

22    all of the time we've spent this week on these deadlines.

23    You know, there were a lot of deadlines.  And you'll

24    remember, there were deadlines that were set and deadlines

25    that were reset and deadlines that were reset and

1          deadlines that were reset.  And then they went into all of
2          that stuff about the policy, 60 days, but there was
3          ultimately only one real deadline.
4               And if you look at -- and you're gonna have it in
5          evidence -- the January 7th email, which I believe is
6          Defendant's Exhibit 3 and it's a plaintiff's exhibit also,
7          and that's where the attorney for Flood Brothers wrote
8          Mr. Felder and said at that point in time, I demand an
9          immediate check in the amount of $18,000 sent to my office
10         for payment of partial costs.
11              And you remember the question about, well, didn't
12         that tell you that we weren't settling the whole case?
13         And Mr. Felder said, no.  The eighteen thousand was
14         partial costs from the beginning.
15              I mean, the very first time it was agreed to,
16         eighteen was partial of twenty-one thousand, so that
17         didn't tell me anything.  What the email went on to say
18         was I will provide you an additional time to demonstrate
19         good faith and begin to provide closure.
20              And then the important part was the demand letter
21         previously served is attached in case you need additional
22         particulars.  And that's important because the demand
23         letter attached is the one that said this is notice to
24         take specific steps to avoid immediate litigation.  To do
25         so, the insurance response previously served must be

1       received by Flood Brothers Restoration by ex-date.  Of

2       course, this January 7 email moves that date to January

3       11th.

4            There is no doubt that Mr. Felder at that point with

5       the claim of litigation pending had the power to close

6       down the case and settle it and he agreed.  It is

7       undisputed he issued the check.  He got permission from

8       Mr. Rouse to just mail it because the direction from

9       Mr. Rouse was send this to my office and Mr. Felder told

10      him in the email that you'll see.  You'll have it in the

11      jury room.  Well, I only have a post office box.  I can't

12      send overnight to a post office box.  Will you agree to

13      just let me mail the check today, and Mr. Rouse agreed and

14      confirmed that agreement.  That email is in there as well.

15      And it is undisputed that is exactly what he did.

16           He sent it.  The check was cashed.  And Mr. Felder

17      thought he had avoided litigation.  What does that mean?

18      I mean, everybody concludes the same thing.  You avoid

19      litigation, you've settled the dispute.

20           This whole idea about partial payment is bogus

21      because it was partial payment from the very first time it

22      was offered, and that didn't change it.  And there is no

23      doubt that the December 20 demand letter was a settlement

24      demand.  If you pay this money, you avoid litigation.

25           If it really wasn't, if this payment of $18,000 with

1       all these demands and letters from lawyers and everything

2       wasn't to avoid litigation, this litigation, what

3       litigation was it to avoid?  That makes no sense.

4            The case was settled.  And Mr. Felder was very

5       reasonable to think the case was settled.  I have resolved

6       this dispute for my insured, Ms. Jimenez, and everything

7       is over.

8            Now, even if it was not settled, which we think it

9       was, but let's assume it wasn't, the Judge is gonna tell

10      you that they have the burden of proof.  That means they

11      have got to prove their damages.  They can't just say, oh,

12      because they didn't get the early pay deadline, our

13      damages are everything that we say they are, whether they

14      are supported or not.  That's not the way it works.

15      They've got to prove that it's all related to water

16      mitigation.

17           You'll remember Ms. Fowler testified and nobody else

18      disputed it -- actually, Mr. Felder agreed with her -- the

19      average contract on water mitigation is about $3,500.

20      Mr. Fowler testified when this bill came in for over

21      twenty-one thousand, he was really surprised, holy moly.

22      Even according to their own testimony, that's like what?

23      Five times more than the average bill?  Okay.

24           Well, Mr. Skylar didn't say, well, I'm not gonna pay

25      that.  That's too large.  What he did was he analyzed it.

1    And all this stuff you've heard about nobody analyzed it.

2    Nobody analyzed it.  Well, you heard Mr. Felder.  He got

3    on the stand.  He's reviewed thousands of these cases.

4    You're gonna hear the Judge say, you're an expert if you

5    have more experience doing something than the average

6    citizen.  Mr. Felder was at one time certified by the

7    IICRC and he's reviewed thousands of these cases and he's

8    never been involved in litigation from a vendor like this.

9    No vendors that he's been involved with has ever sued the

10   company.  So he's been doing a pretty good job apparently.

11        He did an analysis.  Now this stuff that -- he eluded

12   to this Exhibit Number 4, Plaintiff's 4, the $23,000

13   invoice, but it's undisputed.  They admit they never

14   submitted that to Universal.  In fact, it's dated sometime

15   in 2021, not 2018, so I don't think that has any

16   relevance.

17        Mr. Felder went through the bill in detail and he

18   told you that he identified $8,483 worth of entries that

19   he couldn't justify for various reasons.  There wasn't a

20   drying log.  There were about $3,000 worth of Xactimate

21   entries that were wrong.  He did that by going through

22   Xactimate as he always does, and he came up with -- all he

23   could justify from the bill -- and remember, he found some

24   things that were wrong in their favor and he wrote that

25   down too.  So all he could justify was

1    thirteen-one-seventy-nine.

2         Now, you heard him testify, I didn't tell him your

3    claim is denied anything beyond thirteen-one-seventy-nine.

4    What they did was they conferred.  They told Flood

5    Brothers they had a problem with the bill.  That's

6    undisputed.  Of course, now you hear, well, they didn't

7    tell us.  They didn't tell us.  But that's inconsistent

8    with Mr. Fowler stating on the stand to me, I knew they

9    had a problem with the bill.

10        Now, it's clear they had a problem with the bill.

11   Mr. Felder said, I asked him, did you get them?  Did you

12   make them submit to you all of this stuff to see if you

13   could document more of the bill?  He said, no.  We turned

14   immediately to compromise.  That's the way this business

15   stuff works.  And Mr. Fowler's testimony is not

16   inconsistent with that.  They immediately turned to, well,

17   how much would you take?  What would resolve this matter

18   just to put it to rest so we don't have to give you a

19   bunch more information?  And that was $18,000.

20        And so the process started first trying to get Ms.

21   Jimenez to agree.  And then when Mr. Felder could, he

22   settled it.

23        Now, in this delay thing, we saw the kickback text.

24   You remember that Exhibit 17?  You are gonna have it there

25   with you.  This, I think, says a lot about the case.

1          Exhibit 17, the last page.  It's December 16th.  And

2     that's when you remember Ms. Jimenez was asked to endorse

3     the $18,000 check and send a copy to Mr. Fowler.  And her

4     response was still waiting on your response regarding what

5     we spoke about.

6          Now, we don't know exactly what they spoke about

7     although, I mean, that's not in the text.  Mr. Fowler says

8     one of the things that came up was she wanted a kickback.

9     And he admits that.  She wanted a cut of the pie, a cut of

10    the claim.  And everybody knew that was wrong.  His

11    response was not in the text, was not we don't do that

12    kind of thing.  We're not gonna give you a kickback.  His

13    response was, quote, until we get paid in full, we won't

14    give a kickback.

15         Now, that says a couple of things.  One thing that's

16    very important is what's not in the text.  There are no

17    numbers in the text, no dollar numbers; how much the

18    kickback was or anything else.  This may explain why

19    Universal was having a problem getting Michelle Jimenez to

20    specifically agree to a number because just think about

21    it.

22         If you were doing something wrong like this, you

23    wouldn't create the evidence that's gonna nail you down

24    the road.  You wouldn't want, you know, a prosecutor or

25    somebody holding up your text saying, well, you said you

1    wanted him to pay ex.  You would want to retain the
2    ability to say, I wasn't involved in the amount of money
3    being paid.  I didn't have anything to do with that.  Just
4    the way she dealt with Mr. Fowler.  She wouldn't say in
5    there what they talked about.  They talked about a
6    kickback, but that -- what's not in there probably
7    explains why she would never get back to Universal and
8    approve a specific dollar amount.  And we don't know, but
9    maybe that's why all of a sudden instead of doing
10   eighteen, they wanted twenty-one because they needed more
11   money to give her a cut of the pie.  We just don't know
12   that.
13       And here we are in this litigation, and I'm almost
14   finished, you have to wonder if this kind of litigation is
15   a part of their business plan.  You know, it came out this
16   isn't unique for them.  Last year he told me they had
17   eight cases where their bills were being disputed in
18   litigation.
19       So maybe this whole thing with the clever discount
20   and then pay whatever the bill says is a part of their
21   deal.  We think that we are here in this litigation
22   because they think that you will say, well, it's just a
23   big insurance company.  You know, we'll give them whatever
24   they want.  That wouldn't be right, and I think as
25   representatives of the community, you can look at this and

1    say a deal is a deal.  We're not asking for a penny of

2    that money back.  You made a deal.  You can live with it.

3    And we're going on.

4         You're gonna be asked on your verdict form whether

5    you award any additional damages to pay or not.  To be

6    clear, none of the eighteen is being given back to

7    Universal.  Universal hasn't asked for it.

8         You're also gonna be asked do you find by a

9    preponderance of the evidence that Universal Property and

10   Casualty has been stubbornly litigious or has caused

11   unnecessary trouble and expense forcing plaintiff to sue

12   where no bonafide controversy exists.  And there's no

13   damages attached to that.  You're just gonna be asked

14   that.

15        As I said and as Mr. Rouse said at the outset,

16   there's no allegation of bad faith on behalf of either

17   party, and Universal has withdrawn its request for

18   attorney's fees because we think there definitely is a

19   bonafide controversy.

20        The Judge is going to give you instructions about

21   that.  What does a bonafide controversy mean, and she's

22   got instructions and I encourage you to listen to that.

23   But a couple of things are really important.  One of the

24   things that the Judge is going to tell you is the mere

25   fact Universal wouldn't pay anymore money isn't the

1      equivalent of being stubbornly litigious.

2          She's also gonna tell you even if you decide you want

3      to give some more money to Flood Brothers, that doesn't

4      necessarily mean that Universal was being stubbornly

5      litigious as long as they had a good-faith, bonafide basis

6      for disputing this.  A bonafide dispute.  A real dispute.

7          There are a number of real disputes here, a number of

8      real disputes.  One of them when the litigation started

9      was whether there was a contract between Universal and

10     Flood Brothers.  Flood Brothers and their owner have now

11     admitted there wasn't, so that was bonafide dispute that

12     when the litigation started.  There are plenty of bonafide

13     disputes about the amount of damages.  There are plenty of

14     bonafide disputes about whether or not there was a

15     settlement on January 7th when the $18,000 was delivered

16     and cashed.  So I would encourage you to answer no to

17     that.  No.

18         We won't get into any additional phases about whether

19     or not and the amount of attorney's fees, the case would

20     be over then if you answer no.  Otherwise, we're gonna

21     probably have to come back and do some more phases here.

22         Mr. Rouse has already advised you that he gets to

23     come back up.  I don't.  And so if you expect me to hop up

24     and respond to anything he says, I'm not gonna be able to

25     do that.  I'm counting on him not to be mean to me and not

1    to say outrageous things that he knows I can't get up and
2    respond, and I'm hopeful as you are that this will all be
3    over very soon.  Thank you very much.
4          THE COURT:  Thank you, Mr. Bagley.  Mr. Rouse?
5          MR. ROUSE:  Okay.  As promised, I'll be brief.
6    There's a lot of documents over there that you all will
7    have the opportunity to review.  But I want to introduce a
8    few highlights.
9          I can't resist the urge.  I have to respond to what
10   Mr. Bagley mentioned about -- that was a great analogy.
11   That was very entertaining to me, but the funny thing is I
12   feel like it's appropriate for his case.
13         When you talk about the distraction doctrine and the
14   tools, smoke and mirror, that's a great strategy in the
15   law.  That's exactly what Universal has done this entire
16   case because now they are trying to tell you -- they're
17   trying to sell you the idea that there was a bonafide
18   controversy.
19         We had a bonafide controversy as to our ability to
20   pay, as to the timeliness of payment, as to the consent of
21   Michelle Jimenez, and as to the amount of the bill.  How
22   was that a distraction?  Because Mr. Felder admitted --
23   again, I'm hitting a dead horse here.  I understand that,
24   but Mr. Felder admitted -- for the first time he's
25   mentioning these issues.

1          He never talked to Flood Brothers or anyone on behalf

2     of Flood Brothers about any of these issues in terms of

3     their inability to pay on time, in terms of what they

4     believe was fair to pay, in terms of the billing with

5     Xactimate.  None of these issues were ever brought to

6     Flood Brothers.  How can there be a bonafide controversy

7     on those points if you never take the time to even

8     communicate that?

9          For the first time Universal mentioned those issues

10    on the witness stand.  A part of this case will be that

11    they have been stubbornly litigious.  They have caused

12    unnecessary trouble and expense.  If they had these

13    arguments with respect to a bill, is it reasonable, is it

14    logical that they would have presented them to Flood

15    Brothers before three and a half years later?

16         Again, Felder's comments were first made to Flood

17    Brothers yesterday.  That's why we say there's no bonafide

18    dispute here because you're just bringing it up because

19    we're in trial, but that's the smoke and mirror trick.

20         They want to say, well, we're a great insurance

21    company.  Remember, Mr. Bagley, truly I would say, pointed

22    out, made a comment that, you know, I'm trying to do

23    tricks.  I'm trying to distract you.  And he mentioned,

24    you know, we never -- all we agreed to was water

25    mitigation.  All we agreed to was that.  That's what we

1     said they agreed to.  We said that Universal asked them to
2     specifically perform water mitigation.  That's what we
3     said.

4         We've never disputed that Michelle Jimenez didn't
5     sign them up.  Remember the difference between Mr. and
6     Mrs. Fowler.  There is an ordinary case and then there's
7     what they saw at Riders Ridge, which was a complete
8     disaster.  That property did not look like a $3,500 job.
9     That property looked like a disaster.  That's why it took
10    fifty-some-odd thousand dollars for people to repair it.
11    That's after it cost Flood Brothers over $20,000 to get
12    all the water out of the property.  Distraction.

13        But remember, Flood Brothers said normally we work
14    with the homeowners, but when we see something like that,
15    we talk directly to the insurance company because we want
16    to be in an agreement with you.

17        So our case entirely here, ladies and gentlemen of
18    the jury, isn't that this is Michelle Jimenez contracting
19    with them.  Our case is no, Flood Brothers when they saw
20    the damage, they said wait.  We need to speak with
21    Universal.  Do you want us to do this?  How do you want us
22    to do it?  What do you want us to do to show you that
23    we've done it, and then we'll do the work.

24        Mr. Bagley mentioned there is an amount in question.
25    He mentioned there was never a number.  It's like Flood

1    Brothers did the work and then they just wanted them to

2    pay, you know, for a blanket invoice that they were

3    submitting.  But what he didn't discuss with you and what

4    is offered in evidence and you will have it when you

5    deliberate, Plaintiff's Exhibit 7.  Again, this is in

6    October.  Charles Derry communicates with Flood Brothers.

7    Charles Derry looks at the bill.  This is after the work

8    is done.  He's looked over the bill.

9        So Universal saw the bill in October.  They said

10   look, if you will accept eighteen, we'll get you paid.

11   We're done.  That was the deal.  So that's where eighteen

12   came from.

13       So this whole argument for two days about there was a

14   compromise, the compromise happened in October.  And then

15   as a basis of that, they said if you pay me within ten

16   days, we're good.  This is after they compromised.  Then

17   they said after you reviewed everything, if you pay within

18   ten days, we'll accept the eighteen.  They didn't do

19   that.

20       On November the 6th, Flood Brothers communicates

21   directly with Universal to try and avoid having to hire an

22   attorney.  They say, look, you haven't paid.  I'm gonna

23   give you more time to pay, but you've got to pay me or I'm

24   going to hire an attorney.  And, oh, by the way -- and,

25   again, this is Exhibit 8 -- by the way, the discount is

1    not good if you don't meet the extended grace period.

2    That was never -- they never paid on time.

3        So this fascination that they didn't have an

4    agreement earlier is just a sell-job to you.  The idea

5    that Michelle Jimenez was holding this up and that there's

6    somehow some sort of illegal motive on behalf of Flood

7    Brothers is a sell-job.

8        He is the prisoner of the moment.  Flood Brothers is

9    the prisoner of the moment.  They've done all the work,

10   and they had an agreement in October top get paid.  They

11   weren't paid.  They're entitled to the full value of their

12   bill.  Technically, they're entitled to the full value of

13   the work, I would submit, but at least the full $21,600.

14   That's a $3,600 discount to Universal that they didn't

15   take advantage of.  So Flood Brothers is entitled to that.

16       I would submit to you in your collective conscience

17   as jurors, Flood Brothers is entitled to their time to

18   present this issue.

19       And, lastly, I will say this.  This case is about was

20   there stubborn litigiousness on the part of Universal?

21   Did they force Flood Brothers to incur unnecessary time

22   and expense?

23       And, you know, I would actually concede with the

24   defendant that there could be in many cases bonafide

25   issues on these points.  The difference is if you're

1       communicating a bonafide issue before trial, I could

2       concede that there could be a bonafide issue.  Hey, I want

3       to see these bills.  I want to have a discussion about

4       this or that.  But you can't say there's a bonafide issue,

5       number one, if the person that's evaluating it doesn't

6       know, doesn't have the subject matter relevant experience

7       to parse an invoice.

8            Mr. Felder is without a doubt proficient at his work,

9       but he is not a water mitigation expert.  He doesn't have

10      experience doing it.  He's not licensed.  He wasn't

11      licensed the year this invoice was submitted.  He never

12      went to the property.

13           Mr. Felder did not have -- while he said there was a

14      file, he did not introduce anything from the file.  He

15      just identified that adjusters went out to the property.

16      He didn't mention any problem that was communicated to him

17      from any of those agents.

18           So the idea, the proposition that there is a

19      good-faith basis to discount the bill -- and they

20      mentioned, oh, we found $8,400 worth of overcharges and we

21      really should've paid them thirteen thousand.  I don't

22      know about you, but how many companies just give a company

23      five extra thousand.  It doesn't happen.  The reality is

24      it's not -- that is not a credible statement to even make

25      because in October, they agreed to eighteen.  Charles

1  Derry after his discussions and review of the bill, he

2  agreed to eighteen.

3   So when you come into court for the first time

4  presenting alleged gripes or problems with the bill, and

5  then you say we really believe we should've paid thirteen

6  when you agree to eighteen in October doesn't make any

7  sense.  It doesn't hold water.

8   So our stress -- the point that we want to stress the

9  most is there was not a good-faith reason to even be here.

10  Despite the letters that were sent by my office, when it

11  says partial and you have communications with a service

12  provider that says, hey, we're not giving you the discount

13  anymore, there's no other way to interpret that partial

14  language because you have multiple communication that say,

15  hey, you didn't take advantage of the discount.  I want

16  the full value of my invoice.

17   The only reason why we asked for a partial amount of

18  the eighteen is because they had a check floating around

19  that they had already given to Michelle that they did not

20  send to Flood Brothers.  So we're saying give them a check

21  so they can offset their overhead and then pay the

22  remainder of your bill and then we don't have to have a

23  trial.  It's really that simple.

24   But if you're going to say we're not gonna pay your

25  full bill.  We're not gonna pay it on time.  We're not

1   gonna tell you that we have problems with your bill until

2   we appear in court.  And then when we appear in court,

3   we're gonna present someone who's not even licensed to do

4   what we're complaining about that was done, that to me

5   just -- it does not meet even a general expectation for

6   reasonableness.

7        This could have all been avoided, but Flood Brothers

8   was not in control.  They were a prisoner of the moment.

9        So in the end, I would ask that the jury find -- I

10  would ask that you all find that what was done in this

11  case in terms of resolving the oral contract that was made

12  between Universal and Flood Brothers, I would ask that

13  what was done in terms of their failure to timely pay and

14  to pay what they should have paid, I would ask that you

15  find that it was not reasonable; that there was not a

16  good-faith, a bonafide controversy for them to argue

17  because if there was, they would have done so before

18  today, before yesterday.

19       Thank you very, very much for your time.  I

20  definitely appreciate it.

21       THE COURT:  Thank you, Mr. Rouse.

22       All right.  Ladies and gentlemen, before I release

23  you to begin your deliberations, I'm going to give you the

24  law in which applies to this case.  You're not gonna

25  remember everything I say, so I will give you a copy of

1          these jury charges.  Once I read them to you, I will

2          release you to begin your deliberations.

3                                    - - -

1               **CHARGE OF THE COURT**

2          THE COURT:   Ladies and gentlemen, you have been

3     considering the case of Flood Brothers Restoration, LLC,

4     plaintiff, versus Universal Property and Casualty

5     Insurance, defendant, Civil Action Number 19-C-6796-4.

6          The plaintiff filed this action here in the State

7     Court of Gwinnett County in which it contends that the

8     defendant breached the agreement that the parties had

9     entered.   I have outlined to you briefly the written

10    contentions of the parties as contained in the pleadings.

11         The pleadings are not evidence.   They are only claims

12    or contentions of the parties.

13         The plaintiff has the burden of proof, which means

14    that the plaintiff must prove whatever it takes to make

15    out its case except for any admissions made by the

16    plaintiff.   The plaintiff must prove its case by what is

17    known as a preponderance of the evidence, that is,

18    evidence upon the issues involved that while not enough to

19    wholly free the mind from a reasonable doubt, is yet

20    sufficient to incline a reasonable and impartial mind to

21    one side of the issue rather than the other.

22         Evidence is the means by which any fact that is put

23    in issue is established or disproved.   Evidence includes

24    all of the testimony of the witnesses and the exhibits

25    admitted during the trial.

1    Evidence may be direct or circumstantial or both.  In

2    considering the evidence, you may use reasoning and common

3    sense to make deductions and reach conclusions.

4    Direct evidence is the testimony of a witness who

5    asserts that he or she has actual knowledge of a fact such

6    as an eye witness.  Circumstantial evidence is proof of a

7    chain or set of facts and-or circumstances that tend to

8    prove or disprove another fact by inference that is by

9    consistency with such fact or elimination of other facts.

10    There is no legal difference in the weight you may

11    give to either direct or circumstantial evidence.

12    Plaintiff Flood Brothers has made an admission that

13    they performed water mitigation services on Michelle

14    Jimenez's property after contracting exclusively with

15    Michelle Jimenez.

16    Facts admitted by a party in requests for admissions

17    are admissions in judicio that are conclusively

18    established.  Statements made by a party's counsel made in

19    open court are binding upon the party.  Such admissions

20    are admissions in judicio and are conclusive.  A party is

21    estopped from contradicting admissions made in judicio.

22    Testimony has been given in this case by certain

23    witnesses who are termed experts.  Expert witnesses are

24    those who because of their training and experience possess

25    knowledge in a particular field that is not common

403

1  knowledge or known to the average citizen.  The law

2  permits expert to give their opinions based upon their

3  training and experience.  You are not required to accept

4  the testimony of any witness, expert or otherwise.

5      Testimony of an expert, like that of all witnesses,

6  is to be given only such weight and credit as you think it

7  is properly entitled to receive.

8      The jury must determine the credibility of the

9  witnesses.  In deciding this, you may consider all the

10 facts and circumstances of the case, including the

11 witnesses' manner of testifying; their intelligence; the

12 witnesses' means and opportunity of knowing the facts to

13 which they testify; the nature of the facts to which they

14 testify; the probability or improbability of their

15 testimony; their interest or lack of interest in the

16 outcome of the case; and their personal credibility as you

17 observed it.

18     To impeach a witness is to show that the witness is

19 unworthy of belief.  A witness may be impeached by

20 disproving the facts to which the witness testified.

21     Your assessment of a trial witness's credibility may

22 be affected by comparing or contrasting that testimony to

23 statements or testimony of that same witness before the

24 trial started.  It is for you to decide whether there is a

25 reasonable explanation or any inconsistency in a witness's

1    pretrial statements and testimony when compared to the

2    same witness's trial testimony.

3        As with all issues of witness credibility, you, the

4    jury, must apply your common sense and reason to decide

5    what testimony you believe or do not believe.

6        When a party has evidence that rejects or disproves a

7    claim or charge made against the party, he or she fails to

8    produce it or have a more certain and satisfactory

9    evidence relies on that which is of a weaker and inferior

10   nature a presumption arises that the charge or claim is

11   well-founded.  This presumption may be rebutted, however.

12       If a party fails to produce an available witness, the

13   jury shall determine whether such a failure warrants the

14   inference that the witness, if produced, would have

15   testified to facts prejudicial to the party failing to

16   produce the witness.

17       A contract is an agreement between two or more

18   parties for the doing or not doing of some specified

19   thing.  There is no requirement that a contract be in

20   writing.  A contract may be enforceable even though it

21   rests only in words as remembered by witnesses.

22       To constitute a lawful contract, there must be

23   parties able to contract, a consideration for the

24   contract, the agreement of the parties to the terms of the

25   contract, and a lawful subject matter.

405

1        A consideration is valid if any person who promised

2   is entitled to a benefit or any harm is done to one who

3   receives the promise.

4        Damages are given as compensation for injuries

5   sustained.  Damages recoverable for breach of contract are

6   such as arise naturally and according to the usual course

7   of things from the breach and such as the parties

8   contemplated when the contract was made as the probable

9   result of the breach.

10        The expenses of litigation are not generally allowed

11   as a part of the damages.  But if the defendant has been

12   stubbornly litigious or has caused the plaintiff

13   unnecessary trouble and expense, you may allow them.

14        Stubborn litigiousness and causing unnecessary

15   trouble and expense refer to the defendant forcing the

16   plaintiff to sue where no bonafide controversy exists.  If

17   there are no reasonable grounds to contest the claim, even

18   if they ultimately do not prevail, there is no bad faith

19   for purposes of attorney's fees and the expenses of

20   litigation and attorney's fees should not be awarded.  A

21   mere refusal to pay a disputed claim is not the equivalent

22   of stubborn litigiousness.

23        Attorney's fees are not authorized under OCGA 13-6-11

24   if the evidence shows that a genuine dispute exists

25   whether of law or fact, on liability or amount of damages,

1    or on any comparable issue.

2        If you find for the plaintiff, then you must

3    determine an amount to be awarded to the plaintiff.  The

4    law requires that your verdict be unanimous, that is,

5    agreed to by all jury members after the amount is

6    determined.

7        It is unlawful for you to agree in advance to be

8    bound by the figure that is calculated by each of you

9    writing down your own figure and then adding them together

10   and dividing the sum by 12.  If you wish to use this

11   method to arrive at an amount for discussion without

12   binding yourself in advance to accept the result, you may

13   do so.  You are not prohibited from accepting that result

14   and adopting it as your verdict after the amount is

15   determined if you believe from a preponderance of the

16   evidence that the figure arrived at by this method

17   represents just and adequate damages.  However, you must

18   have first found in favor of the plaintiff and you must

19   all agree after the amount has been determined that the

20   amount represents your verdict.

21       Whatever your verdict in the case it must be agreed

22   to by each juror.  It must be in writing, dated, and

23   signed by your foreperson, and it must be returned and

24   read in open court.

25       The Court has prepared a verdict form for your use.

1    Attorney's fees are not to be considered in this

2    phase of the trial.  If appropriate, attorney's fees will

3    be considered in a subsequent phase.

4    I want to emphasize that anything the Court did or

5    said during the trial of this case was not intended to and

6    did not intimate, hint or suggest to you which of the

7    parties should prevail in this case.  Whichever of the

8    parties is entitled to a verdict is a matter entirely for

9    you to determine.  Whatever your verdict it must be agreed

10   to by all of you.

11   The Court's interest in the matter is that the case

12   be fairly presented according to the law and that you as

13   honest, conscientious, impartial jurors consider the case

14   as the Court has instructed you and return a verdict that

15   speaks the truth as you find the truth of the case to be.

16   Your verdict should be a true verdict based upon your

17   opinion of the evidence according to the laws given you in

18   this charge.

19   You are not to show favor or sympathy to one party or

20   the other.  It is your duty to consider the facts

21   objectively without favor, affection or sympathy to either

22   party.

23   In deciding this case, you should not be influenced

24   by the sympathy or prejudice because of race, creed,

25   color, religion, national origin, sexual preference, local

1     or remote residence, economic or corporate status for or

2     against either party.

3          Your verdict must be unanimous.

4          One of your first duties in the jury room will be to

5     select one of your numbers to act as foreperson who will

6     preside over your deliberations and who will sign the

7     verdict to which all 12 of you freely and voluntarily

8     agree.

9          You should start your deliberations with an open

10    mind.  You should consider all the evidence in the case

11    and deliberate with an aim towards reaching a unanimous

12    verdict consistent with your consciences and oaths as

13    jurors.  Avoid premature fixed opinions.  Consult with one

14    another and consider each other's views.  Each of you must

15    decide this case for yourself, but you should do so only

16    after a discussion and consideration of the case with your

17    fellow jurors.

18         Do not hesitate to change an opinion if convinced

19    that it is wrong, however, you should never surrender

20    honest convictions or opinions in order to be congenial or

21    to reach a verdict solely because of the opinions of the

22    other jurors.

23         In a few moments you may retire to the jury room, but

24    do not begin your deliberations until I send you the

25    exhibits and verdict form, which I will do so shortly.  At

1    that time, you may begin your deliberations.

2        Okay.  At this time, I will release you with the

3    bailiffs.

4        Ed, it's almost lunchtime.

5        MR. VASQUEZ:  I'll check with them.

6        THE COURT:  Okay.

7        (Whereupon, the jury was excused from the courtroom.)

8        THE COURT:  Counsels, first thing you need to do is

9    make sure you've got your exhibits in order.

10       I suspect they will probably want to go to lunch

11   first and then come back.

12       I will send out 12 copies of the jury charges.  They

13   are not going to remember all of this that I read, and so

14   I do send that out as a practice.  I will send out the

15   verdict form, but make sure all of your exhibits are in

16   order.

17       (Whereupon, a lunch recess was held.  After which,

18   the jury began their deliberations at 1:00 p.m.  At 1:52

19   p.m., court reconvened.)

20       THE COURT:  All right, counsel.  We have three

21   questions.

22       Question Number 1, how many times has he come to

23   court to deal with this case?  That's Question Number 1.

24       Question Number 2, are there any pretrial documents

25   available?

410

1    And question Number 3, was the initial call between
2    Flood Brothers Restoration, LLC, and Universal Property
3    and Casualty Insurance recorded?
4    My typical response is, you have all the evidence --
5    all the evidence in this case has been submitted.  My
6    response is always something along those lines.  Cannot
7    give any additional information, but I give the attorneys
8    an opportunity to help me phrase it, but that's the theme.
9    You have all -- or all of the evidence for this case has
10   been submitted.
11   Mr. Bagley, how would you --
12   MR. BAGLEY:  Something like that is fine with me,
13   Judge.
14   THE COURT:  Mr. Rouse?
15   MR. ROUSE:  The same.
16   THE COURT:  You have all of the evidence for this
17   case in which you are to use in your deliberations.
18   Counsels, what do you want me to say?
19   MR. ROUSE:  That's fine with me, your Honor.
20   MR. BAGLEY:  That's fine, Judge.
21   THE COURT:  Or just you have all the evidence for
22   this case?  What I have written, you have all of the
23   evidence for this case in which you are to use in your
24   deliberations.  And that will be my answer for all three,
25   okay?

1          Ed, let the attorneys see that, and I will mark this
2     as Court's Exhibit Number 1.
3          Ed, let the attorneys see this and you can take it
4     back to the jurors.  We will wait to see if they have
5     additional questions.
6          (Whereupon, a brief recess was held.)
7          MR. VAZQUEZ:  No more questions for now.
8          (Whereupon, a brief recess was held.)
9          THE COURT:  All right.  So let's see what the jury
10    says.  Are we ready?  Okay.
11         (Whereupon, the jury was escorted into the
12    courtroom.)
13         THE COURT:  All right, ladies and gentlemen.  I
14    understand that we have a verdict?
15         THE FOREPERSON:  Yes, ma'am.
16         THE COURT:  I'm gonna ask the foreperson to rise and
17    state your name.
18         THE FOREPERSON:  Jahleel Wauchope.
19         THE COURT:  Mr. Wauchope, has the jury agreed upon a
20    verdict?
21         THE FOREPERSON:  Yes, ma'am.
22         THE COURT:  Is the verdict in writing?
23         THE FOREPERSON:  Yes, ma'am.
24         THE COURT:  Have you as the foreperson signed it?
25         THE FOREPERSON:  Yes, ma'am.

1          THE COURT:  Is it dated?

2          THE FOREPERSON:  Yes, ma'am.

3          THE COURT:  Okay.  Please hand it to my bailiff.

4          Okay.  Mr. Wauchope, is this the verdict of the jury?

5          THE FOREPERSON:  Yes, ma'am.

6          THE COURT:  Was it unanimous?

7          THE FOREPERSON:  Yes, ma'am.

8          THE COURT:  Okay.  Would you please publish the

9      verdict.

10          THE FOREPERSON:  In the State Court of Gwinnett

11     County, State of Georgia, we, the jury, find for plaintiff

12     Flood Brothers Restoration, LLC, and award damages in the

13     amount of $8,500.

14          And we find by the preponderance of the evidence that

15     Universal Property and Casualty Insurance has been

16     stubbornly litigious and has caused unnecessary trouble

17     and expense forcing plaintiff to sue where no bonafide

18     controversy exists, on this day, April 27th, 2022, signed

19     by me.

20          THE COURT:  Okay.  Mr. Wauchope, as read, is this the

21     verdict of the jury?

22          THE FOREPERSON:  Yes, ma'am.

23          THE COURT:  Please hand it to my bailiffs.

24          Ms. Teri, be so kind and publish it to the attorneys.

25          Counsels, any objection to the verdict?

1           MR. ROUSE:  No objections, your Honor.

2           MR. BAGLEY:  No, your Honor.

3           THE COURT:  All right.  So, ladies and gentlemen, now

4      we go into the second phase.  You have found by a

5      preponderance of the evidence that Universal Property and

6      Casualty Insurance has been stubborn and litigious or has

7      caused unnecessary trouble and expense forcing plaintiff

8      to sue where there was no bonafide controversy exists, so

9      I'm gonna ask you to go out for a few minutes so I can

10     talk with the attorneys and then we will come back and you

11     will hear the second phase.  All right.

12          (Whereupon, the jury was escorted out of the

13     courtroom.)

14          THE COURT:  All right, counsels.  So I think at this

15     point --

16          MR. ROUSE:  I have exhibits that I need to introduce.

17     My invoice, expenses, and that's it.

18          THE COURT:  That's it?

19          MR. ROUSE:  Yes.  They've already been exchanged

20     previously.  The first time we appeared for trial, we

21     exchanged the --

22          THE COURT:  Okay.

23          (Whereupon, a pause in the proceedings was held.)

24          THE COURT:  Okay, counsels.  I guess we have to

25     figure out as relates to what jury charges that I need to

1   give in the second phase also, and agree upon that.

2   Mr. Bagley, I see you still standing.

3       MR. BAGLEY:  Yes, ma'am.  There is a lot of law, your

4   Honor, that says they can only ask for the fees directly

5   related to the defendant and not fees related to other

6   people they are pursing.

7       Now Mr. Rouse is saying, well, we incurred those fees

8   to pursue every witness, but there are things on here

9   about service of process and all of that.  And so I

10  believe the appropriate thing to do would be to expunge

11  the fees related to the Michelle Jimenez side of the

12  matter.  I know that's what the law would require.

13      MR. ROUSE:  In the interest of moving forward, can we

14  take a few minutes between counsel and maybe identify what

15  is problematic.  And that way --

16      THE COURT:  Yes, please do because I intend to get

17  the jury back in here so you can make your arguments

18  because I don't suspect it will take too long.

19      And also while you're doing that so that Debra and I

20  can be working on these jury charges, what additional jury

21  charges --

22      Debra, do you have -- I've already given those such

23  as 22 and 23.  Don't know if I would have to re-give those

24  again.  No, there's not 22 and 23 on here.  It's 24.

25      MS. SIEGEL:  The numbers changed.

1          THE COURT:  Yes.  Counsel, counsel, counsel, hold on.

2     Let's get this because I'm gonna leave the bench so we can

3     work on this.  I'm trying to do it simultaneously.  So

4     please, just bear with me.  Let's try to get the jury

5     charges because Debra has to type them up so that we can

6     move.  Okay.  I'm gonna give you time to talk amongst

7     yourselves, but let's go on as relates --

8          If y'all want me to do it, I'll do it.  I can come up

9     with some, I guess.  But then that's what they're gonna be

10    then.

11         MR. ROUSE:  I would like to do it collaboratively.

12         THE COURT:  Okay.  Let's do it.  Let's do it.

13         Debra, did you have --

14         MS. SIEGEL:  I just have the general language dealing

15    with -- I don't have anything in particular other than

16    like the Phase Two Punitive Charge, which I played with a

17    little bit basically deleting the punitive language and

18    saying you made this determination.  Now you have to

19    determine the amount of the attorney's fees or something

20    like that.

21         THE COURT:  So, Debra, what is that that Mr. Bagley

22    just handed you?

23         MS. SIEGEL:  This basically just says they can only

24    have -- collect attorney's fees or award attorney's fees

25    as they pertain to this defendant, not as opposed to -- as

1    opposed to also including Ms. Jimenez or any charges that

2    would relate to pursuing Ms. Jimenez.

3         THE COURT:  Okay.  So what we'll do since y'all don't

4    have anything, we'll go ahead and we can show you -- we'll

5    print out something and show you what we have, what we'll

6    come up with.

7         MS. SIEGEL:  Which is very basic, to be honest.

8         THE COURT:  So we'll do that.  In the meantime, y'all

9    go ahead and talk about that and see if you can come up

10   with an agreement.

11        (Whereupon, a brief recess was held.)

12        THE COURT:  All right, counsels.  Were y'all able to

13   agree upon --

14        MR. ROUSE:  We redacted the new bill.  It was

15   $70,990.30 for a total of 232.1 hours over the course of

16   the life of this case.

17        THE COURT:  It was seven thousand?

18        MR. ROUSE:  Seventy thousand.

19        THE COURT:  Seven zero?

20        MR. ROUSE:  Yes, seventy thousand.  It was just over

21   seventy thousand, almost seventy-one thousand, but we

22   reduced the bill with expenses associated with Skip Trace

23   and all that work with Michelle.  And we went through line

24   by line and we reduced any amount that was related to

25   specific efforts to locate Michelle or specific efforts in

1       the litigation related to Michelle like motions to

2       publish, things of that sort.

3               THE COURT:  Okay.

4               MR. ROUSE:  So we further reduced the bill by over

5       eleven thousand, and then we added in time for today.  And

6       we reduced out all of the expenses, and the total came to

7       $56,632.60.

8               THE COURT:  All right.

9               MR. BAGLEY:  And what we're talking about doing, your

10      Honor, is basically give the redacted bill to the jury.

11              THE COURT:  Yeah.  I mean, that's what you have to

12      do.

13              MR. BAGLEY:  Right.

14              THE COURT:  Did y'all not redact it?

15              MR. BAGLEY:  We went through and agreed on it.

16              THE COURT:  We'll get you a Sharpie.  And also while

17      Debra is getting a Sharpie, and we'll give you time to

18      redact it, we put a jury verdict and the proposed jury

19      charges on your table too.  It's only three additional

20      jury charges.  And take a look at that so that if we need

21      to make changes, we can go ahead and do that.

22              (Whereupon, a recess was held.)

23              THE COURT:  All right.  You saw the jury verdict?

24              MR. ROUSE:  Yes, your Honor.

25              THE COURT:  Okay.  Any objections to the jury

1       verdict?

2               MR. BAGLEY:  No, ma'am.

3               MR. ROUSE:  No, your Honor.

4               THE COURT:  Okay.  And the three jury charges, have

5       you seen those?

6               MR. ROUSE:  Yes, your Honor.  No objection.

7               THE COURT:  Okay.

8               MR. BAGLEY:  Yes, ma'am.  We're good.

9               THE COURT:  All right.  And there's no opening and

10      closing.  You just do one?

11              MR. ROUSE:  I'm just going to present what my bill

12      is, the time I spent on the case.

13              THE COURT:  Okay.  You'll go first.

14              MR. ROUSE:  Yeah, I'm just gonna talk about -- you

15      know, establish a proffer for my fees.

16              THE COURT:  Okay.  Mr. Bagley, are you gonna ask him

17      any questions?

18              MR. BAGLEY:  I anticipate only asking him a couple.

19              THE COURT:  Okay, then.

20              MR. BAGLEY:  And the only other thing I'll need to do

21      is I think I'm required to move for directed verdict

22      again, you know --

23              THE COURT:  Go ahead and perfect the record.  Go

24      ahead.

25              MR. BAGLEY:  Yeah.

1           THE COURT:  Once he finishes, then you'll do that.
2           MR. BAGLEY:  I'm just gonna say the same thing I said
3      before on the issues and --
4           THE COURT:  Where is your client?
5           MR. BAGLEY:  He had to catch a plane.  He's fine.
6      It's voluntary.
7           THE COURT:  Okay.  We're ready.
8           (Whereupon, the jury was escorted into the courtroom
9      at 3:35 p.m.)
10          THE COURT:  All right, ladies and gentlemen.  We are
11     back for our second phase of it.
12          Mr. Rouse, are you ready?
13          MR. ROUSE:  Yes, your Honor.
14          Ladies and gentlemen of the jury, the second phase of
15     the case is where attorney's fees under 13-6-11 are
16     awarded.  When the jury finds that a party has been
17     stubbornly litigious or caused unnecessary trouble and
18     expense, then it's up to the attorney to establish a
19     proffer or a basis for their time that they've expended on
20     the case, and their experience that gives them a basis for
21     what they charge hourly.
22          I've been a lawyer since 2002.  I have my own
23     practice.  I have a general practice where I do general
24     and civil litigation, complex cases and simple cases.
25     I've had several trials.  I have a lot of trial

1    experience.  And based upon my level of experience, my

2    academic training, and the local averages of attorney fees

3    in the area, I bill at $300 an hour, which is an average

4    rate.  It's not a high.  It's not a low.

5        In this particular case, I spent -- I've kept

6    contemporaneous notes for each hour, each day.  Every time

7    I work on the case, I spend time actually documenting

8    exactly what I'm doing so I can share those

9    contemporaneous notes with my client.  And that's not just

10   particular to Flood Brothers.  It's any of our clients.

11       While I have spent over 230 hours working on this

12   case and having incurred expenses associated with copies,

13   depositions, travel, things of that sort, things that are

14   normal administrative and process-oriented aspects of the

15   case, the amount that I have prepared in this bill that

16   I'm submitting for your consideration has been redacted

17   because I redacted the bill such that it only includes

18   amounts of time and expenses that are associated with the

19   defendant Universal Insurance.

20       With that being said, the bill has been marked as

21   Exhibit 34.  And the total bill for my services to Flood

22   Brothers is $56,207.60.

23       And so I move to enter Plaintiff's Exhibit 34 into

24   the record.

25       THE COURT:  Any objection?

1          MR. BAGLEY:  Your Honor, I have no objection to the

2     admissibility of Exhibit 34, and would like to note that

3     we're not agreeing with the amount of the bill, only to

4     the admissibility in this format.

5          THE COURT:  So noted.  Thank you, counsel.  And

6     Exhibit 34 will be admitted without objection.

7          MR. ROUSE:  Thank you, your Honor.  And with that

8     being said, your Honor, I rest in the second phase.  I

9     understand I'm subject to cross-examination.  I'm not sure

10     if you want to place me under oath, but as an officer of

11     the Court, I'm technically already under oath.

12          MR. BAGLEY:  I think he's fine.

13          THE COURT:  Yes.

14          MR. BAGLEY:  And I'm just going to ask you a few

15     questions.  Your Honor, if it's all right with you, he can

16     do it from there.

17          THE COURT:  That's fine.

18                         CROSS-EXAMINATION

19  BY MR. BAGLEY:

20     Q.   Mr. Rouse, you have some entries on here that were

21  not redacted in June of 2021 for the preparation of pleadings,

22  specifically request for admissions, that were quashed by the

23  Court; is that correct?

24     A.   Yes.

25     Q.   And by quash, you agree with me that means the Court

1    said those pleadings could not be used?

2         A.   Yes.

3         Q.   And you also have a few timed entries in here related

4    to two motions to compel where the Court granted the motion to

5    compel?

6         A.   Yes.

7              MR. BAGLEY:  All right.  That's all I have, your

8         Honor.

9              THE COURT:  Okay.

10             MR. ROUSE:  Would you like me to expound on those

11        entries?

12             MR. BAGLEY:  Well, I think you can take yourself on

13        direct.

14             MR. ROUSE:  Well, the reason why I feel as though the

15        entry for the request for admissions -- and a request for

16        admissions is designed to obtain information about a case.

17        Those requests were not exclusive to Michelle Jimenez.

18        Those requests were designed to obtain information that

19        can move the case forward.  So I believe that they were

20        appropriate.

21             Also, when there's a motion to compel, there's

22        usually a disagreement amongst counsel related to the

23        timeliness or the completeness of a production of

24        information.  Often times that's not within an attorney's

25        control.  It's just obtaining records and producing it.

1          So whether I get a perfect production to provide to

2     the other side is not always in my control.  But no matter

3     whether it's complete or not, it's something that I

4     wouldn't be doing if I wasn't working for the client.

5          So because it's time that I spent working for a

6     client, I believe it's appropriate to submit.

7                        RECROSS-EXAMINATION

8  BY MR. BAGLEY:

9     Q.    Brief follow-up, your Honor.  One comment you made,

10 Mr. Rouse, was you prepared the request for admissions because

11 you believed they were appropriate to obtain information from

12 Universal and that is in June and July of 2021.  But you do

13 agree that the Court held that they were inappropriate and

14 quashed them?

15    A.    While I disagree with the terminology that you use, I

16 would agree that the Court did not enforce the request for

17 admissions.

18              MR. BAGLEY:  That's all I have, your Honor.

19              THE COURT:  Okay.  Anything further?

20              MR. ROUSE:  No, your Honor.

21              THE COURT:  Okay.  Thank you.  I don't think you need

22     to do any closing remarks, do you?

23              MR. ROUSE:  No, your Honor.

24              THE COURT:  Mr. Bagley?

25              MR. BAGLEY:  No, ma'am.

1           THE COURT:  All right, ladies and gentlemen.  That
2     completes the second phase of the trial.
3           I'm going to give you three jury charges.  I will
4     make a copy for you also.  Once you're given that, I will
5     release you back to the jury room and then you can begin
6     your deliberations on the second phase and come back with
7     your verdict.

1          **CHARGE OF THE COURT - SECOND PHASE**

2          THE COURT:  You have decided to award attorney's

3      fees.  Next, you must determine the appropriate amount of

4      attorney's fees.  In doing so, you should consider all of

5      the evidence in the first phase of the trial plus any

6      evidence admitted in the most recent phase of trial.

7          Plaintiff is entitled to recover attorney's fees only

8      for that portion of the fees allocated to the attorney's

9      efforts to process a case of action against a particular

10     defendant.  Plaintiff must prove both the actual amount of

11     fees as well as the reasonableness of the costs.

12         Okay, ladies and gentlemen, that completes my law to

13     you as relates to the second phase.  I am going to release

14     you back to Ms. Teri.  I will send you a copy of the

15     verdict form along with these jury instructions along with

16     the exhibits.

17         (Whereupon, the jury was escorted out of the

18     courtroom at 3:42 p.m.)

19         THE COURT:  Mr. Bagley, do you want to go ahead and

20     make your motion?

21         MR. BAGLEY:  Yes, ma'am.  Thank you, Judge.

22         Your Honor, to perfect the record again, I'm not sure

23     9-11-50 requires this, but it says you have to move after

24     the close of their case and I think this is arguably their

25     case.

1              We would move again for directed verdict on the
2       contract claim, the promissory estoppel claim, the
3       settlement and accord and satisfaction claim, direct
4       action against Universal, and 13-6-11 attorney's fees.
5              THE COURT:  Thank you, counsel.
6              MR. ROUSE:  No response.
7              THE COURT:  Okay.  Thank you, counsel.  The Court
8       will deny defendant's motions on directed verdict for
9       those listed motions.
10             (Whereupon, a brief recess was held while the jury
11      considered their verdict.)
12             THE COURT:  Okay.  Let's bring them in.
13             (Whereupon, the jury was escorted into the courtroom
14      at 3:55 p.m. to publish their verdict.)
15             THE COURT:  Counsels, you may be seated.
16             All right, Mr. Wauchope.  Has the jury agreed upon a
17      verdict?
18             THE FOREPERSON:  Yes, ma'am.
19             THE COURT:  Is this verdict in writing?
20             THE FOREPERSON:  Yes, ma'am.
21             THE COURT:  Has it been signed by you, the
22      foreperson?
23             THE FOREPERSON:  Yes, ma'am.
24             THE COURT:  Is it dated?
25             THE FOREPERSON:  Yes, ma'am.

```
 1            THE COURT:  Please hand it to my bailiff.
 2            All right.  Mr. Wauchope, is this the verdict of the
 3       jury?
 4            THE FOREPERSON:  Yes, ma'am.
 5            THE COURT:  Was it unanimous?
 6            THE FOREPERSON:  Yes, ma'am.
 7            THE COURT:  All right.  Would you please publish the
 8       verdict.
 9            THE FOREPERSON:  In the State Court of Gwinnett
10       County, State of Georgia, we, the jury, award attorney's
11       fees in the amount of $56,207.60 on this day, the 27th of
12       April 2022, signed by me.
13            THE COURT:  Okay.  As read, is this the verdict of
14       the jury?
15            THE FOREPERSON:  Yes, ma'am.
16            THE COURT:  Please hand it to my bailiff.  Please
17       publish it to the attorneys.
18            Counsels, any objections?
19            MR. ROUSE:  No objections, your Honor.
20            MR. BAGLEY:  No, your Honor.
21            THE COURT:  All right.  Ladies and gentlemen, I want
22       to personally thank you for being so diligent and being so
23       attentive.  Thank you so much.  I hope your experience
24       here in State Court has been an enjoyable one.
25            The plaintiff, they wish to thank you, as well as the
```

1    defense because without you, we would not be able to have
2    this process.
3        So that completes your duty here.  Thank you once
4    again.
5        If for whatever reason the attorneys are able to
6    catch you and they wish to ask you a question, if you want
7    to, please take a minute to talk to them.  You are not
8    obligated to do so.  It helps them oftentimes with their
9    next cases.
10        So once again, be safe.  I'm going to turn you back
11    over to the bailiffs.  Have safe travels.  Thank you so
12    much.
13        (Whereupon, the jury was escorted out of the
14    courtroom.)
15        THE COURT:  All right, counsels.  Debra will send a
16    copy of the verdict to everyone.
17        (Whereupon, the jury trial concluded.)
18                        - - -
19
20
21
22
23
24
25

1          IN THE STATE COURT FOR THE COUNTY OF GWINNETT

2                   STATE OF GEORGIA

3

4

FLOOD BROTHERS RESTORATION, LLC,)

5                     )

       Plaintiff,         )        CIVIL CASE

6  -vs-                )        FILE NO: 19-C-6796-S4

                     )

7  UNIVERSAL PROPERTY AND CASUALTY )

  INSURANCE,            )      **CERTIFIED TRANSCRIPT**

8                   )      **VOLUME TWO**

      Defendants.       )

9   _____

10    *Exhibits to the Transcript* of the Jury Trial before the

11       Honorable Ronda Colvin Leary, held at the

12    Gwinnett County Justice and Administration Center,

13     April 25th, 2022 through April 27th, 2022.

14   _____

15  APPEARANCES OF COUNSEL:

16  For the Plaintiff:     Carlton Rouse

                         Attorney at Law

17

  For the Defendant:     Michael Bagley

18                         Attorneys at Law

19

20

21

              KRISTINA K. STEFFEY, CCR, B-2014

22                Certified Court Reporter

                   P.O. Box 491713

23           Lawrenceville, Georgia  30049

                 (404) 316-0381

24

25

1

**I-N-D-E-X   T-O   P-R-O-C-E-E-D-I-N-G-S**

PAGE

2

PRETRIAL MOTIONS . . . . . . . . . . . . . . . . . . .  1
OATH TO SELECTED TRIAL JURY . . . . . . . . . . . . . 27
PRELIMINARY JURY INSTRUCTIONS . . . . . . . . . . . . 28
OPENING ARGUMENT, PLAINTIFF . . . . . . . . . . . . . 34
OPENING ARGUMENT, DEFENSE . . . . . . . . . . . . . . 44
MOTION FOR DIRECTED VERDICT . . . . . . . . . . . . . 207
CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . 295
MOTION FOR DIRECTED VERDICT, ATTORNEY'S FEES. . . . . 296
CLOSING ARGUMENT, PLAINTIFF . . . . . . . . . . . . . 355, 389
CLOSING ARGUMENT, DEFENSE . . . . . . . . . . . . . . 368
CHARGE OF THE COURT . . . . . . . . . . . . . . . . . 398
QUESTIONS OF THE JURY . . . . . . . . . . . . . . . . 406
VERDICT OF THE JURY . . . . . . . . . . . . . . . . . 408
CHARGE CONFERENCE, SECOND PHASE. . . . . . . . . . . 411
CHARGE OF THE COURT, SECOND PHASE. . . . . . . . . . 422
MOTION FOR DIRECT VERDICT, SECOND PHASE. . . . . . . 422
VERDICT OF THE JURY, SECOND PHASE. . . . . . . . . . 423

**EXAMINATION OF WITNESSES**

BECKY FOWLER

Direct Examination by Mr. Rouse. . . . . . . . . . . 55
Cross-Examination by Mr. Bagley. . . . . . . . . . . 70

RANDALL FOWLER

Direct Examination by Mr. Rouse. . . . . . . . . . . 75
Cross-Examination by Mr. Bagley. . . . . . . . . . . 177
Redirect Examination by Mr. Rouse. . . . . . . . . . 291
Recross-Examination by Mr. Bagley. . . . . . . . . . 293

SKYLAR FELDER

Direct Examination by Mr. Bagley . . . . . . . . . . 216
Cross-Examination by Mr. Rouse . . . . . . . . . . . 244
Redirect Examination by Mr. Bagley . . . . . . . . . 286

CARLTON ROUSE

Direct Examination . . . . . . . . . . . . . . . . . 416
Cross-Examination by Mr. Bagley. . . . . . . . . . . 418
Redirect Examination . . . . . . . . . . . . . . . . 420

1           **I-N-D-E-X  T-O  E-X-H-I-B-I-T-S**

2   Plaintiff's

    <u>Exhibits</u>              <u>Identified</u>   <u>Admitted</u>

3

    1 - Ins. Policy            96         97

4   2 - Invoice               66         68

    3 - Invoice               103       133

5   4 - Invoice               101       103

    5 - Work Authorization     98       101

6   6 - Direct Pay Authorization  98       101

    7 - Email                132       134

7   8 - Email                134       135

    9 - Email                136       145

8   10- Email                137       145

    11- Email                139       145

9   12- Email                140       145

    13- Email                141       145

10   14- Email               143       145

    15- Email                144       145

11   16- Email               144       145

    17- Texts                146       160

12   18- Letters              163

    19- Letters              163

13   20- Letters              163

    32- Picture of Check     160       161

14   33- Email               281       283

    34- Rouse Invoice        417       418

15

16

17   DEFENDANT'S

    <u>EXHIBITS</u>

18   2 - Letter               237       289

    3 - Email                238       289

19   4 - Letter               239       289

    5 - Request for Admissions  213       289

20   6 - Email                241       289

    9 - Policy               218       289

21   10- F.B. Pay Authorization  72       289

    11- Invoice              224       289

22

    COURT'S EXHIBIT NUMBER 1   406

23

24

25

1                   ***TRANSCRIPT LEGEND***

2 *(THE FOLLOWING TRANSCRIPT MAY CONTAIN QUOTED MATERIAL; SUCH*
*MATERIAL IS REPRODUCED AS READ OR SPOKEN.)*

3

4 *(PROPER NAMES FOR WHICH CORRECT SPELLING COULD NOT BE VERIFIED*
*ARE SPELLED PHONETICALLY IN THIS TRANSCRIPT.)*

5 *(IN THE FOLLOWING TRANSCRIPT, A DASH [--] IS USED TO INDICATE*
*AN UNINTENTIONAL OR PURPOSEFUL INTERRUPTION IN A SENTENCE; AN*

6 *ELLIPSIS [....] IS USED TO INDICATE HALTING SPEECH OR AN*
*UNFINISHED SENTENCE IN DIALOGUE OR AN OMISSION OF WORD[S] WHEN*

7 *READING WRITTEN MATERIAL; [SIC] IS USED TO INDICATE EXACTLY AS*
*SAID.  UH-HUH IS USED TO INDICATE AN AFFIRMATIVE RESPONSE;*

8 *HUH-UH IS USED TO INDICATE A NEGATIVE RESPONSE.)*

9 *(IN THE FOLLOWING TRANSCRIPT, [UNINTELLIGIBLE/INAUDIBLE] MAY BE*
*USED TO INDICATE WORDS OR PHRASES UTTERED IN TESTIMONY OR*

10 *DIALOGUE WHICH THE COURT REPORTER WAS EITHER UNABLE TO HEAR, TO*
*UNDERSTAND, OR TO DECIPHER.)*

11

12                         - - -

13

14

15

16

17

18

19

20

21

22

23

24

25



| Universal Property & Casualty Insurance Company, a Stock Company c/o Evolution Risk Advisors, Inc.<br><br>**1110 W. Commercial Blvd**<br>**Fort Lauderdale, FL 33309** | Homeowners<br>**Declaration Effective**<br>01/19/2018<br><br>Renewal Policy | **UNIVERSAL PROPERTY**<br>A QUALITY INSURANCE COMPANY |

## THIS IS NOT A BILL

### For Policy or Claims Questions  Contact Your Agent Listed Below

| Policy Number | FROM | Policy Period | TO | MORTGAGEE BILLED | Agent Code |
|---|---|---|---|---|---|
| 1701-1700-0660 | 01/19/2018 | | 01/19/2019 | 12:01 AM Standard Time | GA33587 |

**Named Insured and Address**
Michelle Jimenez
1939 Heatherbrook Ct.
Woodbridge, VA 22192
(202) 813-2688

I certify that this is a true and attested copy of policy 1701-1700-0660 for the period of 1/19/2018 through 1/19/2019.

*Cynthia Lou Burrows*
Authorized Certification Officer
Universal Property & Casualty Ins. Co.

**Agent Name and Address**
H2M Insurance Agency
133 W. Candler Street
Winder, GA 30680
(770) 415-1086

**Insured Location**
4410 RIDERS RIDGE TRL SNELLVILLE, GA 30039   GWINNETT COUNTY

## Premium Summary

| Basic Coverages Premium | Attached Endorsements Premium | Assessments / Surcharges | MGA Fees/Policy Fees | Total Policy Premium (Including Assessments & Surcharges) |
|---|---|---|---|---|
| $1,221.00 | $208.00 | $0.00 | $25.00 | $1,454.00 |

## Rating Information

| Form | Construction | Year | Townhouse/ Rowhouse | Number of Families | Occupied | Protection Class | Territory | BCEG |
|---|---|---|---|---|---|---|---|---|
| HO3 | Frame | 1999 | N | 2 | Y | 2 | 21 | 99 |

| County | Dwelling Replacement Cost | Personal Property Replacement Cost | Protective Device Credits: Burglar | Fire | Sprinkler | Shutter | Wind / Hail Exclusion |
|---|---|---|---|---|---|---|---|
| Gwinnett | Y | Y | None | None | N | N | N |

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy. If we elect to continue this insurance, we will renew this policy if you pay the required renewal premium for each successive policy period subject to our premiums, rules and forms then in effect. You must pay us prior to the end of the current policy period or else this policy will expire.

Insurance is provided only with respect to the following coverages for which a limit of liability is specified, subject to all the conditions of this policy.

| COVERAGES - SECTION I | LIMITS | PREMIUMS | COVERAGES - SECTION II | LIMITS | PREMIUMS |
|---|---|---|---|---|---|
| Coverage A - Dwelling | $292,573 | $1,221.00 | Coverage E - Personal Liability | $300,000 | $18.00 |
| Coverage B - Other Structure | $29,259 | | Coverage F - Medical Payments | $1,000 | $0.00 |
| Coverage C - Personal Property | $146,287 | | | | |
| Coverage D - Loss of Use | $58,515 | | | | |

**Section I coverages subject to 1% - $1,463 all perils deductible per loss.**

In Witness Whereof, the Company has executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by the duly authorized representative of this Company.

_Secretary_

_President_

PLAINTIFF'S EXHIBIT
Blumberg No. 5113
1

Defendant's Requests for Admissions: Exhibit A
Page 1 of 37

UPCIC HO003 (01/19)         Printed Date: 6/26/2019 2:04:58 PM         0430         1 of 2



| Universal Property & Casualty Insurance Company, a Stock Company c/o Evolution Risk Advisors, Inc. 1110 W. Commercial Blvd Fort Lauderdale, FL 33309 | Declaration Effective 01/19/2018 Renewal Policy | UNIVERSAL PROPERTY A CASUALTY INSURANCE COMPANY |
|---|---|---|

## THIS IS NOT A BILL

| Policy Number | FROM | Policy Period | TO | MORTGAGEE BILLED | Agent Code |
|---|---|---|---|---|---|
| 1701-1700-0660 | 01/19/2018 | | 01/19/2019 | 12:01 AM Standard Time | GA33587 |

### Additional Interest

| Mortgagee/Additional Interest 01 | Mortgagee/Additional Interest 02 | Mortgagee/Additional Interest 03 |
|---|---|---|

### Policy Forms and Endorsements Applicable to this Policy

| NUMBER EDITION | DESCRIPTION | LIMITS | PREMIUMS |
|---|---|---|---|
| HO 00 03 10 00 | Homeowners 3 Special Form | | $1,221.00 |
| HO 03 36 07 04 | Limited Fungi, Wet or Dry Rot, or Bacteria Section I - $10,000/$20,000; Section II - $50,000 | | |
| HO 04 86 09 93 | Windstorm Exterior Paint or Waterproofing Exclusion | | |
| UPCIC 01 10 07 11 | Special Provisions - Georgia | | |
| UPCIC SECE 201011 | Screened Enclosures And Carports Exclusion | | |
| HO 04 20 10 00 | Specified Additional Amount Of Insurance For Coverage A (25%) | $73,143 | $31.00 |
| HO 04 96 10 00 | No Coverage for Home Day Care Business | | |
| HO 04 90 10 00 | Personal Property Replacement Cost | $146,287 | $159.00 |
| HO 04 48 10 00 | Other Structures | $29,259 | |
| UPCIC 10 01 98 (08-07) | Existing Damage Exclusion | | |
| | Personal Liability Increase Endorsement | $300,000 | $18.00 |
| | MGA Fee | | $25.00 |

To report a claim please visit us at www.universalproperty.com or call us at 800-218-3206

**THIS POLICY DOES NOT INCLUDE COVERAGE FOR SINKHOLE, EARTHQUAKE OR FLOOD LOSSES. THESE COVERAGES ARE NOT PROVIDED BY UNIVERSAL PROPERTY & CASUALTY INSURANCE COMPANY AND ARE NOT PART OF THIS POLICY.**

Defendant's Requests for Admissions: Exhibit A

Page 2 of 37

This replaces all previously issued policy declarations, if any and is subject to all forms and endorsements attached to this policy.

UPCIC HO003 (01/19)    Printed Date: 6/26/2019 2:04:58 PM    0431    2 of 2

# HOMEOWNERS 3 – SPECIAL FORM

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

**A.** In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

**B.** In addition, certain words and phrases are defined as follows:

1. "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in **b.** below, mean the following:

   **a.** Liability for "bodily injury" or "property damage" arising out of the:

   (1) Ownership of such vehicle or craft by an "insured";

   (2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

   (3) Entrustment of such vehicle or craft by an "insured" to any person;

   (4) Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

   (5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

   **b.** For the purpose of this definition:

   (1) Aircraft means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;

   (2) Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

   (3) Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

   (4) Motor vehicle means a "motor vehicle" as defined in **7.** below.

2. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

3. "Business" means:

   **a.** A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   **b.** Any other activity engaged in for money or other compensation, except the following:

   (1) One or more activities, not described in (2) through (4) below, for which no "insured" receives more than $2,000 in total compensation for the 12 months before the beginning of the policy period;

   (2) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

   (3) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

   (4) The rendering of home day care services to a relative of an "insured".

4. "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

5. "Insured" means:

   **a.** You and residents of your household who are:

   (1) Your relatives; or

   (2) Other persons under the age of 21 and in the care of any person named above;

   **b.** A student enrolled in school full time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

   (1) 24 and your relative; or

   (2) 21 and in your care or the care of a person described in **a.(1)** above; or

c. Under Section II:

(1) With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in **a.** or **b.** above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

(2) With respect to a "motor vehicle" to which this policy applies:

(a) Persons while engaged in your employ or that of any person included in **a.** or **b.** above; or

(b) Other persons using the vehicle on an "insured location" with your consent.

Under both Sections I and II, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

6. "Insured location" means:

a. The "residence premises";

b. The part of other premises, other structures and grounds used by you as a residence; and

(1) Which is shown in the Declarations; or

(2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises described in **a.** and **b.** above;

d. Any part of a premises:

(1) Not owned by an "insured"; and

(2) Where an "insured" is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an "insured";

f. Land owned by or rented to an "insured" on which a one, two, three or four family dwelling is being built as a residence for an "insured";

g. Individual or family cemetery plots or burial vaults of an "insured"; or

h. Any part of a premises occasionally rented to an "insured" for other than "business" use.

7. "Motor vehicle" means:

a. A self-propelled land or amphibious vehicle; or

b. Any trailer or semitrailer which is being carried on, towed by or hitched for towing by a vehicle described in **a.** above.

8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. "Bodily injury"; or

b. "Property damage".

9. "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

10. "Residence employee" means:

a. An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

b. One who performs similar duties elsewhere not related to the "business" of an "insured".

A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

11. "Residence premises" means:

a. The one family dwelling where you reside;

b. The two, three or four family dwelling where you reside in at least one of the family units; or

c. That part of any other building where you reside;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

Defendant's Requests for Admissions: Exhibit A
Page 4 of 37

## DEDUCTIBLE

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section I that exceeds the deductible amount shown in the Declarations.

## SECTION I – PROPERTY COVERAGES

### A. Coverage A – Dwelling

1. We cover:

   a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

   b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2. We do not cover land, including land on which the dwelling is located.

### B. Coverage B – Other Structures

1. We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2. We do not cover:

   a. Land, including land on which the other structures are located;

   b. Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

   c. Other structures from which any "business" is conducted; or

   d. Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely owned by an "insured" or a tenant of the dwelling provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

3. The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

### C. Coverage C – Personal Property

#### 1. Covered Property

We cover personal property owned or used by an "insured" while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:

a. Others while the property is on the part of the "residence premises" occupied by an "insured"; or

b. A guest or a "residence employee", while the property is in any residence occupied by an "insured".

#### 2. Limit For Property At Other Residences

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

a. Moved from the "residence premises" because it is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

b. In a newly acquired principal residence for 30 days from the time you begin to move the property there.

#### 3. Special Limits Of Liability

The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage C limit of liability.

a. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

b. $1,500 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

Copyright, Insurance Services Office, Inc., 1999

c. $1,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

d. $1,500 on trailers or semitrailers not used with watercraft of all types.

e. $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

f. $2,500 for loss by theft of firearms and related equipment.

g. $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollow-ware, tea sets, trays and trophies made of or including silver, gold or pewter.

h. $2,500 on property, on the "residence premises", used primarily for "business" purposes.

i. $500 on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to loss to electronic apparatus and other property described in Categories **j.** and **k.** below.

j. $1,500 on electronic apparatus and accessories, while in or upon a "motor vehicle" but only if the apparatus is equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described in this Category **j.**

k. $1,500 on electronic apparatus and accessories used primarily for "business" while away from the "residence premises" and not in or upon a "motor vehicle". The apparatus must be equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described in this Category **k.**

4. **Property Not Covered**

We do not cover:

a. Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

b. Animals, birds or fish;

c. "Motor vehicles".

(1) This includes:

(a) Their accessories, equipment and parts; or

(b) Electronic apparatus and accessories designed to be operated solely by power from the electrical system of the "motor vehicle". Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described above.

The exclusion of property described in **(a)** and **(b)** above applies only while such property is in or upon the "motor vehicle".

(2) We do cover "motor vehicles" not required to be registered for use on public roads or property which are:

(a) Used solely to service an "insured's" residence; or

(b) Designed to assist the handicapped;

d. Aircraft meaning any contrivance used or designed for flight including any parts whether or not attached to the aircraft.

We do cover model or hobby aircraft not used or designed to carry people or cargo;

e. Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flare-craft and air cushion vehicles;

f. Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

g. Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in **E.10.** Landlord's Furnishings under Section I – Property Coverages;

h. Property rented or held for rental to others off the "residence premises";

i. "Business" data, including such data stored in:

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

j. Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages; or

k. Water or steam.

## D. Coverage D – Loss Of Use

The limit of liability for Coverage **D** is the total limit for the coverages in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.

### 1. Additional Living Expense

If a loss covered under Section **I** makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### 2. Fair Rental Value

If a loss covered under Section **I** makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

### 3. Civil Authority Prohibits Use

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in **1.** Additional Living Expense and **2.** Fair Rental Value above for no more than two weeks.

### 4. Loss Or Expense Not Covered

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use above are not limited by expiration of this policy.

## E. Additional Coverages

### 1. Debris Removal

a. We will pay your reasonable expense for the removal of:

(1) Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

(2) Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

b. We will also pay your reasonable expense, up to $1,000, for the removal from the "residence premises" of:

(1) Your tree(s) felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

(2) A neighbor's tree(s) felled by a Peril Insured Against under Coverage **C;**

provided the tree(s):

(3) Damage(s) a covered structure; or

(4) Does not damage a covered structure, but:

(a) Block(s) a driveway on the "residence premises" which prevent(s) a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

(b) Block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

The $1,000 limit is the most we will pay in any one loss regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

This coverage is additional insurance.

### 2. Reasonable Repairs

a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

b. If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

   (1) Increase the limit of liability that applies to the covered property; or

   (2) Relieve you of your duties, in case of a loss to covered property, described in **B.4.** under Section I – Conditions.

### 3. Trees, Shrubs And Other Plants

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

a. Fire or Lightning;

b. Explosion;

c. Riot or Civil Commotion;

d. Aircraft;

e. Vehicles not owned or operated by a resident of the "residence premises";

f. Vandalism or Malicious Mischief; or

g. Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

### 4. Fire Department Service Charge

We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

### 5. Property Removed

We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

This coverage does not change the limit of liability that applies to the property being removed.

### 6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money

a. We will pay up to $500 for:

   (1) The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

   (2) Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

   (3) Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

   (4) Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

   All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

   This coverage is additional insurance. No deductible applies to this coverage.

b. We do not cover:

   (1) Use of a credit card, electronic fund transfer card or access device:

      (a) By a resident of your household;

      (b) By a person who has been entrusted with either type of card or access device; or

      (c) If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

   (2) Loss arising out of "business" use or dishonesty of an "insured".

c. If the coverage in a. above applies, the following defense provisions also apply:

   (1) We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

   (2) If a suit is brought against an "insured" for liability under a.(1) or (2) above, we will provide a defense at our expense by counsel of our choice.

   (3) We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under a.(3) above.

Defendant's Requests for Admissions: Exhibit A

Copyright, Insurance Services Office, Inc., 1999   0437   **HO 00 03 10 00**

**7. Loss Assessment**

    **a.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage **A**, other than:

        **(1)** Earthquake; or

        **(2)** Land shock waves or tremors before, during or after a volcanic eruption.

    The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

    **b.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

    **c.** Paragraph **P. Policy Period** under Section **I** – Conditions does not apply to this coverage.

    This coverage is additional insurance.

**8. Collapse**

    **a.** With respect to this Additional Coverage:

        **(1)** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

        **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

        **(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

        **(4)** A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

    **b.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

        **(1)** The Perils Insured Against named under Coverage **C**;

        **(2)** Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;

        **(3)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

        **(4)** Weight of contents, equipment, animals or people;

        **(5)** Weight of rain which collects on a roof; or

        **(6)** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

    **c.** Loss to an awning, fence, patio, deck; pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **b.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

    **d.** This coverage does not increase the limit of liability that applies to the damaged covered property.

**9. Glass Or Safety Glazing Material**

    **a.** We cover:

        **(1)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

        **(2)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

        **(3)** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

Copyright, Insurance Services Office, Inc., 1999

b. This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in **a.(2)** above. A dwelling being constructed is not considered vacant.

c. This coverage does not increase the limit of liability that applies to the damaged property.

**10. Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured Against in Coverage **C,** other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

**11. Ordinance Or Law**

a. You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

c. We do not cover:

(1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

**12. Grave Markers**

We will pay up to $5,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against under Coverage **C.**

This coverage does not increase the limits of liability that apply to the damaged covered property.

**SECTION I – PERILS INSURED AGAINST**

**A. Coverage A – Dwelling And Coverage B – Other Structures**

1. We insure against risk of direct physical loss to property described in Coverages **A** and **B.**

2. We do not insure, however, for loss:

a. Excluded under Section I – Exclusions;

b. Involving collapse, except as provided in **E.8.** Collapse under Section I – Property Coverages; or

c. Caused by:

(1) Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This provision does not apply if you have used reasonable care to:

(a) Maintain heat in the building; or

Defendant's Requests for Admissions: Exhibit A

Page 10 of 37

**(b)** Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

**(2)** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

**(a)** Fence, pavement, patio or swimming pool;

**(b)** Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

**(c)** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

**(d)** Pier, wharf or dock;

**(3)** Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

**(4)** Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

**(5)** Mold, fungus or wet rot. However, we do insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water or steam from within:

**(a)** A plumbing, heating, air conditioning or automatic fire protective sprinkler system, or a household appliance, on the "residence premises"; or

**(b)** A storm drain, or water, steam or sewer pipes, off the "residence premises".

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment; or

**(6)** Any of the following:

**(a)** Wear and tear, marring, deterioration;

**(b)** Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

**(c)** Smog, rust or other corrosion, or dry rot;

**(d)** Smoke from agricultural smudging or industrial operations;

**(e)** Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C**.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

**(g)** Birds, vermin, rodents, or insects; or

**(h)** Animals owned or kept by an "insured".

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from an accidental discharge or overflow of water or steam from within a:

**(i)** Storm drain, or water, steam or sewer pipe, off the "residence premises"; or

   Copyright, Insurance Services Office, Inc., 1999

**(ii)** Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section I – Exclusion **A.3.** Water Damage, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **c.(5)** and **(6)** above.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage **C** caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

**1. Fire Or Lightning**

**2. Windstorm Or Hail**

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

**3. Explosion**

**4. Riot Or Civil Commotion**

**5. Aircraft**

This peril includes self-propelled missiles and spacecraft.

**6. Vehicles**

**7. Smoke**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8. Vandalism Or Malicious Mischief**

**9. Theft**

**a.** This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen.

**b.** This peril does not include loss caused by theft:

**(1)** Committed by an "insured";

**(2)** In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

**(3)** From that part of a "residence premises" rented by an "insured" to someone other than another "insured"; or

**(4)** That occurs off the "residence premises" of:

**(a)** Trailers, semitrailers and campers;

**(b)** Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

**(c)** Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 60 days immediately before the loss.

**10. Falling Objects**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**11. Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

Defendant's Requests for Admissions: Exhibit A

Copyright, Insurance Services Office, Inc., 1999   0441

**12. Accidental Discharge Or Overflow Of Water Or Steam**

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:

   (1) To the system or appliance from which the water or steam escaped;

   (2) Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing;

   (3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises"; or

   (4) Caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion **A.3.** Water Damage, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

**13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

**14. Freezing**

a. This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

   (1) Maintain heat in the building; or

   (2) Shut off the water supply and drain all systems and appliances of water.

   However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

b. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

**15. Sudden And Accidental Damage From Artificially Generated Electrical Current**

This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**16. Volcanic Eruption**

This peril does not include loss caused by earthquake, land shock waves or tremors.

**SECTION I – EXCLUSIONS**

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

   **1. Ordinance Or Law**

   Ordinance Or Law means any ordinance or law:

   a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion **A.1.a.** does not apply to the amount of coverage that may be provided for in **E.11.** Ordinance Or Law under Section I – Property Coverages;

   b. The requirements of which result in a loss in value to property; or

   c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

   This Exclusion **A.1.** applies whether or not the property has been physically damaged.

   **2. Earth Movement**

   Earth Movement means:

   a. Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

 Copyright, Insurance Services Office, Inc., 1999

**b.** Landslide, mudslide or mudflow;

**c.** Subsidence or sinkhole; or

**d.** Any other earth movement including earth sinking, rising or shifting;

caused by or resulting from human or animal forces or any act of nature unless direct loss by fire or explosion ensues and then we will pay only for the ensuing loss.

This Exclusion **A.2.** does not apply to loss by theft.

**3. Water Damage**

Water Damage means:

**a.** Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

**b.** Water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

**c.** Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from water damage is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if the failure takes place off the "residence premises". But if the failure results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss caused by that peril.

**5. Neglect**

Neglect means neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion **A.7.** pertains to Nuclear Hazard to the extent set forth in **M.** Nuclear Hazard Clause under Section I – Conditions.

**8. Intentional Loss**

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

**9. Governmental Action**

Governmental Action means the destruction, confiscation or seizure of property described in Coverage **A**, **B** or **C** by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**1.** Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

**2.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**3.** Faulty, inadequate or defective:

**a.** Planning, zoning, development, surveying, siting;

**b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**c.** Materials used in repair, construction, renovation or remodeling; or

**d.** Maintenance;

of part or all of any property whether on or off the "residence premises".

Copyright, Insurance Services Office, Inc., 1999

0443

## SECTION I – CONDITIONS

### A. Insurable Interest And Limit Of Liability

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

1. To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

2. For more than the applicable limit of liability.

### B. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

1. Give prompt notice to us or our agent;

2. Notify the police in case of loss by theft;

3. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages;

4. Protect the property from further damage. If repairs to the property are required, you must:

   a. Make reasonable and necessary repairs to protect the property; and

   b. Keep an accurate record of repair expenses;

5. Cooperate with us in the investigation of a claim;

6. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

7. As often as we reasonably require:

   a. Show the damaged property;

   b. Provide us with records and documents we request and permit us to make copies; and

   c. Submit to examination under oath, while not in the presence of another "insured", and sign the same;

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   a. The time and cause of loss;

   b. The interests of all "insureds" and all others in the property involved and all liens on the property;

   c. Other insurance which may cover the loss;

d. Changes in title or occupancy of the property during the term of the policy;

e. Specifications of damaged buildings and detailed repair estimates;

f. The inventory of damaged personal property described in **6.** above;

g. Receipts for additional living expenses incurred and records that support the fair rental value loss; and

h. Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages, stating the amount and cause of loss.

### C. Loss Settlement

In this Condition **C.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.11.** Ordinance Or Law under Section **I** – Property Coverages. Covered property losses are settled as follows:

1. Property of the following types:

   a. Personal property;

   b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

   c. Structures that are not buildings; and

   d. Grave markers, including mausoleums;

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

2. Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

   a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

      (1) The limit of liability under this policy that applies to the building;

      (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

      (3) The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.

**b.** If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

**(1)** The actual cash value of that part of the building damaged; or

**(2)** That proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

**c.** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

**(1)** Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

**(2)** Those supports described in **(1)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

**(3)** Underground flues, pipes, wiring and drains.

**d.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in **2.a.** and **b.** above.

However, if the cost to repair or replace the damage is both:

**(1)** Less than 5% of the amount of insurance in this policy on the building; and

**(2)** Less than $2,500;

we will settle the loss as noted in **2.a.** and **b.** above whether or not actual repair or replacement is complete.

**e.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition **C. Loss Settlement**, provided you notify us of your intent to do so within 180 days after the date of loss.

**D. Loss To A Pair Or Set**

In case of loss to a pair or set we may elect to:

**1.** Repair or replace any part to restore the pair or set to its value before the loss; or

**2.** Pay the difference between actual cash value of the property before and after the loss.

**E. Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

**1.** Pay its own appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

**F. Other Insurance And Service Agreement**

If a loss covered by this policy is also covered by:

**1.** Other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss; or

**2.** A service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

**G. Suit Against Us**

No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss.

Defendant's Requests for Admissions: Exhibit A

### H. Our Option

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

### I. Loss Payment

We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

1. Reach an agreement with you;
2. There is an entry of a final judgment; or
3. There is a filing of an appraisal award with us.

### J. Abandonment Of Property

We need not accept any property abandoned by an "insured".

### K. Mortgage Clause

1. If a mortgagee is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

2. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

   a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

   b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

   c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs **E.** Appraisal, **G.** Suit Against Us and **I.** Loss Payment under Section **I** – Conditions also apply to the mortgagee.

3. If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

4. If we pay the mortgagee for any loss and deny payment to you:

   a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

   b. At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

5. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

### L. No Benefit To Bailee

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

### M. Nuclear Hazard Clause

1. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

2. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

3. This policy does not apply under Section **I** to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

### N. Recovered Property

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

### O. Volcanic Eruption Period

One or more volcanic eruptions that occur within a 72 hour period will be considered as one volcanic eruption.

### P. Policy Period

This policy applies only to loss which occurs during the policy period.

### Q. Concealment Or Fraud

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

### R. Loss Payable Clause

If the Declarations show a loss payee for certain listed insured personal property, the definition of "insured" is changed to include that loss payee with respect to that property.

If we decide to cancel or not renew this policy, that loss payee will be notified in writing.

## SECTION II – LIABILITY COVERAGES

### A. Coverage E – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

### B. Coverage F – Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location", if the "bodily injury":

a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

b. Is caused by the activities of an "insured";

c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

d. Is caused by an animal owned by or in the care of an "insured".

## SECTION II – EXCLUSIONS

### A. "Motor Vehicle Liability"

1. Coverages E and F do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

a. Is registered for use on public roads or property;

b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

c. Is being:

(1) Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

(2) Rented to others;

(3) Used to carry persons or cargo for a charge; or

(4) Used for any "business" purpose except for a motorized golf cart while on a golfing facility.

2. If Exclusion A.1. does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:

a. In dead storage on an "insured location";

b. Used solely to service an "insured's" residence;

c. Designed to assist the handicapped and, at the time of an "occurrence", it is:

(1) Being used to assist a handicapped person; or

(2) Parked on an "insured location";

d. Designed for recreational use off public roads and:

(1) Not owned by an "insured"; or

(2) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in Definitions B. 6.a., b., d., e. or h.; or

e. A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of:

(1) A golfing facility and is parked or stored there, or being used by an "insured" to:

(a) Play the game of golf or for other recreational or leisure activity allowed by the facility;

Defendant's Requests for Admissions: Exhibit A

Page 18 of 37

Copyright, Insurance Services Office, Inc., 1999

HO 00 03 10 00

(b) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

(c) Cross public roads at designated points to access other parts of the golfing facility; or

(2) A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an "insured's" residence.

## B. "Watercraft Liability"

1. Coverages **E** and **F** do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being:

a. Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

b. Rented to others;

c. Used to carry persons or cargo for a charge; or

d. Used for any "business" purpose.

2. If Exclusion **B.1.** does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

a. Is stored;

b. Is a sailing vessel, with or without auxiliary power, that is:

(1) Less than 26 feet in overall length; or

(2) 26 feet or more in overall length and not owned by or rented to an "insured"; or

c. Is not a sailing vessel and is powered by:

(1) An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

(a) 50 horsepower or less and not owned by an "insured"; or

(b) More than 50 horsepower and not owned by or rented to an "insured"; or

(2) One or more outboard engines or motors with:

(a) 25 total horsepower or less;

(b) More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

(c) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

(d) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

(I) You declare them at policy inception; or

(II) Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

## C. "Aircraft Liability"

This policy does not cover "aircraft liability".

## D. "Hovercraft Liability"

This policy does not cover "hovercraft liability".

## E. Coverage E – Personal Liability And Coverage F – Medical Payments To Others

Coverages **E** and **F** do not apply to the following:

1. **Expected Or Intended Injury**

"Bodily injury" or "property damage" which is expected or intended by an "insured" even if the resulting "bodily injury" or "property damage":

a. Is of a different kind, quality or degree than initially expected or intended; or

b. Is sustained by a different person, entity, real or personal property, than initially expected or intended.

However, this Exclusion **E.1.** does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property;

2. **"Business"**

a. "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

This Exclusion **E.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

b. This Exclusion **E.2.** does not apply to:

(1) The rental or holding for rental of an "insured location";

Defendant's Requests for Admissions: Exhibit A
Page 19 of 37
Page 17 of 22

(a) On an occasional basis if used only as a residence;

(b) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(c) In part, as an office, school, studio or private garage; and

(2) An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

**3. Professional Services**

"Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

**4. "Insured's" Premises Not An "Insured Location"**

"Bodily injury" or "property damage" arising out of a premises:

**a.** Owned by an "insured";

**b.** Rented to an "insured"; or

**c.** Rented to others by an "insured";

that is not an "insured location";

**5. War**

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

**6. Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of a communicable disease by an "insured";

**7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse; or

**8. Controlled Substance**

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

Exclusions **A.** "Motor Vehicle Liability", **B.** "Watercraft Liability", **C.** "Aircraft Liability", **D.** "Hovercraft Liability" and **E.4.** "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

**F. Coverage E – Personal Liability**

Coverage **E** does not apply to:

**1.** Liability:

**a.** For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in **D.** Loss Assessment under Section II – Additional Coverages;

**b.** Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

(1) That directly relate to the ownership, maintenance or use of an "insured location"; or

(2) Where the liability of others is assumed by you prior to an "occurrence";

unless excluded in **a.** above or elsewhere in this policy;

**2.** "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

**3.** "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

**4.** "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

**a.** Workers' compensation law;

Defendant's Requests for Admissions: Exhibit A

b. Non-occupational disability law; or

c. Occupational disease law;

5. "Bodily injury" or "property damage" for which an "insured" under this policy:

a. Is also an insured under a nuclear energy liability policy issued by the:

(1) Nuclear Energy Liability Insurance Association;

(2) Mutual Atomic Energy Liability Underwriters;

(3) Nuclear Insurance Association of Canada;

or any of their successors; or

b. Would be an insured under such a policy but for the exhaustion of its limit of liability; or

6. "Bodily injury" to you or an "insured" as defined under Definitions **5.a.** or **b.**

This exclusion also applies to any claim made or suit brought against you or an "insured":

a. To repay; or

b. Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured".

### G. Coverage F – Medical Payments To Others

Coverage **F** does not apply to "bodily injury":

1. To a "residence employee" if the "bodily injury":

a. Occurs off the "insured location"; and

b. Does not arise out of or in the course of the "residence employee's" employment by an "insured";

2. To any person eligible to receive benefits voluntarily provided or required to be provided under any:

a. Workers' compensation law;

b. Non-occupational disability law; or

c. Occupational disease law;

3. From any:

a. Nuclear reaction;

b. Nuclear radiation; or

c. Radioactive contamination;

all whether controlled or uncontrolled or however caused; or

d. Any consequence of any of these; or

4. To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

### SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

### A. Claim Expenses

We pay:

1. Expenses we incur and costs taxed against an "insured" in any suit we defend;

2. Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage **E** limit of liability. We need not apply for or furnish any bond;

3. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit; and

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

### B. First Aid Expenses

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

### C. Damage To Property Of Others

1. We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

2. We will not pay for "property damage":

a. To the extent of any amount recoverable under Section I;

b. Caused intentionally by an "insured" who is 13 years of age or older;

c. To property owned by an "insured";

d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

e. Arising out of:

(1) A "business" engaged in by an "insured";

(2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

(3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

**HO 00 03 10 00**          Copyright, Insurance Services Office, Inc., 1999          0450

This exclusion **e.(3)** does not apply to a "motor vehicle" that:

   **(a)** Is designed for recreational use off public roads;

   **(b)** Is not owned by an "insured"; and

   **(c)** At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

## D. Loss Assessment

**1.** We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

   **a.** "Bodily injury" or "property damage" not excluded from coverage under Section II – Exclusions; or

   **b.** Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

     **(1)** Is elected by the members of a corporation or association of property owners; and

     **(2)** Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

**2.** Paragraph I. Policy Period under Section II – Conditions does not apply to this Loss Assessment Coverage.

**3.** Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

   **a.** One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

   **b.** A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

**4.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

### A. Limit Of Liability

Our total liability under Coverage **E** for all damages resulting from any one "occurrence" will not be more than the Coverage **E** limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

Our total liability under Coverage **F** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **F** limit of liability shown in the Declarations.

### B. Severability Of Insurance

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

### C. Duties After "Occurrence"

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

**1.** Give written notice to us or our agent as soon as is practical, which sets forth:

   **a.** The identity of the policy and the "named insured" shown in the Declarations;

   **b.** Reasonably available information on the time, place and circumstances of the "occurrence"; and

   **c.** Names and addresses of any claimants and witnesses;

**2.** Cooperate with us in the investigation, settlement or defense of any claim or suit;

**3.** Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

**4.** At our request, help us:

   **a.** To make settlement;

   **b.** To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

Defendant's Requests for Admissions: Exhibit A

Copyright, Insurance Services Office, Inc., 1999

c. With the conduct of suits and attend hearings and trials; and

d. To secure and give evidence and obtain the attendance of witnesses;

5. With respect to **C.** Damage To Property Of Others under Section **II** – Additional Coverages, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if an "insured's" control;

6. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

### D. Duties Of An Injured Person – Coverage F – Medical Payments To Others

1. The injured person or someone acting for the injured person will:

a. Give us written proof of claim, under oath if required, as soon as is practical; and

b. Authorize us to obtain copies of medical reports and records.

2. The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

### E. Payment Of Claim – Coverage F – Medical Payments To Others

Payment under this coverage is not an admission of liability by an "insured" or us.

### F. Suit Against Us

1. No action can be brought against us unless there has been full compliance with all of the terms under this Section **II.**

2. No one will have the right to join us as a party to any action against an "insured".

3. Also, no action with respect to Coverage **E** can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

### G. Bankruptcy Of An "Insured"

Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

### H. Other Insurance

This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

### I. Policy Period

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

### J. Concealment Or Fraud

We do not provide coverage to an "insured" who, whether before or after a loss, has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

## SECTIONS I AND II – CONDITIONS

### A. Liberalization Clause

If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions in coverage, whether that general program revision is implemented through introduction of:

1. A subsequent edition of this policy; or

2. An amendatory endorsement.

### B. Waiver Or Change Of Policy Provisions

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

### C. Cancellation

1. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

2. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.

a. When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

b. When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

Defendant's Requests for Admissions: Exhibit A

Page 23 of 37

**Page 21 of 22**

   Copyright, Insurance Services Office, Inc., 1999   0452

c. When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (1) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (2) If the risk has changed substantially since the policy was issued.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

d. When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

3. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

4. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**D. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

**E. Assignment**

Assignment of this policy will not be valid unless we give our written consent.

**F. Subrogation**

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage **F** or Paragraph **C.** Damage To Property Of Others under Section **II** – Additional Coverages.

**G. Death**

If any person named in the Declarations or the spouse, if a resident of the same household, dies, the following apply:

1. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death; and

2. "Insured" includes:

   a. An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises"; and

   b. With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Defendant's Requests for Admissions: Exhibit A

Page 24 of 37

Copyright, Insurance Services Office, Inc., 1999

0453

**HO 00 03 10 00**

POLICY NUMBER:

<div align="right">

**HOMEOWNERS**
**HO 03 36 07 04**
</div>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE – GEORGIA
### FOR USE WITH FORMS HO 00 03 AND HO 00 05

### SCHEDULE

| | These limits of liability apply to the total of all loss or costs payable under this endorsement, regardless of the number of "occurrences", the number of claims-made, or the number of locations insured under this endorsement and listed in this Schedule. | |
|---|---|---|
| 1. | Section I – Property Coverage Limit Of Liability for the Additional Coverage "Fungi", Wet Or Dry Rot, Or Bacteria | $ |
| 2. | Section II – Coverage E Aggregate Sublimit of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria | $ |
| | Entries may be left blank if shown elsewhere in this policy for this coverage. | |

## DEFINITIONS

The following definition is added:

**"Fungi"**

  **a.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

  **b.** Under Section **II**, this does not include any fungi that are, are on, or are contained in, a good or product intended for consumption.

## SECTION I – PROPERTY COVERAGES

### E. Additional Coverages

Paragraph **10.k.(2)(d)** is deleted in Form **HO 00 05** only.

The following Additional Coverage is added:

  **13. "Fungi", Wet Or Dry Rot, Or Bacteria**

    **a.** The amount shown in the Schedule above is the most we will pay for:

      **(1)** The total of all loss payable under Section I – Property Coverages caused by "fungi", wet or dry rot, or bacteria;

      **(2)** The cost to remove "fungi", wet or dry rot, or bacteria from property covered under Section I – Property Coverages;

      **(3)** The cost to tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

      **(4)** The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of "fungi", wet or dry rot, or bacteria.

    **b.** The coverage described in **13.a.** only applies when such loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

Defendant's Requests for Admissions: Exhibit A

c. The amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Additional Coverage regardless of the:

(1) Number of locations insured under this endorsement; or

(2) Number of claims-made.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

In Form **HO 00 03:**

**A. Coverage A – Dwelling And Coverage B – Other Structures**

Paragraph **2.c.(5)** is deleted and replaced by the following:

(5) Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

Paragraph **2.c.(6)(c)** is deleted and replaced by the following:

(c) Smog, rust or other corrosion;

**B. Coverage C – Personal Property**

**12. Accidental Discharge Or Overflow Of Water Or Steam**

Paragraph **b.(4)** is deleted and replaced by the following:

(4) Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

In Form **HO 00 05:**

**A.** Under Coverages **A, B** and **C:**

Paragraph **2.d.** is deleted and replaced by the following:

d. Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

Paragraph **2.e.(3)** is deleted and replaced by the following:

(3) Smog, rust or other corrosion;

## SECTION I – EXCLUSIONS

Exclusion **A.10.** is added.

**10. "Fungi", Wet Or Dry Rot, Or Bacteria**

"Fungi", Wet Or Dry Rot, Or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

This exclusion does not apply:

a. When "fungi", wet or dry rot, or bacteria results from fire or lightning;

b. To the extent coverage is provided for in the "Fungi", Wet Or Dry Rot, Or Bacteria Additional Coverage under Section I – Property Coverages with respect to loss caused by a Peril Insured Against other than fire or lightning; or

c. With respect to "fungi", wet or dry rot, or bacteria that is located on the portion of the covered property that must be repaired or replaced because of direct physical damage caused by a Peril Insured Against.

However, the exclusion shall continue to apply to:

(1) The cost to treat, contain, remove or dispose of "Fungi", Wet Or Dry Rot, Or Bacteria beyond that which is required to repair or replace the covered property physically damaged by a Peril Insured Against;

(2) The cost of any testing of air or property to confirm the absence, presence or level of "Fungi", Wet Or Dry Rot Or Bacteria whether performed prior to, during or after removal, repair, restoration or replacement; and

© ISO Properties, Inc., 2003

0455

**(3)** Any increase in loss under Coverage **D** – Loss of Use and Additional Coverage **1.** Debris Removal resulting from **c. (1)** and **(2)**.

Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

## SECTION I – CONDITIONS

Condition **P. Policy Period** is deleted and replaced by the following:

**P. Policy Period**

This policy applies to loss or costs which occur during the policy period.

## SECTION II – CONDITIONS

Condition **A. Limit Of Liability** is deleted and replaced by the following:

**A. Limit Of Liability**

Our total liability under Coverage **E** for all damages resulting from any one "occurrence" will not be more than the Coverage **E** limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims-made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one "occurrence".

Our total liability under Coverage **F** for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage **F** limit of liability shown in the Declarations.

However, our total liability under Coverage **E** for the total of all damages arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi", wet or dry rot, or bacteria will not be more than the Section **II** – Coverage **E** Aggregate Sublimit of Liability for "Fungi", Wet Or Dry Rot, Or Bacteria. That sublimit is the amount shown in the Schedule. This is the most we will pay regardless of the:

**1.** Number of locations insured under the policy to which this endorsement is attached;

**2.** Number of persons injured;

**3.** Number of persons whose property is damaged;

**4.** Number of "insureds"; or

**5.** Number of "occurrences" or claims-made.

This sublimit is within, but does not increase, the Coverage **E** limit of liability. It applies separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations.

With respect to damages arising out of "fungi", wet or dry rot, or bacteria described in **A.** Limit Of Liability of this endorsement, Condition **B. Severability Of Insurance** is deleted and replaced by the following:

**B. Severability Of Insurance**

This insurance applies separately to each "insured" except with respect to the Aggregate Sublimit of Liability described in this endorsement under Section **II** – Conditions, **A.** Limit Of Liability. This condition will not increase the limit of liability for this coverage.

All other provisions of the policy apply.

Defendant's Requests for Admissions: Exhibit A
Page 27 of 37

**Page 3 of 3**

**HOMEOWNERS**
**HO 04 86 09 93**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WINDSTORM EXTERIOR PAINT AND WATERPROOFING EXCLUSION

Coverage to any building or structure under this policy excludes loss caused by windstorm or hail to paint or waterproofing material applied to the exterior of the building or structure.

**HO 04 86 09 93**          Copyright, Insurance Services Office, Inc., 1993          0457

**HOMEOWNERS**
**UPCIC 01 10 07 11**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL PROVISIONS – GEORGIA

### DEFINITIONS

The following definition is added:

**"Personal Watercraft"**

a. "Personal Watercraft" means watercraft designed to carry one to three people, propelled by a water jet pump powered by an internal combustion engine and capable of speeds greater than 25 mph.

b. "Personal Watercraft" includes but are not limited to watercraft often referred to as jet skis, wave runners and similar watercraft

### SECTION I – PROPERTY COVERAGES

### E. Additional Coverages

#### 8. Collapse

Paragraph **a.(3)** is deleted and replaced by the following:

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building. However, if any part of the interior dwelling building separates from another part of the interior of the dwelling building, with the result that any part of the interior dwelling building cannot be occupied for its intended purpose, it would be considered to be in a state of collapse.

### SECTION I – EXCLUSIONS

**8. Intentional Loss** is deleted and replaced by the following:

#### 8. Intentional Loss

a. Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

b. However, this exclusion will not apply to deny payment to an innocent co-"insured" if the loss:

(1) Arose out of family violence; and

(2) Is caused by the intentional act of an "insured" against whom a family violence complaint is brought for the act causing the loss.

c. If we pay a claim pursuant to Paragraph **8.b.,** our payment to the innocent co-"insured" is limited to that "insured's" insurable interest in the property. In no event will we pay more than the Limit of Liability.

(This is Exclusion **A.8.** in Forms **HO 00 03** and **HO 00 05.**)

### SECTION I – CONDITIONS

### K. Mortgage Clause

Paragraph **K.3.** is deleted and replaced by the following:

3. If we decide to cancel or not renew this policy, the mortgagee will be notified at least 30 days before the date cancellation or nonrenewal takes effect. If the policy has been in effect for less than 60 days or is cancelled for nonpayment of premium, the mortgagee will be notified at least 10 days before the date cancellation takes effect.

### SECTION II – EXCLUSIONS

### B. "Watercraft Liability"

Paragraph **2.** is amended to read:

2. If Exclusion **B.1.** does not apply, there is still no coverage for **"personal watercraft"** and only for other watercraft if at the time of the occurrence, the watercraft:

Paragraph **2.c.(1)** is amended to read:

(1) An inboard or inboard-outdrive engine motor of:

### E. Coverage E – Personal Liability And Coverage F – Medical Payments To Others

Paragraph **8.** is deleted in all forms and Endorsement **HO 24 73** and replaced by the following:

#### 8. Controlled Substance

"Bodily Injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs.

However, this exclusion does not apply:

Defendant's Requests for Admissions: Exhibit A
Page 29 of 37

**(1)** To the legitimate use of prescription drugs by a person following the orders of a licensed physician; or

**(2)** Where the involvement with controlled substance(s) is not within the knowledge of any "insured".

(This is Exclusion **9.** in **HO 24 73.**)

The following paragraphs are added:

**9.** **"Animal Liability"**

"Bodily Injury" or "property damage" caused directly or indirectly by non-domesticated or exotic animals, or any partial breeds thereof, you own or are kept at the "insured location". Such loss is excluded for all activity or conduct of the insured when a non-domesticated or exotic animal, or any partial breeds thereof, owned or kept at the "insured location" is involved in any way with the loss either directly or indirectly. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

**10.** **"Swimming pool slides, diving boards, trampolines; and skate board ramps"**

"Bodily Injury" or "property damage" caused directly or indirectly by the ownership, maintenance or use by anyone of any of the aforementioned equipment or accessory:

**SECTIONS I AND II – CONDITIONS**

**C. Cancellation**

Paragraphs **1.**, **2.**, **2.a.**, **2.b.**, **2.c.** and **4.** are deleted and replaced by the following:

**1.** You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect, subject to the following:

**a.** If only your interest is affected, the effective date of cancellation will be the later of the following:

**(1)** The date we receive your notice of cancellation; or

**(2)** The date specified in the notice.

However, upon our receipt of your notice of cancellation, we may waive the requirement that the notice state the future effective date of cancellation, as provided in either **1.a.(1)** or **1.a.(2)** above, by confirming to you in writing the date and time of cancellation.

**b.** If by statute, regulation or contract, this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days notice to you and the third party as soon as practicable after receiving your request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

**(1)** 10 days from the date of mailing or delivering our notice; or

**(2)** The effective date of cancellation stated in your notice to us.

**2.** We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice, together with our reasons for cancellation, may be delivered to you, or mailed to you at your last known mailing address. A receipt provided by, or such other evidence of mailing as prescribed or accepted by the U.S. Postal Service will be sufficient proof of notice.

**a.** When you have not paid the premium, whether payable to us or to our agent, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

**b.** When this policy has been in effect for 60 days or less and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the cancellation effective date takes effect.

**c.** When this policy has been in effect for more than 60 days, or at any time if it is a renewal with us, we may cancel only for one or more of the following reasons:

**(1)** Upon discovery of fraud, concealment of a material fact, or material misrepresentation made by, or with the knowledge of, any "insured" in obtaining this policy, continuing the policy, or presenting a claim under this policy;

**(2)** Upon the occurrence of a change in the risk which substantially increases any hazard insured against; or

**(3)** Upon the violation, by the "insured", of any of the material terms or conditions of the policy.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

**4.** If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it no later than the date cancellation takes effect.

Defendant's Requests for Admissions: Exhibit A
Page 30 of 37

© ISO Properties, Inc., 2000   0459   **UPCIC 01 10 07 11**

**D. Nonrenewal** is deleted and replaced by the following:

**D. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your last known mailing address, and to any lienholder named in the policy, written notice, together with our reasons for nonrenewal, at least 30 days before the expiration date of this policy.

A receipt provided by, or such other evidence of mailing as prescribed or accepted by the U.S. Postal Service will be sufficient proof of notice.

The following provision is added:

**H. Our Right To Recompute Premium**

We established the premium for this policy based on the statements you made in the application for insurance. We have the right to recompute the premium if we later obtain information which affects the premium we charged.

All other provisions of this policy apply.

**UPCIC 01 10 07 11**          © ISO Properties, Inc., 2000          0460          **Page 3 of 3**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

SCREENED ENCLOSURES AND CARPORTS EXCLUSION FOR WINDSTORM OR
HAIL LOSS (UPCIC SECE 201011)

Coverage for Windstorm or Hail Loss is excluded for the following items:
1. Aluminum framed screened enclosures
2. Aluminum framed carports

POLICY NUMBER:

**HOMEOWNERS**
**HO 04 20 10 00**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SPECIFIED ADDITIONAL AMOUNT OF INSURANCE FOR COVERAGE A – DWELLING
### FORMS HO 00 02 AND HO 00 03 AND HO 00 05 ONLY

**(APPLIES ONLY WHEN LOSS TO BUILDING INSURED UNDER COVERAGE A EXCEEDS THE COVERAGE A LIMIT OF LIABILITY SHOWN IN THE DECLARATIONS)**

**SCHEDULE\***

| |
|---|
| Additional Amount Of Insurance:<br>_____ %<br>The Additional Amount Of Insurance is determined by multiplying the Coverage **A** limit of liability shown in the Declarations by the percentage amount shown above. |

\*Entry may be left blank if shown elsewhere in this policy for this coverage.

To the extent that coverage is provided, we agree to provide an additional amount of insurance in accordance with the following provisions:

**A.** If you have:

  **1.** Allowed us to adjust the Coverage **A** limit of liability and the premium in accordance with:

    **a.** The property evaluations we make; and

    **b.** Any increases in inflation; and

  **2.** Notified us, within 30 days of completion, of any improvements, alterations or additions to the building insured under Coverage **A** which increase the replacement cost of the building by 5% or more;

The provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged building.

**B.** If there is a loss to the building insured under Coverage **A** that exceeds the Coverage **A** limit of liability shown in the Declarations, for the purpose of settling that loss only:

  **1.** We will provide an additional amount of insurance, up to the amount described in the Schedule above; and

  **2.** Section **I** – Condition **C.** Loss Settlement Paragraph **2.** is deleted and replaced by Paragraphs **2., 3.,** and **4.** as follows:

    **2.** The building insured under Coverage **A** at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts:

    **a.** The replacement cost of that part of the building damaged with material of like kind and quality and for like use;

    **b** The necessary amount actually spent to repair or replace the damaged building; or

    **c.** The limit of liability under this policy that applies to the building, plus any additional amount provided by this endorsement.

    If the building is rebuilt at a new premises, the cost described in **a.** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

    **3.** We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

    **4.** You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to the building on an actual cash value basis. You may then make claim for any additional liability on a replacement cost basis, provided you notify us of your intent to do so within 180 days after the date of loss.

All other provisions of this policy apply.

**HO 04 20 10 00**

Copyright, Insurance Services Office, Inc., 1999

0462

Defendant's Requests for Admissions: Exhibit A
Page 33 of 37
**Page 1 of 1**

HOMEOWNERS
HO 04 96 10 00

THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

# <u>NO</u> SECTION II – LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
# <u>LIMITED</u> SECTION I – PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

**A.** "Business", as defined in the policy, means:

  **1.** A trade, profession or occupation engaged in on a full-time, part-time, or occasional basis; or

  **2.** Any other activity engaged in for money or other compensation, except the following:

    **a.** One or more activities:

      **(1)** Not described in **b.** through **d.** below; and

      **(2)** For which no "insured" receives more than $2000 in total compensation for the 12 months before the beginning of the policy period;

    **b.** Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

    **c.** Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

    **d.** The rendering of home day care services to a relative of an "insured".

**B.** If an "insured" regularly provides home day care services to a person or persons other than "insureds" as their trade, profession or occupation, that service is a "business".

**C.** If home day care service is not a given "insured's" trade, profession or occupation but is an activity:

  **1.** That an "insured" engages in for money or other compensation; and

  **2.** From which an "insured" receives more than $2,000 in total/combined compensation from it and any other activity for the 12 months before the beginning of the policy period;

the home day care service and other activity will be considered a "business".

**D.** With respect to **C.** above, home day care service is only an example of an activity engaged in for money that may be a "business". Any single activity or combination of activities:

  **1.** Described in **A.2.** above, and

  **2.** Engaged in for money by a single "insured";

may be considered a "business" if the $2000 threshold is exceeded.

**E.** With respect to **A.** through **D.** above, coverage does not apply to or is limited with respect to home day care service which is a "business". For example, this policy:

  **1.** Does not provide:

    **a.** Section II coverages. This is because a "business" of an "insured" is excluded under **E.2.** of Section II – Exclusions;

    **b.** Coverage, under Section I, for other structures from which any "business" is conducted; and

  **2.** Limits Section I coverage, under Coverage **C** – Special Limits of Liability, for "business" property:

    **a.** On the "residence premises" for the home day care "business" to $2,500. This is because Category **h.** (**e.** in Form **HO 00 08**) imposes that limit on "business" property on the "residence premises";

    **b.** Away from the "residence premises" for the home day care "business" to $500. This is because Category **i.** (**f.** in Form **HO 00 08**) imposes that limit on "business" property away from the "residence premises". Category **i.** does not apply to property described in Categories **j.** and **k.** (**g.** and **h.** respectively in Form **HO 00 08**).

Defendant's Requests for Admissions: Exhibit A
Page 34 of 37
**Page 1 of 1**

HOMEOWNERS
HO 04 90 10 00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT

## A. Eligible Property

1. Covered losses to the following property are settled at replacement cost at the time of the loss:

   a. Coverage **C**; and

   b. If covered in this policy:

      (1) Awnings, outdoor antennas and outdoor equipment; and

      (2) Carpeting and household appliances;

      whether or not attached to buildings.

2. This method of loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value loss settlement:

   a. Jewelry;

   b. Furs and garments:

      (1) Trimmed with fur; or

      (2) Consisting principally of fur;

   c. Cameras, projection machines, films and related articles of equipment;

   d. Musical equipment and related articles of equipment;

   e. Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:

      (1) Pens or pencils;

      (2) Flasks;

      (2) Smoking implements; or

      (3) Jewelry; and

   f. Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

   Personal Property Replacement Cost loss settlement will not apply to other classes of property separately described and specifically insured.

## B. Ineligible Property

Property listed below is not eligible for replacement cost loss settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

1. Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

2. Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

3. Articles not maintained in good or workable condition.

4. Articles that are outdated or obsolete and are stored or not being used.

## C. Replacement Cost Loss Settlement Condition

The following loss settlement condition applies to all property described in **A.** above:

1. We will pay no more than the least of the following amounts:

   a. Replacement cost at the time of loss without deduction for depreciation;

   b. The full cost of repair at the time of loss;

   c. The limit of liability that applies to Coverage **C**, if applicable;

   d. Any applicable special limits of liability stated in this policy; or

   e. For loss to any item described in **A.2.a. - f.** above, the limit of liability that applies to the item.

2. If the cost to repair or replace the property described in **A.** above is more than $500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

3. You may make a claim for loss on an actual cash value basis and then make claim for any additional liability in accordance with this endorsement provided you notify us of your intent to do so within 180 days after the date of loss.

All other provisions of this policy apply.

Defendant's Requests for Admissions: Exhibit A
Page 35 of 37
Page 1 of 1

POLICY NUMBER:

**HOMEOWNERS**
**HO 04 48 10 00**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# OTHER STRUCTURES ON THE RESIDENCE PREMISES
### INCREASED LIMITS

**SCHEDULE\***

| Description Of Structure And Additional Limit Of Liability |
|---|
| |

\*Entries may be left blank if shown elsewhere in this policy for this coverage.

**SECTION I – PROPERTY COVERAGES**
**COVERAGE B – OTHER STRUCTURES**

We cover each structure that is:

1. On the "residence premises"; and
2. Described in the Schedule above;

for the additional limit of liability shown in the Schedule for that structure.

The limit shown is in addition to the Coverage **B** limit of liability.

Each additional limit of liability shown applies only to that described structure.

All other provisions of this policy apply.

Defendant's Requests for Admissions: Exhibit A

## EXISTING DAMAGE EXCLUSION

The following is excluded:

1. Damages which occurred prior to policy inception regardless of whether such damages were apparent at the time of the inception of this policy or discovered at a later date; or

2. Claims or damages arising out of workmanship, repairs or lack of repairs arising from damage which occurred prior to policy inception.

**This exclusion does not apply in the event of a total loss caused by a Peril Insured Against.**



**FLOOD BROTHERS**
RESTORATION

| | | | |
|---|---|---|---|
| Insured: | MICHELLE JIMENEZ | Home: | (202) 813-2688 |
| Property: | 4410 RIDERS RIDGE TRAIL | | |
| | SNELLVILLE, GA 30039 | | |

| | |
|---|---|
| Claim Rep.: | UNIVERSAL P&C |

| | |
|---|---|
| Estimator: | RANDY FOWLER |
| Company: | FLOOD BROTHERS RESTORATION, LLC |

**Claim Number:** GA18-0102238        **Policy Number:** GA18-0102238        **Type of Loss:** Water Damage

| | | | |
|---|---|---|---|
| Date Contacted: | 9/14/2018 | | |
| Date of Loss: | 9/11/2018 | Date Received: | 9/14/2018 |
| Date Inspected: | 9/14/2018 | Date Entered: | 9/16/2018 11:25 PM |

| | |
|---|---|
| Price List: | GAAT8X_SEP18 |
| | Restoration/Service/Remodel |
| Estimate: | JIMENEZ |

Direct Payment Authorization Attached. EIN 46-5322812



PLAINTIFF'S
EXHIBIT
2

Blumberg No. 5119

0467



**FLOOD BROTHERS**
**RESTORATION**
WATER DAMAGE EXPERTS

**JIMENEZ**
**Main Level**

**Main Level**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 1. Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 | EA @ | 398.77 = | | 797.54 |
| 2. Cleaning & Remediation - Supervisory - after hrs. | 2.00 | HR @ | 69.82 = | | 139.64 |
| 3. Equipment setup, take down, and monitoring (hourly charge) | 10.00 | HR @ | 44.60 = | | 446.00 |
| 4. Equip. setup, take down & monitoring - after hrs | 13.00 | HR @ | 66.96 = | | 870.48 |
| 5. Emergency service call - after business hours | 1.00 | EA @ | 234.32 = | | 234.32 |

**Master Bedroom**                                                                  **Height: 10' 6"**

**Door**                        2' X 6' 8"                        Opens into MASTER_CLOSE

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 6. Dehumidifier (per 24 hour period) - No monitoring | 4.00 | EA @ | 52.50 = | | 210.00 |
| 7. Air mover axial fan (per 24 hour period) - No monitoring | 16.00 | EA @ | 33.00 = | | 528.00 |
| 8. Water extraction from carpeted floor- after business hours | 160.00 | SF @ | 0.68 = | | 108.80 |
| 9. Tear out baseboard - after business hours | 32.00 | LF @ | 0.56 = | | 17.92 |
| 10. Tear out wet carpet pad, cut/bag - after business hours | 160.00 | SF @ | 0.61 = | | 97.60 |
| 11. Lift carpet for drying - after hours | 160.00 | SF @ | 0.42 = | | 67.20 |
| 12. Drill holes for wall cavity drying - after hrs | 32.00 | EA @ | 0.58 = | | 18.56 |
| 13. Apply anti-microbial agent to the floor - after hours | 216.02 | SF @ | 0.29 = | | 62.65 |

**Master Closet**                                                                  **Height: 8'**

**Door**                        2' X 6' 8"                        Opens into MASTER_BEDRO

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 14. Dehumidifier (per 24 hour period) - No monitoring | 4.00 | EA @ | 52.50 = | | 210.00 |
| 15. Air mover axial fan (per 24 hour period) - No monitoring | 8.00 | EA @ | 33.00 = | | 264.00 |
| 16. Water extraction from carpeted floor- after business hours | 47.90 | SF @ | 0.68 = | | 32.57 |
| 17. Tear out baseboard - after business hours | 29.17 | LF @ | 0.56 = | | 16.34 |
| 18. Tear out wet carpet pad, cut/bag - after business hours | 47.90 | SF @ | 0.61 = | | 29.22 |
| 19. Lift carpet for drying - after hours | 47.90 | SF @ | 0.42 = | | 20.12 |
| 20. Drill holes for wall cavity drying - after hrs | 29.17 | EA @ | 0.58 = | | 16.92 |
| 21. Apply anti-microbial agent to the floor - after hours | 47.90 | SF @ | 0.29 = | | 13.89 |



**FLOOD BROTHERS RESTORATION**

**Toilet**                                                                              Height: 8'

**Door**                          2' X 6' 8"                    Opens into MASTER_BATH

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 22. Tear out baseboard - after business hours | 11.17 LF @ | 0.56 = | 6.26 |
| 23. Drill holes for wall cavity drying - after hrs | 11.17 EA @ | 0.58 = | 6.48 |
| 24. Tear out non-salvageable vinyl, cut & bag - after hrs | 32.00 SF @ | 1.54 = | 49.28 |
| 25. Apply anti-microbial agent to the floor - after hours | 10.75 SF @ | 0.29 = | 3.12 |

**Master Bath**                                                                         Height: 8'

**Door**                          2' X 6' 8"                    Opens into TOILET

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 26. Air mover axial fan (per 24 hour period) - No monitoring | 12.00 EA @ | 33.00 = | 396.00 |
| 27. Tear out baseboard - after business hours | 8.00 LF @ | 0.56 = | 4.48 |
| 28. Tear out toe kick and bag for disposal - after bus. hours | 6.00 LF @ | 3.44 = | 20.64 |
| 29. Drill holes for wall cavity drying - after hrs | 10.00 EA @ | 0.58 = | 5.80 |
| 30. Tear out non-salvageable vinyl, cut & bag - after hrs | 60.00 SF @ | 1.54 = | 92.40 |
| 31. Apply anti-microbial agent to the surface area - after hours | 60.00 SF @ | 0.29 = | 17.40 |

**Guest Bath**                                                                          Height: 8'

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 32. Air mover axial fan (per 24 hour period) - No monitoring | 3.00 EA @ | 33.00 = | 99.00 |
| 33. Tear out baseboard - after business hours | 5.00 LF @ | 0.56 = | 2.80 |
| 34. Drill holes for wall cavity drying - after hrs | 6.00 EA @ | 0.58 = | 3.48 |
| 35. Tear out non-salvageable vinyl, cut & bag - after hrs | 32.00 SF @ | 1.54 = | 49.28 |
| 36. Apply anti-microbial agent to the floor - after hours | 42.50 SF @ | 0.29 = | 12.33 |

**B Living**                                                                            Height: 9' 8"

**Door**                          2' 6" X 6' 8"                Opens into B_HALL
**Door**                          2' 6" X 6' 8"                Opens into B_HALL
**Door**                          2' 4" X 6' 8"                Opens into B_STORAGE_2
**Door**                          2' 4" X 6' 8"                Opens into B_STORAGE

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

JIMENEZ                                          10/2/2018              Page: 3



**FLOOD BROTHERS**
**RESTORATION**
—— WATER DAMAGE EXPERTS ——

**CONTINUED - B Living**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 37.  Dehumidifier (per 24 hour period) - XLarge - No monitoring | 5.00 | EA @ | 103.00 | = | 515.00 |
| 38.  Air mover axial fan (per 24 hour period) - No monitoring | 30.00 | EA @ | 33.00 | = | 990.00 |
| 39.  Air mover (per 24 hour period) - No monitoring | 25.00 | EA @ | 28.50 | = | 712.50 |
| 40.  Heat, Vent, & Air Conditioning (Bid Item) | 1.00 | EA @ | 150.00 | = | 150.00 |
| Remove damaged HVAC vents and box | | | | | |
| 41.  Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 400.17 | SF @ | 1.08 | = | 432.18 |
| 42.  Tear out baseboard - after business hours | 75.50 | LF @ | 0.56 | = | 42.28 |
| 43.  Tear out tackless strip and bag for disposal - after hours | 75.50 | LF @ | 1.08 | = | 81.54 |
| 44.  Tear out wet carpet pad, cut/bag - after business hours | 400.17 | SF @ | 0.61 | = | 244.10 |
| 45.  Tear out wet non-salvage cpt, cut/bag - after business hrs | 400.17 | SF @ | 0.66 | = | 264.11 |
| 46.  Interior door slab only - Detach - after business hours | 2.00 | EA @ | 7.14 | = | 14.28 |
| 47.  Tear out wet drywall, cleanup, bag, per LF - 4' aft hrs | 35.00 | LF @ | 5.58 | = | 195.30 |
| 48.  Tear out and bag wet insulation - after hours | 715.17 | SF @ | 0.89 | = | 636.50 |
| 49.  Remove wet susp. ceiling tile, bag for disp. - after hrs | 400.17 | SF @ | 0.46 | = | 184.08 |
| 50.  Apply anti-microbial agent to more than the floor - after hours | 1,115.33 | SF @ | 0.29 | = | 323.45 |
| 51.  Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 12.00 | LF @ | 3.60 | = | 43.20 |

**B Storage**                                                                              **Height: 9' 8"**

| Door | 2' 4" X 6' 8" | Opens into B_LIVING | | | |
|---|---|---|---|---|---|
| **DESCRIPTION** | **QTY** | | **UNIT PRICE** | | **TOTAL** |
| 52.  Air mover (per 24 hour period) - No monitoring | 5.00 | EA @ | 28.50 | = | 142.50 |
| 53.  Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 43.28 | SF @ | 1.08 | = | 46.74 |
| 54.  Tear out tackless strip and bag for disposal - after hours | 24.00 | LF @ | 1.08 | = | 25.92 |
| 55.  Tear out wet carpet pad, cut/bag - after business hours | 43.28 | SF @ | 0.61 | = | 26.40 |
| 56.  Tear out wet non-salvage cpt, cut/bag - after business hrs | 43.28 | SF @ | 0.66 | = | 28.56 |
| 57.  Apply anti-microbial agent to the floor - after hours | 43.28 | SF @ | 0.29 | = | 12.55 |

**B Storage 2**                                                                           **Height: 9' 8"**

| Door | 2' 4" X 6' 8" | Opens into B_LIVING | | | |
|---|---|---|---|---|---|
| **DESCRIPTION** | **QTY** | | **UNIT PRICE** | | **TOTAL** |

JIMENEZ                                                                      10/2/2018          Page: 4



**FLOOD BROTHERS**
RESTORATION

**CONTINUED - B Storage 2**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 58.  Air mover (per 24 hour period) - No monitoring | 5.00 | EA @ | 28.50 | = | 142.50 |
| 59.  Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 43.28 | SF @ | 1.08 | = | 46.74 |
| 60.  Tear out tackless strip and bag for disposal - after hours | 24.00 | LF @ | 1.08 | = | 25.92 |
| 61.  Tear out wet carpet pad, cut/bag - after business hours | 43.28 | SF @ | 0.61 | = | 26.40 |
| 62.  Tear out wet non-salvage cpt, cut/bag - after business hrs | 43.28 | SF @ | 0.66 | = | 28.56 |
| 63.  Apply anti-microbial agent to the floor - after hours | 43.28 | SF @ | 0.29 | = | 12.55 |

**B Hall**                                                                 Height: 9' 8"

| Door | 2' 6" X 6' 8" | Opens into B_PLAYROOM |
|---|---|---|
| Missing Wall | 2' 11 15/16" X 9' 8" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into B_LIVING |
| Door | 2' 6" X 6' 8" | Opens into B_LIVING |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 64.  Dehumidifier (per 24 hour period) - No monitoring | 5.00 | EA @ | 52.50 | = | 262.50 |
| 65.  Air mover axial fan (per 24 hour period) - No monitoring | 20.00 | EA @ | 33.00 | = | 660.00 |
| 66.  Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 162.00 | SF @ | 1.08 | = | 174.96 |
| 67.  Tear out tackless strip and bag for disposal - after hours | 86.00 | LF @ | 1.08 | = | 92.88 |
| 68.  Tear out wet carpet pad, cut/bag - after business hours | 162.00 | SF @ | 0.61 | = | 98.82 |
| 69.  Tear out wet non-salvage cpt, cut/bag - after business hrs | 162.00 | SF @ | 0.66 | = | 106.92 |
| 70.  Tear out and bag wet insulation - after hours | 162.00 | SF @ | 0.89 | = | 144.18 |
| 71.  Remove wet susp. ceiling tile, bag for disp. - after hrs | 162.00 | SF @ | 0.46 | = | 74.52 |
| 72.  Apply anti-microbial agent to the surface area - after hours | 340.00 | SF @ | 0.29 | = | 98.60 |

**B Playroom**                                                             Height: 9' 8"

| Door | 2' 6" X 6' 8" | Opens into B_HALL |
|---|---|---|

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 73.  Air mover axial fan (per 24 hour period) - No monitoring | 5.00 | EA @ | 33.00 | = | 165.00 |

JIMENEZ                                          10/2/2018          Page: 5



FLOOD BROTHERS
RESTORATION

### Sitting

**Height: 9'**

| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into FOYER_ENTRY |
|---|---|---|
| Missing Wall - Goes to Floor | 7' X 6' 8" | Opens into DINING_ROOM |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 74. Dehumidifier (per 24 hour period) - No monitoring | 5.00 EA @ | | 52.50 = | | 262.50 |
| 75. Air mover axial fan (per 24 hour period) - No monitoring | 10.00 EA @ | | 33.00 = | | 330.00 |
| 76. Tear out baseboard - after business hours | 6.00 LF @ | | 0.56 = | | 3.36 |
| 77. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 6.00 LF @ | | 3.60 = | | 21.60 |
| 78. Tear out non-salv solid/eng. wood flr & bag - after hrs | 56.00 SF @ | | 3.92 = | | 219.52 |
| 79. Add for tear out wood floor glued down over wood substrate | 56.00 SF @ | | 2.68 = | | 150.08 |
| 80. Apply anti-microbial agent to the surface area - after hours | 56.00 SF @ | | 0.29 = | | 16.24 |

### Dining Room

**Height: 9'**

| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into FOYER_ENTRY |
|---|---|---|
| Missing Wall - Goes to Floor | 7' X 6' 8" | Opens into SITTING |
| Missing Wall - Goes to Floor | 2' 7" X 6' 8" | Opens into KITCHEN |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 81. Air mover (per 24 hour period) - No monitoring | 15.00 EA @ | | 28.50 = | | 427.50 |
| 82. Air mover axial fan (per 24 hour period) - No monitoring | 5.00 EA @ | | 33.00 = | | 165.00 |
| 83. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 36.66 LF @ | | 3.60 = | | 131.98 |
| 84. Tear out baseboard - after business hours | 36.66 LF @ | | 0.56 = | | 20.53 |
| 85. Tear out non-salv solid/eng. wood flr & bag - after hrs | 171.21 SF @ | | 3.92 = | | 671.14 |
| 86. Add for tear out wood floor glued down over wood substrate | 171.21 SF @ | | 2.68 = | | 458.84 |
| 87. Water extraction from carpeted floor - Heavy - aft bus hrs | 90.00 SF @ | | 0.81 = | | 72.90 |
| 88. Tear out wet drywall, cleanup, bag - after business hours | 120.00 SF @ | | 1.05 = | | 126.00 |
| 89. Temporary Repairs - General Laborer - per hour - after hrs | 2.00 HR @ | | 49.93 = | | 99.86 |
| Remove nailed down built up subfloor | | | | | |
| 90. Generator temporary power cable (per day) | 5.00 DA @ | | 27.00 = | | 135.00 |
| 91. Power distribution box | 5.00 DA @ | | 59.67 = | | 298.35 |

### Foyer/Entry

**Height: 9'**

| Missing Wall | 3' X 9' | Opens into STAIRS |
|---|---|---|
| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into SITTING |
| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into DINING_ROOM |
| Missing Wall | 4' 2" X 9' | Opens into KITCHEN |

JIMENEZ

10/2/2018        Page: 6



**FLOOD BROTHERS**
**RESTORATION**
WATER DAMAGE EXPERTS

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 92.  Air mover axial fan (per 24 hour period) - No monitoring | 5.00 | EA @ | 33.00 | = | 165.00 |
| 93.  Tear out non-salv solid/eng. wood flr & bag - after hrs | 83.00 | SF @ | 3.92 | = | 325.36 |
| 94.  Add for tear out wood floor glued down over wood substrate | 83.00 | SF @ | 2.68 | = | 222.44 |
| 95.  Tear out baseboard - after business hours | 12.00 | LF @ | 0.56 | = | 6.72 |
| 96.  Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 9.00 | LF @ | 3.60 | = | 32.40 |
| 97.  Apply anti-microbial agent to the surface area - after hours | 83.00 | SF @ | 0.29 | = | 24.07 |

**Pantry**        **Height: 9'**

**Door**      2' X 6' 8"       **Opens into KITCHEN**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 98.  Tear out non-salv solid/eng. wood flr & bag - after hrs | 5.17 | SF @ | 3.92 | = | 20.27 |
| 99.  Add for tear out wood floor glued down over wood substrate | 5.17 | SF @ | 2.68 | = | 13.86 |
| 100.  Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 7.17 | LF @ | 3.60 | = | 25.81 |
| 101.  Tear out baseboard - after business hours | 7.17 | LF @ | 0.56 | = | 4.02 |
| 102.  Apply anti-microbial agent to the floor - after hours | 5.17 | SF @ | 0.29 | = | 1.50 |

**Kitchen**        **Height: 9'**

| **Door** | 2' X 6' 8" | **Opens into Exterior** |
|---|---|---|
| **Missing Wall - Goes to Floor** | 8' 10" X 6' 8" | **Opens into LIVING_ROOM** |
| **Missing Wall** | 4' 2" X 9' | **Opens into FOYER_ENTRY** |
| **Missing Wall - Goes to Floor** | 2' 7" X 6' 8" | **Opens into DINING_ROOM** |
| **Door** | 2' X 6' 8" | **Opens into PANTRY** |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 103.  Dehumidifier (per 24 hour period) - XLarge - No monitoring | 5.00 | EA @ | 103.00 | = | 515.00 |
| 104.  Air mover (per 24 hour period) - No monitoring | 15.00 | EA @ | 28.50 | = | 427.50 |
| 105.  Air mover axial fan (per 24 hour period) - No monitoring | 20.00 | EA @ | 33.00 | = | 660.00 |
| 106.  Tear out non-salv solid/eng. wood flr & bag - after hrs | 226.00 | SF @ | 3.92 | = | 885.92 |
| 107.  Add for tear out wood floor glued down over wood substrate | 226.00 | SF @ | 2.68 | = | 605.68 |
| 108.  Tear out wet drywall, cleanup, bag - after business hours | 172.00 | SF @ | 1.05 | = | 180.60 |
| Ceiling and wall | | | | | |
| 109.  Tear out and bag wet insulation - after hours | 80.00 | SF @ | 0.89 | = | 71.20 |
| 110.  Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 14.00 | LF @ | 3.60 | = | 50.40 |
| 111.  Tear out wet drywall, cleanup, bag, per LF - 4' aft hrs | 11.00 | LF @ | 5.58 | = | 61.38 |
| 112.  Tear out wet drywall, cleanup, bag, per LF - 2' aft hrs | 10.00 | LF @ | 3.93 | = | 39.30 |
| 113.  Tear out toe kick and bag for disposal - after bus. hours | 6.00 | LF @ | 3.44 | = | 20.64 |



FLOOD BROTHERS
RESTORATION
WATER DAMAGE EXPERTS

**CONTINUED - Kitchen**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 114.  Tear out cabinetry - lower (base) units - after hours | 21.00 | LF @ | 10.05 = | 211.05 |
| 115.  Tear out countertop - post formed plastic lam. - after hrs | 23.00 | LF @ | 5.55 = | 127.65 |
| 116.  Tear out cabinetry - upper (wall) units - after hours | 18.00 | LF @ | 10.05 = | 180.90 |
| 117.  Refrigerator - Remove & reset | 0.50 | EA @ | 32.82 = | 16.41 |
| 118.  Range - electric - Remove & reset | 0.50 | EA @ | 32.82 = | 16.41 |
| 119.  Dishwasher - Detach & reset | 0.50 | EA @ | 257.35 = | 128.68 |
| 120.  Sink faucet - Detach & reset | 0.50 | EA @ | 113.23 = | 56.62 |
| 121.  Garbage disposer - Detach & reset | 0.50 | EA @ | 151.28 = | 75.64 |
| 122.  P-trap assembly - Detach & reset | 0.50 | EA @ | 56.23 = | 28.12 |
| 123.  Remove Sink - double | 1.00 | EA @ | 15.60 = | 15.60 |
| 124.  Remove Cabinet knob or pull | 28.00 | EA @ | 0.91 = | 25.48 |
| 125.  Apply anti-microbial agent to more than the floor - after hours | 479.42 | SF @ | 0.29 = | 139.03 |

**Living Room**                                                                 Height: 18' 5"

**Missing Wall - Goes to Floor**          8' 10" X 6' 8"          Opens into KITCHEN

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 126.  Add for glued down application over wood substrate | 22.00 | SF @ | 2.34 = | 51.48 |
| 127.  Tear out non-salv solid/eng. wood flr & bag - after hrs | 22.00 | SF @ | 3.92 = | 86.24 |

**Labor Minimums Applied**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 128.  Wood floor covering labor minimum | 1.00 | EA @ | 107.07 = | 107.07 |
| 129.  General labor - labor minimum | 1.00 | EA @ | 17.11 = | 17.11 |
| 130.  Cabinetry labor minimum | 1.00 | EA @ | 142.97 = | 142.97 |



## Grand Total Areas:

| | | | |
|---|---|---|---|
| 7,703.99 | SF Walls | 2,526.02 SF Ceiling | 10,230.01 SF Walls and Ceiling |
| 2,540.89 | SF Floor | 282.32 SY Flooring | 736.53 LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 SF Short Wall | 835.45 LF Ceil. Perimeter |

| | | | |
|---|---|---|---|
| 2,540.89 | Floor Area | 2,746.44 Total Area | 7,752.15 Interior Wall Area |
| 5,272.59 | Exterior Wall Area | 461.96 Exterior Perimeter of Walls | |

| | | | |
|---|---|---|---|
| 0.00 | Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 Total Hip Length | |



**FLOOD BROTHERS**
**R E S T O R A T I O N**

### Summary for Dwelling

| | |
|---|---:|
| Line Item Total | 21,638.69 |
| Settlement Discount | -3,662.40 |

This is a settlement discount, only valid if paid within 10 days.

| | |
|---|---:|
| Material Sales Tax | 23.71 |
| **Replacement Cost Value** | **$18,000.00** |
| **Net Claim** | **$18,000.00** |

RANDY FOWLER

Equipment was on site from 9/14 to 9/21

JIMENEZ

10/2/2018        Page: 10

0476

B Storage

B Storage

B Living

B Hall

B Playroom

Kitchen

Dining Room

Sitting

Living Room

Master Closet

Jack Bath

Foyer/Entry

Master Bath

Master Bedroom



**FLOOD BROTHERS**
**R E S T O R A T I O N**
— WATER DAMAGE EXPERTS —

| | | | |
|---|---|---|---|
| Insured: | MICHELLE JIMENEZ | Home: | (202) 813-2688 |
| Property: | 4410 RIDERS RIDGE TRAIL | | |
| | SNELLVILLE, GA 30039 | | |

Claim Rep.:   UNIVERSAL P&C

Estimator:   RANDY FOWLER
Company:   FLOOD BROTHERS RESTORATION, LLC

**Claim Number:** GA18-0102238      **Policy Number:** GA18-0102238      **Type of Loss:** Water Damage

| | | | | |
|---|---|---|---|---|
| Date Contacted: | 9/14/2018 | | | |
| Date of Loss: | 9/11/2018 | Date Received: | 9/14/2018 | |
| Date Inspected: | 9/14/2018 | Date Entered: | 9/16/2018 11:25 PM | |

Price List:   GAAT8X_SEP18
Restoration/Service/Remodel
Estimate:   JIMENEZ

Direct Payment Authorization Attached. EIN 46-5322812

PLAINTIFF'S
EXHIBIT
3
exhibitstickers

0478



**JIMENEZ**
**Main Level**

## Main Level

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 1. Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA @ | 398.77 = | 797.54 |
| 2. Cleaning & Remediation - Supervisory - after hrs. | 2.00 HR @ | 69.82 = | 139.64 |
| 3. Equipment setup, take down, and monitoring (hourly charge) | 10.00 HR @ | 44.60 = | 446.00 |
| 4. Equip. setup, take down & monitoring - after hrs | 13.00 HR @ | 66.96 = | 870.48 |
| 5. Emergency service call - after business hours | 1.00 EA @ | 234.32 = | 234.32 |

**Master Bedroom**        **Height: 10' 6"**

**Door**    2' X 6' 8"      **Opens into MASTER_CLOSE**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 6. Dehumidifier (per 24 hour period) - No monitoring | 4.00 EA @ | 52.50 = | 210.00 |
| 7. Air mover axial fan (per 24 hour period) - No monitoring | 16.00 EA @ | 33.00 = | 528.00 |
| 8. Water extraction from carpeted floor- after business hours | 160.00 SF @ | 0.68 = | 108.80 |
| 9. Tear out baseboard - after business hours | 32.00 LF @ | 0.56 = | 17.92 |
| 10. Tear out wet carpet pad, cut/bag - after business hours | 160.00 SF @ | 0.61 = | 97.60 |
| 11. Lift carpet for drying - after hours | 160.00 SF @ | 0.42 = | 67.20 |
| 12. Drill holes for wall cavity drying - after hrs | 32.00 EA @ | 0.58 = | 18.56 |
| 13. Apply anti-microbial agent to the floor - after hours | 216.02 SF @ | 0.29 = | 62.65 |

**Master Closet**        **Height: 8'**

**Door**    2' X 6' 8"      **Opens into MASTER_BEDRO**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 14. Dehumidifier (per 24 hour period) - No monitoring | 4.00 EA @ | 52.50 = | 210.00 |
| 15. Air mover axial fan (per 24 hour period) - No monitoring | 8.00 EA @ | 33.00 = | 264.00 |
| 16. Water extraction from carpeted floor- after business hours | 47.90 SF @ | 0.68 = | 32.57 |
| 17. Tear out baseboard - after business hours | 29.17 LF @ | 0.56 = | 16.34 |
| 18. Tear out wet carpet pad, cut/bag - after business hours | 47.90 SF @ | 0.61 = | 29.22 |
| 19. Lift carpet for drying - after hours | 47.90 SF @ | 0.42 = | 20.12 |
| 20. Drill holes for wall cavity drying - after hrs | 29.17 EA @ | 0.58 = | 16.92 |
| 21. Apply anti-microbial agent to the floor - after hours | 47.90 SF @ | 0.29 = | 13.89 |



**Toilet**                                                                                      Height: 8'

Door                              2' X 6' 8"                        Opens into MASTER_BATH

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 22. Tear out baseboard - after business hours | 11.17 LF @ | 0.56 = | 6.26 |
| 23. Drill holes for wall cavity drying - after hrs | 11.17 EA @ | 0.58 = | 6.48 |
| 24. Tear out non-salvageable vinyl, cut & bag - after hrs | 32.00 SF @ | 1.54 = | 49.28 |
| 25. Apply anti-microbial agent to the floor - after hours | 10.75 SF @ | 0.29 = | 3.12 |

**Master Bath**                                                                                 Height: 8'

Door                              2' X 6' 8"                        Opens into TOILET

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 26. Air mover axial fan (per 24 hour period) - No monitoring | 12.00 EA @ | 33.00 = | 396.00 |
| 27. Tear out baseboard - after business hours | 8.00 LF @ | 0.56 = | 4.48 |
| 28. Tear out toe kick and bag for disposal - after bus. hours | 6.00 LF @ | 3.44 = | 20.64 |
| 29. Drill holes for wall cavity drying - after hrs | 10.00 EA @ | 0.58 = | 5.80 |
| 30. Tear out non-salvageable vinyl, cut & bag - after hrs | 60.00 SF @ | 1.54 = | 92.40 |
| 31. Apply anti-microbial agent to the surface area - after hours | 60.00 SF @ | 0.29 = | 17.40 |

**Guest Bath**                                                                                  Height: 8'

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 32. Air mover axial fan (per 24 hour period) - No monitoring | 3.00 EA @ | 33.00 = | 99.00 |
| 33. Tear out baseboard - after business hours | 5.00 LF @ | 0.56 = | 2.80 |
| 34. Drill holes for wall cavity drying - after hrs | 6.00 EA @ | 0.58 = | 3.48 |
| 35. Tear out non-salvageable vinyl, cut & bag - after hrs | 32.00 SF @ | 1.54 = | 49.28 |
| 36. Apply anti-microbial agent to the floor - after hours | 42.50 SF @ | 0.29 = | 12.33 |

**B Living**                                                                                   Height: 9' 8"

Door                              2' 6" X 6' 8"                     Opens into B_HALL
Door                              2' 6" X 6' 8"                     Opens into B_HALL
Door                              2' 4" X 6' 8"                     Opens into B_STORAGE_2
Door                              2' 4" X 6' 8"                     Opens into B_STORAGE

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

JIMENEZ                                                   9/24/2018              Page: 3



**CONTINUED - B Living**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 37. Dehumidifier (per 24 hour period) - XLarge - No monitoring | 5.00 | EA @ | 103.00 = | | 515.00 |
| 38. Air mover axial fan (per 24 hour period) - No monitoring | 30.00 | EA @ | 33.00 = | | 990.00 |
| 39. Air mover (per 24 hour period) - No monitoring | 25.00 | EA @ | 28.50 = | | 712.50 |
| 40. Heat, Vent, & Air Conditioning (Bid Item) | 1.00 | EA @ | 150.00 = | | 150.00 |
| Remove damaged HVAC vents and box | | | | | |
| 41. Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 400.17 | SF @ | 1.08 = | | 432.18 |
| 42. Tear out baseboard - after business hours | 75.50 | LF @ | 0.56 = | | 42.28 |
| 43. Tear out tackless strip and bag for disposal - after hours | 75.50 | LF @ | 1.08 = | | 81.54 |
| 44. Tear out wet carpet pad, cut/bag - after business hours | 400.17 | SF @ | 0.61 = | | 244.10 |
| 45. Tear out wet non-salvage cpt, cut/bag - after business hrs | 400.17 | SF @ | 0.66 = | | 264.11 |
| 46. Interior door slab only - Detach - after business hours | 2.00 | EA @ | 7.14 = | | 14.28 |
| 47. Tear out wet drywall, cleanup, bag, per LF - 4' aft hrs | 35.00 | LF @ | 5.58 = | | 195.30 |
| 48. Tear out and bag wet insulation - after hours | 715.17 | SF @ | 0.89 = | | 636.50 |
| 49. Remove wet susp. ceiling tile, bag for disp. - after hrs | 400.17 | SF @ | 0.46 = | | 184.08 |
| 50. Apply anti-microbial agent to more than the floor - after hours | 1,115.33 | SF @ | 0.29 = | | 323.45 |
| 51. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 12.00 | LF @ | 3.60 = | | 43.20 |

**B Storage**  Height: 9' 8"

**Door**  2' 4" X 6' 8"  Opens into B_LIVING

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 52. Air mover (per 24 hour period) - No monitoring | 5.00 | EA @ | 28.50 = | | 142.50 |
| 53. Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 43.28 | SF @ | 1.08 = | | 46.74 |
| 54. Tear out tackless strip and bag for disposal - after hours | 24.00 | LF @ | 1.08 = | | 25.92 |
| 55. Tear out wet carpet pad, cut/bag - after business hours | 43.28 | SF @ | 0.61 = | | 26.40 |
| 56. Tear out wet non-salvage cpt, cut/bag - after business hrs | 43.28 | SF @ | 0.66 = | | 28.56 |
| 57. Apply anti-microbial agent to the floor - after hours | 43.28 | SF @ | 0.29 = | | 12.55 |

**B Storage 2**  Height: 9' 8"

**Door**  2' 4" X 6' 8"  Opens into B_LIVING

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

JIMENEZ  9/24/2018  Page: 4



**CONTINUED - B Storage 2**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 58. Air mover (per 24 hour period) - No monitoring | 5.00 EA @ | 28.50 = | 142.50 |
| 59. Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 43.28 SF @ | 1.08 = | 46.74 |
| 60. Tear out tackless strip and bag for disposal - after hours | 24.00 LF @ | 1.08 = | 25.92 |
| 61. Tear out wet carpet pad, cut/bag - after business hours | 43.28 SF @ | 0.61 = | 26.40 |
| 62. Tear out wet non-salvage cpt, cut/bag - after business hrs | 43.28 SF @ | 0.66 = | 28.56 |
| 63. Apply anti-microbial agent to the floor - after hours | 43.28 SF @ | 0.29 = | 12.55 |

**B Hall**  Height: 9' 8"

| | | |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into B_PLAYROOM |
| Missing Wall | 2' 11 15/16" X 9' 8" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into B_LIVING |
| Door | 2' 6" X 6' 8" | Opens into B_LIVING |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 64. Dehumidifier (per 24 hour period) - No monitoring | 5.00 EA @ | 52.50 = | 262.50 |
| 65. Air mover axial fan (per 24 hour period) - No monitoring | 20.00 EA @ | 33.00 = | 660.00 |
| 66. Water extract from carpeted floor - Cat 2 wtr- aft bus hrs | 162.00 SF @ | 1.08 = | 174.96 |
| 67. Tear out tackless strip and bag for disposal - after hours | 86.00 LF @ | 1.08 = | 92.88 |
| 68. Tear out wet carpet pad, cut/bag - after business hours | 162.00 SF @ | 0.61 = | 98.82 |
| 69. Tear out wet non-salvage cpt, cut/bag - after business hrs | 162.00 SF @ | 0.66 = | 106.92 |
| 70. Tear out and bag wet insulation - after hours | 162.00 SF @ | 0.89 = | 144.18 |
| 71. Remove wet susp. ceiling tile, bag for disp. - after hrs | 162.00 SF @ | 0.46 = | 74.52 |
| 72. Apply anti-microbial agent to the surface area - after hours | 340.00 SF @ | 0.29 = | 98.60 |

**B Playroom**  Height: 9' 8"

| | | |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into B_HALL |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 73. Air mover axial fan (per 24 hour period) - No monitoring | 5.00 EA @ | 33.00 = | 165.00 |

JIMENEZ

9/24/2018          Page: 5



**FLOOD BROTHERS**
**RESTORATION**

**Sitting**                                                                 Height: 9'

| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into FOYER_ENTRY |
| Missing Wall - Goes to Floor | 7' X 6' 8" | Opens into DINING_ROOM |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
| --- | --- | --- | --- |
| 74. Dehumidifier (per 24 hour period) - No monitoring | 5.00 EA @ | 52.50 = | 262.50 |
| 75. Air mover axial fan (per 24 hour period) - No monitoring | 10.00 EA @ | 33.00 = | 330.00 |
| 76. Tear out baseboard - after business hours | 6.00 LF @ | 0.56 = | 3.36 |
| 77. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 6.00 LF @ | 3.60 = | 21.60 |
| 78. Tear out non-salv solid/eng. wood flr & bag - after hrs | 56.00 SF @ | 3.92 = | 219.52 |
| 79. Add for tear out wood floor glued down over wood substrate | 56.00 SF @ | 2.68 = | 150.08 |
| 80. Apply anti-microbial agent to the surface area - after hours | 56.00 SF @ | 0.29 = | 16.24 |

**Dining Room**                                                              Height: 9'

| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into FOYER_ENTRY |
| Missing Wall - Goes to Floor | 7' X 6' 8" | Opens into SITTING |
| Missing Wall - Goes to Floor | 2' 7" X 6' 8" | Opens into KITCHEN |

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
| --- | --- | --- | --- |
| 81. Air mover (per 24 hour period) - No monitoring | 15.00 EA @ | 28.50 = | 427.50 |
| 82. Air mover axial fan (per 24 hour period) - No monitoring | 5.00 EA @ | 33.00 = | 165.00 |
| 83. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 36.66 LF @ | 3.60 = | 131.98 |
| 84. Tear out baseboard - after business hours | 36.66 LF @ | 0.56 = | 20.53 |
| 85. Tear out non-salv solid/eng. wood flr & bag - after hrs | 171.21 SF @ | 3.92 = | 671.14 |
| 86. Add for tear out wood floor glued down over wood substrate | 171.21 SF @ | 2.68 = | 458.84 |
| 87. Water extraction from carpeted floor - Heavy - aft bus hrs | 90.00 SF @ | 0.81 = | 72.90 |
| 88. Tear out wet drywall, cleanup, bag - after business hours | 120.00 SF @ | 1.05 = | 126.00 |
| 89. Temporary Repairs - General Laborer - per hour - after hrs | 2.00 HR @ | 49.93 = | 99.86 |
| Remove nailed down built up subfloor | | | |
| 90. Generator temporary power cable (per day) | 5.00 DA @ | 27.00 = | 135.00 |
| 91. Power distribution box | 5.00 DA @ | 59.67 = | 298.35 |

**Foyer/Entry**                                                             Height: 9'

| Missing Wall | 3' X 9' | Opens into STAIRS |
| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into SITTING |
| Missing Wall - Goes to Floor | 6' 5" X 6' 8" | Opens into DINING_ROOM |
| Missing Wall | 4' 2" X 9' | Opens into KITCHEN |

JIMENEZ                                               9/24/2018          Page: 6



| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 92. Air mover axial fan (per 24 hour period) - No monitoring | 5.00 EA @ | 33.00 = | 165.00 |
| 93. Tear out non-salv solid/eng. wood flr & bag - after hrs | 83.00 SF @ | 3.92 = | 325.36 |
| 94. Add for tear out wood floor glued down over wood substrate | 83.00 SF @ | 2.68 = | 222.44 |
| 95. Tear out baseboard - after business hours | 12.00 LF @ | 0.56 = | 6.72 |
| 96. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 9.00 LF @ | 3.60 = | 32.40 |
| 97. Apply anti-microbial agent to the surface area - after hours | 83.00 SF @ | 0.29 = | 24.07 |

**Pantry**  Height: 9'

**Door**  2' X 6' 8"  Opens into KITCHEN

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 98. Tear out non-salv solid/eng. wood flr & bag - after hrs | 5.17 SF @ | 3.92 = | 20.27 |
| 99. Add for tear out wood floor glued down over wood substrate | 5.17 SF @ | 2.68 = | 13.86 |
| 100. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 7.17 LF @ | 3.60 = | 25.81 |
| 101. Tear out baseboard - after business hours | 7.17 LF @ | 0.56 = | 4.02 |
| 102. Apply anti-microbial agent to the floor - after hours | 5.17 SF @ | 0.29 = | 1.50 |

**Kitchen**  Height: 9'

**Door**  2' X 6' 8"  Opens into Exterior
**Missing Wall - Goes to Floor**  8' 10" X 6' 8"  Opens into LIVING_ROOM
**Missing Wall**  4' 2" X 9'  Opens into FOYER_ENTRY
**Missing Wall - Goes to Floor**  2' 7" X 6' 8"  Opens into DINING_ROOM
**Door**  2' X 6' 8"  Opens into PANTRY

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 103. Dehumidifier (per 24 hour period) - XLarge - No monitoring | 5.00 EA @ | 103.00 = | 515.00 |
| 104. Air mover (per 24 hour period) - No monitoring | 15.00 EA @ | 28.50 = | 427.50 |
| 105. Air mover axial fan (per 24 hour period) - No monitoring | 20.00 EA @ | 33.00 = | 660.00 |
| 106. Tear out non-salv solid/eng. wood flr & bag - after hrs | 226.00 SF @ | 3.92 = | 885.92 |
| 107. Add for tear out wood floor glued down over wood substrate | 226.00 SF @ | 2.68 = | 605.68 |
| 108. Tear out wet drywall, cleanup, bag - after business hours | 172.00 SF @ | 1.05 = | 180.60 |
| Ceiling and wall | | | |
| 109. Tear out and bag wet insulation - after hours | 80.00 SF @ | 0.89 = | 71.20 |
| 110. Tear out wet drywall, cleanup, bag, per LF - 4" aft hrs | 14.00 LF @ | 3.60 = | 50.40 |
| 111. Tear out wet drywall, cleanup, bag, per LF - 4' aft hrs | 11.00 LF @ | 5.58 = | 61.38 |
| 112. Tear out wet drywall, cleanup, bag, per LF - 2' aft hrs | 10.00 LF @ | 3.93 = | 39.30 |
| 113. Tear out toe kick and bag for disposal - after bus. hours | 6.00 LF @ | 3.44 = | 20.64 |



**CONTINUED - Kitchen**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 114.  Tear out cabinetry - lower (base) units - after hours | 21.00 | LF @ | 10.05 | = | 211.05 |
| 115.  Tear out countertop - post formed plastic lam. - after hrs | 23.00 | LF @ | 5.55 | = | 127.65 |
| 116.  Tear out cabinetry - upper (wall) units - after hours | 18.00 | LF @ | 10.05 | = | 180.90 |
| 117.  Refrigerator - Remove & reset | 0.50 | EA @ | 32.82 | = | 16.41 |
| 118.  Range - electric - Remove & reset | 0.50 | EA @ | 32.82 | = | 16.41 |
| 119.  Dishwasher - Detach & reset | 0.50 | EA @ | 257.35 | = | 128.68 |
| 120.  Sink faucet - Detach & reset | 0.50 | EA @ | 113.23 | = | 56.62 |
| 121.  Garbage disposer - Detach & reset | 0.50 | EA @ | 151.28 | = | 75.64 |
| 122.  P-trap assembly - Detach & reset | 0.50 | EA @ | 56.23 | = | 28.12 |
| 123.  Remove Sink - double | 1.00 | EA @ | 15.60 | = | 15.60 |
| 124.  Remove Cabinet knob or pull | 28.00 | EA @ | 0.91 | = | 25.48 |
| 125.  Apply anti-microbial agent to more than the floor - after hours | 479.42 | SF @ | 0.29 | = | 139.03 |

**Living Room**                                                                 Height: 18' 5"

**Missing Wall - Goes to Floor**          8' 10" X 6' 8"          Opens into KITCHEN

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 126.  Add for glued down application over wood substrate | 22.00 | SF @ | 2.34 | = | 51.48 |
| 127.  Tear out non-salv solid/eng. wood flr & bag - after hrs | 22.00 | SF @ | 3.92 | = | 86.24 |

**Labor Minimums Applied**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 128.  Wood floor covering labor minimum | 1.00 | EA @ | 107.07 | = | 107.07 |
| 129.  General labor - labor minimum | 1.00 | EA @ | 17.11 | = | 17.11 |
| 130.  Cabinetry labor minimum | 1.00 | EA @ | 142.97 | = | 142.97 |



## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 7,703.99 | SF Walls | 2,526.02 | SF Ceiling | 10,230.01 | SF Walls and Ceiling |
| 2,540.89 | SF Floor | 282.32 | SY Flooring | 736.53 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 835.45 | LF Ceil. Perimeter |
| | | | | | |
| 2,540.89 | Floor Area | 2,746.44 | Total Area | 7,752.15 | Interior Wall Area |
| 5,272.59 | Exterior Wall Area | 461.96 | Exterior Perimeter of Walls | | |
| | | | | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |



**Summary for Dwelling**

| | |
|---|---|
| Line Item Total | 21,638.69 |
| Material Sales Tax | 23.71 |
| **Replacement Cost Value** | **$21,662.40** |
| **Net Claim** | **$21,662.40** |

RANDY FOWLER

Equipment was on site from 9/14 to 9/21

JIMENEZ                                            9/24/2018          Page: 10



## FLOOD BROTHERS Restoration
770-985-2748
www.floodbrothersrestoration.com

### HOMEOWNERS DIRECT PAY AUTHORIZATION

**INSURED NAME 1**
Michelle Jimenez

**INSURED NAME 2**
4410 Riders Ridge Trail

**ADDRESS**
Snellville                          GA                    30039

CITY                          STATE                    ZIP CODE

Universal Property & Casualty          GA18-0102238
INSURANCE COMPANY                    CLAIM NUMBER

I/WE, (THE INSURED NAMED ABOVE) HAVE CONTRACTED WITH FLOOD BROTHERS RESTORATION, LLC TO PERFORM MITIGATION SERVICES AT MY/OUR PROPERTY. I/WE HEREBY AUTHORIZE OUR INSURANCE COMPANY (LISTED ABOVE) TO DIRECTLY PAY ALL REPAIRS TO:

FLOOD BROTHERS RESTORATION, LLC
1874 LAUREL CREST DRIVE
SNELLVILLE, GA 30039

IN THE EVENT THAT DIRECT PAYMENT IS NOT A POSSIBILITY, PLEASE LIST FLOOD BROTHERS RESTORATION AS AN ENDORSEE ON ALL PAYMENTS.

INSURED 1 SIGNATURE                                    DATE

INSURED 2 SIGNATURE

1       Main Level - 261-IMG_5287        Date Taken: 9/24/2018



FLOOD BROTHERS
RESTORATION
WATER DAMAGE EXPERTS

FLOOD BROTHERS
Restoration

WORK AUTHORIZATION
WATER MITIGATION / REMEDIATION

(770) 985-2745
www.floodbrothersrestoration.com

Phase 1: Clean, Dry, Remediation

3874 Laurel Crest Drive
Snellville GA 30039

| | |
|---|---|
| Name: Michelle Jimenez | Name |
| Address: 4410 Riders Ridge Trail | Address |
| City: Snellville St: GA Zip: 30039 | City St Zip |
| Phone 1: 202-813-2688 Phone 2 | Phone 1 Phone 2 |
| Email: michelle.jimenez1516@gmail.com | Email |
| Insurance Co: Universal Property & Casualty Phone: 800-425-9113 | Category 1 2 3 Referred By |
| Policy Number: 1701170006660 Claim Number: GA18-0102238 | Date of Inspection Date of Loss |
| Adjuster's Name: Daniel Dobbs Adjuster's Email | Date of Service Date of Pickup |

Services

Description of Loss (Check Options)

Severity

Areas Affected

Services: Customer has contracted with Flood Brothers Restoration (FBR) to perform services needed for mitigation of water and water related damages. Customer is responsible for all charges billed by FBR and will pay invoices within 10 days of receipt of such invoices. When water damage is covered by insurance, FBR will send invoices directly to the insurance company. Customer may also authorize FBR to perform additional services not covered by insurance in which case FBR will invoice these services directly to the customer.

Hazards: ...

Equipment: ...

Cost of Repairs: ...

Insurance Claims: ...

9/24/2018

2 Main Level - 262-IMG_5288 Date Taken: 9/24/2018



FLOOD BROTHERS
RESTORATION
WATER DAMAGE EXPERTS

3    Main Level - 269-IMG_5289        Date Taken: 9/24/2018





4        Main Level - 1-DSC06077        Date Taken: 9/14/2018



5      Main Level - 2-DSC06078          Date Taken: 9/14/2018



6       Main Level - 89-DSC06165        Date Taken: 9/15/2018





7       Main Level/Master Bedroom - 21-     Date Taken: 9/14/2018
        DSC06097



**FLOOD BROTHERS**
**RESTORATION**
— WATER DAMAGE EXPERTS —



8    Main Level/Master Bedroom - 22-    Date Taken: 9/14/2018
DSC06098



9      Main Level/Master Bedroom - 23-      Date Taken: 9/14/2018
       DSC06099



FLOOD BROTHERS
RESTORATION

10      Main Level/Master Bedroom - 24–      Date Taken: 9/14/2018
        DSC06100





11    Main Level/Master Bedroom - 27-    Date Taken: 9/14/2018
      DSC06103





12      Main Level/Master Bedroom - 172-   Date Taken: 9/18/2018
        IMG_5069



FLOOD BROTHERS
R E S T O R A T I O N

13    Main Level/Master Bedroom - 175-   Date Taken: 9/18/2018
      IMG_5072





14   Main Level/Master Bedroom - 176-   Date Taken: 9/18/2018
     IMG_5073



FLOOD BROTHERS
RESTORATION
WATER DAMAGE EXPERTS



15      Main Level/Master Bedroom - 85-     Date Taken: 9/15/2018
        DSC06161

JIMENEZ                                          9/24/2018        Page: 25



16    Main Level/Master Bedroom - 77-     Date Taken: 9/15/2018
      DSC06153



FLOOD BROTHERS
RESTORATION



17    Main Level/Master Closet - 30-    Date Taken: 9/14/2018
      DSC06106



**FLOOD BROTHERS**
**RESTORATION**



| 18 | Main Level/Master Closet - 31-DSC06107 | Date Taken: 9/14/2018 |





19   Main Level/Master Closet - 32-      Date Taken: 9/14/2018
     DSC06108



FLOOD BROTHERS
RESTORATION



| 20 | Main Level/Master Closet - 177-IMG_5074 | Date Taken: 9/15/2018 |



21   Main Level/Master Closet - 81-       Date Taken: 9/15/2018
     DSC06157



FLOOD BROTHERS
RESTORATION



22   Main Level/Master Closet - 184-      Date Taken: 9/18/2018
     IMG_5081

JIMENEZ                                    9/24/2018        Page: 32



FLOOD BROTHERS
RESTORATION



23     Main Level/Master Closet - 183-     Date Taken: 9/20/2018
       IMG_5080





24      Main Level/Toilet - 86-DSC06162     Date Taken: 9/15/2018



FLOOD BROTHERS
RESTORATION



25    Main Level/Master Bath - 28-      Date Taken: 9/14/2018
      DSC06104



26    Main Level/Master Bath - 29-        Date Taken: 9/14/2018
      DSC06105





27    Main Level/Master Bath - 158-     Date Taken: 9/17/2018
      IMG_5055





28      Main Level/Master Bath - 157-      Date Taken: 9/17/2018
        IMG_5054



FLOOD BROTHERS
RESTORATION
— WATER DAMAGE EXPERTS —



29    Main Level/Master Bath - 179-        Date Taken: 9/18/2018
      IMG_5076

JIMENEZ                                              9/24/2018      Page: 39



FLOOD BROTHERS
RESTORATION



| 30 | Main Level/Master Bath - 196-IMG_5210 | Date Taken: 9/20/2018 |





31   Main Level/Guest Bath - 33-        Date Taken: 9/14/2018
     DSC06109





32   Main Level/Guest Bath - 79-   Date Taken: 9/15/2018
     DSC06155



33    Main Level/B Living - 46-          Date Taken: 9/14/2018
       DSC06122



FLOOD BROTHERS
RESTORATION



34    Main Level/B Living - 47-        Date Taken: 9/14/2018
      DSC06123





35    Main Level/B Living - 48-        Date Taken: 9/14/2018
      DSC06124



**FLOOD BROTHERS**
**RESTORATION**



36      Main Level/B Living - 49-        Date Taken: 9/14/2018
        DSC06125



FLOOD BROTHERS
RESTORATION

37    Main Level/B Living - 51-       Date Taken: 9/14/2018
      DSC06127





38    Main Level/B Living - 52-      \    Date Taken: 9/14/2018
      DSC06128



88      Main Level/Kitchen - 17-        Date Taken: 9/14/2018
        DSC06093





89      Main Level/Kitchen - 18-        Date Taken: 9/14/2018
        DSC06094



90      Main Level/Kitchen - 19-        Date Taken: 9/14/2018
        DSC06095





91    Main Level/Kitchen - 40-        Date Taken: 9/14/2018
      DSC06116



92    Main Level/Kitchen - 102-IMG_        Date Taken: 9/14/2018
      4967
      Water came down behind cabinet wall, removed part of backsplash to find wet insulation.

JIMENEZ                                                      9/24/2018        Page: 102





93    Main Level/Kitchen - 14-        Date Taken: 9/14/2018
      DSC06090



FLOOD BROTHERS
RESTORATION

94    Main Level/Kitchen - 90-        Date Taken: 9/14/2018
      DSC06091





95      Main Level/Kitchen - 20-        Date Taken: 9/14/2018
        DSC06096



96      Main Level/Kitchen - 108-IMG_      Date Taken: 9/15/2018
        4988



**FLOOD BROTHERS**
RESTORATION



97      Main Level/Kitchen - 109-IMG_      Date Taken: 9/15/2018
        4989





98      Main Level/Kitchen - 113-IMG_      Date Taken: 9/15/2018
        5017





99     Main Level/Kitchen - 128-IMG_     Date Taken: 9/15/2018
         5018

JIMENEZ                                  9/24/2018     Page: 109





100    Main Level/Kitchen - 96-           Date Taken: 9/15/2018
       55872314023__9DCE5DF8-4064-
       4507-A9D4-21B7459A





101   Main Level/Kitchen - 114-IMG_   Date Taken: 9/15/2018
      5020



**FLOOD BROTHERS**
R E S T O R A T I O N



102    Main Level/Kitchen - 122-IMG_    Date Taken: 9/15/2018
       5011





103    Main Level/Kitchen - 146-IMG_        Date Taken: 9/16/2018
       5043





104   Main Level/Kitchen - 147-IMG_   Date Taken: 9/16/2018
5044





105   Main Level/Kitchen - 210-IMG_   Date Taken: 9/16/2018
      5224





106    Main Level/Kitchen - 192-IMG_    Date Taken: 9/18/2018
       5194





107    Main Level/Kitchen - 208-IMG_        Date Taken: 9/19/2018
       5222





108     Main Level/Kitchen - 207-IMG_     Date Taken: 9/21/2018
        5221





109     Main Level/Stairs - 266-20180921_   Date Taken: 9/21/2018
        142423





110    Main Level/Stairs - 267-20180921_   Date Taken: 9/21/2018
       142607

Main Level

Main Level

Page: 121

9/24/2018

N

B Storage

B Storage

B Living

B Hall

B Playroom

Kitchen

Dining Room

Sitting

Pantry

Foyer/Entry

Living Room

Master Closet

Bath

Master Bath

Master Bedroom

Closet

JIMENEZ

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

FLOOD BROTHERS RESTORATION   )
LLC   )
  )
      Plaintiff,   )   **CIVIL ACTION**
  )
v.   )   **CASE NO. 19C-06796-S4**
  )
MICHELLE JIMENEZ AND UNIVERSAL )
PROPERTY & CASUALTY INS.   )
  )
      Defendants.   )

## RESPONSE TO INTERROGATORIES, REQUESTS FOR PRODUCTION & REQUESTS FOR ADMISSIONS

COMES NOW, Flood Brothers Restoration LLC (hereafter "Plaintiff"), by and through the undersigned, objects to the validity of the purported discovery by Defendant Universal Property & Casualty Ins. as Plaintiff reviewed the docket and there was no indication that the purported discovery was filed with the Court, nevertheless, Plaintiff files this Response to Interrogatories, Requests for Production and Requests for Admissions, as follows:

1.

Please state the name, address, and phone number of any person who responded to or who assisted in responding to these Interrogatories, describing the person's relationship to Plaintiffs.

**RESPONSE**: On behalf of Plaintiff, Randall Fowler (Member/Manager) provided information with respect to the following responses. The address of Plaintiff is: 3874 Laurel Crest Dr., Snellville, GA 30039.



Page 1 of 9

0850

2.

Please provide all of the factual details supporting your contention in the Complaint that Universal is responsible for the payment of the invoices for mitigation services on Michelle Jimenez's property on or about September 14, 2018.

**RESPONSE**: Plaintiff provides that specific conversations were had between the Parties wherein, Defendant identified the property that required service. Defendant confirmed the conditions of service and documentation required to obtain payment. Defendant allowed Plaintiff to begin work and ultimately complete work without objection. Defendant did not complain or lodge any objection to the quality or completeness of Plaintiff's work. Plaintiff provides that it would not have begun performance or agreed to the provision of service without the expressed understanding and agreement from Defendant, Universal Property & Casualty Ins. Further, Plaintiff states that it relied upon the expressions of Universal to its detriment.

3.

Please identify each and every representative of Plaintiff who communicated with Universal regarding the payment of the invoice for mitigation services on Michelle Jimenez's Property.

**RESPONSE**: Plaintiff by and through its representative Randall Fowler had several conversations both before agreeing with it to perform work and thereafter when Plaintiff sought timely payment.

4.

With regard to any and all persons whom you expect to call or may call as a witness upon the trial of this cases, please state for each:

**Page 2 of 9**

a.  his/her full name, address and current telephone number;

b.  the specific subject matter on which you expect such witness to testify;

c.  the substance of the facts, opinions and /or conclusions to which you expect the expert to testify;

d.  a summary of the factual basis for each such opinion or conclusion; and

e.  whether each such person has prepared or provided you with a written or recorded statement or report concerning his/her investigation and , if so, the name and address of all persons who have a copy of each such report or statement.

**RESPONSE**: Plaintiff has not identified an expert to testify at trial.

5.

For each and every response made by Plaintiff to Universal's Requests for Admissions of Matters which was anything other than an unequivocal admission, please state the following:

a.  The factual basis of your response;

b.  The name, address and telephone number of all witnesses you believe have knowledge of the facts enumerated in the preceding subparagraph.

c.  A description of all sources of information related to the facts relied upon in denying the admission, including paper, electronic or otherwise.

**RESPONSE**:

6.

Please provide all of the factual details supporting your contentions in the Complaint that Universal has acted in bad faith, been stubbornly litigious, or has put

Plaintiff to unnecessary trouble and expense, entitling Plaintiff to attorney fees and litigation expenses:

**RESPONSE:** Plaintiff represents that Universal contracted with it to secure services on the subject property. After Plaintiff performed work in a timely fashion and completed work without any complaint from Universal or Jimenez, Universal refused to pay the full cost of the services rendered. Instead, Universal sought to terminate Plaintiff's valid claim for repayment and for reimbursement for legal costs associated with its requests to close the account.

<u>**REQUESTS FOR PRODUCTION OF DOCUMENTS**</u>

1.

Copies of any and all documents which, in any way, support or relate to all of your responses to Defendant's First Interrogatories to Plaintiffs [sic].

**RESPONSE:** Plaintiff responds by including a copy of the contract for the work performed on the subject property as well as the affidavit of Randall Fowler concerning the same.

2.

Copies of any and all documents which, in any way, support or relate to all of your responses to Defendant Universal's First Request for Admissions to Plaintiff.

**RESPONSE:**

3.

Any and all documents that Plaintiff contends are an assignment of the rights of Michelle Jimenez under the homeowner's insurance policy which had been issued to her by Universal Property & Casualty Insurance Company.

0853

**RESPONSE:** Plaintiff is not in possession of documents responsive to this request.

<div align="center">4.</div>

Any and all documents that Plaintiff intends to submit as evidence at the jury trial.

**RESPONSE:** Plaintiff has not complied a finite list of documents to be included at trial. To that end, Plaintiff reserves the right to make such decisions and disclosures contemporaneous with the acceptance of a pretrial order entered into in the case by the Parties.

<div align="center"><u>**REQUESTS FOR ADMISSIONS**</u></div>

<div align="center">1.</div>

Michelle Jimenez was the named insured on the policy of insurance issued by Universal, numbered 1701-1700-0600, insuring certain of her property located at 4410 Riders Ridge Trail, Snellville, Georgia (the "Property"), with a policy period from January 19, 2018 through January 19, 2019 (hereinafter referred to as the "Policy").

**RESPONSE:** Upon information and belief, Plaintiff does not have documents and things to dispute the contractual relationship between Universal and Jimenez. Subject to that limitation, the statement is admitted.

<div align="center">2.</div>

A true and accurate copy of the Policy is attached hereto and incorporated herein as Exhibit "A".

**RESPONSE:** Upon information and belief, Plaintiff does not have documents and things to dispute the contractual relationship between Universal and Jimenez. Subject to that limitation, the statement is admitted.

<div align="center">**Page 5 of 9**</div>

3.

The Plaintiff was not a named insured on the policy of insurance issued by Universal, numbered 1701-1700-0660.

**RESPONSE:** Admitted.

4.

Michelle Jimenez hired Plaintiff to perform water mitigation services on her Property on or about September 14, 2018. (Amended Complaint ¶2).

**RESPONSE:** Admitted as stated.

5.

Plaintiff performed water mitigation services on the Property after contracting exclusively with the perceived owner of the Property, Michelle Jimenez. (Amended Complaint ¶10).

**RESPONSE:** With respect to the contentions within the Amended Complaint, the statement is Admitted as stated.

6.

Plaintiff submitted an invoice, a true and accurate copy of which is attached hereto as Exhibit "B," in the amount of $18,000.00 to Michelle Jimenez, which was then submitted to Universal for payment.

**RESPONSE:** Denied as stated. The invoice attached does not request payment for $18,000.00 unconditionally. Universal is only focusing on a settlement discount which applied if payment was received within ten (10) days.

6.

**Page 6 of 9**

Plaintiff has been paid $18,000.00 for water mitigation services performed on the Property. (Amended Complaint ¶6).

**RESPONSE:** Admitted as stated.

7.

A true and accurate copy of the document titled "Homeowners Direct Pay Authorization" which was ostensibly signed by Michelle Jimenez on September 24, 2018, is attached to an incorporated herein as Exhibit "C". (Amended Complaint ¶ 11).

**RESPONSE:** Admitted.

8.

Plaintiff's Complaint against Universal seeks damages based upon the contention that Michelle Jimenez assigned her rights as the insured under the Policy to Plaintiff regarding the water damage claim for which Plaintiff performed mitigation services pursuant to the terms of the document titled "Homeowners Direct Pay Authorization," which is Exhibit "C" attached hereto.

**RESPONSE:** Denied as stated.

9.

Universal initially issued payment jointly to Plaintiff and Michelle Evans in the amount of $18,000.00, but that check was not negotiated.

**RESPONSE:** Denied.

10.

In reliance upon the Homeowners Direct Pay Authorization and permission granted by the named insured, Universal reissued payment to Plaintiff only in the amount of $18,000.00. (Amended Complaint ¶ 6).

0856

**RESPONSE:** Denied as stated.

<div align="center">12.</div>

A true and accurate copy of the amended invoice in the amount of $21,662.40 is attached hereto and incorporated herein as Exhibit "D".

**RESPONSE:** Admitted as stated.

<div align="center">13.</div>

Michelle Jimenez has failed and declined to pay the difference of $3,662.40 between the original invoice for $18,000.00 and the subsequent invoice of $21,662.40 (Amended Complaint ¶ 7).

**RESPONSE:** Denied as stated.

<div align="center">14.</div>

Michelle Jimenez has failed and declined to instruct Universal to pay the difference of $3,662.40 between the original invoice for $18,000.00 and the subsequent invoice of $21,662.40 (Amended Complaint ¶ 7).

**RESPONSE:** Denied as stated.

Respectfully submitted this 4th day of September 20.

/s/ S. Carlton Rouse
S. Carlton Rouse, Esq.
Georgia Bar No. 003583
Attorney for Plaintiff

**Rouse & Company, LLC**
P.O. Box 392105
Snellville, GA 30039-9997
(678)360-0403(t)
(678)658-9093(f)
s.carlton@rousecolaw.com

<div align="center">**Page 8 of 9**</div>

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| FLOOD BROTHERS RESTORATION LLC | ) ) ) |
| Plaintiff, | ) ) CIVIL ACTION |
| v. | ) ) CASE NO. 19C-06796-S4 |
| MICHELLE JIMENEZ AND UNIVERSAL PROPERTY & CASUALTY INS. | ) ) ) |
| Defendants. | ) |

### CERTIFICATE OF SERVICE

I have served the foregoing **RESPONSE TO INTERROGATORIES, REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS** by depositing the same in the U.S. Mail, with first class postage and/or via electronic service as addressed as follows:

DREW ECKL & FARNHAM, LLP
Attn: Michael Bagley
303 Peachtree Street, Suite 3500
Atlanta, GA 30308
bagleym@deflaw.com

Submitted this 4th day of September, 2020.

/s/ S. Carlton Rouse, Esq.
S. Carlton Rouse, Esq.
Georgia Bar No. 003583

ROUSE & COMPANY, LLC
3375 Centerville Hwy
P.O. Box 392105
Snellville, GA 30039-9997
(678)360-0403(t)
(678)658-9093(f)
s.carlton@rousecolaw.com

Page 9 of 9

0858

From:7707167477

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

FLOOD BROTHERS RESTORATION )
LLC )
                                        )
         **Plaintiff,**          )   **CIVIL ACTION**
                                          )
v.                                    )   **CASE NO. 19C-06796-S4**
                                          )
MICHELLE JIMENEZ AND UNIVERSAL )
PROPERTY & CASUALTY INS. )
                                          )
         **Defendants.**       )

## VERIFICATION

Before the undersigned officer, duly authorized to administer oaths, came Plaintiff, who first being sworn, deposed and said that the foregoing discovery responses are true and correct to the best of my knowledge, information and belief.

This 4th day of September, 2020.

_____
Randall Fowler

Sworn to and subscribed before me,
This the 4 day of Sept 2020

_____
Notary Public

Sharon G Robinson
NOTARY PUBLIC
Fayette County, GEORGIA
My Commission Expires 07/31/2021

Page 1 of 1

Court's Exhibit:
#1

How many times has he
come to Court to deal with
this case?

You have all of the evidence
for this case in which you are
to use in your deliberations.
Judge RCL

Are there any pretrial Documents
~~these~~ available?

Some answer     Judge RCL

Was the initial call between
Flood Brothers Restoration LLC
and Universal Property and
Casualty Ins. Recorded?

Some answer.     Judge RCL

— [signature]    04/27/2022

0860

```
1                        C-E-R-T-I-F-I-C-A-T-E

2

3        STATE OF GEORGIA:

4        COUNTY OF GWINNETT:

5

6        I, Kristina K. Steffey, Official Court Reporter, hereby

7    certify that the foregoing transcript was taken down, as stated

8    in the caption, and the colloquies, questions and answers were

9    reduced to typewriting under my direction; that the foregoing

10   pages represent a true and correct record of the evidence

11   given.

12

13       I further certify that in accordance with O.C.G.A.

14   9-11-28(a), I am not a relative, employee, attorney, or counsel

15   of any party, nor am I financially interested in the action.

16

17       This the 11th day of August 2022.

18

19

20

21

22

23       _____

24            KRISTINA K. STEFFEY, B-2014

25
```