Recorded: 7/28/2022 4:53:00 PM
Fee Amt: $25.00  Page 1 of 98
Douglas County Georgia
ANNETTA D STEMBRIDGE Clerk Superior

Participant ID: 8345148729

BK 4166  PG 611 - 708

Please return to:

Carl H. Anderson, Jr.
Hawkins Parnell & Young LLP
303 Peachtree Street, N.E., Suite 4000
Atlanta, Georgia 30308

# O.C.G.A. § 44-2-20 AFFIDAVIT
## AS TO CERTAIN PROPERTY CURRENTLY OWNED BY EQUITY RESOURCE PARTNERS-BRANCH, LLC, BUT LEASED BY AN AFFILIATED COMPANY, DOUGLASVILLE-BRANCH, LLC, TO O'REILLY AUTOMOTIVE STORES, INC.

Cross-References:

Deed Book 3904, Pages 969-972
Deed Book 3904, Page 973-976

---

| STATE OF MISSOURI | ) | |
|---|---|---|
| | ) | SS: |
| COUNTY OF GREENE | ) | |

Personally appeared before me the undersigned, PHILIP HOPPER ("Affiant"), known to be the person named herein, and who, after first being duly sworn, stated and deposed under oath that the following statements are true and correct and based upon his own personal knowledge.

1.

Affiant gives this Affidavit of his own personal knowledge.

2.

The purpose of this affidavit is to give notice that Affiant is the Vice President Real Estate Expansion and Development for O'Reilly Automotive Stores, Inc., lessee/tenant of a tract of land that is subject to a Build-To-Suit Lease with Douglasville-Branch, LLC, purported owner and an affiliate of Equity Resource Partners-Branch, LLC, dated September 16, 2021 (the "Lease"), for the property located at 4005 Fielding Drive, Douglasville, Georgia 30135 (the "Property").

3.

Affiant has attached a complete copy of the fully-executed Lease hereto as **Exhibit "1."**

EXHIBIT E TO COMPLAINT

4.

Affiant has attached a complete copy of the fully-executed Memo of Lease hereto as **Exhibit "2."** As Affiant understands it, the parties were unable to file the Memo of Lease because of a change in the recordation requirements.

5.

Affiant has attached a complete copy of the fully-executed Limited Warranty Deed into showing the Equity Resource Partners-Branch, LLC, for the Property hereto as **Exhibit "3."**

6.

Affiant has attached a complete copy of the fully-executed Quitclaim Deed into showing the Equity Resource Partners-Branch, LLC, for the Property hereto as **Exhibit "4."**

7.

Pursuant to the Lease, Douglasville-Branch, LLC, as the Landlord covenanted and warranted that it is the owner of the Demised Premises, which is defined as Exhibit A thereto. *See* Lease Section 30.1.

8.

Pursuant to Exhibit "A" to the Lease, the Demised Premises are

## EXHIBIT A
### Description of the Property

All that tract or parcel of land lying and being in Land Lot 74 of the 1st District, 5th Section, Douglas County, Georgia, being shown as "Tract F 2.243 acres 97,714 SF 4005 Fielding Drive", as more particularly shown on that certain "Final Plat The Shoppes at Chapel Hill", dated December 21, 2006, prepared by Vansant- Campbell Land Surveying - Land Planning, and bearing the certification and seal of Adam T. Pearson, Georgia R.L.S. No. 2993, which Final Plat is recorded in Plat Book 35, page 15, Douglas County, Georgia records, which plat is incorporated herein by reference.

9.

Pursuant to the Lease, Douglasville-Branch, LLC, as the Landlord is the fee simple owner of the property to which it granted a leasehold. *See* Lease Section 37.1.

10.

Pursuant to the Lease, Douglasville-Branch, LLC, as the Landlord gave O'Reilly Automotive Stores, Inc., a right of first refusal. *See* Lease Section 32.1.

- 2 -

EXHIBIT E TO COMPLAINT

11.

The property description for the Demised Premises in the Lease is the same one used in the Limited Warranty Deed (Exhibit "3").

12.

Affiant has fulfilled the requirements of O.C.G.A. § 44-2-20 because this Affidavit contains a caption referring to the current owner and contains a paragraph referring to a deed or other recorded instrument in the chain of title of the affected land.

Affiant has filed this Affidavit to protect O'Reilly Automotive Stores, Inc.'s leasehold in the Property.

13.

This Affidavit is provided for all purposes allowed by law. If called upon as a witness, Affiant could and would appear and competently testify as to the within and foregoing facts from Affiant's own personal knowledge.

**[SIGNATURE ON NEXT PAGE]**

31040222v1

**EXHIBIT E TO COMPLAINT**

**FURTHER SAITH AFFIANT NOT.**

**O'REILLY AUTOMOTIVE STORES, INC.**

By: _____

Name: PHILIP HOPPER

Title:   Vice President Real Estate Expansion and
Development

Sworn to and subscribed before me,
this _28_ day of ___July___, 2022.

_____
Notary Public

My Commission expires: _6-21-2024_

NICOLE BULLARD
Notary Public – Notary Seal
STATE OF MISSOURI
Polk County
My Commission Expires June 21, 2024
Commission #20123781

31040222v1

**EXHIBIT E TO COMPLAINT**

# BUILD-TO-SUIT LEASE

THIS BUILD-TO-SUIT LEASE is made and entered into by and between Branch – Douglasville, LLC,  a Georgia limited liability company, with principal offices at 568 Jetton Street, Suite #200, Davidson, North Carolina 28036 hereinafter referred to as "Landlord," and O'Reilly Automotive Stores, Inc., a Missouri corporation, with principal offices at 233 South Patterson, Springfield, Missouri 65802, hereinafter referred to as "Tenant."

## SECTION 1
## LEASE GRANT AND INITIAL TERM

1.1     Landlord hereby demises and l eases to Tenant and Tenant does hereby lease, hire and take from Landlord the real property described on Exhibit A, as shown on Exhibit A-1, having approximately 52,272 square feet, in the City of Douglasville, GA together with the "Improvements" that Landlord shall construct as provided in the Work Letter Agreement attached hereto as Exhibit B (the "Work Letter"), hereinafter collectively referred to as "the Demised Premises," subject to the following terms, conditions and agreements.  The final description for Exhibit A will be determined by a survey provided by Landlord and subject to Landlord and Tenant approval.   Landlord hereby reserves from such lease of the Demised Premises (i) the right to grant utility and/or other easements over, under and across the Demised Premises (not to include any portion of the Demised Premises located within the footprint of the building located on the Demised Premises) to the applicable private, public or governmental authorities for purposes of installing, constructing, reconstructing, using, operating, repairing, replacing, maintaining, relocating and removing any utility lines and/or facilities and (ii) the right to grant perpetual, non-exclusive rights of ingress and egress to and from the applicable public and/or private rights of way over and across the Demised Premises (not to include any portion of the Demised Premises located within the footprint of the building located on the Demised Premises) to the applicable private, public or governmental authorities to access the Demised Premises for such purposes Tenant agrees, from time to time upon the request of Landlord, to execute and deliver to Landlord (at no cost, however, to Tenant) any reasonable instruments presented to Tenant by Landlord which grant utility easements over, across and under the Premises to any applicable private, public or governmental authorities for the purposes described hereinabove in this grammatical paragraph within thirty (30) days of the presentation of such instrument to Tenant by Landlord, provided that any grant does not materially impact access, visibility, or Tenant's ability to conduct its business.

1.2     This Lease shall be for a period of fifteen (15) years, to commence upon the first day of the first month following the earlier to occur:  (i) the issuance of a permanent Certificate of Occupancy for the building that Landlord has constructed on the Demised Premises as provided in the Work Letter or (ii) the date Tenant opens for business (the "Commencement Date"). Upon the commencement of this Lease, Landlord and Tenant will execute a Declaration of Commencement document in the form of Exhibit C.

EXHIBIT E TO COMPLAINT

SECTION 2
CONSTRUCTION OF FACILITY BY LANDLORD

2.1     Landlord shall construct on the Demised Premises the Improvements including a 7,225 square foot building in accordance with the Work Letter and as shown on Exhibit A-1 hereto. Landlord acknowledges the cost of such improvements, unless expressly stated otherwise herein, shall be at Landlord's sole cost and expense.

2.2     Landlord shall construct the Improvements using the Tenant Supplied Items ("TSI") in Work Letter Exhibit B-2. Tenant's estimate of such Tenant Supplied Items for purposes of reconciliation in Section 2.3 below is One Hundred Fifty Three Thousand Seven Hundred Sixty Nine and 64/100 Dollars ($153,769.64) (the "TSI Estimate").

2.3     Within ten (10) days of Landlord's receipt of Tenant's approval of the Permitted Construction Documents pursuant to Section 1.5 of the Work Letter, Landlord shall deposit the amount of the TSI Estimate with Tenant's Escrow Agent in accordance with the Escrow Agreement as shown in Exhibit J attached hereto. In the event Landlord fails to deposit the amount of the TSI Estimate in accordance with the Escrow Agreement within said ten (10) days, and such failure continues for a period of fifteen (15) days after Landlord receives written notice of such failure from Tenant, Tenant shall have the option to terminate this Lease within ten (10) days following the expiration of such 15-day notice period. If Tenant fails to terminate this Lease within such 10-day period, then Tenant shall be deemed to have waived such right to terminate this Lease. Tenant shall draw against the funds held in escrow for reimbursement of any payment or advance made by Tenant on behalf of Landlord for the TSI. Upon completion of the Improvements, Tenant shall provide Landlord and the Escrow Agent with a reconciliation statement and copies of paid invoices for the TSI. If there are outstanding invoices for any building, building components, and/or building equipment, materials and supplies after all the funds held in escrow have been depleted, then within fifteen (15) days of Landlord's receipt of such reconciliation statement and copies of paid invoices, Landlord shall reimburse Tenant for amounts of the outstanding TSI invoices that exceed the TSI Estimate, however such reimbursement shall not exceed ten percent (10%) in excess of the TSI Estimate. In the event the TSI Estimate exceeds the actual amount of the TSI, any remaining amount held in escrow shall be disbursed to Tenant. Notwithstanding anything to the contrary, if any additional or increased cost is a result of an inaccurate or incorrect response on Exhibit B-1, or the result of inaccurate or incorrect information that could have been discovered with reasonable diligence by Landlord, the additional or increased cost shall be borne by Landlord. Failure of Landlord to escrow or properly reimburse Tenant as defined herein, shall grant Tenant the right to offset rent, file a lien against the real property and improvements of Landlord, and/or pursue any and all legal and equitable remedies in order to recover the amounts due Tenant for Landlord's failure to reimburse Tenant for the amount of the outstanding invoices. If the building is to be masonry or block, the portion of the TSI Estimate attributable to the price of the building reflects the frame and roof systems only, and the cost of the masonry or block shall be borne by Landlord.

2.4     Prior to commencing any change in the plans or work during construction of a permitted trade, Landlord shall deliver to Tenant's representatives as designated in the Work Letter a form approved by Tenant, setting forth a description of the change and the total costs of such change, including associated architectural, engineering and construction contractor's fees (the "Change Order"). All Change Orders requested by someone other than Tenant are subject to Tenant's prior written approval, which approval

Tenant shall not unreasonably withhold, condition or delay, within five (5) business days of receipt. If Tenant fails to approve such Change Order, Landlord will not proceed to perform the change.

2.5     Prior to the Construction Commencement Date, as defined in Section 2.2 of the Work Letter, Tenant shall provide Landlord with its prototypical "Coming Soon" sign banner and sign structure plans for same, attached as Exhibit K.   Subject to compliance with applicable law, codes, and ordinances, Landlord shall complete construction of the "Coming Soon" sign structure and place the sign in a location with maximum visibility to passersby within seven (7) days of Construction Commencement Date.

SECTION 3
RENTAL FOR THE INITIAL TERM

3.1     The rental to be paid by Tenant to Landlord for years one (01) through ten (10) of the initial term of the Lease shall be in the monthly amount of Ten Thousand Two Hundred Ninety One and 67/100 Dollars ($10,291.67). The rental to be paid by Tenant to Landlord for years eleven (11) through fifteen (15) of the initial term shall be in the monthly amount of Ten Thousand Nine Hundred Nine and 17/100 Dollars ($10,909.17). All rent shall be paid to the Landlord at the address set forth in Section 33 beginning on the Commencement Date and continuing on the first day of each and every month throughout the initial term and any exercised option of this Lease, in advance, without notice, setoff or deduction, except as expressly set forth herein.

3.2     (A)     If any monthly installment of monthly rental or any other sum due and payable pursuant to this Lease remains due and unpaid ten (10) days after written notice, Tenant shall pay as additional rent hereunder a late payment charge of (i) Five Hundred and No/100 Dollars ($500.00).  However Landlord shall only be obligated to provide Tenant with written notice twice in a calendar year.

        (B)     All unpaid rent and other sums of whatever nature owed by Tenant to Landlord under this Lease shall bear interest from the tenth (10th) day after the due date thereof until paid at the lesser of ten percent (10%) per annum or the maximum interest rate per annum allowed by law.  Acceptance by Landlord of any payment from Tenant hereunder in an amount less than that which is currently due shall in no way affect Landlord's rights under this Lease and shall in no way constitute an accord and satisfaction.

SECTION 4
EXTENSION OPTIONS

4.1     Landlord grants to Tenant four (4) extension options of five (5) years each to extend the term of this Lease on the same terms and conditions as set forth herein, except as to the amount of rental to be paid by Tenant to Landlord for such extension term, which rental shall be as stated in Section 5 below. Should Tenant elect to exercise one or more extension options granted herein, then in order to do so there must be no event of a monetary or non-monetary material default on the part of Tenant hereunder at the time of Tenant's exercise of an extension option or at the time an extension term commences, and Tenant must give Landlord written notice of its intention not less than one hundred eighty (180) days before the end of the initial term of this Lease or any extension term. Tenant's failure to deliver written

EXHIBIT E TO COMPLAINT

notice of Tenant's exercise of an extension option in a timely manner shall be deemed Tenant's waiver of the exercise of Tenant's extension option and any subsequent extension options.

## SECTION 5
### RENT FOR OPTION PERIODS

5.1    The rent for the first option period shall be Eleven Thousand Five Hundred Sixty Three and 72/100 Dollars ($11,563.72) per month.   The rent for the second option period shall be Twelve Thousand Two Hundred Fifty Seven and 54/100 Dollars ($12,257.54) per month.  The rent for the third option period shall be Twelve Thousand Nine Hundred Ninety Two and 99/100 Dollars ($12,992.99) per month.  The rent for the fourth option period shall be Thirteen Thousand Seven Hundred Seventy Two and 57/100 Dollars ($13,772.57) per month.

## SECTION 6
### USE

6.1    It is covenanted and agreed between the parties that the Demised Premises shall be used by Tenant for business use, including but not limited to the sale of auto parts and related goods and service. Tenant shall comply with all laws, ordinances, orders, regulations or zoning classifications of any lawful governmental authority, agency or other public or private regulatory authority (including insurance underwriters or rating bureaus) having jurisdiction over the Demised Premises.  Tenant shall not do any act or follow any practice relating to the Demised Premises which shall constitute a nuisance or detract in any way from the reputation of the Demised Premises as a first-class establishment.  Tenant's duties in this regard shall include allowing no noxious or offensive odors, fumes, gases, smoke, dust, steam or vapors, or any loud or disturbing noise or vibrations to originate in or emit from the Demised Premises. Tenant hereby agrees that this Lease is subordinate to any applicable restrictive covenants, if any, relating to the Demised Premises and Tenant shall abide by such restrictive covenants in connection with its use of the Demised Premises.

6.2    Landlord agrees to prohibit the sale, use, or lease of any portion of Landlord's Residual Property, as depicted on Exhibit A-1 as to an auto parts company or other company which derives more than ten percent (10%) of their business from the sale of wholesale and/or retail auto parts.  This restriction shall include, but not be limited to, such companies as AutoZone, Advance Auto parts, CarQuest, NAPA and Pep Boys and their related entities (including service centers), successors and assignees, or other company which derives more than ten percent (10%) of their business from the sale of wholesale and/or retail auto parts.  It is understood that car repair shops such as Meineke, Cottman and Goodyear shall not be deemed to be in violation of this restriction.

## SECTION 7
### UTILITIES AND TRASH DUMPSTER SERVICES

7.1    Except as noted in Section 8.2, Tenant shall fully and promptly pay all gas, heat, light, power, telephone service and other public utilities of every kind furnished to the Demised Premises throughout the term of this Lease, and all other expenses of every kind whatsoever of or in connection with the use, operation and maintenance of the Demised Premises and all activities conducted thereon, including

EXHIBIT E TO COMPLAINT

initial connection charges and for all electric lights, lamps and tubes.  Landlord shall have no responsibility of any kind for any such utilities, except as noted in Section 8.2, and, except as noted in Section 8.2, failure to any extent of availability, or any slowdown, stoppage or interruption, of any utility services described in this Section 7 resulting from any cause whatsoever shall not render Landlord liable in any respect for damages and will neither be construed as an eviction of Tenant or cause an abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement hereof. .

7.2     Tenant shall have utilities to the Demised Premises transferred into its name upon the Completion Date (as herein defined in Section 2.4 of the Work Letter).

7.3     Tenant shall be responsible for Tenant's trash dumpster services.

SECTION 8
REPAIRS AND MAINTENANCE

8.1     Except as provided in Section 8.2 and 8.3, Tenant shall, at its expense and throughout the term of this Lease, maintain and repair the Demised Premises, including without limitation, signs, glass, doors, ceilings, fixtures, equipment, machinery, floor coverings, exterior painting, fire suppression system (if applicable), sidewalks and landscaping, and utility systems within the building portion of the Demised Premises.  Tenant shall be responsible for general maintenance and repair (not replacement) of the parking lot (so long as same is constructed with concrete). Upon the expiration of Landlord's 12-month warranty (identified below), Tenant shall be responsible for the maintenance, repair, of the HVAC equipment.

8.2     Landlord covenants and agrees, at its expense without reimbursement or contribution by Tenant, throughout the term of this Lease, to keep, maintain, and replace, if necessary, foundations, floors (except floor coverings), slabs, exterior walls (excluding exterior painting), structural systems of the building, load bearing walls, roof, including all components thereof, including but not limited to roof insulation, and roof code compliance, and roof drainage systems (including drains, gutters, and downspouts); parking lot replacement (if necessary), HVAC (replacement only), parking lot drainage, and utility systems to the point of internal distribution to within the building portion of the Demised Premises.  Landlord shall also be responsible for general maintenance and repair of the parking lot (if same is constructed with asphalt). subject to Tenant's obligation for janitorial, trash. snow and ice removal.

8.3     Landlord warrants the Landlord's Improvements (as defined in the Work Letter) against defective workmanship and materials for a period of twelve (12) months from the Commencement Date. Landlord agrees, at its sole cost and expense, to repair or replace any defect in workmanship and materials within five (5) days after receipt of Tenant's written notice thereof (or, if the nature of such defect is such that it cannot be cured within five (5) days, then Landlord shall cure such defect within such longer period of time that is reasonably required, provided that Landlord commence to cure such defect within such 5-day period and diligently perform such cure as soon as reasonably possible thereafter).  Any individual warranties for equipment that extend beyond twelve (12) months for equipment that is Tenant's responsibility to maintain shall be transferred to Tenant after the initial twelve (12) months, to the extent assignable.

## SECTION 9
## TRADE FIXTURES, ALTERATIONS, ADDITIONS AND IMPROVEMENTS

9.1     At any time, Tenant shall have the right to erect or install shelves, bins, machinery, and trade fixtures, providing that Tenant complies with all applicable governmental laws, ordinances and regulations.  At the expiration of this Lease, Tenant shall have the right to remove such items so installed, provided Tenant is not in default at the time of such removal and that Tenant shall repair in a good and workmanlike manner and at Tenant's sole cost and expense any damage caused by removal thereof.    Any trade fixtures not removed by Tenant at the expiration or an earlier termination of the Lease shall become the property of Landlord, in which event Landlord shall be entitled to handle and dispose of same in any manner Landlord deems fit without any liability or obligation to Tenant or any other third party with respect thereto, or (ii) subject to Landlord's removing such property from the Demised Premises and storing same, all at Tenant's expense and without any recourse against Landlord with respect thereto.  Without limiting the generality of the foregoing, the following property shall in no event be deemed to be "trade fixtures" and Tenant shall not remove any such property from the Premises under any circumstances, regardless of whether installed by Landlord or Tenant:    (a) any air conditioning, air ventilating or heating fixtures or equipment; (b) any lighting fixtures or equipment; (c) any dock levelers; (d) any carpeting or other permanent floor coverings; (e) any paneling or other wall coverings; and (f) plumbing fixtures and equipment.

9.2     Tenant shall not construct, erect or maintain any signs on or about the Demised Premises without first having obtained the permits and licenses from the proper governmental authority.  Subject to applicable law, codes and ordinances, Tenant shall have the option of placing its prototypical red background behind Tenant's building signage.  Landlord hereby grants Tenant approval for signs as depicted in Exhibits D-1, D-2, D-3 and D-4 attached hereto. At the expiration of this Lease, Tenant shall have the right to remove such signs so installed, provided Tenant is not in default at the time of such removal and that Tenant shall repair in a good and workmanlike manner and at Tenant's sole cost and expense any damage caused by removal thereof.

9.3     Tenant shall have the right to use a reasonable portion of the roof or building for a satellite dish antenna or pole mounting either attached to the building or set in the ground, as Tenant may require for its communications operation.  Such uses shall not impair the structural integrity of the roof, interfere with the building or its systems, or violate local, city or county ordinances.  Tenant shall use Landlord's roof vendor for the installation and removal of the antenna or satellite dish so as not to void Landlord's roof warranty.  Landlord shall not permit any other uses to interfere with Tenant's use thereof.  At the expiration of the term or any extension, Tenant will remove the antenna or satellite dish, provided that Tenant shall repair in a good and workmanlike manner and at Tenant's sole cost and expense any damage caused by removal thereof.

9.4     Notwithstanding anything set forth in this Lease to the contrary, it is agreed that Tenant reserves the right, without invalidating this Lease or modifying any provision or term hereof, at any time after the Commencement Date of this Lease, once or more often to make alterations, changes and additions to the improvements. Tenant shall make no alterations, changes or improvements to the Demised Premises which impact the exterior of the Demised Premises, the structural integrity of the Demised Premises or cost more than Fifty Thousand and No/100 Dollars ($50,000.00) in the aggregate without first

EXHIBIT E TO COMPLAINT

submitting to Landlord plans and specifications therefor and obtaining the prior written consent of Landlord, which consent Landlord shall not unreasonably withhold, delay or condition. All work done by Tenant shall be performed in a good and workmanlike manner, at Tenant's sole cost and expense, by a contractor approved by Landlord, and in compliance with all applicable law, codes and ordinances. Tenant shall be responsible for insuring that all of its contractors and subcontractors procure and maintain insurance coverage against such risks, in such amounts and with such companies as Landlord may reasonably require. Notwithstanding the foregoing, Tenant may make interior, non-structural alterations, changes or improvements to the Demised Premises without Landlord's prior consent so long as such alterations, changes or improvements do not cost more than Fifty Thousand and No/100 Dollars ($50,000.00).

## SECTION 10
## TAXES

10.1    Tenant shall pay prior to delinquency all taxes, assessments, levies and other charges, general and special that may be assessed and levied by the State, City and County or other municipal corporation during the initial term of this Lease and during the term of any properly exercised extension options on the Demised Premises and improvements constructed by Landlord on the Demised Premises. The real estate taxes for the initial year of the Lease and for the final year of the Lease shall be prorated, with the Tenant responsible only for the period of the tax year payable during which the Demised Premises are leased. It is further provided that Tenant shall be responsible and liable for all personal property taxes assessed for the tangible property of the Tenant on the Demised Premises during the initial term of this Lease and during the term of any properly exercised extension option. Landlord agrees to create a separate tax parcel for the Demised Premises prior to the commencement of the Lease, such that all statements of assessed value, tax statements, tax receipts and any other governmental correspondence shall be mailed directly to Tenant at the address below. Tenant shall have the right to add or hire a consultant and instruct Landlord to send all such documents described above to the consultant at the consultants address as Tenant may require from time to time during the Lease. Further, Landlord agrees to execute any documents required for that mailing.

Address for Tenant's Tax Documents:      O'Reilly Automotive Stores, Inc.
                                         P.O. Box 9167
                                         Springfield, MO 65801
                                         Email: propertymanagement@oreillyauto.com

10.2    Tenant may, at its sole cost and expense, in its own name or in the name of the Landlord, dispute and contest any "taxes" or "tax assessments" by appropriate proceedings diligently conducted in good faith. Any credits, rebates, or abatements shall be for the benefit of the Tenant. Landlord agrees to execute any documents required by the taxing authority relative to Tenant's ability to receive and protest the taxes.

10.3    If Tenant desires to contest any tax or assessment to be paid by it, it shall notify Landlord of its intention to do so at least twenty (20) days prior to the delinquency of such tax assessment. Within twenty (20) days after the final determination of the validity thereof, Tenant shall pay and discharge such tax, assessment, charge, or other item to the extent held valid, and all penalties, interest and costs in

connection therewith. In the event of such contest, Tenant shall protect and indemnify Landlord against all loss, expense and damage resulting therefrom.

## SECTION 11
## LIENS

11.1    Tenant shall keep the Demised Premises free and clear of all liens and claims of liens for labor, services, materials, supplies, or equipment performed on or furnished to the Demised Premises at Tenant's request.

11.2    If any such lien exists, Tenant shall, within twenty (20) days after Tenant's receipt of notice of such lien, have such lien discharged of record or deliver to Landlord a recordable bond in form, amount, and issued by a surety satisfactory to Landlord, indemnifying Landlord against all costs and liabilities resulting from such lien and the foreclosure or attempted foreclosure thereof. If Tenant fails to have such lien released or to deliver such bond to Landlord, Landlord, without investigating the validity of such lien, may pay or discharge the same; and Tenant shall reimburse Landlord upon demand for the amount paid by Landlord, including expenses and attorneys' fees.

11.3    Landlord shall keep the Demised Premises free and clear of all liens and claims of liens for labor, services, materials, supplies, or equipment performed on or furnished to the Demised Premises at Landlord's request.

11.4    If any such lien exists, Landlord shall, within twenty (20) days after Landlord's receipt of notice of such lien, have such lien discharged of record or deliver to Tenant a recordable bond in form, amount, and issued by a surety satisfactory to Tenant, indemnifying Tenant against all costs and liabilities resulting from such lien and the foreclosure or attempted foreclosure thereof. If Landlord fails to have such lien released or to deliver such bond to Tenant, Tenant, without investigating the validity of such lien, may pay or discharge the same; and Landlord shall reimburse Tenant within thirty (30) days of demand for the amount paid by Tenant, including expenses and attorneys' fees. In the event Landlord does not reimburse tenant within said thirty (30) days, Tenant shall be allowed to abate the rent.

## SECTION 12
## SUBORDINATION

12.1    This Lease shall be subject and subordinate to the lien of any mortgage now against said Demised Premises or which may hereinafter be placed against the Demised Premises. . Notwithstanding any subordination of Tenant's interest hereunder, so long as Tenant is not in monetary or material non-monetary default under any of the terms, covenants and conditions of this Lease, after the expiration of all applicable notice and cure periods, neither this Lease nor any of the Tenant's rights hereunder, nor any of Tenant's subleases shall be terminated or subject to termination by any action to enforce the security of, or by any proceeding to foreclosure any mortgage or trust deed encumbering the Demised Premises, and Tenant and its subtenants may remain in possession of the Demised Premises pursuant to the terms of this Lease. Within thirty (30) days of the commencement of this Lease, with regard to existing lenders and lienholders, or within thirty (30) days of the filing of a future mortgage, deed of trust or other lien, Landlord will require the holder of any existing or future mortgage, deed of trust or other lien to execute a Subordination. Non-Disturbance and Attornment Agreement with Tenant in a

EXHIBIT E TO COMPLAINT

recordable form as evidenced by Exhibit E to this Lease, and Landlord will deliver to Tenant a copy of the executed Subordination, Non-Disturbance and Attornment Agreement.

## SECTION 13
## ATTORNMENT

13.1    Tenant agrees that no foreclosure of a mortgage or deed of trust affecting the Demised Premises, nor the institution of any suit, action, summary or other proceeding against the Landlord, or any successor Landlord, or any foreclosure proceeding brought by the holder of any mortgage or deed of trust to recover possession of such property, shall by operation of law or otherwise result in cancellation or termination of this Lease or the obligations of the Tenant hereunder. Upon the request of the holder of any such mortgage, Tenant covenants and agrees to execute an instrument in writing satisfactory to such party or parties or to the purchaser of the mortgaged Demised Premises in foreclosure whereby Tenant attorns to such successor in interest.

## SECTION 14
## TENANT'S ESTOPPEL

14.1    Tenant agrees, at any time, and from time to time, upon not less than twenty (20) business days prior notice by Landlord, to execute, acknowledge and deliver to Landlord, a statement in writing addressed to Landlord or other party designated by Landlord certifying that this Lease is in full force and effect, stating the dates of commencement and expiration of the Lease, stating the dates to which rent, and other charges, if any, have been paid, that Tenant has accepted possession, that the Lease term has commenced, whether or not there exists any default by either party in performance of any covenant, agreement, term, provision or condition in this Lease, and, if so, specifying each such default of which the Tenant may have knowledge and the claims or offsets, if any, claimed by the Tenant. It is intended that such statement may be relied upon by Landlord or a purchaser of Landlord's interests and by any mortgagee or prospective mortgagee of any mortgage or deed of trust affecting the Demised Premises or the building.

## SECTION 15
## COMPLIANCE WITH LAW

15.1    Landlord represents that as of the Completion Date, as defined in Section 2.4 of the Work Letter Agreement, attached hereto as Exhibit B,, the Demised Premises shall be in compliance with all federal, state, county and municipal laws, including but not limited to environmental laws, rules, regulations and statutes applicable to the Demised Premises or the use thereof, and that, to Landlord's actual knowledge, without independent investigations and except as set forth in any environmental site assessment or report delivered by Landlord to Tenant, there are no Hazardous Substances in or on the Demised Premises. Excluding any matters that result from the actions or omissions of Tenant or Tenant's employees, agents or contractors after the Effective Date of this Lease, Landlord shall defend, indemnify and hold harmless Tenant and its agents, employees, successors and assigns, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees, consultants' fees, court costs and litigation expenses) arising out of or in any way related to the presence of Hazardous Substances in or on the Demised Premises resulting from the actions of Landlord or Landlord's employees, agents or contractors. These provisions shall survive the

EXHIBIT E TO COMPLAINT

expiration or termination of this Lease.

15.2    "Hazardous Substances" shall mean mold and shall mean any substance, chemical, contaminant, or waste that is designated or defined as hazardous, toxic or dangerous or as a pollutant or contaminant in any environmental law, including, without limitation, asbestos, polychlorinated biphenyls (PCBs), pesticides, PCE, and petroleum or its by-products.

15.3    Tenant shall not commit or suffer to be committed any waste upon the Demised Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenants, or which may disturb the quiet enjoyment of occupants of adjoining properties.

15.4    Tenant shall, at its sole cost and expense, comply with all of the requirements of all county, municipal, state, federal and other applicable governmental authorities, now in force or which may hereafter be in force, as said laws and regulations affect the Tenant's use of the Demised Premises, including, without limitation, laws and regulations governing Hazardous Substances.  Excluding any matters that result from the actions or omissions of Landlord or Landlord's employees, agents or contractors, Tenant shall defend, indemnify and hold harmless Landlord and its agents, employees, successors and assigns, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees, consultants' fees, court costs and litigation expenses) arising out of or in any way related to the presence of Hazardous Substances in or on the Demised Premises resulting from the actions of Tenant or Tenant's employees, agents or contractors.  These provisions shall survive the expiration or termination of this Lease..

15.5    After the Lease commences, Landlord hereby grants to Tenant the right to and consents that Tenant may apply to the proper authority for variances, exceptions or other relief from building, construction and development codes; and to make application to the proper governmental authority for the issuance of permits, licenses, certificates and other authority for the construction by Tenant on the Demised Premises.  Landlord agrees to cooperate, at no expense to Landlord, with Tenant by executing any applications or other documents that may be required by the governing body.

## SECTION 16
## LANDLORD REPRESENTATIONS AND WARRANTIES

16.1    Landlord represents that it has fee title to the Demised Premises matters of title disclosed in the Landlord's title policy attached as Exhibit F.

16.2    Landlord represents that as of the Completion Date, as defined in Section 2.4 of the Work Letter Agreement, attached hereto as Exhibit B,, Landlord and the Demised Premises and in compliance with, and will continue to be in compliance with, all federal, state, county and municipal environmental laws, rules, regulations and statutes applicable to the Demised Premises or the use thereof.

16.3    Excluding any matters that result from the actions or omissions of Tenant or any third party after the Effective Date of this Lease, Landlord shall defend, indemnify and hold harmless Tenant and its agents, employees, successors and assigns, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses (including, without limitation, reasonable

attorneys' fees, consultants' fees, court costs and litigation expenses) arising out of or in any way related to Landlord's breach of the representations and warranties in this Section. These provisions shall survive the expiration or termination of this Lease.

## SECTION 17
## CONDEMNATION

17.1    If, during the term of this Lease, Landlord receives notice from any public authority that the whole or any part of the Demised Premises or common parking area is being considered for taking by any public authority under the power of eminent domain, Landlord shall immediately provide Tenant with written notice of such action, including a copy of said notice.

17. 2    If the whole or any part of the Demised Premises or common parking area shall be taken by any public authority under the power of eminent domain, or conveyed by Landlord to such authority in lieu of condemnation, and by reason of such taking Tenant determines that Tenant's business cannot be continued in operation on the portion of the Demised Premises or common parking area which remains, either party may, on written notice to the other party, on or before thirty (30) days after such taking, terminate this Lease effective as of the date the Demised Premises or common parking area, or portion thereof, must be vacated pursuant to the condemnation order or the date of any conveyance in lieu of such condemnation.

17.3    If any part of the Demised Premises or common parking area shall be taken by any public authority for any public use, or Landlord makes any conveyance in lieu of such condemnation, and Tenant does not exercise the option to terminate this Lease granted in this Section, then Landlord and Tenant agree that the rights, duties, and obligations of the parties hereunder, including obligations to pay rent under this Lease shall then be modified as shall fairly and equitably adjust the rights, duties, and obligations of the parties hereto under such changed circumstances.

17.4    It is expressly understood and agreed that Tenant shall have no claim or demand of any kind to any award made to Landlord for the land or the building. Tenant shall be entitled to an award from such condemning authority for damages suffered by Tenant for diminution in the value of the leasehold and for loss of Tenant's trade fixtures and improvements. Tenant shall also be entitled to claim an award for damages suffered by Tenant for loss of business or loss of "good will" and for moving and relocation expenses so long as it does not diminish Landlord's award.

## SECTION 18
## DEFAULT OF TENANT

18.1    Each of the following shall constitute an "event of default" under this Lease:

18.1.1 The Tenant shall fail to pay the rental, taxes, or other amounts to be paid by Tenant for more than ten (10) days after written notice to Tenant that said amount has not been paid; provided, however, Landlord shall not be required to deliver more than two (2) such written notices during any twelve (12) month period during the term of this Lease, the third (3rd) and each subsequent failure to pay any amount when due during such 12-month period being an automatic event of default; or

EXHIBIT E TO COMPLAINT

18.1.2  Tenant's failure to perform any other of the terms, conditions or covenants of this Lease to be observed or performed by Tenant for more than sixty (60) days after written notice to Tenant thereof (or, if the nature of such default is such that it cannot be cured within sixty (60) days, then Tenant shall cure such defect within such longer period of time that is reasonably required, provided that Tenant commences to cure such defect within such 60-day period and diligently performs such cure as soon as reasonably possible thereafter); or

18.1.3  The making by Tenant of any general assignment for the benefit of creditors; or should there be filed by or against Tenant a petition to have Tenant adjudged a bankrupt or petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within ninety (90) days); or should an appointed trustee or receiver take possession of substantially all of Tenant's assets at the Demised Premises, or of Tenant's interest in this Lease, where possession is not restored to Tenant within ninety (90) days; or should substantially all of Tenant's assets at the Demised Premises or Tenant's interest in this Lease have been attached or judicially seized, where the seizure is not discharged within ninety (90) days; or

18.1.4  If Tenant shall suffer this Lease to be taken under any writ of execution.

## SECTION 19
## REMEDIES FOR LANDLORD

19.1   If any event of default occurs, the Landlord, besides all such other rights or remedies it may have, shall have the immediate right to enter the Demised Premises and take possession thereof and of all permanent improvements thereon and may remove all persons and property from the Demised Premises by summary action, or otherwise, and such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant, all without service of notice or resort to legal process except as otherwise provided herein. Tenant agrees to quit and deliver up the possession of the Demised Premises, including permanent improvements to the Demised Premises, when this Lease terminates by limitation or in any other manner provided for herein.

19.2   If an event of default occurs, the Landlord may elect to re-enter, as herein provided, or take possession pursuant to legal proceedings or pursuant to any notice provided for herein, and it may either terminate this Lease, or it may from time to time without terminating this Lease make such alterations and repairs as may be necessary to relet the Demised Premises and relet said Demised Premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable. Upon each such reletting all rentals received by Landlord from such reletting shall be applied first to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees, and of costs of such alterations and repairs; third to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder from Tenant. If such rentals received from such reletting during any month be less than that to be paid during that month by Tenant hereunder, Tenant shall be liable for the payment of such deficiency to Landlord.  Such deficiency shall be calculated and become payable monthly. No such re-entry or the taking of possession of the Demised Premises by Landlord shall be construed as an election on its part to terminate this Lease or to accept a surrender

EXHIBIT E TO COMPLAINT

thereof unless a written notice of such intention be given to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach. Any reletting shall be done in such a manner as Landlord may deem proper.

19.3    Should Landlord at any time terminate this Lease for any event of default, in addition to any other remedies it may have, it may recover from Tenant all damages it may incur by reason of such breach, including the cost of recovering the Demised Premises, and the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this Lease for the remainder of the stated term over the then reasonable rental value of the Demised Premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Tenant to Landlord.

19.4    Any and all remedies provided to Landlord for the enforcement of the provisions of this Lease are cumulative and not exclusive and Landlord shall be entitled to pursue either the rights enumerated in this Lease or remedies authorized by law, or both.

## SECTION 20
## DEFAULT BY LANDLORD

20.1    Failure of Landlord to comply with any term, condition or covenant of this Lease, and such failure shall not be cured within sixty (60) days  (or, if the nature of such default is such that it cannot be cured within sixty (60) days, then Landlord shall cure such defect within such longer period of time that is reasonably required, provided that Landlord commences to cure such defect within such 60-day period and diligently performs such cure as soon as reasonably possible thereafter), or within the periods of time set forth in Section 2.3, if a default of Section 2.3, or within the periods of time set forth in the Work Letter, if a Work Letter default, after written notice thereof to Landlord, is an event of default under this Lease.

20.2    Upon the occurrence of any event of default, Tenant shall have the option to pursue any other recourse available under this Lease or the law, including the use of self help and seeking reimbursement from Landlord of the costs incurred in connection therewith.

## SECTION 21
## SUCCESSORS, ASSIGNMENT AND SUBLETTING

21.1    Tenant shall have the right, without the consent of Landlord, but with written notice to Landlord, to assign Tenant's interest in the entire Lease to a parent or a subsidiary (direct or indirect), affiliate, or related entity of Tenant.  Any such assignment shall release Tenant from any further duty, liability or obligation under the Lease so long as Tenant assigns the lease to such a parent or subsidiary (direct or indirect), affiliate or related entity that has been disclosed on Tenant's consolidated financial statements, Exhibit - Subsidiaries of Registrant, which constitute a "significant subsidiary" as defined therein.  An assignment to any other entity not set forth in the Tenant's consolidated financial statements, Exhibit - Subsidiaries of Registrant, shall not release Tenant from any further duty, liability or obligations under the Lease.

21.2    In addition, Tenant may assign this Lease, with Landlord's prior written consent, which shall not

EXHIBIT E TO COMPLAINT

be unreasonably withheld, to a third party entity that is not related to Tenant. Any assignment to an unrelated third party shall be expressly subject to the terms and provisions of this Lease. Landlord acknowledges that an assignment to an unrelated third party with a net worth of Fifty Million and 00/100 Dollars ($50,000,000.00), according to unrelated third party's financial statements, is reasonable. In the event that Landlord consents to an assignment of this Lease to an unrelated third party with a net worth of Fifty Million and 00/100 Dollars ($50,000,000.00) then Tenant shall be relieved of all liability and obligations under this Lease.  Landlord may consent to an assignment, in Landlord's reasonable discretion, to an unrelated third party but without the release of Tenant from any further liability or obligations under Lease, if the unrelated third party has a net worth less than Fifty Million and 00/100 Dollars ($50,000,000.00).

21.3   Tenant shall have the right to sublet the Demised Premises or any portion thereof. Any subletting shall be expressly subject to the terms and provisions of this Lease and restrictions upon the Property.

SECTION 22<br>INDEMNIFICATION

22.1   Tenant shall indemnify and save harmless Landlord and its agents from and against any and all claims, actions, damages, suits, judgments, decrees, orders, liability and expense in connection with loss of life, personal injury and/or damaged property arising from or out of the negligent act or omission of Tenant, its contractors, employees, servants or agents, unless the same shall be caused by the negligence or willful act of Landlord.

22.2   Landlord shall indemnify and save harmless Tenant and its agents from and against any and all claims, actions, damages, suits, judgments, decrees, orders, liability and expense in connection with loss of life, personal injury and/or damaged property arising from or out of the negligence of Landlord, its contractors, employees, servants or agents, unless the same shall be caused by the negligence or willful act of Tenant.

SECTION 23<br>INSURANCE

23.1   Tenant agrees to carry during the term hereof property insurance providing protection against any peril generally included in the classification "special form coverage," insuring the building improvements and betterments on the Demised Premises, including all appurtenances thereto. Said insurance policies shall be with an insurance company or companies with general policy holders' rating of not less than "A-VIII" as rated in the most current available A.M. Best's ratings and which are qualified to do business in the state in which the Demised Premises are located. Tenant agrees, in the event of cancellation, Tenant shall provide Landlord with notice and a copy of the replacement certificate of insurance which complies with all Lease requirements.  Tenant shall, upon request, furnish Landlord a certificate of such Tenant's insurance policies.

23.2   If the buildings situated upon the Demised Premises should be damaged or destroyed, Tenant shall give immediate notice thereof to Landlord. Tenant shall at its sole cost and expense proceed with reasonable diligence to rebuild and repair such buildings to substantially the condition in which they existed prior to such damage or destruction. The rent payable hereunder shall abate by a pro rata

EXHIBIT E TO COMPLAINT

reduction equivalent to the percentage of destruction. If destruction exceeds forty percent (40%) of the square footage of the Demised Premises, or repairs will take over one hundred eighty (180) days to complete, Tenant may, at Tenant's sole discretion, immediately terminate this Lease by giving Landlord written notice. Provided, however, if by reason of any such casualty, the Demised Premises are rendered untenantable in some material portion during the last two (2) years of the then-current Lease term, and the amount of time required for Tenant to perform its restoration work, using due diligence, is in excess of one hundred eighty (180) days, then Landlord shall have the right to terminate this Lease by giving written notice of termination within sixty (60) days after the date of casualty, unless Tenant exercises an option within thirty (30) days of notice of termination, in which case the rental payable hereunder shall fully abate as of the date of such termination notice. Landlord shall have no obligation to rebuild or repair in case of fire or other casualty. If this Lease is terminated pursuant to this Section 23.2, then all insurance proceeds for the building shall be payable to Landlord.

23.3    Tenant shall have the right to maintain insurance on all alterations, additions, partitions and improvements erected by, or on behalf of, Tenant in, or about the Demised Premises. Such insurance shall be for the sole benefit of Tenant and under its sole control. All such policies shall be procured by Tenant from responsible insurance companies.

23.4    Tenant shall, during the entire Lease term, keep in full force and effect, a policy or policies of commercial general liability insurance written on an occurrence form including coverage for product liability, completed operations and contractual liability, with minimum limits of Two Million and 00/100 Dollars ($2,000,000.00) per occurrence. Said insurance policy shall be with an insurance company or companies with general policyholders' rating of not less than "A-VIII" as rated in the most current available A.M. Best's ratings and which are qualified to do business in the state where the Demised Premises are located. Landlord, and any other party reasonably requested by Landlord shall be named an additional insured on such insurance policy, but Landlord being named as an additional insured on such insurance policy shall not result in Landlord avoiding responsibility under the indemnification in Section 22.2. Landlord's mortgagee shall be named as "mortgagee."

23.5    Landlord shall, during the entire Lease term, keep in full force and effect a policy or policies of commercial general liability coverage written on an occurrence form including coverage for completed operations and contractual liability, with minimum limits of Two Million and 00/100 Dollars ($2,000,000.00) per occurrence. Said policy shall name Tenant as an additional insured. Said insurance policy shall be with an insurance company or companies with general policyholders' rating of not less than "A-VIII" as rated in the most current available A.M. Best's ratings, and which are qualified to do business in the state where the Demised Premises are located. In the event of cancellation or a change of coverage, Landlord shall provide Tenant with notice and a copy of the replacement certificate of insurance that complies with all Lease requirements.

### SECTION 24
### WAIVER OF SUBROGATION

24.1    Each party hereto waives any and every claim which arises or may arise in its favor against the other party hereto during the term of this Lease or any renewal or extension thereof for any and all loss of, or damage to, any of its property within or upon, or constituting a part of, the Demised Premises, which loss or damage is covered by valid and collectible fire and extended coverage insurance policies,

EXHIBIT E TO COMPLAINT

to the extent that such loss or damage is recoverable under such insurance policies. Such mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release in this Lease with respect to any loss of, or damage to, property of the parties hereto. Inasmuch as such mutual waivers will preclude the assignment of any aforesaid claim by way of subrogation or otherwise to an insurance company (or any other person), each party hereby agrees to give immediately to each insurance company, which has issued policies of fire and extended coverage insurance, written notice of the terms of such mutual waivers, and to cause such insurance policies to be properly endorsed, if necessary, to prevent the invalidation of such insurance coverage by reason of such waivers.

## SECTION 25
## TENANT'S FINANCING

25.1    Tenant and certain of its affiliates may enter into credit agreements and other financing documents to secure its obligations and liabilities under the Loan Documents by granting to such lenders and their agents, successors and assigns (collectively, "Lender") a security interest in Tenant's Personalty (defined below). Landlord agrees to give notice to Lender of the occurrence of any default by the Tenant under this Lease which may result in termination of the Lease (a "Default Notice"), and Lender shall have the right (but not the obligation) to cure any such default within fifteen (15) days following Lender's receipt of such Default Notice. No action by Lender shall be deemed to be an assumption of any obligation under this Lease, and Lender shall not have any obligation to Landlord except as expressly provided herein. Any Default Notice shall be sent to Lender at such address as Tenant may, from time to time, provide to Landlord.

25.2    In the event Landlord takes possession of the Demised Premises for any reason, including because of termination of this Lease, Landlord agrees that, at Lender's option, the Personalty may remain upon the Demised Premises for a period not to exceed sixty (60) days after receipt by Lender of a Default Notice (the "Removal Period"); provided that Lender pays prorated rent during any such Removal Period at the rental rate in effect immediately prior to the default. If any injunction or stay is issued (including an automatic stay due to a bankruptcy proceeding) that prohibits Lender from removing the Personalty, commencement of the Removal Period shall be deferred until such injunction or stay is lifted or removed. During any Removal Period, Lender or its designee may, upon prior notice to Landlord enter upon such Demised Premises at any time to inspect, remove, sell or otherwise dispose of any Personalty, provided that Lender shall conduct no public or private auctions or sales of the Personalty at the Property, and provided further that Lender shall make the Demised Premises available for inspection by Landlord and prospective tenants and shall cooperate in Landlord's reasonable efforts to re-lease the Demised Premises. Lender shall be responsible at Lender's cost and expense for the repair of any physical damage to the Demised Premises actually caused by the sale and removal of the personal property by or through Lender (ordinary wear and tear excluded). Lender shall not be liable to Landlord for any diminution in value caused by the removal of the Personalty except as specifically set forth herein, or have any duty or obligation to remove or dispose of any Personalty.    In no event shall "Personalty" be deemed to include the following:  (a) any air conditioning, air ventilating or heating fixtures or equipment; (b) any lighting fixtures or equipment; (c) any dock levelers; (d) any carpeting or other permanent floor coverings; (e) any paneling or other wall coverings; and (f) plumbing fixtures and equipment.

EXHIBIT E TO COMPLAINT

## SECTION 26
## PERSONALTY: WAIVER OF LANDLORD'S LIEN:

26.1    All of Tenant's personal property, consisting of, but not limited to, furniture, goods, documents, equipment, leasehold improvements and inventory, that is now or in the future may be located at the Demised Premises (collectively, the "Personalty") shall be and remain the personal property of Tenant, regardless of manner or mode of attachment of any item to the Demised Premises, and shall not be deemed to be fixtures.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the Personalty. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

## SECTION 27
## ENTRY BY LANDLORD

27.1    Landlord and its authorized agents shall have the right, during normal business hours, to enter the Demised Premises (i) to inspect the general condition and state of repair thereof, (ii) to show the Demised Premises to any prospective purchaser or (iii) for any other reasonable purpose.

27.2    During the final one hundred eighty (180) days of the Lease term, if Tenant has not exercised its option to extend the terms of the Lease, Landlord and its authorized agents shall have the right to erect and maintain on or about the Demised Premises customary signs advertising the property for lease.

## SECTION 28
## LANDLORD'S RIGHT OF RECAPTURE

(A)    Retail Operations Go Dark.  It is expressly acknowledged by Landlord that this Lease contains no implied or express covenant for Tenant to continuously conduct business in the Demised Premises.  Tenant's election to discontinue retail operations in the Demised Premises shall not be an event of default as long as Tenant continues to pay rent, real estate taxes and insurance as required in this Lease.  However, in the event Tenant discontinues retail operations in the Demised Premises (excluding, however, an Exempted Discontinuance of retail operations, as defined in Section 28 (B)), and such discontinuance of retail operations continues for one hundred twenty (120) consecutive days, Landlord may, at any time thereafter during the Lease term, elect to terminate this Lease and regain possession of the Demised Premises by written notice to Tenant (the "Termination Notice"), in which event this Lease shall terminate as to all obligations accruing thirty (30) days after the date of receipt of the Termination Notice or such earlier date as set forth in the Termination Notice.  Tenant shall give Landlord advance notice of any intended discontinuance of business from the Demised Premises as soon as would be reasonable for Tenant to do so, considering Tenant's need to keep such decision confidential.  However, unless Landlord terminates the Lease and takes possession as provided above, Tenant shall be obligated to pay rent and the real estate taxes, and insurance as required in this Lease until the end of the then current Lease (or renewal) term with respect to this Section 28.

(B)    Exempted Discontinuances.  The following discontinuances of retail operations shall be exempted    from    the    applicability    of    Landlord's    right    to    terminate    hereunder    ("Exempted

EXHIBIT E TO COMPLAINT

Discontinuance"):  (i) any discontinuance not to exceed one hundred eighty (180) days in connection with a remodeling of the Demised Premises (but not more frequently than once every five (5) years); or (ii) any discontinuance in connection with damage or destruction of the Demised Premises due to fire or other peril pursuant to Section 23 of this Lease.

## SECTION 29
## SURRENDER OF DEMISED PREMISES

29.1    Tenant shall, at the termination of this Lease, vacate the Demised Premises and improvements in a good condition, except for reasonable use and wear thereof, acts of God, or damage by casualty beyond the control of Tenant, and on vacating shall leave the Demised Premises free and clear of all rubbish and debris.

29.2    At the termination of this Lease, Tenant shall have the right to remove shelves, bins, machinery, trade fixtures, signs and other similar items Tenant installed, provided Tenant is not in default at the time of such removal and that Tenant shall repair in a good and workmanlike manner any damage caused by such removal.

29.3    If Tenant remains in possession of the Demised Premises or any part thereof after the expiration of the term of this Lease, whether with or without Landlord's acquiescence, Tenant shall be deemed only a tenant at sufferance and there shall be no renewal of this Lease without a written agreement signed by both parties specifying such renewal. The "monthly" rental payable by Tenant during any such tenancy at will period shall be one hundred twenty-five percent (125%) of the monthly installments of rental payable during the final year immediately preceding such expiration.  Tenant shall also remain liable for any and all damages, direct and consequential, suffered by Landlord as a result of any holdover without Landlord's written approval.

## SECTION 30
## QUIET ENJOYMENT

30.1    Landlord hereby covenants and warrants that Landlord is the owner of the Demised Premises, and the Tenant, upon payment of rents herein provided for and performance of the provisions hereof on its part to be performed, shall and may peacefully possess and enjoy the Demised Premises during the initial term hereof and during the term of any properly exercised extension option without any interruption or disturbance by Landlord or those claiming under them.

## SECTION 31
## INTEGRATION AND MODIFICATION

31.1    This Lease, along with any exhibits, appendices, addenda, schedules, and amendments hereto, encompasses the entire agreement of the parties, and supersedes all previous understandings and agreements between the parties, whether oral or written. The parties hereby acknowledge and represent, by affixing their signatures hereto, that they have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this Lease, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this Lease. The parties hereby waive all rights and remedies, at law or in equity, arising or which may arise as the result

EXHIBIT E TO COMPLAINT

of a party's reliance on such representation, assertion, guarantee, warranty, collateral contract or other assurance, provided that nothing herein contained shall be construed as a restriction or limitation of said party's right to remedies associated with the negligence, willful misconduct or fraud of any person or party taking place prior to, or contemporaneously with, the execution of this Lease. In addition, this Lease may not be altered, amended, or otherwise modified except by the express written agreement of the parties.

## SECTION 32
## RIGHT OF FIRST REFUSAL

32.1    Landlord hereby grants to Tenant the right of first refusal to purchase the Demised Premises. If during the initial term of the Lease, or during the term of any properly exercised extension option, Landlord shall receive from any party not a party to this Lease a bona fide offer that Landlord intends to accept, then within two (2) business days of the receipt by Landlord of such bona fide offer to purchase, Landlord shall deliver to Tenant written notice of all terms of such offer, together with true and accurate copies of any and all written offers, letters of intent or other written communications by which said offer was transmitted to Landlord. Tenant shall have ten (10) business days after receipt from the Landlord of such notice and offer documents to notify Landlord in writing of its intention to exercise the first right of refusal granted herein. Within ten (10) days after so notifying Landlord of such intent, the Landlord and Tenant shall execute a written contract for the sale of the Demised Premises by Landlord to Tenant, which written contract shall be prepared consistent with the material and substantive terms of such bona fide offer. If Tenant shall elect not to exercise the first right of refusal granted herein in the manner herein provided, then the first right of refusal shall lapse and terminate and Landlord shall be free to sell the Demised Premises to the offeror of such bona fide offer on the terms set forth in such bona fide offer, subject to this Lease and Tenant's rights as Tenant hereunder. If the Demised Premises do not sell to the offeror of such bona fide offer, this provision shall not be terminated and Tenant shall have the first right of refusal on any subsequent offers to purchase.

## SECTION 33
## NOTICES

33.1    All notices and other communications required or permitted to be given hereunder shall be in writing and shall be effective as of (i) the date of delivery, if served in person, (ii) two (2) days after the date of mailing, if served by certified or registered mail, postage prepaid and return receipt requested, (iii) the next succeeding business day after deposit with a responsible overnight delivery service similar to UPS and/or Federal Express, (iv) upon receipt, if delivered by facsimile with confirmed transmittal, or (v) upon receipt, if delivered by email with confirmed transmittal. If the last day for giving notice or performing any act hereunder falls on a Saturday, Sunday, or day on which the main post office at Springfield, Missouri, is not open for the regular transaction of business, the time shall be extended to the next day that is not a Saturday, Sunday, or post office holiday.

EXHIBIT E TO COMPLAINT

LANDLORD:
Branch – Douglasville, LLC
Attn: Jeff Watson
568 Jetton Street, Suite # 200
Davidson, NC 28036
watson@piedmontlanddevelopment.com

For Emergencies:
_____
_____

For Overnight Deliveries:
_____
_____
_____

LENDER:
_____
Attn: _____
_____
_____

TENANT:
O'Reilly Automotive Stores, Inc.
Attn: Property Manager
 P.O. Box 1156
Springfield MO 65802
propertymanagement@oreillyauto.com


Loss Prevention & Alarm Services
(417) 829-5855


O'Reilly Automotive Stores. Inc.
Attn: Property Manager
233 S. Patterson Ave.
Springfield MO 65801

## SECTION 34
## MISCELLANEOUS

34.1    Counterparts.  This Lease may be executed in two (2) counterparts, each of which shall be an original but shall together constitute one and the same instrument.

34.2    Force Majeure  Except as otherwise expressly provided in this Lease, if the performance of any act required by this Lease to be performed by either Landlord or Tenant is prevented or delayed by reason of any act of God, including but not limited to, tornado, hurricane, earthquake, high-wind storm damage, wildfires, flood, excessive snowfall, pandemic, epidemic, disease, illness, or other public health emergencies, along with the collateral effects and consequences thereof, strike, lockout, labor trouble, acts of war, terrorism, inability to secure materials, restrictive governmental laws, regulations, decrees, executive orders, public health orders, emergency orders, and ordinances, or any other cause (except financial inability) not the fault of the party required to perform the act, the time for performance of the act will be extended for a period equivalent to the period of delay and performance of the act during the period of delay will be excused.  However, nothing in this Section shall excuse the performance of any act rendered difficult or impossible solely because of the financial condition of the party required to perform the act.  In the event of a closure of Tenant's business due to Force Majeure (as set forth above) for a time period of not less than thirty (30) days, the base rent due to Landlord under the Lease shall be abated until the earlier of: i) the date Tenant is able to reopen, or ii) one hundred eighty (180) days after the date of Tenant's initial closure. In such event, The Initial Term or extension period of the Lease (as applicable) shall be extended by the amount of time Tenant was unable to open for business at the rental

EXHIBIT E TO COMPLAINT

rate in force at the time of the closure, not to exceed one hundred eighty (180) days. The abatement of base rent shall not excuse Tenant's obligation to pay taxes, insurance, and common area maintenance expenses (as applicable) as required under this Lease.

34.3    Warranty of Authority. Each individual executing this Lease on behalf of Landlord and Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Landlord or Tenant, and that this Lease is binding upon Landlord or Tenant. Each person executing this Lease on behalf of Tenant and Landlord hereby covenants and warrants that Tenant and Landlord, as the case may be, is duly incorporated, formed or organized.

34.4    Interpretation. Notwithstanding the fact that this Lease (in its original form) was prepared by Tenant, this Lease has been reviewed by Landlord and its legal counsel and the terms and provisions hereof have been negotiated by both parties and this Lease shall not be construed for or against Landlord or Tenant.

34.5    Time. Time is of the essence of each and every provision hereof.

34.6    Commission. Landlord and Tenant agree that neither has engaged a real estate broker in this transaction and that neither party is obligated to pay a real estate commission on this transaction. Each party shall indemnify and hold the other harmless from and against any and all commissions, fees and expenses and all claims therefor by any broker, salesman or other party in connection with or arising out of such party's actions in entering into this Lease.

34.7    Recording. A certificate or memorandum of this Lease prepared by Tenant, may at the option of Tenant, be recorded. Landlord shall execute a Memorandum of Lease in the form attached hereto and identified as Exhibit I prior to the commencement of the Lease.

34.8    Attorney Fees. If either party to this Lease commences litigation, legal action, or claim to protect its interest, or to enforce any term or provision of this Lease, the losing party in the dispute shall indemnify and hold harmless the prevailing party from any and all reasonable attorneys' fees and court costs incurred by the prevailing party.

34.9    Exhibits. All exhibits, attachments, annexed instruments and addenda referred to herein shall be considered a part hereof for all purposes with the same force and effect as if copied at full length herein.

34.10   No Partnership. Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business or otherwise, or joint venturer or a member of a joint enterprise with Tenant.

34.11   Captions and Context. The captions of the Sections or paragraphs of this Lease are to assist the parties in reading this Lease and are not a part of the terms or provisions of this Lease. Whenever required by the context of this Lease, the singular shall include the plural and the plural shall include the singular. The masculine, feminine and neuter genders shall each include the other.

34.12   Waiver of Breach. No waiver of any breach of any provision of this Lease shall be construed to be a waiver of any preceding or succeeding breach of such provision or of any other provision hereof.

34.13  Applicable Law, Jurisdiction and Forum. This Lease and the rights and obligations of the parties arising hereunder shall be construed in accordance with the laws of the State of Georgia.  In the case of any action, suit or proceeding arising out of this Lease, Landlord and Tenant agree that jurisdiction and venue shall be in Douglas County, State of Georgia.

34.14  Severability.   A determination that any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws will not affect the remainder of this Lease.

34.15  Prohibited Persons and Transactions:  Tenant and Landlord (each, a "Representing Party") each represents and warrants to the other (i) that neither the Representing Party nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Person Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Lease the Representing Party shall comply with the Executive Order and with the Money Laundering Act.

34.16  Effective Date.  The "Effective Date" of this Lease shall be the last date established by affixing signatures (or initials) and date on this Lease.

34.17  Facsimile Signature.  "Facsimile signatures," as that term is commonly used with reference to facsimile machines used in transmitting documents, signatures, photocopies, etc., will be and hereby are declared by all parties to this Lease to be the same as an original signature to this Lease.  A facsimile of this Lease, including the signature portion thereof, will be treated and relied upon by all parties hereto as an original Lease and an authentic signature with the same legal effect as though the facsimile were an original document to which a genuine signature has been affixed.

34.18  Electronic Transfer.  "Electronic transfer" (i.e.: pdf, tif, etc.) as that term is commonly used with reference to electronic scanning and transmission via the Internet.  Documents, signatures, photocopies, etc. will be and hereby are declared by all parties to this Lease to be the same as an original signature to this Lease.  An electronic transfer of this Lease, including the signature portion thereof, will be treated and relied upon by all parties hereto as an original Lease and an authentic signature with the same legal effect as though the electronic were an original document to which a genuine signature has been affixed.

34.19  Computation of Time.   If any date for the occurrence of an event or act under this Lease falls on a Saturday, Sunday or legal holiday in the state of Missouri, the time for the occurrence of such event or act shall be extended to the next succeeding business day.  All time computations under this Lease shall be based on Central Time Zone.

34.20  Transfer of Landlord's Interest.   If Landlord shall sell, assign or transfer all or any part of its interest in the Premises or in this Lease to a successor in interest which expressly assumes the

EXHIBIT E TO COMPLAINT

obligations of Landlord hereunder, then Landlord shall thereupon be released or discharged from all covenants and obligations hereunder, and Tenant shall look solely to such successor in interest for performance of all of Landlord's obligations. Tenant's obligations under this Lease shall in no manner be affected by Landlord's sale, assignment, or transfer of all or any part of such interest(s) of Landlord, and Tenant shall thereafter attorn and look solely to such successor in interest as the Landlord hereunder.

34.21   Limitation of Landlord's Liability.   If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied solely out of the proceeds of sale received upon execution of such judgment levied thereon against the right, title and interest of Landlord in the Demised Premises as the same may then be encumbered; and neither Landlord nor, if Landlord be a partnership, any of the partners comprising Landlord shall have any personal liability for any deficiency. It is understood and agreed that in no event shall Tenant or any person claiming by or through Tenant have the right to levy execution against any property of Landlord other than its interest in the Premises as hereinbefore expressly provided.

## SECTION 35
## OWNERSHIP:

35.1   Landlord shall provide Tenant with written documentation (e.g., a copy of the deed vesting title in Landlord) of Landlord's ownership of the subject property concurrently with Landlord's execution and delivery of this Lease.

## SECTION 36
## ACCESS AND EASEMENTS OF OTHERS:

36.1   Landlord shall not grant or convey any right of access, easement, or other restriction, condition, or covenant affecting the Demised Premises that in any way that will deny or inhibit Tenant's occupancy, use, and quiet enjoyment of the leased Demised Premises for the benefit of any person or entity other than Tenant, without the express written consent of Tenant. Such express written consent to any right or interest upon Tenant's leased Demised Premises for the benefit of another, shall not be deemed received without Tenant's actual receipt of any document purporting to effectuate such grant or conveyance, whether or not such document would require the signature of Tenant.

36.2   Notwithstanding the above, Landlord shall obtain an access easement agreement for the benefit of the adjacent property, which allows the right of access on, over, and across the area identified on the attached Exhibit A-1. Landlord shall prepare said agreement, which is to include the adjacent property owner's pro-rata share of maintenance expenses for such area, for Tenant's review and approval prior to executing and recording, which approval Tenant shall not unreasonably withhold, condition or delay.

## SECTION 37
## LANDLORD/TENANT RELATIONSHIP:

37.1   This Lease shall not be construed as creating an association, trust, partnership or joint venture in any way between the Landlord and Tenant, nor as creating any relationship between Landlord and Tenant other than that of the Landlord, as fee simple owner of the property, granting a leasehold interest

EXHIBIT E TO COMPLAINT

to Tenant in said property, thereby creating solely and strictly a "landlord-tenant" relationship and no other.

## SECTION 38
## FUTURE DEVELOPMENT:

38.1    Landlord and Tenant acknowledge Landlord may be constructing additional improvements to the adjacent property in the future.  In such event, Landlord shall provide Tenant with Landlord's site development plan(s) for Tenant's review and approval prior to commencement of construction, which approval Tenant shall not unreasonably withhold, condition or delay.  Tenant shall provide such approval (or disapproval with reasons therefor) within ten (10) days following Tenant's receipt of the same from Landlord.  If Tenant fails to approve or disapprove such plan(s) within such 10-day period, then Tenant shall be deemed to have approved such plan(s) as submitted.  Landlord's future development shall not materially, adversely impede Tenant's access, visibility, parking, or normal course of business.  If Landlord fails to fulfill the conditions and obligations of this paragraph, then Tenant shall have the right to terminate the Lease by delivering written notice to Landlord containing a certification of the specific condition or obligation that Landlord has failed to fulfill.  If Landlord fails to correct such failed condition or obligation within a period of sixty (60) days following Landlord's receipt of such written notice (or, if the nature of such failure is such that it cannot be cured within sixty (60) days, then Landlord shall cure such failure within such longer period of time that is reasonably required, provided that Landlord commence to cure such failure within such 60-day period and diligently perform such cure as soon as reasonably possible thereafter), then this Lease shall terminate and be null and void.

IN WITNESS WHEREOF, the said Landlord and Tenant have hereunto executed this Lease on the dates set forth below.

LANDLORD:                                                    TENANT:
Branch – Douglasville, LLC                                   O'REILLY AUTOMOTIVE STORES, INC.
a Georgia limited liability company                          a Missouri corporation

By:     Piedmont Land Development, Inc., its Manager

By: Ron L. Turner, Jr.                                       By: Scott Kraus
Title: President                                            Title: Senior Vice President
Date:    8-4-2021                                           Date:    9-16-2021

EXHIBIT E TO COMPLAINT

STATE OF NORTH CAROLINA     )
                                 ) ss

COUNTY OF Rowan             )

On the 4th day of August_____, 2021, before me, a notary public in and for said state, personally appeared **Ron L. Turner, Jr.**, known to me to be the person who executed the within Lease Agreement and acknowledged to me that they executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

_4-8-22_
My Commission Expires:

_Trisha O. Belk_
Notary Public

STATE OF MISSOURI     )
                       ) ss

COUNTY OF GREENE     )

On the 16 day of September_____, 2021, before me, a notary public in and for said state, personally appeared **Scott Kraus**, Senior Vice President of O'Reilly Automotive Stores, Inc., known to me to be the person who executed the within Lease Agreement on behalf of said corporation and acknowledged to me that he executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

_21 June 2024_
My Commission Expires:

_N. Bullard_
Notary Public

NICOLE BULLARD
Notary Public – Notary Seal
STATE OF MISSOURI
Polk County
My Commission Expires June 21, 2024
Commission #20123761

# EXHIBIT A

## LEGAL DESCRIPTION

To be provided by Landlord and inserted

All that tract or parcel of land lying and being in Land Lot 74 of the 1st District, 5th Section, Douglas County, Georgia, being shown as "Tract F 2.243 acres 97,714 SF 4405 Fielding Drive", as more particularly shown on that certain "Final Plat The Shoppes at Chapel Hill", dated December 21, 2006, prepared by Vastani - Campbell Land Surveying - Land Planning, and bearing the certification and seal of Adam T. Pearson, Georgia R.L.S. No. 2993, which Final Plat is recorded in Plat Book 35, Page 63 Douglas County, Georgia records, which plat is incorporated herein by reference.

EXHIBIT E TO COMPLAINT

## EXHIBIT A-1

## DEMISED PREMISES



DEMISED PREMISES

ACCESS EASEMENT AREA



EXHIBIT E TO COMPLAINT

## EXHIBIT B

## WORK LETTER AGREEMENT

Branch – Douglasville, LLC ("Landlord") and O'Reilly Automotive Stores, Inc. ("Tenant") are executing simultaneously with this Work Letter Agreement ("Work Letter"), a written lease (the "Lease") covering the demised premises (the "Demised Premises"), as further described in the Lease.

This Work Letter defines the design and construction of the Improvements (as defined below) that Landlord is obligated to provide on the Demised Premises. If there is a conflict between the terms and provisions of this Work Letter and the Lease, this Work Letter shall control. Terms not otherwise defined in this Work Letter shall have the meaning set forth in the Lease.

This Work Letter is a part of the Lease and is subject to all of its terms and conditions, including all definitions in the Lease. Unless the context otherwise requires, any references to the Lease shall include the Work Letter and the obligations herein shall, to the extent applicable, continue during the Lease term.

In consideration of the mutual covenants herein, Landlord and Tenant mutually agree as set forth below:

## 1. DESIGN.

Landlord and Tenant shall coordinate and provide information to the other in order to accomplish the Permitted Construction Documents (as hereinafter defined) provided for in Section One (1) of this Work Letter in accordance with the following:

1.1    Design Criteria and Standards

   (a)    *Basis for Documents*
   The design of the Improvements shall be based upon criteria set forth in the Lease Agreement, Lease Exhibits (including the Tenant provided sample plans, herein defined as "Reference Set"), Work Letter Exhibits B-1 (Site Investigation and Design Requirements), B-2 (Design/Construction Requirements, including Scope of Work Schedule),   B-3 (Geotechnical Requirements), B-4 (Design Approval),  governing codes, ordinances, and standards. Project design shall comply with all applicable governing laws and regulations, including Americans with Disabilities Act (ADA), in effect at the time of construction.

   (b)    *Form of Documents*
   Landlord and Tenant drawing submittals referenced herein shall adhere to the United States National CAD Standard (Current Edition) Uniform Drawing System (UDS). Drawing sheet size shall be 24"x36". All drawing submittals required herein shall be in PDF format with all sheets contained within a single file. File naming shall contain the City, State, and Tenant's project designated code. Where hard copy submittals are indicated herein, in

EXHIBIT E TO COMPLAINT

addition to the electronic copy, such submittals shall be full size sheets and bound in a complete set.

(c)    *Approval and Consent*

Any approval or consent required by either Tenant or Landlord in this Exhibit B Work Letter Agreement shall not be considered achieved until dated signatures of Landlord Representative's and Tenant's Project Coordinator (as both are provided in Section 5 herein) are provided on the Design Approval Document, attached hereto as Work Letter Exhibit B-4. **Landlord and Tenant shall not move to the next phase of this Work Letter until Work Letter Exhibit B-4 reflects such approval.** Landlord and Tenant shall cooperate in the processing of all plans, documentation, and information of this Work Letter and shall respond to all requests for comments and information in accordance with this Work Letter. Should Tenant provide comment rather than approval to any Landlord submittal herein, such submittal shall be deemed disapproved. In the event of a Tenant comment rather than approval, Landlord shall resubmit such item addressing Tenant's comments. Tenant shall then have fifteen (15) days to provide comment or approval to the resubmitted item.   Such process shall continue until Tenant approves any Landlord requirement herein and provides a dated signature on Exhibit B-4 hereto.   Tenant's approval of any plans, drawings or reports is not a representation or warranty that such items comply with any applicable code, law or regulation. Except as otherwise expressly stated herein, any approval or consent required by either Tenant or Landlord shall require a response within fifteen (15) days upon receipt of a request for comments and/or approvals.

(d)    *Acceptance of Landlord Requirements*

Landlord acknowledges that Tenant's store opening scheduling relies heavily on the timing for information provided in this Work Letter. As such, Tenant may delay its acceptance of any of the Landlord requirements, set forth herein in the following sections of this Work Letter Agreement until fifteen (15) days before the due date for any particular requirement.

## 1.2    Landlord's Due Diligence

No later than thirty (30) days after the Effective Date of the Lease, Landlord shall deliver to Tenant, for its review and approval,  a preliminary site plan based on Lease Exhibit A-1, a land survey based on Lease Exhibit B-1 (electronic copy signed and sealed) including confirmation of any plans (or lack thereof) for road or street improvement projects, medians to be constructed (current or future) or right–of–way takings  that potentially affect access to the Demised Premises or the normal course of business operations of Tenant, an environmental report (Phase I) certified to Tenant and created within six (6) months of the Effective Date of the Lease, a geotechnical report (in accordance with Work Letter Exhibit B-3, and a title policy (collectively "Landlord's Due Diligence Items"). Tenant shall have thirty (30) days to approve Landlord's Due Diligence Items.

## 1.3    Landlord Civil and Site Plans

No later than forty-five (45) days after Tenant's approval of Landlord's Due Diligence Items, Landlord shall deliver to Tenant civil plans and specifications based upon Landlord's Due Diligence Items including preliminary drawings of site grading plan with contours, site

EXHIBIT E TO COMPLAINT

development plan with dimensions, Tenant's proposed ground signage location, site pavement design sections, landscape and irrigation layout plan (if applicable), and site utilities diagram plan (collectively "Landlord Civil Package"). The Landlord Civil Package shall not include exterior project lighting, which shall be part of Tenant's Building Package, as defined in Section 1.4. Tenant shall have thirty (30) days to approve the Landlord Civil Package. No later than five (5) days after Tenant's approval of the Landlord Civil Package, Landlord shall submit to Tenant both a final paper and electronic copy set of construction documents, signed and sealed by a licensed professional.

### 1.4   Tenant Building Package

No later than forty-five (45) days after Tenant's approval of the Landlord Civil Package Tenant shall deliver to Landlord plans including architectural, structural, mechanical, electrical, plumbing, Tenant's sign power requirements, and exterior project lighting plans (collectively "Tenant's Building Package"). Landlord shall have fifteen (15) days to approve Tenant's Building Package. Tenant's Building Package shall be based upon the Reference Set and Work Letter Exhibits B-1 and B-2. Collectively, the Landlord's Civil Package and Tenant's Building Package shall be the "Overall Construction Documents."

### 1.5   Permitted Construction Documents and Permits

**LANDLORD SHALL NOT SUBMIT ANY DOCUMENTS TO ANY GOVERNING AUTHORITIES WITHOUT TENANT'S PRIOR APPROVAL.** No later than five (5) days after approval and compilation of the Overall Construction Documents, Landlord shall submit the Overall Construction Documents to the City of Douglasville, GA and all other appropriate governing authority having review jurisdiction, and apply for all applicable permits (collectively the "Permits"). Landlord shall notify the Project Coordinator and Project Administrator, as defined in Section 5.1 herein, of such submittal. Any change or modification to the Overall Construction Documents after submission of same to the City shall be submitted to Tenant in the form of a proposal request for approval by the Project Coordinator. Throughout the permitting process, Landlord shall provide a weekly status update to the Project Coordinator, in the form of Work Letter Exhibit B-4. Within five (5) days of the City's issuance of the Permits, Landlord shall provide Project Coordinator with a copy of all Permits and the permitted construction plans for the Improvements (the "Permitted Construction Documents"). Tenant shall have ten (10) days to approve the Permitted Construction Documents.

### 1.6   Failure to Perform

In the event Landlord is unable to obtain all Permits or does not adhere to the requirements of this Work Letter then Tenant shall have the option to terminate the Lease. In the event the Lease is so terminated, both parties will be released from any obligation to the other and the Lease shall become null and void.

### 2.   CONSTRUCTION

Landlord shall complete, as defined in Section 2.4(a) herein, the Improvements in accordance with the following:

EXHIBIT E TO COMPLAINT

2.1    Improvements

The specifications, standards, and criteria set forth in the Permitted Construction Documents shall be the "Improvements."

2.2    Construction Commencement

Landlord shall commence construction of the Improvements within forty-five (45) days of Tenant's approval of the Permitted Construction Documents.  Within five (5) days of starting construction, Landlord shall provide Project Administrator with written notice of the date it commenced construction of the Improvements, and such date shall be considered the "Construction Commencement Date."

2.3    During Construction

(a) *Weekly Field Reports and Photos*
Beginning within seven (7) days of the start of site improvement and/or construction and continuing until Tenant accepts the Demised Premises, Landlord shall provide Project Administrator, with weekly field reports and photos of the interior and exterior as set forth in Work Letter Exhibit B-5. and final photos as set forth in Section 2.4(d) herein.  Landlord shall immediately comply with any Tenant request for supplemental photos.  IF LANDLORD FAILS TO SUBMIT WEEKLY FIELD REPORTS AND PHOTOS, TENANT SHALL BE ENTITLED TO RETAIN OR RECOVER FROM LANDLORD, AS LIQUIDATED DAMAGES AND NOT AS A PENALTY, FIVE HUNDRED DOLLARS ($500.00) PER OCCURRENCE.  TENANT MAY RECOVER LIQUIDATED DAMAGES DESCRIBED HEREIN BY ABATEMENT OF TENANT'S OBLIGATION TO PAY RENT ON OR AFTER THE COMMENCEMENT DATE OR DAMAGES VIA ANY OTHER LEGAL REMEDY SET FORTH IN THE LEASE, OR AT LAW OR EQUITY FOR BREACH OF THIS PROVISION. Any liquidated damages not recovered by Tenant by abatement of Tenant's obligation to pay rent shall be payable to Tenant on demand, together with interest from the date of the demand at the highest lawful rate of interest payable by Landlord.

(b) *Inspection*
During the Landlord's construction of the Improvements, Project Administrator or his designee may, in Tenant's sole discretion, periodically visit and inspect the construction to determine if the work is being accomplished in a satisfactory manner.

(c) *Deviation from Permitted Construction Plans*
Any deviations from the Permitted Construction Documents or inadequacies of construction or materials shall be immediately communicated to the Tenant's Representative, as defined in Section 5.1 herein, and Landlord shall commence to correct such items within twenty-four (24) hours of notification.  IN THE EVENT LANDLORD DOES NOT COMMENCE TO MAKE SUCH CORRECTIONS TENANT MAY ISSUE A NOTICE TO STOP WORK TO THE LANDLORD.  IN THE EVENT OF TENANT'S NOTICE TO STOP WORK, TENANT MAY, AT ITS SOLE

EXHIBIT E TO COMPLAINT

DISCRETION, IMMEDIATELY TERMINATE THE LEASE BY WRITTEN NOTICE TO LANDLORD. IF THE LEASE IS TERMINATED BY TENANT, BOTH PARTIES WILL BE RELEASED FROM ANY OBLIGATION TO THE OTHER AND THIS LEASE SHALL BE VOID.

(d) *Force Majeure and Excused Delay*

Landlord shall diligently proceed with the construction of the Landlord's Improvements and complete the same and deliver possession thereof to Tenant on or before the Completion Date (as defined Section 2.4 herein); provided, however, if delay is caused or contributed to by delivery of Tenant Supplied Items or force majeure (as defined in Section 34.2 of the Lease), then the Completion Date shall be extended without penalty for the additional time caused by such delay. Such delays are each referred to as an "Excused Delay." Landlord shall notify Tenant within forty eight (48) hours after an event occurs that will result in an Excused Delay, including a description of the event and the impact on the Schedule. Failure to notify Tenant as required shall result in a potential Excused Delay being deemed a Landlord Delay.

(e) *Possession*

Prior to Acceptance of the Improvements Tenant shall have the right to access the Demised Premises to install fixtures, inventory and equipment ("Fixture Period") Tenant shall conduct its work in such a manner as to maintain harmonious labor relations so as not to interfere unreasonably with, or delay, the work of Landlord.

2.4    Completion

Within one hundred and fifty (150) days of the Construction Commencement Date, Landlord shall Complete (as defined herein) the Improvements. Should Landlord finish construction of the Improvements prior to the expiration of such one hundred and fifty (150) days after the Construction Commencement Date, Tenant may consider the Improvements not yet Complete, at its sole discretion, up to the one hundred fifth (150th) day. The date upon which Landlord has satisfied all of the requirements of this paragraph shall be the "Completion Date."

(a) *Completion Defined*

"Completion", "Complete" or "Completed" as used herein shall mean finished construction of the Improvements on the Demised Premises pursuant to the approved Permitted Construction Documents and delivery of written notice (as required and set forth in Section 33 of the Lease) to Tenant of same, with the exception of Punch List Items (as defined in Section 2.4(d) herein) and in accordance with the Completion Date, has been accomplished.

(b) *Failure to Complete*

LANDLORD AGREES THAT IF THE IMPROVEMENTS ARE NOT COMPLETED ON OR BEFORE THE COMPLETION DATE AS A RESULT OF ANY LANDLORD DELAY (AS DEFINED BELOW), THEN SUCH DELAY SHALL RESULT IN ABATEMENT OF TENANT'S OBLIGATION TO PAY RENT AFTER THE COMMENCEMENT DATE IN AN AMOUNT EQUAL TO TWO THOUSAND AND 00/100 DOLLARS ($2,000.00) PER DAY FOR EACH DAY

EXHIBIT E TO COMPLAINT

BEYOND THE COMPLETION DATE THAT THE IMPROVEMENTS ARE NOT COMPLETED.

(c) *Landlord Delay*

"Landlord Delay" as used herein shall mean any delay that is not an Excused Delay as defined in Section 2.3(d) herein.

(d) *Punch List Items*

Subsequent to the Completion Date and upon forty-eight (48) hour notice to Landlord, the Project Administrator shall provide a "Punch List" to the Landlord identifying the corrective work of the type commonly found on an architectural punch list with respect to the Improvements, which list shall be in Tenant's reasonable discretion based on whether such items were required by the approved Permitted Construction Documents ("Punch List Items"). Landlord shall complete the Punch List Items and provide the Project Administrator with photos verifying completion of the Punch List Items within ten (10) business days after Tenant's delivery of the Punch List Items to Landlord.

(e) *Acceptance of the Improvements*

Within five (5) business days after Tenant's receipt of Landlord's notice that all Punch List Items are complete, the Project Administrator shall notify Landlord, in writing, of all portions of the Improvements that are incomplete and Landlord shall immediately complete such items. Failure to deliver such notice shall constitute an acknowledgment that the Landlord's Improvements are complete. Within ten (10) business days after Tenant's acceptance of the Improvements and Punch List Items, Landlord shall deliver to Tenant a set of documents showing any revisions due to any Change Order (as described in Section 2.4(f) of this Work Letter Agreement) to include interior and exterior photos for the Completed Improvements, along with all warranties and operating manuals for any equipment Tenant is responsible for maintaining. Landlord shall remove or cause to be removed from the Demised Premises all tools, extra building materials, waste materials, debris and rubbish of any sort. The achievement of all items in this Section 2.4(e) shall constitute "Acceptance."

(f) *Change Orders*

Prior to commencing any change in the Permitted Construction Documents or work during construction of a permitted trade, Landlord shall obtain multiple bids for the change and will deliver to Tenant's representatives as designated in the Work Letter the bids and a form approved by Tenant, setting forth a description of the change and the total costs of such change, including associated architectural, engineering and construction contractor's fees (the "Change Order"). All Change Orders requested by someone other than Tenant are subject to Tenant's prior written approval, which may be withheld or granted by Tenant in its sole discretion. If Tenant fails to approve such Change Order, the Change Order will be deemed denied and Landlord will not proceed to perform the change.

2.5    Cost of the Improvements

Tenant shall provide only those material listed as Tenant Supplied Items, as identified as "TSI" in Work Letter Exhibit B-2. Landlord shall reimburse Tenant for the TSI as provided for in Section

EXHIBIT E TO COMPLAINT

2 of the Lease. Landlord agrees to furnish, at Landlord's sole cost and expense, all of the material, labor, and equipment for the construction of the Improvements. Tenant shall not be responsible for any damage, loss or destruction to the Demised Premises resulting from any construction or engineering error or defect. Landlord agrees to indemnify, defend and save Tenant harmless of any and all liability, loss, damages, cost or expenses, including reasonable attorneys' fees, incurred in connection with any claims of any nature relating to Landlord's construction of the Demised Premises and Improvements. Notwithstanding any other provision, term or clause of the Work Letter that states otherwise, if a conflict exists between the indemnification provision of the Work Letter and any indemnification provision set forth in the Lease, the Lease provisions shall control. If Tenant makes any payment or advance at the expense or for the account of Landlord, pursuant to any provisions of the Lease or of this Work Letter, the Tenant is entitled to reimbursement from Landlord within fifteen (15) days of written notice to Landlord of the reimbursement amount. Past due amounts are subject to interest and costs of collection, including attorney fees, at the maximum rate allowed by law. The Tenant may offset for any such claim against any subsequent installment of rent, and if not reimbursed at the expiration of the term hereby granted or any extensions thereof, may remain in possession of the premises until completely reimbursed.

2.6    Coming Soon Sign

Within ten (10) days of the Construction Commencement Date, as defined in Section 2.2, Tenant shall provide Landlord with its prototypical "Coming Soon" sign banner and sign structure plans for same, attached as Exhibit K. Landlord shall complete construction of the "Coming Soon" sign structure and place the sign in a location with maximum visibility to passersby within seven (7) days of Landlord's receipt of Tenant's Coming Soon sign banner and sign structure plans for same. Failure to receive the Coming Soon sign shall not delay the Construction Commencement Date.

3. INSURANCE AND RISK OF LOSS.

3.1    Builder's risk insurance is Landlord's responsibility.

3.2    All materials, work, installations and decorations of any nature brought upon or installed in the Demised Premises before the Commencement Date shall be at the risk of the party who brought such materials or items onto the Demised Premises. Neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage or loss or destruction of such items brought to or installed in the Demised Premises by Tenant prior to such date, except in the event of Landlord's negligence or willful misconduct.

4. CONFORMANCE WITH LAWS.

4.1    All work performed by Landlord shall be done in conformity with applicable codes and regulations of governmental authorities having jurisdiction over the Improvements and the Demised Premises. Valid building permits and other necessary authorizations from appropriate governmental agencies when required, shall be obtained by Landlord at Landlord's expense. Notwithstanding any failure by Tenant to object to any such work, Tenant shall have no responsibility therefore.

EXHIBIT E TO COMPLAINT

4.2    All materials used and incorporated into the Improvements shall be new and of first quality and shall contain no asbestos, asbestos containing materials or materials or substances defined or categorized by either the U.S. Environmental Protection Agency or any state or local law as either "toxic" or "hazardous".

## 5. REPRESENTATIVES.

### 5.1    Tenant's Representatives (Project Coordinator and Project Administrator)

Tenant has designated **Charles Norton** "Project Coordinator" and John Barnes and Robert Turrentine "Project Administrator" as its representatives with respect to the matters set forth in this Work Letter, who shall have full authority and responsibility to act on behalf of Tenant as required in this Work Letter. Tenant may change its Coordinator or Administrator, as the case may be, under this Work Letter at any time by providing five (5) days prior written notice to Landlord. All inquiries, requests, instructions, authorizations and other communications with respect to matters covered by this Work Letter from Landlord shall be made to Project Coordinator or Project Administrator, as the case may be. Landlord will communicate solely with the Project Coordinator or Project Administrator, including providing a Weekly Field Reports and Photos as set forth in Section 2.3 beginning on the Effective Date and continuing until Tenant accepts the Demised Premises.  Landlord will not make any inquiries of or requests to, and will not give any instructions or authorizations to, any other employee or agent of Tenant, including Tenant's architect, engineers, and contractors or any of their agents or employees, with regard to matters covered by this Work Letter.

### 5.2    Landlord's Representative

Landlord has designated _____ as its representative ("Landlord's Representative") with respect to the matters set forth in this Work Letter, who shall have full authority and responsibility to act on behalf of Landlord as required in this Work Letter. Landlord may change its representative under this Work Letter at any time by providing five (5) days prior written notice to Tenant. All inquiries, requests, instructions, authorizations and other communications with respect to the matters covered by this Work Letter from Tenant will be made to Landlord's Representative.

## 6. MISCELLANEOUS.

### 6.1    Sole Obligations
Except as herein expressly set forth with respect to the Improvements, Landlord has no agreement with Tenant and has no obligation to do any work with respect to the Demised Premises. Any other work in the Demised Premises which may be permitted by Landlord pursuant to the terms and conditions of the Lease, including any alterations or improvements as contemplated in the Lease, shall be done at Tenant's sole cost and expense and according to the terms and conditions of the Lease.

### 6.2    Authority; Counterparts

EXHIBIT E TO COMPLAINT

Any person signing this Work Letter on behalf of Landlord or Tenant warrants and represents that such person has authority to do so. This Work Letter may be executed in counterparts, each of which shall be deemed an original, but all of which together constitute one instrument.

6.3    Binding on Successors

Subject to the limitations on assignment and subletting in the Lease, this Work Letter shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

6.4    Time of the Essence

Time is of the essence as to each and every term and provision of this Work Letter. In all instances where Tenant is required to approve an item, if no written notice of approval is given within the stated time period at the end of said period the item shall automatically be deemed disapproved. Except as otherwise provided, all references herein to a "number of days" shall mean and refer to calendar days.

6.5    Attorneys' Fees

In any action to enforce or interpret the terms of this Work Letter, the party prevailing in that action shall be entitled to recover its reasonable attorneys' fees and costs of suit, both at trial and on appeal.

6.6    Incorporation

This Work Letter is and shall be incorporated by reference in the Lease and all of the terms and provisions of the Lease are incorporated herein for all purposes. Any default by Landlord or Tenant hereunder also constitutes a default under the Lease.


LANDLORD:
Branch – Douglasville, LLC
STORES, INC.
a Georgia limited liability company

By:    Piedmont Land Development, Inc., its Manager



By: Ron L. Turner, Jr.
Title:  President
Date:    8. 4, 2021

TENANT:
O'REILLY AUTOMOTIVE

a Missouri corporation



By: Scott Kraus
Title: Senior Vice President
Date:    9-16-2021

EXHIBIT E TO COMPLAINT

## WORK LETTER EXHIBIT B-1

### Build-to-Suit - Site Investigation and Design Requirements

### REQUIRED COMPLETION FOR ALL BUILD TO SUIT DEVELOPMENT PROJECTS

All sections to be completed in full by Landlord.  Landlord represents that the information contained herein is accurate and correct to the best of its knowledge and Tenant shall rely on such representations.

A. General
Prepared By: Jeff Watson – Chen Development, LLC        Date Of Completion: _____ 11/27/20 _____

Project Location
Street: _____ 4005 Fielding Drive _____
City: _____ Douglasville _____
State: _____ Georgia _____

B. Codes
1. Building Code: _____
2. Plumbing Code: _____
3. Mechanical Code: _____
4. Electric Code: _____
5. Energy Code: _____

C. Site Data (Direction referenced to building front)
1. Existing Site Condition Photos Provided
   a.  X Yes
   b.  __ No

2. Preliminary Site Plan Drawing Provided
   a.  X Yes
   b.  __ No

3. Property Dimensions
   Front: _241_ +/-    Right: _220_ +/-    Rear: _220_ +/- Left: _220_ +/-
   Area: _____ S.F.    Acres: _1.2_

4. Existing Topography Estimated Elevation Change (Indicate Direction and Approximate Feet)
   a.  Front / Rear: _____ mostly flat, slopes south _____
   b.  Right Side / Left Side: _____ mostly flat, slopes south _____

5. Zoning Classifications (As defined per local ordinance):
   a.  Subject Property: _____ CCC _____
   b.  Adjacent Front Property: _____ RLD _____
   c.  Adjacent Left Side Property: _____ CCC _____

    d.  Adjacent Right Side Property:        PUD

    e.  Adjacent Rear Property:           CCC

6.  Current use of subject property: _____ vacant land _____

7.  Former use of subject property: _____ vacant land _____

8.  Has site ever been used as gas station or dry cleaners
    a.  __Yes
    b.  X No

9.  Describe any unusual or noteworthy conditions around site: ___ none _____
_____

10. Located in Historical District or Special Architectural Overlay District (Check).
    a.  __ Yes (Specify): _____
    b.  X No

11. Storm Water Detention or Water Quality Measures Required (Check).
    a.  X      Yes    (Specify):     detention    required,    engineer    still
        studying_____
    b.  __ No

12. Street Information and Governing Jurisdiction (Check all that apply and complete):

| | | State | City | County | Private | Median Present |
|---|---|---|---|---|---|---|
| a. | Front: | X State | City | County | Private | Median Present |
| b. | Right: | State | City | County | Private | Median Present |
| c. | Left: | State | X City | County | Private | Median Present |
| d. | Rear: | State | City | County | Private | Median Present |

13. Curb Cut Locations, Quantity, & Widths (Check all that apply and complete)
    a.  __ Front        ____ Qty.    Width(s): _____
    b.  X Left Side    _1_ Qty.    Width(s): _28'_____
    c.  __ Right Side    ____ Qty.    Width(s): _____
    d.  __ Rear        ____ Qty.    Width(s): _____

14. Department Of Transportation permit required (Check).
    a.  X Yes
    b.  __ No

15. Road and Location Projects - Verify with all governing authority any planned or projected projects to the roadways, landscaping, CID, etc. that may affect the project anytime.
_____
_____
_____

16. Access Easements Required (Check)

EXHIBIT E TO COMPLAINT

a.   X_ Yes (Specify): <u>We are subdividing the property and so access will between us as owners/developer</u>
b.   __ No


17. Drive Aisles and Widths (Check all that apply and complete)
   a.   __ Front      Width: __24'____
   b.   __ Right Side  Width: __24'____
   c.   __ Left Side   Width: _24'____
   d.   __ Rear       Width: _24'____

18. Parking
   a.   Zoning Formula: __5:1000 = 37 spaces provided___
   b.   Quantity Required: __37_____
   c.   Quantity Provided: __37_____
   d.   Minimum Space Size: _9 wide by 20 deep_____

19. Pavement Material Type Proposed (Check all that apply)
   X  Concrete X Asphalt

20. Refuse Area Screening Required (Check and complete)
   a.   __ Yes (Specify material to be used) _____
   b.   __ No

21. Perimeter Screen Fence Required by Zoning Ordinance (Check)
   a.   X Yes (Specify): _will provide adjacent PUD (right side)_____
   b.   __ No

22. Landscaping Required by Zoning Ordinance
   a.   X Yes (Specify): _____
   b.   __ No

23. Landscape Irrigation System to be Provided (check)
   a.   X Yes
   b.   __ No

24. Site Lighting Ordinance (check):
   a.   X Yes (Specify): <u>Photometric to be provided.</u>_____
   b.   __ No

25. Sign allowances (size, location, structure, and design requirements, etc.)
      Building Signage: _____
      Ground Signage: _____

26. Site and Exterior Building Lighting – City requirements on type and/or heights (check):
   a.   __ Yes (Specify): _____

EXHIBIT E TO COMPLAINT

b. __ No

27. Utilities (Check if already available to site).
     _X_ Water _X_ Sewer     _X_ Electric   _X_ Gas        _X_ Storm Sewer

28. Electric Utility available (Check all that apply)
     X Aerial            __ Underground
     __ Single Phase     X 3Phase
     ___ Voltage(s)

29. Fire Hydrant within 150 feet of property line (check)
     a.   X Yes. (corner of Fielding Drive and Chapel Hill Road
     b.   __ No

D. Building Data
1. Gross Floor Area of Proposed Development: ___7396 sf

2. PEMB Dimensions: _____85 x 85
     (ex. 85' x 85' or 70' x 100')

     Overall Building Footprint Dimensions on site plan:  _EIFS/Block_____
     Metal – Same as PEMB Dimensions (ex. 85' x 85' or 70' x 100')
     Block – Add 1'4" to PEMB Dimensions (ex. 86'4" x 86'4" or 71'4" x 101'4")
     Brick – Add 2'4" to PEMB Dimensions (ex. 87'4" x 87'4" or 72'4" x 102'4")
     EIFS/Stucco – Add 1'4" to PEMB Dimensions (ex. 86'4" x 86'4" or 71'4" x 101'4")

     **Note:  Accurate exterior building dimension and setback requirements MUST be reflected on the site plan.**

3. Building Orientation Dimensions:
     a. Front Dimension (Elevation with Customer Entry): _____
     b. Side Dimension: _____

4. **Primary Type of Structural Framing System (Check one)**
     a.  X  Pre-Engineered Metal Building System (Metal Panels, Brick, EIFS)
     b. __ Load Bearing (CMU) Walls with Pre-Engineered Metal Roof System
     c. __ Other (Specify): _____

5. **Primary Type of Exterior Finish Material (Check one)**
     a. __ Pre-Engineered Metal Building Exterior Metal Wall Panels (PEMB):
     b. __ Concrete Masonry Units (CMU):
     c. __ Clay Masonry Units (Brick):
     d.  X  Exterior Insulation Finish System (EIFS):
     e. __ Other (Specify): _____

EXHIBIT E TO COMPLAINT

6. Primary Material Colors (Check all that apply)
   a. X  O'Reilly Prototypical Standards:
   b. ___ Custom (Specify): _____

7. Special Architectural Design Requirements, i.e. wainscot, pilasters etc.
   a. Style                                                          (Specify):
   _____
   b. Percentage _____ of _____ Materials:
   _____
   c. Additional    Architectural    features    i.e.    awnings    faux    glass    etc.:
   _____
   _____
   _____

8. Mechanical Equipment Screening Required (Check)
   a. X  Yes (Specify): _____
   b. ___ No

9. Exterior materials and/or architectural style(s) are required or allowed due to one or more of the
   following (Check all that apply)
   a. ___ Building Code
   b. ___ Zoning Ordinance
   c. X  Restrictive Covenants
   d. ___ Developer Requirements

10. Exterior Building Materials Proposed (Describe in referenced to item 3 above)
    a. Front Elevation: ___ EIFS/Block/Masonry base _____
    b. Right Side Elevation: _____ EIFS/Block/Masonry base _____
    c. Rear Elevation: _____ EIFS/Block/Masonry base _____
    d. Left Side Elevation: _____ EIFS/Block/Masonry base _____

11. Building Exterior Perimeter Walls Required to be Fire Rated Assemblies (Check)
    a. X Yes (Rating(s) Required): ___ typically 1 hour, architect/engineer to verify ___
    b. ___ No

12. Energy Code requires HVAC economizers (Check).
    a. ___ Yes
    b. ___ No

13. Building required to be protected with automatic fire suppression system (Check)
    a. ___ Yes
    b. X No

14. Fire Alarm System/Monitoring System required
   a. __ Yes
   b. _X_ No

15. Permit required for Tenant fixtures that is separate from Building Permit (Check)
   a. _X_ Yes
   b. __ No

16. Tenant fixtures required to be anchored (Check)
   a. _X_ Yes
   b. __ No

16. Seismic Calculations required for Tenant fixtures (Check)
   a. __ Yes
   b. _X_ No


E. Developer Information
1. Developer has received applicable O'Reilly prototypical design standards, reference drawings, and specifications and acknowledges proposed design concept shall meet or exceed quality of construction indicated or specified (Check).
   a. __ Yes
   b. __ No
   c. _X_ Not Sure, further clarification required (Specify):  _We haven't received the architectural standards/prototype from O'Reilly_

2. Developer information contained herein has been verified and preliminary approved provided by applicable governing authorities having jurisdiction for the project (Check)
   a. __ Yes (list governing authorities and contact information that has supplied verification )
   
   _____
   _____
   _____
   _____
   _____
   _____

   b.    X No (information will be / could be deemed incomplete without verification)

3. Developer Name and Certification
   Company Name: ____Chen Development, LLC_____
   Representative Name: ___Jeff Watson_____

   Representative Signature: ___ _[signature]_

Title: _____ Manager _____
Date: _____ 11-27-20 _____
Phone Number: _____ office 704-895-2084 mobile 704-906-4491 _____
Email address: _____ watson@piedmontlanddevelopment.com _____

Should Landlord find additional information or requirements of any governing authority it shall provide such information below (and attached as needed):

_____
_____
_____
_____
_____
_____
_____

LANDLORD REPRESENTS AND WARRANTS THAT THE INFORMATION PROVIDED IN THIS EXHIBIT ARE TRUE AND CORRECT.  SHOULD THE INFORMATION HEREIN BE INCOMPLETE, INCORRECT, OR OTHERWISE INCONSISTENT WITH GOVERNING AUTHORITY REQUIREMENTS, TENANT MAY TERMINATE THE LEASE AND SEEK DAMAGES AGAINST LANDLORD FOR THE COSTS EXPENDED FOR ANY TENANT REQUIREMENT OR TENANT SUPPLIED ITEM AS PROVIDED IN THE LEASE OR WORK LETTER AGREEMENT.

## WORK LETTER EXHIBIT B-2

### Build-to-Suit Design / Construction Requirements

Landlord is responsible for the cost of the Improvements, as described in the Work Letter, unless otherwise indicated herein. Questions about construction design requirements indicated herein shall be directed to Tenant's designated Project Representative. This Exhibit is for reference only and any specifics refer to Tenant supplied "Reference Set" for prototypical conditions for use in the Overall Construction Documents as describe in the Work Letter.

1.   **GENERAL**

1.1   Use of these Requirements: Landlord shall use these Design/Construction Requirements, in conjunction with the Reference Set, as a guideline in its production of the Landlord Civil Package and any other requirement provided in the Work Letter Agreement.   Should a discrepancy between these Requirements and the Permitted Construction Documents exist, the Permitted Construction Documents shall control.

1.2   Form of Documents: see Work Letter Section 1.1(a) and (b).

1.3   Design Substitutions: Refer to Tenant's Reference Set for typical design standards and requirements. Landlord's submittals of shop drawings, product data, samples, and request for substitutions shall be directed to O'Reilly's designated Project Representative, as designated in Section 5.1 of the Work Letter for review and approval.

2.   **SITE**

2.1   Drives: Drives and driveways to be constructed shall be a minimum width of 30' in the customer parking area of the site and a minimum of 26' in the employee parking area.

2.2   Pavements: Parking lot may be constructed using reinforced concrete or hot-mix asphalt paving. Parking lot to be designed for standard duty paving minimum sections based on the Landlord's Geotechnical Report.  See provided map for locations requiring the use of asphalt.  If asphalt is used in the construction of the parking lot, a 20' concrete apron shall be installed in the customer head-in parking area along the front of the store.

2.3   Curbing: Concrete curbing (6" high min) shall be provided around perimeter of pavement areas. Provide 6:8 slope profile in areas subject to snow removal, except at head-in parking sidewalk curbs. For head-in parking sidewalk curbs provide integral turn down sidewalk curb profile.

2.4   Concrete Mix Design: All on-site concrete design mix to be 4,000 PSI minimum. Refer to Tenant's prototypical specifications for additional requirements.

2.5   Accessible Parking: Accessible parking and access aisle to align approximately with front entry. Pavement at accessible aisle to be flush with sidewalk and slope down as steep as possible parallel with sidewalk to form 6" high sidewalk curb. Provide tactile warning surface complying

**EXHIBIT E TO COMPLAINT**

with accessibility standards at pavement and sidewalk transition. Provide accessible parking signs mounted in front sidewalk bollards.

2.6    Parking Blocks: Concrete parking blocks to be installed at all head-in parking spaces around building perimeter.

2.7    Refuse Container Pads: Concrete refuse container pad shall be 14'x14' minimum with 6' minimum approach apron. Where screening required, provide 6' high composite fence construction with steel post and double gates with heavy duty hinges. Where required by governing authorities, provide masonry screen wall construction to match building exterior materials.

2.8    Sidewalks: Sidewalks shall be 6' wide minimum and provided at head-in parking along front of building, at freight door, and at exit door landings. Sidewalk control and expansion joint layout around building perimeter to align with front window vertical mullions and freight door.

2.9    Bollards: Concrete filled 4" diameter painted steel pipe bollards (36" high) to be provided as follows: (8 or 9) at front sidewalk aligning with front window vertical mullions and control joints, (2) at freight door sidewalk, and (2) at paving for each refuse container. Set bollards in sidewalk a distance of 10" from face of curb or edge of pavement to centerline.

2.10   Grading: Grading around building perimeter to be 6" minimum below finish floor, except at doors and front sidewalk in contact with building. Grade at front sidewalk in contact with building to be 0.15' minimum below finish floor. Grade at doors to be flush with finish floor and slope away 2% maximum for a distance of 5' minimum perpendicular to building. Accessible parking spaces and aisle to slope 2% maximum in all directions. Designated accessible routes to slope 5% maximum in direction of travel with 2% maximum cross slope. Pavement at parking areas to slope 1% minimum and 5% maximum. Lawn areas to slope 2% minimum. Where building masonry cavity wall construction provided, grading criteria to be adjusted down to provide proper weeping.

2.11   Roof Drainage: Building roof slopes to rear perimeter. Provide concrete splash blocks or underground drainage systems at downspouts discharge locations.

2.12   Landscaping and Plantings: Landscaping shall be designed for the minimum number of plantings required by governing authorities. Avoid obscuring free-standing site sign from right-of-way with large plantings. Provide sod on entire public facing areas, at all other lawn areas adjacent to building perimeter (5' wide minimum) and any place that slopes exceed 1:4. At interior parking islands provide landscape gravel ground cover over weed barrier. At large trees and dense planting areas provide landscape edging around perimeter with mulch over weed barrier.

2.13   Irrigation Systems: Irrigation system with separate meter shall be provided where required by governing authorities or where costs of plantings exceed $5,000.00.

2.14   Site Utilities: Tenant's site utility drawings shall indicate design and routing of electrical service, telephone service, site electrical, site lighting, and building utility service entry points to a

EXHIBIT E TO COMPLAINT

distance of 5' outside of building perimeter for utility service connections of water, sanitary sewer, gas (where available) and fire protection system (where required). Landlord's site utility drawings shall indicate design and routing of water service, irrigation water service (where required), sanitary sewer, gas (where available) and fire protection systems (where required) from building points of connection to utility provider available systems. Final design and locations to be coordinated with Tenant and Landlord drawings.

2.15   Site Lighting: See Reference Set

2.16   Site Signage: Pole sign will be direct buried by Tenant with conduit/electrical wiring to be installed by Landlord. Signage graphics Tenant furnished and installed. Final type and location to be coordinated with Tenant and Landlord drawings.

3.   STRUCTURAL

3.1   Foundation Design: See Reference Set

3.2   Structural Steel Framing: See Reference Set

4.   ARCHITECTURAL

4.1   Building Design: Final building design, quality and quantity of construction shall be based upon Tenant's design standards and criteria defined in **Site Investigation and Design Requirements (Exhibit B-1).** Non-prototypical designs concepts shall be reviewed and approved by Landlord and Tenant. Tenant may provide preliminary design concept drawings of exterior elevations, perspective sketches, or digital modeling indicating and defining exterior material locations, type, finishes, colors and textures. Non-prototypical exterior finish material samples shall be provided, unless otherwise waived by Tenant.

4.2   Construction Type: Building code construction type to be classified as II-B (non-combustible / unprotected). Fire protection systems are not required unless otherwise required by building code or governing authorities. Fire rated assemblies shall be provided as required by project conditions.

4.3   Thermal Envelope: See Reference Set

4.4   Interior Floor Finishes: See Reference Set

4.5   Interior Wall Finishes: See Reference Set

4.6   Interior Ceiling Finishes: See Reference Set

4.7   Door Hardware: See Reference Set

4.8   Toilet Accessories: See Reference Set

5.    PLUMBING

See Reference Set

6.    FIRE PROTECTION

6.1    Fire Hydrants: Where required, shall be provided as required by governing authorities.

6.2    Fire Sprinkler Systems: Where required, shall be designed as required by governing authorities. Tenant drawings shall indicate building design criteria and performance requirements. Final design shall be performed by Landlord's licensed engineer and submitted as shop drawings for review and approval.

7.    MECHANICAL

See Reference Set

8.    ELECTRICAL

See Reference Set

9.    ENERGY MANAGEMENT SYSTEM (EMS)

See Reference Set

10.    SCOPE OF WORK

10.1    Tenant Furnished / Landlord Installed Work: Items indicated as furnished by Tenant include cost of materials, taxes, shipping, and delivery to project site. Landlord shall assist with ordering, site receipt, inventory verification, unloading, handling, storing, protecting, and installation of Landlord and Tenant furnished materials. Refer to Tenant's project manual for specific work procedures and documentation requirements.

10.2    Scope of Work Schedule: The attached "Scope of Work Schedule" provides a detailed description of materials to be provided and installed in the construction of the Improvements. The attached schedule describes the **Tenant Supplied Items**, as referred to in the Work Letter Agreement, in the column labeled "Furnished by Tenant." Tenant shall install only those certain items as denoted in the attached schedule. Landlord shall provide all materials and installation in its construction of the Improvements for those items not indicated to be provided or installed by Tenant. **Should the Permitted Construction Documents provide for materials or installation that is not described in the attached Scope of Work Schedule, Landlord shall procure and install such materials at its sole cost and expense.**

EXHIBIT E TO COMPLAINT

## SCOPE OF WORK SCHEDULE

| PROJECT MANUAL (CSI) SECTION REFERENCE NUMBER | PROJECT MANUAL (CSI) SECTION REFERENCE - Description of Work (Refer to Construction Documents) | FURNISHED BY TENANT | INSTALLED BY TENANT | FURNISHED BY Landlord | INSTALLED BY Landlord | CONTACT INFORMATION |
|---|---|---|---|---|---|---|
| 01 45 16 | QUALITY CONTROL PROCEDURES - Testing and inspections | | | X | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 07 21 00 | BUILDING INSULATION - Pre-engineered metal building batt insulation | X | | | X | GBR SILVERCOTE Jerry Miller 417.861.9513 |
| 08 11 19 | STEEL DOORS AND FRAMES - Exterior doors and frames | X | | | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 08 71 00 | DOOR HARDWARE - Exterior steel door hardware | X | | | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 09 90 00 | PAINTING - Showroom interior painted graphics | | | X | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 10 14 00 | SIGNAGE - Exterior free standing signs, exterior surface mounted signs, temporary marketing and advertising signs (Except monuments, raceways and boxes) | X | X | | | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 10 28 13 | TOILET ACCESSORIES - Tissue paper dispensers, Soap dispensers, Paper towel dispensers | X | | | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 10 80 00 | MISCELLANEOUS SPECIALTIES - Floor safes | X | | | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 12 57 00 | INDUSTRIAL FURNISHING - Racking and shelving | X | X | | | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 13 34 19 | PRE-ENGINEERED METAL BUILIDNG SYSTEM ERECTION - Metal building materials | X | | | X | O'REILLY (Assigned Project Coordinator) 417.862.2674 |
| 22 40 00 | PLUMBING FIXTURES - Water heater unit | X | | | X | GRAYBAR ELECTRIC COMPANY Sandy Young or Sam Cast 800.289.5254 |

| SCOPE OF WORK SCHEDULE | | | | | |
| --- | --- | --- | --- | --- | --- |
| PROJECT MANUAL (CSI) SECTION REFERENCE NUMBER | PROJECT MANUAL (CSI) SECTION REFERENCE - Description of Work (Refer to Construction Documents) | FURNISHED BY TENANT | INSTALLED BY TENANT | FURNISHED BY CONTRACTOR | INSTALLED BY CONTRACTOR | CONTACT INFORMATION |
| 23 74 00 | ROOF TOP HEATING/COOLING UNITS - Equipment | X | | | X | CARRIER CORPORATION  Paul Witz 315-317-2481 or Maria Campanello 315-432-3946 |
| 25 00 00 | CONTROLS AND INSTRUMENTATION - Disconnect switch or circuit breaker | X | | | X | GRAYBAR ELECTRIC COMPANY  Sandy Young or Kathy Schrumpf 800.289.5254 |
| 25 00 00 | CONTROLS AND INSTRUMENTATION - Energy management systems, T-stats, Remote sensors | X | | | X | VENSTAR INC.  (Technical Support) 818.812.9812 |
| 26 24 00 | ELECTRICAL EQUIPMENT  - Switchgear (panel boards, transformers, disconnects, breakers) (Except for roof top units) | X | | | X | GRAYBAR ELECTRIC COMPANY  Sandy Young or Kathy Schrumpf 800.289.5254 |
| 26 50 00 | LIGHTING  - Light fixtures and sensors | X | | | X | GRAYBAR ELECTRIC COMPANY  Sandy Young or Kathy Schrumpf 800.289.5254 |
| 27 00 00 | COMMUNICATIONS  SYSTEMS - Raceways and boxes | | | X | X | O'REILLY (Assigned Project Coordinator)  417.862.2674 |
| 27 00 00 | COMMUNICATIONS  SYSTEMS - Electronics and conductors | X | X | | | O'REILLY (Assigned Project Coordinator)  417.862.2674 |
| 28 00 00 | ELECTRONIC SAFETY AND SECURITY SYSTEMS - Raceways, boxes and equipment | X | X | | | O'REILLY (Assigned Project Coordinator)  417.862.2674 |
| 28 30 00 | FIRE DETECTION AND ALARM SYSTEMS - Raceways, boxes and equipment | X | X | | | O'REILLY Leigh Sides 417.829.5712 |

**EXHIBIT E TO COMPLAINT**

## CONSTRUCTION DOCUMENT SCOPE

**Landlord Civil Design Package**
Cover Sheet
SV1 -    Site Survey
D1.1 -   Demolition Plan
C1 -     Site Development Plan
C1.1 -   Site Grading Plan
C1.2 –   Site Storm Water Controls Details
C2.2 -   Site Details
C2.3 -   Site Details
L1.1 -   Landscape Plan
L1.2 -   Landscape Details
L2.1 -   Landscape Irrigation Plan
US1 –    Utilities Site Plan

Sheets will vary per project and only reflects prototypical condition. Refer to Tenant supplied 'Reference Set' for further details.

**Tenant Building Design Package**
T1.1 -   Cover Sheet
T1.2 –   Scope of Work Schedule
G1.1 –   Code Summary Plan
S1.1 -   Structural Notes
S1.2 -   Sign Foundation Details
S2 –     Foundation Plan
S3.1 -   Foundation Details
S3.2 -   Foundation Details
S4 –     Framing Details
A1.1 -   Floor Plan
A1.2 –   Interior Finish Plan
A2.1 –   Exterior Elevations
A3.1 -   Wall Sections
A3.2 –   Wall Sections
A4.1 –   Interior Elevations
A4.2 –   Interior Sections & Details
A5.1 –   Door Schedule
A5.2 –   Window Schedule
A6.1 –   Exterior Details
US1 –    Utilities Site Plan
SP1 -    Site Lighting Photometrics
SP2 –    Site Lighting Details
SP3 –    Site Lighting Details
P1 -     Plumbing Plan
P2 –     Plumbing Details
M1 -     HVAC Plan
M2 -     HVAC Schedules
M-3 -    HVAC Details
E1 -     Lighting Plan

E2 -   Power Plan
E3 –   Electrical Schedules
E4 –   Electrical Notes
EM1.0 – Gridpoint EMS
EM1.1 – Gridpoint EMS
EM1.2 – Gridpoint EMS
SG1.1 – Site Signage Plan
SG1.2 – Site Signage Details
SG2.1 – Building Exterior Signage

Tenant Building Design Package set will also contain PEMB information that includes but not limited to Anchor Bolt layout, details and reactions, Permit Set, and Final Erection Drawings. Content based on final determination of building design.

Sheets will vary per project and only reflects prototypical condition. Refer to Tenant supplied Reference Set for further details.

Recommended States for Asphalt Lots:

Selected States outlined in Red



| Selected States | | | Divisions & DVP's | |
|---|---|---|---|---|
| Alaska | Massachusetts | Ohio | Chris Farrow | Div 4 |
| Connecticut | Michigan | Pennsylvania | Chris Mancini | Div 9 |
| Indiana | Minnesota | Rhode Island | Doug Bragg | Div 1 |
| Iowa | New Hampshire | Wisconsin | Jason Tarrant | Div 6 |
| Maine | North Dakota | South Dakota | Scott Leonhart | Div 5 |

# WORK LETTER EXHIBIT B-3

## GEOTECHNICAL/MATERIALS TESTING REQUIREMENTS

A Geotechnical Engineer will provide the following geotechnical investigation and engineering services and produce the required Geotechnical Report at Landlord's expense.

## 1.  PROPOSED BUILDING TYPE

1.1      The proposed building will consist of a one-story pre-engineered metal building/masonry building. The proposed foundation will consist of a slab on grade with continuous footings and spread footings to support column loads. Typical floor loads are 125 psf. Maximum column loads are 40 kips. Typical wall loads are 1 k/ft.

## 2.  DRILLING AND SAMPLING METHODS

2.1      Drilling and sampling will include a minimum of six borings (three in the building footprint and three in the parking lot) at a minimum depth of 15 feet for each boring.

2.2      Unless otherwise stipulated, drilling and sampling will be performed in accordance with current applicable ASTM Standards and other standards, including but not limited to ASTM Standards D1586, D1587 and D2113. Samples of soil shall be taken at the ground surface, at two feet below existing grade and at each identifiable change in condition, but not further apart than five feet in each of the borings. Where clayey cohesive soils are encountered, thin-walled tube samples shall be taken of representative strata. Split-spoon samples shall be placed in sealed jars labeled with the following information: (1) boring numbers, (2) sample number, (3) sample depth, (4) blows per increment required to drive sample as per applicable standards, (5) date, (6) project name, and (7) Geotechnical Engineer's name.

2.3      Rock cores shall be not less than 1 3/8 inches in diameter, and shall be placed in core boxes properly labeled as indicated above.

2.4      The samples shall be preserved and field logs prepared either by a Geotechnical Engineer or by an experienced Soil Technician acting under the supervision of a Geotechnical Engineer.

## 3. EVALUATION AND RECOMMENDATIONS

3.1      The Geotechnical Engineer shall analyze the information developed by investigation or otherwise available to the Geotechnical Engineer, including those aspects of the subsurface conditions, which may affect design and construction of proposed structures, and shall report the design and engineering requirements of the project.   Based on such analysis the Geotechnical Engineer shall submit a professional evaluation and recommendations for the necessary areas of consideration, including but not limited to the following:

A.     Foundation support of the structure and slab including type(s) of soil, depths and distribution of

EXHIBIT E TO COMPLAINT

each soil type, consistency and density of clay and granular soils, Atterberg limits and allowable soil bearing pressures. When expansive clay soils are encountered provide maximum anticipated values of vertical differential soil movement and horizontal distance of moisture variation from slab perimeter for both edge lift and center lift conditions.

B.     Anticipation of, and management of, groundwater for design of structures and pavements.

C.     Lateral earth pressures for design of walls below grade, including backfill, compaction and subdrainage, and their requirements.

D.     Soil material and compaction requirements for site fill, construction backfill, and for the support of structures and pavements.

E.     Concrete pavement design.

F.     Stability of slopes.

G.     Seismic activity.

H.     Frost penetration depth and effect, if applicable.

I.      Analysis of the effect of weather and/or construction equipment on soil during construction.

J.     Analysis of soils to ascertain presence of potentially expansive, deleterious, chemically active or corrosive materials or conditions, or presence of gas.

3.2     The Geotechnical Engineer shall report any further exploration and testing required to obtain information that the Geotechnical Engineer requires for a professional interpretation of subsoil conditions at the building site and shall perform such additional work as authorized.  The extent of exploration undertaken shall be consistent with the scope of the project indicated by the information given above.

## 4.  FIELD AND LABORATORY REPORTS

4.1     The Geotechnical Engineer will deliver an electronic copy and one paper copy of the report and logs.  All segments of the reports covering the investigations and analyses shall be made on white paper, 8 1/2 x 11inches, suitable for photocopying and bound in booklet form. If larger drawings are absolutely necessary, they shall be folded and bound into the booklet. Written reports and analyses shall be on the Geotechnical Engineer's letterhead. Each drawing shall carry a title block that contains the project name and location, the Geotechnical Engineer's name and address, the date of the subsurface investigation, the date of the drawings, the initials of the person in charge of the crew making the investigation, the initials of the drafter, and the initials of the Professional Engineer who is the responsible checker.

4.2     All data required to be recorded according to the ASTM Standards or other standard test methods employed shall be obtained, recorded in the field and referenced to boring numbers; soil shall be classified in the field logs in accordance with current applicable ASTM Standards and other standards,

EXHIBIT E TO COMPLAINT

including but not limited to ASTM Standard D2488, but the classification for final logs shall be based on the field information, plus results of tests, plus further inspection of samples in the laboratory by the Geotechnical Engineer preparing the reports.

4.3    Include with the report a chart illustrating the soil classification criteria and the terminology and symbols used on the boring logs.

4.4    Identify the ASTM Standards or other recognized standard sampling and test methods utilized.

4.5    Provide a plot plan giving dimensioned locations of test borings.

4.6    Provide a boring log for each boring plotted and graphically presented showing boring number, sampling method used, date of start and finish, description of soil and thickness of each layer, depth to loss or gain of drilling fluid, hydraulic pressure required or number of blows per foot (N value) and, where applicable, depth to wet cave-in, depth to artesian head, groundwater elevation and time when water reading was made (repeat observation after 24 hours) and presence of gases. Note the location of strata containing organic materials, wet materials or other inconsistencies that might affect engineering conclusions.

4.7    Describe the existing surface conditions and summarize the subsurface conditions found to be present.

4.8    Analyze the probable variations in elevation and movements of subsurface water due to seasonal influences.

4.9    Report all laboratory determinations of soil properties.

EXHIBIT E TO COMPLAINT



## Work Letter Exhibit B-4 Design Approval

**Phase 1 - Sec.1.2 Landlord Due Diligence**

Documents Dated: _____   Documents Dated: _____
Documents Received: _____   Documents Received: _____

Tenant:  O'Reilly Automotive Stores, Inc.   Landlord: _____

_____   _____

Date: _____   Date: _____

---

**Phase 2 - Sec. 1.3 Landlord Civil Design Package**

Documents Dated: _____   Documents Dated: _____
Documents Received: _____   Documents Received: _____

Tenant:  O'Reilly Automotive Stores, Inc.   Landlord: _____

_____   _____

Date: _____   Date: _____

---

**Phase 3 - Sec. 1.4 Overall Construction Documents**

Documents Dated: _____   Documents Dated: _____
Documents Received: _____   Documents Received: _____

Tenant:  O'Reilly Automotive Stores, Inc.   Landlord: _____

_____   _____

Date: _____   Date: _____

---

**Phase 4 - Sec. 1.5 Permitted Construction Documents**

Documents Dated: _____   Documents Dated: _____
Documents Received: _____   Documents Received: _____

Tenant:  O'Reilly Automotive Stores, Inc.   Landlord: _____

_____   _____

Date: _____   Date: _____

EXHIBIT B-5



## WEEKLY FIELD REPORT

Date: _____
Project: _____
GC: _____

**Work in Progress:** _____

_____
_____

**Percent Complete:**

| | | | |
|---|---|---|---|
| Demolition | _____ | Signs | _____ |
| Sitework | _____ | Storefront | _____ |
| Conc/Asphalt Paving | _____ | Painting | _____ |
| Site Concrete | _____ | Flooring | _____ |
| Building Concrete | _____ | Ceilings | _____ |
| Hardware/Doors | _____ | PEMB | _____ |
| Drywall/Framing | _____ | Plumbing | _____ |
| E.I.F.S. | _____ | HVAC | _____ |
| Electrical | _____ | Masonry | _____ |
| | | Landscape | _____ |

Total % Complete _____

Permit Data _____        Start Date _____

**Observations:** _____

_____
_____
_____
_____
_____

**WEEKLY FIELD REPORT**
**ORL-R**

1

EXHIBIT E TO COMPLAINT

EXHIBIT B-5

O'Reilly Auto Parts – Interior Photo Documentation Points



2

EXHIBIT E TO COMPLAINT

EXHIBIT B-5



3

EXHIBIT E TO COMPLAINT

## EXHIBIT C

## DECLARATION OF COMMENCEMENT DATE OF LEASE

This Declaration of Commencement Date of Lease is made as of this _____ day of _____, _____, by and between Branch – Douglasville, LLC, hereinafter referred to as "Landlord", and O' Reilly Automotive Stores, Inc., hereinafter referred to as "Tenant".

Landlord and Tenant state and agree as follows:

1.       Landlord and Tenant have entered into a Lease dated _____,
         _____ for the Demised Premises located at 4005 Fielding Drive, Douglasville, GA

2.       This Lease between the undersigned parties commenced on the _____ day of
         _____, _____. ("Commencement Date")

**LANDLORD:**
Branch – Douglasville, LLC
a Georgia limited liability company

By:      Piedmont Land Development, Inc., its Manager

_____
By: Ron L. Turner, Jr.
Title:  President
Date:_____

**TENANT:**
O'REILLY AUTOMOTIVE STORES, INC.
a Missouri corporation

_____
By: Scott Kraus
Title: Senior Vice President
Date:_____

EXHIBIT E TO COMPLAINT

# EXHIBIT D-1



Manufacture and supply (K) set of illuminated Cloud Logo cabinet and channel letters.

"O'Reilly" Cloud Logo with "AP" channel letters

Formed Cloud Logo with "AP" Formed Caps & Channel Returns
Part# 63/3 : L-CldLogo&Chtrs-WFD









Sample Store Front LayoutNTS
*NTS

## EXHIBIT D-3



# EXHIBIT D-4







EXHIBIT E TO COMPLAINT

## EXHIBIT E

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is effective as of _____ 20__ by and between Pinnacle Bank ("Lender"), Branch – Douglasville, LLC ("Landlord") and O'Reilly Automotive Stores, Inc. (Tenant").

## W I T N E S S E T H

WHEREAS, Landlord and Tenant have entered into that certain Lease Agreement dated as of _____ 20__ (the "Lease"), covering certain premises generally described as 4005 Fielding Drive Douglasville. GA. more particularly described in Exhibit "A" attached to this Agreement (the "Property"); and

WHEREAS, Lender holds a mortgage dated _____ given by Landlord on the Property (the "Mortgage"); and

NOW, THEREFORE, in consideration of the mutual covenants, conditions, provisions and agreements set forth in this Agreement, Lender, Landlord and Tenant hereby represent, acknowledge, covenant and agree as follows:

1.    The Lease. Landlord and Tenant covenant and represent to Lender and to each other that the Lease is in full force and effect.

2.    Subordination. Tenant hereby subordinates the Lease at all times and in all respects to the Mortgage and to all renewals, modifications and extensions thereof. The Lease is and shall at all times be subordinate in all respects to the Mortgage and to all renewals, modifications and extensions thereof, but Lender and Tenant agree that any foreclosure of the Mortgage shall not terminate the Lease.

3.    Non-Disturbance. Tenant's possession under the Lease and Tenant's rights and privileges thereunder shall not be diminished or interfered with by Lender, and accordingly, Tenant's occupancy shall not be disturbed by Lender during the term of the Lease, except in accordance with the terms of the Lease.

4.  Recognition and Attornment.  If Lender succeeds to the interest of Landlord in and to the Property or under the Lease, the Lease and all terms therein, and the rights of Tenant thereunder shall continue in full force and effect and shall not be altered, terminated or disturbed, and Tenant shall be bound to Lender under all of the terms, covenants and conditions of the Lease for the balance of the Lease term thereof with the same force and effect as if Lender were the landlord under the Lease.  In such event, Tenant shall attorn to Lender as its landlord, such attornment to be effective and self-operative without the execution of any other instruments on the part of Lender or Tenant. Upon receipt by Tenant

EXHIBIT E TO COMPLAINT

of such notice from Lender, Tenant shall make all payments of monetary obligations due by Tenant under the Lease to Lender or as Lender may in writing direct, with no liability to Landlord. The respective rights and obligations of Tenant and Lender upon such attornment, to the extent of the then remaining balance of the lease term of the Lease, shall be and are the same as are then in existence between Tenant and Landlord as set forth in the Lease.

5.   Rights Under the Lease.  If Lender shall (a) succeed to the interests of Landlord in and to the Property or under the Lease, or (b) enter into possession of the Property, Lender shall not be:

(i)      liable for any acts or omissions of any prior landlord (including, but not limited to, Landlord), unless Lender was given prior notice thereof;

(ii)     obligated to give Tenant a credit for and/or acknowledge any rent or additional rent which Tenant has paid to Landlord or any prior landlord which is in excess of the rent or additional rent due under the Lease unless such payment is provided for in the Lease as presently existing or as amended in accordance with this Agreement; or

(iii)    liable for any damages Tenant may suffer as a result of any misrepresentation, breach of warranty or any act or failure to act by any party other than Lender.

6.   Lender Opportunity to Cure Landlord Defaults.  Tenant hereby agrees that it shall provide Lender with a copy of any notice of default given to Landlord, pursuant to the terms of the Lease.  In the case of any default by Landlord under the Lease which is of such a nature as to give Tenant a right to terminate the Lease, to reduce rent, or to credit or offset any amounts against future rents, Tenant agrees that no such remedy shall be exercised unless and until Lender shall have been given written notice of such default and the same time to cure such default as Landlord has under the Lease.  The cure rights set forth in this Section 6 may be exercised in the sole discretion of Lender, and under no circumstance shall Lender be required to undertake curative measures on behalf of Landlord.

7.      Notices.  Any notice required or permitted to be delivered hereunder shall be deemed received on the date actually received or rejected if the notice is deposited in the United States mail, postage prepaid, certified mail, return receipt requested, or one business day after being sent by Federal Express or similar overnight courier, addressed to Tenant, Landlord or Lender, as the case may be, at the address of such party set forth opposite the signature of such party hereto, or such other address as may thereafter be provided in writing to the respective parties.  Any notice sent to any party hereunder shall be sent to all parties hereunder.  Tenant shall be entitled to rely upon any notice from Lender hereunder as to the matters stated in and covered by any such notice.

8.      Assignment of Rents.  Tenant acknowledges and agrees that this Agreement constitutes notice to Tenant of the existence of the Mortgage and that the Lease and the rent have been assigned to Lender as security for the note.

EXHIBIT E TO COMPLAINT

9.    Applicable Law.  This Agreement is governed by and will be construed in accordance with the laws of the State of Georgia

10.    Entire Agreement.  This Agreement contains the sole and entire agreement and understanding between the parties with respect to the subject matter hereof and shall supersede any and all other oral or written agreements between the parties with respect to the subject matter hereof.  If this Agreement conflicts with the Lease, then the Lease shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement.

[Remainder of page intentionally left blank.]

EXHIBIT E TO COMPLAINT

IN WITNESS WHEREOF, the parties hereto have caused this Subordination, Non-Disturbance and Attornment Agreement to be duly executed on the respective dates indicated below (the latest of which is the date hereof), but this Agreement is made by the parties hereto effective as of the day and year first above written.

LENDER:

_____                Pinnacle Bank

[Date]

_____
_____
_____

[Address]                                By:    _____
                                         Name:  _____
                                         Title: _____


LENDER ACKNOWLEDGEMENT


STATE OF _____ §
                       §
COUNTY OF _____ §

        This instrument was acknowledged before me on the _____ day of _____,
20____ by _____,  the _____  of
_____, on behalf of said _____.


                        _____
                        Notary Public, State of _____

LANDLORD:

Branch – Douglasville, LLC

_____
[Date]

568 Jetton Street, Suite # 200
Davidson, NC 28036

By:    Piedmont Land Development, Inc., its Manager

By: _____
Name: Ron L. Turner, Jr.
Title:   President


## LANDLORD ACKNOWLEDGEMENT


STATE OF _____ §
§
COUNTY OF _____ §

This instrument was acknowledged before me on the _____ day of _____,
20____   by _____,   the _____ of
_____, on behalf of said _____.



_____
Notary Public, State of _____

TENANT:

O'Reilly Automotive Stores, Inc.

_____
[Date]

233 South Patterson
Springfield, MO  65802

By: _____
Name: John McCoy
Title:   Director of Property Management

## TENANT ACKNOWLEDGEMENT

STATE OF MISSOURI          §
                           §
COUNTY OF GREENE           §

  This instrument was acknowledged before me on the _____ day of _____,
20__ by John McCoy, the Director of Property Management of O'Reilly Automotive Stores, Inc., on
behalf of said corporation.

_____
Notary Public, State of Missouri

**EXHIBIT E TO COMPLAINT**

# EXHIBIT F

## LANDLORD'S TITLE POLICY

To be provided and inserted by Landlord

Parcel ID: _____
Returned to/Prepared by:
    O'Reilly Automotive Stores, Inc.
    Attn:  Property Management
    RE Portfolio Specialist
    233 South Patterson
    Springfield, MO 65802

## EXHIBIT I

## MEMORANDUM OF LEASE

Lease made and entered into on the _____ day of _____, 20___.

1.    Landlord:    Branch – Douglasville, LLC, with principal offices at:
    568 Jetton Street, Suite # 200, Davidson, NC 28036.

2.    Tenant:    O'Reilly Autmotive Stores, Inc., with principal offices at:
    233 S. Patterson, Springfield, MO  65802.

3.    Leased premises located at 4005 Fielding Drive, Douglasville, GA.

4.    Term of Lease: Lease shall be and is for a period of fifteen (15) years, to commence upon the first day of the first month following the earlier to occur:  (i) the issuance of a permanent Certificate of Occupancy for the building that Landlord has constructed on the Demised Premises as provided in the Work Letter or (ii) the date Tenant opens for business (the "Commencement Date").

5.    Extension Options: The Lease provides for four (4) extension options of five (5) years each.   Tenant must give Landlord written notice of its intention to exercise extension options not less than ninety (90) days before the end of the initial term of this Lease and any properly exercised extension.

6.    Landlord hereby grants to Tenant the right of first refusal to purchase the Demised Premises.  In the event Tenant shall elect not to exercise the first right of refusal, then the first right of refusal shall lapse and terminate and Landlord shall be free to sell the demised premises to the offeror of such bona fide offer on the terms set forth in such bona fide offer, subject to the Lease and Tenant's rights as Tenant hereunder.  In the event the premises do not sell to the offeror of such bona fide offer, this provision shall not be terminated and Tenant shall have the first right of refusal on any subsequent offers to purchase the Demised Premises.

7.    Restricted Use: Landlord agrees to prohibit the sale, use, or lease of any portion of Landlord's property or that of its subsidiaries or affiliates immediately adjacent to the Demised Premises to an auto parts company or other company which derives more than

EXHIBIT E TO COMPLAINT

ten percent (10%) of their business from the sale of wholesale and/or retail auto parts. This restriction shall include, but not be limited to, such companies as AutoZone, Advance Auto parts, CarQuest, NAPA and Pep Boys and their related entities (including service centers), successors and assignees, or other company which derives more than ten percent (10%) of their business from the sale of wholesale and/or retail auto parts. It is understood that car repair shops such as Meineke, Cottman and Goodyear shall not be deemed to be in violation of this restriction.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Lease this _____ day of _____, 20____.

| LANDLORD: | TENANT: |
|---|---|
| Branch – Douglasville, LLC | O'REILLY AUTOMOTIVE STORES, INC. |
| a Georgia limited liability company | a Missouri corporation |

By:    Piedmont Land Development, Inc., its Manager

| By: Ron L. Turner, Jr. | By: Scott Kraus |
|---|---|
| Title:  President | Title: Senior Vice President |
| Date: | Date: |

STATE OF _____ )
                      ) ss
COUNTY OF _____ )

On the _____ day of _____, 20__, before me, a notary public in and for said state, personally appeared _____, known to me to be the person who executed the within Memorandum of Lease and acknowledged to me that they executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

_____
My Commission Expires:                    Notary Public


STATE OF MISSOURI    )
                      ) ss
COUNTY OF GREENE     )

On the _____ day of _____, 20__, before me, a notary public in and for said state, personally appeared Scott Kraus, Senior Vice President of O'Reilly Automotive Stores, Inc., known to me to be the person who executed the within Memorandum of Lease on behalf of said corporation and acknowledged to me that he executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

_____
My Commission Expires:                    Notary Public

EXHIBIT J

ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "Escrow Agreement") is made and entered into as of the _____ day of _____, _____ by and among Branch – Douglasville, LLC, or its successors and assigns, ("Landlord"), O'Reilly Automotive Stores, Inc., ("Tenant"), and Chicago Title Insurance, ("Escrow Agent").

WITNESSETH:

**WHEREAS,** Landlord and Tenant have entered into a Build to Suit Lease Agreement dated the _____ day of _____, _____, collectively, hereinafter the "Lease," pursuant to which Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord the premises located at 4005 Fielding Drive, Douglasville, GA (the "Demised Premises"), as more particularly described in the Lease; and

**WHEREAS,** the parties hereto desire to enter into this Escrow Agreement to reflect the understandings of the parties hereto under the Lease as to the dispositions retainage funds that are to be deposited by Landlord with Escrow Agent.

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Escrow Funds.** Landlord has placed in escrow with Escrow Agent the amount of One Hundred Fifty Three Thousand Seven Hundred Sixty Nine and 64/100 Dollars ($153,769.64) (such funds, together with any interest earned thereon, being hereinafter referred to as the "Escrow Funds"). The Escrow Funds will be held and disbursed by Escrow Agent only upon written receipt from all parties.

2.    **Interpleader.** The Escrow Funds will be disbursed by Escrow Agent upon the joint written instructions of Landlord and Tenant. For this purpose, if the Landlord or the Tenant fails to give notice of objection to the other party and to the Escrow Agent within five (5) business days of receipt of a request from the other party for the Escrow Agent to disburse all or any part of the Escrow Funds, then the party failing to so give notice of objection will be deemed to have participated with the other party in giving joint instructions to the Escrow Agent. Notwithstanding the preceding language to the contrary, in the event the TSI Estimate exceeds the actual amount of the TSI, any remaining amount held in escrow shall be disbursed to Tenant. In the event of a dispute as to the disposition by Escrow Agent of any portion of the Escrow Funds, which dispute is not resolved within a reasonable time, Escrow Agent will have the right to deposit with the Douglas County Court, Douglasville, GA, the portion of the Escrow Funds that is in dispute to request that the court determine the disposition of the funds so deposited. Landlord and Tenant agree that the Escrow Funds are being held in accordance with Section 2.3 of the Lease.

**EXHIBIT E TO COMPLAINT**

3.     **Fees.** Escrow Agent shall receive Three Hundred and 00/100 Dollars ($300.00) in connection with its rendering of services as escrow agent, to be paid by Landlord, pursuant to the terms of this Escrow Agreement in the event the transactions contemplated by the Lease close in accordance with the terms thereof.

4.     **Expenses of Escrow Agent.** Escrow Agent will be entitled to be reimbursed for all costs, including reasonable attorney's fees, incurred by Escrow Agent in connection with any interpleader action filed by Escrow Agent under Section 2 of this Escrow Agreement. Said expenses shall be paid to Escrow Agent by the non-prevailing party.

5.     **Actions of the Escrow Agent.** Escrow Agent will not be liable for any error of judgment or for any act done or omitted by it in good faith. Escrow Agent will be entitled to be reimbursed for all costs, including reasonable attorney's fees, incurred in connection with successfully defending any action brought against it by Landlord or Tenant.

6.     **Execution.** This Escrow Agreement may be executed in three or more counterparts, each of which will be deemed to be an original agreement, but all of which will constitute one and the same document. This Escrow Agreement may be executed in separate counterparts by the parties, with the same effect as if all parties executed the same counterpart. A counterpart executed by a party and transmitted by facsimile to the other parties will have the same effect as delivery of the original counterpart.

7.     **Applicable Law.** This Agreement shall be governed by, construed under and interpreted and enforced in accordance with the laws of the State of Georgia.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first written above.

> LANDLORD:
> **Branch – Douglasville, LLC**
> **568 Jetton Street, Suite 200**
> **Davidson, NC 28036**
>
> By:     Piedmont Land Development, Inc., its Manager
>
> BY:     _____
> **Ron L. Turner, Jr., President**

TENANT:

O'REILLY AUTOMOTIVE STORES, INC.
233 S. Patterson Avenue
Springfield, MO 65802

BY: _____
      Scott Kraus


ESCROW AGENT:

CHICAGO TITLE INSURANCE
Two Gateway Center, 19th Floor
603 Stanwix Street
Pittsburgh, PA 15222-1402

By: _____
      Meghan Gray


DATE:_____

EXHIBIT E TO COMPLAINT

EXHIBIT K





EXHIBIT K

FRONT

RIGHT SIDE

TOP

EXHIBIT E TO COMPLAINT

Parcel ID: _____
Returned to/Prepared by:
    O'Reilly Automotive Stores, Inc.
    Attn: Property Management
    RE Portfolio Specialist
    233 South Patterson
    Springfield, MO 65802

## MEMORANDUM OF LEASE

Lease made and entered into on the ____ day of ___September___, 20__.

1.    Landlord:    Branch – Douglasville, LLC, with principal offices at: 568 Jetton Street, Suite # 200, Davidson, NC 28036.

2.    Tenant:    O'Reilly Autmotive Stores, Inc., with principal offices at: 233 S. Patterson, Springfield, MO 65802.

3.    Leased premises located at 4005 Fielding Drive, Douglasville, GA.

4.    Term of Lease: Lease shall be and is for a period of fifteen (15) years, to commence upon the first day of the first month following the earlier to occur: (i) the issuance of a permanent Certificate of Occupancy for the building that Landlord has constructed on the Demised Premises as provided in the Work Letter or (ii) the date Tenant opens for business (the "Commencement Date").

5.    Extension Options: The Lease provides for four (4) extension options of five (5) years each. Tenant must give Landlord written notice of its intention to exercise extension options not less than ninety (90) days before the end of the initial term of this Lease and any properly exercised extension.

6.    Landlord hereby grants to Tenant the right of first refusal to purchase the Demised Premises. In the event Tenant shall elect not to exercise the first right of refusal, then the first right of refusal shall lapse and terminate and Landlord shall be free to sell the demised premises to the offeror of such bona fide offer on the terms set forth in such bona fide offer, subject to the Lease and Tenant's rights as Tenant hereunder. In the event the premises do not sell to the offeror of such bona fide offer, this provision shall not be terminated and Tenant shall have the first right of refusal on any subsequent offers to purchase the Demised Premises.

7.    Restricted Use: Landlord agrees to prohibit the sale, use, or lease of any portion of Landlord's property or that of its subsidiaries or affiliates immediately adjacent to the Demised Premises to an auto parts company or other company which derives more than ten percent (10%) of their business from the sale of wholesale and/or retail auto parts.

This restriction shall include, but not be limited to, such companies as AutoZone, Advance Auto parts, CarQuest, NAPA and Pep Boys and their related entities (including service centers), successors and assignees, or other company which derives more than ten percent (10%) of their business from the sale of wholesale and/or retail auto parts. It is understood that car repair shops such as Meineke, Cottman and Goodyear shall not be deemed to be in violation of this restriction.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Lease this ⅙ day of _September_, 20⅔.

LANDLORD:
Branch – Douglasville, LLC
a Georgia limited liability company

By:    Piedmont Land Development, Inc., its Manager

By: Ron L. Turner, Jr.
Title: President
Date: _8-4-2021_

TENANT:
O'REILLY AUTOMOTIVE STORES, INC.
a Missouri corporation

By: Scott Kraus
Title: Senior Vice President
Date: _9-16-2021_

STATE OF _North Carolina_ )
                        ) ss
COUNTY OF _Rowan_ )

On the 4th day of _August_, 2021, before me, a notary public in and for said state, personally appeared _Ron L. Turner, Jr._, known to me to be the person who executed the within Memorandum of Lease and acknowledged to me that they executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

4-8-22
My Commission Expires:

_Trisha O. Belk_
Notary Public

STATE OF MISSOURI      )
                       ) ss
COUNTY OF GREENE       )

On the 16 day of _September_, 2021, before me, a notary public in and for said state, personally appeared Scott Kraus, Senior Vice President of O'Reilly Automotive Stores, Inc., known to me to be the person who executed the within Memorandum of Lease on behalf of said corporation and acknowledged to me that he executed the same for the purposes therein stated.

Witness my hand and notarial seal subscribed and affixed in said County and State, the day and year first above written.

21 June 2024
My Commission Expires:

_N Bullard_
Notary Public

NICOLE  BULLARD
Notary Public – Notary Seal
STATE OF MISSOURI
Polk County
My Commission Expires June 21, 2024
Commission #20123781

Type: WD
Recorded: 12/30/2020 10:06:00 AM
Fee Amt: $578.00 Page 1 of 4
Transfer Tax: $553.00
Douglas County Georgia
ANNETTA D STEMBRIDGE Clerk Superior

Participant ID(s): 1183408446,
7067927936

## BK 3904  PG 969 - 972

---

[Space above this line for recorder's office]

**Prepared by:**
Truist Bank
303 Peachtree Street, NE, 9th Floor
Mail Code: GA-ATL-0643
Atlanta, Georgia 30308
Attn: Andy McRee, Legal Department

**After Recording Return to:**
BridgeTrust Title Group
National Commercial Unit
6400 Atlantic Boulevard, Suite 160
Norcross, Georgia 30071
Attn: Anslee Foster

Tax Parcel #: 00740150297

### LIMITED WARRANTY DEED

**THIS INDENTURE**, made as of the 29 day of December, 2020, between **TRUIST BANK**, a North Carolina banking corporation, successor in interest to **SUNTRUST BANK**, a Georgia banking corporation (the "<u>Grantor</u>"), and **EQUITY RESOURCE PARTNERS-BRANCH, LLC**, a Georgia limited liability company (the "<u>Grantee</u>") (the words "Grantor" and "Grantee" to include their respective heirs, legal representatives, successors and assigns where the context requires or permits);

### WITNESSETH:

**THAT** the Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does hereby grant, bargain, sell, alien, convey and confirm unto the Grantee, subject to the matters described herein, that certain tract or parcel of land lying and being in Douglas County, Georgia, and more particularly described on <u>Exhibit A</u> attached hereto (the "Land");

**TOGETHER WITH** all buildings, structures and improvements thereon and all rights, members, easements and appurtenances appertaining to the Land and all right, title and interest of the Grantor in and to public alleys, streets and rights-of-way adjacent to or abutting the Land (the Land, together with the foregoing, is hereinafter referred to as the "**Property**");

Douglasville - Deed
101982.2 201948-000001

EXHIBIT E TO COMPLAINT

**PROVIDED THAT** the Property is conveyed subject to all easements, restrictions, covenants, agreements, conditions and other matters of record that lawfully affect the Property or any part thereof and all encroachments and other matters that may be revealed by a survey or inspection of the Property;

**TO HAVE AND TO HOLD** the Property with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee and its heirs, legal representatives, successors and assigns, forever, in fee simple, subject to the matters described herein; and

**AND** the Grantor will warrant and forever defend the right and title to the Property unto the Grantee against the claims of all persons whomsoever claiming by, through or under the Grantor, except for the matters set forth herein.

**[SIGNATURE ON NEXT PAGE]**

**IN WITNESS WHEREOF**, the Grantor has caused this Indenture to be signed, sealed and delivered on its behalf by its duly authorized representative as of the date set forth above.

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires: June 28, 2021

[NOTARIAL SEAL]

SUSAN L AKIN
MY COMMISSION EXPIRES
NOTARY
PUBLIC
JUNE 28, 2021
FULTON COUNTY, GEORGIA

**TRUIST BANK**, a North Carolina banking corporation

By: _____
Name: Terri Lasoft
Title: SVP

[SEAL]

CORPORATE SEAL

Douglasville - Deed
101982.2 201948-000001

**EXHIBIT A**

**Description of the Property**

All that tract or parcel of land lying and being in Land Lot 74 of the 1st District, 5th Section, Douglas County, Georgia, being shown as "Tract F 2.243 acres 97,714 SF 4005 Fielding Drive", as more particularly shown on that certain "Final Plat The Shoppes at Chapel Hill", dated December 21, 2006, prepared by Vansant - Campbell Land Surveying - Land Planning, and bearing the certification and seal of Adam T. Pearson, Georgia R.L.S. No. 2993, which Final Plat is recorded in Plat Book 35, page 15, Douglas County, Georgia records, which plat is incorporated herein by reference.

Douglasville - Deed
101982.2 201948-000001

**EXHIBIT E TO COMPLAINT**

Type: QCD
Recorded: 12/30/2020 10:06:00 AM
Fee Amt: $25.00  Page 1 of 4
Transfer Tax: $0.00
Douglas County Georgia
ANNETTA D STEMBRIDGE Clerk Superior

Participant ID(s): 1183408446,
  7067927936

# BK 3904  PG 973 - 976

[Space above this line for recorder's office]

**Prepared by:**
Truist Bank
303 Peachtree Street, NE, 9th Floor
Mail Code:  GA-ATL-0643
Atlanta, Georgia  30308
Attn: Andy McRee, Legal Department

**After Recording Return to:**
BridgeTrust Title Group
National Commercial Unit
6400 Atlantic Boulevard, Suite 160
Norcross, Georgia 30071
Attn: Anslee Foster

Tax Parcel #: 00740150297

## QUITCLAIM DEED

**THIS INDENTURE**, made as of the 99 day of December, 2020, between **TRUIST BANK**, a North Carolina banking corporation, successor in interest to **SUNTRUST BANK**, a Georgia banking corporation (the "Grantor"), and **EQUITY RESOURCE PARTNERS-BRANCH, LLC**, a Georgia limited liability company (the "Grantee") (the words "Grantor" and "Grantee" to include their respective heirs, legal representatives, successors and assigns where the context requires or permits);

## WITNESSETH:

**THAT** the Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does hereby bargain, sell, remise, release, and forever quit-claim to Grantee, subject to the matters described herein, that certain tract or parcel of land lying and being in Douglas County, Georgia, and more particularly described on **Exhibit A** attached hereto (the "Land");

**TOGETHER WITH** all buildings, structures and improvements thereon and all rights, members, easements and appurtenances appertaining to the Land and all right, title and interest of the Grantor in and to public alleys, streets and rights-of-way adjacent to or abutting the Land (the Land, together with the foregoing, is hereinafter referred to as the "**Property**");

Douglasville – Quitclaim Deed

EXHIBIT E TO COMPLAINT

**PROVIDED THAT** the Property is conveyed subject to all easements, restrictions, covenants, agreements, conditions and other matters of record that lawfully affect the Property or any part thereof and all encroachments and other matters that may be revealed by a survey or inspection of the Property; and

**TO HAVE AND TO HOLD** the Property with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of the Grantee forever, subject to the matters described herein.

**[SIGNATURE ON NEXT PAGE]**

Douglasville – Quitclaim Deed

**EXHIBIT E TO COMPLAINT**

**IN WITNESS WHEREOF**, the Grantor has caused this Indenture to be signed, sealed and delivered on its behalf by its duly authorized representative as of the date set forth above.

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires: _____

[NOTARIAL SEAL]

**TRUIST BANK**, a North Carolina banking corporation

By: _____
Name: Terri Lasoff
Title: SVP

[SEAL]



Douglasville – Quitclaim Deed

**EXHIBIT E TO COMPLAINT**

## EXHIBIT A

### Description of the Property

All that tract or parcel of land lying and being in Land Lot 74 of the 1st District, 5th Section, Douglas County, Georgia, being Tract F as depicted on the final plat of The Shoppes at Chapel Hill recorded in Plat Book 35, Page 15, and being more particularly described as follows:

Beginning at a 1/2 inch rebar found at the southwestern end of the mitered intersection of the eastern right of way line of Chapel Hill Road (right of way width varies) and the southern right of way line of Fielding Drive (right of way width varies); thence proceeding along said right of way line of Fielding Drive the following courses and distances: North 42 degrees 43 minutes 09 seconds East a distance of 40.03 feet to a 1/2 inch rebar found, North 88 degrees 27 minutes 52 seconds East a distance of 110.18 feet to a 1/2 inch rebar found, along a curve to the right with a radius of 369.00 feet and an arc length of 162.18 feet (said curve having a chord bearing of South 78 degrees 56 minutes 40 seconds East and a chord distance of 160.88 feet) to a 1/2 inch rebar found, South 70 degrees 47 minutes 08 seconds East a distance of 80.24 feet to a punch hole found, South 66 degrees 29 minutes 47 seconds East a distance of 4.87 feet to a punch hole found and along a curve to the left with a radius of 225.00 feet and an arc length of 18.25 feet (said curve having a chord bearing of South 68 degrees 24 minutes 28 seconds East and a chord distance of 18.24 feet) to a 1/2 inch rebar found; thence leaving Fielding Drive and proceeding South 01 degrees 30 minutes 44 seconds East a distance of 197.87 feet to a 1/2 inch rebar found on the land lot line common to Land Lots 73 and 74; thence proceeding along said land lot line South 88 degrees 29 minutes 51 seconds West a distance of 384.98 feet to a 1/2 inch rebar found on the eastern right of way line of Chapel Hill Road; thence proceeding along said right of way line of Chapel Hill Road North 03 degrees 01 minutes 35 seconds West a distance of 241.78 feet to a 1/2 inch rebar found, said point being the Point of Beginning.

Said tract contains 97,740 square feet or 2.24 acres.

The above described property is shown on an ALTA/NSPS Land Title Survey for Piedmont Land Development, Inc., prepared by Travis Pruitt & Associates, Inc., dated November 6, 2020. (FN:215-E-029)

Douglasville – Quitclaim Deed

EXHIBIT E TO COMPLAINT