## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| EMILY JOY TAYLOR, CARRI THIER, CHRISTOPHER TOMARAS, M.D., RAYMOND WALKUP, M.D., and SHANE MANGRUM, M.D., | |
| Plaintiffs, | CIVIL ACTION FILE NO. |
| v. | _____ |
| POLARIS SPINE AND NEUROSURGERY, P.C., THE POLARIS SPINE AND NEUROSURGERY, P.C. 401(K) PLAN, and MAX. R STEUER, M.D., | |
| Defendants. | |

## COMPLAINT

Plaintiffs Emily Joy Taylor, Carri Thier, Christopher Ronnie Tomaras, M.D., Raymond Russell Walkup, M.D., and Shane Christian Mangrum, M.D. (collectively, "Plaintiffs") hereby file this Complaint against Defendants Polaris Spine and Neurosurgery, P.C. ("Polaris"), The Polaris Spine and Neurosurgery, P.C. 401(k) Plan (the "Plan"), and Max R. Steuer, M.D. ("Steuer"), alleging the following:

## I.   INTRODUCTION

1.      Plaintiffs bring this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiffs were all employees of Polaris, which was a leading Atlanta-area spine care practice. In order to attract and retain talent, Polaris sponsored the Plan, which is a 401(k) defined-contribution retirement plan subject to ERISA. As a result of their tenure with Polaris and contributions to the Plan, Plaintiffs had significant portions of their life savings invested in the Plan. After an acrimonious dispute with Steuer, who is currently the sole remaining voting member of Polaris, Plaintiffs Dr. Tomaras, Dr. Walkup, Dr. Mangrum, and Ms. Taylor (collectively, the "2021 Plaintiffs") were either terminated by or resigned from Polaris in the third quarter of 2021. Ms. Thier, a long-time Polaris employee, was terminated in the Spring of 2022.

2.      The termination of Plaintiffs' employment with Polaris triggered Plaintiffs' right to take full distributions of their Plan balances. Prior to the events described in this Complaint, the amount of a Plan distribution had always been calculated based on an annual, year-end (as of December 31) valuation of the Plan's assets. Under this practice, Plaintiffs were entitled to receive distributions based on the as-of-December 31, 2021 valuation of the Plan's assets. However, in November 2021, Polaris (by and through Steuer who, on information and belief, served as its only

Board member at the time) changed the terms of the Plan to provide for the valuation of the Plan's assets to be conducted on a daily basis. Polaris and Steuer failed to inform Plaintiffs of this significant change to the valuation of the Plan's assets, and continued to misrepresent to Plaintiffs that the Plan engaged only in an annual, as-of-December 31 valuation of Plan assets, both of which constitute violations of Polaris's and Steuer's fiduciary duties.

3. Based on Polaris's and Steuer's misrepresentations in violation of their fiduciary duties, Plaintiffs continued to operate under the (mis)understanding that they would be entitled to distributions of their Plan benefits based on the value of the Plan's assets as of December 31, 2021 if they submitted their distribution requests after the December 31, 2021 valuation and prior to the completion of the as-of-December 31, 2022 valuation. Indeed, Plaintiffs were each aware that the Plan made distributions based on the as-of-December 31, 2020 valuation to employees who requested distributions prior to the release of the as-of-December 31, 2021 valuation.

4. Defendants knew of, but failed to correct, Plaintiffs' mistaken belief that Plaintiffs would be entitled to a distribution of their Plan benefits based on the as-of-December 31, 2021 valuation if Plaintiffs waited to submit their distribution requests until the completion of the as-of-December 31, 2021 Plan valuation. Defendants' actions in this regard resulted in a reduction in value of Plaintiffs' Plan benefits.

3

5.     Defendants also took other actions which caused an improper and unreasonable delay in Plaintiffs' receipt of their Plan distributions. For example, Defendants delayed the preparation and completion of the as-of-December 31, 2021 valuation of Plan assets, causing it to be issued months later than normal. Later, Defendants represented to Plaintiffs, contrary to the terms of the Plan, that because of the Plan's termination, Plaintiffs could not receive distributions based on the recently conducted as-of-December 31, 2021 valuation and instead would have to wait for an as-of-June 30, 2022 valuation.

6.     A reasonable Plan fiduciary would know, based on what was happening with the economy at the time and the performance of various stock market indexes that a valuation of Plan assets as-of-June 30, 2022 would be lower than a valuation of Plan assets as of December 31, 2021.

7.     Defendants failed to conduct an as-of-June 30, 2022 valuation of Plan assets. Instead, on information and belief, Defendants caused the Plan's assets to be liquidated in the period running up to October 12, 2022, when the market was significantly lower than it was on December 31, 2021—i.e., when Plaintiffs were led to believe the valuation would be conducted and their Plan benefits would be valued for purposes of their distributions. The value of the Plan's assets in October 2022 was also

lower than it would have been had the valuation been conducted as of December 31, 2021 or the dates that Plaintiffs requested their distributions.

8.     Plaintiffs seek to recover the hundreds of thousands of dollars lost in the value of their Plan benefits caused as a result of Defendants' misconduct and breaches of fiduciary duties as well as the attorneys' fees and costs incurred in this action.

## II.   NATURE OF ACTION

9.     Plaintiffs are participants in the Plan, which is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Plaintiffs bring this action pursuant to ERISA, 29 U.S.C. § 1001 *et seq.*, and seek to recover the losses to their Plan benefits caused by Defendants Polaris's and Steuer's breaches of fiduciary duties, their full benefits under the terms of the Plan, equitable relief, attorneys' fees, and other appropriate relief as follows.

## III.   JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and under the specific jurisdictional statute for ERISA claims set forth in ERISA § 502(e), (f), 29 U.S.C. § 1132(e), (f).

11.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, the breaches took place in this District, and Defendants reside or may be found in this District. Venue is also

proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.   PARTIES

### A. <u>Plaintiffs</u>

12.     Plaintiff Emily Joy Taylor is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). She resides in Fulton County, Georgia, and is a citizen of Georgia.

13.     Plaintiff Christopher Tomaras, M.D. is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Fulton County, Georgia, and is a citizen of Georgia.

14.     Plaintiff Raymond Walkup, M.D. is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Fulton County, Georgia, and is a citizen of Georgia.

15.     Plaintiff Shane Mangrum, M.D. is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). He resides in Fulton County, Georgia, and is a citizen of Georgia.

16.     Plaintiff Carri Thier is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). She resides in Cherokee County, Georgia and is a citizen of Georgia.

## B. **Defendants**

17.     Defendant Polaris is a Georgia professional corporation with its corporate

headquarters located at 1150E Hammond Drive, Suite 400, Atlanta, GA 30328. Polaris

is the Plan Sponsor and Plan Administrator of the Plan. Polaris is a named fiduciary of

the Plan under ERISA. Polaris may be served through its registered agent, Registered

Agents, Inc., at 300 Colonial Center Parkway, Suite 100N, Roswell, GA 30076.

18.     Defendant Plan is an "employee pension benefit plan" within the

meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). It is also a "defined

contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The

Plan has been named as a defendant with respect to Plaintiffs' claims for benefits and

pursuant to Federal Rule of Civil Procedure 19(a) for the purpose of ensuring that

complete relief can be afforded. The Plan may be served by service on the Plan

Administrator as set forth above, by service on a Trustee of the Plan, or by service on

the President of Polaris.

19.     Defendant Steuer is a resident and citizen of Georgia. He is a named

fiduciary of the Plan and, on information and belief, is the sole trustee of the Plan. In

addition, on information and belief, Steuer is the sole member of Polaris's board of

directors. As a result and in that capacity, Steuer acts as the Plan Administrator of the

Plan. Steuer is both a named fiduciary and functional fiduciary of the Plan and owes

fiduciary duties to the Plan and to Plaintiffs in their capacities as Plan participants. Steuer may be served at his residential address, 967 Crest Valley Dr., Sandy Springs, GA 30327.

## V.   FACTS

### A. **Background**

20.    Polaris was a medical provider specializing in spine care. It held itself out as "Atlanta's premier center for spine care for over 40 years."

21.    Polaris operated locations in Sandy Springs and College Park in the Atlanta metropolitan area.

22.    Polaris made up the Polaris group of entities (the "Polaris Group") together with Polaris Center for Outpatient Spine Surgery LLC (the "Outpatient Center"), and Polaris Spine Associates LLC ("Polaris Spine Associates").

23.    Plaintiff Dr. Tomaras is a board-certified neurosurgeon with over 20 years' experience. He was employed by Polaris as a physician from July 1998 through July 2021 and held an ownership interest in Polaris for approximately 22 years through the Summer of 2021.

24.    Plaintiff Ms. Taylor was employed by Polaris from June 2004 until July 2021. As of her termination in July 2021, Ms. Taylor was Chief Operating Officer of

Polaris. Ms. Taylor also served as the Chief Administrative Officer of the Outpatient Center from March 2015 through July 2021.

25.     Plaintiff Dr. Walkup is a board-certified neurosurgeon with over 11 years' experience. He was employed by Polaris as a physician from June 2011 through July 2021 and has held an ownership interest in Polaris since approximately 2013.

26.     Plaintiff Dr. Mangrum is a board-certified physiatrist with over 17 years' experience. He was employed as a physician by Polaris from April 2015 through September 2021.

27.     Plaintiff Ms. Thier joined Polaris in or around 1995. She began as a secretary before moving to the position of Clinical Triage Coordinator, which she held for 7 years. Ms. Thier was Polaris's longest-serving employee other than Steuer. Ms. Thier's employment was terminated by Polaris on March 25, 2022.

28.     Defendant Steuer joined Polaris in 1991. He is a board-certified neurosurgeon. He has held an ownership interest in Polaris at all times relevant to this lawsuit. By 2021, Steuer was the oldest and longest-serving doctor in the practice. On information and belief, by July 2021, Steuer was the sole holder of voting membership interests in Polaris. On information and belief, Steuer is the sole member of Polaris's board of directors.

9

**B.  The Parties' Prior Disputes**

29.     For many years, Steuer, Dr. Tomaras, Dr. Walkup, and Dr. Thomas
Morrison owned and managed the Polaris Group. In August of 2019, Dr. Morrison
died unexpectedly. Dr. Morrison's death triggered certain repurchase obligations on
the part of the Polaris Group. In the course of addressing the repurchase obligations, a
dispute arose among the remaining owners over Dr. Walkup's status as a voting
shareholder of Polaris. Dr. Walkup filed an action in Fulton County seeking a
declaration regarding his ownership status.

30.     Steuer then filed a lawsuit in Fulton County against Dr. Tomaras, Dr.
Walkup, and Ms. Taylor asserting various claims. In response, Dr Tomaras, Dr.
Walkup, and Ms. Taylor asserted various counter- and cross-claims against Steuer and
the Polaris Group.

31.     In Dr. Walkup's case, the Georgia State-Wide Business Court ruled that
Dr. Walkup was not a voting shareholder in Polaris. Dr. Walkup subsequently made an
offer to Steuer under the "Buy-Sell" provisions of the governing documents of the
Polaris Group entities. Under these provisions, an offeree was required to elect
between purchasing the offeror's interests or selling the offeree's own interests to the
offeror. Rather than make an election, Steuer challenged Dr. Walkup's right to invoke
the "Buy-Sell" provisions.

10

32.     While Dr. Walkup's Buy-Sell proposal and Steuer's challenges were pending, Steuer made an offer under the Buy-Sell provisions to Dr. Tomaras. In May 2021, the State-Wide Business Court concluded that the conditions for invoking the Buy-Sell Provision had not been met at the time Dr. Walkup made his offer and that, accordingly, Steuer was not required to make an election under the Buy-Sell provision in response to Dr. Walkup's offer.

33.     Subsequently, Dr. Tomaras elected to sell his ownership interests in the Polaris Group to Steuer in accordance with the terms of Steuer's Buy-Sell offer.

34.     After acquiring Dr. Tomaras's ownership interests in the Polaris Group, Steuer owned 100% of the voting shares of Polaris, as well as two thirds of membership interests in both the Outpatient Center and Polaris Spine Associates. Steuer closed on the purchase of Dr. Tomaras's interests on July 13, 2021.

35.     Later on July 13, 2021, Steuer terminated Ms. Taylor and Dr. Walkup from their positions at Polaris. Dr. Mangrum left Polaris on September 28, 2021.

36.     Although Dr. Walkup continues to hold a non-voting interest in Polaris and minority membership interests in the Outpatient Center and Polaris Spine Associates, Steuer holds 100% of the voting shares of Polaris, giving Steuer complete control of Polaris.

11

37.     The extent of Steuer's new-found control of Polaris was evidenced by a special meeting of Polaris's shareholders on or about July 27, 2021. During this meeting, Steuer removed all prior officers of Polaris and elected himself Co-President, Secretary, and Treasurer. His also appointed his wife, Lisa Steuer, Co-President of Polaris.

38.     After leaving Polaris, Drs. Tomaras and Walkup formed Axion Spine & Neurosurgery ("Axion") in July 2021, and employed Ms. Taylor. Dr. Mangrum joined Axion after leaving Polaris in or around September 2021, and Ms. Thier joined Axion after being terminated from Polaris in March 2022. Axion operates three locations in the greater Atlanta area: Atlanta, Alpharetta, and Riverdale.

39.     Since Plaintiffs left Polaris, Polaris has ceased operations.

40.     On or about May 27, 2022, Polaris informed Plaintiffs that the Plan would be terminated as of June 30, 2022.

## C. **The Plan and Its Provisions**

### 1. **History of the Plan**

41.     The Plan is a single-employer benefit plan under ERISA that was established in 1977 and which was intended to provide retirement benefits for eligible employees of Polaris.

42.     Prior to being terminated, the "accounts" that the Plan maintained for Plan participants were not individual segregated investment accounts. Instead, Plan participants' assets were pooled together, with each participant being entitled to a certain sum from the Plan's assets depending on various factors, including the participant's previous contributions to the Plan. Although the Plan's assets were pooled, Plan documents and communications by Polaris referred to individuals' notional "accounts," which represent the amount of the Plan's assets to which the individual was entitled, which was calculated for each individual participant when the Plan's assets were valued, as of each December 31. For ease of reference, this Complaint also refers to a Plaintiff's "account" as representing the sum from the Plan's pooled assets to which that Plaintiff was entitled.

43.     Prior to its termination, the Plan's assets were primarily invested in publicly traded U.S. stocks. (For example, as of December 31, 2021, approximately 69% of the Plan's investments were in publicly traded U.S. stocks.) Accordingly, increases in the value of major U.S. stock indexes typically corresponded with increases in the value of the Plan's assets. Likewise, decreases in the value of major U.S. stock indexes typically corresponded with decreases in the value of the Plan's assets. Despite most of the Plan's assets being invested in publicly traded U.S. stocks,

the Plan's assets and each participant's account were historically valued only annually, as of every December 31.

## 2.   <u>Prior Practice Under the Plan</u>

44.    As of December 2020, the Plan was operating under Plan documents adopted in 2016. A true and correct copy of the 2016 Plan Document (the "2016 Plan Document") is attached hereto as **Exhibit 1**. A true and correct copy of the 2016 adoption agreement (the "2016 Adoption Agreement") is attached hereto as **Exhibit 2**.

45.    Under the 2016 Adoption Agreement, the Plan provided that the valuation of the Plan's assets would be conducted on an annual basis. In particular, the assets of the Plan were valued annually on the last day of the "Plan Year." **Ex. 2**, § H.3. The Plan Year, in turn, is defined to mean the calendar year. *See id.* § A.4

46.    The 2016 Adoption Agreement provided that "Distributions after Termination of Employment for reasons other than death shall commence . . . . [a]s soon as administratively feasible after all contributions have been allocated relating to the Plan Year in which the Participant's Account balance becomes distributable." **Ex. 2** § F.3; *see also* 2016 Plan Document, **Ex. 1**, § 7.02(a) ("[P]ayment of [a terminated employee's] vested Account shall commence at such times . . . as specified in the [2016] Adoption Agreement.").

14

47.     The 2016 Plan Document also provided that the account balance of a Plan participant whose employment had been terminated became distributable upon that participant's completion of a distribution election form. *See* 2016 Plan Document, **Ex. 1**, § 7.02(a).

48.     Consistent with the terms of these Plan documents, the practice of Polaris and the Plan was that, when a participant made a distribution request, the participant would generally receive his or her distribution based upon the Plan's most recent annual as-of-December 31 valuation of Plan assets. If a participant requested a distribution early in a calendar year, before the valuation had been conducted for the most recent year, the participant would be given the option of receiving a distribution based on the most recent valuation or waiting for the valuation of the prior year.

49.     For example, a participant requesting a distribution in 2020 before the as-of-December 31, 2019 valuation was conducted would be given the option of receiving his or her distribution based upon the valuation of Plan assets as of December 31, 2018, or waiting for the as-of-December 31, 2019 valuation to be conducted and receiving a distribution on the basis of the as-of-December 31, 2019 valuation.

50.     Participants whose Plan accounts received contributions subsequent to the valuation date of their distribution would receive a small "top-up" payment to reflect those contributions. For example, a participant whose Plan account received

some contributions in 2020 and who received a distribution based on the as-of-December 31, 2019 valuation would later receive a small "top-up" payment based on their contributions to the Plan in 2020 and the as-of-December 31, 2020 valuation of the Plan's assets.

51.     Historically, the annual as-of-December 31 valuations of the Plan's assets for a particular calendar year were completed by March or April of the next year (i.e., within three to four months after the end of the prior calendar year).

### 3. <u>The Amended and Restated Plan Document</u>

52.     On November 9, 2021, the board of directors of Polaris (which, on information and belief, consisted solely of Steuer) adopted an "amended and restated" "Basic Plan Document #01" (the "2021 Plan Document"), effective January 1, 2021.

53.     A true and correct copy of the board resolution authorizing the adoption of the 2021 Plan Document (the "Resolution") is attached hereto as **Exhibit 3**. The Resolution was signed solely by Steuer and recites that it was taken by unanimous consent of Polaris's directors. Resolution, **Ex. 3** at 1.

54.     The 2021 Plan Document and other 2021 Plan documentation state that they were prepared by Warren Averett Benefit Consultants, LLC ("Warren Averett"). In its role as benefit consultant for the Plan, Warren Averett acted as agent for Polaris, Steuer, and the Plan.

16

55.     A true and accurate copy of the 2021 Plan Document is attached hereto as **Exhibit 4**.

56.     Polaris also created a document styled "Adoption Agreement #001" (the "2021 Adoption Agreement") in relation to the amended and restated Plan. A true and correct copy of the 2021 Adoption Agreement is attached hereto as **Exhibit 5**.

57.     The 2021 Adoption Agreement provides that Polaris is the Plan Sponsor and shall also serve as the Plan Administrator. **Ex. 5**, p.1, Employer Information § 1; *id.* p.30, Plan Operations § 6; *see also* 2021 Plan Document, **Ex. 4** § 11.01(a).

58.     Because Steuer is (on information and belief) the sole Director of Polaris, and completely controls Polaris, Steuer acted as the Plan Administrator and, in that capacity, is a fiduciary to the Plan. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

59.     Steuer was also a Plan fiduciary due to his role as a named trustee of the Plan.

60.     Under the 2021 Plan Document, Polaris "shall be the Plan 'administrator' as such term is defined in section 3(16) of ERISA and as such shall have total and complete discretionary power and authority" to take various actions.

61.     Pursuant to the terms of the 2021 Plan Document, the actions that Polaris as Plan Administrator had total and complete discretionary power and authority to take include:

    a.   "to determine the amount, form or timing of benefits payable hereunder and the recipient thereof and to resolve any claim for benefits in accordance with this Article 11." 2021 Plan Document, **Ex. 3**, § 11.01(b)(2);

    b.   "to prepare and furnish to Participants . . . all information and notices required under applicable law or the provisions of this Plan." *Id.* § 11.01(b)(5); and

    c.   "to perform such other functions and duties as are set forth in the Plan that are not specifically given to the Investment Fiduciary or Trustee." *Id.* § 11.01(b)(18).

62.    The 2021 Plan Document provides that the Plan Administrator "shall . . . be the named fiduciary within the meaning of ERISA section 402." *Id.* at 8.

63.    The 2021 Plan Document further provides that "[i]n performing its duties, the Plan Administrator shall use the care, skill, prudence and diligence under the circumstances than prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 11.01(c).

64.    On information and belief, a summary plan description for the amended and restated 2021 Plan Document ("SPD") was created on or around the time of the

adoption of the 2021 Plan Document. The SPD, however, was not provided to any of the Plaintiffs until after July 1, 2022. The remaining Plan documentation for the amended and restated Plan documents were not provided to Plaintiffs until in or about August 2022.

### 4. <u>Additional Plan Fiduciaries</u>

65.     In connection with the adoption of the amended and restated Plan, Polaris, Steuer, Dr. Bethwel Raore, Ms. Melanie Simmons, and Ms. Melanie Cox executed a trust agreement (the "2021 Trust Agreement") on November 9, 2021. A true and correct copy of the 2021 Trust Agreement is attached hereto as **Exhibit 6**.

66.     Under the 2021 Trust Agreement, Steuer, Dr. Raore, Ms. Cox, and Ms. Simmons are "collectively, [defined as] the 'Trustee.'" **Ex. 6** at 1.

67.     The Board Resolution adopting the 2021 Plan also provides that Steuer, Dr. Raore, Cox, and Simmons "are hereby retained as the Trustees of the Plan." **Ex. 3** at 1.

68.     The tenure of Dr. Raore, Cox, and Simmons as Trustees of the Plan was short-lived. On information and belief, by the end of May 2022, Steuer was the sole remaining trustee of the Plan.

69.     The duties of the Trustee include that the Trustee "shall make distributions out of the Trust Fund pursuant to instructions described in Article V." *Id.* § 2.03.

70.     Under Article V of the 2021 Trust Agreement, the "Trustee shall pay benefits and expenses from the Trust Fund only upon the written direction of the Plan Administrator." *Id.* § 5.04.

71.     Polaris also adopted a "Funding Policy Statement" for the 401(k) Plan, a true and correct copy of which is attached hereto as **Exhibit 7**.

72.     The Funding Policy Statement provides that "the Investment Fiduciaries are Max Steuer, MD, Bethwel Raore, MD, Melanie Simmons and Melanie Cox." **Ex. 7** at 1.

73.     The Funding Policy Statement specified the investment objective of the Plan as follows:

> The basic investment objective for the Trust funding the Plan is the long term stability of Plan assets that provide moderate growth. Investments must be diversified to protect the Plan from cyclical market fluctuations, withstand inflation erosion and provide sufficient liquidity for unexpected distributions as well as anticipated retirements and other termination distributions.

*Id.* at 1.

74.     The Investment Fiduciaries have the "authority and responsibility" to, among other things, "manage the investment of the Trust," and "to supply such

information to any person as may be required." 2021 Plan Document, **Ex. 4**,

§ 11.02(b)(1), (5).

76.     Under the 2021 Plan Document, the Investment Fiduciaries are "subject

to the standards of conduct as prescribed under ERISA." **Ex. 4** at 6. Accordingly,

Steuer was a fiduciary of the Plan in his role as Investment Fiduciary.

76.     On information and belief, Raore, Simmons, and Cox resigned their

positions as Investment Fiduciaries (as well as Trustees) under the Plan by the end of

May 2022, leaving Steuer as the Plan's sole Trustee and Investment Fiduciary by June

1, 2022.

5. <u>**Treatment of Benefits Upon Termination of Employment**</u>

77.     The 2021 Plan Document provides as follows regarding the distribution

of benefits upon the termination of employment:

> Termination of Employment. **A Participant shall become entitled to receive his vested Account pursuant to Section 7.02 following the date he has a Termination of Employment.** . . .

**Ex. 4** § 7.01(e) (emphasis added).

78.     Section 7.02 of the 2021 Plan Document provides as follows:

> (a) Distribution for Reasons Other Than Death. **If a Participant's Account balance becomes distributable pursuant to Section 7.01** for any reason other than death . . . **payment of his vested Account shall commence at such times and shall be payable in the form and at such times as specified in the** [2021] **Adoption Agreement.** . . .

The method of distribution shall be selected by the Participant on a form prescribed by the Plan Administrator.

**Ex. 4** § 7.02(a) (emphasis added).

79.     The 2021 Adoption Agreement provides that distributions for reasons of termination of employment other than death "**shall commence . . . [i]mmediate[ly]**"—that is, "[a]s soon as administratively feasible with a final payment made consisting of any allocation occurring after [the] Termination of Employment." 2021 Adoption Agreement, **Ex. 5** § F.3 (emphasis added).

80.     The 2021 Plan Document provides that "[t]he distributable amount of a Participant's Account is the vested portion of his Account **as of the Valuation Date coincident with or next preceding the date distribution is made to the Participant** or Beneficiary as reduced by any subsequent distributions, withdrawals or loans." **Ex. 4**, § 7.02(c) (emphasis added).

81.     Per the 2021 Plan Document and the 2021 Adoption Agreement, the "Valuation Date" is "**each business day.**" **Ex. 5**, § H.5 (emphasis added); *see also* **Ex. 4**, § 2, p.14.

82.     The valuation provision in the 2021 Plan Documents is materially different than the valuation provision provided for under the prior version of the Plan (i.e., the 2016 Plan Document), which provided that valuations were to be conducted

22

annually as of every December 31. *See* 2016 Adoption Agreement, **Ex. 2**, §§ F.3, H.3; *see also* ¶¶ 44–51, *supra*.

83.     Contrary to—and in violation of—the express valuation and distribution provisions of the current 2021 Plan documents, the Plan fiduciaries did not cause the Plan's assets to be valued each business day.

## D. Defendants' Refusal to Distribute Plaintiffs' Plan Benefits and Termination of the Plan with the Markets at Historic Lows

### 1. Defendants Continued to Behave as Though the Plan Provides for End-of-Year Valuations.

84.     Although the amended and restated Plan adopted by Polaris and Steuer provided for daily valuations, neither Polaris, the Plan, nor any of the Plan fiduciaries (including Steuer) informed Plaintiffs of this fact or provided Plaintiffs with a copy of the amended and restated Plan documents. This omission is significant given that Defendants were aware that Plaintiffs were eligible for distributions and were aware of the past practice and requirements of an annual valuation.

85.     Indeed, the Plan, Polaris, and the Plan's fiduciaries continued to behave as though the Plan still provided for annual as-of-December 31 valuations. They did so knowing of the 2021 Plan Document terms which provided for a daily valuation procedure no later than November 9, 2021 (the date of adoption of the 2021 Plan).

86.     Notably, at least two employees who left Polaris around the same time as

the 2021 Plaintiffs and who requested their distributions at that time received distributions based on the valuation as of December 31, 2020 (i.e., based on the most recent end-of-year valuation as was the practice under the 2016 version of the Plan).

87.     Plaintiffs' benefits under the Plan had all fully vested by the time of their termination of employment.

88.     Accordingly, following the termination of their employment, Plaintiffs considered requesting distributions of their Plan account balances.

89.     Based on past and continuing practice, Polaris's, the Plan's, and the Plan's fiduciaries' failure to provide Plaintiffs with the amended and restated Plan documents, and the misrepresentations and omissions of Polaris, the Plan, and the Plan's fiduciaries, Plaintiffs believed that the Plan was operating on an end-of-year valuation basis. Accordingly, based on Defendants' misconduct, Plaintiffs understood that they would be entitled to distributions based on the as-of-December 31, 2021 valuation of their Plan accounts if they waited to request their distributions until after the December 31, 2021 valuation.

90.     Through their communications with Plaintiffs, Polaris, the Plan, and the Plan's fiduciaries were aware that Plaintiffs believed that the Plan was operating on an end-of-year valuation basis.

91.     Polaris, the Plan, and the Plan fiduciaries did not inform Plaintiffs that the

24

Plan's assets were now subject to daily valuation and misrepresented to Plaintiffs that the Plan's assets continued to be subject to an annual valuation as of December 31.

92.     By way of example, on October 12, 2021, a Warren Averett employee acting on behalf of the Plan and the Plan's fiduciaries (including Polaris and Steuer) told Dr. Mangrum that, if he completed a distribution request at that time, "[y]our distribution would be your account value as of 12-31-2020" because "[t]his 401k is a pooled account and it only gets valued after the plan year end." When the Plan was amended on November 9, 2021, this statement was no longer accurate, but none of the Defendants or their agents informed Plaintiffs of the change.

93.     As another example, on October 29, 2021, the principal of Crawford Investment Counsel, Inc. ("Crawford"), which managed the Plan's investments and in that capacity was an agent of the Plan and the Plan's fiduciaries (including Polaris and Steuer), told Dr. Walkup that "[i]n the past, the plan has been valued and [sic] year-end, and then distributions are made based on year-end values. Since we are fairly close to the end of the year, and because the assets have appreciated in 2021, I think it in your best interest to follow this protocol." These statements were rendered inaccurate by the amendments to the Plan that occurred on November 9, 2021, but neither Defendants nor any of their agents informed Plaintiffs of this change.

94.     By way of further example, on November 18, 2021, a Crawford

employee acting as an agent of Defendants told Dr. Tomaras that "if you submit your request now you will receive the 12/31/2020 value of your holdings[;] . . . you can let [Polaris] know that you do not want your request processed until the 12/31/2021 values have been established."

95.     By way of additional example, on December 31, 2021, Dr. Tomaras wrote to Polaris, as Plan Administrator, stating that he was "writing to request distribution forms . . . once the 12/31 values have been determined." A Polaris employee responded to Dr. Tomaras but did not tell Dr. Tomaras that the Plan had changed to daily valuations.

96.     The misrepresentations and omissions from Defendants and their agents continued into 2022. For example, on February 18, 2022, a Warren Averett employee acting as an agent of Defendants told Dr. Mangrum that "as soon as I complete the 2021 valuation, I will process your distribution."

97.     In delaying the submission of their distribution requests, Dr. Tomaras, Dr. Walkup, and Ms. Taylor relied on the material misrepresentations and omissions by Defendants. If Dr. Tomaras, Dr. Walkup, and Ms. Taylor had known the Plan's assets were subject to daily valuation, they would have requested distributions of their Plan accounts on or around December 31, 2021.

98.     Plaintiff Dr. Mangrum initially requested a distribution of his Plan

account assets no later than November 1, 2021. Relying on the material

misrepresentations and omissions by Defendants and their agents that a later-requested

distribution would be based on the as-of-December 31, 2021 valuation, Dr. Mangrum

discontinued his November 2021 request for a distribution.

99.    No later than February 8, 2022, Dr. Mangrum submitted a second claim

for benefits on the understanding that the claim would be processed after the as-of-

December 31, 2021 valuation. In discontinuing his attempts to obtain a distribution in

November 2021 and waiting until February 2022 to request a distribution of his Plan

account, Dr. Mangrum relied on the misrepresentations and omissions by Defendants

and their agents to his detriment.

100.    If Dr. Mangrum had known in late 2021 that the Plan's assets were

subject to daily valuation, he would have pursued his November 1, 2021 request for

distribution or requested a distribution on or about December 31, 2021.

2. **Polaris, the Plan, and the Plan Fiduciaries Erroneously Tell Plaintiffs that Distributions Cannot be Processed Until a Final Valuation of the Plan Assets Due To The Termination of the Plan**

101.    Although the amended and restated Plan documents provided for daily

valuation, Polaris, the Plan, and the Plan's fiduciaries told Plaintiffs that the Plan's

assets were valued only once per year, as of December 31, and the next annual

valuation would be conducted as of December 31, 2021.

102.    However, on information and belief, Polaris, the Plan, and the Plan's fiduciaries caused the as-of-December 31, 2021 valuation of the Plan's assets to be delayed by failing to provide the necessary documentation and information to Warren Averett and by failing to pay Warren Averett's invoices. As a consequence, the as-of-December 31, 2021 valuation was not completed until on or around May 24, 2022.

103.    On March 25, 2022, Ms. Thier was terminated from her position at Polaris. She was informed that her termination was due to Polaris's declining financial state. Ms. Thier requested a distribution of her entire Plan account on April 5, 2022.

104.    Increasingly concerned that Defendants' actions were jeopardizing their retirement benefits due to the fact that the market was rapidly declining, Ms. Taylor, Dr. Tomaras, and Dr. Walkup submitted distribution requests to Polaris as Plan Administrator in May 2022.

105.    When the as-of-December 31, 2021 valuation of Plan assets was finally completed, Polaris, the Plan, and the Plan fiduciaries refused to use that valuation to value the Plan's assets and determine the amount of Plaintiffs' distributions. Instead, on or about May 27, 2022, Defendants told Plaintiffs that they **still** could not receive distributions because they needed to wait for the Plan's assets to be valued as of June 30, 2022.

106.    Polaris, the Plan, and the Plan fiduciaries told Plaintiffs that this further delay was necessary due to Polaris's closing and the decision to terminate the Plan. According to Defendants, the as-of-June 30, 2022 valuation of Plan assets was going to be the final valuation of the Plan's assets and Plaintiffs were not eligible to receive distributions based on the long-awaited December 31, 2021 valuation of the Plan's assets.

107.    The termination of the Plan, however, did not alter the Plan's requirement that the Plan's assets be valued on a daily basis. Instead, the 2021 Plan Document states as follows:

> Except as provided in Sections 7.10 and 12.03, a Participant shall receive the balance of his Account in a lump sum payment upon termination of the Plan without the establishment of [certain other types of plan]. . . .

**Ex. 4**, § 7.09.

108.    Nothing in Plan Sections 7.10 or 12.03 provides that participants who have requested a distribution must receive a distribution based on a valuation of the Plan's assets as of the Plan's termination date.

109.    Defendants' representations were inaccurate in other ways. By way of example only, on information and belief, there was never an as-of-June 30, 2022 valuation of the Plan's assets.

110.    Defendants' failure to cause distributions to be made as soon as administratively feasible after Plaintiffs submitted their claims for benefits caused Plaintiffs' Plan accounts to lose additional value and violated the terms of the Plan Documents.

### 3. <u>The Liquidation of Plan Assets</u>

111.    On September 28, 2022, Plaintiffs each received a letter (the "Plan Termination Letter") from Polaris stating that "Polaris Spine & Neurosurgery, PC terminated the Plan effective June 30, 2022." A true and accurate copy of the Plan Termination Letter is attached hereto as **Exhibit 8**.

112.    The Plan Termination Letter further stated that Polaris engaged PenChecks Trust Company of America ("PenChecks") as "distribution processor and directed custodian." *Id.*

113.    Although Polaris, Steuer, and their agents had previously represented that distributions from the Plan's assets would be based on the June 30, 2022 valuation, the Plan Termination Letter stated that "The Plan's Third Party Administrator, Warren Averett LLC, is finalizing the determination of all participant account balances **to reflect investment earnings through the date the assets are liquidated and held in cash**. We expect this to be completed as soon as possible." *Id.* (emphasis added).

114.    The Plan Termination Letter further stated that, once Warren Averett's determination was complete, the assets would be transferred to PenChecks for distribution to Plan participants. *Id.*

115.    On October 11, 2022, Ms. Taylor received a letter that stated that Warren Averett was in the process of finalizing participant Plan account balances.

116.    Plaintiffs have not received an explanation from Defendants as to how the amounts of their distributions were calculated. On information and belief, the distributions that Plaintiffs ultimately received were based on the value of the Plan's assets as of the time of their liquidation.

117.    On or about October 13, 2022, Ms. Taylor learned that the Plan's remaining assets had been transferred to PenChecks for distribution.

118.    The failure to base distributions on the December 31, 2021 valuation date, the June 30, 2022 valuation date, or as of the date Plaintiffs requested their distributions caused Plaintiffs to suffer additional losses to the value of their Plan accounts.

119.    A reasonable and prudent fiduciary acting in compliance with his or its fiduciary duty would have known that a delay in the valuation and distribution of Plan assets would be harmful to Plaintiffs and other eligible Plan participants due to the relationship between the valuation of the Plan assets and the performance of the stock

31

market indexes. Given that the stock market indexes were declining, a fiduciary acting in compliance with his or its fiduciary duties would have known that the value of Plan assets was also declining.

120.    The liquidation of the Plan's assets occurred at a time when the markets were at a **historic** low point.

121.    The S&P 500 index closed at 3,577.03 on October 12, 2022. This was the S&P 500's **lowest** closing point since November 2020. This represents a decline of **24.95%** from the index's high closing point of 4,766.18 on December 31, 2021.

122.    The Nasdaq Composite index closed at 10,417.10 on October 12, 2022. This was the index's **lowest** closing point since July 2020. This represents a decline of **33.42%** from the index's closing point of 15,644.97 on December 31, 2021.

123.    The Dow Jones Industrial Average closed at 29,210.85 on Wednesday, October 12, one of its lowest closing points since November 2020. This represents a decline of **19.61%** from the index's closing point of 36,338.30 on December 31, 2021.

124.    The liquidation of the Plan's assets when markets were at lows not seen in over a year caused significant damage to the value of the Plan's assets, including the Plan's assets that were allocated to Plaintiffs' Plan accounts.

4. **Plaintiffs' Requests for Distributions**

*a. Ms. Taylor*

125.    Ms. Taylor was eligible to request a distribution of her Plan Account on July 13, 2021, the date that her employment with Polaris was terminated.

126.    Under the Plan, "a person entitled to benefits from the Plan (a 'Claimant') may apply for such benefits by completing and filing a claim with the Plan Administrator." 2021 Plan Document, **Ex. 4**, § 11.07(a).

127.    Relying on the misrepresentations and omissions of Polaris, the Plan, and the Plan fiduciaries, Ms. Taylor did not request the distribution of her Plan account until May 2022.

128.    Ms. Taylor filed a claim for benefits with Polaris as the Plan Administrator on May 11, 2022.

129.    Pursuant to the Plan documents, Ms. Taylor sought a lump-sum rollover distribution of her entire Plan account.

130.    At this time, stock prices in the United States were trending down. Accordingly, it was important that Polaris, the Plan, and the Plan fiduciaries promptly distribute Plaintiffs' Plan accounts in order to minimize Plaintiffs' losses.

131.   Ms. Taylor followed up with Polaris, Polaris's attorneys, and Warren Averett numerous times in the summer of 2022 in an attempt to ensure that the distribution of her Plan account occurred.

132.   Under the Plan, if the Plan Administrator denies a claim for benefits,

The Plan Administrator **shall** notify the Claimant of any adverse benefit determination **within a reasonable period of time, but not later than 90 days** . . . after receipt of the claim. This period may be extended one time by the Plan for up to 90 days . . . , **provided that** the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial review period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

*Id.* § 11.07(b) (emphasis added).

133.   The Plan Administrator's notice of denial of a claim "**shall**" contain certain information including the reasons for the denial, the pertinent provisions of the Plan, an explanation of any material or information necessary to grant the claim, and an explanation of the steps to appeal the denial of the claim. *Id.* § 11.07(c) (emphasis added).

134.   If a claim is denied, the Claimant may file a written appeal with the Plan Administrator within 60 days "after he receives the Plan Administrator's written notice that the claim as been wholly or partially denied." *Id.* § 11.07(d).

34

135.    Defendants informed Ms. Taylor that she would not receive a distribution based on the as-of-December 31, 2021 valuation, but did not distribute Ms. Taylor's Plan account or issue a formal denial of her claim within 90 days of their receipt of the claim or at any time before August 31, 2022.

136.    Although Defendants failed to issue a formal denial of Ms. Taylor's claim for benefits, Ms. Taylor wrote to Polaris in its role as Plan Administrator and Steuer in his role as Trustee on August 31, 2022. In this letter, Ms. Taylor stated, among other things, that she had not received a timely response to her May 11, 2022 distribution request. Ms. Taylor's letter also stated that "[i]n the absence of the required written notice," Polaris should "consider this my formal appeal of your denial of my claim."

137.    Ms. Taylor did not receive a response to her August 31, 2022 letter.

138.    Defendants' actions in ignoring Ms. Taylor's claim and attempted appeal denied Ms. Taylor meaningful access to the administrative review and appeal process set forth in the Plan.

139.    The Plan made a distribution to Ms. Taylor of $443,621.03 on or about November 11, 2022. This sum was substantially lower than the value of her Plan account on December 31, 2021, which was $508,838.20. The amount of Ms. Taylor's

distribution was also substantially lower than the valuation would have been on May 11, 2022, the date of her claim for benefits.

### b. Dr. Mangrum

140.    Dr. Mangrum was eligible to request a distribution as of September 28, 2021, the date of the termination of his employment with Polaris.

141.    Dr. Mangrum attempted to file a claim for benefits with Polaris as the Plan Administrator on or about November 1, 2021. Pursuant to the Plan documents, Dr. Mangrum sought a lump-sum rollover of his entire Plan account.

142.    Polaris, the Plan, and the Plan fiduciaries failed to make a distribution to Dr. Mangrum of his Plan account at that time.

143.    As referenced above, Steuer, Polaris, the Plan, and their agents (mis)represented to Dr. Mangrum that the Plan was subject to annual, as-of-December 31 valuations, and failed to inform him that the Plan was amended to provide for daily valuations.

144.    Acting in reliance on Polaris's, the Plan's, and the Plan fiduciaries' misrepresentations and failures to inform Dr. Mangrum as to the daily-valuation mechanism purportedly in effect at that time, Dr. Mangrum desisted from seeking a distribution of his Plan account in late 2021. Instead, as a result of Defendants'

misconduct, Dr. Mangrum decided instead to wait until 2022 to request a distribution based on the yet-to-be-conducted valuation as of December 31, 2021.

145.   Dr. Mangrum again filed a claim for benefits with Polaris as the Plan Administrator on February 8, 2022, seeking a lump-sum rollover of his entire Plan account based on the yet-to-be-conducted valuation as of December 31, 2021, in reliance on Polaris's, the Plan's, and the Plan fiduciaries' misrepresentations and failures to inform Dr. Mangrum as to the daily-valuation mechanism purportedly in effect at that time.

146.   Dr. Mangrum did not receive either a formal notice of denial of his claim for benefits or a notice that the review period for his claim for benefits was being extended within 90 days of submitting his distribution request or at any time.

147.   Regardless, Dr. Mangrum followed up with Polaris as Plan Administrator and Warren Averett numerous times during 2022 in an attempt to obtain a timely distribution of his Plan account. On August 11, 2022, Dr. Mangrum identified to Defendants that, under the 2021 Plan documents as written, Plaintiffs were entitled to a distribution based on a daily valuation of their accounts.

148.   On or about August 30, 2022, Dr. Mangrum wrote to Polaris in its role as Plan Administrator. In this letter, Dr. Mangrum stated, among other things, that he had not received a timely response to his distribution request of February 8, 2022. Dr.

37

Mangrum's letter also stated that, although Polaris had failed to provide proper notice of the denial of his claim, Polaris should consider Dr. Mangrum's letter to be a formal appeal of Polaris's denial of his claim. Dr. Mangrum did not receive a response to this letter.

149.   Defendants' actions in ignoring Dr. Mangrum's claims and attempted appeal denied Dr. Mangrum meaningful access to the administrative review and appeal process set forth in the Plan.

150.   Polaris, the Plan, and the Plan fiduciaries did not distribute Dr. Mangrum's Plan account until in or around late November 2022—roughly eight months after his request—when Dr. Mangrum received $174,400. This distribution was in an amount substantially lower than Dr. Mangrum would have received if the Plan's assets had been valued as of November 1, 2021. The distribution that Dr. Mangrum received was also substantially lower than the as-of-December 31, 2021 valuation of Dr. Mangrum's Plan account, which was $201,483.17, and substantially lower than in February 2022, when Dr. Mangrum submitted his subsequent claim for benefits.

### c. Dr. Tomaras

151.   Dr. Tomaras was eligible to request a distribution of his Plan Account as of July 13, 2021, the date of his termination of employment with Polaris.

152.    Relying on the misrepresentations and omissions of Polaris, the Plan, and the Plan fiduciaries, Dr. Tomaras did not request the distribution of his Plan account until May 2022.

153.    Dr. Tomaras filed a claim for benefits with Polaris as the Plan Administrator on May 12, 2022. Pursuant to the Plan documents, Dr. Tomaras sought a lump-sum rollover of his entire Plan account.

154.    Dr. Tomaras did not receive either a formal notice of denial of his May 12, 2022 claim or a notice that the Polaris or the Plan required additional time to process his request.

155.    Although Defendants failed to issue a formal denial of Dr. Tomaras's claim for benefits, Dr. Tomaras wrote to Polaris in its role as Plan Administrator and to Steuer in his role as Trustee on August 30, 2022. In this letter, Dr. Tomaras stated, among other things, that he had not received a timely response to his May 12, 2022 distribution request. Dr. Tomaras's letter also stated that "[i]n the absence of the required written notice," Polaris should "consider this my formal appeal of your denial of my claim." Dr. Tomaras did not receive a response to this letter.

156.    Defendants' actions in ignoring Dr. Tomaras's claim and attempted appeal denied Dr. Tomaras meaningful access to the administrative review and appeal process set forth in the Plan.

157.    The Plan made a distribution to Dr. Tomaras in or around late November 2022 of $1,698,141.62. This amount was substantially lower than the valuation of Dr. Tomaras's account as of December 31, 2021, which was $1,880,303.05, and also substantially lower than the amount that Dr. Tomaras would have received if his Plan account had been valued as of May 12, 2022, the date of his claim for benefits.

### d.  Dr. Walkup

158.    Dr. Walkup was eligible to request a distribution of his Plan Account as of July 13, 2021, the date of his termination of employment with Polaris.

159.    Relying on the misrepresentations and omissions of Polaris, the Plan, and the Plan fiduciaries, Dr. Walkup did not request the distribution of his Plan account until May 2022.

160.    Dr. Walkup filed a claim for benefits with Polaris as the Plan Administrator on May 14, 2022. Pursuant to the Plan documents, Dr. Walkup sought a lump-sum rollover of his entire Plan account.

161.    Dr. Walkup did not receive a notice of denial of his May 14, 2022 claim or a notice that Polaris or the Plan required additional time to process his request.

162.    On or about September 1, 2022 Dr. Walkup wrote to Polaris in its role as Plan Administrator. In this letter, Dr. Walkup stated, among other things, that he had not received a timely response to his May 14, 2022 distribution request. Dr. Walkup's

letter also stated that, although Polaris had failed to provide proper notice of the denial of his claims, Polaris should consider Dr. Walkup's letter to be a formal appeal of Polaris's denial of his claim. Dr. Walkup did not receive a response to this letter.

163.    Defendants' actions in ignoring Dr. Walkup's claim and attempted appeal denied Dr. Walkup meaningful access to the administrative review and appeal process set forth in the Plan.

164.    Dr. Walkup received a distribution of $318,955.71 on December 7, 2022. This amount was substantially lower than the $357,435.50 valuation of his Plan account as of December 31, 2021, and also substantially lower than the valuation would have been on May 14, 2022, the date of his claim for benefits.

### e.  Ms. Thier

165.    Neither Polaris, Steuer, the Plan or their agents informed Ms. Thier that the Plan was amended in November 2021.

166.    Accordingly, Ms. Thier understood that, upon a distribution request, Plan accounts would be valued as of the end of the prior year. Ms. Thier continued to work for Polaris in reliance on her understanding that the Plan was subject to end-of-year valuation until the termination of her employment.

167.    Ms. Thier was eligible to file a claim for benefits on March 25, 2022, the date of her termination of employment.

168.   Ms. Thier filed a claim for benefits with Polaris on April 5, 2022. Pursuant to the Plan documents, Ms. Thier sought a lump-sum rollover of her entire Plan account.

169.   Ms. Thier did not receive a formal notice of denial of her April 5, 2022 claim or a notice that the Polaris or the Plan required additional time to process her claim.

170.   Ms. Thier followed up with Polaris several times during the course of 2022 to request the prompt distribution of her account balance but was repeatedly told that she would have to await further valuations.

171.   Ms. Thier learned that the 2021 Plaintiffs' attempts to appeal the denials of their claims for benefits were ignored by Defendants. Accordingly, attempting to appeal the denial of her claim for benefits would have been futile.

172.   Ms. Thier received a distribution of $ 401,178.77 on November 29, 2022. This amount was substantially lower than the $453,253.79 valuation of her Plan account as of December 31, 2021, and also substantially lower than the valuation would have been on April 5, 2022, the date of her claim for benefits.

**5.   Plaintiffs' Requests for Plan Documentation**

173.   On June 29, 2022, Ms. Taylor requested that Polaris, in its capacity as Plan Administrator, provide her with copies of the Plan documents.

42

174.    Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024, Polaris as Plan Administrator was required to provide copies of these documents within 30 days—by July 29, 2022.

175.    These documents were not provided until August 11, 2022.

**6.  <u>Government Investigations</u>**

176.    On information and belief, the administration and management of the Plan by Polaris and the other fiduciaries of the Plan are currently under investigation by both the United States Department of Labor and the United States Internal Revenue Service.

### VI.   CLAIMS FOR RELIEF

### <u>COUNT I</u>
**(Claim for Equitable Relief, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**
**Against Polaris and Steuer**
**In the Alternative to Counts II–IV**

177.    Plaintiffs repeat and re-allege paragraphs 1 to 176 as if fully set forth herein.

178.    ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that a plan participant may bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

43

179.    Polaris and Steuer knew that Plaintiffs were eligible to request distributions of their Plan accounts upon termination of employment. Polaris and Steuer knew that the change from as-of-December 31 valuations to daily valuations would be material to Plaintiffs' decisions as to when to request distributions of their Plan accounts.

180.    Under ERISA, the fiduciaries of the Plan, including Polaris and Steuer, have a duty to inform Plaintiffs of the change to the valuation provisions of the Plan. They also have a duty to correct any misrepresentations to Plaintiffs and any statements that may have been truthful when made but which later became inaccurate or misleading.

181.    Polaris and Steuer breached their fiduciary duties to Plaintiffs by failing to ensure that Plaintiffs were provided with accurate information regarding when Plaintiffs could obtain distributions of their Plan accounts, by failing to inform Plaintiffs that the Plan's assets were subject to daily valuation, and by misrepresenting that the Plan's assets were subject only to an annual, year-end valuation.

182.    These omissions and misrepresentations were material to Plaintiffs' decisions regarding when to submit claims for benefits.

183.    Polaris and Steuer were aware that Plaintiffs were relying on Defendants' material misrepresentations and omissions to the effect that the Plan's assets were subject to an annual valuation as of December 31.

184.    Having undertaken to value the Plan's assets as of December 31, 2021, Polaris and Steuer had a fiduciary duty to conduct this valuation in a timely manner.

185.    Polaris and Steuer breached their fiduciary duties to Plaintiffs to conduct the valuation as of December 31, 2021 in a timely manner by delaying this valuation until on or about May 24, 2022, which in turn delayed Plaintiffs' requests for distributions.

186.    Polaris and Steuer then breached their fiduciary duties to Plaintiffs again by failing to make distributions based on the as-of-December 31, 2021 valuation and informing Plaintiffs that distributions would be made on the basis of an as-of-June 30, 2022 valuation.

187.    Polaris and Steuer then breached their fiduciary duties to Plaintiffs again by failing to make distributions on the basis of an as-of-June 30, 2022 valuation and instead making distributions on the basis of the value of the Plan's assets when they were liquidated.

188.    Dr. Tomaras, Dr. Walkup, and Ms. Taylor would have requested distributions of their Plan accounts on or about December 31, 2021 but for the

45

omissions and misrepresentations of Polaris and Steuer that a later-requested distribution would be based on the as-of-December 31, 2021 valuation.

189.    Dr. Mangrum would have pursued his November 2021 request for the distribution of his Plan account or requested a distribution on or before December 31, 2021 but for the omissions and misrepresentations of Polaris and Steuer to the effect that a later-requested distribution would be based on the as-of-December 31, 2021 valuation.

190.    Plaintiffs and the Plan have been harmed by Polaris's and Steuer's breach of their fiduciary duties. The value of the Plaintiffs' Plan accounts was far lower when liquidated than that value would have been but for the misrepresentations and omissions by Polaris and Steuer, the delay in conducting the end-of-2021 valuation, and the failure to make distributions on the basis of the as-of-December 31, 2021 valuation. But for Defendants' misconduct, the 2021 Plaintiffs would have requested an earlier distribution of their Plan accounts and would have received a significantly higher distribution.

191.    Ms. Thier worked for Polaris, contributed to the Plan, and requested the distribution of her assets on the understanding that the Plan was subject to as-of-December 31 valuation.

192.   If Defendants' had based distributions on an as-of-December 31 valuation, as they (mis)represented they would, Ms. Thier would have received a distribution of her Plan benefits based on a December 31, 2021 valuation of Plan assets, an amount significantly higher than the value of the distribution that she eventually received.

193.   Plaintiffs do not have an adequate remedy for these violations of fiduciary duty under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), because the terms of the 2021 Plan Document as written do not provide for annual valuations of the Plan's assets as of December 31.

194.   The 2021 Plaintiffs exhausted their administrative remedies under ERISA through their letters of late August and early September 2022, which they instructed Polaris to deem formal appeals of the denials of their claims for benefits, and to which Defendants did not respond. Alternatively, further action by the 2021 Plaintiffs would have been futile given that Defendants ignored their attempts to appeal the denial of their claims for benefits and denied them meaningful access to the administrative appeals process under the Plan.

195.   Ms. Thier's exhaustion of administrative remedies under the Plan and under ERISA was excused because she was denied an adequate remedy and was denied meaningful access to administrative review by Polaris's and Steuer's failure, as

the Plan's fiduciaries, to issue a formal denial of her claim. As to Ms. Thier, an

administrative appeal would have been futile given that Defendants ignored the 2021

Plaintiffs' attempts to appeal the denial of their claims. Alternatively, Ms. Thier

exhausted the administrative remedies required under ERISA and the Plan and

performed all duties and obligations on her part to be performed under the Plan.

196.    Accordingly, in the alternative to the relief requested in Counts II–IV

below, this Court should: (a) reform the Plan documents to provide that Plaintiffs are

entitled to a distribution of their Plan benefits based on the Plan's assets as of

December 31, 2021; (b) order Polaris as Plan Administrator to amend the Plan records

to reflect that the Plaintiffs requested distributions at the appropriate time to receive

distributions of their Plan benefits based on the value of the Plan's assets as of

December 31, 2021, and (c) surcharge Steuer and Polaris in the amount of the

difference between the valuation of Plaintiffs' Plan benefits as of December 31, 2021,

and the amount that Plaintiffs actually received upon the termination of the Plan, in

order to make Plaintiffs whole. Plaintiffs also request an award of their attorneys' fees

and pre- and post-judgment interest.

## COUNT II
### (Claim for Benefits under ERISA §§ 502(a)(1)(B) and 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B)) and 1132(a)(3))
### Against All Defendants
### In the Alternative to Counts I, III, and IV

197.    Plaintiffs repeat and re-allege paragraphs 1 to 176 as if fully set forth herein.

198.    ERISA Section 502(a)(1)(B) allows a plan participant to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

199.    Under the terms of the Plan, Plaintiffs were entitled to distributions of their Plan accounts as soon as administratively feasible after they requested the distributions.

200.    As Plan fiduciaries, Defendants Polaris and Steuer had a duty to cause Plan accounts to be valued properly and to cause distributions to be made as soon as administratively feasible consistent with the terms of the Plan.

201.    Defendants failed to cause Plaintiffs' Plan accounts to be valued properly and distributed as soon as administratively feasible after Plaintiffs requested distributions of their Plan accounts.

202.    Plaintiffs were harmed by Defendants' failure because the value of Plaintiffs' Plan accounts was substantially lower when distributed than it would have been if Plaintiffs' accounts had been valued and distributed as soon as administratively feasible after Plaintiffs requested the distribution of their Plan accounts.

203.    Defendant Polaris and Steuer, as Plan fiduciaries, wrongfully denied Plaintiffs' claims for benefits by failing to distribute the assets in Plaintiffs' Plan accounts upon request.

204.    The 2021 Plaintiffs exhausted their administrative remedies under ERISA through their letters of late August and early September 2022, which they instructed Polaris to deem formal appeals of the denials of their claims for benefits, and to which Defendants did not respond. Alternatively, further action by the 2021 Plaintiffs would have been futile given that Defendants ignored their attempts to appeal the denial of their claims for benefits and denied them meaningful access to the administrative appeals process under the Plan.

205.    Ms. Thier's exhaustion of administrative remedies under the Plan and under ERISA was excused because she was denied an adequate remedy and was denied meaningful access to administrative review by Polaris's and Steuer's failure, as the Plan's fiduciaries, to issue a formal denial of her claim. As to Ms. Thier, an administrative appeal would have been futile given that Defendants ignored the 2021

Plaintiffs' attempts to appeal the denial of their claims. Alternatively, Ms. Thier

exhausted the administrative remedies required under ERISA and the Plan and

performed all duties and obligations on her part to be performed under the Plan.

206.   Accordingly, this Court should declare that Plaintiffs are entitled to

distributions from the Plan's trust account in accordance with the value of their Plan

accounts on the date they requested distributions, and are entitled to recover from the

Plan, Steuer, and Polaris the difference between such valuations and the distributions

that they actually received.

207.   Additionally, given that all of the Plan's assets have already been

distributed, Plaintiffs request this Court surcharge Steuer and Polaris, pursuant to

ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), in the amount of the difference

between the value of their Plan accounts on the date they first requested distributions

and the distributions that they actually received and then contribute that amount to the

Plan for the purposes of having those funds distributed to Plaintiffs. Plaintiffs also

request an award of their attorneys' fees and pre- and post-judgment interest.

## COUNT III
**(Claim for Breach of Fiduciary Duty under ERISA § 502(a)(2), 29 U.S.C.**
**§ 1132(a)(2) and 29 U.S.C. § 1104)**
**Against Defendants Polaris and Steuer**
**In the Alternative to Counts I and II**

208.   Plaintiffs repeat and re-allege paragraphs 1 to 176 as if fully set forth

herein.

209.    Under ERISA Section 409, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. §1109(a).

210.    Under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), a plan participant may bring a suit to enforce the duties of fiduciaries under ERISA Section 409.

211.    ERISA Section 404(a), 29 U.S.C. § 1104(a), requires that a fiduciary discharge its duties with respect to a plan solely in the interests of plan participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, and that a fiduciary act under a prudent person standard of care.

212.    Under ERISA Section 404(a)(1)(D), the fiduciaries of the Plan, including Polaris and Steuer, had a duty to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

213.   Under the terms of the 2021 Plan as written, Polaris as Plan Administrator and Steuer as de facto Plan Administrator, Trustee and Investment Fiduciary were required to ensure that the assets of the Plan were valued on a daily basis.

214.   The terms of the 2021 Plan require Polaris and Steuer to cause distributions to be made to Plaintiffs as soon as administratively feasible after they requested their distributions.

215.   Polaris and Steuer breached their fiduciary duties to Plaintiffs by failing to ensure that the Plan was valued on a daily basis and by failing to cause distributions to be made to Plaintiffs as soon as administratively feasible after Plaintiffs requested distributions from their Plan accounts.

216.   Polaris and Steuer breached their fiduciary duties to Plaintiffs by unreasonably delaying the as-of-December 31, 2021 valuation, by failing to make distributions based on the as-of-December 31, 2021 valuation, by failing to value the assets of the Plan each business day, and by failing to make distributions based on the daily valuation of the Plan's assets at the time Plaintiffs requested their distributions.

217.   Plaintiffs and the Plan have been harmed by Polaris's and Steuer's breach of their fiduciary duties in that the value of the Plan's assets and of Plaintiffs' Plan

accounts was far lower when liquidated than when Plaintiffs requested distribution of their Plan accounts and far lower than their values as of December 31, 2021.

218.   The 2021 Plaintiffs exhausted their administrative remedies under ERISA through their letters of late August and early September 2022, which they instructed Polaris to deem formal appeals of the denials of their claims for benefits, and to which Defendants did not respond. Alternatively, further action by the 2021 Plaintiffs would have been futile given that Defendants ignored their attempts to appeal the denial of their claims for benefits and denied them meaningful access to the administrative appeals process under the Plan.

219.   Ms. Thier's exhaustion of administrative remedies under the Plan and under ERISA was excused because she was denied an adequate remedy and was denied meaningful access to administrative review by Polaris's and Steuer's failure, as the Plan's fiduciaries, to issue a formal denial of her claim. As to Ms. Thier, an administrative appeal would have been futile given that Defendants ignored the 2021 Plaintiffs' attempts to appeal the denial of their claims. Alternatively, Ms. Thier exhausted the administrative remedies required under ERISA and the Plan and performed all duties and obligations on her part to be performed under the Plan.

220.   Accordingly, Polaris and Steuer should be required to make good to the Plan for the benefit of Plaintiffs' accounts the difference in the valuation of Plaintiffs'

Plan accounts between the date upon which they requested distributions and the valuation date for the actual distributions that Plaintiffs received. In the alternative, Polaris and Steuer should be required to make good to the Plan for the benefit of Plaintiffs' accounts the difference in the valuation of Plaintiffs' Plan accounts as of December 31, 2021 and the valuation date for the actual distributions that Plaintiffs received. Plaintiffs also request an award of attorneys' fees and pre- and post-judgment interest.

## <u>COUNT IV</u>
### (Claim for Breach of Co-Fiduciary Duty, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1105)
### Against Defendants Steuer and Polaris
### In the Alternative to Counts I and II

221.    Plaintiffs repeat and re-allege paragraphs 1 to 176 and 208 to 220 as if fully set forth herein.

222.    ERISA Section 405(a)(1)–(3), 29 U.S.C. § 1105(a)(1)–(3), imposes liability on a fiduciary, in addition to any liability under any other provision of ERISA, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.

223.   Steuer and Polaris breached their co-fiduciary duties to Plaintiffs under ERISA Section 405 by failing to remedy the breaches of other fiduciaries, knowingly participating in their breaches and/or enabling their breaches.

224.   Among other things, Steuer and Polaris were each aware of, knowingly participated in, and enabled each other's failures to ensure the daily valuation of the Plan's assets, the omissions and misrepresentations made by each other with respect to the daily-valuation provision in the 2021 Plan Documents, the failure to cause a prompt valuation of the Plan's assets as of December 31, 2021, and the failure to cause a distribution of Plaintiffs' Plan accounts as soon as reasonably feasible after Plaintiffs requested those distributions. All of these were breaches of Steuer's and Polaris's fiduciary duties under ERISA. Steuer and Polaris had knowledge of their breaches and the breaches of their co-fiduciaries and knowingly participated in them and enabled them. They also failed to remedy known fiduciary breaches of their co-fiduciaries to the detriment of Plaintiffs and Plaintiffs' Plan accounts.

225.   Plaintiffs and the Plan have been harmed by Steuer's and Polaris's breach of their co-fiduciary duties in that the values of the Plan's assets and of Plaintiffs' Plan accounts were far lower when liquidated than they were when Plaintiffs requested the distribution of their Plan accounts and far lower than they were as of December 31, 2021.

226.   The 2021 Plaintiffs exhausted their administrative remedies under ERISA through their letters of late August and early September 2022, which they instructed Polaris to deem formal appeals of the denials of their claims for benefits, and to which Defendants did not respond. Alternatively, further action by the 2021 Plaintiffs would have been futile given that Defendants ignored their attempts to appeal the denial of their claims for benefits and denied them meaningful access to the administrative appeals process under the Plan.

227.   Ms. Thier's exhaustion of administrative remedies under the Plan and under ERISA was excused because she was denied an adequate remedy and was denied meaningful access to administrative review by Polaris's and Steuer's failure, as the Plan's fiduciaries, to issue a formal denial of her claim. As to Ms. Thier, an administrative appeal would have been futile given that Defendants ignored the 2021 Plaintiffs' attempts to appeal the denial of their claims. Alternatively, Ms. Thier exhausted the administrative remedies required under ERISA and the Plan and performed all duties and obligations on her part to be performed under the Plan.

228.   Accordingly, Steuer and Polaris should be required to make good to the Plan for the benefit of Plaintiffs all losses that Plaintiffs' Plan accounts suffered between the dates upon which they requested distributions of their Plan accounts and the valuation date for the distributions that Plaintiffs actually received. In the

alternative, Polaris and Steuer should be required to make good to the Plan for the

benefit of Plaintiffs' accounts the difference in the valuation of Plaintiffs' Plan

accounts as of December 31, 2021 and the valuation date for the actual distributions

that Plaintiffs received. Plaintiffs also request an award of attorneys' fees and pre- and

post-judgment interest.

## <u>COUNT V</u>
### (Claim for Monetary Penalty for Failure to Provide Plan Documents, ERISA §§ 104(b)(4) and 502(c)(1)(B), 29 U.S.C. §§ 1024(b)(4), 1132(c)(1)(B)) Against Defendants Polaris and Steuer

229.    Plaintiffs repeat and re-allege paragraphs 1 to 228 as if fully set forth

herein.

230.    ERISA Section 104(b)(4), 29 U.S.C. § 1024(b)(4), provides a right in

plan participants to request plan documents:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

231.    ERISA Section 502(c)(1)(B), 29 U.S.C. § 1132(c)(1)(B), creates a private

right of action for an administrator's violation of Section 104(b)(4):

> Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by

this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $1[10] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph . . . each violation described in subparagraph (B) with respect to any single participant or beneficiary[] shall be treated as a separate violation.

ERISA Section 502(c)(1)(B), 29 U.S.C. § 1132(c)(1)(B); *see also* 29 C.F.R.

§ 2575.502c-1 (exercising statutory authority to increase penalty from $100 to

$110 per day).

232.    Ms. Taylor requested copies of the Plan documents on June 29, 2022. Dr.

Tomaras and Dr. Mangrum requested copies of Plan documents on November 9, 2022.

233.    Copies of the requested Plan documents were not provided to Ms. Taylor

until August 11, 2022. Steuer and Polaris failed to respond to Dr. Tomaras's and Dr.

Mangrum's request for Plan documents.

234.    Accordingly, this Court should award damages to Ms. Taylor in the

amount of $110 per day from the date 30 days after Ms. Taylor requested documents

that Polaris was required to provide through August 11, 2022. The Court should also

award damages to Dr. Tomaras and Dr. Mangrum in the amount $110 per day from the

date 30 days after they requested the documents until Defendants Polaris and Steuer

provide the documents. Plaintiffs also request an award of their attorneys' fees.

## COUNT VI
### (Attorneys' Fees, ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1))
### Against All Defendants

235.   Plaintiffs repeat and re-allege paragraphs 1 to 234 as if fully set forth

herein.

236.    ERISA Section 502(g)(1), 29 U.S.C. 1132(g)(1) provides that "[i]n any

action under this subchapter . . . by a participant . . . the court in its discretion may

allow a reasonable attorney's fee and costs of action to either party."

237.   Accordingly, if Plaintiffs prevail on one or more of the counts set forth

above, this Court should award Plaintiffs their reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court enter judgment as follows:

As to Count I

A.    Declare that Polaris and Steuer violated their duties to Plaintiffs under

the Plan to provide information, to provide distributions of benefits

upon request, and to timely conduct valuations of the Plan's assets.

60

B.     Reform the Plan documents to provide that Plaintiffs are entitled to distributions of their Plan accounts as of December 31, 2021, or such other date as this Court deems equitable and just.

C.     Order Polaris and Steuer, as Plan fiduciaries, to amend the Plan's records to reflect that Plaintiffs requested distributions of their accounts on the appropriate dates to receive distributions based on the valuation of their Plan accounts as of December 31, 2021, or such other date as this Court deems equitable and just.

D.     Surcharge Polaris and Steuer in the amount necessary to place Plaintiffs in the position they would have been in but for Polaris and Steuer's fiduciary breaches.

E.     Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

F.     Award Plaintiffs pre- and post-judgment interest and such other and further relief as the Court deems equitable and just.

As to Count II

A.     Declare that Plaintiffs are entitled to a distribution of their Plan accounts as of the dates that they requested distributions, or, in the

alternative, as of the date that this Court determines is equitable and just.

B.    Order Polaris and/or Steuer to reimburse the Plan in an amount equal to the difference between the value of Plaintiffs' Plan accounts as of the time that Plaintiffs requested distribution of their Plan accounts or, in the alternative, as of the date that this Court determines is equitable and just, and the amount in distributions that Plaintiffs actually received.

C.    Order Polaris and/or Steuer to cause the Plan to pay Plaintiffs their Plan retirement benefits, valued as of the time that Plaintiffs requested distribution of their Plan accounts or, in the alternative, as of the date that this Court determines is equitable and just, and the amount in distributions that Plaintiffs actually received.

D.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

E.    Award Plaintiffs pre- and post-judgment interest and such other and further relief as the Court deems equitable and just.

As to Count III

A.      Declare that Polaris and Steuer breached their fiduciary duties to Plaintiffs.

B.      Declare that Plaintiffs are entitled to the valuation of their Plan accounts as of the dates that they first requested distributions of their Plan accounts, or, in the alternative, the date that this Court determines is equitable and just.

C.      Require that Polaris and Steuer make good to the Plan for the benefit of Plaintiffs the difference between the value of the distributions received by Plaintiffs and the value of Plaintiffs' retirement accounts valued as of the time that Plaintiffs requested distributions of their accounts or, in the alternative, as of the date that this Court determines is equitable and just.

D.      Surcharge Polaris and Steuer in the amount necessary to place Plaintiffs in the position they would have been in but for Polaris's and Steuer's fiduciary breaches.

E.      Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

F.    Award Plaintiffs pre- and post-judgment interest and such other and further relief as the Court deems equitable and just.

<u>As to Count IV</u>

A.    Declare that Steuer and Polaris engaged in co-fiduciary breaches in violation of ERISA Section 405, 29 U.S.C. § 1105.

B.    Require that Steuer and Polaris make good to the Plan for the benefit of Plaintiffs the difference between the value of the distributions received by Plaintiffs and the value of Plaintiffs' retirement accounts as of December 31, 2021, or, in the alternative, such other date or dates that this Court shall determine is equitable and just.

C.    Surcharge Steuer and Polaris in the amount necessary to place Plaintiffs in the position they would have been in but for Steuer's and Polaris's co-fiduciary breaches.

D.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

E.    Award Plaintiffs pre- and post-judgment interest and such other and further relief as the Court deems equitable and just.

As to Count V

A.    Declare that Polaris and Steuer violated their duty to provide

      information under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

B.    Award Plaintiffs $110 per day for Defendants' failure to timely

      provide Plaintiffs with copies of the Plan documents.

C.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section

      502(g), 29 U.S.C. § 1132(g).

D.    Award Plaintiffs pre- and post-judgment interest and such other and

      further relief as the Court deems equitable and just.

As to Count VI

A.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section

      502(g)(1), 29 U.S.C. § 1132(g)(1).

*Signature on Next Page*

Respectfully submitted this 5th day of January, 2023

**HOLLAND & KNIGHT LLP**

*/s/ Todd D. Wozniak*
Todd D. Wozniak
Georgia Bar No. 777275
Nicholas R. Boyd
Georgia Bar No. 849842
1180 West Peachtree Street, NW
Suite 1800
Atlanta, Georgia 30309
(404) 817-8500
todd.wozniak@hklaw.com
nicholas.boyd@hklaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(B).

This 5th day of January, 2023.

**HOLLAND & KNIGHT LLP**

*/s/  Todd D. Wozniak*
Todd D. Wozniak
Georgia Bar No. 777275