EFILED IN OFFICE
CLERK OF STATE COURT
CARROLL COUNTY, GEORGIA

**STCV2022000645**
J044
DEC 05, 2022 08:55 PM

Alan Lee, Clerk
Carroll County, Georgia

## IN THE STATE COURT OF CARROLL COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| POWER GENERATION TRANSPORTATION INC. dba RADIANT LIGHT | CIVIL ACTION FILE |
| Plaintiff | No. No. _____ |
| v. | |
| OWEN CHRISTIAN DICKENS; OWEN CHRISTIAN DICKENS dba OKL TRANSPORT; and OVERKNIGHT LOGISTICS INC. | |
| Defendants | |

## COMPLAINT FOR BREACH OF CONTRACT, FRAUDULENT MISREPRESENTATIONS AND TORTIOUS INTERFERENCE WITH BUSINESS RELATIOSHIPS

### THE PARTIES

COMES NOW Plaintiff Power Generation Transportation Inc dba Radiant Light (hereinafter "Plaintiff" or "Radiant Light"), a Georgia corporation and federally licensed freight hauling broker, by and through its undersigned attorneys, and files this Complaint for Breach of Contract, Fraudulent Misrepresentations, and Tortious Interference with Business Relationships (the "Complaint") against Defendant Owen Christian Dickens (hereinafter "Dickens," an individual); Defendant Owen Christian Dickens dba OKL Transport (hereinafter "OKL Transport," an unregistered company affiliated with Dickens that purports to have its principal place of business in Texas); and Defendant OverKnight Logistics Inc. (hereinafter "Logistics," a Texas company, also affiliated with Dickens.)

1

EXHIBIT A

INTRODUCTION

1.     This Complaint for Breach of Contract, Fraudulent Misrepresentations, and Tortious Interference with Business Relationships is based on an elaborate fraudulent scheme in which Defendant Dickens used at least one unregistered company purporting to be federally licensed carrier as a conduit to induce Plaintiff to enter into a carrier broker/carrier hauling contract with Plaintiff and then performed the contract unlawfully and illegally in a way that breached the broker/carrier contract, caused Plaintiff pecuniary and reputational damages, and exposed Plaintiff's and its clients to unreasonable risk of loss.

2.     Specifically, Dickens used OKL Transport, purporting to be a registered company and federally licensed carrier, to enter into a broker/carrier contract with Plaintiff to haul freight on behalf of Plaintiff's client to Canada.

3.     It then used Logistics, a Texas company, in violation of federal law and regulations, to haul the freight, caused damages to the freight in transit, and then tried to cover up its breach of contract by making multiple material misrepresentations to Plaintiff as to which company actually hauled the freight, and by failing to provide required documentation to verify the performance of the contract.

4.     Defendants also provided Plaintiff with forged and/or incorrect documentation.

5.     As a result of Defendants' poor performance, Plaintiff's clients withheld part of the payment for the haul.

6.     When Plaintiff and its bond company invoked Plaintiff's right under the contract to withhold payment for the haul, Defendants started and still continue to harass and try to collect from Plaintiff's clients: the shipper and consignee, thus interfering tortiously with Plaintiff's business relationships.

JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction and personal jurisdiction over the defendants because, among other things, the broker/carrier contract provides that lawsuits arising out of the contract will be filed in Carroll County, the misrepresentations that underly Plaintiff's fraud claims were made to Plaintiff in Georgia, Defendants conducted business in Georgia, and caused injury to Plaintiff in Georgia.

8.     Venue is proper in this Court because the choice of forum provision of the contract provides for lawsuits to be filed in this Court and because Defendants' misrepresentations were made to Plaintiff in Carroll County, Georgia.

FACTUAL BACKGROUND

A.  Misrepresentations to Secure the Contract and Breach of Contract:

9.     Radiant Light tendered a freight and hired OKL Transport (MC 1284518) as a carrier to pick up two (2) oversized loads from Oklahoma on April 21, 2022 and deliver it in Canada on April 28, 2022 at a price of $32,000 each.

10.     However, a separate entity, Logistics (MC1036792) transported the freight in direct violation of the Broker/Carrier Agreement (Ex. A), which expressly prohibits a carrier from giving the freight to another carrier to transport.

11.     Logistics then tried to misrepresent itself to Radiant Light as OKL Transport by submitting fraudulent documentation that purported to be from OKL Transport.

12.     Simply put, OKL Transport held itself out to Radiant Light as a Motor Carrier but intended all along to re-broker the transportation of the freight to Logistics—and did in fact re-broker it to Logistics.

13.     This is classic double-brokering in direct violation of the Broker/Carrier Agreement as well as federal law and regulations.

14. 49 CFR § 371.1 prohibits certain misrepresentations and caselaw clearly assigns responsibility for improper double-brokering: (a) A broker shall not perform or offer to perform any brokerage service (including advertising), in any name other than that in which its registration is issued. (b) A broker shall not, directly or indirectly, represent its operations to be that of a carrier. Any advertising shall show the broker status of the operation.

15. OKL Transport misrepresented itself as a carrier, only to re-broker the transportation to a different entity.

16. OKL Transport's unlawful conduct was not without material consequence to Radiant Light, as it exposed Radiant Light to civil liability under 49 USC 14916(c) ("Any person who knowingly authorizes, consents to, or permits, directly or indirectly, either alone or in conjunction with any other person, a violation of subsection (a) is liable."

17. Furthermore, it is well established under *Southern Pacific Transportation Company v. Commercial Metals Company*, 456 U.S. 336 (1982) that shippers and consignees bear the risk of double payment if they decide to hire a broker instead of paying the delivering carrier directly.

18. That is the very exposure Radiant Light was trying to avoid by hiring OKL Transport as a carrier, not a broker.

19. In addition to violating federal law and regulations, OKL Transport's conduct is also an egregious breach of the Broker/Carrier agreement.

20. The Broker/Carrier Agreement (**Ex. A**) provides in ¶10 that CARRIER understands that re-brokering and double brokering may be prohibited by law and will not re-broker, assign or interline the shipments hereunder without the express written consent of BROKER prior to the shipment being tendered to any other CARRIER. If CARRIER breaches this provision, BROKER shall have the right of paying the monies it owes CARRIER directly to

4

the delivering carrier, in lieu of payment to CARRIER, and BROKER shall thereby be released from any further obligation to pay CARRIER.

21.     The Broker/Carrier Agreement also provides: CARRIER warrants that at all times during this Agreement it will act as a "motor carrier," as that term is defined under 49 U.S.C. §13102 and any applicable federal or state regulations, statutes, decisional law or administrative law.

22.     The Broker/Carrier Agreement also provides: CARRIER further warrants that at all times during this Agreement it will remain licensed and authorized by the Federal Motor Carrier Safety Administration to provide interstate transportation services or that it provides only intrastate service and complies with all applicable state registration requirements, and warrants that it will maintain insurance or otherwise demonstrate financial responsibility in accordance with all applicable federal and state regulations.

23.     OKL Transport is clearly in breach of these provisions.

24.     It is immaterial that Logistics was an active brokerage, and not a carrier, at the time the load was tendered and delivered to OKL Transport.

25.     If OKL Transport was not going to transport the load as a carrier, it should have disclosed that information to Radiant Light who ended up relying detrimentally on the representation in the Broker/Carrier Agreement that OKL Transport was going to be the carrier.

26.     The deficient paperwork that Defendants provided to Radiant Light to date show that Logistics (not OKL Transport) transported the freight to Canada.

27.     Logistics could not have done so lawfully, as brokerage, without a carrier license.

28.     In so doing, Logistics also violated the Broker/Carrier Agreement which provides that Carrier's name will be provided at the time of booking and must be listed on the Shipper's BOL.

29.     It also provides that the Carrier agrees to list itself on the bill of lading.

30.     Furthermore, for full coverage of the freight, Plaintiff's insurance requires that Carrier name will be provided at the time of booking and must be listed on the shipper's BOL.

31.     Accordingly, the Broker/Carrier Agreement provides in ¶10 that CARRIER agrees to list itself on the bill of lading as the party in possession and control of the freight.

32.     However, it was Logistics, and not OKL Transport, that transported the haul and was identified on the BOL.

B.   Continuing Misrepresentations During Transportation and Deficient Documentation:

33.     From the onset, Radiant Light could not communicate directly with the drivers and had to communicate with Gina and Owen at email addresses and signature lines that reflected OverKnight Logistics.

34.     Radiant Light was told then that OKL in "OKL Transport" stood for "OverKnight Logistics."

35.     OKL Transport could have clarified at the time that an affiliated company with a different MC Number was transporting the freight, but it chose instead to continue the misrepresentation that OKL Transport was transporting the freight.

36.     After the freight was loaded and rolling out of Oklahoma, Radiant Light contacted the customs broker who confirmed that the trucks and trucking company (Logistics) were not cleared to cross into Canada.

37.     Radiant Light had to rush to get Logistics cleared to enter Canada, as the trucks did not have the SCAC code needed to enter into Canada.

38.     That was yet another misrepresentation, because the contracted carrier (OKL Transport) had misrepresented its ability to cross into Canada.

39.     Radiant Light also made multiple attempts to contact the carrier during the transportation to maintain MacroPoint tracking, but the carrier was unresponsive.

40.     This deficiency resulted in a noted rate reduction of ten percent (10%) per the Broker/Carrier agreement and Rate Conformation.

41.     After the freight was cleared to enter into Canada and was delivered on April 28, Radiant Light requested the Proof of Delivery (POD) immediately, but it had to wait for 24 hours to receive a POD.

42.     The POD listed Logistics as the Carrier with an address (6802 East Fwy, Baytown, TX 77521) that was different than the address provided by OKL Transport.

43.     This POD from Logistics was also signed by, Michael Birlatt, the escort driver, not the consignee's point of contact, Angela Paul.

44.     In the interim, the consignee reported damages to the freight.

45.     To ascertain that the damages were noted on the BOL, Radiant Light repeatedly asked for the original BOLs and Packing List, but it took Defendants more than two days to finally provide the original BOL/POD with damages clearly marked on the paperwork.

46.     Radiant Light then assessed rate reductions of fifty percent (50%) for turning in the POD late.

47.     While waiting for the BOL and POD, Radiant Light also requested the Driver Electronic Logs (DEL) to confirm the delay at the border and delayed delivery.

48.     Under the Broker/Carrier Agreement and the Rate Conformation, Radiant Light can request any and all necessary documents in order to confirm any delays, discrepancies, and issues; failure to provide these documents can result in Reduction of Rate 50% or No Pay for the shipment.

49.     No DEL have been submitted to date.

50.     On Monday May 2, 2022, Radiant Light received an invoice from Logistics, sent by Rebecca Dickens (e.dickens@overknightlogistics.com).

51.     The Invoice, number 5693, was from Logistics with an address (6802 East Fwy, Baytown, TX 77521) that was different than the address provided by OKL Transport.

52.     The invoice included the PODs that listed Logistics as the carrier that hauled and delivered the load. This invoice reflected that Logistics was the carrier that hauled and delivered the load.

53.     The Broker/Carrier Agreement provides in II. 3. Broker Obligations: Broker shall pay CARRIER for services rendered in an amount equal to the rates and charges agreed to as set forth on any Load Confirmation(s) that is issued and that supplements and amends this Agreement to the extent its terms conflict with those in this Agreement. This Agreement or the Load Confirmation also governs all assessorial services which may be required or performed. CARRIER shall not bill for any accessorial or other charge not approved in this Agreement or in any Load Confirmation(s). Rates may be amended orally but must be confirmed in writing within five working days of the modification in order to remain binding between the PARTIES. As a condition precedent to payment, CARRIER must submit proof of delivery with its invoices, and the invoices must reflect that CARRIER delivered the freight to its final destination.

54.     Until it received, the invoice, Radiant Light was still under the impression that it came from OKL Transport.

55.     However, when it received an email from AWA Broker & Bankruptcy Alert about OverKnight Logistics INC, MC1036792 (Logistics) and their pending bond rescission/cancelation midterm, Radiant Light realized then that Logistics was a separate company, a full brokerage with no active carrier authority.

8

56.     It then became clear that Dickens owned both companies and that he was fraudulently trying to pass them for the same company to circumvent the requirements of the contract.

57.     Further research then showed that Dickens had four motor carrier MCs with no linked DOT numbers.

58.     Each separate DOT number had a variation of Owen Dickens name, different address, and phone number.

59.     In short, Radiant Light then realized it was the victim of a deliberate scam.

60.     Radiant light then invoked its right under the to withhold payment, because of the breach, the misrepresentations, and the charge reductions, resulting from damage to the freights and all the irregularities attendant to the hauling.

61.     Although Radiant light duly notified Defendants of its decision to withhold payment (Ex. B) on account of Defendants' fraudulent misrepresentations and breach of the contract, Defendants persisted in harassing Plaintiff's clients.

62.     This continuing harassment gives rise to Plaintiff's claim for tortious interference with its business relationships.

63.     Notably, Defendants' attempt to cover up the fact that OKL Transport is an unregistered company that is separate and distinct from Logistics, and "merge" OKL Transport and Logistics as if they were one and the same, is reflected in the communication that Defendants' counsel sent to Plaintiff's bond company, after the latter denied payment under the Bond. (**Ex. B.**)

64.     In that letter, Defendants' counsel represented for the first time that they represented "OKL Transport dba OverKnight Logistics." That statement is incorrect and outright misleading.

65. OKL Transport never held itself out to Plaintiff as dba OverKnight Logistics.

66. Dickens and OKL Transport entered into the broker/carrier agreement with Plaintiff, then OKL Transport used Logistics to haul the freight in violation of the contract without disclosing that fact to Plaintiff. Dickens and OKL Transport later attempted to misrepresent to Plaintiff that it was OKL Transport that hauled the freight by trying fraudulently to pass off Logistics's documents as OKL Transport's documents.

## COUNT I – BREACH OF CONTRACT

67. The allegations of the preceding paragraphs are incorporated in this paragraph as though they are fully set forth herein.

68. The Broker/Carrier Agreement constitutes a valid and enforceable contract supported by mutual consideration.

69. By misrepresenting to Plaintiff that it was a Carrier while intending all along to have unregistered companies purporting to be federally licensed brokers or carriers as a conduit to induce Plaintiff to enter into the Broker/Carrier contract with Plaintiff and then performing the contract unlawfully and illegally, Dickens and the Defendants  breached said contract and thereby caused Plaintiff to suffer pecuniary and reputational damages, exposed Plaintiff's and its clients to unreasonable exposure.

70. Plaintiff is therefore entitled to damages in an amount to be determined at trial against Defendants, as a result of said breach of contract.

COUNT II – FRAUDULENT MISREPRESENTATIONS

71. The allegations of the preceding paragraphs are incorporated in this paragraph as though they are fully set forth herein.

72. Defendants acting alone or in concert made false or misleading statements to Plaintiff to induce Plaintiff to enter into the Broker/Carrier Contract.

73.     Defendants knew the statements were false and intentionally made the statements with the intention that Plaintiff would rely on said statements

74.     Plaintiff indeed relied reasonably and justifiably on the misrepresentations.

75.     Plaintiff incurred pecuniary and reputational damages as a result of Defendants' misrepresentations.

76.     Plaintiff is therefore entitled to damages in an amount to be determined at trial against Defendants, as a result of said misrepresentations.

COUNT III –TORTIOUS INTERFERENCE WITH CONTRACTUAL
OR BUSINESS RELATIONSHIPS

77.     The allegations of the preceding paragraphs are incorporated in this paragraph as though they are fully set forth herein.

78.     Plaintiff has a mutually beneficial contractual or business relationship with its clients: the shipper and the consignee in this case.

79.     By attempting to collect payment that Plaintiff had denied had denied from the shipper and consignees, despite knowing that they are not entitled to said payment, Defendants acted improperly, purposefully, maliciously, and without privilege with the intent to injure and disrupt the business relationship between Plaintiff and its clients.

80.     Defendants' conduct has caused and continues to cause Plaintiff pecuniary and reputational damages.

81.      Plaintiff is therefore entitled to damages in an amount to be determined at trial against Defendants, as a result of said tortious interference.

COUNT IV – ATTORNEY'S FEES

82.     The allegations of the preceding paragraphs are incorporated in this paragraph as though they are fully set forth herein.

11

83.     Defendants have acted in bad faith in making and performing the Broker/Carrier contract, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense.

84.     Plaintiff is therefore entitled to have its attorney's fees in an amount to be determined at trial cast against Defendants

**WHEREFORE,** Plaintiff respectfully prays as follows:

(1) That process issue and be served upon Defendant as provided by law;

(2) That judgment be entered against Defendant in an amount to be determined at trial;

(3) That the Court grant Plaintiffs such other and further relief that it deems just and proper.

Dated this 5th day of December 2022

*Oduola-Owoo*
Latif Oduola-Owoo, Esq.
Attorney for the Plaintiffs
Georgia Bar Number: 100136

ARRINGTON | OWOO, P.C.
Promenade II
1230 Peachtree Street, Suite 1900
Atlanta, Georgia 30309
Phone: 404-421-8098
Fax: 404-549-6772
latif@aomlaw.com

# Ex. A

**Carrier Profile**

Carrier Name: _OKL Transport_

Physical Address: City: _11831 Obsidian Ln_
_Dayton TX 77535_

Primary Contact: _Gina Garcia_

Phone: _281 7214360_

FAX: _____

Email: _g.garcia@ overKnight logistics . com_

DOT#: _3686694_

MC#: _1284518_

SCAC: _____

EIN#: _____

After hours contact info: _Gina Garcia_

Phone: _281 7214360_

REMIT TO (If you use a factoring company, insert that here): _____

Address: _See attachment_

City: _____

State: _____

Contact: _____

## Carrier References

*Please list 3 references for whom you have hauled for*

**Contact Name/Company:** Knight Industrial  Tom Sides

**Contact Name/Company:** Contractors Cargo.  David Soriano

**Contact Name/Company:** Total Quality Logistics -  Virgil Wade

# BROKER/CARRIER AGREEMENT

This **Broker/Carrier Agreement** is being entered into by and between POWER GENERATION TRANSPORT, INC a _____ (hereinafter referred to as "**BROKER**"), and *OKL Transport* , (hereinafter referred to as "**CARRIER**") as defined below, on this _18_ day of *April* , 20*22*

## I.    PARTIES

A.    POWER GENERATION TRANSPORT, INC is the "Broker" as that term is defined under 49 U.S.C. § 13102(2) or any regulation, amendment or renumbered law by which the United States or any agency thereof defines a freight broker and any applicable federal or state regulations, statutes, decisional law or administrative law.  BROKER will arrange for the freight tendered by a shipper to be transported by CARRIER under the means, manner, method, and terms selected by the shipper or CARRIER, but BROKER is not engaged in the business of and will not act as a "Carrier," "Motor Carrier," or "Freight Forwarder," as those terms are defined under 49 U.S.C. § 13102, and BROKER is not engaged in the business of and will not act as a "Rail Carrier" as that term is defined under 49 U.S.C. § 11706.

B.    *OKL Transport* is the "CARRIER," and hereby agrees to transport freight identified by BROKER as requiring transportation services.

C.    BROKER and CARRIER will sometimes be referred to collectively as "The Parties."

## II.    RECITALS

1.    **Term**- The term of this Agreement shall be one (1) year, commencing on the date listed above. If not cancelled by one of The Parties, the Agreement shall automatically renew itself for consecutive one year terms. The Agreement can be terminated at any time by either of The Parties with thirty (30) days written or electronic notice to the other party, provided all balances are settled, and the termination can be with or without cause.

2.    **Broker Requirements**- BROKER warrants that it is licensed to arrange for the transportation of freight pursuant to license number MC- 361615 , but that it does not transport freight, and that it will maintain such authority as required by all applicable federal and state laws and regulations throughout the course of this Agreement. BROKER also warrants that it will maintain a surety bond or trust fund agreement as required by the Federal Motor Carrier Safety Administration in the amount of $75,000.00 or in such amount as may be amended from time to time and furnish CARRIER with proof of same upon request.

3.    **Broker Obligations**- Broker shall pay CARRIER for services rendered in an amount equal to the rates and charges agreed to as set forth on any Load

Confirmation(s) that is issued and that supplements and amends this Agreement to the extent its terms conflict with those in this Agreement. This Agreement or the Load Confirmation also governs all assessorial services which may be required or performed. CARRIER shall not bill for any accessorial or other charge not approved in this Agreement or in any Load Confirmation(s). Rates may be amended orally but must be confirmed in writing within five working days of the modification in order to remain binding between the PARTIES. As a condition precedent to payment, CARRIER must submit proof of delivery with its invoices, and the invoices must reflect that CARRIER delivered the freight to its final destination.

      a.      BROKER agrees to arrange for the transportation of a shipper's freight with CARRIER pursuant to the terms of this Agreement, and to comply with all federal, state, and local laws and regulations pertaining to the brokerage services covered by this Agreement.

      b.      The Parties agree that BROKER'S responsibilities under this Agreement are limited to arranging for the transportation of a shipper's freight with CARRIER, and not actually performing the transportation services, possessing the freight, or controlling the means or methods of the transportation.

4.    **Carrier Obligations** - CARRIER warrants that at all times during this Agreement it will act as a "motor carrier," as that term is defined under 49 U.S.C. § 13102 and any applicable federal or state regulations, statutes, decisional law or administrative law. CARRIER further warrants that at all times during this Agreement it will remain licensed and authorized by the Federal Motor Carrier Safety Administration to provide interstate transportation services or that it provides only intrastate service and complies with all applicable state registration requirements, and warrants that it will maintain insurance or otherwise demonstrate financial responsibility in accordance with all applicable federal and state regulations.

CARRIER is solely responsible for the operation of the equipment, actions of the driver, any other persons associated with the operation of the equipment, transportation of freight, securement or any other aspect of actions of a motor carrier as that term is defined by law. CARRIER is solely responsible for the safety and operation of the equipment, and the actions of all drivers and other persons or entities responsible for the transportation of freight. Nothing in this Agreement abrogates the responsibility of the CARRIER to operate safely and in accordance with all law and good accepted best practices of a motor carrier.

CARRIER represents that it is in compliance with and shall maintain, during the terms of this Agreement, compliance with all applicable federal, state and local laws relating to the provision of its services.

CARRIER will notify BROKER immediately if its federal Operating Authority is revoked, suspended or rendered inactive for any reason; and/or if it is sold, or if there is a change in control of ownership, and/or any insurance required hereunder

is threatened to be or is terminated, cancelled (whether by an insurer or surety provider by CARRIER, or by any person or entity), suspended, or revoked for any reason.

    a.     CARRIER agrees it will not have a U.S. DOT safety rating or evaluation of unsatisfactory or conditional. Any change in CARRIER'S safety rating requires immediate written notification to BROKER. CARRIER may not have an unsatisfactory or conditional rating under any rating system. If CARRIER'S rating becomes conditional or unsatisfactory, CARRIER is no longer authorized as a CARRIER under this Agreement.

    b.     Upon reasonable demand, CARRIER shall provide to BROKER copies of its DOT Operating Authority, Policy of Insurance, including all endorsements, Certificate of Insurance, surety, and financial responsibility.

4.    **Food Protocols**

All equipment provided for the transportation of food or food grade products will comply with the requirements of The Sanitary Food Transportation Act, or, to the extent that CARRIER performs services hereunder within, or to or from Canada, the Food and Drug Acts and any/all other applicable statutes and regulations, including, but not limited to the Ontario Food Safety and Quality Act, 2001, or any other jurisdiction's equivalent, and none of the equipment so provided has been or will be used for the transportation of any waste of any kind, garbage, hazardous materials, poisons, pesticides, herbicides, or any other commodity that might adulterate or contaminate food, food products or cosmetics.

Where a seal is placed on a trailer by consignor, shipper, CARRIER or other party, CARRIER is responsible to maintain the seal intact until removed by an authorized employee of consignee upon delivery. CARRIER is liable for any and all claims, losses, or liabilities arising from or as a result of any unauthorized removal of seal, broken seal, missing seal, tampered seal, or mismatched seal number. CARRIER is solely responsible for ensuring that cargo is maintained according to any requirements stated on the bill of lading or load confirmation

CARRIER must ensure that all personnel transporting or handling freight subject to the Food Safety Modernization Act of 2011 and its implementing regulations (collectively the "Act"), receive training required by the Act. BROKER will transmit to CARRIER, on the Load Confirmation or separately by email, the shipper's or consignee's protocols and requirements for transporting food shipments subject to the Act. CARRIER must strictly comply with all such protocols and requirements. CARRIER'S failure to comply with such protocols and requirements will permit the consignor, consignee, or broker to declare any freight transported on a shipment on which noncompliance occurred to be rejected and a total loss.



5. **Shipper-Broker Relationship**- The Parties agree that BROKER at all times will be acting as an independent contractor, and not an employee, agent, or principal of a shipper.

6. **Broker-Carrier Relationship**- CARRIER agrees and acknowledges that as the motor carrier transporting a shipper's freight pursuant to this Agreement, CARRIER is an independent contractor, and not an employee, agent or principal of BROKER. CARRIER further agrees and acknowledges that its employees and agents, including the driver or drivers transporting freight, are not the employees or agents of BROKER, and that BROKER does not control or have the right to control the CARRIER, its employees, agents, drivers, or any person or entity associated with the CARRIER.

   CARRIER must give priority to compliance with all laws and regulations and must not interpret any provision of this Agreement or request or communication from any employee or agent of BROKER, shipper, consignor, or BROKER's customer(s) to authorize or encourage, directly or by implication, CARRIER to deviate from any law or regulation applicable to CARRIER's operations as a motor carrier. BROKER will not coerce CARRIER, and any directions or instructions given by BROKER to CARRIER for the transportation of the freight shall be for information and convenience only, and CARRIER retains full control of the details of transportation of freight assigned to it under this Agreement. BROKER will not impose fines on CARRIER unless BROKER is instructed to do so by the shipper.

7. **No Broker Liability**- CARRIER agrees and acknowledges that BROKER will not be liable to a shipper for any act or omission of the CARRIER or any of its "employees" which transport a shipper's freight, as the term "employee" is defined under 49 C.F.R. §390.5 or for any of Carrier's Agents, Principals, Assigns or Subcontractors. CARRIER thus agrees and acknowledges to indemnify and hold harmless BROKER for any cargo loss or damage, or for delay in the delivery of a shipper's freight, or for any actual or consequential damages resulting therefrom.

   CARRIER shall defend, indemnify and hold BROKER and its shipper customer harmless from any claims, actions or damages, arising out of its performance under this Agreement, including cargo loss and damage, theft, delay, damage to property, and personal injury or death, and BROKER shall defend, indemnify, and hold CARRIER harmless from any claims, actions, or damages, including cargo loss and damage, theft, delay, property damage, bodily injury or death, arising out of its performance hereunder. Neither Party shall be liable to the other for any claims, actions or damages due to the negligence, culpable conduct or intentional act of the other Party, or the shipper. The obligation to defend shall include all costs of defense as they accrue.

   Except for CARRIERS'S liability under Paragraph 10, unless otherwise agreed in writing, and regardless of whether the Parties' insurance as referred to in this Agreement above is valid or provides coverage, the Parties' indemnity obligations shall not exceed the monetary insurance limits referred to in the paragraph above.

8. **No Broker Control**- The Parties agree that BROKER will not assert any control nor have any right to exercise control over a shipper's freight, including, but not limited to, taking possession of a shipper's freight, and BROKER shall not direct or control the routes taken by CARRIER in the transportation of a shipper's freight.

9. **Carrier Liability**- CARRIER hereby assumes the liability of a motor carrier as provided in §14706 of Title 49 of the United States Code (the Carmack Amendment), and all claims for loss, damage and/or salvage will be handled and processed in accordance with 49 C.F.R. Part 370.

10. **Bills of Lading**-

   a.   For each shipment tendered to CARRIER, CARRIER will provide to the shipper a standard bill of lading that is in accordance with 49 C.F.R. §373, listing the consignor and consignee, the origins and destinations, the number of packages, the description of the freight, and the weight, volume or measurement of the freight. The Parties agree that BROKER will not be a party to the bill of lading.

   b.   CARRIER acknowledges that BROKER should not be listed on the bill of lading and that if BROKER is listed on the Bill of Lading as the carrier this will occur for the convenience of the shipper only and CARRIER at all times is the actual carrier of goods and BROKER'S role is limited to arranging for transportation. In the event BROKER'S name is listed on the bill of lading, shipping manifest or other similar document, as the carrier, CARRIER shall cross-out or otherwise remove BROKER'S name and enter CARRIER'S name as applicable.

   c.   CARRIER understands that re-brokering and double brokering may be prohibited by law and will not re-broker, assign or interline the shipments hereunder without the express written consent of BROKER prior to the shipment being tendered to any other CARRIER. If CARRIER breaches this provision, BROKER shall have the right of paying the monies it owes CARRIER directly to the delivering carrier, in lieu of payment to CARRIER, and BROKER shall thereby be released from any further obligation to pay CARRIER. Upon Broker's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. IN ADDITION TO THE INDEMNITY OBLIGATION IN PARAGRAPH 7, CARRIER WILL BE LIABLE FOR CONSEQUENTIAL DAMAGES FOR VIOLATION OF THIS PARAGRAPH.

      i.   The Parties agree that the shipment of freight will move under the terms and conditions listed in the bill of lading, except where inconsistent with the terms of this Agreement.

      ii.   CARRIER agrees to list itself on the bill of lading as the



party in possession and control of the freight.

iii.          The terms and conditions of the bill of lading shall not operate to alter or modify the terms of this Agreement between CARRIER and BROKER.

iv.          CARRIER shall issue a bill of lading in compliance with 49 U.S.C. §80101 et seq., 49 C.F.R. §373.101 (and any amendments thereto), for the property it receives for transportation under this Agreement. Unless otherwise agreed in writing, CARRIER shall become responsible/liable for the freight when it takes/receives possession thereof, and the trailer(s) is loaded, regardless of whether a bill of lading has been issued, and/or delivered to CARRIER, and which responsibility/liability shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt. Any terms of the bill of lading (including but not limited to payment terms, released rates or released value) inconsistent with the terms of this Agreement shall be ineffective. Failure to issue a bill of lading or sign a bill of lading acknowledging receipt of the cargo by CARRIER shall not affect the liability of CARRIER. Said Bills of Lading are intended by the Parties to be Bills of Lading, as that term is interpreted under the Carmack Amendment and applicable law and not merely as "delivery receipts", "freight receipts" or any similar term.

11.    **Non-Solicitation of Shippers**- CARRIER agrees that it will not directly or indirectly conduct business with any shipper whose freight was transported pursuant to this Agreement for a period of two (2) years beginning with the last day such service was performed for that shipper. The Parties agree that a breach of this provision shall entitle BROKER, as reasonable liquidated damages and not as a penalty, to the full amount of commissions and/or compensation under the terms set forth in this Agreement that would have been due to BROKER had it arranged for the movement of said freight.

12.    **Assignment/Modifications of Agreement**- Neither CARRIER or BROKER may assign or transfer any rights under this Agreement, in whole or in part, without the prior written consent of the other party. Further, neither CARRIER nor BROKER may amend or modify the terms of this Agreement without the prior written consent of an expressly authorized official of the other party. For BROKER, only a company official with the title of Vice President or higher is authorized to agree to amendments to this Agreement. Any amendments or modifications to this Agreement not agreed to by both CARRIER and BROKER shall be null and void.

13. <u>**Insurance**</u> - CARRIER shall furnish BROKER with Certificate(s) of Insurance; financial responsibility or insurance policies providing thirty (30) days advance written notice of cancellation or termination; and unless otherwise agreed, subject to the following minimum limits:

    A. general liability $1,000,000;

    B. commercial auto or commercial motor vehicle insurance    $1,000,000, ($5,000,000 if transporting hazardous materials including environmental damages due to release or discharge of hazardous substances; hazmat carriers must have endorsement CA9948, sudden and accidental pollution coverage, and this endorsement must be shown on the Certificate of Insurance provided to BROKER);

    C. cargo damage/loss, $ 100,000      This coverage must be All Risk Broad Form Motor Truck Cargo Legal Liability Coverage.  The coverage provided under the policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage relating to cargo claims including, but not limited to, exclusions of unattended or unattached trailers, unattended or unlocked vehicles, theft, or for any commodities transported under this Agreement, refrigeration breakdown or lack of refrigerator fuel. Furthermore, if the commodity being hauled is refrigerated, refrigeration breakdown coverage will be provided and the CARRIER will honor and abide by the servicing requirements set forth in the insurance policy or endorsement.  Furthermore, if the commodity being hauled is on a flatbed or similar open conveyance, that there be no exclusion for wetness, rust, corrosion or moisture.

    D. workers' compensation with limits required by law.

Except for the higher coverage limits which may be specified above, the insurance policies and financial responsibility shall comply with minimum requirements of the Federal Motor Carrier Safety Administration and any other applicable regulatory state agency.  Nothing in this Agreement shall be construed to avoid CARRIER'S liability due to any exclusion or deductible of any insurance policy or to limit CARRIER'S liability for contribution and/or indemnification and defense of the BROKER.

Coverage must be written with a CARRIER rated A- or better as rated by AM Best Company. When an intrastate policy is issued, BROKER must be named as an additional insured.

14. <u>**Miscellaneous**</u>

    a. **Non-Exclusive Agreement:** CARRIER and BROKER acknowledge and agree that this contract does not bind the respective Parties to exclusive services to each other.  Either party may enter into similar agreements with other carriers, brokers, or



freight forwarders.

    b.    **Waiver of Provisions**:

        i.    Failure of either Party to enforce a breach of waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach, and shall not affect or limit the right of either Party to thereafter enforce such a term or provision.

        ii.    This Agreement is for specified services pursuant to 49 U.S.C.§14101(b). To the extent that terms and conditions herein are inconsistent with Part (b), Subtitle IV, of Title 49 U.S.C. (ICC Termination Act of 1995), the Parties expressly waive any or all rights and remedies they may have under the Act.

15.    **Severability**- If any portion or provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, The Parties agree that said portion or provision of the Agreement shall be severable, and that the remaining provisions of the Agreement shall continue in full force and effect.

16.    **Notices**- Any and all written or electronic notices required or permitted to be given under this Agreement shall be addressed as follows:

(BROKER)               (CARRIER)

POWER GENERATION TRANSPORT, INC         _OKL Transport_

GREGORY MADURO            Attn: _Gina Garcia_

2525 C- PLEASANT HILL ROAD        _11831 Obsidian Ln_

CARROLLTON, GA 30116          _Dayton TX 77375_

17.    **Force Majeure**- In the event that fire, flood, other natural disaster, war, embargo, riot, or civil disobedience prevents the performance of either BROKER or CARRIER'S obligations under this agreement, that party shall not be liable to the other party for such failure to perform.

18.    **Choice of Law and Venue**- All issues concerning the construction, interpretation, validity, and enforceability of this Agreement, and any other dispute arising out of this Agreement, whether in a court of law or in alternative dispute resolution, shall be governed by and construed and enforced in accordance with the laws of the State of   GEORGIA  , including the applicable statutes of limitations under   GEORGIA   law, without giving effect to any choice of law provision applying the laws of another jurisdiction.

19.    **Indemnification**: CARRIER will indemnify and hold harmless BROKER, its employees, officers, directors, agents, principals and assigns from any liability, settlements, judgments, verdicts, attorney fees or expense or any nature whatsoever

arising out of any claims, demands or suits against BROKER which in any way relate to a claim of BROKER's liability or culpability for the actions of CARRIER, including negligent or improper hiring or retention of the CARRIER, its employees (statutory or otherwise) agents, principals, officers, directors, assigns or anyone acting by or for CARRIER, for any aspect of the transportation of freight, public liability, personal injury, bodily injury, emotional or mental distress, wrongful death, loss of consortium, cargo liability or any claim or cause of action recognized by any state, municipality, county or any jurisdiction, Administrative Agency, or the Government of the United States. CARRIER agrees to have insurance to cover its indemnification obligations under this section, but CARRIER's indemnification obligations are not capped by the amount of any available insurance.

20.  **Entire Agreement**- This Agreement, including all appendices and addenda, constitutes the entire agreement intended by and between The Parties and supersedes all prior agreements, representations, warranties, and understandings, whether oral or in writing.

21.  **Modification of Agreement** - This Agreement and Exhibit A et seq. attached may not be amended, except by mutual written agreement, or the procedures set forth above.

**IN WITNESS WHEREOF**, The Parties have caused this Agreement to be executed on the effective date listed above in their respective names by their fully authorized representatives below:

BROKER

*Gregory Maduro*

Signed

GREGORY MADURO

Printed

CEO - OWNER

Title

CARRIER

*Gina Garcia*

Signed

*Gina Garcia*

Printed

*Ops / Logistics Mgr.*

Title

# Ex. B



**Cristina Belaval, Partner**
5507 Louetta Rd., Suite A
Spring, TX 77379
Direct: 832-559-5522
cristina@fuentesfirm.com
www.fuentesfirm.com

**Juan Roberto Fuentes,** *Managing Partner*
**Brian Schrumpf,** *Partner*
**David Helmey,** *Partner*
**Cristina Belaval,** *Partner*
**Stefan Casso,** *Attorney*
**William Morris**, *Attorney*
**Sadi R. Antonmattei-Goitia,** *Attorney*
**Kimberly Rankin,** *Attorney*
**Nicholas Van Cleve,** *Attorney*
**Katherine Santmyer,** *Attorney*
**Dennis Moore,** *Attorney*
**Autumn DeLee,** *Attorney*
**Bryson Matthews,** *Attorney*
**Michael Crain**, *Attorney*
**Skylar Stanley,** *Attorney*

October 31, 2022

Stephen Silva                              ***Via email:***   Steve.Silva@Markel.com
Markel Surety
P.O. Box 5008
Woodland Hills, CA 91365

      Principal:     Power Generation Transport, Inc.
      Bond No.:    3483909
      Surety:       SureTec Insurance Company

Dear Stephen,

      Please be advised that our firm represents OKL Transport dba OverKnight Logistics in the above-referenced matter.   As you are aware, a transportation broker is "a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier." 49 C.F.R. § 371.2. OKL Transport only acts as authorized motor carrier when it engages in interstate commerce through movements not subject to any exemption from federal economic regulation. BMC-84 Surety Bonds are prohibited from directing or paying funds for claims arising from movements that are exempted from federal economic regulation.

      As far as we can deduct from the correspondence exchanged by you with Owen Dickens, Markel Surety is claiming that OKL Transport double brokered the loads in violation of the broker-carrier agreement.  The broker, Power Generation Transport, Inc. dba Radiant Light ("Radiant") alleges that OverKnight Logistics carried the load instead of OKL Transport.  This claim lacks support under the contract and the law.

OverKnight Logistics INC, MC1036792 was an active broker, not a carrier, at the time the load was tendered and delivered.  Thus, there is no double brokering.  Please see evidence of bond from SAFER.

| 84 | SURETY | COLONIAL SURETY COMPANY | 104857 | $0 | $75,000* | 02/01/2022 | 06/10/2022 Cancelled |
|----|--------|-------------------------|--------|-----|----------|------------|----------------------|

OverKnight Logistics, MC1036792 as broker does not move loads.  The mere fact that a brokers appears on a bill of lading as carrier does not mean that a load was double brokered or moved by OverKnight Logistics.  At the time the load was carried, none of OKL Transport's trucks were operated under the brokerage authority, but the carrier authority from OKL Transport, MC 1284518.

SureTec Insurance Company's ("SureTec") obligations are governed by the terms of the Bond/Trust provided by standard forms BMC-84 or BMC-85.  BMC-84 form states that its purpose is to benefit motor carrier and the Surety is liable to OKL Transport for broker's breach:

> WHEREAS, this bond is written to assure compliance by the Principal as either a licensed Broker or a licensed Freight Forwarder of Transportation by motor vehicle with 49 U.S.C. 13906(b), and the rules and regulations of the Federal Motor Carrier Safety Administration, **relating to insurance or other security** for the protection of motor carriers and shippers, and shall inure to the benefit of any and all motor carriers or shippers to whom the Principal may be legally liable for any of the damages herein described.

Similarly, Form BMC 85 expressly states that Trustee's duties are to "pay ... directly to a shipper or motor carrier any sum or sums which Trustee, in good faith, determines that the Trustor has failed to pay".   Thus, under both contracts OKL Transport is a third-party beneficiary bestowed with the right to pursue payment directly upon the freight brokers' breach.

The shipping documents provided are sufficient to sustain a claim for breach of contract, to the extent that: (1) OKL Transport provided transportation services for compensation under contract or series of contracts, including bills of lading, arranged Radiant, (2) Radiant failed to carry out the contracts or bills of lading by failing to tender payment of the amount owed, (3) SureTec issued a bond or trust on behalf of Radiant to ensure said freight broker's financial responsibility by providing for payments to carriers if Radiant failed to pay, and (4) to this day, SureTec has failed to compensate OKL Transport for Radiant's breach.

OKL Transport initiated their claims on or around July 26, 2022.  Pursuant to 49 U.S.C.A. §13906 (b) (2) (B), if a surety/trustee receives notice of a claim under subparagraph (A), subparagraph (B) the surety/trustee must respond to the claim within thirty (30) days of receipt and, in the case of a denial, deny the claim in writing setting forth the grounds for the denial. The double brokering claim is unwarranted and, to this date, SureTec has failed to formally deny OKL Transport's claims in writing setting forth the grounds for such denial, in violation of the law.

SureTec has until Monday November 7, 2022, to proceed with payment or deny the claim. If payment is not processed by them, we will move forward with suit against all liable parties.

Sincerely,

*Cristina S. Belaval*
**THE FUENTES FIRM, P.C.**

| | |
|---|---|
| **Subject:** | Power Generation Transport, Inc. / Transportation - US / OverKnight Logistics (Catalyst Finance, L.P.) |
| **Date:** | Tuesday, November 15, 2022 at 2:05:11 PM Eastern Standard Time |
| **From:** | Silva, Steve |
| **To:** | cristina@fuentesfirm.com |
| **CC:** | Gregory Maduro |
| **Attachments:** | 49 USC §13906.pdf, 221031--ca attachment.pdf |

November 15, 2022

Cristina Belaval, Partner
5507 Louetta Rd., Suite A
Spring, TX 77379

By email only:  cristina@fuentesfirm.com

Re:      Principal:        Power Generation Transport, Inc.
         Bond No.:         3483909
         Surety:           SureTec Insurance Company
         Claimant:         Owens Dickens, OKL Transport

Dear Ms. Belaval:

We are in receipt of your recent email with attachment.  We have concluded our review based on the information and documentation presented to date.

Please recall that the conditions for your recovery from the bond are set forth in 49 USC 13906 (b)(2)(A), copy attached, which provides as follows:

   A. Payment of Claims. - -A surety bond, trust fund, or other financial security obtained under paragraph (1) shall be available to pay any claim against a broker arising from its failure to pay freight charges under its contracts, agreements or arrangements for transportation subject to jurisdiction under chapter 135 <u>if</u>- -

         (i)      subject to review by the surety provider, the broker consents to the payment;
         (ii)      in any case in which the broker does not respond to adequate notice to address the validity of the claim, the surety provider determines that the claim is valid; or
         (iii)      the claim is not resolved within a reasonable period of time following a reasonable attempt by the claimant to resolve the claim under clauses (i) and (ii), and <u>the claim is reduced to a judgment against the broker</u>. (Emphasis added)

We understand your position, as well as of that of your client, wherein you believe that the necessary information and documentation to support your claim's claim has been submitted.  As

noted in our last letter to your client, we must refer you to the conditions for recovery, cited above.

Relative to the conditions for recovery, the bond principal has not consented to payment and he has responded to your client's claim and continues to actively dispute it citing concerns with entities other than Owen Christian Dickens dba OKL Transport appearing on some of the paperwork, as well as whether potential double brokering had occurred, along with charges he believes would apply and otherwise offset a portion of your client's claim.  Based on your current response we understand that you dispute that paperwork showing another entities name is relevant or that double brokering has occurred.

The bond principal has responded to the claim and disputes the claim and so conditions (i) and (ii) have not been met as discussed under the conditions for recovery.  As a result, we cannot find that the above conditions have been satisfied and have no alternative other than to decline your client's claim. If you receive a judgment against the principal, please provide us with a copy.

This communication and all prior or subsequent communications and/or investigative efforts are made with the express reservation of all rights and defenses the Surety has or may have at law, equity or under the terms and provisions of the bond and contract documents.  This reservation includes, without limitations, defenses that may be available under any applicable notice of suit limitation provisions.

Regards,


**Stephen Silva**
**Claims Supervisor**

Markel Surety
Markel Insurance Company/SureTec Insurance Company
P.O. Box 5008
Woodland Hills, CA 91365
Direct: (818) 867-6901
Fax: (818) 867-6950
www.suretec.com
www.markelcorp.com
Please review our privacy policy at www.markel.com/privacy-policy