IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| J.K. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | |
| | : | |
| RAMADA WORLDWIDE, INC.; and | : | |
| NEWTEL V CORPORATION d/b/a | : | |
| Ramada Limited Suites; | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Matthew B. Stoddard
M. Janine Bell
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
janine@legalhelpga.com

**Attorneys for Plaintiff**

# TABLE OF CONTENTS

Introduction.................................................................................................3

The Parties.................................................................................................4

Procedural Issues.........................................................................................4

J.K Is Trafficked for Sex at Limited Suites….............................................6

COUNT 1:  TVPRA Civil Beneficiary Claims Against Newtel.............................9

COUNT 2:  TVPRA Vicarious Liability Claims Against Ramada……………...17

    A.    Actual Agency……………………………………………………17

    B.    Apparent Agency……………………………………………22

    C.    Aiding and Abetting………………………………………23

    D.    Joint Venture Liability……………………………………24

Proximate Cause and Damages........................................................................26

Prayer for Relief.........................................................................................28

## INTRODUCTION

1.      This lawsuit, brought by a sex trafficking victim against Ramada Worldwide and its Alpharetta based franchisee, seeks damages under the Trafficking Victims Protection Reauthorization Act (TVPRA). *See* 18 U.S.C. § 1595(a) (stating that a sex trafficking victim "may bring a civil action against . . . whoever knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of the" TVPRA.); *see also Doe #1 v. Red Roof Inn, Inc.*, 21 F.4th 714 (11th Cir. 2021); *Ricchio v. McLean*, 853 F.3d 55 (1st Cir. 2017).

2.      From approximately October of 1997 until approximately June of 2015, a Ramada Limited Suites hotel located at 3020 Mansell Road, Alpharetta, Georgia (the "Limited Suites") was:

        a.      owned by Defendant Newtel V Corporation ("Newtel"), and

        b.      jointly operated and managed by Defendant Newtel and Defendant Ramada Worldwide ("Ramada").

3.      During this ownership and management (beginning in approximately January of 2013 and ending approximately December of 2014), Plaintiff J.K was repeatedly trafficked for sex at the Limited Suites by "Kelvin."

4.      Limited Suites was a notorious hotspot for illicit activity that had been attracting sex trafficking and prostitution ventures for years, and Defendants knew it.

## THE PARTIES

5.      Plaintiff J.K is a resident and citizen of Alpharetta, Georgia.

6.      Plaintiff J.K consents to the jurisdiction of this Court.

7.      Defendant Newtel is an administratively dissolved Georgia for profit corporation that owned and helped manage the Limited Suites.

8.      Defendant Ramada Worldwide is a foreign for-profit corporation that jointly managed the Limited Suites with Defendant Newtel.

## PROCEDURAL ISSUES

9.      Given the nature of the case, J.K is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed J.K's full name to defense counsel or will immediately upon identification of defense counsel.  When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for J.K to proceed anonymously.   Upon information and belief, Defendant will consent to J.K proceeding without publicly disclosing her names.

10.     As an administratively dissolved corporation, Defendant Newtel can be served through "any person, who, as an agent or officer of such corporation, was subject to be[ing] served as its officer or agent at the time of dissolution." O.C.G.A. § 14-4-161(b).  Those persons are:

      a.     Lewis Newman: 3032 Bakers Meadows SE, Atlanta, Georgia

      b.     Yogesh P. Patel: 816 Brighton Ave, Southlake, Texas

      c.     Shakuntal Y Patel: 816 Brighton Ave, Southlake, Texas

11.     Defendant Newtel was properly served with process in this matter.

12.     Defendant Newtel is subject to the jurisdiction and venue of this Court.

13.     Defendant Ramada can be served through its registered agent Corporate Creations Network, Inc. located at 2985 Gordy Parkway, Marietta GA 30066.

14.     Defendant Ramada was properly served with process in this matter.

15.     Defendant Ramada is subject to the jurisdiction and venue of this Court.

16.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act which is a law of the United States.

17.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Alpharetta,

Fulton County, Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## J.K IS TRAFFICKED FOR SEX AT LIMITED SUITES

18.     In January of 2013, J.K was a minor living with her grandmother who began chatting with a man named "Kelvin" on an online dating website.

19.     After several online interactions, J.K. agreed to meet Kelvin in person and she told Kelvin where she lived.

20.     Kelvin then arrived at J.K.'s grandmother's home, picked up J.K., and took J.K. to the Limited Suites.

21.     Kelvin promised J.K. clothes, housing, and other items.

22.     Kelvin also told J.K. that she would be required to have sex with men in exchange for money, that the money would go to Kelvin, and that Kelvin would use the money to buy clothes, housing, and other items for J.K.

23.     Between approximately January of 2013 and approximately December of 2014, J.K. spent weeks at a time at the Limited Suites being sold for sex by Kelvin.

24.     Kelvin threatened violence on J.K. if J.K. did not continue to perform sex work at the Limited Suites.

25.     Kelvin raped J.K. most nights.

26.     Kelvin filmed J.K.'s sex acts, and when J.K. threatened to stop performing the sex acts, Kelvin punished J.K. by sending the sex act videos to persons J.K. knew.

27.     Kelvin repeatedly told J.K. that she owed Kelvin money and that J.K. would never be able to pay off the debt and would be forced to continue to work for Kelvin as his sex slave forever.

28.     Kelvin forced J.K. to do drugs including cocaine, methamphetamine, and MDMA.

29.     J.K was sexually assaulted hundreds of times while at the Limited Suites.

30.     Kelvin took the commercial sex act proceeds.

31.     For the duration of the stays, Kelvin used a portion of the proceeds from the commercial sex acts to book lodging at the Limited Suites for the next night.

32.     Kelvin would use Defendants' WIFI network to post advertisements for J.K. to perform sex acts, and men would thereafter rape J.K. because of these advertisements.  Upon information and belief, Kelvin paid for use of Defendants WIFI network either through the room rental fees or a separate charge.

33.     Kelvin would not let the cleaning staff clean the rooms where J.K. was performing commercial sex acts.  Instead, either Kelvin or J.K. (at Kelvin's

direction) would ask Defendants' cleaning staff for towels and sheets.  These requests for towels and sheets were made multiple times each day, and Defendants' staff always complied.  That's right – Defendants gave multiple sets of sheets each day to Kelvin and/or J.K.

34.    While Defendants locked the front lobby entrance in the evening, Defendants either (i) zip-tied the strike bar on the side entry door so it would not lock or (ii) allowed others to zip tie this door.  As a result, this side door always remained unlocked so those wishing to buy commercial sex from Kelvin and the other traffickers at Limited Suites could enter and exit the hotel and rape J.K. and other human beings at will.

35.    J.K. was not the only human being sold for sex at the Limited Suites.

36.    J.K. (at Kelvin's direction) and other women were frequently propositioning visitors in the hotel hallways for sex acts and would sometimes knock of doors in the hotel to see if any guests in those rooms would agree to pay for sex acts.

37.    Defendants also knew of drug use in their common areas including the smoking of crack cocaine in the hallways.  An act that was occurring frequently.

38.     In approximately December of 2014, after long periods of abuse, J.K.'s friends / family met with Kelvin and paid him $3,000.00 to never talk to J.K. again. Kelvin took the money, and J.K. escaped.

## COUNT 1: TVPRA CIVIL BENEFICIARY CLAIM AGAINST NEWTEL

39.     The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA") provides a civil cause of action to victims like J.K against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" violated the TVPRA.

40.     Defendant Newtel "knowingly benefited" from J.K's trafficking because:

      a.     Kelvin rented rooms at the Limited Suites;

      b.     Defendant Newtel collected revenue from the room rentals and the use of the WIFI network; and

      c.     J.K was advertised for sex through the WIFI network and forced to have sex in those rooms.

41.     Defendant Newtel took part in a common undertaking involving risk or profit with the trafficker(s) because:

      a.     Plaintiff's trafficker(s) would pay in cash for one night at a time, booking the next night's stay before check-out time;

b.   Defendant Newtel directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

d.   Defendant Newtel was directly renting rooms to the same trafficker(s) – Plaintiff's trafficker(s);

e.   Defendant Newtel had commercial dealings with Plaintiff's trafficker(s) and then continued to rent rooms to Plaintiff's trafficker(s).

f.   Defendant Newtel had a continuous business relationship with Plaintiff's trafficker(s) such that Defendant established a pattern of conduct with those trafficker(s).

g.   After renting the room for the first night, Plaintiff's trafficker(s) had prior commercial dealings with Defendant Newtel and then reinstated those dealings.

h.   Defendant Newtel associated with Plaintiff's trafficker(s) in an effort to force Plaintiff to serve Defendant Newtel's business objectives.

i.   Defendant Newtel owned, operated, and maintained the hotel in question.

42.   The criminal portion of the TVPRA states, in relevant part, that "whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . that means of force, threats of force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age

of 18 years and will be caused to engage in a commercial sex act shall be punished .

. .” under the TVPRA. 18 U.S.C. §1591(a).

43.     Plaintiff's trafficker's undertaking with Defendant Newtel violated the

TVPRA with respect to Plaintiff because:

a.     Kelvin recruited J.K to participate in commercial sex acts at Defendant's hotel by, among other reasons, stating that he would take care of her and then making her work as a prostitute;

b.     Kelvin harbored J.K at Defendant's hotel for the purpose of J.K participating in commercial sex acts at the property;

c.     Kelvin transported J.K to Defendant's hotel for the purpose of J.K participating in commercial sex acts at the hotel;

d.     Kelvin maintained J.K at Defendant's hotel for the purpose of J.K participating in commercial sex acts at the hotel;

e.     The commercial sex acts occurred at Defendant's hotel in rooms rented by Kelvin;

f.     Kelvin used force, threats of force, fraud, and coercion to cause J.K to participate in commercial sex acts at Defendant's property;

g.     Kelvin threatened J.K with violence and used this tactic to cause J.K to engage in commercial sex acts at Defendant's property;

h.     Kelvin de-frauded J.K by falsely telling her that he would take care of her, and then forcing her to work as a prostitute for him;

i.     Kelvin coerced J.K to participate in commercial sex acts at Defendant's property by threatening J.K. with physical harm if she did not continue to engage in commercial sex acts at Defendant's property;

j.      Kelvin knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited J.K to engage in commercial sex acts in the hotel rooms that Kelvin rented from Defendant;

k.      Buyers came to Defendant's hotel, purchased the "right" to have sex with J.K from Kelvin, and then the buyers raped J.K in Defendant's hotel;

l.      Kelvin was aware that J.K. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendant's hotel;

m.      Kelvin created sex tapes of J.K., threatened to disclose those tapes to others if she did not continue to perform commercial sex acts and did eventually disclose those tapes to others as punishment with J.K. "misbehaved,"

n.      Kelvin utilized Defendant Newtel's wireless internet connection to post advertisements of J.K. for the commercial sex acts; and

n.      Other actions to be proven at trial.

44.     The venture in which Defendant Newtel participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of credit cards to post online advertisements through websites for selling J.K in commercial sex acts, the use of the internet to post sex advertisements, the use of interstate highways to transport J.K to the hotels by her trafficker(s) (and her associates), and other reasons to be proven at trial.

45.     Defendant Newtel had actual or constructive knowledge that the

undertaking violated the TVPRA, i.e., Defendant Newtel had actual or constructive knowledge that J.K was being trafficked for sex. *See* Fed. R. Civ. P. 9(b)("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, *LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

46.     Defendant Newtel directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its hotel at all relevant times, giving Defendant Newtel specific and direct knowledge of sex trafficking, including the sex trafficking that victimized J.K, and other crimes at the Limited Suites during the relevant period.

47.     J.K's victimization followed a pattern that was readily observable and should have been obvious to Defendant's hotel employees based on information available to the public at large and to the hotel industry.

48.     Defendant Newtel knew or should have known of the existence and prevalence of sex trafficking at budget motels and its illegality because of industry knowledge such as:

    a.     the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000.

    b.    the implementation of the Tourism Child Protection Code of Conduct (the "Code") by End Child Prostitution and Trafficking (ECPAT-USA) which outlines well-established best practices for the hospitality industry to combat sex trafficking, and identifies six simple steps hotels can take to prevent child sex trafficking.

    c.    extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking

    d.    extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and

    e.    the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

49.    Defendant Newtel had actual knowledge of the publicly available online reviews from Google, My Business, Priceline, Trip Advisor, etc. in which customers reported allegations of prostitution, sex trafficking, and other illicit activities occurred at the Limited Suites including reviews that state:

    a)    This place is used by prostitutes and the owners know it but don't do anything about since its money from them.  Do not stay there.  You don't want to know what you can catch by sleeping in one of those beds

    b)    . . .a pimp and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady.  I. . . complained about the incident and the desk manager doesn't respond. . .

    c)    Condoms under the bed. . .room safety lock on door had been busted off. . .

d)  I stayed. . .five nights. . .traffic up and down the hall all night every night I was there. . .I am a female traveling alone. . .not safe. . .

e)  Outside doors remained unlocked at night. . .

f)   It is a sleazy dive hotel. . .the card access lock is broken and they have zip tied the emergency bar on the door so that the door remains unlocked, which means that ANYONE can have access to the hotel at ANY time. . .the hotel was dangerous. . .

g)  . . .big argument at the front desk with a group of people. . .[many hours later] we witnessed 4 people in the hallway [who] had come to get some weed. . .[later] two girls were fighting in the parking lot. . .we left after the first night and f[ound] a different hotel. . .

50.     Upon information and belief, Defendant had actual or constructive knowledge of law enforcement activity reporting widespread prostitution, sex trafficking, and other illicit activities occurring at Defendant's hotel.

51.     Upon information and belief, based on the numerous arrests, investigations, and police reports, Defendant knew or should have known of the sex trafficking and prostitution ventures operating out of its hotel prior to Plaintiff's sex trafficking.

52.     Regarding J.K, Defendant Newtel and/or its employees observed the vast majority of the evidence that the Department of Homeland Security ("DHS") posts as guidelines to identify and prevent of sex trafficking for hotel staff to be vigilant in observing including:

a.  persons who show signs of malnourishment, poor hygiene, fatigue,

sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b.  persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons; and

n.  persons asking staff or patrons for food or money.[1]

---

[1] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).

53.    Regarding J.K, Defendant Newtel and/or its employees observed the vast majority of the evidence that the organization End Child Prostitution and Trafficking (ECPAT-USA) has listed as specific indicators of human trafficking that hotel staff should recognize to combat trafficking including: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings.[2]

## COUNT 2: TVPRA VICARIOUS LIABILITY CLAIM AGAINST RAMADA

54.    Defendant Ramada is liable under the law for the actions and inactions of Defendant Newtel.

## COUNT 1(A)
## ACTUAL AGENCY

55.    Upon information and belief, Defendant Ramada acknowledged that Defendant Newel would act on behalf of Defendant Ramada in operating and

---

[2]    *See* ECPAT-USA, *Human Trafficking Indicators*, available at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

managing the Limited Suites because:

    a.    Defendant Ramada provided Defendant Newel with its trademark, brand system, signage and other similar items such that Ramada's name was on the door and the hotel was called a "Ramada Limited Suites"

    b.    Defendant Ramada agreed to receive money from Defendant Newel for Defendant Ramada aiding in the management and operation of the facility.

    c.    Defendant Ramada helped Defendant Newell advertise rooms for rent at the Limited Suites using the Ramada system and that advertising referred to the hotel as a Ramada Limited Suites hotel.

    d.    Defendant Ramada's marketing materials described the location as a Ramada property.

56.    Upon information and belief, Defendant Newtel accepted the undertaking of operating and managing the Limited Suites on behalf of Ramada because:

    a.    Defendant Newtel cooperated with Defendant Ramada and received the equipment Defendant Ramada provided and placed the equipment, trademarks, brand marks, signage and other similar features throughout the Limited Suites;

    b.    Defendant Newtel modified the Limited Suites at Defendant Ramada's direction and in conformance with standards dictated by Defendant Ramada.

    c.    Defendant Newtel paid Ramada royalty fees equal to a percentage of gross room revenue.

    d.    Defendant Newtel paid Ramada a Ramada Inn National

Association Services Assessment Fee equal to a percentage of gross room revenue.

e.   Defendant Newtel paid taxes for Defendant Ramada equal to all taxes owed on all recurring fees that Defendant Newtel paid Defendant Ramada.

f.   Defendant Newtel paid a Central Commission Payment Program global distribution fee and internet booking fees to Defendant Ramada based on the number of persons who booked the Limited Suites online.

g.   Defendant paid Guest Service assessment fees to Defendant Ramada when Guests complained about the Limited Suites facility.

57.   Upon information and belief, Defendant Ramada controlled the actions of Defendant Newtel because:

a.   Defendant Ramada required Defendant Newtel to use the business name for the Limited Suites that Defendant Ramada chose;

b.   Defendant Ramada required Defendant Newtel to join the Ramada Inns National Association;

c.   Defendant Ramada required Defendant Newtel to attend each Ramada Inn National Association Conference.

d.   Defendant Ramada dictated how the Limited Suites would be equipped and supplied.

e.   Defendant Ramada required Defendant Newtel to prove that it had equipped and supplied the Limited Suites according to Defendant Ramada's demands.

f.   Defendant Ramada required any changes that Defendant Newtel

wanted made to the actual realty at the Limited Suites be approved by Defendant Ramada.

j.    Defendant Ramada determined the hours that Defendant Newtel would keep the Limited Suites open for business and directed that Defendant Newtel could NOT close the Limited Suites for any holidays.

k.    Defendant Ramada required Defendant Newtel to accept payment by whatever credit and debit cards Defendant Ramada designated

l.    Defendant Ramada dictated how Defendant Newtel must hold customer credit card data.

m.   Defendant Ramada required Defendant Newtel to join a marketing program for Limited Suites and advertise the Limited Suites through the marketing program.

n.    Defendant Ramada required Defendant Newtel managers to attend job training at an offsite location chosen by Defendant Ramada for an approximate two-week duration.

o.    Defendant Ramada provided training tools, training materials, and training programs to Defendant Newtel and required Defendant Newtel employees to be trained to the Defendant Ramada program.

p.    Defendant Ramada directed and required Defendant Newtel to use a Defendant Ramada's chosen method of accounting for the Defendant Newtel business

q.    Defendant Ramada directed Defendant Newtel to send all accounting data to Defendant Ramada and Defendant Ramada thereafter audited the accounting on a regular basis.

r.    Defendant Ramada required Defendant Newtel to allow Defendant Ramada to inspect the facility at any time and

unannounced and Defendant Ramada would inspect the Limited Suites to make sure that Defendant Newtel was following all of Defendant Ramada's directions on how the facility should be run and would thereafter "dock Defendant Newtel" monetarily if Defendant Ramada standards were not being met.

s.    Defendant Ramada required Defendant Newtel to provide rooms to Defendant Ramada at an "employee rate"

t.    Defendant Ramada had the power to tell Defendant Newtel to upgrade and renovate the facility in the way that Defendant Ramada wanted the facility renovated, and Defendant Newtel had to do so.

u.    Defendant Ramada required Defendant Newtel owners to attend orientation and training.

v.    Defendant Ramada could force Defendant Newtel owners, managers, and staff to attend and participate in remedial training.

w.    Defendant Ramada required Defendant Newtel to use Defendant Ramada's computerized reservation system software for all its booking business.

x.    Defendant Ramada could establish and control all aspects of the system stated herein including changing or deleting portions of the system, and Defendant Newtel would have to go along with Defendant Ramada's changes and / or deletions.

y.    Defendant Ramada had the ability to fire Defendant Newtel (i.e., terminate the parties' agreement) if Defendant Newtel did not follow the direction and authority of Defendant Ramada.

z.    Defendant Ramada would also dock Defendant Newtel's pay for guest complaints that Defendant Ramada received about the Limited Suites.

## COUNT 2(B)
## <u>APPARENT AGENCY</u>

58.     Defendant Newtel reasonably appeared to be an agent of Defendant Ramada.

59.     Defendant Ramada made representations to J.K. and the world at large including:

      a.     Providing years of advertising to develop a Ramada Trademark with which J.K. was familiar and which had secondary meaning for a large reputable hotel chain which followed the law.

      b.     Having the Ramada signs and marks located at the Limited Suites which communicated to J.K. that the facility was, in fact, a large reputable hotel chain which followed the law.

      c.     Calling the Limited Suites a Ramada property.

60.     Defendant Ramada's representations caused J.K. to reasonably believe that Defendant Newtel was authorized to act for Defendant Ramada's benefit because:

      a.     J.K. was never informed that the hotel was owned or managed by anyone other than Defendant Ramada and J.K reasonably believed that Defendant Ramada did, in fact, own and manage the Limited Suites.

      b.     the signage, internet advertising, and statements made led J.K. and the general public to believe that the hotel was owned and managed by Defendant Ramada.

61.     While reliance is not required, Defendant Ramada's actions induced

Plaintiff's detrimental, justifiable reliance upon the appearance of the agency relationship because:

a. Upon first driving around with Kelvin, and when first exiting Kelvin's car prior to her trafficking, J.K. had more power in the relationship dynamic and the jury could, therefore, find that J.K. could have escaped the situation or directed Kelvin to another hotel at this time, and that J.K. did not do so because she felt comfortable and safe with her "new date" at the Limited Suites because it was a large hotel brand she knew of and she therefore assumed it would be a safe place to be.

## COUNT 2(C)
## AIDING AND ABETTING

62. "Whoever. . .aids, abets. . .[or] induces [] commission" of "an offense against the United States" "is punishable as a principal." 18 U.S.C. § 2(a).

63. Defendant Ramada aided and abetted non-party Kelvin's violation of 18 U.S.C. § 1591.

64. The substantive offenses by Defendant Newtel and non-party Kelvin are stated in detail above.

65. Upon information and belief, it is possible for the jury to infer that Defendant Ramada knew the offenses were being committed because the following combinations of suspicion and indifference to truth show that Defendant Ramada had a strong suspicion that J.K. was being trafficked yet shut its eyes for fear of what it would learn if it opened its eyes:

    a.    Defendant Ramada's booking system detailed that Kelvin was consistently renting rooms at the Limited Suites and for short period of time and over and over again.

    b.    Defendant Ramada had access to Kelvin's driver's license or ID card showing that Kelvin was a Georgia resident with a nearby address and therefore not in need of legitimate travel lodging.

    c.    Defendant Ramada frequented the Limited Suites for what Defendant Ramada called "quality assurance inspections" and Defendant Ramada therefore saw the same signs and symptoms of trafficking that Defendant Newtel saw, and which are stated above.

66.    Upon information and belief, it is also possible for the jury to find that Defendant Ramada desired the crimes to continue because:

    a.    Defendant Ramada wanted revenue and its deal with Defendant Newtel was such that Defendant Ramada made more money if Defendant Newtel continued to rent rooms to Kelvin.

    b.    Defendant Ramada knew or closed its eyes to the problem of J.K. being trafficked.

    c.    Defendant Ramada continued to provide its reservation system, its credit card processing system, its trademark and brand system, and the other assistance to Defendant Newtel detailed above so that Kelvin could continue to rent rooms at Limited Suites and so that J.K. could continue to be raped in those rooms.

## COUNT 2(D)
## <u>JOINT VENTURE LIABILITY</u>

67.    Upon information and belief, Defendant Ramada and Defendant Newtel were engaged in a joint venture such that Defendant Newtel's actions are

imputed to Defendant Ramada. *See Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002) ("a joint venture. . .may be created by. . .implied contract. . .consist[ing] of the following elements. . .")

68.   Upon information and belief, Defendant Ramada and Defendant Newtel were in a business relationship as follows:

a.   the parties agreed to operate and manage the Limited Suites in a way that created a joint venture relationship even if Defendant Ramada may have uttered the talismanic phrase "this is not a joint venture" during the discussions at some point.

b.   Defendant Ramada and Defendant Newtel formed a business arrangement under which they pooled their resources to accomplish a specific task and fulfill an enumerated goal.

c.   Defendant Ramada brought advertising know how, management know how, a trademark with secondary meaning, operational systems, training programs, software programs for business management, a system of accounting, etc. to the joint venture.

d.   Defendant Newtel brought a hotel building, some local knowledge, and labor such as cleaners and desk clerks to the joint venture.

e.   Defendant Ramada and Defendant Newtel pooled these resources to operate and manage the Limited Suites hotel for the purpose and business goal of making a profit.

f.   These actions and the arrangement other than any phrase by Defendant Ramada stating "a joint venture is not intended" actually created a joint venture, and if such phrase was uttered, the parties actions showed differently such tha any original agreement was modified and such that the Defendants thought of themselves as partners and acted as if they were partners.

69.     Defendant Ramada and Defendant Newtel had joint control and a joint right of control over the Limited Suites because of all the above stated facts.

70.     Defendant Ramada and Defendant Newtel had a joint proprietary interest in the management and operation of the Limited Suites as shown above.

71.     Defendant Ramada and Defendant Newtel had a right to share in the profits and losses as stated above.

72.     Defendant Ramada and Defendant Newtel had a common purpose in the joint venture of maximizing the profits from room rentals at Limited Suites.

## PROXIMATE CAUSE AND DAMAGES

73.     J.K's sex trafficking at the Limited Suites was a foreseeable and preventable result of Defendants actions and inactions including failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its hotel and failing to prevent J.K's continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

74.     As a direct and proximate result of Defendants' actions, J.K suffered substantial physical, emotional, and psychological harm and other damages.

75.     Defendants are jointly and severally liable with each other and the trafficker and any other non-party actors who participated in the trafficking for the indivisible injuries that were proximately caused to J.K.

76.     Defendants are liable for J.K's damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under the TVPRA and other federal law. *See* 18 U.S.C. § 1595(a) (a victim "may recover damages and reasonable attorneys fees"); *see also Barry v. Edmunds*, 116 U.S. 550, 562 (1886) ("it is a well-established principle of the common law. . .that a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant. . ."); 18 U.S.C. § 2255(a) (minor victim may recover "actual damages. . .reasonable attorney's fees. . .[and] punitive damages. . .")

77.     Plaintiff J.K brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

      a.     Personal injuries;

      b.     Past, present and future pain and suffering;

      c.     Disability;

      d.     Disfigurement;

      e.     Mental anguish;

      f.     Loss of the capacity for the enjoyment of life;

g.  Loss of earning capacity;

h.  Lost wages;

i.  Diminished capacity to labor;

j.  Incidental expenses;

k.  Past, present and future medical expenses;

l.  Permanent injuries;

m.  Attorney's fees;

n.  Punitive damages; and

o.  Consequential damages to be proven at trial.

78.  Punitive damages should be imposed upon Defendants without limitation or cap for its actions which are explained more fully above.

79.  Defendants is also liable for paying Plaintiff's attorneys' fees and litigation expenses pursuant to the TVPRA.

80.  Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendants, and one or more or all of the above stated acts were the proximate cause of the injuries and damages sustained by the Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against the Defendant and for

the following:

1)   That process and summons issue requiring each Defendant to appear as provided by law to answer the allegations of the Complaint;

2)   Plaintiff be awarded actual damages in amounts to be shown at trial;

3)   Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from each Defendant;

4)   Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)   Punitive damages be imposed upon each Defendant;

7)   Plaintiff be awarded a trial by jury; and

8)   Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 10th day of January, 2023.

/s/ Matthew B. Stoddard
Matthew B. Stoddard
Ga. Bar No.: 558215
M. Janine Bell
Ga. Bar No.: 538932
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
janine@legalhelpga.com