# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: May 04, 2022

Lee Micheal Mabry
1527 Red Briarway, Apt 3
Jonesboro, GA 30236

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Lee Micheal Mabry (BNC#: 21E9879E07818)                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

Lee Micheal Mabry (BNC#: 21E9879E07818)                           Page 3 of 3

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security.  You may also call (800) 772-1213 with questions.  If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office.  Please have this notice and decision with you.  The telephone number of the local office that serves your area is (866) 331-2215.  Its address is:

                Social Security
                6670 Merchants Way
                Morrow, GA 30260-1776

                                  Suzanne A. Littlefield
                                  Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Flynn
         315 W. Ponce De Leon
         Avenue, Suite 940
         Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

<u>**IN THE CASE OF**</u>                              <u>**CLAIM FOR**</u>

Lee Micheal Mabry_____                 Supplemental Security Income_____
(Claimant)

_____          _____
(Wage Earner)                                    (Social Security Number)

<u>**JURISDICTION AND PROCEDURAL HISTORY**</u>

This case is before me on remand from the Appeals Council.  In its remand order, Appeals
Council noted the following:

- The hearing decision indicates the State agency consultant opinions were persuasive, and
  details mental limitations regarding the claimant's ability to adapt to workplace changes
  and stress (see Decision, pages 8-9). However, these limitations were not included in the
  residual functional capacity (Finding 5), and the inconsistency is not sufficiently
  explained.

- The hearing decision found the claimant to have engaged in substantial gainful activity
  during the following periods: April 1 through June 30, 2018 (Finding 1). In support of
  this finding, the hearing decision cited to Exhibit 12D, and noted that it showed the
  claimant earned $3,7003.00 in the 3rd quarter of 2018 (Hearing Decision, page 3). The
  Council notes that the 3rd quarter would encompass July 1 through September 30, and
  not April 1 through June 30, and that the claimant had no reported earnings during the
  2nd quarter of 2018 (Exhibits 12D and 14D). As such, further consideration of the
  claimant's work activity in 2018 is warranted. As Finding 1 was used as the basis for
  Finding 6, that the claimant had past relevant work, further consideration is also
  warranted with this respect. Additionally, the Council notes, that while the 2018 work
  was performed after the alleged onset date, it is unclear from the decision if this fits an
  exception as to when work performed after the alleged onset date could be considered
  past relevant work. While the claimant had also testified to working as a laundry worker
  in 2015, there is not enough information available to make a determination if this would
  be past relevant work. As such, further consideration of the claimant's past work at step 4
  is warranted.

The Appeals Council directed me to do the following:

- Clarify the dates and earnings from 2018 to determine during what portion of that year, if
  any, the claimant was engaged in substantial gainful activity.

See Next Page

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96 -8p). In so doing, evaluate the prior administrative medical findings pursuant to the provisions of 20 CFR 416.920c. As appropriate, I may request the medical sources to provide additional evidence and/or further clarification of the opinions (20 CFR 416.920b. I may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's medical sources.

- Give further consideration to whether the claimant has past relevant work and, if so, can perform it (20 CFR 416.960(a)-(b)). If warranted, obtain vocational expert evidence to assist in evaluating whether the claimant can perform past relevant work. If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. I will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence I will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

- If the claimant is found disabled, conduct the further proceedings required to determine whether drug addiction is a contributing factor material to the determination of disability.

- In compliance with the above, I will offer the claimant an opportunity for a hearing, consider the additional evidence submitted with the request for review, take any further action needed to complete the administrative record and issue a new decision.

I have complied with all aspects of the remand order. Specifically, I have done the following: provided a new analysis of the State agency consultant opinions; provided a new analysis of the claimant's substantial gainful activity at step one; provided a new analysis of the claimant's past relevant work at step four; held a new hearing to elicit new testimony from the claimant and a vocational expert; reconsidered the residual functional capacity in light of new evidence submitted by the claimant since the remand; and explained why the claimant is still disabled at steps four and five.

On November 4, 2021, I held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing, and confirmed such agreement at the start of the hearing. The claimant is represented by Kathleen Flynn, an attorney; however, Attorney Erica Dempsy represented the claimant at this hearing. Bassey Duke, an impartial vocational expert, also appeared at the hearing. The claimant is alleging disability since February 1, 2015.

See Next Page

The claimant submitted or informed me about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)). The record was held open for outstanding evidence, and the representative submitted new treatment notes from Clayton Center Community Board.  This evidence has been admitted as Exhibit 31F and considered in the decision below; nothing else was received.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), I have considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, I conclude the claimant has not been under a disability within the meaning of the Social Security Act since October 11, 2017, the date the application was filed.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or

combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After careful consideration of the entire record, I make the following findings:

See Next Page

**1.    The claimant engaged in substantial gainful activity during the following periods:  July 2018 to October 2018 (20 CFR 416.920(b) and 416.971 *et seq.*).**

The Detailed Earnings Query indicates that the claimant earned no more than $85 in 2017, which was well below the threshold for substantial gainful activity (20D/2).  The Detailed Earnings Query shows that JIBE Staffing paid the claimant $3,703.00 in the third quarter of 2018 and $950 in the fourth quarter of 2018 (12D/1).  At the first hearing, the claimant stated that he did this job for about a month, then later acknowledged that it may have been two months (First Hearing Record).  At the second hearing, the claimant stated simply that this work lasted for three months (Second Hearing Record).  The latter testimony is more consistent with his reported earnings of $1,000 to $1,200 per month (First Hearing Record).  Thus, the total earnings of $4,653 must be divided by three to obtain the average monthly earnings.  This operation yields $1,551 per month, which exceeds $1,180 and thus constitutes substantial gainful activity.  While the exact period is not entirely clear from the record, the amount of earnings in the fourth quarter of 2018 suggests less than a full month of work based e.g. on his reporting earnings (First Hearing Record).  Thus, the three month period would have begun some time in July 2018 and ended some time in October 2018.

This work cannot be considered a trial work period because it ended due to his arrest and incarceration.  The claimant testified that his supervisor was a family member who let him take six to seven breaks per day; however, there is no support for this claim outside of his testimony (Second Hearing Record).  Accordingly, I find that the claimant performed substantial gainful activity from July 2018 to October 2018.  As a result, there was no twelve-month period without substantial gainful activity from the protective filing date, October 11, 2017, to the end of the claimant's work in October 2018.  Therefore, the first date for consideration is after the claimant went to jail in late 2018.  In the alternative, the claimant would still be found not disabled for the entire period under adjudication even if he had not performed substantial gainful activity in 2018.  To demonstrate this, I will proceed with the five-step evaluation process for the entire period under adjudication.

**2.    The claimant has the following severe impairments:  cervical degenerative disc disease and congenital fusion, major depressive disorder, schizophrenia, PTSD status-post gunshot injuries with retained projectiles (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant's medically determinable impairments of stimulant, cannabis, and tobacco abuse are nonsevere.  I considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.  Regarding Drug and alcohol use/abuse and tobacco use, the claimant is in relapse prevention and for an extended period of time reported no relapse of substances (6F, 7F).  Between September 19, 2019 and September 24, 2019 the claimant was admitted to Georgia Regional Hospital where he was diagnosed with malingering, other psychoactive substance use, other stimulant use, tobacco use, and cannabis use.  He was discharged having met treatment goals (15F).  Since then, he has reported regular cannabis use that is present even when his symptoms are controlled (see 31F/25,

30).  There is no medical evidence that the claimant's substance abuse disorder has a material effect on the claimant's impairments.  His impairments are not disabling with or with substance use.

The claimant's orbital wall fracture is not severe.  In June 2018, the claimant presented to Grady Hospital having allegedly fallen from a balcony.  A cervical spine x-ray showed a chronic appearing left medial orbital wall fracture, age-indeterminate fractures of the bilateral nasal bones, and frontal process of the right maxilla.  After examination and medication treatment, he was discharged home with prescriptions for Motrin and Flexeril to take as needed (12F).  This was an acute injury, and there was no evidence of long-term complications.  Although the claimant reported a new onset of facial pain in June 2020, x-rays of the facial bones showed no abnormalities (30F/15, 29, 34).  A dental issue was suspected (see 30F/36).  The claimant was given ibuprofen, and no significant treatment was needed (30F/36).

**3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

In reaching this conclusion, I have reviewed the claimant's impairments using 1.00 et seq. (musculoskeletal) of the Listing of Impairments contained in 20 CFR Part 404, Appendix 1 to Subpart P.  I note that no medical expert or medical consultant found that the claimant's impairments are equivalent in severity to a listed impairment.

The current evidence fails to establish an impairment that is accompanied by signs reflective of listing-level severity.  Specifically, Section 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) is not met because the record does not establish the criteria in all required paragraphs (A, B, C, and D).  Section 1.15(D) is not met because the claimant has not alleged, and the record does not support, the medical need for a walker, bilateral cane, bilateral crutch, wheeled and seated mobility device, or one-handed hand-held assistive device.  Indeed, the claimant has generally demonstrated a normal gait and unassisted ambulation (25F/12; 29F/19; 30F/35, 43; 31F/16, 26, 35).  There is no evidence of inability to use both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements; instead, the record shows findings of normal strength, sensation, and motion throughout the musculoskeletal system (25F/10-11; 29F/18-19, 32, 40, 66; 30F/35, 52).

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.15.  In making this finding, I have considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has no limitation.  The claimant has been able to follow and engage in the entire disability application process, tend to his own personal needs independently, learn and adhere to a medication regime, and manage his

daily activities.  The claimant has reported forgetfulness, but his medical providers have generally noted normal memory and intellect (27F/11; 28F/10, 17; 29F/19; 30F/97; 31F/17, 27).

In interacting with others, the claimant has a moderate limitation.  Per the evidence, the claimant is easily startled and has paranoia surrounding being shot; however, he gets along well with his mother, aunt, son, and ex-girlfriend who reportedly cares for his son.  It does not appear that the claimant has exhibited any outrageous or inappropriate behavior toward medical staff that would invoke fear for their personal safety.  In fact, one medical record indicates that although the claimant professed a sad mood, he was smiling and speaking with the medical staff (6F).  The claimant has alleged that he is irritable, aggressive, and paranoid, yet he was consistently cooperative with medical providers, and he exhibited normal speech, behavior, and eye contact, outside of a few brief periods of symptom exacerbation (27F/11; 28F/17; 29F/29; 30F/40-41, 52, 97; 31F/17, 27).

With regard to concentrating, persisting or maintaining pace, the claimant has a mild limitation.  The record shows that the claimant manages his daily routine from bathing, dressing, taking medication and attending appointments.   The claimant has alleged poor concentration, but his medical providers have typically found his concentration to be intact outside of a temporary period of symptom exacerbation in November 2020 (26F/9; 27F/6, 11, 15; 28F/10, 14).  He alleged fatigue and poor sleep, but he has generally appeared awake and alert in medical visits (26F/9; 28F/17; 30F/35, 40; 31F/16).

As for adapting or managing oneself, the claimant has experienced a mild limitation.  There is no evidence to contradict that the claimant is independent in personal care and hygiene.  The claimant attests that he lives in a shelter and he is presumably tasked with providing his own personal maintenance.  The claimant is able to get to and from medical appointments as well as provide food for himself.  The claimant alleged that he is psychotic, but he has generally presented with good grooming, appropriate appearance, and not responding to internal stimuli (28F/17; 29F/15; 30F/38, 104; 31F/16, 26).  He has generally reported no hallucinations while taking his medications (see 25F/12; 30F/36; 31F/15, 25).  While his mood and affect have sometimes reflected depression, he has often been described as euthymic (25F/12; 28F/17; 29F/15; 30F/98; 31F/17, 27).  Judgment and insight have fluctuated, but were often noted to be fair to normal (27F/11; 31F/36).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  There is no evidence of marginal adjustment, defined as the minimal capacity to adapt to change in the claimant's environment or to demands not already part of his daily life (see 25F/12; 30F/36; 31F/15, 25).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of

mental functioning.  The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

**4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant should have only incidental contact with the public and can function in a small work group of familiar people.**

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. I also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

At the second hearing, the claimant made numerous allegations concerning his severe impairments, which the undersigned summarizes as follows:

> He had a traumatic neck injury, and now he has to watch how he moves or he will be a paraplegic.  He cannot lift more than 10 pounds.  Sometimes he uses a walker.  He wears a neck brace since he was assaulted by his cousin in 2020.  He slipped a vertebrae in his neck, so now he just lies down at home.  He does not do any chores; his nephew does everything.  He has depression.  He isolates himself.  He has paranoia due to PTSD; he thinks everybody is trying to kill him.  He started going to meetings and counseling in 2018, which has helped.  ((Hearing Record).

 In his prior testimony, he noted that he walks with a limp; has nerve damage to his feet; needs to elevate his feet to reduce swelling; has trouble picking up small objects due to numbness; has difficulty with reaching overhead and squatting; has fatigue, poor concentration, hallucinations, and poor sleep; cannot be around people due to trauma; and is generally irritable (Hearing Record).

See Next Page

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant reportedly suffered a gunshot wound to the right ankle and the buttock in 2015. He has also complained about neck pain and swelling, and there is medical documentation of cervical spine tenderness to palpation, congenital fusion of C2 and C3, hypoplasia at C1 with amorphous calcification adjacent to the anterior arch, slight widening of the predental interval, and left upper extremity weakness and intermittent numbness (2F; 6F; 7F). However, other evidence shows that his symptoms are not as severe as alleged.

The claimant alleged that he has a limping gait and uses a walker, but his medical providers have noted a normal gait and unassisted ambulation, and there is no evidence that a walker was ever prescribed (25F/12; 29F/19; 30F/35, 43; 31F/16, 26, 35). He alleged reduced use of his hands due to numbness, but physical examinations have shown 5/5 strength with no sensory or motor deficits (29F/32, 67; 30F/35, 54). The claimant has alleged reduced postural abilities and use of a neck brace, but he has demonstrated full range of motion in the neck and musculoskeletal system generally, and there is no evidence that a neck brace was ever prescribed (25F/10-11; 29F/18-19, 32, 40, 66; 30F/35, 52). Thus, the undersigned finds no medical necessity for a walker or brace. He alleged that he needs to elevate his feet to reduce swelling, but there were no findings of edema, nor is there any evidence that a medical provider recommended elevation (see 25F/9; 29F/32; 30F/37). His representative suggested that he would be off task due to pain, but he has generally appeared in no acute distress (29F/15; 30F/35).

In fact, the claimant's allegations of related symptoms were sporadic and treatment remained conservative. He said that a doctor told him certain movements or activities (including lifting and carrying over 10 pounds) could leave him a paraplegic, but there is no record of this in the treatment notes. Indeed, the only abnormality on cervical x-rays in May 2021 was congenital fusion of the C2 and C3 cervical segments (29F/11). The primary treatment for this condition has been ibuprofen (see 30F/38). He said that he saw a neurologist, but there is no evidence of treatment with a specialist, physical therapy, advanced pain relief measures such as injections, or emergency treatment for uncontrolled pain (30F/38).

Accordingly, I have considered the imaging and course of treatment for the spine impairment in providing physical limitations. Specifically, I have accommodated the claimant's neck and back pain by restricting him to light work. Still, the record as a whole, including the conservative treatment history and findings of normal gait, supports the conclusion that the claimant is capable of performing work within the above residual functional capacity.

With regard to the claimant's PTSD, he sustained a gunshot wound to the right ankle and buttock in 2015, which appears to have resulted in some residual paranoia. However, the medical evidence does not support a disabling mental impairment of PTSD. Between the alleged onset date and October 2017, medical records were unremarkable. Mental status examinations showed that the claimant is alert and oriented, with an appropriate affect and mood, neat and clean, and

exhibiting appropriate behavior and logical thought when examined.  November 2015 office treatment records from Correct Care Solutions note that the claimant had no mental health problems.  There was no indication of suicidal ideations or attempts but some thoughts of harming others with no identified target.  He had been determined to be a low risk for suicide and homicide (2F-6F).

Since October 2017, there have been a few hospitalizations, but overall, they have been of short duration.  Additionally, findings have not been significant enough to warrant more extensive treatment or mental restrictions in performing work and/or activities of daily living.  In October 2017, the claimant was admitted to Grady Hospital for homicidal intent with target.  Upon examination, the claimant expressed that he "would not hurt anyone", that he has changed his life, denied having a gun or weapon, and regretted past violent behavior.  The attending physician assessed him with good insight and judgment, cooperativeness, and linear and goal directed thought processes.  The claimant agreed to continue therapy and was prescribed medication and discharged the same day in stable condition (6F).

On September 16, 2019, he was admitted to Northside Gwinnett Hospital for approximately two days where he was diagnosed with major depressive disorder, PSTD, hallucinations, and cannabis use disorder.  He expressed paranoid thinking.  Notably, it was documented that the claimant had used drugs and that he was not in therapy (19F).  When the claimant was admitted to Georgia Regional Hospital on September 19, 2019, his thought process was linear, coherent, goal/future directed, and reality based.  Although he endorsed audio and visual hallucinations, it was not thought-blocking and he was not responding to internal stimuli.  He smiled and spoke to staff members, and he exhibited fair insight and judgment.  He was also considered a malingerer (15F).  The day after he was discharged from Georgia Regional, the claimant presented to Grady Hospital endorsing auditory hallucinations and paranoid delusions after hearing gunshots.  Upon examination, the claimant was future-oriented and linear and not acutely psychotic.  He did not appear in distress or responding to internal stimuli.  He did not meet 1013 requirements at that time.  He was discharged to self with resources to follow up at 10 Park Place (16F).

The only other inpatient admission occurred in November 2020, and this was secondary to medication noncompliance (26F/8; 27F/4-5).  He was noted to have poor hygiene, paranoid delusions, labile affect, and impaired insight and judgment (26F/7-9).  He was rambling and paranoid with impaired concentration (27F/6).  He was diagnosed with schizophrenia (26F).  However, once the claimant started taking his medications, he improved, resulting in his discharge seven days later in stable condition (27F/9-10).

Since then, the record shows general improvement in the claimant's mental health.  The claimant has been receiving counseling and medication management (see 31F/37).  His prescribed medications included Prozac, Zyprexa, and Abilify injections (31F/8, 15).  He has generally reported good response to treatment when he is compliant with his medications (see 25F/12; 29F/15; 30F/36, 95; 31F/15, 25).  In March and May of 2021, the claimant reported stable mood, minimal and manageable depression and anxiety, adequate appetite, good sleep, and no hallucinations or delusions (31F/15, 25).  While the claimant reported worsening symptoms in October 2021, including hallucinations, paranoia, and panic attacks, this was after he stopped taking his medication (31F/10, 35).  Notably, there was no subsequent treatment that would

support the persistence of these symptoms, and the claimant did not require emergency or inpatient treatment.  Overall, the record shows good symptom control with medication and counseling, and in four and a half years there were only three relatively short periods of symptom exacerbation requiring more than conservative treatment.

It appears that the claimant suffered some depression and anhedonia after an assault; however, he readily admitted that his symptoms have improved with medication.  There are no medical records showing that the claimant has had or requires more aggressive treatment that the routine and conservative treatment he has been provided.  He has been medically diagnosed as a malingerer and there are times when he has not been complaint with medication and therapy.  Lastly, the claimant states that he is less depressed and that his mental health is much better when he is medication.  He is easily stabilized with medication when he has been admitted to the hospital and the record documents several affirmations of the claimant attesting to the benefits of his medication (6F, 7F, 15F, Hearing Testimony).

Other evidence shows that the claimant's symptoms are not as severe as alleged.  The claimant has reported forgetfulness, but his medical providers have generally noted normal memory and intellect (27F/11; 28F/10, 17; 29F/19; 30F/97; 31F/17, 27).  The claimant has alleged that he is irritable, aggressive, and paranoid, yet he was consistently cooperative with medical providers, and he exhibited normal speech, behavior, and eye contact, outside of a few brief periods of symptom exacerbation (27F/11; 28F/17; 29F/29; 30F/40-41, 52, 97; 31F/17, 27).  The claimant has alleged poor concentration, but his medical providers have typically found his concentration to be intact outside of a temporary period of symptom exacerbation in November 2020 (26F/9; 27F/6, 11, 15; 28F/10, 14).  He alleged fatigue and poor sleep, but he has generally appeared awake and alert in medical visits (26F/9; 28F/17; 30F/35, 40; 31F/16).

The claimant alleged that he is psychotic, but he has generally presented with good grooming, appropriate appearance, and not responding to internal stimuli (28F/17; 29F/15; 30F/38, 104; 31F/16, 26).  He has generally reported no hallucinations while taking his medications (see 25F/12; 30F/36; 31F/15, 25).  While his mood and affect have sometimes reflected depression, he has often been described as euthymic (25F/12; 28F/17; 29F/15; 30F/98; 31F/17, 27).  Judgment and insight have fluctuated, but were often noted to be fair to normal (27F/11; 31F/36).  Overall, the evidence suggests largely mild limitations in mental functioning.  Nevertheless, given the scattered findings of paranoia and irritability related to PTSD (e.g. 27F/6; 31F/36), the claimant is limited to incidental work with the public and a small work group of familiar people.

It appears that the claimant's biggest issue with work is his frequent incarceration.  Per Fulton County jail records, over the past several years, the claimant has been incarcerated 13 times and at the time of the hearing, he was again incarcerated, which is his second incarceration this calendar year.  While incarcerated, there were some mental notations of treatment and suicidal ideation, but like the other evidence of record, the findings were not significant enough to warrant aggressive or extensive treatment beyond counseling and medication (14F, 20F, 21F, 23F).

The Medical Consultants for Disability Determination Services (DDS) found that the claimant can perform the full range of light work (1A; 3A).  This is persuasive.  It is supported by an overview of the conservative treatment history (3A/13), and it is consistent with findings of normal gait, strength, sensation, and range of motion (25F/10-12; 29F/18-19, 32, 40, 66; 30F/35, 43; 31F/16, 26, 35).

The Psychological Consultants for DDS found that the claimant is capable of interacting with others at a basic level but will fair best in work that has reduced contact with the public and does not require significant collaboration with coworkers to meet production demands; and can respond appropriately to supervision, but may at times misinterpret criticism, but can tolerate this without loss of production or function.  They find that the claimant has adequate adaptation abilities if changes are simple, well-explained, infrequent and are introduced gradually; would not have problems with routine changes that are inherent in the job description; and may have increased psychological symptoms with rapid changes or high stress, but not to the level that would interfere with overall execution of tasks (1A; 3A).

This opinion is persuasive in part and unpersuasive in part.  The absence of more than mild limitations in the first and third areas of functioning is persuasive.  This portion of the opinion is supported by a discussion of evidence such as the normal mental status examinations (see 3A/12), and it is consistent with findings of normal memory, concentration, and cognition (27F/11; 28F/10, 17; 29F/19; 30F/97; 31F/17, 27).  The presence of moderate limitations related to adaptation is not persuasive.  This portion of the opinion is not well-supported; the only real explanation is that the claimant "had some reduced coping recently," but no details were given (3A/12).  Moreover, this portion is inconsistent with findings of euthymic mood and good grooming (25F/12; 28F/17; 29F/15; 30F/98; 31F/17, 27).  Per the medical evidence, the claimant has mental health symptoms, but medication, when in compliance, is beneficial (31F/15, 25).  The claimant is still able to independently manage his daily needs as well as manage his medication and medical appointments (First Hearing Record).

The need for limitations related to social interaction is persuasive.  It is supported by reference to the "history of interpersonal conflict" (3A/12), and it is consistent with the scattered findings of paranoia and irritability related to PTSD (e.g. 27F/6; 31F/36).  That these limitations are merely moderate, rather than marked or extreme, is also persuasive.  This portion of the opinion is supported by a discussion of evidence such as the normal mental status examinations (see 3A/12), and it is consistent with findings of cooperative behavior (27F/11; 28F/17; 29F/29; 30F/41, 52, 97; 31F/17, 27).  However, the particular limitations articulated by the Psychological Consultants are somewhat vague and uncertain (e.g. "reduced contact," "significant collaboration," "may at times", etc.).  Thus, I have departed from the specific verbiage in finding that the claimant can do work requiring incidental public contact and a small work group of familiar people.

In sum, the above residual functional capacity assessment is supported by the longitudinal evidence of record.  I have accommodated the claimant's back and neck by restricting him to light work.  I have accommodated the claimant's irritability and paranoia by limiting social interactions at work.  Additional limitations are not warranted given the objective medical

evidence, the course of treatment, the claimant's activities of daily living, and the record as a whole.

**5.   For the period after October 2018, the claimant is capable of performing past relevant work as a laundry worker.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**

The claimant reported working in a laundry warehouse for three months in 2018 (Second Hearing Record).  He stated that the work entailed sorting and collecting clothing in a warehouse for cleaning (Second Hearing Record).  The vocational expert classified this job as "laundry worker" (Dictionary of Occupational Titles code 302.685-010; specific vocational preparation level 2; light exertional level as generally performed) (First Hearing Record; Second Hearing Record).

The claimant's experience as a laundry worker constitutes past relevant work for the period subsequent to October 2018.  This job was performed within fifteen years of the date of decision (Second Hearing Record).  The claimant's monthly earnings in this position rose to the level of substantial gainful activity, as explained above (see 12D/1; Second Hearing Record).  Finally, the claimant performed this work for three months, which was sufficient time to learn a job at SVP level 2 per the vocational expert (i.e. a job only requiring 30 days or less to learn) (Second Hearing Record).  Accordingly, this job meets the recency, duration, and substantial gainful activity requirements and is past relevant work.

At the hearing, I asked the vocational expert if a hypothetical individual with the claimant's age, education, work experience, and residual functional capacity could perform any of the claimant's past work.  The vocational expert testified that such a hypothetical individual would be able to perform the claimant's past work as generally and actually performed in the national economy. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed. Although this job can only be past relevant work for the period after October 2018, it would constitute other work in significant numbers at step five, as explained below.

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 416.969 and 416.969a). Therefore, I make the following alternative findings for step five of the sequential evaluation process.

The claimant was born on June 27, 1983, and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).  The claimant has a limited education (20 CFR 416.964).  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the

medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:

- Laundry worker (DOT 302.685-010; SVP 2; light; over 56,000 jobs);
- Assembler (DOT 706.684-022; SVP 2; light; over 22,000 jobs);
- Silverware wrapper (DOT 318.687-018; SVP 1; light; over 55,000 jobs).

Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**6.   The claimant has not been under a disability, as defined in the Social Security Act, since October 11, 2017, the date the application was filed (20 CFR 416.920(f)).**

<u>**DECISION**</u>

Based on the application for supplemental security income filed on October 11, 2017, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Suzanne A. Littlefield*
_____
Suzanne A. Littlefield
Administrative Law Judge

May 04, 2022
_____
Date

# LIST OF EXHIBITS

### Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1A | Disability Determination Explanation | | 2017-12-11 | 14 |
| Y13 | 2A | Disability Determination Transmittal | | 2017-12-11 | 1 |
| Y13 | 3A | Disability Determination Explanation | | 2018-04-05 | 17 |
| Y13 | 4A | Disability Determination Transmittal | | 2018-04-05 | 1 |
| Y13 | 5A | ALJ Hearing Decision | | 2020-09-08 | 17 |
| Y13 | 6A | AC Order | | 2021-01-25 | 6 |

### Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1B | Appointment of Representative | | 2017-10-11 | 2 |
| Y13 | 2B | Representative Fee Agreement | | 2017-10-11 | 2 |
| Y13 | 3B | T16 Notice of Disapproved Claim | | 2017-12-13 | 5 |
| Y13 | 4B | Request for Reconsideration | | 2017-12-19 | 3 |
| Y13 | 5B | T16 Disability Reconsideration Notice | | 2018-04-09 | 4 |
| Y13 | 6B | Request for Hearing by ALJ | | 2018-04-24 | 2 |
| Y13 | 7B | Request for Hearing Acknowledgement Letter | | 2018-04-25 | 15 |
| Y13 | 8B | Objection to Video Hearing | | 2018-05-01 | 1 |
| Y13 | 9B | Hearing Notice | | 2019-12-03 | 29 |
| Y13 | 10B | Notice Of Hearing Reminder | | 2020-03-17 | 6 |
| Y13 | 11B | Notice to Show Cause for Failure to Appear | | 2020-04-08 | 3 |

| | | | | |
|---|---|---|---|---|
| Y13 | 12B | Response to Show Cause Notice | 2020-04-15 | 2 |
| Y13 | 13B | Hearing Notice | 2020-05-06 | 25 |
| Y13 | 14B | SSA-1696 - Claimant's Appointment of a Representative | 2020-07-29 | 1 |
| Y13 | 15B | SSA-1693 - Fee Agreement for Representation before SSA | 2020-07-29 | 1 |
| Y13 | 16B | Outgoing ODAR Correspondence | 2020-03-31 | 4 |
| Y13 | 17B | AC Correspondence | 2020-11-10 | 5 |
| Y13 | 18B | Request for Hearing Acknowledgement Letter | 2021-03-24 | 15 |
| Y13 | 19B | COVID Hearing Agreement Form | 2021-04-20 | 2 |
| Y13 | 20B | COVID Hearing Agreement Form | 2021-03-24 | 14 |
| Y13 | 21B | Hearing Notice | 2021-08-19 | 25 |
| Y13 | 22B | Notice Of Hearing Reminder | 2021-10-07 | 6 |
| Y13 | 23B | Fee Agreement for Representation before SSA | 2021-11-01 | 1 |
| Y13 | 24B | SSA-1696 - Claimant's Appointment of a Representative | 2021-11-01 | 1 |

### Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1D | Application for Supplemental Security Income Benefits | | 2017-11-01 | 8 |
| Y13 | 2D | Certified Earnings Records | | 2018-11-16 | 2 |
| Y13 | 3D | Detailed Earnings Query | | 2018-11-16 | 2 |
| Y13 | 4D | Summary Earnings Query | | 2018-11-16 | 1 |
| Y13 | 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2018-11-16 | 1 |

| Y13 | 6D  | WHAT - Work History Assistant Tool | 2020-03-30 | 5 |
| Y13 | 7D  | Certified Earnings Records | 2020-03-30 | 1 |
| Y13 | 8D  | Detailed Earnings Query | 2020-03-30 | 3 |
| Y13 | 9D  | Summary Earnings Query | 2020-03-30 | 1 |
| Y13 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2020-03-30 | 1 |
| Y13 | 11D | Certified Earnings Records | 2020-06-25 | 2 |
| Y13 | 12D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2020-06-30 | 1 |
| Y13 | 13D | Detailed Earnings Query | 2020-06-30 | 2 |
| Y13 | 14D | Summary Earnings Query | 2020-06-30 | 1 |
| Y13 | 15D | WHAT - Work History Assistant Tool | 2020-07-01 | 9 |
| Y13 | 16D | Certified Earnings Records | 2020-07-29 | 2 |
| Y13 | 17D | Detailed Earnings Query | 2021-06-12 | 2 |
| Y13 | 18D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021-06-12 | 1 |
| Y13 | 19D | WHAT - Work History Assistant Tool | 2021-10-25 | 1 |
| Y13 | 20D | Detailed Earnings Query | 2021-10-25 | 2 |
| Y13 | 21D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021-10-25 | 1 |
| Y13 | 22D | Summary Earnings Query | 2021-10-25 | 1 |
| Y13 | 23D | DIBWIZ | 2021-10-25 | 3 |
| Y13 | 24D | Certified Earnings Records | 2021-10-25 | 2 |
| Y13 | 25D | DISCO DIB Insured Status Report | 2021-10-25 | 2 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|-----------|-----|-------------|----------|--------|-------|-------|

| | | | | | |
|---|---|---|---|---|---|
| Y13 | 1E | Disability Report - Adult | | to 2017-11-01 | 8 |
| Y13 | 2E | Disability Report - Field Office | | to 2017-11-01 | 2 |
| Y13 | 3E | Unsuccessful Development Attempt to Secure Non-Medical | Clayton CO. School System | to 2017-12-19 | 2 |
| Y13 | 4E | Disability Report - Appeals | | to 2017-12-20 | 8 |
| Y13 | 5E | Disability Report - Field Office | | to 2017-12-20 | 2 |
| Y13 | 6E | Disability Report - Appeals | | to 2018-04-24 | 9 |
| Y13 | 7E | Disability Report - Field Office | | to 2018-04-24 | 2 |
| Y13 | 8E | Disability Report - Appeals | | to 2018-04-24 | 8 |
| Y13 | 9E | Unsuccessful Development Attempt to Secure Non-Medical | Forest Park High School/Clayton CO | to 2018-05-30 | 3 |
| T2L | 10E | Exhibit List to Rep PH2E | Oho | to 2018-11-16 | 11 |
| T2L | 11E | Resume of Vocational Expert | David Salewsky | to 2019-11-29 | 2 |
| T2L | 12E | Five Day Rule Letter | Kathleen Flynn | to 2020-03-10 | 2 |
| Y13 | 13E | Post Office Returned Mail - NOH Reminder | | to 2020-03-31 | 4 |
| Y13 | 14E | Representative Brief | K. Flynn, Representative | to 2020-03-31 | 2 |
| Y13 | 15E | Resume of Vocational Expert | David Salewsky M.Ed., Crc | to 2020-06-30 | 2 |
| Y13 | 16E | Representative Correspondence - Five Day Letter | Kathleen Flynn | to 2020-07-01 | 3 |
| Y13 | 17E | Representative Correspondence | Kathleen Flynn | to 2020-07-20 | 2 |
| Y13 | 18E | Resume of Vocational Expert | David Salewsky, M.Ed., Crc | to 2020-07-22 | 2 |

| Y13 | 19E | Representative Correspondence | 2020-07-29 to | 2 |
| Y13 | 20E | Representative Brief | to 2020-10-16 | 8 |
| Y13 | 21E | Misc Disability Development and Documentation | 2021-09-13 to | 1 |
| Y13 | 22E | Resume of Vocational Expert | 2021-10-05 to | 2 |
| Y13 | 23E | Misc Disability Development and Documentation | 2021-10-05 to | 2 |
| Y13 | 24E | Representative Brief | 2001-11-01 to | 2 |
| Y13 | 25E | Misc Disability Development and Documentation | 2021-11-02 to | 1 |

## **Medical Records**

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 1F | Medical Records covering the period | | Georgia Dept Of Corrections | 2006-04-05 to 2007-07-10 | 187 |
| Y13 | 2F | Office Treatment Records | | Correct Care Solutions | to 2015-11-28 | 15 |
| Y13 | 3F | HIT MER | | Ochin, Inc. | to 2017-09-25 | 5 |
| Y13 | 4F | Progress Notes | | St Josephs Mercy Care Services | to 2017-09-25 | 12 |
| Y13 | 5F | Progress Notes | | St Josephs Mercy | to 2017-09-25 | 9 |
| Y13 | 6F | Hospital Records | | Grady Hospital | 2014-08-06 to 2017-10-16 | 59 |
| Y13 | 7F | Hospital Records | | Grady Memorial Hospital | 2017-08-22 to 2017-11-01 | 115 |
| Y13 | 8F | Outpatient Hospital Records | | Grady Memorial Hospital | 2017-11-01 to 2017-12-04 | 31 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | 9F | Hospital Records | St Josephs Mercy Care Services | to 2017-12-28 | 5 |
| Y13 | 10F | Medical Source - No MER Available | Grady Memorial Hospital | to 2017-12-28 | 3 |
| Y13 | 11F | Medical Source - No MER Available | Choa | to 2018-02-28 | 3 |
| Y13 | 12F | Emergency Department Records | Grady Memorial Hospital | 2018-06-21 to 2018-06-21 | 8 |
| T2L | 13F | Medical Source - No MER Available | St Josephs Mercy Care | to 2019-05-10 | 4 |
| T2L | 14F | Prison Records | Clayton County Jail | 2017-08-22 to 2019-05-10 | 104 |
| T2L | 15F | Inpatient Hospital Records | Georgia Regional Hospital At Atlanta | 2019-09-19 to 2019-09-24 | 57 |
| T2L | 16F | Emergency Department Records | Grady Memorial Hospital | to 2019-09-25 | 12 |
| T2L | 17F | Medical Source - No MER Available | St. Josephs Mercy Care | to 2020-01-10 | 4 |
| Y13 | 18F | Medical Evidence of Record | Grady | 2019-09-23 to 2020-03-10 | 3 |
| Y13 | 19F | Emergency Department Records | Northside Gwinnett Hospital | 2019-09-15 to 2019-09-18 | 75 |
| Y13 | 20F | Office Treatment Records | Naph Care | 2018-11-30 to 2019-09-28 | 202 |
| Y13 | 21F | Outpatient Hospital Records | Fulton County Jail | 2016-03-25 to 2020-02-27 | 201 |
| T2L | 22F | Medical Source - No MER Available | Grady | to 2020-06-09 | 3 |
| Y13 | 23F | Medical Prison Records | Fulton County Jail | 2019-08-26 to 2020-07-20 | 83 |
| Y13 | 24F | Medical Source - No MER Available | Emory Decatur Hospital | | 7 |

| Y13 | 25F | Medical Evidence of Record | Clayton County Jail | 2019-02-15 to 2020-07-13 | 22 |
| Y13 | 26F | Office Treatment Records | Dekalb Community Service Board | 2020-11-12 to 2020-11-20 | 10 |
| Y13 | 27F | Hospital Records | Anchor Hospital | 2020-11-20 to 2020-11-27 | 17 |
| Y13 | 28F | Office Treatment Records | Clayton County Community Service Board | 2020-12-18 to 2021-01-05 | 19 |
| Y13 | 29F | Progress Notes | Clayton County Jail | 2020-07-12 to 2021-06-08 | 90 |
| Y13 | 30F | Progress Notes | Fulton County Jail | 2020-07-20 to 2021-07-26 | 123 |
| Y13 | 31F | Progress Notes | Clayton Center Community Board | 2021-03-29 to 2021-10-13 | 42 |