IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| A.G. and H.H., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | NO. |
| v. | ) | |
| | ) | |
| DAYARAM V. PATEL. | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DAMAGES**

COME NOW Plaintiffs in the above-styled action and hereby file their

Complaint as follows:

**Introduction**

1.

This case involves the child sex trafficking of Plaintiffs A.G. and H.H. who

were both trafficked for sex as minors at the "Airway Motel" located 720 Fulton

Industrial Blvd NW, Atlanta, GA 30336.  When she was only 14 years old, A.G. was

trafficked for sex for approximately two weeks at the Airway Motel by a man who

was 25 years old.  A few months before, H.H., only 17 at the time, was trafficked at

the Airway Motel from June 21, 2015 until September 11, by a man who was 41

years old.  As set forth herein, the Airway Motel and its owner and operator Mr.

Dayaram V. Patel, were notorious for negligently and recklessly permitting and

1

profiting from sex trafficking, drug dealing, and violent crime that occurred at the Airway Motel, including Plaintiffs' trafficking.   Given the nature of the case, Plaintiffs are identified in this Complaint by their initials to prevent public disclosure of their names. Plaintiffs' counsel has previously disclosed A.G. and H.H.'s full names to Defendant and Defendant's counsel.[1]

2.

During all relevant time periods, Defendant Dayaram V. Patel owned and operated the Airway Motel located at 720 Fulton Industrial Blvd NW, Atlanta, GA 30336.

3.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct personally or by or through one or more of his agents, employees, or other representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant's motel.

---

[1] Plaintiffs have concurrently filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of A.G. and H.H.  Plaintiffs' anonymity will provide for their own personal safety and will protect Plaintiffs from the public disclosure of details which are intimate and personal in nature.

4.

As the owner and operator of the Airway Motel, Defendant is liable for his own acts and omissions. Defendant also had ultimate responsibility for hiring, training, supervising, and managing the motel employees, and Defendant was vicariously liable for the acts or omissions of same.

5.

Defendant knew or should have known of the rampant sex trafficking and prostitution at the Airway Motel for years, before, during, and after Plaintiffs' trafficking. Defendant knew or should have known, among other reasons, because:

    a.    Defendant was aware of and saw these specific Plaintiffs while they were trafficked for sex at the motel;

    b.    Defendant personally interacted with Plaintiffs and Plaintiffs' traffickers while Plaintiffs were being held at the motel and trafficked for sex;

    c.    Defendant and some of his employees personally lived at the Airway Motel and were present at the Airway Motel at all relevant times and thus personally observed the sex trafficking and other illegal activity occurring there;

    d.    Defendant knew of and permitted other instances of sex trafficking and prostitution to occur at the motel;

e.     Sex trafficking victims, including under-age girls, were often forced to stand outside their motel doors and walk around in front of the motel and in the motel parking lot in revealing clothing until they were approached and bought by buyers who came to the motel looking to purchase victims for sex;

f.     Buyers of sex would frequently drive through the motel's U-shaped parking lot as if it were a busy fast-food drive-through to look at all the different children, young girls, and women being sold for sex who were standing in front of their motel rooms or walking through the parking lot.  The buyers would then stop and park in front of the victim they wanted to purchase.  The buyers would then hand over money to the victims and/or their traffickers and proceed to enter the motel rooms for short periods of time to have sex with the victims. After having sex with the victims, the buyers would get in their cars and leave.  This activity and pattern occurred at the Airway Motel repeatedly every single day throughout the day;

g.     Defendant knew or should have known of the frequent and ongoing similar crimes occurring at the motel, including rampant sex trafficking, prostitution, drug dealing, and violent crime;

h.     Defendant rented rooms at the motel to sex traffickers and drug

4

dealers on an ongoing basis, in some instances for many weeks or months at a time;

i.   Defendant permitted a rap video to be filmed in public, open areas at Airway Motel which depicted and glorified sex trafficking. Victim H.H. and her trafficker were captured in the rap video while she was being trafficked for sex at the Airway Motel; and

j.   Defendant knew or should have known of rampant sex trafficking generally in the Fulton Industrial Boulevard area where the Airway Motel was located, and at the Airway Motel specifically.

6.

Despite all of the above knowledge, Defendant negligently and recklessly failed to take appropriate and reasonable measures to prevent sex trafficking from occurring at his motel, including Plaintiffs' sex trafficking in particular, and instead profited from the sex trafficking of the minor Plaintiffs.

7.

At all times relevant to this Complaint, A.G. and H.H. were minor victims of child sex trafficking at Defendant's motel.

8.

Defendant knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue from the rental of the rooms in which Plaintiffs' were trafficked. The

money that was obtained from selling Plaintiffs was then returned to the motel to rent the rooms for additional nights so that Plaintiffs' trafficking could continue.

9.

Defendant participated in a venture in several ways, outlined *infra*, but among them, by its ongoing association and continuous business relationship with Plaintiffs' traffickers; providing to Plaintiffs' traffickers the rooms they needed in which to repeatedly sell the minor Plaintiffs for sex to scores of men at the motel over the course of days, weeks, and months.

10.

This venture violated the TVPRA because the minor Plaintiffs were in fact trafficked for sex at the Airway Motel as described herein.

11.

Defendant knew or should have known that his operation of the Airway Motel violated the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, et seq., (the "TVPRA"), because Defendant rented rooms at his motel to sex traffickers and for the reasons outlined herein should have known that the sex traffickers were using those rooms to sell the two minor Plaintiffs for sex. As such, Defendant is liable to Plaintiffs for their damages under § 1595(a) of the TVPRA.

12.

A person under the age of 18 cannot consent to having sex in exchange for money under any circumstance. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is *criminal* sex trafficking under federal law and does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), *et seq.* Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1). Still, Plaintiffs A.G. and H.H. were forcibly and repeatedly sold for sex by violent traffickers at the Airway Motel, and despite such crimes obviously occurring, Defendant failed to intervene in any way to report or stop such crimes.

13.

Plaintiffs bring this suit against Defendant to recover for the physical, emotional, and mental harm caused by their sexual exploitation at the motel, which was permitted to occur as a direct and proximate result of Defendant's negligent, reckless, and willful failures to prevent prostitution, crime, violence, and sex trafficking from occurring at his motel.

## Parties, Jurisdiction, and Venue

14.

A.G. is a citizen of the United States of America, is a resident of the State of Georgia, and consents to the jurisdiction of this Court.  A.G. was born in 2001 and was a minor at the time of her sex trafficking alleged herein.

15.

H.H. is a citizen of the United States of America, is a resident of the State of Missouri, and consents to the jurisdiction of this Court.  H.H. was born in 1998 and was a minor at the time of her sex trafficking alleged herein.

16.

At all times relevant to this complaint, Defendant owned, managed, supervised, operated, oversaw, controlled the operation of, and rented rooms at the Airway Motel, from which Defendant benefited financially.

17.

Defendant is a resident of the State of Georgia and resides at 4109 Daniel Green Trail SE, Smyrna, Cobb County, GA 30080, where service can be made upon him.

18.

Jurisdiction and venue are proper as to Defendant, and Defendant was properly served with process in this action.

## Crime and Sex Trafficking at the Airway Motel

### 19.

For many years prior to Plaintiffs' trafficking, the Airway Motel was rampant with other instances of sex trafficking, prostitution, crimes against women, dangerous illegal activity, drugs, and violence.

### 20.

The Airway Motel is a very small motel, with roughly 30 rooms in a single-story building arranged in a U shape.  All of the rooms and the front office are part of the U shape, with all rooms facing the inside of the U. This means that every room in the motel is easily visible to all employees in the front office at all times.

### 21.

Prior to and Plaintiffs' trafficking at the Airway Motel, numerous witnesses observed obvious sex trafficking, prostitution, and other crimes occurring at the property:

## Witness Number 1

### 22.

A witness named K.S.[2] who is familiar with the Airway Motel has provided a witness declaration attached hereto as Exhibit 1.

---

[2] K.S. is identified pseudonymously by her initials and her name is redacted from Exhibit 1, pending the Court's ruling on Plaintiffs' Motion for Protective Order,

23.

K.S. lived at the Airway Motel off and on from 2012 through 2019. Exhibit 1, ¶ 1. In those years, K.S. was a victim of sex trafficking, including at the Airway Motel, and also worked at times as an independent prostitute. *Id.* ¶ 2.

24.

The whole time K.S. was at the Airway Motel, the prostitution and sex trafficking at the motel was rampant and very obvious.  Girls were walking around the motel "picking up tricks and dates" all day and night.  Buyers and pimps were always on the property.  Exhibit 1, ¶ 3.

25.

K.S. observed that girls would often stand out in front of the motel and flag down cars and truckers while wearing almost no clothes to get them to come to the Airway to buy sex.  And, Buyers of sex would go in and out of the rooms every day at all hours of the day and night. Exhibit 1, ¶ 3.

26.

K.S. estimates that there were 10-20 girls being sold for sex at the Airway Motel and there were usually 20-30 pimps hanging around the motel, controlling

---

which contemplates the protection of the public disclosure of the identities of sex trafficking victims.

those girls and selling drugs.  Exhibit 1, ¶ 4.  Again, the motel only had about 30 rooms.

27.

Pimps would often rent multiple rooms at the Airway Motel depending on how many girls they had working there, and it was common for the pimps to have one room for the girls they were selling and another room for the pimps to sell drugs out of.  Ultimately, if a pimp had several girls, they would rent several rooms at the motel for the girls to work out of.  Exhibit 1, ¶ 5.

28.

K.S. and other girls were often beaten by their pimps in the parking lot of the Airway Motel.  The motel employees saw this kind of activity frequently and also saw girls with bruises and cuts on their faces from their beatings.  Exhibit 1, ¶ 6.

29.

While at the Airway Motel, K.S. observed 3-4 young girls who were obviously under the age of 18 being sold for sex at the motel. Exhibit 1, ¶ 7.

30.

K.S. observed that the manager of the Airway Motel would come to each door to pick up money for the next day's rent from the girls and pimps staying in the various rooms.  Exhibit 1, ¶ 9.

31.

Defendant either saw or should have seen all of these same things that K.S. saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

## **Witness Number 2**

32.

A witness named Ms. Wilcox who is familiar with the Airway Motel has signed a witness declaration that is attached hereto as Exhibit 2.

33.

Ms. Wilcox was at the Airway Motel in 2015, and while she was there, she witnessed approximately 10–15 girls walking around the property who were often dressed in lingerie or just bras and panties staying at the motel. Based on her observations, Ms. Wilcox believed that some or all of these girls were being sold for sex to buyers who would visit the property. Exhibit 2, ¶ 2.

34.

Ms. Wilcox believed these girls were being sold for sex based on the fact that they would often walk in front of the motel or stand outside their rooms waiting for men to approach them, and then the girls would take the men into their rooms for a short period of time.  Ms. Wilcox also observed men who she believed to be the girls' pimps hanging around the girls at the motel.  Exhibit 2, ¶ 4.

35.

Although prostitution and sex trafficking were visible at the Airway Motel, Ms. Wilcox never saw or heard of any of the motel employees telling any of the pimps or other criminal to leave the property or otherwise taking any action to try to stop any of the activity occurring.  Exhibit 2, ¶ 9.

36.

Defendant either saw or should have seen all of these same things that Ms. Wilcox saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

## **Witness Number 3**

37.

A witness named Mr. Upshaw who is familiar with the Airway Motel has provided a witness declaration attached hereto as Exhibit 3.

38.

During 2014 and 2015, Mr. Upshaw lived at the Airway Motel for several months while he was working as a security guard at nearby businesses.  *See* Exhibit 3, ¶ 2.

39.

When staying at the Airway Motel, Mr. Upshaw saw approximately 10 girls per day walking around the property half dressed.  A lot of these girls looked like

teenagers and told Mr. Upshaw about how they had to sell themselves for sex and give the money to their pimp. Mr. Upshaw saw many girls being trafficked at the motel. Exhibit 3, ¶ 3.

40.

Mr. Upshaw saw truckers often park their trucks beside the motel and then walk through the motel parking lot to solicit sex from the girls who were being sold at the Airway Motel. Exhibit 3, ¶ 4.

41.

Mr. Upshaw also witnessed a lot of traffic from regular cars pulling through the parking lot, which was "busy, like a Chic-Fil-A drive through," with cars and men constantly pulling through the parking lot and going in an out of the rooms of the girls being sold for sex. Exhibit 3, ¶ 4.

42.

Mr. Upshaw observed that most of the girls at the motel were under the control of a pimp, and he frequently saw these girls handing cash over to their pimps after a date with a buyer at the motel.  Mr. Upshaw also observed girls being thrown out of hotel rooms, with their teeth knocked out, and blackened eyes. Exhibit 3, ¶ 5.

43.

Mr. Upshaw also frequently spoke to Mr. Patel, whom he believed to be the property manager/owner of the motel.  Mr. Upshaw asked Mr. Patel if he would like

14

Mr. Upshaw to do security at the motel to try to help the crime problem, but Mr. Patel told Mr. Upshaw that he did not want to pay for a security guard, nor would he give a discount on the room in exchange for Mr. Upshaw providing security. Exhibit 3, ¶¶ 7-8.

44.

Defendant either saw or should have seen all of these same things that Mr. Upshaw saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

**<u>Witness Number 4</u>**

A witness named Mr. Dumas who is familiar with the Airway Motel has provided a witness declaration attached hereto as Exhibit 4.

45.

Mr. Dumas worked at the Airway Motel for approximately one to two weeks in May 2015 helping paint the inside of some of the rooms at the Airway Motel. Exhibit 4, ¶ 1.

46.

Mr. Dumas witnessed that prostitution at the Airway Motel was obvious. While Mr. Dumas was at the Airway Motel he saw several girls standing in the doorway of their rooms trying to get men to come into their rooms to pay for sex. Exhibit 4, ¶ 3.

15

47.

One of the girls specifically asked Mr. Dumas if he wanted a date with her. Exhibit 4, ¶ 3.

48.

Mr. Dumas saw men pull up to the girls' rooms and go in for a short while. In total, Mr. Dumas witnessed approximately six girls each day who were engaged in prostitution at the motel, and he witnessed numerous men hanging around the motel who Mr. Dumas believed were doing something "sketchy or illegal." Exhibit 4, ¶ 4.

49.

On May 25, 2015, Mr. Dumas himself was the victim of a crime at the Airway Motel when his firearm was stolen from his vehicle while parked at the property.

50.

Defendant either saw or should have seen all of these same things that Mr. Dumas saw, and thus, they either recognized or should have recognized that sex trafficking was occurring at the motel.

51.

Before and during Plaintiffs' sex trafficking at the Airway Motel, Defendant and other Airway Motel employees knew or should have known about the crime, including specifically the sex trafficking occurring at the motel.

52.

Prior to Plaintiffs' sex trafficking at the Airway Motel, Defendant and other Airway Motel employees knew or should have known that rooms at the Airway Motel were frequently used for short interactions of commercial sex with guests being trafficked at the motel.

53.

Prior to and during Plaintiffs' trafficking at the Airway Motel, the premises and its approaches were known for crime, prostitution, and sex trafficking, which is why Plaintiffs' sex traffickers kept Plaintiffs at the Airway Motel to be sold for sex there; Defendant provided an open, busy market for just that type of illegal activity.

**<u>Plaintiff A.G.'s Sex Trafficking at the Airway Motel</u>**

54.

When she was 14 years old, in approximately early December 2015, Plaintiff A.G was trafficked for sex at the Airway Motel for an approximately two-week period.  A.G.'s trafficking occurred less than three months after the FBI raided the Airway Motel to rescue H.H.

17

55.

Prior to being taken to the Airway Motel, 14-year-old A.G. was at a party where she accepted a ride from a man she did not know.  This man drove A.G. to the Airway Motel and dropped A.G. off at the motel with a 25-year-old man who turned out to be a gang member and sex trafficker.

56.

During the next two weeks, A.G. was sold for sex by this trafficker to unknown adult male strangers approximately five to ten times per day.  A.G.'s first sexual experience was the first time she was sold for sex at Defendant's motel.

57.

Every day, A.G. was required to dress in revealing clothes and stand outside or walk in front of the motel until unknown men would approach her and buy her for sex.  Male buyers of sex constantly drove through the motel's parking lot to search for girls and women to buy for sex because the motel was known to allow that kind of activity.  A.G.'s trafficker knew other pimps at the motel and never let A.G. out of his sight. He always possessed a gun and told A.G. if she ever tried to leave, he would kill her.

58.

Multiple times per day, these unknown, adult male strangers would approach A.G. while she was standing outside the motel, pay for sex with A.G., and then go into A.G.'s motel room for short periods of time to statutorily rape her.

59.

A.G.'s trafficker kept the money that was paid to purchase A.G. for sex and would then use some of that money to continue to pay rent at the motel each day.

60.

A.G.'s trafficker stayed at this motel in particular because the motel was known to be a common location for prostitution, sex crimes, and sex trafficking to occur and because Defendant did not take any actions to try to prevent A.G.'s sex trafficking from continuing to occur.

61.

While A.G. was being sold for sex, her trafficker, along with other traffickers, would stand around the outside of the motel in view of motel employees, waiting for each sexual encounter to end to receive the money.

62.

A.G. witnessed 7–10 other girls being sold for sex at the Airway Motel, most of whom were young, like her. She also witnessed 5–6 other pimps

trafficking girls at the motel. These girls and their pimps were obvious their activity should have been seen by Defendant.

63.

During the time A.G. was being sold for sex, Defendant and his employees either lived at the Airway Motel themselves or, at a minimum, staffed the motel 24 hours per day, 7 days per week, and thus, Defendant should have seen the sex-trafficking activity that was occurring openly and publicly on its property, including Plaintiffs'.

64.

Thus, Defendant frequently saw A.G., her trafficker, and other sex traffickers and sex trafficking victims at the motel.

65.

Defendant had friendly relationships with traffickers at the motel, including A.G.'s trafficker, and thus would not call the police to report their criminal activity, which Defendant either knew or should have known was occurring.

66.

For example, on one occasion, one of A.G.'s buyers stayed in the motel room for longer than the amount of time for which he had purchased A.G.  A.G.'s trafficker then came back to the room and ran the buyer off.  Shortly thereafter, the buyer returned to the motel with a gun and began shooting at A.G. and her trafficker.

A.G.'s trafficker then used his own gun to shoot back at the buyer. Following the shootout, a motel employee came to check on A.G.'s trafficker and confirm that A.G.'s trafficker had not been shot. The motel employee was relieved to find out A.G.'s trafficker had not been shot and thereafter allowed the trafficker to continue to stay at the motel without even calling the police. The motel employee simply moved A.G. and her trafficker to another room on the other side of the motel.

67.

While A.G. was trafficked for sex at the Airway Motel, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant and the other motel employees knew or should have known. These included A.G.'s young age and inappropriate dress, her being required to openly stand or walk in front of the motel to be approached by adult male strangers who would then accompany A.G. into her motel room for short periods of time, and A.G.'s monitoring and control by her trafficker, who was a 25-year-old man.

68.

A.G.'s sex trafficker operated openly and brazenly at the Airway Motel, as did other sex traffickers. In addition to A.G.'s trafficking, there were numerous other sex trafficking victims at the motel at any given time and numerous other traffickers controlling those girls at the motel.

21

69.

Due to the high number of victims being sold for sex at the motel, a large number of buyers frequented the motel each day.  These buyers were almost all men who came to the motel to cruise the parking lot, pick out a victim, and go to their room for short periods of time, carrying no luggage or anything that would indicate they were a guest of the motel.  Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the motel.

70.

Defendant knew or should have known that the Airway Motel served as an open market for sex, including with victim A.G., based on all of the obvious activity that occurred in the open and public areas on Defendant's motel property.

71.

After being trafficked at the Airway Motel for approximately two weeks (and closely following the shootout described above), A.G.'s trafficker decided to move her to another motel.

72.

After A.G. was trafficked at the second hotel, the police eventually rescued her at the second hotel on December 31, 2015.  A.G.'s trafficker was arrested and eventually plead guilty to trafficking A.G. for sexual servitude, statutory rape,

pimping for person under 18, and violation of Street Gang Terrorism and Prevention Act.

73.

To this point, however, Defendant has faced no consequences for his role in permitting and profiting from either A.G.'s or H.H.'s trafficking.

**Plaintiff H.H.'s Sex Trafficking at the Airway Motel**

74.

When she was 17 years old, Plaintiff H.H. was taken to the Airway Motel on June 21, 2015 by a violent and abusive male trafficker who was 41 years old.

75.

For the next approximately 82 days, H.H. was trafficked for sex at the Airway Motel.

76.

Each and every day, H.H. was required to dress in revealing clothes and stand outside of the motel until unknown men would approach her and buy her for sex.

77.

Multiple times per day, these unknown, adult male strangers would approach H.H., pay for sex with her at the motel, and then go into H.H.'s motel room for short periods of time to have unwanted sex with her.

78.

H.H.'s trafficker kept the money that was paid to purchase her for sex and used some of that money to continue to pay rent at the motel each day. H.H.'s trafficker kept her at this motel in particular because the motel was known to be a common location for prostitution, sex crimes, and sex trafficking to occur and because Defendant did not take any actions to try to prevent H.H.'s sex trafficking from continuing to occur.

79.

While H.H. was being sold for sex, her trafficker, along with other criminals, would stand around the outside of the motel in view of motel employees, waiting for each sexual encounter to end to receive the money.

80.

While H.H. was being trafficked at the Airway Motel, a rap video was filmed in the parking lot and common areas of the Airway Motel, in full view of motel employees.

81.

This rap video depicted and glorified the sex trafficking that was occurring at the Airway Motel, including that of H.H.

82.

H.H. was shown in the rap video, including at least one scene when she was standing outside her motel room in revealing clothing and high-heels waiting for a truck driver to approach her and buy her for sex, all while H.H.'s trafficker watched over her:



83.

In another scene, H.H. was shown with her trafficker and another 17-year old trafficking victim who was being sold out of the motel.

84.

Defendant never took any actions to prevent or stop the rap video despite the open and obvious activity involved in its filming.

85.

H.H.'s trafficker would either pay cash for the room each day or H.H. herself would walk into the front office and pay cash for the room, giving Defendant ample opportunity to observe her age and inappropriate appearance. Despite her age and appearance as depicted above, Defendant never asked for any form of identification from the minor H.H. when she paid for the room.

86.

During the time H.H. was being trafficked for sex, Defendant and his employees either lived at the Airway Motel themselves or, at a minimum, staffed the motel 24 hours per day, 7 days per week, and thus, Defendant and his employees could see the sex-trafficking activity that was occurring openly and publicly on its property.

87.

Thus, Defendant frequently saw H.H., her trafficker, and the other sex traffickers and sex trafficking victims at the motel.

88.

Defendant had friendly relationships with traffickers at the motel, including with H.H.'s trafficker, and thus would negligently not call the police to report their criminal activity, which Defendant either knew or should have known was occurring.

89.

While H.H. was trafficked for sex at the Airway Motel, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant and the other motel employees knew or should have known. These included H.H.'s young age and inappropriate dress, her being required to openly stand in front of the motel to be approached by adult male strangers who would then accompany H.H. into her motel room for short periods of time, and H.H.'s monitoring and control by her trafficker, who was a 41-year old man.

90.

H.H.'s sex trafficker operated openly and brazenly at the Airway Motel, as did other sex traffickers. In addition to H.H.'s trafficking, there were numerous other sex trafficking victims at the motel at any given time and numerous other traffickers controlling those girls at the motel.

91.

Due to the high number of victims being sold for sex at the motel, a large number of buyers frequented the motel each day. These buyers were almost all men who came to the motel to cruise the parking lot, pick out a victim, and go to their room for short periods of time, carrying no luggage or anything that would indicate they were a guest of the motel. Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the motel.

92.

Defendant knew or should have known that the Airway Motel served as an open market for sex, including with victim H.H., based on all of the obvious activity that would occur in the open and public areas on Defendant's motel property.

93.

On September 11, 2015, the Atlanta police and FBI Metro Area Trafficking Children Task Force raided the Airway Motel after receiving a tip that a minor was being sold for sex in room #14 at the motel.  Upon hearing a knock on the motel door, H.H.'s trafficker hid his gun and required her to hide the trafficker's drugs inside her vagina.  Ultimately, after the police and FBI entered the room, H.H.'s trafficker admitted that he knew H.H. was 17 years old, knew she was having sex for money, and admitted that he would then take all of the money since he was "the man of the house."

94.

H.H.'s trafficker was arrested, and the police noted that he had a large tattoo across his back shoulders that read "PIMP HARD."

## Prior Police Activity at the Airway Motel

95.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Airway Motel.

28

Much of this activity either alerted or should have alerted Defendant to the motel's rampant sex trafficking, prostitution, and sex crime problem.  As mere examples, among many other instances, the police responded to the following prior incidents at the motel shortly prior to Plaintiffs' trafficking:

i. On June 17, 2014, a man reported that he was robbed at the motel.  Upon further questioning, the man advised that he was attempting to buy services from a prostitute and there was a dispute over money and that the female advised that she would need to check with her pimp.  Shortly thereafter, the pimp entered the room, accused the man of disrespecting his prostitute and pointed a pistol in the man's face and then proceeded to steal $20 from the man before fleeing the motel room;

ii. On September 3, 2014, a victim flagged down police and said she was assaulted.  After further questions, the victim told the police that she was rooming with a man who forced her to go out and see dates and advised the police that the man would "physically man handle her until she went onto the street and bring back money."  She was "in fear of being continually harmed" and on the morning of the assault, she had attempted to leave, but the man "grabbed her by the arm, grabbed her by the throat and lifted her into the air causing her to choke and lose her breath";

iii.  On September 8, 2014, the police arrested a woman at the motel and noted that she was a "suspected prostitute in the area."  The police also noted that "she was dressed provocatively wearing tight shorts and a see through shirt"; and

iv.  On April 13, 2015, a victim reported to the police that that she had been physically attacked by her "boyfriend" at the motel because the "boyfriend" wanted the victim's prostitution money in order to buy drugs. When the victim refused, the boyfriend attacked her.  The police observed "a large bleeding bite wound to her right eye brow and had blood on her shirt."

96.

These types of prior reported police activity, along with many other examples, all caused or should have caused Defendant to recognize that the motel was frequently being used for the purposes of sex trafficking.

**Defendant's Negligent Failure to Act**

97.

Defendant and the other Airway Motel employees knew or should have known that obvious sex trafficking, including Plaintiffs' sex trafficking, was occurring every day at the Airway Motel.

30

98.

Despite this knowledge, Defendant negligently and recklessly allowed the crimes perpetrated against Plaintiffs and other sex trafficking victims to continue.

99.

Despite the dangerous, illegal, and criminal activity at the motel, Defendant and the motel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

100.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable and necessary steps to stop such illegal and dangerous activities from occurring.

101.

Additionally, Defendant and the motel negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the motel.

102.

Defendant and the motel also negligently failed to provide proper training to their employees on what they were supposed to do if they saw or suspected that dangerous or illegal activity, prostitution, or sex trafficking was occurring at the motel.

103.

Defendant and the motel also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, on how the staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so that the motel could better deter or prevent crime in the future.

104.

Defendant and the motel also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

105.

Defendant and the motel knew or should have known that they were permitting the motel to be used as a place of prostitution and sex trafficking.

**Defendant's Knowledge of Sex Trafficking Generally**

106.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

107.

Defendant knew or should have known that during the relevant period Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at the Airway Motel. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.[3]  In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiffs and other victims.

---

[3] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited April 1, 2021); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited April 1, 2021).

108.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[4] and as "the number one city for child sex trafficking."[5]

109.

Defendant knew or should have known that the motel and the surrounding Fulton Industrial Boulevard area were known to be common and notorious locations for prostitution, sex crimes, and sex trafficking to occur.[6]  That is why Plaintiffs' traffickers sold them there.

---

[4] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited April 1, 2021).
[5] *Id.*
[6] *See, e.g.*, Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014) (Noting that "street-level prostitution . . . occurs along specific tracks within more densely urban areas, particularly the Fulton Industrial area."), 123,  *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited July 26, 2022); Aaron Diamant, *Loophole Helps Cheap Hotels Serve as Save Havens for Violent Crime,* WSB-TV 2, (May 20, 2016) https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/. (Last visited July 26, 2022)

110.

Defendant knew or should have known that motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" City *of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

111.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving motels and motels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[7] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[8] And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with motels at some point during their exploitation . . . . Unfortunately,

---

[7] *Human Trafficking and Hotels & Motels*, Polaris Project, https://polarisproject.org/human-trafficking-and-hotels-motels/ (last visited April 1, 2021).

[8] Jon Conte, *et al., Inhospitable to Human Trafficking Program Evaluation*, at 2, Businesses Ending Slavery and Trafficking, (July 2014), https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf at 5 (last visited April 1, 2021).

94% also disclosed that they never received any assistance, concern, or identification from motel staff."

112.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[9]

113.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels can take:

    a. establish corporate policy and procedures against sexual exploitation of children;

    b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

    c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

    d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

    e. support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

---

[9] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited April 1, 2021).

36

     f.  report annually on the company's implementation of Code-related activities.

114.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels the tools to address the scourge of sex trafficking at motels.

115.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels detect and respond to human trafficking.  DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and motels, such as:

     a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

     b.  persons who lack freedom of movement or are constantly monitored;

     c.  persons who have no control over or possession of money or ID;

     d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

     e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

37

f.   the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.   extended stay with few or no personal possessions in the room;

h.   excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.   the same person reserves multiple rooms;

j.   a room is rented hourly, less than a day, or for an atypical extended stay;

k.   attempts to sell items to or beg from patrons or staff;

l.   cars in the parking lot regularly parked backward, so the license plates are not visible;

m.   loitering and solicitation of male patrons;

n.   waiting at a table or bar and picked up by a male (trafficker or customer);

o.   persons asking staff or patrons for food or money; and

p.   persons taking cash or receipts left on tables.

116.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendant, for a fee, provided that market, a private and anonymous market for Plaintiffs to be sold for sex at its motel.

**Count I – Statutory Liability under 18 U.S.C. § 1595**

117.

Plaintiffs incorporate the Paragraphs above, as if fully set forth herein.

38

118.

In violation of the TVPRA, Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known violated the TVPRA.

119.

Defendant knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue and/or profit generated from the motel rooms from which Plaintiffs were trafficked.

120.

Defendant knowingly benefitted from Plaintiffs' sex trafficking because Plaintiffs' sex traffickers continued to use the money gained from Plaintiffs' sex trafficking to pay for the motel rooms in which Plaintiffs were trafficked, and Defendant, as the owner and operator of the motel, then financially benefitted from such room rentals.

121.

Defendant participated in a venture by knowingly owning and operating a motel that generated revenue through room rentals.

122.

Defendant participated in a venture by knowingly owning and operating a motel which Defendant knew or should have known was being used by sex

traffickers for the purpose of trafficking victims for sex in violation of the TVPRA, including Plaintiffs.

123.

Defendant knew or should have known that renting its rooms to sex traffickers, including Plaintiffs', violated the TVPRA.

124.

Defendant participated in a venture by operating the Airway Motel in such a manner that the motel allowed sex trafficking to occur so that it could profit from the room revenue the illegal activity generated.

125.

Defendant knew or should have known that its operation of the motel harbored victims of sex trafficking, including Plaintiffs, in violation of the TVPRA.

126.

Defendant participated in a venture by associating with, and renting rooms to, Plaintiffs' sex traffickers at the Airway Motel, providing Plaintiffs' traffickers with the necessary venue for Plaintiffs' sex trafficking, despite the fact that Defendant knew or should have known Plaintiffs' sex traffickers were trafficking Plaintiffs for sex at the motel.

127.

Defendant knew or should have known that its association with, and renting

rooms to, Plaintiffs' sex traffickers violated the TVPRA.

128.

In the course of these ventures, numerous buyers paid to have sex with Plaintiffs in Defendant's motel rooms.

129.

The ventures in which Defendant participated were in or affecting interstate commerce.

130.

Defendant knew or should have known the ventures violated the TVPRA because Defendant and his agents, employees, and representatives had the opportunity to observe Plaintiffs at the motel, with and without their traffickers, the signs of sex trafficking exhibited by Plaintiffs, their traffickers, their rooms, and the frequent traffic of adult male buyers into and out of the Plaintiffs' motel rooms each day they were being trafficked.

131.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of his agents and representatives and other motel employees.

132.

Plaintiffs have suffered physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

133.

Defendant is liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

134.

Defendant is jointly and severally liable for damages arising from the indivisible injuries caused to Plaintiffs, whose damages were proximately caused by the acts discussed in this count.

## **Count II – Attorneys' Fees and Expenses of Litigation Pursuant to O.C.G.A. § 13-6-11 for Bad Faith Conduct**

135.

Plaintiffs incorporate the Paragraphs above, as if fully set forth herein.

136.

Defendant acted in bad faith, has been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense.

137.

Defendant has engaged in a long-running pattern of bad faith conduct both before and after Plaintiffs' sex trafficking which demonstrates that Defendant has no regard for safety at his motel and that Defendant exerts a bad faith effort (or no effort) to prevent and deter dangerous illegal activities, crime, prostitution, and sex trafficking.

138.

Defendant engaged in a long running pattern of bad faith conduct and engaged in specific bad faith conduct toward Plaintiffs, including failing to intervene or prevent Plaintiffs' sex trafficking when Defendant knew or should have known of the same.

139.

Defendant is liable to Plaintiffs for attorney's fees and expenses of litigation in an amount to be proven at trial.

**Damages**

140.

Plaintiffs incorporate the Paragraphs above, as if fully set forth herein.

141.

As a proximate and foreseeable result of Defendant's acts described herein, Plaintiffs sustained personal injuries, physical abuses, mental and emotional pain

and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incidents at issue, and to recover for all statutory damages, general damages, special damages, compensatory damages, consequential damages, pain and suffering, and all other damages permissible under Georgia and federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present and future conscious pain and suffering;

c)   Loss of enjoyment of life;

d)   Medical expenses;

e)   Mental anguish and emotional distress;

f)   Loss of past, present, and future wages;

g)   Incidental expenses;

h)   All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

i)   Consequential damages to be proven at trial.

142.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendant and his employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious

indifference to consequences.

143.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-15-14, and 18 U.S.C. § 1595(a)).

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendant, and for the following:

a)   Process issue as provided by law;

b)   Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendant;

c)   Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d)   Plaintiffs be awarded a trial by jury; and

e)   Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

45

This 11th day of January, 2023.

**ANDERSEN, TATE & CARR, P.C.**

*/s/ Patrick J. McDonough*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Attorneys for Plaintiffs

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680