# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: May 18, 2022

Deborah Lavon Jackson
3755 N. Decatur Road
Apt. A
Decatur, GA 30032

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you or your representative may submit written exceptions to the Appeals Council.  "Written exceptions" are your statements explaining why you disagree with my decision.  Please write the Social Security number associated with this case on any written exceptions you send.

Please send your written exceptions to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Or Fax:  (833) 763-0406**

If you need help, you may file in person at any Social Security or hearing office.

**Time Limit To File Written Exceptions (30 Days)**

You must file your written exceptions with the Appeals Council **within 30 days** of the date you get this notice.  The Appeals Council assumes that you got this notice within 5 days after the date of the notice unless you show that you did not get it within the 5-day period.

If you need more time to file your written exceptions, you must file a written request with the Appeals Council.  You must file the request for an extension within 30 days of the date you get

Form HA-L76-OP2 (03-2010)

this notice.  If you request more than 30 days, you must explain why you need the extra time.
The Appeals Council will decide whether to grant your request for more than a 30-day extension.

**How Written Exceptions Work**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the
parts with which you agree.  The Appeals Council's action may be more or less favorable or
unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations,
Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

  • Find that there is no reason to change my decision,
  • Dismiss your case,
  • Return your case to me or another administrative law judge for a new decision, or
  • Issue its own decision.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals
Council does not change my decision, my decision will become the final decision after remand.
Any future claim you file will not change a final decision on this claim if the facts and issues are
the same.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not file written exceptions.  The
Appeals Council will notify you within 60 days of the date of this notice if it decides to review
your case.

**Filing An Action In Federal District Court**

If you do not file written exceptions and the Appeals Council does not review my decision on its
own, my decision will become final on the 61st day following the date of this notice.  After my
decision becomes final, you will have 60 days to file a new civil action in Federal district court.
You will lose the right to a court review if you do not file a civil action during the 60-day period
starting with the day my decision becomes final.  However, you can ask the Appeals Council to
give you more time to file a civil action.  The Appeals Council will grant your request for more
time only if you can show a good reason for needing more time.  We will not send you any more
notices about your right to file in Federal district court.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the
same as filing exceptions to my decision or filing a civil action in Federal court.  If you disagree
with my decision and you file a new application instead of filing written exceptions or appealing
to Federal court, you might lose some benefits or not qualify for benefits at all.  My decision
could also be used to deny a new application for benefits if the facts and issues are the same.   If

Deborah Lavon Jackson (BNC#: 21VY556C23875)                    Page 3 of 3

you think my decision is wrong, you should file your exceptions within 30 days or file a new civil action between the 61st and 121st days after the date of this notice.

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security.  You may also call (800) 772-1213 with questions.  If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office.  Please have this notice and decision with you.  The telephone number of the local office that serves your area is (866) 931-9946.  Its address is:

>              Social Security
>              401 W Peachtree St NW
>              Suite 2860 Flr 28
>              Atlanta, GA 30308-9972


>              Carla McMichael
>              Administrative Law Judge


Enclosures:
Decision Rationale


cc:     Erica Dempsey, Esq.
        Law Offices of Kathleen M. Flynn, LLC
        315 W. Ponce De Leon Avenue
        Suite 940
        Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

**IN THE CASE OF**                              **CLAIM FOR**

                                                Period of Disability, Disability Insurance
Deborah Lavon Jackson                           Benefits, and Supplemental Security Income
(Claimant)
_____

_____               _____
(Wage Earner)                                   (Social Security Number)

**JURISDICTION AND PROCEDURAL HISTORY**

This case is before the undersigned Administrative Law Judge on remand from the Appeals
Council pursuant to a remand from the United States District Court for the NORTHERN
DISTRICT GEORGIA (Exhibits 11A and 17A).  On March 31, 2022, the undersigned held a
telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease
2019 (COVID-19) Pandemic.  All participants attended the hearing by telephone. The claimant
agreed to appear by telephone before the hearing, and confirmed such agreement at the start of
the hearing (Exhibit 41B).  The claimant was represented by Erica Dempsey, an attorney.  Julie
McKeown, an impartial vocational expert, also participated and testified at the hearing.

Pursuant to the District Court remand order, Appeals Council has directed the undersigned to
completely consolidate the subsequent Title XVI disability benefits claim, filed on February 28,
2017, with the current claims (20 CFR 416.1452 and HALLEX I -1-10-10) so that the opinions
of the State agency consultants are also included in the current claim.  The undersigned was also
directed to give further consideration to the treating source opinion, pursuant to the provisions of
20 CFR 404.1527 and 416.927, and explain the weight given to such opinion evidence.  The ALJ
was directed to give further review of the claimant's diagnosed, severe bipolar disorder and
further evaluate her mental impairment in accordance with the special technique described in 20
CFR 404.1520a and 416.920a (Exhibit 17A).  The undersigned complied with the directives of
the Appeals Council in the decision below.  The claimant is alleging disability since September
1, 2006.

The claimant submitted or informed the Administrative Law Judge about all written evidence at
least five business days before the date of the claimant's scheduled hearing (20 CFR 404.935(a)
and 416.1435(a)).

**ISSUES**

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of
the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful
activity by reason of any medically determinable physical or mental impairment or combination

See Next Page

of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2007.  Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from September 1, 2006, through the date of this decision.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

See Next Page

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.**

See Next Page

**2.    The claimant has not engaged in substantial gainful activity since September 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).**

**3.    The claimant has the following severe mental impairments: bipolar disorder, PTSD, and schizophrenia disorder (20 CFR 404.1520(c) and 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.  Based on a review of the medical record in this case, the undersigned finds that the claimant has the following nonsevere physical disorders: asthma, hypertension, GERD, and lumbar degenerative disc disease.  The claimant indicated in her disability psychological evaluation report that she  took medication to manage her high blood pressure, asthma, and GERD problems (Exhibit 5F, page 2).  In her disability physical examination report by Debbie R. Brewer, M.D., the claimant reported treating her asthma condition with an Albuterol inhaler, Combivent inhaler, Singular, and Claritin.  The claimant also reported taking medications for hypertension and her GERD conditions (Exhibit 8F, page 2).  Dr. Brewer stated the claimant did not use an assistive device for ambulation at the time of her examination, and she stated the claimant had no functional limitations with hearing, communication skills, reaching, handling, fingering/feeling, prolonged sitting, gait/balance, climbing, bending, and stooping.  Dr. Brewer stated the claimant had normal range of motion in her back, and she was nontender with normal alignment.  She stated the claimant had normal gait/station and did not require use of an assistive device for ambulation (Exhibit 8F, page 4).

The medical record contains an MRI report of the claimant's lumbar spine dated August 1, 2016 (Exhibit 27F, page 4).  The report stated the claimant had normal vertebral body height, alignment, and marrow signal.  The report stated the claimant's intervertebral disc heights were maintained, and she had minimal marginal osteophyte formation anteriorly at each level from L1-L2 through L5-S1.  The report indicated the claimant had no significant disc herniation or spinal canal narrowing at any level (Exhibit 27F, page 4).

The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

In the disability physical examination report dated June 12, 2007, Dr. Brewer stated the claimant she was diagnosed with bipolar disorder in 2001 and with schizophrenia in 2005, when she was in imprisoned in North Georgia.  She stated the claimant was treated with medication and counseling at that time, and the claimant had no past psychiatric hospitalizations except in the prison infirmary.  Dr. Brewer stated the claimant's symptoms at that time included crying spells, sad mood, fatigue, insomnia, memory problems, a lack of interest or energy to do her usual activities, auditory and visual hallucinations where she hears the voice of her deceased mother and sees spots and shadows.  Dr. Brewer stated that during her manic episodes, the claimant experienced racing thoughts and impulsivity, and she reported cycling between depression and

mania two to three times per week. Dr. Brewer stated the claimant was being treated at that time by doctors at Grady Memorial hospital, and she was receiving counseling at the Northside Clinic. Dr. Brewer stated the claimant was taking Wellbutrin, Seroquel, and Prozac at that time. Dr. Brewer stated the claimant felt limited by her condition because she had difficulty focusing due to the side effects of her medications. The claimant reported having difficulty functioning and holding down a job (Exhibit 8F, page 1).

The medical record contains a disability psychological evaluation report dated May 2, 2007 from David B. Rush, Ph.D. (Exhibit 5F). Dr. Rush stated the claimant reported receiving psychiatric services previously at Clayton Mental Health Center, and she had been prescribed Wellbutrin, Prozac, and Remeron by a former psychiatrist. The claimant indicated these medications were not as effective as she would have like them to be in managing her symptoms at that time. The claimant reported receiving treatment for substance abuse in the past, and she was attending AA and Narcotics Anonymous meetings at that time. The claimant reported using cocaine for the last time one month prior to her evaluation, and she denied any current use of any substance at the time of her evaluation (Exhibit 5F, page 2).

Dr. Rush stated the claimant endorsed numerous psychiatric symptoms at the time of her evaluation. He stated the claimant reported symptoms of sadness, forgetfulness, fatigue, feeling hyper, sleep disturbance, auditory hallucinations, and paranoia over the prior months. The claimant reported going into rages and threatening other people when she was triggered by stress. The claimant indicated she did not like being out in groups of other people. The claimant reported experiencing auditory hallucinations, along with periodic sleep disturbance, despite taking medication to manage these problems. Dr. Rush stated the claimant denied having any homicidal or suicidal ideations at that time (Exhibit 5F, page 2).

Dr. Rush stated the claimant denied having any problems with previous employers or co-workers on any job. Dr. Rush stated the claimant did not report any problems performing household chores, including making her bed, vacuuming, washing dishes, and doing laundry. Dr. Rush stated the claimant was able to prepare meals, and handle her personal care including dressing herself without difficulty. Dr. Rush stated the claimant reported exercising on a regular basis. Dr. Rush stated the claimant was oriented in all spheres, and he indicated her long-term and recent memories were both intact at that time. Dr. Rush did indicate the claimant's short-term memory was impaired as evidenced by her inability to recall any of three words at five minutes; however, he found the claimant's naming ability and concentration to be intact at that time (Exhibit 5F, page 3).

Dr. Rush diagnosed the claimant as having a major depressive disorder, single episode, severe with psychotic features. He also indicated the claimant had a history of alcohol and cocaine abuse. Dr. Rush stated the claimant had the ability to understand and carry out simple instructions; however, as directives become more complex, she would have difficulty completing them. He stated that the claimant's ability to get along with other people was impaired, due to her discomfort with being around more than a few people at a time. Dr. Rush stated that when under stress, the claimant had interacting interpersonally, and the claimant typically managed stressors by using alcohol or drugs (Exhibit 5F, page 4).

See Next Page

The medical record contains treatment notes from Steven Sugg, M.D., the claimant's treating psychiatrist at Northside Hospital Mental Health Center (Exhibits 14F, 22F, and 27F).  The treatment notes and intake screening report dated June 20, 2007 indicated the claimant was diagnosed as having Bipolar I disorder (Exhibit 14F, pages 1 and 107).  Dr. Sugg completed a medical source statement dated November 8, 2007, in which he stated that due to the claimant's bipolar disorder, she was unable to return to any type of work activity for at least the next 6-9 months, and the claimant had not been able to engage in work activity over the prior three months.  Dr. Suggs stated the claimant might be able to engage in work activity in 36 weeks.  He also indicated the claimant did not need a full-time caretaker (Exhibit 14F, page 71).  A treatment note dated May 14m 2008 indicated the claimant was diagnosed as having a Type II Bipolar Disorder (Exhibit 14F, page 117).

The medical record contains treatment notes dated October 9, 2017 from Malaika Berkeley, M.D. of St. Joseph's Mercy Care Services, which stated the claimant was diagnosed as having chronic PTSD and a bipolar affective disorder (Exhibit 47F, page 5).  Dr. Berkeley indicated the claimant was doing well at that time, and the claimant was alert and oriented to person, place, and time.  She indicated the claimant's mood was appropriate for the situation at that time, and her thought content was appropriate at that time, with no abnormal perceptions noted during the examination.  Dr. Berkeley indicated the claimant's memory was good, and her attention/concentration was clear.  Dr. Berkeley stated the claimant's judgement and insight was good and fair.  Dr. Berkeley prescribed Sertraline and Risperidone for treatment of the claimant's mental disorders (Exhibit 47F, pages 8-9).

A follow-up note dated May 23, 2019 from Juntira Laothavorn, M.D. of St. Joseph's Merch Care indicated the claimant was doing well with her medication, and her mood was better.  The note indicated the claimant was sleeping and eating well (Exhibit 34F, page 14).  A note dated June 12, 2019 from Ashunte Claybrooks, LPC stated the claimant's posture, behavior, mood, and affect were all within normal limits at that date.  The note stated the claimant's attention, concentration, ad thought content were all within normal limits, and the claimant's mood was appropriate for the situation at that time.  The note stated the claimant was alert and oriented to person, place, and time (Exhibit 34F, page 29).

The record shows the claimant began receiving mental health services at Grady Hospital in March of 2020 (Exhibit 54F).   The medical record contains a treatment note dated November 4, 2020 from Margaret Renfroe, Certified Peer Specialist, of St. Joseph's Mercy Care, which indicated the claimant was diagnosed as having a mild alcohol use disorder along with her bipolar disorder.  The note stated the claimant's cocaine dependence was in remission (Exhibit 56F, page 1); however, subsequent treatment notes indicated the claimant was later diagnosed as having a severe cocaine use disorder (Exhibits 56F, page 92 and 60F, page 3).  A treatment note dated November 13, 2020 from Prenica Gant, M.D. of Grady Hospital stated the claimant denied having a depressed mood or anhedonia on that date (Exhibit 55F, page 3).  A note dated November 17, 2021 indicated the claimant was diagnosed as having a moderate Percocet use disorder (Exhibit 60F, page 3).  A note dated December 20, 2021 indicated the claimant denied any current or recent substance use, and the note indicated the claimant was stable on her medications at that time (Exhibit 60F, page 17).

See Next Page

Based on a review of the above medical record in this case, the undersigned finds that the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Sections 12.03 (Schizophrenia spectrum and other psychotic disorders), 12.04 (Depressive, bipolar and related disorders), and 12.15 (Trauma and stressor-related disorders).  The medical record discussed above does not show that the claimant has a schizophrenia spectrum impairment which meets or equals the criteria of 12.03(A).  The record does not show that the claimant suffered from delusions, hallucinations, disorganized thinking, or grossly disorganized behavior or catatonia as stated in 12.03(A).  The medical record does not show that the claimant has a bipolar disorder, which meets or equals the criteria of 12.04(A)(2).  The medical record does not show that the claimant's bipolar disorder caused her to have pressured speech, flight of ideas, inflated self-esteem, or involvement in activities that had a high probability of painful consequences, which were not recognized; or caused her to have an increase in goal-directed activity or psychomotor agitation.  The medical record also does not show that the claimant suffered from a trauma or stressor-related disorder that caused her to seek exposure to actual or threatened death, serious injury, or violence as required under 12.15(A)(1).

In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a mild limitation.  Dr. Rush stated the claimant was able to understand and carry out simple instructions (Exhibit 5F, page 4).  The claimant's friend stated in her Third Party Adult Function report that the claimant needed a through, simple explanation in order to follow both spoken and written instructions (Exhibit 4E, page 9).

In interacting with others, the claimant has a moderate limitation.  Dr. Rush indicated the claimant had an impairment in her ability to get along with other people due to her discomfort when being around more than a few people at a time (Exhibit 5F, page 4).  The claimant's friend in her Third Party Adult Function report that the claimant socialized with other people and attended church services on a regular basis (Exhibit 4E, page 8).

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  Dr. Rush stated the claimant was oriented in all spheres at the time of her evaluation, and he stated the claimant's long-term and recent memory was intact.  He stated the claimant's naming ability and concentration was intact at that time, and he stated the claimant's insight and judgment was adequate at that time (Exhibit 5F, page 3).  The claimant's friend stated in her Third Party Adult Function Report that the claimant could maintain attention for 20-30 minutes at a time (Exhibit 4E, page 9).

As for adapting or managing oneself, the claimant has experienced a mild limitation.  The claimant's friend stated in her Third Party Adult Function report, that the claimant had no

problem in handling her personal care, and she did not need special reminders to take care of her personal needs or grooming. The claimant's friend indicated the claimant could prepare simple meals and perform household chores. She also indicated the claimant could leave her home and go shopping on her own for groceries, and the claimant was able to handle her finances (Exhibit 4E). Dr. Rush also indicated the claimant was able to perform household chores, making simple meals, and handling her personal care. He also stated the claimant enjoyed exercising (Exhibit 5F, pages 2-3). Dr. Brewer stated the claimant was able to handle her personal care skills such as dressing, feeding herself and bathing, with dexterity, and the claimant had the ability to use her hands for buttoning and tying her shoes (Exhibit 8F, page 4).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied. The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The medical record in this case does not show that the claimant has a medically documented history of the existence of any mental disorder lasting over a period of at least 2 years, with evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder; and

2. Marginal adjustment, that is, the claimant only had a minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life (Exhibit 4E).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of medium level work as defined in 20 CFR 404.1567(c) and 416.967(c); however, she has non-exertional limitations. The claimant is limited to simple type tasks, which require only simple, work-related decision making, and only few workplace changes. She can engage in occasional interactions with co-workers and the public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927.

See Next Page

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant's representative stated the claimant was disabled due to a combination of mental and physical impairments including depression, bipolar disorder, asthma, GERD, and lumbar spinal stenosis. The claimant stated she was unable to engage in work activity due to problems standing on her feet for long periods along with her mental problems. She indicated she had difficulty maintaining her concentration and following instructions. The claimant testified that she used a walker to assist with ambulation on a daily basis, and she sometimes used a cane to assist with ambulation. She indicated these devices were not prescribed by any physician. The claimant testified that she had chronic pain in her hips, knees, legs, and neck, and she was taking Percocet to manage her pain.

In the disability physical examination report from Dr. Brewer, the claimant reported treating her asthma condition with an Albuterol inhaler, Combivent inhaler, Singular, and Claritin. The claimant also reported taking medications for hypertension and her GERD conditions (Exhibit 8F, page 2). Dr. Brewer stated the claimant had no cyanosis, clubbing, tenderness, edema, redness, or warmth in her extremities/joints. She stated the claimant's pulses were intact and the claimant was +2/4 in her bilateral extremities. Dr. Brewer stated the claimant had normal range of motion in all extremity joints, and the claimant could squat 100 percent and had no difficulty recovering (Exhibit 8F, page 3). Dr. Brewer stated the claimant was able to walk heel-to-toe, walk on her heels and walk on her toes. She stated the claimant had normal straight leg lifting, and normal gait and station. She stated the claimant had normal grasp/grip strength and had 5/5 bilateral muscle strength in all extremities (Exhibit 8F, page 4).

Dr. Brewer stated the claimant did not use an assistive device for ambulation at the time of her examination, and she stated the claimant had no functional limitations with hearing, communication skills, reaching, handling, fingering/feeling, prolonged sitting, gait/balance, climbing, bending, and stooping. Dr. Brewer stated the claimant had normal range of motion in her back, and she was nontender with normal alignment. She stated the claimant had normal gait/station and did not require use of an assistive device for ambulation (Exhibit 8F, page 4).

The medical record contains an MRI report of the claimant's lumbar spine dated August 1, 2016 (Exhibit 27F, page 4). The report stated the claimant had normal vertebral body height,

alignment, and marrow signal.  The report stated the claimant's intervertebral disc heights were maintained, and she had minimal marginal osteophyte formation anteriorly at each level from L1-L2 through L5-S1.  The report indicated the claimant had no significant disc herniation or spinal canal narrowing at any level (Exhibit 27F, page 4).

The medical record shows that the claimant was involved in motor vehicle accidents on February 4, 2017 (Exhibit 33F) and on June 9, 2019 (Exhibit 42F, page 3).  A physical exam report dated July 2, 2019 indicated the claimant had normal motor strength, bulk, and tone in her bilateral arms and low back.  The exam report stated the claimant had normal gait and strength within normal limits (Exhibit 42F, pages 3-4).  An MRI report dated July 23, 2019 found no evidence of any osseous injury or ligamentous injury.  The spinal cord showed normal signal intensity and normal contour, and the MRI showed only mild canal narrowing at C2-C3 and C4-C5 due to degenerative disc disease (Exhibit 35F, pages 1-2).

Dr. Rush stated the claimant had the ability to understand and carry out simple instructions; however, as directives become more complex, she would have difficulty completing them.  He stated that the claimant's ability to get along with other people was impaired, due to her discomfort with being around more than a few people at a time.  Dr. Rush stated that when under stress, the claimant had interacting interpersonally, and the claimant typically managed stressors by using alcohol or drugs (Exhibit 5F, page 4).

The treatment note dated October 9, 2017 from Dr. Berkeley stated the claimant was diagnosed as having chronic PTSD and a bipolar affective disorder (Exhibit 47F, page 5).  Dr. Berkeley indicated the claimant was doing well at that time, and the claimant was alert and oriented to person, place, and time.  She indicated the claimant's mood was appropriate for the situation at that time, and her thought content was appropriate at that time, with no abnormal perceptions noted during the examination.  Dr. Berkeley indicated the claimant's memory was good, and her attention/concentration was clear.  Dr. Berkeley stated the claimant's judgement and insight was good and fair.  Dr. Berkeley prescribed Sertraline and Risperidone for treatment of the claimant's mental disorders (Exhibit 47F, pages 8-9).

The note dated May 23, 2019 from Dr. Laothavorn indicated the claimant was doing well with her medication, and her mood was better.  The note indicated the claimant was sleeping and eating well (Exhibit 34F, page 14).  A note dated June 12, 2019 from Ashunte Claybrooks, LPC stated the claimant's posture, behavior, mood, and affect were all within normal limits at that date.  The note stated the claimant's attention, concentration, ad thought content were all within normal limits, and the claimant's mood was appropriate for the situation at that time.  The note stated the claimant was alert and oriented to person, place, and time (Exhibit 34F, page 29).

The treatment note dated November 4, 2020 from Margaret Renfroe, Certified Peer Specialist, of St. Joseph's Mercy Care, stated the claimant was diagnosed as having a mild alcohol use disorder along with her bipolar disorder.  The note stated the claimant's cocaine dependence was in remission (Exhibit 56F, page 1); however, subsequent treatment notes indicated the claimant was later diagnosed as having a severe cocaine use disorder (Exhibits 56F, page 92 and 60F, page 3).  The treatment note dated November 13, 2020 from Dr. Gant stated the claimant denied having a depressed mood or anhedonia on that date (Exhibit 55F, page 3).  A note dated

November 17, 2021 indicated the claimant was diagnosed as having a moderate Percocet use disorder (Exhibit 60F, page 3). A note dated December 20, 2021 indicated the claimant denied any current or recent substance use, and the note indicated the claimant was stable on her medications at that time (Exhibit 60F, page 17).

After careful consideration of the evidence, the undersigned found the claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. The undersigned found the claimant's statements about the intensity, persistence, and limiting effects of her symptoms inconsistent, because the objective medical record shows the claimant was doing well when complaint with taking her medication and avoiding substance abuse. The examination reports from the above medical providers indicted the claimant was doing well both mentally and physically when complaint with treatment for her various impairments.

In reaching the claimant's residual functional capacity the undersigned has considered the opinion of all treating and examining physicians. Specifically, the undersigned has considered and given some weight to the mental impairment questionnaire at Exhibits 3F and 16F. This questionnaire appears to be completed by a Judil Quinn, although the handwriting is not clear. Also, this person does not appear to be a treating physician since the signature space for the doctor is left blank. The undersigned is not certain who this person is, consequently, the undersigned cannot give much weight to this opinion. The medical records that accompany this questionnaire appear to be completed by different providers, and they show ongoing cocaine and alcohol abuse.

The undersigned has also considered the opinion of Dr. David Rush as noted in his consultative evaluation report and has given this opinion more weight. Dr. Rush noted difficulty interacting with other and limited to performing simple instructions, which is consistent with the record and the opinion of Dr. Brewer-Kelly, who also noted difficulty with social interaction. Due to Dr. Rush's opinion the undersigned has limited the claimant to performing only simple tasks and only occasional interaction with co-workers and supervisors (Exhibits 5F, and 8F). The opinion of Dr. Brewer-Kelly is also awarded more weight as it is consistent with the claimant's treatment records in 2007, which shows no complaints of any physical impairment that would preclude work activity.

The opinion of Dr. Mark Williams, Ph.D., a non-examining medical consultant for the State Disability Determination Service has also been considered and given more weight as it is consistent with the medical evidence and the opinion of Dr. Rush in his consultative evaluation report (Exhibit 6F). Dr. Williams noted no more than moderate limitations due to her mental impairments and his opinion is consistent with the claimant's activities at the time. The claimant was able to drive, use public transportation, and perform all her daily living activities independently. She would experience difficulty in interacting with other; thus, a limitation for only occasional interaction has been noted in the established residual functional capacity. The opinion of Dr. John Hollender, Ph.D. at Exhibit 12F, is given less weight because the record shows mental health treatment, which supports the established limitations.

See Next Page

The opinions of Dr. Steven Sugg, a psychiatrist and Mr. Eugene Hertzer, LPC, are given limited weight because they only treated the claimant for the span of a year, during which the claimant did not present for her scheduled appointment on several occasions (Exhibit 14F). Additionally, Dr. Sugg assigned a Global Assessment of Functioning of 50%; however, a global assessment of functioning (GAF) is a medical opinion and must be considered with the rest of the relevant evidence; however, it is of limited use in assessing the severity of a mental impairment. GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot. They do not provide a reliable longitudinal picture of the claimant's mental functioning. Accordingly, the undersigned does not rely on GAF evidence as the primary support for findings of impairment severity or of mental limitations. The undersigned has considered; however, whether GAF scores are supported by other clinical findings and whether they are consistent with other evidence in the case record. In this case the GAF scores only shows the physician assessment during this short treating period and does not consider the longitudinal record. The undersigned also found Dr. Sugg's assessment inconsistent with the overall medical record discussed above in this decision, The medical record in this case did not support the severity of the claimant's bipolar disorder as alleged by Dr. Sugg. The record indicated the claimant did well when she was complaint with taking her medication and sustaining from substance use.

The undersigned gave less weight to the assessment of the State Agency medical consultant at the initial level, Ronald Rosen, M.D., because he found the claimant was limited to a light level residual functional capacity (Exhibit 18A, pages 7-9). The undersigned found the claimant could engage in up to medium level work based on the examination report of Dr. Brewer. Dr. Brewer stated the claimant had no cyanosis, clubbing, tenderness, edema, redness, or warmth in her extremities/joints. She stated the claimant's pulses were intact and the claimant was +2/4 in her bilateral extremities. Dr. Brewer stated the claimant had normal range of motion in all extremity joints, and the claimant could squat 100 percent and had no difficulty recovering (Exhibit 8F, page 3). Dr. Brewer stated the claimant was able to walk heel-to-toe, walk on her heels and walk on her toes. She stated the claimant had normal straight leg lifting, and normal gait and station. She stated the claimant had normal grasp/grip strength and had 5/5 bilateral muscle strength in all extremities (Exhibit 8F, page 4).

Dr. Brewer stated the claimant did not use an assistive device for ambulation at the time of her examination, and she stated the claimant had no functional limitations with hearing, communication skills, reaching, handling, fingering/feeling, prolonged sitting, gait/balance, climbing, bending, and stooping. Dr. Brewer stated the claimant had normal range of motion in her back, and she was nontender with normal alignment. She stated the claimant had normal gait/station and did not require use of an assistive device for ambulation (Exhibit 8F, page 4). The undersigned gave great weight to the assessment of Dr. Brewer in this case because her assessment is supported by the overall medical record in this case. The assessment of Dr. Brewer is also supported by the MRI report of the claimant's lumbar spine dated August 1, 2016 (Exhibit 27F, page 4). The report stated the claimant had normal vertebral body height, alignment, and marrow signal. The report stated the claimant's intervertebral disc heights were maintained, and she had minimal marginal osteophyte formation anteriorly at each level from

L1-L2 through L5-S1.  The report indicated the claimant had no significant disc herniation or spinal canal narrowing at any level (Exhibit 27F, page 4).

The opinions of Dr. Hector Manlapas and William Render non-examining medical consultants who completed a physical residual functional capacity form were given some weight (Exhibits 9F, and 11F).  Their opinions are consistent with the medical records for 2007, which shows no physical impairments that would limit the claimant's ability to work.  Based on the foregoing, the undersigned finds the claimant has the residual functional capacity stated above in Finding #5.

**6.    The claimant has no past relevant work experience (20 CFR 404.1565 and 416.965).**

**7.    The claimant was born on October 26, 1965 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).**

**8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).**

**9.    Transferability of job skills is not an issue because the claimant does not have past relevant work experience (20 CFR 404.1568 and 416.968).**

**10.   Considering the claimant's age, education, lack of past relevant work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.28 and Rule 203.21; however, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the

claimant's age, education, lack of past relevant work experience, and residual functional
capacity.  The vocational expert testified that given all of these factors the individual would be
able to perform the requirements of representative unskilled, medium level occupations such as
laundry worker (DOT #361.685-018)(svp-2) with 50,000 jobs in the national economy, floor
waxer (DOT #381.687-034)(svp-2) with 70,000 jobs in the national economy, and kitchen helper
(DOT #318.687-010)(svp-2) with 250,000 jobs in the national economy.  Pursuant to SSR 00-4p,
the undersigned has determined that the vocational expert's testimony is consistent with the
information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the
claimant's age, education, lack of past relevant work experience, and residual functional
capacity, the claimant is capable of making a successful adjustment to other work that exists in
significant numbers in the national economy.  A finding of "not disabled" is therefore
appropriate under the framework of the above-cited rules.

**11.  The claimant has not been under a disability, as defined in the Social Security Act,
from September 1, 2006, through the date of this decision (20 CFR 404.1520(g) and
416.920(g)).**

<u>**DECISION**</u>

Based on the application for a period of disability and disability insurance benefits protectively
filed on January 5, 2007, the claimant is not disabled under sections 216(i) and 223(d) of the
Social Security Act.

Based on the application for supplemental security income protectively filed on January 5, 2007,
the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.


/s/ *Carla  McMichael*
_____
Carla McMichael
Administrative Law Judge

May 18, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1A | Initial Disability Determination by State Agency, Title II | | 2007-07-11 | 1 |
| Y13 | 2A | Initial Disability Determination by State Agency, Title XVI | | 2007-07-11 | 1 |
| Y13 | 3A | Recon Disability Determination by State Agency, Title II | | 2008-03-20 | 1 |
| Y13 | 4A | Recon Disability Determination by State Agency, Title XVI | | 2008-03-20 | 1 |
| Y13 | 5A | ALJ Hearing Decision | | | 12 |
| Y13 | 6A | AC Order | | | 4 |
| T1I | 7A | ALJ Hearing Decision | | 2011-12-15 | 18 |
| T1I | 8A | AC Order | | 2013-08-16 | 5 |
| Y13 | 9A | Complaint | | | 42 |
| Y13 | 10A | Decision of U.S. District Court | | 2018-03-22 | 17 |
| Y13 | 11A | Decision of U.S. District Court | | 2018-03-23 | 1 |
| Y13 | 12A | EAJA Award | | 2018-07-18 | 2 |
| Y13 | 13A | AC Order | | 2018-08-16 | 7 |
| Y13 | 16A | ALJ Hearing Decision | | 2020-02-20 | 23 |
| Y13 | 17A | AC Order | | 2021-02-11 | 6 |
| Y13 | 14A | ALJ Hearing Decision | | 2014-10-24 | 6 |
| Y13 | 15A | AC Denial | | 2016-05-25 | 6 |
| Y13 | 18A | Disability Determination Explanation: DDE T16: PRFC signd by dds dr; prtf compltd | | 2018-12-13 | 10 |
| Y13 | 19A | Disability Determination Transmittal | | 2018-12-13 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1B | Appointment of Representative | | 2007-06-06 | 1 |
| Y13 | 2B | SSI Notice of Disapproval | | 2007-07-11 | 4 |
| Y13 | 3B | Social Security Notice of Disapproval | | 2007-07-11 | 4 |
| Y13 | 4B | Appointment of Representative | | 2007-08-29 | 1 |
| Y13 | 5B | Representative Fee Agreement | | 2007-08-29 | 1 |
| Y13 | 6B | Request for Reconsideration | | 2007-09-05 | 1 |
| Y13 | 7B | Social Security Notice of Recon | | 2008-03-20 | 4 |
| Y13 | 8B | SSI Notice of Recon | | 2008-03-20 | 3 |
| Y13 | 9B | Request for Hearing by ALJ | | 2008-04-08 | 1 |
| Y13 | 10B | Request for Hearing Acknowledgement Letter | | 2008-04-30 | 13 |
| Y13 | 11B | Notice of Representation | | 2008-05-08 | 1 |
| Y13 | 12B | Hearing Notice | | 2009-05-22 | 21 |
| Y13 | 13B | Appointment of Representative | | 2009-07-27 | 1 |
| Y13 | 14B | Representative Fee Agreement | | 2009-07-28 | 1 |
| Y13 | 15B | Request for Review of Hearing Decision/Order | | 2009-12-23 | 7 |
| Y13 | 16B | Representative Fee Agreement | | | 1 |
| Y13 | 17B | Appointment of Representative | | | 1 |
| Y13 | 18B | Hearing Notice | | 2011-03-29 | 24 |
| Y13 | 19B | Hearing Notice | | 2011-04-14 | 2 |
| Y13 | 20B | Notice Of Hearing Reminder | | 2011-05-12 | 4 |
| T1I | 21B | Hearing Notice | | 2011-05-25 | 4 |
| T1I | 22B | AC Correspondence | | 2012-06-06 | 10 |
| T1I | 23B | Request for Hearing Acknowledgement Letter | | 2013-08-22 | 9 |
| Y22 | 24B | Transfer Request for Hearing | | 2013-10-21 | 6 |

| | | | | | |
|---|---|---|---|---|---|
| Y22 | 25B | Hearing Notice | | 2014-06-10 | 27 |
| Y22 | 26B | Resume of Vocational Expert | | | 2 |
| Y22 | 27B | Notice Of Hearing Reminder | | 2014-09-16 | 6 |
| Y22 | 28B | Appointment of Representative: Kathleen Flynn & Sydney Jakes | | 2014-09-30 | 1 |
| Y22 | 29B | Representative Fee Agreement: Kathleen Flynn & Sydney Jakes | | 2014-09-30 | 1 |
| Y13 | 30B | Request for Hearing Acknowledgement Letter | | 2018-10-15 | 14 |
| Y13 | 31B | Objection to Video Hearing | | 2018-10-19 | 1 |
| Y13 | 32B | Objection to Video Hearing | | 2018-10-19 | 1 |
| T2L | 33B | Hearing Notice | | 2019-08-01 | 29 |
| Y13 | 35B | Acknowledge Notice of Hearing | | 2019-09-12 | 2 |
| Y13 | 36B | Notice Of Hearing Reminder | | 2019-10-17 | 6 |
| Y13 | 34B | Withdrawal/Revocation of Representation | | 2019-09-13 | 1 |
| Y13 | 37B | Withdrawal/Revocation of Representation | During hearing | 2019-10-31 | 2 |
| Y13 | 38B | Appointment of Representative | | 2019-10-24 | 1 |
| Y13 | 39B | Representative Fee Agreement | | 2019-10-31 | 1 |
| Y13 | 40B | Objection to Video Hearing | | 2021-03-29 | 1 |
| Y13 | 41B | COVID Hearing Agreement Form-phone accepted | | 2021-03-29 | 2 |
| Y13 | 42B | Hearing Notice | | 2021-08-25 | 25 |
| Y13 | 43B | Claimant's Change of Address Notification | | 2021-09-01 | 1 |
| Y13 | 44B | Acknowledge Notice of Hearing | | 2021-09-10 | 2 |
| Y13 | 45B | Notice Of Hearing Reminder | | 2021-11-02 | 6 |
| Y13 | 46B | Hearing Notice | | 2021-12-14 | 25 |

| Y13 | 47B | Notice Of Hearing Reminder | | 2022-02-17 | 6 |
| Y13 | 48B | SSA-1696 - Claimant's Appointment of a Representative | | 2022-01-10 | 4 |
| Y13 | 49B | Fee Agreement for Representation before SSA | | 2022-01-10 | 1 |
| Y13 | 50B | Hearing Notice | | 2022-03-24 | 27 |
| Y13 | 51B | Hearing Notice | | 2022-03-24 | 27 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1D | Application for Supplemental Security Income Benefits | | 2007-01-21 | 3 |
| Y13 | 2D | Application for Disability Insurance Benefits | | 2007-07-12 | 2 |
| Y13 | 3D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 5 |
| Y13 | 4D | DISCO DIB Insured Status Report | | | 2 |
| Y13 | 5D | Detailed Earnings Query | | | 8 |
| Y13 | 6D | Summary Earnings Query | | | 1 |
| Y13 | 7D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 1 |
| Y13 | 8D | WHAT - Work History Assistant Tool | | 2019-10-09 | 2 |
| Y13 | 9D | Summary Earnings Query | | 2019-10-30 | 1 |
| Y13 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2019-10-30 | 1 |
| Y13 | 11D | Detailed Earnings Query | | 2019-10-30 | 2 |
| Y13 | 12D | WHAT - Work History Assistant Tool | | 2021-07-29 | 12 |
| Y13 | 13D | Detailed Earnings Query | | 2021-07-29 | 8 |
| Y13 | 14D | Summary Earnings Query | | 2021-07-29 | 1 |

| Y13 | 15D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021-07-29 | 1 |
|---|---|---|---|---|
| Y13 | 16D | Certified Earnings Records | 2021-07-30 | 3 |
| Y13 | 17D | Summary Earnings Query | 2022-03-15 | 1 |
| Y13 | 18D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-03-15 | 1 |
| Y13 | 19D | Detailed Earnings Query | 2022-03-15 | 9 |
| Y13 | 20D | WHAT - Work History Assistant Tool | 2022-03-17 | 1 |
| Y13 | 21D | Certified Earnings Records | 2022-03-17 | 3 |

### Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 1E | Disability Report - Field Office | | | to 2007-02-09 | 3 |
| Y13 | 2E | Disability Report - Adult | | | to 2007-02-09 | 8 |
| Y13 | 3E | Work History Report | | | to 2007-02-09 | 8 |
| Y13 | 4E | 3rd Party Function Report - Adult | | Vera Hayes | to 2007-02-28 | 22 |
| Y13 | 5E | Function Report - Adult | | Jackson, Deborah Lavon | to 2007-03-08 | 8 |
| Y13 | 6E | Claimant Correspondence | | Jackson, Deborah Lavon | to 2007-04-06 | 9 |
| Y13 | 7E | Disability Report - Field Office | | | to 2007-09-12 | 3 |
| Y13 | 8E | Disability Report - Appeals | | | to 2007-09-12 | 7 |
| Y13 | 9E | Disability Report - Field Office | | | to 2008-04-29 | 3 |
| Y13 | 10E | Disability Report - Appeals | | | to 2008-04-29 | 7 |
| Y13 | 11E | Attorney/Representative -Supplied Evidence | | | | 2 |
| Y13 | 12E | Claimant Correspondence | | | | 1 |

| | | | | | |
|---|---|---|---|---|---|
| T1I | 13E | Representative Brief | Kathleen M. Flynn | to 2012-02-10 | 9 |
| Y22 | 14E | Post Office Returned Mail | | to 2013-08-22 | 3 |
| Y22 | 15E | Representative Correspondence | | 2014-09-08 to 2014-09-08 | 1 |
| Y22 | 16E | Post Office Returned Mail | Notice Of Order Of Appeals Council | 2013-12-06 to 2013-12-06 | 5 |
| LEW | 17E | Representative Brief | | 2014-12-16 to | 6 |
| T2L | 18E | Exhibit List to Rep PH2E | Oho | to 2019-02-25 | 11 |
| T2L | 19E | Work Background | Jackson, Deborah Lavon | to 2019-04-17 | 4 |
| T2L | 20E | Recent Medical Treatment | Jackson, Deborah Lavon | to 2019-04-17 | 2 |
| T2L | 21E | Medications | Jackson, Deborah Lavon | to 2019-04-17 | 2 |
| T2L | 22E | Representative Correspondence | Rep Flynn | to 2019-10-16 | 3 |
| Y13 | 23E | Resume of Vocational Expert | A. Billehus | | 4 |
| Y13 | 24E | Exhibit List to Rep PH2E | Y13 | to 2021-07-30 | 11 |
| Y13 | 25E | Misc Disability Development and Documentation | Kathleen Flynn | to 2021-10-29 | 2 |
| Y13 | 26E | Resume of Vocational Expert | G. Mark Leaptrot | to 2021-11-03 | 2 |
| Y13 | 27E | Misc Disability Development and Documentation | | 2021-11-23 to | 2 |
| Y13 | 28E | Misc Disability Development and Documentation | | 2021-11-24 to | 1 |
| Y13 | 29E | Representative Correspondence | | 2021-11-29 to | 2 |
| Y13 | 30E | Representative Correspondence | | 2021-11-29 to | 2 |

| Y13 | 31E | Representative Correspondence | | | 2022-02-09 to | 1 |
|-----|-----|------------------------------|--|--|-----------|---|
| Y13 | 32E | Misc Disability Development and Documentation | | | 2022-02-09 to | 2 |
| Y13 | 33E | Misc Disability Development and Documentation | | | 2022-02-10 to | 2 |
| Y13 | 34E | Resume of Vocational Expert | | Julie S. Mckeown Ms | 2022-02-15 to | 3 |
| Y13 | 35E | Representative Correspondence | | | 2022-03-17 to | 1 |

## **Medical Records**

| Component | No. | Description | Received | Source | Dates | Pages |
|-----------|-----|-------------|----------|--------|-------|-------|
| Y13 | 1F | Physician Progress Note | | Horace R White Md | 2004-01-24 to 2004-01-29 | 4 |
| Y13 | 2F | Outpatient Medical Records covering period | | Cobb CO Community Services Board Outpatient Mhc | 2003-10-29 to 2004-02-17 | 15 |
| Y13 | 3F | Work History Report | | Jackson, Deborah Lavon | to 2006-10-24 | 26 |
| Y13 | 4F | Substance Abuse Evaluation | | Clayton Community Service Board Mhc | to 2006-10-24 | 20 |
| Y13 | 5F | Consultative Examination Report | | David Rush PhD | to 2007-05-02 | 4 |
| Y13 | 6F | Psychiatric Review Technique | | Mark A. Williams, PhD | to 2007-05-22 | 14 |
| Y13 | 7F | Mental RFC Assessment | | Mark A. Williams, PhD | to 2007-05-22 | 4 |
| Y13 | 8F | Consultative Examination Report | | Debbie R Brewer Kelly Md | to 2007-06-12 | 12 |
| Y13 | 9F | Physical RFC Assessment | | Hector Manlapas | to 2007-07-09 | 8 |
| Y13 | 10F | Outpatient Record Covering the Period | | Grady Memorial Hospital | 2007-05-30 to 2007-12-27 | 45 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | 11F | Physical RFC Assessment | William Render | to 2008-03-20 | 8 |
| Y13 | 12F | Psychiatric Review Technique | John Hollender, PhD | to 2008-03-20 | 14 |
| Y13 | 13F | Emergency Room Record | Grady | 2007-05-30 to 2008-05-09 | 18 |
| Y13 | 14F | Outpatient Record Covering the Period | | 2007-07-19 to 2008-07-16 | 128 |
| Y13 | 15F | Emergency/Outpatient Record | Grady | 2009-03-16 to 2009-05-06 | 14 |
| Y13 | 16F | Impairment Questionnaire | Mental Impartment Questionnaire | 2007-02-19 to 2007-02-19 | 4 |
| T1I | 17F | Prison Records | Pulaski State Prison | 2010-08-03 to 2011-03-14 | 23 |
| Y22 | 18F | Office Treatment Records | Dekalb County Jail | 2009-03-17 to 2010-07-10 | 39 |
| Y22 | 19F | Hospital Records | Grady Hospital | 2009-06-23 to 2011-11-02 | 18 |
| Y22 | 20F | Office Treatment Records | Georgia Dept Of Corrections | 2005-09-25 to 2010-09-20 | 203 |
| Y22 | 21F | Progress Notes | Cobb Community Service Board | 2003-10-29 to 2004-02-17 | 8 |
| Y22 | 22F | Emergency Department Records | Northside Behavioral Health | 2009-07-06 to 2011-11-01 | 68 |
| Y22 | 23F | Medical Source - No MER Available | Clayton Center Community Service Board | | 2 |
| Y22 | 24F | Office Treatment Records | Emanuel Womens Facility | 2013-03-06 to 2014-07-08 | 56 |
| Y22 | 25F | Office Treatment Records | Emanuel Womens Facility | 2013-04-09 to 2014-06-02 | 6 |

| LEW | 26F | Attorney/Representative -Supplied Evidence | Dept Of Corrections | 2005-09-26 to 2006-10-30 | 110 |
|-----|-----|-----|-----|-----|-----|
| Y13 | 27F | Outpatient Medical Records covering period | Northside Hospital | 2007-06-20 to 2016-08-01 | 266 |
| Y13 | 28F | Emergency/Outpatient Record | Grady Memorial Hospital | 2011-10-07 to 2017-05-07 | 41 |
| Y13 | 29F | Outpatient Medical Records covering period | Wellstar Atlanta Medical Center | 2009-06-12 to 2017-09-05 | 54 |
| Y13 | 30F | Outpatient Medical Records covering period | St. Josephs Mercy Care | 2015-11-17 to 2018-07-11 | 244 |
| Y13 | 31F | Outpatient Medical Records covering period | Grady Hospital | 2011-11-02 to 2018-07-18 | 149 |
| Y13 | 32F | Hospital Records | St. Josephs Mercy Care | 2018-11-13 to 2019-04-25 | 136 |
| T2L | 33F | Office Treatment Records | Allspine Surgery Center | 2015-01-01 to 2018-06-27 | 48 |
| T2L | 34F | Progress Notes | St. Josephs Mercy Care | 2019-04-25 to 2019-06-12 | 29 |
| Y13 | 35F | Radiology Report | Outpatient Imaging | 2019-07-23 to 2019-07-24 | 4 |
| Y13 | 36F | Medical Source - No MER Available | Cobb Douglas Csb | 2004-02-18 to 2019-08-22 | 2 |
| T2L | 37F | Progress Notes | Grady Memorial Hospital | 2017-05-06 to 2019-08-26 | 130 |
| T2L | 38F | Medical Source - No MER Available | Allspine Surgery Center No Records Found | 2018-06-28 to 2019-08-22 | 2 |
| T2L | 39F | Medical Source - No MER Available | St Josephs Mercy Care | to 2019-09-13 | 4 |

| T2L | 40F | Hospital Records | | Wellstar Atlanta Medical Center | 2017-09-07 to 2018-02-08 | 22 |
|-----|-----|------------------|--|------------------|------------------------|----|
| T2L | 41F | Medical Source - No MER Available | | Clayton Center Community Service Board | to 2019-10-17 | 3 |
| Y13 | 42F | Office Treatment Records | During hearing | Georgia Interventional Medicine | 2019-06-24 to 2019-10-29 | 31 |
| Y13 | 50F | Progress Notes | | Hope Neurological % Medical Services | 2019-11-08 to 2019-12-12 | 24 |
| Y13 | 51F | Progress Notes | | Grady Memorial Hosptal | 2019-12-18 to 2020-01-22 | 11 |
| Y13 | 52F | Emergency Department Records | | Fulton County Jail Complex, Ga | 2017-12-19 to 2020-02-13 | 74 |
| Y13 | 53F | Progress Notes | | Grady Memorial Hosptal | 2020-01-22 to 2020-06-25 | 49 |
| Y13 | 54F | Progress Notes | | Grady Memorial Hosptal | 2020-03-20 to 2020-10-29 | 91 |
| Y13 | 55F | Progress Notes | | Grady Memorial Hosptal | to 2020-11-13 | 11 |
| Y13 | 56F | Office Treatment Records | | St Joseph's Mercy Care | 2020-11-04 to 2021-06-21 | 119 |
| Y13 | 57F | Progress Notes | | Grady Memorial Hosptal | 2020-08-13 to 2021-06-22 | 86 |
| Y13 | 43F | Progress notes covering the period | | Mercy Care At City Of Refuge | 2015-11-16 to 2017-01-11 | 196 |
| Y13 | 44F | Hospital Records for admission through discharge | | Grady Memorial Hospital | 2015-11-12 to 2017-02-28 | 251 |
| Y13 | 45F | Progress notes covering the period | | St Josephs Mercy Care Services | 2017-01-12 to 2017-05-22 | 83 |

| Y13 | 46F | Hospital Records for admission through discharge | Grady Memorial Hospital | 2017-02-28 to 2017-05-31 | 106 |
| Y13 | 47F | Progress notes covering the period | St Josephs Mercy Care Services | 2017-10-09 to 2018-07-11 | 53 |
| Y13 | 48F | HIT MER | Ochin, Inc. | 2016-07-12 to 2018-07-18 | 129 |
| Y13 | 49F | Hospital Records for admission through discharge | Grady Memorial Hospital | 2017-10-03 to 2018-10-29 | 238 |
| Y13 | 58F | Progress notes covering the period | St Josephs Mercy Care | 2021-08-24 to 2021-10-25 | 69 |
| Y13 | 59F | Progress Notes | Grady Memorial Hospital | to 2021-10-25 | 9 |
| Y13 | 60F | Medical Records covering the period | St Josephs Mercy Care | 2021-11-17 to 2021-12-20 | 38 |
| Y13 | 61F | Hospital Records | Grady Memorial Hospital | 2021-11-01 to 2021-12-30 | 26 |