# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
10155 Eagle Drive
Covington, GA 30014-3804

Date: April 29, 2022

Virgil Lee Pettway
597 Woodbridge Court
Stone Mountain, GA 30088-1734

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Virgil Lee Pettway (BNC#: 21OC735A23679)                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Virgil Lee Pettway (BNC#: 21OC735A23679)                    Page 3 of 3

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security.  You may also call (800) 772-1213 with questions.  If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office.  Please have this notice and decision with you.  The telephone number of the local office that serves your area is (877) 626-9909.  Its address is:

> Social Security
> 3554 Covington Highway
> Decatur, GA 30032-9803

> Kristen Glover
> Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

**IN THE CASE OF**                               **CLAIM FOR**

Virgil Lee Pettway                               Supplemental Security Income
(Claimant)

_____                 _____
(Wage Earner)                                    (Social Security Number)

**JURISDICTION AND PROCEDURAL HISTORY**

On February 19, 2020, the claimant filed an application for supplemental security income, alleging disability beginning June 1, 2008. The claim was denied initially on April 2, 2021, and upon reconsideration on September 13, 2021. Thereafter, the claimant filed a written request for hearing received on October 11, 2021 (20 CFR 416.1429 *et seq.*). On March 29, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing (Exhibit B16B) and confirmed such agreement at the start of the hearing. The claimant is represented by Kathleen Flynn, an attorney. Ms. Flynn's associate, Brynne Holt, appeared at the hearing. Mary Cornelius, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about additional written evidence less than five business days before the scheduled hearing date. The undersigned Administrative Law Judge finds that the requirements of 20 CFR416.1435(a) are satisfied and admits this evidence into the record.

**ISSUES**

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since February 19, 2020, the date the application was filed.

See Next Page

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

See Next Page

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since February 19, 2020, the application date (20 CFR 416.971 *et seq*.).**

The claimant worked after the application date, but this work activity did not rise to the level of substantial gainful activity.  Records reflect earnings of $180.00 in the first quarter of 2021 (Exhibits D2D, D3D, D4D, D5D, D6D, D6D, D7D, D8D, D9D).

**2.   The claimant has the following severe impairments:  degenerative joint disease of the lumbar spine; congestive heart failure; asthma; and schizoaffective disorder (20 CFR 416.920(c)).**

The medical evidence of record reflects that the claimant has degenerative joint disease of the lumbar spine (Exhibits D11F, D12F, D13F, D16F, D19F, D20F, D22F, D25F, D28F, D30F, D33F).

On May 22, 2020, examination of the claimant's lumbar spine revealed tenderness to palpation of the bilateral facet joints, pain with extension, lateral flexion, and facet loading, decreased right quadricep strength, and diminished sensation in the anterior leg (Exhibits D11F, D16F).  Straight leg raising was positive at 45 degrees bilaterally, and the claimant's gait was antalgic, with forward leaning posture.  The next month, on June 16, 2020, an MRI of the claimant's lumbar

spine showed multilevel degenerative disc disease, with disc bulging from the L2-L3 to L5-S1 levels (Exhibits D16F, D20F).  There was foraminal stenosis, with annular fissure, contacting the L4 nerve root, at the L4-L5 level.

Tiffany Lee, M.D., conducted a consultative psychological examination on July 13, 2020 (Exhibit D12F).  On that occasion, the claimant reported low back pain, which radiated to her legs, right greater than left.  Examination of her back revealed decreased range of movement of the dorsolumbar spine, with tenderness to palpation of the thoracic and lumbar paraspinal muscles.  Straight leg raising was positive in the claimant's right lower extremity.  Her gait was characterized by a limp, and she was unable to squat to the floor.  Dr. Lee's assessment included lumbago, with sciatica.  Later that month, on July 30, 2020, x-rays of the claimant's lumbar spine showed mild multilevel degenerative changes (Exhibits D12F, D13F).

On October 19, 2020, examination of the claimant's lumbar spine was positive for tenderness to palpation of the bilateral facet joints, tenderness in the left paraspinous muscles, and pain with extension, lateral flexion, and facet loading (Exhibit D20F).  On August 10, 2021 (Exhibit D25F), November 1, 2021 (Exhibit D28F), and December 6, 2021, inspections of her lumbar spine showed tenderness to palpation of the bilateral facet joints and pain with extension and lateral flexion.  Straight leg raising was positive at 30 degrees bilaterally on each occasion.

On January 12, 2022, examination of the claimant's lumbar spine revealed tenderness in the paraspinous muscles bilaterally, pain with extension and lateral flexion, diminished motor strength, and positive straight leg raising (Exhibit D30F).  Her gait was antalgic.

Pain management services have been provided (Exhibits D11F, D16F, D19F, D20F, D25F, D28F, D30F).  Medications, including Cyclobenzaprine, Norco, Acetaminophen-Codeine, Hydrocodone-Acetaminophen, Ibuprofen, Gabapentin, Amitriptyline, and Lidoderm patch, and have been prescribed for her chronic back pain (Exhibits D10F, D11F, D15F, D16F, D18F, D19F, D20F, D22F, D25F, D28F, D30F).  In addition, bilateral L4-L5 transforaminal epidural steroid injections were administered on July 31, 2020 (Exhibit D16F), and September 21, 2020, a diagnostic left medial branch block, at the L3-L4, L4-L5, and L5-S1 levels, was completed on November 20, 2020 (Exhibits D19F, D20F), left L3-L4, L4-L5, and L5-S1 medial branch blocks were administered on February 8, 2021 (Exhibits D19F, D20F), and left L3-L4, L4-L5, and L5-S1 radiofrequency ablation was completed on September 30, 2021 (Exhibit D25F).  Physical therapy was provided prior to the period at issue (Exhibits D21F, D23F).

Records further reveal that the claimant has a history of congestive heart failure (Exhibit D7F, D8F, D12F).

The evidence also indicates that the claimant has asthma, for which Albuterol Sulfate, via nebulizer, Flovent HFA, and Ventolin HFA, have been prescribed (Exhibits D18F, D22F).

In addition, the claimant has been diagnosed with bipolar affective disorder and schizoaffective disorder, bipolar type (Exhibit B26F).  Medications, including Lamotrigine, Sertraline, Trazodone, Amitriptyline, Aripiprazole, Olanzapine, and Bupropion, have been prescribed, and individual therapy has been provided.

The claimant has reported depression, passive suicidal ideation, anxiety, irritability, agitation, anger, impaired sleep, and auditory and visual hallucinations (Exhibit B26F).  On mental status examinations, the claimant's mood and affect were depressed, sad, and tearful, and her cognition was impaired.  She endorsed passive suicidal ideation, hallucinations, and paranoia, and thought blocking was present.

The above medically determinable impairments significantly limit the claimant's ability to perform basic work activities as required by Social Security Ruling 85-28.

In addition to the foregoing impairments, which are severe, the claimant has the following impairments, which are non-severe:  hypertension (Exhibits D7F, D8F, D15F, D18F, D21F, D23F, D24F, D33F), uterine fibroids, status post ablation and hysterectomy (Exhibits D18F, D21F, D23F), gastroesophageal reflux disease ("GERD") (Exhibits D10F, D15F, D22F, D23F, D24F), obesity (Exhibits D7F, D8F, D10F, D11F, D15F, D16F, D18F, D19F, D20F, D21F, D22F, D23F, D25F, D30F, D33F), and dyslipidemia (Exhibit D24F).  These impairments are non-severe, as they result in no more than minimal functional limitations and/or do not meet the 12-month durational requirement of the Act.  The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

None of the claimant's physical impairments has the same attendant findings as any impairment contained in Appendix 1.  Specific consideration was given to listings 1.15, disorders of the skeletal spine, resulting in compromise of a nerve root, 3.03, asthma, and 4.02, chronic heart failure.

The severity of the claimant's mental impairment does not meet or medically equal the criteria of listings 12.03 and 12.04.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a moderate limitation.  On September 18, 2019, November 12, 2019, December 12, 2019, February 5, 2020, and April 13, 2020, the claimant could recall two out of three words (Exhibit D26F).  On August 5, 2020, the date of the consultative psychological examination, the claimant provided personal information (Exhibit D14F).  Her immediate and short-term memory were within normal limits, but she recalled zero of three items after some delay.  On October 22, 2020, November 30, 2020, and January 29, 2021, the claimant could recall two out of three words (Exhibit D26F).  Her memory was intact on March 25, 2021 (Exhibit D26F), and April 14, 2021, and her recent and

remote memories were normal on August 9, 2021 (Exhibit D24F).  She recalled two out of three words on August 12, 2021, and September 10, 2021 (Exhibit D26F).

In interacting with others, the claimant has a moderate limitation.  On July 6, 2021, she reported that she had had a wonderful weekend with her children and grandchildren (Exhibit D26F).  The claimant was alert and oriented, with good eye contact and productive and coherent speech, on August 5, 2020, the date of the consultative psychological examination (Exhibit D14F).  Rapport was established and maintained.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  On August 5, 2020, the claimant presented with adequate ability to focus throughout the consultative psychological examination (Exhibit D14F).

As for adapting or managing oneself, the claimant has experienced a moderate limitation.  On July 13, 2020, the claimant reported that she was able to dress, feed, and perform laundry independently (Exhibit D12F).  The claimant, who lived in a home with her nine-year-old granddaughter, had a driver's license and drove as needed as of August 5, 2020, the date of the consultative psychological examination (Exhibit D14F).  The examiner commented that she appeared to have no difficulty taking care of her personal hygiene needs.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except that she can never climb ladders, ropes, or scaffolds.  She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  She can have no more than frequent exposure to dust, fumes, gases, and other pulmonary irritants, vibration, and workplace hazards, such as moving machinery and unprotected heights.  Similarly, she can have no more than frequent exposure to extreme hot and cold temperatures.  The claimant is limited to simple and routine tasks, occasional interaction with the public, and gradual and infrequent workplace changes.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The

undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

At the hearing, the claimant testified that she has difficulty walking and falls often because of back pain, which goes down her legs, and leg weakness. She denied sustained improvement of her symptoms from injections. She alleged that her medications make her sleepy. The claimant further testified that she has an irregular heartbeat and shortness of breath.

The claimant estimated that she could lift 10 pounds and walk for five to 10 minutes. She said that she could not squat. According to the claimant, she spent most of her time laying down.

In addition, the claimant testified that she has depression, with impaired memory, concentration, and focus. Her ability to get along with others, she said, is fair. She reported that she has hallucinations.

The claimant described that she could come out of her room and sit in the living room, around others, on good days. On bad days, however, she did not leave her room because she wanted to hurt other people or herself.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

At the outset, the undersigned notes that all of the evidence found in Exhibits D1F, D2F, D3F, D4F, D5F, D6F, D7F, D8F, D9F, D17F, and D29F and a portion of the evidence found in Exhibits D21F, D23F, and D26F reflects treatment rendered prior to February 19, 2020, the date the claimant's application was protectively filed.

In terms of the claimant's alleged back pain, the severity of symptoms and degree of limitation reported are unsupported by objective findings.  On July 13, 2020, for example, the date of the consultative medical examination, inspection of her back revealed decreased range of movement of the dorsolumbar spine, with tenderness to palpation of the thoracic and lumbar paraspinal muscles (Exhibit D12F).  Straight leg raising, though positive in her right lower extremity, was normal in the left lower extremity, and strength, while decreased, at four out of five, in the claimant's right upper extremity, was otherwise full, at five out of five, throughout.  Sensation, cranial nerves II through XII, and cerebellar function were intact, and Romberg was negative. The claimant was unable to squat to the floor but could stand on her toes and heels.  She could climb on the examining table, rise from a chair, and go from a standing position to a sitting position without assistance.  Although she had a limp while ambulating, her gait was steady, and no assistive device was required for stability.

Later that month, on July 30, 2020, x-rays of the claimant's lumbar spine showed only "mild" multilevel degenerative changes (Exhibits D12F, D13F).

On October 19, 2020, examination of the claimant's lumbar spine was positive for tenderness to palpation of the bilateral facet joints, tenderness in the left paraspinous muscles, and pain with extension, lateral flexion, and facet loading (Exhibit D20F).  However, motor strength, sensation, and the claimant's gait were normal, and straight leg raising was negative bilaterally.

On August 10, 2021 (Exhibit D25F), November 1, 2021 (Exhibit D28F), and December 6, 2021, inspections of the claimant's lumbar spine showed tenderness to palpation of the bilateral facet joints and pain with extension and lateral flexion.  Straight leg raising was positive at 30 degrees bilaterally on each occasion. However, motor strength was full and sensory examination was normal.  No narcotic pain medication was prescribed on the former occasion, as the claimant had last filled the prescription in December 2020 (Exhibit D25F).  On November 1, 2021, the claimant reported 80 percent relief, with functional improvement, following left radiofrequency ablation (Exhibit D28F).

More recently, on February 5, 2022, musculoskeletal examination showed normal ranges of motion and neurological examination showed intact cranial nerves, no focal deficits, and no sensory abnormalities (Exhibit D33F).

With regard to the claimant's alleged congestive heart failure, on December 6, 2019, an echocardiogram showed only grade I diastolic dysfunction and normal left ventricular systolic function, with an estimated left ventricular ejection fraction of 60 to 65 percent (Exhibits D7F, D8F).  Later that month, on December 30, 2019, exercise tolerance testing was normal.  On July 30, 2020, x-rays of the claimant's chest were normal (Exhibits D12F, D13F), and on October 27, 2020, x-rays of her chest showed no acute cardiopulmonary process (Exhibits D21F, D23F).  On the latter occasion, an electrocardiogram showed normal sinus rhythm (Exhibits D21F, D23F).

Cardiovascular examinations were normal on March 16, 2020 (Exhibits D10F, D18F, D22F), July 13, 2020 (Exhibit D12F), August 4, 2020 (Exhibits D15F, D18F, D22F), February 8, 2021 (Exhibit D19F), August 9, 2021 (Exhibit D24F), January 12, 2022 (Exhibit D30F), and February 5, 2022 (Exhibit D33F).

In terms of the claimant's asthma, which was frequently described as "stable" and "well controlled" on a low dose inhaled corticosteroid (Exhibits D18F, D22F, D23F), respiratory examinations were normal on March 16, 2020 (Exhibits D10F, D18F, D22F), July 13, 2020 (Exhibit D12F), August 4, 2020 (Exhibits D15F, D18F, D22F), February 8, 2021 (Exhibit D19F), August 9, 2021 (Exhibit D24F), January 12, 2022 (Exhibit D30F), and February 5, 2022 (Exhibit D33F). X-rays of the claimant's chest were normal on July 30, 2020 (Exhibits D12F, D13F), and showed no acute cardiopulmonary process on October 27, 2020 (Exhibits D21F, D23F).

With regard to the claimant's alleged mental impairments, the severity of symptoms and degree of limitation reported are unsupported. On July 18, 2019, for example, her mood and affect were depressed, and she endorsed passive suicidal ideation and auditory and visual hallucinations (Exhibit D26F). However, the claimant was alert, oriented, calm, and cooperative, with good eye contact, normal speech, logical and goal directed thought processes, and intact cognition, insight, and judgment.

On September 18, 2019, November 12, 2019, December 12, 2019, and February 5, 2020, the claimant's mood and affect were depressed, her cognition was impaired, and she endorsed passive suicidal ideation and auditory and visual hallucinations. Mental status examinations, though, were otherwise normal. Specifically, the claimant was alert, oriented, calm, and cooperative, with good eye contact, normal speech, logical and goal directed thought processes, and intact insight and judgment.

The claimant was alert and oriented, with normal mood and affect, on March 16, 2020 (Exhibits D10F, D18F, D22F). On July 13, 2020, the date of the consultative medical examination, she was alert and oriented, with appropriate mood and affect and no evidence of problems with her memory (Exhibit D12F). She did not appear depressed or anxious. The next day, on July 14, 2020, the claimant's mood was euthymic, her attitude was cooperative, her psychomotor activity was calm, her eye contact was good, and her speech fluent and non-pressured (Exhibit D26F).

On mental status examination on August 5, 2020, the date of the consultative psychological examination, the claimant was alert and oriented, with a euthymic mood, normal affect, good eye contact, productive and coherent speech, average insight and judgment, adequate focus, and intact immediate and short-term memory (Exhibit D14F). She denied homicidal and suicidal thoughts, as well as psychosis, and demonstrated no signs of hallucinations or delusions.

According to Scott Duncan, Psy.D., the consultative psychological examiner, the claimant "presented with no obvious signs of any mental health issues and appeared to be attempting to malinger mental health issues." In his summary, he wrote, "She displayed and reported no symptoms consistent with any mental health diagnosis. She attempted to malinger poor memory and psychosis and a form diagnosis of such was given… She presents as a friendly individual. Psychologically and intellectually, she does not appear limited by any significant psychological or cognitive symptoms. She understands the basic rules of social convention. Her ability to take and follow instructions in a typical workplace would be unimpaired, based on her presentation. Her capacity to respond adequately to appropriate criticism in a typical workplace is judged to be

unimpaired.  During the evaluation period, her concentration was unimpaired.  Her ability to concentrate over the extent of a typical workday is considered to be unimpaired.  Her ability to remain attentive to a routine and regular task over the span of a typical workday is considered to be unimpaired.  Her ability to make simple, work-related, rational decisions that could affect her safety and the safety of others is considered to be unimpaired.  The claimant's ability to communicate in an understandable manner and to understand what is being said is considered to be unimpaired.  Her ability to be able to maintain regular attendance is considered to be unimpaired.  Her ability to work near and cooperatively with others is considered to be unimpaired.  She could handle her funds; she does so now."

The claimant was alert and oriented, with normal mood and affect, on March 19, 2021 (Exhibit D22F).  Mental status examinations were normal on March 25, 2021, and April 14, 2021 (Exhibit D26F).  Specifically, the claimant's behavior was cooperative and calm, her speech was normal, her mood was euthymic, her affect was pleasant and mood congruent, and her memory, insight, judgment, and thought processes were intact.

On May 26, 2021, the claimant was alert and oriented, with normal mood and affect (Exhibit D24F).  Mental status examination was normal on June 23, 2021 (Exhibit D26F), and on August 9, 2021, the claimant was alert and oriented, with normal mood, affect, recent memory, and remote memory (Exhibit D24F).

The claimant reported ongoing paranoia and hallucination on September 10, 2021 (Exhibit D26F).  However, her mood was pleasant and mental status examination was otherwise unremarkable.  More recently, the claimant's mood, affect, and speech were normal on February 5, 2022 (Exhibit D33F).

There is evidence of medication non-compliance, as well as acknowledged improvement with treatment.  On December 12, 2019, for example, the claimant reported that she had been off her medications for a month (Exhibit D26F).  However, she admitted, "They were working real[ly] good when I was taking them all."  On February 5, 2020, the claimant stated, "I need to get back on my medicine."  She said, "I keep taking myself off of my medicine because I start feeling good and get in a stubborn mood about taking medicine."  On July 14, 2020, the claimant relayed, "I [am] doing pretty good because I [am] taking my medication."  Her hallucinations had decreased, and she was sleeping well.  On October 22, 2020, the claimant stated, "The medications are working well for me.  I [have] been taking them right and I [have] been okay."  Her hallucinations and paranoia, she said, were better.  On November 30, 2020, she reported that things were "really good."  Her medications were working, her mood was better, and she was sleeping well.  She denied hallucinations and paranoia.  On January 29, 2021, the claimant continued to report that she was "doing good" and that her medications were working.  She was sleeping well, her appetite was good, her mood was stable, and she had not had hallucinations or paranoia.  She continued to report medication efficacy on May 12, 2021.

There is no evidence of any end organ damage secondary to the claimant's hypertension, which is managed with medication, including Amlodipine and Atenolol (Exhibits D7F, D8F, D10F, D15F, D18F, D21F, D22F, D23F, D24F, D33F), and has been described as "stable" and "well controlled" on numerous occasions (Exhibits D18F, D22F, D33F).  Her blood pressure was

recorded as 122/80 on July 13, 2020 (Exhibit D12F), and 122/73 on February 5, 2022 (Exhibit D33F).

Cardiovascular examinations were normal on March 16, 2020 (Exhibits D10F, D18F, D22F), July 13, 2020 (Exhibit D12F), August 4, 2020 (Exhibits D15F, D18F, D22F), February 8, 2021 (Exhibit D19F), August 9, 2021 (Exhibit D24F), January 12, 2022 (Exhibit D30F), and February 5, 2022 (Exhibit D33F).  On July 30, 2020, x-rays of the claimant's chest were normal (Exhibits D12F, D13F), and on October 27, 2020, x-rays of her chest showed no acute cardiopulmonary process (Exhibits D21F, D23F).  On the latter occasion, an electrocardiogram showed normal sinus rhythm (Exhibits D21F, D23F).

As indicated above, the claimant is obese (Exhibits D7F, D8F, D10F, D11F, D15F, D16F, D18F, D19F, D20F, D21F, D22F, D23F, D25F, D30F, D33F).  Her height, weight, and body mass index were recorded as 64 inches, 193 pounds, and 33.1, respectively, on March 16, 2020 (Exhibits D10F, D18F, D22F), 62 inches, 179 pounds, and 32.74, respectively, on November 20, 2020 (Exhibit D19F), 62 inches, 175 pounds, and 32, respectively, on August 9, 2021 (Exhibit D25F), and 62 inches, 180 pounds, and 33.03, respectively, on January 12, 2022 (Exhibit D30F). Notwithstanding her obesity, however, cardiovascular and respiratory examinations were consistently unremarkable.

The claimant's fibroids were treated with ablation and hysterectomy, and her GERD has been treated with Famotidine and Pantoprazole (Exhibits D10F, D15F, D18F, D22F, D24F).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

On July 13, 2020, Dr. Lee, the consultative medical examiner, concluded, "She should avoid activities that require distance walking, unprotected heights, excessive bending, heavy lifting, pushing/pulling, or operating machinery using her upper and right lower extremities (R>L) until further evaluation has been completed and treatment options considered.  She is advised to avoid concentrated areas of toxins, fumes, and inhalants secondary to her history of asthma (Exhibit D12F)."  Dr. Lee's opinion is partially persuasive.  While her examination of the claimant's back revealed decreased range of motion, tenderness to palpation of the thoracic and lumbar paraspinal muscles, and positive straight leg raising in the right lower extremity, supporting some limitations, her opinion is vague, and the claimant has no medically determinable right upper extremity impairment. The evidence of record discussed in this decision, including the claimants treatment for back pain and imaging findings are consistent with some limitations in postural actions, as well as exertional range.

The conclusions of Disability Determination Services psychological consultant's Lindi Meadows, Ph.D., and R. Kirby, Ph.D., on August 7, 2020, and August 25, 2021, respectively, that the claimant's mental impairment was non-severe, are not persuasive (Exhibits D1A, D4A). The record, including behavioral health treatment records (Exhibit D26F), demonstrates that the

claimant's mental impairment, though not disabling, is severe.  The claimant has reported depression, passive suicidal ideation, anxiety, irritability, agitation, anger, impaired sleep, and auditory and visual hallucinations (Exhibit B26F).  On mental status examinations, her mood and affect were depressed, sad, and tearful, her cognition was impaired, she endorsed passive suicidal ideation, hallucinations, and paranoia, and thought blocking was present.

The record includes two physical residual functional capacity assessments completed by Disability Determination Services medical consultant's (Exhibit D1A, D4A).  On August 24, 2020, Disability Determination Services medical consultant Robert Strickland, M.D., opined that the claimant could perform light work activity exertionally, frequently climb ramps and stairs, balance, kneel, crouch, and crawl, occasionally stoop, and never climb ladders, ropes, or scaffolds (Exhibit D1A).  On September 8, 2021, Disability Determination Services medical consultant James Upchurch, M.D., opined that the claimant could perform light work activity exertionally, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and never climb ladders, ropes, or scaffolds (Exhibit D4A).  He further opined that the claimant should avoid concentrated exposure to extreme cold, extreme hot, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  These opinions are moderately persuasive, as they are somewhat supported by the explanation provided.  Dr. Upchurch's opinion is more persuasive, as it includes environmental limitations, which are warranted by the claimant's histories of congestive heart failure and asthma.  However, there is no evidence of  exacerbation or flare of either.  As noted above, cardiovascular and respiratory examinations were normal on March 16, 2020 (Exhibits D10F, D18F, D22F), July 13, 2020 (Exhibit D12F), August 4, 2020 (Exhibits D15F, D18F, D22F), February 8, 2021 (Exhibit D19F), August 9, 2021 (Exhibit D24F), January 12, 2022 (Exhibit D30F), and February 5, 2022 (Exhibit D33F).  On July 30, 2020, x-rays of the claimant's chest were normal (Exhibits D12F, D13F), and on October 27, 2020, x-rays of her chest showed no acute cardiopulmonary process (Exhibits D21F, D23F).

Finally, Janice Gould, NP-C, the claimant's pain management provider, completed a Pain Evaluation, Physical Capacities Evaluation, and Listing 1.15 evaluation on March 12, 2022 (Exhibit D32F).  In the Pain Evaluation, she indicated that the claimant had low back pain, which radiated down her lower extremities, and that her pain or other symptoms were "frequently" severe enough to interfere with the attention and concentration needed to perform even simple tasks.  She wrote, "At this time, I don't expect that the [patient] can work."  This opinion, that the claimant could not work, is not persuasive, as it is conclusory, unsupported by specific findings, and speaks to an issue reserved to the Commissioner.  The opinion regarding concentration and attention is not persuasive as the explanation does not support this opinion, it is also not supported in this provider's treatment records, and it is not consistent with the limited mental health records available to review.

In the Physical Capacities Evaluation, Ms. Gould opined that the claimant could sit for one total, and at one time, during an eight-hour workday, stand and walk for two hours total, and for one hour at one time, during an eight-hour workday, lift and/or carry five pounds occasionally, zero pounds frequently, occasionally bend, reach, and stoop, and never squat, climb, or crawl.  She said that the claimant needed freedom to rest, recline, or lie down at her discretion throughout a normal workday and that she could not use her feet for repetitive movements.  She indicated that the claimant's impairments could reasonably be expected to produce pain at a level that would

preclude full-time, competitive work activity on a sustained basis, and estimated that she would be absent from work more than two days a month. Ms. Gould's opinion is not persuasive, as it unsupported by the explanation provided or her own records, and is inconsistent with the objective medical evidence, including pain management records, imaging studies, and the results of the consultative medical examination.

On July 13, 2020, the date of the consultative medical examination, inspection of the claimant's back revealed decreased range of movement of the dorsolumbar spine, with tenderness to palpation of the thoracic and lumbar paraspinal muscles, as well as positive straight leg raising (Exhibit D12F). However, strength, while decreased in the claimant's right upper extremity, was otherwise full, at five out of five, throughout, sensation, cranial nerves II through XII, and cerebellar function were intact, and Romberg was negative. The claimant was unable to squat to the floor but could stand on her toes and heels, climb on the examining table, rise from a chair, and go from a standing position to a sitting position without assistance. Although she had a limp while ambulating, her gait was steady, and no assistive device was required for stability. On July 30, 2020, x-rays of the claimant's lumbar spine showed only "mild" multilevel degenerative changes (Exhibits D12F, D13F).

On October 19, 2020, examination of the claimant's lumbar spine was positive for tenderness to palpation of the bilateral facet joints, tenderness in the left paraspinous muscles, and pain with extension, lateral flexion, and facet loading (Exhibit D20F). However, motor strength, sensation, and the claimant's gait were normal, and straight leg raising was negative bilaterally. On August 10, 2021 (Exhibit D25F), November 1, 2021 (Exhibit D28F), and December 6, 2021, inspections of her lumbar spine showed tenderness to palpation of the bilateral facet joints, pain with extension and lateral flexion, and positive straight leg raising at 30 degrees bilaterally. However, motor strength was full and sensory examination was normal. More recently, on February 5, 2022, musculoskeletal examination showed normal ranges of motion and neurological examination showed intact cranial nerves, no focal deficits, and no sensory abnormalities (Exhibit D33F).

The Listing 1.15 evaluation completed by Ms. Gould is not persuasive, as it is unsupported by, and inconsistent with, treatment records, which do not include the need for, or prescription of, a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands.

**5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).**

The claimant has past relevant work as a child monitor (DOT number 301.677-010; medium; semi-skilled; svp of 3). As required by Social Security Ruling 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period. At the hearing, the vocational expert testified that the claimant could not perform her past relevant work, as it required the performance of work activities inconsistent with the residual functional capacity above. Accordingly, the claimant is unable to perform past relevant work as actually or generally performed.

See Next Page

**6.    The claimant was born on January 25, 1969, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).**

**7.    The claimant has at least a high school education (20 CFR 416.964).**

**8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.14.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as mail sorter clerk (DOT number 209.687-026; light; unskilled; svp of 2; 60,000 jobs in the national economy), office helper (DOT number 239.567-010; light; unskilled; svp of 2; 160,000 jobs in the national economy), and hospital plastic assembler (DOT number 712.687-010; light; unskilled; svp of 2; 200,000 jobs in the national economy).

Pursuant to Social Security Ruling 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

See Next Page

Virgil Lee Pettway (BNC#: 21OC735A23679)                    Page 15 of 15

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**10.  The claimant has not been under a disability, as defined in the Social Security Act, since February 19, 2020, the date the application was filed (20 CFR 416.920(g)).**

## DECISION

Based on the application for supplemental security income filed on February 19, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Kristen Glover*
_____
Kristen Glover
Administrative Law Judge

April 29, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|-----------|-----|-------------|----------|-------|-------|
| T1I | D1A | Disability Determination Explanation-DI INITIAL:PRT/RFC-MD | | 2020-10-16 | 16 |
| T1I | D2A | Initial Disability Determination by State Agency, Title XVI | | 2020-10-16 | 1 |
| T1I | D3A | Reconsideration Disability Determination by State Agency, Title XVI | | 2021-09-13 | 1 |
| T1I | D4A | Disability Determination Explanation-DI RECON:PRT/RFC-MD | | 2021-09-13 | 11 |
| T1I | D5A | ALJ Hearing Decision | | 2013-12-04 | 17 |
| T1I | D6A | Order of Dismissal | | 2016-02-02 | 4 |
| T1I | D7A | AC Denial | | 2016-10-11 | 3 |
| T1I | D8A | ALJ Hearing Decision | | 2019-03-29 | 21 |
| T1I | D9A | AC Denial | | 2020-02-05 | 6 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|-----------|-----|-------------|----------|-------|-------|
| T1I | D1B | T16 Notice of Disapproved Claim | | 2020-10-16 | 5 |
| T1I | D2B | SSA-1696 - Claimant's Appointment of a Representative | | 2020-11-13 | 19 |
| T1I | D3B | Request for Hearing by ALJ | | 2021-03-29 | 3 |
| T1I | D4B | Request for Reconsideration | | 2021-03-29 | 3 |
| T1I | D5B | Request for Reconsideration | | 2021-04-02 | 1 |
| T1I | D6B | T16 Disability Reconsideration Notice | | 2021-09-13 | 3 |

| T1I | D7B | Request for Hearing by ALJ | | 2021-10-13 | 2 |
| T1I | D8B | Fee Agreement for Representation before SSA | | 2021-11-26 | 1 |
| T1I | D9B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-11-26 | 7 |
| T1I | D10B | Request for Hearing by ALJ | | 2021-11-26 | 1 |
| T1I | D11B | Request for Hearing Acknowledgement Letter | | 2021-11-30 | 15 |
| T1I | D12B | Outgoing ODAR Correspondence | | 2021-11-30 | 16 |
| T1I | D13B | Hearing Notice | | 2021-12-08 | 25 |
| T1I | D14B | Objection to Video Hearing | | 2021-12-21 | 1 |
| T1I | D15B | COVID Hearing Agreement Form | | 2021-12-21 | 2 |
| T1I | D16B | Acknowledge Notice of Hearing | | 2022-01-04 | 2 |
| T1I | D17B | Outgoing ODAR Correspondence | | 2022-02-11 | 16 |
| T1I | D18B | Notice Of Hearing Reminder | | 2022-03-01 | 6 |
| T1I | D19B | SSA-1696 - Claimant's Appointment of a Representative | | 2022-03-28 | 2 |
| T1I | D20B | Fee Agreement for Representation before SSA | | 2022-03-28 | 2 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | D1D | Application for Supplemental Security Income Benefits | | 2020-02-19 | 10 |
| T1I | D2D | Detailed Earnings Query | | 2022-02-10 | 2 |
| T1I | D3D | Summary Earnings Query | | 2022-02-10 | 1 |

| T1I | D4D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-02-10 | 1 |
| T1I | D5D | Certified Earnings Records | 2022-02-10 | 3 |
| T1I | D6D | Detailed Earnings Query | 2022-03-22 | 2 |
| T1I | D7D | Summary Earnings Query | 2022-03-22 | 1 |
| T1I | D8D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-03-22 | 1 |
| T1I | D9D | Certified Earnings Records | 2022-03-22 | 4 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | D1E | Disability Report - Field Office | | | to 2020-02-19 | 3 |
| T1I | D2E | Disability Report - Adult | | | to 2020-02-19 | 9 |
| T1I | D3E | Work History Report | | | to 2020-02-19 | 9 |
| T1I | D4E | Function Report - Adult | | Pettway, Virgil Lee | to 2020-03-10 | 10 |
| T1I | D5E | Work History Report | | Pettway, Virgil Lee | to 2020-03-10 | 12 |
| T1I | D6E | 3rd Party Function Report - Adult | | Valeria Vail-Godmother | to 2020-03-10 | 10 |
| T1I | D7E | Disability Report - Appeals | | | to 2021-03-13 | 8 |
| T1I | D8E | Disability Report - Appeals | | | to 2021-04-02 | 7 |
| T1I | D9E | Disability Report - Field Office | | | to 2021-04-02 | 2 |
| T1I | D10E | Disability Report - Appeals | | | to 2021-04-02 | 8 |
| T1I | D11E | Disability Report - Appeals | | | to 2021-10-13 | 8 |
| T1I | D12E | Disability Report - Appeals | | | to 2021-11-26 | 7 |
| T1I | D13E | Disability Report - Field Office | | | to 2021-11-26 | 2 |

| Component | No. | Description | | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | D14E | Disability Report - Appeals | | | to 2021-11-26 | 8 |
| T1I | D15E | Exhibit List to Rep PH2E | | | to 2022-02-11 | 11 |
| T1I | D16E | Misc Disability Development and Documentation | | | 2022-02-23 to | 2 |
| T1I | D17E | Pharmacy Prescription History/Records | | Walmart Pharmacy | 2021-01-01 to 2022-03-03 | 5 |
| T1I | D18E | Resume of Vocational Expert | | Mary Cornelius | 2022-03-22 to | 1 |
| T1I | D19E | Recent Medical Treatment | | Claimant | to 2022-09-17 | 2 |
| T1I | D20E | Representative Brief | | | 2022-03-28 to | 3 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | D1F | Hospital Records | | Emory Midtown Hospital | 2013-04-25 to 2013-08-27 | 62 |
| T1I | D2F | Hospital Records | | Dekalb Medical | 2012-08-27 to 2015-06-30 | 171 |
| T1I | D3F | Hospital Records | | Emory Healthcare | 2013-04-08 to 2015-10-28 | 363 |
| T1I | D4F | Hospital Records | | Oakhurst Medical Centers | to 2019-04-29 | 2 |
| T1I | D5F | Hospital Records | | Emory Center For Pain Management | to 2019-08-23 | 9 |
| T1I | D6F | Hospital Records | | Emory Midtown Hospital | 2016-02-18 to 2019-08-23 | 58 |
| T1I | D7F | Hospital Records | | Atlanta Heart Specialists Llc | 2019-11-21 to 2020-01-17 | 20 |
| T1I | D8F | Progress Notes | | Atlanta Heart Specialists Llc | 2019-11-21 to 2020-01-17 | 14 |

| T1I | D9F | Hospital Records | Oakhurst Medical Center | 2019-04-29 to 2020-02-06 | 58 |
| T1I | D10F | Hospital Records | Oakhurst Medical Center | to 2020-03-16 | 14 |
| T1I | D11F | Progress Notes | Alliance Spine And Pain Centers | 2020-05-22 to 2020-05-22 | 10 |
| T1I | D12F | CE Orthopedic | Tiffany Strawbridge Lee Md | to 2020-07-13 | 13 |
| T1I | D13F | CE Orthopedic | Tiffany Strawbridge Lee Md | to 2020-07-30 | 4 |
| T1I | D14F | CE Psychology | Scott A Duncan Psyd | to 2020-08-05 | 6 |
| T1I | D15F | Hospital Records | Oakhurst Medical Centers | 2020-08-04 to 2020-08-08 | 14 |
| T1I | D16F | Office Treatment Records | Alliance Spine And Pain Centers | 2020-06-19 to 2020-09-21 | 34 |
| T1I | D17F | Hospital Records | Southern Interventional Pain Center | 2019-01-11 to 2020-10-22 | 9 |
| T1I | D18F | Hospital Records | Oakhurst Medical Centers | 2019-04-29 to 2020-12-29 | 86 |
| T1I | D19F | Office Treatment Records | Alliance Spine And Pain Centers | 2020-11-20 to 2021-02-08 | 27 |
| T1I | D20F | Office Treatment Records | Alliance Spine And Pain Centers | 2020-10-19 to 2021-02-08 | 44 |
| T1I | D21F | Hospital Records | Emory Healthcare | 2012-04-18 to 2021-04-16 | 215 |
| T1I | D22F | Hospital Records | Oakhurst Medical Centers | 2020-03-16 to 2021-04-30 | 37 |
| T1I | D23F | Hospital Records | Emory Clinic Medical Records Department - M | 2012-04-18 to 2021-04-30 | 198 |

| T1I | D24F | Hospital Records | Medcura Health | 2021-05-26 to 2021-08-09 | 26 |
| T1I | D25F | Hospital Records | Alliance Spine And Pain | 2021-08-10 to 2021-09-30 | 20 |
| T1I | D26F | Hospital Records | Medcura Health | 2019-07-18 to 2021-10-07 | 152 |
| T1I | D27F | Hospital Records | Medcura Health | 2021-11-04 to 2021-11-04 | 15 |
| T1I | D28F | Office Treatment Records | Alliance Spine And Pain Centers | 2021-11-01 to 2021-12-06 | 11 |
| T1I | D29F | Hospital Records | Emory Midtown Hospital | 2016-02-18 to 2019-08-23 | 56 |
| T1I | D30F | Office Treatment Records | Alliance Spine And Pain Centers | 2022-01-12 to 2022-01-12 | 11 |
| T1I | D31F | Office Treatment Records | Medcura Health | 2022-02-11 to 2022-02-11 | 10 |
| T1I | D32F | Office Treatment Records | Janice Carol Gould, Np-C | to 2022-03-12 | 8 |
| T1I | D33F | Hospital Records | Emory Decatur Hospital | 2022-02-04 to 2022-02-04 | 103 |