

# NEWS PERSONNEL EMPLOYMENT AGREEMENT

This Agreement ("Agreement") is made and entered into this 3rd of September, 2020 by and between **Dave Platta** ("Employee") and GRAY MEDIA GROUP, INC. d/b/a **WTVM-TV** ("Employer").

## WITNESSETH

WHEREAS, Employer desires to employ Employee upon the terms and subject to the conditions hereinafter set forth, and Employee desires to accept such employment;

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

(1) **Employment.** Employee's employment under this Agreement shall commence on: **September 3, 2020.**

(2) **Title.** Employee's initial title will be: **Sports Director**

(3) **Location.** Employee's principal work location will be the business offices of WTVM-TV (the "Station"), currently located at: 1909 Wynnton Road, Columbus, Georgia 31906

(4) **Term.**

(a) Employee's first date of employment will be: **September 3, 2020.**

(b) The period of employment will be from the first date of employment through: September 2, 2023.

(c) During the first 90 days of the Term, Employee will be considered a probationary employee. During the 90-day probationary period, Employer will evaluate your fitness and suitability for Employee's position. Employee's employment may be terminated by Employer during the 90-day probationary period for any reason or no reason and without any explanation. In the event of such termination, Employee shall be entitled to payment of any accrued but unpaid wages as of the time of such termination and shall have no further right to payment (including any severance). **This Section 4(c) does not apply to an individual who has been employed by Employer or an affiliate for more than 90 days immediately preceding the date of this Agreement.**

Employee Initials _____

**(d)** After the 90-day probationary period, Employee's employment under this Agreement may be terminated by Employer prior to the end of the Initial Term or the Option Period in accordance with Sections 11-13 of Attachment A. After the Term, Employee will remain subject to all provisions of this Agreement that ordinarily survive such termination, including without limitation, Sections 8-10 of Attachment A.

**(5)** **Compensation.** Subject to the terms and conditions set forth in this Agreement, Employer shall pay and Employee shall accept the following annual compensation for performing Employee's job duties under this Agreement:

| | |
|---|---|
| For the Term: | $87,290.00/annual - |
| For the First Option Period: | $89,036.00/annual |
| For the Second Option Period: | $91,262.00/annual |

Employee may be entitled to bonuses and additional compensation set forth on Attachment B. In order to receive any bonus, Employee must be employed on the date that bonuses are paid.

Notwithstanding anything to the contrary herein, Employee will accrue Paid Time Off ("PTO") in a manner consistent with the Company's standard policies.

All compensation payable to Employee pursuant to this Agreement shall be subject to applicable taxes and withholding required under federal, state or local law. Further, it is understood by the parties to this Agreement that, Employee may be required to work on occasion more than eight hours per day or more than forty (40) hours per week. Employee understands that, while Employee's hours may vary from week to week, Employee's weekly salary will not vary because Employee's salary compensates Employee for all hours worked.

**(6)** **Early Termination Restrictions.** Employee understands and agrees that any breach of the terms of this Agreement including, without limitation, by early termination of the Agreement or failure to comply with the exclusivity provisions, will cause damage to Employer that is difficult to estimate. In addition to any other relief that may be available to Employer (including injunctive relief), in the event that Employee breaches the terms of this Agreement, including without limitation, by early termination of the Agreement or failure to comply with the exclusivity provisions, Employee agrees to reimburse Employer within 10 days following a demand for payment by Employer in an amount equal to: (i) the total amount of any moving expenses paid to or on behalf of Employee by Employer in, plus (ii) four (4) weeks' gross compensation in the event of any breach occurring during the Initial Term, six (6) weeks' gross compensation in the event of any breach occurring during the Option Period or four (4) weeks' gross compensation in the event of any breach occurring during any subsequent renewal period. For purposes of this Agreement, Employee's weekly "gross compensation" shall be equal to Employee's average weekly wage payment calculated based on the payroll records of the Company for the four (4) week

Page 2

Employee Initials _____

period preceding the date of the termination of employment including any commissions but excluding any extraordinary payment as determined by the Company.

(7) **Consent to Notification.** Employee hereby consents to notification by the Company to any new employer of Employee (whether Employee is an employee, consultant, independent contractor, director, partner, officer, advisor, executive or manager) about Employee's obligations under this Agreement and delivery by the Company of a copy of this Agreement to any such new employer. Employee agrees and acknowledges that the Company's (or the Company's legal counsel's) notification is proper under the controlling state or federal law and that such notification is not interfering with Employee's relationship with Employee's new employer in any way.

(8) **Entire Agreement.** This Agreement together with the Standard Terms and Conditions set forth in Attachment A set forth the entire agreement between the parties and no promises or representations not expressly set forth in this Agreement shall have any effect, and shall be considered merged and integrated into this Agreement. This Agreement may be amended or modified only by a writing signed by the parties.

IN WITNESS WHEREOF, the parties hereto have executed, or caused their duly authorized representative to execute, this Agreement as of the day and year set forth above.

EMPLOYER:
Gray Media Group, Inc.
d/b/a WTVM-TV

BY: _Holly Steuart_ (signature)

TITLE: VP & GM

EMPLOYEE: _(signature)_

Employee Initials ____

## ATTACHMENT A
## News Personnel Employment Agreement
## Standard Terms and Conditions

**(1)** **Duties.**

**(a)** During the Term, Employee shall have such duties as are consistent with Employee's position and shall perform such duties and responsibilities that Employer may, in its sole discretion, assign to Employee (the "Services"). Employee agrees that: (1) Employer has the right to alter Employee's duties and title from time to time, and that (2) Employee's title itself neither confers rights upon Employee nor does it limit, in any way, Employer's discretion to alter Employee's duties.

**(b)** During the Term, Employee shall not engage in any conduct that could reflect negatively on Employer or its reputation in the community. Employee shall not commercially endorse any product or service, without the prior written approval of Employer.

**(c)** Employee shall perform and discharge faithfully, diligently and to the best of Employee's ability such duties and responsibilities and shall devote Employee's full-time efforts to the business and affairs of Employer.

**(d)** At no time during the Term shall Employee own or have any interest in any entity where such ownership may conflict with the full and faithful performance of Employee's duty to Employer, specifically including, but not limited to, any companies that produce or distribute video content, features, syndicated films, records, radio or television programs, or that manage or represent talent.

**(2)** **Work Standard and Compliance with Laws.** Employee agrees that Employee will at all times comply with and abide by all terms and conditions of this Agreement and all applicable work policies, procedures and rules as may be issued by Employer, including, without limitation, policies relating to Payola/Plugola. Employee further agrees that Employee shall comply with all federal, state, and local statutes, regulations, and public ordinances governing Employee's work.

**(3)** **Additional Benefits.** During the Term, Employer will provide Employee with Employer's standard benefits package for individuals employed in the same or a similar capacity as Employee.

**(4)** **Exclusivity of Performance.**

**(a)** Employee agrees that, during the Term, Employee shall not engage in any other trade, business or occupation that will interfere with Employee's obligations to Employer, as described in this Agreement.

**(b)** Employee agrees that, during the Term, Employer shall have the exclusive right to Employee's performance of any media-related services and Employee shall

Page 4

Employee Initials _____

not render any media-related services to any person or entity other than Employer, without the prior, written consent of Employer.

**(c)** Employee agrees not to perform Services, authorize or permit the use of Employee's name, image or likeness, or make personal appearances in connection with Services performed for or by any other company, business or interest, which conflicts with the full and faithful performance of Employee's duties for Employer, without the prior written consent of Employer.

**(d)** Employee will not prepare or provide, for publication by persons or entities other than Employer, information or materials that associate or identify Employee with Employer, and Employee will not authorize or permit the use of Employee's name or likeness in connection with the advertising of any product or service without the prior written consent of Employer.

**(5)** **Use Of Image.** Employee hereby grants Employer the royalty-free non-exclusive license to use, and the right to license others to use, Employee's name, sobriquet, voice, caricature, biography and likeness or any other rights of publicity or indicia of identity in any present or future medium worldwide. Employee acknowledges and agrees that Employee has no right of approval, no claim to any compensation, and no other claim arising out of any use described herein.

**(6)** **Conduct.**

**(a)** Employee acknowledges Employer's responsibility to the public and warrants that Employee always has in the past and will at all times in the future conduct him or herself with due regard to social conventions and public morals and decency, and agrees that Employee shall not commit any act or become involved in any situation or occurrence tending to degrade Employee in the mind of the public or which may bring Employee into public disrepute, contempt, scandal or ridicule, or tend to shock, insult or offend the community or which may reflect unfavorably on Employee or Employer or any sponsor of the programs hereunder or its advertising agency, whether or not information regarding such becomes public.

**(b)** Employee recognizes that, because of the visual nature of the television medium, Employee's personal appearance and demeanor have a great impact on the usefulness and value of the Services provided by Employee under this Agreement. Employee understands and agrees that Employer may properly consider the actual or anticipated response of its audience to Employee's personal qualities, as well as any other relevant factor, in deciding what Services Employee may be asked to provide. It is therefore agreed that Employer shall have the right to make reasonable demands from time to time regarding Employee's appearance, including, without limitation, Employee's wardrobe, hairstyle and makeup, as Employer may deem appropriate with respect to the Services Employee may be asked to provide and Employee shall comply with any such demands made by Employer.

Employee Initials ____

**(7)   Use of Services And Scheduling.**

(a)   Employee understands and agrees that this Agreement in no way restricts the right of Employer at any time, and from time to time, to change its broadcast schedule, including without limitation the time, day, length, content, format and frequency of any programs broadcast and to determine whether various programs should be originated (i) at Employer's studios or elsewhere and (ii) in live or recorded form.

(b)   Employee also understands and agrees that, because of the nature of Employer's business, Employer cannot guarantee to what extent, if any, Employee will be requested to perform the Services. Accordingly, nothing in this Agreement shall be construed to require Employer to use Employee's Services or to produce, broadcast or distribute any program, or to use Employee only as talent, and Employer shall have fulfilled its obligations under this Agreement by making the payments to Employee required by this Agreement.

(c)   Employer may lend and authorize the lending of Employee's Services to any program or programs produced, transmitted or otherwise distributed by Employer, its parent companies, subsidiaries or affiliates. In each such event, this Agreement will continue in full force and effect and Employer will retain its rights hereunder. Employer will pay Employee the compensation provided herein and will be entitled to keep any compensation paid to Employer for the lending of Employee's Services. Employee will render Services as Employer may agree to lend and Employer may grant to the recipient of those Services such incidental rights in connection with those Services as Employer may be entitled to hereunder. No act or omission on the part of any such recipient will constitute a breach by Employer of this Agreement, unless any such act or omission on the part of such recipient would have been a breach hereunder if done by Employer.

**(8)   Property Rights.** Any scripts, videotapes, films, recordings, photographs and any part thereof, in which Employee has been involved with Employer in any way, shall remain the exclusive property of Employer, with Employee having no rights therein. Employee acknowledges Employer as the sole and rightful owner of any "intellectual property," including but not limited to, any programs, inventions, copyright material, trademarks, tradenames, patents, and the like, which Employee may create, prepare or procure, alone or with others, during employment with Employer, where such creation, preparation or procurement involved the use of Employer's time or resources.

**(9)   Confidentiality and Non-Disclosure.**

(a)   During the Term, Employee will have access to proprietary information and confidential records of the Station and its affiliated entities. Employee agrees that Employee will not, for so long as the information remains confidential or a trade secret under applicable law, divulge, furnish or make accessible to anyone or appropriate for Employee's own use (except as may be duly authorized to perform Employee's duties hereunder) any Confidential Information of the Station and its affiliated entities, which has been disclosed to Employee, or of which Employee became aware as a consequence of or through Employee's employment, unless required by applicable law, (including

Employee Initials ____

regulation, legal process or judicial order). For the purposes of this Agreement, "Confidential Information" is information or material that has not been made generally available to the public by the Station or its affiliated entities and is: (i) generated, collected or used in the operations of the Station or its affiliated entities and relates to the actual or anticipated business of the Station or its affiliated entities; (ii) suggested by or resulting from any task assigned to or work performed by Employee during his employment with the Station or during the Term; or (iii) received from Station entities or vendors or potential vendors or customers. Confidential Information includes, without limitation: business secrets, or business opportunities of the Station or its affiliated entities, including without limitation, marketing, political, advertising and promotional ideas and strategies, marketing surveys and analyses, technology, budgets, business plans, customer or supplier lists, research or financial, purchasing, planning data or information.

**(b)** Employee agrees that Employer will suffer irreparable injury if Employee uses or discloses any Confidential Information. Therefore, without limiting any other legal or equitable remedies available to it, if Employee uses or discloses or threatens to use or disclose such confidential information on behalf of Employee or others, Employer will be entitled to obtain equitable relief by injunction or otherwise from any court of competent jurisdiction, including without limitation, an injunction to prevent Employee from breaching the provisions of this Section restricting disclosure of confidential information. For purposes of this Agreement, information that is considered "trade secrets" under applicable law shall be subject to the maximum protection permitted by law.

**(c)** Immediately upon termination of this Agreement or at any point prior to or after that time upon the specific request of Employer, Employee shall return to Employer all written or descriptive materials of any kind in Employee's possession which contain trade secrets or confidential information and the obligations in this Agreement shall continue until their expiration under the terms of this Agreement.

**(10) Restrictive Covenants.** Employee agrees that, while employed by Employer and for the one-year period following termination of employment, regardless of the reason for termination:

**(a)** Employee shall not perform any activities that are the same as or similar to the Services (as defined above) or such other services as performed by Employee for Employer within the two-year period preceding the termination of employment or, make any personal appearances, or authorize or permit the use of his/her name, image, voice, sobriquet, biography, recorded performance, picture, portrait, caricature, electrical transcription, tape, digitized image, animated image, audio file, graphic file, text file, compact disc recording, web page or other recording or likeness for or on behalf of any Competitor without the express prior written consent of Employer (which consent may be withheld at Employer's discretion). For purposes of this Section, the term "Competitor" means any television station, radio station, cable television facility or program or any other video delivery system (including, without limitation, broadcast, cable, satellite or internet) that competes with Employer for viewers, advertisers or the like within all or any portion of the Designated Market Area ("DMA") of the Station (as currently defined by

Employee Initials _____

Nielsen Media Research) other than Employer or any entity that owns, is owned or controlled by, or licensed to, Employer.

**(b)** Employee shall not (directly or indirectly), on behalf of Employee or any other person or entity, hire, solicit, take away or attempt to hire, solicit or take away any person who is (or in the preceding six (6) months was) an employee, director or independent contractor of Employer or its affiliates and shall not induce or attempt to induce, or influence or attempt to influence, any person employed by Employer or its affiliates to terminate his or her employment with Employer or its affiliates.

Employee acknowledges and agrees that he/she has carefully considered the nature and extent of the restrictions upon him/her and the rights and remedies conferred upon Employer under this Agreement, and hereby acknowledges and agrees that the same are reasonable in time and territory, are designed to eliminate competition which otherwise would be unfair to Employer, do not stifle the inherent skill and experience of Employee, are fully required to protect legitimate interests of Employer, and do not confer a benefit upon Employer disproportionate to the detriment of Employee. Each of the above-recited covenants shall be deemed and shall be construed as a separate and independent covenant. Any court of competent jurisdiction which determines that the above-recited covenants or any portion thereof are overbroad or otherwise unenforceable may reform or revise such covenants to the extent necessary to conform with existing law such that the revised covenants, or portions thereof, shall be read as broadly as the law allows. Should any part or provision of any such covenants be reformed or declared invalid, such reformation or invalidity shall in no way render invalid or unenforceable any other part or provision thereof or any other separate covenant of Employee not declared invalid. Employee agrees that the injury Employer will suffer in the event of the breach by Employee of any clause of this Section 10 will cause Employer irreparable injury that cannot be adequately compensated by monetary damages alone. Therefore, Employee agrees that Employer, without limiting any other legal or equitable remedies available to it, shall be entitled to obtain equitable relief by injunction or otherwise from any court of competent jurisdiction, including, without limitation, injunctive relief to prevent Employee's failure to comply with the terms and conditions of this Section 10. The one-year period referenced in subsections (a) and (b) shall be extended on a day-for-day basis for each day during which Employee violates the provisions of subsections (a) or (b) in any respect, so that Employee is restricted from engaging in the activities prohibited by subsections (a) and (b) for the full one-year period.

**(11) Termination for Cause.** Employee's employment may be terminated at any time by Employer for Cause without any liability owing to Employee or Employee's beneficiaries if:

**(a)** Employee neglects or refuses to discharge Employee's duties or refuses to comply with any lawful instructions given to Employee;

**(b)** Employee commits any material breach of this Agreement; or

**(c)** Employee is guilty of gross misconduct.

Employee Initials

For the purposes of this Agreement the following acts shall constitute gross misconduct:

i. any act involving fraud or dishonesty;

ii. any arrest, charge or indictment for any crime constituting a felony or any misdemeanor involving moral turpitude;

iii. the carrying out of any activity that would prejudice and/or reduce the good name and standing of Employer, or would bring it into contempt, ridicule or would reasonably shock or offend the community in which Employer is located;

iv. attendance at work or at a work related function in a state of intoxication or otherwise being found in possession at Employee's place of work or at a work related function of any prohibited drug or substance, possession of which would amount to a criminal offense;

v. assault or other act of violence against any employee of Employer or other person during the course of Employee's employment; or

vi. violation of any Employer policy, including without limitation Employer's policies concerning motor vehicles, social media and political activities.

**(12) Termination Upon Death or Disability.** Notwithstanding anything herein to the contrary, Employee's employment under this Agreement shall end immediately upon Employee's death. In addition, Employee's employment under this Agreement shall end upon the date designated by Employer in a written notice provided to Employee following Employee's absence from work by reason of Employee's Disability. For purposes of this Agreement, the term "Disability" shall mean Employee's inability to perform the material functions of Employee's job for a period of at least sixteen weeks during any twelve-month period. In the event of a termination by reason of death or Disability, Employee shall be entitled to payment of any accrued but unpaid wages (including any accrued but unused PTO) as of the time of such termination and shall have no further right to payment (including any severance) of any kind from Employer other than payment of benefits under a retirement, health or other welfare plan in which Employee participated as of the date of Employee's termination under this Section.

**(13) Other Terminations.** Employer reserves the right to terminate Employee's employment under this Agreement at any time, without cause, by providing Employee four (4) weeks' written notice or paying Employee four (4) weeks' salary in lieu of four (4) weeks' notice. Following Employee's termination, Employee shall be entitled to payment of any accrued but unpaid wages (including any accrued but unused PTO) as of the time of such termination and the four (4) week payment set forth herein but shall have no further right to payment (including any severance) of any kind from Employer other than payment of benefits under a retirement, health or other welfare plan in which Employee participated as of the date of Employee's termination under this Section.

**(14) Suspension.** Employer may choose to suspend Employee's employment (and its obligation to pay compensation to Employee) if Employee fails or refuses to perform the services required under this Agreement properly, violates any of the terms of this Agreement, intentionally alters

Page **9**

Employee Initials_____

Employees physical appearance in a manner that detracts from Employees appearance (as determined by Employer) or engages in any conduct which would justify Employee's termination under the terms of this Agreement (including without limitation these Standard Terms and Conditions). Such suspension shall continue for a reasonable period of time or until Employee is able and willing to perform the services properly, provided however that any suspension shall be no less than one work week in length and, if longer than one work week shall be extended in weekly increments. Employer, at its option, may extend the Initial Term or any Option Period for the length of any such suspension(s) by giving notice of the extension to Employee. Employer's decision to suspend Employee's employment under this Section will not affect Employer's right to terminate Employee's employment before Employee becomes willing and able to resume performing the services properly or after any subsequent incident which would justify termination under this Agreement.

**(15) Governing Law.** This Agreement shall be governed by the laws of the State in which the principal business offices of the Station are located and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with such laws without regard to principles of conflict of laws. The parties submit to the exclusive jurisdiction and venue of any local, state or federal court located within the State in which the principal business office of the Station are located for resolution of any and all claims, causes of action or disputes arising out of, related to or concerning this Agreement and the parties agree to waive any claim relating to forum non conveniens.

**(16) Waiver of Jury Trial.** The parties acknowledge and agree that any suit, action or proceeding, whether claim or counterclaim, of any kind or nature brought by either party arising out of the interpretation, enforcement or breach of this Agreement shall be resolved by a judge alone, and both parties hereby waive and forever renounce the right to a trial before a civil jury of any such suit, action or proceeding.

**(17) Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of Employee, together with Employee's heirs and personal representatives, and Employer, its successors and assigns.

**(18) Waiver.** The waiver by either party of a breach of any provision contained in this Agreement shall not be construed as or operate as a waiver of any subsequent breach.

**(19) Severability.** If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end, the provisions hereof shall be deemed severable.

Employee Initials _____