No. 21-60845
United States Court of Appeals, Fifth Circuit.

# BST Holdings v. Occupational Safety & Health Admin.

17 F.4th 604 (5th Cir. 2021)
Decided Nov 12, 2021

No. 21-60845

11-12-2021

BST HOLDINGS, L.L.C.; RV Trosclair, L.L.C.; Trosclair Airline, L.L.C.; Trosclair Almonaster, L.L.C.; Trosclair and Sons, L.L.C.; Trosclair ; Trosclair, Incorporated; Trosclair Carrollton, L.L.C.; Trosclair Claiborne, L.L.C.; Trosclair Donaldsonville, L.L.C.; Trosclair Houma, L.L.C.; Trosclair Judge Perez, L.L.C.; Trosclair Lake Forest, L.L.C.; Trosclair Morrison, L.L.C.; Trosclair Paris, L.L.C.; Trosclair Terry, L.L.C.; Trosclair Williams, L.L.C.; Ryan Dailey ; Jasand Gamble; Christopher L. Jones; David John Loschen; Samuel Albert Reyna; Kip Stovall; Answers in Genesis, Incorporated; American Family Association, Incorporated ; Burnett Specialists; Choice Staffing, L.L.C. ; Staff Force, Incorporated ; Leadingedge Personnel, Limited; State of Texas ; HT Staffing, Limited; doing business as HT Group; The State of Louisiana ; Cox Operating, L.L.C.; Dis-Tran Steel, L.L.C. ; Dis-Tran Packaged Substations, L.L.C.; Beta Engineering, L.L.C. Optimal Field Services, L.L.C.; The State of Mississippi; Gulf Coast Restaurant Group, Incorporated; The State of South Carolina; The State of Utah; Word of God Fellowship, Incorporated, doing business as Daystar Television Network, Petitioners, v. OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR; United States Department of Labor; Martin J. Walsh, Secretary, U.S. Department of Labor; Douglas Parker, in his Official Capacity as Assistant Secretary of Labor for Occupational Safety and Health, Respondents.

Daniel Robert Suhr, Jeffrey Jennings, Liberty Justice Center, Chicago, IL, Sarah Harbison, Pelican Institute for Public Policy, New Orleans, LA, for Petitioners BST Holdings, L.L.C., RV Trosclair, L.L.C., Trosclair Airline, L.L.C., Trosclair Almonaster, L.L.C., Trosclair and Sons, L.L.C., Trosclair & Trosclair, Incorporated, Trosclair Carrollton, L.L.C., Trosclair Claiborne, L.L.C., Trosclair Donaldsonville, L.L.C., Trosclair Houma, L.L.C., Trosclair Judge Perez, L.L.C., Trosclair Lake Forest, L.L.C., Trosclair Morrison, L.L.C., Trosclair Paris, L.L.C., Trosclair Terry, L.L.C., Trosclair Williams, L.L.C., Ryan Dailey, Jasand Gamble, Christopher L. Jones, David John Loschen, Samuel Albert Reyna, and Kip Stovall. Jeffrey Carl Mateer, Esq., General Counsel, First Liberty Institute, Plano, TX, for Petitioner Answers in Genesis, Incorporated. Jeffrey Carl Mateer, Esq., General Counsel, First Liberty Institute, Plano, TX, David J. Hacker, Lea Patterson, Keisha Russell, Hiram Stanley Sasser, III, First Liberty Institute, Plano, TX, for Petitioners American Family Association, Incorporated, and Word of God Fellowship, Incorporated. Matthew R. Miller, Esq., Robert E. Henneke, Texas Public Policy Foundation, Austin, TX, for Petitioners Burnett Specialists, Choice Staffing, L.L.C., Staff Force, Incorporated, Leadingedge Personnel, Limited, and HT Staffing, Limited. Judd Edward Stone, II, Ryan Baasch, William Francis Cole, Esq., Lanora Christine Pettit, Benjamin D. Wilson, Office of the Attorney

General, Office of the Solicitor General, Austin, TX, Leif A. Olson, Office of the Attorney General, Austin, TX, for Petitioner State of Texas. Elizabeth Baker Murrill, Esq., Assistant Attorney General, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Joseph Scott St. John, Louisiana Department of Justice, Office of the Solicitor General, New Orleans, LA, for Petitioner State of Louisiana. John Stone Campbell, III, John Parham Murrill, Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, for Petitioners Cox Operating, L.L.C., Dis-Tran Steel, L.L.C., Dis-Tran Packaged Substations, L.L.C., Beta Engineering, L.L.C., and Optimal Field Services, L.L.C. Justin Lee Matheny, Esq., Office of the Attorney General for the State of Mississippi, Jackson, MS, Scott Stewart, Mississippi Attorney General's Office, Jackson, MS, for Petitioner State of Mississippi. Aaron Randall Rice, Attorney, Mississippi Justice Institute, Jackson, MS, for Petitioner Gulf Coast Restaurant Group, Incorporated. Thomas T. Hydrick, Office of the Attorney General for the State of South Carolina, Columbia, SC, for Petitioner State of South Carolina. Melissa A. Holyoak, Senior Counsel, Office of the Attorney General for the State of Utah, Salt Lake City, UT, for Petitioner State of Utah. Steven Paul Lehotsky, Lehotsky Keller, L.L.P., Washington, DC, Scott A. Keller, Lehotsky Keller, L.L.P., Austin, TX, for Petitioners Texas Trucking Association, Mississippi Trucking Association, Louisiana Motor Transport Association, American Trucking Associations, Incorporated, National Federation of Independent Business, National Retail Federation, FMI-The Food Industry Association, National Association of Convenience Stores, National Association of Wholesaler-Distributors, International Warehouse & Logistics Association, and International Foodservice Distributors Association. Martin Vincent Totaro, Brian James Springer, U.S. Department of Justice, Civil Division, Appellate Section, Washington, DC, Edmund C. Baird, Kate S. O'Scannlain, Thomas E. Perez, Marisa C. Schnaith, U.S. Department of Labor, Office of the Solicitor, Washington, DC, for Respondents. John J. Bursch, Bursch Law, P.L.L.C., Caledonia, MI, for Amicus Curiae Bentkey Services, L.L.C. Sheng Tao Li, Washington, DC, for Amicus Curiae New Civil Liberties Alliance. Jeffrey B. Dubner, Rachel Fried, Jessica Morton, Democracy Forward Foundation, Washington, DC, for Amicus Curiae American Medical Association.

Kurt D. Engelhardt, Circuit Judge

Daniel Robert Suhr, Jeffrey Jennings, Liberty Justice Center, Chicago, IL, Sarah Harbison, Pelican Institute for Public Policy, New Orleans, LA, for Petitioners BST Holdings, L.L.C., RV Trosclair, L.L.C., Trosclair Airline, L.L.C., Trosclair Almonaster, L.L.C., Trosclair and Sons, L.L.C., Trosclair & Trosclair, Incorporated, Trosclair Carrollton, L.L.C., Trosclair Claiborne, L.L.C., Trosclair Donaldsonville, L.L.C., Trosclair Houma, L.L.C., Trosclair Judge Perez, L.L.C., Trosclair Lake Forest, L.L.C., Trosclair Morrison, L.L.C., Trosclair Paris, L.L.C., Trosclair Terry, L.L.C., Trosclair Williams, L.L.C., Ryan Dailey, Jasand Gamble, Christopher L. Jones, David John Loschen, Samuel Albert Reyna, and Kip Stovall.

Jeffrey Carl Mateer, Esq., General Counsel, First Liberty Institute, Plano, TX, for Petitioner Answers in Genesis, Incorporated.

Jeffrey Carl Mateer, Esq., General Counsel, First Liberty Institute, Plano, TX, David J. Hacker, Lea Patterson, Keisha Russell, Hiram Stanley Sasser, III, First Liberty Institute, Plano, TX, for Petitioners American Family Association, Incorporated, and Word of God Fellowship, Incorporated.

Matthew R. Miller, Esq., Robert E. Henneke, Texas Public Policy Foundation, Austin, TX, for Petitioners Burnett Specialists, Choice Staffing, L.L.C., Staff Force, Incorporated, Leadingedge Personnel, Limited, and HT Staffing, Limited.

Judd Edward Stone, II, Ryan Baasch, William Francis Cole, Esq., Lanora Christine Pettit, Benjamin D. Wilson, Office of the Attorney General, Office of the Solicitor General, Austin, TX, Leif A. Olson, Office of the Attorney General, Austin, TX, for Petitioner State of Texas.

Elizabeth Baker Murrill, Esq., Assistant Attorney General, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Joseph Scott St. John, Louisiana Department of Justice, Office of the Solicitor General, New Orleans, LA, for Petitioner State of Louisiana.

John Stone Campbell, III, John Parham Murrill, Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, LA, for Petitioners Cox Operating, L.L.C., Dis-Tran Steel, L.L.C., Dis-Tran Packaged Substations, L.L.C., Beta Engineering, L.L.C., and Optimal Field Services, L.L.C.

Justin Lee Matheny, Esq., Office of the Attorney General for the State of Mississippi, Jackson, MS, Scott Stewart, Mississippi Attorney General's Office, Jackson, MS, for Petitioner State of Mississippi.

Aaron Randall Rice, Attorney, Mississippi Justice Institute, Jackson, MS, for Petitioner Gulf Coast Restaurant Group, Incorporated.

Thomas T. Hydrick, Office of the Attorney General for the State of South Carolina, Columbia, SC, for Petitioner State of South Carolina.

Melissa A. Holyoak, Senior Counsel, Office of the Attorney General for the State of Utah, Salt Lake City, UT, for Petitioner State of Utah.

Steven Paul Lehotsky, Lehotsky Keller, L.L.P., Washington, DC, Scott A. Keller, Lehotsky Keller, L.L.P., Austin, TX, for Petitioners Texas Trucking Association, Mississippi Trucking Association, Louisiana Motor Transport Association, American Trucking Associations, Incorporated, National Federation of Independent Business, National Retail Federation, FMI-The Food Industry Association, National Association of Convenience Stores, National Association of Wholesaler-Distributors, International Warehouse & Logistics Association, and International Foodservice Distributors Association.

Martin Vincent Totaro, Brian James Springer, U.S. Department of Justice, Civil Division, Appellate Section, Washington, DC, Edmund C. Baird, Kate S. O'Scannlain, Thomas E. Perez, Marisa C. Schnaith, U.S. Department of Labor, Office of the Solicitor, Washington, DC, for Respondents.

John J. Bursch, Bursch Law, P.L.L.C., Caledonia, MI, for Amicus Curiae Bentkey Services, L.L.C.

Sheng Tao Li, Washington, DC, for Amicus Curiae New Civil Liberties Alliance.

Jeffrey B. Dubner, Rachel Fried, Jessica Morton, Democracy Forward Foundation, Washington, DC, for Amicus Curiae American Medical Association.

Before Jones, Duncan, and Engelhardt, Circuit Judges.

609 Kurt D. Engelhardt, Circuit Judge*609 The Occupational Safety and Health Administration (OSHA) "reasonably determined" in June 2020 that an emergency temporary standard (ETS) was "not necessary" to "protect working people from occupational exposure to infectious disease, including COVID-19." *In re AFL-CIO*, 2020 WL 3125324, at *1 (D.C. Cir. June 11, 2020). This was not the first time OSHA had done this; it has refused several times to issue ETSs despite legal action urging it do so. *See, e.g., In re Int'l Chem. Workers Union*, 830 F.2d 369 (D.C. Cir. 1987) (per curiam). In fact, in its fifty-year history, OSHA has issued just ten ETSs.[1] Six were challenged in court; only one survived.[2] The reason for the rarity of this form of emergency action is simple: courts and the Agency have agreed for generations that "[e]xtraordinary power is delivered to [OSHA] under the emergency provisions of the Occupational Safety and Health Act," so "[t]hat power should be delicately exercised, and only in those emergency situations

which require it." *Fla. Peach Growers Ass'n v. U.S. Dep't of Lab.* , 489 F.2d 120, 129–30 (5th Cir. 1974).

> 1 Cong. Rsch. Serv., Occupational Safety and Health Administration (OSHA): Emergency Temporary Standards (ETS) and COVID-19, at 34 tbl. A-1 (Nov. 10, 2021), *available at* https://crsreports.congress.gov/product/pdf/R/R46288.
>
> 2 It bears noting at the outset that most of the few ETSs issued by OSHA were immediately stayed pending merits review. *See Asbestos Info. Ass'n/N. Am. v. OSHA* , 727 F.2d 415, 418 (5th Cir. 1984) ; *Indus. Union Dep't, AFL-CIO v. Bingham* , 570 F.2d 965, 968 (D.C. Cir. 1977) ; *Taylor Diving Salvage Co. v. U.S. Dep't of Lab.* , 537 F.2d 819, 820–21 (5th Cir. 1976) (per curiam); *Fla. Peach Growers Ass'n v. U.S. Dep't of Lab.* , 489 F.2d 120, 129-30 (5th Cir. 1974).

This case concerns OSHA's most recent ETS—the Agency's November 5, 2021 Emergency Temporary Standard (the "Mandate") requiring employees of covered employers to undergo COVID-19 vaccination or take weekly COVID-19 tests and wear a mask.[3] An array of petitioners seeks a stay barring OSHA from enforcing the Mandate during the pendency of judicial review. On November 6, 2021, we agreed to stay the Mandate pending briefing and expedited judicial review. Having conducted that expedited review, we reaffirm our initial stay.

> 3 *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (to be codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918, 1926, and 1928).

I.

OSHA promulgated its much anticipated[4] vaccine mandate on November 5, 2021. Framed as an ETS, the Mandate requires all employers of 100 or more employees to "develop, implement, and *610 enforce a mandatory COVID-19 vaccination policy" and require any workers who remain unvaccinated to "undergo [weekly] COVID-19 testing and wear a face covering at work in lieu of vaccination." 86 Fed. Reg. 61,402, 61,402.

> 4 Debates over the Biden Administration's forthcoming vaccine mandate roiled the country throughout much of the Fall. For obvious reasons, the Mandate affects every person in America in one way or another.

On the afternoon of the Mandate's publication, a diverse group of petitioners (including covered employers, States, religious groups, and individual citizens) moved to stay and permanently enjoin the mandate in federal courts of appeals across the nation. Finding "cause to believe there are grave statutory and constitutional issues with the Mandate," we intervened and imposed a temporary stay on OSHA's enforcement of the Mandate. For ease of judicial review, and in light of the pressing need to act immediately, we consolidated our court's petitions under the case number captioned above.

Many of the petitioners are covered private employers within the geographical boundaries of this circuit.[5] Their standing[6] to sue is obvious—the Mandate imposes a financial burden upon them by deputizing their participation in OSHA's regulatory scheme, exposes them to severe financial risk if they refuse or fail to comply, and threatens to decimate their workforces (and business prospects) by forcing unwilling employees to take their shots, take their tests, or hit the road.

> 5 Because these petitioners are the targets of the Mandate and bear the brunt of OSHA's regulatory power, we principally analyze the petitions from their perspective. This is not to say that the claims of other petitioners such as States or individual citizens would be any less successful on a thorough analysis.

> 6 "Only one of the petitioners needs to have standing to permit us to consider the petition for review." *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).

The petitioners seek a stay—and ultimately a permanent injunction—of the Mandate's enforcement pending full judicial review of the Mandate. We address their request for a stay today.[7]

> 7 Our November 6, 2021 stay order preserved the status quo during the pendency of briefing. The unusual procedural posture of this case makes for an unusual process. Ordinarily, a federal plaintiff aggrieved by an adversary's threatened course of action must go to a *district court* to seek injunctive relief at the outset. In this ordinary scenario, a preliminary injunction precedes a permanent injunction, and trial-court review precedes appellate review. But this is not a typical case. Here, the statute giving OSHA the power to issue emergency temporary standards like the Mandate also provides for direct and immediate judicial review in "the United States court of appeals for the circuit wherein" "[a]ny person who may be adversely affected by" an ETS "resides or has his principal place of business." *See* 29 U.S.C. § 655(f). Satisfied of our jurisdiction to proceed under that provision, but mindful of our unusual procedural posture, we apply the traditional factors for a stay pending judicial review and draw factual support from the attachments to the pleadings, uncontested facts, and judicial notice.

## II.

The "traditional stay factors ... govern a request for a stay pending judicial review." *Nken v. Holder*, 556 U.S. 418, 426, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Under the traditional stay standard, a court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

*611 Each of these factors favors a stay here.

### A.

We first consider whether the petitioners' challenges to the Mandate are likely to succeed on the merits. For a multitude of reasons, they are.

We begin by stating the obvious. The Occupational Safety and Health Act, which created OSHA, was enacted by Congress to assure Americans "safe and healthful working conditions and to preserve our human resources." *See* 29 U.S.C. § 651 (statement of findings and declaration of purpose and policy). It was not—and likely *could* not be, under the Commerce Clause and nondelegation doctrine[8]—intended to authorize a workplace safety administration in the deep recesses of the federal bureaucracy to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways. *Cf. Ala. Ass'n of Realtors v. HHS*, —— U.S. ——, 141 S. Ct. 2485, 2488–90, —— L.Ed.2d —— (2021) (per curiam).

> 8 The nondelegation doctrine constrains Congress's ability to delegate its legislative authority to executive agencies. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371–72, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("The Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States' ... and we have long insisted that 'the integrity and maintenance of the system of government ordered by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." (first quoting

U.S. Const. art. I, § 1 ; then quoting *Field v. Clark* , 143 U.S. 649, 692, 12 S.Ct. 495, 36 L.Ed. 294 (1892) )).

On the dubious assumption that the Mandate *does* pass constitutional muster—which we need not decide today[9]—it is nonetheless fatally flawed on its own terms. Indeed, the Mandate's strained prescriptions combine to make it the rare government pronouncement that is both overinclusive (applying to employers and employees in virtually all industries and workplaces in America, with little attempt to account for the obvious differences between the risks facing, say, a security guard on a lonely night shift, and a meatpacker working shoulder to shoulder in a cramped warehouse) *and* underinclusive (purporting to save employees with 99 or more coworkers from a "grave danger" in the workplace, while making no attempt to shield employees with 98 or fewer coworkers from the very same threat). The Mandate's stated impetus—a purported "emergency" that the entire globe has now endured for nearly two years,[10] and which OSHA itself spent nearly two *months* responding to[11]—is unavailing as *612 well. And its promulgation grossly exceeds OSHA's statutory authority.

---

[9] *But see infra* subsection II.A.2.f.

[10] As Justice Gorsuch recently observed, society's interest in slowing the spread of COVID-19 "cannot qualify as [compelling] forever," for "[i]f human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1–3 v. Mills* , —— U.S. ——, ——, —— S.Ct. ——, —— L.Ed.2d ——, 2021 WL 5027177, at *3 (Oct. 29, 2021) (Gorsuch, J., dissenting); *see also Fla. Peach Growers* , 489 F.2d at 131 (situation ongoing for "last several years ... fail[ed] to qualify for [OSHA] emergency measures").

[11] The President announced his intention to impose a national vaccine mandate on September 9, 2021. *See, e.g.* , Kevin Liptak & Kaitlan Collins, *Biden Announces New Vaccine Mandates that Could Cover 100 Million Americans* , CNN (Sept. 9, 2021), https://www.cnn.com/2021/09/09/politics/joe-biden-covid-speech/index.html (" 'We've been patient, but our patience is wearing thin, and your refusal has cost all of us,' Biden said, his tone hardening toward Americans who still refuse to receive a vaccine despite ample evidence of their safety and full approval of one ...."). OSHA issued the Mandate nearly two months later, on November 5, 2021, and the Mandate itself prominently features yet another two-month delay. One could query how an "emergency" could prompt such a "deliberate" response. In similar cases, we've held that OSHA's failure to act promptly "does not conclusively establish that a situation is not an emergency," but "may be evidence that a situation is not a *true* emergency." *Asbestos Info.* , 727 F.2d at 423 (emphasis added).

1.

After the President voiced his displeasure with the country's vaccination rate in September,[12] the Administration pored over the U.S. Code in search of authority, or a "work-around,"[13] for imposing a national vaccine mandate. The vehicle it landed on was an OSHA ETS. The statute empowering OSHA allows OSHA to bypass typical notice-and-comment proceedings for six months by providing "for an emergency temporary standard to take immediate effect upon publication in the Federal Register" if it "determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger." 29 U.S.C. § 655(c)(1).

---

[12] *See supra* note 11.

> 13 On September 9, 2021, White House Chief of Staff Ron Klain retweeted MSNBC anchor Stephanie Ruhle's tweet that stated, "OSHA doing this vaxx mandate as an emergency workplace safety rule *is the ultimate work-around for the Federal govt to require vaccinations.* " *See, e.g.* , Pet'rs Burnett Specialists, Choice Staffing, LLC, and Staff Force Inc.'s Reply Brief at 4 (emphasis added).

As the name suggests, *emergency* temporary standards "are an 'unusual response' to 'exceptional circumstances.' " *Int'l Chem. Workers* , 830 F.2d at 371 (quoting *Pub. Citizen Health Rsch. Grp. v. Auchter* , 702 F.2d 1150, 1155 (D.C. Cir. 1983) ). Thus, courts have uniformly observed that OSHA's authority to establish emergency temporary standards under § 655(c) "is an 'extraordinary power' that is to be 'delicately exercised' in only certain 'limited situations.' " *Id.* at 370 (quoting *Pub. Citizen* , 702 F.2d at 1155 ).[14]

> 14 The Agency has thus conceded in the past that "[t]he OSH Act does not authorize OSHA to issue sweeping health standards to address entire classes of known and unknown infectious diseases on an emergency basis without notice and comment." *See* Department of Labor's Resp. to the Emergency Pet. for a Writ of Mandamus at 33–34, *In re AFL-CIO* , No. 20-1158 (D.C. Cir. May 29, 2020) [hereinafter OSHA D.C. Circuit Brief].

But the Mandate at issue here is anything *but* a "delicate[ ] exercise[ ]" of this "extraordinary power." *Cf. Pub. Citizen* , 702 F.2d at 1155. Quite the opposite, rather than a delicately handled scalpel, the Mandate is a one-size-fits-all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers) that have more than a little bearing on workers' varying degrees of susceptibility to the supposedly "grave danger" the Mandate purports to address.

2.

Thus, as § 655(c)(1) plainly provides, to be lawfully enacted, an ETS must: (1) address "substances or agents determined to be toxic or physically harmful"—or "new hazards"—in the workplace; (2) show that workers are exposed to such "substances," "agents," or "new hazards" in the workplace; (3) show that said exposure places workers in "grave danger"; and (4) be "necessary" to alleviate employees' exposure to gravely dangerous hazards in the workplace. As we have noted in the past, the precision of this standard makes it a difficult one to meet. *See Fla. Peach Growers* , 489 F.2d at 130 (observing that OSHA's ETS authority "requires determination of danger from exposure to *613 harmful substances, not just a danger of exposure; and, not exposure to just a danger, but to a grave danger; and, not the necessity of just a temporary standard, but that an emergency [temporary] standard is necessary").[15]

> 15 In prior litigation, OSHA acknowledged that many "workplaces" covered by a COVID-19 ETS "are not merely workplaces," but are also "stores, restaurants, and other places occupied by workers and the general public alike, in which the measures called for require a broader lens—and at times a broader mandate—than available to OSHA." *See* OSHA D.C. Circuit Brief at 20.

(a)

In its brief, Texas makes a compelling argument that § 655(c)(1)'s neighboring phrases "substances or agents" and "toxic or physically harmful" place an airborne virus beyond the purview of an OSHA ETS in the first place. To avoid "giving unintended breadth to the Acts of Congress," courts "rely on the principle of *noscitur a sociis* — a word is known by the company it keeps." *Yates v. United States* , 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (cleaned up). Here, OSHA's attempt to shoehorn an airborne virus that is both widely present in society (and thus not particular to any workplace) and non-life-threatening to a vast majority of employees into a

neighboring phrase connoting *toxicity* and *poisonousness* is yet another transparent stretch. Other cases involving OSHA (though not ETSs per se) shed further light on the intended meaning of these terms. *See, e.g., UAW v. OSHA*, 938 F.2d 1310, 1314 (D.C. Cir. 1991). *See generally Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980). Any argument OSHA may make that COVID-19 is a "new hazard[ ]" would directly contradict OSHA's prior representation to the D.C. Circuit that "[t]here can be no dispute that COVID-19 is a *recognized* hazard." *See* OSHA D.C. Circuit Brief at 25 (emphasis added).

(b)

A natural first step in enacting a lawful ETS is to show that employees covered by the ETS are in fact *exposed* to the dangerous substances, agents, or hazards at issue—here, COVID-19. *See, e.g., Int'l Chem. Workers*, 830 F.2d at 371 (noting OSHA's stated view "that a finding of 'grave danger' to support an ETS be based upon exposure in actual levels found in the workplace"). As it pertains to the vast majority of private employees covered by the Mandate, however, OSHA fails to meet this threshold burden. In defending the Mandate before this court, the Government credits OSHA with "describ[ing] myriad studies showing workplace [COVID-19] 'clusters' and 'outbreaks' and other significant 'evidence of workplace transmission' and 'exposure.' " *See* Resp'ts' Opp'n to Emergency Stay Mot. at 8. But this misses the mark, as OSHA is required to make findings of exposure—or at least the presence of COVID-19—in *all* covered workplaces.

Of course, OSHA cannot possibly show that every workplace covered by the Mandate currently has COVID-positive employees, or that every industry covered by the Mandate has had or will have "outbreaks." As discussed below, this kind of overbreadth plagues the Mandate generally. *See infra* subsection II.A.2.d.

(c)

Equally problematic, however, is that it remains unclear that COVID-19—however tragic and devastating the pandemic has been—poses the kind of grave danger § 655(c)(1) contemplates. *See, e.g.,* *614 *Int'l Chem. Workers*, 830 F.2d at 371 (noting that OSHA itself once concluded "that to be a 'grave danger,' it is not sufficient that a chemical, such as cadmium, can cause *cancer* or *kidney damage* at a high level of exposure" (emphasis added)). For starters, the Mandate itself concedes that the effects of COVID-19 may range from "mild" to "critical." As important, however, the status of the spread of the virus has varied since the President announced the general parameters of the Mandate in September. (And of course, this all assumes that COVID-19 poses any significant danger to workers to begin with; for the more than *seventy-eight* percent[16] of Americans aged 12 and older either fully or partially inoculated against it, the virus poses—the Administration assures us—little risk at all.) *See, e.g.*, 86 Fed. Reg. 61,402, 61,402 –03 ("COVID-19 vaccines authorized or approved by the [FDA] effectively protect vaccinated individuals against severe illness and death from COVID-19.").

> [16] *See* CDC, Covid Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

The Administration's prior statements in this regard further belie the notion that COVID-19 poses the kind of emergency that allows OSHA to take the extreme measure of an ETS. In reviewing agency pronouncements, courts need not turn a blind eye to the statements of those issuing such pronouncements. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). In fact, courts have an affirmative duty *not* to do so. It is thus critical to note that the Mandate makes no serious attempt to explain why OSHA and the President himself[17] were against vaccine mandates before they were for one here. *See, e.g.*, Occupational Exposure to

Bloodborne Pathogens, 54 Fed. Reg. 23,042, 23,045 (May 30, 1989) ("Health in general is an intensely personal matter.... OSHA prefers to encourage rather than try to force by governmental coercion, employee cooperation in [a] vaccination program."); Letter from Loren Sweatt, Principal Deputy Assistant Sec'y, OSHA, to Richard L. Trumka, President, AFL-CIO at 3 (May 29, 2020) [hereinafter Sweatt Letter] (acknowledging as a general matter that it "would not be necessary for OSHA to issue an ETS to protect workers from infectious diseases" because "OSHA lacks evidence to conclude that all infectious diseases to which employees may be exposed at a workplace constitute a 'grave danger' for which an ETS is an appropriate remedy"). Because it is generally "arbitrary or capricious" to "depart from a prior policy *sub silentio* ," agencies must typically provide a "detailed explanation" for contradicting a prior policy, particularly when the "prior policy has engendered serious reliance interests." *FCC v. Fox* , 556 U.S. at 515, 129 S.Ct. 1800. OSHA's reversal here strains credulity, as does its pretextual basis.[18] Such shortcomings are all hallmarks of unlawful agency actions.

> [17] In December of 2020, the President was quoted as saying, "No I don't think [vaccines] should be mandatory." *See, e.g.* , Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020* , Newsweek (Sept. 10, 2021), https://www.newsweek.com/fact-check-joe-biden-no-vaccines-mandatory-december-2020-1627774.

> [18] *See supra* note 13 (Klain endorsement of the term "work-around").

To be sure, "OSHA's assessment of ... scientifically complex [facts] and its balancing of the competing policies that underlie the decision whether to issue an ETS ... are entitled to great deference," but this is not a case where any amount of deference would make a bit of difference. *Int'l Chem. Workers* , 830 F.2d at 371.

615 *615 (d)

We next consider the necessity of the Mandate. The Mandate is staggeringly overbroad. Applying to 2 out of 3 private-sector employees in America, in workplaces as diverse as the country itself, the Mandate fails to consider what is perhaps the most salient fact of all: the ongoing threat of COVID-19 is more dangerous to *some* employees than to *other* employees. All else equal, a 28 year-old trucker spending the bulk of his workday in the solitude of his cab is simply less vulnerable to COVID-19 than a 62 year-old prison janitor. Likewise, a naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus. The list goes on, but one constant remains—the Mandate fails almost completely to address, or even respond to, much of this reality and common sense.

Moreover, earlier in the pandemic, the Agency recognized the practical impossibility of tailoring an effective ETS in response to COVID-19. *See* OSHA D.C. Circuit Brief at 16, 17, 21, 26 ("Based on substantial evidence, OSHA determined that an ETS is not necessary both because there are existing OSHA and non-OSHA standards that address COVID-19 and because an ETS would actually be counterproductive.... To address all employers and to do so with the requisite dispatch, an ETS would at best be an enshrinement of these general and universally known measures that are already enforceable through existing OSHA tools that require employers to assess and address extant hazards. OSHA's time and resources are better spent issuing industry-specific guidance that adds real substance and permits flexibility as we learn more about this virus. Given that we learn more about COVID-19 every day, setting rules in stone through an ETS (and later a permanent rule) may undermine worker protection by permanently mandating precautions that later prove to be inefficacious.... [A]n ETS could only enshrine broad legal standards that are already in place or direct employers to develop COVID-19 response plans specific to their businesses, something

employers are already doing. Such a step would be superfluous at best and could be counterproductive to ongoing state, local, and private efforts.... Additionally, employers may choose any effective method to abate a recognized hazard under the general duty clause. Contrary to AFL-CIO's argument, this flexibility is likely to improve worker safety, because employers must choose a means of abatement that eliminates the hazard or materially reduces it to the extent feasible."). OSHA itself admitted that "an ETS once issued could very well become ineffective or counterproductive, as it may be informed by incomplete or ultimately inaccurate information." *Id.* at 30, 32–33 (acknowledging further that "[a]dequate safeguards for workers could differ substantially based on geographic location, as the pandemic has had dramatically different impacts on different parts of the country. State and local requirements and guidance on COVID-19 are thus critical to employers in determining how to best protect workers, and OSHA must retain flexibility to adapt its advice regarding incorporation of such local guidance, where appropriate.... [A]n ETS meant to broadly cover all workers with potential exposure to COVID-19—effectively *all* workers across the country—would have to be written at such a general level that it would risk providing very little assistance at all").

In light of this immense complexity, one might naturally ask the Agency—is this situation truly amenable to a one-size-fits-all Mandate? The likely answer may be why OSHA has in the past "determined that the best approach for responding

616 to *616 the pandemic is to enforce the existing OSH Act requirements that address infectious disease hazards, while also issuing detailed, industry-specific guidance," which is generally "more effective than promulgating a rigid set of requirements for all employers in all industries based on limited information." *See* Sweatt Letter at 2. In sum, as OSHA itself has previously acknowledged, an ETS appears to be a "poorly-suited approach for protecting workers against [COVID-19] because no standard that covers all of the Nation's workers would protect all those workers equally." *See id.* at 9.

At the same time, the Mandate is also *underinclusive.* The most vulnerable worker in America draws no protection from the Mandate if his company employs 99 workers or fewer. The reason why? Because, as even OSHA admits, companies of 100 or more employers will be better able to administer (and sustain) the Mandate. *See* 86 Fed. Reg. 61,402, 61,403 ("OSHA seeks information about the ability of employers with fewer than 100 employees to implement COVID-19 vaccination and/or testing programs."). That may be true. But this kind of thinking belies the premise that any of this is truly an *emergency.* Indeed, underinclusiveness of this sort is often regarded as a telltale sign that the government's interest in enacting a liberty-restraining pronouncement is not in fact "compelling." *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* , 508 U.S. 520, 542–46, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (city's ban on religious animal sacrifice but corresponding allowance of other activities similarly endangering public health belied its purportedly "compelling" interest in safe animal disposal practices). The underinclusive nature of the Mandate implies that the Mandate's true purpose is not to enhance workplace safety, but instead to ramp up vaccine uptake by any means necessary.[19]

> [19] The Mandate is also underinclusive in the solutions it proposes. Indeed, even in its fullest force, the Mandate cannot prevent vaccinated employees from spreading the virus in the workplace, or prevent unvaccinated employees from spreading the virus in between weekly tests.

(e)

If the deficiencies we've already covered aren't enough, other miscellaneous considerations seal the Mandate's fate. For one, "[t]he Agency cannot

use its ETS powers as a stop-gap measure," *Asbestos Info.*, 727 F.2d at 422, but concedes that that is precisely what the Mandate is intended to do here. *See* 86 Fed. Reg. 61,402, 61,434–35 (admitting that "[c]rafting a multi-layered standard that is comprehensive and feasible for all covered work settings, including mixed settings of vaccinated and unvaccinated workers, is an extraordinarily challenging and complicated undertaking, yet the grave danger that COVID-19 poses to unvaccinated workers obliges the agency to act as quickly as possible"). For another, courts have consistently recognized that the "protection afforded to workers [by an ETS] should outweigh the economic consequences to the regulated industry," *Asbestos Info.*, 727 F.2d at 423, but for all the reasons we've previously noted, the Mandate flunks a cost-benefit analysis here.

(f)

It lastly bears noting that the Mandate raises serious constitutional concerns that either make it more likely that the petitioners will succeed on the merits, or at least counsel against adopting OSHA's broad reading of § 655(c) as a matter of statutory interpretation.*617 First, the Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power. A person's choice to remain unvaccinated and forgo regular testing is noneconomic inactivity. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 522, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (Roberts, C.J., concurring); *see also id.* at 652–53, 132 S.Ct. 2566 (Scalia, J., dissenting). And to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power. *Zucht v. King*, 260 U.S. 174, 176, 43 S.Ct. 24, 67 L.Ed. 194 (1922) (noting that precedent had long "settled that it is within the police power of a state to provide for compulsory vaccination"); *Jacobson v. Massachusetts*, 197 U.S. 11, 25–26, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (similar). The Mandate, however, commandeers U.S. employers to compel millions of employees to receive a COVID-19 vaccine or bear the burden of weekly testing. 86 Fed. Reg. 61,402, 61,407, 61,437, 61,552. The Commerce Clause power may be expansive, but it does not grant Congress the power to regulate noneconomic inactivity traditionally within the States' police power. *See Sebelius*, 567 U.S. at 554, 132 S.Ct. 2566 (Roberts, C.J., concurring) ("People, for reasons of their own, often fail to do things that would be good for them or good for society. Those failures—joined with the similar failures of others—can readily have a substantial effect on interstate commerce. Under the Government's logic, that authorizes Congress to use its commerce power to compel citizens to act as the Government would have them act."); *see also Bond v. United States*, 572 U.S. 844, 854, 134 S.Ct. 2077, 189 L.Ed.2d 1 (2014) ("The States have broad authority to enact legislation for the public good—what we have often called a 'police power.' ... The Federal Government, by contrast, has no such authority...." (citations omitted)). Indeed, the courts "*always* have rejected readings of the Commerce Clause ... that would permit Congress to exercise a police power." *United States v. Lopez*, 514 U.S. 549, 584, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Thomas, J., concurring). In sum, the Mandate would far exceed current constitutional authority.

Second, concerns over separation of powers principles cast doubt over the Mandate's assertion of virtually unlimited power to control individual conduct under the guise of a workplace regulation. As Judge Duncan points out, the major questions doctrine confirms that the Mandate exceeds the bounds of OSHA's statutory authority. Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (cleaned up). The Mandate derives its authority from an old statute employed in a novel manner,[20] imposes nearly $3 billion in compliance costs, involves broad medical considerations that lie outside of OSHA's core competencies, and

purports to definitively resolve one of today's most hotly debated political issues. *Cf. MCI Telecomms. Corp. v. AT&T* , 512 U.S. 218, 231, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (declining to hold that the FCC could eliminate telecommunications rate-filing requirements); *FDA v. Brown & Williamson Tobacco Corp.* , 529 U.S. 120, 159–60, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (declining to hold that the FDA could regulate cigarettes); *Gonzales v. Oregon* , 546 U.S. 243, 262, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (declining to allow DOJ to ban physician-assisted

618  *618 suicide). There is no clear expression of congressional intent in § 655(c) to convey OSHA such broad authority, and this court will not infer one. Nor can the Article II executive breathe new power into OSHA's authority—no matter how thin patience wears.

> [20] Here, it is simply unlikely that Congress assigned authority over such a monumental policy decision to OSHA—hard hats and safety goggles, this is not.

At the very least, even if the statutory language were susceptible to OSHA's broad reading—which it is not—these serious constitutional concerns would counsel this court's rejection of that reading. *Jennings v. Rodriguez* , ––– U.S. ––––, 138 S. Ct. 830, 836, 200 L.Ed.2d 122 (2018).

* * *

Accordingly, the petitioners' challenges to the Mandate show a great likelihood of success on the merits, and this fact weighs critically in favor of a stay.

B.

It is clear that a denial of the petitioners' proposed stay would do them irreparable harm. For one, the Mandate threatens to substantially burden the liberty interests[21] of reluctant individual recipients put to a choice between their job(s) and their jab(s). For the individual petitioners, the loss of constitutional freedoms "for even minimal periods of time ... unquestionably constitutes irreparable injury." *Elrod v. Burns* , 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

> [21] Not to mention the free religious exercise of certain employees. *See* U.S. Const. amend. I ; *cf. Holt v. Hobbs* , 574 U.S. 352, 361, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015).

Likewise, the companies seeking a stay in this case will also be irreparably harmed in the absence of a stay, whether by the business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, the diversion of resources necessitated by the Mandate, or by OSHA's plan to impose stiff financial penalties on companies that refuse to punish or test unwilling employees. The Mandate places an immediate and irreversible imprint on all covered employers in America, and "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *See Texas v. EPA* , 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich* , 510 U.S. 200, 220–21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (Scalia, J., concurring in part and in the judgment)).

The States, too, have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach.

C.

In contrast, a stay will do *OSHA* no harm whatsoever. Any interest OSHA may claim in enforcing an unlawful (and likely unconstitutional) ETS is illegitimate. Moreover, any abstract "harm" a stay might cause the Agency pales in comparison and importance to the harms the absence of a stay threatens to cause countless individuals and companies.

D.

For similar reasons, a stay is firmly in the public interest. From economic uncertainty to workplace strife, the mere specter of the Mandate has contributed to untold economic upheaval in recent months. Of course, the principles at stake when it comes to the Mandate are not reducible to dollars and cents. The public interest is also served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own *619 convictions—even, or perhaps *particularly*, when those decisions frustrate government officials.

* * *

The Constitution vests a limited legislative power in Congress. For more than a century, Congress has routinely used this power to delegate policymaking specifics and technical details to executive agencies charged with effectuating policy principles Congress lays down. In the mine run of cases—a transportation department regulating trucking on an interstate highway, or an aviation agency regulating an airplane lavatory—this is generally well and good. But health agencies do not make housing policy, and occupational safety administrations do not make health policy. *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. at 2488–90. In seeking to do so here, OSHA runs afoul of the statute from which it draws its power and, likely, violates the constitutional structure that safeguards our collective liberty.

For these reasons, the petitioners' motion for a stay pending review is GRANTED. Enforcement of the Occupational Safety and Health Administration's "COVID-19 Vaccination and Testing; Emergency Temporary Standard"[22] remains STAYED pending adequate judicial review of the petitioners' underlying motions for a permanent injunction.[23]

---

22  86 Fed. Reg. 61,402 (Nov. 5, 2021) (to be codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918, 1926, and 1928).

23  The Clerk of Court shall ensure that this order applies with equal force to all related motions consolidated into this case in accordance with the court's November 6, 2021 order.

In addition, IT IS FURTHER ORDERED that OSHA take no steps to implement or enforce the Mandate until further court order.

Stuart Kyle Duncan, Circuit Judge, concurring:

In addition to the many reasons ably identified by Judge Engelhardt's opinion, I underscore one reason why these challenges to OSHA's unprecedented mandate are virtually certain to succeed.

Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, —— U.S. ——, 141 S. Ct. 2485, 2489, —— L.Ed.2d —— (2021) (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014)). OSHA's rule reaches "two-thirds of all private-sector workers in the nation." 86 Fed. Reg. 61,402, 61,403 (Nov. 5, 2021). It compels covered employers to (1) make employees get vaccinated or get weekly tests at their expense and wear masks; (2) "remove" non-complying employees; (3) pay per-violation fines; and (4) keep records of employee vaccination or testing status. 86 Fed. Reg. at 61,402–03, 61,551–54; 29 U.S.C. § 666. OSHA invokes no statute expressly authorizing the rule. Instead, OSHA issued it under an emergency provision addressing workplace "substances," "agents," or "hazards" that it has used only ten times in the last 50 years and never to mandate vaccines. 86 Fed. Reg. at 61,403; *see* 29 U.S.C. § 655(c)(1).

Whether Congress could enact such a sweeping mandate under its interstate commerce power would pose a hard question. *See NFIB v. Sebelius*,

567 U.S. 519, 549–61, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). Whether OSHA can do so does not.

I concur in granting a stay.

casetext