NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 21A244 and 21A247
_____

NATIONAL FEDERATION OF INDEPENDENT BUSINESS, ET AL., APPLICANTS
21A244                          v.
DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.


OHIO, ET AL., APPLICANTS
21A247                          v.
DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

PER CURIAM.

The Secretary of Labor, acting through the Occupational Safety and Health Administration, recently enacted a vaccine mandate for much of the Nation's work force. The mandate, which employers must enforce, applies to roughly 84 million workers, covering virtually all employers with at least 100 employees. It requires that covered workers receive a COVID–19 vaccine, and it pre-empts contrary state laws. The only exception is for workers who obtain a medical test each week at their own expense and on their own time, and also wear a mask each workday. OSHA has never before imposed such a mandate. Nor has Congress. Indeed, although Congress has enacted significant legislation addressing the COVID–19 pandemic, it has declined to enact

any measure similar to what OSHA has promulgated here.

Many States, businesses, and nonprofit organizations challenged OSHA's rule in Courts of Appeals across the country. The Fifth Circuit initially entered a stay. But when the cases were consolidated before the Sixth Circuit, that court lifted the stay and allowed OSHA's rule to take effect. Applicants now seek emergency relief from this Court, arguing that OSHA's mandate exceeds its statutory authority and is otherwise unlawful. Agreeing that applicants are likely to prevail, we grant their applications and stay the rule.

## I

### A

Congress enacted the Occupational Safety and Health Act in 1970. 84 Stat. 1590, 29 U. S. C. §651 *et seq.* The Act created the Occupational Safety and Health Administration (OSHA), which is part of the Department of Labor and under the supervision of its Secretary. As its name suggests, OSHA is tasked with ensuring *occupational* safety— that is, "safe and healthful working conditions." §651(b). It does so by enforcing occupational safety and health standards promulgated by the Secretary. §655(b). Such standards must be "reasonably necessary or appropriate to provide safe or healthful *employment*." §652(8) (emphasis added). They must also be developed using a rigorous process that includes notice, comment, and an opportunity for a public hearing. §655(b).

The Act contains an exception to those ordinary notice-and-comment procedures for "emergency temporary standards." §655(c)(1). Such standards may "take immediate effect upon publication in the Federal Register." *Ibid.* They are permissible, however, only in the narrowest of circumstances: the Secretary must show (1) "that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from

Per Curiam

new hazards," and (2) that the "emergency standard is necessary to protect employees from such danger." *Ibid.* Prior to the emergence of COVID–19, the Secretary had used this power just nine times before (and never to issue a rule as broad as this one). Of those nine emergency rules, six were challenged in court, and only one of those was upheld in full. See *BST Holdings, L.L.C.* v. *Occupational Safety and Health Admin.*, 17 F. 4th 604, 609 (CA5 2021).

B

On September 9, 2021, President Biden announced "a new plan to require more Americans to be vaccinated." Remarks on the COVID–19 Response and National Vaccination Efforts, 2021 Daily Comp. of Pres. Doc. 775, p. 2. As part of that plan, the President said that the Department of Labor would issue an emergency rule requiring all employers with at least 100 employees "to ensure their workforces are fully vaccinated or show a negative test at least once a week." *Ibid.* The purpose of the rule was to increase vaccination rates at "businesses all across America." *Ibid.* In tandem with other planned regulations, the administration's goal was to impose "vaccine requirements" on "about 100 million Americans, two-thirds of all workers." *Id.,* at 3.

After a 2-month delay, the Secretary of Labor issued the promised emergency standard. 86 Fed. Reg. 61402 (2021). Consistent with President Biden's announcement, the rule applies to all who work for employers with 100 or more employees. There are narrow exemptions for employees who work remotely "100 percent of the time" or who "work exclusively outdoors," but those exemptions are largely illusory. *Id.,* at 61460. The Secretary has estimated, for example, that only nine percent of landscapers and groundskeepers qualify as working exclusively outside. *Id.,* at 61461. The regulation otherwise operates as a blunt instrument. It draws no distinctions based on industry or risk of exposure to COVID–19. Thus, most lifeguards and

linemen face the same regulations as do medics and meat-packers.  OSHA estimates that 84.2 million employees are subject to its mandate.  *Id.,* at 61467.

Covered employers must "develop, implement, and enforce a mandatory COVID–19 vaccination policy."  *Id.*, at 61402.  The employer must verify the vaccination status of each employee and maintain proof of it.  *Id.*, at 61552.  The mandate does contain an "exception" for employers that require unvaccinated workers to "undergo [weekly] COVID–19 testing and wear a face covering at work in lieu of vaccination."  *Id.*, at 61402.  But employers are not required to offer this option, and the emergency regulation purports to pre-empt state laws to the contrary.  *Id.,* at 61437.  Unvaccinated employees who do not comply with OSHA's rule must be "removed from the workplace."  *Id.,* at 61532.  And employers who commit violations face hefty fines: up to $13,653 for a standard violation, and up to $136,532 for a willful one.  29 CFR §1903.15(d) (2021).

### C

OSHA published its vaccine mandate on November 5, 2021.  Scores of parties—including States, businesses, trade groups, and nonprofit organizations—filed petitions for review, with at least one petition arriving in each regional Court of Appeals.  The cases were consolidated in the Sixth Circuit, which was selected at random pursuant to 28 U. S. C. §2112(a).

Prior to consolidation, however, the Fifth Circuit stayed OSHA's rule pending further judicial review.  *BST Holdings*, 17 F. 4th 604.  It held that the mandate likely exceeded OSHA's statutory authority, raised separation-of-powers concerns in the absence of a clear delegation from Congress, and was not properly tailored to the risks facing different types of workers and workplaces.

When the consolidated cases arrived at the Sixth Circuit, two things happened.  First, many of the petitioners—

Per Curiam

nearly 60 in all—requested initial hearing en banc. Second, OSHA asked the Court of Appeals to vacate the Fifth Circuit's existing stay. The Sixth Circuit denied the request for initial hearing en banc by an evenly divided 8-to-8 vote. *In re MCP No. 165*, 20 F. 4th 264 (2021). Chief Judge Sutton dissented, joined by seven of his colleagues. He reasoned that the Secretary's "broad assertions of administrative power demand unmistakable legislative support," which he found lacking. *Id.,* at 268. A three-judge panel then dissolved the Fifth Circuit's stay, holding that OSHA's mandate was likely consistent with the agency's statutory and constitutional authority. See *In re MCP No. 165*, 2021 WL 5989357, ___ F. 4th ___ (CA6 2021). Judge Larsen dissented.

Various parties then filed applications in this Court requesting that we stay OSHA's emergency standard. We consolidated two of those applications—one from the National Federation of Independent Business, and one from a coalition of States—and heard expedited argument on January 7, 2022.

## II

The Sixth Circuit concluded that a stay of the rule was not justified. We disagree.

### A

Applicants are likely to succeed on the merits of their claim that the Secretary lacked authority to impose the mandate. Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided. The Secretary has ordered 84 million Americans to either obtain a COVID–19 vaccine or undergo weekly medical testing at their own expense. This is no "everyday exercise of federal power." *In re MCP No. 165*, 20 F. 4th, at 272 (Sutton, C. J., dissenting). It is instead a significant encroachment into the lives—and health—of a

vast number of employees. "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. \_\_\_, \_\_\_ (2021) (*per curiam*) (slip op., at 6) (internal quotation marks omitted). There can be little doubt that OSHA's mandate qualifies as an exercise of such authority.

The question, then, is whether the Act plainly authorizes the Secretary's mandate. It does not. The Act empowers the Secretary to set *workplace* safety standards, not broad public health measures. See 29 U. S. C. §655(b) (directing the Secretary to set "*occupational* safety and health standards" (emphasis added)); §655(c)(1) (authorizing the Secretary to impose emergency temporary standards necessary to protect "employees" from grave danger in the workplace). Confirming the point, the Act's provisions typically speak to hazards that employees face at work. See, *e.g.,* §§651, 653, 657. And no provision of the Act addresses public health more generally, which falls outside of OSHA's sphere of expertise.

The dissent protests that we are imposing "a limit found no place in the governing statute." *Post*, at 7 (joint opinion of BREYER, SOTOMAYOR, and KAGAN, JJ.). Not so. It is the text of the agency's Organic Act that repeatedly makes clear that OSHA is charged with regulating "occupational" hazards and the safety and health of "employees." See, *e.g.,* 29 U. S. C. §§652(8), 654(a)(2), 655(b)–(c).

The Solicitor General does not dispute that OSHA is limited to regulating "work-related dangers." Response Brief for OSHA in No. 21A244 etc., p. 45 (OSHA Response). She instead argues that the risk of contracting COVID–19 qualifies as such a danger. We cannot agree. Although COVID–19 is a risk that occurs in many workplaces, it is not an *occupational* hazard in most. COVID–19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no

Per Curiam

different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases.  Permitting OSHA to regulate the hazards of daily life—simply because most Americans have jobs and face those same risks while on the clock—would significantly expand OSHA's regulatory authority without clear congressional authorization.

The dissent contends that OSHA's mandate is comparable to a fire or sanitation regulation imposed by the agency. See *post*, at 7–9.  But a vaccine mandate is strikingly unlike the workplace regulations that OSHA has typically imposed.  A vaccination, after all, "cannot be undone at the end of the workday."  *In re MCP No. 165*, 20 F. 4th, at 274 (Sutton, C. J., dissenting).  Contrary to the dissent's contention, imposing a vaccine mandate on 84 million Americans in response to a worldwide pandemic is simply not "part of what the agency was built for."  *Post*, at 10.

That is not to say OSHA lacks authority to regulate occupation-specific risks related to COVID–19.  Where the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible.  We do not doubt, for example, that OSHA could regulate researchers who work with the COVID–19 virus.  So too could OSHA regulate risks associated with working in particularly crowded or cramped environments.  But the danger present in such workplaces differs in both degree and kind from the everyday risk of contracting COVID–19 that all face.  OSHA's indiscriminate approach fails to account for this crucial distinction—between occupational risk and risk more generally—and accordingly the mandate takes on the character of a general public health measure, rather than an "*occupational* safety or health standard."  29 U. S. C. §655(b) (emphasis added).

In looking for legislative support for the vaccine mandate, the dissent turns to the American Rescue Plan Act of 2021, Pub. L. 117–2, 135 Stat. 4.  See *post*, at 8.  That legislation,

signed into law on March 11, 2021, of course said nothing about OSHA's vaccine mandate, which was not announced until six months later.  In fact, the most noteworthy action concerning the vaccine mandate by either House of Congress has been a majority vote of the Senate disapproving the regulation on December 8, 2021.  S. J. Res. 29, 117th Cong., 1st Sess. (2021).

It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind—addressing a threat that is untethered, in any causal sense, from the workplace.  This "lack of historical precedent," coupled with the breadth of authority that the Secretary now claims, is a "telling indication" that the mandate extends beyond the agency's legitimate reach.  *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505 (2010) (internal quotation marks omitted).*

### B

The equities do not justify withholding interim relief.  We are told by the States and the employers that OSHA's mandate will force them to incur billions of dollars in unrecoverable compliance costs and will cause hundreds of thousands of employees to leave their jobs.  See Application in No. 21A244, pp. 25–32; Application in No. 21A247, pp. 32–33; see also 86 Fed. Reg. 61475.  For its part, the Federal Government says that the mandate will save over 6,500 lives and prevent hundreds of thousands of hospitalizations.  OSHA Response 83; see also 86 Fed. Reg. 61408.

It is not our role to weigh such tradeoffs.  In our system of government, that is the responsibility of those chosen by

---

*The dissent says that we do "not contest," *post*, at 6, that the mandate was otherwise proper under the requirements for an emergency temporary standard, see 29 U. S. C. §655(c)(1).  To be clear, we express no view on issues not addressed in this opinion.

Per Curiam

the people through democratic processes. Although Congress has indisputably given OSHA the power to regulate occupational dangers, it has not given that agency the power to regulate public health more broadly. Requiring the vaccination of 84 million Americans, selected simply because they work for employers with more than 100 employees, certainly falls in the latter category.

*     *     *

The applications for stays presented to JUSTICE KAVANAUGH and by him referred to the Court are granted.

OSHA's COVID–19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61402, is stayed pending disposition of the applicants' petitions for review in the United States Court of Appeals for the Sixth Circuit and disposition of the applicants' petitions for writs of certiorari, if such writs are timely sought. Should the petitions for writs of certiorari be denied, this order shall terminate automatically. In the event the petitions for writs of certiorari are granted, the order shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

Cite as:  595 U. S. ____ (2022)          1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21A244 and 21A247

————————

## NATIONAL FEDERATION OF INDEPENDENT BUSINESS, ET AL., APPLICANTS
21A244                        *v.*
## DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.


## OHIO, ET AL., APPLICANTS
21A247                        *v.*
## DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, concurring.

The central question we face today is:  Who decides?  No one doubts that the COVID–19 pandemic has posed challenges for every American.  Or that our state, local, and national governments all have roles to play in combating the disease.  The only question is whether an administrative agency in Washington, one charged with overseeing workplace safety, may mandate the vaccination or regular testing of 84 million people.  Or whether, as 27 States before us submit, that work belongs to state and local governments across the country and the people's elected representatives in Congress.  This Court is not a public health authority. But it is charged with resolving disputes about which authorities possess the power to make the laws that govern us under the Constitution and the laws of the land.

\*

I start with this Court's precedents.  There is no question
that state and local authorities possess considerable power
to regulate public health.  They enjoy the "general power of
governing," including all sovereign powers envisioned by
the Constitution and not specifically vested in the federal
government.  *National Federation of Independent Business*
v. *Sebelius*, 567 U. S. 519, 536 (2012) (opinion of Roberts,
C. J.); U. S. Const., Amdt. 10.  And in fact, States have pur-
sued a variety of measures in response to the current pan-
demic.  *E.g.*, Cal. Dept. of Public Health, All Facilities Let-
ter 21–28.1 (Dec. 27, 2021); see also N. Y. Pub. Health Law
Ann. § 2164 (West 2021).

The federal government's powers, however, are not gen-
eral but limited and divided.  See *McCulloch* v. *Maryland*,
4 Wheat. 316, 405 (1819).  Not only must the federal gov-
ernment properly invoke a constitutionally enumerated
source of authority to regulate in this area or any other.  It
must also act consistently with the Constitution's separa-
tion of powers.  And when it comes to that obligation, this
Court has established at least one firm rule:  "We expect
Congress to speak clearly" if it wishes to assign to an exec-
utive agency decisions "of vast economic and political sig-
nificance."  *Alabama Assn. of Realtors* v. *Department of
Health and Human Servs.*, 594 U. S. ___, ___ (2021) (*per cu-
riam*) (slip op., at 6) (internal quotation marks omitted).  We
sometimes call this the major questions doctrine.  *Gundy* v.
*United States*, 588 U. S. ___, ___ (2019) (Gorsuch, J., dis-
senting) (slip op., at 20).

OSHA's mandate fails that doctrine's test.  The agency
claims the power to force 84 million Americans to receive a
vaccine or undergo regular testing.  By any measure, that
is a claim of power to resolve a question of vast national
significance.  Yet Congress has nowhere clearly assigned so
much power to OSHA.  Approximately two years have
passed since this pandemic began; vaccines have been

available for more than a year.  Over that span, Congress
has adopted several major pieces of legislation aimed at
combating COVID–19.  *E.g.*, American Rescue Plan Act of
2021, Pub. L. 117–2, 135 Stat. 4.  But Congress has chosen
not to afford OSHA—or any federal agency—the authority
to issue a vaccine mandate.  Indeed, a majority of the Sen-
ate even voted to *disapprove* OSHA's regulation.  See S.J.
Res. 29, 117th Cong., 1st Sess. (2021).  It seems, too, that
the agency pursued its regulatory initiative only as a legis-
lative "'work-around.'"  *BST Holdings, L.L.C.* v. *OSHA*, 17
F. 4th 604, 612 (CA5 2021).  Far less consequential agency
rules have run afoul of the major questions doctrine.  *E.g.*,
*MCI Telecommunications Corp.* v. *American Telephone &
Telegraph Co.*, 512 U. S. 218, 231 (1994) (eliminating rate-
filing requirement).  It is hard to see how this one does not.

What is OSHA's reply?  It directs us to 29 U. S. C.
§ 655(c)(1).  In that statutory subsection, Congress author-
ized OSHA to issue "emergency" regulations upon deter-
mining that "employees are exposed to grave danger from
exposure to substances or agents determined to be toxic or
physically harmful" and "that such emergency standard[s]
[are] necessary to protect employees from such danger[s]."
According to the agency, this provision supplies it with "al-
most unlimited discretion" to mandate new nationwide
rules in response to the pandemic so long as those rules are
"reasonably related" to workplace safety.  86 Fed. Reg.
61402, 61405 (2021) (internal quotation marks omitted).

The Court rightly applies the major questions doctrine
and concludes that this lone statutory subsection does not
clearly authorize OSHA's mandate.  See *ante*, at 5–6.  Sec-
tion 655(c)(1) was not adopted in response to the pandemic,
but some 50 years ago at the time of OSHA's creation.  Since
then, OSHA has relied on it to issue only comparatively
modest rules addressing dangers uniquely prevalent inside
the workplace, like asbestos and rare chemicals.  See *In re:
MCP No. 165*, 20 F. 4th 264, 276 (CA6 2021) (Sutton, C. J.,

4    NATIONAL FEDERATION OF INDEPENDENT BUSINESS *v.*
OSHA

Gorsuch, J., concurring

dissenting from denial of initial hearing en banc).  As the agency itself explained to a federal court less than two years ago, the statute does "not authorize OSHA to issue sweeping health standards" that affect workers' lives outside the workplace.  Brief for Department of Labor, *In re: AFL–CIO*, No. 20–1158, pp. 3, 33 (CADC 2020).  Yet that is precisely what the agency seeks to do now—regulate not just what happens inside the workplace but induce individuals to undertake a medical procedure that affects their lives outside the workplace.  Historically, such matters have been regulated at the state level by authorities who enjoy broader and more general governmental powers.  Meanwhile, at the federal level, OSHA arguably is not even the agency most associated with public health regulation.  And in the rare instances when Congress has sought to mandate vaccinations, it has done so expressly.  *E.g.*, 8 U. S. C. § 1182(a)(1)(A)(ii).  We have nothing like that here.

*

Why does the major questions doctrine matter?  It ensures that the national government's power to make the laws that govern us remains where Article I of the Constitution says it belongs—with the people's elected representatives.  If administrative agencies seek to regulate the daily lives and liberties of millions of Americans, the doctrine says, they must at least be able to trace that power to a clear grant of authority from Congress.

In this respect, the major questions doctrine is closely related to what is sometimes called the nondelegation doctrine.  Indeed, for decades courts have cited the nondelegation doctrine as a reason to apply the major questions doctrine.  *E.g.*, *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 645 (1980) (plurality opinion).  Both are designed to protect the separation of powers and ensure that any new laws governing the lives of Americans are subject to the robust democratic processes the Constitution demands.

The nondelegation doctrine ensures democratic account-ability by preventing Congress from intentionally delegat-ing its legislative powers to unelected officials.  Sometimes lawmakers may be tempted to delegate power to agencies to "reduc[e] the degree to which they will be held accounta-ble for unpopular actions."  R. Cass, Delegation Reconsid-ered: A Delegation Doctrine for the Modern Administrative State, 40 Harv. J. L. Pub. Pol'y 147, 154 (2017).  But the Constitution imposes some boundaries here.  *Gundy*, 588 U. S., at ___  (GORSUCH, J., dissenting) (slip op., at 1).  If Congress could hand off all its legislative powers to une-lected agency officials, it "would dash the whole scheme" of our Constitution and enable intrusions into the private lives and freedoms of Americans by bare edict rather than only with the consent of their elected representatives.  *Department of Transportation* v. *Association of American Rail-roads*, 575 U. S. 43, 61 (2015) (ALITO, J., concurring); see also M. McConnell, The President Who Would Not Be King 326–335 (2020); I. Wurman, Nondelegation at the Found-ing, 130 Yale L. J. 1490, 1502 (2021).

The major questions doctrine serves a similar function by guarding against unintentional, oblique, or otherwise un-likely delegations of the legislative power.  Sometimes, Con-gress passes broadly worded statutes seeking to resolve im-portant policy questions in a field while leaving an agency to work out the details of implementation.  *E.g.*, *King* v. *Burwell*, 576 U. S. 473, 485–486 (2015).  Later, the agency may seek to exploit some gap, ambiguity, or doubtful ex-pression in Congress's statutes to assume responsibilities far beyond its initial assignment.  The major questions doc-trine guards against this possibility by recognizing that Congress does not usually "hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001).  In this way, the doctrine is "a vital check on expansive and aggressive assertions of executive author-ity."  *United States Telecom Assn.* v. *FCC*, 855 F. 3d 381,

417 (CADC 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc); see also N. Richardson, Keeping Big Cases From Making Bad Law: The Resurgent Major Questions Doctrine, 49 Conn. L. Rev. 355, 359 (2016).

Whichever the doctrine, the point is the same. Both serve to prevent "government by bureaucracy supplanting government by the people." A. Scalia, A Note on the Benzene Case, American Enterprise Institute, J. on Govt. & Soc., July–Aug. 1980, p. 27. And both hold their lessons for today's case. On the one hand, OSHA claims the power to issue a nationwide mandate on a major question but cannot trace its authority to do so to any clear congressional mandate. On the other hand, if the statutory subsection the agency cites really *did* endow OSHA with the power it asserts, that law would likely constitute an unconstitutional delegation of legislative authority. Under OSHA's reading, the law would afford it almost unlimited discretion—and certainly impose no "specific restrictions" that "meaningfully constrai[n]" the agency. *Touby* v. *United States*, 500 U. S. 160, 166–167 (1991). OSHA would become little more than a "roving commission to inquire into evils and upon discovery correct them." *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 551 (1935) (Cardozo, J., concurring). Either way, the point is the same one Chief Justice Marshall made in 1825: There are some "important subjects, which must be entirely regulated by the legislature itself," and others "of less interest, in which a general provision may be made, and power given to [others] to fill up the details." *Wayman* v. *Southard*, 10 Wheat. 1, 43 (1825). And on no one's account does this mandate qualify as some "detail."

*

The question before us is not how to respond to the pandemic, but who holds the power to do so. The answer is clear: Under the law as it stands today, that power rests

GORSUCH, J., concurring

with the States and Congress, not OSHA. In saying this much, we do not impugn the intentions behind the agency's mandate. Instead, we only discharge our duty to enforce the law's demands when it comes to the question who may govern the lives of 84 million Americans. Respecting those demands may be trying in times of stress. But if this Court were to abide them only in more tranquil conditions, declarations of emergencies would never end and the liberties our Constitution's separation of powers seeks to preserve would amount to little.

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 21A244 and 21A247

————————

## NATIONAL FEDERATION OF INDEPENDENT BUSINESS, ET AL., APPLICANTS

21A244                    *v.*
## DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.

## OHIO, ET AL., APPLICANTS

21A247                    *v.*
## DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, ET AL.

ON APPLICATIONS FOR STAYS

[January 13, 2022]

JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, dissenting.

Every day, COVID–19 poses grave dangers to the citizens of this country—and particularly, to its workers. The disease has by now killed almost 1 million Americans and hospitalized almost 4 million. It spreads by person-to-person contact in confined indoor spaces, so causes harm in nearly all workplace environments. And in those environments, more than any others, individuals have little control, and therefore little capacity to mitigate risk. COVID–19, in short, is a menace in work settings. The proof is all around us: Since the disease's onset, most Americans have seen their workplaces transformed.

So the administrative agency charged with ensuring health and safety in workplaces did what Congress commanded it to: It took action to address COVID–19's continuing threat in those spaces. The Occupational Safety and

Health Administration (OSHA) issued an emergency temporary standard (Standard), requiring *either* vaccination *or* masking and testing, to protect American workers. The Standard falls within the core of the agency's mission: to "protect employees" from "grave danger" that comes from "new hazards" or exposure to harmful agents. 29 U. S. C. §655(c)(1). OSHA estimates—and there is no ground for disputing—that the Standard will save over 6,500 lives and prevent over 250,000 hospitalizations in six months' time. 86 Fed. Reg. 61408 (2021).

Yet today the Court issues a stay that prevents the Standard from taking effect. In our view, the Court's order seriously misapplies the applicable legal standards. And in so doing, it stymies the Federal Government's ability to counter the unparalleled threat that COVID–19 poses to our Nation's workers. Acting outside of its competence and without legal basis, the Court displaces the judgments of the Government officials given the responsibility to respond to workplace health emergencies. We respectfully dissent.

## I

In 1970, Congress enacted the Occupational Safety and Health Act (Act) "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources," including "by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems." 29 U. S. C. §§651(b), (b)(5). To that end, the Act empowers OSHA to issue "mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." §651(b)(3). Still more, the Act requires OSHA to issue "an emergency temporary standard to take immediate effect upon publication in the Federal Register if [the agency] determines (A) that employees are exposed to grave danger from exposure to substances or agents de-

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

termined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger." §655(c)(1).

Acting under that statutory command, OSHA promulgated the emergency temporary standard at issue here. The Standard obligates employers with at least 100 employees to require that an employee either (1) be vaccinated against COVID–19 or (2) take a weekly COVID–19 test and wear a mask at work. 86 Fed. Reg. 61551–61553. The Standard thus encourages vaccination, but permits employers to adopt a masking-or-testing policy instead. (The majority obscures this choice by insistently calling the policy a "vaccine mandate." *Ante,* at 1, 4, 7, 8.) Further, the Standard does not apply in a variety of settings. It exempts employees who are at a reduced risk of infection because they work from home, alone, or outdoors. See 86 Fed. Reg. 61551. It makes exceptions based on religious objections or medical necessity. See *id.*, at 61552. And the Standard does not constrain any employer able to show that its "conditions, practices, means, methods, operations, or processes" make its workplace equivalently "safe and healthful." 29 U. S. C. §655(d). Consistent with statutory requirements, the Standard lasts only six months. See §655(c)(3).

Multiple lawsuits challenging the Standard were filed in the Federal Courts of Appeals. The applicants asked the courts to stay the Standard's implementation while their legal challenges were pending. The lawsuits were consolidated in the Court of Appeals for the Sixth Circuit. See 28 U. S. C. §2112(a)(3). That court dissolved a stay previously entered, thus allowing the Standard to take effect. See *In re MCP No. 165*, 2021 WL 5989357, ___ F. 4th ___ (2021). The applicants now ask this Court to stay the Standard for the duration of the litigation. Today, the Court grants that request, contravening clear legal principles and itself causing grave danger to the Nation's workforce.

## II

The legal standard governing a request for relief pending appellate review is settled.  To obtain that relief, the applicants must show: (1) that their "claims are likely to prevail," (2) "that denying them relief would lead to irreparable injury," and (3) "that granting relief would not harm the public interest."  *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. ___, ___ (2020) (*per curiam*) (slip op., at 2).  Moreover, because the applicants seek judicial intervention that the Sixth Circuit withheld below, this Court should not issue relief unless the applicants can establish that their entitlement to relief is "indisputably clear." *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___, ___ (2020) (ROBERTS, C. J., concurring in denial of application for injunctive relief ) (slip op., at 2) (internal quotation marks omitted).  None of these requirements is met here.

## III
### A

The applicants are not "likely to prevail" under any proper view of the law.  OSHA's rule perfectly fits the language of the applicable statutory provision.  Once again, that provision commands—not just enables, but commands—OSHA to issue an emergency temporary standard whenever it determines "(A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger."  29 U. S. C. §655(c)(1).  Each and every part of that provision demands that, in the circumstances here, OSHA act to prevent workplace harm.

The virus that causes COVID–19 is a "new hazard" as well as a "physically harmful" "agent."  Merriam-Webster's Collegiate Dictionary 572 (11th ed. 2005) (defining "hazard"

as a "source of danger"); *id.*, at 24 (defining "agent" as a "chemically, physically, or biologically active principle"); *id.*, at 1397 (defining "virus" as "the causative agent of an infectious disease").

The virus also poses a "grave danger" to millions of employees.  As of the time OSHA promulgated its rule, more than 725,000 Americans had died of COVID–19 and millions more had been hospitalized.  See 86 Fed. Reg. 61408, 61424; see also CDC, COVID Data Tracker Weekly Review: Interpretive Summary for Nov. 5, 2021 (Jan. 12, 2022), https://cdc.gov/coronavirus/2019–ncov/covid-data/covidview/past-reports/11052021.html.  Since then, the disease has continued to work its tragic toll.  In the last week alone, it has caused, or helped to cause, more than 11,000 new deaths.  See CDC, COVID Data Tracker (Jan. 12, 2022), https://covid.cdc.gov/covid-data-tracker/#cases_deathsinlast7days.  And because the disease spreads in shared indoor spaces, it presents heightened dangers in most workplaces.  See 86 Fed. Reg. 61411, 61424.

Finally, the Standard is "necessary" to address the danger of COVID–19.  OSHA based its rule, requiring either testing and masking or vaccination, on a host of studies and government reports showing why those measures were of unparalleled use in limiting the threat of COVID–19 in most workplaces.  The agency showed, in meticulous detail, that close contact between infected and uninfected individuals spreads the disease; that "[t]he science of transmission does not vary by industry or by type of workplace"; that testing, mask wearing, and vaccination are highly effective—indeed, essential—tools for reducing the risk of transmission, hospitalization, and death; and that unvaccinated employees of all ages face a substantially increased risk from COVID–19 as compared to their vaccinated peers.  *Id.*, at 61403, 61411–61412, 61417–61419, 61433–61435, 61438–61439.  In short, OSHA showed that no lesser policy would prevent as much death and injury from COVID–19 as the

Standard would.

OSHA's determinations are "conclusive if supported by substantial evidence." 29 U. S. C. §655(f). Judicial review under that test is deferential, as it should be. OSHA employs, in both its enforcement and health divisions, numerous scientists, doctors, and other experts in public health, especially as it relates to work environments. Their decisions, we have explained, should stand so long as they are supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 522 (1981) (quoting *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 477 (1951)). Given the extensive evidence in the record supporting OSHA's determinations about the risk of COVID–19 and the efficacy of masking, testing, and vaccination, a court could not conclude that the Standard fails substantial-evidence review.

## B

The Court does not dispute that the statutory terms just discussed, read in the ordinary way, authorize this Standard. In other words, the majority does not contest that COVID–19 is a "new hazard" and "physically harmful agent"; that it poses a "grave danger" to employees; or that a testing and masking or vaccination policy is "necessary" to prevent those harms. Instead, the majority claims that the Act does not "plainly authorize[]" the Standard because it gives OSHA the power to "set *workplace* safety standards" and COVID–19 exists both inside and outside the workplace. *Ante,* at 6. In other words, the Court argues that OSHA cannot keep workplaces safe from COVID–19 because the agency (as it readily acknowledges) has no power to address the disease outside the work setting.

But nothing in the Act's text supports the majority's limitation on OSHA's regulatory authority. Of course, the ma-

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

jority is correct that OSHA is not a roving public health regulator, see *ante,* at 6–7: It has power only to protect employees from workplace hazards. But as just explained, that is exactly what the Standard does. See *supra*, at 5–6. And the Act requires nothing more: Contra the majority, it is indifferent to whether a hazard in the workplace is also found elsewhere. The statute generally charges OSHA with "assur[ing] so far as possible . . . safe and healthful working conditions." 29 U. S. C. §651(b). That provision authorizes regulation to protect employees from all hazards present in the workplace—or, at least, all hazards in part created by conditions there. It does not matter whether those hazards also exist beyond the workplace walls. The same is true of the provision at issue here demanding the issuance of temporary emergency standards. Once again, that provision kicks in when employees are exposed in the workplace to "new hazards" or "substances or agents" determined to be "physically harmful." §655(c)(1). The statute does not require that employees are exposed to those dangers only while on the workplace clock. And that should settle the matter. When Congress "enact[s] expansive language offering no indication whatever that the statute limits what [an agency] can" do, the Court cannot "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___, ___ (2020) (slip op., at 16) (alteration and internal quotation marks omitted). That is what the majority today does—impose a limit found no place in the governing statute.

Consistent with Congress's directives, OSHA has long regulated risks that arise both inside and outside of the workplace. For example, OSHA has issued, and applied to nearly all workplaces, rules combating risks of fire, faulty electrical installations, and inadequate emergency exits—even though the dangers prevented by those rules arise not

only in workplaces but in many physical facilities (*e.g.,* stadiums, schools, hotels, even homes). See 29 CFR §1910.155 (2020) (fire); §§1910.302–1910.308 (electrical installations); §§1910.34–1910.39 (exit routes). Similarly, OSHA has regulated to reduce risks from excessive noise and unsafe drinking water—again, risks hardly confined to the workplace. See §1910.95 (noise); §1910.141 (water). A biological hazard—here, the virus causing COVID–19—is no different. Indeed, Congress just last year made this clear. It appropriated $100 million for OSHA "to carry out COVID–19 related worker protection activities" in work environments of all kinds. American Rescue Plan Act of 2021, Pub. L. 117–2, 135 Stat. 30. That legislation refutes the majority's view that workplace exposure to COVID–19 is somehow not a workplace hazard. Congress knew—and Congress said—that OSHA's responsibility to mitigate the harms of COVID–19 in the typical workplace do not diminish just because the disease also endangers people in other settings.

That is especially so because—as OSHA amply established—COVID–19 poses special risks in most workplaces, across the country and across industries. See 86 Fed. Reg. 61424 ("The likelihood of transmission can be exacerbated by common characteristics of many workplaces"). The majority ignores these findings, but they provide more-than-ample support for the Standard. OSHA determined that the virus causing COVID–19 is "readily transmissible in workplaces because they are areas where multiple people come into contact with one another, often for extended periods of time." *Id.,* at 61411. In other words, COVID–19 spreads more widely in workplaces than in other venues because more people spend more time together there. And critically, employees usually have little or no control in those settings. "[D]uring the workday," OSHA explained, "workers may have little ability to limit contact with coworkers, clients, members of the public, patients, and

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

others, any one of whom could represent a source of expo-
sure to" the virus. *Id.*, at 61408. The agency backed up its
conclusions with hundreds of reports of workplace COVID–
19 outbreaks—not just in cheek-by-jowl settings like fac-
tory assembly lines, but in retail stores, restaurants, medi-
cal facilities, construction areas, and standard offices. *Id.*,
at 61412–61416. But still, OSHA took care to tailor the
Standard. Where it could exempt work settings without ex-
posing employees to grave danger, it did so. See *id.*, at
61419–61420; *supra*, at 3. In sum, the agency did just what
the Act told it to: It protected employees from a grave dan-
ger posed by a new virus as and where needed, and went no
further. The majority, in overturning that action, substi-
tutes judicial diktat for reasoned policymaking.

The result of its ruling is squarely at odds with the stat-
utory scheme. As shown earlier, the Act's explicit terms au-
thorize the Standard. See *supra,* at 4–6. Once again,
OSHA must issue an emergency standard in response to
new hazards in the workplace that expose employees to
"grave danger." §655(c)(1); see *supra*, at 2–4. The entire
point of that provision is to enable OSHA to deal with emer-
gencies—to put into effect the new measures needed to cope
with new workplace conditions. The enacting Congress of
course did not tell the agency to issue this Standard in re-
sponse to this COVID–19 pandemic—because that Con-
gress could not predict the future. But that Congress did
indeed want OSHA to have the tools needed to confront
emerging dangers (including contagious diseases) in the
workplace. We know that, first and foremost, from the
breadth of the authority Congress granted to OSHA. And
we know that because of how OSHA has used that authority
from the statute's beginnings—in ways not dissimilar to the
action here. OSHA has often issued rules applying to all or
nearly all workplaces in the Nation, affecting at once many
tens of millions of employees. See, *e.g.*, 29 CFR §1910.141.
It has previously regulated infectious disease, including by

facilitating vaccinations.  See §1910.1030(f).  And it has in
other contexts required medical examinations and face cov-
erings for employees.  See §§1910.120(q)(9)(i), 1910.134.  In
line with those prior actions, the Standard here requires
employers to ensure testing and masking if they do not de-
mand vaccination.  Nothing about that measure is so out-
of-the-ordinary as to demand a judicially created exception
from Congress's command that OSHA protect employees
from grave workplace harms.

If OSHA's Standard is far-reaching—applying to many
millions of American workers—it no more than reflects the
scope of the crisis.  The Standard responds to a workplace
health emergency unprecedented in the agency's history: an
infectious disease that has already killed hundreds of thou-
sands and sickened millions; that is most easily transmit-
ted in the shared indoor spaces that are the hallmark of
American working life; and that spreads mostly without re-
gard to differences in occupation or industry.  Over the past
two years, COVID–19 has affected—indeed, transformed—
virtually every workforce and workplace in the Nation.  Em-
ployers and employees alike have recognized and responded
to the special risks of transmission in work environments.
It is perverse, given these circumstances, to read the Act's
grant of emergency powers in the way the majority does—
as constraining OSHA from addressing one of the gravest
workplace hazards in the agency's history.  The Standard
protects untold numbers of employees from a danger espe-
cially prevalent in workplace conditions.  It lies at the core
of OSHA's authority.  It is part of what the agency was built
for.

## IV

Even if the merits were a close question—which they are
not—the Court would badly err by issuing this stay.  That
is because a court may not issue a stay unless the balance
of harms and the public interest support the action.  See

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

*Trump* v. *International Refugee Assistance Project*, 582 U. S. ___, ___ (2017) (*per curiam*) (slip op., at 10) ("Before issuing a stay, it is ultimately necessary to balance the equities—to explore the relative harms" and "the interests of the public at large" (alterations and internal quotation marks omitted)); *supra,* at 4. Here, they do not. The lives and health of the Nation's workers are at stake. And the majority deprives the Government of a measure it needs to keep them safe.

Consider first the economic harms asserted in support of a stay. The employers principally argue that the Standard will disrupt their businesses by prompting hundreds of thousands of employees to leave their jobs. But OSHA expressly considered that claim, and found it exaggerated. According to OSHA, employers that have implemented vaccine mandates have found that far fewer employees actually quit their jobs than threaten to do so. See 86 Fed. Reg. 61474–61475. And of course, the Standard does not impose a vaccine mandate; it allows employers to require only masking and testing instead. See *supra*, at 3. In addition, OSHA noted that the Standard would provide employers with some countervailing economic benefits. Many employees, the agency showed, would be more likely to stay at or apply to an employer complying with the Standard's safety precautions. See 86 Fed. Reg. 61474. And employers would see far fewer work days lost from members of their workforces calling in sick. See *id.*, at 61473–61474. All those conclusions are reasonable, and entitled to deference.

More fundamentally, the public interest here—the interest in protecting workers from disease and death—overwhelms the employers' alleged costs. As we have said, OSHA estimated that in six months the emergency standard would save over 6,500 lives and prevent over 250,000 hospitalizations. See *id.,* at 61408. Tragically, those estimates may prove too conservative. Since OSHA issued the Standard, the number of daily new COVID–19 cases has

risen tenfold.  See CDC, COVID Data Tracker (Jan. 12, 2022), https://covid.cdc.gov/covid-data-tracker/#trends_ dailycases (reporting a 7-day average of 71,453 new daily cases on Nov. 5, 2021, and 751,125 on Jan. 10, 2022).  And the number of hospitalizations has quadrupled, to a level not seen since the pandemic's previous peak.  CDC, COVID Data Tracker (Jan. 12, 2022), https://covid.cdc.gov/covid-data-tracker/#new-hospital-admissions (reporting a 7-day average of 5,050 new daily hospital admissions on Nov. 5, 2021, and 20,269 on Jan. 10, 2022).  And as long as the pandemic continues, so too does the risk that mutations will produce yet more variants—just as OSHA predicted before the rise of Omicron.  See 86 Fed. Reg. 61409 (warning that high transmission and insufficient vaccination rates could "foster the development of new variants that could be similarly, or even more, disruptive" than those then existing).  Far from diminishing, the need for broadly applicable workplace protections remains strong, for all the many reasons OSHA gave.  See *id.,* at 61407–61419, 61424, 61429–61439, 61445–61447.

These considerations weigh decisively against issuing a stay.  This Court should decline to exercise its equitable discretion in a way that will—as this stay will—imperil the lives of thousands of American workers and the health of many more.

*          *          *

Underlying everything else in this dispute is a single, simple question: Who decides how much protection, and of what kind, American workers need from COVID–19?  An agency with expertise in workplace health and safety, acting as Congress and the President authorized?  Or a court, lacking any knowledge of how to safeguard workplaces, and insulated from responsibility for any damage it causes?

Here, an agency charged by Congress with safeguarding employees from workplace dangers has decided that action

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

is needed. The agency has thoroughly evaluated the risks that the disease poses to workers across all sectors of the economy. It has considered the extent to which various policies will mitigate those risks, and the costs those policies will entail. It has landed on an approach that encourages vaccination, but allows employers to use masking and testing instead. It has meticulously explained why it has reached its conclusions. And in doing all this, it has acted within the four corners of its statutory authorization—or actually here, its statutory mandate. OSHA, that is, has responded in the way necessary to alleviate the "grave danger" that workplace exposure to the "new hazard[]" of COVID–19 poses to employees across the Nation. 29 U. S. C. §655(c)(1). The agency's Standard is informed by a half century of experience and expertise in handling workplace health and safety issues. The Standard also has the virtue of political accountability, for OSHA is responsible to the President, and the President is responsible to—and can be held to account by—the American public.

And then, there is this Court. Its Members are elected by, and accountable to, no one. And we "lack[] the background, competence, and expertise to assess" workplace health and safety issues. *South Bay United Pentecostal Church*, 590 U. S., at ___ (opinion of ROBERTS, C. J.) (slip op., at 2). When we are wise, we know enough to defer on matters like this one. When we are wise, we know not to displace the judgments of experts, acting within the sphere Congress marked out and under Presidential control, to deal with emergency conditions. Today, we are not wise. In the face of a still-raging pandemic, this Court tells the agency charged with protecting worker safety that it may not do so in all the workplaces needed. As disease and death continue to mount, this Court tells the agency that it cannot respond in the most effective way possible. Without legal basis, the Court usurps a decision that rightfully belongs to others. It undercuts the capacity of the responsible

14  NATIONAL FEDERATION OF INDEPENDENT BUSINESS *v.*
OSHA

BREYER, SOTOMAYOR, and KAGAN, JJ., dissenting

federal officials, acting well within the scope of their au-
thority, to protect American workers from grave danger.