D-2

# LIABILITY DEMAND

Witherite Law Group Client:

Melissa L. Maeweathers

**WITHERITE LAW GROUP**

**D-2**



**Adewale Odetunde**

Writer's Direct Dial: (470) 480-7545
Writer's Fax: (470) 881-8821
Writer's E-Mail: Adewale.Odetunde@witheritelaw.com

August 31, 2022

<u>VIA CMRRR# 9214 8969 0099 9790 1644 4132 22</u>
Attn: Mr. Jason Wyrick
Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP
Meridian II, Suite 2000
275 Scientific Driver
Peachtree Corners, GA 30092

| | | |
|---|---|---|
| Re: | Our Client(s): | Melissa L. Maeweathers |
| | Insured Driver: | Carl T. Honaker |
| | Claim No: | AL156539 |
| | Date of Loss: | 6/14/2021 |

Dear Mr. Wyrick:

We represent Melissa L. Maeweathers for personal injuries resulting from an automobile collision that occurred on June 14, 2021, with your insured JNJ Express, Inc. and its driver Carl T. Honaker. This offer to settle is made pursuant to O.C.G.A. § 9-11-67.1, as well as § 51-12-14, which is known as the Unliquidated Damages Interest Act. This demand should be immediately sent to your insured so they will have the opportunity to speak with their own attorney.

As a Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP representative, your interests and those of your insured are clearly in conflict. The Supreme Court of Georgia mandates that you have **the duty to accept reasonable settlement demands within policy limits.** We are authorized to settle the claim of Melissa L. Maeweathers for the amount of $929,000.

<b><u>MATERIAL TERMS OF SETTLEMENT</u></b>

Under O.C.G.A. 9-11-67.1 and the common law, we are providing this reasonable opportunity to settle claims against your insured under the terms below and those terms in the attached Limited Liability Release. Some of the material terms are conditions of acceptance, not of performance. If you fail to perform a condition of acceptance promptly, there will be no settlement agreement, and we will be forced to sue your insured. **<u>Time is of the essence for every condition.</u>**

You have 30 days from receipt of this offer to provide to us a written statement pursuant to O.C.G.A. 9-11-67.1 (b) whether you agree to all the terms of this offer. The 30-day period shall be conclusively established by the green return-receipt-requested postcard provided by the US Postal Service [or the date provided to us by the statutory overnight delivery service].

Monetary payment demanded is $929,000. If you choose to make the payment in a method other than cash, the payment must be made payable to "Melissa L. Maeweathers and her Attorneys, Witherite Law Group, LLC." The monetary payment must be received by the undersigned not less than ten (10) days after you provide a written statement of agreement. **<u>Our timely receipt of payment is an essential element of acceptance.</u>** If you do not ensure that we receive timely payment within the deadline, there will be no settlement, and we will be forced to sue your insured.

The party or parties to be released if this offer is accepted will be those released in accordance with the terms of the Limited Liability Release. The type of release offered is the enclosed Limited Liability Release. The claims to be released are those released pursuant to the enclosed Limited Liability Release.

If you do not expeditiously fulfill all conditions of acceptance, this offer will be deemed rejected, and we will file a lawsuit against your insured to recover the total amount of losses caused by your insured instead of the limited amount afforded by your coverage and other coverage that may be available.

This firm's Tax Identification Number is 83-1406425. We will be happy to provide a signed W-9 upon your request, but your request will not extend any time limits under this offer.

Sincerely,

Adewale Odetunde
Attorney

ASO/fz
Enclosures

# GEORGIA LIMITED LIABILITY RELEASE

### LIMITED LIABILITY RELEASE
### PURSUANT TO O.C.G.A. § 33-24-41.1

KNOW ALL MEN by these presents that Melissa L. Maeweathers, (collectively referred to herein as "the UNDERSIGNED") for and in consideration of the payment of $929,000 to Melissa L. Maeweathers in hand paid, receipt and sufficiency of which is hereby acknowledged, do hereby and for the heirs, executors, and administrators of the Undersigned acquit, remise, release, and forever discharge (hereinafter "Insurance Carrier") with regard to JNJ Express, Inc. and its driver, Carl T. Honaker's liability Policy No. CA200150 and does hereby acquit, remise, release, and forever discharge JNJ Express, Inc. and its driver, Carl T. Honaker (hereinafter "Limited Liability Releasees") except to the extent other insurance coverage is available, which covers the claim or claims of the Undersigned against the Limited Liability Releasees, from any and all claims, demands, rights, and causes of action of whatsoever kind and nature, including but not limited to property damage, punitive and exemplary damages, attorney's fees, and bodily injuries of the Undersigned, specifically including but not limited to, all known and unknown bodily and personal injuries of the Undersigned, any claim for loss of consortium, all hospital bills, doctor bills, drug bills, and other medical expenses that belong to the Undersigned or which may hereafter accrue to the Undersigned on account of or resulting from the rear-end collision, casualty, or event which occurred on or about the evening of June 14, 2021, on Interstate 85 in Gwinnett County, Georgia (hereinafter referred to as the "Occurrence").

All sums set forth herein constitute damages on account of personal physical injuries and personal physical sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended (The Code). It is mutually agreed that the monies being paid under this Limited Liability Release are not accepted by the Undersigned as full and complete compensation for all losses incurred by the Undersigned as the result of the Occurrence. The parties to this Limited Liability Release agree that the consideration set forth herein does not make the Undersigned whole nor does it fully compensate them for the injuries that resulted from the collision at issue.

This Limited Liability Release does not release Insurance Carrier for any other policies of insurance it has issued to Limited Liability Releasees or any other person or entity, including the to the Undersigned, and the Undersigned maintain all rights against Insurance Carrier to pursue recovery against Insurance Carrier regarding any and all policies not specifically identified by policy number herein.

It is understood and agreed that this Limited Liability Release is entered into pursuant to the provisions set forth in O.C.G.A. § 33-24-41.1, and it is intended that the force and effect of this Limited Liability Release shall be as intended by the aforesaid Code section. This release shall operate as a full and final release of the Insurance Carrier with regard to Policy No. CA200150 only from any and all claims arising out of the above-described Occurrence, casualty, or event and a release of the Limited Liability Releasees regarding any and all claims, except that this Limited Liability Release shall not bar any claims the Undersigned has against the Limited Liability Releasees to the extent other insurance coverage is available which covers the claim or claims of the Undersigned against the Limited Liability Releasees. This Limited Liability Release shall not operate as a release of any other persons or entities not specifically named herein and shall not operate as a release of the Undersigned's claim(s) against any other tortfeasor or insurance carrier not named in this Limited Liability Release.

IT IS UNDERSTOOD AND AGREED that this Limited Liability Release does not preclude any claims that the Undersigned may have against any uninsured motorist or underinsured motorist insurance that may provide coverage for their claims.

The Undersigned do further covenant and agree that should an action be tried to a conclusion and a judgment be entered against Limited Liability Releasees or any one of them in excess of the amount paid herein, which has been paid by Limited Liability Releasees, the Undersigned will, under no circumstances, seek satisfaction of or attempt to collect such judgment by levy or execution upon the property of Limited Liability Releasees, nor shall

the Undersigned initiate any proceeding for the enforcement of such judgment in any other manner against Limited Liability Releasees.

Nothing in this agreement shall be deemed to constitute any waiver, nor shall the Undersigned be estopped with reference to any and all other rights or claims which they may have under any uninsured or underinsured motorist provisions or any policy under which he is entitled to coverage, all such rights being expressly reserved. Nothing in this agreement shall be deemed to waive, nor shall the Undersigned be estopped in enforcing, a judgment rendered in this action against any other party or against any uninsured or underinsured motor carrier affording coverage to the Undersigned and bound by any such judgment pursuant to the provisions of O.C.G.A. § 33-24-41.1. Any provision, declaration, representation, covenant or agreement set forth in this Limited Liability Release that would prevent the Undersigned from continuing their claims and civil action against their UM/UIM policies of insurance is void ab initio. Any provision, declaration, representation, covenant or agreement set forth in this Limited Liability Release that would prevent the Undersigned's UM/UIM insurance carrier from asserting any rights of subrogation that such insurance companies may have against the Limited liability Releasees or any other person or entity shall be void ab initio.

The Undersigned do further covenant and agree that at such time as their rights as against any other party or any uninsured or underinsured motorist carrier shall have been adjudicated by final judgment and they have recovered such amounts to which he may be entitled by reason of such uninsured or underinsured motorist coverage, any judgment entered against Limited Liability Releasees shall be canceled of record in any and all counties in which such judgment has been entered. The Undersigned have no obligation to indemnify the Limited Liability Releasees for any reason or purpose.

It is expressly understood and agreed that this Limited Liability Release is a settlement of claims for which the parties released hereby deny all liability and that, by this release, the parties released hereby intend merely to avoid litigation. This Limited Liability Release in no way prejudices the rights of the released parties to deny liability in any action based upon the said Occurrence, casualty, or event.

All agreements and understandings between the parties hereto are embodied and expressed herein, and the terms of the Limited Liability Release are contractual and not mere recitals. The Undersigned are 18 years of age or older and laboring under no disabilities that would prevent the Undersigned from understanding, agreeing to and executing this Limited Liability Release.

The Undersigned agree to take reasonable steps to satisfy valid liens accrued as a result of the Undersigned's alleged injuries arising out of the subject Occurrence as required by law.

The Undersigned understand that the injuries sustained are or maybe permanent and progressive and the recovery therefrom is uncertain and indefinite, and the Undersigned understand that the consideration paid pursuant to this Limited Liability Release does not provide full compensation or satisfaction for the injuries and damages of the Undersigned.

It is understood and agreed that the Undersigned relied wholly upon the judgement of the Undersigned and the belief and knowledge of the Undersigned as to the nature, extent, effect, and duration of said injuries and liability, if any, and such is made without reliance upon any statement or representation of the parties hereby released or their representatives or by any physician or surgeon.

The Undersigned further declare and represent that no promise, inducement, or agreement not herein expressed has been made to the Undersigned and that this Limited Liability Release contains the entire agreement between the parties.

All the foregoing representations are made in order for the parties released hereby to rely upon them in effecting this Limited Liability Release and compromise.

The Undersigned hereby acknowledge receipt of this Limited Liability Release and that it is notice in writing of lack of consent of the Limited Liability Releasees to this settlement and that the Limited Liability Releasees are not precluded from further assertion of claims against the Undersigned by virtue of this Limited Liability Release.

**D-2**

# Client's Name: KEY CASE FACTS/IMAGES

**DATE OF INCIDENT:** June 14, 2021

**CLIENT:** Melissa Maeweathers

**INSURED DRIVER:** Carl T. Honaker

**POLICE INVOLVEMENT:** Officer Maclean, with the Gwinnett County Police Department, was dispatched to the scene of the crash. After conducting a thorough field investigation, Officer Maclean determined that your insured was at fault for the crash.

**Vehicle 1: Carl Honaker**
**Vehicle 2: Melissa Maeweather**



D-2

D-2

## CASE SUMMARY:   Melissa Maeweathers

Melissa Maeweather was traveling south on Interstate 85 in Gwinnett Count, Georgia. Your careless insured was also driving south on Interstate 85, attempted to merge lanes when unsafe, and crashed into the driver's side of Melissa's vehicle. The impact was so hard, Melissa's vehicle spun around several times and came to an abrupt stop in the far left lane.





D-2

# FINANCIAL IMPACT SUMMARY

Due to the carelessness of your insured, Melissa suffered injuries to her back, neck, and right knee. Enclosed, please find the specials with respect to Melissa L. Maeweathers. **The summary of Ms. Melissa L. Maeweathers's financial impact is as follows:**

| | |
|---|---:|
| Georgia Spine & Orthopaedics - Tucker | $52,443.25 |
| Atlanta Medical Institute | $2,620.00 |
| Team Rehabilitation | $3,835.00 |
| American Health Imaging | $4,595.00 |
| Surgery Center of Roswell | $28,877.45 |
| Lost Wages | $4,078.00 |
| Rental | $1,503.00 |
| **TOTAL** | **$97,951.70** |

**D-2**

## MEDICAL: PAIN AND INJURIES

Upon impact, Melissa's head and body violently jolted side to side, causing her head to hit the driver's window. She had no time to brace herself for the impact or for the violent spins her vehicle did after the blow to her car. Melissa immediately felt a sharp pain in in her right knee. After speaking with the officer dispatched to the scene of the crash, Melissa went home where she iced her knee to relieve the sharp pain.

The next day, Melissa's pain had increased tremendously. She was now experiencing pain in her neck and back that also prohibited her from completing her daily routine. She knew she needed treatment for her injuries and sought treatment with Dr. Erik Bendiks at Georgia Spine & Orthopaedics.

During her appointment with Dr. Bendiks, Melissa complained of pain in her neck and lower back. Melissa described the neck pain as stiff and rated the pain a six out of 10. She rated her lower back pain a six out of 10 and advised that it was aggravated by getting up from laying down. During her physical exam, Melissa exhibited tenderness to palpation in her cervical and lumbar spine. She also experienced pain with range of motion in her neck and lower back. The doctor then referred her to Dr. Vinson Smith for an evaluation of the right knee. Dr. Bendiks also prescribed medication for the pain and ordered multiple MRIs.

At her appointment with Dr. Vinson, Melissa was prescribed medication for the pain, instructed to ice her knees, and recommended to follow an at-home exercise program.

At her appointment with Atlanta Medical Institute, Melissa complained of pain in her neck, upper back, and lower back. She explained to the physician that the pain was exacerbated with movement, bending, prolonged standing, and overhead reaching. The doctor recommended she begin a treatment regimen consisting of therapeutic exercises, electrical muscle stimulation, ice/heat, and stretching.

Although therapy with Atlanta Medical Institute provided Melissa with minor relief, she continued to struggle and complete simple tasks such as bathing and dressing herself without feeling aggravating pain.

Medication and limiting physical activity was not helping, so Melissa attempted therapy. At her initial therapy session with Team Rehabilitation, Melissa complained of pain in her right knee. She explained that working as a front-end supervisor for Walmart was extremely difficult for her since it required extended walking and standing. The doctors then recommended she begin a chiropractic regimen consisting of the following:

- Neuromuscular reeducation
- Manual therapy
- Therapeutic activities

**Cervical MRI:**
- **Disc herniations are present at C4-5, C6, and C6-7. Canal stenosis is present on the right C4-5. All 3 herniations consistent with the recent injury. Straightening of the cervical lordosis is present consistent with associated muscle spasm.**

**Lumbar MRI:**
- **L3-4 and L4-5 a hallow disc bulge present at L4-5.**



After reviewing the MRIs, Melissa understood that the several disc herniation in her neck and a disc bulge in her lower back caused her persistent pain. The doctors instructed her to continue therapy and avoid activities that required prolonged standing, walking, or squatting. Since therapy had not given Melissa any relief, the doctors recommended she undergo two sets of cervical medical branch blocks at the C4-6 and two sets of left L4-5 and L5-S1 facet injections.

Desperate for relief and ready to increase her physical activity, Melissa underwent the recommended injections, but they did not provide the relief Melissa had hoped for. She continued to experience pain when bending, lifting, and constant walking, so Dr. Bendiks recommended she undergo a left endoscopic rhizotomy at L4-S1.

Since injections, therapy, medication, and rest had failed Melissa, she scheduled her surgery and underwent the rhizotomy in her lumbar spine.



After months of therapy, injections, and a surgical procedure, Melissa continues to constantly rest her knee, limit her physical activity, and stretch her back to make it through the day. She is nowhere near the same shape she was in before the crash and knows she will feel the effects of her serious injuries for the rest of her life. She continues to do an at-home therapy regimen and limits her physical activity when experiencing any exacerbations.

**D-2**

# EMPLOYMENT: LOST WAGES AND EARNING CAPACITY

As a result of the injuries Melissa Maeweathers suffered in this car wreck, she missed time from work as a front-end team lead for Walmart. Enclosed is a lost wage verification form signed by Greg Robertson. Melissa's lost earnings total is $ 4,842.75.




**D-2**

# HUMAN LOSS: PAIN AND SUFFERING

## HOW IS CLIENT TODAY?

"I have had the privilege of working with Melissa since 2006, and over the past 16 years she has displayed the highest level of both work quality and ethics. The car wreck that occurred June 2021 impacted her life financially, mentally and physically.

After the wreck she was unable to work due to the injuries she suffered, injuries that she still suffers from today. Due to back injuries and back surgery, she is unable to walk and stand for long periods of time. Her job requires her to stand and walk for eight or more hours a day. This puts a huge strain on her physically, leading to her stepping down to a lesser position and taking a reduction in pay.

There has been a financial strain placed on her family due to missed time at work, medical bills, and an extended time (5 months) without a vehicle. As a single parent, loss of income has had a detrimental effect on her family. This added stress and the ongoing anxiety she has from the wreck has made her life very challenging.

I have seen Melissa go through many changes since 2021, she is currently trying to get her life back to where it was before this accident took place, however it has been a challenge."

Jennifer Phillips

"This wreck caused a financial hardship for me and my kids. I had to pay for a rental car for 5 months because the insurance company dragged their feet on taking care of my property damage. While I was paying for a rental, I also had to pay for a vehicle that I was not even able to drive. Although I have now paid off the old car loan, the late payments I was making affected my credit. I now had to get a vehicle with my father because of the financial situation the wreck left me in. The crash caused me anxiety, and I am now on medication for it. Every time that I get on 85, I get tense and fear being behind the wheel. Returning to work was very difficult and stressful. Since I could no longer perform and complete my duties at work, I was demoted, and my income decreased more than two dollars an hour."

Melissa Maeweathers

**D-2**

# APPENDIX: EVIDENCE/DOCUMENTATION

Your insured was given a warning for failing to drive within single lane.

**GEORGIA UNIFORM TRAFFIC CITATION, SUMMONS AND ACCUSATION** — WARNING (circled)

DDS-32 (03/14)

Citation Number: N 060943
NCIC Number: GA0670200

- Upon Month: Jun 14 (Day) Mon (Year) 2021 at 0059 A.M.
- GWINNETT COUNTY POLICE
- Operator License No.: 09708385
- License Class or Type: A   State: TX   Expires: 2025
- Name: Honaker, Tony Carl
- Address: 26936 Wild Duck Lane
- City: Hockley   State: TX   Zip Code: 77447
- Age: 62   Hair: Gry   Hgt: 5'07"   Wgt: 180   Sex: M   Eyes: Bro   Race: W
- Veh Yr: 2019   Make: International   Style: Truck Tractor   Color: BW
- Registration No.: HO135HZ   Yr: 2021   State: TN
- CDL: YES   ACCIDENT: YES   INJURIES: NO   FATALITIES: NO

OFFENSE (Other than above): Failure to drive within single lane
In Violation of Code Section: 40-6-48(1)   Local Ordinance

REMARKS: See Report

WEATHER: Clear
ROAD (A): Dry   (B): Concrete
TRAFFIC: Light
LIGHTING: Darkness

County of: Gwinnett
On: I85 SB
at (secondary location): Lawrenceville Suwanee Rd
OFFICER: Maclean, CD   Badge #: 2193   Div: Ch.F

City: Lawrenceville, Georgia

Badge #: 2193

COURT COPY

D-2

**In the last two years, your insured has been involved in more than 40 crashes. Four of them were fatal.**

### Crashes reported to FMCSA by states for 24 months prior to: 08/11/2022

**Note:** Crashes listed represent a motor carrier's involvement in reportable crashes, without any determination as to responsibility.

Crashes:

| Type | Fatal | Injury | Tow | Total |
|---|---|---|---|---|
| Crashes | 4 | 12 | 28 | 44 |

**A fatal crash that occurred a few years ago involved another one of your insured for failing to control speed. This wreck could have also been prevented.**

News    Trucking

# Parents of girl killed in truck crash sue driver, motor carrier



Clarissa Hawes • Friday, November 22, 2019 • 1 minute read



The parents of Joselyn Allen-Gracey, 9 years old, have filed a lawsuit against Memphis-based JNJ Express and its driver stemming from a fatal crash on I-95 in September. (Photo: Jim Allen/FreightWaves)



The parents of a 9-year-old girl killed earlier this year in a tractor-trailer crash on Interstate 95 in Delaware have filed a federal lawsuit against the truck driver and the Memphis-based motor carrier.

D-2

Linda Asamoah and Patrick Owusu of Newark, Delaware, filed suit in U.S. District Court in Wilmington in mid-November against JNJ Express Inc. of Memphis and its truck driver, Brian Keith Winningham, 39, of Fairmont, North Carolina.

Court documents allege that Winningham failed to stop during rush-hour traffic on Sept. 24 and rear-ended three vehicles, including the SUV driven by Asamoah, forcing them off the road, before his 2014 Kenworth hit a guardrail and overturned.

Roselyn Adjei-Owusu died and Asamoah was permanently paralyzed in the crash, according to the lawsuit.

The suit alleges that Winningham was negligent because he failed to control the speed of his vehicle or apply his brakes in a timely manner to avoid the collision. It also claims he failed to take timely or proper evasive action.

Because Winningham drove for JNJ Express, the lawsuit alleges the carrier is vicariously liable for his actions.



John Ennis Jr., vice president of JNJ Express, did not respond to FreightWaves' request for comment.

JNJ operates a fleet of around 400 trucks, according to the Federal Motor Carrier Safety Administration SAFER website.

An occupant of another vehicle involved in the crash, Albert Frankel, 61, of Middletown, Delaware, also died.

The FREIGHTWAVES TOP 500 For-Hire Carriers list includes JNJ Express (No. 219).

#Brian Keith Winningham    #fatal crash    #I-95 crash

#JNJ Express    #Linda Asamoah    #Roselyn Adjei-Owusu

11    Comments

D-2

| 392.2FC | Following too close | 1 | 0 | 5 | Unsafe Driving |
|---|---|---|---|---|---|
| 392.2LC | Improper lane change | 1 | 0 | 5 | Unsafe Driving |
| 392.2LV | Lane Restriction violation | 31 | 0 | 3 | Unsafe Driving |

**In the past two years, your insured has more than 30 lane violations. Does your insured properly train its drivers on proper lane change?**

| 392.2FC | Following too close | 1 | 0 | 5 | Unsafe Driving |
|---|---|---|---|---|---|
| 392.2LC | Improper lane change | 1 | 0 | 5 | Unsafe Driving |
| 392.2LV | Lane Restriction violation | 31 | 0 | 3 | Unsafe Driving |

**Your insured failed to obey the driving guidelines listed in the Georgia Commercial Driver's Manual.**



**2.4.2 – Seeing to the Sides and Rear**
It's important to know what's going on behind and to the sides. Check your mirrors regularly. Check more often in special situations.

**Mirror Adjustment.** Mirror adjustment should be checked prior to the start of any trip and can only be checked accurately when the trailer(s) are straight. You should check and adjust each mirror to show some part of the vehicle. This will give you a reference point for judging the position of the other images.

**Regular Checks.** You need to make regular checks of your mirrors to be aware of traffic and to check your vehicle.

**Traffic.** Check your mirrors for vehicles on either side and in back of you. In an emergency, you may need to know whether you can make a quick lane change. Use your mirrors to spot overtaking vehicles. There are "blind spots" that your mirrors cannot show you. Check your mirrors regularly to know where other vehicles are around you, and to see if they move into your blind spots.

**Check Your Vehicle.** Use the mirrors to keep an eye on your tires. It's one way to spot a tire fire. If you're carrying open cargo, you can use the mirrors to check it. Look for loose straps, ropes, or chains. Watch for a flapping or ballooning tarp.

**Special Situations.** Special situations require more than regular mirror checks. These are lane changes, turns, merges, and tight maneuvers.

**Lane Changes.** You need to check your mirrors to make sure no one is alongside you or about to pass you. Check your mirrors:
- **Before you change lanes to make sure there is enough room.**
- **After you have signaled, to check that no one has moved into your blind spot.**
- **Right after you start the lane change, to double-check that your path is clear.**
- **After you complete the lane change.**

**Turns.** In turns, check your mirrors to make sure the rear of your vehicle will not hit anything.

**Merges.** When merging, use your mirrors to make sure the gap in traffic is large enough for you to enter safely.

**Tight Maneuvers.** Any time you are driving in close quarters, check your mirrors often. Make sure you have enough clearance.

**How to Use Mirrors.** Use mirrors correctly by checking them quickly and understanding what you see.
- **When you use your mirrors while driving on the road, check quickly. Look back and forth between the mirrors and the road ahead. Don't focus on the mirrors for too long. Otherwise, you will travel quite a distance without knowing what's happening ahead.**
- **Many large vehicles have curved (convex, "fisheye," "spot," "bugeye") mirrors that show a wider area than flat mirrors. This is often helpful. But everything appears smaller in a convex mirror than it would if you were looking at it directly. Things also seem farther away than they really are. It's important to realize this and to allow for it. Figure 2.7 shows the field of vision using a convex mirror.**

- **Are your drivers trained in safe lane usage and lane changing? How? When? By whom? To what standard of performance?**
- **Do your drivers practice safe lane usage and lane changing habits?**
- **Do qualified personnel ever ride with your drivers to assess safe driving habits?**
- **Do you and your drivers know that most lane use and lane changing accidents result from following too closely?**

Your driver could have prevented this crash by doing the following:
- **Give right of way, don't take it. Blind spots to the right of large vehicles are well known.**
- **Clean mirrors and check adjustment frequently.**

**D-2**