# Exhibit 1

Execution Copy
9/23/08

**PARCEL DESIGN, DEVELOPMENT AND OPERATING AGREEMENT
(PROJECT PARCEL 7, LOT 1)**

THIS PARCEL DESIGN, DEVELOPMENT AND OPERATION AGREEMENT (PROJECT PARCEL 7, LOT 1) is made and entered into this _____ day of September, 2008, by and between COLLEGE PARK BUSINESS AND INDUSTRIAL DEVELOPMENT AUTHORITY ("BIDA"), a public body corporate and politic and an instrumentality and public corporation created and existing under the laws of the State of Georgia, and COLLEGE PARK GATEWAY OFFICE ONE, LLC ("Parcel Developer"), a Delaware limited liability company.

RECITALS

A.      BIDA is the owner of a convention center located within the City of College Park, commonly known as the "Georgia International Convention Center" (the "GICC").

B.      BIDA is the owner of approximately 28.82 acres of real property located adjacent to and partially surrounding the GICC and being more particularly described on Exhibit A attached hereto and by this reference made a part hereof (the "Land").

C.      BIDA determined it is in the best interest of BIDA and the City of College Park to facilitate the development of hotel rooms, meeting space, parking and other infrastructure on the Land in order to serve the public purpose of maximizing the economic impact of the GICC.

D.      Grove Street Partners, LLC ("Master Developer") has master planned the Land as a phased mixed-use development consisting of office, retail, hotel and parking components.

E.      In order to facilitate Master Developer's Development of the Land, Master Developer and BIDA entered into that certain Master Design, Development and Operating Agreement, dated as of August 3, 2007, as amended from time to time (the "Master Development Agreement"), which sets forth the respective duties, responsibilities and obligations of BIDA and Master Developer with respect to the development of the Land.

F.      Pursuant to the Master Development Agreement, BIDA shall enter into Parcel DDO Agreements with parcel developers to govern the Development of tracts within the Land as directed and required by Master Developer.

G.      BIDA and Parcel Developer intend to enter into this Agreement to set forth the respective duties, responsibilities and obligations of each Party with respect to the development of the Project Parcel by Parcel Developer, all as more particularly set forth herein.

NOW, THEREFORE, for and in consideration of the Project Parcel, Ten Dollars ($10.00) in hand paid by the Parties, one to the other, the covenants herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, BIDA and Parcel Developer do hereby agree as follows:

# ARTICLE 1
# DEFINITIONS

1.1.   <u>General Interpretive Principles</u>.   The recitals to this Agreement are hereby incorporated into this Agreement.   For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires, (a) each term defined in <u>Section 1.2</u> has the meaning assigned to such term in such Section and includes the plural as well as singular and the use of any gender in this Agreement shall be deemed to include the other gender; (b) the word "including" means "including, but not limited to," and (c) the headings in this Agreement are for convenience only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of any of the provisions of this Agreement.   Except as otherwise expressly provided or unless this Agreement otherwise requires, references herein to any agreement shall mean and include all amendments and modifications to such agreement made in accordance with the terms of such agreement or the terms of any other agreement which governs such amendment or modification.   Except as otherwise expressly provided or unless this Agreement otherwise requires, references herein to any plan shall mean and include all amendments or modifications of such plan made in accordance with the terms of such plan or in accordance with the terms of any agreement which governs such amendment or modification.

1.2.   <u>Defined Terms</u>.   As used in this Agreement, the following terms shall have the following respective meanings:

1.2.1   <u>Agreement</u> shall mean this Parcel Design, Development and Operating Agreement (Project Parcel 7, Lot 1), as the same may be amended, modified and/or restated and in effect from time to time.

1.2.2   <u>Airport</u> shall mean Hartsfield-Jackson Atlanta International Airport.

1.2.3   <u>Annual Fee Payment</u> shall have the meaning given such term in <u>Section 4.1</u> of this Agreement

1.2.4   <u>Applicable Laws</u> shall mean all existing and future laws (including common laws), rules, regulations, statutes, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by, any Governmental Authority, and judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction (including those pertaining to health, safety or the environment and those pertaining to the construction, use, operation or occupancy of the Property or any portion thereof).

1.2.5   <u>Appraisal Process</u> shall have the meaning given such term in <u>Section 17.1</u> of this Agreement.

1.2.6   <u>Beneficial Owner</u> shall mean Kevin M. Kern, James H. Groome, Jr., and/or James M. Stormont, Jr., or an entity Controlled by one or more of them.

1.2.7   <u>BIDA</u> shall have the meaning given such term in the first paragraph of this Agreement.

1.2.8   <u>BIDA Event of Default</u> shall mean any of the events described in <u>Section 11.3</u> of this Agreement.

1.2.9   <u>City Covenants</u> shall mean those certain City Covenants attached as <u>Exhibit C</u> to that certain Limited Warranty Deed dated April 17, 2000 by and between City of College Park, BIDA, collectively as grantor, and City of Atlanta, as grantee, recorded in Deed Book 28909, Page 283 of the Fulton County Records, and in Deed Book 4346, Page 123, Clayton County Records, as such covenants have been or are amended, modified or restated from time to time.

1.2.10   <u>City of Atlanta</u> shall mean the City of Atlanta, a municipal corporation of the State of Georgia.

1.2.11   <u>City of College Park</u> shall mean the City of College Park, a municipal corporation created and existing under the laws of the State of Georgia.

1.2.12   <u>Clayton County Records</u> shall mean the records of the Clerk of Superior Court of Clayton County, Georgia.

1.2.13   <u>Comparable Treasury Issue</u> shall mean the fixed rate United States Treasury security selected by a Reference Treasury Dealer as having a maturity most comparable to the final Remaining Scheduled Parcel PILOT Payment (and which are not callable prior to maturity) that would be utilized, as of the time of selection and in accordance with customary financial practices, in pricing new issues of taxable debt securities of comparable maturity to the final Remaining Scheduled Parcel PILOT Payment.

1.2.14   <u>Comparable Treasury Price</u> shall mean, with respect to any disbursement date, (1) the average of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) on the third business day preceding such disbursement date, as set forth in the daily statistical release (or any successor release) published by the Federal Reserve Bank of New York and designated "Composite 3:30 p.m. Quotations for U.S. Government Securities," or (2) if such release (or any successor release) is not published or does not contain such prices on such business day, the average of all the Reference Treasury Dealer Quotations.

1.2.15   <u>Condemnation</u> shall mean the transfer of title to real property to a Governmental Authority by virtue of the exercise of expropriation, appropriation, condemnation or other power in the nature of eminent domain, or by voluntary transfer from the owner of such real property under threat of such a taking.

1.2.16   <u>Condemning Authority</u> shall have the meaning given such term in <u>Section 13.1</u> of this Agreement.

1.2.17  CONRAC Facility shall mean the consolidated rental car facility currently being constructed by the City of Atlanta as an amenity to the Airport.

1.2.18  Construction Loan shall mean any loan provided by any Lender with respect to, and secured by, the Project Parcel, the Property and/or this Agreement.

1.2.19  Control (including the terms Controlled by or under common Control with) shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting rights, by contract, as managing member, manager, general partner, or otherwise.

1.2.20  Declaration shall mean that certain Master Declaration of Protective Covenants, Conditions, Restrictions and Easements dated April 10, 2008 by BIDA, recorded at Deed Book 46657, Page 216 in the Fulton County Records and at Deed Book 9455, Page 582 in the Clayton County Records and encumbering the Land, as the same may be amended, modified, and/or restated and in effect from time to time.

1.2.21  Develop (including the terms Development and Developed) shall mean the design, permitting, construction, and installation of the improvements, including buildings and infrastructure, on the Project Parcel for and on behalf of BIDA.

1.2.22  Easement Request shall have the meaning given such term in Section 2.3 of this Agreement.

1.2.23  Effective Date shall mean the date which is in the first paragraph of this Agreement.

1.2.24  Environmental Laws shall mean any and all federal, state and local statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or the release of any materials into the environment, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Clean Water Act (33 U.S.C. Sections 1251 et seq.), the Clean Air Act (42 U.S.C. Sections 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Sections 1801 et seq.), and the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.).

1.2.25  Fair Market Value shall mean the fair market value established for the Project Parcel through the Appraisal Process.

1.2.26  Fair Market Value Date shall be the date of the notice by which Parcel Developer exercises its right to acquire the Property pursuant to Section 17.1 of this Agreement.

1.2.27  Financing shall mean any loan, whether for construction or permanent purposes, obtained by BIDA at the request of Parcel Developer, the proceeds of which are used to finance

or refinance the Project Parcel Development or any portion thereof.  Financing may be provided by a Lender or a Parcel Developer.  Financing shall not include the PILOT Bonds.

1.2.28  Force Majeure Event shall have the meaning given such term in Section 22.4 of this Agreement.

1.2.29  Fulton County Records shall mean the records of the Clerk of Superior Court of Fulton County, Georgia.

1.2.30  Gateway APM Station shall mean the stop or station on the People Mover System which is now or hereafter to be located at or adjacent to the GICC.

1.2.31  GICC shall have the meaning given such term in Recital A of this Agreement.

1.2.32  Governmental Authority shall mean any federal, state, county, municipal or other governmental or regulatory authority, agency, board, body, commission, instrumentality, court or quasi-governmental authority (or private entity in lieu thereof).

1.2.33  Gross Receipts shall have the meaning given such term in Section 5.1 of this Agreement.

1.2.34  Initial Appraisal shall have the meaning given such term in Section 17.1 of this Agreement.

1.2.35  Intergovernmental Agreement shall mean those agreements and other documents which, from time to time, have been entered into among the City of College Park, BIDA and the City of Atlanta and as more particularly listed on Exhibit H attached hereto and by this reference made a part hereof.

1.2.36  Land shall have the meaning given such term in Recital Paragraph B of this Agreement.

1.2.37  Late Notice shall have the meaning given such term in Section 1.2.71 of this Agreement.

1.2.38  Lender shall mean an institutional lender such as a bank, mortgage company, insurance company, or investment company fund, which provides financing to BIDA at the request of Parcel Developer in connection with the Project Parcel Development or any portion thereof.  Lender shall not include the issuer or any purchaser of the PILOT Bonds.

1.2.39  M/WBE Plan shall mean that certain Minority/Women Business Enterprise Plan attached hereto as Exhibit B and by this reference made a part hereof.

1.2.40  Master Developer shall have the meaning given such term in Recital Paragraph D of this Agreement.

1.2.41 <u>Master Development Agreement</u> shall have the meaning give such term in <u>Recital Paragraph E</u> of this Agreement.

1.2.42 <u>Master Plan</u> shall mean that certain Master Plan by Phase, Georgia International Convention Center Hotel Headquarters Complex prepared by Master Developer showing the mixed-use development planned by Master Developer for the Land, a copy of which is attached hereto as <u>Exhibit C</u> and by this reference made a part hereof.

1.2.43 <u>Material Change</u> shall mean any decrease of ten percent (10%) or more in the square footage or number of improvements constituting the Project Parcel Development; provided in no event shall any square footage or number decrease below the minimum, if any, set forth in <u>Section 2.1</u>.

1.2.44 <u>Outstanding BIDA Financings</u> shall have the meaning set forth in <u>Section 17.1</u> of this Agreement.

1.2.45 <u>Parcel Developer</u> shall have the meaning given to such term in the first paragraph of this Agreement.

1.2.46 <u>Parcel Developer Event of Default</u> shall mean any of the events described in <u>Section 11.1</u> of this Agreement.

1.2.47 <u>Parcel DDO Agreement</u> shall mean a Parcel Design, Development and Operation Agreement to be entered into by BIDA and a developer of a parcel of the Land relating to the Development and operation of a parcel within the Land.  This Agreement is a Parcel DDO Agreement.

1.2.48 <u>Parcel PILOT Agreement</u> shall mean that certain Parcel PILOT Agreement dated on or about the PILOT Bonds Closing Date by and between BIDA and Parcel Developer.

1.2.49 <u>Parcel PILOT Payments</u> shall have the meaning set forth in <u>Section 16.2</u> of this Agreement.

1.2.50 <u>Parking Parcel</u> shall mean that portion of the Project Parcel equal to 2.29 acres which consists solely of parking spaces both within a parking deck and in and around the Project Parcel as surface parking as shown on the Project Parcel Plan.

1.2.51 <u>Party</u> shall mean BIDA or Parcel Developer and their respective successors and permitted assigns.

1.2.52 <u>People Mover Easement Agreement</u> shall mean that certain People Mover Easement Agreement dated April 17, 2000 by and between Gateway Airport Associates, L.P. and the City of Atlanta, recorded in Deed Book 4346, page 152 of the Fulton County Records, as the same has been or may be amended, modified or restated from time to time.

1.2.53 <u>People Mover System</u> shall mean the elevated train system currently being constructed by the City of Atlanta from the Airport to the CONRAC Facility for the movement of people between such facilities and the intermediate facilities between such terminus, including the GICC and adjacent improvements.

1.2.54 <u>Performance Bond</u> shall mean the meaning given such term in <u>Section 7.4</u> of this Agreement.

1.2.55 <u>Permitted Title Exceptions</u> shall mean those matters which encumber the Project Parcel and are more particularly listed in <u>Exhibit I</u> attached hereto and by this reference made a part hereof.

1.2.56 <u>Person</u> shall mean any natural person, proprietorship, firm, partnership, association, corporation, company, limited liability company, trust, business trust, governmental authority or other legal entity.

1.2.57 <u>Personal Property</u> shall mean all furniture, fixtures, equipment and all other personal property purchased by or on behalf of BIDA for use in connection with the operation of the Property.

1.2.58 <u>PILOT Bonds</u> shall mean those certain revenue bonds issued by BIDA, in one or more series, in an original aggregate principal amount sufficient to yield Seven Million and No/100 Dollars ($7,000,000.00) to Parcel Developer for the Development of the Project Parcel Development, all as more particularly described in the Parcel PILOT Agreement.

1.2.59 <u>PILOT Bonds Closing Date</u> shall mean the date on which the PILOT Bonds shall be issued, which date shall be no later than October 15, 2008.

1.2.60 <u>Plans</u> shall mean all plans, specifications, drawings and site plans which are prepared in connection with the improvements to the Project Parcel and which have been approved by applicable Governmental Authorities and as required under the Declaration.

1.2.61 <u>Prime Rate</u> shall mean the Wall Street Journal Prime Rate, which is the Prime Rate published in the "Money Rates" section of the *Wall Street Journal* from time to time. In the event the *Wall Street Journal* shall cease to publish a Prime Rate, BIDA will select a national banking institution whose "prime rate" will then be the Prime Rate.

1.2.62 <u>Project Parcel</u> shall mean that certain tract of real property within the Land being more particularly described on <u>Exhibit E</u> attached hereto and by this reference made a part hereof and being more particularly depicted on the Project Parcel Plan, and consisting of approximately 4.82 acres.

1.2.63 <u>Project Parcel Completion Date</u> shall mean the later to occur of (i) April 1, 2010, or (ii) ten (10) months after the PILOT Bonds Closing Date, subject to a day-for-day adjustment, if any, as provided in <u>Section 22.4</u>.

1.2.64  <u>Project Parcel Development</u> shall have the meaning set forth in <u>Section 2.1</u> of this Agreement.

1.2.65  <u>Project Parcel Plan</u> shall mean that certain Project Parcel 7, Lot 1 Plan prepared by Parcel Developer showing the Project Parcel Development, a copy of which is attached hereto as <u>Exhibit F</u> and by this reference made a part hereof.

1.2.66  <u>Property</u> shall mean the Project Parcel, the Personal Property and all improvements located thereon.

1.2.67  <u>Reference Treasury Dealer</u> shall mean each of Citigroup Global Markets, Inc. and Goldman Sachs & Company and their respective successors; provided, however, that if any of the foregoing shall cease to be a primary U.S. Government securities dealer in New York City (a "Primary Treasury Dealer"), BIDA shall substitute therefor another nationally recognized investment banking firm that is a Primary Treasury Dealer.

1.2.68  <u>Reference Treasury Dealer Quotations</u> shall mean, with respect to each Reference Treasury Dealer and any disbursement date, the average, as determined by BIDA, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to BIDA and Parcel Developer by such Reference Treasury Dealer at 3:30 p.m., New York City time on the third business day preceding such disbursement date.

1.2.69  <u>Reimbursement Process</u> shall mean the process by which Parcel Developer shall obtain reimbursement from BIDA as described in this Agreement and shall comprise the following procedures: (i) Parcel Developer shall submit to BIDA (at the following address: c/o City of College Park Accounting Department, 3667 Main Street, College Park, Georgia 30337, Attn: Finance Director) monthly invoices, which shall include reasonable back-up information, for any work completed on BIDA's behalf as described herein; and (ii) BIDA shall pay such monthly invoices in full within twenty (20) days of receipt by the College Park Accounting Department thereof. Should BIDA fail to pay any such monthly invoices when due hereunder, Parcel Developer shall send a notice to BIDA of such overdue payment (the "<u>Late Notice</u>"). If no payment is made by BIDA within ten (10) days after its receipt of the Late Notice, Parcel Developer may offset any payments due to BIDA pursuant to this Agreement by such unpaid amount.  Any payment not made when due hereunder shall accrue interest from the date due until paid at the Prime Rate.  Notwithstanding any provision in <u>Section 1.2.68</u> to the contrary, BIDA, within five (5) business days subsequent to receipt of any monthly invoice from Parcel Developer, may provide to Parcel Developer any objection thereto.  BIDA and Parcel Developer shall work together in good faith to resolve any objection raised by BIDA.  BIDA timely shall pay any portion of a monthly statement to which it does not raise an objection.

1.2.70  <u>Remaining Scheduled Annual Fee Payments</u> shall mean the remaining scheduled Annual Fee Payments that would be due after the related disbursement date but for the Condemnation, through and including the final Remaining Scheduled Parcel PILOT Payment.

1.2.71 <u>Remaining Scheduled Parcel PILOT Payments</u> shall mean the remaining scheduled Parcel PILOT Payments that would be due after the related disbursement date but for the Condemnation.

1.2.72 <u>Second Appraisal</u> shall have the meaning given such term in <u>Section 17.1</u> of this Agreement.

1.2.73 <u>Specially Designated National or Blocked Person</u> shall mean:  (i) persons designated by the U.S. Department of Treasury's Office of Foreign Assets Control, or other governmental entity, from time to time as a "specially designated national or blocked person" or similar status, (ii) a person described in Section 1 of U.S. Executive Order 13224 issued on September 23, 2001, or (iii) a person otherwise identified by government or legal authority as a person with whom manager or its affiliates are prohibited from transacting business.

1.2.74 <u>Substantial Completion</u> shall mean (i) substantial completion of the Project Parcel Development in conformance, in all material respects, with the Plans and the requirements of this Agreement (other than minor punchlist items, which will not individually or in the aggregate impair the use of the Project Parcel Development for its intended use) and free of all liens and (ii) Parcel Developer has obtained all required permits for the opening of the Project Parcel Development.

1.2.75 <u>Term</u> shall have the meaning set forth in <u>Section 3.1</u> of this Agreement.

1.2.76 <u>Treasury Rate</u> shall have the meaning, with respect to any disbursement date, the rate per annum equal to the semi-annual equivalent yield to maturity (computed as of the second business day immediately preceding such disbursement date) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such disbursement date.

1.2.77 <u>Trust Indenture</u> shall have the meaning set forth in <u>Section 16.1</u> of this Agreement.

1.2.78 <u>Venue</u> shall have the meaning set forth in <u>Section 11.5</u> of this Agreement.

## ARTICLE 2
## THE PROJECT

2.1.    <u>The Project Parcel Plan</u>.  Parcel Developer, in accordance with the terms of this Agreement, shall have the exclusive right to Develop the Project Parcel.  The Project Parcel will be Developed as an approximately 130,000 gross square foot, four (4) story office building with structured and surface parking (the "<u>Project Parcel Development</u>", which such definition shall include the uses described in <u>Section 2.2</u>).  The Project Parcel Development is more particularly shown on the Project Parcel Plan.

2.2.    <u>Project Parcel Development</u>.  Parcel Developer, subject to Applicable Laws and the terms and conditions of the Declaration and this Agreement, shall initially develop and

operate on the Project Parcel the improvements listed in the Project Parcel Development. Parcel Developer may request, in writing to BIDA, Material Changes to such improvements and any such Material Changes shall be subject to BIDA's approval, in its sole reasonable discretion; it being acknowledged that changes which are not Material Changes shall not require BIDA's consent.

Parcel Developer shall prepare plans and specifications for the Project Parcel Development, shall submit such plans and specifications for review and approval as required pursuant to the Declaration and Applicable Laws and shall obtain or provide Financing to pay the costs and expenses of such plans and specifications. Parcel Developer shall obtain all permits and licenses and obtain or provide Financing to pay all fees necessary for the Development of the Project Parcel. The Parcel Developer will commence construction of the Project Parcel Development within ten (10) days subsequent to: (i) the PILOT Bonds Closing Date and (ii) the receipt of all necessary construction permits from the City of College Park but in all events on or before December 15, 2008 and pursue with all diligence the construction and undertaking of the Project Parcel Development in accordance with the Project Parcel Plan and in a good and workmanlike manner, in accordance with Applicable Laws. The Parcel Developer will cause the Project Parcel Development to be completed and operational on or before the Project Parcel Completion Date. For purposes of this Agreement, commencement of construction shall mean the commencing of grading and/or other site work in accordance with applicable permits therefor.

2.3. <u>Rights and Easements</u>. BIDA, subject to the terms and conditions set forth in this Agreement, grants, conveys and transfers to Parcel Developer the right to Develop the Project Parcel for the Project Parcel Development. BIDA acknowledges that the Development of the Project Parcel may require easements, including, without limitation, temporary construction easements to work in other undeveloped areas of the Land during the Development, permanent access easements through, over and across other areas of the Land or other BIDA property, licenses and other use rights be granted to Parcel Developer and/or third parties. BIDA, upon the terms and conditions set forth in the following sentence, agrees to execute such easements, licenses or similar documents as are necessary and reasonable for the Development of the Project Parcel as the Project Parcel Development; provided however, nothing herein shall require BIDA to encumber any portion of the Land for which a Parcel DDO Agreement is not then in effect, if such encumbrance materially and adversely affects future development of such portion of the Land. Parcel Developer shall deliver to BIDA a written request (an "<u>Easement Request</u>") relating to such easements, licenses or similar documents (which Easement Request shall include the document to be executed, a survey showing the easement requested or area impacted and a statement as to the purpose of the requested document). BIDA shall deliver the requested easement, license or similar document to Parcel Developer within ten (10) business days subsequent to receipt of the Easement Request if the matter is administrative and within thirty (30) days subsequent to receipt of the Easement Request if the matter must be addressed by the city council of the City of College Park. Notwithstanding the foregoing, in the event that the Easement Request is for a temporary license which is critical to the construction process, and the delay of the delivery of such would cause the Project Parcel Development to stop or be delayed, BIDA shall deliver the requested temporary license agreement within five (5) days after written request. Any easement so granted may be relocated from time to time using proceeds of any

Financing in the event such easement interferes with the development of the Land or by BIDA, at BIDA's expense, if it desires to do so. The Parties agree to execute such documents as are reasonably necessary to evidence any such relocation.

      2.4.   <u>Development of Phase II and Phase III on Tract 7</u>. The Project Parcel Plan is "Phase I" of a three (3) phase development of Tract 7 (the "<u>Tract 7 Master Development</u>"; for convenience not necessarily for development order, the three (3) phases shall be referred to in this Section 2.4 as "Phase I", "Phase II" and "Phase III") as shown on the Tract 7 site plan attached hereto as <u>Schedule 2.4</u> and made a part hereof by this reference (the "<u>Tract 7 Master Site Plan</u>"). Phase I, which is herein defined on the Project Parcel Plan, contains areas and acreage for parking which, although initially part of the Project Parcel Plan, will not remain solely utilized by Parcel Developer upon the commencement of the development of Phase II and Phase III. Parcel Developer is paying the Annual Fee Payment for the entire acreage encompassed by the Project Parcel Plan. The Parties acknowledge and agree that, as a result of the development of Phase II and/or Phase III, at such time as a Parcel DDO Agreement is entered into by and between BIDA and any party for the development of Phase II and/or Phase III, (i) certain rights and obligations contained herein with respect to the Parking Parcel shall automatically and immediately be transferred to the developer of Phase II or Phase III (each a "Phase Developer"), as hereinafter provided, and (ii) a portion of the Annual Fee Payment payable hereunder shall be allocated to the Phase II or Phase III parcel based upon the foregoing formula: the amount of the Annual Fee Payment attributable to the Parking Parcel, which is One Hundred Fifty Five Thousand Four Hundred Twelve and No/100 Dollars ($155,412.00), times a fraction, the numerator of which is the acreage with respect to the Phase II or Phase III parcel , as applicable, and the denominator of which is the acreage of the Tract 7 Master Development currently estimated and planned to be 5.68 acres, excluding the Parking Parcel. The acreage shall be modified to reflect more or less acreage based upon the final site plans for either the Phase II or Phase III parcel. By way of example, assuming the Phase II parcel acreage equals 2.0, then the portion of the Annual Fee Payment payable hereunder attributable to the Parking Parcel will be reduced by $54,722.54 and would equal $100,689.46 ($155,412.00 x 2.0/5.68 = $54,722.54, $155,412.00 - $54,722.54 = $100,689.46) and the Annual Fee Payment attributable to the portion of the Parking Parcel utilized by the Phase II parcel shall be $54,722.54. As a result of this provision, a Phase Developer shall be entitled, pursuant to the terms and conditions of this Agreement and pursuant to the Tract 7 Master Site Plan, to have certain rights with respect to the development and construction of the additional parking spaces needed for the Phase II and/or Phase II development, as applicable, which rights shall include, without limitation, entering into a development agreement with a third party developer to develop such additional parking spaces in conjunction with BIDA and Parcel Developer (which rights shall include the right to increase the size, height and width of any structured parking located on the Parking Parcel and to eliminate surface parking, in whole or in part, on the Parking Parcel) and pursuant to the terms and provisions of the Parcel DDO Agreement entered into by the Phase Developer and BIDA. Upon the execution of the Parcel DDO Agreement for the Phase II and/or Phase III development, the Annual Fee Payment due from Parcel Developer hereunder shall be adjusted based upon the foregoing reallocation and shall commence immediately and continue for the duration of the Term, except in the event of the receipt of another reallocation based upon the development of another phase of the Tract 7 Master Development, in which case, the Annual Fee Payment shall be further adjusted accordingly. Parcel Developer acknowledges that as of the Effective Date, plans for the Phase II and Phase III development have yet to be finalized and thus the Parties

may not have contemplated all agreements and other matters relating to the development of Phase II and Phase III. As such Parcel Developer agrees that it will cooperate, in good faith, with BIDA and the developers of the Phase II and Phase III to effectuate the development of such phases and will enter into such other agreements as are reasonably required with respect thereto.

Parcel Developer agrees that the parking structure to be constructed as part of Project Parcel Development shall be designed and constructed such that the foundations, columns, footings and other support features of such parking structure shall be sufficient to support future expansion of such parking structure to accommodate a five (5) level parking structure with approximately 1,250 parking spaces.

Notwithstanding anything to the contrary, nothing in this Agreement shall be deemed to require a Phase Developer to utilize the Parking Parcel for the parking needs of Phase II and/or Phase III, or to contribute to the Annual Fee Payment for the Parking Parcel if the Phase Developer does not elect to utilize the Parking Parcel for parking of Phase II and/or Phase III, as appropriate.

## ARTICLE 3
## TERM

3.1.    Term. This Agreement shall be for a period commencing on the Effective Date and, unless sooner terminated as hereinafter provided, shall terminate at midnight on August 2, 2057 (the "Term").

## ARTICLE 4
## FEES

4.1.    Annual Fee Payment. During the Term, Parcel Developer agrees to pay to BIDA, without notice, demand, deduction, set off or abatement, except as herein specifically provided, in lawful money of the United States of America, at BIDA's address set forth in Section 21.1 below or at such other place as BIDA shall designate in writing from time to time, a fee as set forth in this Section 4.1 (the "Annual Fee Payment"). The Annual Fee Payment shall be paid as provided and commencing as described below:

(a)    The sum of Three Hundred Twenty Seven Thousand One Hundred Twenty and No/100 Dollars ($327,120.00) per annum or so much thereof as is then due and payable in twelve (12) equal monthly installments. Notwithstanding anything herein to the contrary, the Annual Fee Payment shall commence and the initial payment shall be due on the PILOT Bonds Closing Date. In the event that the first payment due hereunder shall be due on a date other than the first (1st) day of the month, such payment shall be prorated based upon the actual number of days remaining in the month in which such payment is due. Following the initial payment, the subsequent monthly payments of the Annual Fee Payment shall be due on the first (1st) day of each month during the Term.

(b)    Notwithstanding any to contrary contained in Section 4.1(a), the Annual Fee Payment shall be subject to adjustment pursuant to Section 2.4.

1965067.v9

4.2.    General Provisions Relating to Annual Fee Payment.

(a)    No payment by Parcel Developer or acceptance by BIDA of an amount less than the Annual Fee Payment stipulated shall be deemed a waiver of any additional amount due.  No partial payment or endorsement on any check or any letter accompanying any payment of the Annual Fee Payment shall be deemed an accord and satisfaction, but BIDA may accept such payment without prejudice to BIDA's right to collect the balance of the Annual Fee Payment due under the terms of this Agreement.

(b)    This Agreement is a net transaction to BIDA.  It is the purpose and intent of BIDA and Parcel Developer that Annual Fee Payment shall be absolutely net to BIDA, so that this Agreement shall yield, net to BIDA, the Annual Fee Payment specified in this Article 4 throughout the Term, and that all costs, expenses and obligations of every kind and nature whatsoever relating to the Property which may arise and become due during the Term shall be paid by Parcel Developer.  Notwithstanding anything to the contrary in this Article 4, upon the purchase of the Property by Parcel Developer pursuant to Article 17 herein, the obligation to pay the Annual Fee Payment shall terminate and this Agreement shall terminate effective as of the closing date of such purchase.

**ARTICLE 5**
**USE OF PROPERTY**

5.1.    Operation.  BIDA hereby grants to Parcel Developer the sole and exclusive right to manage and operate the Property pursuant to the terms of this Agreement for and on behalf of BIDA, and Parcel Developer shall, as the agent of BIDA, manage and operate the Property during the Term in a businesslike and efficient manner in compliance with Applicable Laws. Except as otherwise specifically limited under this Agreement, Parcel Developer, as sole and exclusive agent of BIDA over the Property, shall have absolute control and discretion in the management and operation of the Property, including, without limitation, the right and power to negotiate and enter into such reasonable contracts as may be reasonably necessary or advisable in connection with the operation of the Property and, except as herein provided, the right to determine the rents, rates, fees and charges for the use of the Property or any merchandise, services or products sold at the Property.  BIDA shall have no obligation or liability with respect to any contracts entered into by Parcel Developer with respect to the Property, provided in the event it shall be determined that BIDA has an obligation or liability with respect to any such contract, such obligation or liability shall be limited to the revenues and receipts derived from the ownership and operation of the Property.  Parcel Developer shall collect all revenues, rents, fees, charges, or other income of any kind from any source derived from the ownership and operation of the Property (the "Gross Receipts") for and on behalf of BIDA.

5.2.    Operating Fees.  Parcel Developer shall receive, as compensation for managing and operating the Property for and on behalf of BIDA, fees equal to the Gross Receipts, payable when Parcel Developer collects the Gross Receipts pursuant to Section 5.1.

5.3.    Responsibility for Operation, Maintenance, and Repair Costs.  Parcel Developer shall be responsible for paying all costs and expenses of any kind related to the Property, including, without limitation, all costs and expenses of designing, constructing, financing, operating, maintaining and repairing the Property, and BIDA shall have no obligation, responsibility, or liability to pay any such costs or expenses.  During the Term, Parcel Developer shall perform at its expense all repairs and maintenance to the Property.

5.4.    Permitted Use.  Parcel Developer, in accordance with and subject to the terms of this Agreement, shall have the exclusive right to use the Project Parcel for the Development of the Project Parcel and the operation of the Project Parcel Development and for no other purpose. Notwithstanding the foregoing, Parcel Developer, with the prior written consent of BIDA, which consent shall not be unreasonably withheld, delayed or conditioned, shall have the right to change the permitted use of the Project Parcel; provided in the event such requested change in use relates to a change in the use of the Project Parcel Development as an office building, the consent of BIDA may be given or withheld in BIDA's sole and absolute discretion.

5.5.    Restriction on Use.  Parcel Developer shall not use, nor shall it permit or suffer use of the Property for any illegal or unlawful purpose, nor in any manner to create any nuisance or trespass.  Parcel Developer shall comply with all Applicable Laws concerning the condition or use of the Property or any part thereof, or the business(es) conducted thereon.  Parcel Developer shall likewise observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance required to be maintained by Parcel Developer at any time with respect to the Property.  Parcel Developer may, however, with the prior written consent of BIDA, such consent to not be unreasonably withheld, delayed or conditioned, in good faith (and wherever necessary in the name of, but without expense to, BIDA), contest the validity of any Applicable Law; and, pending the determination of such contest, may postpone compliance with such Applicable Law, except that Parcel Developer shall not postpone compliance therewith in such a manner as to subject BIDA to any fine or penalty or to prosecution for any misdemeanor, felony or other crime, or to cause the Property or any part thereof to be condemned or encumbered by a lien, levy or any other such instrument.

5.6.    Master Declaration.  The Project Parcel is encumbered by the Declaration.  This Agreement is subject to the terms and conditions of the Declaration.

## ARTICLE 6
## GENERAL COVENANTS OF PARCEL DEVELOPER

During the Term, Parcel Developer shall comply with the following general obligations:

6.1.    Completion of Improvements.  Parcel Developer will undertake the Project Parcel Development substantially in accordance with the Plans with diligence and continuity to completion, in a good and workmanlike manner and free and clear of all liens and claims for material supplied or for labor or services performed in connection with the Project Parcel Development.

6.2.    Compliance with Construction Loan Documents.  Parcel Developer agrees to comply with each and every material obligation and covenant of Parcel Developer in the documents evidencing any construction loan for the Project Parcel Development or any portion thereof.

6.3.    Litigation.  Parcel Developer will notify BIDA in writing, within five (5) days of receipt of actual notice thereof, of any actual, pending or threatened claim, demand, litigation or adversarial proceeding which could reasonably be expected to materially and adversely affect the Project Parcel Development or Parcel Developer.  Parcel Developer will notify BIDA in writing and within five (5) days of any matter that Parcel Developer reasonably considers could reasonably be expected to result or does result in a material adverse change in the financial condition or operation of Parcel Developer or the Project Parcel Development.

6.4.    Maintenance of Property by Parcel Developer.  Parcel Developer agrees that it will, at Parcel Developer's own expense, keep the Property or cause the Property to be kept in as reasonably safe condition as its activities thereon shall permit and will maintain the Property in a neat and clean condition, including cutting grass and removal of trash and debris at the Property.

6.5.    Lien and Other Charges.  Parcel Developer will duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue all claims for labor, materials, or supplies that if unpaid might by law become a lien or charge upon the Property.  Parcel Developer shall indemnify and hold harmless BIDA from and against any loss or damage due to any lien filed against the Property on account of nonpayment or dispute with respect to labor or materials furnished in connection with the construction or repair of any improvements now or hereafter on the Project Parcel.  This indemnity shall survive the termination or expiration of this Agreement.

6.6.    Compliance with Laws, Contracts, Licenses and Permits.  Parcel Developer will comply with (a) all Applicable Laws affecting the Property and the Project Parcel Development, (b) all agreements and instruments by which it or the Property may be bound, and all restrictions, covenants and easements affecting the Property, (c) all applicable decrees, orders and judgments and (d) all licenses and permits required by Applicable Law and regulations for the operation of the Property.

6.7.    Event Notices.  Parcel Developer will promptly notify BIDA in writing of (a) the occurrence of any default which with time, notice or both, would constitute a Parcel Developer Event of Default; (b) the occurrence of any levy or attachment against its assets or other event which could reasonably be expected to have a material adverse effect on the ability of Parcel Developer to undertake, complete or operate the Project Parcel Development; and (c) the receipt by Parcel Developer of any written notice of default or notice of termination with respect to any material contract or agreement relating to the construction, operation, or use of the Project Parcel Development, including a default with respect to any Financing for the Project Parcel Development, which could reasonably be expected to materially and adversely affect the ability of Parcel Developer to undertake, complete or operate the Project Parcel Development.

6.8.   <u>Insurance</u>.  Parcel Developer will keep the Property continuously insured, with the coverage and on the terms set forth in the Declaration.

6.9.   <u>Further Assurances</u>.  Parcel Developer agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements and amendments hereto and such further instruments as may be reasonably required for carrying out the intention or facilitating the performance of this Agreement.

6.10.   <u>Performance by Parcel Developer</u>.  Parcel Developer will perform all acts to be performed by it hereunder and will refrain from taking or omitting to take any action that would materially violate Parcel Developer's representations and warranties hereunder or render the same materially inaccurate as of the date hereof and on the dates of any fundings of the PILOT Bonds proceeds or that in any material way would prevent the consummation of the transactions contemplated hereby in accordance with the terms and conditions hereof.

6.11.   <u>Entity Maintenance</u>.  Parcel Developer will preserve and maintain its existence, rights, licenses, permits, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified in good standing as a foreign entity in each jurisdiction where the failure of Parcel Developer to preserve and maintain such existence, rights, franchises, privileges and qualification would materially adversely affect the interests of Parcel Developer under this Agreement, or the ability of Parcel Developer to perform its obligations under this Agreement.

6.12.   <u>Contract Compliance</u>.  Parcel Developer will perform and comply with each of the material provisions of each indenture, credit agreement, contract or other agreement by which Parcel Developer or its properties are bound, non-performance or non-compliance with which would have a material adverse effect upon the business or credit of Parcel Developer or in any way affect the ability of Parcel Developer to perform its obligations under this Agreement.

6.13.   <u>Project Parcel Visitation</u>.  Parcel Developer, upon reasonable notice and at any reasonable time and from time to time, will permit BIDA, the City of College Park or any agents or representatives thereof, to visit the Project Parcel and the Project Parcel Development or any portion thereof to determine compliance with the terms of this Agreement.

6.14.   <u>Environmental Compliance</u>. Parcel Developer will cause the Property to remain in compliance with applicable Environmental Laws.

**ARTICLE 7**
**SPECIAL COVENANTS OF PARCEL DEVELOPER**

7.1.   <u>Equal Business Opportunity Plan</u>.  Parcel Developer will comply with and implement the M/WBE Plan with respect to the participation of competitive certified minority business enterprises/ female business enterprises in all business opportunities which relate to the Development of the Project Parcel Development.  Parcel Developer and BIDA hereby approve the M/WBE Plan attached hereto as <u>Exhibit "B"</u>.  Parcel Developer will provide to BIDA, within five (5) days subsequent to receipt thereof, a copy of each report provided to Parcel Developer pursuant to <u>Section VI</u> of the M/WBE Plan.  Parcel Developer will use reasonable efforts to

cause each trade contractor to incorporate any reasonable comments BIDA has with respect to such report information in its next monthly report.

7.2.   <u>Principal Guaranty</u>.  Each principal and Beneficial Owner of Parcel Developer, who also is a guarantor under any Construction Loan under a guarantee similar to that attached hereto as <u>Schedule 7.2</u>, shall guarantee to BIDA the completion of the Project Parcel Development in accordance with the terms hereof; provided, in the event no guarantee is required by the Lender(s) under a Construction Loan, the completion guarantee required in this <u>Section 7.2</u> shall be provided by the Beneficial Owners.  Each guarantor, at the later to occur of (i) the execution of this Agreement, or (ii) the closing of a construction loan for the Project Parcel Development, shall execute and deliver to BIDA a guaranty in the form attached hereto as <u>Schedule 7.2</u> and by this reference made a part hereof.

7.3.   <u>BIDA Funding</u>.

(a)   All funding for the Project Parcel Development shall be provided by (i) the net proceeds from the PILOT Bonds allocated to Parcel Developer pursuant to the Parcel PILOT Agreement and (ii) loans obtained by BIDA at the request of Parcel Developer, which loans may be made by a Lender or Parcel Developer.  Parcel Developer shall be responsible for identifying all Lenders.  Such loans shall be evidenced by revenue bonds issued by BIDA.  Parcel Developer shall own a draw-down revenue bond issued by BIDA, as more fully described in subsection (c) of this <u>Section 7.3</u>.  Each revenue bond owned by Parcel Developer shall mature on the earlier of (1) the date that is fifty (50) years from the date of issuance of each such bond or (2) the termination date of this Agreement, in the case of revenue bonds owned by Parcel Developer.  The entire principal of each revenue bond owned by Parcel Developer shall be payable at maturity, provided, however, with the prior written consent of Parcel Developer, BIDA shall have the right to prepay, at its option, the principal of any such revenue bond at any time without premium or penalty.

(b)   Each revenue bond owned by Parcel Developer shall bear interest at the Prime Rate on the outstanding principal amount thereof, which interest shall accrue and compound annually on December 31 of each year and shall be payable at the maturity of the related revenue bond.  If any revenue bond owned by Parcel Developer matures before the termination of this Agreement, BIDA shall issue its revenue bond to refund by exchange any such maturing revenue bond.  BIDA shall cooperate with Parcel Developer in issuing and securing its revenue bonds to evidence any Financing; provided, however, that BIDA shall not be obligated to secure any such revenue bonds by any assets or revenues other than the Project Parcel and the Gross Receipts.  In furtherance of the immediately preceding sentence, BIDA agrees that, upon not less than thirty (30) days prior notice, Parcel Developer shall have the right to accelerate the maturity of revenue bonds in connection with any assignment of this Agreement, the capitalization or recapitalization of Parcel Developer and any subsequent Financing, and BIDA agrees to issue new revenue bonds in connection therewith in accordance with the other terms of this Agreement.

(c)   BIDA shall issue revenue bonds in one or more series to evidence the loans made by a Lender or Parcel Developer in connection with the Project Parcel Development, which revenue bond shall be in form and substance reasonably satisfactory to Parcel Developer

and BIDA.  On the date of issuance of the PILOT Bonds, BIDA shall have authorized and issued (i) to the Lender or each of the Lenders designated by Parcel Developer, a revenue bond or bonds representing all or a portion of the loan from such Lender or Lenders and (ii) to Parcel Developer, a revenue bond in each case in an aggregate principal amount representing (x) the estimated amount of capital expenditures to be financed by BIDA from proceeds of loans provided by Parcel Developer over the Term, and (y) the amount of debt service paid by Parcel Developer when due and payable under any loan from a Lender.  During the Term, BIDA shall authorize and issue such additional revenue bonds to an additional Lender or Lenders, to Parcel Developer in an aggregate principal amount estimated by the party making such loan to BIDA equal (together with all other revenue bonds held by such party and drawn in the full available principal amount thereof) to the estimated aggregate amount of all such loans.  All such revenue bonds shall be structured to provide that all or any portion of the aggregate principal amount thereof may be drawn from time to time as the applicable loans are made; such amounts drawn to be noted by the holder of the revenue bond on its records as provided in such revenue bonds.  It is the intent of the parties that all such revenue bonds in the aggregate will reflect the full cost of acquiring, constructing, equipping and improving the Project Parcel during the Term.

7.4.    Payment of the Project Parcel Development Costs.  Any and all costs incurred to Develop the Project Parcel Development shall be funded as follows: (i) first, from the net proceeds of the PILOT Bonds on a dollar for dollar basis against equity provided by Parcel Developer until such time as either the committed equity or the net PILOT Bond proceeds are exhausted, and (ii) second, from the balance of either the committed equity or net PILOT Bond proceeds such that all committed equity and all net PILOT Bond proceeds are invested in the project prior to any loans obtained by Parcel Developer, and (iii) third, from the proceeds of any loans obtained on behalf of BIDA by Parcel Developer.

7.5.    Payment and Performance Bonds.  Parcel Developer shall obtain, or cause to be obtained, a payment and performance bond for the Project Parcel Development ("Performance Bond").  The Performance Bond shall (i) be issued by an underwriter reasonably acceptable to BIDA; (ii) secure the obligation to complete the Project Parcel Development in accordance with this Agreement; (iii) be in compliance with all applicable requirements of Article 3 of Chapter 91 of Title 36 of the Official Code of Georgia Annotated; (iv) be in form and substance reasonably acceptable to BIDA; and (v) name BIDA as an obligee thereunder.  BIDA acknowledges that other parties may be named as an obligee under the Performance Bond; provided, except for an institutional lender holding a first priority security interest with respect to the improvements described in the Performance Bond, BIDA shall have priority over any other obligee.  Parcel Developer acknowledges and agrees that delivery to BIDA of a Performance Bond, in the form herein required, for the Project Parcel Development shall be a condition to Parcel Developer's right to construct such improvement and that Parcel Developer shall deliver the applicable Performance Bond to BIDA at least ten (10) days prior to commencement of construction with respect to the improvements described in such bond.

7.6.    Green Measures.    In accordance with the terms of the Declaration, Parcel Developer, to the extent economically feasible, will target for each building within the Project Parcel Development the Leadership in Energy and Environmental Design certification described in the Declaration.

1965067.v9

## ARTICLE 8
## SPECIAL COVENANTS OF BIDA

8.1.   BIDA Approvals.  In order to facilitate the timely development of the Project Parcel Development, BIDA hereby designates the executive director of the GICC as the point of contact to whom all requests and submissions relating to this Agreement are to be submitted by Parcel Developer.  All requests and submissions also shall be copied to the city manager of the City of College Park.   Submissions relating to the construction of the Project Parcel Development, such as permit request, construction plans and other items relating to such construction, shall be submitted to the City of College Park in the ordinary course of business.  BIDA shall have the right to appoint a substitute representative from time to time upon ten (10) days prior notice to Parcel Developer.  Such representative shall have no power to bind or otherwise obligate BIDA or the City of College Park with respect to any request or submission or incur any costs, expenses, liabilities or other financial obligations on behalf of BIDA or the City of College Park.  All such requests or submissions must be submitted to and approved by the applicable parties, agencies or departments which have jurisdiction with respect to the request or submission.

8.2.   Encumbrances.  Except as specifically set forth herein or as otherwise required pursuant to the Intergovernmental Agreement or any Permitted Title Exception, BIDA shall not grant or create any liens, security interest, easements or other encumbrances which would affect title to the Project Parcel.  In the event BIDA, pursuant to the Intergovernmental Agreement or any Permitted Title Exception, shall have the discretionary right to consent to a lien, security interest, easement or other encumbrance which will affect all or any portion of the Project Parcel, BIDA will submit all materials received by BIDA in connection with a request for BIDA's consent to Parcel Developer for review by Parcel Developer.  Such submission will include notice of the time period in which BIDA is required, or intends to respond, and the date, which shall be at least ten (10) days after the date of the submission to Parcel Developer if BIDA's period so allows, upon which Parcel Developer should give notice of its approval of the submission or its objections thereto.  If Parcel Developer has objections to the requested consent, BIDA will work in good faith with Parcel Developer (who too shall work in good faith) and the party requesting the consent to resolve such objections within the time period provided in the instrument pursuant to which such discretionary consent is required.   In the event Parcel Developer's objections are not timely resolved to Parcel Developer's satisfaction, then Parcel Developer shall give written notice to BIDA of Parcel Developer's denial of the requested consent.   Failure of Parcel Developer timely to provide BIDA written notice of Parcel Developer's denial of the requested consent shall be deemed an approval of such request.  If Parcel Developer shall deny consent as provided above, then BIDA shall provide the requesting party with notice of BIDA's denial of such consent.  If Parcel Developer shall notify BIDA that Parcel Developer's consent to a request is given, then BIDA, in its sole discretion, may approve or disapprove the request in accordance with the terms of the instrument pursuant to which the consent is requested.   With respect to any discretionary consent request for which Parcel Developer denies its consent, and as a result thereof BIDA denies the requested consent, Parcel Developer shall and hereby indemnifies, defends and agrees to hold harmless BIDA for and against any and all claims suits, causes of action, costs, expenses and other liabilities BIDA may or shall incur as a result of the denial of the requested consent.  This indemnity shall survive the

termination of this Agreement.  Notwithstanding the foregoing, Parcel Developer acknowledges that this provision does not and is not intended to limit the discretion of BIDA nor the City Council of the City of College Park in matters in which it is compelled or required to undertake pursuant to the Intergovernmental Agreement or a Permitted Title Exception.

8.3.    Future Agreements.  Except as required by applicable law, BIDA shall not enter into any agreement of any kind which adversely affects title to the Project Parcel and/or the rights of Parcel Developer hereunder without the prior written consent of Parcel Developer which consent shall not be unreasonably withheld, delayed or conditioned.

8.4.    Environmental.  BIDA shall not intentionally do or cause another Person to do anything which would cause the Project Parcel to be in violation of the Environmental Laws.

8.5.    Zoning.  BIDA shall not intentionally do or cause another Person to do anything which would affect the zoning of the Project Parcel without the prior written consent of Parcel Developer, which consent shall not be unreasonably withheld, delayed or conditioned.

8.6.    Infrastructure.  BIDA shall not do or cause another Person to do anything which would affect the Project Infrastructure (as defined in the Master Development Agreement) and the Stormwater Facilities (as defined in the Declaration) so that the Project Infrastructure and the Stormwater Facilities would not be sufficient to support the Mixed-Use Development, generally, and the Project Parcel Development, specifically.

8.7.    Further Assurances.  BIDA agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements and amendments hereto and such further instruments as may be reasonably required for carrying out the intention or facilitating the performance of this Agreement.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

9.1.    From Parcel Developer.  Parcel Developer hereby represents and warrants to BIDA as follows:

(a)    Parcel Developer is a Delaware limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in the State of Georgia.  Parcel Developer has all requisite power and authority to execute, deliver and perform its duties under this Agreement.  On or before the PILOT Bonds Closing Date, Parcel Developer shall provide an organization chart to BIDA disclosing all of the members of Parcel Developer.

(b)    The execution, delivery and performance by Parcel Developer of this Agreement and all other instruments and documents to be delivered hereunder, and the transactions contemplated hereby and thereby, are within Parcel Developer's powers, have been duly authorized by all necessary action, do not contravene (i) Parcel Developer's operating agreement, or (ii) any law, rule, regulation, order or judgment applicable to, or any contractual

restriction binding on or affecting, Parcel Developer, and do not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

(c)     No authorization or approval or other action, by and no notice to or filing with, any Governmental Authority or regulatory body is required for the due execution, delivery and performance by Parcel Developer of this Agreement or any other document or instrument to be delivered hereunder.

(d)     This Agreement is the legal, valid and binding obligation of Parcel Developer enforceable against Parcel Developer in accordance with its respective terms.

(e)     To the best knowledge of Parcel Developer, there has not been any failure by Parcel Developer to file at or prior to the time required any report or other filing with any regulatory or other Governmental Authority having jurisdiction over it, which failure would materially adversely affect the business, operations, affairs, assets, condition, financial or otherwise, or prospects of Parcel Developer.

(f)     All factual statements set forth in the representations and warranties of the Parcel Developer in this Agreement or any schedule, exhibit, certificate or document prepared by Parcel Developer pursuant to the obligations of this Agreement are true in all material respects.

9.2.    From BIDA.  BIDA hereby represents and warrants that:

(a)     BIDA is a public body corporate and politic duly created and existing under the laws of the State of Georgia and is duly qualified and authorized to carry on the undertakings contemplated by this Agreement.

(b)     BIDA has the requisite power and authority to execute and deliver this Agreement, to incur and perform its obligations hereunder, and to carry out the transactions contemplated by this Agreement.

(c)     The execution, delivery and performance of this Agreement has been duly authorized by all necessary action and proceedings by or on behalf of BIDA, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of BIDA as a condition to the valid execution, delivery, and performance by BIDA of this Agreement.

(d)     Except for Alan Gravitt and Linda Gravitt v. City of College Park, et. al., Civil Action Case No. 2007-CV-127768, and only inasmuch as that case pertains to the eligibility of certain members of the BIDA board to serve on the board, there are no actions, suits, proceedings or investigations of any kind pending or, to its knowledge, threatened against BIDA before any court, tribunal or administrative agency or board or any mediator or arbitrator that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(e)     As of the PILOT Bonds Closing Date and except for the Intergovernmental Agreement, the Master Development Agreement and the memorandum relating thereto, the Declaration and the Permitted Title Exceptions, BIDA has not entered into any agreement of any kind affecting the Project Parcel in any way without the prior written consent of Parcel Developer.

(f)     As of the PILOT Bonds Closing Date, to the best of BIDA's actual knowledge, the Project Parcel is in compliance with the Environmental Laws.

(g)     As of the PILOT Bonds Closing Date, the Project Parcel will have access to a public right-of-way.

(h)     As of the PILOT Bonds Closing Date, the Project Infrastructure (as defined in the Master Development Agreement) and the Stormwater Facilities (as defined in the Declaration) are in good working order.

9.3.    Timing.  The representations and warranties of Parcel Developer shall be true and correct as of the date hereof, and the date of each funding pursuant to the Parcel PILOT Agreement.  Parcel Developer shall execute a recertification of its representations and warranties with each funding under the Parcel PILOT Agreement.  The representations and warranties of BIDA shall be true and correct as of the date hereof and as of the PILOT Bonds Closing Date.

**ARTICLE 10**
**FINANCING**

Except as set forth in Article 14, Parcel Developer shall not be entitled to assign, pledge or otherwise encumber this Agreement or Parcel Developer's rights, duties or obligations hereunder.  The Parties acknowledge that construction financing and permanent financing for the improvements which are to comprise the Project Parcel Development are necessary and desirable.  The Parties further acknowledge that the structure of the transaction between the Parties will require the cooperation of the Parties in order to obtain Financing and each agrees to cooperate and work together in good faith in order to obtain Financing.  Parcel Developer shall be responsible for arranging Financing for the Project Parcel Development.  If required by a Lender, BIDA shall grant a Lender a first priority (subject to certain limitations, including without limitation, Parcel PILOT Payments and Annual Fee Payments) non-recourse security interest in the Property.  BIDA will be the borrower under such Financing, provided in all events any Financing shall be fully non-recourse to BIDA.  Parcel Developer shall be entitled to make draw requests directly from a Lender under a Financing for the Project Parcel Development, without BIDA's consent as long as a Parcel Developer Event of Default does not then exist hereunder.  Parcel Developer shall be entitled to pay any and all monies owed under a Financing directly to a Lender for the account of BIDA not only in the event BIDA fails to do so, but as a matter of course.  The Parties will work together with Lender to address the remedies of Lender upon a default under a Financing, including, but not limited to, the ability to cure any default committed by BIDA and to be reimbursed for the costs of such cure by BIDA; provided in all events this Agreement and the Parcel PILOT Agreement shall be superior in priority to the Financing.  This Agreement may be assigned to Lender as security for Financing.  Unless

otherwise agreed to by BIDA, in the event a Lender or its successor shall succeed to the interest of Parcel Developer under this Agreement or shall obtain fee title to the Property, Lender's interest shall be subject to this Agreement and the Parcel PILOT Agreement and Lender, among other matters, shall be liable for payment of the Annual Fee Payment and any payment due under the Parcel PILOT Agreement with respect to the Project Parcel.   Loan documents for all Financings shall contain notice and cure periods acceptable to BIDA in its reasonable discretion. All costs relating to any Financing, including attorneys' fees incurred by BIDA in connection therewith, shall be paid from proceeds of the Financing.   Any legal fees incurred by Parcel Developer related to, and in connection with, the issuance of PILOT Bonds shall be paid from the PILOT Bonds proceeds.

**ARTICLE 11**
**DEFAULTS AND REMEDIES**

11.1.   <u>Parcel Developer Event of Default</u>.   The occurrence of any of the following events which is not cured or satisfied within the applicable notice and cure periods set forth below, if any, shall constitute a Parcel Developer Event of Default under this Agreement and shall entitle BIDA to exercise the rights and remedies set forth in <u>Section 11.2</u> below.

(a)   any failure to pay the Annual Fee Payment, the payment due pursuant to <u>Section 16.2</u> or any other monetary payments due from Parcel Developer to BIDA under this Agreement and such failure continues for a period of twenty (20) days after receipt by Parcel Developer of notice from BIDA of such failure;

(b)   any failure to diligently pursue the Development of the Project Parcel Development, including the failure of Parcel Developer to cause the Project Parcel Development to be open and operating on or before the Project Parcel Completion Date, and such failure continues for a period as follows:   sixty (60) days after Parcel Developer's receipt from BIDA of notice of any failure to pursue construction and one hundred eighty (180) days after receipt by Parcel Developer of notice from BIDA of any failure to achieve Substantial Completion;

(c)   any failure by Parcel Developer to observe, comply with or perform any other obligation under this Agreement, and such failure continues for a period of thirty (30) days subsequent to receipt of notice thereof from BIDA (unless the nature of the specified failure is such that more than thirty (30) days are reasonably required to complete its cure, and Parcel Developer commences to cure within said thirty (30) day period and thereafter diligently prosecutes the same to completion, in which event Parcel Developer shall have a reasonable amount of time to complete such cure);

(d)   any default by Parcel Developer under the Parcel PILOT Agreement or under any document executed by Parcel Developer in connection with the PILOT Bonds, and such failure continues for any notice and cure period set forth in the agreement or document under which the default has occurred;

(e)   the making of a general assignment for the benefit of creditors; or the institution of any proceeding by or against Parcel Developer seeking to adjudicate Parcel

Developer as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection relief, or composition of Parcel Developer or its debts under any Applicable Law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for Parcel Developer or for any substantial part of its property and, in the case of any proceeding instituted against Parcel Developer (but not instituted by Parcel Developer) is being diligently contested by Parcel Developer in good faith, either such proceeding shall remain undismissed or unstayed for a period of ninety (90) days from the institution thereof or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, Parcel Developer or any substantial part of Parcel Developer's property) shall occur; or any action shall be taken by Parcel Developer to authorize any of the actions set forth above in this subsection (e); and

        (f)    any failure by Parcel Developer to maintain any required Performance Bond and such failure continues for a period of ten (10) days subsequent to receipt by Parcel Developer of notice from BIDA of such failure.

    11.2.  <u>Remedies for Parcel Developer Event of Default</u>.  If a Parcel Developer Event of Default shall occur, BIDA may:

        (a)    without terminating this Agreement, take any action reasonably necessary to cure any such Parcel Developer Event of Default for the account of Parcel Developer and to charge Parcel Developer for the cost of such cure;

        (b)    terminate this Agreement, if such Parcel Developer Event of Default is pursuant to <u>Section 11.1(b)</u>; and/or

        (c)    without terminating this Agreement, seek BIDA's rights and remedies at law or in equity to enforce compliance by Parcel Developer of its obligations hereunder pursuant to and in accordance with <u>Section 11.5</u>; provided in all events the rights and remedies afforded to BIDA pursuant to this <u>Section 11.2</u> shall include, without limitation, the right to lien all interest of Parcel Developer in and to the Project Parcel Development and this Agreement, the right to foreclose any such lien, the right to take possession of the Project Parcel and any improvements thereon subsequent to a Parcel Developer Event of Default and the right to the appointment of a receiver.

    Any reasonable amounts actually expended by BIDA to cure a Parcel Developer Event of Default shall be payable by Parcel Developer fifteen (15) days after Parcel Developer receives notice thereof from BIDA, and shall bear interest at the Prime Rate from the expiration of said fifteen (15) day period to the date Parcel Developer reimburses BIDA or BIDA is otherwise made whole for such expense.  In the event any amounts owed BIDA due to such default are not timely paid, BIDA shall have the right to offset the amount due BIDA against any sums due from BIDA to Parcel Developer under this Agreement including, without limitation, operating fees payable pursuant to <u>Section 5.2</u>, against any amounts to which Parcel Developer has a recapture right pursuant to the Parcel PILOT Agreement and against any undrawn PILOT Bonds proceeds

allocated to the Project Parcel Development.  Except with respect to a termination of the Agreement, the exercise of any remedy set forth above by BIDA shall not release or relieve Parcel Developer of its continuing obligations hereunder or under any other agreement to which Parcel Developer and BIDA are parties.  The rights and remedies set forth herein may be exercised individually or cumulatively.

Except as expressly set forth in Section 11.2, under no circumstance, in the event of a Parcel Developer Event of Default, shall BIDA, as a remedy thereto, have the right to terminate this Agreement.

11.3.   BIDA Event of Default.  The occurrence of any of the following events which is not cured or satisfied within the applicable notice and cure periods set forth below, if any, shall constitute a BIDA Event of Default under this Agreement and shall entitle Parcel Developer to exercise the rights and remedies set forth in Section 11.4 below.

(a)      Any failure by BIDA to observe, comply with or perform any material obligation under this Agreement, provided that such failure continues for a period of thirty (30) days subsequent to receipt of notice thereof from Parcel Developer (unless the nature of the specified failure is such that more than thirty (30) days are reasonably required to complete its cure, and BIDA commences to cure within said thirty (30) day period and thereafter diligently prosecutes the same to completion).

11.4.   Remedies for BIDA Event of Default.  In the event of any BIDA Event of Default pursuant to Section 11.3 above, Parcel Developer may:

(a)      take any action reasonably necessary to cure any such BIDA Event of Default for the account of BIDA, and to charge BIDA for the cost of such cure; and/or

(b)      seek Parcel Developer's rights and remedies at law or in equity to enforce compliance by BIDA of its obligations hereunder pursuant to and in accordance with Section 11.5.

Any reasonable amounts actually expended by Parcel Developer to cure a BIDA Event of Default shall be payable by BIDA fifteen (15) days after BIDA receives notice thereof from Parcel Developer, and shall bear interest at the Prime Rate from the expiration of said fifteen (15) day period to the date BIDA reimburses Parcel Developer or Parcel Developer is otherwise made whole for such expense.  In the event any amounts owed Parcel Developer due to such default are not timely paid, Parcel Developer shall have the right to offset the amount due Parcel Developer against any sums due from Parcel Developer to BIDA under this Agreement, except the amounts payable by Parcel Developer pursuant to the Parcel PILOT Agreement.  The exercise of any remedy set forth above by Parcel Developer shall not release or relieve BIDA of its continuing obligations hereunder or under any other agreement to which BIDA and Parcel Developer are parties.

Under no circumstance, in the event of a BIDA Event of Default, shall Parcel Developer, as a remedy thereto, have the right to terminate this Agreement.

11.5.   Mediation and Venue.   Any dispute which should arise relating to the Project Parcel, the Project Parcel Development and this Agreement between the Parties shall be resolved as follows: (i) the Parties hereto agree to utilize non-binding mediation, as provided herein, to attempt to resolve all disputes hereunder prior to commencing any other action; and (ii) should mediation fail to resolve such dispute, the Parties may proceed at law or in equity; however, the Parties hereby agree that, and consent to, any such action shall be commenced only in the Superior Court of Fulton County, Georgia (the "Venue"). This provision shall not apply in the event that the relief sought by either Party is injunctive relief, which shall include, but not be limited to, temporary restraining orders, except with respect to the Venue.

The Parties shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the Parties mutually agree otherwise, shall be in accordance with the Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other Party and with the American Arbitration Association. Any mediation must be requested within thirty (30) days subsequent to the date the party receives written notice of the existence of a claim, dispute or other matter and the mediation will be completed within sixty (60) days subsequent to such event. The Parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in Fulton County, Georgia, unless another location is mutually agreed upon.

## ARTICLE 12
## CITY AUTHORITY

12.1.   City Appointment.   Notwithstanding any provisions herein to the contrary, BIDA does hereby and herein appoint the City of College Park as its agent to act on its behalf, to receive and respond on its behalf all notices, instructions, communications and other such matters, to make necessary elections and decisions, and to act as may be desired and as may be required or allowed.

## ARTICLE 13
## CONDEMNATION

13.1.   Condemnation.   If at any time during the Term, all or any part of the Property shall be the subject of a Condemnation under any statute or by right of eminent domain or private purchase in lieu thereof by a public body vested with the power of eminent domain ("Condemning Authority"), Parcel Developer hereby assigns to BIDA any and all awards, claims, rights, interests or demand whatsoever to which Parcel Developer may be entitled by reason of such Condemnation; provided, however, BIDA shall consult with Parcel Developer in connection with any condemnation proceedings relating to any improvements constructed on the Project Parcel and Parcel Developer shall have reasonable approval rights as to any material decisions relating to the conduct of such Condemnation proceeding and the amount of any award relating to any improvements constructed on the Project Parcel. BIDA shall be entitled, with Parcel Developer's prior reasonable approval, to pursue, exercise and prosecute any challenge, appeal, recovery, award, claim, rights or demand whatsoever accruing to either Party for compensation for the taking of any interest in the Property. Parcel Developer agrees to cooperate

fully with and assist BIDA in challenging, appealing or otherwise seeking compensation or payment for the taking of any interest in the Property.

In the event that all of the Project Parcel or so much thereof as shall make it impossible or impracticable, in the reasonable opinion of BIDA to undertake the Development of the Project Parcel as herein described, shall be acquired, taken or condemned, then this Agreement shall terminate on the date that title vest in the Condemning Authority. Parcel Developer waives any claim and shall have no claim against BIDA for the value of the unexpired term of this Agreement.

13.2.  Payment of Funds.  In the event of termination of this Agreement under Section 13.1, BIDA and Parcel Developer agree that any funds received by BIDA by reason of such taking pursuant to a sale, final order, final settlement, final award or final judgment, after the payment of all reasonable, out-of-pocket costs and expenses, including, but not limited to, attorneys fees relating to such taking, shall be disbursed as follows:

(a)  First, to BIDA in an amount equal to the sum of the present values of the Remaining Scheduled Parcel PILOT Payments discounted, on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months), at the Treasury Rate;

(b)  Second, to retire in full all Financing, except for Financing held by Parcel Developer;

(c)  Third, to BIDA in an amount equal to the sum of the present values of the Remaining Scheduled Annual Fee Payments discounted, on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months), at the Treasury Rate;

(d)  Fourth, to retire in full all Financing (without interest or return) held by Parcel Developer; and

(e)  Finally, ninety percent (90%) of the balance to Parcel Developer and ten percent (10%) of the balance to BIDA, *pari passu.*

13.3.  Partial Taking.  If less than the entire Property shall be taken in any proceeding and this Agreement shall not be terminated as provided in Section 13.1, this Agreement shall continue in full force and effect in accordance with its terms with respect to the untaken portion of the Property and there shall be no reduction or abatement in the Annual Fee Payment, and BIDA will disburse to Parcel Developer all funds received by BIDA by reason of such taking pursuant to a sale, final order, final settlement, final award or final judgment less (a) the reasonable, out-of-pocket costs and expenses, including but not limited to, attorneys fees relating to such taking, (b) the amount necessary to retire all Financing relating to the portion of the Project Parcel taken thereby, (c) an amount sufficient to redeem the PILOT Bonds allocable to the portion of the Project Parcel taken (which shall be determined by the amount that aggregate PILOT Bonds Payments payable on an overall basis bears to aggregate Parcel PILOT Payments payable by Parcel Developer) and (d) an amount equal to ten percent (10%) of the then Fair

Market Value in an unimproved state of the land taken and any interest thereon which has accrued pursuant to Applicable Law; which amounts shall be payable to or retained by BIDA.

13.4.   City of Atlanta.   Parcel Developer, without the prior written consent of BIDA, shall not enter into any agreements, orders, settlements or any other document transferring any interest in all or any portion of the Property to the City of Atlanta.

**ARTICLE 14**
**ASSIGNMENT**

14.1.   BIDA Assignment.   At any time subsequent to the full funding of the net proceeds of the PILOT Bonds which are allocable to the Project Parcel Development, BIDA shall have the right to convey, transfer or assign this Agreement or its rights, duties or obligations hereunder, in whole or in part, to the City of College Park or any other tax-exempt entity without the consent of Parcel Developer so long as such transferee expressly assumes this Agreement in writing and a copy of the same is provided to Parcel Developer. Upon such conveyance, transfer or assignment, BIDA shall be released of all further obligations as to this Agreement or the rights, duties or obligations so conveyed, transferred or assigned as long as such assignee assumes all of BIDA's obligations under this Agreement as a condition to the conveyance, transfer or assignment. Except as provided in the preceding sentences, BIDA may not convey, transfer or assign this Agreement or its rights, duties or obligations hereunder.

14.2.   Parcel Developer Assignment.   This Agreement shall not be assignable by Parcel Developer, without the prior written consent of BIDA, which consent shall not be unreasonably withheld, conditioned or delayed and which shall be made by BIDA strictly in accordance with customary commercial practices, except this Agreement may be assigned or pledged by the Parcel Developer without such consent in connection with any financing of the Project Parcel as contemplated by Article 10 hereof. BIDA shall be deemed to have consented to an assignment of this Agreement if Parcel Developer shall request in writing BIDA to consent to such assignment and BIDA does not respond in writing (and if disapproved by BIDA, then the writing must specify the reasons for disapproval) within the later of (i) twenty (20) days of the receipt of such request by the Parcel Developer, or (ii) five (5) business days after receipt by BIDA of any additional information or documents timely requested by BIDA as provided hereinbelow. Parcel Developer's written request to BIDA as contemplated hereby shall include, without limiting what such request may include, the following: information on the proposed assignee including the proposed assignee's name, address, corporate or entity structure and biography or history of the proposed assignee including any hotel experience; if applicable, a certification or other reasonable evidence of the proposed assignee's compliance with the criteria set forth below in subsections (a), (b), (c) and (d); and a copy of the proposed assignment and assumption agreement by and between Parcel Developer and the proposed assignee. Within seven (7) days after BIDA's receipt of such written request, BIDA shall have the right to request reasonably in writing any additional, non-confidential information or documentation regarding the proposed assignee or the proposed assignment, and BIDA shall have the right to interview, either via telephone or in person, a representative of the proposed assignee, which interview shall take place, if timely so requested by BIDA, within the 20-day period referenced above. With respect to BIDA's reasonable evaluation of the proposed assignee, by way of example only, it shall be

reasonable for BIDA to (a) evaluate whether or not the proposed assignee has, in BIDA's reasonable judgment, sufficient financial resources to fulfill Parcel Developer's obligations under this Agreement (provided, however, it being understood, that any Person (or any Affiliate of any Person) with a verifiable net worth of at least the lesser of (i) Five and no/100 Million Dollars ($5,000,000.00), or (ii) twenty-five percent (25%) of the total consideration paid for the assignment, including, without limitation, the amount of all assumed debt, shall be deemed to have such sufficient financial resources), (b) determine whether or not the proposed assignee has sufficient experience in owning an office building or has engaged an experienced office management company, (c) determine whether or not the proposed assignee has been convicted of a felony in any state or federal court, or is in control of or controlled by persons who have been convicted of felonies in any state or federal court; and (c) determine whether the assignee is not, nor any of its affiliates or any other Person related to such Person that is proscribed by applicable law is, a Specially Designated National or Blocked Person. Any assignment, transfer or conveyance made pursuant to this Section 14.2 must satisfy the following provisions:

(a)    such successor Parcel Developer shall assume the obligations of the assignment of Project Parcel Developer under the Parcel PILOT Agreement;

(b)    such successor Parcel Developer shall assume the Annual Fee Payment obligations which are attributable to the Project Parcel as provided for in Section 4.1; and

(c)    such successor Parcel Developer shall assume any and all other obligations, for all purposes, attributable to Parcel Developer pursuant to this Agreement.

14.3.    Parcel Developer Release.  Upon an assignment, transfer or conveyance pursuant to Section 14.2, the transferring, assigning or conveying Parcel Developer shall be fully and completely released from any and all obligations under this Agreement and shall have no further responsibilities relating hereto, including, but not limited to, the payment of the Annual Fee Payment and the Parcel PILOT Payments.

14.4.    Attornment.  In the event of an assignment, transfer or conveyance pursuant to Section 14.2, BIDA agrees that this Agreement shall remain in full force and effect and agrees to attorn to such assignee as if such assignee was the original Parcel Developer hereunder.

## ARTICLE 15
## PEOPLE MOVER SYSTEM AND CONRAC

15.1.    City of Atlanta Agreements.  Pursuant to the City Covenants and the People Mover Easement Agreement, the City of Atlanta has the right to construct the CONRAC Facility and the People Mover System.  The City of Atlanta has commenced construction of the CONRAC Facility and the People Mover System.  BIDA will use its best efforts to ensure that the CONRAC Facility and the People Mover System are developed and constructed in accordance with the City Covenants.  BIDA will not take any position adverse to the terms of the City Covenants relating to the CONRAC Facility and the People Mover System.  BIDA agrees that BIDA, at no cost of BIDA, will reasonably assist and cooperate with Parcel Developer in its efforts to ensure that the Project Parcel Development will have legal access to, and use of, the People Mover System; such efforts to include, if necessary, use of commercially reasonable

1965067.v9

efforts to coordinate easement rights with the City of Atlanta and the granting to Parcel Developer of perpetual non-exclusive easements as reasonably necessary for ingress and egress from the Project Parcel Development improvements to the Gateway APM Station.

15.2.  <u>People Mover Easement</u>.  Parcel Developer acknowledges that its rights with respect to the People Mover System and the CONRAC Facilities are subject to the terms and conditions set forth in the Intergovernmental Agreement.  In the event Parcel Developer's agreement or consent are required to fulfill any obligation of BIDA, the City of College Park, or the Gateway Parties (as such term is defined in the Intergovernmental Agreement), Parcel Developer agrees to promptly provide such agreement or consent and to execute any documents requested by BIDA to evidence the same.  The City of College Park and BIDA shall not modify, amend or alter any material terms of any agreements affecting the Project Parcel, including, without limitation, the Intergovernmental Agreement, to adversely impact access to the People Mover System to and from the Project Parcel, adversely affect the Project Parcel's use of the People Mover System or increase any costs of which Project Developer is responsible, in whole or in part, without the prior written consent of Master Developer, such consent to not be unreasonably withheld, conditioned or delayed.

**ARTICLE 16**
**PILOT BONDS**

16.1.  <u>PILOT Bonds</u>.  BIDA shall issue the PILOT Bonds on or before the PILOT Bonds Closing Date and shall make the net proceeds of the PILOT Bonds allocated to the Project Parcel Development pursuant to the Parcel PILOT Agreement available to be jointly requisitioned by BIDA and Parcel Developer, pursuant to the joint requisition process established in the trust indenture securing the PILOT Bonds (the "<u>Trust Indenture</u>") to pay the costs of acquiring, constructing and installing the Project Parcel Development in accordance with the documents executed in connection with the PILOT Bonds closing.  BIDA shall have no obligation to make such net proceeds available as provided above in the event there shall be a continuing Parcel Developer Event of Default.  At the closing of the PILOT Bonds, a legal opinion will be issued by BIDA counsel to BIDA and Parcel Developer which will be a reasoned opinion that this Agreement does not create a taxable interest in the Property.

16.2.  <u>Parcel PILOT Payments</u>.  Pursuant to the Parcel PILOT Agreement, Parcel Developer shall make payments to BIDA (the "<u>Parcel PILOT Payments</u>").  Parcel Developer shall be responsible for the payment of Parcel PILOT Payments relating to the Project Parcel Development in an amount equal to the ad valorem property taxes that would be due if title to the Project were vested in Parcel Developer. In calculating the yearly amount payable as the Parcel PILOT Payment for a given year, BIDA and Parcel Developer shall obtain from the tax assessor of Clayton County the fair market value and the assessed value of the Project for the year in which such payments are due.  BIDA shall file all tax returns and other reports with the tax assessor of Clayton County that are necessary or desirable in order to establish the fair market value of the Project from time to time and shall obtain exemption from all ad valorem property taxes to the extent permitted under applicable Georgia laws. BIDA and Parcel Developer shall cooperate fully in furnishing to the tax assessor of Clayton County such information as may be reasonably required to establish the fair market value of the Project for ad valorem property tax purposes.  Parcel Developer, at its sole cost and expense, may, in the name and on behalf of

BIDA, contest or appeal the fair market value or assessed value of the Project determined by the tax assessor of Clayton County, using any contest or appeal rights that are available to BIDA or any individual taxpayer under applicable Georgia laws.  The Parcel PILOT Payments shall be due annually on or before the date of each year during the term of the Parcel PILOT Agreement set for payment of ad valorem property taxes in Clayton County generally.

In the event that any tangible property interest of the Parcel Developer in the Parcel Project becomes subject to ad valorem property taxation during the period of time that title to the Parcel Project is vested in BIDA, the amounts to be paid pursuant to the Parcel PILOT Agreement shall be reduced (but not below zero) by the actual payments paid by the Parcel Developer or any party that succeeds to the interest of the Parcel Developer under this Agreement (including, without limitation, any lender of the Parcel Developer) as such taxes, other than special assessments.

16.3.   Allocable Rent Payment Recapture.  Parcel Developer and BIDA shall be entitled to be repaid certain payments made by such Parties pursuant to and in accordance with the Parcel PILOT Agreement.

16.4.   Ad Valorem Taxes.  In the event that Parcel Developer is required by a court of competent jurisdiction in a non-appealable decision to pay  ad valorem taxes assessed on the Property by any taxing authority as a result of its interest in the Property, Parcel Developer shall be entitled to a reduction *pro tanto* from the Parcel PILOT Payments due for the Property up to the amount of the ad valorem taxes so paid.

16.5   Limitation on Maturity of PILOT Bonds.  BIDA agrees that it shall not issue any bonds secured by amounts payable under the Parcel PILOT Agreement that mature later than thirty (30) years from the PILOT Bonds Closing Date and agrees that it will diligently enforce all covenants against the trustee in the Trust Indenture with respect to payment of said bonds.

## ARTICLE 17
## RIGHT OF PURCHASE

17.1.   Right of Purchase.  At any time from and after the satisfaction of the PILOT Bonds through the end of the Term and provided there is no continuing Parcel Developer Event of Default, Parcel Developer shall have the right to acquire the Property upon the terms and conditions set forth in this Section 17.1.  The purchase price for the Property shall be an amount equal to the sum of (i) an amount sufficient to retire all Financing related to the Property (the "Outstanding BIDA Financings"), and (ii) an amount equal to ten percent (10%) of the Project Parcel's Fair Market Value as of the Fair Market Value Date.  Parcel Developer may pay the purchase price of the Project Parcel attributable to retiring any Outstanding BIDA Financings owned by Parcel Developer by delivering the revenue bonds evidencing such Outstanding BIDA Financings to BIDA for cancellation and BIDA, upon receipt, immediately shall cancel such revenue bonds.  In order to determine the Fair Market Value, the Parties shall undertake the following process (the "Appraisal Process"):  Within thirty (30) days subsequent to BIDA's receipt of written notice from Parcel Developer of Parcel Developer's election to acquire the Property (which notice cannot be given prior to the satisfaction of the PILOT Bonds), Parcel Developer and BIDA shall mutually agree upon an appraiser to appraise the Project Parcel (the

"Initial Appraisal").  The appraiser shall be instructed to determine the Fair Market Value of the Project Parcel as of the Fair Market Value Date as if there were no vertical improvements thereon, but assuming the Project Parcel was zoned as it is then developed and including therein the value of any infrastructure in place on the Project Parcel as of the Effective Date.  The cost of the Initial Appraisal shall be borne by Parcel Developer.  In the event BIDA or Parcel Developer are not satisfied with the Initial Appraisal, each Party, at such Party's cost, shall engage its own appraiser to perform an appraisal of the Project Parcel (each a "Second Appraisal").  If Second Appraisals are done, the Fair Market Value for the Property shall be the average of the Fair Market Value of the Project Parcel contained in the Initial Appraisal and the Fair Market Value of the Project Parcel contained in the Second Appraisal whose Fair Market Value is closest to the Fair Market Value in the Initial Appraisal.  Parcel Developer shall exercise its right to acquire the Property by written notice to BIDA and the closing of the acquisition shall occur on or before sixty (60) days subsequent to the determination of the purchase price for the Property but in all events on or before one hundred eighty (180) days subsequent to Parcel Developer's notice.  BIDA shall convey title to the Property to Parcel Developer by limited warranty deed (and a quitclaim bill of sale as to the Personal Property) and such title shall be subject to such matters as are in the Fulton County Records and/or the Clayton County Records, as applicable, as of the date of such closing.  Each Party shall execute such closing documents as are customary for similar closings.  BIDA shall pay any transfer tax due with respect to the recording of the limited warranty deed and its legal fees and expenses; all other costs shall be borne by Parcel Developer.  Upon a purchase of the Property pursuant to this Article 17 by Parcel Developer, the obligation to pay any further Annual Fee Payments and Parcel PILOT Payments shall immediately terminate and this Agreement shall terminate.

## ARTICLE 18
## SIGNAGE

18.1.   GICC Signage.   To the extent Master Developer shall assign (by written instrument) to Parcel Developer the right, pursuant to the license granted Master Developer in the Master Development Agreement, to place static development signage on the back spline of the Camp Creek Parkway large monolith sign and on the back spline of the Highway 29 small monolith sign, then BIDA shall recognize Parcel Developer's rights with respect to such signage. Parcel Developer shall comply with the design criteria for the monolith signs provided by BIDA to Master Developer and all signage to be installed by Parcel Developer pursuant to the assignment shall be in accordance with such criteria and shall be subject to the approval of BIDA, which approval shall not be unreasonably withheld, prior to the installation of such signage.  Any signage installed by Parcel Developer pursuant to this Section 18.1, shall not include the usage of any video displays.  Parcel Developer shall be solely responsible for all costs and expenses associated with the design, production and installation of any signage allowed hereunder.  Parcel Developer hereby indemnifies and holds harmless BIDA from any claims, costs, damages, causes of actions or other liabilities arising from or relating to Parcel Developer's use of the rights accruing to Parcel Developer under such assignment and this Section 18.1.  In the event Parcel Developer shall damage or harm the monolith signs above-described, Parcel Developer shall promptly repair such damage, including any damage to a third party's sign.  All signage installed by Parcel Developer pursuant to this Section 18.1 shall comply with all

Applicable Laws and shall be consistent with the existing signage for the GICC.  The indemnity set forth in this Section 18.1 shall survive the termination or expiration of this Agreement.

18.2.   Project Parcel Signage.  All signage within the Project Parcel Development shall comply with the Declaration, any covenants and restrictions of record and Applicable Laws.

## ARTICLE 19
## INDEMNIFICATION

19.1   Parcel Developer Indemnity.  Except to the extent caused by the negligence or misconduct of BIDA or its employees, members, agents or officers, Parcel Developer shall indemnify and hold harmless BIDA, its employees, members, agents or officers from and against all claims, causes of action, damages, costs, expenses or other liabilities of whatsoever nature arising (i) from any act, omission or negligence of Parcel Developer or Parcel Developer's contractors, subcontractors, employees, agents, consultants, licensees or invitees arising from an accident, injury or damage in or about the Property whatsoever caused to any Person or to the property of any Person; (ii) from any lawsuit filed against Parcel Developer or the Property as a result of Parcel Developer's action or failure to act; (iii) from any violation of Applicable Law, occurring from and after the Effective Date and until the end of the Term or the earlier termination of this Agreement, in or about the Property; (iv) in connection with any contracts or agreements entered into by Parcel Developer in connection with the operation and management of the Property; or (v) from any obligation of Parcel Developer under this Agreement.  This indemnity obligation shall include the obligation to defend, by counsel mutually approved by BIDA and Parcel Developer in their respective reasonable discretion, any claim, suit or other cause of action presented to BIDA.  The provisions of this Section 19.1 shall survive the termination or expiration of this Agreement.

## ARTICLE 20
## ESTOPPEL CERTIFICATE

20.1.   Estoppel Certificate.  From time to time, each Party, on or before the date specified in a request therefor made by the other Party, which date shall not be earlier than ten (10) days from the making of such request, but not more than three (3) times per calendar year, shall execute, acknowledge and deliver to the other Party a certificate evidencing whether or not (i) this Agreement is in full force and effect; (ii) this Agreement has been amended in any way; and (iii) there are any existing defaults on the part of either party hereunder, to the knowledge of such other Party, and specifying the nature of such defaults, if any; (iv) stating the date to which the Annual Fee Payment and other amounts due hereunder, if any, have been paid; and (v) such other matters as may reasonably be requested by such Party.  Each certificate delivered pursuant to this Section 20.1 may be relied on by the addressee thereof and any prospective transferee of BIDA's or Parcel Developer's interest hereunder and any Lender.

## ARTICLE 21
## NOTICE

21.1   Notice.  All notices, elections, or demands permitted or required to be made under this Agreement shall be made in writing, signed by the Party giving such notice, election, or

demand, and shall be deemed to have been properly given, unless otherwise specifically provided in this Agreement, (i) when delivered in person, or (ii) one (1) day after deposit with an overnight delivery service (such as Airborne, Federal Express, UPS, or other similar overnight service) for next day delivery, delivery charges prepaid, addressed to the appropriate party at the address set out below, or (iii) sent by certified mail, return receipt requested to the appropriate party at the address set out below:

|  |  |
|---|---|
| Notices to Parcel Developer: | College Park Gateway Office One, LLC<br>c/o Grove Street Partners, LLC<br>3625 Cumberland Boulevard<br>Suite 400<br>Atlanta, Georgia 30339<br>Attention: Mr. Kevin M. Kern |
| with a copy to: | Sheley & Hall, P.C.<br>303 Peachtree Street, NE<br>Suite 4440<br>Atlanta, Georgia 30308<br>Attention: Raymond P. Sheley, Esq. |
| Notices to BIDA: | College Park Business and Industrial<br>Development Authority<br>3667 Main Street<br>College Park, Georgia   30337<br>Attention:   Development Director |
| with copies to: | City of College Park<br>City Hall Complex<br>3667 Main Street<br>College Park, Georgia  30337<br>Attention:   City Manager |
|  | Fincher Denmark & Williams LLC<br>2262 Mount Zion Road<br>Jonesboro, Georgia 30236<br>Attention:   Steven M. Fincher, Esq.<br>                    Attorney for the City of College Park |
|  | Mack & Harris, P.C.<br>205 Corporate Center Drive<br>Suite B<br>Stockbridge, Georgia  30281<br>Attention:   Robert L. Mack, Jr., Esq.<br>                    Attorney for BIDA |

Rejection or other refusal by the addressee to accept, or the inability to deliver because of a changed address of which no notice was given, shall be deemed to be receipt of the notice, election or demand sent.  Any party shall have the right, from time to time, to change the address to which notices, elections or demands are sent by giving to all other applicable parties at least ten (10) days prior notice of the changed address.

The address for the executive director of the GICC is:

Georgia International Convention Center
2000 Convention Center Concourse
College Park, Georgia 30337

## ARTICLE 22
## MISCELLANEOUS

22.1.  <u>Governing Law</u>.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.  The venue for any action or suit brought against any Party relating to this Agreement or the enforcement of any provisions hereof shall be Fulton County, Georgia.

22.2.  <u>Severability</u>.  The invalidity of any one of the covenants, agreements, conditions or provisions of this Agreement, or any portion thereof, shall not affect the remaining portions of this Agreement, or any part hereof, and this Agreement shall be modified to substitute in lieu of the invalid provision, a like and valid provision which reflects the intent of the Parties with respect to the covenant, agreement, condition or provision which has been deemed or determined to be invalid.

22.3.  <u>Waiver</u>.  No consent or waiver, express or implied, by any Party to or of any breach or default by the other Party in the performance by such other Party of the obligations thereof under this Agreement shall be deemed or construed to be a consent or wavier to or of any other breach or default in the performance by such other Party of the same or any other obligations of such other Party under this Agreement.  Failure on the part of any Party to complain of any act or failure to act of any other Party or to declare such other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party under this Agreement.

22.4.  <u>Force Majeure Event</u>. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the Party obligated to perform (collectively, a "<u>Force Majeure Event</u>"), notwithstanding anything to the contrary contained in this Agreement, shall excuse the performance of such Party for a period equal to any such prevention, delay or stoppage and therefore, if this Agreement specifies a time period for performance of an obligation of either Party, that time period shall be extended day-to-day for the Force Majeure Event which caused the period of delay in such Party's performance.  A Force Majeure Event

shall not apply to a Party's obligation to pay any amounts due from such Party pursuant to this Agreement.

22.5.   Nature of Agreement.   It is the Parties' intent that this Agreement create a personal right in the Parties and not an estate or interest in real property.  Nothing herein should be construed to create an estate for years or any other estate or real property interest in the Project Parcel in favor of Parcel Developer.  This Agreement shall be deemed solely to be a contract that obligates Parcel Developer to design and develop the Project Parcel for BIDA and to operate the Property for and on behalf of BIDA.  To the extent the possessory rights herein established in favor of Parcel Developer must be given a specific label, the Parties agree that such rights shall be and are either a usufruct or an irrevocable license coupled with an interest and are not an estate for years.  Subject only to the terms of this Agreement, so long as Parcel Developer is not in default in the performance of its obligations under this Agreement, BIDA covenants that Parcel Developer shall and may at all times during the Term hold and have the quiet and peaceful enjoyment of the Property and the sole and exclusive possession and use of the Property without objection or interference from BIDA or any party claiming under BIDA, and BIDA agrees to take no action that would interfere with Parcel Developer's ability to fully perform its obligations under this Agreement.

22.6.   Default Interest.  In the event a Party hereto has an obligation to make a payment, and fails to make such payment, interest shall begin to accrue at the Prime Rate upon ten (10) days from receipt of the second notice that such payment is due, until such time as payment is made in full.

22.7.   Recorded Memorandum of Notice.  The Parties agree that Parcel Developer shall prepare a memorandum of notice which shall serve its sole purpose of providing notice that the Project Parcel is subject to this Agreement and the rights granted hereby. Such memorandum shall be in recordable form, executed by BIDA and Parcel Developer and recorded simultaneously with the execution of this Agreement. Upon termination or expiration of this Agreement, the Parties shall jointly execute an instrument terminating or canceling such memorandum of notice.  In the event that either Party does not so execute such an instrument within ten (10) days of receipt of such termination or cancellation from the other Party, the non-responding party hereby appoints the other party as its authorized agent solely for the purpose of executing such an instrument on the non-responding Party's behalf.

22.8.   Interpretations.   In all cases, the provisions set forth or provided for in this Agreement shall be construed together and given that interpretation or construction which will best effect the intent of the purpose set forth in the Recitals hereof.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any Party, including, without limitation, BIDA, by any court or other Governmental Authority by reason of such Party's having or being deemed to have structured or dictated such provision.

22.9.   Exhibits.  All exhibits and schedules referred to herein and attached hereto are deemed incorporated herein by reference with the same force and effect as if each exhibit were set forth in the body of this Agreement in its entirety.

22.10. <u>Time of Essence</u>.  Time is of the essence with respect to this Agreement and every provision hereof.

22.11. <u>Tax Treatment</u>.  BIDA shall not claim on any federal income tax return any depreciation deductions or tax credits with respect to the Property or any interest deductions with respect to any Financing and shall cooperate with Parcel Developer in enabling Parcel Developer to claim such deductions and tax credits (including, without limitation, amending this Agreement), but only to the extent that such cooperation (including any amendment to this Agreement) does not cause, in the sole judgment of BIDA, this Agreement to create a taxable interest in the Property for ad valorem property tax purposes.

[SIGNATURES FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, BIDA has caused its authorized representatives and Parcel Developer has caused its manager to execute this Agreement as of the Effective Date.

**BIDA:**

COLLEGE PARK BUSINESS AND INDUSTRIAL DEVELOPMENT AUTHORITY, a public body corporate and politic and an instrumentality and public corporation created under the laws of the State of Georgia

By: _____

April Wyatt, Chairperson

ATTESTED TO:

By: _____

Walt Belamy, Secretary

**PARCEL DEVELOPER:**

COLLEGE PARK GATEWAY OFFICE ONE, LLC, a Delaware limited liability company

By: _____

Print Name: _KEVIN M. KERN_

Title: _MANAGER_

1965067.v9

## EXHIBITS

| Exhibit A | Legal Description of the Land |
|---|---|
| Exhibit B | EBO Plan |
| Exhibit C | Master Plan |
| Exhibit D | Intentionally Omitted |
| Exhibit E | Legal Description of the Project Parcel |
| Exhibit F | Project Parcel Plan |
| Exhibit G | Intentionally Omitted |
| Exhibit H | Intergovernmental Agreement |
| Exhibit I | Permitted Title Exceptions |

## SCHEDULE

| Schedule 2.4 | Tract 7 Master Site Plan |
|---|---|
| Schedule 7.2 | Form of Principal Guaranty |

1965067.v9

# EXHIBIT A

## (Legal Descriptions – Tracts 3, 5, 6, 7 and 8)

**Tract 3**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 6, 13th District, Clayton County, Georgia, and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING, commence at the point of intersection of the northwesterly right-of-way line of Convention Center Concourse with the southwesterly right-of-way line of Camp Creek Parkway; run thence southwesterly, southerly and southeasterly along the northwesterly, westerly and southwesterly right-of-way line of Convention Center Concourse and along the arc of a 520.00-foot radius curve to left for an arc distance of 409.75 feet to a point (said arc being subtended by a chord bearing south 07 degrees 48 minutes 24 seconds west a chord distance of 399.23 feet, and having a central angle of 45 degrees 08 minutes 52 seconds); and run thence south 14 degrees 46 minutes 02 seconds east, along the southwesterly right-of-way line of Convention Center Concourse, a distance of 209.56 feet to the POINT OF BEGINNING: FROM THE POINT OF BEGINNING THUS ESTABLISHED, leaving the southwesterly right-of-way line of Convention Center Concourse, run thence south 86 degrees 58 minutes 12 seconds west a distance of 342.65 feet to a point; run thence south 35 degrees 02 minutes 31 seconds west a distance of 306.27 feet to a point; run thence south 38 degrees 21 minutes 40 seconds west a distance of 130.06 feet to a point on the northeasterly right-of-way line of Convention Center Concourse; run thence south 58 degrees 53 minutes 59 seconds west, along the northeasterly right-of-way line of Convention Center Concourse, a distance of 103.82 feet to a point; run thence southeasterly, easterly, northeasterly, northerly and northwesterly, along the northeasterly, northerly, northwesterly, westerly and southwesterly right-of-way line of Convention Center Concourse and along the arc of a 350.04-foot radius curve to the left of an arc distance of 829.86 feet to a point (said arc being subtended by a chord bearing north 53 degrees 10 minutes 00 seconds east a chord distance of 648.72 feet, and having a central angle of 135 degrees 50 minutes 00 seconds); and run thence north 14 degrees 46 minutes 02 seconds west along the southwesterly right-of-way line of Convention Center Concourse a distance of 36.78 feet to the POINT OF BEGINNING; being the same property shown as Tract 3, containing 4.661 acres, more or less, on that certain Subdivision Plat of Gateway Center for College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., prepare by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated October 4, 2004 and recorded in Plat Book 36, at pages 86 and 87, Clayton County, Georgia records.

The above-described property is shown as Tract 3 on Property Plat for Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated February 17, 2006.

Also:

**Tract 5**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 6, 13th District, Clayton County, Georgia, and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING, COMMENCE at the point of intersection of the southwesterly right-of-way line of Camp Creek Parkway with the southeasterly right-of-way line of Convention Center Concourse; run thence south 57 degrees 00 minutes 00 seconds east, along said southwesterly right-of-

way line of Camp Creek Parkway, a distance of 103.98 feet to the POINT OF BEGINNING:  FROM THE POINT OF BEGINNING THUS ESTABLISHED, run thence south 57 degrees 00 minutes 00 seconds east, along said southwesterly right-of-way line of Camp Creek Parkway, a distance of 68.61 feet to a point; run thence south 41 degrees 17 minutes 46 seconds east, along said southwesterly right-of-way line of Camp Creek Parkway, a distance of 137.67 feet to a point; run thence south 14 degrees 30 minutes 04 seconds east, along the Off Ramp of Camp Creek Parkway, a distance of 373.84 feet to a point; leaving said Off Ramp of Camp Creek Parkway, run thence south 45 degrees 58 minutes 50 seconds west a distance of 218.42 feet to a point; run thence south 46 degrees 56 minutes 19 seconds west a distance of 49.93 feet to a point; run thence north 46 degrees 52 minutes 34 seconds west a distance of 56.80 feet to a point; run thence south 49 degrees 37 minutes 42 seconds west a distance of 55.79 feet to a point; run thence south 10 degrees 57 minutes 53 seconds west a distance of 49.89 feet to a point; run thence north 77 degrees 56 minutes 08 seconds west a distance of 62.19 feet to a point on the southeasterly right-of-way line of Convention Center Concourse; run thence northeasterly, northerly and northwesterly along the southeasterly, easterly and northeasterly right-of-way line of Convention Center Concourse and along the arc of a 470.00-foot radius curve to the left for an arc distance of 172.62 feet to a point (said arc being subtended by a chord bearing north 01 degree 18 minutes 30 seconds east a chord distance of 171.65 feet, and having a central angle of 21 degrees 02 minutes 35 seconds); run thence north 09 degrees 12 minutes 49 seconds west, along the northeasterly right-of-way line of Convention Center Concourse a distance of 370.49 feet to a point; run thence northwesterly, northerly and northeasterly, along the northeasterly, easterly and southeasterly right-of-way line of Convention Center Concourse and along the arc of a 400.00-foot radius curve to the right for an arc distance of 144.71 feet to a point (said arc being subtended by a chord bearing north 01 degree 09 minutes 01 second east a chord distance of 143.92 feet, and having a central angle of 20 degrees 43 minutes 40 seconds); run thence along the arc of a 212.54-foot radius curve to the left for an arc distance of 167.79 feet to a point on said southwesterly right-of-way line of Camp Creek Parkway at the POINT OF BEGINNING (said arc being subtended by a chord bearing north 75 degrees 35 minutes 24 seconds east a chord distance of 163.47 feet, and having a central angle of 45 degrees 13 minutes 55 seconds); and being the same property shown as Tract 5, containing 4.517 acres, more or less, on that certain Subdivision Plat of Gateway Center for College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated October 4, 2004 and recorded in Plat Book 36, at pages 86 and 87, Clayton County, Georgia records.

The above-described property is shown as Tract 5 on Property Plat for Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated February 17, 2006.

Also:

**Tract 6**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 6, 13th District, Clayton County, Georgia, and being more particularly described as follows:

BEGIN at the point of intersection of the southeasterly right-of-way line of Convention Center Concourse with the northeasterly right-of-way line of Gateway Boulevard; run thence run thence northeasterly, along the southeasterly right-of-way line of Convention Center Concourse and along the arc of a 470.00-foot radius curve to the left for an arc distance of 293.02 feet to a point (said arc being subtended by a chord bearing north 29 degrees 41 minutes 24 seconds east a chord distance of 288.30 feet, and having a central angle of 35 degrees 43 minutes 16 seconds); run thence south 77 degrees 56 minutes 08 seconds east a distance of 62.19 feet to a point; run thence north 10 degrees 57 minutes 53 seconds east a distance of 49.89 feet to a point; run thence north 49 degrees 37 minutes 42 seconds east a distance of 55.79 feet to a

point; run thence south 46 degrees 52 minutes 34 seconds east a distance 56.80 feet to a point; run thence south 43 degrees 03 minutes 41 seconds east along the southwesterly right-of-way line of Conley Street a distance of 131.56 feet to a point; run thence southeasterly, southerly and southwesterly along the arc of an 80.71 radius curve to the right (and along the southwesterly, westerly and northwesterly right-of-way line of Conley Street) for an arc distance of 125.91 feet (said arc being subtended by a chord bearing south 01 degrees 37 minutes 51 seconds west a chord distance of 113.53 feet, and having a central angle of 89 degrees 23 minutes 03 seconds) to a point on the northwesterly right-of-way line of Roosevelt Highway; run thence southwesterly, along the northwesterly right-of-way line of Roosevelt Highway, the following courses and distances:  south 46 degrees 19 minutes 21 seconds west a distance of 61.85 feet to a point; thence south 57 degrees 50 minutes 41 seconds west a distance of 50.14 feet to a point; thence southwesterly along the arc of a 62.00-foot radius curve to the left for an arc distance of 200.74 feet (said arc being subtended by a chord bearing south 47 degrees 37 minutes 25 seconds west a chord distance of 200.73 feet, and having a central angle of 01 degree 54 minutes 32 seconds); and thence southwesterly, westerly and northwesterly along the arc of a 62.00-foot radius curve to the right for an arc distance of 104.81 feet to a point on the northeasterly right-of-way line of Gateway Boulevard (said arc being subtended by a chord bearing north 84 degrees 54 minutes 03 seconds west a chord distance of 92.77 feet, and having a central angle of 96 degrees 51 minutes 36 seconds); run thence northwesterly along the northeasterly right-of-way line of Gateway Boulevard and along the arc of a 400.00 foot radius curve to the right for an arc distance of 26.61 feet to a point (said arc being subtended by a chord bearing north 34 degrees 33 minutes 54 seconds west a chord distance of 26.61 feet, and having a central angle of 03 degrees 48 minutes 43 seconds); run thence north 32 degrees 39 minutes 33 seconds west, along the northeasterly right-of-way line of Gateway Boulevard, a distance of 82.84 feet to a point; and run thence north 07 degrees 26 minutes 56 seconds east, along the northeasterly right-of-way line of Gateway Boulevard, a distance of 30.92 feet to said point of intersection of the southeasterly right-of-way line of Convention Center Concourse with the northeasterly right-of-way line of Gateway Boulevard at the POINT OF BEGINNING; and being the same property shown as Tract 6, containing 2.357 acres, more or less, on that certain Subdivision Plat of Gateway Center for College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated October 4, 2004 and recorded in Plat Book 36, at pages 86 and 87, Clayton County, Georgia records.

The above-described property is shown as Tract 6 on Property Plat for Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated February 17, 2006.


Also:

**Tract 7**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 6, 13th District, Clayton County, Georgia, and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING, commence at a point on the northwesterly right-of-way line of Roosevelt Highway, said point having NAD 83 (Georgia West Zone) values of Grid N:403642.563 meters, Grid E:672988.186 meters, Latitude:  33 degrees 38 minutes 24.901 seconds, Longitude:  84 degrees 27 minutes 28.287 seconds with a Scale Factor of 0.9999089922 and a Convergence – 0 degrees 09 minutes 41 seconds (said Point of Commencement also being at the point of intersection of the line common to Land Lot 28, 13th District, Fulton County, Georgia and Land Lot 27, 13th District, Clayton County, Georgia, with said northwesterly right-of-way line of Roosevelt Highway); thence along said northwesterly right-of-way line of Roosevelt Highway run the following courses and distances:  north 46

degrees 18 minutes 12 seconds east a distance of 155.96 feet to a point; thence north 46 degrees 26 minutes 23 seconds east a distance of 552.71 feet to a point; and thence north 47 degrees 15 minutes 11 seconds west a distance of 2.41 feet to the POINT OF BEGINNING:   FROM THE POINT OF BEGINNING THUS ESTABLISHED, thence leaving said northwesterly right-of-way line of Roosevelt Highway, run north 47 degrees 15 minutes 11 seconds west a distance of 528.17 feet to a point; thence north 38 degrees 21 minutes 41 seconds east a distance of 457.91 feet to a point on the southwesterly right-of-way line of Convention Center Concourse; thence along the southwesterly, southerly and southeasterly right-of-way line of Convention Center Concourse, run the following courses and distances: south 58 degrees 53 minutes 59 seconds east a distance of 36.92 feet to a point; and thence southeasterly along the arc of a 470.00-foot radius curve to the left for an arc distance of 442.71 feet to a point at the corner formed by the intersection of said southeasterly right-of-way line of Convention Center Concourse with the southwesterly right-of-way line of Gateway Boulevard (said arc being subtended by a chord bearing south 85 degrees 53 minutes 04 seconds east a chord distance of 426.53 feet, and having a central angle of 53 degrees 58 minutes 09 seconds); thence along the southwesterly right-of-way line of Gateway Boulevard, run the following courses and distances:  south 72 degrees 45 minutes 11 seconds east a distance of 30.93 feet to a point; thence south 32 degrees 39 minutes 33 seconds east a distance of 82.82 feet to a point; and thence southeasterly along the arc of a 520.00 foot radius curve to the left for an arc distance of 54.47 feet to a point on said northwesterly right-of-way line of Roosevelt Highway (said arc being subtended by a chord bearing south 35 degrees 39 minutes 35 seconds east a chord distance of 54.44 feet, and having a central angle of 06 degrees 0 minutes 04 seconds); thence along said northwesterly right-of-way line of Roosevelt Highway, run the following courses and distances; southwesterly along the arc of a 72.0-foot radius curve to the right for an arc distance of 106.07 feet to a point (said arc being subtended by a chord bearing south 04 degrees 05 minutes 58 seconds west a chord distance of 96.74 feet, and having a central angle of 84 degrees 24 minutes 38 seconds); thence south 34 degrees 16 minutes 49 seconds west a distance of 70.18 feet to a point; thence south 46 degrees 19 minutes 21 seconds west a distance of 135.11 feet to a point; thence south 46 degrees 20 minutes 09 seconds west a distance of 75.03 feet to a point; thence south 46 degrees 20 minutes 09 seconds west a distance of 70.59 feet to a point; thence south 53 degrees 53 minutes 22 seconds west a distance of 52.20 feet to a point; and thence south 45 degrees 20 minutes 40 seconds west a distance of 235.68 feet to the POINT OF BEGINNING, and being the same property shown as Tract 7, containing 7.972 acres, more or less, on that certain Subdivision Plat of Gateway Center for College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated October 4, 2004 and recorded in Plat Book 36, at pages 86 and 87, Clayton County, Georgia records.

The above-described property is shown as Tract 7 on Property Plat for Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated February 17, 2006.

Also:

**Tract 8**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 5, 13th District, Fulton County, Georgia, and in Land Lot 6, 13th District, Clayton County, Georgia, and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING, commence at a point on the northwesterly right-of-way line of Roosevelt Highway, said point having NAD 83 (Georgia West Zone) values of Grid N:403642.563 meters, Grid E:672988.186 meters, Latitude:  33 degrees 38 minutes 24.901 seconds, Longitude:  84 degrees 27 minutes 28.287 seconds with a Scale Factor of 0.9999089922 and a Convergence – 0 degrees

09 minutes 41 seconds (said Point of Commencement also being at the point of intersection of the line common to Land Lot 28, 13th District, Fulton County, Georgia and Land Lot 27, 13th District, Clayton County, Georgia, with said northwesterly right-of-way line of Roosevelt Highway); thence along said northwesterly right-of-way line of Roosevelt Highway run the following courses and distances:  north 46 degrees 18 minutes 12 seconds east a distance of 155.96 feet to a point; thence north 46 degrees 26 minutes 23 seconds east a distance of 552.71 feet to a point; and thence north 47 degrees 15 minutes 11 seconds west a distance of 2.41 feet to a point; thence leaving said northwesterly right-of-way line of Roosevelt Highway, run north 47 degrees 15 minutes 11 seconds west a distance of 692.65 feet to the POINT OF BEGINNING:  FROM THE POINT OF BEGINNING THUS ESTABLISHED, run thence north 47 degrees 15 minutes 11 seconds west a distance of 1292.23 feet to a point; run thence north 01 degree 45 minutes 38 seconds west a distance of 439.10 feet to a point; run thence north 88 degrees 14 minutes 22 seconds east a distance of 24.00 feet to a point on the southwesterly right-of-way line of Convention Center Concourse; thence along the southwesterly right-of-way line of Convention Center Concourse, run the following courses and distances:  southeasterly along the arc of a 520.00-foot radius curve to the left for an arc distance of 518.58 feet to a point (said arc being subtended by a chord bearing south 30 degrees 19 minutes 49 seconds east a chord distance of 497.36 feet, and having a central angle of 57 degrees 08 minutes 22 seconds); and south 58 degrees 53 minutes 59 seconds east a distance of 1110.99 feet to a point; and leaving said southwesterly right-of-way line of Convention Center Concourse, thence south 38 degrees 21 minutes 41 seconds west a distance of 424.43 feet to the POINT OF BEGINNING, and being the same property shown as Tract 8, containing 9.315 acres, more or less, on that certain Subdivision Plat of Gateway Center for College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering and Inspections Systems, Inc., dated October 4, 2004 and recorded in Plat Book 263, at pages 69 and 70, Fulton County, Georgia records and in Plat Book 36, at pages 86 and 87, Clayton County, Georgia records.

The above-described property is shown as Tract 8 on Property Plat for Gateway Airport Associates, L.P., prepared by John E. Norton, G.R.L.S. No. 1848 of Engineering & Inspections Systems, Inc., dated February 17, 2006.

1965067.v9

**EXHIBIT B**

EQUAL BUSINESS OPPORTUNITY PLAN

M/WBE PARTICIPATION PLAN

## I. POLICY:

A. POLICY STATEMENT

It is the policy of Grove Street Partners (hereafter, known as the "Owner") that Minority and Women Business Enterprises (M/WBEs) shall have the maximum opportunity to participate in the purchasing process. Therefore, the Owner encourages all M/WBEs to compete for, win and receive contracts for goods, services and construction. Also, the Owner encourages all companies to subcontract portions to M/WBEs. It is the wish of the Owner that M/WBEs be given the opportunity to bid on various parts of the work. This desire on the part of the Owner is not intended to restrict or limit competitive bidding or to increase the cost of the work. The Owner supports a healthy free market system that seeks to include responsible businesses and provide ample opportunity for business growth and development for all entities.

B. M/WBE GOALS:

The Owner has established the goal of at least 35% M/WBE participation. When award of a bid package is made with M/WBE participation less than stated goal, the Trade Contractor shall employ good faith efforts to increase the M/WBE participation to meet the project's goals.

Whenever additional contract supplements, extra work orders, or when change orders are made that individually, or in the aggregate, increase the total dollar value of the individual contract, the Trade Contractor shall attempt to maintain the level of M/WBE participation equal to or greater than established in the original Contract.

C. APPLICABILITY

The Trade Contractor shall include these guidelines in all subcontracts and purchase orders for procurements resulting from this Contract so that such provisions will be binding upon each subcontractor, regular dealer, manufacturer, consultant, or service agency.

1603510 v18

## II. VERIFICATION OF CERTIFICATION:

### A. ELIGIBILITY

A current list containing the names of firms that have been verified as eligible to participate as M/WBE's can be obtained through the M/WBE Program Coordinator, MHR International, by contacting them at (404) 880-9602. This list is not an endorsement of the quality of performance of the business, but is simply an acknowledgment of the firm's participation that may be counted towards the project's M/WBE goal. Acknowledgement of M/WBE status will be accepted from the following certifying agencies:

- City of Atlanta Office of Contract Compliance
- Fulton County Office of Contract Compliance
- Georgia Department of Transportation
- Georgia Minority Supplier Development Council
- National Minority Supplier Development Council
- Women's Business Enterprise National Council

Firms certified subsequent to the list compilation may be counted towards the project's M/WBE goals only if their certification is active at the time of the contract award.

Additionally, M/WBE firms must submit a completed **M/WBE Questionnaire and Affidavit** *(MWBE Form #1)* that delineates the company's minority and women ownership percentage and experience. This form requires detailed information pertaining to the business type, company size, employee make-up, annual income and other pertinent information.

As used in this requirement, the following terms have the meanings indicated:

1.  Minority Business Enterprise (MBE): a sole proprietorship, partnership, or corporation owned, operated, and controlled by minority group members who have at least 51% ownership. The minority group member(s) must have day to day operational and managerial control, and an interest in capital and earnings commensurate with his, or her percentage of ownership.

2.  Minority Group Member(s): persons legally residing in the United States who are African-American, Hispanic American, Asian American or Native American.

3.  Women's Business Enterprise (WBE): a sole proprietorship, partnership, or corporation owned, operated and controlled by a woman or women who have at least 51% ownership. The woman or women must have day to day operational and managerial control, and an interest in capital and earnings commensurate with her, or their, percentage of ownership.

2

1965067.v9

## III.   BIDDER'S REQUIREMENTS

All bidders must submit an **M/WBE Utilization Plan** *(M/WBE Form #3)* with their bid proposal.  This form is a document that lists all M/WBE firms to be utilized in performance of the Trade Contractor's bid.  The form requires the bidder to list M/WBE company names, their relationship to the bidder (joint venture, subcontractor, supplier), the scope of work, the value of the contract/subcontract, M/WBE percentage, and the start and end dates.  Failure to do so may render a bid non-responsive.

## IV.   COUNTING M/WBE PARTICIPATION:

M/WBE participation toward attainment of the goal will be credited on the basis of total joint venture and subcontract amounts submitted by the bidder and subcontractors for the contract amount.

1.     The total value of contracts awarded for construction and services to an eligible M/WBE is counted toward the M/WBE goal, provided the M/WBE performs a commercially useful function (CUF).  The Trade Contractor is responsible for ensuring that the goal is met using M/WBEs that perform a CUF.

2.   The Trade Contractor shall operate in a manner consistent with the guidelines set forth in the M/WBE Program.  A CUF is performed when an M/WBE is responsible for the execution of a distinct element of work by actually managing, supervising, and performing the work in accordance with standard industry practices, except when such practices are inconsistent with stated Owner policies, and when the M/WBE receives due compensation as agreed upon for the work performed.  To determine whether a M/WBE is performing a CUF, the Owner shall evaluate the amount of work contracted in accordance with the M/WBE goals, industry practices and other relevant factors.  When an arrangement between the Trade Contractor and the M/WBE represents standard industry practice, if such arrangement erodes the ownership, control or independence of the M/WBE, or fails to meet the CUF requirement, the Trade Contractor will not receive credit toward the goal.

3.   A Trade Contractor may count toward the M/WBE goal 100% of expenditures to an M/WBE trucker.  The M/WBE trucker must manage and supervise the trucking operations with its own employees and use equipment owned and/or leased by the M/WBE.  No credit will be counted unless the M/WBE trucker is a certified M/WBE.

4.   A Trade Contractor may count toward the M/WBE goal the portion of the dollar value with a joint venture equal to the percentage of the ownership and control of the M/WBE partner in the joint venture.  Joint ventures must be reviewed and approved prior to the bid opening.  Prospective bidders must first submit the **Joint Venture Affidavit and Application** *(MWBE Form #2)* to be furnished at the pre-qualification stage.  Afterwards, joint ventures will be submitted and shall include a detailed breakdown of the following:

3

a. Contract responsibility of the M/WBE for specific items of work;
b. Capital participation by the M/WBE;
c. Specific equipment to be provided to the joint venture by the M/WBE;
d. Specific responsibilities of the M/WBE in the control of the joint venture;
e. Specific manpower and skills to be provided to the joint venture by the M/WBE;
f. Percentage distribution to the M/WBE of the projected profit or loss incurred by the joint venture;

5. A Trade Contractor may count toward the M/WBE goal only expenditures for materials and supplies obtained from M/WBE suppliers and manufacturers in accordance with the following:

a. The Trade Contractor may count expenditures for material and supplies obtained from M/WBE suppliers and manufacturers toward M/WBE goals, provided that the M/WBE assumes the actual and contractual responsibility for the provision of materials and supplies.

b. The Trade Contractor may count the entire expenditure made to an M/WBE manufacturer. A manufacturer is defined as an individual or entity that produces goods from raw materials or substantially alters them before resale. The M/WBE manufacturer shall be certified as such by an agency recognized by the Owner.

c. A Trade Contractor may count as M/WBE participation the entire expenditure to an MBE or WBE supplier when the supplier;

(1) assumes the actual and contractual responsibility for furnishing the supplies and materials,
(2) is recognized as a distributor by the industry involved in the contracted supplies and materials,
(3) owns or leases a warehouse, yard, building, or any other facilities that are viewed as customary or necessary by the industry,
(4) distributes, delivers and services products with its own staff and/or equipment.
(5) deals in bulk items such as steel, cement, aggregates, and petroleum products are not required to maintain items in stock, but they must own or operate distribution equipment. The M/WBE supplier shall be certified by an agency recognized by the Owner.

6. The Trade Contractor will not receive credit if the Trade Contractor makes direct payment to the M/WBE's material supplier. However, it will be permissible for a

4

material supplier to invoice the Trade Contractor and M/WBE jointly and be paid jointly by the Trade Contractor and the M/WBE firms.

7. The Trade Contractor will not receive credit toward the M/WBE goal for any subcontracting arrangement contrived to artificially inflate the M/WBE participation.

## V.   GOOD FAITH EFFORTS:

When the M/WBE goals cannot be met, the Trade Contractor with the assistance of the MWBE Program Coordinator shall document and submit justification in writing to the Owner by providing a statement as to why the goals could not be met. The quality and intensity of the Trade Contractor's good faith efforts will be evaluated by the Owner. The Trade Contractor must demonstrate the good faith efforts taken to meet the M/WBE goals including, but not limited to, the following:

1. Efforts made to select portions of the work proposed to be performed by M/WBEs in order to increase the likelihood of achieving the stated goal.

2. Written notification, at least seven (7) calendar days prior to the opening of bids, soliciting individual M/WBEs interested in participation in the Contract as a subcontractor, regular dealer, manufacturer, consultant, or service agency and for what specific items or type of work.

3. Written notification to disadvantaged economic development assistance agencies and organizations which provide assistance in recruitment and placement of M/WBEs of the type of work, supplies, or services being considered for M/WBEs on this Trade Contract.

4. Efforts made to negotiate with M/WBEs for specific items of work, including evidence on:

   a. The names, addresses, telephone numbers of M/WBEs who were contacted, the dates of initial contact and whether initial solicitations of interest were followed up by contacting the M/WBEs to determine, with certainty, whether the M/WBE is interested. Personal or telephone contacts are expected.

   b. A description of the information provided the M/WBEs regarding the plans and specifications and estimated quantities for portions of the work to be performed.

   c. A statement of why additional agreements with M/WBEs were not reached.

   d. Documentation of each M/WBE contacted, but rejected, and the reasons for the rejection.

5

1965067.v9

5. Absence of any agreements between the Trade Contractor and the M/WBE in which the M/WBE promises not to provide subcontracting quotations to other bidders.

6. Efforts made to assist the M/WBEs that need assistance in obtaining bonding, insurance, or lines of credit required by the Trade Contractor.

7. Documentation that qualified M/WBEs are not available, or not interested.

8. Attendance at any seminar scheduled by the Program Manager to encourage better Trade Contractor-subcontractor relationships, forthcoming M/WBE utilization opportunities (i.e. pre-bid workshops, seminars), etc.

9. Advertisements in general circulation media, trade association publications, disadvantaged-focused media, of interest in utilizing M/WBEs and area of interest.

10. Efforts to effectively use the services of available disadvantaged community organizations; disadvantaged contractor's groups; local, state and federal disadvantaged business assistance offices; and other organizations that provide assistance in recruitment and placement of M/WBEs.

11. The Trade Contractors shall provide a summary of quotes received from non-M/WBEs and M/WBEs, when a non-M/WBE was chosen in an area where M/WBEs quoted.

12. The Trade Contractors shall assist M/WBEs in reviewing plans and specifications, if required.

13. The Trade Contractor's efforts will be evaluated considering the ability of other bidders in meeting the goals.

The demonstration of good faith efforts by the Trade Contractor must, in the end, prove the Trade Contractor had actively and aggressively sought out M/WBEs to participate in the project.

The information provided will be evaluated to determine if the bidder is responsive. All the information provided must be accurate and complete in every detail. The bidder's attainment of the M/WBE goal or demonstration of good faith effort will assist in determining the award of the Contract.

## VI.   REPORTING REQUIREMENTS:

6

At the conclusion of each pay period, the Trade Contractor shall submit the **M/WBE Monthly Utilization Report** *(M/WBE Form #6)* of payments to Subcontractors, Material Suppliers and other vendors. The Trade Contractor shall verify actual payments to all subcontractors and vendors, including M/WBEs for the previous month's reporting period. This report is a detailed comprehensive report on monthly M/WBE activity for each project. It includes M/WBE name, relationship to Trade Contractor, percent of total contract, subcontract award amount, M/WBE billing amount, and affidavit confirmation information.

The Trade Contractor must submit the **Affidavit of Payment Made,** *(M/WBE Form #7)* which is a payment verification document and further verifies payments made to M/WBE Trade Contractors and/or subcontractors. M/WBE subcontractors shall submit the **Affidavits of Payment Received** *(M/WBE Form #8).* This form verifies payments received by subcontractors.

These reports will be required until all subcontract performance activity is complete and the project is completed. Reports are required, regardless or whether or not subcontract performance activity occurred during the monthly reporting period.

Upon completion of all subcontract performance activity, and prior to final payment, the Trade Contractor shall submit an **M/WBE Final Utilization Report** *(M/WBE Form #9)* to the Owner. This report reflects all M/WBE activity on the project. It shall include Subcontractor/Supplier name, work performed and total dollar amount paid to the M/WBE. When the actual amount paid to a subcontractor, or vendor, is less than the award amount, a complete explanation of the difference is required.

If the M/WBE goal is not met, documentation supporting good faith efforts shall be submitted. Failure to submit this documentation, or the required reports, may result in the withholding of partial payments to the Trade Contractor, until the reports are submitted. All payments due to subcontractors, which affect M/WBE goal attainment, including retainage, shall be paid by the Trade Contractor before the Owner releases the final payment to the Trade Contractor.

The Owner reserves the right to conduct an audit of M/WBE participation prior to processing the final application for payment or at any time during the work.

## VII. SUBSTITUTIONS OF M/WBE FIRMS AFTER TRADE CONTRACT AWARD:

1. When a listed M/WBE is unwilling or unable to perform the items of work specified on the M/WBE Utilization Plan, the Trade Contractor shall immediately notify the Owner. When a Trade Contractor's request to be relieved of the obligation to use the named M/WBE results in a M/WBE goal shortfall, the Trade Contractor shall immediately take steps to obtain another certified M/WBE to perform an equal amount of allowable credit work or make documented good faith efforts to do so. The new M/WBE's name and designated work shall be

7

submitted to the Owner for approval using the **M/WBE Substitution Form** *(M/WBE Form #5)* prior to proceeding with the work. This form requires information on the subcontractor being replaced, including the amount of work completed and payments made. The reason for replacement must be included as well as the name of the replacement company.

2. If the Trade Contractor is unable to replace a defaulting M/WBE with another M/WBE for the applicable item, a good faith effort shall be made to subcontract other items to M/WBEs for the purpose of meeting the goals. The Owner will determine if the Trade Contractor made an acceptable good faith effort in awarding work to M/WBE firms.

   a. The designated M/WBE or an approved substitute shall perform contract items designated to be performed by the M/WBE on the M/WBE Utilization Plan. Substitutions of named M/WBEs must be approved in writing by the Owner. Substitute M/WBE's shall not commence work until the Trade Contractor is able to demonstrate that the listed M/WBE is unable to perform because of default over extension on other jobs, or other acceptable justification. It is not intended that a Trade Contractor's ability to negotiate a more advantageous contract with another subcontractor be considered a valid basis for change. Substitution of M/WBEs will be allowed only when the M/WBE is unable to perform due to default, over extension on other jobs, or other similar justification.

   Evidence of good faith efforts exerted by the Trade Contractor shall be submitted to the Owner for approval. Items of work eliminated from the project will not diminish the Trade Contractor's responsibility to make reasonable efforts to provide opportunities for M/WBE participation.

   b. Under no circumstances will a Trade Contractor self-perform work originally designated to be performed by a M/WBE without prior written approval from the Owner.

8

1965067.v9

### VIII. MISCELLANEOUS REQUIREMENTS:

A.   ADDITIONAL REQUIREMENTS

1.   The Trade Contractor shall establish a program, which will effectively promote increased participation by M/WBEs in the performance of contracts and subcontracts. The Trade Contractor shall also designate, and make known to the Owner, a liaison officer who will be responsible for the administration of the Trade Contractor's M/WBE program.

2.   M/WBEs shall submit the **Verification of Agreed M/WBE Utilization** *(MWBE Form #4)* after Contract award. This form acknowledges that the Trade Contractor has agreed to contract with the M/WBE stated in the form.

3.   Once a Contract is awarded, it is important to remember that no minority or woman Trade Contractor that has been selected to perform as part of the M/WBE participation plan should be required to change their bid to a lower figure or perform less than indicated without satisfactory explanation to the Owner.

4.   The Trade Contractor shall enter into subcontracts or written agreements with the M/WBEs identified in the M/WBE Utilization Plan.   The Trade Contractor shall submit copies of subcontracts or agreements of each M/WBE identified in M/WBE Utilization Plan to the Owner prior to the issuance of a Notice to Proceed.

5.   The Trade Contractor shall keep each M/WBE informed of the project progress schedule and allow each M/WBE adequate time to schedule work, stockpile materials, and otherwise prepare for the subcontract work.

6.   At any point during the project when it appears that the scheduled amount of M/WBE participation may not be achieved, the Trade Contractor shall provide evidence to the Owner demonstrating how the goal will be met.

7.   When the Owner has reason to believe the Trade Contractor, subcontractor, or M/WBE are not operating in compliance with the terms of the M/WBE guidelines to include, but not limited to, the encouragement of fronting, brokering, or not providing a CUF, the Owner will conduct an investigation of such activities with the cooperation of the parties involved.  If the Owner finds that any person or entity is not in compliance, the Owner will notify such person or entity in writing as to specific instances or matters found to be in noncompliance.

8.   To ensure that the obligations under subcontracts awarded to subcontractors are met, the Owner will review the Trade Contractor's efforts to promptly pay subcontractors for work performed in accordance with the executed subcontracts.  The Trade Contractor shall pay all subcontractors and suppliers, including M/WBEs, their respective amounts due for satisfactorily completed work no later than ten (10) calendar days after the Trade Contractor receives payment from the Owner for the items performed by the subcontractors.  The Trade Contractor shall provide all subcontractors

1603510.17

with an accounting breakdown to include quantities paid and deductions made from the subcontractor's partial payment at the time the check is delivered.

9.  The Owner reserves the right to withhold any progress payment from the Trade Contractor if it is determined that a M/WBE is not performing a CUF. Payment may be withheld in the amount of the M/WBE goal that is in jeopardy until either the Trade Contractor submits to the Owner a revised plan for achieving the Trade Contractor's goal and the plan is approved or the M/WBE goal amount in question has been met.

10. The Owner will monitor the Trade Contractor's M/WBE involvement during the contract, the level of effort by the Trade Contractor in meeting or exceeding the goals in the contract, the Trade Contractor's attempt to do so, and the efforts in soliciting such involvement. At the completion of the project if the Trade Contractor has failed to meet the M/WBE goal and has not demonstrated good faith efforts or obtained a reduction or waiver of the goal, the Owner may withhold an amount equal to the difference between the scheduled or approved amount of M/WBE participation and the actual M/WBE participation achieved as damages.

B.  RECORD KEEPING REQUIREMENTS:

The Trade Contractor shall keep records for at least three (3) years or as necessary for the Owner to determine compliance with the M/WBE contractual obligations. These records shall include the names of subcontractors, including M/WBEs; copies of subcontracts; the type of work being performed; documentation such as canceled checks and paid invoices verifying payment for work, services, and procurement; and documentation of correspondence, verbal contacts, telephone calls, and other efforts to obtain services of M/WBEs. When requested, the Trade Contractor shall submit the form, manner and content as prescribed by the Owner. The Owner reserves the right to investigate, monitor and/or review actions, statements, and documents submitted by any Trade Contractor, Subcontractor, or M/WBE.

C.  M/WBE OBLIGATION:

The Trade Contractor agrees to take all reasonable steps necessary to ensure that M/WBEs have an opportunity to participate in the performance of contracts and subcontracts, financed in whole or in part with Owner. The Trade Contractor shall not discriminate on the basis of race, religion, color, national origin or sex in the award and performance of this work financed in whole, or in part, by Owner.

D.  FAILURE TO COMPLY WITH M/WBE PROGRAM GUIDELINES:

All Trade Contractors are hereby advised that failure to carry out the guidelines set forth above shall constitute a breach of contract, and may result in rejection of the bid; termination of the Contract; or other such remedy as deemed necessary.

· 10

1965067.v9

Failure to comply with the Minority and M/WBE guidelines shall include, but not be limited to:

    a)  failure to submit the M/WBE Utilization Statement with the bid;

    b)  failure to comply with the Submission Requirements outlined in these guidelines;

    c)  failure to request a partial or complete waiver from the established goal as established in the Contract if it is determined that the established project goal will not be met;

    d)  failure to exert a reasonable good faith effort to achieve the scheduled amount of M/WBE participation set forth on the approved M/WBE Utilization Plan, and;

    e)  failure to provide reasonable opportunities for M/WBEs.

11

1965067.v9

EXHIBIT C



# EXHIBIT D

**INTENTIONALLY OMITTED**

**EXHIBIT E**

**LEGAL DESCRIPTION OF PROJECT PARCEL**

**EXHIBIT F**

**PROJECT PARCEL PLAN**



1965067.v9

## EXHIBIT G

### INTENTIONALLY OMITTED

## EXHIBIT H

## INTERGOVERNMENTAL AGREEMENTS

- Intergovernmental Agreement Between the City of College Park, Georgia, the College Park Business and Industrial Development Authority and the City of Atlanta, Georgia dated as of March 16, 2000.

- First Amendment to Intergovernmental Agreement between the City of Atlanta, the City of College Park and the College Park Business and Industrial Development Authority, dated December 16, 2003

- Second Amendment to Intergovernmental Agreement between the City of Atlanta, the City of College Park and the College Park Business and Industrial Development Authority, dated October 10, 2005.

- Airport Access Roadway Air Rights Easement between the City of Atlanta and the City of College Park, dated October 10, 2005.

- Automated People Mover Guideway Air Rights Easement between the City of Atlanta and the City of College Park, dated October 10, 2005.

- Third Amendment to Intergovernmental Agreement between the City of Atlanta, the City of College Park and the College Park Business and Industrial Development Authority, dated October 10, 2005.

- Easement Agreement by and between the City of Atlanta, the College Park Business and Industrial Development Authority and Gateway Airport Associates, L.P., dated October 10, 2005.  [Egress Drive Easement]

- Right-of-Flight Easement Agreement, by and between the College Park Business and Industrial Development Authority, Gateway Airport Associates, L.P. and the City of Atlanta, dated October 10, 2005.

- Amendment to City Covenants, by and between the City of College Park, Georgia, the College Park Business and Industrial Development Authority and the City of Atlanta, Georgia, dated October 10, 2005.

- People Mover Easement Agreement, dated April 17, 2000 by and between Gateway Airports Associates, L.P. and the City of Atlanta.  [Assumed by BIDA]

- First Amendment to People Mover Easement by and between the College Park Business and Industrial Development Authority, Gateway Airport Associates, L.P. and the City of Atlanta, dated October 10, 2005.

## SCHEDULE 2.4

## TRACT 7 MASTER SITE PLAN



## SCHEDULE 7.2

## PERFORMANCE GUARANTY

This Performance Guaranty ("Guaranty") is made and entered into as of the _____ day of _____, 2007, by the undersigned ("Guarantor") in favor of the COLLEGE PARK BUSINESS AND INDUSTRIAL DEVELOPMENT AUTHORITY ("Owner"), a public corporation created and existing under the laws of the State of Georgia, to induce Owner to enter into that certain Parcel Design, Development and Operating Agreement dated _____, 200___ (the "Development Agreement") with _____ ("Developer"), pursuant to which Developer shall cause the development of the property described therein by several independent parcel developers and cause the construction thereon of the improvements described on Exhibit "A" (the "Project Parcel Development").

Guarantor hereby agrees as follows:

1.     Completion of Project Parcel Development.  Guarantor agrees that the Project Parcel Development will be completed on or before the completion date set forth in the Development Agreement.

2.     Guaranty of Obligations.  For and in consideration of the benefit flowing to Guarantor as a result of Developer's performance of work on the Project Parcel Development and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Owner and its successors and assigns, the performance by Developer of all obligations of Developer to Owner relating to the construction and development of the Project Parcel Development, but not otherwise, pursuant to the Development Agreement and all other documents and instruments as may be executed by Developer in connection with the Project Parcel Development, as any of the same may be modified or amended at any time after the date hereof (the "Developer's Obligations").  If for any reason whatsoever, Developer shall default in the Developer's Obligations, but not otherwise, then, upon notice to Guarantor, Guarantor agrees that it shall do the following:  (a) assume responsibility of the Developer's Obligations, (b) perform and discharge, at Guarantor's expense, the Developer's Obligations on or before the completion date set forth in the Development Agreement, (c) remove or satisfy of record any and all liens, charges and encumbrances arising from Guarantor's performance under this Guaranty and the Development Agreement; and (d) indemnify and hold Owner harmless from any and all costs or expenses incurred by Owner in completing the Project where Guarantor fails to take the action required under clauses (a) through (d) of this paragraph.  All obligations to be performed by Guarantor hereunder and the Development Agreement are hereinafter collectively called the "Guaranteed Obligations".

3.     Absolute Obligation.  Guarantor acknowledges that its obligations hereunder are unconditional, absolute, irrevocable and continuing, and Owner may call upon Guarantor to perform hereunder at any time and from time to time, upon default by Developer under the Development Agreement past any applicable notice and cure and/or grace periods.  Guarantor shall pay, and the Guaranteed Obligations shall include, all fees, costs and expenses actually incurred by Owner, including reasonable attorneys' fees and expenses and court costs, incurred

by Owner due to any default in the performance of the Guaranteed Obligations or in Owner's enforcement of this Guaranty.

4.     Reports and Notices to Owner.  So long as any part of Developer's Obligations or the Guaranteed Obligations, as applicable, are outstanding or remain to be performed, Guarantor shall promptly notify Owner in writing of all threatened or actual actions, suits, investigations or proceedings before any court, arbitrator or governmental entity involving the following and which might reasonably be expected to materially and adversely effect Guarantor's ability to perform its obligations hereunder:  (i) Guarantor or Developer; (ii) an adverse change in the condition (financial or otherwise) of Guarantor or Developer; and (iii) any seizure of or levy upon any part of Guarantor's or Developer's property(ies) where such seizure or levy has an adverse effect on the business, operations or assets of Guarantor or Developer.  Upon request by Owner, Guarantor shall obtain from any construction lender for the Project Parcel Development a statement from such lender as to the status of such construction loan and shall deliver the same to Owner within twenty (20) days subsequent to Owner's request therefor.

5.     Independence of Obligations.  The obligations of Guarantor under this Guaranty are independent of the obligations of Developer to Owner.  This Guaranty is a guaranty of performance and not a guaranty of collection.  A separate action may be brought hereunder against Guarantor whether or not an action is commenced against Developer with respect to the Developer's Obligations.  Guarantor waives any requirement that Owner exhaust any right or take any action against Developer, any security or any other guarantor before proceeding to exercise any right or remedy against Guarantor hereunder.  Guarantor expressly waives all diligence and suit on the part of Owner in the enforcement of the Guaranteed Obligations. Guarantor expressly waives whatever right Guarantor may have pursuant to Official Code of Georgia Annotated (O.C.G.A.) Section 10-7-24 (as now or hereafter amended) to require Owner to take action against Developer or any other person or entity in connection with the Developer's Obligations or otherwise.

6.     Continuation of Obligations.  Guarantor's obligations hereunder shall not be impaired, modified, changed or released in any manner whatsoever by reason of the following: (i) any assertion by Owner against Developer of any rights or remedies Owner may have in connection with the Developer's Obligations; (ii) any acquisition, retention, modification, exchange, compromise, surrender or release by Owner in whole or in part of any security interest, guaranty or other undertaking or security relating to the Developer's Obligations; (iii) any impairment, modification, change, release or limitation of the liability of Developer or its estate in bankruptcy in connection with the Developer's Obligations, or stay of actions or lien enforcement proceedings against Developer, its property or its estate in bankruptcy; (iv) any remedies for the enforcement of the Developer's Obligations, resulting from the operation of any present or future provisions of the United States Code relating to bankruptcy or any other state or federal statute relating to bankruptcy, insolvency or relief for debtors, or the appointment of a receiver or the decision of any court; (v) any waiver, indulgence, extension, compromise, settlement, modification, amendment, forbearance, omission or delay by Owner or Developer with respect to the Developer's Obligations; (vi) any further dealings among Developer, Owner, any other guarantor, surety or other party or any combination thereof; (vii) any action taken or omitted by Owner whether or not such action or failure to act varies or increases the risk of, or affects the rights or remedies of, Guarantor; (viii) any other action or thing which might, but for

the provisions of this paragraph, be deemed a legal or equitable discharge of a surety or guarantor; (ix) any transfer or assignment by Owner of any or all of the Developer's Obligations, the Development Agreement, or any or all of Owner's rights hereunder or thereunder; or (x) recovery from Developer becomes barred by the statute of limitations.

Guarantor expressly waives, consents, surrenders and renounces any defense to the performance of the Guaranteed Obligations based upon any of the foregoing acts, omissions, things, agreements, waivers or any of them; it being the purpose and intent of Guarantor that the Guaranteed Obligations are absolute, unconditional and irrevocable under any and all circumstances.

7.    Waiver of Notices, Demands and Defenses.  Guarantor hereby expressly waives (i) notice of acceptance of this Guaranty and all other notices to which Guarantor might otherwise now or hereafter be entitled to receive in connection herewith or in connection with this Guaranty with the Guaranteed Obligations, including notice of default hereunder or the Development Agreement; (ii) notice of the existence or creation of any Guaranteed Obligations; (iii) notice of the occurrence of any of the acts, omissions, things, consents, agreements or waivers referred to in the paragraph of this Guaranty entitled "Continuation of Obligations"; and (iv) presentment for payment, demand, protest, notice of nonpayment, notice of demand, notice of protest and all other demands and notices whatsoever with respect to any of the Guaranteed Obligations or the Development Agreement.

8.    Deferral of Subrogation.  Until full satisfaction of the Guaranteed Obligations, Guarantor shall not exercise any right of subrogation it may have against Developer in connection with this Guaranty.  If any amount is paid to Guarantor on account of such right of subrogation at any time when all Guaranteed Obligations are not paid in full, Guarantor shall hold such amount in trust for the benefit of Owner and forthwith shall pay such amount to Owner to be credited and applied to the Guaranteed Obligations.

9.    Irrevocability and Revival.  This Guaranty shall be irrevocable by Guarantor and shall remain in effect until all of the Developer's Obligations under the Development Agreement and Guarantor's obligations hereunder have been performed to full and final completion. This Guaranty shall continue to be effective or be revived and reinstated, as the case may be, in the event that any payment received by Owner of any of the obligations guaranteed hereby is returned or rescinded for any reason including without limitation, by reason of any present or future federal, state or other law or regulation relating to bankruptcy, insolvency or other relief of debtors.

10.    Representations and Warranties.  Guarantor represents and warrants to Owner that (i) Guarantor will derive a direct financial benefit from Developer's performance of work on the Project Parcel Development; (ii) as of the date hereof and taking into consideration the additional liabilities represented by this Guaranty, Guarantor is solvent, has a reasonable amount of capital to conduct its business and is able to pay its debts as they mature; and (iii) this Guaranty is valid, enforceable and binding upon Guarantor in accordance with its terms, conditions and provisions.

11.    Notices.  All notices and other communications required or permitted hereunder shall be in writing and shall be sent by (i) personal delivery, (ii) expedited overnight delivery

service with proof of delivery, or (iii) postage prepaid U.S. certified or registered mail, return receipt requested, to the address of a party (or to such other address as a party may notify the others) as follows:

If to Guarantor:

_____
_____
_____
_____
Attention: _____

If to Owner:

College Park Business and Industrial
Development Authority
3667 Main Street
College Park, Georgia   30337
Attention:  Development Director

with copies to:

City of College Park
City Hall Complex
3667 Main Street
College Park, Georgia  30337
Attention:   City Manager

Fincher Denmark & Williams, LLC
2262 Mount Zion Road
Jonesboro, Georgia 30236
Attention:   Steven M. Fincher, Esq.
        Attorney for City of College Park

Mack & Harris, P.C.
205 Corporate Center Drive
Suite B
Stockbridge, Georgia  30281
Attention:  Robert L. Mack, Jr., Esq.
        Attorney for BIDA

Notices shall be effective on the date and time of personal delivery, or, in the case of delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein.

12.     No Further Authorization Required.  Guarantor authorizes Owner to perform any or all of the following acts at any time in its sole discretion, all without notice to Guarantor and without affecting Guarantor's obligations under this Guaranty: (i) to enter into modifications, renewals, and extensions of and amendments to the Development Agreement; and (ii) to request and/or approve modifications to the Project Parcel Development plans.

13.     Subordination. If Guarantor shall advance any sum to Developer, or if Developer shall hereafter become indebted to the Guarantor, then at any time after Guarantor's receipt of

written notice from Owner that Developer has defaulted under the Development Agreement, all such sums or indebtedness shall be subordinate in all respects to any amounts due and owing to Owner pursuant to the Development Agreement.

14.   <u>Miscellaneous</u>.  Time is of the essence of this Guaranty and each and all of its provisions.  With respect to any interest demanded from Guarantor based upon the Guaranteed Obligations, such interest shall be limited to the highest rate allowed by applicable law.  No failure or delay by Owner in exercising any of its rights or remedies hereunder shall operate as a waiver thereof and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of such rights and remedies.  All rights and remedies of Owner hereunder are cumulative and not exclusive of any rights or remedies provided by law and all such rights may be exercised separately, successively or concurrently or not exercised without affecting or limiting any other right of Owner and without affecting or impairing the liability of Guarantor until and unless each of the Guaranteed Obligations has been performed.  This Guaranty shall be construed and interpreted, and all rights and obligations of the parties determined, in accordance with the laws of the State of Georgia.  This Guaranty constitutes the entire agreement between Guarantor and Owner with respect to the subject matter hereof and may not be modified except by a writing executed by Owner and Guarantor.  If any paragraph or part thereof shall for any reason be held or adjudged to be invalid, illegal or unenforceable by any court of competent jurisdiction, such paragraph or part thereof so adjudicated invalid, illegal or unenforceable shall be deemed separate, distinct and independent, and the remainder of this Guaranty shall remain in full force and effect and shall not be affected by such holding or adjudication.  Guarantor hereby waives trial by jury in any action brought with respect to this Guaranty.  This Guaranty shall bind Guarantor and its heirs, executors, administrators, legal representatives, successors and assigns and shall inure to the benefit of, and be enforceable by, Owner and its successors and assigns.  This Guaranty may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Guarantor has executed and sealed this Guaranty on the date first above written.

GUARANTOR:

_____