# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: April 22, 2022

Juan B Pullen
5348 Jerome Rd
Atlanta, GA 30349

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter. The form is available at https://www.ssa.gov/forms/ha-520.html. Please write the Social Security number associated with this case on any appeal you file. You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Juan B Pullen (BNC#: 21RX139G73462)                                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Juan B Pullen (BNC#: 21RX139G73462)                     Page 3 of 3

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security.  You may also call (800) 772-1213 with questions.  If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office.  Please have this notice and decision with you.  The telephone number of the local office that serves your area is (877) 828-1694.  Its address is:

> Social Security
> Bldg 2400 Suite 122
> 3800 Camp Creek Pkwy
> Atlanta, GA 30331-9819


> Suzanne A. Littlefield
> Administrative Law Judge


Enclosures:
Decision Rationale


cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|
| | Period of Disability and Disability Insurance Benefits |
| Juan B Pullen | |
| (Claimant) | |
| | |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

This case is before me on remand from the Appeals Council based upon the decision of another judge. On February 17, 2022, I held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing and confirmed such agreement at the start of the hearing. The claimant is represented by Kathleen Flynn, an attorney; however, at the hearing, Attorney Brynne Holt appeared and represented the claimant. Ann Thomas, an impartial vocational expert, was sworn in at the hearing, but did not testify.

The claimant is alleging disability since December 26, 2016.

In its remand order (Ex. 6A), Appeals Council directed me to

- Properly identify the period at issue.
- As needed, further develop the record and obtain additional evidence concerning the claimant's alleged impairments in order to complete the administrative record in accordance with regulatory standards concerning consultative examinations and existing medical evidence (20 CFR 404.1512).
- Compile the official record in this case in accordance with the regulatory directives. In so doing, consider and as needed exhibit the evidence that was not included in the official record. Particular attention should be paid to the evidence from Dr. Alfred Ayeni Oluropo. Exhibits should be selected, arranged and marked pursuant to the guidance provided in HALLEX-I-2-1-15 and I-2-1-20. Medical evidence not added to the official record should be addressed by providing supporting rationale for its exclusion to the extent necessary.
- Consider whether the claimant is disabled as defined in the Act for all relevant times by applying the mandated sequential evaluation process outlined in the regulations at 20 CFR 404.1520.

See Next Page

Further to this order, I have obtained additional medical evidence from the claimant's various treatment providers. This evidence appears in the record as Exhibits 22F through 28F. Dr. Oluropo's consultative examination has been exhibited as Exhibit 21F and discussed accordingly. I have considered the claimant's disability pursuant to the mandated sequential evaluation process. Additionally, I held a supplemental hearing.

Regarding the period at issue, I have considered whether the claimant's alleged visual limitations indicate that the claimant meets the disability insured status requirements of the Act through March 31, 2038 (statutory blindness), as opposed to June 30, 2019 (non-blindness). The claimant alleged blind or low vision in his initial disability report (Ex. 2E). However, a review of the medical evidence confirms that the claimant does not meet the requirements for statutory blindness as defined in the law (20 CFR 404.1581). The claimant has been diagnosed with myopia (Ex. 6F). However, his vision issues are corrected with glasses and/or contact lenses, to the extent that he can drive and see distances (Ex. 15F/79-81; 21F/6). At the consultative examination, the claimant was diagnosed with "corrected low vision," but did not take a vision test at that examination (Ex. 21F). There is no basis in the record for any limitations related to visual allegations. For this reason, the undersigned clarifies that the proper date last insured for his case remains June 30, 2019.

If the claimant wishes that written evidence be considered at the hearing, then the claimant must submit or inform me about the evidence no later than five business days before the date of the scheduled hearing (20 CFR 404.935(a)). Pursuant to 20 CFR 404.935(b), if the claimant misses this deadline but submits or informs me about written evidence before the hearing decision is issued, I will accept the evidence if: (1) an action of the Social Security Administration misled the claimant; (2) the claimant had a physical, mental, educational, or linguistic limitation(s) that prevented submitting or informing me about the evidence earlier, or (3) some other unusual, unexpected, or unavoidable circumstance beyond the claimant's control prevented the claimant from submitting or informing me about the evidence earlier.

The claimant submitted or informed me about additional written evidence less than five business days before the scheduled hearing date. I decline to admit this evidence because the requirements of 20 CFR 404.935(b) are not met. Specifically, the Evidence Acquisition Letter the claimant's counsel submitted on January 21, 2022 did not specify what evidence was missing and/or was being acquired (Ex. 15E).

At the hearing, the claimant's counsel objected that I did not take additional testimony from the claimant about his mental health issues, which she contended met or equaled a listing. However, at the hearing, the representative could not point to any limitations given in the medical evidence which she believed met the listing. There is a Representative Brief in which she alleged that the claimant met or equaled listings 12.04, 12.06 and 12.15, with marked limitations in maintaining concentration, persistence, and pace, interacting with others, and adapting and managing oneself and a citation to Exhibit 28F. However, a review of this exhibit reveals nothing about specific limitations. In fact, at least one medical record indicates that the claimant was able to control his symptoms with medication (Ex. 28F/44). Even if this were not the case, the medical records in Exhibit 28F represent the period between July 6 and September 7, 2021, which is almost two years after the date last insured. Therefore, there is no evidence that additional testimony would

have resulted in a different decision.  The claimant's testimony without medical support would only further show allegations not supported by and inconsistent with the medical evidence and serve no purpose.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i) and 223(d) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

There is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through June 30, 2019 (hereinafter "the date last insured").  Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, I conclude the claimant was not under a disability within the meaning of the Social Security Act from December 26, 2016, through the date last insured.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574 and 404.1575).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or

combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512 and 404.1560(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

See Next Page

**1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.**

**2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 26, 2016 through his date last insured of June 30, 2019 (20 CFR 404.1571 *et seq*.).**

The evidence of the claimant's earnings indicates that he did not engage in any work activity throughout the relevant period (Ex. 9D/1; 22D).

**3.    Through the date last insured, the claimant had the following severe impairments: bilateral hallux valgus; bilateral heel spurs; bilateral plantar fasciitis; degenerative joint disease of the right first metatarsophalangeal joint with early bunion formation; right-sided patellofemoral dysfunction; obesity; obstructive sleep apnea; alcoholic hepatitis; alcoholic pancreatitis; depressive disorder; generalized anxiety disorder; insomnia; post-traumatic stress disorder; and alcohol use disorder (20 CFR 404.1520(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

As noted above, the claimant was also diagnosed with a refractive error and pre-glaucoma (Ex. 10F/4). However, the impairments no more than minimally limited his ability to engage in basic work activities. His visual acuity corrected to 20/20 bilaterally (Ex. 12F/32; 17F/21). Therefore, I find that the claimant's refractive error and pre-glaucoma constituted non- severe impairments.

The claimant was also diagnosed with hypertension (Ex. 10F/2). However, the impairment no more than minimally limited his ability to engage in basic work activities. The impairment was under good control on his prescribed medical regimen, suggesting that it was amenable to proper medical management (Ex. 12F/49). Therefore, I find that the claimant's hypertension constituted a non-severe impairment.

The claimant was diagnosed with tinnitus (Ex. 12F/62). However, the impairment no more than minimally limited his ability to engage in basic work activities. There was no evidence that saw an audiologist during the relevant period. There was no evidence that his hearing impairment affected his ability to engage in conversation. Therefore, I find that the claimant's tinnitus constituted a non-severe impairment.

The claimant had a history of pheochromocytoma, status post laparoscopic left adrenalectomy (Ex. 12F/81). There was no evidence of any residual symptoms following the procedure, including headaches, heavy sweating, tremors, or shortness of breath. Therefore, I find that the claimant's history of pheochromocytoma constituted a non-severe impairment.

The claimant was diagnosed with cholestasis, status a cholecystectomy. The claimant's abdominal pain improved after the cholecystectomy, suggesting that the impairment was amenable to proper medical management (Ex. 18F/109; 19F/17). Therefore, I find that the claimant's cholestasis constituted a non-severe impairment.

I considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

I considered all listings related to the claimant's severe impairments. I did not find that the claimant had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Specifically, I considered listings 12.04, 12.06 and 12.15, and Social Security Ruling 19=2p for obesity.

The musculoskeletal listings have changed since the prior hearing decision.  Regarding the claimant's heel spurs, plantar fasciitis and degenerative joint disease, Social Security currently analyzes these impairments under 1.18 (Abnormality of Major Joint) rather than the old listing 1.02.  Here, the claimant does not meet this listing, as there is no evidence indicating that the claimant cannot perform fine and gross movements with at least one upper extremity due to a combination of extremity-related limitations and the use of a medically necessary mobility device.  The claimant generally displayed a normal, steady gait (Ex. 12F/56; 14F/88; 15F/19; 18F/123; 20F/8). He did not consistently use a cane or other assistive device to ambulate (Ex. 17F/25; 18F/279).  At the consultative examination, the claimant was able to get on and off the exam table without a cane (Ex. 21F).

The effects of the claimant's obesity were considered under Social Security Ruling (SSR) 19-2p. SSR 19-2p requires Administrative Law Judges to consider the claimant's obesity in determining whether the impairment meets or equals a listing. There was no evidence in the medical record that the claimant's obesity: (1) increased the severity of coexisting or related impairments to the extent that the combination of impairments met the requirements of a listing or (2) was medically equivalent to a listed impairment. Therefore, I find that the claimant's obesity did not meet or medically equal a listing.

The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, I have considered whether the "paragraph B" criteria were satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant had a mild limitation.  His examiners described his memory as intact (Ex. 12F/15; 14F/77; 15F/19; 18F/164; 19F/15).  He acted as his own medical historian and verbalized understanding of instructions, suggesting that

he retained the ability to remember and apply information (Ex. 12F/16). Therefore, I find that the claimant experienced a mild limitation understanding, remembering, or applying information.

In interacting with others, the claimant had a moderate limitation.  While his examiners occasionally noted a depressed, frustrated mood and constricted affect (Ex. 12F/18; 14F/77), these findings were not consistent throughout the record. He frequently presented to medical examinations with a euthymic, normal mood and affect (Ex. 10F/29; 12F/20; 14F/88; 18F/137; 20F/13). While he reported self-isolative behavior, he attended spectator sports, participated in events with his daughters, and visited his cousins throughout the period (Ex. 12F/13; 18F/151). He also traveled out-of-state to visit his brother (Ex. 19F/14). There was no evidence of abnormal, inappropriate behavior during medical examinations. Therefore, I find that the claimant experienced a moderate limitation interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation.  While he reported an inability to pay attention to a task for an extended period of time, his examiners described his concentration as normal (Ex. 12F/20; 14F/88). There was no evidence that he required redirection during medical examinations. Therefore, I find that the claimant experienced a moderate limitation concentrating, persisting, or maintaining pace.

As for adapting or managing oneself, the claimant had experienced a moderate limitation.  He retained the ability to drive, shop for groceries, prepare meals, and maintain his personal care (Ex. 6E). While he reported difficulty handling stress and changes in routine, there was no evidence that he was hospitalized or received any other inpatient treatment throughout the relevant period. Therefore, I find that the claimant experienced a moderate limitation adapting or managing oneself.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  Regarding listings 12.04 (Depressive, Bipolar and Related Disorders) and 12.06 (Anxiety and Obsessive-Compulsive Disorders), there is no medically documented history on file that this impairment is serious and persistent in nature.  That is, the claimant did not have a serious and persistent depressive, anxiety or related disorder lasting at least two years, with evidence of (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of this mental disorder; and (2) marginal adjustment, as demonstrated by minimal capacity to adapt to changes in the claimant's environment, or to demands that are not already part of the claimant's daily life.  Here, the evidence indicates that the claimant is able to adapt to at least minimal changes in his environment.  Therefore, the "C criteria" for listings 12.04 and 12.06 are not met.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of

mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

**5.   After careful consideration of the entire record, I find that, through the date insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could sit without interruption for no more than about thirty minutes, followed by an opportunity to stand and stretch briefly (one-to-two minutes), without leaving the work station and remaining on task. He could stand and/or walk without interruption for a combined uninterrupted total of up to about thirty minutes, followed by an opportunity to sit for up to five minutes, while remaining on task. He could frequently balance, stoop, crouch, kneel, crawl and climb ramps and stairs. He could occasionally climb ladders, ropes, or scaffolds. He could never operate a motor vehicle as an occupational requirement. He could only occasionally work around extraordinary hazards, such as unprotected heights or dangerous machinery (having exposed moving parts or requiring alertness and/or agility in order to evade). With ordinary supervision and consistent with occupations that could be learned in up to thirty days, he remained able to perform the mental demands of work that required him to remember instructions and apply commonsense understanding to carry out a few routine and uninvolved tasks over and over again according to set procedures and sequence with little diversion or interruption. He could make related decisions to deal with problems involving several concrete variables in or from standardized situations. He was limited to working generally, but not exclusively, with data and objects, rather than people. He could tolerate occasional superficial interaction with the public. He remained able to engage appropriately with supervisors and co-workers for superficial and task-oriented interactions.**

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. I also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

See Next Page

he claimant was diagnosed with bilateral hallux valgus with plantar fasciitis and heel spurs (Ex. 15F/51), degenerative joint disease of the right first metatarsophalangeal joint with early bunion formation (Ex. 15F/51), obesity (Ex. 14F/68), obstructive sleep apnea (Ex. 10F/6), alcoholic hepatitis (Ex. 12F/68), and alcoholic pancreatitis (Ex. 12F/68). He reported throbbing pain over the arch and balls of both feet (Ex. 15F/12, 48). He indicated that the pain affected his ability to stand or walk for an extended period of time. For example, he indicated that he was unable to stand for more than ten minutes or walk for more than fifteen minutes at a time before needing to change positions (8/24/20 Hearing Testimony). He indicated that he uses a cane to ambulate (8/24/20 Hearing Testimony).

The claimant was also diagnosed with depressive disorder (Ex. 15F/103), generalized anxiety disorder (Ex. 12F/9), post-traumatic stress disorder (Ex. 15F/103), insomnia (Ex. 2F/14), and alcoholic use disorder (Ex. 12F/15).  At the first hearing, he reported periods of depression, characterized by crying spells and self-isolative behavior. He reported frequent panic attacks, which further affected his ability to spend time around others. He reported nightmares and flashbacks from his time in the military. He reported intermittent sleep throughout a typical night. He indicated that his impairments affected his ability to be around others, handle stress, and concentrate for an extended period of time (8/24/20 Hearing Testimony).

At the most recent hearing, the claimant's representative provided most of the testimony.  Ms. Holt opined that the claimant's issues with his feet, vision and reduced range of motion at the consultative examination suggest that the claimant is more disabled than originally noted.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The imaging studies did not substantiate the claimant's statements regarding the subjective symptoms he experiences as a result of the impairments affecting his feet. In February 2017, he underwent a series of x-rays of both feet. The x-rays of his right foot only revealed "mild" hallux valgus with early associated bunion formation, a "tiny" plantar heel spur, "minimal" degenerative changes in the first MTP joint, and pes planus (Ex. 15F/51). The x-rays of his left foot only revealed a "tiny" plantar heel spur and pes planus (Ex. 15F/51).

The examination notes did not support the reported severity of the impairments affecting the claimant's feet. His examiners did not generally note any abnormal findings, aside from tenderness and pain upon palpation of both ankles (See, e.g., Ex. 12F/56; 15F/50). He generally displayed full, painless range of motion throughout both ankles (See, e.g., Ex. 10F/33; 12F/56). He generally displayed 4/5 strength upon inversion and eversion of both ankles (See, e.g., Ex. 10F/33; 12F/56). There was no pain or crepitus upon movement of his first metatarsophalangeal joint (Ex. 15F/51). He generally displayed a normal, steady gait (See, e.g., Ex. 12F/56; 14F/88; 15F/19; 18F/123; 20F/8). He did not consistently use a cane or other assistive device to ambulate (See, e.g., Ex. 17F/25; 18F/279).

See Next Page

The claimant received conservative treatment for the impairments affecting his feet. There was no evidence that he underwent surgical procedure throughout the relevant period. While he attended physical therapy, there was "very limited compliance to [his] home [exercise] program" (Ex. 17F/25). For example, he was only able to demonstrate two of the seven exercises he was directed to perform (Ex. 17F/25). The conservative treatment suggested that the claimant's impairments were not as severe as alleged throughout this application for Disability Insurance Benefits.

In discussing the claimant's right patellofemoral dysfunction, the examination notes did not indicate that the claimant experienced greater limitations than found herein. Despite the impairment, he retained full, painless range of motion and full patellar mobility throughout his right knee (Ex. 5F/294, 406). He also displayed 4/5 strength throughout his right knee (Ex. 5F/294). There was no evidence of ligament of meniscus involvement, as a valgus stress test, varus stress test, anterior drawer test, and posterior drawer test returned negative (Ex. 5F/406).

The claimant received conservative treatment for his patellofemoral dysfunction. While he used a knee brace and attended physical therapy (Ex. 6F/65), there was no evidence that he received an injection or underwent a surgical procedure during the relevant period. The conservative treatment suggests that his knee pain was not as severe as alleged throughout this application for Disability Insurance Benefits.

Regarding the claimant's obesity, the examination notes did not indicate that the claimant experienced greater limitations than found herein. Despite his body habitus, there was generally no evidence of edema throughout his musculoskeletal system (See, e.g., Ex. 12F/52, 69; 4F/80; 15F/29; 18F/191). He generally displayed intact sensation and at least 4/5 strength throughout all major joints (See, e.g., Ex. 2F/101; 5F/250; 12F/35, 43, 56; 18F/160). As described above, he generally displayed a normal, steady gait (See, e.g., Ex. 12F/56; 14F/88; 15F/19; 18F/123; 20F/8). He did not consistently use a cane or other assistive device to ambulate (See, e.g., Ex. 17F/25; 18F/279).

Moving on to the claimant's type I neurofibromatosis, the examination notes did not indicate that the claimant experiences greater limitations than found herein. While his examiners described neurofibromas and café-au-lait spots over his arms, chest, and back (See, e.g., Ex. 12F/53; 18F/274), there was no evidence of scoliosis, optic gliomas, or bone deficits. He received rare treatment for the impairment, as there was no evidence that he saw a dermatologist from April 25, 2013 through December 9, 2019 (See Ex. 18F/95-96).

In December 2019, he underwent an excision of multiple neurofibromas without complication (Ex. 18F/95-96). In discussing the claimant's obstructive sleep apnea, the claimant remained non-compliant with his prescribed medical regimen throughout the relevant period. He was prescribed a continuous positive airway pressure (CPAP) machine (See, e.g., Ex. 14F/75). In July 2018, he indicated that he did not use the machine due to nasal congestion (Ex. 14F/75). In November 2019, he indicated that he did not use the CPAP because the mask was uncomfortable (Ex. 18F/145). While he was instructed on nasal and full interfaces, the most recent report indicated that he remained zero percent compliant with the device (Ex. 20F/17). Despite the non-compliance, he did not generally appear sleepy or lethargic during medical examinations.

See Next Page

Regarding the claimant's alcoholic hepatitis and pancreatitis, the examination notes did not indicate that the claimant experienced greater limitations than found herein. While he reported a history of abdominal pain, a December 2019 cholecystectomy appeared to have alleviated his symptoms (Ex. 18F/109; 19F/17). In November 2019, he underwent an ultrasound of his abdomen, which indicated that the visualized segments of the pancreas appeared unremarkable (Ex. 18F/37-38). Moreover, there was no persistence evidence of nausea, vomiting, fever, or jaundice.

In compliance with the remand order, I have considered the consultative examination that state agency medical consultant Alfred Ayeni Oluropo, M.D. performed on February 28, 2019.  At this examination, the claimant alleged disability due to blindness or low vision; depression, PTSD and anxiety; bilateral shin splints; pes planus; and difficulty sleeping.  On examination, the claimant was 62 inches tall and weighed 216.2 pounds, corresponding to a BMI of 39.54. Visually, the claimant's eyes were symmetrical; extraocular muscles were intact bilaterally; conjunctiva was clear; and pupils were equal, round, reactive to light and accommodation.  The claimant was generally alert and oriented x3 with a steady gait.  He was able to get on and off the exam table without using a cane.  His upper extremity motor strength was 5/5 bilaterally.  There was limited range of motion of the spine with no spinal tenderness, scoliosis or costovertebral angle tenderness.  SI joints were nontender.  Straight leg raise was positive at 60 degrees bilaterally.  He had normal fine and gross coordination of the upper extremities, and normal functional use of the upper extremities.  Grip and pinch were 4/5 in both hands, indicating only mild weakness and movement against resistance.  Based on this examination, as well as the claimant's subjective statements, Dr. Oluropo diagnosed the claimant with obstructive sleep apnea, ongoing with consistent CPAP use; chronic right groin pain, status post hx of right groin strain; bilateral shin splints; pes planus ongoing with bilateral feet and heel pain; low vision with progressive worsening; and depressioin, PTSD and anxiety, ongoing with insomnia and memory loss (Ex. 21F).

Moving on to the claimant's severe mental impairments, the examination notes did not support their reported severity. His providers did not generally note any abnormal findings, aside from an abnormal mood and affect (See, e.g., Ex. 12F/15; 14F/77). For example, his providers generally described his: (1) insight as good or fair; (2) judgment as good or fair; (3) thought processes as goal-directed, linear, or organized; (4) thought content as within normal limits; (5) memory as intact; (6) impulse control as good; (7) speech as spontaneous; (8) eye contact as good; and (9) concentration as normal (See, e.g., Ex. 5F/317; 6F/178, 279; 12F/15, 18, 20; 14F/74, 77, 87, 107; 15F/18, 61; 18F/164; 19F/15; 20F/7-8). There was no evidence of psychomotor retardation, psychomotor agitation, or delusional content (Ex. 12F/15, 18; 14F/74, 107). Despite his insomnia, he did not appear sleepy or lethargic during medical examinations.

The claimant's severe mental impairments appeared amenable to proper medical management. He indicated that his anxiety remains controlled on clonazepam (Ex. 14F/74; See also Ex. 20F/6). He was able to sleep on zolpidem (Ex. 20F/6). He did not take medication for his depression, as he indicated it remained under control without medication (See Ex. 12F/18). The amenability to proper medical management suggested that the claimant's impairments were not as severe as alleged throughout this application for Disability Insurance Benefits

The claimant received relatively conservative treatment for his severe mental impairments. While he has attended group therapy and attended appointments with a therapist, there was no evidence that he received any inpatient treatment during the relevant period. The conservative treatment further suggested that the claimant's impairments were not as severe as alleged throughout this application for Disability Insurance Benefits.

The claimant's activities of daily living did not support the reported severity of his mental impairments. While he reported self-isolative behavior, he attended spectator sports, participated in events with his daughters, and visited his cousins throughout the relevant period (Ex. 12F/13; 18F/151). He also traveled out-of-state to visit his brother (Ex. 19F/14). He retained the ability to drive, shop for groceries, prepare meals, and maintain his personal care (See Ex. 6E). Throughout the record, the claimant described activities of daily living that were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

I considered the claimant's severe impairments, in combination, in forming the limitations throughout his residual functional capacity. I considered the claimant's severe physical impairments in forming the exertional, environmental, and postural limitations throughout his residual functional capacity. I considered the claimant's severe mental impairments in forming the mental limitations throughout his residual functional capacity.

As for medical opinion(s) and prior administrative medical finding(s), I cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. I have fully considered the medical opinions and prior administrative medical findings as follows:

In forming the physical limitations throughout the claimant's residual functional capacity, I considered the opinions of state agency physical health consultants Patricia Schiff, M.D., and George Walker, M.D. Both Dr. Schiff and Dr. Walker opined that the claimant retained the ability to perform medium work with postural and environmental limitations (Ex. 1A/16- 18; 3A/15-17). I find both opinions to be somewhat persuasive, as they were consistent with the evidence available at the time they were formed. However, as state agency physical health consultants, neither Dr. Schiff nor Dr. Walker had the opportunity to review and consider the entire medical record before forming their opinions. The more recent examination notes indicate that the claimant experienced slightly greater exertional limitations than opined by either state agency physical health consultant.

I also considered the August 2019 opinion of Mary G. Lynch, M.D. Dr. Lynch opined that the claimant's medically determinable ophthalmological impairments no more than minimally limited his ability to engage in basic work activities (Ex. 16F). I find Dr. Lynch's opinion to be persuasive, as it was consistent with the examination notes throughout the record. As described above, his visual acuity corrected to 20/20, bilaterally (See, e.g., Ex. 12F/32; 17F/21). Moreover, Dr. Lynch's opinion was within her area of expertise.

In forming the mental limitations throughout the claimant's residual functional capacity, I considered the opinion of state agency mental health consultant Warren Hinson, M.D. Dr.

Hinson opined that the claimant retained the ability to maintain basic social interactions (Ex. 1A/20). Dr. Hinson opined that the claimant experienced a moderate limitation adapting to change (Ex. 1A/20). I find Dr. Hinson's opinion to be somewhat persuasive, as it was consistent with the evidence available at the time his opinion was formed. However, as a state agency mental health consultant, Dr. Hinson did not have the opportunity to review and consider the entire medical record before forming his opinion. The more recent examination notes indicate that the claimant experienced slightly greater limitations than opined by Dr. Hinson.

I also considered the opinion of state agency mental health consultant Douglas Robbins, Ph.D. Dr. Robbins opined that the claimant retained the ability to sustain concentration for simple instructions, interact with supervisors, and adapt to changes in a work setting (Ex. 3A/19). Dr. Robbins opined that the claimant's ability to interact with large groups and co-workers was reduced (Ex. 3A/19). I find Dr. Robbins' opinion to be somewhat persuasive, as it was consistent with the mental status examinations throughout the record. However, portions of Dr. Robbins' opinion were vague, as they were not in functionally relevant terms.

I also considered the opinions of Roohi Abubaker, M.D. Dr. Abubaker opined that the claimant experienced "[n]o useful ability to function" in a number of areas, including: (1) relating to co-workers; (2) dealing with the public; (3) interacting with supervisors; (4) dealing with work stress (Ex. 11F/3). Dr. Abubaker opined that the claimant experienced a marked limitation: (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; and (3) adapting or managing oneself (Ex. 11F/7). As a result, Dr. Abubaker opined that the claimant was unable to work throughout the relevant period (Ex. 8F/2; 15F/103). I find Dr. Abubaker's opinions to be unpersuasive, as they were inconsistent with the relatively normal mental status examinations throughout the record. As described above, his providers generally described his: (1) insight as good or fair; (2) judgment as good or fair; (3) thought processes as goal-directed, linear, or organized; (4) thought content as within normal limits; (5) memory as intact; (6) impulse control as good; (7) speech as spontaneous; (8) eye contact as good; and (9) concentration as normal (See, e.g., Ex. 5F/317; 6F/178, 279; 12F/15, 18, 20; 14F/74, 77, 87, 107; 15F/18, 61; 18F/164; 19F/15; 20F/7-8). Dr. Abubaker's opinions were also inconsistent with the relatively conservative treatment the claimant received. Moreover, a detailed explanation did not support Dr. Abubaker's opinions. Finally, Dr. Abubaker did not have the opportunity to review and consider the entire medical record before forming his opinions.

Finally, I have considered the consultative examination report (Ex. 21F). However, this is not persuasive as to any additional limitations in the original RFC. Although he was able to examine the claimant directly, he gave no specific limitations as to the claimant's current functional abilities. He also assessed mental health diagnoses that were outside of the scope of the examination for which he was hired. He assessed the claimant with "corrected low vision" based upon the testimony of the claimant, but did no vision testing himself. He found a BMI of 39.54, but did not address obesity at any time in his evaluation. Finally, even without a formal medical source statement, I note that the claimant's exam report was relatively unremarkable, as evidenced by his ability to ambulate without a cane and only slight limitations in manipulation. Therefore, I find this examination to be consistent with the original RFC, but not consistent with further restrictions.

See Next Page

Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by careful consideration of all the evidence.  The claimant's reported symptoms were not found to be fully consistent with the record.  Further, the totality of the evidence supported the residual functional capacity assessment set forth above.

**6.   Through the date last insured, the claimant was capable of performing past relevant work as a "mail sorter." This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).**

Because the claimant's residual functional capacity did not change after considering of the issues, I have relied on the previous vocational expert's testimony at the original August 24, 2020 hearing.  Using the Dictionary of Occupational Titles (DOT), the vocational expert at that hearing the claimant's past work as follows:

1) Delivery Driver (292.353-010), listed as medium, semi-skilled work with a Specific Vocational Preparation (SVP) of 3, actually performed at the heavy level;

2) Security Guard (372.667-034), listed as light, unskilled work with a SVP of 3;

3) Mobility Van Driver (913.663-018), listed as medium, semi-skilled work with a SVP of 3;

4) Mail Sorter (209.687-026), listed as light, unskilled work with a SVP of 2; and

5) Mail Handler (209.687-014), listed as light, semi-skilled work with a SVP of 4, actually performed at the heavy level.

I find that all of the identified occupations meet the regulatory definition of "past relevant work," given that the claimant performed those jobs (1) within the past fifteen years; (2) for a sufficient length of time to learn how to do them and reach an average performance level; and (3) at a level of earnings that constitutes substantial gainful activity. I note specifically that the claimant worked as a "mail sorter" from September 1994 through February 2009 (Ex. 4E/1, 3). He earned at least $20,000 a year from 2004 through 2008, inclusive (See, e.g., Ex. 8D/1).

In response to a question regarding a hypothetical individual of the claimant's age, education, and work background, with a residual functional capacity the same as assessed herein, the vocational expert testified that such an individual would be able to perform the position of "mail sorter," both as actually performed by the claimant and as generally performed in the national economy. In accordance with SSR 00-4p, I find that the vocational expert's testimony does not conflict with the DOT or its companion publication, the Selected Characteristics of Occupations. The position of "mail sorter" does not require the performance of any activities precluded by the claimant's residual functional capacity. In comparing the claimant's residual functional capacity with the physical and mental demands of work as a "mail sorter," I find that, through his date last insured, the claimant was able to perform that occupation as he actually performed it and in the manner in which it is generally performed in the economy.

See Next Page

Juan B Pullen (BNC#: 21RX139G73462)                              Page 15 of 16

In addition to past relevant work, there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed prior to his date last insured, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 404.1569 and 404.1569(a)). Therefore, I make the following alternative findings for step five of the sequential evaluation process.

The claimant was born on June 14, 1971 and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).  The claimant has at least a high school education (20 CFR 404.1564).  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Through the date last insured, if the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, I asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as:

1) Assembler, Electrical Accessories (DOT Code 729.687-010), listed as light, unskilled work with a Specific Vocational Preparation (SVP) of 2, with approximately 49,000 positions in the national economy; and

2) Assembler, Plastic Hospital Products (DOT Code 712.687-010), listed as light, unskilled work with a SVP of 2, with approximately 23,000 positions in the national economy.

Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony regarding past relevant work and other work in the state and national economies does not conflict with the information contained in the Dictionary of Occupational Titles (DOT) or its companion

publication, the <u>Selected Characteristics of Occupations</u>. The vocational expert affirmed that her opinions as to the impact of limitations that these publications do not specifically address (e.g., alternating between sitting and standing, distinguishing public interaction from other workplace interaction) were based upon her education, experience and personal observations as a vocational rehabilitation consultant. I accept the expert's testimony, finding that it is well-founded.

Based on a full and thorough consideration of the record as a whole, including the testimony of the vocational expert, I conclude that the claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy at all times through the expiration of his insured status, considering his age, education, work experience, and residual functional capacity. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from December 26, 2016, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(f)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on June 21, 2018, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through June 30, 2019, the last date insured.


/s/ *Suzanne A. Littlefield*
Suzanne A. Littlefield
Administrative Law Judge

April 22, 2022
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1A | Disability Determination Explanation | | 2019-03-13 | 23 |
| Y13 | 2A | Disability Determination Transmittal | | 2019-03-21 | 1 |
| Y13 | 3A | Disability Determination Explanation | | 2019-08-17 | 22 |
| Y13 | 4A | Disability Determination Transmittal | | 2018-06-21 | 1 |
| Y13 | 5A | ALJ Hearing Decision | | 2020-10-23 | 21 |
| Y13 | 6A | AC Order | | 2021-05-13 | 5 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1B | Appointment of Representative | | 2018-08-06 | 1 |
| Y13 | 2B | Representative Fee Agreement | | 2018-08-06 | 1 |
| Y13 | 3B | T2 Notice of Disapproved Claim | | 2019-03-26 | 4 |
| Y13 | 4B | Request for Reconsideration | | 2019-04-02 | 1 |
| Y13 | 5B | T2 Disability Reconsideration Notice | | 2019-08-19 | 6 |
| Y13 | 6B | Request for Hearing by ALJ | | 2019-09-05 | 2 |
| Y13 | 7B | Request for Hearing Acknowledgement Letter | | 2019-09-13 | 14 |
| Y13 | 8B | Objection to Video Hearing | | 2019-10-03 | 1 |
| T2L | 9B | Hearing Notice | | 2020-05-29 | 25 |
| T2L | 10B | Acknowledge Notice of Hearing | | 2020-06-15 | 2 |
| Y13 | 11B | Representative Correspondence | | 2020-08-18 | 1 |

| Y13 | 12B | SSA-1696 - Claimant's Appointment of a Representative | | 2020-08-07 | 2 |
| Y13 | 13B | SSA-1693 - Fee Agreement for Representation before SSA | | 2020-08-07 | 2 |
| LEX | 14B | Request for Review of Hearing Decision/Order | | 2020-12-23 | 4 |
| Y13 | 15B | AC Correspondence | | 2021-01-05 | 5 |
| Y13 | 16B | AC Correspondence | | 2021-03-03 | 5 |
| Y13 | 17B | COVID Hearing Agreement Form | | 2021-06-22 | 8 |
| Y13 | 18B | Request for Hearing Acknowledgement Letter | | 2021-06-24 | 13 |
| Y13 | 19B | Outgoing ODAR Correspondence | | 2021-06-30 | 2 |
| Y13 | 20B | COVID Hearing Agreement Form | | 2021-07-16 | 2 |
| Y13 | 21B | Hearing Notice | | 2021-11-09 | 25 |
| Y13 | 22B | Acknowledge Notice of Hearing | | 2021-11-11 | 2 |
| Y13 | 23B | Notice Of Hearing Reminder | | 2022-01-20 | 6 |

## **Non-Disability Development**

| Component | No. | Description | Received | Dates | Pages |
| --- | --- | --- | --- | --- | --- |
| Y13 | 1D | Application for Disability Insurance Benefits | | 2018-08-06 | 7 |
| Y13 | 2D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2020-01-30 | 1 |
| Y13 | 3D | Detailed Earnings Query | | 2020-01-30 | 4 |
| Y13 | 4D | Summary Earnings Query | | 2020-01-30 | 1 |
| Y13 | 5D | Certified Earnings Records | | 2020-01-30 | 2 |
| Y13 | 6D | WHAT - Work History Assistant Tool | | 2020-08-17 | 7 |
| Y13 | 7D | Certified Earnings Records | | 2020-08-17 | 3 |
| Y13 | 8D | Detailed Earnings Query | | 2020-08-18 | 4 |

| Y13 | 9D | Summary Earnings Query | 2020-08-18 | 1 |
| Y13 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2020-08-18 | 1 |
| Y13 | 11D | VA Disability Rating Verification | 2018-04-19 | 5 |
| Y13 | 12D | VA Disability Rating Verification | 2020-08-18 | 2 |
| Y13 | 13D | Detailed Earnings Query | 2021-07-15 | 3 |
| Y13 | 14D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021-07-15 | 1 |
| Y13 | 15D | Summary Earnings Query | 2021-07-15 | 1 |
| Y13 | 16D | Certified Earnings Records | 2021-07-15 | 3 |
| Y13 | 17D | WHAT - Work History Assistant Tool | 2022-02-11 | 1 |
| Y13 | 18D | DIBWIZ | 2022-02-11 | 3 |
| Y13 | 19D | Certified Earnings Records | 2022-02-11 | 3 |
| Y13 | 20D | DISCO DIB Insured Status Report | 2022-02-11 | 2 |
| Y13 | 21D | Detailed Earnings Query | 2022-02-11 | 5 |
| Y13 | 22D | Summary Earnings Query | 2022-02-11 | 1 |
| Y13 | 23D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-02-11 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
| --- | --- | --- | --- | --- | --- | --- |
| Y13 | 1E | Work History Report | | Pullen, Juan B | to 2018-08-06 | 10 |
| Y13 | 2E | Disability Report - Adult | | Pullen, Juan B | to 2018-08-06 | 7 |
| Y13 | 3E | Disability Report - Field Office | | Pullen, Juan B | to 2018-08-06 | 3 |
| Y13 | 4E | Work History Report | | Pullen, Juan B | to 2018-09-05 | 9 |

| Y13 | 5E | Function Report - Adult | Pullen, Juan B | to 2018-09-10 | 8 |
| Y13 | 6E | 3rd Party Function Report - Adult | Sharon Pullen | to 2018-09-10 | 8 |
| Y13 | 7E | Disability Report - Field Office | Pullen, Juan B | to 2019-04-02 | 2 |
| Y13 | 8E | Disability Report - Appeals | Pullen, Juan B | to 2019-04-02 | 7 |
| Y13 | 9E | Disability Report - Field Office | Pullen, Juan B | to 2019-09-05 | 2 |
| Y13 | 10E | Disability Report - Appeals | Pullen, Juan B | to 2019-09-05 | 7 |
| T2L | 11E | Misc Disability Development and Documentation | Kathleen Flynn | to 2020-07-20 | 2 |
| Y13 | 12E | Resume of Vocational Expert- Dian L. Haller | Dian L. Haller | to 2020-08-12 | 2 |
| LEX | 13E | Representative Brief | Kathleen Flynn, Esquire | 2021-01-05 to 2021-01-05 | 12 |
| Y13 | 14E | DD214 | Military | to 1997-09-22 | 1 |
| Y13 | 15E | Correspondence regarding efforts to obtain evidence | | 2022-01-21 to | 2 |
| Y13 | 16E | Resume of Vocational Expert | | 2022-01-28 to | 2 |
| Y13 | 17E | Representative Brief | | 2022-02-16 to | 2 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
| --- | --- | --- | --- | --- | --- | --- |
| Y13 | 1F | Office Treatment Records | | Va Medical Center | 2014-06-23 to 2015-06-24 | 16 |
| Y13 | 2F | Office Treatment Records | | Va Medical Center | 2013-12-19 to 2015-11-04 | 225 |
| Y13 | 3F | Medical Evidence of Record | | Kathleen M Flynn Llc | to 2016-10-20 | 9 |
| Y13 | 4F | Medical Evidence of Record | | Kathleen M Flynn Llc | 2014-12-21 to 2017-01-01 | 577 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | 5F | Medical Evidence of Record | Kathleen M Flynn Llc | 2010-01-01 to 2017-05-23 | 407 |
| Y13 | 6F | Medical Evidence of Record | Kathleen M Flynn Llc | 2017-05-04 to 2017-07-21 | 435 |
| Y13 | 7F | Medical Evidence of Record | Kathleen M Flynn Llc | to 2018-01-20 | 4 |
| Y13 | 8F | Medical Evidence of Record | Atlanta Va | to 2018-01-24 | 2 |
| Y13 | 9F | Medical Evidence of Record | Va Letter | to 2018-04-25 | 3 |
| Y13 | 10F | Medical Evidence of Record | Kathleen M Flynn Llc | 2017-08-26 to 2018-06-22 | 47 |
| Y13 | 11F | Mental RFC Assessment | Kathleen M Flynn Llc | to 2018-08-01 | 8 |
| Y13 | 12F | HIT MER | Veterans Affairs (Va) | 2015-12-01 to 2018-12-28 | 125 |
| Y13 | 13F | Medical Evidence of Record | Kathleen M Flynn Llc | to 2019-02-19 | 2 |
| Y13 | 14F | Medical Evidence of Record | Kathleen M Flynn Llc | 2018-07-02 to 2019-04-13 | 140 |
| Y13 | 15F | Medical Evidence of Record | Va Medical Center | 2017-07-27 to 2019-07-02 | 182 |
| Y13 | 16F | Office Treatment Records | Dr. Mary Lynch | 2019-08-27 to 2019-08-27 | 4 |
| Y13 | 17F | Progress Notes | Atlanta Va Medical Center | 2019-08-15 to 2019-08-29 | 31 |
| Y13 | 18F | Hospital Records | Atlanta Va Medical Center | 2019-08-29 to 2020-01-27 | 286 |
| T2L | 19F | Progress Notes | Atlanta Va Medical Center | 2020-03-24 to 2020-03-26 | 21 |
| Y13 | 20F | Hospital Records | Atlanta Vamc | 2020-05-03 to 2020-07-10 | 18 |

| Y13 | 21F | CE Orthopedic | Oluropo Alfred Ayeni Md | to 2019-02-28 | 9 |
| Y13 | 22F | Progress Notes | Atlanta Va Medical Center | 2020-07-21 to 2021-04-14 | 68 |
| Y13 | 23F | Progress Notes | Department Of Veteran Affairs | 2021-04-27 to 2021-06-29 | 23 |
| Y13 | 24F | Misc Medical Records | Disability Benefits Questionnaire | 1989-11-22 to 2013-12-11 | 675 |
| Y13 | 25F | Progress Notes | Atlanta Vamc | 2011-04-13 to 2017-01-01 | 1909 |
| Y13 | 26F | Progress Notes | Department Of Veterans Affairs | 1983-11-29 to 2020-09-02 | 616 |
| Y13 | 27F | Progress Notes | Department Of Veterans Affairs | 1983-11-29 to 2020-09-02 | 1954 |
| Y13 | 28F | Progress Notes | Atlanta Va Medical Center | 2021-07-06 to 2021-09-27 | 54 |