**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **RONDARIUS HOLMES,** | |
| Plaintiff, | |
| v. | **CIVIL ACTION FILE NO:** |
| **YRC, INC.,** | |
| Defendant. | |

## <u>COMPLAINT AND JURY DEMAND</u>

**COMES NOW** Rondarius Holmes ("Mr. Holmes" or "Plaintiff") by and through his undersigned attorney to hereby file this Complaint and Jury Demand for relief and damages against YRC, Inc. ("Defendant," "the Company" or "YRC") as follows:

### NATURE OF THE ACTON

1.      This action is to correct unlawful employment practices by YRC, one of the oldest and largest trucking companies in the United States.  Mr. Holmes is a line-haul driver for YRC who works at its Marietta, Georgia terminal. Plaintiff

brings this civil action against YRC to recover damages against Defendant for its violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII") and 42 U.S.C. §1981 ("Section 1981"), concerning allowing a hostile work environment based on Plaintiff's race to persist, which interfered with the terms and conditions of his employment with YRC and caused him emotional distress, humiliation, embarrassment, and mental anguish.

Plaintiff further brings this civil action against Defendant because after he complained of a racially hostile work environment, not only did YRC fail to take prompt action to stop the harassment and prevent it from recurring, but also YRC told him that he would be watched. This comment and act of being told he would be watched well might have dissuaded a reasonable worker from making or supporting a charge of discrimination; therefore, Plaintiff brings a complaint pursuant to the anti-retaliation provision of Title VII as this response also has caused him emotional distress, humiliation, embarrassment, and mental anguish.

This civil action is also to correct YRC's unlawful employment practices under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq.*  Mr. Holmes also brings a claim for interference with his rights under the FMLA given

that YRC failed to provide him with leave under the FMLA after he notified YRC of a need for leave because of the serious health condition of his mother. Mr. Holmes seeks to recover lost compensation and benefits, liquidated damages, and other actual monetary losses sustained as a direct result of this FMLA interference violation.

Additionally, Mr. Holmes brings a claim for retaliation under the FMLA, because after notifying YRC of his need for FMLA leave, he was threatened with termination, which conduct might well have dissuaded a reasonable worker from engaging in protected activity.  Mr. Holmes seeks to recover lost compensation and benefits, liquidated damages, and/or other actual monetary losses sustained as a direct result of this FMLA retaliation violation.

## PARTIES

2.      Mr. Holmes is an individual and a resident of the State of Georgia.

3.      Mr. Holmes is an African American adult male.

4.      Defendant is a foreign for-profit corporation registered with the Georgia Secretary of State Corporations Division.

3

5.    Defendant operates and exists under the laws of the State of Georgia.

## SUBJECT MATTER JURISDICTION

6.   This Court has subject matter jurisdiction concerning Plaintiff's civil action pursuant to 28 U.S.C. §§1331 and 1343, as the allegations in this civil action concern the laws of the United States of America and the deprivation of a right or privilege of a citizen of the United States.

## PERSONAL JURISDICTION

7.    Defendant may be served with process concerning this civil action through its registered agent, registered with the Georgia Secretary of State, The Corporation Company (FL), 106 Colony Park Drive, Suite 800-B, Cumming, Georgia 30040.

## VENUE

8.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the employment practices and other conduct engaged in by Defendant concerning Plaintiff's Complaint occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

4

9.  Mr. Holmes filed a Charge of Discrimination, Number 410-2022-01851 against Defendant with the EEOC on March 3, 2022. (See Exhibit No. 1.)

10.  On November 1, 2022, the EEOC issued Mr. Holmes a right to sue letter for EEOC Charge Number 410-2022-01851 ("Right to Sue Letter"). (See Exhibit No. 2.)

11.  Mr. Holmes has filed this present civil action within 90 days of receiving his Right to Sue Letter.

## FACTUAL ALLEGATIONS

12.  Plaintiff incorporates by reference paragraphs 1 through 11 hereinabove as though set forth fully and separately herein.

13.  YRC transports industrial, commercial, and retail goods across North America by commercial trucks. It is one of the oldest and largest trucking companies in the United States.

14.  Mr. Holmes was hired by Defendant on or about May 17, 2017, to work as a full-time line-haul driver from its Marietta, Georgia terminal (the "terminal").

15.     As a line-haul driver, Mr. Holmes received assignments that required him to drive a truck to transport and deliver freight for the Company's clients.

16.     On or about June 19, 2021, Mr. Holmes returned to the terminal after making a delivery. He parked his tractor under the dispatcher's window and proceeded to go inside to get a second load of freight to deliver.

17.     When he stepped out of his tractor, a YRC employee by the name of Charles "Taylor" Dunn ("Mr. Dunn") (a white adult male) who was across the yard, yelled at him angrily, "Hey, boy, you better move that truck, or I will do it for you."

18.     Mr. Holmes responded to Mr. Dunn, stating, "I'm not your boy."

19.     Within seconds, Mr. Dunn charged toward Mr. Holmes, got in his face, and tried to provoke him to fight.

20.     Mr. Holmes did not respond to the provocation and chose not to fight Mr. Dunn.

21.     Upon realizing that Mr. Holmes was not going to fight, Mr. Dunn provoked him further, telling him, "That's why I don't like you nigger boys— you're afraid to fight."

22.     Immediately following the incident, Mr. Holmes reported Mr. Dunn's racially motivated acts of harassment, ridicule, and intimidation to supervisors Dewayne (last name unknown) and Tony Smith.

23.     Later that same evening, after getting his load of freight, Mr. Holmes went back to his truck to make his next delivery. It was then that he noticed his truck had been tampered with.

24.     Mr. Holmes discovered that Mr. Dunn had located a spare key, which he used to unlock and enter Mr. Holmes' truck, where he dismantled the fuse box and stole money from Mr. Holmes' bag.

25.     On or about June 20, 2021, Mr. Holmes reported the above-described June 19 incident to the terminal manager, who evidently reported the incident to YRC's human resources ("HR") office.

26.     On or about June 22 or 23, 2021, Mr. Holmes was contacted by a YRC HR representative, Jessica, who interviewed him about the incident.

27.     In or around November 2021, Mr. Holmes called YRC's HR office and left a message for Jessica, but he never received a call back.

28.  From November 2021 through March 2022, Mr. Holmes received no response whatsoever from YRC's HR department, managers, or supervisors, and there were no actions taken by YRC to remedy the racially hostile work environment he was experiencing.

29.  At no time since June 2021 was Mr. Dunn suspended from employment or transferred to work in a different department.

30.    Instead, since June 2021, Mr. Dunn was permitted to interact with Mr. Holmes daily, and during this time he continued to direct various acts of harassment at Mr. Holmes, which included but were not limited to walking in his way to provoke a fight, staring him down, and taunting him by commenting, "I'm still here; I'm not fired yet."

31.  On or about March 7, 2022, Mr. Holmes sent an email to Darrel Harris, YRC's president, complaining of more racial harassment at the terminal.  Mr. Holmes complained that YRC supervisors or managers had placed a sign at the terminal stating, "New Bids Hung," instead of using the verbiage "Bids Posted" and that the use of the word "Hung" was an intentionally racially motivated act.

8

32.     Upon information and belief, on or about March 8 or 9, 2022, Mr. Harris visited the terminal and met with the terminal manager.

33.   On April 28, 2022, it was then, 10 months after his first complaint of racial harassment creating a hostile work environment, that Mr. Holmes first heard what if any remedial action Defendant was taking concerning his complaint: Jennifer Butler, Senior HR Manager, sent a letter to Mr. Holmes concerning his racial harassment in the workplace (i.e., racial epithets, threat of physical violence, and criminal damage to property committed by Mr. Dunn and the "New Bids Hung" sign).

34.   Significantly, in the letter, Ms. Butler acknowledged that the Company confirmed that Mr. Dunn had entered Mr. Holmes' truck, turned off the lights, and pulled out fuses.

35.   Upon information and belief, although the Company admitted that Mr. Dunn had tampered with Mr. Holmes' vehicle, Mr. Dunn was not fired by YRC immediately after this was confirmed.

36.    If Mr. Holmes had not noticed that his truck had been tampered with, Mr. Dunn's actions would have caused Mr. Holmes to operate an unsafe commercial vehicle on the public roads.

37.    Not only is operating an unsafe commercial vehicle a violation of Department of Transportation regulations governing YRC, but also the damage caused by Mr. Dunn's tampering could have resulted in an accident, causing serious injury or death to Mr. Holmes or other motorists.

38.    Moreover, under Georgia law, O.C.G.A. §16-7-22, Mr. Dunn's knowingly tampering with property in a manner so as to endanger human life is a crime.

39.    Significantly, although there was a surveillance camera that recorded Mr. Dunn's racially motivated acts toward Mr. Holmes on June 19, 2021, Ms. Butler's letter failed to state whether her investigation included reviewing footage from this recording.

40.    Significantly, although there were two witnesses to Mr. Dunn's racially motivated acts toward Mr. Holmes on June 19, 2021, Ms. Butler's letter

failed to state whether her investigation included interviewing these witnesses and taking statements.

41.     In her April 28, 2022, letter, Ms. Butler stated that management was instructed not to use the "Bids Hung" verbiage on signs going forward.

42.     On or about June 18, 2022, YRC's terminal manager, Charles last name unknown, called Mr. Holmes to ask him why he was on the "sick board." Mr. Holmes explained that he was experiencing a family emergency concerning his mother, who had called 911 to be transported to the hospital because of a serious health condition.

43.     Mr. Holmes' mother had recently had a mastectomy because of breast cancer. Mr. Holmes went on to explain to Charles that he called in to be placed on the sick board because he had to travel to Alabama to take care of his mother, who was experiencing a serious health condition, and that he would bring in supporting documents when he returned the following day.

44.     Charles responded callously, stating, "Don't your mom have other kids?" to imply that Mr. Holmes should be at work and another of her children rather than Mr. Holmes should be taking care of her.

11

45.     Charles then mentioned that Mr. Holmes could take FMLA leave, but then he retracted this offer and said he was going to start paperwork to begin terminating Mr. Holmes' employment.

46.     After this conversation with Charles, Mr. Holmes felt deterred and discouraged from making future requests for FMLA leave or notifying YRC of the serious health condition concerning a parent, spouse, child, or himself.

47.     In or around September 2022, once again, Mr. Holmes observed verbiage used at the terminal to post bids stating "Bids Hung." This occurred after Ms. Butler supposedly had instructed terminal management not to use these words going forward.

48.     In or around November 2022, Mr. Holmes saw the "Bids Hung" verbiage posted at the terminal once again, and he took a picture.

49.     On or around November 22, 2022, Mr. Holmes was suddenly and unexpectedly called into the terminal manager's office for a meeting, where he was told by Charles (again, YRC's terminal manager) that YRC had told Charles to watch Mr. Holmes.

12

50.  Charles, the manager, showed Mr. Holmes a list of names of employees he was told to watch. When Mr. Holmes asked Charles why he was going to be watched, Charles refused to respond.

51.  Mr. Holmes felt that he was being told he would be watched because of the complaints he had filed with HR and the president of the Company.  After this conversation with Charles, Mr. Holmes felt deterred and discouraged from filing future complaints of racial harassment or retaliation.

## COUNT I

### (Hostile Work Environment on the basis of race
### in Violation of Title VII and Section 1981)

52.   Mr. Holmes incorporates by reference paragraphs 1 through 51 hereinabove as though set forth fully and separately herein.

53.   Defendant violated 42 U.S.C. § 2000e-2(a)(1) and Section 1981 because Mr. Holmes was the victim of racial harassment insofar as his workplace was permeated with discriminatory intimidation, ridicule, and insults, which harassment was sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive working environment.

13

54.     As an African-American, Mr. Holmes belongs to a protected group.

55.     Mr. Holmes was subjected to unwelcome harassment at work, namely, (a) being called "boy" by his white co-worker Mr. Dunn, (b) being called a "nigger" by his white co-worker Mr. Dunn, and (c) being aggressively confronted and badgered by his white co-worker Mr. Dunn to fight.

56.     Mr. Holmes was further subjected to unwelcome harassment at work immediately after his white co-worker used racial epithets toward him and hounded him to fight: (a) his truck was broken into, (b) money was stolen from him, and (c) the fuses were taken out of his truck.

57.     Mr. Holmes was repeatedly subjected to unwelcome harassment at work thereafter, despite filing a complaint, which included but was not limited to allegations about Mr. Dunn: (a) walking in his way to antagonize him and try to provoke a fight; (b) staring him down; and (c) taunting him by commenting, "I'm still here; I'm not fired yet."

58.  Mr. Dunn was further subjected to unwelcome harassment at work by signs posted at the workplace in March, September, and November 2022 stating, "New Bids Hung."

59.     The above-described unwelcome harassment experienced by Mr. Holmes was based on his protected characteristic of race.

60.     The above-described unwelcome harassment experienced by Mr. Holmes was sufficiently severe.

61.     The above-described unwelcome harassment experienced by Mr. Holmes was sufficiently pervasive.

62.     YRC is vicariously liable for the hostile work environment that Mr. Holmes experienced and the harassing behavior that was engaged in by Mr. Dunn because Mr. Dunn is a co-worker, YRC knew or should have known of his harassing behavior toward Mr. Holmes, and YRC failed to take prompt remedial action.

63.     YRC is directly liable for the hostile work environment that Mr. Holmes experienced and the harassing behavior that was engaged in by its supervisors or managers (who have authority over Mr. Holmes) because they took actions to create or allow signs to be posted at work referring to the word "hung" repeatedly as an act of racial intimidation, ridicule, and insult.

64.     To the extent that the "New Bids Hung" signs were repeatedly posted by employees, YRC is vicariously liable because it failed to take prompt remedial

action and failed to take reasonable steps to stop this act of harassment from recurring.

65.     As a result of the racially hostile work environment, Plaintiff suffered emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II

### (Retaliatory Harassment/Mistreatment in Violation of Title VII and Section 1981)

66.     Mr. Holmes incorporates by reference paragraphs 1 through 65 hereinabove as though set forth fully and separately herein.

67.     Defendant violated 42 U.S.C. § 2000e-3(a) and Section 1981 by engaging in harassing behavior or mistreating Mr. Holmes in retaliation for his protected activity and said harassment or mistreatment might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

68.     Mr. Holmes engaged in protected activity under Title VII and Section 1981 in that he lodged an internal complaint with YRC's HR department and president concerning a race-based hostile work environment at the terminal.

69.     Thereafter, Mr. Holmes was called into his terminal manager's office for a meeting and told that he would be watched.

70.  His terminal manager showed him a list of names of employees he was told to watch. When Mr. Holmes asked his terminal manager why he was going to be watched, his terminal manager refused to respond.

71.     After being told he would be watched, Mr. Holmes felt deterred and discouraged from filing future complaints of racial harassment or retaliation.

72.     As a result of the retaliatory harassment/mistreatment, Plaintiff suffered emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT III

### (Interference with FMLA rights in violation of the FMLA)

73.     Mr. Holmes incorporates by reference paragraphs 1 through 72 hereinabove as though set forth fully and separately herein.

74.     Defendant violated the FMLA by interfering with Plaintiff's exercise or attempted exercise of his rights under the FMLA.

75.     Plaintiff is an eligible employee of an FMLA-defined employer, who has a parent who had a serious health condition as defined by 29 U.S.C. § 2611(11).

76.     Mr. Holmes placed YRC on notice of his need for FMLA leave, pursuant to 29 C.F.R. § 825.302(b), during his conversation with his manager, wherein he notified his manager that he was experiencing a family emergency concerning his mother, who had called 911 to be transported to the hospital because of a serious health condition, and that he would bring in supporting documents when he returned the following day.

77.     Mr. Holmes provided sufficient information for YRC to allow it to reasonably determine whether FMLA leave was needed.

78.     YRC failed to offer or provide FMLA leave that Mr. Holmes was entitled to receive, in violation of the FMLA.

79.     YRC's manager briefly mentioned that Mr. Holmes could take FMLA leave but immediately in the same conversation withdrew this offer and threatened to fire Mr. Holmes instead.

80.     Neither Mr. Holmes' manager nor any other YRC employee or agent ever provided Mr. Holmes with any FMLA paperwork such as certification documents to apply for FMLA leave.

81.  As a result of YRC's interference with his rights under the FMLA, Plaintiff sustained lost compensation and benefits, liquidated damages, and/or other actual monetary losses.

## COUNT IV

### (Retaliation in violation of the FMLA)

82.  Mr. Holmes incorporates by reference paragraphs 1 through 81 hereinabove as though set forth fully and separately herein.

83.  Plaintiff is an eligible employee of an FMLA-defined employer, who has a parent who had a serious health condition as defined by 29 U.S.C. § 2611(11).

84.  Mr. Holmes placed YRC on notice of his need for FMLA leave, pursuant to 29 C.F.R. § 825.302(b), during his conversation with his manager, wherein he notified his manager that he was experiencing a family emergency concerning his mother, who had called 911 to be transported to the hospital because of a serious health condition, and that he would bring in supporting documents when he returned the following day.

85.  Mr. Holmes provided sufficient information for YRC to allow it to reasonably determine whether FMLA leave was needed.

19

86.   Mr. Holmes' manager threatened to fire Plaintiff instead of giving him FMLA leave.

87.  This threat of termination might well have dissuaded a reasonable worker from engaging in the protected activity of putting his or her employer on notice of the need to take FMLA leave.

88.   As a result of YRC's retaliation for attempting to exercise his rights under the FMLA, Plaintiff sustained lost compensation and benefits, liquidated damages, and/or other actual monetary losses.

## JURY TRIAL DEMAND

89.   Plaintiff requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** based on the above-stated claims Defendant has violated Plaintiff's rights afforded to him under Title VII, Section 1981, and the FMLA; as such, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to compensation for Plaintiff's emotional distress, embarrassment, mental anguish, and humiliation.

B. Back pay and lost benefits;

C.  Actual losses;

D.  Liquidated damages;

E.   Punitive damages to the extent allowed by law;

F.   Attorneys' fees and the costs of this action;

G.   Pre-judgment and post-judgment interest at the highest lawful rate; and

H.  Such further relief as the Court deems just and proper.

Respectfully submitted this 30th day of January 2023.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: s/ *Jermaine A. Walker*
Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Road, Suite 705
Atlanta, Georgia 30326
(telephone) 404-301-4020
jwalker@hkm.com
**Attorney for Plaintiff**

21