JS44 (Rev. 10/2020 NDGA)

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

## DEFENDANT(S)

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

**ATTORNEYS** (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

- 1 U.S. GOVERNMENT PLAINTIFF
- 2 U.S. GOVERNMENT DEFENDANT
- 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)
- 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| PLF | DEF | | PLF | DEF | |
|-----|-----|---|-----|-----|---|
| 1 | 1 | CITIZEN OF THIS STATE | 4 | 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| 2 | 2 | CITIZEN OF ANOTHER STATE | 5 | 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| 3 | 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | 6 | 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

- 1 ORIGINAL PROCEEDING
- 2 REMOVED FROM STATE COURT
- 3 REMANDED FROM APPELLATE COURT
- 4 REINSTATED OR REOPENED
- 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)
- 6 MULTIDISTRICT LITIGATION - TRANSFER
- 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT
- 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

**(IF COMPLEX, CHECK REASON BELOW)**

1. Unusually large number of parties.
2. Unusually large number of claims or defenses.
3. Factual issues are exceptionally complex
4. Greater than normal volume of evidence.
5. Extended discovery period is needed.

6. Problems locating or preserving evidence
7. Pending parallel investigations or actions by government.
8. Multiple use of experts.
9. Need for discovery outside United States boundaries.
10. Existence of highly technical issues and proof.

## CONTINUED ON REVERSE

FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT $_____ APPLYING IFP_____ MAG. JUDGE (IFP)_____

JUDGE_____ MAG. JUDGE_____ NATURE OF SUIT_____ CAUSE OF ACTION_____
_(Referral)_

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
150 RECOVERY OF OVERPAYMENT &
    ENFORCEMENT OF JUDGMENT
152 RECOVERY OF DEFAULTED STUDENT
    LOANS (Excl. Veterans)
153 RECOVERY OF OVERPAYMENT OF
    VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
110 INSURANCE
120 MARINE
130 MILLER ACT
140 NEGOTIABLE INSTRUMENT
151 MEDICARE ACT
160 STOCKHOLDERS' SUITS
190 OTHER CONTRACT
195 CONTRACT PRODUCT LIABILITY
196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
210 LAND CONDEMNATION
220 FORECLOSURE
230 RENT LEASE & EJECTMENT
240 TORTS TO LAND
245 TORT PRODUCT LIABILITY
290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
310 AIRPLANE
315 AIRPLANE PRODUCT LIABILITY
320 ASSAULT, LIBEL & SLANDER
330 FEDERAL EMPLOYERS' LIABILITY
340 MARINE
345 MARINE PRODUCT LIABILITY
350 MOTOR VEHICLE
355 MOTOR VEHICLE PRODUCT LIABILITY
360 OTHER PERSONAL INJURY
362 PERSONAL INJURY - MEDICAL
    MALPRACTICE
365 PERSONAL INJURY - PRODUCT LIABILITY
367 PERSONAL INJURY - HEALTH CARE/
    PHARMACEUTICAL PRODUCT LIABILITY
368 ASBESTOS PERSONAL INJURY PRODUCT
    LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
370 OTHER FRAUD
371 TRUTH IN LENDING
380 OTHER PERSONAL PROPERTY DAMAGE
385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
422 APPEAL 28 USC 158
423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
440 OTHER CIVIL RIGHTS
441 VOTING
442 EMPLOYMENT
443 HOUSING/ ACCOMMODATIONS
445 AMERICANS with DISABILITIES -  Employment
446 AMERICANS with DISABILITIES -  Other
448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
462 NATURALIZATION APPLICATION
465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
463 HABEAS CORPUS- Alien Detainee
510 MOTIONS TO VACATE SENTENCE
530 HABEAS CORPUS
535 HABEAS CORPUS DEATH PENALTY
540 MANDAMUS & OTHER
550 CIVIL RIGHTS - Filed Pro se
555 PRISON CONDITION(S) - Filed Pro se
560 CIVIL DETAINEE: CONDITIONS OF
    CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
550 CIVIL RIGHTS - Filed by Counsel
555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
625 DRUG RELATED SEIZURE OF PROPERTY
    21 USC 881
690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
710 FAIR LABOR STANDARDS ACT
720 LABOR/MGMT. RELATIONS
740 RAILWAY LABOR ACT
751 FAMILY and MEDICAL LEAVE ACT
790 OTHER LABOR LITIGATION
791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
820 COPYRIGHTS
840 TRADEMARK
880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
830 PATENT
835 PATENT-ABBREVIATED NEW DRUG
    APPLICATIONS (ANDA) - a/k/a
    Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
861 HIA (1395ff)
862 BLACK LUNG (923)
863 DIWC (405(g))
863 DIWW (405(g))
864 SSID TITLE XVI
865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
870 TAXES (U.S. Plaintiff or Defendant)
871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
375 FALSE CLAIMS ACT
376 Qui Tam  31 USC 3729(a)
400 STATE REAPPORTIONMENT
430 BANKS AND BANKING
450 COMMERCE/ICC RATES/ETC.
460 DEPORTATION
470 RACKETEER INFLUENCED AND CORRUPT
    ORGANIZATIONS
480 CONSUMER CREDIT
485 TELEPHONE CONSUMER PROTECTION ACT
490 CABLE/SATELLITE TV
890 OTHER STATUTORY ACTIONS
891 AGRICULTURAL ACTS
893 ENVIRONMENTAL MATTERS
895 FREEDOM OF INFORMATION ACT 899
899 ADMINISTRATIVE PROCEDURES ACT /
    REVIEW OR APPEAL OF AGENCY DECISION
950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
410 ANTITRUST
850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
896  ARBITRATION
    (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY
TRACK FOR EACH CASE
TYPE. SEE LOCAL RULE 26.3**

---

## VII. REQUESTED IN COMPLAINT:

    CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23    DEMAND \$_____

**JURY DEMAND**    YES    NO  (CHECK YES <u>ONLY</u> IF DEMANDED IN COMPLAINT)

---

## VIII. RELATED/REFILED CASE(S) IF ANY

    JUDGE_____    DOCKET NO._____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES:  (CHECK APPROPRIATE BOX)
    1.  **PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.**
    2.  **SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.**
    3.  **VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.**
    4.  **APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME
        BANKRUPTCY JUDGE.**
    5.  **REPETITIVE CASES FILED BY <u>PRO SE</u> LITIGANTS.**
    6.  **COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):**


    7.  **EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO.**    **, WHICH WAS
        DISMISSED. This case**  **IS**  **IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.**

---

*Andrew Floischman 1/31/2023*

<u>SIGNATURE</u> OF ATTORNEY OF RECORD        DATE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JEFFREY GRAY,<br><br>   *Plaintiff,*<br><br> v.<br><br>CITY OF ALPHARETTA, a political subdivision of the State of Georgia;<br><br>ARICK FURR, a Lieutenant of the Alpharetta Department of Public Safety, in his individual capacity; and<br><br>HAROLD SHOFFEITT, an officer of the Alpharetta Department of Public Safety, in his individual capacity,<br><br>   *Defendants.* | Civil Action No.:<br>1:23-mi-99999<br><br><br>**COMPLAINT FOR<br>CIVIL RIGHTS VIOLATIONS**<br><br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Army veteran Jeffrey Gray stood on the sidewalk in front of Alpharetta City Hall with a cardboard sign reading "God Bless the Homeless Vets" and saying the same aloud to passersby. For this, Alpharetta police lieutenant Arick Furr detained and arrested Gray for "panhandling"—in accordance with Alpharetta's anti-panhandling policy, practice, or custom—

searched Gray to obtain his identification, and turned off Gray's camera to prevent him from filming the officer misconduct.

2.     After Officer Harold Shoffeitt joined in the detention, both officers interrogated and berated Gray before eventually releasing him.

3.     But when Gray sought to return to his advocacy, Lt. Furr banned Gray indefinitely from the area, prohibiting him from continuing to engage in expressive activity.

4.     Video and audio recordings of Gray's interactions with Alpharetta police are *available at* https://bit.ly/JeffGrayInAlpharetta.

5.     Gray's speech about the plight of homeless veterans—whether "panhandling" or not—and his subsequent questioning of Lt. Furr's actions was clearly established as protected political expression. *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

6.     Even if Gray *was* "panhandling," it is clearly established that the First Amendment protects speakers asking others for help. *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).

7.     In arresting Gray for his refusal to identify himself, Alpharetta police violated Gray's clearly established First Amendment right to speak without being compelled to identify himself. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–67 (2002).

8.     By preventing Gray from filming portions of their interaction, Lt. Furr violated Gray's clearly established First Amendment right to film law enforcement activity in public. *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

9.     When Lt. Furr indefinitely banned Gray from the public sidewalks outside of Alpharetta's City Hall, without procedural due process, he implemented Alpharetta's system of prior restraints in violation of clearly established First and Fourteenth Amendment rights. *United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir. 2000); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1267 (11th Cir. 2011).

10.     And in detaining, arresting, and searching Gray without reasonable articulable suspicion of a crime, the officers violated Gray's clearly established Fourth Amendment right to be free from unreasonable search and seizure. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Bourgeois v. Peters*, 387 F.3d 1303, 1315–17 (11th Cir. 2004).

11.     Gray brings this action to vindicate his constitutional rights: to hold a sign in a public space, to peacefully communicate a political message to others, to not be unjustly compelled to identify himself, to safely film police officers without interference, and to not be subject to unlawful search and seizure for doing so in the future.

3

## JURISDICTION AND VENUE

12.     This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

13.     This Court has jurisdiction over the federal claims asserted under 28 U.S.C. §§ 1331 and 1343.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the City of Alpharetta resides in this district and, on information and belief, the individual defendants reside in the State of Georgia.

15.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in Fulton County, which is located in the Atlanta Division of the Northern District of Georgia.

## THE PARTIES

16.     Plaintiff Jeffrey Gray is a United States citizen and a resident of St. Johns County, Florida. As a veteran of the United States Army, he believes in raising awareness of the plight of homeless veterans, protecting constitutional rights, and ensuring that law enforcement officers honor their oath "to support and defend" the United States Constitution. On January 27, 2022, officers employed by the City of Alpharetta ignored that oath when they detained, arrested, and searched Gray for engaging in alleged

4

"panhandling" speech, unjustly forced him to identify himself, terminated his filming of the officers' misconduct, and indefinitely banned him from the public sidewalks outside of City Hall.

17.     Defendant City of Alpharetta is a municipal corporation organized under the laws of the State of Georgia. Through its police, the City of Alpharetta has implemented a policy, practice, or custom of prohibiting any speech that it deems "panhandling." Pursuant to this policy, it also implements a regime of prior restraint through verbal and written bans— excluding people, like Gray, from speaking in public spaces without a meaningful opportunity to contest the deprivation of their rights. Alpharetta police enforced this policy against Gray in violation of his First and Fourteenth Amendment rights.

18.     Defendant Arick Furr is a lieutenant employed by the Department of Public Safety of the City of Alpharetta. On January 27, 2022, Furr confronted Gray for allegedly panhandling outside Alpharetta City Hall, and consequently detained and arrested Gray, searched him to obtain his identity, turned his camera off to prevent him from further filming the encounter, and then banned Gray from sharing his protected message on the public sidewalks in front of Alpharetta City Hall. When Lt. Furr detained, arrested, searched, and banned Gray for "panhandling," he acted under

Alpharetta's anti-panhandling policy, in violation of Gray's First, Fourth, and Fourteenth Amendment rights. At all times relevant to the Complaint, Defendant Furr acted under the color of law. He is sued in his individual capacity.

19.     Defendant Harold Shoffeitt is a police officer employed by the Department of Public Safety of the City of Alpharetta. Officer Shoffeitt assisted Lieutenant Furr in detaining Gray under Alpharetta's anti-panhandling policy, in violation of Gray's First and Fourth Amendment rights. At all times relevant to the Complaint, Defendant Shoffeitt acted under the color of law. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### *Gray engaged in protected speech outside of Alpharetta City Hall.*

20.     On January 27, 2022, Gray stood on the public sidewalk in front of Alpharetta City Hall, approximately twenty feet from the front door to City Hall, holding a cardboard sign reading "God Bless the Homeless Vets."

21.     Gray greeted two people as they walked toward the entrance to City Hall with the words "God bless the homeless veterans."

22.     Gray said "God bless the homeless vets," or "God bless the homeless veterans" in a peaceful manner and at a reasonable volume typical for speaking on a public sidewalk.

6

23.     Gray peacefully stood with his sign for less than five minutes.

24.     Gray did not engage in disorderly conduct.

25.     Gray did not ask any person for money or other charitable support while in Alpharetta.

26.     One of the people Gray greeted was Dan Merkel, an Alpharetta city councilman.

27.     Before entering City Hall, Councilman Merkel told Gray, "No panhandling up here."

28.     Upon entering City Hall, Councilman Merkel approached Lt. Furr, who was sitting inside the front corridor.

29.     Councilman Merkel complained to Lt. Furr about Gray allegedly panhandling.

30.     Councilman Merkel intended for Lt. Furr to silence Gray.

31.     Lt. Furr then opened the entrance door and, echoing Councilman Merkel's words, told Gray there was "no panhandling here" and to "move on." He also told Gray to "leave the downtown area, period." Lt. Furr then returned inside.

32.     Gray remained on the public sidewalk in front of City Hall holding his sign.

33.     Moments later, Gray greeted a woman entering City Hall with the phrase "God bless homeless vets."

34.     After entering City Hall, the woman spoke to Lt. Furr gesturing outside.

35.     The woman complained to Lt. Furr about Gray's speech in front of City Hall.

***Lt. Furr detains and handcuffs Gray.***

36.     Immediately after speaking to the woman, Lt. Furr reemerged from City Hall.

37.     As shown in Gray's recordings, and as concluded in a subsequent Alpharetta police disciplinary report, Lt. Furr took no investigative steps to corroborate the information provided by Councilman Merkel or the woman.

38.     Instead of conducting an investigation, Lt. Furr immediately ordered Gray to "come here," thrice repeated his command that Gray "leave," and again said there was "no panhandling here."

39.     Less than five minutes had passed since Gray began holding his sign and speaking briefly to passersby in front of Alpharetta City Hall.

40.     When Gray did not leave, Lt. Furr demanded Gray's identification.

41.     Gray showed Lt. Furr that he had his driver's license but said that he did not want to give it to Lt. Furr without an explanation of the alleged crime justifying the detention.

42.     Lt. Furr again demanded Gray's identification.

43.     Gray declined and asked Lt. Furr to describe the "reasonable, articulable suspicion that crime is afoot," to justify his demand that Gray show him an identification card.

44.     Lt. Furr responded that "panhandling's illegal in the City of Alpharetta."

45.     When Gray laughed in disbelief and took a step away from Lt. Furr, the lieutenant immediately grabbed Gray's right wrist and ordered him to "put your hands behind your back," saying, "I'm not going to deal with you."

46.     Lt. Furr held Gray's arms behind his back and marched Gray to a nearby bench.

47.     Lt. Furr handcuffed Gray at the bench.

48.     Gray did not physically resist his arrest or threaten the officers' safety in any way.

49.     Although Gray did not ask anyone for charitable support, when Gray asked Lt. Furr why he thought Gray was panhandling, Lt. Furr answered that "two witnesses" said Gray had "asked people for money."

50.     Gray told Lt. Furr that he had not asked anyone for money and that he had a "camera that's been recording this whole thing the whole time."

51.     Gray questioned Lt. Furr's authority and criticized him, calling Lt. Furr a "disgrace."

52.     Gray expressed disbelief that Lt. Furr was a lieutenant in rank.

**_Lt. Furr stops Gray from filming their interaction._**

53.     As Lt. Furr sat Gray on the bench, Gray asked Lt. Furr to "turn the camera so it's filming what's going on."

54.     Lt. Furr instead picked up the camera and turned it to face away from Gray and Lt. Furr.

55.     After Lt. Furr reached into Gray's pocket to seize Gray's driver's license, Lt. Furr then picked up Gray's camera, switched it off, and put it in Gray's pocket.

56.     Gray objected to Lt. Furr turning off the camera and asked him why he did so.

57.     Lt. Furr told Gray he turned the camera off "because of your battery here."

10

58.     Lt. Furr's claim that he turned the camera off to preserve its battery was a pretext.

59.     Lt. Furr intended to prevent Gray from further recording their interaction.

60.     According to the subsequent Alpharetta police disciplinary report following an investigation or Lt. Furr's actions, Lt. Furr told his supervisor that he turned off Gray's camera because he was frustrated by Gray.

61.     According to the same written report, Lt. Furr conceded to his supervisor that he "knew that he should not have manipulated the camera and should have allowed the camera to continue to record."

62.     Lt. Furr's termination of the recording thwarted Gray's intent to film his experience in front of Alpharetta City Hall that day.

63.     Lt. Furr's termination of the recording served no legitimate law enforcement purpose.

64.     Unbeknownst to Lt. Furr, Gray's Apple Watch continued to record audio, but not video, of their interaction.

***Lt. Furr and Officer Shoffeitt interrogate, criticize, and search Gray.***

65.     As audio recorded by Gray's Apple Watch confirms, Lt. Furr again told Gray that in the "City of Alpharetta, you can't ask people for money."

66.     Shortly after, Officer Shoffeitt joined Lt. Furr in his detention of Gray.

67.     Officer Shoffeitt refused to listen to Gray's explanation of the events.

68.     Officer Shoffeitt told Gray that "holding a sign [and] standing there is panhandling."

69.     Officer Shoffeitt repeatedly asked Gray to describe his "goal."

70.     Lt. Furr told Officer Shoffeitt that Gray's goal was "to cause confrontation."

71.     Gray explained to Officer Shoffeitt that he was trying to "raise awareness of homeless veterans."

72.     Officer Shoffeitt criticized Gray, stating that "standing here where there's no homeless veterans is not going to bring any awareness to any of them."

73.     Officer Shoffeitt rhetorically asked what Gray wanted the people coming in and out of City Hall "to do" and criticized Gray's advocacy for "not offering anything they can do."

74.     Officer Shoffeitt also rhetorically asked Gray why he didn't "have a flyer that says 'help me at the homeless shelter'" or "'help veterans.'"

75.     Officer Shoffeitt told Gray, "You're just coming here to cause controversy," and that "when you do that, just to make controversy out of your own words, that's disorderly conduct."

76.     Officer Shoffeitt told Gray that Lt. Furr reported "witnesses saying you're being controversial out here."

77.     Lt. Furr conducted a second search of Gray's person, removed the handcuffs, and walked away, leaving Gray in the custody of Officer Shoffeitt.

78.     Lt. Furr went to his cruiser to contact dispatch and use Gray's seized driver's license to determine whether Gray had any outstanding warrants.

79.     Officer Shoffeitt then told Gray that "asking people for money, that fits the panhandling that they ask you not to do."

80.     Gray, after explaining that he had not asked "a single person for money," asked Officer Shoffeitt if he was "still being detained."

81.     Officer Shoffeitt responded that he was "not sure" of Lt. Furr's plan.

82.     With his hands now free, Gray turned his camera on so it could film the remainder of the interaction.

83.     Lt. Furr returned and told Gray that "one of the councilmen and a female came in and said you're asking for money."

13

84.     Lt. Furr again told Gray that you "can't panhandle in the City of Alpharetta."

85.     After Gray again explained that he was not panhandling, Lt. Furr responded that Gray was "just trying to cause confrontation."

86.     Lt. Furr conceded that he "didn't see [Gray] yelling at people," but said "people are coming in, saying [Gray was] yelling at them."

87.     Gray explained that he had not yelled at anyone, but was just saying "good morning, God bless the homeless veterans."

88.     Lt. Furr told Gray that he should "think about delivery and how people are gonna receive that message."

89.     Gray asked if he was free to leave and Lt. Furr said he was free to go.

90.     Gray then asked Lt. Furr "Can I continue what I was doing?"

91.     Lt. Furr responded, "no sir, you need to leave."

92.     Lt. Furr added that "asking people for money, yelling at people" was unlawful in Alpharetta.

93.     Afraid the officers would arrest and jail him if he returned to his peaceful advocacy for homeless veterans in front of Alpharetta City Hall, Gray explained that he did not "want to go to jail," walked to his vehicle, and drove away.

***Lt. Furr documents the encounter in a "Criminal Trespass Warning."***

94.    After Lt. Furr detained and indefinitely banned Gray, he prepared a "CRIMINAL TRESPASS WARNING" purporting to document the incident.

95.    The trespass warning states that "two different individuals" told Lt. Furr that Gray was "panhandling and yelling at people outside" and that Furr told Gray that "panhandling was not allowed in Alpharetta."

96.    Lt. Furr wrote that after he first confronted Gray, he was "told again by another citizen"—a third witness—who told him "there was a male yelling at people and asking for money."

97.    The January 27, 2022, video and audio recordings of Gray's time in front of City Hall before and during the encounter with Lt. Furr confirm that Gray did not yell or ask for money.

98.    The video and audio recordings of Gray's time in front of City Hall, as well as Alpharetta's own video recording of Lt. Furr from inside City Hall, confirm that Lt. Furr only spoke to two people before detaining Gray.

99.    As the video and audio recordings show, there was no third witness who spoke to Lt. Furr.

100.   The trespass warning states that Lt. Furr detained Gray when he refused to produce identification and that Lt. Furr issued Gray "a warning for panhandling."

101.   The trespass warning also falsely claims that "Gray agreed to leave."

102.   Gray left only because Lt. Furr ordered him to do so, and because he feared the officers would arrest and jail him if he remained.

103.   The written trespass warning purports to provide notice to Gray, even though Lt. Furr and Officer Shoffeitt never provided it to him, that "you are trespassing on private property and the owners of such property request that you not return for a period not to exceed one (1) year."

104.   The written trespass warning is consistent with Lt. Furr's verbal command that Gray leave the public space outside of Alpharetta City Hall.

105.   The written trespass warning, a standardized form, does not provide any information about how to challenge the warning's dictate to avoid the property.

106.   Gray did not receive a copy of the written trespass warning from Lt. Furr.

107.   About a month later, Gray learned of the written trespass warning after an uninvolved person received a copy of it via a public records request and forwarded it to him.

***After Gray posts video of the encounter to YouTube, Lt. Furr writes a "revised" memo.***

108.   On the morning of February 5, 2022, Gray posted a video documenting a portion of the January 27, 2022, encounter to YouTube. The video, like many others created by Gray showing his positive and negative interactions with law enforcement, contrasted Alpharetta's response with the positive interaction he had with a law enforcement officer in Roswell, Georgia. This video is available at https://bit.ly/JeffGrayRoswell.

109.   On the same day Gray posted the comparison video, members of the public began contacting Alpharetta's elected officials, arguing that the police had violated Gray's First Amendment rights.

110.   On information and belief, Alpharetta Mayor Jim Gilvin viewed the video and then sent an email to Alpharetta Police Chief John Robison asserting that "it looks like one of our officers may have arrested a man for soliciting money in front of our city hall."

111.   Chief Robison responded by telling Gilvin via email that Lt. Furr "had two witnesses tell him [Gray] was asking for money."

112.   Chief Robison later emailed Mayor Gilvin asserting that "[t]here's just nothing to this" and that Lt. Furr "put the guy in cuffs because he was playing games about be[ing] identified."

113.   After Gray posted the video, Lt. Furr wrote a "revised memo," dated February 5, 2022, about the January 27, 2022, interaction with Gray.

114.   Lt. Furr sent the "revised memo" to his supervisor, J.T. Simpson, Alpharetta Police Department's Captain of the Uniform Patrol Division.

115.   Alpharetta Police Chief John Robison also received the "revised memo."

116.   Chief Robison shared the "revised memo" with Mayor Gilvin.

117.   In the "revised memo," Lt. Furr claimed that "a citizen" alerted him that Gray was "panhandling aggressively and yelling at people outside," adding the word "aggressively."

118.   Lt. Furr's "revised memo" also identified Councilman Merkel as "another citizen" who complained.

119.   As the video and audio recordings show, Gray did not "panhandl[e] aggressively and yell[] at people" while outside of Alpharetta City Hall on January 27, 2022.

120.   Lt. Furr's "revised memo" omits reference to any third witness, as he had alleged in the trespass warning.

18

121.   On or about March 3, 2022, the Alpharetta Department of Public Safety disciplined Lt. Furr following an investigation into his conduct on January 27, 2022.

122.   The Alpharetta Department of Public Safety's investigation into Lt. Furr's actions concluded that:

(a)   Lt. Furr's detention of Gray was without a "legal basis" and "not within the scope of the law";

(b)   Lt. Furr did not take "investigative steps to corroborate" Councilman Merkel's allegations;

(c)   There was no indication that Gray was a "threat to anyone";

(d)   Lt. Furr's search of Gray's pocket was without "legal justification";

(e)   Lt. Furr's termination of Gray's recording was without "apparent justification";

(f)   Lt. Furr's "order" that Gray "leave the area" was without "legal justification," but;

(g)   Lt. Furr should have investigated the complaints about Gray panhandling in order to perform "good customer service."

123.   Although Alpharetta's Department of Public Safety concluded that the trespass notice was without a lawful basis, it has not rescinded the written notice or Lt. Furr's verbal order indefinitely banning Gray from returning to Alpharetta City Hall.

124.   Gray has relatives who reside in the area north of Atlanta and occasionally travels to the area around Alpharetta. Gray has purposefully avoided entering Alpharetta's city limits due to the directive that he not return, taking different routes to avoid the City of Alpharetta.

### *Alpharetta has a policy, practice, or custom of chilling and punishing "panhandling" speech.*

125.   Alpharetta's police department implements a policy, practice, or custom of harassing, threatening, detaining, arresting, and/or citing for trespass members of the public who engage in "panhandling" speech—asking people for monetary or other charitable support—on public property, despite the absence of reasonable suspicion that the individuals violated any law.

126.   On information and belief, Alpharetta's anti-panhandling policy is unwritten.

127.   Alpharetta's Department of Public Safety has, through its social media channels, warned residents about "crazy scams" by "panhandlers":

> PANHANDLERS – Many panhandlers, some of whom portray themselves as veterans, homeless, or stranded individuals, are nothing more than professional swindlers who make easy money playing upon the patriotism, generosity, or sympathies of compassionate citizens. Caution should always be exercised when solicited for money by people on the street.

20

128.   Among Alpharetta police officers, there is a consistent practice of telling people that solicitation or panhandling is unlawful, regardless of the location or manner in which they seek assistance.

129.   Among Alpharetta police officers, there is a consistent practice of harassing, threatening, detaining, arresting, and/or citing people for trespass for engaging in solicitation or panhandling, regardless of the location or manner in which they seek assistance.

130.   According to Alpharetta police reports, over 40 Alpharetta police officers filed more than 100 reports related to individuals allegedly panhandling or soliciting between January 6, 2020, and October 25, 2022.

131.   Many of these reports reflect the Department's policy, practice, or custom of criminalizing speakers who engage in First Amendment protected speech, such as asking others for monetary or other support.

132.   For example, on March 1, 2020, Officer Alvizua-Flores "observed" a musician "setting up a speaker, guitar, and a box to collect money" outside a store. Officer Alvizua-Flores wrote in a police report that he told the musician that it was "against city ordinance to panhandle in the city."

133.   On March 5, 2020, Officer Bender encountered a family asking passersby for charity. Officer Bender wrote in his report that he told them to "stop panhandling in Alpharetta or [you] will go to jail."

21

134.   On May 22, 2020, Officer Fields encountered a man "holding a sign asking for money." Officer Fields wrote in his report that he told the man "panhandling was not allowed in Alpharetta[,]" and that he threatened the man that he "would be cited if caught panhandling again in the area."

135.   On September 1, 2020, Officer Nowlin encountered a "panhandler" and wrote in his report that he told him that "he cannot beg for money in the city."

136.   On October 8, 2020, Officer Bradford encountered a group on public property distributing flyers promoting a local church that supports people experiencing substance-use disorder and homelessness, and seeking donations. Officer Bradford accused them of "panhandling" and told the group that they could not "idle or loiter[.]"

137.   On November 24, 2020, Officer Nowlin wrote in a report that he encountered a woman whose "English was not good" and that he told her that "she cannot panhandle in Alpharetta."

138.   Two days later, Officer Mullins encountered the same woman and wrote in her report that she told the woman to "leave Alpharetta[.]"

139.   On February 7, 2021, Officer Nowlin encountered a man "with his wife and toddler panhandling" outside of a restaurant. Officer Nowlin

wrote in his report that he "explained that they cannot panhandle in Alpharetta."

140.   On February 21, 2021, Officer Kimbel encountered a man seeking charity outside of a store, holding a "card board sign saying help I'm a veteran." Officer Kimbel wrote in his report that he "told him that he cannot panhandle in Alpharetta and for that matter anywhere in North Fulton County."

141.   On August 29, 2021, Officer Fields encountered a man asking for charitable support on a roadside. Officer Fields wrote in his report that he told the man that "both standing in the roadway and panhandling were against the law in Alpharetta."

142.   Eight days before Christmas in 2021, Officer Medico arrested a homeless woman for "soliciting in roadway." In his report, Officer Medico noted that the woman "has been warned not to panhandle in the city" by multiple Alpharetta officers.

143.   Pursuant to Alpharetta Department of Public Safety policy, all criminal and non-criminal incidents are documented in reports.

144.   Pursuant to Alpharetta Department of Public Safety Policy No. 02-04, all reports are submitted to a supervisor who must "thoroughly review" each report.

145.   Pursuant to Alpharetta Department of Public Safety Policy No. 03-07, reports approved by a supervisor are then submitted to a centralized records system.

146.   Mayor Gilvin knew and knows of Alpharetta's anti-panhandling policy.

147.   Mayor Gilvin has continued to make clear—despite knowing about Gray's arrest and the subsequent discipline of Lt. Furr—that he does not want people panhandling in Alpharetta.

148.   At a May 2, 2022 City Council meeting, in discussing a proposal to license street performers, Mayor Gilvin noted that he did not have negative experiences with street performers elsewhere, but was "much more concerned about the panhandlers on the streetcorners with signs in the middle of intersections, and things like that."

149.   Councilman Merkel also knew and knows of Alpharetta's anti-panhandling policy.

150.   At the May 2, 2022 City Council meeting, Councilman Merkel, acting as Mayor Pro Tem, noted how Alpharetta was "already fighting panhandlers as it is," in expressing his disapproval of the street performer proposal.

151.   The anti-panhandling policy is so well understood among Alpharetta officials that the mention of panhandling from Councilman Merkel spurred immediate action from Lt. Furr to chill Gray's protected speech.

152.   Alpharetta's police officers continue to enforce its anti-panhandling policy even after the city's senior leadership became aware of Lt. Furr's unlawful detention and arrest of Gray, and the subsequent discipline of Lt. Furr.

153.   On June 15, 2022, Officer Kimbel detained a woman and three children because she held a sign saying she had "3 children and need $ to help with rent." In his report, Officer Kimbel noted that he told the woman "not to ask for money again" because the Georgia Division of Family and Children Services was involved and it would be "jail for them if they come back."

154.   On October 25, 2022, Officer Kimbel reported that he "bluntly told [a juvenile] that the next time they are panhandling in Alpharetta they would be arrested and go to jail."

## INJURIES TO PLAINTIFF

155.   The City of Alpharetta and the conduct of its sworn law enforcement officers injured Gray—injuries that continue to this day—

25

because Alpharetta has a policy, practice, or custom banning speech its police
deem to be "panhandling."

156.   On January 27, 2022, Lt. Furr prevented Gray from engaging in
protected expression about society's treatment of homeless veterans,
physically restrained Gray, and expressly ordered him to not reengage in his
expressive activity—chilling and restraining his ability to speak.

157.   Gray was injured because Lt. Furr forcibly terminated, over
Gray's objection, his filming of Lt. Furr's conduct.

158.   Gray was further injured when Lt. Furr stripped him of his
anonymity and privacy, forcing him to identify himself and recording his
name and information in public records.

159.   Gray was also injured because Lt. Furr detained, handcuffed, and
searched Gray without reasonable articulable suspicion of a crime—unjustly
restraining Gray's free movement and invading his privacy.

160.   During their detention of Gray, Lt. Furr and Officer Shoffeitt also
denigrated Gray's expressive activity, condemned him for being
"controversial," and threatened to charge him with disorderly conduct
because of the content of his speech.

161.   The officers' conduct in detaining, interrogating, and berating
Gray degraded his personal dignity, restrained his personal autonomy, and

further eroded his faith that police will "support and defend" the United States Constitution.

162.   The injuries to Gray's ability to speak in Alpharetta are not left in the past—they are ongoing.

163.   Alpharetta police continue to enforce the city's anti-panhandling policy against speech they perceive to be panhandling, and there is a substantial risk that Alpharetta officers will again interpret Gray's speech to be "panhandling," chilling his speech.

164.   In addition, Lt. Furr's indefinite ban of Gray burdened and continues to burden Gray's ability to engage in protected speech of any kind in Alpharetta, particularly in front of Alpharetta City Hall, and forces him to feel as though he cannot travel through or within Alpharetta.

165.   Gray wants to continue advocating for homeless veterans in Alpharetta. But Alpharetta's continued enforcement of its anti-panhandling policy and its officers' unlawful detention, arrest, and search of his person, caused and continue to cause Gray to fear detention, arrest, invasion of privacy, and imprisonment for exercising his First Amendment right to engage in such advocacy.

**FIRST CAUSE OF ACTION**
**First Amendment Retaliation**
**(42 U.S.C. § 1983)**
**(Against Lt. Furr and Officer Shoffeitt in their Individual Capacities)**

166.   Plaintiff re-alleges and incorporates the paragraphs 1–165 of this Complaint as if repeated here.

167.   The First Amendment protects the right to be free from retaliation by a public official for the exercise of the right to speak.

168.   It is well established that the First Amendment protects charitable solicitation, including so-called "panhandling." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).

169.   It is well established that the First Amendment protects expression on public issues. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011).

170.   Gray's expression—whether through his sign or saying "God bless the homeless vets," and whether construed as raising awareness for homeless veterans or as "panhandling"—is protected by the First Amendment.

171.   It is well established that the First Amendment protects "verbal criticism and challenge directed at police officers." *Houston v. Hill*, 482 U.S. 451, 461–62 (1987).

28

172.   Gray's verbal criticism of the authority and conduct of Lt. Furr and Officer Shoffeitt is protected by the First Amendment.

173.   Lt. Furr and Officer Shoffeitt's actions would be sufficient to deter a person of ordinary firmness from exercising their First Amendment rights. These actions included:

    (a)    Physically detaining Gray;

    (b)    Placing Gray in handcuffs;

    (c)    Terminating Gray's video recording;

    (d)    Requiring Gray to provide identification;

    (e)    Attempting to learn whether Gray could be detained on an unrelated warrant;

    (f)    Searching Gray;

    (g)    Prohibiting Gray from continuing to engage in expressive activity; and

    (h)    Requiring Gray to leave and not return to the "downtown area" around Alpharetta City Hall for at least one year.

174.   Lt. Furr and Officer Shoffeitt falsely asserted that panhandling is prohibited by Alpharetta ordinance.

175.   Lt. Furr and Officer Shoffeitt's conduct was motivated by their objections to the content of Gray's sign, by his vocalization of the words "God bless the homeless vets," by Gray's criticism of Lt. Furr, by Gray's verbal

29

challenge to Lt. Furr's authority, and by Gray's attempt to film Lt. Furr's response to his expressive activity.

176.   As further alleged in paragraphs 280 through 288, *infra*, Lt. Furr and Officer Shoffeitt lacked reasonable suspicion, arguable reasonable suspicion, probable cause, or arguable probable cause to detain or arrest Gray.

177.   At the conclusion of the officers' interaction with Gray, Lt. Furr prevented Gray from continuing to engage in expressive activity, curtailing and chilling Gray's protected speech.

178.   Lt. Furr had no lawful basis to prohibit Gray from continuing to engage in expressive activity.

179.   Actions taken by Lt. Furr and Officer Shoffeitt—including detaining, arresting, and searching Gray—in retaliation for Gray's expressive activity damaged Gray by depriving him of his well-established constitutional right to engage in expressive activity on the public sidewalk outside of City Hall, a traditional public forum, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages, against Lt. Furr and Officer Shoffeitt.

180.   Because the retaliatory actions taken by Lt. Furr and Officer Shoffeitt were malicious, oppressive, and in reckless disregard of Gray's well-

established First Amendment rights, Gray is entitled to punitive damages against Lt. Furr and Officer Shoffeitt.

## SECOND CAUSE OF ACTION
**First Amendment Facial Overbreadth Challenge to the City of Alpharetta's Policy, Practice, or Custom Prohibiting "Panhandling"**
**(42 U.S.C. § 1983)**
**(Against the City of Alpharetta)**

181.   Plaintiff re-alleges and incorporates paragraphs 1–165 and 168–70 of this Complaint as if repeated here.

182.   It is well settled that a municipality may be subject to Section 1983 liability for the unconstitutional actions of its employees if (1) the plaintiff's constitutional rights were violated; (2) the municipality has a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

183.   The City of Alpharetta, through its police department, maintains a policy, practice, or custom prohibiting "panhandling" anywhere in Alpharetta.

184.   Alpharetta police officers have repeatedly instructed members of the public that holding a sign, "panhandling," or engaging in other forms of

solicitation on public property is prohibited in the City of Alpharetta. *See supra* ¶¶ 128–42, 152–54.

185. Alpharetta police officers have repeatedly threatened to cite or arrest individuals for panhandling in Alpharetta. *Id.*

186. These instructions are reflected in numerous reports to superior officers, for incidents between January 6, 2020, and October 25, 2022.

187. On information and belief, Alpharetta's Department of Public Safety maintains no written policy contradicting or deterring this policy, practice, or custom.

188. It is well established that asking others for charity—whether characterized as organizational solicitation or individual "panhandling"—is expression protected by the First Amendment. *City of Fort Lauderdale*, 177 F.3d at 956.

189. City of Alpharetta policymakers know or should know that maintaining a policy, practice, or custom of prohibiting any and all "panhandling" within city limits violates the well-established First Amendment right to free expression, but were supportive of or deliberately indifferent to the existence and enforcement of the anti-panhandling policy.

190.   Lt. Furr and Officer Shoffeitt acted pursuant to the City of Alpharetta's anti-panhandling policy when they acted to chill Gray's protected expressive activities.

191.   Even if Gray had engaged in "panhandling," as alleged by Councilman Merkel, Lt. Furr, and Officer Shoffeitt, the City of Alpharetta's policy, practice, or custom prohibiting "panhandling" is facially unconstitutional under the First Amendment.

192.   The City of Alpharetta's policy, practice, or custom reaches and restricts a real and substantial range of expression protected by the First Amendment.

193.   Gray has been injured by enforcement of this policy, practice, or custom.

194.   Gray challenges Alpharetta's anti-panhandling policy, practice, or custom on its face.

195.   If not for Alpharetta's policy, practice, or custom of prohibiting "panhandling," Gray would travel through Alpharetta and continue to hold the "God Bless the Homeless Vets" sign in front of Alpharetta's City Hall.

196.   The denial of constitutional rights is an irreparable injury per se. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

197.   Gray has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

198.   Without declaratory and injunctive relief from this Court, Defendants' unconstitutional policy, practice, or custom will continue to be enforced and Gray will continue to suffer irreparable harm.

199.   As a direct and proximate result of the City of Alpharetta's policy, practice, or custom of prohibiting "panhandling" in Alpharetta, Gray has suffered and continues to suffer irreparable injury, including being deprived of his constitutional right to free speech, entitling Gray to declaratory and compensatory damages, including at least nominal damages, against the City of Alpharetta, and injunctive relief enjoining the City of Alpharetta from continuing to enforce its policy, practice, or custom.

## THIRD CAUSE OF ACTION
**As-Applied First Amendment Challenge to the City of Alpharetta's Policy, Practice, or Custom Prohibiting "Panhandling"**
**(42 U.S.C. § 1983)**
**(Against the City of Alpharetta, Lt. Furr and Officer Shoffeitt in their Individual Capacities)**

200.   Plaintiff re-alleges and incorporates paragraphs 1–165, 168–70, 182–90, 193, and 195–99 of this Complaint as if repeated here.

34

201.   Although Gray never asked any person for monetary or other charitable support, his expression was interpreted by Councilman Merkel, Lt. Furr, and Officer Shoffeitt as "panhandling."

202.   Pursuant to Alpharetta's policy, practice, or custom of prohibiting "panhandling," Gray was ordered by Lt. Furr to discontinue his expressive activity, detained, handcuffed, and indefinitely banned from the area.

203.   Alpharetta's policy, practice, or custom, even if it was constitutional, could not lawfully be applied to Gray because Gray was not engaged in "panhandling." *See City of Fort Lauderdale*, 177 F.3d at 956.

204.   Gray is entitled to declaratory and injunctive relief enjoining the City of Alpharetta from enforcing its anti-panhandling policy, practice, or custom against him.

205.   In applying its policy, practice, or custom of prohibiting "panhandling" in Alpharetta, the City of Alpharetta injured Gray by depriving him of his constitutional right to engage in expressive activity in traditional public fora, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages, against all Defendants.

206.   Because the application of Alpharetta's policy, practice, or custom of prohibiting "panhandling" was applied in reckless disregard of Gray's well-established First Amendment rights, Gray is entitled to punitive damages

35

against Lt. Furr and Officer Shoffeitt.

## FOURTH CAUSE OF ACTION
**Facial First Amendment Challenge to the City of Alpharetta's Policy,
Practice, or Custom Prohibiting "Panhandling" as a
Content-Based Limitation on Speech
(42 U.S.C. § 1983)
(Against the City of Alpharetta)**

207.   Plaintiff re-alleges and incorporates paragraphs 1–165,
168–70, and 182–99 of this Complaint as if repeated here.

208.   The First Amendment generally prohibits regulations that target
speech because of the content or viewpoint expressed. *Rosenberger v. Rector
& Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

209.   A municipal government "has no power to restrict expression
because of its message, its ideas, its subject matter, or its content." *Reed v.
Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v.
Mosley*, 408 U.S. 92, 95 (1972)).

210.   Content-based restrictions on speech "are presumptively
unconstitutional and may be justified only if the government proves that they
are narrowly tailored to serve compelling state interests." *Id.*

211.   Alpharetta's policy, practice, or custom of prohibiting "panhandling" is a content-based limitation on speech because it singles out speech that solicits others for support.

212.   Alpharetta lacks a compelling government interest to prohibit "panhandling" writ large.

213.   Alpharetta's policy, practice, or custom is not narrowly tailored because it burdens substantially more speech than is necessary to further Alpharetta's legitimate interests, if any.

214.   Gray is entitled to declaratory and injunctive relief enjoining the City of Alpharetta from continuing to enforce its written policy, practice, or custom.

215.   If not for Alpharetta's policy, practice, or custom of prohibiting "panhandling," Gray would travel through Alpharetta and again hold the "God Bless the Homeless Vets" sign in front of Alpharetta's City Hall.

216.   The denial of constitutional rights is an irreparable injury per se. *Elrod*, 427 U.S. at 373.

217.   Gray has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

218.   Without declaratory and injunctive relief from this Court, Defendants' unconstitutional policy, practice, or custom will continue and Gray will continue to suffer irreparable harm.

219.   As a direct and proximate result of the City of Alpharetta's policy, practice, or custom of prohibiting "panhandling" in Alpharetta, Gray has suffered and continues to suffer irreparable injury, including being deprived of his constitutional right to free speech, entitling Gray to declaratory and compensatory damages, including at least nominal damages, against the City of Alpharetta, and injunctive relief enjoining the City of Alpharetta from continuing to enforce its policy, practice, or custom.

## FIFTH CAUSE OF ACTION
### First Amendment Challenge to Lt. Furr's Interference with Gray's Right to Anonymity and Freedom from Compelled Speech (42 U.S.C. § 1983) (Against Lt. Furr in his Individual Capacity)

220.   Plaintiff re-alleges and incorporates paragraphs 1–124, 155–65, and 167–78 of this Complaint as if repeated here.

221.   The First Amendment protects the right of speakers to engage in public expressive activity, including solicitation, without being compelled to identify themselves to government authorities. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–67 (2002).

222.   The First Amendment also protects the right to refrain from speaking, just as it protects the right to speak. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

223.   Compulsory identification of a speaker requires, at a minimum, sufficient cause. *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 200 (1999).

224.   Gray was unlikely to be recognized by any person in Alpharetta.

225.   On information and belief, Gray's identity was not known to Lt. Furr before Lt. Furr confronted Gray.

226.   Lt. Furr knew that Gray did not want to identify himself to law enforcement.

227.   Lt. Furr lacked sufficient cause to compel Gray to identify himself to law enforcement.

228.   Alpharetta Chief of Public Safety John Robison asserted to city leadership that Lt. Furr "put [Gray] in cuffs because he was playing games about [being] identified."

229.   Lt. Furr attempted to compel Gray to verbally identify himself to law enforcement.

230.   When Gray refused, Lt. Furr handcuffed and searched Gray without his consent in order to obtain his identification.

39

231.   Lt. Furr then recorded information about Gray's identity in records, including but not limited to a written trespass warning that would subject Gray to arrest if he returned to the sidewalk in front of City Hall.

232.   By forcibly compelling Gray to identify himself, Lt. Furr injured Gray by violating his well-established First Amendment right to engage in anonymous expression, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages, against Lt. Furr.

233.   Because Lt. Furr's conduct in forcibly compelling Gray to identify himself was malicious, oppressive, and in reckless disregard of Gray's well-established First Amendment rights, Gray is entitled to punitive damages against Lt. Furr.

## SIXTH CAUSE OF ACTION
### First Amendment Challenge to Lt. Furr's Interference with Gray's Right to Film Police
### (42 U.S.C. § 1983)
### (Against Lt. Furr in his Individual Capacity)

234.   Plaintiff re-alleges and incorporates paragraphs 1–122, 125–65, 167–78, and 183–88 of this Complaint as if repeated here.

235.   Gray has a well-established First Amendment right to film police officers carrying out their official duties in public, including his own

40

interactions with law enforcement, without police interference. *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

236.   After placing Gray in handcuffs, Lt. Furr switched off Gray's camera.

237.   Lt. Furr knew that terminating the video recording was against Gray's wishes.

238.   Lt. Furr's termination of Gray's filming did not serve any law enforcement or public safety purpose.

239.   Lt. Furr's stated intent (to preserve "your battery") was a pretext to prevent Gray from further recording the interaction.

240.   During a subsequent disciplinary investigation, Lt. Furr admitted that he turned off Gray's camera because Gray "frustrated" him, despite knowing he should have let the camera continue to record.

241.   Lt. Furr's termination of Gray's filming was intended to prevent Gray from continuing to film the interaction.

242.   Lt. Furr's termination of Gray's filming was a result of Lt. Furr's animus for Gray's expression, including the documenting of Lt. Furr's treatment of Gray and Gray's verbal challenges to Lt. Furr's authority.

243.   Lt. Furr's interference burdened Gray's right to film his interaction with law enforcement.

244.   In turning the camera lens away and then turning the camera off to avoid being filmed, Lt. Furr injured Gray by depriving him of his well-established constitutional right to film police officers carrying out their official duties in public, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages, against Lt. Furr.

245.   Because Lt. Furr's interference with Gray's right to film was malicious, oppressive, and in reckless disregard of Gray's well-established First Amendment rights, Gray is entitled to punitive damages against Lt. Furr.

## SEVENTH CAUSE OF ACTION
### First Amendment Challenge to Prior Restraint of Gray's Protected Speech
### (42 U.S.C. § 1983)
### (Against the City of Alpharetta
### and Lt. Furr in his Individual Capacity)

246.   Plaintiff re-alleges and incorporates paragraphs 1–165, 167–78, 183–88, and 190 of this Complaint as if repeated here.

247.   The City of Alpharetta has implemented a system of prior restraints by issuing verbal and written trespass warnings denying access to public spaces traditionally used for expressive activity. *See, e.g.*, *Catron v.*

*City of Saint Petersburg*, 658 F.3d 1260, 1267–69 (11th Cir. 2011) (applying prior restraint doctrine to trespass warnings).

248.   On information and belief, the City of Alpharetta delegates to its police officers, including Lt. Furr, the authority to issue trespass warnings, notices, or directives to members of the public barring them from city property or public spaces.

249.   Once an individual receives a trespass notice, reappearing in the noticed location can result in criminal citation or arrest. O.C.G.A. § 16-7-21(b)(2).

250.   Prior restraints are permissible, if at all, only where they are issued pursuant to "narrow, objective, and definite standards[.]" *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–151 (1969).

251.   The City of Alpharetta's system of issuing trespass notices is not subject to narrow, objective, and definite standards.

252.   A prior restraint is permissible, if at all, only where the government bears "the burden of going to court" to justify its prior restraint. *United States v. Frandsen*, 212 F.3d 1231, 1238 (11th Cir. 2000).

253.   A prior restraint is permissible, if at all, only where the "restraint prior to a judicial determination" is only "for a specified brief time period in order to preserve the status quo[.]" *Id*.

254.   A system of prior restraint is permissible, if at all, only where it provides "an avenue for prompt judicial review of" an official's decision. *Id.*

255.   Lt. Furr issued a verbal trespass warning to Gray, indefinitely prohibiting Gray from continuing to engage in expressive activity in front of Alpharetta City Hall.

256.   The trespass warning was an exercise of the authority delegated to Lt. Furr by the City of Alpharetta and/or enforcement of the City of Alpharetta's custom, policy, or practice of prohibiting "panhandling" in public.

257.   Lt. Furr memorialized the trespass warning in a written "CRIMINAL TRESPASS WARNING," but did not deliver this document to Gray.

258.   Lt. Furr did not inform Gray of any expiration date to the verbal trespass warning.

259.   When Gray indicated that he wanted to continue to engage in expressive conduct in front of City Hall, Lt. Furr told him he could not do so and that he needed to leave.

260.   The City of Alpharetta's system of issuing trespass notices did not require Lt. Furr to submit his determination to any court.

261.   Lt. Furr did not inform Gray of any process by which he could challenge the trespass warning.

262.   The City of Alpharetta's system of issuing trespass notices did not provide an avenue for prompt judicial review of the decision by Lt. Furr to bar Gray from a public space.

263.   The verbal trespass warning to Gray did not serve a legitimate governmental interest.

264.   The City of Alpharetta's system of issuing trespass warnings for public spaces has no procedural safeguards, such as the ability to contest or appeal their issuance.

265.   Even after the City of Alpharetta's police determined that Lt. Furr had violated Gray's rights, it took no action to rescind the trespass warnings, exhibiting deliberate indifference to the continuing limitation on Gray's right to access a traditional public forum to engage in protected speech.

266.   In implementing, and applying to Gray, a system of prior restraints in the form of verbal and written trespass warnings without a meaningful opportunity to be heard, the City of Alpharetta and Lt. Furr injured Gray by depriving him of his First Amendment right to free speech,

entitling Gray to declaratory and compensatory damages, including at least nominal damages.

267.   Because Lt. Furr's imposition of a prior restraint without due process of law was malicious, oppressive, and in reckless disregard of Gray's well-established First and Fourteenth Amendment rights, Gray is entitled to punitive damages against Lt. Furr.

## EIGHTH CAUSE OF ACTION
### Violation of Fourteenth Amendment—Procedural Due Process
### (42 U.S.C. § 1983)
### (Against the City of Alpharetta
### and Lt. Furr in his Individual Capacity)

268.   Plaintiff re-alleges and incorporates paragraphs 1–165, 167–78, 183–90, and 247–267 of this Complaint as if repeated here.

269.   The trespass warnings deprived Gray of his fundamental liberty interest in engaging in expressive activity in a traditional public forum and accessing Alpharetta property open to the public. *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266–67 (11th Cir. 2011) (citing *City of Chicago v. Morales*, 527 U.S. 41 (1999) (plurality opinion)).

270.   The right to procedural due process requires an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v.*

*Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

271.   The trespass warning was issued without pre-deprivation opportunity to be heard.

272.   On information and belief, there is no established procedure to be heard concerning a trespass warning issued by the Alpharetta Department of Public Safety.

273.   The risk of an erroneous deprivation of Gray's interests is substantial because Alpharetta police officers may issue warnings without any procedure to challenge or rescind the warning. *Catron*, 658 F.3d at 1267.

274.   The fiscal and administrative burdens attendant with a procedure to challenge or rescind the warning are minimal.

275.   The fiscal and administrative burdens attendant with a prior restraint, including the availability of prompt judicial review and the government's burden to initiate judicial review, are mandated by the First Amendment. *Frandsen*, 212 F.3d at 1238.

276.   Gray's fundamental and procedural due process rights have been injured by being verbally and formally forbidden, by Lt. Furr, from the public sidewalk in front of Alpharetta City Hall.

277.   In implementing, and applying to Gray, a system of prior restraints in the form of verbal and written trespass warnings without a meaningful opportunity to be heard, the City of Alpharetta and Lt. Furr damaged Gray by depriving him of his Fourteenth Amendment right to due process, entitling Gray to declaratory and compensatory damages, including at least nominal damages.

## NINTH CAUSE OF ACTION
### Violation of Gray's Fourth Amendment Rights— Unlawful Seizure and False Arrest (42 U.S.C. § 1983)
### (Against Lt. Furr and Officer Shoffeitt in their Individual Capacities)

278.   Plaintiff re-alleges and incorporates paragraphs 1–165 and 167–75 of this Complaint as if repeated here.

279.   Gray had a right under the Fourth Amendment, as incorporated against the State of Georgia and its municipalities by the Fourteenth Amendment, to be free from unreasonable seizure by Lt. Furr and Officer Shoffeitt. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Alston v. Swarbrick*, 954 F.3d 1312, 1318–19 (11th Cir. 2020).

280.   Lt. Furr seized Gray by demanding that he "come here," demanding that Gray provide identification, ordering Gray to place his hands behind his back, and handcuffing Gray.

48

281.   Lt. Furr's detention of Gray was unreasonable.

282.   A seizure must be "justified at its inception." *Terry*, 392 U.S. at 21. An investigative stop is permissible only where an officer has "an objectively reasonable suspicion" that an individual "had engaged, or was about to engage, in a crime." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004).

283.   A "reasonable officer in the same circumstances and possessing the same knowledge" as Lt. Furr could not have reasonably believed that he or she had reasonable suspicion to detain Gray. *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (quoting *Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994)).

284.   Lt. Furr's detention of Gray was therefore without arguable reasonable suspicion.

285.   Lt. Furr arrested Gray, placing him in handcuffs without an articulable and objectively reasonable belief that Gray was potentially dangerous or had committed a crime.

286.   Officer Shoffeitt ratified and effectuated Gray's arrest.

287.   Reasonable officers in the same circumstances and possessing the same knowledge as Lt. Furr and Officer Shoffeitt could not have believed that

probable cause existed to arrest Gray. *Swint v. City of Wadley*, 51 F.3d 988, 996 (11th Cir. 1995); *Alston*, 954 F.3d at 1319.

288.   Lt. Furr and Officer Shoffeitt's arrest of Gray was therefore without arguable probable cause.

289.   In detaining and arresting Gray without adequate cause, Lt. Furr and Officer Shoffeitt damaged Gray by depriving him of his well-established Fourth Amendment right to be free of unreasonable seizure, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages.

290.   Because Lt. Furr and Officer Shoffeitt's seizure of Gray was malicious, oppressive, and in reckless disregard of Gray's well-established Fourth Amendment rights, Gray is entitled to punitive damages against Lt. Furr and Officer Shoffeitt.

**TENTH CAUSE OF ACTION**
**Violation of Gray's Fourth Amendment Rights—**
**Unlawful Search**
**(42 U.S.C. § 1983)**
**(Against Lt. Furr in his Individual Capacity)**

291.   Plaintiff re-alleges and incorporates paragraphs 1–165 and 167–75, and 279–88 of this Complaint as if repeated here.

292.   Gray had a right under the Fourth Amendment, as incorporated against the State of Georgia and its municipalities by the Fourteenth Amendment, to be free from unlawful search by Lt. Furr. *Bourgeois v. Peters*, 387 F.3d 1303, 1312, 1315–17 (11th Cir. 2004).

293.   There was no legal justification for Lt. Furr to reach into Gray's pocket.

294.   Lt. Furr conducted a warrantless search of Gray's pocket.

295.   Lt. Furr's search of Gray's pocket was unreasonable.

296.   If Lt. Furr searched Gray's pocket during a *Terry* stop, Lt. Furr's search was not reasonably limited in scope to "the protection of the officer by disarming a potentially dangerous man." *Sibron v. New York*, 392 U.S. 40, 65–66 (1968).

297.   If Lt. Furr searched Gray's pocket as a search incident to arrest, it was unreasonable because Gray's arrest was without probable cause.

298.   In searching Gray's person without adequate cause or a search warrant, Lt. Furr damaged Gray by violating his well-established Fourth Amendment right against unreasonable search, entitling Gray to declaratory relief and compensatory damages, including at least nominal damages, against Lt. Furr.

299.    Because Lt. Furr's conduct in searching Gray's person was malicious, oppressive, and in reckless disregard of Gray's well-established Fourth Amendment right, Gray is entitled to punitive damages against Lt. Furr.

## PRAYER FOR RELIEF

WHEREFORE, Gray respectfully requests that this Court enter judgment against Defendants and issue the following forms of relief:

A.    Declare that Gray's expressive activity was protected by the First Amendment;

B.    Declare that the City of Alpharetta's policy, practice, or custom of prohibiting all "panhandling" in the City of Alpharetta violates the First Amendment;

C.    Declare that Lt. Furr violated Gray's rights to speak, to do so anonymously, and to refrain from speaking;

D.    Declare that Lt. Furr violated Gray's First Amendment right to film their interaction in its entirety;

E.    Declare that the City of Alpharetta's practice, effectuated by Lt. Furr's verbal and written criminal trespass warnings, constitutes an unlawful system of prior restraints;

F.     Declare that Lt. Furr's verbal and written criminal trespass warnings issued to Gray violated Gray's fundamental and procedural due process rights;

G.     Declare that Lt. Furr and Officer Shoffeitt violated Gray's Fourth Amendment right to be free from unreasonable seizure;

H.     Declare that Lt. Furr violated Gray's Fourth Amendment right to be free from unreasonable search;

I.     Issue an injunction prohibiting the City of Alpharetta from enforcing its policy, practice, or custom of prohibiting all "panhandling" in the City of Alpharetta;

J.     Award nominal, compensatory, and other damages to Gray in an amount determined by the enlightened conscience of fair and impartial jurors;

K.     Award punitive damages against Lt. Furr and Officer Shoffeitt;

L.     Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

M.     Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

DATED:      January 31, 2023

Respectfully submitted,

/S/ *Adam Steinbaugh*
ADAM STEINBAUGH*
PA Bar No. 326475; CA No. 304829
JAMES M. DIAZ*
VT Bar No. 5014
HARRISON M. ROSENTHAL*
PA Bar No. 332452; KS Bar No. 28894;
MO No. 72990
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:  (267) 573-3073
adam@thefire.org
jay.diaz@thefire.org
harrison.rosenthal@thefire.org

*Counsel for Plaintiff Jeffrey Gray*

**Pro Hac Vice* motions forthcoming

/S/ *Andrew S. Fleischman*
ANDREW S. FLEISCHMAN
Georgia Bar No. 949071
SESSIONS & FLEISCHMAN LLC
3155 Roswell Road, Ste. 220
Atlanta, GA 30305
Tel:   (470) 524-6379
Fax:  (470) 745-0734
andrew@thesessionslawfirm.com