**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| AMY LOUISE MATZ, an individual, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) ) | Case No. _____ |
| 3M COMPANY, | ) ) ) | |
| *Defendant.* | ) ) ) | **[JURY TRIAL DEMANDED]** |

**COMPLAINT**

1.      Plaintiff Amy Louise Matz seeks relief from Defendant 3M Company's pattern of discriminatory and illegal behavior against employees who hold sincere religious and medical objections to 3M's COVID-19 vaccination mandate policy.

2.      In October 2021, Defendant imposed an unnecessary, draconian vaccine mandate for all employees that addresses a very remote risk: asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

3.      Defendant refused to accept and accommodate Plaintiff's sincere objections to the vaccine.

4.     Defendant's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of her body by receiving the experimental and harmful mRNA COVID-19 vaccine, at the expense of her religious beliefs, bodily autonomy, medical privacy, and possibly health – or losing her livelihood.

5.     This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Georgia civil rights law.

6.     Defendant's actions violated federal and Georgia law by mandating an experimental medical treatment, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.     Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Georgia against precisely such Catch-22 "choices."

## **PARTIES**

8.     Plaintiff Amy Louise Matz ("Matz" or "Plaintiff") is a resident of Powder Springs, Georgia. She was employed at 3M Company as a Senior Implementation Consultant on a 3M Enterprise Implementation Team ("EIT").

9.     She was subjected to discriminatory treatment and terminated because of 3M's COVID-19 vaccine mandate.

10.      3M Company ("3M" or "Defendant") is a technology company that manufactures health, safety, industrial and consumer products. As of 2021, 3M employed nearly 100,000 employees worldwide. 3M is headquartered in Saint Paul, Minnesota. 3M may be served by serving its registered agent for service of process Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092 or in any other manner provided by law.  Defendant has significant contacts and operations and offices in the Northern District of Georgia

## JURISDICTION AND VENUE

11.      This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq. and Title III of the Americans with Disabilities Act under 42 U.S.C. §§ 12181, et seq.

12.      This Court has supplemental jurisdiction over the state claims raised in this matter pursuant to 28 United States Code ("U.S.C.") Section 1367. Plaintiff seeks remedies under the Georgia Fair Employment Practices Act of 1978, GA Code § 45-19-20 et seq.

13.      Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

14.     An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**3M's Discriminatory Treatment of Plaintiff**

15.     In September 2021, 3M mandated that Plaintiff become fully vaccinated for COVID-19 by December 8, 2021. All salaried employees were subject to the same requirement.

16.     Plaintiff was told that she would be terminated if she did not become fully vaccinated.

17.     3M provided an online questionnaire that allowed employees to request religious and medical accommodations and exemptions from the mandate. A third party, Sedgwick, was assisting 3M with the exemption process.

18.     Plaintiff submitted her first religious accommodation request on May 11, 2022, and responded on May 19, 2022, to a follow-up questionnaire from 3M.

19.      In her first request, Plaintiff explained that through the Holy Spirit, God had counseled her to keep her body pure and not partake of the Covid vaccine.

20.         "God created my body and my body belongs to God. My body is a temple of the Holy Spirit and should not be used for unwanted intrusions, such as vaccines," Plaintiff wrote to 3M in her answers to the follow-up questionnaire.

21.         "I, as a believer in Jesus Christ as my Lord and Savior, believe in the tenets of the Holy Bible which state I was made in the image of God and I am an image-bearer of God. I will be called into account for all I do – including what I do to my own body! To be forced to do something which violates my beliefs is to sin against God."

22.         During the May 25, 2022, phone call at which she was terminated by a 3M human relations employee, Plaintiff informed him that she had just learned from her aunt that there is a genetic mutation, Factor V Leiden, that runs in Plaintiff's family that makes people with the mutation prone to get blood clots.

23.         Blood clots are a known concern with COVID-19 vaccination. For example, in May, 2002, the Food and Drug Administration ("FDA") put new restrictions on who could get the Johnson & Johnson vaccine, based on a fresh review of data on the life-threatening blood clots that had been associated with the vaccine.

24.         Additionally, Plaintiff overcame what she believes was a COVID-19 infection in January 2021, and therefore, likely has natural immunity.

25.        Also, 3M had required Plaintiff to work remotely from January 4,

2021, when she was hired by 3M.

26.        So, Plaintiff worked remotely during her entire tenure at 3M, and her

refusal to take the Covid vaccine did not create a hardship for the company.

27.        Plaintiff had been employed at the job since January 4, 2021.

28.        Plaintiff was officially terminated on May 25, 2022 for not complying

with 3M's vaccine mandate.

29.        Plaintiff was an exemplary and valuable 3M employee.

30.        Her base pay was approximately $103,000, annually, with a bonus of

about $7,000 if she met her goals, bringing her annual salary to roughly $110,000.

31.        Being fired caused significant damage to Plaintiff.

32.        She had to postpone her planned October, 2022, wedding due to lack

of income.

33.        She had heated discussions over finances with her fiancé. His income

was limited, but he was able to work overtime to help pay for Plaintiff's food, gas

for her car and bills.

34.        Plaintiff also had to lean financially on her father, mother, brother and

son for such essential expenses as gasoline, food, cell phone bills and a trip to a

dear friend's memorial service.

35.        Plaintiff filed a discrimination complaint on September 2, 2022 with the U.S. Equal Employment Opportunity Commission ("EEOC").

36.        Plaintiff received a Notice of Right to Sue from the EEOC on November 3, 2022. *See* Exhibit A. This Complaint has followed.

**COVID Vaccines Violate Plaintiffs' Religious Beliefs**

37.        Plaintiff holds sincere religious concerns surrounding the process used to manufacture the vaccines.

38.        Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).



In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

39.        For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.

40.        In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were

actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."

41.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus in 1985."

42.     As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase. All HEK 293 cells are descended from tissue taken in 1973 from either an abortion or miscarriage that took place in the Netherlands.

43.     While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

44.     Plaintiffs believe any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

**Defendant Cannot Show that Allowing Unvaccinated Employees to Stay Would Cause an Undue Hardship**

45.     Defendant denied Plaintiff's religious exemption on the grounds that granting it would impose an undue hardship on Defendant.

46.        The only grounds for claiming undue hardship would be the claim that unvaccinated employees would pose a risk to their coworkers.

47.        Where (1) the COVID-19 vaccine is not effective at reducing infection; (2) the COVID-19 vaccine is not effective at preventing transmission, (3) natural immunity to SARS-CoV-2 is preferential to vaccine-induced immunity, and (4) the vaccine poses abundant health risk, Plaintiff not only poses no risk to fellow 3M employees but are themselves put at risk from Defendant's mandate.

### *The COVID-19 Vaccine Does Not Prevent Infection or Transmission*

48.        The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

49.        A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."

50.        Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.

51.     Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity. Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

52.     A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv. At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff. The staff all recovered quickly, but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of COVID-19.

53.     A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.

54.     It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

### *Natural Immunity is Durable, Lasting, and Superior to Vaccination*

55.     Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

56.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered. However, Defendant wholesale disregards the relevance of natural immunity entirely.

57.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.

58.     Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19. More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to ***13 times more likely to contract the***

***virus than those who were previously infected with the virus*** and that "natural immunity confers longer lasting and stronger protection against infection."

59.          Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of ***zero***, despite some of the studied individuals having been around COVID-positive patients more than the regular population. Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.

60.          The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).

61.          Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

62.          Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

63.　　　　Forcing Plaintiffs, who may have had natural immunity, to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

64.　　　　All three of the available COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

65.　　　　Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

66.　　　　There has never been a successful coronavirus vaccine in history.

67.　　　　Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which Covid vaccines can any longer claim credit for.

68.      Recent reporting data presents an alarming picture: as of the time of this filing, there have been 31,446 deaths reported to VAERS from COVID-19 vaccines and 1,591,545 total adverse events.

69.      The input of event reports to VAERS since the COVID vaccines were rolled out is ***far greater than all cumulative adverse event reports to VAERS for the prior 30 years***: an alarming statistic.

70.      This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so. The CDC has failed to account for this underreporting.

71.      Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.

72.      COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

73.      Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in

young males. Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

74.      Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier. It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

75.      We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries. Since there exists no way to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person. Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

76.      The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims.

Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes him to a variety of health risks ranging from headaches and blood clots to death.

77.        The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

78.        Given these proven facts, which were accessible at the time that 3M implemented its vaccine mandate, Defendant knew or should have known that allowing Plaintiff to continue at her positions would not pose a risk or undue burden to 3M.

**Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

79.        The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc*., No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis. 2018)

[resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

80.        Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

81.        Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

82.        In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

83.        The *Saint Thomas Health* case resulted in a consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The

decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

84.          Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." BST Holdings v. OSHA, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

85.          What is more, on November 21, 2021, the Honorable District Judge William LaFortune of the Tulsa County District Court granted the State of Oklahoma's application for a temporary restraining order against Ascension Healthcare, after the hospital rode roughshod over the religious rights of its employees by imposing a draconian vaccine mandate similar to 3M's. *O'Connor v. Ascension Healthcare*, Case. No. CJ-2021-3251 (Tulsa Cnty. Dist. Ct. 2021) (docket publicly accessible on OSCN.net); *See also O'Connor v. Ascension Healthcare*, Case No. 21-CV-488-TCK-SH (N.D. Okla. 2021) (the Honorable

Judge Kern remanding the case to Tulsa County District Court for further proceedings).

**3M's Mandate Continues the Inglorious History of Medical Experiments**

86.     Born amidst malaria and smallpox pandemics, the Constitution authorized no emergency exception to the liberties secured under it.

87.     The Founding Fathers understood the virus of concentrated power posed more of a threat than any biological virus could.

88.     The Ninth Amendment to the Constitution safeguarded all ancient rights and liberties, including the ancient tort of battery. United States Constitution, Amendment IX.

89.     The right against battery assured "the right of every individual to the possession and control of her own person, free from all restraint or interference of others," which would be "sacred" and protected under the law. *Union Pacific R. Co. Botsford*, 141 U.S. 250, 251 (1891).

90.     The famed Justice Benjamin Cardozo defined the doctrine as the universal right of every person "to determine what shall be done with her own body." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914).

91.     This right to informed consent incorporates necessarily the right to refuse treatment: "The forcible injection of medication into a nonconsenting

person's body represents a substantial interference with that person's liberty."
*Washington v. Harper*, 494 U.S. 210, 229 (1990).

92.        The Nuremberg Code enshrines the right of informed consent as a
matter of universal law, so widely recognized, courts consider it a jus cogens legal
principle enforceable everywhere. *Abdullah v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir.
2009).

93.        Based on these precepts, courts require clear and convincing evidence
that a person poses an imminent, severe risk to others before those individuals may
be subject to forced medical care. *O'Conner v. Donaldson*, 422 U.S. 563 (1975);
*Addington v. Texas*, 441 U.S. 418 (1978).

### *Eugenics Era*

94.        We only deviated from this Informed Consent standard of medical
care during the Eugenics Era, a diseased doctrine birthed in the medical academies
of the United States at the turn of the last century, as a deformed outgrowth of the
then in-vogue school of Social Darwinism.

95.        A trio of decisions carved out emergency exceptions to Constitutional
liberties, including authorizing a fine for not taking a vaccine (*Jacobson v.
Massachusetts*, 197 U.S. 11 (1905)), forced sterilizations of poor and politically
unprotected populations (*Buck v. Bell,* 274 U.S. 200 (1927), which relied

exclusively on expanding Jacobson), and culminated in the kind of "emergency exception" logic that led a court to authorize forced detention camps. *Korematsu v. United States*, 323 U.S. 214 (1944).

96.        This trilogy of infamy sees its corpses rise again as "precedents" seemingly permitting governments to reinstate Eugenics-Era logic across the legal landscape. Indeed, recent governmental defendants cited the forced sterilization decision in Buck as the basis for forced vaccine mandates of teenagers. *Buck v. Bell*, 274 U.S. 200 (1927).

### *Nuremberg Code Era*

97.        Reeling from the moral horror of the Nazi regime, and its enthusiastic embrace of eugenics, American jurists led the way in reestablishing the Constitutional order by invalidating the eugenics-era precedents and by instituting the Nuremberg Code of 1947, whose governing principles of Informed Consent for all matters of medicine form a jus cogens principle of universal, internationally recognized law, enforceable amongst all civilized nations, as federal courts established.

98.        The right to bodily autonomy formed the foundation for Supreme Court recognition of the right to privacy and guided the standards governing all matters of medical care concerning the state. Only clear and convincing evidence

of an imminent danger to others justifies forced medical care. *Washington v. Harper*, 494 U.S. 210, 229 (1990); *Addington v. Texas*, 441 U.S. 418 (1978).

99.        Only business necessity warrants a place of public accommodation or employer to discriminate against someone based on her perceived medical status. 42 U.S.C. § 12101.

100.        The Nuremberg Code-derived governance of medical authority reversed the eugenics-era precedents, empowered individuals with a meaningful participatory role, and empowered democratic oversight, judicial supervision, and procedural safeguards on the medical regulatory process, enshrining informed consent as the ethical foundation of modern medicine and a fundamental human liberty so universal that courts acknowledge it as a peremptory norm.

### *Rushed Drugs & Medical Experiments*

101.        The concern over uninformed, nonconsensual and pharmacological failures haunt the history of rushed drugs, biologics and negligent courts.

102.        From Tuskegee to the military, from the foster homes of young women to the Indian health care services on reservations, from facilities for the mentally ill to jails for women, the least powerful and most trusting have been victimized by government medical experimentation, without recourse or remedy.

103.     Deceptive denial of syphilis treatment, forced sterilizations, testing of radioactive ingredients on unwitting patients, psychological experimentation on unsuspecting students (like the MK-Ultra type testing on Ted Kaczynski at Harvard), the LSD testing on government employees, the chemical testing over San Francisco or in New York City subways, the mustard gas secret tests on drafted soldiers – history has taught us that government must be reined in lest it treat its citizenry as rats in a cage or guinea pigs for experimentation.

104.     In 1955, regulators rushed approval of a polio vaccine that caused an outbreak of polio in hundreds of children, known as the Cutter Incident. Later scholars attributed the blame to the federal government's failures in rushing the product to market. In 1959, the Belgian Congo rushed another polio vaccine.

105.     Twenty-five years later, a new virus emerged in the population: AIDS. Detailed journalistic investigations have attributed it to the use of contaminated monkey kidneys in the development of polio vaccines. In 1963, Americans discovered that the polio vaccine from monkey kidneys contained the Simian Virus 40 that could cause cancer in humans. In 1976, the Ford administration rushed a vaccine for swine flu.

106.     The virus proved less deadly than anticipated, but the vaccine proved far more dangerous, causing thousands of Americans to develop a serious neurological disorder known as Guillain-Barre Syndrome, causing paralysis.

107.        As the "60 Minutes" report from the time identified, the FDA was

again the source of failure because of the rushed, pressured political environment

of the time. Most recently, in 2018, the World Health Organization rushed

approval of a vaccine against Dengue Fever, despite warnings from dissident

doctors, which left hundreds of children dead and thousands more injured.

108.        Defendant, in implementing its vaccine mandate and coercing

employees to take this rushed and potentially dangerous vaccine, is continuing this

sordid history.

## FIRST CAUSE OF ACTION
### Religious Discrimination
### [Violation of Title VII of the Civil Rights Act of 1964;
### 42 U.S.C. § 2000e et seq.]

109.        Plaintiff hereby incorporates by reference the allegations contained in

the preceding paragraphs as if fully set forth herein.

110.        Title VII prohibits "discriminat[ion] against any individual with

respect to their compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc*., 575

U.S. 768 (2015).

111.     Title VII imposes upon an employer the duty to make reasonable

accommodations for the religious observances short of incurring an undue

hardship.

112.     Once an employee has established a prima facie case of

discrimination, the burden shifts to the defendant to show that it could not

reasonably accommodate the employee without undue hardship. *Maroko v. Werner*

*Enterprises, Inc.*, 778 F. Supp. 2d 993 (D. Minn. 2011).

113.     Plaintiff asserted bona fide religious beliefs that conflicted with 3M's

mandatory vaccine policy and notified 3M of those beliefs by filing an exemption

and accommodation request per 3M's policies.

114.     Defendant 3M utterly failed to offer any reasonable accommodation,

failed to engage in the interactive process with Plaintiff, failed to perform an

individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's

religious exemption.

115.     Defendant took adverse employment action against Plaintiff by

terminating employment.

116.     By denying reasonable accommodation and executing punitive

measures against Plaintiff, Defendant discriminated against Plaintiff due to her

religious beliefs.

117.      Defendant's failure to provide religious accommodations has substantially injured Plaintiff. For example, Plaintiff lost income for more than four months until she found another job. Being fired because of her religious beliefs – and having the threat of termination hang over her for months – was stressful and depressing for the Plaintiff.

118.      On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

119.      Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiffs' religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several additional reasons.

120.      First, upon receiving Plaintiff's request for a religious accommodation, Defendant did not give that request the individualized consideration demanded by Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue. In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . .

because of a sincerely held religious belief." *Id*. at K.12. The EEOC's response

was as follows:

> Once an employer is on notice that an employee's
> sincerely held religious belief, practice, or observance prevents
> the employee from getting the COVID-19 vaccine, the employer
> must provide a reasonable accommodation unless it would pose
> an undue hardship . . . . Under Title VII, an employer should
> thoroughly consider all possible reasonable accommodations . . . .
> In many circumstances, it may be possible to accommodate those
> seeking reasonable accommodations for their religious beliefs,
> practices, or observances.

*Id*. (emphasis added). Elsewhere in that document, the EEOC identified

the types of reasonable accommodations employers must consider when

they receive requests for religious accommodations, including "masks,"

"testing," "telework," "social distancing protocols," "making changes in

the work environment (such as [modification] to ventilation systems or

limiting contact with other employees and non-employees," and "regular

hand washing." *Id*. at K.5.

121.     Here, Defendant failed to "thoroughly consider all possible

reasonable accommodations," as required by the EEOC and provided a far cry

from the "individualized" assessment required by the EEOC. *Id*. at K.5.

122.     Second, Defendant cannot show that affording Plaintiff the types of

accommodations the EEOC identified in the COVID-19 Technical Assistance as

being reasonable in the context of employer vaccination policies—i.e., "masks,"

"testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

123.    Third, because of policies implemented by 3M due to COVID-19, Plaintiff Matz had been primarily working remotely. Plaintiff Matz therefore posed little to no threat of either catching or transmitting COVID-19 to or from fellow employees.

124.    Defendant cannot show that allowing Plaintiff to continue in her position as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

125.    Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

126.    As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against them on the basis of her religious beliefs and failing to provide reasonable accommodation.


## SECOND CAUSE OF ACTION
### Disability Discrimination
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]**

127.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128.      The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

129.     Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "*being regarded as having such an impairment* []." (*Id.,* at subparagraph (C)) (emphasis added).

130.     Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

131.       "An employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of persuasion falls on the employer.

132.       An employer has a duty under the ADA to engage in an "interactive process" with the employee to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

133.       Defendant failed to engage in an interactive process with Plaintiff and to conduct an individualized assessment of her unique circumstances.

134.       3M discriminated against Plaintiff based on a perceived disability: being unvaccinated.

135.       Defendant regarded unvaccinated individuals as being "disabled" and unable to perform the duties of their employment.

136.       Based on this perceived disability, Defendant discriminated against Plaintiff by threatening termination if she failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under 3M's policy.

137.       Plaintiff was constructively terminated due to her COVID-19 vaccination status, despite the fact that Plaintiff had been successfully performing

her job for months with no apparent danger to fellow employees or 3M's operation.

138.	By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment (PPE), and complying with other various safety protocols until the number of COVID infections reduced to acceptable levels.

139.	Defendant cannot show that offering alternative, less-intrusive accommodations would cause an undue hardship, for the same reasons outlined in the context of Defendant's religious discrimination.

140.	Defendant's failure to provide accommodations has harmed and continues to harm Plaintiff.

141.	By failing to engage in the interactive process, offer any reasonable accommodation, and constructively terminating Plaintiff based on her medical decision, Defendant's discriminatory actions were in violation of the ADA.

### THIRD CAUSE OF ACTION
**Religious Discrimination**
**[Violation of the Georgia Fair Employment Practices Act of 1978;**
**GA Code § 45-19-20 et seq.]**

142.	Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

143.        The Georgia Human Relations Act declares that it is an unlawful practice for an employer "[t]o fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, *religion*, national origin, sex, disability, or age…" GA Code § 45-19-29(1) (emphasis added).

144.        "Religion" means all aspects of religious observance and practice as well as belief. GA Code § 45-19-22(7).

145.        Defendant is an "employer" as defined in GA Code § 45-19-22(5).

146.        Defendant has a duty to reasonably accommodate Plaintiff's religious observance or practice, absent an undue hardship on the conduct of Defendant's operation. GA Code § 45-19-22(4).

147.        Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

148.        Plaintiff offered numerous alternative accommodations such as regular testing, at her own expense, and the wearing of personal protective equipment, that would not infringe on her sincerely held religious beliefs but aimed to address 3M's concerns.

149.        Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

150.        Defendant took adverse employment action against Plaintiff by terminating employment and forcing Plaintiff to retire early.

151.        By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiffs due to their religious beliefs.

152.        Defendant's failure to provide religious accommodations has substantially injured Plaintiff.

153.        Defendant cannot show that allowing Plaintiff to continue in their positions as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

154.        Evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

155.        As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against him on the basis of her religious beliefs and failing to provide reasonable accommodation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

a.        A finding that Plaintiff has a fundamental right to her bodily autonomy, and to make health decisions in accordance with her beliefs and conscience.

b.        A finding that Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Georgia Fair Employment Practices Act of 1978;

c.        Order that Defendant reinstate Plaintiff to her original position;

d.        Enjoin Defendant from taking any further adverse employment action against Plaintiff;

e.        Enjoin Defendant from taking any similar discriminatory adverse employment action against any other 3M employee;

f.        An order that Plaintiff be compensated, to the extent allowable under Georgia state and Federal law, for her monetary damages;

g.        An order that Defendant pays Plaintiff's costs associated with bringing this lawsuit, including her reasonable attorneys' fees and costs; and

h.      A grant of any such further relief as the Court deems necessary and proper in

the public interest.

Respectfully submitted, this 1ˢᵗ day of February, 2023.

LAW OFFICE OF JASON H. COFFMAN

*/s/ Jason H. Coffman*
Jason H. Coffman
Florida Bar No. 23974

Attorney for Plaintiff *Amy Louise Matz*

3280 Peachtree Road, NE, Ste 700
Atlanta, GA 30305
(404) 581-3834
e-mail: jcoffman@jcoffmanlaw.com

**Appearing Specially Subject To *Pro Hac
Vice* Admission:**

Robert E. Barnes, Esq.
*Subject to admission pro hac vice*
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com

Counsel for Plaintiff *Amy Louise Matz*

# EXHIBIT A

EEOC Form 161-B (01/2022)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Ms. Amy L. Matz**<br>**5105 Glendora Drive**<br>**POWDER SPRINGS, GA 30127** | From: | **Baltimore Field Office**<br>**31 Hopkins Plaza, Suite 1432**<br>**Baltimore, MD 21201** |
|---|---|---|---|

| EEOC Charge No.<br>**410-2022-08809** | EEOC Representative<br>**Legal Unit** | Telephone No.<br>**(256) 589-0707** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Less than 180 days have elapsed since the filing date. I certify that the Commission s processing of this charge will not be completed within 180 days from the filing date.

The EEOC is terminating its processing of this charge.

**Equal Pay Act (EPA):** *You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Rosemarie Rhodes
11/03/2022

Enclosures(s)

**Rosemarie Rhodes**
**Director**

cc:   **Michael A Wildholder**
**c/o Little Mendelson, P.C.**
**2301 McGee Street, Ste. 800**
**Kansas City, MO 64108**

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***