IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TANESHA GRAHAM and JOSEPH KING,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF SOUTH FULTON, GA.<br><br>    Defendant. | Civil Action No.:<br><br>Jury Trial Demanded |

# COMPLAINT

COME NOW Plaintiffs Tanesha Graham and Joseph King, by and through their undersigned co-counsels, and file this employment discrimination lawsuit against Defendant City of South Fulton, GA., ("South Fulton"), pursuant to Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C.A. § 2000e-3(a), as well as a supplemental claim under the Georgia Whistleblower Act (O.C.G.A. § 45-1-4). Plaintiffs, who were both public employees, bring this action to hold their prior employer, South Fulton, accountable for violating their statutory rights by subjecting them to a retaliatory hostile environment based on their opposition to

1

and reporting of discriminatory conduct; and by retaliating against Plaintiffs, for disclosing a violation of, or noncompliance with a law, rule, or regulation to their supervisors and to government agencies, the South Fulton Human Resources Department and the South Fulton Police Department.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the federal claims asserted in this action under 28 U.S.C. §§1331 and 1343.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as Defendant is located in this District and division, and the events or omissions giving rise to the claims occurred in this District and division.

3. This Court has supplemental jurisdiction of the state law claim Plaintiffs assert, pursuant to 28 U.S.C. §1367.

## PARTIES

4. Plaintiff Tanesha Graham (hereinafter, "Ms. Graham") is a resident of Suwanee, Georgia, and at all times relevant to this complaint, was employed by Defendant as South Fulton's Human Resources Director.

5. Plaintiff Joseph King (hereinafter, "Officer King") is a resident of Lawrenceville, Georgia, and at all times relevant to this complaint, was employed by Defendant South Fulton as a detective.

6. Plaintiffs are covered employees under Title VII and the Georgia Whistleblower Act during the period in which they were employed by Defendants.

7. Defendant is an employer as defined by Title VII and the Georgia Whistleblower Act, and is therefore subject to their provisions.

8. South Fulton is a municipality of the State of Georgia and is responsible for the funding and operation of the South Fulton Department of Human Resources and the South Fulton Police Department. South Fulton may be served with summons at 5440 Fulton Industrial Blvd, Atlanta, Georgia 30336.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. On October 24, 2022, Plaintiffs timely filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation under Title VII. *See* Ex. A-B. Plaintiffs each received Right to Sue Letters on or about December 5, 2022. This lawsuit is initiated prior to his statutory deadline of 90 days.

## FACTUAL ALLEGATIONS

10. Ms. Graham served as South Fulton's Human Resources ("HR") Director from April 2021 to August 2022. She has previously served in senior management HR roles for two other Georgia municipalities, Suwanee and Norcross.

11. Officer King was employed by the South Fulton Police Department ("SFPD" or the "Department") as a Homicide Detective from October 10, 2018 to June 6, 2022.

12. During Officer King's tenure with SFPD, he won accolades for his exemplary performance, including recognition by the Department as South Fulton's Detective of the Year in 2020 and as Fulton County's Detective of the year in 2022. During 2020, King was the only SFPD detective who compiled a 100% case closure rate.

13. In 2021, Officer King's experience with drug-related homicides led to a cross-assignment to SFPD's narcotics unit.

**Evidence of corruption within the South Fulton Police Department**

14. During 2021, Officer King and other members of the Department observed numerous infractions and violations of SFPD regulations by Lieutenant Shannon McKesey, the head of the department's narcotics unit, including the consumption of alcohol on duty, use of city funds to pay undercover officers to purchase alcohol for use while they were performing their assignment, prohibited fraternization including a sexual relationship between McKesey and a lower ranking officer, and tampering with funds collected during drug arrests and execution of search warrants.

15. McKesey practiced open intimidation and verbal bullying of officers and was suspected by several, including Officer King, of sabotaging work assignments to damage potential rivals whom she viewed as competition for advancement.

16. McKesey also frequently used racial slurs in the presence of police personnel, including Officer King. During crime scene investigations, she was known to refer to suspects and witnesses as "n******", and to describe African American persons in derogatory and offensive terms.

17. While McKesey's pattern of flagrant misconduct was widely known within the department, Officer King and his colleagues were reluctant to report her behavior within their chain of command. McKesey maintained a close personal friendship with the wife of SFPD, Keith Meadows ("Chief Meadows") and McKesey openly touted the fact that Chief Meadows had mentored her.

18. In October 2021, Officer King and another officer filed complaints regarding McKesey's infractions with the city's new HR Director, Ms. Graham.

19. The HR Department was obligated under South Fulton's regulations to report the misconduct allegations to Chief Meadows. As a subject of the complaints, who was entitled to respond, McKesey was also notified.

20. Consistent with SFPD's policies, Officer King and the other officer who lodged a complaint were reassigned to units that were not under McKesey's supervision, and McKesey was advised that she was to avoid contact with them.

21. Ms. Graham launched an investigation of the allegations she received against McKesey and during the fall of 2021 through the winter of 2022, interviewed approximately 12 other officers who corroborated the claims by Officer King and his colleague, including the reports of alcohol use on duty, use of city funds for improper purposes, sexual conduct with a colleague, interference with officers McKesey perceived as threats, racially offensive language in the presence of officers, and tampering with cash seized during drug investigations.

22. The scope of the HR investigation encompassed evidence that McKesey's conduct violated various departmental regulations against abuse of authority, consumption of alcohol of duty, fraternization with subordinates, tampering with proceeds seized during police work; as well as evidence that McKesey's use of racial epithets and her sexual relationship with an employee exposed South Fulton to liability under federal anti-discrimination law.

23. Chief Meadows, despite an abundance of evidence that McKesey was unfit for command of her unit, refused to suspend McKesey or place her on administrative leave. As Ms. Graham's investigation continued, McKesey continued to exercise supervisory authority over at least some of her accusers.

24. In addition to failing to act on the gathering evidence against the head of one of the most sensitive and important units under his leadership, Chief Meadows began to take steps that had a clear effect of obstructing the investigation.

25. For example, Chief Meadows pressured Ms. Graham to name witnesses implicating McKesey in wrongdoing. He also warned Ms. Graham that he viewed her investigation as a distraction to the department and attempted to preclude her from launching other investigations of the Department.

26. Chief Meadows even went so far as to reassign Officer King and the other original complaining officer to work under McKesey's supervision, a fundamental breach of the principle that the subject of a misconduct complaint should not be in a position to command her accusers. That principle is particularly vital when the accused is in position to place her subordinates in high risk and dangerous assignments.

27. On March 29, 2022, Ms. Graham issued a report of the findings of her misconduct probe. She recommended McKesey's demotion and the institution of department wide training about bullying and harassment within SFPD.

28. Ms. Graham also advised City Manager Tammi Saddler Jones ("Ms. Jones") that she believed that there was sufficient evidence of unlawful behavior

beyond HR violations that the McKesey probe should be referred to an outside agency.

29. During a meeting with Ms. Jones and Ms. Graham on April 27, 2022, Chief Meadows stunned Ms. Graham with the aggressive and threatening nature of his response to the investigation. Chief Meadows admonished Ms. Graham for describing her findings with certain police personnel, and insisted that the entire evidentiary file be presented to him, a violation of the HR Department's policy that it retain control over documents generated in the course of an investigation.

30. At several points during the meeting, Chief Meadows lost his composure, raising his voice to the point of screaming, and shoving several documents forcibly toward Ms. Graham.

31. Chief Meadows at first proposed that the investigation be transferred to the SFPD Internal Affairs Department, which Ms. Graham regarded as an unmistakable effort to ensure that Chief Meadows would retain control of the outcome of the inquiry.

32. Despite the initial resistance from the Chief, Ms. Jones decided to move in the direction of finding an external investigation. The Smyrna, Georgia Internal Affairs Department ("Smyrna IA") was selected to conduct its own probe of misconduct by McKesey, who remained in command of the narcotics unit in the face of numerous complaints about her leadership, ethics, and judgment.

**Retaliation against Officer King**

33. In May 2022, Officer King was interviewed by a team of investigators from Smyrna IA.

34. Two days after his interview, Officer King was notified by SFPD they had launched an investigation of a tip that he had faked a COVID vaccination card, which had been submitted over a year earlier.

35. Officer King was able to promptly confirm through the Georgia Department of Public Health that his COVID vaccination card was accurate, but Officer King perceived the spurious complaint as a warning shot that his whistleblowing would have adverse consequences for his career and that he was a continuing target for reprisal.

36. Officer King chose to accept an Investigator position at the Fulton County District Attorney's Office, which he started in June 2022.

37. Within his first couple of weeks working at the District Attorney's Office, Officer King learned from his new supervisor that Chief Meadows and other unidentified persons within SFPD were actively disseminating false and derogatory information about Officer King to the DA's office in a blatant attempt to get him fired.

38. After Mr. King started working at the DA's Office, he also began receiving unsolicited calls from McKesey, which to Officer King appeared to

9

oscillate between veiled threats and efforts to bait him into contradicting his previous allegations.

39. The barrage of ill-concealed threats and efforts to ruin his career subjected Officer King to emotional distress and anxiety, and raised the specter that the repercussions would only escalate.

**Retaliation against Ms. Graham**

40. In February 2022, while the HR Department's investigation of police corruption was underway, a false allegation was unfurled against Ms. Graham by an employee in the Department who alleged that Ms. Graham had been verbally abusive towards her. Despite a dearth of any supporting evidence, Mrs. Saddler Jones' inquiry into the incident lasted three months before Ms. Graham was notified in early May 2022 that the complaint had no merit.

41. Still, despite finding the complaint was groundless, on May 2nd, Ms. Saddler-Jones took corrective action against Ms. Graham, directing her to undergo mandatory "emotional intelligence training."

42. That same day, on May 2, 2022, Ms. Saddler-Jones disclosed to Ms. Graham that there was internal pressure from political forces in South Fulton to terminate Ms. Graham. Ms. Saddler-Jones specifically mentioned that Chief Meadows had reached out to one of his allies on the City Council, Helen Willis, and that Councilor Willis had threatened to push for her colleagues to oust Ms.

Saddler-Jones if she did not "make changes" in the personnel structure at City Hall, including firing Ms. Graham.

43. According to Ms. Saddler-Jones, Councilor Willis further stated that the Council was prepared to terminate the City Manager's contract if Chief Meadows were not given veto power over the selection of an independent investigator.

44. The close proximity between the corrective action against her and Ms. Saddler-Jones' warning about political pressure to fire Ms. Graham made Ms. Graham deeply apprehensive, and led her to craft a document labeled "Hostile Work Environment Notice", which was emailed to Ms. Saddler-Jones on the morning of May 3, 2022.

45. The Notice was based on CSF's Healthy Workplace Ordinance, ORD 2022-009 Section 2-6010.2, which prohibits "hostile and humiliating remarks of professional disqualification" and "unjustified threats of dismissal."

46. In her Notice, Ms. Graham directly complained about retaliation in the form of interference by Chief Meadows and Councilor Willis, which she alleged resulted in anxiety, and emotional trauma directly related to workplace stress. She also advised that she had sought counseling for anxiety and insomnia caused by the stress of the situation.

47. Soon after the filing of her Hostile Environment Notice, Ms. Graham noticed that the scope of her duties began to be reduced by the City Manager. Ms Graham was increasingly excluded from meetings involving city business that would normally require the presence of the HR Director.

48. For example, on June 15, 2022, Ms. Graham was not allowed to weigh-in on the termination of the city's purchasing manager. Termination of senior municipal officials normally required input by the HR Director.

49. Ms. Saddler-Jones also precluded Ms. Graham from conducting an investigation of employee complaints within the Finance Department, although leading inquiries into complaints by city employees was one of Ms. Graham's core job duties.

50. Chief Meadows and Councilor Wills openly bypassed Ms. Graham to engage her subordinates in her department, a breach of the ordinary deference given the HR Director to manage her own staff, and in Councilor Willis' case, a violation of the city ordinance precluding council members from exercising managerial authority over municipal departments.

51. Ms. Graham was not permitted to observe or advise any aspects of Smyrna IA's probe of McKesey. In fact, she only learned of the investigative report through an email that was sent to her principal deputy.

52. As Ms. Graham became increasingly marginalized, she inquired about the status of her own hostile environment complaint against city officials. On or about June 23rd, weeks after she initiated the complaint, Ms. Graham was informed that the matter had been assigned to an outside law firm for investigation.

53. On July 11, 2022, Ms. Graham met with the external investigator, who told her that only 30 minutes had been allotted for the interview. During the half hour, Ms. Graham was presented a set of cursory, conclusory questions and was told that the investigation had been expanded to include rumors that Ms. Graham had hired blood relatives to city positions in violation of nepotism policies.

54. The investigator promised to conduct a second interview, which never occurred.

55. On August 2, 2022, Ms. Graham discovered that her access to SF's computer systems had been deactivated. Assistant City Manager Don Toms advised her that the decision had been made to offer Ms. Graham a severance package in advance of her employment with South Fulton ending.

56. On August 4, 2022, Saddler-Jones confirmed to Ms. Graham that a severance package was in the works.

57. Over the next three weeks, Ms. Graham remained in a limbo status with South Fulton. City officials were apparently instructed that they did not need to engage her directly; in fact, at one point, Councilor Willis emailed senior

members of the HR Department that she would be contacting them directly regarding certain HR tasks, which as noted above, directly contravenes municipal regulations regarding the independence of municipal staff from political interference.

58.   Ms. Graham offered her resignation on August 26, 2022, an involuntary decision based on the extreme stress South Fulton's municipal leadership exerted on her and the fact that her job responsibilities were being visibly curtailed, to the detriment of her professional reputation.

## CAUSES OF ACTION

### COUNT ONE
### RETALIATORY HARASSMENT
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3(a))
### (Plaintiff King)

59.   Plaintiff King re-alleges the allegations in the preceding paragraphs as if set forth herein.

60.   Plaintiff King engaged in protected activity under Title VII by reporting to the Defendant's Human Resources Department that the chief of the South Fulton Police Department's narcotics unit regularly employed racial slurs while on duty.

61.   South Fulton, through various officers and agents of its police department, retaliated against Plaintiff King for actions that included his reporting of racially discriminatory conduct by subjecting him to a retaliatory hostile work

environment, i.e., ongoing mistreatment that might have dissuaded a reasonable person from opposing discrimination in the workplace.

62. South Fulton's retaliatory conduct against Plaintiff King included the instigating of false claims that he fabricated an official document, reassigning him to a unit directed by the subject of his complaints, and continuing efforts by Department personnel including the Chief of Police to spread derogatory and false information about Plaintiff to a subsequent employer.

63. As a direct and proximate result of South Fulton's retaliatory conduct, Plaintiff King has suffered compensatory damages including mental anguish, emotional distress, and anxiety.

**COUNT II**
**RETALIATORY HARASSMENT**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3(a)**
**(Plaintiff Graham)**

64. Plaintiff Graham re-alleges the allegations in the preceding paragraphs as if set forth herein.

65. Plaintiff Graham engaged in protected activity under Title VII in her capacity as South Fulton's Human Resources Director by investigating and subsequently reporting to municipal officials evidence that the head of the South Fulton Police Department's narcotics unit engaged in unlawful activity including

15

regularly making racial slurs while on duty, and subjecting a subordinate to a potentially coercive sexual relationship.

66. Plaintiff Graham further engaged in protected activity by lodging her own internal complaint with South Fulton that she was being subjected to a hostile environment based on her reporting and investigation of unlawful activity that included sex and race based discriminatory conduct.

67. South Fulton, through officials including its Chief of Police, City Manager, and a member of the City Council retaliated against Plaintiff Graham for reporting and investigating discriminatory conduct under Title VII by subjecting her to a retaliatory hostile work environment, i.e., ongoing mistreatment that might have dissuaded a reasonable person from opposing discrimination in the workplace.

68. South Fulton's retaliatory conduct against Plaintiff Graham included the following: verbally and physically threatening behavior from the Chief of Police; political pressure from municipal officials aimed at encouraging the City Manager to terminate Plaintiff Graham; a reduction in the scope of Plaintiff Graham's duties and responsibilities; unjustified corrective action; a failure to investigate Plaintiff Graham's complaints of a hostile work environment; and threats that Plaintiff Graham's termination was imminent.

69. As a direct and proximate result of South Fulton's retaliatory conduct, Plaintiff Graham has suffered economic damages including the loss of income and compensatory damages including mental anguish, emotional distress, and anxiety.

### COUNT III
### Georgia Whistleblower Act
### (O.C.G.A. § 45-1-4)
### (as to Plaintiffs Graham and King)

70. Plaintiffs re-allege the foregoing allegations as if set forth herein.

71. Georgia's whistleblower statute (O.C.G.A. § 45-1-4) prohibits public employers from retaliating against public employees who report a violation of, or noncompliance with, a regulation, rule, or law to a supervisor or governmental agency.

72. Plaintiffs Graham and King, both public employees, engaged in protected activity under the Georgia Whistleblower Act by by engaging in the aforementioned reporting of discriminatory conduct outlined in Counts I and II, and by disclosing numerous other forms of misconduct by the head of the South Fulton Police Department's narcotics unit, including misuse of funds seized in investigations, consumption of alcohol while on duty, sexual misconduct with a subordinate, intimidation of police officers, and interference with officers' work assignments.

73. All of the acts identified above violated laws, rules or regulations that governed the South Fulton Police Department.

74. Plaintiffs Graham and King were subjected to retaliation by officials of South Fulton as alleged above, including in Plaintiff Graham's case, the incidents alleged in Count II and in Plaintiff King's case, the incidents alleged in Count I.

75. As a direct and proximate result of South Fulton's violation of the Georgia Whistleblower Act, Plaintiffs Graham and King have suffered compensatory damages including mental anguish, emotional distress, and anxiety, and in Plaintiff Graham's case, economic damages including lost income.

**PRAYER FOR RELIEF**

1. Wherefore, Plaintiffs demands judgment against Defendant as follows:

    a. All damages that may be awarded under Title VII of the of the Civil Rights Act of 1964, ("Title VII") and the Georgia Whistleblower Protection Act (O.C.G.A. § 45-1-4), including lost wages and back pay; general compensatory damages including but not limited to damages for mental anguish and emotional distress;

    b. Special damages to the extent allowed by law;

c. Injunctive relief under Title VII preventing and prohibiting Defendant from engaging in its present practices in violation of the laws cited herein;

d. Reasonable attorney's fees and expenses and costs pursuant to 42 U.S.C. §1988;

e. Such other relief as this court deems just and appropriate.

Respectfully submitted, the 7th day of February 2023.

/S/ Arnold J. Lizana
Law Offices of Arnold J. Lizana III
GA Bar No.: 698758
1175 Peachtree Street NE, 10th Floor
Atlanta, GA 30361
T: (404) 207-1559
F: (470) 231-0672
alizana@attorneylizana.com

/S/ Artur G. Davis
HKM Employment Attorneys LLP
ASB-3672-D56A
2024 3rd Ave. NSuite 307
Birmingham, AL 35203
T: (205)881-0935
adavis@hkm.com
(applying for admission *pro hac vice*)

**ATTORNEY FOR PLAINTIFFS**