## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § | |
| Defendants. | § | |

---

### COMPLAINT

---

**PNC BANK, NATIONAL ASSOCIATION**, through its undersigned counsel, hereby sues **CORE TECHNOLOGIES, INC., CORE TECHNOLOGIES FEDERATED, LLC; ROBERT E. EIGEN; & DEBBIE D. BINETTE** for enforcement of a commercial credit card agreement and three guaranty and suretyship agreements, and alleges as follows:

### PARTIES

1. Plaintiff **PNC BANK, NATIONAL ASSOCIATION** ("**Plaintiff**" or "**PNC Bank**") is a national banking association. "All national

banking associations shall, for purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." 28 U.S.C. § 1348. PNC Bank's main office, as designated in its articles of association, is located in Delaware. Thus, PNC Bank is a citizen of Delaware. Plaintiff is the owner and holder of the promissory note, security agreement, guaranty and suretyship agreements, and other loan documents made the basis of this lawsuit.

2.      Defendant **CORE TECHNOLOGIES, INC.** ("**Core Technologies**" or "**Borrower**") is a corporation that is incorporated in Georgia and has its principal place of business Georgia. Thus, Defendant Core Technologies is a citizen of Georgia under 28 U.S.C. § 1332(c)(1). Defendant Core Technologies is the primary Borrower of the indebtedness made the basis of this dispute.

3.      Defendant **CORE TECHNOLOGIES FEDERATED, LLC** ("**Core Technologies Federated**") is a limited liability company made up of two members, Erik Eigen, who is domiciled in Norcross, GA, and Debbie Binette, who is domiciled in Roswell, GA. Thus, Defendant Core Technologies Federated is a citizen of Georgia. Core Technologies Federated guaranteed the obligations of Borrower made the basis of this dispute.

4.      Defendant **ROBERT E. EIGEN** ("**Eigen**" or "**Defendant Eigen**") is a natural person who is domiciled in Norcross, Georgia. Thus,

Defendant Eigen is a citizen of Georgia. Defendant Eigen guaranteed the obligations of Borrower made the basis of this dispute.

5.      Defendant **DEBBIE D. BINETTE** ("**Binette**" or "**Defendant Binette**") is a natural person who is domiciled in Roswell, Georgia. Thus, Defendant Binette is a citizen of Georgia. Defendant Binette guaranteed the obligations of Borrower made the basis of this dispute. Hereinafter Defendants Core Technologies, Core Technologies Federated, Eigen, and Binette may, where appropriate, be collectively referred to as "Defendants".

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Delaware and citizens of Georgia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that all Defendants reside in this district.

## FACTS

8.      On or about December 11, 2020, Core Technologies, Inc. executed and delivered to PNC Bank the PNC Commercial Credit Card Program Authorization and Agreement (the "P-Card Agreement") evidencing Core Technologies agreement to the terms and conditions contained therein in exchange for a PNC commercial credit card with an

original credit limit of $500,000.00. Attached hereto as Exhibit "A" is a true and correct copy of the P-Card Agreement.

9.      On or about November 16, 2020, Defendant Core Technologies Federated executed a Guaranty and Suretyship Agreement, guaranteeing full and prompt payment and satisfaction of all of Core Technologies' obligations to PNC Bank, including Core Technologies' obligations under the P-Card Agreement, jointly and severally. Attached hereto as Exhibit "B" is a true and correct copy of the Guaranty and Suretyship Agreement executed by Core Technologies Federated (the "Core Technologies Federated Guaranty").

10.     On or about November 19, 2020, Defendant Eigen executed a Guaranty and Suretyship Agreement, guaranteeing full and prompt payment and satisfaction of all of Core Technologies' obligations to PNC Bank, including Core Technologies' obligations under the P-Card Agreement, jointly and severally. Attached hereto as Exhibit "C" is a true and correct copy of the Guaranty and Suretyship Agreement executed by Eigen (the "Eigen Guaranty").

11.     On or about November 17, 2020, Defendant Binette executed a Guaranty and Suretyship Agreement, guaranteeing full and prompt payment and satisfaction of all of Core Technologies' obligations to PNC Bank, including Core Technologies' obligations under the P-Card Agreement, jointly and severally. Attached hereto as Exhibit "D" is a true and correct

copy of the Guaranty and Suretyship Agreement executed by Binette (the "Binette Guaranty").

12.     Plaintiff, PNC Bank, is the beneficial owner and holder of the P-Card Agreement, Core Technologies Federated Guaranty, Eigen Guaranty, and Binette Guaranty (collectively, the "Loan Documents"). The Core Technologies Federated Guaranty, Eigen Guaranty, and Binette Guaranty may, where appropriate, be collectively referred to as the "Guaranties."

13.     Defendants defaulted on the Loan by failing to timely make the principal and interest payments when due under the P-Card Agreement

14.     On or about August 9, 2022, PNC Bank sent Core Technologies a Notice of Termination of the subject P-Card Agreement, notifying the Borrower that the P-Card Agreement would terminate on October 11, 2022 ("Termination Date"), and that all amounts outstanding under the P-Card agreement must be paid in full no later than the Termination Date (the "P-Card Termination Letter"). Attached hereto as Exhibit "E" is a true and correct copy of the P-Card Termination Letter.

15.     The amounts outstanding under the P-Card Agreement were not paid in full by the Termination Date.

16.     On or about August November 8, 2022, PNC Bank, by and through its undersigned counsel, sent Defendants a Notice of Default, Demand for Payment, and Reservation of Rights Letter informing Defendants that they are in default under the Loan Documents, and

demanding that Defendants make arrangements to pay the outstanding balance under the P-Card Agreement immediately. Attached hereto as Exhibit "F" is a true and correct copy of the November 8, 2022 demand letter (the "November 2022 Demand Letter"). Defendants failed to pay the outstanding balance or otherwise respond to the November 2022 Demand Letter.

17.     On or about January 5, 2023, PNC Bank, through its undersigned counsel, sent Defendants a follow-up to its November 2022 Demand Letter, informing Defendants that they remain in default under the Loan Documents, and demanding Defendants repay the full outstanding balance immediately. Attached hereto as Exhibit "G" is a true and correct copy of the January 5, 2023 demand letter (the "January 2023 Demand Letter")[1].

18.     The Defendants have failed to repay the outstanding balance under the P-Card Agreement or otherwise respond to the Demand Letters.

19.     As of February 7, 2023, the outstanding balance under the P-Card Agreement is $150,000.00.

20.     Further, pursuant to the Guaranties, Defendants Core Technologies Federated, Eigen, and Binette owe all expenses, as well as all

---

[1] The November 2022 Demand Letter and January 2023 Demand Letter may be collectively referred to as the "Demand Letters."

reasonable attorneys' fees, costs, and interest accrued from the date of every such payment, incurred by PNC Bank in enforcing the Loan Documents.

21.    All condition precedents have been performed, have occurred, or have been waived.

## COUNT ONE – BREACH OF P-CARD AGREEMENT
### (As against Core Technologies, Inc.)

22.    PNC Bank repeats and re-alleges paragraphs 1 through 21 hereof, as if fully set forth herein.

23.    A contract exists between PNC Bank and Defendant Core Technologies, as evidenced by the P-Card Agreement. See Ex. A.

24.    PNC Bank is the beneficial owner and holder of the P-Card Agreement.

25.    Defendant Core Technologies is in material breach of the P-Card Agreement and has defaulted under its terms by, among other things, failing to timely pay all outstanding amounts due on or before the Termination Date.

26.    As a direct and proximate result of Core Technologies' breach and default of the P-Card Agreement, PNC Bank has suffered damages and Core Technologies owes to PNC Bank that full amount of the outstanding balance.

**WHEREFORE**, Plaintiff, PNC Bank, demands judgment against Defendant Core Technologies for the full outstanding balance under the P-Card Agreement, and for any other relief as the Court deems just and proper.

## COUNT TWO – BREACH OF GUARANTY
### (As to Defendant Core Technologies Federated)

27.   PNC Bank repeats and re-alleges paragraphs 1 through 21 as if fully set forth herein.

28.   Defendant Core Technologies Federated executed the Core Technologies Federated Guaranty on or about November 16, 2020 through which Core Technologies Federated agreed to unconditionally guaranty the prompt payment and performance of all obligations of Defendant Core Technologies to Plaintiff PNC Bank, including but not limited to Core Technologies' obligations to PNC Bank under the P-Card Agreement.

29.   Plaintiff PNC Bank currently owns and holds the Core Technologies Federated Guaranty.

30.   Defendant Core Technologies Federated defaulted under the Core Technologies Federated Guaranty by, among other things, failing to ensure prompt performance and payment of Core Technologies' obligations to PNC Bank.

31.   Specifically, Defendant Core Technologies Federated has failed to make any payment on the Guaranty.

32.     PNC Bank has sustained damages as a direct and proximate result of Defendant Core Technologies Federated's default under the Guaranty.

**WHEREFORE**, Plaintiff PNC Bank demands judgment against Defendant Core Technologies Federated for all amounts due and owing under the Guaranty, together with reasonable attorneys' fees, costs, expenses, and for any other relief the Court deems just and proper.

## COUNT THREE – BREACH OF GUARANTY
### (As to Defendant Robert Eigen)

33.     PNC Bank repeats and re-alleges paragraphs 1 through 21 as if fully set forth herein.

34.     Defendant Eigen executed the Eigen Guaranty on or about November 19, 2020 through which Defendant Eigen personally agreed to unconditionally guaranty the prompt payment and performance of all obligations of Defendant Core Technologies to Plaintiff PNC Bank, including but not limited to Core Technologies' obligations to PNC Bank under the P-Card Agreement.

35.     Plaintiff PNC Bank currently owns and holds the Eigen Guaranty.

36.     Defendant Eigen defaulted under the Eigen Guaranty by, among other things, failing to ensure prompt performance and payment of Core Technologies' obligations to PNC Bank.

37.    Specifically, Defendant Eigen has failed to make any payment on the Guaranty.

38.    PNC Bank has sustained damages as a direct and proximate result of Defendant Eigen's default under the Guaranty.

**WHEREFORE**, Plaintiff PNC Bank demands judgment against Defendant Eigen for all amounts due and owing under the Guaranty, together with reasonable attorneys' fees, costs, expenses, and for any other relief the Court deems just and proper.

**COUNT FOUR – BREACH OF GUARANTY**
**(As to Defendant Debbie Binette)**

39.    PNC Bank repeats and re-alleges paragraphs 1 through 21 as if fully set forth herein.

40.    Defendant Binette executed the Binette Guaranty on or about November 17, 2020 through which Defendant Binette personally agreed to unconditionally guaranty the prompt payment and performance of all obligations of Defendant Core Technologies to Plaintiff PNC Bank, including but not limited to Core Technologies' obligations to PNC Bank under the P-Card Agreement.

41.    Plaintiff PNC Bank currently owns and holds the Binette Guaranty.

42.     Defendant Binette defaulted under the Binette Guaranty by, among other things, failing to ensure prompt performance and payment of Core Technologies' obligations to PNC Bank.

43.     Specifically, Defendant Binette has failed to make any payment on the Guaranty.

44.     PNC Bank has sustained damages as a direct and proximate result of Defendant Binette's default under the Guaranty.

**WHEREFORE**, Plaintiff PNC Bank demands judgment against Defendant Binette for all amounts due and owing under the Guaranty, together with reasonable attorneys' fees, costs, expenses, and for any other relief the Court deems just and proper.

## CONCLUSION

Plaintiff PNC Bank hereby demands judgment, jointly and severally, against Defendant Core Technologies, Inc. for the outstanding balance due and owing under the P-Card Agreement, against Defendants Core Technologies Federated, LLC, Robert E. Eigen, and Debbie D. Binette for the outstanding balance due and owing under the P-Card Agreement and the reasonable attorneys' fees, costs, and expenses incurred by PNC Bank in enforcing the Loan Documents, and for any other relief the Court deems just and proper.

**Dated:**        **February 7, 2023**

11

Respectfully submitted,

*/s/ Danielle E. Douglas*
Danielle E. Douglas
(Ga. Bar No. 192316)
ADAMS AND REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, Alabama 35203
(205) 250-5000
(205) 250-5034 (facsimile)
danielle.douglas@arlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this Tuesday, February 7, 2023 I have filed the forgoing using the CM/ECF system, and I have served the forgoing on the following parties by sending a copy via Certified Mail, Signature Required:

Core Technologies, Inc.
Attn: Robert Eigen
2800 Colonnades Court
Norcross, GA 30071

Core Technologies Federated, LLC
Attn: Robert Eigen
2800 Colonnades Court
Norcross, GA 30071

Robert E. Eigen
3295 Commons Gate Bend
Norcross, GA 30092

Debbie D. Binette
5216 Tealing Drive NE
Roswell, GA 30075

*/s/ Danielle E. Douglas*
OF COUNSEL

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

---
### COMPLAINT
---

# EXHIBIT A



## PNC COMMERCIAL CARD PROGRAM AUTHORIZATION AND AGREEMENT

**Authorization and Agreement**

This PNC Commercial Card Program Authorization and Agreement (including any Exhibits or Addenda attached hereto, this "**Authorization**") is made by and between Core Technologies, Inc. (individually and collectively, if more than one, the "**Company**") and PNC Bank, National Association ("**PNC**") and shall become effective upon the later of the execution dates (the "**Effective Date**") set forth on the signature page hereof. The Company hereby acknowledges receipt of, and agrees to be legally bound by, the PNC Commercial Card Program Terms and Conditions (version March 2020) (as amended in accordance with the terms of the Agreement, defined below, the "**Program Terms**"), which, together with this Authorization, set forth the terms and conditions under which PNC will extend credit to the Company by establishing one or more commercial card programs using the Visa network for the Company as detailed in Section 2 (individually and collectively, if more than one, the "**Program**"). This Authorization and the Program Terms constitute the agreement of the parties related to the Program (as amended, modified or supplemented from time to time, the "**Agreement**"). Capitalized terms used but not defined in this Authorization have the meanings given to them in the Program Terms. The Company agrees that the (i) Company shall pay to PNC all amounts outstanding from time to time under each Program in accordance with the Agreement and (ii) obligations of each Company who signs this Authorization shall be joint and several.

**The Company and PNC, intending to be legally bound, hereby agree as follows:**

**1.      Company Credit Limit.** The maximum aggregate Company Credit Limit available to the Company for (i) the Program, (ii) any other commercial card program the Company may have with PNC, and (iii) any program the Company may have on PNC's ActivePay Private Network℠, is as follows:

　　　　　Company Credit Limit: **$500,000.00**

**2.      Program.** The Company has selected, and PNC has agreed to provide, the following Program(s) with the respective billing terms and incentives set forth below (check and complete as applicable):

| | | | |
|---|---|---|---|
| **(i)** | __X__ | **Company Bill Program** | |
| | (a) | **Billing Cycle:** | Monthly |
| | (b) | **Company Bill Payment Due Date:** | ___28__ days after Statement Date |
| | (c) | **Incentives (check one):** | __N/A__ Rebate (see attached Rebate Schedule) |
| | | | ___X___ Commercial Card Rewards – Company earns points at a rate of __4__ points per $1.00 (see attached Rewards Terms) |
| **(ii)** | _N/A_ | **Cardholder Bill Program** | |
| | (a) | **Billing Cycle:** | Monthly |
| | (b) | **Cardholder Bill Payment Due Date:** | _____ days after Statement Date |
| | (c) | **Cardholder Past Due Payment Due Date:** | _____ days after Cardholder Bill Payment Due Date |
| | (d) | **Company Contingent Payment Due Date:** | _____ days after Cardholder Bill Payment Due Date |
| | (e) | **Incentives (check one):** | _____ Rebate (see attached Rebate Schedule) |
| | | | _____ Commercial Card Rewards – Cardholder earns points at a rate of _____ points per $1.00 (see attached Rewards Terms) |

**3.      Collateral.** All of the obligations of the Company under the Agreement are intended to be secured by the property described in any collateral security documents executed and delivered to PNC in connection with the Agreement or that

1

previously may have been or may in the future be executed and   delivered to PNC, or an agent acting on behalf of PNC, to secure any obligations of the Company to PNC; provided, however, the Collateral is not intended to include real property, and the applicability of any lien on such real property is hereby disclaimed by PNC, unless expressly provided otherwise below.

**4.** **Additional Collateral.** In addition to the collateral granted in the collateral documents referenced above and any other collateral referenced elsewhere in the Agreement, the Program is secured by the following collateral, if any, as indicated below:

**(i)** **Accounts (check if applicable):** _____ MMDA _____ CD _____ Savings Account _____ Investment Account

If checked above, at all times, the Company's obligations under the Agreement shall be secured by a first priority perfected lien on a certificate of deposit, money market deposit account, savings account or investment account, as applicable, issued by or maintained at PNC (the "**Collateral Account**"), all pursuant to and as more fully described in a pledge agreement in form and substance acceptable to PNC (the "**Pledge Agreement**"). If at any time the value of the Collateral Account is less than the amount required by the Pledge Agreement or related loan document (or, if no amount is specified, the Company Credit Limit), then the Company shall immediately pledge additional collateral to PNC of sufficient value to meet the value requirements for the Collateral Account. In addition to any other default described in the Agreement, it shall be a default under the Agreement if: (a) PNC ceases to have a first priority perfected lien and security interest in the Collateral Account; or (b) any default or event of default occurs under the Pledge Agreement.

**(ii)** **Letter of Credit (check if applicable):** _____

If checked above, at all times, the Company's obligations under the Agreement shall be secured by an irrevocable unconditional letter of credit in favor of PNC in the face amount of the Company Credit Limit in form and substance and issued by a bank acceptable to PNC (the "**Letter of Credit**"). In addition to any other default described in the Agreement, it shall be a default under the Agreement if: (a) the Letter of Credit ceases to be in full force and effect; or (b) PNC receives a notice from the issuer of the Letter of Credit stating that it will not extend the expiration date of the Letter of Credit for an additional period beyond its then current expiry date and the Company does not deliver to PNC a replacement Letter of Credit, in form and substance and issued by a bank acceptable to PNC, on or before thirty (30) days prior to the then current expiry date of the Letter of Credit. In addition to any other remedies provided in the Agreement, upon the occurrence of a default under the Agreement, PNC may draw on the Letter of Credit.

**(iii)** **Other (check if applicable and describe):** _____

**5.** **Fees.** The attached Fee Schedule lists the fees that will be assessed, as applicable, to the Program.

**6.** **Cash Advances.** As of the Effective Date, the Company _____ has _____ has not (check as applicable; failure to check either blank shall be deemed an election by the Company to not allow cash advances) elected to allow cash advances. Such election may be changed by the Company after the Effective Date by providing notice to PNC in accordance with the terms of the Agreement and without the need for a written amendment to the Agreement.

**7.** **Initial Designated Affiliates.** As of the Effective Date, the Company desires to name the following subsidiaries and/or affiliates as "Designated Affiliates" under the Program, subject to approval by PNC. The Company may add or eliminate Designated Affiliates with approval from PNC after the Effective Date by providing notice to PNC in accordance with the terms of the Agreement and without the need for a written amendment to the Agreement.

| Designated Affiliates |
|---|
|  |
|  |
|  |
|  |

**8.** **Use of Electronic Signatures and Records.** At PNC's option, electronic records and signatures may be used in connection with the Agreement. See the Program Terms for details.

2

**SIGNATURE PAGE**

By executing this Signature Page, the undersigned acknowledge that they have read the Agreement and agree to abide and be bound by its terms and conditions.

**PNC BANK, NATIONAL ASSOCIATION**

By: *Anthony B. DeBlasio*
(Signature)
Name: Anthony B. DeBlasio
Title: Vice President
Date: 12/11/20

**CORE TECHNOLOGIES, INC.**

By: *Robert Eigen*
(Signature of Authorized Representative)
Print Name: Robert E. Eigen
Title: Vice - president
Email Address: eeigen@coretechinc.com
Telephone Number: 470-402-3902
Date: 11/16/2020

Form of Organization *(please check)*:
  X   Corporation          Partnership
_____   Limited liability company
_____   Other (Specify: _____)

The following address will be used by PNC for giving Company notices under the Agreement.

| | | |
|---|---|---|
| Street Address: 2800 Colonnades Court | | |
| City: Peachtree Corners | State: Georgia | Zip: 30071 |
| Telephone: (678) 894-8260 | Facsimile: (    ) | |
| Program Administrator Email Address: mgarcia@coretechinc.com | | |

3

## OFFICER'S CERTIFICATE

The undersigned certifies to PNC that the officer(s)/partner(s)/member(s) who signed this Authorization and any other documents executed in connection with the Agreement or the Program (individually and collectively if more than one, the "**Authorized Representative**"): (i) was authorized and directed to execute and deliver, including to electronically execute and deliver, in the name of and on behalf of Company, this Authorization with PNC, and (ii) has further been authorized by the Company, at any time and from time to time: (A) to obtain financial services and products of any kind from PNC or from any other direct or indirect subsidiary of The PNC Financial Services Group, Inc. (collectively, "**PNC Financial Services Group**"), including but not limited to loans and other products involving the extension of credit and other treasury management services and products; (B) to guarantee the payment and performance of the indebtedness and obligations of other persons or entities to PNC Financial Services Group; (C) to pledge, assign, transfer, mortgage, grant a security interest in or lien on any real or personal property (tangible or intangible) of the Company to or in favor of PNC Financial Services Group as collateral security for the payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties of the Company or of any other persons or entities to PNC Financial Services Group (whether or not in connection with a guaranty of such other person's or entity's obligations to PNC Financial Services Group); (D) to execute, accept, authorize agreement to and/or deliver to or in favor of, including to electronically execute, accept, authorize agreement to and/or deliver to or in favor of, PNC Financial Services Group such agreements, documents and instruments, required or requested by PNC Financial Services Group in connection with any of the foregoing products, services or actions, including but not limited to loan agreements or other evidence of indebtedness, guaranties, treasury management service agreements, collateral security documents (including but not limited to security agreements, financing statements, pledge agreements, assignments, mortgages or deeds of trust), and any supporting documents required by the terms of any of the foregoing agreements, documents or instruments; all in such form as may be requested by PNC Financial Services Group and any of which may contain a warrant of attorney authorizing PNC Financial Services Group to confess judgment against the Company for all sums due or to become due by the Company to PNC Financial Services Group and/or a provision waiving the right to trial by jury; (E) to execute and deliver to or in favor of, including to electronically execute and deliver to or in favor of, PNC Financial Services Group any amendments, modifications, renewals or supplements of or to any of the foregoing agreements, documents or instruments; (F) to take any other action requested, required or deemed advisable by PNC Financial Services Group in order to effectuate the foregoing; and (G) to delegate the foregoing duties to one or more other representatives of the Company.

The undersigned further certifies that (1) the authority granted herein has been duly authorized by all necessary action on behalf of the Company and does not violate the articles or certificates of incorporation, the by-laws or regulations, or other organizational documents of the Company; and (2) the Authorized Representative holds the office, title or status with the Company specified below the Authorized Representative's signature, the email address and telephone number provided is the Authorized Representative's true and correct email address and telephone number for conducting Company business, and any original signature following the Authorized Representative's name is such person's actual signature.

The authority vested in the Authorized Representative specified herein will remain in full force and effect until a certified copy of a notice revoking or modifying this Company Certification and such authority has been delivered to PNC and PNC has had a reasonable time to act thereon.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the undersigned have hereunto set their hands.

*By: _Debbie Binette_

Print Name: _Debbie Binette_

Title: _President_

Date: _11 / 17 / 2020_

*NOTE: If the Company has more than one officer, member or manager, then the person signing above must be **a second officer, member or manager of the Company** that is someone other than the Authorized Representative who signed the Agreement.

Commercial Card
October 2020

PNC COMMERCIAL CARD PROGRAM AUTHORIZATION AND AGREEMENT

 **PNC**

*Prepared for:*
*Core Technologies, Inc.*

## Fee Schedule[1]

| Fee Category / Description | Fee |
|---|---|
| **I. Program Configuration** | |
| First Corporate Account per program | **Waived** |
| Additional Corporate Accounts per program | $500 per corporate account (*one-time fee*) |
| **II. Card Attributes** | |
| Executive Accounts [2] | $295 per year / per cardholder account |
| Rewards Enrollment | $75 per year / per cardholder account |
| Card Design [3] | |
| *Standard*: PNC standard design w/single color Company logo | $250 per logo |
| *Customized:* Company customized design or multi-color Company logo | $250 per image upload |
| File formatting modifications (if applicable) | $200 per image modification |
| Custom Card production | $3 per card |
| **III. Technology** | |
| **Visa IntelliLink** (*ancillary services*) | |
| Compliance Auditor Maintenance | $100 per month |
| Compliance Auditor Transaction Fee | $0.03 per item |
| Receipt Imaging | $100 per month / per corporate account |
| Customized File Development | Pass through at cost with $4,500 minimum |
| **ActivePay®** (*ancillary services*) | |
| Receipt Imaging via FAX | $0.18 per page |
| Receipt Imaging | $100 per month / per corporate account |
| Web Services | Customized development cost |
| Data Transmission Files for Program Management (setup) | Pass through at cost of $1,000 (*one-time fee*) |
| Customized File Development: | |
| Data File Formatting | Pass through at cost with $4,000 minimum |
| Data Archive Retrieval | Pass through at cost with $5,000 minimum |
| **IV. Transactional** | |
| Commercial Card Alerts (Email or Text)[4] | **Waived** |
| | |
| Cash Advance | $3 or 3% per advance (*whichever is greater*) |
| | |
| Foreign Exchange [5] | Exchange Rate + 1% |
| | |
| Late Fee - Company Bill Program | 1% of outstanding balance at the following number of days past the next statement close date based on the following program statement cycles: |
| | Monthly (or longer) cycle: 15 days |
| | Bi-weekly cycle: 10 days |
| | Weekly cycle: 5 days |
| Late Fee - Cardholder Bill Program | $15 at 31 days past Cardholder Bill Payment Due Date; 2% of outstanding balance at 61 days past Cardholder Bill Payment Due Date |

Commercial Card
October 2020

[1] **Fee Schedule:** This Fee Schedule sets forth the fees that are applicable to PNC's standard commercial card programs. Some of these fees may not apply depending on the attributes of the specific Program.

[2] **Executive Accounts:** Annual fee applies when no more than 5% of all cards in the Program are Executive Accounts. If more than 5% of total cards are Executive Accounts, PNC reserves the right to assess a higher annual fee. Certain benefits for Executive Accounts require enrollment. Benefits for Executive Accounts include the coverages found at pnc.com/commercialcard/executivebenefits.

[3] **Card Design:** Company Logo cards are available 1-2 weeks after design approval. Custom Card designs may take up to 12 weeks for delivery.

[4] **Alerts:** Message and data rates may apply to the recipient of the alerts.

[5] **Foreign Exchange Fee:** Visa will convert the amount from the transaction currency into U.S. dollars, using a conversion exchange rate that is either a rate selected by Visa from a range of rates available in wholesale currency markets for the applicable central processing date (which rate may vary from the rate Visa receives), or the government-mandated rate in effect for the applicable central processing date, plus in each instance, 1%.

Commercial Card
October 2020

PNC COMMERCIAL CARD PROGRAM AUTHORIZATION AND AGREEMENT

 **PNC**

*Prepared for*
*Core Technologies, Inc.*

**Rewards Terms**

# PNC Commercial Card
# Rewards
## (Company Ownership of Points)

### Terms & Conditions

PNC Commercial Card Rewards (the "**Rewards Program**") is a promotional incentive program offered by PNC Bank, National Association ("**Issuer**," "**we**," and "**us**"). These terms and conditions apply, as indicated herein, both to the business (the "**Company**") that has contracted with us for the issuance of PNC commercial card(s) and the individual(s) that use the card(s) ("**cardholder**"). Under the Rewards Program, the Company earns points every time a cardholder makes a qualifying purchase or engages in a qualifying transaction with an eligible PNC commercial card that has been enrolled in the Rewards Program. The Company can use these points to obtain merchant gift or travel certificates, gift cards, merchandise, and much more (referred to generally as "**Rewards**"). By participating in the Rewards Program, the Company and the cardholders are agreeing to be bound by the following terms and conditions, as provided herein. These terms and conditions are part of the Program Terms and Authorization (the "**Card Agreement**") between us and the Company, and, if applicable, the cardholders, which governs use of the PNC commercial card(s) and the Rewards Program. In the event of a conflict between the Card Agreement and these terms and conditions, the Card Agreement will govern, except these terms and conditions shall govern in any matter relating to the Rewards Program.

### Changes to the Rewards Program

We may modify, restrict or change the Rewards Program at any time, which changes may include, but are not limited to, changing the number of points the Company earns for a particular type of activity or the number of points the Company needs to reach a particular Reward tier or to redeem a particular Reward, or omitting or adding reward levels or categories, or changing the selection of Rewards, or imposing, increasing or eliminating points caps or Rewards Program fees, or changing the conditions under which points expire or are forfeited. We will notify the Company of material changes to the Rewards Program terms and conditions (using the information provided during enrollment or otherwise) and, unless the Company decides to terminate its Rewards Program participation, the Company and the cardholders will be bound by the revised terms and conditions. We also reserve the right to suspend or terminate the Rewards Program, or the Company's or any cardholder's participation in the Rewards Program, at any time without compensation to the Company or to the cardholder.

### Eligibility

PNC commercial cards issued in the United States and in good standing may be eligible to participate in the Rewards Program. We reserve the right to determine in our sole discretion whether a particular PNC commercial card is eligible to participate in the Rewards Program.

### Enrollment

To participate in the Rewards Program, an authorized representative of the Company ("**Authorized Representative**" or "**you**") must be authorized by the Company to enroll eligible PNC commercial card(s) issued under the Company's commercial card account in the Rewards Program, establish a Rewards Program account ("**PNC Commercial Card Rewards Account**"), and accept these terms and conditions on behalf of the Company and the cardholders, and by enrolling you represent that you are so authorized. We have automatically enrolled the Company's PNC commercial card(s) in the Rewards Program and established a Rewards Program account for the Company.

Once the Company's commercial card account has been enrolled successfully, you will select a password that is required to access the Rewards Program website (pnc.com/commercialcard/rewards) or telephone number (1-888-919-3173). It is the Company's responsibility to keep any password safe and known only to Authorized Representatives because the Company is responsible for all activity in the Company's PNC Commercial Card Rewards Account.

An annual membership fee for each enrolled PNC commercial card will automatically be charged to the Company's commercial card account. The amount of the membership fee will be set forth in the fee schedule provided to the Company by us and incorporated into the Card Agreement. The membership fee will be assessed annually and will appear on the Company's statement.

The PNC Commercial Card Rewards Account will be established in the name of the Company that owns the PNC commercial card account, and all Qualifying Purchases (as defined below) made by cardholders with the enrolled PNC commercial cards issued under that PNC commercial card account will accrue to the PNC Commercial Card Rewards Account established for that card account.

### Qualifying Purchase

Only Qualifying Purchases with enrolled PNC commercial card(s) can earn points. A "**Qualifying Purchase**" is any signature-based or PIN-based purchase, Internet purchase, phone or mail order purchase, bill payment, contactless purchase (purchase made by holding a PNC commercial card or other device up to a secure reader instead of swiping the card), or small dollar purchase for which the cardholder is not

required to sign, made with an enrolled PNC commercial card. Payments of existing card balances, balance transfers, cash advances, ATM transactions, convenience checks, Interlink-processed transactions, fees charged by us (for example, annual fees, finance charges, and related service charges, if any apply), payments made for pre-paid and re-loadable cards such as certain gift cards and similar cards, and payments made for payment instruments that can readily be converted to cash (for example, travelers cheques, money orders, wire transfers, and similar products or services) are not Qualifying Purchases.  We reserve the right to determine in our sole discretion whether a particular PNC commercial card transaction is a Qualifying Purchase.

## Points

Once enrollment is completed, the Company will start earning points for the Qualifying Purchases made with enrolled PNC commercial card(s) based on the actual purchase amount, including tax.

The Company will earn that number of points designated in the Card Agreement for each $1.00 of a Qualifying Purchase made with enrolled PNC commercial card(s).  Purchase amounts, including tax, will be rounded to the nearest whole dollar amount to determine the number of points to be posted to the Company's PNC Commercial Card Rewards Account.

Any returns, credits, or chargebacks earn "negative" points and such "negative" points will reduce the total points posted to the Company's PNC Commercial Card Rewards Account.

If at any time a PNC commercial card account is not in good standing, Qualifying Purchases made with enrolled PNC commercial cards issued under that card account while the card account is not in good standing will not accrue any points.

Points have no cash or other value, except to obtain Rewards as set forth below.

The Company may not purchase points or transfer points from one PNC Commercial Card Rewards Account to another PNC Commercial Card Rewards Account, even if both are in the Company's name.  The Company also may not transfer or sell its PNC Commercial Card Rewards Account.

## Point Expiration/Forfeiture

All points will expire at the end of the 36th month from the month in which they were posted to the Company's PNC Commercial Card Rewards Account.  The Company's points will be forfeited if its PNC commercial card account is closed by the Company or us, or if the Company's PNC Commercial Card Rewards Account is terminated by the Company or us (we will determine in our sole discretion what is a closed account or a terminated PNC Commercial Card Rewards Account for this purpose).  The Company will not be provided with notice of expiration or forfeiture of points. The Company is not entitled to compensation from us or from any other entity, when its points expire or if they are forfeited for any reason.

## Rewards

To redeem points in the Company's PNC Commercial Card Rewards Account to obtain Rewards, go to the Rewards Program website at pnc.com/commercialcard/rewards or call 1-888-919-3173.  The Company can only acquire Rewards to the extent that it has the required number of points in its PNC Commercial Card Rewards Account.  The Company cannot combine points in one PNC Commercial Card Rewards Account with points in another PNC Commercial Card Rewards Account.  All Rewards are subject to availability and have no cash value.

Each Reward will be subject to terms and conditions specific to the Reward that will be provided to the Company in conjunction with the Reward.  These terms and conditions may address such matters as the expiration date of the Reward, the purchase or other requirements to use the Reward, any warranties for the Reward, or any other limitations or restrictions on obtaining, retaining or using the Reward.  We are not liable to the Company if a Reward expires prior to the Company's use of the Reward.  An expired Reward will no longer be available for use or redemption.

Points are redeemed on a "first in, first out" basis, such that the first points earned will be the first points redeemed over the life of the Company's PNC Commercial Card Rewards Account.  Once a redemption order is placed, the Company's PNC Commercial Card Rewards Account will be reduced by the number of points used to acquire the Reward.  If the Company orders a Reward that is subsequently cancelled or otherwise becomes unavailable after the order is placed, the Company's points will be reinstated to its PNC Commercial Card Rewards Account and the Company will be notified of the cancelled order.  In the event of a return, chargeback, credit or other adjustment that results in insufficient points for the Reward ordered, the Reward order will not be fulfilled.  If the Reward order is fulfilled and we later discover that the Company did not have sufficient points for that Reward in its PNC Commercial Card Rewards Account, in addition to any other action we may take, the Company will forfeit all future point earnings until such time as sufficient points are accrued to cover the redemption of the Reward.

Many of the Rewards are certificates that are redeemed at a participating merchant location.  The Company and the merchant are responsible for compliance with all laws related to the Reward, including the payment and collection of any federal, state, or local taxes.  Refer to the Reward certificate for details.

Any merchandise Reward, if it has been damaged in transit, can be returned to us in its original packaging within ten (10) days of the Company's receipt, in which event the Company will receive a full reinstatement of the points the Company redeemed to acquire the Reward.  Contact 1-888-919-3173 for return instructions.  All non-merchandise Rewards (for example, gift cards and certificates) cannot be returned.  Except as otherwise provided above in connection with merchandise damaged in transit, redeemed Rewards are not refundable, exchangeable, replaceable, redeemable, or transferable for cash, credit, other Rewards or points under any circumstances; we and

8

participating merchants are not responsible for replacing lost, stolen, or mutilated Rewards, including retail or travel certificates, gift certificates, gift cards, or merchandise.

For the current list and description of the Rewards, as well as the number of points necessary to obtain each Reward, go to the Rewards Program website at pnc.com/commercialcard/rewards or call 1-888-919-3173

### Shipping

There is no shipping or handling fee for standard delivery of the Rewards. Rewards generally will be sent to the Company within 4 weeks of placing its Rewards order. Rewards cannot be shipped to any address outside of the 50 United States or the District of Columbia, but can be shipped to APO/FPO addresses.

### Communications with Rewards Program Participants

We may communicate with the Company regarding any matter related to the Rewards Program by mail, by telephone or by electronic communications. If any Authorized Representative uses the Rewards Program website, we may make electronic communications to such person, including electronic mail and/or postings to the Rewards Program website. All electronic communications from us shall be deemed to be communications "in writing" and deemed delivered no later than the earlier of the date actually received or 5 days from the date of posting or dissemination. Authorized Representatives may update the Company's contact information by visiting pnc.com/commercialcard/rewards and updating its PNC Commercial Card Rewards Account profile or by calling 1-888-919-3173.

To access information electronically, Authorized Representatives need an IBM or MAC compatible computer, Internet access, an Internet Browser (Netscape Navigator version 4.08 or Internet Explorer version 5.0 (or later versions) for IBM compatible computers, or Netscape Navigator 5.0 or Internet Explorer 5.0 (or later versions) for MAC compatible computers) and an email account. To retain copies of electronic communications, Authorized Representatives will need a printer attached to their computer or sufficient storage space in their disk drive to save an electronic copy. Additionally, each Authorized Representative must have the Company's password to access the Company's information electronically or to conduct any activity online regarding the Company's PNC Commercial Card Rewards Account on the Rewards Program website.

Authorized Representatives can reach us by telephone at 1-888-919-3173 if any Authorized Representative would like to request a paper copy of these terms and conditions, or to withdraw the Company's consent to receive electronic communications. However, if any Authorized Representative uses the Rewards Program website, we are not obligated to provide any additional communications to the Company, other than these terms and conditions, in a paper writing. We also reserve the right at our option to terminate the Company's participation in the Rewards Program if any Authorized Representative withdraws the Company's consent to receive electronic communications regarding the Rewards Program.

At the Company's option, the Company may choose to receive information of a promotional nature about the Rewards Program. If the Company would like to change its consent to receive these promotions, please visit pnc.com/commercialcard/rewards or call 1-888-919-3173 to update the Company's PNC Commercial Card Rewards Account profile.

### PNC Commercial Card Rewards Account Activity

Authorized Representatives can view the Company's PNC Commercial Card Rewards Account activity at any time online at pnc.com/commercialcard/rewards, which will show the number of points the Company has in its PNC Commercial Card Rewards Account, the recent Qualifying Purchases made with the enrolled PNC commercial cards, and any redemption activity on that PNC Commercial Card Rewards Account. Authorized Representatives can also call 1-888-919-3173 for such information. It may take 1-2 weeks for some of the Company's Qualifying Purchases to be posted to the Company's PNC Commercial Card Rewards Account. Some transactions, for example, online purchases or foreign transactions, may take longer to be posted.

### Canceling Rewards Program Participation

An Authorized Representative may cancel the Company's participation in the Rewards Program at any time by visiting the Rewards Program website at pnc.com/commercialcard/rewards or calling 1-888-919-3173. All points in the Company's PNC Commercial Card Rewards Account will be forfeited and cannot be transferred to another PNC Commercial Card Rewards Account.

### Lost, Stolen or Damaged Cards

The Company will not lose the points in its PNC Commercial Card Rewards Account if an enrolled PNC commercial card is lost, stolen or damaged and we provide a replacement card, even if such replacement card has a different card number. If any enrolled PNC commercial card is lost or stolen, the Company or cardholder should call us immediately at 1-800-685-4039 or the telephone number provided in the Card Agreement to report the loss or theft, and then have an Authorized Representative call us at 1-888-919-3173 regarding the points in the Company's PNC Commercial Card Rewards Account.

### Customer Service

If the Company has a problem or question regarding whether the Company earned points from a particular Qualifying Purchase, whether a Reward was properly redeemed or the status of the Company's redemption order, or any other question regarding the Rewards Program, Authorized Representatives can reach us at pnc.com/commercialcard/rewards or by telephone at 1-888-919-3173.

If an Authorized Representative contacts us regarding an error or mistake with respect to the Company's PNC Commercial Card Rewards Account, we will use reasonable efforts to investigate and correct the error or mistake, subject to the limitations set forth in these terms and conditions. In any event, an Authorized Representative must notify us within 60 days of the posting date or the date of the alleged error or

mistake in order for us to undertake an investigation of the matter.  We may require the Company to provide written confirmation of the alleged error or mistake.  If we do not receive the requested written confirmation at the address and within the time frame requested by us, we may in our sole discretion determine not to correct the alleged error or mistake.  If we complete our investigation of the alleged error or mistake and notify the Company of our determination, we have no further responsibilities should the Company later reassert the same alleged error or mistake.  All questions or disputes regarding the Rewards Program, including eligibility, earning points, or redemption of points for Rewards, will be resolved by us in our sole discretion.

**Disclaimers and Limitations**
We are not responsible for any disputes between or involving the Company, cardholders or other authorized users relating to points, redemption for Rewards, or use of Rewards.

Rewards are provided by a variety of merchants.  We and our service providers are not responsible to the Company for the quality or performance of the Rewards or the products or merchandise purchased or obtained with the Rewards.  The Company may be subject to additional terms and conditions, warranties or other requirements of the merchant, manufacturer or other Rewards provider.  We make no guarantee, warranty or representation of any kind, express or implied, with respect to the Rewards, including but not limited to warranties of merchantability or fitness for a particular purpose.  We are not liable for any injury, damage or loss to person or property or any expense, accident or inconvenience that may arise from  the use of the points, or the use of the Rewards or products or merchandise purchased or obtained with the Rewards, or otherwise in connection with the Rewards Program.  Further, we are not responsible for merchants, manufacturers or other Reward providers that discontinue or cancel a Reward due to bankruptcy or for any other reason.  We make no representation or endorsement of any Reward, merchant or other provider of a Reward in connection with the Rewards Program.

The Company and cardholders hereby release and hold us and all parties associated with the Rewards Program harmless from any claim, liability or damage relating to the Rewards Program or use of the Rewards.  Any Reward offered under this Rewards Program is void where prohibited by law.  Notwithstanding anything in these terms and conditions to the contrary, we and our service providers shall have no liability to the Company or the cardholders in connection with the Rewards Program.

Any required arbitration or other dispute resolution process provided for in the Card Agreement shall apply to the Company's and the cardholders' participation in the Rewards Program.

**Privacy**
All information collected about the Company in connection with the Rewards Program is subject to our privacy policy, a copy of which you can get from us. If anyone uses the Rewards Program website, such person is also subject to the PNC privacy policy, which can be found at www.pnc.com/privacy.

10

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

## COMPLAINT

# EXHIBIT B

# Guaranty and Suretyship Agreement



**THIS GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**") is made and entered into as of <u>November 16, 2020</u> by **CORE TECHNOLOGIES FEDERATED, LLC** (the "**Guarantor**"), with an address at 2800 Colonnades Court, Peachtree Corners, Georgia 30071, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at Firstside Center, 500 First Avenue, Pittsburgh, Pennsylvania 15219, Attn: Commercial Card Operations, to **CORE TECHNOLOGIES, INC.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## 1. Guaranteed Obligations.

(a)     The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest rate, commodity or currency swap, future, option or other similar transaction or agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

(b)     Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute (the "**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading Commission (the "**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect to the

particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrower and the Bank, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

        **(c)**      If the Borrower defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to the Bank.

        **2.**     **Nature of Guaranty; Waivers.**  This is a guaranty of payment and performance, and not merely of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

        This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

        Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived.  The Guarantor waives all defenses based on suretyship or impairment of collateral, and all defenses or benefits relating to or arising under any anti-deficiency laws.

        The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

        **3.**     **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank.  The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such

**Form 9A (Surety)  Rev. 9/20**
**AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI**

contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

**4.     Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

**5.     Enforceability of Obligations.**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted. The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

The Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.

**6.     Events of Default.**  The occurrence of any of the following shall be an "**Event of Default**": (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty. Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Guaranteed Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or (d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

**7.     Right of Setoff.**  In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

**8.     Collateral.**  This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any obligations of the Guarantor to the Bank.

- 3 -

**9.    Costs.**  To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.    Postponement of Subrogation.**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

**11.    Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as otherwise provided in this Guaranty) and will be effective upon receipt.  Notices may be given in any manner to which the Bank and the Guarantor may agree. Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the Bank and the Guarantor agree that Notices may be sent electronically to any electronic address provided by either to the other from time to time.  Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**12.    Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**13.    Illegality.**  If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**14.    Changes in Writing.**  No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**15.    Entire Agreement.**  This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

**16.    Successors and Assigns.**  This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

**Form 9A (Surety)  Rev. 9/20**
**AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI**

**17.    Interpretation.** In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

**18.    Anti-Money Laundering/International Trade Law Compliance.** The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, the date of each disbursement of loan proceeds, the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (C) the funds used to repay the loan proceeds are not derived from any unlawful activity; and (D) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including but not limited to any Anti-Terrorism Laws. Guarantor covenants and agrees that it shall immediately notify the Bank in writing upon the occurrence of a Reportable Compliance Event. Notwithstanding anything to the contrary in this Guaranty or any other document executed in connection with the Guaranteed Obligations, the collateral securing any debt, liabilities or other obligations of any Obligor shall not include any Embargoed Property, but only to the extent and for so long as such collateral is or remains Embargoed Property.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means the Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of the Borrower acting in any capacity in connection with the Facility; "**Embargoed Property**" means any property (a) in which a Sanctioned Person holds an interest; (b) beneficially owned, directly or indirectly, by a Sanctioned Person; (c) that is due to or from a Sanctioned Person; (d) that is located in a Sanctioned Country; or (e) that would otherwise cause any actual or possible violation by Bank of any applicable Anti-Terrorism Law if the Bank were to obtain an encumbrance on, lien on, pledge of or security interest in such property or provide services in consideration of such property; "**Obligor**" means the Guarantor, the Borrower, any other guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Obligations; "**Reportable Compliance Event**" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority. "**Sanctioned Person**" means any individual person, a group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance

- 5 -

Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**19.** **Indemnity.** The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the "**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) (each, a "**Claim**") which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any Claim that is determined by a court of competent jurisdiction in a final, non-appealable judgment to have been solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty. The Guarantor may participate at its expense in the defense of any such action or Claim.

**20.** **Governing Law and Jurisdiction.** This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located (the "**State**"). THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN SUCH STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

**21.** **Counterparts; Electronic Signatures and Records.** This Guaranty may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Notwithstanding any other provision herein, the Guarantor agrees that this Guaranty, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this section may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

**22.** **Limitation of Personal Liability.** Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations and the execution of this Guaranty, the spouse who is deemed not to be the applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit the Bank's right to obtain such judgment, order or other relief against such individual as may be necessary for the Bank to exercise all of its rights and remedies with

- 6 -

respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

       **23.**    **Equal Credit Opportunity Act.**  If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

       **24.**    **Authorization to Obtain Credit Reports.**  By signing below, each person, who is signing in his or her individual capacity, requests and provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain such individual's personal credit profile from one or more national credit bureaus. This authorization extends to obtaining a credit profile in (i) considering an application for credit that is evidenced, guaranteed or secured by this document, (ii) assessing creditworthiness and (iii) considering extensions of credit, including on an ongoing basis, as necessary for the purposes of (a) update, renewal or extension of such credit or additional credit, (b) reviewing, administering or collecting the resulting account and (c) reporting on the repayment and satisfaction of such credit obligations. By signing below, such individual further ratifies and confirms his or her prior requests and authorizations with respect to the matters set forth herein. For the avoidance of doubt, this provision does not apply to persons signing below in their capacities as officers or other authorized representatives of entities, organizations or governmental bodies.

       **25.**    **Representation by Counsel.**  The Guarantor hereby represents that it has been represented by competent counsel of its choice, or has knowingly waived its right to use and retain counsel, in the negotiation and execution of this Guaranty; that it has read and fully understood the terms hereof; that the Guarantor and any retained counsel have been afforded an opportunity to review, negotiate and modify the terms of this Guaranty; and that it intends to be bound hereby. In accordance with the foregoing, the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract shall not be employed in the construction and interpretation of this Guaranty.

       **26.**    **State Specific Provisions.**

       **(a)**    **Power to Confess Judgment.  The Guarantor hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of the Bank or any holder hereof for the amount of the Guaranteed Obligations and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant. The Guarantor hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. The Guarantor acknowledges and agrees that, pursuant to the foregoing power to confess judgment granted to the Bank, the Guarantor is voluntarily and knowingly waiving its right to notice and a hearing prior to the entry of a judgment by the Bank against the Guarantor.**

       **No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Bank shall elect until such time as the Bank shall have received payment in full of the Guaranteed Obligations and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Bank may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by the Bank.**

27.    WAIVER OF JURY TRIAL. THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understands all the provisions of this Guaranty, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

CORE TECHNOLOGIES FEDERATED, LLC

By: _Robl Eye_____
                                    (SEAL)
Print Name: _Robert E. Eicpen_
Title: _Vice-president_

Form 9A (Surety)  Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

## Disclosure for Confession of Judgment
### (GUARANTOR)

| | |
|---|---|
| **Undersigned:** | **Core Technologies Federated, LLC**<br>**2800 Colonnades Court**<br>**Peachtree Corners, Georgia 30071** |
| **Lender:** | **PNC Bank, National Association**<br>**Firstside Center**<br>**500 First Avenue**<br>**Pittsburgh, Pennsylvania 15219**<br>**Attn: Commercial Card Operations** |

The undersigned has executed, and/or is executing, on or about the date hereof, a guaranty in respect of the obligations owed to Lender by Core Technologies, Inc., under which the undersigned is obligated to repay monies to Lender.

A.   THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED. BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT MAY BE ASSERTED AGAINST IT BY LENDER THEREUNDER BEFORE JUDGMENT IS ENTERED, THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO LENDER'S ENTERING JUDGMENT AGAINST IT BY CONFESSION PURSUANT TO THE TERMS THEREOF.

B.   THE UNDERSIGNED ALSO ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY, AFTER ENTRY OF JUDGMENT AND WITHOUT EITHER NOTICE OR A HEARING, FORECLOSE UPON, ATTACH, LEVY, TAKE POSSESSION OF OR OTHERWISE SEIZE PROPERTY OF THE UNDERSIGNED IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. BEING FULLY AWARE OF ITS RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE TO OPEN OR STRIKE THE JUDGMENT), THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES ITS RIGHTS TO NOTICE AND A HEARING AND EXPRESSLY AGREES AND CONSENTS TO LENDER TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE UNDERSIGNED.

C.   The undersigned certifies that a representative of Lender specifically called the confession of judgment provisions in the above document to the attention of the undersigned, and/or that the undersigned was represented by legal counsel in connection with the above document.

D.   The undersigned hereby certifies:  that its annual income exceeds $10,000; that all references to "the undersigned" above refer to all persons and entities signing below; and that the undersigned received a copy hereof at the time of signing.

Dated: 11/16/2020

**CORE TECHNOLOGIES FEDERATED, LLC**

By: John Eigen

(SEAL)

Print Name: Robert E. Eigen

Title: Vice-president.

- 9 -

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

---

### COMPLAINT

---

# EXHIBIT C

# Guaranty and Suretyship Agreement



**THIS GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**") is made and entered into as of <u>November 19, 2020</u> by **ROBERT E. EIGEN** (the "**Guarantor**"), with an address at 3295 Commons Gate Bend, Norcross, Georgia 30092, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at Firstside Center, 500 First Avenue, Pittsburgh, Pennsylvania 15219, Attn: Commercial Card Operations, to **CORE TECHNOLOGIES, INC.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.     <u>**Guaranteed Obligations.**</u>

        **(a)**     The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest rate, commodity or currency swap, future, option or other similar transaction or agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

        **(b)**     Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute (the "**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading Commission (the "**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular

Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrower and the Bank, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

(c)     If the Borrower defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to the Bank.

2.     **Nature of Guaranty; Waivers.**  This is a guaranty of payment and performance, and not merely of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived.  The Guarantor waives all defenses based on suretyship or impairment of collateral, and all defenses or benefits relating to or arising under any anti-deficiency laws.

The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

3.     **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank.  The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such

- 2 -

contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

4.  **Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

5.  **Enforceability of Obligations.**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted.  The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

The Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.

6.  **Events of Default.**  The occurrence of any of the following shall be an "**Event of Default**": (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty.  Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Guaranteed Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or (d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

7.  **Right of Setoff.**  In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts.  Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor.  Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

8.  **Collateral.**  This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any obligations of the Guarantor to the Bank.

- 3 -

**9.** **Costs.**  To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.** **Postponement of Subrogation.**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

**11.** **Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as otherwise provided in this Guaranty) and will be effective upon receipt.  Notices may be given in any manner to which the Bank and the Guarantor may agree. Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the Bank and the Guarantor agree that Notices may be sent electronically to any electronic address provided by either to the other from time to time.  Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**12.** **Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**13.** **Illegality.**  If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**14.** **Changes in Writing.**  No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**15.** **Entire Agreement.**  This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

**16.** **Successors and Assigns.**  This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

- 4 -

17.    **Interpretation.**  In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty.  Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose.  If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

18.    **Anti-Money Laundering/International Trade Law Compliance.**  The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, the date of each disbursement of loan proceeds, the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (C) the funds used to repay the loan proceeds are not derived from any unlawful activity; and (D) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including but not limited to any Anti-Terrorism Laws. Guarantor covenants and agrees that it shall immediately notify the Bank in writing upon the occurrence of a Reportable Compliance Event. Notwithstanding anything to the contrary in this Guaranty or any other document executed in connection with the Guaranteed Obligations, the collateral securing any debt, liabilities or other obligations of any Obligor shall not include any Embargoed Property, but only to the extent and for so long as such collateral is or remains Embargoed Property.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means the Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of the Borrower acting in any capacity in connection with the Facility; "**Embargoed Property**" means any property (a) in which a Sanctioned Person holds an interest; (b) beneficially owned, directly or indirectly, by a Sanctioned Person; (c) that is due to or from a Sanctioned Person; (d) that is located in a Sanctioned Country; or (e) that would otherwise cause any actual or possible violation by Bank of any applicable Anti-Terrorism Law if the Bank were to obtain an encumbrance on, lien on, pledge of or security interest in such property or provide services in consideration of such property; "**Obligor**" means the Guarantor, the Borrower, any other guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Obligations; "**Reportable Compliance Event**" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority.  "**Sanctioned Person**" means any individual person, a group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance

Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**19.**   **Indemnity.**  The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the "**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) (each, a "**Claim**") which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any Claim that is determined by a court of competent jurisdiction in a final, non-appealable judgment to have been solely attributable to an Indemnified Party's gross negligence or willful misconduct.  The indemnity agreement contained in this Section shall survive the termination of this Guaranty.  The Guarantor may participate at its expense in the defense of any such action or Claim.

**20.**   **Governing Law and Jurisdiction.**  This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located (the "**State**"). THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN SUCH STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT).  The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction.  The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor.  The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

**21.**   **Counterparts; Electronic Signatures and Records.**  This Guaranty may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.  Notwithstanding any other provision herein, the Guarantor agrees that this Guaranty, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record.  Any Communication may, at the Bank's option, be signed or executed using electronic signatures.  For the avoidance of doubt, the authorization under this section may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

**22.**   **Limitation of Personal Liability.**  Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations and the execution of this Guaranty, the spouse who is deemed not to be the applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit the Bank's right to obtain such judgment, order or other relief against such individual as may be necessary for the Bank to exercise all of its rights and remedies with

- 6 -

respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

23.    **Equal Credit Opportunity Act.**  If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

24.    **Authorization to Obtain Credit Reports.**  By signing below, each person, who is signing in his or her individual capacity, requests and provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain such individual's personal credit profile from one or more national credit bureaus. This authorization extends to obtaining a credit profile in (i) considering an application for credit that is evidenced, guaranteed or secured by this document, (ii) assessing creditworthiness and (iii) considering extensions of credit, including on an ongoing basis, as necessary for the purposes of (a) update, renewal or extension of such credit or additional credit, (b) reviewing, administering or collecting the resulting account and (c) reporting on the repayment and satisfaction of such credit obligations. By signing below, such individual further ratifies and confirms his or her prior requests and authorizations with respect to the matters set forth herein. For the avoidance of doubt, this provision does not apply to persons signing below in their capacities as officers or other authorized representatives of entities, organizations or governmental bodies.

25.    **Representation by Counsel.**  The Guarantor hereby represents that it has been represented by competent counsel of its choice, or has knowingly waived its right to use and retain counsel, in the negotiation and execution of this Guaranty; that it has read and fully understood the terms hereof; that the Guarantor and any retained counsel have been afforded an opportunity to review, negotiate and modify the terms of this Guaranty; and that it intends to be bound hereby. In accordance with the foregoing, the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract shall not be employed in the construction and interpretation of this Guaranty.

26.    **State Specific Provisions.**

(a)    **Power to Confess Judgment.  The Guarantor hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of the Bank or any holder hereof for the amount of the Guaranteed Obligations and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant.  The Guarantor hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. The Guarantor acknowledges and agrees that, pursuant to the foregoing power to confess judgment granted to the Bank, the Guarantor is voluntarily and knowingly waiving its right to notice and a hearing prior to the entry of a judgment by the Bank against the Guarantor.**

**No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Bank shall elect until such time as the Bank shall have received payment in full of the Guaranteed Obligations and costs.  Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Bank may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by the Bank.**

Form 9A (Surety) Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

27.     WAIVER OF JURY TRIAL. THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understands all the provisions of this Guaranty, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

                                              _____ (SEAL)
                    **ROBERT E. EIGEN**

- 8 -

## Disclosure for Confession of Judgment
### (GUARANTOR)

**Undersigned:**    **Robert E. Eigen**
          **3295 Commons Gate Bend**
          **Norcross, Georgia 30092**

**Lender:**       **PNC Bank, National Association**
          **Firstside Center**
          **500 First Avenue**
          **Pittsburgh, Pennsylvania 15219**
          **Attn: Commercial Card Operations**

The undersigned has executed, and/or is executing, on or about the date hereof, a guaranty in respect of the obligations owed to Lender by Core Technologies, Inc., under which the undersigned is obligated to repay monies to Lender.

A.    THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED. BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT MAY BE ASSERTED AGAINST IT BY LENDER THEREUNDER BEFORE JUDGMENT IS ENTERED, THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO LENDER'S ENTERING JUDGMENT AGAINST IT BY CONFESSION PURSUANT TO THE TERMS THEREOF.

B.    THE UNDERSIGNED ALSO ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY, AFTER ENTRY OF JUDGMENT AND WITHOUT EITHER NOTICE OR A HEARING, FORECLOSE UPON, ATTACH, LEVY, TAKE POSSESSION OF OR OTHERWISE SEIZE PROPERTY OF THE UNDERSIGNED IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. BEING FULLY AWARE OF ITS RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE TO OPEN OR STRIKE THE JUDGMENT), THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES ITS RIGHTS TO NOTICE AND A HEARING AND EXPRESSLY AGREES AND CONSENTS TO LENDER TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE UNDERSIGNED.

C.    The undersigned certifies that a representative of Lender specifically called the confession of judgment provisions in the above document to the attention of the undersigned, and/or that the undersigned was represented by legal counsel in connection with the above document.

D.    The undersigned hereby certifies:  that its annual income exceeds $10,000; that all references to "the undersigned" above refer to all persons and entities signing below; and that the undersigned received a copy hereof at the time of signing.

Dated:  11 | 16 | 2020                          Robert Eigen                    (SEAL)

                                          **ROBERT E. EIGEN**

Form 9A (Surety)  Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

## COMPLAINT

# EXHIBIT D

# Guaranty and Suretyship Agreement



**THIS GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**") is made and entered into as of ___*Nov  17, 2020*___, by **DEBBIE D. BINETTE** (the "**Guarantor**"), with an address at 5216 Tealing Drive Northeast, Roswell, Georgia 30075, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at Firstside Center, 500 First Avenue, Pittsburgh, Pennsylvania 15219, Attn: Commercial Card Operations, to **CORE TECHNOLOGIES, INC.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.     **Guaranteed Obligations.**

    **(a)**    The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest rate, commodity or currency swap, future, option or other similar transaction or agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

    **(b)**    Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute (the "**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading Commission (the "**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular

Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrower and the Bank, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

(c)     If the Borrower defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to the Bank.

2.     **Nature of Guaranty; Waivers.**  This is a guaranty of payment and performance, and not merely of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived.  The Guarantor waives all defenses based on suretyship or impairment of collateral, and all defenses or benefits relating to or arising under any anti-deficiency laws.

The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

3.     **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank.  The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such

- 2 -

contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

     **4.**     **Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

     **5.**     **Enforceability of Obligations.**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted. The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

     The Guarantor expressly waives the effect of any statute of limitations or other limitations on any actions under this Guaranty.

     **6.**     **Events of Default.**  The occurrence of any of the following shall be an "**Event of Default**": (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty. Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Guaranteed Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or (d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

     **7.**     **Right of Setoff.**  In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

     **8.**     **Collateral.**  This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any obligations of the Guarantor to the Bank.

- 3 -

**9.    Costs.**  To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.    Postponement of Subrogation.**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

**11.    Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as otherwise provided in this Guaranty) and will be effective upon receipt.  Notices may be given in any manner to which the Bank and the Guarantor may agree. Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the Bank and the Guarantor agree that Notices may be sent electronically to any electronic address provided by either to the other from time to time.  Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**12.    Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**13.    Illegality.**  If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**14.    Changes in Writing.**  No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**15.    Entire Agreement.**  This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

**16.    Successors and Assigns.**  This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

Form 9A (Surety)  Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

17.     **Interpretation.**  In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty.  Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose.  If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

18.     **Anti-Money Laundering/International Trade Law Compliance.**  The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, the date of each disbursement of loan proceeds, the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country in violation of any law, regulation, order or directive enforced by any Compliance Authority; (C) the funds used to repay the loan proceeds are not derived from any unlawful activity; and (D) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including but not limited to any Anti-Terrorism Laws.  Guarantor covenants and agrees that it shall immediately notify the Bank in writing upon the occurrence of a Reportable Compliance Event. Notwithstanding anything to the contrary in this Guaranty or any other document executed in connection with the Guaranteed Obligations, the collateral securing any debt, liabilities or other obligations of any Obligor shall not include any Embargoed Property, but only to the extent and for so long as such collateral is or remains Embargoed Property.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means the Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of the Borrower acting in any capacity in connection with the Facility; "**Embargoed Property**" means any property (a) in which a Sanctioned Person holds an interest; (b) beneficially owned, directly or indirectly, by a Sanctioned Person; (c) that is due to or from a Sanctioned Person; (d) that is located in a Sanctioned Country; or (e) that would otherwise cause any actual or possible violation by Bank of any applicable Anti-Terrorism Law if the Bank were to obtain an encumbrance on, lien on, pledge of or security interest in such property or provide services in consideration of such property; "**Obligor**" means the Guarantor, the Borrower, any other guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Obligations; "**Reportable Compliance Event**" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority.  "**Sanctioned Person**" means any individual person, a group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance

- 5 -

Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

19. **Indemnity.** The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the "**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) (each, a "**Claim**") which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any Claim that is determined by a court of competent jurisdiction in a final, non-appealable judgment to have been solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty. The Guarantor may participate at its expense in the defense of any such action or Claim.

20. **Governing Law and Jurisdiction.** This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located (the "**State**"). THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN SUCH STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

21. **Counterparts; Electronic Signatures and Records.** This Guaranty may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Notwithstanding any other provision herein, the Guarantor agrees that this Guaranty, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this section may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

22. **Limitation of Personal Liability.** Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations and the execution of this Guaranty, the spouse who is deemed not to be the applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit the Bank's right to obtain such judgment, order or other relief against such individual as may be necessary for the Bank to exercise all of its rights and remedies with

- 6 -

respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

23. **Equal Credit Opportunity Act.** If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

24. **Authorization to Obtain Credit Reports.** By signing below, each person, who is signing in his or her individual capacity, requests and provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain such individual's personal credit profile from one or more national credit bureaus. This authorization extends to obtaining a credit profile in (i) considering an application for credit that is evidenced, guaranteed or secured by this document, (ii) assessing creditworthiness and (iii) considering extensions of credit, including on an ongoing basis, as necessary for the purposes of (a) update, renewal or extension of such credit or additional credit, (b) reviewing, administering or collecting the resulting account and (c) reporting on the repayment and satisfaction of such credit obligations. By signing below, such individual further ratifies and confirms his or her prior requests and authorizations with respect to the matters set forth herein. For the avoidance of doubt, this provision does not apply to persons signing below in their capacities as officers or other authorized representatives of entities, organizations or governmental bodies.

25. **Representation by Counsel.** The Guarantor hereby represents that it has been represented by competent counsel of its choice, or has knowingly waived its right to use and retain counsel, in the negotiation and execution of this Guaranty; that it has read and fully understood the terms hereof; that the Guarantor and any retained counsel have been afforded an opportunity to review, negotiate and modify the terms of this Guaranty; and that it intends to be bound hereby. In accordance with the foregoing, the general rule of construction to the effect that any ambiguities in a contract are to be resolved against the party drafting the contract shall not be employed in the construction and interpretation of this Guaranty.

26. **State Specific Provisions.**

(a) **Power to Confess Judgment. The Guarantor hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of the Bank or any holder hereof for the amount of the Guaranteed Obligations and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant. The Guarantor hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. The Guarantor acknowledges and agrees that, pursuant to the foregoing power to confess judgment granted to the Bank, the Guarantor is voluntarily and knowingly waiving its right to notice and a hearing prior to the entry of a judgment by the Bank against the Guarantor.**

**No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Bank shall elect until such time as the Bank shall have received payment in full of the Guaranteed Obligations and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Bank may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by the Bank.**

Form 9A (Surety) Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

27.     <u>WAIVER OF JURY TRIAL</u>.  THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understands all the provisions of this Guaranty, including the confession of judgment and waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

(SEAL)

**DEBBIE D. BINETTE**

**Form 9A (Surety)  Rev. 9/20**
**AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI**

## Disclosure for Confession of Judgment
### (GUARANTOR)

**Undersigned:**      **Debbie D. Binette**
**5216 Tealing Drive Northeast**
**Roswell, Georgia 30075**

**Lender:**      **PNC Bank, National Association**
**Firstside Center**
**500 First Avenue**
**Pittsburgh, Pennsylvania 15219**
**Attn: Commercial Card Operations**

The undersigned has executed, and/or is executing, on or about the date hereof, a guaranty in respect of the obligations owed to Lender by Core Technologies, Inc., under which the undersigned is obligated to repay monies to Lender.

A.      THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY ENTER JUDGMENT BY CONFESSION AGAINST THE UNDERSIGNED. BEING FULLY AWARE OF ITS RIGHTS TO PRIOR NOTICE AND A HEARING ON THE VALIDITY OF ANY JUDGMENT OR OTHER CLAIMS THAT MAY BE ASSERTED AGAINST IT BY LENDER THEREUNDER BEFORE JUDGMENT IS ENTERED, THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES THESE RIGHTS AND EXPRESSLY AGREES AND CONSENTS TO LENDER'S ENTERING JUDGMENT AGAINST IT BY CONFESSION PURSUANT TO THE TERMS THEREOF.

B.      THE UNDERSIGNED ALSO ACKNOWLEDGES AND AGREES THAT THE ABOVE DOCUMENT CONTAINS PROVISIONS UNDER WHICH LENDER MAY, AFTER ENTRY OF JUDGMENT AND WITHOUT EITHER NOTICE OR A HEARING, FORECLOSE UPON, ATTACH, LEVY, TAKE POSSESSION OF OR OTHERWISE SEIZE PROPERTY OF THE UNDERSIGNED IN FULL OR PARTIAL PAYMENT OF THE JUDGMENT. BEING FULLY AWARE OF ITS RIGHTS AFTER JUDGMENT IS ENTERED (INCLUDING THE RIGHT TO MOVE TO OPEN OR STRIKE THE JUDGMENT), THE UNDERSIGNED HEREBY FREELY, KNOWINGLY AND INTELLIGENTLY WAIVES ITS RIGHTS TO NOTICE AND A HEARING AND EXPRESSLY AGREES AND CONSENTS TO LENDER TAKING SUCH ACTIONS AS MAY BE PERMITTED UNDER APPLICABLE STATE AND FEDERAL LAW WITHOUT PRIOR NOTICE TO THE UNDERSIGNED.

C.      The undersigned certifies that a representative of Lender specifically called the confession of judgment provisions in the above document to the attention of the undersigned, and/or that the undersigned was represented by legal counsel in connection with the above document.

D.      The undersigned hereby certifies:  that its annual income exceeds $10,000; that all references to "the undersigned" above refer to all persons and entities signing below; and that the undersigned received a copy hereof at the time of signing.

Dated: 11/17/2020

_Debbie D Binette_ (SEAL)

**DEBBIE D. BINETTE**

Form 9A (Surety)  Rev. 9/20
AL/CO/CT/DC/DE/FL/MA/MD/MI/MN/MO/NJ/NY/PA/SC/TX/VA/WI

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

---

## COMPLAINT

---

# EXHIBIT E



VIA OVERNIGHT MAIL

August 9, 2022

Core Technologies, Inc.
2800 Colonnades Court
Norcross, GA 30071
Attn: Robert Eigen, Vice President

Re:      PNC Commercial Card Agreement

Dear Mr. Eigen:

Reference is made to the following commercial card agreement (as amended, modified or supplemented from time to time, the "**Agreement**") between Core Technologies, Inc. (the "**Company**") and PNC Bank, National Association (the "**Bank**"):

PNC Commercial Card Program Authorization and Agreement, effective as of December 11, 2020

The Agreement sets forth the terms and conditions under which the Bank has provided one or more Card programs (individually and collectively, the "**Program**") for the Company. Capitalized terms in the Agreement have the same meaning herein as in the Agreement, unless otherwise defined herein.

The Agreement provides that the Bank may terminate the Agreement at any time without cause upon at least sixty (60) days' prior written notice to the Company. This letter constitutes written notice that the Bank is exercising its rights under the foregoing provision to terminate the Agreement. Accordingly, the Agreement will terminate on October 11, 2022 (the "**Termination Date**"). All amounts outstanding under the Agreement must be paid in full no later than the Termination Date, and no purchases or cash advances may be made after the Termination Date. In addition, the Bank reserves the right to terminate the Agreement immediately upon the occurrence of any Default prior to the Termination Date.

The Bank hereby expressly reserves all its rights and remedies against the Company under the Agreement, and under applicable law and equity. This letter, any forbearance, any action or failure to act, any acceptance of any payment, and any negotiation by the Bank are not and shall not be construed to be a modification, alteration, release, limitation, or waiver, of any right, remedy, power, or privilege of the Bank under the Agreement, applicable law, or equity. The failure of the Bank to exercise any right, remedy, power or privilege under the Agreement, applicable law, or equity does not constitute a waiver thereof or an agreement not to exercise any right, remedy, power, or privileges it has or may have.

If you have any questions, please contact us at (800) 685-4039.

Sincerely,

PNC BANK, NATIONAL ASSOCIATION

By: _Magdi Saad_____

Magdi Saad
Assistant Vice President

**The PNC Financial Services Group**

Firstside Center  500 First Avenue  P7-PFSC-03-D  Pittsburgh  Pennsylvania  15219
www.pnc.com

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

---

## COMPLAINT

---

# EXHIBIT F



**Attorneys at Law**
**Alabama**
Colorado
Florida
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Tennessee
Texas
Washington, DC

November 8, 2022

### Notice of Default, Demand for
### <u>Payment, and Reservation of Rights</u>

**Danielle E. Douglas**
Direct:  205.250.5024
E-Fax:  205.488.8024
danielle.douglas@arlaw.com

<u>**VIA FEDEX, SIGNATURE REQUIRED**</u>

Core Technologies, Inc.
As Borrower
Attn: Robert Eigen
2800 Colonnades Court
Norcross, GA 30071

Re:     Payment default by Core Technologies, Inc. as Borrower ("Borrower") and Core Technologies Federated, LLC, Robert Eigan, and Debbie D. Binette as Guarantors (the "Guarantors," and collectively with Borrower, the "Obligors") under that certain PNC Commercial Card Program Authorization and Agreement dated December 11, 2020, and those certain Guaranties dated November 16th, 17th, and 19th, 2020.

Dear Obligors:

We write on behalf of PNC Bank, N.A. ("PNC").  This is notice of Obligors' default under the following:

(a)     that certain PNC Commercial Card Program Authorization and Agreement dated December 11, 2020 (the "<u>P-Card Agreement</u>");

(b)     that certain Guaranty and Suretyship Agreement dated November 16, 2020 executed by Core Technologies Federated, LLC and delivered to PNC (the "<u>Core Technologies Federated Guaranty</u>");

(c)     that certain Guaranty and Suretyship Agreement dated November 17, 2020 executed by Debbie D. Binette and delivered to PNC (the "<u>Binette Guaranty</u>"); and

(d)     that certain Guaranty and Suretyship Agreement dated November 19, 2020 executed by Robert E. Eigen and delivered to PNC (the "<u>Eigen Guaranty</u>").

The P-Card Agreement, Core Technologies Federated Guaranty, Binette Guaranty, Eigen Guaranty (collectively, the "<u>Guaranties</u>"), and all amendments, schedules, exhibits, forbearances, addendums and other documents and agreements thereto, are collectively referred to herein as the "<u>Loan Documents</u>."

This letter is notice to the Obligors that certain Events of Default have occurred under the Loan Documents as a result of Obligors' failure to pay the balance due and owing under the Loan Documents (the "Notice"). Borrower was notified by PNC on August 9, 2022 that all amounts outstanding under the P-Card Agreement were to be paid in full no later than October 11, 2022. Unfortunately, all amounts outstanding under the P-Card Agreement have still not been paid (the "Existing Default").

As of November 8th, 2022, the past due outstanding amounts included $150,000.00 of overdue principal, plus late fees incurred pursuant to the terms of the P-Card Agreement, plus attorneys' fees and costs pursuant to the Guaranties. **Demand is hereby made on Borrower for the immediate payment of these amounts to PNC. You will receive no further Notice before PNC takes legal action against Obligors if arrangements are not made for payment of the entire outstanding balance, plus late fees, attorneys' fees, and costs.**

All rights and remedies of PNC under the Loan Documents, including, without limitation, all rights and remedies now or hereafter existing as a result of the Existing Default are expressly reserved. Nothing in this letter, and no action or failure to act by PNC, including the acceptance of any partial payments, shall constitute, or be deemed or construed to constitute, a waiver, modification, or release by PNC of any right or remedy under the Loan Documents, or available at law or in equity, as against Obligors, each of which rights and remedies are hereby expressly reserved by PNC as aforesaid. PNC reserves the right to commence an action or actions against the Obligors pursuant to the consent to jurisdiction provisions of the Loan Documents.

Additionally, PNC continues to reserve all rights and remedies and may choose to exercise such rights and remedies under the Loan Documents at any time in the future without any further written notice to Obligors. Such rights and remedies include, without limitation, seeking to collect the amounts owed under the Loan Documents, to accelerate the amounts owed under the Loan Documents, to commence appropriate judicial or non-judicial proceedings to protect its interest in any and all other collateral securing Obligors' obligations to PNC, and to collect all of the attorneys' fees and costs that it incurs in connection with its collection efforts related to the Loan Documents to the full extent provided for in the Loan Documents and/or applicable law.

In light of the Existing Default, no forbearance, delay or inaction by PNC in the exercise of its rights and remedies, no payment or continuing performance by Obligors in connection with or under the Loan Documents, and nothing in this Notice or any document executed prior to this Notice: (a) shall constitute (i) a modification or alteration of the terms, conditions or covenants of the Loan Documents, all of which remain in full force and effect, (ii) a waiver of any default or event of default resulting from the Existing Default or of any other default or event of default, if any, that may now or hereafter exist, (iii) a waiver, release or limitation upon the rights and remedies under, or of PNC's exercise of any of its rights and remedies under, the Loan Documents or applicable law, all of which are hereby expressly reserved, (iv) a modification or an alteration of the terms, conditions, or covenants of any of the Loan Documents, all of which remain in full force and effect; or (b) shall release Obligors in any way from any of their respective duties, obligations, covenants or agreements under the Loan Documents.

PNC has not waived or granted any forbearance with respect to, and is not obligated to waive, or grant any forbearance with respect to, the Existing Default or any other default or event

of default, whether now existing or that may occur after the date of this Notice.  PNC reserves the right to require strict compliance with all terms of the Loan Documents.  No conversations, e-mail messages or other written communications, or unwritten agreements or understandings will be binding on PNC or waive or modify any of the matters specified in this Notice or any of the Loan Documents or the rights and remedies under the Loan Documents.

Except as set forth above, PNC has chosen not to exercise each and every right and remedy under the Loan Documents at this time as a consequence of the above Event of Default, but may choose to do so at any time in the future without any further written notice to the Obligors. Please note that, although this Notice does not relate to any other credit facility or agreement between PNC and Obligors, PNC specifically reserves all rights and remedies afforded to it through any other such agreement(s).

Please govern yourselves accordingly, and contact the undersigned immediately upon your receipt of this correspondence to make arrangements to pay the total outstanding balance of $150,000.00, plus late fees, attorneys' fees, and costs.

Sincerely,

Danielle E. Douglas

DED

cc:     Linda McCalmont, Vice President, PNC Bank, N.A. (via email)
        Robert E. Eigen, Guarantor (3295 Commons Gate Bend, Norcross, GA 30092)
        Debbie D. Binette, Guarantor (5216 Tealing Drive NE, Roswell, GA 30075)
        Core Technologies Federated, LLC, Guarantor (2800 Colonnades Court, Peachtree Corners, GA 30071)

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | § § | |
| Plaintiff, | § | |
| v. | § | Civil Action No.: _____ |
| | § | |
| CORE TECHNOLOGIES, INC., a Georgia Corporation; CORE TECHNOLOGIES FEDERATED, LLC, a Georgia LLC; ROBERT E. EIGEN, a resident of Georgia; & DEBBIE D. BINETTE, a resident of Georgia; | § § § § § § | |
| Defendants. | § | |

---

### COMPLAINT

---

# EXHIBIT G



**ADAMS AND REESE** LLP ®

**Attorneys at Law**
**Alabama**
Colorado
Florida
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Tennessee
Texas
Washington, DC

January 5, 2023

**Follow-Up to Notice of Default, Demand for**
**Payment, and Reservation of Rights**

**Danielle E. Douglas**
Direct:  205.250.5024
E-Fax:  205.488.8024
danielle.douglas@arlaw.com

**HAND DELIVERY**

Core Technologies, Inc.
As Borrower
Attn: Robert Eigen
2800 Colonnades Court
Norcross, GA 30071

Re:     Follow-up to notice of payment default by Core Technologies, Inc. as Borrower
("Borrower") and Core Technologies Federated, LLC, Robert Eigan, and Debbie
D. Binette as Guarantors (the "Guarantors," and collectively with Borrower, the
"Obligors") under that certain PNC Commercial Card Program Authorization and
Agreement dated December 11, 2020, and those certain Guaranties dated
November 16th, 17th, and 19th, 2020.

Dear Obligors:

We write on behalf of our client PNC Bank, National Association ("PNC") as a follow-up
to our letter dated November 8, 2022, a copy of which is enclosed herein for ease of reference. It
is our understanding that the amounts owed to PNC remain outstanding. **Please contact the
undersigned immediately upon receipt of this letter to arrange payment of the outstanding
amounts.** You may contact me by phone at (205) 250-5024, or by email at
danielle.douglas@arlaw.com.

Sincerely,

Danielle E. Douglas

cc:     Linda McCalmont, Vice President, PNC Bank, N.A. (via email)