# UNITED STATES DISTRICT COURT
# NOTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| MIKE SHAFER, on Behalf of Himself and All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　v.<br><br>ACTIVE NETWORK LLC, GLOBAL PAYMENTS, INC., JEFF SLOAN, CAMERON BREADY, PAUL TODD, AND JOSH WHIPPLE,<br><br>　　　　　　　　　Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mike Shafer ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Laws ("Complaint") against Global Payments, Inc. ("Global Payments" or the "Company") and Active Network, LLC ("Active Network" or "Active"); Jeff Sloan ("Sloan"), Global Payments' Chief Executive Officer ("CEO"); Cameron Bready ("Bready"), Global Payments' President and Chief Operating Officer ("COO"); Paul Todd ("Todd"), Global Payments' former Chief Financial Officer ("CFO"); and Josh Whipple ("Whipple"), Global Payments' Senior Executive Vice President and current CFO,[1] based upon, *inter alia*, the investigation conducted by counsel, which included a review of Global Payments' public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Global Payments, analysts' reports and advisories about Global Payments and other information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Global Payments

---

[1] Sloan, Bready, Todd, and Whipple are sometimes referred to herein as the "Individual Defendants," and together with Global Payments and Active Network, the "Defendants."

1

and the Individual Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Global Payments securities between October 31, 2019 and October 18, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Global Payments is a Georgia company headquartered in Atlanta, Georgia. Global Payments is a leading payments technology company that delivers innovative software and services to merchants and financial institutions worldwide. Global Payments is a Fortune 500 company and is a member of the S&P 500. One of Global Payments' wholly owned subsidiaries is Active Network, which provides third-party registration and payment processing services to consumers signing up to participate in events. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and

2

compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Active Network used deceptive and abusive acts and practices to dupe its customers into enrolling into Active Network's own discount club; (b) since July 2011, Active Network, and by extension, Global Payments, was aware of such unauthorized conduct and that it was violating relevant regulations and laws aimed at protecting its consumers; (c) since 2011, Global Payments failed to properly monitor its subsidiary from engaging in such unlawful conduct, detect and stop the misconduct, and identify and remediate harmed consumers; (d) all the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (e) Global Payments' revenues were in part the product of Active Network's unlawful conduct and thus unsustainable; and (f) as a result, the Company's public statements were materially false and misleading at all relevant times.

3.      On October 18, 2022, the truth about Global Payments' practices was disclosed when the Consumer Financial Protection Bureau ("CFPB") issued a Complaint against Active Network for illegally cramming consumers with membership fees.

4.      On this news, the price of Global Payments' stock fell precipitously and closed at $113.67 on October 18, 2022.

5.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

8.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act 15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Global Payments maintains its headquarters in Atlanta, Georgia, which is situated in this District. Many of the acts, the alleged misstatements and omissions were made or omitted, and subsequent damages took place in this Judicial District as well. Pursuant to Global Payments' most recent quarterly report (SEC Form 10-Q), as of October 31, 2022, there were 270,401,146 shares of Global Payments' common stock outstanding. Global Payments' common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands,

of investors in Global Payments' common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

9.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

### III.   PARTIES

10.      Plaintiff is a resident of Washington. As set forth in the attached Certification(s), incorporated by reference herein, Plaintiff acquired Global Payments securities during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.      Defendant Global Payments is a Georgia publicly traded corporation with its principal place of business at 3550 Lenox Road, Atlanta Georgia. Global Payments is the publicly traded parent company of Active Network, LLC, and its shares trade on the NYSE under the ticker symbol "GPN."

12.      Defendant Jeff Sloan is the Chief Executive Officer of Global Payments. He joined Global Payments as President in 2010 and became Chief Executive Officer in 2013.

13.     Defendant Cameron Bready is the President and Chief Operating Officer of Global Payments and has held these roles from 2020 to 2022. From 2014 to 2019, Cameron served as Global Payments' Senior Executive Vice President and Chief Financial Officer.

14.     Defendant Paul Todd was Global Payments' Chief Financial Officer from 2014 to June 30, 2022.

15.     Defendant Josh Whipple is the Senior Executive Vice President and Chief Financial Officer of Global Payments. Prior to the appointments of these roles effective July 1, 2022, Defendant Whipple served as the Company's Chief Strategy and Enterprise Risk Officer from 2015 to 2022.

16.     The Individual Defendants possessed the authority to control the contents of statements made by Global Payments in its reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Global Payments' reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their positions with Global Payments, and their access to Global Payments' material information that was unavailable to the public, the Individual Defendants knew that

the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Background

17.    Founded in 1967, Global Payments is a Georgia company headquartered in Atlanta, Georgia. Global Payments is a leading payments technology company that delivers innovative software and services to approximately 4 million merchant locations and more than 1,350 financial institutions across more than 170 countries throughout North America, Europe, Asia-Pacific and Latin America. Global Payments' technologies and services allow the Company to provide a broad range of solutions that enable its customers to operate their businesses more efficiently across a variety of channels across the world.

18.    Global Payments is a Fortune 500 Company, is a member of the S&P 500, and its stock is traded on the New York Stock Exchange under the symbol "GPN."

19.    Active Network, LLC is a wholly owned subsidiary of Global Payments, Inc. and was acquired by the Company in 2017 for a reported $1.2 billion.

20.     Active Network offers or provides payments processing and storage services to consumers for personal, family, or household purposes, namely to consumers sending payments for event registrations such as a race. Active Network transmits payments primarily through its parent company, Global Payments. Global Payments further processes the payments and receives remittances that it transmits back to Active Network for further processing and distribution to event organizers.

21.     Active Network's webpages, since at least 2019, have stated that Active Network has been providing "online payment processing to event organizers for over 13 years" and that it is committed to "stor[ing], process[ing] and transmit[ting] cardholder data" securely.

22.     Event organizers contract with Active Network so participants in their events can register and pay for events online. Active Network collects the consumers' registration information and consumer payments data so that it can transmit the consumer payments data through the payments systems. Active Network is compensated by collecting a portion of the remittances that it transmits to the event organizers.

23.     Since at least July 21, 2011, Active Network has marketed and sold Active Advantage, a discount membership club, to consumers. Its members are

presented with redeemable discounts for processing fees, beer and wine tastings, sports apparel, flowers, travel, lodging, and race registrations.

### a. Active Network Lured Its Customers Into Active Advantage Program

24.     Event consumers search online to register for events in which they wish to participate. Consumers typically first find the event organizer's webpage and locate the specific desired event. Once the consumer decides to register for the event, they are transferred to Active Network's website to provide event registration information and their consumer payment data,

25.     After providing their event registration and consumer payment information, consumers are next presented with the Active Advantage inserted offer page. Consumers are required to click one of two buttons at the bottom of the inserted offer page to complete their event registration and payment. The two buttons usually consist of a bright blue box titled "Accept" and a gray box titled "No thanks." Consumers are then asked to confirm their email address and billing data, and either select "Accept" or "No Thanks" button.

26.     A significant number of consumers click the highlighted "Accept" button and mistakenly enroll in Active Advantage. If these consumers do not cancel the membership that they mistakenly enrolled in by the end of the trial period, Active

Network begins to automatically withdraw the annual fee ($89.95) from their accounts or billing consumers' accounts for the annual fee.

### b. Active Network's Unlawful Tactics Significantly Harmed Consumers

27.   Millions of Active Network consumers, for over a decade, have been misled into enrolling in Active Advantage through this inserted offer, evidenced by Active Network's own data, the high rates of consumers requesting that their credit card issuer reverse the transaction, and numerous consumer complaints.

28.   Since July 21, 2011, Active Network has received over $300 million in fees from more than three million consumers enrolled in Active Advantage.

29.   Between July 21, 2011 and early 2020, members who enrolled in Active Advantage via and inserted offer redeemed only $8.4 million in Active Advantage benefits compared to the $300 million in membership fees Active Network deceptively collected from its members during this time period—meaning that the value of Active Network provided benefits used by consumers is only 2.8% of the fees consumers paid during this time. The inserted enrollment offer has produced about 93% of the fees collected for Active Advantage.

30.   Active Network documented that about 72% of the consumers who were enrolled in Active Advantage and who requested to cancel their membership in 2019 were "unaware" of their membership.

31.    On October 18, 2022, investors learned of these practices when the Consumer Financial Protection Bureau ("CFPB") filed a lawsuit in the United States District Court for the Eastern District of Texas alleging: (i) Active Network engaged in deceptive and abusive acts and practices in violation of the Consumer Financial Protection Act of 2010 ("CFPA") by enrolling consumers in and charging them for discount club memberships without their knowledge, consent, or a full understanding of the material terms of the transaction; and (ii) Active Network violated the Electronic Fund Transfer Act ("EFTA") and Regulation E when it increased consumers' membership fees without sending the consumer written notice of the new amount and date of the new annual fee at least 10 days before initiating the new payment.

**B. Materially False and Misleading Statements Issued During the Class Period**

32.    The Class Period begins on October 31, 2019. On October 31, 2019, Global Payments held a Q3 2019 Earnings Call. During the call, Defendant Bready discussed growth components of the Company and stated, in pertinent part:

> The second thing I would say in our own software businesses, ***we continue to see strong bookings growth across AdvancedMD and ACTIVE as well.*** SICOM had a very strong quarter and has very strong momentum heading into 2020 having received recently some positive news from one of its largest customers about a roll out of a new product across its base of franchisees in 2020, which

11

we think will be a nice tailwind for that business heading into the year.[2]

33.    On November 13, 2019, Defendant Bready discussed Global Payments' business and consumer segment at Citigroup Financial Technology Conference. He said, in pertinent part:

> And so, we're excited to see where we can go with the business. That being said, we are value oriented. So end of day, if we think there's a higher better use for that business relative to being a part of Global Payments, we'll naturally be open minded to exploring that. But sitting here today, we're very focused on executing this strategy. We think this strategy will add a meaningful amount of value to the business and consumer segment as well as the company overall. And time will tell how that plays out for us. ***But we're excited about the way we are positioning that business in the market now as a combined company.***[3]

34.    This statement was materially false and misleading because Defendant Bready emphasized that Global Payments' consumer segment, which includes

---

[2] *Q3 2019 Earnings Call*, Global Payments, Inc. (GPN) (Oct. 31, 2019), https://s201.q4cdn.com/737310508/files/doc_downloads/events/2019/10/31/CORRECTED-TRANSCRIPT_-Global-Payments-Inc.(GPN-US)-Q3-2019-Earnings-Call-31-October-2019-8_00-AM-ET.pdf.

[3] *Citigroup Financial Technology Conference*, Global Payments, Inc. (GPN) (Nov. 13, 2019), https://s201.q4cdn.com/737310508/files/doc_downloads/events/2019/11/13/CORRECTED-TRANSCRIPT_-Global-Payments-Inc.(GPN-US)-Citigroup-Financial-Technology-Conference-13-November-2019-12_30-PM-ET.pdf.

Active Network, was heavily valued by the Company when in actuality, during this time, Active Network was grossly misleading consumers through improper conduct.

35.    On October 29, 2020, Global Payments held its Q3 2020 Earnings Call. During the call, Defendant Sloan discussed the Company's performance in light of the Covid-19 pandemic. He stated, in pertinent parts:

> ***We delivered third quarter results that substantially exceeded our expectations because of our differentiated strategy and technology enablement to drive digital growth.*** Each of adjusted net revenue, adjusted operating margin and adjusted earnings per share significantly outperformed the targets we put in place post the pandemic outbreak, and we continue to gain share relative to our markets…. ***Even in our businesses that have been more impacted by the pandemic, including ACTIVE and our K-12 primary education and gaming businesses, we are seeing sequential improvement, giving us increased confidence for 2021. Our strategy of delivering the full value stack in key verticals continues to produce deeper, richer and more value-added relationships with customers and is becoming table stakes in the markets we serve.***[4]

36.    On August 2, 2021, Global Payments held its Q2 2021 Earnings Call. During the call, Defendant Bready spoke about the Company's results in light of the pandemic and stated, in pertinent part:

---

[4] *Q3 2020 Earnings Call*, *Global* Payments, Inc. (GPN) (Oct. 29, 2020), https://s201.q4cdn.com/737310508/files/doc_downloads/events/2020/10/29/CORRECTED-TRANSCRIPT_-Global-Payments-Inc.(GPN-US)-Q3-2020-Earnings-Call-29-October-2020-8_00-AM-ET.pdf.

> ***Active has seen very strong booking trends. Many of
> those events are occurring in the back half of 2021. So, I
> think we feel very good about how that business is poised
> to recover.*** And again, AdvancedMD and TouchNet have
> continued to grow right through the pandemic, obviously,
> a double-digit pace throughout 2020 and 2021. So, those
> businesses are obviously in a very healthy position overall.
> But getting a nice tailwind from active in schools in
> particular in the back half of the year will help the vertical
> market business continue to recover as an overall matter.[5]

37.     This statement is materially false and misleading because Defendant Bready misled investors into believing that Active Network's revenues were increasing in strength despite the impact of Covid-19, but the "strong booking trends" were actually due to Active Network's illegal conduct.

38.     On September 8, 2021, Global Payments held an investor conference. Slide 24 of the presentation discussed the Company's goals with respect to its consumer practice and stated in pertinent part:

> "Shifting Paradigm: Transactions to experiences"
>
> • Allows customers to meet consumers how and where they want to be met
>
> • Improves user experience-results in unique value proposition.

---

[5] *Q2 2021 Earnings Call*, Global Payments, Inc. (GPN) (Aug. 2, 2021), https://s201.q4cdn.com/737310508/files/doc_downloads/events/2021/08/02/CORRECTED-TRANSCRIPT_-Global-Payments-Inc.(GPN-US)-Q2-2021-Earnings-Call-2-August-2021-8_00-AM-ET-(2).pdf.

39.     This statement is materially false and misleading because while Global Payments claims it aims to enhance the consumer experience, Active Network's unlawful conduct demonstrates otherwise.

40.     On November 2, 2021, Global Payments conducted its Q3 2021 Earnings Call. Defendant Bready discussed the Company's growth rates and said, in pertinent part:

> "So, I'll pause there and maybe just turn my attention to bookings trends because that continues to be a very good story for the vertical market businesses, ***we saw excellent new booking trends in the quarter***…And ACTIVE and schools continue to see good booking trends, despite obviously the overall macro continuing to weigh on those businesses. ***ACTVE bookings were up in the mid-teens, year-over-year…***"[6]

41.     On February 18, 2022, Global Payments filed its form 10-K with the SEC, which contained generic, boilerplate representations regarding the risks it faces as entity subject to consumer protection and CFPB oversight, stating, in relevant parts:

> The Dodd-Frank Act also created Consumer Financial Protection Bureau ("CFPB"), which has assumed responsibility for enforcing federal consumer protection laws, and the Financial Stability Oversight Council, which

---

[6] *Q3 2021 Earnings Call*, Global Payments, Inc. (GPN) (Nov. 2, 2021), https://s201.q4cdn.com/737310508/files/doc_downloads/events/2021/11/02/CORRECTED-TRANSCRIPT_-Global-Payments-Inc.(GPN-US)-Q3-2021-Earnings-Call-2-November-2021-8_00-AM-ET-(1).pdf.

has the authority to determine whether any nonbank financial company, such as us, should be supervised by the Board of Governors of the Federal Reserve System (the "Federal Reserve") on the ground that it is "systemically important" to the U.S. financial system. Accordingly, we may be subject to additional systemic risk-related oversight.

\*       \*       \*

As a payments technology company, our business is affected by laws and complex regulations and examinations that affect us and our industry in the countries in which we operate. Regulation and proposed regulation of the payments industry has increased significantly in recent years. ***Failure to comply with regulations or guidelines may result in the suspension or revocation of a license or registration, the limitation, suspension or termination of service, and the imposition of civil and criminal penalties, including fines, or may cause customers or potential customers to be reluctant to do business with us, any of which could have an adverse effect on our financial condition.***

Interchange fees are subject to intense legal, regulatory and legislative scrutiny worldwide. For instance, the Dodd-Frank Act restricts the amounts of debit card fees that certain issuing institutions can charge merchants and allows merchants to set minimum amounts for the acceptance of credit cards and to offer discounts for different payment methods. These types of restrictions could negatively affect the number of debit transactions, which would adversely affect our business. ***The Dodd-Frank Act also created the CFPB, which has assumed responsibility for enforcing federal consumer protection laws***, and the Financial Stability Oversight Council, which has the authority to determine whether any nonbank financial company, such as us, should be supervised by the

16

Board of Governors of the Federal Reserve on the ground that it is "systemically important" to the U.S. financial system. Any such designation would result in increased regulatory burdens on our business, which increases our risk profile and may have an adverse effect on our business, financial condition, results of operations and cash flows.

Because we directly or indirectly offer or provide financial services or products to consumers, we are subject to prohibitions against unfair, deceptive, or abusive acts or practices under the Dodd-Frank Act. More generally, all persons engaged in commerce, including, but not limited to, us and our merchant and financial institution customers, are subject to Section 5 of the Federal Trade Commission ("FTC") Act prohibiting unfair or deceptive acts or practices ("UDAP"). We also have businesses that are subject to credit reporting and debt collection laws and regulations in the U.S. Various federal and state regulatory enforcement agencies, including the FTC, ***the CFPB and the states' attorneys general, have the authority to take action against nonbanks that engage in UDAP or violate other laws, rules or regulations and, to the extent we are in violation of these laws, rules or regulations or processing payments for a merchant that may be in violation of these laws, rules or regulations, we may be subject to enforcement actions and as a result may incur losses and liabilities.***[7]

---

[7] Global Payments, Inc., Annual Report (Form 10-K) (Dec. 31, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001123360/000112336022000007/gpn-20211231.htm.

Plainly, these risk warnings were generic "catch-all" provisions that were not tailored to Global Payment's actual known risks with respect to Active Network's ongoing violations with its consumer sales practices.

42.    Appended as exhibits to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2022 wherein Defendants Sloan and Todd certified that the "(1) Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Global Payments Inc."

43.    The statement alleged in ¶ 43 above were present in the Company's 2020 Form 10-K with signed certifications from Defendants Sloan and Todd as well as the Company's 2019 Form 10-K, which had signed certifications from Defendants Sloan and Bready.

44.    On May 2, 2022, Global Payments conducts its Q1 2022 Earnings Call. During the call, Defendant Sloan provided the following commentary on the Company's performance:

> *So actually our performance has accelerated in a number of the businesses* that Cameron can describe within vertical markets in terms of reopenings, Darrin, that had been more recent laggards; examples include *ACTIVE and K-12 have also returned to growth. So we feel really good about kind of where we are there, and as*

> *we said in our prepared remarks, we think that's really going to be a tailwind for our business this year and thereafter.*
>
> Addressing your second question, before I turn it over to Cameron to give a little bit more color, this, I think, is a strategy matter. I think *we are very pleased with the resilience of our merchant business kind of across-the-board . . .*[8]

### C. The Truth Begins to Emerge

45.     On October 18, 2022, investors learned of these practices when the CFPB sued Active Network in federal court alleging: (i) Active Network violated the CFPA by engaging in deceptive and abusive acts and practices when it enrolled consumers and charged them for discount club memberships without their knowledge, consent, or a full understanding of the material terms of the transaction; (ii) Active Network violated the EFTA and Regulation E when it increased consumers' membership fees without sending them written notice of the new amount and date of the new annual fee at least 10 days before initiating the new payment; and (iii) the violations of the EFTA and Regulation E also constituted violations of the CFPA.

---

[8] *Q1 2022 Earnings Call*, Global Payments, Inc. (GPN) (May 2, 2022), https://s21.q4cdn.com/254933054/files/doc_financials/2022/Q1/Global-Payments,-Inc.(GPN-US),-Q1-2022-Earnings-Call,-2-May-2022-8_00-AM-ET.pdf.

46.    On this news, the price of Global Payments' stock declined $1.33 and closed at $113.67 on October 18, 2022.

47.    As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## V.    CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired Global Payments securities during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Global Payments shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

51.     The Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

52.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Global Payments and the Individual Defendants to investors during the Class Period included

21

misrepresentations of material facts about the severity and scope of the investigation by the CFPB into the Active Network's consumer sales practices;

- whether Global Payments and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Global Payments' and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Global Payments shares during the Class Period were impacted by Global Payments' and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

53.  A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

54.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct Global Payments and the Individual Defendants.

55.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI.    APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

56.    The market for Global Payments shares was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Global Payments' shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity

of the market price of Global Payments shares and market information relating to Global Payments and have been damaged thereby.

57.     During the Class Period, the artificial inflation of Global Payments' shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Global Payments' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Global Payments' financials and its business, operations, and prospects, thus causing the price of Global Payments' shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Global Payments shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Global Payments shares at such artificially inflated prices, and each of them has been damaged as a result.

58.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Global Payments and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Global Payments' shares were traded on the NYSE and were covered by numerous analysts;

- Global Payments' shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Global Payments shares; and

- Plaintiff and Class members purchased and/or sold Global Payments securities between the time Global Payments and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59.    As a result of the foregoing, the market for Global Payments shares promptly digested current information regarding Global Payments from all publicly

available sources and reflected such information in Global Payments' share price. Under these circumstances, all purchasers of Global Payments' securities during the Class Period suffered similar injury through their purchase of Global Payments' shares at artificially inflated prices. Thus, a presumption of reliance applies.

60.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

61.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above. Because this action involves Defendants' failure to disclose material adverse information regarding Global Payments' business operations and compliance risks—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.   LOSS CAUSATION

62.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

63.    During the Class Period, Plaintiff and the Class purchased Global Payments' shares at artificially inflated prices and were damaged thereby. The price of Global Payments' shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII.  NO SAFE HARBOR

64.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled

herein, Global Payments and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Global Payments who knew that those statements were false and misleading when made.

## IX.    SCIENTER ALLEGATIONS

65.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Global Payments and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Global Payments, their control over, and/or receipt and/or modification of Global Payments' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Global Payments, participated in the fraudulent scheme alleged herein.

66.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

67.    The Individual Defendants, because of their positions with Global Payments, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of

Global Payments' corporate statements and are therefore responsible and liable for the representations contained therein.

## X.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**
**Against All Defendants**

68.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

69.    During the Class Period, Global Payments and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

70.    Global Payments and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Global Payments shares during the Class Period.

71.    Global Payments and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Global Payments were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Global Payments and the Individual Defendants, through receipt of information reflecting true facts about Global Payments, their control over, and/or receipt of or modification to Global Payments' allegedly materially misleading statements, which made them aware of Global Payments' confidential proprietary information, participated in the fraudulent scheme complained of herein.

72.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Global Payments, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Global Payments employees to investors, including Plaintiff and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts—such as the severity of investigation by the CFPB into certain of Global Payments' consumer sales practices—important in deciding whether to buy shares of Global Payments stock

31

and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts.

73.    Pursuant to the foregoing, the price of Global Payments shares was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Global Payments and the Individual Defendants, Plaintiff and Class members relied on the statements made by Global Payments and the Individual Defendants and/or the integrity of the market price of Global Payments shares during the Class Period in purchasing Global Payments securities at prices that were artificially inflated due to false and misleading statements made by Global Payments and the Individual Defendants.

74.    Were Plaintiff and Class members made aware that the market price of Global Payments shares was artificially and falsely inflated by misleading statements made by Global Payments and the Individual Defendants, and by material adverse information that Global Payments and the Individual Defendants failed to disclose, they would not have purchased Global Payments securities at artificially inflated prices, or purchased them at any price.

75.    Based on the wrongful conducts alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

76.    Global Payments and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Global Payments shares during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Violation of Section 20(a) of the Exchange Act)
### Against the Individual Defendants

77.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

78.    During the Class Period, the Individual Defendants were involved in the management and operation of Global Payments' consumer sales practices. Due to their senior positions, they had knowledge of adverse non-public information regarding Active Network's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

79.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Global Payments' financial condition and results of operations, and to correct any public statements issued by Global Payments which were materially false or misleading.

80.     Due to their positions of authority at Global Payments, the Individual Defendants controlled the contents of various public filings, press releases and reports which Global Payments disseminated in the market during the Class Period. During the Class Period, the Individual Defendants utilized their authority to cause Global Payments to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at Global Payments pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of Global Payments shares to be artificially inflated.

81.     Based on the conduct described above, the Individual Defendants are liable for the violations committed by Global Payments pursuant to Section 20(a) of the Exchange Act.

## XI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

- Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

- Awarding damages in favor of Plaintiff and members of the Class against Global Payments and the Individual Defendants, jointly and

severally, for all damages sustained as a result of Global Payments' wrongdoing, in an amount to be proven at trial;

- Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

- Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

- Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED:  February 8, 2023                **JOHNSON FISTEL, LLP**

_s/ Michael I. Fistel, Jr._
Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
Georgia Bar No. 262062

Mary Ellen Conner
maryellenc@johnsonfistel.com
Georgia Bar No. 195077
Enoch P. Hicks
enochh@johnsonfistel.com
Georgia Bar No. 347202
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)

**LOWEY DANNENBERG, P.C.**
Vincent Briganti
vbriganti@lowey.com
*(Pro Hac Admission to Be Requested)*
Andrea Farah
afarah@lowey.com
(*Pro Hac Admission to Be Requested*)
Alesandra Greco
agreco@lowey.com
(*Pro Hac Admission to Be Requested*)
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914/997-0500

*Counsel for Plaintiff*

SWORN CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Mike Shafer, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against Global Payments, Inc. ("Global Payments") and other defendants.

3. I purchased Global Payments' securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

4. I am willing to serve as a representative party(s) on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in Global Payments' securities during the Class Period are set forth below.

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


2/7/2023

Date

DocuSigned by:

*Mike Shafer*

57642354782A4F0...

Mike Shafer

Mike Shafer's Transactions in Global Payments' securities during the class period:

| Date Acquired | Transaction Type | Quantity | Gain or Loss |
|---|---|---|---|
| 02/03/2022 | Purchase | 350 | ($52,020.5) |