# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
10155 Eagle Drive
Covington, GA 30014–3804

Date: June 24, 2022

Shanna Cortez

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA–520) or write a letter. The form is available at https://www.ssa.gov/forms/ha-520.html. Please write the Social Security number associated with this case on any appeal you file. You may call (800) 772–1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041–3255**

Form HA–L76–OP2 (03–2010)
**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1–800–269–0271 (TTY 1–866–501–2101).**

See Next Page

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under

Form HA-L76-OP2 (03-2010)

See Next Page

Shanna Cortez (BNC#: 21NL910C99702)                    Page 3 of 3

special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If you disagree with my decision, you should file an appeal within 60 days.

**If You Have Any Questions**

1.  Visit www.ssa.gov for fast, simple, and secure online service.
2.  Call us at **1–800–772–1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1–800–325–0778**. Please mention this notice and decision when you call.
3.  You may also call your local office at (877) 626–9909.

> Social Security
> 3554 Covington Hwy
> Decatur, GA 30032–9803

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

> Wylly Jordan
> Administrative Law Judge

Enclosures:
Decision Rationale

cc:    Kathleen Flynn
       315 W. Ponce De Leon
       Avenue, Suite 940
       Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|
| | Period of Disability, Disability Insurance Benefits, and Supplemental Security Income |
| Shanna Cortez | |
| (Claimant) | |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

On October 9, 2020, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits.  The claimant also filed a Title XVI application for supplemental security income on October 9, 2020.  In both applications, the claimant alleged disability beginning March 21, 2020.  These claims were denied initially on July 23, 2021, and upon reconsideration on September 24, 2021.  Thereafter, the claimant filed a written request for hearing received on October 7, 2021, (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*).  On May 6, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID–19) Pandemic.  All participants attended the hearing by telephone.  The claimant agreed to appear by telephone before the hearing and confirmed such agreement at the start of the hearing.  (Exhibit 9B)  The claimant is represented by Kathleen Flynn, an attorney, and was represented at the hearing by attorney Brynne Holt.  Deauna Froneberger, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 404.935(a) and 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

See Next Page

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2024. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from March 21, 2020, through the date of this decision.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five–step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self–employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922, Social Security Rulings (SSRs) 85–28 and 16–3p). If the claimant does not have a

severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96–8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the

See Next Page

claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.**

**2.   The claimant has not engaged in substantial gainful activity since March 21, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

**3.   The claimant has the following severe impairments: depression, anxiety, post-traumatic stress disorder, obesity, migraines, drug dependence (cannabis), degenerative joint disease (20 CFR 404.1520(c) and 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The undersigned finds that the claimant's hypertension, gastroesophageal reflux disease, vitamin D deficiency, hyperlipidemia, syncope, and herpes are non-severe impairments.  The record reveals little evidence of diagnosis, diagnostic findings, or treatment of these conditions, which undermines that these conditions significantly reduce the claimant's functionality throughout a 12-month period.

The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The claimant's degenerative joint disease does not meet or medically equal listing 1.18 for abnormality of a major joint in any extremity as there is not documentation of (A) chronic joint pain or stiffness, AND (B) abnormal motion, instability, or immobility of the affected joint(s), AND (C) anatomical abnormality of the effected joints (noted on physical examination or imaging), AND (D) impairment-related physical limitation of musculoskeletal functioning that has lasted (or is expected to last) for a continuous period of at least 12

months, _and_ the medical documentation of at least one of the following: (1) a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands, _or_ (2) an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, _and_ a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper or a wheeled and seated mobility device involving the use of one hand, _or_ (3) an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustained, and complete work-related activities involving fine and gross movements.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has moderate limitations.  The claimant alleged that she has difficulty remembering generally, following instructions, completing tasks, shopping, driving, and reading.  However, the claimant also stated that she could perform simple maintenance, prepare meals, pay bills, go to doctor's appointments, take medications, shop, read, and play games.  In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and respond to questions from medical providers.  (Exhibit 5F and Exhibit 9F)

In interacting with others, the claimant has moderate limitations.  Here, the claimant alleged that she has difficulty engaging in social activities, getting along with others, and spending time in crowds.  However, according to her statements, the claimant is also able to get along with others, spend time with friends and family, and live with others.  Finally, the medical evidence shows that the claimant was described as pleasant and cooperative and had good interactions with non-medical staff. (Exhibit 5F and Exhibit 9F)

The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace.  For this criterion, the claimant has moderate limitations.  The claimant contended that she has limitations in concentrating generally, following instructions, completing tasks, avoiding distractions, and maintaining a regular work schedule.  On the other hand, the claimant said that she is also

able to prepare meals, watch TV, play games, manage funds, use the internet, and handle her own medical care.  (Exhibit 5F and Exhibit 9F)

Finally, the claimant has moderate limitations in her ability to adapt or manage herself.  The claimant asserted that she has difficulties handling change and managing her mood.  That said, the claimant also stated that she is able to handle self–care and personal hygiene, care for pets, and care for children.  Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene and no problem getting along well with providers and staff.  (Exhibit 5F and Exhibit 9F)

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except can lift and/or carry 50 pounds occasionally, 25 pounds frequently.  She can stand and/or walk, with normal breaks, for a total of 6 hours per 8–hour workday, and can sit, with normal breaks, for a total of 6 hours per 8–hour workday.  In terms of postural limitations, she can never climb ladders, ropes, or scaffolds.  In terms of manipulative limitations, she can occasionally reach overhead with her right dominant upper extremity.  There are no visual or communicative limitations.  In terms of environmental limitations, she must avoid unprotected heights, moving mechanical parts, multilevel workspaces with steps or open pits, flashing**

**lights, and she must never operate a motor or motorized vehicle in the workplace.  In terms of mental limitations, she would be able to understand, remember, and carry out simple, routine instructions, consistent with SVP 1 and 2 jobs.  She could work in a low stress environment, defined as involving simple, work-related decisions; involving no assembly line work; and having only occasional changes in the work setting.  She can tolerate occasional interaction with supervisors, and occasional interaction with coworkers and the public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

At the hearing, the claimant testified that she is 43 years old, 5'5 and 200 pounds.  She has a driver's license but she does not drive.  She does not leave the house because she is afraid to go outside.  She will go out on the patio for five minutes with her mother. She orders food online and she only leaves the house to go to doctor's appointments.  She has to psych herself up to go out for these appointments and she cannot be out for long or her blood pressure will go up and she will pass out.  She has a pharmacy technician certificate and she graduated high school.  She has not done anything to earn any money since the alleged onset date, March 21, 2020.  She is unable to work because she cannot go outside.  She is forgetful and manic, with impulse control problems and the inability to perform simple tasks.  Someone drove a truck through her apartment, she has been stalked, and her car was hijacked.  She does not feel safe going outside.  She has been through traumatic events and she has panic

attacks and crying spells every day.  Sometimes her panic attacks cause her to pass out.  During a typical day she watches television or sleeps because the medication makes her so sleepy.  She cannot remember what happened long enough to follow a movie.  She gets along well with her daughter and her mother, but she does not deal with very many people because she cannot tolerate stress.  She has not used marijuana in one year.  She has debilitating migraines that feel like a hot knife behind her eyes and being kicked in the head at the same time.  In March 2020, her ex broke into her apartment and beat her up, damaging her arm.  She still has no strength in her right arm and she is unable to pick up anything over 5 pounds or lift her arm over her head.  She is right handed.  When her blood pressure is high, her legs and feet swell and she gets anxious.  She has to elevate her legs every day for three hours a day above her chest.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant's subjective complaints to her physicians, the objective findings documented in her medical records, and the treatment she has required do not support a finding that her severe impairments prevent her from performing all work.

Although the claimant testified that she has not done any work to earn money since the alleged onset of March 21, 2020, treatment records include numerous references to self employment with an online business.  Treatment notes dated August 25, 2021, state that the claimant reported that she was developing her online business named High Art Resin Shop.  (Exhibit 9F/57)  On September 1, 2021, she reported to her psychologist, Dr. James Griffin, that she was excited about her online business getting a positive reviews, and that she was planned to start drop shipping online soon.  (Exhibit 9F/55)  Psychology notes dated September 8, 2021, state that the claimant appeared to be performing at an exceptionally high level in promoting her business, which appeared to be helping her to eliminate depression and anxiety.  The claimant reported that she had been promoting her business on multiple platforms, creating business performance goals, and that Etsy, Shopify, and the business were therapeutic for her.  (Exhibit 9F/53)

On September 15, 2021, the claimant reported to her psychologist that she was conducting her business by the numbers including paying taxes.  (Exhibit 9F/52)

See Next Page

Psychology notes dated October 13, 2021, state that the claimant talked about the issues she was having in managing her online business, noting that she switched providers and changed her brand to resin wall art.  (Exhibit 9F/47)  On October 27, 2021, the claimant reported that her business was going well, and that she started to carry her own t-shirts that she designed, in addition to the resin cracks.  (Exhibit 9F/44)  On November 10, 2021, the claimant reported that she was maintaining her web store.  (Exhibit 9F/41)  On January 5, 2022, the claimant reported that she was working on the online business.  (Exhibit 9F/29)  On February 23, 2022, the claimant reported that she was making resin coasters for her online store.  (Exhibit 9F/14)

Although the claimant reports that she is unable to leave the house except to go to doctor appointments, therapy notes indicate that the claimant reported going on numerous dates with numerous people.  Psychology notes dated December 22, 2021, state that the claimant reported that she went on a bunch of dates, and that she went on four dates in one date from Double List.  She stated that she went on one date that involved hanging out the date's house all day.  The claimant also reported going to a meet-and-greet and meeting a guy named Larry.  The claimant stated that she had been going outside on the dates with the guys.  The claimant also reported that she was dating a gardener who lived at the apartment complex.  (Exhibit 9F/30)

Psychology treatment notes dated January 5, 2022, state that the claimant presented in a good mood and that she was not worried about anything.  Dr. Griffin stated that the claimant appeared to be managing her anxiety and depression effectively.   The claimant stated that she was in a new relationship, working on her online business, and working on a webpage.   (Exhibit 9F/29)

The claimant reported to Dr. Griffin on January 12, 2022, that she was recovering from the flu, but that she had not had any depressive or anxious episodes.  Dr. Griffin stated that the claimant appeared to be managing her response to trauma successfully.  (Exhibit 9F/28)

On January 19, 2022, the claimant reported increased depression, noting that she recently ran out of her medications.  (Exhibit 9F/26)

Follow up treatment notes state that the claimant suffered a depressive episode with increased anxiety during January 2022 due to discontinuation of her medication, but that once she was restarted on her medications her mental symptoms improved.  Dr. Griffin evaluated the claimant on February 3, 2022, and noted that the claimant appeared to be in a much better mood now that she had her proper medication.  Dr. Griffin stated that the claimant appeared to be successfully managing stress factors in her life leading to depression. (Exhibit 9F/20)

Dr. Griffin evaluated the claimant on February 23, 2022, and stated that the claimant appeared to be in an upbeat mood without occasional episodes of depression.  (Exhibit 9F/14)

Dr. Griffin's treatment notes state that the claimant suffered a trauma of a truck driver driving his truck through her apartment building and into her specific apartment.  The claimant's personal items were destroyed and that her daughter and herself were traumatized by the incident, with scrapes and bruises and a disrupted routine.  (Exhibit 9F/13)

Dr. Griffin evaluated the claimant on March 30, 2022, and stated that the claimant appeared to be recovering and that she appeared less anxious and depressed about the car accident. Dr. Griffin stated that the claimant appeared to be managing anxiety adequately with random episodes of depression. (Exhibit 9F/5)

Primary care treatment notes state that the claimant's migraines are well controlled with Topamax and Imitrex.  (Exhibit 8F)

Psychiatry treatment notes dated July 17, 2020, state that the claimant was establishing care for anxiety, panic attacks, post-traumatic stress disorder, and depression.  The claimant's medications were adjusted to Lexapro, Hydroxyzine; Trazadone; and Prazosin.  The claimant was advised to abstain from marijuana use.  (Exhibit 2F/5-11)

Follow up psychiatry treatment notes dated September 29, 2020, state that the claimant reported medication compliance and ongoing therapy.  The claimant reported that she was doing good and that her anxiety and anhedonia were improved, with normal appetite, okay energy, and no suicidal ideations, good sleep.  The claimant reported improvement in her mood swings and depression, less difficulty with focusing and concentration, and less easily distracted with the ability to do tasks for extended period of time.  The claimant denied fatigue, tiredness, lethargy, and anhedonia.  Medication side effects were not noted.  (Exhibit 2F/29-34)

The claimant's ability to perform work-related mental and physical activities is compromised, but not to the extent of total disability, as this claim alleges.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

See Next Page

Anna Wright, NPC and Dr. Bryon Evans of Psychiatric Consultants of Atlanta wrote a medical source statement dated April 26, 2022, stating that the severity of her anxiety rendered her with limited capacity to perform in high stress situations appropriately.  It was noted that the claimant was not incapable of following directions but once the anxiety is exacerbated, she has limited control over emotion, and that due to the unpredictability of her exacerbations that it was not possible for her emotional state to be predicable so when severely anxious she may not behave reliably enough to work.  The claimant was noted to have fair ability to function in the activities involving understanding and memory, fair ability to maintain personal appearance and behave in an emotionally stable manner, and poor to no ability to relate predictably in social situations and demonstrate reliability.  (Exhibit 10F/1)

Ms. Wright and Dr. Evans went on to state that the claimant had medically documentation of depression, anxiety, and post-traumatic stress disorder with marked limitations in understanding, remembering, and using information; interacting with others; concentration, persistence, and pace; and adapting and managing oneself.  They also stated that the claimant's mental disorder was serious and persistent with a medically documented history of the existence of the disorder over a period of at least two years with evidence of medical treatment, mental health therapy, psychosocial support, or highly structured setting that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder and that the claimant has minimal capacity to adapt to changes in their environment or to demands that are not already part of their daily life.  Ms. Wright and Dr. Evan stated that due to the unpredictability of exacerbations of the claimant's depressive moods as well as severe anxiety due to post-traumatic stress disorder symptoms and triggers, that the claimant may not consistently behave up to part in a work or office type setting.  They further stated that the claimant's mood swings could be exacerbated unpredictably whenever she as exposed to different triggers make her judgement and insight difficult to predict.  (Exhibit 10F/2-10)

Ms. Wright stated that she had been treating the claimant since March 21, 2021, for post-traumatic stress disorder, major depressive disorder, and generalized anxiety disorder and that it was her opinion that these diagnoses existed separate and apart from any history of drug or alcohol use, stating that the claimant was disabled from these medical conditions even when she was not consuming alcohol or drugs.  (Exhibit 10F/11)

Although the record contains extensive records from Psychiatric Consultants of Atlanta, there is only one treatment note in which Ms. Wright evaluated the claimant, dated August 5, 2021.  There are no treatment notes from Dr. Evans in the medical evidence of record.  Ms. Wright evaluated the claimant on August 5, 2021, and the claimant reported that she was doing really well, feeling better on the medication, denying side effects.  The claimant requested medication refills and denied any new or ongoing problems.  The claimant denied

generalized anxiety symptoms including excessive worry and anxious mood, denied panic attacks, denied depressed mood, denied anhedonia, and reported good sleep, good appetite, good energy, with no suicidal ideations and no reported depressive symptoms.  The claimant reported normal sleep and denied insomnia, denied irritability, denied angry mood, and denied flights of fancy and euphoric mood.  The claimant did report recent setback in anxiety and depression after encounter with her ex-husband with increased anxiety, crying, hopelessness, and suicidal ideations.  The claimant was continued on her medication.  (Exhibit 9F/63–65)

The statements and opinions of Ms. Wright and Dr. Evans at Exhibit 10F are not persuasive as the accompanying treatment notes fail to corroborate the stated long term treatment relationship indicated by Exhibit 10F.  The record documents that the claimant has been receiving psychiatric treatment since July 2020, however, it does not document that Ms. Wright or Dr. Evans have been the ones primarily providing the claimant's medication management.  Additionally, their statements and opinions are significantly inconsistent with the extensive activities of daily living documented in the claimant's therapy treatment notes as discussed in more detail above.

Consultative examiner Dr. Jessie Al-Amin conducted a physical examination of the claimant on March 31, 2021, and diagnosed the claimant with a history of posttraumatic stress disorder, and paranoia; history of migraine headaches; essential hypertension, uncontrolled; possible short-term memory problems; chronic right shoulder pain and chronic right hand pain; and history of syncopal episodes.  Dr. Al-Amin stated that the claimant may lift as tolerated, above right shoulder work might be problematic, might have problem handling object in right hand, may have difficulty with prolonged sitting, prolonged standing or walking may be problematic, has no difficulty climbing stairs, has no problem bending or stooping, and has no environmental restrictions.  (Exhibit 3F)

Dr. Al-Amin's findings are moderately persuasive, although the limitations as stated are vague and there is little medical evidence to support that the claimant's physical impairments result in significant lifting limitations or in limitations in the claimant's ability to stand in walk.  The claimant reported to Dr. Hartzell that she exercises regularly on her Stairmaster and therapy treatment notes routinely note that the claimant reported exercising for an hour three times a day.  (Exhibit 5F/4 and Exhibit 9F)

Consultative examiner Dr. Arthur Hartzell conducted a mental status examination of the claimant on July 14, 2021, and diagnosed the claimant with post-traumatic stress disorder and persistent depressive disorder (dysthymia), early onset.  Dr. Hartzell stated that the claimant is capable of understanding and remembering simple directions, based on her performance during this evaluation today. Dr. Hartzell stated that the claimant may have moderate

See Next Page

difficulty understanding, remembering and following detailed directions due to anxiety interfering at times.  Dr. Hartzell stated that the claimant is capable of sustaining concentration, persistence and pace that would permit the timely completion of assigned simple tasks. Dr. Hartzell stated that the claimant would have marked difficulty interacting with co–workers, supervisors and the public, as she is withdrawn from others and has more anxiety in public situations, based on report.  Dr. Hartzell stated that the claimant would have moderate to marked difficulty, depending upon the work environment, adapting to the stress of the work environment, based on her current mental status as described above and that she would have marked difficulty adapting to a stressful work environment, given her psychiatric history. Dr. Hartzell stated that the claimant's medical problems, physical abilities, and limitations must be accessed by a physician, in regards to her ability to adapt to the stress of a work environment, physically.  (Exhibit 5F)

Dr. Hartzell's opinions are moderately persuasive although the medical evidence as whole does not support marked limitations in any domain, as activities of daily living documented over years of mental health treatment notes are inconsistent with marked limitations.  (Exhibit 2F and Exhibit 9F)

Regarding the opinions of the DDS medical consultants, the undersigned find the initial determination in Exhibits 1A/2A to be unpersuasive as that determination found the claimant's mental impairments to be non–severe, which is inconsistent with the claimant's well documented long term formal mental health treatment record.

The State Agency medical consultant who performed the mental residual functional capacity assessment of the claimant at the Reconsideration level found that the claimant would have difficulty understanding complex instructions but retains the ability to understand and carry out simple instructions; with the ability to sustain concentration for simple instructions but not complex ones; reduced ability to interact with large groups and coworkers but retains the ability to interact with supervisors;  and reduced ability to adapt to changes in work like setting but retains the ability to be aware of hazards, use public transportation and set realistic goals.  This opinion is partially persuasive as it is generally consistent with the medical evidence of record and the claimant's extensive activities of daily living.  However, based on the claimant's long term psychiatric treatment and ongoing clinical symptoms, the undersigned has found the claimant's mental impairments to be more limited than opined by the State Agency medical consultants and assessed the claimant with specific limitations in the residual functional capacity above to accommodate her mental impairments.

The State Agency medical consultant who performed physical residual functional capacity assessment of the claimant at the Initial level found that the claimant was limited to light work with occasional climbing of ramps and stairs,

no climbing of ladders, ropes, and scaffolds; occasional reaching, handling, and fingering with the left upper extremity; and occasional balancing, stooping, crouching, kneeling, and crawling; with the need to avoid concentrated exposure to noise, bright lights and all exposure to hazards consistent with migraine and seizure precautions. (Exhibit 1A/2A)

At the reconsideration level, the claimant's physical impairments were found to be non-severe.  (Exhibit 5A/6A), although her mental impairments were found to be severe.  As discussed in detail above, the undersigned finds both physical and mental severe impairments.  As such, the opinions at the reconsideration level are only found to be partially persuasive.

The undersigned has taken the entirety of the medical evidence into account and found the claimant's physical impairments to be severe, but found that the claimant is limited to medium work based on her reported physical activity and activities of daily living, and assessed the claimant with a more detailed and specific postural, manipulative, and environmental limitations than opined by the State Agency medical consultant at the initial level.

Accordingly, after a thorough review of the evidence of record, the testimony from the hearing, and opinions of record in light of the listing requirements, the undersigned finds that the above residual functional capacity assessment is supported.

**6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a veterinary technician, DOT #079.361-014, medium, SVP 6.   As required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period. Based on the above residual functional capacity, the vocational expert testified that the claimant could not perform the demands of her/his past relevant work. Accordingly, the claimant is unable to perform past relevant work as actually or generally performed.

**7.   The claimant was born on April 17, 1979 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).**

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the**

**claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).**

10. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical–Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical–vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83–11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical–vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83–12 and 83–14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical–Vocational Guidelines provides a framework for decisionmaking (SSR 85–15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical–Vocational Rule 203.29.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a hospital cleaner (SVP 2, medium, DOT #323.687–010, with approximately 48,000 jobs nationally); kitchen helper (SVP 2, medium, DOT #318.687–010, with approximately 180,000 jobs nationally); and an industrial cleaner (SVP 2, medium, DOT # 381.687–018, with approximately 16,000 jobs nationally).

In the alternative, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the above stated residual functional capacity but with the additional limitations of full range of light work, lifting and carrying 20 pounds occasionally and 10 pounds frequently.

See Next Page

The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as an marker (SVP 2, light, DOT #209.587–034, with approximately 131,000 jobs nationally); photocopy machine operator (SVP 2, light, DOT #207.685–014, with approximately 10,000 jobs nationally); and a router (SVP 2, light, DOT # 222.587–038, with approximately 31,000 jobs nationally).

Furthermore, at the hearing, the vocational expert testified that in an 8–hour workday (in addition to normal breaks) an individual could be off task 14% of the time and not affect the jobs or numbers cited above.  The vocational expert also testified that an individual could be absent 1 day per month and this limitation would not affect the jobs or numbers cited above.  Although the off–task provision and absenteeism is not supported by the record, even if the claimant had these additional limitations, she would still be capable of performing the jobs of hospital cleaner, kitchen helper, industrial cleaner, marker, photocopying machine operator, and router.

Pursuant to SSR 00–4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, as supplemented by the vocational expert's training, education, and experience where necessary.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above–cited rule.

Consideration has also been given to the claimant's history of substance abuse, and based on the evidence as discussed within this decision, it is concluded that the claimant's mental and  physical limitations do not result in disabling functional limitations when considered with or without the substance abuse.  Therefore, the materiality of the claimant's substance abuse is not at issue, and no "material" determination is needed (20 CFR 404.1535 and 416.935).

**11. The claimant has not been under a disability, as defined in the Social Security Act, from March 21, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

<u>DECISION</u>

Based on the application for a period of disability and disability insurance benefits protectively filed on October 9, 2020, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

See Next Page

Shanna Cortez (BNC#: 21NL910C99702)                     Page 17 of 17

Based on the application for supplemental security income filed on October 9, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ Wylly  Jordan III
_____
Wylly Jordan
Administrative Law Judge

June 24, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1A | INITIAL.DIB.RFC1/ L. SKLAR MD | | 2021-05-03 | 18 |
| T1I | 2A | INITIAL.DI.RFC1/ L. SKLAR MD | | 2021-05-03 | 18 |
| T1I | 3A | INITIAL.DI/ L. SKLAR MD | | 2021-07-23 | 1 |
| T1I | 4A | INITIAL.DIB/ L. SKLAR MD | | 2021-07-23 | 1 |
| T1I | 5A | RECON.DIB.MRFC1/ SANNAGAI BROWN MD | | 2021-09-22 | 9 |
| T1I | 6A | RECON.DI.MRFC1/ SANNAGAI BROWN MD | | 2021-09-22 | 9 |
| T1I | 7A | RECON.DI/ SANNAGAI BROWN MD | | 2021-09-24 | 1 |
| T1I | 8A | RECON.DIB/ SANNAGAI BROWN MD | | 2021-09-24 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1B | Notice of Disapproved Claim – Concurrent | | 2021-07-23 | 5 |
| T1I | 2B | SSA-1696 – Claimant's Appointment of a Representative | | 2021-08-10 | 1 |
| T1I | 3B | Fee Agreement for Representation before SSA | | 2021-08-10 | 1 |

| T1I | 4B | T2 Disability Reconsideration Notice | | 2021–09–24 | 4 |
| T1I | 5B | T16 Disability Reconsideration Notice | | 2021–09–24 | 3 |
| T1I | 6B | Authorized Representative Cover Letter | | 2021–10–07 | 1 |
| T1I | 7B | Request for Hearing by ALJ | | 2021–10–08 | 2 |
| T1I | 8B | Request for Hearing Acknowledgement Letter | | 2021–10–18 | 20 |
| T1I | 9B | COVID Hearing Agreement Form | | 2021–10–22 | 2 |
| T1I | 10B | Hearing Notice | | 2022–02–11 | 14 |
| T1I | 11B | SSA–1696 – Claimant's Appointment of a Representative | | 2021–10–07 | 3 |
| T1I | 12B | Notice Of Hearing Reminder | | 2022–04–08 | 4 |
| T1I | 13B | Fee Agreement for Representation before SSA | | 2022–05–05 | 2 |
| T1I | 14B | SSA–1696 – Claimant's Appointment of a Representative | | 2022–05–05 | 5 |

## Non–Disability Development

| Component | No. | Description | Received | Dates | Pages |
| --- | --- | --- | --- | --- | --- |
| T1I | 1D | Lead Protective Filing Worksheet | | 2020–10–09 | 3 |
| T1I | 2D | Application for Disability Insurance Benefits | | 2021–07–26 | 2 |

| | | | | | | |
|------|------|-------------|-----------------|------------|----------------|-------|
| T1I | 3D | Application for Supplemental Security Income Benefits | | | 2021–10–15 | 7 |
| T1I | 4D | Detailed Earnings Query | | | 2022–03–23 | 5 |
| T1I | 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022–03–23 | 1 |
| T1I | 6D | Summary Earnings Query | | | 2022–03–23 | 1 |
| T1I | 7D | Certified Earnings Records | | | 2022–03–23 | 3 |
| T1I | 8D | Summary Earnings Query | | | 2022–04–25 | 1 |
| T1I | 9D | Detailed Earnings Query | | | 2022–04–25 | 4 |
| T1I | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022–04–25 | 1 |
| T1I | 11D | Certified Earnings Records | | | 2022–04–25 | 3 |

## Disability Related Development

| Compone nt | No. | Description | Received | Source | Dates | Pages |
|------------|------|-------------------------------|----------|------------------|-----------------|-------|
| T1I | 1E | Disability Report – Field Office | | | to 2020–10–22 | 3 |
| T1I | 2E | Work History Report | | | to 2020–10–22 | 11 |
| T1I | 3E | Disability Report – Adult | | | to 2020–10–22 | 9 |
| T1I | 4E | Function Report – Adult | | Shanna Cortez | to 2020–11–16 | 8 |
| T1I | 5E | Work History Report | | Shanna Cortez | to 2020–11–16 | 12 |
| T1I | 6E | 3rd Party Function Report – Adult | | Beverly Sessoms | to 2020–11–20 | 8 |
| T1I | 7E | Report of Contact | | | to 2021–08–10 | 2 |

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 8E | Disability Report – Field Office | | | to 2021–08–12 | 3 |
| T1I | 9E | Disability Report – Appeals | | | to 2021–08–12 | 8 |
| T1I | 10E | HIT Response | | Wellstar Health System | 2019–01–01 to 2021–09–01 | 1 |
| T1I | 11E | Function Report – Adult | | Shanna Cortez | to 2021–09–09 | 8 |
| T1I | 12E | Disability Report – Field Office | | | to 2021–10–08 | 3 |
| T1I | 13E | Disability Report – Appeals | | | to 2021–10–08 | 8 |
| T1I | 14E | Report of Contact | | Covington Oho | to 2021–10–22 | 1 |
| T1I | 15E | Exhibit List to Rep PH2E | | Covington Oho | to 2022–03–23 | 5 |
| T1I | 16E | Misc Disability Development and Documentation | | | to 2022–04–07 | 2 |
| T1I | 17E | Authorization for Source to Release Information to SSA | | | to 2022–04–15 | 3 |
| T1I | 18E | Resume of Vocational Expert | | | to 2022–04–29 | 5 |
| T1I | 19E | Report of Contact | | | to 2022–05–05 | 1 |
| T1I | 20E | Report of Contact | | | to 2022–05–05 | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 1F | Emergency Department Records | | Atlanta Medical Center – M | 2020–03–07 to 2020–03–07 | 63 |
| T1I | 2F | Progress Notes | | Psychiatric Consultants Of Atl | 2020–04–17 to 2020–10–09 | 43 |

| | | | | | |
|---|---|---|---|---|---|
| T1I | 3F | Consultative Examination Report | Jessie Louise Muse Al Amin Md – CE | to 2021– 03–31 | 10 |
| T1I | 4F | Progress Notes | Emory Clinic Medical Records Department – M | 2021–06– 11 to 2021–06– 11 | 10 |
| T1I | 5F | Consultative Examination Report | Arthur W Hartzell PhD – CE | to 2021– 07–14 | 9 |
| T1I | 6F | Emergency Department Records | Atlanta Medical Center | 2010–08– 10 to 8202–03– 07 | 85 |
| T1I | 7F | Medical Source – No MER Available | Emory Clinic | to 2021– 10–07 | 7 |
| T1I | 8F | Outpatient/Inpatient Rehabilitation Records | Anwan Wellness Medical Center | 2020–05– 04 to 2022–02– 22 | 96 |
| T1I | 9F | Outpatient/Inpatient Rehabilitation Records | James Griffin, PhD | 2021–07– 21 to 2022–04– 06 | 71 |
| T1I | 10F | Medical Opinion – Mental | Anna Wright, Npc/Dr. Byron Evans, Md | to 2022– 04–26 | 11 |