# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MILDRED COLLINS-WILLIAMS
as administrator of the estate of
Tijuana Frazier and guardian and
next friend of ▮Q.H.▮, a
minor, and PEBBLES MCCLAIN
as guardian and next friend of
▮J.F.▮ and ▮I.F.▮,
minors,

      Plaintiffs,

   v.

CONTOUR EASTWYCK LLC,


      Defendant.

CIVIL ACTION NO.

1:20-CV-3129-CAP


## <u>O R D E R</u>

On April 6, 2019, Tijuana Frazier was killed while sleeping inside an apartment when a bullet came through an outside wall. The apartment was in Eastwyck Village ("Eastwyck"), a complex owned by defendant Contour Eastwyck LLC ("Contour"). Compl. ¶¶ 6, 10-15 [Doc. No. 1-2].  Ms. Frazier's estate and minor children have sued Contour for failing to keep the premises safe pursuant to O.C.G.A. § 51-3-1, allowing and maintaining a nuisance of dangerous criminal conditions pursuant to O.C.G.A. § 41-1-1, and negligent hiring, training, supervision, and retention of employees working for and

responsible for Eastwyck.  *Id.* ¶¶ 16-35.  The plaintiffs seek damages related to Ms. Frazier's personal injuries, pain and suffering, disability, disfigurement, mental anguish, funeral costs, loss of capacity for the enjoyment of life, economic losses, incidental expenses, lost earnings, loss of earning capacity, consequential damages, punitive damages, and attorneys' fees pursuant to O.C.G.A. § 13-6-11 as well as any other damages allowed under the laws of the State of Georgia.  *Id.* ¶¶ 36-40.

Since early 2021, many discovery disputes have come before the court in this matter. In what could be considered the crescendo of these wide-ranging disputes, the plaintiffs' second motion for sanctions [Doc. No. 185]—which incorporates arguments from the parties' briefing in regard to the plaintiffs' first motion for sanctions [Doc. No. 160]—is now before the court.[1] This matter has been extensively briefed [Doc. Nos. 160, 167, 169, 185, 193, 195, 200, and 201] through filings that notably incorporate and/or reference the majority of the 218 filings (in addition to their exhibits) on the docket. Moreover, the court has held two hearings in which the parties have

---

[1] On February 14, 2022, the court dismissed as moot the plaintiffs' first motion for sanctions but informed the parties that it would consider the issues and arguments raised in the first motion for sanctions in its consideration of the second motion for sanctions. Feb. 14, 2022 Order [Doc. No. 212].

addressed the issues raised in the motions for sanctions: a hearing on August 11, 2021 intended to address the plaintiffs' motion to compel a forensic inspection of the defendant's emails ("forensic inspection hearing") and a two-day hearing on February 9 and 10, 2022 to directly address the pending motions for sanctions. The transcripts for these hearings are available on the docket. *See* Forensic Inspection Hr'g Tr. [Doc. No. 218]; Sanctions Hr'g Trs. I and II [Doc. Nos. 217 and 214]. At the forensic inspection hearing, the plaintiffs submitted exhibits to the court and copied opposing counsel. In addition, at the sanctions hearing each party utilized visual aids. The defendant's sanctions hearing exhibits are already preserved on the docket [Doc. No. 209-1], and the plaintiffs' forensic inspection hearing exhibits have been preserved pursuant to a filing made just prior to the issuance of this order. *See* Dec. 15, 2022 Order [Doc. No. 219].

In summary, after exhaustive arguments and opportunities for input from the parties, this matter is now ripe for review. Although not its typical practice, the court—due to the length of this order—includes a table of contents for reference and ease of navigation.

# Contents

I.   Introduction .................................................................................................13

II.  Case Background & Pertinent Facts .........................................................16

   A.   Overview of the Defendant ....................................................................16

       1.   The Defendant's Ownership of Eastwyck ...........................................16

       2.   The Defendant's Insurers .....................................................................17

       3.   The Defendant's Counsel and Experts ................................................18

          a)   Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP ................18

          b)   Mike Magilton ....................................................................................19

          c)   Gray, Rust, St. Amand, Moffett & Brieske, LLP ..............................19

          d)   Woodall and Broome Investigations ..................................................21

          e)   Relevant Data Technologies ...............................................................21

       4.   Cases Pending Against the Defendant ..................................................22

          a)   Mayes v. Contour Eastwyck, LLC ......................................................22

          b)   Connor v. Contour Eastwyck, LLC .....................................................24

          c)   Woodall v. Contour Companies ..........................................................24

       5.   The Defendant's Employees .................................................................25

          a)   Corporate Employees ..........................................................................25

             (1)   Pete Dedvukaj .............................................................................25

             (2)   Nora Prekelezaj ..........................................................................26

             (3)   Latasha Dia .................................................................................26

             (4)   Marshal Rhodes ..........................................................................27

             (5)   Savanna Leonard ........................................................................29

          b)   Eastwyck Property-Level Employees ..................................................29

             (1)   Marshal Rhodes ..........................................................................30

             (2)   Bradley Payne .............................................................................30

             (3)   Antoinette NarCisse ....................................................................32

             (4)   Dian Pauleon ...............................................................................33

             (5)   Rashanda Goolsby .......................................................................34

             (6)   Keith Thurman ............................................................................35

             (7)   Wendal Johnson ..........................................................................35

             (8)   Ashelynn Burt-Jones and Jori Jones .........................................37

    6.    The Defendant's Documents ........................................................39

        a)   Payroll Records ....................................................................39

        b)   Employee Files .....................................................................40

        c)   Financial Records.................................................................41

        d)   Emails ...................................................................................42

            (1)    GoDaddy Emails ..........................................................42

            (2)    Gmail Emails ................................................................44

B.   Pre-Litigation.............................................................................................51

    1.    The DKPD Investigated Ms. Frazier's Death .......................................51

    2.    The Defendant Anticipated and Was Notified of Potential Litigation.................53

        a)   The Defendant Anticipated Litigation ....................................53

        b)   The Plaintiffs Sent a Preservation of Evidence Letter ...................54

        c)   The Defendant Hired Counsel and Investigated the Shooting.........55

    3.    The Defendant Deleted Ms. Pauleon's and Ms. Goolsby's Email Account...........58

    4.    The Plaintiffs Sent a Demand Letter........................................................58

    5.    Nautilus Hired GRSMB and Responded to the Plaintiffs' Demand Letter .........58

    6.    The Defendant Rehired Ms. Rhodes and Deleted Her Prior Email Address ........59

    7.    The Defendant Interviewed Charles Cooper and Created a Report ...................60

C.   Litigation....................................................................................................62

    1.    Initial Filings ..........................................................................................62

    2.    Early Discovery Efforts ..........................................................................63

        a)   Interrogatory Responses .........................................................63

        b)   Responses to Requests for Production....................................64

    3.    The Plaintiffs Deposed Wendal Johnson ................................................71

    4.    The Plaintiffs Sought to Amend the Complaint and the Defendant Sought Summary Judgment ...............................................................................72

    5.    Discovery Continued ..............................................................................73

        a)   The Defendant Responded to Additional Document Requests .........73

        b)   The Defendant Supplemented and Corrected Interrogatory Responses ..........74

        c)   The Plaintiffs Deposed Ms. Prekelezaj..................................75

        d)   The Plaintiffs Deposed Ms. Dia .............................................78

        e)   Discovery Disputes Ensued and the Court Extended Discovery .......78

    f)    The Plaintiffs Moved to Compel the Production of ESI .....................................80

        (1)    The Plaintiffs Filed the Motion ...............................................................80

        (2)    The Parties Corresponded Regarding the Motion......................................83

        (3)    The Defendant Petitioned the Court for an Extension of Time.................85

        (4)    The Defendant Responded to the Motion to Compel ESI ..........................86

        (5)    The Plaintiffs Replied Regarding Their Motion to Compel ESI ................90

        (6)    The Court Ordered a Search of the Defendant's Emails............................93

        (7)    The Plaintiffs Provided the Defendant with Search Terms.......................94

        (8)    The Defense Counsel Incorrectly Represented that the Search Was
Complete ...............................................................................................................95

        (9)    The Defendant Certified it Lost Access to Key Accounts and Requested an
Extension ..............................................................................................................97

    g)    The Plaintiffs Sought a Forensic Inspection of Email Servers .......................100

        (1)    The Plaintiffs Filed a Motion for a Forensic Inspection ..........................100

        (2)    The Court Set a Briefing Schedule and the Defendant Finished Its Court-
Ordered Email Production ...................................................................................102

        (3)    The Defendant Responded ........................................................................104

        (4)    The Plaintiffs Replied ...............................................................................107

        (5)    The Defendant Moved to Strike the Plaintiffs' Reply ..............................109

        (6)    The Court Set a Hearing............................................................................110

        (7)    The Parties Submitted a Proposed Protocol.............................................110

            (a)    Who Should Conduct the Inspection.................................................111

            (b)    The Breadth of the GoDaddy Inspection .............................................111

            (c)    Inspection of Gmail Accounts................................................................112

            (d)    Objections to Production .....................................................................114

6.    The Plaintiffs Uncovered Sanctionable Conduct .................................................114

    a)    The Plaintiffs Discovered 42 Undisclosed Eastwyck Employees....................114

    b)    The Plaintiffs Discovered Undisclosed Security Documents ...........................116

    c)    The Plaintiffs Discovered the Defendant Produced Annual Profit and Loss
Statements in *Mayes*..........................................................................................118

    d)    The Plaintiffs Discovered the Defendant Violated the DKPD Confidentiality
Agreement ...........................................................................................................119

7.    The Plaintiffs Filed Their First Motion for Sanctions .........................................120

a) The Plaintiffs' Allegations ...........................................................120

(1) The Defendant Failed to Disclose 42 Employees. .....................120

(2) The Defendant Failed to Properly Identify the Property Manager on the Date of the Shooting ...............................................................122

(3) The Defendant Intentionally Withheld Security Logs. .............123

(4) The Defendant Did Not Disclose the *Mayes* Case ...................123

(5) The Defendant Objected to Producing Documents in Bad Faith.............124

b) The Plaintiffs' Requested Remedies ........................................124

(1) Mitigating Remedies ...............................................................125

(2) Sanctions ...............................................................................125

(a) The Court's Inherent Authority ..........................................126

(b) Rule 26(g) ..............................................................................127

(c) Rule 37(c)(1) ..........................................................................127

8. The Court Held a Hearing on the Motion to Compel a Forensic Inspection.......128

9. The Court Compelled a Forensic Inspection........................................137

10. The Defendant Responded to the Motion for Sanctions ........................139

a) The Defendant's Failure to Disclose 42 Employees .......................140

b) The Defendant's Failure to Properly Identify the Property Manager on the Date of the Shooting..............................................................145

c) The Defendant's Failure to Produce Security Logs........................146

d) The Defendant's Failure to Disclose *Mayes* and Produce Documents It Produced in *Mayes* .........................................................147

e) The Defendant's Response to the Plaintiffs' Proposed Sanctions ...................148

(1) The Court's Inherent Authority...............................................148

(2) Rule 26(g) Sanctions ...............................................................149

(3) Rule 37(c) Sanctions...............................................................149

11. The Plaintiffs Replied Regarding their Motion for Sanctions ...............151

12. The Plaintiffs Discovered Charles Cooper ........................................153

13. The Parties Updated the Court on the Forensic Inspection.................155

a) The Plaintiffs Updated the Court and Requested Clarification ....................155

b) The Defendant Responded to the Plaintiffs' Update......................157

14. The Plaintiffs Filed a Second Motion for Sanctions ............................158

a)    The Plaintiffs' Specific Arguments for Sanctions ...............................................159

    (1)    The Defendant Wrongly Identified Ms. Rhodes as the Property Manager and Failed to Disclose or Search her Email .........................................................159

    (2)    The Defendant Spoliated Emails .................................................................160

        (a)    The Defendant's Gmail Accounts ....................................................160

        (b)    Ms. Pauleon's Email Account .........................................................161

    (3)    The Defendant Spoliated/Hid Security Logs .............................................162

    (4)    The Defendant Hid an Eyewitness...............................................................163

    (5)    The Defendant and the Defense Counsel Falsely Claimed that Wendal Johnson Did Not Work for the Defendant .............................................................164

    (6)    The Defendant Consistently Made False Statements ................................166

    (7)    The Defendant Failed to Comply with the ESI Order ..............................174

        (a)    Email Production...............................................................................174

        (b)    Tardy Forensic Inspection Report..................................................174

        (c)    Inadequate Efforts Regarding the Defendant's Gmail Accounts ..........175

b)    Sanctions Requested ..............................................................................................176

c)    Authority for the Requested Sanctions ................................................................177

    (1)    Rule 26(g) ......................................................................................................177

    (2)    Rule 37 ...........................................................................................................178

    (3)    The Court's Inherent Authority.................................................................179

15.    The Defendant Filed the Forensic Investigator's Report and the Parties Filed a Joint Status Report .........................................................................................................179

16.    The Defendant Responded to the Plaintiffs' Second Motion for Sanctions.........183

a)    Responses to the Plaintiffs' Specific Allegations.................................................184

    (1)    There Was No Eyewitness to the Shooting ...............................................184

        (a)    Mr. Cooper Was Not an Eyewitness ........................................184

        (b)    Mr. Murray Was Not an Eyewitness .......................................189

    (2)    The Defendant Was Disorganized But Did Not Intentionally Hide Employee Records...................................................................................................192

    (3)    The Defendant Was Upfront with the Court about the Tardy Forensic Examination.......................................................................................................193

    (4)    The Forensic Expert's Report Confirmed the Defendant's Representations Regarding Deleted Accounts ..............................................................194

(5)    The Plaintiffs Waited Seven Months to Request the Defendant to Search its Email Accounts ........................................................................... 195

(6)    The Defendant Never Misled the Plaintiffs to Believe an Email Search Was Being Conducted Prior to April 2021 ........................................... 195

(7)    The Remaining Discovery Issues are Credibility Issues, not Sanctionable Conduct .......................................................................................... 199

    (a)    The Defendant is Not Withholding Security Logs ................................ 199

    (b)    Wendal Johnson Did Not Receive Paychecks, So It Is Not Surprising He Did Not Appear in Employee Files or W-2 Records ......................................... 201

    (c)    Ms. Rhodes and Ms. Prekelezaj Have Different Understandings of When Ms. Rhodes' Leave Started and Ended ............................................................. 202

b)    The Court Should Impose Rule 11 Sanctions on the Plaintiffs and the Plaintiffs' Counsel .................................................................................. 204

17.    The Plaintiffs Filed a Reply Regarding Their Second Sanctions Motion ............ 206

a)    The Defendant Spoliated Evidence ................................................... 207

b)    The Defendant Has Continually Failed to Fulfill Its Responsibilities in Regard to ESI .................................................................................................. 208

c)    The Defendant Did Not Refer to the Eyewitness It Thought Was Charles Cooper in Its Summary Judgment Brief ..................................................... 211

d)    The Plaintiffs Believe that Mr. Cooper Was an Eyewitness ...................... 212

e)    The Defendant's Conduct Warrants Sanctions ..................................... 214

18.    The Court Held a Hearing on the Pending Sanctions Motions ......................... 217

a)    The Plaintiffs' Presentation .............................................................. 221

    (1)    The Defendant Unilaterally Limited the Date Range of the Forensic Examination ............................................................................... 221

    (2)    The Defendant's Privilege Log is Problematic .......................... 222

    (3)    The Defendant's Definition of Responsiveness is Problematic ............... 223

    (4)    The Plaintiffs Cannot Find Charles Cooper ............................... 224

    (5)    The Plaintiffs Did Not Want to Take Additional Depositions Until the Document Production Was Complete .................................................. 225

    (6)    The Court Must Sanction the Defendant *and* the Defense Counsel ........ 225

    (7)    The Compromised Discovery is Relevant to Ms. Frazier's Legal Status on the Property .............................................................................. 228

    (8)    The Court Should Strike the Answer ....................................... 229

b)    Ms. Prekelezaj's Testimony ...........................................................230

   (1)    The Email Searches .........................................................230

      (a)    The Initial Email Search ...........................................230

      (b)    The Forensic Examination ......................................231

   (2)    Ms. Prekelezaj Discussed Documents Produced in *Mayes* but Withheld in this Matter ...........................................................................231

   (3)    Ms. Prekelezaj Testified She Had No Prior Knowledge of Mr. Cooper ....232

   (4)    Ms. Prekelezaj Discussed the Undisclosed Employees ............................232

   (5)    Ms. Prekelezaj Testified Regarding Mr. Johnson's Employment Status .237

   (6)    Ms. Prekelezaj Testified Regarding the Property Manager at the Time of the Shooting ....................................................................................240

   (7)    Ms. Prekelezaj Testified Regarding Employee Email Accounts ..............242

   (8)    Ms. Prekelezaj Discussed Ms. Rhodes' Employment Dates .....................244

   (9)    Ms. Prekelezaj Testified Regarding the Threat of Nautilus Pulling Insurance Coverage ....................................................................................244

   (10)   Ms. Prekelezaj Testified Regarding the Defendant's Failure to Preserve Documents and Emails .............................................................................245

c)    Mr. Draper's Testimony ...............................................................245

   (1)    Mr. Draper Explained His Process ..............................................246

   (2)    Mr. Draper Explained Why He Did Not Log into GoDaddy ....................250

   (3)    Mr. Draper Discussed Ms. Pauleon's Email .............................................251

   (4)    Mr. Draper Testified Regarding Missing the Forensic Report Deadline..253

   (5)    Mr. Draper Denied Doing Favors for GRSMB ...........................................254

   (6)    Mr. Draper Testified Regarding "Systematically Deleted" Emails ..........254

d)    The Defendant's Presentation .......................................................255

   (1)    The Defendant's Response to the Court-Ordered Forensic Inspection.....255

   (2)    The Defense Counsel's Conflicting Reasons for not Disclosing Charles Cooper ......................................................................................................257

   (3)    The Non-Disclosure of Eastwyck Employees ............................................262

   (4)    The Conversation Regarding Nautilus Pulling Insurance Coverage .......263

   (5)    The Eastwyck Property Manager ..................................................265

   (6)    The Defendant's Email Deletion Procedure ..............................................266

   (7)    Ms. Prekelezaj's Inconsistent Statements ...............................................269

(8)    Documents Produced in *Mayes* But Withheld in this Matter ...................269

(9)    The Security Logs .........................................................................270

(10)   The Defendant's Failure to Disclose *Mayes*..............................271

(11)   The Leasing Office Gmail Account .........................................272

(12)   Mr. Johnson's Employment Status............................................275

(13)   The Defendant's Withdrawn  Summary Judgment Motion.....................277

(14)   The Disputed Discovery's Relevance to Ms. Frazier's Legal Status .........277

(15)   The Defendant's Arguments Against the Requested Sanctions ...............278

(16)   The Defendant's Analysis of its Conduct Pursuant to the Federal Rules of Civil Procedure ........................................................................280

(a)    Rule 26(g)....................................................................280

(b)    Rule 37 ........................................................................281

III.  Authority to Sanction: Legal Standards and Analysis ....................................283

A.   Rule 26(g) .................................................................................283

1.   Legal Standard ..................................................................283

a)   Rule 26(g) Requirements ........................................................283

b)   Rule 26(g) Sanctions ...........................................................285

c)   The "Reasonable Inquiry" Requirement.......................................285

2.   Analysis .........................................................................290

a)   The  Defense Counsel Did Not Conduct a Reasonable Inquiry Before Certifying the Defendant's Discovery Responses ...................................................291

(1)   The Defense Counsels' Limited and Passive Role in Discovery...............291

(2)   The Defense Counsels' Excuses ............................................293

(a)    The Defense Counsel Blamed Their Client............................293

(b)    The Defense Counsel Blamed the Plaintiffs .........................294

(c)    The Defense Counsel Blamed the Defendant's Prior Law Firm ..........295

(d)    The Defense Counsel Claimed Electronic Mail Is Not Electronically Stored Information .........................................................296

(3)   The Court Rejects the Defense Counsels' Arguments............................296

(a)    The Defense Counsel Did Not Conduct a Reasonable Inquiry.............297

(b)    The Defendant's Verification Cannot Shield the Defense Counsel from Sanctions for an Improper Certification.........................................298

(c)    The Plaintiffs Asked the Defendant to Preserve and Search Emails ...299

       (d)     It Was the Defense Counsels' Responsibility to Conduct Custodian Interviews of the Defendant and Search the Appropriate Data ..................... 301

       (e)     The Forensic Inspection Was a Consequence of the Defendant's Discovery Deficiencies ....................................................................................... 302

       (f)     Current Counsel Were Not Excused From Conducting a Reasonable Inquiry Because the Defendant Previously Hired Different Counsel ............ 303

    b)    The Defendant's Discovery Responses and Document Production Were Incomplete and Inaccurate ........................................................................................ 304

    c)    The Defense Counsel Improperly Withheld the Identity of a Witness ........... 306

    d)    The Defendant Made Baseless Objections to the Production of Documents ... 311

B.   Rule 37(e) ............................................................................................................... 312

   1.   Legal Standard ................................................................................................... 312

   2.   Analysis ............................................................................................................. 315

    a)    The Defendant's Behavior Meets the Threshold for Spoliation Sanctions ...... 315

    b)    The Defendant's Spoliation Prejudiced the Plaintiffs ..................................... 316

    c)    The Defendant Acted with the Intent to Deprive the Plaintiffs of the Spoliated Emails ...................................................................................................................... 318

       (1)     Ms. Rhodes' Deleted Email Account ........................................................ 318

       (2)     Ms. Pauleon's Deleted Email Account ...................................................... 320

       (3)     The Gmail Accounts .................................................................................. 323

C.   Rule 37(c)(1) .......................................................................................................... 328

   1.   Legal Standard ................................................................................................... 328

   2.   Analysis ............................................................................................................. 330

D.   Rule 37(b) .............................................................................................................. 332

   1.   Legal Standard ................................................................................................... 332

   2.   Analysis ............................................................................................................. 333

E.   The Court's Inherent Authority To Sanction ......................................................... 337

   1.   Legal Standard ................................................................................................... 337

   2.   Analysis ............................................................................................................. 339

    a)    The Defendant Demonstrated a Pattern of Misrepresentations ................... 340

    b)    The Defendant Employed Misleading Half-Truths ......................................... 342

    c)    The Defendant Made Many Assertions Lacking a Factual Basis ................... 343

    d)    The Defendant Converted Speculation Into Fact ............................................ 346

       e)    Trickery and Wordplay Dominated the Defendant's Approach to Discovery..348

       f)    The  Defendant's Failures Demonstrate a Pattern of Bad-Faith Behavior.....350

    3.   The Defense Counsels' Role in the Bad Faith Behavior.....................................353

IV. Imposition of Sanctions ...............................................................................................355

   A.   The Defendant...........................................................................................................355

    1.   The Court Strikes the Defendant's Answer.........................................................356

    2.   The Court Requires the Defendant to Pay the Plaintiffs' Attorney Fees............361

   B.   The Defense Counsel................................................................................................363

V.   Conclusion....................................................................................................................366

## I.    Introduction

In a June 7, 2021 brief the defendant submitted regarding one of the discovery disputes in this matter, the defendant argued that "it cannot identify documents [it] do[es] not know exist." Def.'s Resp. to Pls.' Mot. to Compel ESI at 2 [Doc. No. 139].  The court, operating under the assumption that the defense counsel were competent in and committed to their roles as officers of the court, did not realize when it read this assertion that it was emblematic of the defendant's (and the defense counsels') approach to this case. However, after sifting through literally hundreds of pages of briefing, hearing transcripts, and evidence of record and diverting countless hours from cases rightfully litigated on the merits, the court is now thoroughly convinced that the defendant's—and the defense counsels'—strategy in this litigation has been to know as little as possible about its/their client's

documents and the underlying facts, enabling delay, denial, non-disclosure and outright document destruction at every turn. That approach over the past two years—combined with the defendant's ever-shifting and contradictory testimony and decisions to deprive access to unquestionably discoverable evidence and witnesses that it (self-servingly) argues were unimportant[2]—has resulted in a case incapable of resolution on the "facts." This outcome, which is detestable to justice from any angle, is made even more distasteful when one considers the intangible costs of delayed justice to the minor plaintiffs and their guardians in this matter—who deserve a timely resolution on the merits rather than litigatory schemes that inevitably protract and delay the closing of a painful chapter.

To conclude that sanctions are due against the defendant and the defense counsel in this matter is straightforward, but to fairly evaluate, designate, and levy such sanctions is a heavy task riddled with complexity. At every step, the court has been mindful of the bounds of discretion and has sought to fairly and thoroughly examine the facts set before it. To that end,

---

[2] *See, e.g.*, Def.'s Resp. to Second Mot. for Sanctions at 3 – 4 [Doc. No. 193] (attempting to justify the non-disclosure of a witness by arguing that the witness's testimony was not important); Def.'s Resp. to First Mot. for Sanctions at 3 [Doc. No. 167] (arguing that the plaintiffs "grossly exaggerate[d]" the probative value of 42 undisclosed witnesses).

14

the court has developed a robust case background that incorporates the parties' arguments, the documentary evidence on the record, and—where necessary—the court's findings of fact. The court's factual findings are based upon the testimony, exhibits, and briefs on the record as well as facts subject to judicial notice, including the defense counsels' advertised experience on their firm webpage as well as in the member records of the State Bar of Georgia. In this case, the defendant's inconsistent representations and the inconsistent testimony of its representative and employees required the court to make determinations regarding even simple facts important for context but not essential to the resolution of the pending sanctions motion, such as the job titles different employees held, what Contour-related entity the individuals worked for, who the employees answered to, or how the different Contour companies were related. Ultimately, where the court was faced with irreconcilable inconsistencies, the facts articulated herein reflect the testimony and/or evidence the court found the most credible.

To the case background, the court has applied the applicable law governing misconduct as articulated in the Federal Rules of Civil Procedure and the case law discussing the court's inherent powers. Finally, the court has sought to impose sanctions for the defendant's and the defense counsels' manifold transgressions in a manner that, as much as possible, makes the

plaintiffs whole, discourages such antics in the future, restores judicial authority, and affirms the integrity of the judicial system and the legal profession.

## II.    Case Background & Pertinent Facts[3]

### A.    Overview of the Defendant

#### 1.    The Defendant's Ownership of Eastwyck

In 2017, the defendant purchased Eastwyck for approximately 25 million dollars.[4] Dedvukaj Dep. at 26:16 – 27:8 [Doc. No. 160-13]. At or near

---

[3] The court has cited to many depositions. Where the page numbers of the deposition transcripts differ from the page number of the court filing, the court has used the page number on the original transcript and disregarded the court filing pagination.

[4] Contour Eastwyck is a limited liability company made up of many members, including Contour Development Group LLC. Prekelezaj Dep. 18:5 – 20:14; 24:7-9 [Doc. No. 128-1]. In his deposition, Pete Dedvukaj, CEO of Contour Development Group, testified that "I did purchase Eastwyck . . .". Dedvukaj Dep. at 26:18 [Doc. No. 160-13]. Later in his deposition, Mr. Dedvukaj testified that he meant Contour Development Group purchased the property on October 1, 2017. *Id.* at 127:3-8. The court is uncertain how/when title was transferred from Contour Development Group to Contour Eastwyck LLC. However, despite its assertions to the contrary in discovery, it seems clear to the court that Contour Development Group essentially managed Contour Eastwyck; hence creating some confusion as to what "Contour" company individuals were referencing in their depositions. Prekelezaj Dep. at 24:17-19 [Doc. No. 128-1] (Contour Development Group provided "services" to Contour Eastwyck); Dedvukaj Dep. at 39:5-18 [Doc. No. 160-13] (testifying that he managed "construction and rehab, improvements, physical conditions of the buildings and parking lots and structures of the property" at Eastwyck

the time of the purchase, Contour Development Group CEO Pete Dedvukaj documented several concerns with crime and dangerous conditions on the property in an email he forwarded to Contour Development Group's Vice President of Asset Management Latasha Dia, including major drug activities, unauthorized tenants, and shootings. Oct. 2, 2017 Dedvukaj to Dia email [Doc. No. 185-20]. Despite these articulated concerns, the defendant ultimately purchased the property, which it owned until it sold the property to Nirvana Group in February 2021. Dedvukaj Dep. at 27:9-14 [Doc. No. 160-13] (sold to Nirvana Group); Prekelezaj Dep. at 28:5-7 [Doc. No. 128-1] (property sold in February 2021).

## 2. The Defendant's Insurers

The defendant is insured by two insurance companies in relation to this action: **Colony Insurance Company ("Colony")** and **Nautilus Insurance Company ("Nautilus").** May 10, 2019 Cruiser Mitchell to Rafi Ltr. [Doc. No. 185-3]. Colony is the defendant's primary insurer with a liability limit of $1,000,000 and Nautilus is the defendant's excess insurer (umbrella coverage

---

while Contour Development Group employee LaTasha Dia "does the management part of it, payroll and all of that."). *But see* Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 37 [Doc. No. 126-1] ("Defendant is the owner and manager of the subject property" and, thus, did not have any contracts with another entity regarding management or property management at Eastwyck).

insurer) with a policy limit of $5,000,0000. *Id.*; *see also* Pls.' Mot. for Approval of Partial Settlement at 3 [Doc. No. 164]. In February 2021, the plaintiffs reached a conditional partial settlement of the claims brought in this lawsuit with Colony subject to the court's approval. Pls.' Mot. for Approval of Partial Settlement at 3 [Doc. No. 164]. This partial settlement is for the $1,000,000 policy limit of the primary insurance policy issued to the defendant by Colony in exchange for a limited liability release. *Id.* at 3 – 4. The court has not approved the settlement as presented at this time. Nov. 9, 2021 Order [Doc. No. 178].

### 3.    The Defendant's Counsel and Experts

Because of the length of this order and the number of individuals, firms, and companies involved in this litigation, the court will briefly review the professionals the defendant hired in this litigation most pertinent to this order.

#### a)    Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP

**Cruse, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP ("Cruser Mitchell")** originally represented the defendant in relation to Ms. Frazier's death.  May 10, 2019 Cruser Mitchell to Rafi Ltr. [Doc. No. 185-3]. Attorneys

**Glenn C. Tornillo**, **Dominko C. Rumph**, and **J. Robb Cruser** were all involved in this initial representation. *Id.*

### b)    Mike Magilton

**Mike Magilton** is a private investigator hired by Cruser Mitchell who visited Eastwyck several times following Ms. Frazier's death and met with the DeKalb County Police Department ("DKPD") regarding a potential eyewitness to the shooting. Cooper Timeline at 1 [Doc. No. 186-1]; Det. Tappan's Case Note – Supplemental Form [Doc. No. 91-2]; *see also* Audio Recording of Rumph-Magilton-Tappan Meeting [Doc. No. 186-2].

### c)    Gray, Rust, St. Amand, Moffett & Brieske, LLP

**Gray, Rust, St. Amand, Moffett & Brieske, LLP ("GRSMB")** is the law firm that currently represents the defendant in this action. Attorneys **Chris J. Perniciaro** and **Matthew G. Moffett,** who appears to be a named partner at GRSMB, signed the notice of removal in this matter as attorneys of record. Def.'s Pet. for Removal at 8 [Doc. No. 1]. At the sanctions hearing, attorney Moffett noted that he is the senior attorney working on this matter and stated that he has been practicing law for 30 years. Sanctions Hr'g Tr. I at 41:21-23 [Doc. No. 217]; Sanctions Hr'g Tr. II at 43:6-10. [Doc. No. 214].

The GRSMB website, of which this court will take judicial notice for the limited purpose of ascertaining the defense counsels' advertised experience,

states that both attorney Moffett and attorney Perniciaro are partners at GRSMB.[5]  GRSMB, https://www.grsmb.com/attorneys/matthew-g-moffett-6/ (last visited Nov. 30, 2022) and https://www.grsmb.com/attorneys/chris-j-perniciaro (last visited Nov. 30, 2022).  According to GRSMB's website, attorney Moffett has tried over 100 cases involving serious injury or death, is a frequent speaker at conferences and events, and is a past president of the Georgia Defense Lawyers Association. GRSMB, https://www.grsmb.com/attorneys/matthew-g-moffett-6/ (last visited Nov. 30, 2022). Attorney Perniciaro also appears to be a speaker at Georgia Bar Continuing Legal Education lectures, including a November 2021 engagement to speak about "Big Case Defense: From Proficient Evaluation to Positive Resolution." GRSMB, https://www.grsmb.com/attorneys/chris-j-perniciaro (last visited Nov. 30, 2022). The State Bar of Georgia website, of which this court will also take judicial notice, states that attorney Moffett has been an active member in good standing of the State Bar of Georgia with no public disciplinary history of record since 1990, following his graduation from Emory University Law School. State Bar of Georgia Member Directory

---

[5] *See, e.g., Goodloe v. Royal Caribbean Cruises, Ltd.*, Case No. 18-21125-CIV-Altonaga/Goodman, 2019 U.S. Dist. LEXIS 56638, at *12 n.3 (S.D. Fla. Feb. 15, 2019) (taking judicial notice of law firm website to document attorney's experience).

Search, Mr. Matthew Glenn Moffett, https://www.gabar.org/MemberSearchDetail.cfm?ID=NTE1Mzlz (last visited Nov. 30, 2022). The State Bar of Georgia website further reflects that attorney Perniciaro was admitted to the State Bar of Georgia in 2014 following graduation from Mercer University Law School and is an active member in good standing with no public disciplinary history of record. State Bar of Georgia Member Directory Search, Mr. Christopher Joel Perniciaro, https://www.gabar.org/MemberSearchDetail.fm?ID-NjE4NDc3 (last visited Nov. 30, 2022).

### d) Woodall and Broome Investigations

**Woodall and Broome Investigations** is an investigation firm GRSMB hired to investigate and interview Charles Cooper, an Eastwyck resident who—at the very least—heard shots fired on the date of Ms. Frazier's death. *See* Cooper Interview Tr. at 2 – 4 [Doc. No. 194-3]. **Jeff Morley** worked as an investigator with Woodall and Broome and conducted the interview with Mr. Cooper. *Id.*

### e) Relevant Data Technologies

**Relevant Data Technologies ("RDT")** is a firm that provides expertise in eDiscovery, data collections, and litigation support services. *See* Draper Expert Rpt. at 3 ¶ 1 [Doc. No. 189-1]. The defendant hired RDT to

21

conduct the forensic examination the court compelled in this matter. *Id.* at 3 ¶ 2. **Robert Draper** is the owner and President of RDT who conducted the forensic inspection and testified at the sanctions hearing on this matter. *See generally id.*; Sanctions Hr'g Tr. I at 88 - 120 [Doc. No. 217].

### 4.    Cases Pending Against the Defendant

There are several cases filed against the defendant in state court that are relevant to the discovery in this matter. The court's knowledge of these cases is limited to the documents presented before it in this matter; therefore, the court does not and will not attempt to expound upon the current status of these matters or provide a comprehensive overview. Instead, the court will restrict its review of these cases to the filings available on this court's docket.

### a)    Mayes v. Contour Eastwyck, LLC

*Mayes v. Contour Eastwyck, LLC,* ("*Mayes*" or "the *Mayes* case"), File No. 20-C-04895-S2, is a case filed the State Court of Gwinnett County. *See* Def.'s Resp. in Opp'n to Pls.' Mot. To Compel Disc. in *Mayes* [Doc. No. 156-2] (providing case caption). Pursuant to documents before this court, *Mayes* involves the October 3, 2019 shooting of a minor at Eastwyck in which the plaintiffs allege that the defendant was negligent in providing security and in supervising, hiring, training, and retaining its employees. *See* Def.'s Resp. in Opp'n to Pls.' Mot. to Compel Disc. in *Mayes* at 1 [Doc. No. 156-2]. In *Mayes*,

the defendant was initially[6] represented by Cruser Mitchell. *Id.* at 8 (defendant's signature page). Under Cruser Mitchell's representation, the defendant produced information and documents in *Mayes* that it has denied the existence of or objected to producing in the instant litigation, including the names of 42 Eastwyck employees, security documents, employee files, and profit and loss statements. *See infra* Section II.C.6. In addition, the defendant has provided many discovery responses in *Mayes* that directly contradict its responses in this case. *Id.* Relevant documents from *Mayes* on the docket in this matter include:

- the defendant's response brief in opposition to a motion to compel discovery ("*Mayes* response brief") [Doc. No. 156-2];

- the defendant's first and supplemental response and objections to the *Mayes* plaintiffs' interrogatories ("*Mayes* Interrogatory Responses") [Doc. No. 160-8];

- Marshal Rhodes' deposition ("*Mayes* Rhodes Dep.") [Doc. No. 185-18];

- Latasha Dia's deposition ("*Mayes* Dia Dep.") [Doc No. 185-19];

---

[6] At the sanctions hearing, the plaintiffs informed the court that GRSMB has assumed representation of the defendant in *Mayes*. Sanctions Hr'g Tr. I at 29:17-21 [Doc. No. 217].

23

- a list of 62 Eastwyck employees the defendant disclosed in a document production in *Mayes* ("*Mayes* List of Eastwyck Employees") [Doc. No. 160-1]; and

- timesheets created by Eastwyck security guards Keith Thurman and Ronald Eskridge logging their duties performed that were disclosed in a document production in *Mayes* ("*Mayes* Security Documents") [Doc. No. 160-11].

### b)   Connor v. Contour Eastwyck, LLC

*Connor v. Contour Eastwyck, LLC* ("*Connor*"), Case No. 19M07721 is a case filed against the defendant in the Magistrate Court of DeKalb County. *See* Pls.' Reply re: Pls.' Mot. to Compel Email Produc. at 3 – 4 [Doc. No. 140]. While the facts of *Connor* are not before the court, *Connor* is relevant to this litigation in light of April 9, 2019 emails between the *Connor* plaintiff and her husband, who were Eastwyck residents, and the defendant's corporate employees, including CEO Pete Dedvukaj.  April 9, 2019 email from Hunter to Pauleon, Dia, and Dedvukaj [Doc. No. 140-1].

### c)   Woodall v. Contour Companies

*Woodall v. Contour Companies*, Case No. 19M07652, is a case filed in the Magistrate Court of DeKalb County. *See* Pls.' Reply re: Pls.' Mot. to Compel Email Produc. at 6 [Doc. No. 140]. *Woodall* is before this court

because the *Woodall* complaint includes a January 18, 2019 email from eastwyckvillages@gmail.com signed by Ashelynn Burt-Jones, an employee of which the defendant denied having knowledge or records for the majority of this litigation. Jan. 18, 2019 email from Burt-Jones to Woodall [Doc. No. 140-4].

### 5.    The Defendant's Employees

### a)    Corporate Employees

In this order, several of the defendant's corporate-level employees are frequently referenced. The court will briefly describe the most frequently referenced individuals and their role (as the court understands it) in the company.

### (1)    Pete Dedvukaj

Pete Dedvukaj is the CEO of Contour Development Group (also known as "Contour Companies"). Dedvukaj Dep. at 6:18-22 [Doc. No. 160-13]. He testified that he founded Contour Development Group. *Id.* at 7:5-7. He testified that his son, David [Dedvukaj], and his two daughters, Nora [Prekelezaj] and Lindita work for Contour. *Id.* at 8:4-6. He further testified that the majority of the time he oversees acquisitions and dispositions as well as the redevelopment and rehabilitation of apartments. *Id.* at 8:23 – 9:2. Although his level of involvement at Eastwyck is disputed, the record reflects

25

that at least one Eastwyck resident emailed Mr. Dedvukaj about an ongoing issue in his unit. April 9, 2019 email from Hunter to Pauleon, Dia, and Dedvukaj [Doc. No. 140-1].

### (2)   Nora Prekelezaj

Nora Prekelezaj is Contour Companies' Vice-President of Operations. Prekelezaj Dep. at 6:1-2 [Doc. No. 128-1]. In this role, she manages the day-to-day operations between all companies. Sanctions Hr'g Tr. I at 49:24 – 50:4 [Doc. No. 217]. Ms. Prekelezaj is Pete Dedvukaj's daughter. Dedvukaj Dep. at 8:4-6 [Doc. No. 160-13]. Ms. Prekelezaj has served as the defendant's 30(b)(6) witness in this matter. *See generally* Prekelezaj Dep. [Doc. No. 128-1]. In a supplemental interrogatory response in the *Mayes* case, the defendant stated that Ms. Prekelezaj and her brother, David Dedvukaj, wholly owned Contour Eastwyck. *Mayes* Interrog. Resp. [Doc. No. 160-8 at 18].

### (3)   Latasha Dia

Latasha Dia is Contour Development Group's Vice President of Asset Management. Sanctions Hr'g Tr. I at 62:6-7 [Doc. No. 217]; Dia Dep. at 5:19-20 [Doc. No. 127-1] (clarifying she worked for Contour Companies).  In that role, she testified that she is "in charge of the acquisition systems and disposition systems, meaning that we put people in place for operations, management, maintenance, cleaning staff, vendors, et cetera." Dia Dep. at

26

6:1-5 [Doc. No. 127-1]. Ms. Dia's employment with the Contour Development Group began in 2015.[7] Prekelezaj Dep. 57:7-8 [Doc. No. 128-1]. In 2017, when the defendant acquired Eastwyck, Ms. Dia was responsible for hiring managers for the property. Dia Dep. 19:15-22 [Doc. No. 127-1]. The Eastwyck property managers reported to Ms. Dia. Prekelezaj Dep. 56:25 – 57:2 [Doc. No. 128-1]; Dia Dep. 22:3-10 [Doc. No. 127-1]. Ms. Prekelezaj testified that Ms. Dia reported to Pete Dedvukaj, Prekelezaj Dep. 57:3-6 [Doc. No. 128-1], but Ms. Dia testified that she answered to the set of owners or the decision-makers for the specific property she was managing. Dia. Dep. 14:5 - 16:1 [Doc. No. 127-1]. Ms. Dia worked with Pete Dedvukaj to oversee all of the Contour Development Group's properties. Prekelezaj Dep. at 57:11-13 [Doc. No. 128-1].

### (4)    Marshal Rhodes

Marshal Rhodes has acted in both corporate and property level roles. Ms. Rhodes was the defendant's first property manager at Eastwyck in 2017. *Mayes* Rhodes Dep. 30:11-14 [Doc. No. 185-18]; Dia Dep. 21:21 – 22:2 [Doc. No. 127-1]. Ultimately, she was promoted to regional responsibilities. *Mayes*

---

[7] Ms. Prekelezaj did not specify for which Contour company Ms. Dia worked; therefore, the court used context to determine that Ms. Dia's employment began with Contour Development Group, rather than the defendant, in 2015.

27

Rhodes Dep. at 30:15-19 [Doc. No. 185-18]. In the regional role, Ms. Rhodes reported to Ms. Dia and oversaw Bradley Payne, whom she testified was the new Eastwyck property manager. *Id.* Ms. Rhodes ended her employment with the defendant in 2018. *See id.* at 18:12-20.

In January 2020, Ms. Rhodes was rehired by the defendant as an operations manager. *Id.* at 17:1-15. In this role, she was assigned the following email address: mrhodes@contourcompanies.com.[8] *Id.* at 98:5-7. Her previous email address of marshal@contourdevelopmentgroup.com was deleted the same day her new email address was created. *See id.* at 98:5-20 (stating that her email address was changed when the defendant re-employed her); Draper Expert Rpt. App. A at 13 [Doc. No. 189-1] (showing marshal@contourdevelopmentgroup.com was deleted on January 21, 2020 and mrhodes@contourcompanies.com was created that same day).

Contrary to many of the defendant's assertions, Ms. Rhodes did not work for the defendant at the time of Ms. Frazier's death. She was, however, involved in facilitating some of the defendant's discovery responses in this matter. Def.'s Resp. to Pls.' Mot. to Compel at 9 – 10 [Doc. No. 139] (stating

---

[8] The deposition transcript states that Ms. Rhodes' new email address is Mrhodes@contracompanies.com, which appears to be a typographical error.

Ms. Rhodes searched the computers at Eastwyck's leasing office for incident reports, criminal trespass logs, and security logs). Concerningly, although Ms. Rhodes was employed by the defendant and available for questioning throughout this litigation, Ms. Prekelezaj testified at the sanctions hearing that she never confirmed with Ms. Rhodes that Ms. Rhodes was (as Ms. Prekelezaj wrongly asserted) the manager on the date of the shooting. Sanctions Hr'g Tr. I at 77:16 – 78:4 [Doc. No. 217].

### (5)    Savanna Leonard

Savanna Leonard is the defendant's human resources administrator. Prekelezaj Dep. at 28:18-24 [Doc. No. 128-1]. Ms. Prekelezaj initially testified that Ms. Leonard helped her review payroll records in the defendant's payroll system and any employee files for this litigation. *Id.* at 28:10 - 31:5. Months later, after the plaintiffs' counsel discovered the defendant had disclosed many additional employees in another litigation, Ms. Prekelezaj altered her testimony to state that Ms. Leonard alone searched employee files but did not search payroll records. Second Decl. of Nora Prekelezaj ("Second Prekelezaj Decl.") ¶¶ 4, 7 [Doc. No. 167-1]; *see infra* Section II.C.18.b)(1)(b)(4).

### b)    Eastwyck Property-Level Employees

During the defendant's ownership of Eastwyck, it employed over **62 property-level employees.** Third Decl. of Nora Prekelezaj ("Third

Prekelezaj Decl.") ¶¶ 2 – 3 [Doc. No. 185-2] (listing employees who were issued a W-2 by the defendant or appeared on the defendant's payroll lists). Some of those employees have been more prominent in this litigation than others. The court will highlight those referenced most in this order with relevant details.

### (1)    Marshal Rhodes

As noted above, Ms. Rhodes was the defendant's first property manager at Eastwyck. *Mayes* Rhodes Dep. 30:11-14 [Doc. No. 185-18]; Dia Dep. 21:21 – 22:2 [Doc. No. 127-1]. In this role, she used the following email address: marshal@contourdevelopmentgroup.com. *Mayes* Rhodes Dep. 98:5-20 [Doc. No. 185-18]; Draper Expert Rpt. App. A at 13 [Doc. No. 189-1].

### (2)    Bradley Payne

Although the defendant has had a difficult time articulating Bradley Payne's title and Mr. Payne's role likely shifted over the course of his employment,[9] it appears to the court that Mr. Payne was Ms. Rhodes'

---

[9] In the defendant's response to the plaintiffs' first interrogatories, Mr. Payne was first identified as "the former leasing manager." *See* Def.'s Resp. and Objs. to Pls.' First Interrog. ¶ 1 [Doc. No. 51-2 at 3]. Elsewhere in the same interrogatory response, the defendant referred to Mr. Payne as an "assistant property manager." *Id.* at ¶ 2. In her April 16, 2021 deposition as the defendant's 30(b)(6) witness, Ms. Prekelezaj testified that Mr. Payne was an assistant to the property manager and stated that it would be false to say

assistant property manager at Eastwyck in 2017. *Mayes* Rhodes Dep. 29:19 -
30:2 [Doc. No. 185-18]. After Ms. Rhodes was promoted to regional
responsibilities, Mr. Payne became property manager at Eastwyck. *Id.* at
30:6-10; *see also Mayes* Suppl. Interrog. Resps. [Doc. No. 160-8 at 22]
(identifying Mr. Payne as a property manager in 2018 and 2019); *see also*
Payne to Dia March 22, 2018 email [Doc. No 185-21] (Payne's signature line
states "Property Manager, CAPM"). As the property manager, Mr. Payne
reported to Ms. Rhodes and Ms. Dia. *Mayes* Rhodes' Dep. at 30:15-19 [Doc.
No. 185-18]. In his correspondence with Ms. Dia, Mr. Payne alerted her to
security concerns on the property and sought her permission on at least two

---

that Mr. Payne was ever a manager. Prekelezaj Dep. 64:2-5; 65:8-23; 71:16-
19 [Doc. No. 128-1]. Confusingly, at the sanctions hearing, Ms. Prekelezaj
testified that, at the time of her deposition (where she testified it would be
false to say Mr. Payne had ever been a property manager), she actually
believed that Bradley Payne *was* the property manager at the time of Ms.
Frazier's death. Sanctions Hr'g Tr. I at 63:25 – 64:10 [Doc. No. 217]. In Ms.
Dia's April 22, 2021 deposition, Ms. Dia testified that Mr. Payne had multiple
roles at Eastwyck including acting as a resident coordinator, working in
collections, and serving as an "assistant to a manager." Dia Dep. 22:11-21
[Doc. No. 127-1]. Ms. Dia further testified that Mr. Payne "liked to see himself
as property manager," but she never hired or promoted him as property
manager. *Id.* at 22:22 – 24:17. However, in its supplemental interrogatory
responses in *Mayes* submitted on February 2021 that Ms. Dia verified, the
defendant identified Mr. Payne as an Eastwyck property manager in 2018
and 2019. *Mayes* Interrog. Resp. at 22, 25 [Doc. No. 160-8]. Moreover, at the
sanctions hearing, Ms. Prekelezaj testified that Mr. Payne was an Eastwyck
property manager. Sanctions Hr'g Tr. I at 55:19-21 [Doc. No. 217].

occasions to hire an additional security officer.[10] Ms. Dia declined Mr. Payne's August 3, 2018 petition for help, stating, "No new hires at this time." Payne to Dia August 3, 2018 email at 1 [Doc. No. 185-22].

Mr. Payne's employment with the defendant ended on March 9, 2019, approximately one month before Ms. Frazier's death. *See* Separation Notice signed by Latasha Dia [Doc. No. 160-7]. His bradley@contourdevelopmentgroup.com account was deleted that same day. March 9, 2019 GoDaddy to contourllc@gmail.com email [Doc. No. 151-2 at 2].

### (3)   Antoinette NarCisse

Antoinette NarCisse was hired as a "Leasing Agent" on October 15, 2018. NarCisse Offer Letter [Doc. No. 167-6]. At some point, Ms. Dia apparently promoted her to a short-term property manager at Eastwyck

---

[10] On March 22, 2018, Mr. Payne emailed Ms. Dia and told her that his security officer was "constantly having issues breaking up fights, residents and guest with guns, filming music videos." Payne to Dia March 22, 2018 email [Doc. No. 185-21]. Mr. Payne requested more pay for the security officer and the authority to hire one more officer as "we are about to loose [sic] all officers and we can't afford to have this happen and will get worse in the upcoming summer months." *Id.* On August 3, 2018, Mr. Payne again emailed Ms. Dia requesting authority to hire another officer, indicating that "2 officers on a 400+ unit property which is deemed a 'Red Zone' Level 3 area" was not enough. Payne to Dia August 3, 2018 email [Doc. No. 185-22 at 2]. In this email, he stated that he had "another resident that is interested in coming on staff as our Security officer and only wants a percentage off the rent and not any monetary compensation." *Id.*

before she was fired for nonperformance. Dia Dep. at 26:18-25 (identifying Ms. NarCisse as a short-term Eastwyck property manager); *id.* at 114:22 – 115:6 (stating Ms. NarCisse was fired for nonperformance) [Doc. No. 127-1]. Although Ms. Dia did not remember Ms. NarCisse raising any safety concerns with her and stated that she did not talk with her about crime on the property, *id.* at 119:20 – 120:10, on January 19, 2019, Ms. NarCisse wrote Ms. Dia stating that there were "a couple of big issues regarding crime, and safety that could help aid in moving this property in a positive direction such as repairing the gate." Jan. 18, 2019 NarCisse to Dia email [Doc. No. 185-23].

According to a brief filed by the defendant, Ms. NarCisse was terminated on January 25, 2019, Def.'s Resp. in Opp'n to Pls.' Mot. to Compel [Doc. No. 139 at 7], and an email account she used, antoinette@contourcompanies.com, was deleted on February 7, 2019. Feb. 7, 2019 GoDaddy to contourllc@gmail.com email [Doc. No. 151-2 at 3].

### (4)   Dian Pauleon

As with Mr. Payne, the defendant has had a difficult time articulating Ms. Pauleon's role(s) at Eastwyck.[11] However, in a March 30, 2019, letter to

---

[11] In its initial response to the plaintiffs' first interrogatories, the defendant identified Ms. Pauleon as one of Eastwyck's property managers [Doc. No. 51-2 at 3 ¶ 2]. However, in the defendant's 30(b)(6) deposition on April 16, 2021,

residents, the defendant introduced Ms. Pauleon as the new Eastwyck property manager.[12] Eastwyck Letter to Residents [Doc. No. 185-1]. On April 6, 2019, while Ms. Pauleon was the property manager, Ms. Frazier was killed. According to the plaintiffs' brief, which the defendant has not disputed, Ms. Pauleon was terminated on May 31, 2019. Pls.' Second Mot. for Sanctions [Doc. No. 185 at 3].

### (5)   Rashanda Goolsby

Rashanda Goolsby was an Eastwyck property manager following Ms. Pauleon. *Mayes* Suppl. Interrog. Resps. at 22 [Doc. No. 160-8].

---

Ms. Prekelezaj identified Ms. Pauleon as an Eastwyck leasing agent who could have assisted Bradley Payne. Prekelezaj Dep. 55:22-25; 71:11-19; 72:7-14 [Doc. No. 128-1]. On August 27, 2021, the defendant asserted in briefing that Ms. Pauleon was Marshal Rhodes' assistant as of April 6, 2019. Def.'s Resp. to Pls.' First Mot. for Sanctions at 8 [Doc. No. 167]. However, in its supplemental interrogatory responses verified by Ms. Dia on January 22, 2021 and submitted on February 19, 2021 in *Mayes*, the defendant identified Ms. Pauleon as an Eastwyck property manager in 2019 [Doc. No. 160-8 at 22]. In addition, at the sanctions hearing, Ms. Prekelezaj stated that she learned from the payroll records that Ms. Pauleon was the property manager at the time of Ms. Frazier's death. Sanctions Hr'g Tr. I at 55:22 – 56:5 [Doc. No. 217].

[12] Moreover, Ms. Dia testified that she hired Ms. Pauleon as property manager at Eastwyck. Dia Dep. 25:15 – 26:15 [Doc. No. 127-1].

### (6)    Keith Thurman

Keith Thurman was a security guard at Eastwyck. Sanctions Hr'g Tr. I at 71:14-15 [Doc. No. 217]. Security guard Thurman testified that he was the defendant's only Eastwyck security guard at the time Ms. Frazier was shot and killed. Thurman Dep. at 28:22-25 [Doc. No. 166-1]. At least one resident emailed eastwyckvillages@gmail.com regarding an issue with security guard Thurman, which Monique Mosley forwarded to Ms. Dia from her personal account (Monique.d.mosley@gmail.com), and Ms. Dia, in turn, forwarded to Ms. Rhodes [Doc. No. 140-3 at 91 – 92].

### (7)    Wendal Johnson

Wendal Johnson acted for a brief time as a security officer/courtesy officer at Eastwyck.[13] Johnson was first pinpointed as an Eastwyck security

---

[13] Throughout the majority of this litigation, the defendant denied that Mr. Johnson was an employee. *See* Sanctions Hr'g Tr. I at 54:2-15 [Doc. No. 217]. However, in her Third Declaration, Ms. Prekelezaj admitted that Mr. Johnson appeared on payroll lists but was not issued a W-2 pay statement. Third Prekelezaj Decl. ¶ 5 [Doc. No. 185-2]. Although she stated in her declaration that five other people who appeared on employee lists were not Eastwyck employees, she simply stated that Johnson "was not issued an email account because they were only issued to select managers." *Id*. Thus, it appears to the court that Ms. Prekelezaj admitted that Mr. Johnson was an Eastwyck employee. Confusingly, at the sanctions hearing, Ms. Prekelezaj retreated from the position that Mr. Johnson was an employee, stating that "he was not in our W-2 records. So, no, he was not [an employee]." Sanctions Hr'g Tr. I at 72:3-6 [Doc. No. 217].

officer in the plaintiffs' demand letter to the defendant's insurer. *See* Def.'s Resp. to Time-Limited Demand at 2 [Doc. No. 185-7] ("You included a signed statement from Wendal Johnson with your Demand Letter that claims Mr. Johnson was a security officer on the property."). In a follow-up demand letter, the plaintiffs identified Mr. Johnson as a former Eastwyck security guard who worked the 6:00 pm to 5:00 am shift from April 2018 to July 2018. Second Demand Ltr. at 15 [Doc. No. 1-1].[14] According to the second demand letter, which cites to an affidavit not before the court, Mr. Johnson stated that he was hired by "Pete, the owner," who told "Bradley to give me whatever it takes to do my job."[15] *Id.* at 14. The demand letter further asserted, by reference to Mr. Johnson's unattached affidavit, that Mr. Johnson shot and killed someone in self-defense while working for Eastwyck.[16] *Id.* at 18. In the demand letter, the plaintiffs also cited to a police report referencing a

---

[14] As with the depositions in this matter, the court cites to the page number of the document rather than the page number of the court filing.

[15] In his deposition, Mr. Dedvukaj denied knowing anyone named "Wendall [sic] Johnson." Dedvukaj Dep. at 125:25 – 126:3 [Doc. No. 160-13].

[16] Pursuant to an excerpt of Mr. Johnson's affidavit describing this incident, Keith Thurman came to the scene after the shooting. Second Demand Ltr. at 18 [Doc. No. 1-1]. Mr. Johnson stated that he spoke with Bradley Payne about it and left a voicemail about it with Pete Dedvukaj, who never returned his call. *Id.*

shooting at Eastwyck involving "the security guard, Mr. Wendal Johnson," as well as a 911 call log showing multiple calls from Mr. Johnson, a "courtesy ofc" or "security" regarding the Eastwyck property. *Id.* at 16 – 17.

In his deposition, security guard Thurman confirmed that he worked with Mr. Johnson, whom he described as a night-shift security officer at Eastwyck. Thurman Dep. at 24:23 – 25:17 [Doc. No. 166-1]. Security guard Thurman further confirmed that Mr. Johnson was involved in a shooting in which one of the individuals died, after which Mr. Johnson was transferred to another property and subsequently terminated. *Id.* at 188:2 – 191:10.

### (8)    Ashelynn Burt-Jones and Jori Jones

Ashelynn Burt-Jones and Jori Jones were Eastwyck employees. Although the defendant has denied having records of these employees throughout the majority of this litigation, it produced an employee list for the Eastwyck property in the *Mayes* case that included both of their names. *Mayes* List of Eastwyck Employees [Doc. No. 160-1].[17] After the plaintiffs

---

[17] Doc. No. 160-1 is simply a two-page list of names with no identifying information other than a Bates stamp that states "Contour Eastwyck 001002" and "Contour Eastwyck 001003" in the bottom right corners. In the plaintiffs' brief to which it is attached, the plaintiffs state that it is the Eastwyck employee list the defendant produced in *Mayes*. Pls.' First Mot. for Sanctions at 3 n.1 [Doc. No. 160]. The defendant does not dispute that this list is correct

confronted the defendant with this list through the plaintiffs' first motion for sanctions [Doc. No. 160], the defendant acknowledged through the Third Declaration of Nora Prekelezaj on November 12, 2021 that both Ashelynn Burt-Jones and Jori Jones were Eastwyck employees [Doc. No. 185-2 ¶ 3].

As previously noted, a May 1, 2019 filing in the *Woodall* case against the defendant included an email from eastwyckvillages@gmail.com signed by Ashelynn Burt-Jones [Doc. No. 140-4]. Moreover, the plaintiffs specifically inquired about employees "Jori" (initials JJ) and "Ashelynn" (initials ABJ) that the plaintiffs located on 2018 scheduling calendars produced by the defendant. Def.'s Resps. and Objs. to Pls.' Fifth Req. for Produc. ¶ 66 [Doc. No. 160-6]. The defendant responded that it had "performed a reasonable inquiry through searching its records" but did "not have any records of any employees by the first names of 'Jori (initials JJ)' or 'Ashelynn (initials ABJ).'" *Id.* In addition, Ms. Prekelezaj testified that the defendant had no records of anyone named Ashelynn Burt-Jones and Jori Jones working at Eastwyck.[18]

---

in its response brief. *See generally* Def.'s Resp. in Opp'n to Pls.' Mot. for Sanctions [Doc. No. 167].

[18] In the defendant's 30(b)(6) deposition, Ms. Prekelezaj stated that "we looked through our payroll files in [our electronic payroll system] and also reached out to any managers on site, and we did not come up with anything for Jori or Ashelynn." Prekelezaj Dep. at 182:6-12 [Doc. No. 128-1]. In her

Prekelezaj Dep. 181:18 – 182:20 [Doc. No. 128-1]. Moreover, in briefing as late as two months before the plaintiffs' motion to compel, the defendant (and counsel) continued to maintain that it had no record of Ashelynn Burt-Jones or Jori Jones being employees. *See* Def.'s Resp. to Mot. to Compel ESI at 8 [Doc. No. 139].

### 6.    The Defendant's Documents

In regard to this order, there are four sets of relevant documents maintained by the defendant: the defendant's **payroll records**, the defendant's **employee files**, the defendant's **financial records**, and the defendant's **emails**.

### a)    Payroll Records

In the defendant's 30(b)(6) deposition, Ms. Prekelezaj testified that its payroll records are stored in Intuit, a payroll system that the defendant has used since it incorporated in 2013. Prekelezaj Dep. at 30:2-10 [Doc. No. 128-

---

testimony at the sanctions hearing, Ms. Prekelezaj contradicted her earlier deposition testimony and testified that, in attempting to identify Eastwyck employees, she did not look through tax records, including 1099s or W-2s; did not search emails; and did not ask people who actually worked at the property who worked there. Sanctions Hr'g Tr. I at 68:6-23 [Doc. No. 217]. Instead, she stated that Ms. Leonard alone looked through Dropbox files where she had placed some electronic versions of employee files. *Id.* at 51:3-7; *see also id.* at 51:17-23 (clarifying that employee files were kept in hard copy until Ms. Leonard joined the company and started uploading files into Dropbox).

1]. She further testified that the payroll records should include electronically stored records for every person ever employed by Contour Eastwyck. *Id.* at 30:11-24.

### b)    Employee Files

Ms. Prekelezaj testified on behalf of the defendant that its employee files consisted of employee applications, tax forms, garnishment forms, childcare forms, direct deposit forms, health benefit forms, employee complaint forms, possibly employee discipline forms, a reason for termination (if applicable), and separation paperwork. *Id.* at 31:10 – 32:17. She clarified that such files would not include annual evaluations, which were done at the property level. *Id.* at 32:18 – 33:4. Employee files were kept in Michigan, not at the local level.[19] *Id.* at 33:5 – 13; Def.'s Resp. in Opp'n to First Mot. for Sanctions at 6 n.3 [Doc. No. 167]. Ms. Prekelezaj testified that the defendant would never give out its employees' confidential financial information. Prekelezaj Dep. at 167:12-17 [Doc. No. 128-1]. In response to the plaintiffs' request for production of documents in this case, the defendant flatly objected

---

[19] At the sanctions hearing on February 9, 2022, Ms. Prekelezaj stated that Ms. Leonard began uploading employee files into Dropbox to keep them electronically after she joined the company. Sanctions Hr'g Tr. I at 51:17-23 [Doc. No. 217].

to turning over the confidential financial information of its employees contained in personnel files. Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 34 [Doc. No. 126-1]. Nevertheless, the defendant produced the employee files for all of these 62 Eastwyck employees without objection and without redactions in *Mayes*. *See infra* Section II.C.6.a).

### c)  Financial Records

Ms. Prekelezaj testified on behalf of the defendant that budgets for Eastwyck still exist that were created by Pete Dedvukaj. Prekelezaj Dep. at 177:9-24 [Doc. No. 128-1]. She further testified that any budget documents concerning security would be kept in QuickBooks, the defendant's accounting software. *Id.* at 172:25 – 173:16. At Ms. Prekelezaj's deposition, attorney Perniciaro specifically instructed her not to answer budget-related questions, stating:

> You know that the budgets exist so I don't -- I'm not going to let her answer questions about the preparation of the budgets or any of the financial matters and the inner workings of the financial matters within the company for all the reasons that are stated in the response to request number 43.

*Id.* at 174:2-8. In response to the plaintiffs' request for production of documents, the defendant objected to producing the defendant's security budgets, documents demonstrating the defendant's budget and expenditures for crime prevention and deterrence, documents demonstrating how much

41

money the defendant spent after Ms. Frazier's death to increase safety and security measures, and the defendant's profit and loss statements, claiming that these documents constituted confidential financial records. Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶¶ 43 – 47 [Doc. No. 126-1]. Despite these objections, the defendant produced its profit and loss statements in *Mayes*. *See infra* Section II.C.6.c).

### d) Emails

The defendant used two forms of email accounts to conduct its business: **GoDaddy** and **Gmail.**

### (1) GoDaddy Emails

The defendant's primary email accounts were managed through GoDaddy. According to the forensic expert, "GoDaddy exported and provided a complete and historical list of Contour email accounts."[20] Draper Expert Rpt. at 5 ¶ 13 [Doc. No. 189-1]. The defendant had no email retention policy, though Ms. Prekelezaj somewhat confusingly testified in her 30(b)(6) deposition that the defendant's emails had always been backed up on the defendant's domain database. Prekelezaj Dep. 120:22-23 [Doc. No. 128-1]

---

[20] The forensic expert included a list of email accounts as Exhibit A to his report, [Doc. No. 189-1 at 8 – 15], which he stated represents the "full list of GoDaddy accounts, as provided by GoDaddy." Draper Expert Rpt. at 5 ¶ 17 [Doc. No. 189-1].

("We do not have an email retention policy."); *id.* at 119:20 – 120:3; 120:24-25 (the emails are "backed up on the database."). The forensic expert who eventually examined the defendant's accounts summarized the defendant's retention of its GoDaddy emails as follows:

> . . . [t]he defendant does not archive legacy email data for any employees. It has been confirmed that once an email account has been marked for deletion, no other back up attempts are made, and no copies are kept. As a courtesy, GoDaddy will keep the email data for 30 days, but after that time all data becomes completely unrecoverable. . . . All the GoDaddy email accounts appear to have been managed under this standard policy . . . .

Draper Expert Rpt. at 6 ¶ 23 [Doc. No. 189-1]. Although the expert stated in his report that "[i]f [an] employee was terminated the email account was systematically deleted after 30 days" *id.* at 5 ¶ 12, he clarified at the sanctions hearing that "systematically deleted . . . has to do with the GoDaddy and not the actual client itself." Sanctions Hr'g Tr. I at 117:23-24 [Doc. No. 217]. He continued:

> So once an e-mail account is deleted by the client or deleted because it's just not renewed, it will sit with GoDaddy for 30 days even after it's been deleted, where it can still be recoverable. But after 30 days, GoDaddy itself will erase any information associated with a deleted account, and then it becomes fully unrecoverable. And that's what I was talking about through deleted accounts becoming systematically deleted and unrecoverable, is after 30 days by GoDaddy.

*Id.* at 117:24 – 118:9. The forensic expert conceded at the hearing that he did not know if the accounts were deleted manually or if they just expired, though he offered to investigate that. *Id.* at 118:14 – 119:4. At the sanctions hearing, Ms. Prekelezaj testified that "all accounts for former employees are deleted so that we can reuse those e-mails for new employees," *id.* at 59:20-21. However, moments later, she admitted that the defendant did not delete Ms. Pauleon's account because "we had found out there was another way on GoDaddy: You don't have to delete a [sic] e-mail, you can reuse it." *Id.* at 59:24 – 60:3. Thus, Ms. Pauleon's account was reassigned to Ms. Goolsby. *Id.* at 60:4-5. Throughout this litigation, the process of reusing an email by a different name without deleting it was referred to as "creating an alias." *Id.* at 20:6-13; 103:20 – 104:3. At the sanctions hearing, the forensic expert admitted that he did not know how the account change from Ms. Pauleon to Ms. Goolsby happened. *Id.* at 110:6-19.

### (2) Gmail Emails

Even though the defendant's 30(b)(6) representative testified that the defendant did not direct employees to create Gmail accounts, Prekelezaj Dep. 157:16-18 [Doc. No. 128-1], and the defendant argued in the Joint Notice of Compliance with the Court's July 23, 2021 Order that it was not aware of Gmail accounts used by individual leasing office employees [Doc. No. 159 at

5], documents the defendant produced and emails uncovered in other litigation against the defendant show that its employees used Gmail accounts to conduct Eastwyck business and received emails from these accounts, even at the corporate level. *See, e.g.,* Mosley to Dia email [Doc. No. 140-3 at 91 – 92] (showing Ms. Dia received an email from the eastwyckvillages@gmail.com account); April 30, 2019 Jennifer.eastwyck@gmail.com to Pauleon to Dia email [Doc. No. 156 at 13 – 14][21] (demonstrating that Ms. Dia received emails from an individual Gmail account used at the property level); 2019 GoDaddy to contourllc@gmail.com emails [Doc. No. 151-2 at 3] (demonstrating Gmail was used at the Contour Development Group corporate level).

The four primary Gmail addresses discussed in this order include:

- **contourllc@gmail.com:** This account was operated in the name of David Dedvukaj and was used at the corporate level to communicate with GoDaddy to delete email addresses. 2019 GoDaddy to contourllc@gmail.com emails [Doc. No. 151-2]. Ms. Prekelezaj further elaborated that this account was "used by

---

[21] The body of this email was pasted into the Plaintiffs' Reply to the Defendant's Response to the Plaintiffs' Motion to Compel Forensic Examination [Doc. No. 156]. Although the court would have preferred to see the actual email, the defendant has not contested the plaintiffs' description of it.

Contour Development Group for retention of receipts from vendors (Home Depot, Lowes, etc.)," was not used for a specific property, and was used "as a recovery email for [Contour Development Group's] GoDaddy account." Third Prekelezaj Decl. at 17 ¶ 7 [Doc. No. 185-2].

- **Jennifer.eastwyck@gmail.com:** The account was operated in the name of Eastwyck employee Jennifer Bentley. April 30, 2019 Jennifer.eastwyck@gmail.com to Pauleon to Dia email [Doc. No. 156 at 14]; Third Prekelezaj Decl. at 9 ¶ 3 [Doc. No. 185-2] (stating Jennifer Bentley "may have created and used . . . Jennifer.eastwyck@gmail.com."). At least one email from this account was apparently forwarded to Ms. Dia.[22] *Id.*

- **Britknie.eastwyck@gmail.com:** This account was operated in the name of Eastwyck employee Britknie Bush. May 17, 2019 Pauleon to Bush email [Doc. No. 140-5]. Ms. Prekelezaj acknowledged in her Third Declaration that Britknie Bush "may have created and used" britknie.eastwyck@gmail.com. Third Prekelezaj Decl. at 4 ¶ 3 [Doc. No. 185-2].

---

[22] *See supra* n.21.

- **eastwyckvillages@gmail.com:** The defendant used eastwyckvillages@gmail.com as the public facing Eastwyck email account, displaying it on letterhead, on an Eastwyck website, and receiving emails at it from Eastwyck residents. *See* March 30, 2019 Ltr. to Residents [Doc. No. 185-1] (displaying Gmail on letterhead); Sanctions Hr'g Tr. I at 75:3-15 [Doc. No. 217] (Ms. Prekelezaj testifying that the leasing office Gmail account was displayed on the website while the defendant owned the property); Nov. 12, 2020 Hickson to leasing office Gmail account email re: safety/security concerns [Doc. No. 140-3 at 92]; Jan. 18, 2019 Woodall to leasing office Gmail account email [Doc. No. 140-4].

The forensic inspector was provided with the three known Eastwyck-level Gmail addresses and stated that the defendant informed him that the information for these accounts was not stored locally or as part of a general retention policy. Draper Expert Rpt. at 5 ¶ 19 [Doc. No. 189-1]. The defendant has maintained that it does not have access to these three known Eastwyck-level email addresses. In regard to Ms. Bush's and Ms. Bentley's Gmail

addresses, the defendant asserts that it has not located passwords.[23] Third

Prekelezaj Decl. at 4, 9 ¶ 3 [Doc. No. 185-2]. Ms. Prekelezaj stated further in

regard to Ms. Bush's Gmail:

> Marshal Rhodes, an employee of Contour Eastwyck, LLC, visited
> the leasing office at Eastwyck Village after the property was sold
> with permission of the new owner. No password records were
> found associated with this email account. I attempted to access
> the account by selecting the FORGOT PASSWORD option. Gmail
> requested a last known password, which Contour could not
> locate. Gmail prompted that it would send a code to
> "eas••••••••••@gmail.com," believed to be
> eastwyckvillages@gmail.com, which Contour cannot access. I
> selected "TRY ANOTHER WAY," and Gmail showed a message
> that it would send a code to (•••) •••-••51. Contour cannot
> locate the full phone number or the identity of the person
> associated with the number. Contour's attorney also called this
> former employee at (404) 324-6921 to request access to the
> account. Someone answered but then hung up immediately. A
> voicemail was left but no response was received.[24]

*Id.* at 4 – 5. In regard to Ms. Bentley's Gmail address, the defendant asserts:

> Marshal Rhodes, an employee of Contour Eastwyck, LLC, visited
> the leasing office at Eastwyck Village after the property was sold
> with permission of the new owner. No password records were
> found associated with this email account. I attempted to access
> the account by selecting the "FORGOT PASSWORD" option.

---

[23] At the August 9, 2021 forensic inspection hearing, it was clear that the
defendant had not yet endeavored to find contact information for Ms. Bush
or Ms. Bentley. Forensic Inspection Hr'g Tr. at 27:15 – 28:15 [Doc. No. 218].

[24] The phone number that the defendant's attorney called ends in "21", which
is different than the phone number with terminal digits of "51" where Ms.
Prekelezaj indicated Gmail sent the recovery code. It is unclear why the court
why the defense counsel called the number ending in "21."

Gmail requested a last known password, which Contour cannot locate. Gmail prompted that it would send a code to "jen•••••••••••••@gmail.com," which Contour cannot access. I selected TRY ANOTHER WAY, and it showed the message that it would send a code to (•••) •••-••41. Contour cannot locate the full phone number or the identity of the person associated with this phone number. Contour's attorney also called this former employee at (404) 903-7641 to request access to the account. Ms. Bentley could not provide a password and stated she could not assist with gaining access to the account by sending a verification code to her phone number.

*Id.* at 9 – 10.

The defendant has consistently maintained that it lost access to the eastwyckvillages@gmail.com account but has asserted incongruent accounts of what happened to it. The defendant asserted on June 7, 2021 that it had not had access to the leasing office Gmail account (eastwyckvillages@gmail.com) for approximately one year. Def.'s Resp. to Pls.' Mot. to Compel [Doc. No. 139 at 8]. A month later, on July 9, 2021, the defendant's 30(b)(6) witness asserted in an unverified letter filed with the court that the defendant lost access to the account when it sold the property, including the computers on which the passwords were saved, on January 27, 2021. Prekelezaj Ltr. [Doc. No. 151-1]. In that letter, Ms. Prekelezaj stated that Eastwyck employees likely accessed the leasing office Gmail account using a single computer at Eastwyck that remained logged into the email account, thus not requiring the employees to repeatedly enter a username or

49

password. *Id.* At the August 9, 2021 hearing, the defense counsel stated that his client did not have the password and assumed that the company that purchased Eastwyck is using the account now. Forensic Inspection Hr'g Tr. at 26:3-20 [Doc. No. 218]. He said his client wanted permission from the current Eastwyck owners before it tried to reset the Gmail password and suggested that the parties send a joint subpoena asking the new owners for access to the account. *Id.* at 26:14 – 27:1. Apparently, at some point thereafter the defendant contacted the new Eastwyck owners and visited the site. In the forensic expert's report, Mr. Draper stated:

> The email and password for the "eastwyckvillages@gmail" account was accessed and managed on a local computer and [sic] the Eastwyck Villages office. That location was sold "turn-key" to the new owner, who also took possession of the local computers used to access the Gmail account. The new owner was contacted by Contour on several occasions in an attempt to access the computers, including a physical visit to the office where it was learned the computers were recycled and were no longer available. Since the password and account information for this Gmail account were stored locally, that information is no longer accessible.

Draper Expert Rpt. at 5 – 6 ¶ 19 [Doc. No. 189-1]. The expert stated further in regard to the Gmail accounts:

> These accounts seem to be "one-offs" created by an individual user to provide a short-term solution. The creation of these accounts is not standard company policy and wasn't managed by the company. In fact, it was difficult to identify where the directive to create these accounts originated. The lack of policy

created a scenario where these Gmail accounts have become unmanaged and inaccessible.

*Id.* at 6 ¶ 24.

## B.    Pre-Litigation

### 1.    The DKPD Investigated Ms. Frazier's Death[25]

On April 6, 2019, detectives from DKPD were dispatched to Eastwyck in regard to Ms. Frazier's death. DKPD Investigative File Excerpts at $1-2$ [Doc. No. 195-1]. On that same day, the detectives interviewed Danna Harris, in whose room Ms. Frazier died, Harris's sister Shanika Benton, and Jamie Turk. *Id.* at $2-5$. According to the police file, Benton and Harris both testified that they picked up Ms. Frazier around 3:00 AM or 4:00 AM when they got off work at Phase 1 nightclub. *Id.* at $2-4$. Harris said, "they went back to his residence, [Ms. Frazier] smoked some crack, went up to his bedroom, had sex, and went to sleep." *Id.* at 2. He said that he got up around 7:00 AM and she was still asleep. *Id.* Later that afternoon, he tried to wake her up, saw blood on the bed, and smelled feces. *Id.* at 2; 4.

---

[25] The court will not attempt to provide a comprehensive overview of DKPD's investigation efforts related to this matter. Instead, it will briefly summarize only those portions of the DKPD file relevant to this order.

In investigative notes from the date of Ms. Frazier's death, Detective D.H. Collins stated that he "learned from neighbors that they some [sic] of them had heard gunshots early in the morning around 0830am [sic]." [26] *Id.* at 2. Detective Collins further noted that onsite security guard Thurman made a 911 call in regard to gunfire reported by the residents. *Id.* Detective Collins also acknowledged that another officer identified an apparent defect to the outside of the residence in the area of the bedroom where Ms. Frazier's body was found. *Id.*

On April 10, 2019, Detective Tappan called to speak to Keith Thurman. According to Detective Tappan's notes, security guard Thurman stated that a:

> resident called him [on the morning of Ms. Frazier's death] and said that he heard shooting out there that morning; he didn't see who was shooting, but thinks that it might have been the young man in 384 Eastwyck that was always walking around out there with a handgun. [Security guard Thurman] said that he accidentally told the 911 operator unit 386, but he meant 384. He knows that the guy that stayed there was arrested recently and

---

[26] This was supported in the file by statements from two Eastwyck residents stating that they heard 3 – 4 gunshots at around 8:00 AM. DKPD Investigative File Excerpts at 7 – 8 [Doc. No. 195-1]. The statements are actually dated April 7, 2019—the day after Ms. Frazier's death. *Id.* This appears to be an error; however, this order does not turn on the resolution of this discrepancy. Detective Ward testified in deposition that South Precinct officers responded to Eastwyck at approximately 8:43 AM in regard to shots fired, but no one was able to determine if any of those shots fired were one of the ones that killed Ms. Frazier. Ward Dep. 59:7-21 [Doc. No. 186-3].

was incarcerated during the incident, so it could not have been him, but the shooter maybe shot their location as payback. That person was identified as Romonte Harris from Danna Harris' statement.

I asked [security guard Thurman] to text me the guy who called him that morning's number. He said that he would. A few minutes later he texted me the name: Mr. Murray ph: 678-651-7088. I called Mr. Murray. He said that he stays in unit 382. On the day of the murder he heard several gunshots around 3:00 AM that morning and a couple around 7:30 AM. He said that those two shots sounded like they came from behind his apartment, but he never looked outside and never saw anyone. I asked him if any of the neighbors have been talking about this incident. He said that the word is that this maybe [sic] payback for whatever the two young guys that stay in 384 have been doing.

*Id.* at 5.

### 2.    The Defendant Anticipated and Was Notified of Potential Litigation

#### a)    The Defendant Anticipated Litigation

Ms. Frazier's death occurred on April 6, 2019. At the time, Dian Pauleon was the property manager at Eastwyck. Eastwyck Letter to Residents [Doc. No. 185-1]; Sanctions Hr'g Tr. I at 55:22 – 56:5 [Doc. No. 217]. Two days after Ms. Frazier's death, Ms. Pauleon sent Ms. Dia an email that the defendant included in its privilege log as attorney-work product/anticipation of litigation; attorney-client privilege. Def.'s Priv. Log at 7 [Doc. No. 213-1].

### b) The Plaintiffs Sent a Preservation of Evidence Letter

On April 16, 2019, ten days after the fatal shooting that killed Ms. Frazier, the plaintiffs' counsel sent a letter to the defendant notifying it that he represented the plaintiff Mildred Collins-Williams in connection with Ms. Frazier's death. Preservation Ltr. [Doc. No. 194-10]. In this letter, the plaintiffs' counsel instructed the defendant to preserve evidence as follows:

### Request to Preserve Evidence

This letter is a request for you to preserve evidence related to Tijuana Lakisha Frazier's Shooting. We specifically request that the following evidence be maintained and preserved and not be destroyed, modified, altered, repaired, or changed in any manner:

1.   Video recordings of April 6, 2019;
2.   Audio recordings of April 6, 2019;
3.   Photographs of property;
4.   All incident reports, security logs, or other documents  showing events from April 6, 2019;
5.   All documents related to employees who worked at or had any responsibilities related to Eastwyck Village from April 6, 2014 through present;
6.   All incident reports involving crime at Eastwyck Village from April 6, 2014 through present;
7.   All company policies, procedures, or other internal documents that relate to security, safety, crime, crime prevention, or the like;
8.   All communications regarding safety, security, crime, or crime prevention related to Eastwyck Village;
9.   All financial documents related to Eastwyck Village from April 6, 2014 through present;

10. All other documents and things that may relate to the Shooting of Tijuana Lakisha Frazier; and
11. All other documents and things that may relate to the safety, security, and threat of crime at Eastwyck Village from April 6, 2014 through present.

If you are unsure whether a document or thing needs to be saved, please save it. You may contact me at the number below to discuss whether to preserve any items you are unsure about. If you fail to preserve and maintain evidence, we will have no alternative but to seek any sanctions allowed under the law. *See R.A. Siegel Co. v. Bowen*, 246 Ga. 177 (2000).

*Id.* at 2 – 3.

### c) The Defendant Hired Counsel and Investigated the Shooting

On May 10, 2019, Cruser Mitchell attorneys Tornillo, Rumph, and Cruser sent a letter to the plaintiffs' counsel stating that they had received the plaintiffs' April 17, 2019 preservation of evidence letter and directing all future correspondence from the plaintiffs to their attention. Cruser Mitchell Ltr. [Doc. No. 185-3]. On May 3 and May 14, 2019, attorney Rumph and investigator Magilton visited the Eastwyck complex in regard to Ms. Frazier's death. Audio Recording of 5/21/19 Meeting with Det. Tappan [Doc. No. 186-2]. On May 21, 2019, attorney Rumph and investigator Magilton met with DKPD Detective Tappan regarding information that they believed to be pertinent to the Tijuana Frazier murder case. *See* Det. Tappan's 5-21-19 Case Note – Supplemental Form [Doc. No. 91-2]; Audio Recording of 5/21/19

55

Meeting [Doc. No.  186-2]. According to Detective Tappan's supplemental notes, attorney Rumph and investigator Magilton informed him that they had identified a witness who did not want to speak to the police but told the following information to another person, who told attorney Rumph and investigator Magilton:

> [A]t approximately 07:30 hours on the morning of the murder, they saw a black male with an Arabic tattoo on his neck walk out of apartment 403. He was talking on the phone. He stood on the side of the building and fired 3 shots at the 384 apartment with a handgun. He then handed his gun to another male who walked into apartment 403. This male then put his hoodie over his head and walked towards the front of the apartment complex. This male is described as being 5'10" – 6-01", 170-190 lbs., dark skin, late 30's to early 40's and recently was released from City of Atlanta Jail on Rice Street. His black BMW had all of the tires slashed and the front windshield broken last week by a woman he was dating. He had his vehicle towed. No police report was filed.

Det. Tappan's 5-21-19 Case Note – Supplemental Form [Doc. No. 91-2]. Although not reflected in Detective Tappan's notes, the defendant's representatives stated in the recorded interview that the witness drove a royal blue Firebird and was worried about reprisal from the person who is believed to have done the shooting. Audio Recording of 5/21/19 Meeting, beginning at 22:40 [Doc. No.  186-2]. Attorney Rumph and investigator Magilton stated that they believed there was validity to the informant's

statement and were almost certain there would be a wrongful death suit filed. *Id.*

Detective Tappan further noted that attorney Rumph and investigator Magilton said that there were three defects to the apartment: one just over the front door, one over the living room window, and a third that was "the kill shot" going into the upstairs bedroom." Det. Tappan's 5-21-19 Case Note – Supplemental Form [Doc. No. 91-2]. Detective Tappan noted that he told them "that numerous detectives and crime scene persons were at the apartment and went there on two different occasions and they only noted a single bullet (gunshot defect) to the apartment." *Id.* He did write, however, that after looking through photographs from the crime scene that he saw several possible defects but was "unable to determine with any certainty that they were caused from a projectile." *Id.* While he thought the one over the door was not from a projectile, he acknowledged that the one over the window did look like it was from a projectile. *Id.* However, he reiterated in his report that "numerous detectives looking at the defects determined that there was only one caused by a projectile" and another detective indicated that there was only one. *Id.*

57

### 3. The Defendant Deleted Ms. Pauleon's and Ms. Goolsby's Email Account

After Ms. Pauleon's May 31, 2019 termination, Ms. Pauleon's email account was not deleted. Sanctions Hr'g Tr. I at 59:22-60:5 [Doc. No. 217]. Instead, it was reassigned to Ms. Goolsby and subsequently closed on July 18, 2019. *Id.* at 59:22-60:5; 104:13-19 [Doc. No. 217]; Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions [Doc. No. 193 at 11 – 12] ("Pauleon's account was changed to rgoolsby@contourcompanies.com and subsequently closed on July 18, 2019.").

### 4. The Plaintiffs Sent a Demand Letter

On October 31, 2019, the plaintiffs sent a settlement demand to Nautilus, which Nautilus received on November 4, 2019. Resp. to Time-Limited Demand at 1 [Doc. No. 185-7]. This letter does not appear to be on the docket.

### 5. Nautilus Hired GRSMB and Responded to the Plaintiffs' Demand Letter

On December 3, 2019, attorney Perniciaro sent the plaintiffs a letter in response to the plaintiffs' demand and a request for clarification. *Id.* In this letter, attorney Perniciaro informed the plaintiffs' counsel that Nautilus had retained his law firm in connection with Ms. Frazier's death. *Id.* Attorney

Perniciaro represented that "[i]t is unclear whether the bullet that struck Ms. Frazier came from a firearm discharged on the Eastwyck apartment grounds or if that firearm was discharged as a result of a criminal act." *Id.* at 2. The letter further stated that, although the plaintiffs included a signed statement from Mr. Johnson with their Demand Letter that claimed Mr. Johnson was a security officer on the property, the defendant did "not have any employment records for Mr. Johnson." *Id.* at 2. Therefore, the defendant requested the plaintiffs to "clarify whether Mr. Johnson was an employee of Contour and provide any evidence [they had] supporting [the] same." *Id.* at 2 – 3.

### 6. The Defendant Rehired Ms. Rhodes and Deleted Her Prior Email Address

In January 2020, Eastwyck's previous property manager Ms. Rhodes was rehired by Contour Development Group as an operations manager. *Mayes* Rhodes Dep. 16:14-25 [Doc. No. 185-18]. During her initial employment, Ms. Rhodes used the email account: marshal@contourdevelopmentgroup.com. *Id.* at 98:8-10. Her previous email address was deleted on January 21, 2020, and a new email address (mrhodes@contourcompanies.com) was created that same day. *See id.* at 98:5-20 (Ms. Rhodes stating that her email address was changed when the defendant re-employed her); Draper Expert Rpt. App. A at 13 [Doc. No. 189-

59

1] (showing marshal@contourdevelopmentgroup.com was deleted on January 21, 2020 and mrhodes@contourcompanies.com was created that same day).[27] Ms. Rhodes testified in *Mayes* that she did not have access to her emails from her prior employment period when she returned to the defendant's employment in 2020. *Mayes* Rhodes Dep. at 80:11-19 [Doc. No. 185-18].

### 7. The Defendant Interviewed Charles Cooper and Created a Report

The defense counsel believed that Charles Cooper, an Eastwyck resident, might be the elusive eyewitness addressed in the May 21, 2019 meeting between attorney Rumph, investigator Magilton and Detective Tappan. Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 7 [Doc. No. 193]. Thus, on June 1, 2020, defense investigator Morley obtained a recorded statement from Charles Cooper. Def.'s Resps. and Objs. to Pls.' Ninth Req. for Produc. at ¶ 73 [Doc. No. 185-8] (stating date of recorded statement); *see generally* Cooper Statement [Doc. No. 194-3]. In the statement, which the defendant transcribed, Mr. Cooper said that he heard a single shot between 7:00 AM and 8:00 AM while he was watching television and cooking

---

[27] Confusingly, the expert report reflects that marshal@contourdevelopmentgroup.com was also deleted on October 11, 2016. Draper Expert Rpt. App. A at 13 [Doc. No. 189-1]. The parties have not provided the court with context for this deletion; therefore, the court assumes it is irrelevant to the matters currently before it.

breakfast. Cooper Statement at 3:20 – 4:12 [Doc. No. 194-3]. He stated that he did not call 911, look outside, or speak with police officers. *Id.* at 4:13-24. He stated that the security officer came over to talk with him maybe "a couple days after or a week later or something" and asked, "Did I know about – did I know that a lady – that a lady had got killed. I'm like what? I'm like I didn't know nobody got – got killed." *Id.* at 5:17 – 6:8. When asked if he had ever heard a stray bullet entering an apartment at the property before or seen gun violence at the property before, he stated that "[t]hey shoot over here all the time, especially here" "at least once a month," "but nothing around his building." *Id.* at 13:2 – 14:8. He further stated that he sees security "riding past sometimes" when he gets off work "or on the weekends when he smokes," which is how he got to know the security officer. *Id.* at 14:-24. He further stated that the police patrolled "all the time through here, yeah, because there's too much crime, yeah, when I'm at home." *Id.* at 17:3-9.

Subsequently, on July 17, 2020, the defense investigator prepared a report regarding Charles Cooper for the defense counsel. Def's Resps. and Objs. to Pls.' Ninth Req. for Produc. at ¶ 73 [Doc. No. 185-8].

### C.  Litigation

#### 1.  Initial Filings

On June 29, 2020, the plaintiffs filed this lawsuit in the State Court of DeKalb County. Compl. [Doc. No. 1-2].  Apparently, soon thereafter the plaintiffs served requests for production and requests for admission on the defendant. On July 29, 2020, the defendant removed this case to this court [Doc. No. 1], and on August 13, 2020 the plaintiffs served the defendant with their first interrogatories [Doc. No. 7]. On August 26, 2020, the parties submitted a Joint Preliminary Report and Discovery Plan ("JPRDP") in this matter [Doc. No. 9]. In the JPRDP, the parties indicated they were seeking discovery of electronically stored information ("ESI"), stating:

> It is unknown at this time whether discoverable materials, that have not already been produced, have been electronically created, maintained or stored. The parties have agreed that should discoverable materials be revealed during the course of discovery, they will meet and discuss the sources and scope of the production of such items and the format for the production of such items for the purposes of agreements relative to the production of such items. The parties do not waive any potential objections to discovery requests by making this statement.

*Id.* at 9. When stating whether they "agree[d] to limit the scope of production [of ESI] (e.g., accessibility, search terms, date limitations, or key witnesses)" the parties stated that they had agreed "that they will conduct searches of

relevant electronically stored databases for discoverable documents." *Id.*
They further stated that they were:

> willing to work with one another regarding the production of any
> and all electronically stored information in the format it is
> usually maintained. Specifically, there is no objection to the
> production of electronically stored information in the .PDF
> format.

*Id.* at 10. They agreed that the defendant would respond to the discovery the
plaintiffs propounded in state and federal court on September 25, 2020. *Id.*

On August 27, 2020, the court entered a scheduling order, setting this
case on a six-month discovery track ending on February 26, 2021 [Doc. No.
14].

### 2.    Early Discovery Efforts

#### a)    Interrogatory Responses

In the defendant's first interrogatory responses, it disclosed only 13
employees that worked at Eastwyck in the five years prior to the incident,
including Ms. Pauleon, Ms. Rhodes, Mr. Payne, Ms. NarCisse, security guard
Thurman, Ms. Bush, and Ms. Bentley, as well as Bernard Baker, Ed Platt,
Elease Girard, Walter Tarver, Samiya Steers, and Ronald Eskridge. Def.'s
Resps. and Objs. to Pls.' First Interrogs. ¶ 2 [Doc. No. 185-10]. The defendant
further stated that Mr. Payne and security employee Keith Thurman were

employees present on the date of Ms. Frazier's death.[28] *Id.* ¶ 1. Notably, the defendant did not disclose Charles Cooper in its September 25, 2020 response to the plaintiffs' interrogatory asking it to "identify all persons known to you who have any knowledge regarding the facts or circumstances surrounding the incident or any element of damages in this case."[29] *Id.* ¶ 3.

### b) Responses to Requests for Production

On September 25, 2020, the defendant responded to the plaintiffs' requests for production of documents, making many sweeping objections. *See* Def.'s Resp. to Pls.' First Req. for Produc. [Doc. No. 126-1]. However, the defendant produced some emails to the plaintiffs, including emails reflecting the email addresses for Mr. Payne, Ms. Dia, Ms. NarCisse, Ms. Rhodes (mrhodes@contourdevelopmentgroup.com), Ms. Pauleon, Ms. Bush (britknie.eastwyck@gmail.com) and the leasing office Gmail account (eastwyckvillages@gmail.com). Def.'s Resp. in Opp'n to Pls.' Second Mot. for

---

[28] The defendant qualified its answer, stating that Mr. Payne was at Eastwyck on the date of Ms. Frazier's death "upon information and belief." Def.'s Resps. and Objs. to Pls.' First Interrogs. ¶ 1 [Doc. No. 185-10].

[29] In response to this interrogatory, the defendant provided the following names: Mildred Collins-Williams, Pebbles McClain, Keith Thurman, Detective Chris Tappan, Detective Ward, Detective Collins, Detective Wright, Jerome Danna Harris, Coretta Stover, Shaneka Benton, Officer A. Majarrez. Def.'s Resps. and Objs. to Pls.' First Interrogs. ¶ 3 [Doc. No. 185-10].

Sanctions at 14 [Doc. No. 193]. In addition, the defendant represented that it would produce the following documents "subject to and without waiving" numerous objections that can be reviewed in the original document:

- Documents that mention, refer to, or relate to Ms. Frazier's death (not including attorney work product documents or attorney-client communications);

- Copies of all statements of any person relating to the incident that would not fall under attorney-client privilege or attorney work product doctrine, including DKPD documents after entry of a protective order;

- Copies of all reports, memoranda, or notes from any individual who has investigated any aspect or element of the incident (not including documents protected by attorney-client privilege or the attorney work product doctrine);[30]

- Videotapes and photographs from the DKPD, subject to the entry of a confidentiality order;

---

[30] The defendant noted that it was "withholding reports prepared by Defendant's insurance adjusters/investigators dated November 6, 2019 and September 22, 2019, prepared in anticipation of litigation and subject to the attorney work-product doctrine." Def.'s Resp. to Pls.' First Req. for Produc. ¶ 3 [Doc. No. 126-1]. **Importantly, the defendant made no similar reference in regard to its investigator's report concerning the statement of Charles Cooper.** *See id.*

- Incident reports prepared by the prior owner and/or manager regarding alleged crimes occurring at Eastwyck;

- Security logs located after conducting a reasonable inquiry;

- Complaints regarding violent crime on the subject premises;

- Prior incident reports prepared by the defendant or the defendant's agents;

- Documents relating to security and any security measures considered or undertaken at the Premises before the incident;

- Patrol logs, security logs, incident reports, inspection reports, daily logs or other documents received from a company or individual retained or consulted to provide security at Eastwyck within the last 5 years;

- the defendant's Community Policies and Procedures;

- documents regarding repairs and maintenance of the gating and fencing prior to the subject incident;[31]

- newsletters, flyers or memos related to Eastwyck for the five years before the incident;

---

[31] The defendant noted that it would not produce documents about gating and fencing repairs that were dated after Ms. Frazier's death. Def.'s Resp. to Pls.' First Req. for Produc. ¶ 22 [Doc. No. 126-1].

- documents regarding a security plan aimed at deterring third-party crime or what the defendant believed to be dangerous activity at Eastwyck;

- documents related to security measures prior to the subject incident;

- work orders, maintenance requests, and other documents reflecting repairs, upgrades, requests for repairs, and installation of security features at Eastwyck;

- emails, text messages, letters and other correspondence to or from any person or entity regarding the gate at Eastwyck;

- emails, text messages, letters and any other correspondence the defendant had sent to or received from Eastwyck residents regarding crimes at Eastwyck or the prevention of crimes at Eastwyck;

- documents, photographs, drawings, architectural plans, and designs that depict Eastwyck's layout, including documentation of the area where Ms. Frazier's death occurred;

- the work schedules for all Eastwyck employees from two weeks before the incident until two weeks after the incident;

- contracts and agreements with any other person or entity the defendant contends is responsible for the incident;

- notes, memoranda, minutes, and all other written evidence of meetings held by the defendant, its employees, agents or independent contractors where safety, security, and third-party crime were discussed over the past five years;

- contract agreements or documents of any nature entered into between the defendant and any other individual or company regarding the security, lighting or fencing at Eastwyck;

- all photographs, documents, or demonstrative evidence the defendant intended to use in the defense of this case at trial other than impeachment evidence;

- the lease in effect for the Eastwyck unit in which Tijuana Frazier was shot;

- documents and things identified in the defendant's interrogatory responses (subject to the defendant's objections to those interrogatories);

- the declarations pages to the defendant's Colony Insurance Company primary liability policy and Nautilus Insurance Company excess policy; and

- DKPD documents related to the incident in question, subject to the entry of a confidentiality order.

*See* Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶¶ 1 - 59 [Doc. No. 126-1].

The defendant objected to producing its financial records; documents "filed, served or sent to anyone" regarding repairs or maintenance at Eastwyck rendered necessary due to criminal activity; "documents, pleadings and/or exhibits" connected to any negligent security related litigation or claim involving personal injuries at Eastwyck; documents related to repairs necessitated by breaking and entering or burglary; advertisements and marketing materials; its confidential and proprietary policies and procedures (including employee handbooks, policy or procedure manuals, or videotapes or policies regarding safety, training, crime prevention, crime deterrents, loss prevention, or any security measures at Eastwyck); employee personnel files, applications, work schedules, and training records; biographies, resumes, and curriculum vitas for employees and agents responsible for safety decisions at Eastwyck; tenant files for individuals with leases at Eastwyck on the date of Ms. Frazier's death or for five years before her death; and documents, photographs, or video recordings related to the surveillance of the plaintiffs or their families after the incident. *Id.* at ¶¶ 11, 12, 15, 30, 32, 34, 40; 41; 42; 43 – 47; 56. In addition, the defendant represented that it was not in possession of any documents related to communications between the

defendants, any plaintiffs, and Ms. Frazier; videotapes or photographs of Eastwyck taken within the 7 days preceding Ms. Frazier's death; communications between Eastwyck and law enforcement or investigative agencies regarding criminal activity on the premises, including Ms. Frazier's death; videotapes or photographs showing crime on or at Eastwyck; contracts or agreements with another defendant; contracts with another entity for management at Eastwyck; trial experts; or documents related to the defendant's search for ESI, including what terms were considered, what terms were used, and how many "hits" each term produced. *Id.* at ¶¶ 4, 6, 18, 25;  35; 37; 48 – 51; 54.

On November 9, 2020, the defendant responded to the plaintiffs' Second Request for Production of Documents by stating that, subject to and without waiving an objection based on vagueness and ambiguity, it had produced "all leases, correspondence, notes, complaints, personnel files, tenant files and other documents" relating to tenants Marlen McKinley, Tiffany Burston, Emery Goodman, Monique Mosley-Davis, Keidrick Hickson, and Shaneka Benton and was searching for records and would supplement regarding Wendal Johnson, Mack Kirksey, Danna Harris, and Coretta Stover. Def.'s Resps. and Objs. to the Pls.' Second Req. for Produc. ¶ 1 [Doc. No. 126-1 at 36 – 37].

On December 7, 2020, the defendant provided the plaintiffs with the DKPD's criminal investigation file, including Detective Tappan's supplemental notes about his meeting with attorney Rumph and investigator Magilton. Dec. 7, 2020 emails between opposing counsel [Doc. No. 194-2]. On December 30, 2020, the defendant responded to the plaintiffs' Third Request for Production of Documents [Doc. No. 126-1 at 40 – 47]. In this response, the defendant stated—relevant to this order—that it would supplement its production with the tenant file of Keina Murray in unit 381. *Id.* at 44 ¶ 62. In addition, the defendant stated that it would not produce the personnel files for former employees Bradley Payne and Antoinette Narcisse due to objections. *Id.* at 43 – 44 ¶ 61. It further stated that it would produce documents related to Wendal Johnson in its possession. *Id.* at 44 ¶ 61.

### 3.    The Plaintiffs Deposed Wendal Johnson[32]

On November 11, 2020, the plaintiffs deposed Mr. Johnson. *See* Johnson Dep. [Doc. No. 51-9]. In his deposition, Mr. Johnson testified that he worked for Eastwyck in exchange for a $400 discount on his rent. *Id.* at 10:17 – 11:24. He testified that he worked approximately 40 hours a week from

---

[32] The court has not attempted to summarize or evaluate the entirety of Mr. Johnson's deposition; rather, it has simply documented the testimony that is relevant to the pending motion.

April 2018 to July 2018 and was not paid in any other way than the rent discount. *Id.* at 12:8-18. Mr. Johnson further testified that he did not live at Eastwyck, but he would take naps there during his breaks from working. *Id.* at 147:3-7. He testified that his name was, however, on his wife's lease for apartment 318. *Id.* at 147:8-23. He asked for a discount on rent to help his wife, who wasn't paid much. *Id.* at 148:12-18.

### 4.    The Plaintiffs Sought to Amend the Complaint and the Defendant Sought Summary Judgment

On January 12, 2021, the plaintiffs filed a motion to amend the complaint to add Bradley Payne, who the plaintiffs believed to be the property manager at the time of the shooting, and remand to the state court of Dekalb County.[33] Mot. to Am. Compl. and Remand [Doc. No. 51]. The next day, the defendant filed a motion for summary judgment [Doc. Nos. 55 - 57] in which it argued that Ms. Frazier was not an invitee at Eastwyck when she was

---

[33] As discussed above, the defendant had a difficult time articulating the details of Mr. Payne's employment. *See supra* Section II.A.5.b)(2). As an example, the defendant identified Mr. Payne, "the former leasing manager," as an employee at Eastwyck on the day Ms. Frazier died. Def.'s Resp. and Objs. to Pls.' First Interrog. ¶ 1 [Doc. No. 51-2 at 3]. In fact, employee records (which the defendant had at the time attorney Perniciaro signed the defendant's first response to interrogatories) show that Ms. Dia signed Mr. Payne's separation notice on March 8, 2019, almost a month before Ms. Frazier's death. Payne Separation Notice [Doc. No. 160-7].

struck by a bullet and that there is no evidence "the bullet was fired due to foreseeable or preventable criminal activity occurring on the property."[34] Def.'s Mot. for Summ. J. at 6 [Doc. No. 55-1]. Thereafter, both parties withdrew their motions [Doc. Nos. 63 and 65] per a joint stipulation [Doc. No. 62] that they intended to conduct additional discovery.

### 5. Discovery Continued

#### a) The Defendant Responded to Additional Document Requests

On February 8, 2021, the defendant responded to the plaintiffs' fourth request for production of documents regarding tenants/employees Sheryl

---

[34] In its motion, the defendant argued there is evidence that Ms. Frazier came to the property to use crack cocaine, and "there is no evidence in this case [the defendant] knew that the decedent was on the property using crack cocaine." Def.'s Mot. for Summ. J. at 11 - 13 [Doc. No. 55-1]. The defendant argued further that:

> []there is no evidence here that [the defendant] had knowledge of the purported actual danger posed to the decedent, whatever that was. Neither is there evidence that [the defendant] was aware of the decedent's presence prior to her injury. Without evidence as to the circumstances of the shot that struck the decedent or evidence [the defendant] knew the decedent was on the property, there can be no finding that [the defendant] willfully or wantonly injured the decedent.

*Id.* at 14. In addition, the defendant contended that "[b]ecause there is no evidence the shot that killed the decedent came from [the defendant's] property, there can be no breach of a duty owed." *Id.* at 15.

Moody and Elease Gerard. Def.'s Resp. to Pls.' Fourth Req. for Produc. at 48 – 53 [Doc. No. 126-1]. On February 17, 2021, the defendant responded to the plaintiffs' fifth request for production of documents. *Id.* at 54 – 59. This request asked the defendant to produce:

> all personnel file and contact information for Contour Eastwyck employees "Jori" (initials JJ) and "Ashelynn" (initial ABJ). (Note: these employees are on the 2018 scheduling calendars produced by Defendant, but were not identified in response to Defendant's Response to Interrogatory #2. Please amend Interrogatory #2 so it is complete and state whether the newly added employees are still employed by Contour Eastwyck.)

*Id.* at 57 ¶ 66.

> The defendant responded with a myriad of objections before stating:

> Subject to and without waiving these objections, Defendant performed a reasonable inquiry through searching its records for the identifies of all persons that were employed by Contour to work on the premises over the past five years and does not have records of any employees by the first names of "Jori (initials JJ)" or "Ashelynn (initial ABJ)."

*Id.* at 58 ¶ 66.

### b) The Defendant Supplemented and Corrected Interrogatory Responses

On February 17, 2021 Latasha Dia verified the defendant's interrogatory responses and first supplemental interrogatory responses [Doc.

No. 160-5 at 2].[35] In the supplemental interrogatory response, the defendant amended its prior response that Bradley Payne was present at Eastwyck on the date of Ms. Frazier's shooting to clarify that he was no longer employed on that date. *Id.* at 5 ¶ 1. Instead, the defendant stated that—pursuant to its time records—Bernard Baker, Brit'knie Bush, Joseph Farris, and Mervyn Gale worked on that date. *Id.* The defendant also supplemented its original list of 13 employees with seven additional names,[36] bringing the total number of disclosed Eastwyck employees up to twenty. *Id.* at 5 – 11 ¶ 2. The defendant did not supplement the list of persons with knowledge regarding the facts or circumstances of the case with Charles Cooper's name. *Id.* at 11 – 12 ¶ 3.

### c) The Plaintiffs Deposed Ms. Prekelezaj

On April 16, 2021, the plaintiffs took the 30(b)(6) deposition of Nora Prekelezaj. *See* Prekelezaj Decl. [Doc. No. 128-1]. At that deposition, Ms.

---

[35] When the court refers to page numbers on this document [Doc. No. 160-5], it is referencing the page numbers of the court filing versus the page numbers on the original document.

[36] These names included maintenance employee Joseph Farris, maintenance employee Mervyn Gale, maintenance employee Oscar Sims, leasing office employee Tierra Barker, housekeeping employee Tamieka Hill, leasing office employee Gwendolyn Whitt, and leasing office employee Marya Rooks.

Prekelezaj made a number of statements and representations subsequently proven to be untrue,[37] including:

- that the defendant—after looking through payroll files on Intuit and speaking with managers on site—had no records of anyone named Ashelynn Burt-Jones or Jori Jones working at Eastwyck;[38]

- that the defendant's emails had always been backed up on the defendant's domain database;[39]

- that the 20 Eastwyck employee names that the defendant provided in response to the plaintiffs' interrogatories was the complete list of every employee employed at Eastwyck from the date of its inception until the day it was sold;[40]

- that Marshal Rhodes was the only person who had ever been a property manager at Eastwyck;[41]

---

[37] Ms. Prekelezaj's deposition testimony and the errors contained therein will be discussed at length throughout this order.

[38] *Id.* at 182:6-12.

[39] *Id.* at 119:20 - 120:3; 120:24-25.

[40] *Id.* at 71:2-10.

[41] *Id.* at 71:11 – 72:20.

- that Ms. Prekelezaj met in person with Ms. Leonard and reviewed payroll records in the defendant's payroll system, Intuit, and employee files;[42] and

- that Mr. Payne was never a property manager.[43]

In addition, Ms. Prekelezaj testified that–despite the emails previously produced by the defendant in response to discovery and despite the defendant's written representations that it had or would search specifically for "emails, text messages, letters and any other correspondence the defendant had sent to or received from Eastwyck residents regarding crimes at Eastwyck or the prevention of crimes at Eastwyck"[44]—the defendant had not searched for any emails related to complaints of crime at Eastwyck because emails would not constitute "official complaints." *Id.* at 121:1-19. Later in her deposition, Ms. Prekelezaj testified that the defendant searched for anything "saved within our desktops or within any kind of Dropbox folders" but "did not search emails." *Id.* at 178:5-23.

---

[42] *Id.* at 28:10 - 31:5.

[43] *Id.* at 64:2 - 65:23; 71:16-19.

[44] *See supra* Section II.C.2.b); *see also* Def.'s Resps. and Objs. to Pls.' First Req. for Produc. at 18 ¶ 29 [Doc. No. 126-1].

#### d)     The Plaintiffs Deposed Ms. Dia

On April 22, 2021, the plaintiffs deposed Ms. Dia.  *See* Dia Dep. [Doc. No. 127-1]. Like Ms. Prekelezaj, Ms. Dia made many misrepresentations in her deposition. Those statements are discussed more fully below. *See infra* Section II.C.14.a)(6).

#### e)     Discovery Disputes Ensued and the Court Extended Discovery

In early 2021, numerous discovery disputes arose between the parties. For example, non-party DKPD objected to the defendant's subpoena to examine Ms. Frazier's cell phone [Doc. No. 75]; the plaintiffs moved to quash the defendant's subpoena to DKPD regarding Ms. Frazier's cell phone [Doc. No. 78]; the plaintiffs moved to quash the defendant's subpoena to T-Mobile seeking all of Ms. Frazier's call and text records [Doc. No. 82]; and the plaintiffs moved to quash the defendant's subpoenas to Ms. Frazier's healthcare providers regarding her mental health [Doc. No. 83]. On February 24, 2021—with these motions pending—the parties filed a consent motion to amend the scheduling order, significantly expanding the time for discovery [Doc. No. 85]. The court denied this motion, finding the requested extension unreasonable. Feb. 25, 2021 Order [Doc. No. 87]. The court ordered the parties' counsel to meet and confer to resolve or narrow their discovery

disputes and the scope of the proposed discovery, staying all discovery deadlines until the parties filed a notice on the docket of a narrowed list of disputes and a motion for a new, more reasonable discovery schedule. *Id.* at 3 – 4. The same day that the court issued the order staying discovery, the defendant filed a motion to compel DKPD to comply with a subpoena [Doc. No. 88], followed the next day by another motion to compel the plaintiffs to provide complete responses to deposition questions, interrogatories, and requests for production of documents related to a life insurance policy insuring Ms. Frazier [Doc. No. 93].

On March 17, 2021, the parties filed a certificate of compliance with the court's order [Doc. No. 98] and another consent motion to amend the scheduling order [Doc. No. 99]. In the certificate of compliance, the parties indicated that they were able to resolve some of the pending discovery motions [Doc. Nos. 82, 83, and 93] and needed extra time to resolve issues surrounding the production of Ms. Frazier's cellphone, which was in the custody of non-party DKPD, and the deposition of Pete Dedvukaj [Doc. No. 98].[45]

---

[45] Pete Dedvukaj ultimately agreed to appear for deposition [Doc. No. 122].

In light of the parties' apparent cooperation, the court granted the parties' proposed amendments to the scheduling order, extending discovery through June 30, 2021 [Doc. No. 100]. The parties continued to brief outstanding discovery issues, which the court resolved by orders on May 14, 2021 [Doc. No. 129] and June 25, 2021 [Doc. No. 143].

### f)  The Plaintiffs Moved to Compel the Production of ESI

The court's June 25, 2021 order addressed the plaintiffs' May 13, 2021 motion to compel the production of ESI [Doc. No. 126]. Because of its pertinence to the pending sanctions motion, the court will address it in detail.

### (1)  The Plaintiffs Filed the Motion

In the plaintiffs' motion to compel the production of ESI, they contended that the parties had agreed that they would search for and produce ESI in the JPRDP.[46] *Id.* at 3. Thus, when the defendants represented that they were searching for and would supplement their production with security logs, incident reports, and complaints of violent crime, among other things, the plaintiffs assumed that the defendant searched for and produced its responsive emails. *Id.* However, as discussed above, Ms. Prekelezaj revealed

---

[46] *See supra* Section II.C.1.

in deposition that the defendant did not search emails for complaints about criminal activity or crime-related incidents that occurred at the apartment complex where Ms. Frazier was shot because emails did not constitute official complaints. *See supra* Section II.C.5.c); Prekelezaj Dep. at 121:1-19 [Doc. No. 128-1]. The plaintiffs argued that, although  Ms. Prekelezaj testified that official complaints are not received via email, Ms. Dia testified that she received incident reports via email.[47] Pls.' Mot. to Compel the Produc. of ESI

---

[47] Ms. Dia testified that an incident report should be filled out in the case of a slip, trip and fall, vehicle damage, auto accident, property damage, assault, or theft. Dia Dep. at 56:8 -  60:8 [Doc. No. 127-1]. The deposition continued:

> Q      Okay. And how were these incident reports transmitted to you?
>
> **A      They would have been electronically.**
>
> MR. PERNICIARO: I'm going to object on the grounds of I don't think a foundation was laid for that yet, but –
>
> Q      These incident reports were transmitted to you; correct?
>
> **A      They were emailed to me.**
>
> Q      Okay. So they were emailed to you, I assume at you – would that be at your Contour company's email address?
>
> **A      I don't know. I've had multiple emails during the course of our ownership and management of Eastwyck.**

at 4 [Doc. No. 126]. At the time of the filing of the plaintiffs' motion, the plaintiffs stated the defendant had produced only four emails to the plaintiffs, which indicated that a reasonable search of ESI had not occurred. *Id.* at 6 – 7. As a remedy, the plaintiffs requested that the court order the defendant to conduct a search for all responsive ESI from the date the defendant purchased Eastwyck to the present of the following individuals or custodians: Ms. Dia, Ms. Prekelezaj, Mr. Dedvukaj, Ms. Rhodes, Mr. Payne, Ms. NarCisse, Ms. Pauleon, security guard Thurman, security guard Eskridge, Mr. Johnson, Ms. Burt-Jones, Ms. Jori Jones, and any and all email accounts associated with the leasing office or its employees. *Id*. at 10. The plaintiffs noted that, unfortunately, they did not know the identity of each custodian and account because some of the defendant's employees had multiple emails over the course of their employment and there was a lack of clarity on which employees had accounts. *Id.* The plaintiffs proposed using 69 search terms and asked that the court order that the defendant conduct a search for all responsive ESI from all available data sources, which the plaintiffs could not

---

Q    But it would have been –

**A    But it would have been a company email.**

*Id.* at 59:9 – 60:1.

82

define further because it did not "know of all potential sources that are in use or have been used by the [d]efendant despite their inquiries to [d]efense counsel," but might include computers on site that the leasing staff used and a server where the defendant's email correspondence is stored. *Id.* at 10 – 12. The plaintiffs further requested that the court order the defendant to "provide full and complete responses to [p]laintiffs' discovery requests based upon its search for [ESI], to provide the [p]laintiff with full and complete information regarding its search protocols, and, if necessary, hold a conference with the parties to address [d]efendant's search for ESI and any scheduling issues that have arisen as a result of [d]efendant's belated search." *Id.* at 12.

### (2) The Parties Corresponded Regarding the Motion

After the plaintiffs filed their motion to compel the production of ESI, counsel for the parties engaged in a somewhat contentious series of emails and telephone conversations documented in the emails. May 2021 emails between opposing counsel [Doc. No. 139-1]. In this exchange, the defense counsel attempted to persuade the plaintiffs' counsel, as it attempted to persuade the court in its subsequent response brief, that the plaintiffs' motion to compel ESI was moot because the defendant was voluntarily conducting

an email search. *Id.* at 7. The defendant also asked the plaintiffs to consent to an extension of time for the defendant to respond to the motion to compel. *Id.* The plaintiffs did not consent to an extension and asked the defendant for an update on the voluntary email search the defendant was allegedly conducting. *Id.* at 6. The defense counsel wrote back that he was expecting the emails the next morning and reiterated the defendant's request for an extension of time. *Id.* at 5. The next morning, the defense counsel emailed the plaintiffs' counsel again and revealed that Ms. Prekelezaj:

> searched her email using the search terms and date range we previously provided and did not come up with any results.
>
> She is still searching Latasha Dia's and Marshal Rhodes['] email accounts and including the term "incident" to look for any incident reports that were emailed.

*Id.* at 4 – 5. Once again, he requested that the plaintiffs agree to an extension. *Id.* at 5. The plaintiffs again refused. *Id.* at 4. When the defense counsel asked the plaintiffs' counsel what concerns the plaintiffs had, the plaintiffs' counsel responded:

> We gave you a list of people to search.
> We gave you a list of terms to search.
> You decided to search 3 accounts.
> You decided to use approximately 10 terms.
> You said the search was ongoing as of April 26th.
> You said we'd have supplemental responses by May 7th.
> Today is May 26th, the day before your response is due. You said yesterday that you expected to get the emails this morning but

couldn't sort through them because you were in a mediation. Now you're saying that's not true and you actually didn't get any emails yet because Nora [Prekelezaj] couldn't find any on her account.

I get it – you don't want to do a response, but so far nothing you or Contour has said about the search for ESI has come true. I'm not going to consent to any sort of extension and tell the court that we think it will be resolved between the parties when I know that's not going to be the case. You've agreed that all of this is relevant and discoverable in our phone call yesterday.

*Id.* at 3 – 4.

### (3)    The Defendant Petitioned the Court for an Extension of Time

Although the plaintiffs did not consent to an extension, the defendant moved for an extension of time to respond to the motion to compel a search of its ESI on May 26, 2021 [Doc. No. 132]. In its motion for an extension, the defendant promoted its theory that the plaintiffs' motion to compel was moot, stating:

Defendant Contour has communicated that it agrees the documents Plaintiffs are seeking are discoverable and that Defendant intends to produce documents in response. Defendant Contour had agreed to do that before Plaintiffs filed their motion to compel. Defendant Contour has been conducting this search and has already completed a search of one email account and is continuing its search.

*Id.* at 1 - 2. Notably, the defendant did not inform the court that the one account presumably searched—Ms. Prekelezaj's—had not produced even a single document. *See generally id.* Nor did its motion for an extension notify

85

the court that there were further disagreements between the parties regarding the defendant's voluntary search. *Id.*

Based on the defendant's representations, which the court now sees were less than transparent, the court granted the defendant's motion and extended the defendant's response time. May 27, 2021 Order [Doc. No. 133].

### (4) The Defendant Responded to the Motion to Compel ESI

The defendant filed its permissibly late response brief on June 7, 2021. *See generally* Def.'s Resp. to Pls.' Mot. to Compel Produc. of ESI [Doc. No. 139]. Confusingly, the defendant argued first that it "did initially search electronically stored information to respond to Plaintiffs' document requests," then stated, "at no point did [d]efendant falsely represent that it conducted a search of email accounts or lead [p]laintiffs to think that" *Id.* at 2. Regardless, it argued that the plaintiffs' motion was moot because it made the email search at the verbal request of the plaintiffs' counsel after Ms. Dia's deposition and produced the responsive documents on May 27, 2021. *Id.* at 3. The defendant argued that it had searched the accounts of Ms. Dia, Ms. Prekelezaj, and Ms. Rhodes using eleven search terms from the date the

property was acquired through the date of the incident.[48] *Id.* In its brief, the defendant asserted that "Ms. Rhodes['] e-mail account is the best source of the information and documents [p]laintiffs are seeking because Ms. Rhodes oversaw the daily operations of the property, maintenance calls, and leasing activity from the time Contour purchased the property until after the subject incident." *Id.* at 6-7. Critically, the defendant did not inform the plaintiffs OR THE COURT in this brief that Ms. Rhodes' email account that she used before she was re-employed in 2020 had been deleted, making a purported search of Ms. Rhodes' email account for the date range of October 1, 2017 through April 6, 2019 useless at best and fraudulent at face-value.[49] The

---

[48] In an email with the plaintiffs' counsel on May 27, 2021, the defense counsel acknowledged that the defendant's self-conducted production contained emails dated after Ms. Frazier's death. May 2021 emails between opposing counsel at 2 [Doc. No. 139-1]. The defendant's failure to abide by the parameters of the search it was allegedly conducting should have raised red flags for the defense counsel about the integrity of the defendant's search.

[49] It is clear to the court that the defendant's intent was to convince all parties, including the court, that Ms. Rhodes' pre-incident emails had been searched. In the brief, the defendant explicitly states, "Ms. Rhodes is now employed by Contour Old Town Villas **and her email account is still active**," clearly implying that there had been no change to her email account and her emails from before Ms. Frazier's death had been searched. Def.'s Resp. to Pls.' Mot. to Compel Produc. of ESI at 6 [Doc. No. 139] (emphasis added). Moreover, the defendant's search of Ms. Rhodes' emails is described as producing "emails regarding complaints of bed bugs, pest control services, evictions, Defendant's security employee, and privileged communications

defendant also used its brief as an opportunity to assert that "there is no indication that tenants had [CEO Pete] Dedvukaj's email address to send complaints about safety or security issues at Eastwyck Village", *id.* at 6, and, in so doing, apparently turned a blind eye to emails like those <u>attached to the complaint</u> in *Connor v. Contour* demonstrating residents emailing Pete Dedvukaj in regard to an on-going issue in a unit.[50] April 9, 2019 email from Hunter to Pauleon, Dia, and Dedvukaj [Doc. No. 140-1]. Moreover, in the defendant's response brief, the defendant (and counsel) continued to maintain that it had "no record of Ashelynn Burt- Jones or Jori Jones being [employees]," *id.* at 8, steadfastly refusing to acknowledge the references to

---

with counsel after this lawsuit was filed." *Id.* Clearly, this is the type of emails that the plaintiffs and the court would expect to see from a property manager at Eastwyck. By referencing these types of emails without disclosing that they were not from her time as Eastwyck property manager, the defendant clearly hoped to evade detection regarding the spoliation of her most relevant emails. And the defendant almost succeeded! But for the sheer tenacity of the plaintiffs' counsel in pursuing this matter, no one would be any wiser that the defendant's self-promoted "best source of the information and documents" the plaintiffs are seeking had been deleted—for no apparent good faith reason—months after the defendant was on notice of the likelihood of litigation and the duty to preserve in this matter.

[50] Furthermore, the defendant's statement that "[t]here is no reason to think Mr. Dedvukaj would receive incident reports that were not also sent to Latasha Dia, making a search of her email account sufficient and reasonable" is conclusory and unsupported by any record evidence. *See* Def.'s Resp. to Pls.' Mot. to Compel Produc. of ESI at 6 [Doc. No. 139].

these employees on its own scheduling calendars *that it produced* or the email attached to the complaint in *Woodall v. Contour Companies* from eastwyckvillages@gmail.com signed by Ashelynn Burt-Jones. *See supra* Section II.A.5.b)(8). Similarly, the defendant continued to maintain that Wendal Johnson was not an employee, ignoring Mr. Johnson's deposition testimony that he worked there, *see supra* Section II.C.3., and security guard Thurman's May 7, 2021 deposition testimony that Mr. Johnson worked the night shift as a security officer at Eastwyck and was involved in a shooting death. Thurman Dep. at 24:23 – 25:17; 188:2 – 191:10 [Doc. No. 166-1]. Finally, the defendant chose to assert in this brief that "it had not had access to the leasing office email account for approximately one year and [could not] search the account," again without citation to any record evidence supporting its veracity. Def.'s Resp. to Pls.' Mot. to Compel Produc. of ESI at 8 [Doc. No. 139].

In addition to the above misrepresentations, the defendant also stated that the email accounts of Mr. Payne, Ms. NarCisse, and Ms. Pauleon had been "deactivated," making their emails inaccessible. *Id.* at 7. It further noted that employees Keith Thurman and Gabriel Eskridge were security employees who were not issued company email accounts. *Id.* at 7 – 8. The defendant contended that it searched its physical office for incident reports,

89

criminal trespass logs, and security logs, producing what it found. *Id.* at 9. The defendant further contended that Marshal Rhodes searched electronic files to respond, including the computers at Eastwyck's leasing office. *Id.* at 10.

### (5)   The Plaintiffs Replied Regarding Their Motion to Compel ESI

In reply, the plaintiffs argued that the defendant's late-breaking search was unreasonably limited; that the defendant's search should have extended beyond the date of the incident itself;[51] that the defendant should have searched its deactivated emails;[52] and that the defendant should have searched the emails of Mr. Dedvukaj and Ms. Burt-Jones. *See generally* Pls.' Reply re: Mot. to Compel Produc. of ESI [Doc. No. 140]. In addition, the plaintiffs argued that the defendant's assertion that it had not had access to the leasing office Gmail account (eastwyckvillages@gmail.com) for over a year

---

[51] Moreover, the plaintiffs contended the defendant's representations regarding the time frame in which emails were searched (October 1, 2017 through April 6, 2019) were inaccurate because the defendant produced emails outside of that time period. Pl.'s Reply re: Mot. to Compel Produc. of ESI at 9 [Doc. No. 140].

[52] In the 30(b)(6) deposition, Ms. Prekelezaj testified that the defendant's emails had always been backed up on the defendant's domain database. Prekelezaj Dep. 119:20 – 120:3; 120:24-25 [Doc. No. 128-1].

was suspect because that would mean that it operated the property for at least 7 months without access to the Gmail account.[53] *Id.* at 4. The plaintiffs further contended that even though the defendant's 30(b)(6) representative testified that the defendant did not direct employees to create Gmail accounts, documents the defendant produced show that its employees used Gmail accounts, including eastwyckvillages@gmail.com and britknie.eastwyck@gmail.com. *Id.* at 5 – 7. Moreover, the plaintiffs contended that the defendant's search, which consisted of their Vice President of Operations searching email accounts, was unreliable and should have included many documents that were not produced.[54] *Id.* at 8 – 9. Finally, the plaintiffs argued that the defendants produced security logs for the month

---

[53] The plaintiffs argued this was particularly suspicious because one of the emails the defendant produced showed that the Gmail account was receiving emails related to employees as late as November 12, 2020. Pls.' Reply re: Mot. to Compel Produc. of ESI at 5  [Doc. No. 140] (citing Doc. No. 140-3 at 91 - 92).

[54] Despite the defendant's representation that it searched for the term "secur!", the plaintiffs stated that they identified emails from lawsuits filed in other cases against the defendant containing that term that were produced in those cases but not this case. Pls.' Reply re: Pls.' Mot. to Compel Produc. of ESI at 8 [Doc. No. 140]. Moreover, the plaintiffs contended that a reliable search should have also returned emails containing lease agreements because the word "security" is used in every lease agreement. *Id.* at 8 – 9. In addition, the plaintiffs contended that the email search should have produced an incident form related to Ms. Frazier's death. *Id.* at 9.

of Ms. Frazier's death but did not demonstrate from what emails/accounts they came, "raising questions about how or why they were included if they were not part of any particular email correspondence and would have obviously been created after the date which [d]efendant states it searched for emails." *Id.* at 10.

In conclusion, the plaintiffs contended that their motion to compel ESI was not moot and that the court should order the defendant to conduct a search for all responsive ESI from all available data sources using, at a minimum, the search terms set forth in the plaintiffs' motion from the accounts set forth in the plaintiffs' motion. *Id.* at 11. In addition, the plaintiffs asked the court to order the defendant to utilize a neutral forensic IT expert to conduct the search and comply with the discovery obligations, and further order the defendant to supplement its responses to the plaintiffs' discovery requests to demonstrate what responses were complete and which responses they supplemented with their emails. *Id.* at 10 – 11. The plaintiffs asked that the court order the defendant to provide the plaintiffs with full and complete details regarding the accounts searched, the deactivated accounts, the methods by which the accounts were deactivated, what email hosting system

the defendant used and the location and existence of any hard drives, local servers or cloud based servers.[55] *Id.* at 3.

### (6)   The Court Ordered a Search of the Defendant's Emails

On June 25, 2021, the court granted in part and denied in part the plaintiffs' motion to compel. June 25, 2021 Order [Doc. No. 143]. The court agreed with the plaintiffs that the defendant's search terms were too restrictive. *Id.* at 2 – 3. The court also found that the defendant's argument that former employees' emails were deactivated following their departure was disingenuous.[56] *Id.* at 3. The court ordered the defendant to expand its search to include the email accounts of Mr. Dedvukaj, Mr. Payne, Ms. NarCisse, Ms. Pauleon, and the leasing office Gmail account. *Id.* at 3. If the defendant was unable to search those accounts, the court ordered the

---

[55] If the defendant deleted former manager Dian Pauleon's emails, the plaintiffs argued this raises a spoliation issue as she was not terminated until after the defendant received a preservation of evidence letter. Pls.' Reply re: Pls.' Mot. to Compel Produc. of ESI at 7 [Doc. No. 140].

[56] Despite its later contention that it was a standard business practice to affirmatively and permanently delete the emails of its former employees after their departure, the defendant had only stated at this juncture in the litigation that the emails of its former employees were "deactivated." The court found that a deactivated email was still searchable. June 25, 2021 Order at 3 [Doc. No. 143]. Moreover, the court found that the defendant's unverified contention that had not had access to the leasing office Gmail account for approximately one year was insufficient. *Id.*

defendant to certify the same by a filing on the record providing a precise explanation of why the accounts could not be accessed and searched. *Id.* The court further ordered the plaintiffs to provide the defendant with a list of 14 additional search terms and ordered the defendant to use those terms to search the identified email accounts and produce responsive documents within 10 days of the receipt of those terms from the plaintiffs. *Id.* at 4. The court did not require the defendant to search "all available data sources" as requested by the plaintiffs because the plaintiffs did not specify what those sources were, and Ms. Prekelezaj testified that the defendant searched its computers and the online repository Dropbox.[57] *Id.* The court also extended the discovery period through July 14, 2021. *Id.*

### (7)    The Plaintiffs Provided the Defendant with Search Terms

On June 25, 2021, the same day that the court issued its order, the plaintiffs' counsel emailed the defense counsel 25 search terms to be used in conducting the court-ordered search. June 25, 2021 email between opposing counsel [Doc. No. 152-2]. Those terms included: safety, secur*, crime*, murder*, shoot*, police*, gun*, report*, kill*, incident*, *safe* (intended to

---

[57] Notably, at this juncture the court did not understand the degree of deception and non-disclosure the defendant's lackluster discovery responses represented.

search for both safe and unsafe with anything after), shot*, injur*, officer*, gate*, assault*, crime*, keith*, Gab*, Ron*, claim*, Wend*, Cop*, 911, bullet*. *Id.* In the email, the plaintiffs' counsel asked the defense counsel to provide "a full list of the accounts searched because we understand that some individuals may have had multiple email accounts." *Id.* The plaintiffs further requested that the search include the contents of any attachments and be produced in their native formats along with all documents showing the number of hits that each search term returned per the initial request for production. *Id.*

### (8)    The Defense Counsel Incorrectly Represented that the Search Was Complete

On July 6, 2021, the defense counsel represented to the plaintiffs' counsel that the defendant "completed the search." July 6 – 9 , 2021 emails between opposing counsel at 7 [Doc. No. 155-1].  Apparently, this new search resulted in only four pages of emails consisting of two distinct email threads from Pete Dedvukaj's account in PDF format. Pls.' Mot. to Compel Forensic Exam at 2 [Doc. No. 152] (citing July 6, 2021 Produc. [Doc. No. 152-1]). It was only after the plaintiffs' counsel asked the defense counsel numerous questions about how the search was conducted that the defense counsel disclosed (and, presumably, realized) that his client had not searched

95

Marshal Rhodes' and Latasha Dia's accounts because the defense counsel "misread the order." July 6 – 9, 2021 emails between opposing counsel at 6 [Doc. No. 155-1]. The defense counsel also stated in correspondence with the plaintiffs' counsel that he did not "know who did the searches but it looks like Nora Prekelezaj assisted." *Id.* at 5. In this same email, the defense counsel stated that he did not know "why they [sic] the emails are in the format they are in" or "if any emails were withheld or what exactly [the plaintiffs' counsel] mean[t] by that." *Id.* at 6. Without his client's confirmation, the defense counsel speculated that the leasing office Gmail account was accessed through a computer at the leasing office that remained logged in, "which explains why we don't have access to it now." *Id.* at 6. The defense counsel further speculated that Eastwyck's new owner might have considered the Gmail account ownership to have passed to them with the sale of the property. *Id.* The defense counsel stated that his client had confirmed that the accounts for Ms. Pauleon, Mr. Payne, and Ms. NarCisse were deleted when the employees were terminated which was the "normal course of business." *Id.* at 5.

In response to the defense counsel's email, the plaintiffs' counsel asked numerous questions, including why Marshal Rhodes' account was not deleted when she left the company and then came back. *Id.* at 2. In addition, the

plaintiffs' counsel pointed out—and the court has verified—that emails the defendant found in Pete Dedvukaj's account should have been produced in the defendant's "voluntary" May production if the defendant had conducted the search of Ms. Dia and Ms. Prekelezaj's account as represented. *Id.* at 2.

### (9)  The Defendant Certified it Lost Access to Key Accounts and Requested an Extension

On July 9, 2021, the defendant "certified" via a brief and an unverified letter from Ms. Prekelezaj that the accounts of Mr. Payne, Ms. NarCisse and Ms. Pauleon were deleted. Def.'s Certification at 2 [Doc. No. 151].[58] Citing to Ms. Prekelezaj's letter, the defendant represented that when an employee is terminated, the defendant "will request Go Daddy delete the email account for the employee (if one exists) for various reasons, including the cost of services." *Id.* The defendant attached emails from GoDaddy to

---

[58] The defendant stated that, if required, it would "convert Ms. Prekelezaj's letter to a sworn declaration." Def.'s Certification at 3 [Doc. No. 151]. The court cannot fathom why Ms. Prekelezaj's letter was not presented as a sworn declaration in the first instance. Whether the decision for Ms. Prekelezaj to submit this information in the form of a letter rather than a sworn declaration was the result of strategy or of blind trust, the court finds it a questionable professional calculation by attorney Perniciaro, who signed this certification.

contourllc@gmail.com[59] stating that bradley@contourdevelopmentgroup.com was deleted on March 9, 2019 and antoinette@contourcompanies.com was deleted on February 7, 2019 [Doc. No. 151-2]. In her letter upon which the defendant's certification relies, Ms. Prekelezaj stated that the defendant's search "could not find a confirmation of deletion of dian@contourcompanies.com, however the email was deleted upon her termination with the company." Prekelezaj Ltr. [Doc. No. 151-1]. The defendant's brief, citing a GoDaddy Help page, asserted that, "[o]nce a user is deleted, its contents are no longer accessible, and any aliases must be added to another user or distribution group." Def.'s Certification at $2-3$ [Doc. No. 151] (citing GoDaddy Help Instructions [Doc. No. 151-3 at 2]). Notably, despite the plaintiffs' request that the defendant set forth which accounts it searched (in light of Ms. Dia's testimony that some employees had multiple accounts), the defendant alerted neither the court nor opposing counsel of Ms. Rhodes' deleted email account at this time nor did it alert the court or

---

[59] Although Ms. Prekelezaj testified in her deposition that the defendant did not direct employees to create Gmail accounts [Doc. No. 128-1 at 157:15-18], this Gmail address—used in emails from GoDaddy attached to Ms. Prekelezaj's letter [Doc. No. 151-1]—was apparently sanctioned by the company.

opposing counsel that Ms. Pauleon's email account was converted to Ms. Goolsby's account. *See generally id.*

Directly contradicting her earlier statement that the defendant lost access to the leasing office Gmail account sometime in summer 2020, Ms. Prekelezaj asserted that the defendant lost access to the account when it sold the Eastwyck property on January 27, 2021. Prekelezaj Ltr. [Doc. No. 151-1]. Pointing to emails *produced by the plaintiffs*, the defendant's brief stated that the account was a Gmail address "likely accessed through a physical computer at the property's leasing office." Def.'s Certification at 3 [Doc. No. 151]. In her letter, Ms. Prekelezaj stated:

> This leasing email account was a "gmail" account. My search has concluded that we are not in possession of a password or log-on [sic] to access this account. The account was likely accessed by employees using a single computer located at the property that remained logged into the email account and not requiring the employees repeatedly using a password or username.

[Doc. No. 151-1].

In its certification, the defendant further represented that while it had completely searched and produced emails from Ms. Prekelezaj's and Mr. Dedvukaj's accounts, it had not yet completed the search for Ms. Rhodes' and Ms. Dia's emails because of "lost time due to a federal holiday and a mistake

99

by counsel in not listing all of the accounts to be searched."[60] Def.'s Certification at 3 [Doc. No. 151]. Accordingly, the defendant requested an extension of time to finalize the task. *Id.*

### g) The Plaintiffs Sought a Forensic Inspection of Email Servers

#### (1) The Plaintiffs Filed a Motion for a Forensic Inspection

The next day, on July 10, 2021, the plaintiffs filed another motion to compel and a response opposing the defendant's request for additional time. Pls.' Mot. to Compel Forensic Inspection [Doc. No. 152]. In this motion to compel, the plaintiffs requested an order: (1) requiring an inspection of the defendant's servers and email accounts by a forensic IT expert at the

---

[60] As discussed above, *see supra* section II.C.5.f)(8), the defense counsel originally represented to the plaintiffs on July 6, 2021 that the defendant "completed the search." July 6 – 9, 2021 emails between opposing counsel at 7 [Doc. No. 155-1]. It was only after the plaintiffs' counsel asked the defense counsel numerous questions about how the search was conducted that the defense counsel disclosed (and, presumably, realized) that his client had not searched the accounts for Marshal Rhodes and Latasha Dia because the defense counsel "misread the order." *Id.* at 6. Although the defense counsel attached this email chain to its brief in response to the plaintiffs' motion to compel a forensic inspection to illustrate that the plaintiffs "refused to cooperate with Defendant in good faith" [Doc. No. 155 at 2 – 3], it appears to the court from a plain reading of the emails that—had the plaintiffs' counsel not been a vigilant advocate for his clients—Ms. Dia's and Ms. Rhodes' accounts would not have been searched as required by the court's order.

defendant's expense; (2) extending the discovery deadlines; (3) denying the defendant's motion for additional time as untimely; and (4) for any sanctions warranted by the defendant's continued discovery misconduct. *Id.* at 2.

In support of their motion, the plaintiffs argued that the defendant's search had been woefully inadequate, resulting in only four pages of emails that should have previously been produced based on the defendant's representations. *Id.* at 2.  The plaintiffs further called the integrity of the defendant's search into question, arguing that the defendant should have produced an email from the *Connor v. Contour* case [Doc. No. 140-1] that they attached to a previous brief after searching Mr. Dedvukaj's account using the search terms, but did not. Pls.' Mot. to Compel Forensic Inspection at 4 [Doc. No. 152].

In addition to their concerns about the thoroughness of the defendant's search, the plaintiffs also expressed concern that the emails were produced in PDF format instead of native format, which stripped them of metadata and attachments. *Id.* at 5. The plaintiffs reiterated their concern that security guard Thurman's April 2019 security logs, produced by the defendant on May 27, 2021, did not indicate in whose account the security logs were located or what search term produced the logs. *Id.* at 5 – 6. The plaintiffs argued that this raised serious questions about why emails were converted to PDF, why

the logs were included despite not being attached to an email, and what may have been removed in the process. *Id.* at 6.

Next, the plaintiffs argued that the defendant's certification that certain email accounts were inaccessible was false. *Id.* at 6. In support of this argument, the plaintiffs pointed to Ms. Prekelezaj's deposition testimony that the defendant's emails were backed up on their domain database. *Id.* at 6 – 7. Moreover, the plaintiffs pointed out that the defendant had contradicted itself in regard to when it lost access to the leasing office Gmail account, stating initially that they lost access to the account before the filing of the lawsuit (but after receiving preservation letters), and later asserting that it lost access to the account on January 27, 2021 when the property was sold. *Id.* at 7. The plaintiffs further argued that the defendant had not taken any steps to recover the account or glean information about the account. *Id.* at 7.

### (2) The Court Set a Briefing Schedule and the Defendant Finished Its Court-Ordered Email Production

Three days after the plaintiffs filed their motion to compel a forensic inspection, the court set a briefing schedule and stayed the time for filing dispositive motions and *Daubert* motions. July 13, 2021 Order [Doc. No. 153].

That same day, the defendant "completed the search of the remaining two accounts and submitted the results to Plaintiffs in native format as they requested." Def.'s Resp. to Mot. to Compel Forensic Examination at 4 [Doc. No. 155]. Pursuant to Ms. Prekelezaj's Declaration, each account holder searched their own inboxes using all of the keywords provided, and the emails related to Eastwyck Village were identified for production. Prekelezaj Decl. ¶ 8 [Doc. No. 155-3].[61] Apparently, this production consisted of four additional emails from Ms. Dia's and Ms. Rhodes' email accounts, two of which the defendant previously produced.[62] Pls.' Reply re: Pls.' Mot. to Compel Forensic Examination at 13 – 14 [Doc. No. 156]. Although the plaintiffs contended that the two "new" emails should have already been produced based on the defendant's representations regarding its search in May 2021, the court notes

---

[61] In this declaration, Ms. Prekelezaj also included information previously submitted in unverified letter format regarding the accounts of Ms. Pauleon, Mr. Payne, and Ms. NarCisse as well as the leasing office Gmail account. Prekelezaj Decl.  ¶¶ 2 - 7 [Doc. No. 155-3].

[62] The plaintiffs stated they were unable to attach the emails to their brief due to technical considerations. Pls.' Reply re: Pls.' Mot. to Compel Forensic Examination at 13 n.11 [Doc. No. 156].

that both of these emails were dated after the subject incident and thus were outside of the time frame the defendant allegedly searched.[63] *Id.*

### (3)    The Defendant Responded

On July 16, 2021, the defendant responded to the plaintiffs' motion to compel a forensic inspection, arguing that the plaintiffs did not make a good faith effort to confer with the defendant,[64] maintaining that it had conducted the search as ordered, and **once again** failing to notify the court or opposing counsel (1) that Ms. Rhodes had more than one account and (2) that Ms. Rhodes' pre-incident email account had been deleted. *See generally* Def.'s

---

[63] The two new emails included one titled "[External] Police Called Out for Keith Thurman Again" that included the terms "shooting," "safety," "incident," and "police" and another from Jennifer.eastwyck@gmail.com that was forwarded to Latasha Dia, which the plaintiffs argued was evidence that management had knowledge that employees used Gmail accounts for work. Pls.' Reply re: Mot. to Compel Forensic Examination at 13–14 [Doc. No. 156]. The plaintiffs cut and pasted the body of the email from Jennifer.eastwyck@gmail.com but did not attach the email to their brief. *Id.* at 14.

[64] In its response brief, the defendant contended that the plaintiffs' "strategy is to bombard counsel with multiple emails and create as much chaos as possible". Def.'s Resp. to Pls.' Mot. to Compel Forensic Examination at 2 [Doc. No. 155]. Although the parties conferred via videoconference, the defendant complained that it lasted less than five minutes "during which time Plaintiffs made multiple requests about 'reports' reflecting the number of hits from the keyword searches, documents being produced in native format, and details on the persons conducting the search . . [n]one of which were required by the prior discovery order but none [d]efendant refused." *Id.*

104

Resp. to Pls.' Mot. to Compel Forensic Examination [Doc. No. 155]. Notably, although Ms. Prekelezaj stated in her Declaration that she could not explain why emails the plaintiffs identified in their motion to compel forensic examination were not found during the defendant's initial response, Prekelezaj Decl. ¶ 9 [Doc No. 155-3], the defense counsel—without any documented confirmation from his clients—speculated that: "the emails could have been innocently deleted from the account before the search, they could have been rejected by the inbox; the content could be unsearchable, or the account owners [conducting the search] could have entered the search terms incorrectly." Def.'s Resp. to Pls.' Mot. to Compel Forensic Inspection at $4-5$ [Doc. No. 155]. The defendant further argued that the emails accidentally withheld were irrelevant to the case. *Id.* at 5.

In response to the plaintiffs' argument that the emails from the deleted GoDaddy accounts were still available (based on Ms. Prekelezaj's deposition testimony that the emails were backed up), the defendant stated that the deleted email accounts were truly inaccessible. *Id.* at 5. In regard to Ms. Pauleon's deleted account, the defendant contended—without citation—that it was deleted in the normal course of business and thus did not constitute

spoliation or improper conduct.[65] *Id.* at 9. The defendant acknowledged that it lost access to the leasing office Gmail account after it was on notice that the plaintiffs intended to pursue litigation, arguing that it did not matter whether the Gmail account access was lost in June 2020 or January 2021 because the plaintiffs had made their intent to pursue litigation for this incident clear since December 2019 or earlier. *Id.* at 5 – 6.

The defendant argued that the plaintiffs' concerns that it had produced some emails in PDF format versus native format to conceal metadata and attachments were unfounded, but it contended that the confusion could be abated by an IT expert re-doing the search and producing all emails in native format. *Id.* at 6. To that point, the defendant agreed that the dispute was at such a stage that a forensic review of the data was appropriate and proposed that it utilize an IT expert of its own choosing at its own cost.[66] *Id.* at 6 – 7.

---

[65] It appears that, at least at this juncture, the defendant still did not know (or chose not to disclose) when or how Ms. Pauleon's account was deleted. *See* Prekelezaj Decl. ¶ 5 [Doc. No. 155-3] ("Our search could not find a confirmation of deletion for dian@contourcompanies.com, however the email was deleted upon her termination with the company.")

[66] The defendant contended that the GoDaddy email accounts were the only relevant data source, which could be searched (using an IT expert) in the following way:

1. Remotely exporting the inboxes of the users;

The defendant further informed the court that it had previously obtained an estimate for a forensic examination, but the plaintiffs refused, saying there were too many "issues" with the defendant's investigator. *Id.* at 7.

### (4)    The Plaintiffs Replied

On July 19, 2021, the plaintiffs filed a reply brief in which the plaintiffs called the court and the defense counsels' attention to *Mayes v. Contour Eastwyck, LLC* for the first time. Pls.' Reply re: Mot. to Compel Forensic Inspection at 3 [Doc. No. 156]. The plaintiffs contended that the defendant

---

2.   Searching them using forensic IT tools, producing the emails in native format;

3.   Defense counsel reviewing them for possible objectionable, non-discoverable, or privileged information, identifying withheld documents; and

4.   Producing to opposing counsel native files of emails with a written certification from the expert identifying what was searched, how it was searched, and identifying any irregularities.

Def.'s Resp. to Pls.' Mot. to Compel Forensic Inspection at 8 [Doc. No. 155]. The defendant argued that, rather than accepting this plan, the plaintiffs wanted unfettered access to the defendant's email accounts at the defendant's cost, which was not supported by the evidence or law. *Id.* The defendant then asserted that Federal Rule of Civil Procedure 34 allows the responding party to search its own data and does not give the requesting party the right to conduct the actual search. *Id.* at 9.

had provided responses to the State Court of Gwinnett County in *Mayes* regarding available discovery that were false in light of discovery it produced in the instant action.[67] *Id.*

In addition to calling the court's attention to *Mayes*, the plaintiffs reiterated that the court should compel a forensic inspection and require the defendant to answer important questions under oath. *Id.* at 4 – 7. In support of its arguments, the plaintiffs contended that the defendant failed in identifying the sources of its ESI (including what email accounts it used and when it ceased to use those accounts); failed to preserve ESI, including Ms. Pauleon's account and the eastwyckvillages@gmail.com account, after it was on notice of potential litigation and had obtained counsel regarding the same; failed in collecting ESI (causing the defendant to shift from arguing that the plaintiffs' motion to compel ESI was moot to agreeing that a forensic inspection was necessary); and failed in producing ESI (in multiple formats and stripped of metadata). *Id.* at 8 – 13. Finally, the plaintiffs argued that the defendant produced only two new emails in its expanded search of Ms.

---

[67] The plaintiffs stated that the defendant claimed in response to a motion to compel in *Mayes* that it did not have any emails related to criminal activity at Eastwyck. Pls.' Reply re: Mot. to Compel Forensic Examination at 3 [Doc. No. 156]. The plaintiffs argued that—because the defendant has produced some emails about criminal activity at Eastwyck in this case—the defendant's statement in *Mayes* is demonstrably false. *Id.*

Rhodes' and Ms. Dia's account that it should have produced pursuant to the search it supposedly conducted prior to its May 27 production.[68] *Id.* at 13 – 14.

### (5) The Defendant Moved to Strike the Plaintiffs' Reply

The next day, the defendant filed a motion to strike the plaintiffs' reply brief or, in the alternative, a motion for leave to file a surreply and conduct a hearing. Def.'s Mot. to Strike [Doc. No. 157]. In its filing, the defendant requested an opportunity to respond to the plaintiffs' proposed protocol for a forensic inspection as well as the questions the plaintiffs proposed that the defendant answer under oath. *Id.* at 2. In addition, the defendant took issue with the plaintiffs raising the *Mayes* case in a reply brief and stated that it would need time to speak with the *Mayes* defense counsel to vet the plaintiffs' serious allegations. *Id.* at 3. The defendant further requested that the court conduct a hearing on the plaintiffs' motion to compel and noted that it would be willing to invite its proposed IT expert, RDT, to the hearing so that its representative could demonstrate his neutrality in the scope of work he would conduct. *Id.* at 4.

---

[68] *See supra* Section II.C.5.g)(2).

### (6)    The Court Set a Hearing

On July 23, 2021, the court denied the defendant's motion to strike the plaintiffs' reply brief but set a hearing in regard to the plaintiffs' motion to compel a forensic inspection. July 23, 2021 Order [Doc. No. 158]. The court directed the parties to file a joint proposal as to how the inspection should be conducted and who should bear the cost of the inspection. *Id.*[69]

### (7)    The Parties Submitted a Proposed Protocol

The parties filed a proposed protocol on August 4, 2021. Aug. 4, 2021 Certificate of Compliance [Doc. No. 159]. In the proposed protocol, the parties agreed on several points, including: the terms that should be searched; that the forensic examiner should search for emails, audit trails, backups, imaging, and other information that could be recovered for certain "deleted" emails; that the forensic examiner should provide the defendant with all data in native format; that the defendant should produce data in its native format within 30 days of receiving it from the forensic examiner; that the parties

---

[69] In the order, the court noted that the parties were in agreement that a forensic inspection was necessary. July 23, 2021 Order at 1 [Doc. No. 158]. The court also elected not to construe the defendant's motion to strike as a motion for leave to file a surreply because the defendant failed to attach the proposed surreply. *Id.* at 2. The court granted the defendant leave to file a proper motion related to the proposed surreply by July 30, 2021. *Id.* The defendant did not file such a motion or a surreply.

should cooperate regarding any extension needed if the data could not reasonably be reviewed before the agreed upon deadline; and that the forensic examiner should preserve all data until the conclusion of the case. *See generally id.* The parties also outlined the following points of contention:

### (a) Who Should Conduct the Inspection

The plaintiffs preferred for the court to appoint a neutral inspector or allow the plaintiffs to choose a neutral inspector. *Id.* at 1. The defendant offered to incur the costs of the inspection using RDT, the inspector who examined the decedent's cell phone. *Id.* at $1-2$.

### (b) The Breadth of the GoDaddy Inspection

The plaintiffs wanted the defendant to identify all Go Daddy/Microsoft 365 accounts, emails and "aliases" used by the defendant when it owned Eastwyck and then to determine which accounts were used by employees to conduct Eastwyck business to provide the parties and the forensic examiner with the full and complete picture of which accounts exist or existed, to whom those accounts were assigned, and whether those accounts were deleted or repurposed as an alias for another account. *Id.* at $2-3$. The defendant wanted to limit the identification to accounts, aliases, and creation/deletion dates to

the individuals and leasing office identified in the court's June 25 order, stating that it could not "agree to incur the expense of searching for and examining additional unidentified accounts for unidentified individuals beyond what was contemplated in this Court's prior order."[70] *Id.* at 2.

### (c)    Inspection of Gmail Accounts

The plaintiffs wanted to know what Gmail accounts the defendant used while it owned Eastwyck and wanted the forensic examiner to export data from those accounts, including eastwyckvillages@gmail.com; Britknie.eastwyck@gmail.com; and Jennifer.eastwyck@gmail.com. *Id.* at 6. Despite repeatedly being confronted by Gmail accounts used by employees throughout this litigation, the defendant stubbornly claimed to be aware of only one Gmail account used by leasing office employees. *Id.* at 5. In this particular court filing, the defendant—without evidentiary support— elaborated upon its most recent representation that it lost access to that account when it sold the property, this time stating that it "believe[d] the account to be in control of the current/subsequent property owner, Nirvana

---

[70] Although the court did not formally raise this issue at the time, it found the defendant's concern somewhat curious in light of the defendant's previous representations regarding the limited number of employees that worked at Eastwyck. In hindsight, the court finds that the defendant's objection foreshadowed what the plaintiffs uncovered next: that the defendant had at least 42 undisclosed Eastwyck employees. *See infra* Section II.C.6.a).

Capital." *Id.* at 5. The defendant stated further that it had "agreed to cooperate with [p]laintiffs in attempting to gain access to the account with the permission of the current property owner" and represented that it had "requested permission from the current property owner to conduct a search for discoverable emails."[71] *Id.* at 5.

The plaintiffs, noticing the defendant's subtly shifting representations regarding the leasing office Gmail account, requested that the defendant be required to state a number of details in regard to it, including:

- whether the defendant was able to access the leasing office account;

- the steps taken by the defendant to determine whether it had access to the account;

- the steps taken to regain access to the account;

- the date on which it lost access to the account;

- the identity of the Contour employee who provided the login information to the new property owner;

- the date on which the defendant provided the login information to the new property owner; and

---

[71] The court gleans from this representation that—despite the court order compelling it to search this account previously—the defendant had not taken even the simplest of steps to gain access to the account. *See supra* Section II.C.5.f)(6).

- how the defendant provided the login information to the new owner.

*Id.* at 5 – 6. In addition, the plaintiffs requested that the forensic examiner export all data from Gmail accounts clearly used by the defendant's employees. *Id.* at 6.

### (d)    Objections to Production

Notably, the parties disagreed about whether the defendant could object to the production of responsive documents identified by the forensic examiner. *Id.* at 8 – 9. The defendant wished to withhold documents that are not privileged but otherwise objectionable, while the plaintiffs believed that the defendant should produce all documents produced by the forensic examination protocol that were not privileged and that privileged documents must be identified in a privilege log. *Id.* at 9.

### 6.    The Plaintiffs Uncovered Sanctionable Conduct

#### a)    The Plaintiffs Discovered 42 Undisclosed Eastwyck Employees

On August 5, 2021, the day after the parties submitted their joint proposal document regarding the forensic inspection to this court, the defendant—represented by Cruser Mitchell—identified 62 Eastwyck employees in the *Mayes* case. Pls.' First Mot. for Sanctions at 3  [Doc. No. 160]; *Mayes* List of Eastwyck Employees [Doc. No. 160-1]. This represented

42 more employees than the defendant identified in discovery responses or depositions in this case and two of which (Ashelynn Burt-Jones and Jori Jones) it had continually disavowed as employees.[72] *See supra* Section II.C.5.b) (discussing the total number of employees the defendant disclosed

---

[72] In her deposition, Ms. Prekelezaj testified there were only 20 Eastwyck employees between October 30, 2017 through January 27, 2021 as follows:

> Q:    So your sworn testimony today here is that Contour Eastwyck has provided us the names of every employee who was employed at the property from its inception until the day it was sold?

> Mr. PERNICARIO: Object to the form, asked and answered now about five times.

>      Go ahead.

> Q:    (By Mr. Brown) You can answer, ma'am.

> A:    Correct.

Prekelezaj Dep. 71:2-10 [Doc. No. 128-1]. When asked what the defendant did to determine whether it had any employees by the names of Jori or Ashelynn, Ms. Prekelezaj stated that "[w]e looked through our payroll files in Intuit and also reached out to any mangers on site, and we did not come up with anything for Jori or Ashelynn." *Id.* at 182:6-12. At the sanctions hearing, Ms. Prekelezaj contradicted this deposition testimony and testified that, in attempting to identify Eastwyck employees, she did not look through tax records, including 1099s or W-2s; did not search emails; and did not ask people who actually worked at the property who worked there. Sanctions Hr'g Tr. I at 68:6-23 [Doc. No. 217].

after supplementing interrogatory responses) and Section II.A.5.b)(8). (discussing the defendant's evolving testimony regarding Eastwyck employees Ashelynn Burt-Jones and Jori Jones). In addition, despite objecting to the production of the same in the instant action, the defendant produced the employee files for all 62 Eastwyck employees without objection and without redactions in *Mayes*. Pls.' First Mot. for Sanctions at 10 [Doc. No. 160].

### b) The Plaintiffs Discovered Undisclosed Security Documents

Despite the defendant's assurances that it had produced all security logs created before the incident in its possession,[73] the plaintiffs found

---

[73] In her deposition, Ms. Prekelezaj testified as follows:

Q:      . . . What steps did Contour take to make sure that all the security logs were saved?

**A:      The security personnel was directed to not destroy or get rid of any security logs ever.**

Q:      Okay. Has Contour produced all the security logs from the time that it purchased the property up until Ms. Frazier's incident?

**A:      What was in our possession, yes.**

security logs produced in *Mayes* that had not been produced in this case. *Id.*

at 8 – 9. Although they were labeled as time sheets, a review of the documents

shows that they detailed security duties performed (i.e., function as a form of

a security log). *See Mayes* Security Documents [Doc. No. 160-11].

---------------------------

      Q:     Okay. IF they were – well, I'm trying to figure out where
the rest of the logs are. Why doesn't Contour have security logs
before December 10th, 2018?

      **A:**     **I don't know.**

      Q:     Well, what steps did you take to confirm that those are
the only security logs that Contour is in possession of?

      MR. PERNICIARO: Object to the sense it goes outside the
scope.
      Go ahead.

      **A:**     **I reached out to management and to Ms. Dia to
gather all the documents available that were requested.**

      Q:     (By Mr. Brown) Did you ever reach out to the security
officers themselves?

      **A:**     **No.**

      Q:     Why not?

      **A:**     **I dealt with Latasha and Marshal on a day-to-day. I
never dealt with the security officers so I never reached
out to them.**

Prekelezaj Dep. 122:11 – 123:13 [Doc. No. 128-1].

### c) The Plaintiffs Discovered the Defendant Produced Annual Profit and Loss Statements in *Mayes*

As with the employee files, the defendant produced annual profit and loss statements in *Mayes* that it withheld in the case at hand. Pls.' First Mot. for Sanctions at 10 – 11 [Doc. No. 160]. In this case, the plaintiffs requested financial documents including (1) all budgets for security at Eastwyck from 5 years before the incident through the calendar year of the incident; (2) all documents showing how much money was allocated for crime prevention and deterrence at Eastwyck from 5 years before the incident through the present; (3) all documents showing how much money was actually spent on crime prevention and deterrence at Eastwyck from 5 years before the incident through the present; (4) all documents showing how much money was spent after the date of the incident to increase safety and security measures at the Premises; and (5) **all profit and loss statements for the Premises from 5 years before the Incident through the calendar year of the Incident**. Def.s' Resp. and Objs. to Pls.' First Req. for Produc. at 24 – 26 ¶¶ 43 – 47 [Doc. No. 160-10] (emphasis added). In response to each of these requests, the defendant objected as follows:

> Defendant objects to this request as seeking confidential and proprietary business records not subject to public disclosure. Defendant further objects to this request as invading Defendant's

right to privacy and not being proportional to the needs of this case. Defendant objects to this request as irrelevant. Defendant objects to this request as calculated for purposes of annoyance, harassment, and embarrassment. Defendant objects to producing its confidential financial records for these reasons.

*Id.*

In contrast to its response in this case, the defendant produced its profit and loss statements without objection, without redaction, and without a protective order in *Mayes*. Pls.' First Mot. for Sanctions at 10 - 11 [Doc. No. 160].

### d) The Plaintiffs Discovered the Defendant Violated the DKPD Confidentiality Agreement

In addition to the undisclosed employee files, undisclosed security documents, and undisclosed profit and loss statements, the plaintiffs also discovered that the defendant produced in *Mayes* every document that it produced in this case, including the DKPD investigative file of Ms. Frazier's murder. Pls.' First Mot. for Sanctions at 11 [Doc. No. 160]. Because the defendant produced the investigative file in *Mayes* without requiring a confidentiality agreement, the plaintiffs contended the defendant violated the confidentiality agreement with DKPD in this case. *Id.*

### 7. The Plaintiffs Filed Their First Motion for Sanctions

The day before the scheduled hearing on the motion to compel a forensic inspection—and five days after discovering the undisclosed witnesses in *Mayes*—the plaintiffs filed their first motion for sanctions. *Id.*

#### a) The Plaintiffs' Allegations

##### (1) The Defendant Failed to Disclose 42 Employees.

As noted above, the plaintiffs discovered 42 undisclosed Eastwyck employees, which is inconsistent with the defendant's written discovery responses and Ms. Prekelezaj's deposition testimony. *See supra* Section II.C.6.a). The plaintiffs claimed that the defendant's failure to disclose its employees was unquestionably harmful to it and pointed to the affidavit of one of the defendant's undisclosed employees as an example. *See* Pls.' First Mot. for Sanctions at 11 – 13 [Doc. No. 160]; Aff. of Aaron Lyons ("Lyons Aff.") [Doc. No. 160-12]. In his affidavit, the former employee stated that he heard 10 shootings from the property and saw shell casings in his two months with the property; would drop to the ground along with other employees when shootings happened to avoid getting shot; that the leasing office staff kept the leasing office door locked because they were scared; and that the leasing office

staff requested but were denied more security by owners. *See generally* Lyons Aff. [Doc. No. 160-12]. In addition, the former employee testified that there were a lot of drugs on the property, which people used openly and which the security officers did not try to stop. *Id.* at ¶¶ 17 – 18. He further testified that the employees knew about the drug use and all talked about it. *Id.* at ¶ 18(2). The plaintiffs contended that they could not be sure that the *Mayes* production identified all of the defendant's employees, but that—at a minimum—the plaintiffs were now saddled with the task of locating 42 new employees, interviewing them, and potentially deposing them. Pls.' First Mot. for Sanctions at 12 – 13 [Doc. No. 160]. The plaintiffs contended that "[m]emories fade, phone numbers change, and people move;" therefore, the defendant's failure to produce these 42 employees had irreparably prejudiced the plaintiffs. *Id.* at 13. In addition, the plaintiffs argued that the defendant's failure to identify all of its employees underscored the importance of the defendant identifying all of its email accounts for the entirety of its ownership of Eastwyck. *Id.*

### (2)   The Defendant Failed to Properly Identify the Property Manager on the Date of the Shooting

The plaintiffs argued that the defendant gave inconsistent discovery responses in this case and in *Mayes* about who its property managers were at Eastwyck, and that responses in both cases were incomplete. *Id.* at 6 – 7. Furthermore, the plaintiffs contended that the defendant still had not verified who was managing the property at the time of the incident. As an example, the plaintiffs pointed to the defendant's evolving answers regarding Mr. Payne's role at the property. *See supra* Section II.A.5.b)(2). In addition, the plaintiffs pointed to the defendant's verified interrogatories in *Mayes* on February 19, 2021 that identified Marshal Rhodes as the property manager in 2017, Bradley Payne as the property manager in 2018, and Mr. Payne, Ms. Pauleon, Ms. Goolsby, and Gwendolyn R. Whitt as the property managers in 2019. Pls.' First Mot. for Sanctions at 7 [Doc. No. 160]. These responses directly contradicted the defendant's 30(b)(6) deposition in this case, where Ms. Prekelezaj testified that the only person who had ever been an Eastwyck property manager was Ms. Rhodes. Prekelezaj Dep. 71:11 – 72:20 [Doc. No. 128-1].

### (3)    The Defendant Intentionally Withheld Security Logs.

The plaintiffs argued that the defendant intentionally withheld responsive security documents it produced in *Mayes* despite affirming that it had produced all security logs in its possession that were created before the incident. Pls.' First Mot. for Sanctions at 8 – 9 [Doc. No. 160]. The facts underlying this allegation are set forth above. *See supra* Section II.C.6.b).

### (4)    The Defendant Did Not Disclose the *Mayes* Case

On April 22, 2021, Ms. Dia testified that the instant case is the only case she knew about involving an innocent victim in a shooting at the Eastwyck property, as follows:

Q    How many shootings are you aware of during the time that Contour owned the property?

**A    On the property or in the area?**

Q    On the property. We'll start with on the property.

**A    I'm only aware of this one.**

Q    What about in the area? Are you aware of any in the area?

**A    There has been shootings in the area. I've not done any research on that. It's all been hearsay.**

Dia Dep. 113:5-15 [Doc. No. 127-1]. However, the plaintiffs contended that Ms. Dia also verified the *Mayes* interrogatories, a case which also involved an innocent shooting victim at Eastwyck. Pls.' First Mot. for Sanctions at 9 [Doc. No. 160]. The plaintiffs argued that the defendant failed to disclose the *Mayes* case because it was producing information in that case that it was not producing in this case, including personnel files for 62 employees, yearly profit and loss statements, and the DKPD investigative file of Ms. Frazier's murder without a protective order. *Id.* at 9 – 10.

### (5) The Defendant Objected to Producing Documents in Bad Faith

As set forth above, the defendant objected to producing personnel files and annual profit and loss statements in this matter that it produced without objection in *Mayes*. *See supra* Section II.C.6.a) and c). Because the defendant's objections to producing such documents in this matter were grounded in privacy/confidentiality concerns, among other things, the plaintiffs contended that the defendant's objections were artificial and made in bad faith. Pls.' First Mot. for Sanctions at 9 – 11 [Doc. No. 160].

### b) The Plaintiffs' Requested Remedies

On the basis of the defendant's discovery infractions, the plaintiffs requested two mitigating remedies as well as harsh sanctions for the

defendant under the court's inherent authority, Rule 26(g) and Rule 37(c). *Id.* at 11 – 22.

### (1)     Mitigating Remedies

In terms of mitigating remedies, the plaintiffs requested additional discovery time to contact, interview, and potentially depose the new employees and to attempt to ascertain whether the list of Eastwyck employees the defendant presented in *Mayes* is complete. *Id.* at 11 – 13. Additionally, the plaintiffs requested that the court require the defendant to identify all of its email accounts for the entirety of its ownership of Eastwyck to verify that the list of Eastwyck employees produced in *Mayes* is complete and to provide the plaintiffs with the work email accounts for the 42 undisclosed employees. *Id.* at 13.

### (2)     Sanctions

In addition to the mitigating remedies, the plaintiffs contended that the defendant's misconduct should be punished in the form of an issue preclusion sanction. Specifically, the plaintiffs requested that the court preclude the defendant from contesting that it breached a duty to Ms. Frazier and that its breach was the cause of her death. *Id.* at 21. In addition, the plaintiffs requested that the court order the defendant to pay their attorneys' fees and costs associated with bringing the motion for sanctions, the motions

and time related to the defendant's deficient production of emails, and for all
time spent on future discovery related in any way to the 42 new employees or
information the defendant wrongfully withheld. *Id.* at 21 – 22. The plaintiffs
contended that such sanctions were warranted pursuant to the court's
inherent authority, Federal Rule of Civil Procedure Rule 26(g), and Rule
37(c)(1).

### (a)   The Court's Inherent Authority

The plaintiffs contended that the court should impose sanctions for
litigation misconduct under its inherent authority because the defendant
acted in bad faith by hiding the identities of 42 employees, offering false
discovery responses and deposition testimony, hiding security documents,
and making baseless objections to the production of documents that it freely
produced in *Mayes*. *Id.* at 14 – 16.

Moreover, the plaintiffs contended the defendant asserted in multiple
briefs that its search for documents was complete and that it had produced
all discoverable documents, but those promises were "entirely false" as
demonstrated by *Mayes*. *Id.* at 15. The plaintiffs asserted they have been
severely prejudiced by the defendant's discovery misconduct. *Id.* at 14 – 15.
They argued that they have not been able to investigate fairly and efficiently;
that justice has been delayed; that they have been forced to file several

motions to compel; and that they haven't had access to the entirety of the "inside information" from employees needed to succeed on the merits. *Id.* at 14 – 16.

### (b)    Rule 26(g)

The plaintiffs also argued that sanctions are due under Rule 26(g) because the defendant provided, and the defense counsel certified, blatantly false discovery responses as shown by the *Mayes* production. *Id.* at 17. The plaintiffs argued the defendant's objections to basic deposition questions[74] about finances and objections to producing personnel files and profit and loss statements—which it produced in *Mayes*—support the imposition of sanctions under Rule 26(g) because the objections were interposed for an improper purpose and have prejudiced the plaintiffs and caused unnecessary delay. *Id.* at 16 – 19.

### (c)    Rule 37(c)(1)

Finally, the plaintiffs argued that the court should sanction the defendant under Rule 37(c)(1) because the defendant failed to disclose information requested pursuant to Rule 26, repeatedly misrepresented the

---

[74] In his deposition, Pete Dedvukaj felt insulted by and refused to answer questions about cash flow. *See* Dedvukaj Dep. 85:18 – 93:20 [Doc. No. 160-13].

completeness and truthfulness of its response, and failed to supplement its responses as mandated by Rule 26(e)(1)(A). *Id.* at 19 – 20.

### 8. The Court Held a Hearing on the Motion to Compel a Forensic Inspection

On August 11, 2021, the day after the plaintiffs filed their first motion for sanctions, the court held a hearing on the plaintiffs' motion to compel a forensic inspection. *See* Minute Entry for Proceedings [Doc. No. 161]. At the hearing, the plaintiffs' counsel organized the plaintiffs' arguments into three topics: what should be searched, who should perform the search, and what should be produced after the search. Forensic Inspection Hr'g Tr. at 3:7-13 [Doc. No. 218].

In regard to the first topic, the plaintiffs' counsel argued that the defendant's backup domain database,[75] Gmail accounts, and GoDaddy emails all needed to be searched. *Id.* at 4:9-15. However, to do an appropriate search, the plaintiffs' counsel contended that they needed to know what emails are

---

[75] In arguing that the domain database needed to be searched, the plaintiffs contrasted Ms. Prekelezaj's 30(b)(6) April 16, 2021 deposition testimony in this case that the defendant's emails had always been backed up on the defendant's domain database to Ms. Prekelezaj's 30(b)(6) July 23, 2021 testimony in *Mayes* that "[o]ur emails aren't backed up. We use GoDaddy as our domain provider. So, our – our emails are – they're not stored anywhere or backed up anywhere." Pls.' Forensic Inspection Hr'g Ex. A [Doc. No. 219-1].

out there, what emails have existed, and whether those accounts can now be

searched—which required an understanding of who the defendant's

employees were. *Id.* at 6:18 – 7:4. The plaintiffs then raised the issues

discussed in their previously filed briefs regarding the defendant's 42

undisclosed employees, the defendant's continued disavowal of Gmail

addresses its employees used, and the missing access to the leasing office

Gmail account.[76] *Id.* at 7:5 – 14:11.

At the hearing, the plaintiffs' counsel also expressed the plaintiffs need

to determine whether the defendant used aliases in conjunction with their

GoDaddy email accounts, describing aliases as follows:

> When someone wants to buy an e-mail account with GoDaddy,
> you actually buy a license. That license allows you to assign an
> e-mail account. So, for example, in my office where we use this
> same platform, I buy a license to have an e-mail account, and
> then I assign it to Alex Brown, I assign it to myself. Those
> licenses, those licenses can be used for multiple e-mail accounts
> and they can be renamed. So, God forbid, Alex Brown ever leaves
> my law firm and somebody else is sitting there, I can change Alex
> Brown's e-mail to that new person's e-mail account. So GoDaddy
> calls this process aliases. When you want to change the e-mail
> address tied to a license, you create an alias. For example, the
> first person that I ever hired at my firm, her name is Audrey, and
> she's now a lawyer but I had hired her as a paralegal. Audrey's

---

[76] The plaintiffs' counsel presented Ms. Prekelezaj's *Mayes* deposition
transcript in which she stated that Eastwyck had a leasing office Gmail
account inherited from the previous ownership that tenants could email
things to, but she did "not believe it was searched" and doesn't "know why it
was not searched." Pls.' Forensic Inspection Hr'g Ex. B [Doc. No. 219-2].

> e-mail in my firm has become Britney, then it became Chris and
> now it's Casey, because that one license has been renamed
> multiple times. So right now if I want to find Audrey's e-mails
> from 2015, I can go on Casey's e-mail, scroll all the way back and
> I can find Audrey's 2015 e-mails because when I create an alias
> and when you create an alias on a GoDaddy platform, all it does
> is rename the e-mail account. So when I send an e-mail, it will go
> to that same account.

*Id.* at 15:1 – 22. The plaintiffs' counsel thus explained that the plaintiffs
wanted to determine if some of the emails that the defendant claimed were
deleted might be recoverable through another employee's email account. *Id.*
at 15:23 – 17:2. The plaintiffs' counsel stated that the defendant could self-
report regarding these aliases; however, he argued that hiring a forensic
examiner to analyze the defendant's GoDaddy account to determine "what we
need to know; what are the licenses, what are the aliases, what are the
addresses, and what can be accessed and what can't" was a more reasonable
solution. *Id.* at 17:3-12. The plaintiffs' counsel also requested knowledge of
when accounts were deleted or changed so the plaintiff could accurately
evaluate issues of preservation of evidence and spoliation. *Id.* at 17:21 – 18:4.
In terms of the expert who should perform the search, the plaintiffs' counsel
requested that "literally anyone but defendant's expert should run the search,
anyone" because of concerns regarding the proposed defense expert's
neutrality. *Id.* at 18:5-16.  Finally, in terms of what should be produced, the

plaintiffs' counsel requested every non-privileged email that contained one of the parties' agreed terms, which the plaintiffs' counsel referred to as nonprivileged responsive emails. *Id.* at 18:17 – 20:4.

In response, the defense counsel contended that this could have been settled by counsel rather than motions practice, stating that:

> as soon as we received the request to do the ESI, we immediately agreed, like actually after the corporate representative's deposition we agreed to do the search. So it's all been a question about parameters and a bunch of technical information that, unfortunately, the corporate representative's depositions, the transcripts that you were provided, your Honor, Ms. Prekelezaj, she's not a technical person. This is a family company and she doesn't understand what the difference is between a domain and a backup system and GoDaddy accounts because, in reality, it's all the same thing, it's all the same thing. So we've tried to agree.

*Id.* at 21:18 – 22:3.[77]

---

[77] Later in the hearing, the plaintiffs' counsel took issue with attorney Perniciaro's characterization of the defendant, stating:

> It was said earlier this is a mom and pop shop, that this is a self-run business owned by a family, and that's true. It's a family who owns tens of millions of dollars of property in multiple states. And it's a company, the defendant is, who has an outside IT company. They have an outside IT company. I'm going to repeat that one more time. They have an outside IT company that is still employed by them. And this defendant in this case has never told us that. We learned about that today from the Gwinnett County case. The company's name is Cigna (phonetic) Systems. So this mom and pop store that's struggling to apparently find e-mails and know what accounts there are has an outside IT company

In regard to the employees disclosed in the *Mayes* case, the defense counsel alleged he "just found out about that yesterday" through the plaintiffs' motion and hadn't "had a chance to talk to [his] client about that." *Id.* at 22:9-14. He further stated that the defendant had:

> conducted a search and they have payroll records in their company headquarters in Michigan. There's a single employee who runs the HR department, and she ran a search of employees that were supposedly employed at that property. If she made some sort of technical error when she ran that search that's a problem.

*Id.* at 22:21 – 23:1. However, the defense counsel stated there was no evidence that it was intentional and that he had not had an opportunity to investigate. *Id.* at 23:3-7.

The defense counsel again requested that the defendant be allowed to use its expert, RDT, as the forensic investigator because the defendant trusted RDT to control costs. *Id.* at 23:8-18. The defense counsel further stated that the defendant was willing for the expert to search the four active GoDaddy accounts it had previously searched but that the other accounts

---

> that's never been disclosed. So I encourage the Court to consider that when we're talking about a mom and pop shop that owns hundreds of millions of dollars of real estate across this country.

*Id.* at 43:15 – 44:4. The defense counsel did not object to the plaintiffs' description of his client.

were deleted. *Id.* at 24:24 − 26:2. In regard to the leasing office Gmail account, the defense counsel agreed that it should be searched but stated that his client did not have the password and assumed that the company that purchased Eastwyck is using the account now. *Id.* at 26:3-20. He said his client wanted permission from the current Eastwyck owners before it tried to reset the Gmail password and suggested that the parties send a joint subpoena asking the new owners for access to the account.[78] *Id.* at 26:14 − 27:1.

In regard to the Gmail accounts that Eastwyck employees created and used, the defense counsel acknowledged that the defendant had produced emails containing those Gmail addresses and stated:

> Whether or not anybody ever spoke to these two employees who don't work for my client anymore, and they haven't worked for them for some time, to find out, you know, who directed them to create these accounts, whether to use them for their employment, I don't know, nobody has done that, at least not to my knowledge. And the plaintiffs haven't disclosed any information that they attempted to contact these people. I assume that they have their contact information. Maybe they haven't been able to find them yet. I haven't spoken to them. But these are not official company accounts. These were not something that these employees were directed to create. But if we had access to those as well, if we had

---

[78] The court remains perplexed as to why the defendant continued to suggest a joint subpoena rather than attempting to take the most moderate of steps to regain access to the account, such as asking the new owner if they were, in fact, using the account or ascertaining whether the account was included in the sale of Eastwyck.

access to those and we had the permission of whoever would be the owner of those accounts, no issue with searching those as well.

*Id.* at 27:6-19. When asked by the court whether the defendant had endeavored to get contact information for the former employees associated with the Gmail accounts, the defense counsel initially stated, "Yes." *Id.* at 27:25 – 28:7. However, he immediately stated,

Have we attempted to get contact information for these individuals? I think we have it now from the employee files that were recently found, at least their last known. I would be happy to pick up the phone and call these people after the hearing, your Honor. Like I said, I just found out about this, me personally, these employee files, last night, and I haven't had a chance to talk to my client.

*Id.* at 28:9-15.[79] Later in the hearing, the defense counsel stated that he thinks "that these employees decided on their own to create their own Gmail

---

[79] When probed by the court as to why his client was so late in giving him information about the additional employees, attorney Perniciaro responded that he suspected:

that they searched for the employees like I asked them to, and they found what they found. And they searched a different way recently in [*Mayes*] and they found more employees. I think that is the case. . . . All I know is that they were asked to do something and they produced the information which an employee swore was correct to the best of their knowledge at the time. It's in a verified interrogatory response. And if they misstated something intentionally, then they did, but I don't have any reason to think that they did.

accounts and start using them as part of their jobs, but they were not the leasing office account that my client was aware of." *Id.* at 41:12-15. The defense counsel recognized that Ms. Dia had received an email that included one of these Gmail accounts but stated "[w]hether or not she recalls getting that e-mail is another matter." *Id.* at 41:16-19.[80]

In regard to what should be produced, the defense counsel maintained that the defendant wanted to preserve objections it originally made to production rather than simply producing all non-privileged emails that contained search terms. *Id.* at 30:7 – 33:10. The defense counsel envisioned that the defendant "would identify any documents that we thought were not discoverable but they may not be privileged and, you know, obviously give the plaintiff an opportunity to try to explain why they think they are discoverable and maybe we can work it out." *Id.* at 31:16-21. The defense counsel stated

---

Forensic Inspection Hr'g Tr. at 28:17 – 29:9 [Doc. No. 218].

[80] The plaintiffs' counsel informed the court that they had spoken to the employees who operated the Gmail accounts as counsel for both parties had known about them for six months. Forensic Inspection Hr'g Tr. at 42:6-9 [Doc. No. 218]. The plaintiffs' counsel represented to the court that the employees said that they were instructed by their managers to create these accounts, which is why the accounts have "Eastwyck" in the name. *Id.* at 42:9-15. The defense counsel stated that "his clients may dispute that, I don't know. I haven't spoken to those people." *Id.* at 42:16-17.

135

that if the emails "don't relate to anything in the case, they're not discoverable," though—after the court responded "[w]ell, it may not be relevant but it may be discoverable"—the defense counsel conceded, "It may be." *Id.* at 32:18 – 33:6. The court thereafter noted that "it would seem . . . the defendant's side of the case . . . seem[s] to keep – to keep discovery going and embroiling all these little problems that just shouldn't occur." *Id.* at 33:7-10.

The court concluded the hearing by indicating its intention to use the defendant's chosen expert at the defendant's cost.[81] *Id.* at 39:7-12. The court warned the defense counsel of cases involving similar discovery infractions, and stated, "You need to warn your client we're going to try one more round and after that we're going to start looking at real sanctions. And the ultimate sanction is to dismiss the answer and let them proceed with damages." *Id.* at 44:7 – 45:21. The defense counsel promised the court that he would do everything he could to ensure that his client would not be before the court again on another discovery matter. *Id.* at 46:1-5.

---

[81] The defense counsel indicated at the hearing that he did not anticipate that the forensic inspection would take longer than a week. Forensic Inspection Hr'g Tr. at 38:17 – 39:5 [Doc. No. 218]. The court cautioned the defense counsel that the expert would likely need more than a week to do the examination the court had in mind. *Id.* at 40:3-6.

### 9. The Court Compelled a Forensic Inspection

On August 13, 2021 the court resolved the points of contention set forth in the parties proposed protocol for a forensic inspection as follows:

(1) The defendant should bear the costs of the forensic inspection, using its vendor of choice: Relevant Data Technologies.

(2) The forensic inspector should identify all GoDaddy/Microsoft 365 accounts, emails, and aliases used by the defendant while it owned Eastwyck and then identify which accounts, emails and aliases were used by employees to conduct business related to Eastwyck. To assist the forensic inspector in this process, the parties were directed to provide opposing counsel and the forensic inspector with a list of all known or suspected employees during this time frame. If employees identified by either party do/did not have accounts, the defendant was instructed to state under oath that no such accounts exist and explain why.

(3) The forensic inspector should identify all Gmail accounts the defendant used while it owned Eastwyck, including but not limited to eastwyckvillages@gmail.com, britknie.eastwyck@gmail.com, and Jennifer.eastwyck@gmail.com. To assist the forensic inspector, the defendant was directed to provide the plaintiffs and the forensic inspector with a list of all the Gmail accounts the defendant used while it operated Eastwyck. The

137

forensic inspector was directed to access and export all data from those Gmail accounts.

(4) If the forensic inspector could not access any account (GoDaddy, Gmail, etc.) from a technical perspective, the forensic inspector should explain why.

(5) If the defendant could not provide the forensic inspector with access to an implicated account after reasonable diligence and effort, the defendant was required to state under oath what efforts it took to determine whether it has access to the account, what steps it took to obtain/regain access to the account, the identity of any of defendant's employees who had access to the account, and why it ultimately could not provide access to the forensic inspector.

(6) The forensic inspector should provide the defendant with all data, including emails and attachments, in their native format, in a rolling production, and the defendant should review each document for responsiveness and privilege.

(7) No later than 14 days following the conclusion of his inspection, the forensic inspector should submit a report for the court summarizing his/her process, findings, obstacles encountered, and any other relevant information.

(8) Within 30 days of receiving the data from the forensic inspector, the defendant should produce **all** responsive, non-privileged documents (including emails previously produced) in their native format, along with a privilege log for any privileged documents. The parties were instructed to cooperate regarding any extension needed if the amount of data could not reasonably be reviewed prior to the agreed upon deadline. Aug. 13, 2021 Order [Doc. No. 162].

The court reiterated that this inspection should involve a rolling production, and the deadline for the conclusion of the forensic inspection was November 15, 2021. *Id.* at 4. No later than December 31, 2021, the court directed the parties to confer and submit to an update and proposed timeline for the completion of discovery in this matter. *Id.*

### 10. The Defendant Responded to the Motion for Sanctions

On August 24, 2021, the defendant responded to the plaintiffs' first motion for sanctions with two main ideas [Doc. No. 167]. First, the defendant argued that that the plaintiffs' requested issue preclusion sanction was equivalent to a default judgment and was not proportionate to the alleged

discovery infractions.[82] *Id.* at 1. Second, the defendant contended that its "poor record keeping should not result in a penalty of civil liability for failing to keep organized records." *Id.*

The defendant responded to the plaintiffs' specific arguments as follows:

### a)   The Defendant's Failure to Disclose 42 Employees

The defendant argued that it conducted a good faith search for its employee files and did not intentionally conceal anything. *Id.* at 3 – 4. Rather than focusing on its own responsibility for failing to disclose these employees or its erroneous discovery responses, the defendant (incredibly) implied that the plaintiffs' counsel contributed to its mistakes. The defendant argued that the plaintiffs' counsel embarked on a discovery strategy "intended to harass and overwhelm [the] [d]efendant," including serving many written discovery requests, noticing multiple depositions, filing motions to quash subpoenas for the decedent's medical records and cellphone communications, filing a motion to add a party/remand, "all of which required extensive time and effort to

---

[82] In arguing that the defendant's discovery omissions were reasonable and excusable, the defendant pointed to portions of plaintiff Mildred Collins-Williams' deposition that differed from some of her interrogatory responses. Def.'s Resp. in Opp'n to Pls.' Mot. for Sanctions at 5 – 6 [Doc. No. 167].

respond." *Id.* at 4 – 5; 11 – 12. Notably, the defendant failed to acknowledge that its incomplete and inaccurate discovery responses played a role in the overwhelming discovery to which it claims the plaintiffs subjected it. Moreover, the defendant failed to call attention to the fact that the plaintiffs' motion to amend and remand [Doc. No. 51], which was based on the defendant's misrepresentation that Mr. Payne was working at the time of Ms. Frazier's death, was withdrawn [Doc. No. 62] before the defendant responded. In addition, the defendant failed to acknowledge that the court stayed the discovery deadlines in this matter [Doc. No. 87] while the parties resolved the issues raised in the plaintiffs' motions to quash the defendant's subpoenas to T-Mobile and Ms. Frazier's medical providers [Doc. Nos. 82 and 83], negating the need for a response from the defendant. Finally, the defendant neglected to remind the court that the court found merit in the plaintiffs' arguments regarding an unrestricted search of Ms. Frazier's cell phone, causing the court to grant a protective order regarding the same [Doc. No. 129].

The defendant's 30(b)(6) witness, Ms. Prekelezaj, stated in declaration that the defendant "did not intentionally withhold the names of any former employees when providing the initial list." Second Decl. of Nora Prekelezaj ("Second Prekelezaj Decl.") ¶ 8 [Doc. No. 167-1]. She stated that, in the instant action, she asked human resources employee Savanna Leonard to

141

assist her in preparing the employee list. *Id.* ¶ 4. Despite the defendant's

argument that gathering the defendant's information "requires combining

the knowledge of multiple persons and documents" [Doc. No. 167 at 3] and

Ms. Prekelezaj's previous deposition testimony that **she and Ms. Leonard**

looked through **payroll records and employee files**,[83] Ms. Prekelezaj

---

[83] Ms. Prekelezaj testified as follows in her deposition:

> Q    . . . Let's move on to area of inquiry number 3. . . . Identification of all persons employed by Contour Eastwyck, LLC from its inception until the sale of the property in February of 2021. And it lists what this should include.
>
> Tell me, what – what have you done to prepare yourself to provide all of the information known or reasonably available to Contour Eastwyck with respect to matter of examination number 3.
>
> **A    I gathered information with our HR admin and asked her to go through payroll records and any employee files and get the information on—that is requested, so their employment dates, reasons for termination, anything like that.**
>
> Q    Okay. And who is the HR person?
>
> **A    Her name is Savanna Leonard.**
>
> .    .    .
>
> Q    What documents did you review with Savanna?
>
> **A    Payroll records and employee files.**

142

stated in her Second Declaration that **Leonard alone** searched **a drop box repository of employee files** and **physical employee files** contained at the defendant's office in Bloomfield Hills, Michigan. Second Prekelezaj Decl. ¶ 4. Moreover, despite the fact that she testified in deposition that she spent a couple of hours pulling up the payroll records for Intuit,[84] Ms. Prekelezaj stated in her Second Declaration that she incorrectly **assumed** in her deposition that **Ms. Leonard** had searched payroll records in addition to employee files. *Id.* ¶ 7. She stated that Ms. Leonard helped her again when she was gathering employee files for the defense counsel in the *Mayes* case in addition to an accountant who reviewed W-2 information. *Id.* ¶¶ 10-11. She

---

Prekelezaj Dep. at 28:3-24; 29:25-30:1 [Doc. No. 128-1].

[84] Ms. Prekelezaj testified:

Q   And how long did it take you to pull up the payroll records for Contour Eastwyck, LLC?

**A   A couple hours. You just log in and they're there, so –**

Q   Okay. You can filter by –

**A   You search for them.**

Prekelezaj Dep. at 30:25 – 31:5 [Doc. No. 128-1].

stated that the defendant "discovered a box of employee files that was not found the first time" and that "was not labeled for the Eastwyck Village property." *Id.* ¶ 12. She stated that she provided these new employee files to the *Mayes* defense counsel on August 4, 2021 "but forgot to notify the defense counsel in this case."[85] *Id.* ¶ 14.

The defendant argued that if it was truly trying to hide the additional employees, it would not have produced them in *Mayes* because it knew that the plaintiffs' counsel was actively monitoring the *Mayes* litigation.[86] Def.'s Resp. in Opp'n to the Pls.' Mot. for Sanctions at 7 [Doc. No. 167]. In addition, the defendant (somewhat shockingly) contended that "only twenty-five of the forty-two [undisclosed] employees were employed before the subject occurrence;" therefore, the "[p]laintiffs inflate the number of *relevant* former employees that were undisclosed." *Id.* at 7.

---

[85] She further asserted that the reason defense counsel in this case was not aware of the additional employees "is because I did not provide the additional employee files or names recently located for the *Mayes* case." Second Prekelezaj Decl. ¶ 14 [Doc. No. 167-1].

[86] Despite this assertion, it appears that the defense attorneys in this matter were not actively monitoring the *Mayes* case or probing their client about the alleged discrepancies in its responses between the two cases.

### b) The Defendant's Failure to Properly Identify the Property Manager on the Date of the Shooting

In response to the plaintiffs' claim that the defendant failed to identify the property manager on the date of the shooting, the defendant contended—in remarkable disregard for the fact that Ms. Rhodes was not an employee of the company at the time—that "[p]laintiffs have had the identity and employment dates for the property manager at all relevant times, Marshal Rhodes, along with her assistant as of April 6, 2019, Dian Pauleon." *Id.* at 8. In addition, the defendant contended that Ms. Prekelezaj's testimony that Bradley Payne and Dian Pauleon were assistants to the property manager versus actual property managers "is inconsequential and not proven to be untrue."[87] *Id.* at 9.

---

[87] Citing to Antoinette Narcisse's offer letter [Doc. No. 167-6], the defendant argued that "[t]here is an inconsistency whether Antoinette [sic] Narcisse was a manager because her employee file reflects she was hired as a 'Leasing Agent', but others identified her as a manager." Def.'s Resp. in Opp'n to Pls.' Mot. for Sanctions at 8 [Doc. No. 167]. The court is perplexed by this argument as it is common knowledge that many employees are hired in one position and then internally promoted thereafter. Nevertheless, the defendant again relied upon Ms. Narcisse's offer letter as the sole support for its blanket statement that "[a]t least some other employees worked in a capacity that differed from their title on paper." *Id.* at 9.

### c) The Defendant's Failure to Produce Security Logs

Although the defendant's employees' contradictory deposition testimonies reflects that the defendant did not know where it kept its security logs, the defendant nonetheless argued that it diligently searched the area where security logs were stored at the property's leasing office.[88] *Id.* at 9 – 10. Without citation, the defendant argued that the security logs "were produced to [p]laintiffs thinking all were found." *Id.* at 11 [Doc. No. 167]. And, citing to the declaration of attorney Perniciaro [Doc. No. 167-2], the defendant further

---

[88] Security guard Thurman testified that he turned in his daily logs to the property manager at the office at the end of each day, where they were put in security logbooks. Thurman Dep. at 39:20 – 40:12 [Doc. No. 166-1]. Similarly, he testified that incident reports were stored with the manager at the office. *Id.* at 41:13-17. Ms. Dia testified that daily security reports were "stored on site in their – a place that a manager would designate just for that," but she did not know if they were ever scanned or uploaded into the computers at the property. Dia Dep. 54:9-20 [Doc. No. 127-1]. Ms. Prekelezaj, testifying on behalf of the defendant, stated that the security personnel kept security logs and were "not supposed to throw anything out or destroy anything." Prekelezaj Dep. 111:5-13 [Doc. No. 128-1]. She further testified that she was not aware of security logs being filed in the office or scanned. *Id.* at 111:14-18. She testified that the defendant searched for these security logs by making a request to "Marshal Rhodes or the property manager to get those from security personnel." *Id.* at 113:3-8. She stated that incident reports were stored in a locked file cabinet, were not to be thrown out or destroyed, and were in the possession of the new owner of Eastwyck. *Id.* at 113:13 – 114:16. She testified that when the defendant sold the property, it did not take any steps that she is aware of to copy or keep the documents that were on site. *Id.* at 114:17-22.

146

argued that "[n]one were withheld."[89] *Id.*  Moreover, the defendant argued that the documents the plaintiffs claimed it withheld were technically time sheets, not security logs, even though the defendant admitted that "they demonstrate a security guard doing his job as he was trained while not encountering violence on the property." *Id.* at 10.

### d)    The Defendant's Failure to Disclose *Mayes* and Produce Documents It Produced in *Mayes*

In its response brief, the defendant did not address Ms. Dia's failure to identify the shooting addressed in the *Mayes* case. It did, however, seek to excuse its failure to produce the documents produced in *Mayes*, stating:

> It makes no difference what another outside defense firm's discovery strategy is in the *Mayes* case. A document or information request is either within the scope of discovery or it is not. Its [sic] either overbroad and unduly burdensome or its [sic] not.

*Id.* at 11. Without acknowledging the obvious—that it is nonsensical to argue that it is too burdensome to produce documents it willingly produced in another litigation—the defendant argued that the plaintiffs' discovery "was extremely overbroad and irrelevant" and that "[i]t could take an enormous

---

[89] Attorney Perniciaro's declaration merely states that neither he nor attorney Moffett, "withheld the identities of former employees of Contour Eastwyck LLC or security logs from Plaintiffs." Perniciaro Decl. ¶ 4 [Doc. No. 167-2].

amount of time and money if Defendant were to waive all objections and produce all the documents requested." *Id.* at 11 – 12. It further stated in a footnote that the defense counsel in the *Mayes* case have now signed a copy of the confidentiality agreement regarding the DKPD's investigation of Ms. Frazier's death. *Id.* at 12 n.7. Finally, it argued that the plaintiffs never challenged the defendant's objections to their overbroad discovery requests for employee files or profit and loss information. *Id.* at 17 – 18. The defendant contended that the defendant's profit and loss information and the information contained in the employee files is largely irrelevant to the underlying action. *Id.* at 18.

### e) The Defendant's Response to the Plaintiffs' Proposed Sanctions

#### (1) The Court's Inherent Authority

The defendant contended that default judgment is not warranted under the court's inherent powers, which must be exercised with restraint and discretion. *Id.* at 15. The defendant argued that, rather than striking defenses, the court should reopen discovery to allow the plaintiffs to depose witnesses and re-depose the defendant's representatives.[90] *Id.* The defendant

---

[90] The defendant offered to pay the court reporter costs associated with re-deposing its representatives. Def.'s Resp. in Opp'n to Pls.' First Mot. for Sanctions at 15 [Doc. No. 167].

argued that this would remedy the plaintiffs' prior lack of knowledge of these former employees. *Id*.

### (2)   Rule 26(g) Sanctions

The defendant argued that Federal Rule of Civil Procedure 26(g) sanctions for improper certifications of discovery responses and disclosures are not warranted because the defense counsel was not aware of the undisclosed employees and the defendant's representative testified that the list was complete after performing a reasonable search. *Id*. at 16. The defendant argued that Jori Jones and Ashelynn Burt-Jones "could not be located through Defendant's first search so it could not confirm they were employees." *Id*. The defendant—or, more appropriately, the defense counsel—contended that the "personnel files were located in Michigan and were not accessible to counsel . . . [so] its reliance on testimony and representatives of Defendnat [sic] as to its search constitutes a reasonable inquiry under Rule 26(g)." *Id*. Notably, the defendant did not cite any authority in support of this argument.

### (3)   Rule 37(c) Sanctions

The defendant also argued that sanctions under Rule 37(c) are not warranted "[s]ubject to reopening discovery and if needed, re-deposing Defendant's representatives, and it paying for the court reporter costs." *Id*.

149

The defendant further argued that the six-day gap between when the defendant produced the information to counsel in *Mayes* and the plaintiffs filed the first motion for sanctions did not give the defendant time to supplement in this case.[91] *Id.* at 16 – 17. Although the defendant recognized that it "forgot" it needed supplement its interrogatory responses in this case, it contended that "[m]aybe Prekelezaj would have remembered and told the defense counsel before Plaintiffs ran out and file [sic] this Motion." *Id.* at 17. It further contended that her intention was not to deceive or conceal since the information was disclosed in *Mayes*. *Id.* at 17.

The defendant concluded its argument by asserting that its neglect is excusable and can be remedied. *Id.* at 19. It asked the court to reopen

---

[91] In support of this argument, the defendant cited to *Ares-Perez v. Caribe Physicians Plaza Corp.*, 261 F. Supp. 3d 265 (D.P.R. 2017) for the proposition that producing a document that the party previously denied existing 40 days after learning of its existence was compliant with the duty to timely correct an interrogatory answer. Def.'s Resp. in Opp'n to Pls.' Mot. for Sanctions at 17 [Doc. No. 167]. That case is neither controlling nor applicable. In *Ares-Perez*, the plaintiff learned of the missing document at a deposition taken within the discovery period and produced it "after a long and arduous search" the next month, 20 days before the discovery period ended. *Ares-Perez*, 261 F. Supp. 3d at 268. This case involves the discovery of documents and information the defendant produced in another litigation by the extremely vigilant plaintiffs' attorney after a protracted discovery in which the defendant repeatedly (in written discovery and depositions) disavowed their existence.

discovery for the plaintiffs to depose the former employees they want to depose and re-depose the defendant's representatives if necessary. *Id.*

### 11. The Plaintiffs Replied Regarding their Motion for Sanctions

Three days after the defendant filed its response brief, the plaintiffs replied, arguing that the defendant made more false statements in its response brief. Pls.' Reply re: Pls.' First Mot. for Sanctions at 2 – 3 [Doc. No. 169]. Specifically, the plaintiffs pointed to the discrepancies between Ms. Prekelezaj's deposition testimony and her Second Declaration filed in support of the defendant's response brief as set forth above. *See supra* Section II.C.10.a). The plaintiffs contended that regardless of whether Ms. Prekelezaj reviewed payroll records with Ms. Leonard or whether she wrongly assumed Ms. Leonard searched them, she perjured herself. *Id.* at 5. Moreover, the plaintiffs pointed out that if Ms. Prekelezaj reviewed all of the payroll records with Ms. Leonard as she stated in her deposition, she wrongly withheld the names of 42 employees, and if she did not review the payroll records, then she failed to conduct a good faith search for information. *Id.* Moreover, the plaintiffs contended that the discrepancy in Ms. Prekelezaj's testimony should have alerted the defense counsel that something was not right. *Id.* at 5 – 6.

The plaintiffs maintained that sanctions are warranted. *Id.* at 7 – 10. In regard to Rule 26(g) sanctions, the plaintiffs contended that "[i]t defies logic that the defense counsel could truly believe he 'was not aware of other undisclosed employees' when Plaintiffs' [sic] were sending discovery requests about specific employees, such as Jori Jones and Ashelynn Burke-Jones, *directly to him*." *Id.* at 8. The plaintiffs further argued that the fact that the defendant's personnel files were at the defendant's headquarters in Michigan does not excuse their attorney from conducting a good faith search. *Id.* Furthermore, the plaintiffs contended that payroll records, which have always been the most reliable indicator of who a company employed, were clearly available to the defendant at all times. *Id.* The plaintiffs further argued that the defendant's proposed resolution of re-opening discovery and allowing the plaintiffs to depose new witnesses and re-depose others is insufficient because it does not cure the real problem: that "Defendant and its counsel [are] willing to say anything without the slightest regard for its truthfulness, so long as it suits their needs and helps them escape responsibility." *Id.* at 9. The plaintiffs argued that if they had taken the defendant at its word, only a few emails would have been produced and the defendant would have successfully withheld 42 employees throughout the entire litigation. *Id.* at 9.

### 12. The Plaintiffs Discovered Charles Cooper

On October 14, 2021, the defendant served its second requests for admission ("RFA") on the plaintiffs, which asked about statements made to the police by the occupants of the apartment where Ms. Frazier was killed. Charles Cooper Timeline at 7 [Doc. No. 186-1]. To answer the RFAs, the plaintiffs' counsel rewatched hours of police body camera footage and noticed a blue Pontiac Firebird. *Id.* The plaintiffs' counsel thereafter discovered the Firebird was owned by Anthony Cooper who lived at 404 Eastwyck Circle. *Id.* The plaintiffs' counsel found and contacted Tony Cooper, who informed counsel that his brother, Charles, used the Firebird. *Id.* When the plaintiffs' counsel called Charles Cooper, he said "other attorneys had been calling him, he did not want to talk, and hung up." *Id.*

The plaintiffs "immediately served Defendant with 9th Requests for Production of Documents seeking statements and communications with the Cooper bothers and tenants of that apartment." *Id.* On November 18, 2021, the defendant admitted that it had a recorded statement dated June 1, 2020 from Charles Cooper and a report dated July 17, 2020 about him from an investigator they hired, but the defendant did not expound on his connection to the case. *Id.*; *see also* Def.'s Resp. to Ninth Req. for Produc. ¶ 73 [Doc. No. 185-8]. The plaintiffs asked the defense counsel to provide more identifying

153

information about Charles Cooper: "who he was[;] . . . what he knew about the incident;" and to whom he made the recorded statement identified in the defendant's response to the plaintiffs' ninth request for production of documents. Charles Cooper Timeline at 8 [Doc. No. 186-1]; Nov. 22 – 23 email between opposing counsel at 1 [Doc. No. 185-15]. The defendant directed the plaintiffs to previously disclosed documents in the DKPD file that did not reference Charles Cooper and stated that "[t]he statement was made to an investigator that is the defendant's consulting expert not subject to identification under Rule 26." Nov. 22 – 23 email between opposing counsel [Doc. No. 185-15 at 1]. A week later, the defendant served an amended response to the plaintiffs' first interrogatories in which it listed Charles Cooper as a person "having knowledge regarding the facts or circumstances surrounding the Incident or any element of damages in the case," as follows:

> Charles Cooper, (678) 939-9008. Cooper was a resident at 404 Eastwyck Circle on the date of the time. Cooper heard a shot while he was inside his unit the morning of April 6, 2019. He did not observe anything.

Def.'s Third Suppl. Resp. and Objs. to Pls.' First Interrogs. [Doc. No. 185-16 at 4]. On December 3, 2021, the defendant produced the June 1, 2020 recorded statement from Charles Cooper "only after [p]laintiffs supplied [d]efense counsel with authority showing that a party waives work product

privilege by failing to disclose the existence of privileged documents." Charles Cooper Timeline at 8 [Doc. No. 186-1]. The defendant did not produce its investigator's report about Mr. Cooper. *Id.*

### 13. The Parties Updated the Court on the Forensic Inspection

#### a) The Plaintiffs Updated the Court and Requested Clarification

On November 8, 2021, the plaintiffs filed a status report and request for clarification regarding the August 13 order [Doc. No. 177]. In the status report, the plaintiffs revealed that, at that point, the defendant had produced only 27 documents and had collected data from only four accounts: Ms. Rhodes, Mr. Dedvukaj, Ms. Prekelezaj, and Ms. Dia. *Id.* at 1 – 3. According to the plaintiffs, the defendant approached the plaintiffs after running an initial search of these four accounts and claimed that the number of hits was unreasonable. *Id.* at 1. The plaintiffs voluntarily agreed to limit certain search terms to narrow the search and production, and the plaintiffs believed at the time of the filing that the total number of responsive documents was approximately 33,970. *Id.* at 2. The plaintiffs reported that as of October 28, the defendant had reviewed 7,080 of these documents but was not ready to produce them. *Id.* Some of the delay seemed to stem from the defendant's

privacy concerns and desire for a protective order, which the plaintiffs represented the parties were working toward. *Id.* However, the plaintiffs were concerned about the lack of production as they surmised that not all of the roughly 7,000 unproduced documents that the defendant had reviewed could require the safeguards of a protective order. *Id.* at 3. Moreover, the plaintiffs were concerned because the parties appeared to have differing definitions of responsiveness. *Id.* The plaintiffs' position was that all emails containing one or more of the search terms were responsive; the defendant's position was that emails that were "hits" must be reviewed for responsiveness and that it was only required to produce emails that it believed were related to "prior complaints of crime" and "security measures." *Id.* at 4. The plaintiffs were concerned that allowing the defendant to exercise such discretion, given the history of the case, would result in on-going uncertainty for the plaintiffs regarding whether important emails had been improperly withheld. *Id.* at 5 – 6. The plaintiffs asserted that they were "more than happy to review countless documents that turn out to be not relevant, rather than risk the chance that it [sic] does not receive important information, which has been the unfortunate pattern in this case." *Id.* at 6.

#### b) The Defendant Responded to the Plaintiffs' Update

Two days later, the defendant responded to the plaintiffs' status report. Def.'s Resp. to Pls.' Status Rpt. [Doc. No. 179]. In this filing, the defendant represented that the initial email search flagged over 125 GB of data, which was much more than the defendant anticipated. *Id.* at $1-2$. The defendant narrowed the date range of the emails to be searched from October 1, 2017 through April 30, 2019, and the examiner reported that this resulted in roughly 165,000 total documents. *Id.* at 2. The parties agreed to modify the search terms, which resulted in between 33,970 and 44,000 documents.[92] *Id.* The defendant reported that to date, 29 days after receipt of the data, the defense counsel had reviewed 9,339 documents for responsiveness and privilege. *Id.* at 3. It further asserted that it had produced 223 non-sensitive documents at the time of filing and had another 128 documents ready to produce subject to a confidentiality order the parties were developing. *Id.* The defendant was strongly against producing all emails that contained the search terms, believing that many were completely irrelevant and would provide the plaintiffs' counsel with "as much sensitive information about

---

[92] The wide range in the final tally of documents reflected an apparent disagreement among the parties [Doc. No. 179 at 2].

Contour Development Group as possible to leverage to Plaintiffs' advantage in this case and other claims Plaintiffs' counsel has lodged against other properties." *Id.* at 3 – 7. Therefore, the defendant requested that it "be allowed to continue to search for documents related to Plaintiffs' initially targeted subjects: crimes occurring on the premises or security measures on the Premises." *Id.* at 7. The defendant represented that it intended to supplement its prior responses to the plaintiffs' Rule 34 requests with documents located through the forensic examination and provide a privilege log for "responsive" documents. *Id.* Notably, the defendant did not reiterate attorney Perniciaro's representation at the forensic inspection hearing that it "would identify any documents that we [think are] not discoverable but they may not be privileged and, you know, obviously give the plaintiff an opportunity to try to explain why they think they are discoverable and maybe we can work it out." Forensic Inspection Hr'g Tr. at 31:16-21 [Doc. No. 218].

### 14.     The Plaintiffs Filed a Second Motion for Sanctions

On December 21, 2021, the plaintiffs filed their Second Motion for Sanctions based on "continued and pervasive misconduct by Contour and its counsel, despite warning from this Court that any further misconduct would result in significant sanctions." Pls.' Second Mot. for Sanctions at 1 [Doc. No. 185]. In their brief, the plaintiffs requested that the court (1) strike the

defendant's answer and (2) pay the plaintiffs' attorneys fees and costs for the 1.5 years of litigation for violations of Rule 26(g), 37(b), 37(c), and 37(e). *See generally id.*

### a)   The Plaintiffs' Specific Arguments for Sanctions

#### (1)   The Defendant Wrongly Identified Ms. Rhodes as the Property Manager and Failed to Disclose or Search her Email

As noted above, the defendant previously stated before the court in its response to the plaintiffs' motion to compel ESI that it had searched Ms. Rhodes' email and that it was "the best source of the information Plaintiffs are seeking because Ms. Rhodes oversaw the daily operations of the property, maintenance calls, and leasing activity from the time Contour purchased the property until the subject incident." *See supra* Section II.C.5.f)(4). In addition, as noted above, the defendant confidently responded to the plaintiffs' motion for sanctions that the "[p]laintiffs have had the identity and employment dates for the property manager at all relevant times, Marshal Rhodes, along with her assistant as of April 6, 2019, Dian Pauleon." *See supra* Section II.C.10.b).

In their second motion for sanctions, the plaintiffs argued that they learned from Ms. Rhodes' deposition in *Mayes* that Ms. Rhodes left Contour

in late 2018 and did not return until January 2020, so she was not employed

by the defendant and did not work at Eastwyck when the incident occurred.

Pls.' Second Mot. for Sanctions at 9 [Doc. No. 185]. Moreover, the plaintiffs

learned that the email account Ms. Rhodes used before the incident occurred

(marshal@contourdevelopmentgroup.com), which would have the

information most relevant to the case at hand, was different from the email

address Ms. Rhodes used after she returned to the defendant's employment

eight months after the shooting (mrhodes@contourcompanies.com). *Id.* at 9

– 10 (citing Rhodes *Mayes* Dep. 80:6-19 [Doc. No. 185-18]). The plaintiffs

argued that the search of Ms. Rhodes' more recent email address was

nothing more than a diversion and further pointed out that the defendant

had neither disclosed nor searched Ms. Rhodes' pre-incident email address.

*Id.*

### (2)    The Defendant Spoliated Emails

The plaintiffs contended that the defendant deleted and knowingly

relinquished access to and control of vital email accounts, including the

following:

### (a)    The Defendant's Gmail Accounts

The plaintiffs argued that the defendant "intentionally gave up control

and lost access to the property's primary leasing office email account,

eastwyckvillages@gmail.com" during discovery. Pls.' Second Mot. for Sanctions at 1 [Doc. No. 185]. The plaintiffs asserted that the defendant used this account as the Eastwyck leasing office's primary account until February 2021, when it sold the property. *Id.* at 2 (citing to Eastwyck Village letterhead on a letter dated March 30, 2019 [Doc. No. 185-1]). Despite the email address's public prominence, the plaintiffs contended that the defendant pretended not to know about it, failed to search it, and—according to Ms. Prekelezaj's assertions in her Third Declaration—permanently lost access to the account when it sold the property, including the computers on which the passwords were saved, in February 2021. *Id.* (citing Third Prekelezaj Decl. [Doc. No. 185-2 ¶ 6]). In addition, the plaintiffs contended that Ms. Prekelezaj's Third Declaration confirms that the defendant made little effort to recover the Gmail accounts britknie.eastwyck@gmail.com and Jennifer.eastwyck@gmail.com and has apparently lost access to both, despite the fact that it used both accounts after the incident. *Id.*

### (b)   Ms. Pauleon's Email Account

Despite the defendant's earlier representations about who managed the property at the time of the incident, the plaintiffs argued that the defendant's personnel files and emails show that Dian Pauleon was the property manager at that time. *Id.* at 3. Ms. Pauleon was terminated on May

31, 2019, almost two months after the incident; however, Ms. Prekelezaj asserted in her Third Declaration that Ms. Pauleon's account "is believed to have been removed following her termination and can no longer be accessed after 30 days." *Id.* (citing Third Prekelezaj Decl. ¶ 3 [Doc. No. 185-2]). The plaintiffs argued that *if* the account was deleted after Ms. Pauleon was terminated, it was deleted after the defendant was represented by counsel and after the plaintiffs sent a preservation of evidence letter.[93] *Id.* The plaintiffs further contended that although the defendant claimed such email accounts were "customarily deleted," Ms. Prekelezaj's Third Declaration demonstrates that such deletions were manual and affirmative and that some did not occur until almost two years following an employee's termination. *Id.* at 3.

### (3)   The Defendant Spoliated/Hid Security Logs

The plaintiffs also contended that the defendant spoliated or hid the May 2019 security logs, which the plaintiffs requested to find out what

---

[93] The plaintiffs took issue with the language used by the defendant and argued that, in the absence of documentary evidence that it was truly deleted or that the forensic examiner could not regain access, the defendant had not provided definitive answers about whether Ms. Pauleon's account still exists or details about its deletion. Pls.' Second Mot. for Sanctions at 3 [Doc. No. 185].

security guards learned after Ms. Frazier's death and what changes, if any, the defendant made to its security logs. *Id.* at 4. In support of its argument, the plaintiffs pointed to two identical security logs with 28 days' worth of entries: one labeled February 2019 and one labeled May 2019. *Id.* at 4 (citing Doc. Nos. 185-4 and 185-5). The plaintiffs contended that either the defendant "tried to pass off the February 2019 logs as the May 2019 logs to hide the real May 2019 logs or it destroyed the May 2019 logs and cannot produce them." *Id.* at 4.

### (4)    The Defendant Hid an Eyewitness

The plaintiffs further contended that the defendant hid the existence and identity of Charles Cooper, whom the plaintiffs believe to be an eyewitness to the shooting. *Id.* at 5. The plaintiffs argued that the defendant and the defense counsel "intentionally hid the fact that [they] knew about Charles Cooper and his knowledge of the shooting for the entirety of this litigation and only came clean when they were caught red-handed." *Id.* The plaintiffs argued that the defendant and the defense counsel acted together and deliberately to subvert justice and prejudice Plaintiffs." *Id.* at 6. The plaintiffs contended that the defendant "pushed a false narrative about there being no eyewitnesses to Plaintiffs," even moving for summary judgment "on

the grounds that Plaintiffs could not prove how the shooting happened because there were no eyewitnesses." *Id.* at 5 – 6.

### (5)   The Defendant and the Defense Counsel Falsely Claimed that Wendal Johnson Did Not Work for the Defendant

The plaintiffs stated they first learned about Wendal Johnson from police reports, where they learned he was a security guard at Eastwyck and, while on duty, shot a man there. *Id.* at 6. They obtained an affidavit from Mr. Johnson in which he stated he worked at the property and included it and the police reports that mention him in a 2019 pre-suit demand. *Id.* However, in attorney Perniciaro's December 2019 response to the plaintiffs' demand letter, attorney Perniciaro stated that the defendant did not have any employment records for Mr. Johnson. *Id.* Therefore, he asked the *plaintiffs* to "clarify whether Mr. Johnson was an employee of Contour and provide any evidence you have support [sic] the same." *Id.* at 6 – 7.

The plaintiffs then detailed how, throughout this litigation, the defendant denied[94] (or refused to confirm)[95] that Mr. Johnson was an employee, even after the plaintiffs deposed Mr. Johnson and he testified he worked for the defendant and chronicled his employment there and interactions with co-workers. *Id.* at 7. Finally, in her Third Declaration, Ms. Prekelezaj recognized Wendal Johnson as an individual that appeared on

---

[94] In the 30(b)(6) deposition, Ms. Prekelezaj testified on behalf of the defendant as follows:

> Q      (After naming Keith Thurman and Ronald Eskridge) And so those are the only two – so are those the only two security employees that ever worked at Eastwyck?
>
> **A      Correct.**
>
> Q      Did Eastwyck ever employ anyone named Wendal Johnson?
>
> **A      No.**
>
> Q      Do you know who Wendal Johnson is?
>
> **A      I have no idea.**

Prekelezaj Dep. 90:15-23 [Doc. No. 128-1].

[95] On December 7, 2020, the defendant responded to a RFA asking it to "[a]dmit that at some point in time Contour employed Wendal Johnson" by stating, "Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request." Def.'s Resps. and Objs. to Pls.' Second RFAs ¶ 18 [Doc. No. 185-12].

payroll lists but was not issued a W-2 pay statement. Third Prekelezaj Decl. at 15 – 16 ¶ 5 [Doc. No. 185-2]. The plaintiffs contended that this makes Mr. Johnson the 43rd employee that the defendant attempted to hide from the plaintiffs, and that there is no reasonable explanation for why it claimed for two years that Mr. Johnson did not work at the property when it was obvious that he did. Pls.' Second Mot. for Sanctions at 7 [Doc. No. 185].[96]

### (6)   The Defendant Consistently Made False Statements

In addition to Ms. Prekelezaj's allegedly false/contradictory statements detailed in the first motion for sanctions, the plaintiffs contended that the defendant's Vice President Latasha Dia made many false statements in defense of this lawsuit and the *Mayes* lawsuit. *Id.* at 10 – 11. In support of this argument, the plaintiffs pointed the court to Ms. Dia's April 22, 2021 deposition testimony regarding her knowledge of crime at Eastwyck, as follows:

Q  Did you feel it was dangerous [at Eastwyck]?

**A  I had no knowledge of danger or crime.**

---

[96] In their brief, the plaintiffs also pointed out that the defendant admitted there were two other employees, Kristy Williams and Vera Payne, that it previously failed to disclose, bringing the total number of employees the defendant hid and its counsel failed to find and disclose to 45. Pls.' Second Mot. for Sanctions at 7 – 8 [Doc. No. 185].

> Q  Okay. So when you first got involved, you know, when you first got assigned to the Eastwyck property, you had no knowledge of any danger or crime, you're saying; is that correct?
>
> **A  Correct.**

*Id.* at 10 (citing Dia Dep. at 74:21 - 75:4 [Doc. No. 127-1]). In addition, the plaintiffs pointed to Ms. Dia's deposition testimony that no staff members ever told her there was a problem with crime at Eastwyck or asked for additional security, and that Eastwyck could have had as many security officers as the property managers requested:

> Q  Did anyone on a staff – or I guess at property level ever tell you that, hey, there's a problem with crime here, we need to do something about it?
>
> **A  Do something about crime?**
>
> Q  Yeah.
>
> **A  No.**
>
> Q  Did anyone ever ask you for additional security?
>
> **A  Courtesy officers?**
>
> Q  Yes, courtesy officers.
>
> **A  Not to my knowledge.**

*Id.* at 10 (citing Dia Dep. at 86:13-24 [Doc. No. 127-1]).

167

Q  Did y'all have any discussions about getting any additional courtesy officers as a result of the gunshots on the property?

**A  No, not as a result of the gunshots.**

Q  Did y'all have a discussion about getting additional courtesy offices as a result of any criminal activity occurring on the property?

**A  No, not that I'm aware of.**

*Id.* at 10 – 11 (citing Dia *Mayes* Dep. at 95:9-16 [Doc. No. 185-19]).

Q  Did y'all have more than two courtesy officers at a time in 2018?

**A  Not that I recall.**

Q  Would—the most you would have at a time is two? Is that fair?

**A  I believe that was what the manager felt comfortable with, so . . .**

Q  And that's also for 2019? The most you would have would be two?

**A  The most – I'm – we could have had as many as the property manager requested. But there was no further request on that. I think Keith felt good with just one other guy, and that's just how it happened.**

*Id.* at 11 (citing Dia *Mayes* Dep. 146:15 – 147:3 [Doc. No. 185-19]).

In contrast to her deposition testimony stating that she had no knowledge of crime or danger at Eastwyck, the plaintiffs pointed the court to an email forwarded to Ms. Dia from Pete Dedvukaj dated October 2, 2017 discussing the transfer of the property from the prior owner to the defendant titled "Eastwyck – Biscayne" in which many references were made to serious crime and dangerous conditions. *Id.* at 11 (citing Dedvukaj to Dia email [Doc. No. 185-20]). In the email,[97] Mr. Dedvukaj listed issues that would affect his bank terms and insurance, including:

- "Major drug activities, violent gangs, shootings, hundreds of illegal occupants, unauthorized tenants;"

- "Maintenance and leasing staff can't go into many apartments its very dangerous for them threatened by this tenants with knives and Pitbulls. We constantly requesting lists, names of these tenants criminal background of these tenants from this housing agencies and definitely it's not working;"

- "Law-enforcement telling our staff that this people are mentally unstable and his daily routine for them to behave this way;"

- "Law-enforcement said there was nothing they could do til we start the process of terminating this tenants and all other tenants they are illegally occupying the property including over 20 squatters."

---

[97] The court has not edited the language used in the email; hence, errors—typographical or otherwise—reflect the original text.

- "When bank send the appraisers on Sep 12 requested crime activities from police department, requested violations from cod enforcement and from fire department. It is a long list of criminal drug and shootings in this properties, long list of code violations including down units work done no permits, many fires Eastwyck and Biscayne."

Dedvukaj to Dia email [Doc. No. 185-20]. The plaintiffs further pointed the court to a March 22, 2018 email from Mr. Payne to Ms. Dia indicating that the issues were not resolved, that Ms. Dia had knowledge of them, and that at least one individual who signed his name using the title of property manager was requesting additional security officers:

> Latasha,
>
> My security officers have came [sic] to me regarding there [sic] pay and unit compensation. He needs to make $15.00 /Hour [sic] with the same 30% discount they already have in place.
>
> He is constantly having issues breaking up fights, residents and guest with guns, filming music videos. This is a lot for one officer to handle with with [sic] he is getting compensated for.
>
> We are about to loose [sic] all officers and we cant [sic] afford to have this happen and will get worse in the upcoming summer months.
>
> We need to propose 3 (8) hour shifts and need to hire 1 more officer.
>
> Please help me.

*Id.* at 11 (citing Payne to Dia March 22, 2018 email [Doc. No. 185-21]). In a later email to Ms. Dia in August 2018, Mr. Payne again detailed security concerns as follows:

> I have gotten with all officers and advised them they do (12) hour shifts which they currently do and they as well split up the hours for the security coverage due to only 2 officers on a 400+ unit property which is deemed a "Red Zone" Level 3 area.

> We as well need another officer on property so we can do (3) 8 hour shifts. I have another resident that is interested in coming on staff as our Security officer and only wants a percentage off the rent and not any monetary compensation.

*Id.* at 11 (citing Payne to Dia August 3, 2018 email at 2 [Doc. No. 185-22]). In response to this email, Ms. Dia wrote, "No new hires at this time." *Id.* (citing Payne to Dia August 3, 2018 email at 1 [Doc. No. 185-22]).

Next, the plaintiffs pointed to Ms. Dia's deposition testimony that no one ever told her that fixing the gate at Eastwyck would help the defendant lease apartments:

> Q  Did [Antoinette NarCisse] ever raise any safety concerns with you?

> **A  I don't recall.**

> Q  Did she ever ask you about the gate?

> **A  I don't recall the conversations.**

> Q  Did she ever talk to you about crime on the property?

**A  No. And to be honest, we didn't talk that often.**

*Id.* at 11 (citing Dia Dep. 120:2-10 [Doc. No. 127-1]). And then the plaintiffs directed the court to the following email from Ms. NarCisse to Ms. Dia in which Ms. NarCisse wrote, regarding the property:

> There are a couple of big issues regarding crime, and safety that could help aid in moving this property in a positive direction such as repairing the gate. Residing here myself has opened my eyes to issues I don't think could have been seen prior, and most of these things I'm sure I'll need your help with.

*Id.* at 11 (citing Jan. 18, 2019 NarCisse to Dia email at $1-2$ [Doc. No. 185-23]).

Finally, the plaintiffs pointed the court to Ms. Dia's deposition testimony, in which she claimed the defendant hired only courtesy officers and not security officers:

> Q  And then security officers, who was responsible for hiring security officers?

> **A  Security officers?**

> Q  Yes.

> **A  I don't recall having any security officers.**

> Q  You don't recall any security officers. Okay. Well, who was responsible for hiring Keith Thurman?

> **A  Keith, the courtesy officer.**

172

Q  Ah, courtesy officer.

**A  Correct.**

Q  Okay. Can you explain to me what the distinction between a courtesy officer and a security officer is?

**A  I have my own definition, but if you want specifics, I would say we will have to Google the difference between those two.**

Q  I want your definition.

**A  I don't want to speculate. I don't want to offer my opinion.**

Q  Well, you just told me that you didn't have any security officers, but you had courtesy officers.

**A  They were hired as a courtesy.**

Q  To you, what is the difference between a security officer and a courtesy officer?

**A  That sounds like a legal question, but I will say he was hired as a courtesy officer and not a security officer.**

*Id.* at 11 (citing Dia Dep. 28:20 – 29:25 [Doc. No. 127-1]). The plaintiffs thereafter pointed the court to an email from Ms. Dia to Ralph Street and Pete Dedvukaj in which she identified concerns with the theft of copper and then stated/asked: "Someone should be held accountable for this, do we have security or not?" *Id.* at 11 (citing Feb. 8, 2018 Dia to Street email [Doc. No. 185-24]).

### (7)   The Defendant Failed to Comply with the ESI Order

The plaintiffs also contended that the defendant, the defense counsel, and the defendant's chosen forensic inspector failed to comply with the court's ESI order in the following ways:

### (a)   Email Production

As of December 21, 2021, the plaintiffs complained that the defendant had last produced emails on November 18, 2021. *Id.* at 12. In an email dated December 2, 2021, the defense counsel asserted that the defendant "still [had] several thousand emails to review." *Id.* at 12 (citing Dec. 2, 2021 email between opposing counsel [Doc. No. 185-25]).   The plaintiffs further contended that they had not yet received supplemental responses to their previous requests for production of documents or received a privilege log for any emails withheld by the defendant. *Id.*

### (b)   Tardy Forensic Inspection Report

The plaintiffs contended that as of December 21, 2021, the forensic inspector had not filed his report, despite the court order requiring him to do so no later than 14 days following the completion of his inspection. *Id.* at 12 – 13.  The plaintiffs contended that the report was due on October 26, which was 14 days after the forensic inspector provided the data to the defense

174

counsel, or—at the latest—by November 29, which was 14 days after the November 15 deadline for the completion of the inspection. *Id.* at 13.

### (c)   Inadequate Efforts Regarding the Defendant's Gmail Accounts

While the plaintiffs acknowledged the defendant made a "half-hearted attempt to gain access to the three Gmail accounts" the plaintiffs previously identified, they argued that the defendant's Third Declaration failed to identify additional Gmail accounts its employees used and what, if any efforts the defendant made to ascertain whether such accounts existed.[98] *Id.* They also contended that the defendant and its counsel violated the ESI order by failing to identify which employees previously had access to the Gmail accounts the defendant used. *Id.*

---

[98] To illustrate this point, the plaintiffs pointed to Keith Thurman's deposition testimony that he emailed pictures of issues on the property to the defendant's management and argued that the defendant has not stated to which email addresses security guard Thurman sent emails or from which email addresses security guard Thurman emailed. Pls.' Second Mot. for Sanctions at 13 [Doc. No. 185]; Sanctions Hr'g Tr. I at 15:13-17 [Doc. No. 217]; *see also* Thurman Dep. 46:11 – 47:23 [Doc. No. 166-1] (discussing how he emailed the leasing office Gmail account).  At the sanctions hearing, the plaintiffs contended that the defendant never asked security guard Thurman to search his own emails "because Contour doesn't actually want to find these e-mails because they would be so devastating." Sanctions Hr'g Tr. I at 15:18-24 [Doc. No. 217].

### b) Sanctions Requested

In terms of sanctions, the plaintiffs requested that the court strike the defendant's answer and require it to pay the plaintiffs' attorney fees and costs for the year and a half of litigation in which the defendant prevented the plaintiffs from obtaining discovery. *Id.* at 23. The plaintiffs contended that an issue preclusion sanction, which they requested in their first motion for sanctions, is no longer a sufficient sanction because it would allow the defendant to benefit from its misconduct, "encourage such behavior and embolden other bad actors to continue to undermine the integrity of the judicial system." *Id.* at 23 – 24. The plaintiffs further argued that the defense counsel told the plaintiffs' counsel outside of the courtroom following the previous hearing that "if [p]laintiffs continue uncovering misconduct by Contour, then its insurance carrier, Nautilus, would pull insurance coverage, leaving any judgment uncollectable, because Contour sold the property and divested itself of all assets in February 2021." *Id.* at 23 n.26. The plaintiffs argued that the defense counsel made this "threat . . . to stop [p]laintiffs from searching for the truth, which [p]laintiffs have now learned includes intentional, blatant misconduct by [d]efense counsel himself, or risk recovering nothing." *Id.*

176

### c) Authority for the Requested Sanctions

### (1) Rule 26(g)

The plaintiffs argued that both the defendant and the defense counsel must be sanctioned pursuant to Federal Rule of Civil Procedure Rule 26(g). *Id.* at 14 – 17. The plaintiffs contended that "[w]hen confronted with Contour's dishonesty, [d]efense counsel has repeatedly failed to cure the deficiencies and misrepresentations; in other words, failed to stop and think" as required by Rule 26(g). *Id.* at 15. In addition, pointing to the concealment of Charles Cooper, the plaintiffs argued that the defense counsel "authored false discovery responses, made false statements, and even tried to convince this [c]ourt to grant summary judgment based on grounds [d]efense counsel knew to be false." *Id.* The plaintiffs argued that it is "obvious now that [d]efense counsel has not done a proper custodian interview, which has resulted in significant amounts of relevant ESI being lost, witnesses not being disclosed, and false information being told to [p]laintiffs, which has necessitated the filing of numerous motions by [p]laintiffs." *Id.* at 16. Despite being presented with evidence that the defendant was being dishonest, the plaintiffs contended that the defense counsel "double-down[ed] on his defense of their actions." *Id.* The plaintiffs argued that "where [the defendant's] misconduct ends and [d]efense counsel's begins is difficult to say, but it is

177

clear that they were both simultaneously engaged in dishonest, unethical, and unprofessional behavior." *Id.* at 17.

### (2)    Rule 37

The plaintiffs argued that the court should sanction the defendant and its counsel under Rule 37(b) for willfully disobeying the court's forensic inspection order, under Rule 37(c) for failing to disclose witnesses, employees, and documents; and under Rule 37(e) for spoliation of important ESI. *Id.* at 17. In regard to Rule 37(b), the plaintiffs contended that sanctions are warranted because the December 15 deadline for the defendant to produce all responsive documents came and went without compliance, a request for extension, or any other explanation and, thus, demonstrates bad faith. *Id.* at 17 – 18. In regard to Rule 37(c), the plaintiffs alleged sanctions are warranted because the defendant hid witnesses (Eastwyck employees and Mr. Cooper) and otherwise disregarded its disclosure obligations under Rule 26(a) and (e), resulting in witnesses disappearing or their memories fading. *Id.* at 18. As an illustration, the plaintiffs alleged that the defense counsel has had years of unfettered access to Charles Cooper, who will not now talk to additional lawyers or answer the plaintiffs' calls. *Id.* The plaintiffs further alleged that the defendant's proposed solution of reopening discovery and allowing the plaintiffs to re-depose witnesses who have previously testified and depose

new witnesses is insufficient because it cannot cure the prejudice created by the discovery failures to date. *Id.* at 18 – 19.

Next, in regard to Rule 37(e), the plaintiffs argued that the defendant fired Ms. Pauleon and deleted her email account and lost access to its various Gmail accounts *after* receiving a preservation letter and retaining legal representation regarding this matter. *Id.* at 19 – 20. The plaintiffs argued that the defendant acted with the intent to deprive the plaintiffs of highly relevant evidence and blatantly disregarded its obligation to preserve electronically stored information, warranting the imposition of harsh sanctions. *Id.* at 21 – 22.

### (3)    The Court's Inherent Authority

Finally, the plaintiffs contended that sanctions are warranted against the defendant and defense counsel pursuant to the court's inherent authority because the defendant has continued to act in bad faith "to deprive [p]laintiffs of the specific evidence needed to prove their claim and deny justice to the family of Tijuana Frazier. . .". *Id.* at 22.

### 15.    The Defendant Filed the Forensic Investigator's Report and the Parties Filed a Joint Status Report

A week after the plaintiffs filed their second motion for sanctions, the defendant filed the expert report of Robert Draper, the ESI forensic examiner

in this matter. Draper Expert Rpt. [Doc. No. 189-1]. The next day, the defendant filed a consent motion for protective order [Doc. No. 190], and two days after that, the parties filed their joint status report [Doc. No. 191]. In the status report, the parties reported that the defendant had reviewed 26,732 documents and had produced 902 that it deemed responsive and not privileged. Dec. 31, 2021 Joint Status Rpt. at 1 [Doc. No. 191]. The parties stated that the plaintiffs had repeatedly asked for a privilege log, and the defendant "is preparing one." *Id.* The defendant stated it had approximately 20,000 remaining documents to review, which might increase if email attachments were responsive. *Id.* The defendant estimated that it could complete production by February 15, 2022. *Id.* The defendant claimed that its progress had been interrupted and delayed by "two unfounded sanctions motions, multiple written discovery requests, and continuous emails from [p]laintiffs." *Id.* at 2. The defendant claimed it was further delayed because the plaintiffs filed a request that the defendant change the method of its review that caused the defendant to be "unsure whether documents would have to be re-analyzed."[99] *Id.* (citing Pls.' Status Rpt. and Req. for

---

[99] The court is perplexed by this argument. In their request for clarification, the plaintiffs asked that the defendant turn over all non-privileged documents that contain one of the court-sanctioned search terms. It appears

Clarification [Doc. No. 177]). The defendant claimed it incurred $30,268.45 in expert fees, far in excess of what it anticipated, and which it anticipated to increase in light of storage fees. *Id.* The defendant stated that its attorneys spent 70.3 hours reviewing emails at a rate of 380 documents per hour, which did not include time corresponding with opposing counsel, the client, or the expert. *Id.* The defendant objected to further forensic inspection because its existing inspection was comprehensive and costly. *Id.* at 3. The defendant further stated that the plaintiffs' counsel emailed the forensic examiner with questions that resulted in hours of additional work, for which the plaintiffs had refused to pay. *Id.* The defendant further stated that the plaintiffs had not indicated that they would pay for costs associated with responding to their additional questions. *Id.*

The plaintiffs stated that they had voluntarily agreed, at the defendant's request, to narrow several search terms to create a more efficient search. *Id.* at 2. The plaintiffs further stated that many of questions they asked the examiner were related to narrowing the search terms to lower the

---

to the court that the defendant chose to engage in a more onerous review of the documents of its own accord; therefore, the plaintiffs' requested clarification would require LESS review and analysis, not more. The court can conceive of no reason why the plaintiffs' request for clarification would cause the defendant to re-analyze any documents.

expense of the forensic exam. *Id.* at 4. The plaintiffs asserted that they were concerned with the rate of the defendant's production and the accuracy of its estimates, particularly because the defendant had revised its early December estimate of "several thousand" remaining emails to review to approximately 20,000 emails to review. *Id.* at 2. The plaintiffs stated that the recently submitted examiner's report raised important questions for which they had not yet received a response, and that the plaintiffs believed that an additional review of the defendant's GoDaddy account, Gmail accounts and data by a different examiner might be necessary. *Id.* at 3. The plaintiffs stated that they believed additional email accounts needed to be searched, including contourllc@gmail.com, info@contourdevelopmentgroup.com, and any additional accounts uncovered as a result of the defendant's search. *Id.*

In terms of a discovery timeline, the plaintiffs stated that if the document production was completed by February 15, 2022, the plaintiffs would then need to review the full production as well as the privilege log. *Id.* at 4. Based on the information currently available to them, the plaintiffs stated that they anticipated re-deposing Mr. Dedvukaj, Ms. Dia, security guard Thurman, and DKPD officers and deposing several more individuals. *Id.* at 4 – 5. In addition, the plaintiffs believed additional written discovery was necessary and that the defendant's data might need to be searched using

additional search terms based on the results of the defendant's production. *Id.* at 5 – 6. The plaintiffs stated they believed that fact discovery could be completed by July 1, 2022 and expert discovery could be completed by August 2022. *Id.* at 6.

The defendant stated that it did not intend to conduct additional discovery and disputed the necessity of the plaintiffs' proposed depositions. *Id.* The defendant argued that the plaintiffs should have requested a word search of its emails prior to the depositions of Ms. Dia, security guard Thurman, and Mr. Dedvukaj. *Id.* The defendant further contended that the plaintiffs had known of Bradley Payne, Dian Pauleon, Marshal Rhodes, and Gabriel Eskridge for 15 months and should have taken those depositions earlier. *Id.*

### 16.   The Defendant Responded to the Plaintiffs' Second Motion for Sanctions

Several days after the parties filed their joint status report, the defendant responded in opposition to the plaintiffs' second motion for sanctions. Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions [Doc. No. 193] (redacted with permission; unredacted pages available at Doc. No. 195-4). In its response, the defendant claimed that the plaintiffs' second motion

for sanctions showed a lack of professionalism and an inability to litigate legal claims on the merits. *Id.* at 1.

### a) Responses to the Plaintiffs' Specific Allegations

#### (1) There Was No Eyewitness to the Shooting

The defendant argued that there was no eyewitness to the shooting that killed Ms. Frazier. *Id.* at 2. Below, the court will address the defendant's arguments regarding Mr. Cooper and Mr. Murray.

##### (a) Mr. Cooper Was Not an Eyewitness

Although the defense counsel conceded that they "initially believe[ed] [Mr.] Cooper might be an eyewitness," after their investigator obtained Mr. Cooper's statement "they determined [Mr.] Cooper was not in fact an eyewitness." *Id.* at 3, 7. The defendant argued that Mr. Cooper does not know "where the shot originated, who shot the gun, or why" and even "lacked knowledge of anyone getting killed." Def.'s Resp. to Charles Cooper Timeline ¶ 16 [Doc. No. 195-3]. The defendant contended that it gave the plaintiffs Mr. Cooper's statement in which he stated he was not an eyewitness prior to the filing of the second motion for sanctions; thus, the plaintiffs' motion "push[ed] a falsehood." Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 3 [Doc.

No. 193]. Accordingly, the defendant insinuated via a footnote that the plaintiffs' counsel violated Federal Rule of Civil Procedure 11 by making a factual statement in a filing for which he has no evidentiary support and no reasonable likelihood of obtaining evidentiary support. *Id.* at 3 n.3.

Because Mr. Cooper was not an eyewitness, the defendant argued that he did not and could not contradict their subsequently withdrawn summary judgment motion. *Id.* at 4 – 5; unredacted pages at 3 – 4 [Doc. No. 195-4]. Moreover, the defendant argued that it alerted the court in the summary judgment brief to "a reference in the police investigation file [that the defendant initially believed originated from Mr. Cooper] that a person exited an apartment and fired a single shot in the air around the time of the subject occurrence," indicating that the defendant was not trying to hide anything.[100] Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 4 – 5 [Doc. No. 193]; unredacted pages at 3 – 4 [Doc. No. 195-4]. Similarly, the defendant argued

---

[100] Detective Tappan's notes state that attorney Rumph and investigator Magilton told him about an eyewitness who saw someone fire three shots at the 384 apartment with a handgun, not a "single shot in the air" as the defendant sets forth in its summary judgment brief. *See* DKPD Investigative File Excerpts at 6 [Doc. No. 195-1]. Thus, the summary judgment brief does not appear to address the witness about which attorney Rumph and investigator Magilton informed Detective Tappan. It is unclear to the court from where the defendant derived its statement regarding a witness firing a single shot into the air.

that Mr. Cooper's testimony did not require any alteration to deposition questioning because "[b]y simply hearing a single shot without seeing or hearing anything else it is impossible for Cooper's statement to have shown the shot was intentional." Def.'s Resp. to Charles Cooper Timeline ¶ 17 [Doc. No. 195-3].  The defendant also asserted that the deposed detective had access to the entire police file containing cumulative witness statements about hearing gunshots at various times. *Id.*

In regard to discovery, the defendant argued that it did not disclose Mr. Cooper because "whether [Mr.] Cooper heard the relevant shot [that killed Ms. Frazier] is not certain".[101] Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 4 [Doc. No. 193]. To justify this decision, the defendant attempted to contrast the plaintiffs' interrogatories, which requested the identity of persons with knowledge of facts surrounding the shooting, with Mr. Cooper's denial of direct knowledge of anyone being shot or killed. *Id.* at 4 n.5.  Moreover, the defendant argued that "Detective Ward testified the shots reported around the time Mr. Cooper said he heard shots were never

---

[101] Moreover, the defendant—or, more accurately, defense counsel—contends that its corporate representative was not provided with Mr. Cooper's statement because Mr. Cooper was not identified as an eyewitness or someone with knowledge of the decedent's shooting death. Def.'s Resp. to Cooper Timeline ¶ 20 [Doc. No. 195-3].

determined to be the shot that hit the deceased."[102] *Id.* at 7; unredacted pages at 6 [Doc. No. 195-4]. The defendant did concede elsewhere, however, that "someone may disagree with the defense counsel's assessment that [Mr.] Cooper was not someone with knowledge of Tijuana Frazier's shooting death." Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 4 [Doc. No. 193].

In regard to requests for production, the defendant contended that it did not identify Mr. Cooper's statement obtained by its investigator or the investigator's report in a privilege log because these items were expressly not requested.[103] *Id.* at 8 − 9. The defendant contended that the plaintiffs did not

_____

[102] In the portion of Detective Ward's deposition cited by the defendant, Detective Ward stated that officers responded to the area at approximately 8:43 AM in reference to shots fired, but no one from his unit was able to determine if any of those shots were one of the ones that hit Ms. Frazier. Ward Dep. at 59:7-21 [Doc. No. 186-3]. Mr. Cooper stated in his interview with the defendant's investigator that he heard a shot between 7 and 8 AM, not at 8:43 AM. Charles Cooper Statement at 4:1-10 [Doc. No. 194-3]. Thus, it is not clear that the shots Detective Ward referenced included the shot that Mr. Cooper stated he heard.

[103] The defendant pointed to two of the plaintiffs' Rule 34 requests for production of documents, which were worded as follows:

Plaintiffs' First Request for Production of Documents #2:

Copies of all statements of any person relating to the Incident. Please note: this Request is NOT seeking documents

187

amend their document requests excluding work product statements in February or April 2021; therefore, the defendant was not obligated to identify the Cooper investigatory documents in its privilege log. Def.'s Resp. to

_____

protected by attorney-client privilege or attorney work product doctrine but IS seeking statements created in the regular course of business. So, please do not assert attorney-client privilege or attorney work product objections, because we are not seeking such information.

Plaintiffs' First Request for Production of Documents #3:

Copies of all reports, memorandum, or notes from any individual who has investigated any aspect or element of the Incident. This Request is NOT seeking documents protected by attorney-client privilege or attorney work product doctrine; but IS seeking statements created in the regular course of business. So, please do not assert attorney-client privilege or attorney work product objections, because we are not seeking such information.

[Doc. No. 185-11 at 3 - 4]. While the defendant makes much of the fact that the plaintiffs excluded documents protected by attorney-client privilege or attorney work product doctrine from their requests, the court observed above, *see supra* Section II.C.2.b), that—in response to request for production #3— the defendant nonetheless noted that it was "withholding reports prepared by Defendant's insurance adjusters/investigators dated November 6, 2019 and September 22, 2019, prepared in anticipation of litigation and subject to the attorney work-product doctrine." Def.'s Resp. to Pls.' First Req. for Produc. ¶ 3 [Doc. No. 126-1]. Importantly, the defendant made no similar reference in regard to its investigator's report concerning Mr. Cooper or the recorded statement of Mr. Cooper. *See id.*

Charles Cooper Timeline ¶¶ 18 and 19 [Doc. No. 195-3]; Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 8 – 9 [Doc. No. 193].

To highlight the unimportance of Mr. Cooper's testimony, the defendant argued that the plaintiffs had not yet deposed Mr. Cooper despite knowing of him for over a month. Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 7 [Doc. No. 193]. The defendant pointed out that this is similar to the plaintiffs' decisions not to depose any of the other people noted in the police records as individuals who may have heard the shooting that killed Ms. Frazier. *Id.* at 5  – 7; unredacted pages at 4 – 6 [Doc. No. 195-4].

### (b)   Mr. Murray Was Not an Eyewitness

The defendant argued that the DKPD file that the defendant produced to the plaintiffs on December 7, 2020:

> contain[ed] references to an eyewitness to the shooting supposedly known by Defendant's former employee, Keith Thurman.[104] Detective Chris Tappan interviewed Thurman who identified a "Mr. Murray" living in the Apartment 382 next door to where the bullet landed in Apartment 384. Although Thurman's interview is hard to follow, Thurman stated Mr. Murray called to report gunshots he heard but did not see anyone

---

[104] In support of this statement, the defendant cited to Bates Number 2095, which are Detective Tappan's notes from his May 21, 2019 meeting with attorney Rumph and investigator Magilton [Doc. No. 195-1 at 6].

fire a weapon.[105] Thurman also said he heard gunshots and reported them to 911 after receiving the tenant's call. Tappan then spoke with Murray, who said "he heard several gunshots around 3:00 AM that morning and a couple around 7:30 AM," but he never saw anyone. Plaintiffs never sought to depose Murray, nor do they mention him in their motion.

*Id.* at 5 − 6; unredacted pages at 4 − 5 [Doc. No. 195-4].

Based on the plain language used, the ordering of this passage, and the documents cited, it appears the defendant intended the court to understand that:

(1)    Security guard Thurman told attorney Rumph and investigator Magilton that there was an anonymous eyewitness to the shooting.

(2)    Attorney Rumph and investigator Magilton told Detective Tappan about the eyewitness.

---

[105] In support of this statement, the defendant cited to Bates Number 2089, which are Detective Tappan's notes from his April 10, 2019 conversation with security guard Thurman. *See* DKPD Investigative File Excerpts at 5 [Doc. No. 195-1]. The defendant also cited to Doc. No. 188-2, which it denoted as the "Tappan-Thurman" interview. However, Doc. No. 188-2 is a notice of manual filing of the audio recording of the interview between Detective Tappan, attorney Rumph, and investigator Magilton. The court could not find the Tappan-Thurman interview on the record.

(3)    Detective Tappan subsequently interviewed security guard
       Thurman, who identified Mr. Murray as a witness who heard but
       did not see a shooting.

(4)    Detective Tappan next interviewed Mr. Murray, who confirmed
       that he heard but did not see a shooting.

(5)    There was no actual eyewitness.

Despite this suggestive wording, Detective Tappan's notes from his
interview with attorney Rumph and investigator Magilton do not reveal
security guard Thurman as the unnamed source that had contact with the
alleged eyewitness.[106] *See* DKPD Investigative File Excerpts at 6 [Doc. No.
195-1]. Moreover, the cited documents reveal that Detective Tappan spoke to
security guard Thurman regarding Mr. Murray more than a month prior to
the meeting with attorney Rumph and investigator Magilton, not in follow-
up to that meeting. *Id.* at 5. Detective Tappan called Mr. Murray on April 10,

---

[106] In the plaintiffs' reply brief, they stated that they "have very recently come
to strongly believe that [the] 'go-between' [giving information about the
alleged eyewitness] is [d]efendant's security guard, Keith Thurman, who is
represented by [d]efense counsel in this action." Pls.' Reply to Pls.' Second
Mot. for Sanctions at 9 [Doc. No. 200]. The plaintiffs' new belief was founded
upon evidence produced in the *Mayes* case that showed security guard
Thurman was passing information to an unidentified private investigator
and recording entries in his logs about it. *Id.* at 10.

2019—again, well before the meeting with attorney Rumph and investigator Magilton—who said he heard gunshots around 3:00 AM that morning and a couple around 7:30 AM on the date of Ms. Frazier's death, but never saw anyone. *Id.* Although Detective Tappan appeared to speculate about whether Mr. Murray was the unnamed eyewitness in his meeting with attorney Rumph and investigator Magilton, he simply stated that he needed to review his notes. Audio Recording of Tappan-Rumph-Magilton Interview at approx. 43 min mark [Doc. No. 188-2]. Detective Tappan never mentioned Mr. Murray by name, and it is not indicated anywhere on the record before the court that Mr. Murray was the eyewitness attorney Rumph and investigator Magilton referenced. *Id.*

### (2)     The Defendant Was Disorganized But Did Not Intentionally Hide Employee Records

In regard to the undisclosed witnesses, the defendant admitted that it "had a problem with keeping organized employee records," thus, it agreed to make its corporate representative available for deposition. Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 9 [Doc. No. 193]. It stated that its corporate representative had already given testimony via declaration as to why the prior employee list was incomplete. *Id.* (citing Second Prekelezaj Decl. [Doc. No. 167-1]). The defendant argued that the plaintiffs are throwing

the three additional employees that the defendant found listed on employee lists in the defendant's face despite the fact that the defendant disclosed them. *Id.*

### (3)   The Defendant Was Upfront with the Court about the Tardy Forensic Examination

In regard to the forensic expert's report, the defendant argued that it informed the court in response to the plaintiffs' status update on November 10 that it had not completed the forensic examination due to the unanticipated amount of data. *Id.* at 10. The defendant contends that the forensic examiner's report was not due until the examination was complete, but the plaintiffs disagreed, so the defendant had the expert complete his report and filed it on December 28, 2021 before completion of the examination of the email accounts. *Id.* The defendant further contended that the documents returned from the search were staggering, resulting in an expert fee that was "astronomically higher than what was estimated." *Id.* The defendant further stated that "the ESI order did not contemplate the email search would return over 45,000 emails" and "[d]efendant does not have a team of lawyers to conduct document review 12 hours per day, day after day." *Id.* at 23.  In light of the fees incurred and the time the defense counsel has

spent on this matter, the defendant argued that the plaintiffs' contention that this exam was not conducted in good faith is "ridiculous." *Id.* at 11.

### (4) The Forensic Expert's Report Confirmed the Defendant's Representations Regarding Deleted Accounts

The defendant asserted that the forensic expert confirmed what the defendant has maintained about GoDaddy accounts being inaccessible thirty days after their deletion. *Id.* at 11 (citing Draper Expert Rpt. at 5 ¶¶15 – 16 [Doc. No. 189-1]). As a result, the defendant contended that the following accounts of persons employed prior to Ms. Frazier's death are inaccessible: Antoinette Narcisse, Bradley Payne, Jennifer Bentley,[107] Dian Pauleon and Rashanda Goolsby. *Id.* at 12 – 13. The defendant asserted that it was not hiding Ms. Pauleon's email account; instead, it was changed to Rashanda Goolsby and subsequently closed on July 18, 2019.[108] *Id.* at 11 – 12.

---

[107] The defendant asserted that no account was found for Jennifer Bentley. Def.s' Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 13 [Doc. No. 193]. While it acknowledged she may have been provided an account, the defendant stated that it "appears to have never been activated or was removed post-termination." *Id.* at 13 n.27.

[108] The defendant argued that "[e]ven if this email account was deleted after notice of contemplated litigation, [the] [p]laintiffs never requested [the] [d]efendant [to] search it or preserve any email accounts before July 18, 2019." Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 12 [Doc. No.

### (5)    The Plaintiffs Waited Seven Months to Request the Defendant to Search its Email Accounts

The defendant claimed that on September 25, 2020, it produced emails to the plaintiffs that reflected the email addresses of Bradley Payne, Latasha Dia, Antoinette NarCisse, Marshal Rhodes (mrhodes@contourdevelopmentgroup.com); Dian Pauleon (dian@contourcompanies.com), Britknie Bush (britknie.eastwyck@gmail.com), and the leasing office Gmail account (eastwyckvillages@gmail.com). *Id.* at 14. The defendant contended that after receiving documents including these email accounts, the plaintiffs still waited seven months before it requested the defendant to search the accounts. *Id.* at 14 – 15.

### (6)    The Defendant Never Misled the Plaintiffs to Believe an Email Search Was Being Conducted Prior to April 2021

The defendant argued the plaintiffs' initial document requests did not seek a keyword email search, and the defendant never misled the plaintiffs to believe that an email search was being conducted prior to the plaintiffs

---

193]. "In fact," the defendant continued, "[the] [p]laintiffs' notice of litigation letter failed to mention e-mail accounts at all." *Id.*

requesting one in April 2021.[109] *Id.* at 15 – 17. The defendant identified

several of the plaintiffs' document requests that sought emails and argued

that it objected or otherwise adequately responded, as follows:

> **Plaintiffs' Request for Production #14:** All text messages,
> emails, letters, and any other correspondence between Eastwyck
> security personnel and any of your other employees, agents, or
> contractors.

> **Defendant's Response:** Defendant objects to this request as
> overbroad, irrelevant, unduly burdensome, and not proportional
> to the needs of this case. Subject to and without waiving these
> objections, Defendant will produce security logs located after
> conducting a reasonable inquiry.

*Id.* at 15 (citing Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 14

[Doc. No. 185-11]). In its response brief, the defendant clarified that it made

this objection because the plaintiffs' request was "not tailored to reports of

crimes on the premises." *Id.* Nonetheless, it argued that it produced 216

pages of security logs and criminal trespass files, followed by an additional

production of criminal trespass records and incident reports. *Id.*

> **Plaintiffs' Request for Production #15:** All work orders,
> maintenance requests, emails, text messages, or other
> documents reflecting repairs or requests for repairs related to
> any breaking and entering and/or burglary at the Premises.

---

[109] Instead, the defendant argued that it objected to some of the plaintiffs'
requests for production, told them it would produce security logs (which it
did), and told them that it would search and supplement at least one
document request seeking emails. *Id.* at 16.

**Defendant's Response:** Defendant objects to this request as irrelevant, unduly burdensome, and not proportional to the needs of this case. Breaking and entering and/or burglary are not substantially similar to the present alleged incident.

*Id.* at 16 (citing Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 15 [Doc. No. 185-11]). The defendant explained that it flatly objected to the plaintiffs' request because "the property crimes were not substantially similar to the present incident involving a firearm," and further stated that the plaintiffs never filed a motion for a ruling on the defendant's objection. *Id.*

**Plaintiffs' Request for Production #28:** All emails, text messages, letters, and other correspondence to or from any person or entity regarding the gate at the Premises.

**Defendant's Response**: Defendant objects to this request as overbroad and encompassing communications after the subject incident. Subject to and without waiving these objections, Defendant is searching for responsive documents and will supplement.

*Id.* at 16 (citing Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 28 [Doc. No. 185-11]). The defendant argued that it produced a document reflecting a proposal for a gate repair and replacement and an email from a former employee to a regional manager referencing a needed gate repair. *Id.*

**Plaintiffs' Request for Production #29:** All emails, text messages, letters, and any other correspondence you have sent to or received from Eastwyck residents regarding crimes at the Premises or the prevention of crime at the Premises.

197

> **Defendant's Response:** Defendant objects to this request as
> overbroad. Defendant objects to this request as encompassing
> irrelevant documents after the subject incident. Defendant
> objects to this request as seeking documents regarding crimes
> that are not substantially similar to the crime alleged in this
> lawsuit. Subject to and without waiving these objections,
> Defendant is searching for documents responsive to this request
> and will supplement.

*Id.* (citing Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶ 29 [Doc. No.
185-11]). The defendant argued that it produced 1,821 pages, including the
previously discussed criminal trespass files, gate repair quote and email, and
security logs as well as prior lawsuits by tenants alleging negligent security,
property rules prohibiting crime and illegal drug usage, and tenant files of
witnesses identified by the plaintiffs. *Id.* at 16 – 17.

The defendant argued that none of the plaintiffs' discovery requests
sought a forensic search of its email accounts, and the plaintiffs did not follow
up about the emails or ask for a key word search until April 2021. *Id.* at 17.
The defendant contended that, instead, the plaintiffs were "focused on
improperly joining a former employee as a defendant so they could destroy
federal diversity jurisdiction." *Id.* The defendant once again failed to point
out that the plaintiffs' motion to add the former employee (Mr. Payne) as a
defendant was based upon incorrect information the defendant provided in
response to an interrogatory.

### (7)　The Remaining Discovery Issues are Credibility Issues, not Sanctionable Conduct

The defendant contended that the plaintiffs' remaining discovery complaints were credibility issues, not sanctionable conduct. *Id.* at 18. In support of this point, the defendant made the following arguments:

### (a)　The Defendant is Not Withholding Security Logs

Defense *counsel* asserted that they are not withholding security logs for May 2019, *id.* at 18, and cited to the following excerpt of Ms. Prekelezaj's deposition for the assertion that the defendant's representatives previously searched for security logs based on where they were kept and provided them in this case:

> Q　Okay. How did Contour search for these security logs? Like how did you go about finding – getting them to produce them?
>
> **A　This was a request that was sent to Marshal Rhodes or the property manager to get those from security personnel.**
>
> . . .
>
> Q　… I do want to follow up on the security logs. What steps did Contour take to make sure that all the security logs were saved?
>
> **A　The security personnel was directed to not destroy or get rid of any security logs ever.**

199

     Q    Okay. Has Contour produced all the security logs from the time that it purchased the property up until Ms. Frazier's incident?

     **A    What was in our possession, yes.**

     Q    Okay. If they were – well, I'm trying to figure out where the rest of the logs are. Why doesn't Contour have security logs before December 10th, 2018?

     **A    I don't know.**

     Q    Well, what steps did you take to confirm that those are the only security logs that Contour is in possession of?

        . . .

     **A    I reached out to management and to Ms. Dia to gather all documents available that were requested.**

     Q    (By Mr. Brown) Did you ever reach out to the security officers themselves?

     **A    No.**

     Q    Why not?

     **A    I dealt with Latasha and Marshal on a day-to-day. I never dealt with the security officers so I did not reach out to them.**

Prekelezaj Dep. 113:3-8; 122:10 – 123:13 [Doc. No. 128-1]. As the court has previously noted, the conflicting testimony of the defendant's employees indicates that—despite Ms. Prekelezaj's testimony—the defendant did not seem to know where its security logs were kept. *See supra* Section II.C.10.c).

The defendant contended that the plaintiffs' counsel acquired the duplicative May 2019 logs from another case in which the defendant is represented by different counsel and argued that "[w]hether they were mislabeled or are duplicates of another month is something that was never asked of the purported author, Keith Thurman[,] who is no longer employed by [d]efendant."[110] Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 18 [Doc. No. 193].

### (b) Wendal Johnson Did Not Receive Paychecks, So It Is Not Surprising He Did Not Appear in Employee Files or W-2 Records

Recognizing that its 30(b)(6) representative testified that she was not aware of "a Wendel Johnson" being employed at Eastwyck, the defendant stated—without citation—that it "searched for records before and after this deposition related to Wendal Johnson and could not find an employee file or any W-2 records." *Id.* at 18 – 19. The defendant, acknowledging for the first time in this litigation Mr. Johnson's deposition testimony that he worked for the defendant, argued that it is "not surprising" that Mr. Johnson did not

---

[110] Apparently, the defendant produced these security documents in the *Mayes* case. The court does not understand why the defendant, as the provider of these documents, cannot provide additional clarity on these logs.

appear in employee files or W-2 payroll records because he testified that he received a discount on his wife's Eastwyck apartment in lieu of pay. *Id.* at 19 (citing Johnson Dep. at 147:3 – 149:17 [Doc. No. 51-9]). The defendant stated that Mr. Johnson's name was not discovered in Eastwyck records until the forensic email search uncovered it. *Id.*

### (c) Ms. Rhodes and Ms. Prekelezaj Have Different Understandings of When Ms. Rhodes' Leave Started and Ended

Somewhat incredibly, the defendant contended that the discrepancy between Ms. Prekelezaj's testimony that Ms. "Rhodes was on personal leave from her job but remained the manager of Eastwyck in some capacity" and Ms. Rhodes' testimony that she left her employment with Eastwyck in 2018 and did not return until 2020 is nothing more than a "credibility issue" based on different recollections. *Id.* at 19 – 20. The defense counsel—once again subtly differentiating between their culpability and their client's culpability—stated that the plaintiffs' "incidious [sic] statement that *defense counsel* misrepresented Rhodes as the manager during an incorrect time

frame is baseless as usual" and suggested that the plaintiffs cross-examine Ms. Prekelezaj.[111] *Id.* at 20 (emphasis added).

Rather than taking responsibility for its glaring misrepresentations regarding Ms. Rhodes and the importance of her emails in both its 30(b)(6) deposition and its subsequent briefs, the defendant attempted to shift responsibility to the plaintiffs: arguing (1) that if the plaintiffs had chosen to depose Ms. Rhodes, they could have cross-examined her about her prior email accounts and discovered the change; and (2) that it did not hide Ms. Rhodes's pre-incident email address from the plaintiffs because it was disclosed in a document production. *Id.* at 19 – 21. Confusingly, the defendant—who

---

[111] In the plaintiffs' second motion for sanctions, the plaintiffs sought to hold both the defendant and the defense counsel responsible for the defendant's previous misrepresentations about Ms. Rhodes's employment status. *See* Pls.' Second Mot. for Sanctions at 8 – 9 [Doc. No. 185]. In regard to defense counsel, the plaintiffs argued as follows: "Based on his statements to the Court, Defense counsel Perniciaro has been in frequent contact with Rhodes. Either Defense counsel failed to ask Rhodes if she was the manager at the time of the incident but claimed she was nonetheless, or worse, knew Rhodes was not the manager but continued to say she was." *Id.* at 9. In other words, the plaintiffs theorized that attorney Perniciaro participated in the wrongdoing because his apparent access to Ms. Rhodes combined with his professional obligations should have revealed the truth. As the court noted in the introduction to this order, many of the problems in this matter appear to be the result of the defendant and the defense counsels' steadfast commitment to knowing as little about the underlying facts as possible. *See supra* Section I.

affirmatively deleted Ms. Rhodes' email address and gave her a new one after it received a preservation notice and a demand letter concerning this litigation—then appeared to state that it did not discover the email change until after the forensic examiner combed through the GoDaddy account data. *Id.* at 20 – 21. However, it contends that "none of this matters" because Ms. Rhodes' pre-incident email account was deleted on January 21, 2020, "well-before [sic] the plaintiffs filed this lawsuit or asked the defendant to search its email accounts." *Id.* The defendant once again stated that the plaintiffs did not ask the defendant to preserve any email accounts prior to litigation and the account was lost before the plaintiffs filed suit. *Id.* at 20 – 21.

### b) The Court Should Impose Rule 11 Sanctions on the Plaintiffs and the Plaintiffs' Counsel

Once again, the defendant argued that it did not seek sanctions even though plaintiff Mildred Collins-Williams made misrepresentations in her written discovery that she contradicted in her depositions. *Id.* at 21. However, the defendant contended that the court should now impose sanctions on the plaintiffs and their counsel under Rule 11(c)(3) so the defendant can recoup its extensive fees in having to respond to the plaintiffs' "baseless motion" because:

> [i]t is clear from the extensive time and costs [d]efendant has invested in this case since the last hearing that it heeded this

[c]ourt's warning. Incurring tens of thousands of dollars and spending countless hours to provide the ungrateful [p]laintiffs with the discovery they requested through an expensive forensic examination of email accounts is proof enough.

*Id.* at 22. Specifically, the defendant complained that the plaintiffs' motion failed to inform the court that:

(1) Charles Cooper was not an eyewitness;

(2) Charles Cooper's statement was not requested in discovery because the plaintiffs excluded attorney work product from their document request;

(3) The plaintiffs did not ask the defendant to preserve email accounts before filing this lawsuit;

(4) The plaintiffs received a document production containing email addresses that it did not ask the defendant to search until seven months into discovery and after they had been lost in the normal course of business; and

(5) The defendant exerted energy and time into the magnanimous document production and informed the court they would not finish by the deadline.

*Id.* at 22. In addition, the defendant argued that it did not spoliate evidence, repeating (once again) that the plaintiffs did not ask them to preserve email accounts or conduct a forensic examination until well after they became inaccessible. *Id.* at 23. The defendant further argued that even if "technical

spoliation" occurred, the plaintiffs still have a great deal of ESI available to them, including emails from the now inaccessible email accounts, and this court should not grant the plaintiffs' request for sanctions.[112] *Id.* at 24 – 25.

### 17.   The Plaintiffs Filed a Reply Regarding Their Second Sanctions Motion

On January 18, 2022, the plaintiffs filed a reply brief regarding their second motion for sanctions [Doc. No. 200]. In their reply brief, they made the following key contentions:

---

[112] The defendant claimed that the plaintiffs were already bragging to the defendant's insurer on November 10, 2021 about the evidence in their possession in an email that contained the following language:

> I wanted to give Nautilus an update on this case.

> See the highlighted email below where Contour's CEO admits in 2017 that he knew Eastwyck had "major drug activities, violent gangs, shootings, hundreds of illegal occupants, unauthorized tenants" and that he knew about "a long list of criminal drug and shootings."

> We are through just 50 of the *thousands* of emails from Contour's ESI search, and the defense case has already worsened from the back alley dumpster fire it has always been to more of a Deepwater Horizon type event… next stop is Chernobyl, I guess.

> I will continue to keep you updated.

Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 25 [Doc. No. 193] (citing email from pls.' counsel to Nautilus [Doc. No. 194-12]).

a) **The Defendant Spoliated Evidence**

The plaintiffs argued that the defendant destroyed[113] relevant email accounts after it received a preservation of evidence letter, including the leasing office Gmail account, Marshal Rhodes' pre-incident email account, and property manager Dian Pauleon's account. Pls.' Reply re: Pls.' Second Mot. for Sanctions at 1 – 3 [Doc. No. 200]. They asserted that the defendant's argument that the preservation letter had to specifically tell the defendant to preserve ESI is absurd and has been rejected by other courts. *Id.* at 1. Moreover, the plaintiffs argued that the defendant's response failed to address the leasing office Gmail account, which the defendant's corporate-level employees had knowledge of because employee Jaqita Abrams emailed Latasha Dia in February 2019 with the login information so she could access it whenever she desired.[114] *Id.* at 2. The plaintiffs also reiterated that the

---

[113] In their brief, the plaintiffs argued that the defendant has conflated two distinct terms in regard to its email accounts: deactivated and deleted. Pls.' Reply re: Pls.' Second Mot. for Sanctions at 3 [Doc. No. 200]. Previously, the defendant represented that the GoDaddy emails had been deactivated, which the court and the plaintiffs both considered recoverable. *Id.* However, now the defendant asserts that the accounts were deleted and thereby unrecoverable because there was no backup. *Id.*

[114] While the plaintiffs attached the redacted login information for the Gmail account, they did not provide the email from Ms. Abrams to Ms. Dia. *See* Leasing Office Passwords [Doc. No. 200-1].

defendant misrepresented Marshal Rhodes' position at the property while also spoliating her most relevant pre-incident emails in 2020 (after receiving the preservation letter) and trumpeting the importance and availability of these emails. *Id.* at 2 – 3.

### b) The Defendant Has Continually Failed to Fulfill Its Responsibilities in Regard to ESI

The plaintiffs argued that the defendant lacks a fundamental understanding of how discovery is supposed to work and that the forensic inspection involving a keyword search of its emails is a consequence of its discovery misconduct as opposed to something the plaintiffs should have asked for earlier in litigation. *Id.* at 5. The plaintiffs contended that their first discovery requests asked for emails, which the defendant understood because it produced a few. *Id.* at 4. The plaintiffs argued that the defendant's contention that those emails should have triggered the plaintiffs to specifically request the defendant to search some accounts included in that production misconstrues basic tenants of discovery and the defendant's duties pursuant to Rule 26. *Id.* at 4 – 5.

The plaintiffs contended that the defendant's excuses based on the volume of emails that it uncovered pursuant to the forensic review are without merit because the defendant—not the court or the plaintiffs—is the

party that is supposed to have the most knowledge about its email accounts and the data contained therein. *Id.* at 5. The plaintiffs argued further that the defendant has represented to the court and the plaintiffs that it has as many as 20,000 documents left to review but told the forensic examiner on December 9, 2021 that they hoped to finish in the next few days. *Id.* at 6. The plaintiffs argued that the plain language of the court's ESI order required the defendant to file the forensic inspector's report 14 days after he completed his inspection, which was due by November 15. *Id.* at 4. The plaintiffs asked the court to require the search of contourllc@gmail.com and info@contourdevelopmentgroup.com, which were uncovered in the defendant's search. *Id.* at 6.

In regard to the forensic inspection, the plaintiffs lodged the following complaints:

- The forensic expert never logged into the GoDaddy administrative page, which would have given him access to each account and would have been necessary to determine historic aliases;

209

- The forensic inspector did not include any aliases in his report and did not inquire about historic aliases;[115] and

- The forensic inspector did not contact Google to attempt to access the leasing office Gmail account and instead informed the plaintiffs "that it is highly unlikely that this will succeed and . . . the account is lost forever."[116]

*Id.* at 6 – 7.

---

[115] The plaintiffs claimed that the defendant's assertion in its response brief that Ms. Pauleon's email became Ms. Goolsby's email was the first the plaintiffs had heard of this alias. Pls.' Reply re: Pls.' Second Mot. for Sanctions at 7 [Doc. No. 200]. After the defendant filed its response brief, the plaintiffs had a recorded Zoom conference with the forensic expert where the expert disclosed that he learned of the alias in a second phone call with GoDaddy to follow up on Ms. Pauleon's account. *Id.* at 7. The plaintiffs argued that, despite learning that he overlooked an important alias, Mr. Draper did nothing else. *Id.*

[116] At the sanctions hearing, the plaintiffs supplemented this argument, contending that they still do not know, in regard to the leasing office Gmail account: what passwords the defendant attempted to use, what passwords Mr. Draper attempted to use, whether anyone at Contour has a phone number ending in the recovery number digits or received a recovery email, and whether the defendant has an 18-character email account. Sanctions Hr'g Tr. I at 14:17 – 15:6 [Doc. No. 217].

c)      **The Defendant Did Not Refer to the Eyewitness It Thought Was Charles Cooper in Its Summary Judgment Brief**

The plaintiffs argued that the hearsay statement that the defendant made in its summary judgment brief referenced Mr. Murray, not Charles Cooper. *Id.* at 7- 9. In other words, the plaintiffs argued the defendant did not disclose the alleged eyewitness that attorney Rumph and investigator Magilton spoke to Detective Tappen about in May 2019 in its summary judgment brief. *Id.*

While the court agrees that the defendant's summary judgment brief's reference to a hearsay statement is inconsistent with the description of the eyewitness that attorney Rumph and investigator Magilton told Detective Tappen about, *see supra* Section II.C.16.a)(1)(b), the defendant did not appear to reference Mr. Murray either. In its summary judgment brief, the defendant stated:

> Although there is a reference in the police investigation file that a person exited an apartment and fired a single shot in the air around the time of the subject occurrence, this potential hearsay statement is insufficient to establish that this incident was related to the decedent's injury.

Def.'s Mot. for Summ. J. at 16 [Doc. No. 55-1]. Detective Tappen's notes from his conversation with Mr. Murray reflect that Mr. Murray "heard several gunshots around 3:00 AM that morning and a couple around 7:30 AM . . . that

. . . sounded like they came from behind his apartment, but he never looked outside and never saw anyone." DKPD Investigative File Excerpts at 5 [Doc. No. 195-1]. Consequently, it does not appear that the defendant was referencing Mr. Murray in its summary judgment brief either. As noted above, the court is not certain to whom the defendant was referring in its summary judgment brief.

### d) The Plaintiffs Believe that Mr. Cooper Was an Eyewitness

The plaintiffs reiterated why they believe that Charles Cooper was the eyewitness discussed at the meeting between attorney Rumph, investigator Magilton, and Detective Tappan. Pls.' Reply re: Pls.' Second Mot. for Sanctions at 8 – 9 [Doc. No. 200]. As previously noted, during that meeting, the defendant's representatives said that the gentleman "who basically saw the shooting, or at least the handoff" drove a royal blue Firebird. *Id.* at 8 (citing Audio Recording of 5/21/19 Meeting, beginning at 19:07 [Doc. No. 186-2]). The plaintiffs stated that DKPD body camera footage from the date of the incident shows a royal blue Firebird registered to Anthony Cooper, Charles Cooper's brother, at the address of 404 Eastwyck Circle, located horizontally across from the building where Ms. Frazier was killed. *Id.; see also* Eastwyck Villages Map [Doc. No. 200-8]. The plaintiffs referred the court

212

to the Eastwyck lease for unit 404, which lists Charles Cooper as the resident. Eastwyck Unit 404 Lease [Doc. No. 200-7]. The plaintiffs claimed that the bullet trajectory analysis developed by DKPD shows that the bullet that killed Ms. Frazier was fired from the parking lot between Mr. Cooper's building and building 60 and lines up with what the defendant's representatives told DKPD on May 21, 2019. Pls.' Reply to Pls.' Second Mot. for Sanctions at 9 [Doc. No. 200]. In May 2020, the current defense counsel sent an investigator to obtain a statement from Mr. Cooper, which the plaintiffs argued suggests that the defendant knew that Mr. Cooper knew something. *Id.* The plaintiffs argued that the statement Mr. Cooper gave the defense investigator is not necessarily true. *Id.* However, the plaintiffs contended that if Mr. Cooper is not the eyewitness referenced in the May 21, 2019 meeting, then there is yet another yet-to-be identified witness who lives nearby and who drives a blue Firebird. *Id.* The plaintiffs argued that they "have very recently come to strongly believe" that security guard Thurman knew who the witness was because evidence produced in *Mayes* shows that security guard Thurman was involved in passing information to a private

investigator.[117] *Id.* at 9 – 10. Because security guard Thurman is represented by the defense counsel in this action, the plaintiffs argued that his knowledge would be imputed to the defendant as his employer.[118] *Id.* at 10.

### e)   The Defendant's Conduct Warrants Sanctions

In light of the above, the plaintiffs reiterated that the defendant's misconduct warrants sanctions. *Id.* at 10.  In support of this, the plaintiffs argued that the defendant's misrepresentations about Marshal Rhodes were not a "credibility issue" to be determined by the jury or something of which the defendant and Ms. Rhodes could have different understandings. *Id.* at 11. The plaintiffs reiterated that Ms. Rhodes testified herself that she had no role with the defendant between September 2018 and January 2020. *Id.* at 10. Moreover, despite continuously touting that Ms. Rhodes' emails were the best source of information the plaintiffs were seeking, the defendant never informed the plaintiffs that they were searching the wrong email account. *Id.* at 11. The plaintiffs argued that a list produced by the forensic expert from

---

[117] Keith Thurman documented in a June 13, 2019 security log produced in the *Mayes* case that he "pass[ed] information to in [sic] a meeting with Property Manager and private investiga . . .". June 13, 2019 Thurman Security Log [Doc. No. 200-9].

[118] The plaintiffs further asserted that this is why they want the May 2019 security logs that they have not received. Pls.' Reply re: Pls.' Second Mot. for Sanctions at 10 [Doc. No. 200].

GoDaddy on November 11, 2021 showed that Ms. Rhodes' previous email was deleted in January 2020, which should have been a clear indicator to counsel that there was a problem. *Id.*

In regard to the missing May 2019 security logs, the plaintiffs asserted that if the defendant is not withholding those security logs, as it contends, that the May 2019 security logs were lost or destroyed after the defendant knew that litigation was foreseeable. *Id.* at 12.

The plaintiffs alleged that the defendant's failure to disclose or admit Wendal Johnson as an employee until the forensic inspection was underway is illustrative of the defendant's (and the defense counsels') approach to discovery in this matter. *Id.* The plaintiffs contended that they independently discovered Mr. Johnson, told the defendant about him, and took his deposition, yet the defendant did not conduct a thorough enough search to discover that Mr. Johnson worked security on their property and was listed on employee lists mailed to management until after the plaintiffs filed multiple motions and the court ordered an email search. *Id.*

In regard to Charles Cooper, the plaintiffs conceded that their discovery requests excluded privileged documents, including Mr. Cooper's statement to the defense investigator. *Id.* at 12 – 13. However, they contended

that the defendant's failure to disclose Mr. Cooper as someone with discoverable information is sanctionable pursuant to Rule 26. *Id.* at 13.

The plaintiffs argued that the size of the defendant's production does not excuse it for spoliating relevant evidence. *Id.* at 14. The plaintiffs further asserted that the affirmative steps taken by the defendant in deleting email accounts or losing access to the Gmail account after being placed on notice of potential litigation establish its intent in deleting the emails. *Id.* The plaintiffs argued that the emails of everyone who worked on the property level—who were on site every day interacting with tenants, managing security officers, and dealing with the extensive issues at the property—are gone forever if they were not forwarded to the accounts of Ms. Dia, Ms. Prekelezaj or Mr. Dedvukaj. *Id.* at 15. Because this evidence cannot be replaced and is highly material to the plaintiffs' claims, the plaintiffs alleged they have been highly prejudiced.[119] *Id.*

---

[119] In Ms. Dia's *Mayes* deposition, she stated that knowledge of many violent incidents at Eastwyck stopped at the property level. Dia *Mayes* Dep. 178:21 – 182:2 [Doc. No. 185-19].

216

### 18. The Court Held a Hearing on the Pending Sanctions Motions

On February 10, 2022, the court held a hearing on the plaintiffs' pending motions for sanctions. *See generally* Sanctions Hr'g Tr. [Doc. Nos. 217 (Vol. I) and 214 (Vol. II)]. The court informed the parties that it was holding the hearing to consider sanctions against both the defendant and the defense counsel for alleged discovery misconduct related to the following actions or failures to act:

- The defendant failed to disclose more than 42 employees who worked at the Eastwyck apartment complex;

- The defendant failed to properly identify the property manager at the Eastwyck apartment complex on the date of the shooting;

- The defendant failed to produce time sheets containing security log information;

- The defendant failed to disclose another case (*Mayes*) pending against it in Georgia state court that also involves an innocent shooting victim at the Eastwyck apartment complex;

- The defendant spoliated various email accounts, including all accounts used by employees who worked at the Eastwyck apartment complex

before or at the time of Ms. Frazier's death and Gmail accounts it used to conduct business related to the Eastwyck apartment complex;

- The defendant spoliated data stored on computers located at the Eastwyck apartment complex by selling the computers along with the property;

- The defendant spoliated or hid Eastwyck security logs from May 2019;

- The defendant failed to disclose the identity of Charles Cooper, an individual having knowledge of the circumstances surrounding Ms. Frazier's death;

- The defendant failed to properly identify Wendal Johnson as an employee;

- The defendant failed to disclose and search the email account assigned to Marshal Rhodes most likely to have relevant data, instead deleting the account and attempting to divert the plaintiffs to an email account created for Marshal Rhodes after Ms. Frazier's death;

- The defendant's employees failed to make truthful statements in depositions;

- The defendant needlessly objected to and withheld documents that it produced without objection in a similar proceeding in state court;

- The defendant failed to make a thorough forensic investigation as contemplated by this court's order; and

- The defendant failed to comply with this court's deadlines for the forensic inspection and production or otherwise request an extension from the court or opposing counsel.

Sanctions Hr'g Tr. I at 3:24 – 5:24 [Doc. No. 217]. The court informed the plaintiffs that they would be given the opportunity to call any other bases for sanctions articulated in their briefs to the court's attention during the hearing. *Id.* at 6:17-20. The court further informed the defendant and the defense counsel that it was considering granting the plaintiffs' requested sanctions as well as imposing any other sanctions that the behavior warrants pursuant to the court's inherent authority as well as the Federal Rules of Civil Procedure, particularly Rules 26(g), 37(b), 37(c) and 37(e). *Id.* at 6:21-25. The court listed those sanctions as including:

- An issue preclusion sanction that would preclude the defendant from contesting that it breached a duty to Ms. Frazier and that its breach caused her death;

- Striking the defendant's answer and entering default judgment for the plaintiffs;

219

- Ordering the defendant to pay all fees and costs that the plaintiffs incurred in bringing the motions for sanctions, in dealing with the defendant's deficient production of emails, and for all time spent on future discovery related in any way to information or witnesses the defendant has wrongfully withheld; and/or

- Ordering the defendant to pay all costs and expenses incurred throughout this action.

*Id.* at 5:25 – 6:25. Although the court noted that the parties had an opportunity to fully brief the issues before the court, it stated that it "scheduled this hearing and ordered the presence of the defendant's 30(b)(6) witness and the defendant's forensic expert Rob Draper to provide the defendant with another, more thorough, opportunity to be heard on this matter." *Id.* at 7:1-6.

At the hearing, the plaintiffs informed the court that while the issues in the first motion for sanctions are still relevant, the plaintiffs are now seeking the sanctions requested in the second motion for sanctions. *Id.* at 37:8 – 40:16 ("We think the answer should be struck . . . a trial should proceed on apportionment and damages, and . . . [the plaintiffs] should be entitled to [their] attorneys' fees and the costs for 19 months" of litigation).

220

Consequently, the court denied the first motion for sanctions as moot but assured the parties that it would consider the arguments raised therein when addressing the second motion for sanctions. February 14, 2022 Order [Doc. No. 212]. At the hearing, Ms. Prekelezaj and Mr. Draper testified, and attorney Perniciaro spoke on his own behalf. The court will briefly summarize relevant portions of the parties' arguments.[120]

### a) The Plaintiffs' Presentation

This order has already addressed the majority of the plaintiffs' arguments. Therefore, the court will address only a few points raised by the plaintiffs' counsel at the sanctions hearing.

### (1) The Defendant Unilaterally Limited the Date Range of the Forensic Examination

The plaintiffs' counsel contended that although the court order compelling a forensic examination did not limit the date range of the search the defendant was required to conduct, the defendant unilaterally decided that it would only review and produce emails before May 1, 2019, less than a month after the shooting. Sanctions Hr'g Tr. I at 26:12-15 [Doc. No. 217]. The plaintiffs' counsel argued this timeframe was inadequate. *Id.* at 26:12-21.

---

[120] The court will not attempt to summarize or regurgitate every argument made over a hearing that spanned a two-day period but will instead focus on the portions it found most relevant to this order.

Moreover, the plaintiffs' counsel argued that the defendant produced at least one email from 2022, raising questions about the reliability of the defendant's search. *Id.* at 28:9-15.

### (2) The Defendant's Privilege Log is Problematic

The plaintiffs' counsel contended that the defendant's privilege log, which was not produced until February 4, 2022, is "inadequate and obstructive." *Id.* at 25:10-12. He argued, as an example, that the defendant withheld the payroll list "under some sort of financial privilege," stating, "[t]hey won't provide us a date. They won't tell us what e-mail it was attached to. They won't tell us who it was sent to and for, and they won't tell us any of this." *Id.* at 25:12-24. Moreover, the plaintiffs' counsel pointed to a privilege log entry for an email from Ms. Pauleon to management less than a month after the shooting. *Id.* at 26:1-4. The plaintiffs' counsel argued that the entry, which was withheld on the basis of attorney work product and attorney-client privilege, does not contain a subject or substance and does not include an attorney as a sender or a recipient. *Id.* at 26:4-7. Moreover, the plaintiffs' counsel contended that the defendant withheld documents without telling the plaintiffs what emails they match up to, making it impossible for the plaintiffs to evaluate privilege. *Id.* at 26:8-11.

### (3)  The Defendant's Definition of Responsiveness is Problematic

Once again, the plaintiffs' counsel raised the concerns stated in the plaintiffs' November 2021 status update to the court that the defendant was withholding documents that contained the court-ordered search terms because it deemed them unresponsive. *Id.* at 26:22 – 27:3; Sanctions Hr'g Tr. II at 65:8 – 68:23 [Doc. No. 214]. The plaintiffs' counsel argued that, based on the defendant's representations, the forensic review of the defendant's documents resulted in 31,000 emails containing the court-ordered search terms. *Id.* at 67:11. The plaintiffs' counsel contended that the plaintiffs were willing to take all such documents and stated, "You can bring the dump truck and put it right on my front yard and I'll take every document possible." *Id.* at 67:5-8. However, out of the 31,000 documents, the defendant produced only approximately 1,000. *Id.* at 67:11-16. The plaintiffs' counsel argued that there are at least 29,000 emails that the defendant reviewed which are not listed on the privilege log and which the plaintiffs know nothing about. *Id.* at 67:17-19. Moreover, the plaintiffs' counsel argued that—despite the protective order—the defendant is withholding documents pursuant to privilege that it produced in *Mayes* without the benefit of a protective order. Sanctions Hr'g Tr. I at 28:21 – 29:2 [Doc. No. 217].

The plaintiffs' counsel further reminded the court that, initially, the defendant gave them only four emails, which fuels the plaintiffs' distrust of the defendant. Sanctions Hr'g Tr. II at 68:1-3 [Doc. No. 214]. In his arguments, the plaintiffs' counsel pointed out that the defendant was not adhering to its own parameters and had produced documents that had nothing to do with the case, meaning that the defendant had likely underproduced documents as well. Sanctions Hr'g Tr. I at 27:13 – 28:8 [Doc. No. 217].

### (4)   The Plaintiffs Cannot Find Charles Cooper

At the hearing, the plaintiffs' counsel first asserted that the plaintiffs located Charles Cooper, called him and "he told [them] to go pound sand. He was done talking to lawyers. He had already given his story twice." *Id.* at 32:2-4. However, the plaintiffs' counsel argued that now the plaintiffs cannot locate him despite hiring a private investigator. *Id.* at 32:12-17. At the hearing the next day, he elaborated on the plaintiffs' efforts as follows:

> Here's what our private investigator told us when we tried to find – as we're trying to find Charles Cooper. Our investigator's name is Stacy, and Stacy said:
>
> I went to the property and there were two groups getting ready to fight. One girl had a brick in her hand and they stabbed her in the head. I knocked. The apartment was dark. I'm not

convinced there are any people living there, but my car was exposed and I certainly wasn't hanging out there.

That's January 26 of this year. We have been looking for Charles Cooper for two months.

Sanctions Hr'g Tr. II at 72:1-11 [Doc. No. 214].

### (5) The Plaintiffs Did Not Want to Take Additional Depositions Until the Document Production Was Complete

The plaintiffs' counsel responded to the defendant's persistent criticism that the plaintiffs have not taken additional depositions as individuals and witnesses became known to them, arguing that "we weren't going to take depositions without having all of the documents that we needed." *Id.* at 56:5-12. Since the plaintiffs received the defendant's last production of documents days before the hearing, the plaintiffs' counsel argued that the plaintiffs have not had an opportunity to conduct those depositions. *Id.*

### (6) The Court Must Sanction the Defendant *and* the Defense Counsel

The plaintiffs' counsel contended that the court must sanction the defense counsel as well as the defendant, stating:

And the reason for that is, after the August hearing, Contour's counsel told us to stop searching for the truth. He said, if you keep uncovering things, if you keep finding out all the things that went wrong, you know what's going to happen? The insurance company is going to pull coverage.

225

There's a $5 million excess policy in this case, which is what Contour's lawyers are defending this case upon.

. . .

After this hearing, when we went out in the hallway, in August, we told defense counsel we believed that there were more problems with Contour's behavior, that we knew more about what was wrong. We just weren't ready to prove it.

And he told us we better stop looking, we better stop trying to find out the truth, because, he said, if we find out too much, then the insurance carrier is going to pull coverage.

And that's important, because Contour sold the property in January of 2021. So they've divested themselves of all assets. There's no income. We can't go and get money from Contour at the end of this. The only place we can get money is Contour's $5 million excess policy.

We've already gotten the first million. You've looked at that settlement, your honor.

Now, we've had two choices. We stop searching because we're worried, or we keep trying to find out the truth. So what's going to happen if only Contour is sanctioned is Contour's insurer is going to file a declator -- I can't speak -- a dec action. If Contour is sanctioned alone, their answer is struck only because of Contour's misconduct, not their counsel's, the insurance company is going to file a dec action against Contour and say, there's no coverage. And then even if we win this case, we'll have a piece of paper that's a judgment that we cannot collect on.

That was the threat that was made in August.

And I respectfully submit to the court that defense counsel should be worried about his client and himself not committing misconduct rather than trying to stop us from finding it out.

Sanctions Hr'g Tr. I at 37:20 – 39:9 [Doc. No. 217].

The next day, the plaintiffs' counsel pointed out that that the defense counsel had not produced any preservation of evidence letters or any instructions showing they actually counseled their clients. Sanctions Hr'g Tr. II at 82:3-7 [Doc. No. 214]. He argued that the defense counsel were asking their client "self-serving questions . . . to save their behind" and stated that it seemed like the defendant's corporate representative was "put on the stand to get the bus run over her." *Id.* at 81:22 – 82:2. When the court probed further, the plaintiffs' counsel changed his position from the previous day's argument, stating that the potential of the insurance company pulling coverage "was not the reason" the court should sanction the defense counsel. *Id.* at 83:9-14. In fact, the plaintiffs' counsel said that while he believed it was inappropriate for the defense counsel to threaten that the insurance company will pull coverage, he did "not believe that the insurance company potentially pulling coverage is a reason to sanction defense counsel."[121] *Id.* at 86:7-13.

---

[121] However, the plaintiffs' counsel stated that if the court strikes the defendant's answer, he feels confident that Nautilus is going to pull coverage "and say Contour violated their insurance coverage contract by not – by

Instead, he argued that "the reason [the court] should sanction the defense firm and the defendant is because . . . the conduct is joint and because defense counsel committed misconduct on his own." *Id.* at 83:15-19. However, the plaintiffs' counsel appeared to change his mind once again a few moments later, when he argued that the following four reasons exist for sanctions against the defense counsel: (1) to punish the defense counsels' misconduct; (2) to make sure the defense counsel doesn't engage in this type of behavior again; (3) to discourage other attorneys from engaging in the type of behavior the defense counsel exhibited in this action; and (4) to prevent the insurance company from pulling coverage. *Id.* at 88:13-24.

### (7)    The Compromised Discovery is Relevant to Ms. Frazier's Legal Status on the Property

The plaintiffs' counsel contended that the lost discovery is relevant to the determination of Ms. Frazier's legal status. *Id.* at 76:11 – 79:4. Acknowledging the defendant's argument that Ms. Frazier "was a trespasser

---

committing misconduct and violating the rules." Sanctions Hr'g Tr. II  at 87:14-17 [Doc. No. 214]. Because the defendant is "not a solvent company" that "may have been administratively dissolved," the plaintiffs' counsel argued that the plaintiff will be "left without recourse" with "a paper judgment" if the defendant is the only one sanctioned. *Id.* at 87:6-23. Therefore, he argued that it would be better not to sanction anyone at all than to sanction only the defendant, because "at least there will be insurance coverage and at least we have a fighting chance, in spite of not having all these emails and being lied to for months and years." *Id.* at 87:24 – 88:3.

because she was doing something illegal in the unit, and that was violating the lease," the plaintiffs' counsel argued that emails on the property level side could show that the defendant allowed people to violate the lease and commit crimes without eviction. *Id.* at 76:21 – 77:6. However, because "the emails are gone[,] . . .[the plaintiffs] can't show that Contour approved the behavior that was going on." *Id.* at 77:13-15.

### (8) The Court Should Strike the Answer

The plaintiffs' counsel contended that there are three parts to this case: (1) What was Ms. Frazier's legal status on the property? (2) Were there substantially similar crimes? and (3) Could the defendant have taken reasonable steps to protect Ms. Frazier? *Id.* at 80:5-11. He argued that if the court only precludes the defendant from arguing that Ms. Frazier was not an invitee and from saying that the prior crimes on the property were not substantially similar, the defendant is going to say that there were no reasonable security measures that could have prevented this crime. *Id.* at 79:22 – 80:18. The plaintiffs' counsel contended that the defendant would still be able to benefit from its misconduct. *Id.* at 80:19-20. He further stated that with "the most important witness hidden, the eyewitness," "probably tens of thousands" of destroyed emails, the undisclosed Eastwyck employees that the plaintiffs uncovered, and the large amount of time spent "trying to figure out

basic things, like who the manager is," this is the ideal case for striking the answer. *Id.* at 81:1-14. He argued that issue preclusion "isn't going to send the message that needs to be sent here to Contour, who is a serial litigator," who "march[es] up a corporate representative who disagrees with her own vice president and then disagrees with herself when asked by a federal court judge . . . [and who then] disagree[s] with their lawyers." *Id.* at 81:15-22.

### b)   Ms. Prekelezaj's Testimony

Before the defendant presented its arguments in full, the defense counsel called Ms. Prekelezaj to the stand. She testified to several points of contention and confusion in this case, as summarized below.

### (1)   The Email Searches

### (a)   The Initial Email Search

Ms. Prekelezaj agreed with the plaintiffs' counsel that the defendant "repeatedly promised that it had produced all e-mails before it actually had produced all e-mails." Sanctions Hr'g Tr. I at 80:6-9 [Doc. No. 217]. In regard to the email search in this matter that resulted in fewer than 100 emails, Ms. Prekelezaj agreed that the defendant stated that it had produced all emails. *Id.* at 80:1-13. She further agreed that, at that time, the defendant had almost 1,000 undisclosed emails. *Id.* at 80:10 – 15.

### (b)    The Forensic Examination

In regard to the forensic examination, Ms. Prekelezaj testified that she did not know why the defendant had only searched emails through May 1, 2019. *Id.* at 80:16-18. She further testified that she did not know whether the defendant made that decision or the lawyers made that decision. *Id.* at 80:16-20.

### (2)    Ms. Prekelezaj Discussed Documents Produced in *Mayes* but Withheld in this Matter

Despite her designation as the defendant's 30(b)(6) witness, Ms. Prekelezaj testified that she did not know whether the attorneys or the defendant wanted to withhold the documents it produced in *Mayes* in the instant action. *Id.* at 75:16 – 76:6. When asked why the defendant produced documents in *Mayes* that weren't produced in this case, she stated that she didn't know, but that the attorneys would know. *Id.* at 76:7-11. In Ms. Prekelezaj's Third Declaration, she stated that the defendant "takes steps to prevent disclosure of [profit and loss statements, balance sheets, tax returns, tenant balance information, and personal financial information of employees, tenants, and managing members], such as seeking protective orders in legal cases or seeking confidentiality agreements." Third Prekelezaj Decl. ¶ 9 [Doc.

No. 185-2]. Based on Ms. Prekelezaj's lack of knowledge at the sanctions hearing and the defendant's decision to disclose this type of information in *Mayes* without protections, the court is not convinced that the defendant routinely takes the protective steps Ms. Prekelezaj referenced in her declaration.

### (3)  Ms. Prekelezaj Testified She Had No Prior Knowledge of Mr. Cooper

Ms. Prekelezaj testified that the first time she had heard about an eyewitness to the shooting was at the instant hearing. Sanctions Hr'g Tr. I at 84:2-19 [Doc. No. 217].

### (4)  Ms. Prekelezaj Discussed the Undisclosed Employees

On the witness stand, Ms. Prekelezaj echoed the majority of the testimony set forth in her Second Declaration [Doc. No. 167-1] regarding the defendant's search for employee files. Sanctions Hr'g Tr. I at 50:11 - 54:1 [Doc. No. 217]. Specifically, she stated that Ms. Leonard conducted the first search for employee files by looking at the Dropbox files where she had placed electronic versions of files and then gave Ms. Prekelezaj a list of employees,

which Ms. Prekelezaj turned over.[122] *Id.* at 51:3-7. She testified that she didn't look at tax records or emails or speak to employees other than "our HR and administrators" to determine who the employees were. *Id.* at 67:17 – 68:23.

She stated that in the *Mayes* case, her attorneys asked that she do another search of employee files and then Ms. Leonard came across hard copies of employee files misplaced on a different shelf of the storage cabinet. *Id.* at 51:8 – 16. When asked why she didn't give the missing box of employee files—which she discovered sometime in early summer 2021—over to the defense counsel in this case, Ms. Prekelezaj stated: "It didn't occur to me that I had to send files or findings that I was sending for one case over to the other attorneys for another case." *Id.* at 53:16-18; 85:23 – 86:2.

On the second day of the hearing, the court followed up on Ms. Prekelezaj's earlier testimony to inquire about the discrepancies between her

---

[122] Attorney Perniciaro later asked Ms. Prekelezaj, "And Savannah [Leonard] searched physical files and some electronic files, you said?" Sanctions Hr'g Tr. I at 52:5-6 [Doc. No. 217]. Ms. Prekelezaj responded, "Yes, that she had uploaded herself into Dropbox over time." *Id.* at 52:7. The court notes that, while her Second Declaration (likely drafted by counsel) states that Ms. Leonard searched Dropbox files and physical files [Doc. 167-1 ¶ 4], when Ms. Prekelezaj testified without the benefit of her counsel's leading question, she made no reference to Ms. Leonard searching physical files. Sanctions Hr'g Tr. I at 51:5-7 [Doc. No. 217].

original deposition testimony, in which she stated that she *and* Ms. Leonard reviewed employee records and that she spent two hours searching Intuit payroll records, and her August 23, 2021 declaration testimony. Sanctions Hr'g Tr. II at 5:1 – 9:11 [Doc. No. 214]. Ms. Prekelezaj testified as follows:

(The court read her deposition testimony)

Q    Do you remember that testimony?

A    I do.

Q    And was that accurate, or is that still accurate?

A    Somewhat, yes. Because I didn't review them with Savannah; I had Savannah review them before she gave them to me, the employee files.

Q    All right. And you, it's my belief from that testimony, you spent two hours searching the Intuit records which had all the payroll records, correct?

A    Correct.

Q    Well, meanwhile, on August 24, 2021, let's see, it's dated the 23rd of August, and signed by you, there is a declaration. And it says during my deposition I also assumed that Ms. [Leonard] had searched payroll records in addition to employee files. I was incorrect in assuming that payroll records were searched. Just electronic and physical employee files were searched.

Is that correct?

A    That is correct.

Q    But both of them can't be correct.

234

A    I believe the first question, the first testimony I thought he was asking how long it would take to search Intuit. My answer was a couple hours.

I did not search Intuit for a couple hours. Savannah was entitled with that task. And then, came to find out, she didn't physically search the Intuit records.

Q    So you did not search Intuit, yourself?

A    That is correct.

Q    Have you now searched Intuit?

A    We went back, I went back, yes, with my accountant, and we researched Intuit, and that's how she was able to pull W-2 records.

Through her accounting, she has a different kind of delegation to use Intuit, so she was able to pull the W-2 records.

Q    And is that how you found the 45 newly found employees?

A    Correct.

*Id.* at 5:12 – 8:25. Notably, Ms. Prekelezaj's testimony to the court that she discovered the 45 newly found employees through Intuit differed from her previous testimony at the hearing that the employees were discovered through a combination of payroll record searching and finding a box of files

in a storage closet.[123] Sanctions Hr'g Tr. I at 51:8-16; 52:23 – 53:7 [Doc. No. 217]. Presumably—based on Ms. Prekelezaj's testimony to the court on the second day of the hearing—if Ms. Prekelezaj had chosen to utilize Intuit sooner, she would not have needed to look through the storage closet to uncover the missing employees.[124]

When asked what the attorneys in *Mayes* did differently to obtain the relevant documents, Ms. Prekelezaj maintained, "They didn't do anything differently. It just never occurred to me to give them the information we found from the *Mayes* case."[125] *Id.* at 70:10-15. When asked by attorney Perniciaro if his firm had requested those files from her before, she stated that he had requested employee files more than once by "e-mail, phone, any conversation

---

[123] In her Second Declaration, Ms. Prekelezaj testified that the defendant "discovered a box of employee files that was not found the first time . . .[that] was not labeled for the Eastwyck Village property . . .[and which] contained additional employee files that were not previously located." Second Prekelezaj Decl. ¶¶ 12-13 [Doc. No. 167-1]. She testified that she also enlisted the assistance of the defendant's accountant to review W-2 information to identify the former employees working at Eastwyck Villages. *Id.* ¶ 11.

[124] The court gave the defense counsel and the plaintiffs' counsel an opportunity to further question Ms. Prekelezaj after her testimony to the court, but both declined to do so. Sanctions Hr'g Tr. II at 9:2-9 [Doc. No. 214].

[125] However, she did agree at another point in her testimony that the *Mayes* attorneys asked her to look at tax records and payroll records, which she did not do in this case. Sanctions Hr'g Tr. I at 67:1 – 68:23 [Doc. No. 217].

we had" but that it was not an annoyance. *Id.* at 82:8-21. She informed the court that she didn't remember whether the current attorneys gave her any instructions about what to keep and preserve and make sure things didn't disappear. *Id.* at 84:24 – 85:7.

### (5)   Ms. Prekelezaj Testified Regarding Mr. Johnson's Employment Status

Ms. Prekelezaj first discussed Wendel Johnson on direct examination with attorney Perniciaro. *Id.* at 54:2 – 55:9. Attorney Perniciaro referred to Mr. Johnson as "an employee . . . a security guard at the property." *Id.* at 54:2-5. Notably, Ms. Prekelezaj did not correct her attorney. She stated that Mr. Johnson did not come up in any of the W-2 files, payroll files, or employee files, so he was not disclosed as an employee.[126] *Id.* at 54:6-15. She stated that she did not know why no one recognized his name as someone who worked at

---

[126] Despite this testimony, it does not appear to the court that Ms. Prekelezaj (or anyone else for that matter) looked through the defendant's W-2 files, payroll files, or anything other than the employee files Ms. Leonard had stored in Dropbox until summer 2021. *See* Sanctions Hr'g Tr. I at 51:3 – 52:4 [Doc. No. 217] (Ms. Prekelezaj testified that the first search she did for Eastwyck employees was in this case and involved Ms. Leonard looking through Dropbox for employee files); *id.* at 52:20 – 53:7 (Ms. Prekelezaj testified that the search for Eastwyck documents in *Mayes*, which she called the "second search" involved a search of W-2 records, payroll records, and paper files); *id.* at 70:23 – 71:6 (Ms. Prekelezaj testified that the second search occurred in summer of 2021).

the property and acknowledged that she could have asked questions about him to find out additional information, but all of the people who could have hired Mr. Johnson (namely, Ms. Pauleon, Mr. Payne, and Ms. Goolsby) were no longer with the company.[127] *Id.* at 54:16-23; 55:14-21. She testified that he never received a paycheck. *Id.* at 54:24 – 55:2. She did not, on direct examination, testify that Mr. Johnson was not an employee.

On cross-examination, however, Ms. Prekelezaj testified that Mr. Johnson was not an employee:

> A     I don't know that [Mr. Johnson] was our security guard. He was never paid by our company.

> Q     Wait. So he might not be an employee. Well, let me ask you this: Was Wendal Johnson an employee of Contour Eastwyck?

> A     In the records we found, he was not in our W-2 records, so no, he was not.

> Q     So you had a security guard, armed, with a bulletproof vest, walking around the property, being aided by your staff, being trained by your current security guard, and he was not an employee?

---

[127] Ms. Prekelezaj specifically testified that she "guess[ed] [she] could have, you know, kept asking questions about [Mr. Johnson]," when asked if there was anyone she "could have spoken to differently to try to find any additional information about [Mr. Johnson]." Sanctions Hr'g Tr. I at 54:19-23 [Doc. No. 217]. However, Ms. Prekelezaj also testified that she didn't speak to people who actually worked at Eastwyck to ask them who worked there. *Id.* at 68:15-23. Thus, in spite of her phrasing at the hearing, it does not appear to the court that Ms. Prekelezaj asked anyone who actually could have worked with Mr. Johnson, like security guard Thurman, about him.

A     He was not paid by our company. He was not on our payroll. He did never – He never received a paycheck from our company.

Q     That's because he was paid through a lease abatement. He lived there, right?

A     I guess so. I don't know that he lived there.

Q     Do you remember signing a third declaration recently – it would have been about a month or so ago – which listed all the Contour employees?

A     Yes.

Q     Why did you include Wendal Johnson on that list if he wasn't an employee?

A     He never was on our W-2 records. He never received a paycheck from our company.

Q     Ma'am, my question is: in your third declaration, you affirmatively stated Wendal Johnson was an employee. Do you want me to show you?

 [Shows the witness]

A     Those are asking about the e-mail accounts and why he was not issued an e-mail account.

Q     And he wasn't issued an e-mail account because he was a security guard, right?

A     He wasn't issued an e-mail account because he wasn't an employee. Only management would have received an e-mail account –had he been an employee.

239

Q      Ma'am, do you know if Wendal Johnson was paid via rent abatement?

A      I do not know that, no.

Q      I'll also say to you that your list of employees in your third declaration starts with the following sentence: the following individuals appear on payroll lists but were not issued a W-2. And then Wendal Johnson is listed. So he was on a payroll list?

A      Correct. But he wasn't issued a W-2, which means he was never paid by our company.

Q      Ma'am, I'm not going to play semantics with you. He was issued a—He was on your payroll list. He worked for your company. He did security there. Right?

A      No, because he was never paid by our company.

Q      Understood.

A      He was not an employee.

Q      Understood.

*Id.* at 71:25 – 74:8.

### (6)     Ms. Prekelezaj Testified Regarding the Property Manager at the Time of the Shooting

Ms. Prekelezaj testified at the hearing that payroll records indicated that Ms. Pauleon was the Eastwyck property manager at the time of Ms. Frazier's death. *Id.* at 56:2-5. In the middle of Ms. Prekelezaj's testimony, attorney Perniciaro interjected as follows:

240

> Your Honor, can I just state that we identified Dian Pauleon as the property manager in our initial discovery responses. I don't know if it's proper for me to do, but there was a comment from plaintiffs' counsel that they didn't find out about who the property manager was at the time of the incident until some late point in the litigation. But the record would show that we identified her as the property manager.

*Id.* at 56:6-13. As noted above, the defendant identified Ms. Pauleon as *one of* Eastwyck's property managers over the past five years in response to the plaintiffs' first interrogatories but then was unable to consistently articulate her role throughout this litigation. *See supra* Section II.A.5.b)(4). Moreover, in response to the plaintiffs' first motion for sanctions, the defendant stated that "[p]laintiffs have had the identity and employment dates for the property manager at all relevant times, Marshal Rhodes, along with her assistant as of April 6, 2019, Dian Pauleon." Def.'s Resp. in Opp'n to the Pls.' Mot. for Sanctions at 8 [Doc. No. 167]. Ms. Prekelezaj agreed with the plaintiffs' counsel on cross-examination that her testimony at the hearing was the first time in 19 months of litigation that she had told the plaintiffs that Ms. Pauleon was the property manager. Sanctions Hr'g Tr. I at 66:8-15 [Doc. No. 217]. On direct examination, she stated that she believed, at the time of her deposition, that the property manager at the time of Ms. Frazier's death was Mr. Payne. *Id.* at 64:4-10. However, in her deposition, as noted previously,

she testified that Ms. Rhodes was the manager at all relevant times. Prekelezaj Dep. 71:11 – 72:20 [Doc. No. 128-1].

### (7)   Ms. Prekelezaj Testified Regarding Employee Email Accounts

Ms. Prekelezaj testified that the defendant's employees were supposed to be using company-issued email accounts that were linked to the defendant's domain and to which the defendant had access.[128] Sanctions Hr'g Tr. I at 57:3-13 [Doc. No. 217]. In regard to deleting the accounts, she testified that "it's just always been our process to just deactivate or delete the e-mail after an employee's no longer with the company so that we can reuse that e-mail for someone else." *Id.* at 57:14-17. However, she later testified that the defendant found out it could reuse an email without deleting it, so Ms. Pauleon's account was recreated for and reassigned to a new property manager. *Id.* at 59:22 – 60:5.

Ms. Prekelezaj testified that the leasing office Gmail account predated the defendant's ownership of Eastwyck. *Id.* at 60:9 – 61:3. She testified that she does not recall providing information as to when access to that account

---

[128] However, she also testified that property managers were typically the only property level employees who received company email addresses. Sanctions Hr'g Tr. I at 57:18-19 [Doc. No. 217].

was lost and stated that information could have come from Ms. Dia or Ms. Rhodes. *Id.* at 63:7-22. She stated that the defendant had attempted to recover and reset a password to the leasing office account but none of the defendant's current employees had a phone number associated with the last two digits of the password recovery number and none of the defendant's employees were associated with the recovery email, which was another Gmail account not created by the defendant.[129] *Id.* at 61:6 – 63:6. However, on cross-examination she admitted that she did not ask every employee if they received a recovery email from the leasing office Gmail account. *Id.* at 76:24 – 77:6.

---

[129] The defense counsel noted that there was a suspicion that the recovery email address was contourdevelopment@gmail.com. Sanctions Hr'g Tr. I at 62:8-9 [Doc. No. 217]. Ms. Prekelezaj said that if such an account existed, she would have been the one that created it because Contour Development is another company that is part of the umbrella of companies that is the development company. *Id.* at 62:13-20. However, she testified that she did not create it and that email does not exist as far as she knows. *Id.* at 62:19-20. She further stated that she attempted to reset the password for contourdevelopment@gmail.com and it came up as an invalid email. *Id.* at 62:25 – 63:6.

### (8) Ms. Prekelezaj Discussed Ms. Rhodes' Employment Dates

In regard to Ms. Rhodes' employment dates, Ms. Prekelezaj acknowledged that she "misspoke and was wrong in what [she] said" in her deposition. *Id.* at 64:14-25. On cross-examination, she acknowledged that it would have taken her two seconds to ask Ms. Rhodes, who currently works for a Contour Development Group company, whether she was the manager on the date of the shooting, and she does not know why she did not ask her that. *Id.* at 77:25 – 78:4

### (9) Ms. Prekelezaj Testified Regarding the Threat of Nautilus Pulling Insurance Coverage

Ms. Prekelezaj testified that she had no knowledge of a letter sent by the plaintiffs' counsel to the defendant telling the defendant about the conversation between opposing counsel regarding Nautilus pulling insurance coverage. *Id.* at 79:10-16. She testified that the defendant has a general counsel who probably would have received that letter. *Id.* at 79:15-16. Thus, she said the first time she had heard that the defendant's insurance might be pulled was at the instant hearing. *Id.* at 79:17-19. While she said that prospect was "very scary," she acknowledged that the defendant doesn't have any assets because it sold the company. *Id.* at 79:20-24. When asked if the

defendant had any money in the bank account she said, "I don't know without looking at the bank account." *Id.* at 79:25 – 80:1. She did not know why her attorneys did not give her the August letter discussing Nautilus pulling insurance coverage. *Id.* at 80:2-5.

### (10)   Ms. Prekelezaj Testified Regarding the Defendant's Failure to Preserve Documents and Emails

Ms. Prekelezaj testified that she received the plaintiffs' preservation of evidence letter. *Id.* at 66:16-18. She further stated she was aware that the preservation of evidence letter requested all employee files and documents relating to employees. *Id.* at 66:19-22.  She further agreed with the plaintiffs' counsel that the defendant had years to find the employee files. *Id.* at 66:23-25. When the court asked her whether the current defense counsel gave her any instructions about what to keep and preserve, she stated that she could not remember. *Id.* at 84:24 – 85:3.

### c)   Mr. Draper's Testimony

After Ms. Prekelezaj testified, Mr. Draper—who was hired to conduct the forensic inspection—testified regarding the inspection. Sanctions Hr'g Tr. I at 88:3 – 120:5 [Doc. No. 217]. Pertinent points from his testimony are discussed below.

### (1)    Mr. Draper Explained His Process

Mr. Draper explained that his company follows industry guidelines, most of which are set by the Sedona Conference and the Electronic Discovery Reference Model, which guides "how data is to be collected." *Id.* at 90:20-24. Following these guidelines, he stated that his company first focused on where the key data would reside and identified it, collected it, ingested it, and indexed it for searching. *Id.* at 91:24 – 92:2. In this case, Mr. Draper said that the data that was collected was from four GoDaddy email accounts "presented in the order and given to [him] by the parties." *Id.* at 92:7-15. He stated that— very early in the matter—attorney Perniciaro gave him "a full list of employee lists with e-mail account information from the defendant" that "was imaged and sent to both parties." *Id.* at 92:16 – 93:2. He stated that he was "next given the ability to discuss the account in totality, the e-mail account, with GoDaddy," whom he "met with . . . on several occasions." *Id.* at 93:6-9. He stated that GoDaddy gave him a list of email accounts, including all accounts that ever existed under the Contour domain, active and deleted accounts, and information regarding when they were set up, when they were deleted, and "what would have been the last change if they were still active." *Id.* at 93:9-14; 93:20 – 94:6. He further stated that he also had "some organizational e-mails and whatever active aliases were in use at the time." *Id.* at 93:16-17.

He verified that the information he was given was included in his report and was not filtered through the defendant or the defense counsel, though he acknowledged that he "erroneously left out the groups and the aliases and only included the e-mail addresses" when he was creating the report. *Id.* at 94:5-13. He testified that he had since updated his report. *Id.* at 94:18-19.

In this matter, Mr. Draper testified that the keyword search terms were bringing back a large volume of data—over 100,000 keyword hits—from the four available email accounts, that was "well over 100 gigs of data." *Id.* at 96:6 – 97:9. He testified that this was "too much data to be reviewed," so he tried to work with the parties to amend their terms "to actually bring back the documents that were responsive in this matter and eliminate the false positives." *Id.* at 97:11-18. He testified he made some suggestions "of [his] own accord" to cull the data set, including using a date limiter and revising the search terms. *Id.* at 98:10 – 99:15. However, on cross-examination, he testified that he did not pick the May 1, 2019 date limiter and that, while he doesn't know who made that decision, he "was told by Chris [Perniciaro] if it was to limit the search." *Id.* at 113:7-25. He testified that the terms were "subsequently narrowed through several weeks of work between the parties, some of which [he] was involved with directly on phone calls with both parties." *Id.* at 99:23 – 100:1. When asked by attorney Perniciaro if, when

247

attempting to limit the amount of data produced, he had "any difficulties with any of this where anybody was being obstructive or not attempting to work together in good faith," Mr. Draper stated:

> We ran into some issues when we really had determined—it looked like we were making some progress on the calls. Mr. Rafi was not part of the calls; Mr. Brown was for his firm. I don't know if Mr. Rafi had all the information, but he certainly asked for a lot of information about the keyword search terms and the data after we had worked on the terms together, yes.

*Id.* at 100:2-12.[130] He testified that he worked with the parties through email and phone calls and that nobody tried to keep him from talking to anyone else. *Id.* at 100:13-25. However, on cross-examination, when Mr. Rafi asked, "Are you aware that defense counsel told us we could not talk to you at certain points unless we paid you?", the following exchange occurred:

> A      I am aware that at times questions were being asked that appeared to be – seemed and appeared to be maybe more obstructive than productive –

---

[130] At another point in the hearing, Mr. Draper testified that he:

> would have appreciated it more if both parties came to me with the e-mail addresses and data stores and contents where they wanted me to search, and I could have put my time there rather than doing a whole bunch of work and having one person in the background trying to tear it down. It would have been much better if we would have all just worked together to find this data.

*Id.* at 101:20 – 102:1. The court presumes based on context that Mr. Draper was referencing attorney Rafi.

Q      Are you calling me obstructive, sir?

A      Pardon me?

Q       Are you calling me obstructive?

A      I said questions were being asked. I don't think I –

Q      Who asked those questions, sir?

A      There were questions being asked in regard to the case –

Q      My question to you is: Who asked you the questions?

A       -- that weren't – I will have to look and see if they were asked. But there were questions that were being asked, and maybe they were by your firm. Whether they were by you or somebody else, I don't know. You're asking me to speak for somebody else.

        But there was e-mails that said, if you're going to continue this type of questioning and asking for additional work that doesn't seem truly within the scope, then you would have to agree to pay for that type of work.

Q      And the context of that was we, my law firm, we were being asked to limit the search terms. And in response, we asked you questions to understand how the limitation would work, correct?

A      I don't believe that that's the – I don't believe that's the place where you were limited in asking questions. Any time there were questions asked about the keyword search terms, they were – they were addressed. I did take quite a bit of time to respond to keyword search terms at one point, and then you wanted the response in a different type of way. You said, well, let's just do it this way.

And again, those were – those were delays, But I don't think Chris ever said, don't respond to those in that nature. I absolutely did.

I think it was maybe at a request that came after – after that. And we still hadn't got the report done at that point.

*Id.* at 115:15 – 117:3.

On cross-examination, Mr. Draper would not directly answer the following question from attorney Rafi: "My office never asked you to limit the search terms in any way, correct?" *Id.* at 111:17 - 112:14. Instead, he stated that he was on phone calls with attorneys representing both parties where the plaintiffs' counsel worked in conjunction with "us" to use keywords to limit the data set. *Id.* When asked if the plaintiffs' counsels' cooperation "likely saved Contour thousands and thousands of dollars . . . in them not having to review all these e-mails," Mr. Draper responded:

There's certainly always time and costs and things related to discovery, so you do want to get to the reasonable place. I believe we did end up at a reasonable place for discovery, yes.

*Id.* at 112:15-20.

### (2)    Mr. Draper Explained Why He Did Not Log into GoDaddy

Mr. Draper testified that he did not log into the defendant's GoDaddy account but instead had phone calls with GoDaddy's software support

representatives about the defendant's account. *Id.* at 101:13 – 103:15.

Specifically, Mr. Draper testified:

> . . . any time you're working with a software in our industry, and we have a question about the particular software and about the job that the software can do, we go directly to the software and the software support. We talk to the experts at the software companies. We do not try to poke around and see what we can find in something if we can get an absolute from the software company, with the blessing of the software company.
>
> We don't know when a code change was made. We don't know when a change to the interface was made. We don't know if they changed from the AWS to moving to Asher, which GoDaddy did just recently move to Asher.
>
> So what is kept by GoDaddy in their own interfaces, in their own databases, is much more voluminous than they make available to their clients to view in the graphical user interface.

*Id.* at 102:18 – 103:8. He stated that he was "being told there was no more information that [he] could have gained" by logging into GoDaddy himself, and, in fact, there was "information that could be gained through working with them . . . that could not be gained through the interface." *Id.* at 103:9-15.

### (3) Mr. Draper Discussed Ms. Pauleon's Email

In Mr. Draper's report, he stated that "the e-mail accounts or possible aliases for . . . Dian Pauleon . . . have . . . been confirmed as deleted and unrecoverable." *Id.* at 104:6-11. On cross-examination, the plaintiffs' counsel

251

pointed to the defendant's representation in a brief that Ms. Pauleon's account was changed to rgoolsby@contourcompanies.com, and Mr. Draper confirmed that the information regarding the account change was not included in the report but was discussed on a call involving both parties that occurred after the report was filed. *Id.* at 109:10-24. When asked if he included the information about the account change from Ms. Pauleon to Ms. Goolsby in his updated report, which he testified he revised two days prior to the hearing, Mr. Draper stated:

> No one made me aware that that – how that account change occurred was important. If how that account change occurred is important, I need to investigate how that account change happened. Was it an alias? Was it a name change? Did they stop one? Did they merge the mail? Did they bring it over? Do they have that information?
>
> I don't have that information. I did not think that was something that was important to the case. And if it is, it's the first time I'm hearing it now. And I'm more than willing to investigate it and figure out exactly how that change occurred. But I am not sure.

*Id.* at 110:3-19.

Similarly, on direct examination, Mr. Draper testified that after he did a "little bit of a deeper dive with the aid of some people at GoDaddy," he determined that "the R. Goolsby account, which had since been deleted and unrecoverable at one time previously before R.S. Goolsby, was the Dian

Pauleon e-mail account." *Id.* at 104:13-19. He noted that "both of those e-mail accounts [were] deleted." *Id.* at 104:19-20. He stated he did not know and did not validate if one was an alias or if the defendant just did a complete account change since neither of the accounts were recoverable. *Id.* at 104:21-23.

### (4)     Mr. Draper Testified Regarding Missing the Forensic Report Deadline

Mr. Draper acknowledged in his testimony that the court's order "asks for the conclusion of the forensic report to be November 15, [2021]" but conceded that the report was not finalized and turned in until December 2021. *Id.* at 89:20 – 90:10. On cross-examination, he agreed that he sent an email to the defense counsel on November 15, 2021 acknowledging that the deadline for the report was that day. *Id.* at 114:6-18. He stated he should have:

> followed that up with, due to the multiple back-and-forth and multiple weeks, I'm going to need more time. Can you please ask for that? And I did not. And that's where I left off.
>
> But I knew the deadline. I knew how much work still had to be done. And, again, I made Chris [Perniciaro] aware of that. But what I should have done is made both parties aware that I would need more time. I'm sorry about that.

*Id.* at 114:20 – 115:2.

### (5)   Mr. Draper Denied Doing Favors for GRSMB

In his testimony, Mr. Draper acknowledged that he had worked with attorney Perniciaro on other matters before. *Id.* at 101:1-4. However, he stated that "never would I ever do a favor" when asked if any of the work that he did on this matter was "specially done to do any favors or anything like that for [GRSMB]." *Id.* at 101:5-8.

### (6)   Mr. Draper Testified Regarding "Systematically Deleted" Emails

The court asked Mr. Draper to explain what he meant by "systematically deleted" when he stated in his report that "the e-mail accounts were terminated and employees were systematically deleted." *Id.* at 117:20-22. Mr. Draper responded that:

> the systemically deleted portion has to do with GoDaddy and not the actual client itself. So once an e-mail account is deleted by the client or deleted because it's just not renewed, it will sit with GoDaddy for 30 days even after it's been deleted, where it can still be recoverable.
>
> But after 30 days, GoDaddy itself will erase any information associated with a deleted account, and then it becomes fully unrecoverable.
>
> And that's what I was talking about through deleted accounts becoming systematically deleted and unrecoverable, is after 30 days by GoDaddy.

*Id.* at 117:23 – 118:9. Mr. Draper further testified that he did not determine if the defendant manually deleted the accounts or simply deleted them because an account expired. *Id.* at 118:14 – 119:4

### d) The Defendant's Presentation

Although the court will not attempt to summarize every statement made by the defense counsel at the two-day hearing, in light of the gravity of the sanctions sought against the defendant and the defense counsel, the court has carefully analyzed the defendant's presentation at the hearing and summarized the arguments most pertinent to this order.

### (1) The Defendant's Response to the Court-Ordered Forensic Inspection

Since the last hearing in this matter, the defense counsel stated they spent 136 hours searching over 31,000 documents and paid the forensic examiner over $30,000. Sanctions Hr'g Tr. II at 33:9-14 [Doc. No. 214].[131] Attorney Perniciaro argued that "[w]e coordinated our employees to speak with the forensic examiner, answer every question that he had . . . [and] provided every password or credential that the forensic examiner wanted

---

[131] Attorney Perniciaro stated that he "know[s] the most . . . over Mr. Moffett with regards to the email search that we have been doing pursuant to your order, so if you have any questions about our complaints with it and the efforts we have taken," he would be happy to try to answer those. Sanctions Hr'g Tr. II at 38:20-24 [Doc. No. 214].

because we were doing our best to follow the order." *Id.* at 33:15-19. He further stated that "[w]e ran out of time because we had way too many documents to search." *Id.* at 33:20-21. Attorney Perniciaro argued that "before the expiration of the deadline, I personally reached out to your office, I think through an email, to request a conference call to discuss a situation that had arisen, and I think we were directed to file a motion." *Id.* at 33:20-25. The defense counsel stated that the plaintiffs filed a motion first, but that in response to that motion the defendant indicated what it had done so far, what was expected to be done going forward, and of its need for additional time. *Id.* at 34:1-12. Attorney Perniciaro argued that—in compliance with the order—the defendant had attempted to work with the plaintiffs regarding needed extensions due to the volume of documents. *Id.* at 34:5-8. He further stated that the plaintiffs' counsel asked for the defendant to conduct the search and produce documents in a completely different way than the defense counsel understood the order to read, which caused a delay of even more time passing.[132] *Id.* at 34:16-20.

_____

[132] Attorney Perniciaro appeared to be referencing the parties' different definitions of "responsiveness" addressed in the plaintiffs' November 8, 2021 status update to the court. *See supra* Section II.C.13. As the court has previously noted in this order, the plaintiffs' definition of responsiveness

Attorney Perniciaro defended the defendant's decision to limit the date of the search through May 1, 2019, citing the large volume of data and the court's previous statement that the defendant "should search documents beyond the incident date." *Id.* at 35:5-16. The defense counsel acknowledged the date limiter the defendant chose "was only a month past" the incident but stated that "we just finished reviewing all [the voluminous data produced with the benefit of the date limiter] last week." *Id.* at 35:12-16. The defense counsel further stated that the defendant "would be happy to continue reviewing additional data," but "would still be reviewing [data] at this hearing, today, if we didn't limit the date somewhat." *Id.* at 35:17-20.

### (2) The Defense Counsel's Conflicting Reasons for not Disclosing Charles Cooper

At the sanctions hearing, attorney Perniciaro argued that after the defense counsel determined Charles Cooper was not an eyewitness, "we forgot about him." Sanctions Hr'g Tr. I at 43:9-15 [Doc. No. 217]. Attorney Perniciaro stated that if the plaintiffs had not excluded attorney work product in their requests for production, "we wouldn't be here about [the Mr.

---

would have actually required <u>less</u> analysis on the part of the defense counsel than the defendant's definition. *See supra* n.99.

Cooper] issue," presumably because he would have remembered to produce Mr. Cooper's statement or include it in a privilege log.[133] *Id.* at 44:11-19 [Doc. No. 217].

However, almost immediately after claiming that he forgot about Charles Cooper, attorney Perniciaro told the court that the reason he didn't turn the information over regarding Mr. Cooper was because "we did not believe he was witness to the incident at the time." *Id.* at 46:3-12. Attorney Perniciaro acknowledged that Mr. Cooper heard a shot and stated that "if he was the only person that heard a shot any time that day, maybe it would be a different story." *Id.* at 44:20 – 46:2. However, he argued that five other people had the same basic testimony as Mr. Cooper. *Id.*

---

[133] Although attorney Perniciaro made much of the fact that the plaintiffs excluded attorney work product from their requests for production, calling it "one of the most unusual discovery requests [he] had ever received," Sanctions Hr'g Tr. I at 44:13-19 [Doc. No. 217], the defense counsel—as previously noted—apparently ignored this exclusionary language in drafting the defendant's responses. *See supra* Section II.C.16.a)(1)(a). Thus, the court is skeptical of attorney Perniciaro's self-serving suggestion that he *would have* included a reference to documents concerning Mr. Cooper but for the plaintiffs' exclusionary wording. The record clearly reflects that—despite this language—the defendant asserted the attorney-work product doctrine in regard to other materials but did not disclose anything that would have hinted at the presence of Mr. Cooper.

The next day at the hearing, attorney Perniciaro revisited this issue, and clarified that he had never personally spoken to Mr. Cooper. Sanctions Hr'g Tr. II at 27:25 – 28:1 [Doc. No. 214]. Once again, he reiterated that he forgot about Mr. Cooper, stating, "We were so deflated, we thought this was an eyewitness and it turned out not to be, and we just forgot about him."[134] *Id.* at 28:6-8. Attorney Perniciaro further stated that when the plaintiffs requested information from the defendant about Mr. Cooper, attorney Moffett asked, "[W]hat do we have on him?" *Id.* at 28:9-10. Attorney Perniciaro said:

> [W]e have work product, we have a statement that we took from him, but he said he didn't know anything about anybody being shot or kill [sic], and [attorney Moffett] said to produce it.
>
> So we did, we produced it. He [sic] produced his address. Produced his lease agreement. And we even had the statement transcribed.

---

[134] At the conclusion of the hearing, attorney Moffett took a slightly different position, arguing that "we were never informed [Mr. Cooper] was an eyewitness. We were informed there may be eyewitnesses on the property, and that's why the investigator went out here, to see if eyewitnesses could be located." Sanctions Hr'g Tr. II at 90:10-15 [Doc. No. 214]. Attorney Moffett argued that Mr. Cooper heard a gunshot but "never told anybody, to my knowledge, he eyewitnessed anything. He hasn't changed any story. There is no prior statement. I don't know where this is coming from. I have never seen anything about this individual. I have never even talked to this individual." *Id.* at 90:18-23. Shortly after attorney Moffett made these representations, attorney Perniciaro stated to the court that "I spent the most time investigating for our client on this case. And we thought that that person was a witness and they turned out not to be. There is no other witness." *Id.* at 99:9-11.

*Id.* at 28:10-16.[135] Attorney Perniciaro further represented that the defense counsel located Mr. Cooper, who still lives at Eastwyck, the previous evening. *Id.* at 28:17-25. He stated that Mr. Cooper was still available for deposition, which the defense counsel would be happy to arrange.[136] *Id.* at 28:17-19.

Once again, attorney Perniciaro, who twice represented to the court that the defense counsel "forgot" about Mr. Cooper, seemed to contradict himself, stating that the defense counsel "made a judgment call" that Mr. Cooper didn't know anything about the incident.[137] *Id.* at 29:1 – 3. However, he conceded that the judgment call "probably was a mistake." *Id.* at 29:4.

---

[135] The plaintiffs' counsel contended that the defendant only produced Charles Cooper's statement after the plaintiffs "cited case law saying that if you don't assert a privilege and don't disclose the document, then you have waived your privilege." Sanctions Hr'g Tr. II at 70:22 – 71:4 [Doc. No. 214].

[136] While attorney Perniciaro stated that "we even talked to a neighbor and confirmed that [Mr. Cooper] still lives there," it does not appear to the court that the defense counsel spoke to Mr. Cooper—much less confirmed he was available for deposition. *See* Sanctions Hr'g Tr. II at 28:23-25 [Doc. No. 214].

[137] In support of this judgment call, attorney Perniciaro argued again that the police were not able to pinpoint when the gunfire that killed Ms. Frazier occurred, and stated:

> So for us, trying to pinpoint exactly who heard the gunshots that were related to the incident, which is what we were asked about, it became an issue of well, who is who and what's what?

Despite the admitted error in judgment, attorney Perniciaro argued that there was no prejudice to the plaintiffs in his failure to disclose Mr. Cooper because Mr. Cooper is still available, did not actually observe anything that anyone else did not already hear, and the defense counsel provided the work product.[138] *Id.* at 29:22 – 30:2. He concluded by stating:

> I know that Mr. Cooper has expressed his displeasure at talking to lawyers, apparently. But I think that he would appear for a deposition. We actually tried to bring him here today but were unable to do that, but we were able to confirm that he still lives there.

*Id.* at 30:5-9. As previously noted, it does not appear that the defense counsel spoke to Mr. Cooper to confirm attorney Perniciaro's representation that he believed Mr. Cooper would appear for a deposition.

Later in the defendant's presentation, attorney Moffett stated that he took responsibility for attorney Perniciaro's decision, which he described as a "judgment call that I'm going to criticize" made by "a younger lawyer working for me." *Id.* at 43:6-10.

---

And maybe we should have just said everybody, but at the time that's how it played out.

Sanctions Hr'g Tr. II at 29:8-21 [Doc. No. 214].

[138] The record reflects that the defendant did not turn over the investigator's report regarding his conversation and investigation of Mr. Cooper.

### (3)   The Non-Disclosure of Eastwyck Employees

The defense counsel argued that 17 of the 42 employees that were not previously disclosed to the plaintiffs were employed after the shooting; therefore, they do not have relevant knowledge.[139] Sanctions Hr'g Tr. I at 47:23 – 48:1 [Doc. No. 217]. Moreover, the defense counsel argued that many of these individuals were maintenance employees who worked for only short periods of time. *Id.* at 48:1-3. As in the defendant's briefs, the defense counsel made a point to distinguish between their knowledge and their client's knowledge, stating, "We didn't have the information that was provided to the other defense lawyers, and we didn't get it. So, you know, the client should have provided it to both of their defense attorneys, but it just wasn't done." *Id.* at 48:7-11.

The defense counsel argued that an adequate remedy for this error is the re-deposition of Ms. Prekelezaj at the defendant's expense. Sanctions Hr'g Tr. II at 11:8-4 [Doc. No. 214]. Attorney Moffett argued that he did not see

---

[139] On the second day of the hearing, attorney Moffett made several statements that were inconsistent with the evidence in this matter, including that "26 of the [previously undisclosed employees] were identified in initial discovery responses by the defense." Sanctions Hr'g Tr. II at 10:2-6 [Doc. No. 214]. The court assumes from this error and similar misstatements made by attorney Moffett that his involvement in this matter prior to the sanctions hearing was likely quite minimal.

"how the plaintiffs' counsel or plaintiff is prejudiced in light of the total circumstances involved and what we proposed to resolve that issue." *Id.* at 11:15-17. When asked by the court whether the court should award the plaintiffs attorneys' fees for having to work through the mistake, attorney Moffett responded:

> Respectfully, your Honor, I think this would have been resolved before your Honor had to entertain this through the deposition we offered and to pay for the deposition. I'm not sure what remedy they seek.
>
> Had they contacted me, I could have made that recommendation. I did make that recommendation, we made it after they filed their motion. I thought that was reasonable and appropriate under the circumstances.
>
> That would be my response, your Honor.

*Id.* at 11:23 – 12:9.

### (4)  The Conversation Regarding Nautilus Pulling Insurance Coverage

Attorney Perniciaro stated before the court that after the previous hearing, the plaintiffs' counsel approached him and said that they had "evidence that somebody lied and that they were being paid to testify for the company." *Id.* at 98:13-16. He claimed:

> And I said that's a problem, can you please provide that to me. They didn't provide me anything to back up their threat. And I said if that's true, then that could compromise insurance coverage.

263

> And it gets twisted into well, they are threatening us to not keep digging. They said they even used quotes.
>
> So, I don't know -- really, I'm tired of having to keep reciting the conversation, but that's – it's embarrassing, really, to have to keep doing this.
>
> I'm sorry and I apologize that I even got myself into that situation.
>
> If they got that impression from that conversation, it's completely not what I meant and it's not what I said, whatever they have quoted.

*Id.* at 98:17 – 99:5. Attorney Perniciaro further stated that the plaintiffs' counsel sent a letter with their allegations to the insurer, stating, "I honestly thought that I might have to sue these people for libel, because it was so false and defamatory. And they put in their letter that I was happy about it, which is just absurd." Sanctions Hr'g Tr. I at 43:4-8 [Doc. No. 217]. However, he stated that he didn't write the plaintiffs after receiving the allegedly libelous and defamatory letter because "I knew it wouldn't do any good." Sanctions Hr'g Tr. II at 98:11-12 [Doc. No. 214].

Although attorney Perniciaro stated that he had to "explain this to the insurance client," *id.* at 98:9-10, Ms. Prekelezaj testified that she did not know anything about the letter and that the instant hearing was the first

time that she had heard that the defendant might lose its insurance coverage in this matter. Sanctions Hr'g Tr. I at 79:7-19 [Doc. No. 217].

### (5) The Eastwyck Property Manager

Perhaps owing to his lack of familiarity with the case, attorney Moffett made several misstatements in his arguments regarding the defendant's failure to properly identify the property manager. Chief among these was attorney Moffett's assertion that, at the time of the defendant's September 25, 2020 discovery responses, the defendant identified all four of the property managers through the date of the incident and "specifically identified Dian Pauleon," the manager at the time of the incident. Sanctions Hr'g Tr. II at 12:17 – 13:2 [Doc. No. 214]. In addition, attorney Moffett contended that the defendant identified 20 Eastwyck employees, presumably at that same time. *Id.* at 13:3-5.

As the defendant's September 25, 2020 responses and objections to the plaintiffs' interrogatories make clear, the defendant initially identified only 13 Eastwyck employees, a list which it stated it would supplement. Def.'s Resp. and Objs. to Pls.' First Interrogs. ¶ 2 [Doc. No. 51-2 at 3-4]. Those employees include two individuals identified as "property managers," Ms. Pauleon and Ms. NarCisse, and two individuals identified as "leasing mangers," Ms. Rhodes and Mr. Payne. *Id.* As previously noted, Mr. Payne

was also identified in the same document as an assistant property manager. *Id.* at 4. The list did not clearly identify the four relevant property managers, did not include twenty employees, and—importantly—did not designate Ms. Pauleon as the manager at the time of Ms. Frazier's death. *Id.* Moreover, as detailed throughout this order, the defendant's representatives consistently gave conflicting testimony regarding the roles of these individuals. In fact, the day after Ms. Prekelezaj gave testimony referring to Mr. Payne as a property manager at the sanctions hearing, attorney Moffett referred to him as an "assistant property manager," illustrating some of the difficulties the court has had establishing who did what for the defendant. Sanctions Hr'g Tr. II at 13:16-17; 14:19-21 [Doc. No. 214].

### (6) The Defendant's Email Deletion Procedure

At the hearing, attorney Moffett argued that it was the "[s]tandard operating procedure of this defendant property owner . . . to delete email accounts of terminated employees within about 30 days of termination, if not sooner." *Id.* at 13:9-12. However, although the defense counsel got confused amongst themselves about this detail at the hearing, the record reflects that the email for Ms. Rhodes, who left her employment with the defendant in 2018, was not deleted until she returned in 2020. *See id.* at 14:24 – 15:12

(reflecting counsels' confusion about when the account was deleted); *see supra* Section II.B.6. Moreover, as has been discussed extensively throughout this order, Ms. Pauleon's email was also not deleted pursuant to this policy but was instead converted to Ms. Goolsby's email. *See supra* Section II.B.3. Finally, the plaintiffs' counsel pointed out at the hearing (and the defense counsel did not refute) that two other separated employees' emails were not deleted pursuant to the alleged policy. *See* Sanctions Hr'g Tr. II at 63:4-7 [Doc. No. 214].

Attorney Moffett argued that the defendant recovered 217 of Ms. Rhodes' emails from her deleted account by searching other accounts that received her emails. *Id.* at 15:13-20. He further asserted that the defendant produced 83 of these emails to the plaintiffs, logging the rest in the privilege log. *Id.* He stated that the defendant would turn over those privileged emails to the court or opposing counsel if so ordered. *Id.* at 15:19-16:1.

When asked by the court why the defendant would have a policy to delete an ex-employee's emails within 30 days of termination, attorney Perniciaro responded:

> The way I understand that policy is because it costs money for the company to maintain those email accounts with their service provider – not Gmail, that's free, but this GoDaddy, that's their – their email provider, it costs them money for each account that they have.

> So when an employee is terminated, they can continue to pay for that account even though there is no employee, or they can discontinue it.

*Id.* at 21:8-19.[140] Attorney Perniciaro then reiterated that when an email was discontinued, the emails were permanently deleted after 30 days. *Id.* at 21:22 -23. He did not know the cost to maintain an account. *Id.* at 21:24 – 22:5.

Although attorney Perniciaro acknowledged that Ms. Pauleon's account and Ms. Rhodes' pre-incident account had been permanently deleted, he asserted that the defendant had recovered[141] 80 emails from Ms. Pauleon's account located in other people's accounts in addition to the approximately 200 emails from Ms. Rhodes' pre-incident account previously discussed by attorney Moffett. *Id.* at 22:17 – 23:8. He further added that "there's just so

---

[140] Following the defendant's presentation, the plaintiffs' counsel took issue with the defense counsels' theory that money is the reason the defendant deletes emails. *See* Sanctions Hr'g Tr. II at 63:8-19 [Doc. No. 214]. The plaintiffs' counsel asserted that "Contour was bought for $25 million, and sold for $36 million, and Contour owns multiple properties in Georgia and creates [sic]." *Id.* at 63:8-11. According to the plaintiffs' counsel, who researched his own GoDaddy account, an email account can be renewed for $23.88 a year. *Id.* at 63:12-15. The plaintiffs' counsel stated that the defendant's contention that it deletes emails to save money is "nonsense." *Id.* at 63:18-19.

[141] The plaintiffs' counsel argued that the term "recovered" is a misnomer because the email accounts that were deleted were permanently deleted. Sanctions Hr'g Tr. II at 63:20-22 [Doc. No. 214]. He clarified that emails that were sent from deleted accounts and received by other people whose accounts were not deleted were found. *Id.* at 63:23-25.

many different accounts that were out there, and so many sources of data, to say that the loss of one account puts anyone in the position where they can't properly maintain their case I think is not 100 percent accurate." *Id.* at 23:9-13.

### (7)  Ms. Prekelezaj's Inconsistent Statements

The defense counsel did not directly address the untruthful statements their client's employees made in depositions; however, attorney Perniciaro agreed with the court that there were some inconsistencies in Ms. Prekelezaj's various testimonies. For instance, after the court pointed out that "[s]he said she spent two hours looking through the records, and then she didn't," attorney Perniciaro stated, "I don't think that anybody looked through the payroll records. I think she had guessed during her deposition, when she should not have." *Id.* at 36:25 – 37:7. When pressed by the court on this matter, attorney Perniciaro further stated that he thought her inconsistent testimony was "a guess as to what somebody else had done, is the way I took it to be." *Id.* at 37:10-11.

### (8)  Documents Produced in *Mayes* But Withheld in this Matter

In regard to the documents the defendant objected to producing in this matter yet produced in *Mayes*, attorney Perniciaro addressed the employee

files only and stated that the defense firm in *Mayes* made a different decision than his firm. *Id.* at 37:25 – 38:11. He argued that the employee files that the plaintiffs asked for were people that they already knew about and had identified, and his firm determined that it would be easier to provide the contact information for those employees, their titles, and their dates of employment rather than having to redact tax forms that had no substantive value. *Id.* The defense counsel did not address the financial information produced in *Mayes* that the defendant objected to producing in this case.

### (9)    The Security Logs

The defendant, or more appropriately—the defense counsel—argued that they had produced "all of the [security-related] time sheets we were given and the security logs that we were asked in [sic] September of 2020." *Id.* at 16:24 – 17:2. Attorney Perniciaro stated that the plaintiffs asked in October 2021 for a security log for May 2019. *Id.* at 26:9-11. He said that "we obtained a document from the *Mayes* case that was titled May 2019 Security Log" and provided it to opposing counsel.[142] *Id.* at 26:12-14.  Thereafter, he

---

[142] The court continues to be concerned about the way in which the defense counsel refers to documents obtained in the *Mayes* case. Although the defense *counsel* may have obtained these documents from the defendant's production in *Mayes*, the defendant itself *produced* those documents.  The court does not understand why the defense counsel could not pursue these issues and questions further with their client.

said he received a phone call from the plaintiffs in which they said that the May log looked like it was from another month, so he said, "I told them I received this from the *Mayes* case, it was titled May 2019 Security Log, and that's all I have." *Id.* at 26:19-20. He concluded by stating that "we searched for security logs at the property, we produced whatever we found. We obtained documents from the subsequent case, the *Mayes* case, and we produced those as well. There's nothing that's out there that's being withheld." *Id.* at 26:24 – 27:3.

Attorney Moffett argued that the time sheets that the plaintiffs complained the defendant withheld were from the employee file of security guard Eskridge found in the storage closet. *Id.* at 16:9-23. He argued that he did not know why these sheets are relevant, but now the plaintiffs have security guard Eskridge's entire file. *Id.*

### (10)  The Defendant's Failure to Disclose *Mayes*

Attorney Moffett argued that the *Mayes* case did not happen until after the instant action, so the defendant was not under an obligation to disclose it. *Id.* at 17:8-21. However, he argued that the defendant produced security logs created prior to Ms. Frazier's death as well as police reports with regard to pre-incident situations, investigations, and "whatnot." *Id.* at 17:22-25.

271

Furthermore, he contended that all of that information is available through the open records act from the relevant police departments. *Id.* at 18:13.

The defense counsel did not address Ms. Dia's April 22, 2021 testimony that the instant case is the only case she knew about involving an innocent victim in a shooting at Eastwyck. *See supra* Section II.C.7.a)(4).

### (11)   The Leasing Office Gmail Account

In regard to the leasing office Gmail account, attorney Perniciaro explained again that the account was set up by the prior property owner and Eastwyck employees continued to use it. *Id.* at 25:16-19. Attorney Perniciaro argued that the computers where the employees allegedly used the account (and on which the password was saved) were at the leasing office and stayed there when the defendant sold the property. *Id.* at 25:20-21. The defense counsel stated that the defendant did two things when it received notice from the plaintiffs that they wanted to search the account: (1) they "scramble[ed] trying to find a password for it," and (2) "one of the [defendant's] employees went to the property and talked to the people that were working there for the new owner and tried to access this computer and tried to get access to the Gmail account." *Id.* at 25:21 – 26:2. In regard to the computers at the Eastwyck office, attorney Perniciaro represented that "the new owner had repurposed the hard drive and apparently none of this information was still

there, the saved password for this account."[143] *Id.* at 26:3-6. In regard to the password, attorney Perniciaro represented to the court that he personally had entered every password he could find for that account, but it could not be accessed. *Id.* at 20:9-19. He further stated that "this was just one of the email accounts that were used for the property" and that the defendant had searched other accounts and found the types of documents speculated to be in the leasing office Gmail account. *Id.* at 20:20 – 21:2. However, the court notes that only four accounts were searched in this matter, all of which belonged to corporate level employees and none of which were specific to Eastwyck. The court further notes that, rather than "scrambling" to find a password, the record (as detailed throughout this order) reflects that the defendant spent several months speculating on paper that it sold the account to Nirvana and could no longer access it rather than actively attempting to regain access to it.

---

[143] Other than the password for the computer, attorney Perniciaro represented that "there's no evidence or data on any of the leasing office computers that was not produced and found and provided to the other side*, that we're aware of.*" Sanctions Hr'g Tr. II at 25:8-10 [Doc. No. 214] (emphasis added). The court has emphasized the phrase "that we're aware of" because, as set forth in the introduction, a common theme in this case is the defendant's (and the defense counsels') professed lack of awareness of the defendant's own documents, which it has clearly sought to use to its advantage.

273

Attorney Perniciaro argued that at the original Rule 26(f) conference, the plaintiffs' counsel "did not mention anything about specific email accounts that he wanted to search or any email accounts in general." *Id.* at 18:18 – 19:2. Attorney Perniciaro then acknowledged that the plaintiffs' counsel would not have known of specific email accounts at that time, "but we didn't discuss – we didn't discuss ways that the defendant would search electronic data, although something did make its way into the report, the discovery report and plan, it was just kind of boilerplate language where the parties agreed to search their electronic discovery."[144] *Id.* at 19:3-9. Attorney Perniciaro argued that "the first time this leasing office email account came up" and "[t]he first time anything came up about searching accounts with keywords for specific things" was well into 2021, right after the corporate representative's deposition. *Id.* at 19:10-14. He continued:

> Otherwise, we would have searched it, we would have done something to preserve it. Obviously, some of the employees knew about it because it had existed prior to my client's purchasing the property. . . .

---

[144] The plaintiffs' counsel later argued that this statement wasn't boilerplate because the defendant already had the plaintiffs' requests for production at that point that sought emails. Sanctions Hr'g Tr. II at 62:1-4 [Doc. No. 214]. The court cannot find the certificate of service for these requests for production on the record but notes that the plaintiffs contended these requests for production were served in June, which was prior to removal to this court.

The account was continued to be used for the property by some of our employees. That's true.

The account was listed on a few documents that we produced at the beginning of the case. The email address was listed on a few memos or letters sent to all the tenants on the property.

So those documents were given to the plaintiff, but neither them, or I, discussed searching that account until April of last year. At that point in time the client had sold the property.

And they, apparently, had not preserved the password to that account. And that's where we find ourselves today where we're trying to access the account and do whatever we can to get access to it.

*Id.* at 19:15 – 20:8.

### (12) Mr. Johnson's Employment Status

Although the defendant's 30(b)(6) witness Ms. Prekelezaj testified on the first day of the sanctions hearing that Wendel Johnson was not an employee, the defense counsel argued before the court that the defendant had "never denied that he worked for us in our different discovery responses" and that there "was no misrepresentation about whether he worked for Contour or not." *Id.* at 30:16-17; 31:16-17. Moreover, in direct contradiction to Ms. Prekelezaj's assertion that Mr. Johnson was not an employee, attorney Perniciaro acknowledged that the plaintiffs had obtained a statement from Mr. Johnson before the start of the lawsuit regarding his employment at

Eastwyck, that there was testimony from witnesses that he worked on the property as a security guard, and that "we think that he was hired by one of the property managers there and given some sort of lease abatement, but was not actually paid for his work." *Id.* at 30:19-22; 31:4-5, 31:15-16. Moreover, in contradiction to Ms. Prekelezaj's previous testimony that she did not search payroll records until she did so for *Mayes* sometime in the summer of 2021, attorney Perniciaro argued that:

> [W]hen we were asked about him, we looked. We looked multiple times. We looked for anything related to him and we couldn't find any documents – he never filled out an application. He never filled out a W-2 form. Never received a paycheck, as I mentioned. He didn't even show up on his wife's lease.

*Id.* at 30:23 – 31:3. Thus, it appears to the court that the defendant did not actually look into these documents (beyond Ms. Leonard's search of her Dropbox folder) until after the plaintiffs filed their first motion for sanctions in conjunction with the documents they unearthed in the *Mayes* case.[145]

---

[145] The defense counsel conceded later in the hearing, in reference to Ms. Prekelezaj's deposition testimony, that "I don't think that anybody looked through the payroll records." Sanctions Hr'g Tr. II at 37:5-6 [Doc. No. 214].

### (13)  The Defendant's Withdrawn  Summary Judgment Motion

Attorney Moffett argued that the defendant's summary judgment motion, the thrust of which concerned Ms. Frazier's legal status, was filed as a matter of strategy because the defense counsel wanted that issue before the court before the plaintiffs filed a motion to remand to state court. *Id.* at 44:25 − 45:21. He reiterated that the motion was withdrawn after the opposing counsel agreed that they would not try to sandbag each other moving forward. *Id.* at 45:25 − 46:3. He further stated that the summary judgment motion "had nothing to do with these issues before your Honor right now. It had to do with the legal status, which is separate and distinct from these discovery issues." *Id.* at 46:6-10.

### (14)  The Disputed Discovery's Relevance to Ms. Frazier's Legal Status

Attorney Moffett argued that the discovery issues before the court do not involve what he defined as the primary legal issue for consideration: the legal status of Ms. Frazier at the time of her death. *Id.* at 39:6-7. He argued that to trigger liability under the premises liability statute, O.C.G.A. § 51-3-1, Ms. Frazier must have been "an invitee furthering the business interests of the property owner." *Id.* at 39:11-14. However, he contended that the

evidence shows that Ms. Frazier was inside a tenant's unit breaking criminal law and violating the property rules by using illegal drugs. *Id.* at 39:15-19. He argued that if Ms. Frazier, as a matter of law or by the jury, was deemed to be a licensee or trespasser, "that's a different duty owed and it's a willful and wanton duty, and I don't think anybody would even posture a position or argument that there is any evidence that would ever exist to support that the legal duty was breached." *Id.* at 39:21 – 40:1. Attorney Moffett argued that none of the discovery issues are germane to the legal status of Ms. Frazier. *Id.* at 40:2-4.

### (15)   The Defendant's Arguments Against the Requested Sanctions

Attorney Moffett argued that the plaintiffs' proposed remedies of striking the answer or an issue preclusion sanction for duty breached and cause of death skip over the legal status of Ms. Frazier, which is not impacted by the discovery issues. *Id.* at 40:11-15. He further argued that attorneys' fees are not warranted in regard to the sanctions motions because these issues could have been avoided if the plaintiffs' counsel had reached out to the defense counsel before filing their first motion for sanctions.[146] *Id.* at 41:1-12.

---

[146] Attorney Moffett asserted that the plaintiffs' first motion for sanctions was akin to a blind lawsuit because "we didn't have any information or knowledge

Attorney Moffett argued that the deposition of the corporate representative at the defendant's expense is a sufficient remedy, which the defendant offered, along with any other "deposition [the plaintiffs] feel they need to redo." *Id.* at 41:13-19. Attorney Moffett further argued that he would subpoena Mr. Cooper for a deposition at the defendant's expense or on the witness stand in the courtroom. *Id.* at 42:2-6. In regard to costs and expenses, attorney Moffett stated that if there are any depositions that the plaintiffs' counsel felt needed to be redone because someone found a box of 26 new employee names and files in a room, "I'm happy to do that." *Id.* at 43:17-23. When the court questioned the utility of re-deposing Ms. Prekelezaj in light of her shifting testimony, attorney Moffett responded:

> I can only instruct the witness to answer truthfully the questions. That's what we do.
>
> And that's all I can offer to the Court. I can put somebody else up from the company. I'm happy to do that. She was the designated person, but if there's must be else [sic] at the company, perhaps, that they would like to depose, we can make that arrangement.
>
> I know they deposed her [father]. We can certainly make those arrangements.

*Id.* at 44:9-19.

---

about the subject matter" of that first motion. Sanctions Hr'g Tr. II at 42:1-12 [Doc. No. 214].

### (16)   The Defendant's Analysis of its Conduct Pursuant to the Federal Rules of Civil Procedure

The defense counsel argued that the defendant has not violated the Federal Rules of Civil Procedure. The court will address these contentions rule by rule.

### (a)   Rule 26(g)

In regard to Rule 26(g), attorney Moffett argued that the defendant has responded to 13 sets of written discovery, has produced 3,000 pages of documents outside of the emails, and has produced 1,158 documents from the email search. *Id.* at 47:25 – 48:3. He stated that he would "stand in my place and certify" that the current defense counsel, who was not involved in this matter at the time of the preservation letter, asked the defendant to produce all information and all documents responsive to discovery requests. *Id.* at 46:17-20; 47:14-24. He further stated that the defense counsel produced what they were provided and logged other materials into a privilege log. *Id.* at 46:20-21. He argued that—in regard to the forensic inspection—the defense counsel were trying to cull the production down to produce emails relevant and related to the legal issues in this case because the defense counsel did not want to be accused of a document dump. *Id.* at 47:1-8.

### (b)     Rule 37

In regard to Federal Rule of Civil Procedure 37(b)(2), attorney Moffett argued the court's order instructed the parties to work together as to the timing and extensions based on what was revealed during the forensic inspection. *Id.* at 48:9-14. He contended that the defendant complied with this directive, making filings with the court where it required extra guidance. *Id.*

In regard to Federal Rule of Civil Procedure 37(c)(1), attorney Moffett argued the defendant (or the defense counsel) supplemented discovery with information, "provided information as we received it," and "provided documents as we received them or we logged a privilege log." *Id.* at 48:15-19.

In regard to Federal Rule of Civil Procedure 37(e), attorney Moffett stated to the court—for the first time—that the defendant is not contesting that it had knowledge of prior violent personal crime on the property.[147] *Id.* at 49:14-15. Instead, attorney Moffett stated that the defendant's issue concerns Ms. Frazier's legal status. *Id.* at 49:19-21. He further argued that the plaintiffs had the evidence they needed "on the issues they want to concentrate on" and had even used some of that evidence in negotiations with

---

[147] Notably, the defense counsel did not stipulate that such prior crime was substantially similar to the shooting that took Ms. Frazier's life.

the excess insurance company. *Id.* at 50:2-6; 50:16-18. Attorney Moffett

stated that the plaintiffs were:

> telling the decision-makers of the insurance policy how good this
> case is for them and how bad it is for us based on evidence we
> have given them, but they are arguing to your court or to your
> Honor that they are somehow prejudiced from the evidence we
> have given them or what they speculate might be out there that
> we can't recover.

*Id.* at 50:9-15. He continued:

> The way I handle discovery is, okay, I'm going to give you
> everything or I'm going to tell you that I'm not giving you
> something and I'm going to tell you why.

> If the judge orders me to give it, I'm going to give it. And
> sometimes I'll say I'm not going to make you file a motion, if you
> want to call the judge and get a conference, we can talk about it
> and, if the judge orders me to produce it, so be it, but, in good
> faith, I'm going to make my objection. That's the way I handle
> discovery.

> And I know that if you are standing in front of a state or
> federal court judge, like your Honor, and you haven't produced
> something, you better have a very good reasonable position as to
> why you haven't.

> So it's better to produce or, if you're not going to produce,
> explain generally why. And that's what we do and that's what
> we did.

*Id.* at 51:1-18. The defense counsel further argued that the defendant followed its company policy in regard to email accounts, which "they delete because they don't want to pay to keep [them]." *Id.* at 51:19-25.

## III.   Authority to Sanction: Legal Standards and Analysis

Having examined the case background in great detail, the court will now discuss the authority for sanctions pursuant to Federal Rules of Civil Procedure 26(g), 37(e), 37(c)(1), 37(b), and the court's inherent authority. The court will then analyze whether sanctions are available in this matter pursuant to each of these authorities. The court will decline to determine what sanctions it will issue until it establishes the authority for the requested sanctions.

### A.        Rule 26(g)

#### 1.        Legal Standard

##### a)        Rule 26(g) Requirements

Fair trials require fair discovery, which can be accomplished only if the parties are truthful and deferential to the mandates set forth in the Federal Rules of Civil Procedure. *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1305 (11th Cir. 2003) ("Rules exist emphasizing the importance of truth in the discovery process and the need for a litigant to be

able to rely upon the opposing party's discovery responses."). Counsel, as "'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice," and are essential to ensuring that their clients follow the rules "that promote the search for truth that is the heart of our judicial system." *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1546 (11th Cir. 1993). Thus, Federal Rule of Civil Procedure 26(g) requires at least one attorney of record (unless the party is unrepresented) to sign every discovery request, response, or objection certifying that:

> to the best of the [attorney's] knowledge, information, and belief **formed after a reasonable inquiry**:
>
> (B) with respect to a discovery request, response, or objection, it is:
>
> > (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
> >
> > (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
> >
> > (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed. R. Civ. P. 26(g)(1)(B) (emphasis added). An attorney's signature on discovery responses "certifies that the lawyer has made a reasonable effort to

assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." *Green Leaf Nursery*, 341 F.3d at 1305 (citing Fed. R. Civ. P. 26(g) advisory committee notes).

### b) Rule 26(g) Sanctions

If the court finds a violation, Rule 26(g) requires the imposition of sanctions as follows:

> [I]f a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Rule 26(g)(3). The 1983 Advisory Committee Notes state that while "[t]he nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances," "Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it." Fed. R. Civ. P. 26(g) advisory committee's notes on 1983 amendments.

### c) The "Reasonable Inquiry" Requirement

The focal point of Rule 26(g) in the case at hand is whether the defense counsel made a reasonable inquiry prior to certifying the defendant's discovery responses. The 1983 Advisory Committee Notes state that the

certification requirement of Federal Rule of Civil Procedure 26(g) "obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." *Id.* At the time, the advisory committee notes stated that:

> [T]he attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances.

*Id.* The advisory notes continued:

> Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.

*Id.*

Of course, a great deal has changed since 1983, particularly in the wake of the digital revolution. Over time, the Federal Rules of Civil Procedure and the cases interpreting them have evolved to accommodate the growing reality of ESI. *See DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 926 (N.D. Ill. 2021) ("The impact of ESI on discovery cannot be overstated. Indeed, it is almost quaint now to say that all litigation involves

ESI.").[148] Sixteen years ago, the 2006 Advisory Committee Notes clarified that "a Rule 34 request for production of 'documents' should be understood to encompass, and the response should include, electronically stored information unless discovery in the action has clearly distinguished between electronically stored information and documents." Fed. R. Civ. P. 34 advisory committee's notes on 2006 amendments.[149] And, emergent case law, particularly in business litigation, began to caution counsel that courts were increasingly unlikely to find an attorney's blind reliance on client assertions "reasonable under the circumstances" in the context of ESI. *See DR Distribs., LLC*, 513 F. Supp. 3d at 926 ("By 2009, courts were issuing wake up calls to counsel about electronic discovery."). In short, simply sending discovery requests to the client, making no effort to determine what the client did to investigate, and then uncritically accepting what the client gave in return was generally deemed insufficient for purposes of Rule 26(g) on the part of

---

[148] The *DR Distributors* case is not controlling precedent in this circuit, but the court found this particularly well-researched and written opinion (and the cases that have utilized it) educational and persuasive regarding the discovery issues in this matter.

[149] Those notes continued: "Rule 34(a)(1) is expansive and includes any type of information that is stored electronically. A common example often sought in discovery is electronic communications, such as e-mail." Fed. R. Civ P. 34 advisory committee's notes on 2006 amendments.

counsel. *See Venator v. Interstate Res., Inc.*, No. CV415-086, 2016 U.S. Dist. LEXIS 50964, at *30 (S.D. Ga. April 15, 2016) ("Attorneys must do more than turn over requests to a client's employee and expect that person, particularly if he or she is a non-lawyer, to conduct an investigation that satisfies Rule 26(g)."). In fact, parties in this district were placed on notice a decade ago that counsel and client may be sanctioned pursuant to Rule 26(g) even if an attorney had extensive communications with a client about data but did not confirm that the appropriate data was searched or physically search places where evidence is typically stored. *See In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1351 (N.D. Ga. 2012) (finding rule 26(g) sanctions were appropriate where Delta's counsel, Delta's IT department, and IBM had several conversations but counsel did not confirm that collected hard drives were actually searched, counsel did not inspect the evidence locker, and counsel continually represented that they had done both); *see also Venator*, 2106 U.S. Dist. LEXIS 50964, at *33 ("[A]ttorneys have a post-investigation obligation to make sure all responsive information is provided."). In other words, a reasonable inquiry pursuant to Rule 26(g) typically requires more (and sometimes much more) than the bare minimum of simply asking the client for documents, and counsel that chooses to engage in such a superficial inquiry engage in the litigatory equivalent of Russian

288

roulette. *See DR Distribs., LLC*, 513 F. Supp. 3d at 924 ("[C]ounsel who [do] not understand or take seriously ESI issues [are] playing Russian roulette").

As this discussion makes clear, the case law applying Rule 26(g) to electronic discovery sets a high bar for attorneys. It is now generally understood that an attorney must take an active role in the investigation of his or her client's ESI. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 569 F. Supp. 3d 626, 636 (E.D. Mich. 2021); (". . . an attorney may not simply rely on custodian self-collection of ESI."); *DR Distribs., LLC*, 513 F Supp. 3d at 925 ("By 2006, it was generally understood that attorneys could not get away with 'I don't understand these computers' anymore."). And, to be meaningful, an attorney's active, affirmative guidance must permeate all five of the fundamental steps of ESI document disclosure and discovery, including the (1) identification, (2) preservation, (3) collection, (4) review, and (5) production of documents. *DR Distribs., LLC.*, 513 F. Supp. 3d at 927 ("Since at least 2006, counsel have been required to take an active, affirmative role in advising their clients about the identification, preservation, collection, and production of ESI.").

To successfully navigate subsequent responsibilities, counsel must engage in a thorough custodian interview at the outset of their engagement in a matter. *Id.* at 926 – 27 (". . . a proper and thorough custodian interview

is mandated by the Federal Rules of Civil Procedure and the Rules of Professional Conduct."). A reasonable custodian interview "[a]t the least . . . consists of locating the relevant people and the locations and types of ESI."[150] *Id.* at 927 (citing 1 Arkfeld's Best Practices: Electronic Discovery § 4.7). In addition, it "can require counsel to cross-examine the client and test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced." *Id.* (citations omitted).

### 2. Analysis

In this case, two things are abundantly clear: (a) the defense counsel did not conduct a "reasonable inquiry" before signing the defendant's discovery responses as required by Rule 26(g); and (b) consequently, the defendant's discovery responses and document production were incomplete

---

[150] The *DR Distributors* court defined the relevant people as "the individuals who have custody of the relevant ESI or the ability to obtain the ESI." 513 F. Supp. 3d at 927. The court stated further: "The failure to adequately interview key custodians that results in the failure to identify, preserve, collect, and produce the relevant ESI can result in sanctions." *Id.* (citations omitted).

and inaccurate. It is also clear that (c) the defense counsel improperly withheld the identity of a witness in violation of Rule 26(g); and (d) that the defendant made baseless objections to the production of its profit and loss statements and employee files. The court will address each of these points in greater detail below.

### a)   The  Defense Counsel Did Not Conduct a Reasonable Inquiry Before Certifying the Defendant's Discovery Responses

As noted above, it is clear that the defense counsel failed to make a reasonable inquiry before certifying the defendant's discovery responses. The court will first address the limited efforts the defense counsel took and will then address some of the various excuses the defense counsel asserted for their insufficient inquiry.

### (1)   The Defense Counsels' Limited and Passive Role in Discovery

The defense counsels' own testimony and behavior before this court illustrate how little they did to guide their client in discovery. Rather than assuming an active and scrutinizing role regarding the (1) identification, (2) preservation, (3) collection, (4) review, and (5) production of their client's documents, the defense counsel limited the scope of their advisement to

sending discovery requests to their client, asking their client for the documents the plaintiffs requested, and uncritically accepting what the defendant gave in return. In fact, when discussing why employees Jori Jones and Ashelynn Burt-Jones were not located sooner, the defense counsel admitted as much, explaining their lack of proactive guidance as follows: the "personnel files were located in Michigan and were not accessible to counsel . . . [so] its reliance on testimony and representatives of Defendnat [sic] as to its search constitutes a reasonable inquiry under Rule 26(g)." Def.'s Resp. in Opp'n to the Pls.' Mot. for Sanctions at 16 [Doc. No. 167]. At the sanctions hearing, attorney Moffett offered no further evidence of active engagement, stating, "With respect to Rule 26(g), we did ask our client – and I will stand in my place and certify, we asked our client to produce all information and all documents responsive to discovery requests. We produced what we were provided, and we logged other materials on a privilege log." Sanctions Hr'g Tr. II at 46:17-21 [Doc. No. 214].

Evidently, the defense counsels' "hands off" approach to discovery extended well beyond the defendant's early discovery responses. For example, after the court ordered a search of the defendant's documents on June 25, 2021 [Doc. No. 143], attorney Perniciaro revealed in communications with the plaintiffs' counsel that he did not "know who did the searches but it looks like

Nora Prekelezaj assisted." July 6 – 9, 2021 emails between opposing counsel at 5 [Doc. No. 155-1]. He further stated that he did not know "why they [sic] the emails are in the format they are in," or "if any emails were withheld or what exactly [the plaintiffs' counsel] mean[t] by that." *Id.* at 6. He further speculated about, rather than confirmed, details regarding the Eastwyck leasing office Gmail account. *Id.*

### (2)    The Defense Counsels' Excuses

As in the *DR Distributors* case, the defense counsel sought to "[b]lame everyone and everything else" rather than taking responsibility for their own discovery errors. 513 F. Supp. 3d at 942 n.47. In this case, the defense counsel sought to avoid sanctions by blaming their client, blaming the plaintiffs, blaming the defendant's previous counsel, and, in what the court perceives to be a truly desperate effort, contending that ESI does not encompass emails. The court will address each of these excuses in turn.

### (a)    The Defense Counsel Blamed Their Client

At the forensic inspection hearing, attorney Perniciaro disavowed responsibility and attempted to hide behind his client's verification of their interrogatory responses when asked by the court why the defendant was so

late in giving him information about the 42 undisclosed employees identified in *Mayes* as follows:

> All I know is that they were asked to do something and they produced the information which an employee swore was correct to the best of their knowledge at the time. It's in a verified interrogatory response. And if they misstated something intentionally, then they did, but I don't have any reason to think that they did.

Forensic Inspection Hr'g Tr. at 29:4-9 [Doc. No. 218].

### (b)    The Defense Counsel Blamed the Plaintiffs

In addition to essentially blaming their client for the subpar discovery responses, the defense counsel attempted to blame *the plaintiffs* for many of their deficiencies. The crux of this oft-repeated position was that the defendant did not produce documents because the plaintiffs did not specifically ask the defendant to preserve and produce those things. For instance, in response to the plaintiffs' second motion for sanctions, the defendant complained that the plaintiffs did not ask the defendant to preserve email accounts before filing this lawsuit; did not ask the defendant to search specific email addresses buried in the defendant's initial document production; and did not ask the defendant to conduct a forensic inspection until well after some of the defendant's accounts became inaccessible. *See*

Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 22 – 23 [Doc. No. 193]. Moreover, despite its misleading and emphatic representations regarding the value and relevance of Ms. Rhodes' email account, the defendant blamed *the plaintiffs* for not knowing that it only searched Ms. Rhodes' post-incident email account, implying that if the plaintiffs had chosen to depose Ms. Rhodes, they could have discovered that her pre-incident account was deleted in 2020. *Id.* at 19 – 20. In addition, the defense counsel essentially argued that they were too busy and distracted by the plaintiffs' multitudinous discovery requests to conduct a more thorough discovery effort. *See, e.g., supra* Section II.C.10.a).

### (c) The Defense Counsel Blamed the Defendant's Prior Law Firm

At the sanctions hearing, attorney Moffett seemed to proffer an additional excuse for the defense counsels' failure to conduct a reasonable inquiry, implying that the current defense counsel could not be held responsible for many of the issues in this case because "my firm was not involved in this matter at the time of the preservation letters" and it was "another firm that was investigating this matter" then. Sanctions Hr'g Tr. II at 47:14-21 [Doc. No. 214]. He further stated that "[i]t was only after we got

the case that we could engage and take action. And that was long after these preservation letters were sent." *Id*. at 47:22-24.

### (d)    The Defense Counsel Claimed Electronic Mail Is Not Electronically Stored Information

Finally, the defense counsel sought to excuse their failures in regard to the defendant's documents by—somewhat bewilderingly—attempting to distinguish emails from "electronically stored information." *See* Def.'s Resp. to Pls.' Mot. to Compel at 2 [Doc. No. 139]. For example, in defending its initial search for documents as "reasonable," the defendant stated that it "did initially search electronically stored information to respond to Plaintiffs' document requests" but "[a]t no point  .  .  . falsely represent[ed] that it conducted a search of email accounts or lead Plaintiffs to think that." *Id.*

### (3)    The Court Rejects the Defense Counsels' Arguments

The defense counsels' certification of the defendant's discovery responses did not comply with Rule 26(g), and their various attempts to evade sanctions are not compelling. Below is a more thorough explanation of these conclusions.

### (a)   The Defense Counsel Did Not Conduct a Reasonable Inquiry

The defense counsel did not conduct a reasonable inquiry prior to certifying the defendant's discovery responses, which common sense alone should have made evident. Attorney Perniciaro acknowledged before the court that he had reservations about Ms. Prekelezaj's technical skills, describing her as "not a technical person" who "doesn't understand" technical terminology and distinctions. Forensic Inspection Hr'g Tr. at 21:18 – 22:3 [Doc. No. 218]. However, the record reflects that, using her as a point person, he left the identification and collection of the defendant's documents and records—including electronic records—in this matter almost entirely up to her and her (non-IT) co-workers. As the plaintiffs' exhaustive discovery requests about unidentified employees (that the defense counsel complained about repeatedly in briefings) indicated fairly quickly, this strategy was flawed. However, despite ample warnings that they needed to "stop and think" about the completeness and legitimacy of the defendant's responses, conduct thorough custodian and client interviews,  or—at a minimum—visit their client and inspect their records on-site, the defense counsel limited their involvement to relying on their client's testimony, sending document requests to the defendant, asking the defendant to produce the documents, and

producing the defendant's responses. In the circumstances presented in this case, this was not a "reasonable inquiry" in regard to the defendant's paper documents and interrogatory responses, and—as the case law cited above makes clear—it certainly was not a "reasonable inquiry" in regard to the defendant's ESI.

### (b)    The Defendant's Verification Cannot Shield the Defense Counsel from Sanctions for an Improper Certification

At the forensic inspection hearing, attorney Perniciaro seemed to indicate that the defense counsel cannot be sanctioned pursuant to Rule 26(g) because the defendant verified its discovery responses. The court knows of no authority that supports this position. As the District Court of the Eastern District of Pennsylvania noted, certification and verification are two distinct concepts under the Federal Rules of Civil Procedure. *See State Farm Mut. Auto Ins. Co. v. New Horizon, Inc.*, 250 F.R.D. 203, 219 – 20 (E.D. Penn. 2008). "Rule 26(g) does not require a signing attorney to certify the truthfulness of a client's factual responses to a discovery request," but it does require the attorney to certify that he or she "has made a reasonable effort to assure that the client has provided all of the information and documents available to him that are responsive to the discovery demand." *Id.* at 220 (citing Fed. R. Civ.

P. 26 committee's notes on 1983 amendments). While reliance on a clients' sworn testimony could bolster the sufficiency of a reasonable inquiry that involved ample guidance and critical cross-examination on the part of counsel, it cannot serve as a substitute for that inquiry. To find otherwise would be to encourage behavior on the part of counsel that renders the Rule 26(g) certification requirement meaningless.

As discussed above, the record reflects that counsel did little—and perhaps nothing—more than ask Ms. Prekelezaj for documents and rely on the defendant's representations. *See* Sanctions Hr'g Tr. I at 82:8-22 [Doc. No. 217]. This was insufficient to satisfy Rule 26(g)'s mandate that certifying attorneys make a reasonable inquiry into the factual basis of the defendant's responses. *See In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1350-51. The defendant's verification does not provide a shield for its attorneys' failures.

### (c)  The Plaintiffs Asked the Defendant to Preserve and Search Emails

The court is truly flummoxed by the defendant's position that the plaintiffs did not request the defendant to preserve emails. The plaintiffs' preservation letter, sent in 2019, unambiguously asked the defendant to preserve "communications." An argument in 2019 that "communications"

does not include electronic communications, such as emails, is not credible. Moreover, the preservation letter directed the defendant to reach out to the plaintiffs' counsel if there was any confusion over what should be preserved, which the defendant did not do.

Similarly, the court finds no merit in the defendant's argument that the plaintiffs did not request it to search emails. As noted in the discussion of the law, the Rule 34 Advisory Committee Notes clarified sixteen years ago that a request for production of documents encompasses ESI, including emails.[151] Fed. R. Civ. P. 34 advisory committee's notes on 2006 amendments. The court finds it incredibly difficult to believe that two partner-level defense attorneys were unaware of this now-established development in the law.

---

[151] The defense counsel are not excused of their subpar inquiry by their somewhat ludicrous argument that emails (commonly understood to represent electronic mail) are not ESI. This argument reflects either an authentic but shocking lack of competence on the part of the defense counsel or an unoriginal, manufactured ignorance. *See, e.g., DR Distribs.*, 513 F. Supp. 3d at 873-74 (describing a party's testimony that "he never thought that 'electronic records' included web-based emails" as the party's attempt to "portray[ ] himself to be a luddite, unknowledgeable in the ways of information technology."). In either case, as this court has previously noted, modern-day counsel "do not get a free pass to avoid complying with their obligations" simply because they "don't understand these computers." *See DR Distribs., LLC*, 513 F Supp. 3d at 925. Emails are a classic example of ESI and should not have been excluded from the defendant's search absent an explicit agreement between the parties.

Moreover, even if the defense counsel *were* completely oblivious as to the required scope of a document production, the plaintiffs explicitly asked for emails in several of their document requests. In regard to two of these requests, the defendant stated that that it was searching for and would supplement its production. *See* Def.'s Resps. and Objs. to Pls.' First Req. for Produc. ¶¶ 28 and 29 [Doc. No. 126-1]. Thus, the defendant was on plain notice from the language of the plaintiffs' document requests that emails were contemplated and represented that it would search for and supplement its production with the same. The court simply cannot accept the position proffered by the defense counsel that the defendant did not understand or was not on notice that the plaintiffs' discovery requests included emails. The defense counsels' certification of the defendant's discovery responses in light of their total failure to ensure their client searched for or produced emails was a dereliction of duty pursuant to Rule 26(g).

### (d) It Was the Defense Counsels' Responsibility to Conduct Custodian Interviews of the Defendant and Search the Appropriate Data

Similarly, the court cannot accept the defendant's position that the plaintiffs had to specifically instruct it as to which of the defendant's accounts it was required to search. As a case *cited by the defendant* in its response to

the plaintiffs' motion to compel a forensic inspection stated, Federal Rule of Civil Procedure 34 makes it clear that it is the responding party's duty to search its own data. *See In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003). It is nonsensical that a party should have primary responsibility for searching its own documents but that the opposing party, who presumably has no or limited understanding of those documents and the relevant custodians—must tell the producing party which of those documents or whose accounts it must search. It was the defense counsels' responsibility to conduct proper custodian interviews of the defendant and its employees and ensure that the proper accounts were searched. *See DR Distribs.*, LLC, 513 F. Supp. 3d at 963 ("With regard to ESI, reasonable inquiry necessitates a proper custodian interview . . . [which] is merely a modern outgrowth of a client interview . . . long . . . needed to establish a reasonable inquiry."). The defense counsel utterly failed in this regard and cannot avoid Rule 26(g) sanctions by pinning their failures on the plaintiffs.

### (e)    The Forensic Inspection Was a Consequence of the Defendant's Discovery Deficiencies

It also was not the plaintiffs' responsibility, at least initially, to tell the defendant which keywords to search or to request a forensic inspection. In

this case, a forensic inspection (that the defendant agreed was necessary) and a court-ordered keyword search were the result of the defendant's discovery failures. Rather than being punitive, the forensic inspection represented both a potential remedy for the defendant's insufficient document collection and production AND an opportunity for the defendant to collaborate with an expert to demonstrate that it had not destroyed the evidence required for a fair trial. The vast majority of cases do not require this degree of oversight from the court or scrutiny from the plaintiffs; thus, the plaintiffs were not in error for not requesting a keyword search or forensic inspection sooner. Rather, at least in this case, the court-ordered forensic inspection and keyword search should be interpreted as the court's attempt to mitigate the problems caused by the defense counsels' failure to appropriately guide their client through the discovery process.

> **(f)  Current Counsel Were Not Excused From Conducting a Reasonable Inquiry Because the Defendant Previously Hired Different Counsel**

The court is also not compelled by attorney Moffett's argument that the current counsel were not retained at the time of the preservation letters and, therefore, cannot be held responsible for their client's failures in regard to preserving and producing data. While the court agrees that the defense

counsel could not take action in this matter until they were counsel of record, they were so retained before this lawsuit was filed and before a majority of the complained about accounts were lost. The current defense counsel were not excused from their obligations in regard to guiding their client through the identification and preservation of documents simply because another firm was previously engaged. Moreover, attorney Perniciaro's signature on the defendant's discovery responses certified that he personally had conducted a reasonable inquiry into these matters, which he clearly did not do.

### b) The Defendant's Discovery Responses and Document Production Were Incomplete and Inaccurate

Because attorney Perniciaro certified the defendant's discovery responses without making a reasonable inquiry as required by Rule 26(g), he enabled the defendant to make incomplete and inaccurate discovery responses, such as (1) initially stating that Mr. Payne was working on the property on the date of Ms. Frazier's death; (2) first claiming that only 13, and later 20, employees worked at Eastwyck; (3) denying that Ashelynn Burt-Jones, Jori Jones, and Wendal Johnson worked at Eastwyck; and (4) withholding hundreds, if not thousands, of responsive documents and destroying many others without disclosing their destruction. These omissions and errors were costly to everyone involved in this litigation. Examples of

expenses induced by the defendant's errors include (1) the wasted time spent and expense incurred by the plaintiffs in drafting and filing their motion to amend the complaint to add Mr. Payne as a named defendant based on the defendant's representations that he was present and on-duty at the time of the shooting;[152] (2) the wasted time spent and expense incurred pursuing discovery related to the 45 undisclosed Eastwyck employees, including, but not limited to, Wendal Johnson, Ashelynn Burt-Jones, and Jori Jones; (3) the wasted time spent and expense incurred conducting depositions before document productions were complete or discovery responses were fully supplemented; (4) the wasted time spent and expense incurred by the plaintiffs in investigating other cases against the defendant to answer discovery questions to which the plaintiffs could not secure the answer to in this litigation; (5) the wasted time spent and expense incurred in regard to setting the parameters for and conducting/surveilling the forensic inspection; and (6) the wasted attorney time spent and expense incurred drafting and

---

[152] After the plaintiffs filed a motion to amend the complaint to add Mr. Payne as a party, the defendant amended its interrogatory responses to clarify that Mr. Payne was not on duty at the time of the incident because he was terminated prior. There is no reason that the defendant could not have looked at its payroll records prior to submitting its first interrogatory responses and correctly answered this interrogatory response. Even very modest guidance by the defense counsel could have prevented this waste of time.

filing motions to compel and motions for sanctions. This recitation of expenses is illustrative rather than exhaustive.

In addition to the monetary expenses caused by the defense counsels' improper certification, the inaccurate and incomplete discovery responses have had an overwhelming effect on the evidence in this matter. The most important emails have been long-since lost, many of the defendant's previous employees are now unfindable or unwilling to cooperate in this matter, and the plaintiffs' ability to prosecute this matter has been severely hampered.

The court finds that there is simply no excuse for the defense counsels' certifications of the defendant's discovery responses. Doing so required ignoring numerous red flags, abdicating professional responsibilities, and turning a blind eye to established law. Accordingly, the court concludes the defendant and defense counsel have violated Rule 26(g) and that sanctions must be awarded.

### c)   The Defense Counsel Improperly Withheld the Identity of a Witness

The next discovery infraction the court will discuss pursuant to Rule 26(g) is defense counsels' failure to disclose Charles Cooper in response to the plaintiffs' interrogatories. Somewhat uniquely, the responsibility for this rests with the defense counsel alone. Despite presumably paying for the time

its present counsel spent investigating Mr. Cooper, Ms. Prekelezaj testified as the company representative at the sanctions hearing that she had never heard of Mr. Cooper until that day. Sanctions Hr'g Tr. I at 84:8-19 [Doc. No. 217]. Moreover, the defense counsel stated that they did not provide Ms. Prekelezaj with Mr. Cooper's statement because Mr. Cooper was not identified as an eyewitness or someone with knowledge of the decedent's shooting death. Def.'s Resp. to Cooper Timeline ¶ 20 [Doc. No. 195-3]. Therefore, the record reflects that it was the defense counsel alone who were capable of disclosing Mr. Cooper in response to discovery asking it to "identify all persons known to you who have any knowledge regarding the facts or circumstances surrounding the incident or any element of damages in this case." Def.'s Resps. and Objs. to Pls.' First Interrogs. ¶ 3 [Doc. No. 185-10]. However, attorney Perniciaro chose not disclose Mr. Cooper, casting an ominous shadow of doubt over the underlying facts of this matter.

As this order reflects, attorney Perniciaro's stated reasons for not disclosing Mr. Cooper were inconsistent and contradictory. In response to the plaintiffs' second motion for sanctions, the defense counsel made a technical argument, contending that they did not disclose Mr. Cooper because "whether Cooper heard the relevant shot [that killed Ms. Frazier] is not certain." *See supra* Section II.C.16.a)(1)(a) (citing Def.'s Resp. in Opp'n to Pls.' Second Mot.

for Sanctions at 4 [Doc. No. 193]). The defense counsel also argued that they did not disclose or produce their investigator's report or Mr. Cooper's statement in response to the plaintiffs' requests for production because these items were expressly not requested, which this court finds questionable in light of the other documents protected by the attorney work product doctrine that the defendant explicitly stated it was withholding. *See id.*

As described in more detail above, at the sanctions hearing, attorney Perniciaro suddenly claimed that the defense counsel didn't disclose Mr. Cooper because they "forgot about him," which he insinuated was partially the plaintiffs' fault for excluding attorney work product in their requests for production. *See supra* Section II.C.18.d)(2); Sanctions Hr'g Tr. I at 43:11-15; 44:11-19. However, he then almost immediately changed his position and told the court that he didn't turn the information over because "we did not believe he was a witness to the incident at the time." Sanctions Hr'g Tr. I at 46:9-12 [Doc. No. 217]. The next day, attorney Perniciaro once again reiterated that he forgot about Mr. Cooper, and then—again—seemed to recant that position and phrase the decision not to disclose Mr. Cooper as a proactive "judgment call." Sanctions Hr'g Tr. II at 28:6 – 29:7 [Doc. No. 214] Attorney Moffett thereafter affirmed that it was a "judgment call," albeit one that he was "going to criticize." *Id.* at 43:6-10.

308

In light of attorney Perniciaro's own statements (not to mention those of his law partner's) to the contrary, the court does not find his representations that he "forgot" to disclose Mr. Cooper credible. Similarly, the court is not persuaded by the defense counsels' arguments in their brief that they did not have to disclose Mr. Cooper because it was uncertain whether he heard the relevant shot. As noted in Section II.C.16.a)(1)(a), the defense counsel attempted to support this position by arguing that Mr. Cooper was not a "person with knowledge of facts surrounding the shooting" because he did not have direct knowledge of anyone being shot or killed. *Id.* This argument is nonsensical, as the court suspects the defense counsel is aware. The defense counsel knew that Mr. Cooper, at the very least, heard a shot on the day of Ms. Frazier's death near where Ms. Frazier died. In fact, the defense counsel admitted to suspecting that Mr. Cooper was an eyewitness. Just because Mr. Cooper stated that he did not have knowledge that Ms. Frazier died from a gunshot does not mean that his alleged knowledge of shots on the date and near the location of Ms. Frazier's death was irrelevant. Mr. Cooper unquestionably should have been disclosed in response to the plaintiffs' interrogatory.

The court finds that the defense counsel unambiguously violated Rule 26(g) by not disclosing Mr. Cooper. Rather than certifying, as an officer of the

court, that their client followed the Rules of Civil Procedure, the defense counsel hid a witness from the court AND their client that they should have disclosed. The Eleventh Circuit has found that such conduct, where an attorney "'either carelessly or deliberately' covered up evidence" is "'tantamount to [objective] bad faith.'" *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1241 (11th Cir. 2006) (citing *Malautea*, 987 F.2d 1536).

The court further finds that the plaintiffs have been prejudiced (and the truth has been compromised) by the defense counsels' failure to disclose Mr. Cooper. Although the defense counsel has argued that Mr. Cooper's statement reveals he was not an eyewitness, they have deprived the plaintiffs of a timely opportunity to interview Mr. Cooper and evaluate his veracity.[153] And even if the plaintiffs were able to interview Mr. Cooper now, at this late point in the litigation, such an opportunity would hardly be fair considering the time that has elapsed since the incident and Mr. Cooper's indication that he has no desire to speak with "any more attorneys." Moreover, the court finds that the defense counsels' behavior in shielding their client from knowledge of Mr. Cooper, in conjunction with failing to disclose Mr. Cooper

---

[153] Notably, the defense counsel did not—at any point—share with the court or the plaintiffs' counsel their investigator's report regarding Mr. Cooper, which would doubtlessly contain opinions about Mr. Cooper's truthfulness.

in response to the pertinent interrogatories, calls into question whether Mr. Cooper may have said anything to the defendant's representatives off the record. If Mr. Cooper's testimony is as harmless and insignificant as the defense counsel has indicated and on par with the testimony of other potential witnesses, then what credible reasons could the defense counsel have for withholding his identity? The court can find none; hence, it finds that the defense counsels' bad faith behavior in hiding Mr. Cooper has—at a minimum—violated Rule 26(g) and requires the imposition of sanctions.

### d)    The Defendant Made Baseless Objections to the Production of Documents

The final issue the court will consider in regard to Rule 26(g) concerns objections based on privacy, confidentiality, and undue burden that the defendant made to producing documents, such as employee files and profit and loss records, that it produced without protections or restrictions in *Mayes*. Succinctly, the court concludes that while the defendant's objections premised on privacy, confidentiality, and undue burden in regard to documents that it produced in another case without restriction *accomplished* an improper purpose (such as "to harass, cause unnecessary delay, . . . needlessly increase the cost of litigation," or—most concerningly—prevent the plaintiffs from obtaining information that would assist their case), *see*

Rule 26(g)), the court will not assume that the defense counsel *lodged* the objections for this purpose. It is not uncommon for parties to initially object to producing sensitive data such as employee personal data and profit and loss statements in litigation. While such objections appear to be inauthentic in this case, the court holds the defendant, who has in-house counsel and should be aware of what is disclosed to different counsel in another litigation, responsible rather than the defense counsel. Therefore, the court will not sanction the defendant or the defense counsel pursuant to Rule 26(g) for this conduct (but will consider it when contemplating sanctions pursuant to the court's inherent authority).

### B.     Rule 37(e)

#### 1.     Legal Standard

"Spoliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (citation and quotation marks omitted). "In some circumstances, a party's spoliation of critical evidence may warrant the imposition of sanctions." *Id.* (citation and quotation marks omitted). Spoliation of ESI is governed by Federal Rule of Civil Procedure 37(e), which was amended in 2015 to state:

> If electronically stored information that should have been
> preserved in the anticipation or conduct of litigation is lost
> because a party failed to take reasonable steps to preserve it, and
> it cannot be restored or replaced through additional discovery,
> the court:
>
> (1) upon finding prejudice to another party from loss of the
> information, may order measures no greater than necessary to
> cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to
> deprive another party of the information's use in the litigation
> may:
>
> (A) presume that the lost information was unfavorable to the
> party;
>
> (B) instruct the jury that it may or must presume the information
> was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Based on the plain language or Rule 37(e), a sanctions analysis for spoliation of ESI requires the court to address three initial questions: (1) was there a duty to preserve the missing ESI, (2) was the ESI lost because the party failed to take reasonable steps to preserve it, and (3) is the missing ESI evidence that cannot be restored or replaced through additional discovery. *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, No. 14-CV-62216-MARRA/MATTHEWMAN, 2016 U.S. Dist. LEXIS 39113, at *12 – 16 (S.D. Fla. Mar. 22, 2016).

313

> If the answer to any of questions 1-3 is 'no', then the Court need proceed no further under Rule 37(e), and a motion for spoliation sanctions or curative measures must be denied. If the answer to all three of the questions is 'yes', however, then the Court must analyze the facts at hand under subsection (e)(1) if there is a finding of 'prejudice' or under subsection (e)(2) if there is a finding of 'intent to deprive.'

*Id.* at *16.

"The Advisory Committee's notes make clear that destruction of evidence due to 'negligence or gross negligence' does not warrant" the more severe sanctions. *Ala. Aircraft Indus. v. Boeing Co.*, No. 20-11141, 2022 U.S. App. LEXIS 4039, at *40 – 41 (11th Cir. Feb. 14, 2022) (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). "The rule is less clear, however, in providing affirmative guidance as to what sort of evidence would support a finding of an intent to deprive." *Id.* "Courts in this circuit have suggested that the 'intent to deprive' standard in Rule 37(e)(2) is harmonious with the 'bad faith' standard previously established." *FTC v. F&G Int'l Grp. Holdings, LLC*, 339 F.R.D. 325, 332 (S.D. Ga. 2021); *see Tesoriero*, 965 F.3d at 1183 (observing that "bad faith" is the standard for spoliation sanctions).

> In establishing bad faith, the party seeking spoliation sanctions can rely on circumstantial evidence, including: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have

known of its duty to preserve the evidence; and (4) the affirmative
act causing the loss cannot be credibly explained as not involving
bad faith by the reason proffered by the spoliator.

*FTC v. F&G Int'l Grp. Holdings, LLC*, 339 F.R.D. at 332.

### 2.    Analysis

#### a)    The Defendant's Behavior Meets the Threshold for Spoliation Sanctions

In this case, it is abundantly clear that the defendant's deletion of/lost access to Ms. Pauleon's email account, Ms. Rhodes' pre-incident email account, the Eastwyck leasing office Gmail account, and the Gmail accounts associated with Britknie Bush and Jennifer Bentley[154] meets the threshold for spoliation sanctions. All of these accounts[155] were lost after the defendant began creating documents in anticipation of litigation on April 8, 2019 and

---

[154] Spoliation also likely occurred in regard to the missing May 2019 security log; however, because no evidence currently before the court affirmatively verifies that this log existed, the court will not issue sanctions in regard to this log at this time.

[155] The evidence shows that Ms. Pauleon was emailing Ms. Bush at Ms. Bush's Eastwyck Gmail account on May 17, 2019.  Pauleon to Bush May 17, 2019 email [Doc. No. 140-5]. The plaintiffs' brief, which the defendant has not refuted in this regard, claims that Ms. Pauleon and Ms. Bentley were corresponding via Ms. Bentley's Eastwyck Gmail account on April 30, 2019. Pls.' Reply re: Pls.' Mot. to Compel Forensic Inspection at 14 [Doc. No. 156]. This email was then allegedly forwarded to Ms. Dia. *Id.*

after the defendant received the preservation letter from the plaintiffs' counsel on April 16, 2019.[156] *See Ala. Aircraft Indus.*, 2022 U.S. App. LEXIS 4039, at *38 (" . . . the duty to preserve arises when litigation is pending or reasonably foreseeable at the time of the alleged spoliation") (citations and internal quotations omitted). It is undisputed that the defendant did not take any steps to preserve its data or access to its data after it received the plaintiffs' preservation letter or after litigation became reasonably foreseeable. In fact, the defendant stated that "it had no email retention policy," and it is apparent that it did not develop one in light of the reasonably foreseeable litigation. It is undisputed that the evidence cannot be recovered, as confirmed by the defendant's forensic examiner and the defendant's multiple representations in briefs regarding the same. Similarly, there is not a way to replace these valuable email accounts because no one seems to know exactly what they contained.

### b) The Defendant's Spoliation Prejudiced the Plaintiffs

Just as it is clear to the court that spoliation of critical documents occurred, it is clear that such spoliation prejudiced the plaintiffs. With the

---

[156] The court finds the defendant's argument that the preservation letter did not specify "emails" completely unpersuasive, as discussed in Section III.A.2.a)(3)(c).

exception of a few emails that included the four management email accounts the defendant was able to search, the defendant effectively destroyed or lost access to all of the property-level emails for Eastwyck during the relevant time period. Ms. Dia testified in her deposition in *Mayes* that knowledge of many violent incidents at Eastwyck stopped at the property level. Dia *Mayes* Dep. 181:4-182:2 [Doc. No. 185-19]. In its briefing, the defendant stated that Ms. Rhodes' [pre-incident] email account "is the best source of the information and documents [p]laintiffs are seeking because Ms. Rhodes oversaw the daily operations of the property, maintenance calls, and leasing activity from the time Contour purchased the property until after the subject incident." Def.'s Resp. to Pls.' Mot. to Compel ESI at 6 – 7 [Doc. No. 139]. These property-level emails between employees and between third parties, such as tenants, and employees were indisputably the most likely source of evidence of the defendant's knowledge of prior similar crimes, evidence of the defendant's explicit or tacit endorsement of illegal activities, and even evidence related to Ms. Frazier's legal status on the property the night she was killed. However, the defendant destroyed all such evidence. The prejudice to the plaintiffs is severe and cannot be cured, particularly because Ms. Rhodes, who was not even employed at the time of Ms. Frazier's death, is apparently the defendant's only Eastwyck property-level employee who is still working for a

Contour company and former employees have indicated that they do not want to assist in this litigation. *See* Third Prekelezaj Decl. [Doc. No. 185-2] at 5 (noting that when the defense counsel tried to call Ms. Bush, "[s]omeone answered but then hung up immediately. A voicemail was left but no response was received.") and 10 (noting the defense counsel reached Ms. Bentley, but she could not provide a password to the Gmail account she used on behalf of Eastwyck and "stated she could not assist with gaining access to the account by sending a verification code to her phone number."). As previously noted, the contents of the emails cannot be replaced by other means because no one knows what information was contained within the emails, particularly from third parties such as tenants.

### c) The Defendant Acted with the Intent to Deprive the Plaintiffs of the Spoliated Emails

#### (1) Ms. Rhodes' Deleted Email Account

It is abundantly clear that the defendant acted with the intent to deprive the plaintiffs of the deleted information. It is undisputed that the defendant affirmatively deleted Ms. Rhodes' pre-incident GoDaddy email account well after it began creating documents in anticipation of litigation, after it received a preservation of evidence letter, and after it retained counsel

in this matter.[157] *See Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV-ZLOCH/ROSENBAUM, 2009 U.S. Dist. LEXIS 111659, at *46 (S.D. Fla. Nov. 16, 2009) (finding that the movant had shown an affirmative act where the spoliator intentionally deleted an email inbox). Although the defendant has sought to explain the deletion of these accounts as a "standard business practice," the record reflects that the defendant's actions were anything but standard. Ms. Rhodes left the company in October 2018. Rather than deleting her account in the normal course of business, the defendant retained her emails until she returned to the company's employment in January 2020. It was only at that time, after current counsel had assumed representation in this matter and the defendant was on notice that such emails needed to be preserved, that the defendant permanently deleted Ms. Rhodes' email account and issued her a new email account. Throughout the duration of this litigation, the defendant then attempted to mislead the plaintiffs and the court into believing that Ms. Rhodes' new email account encompassed her emails from her prior period of employment and that it had searched them

---

[157] Although Mr. Draper stated than an email account can be deleted by the client or deleted because it is not renewed and that he did not investigate that issue, Ms. Prekelezaj testified at the sanctions hearing that "all accounts for former employees are deleted so that we can reuse those e-mails for new employees." Sanctions Hr'g Tr. I at 59:20-22 [Doc. No. 217].

for the same, never disclosing that it had—in fact—deleted the emails that it touted as the most important emails to this litigation.

There is no credible excuse for this behavior. Worse than intending to deprive the plaintiffs of the material information in Ms. Rhodes' emails, the defendant blatantly misled the plaintiffs (and the court) into thinking it had searched the deleted emails. And of course, it would have succeeded but for the plaintiffs' counsel's vigilance in investigating the records in the *Mayes* case. When found out, the defendant—rather than taking responsibility—sought to blame the plaintiffs for the mistake: stating that the plaintiffs could have learned of the deleted email themselves if they had chosen to depose Ms. Rhodes or if they had found her old email address in a previous document production. Moreover, the defendant argued her email account was lost before the plaintiffs filed suit, failing to point out it was lost due to the defendant's affirmative actions well after the defendant was on notice of potential litigation. Such behavior, not to mention the reprehensible arguments promulgated by the defense counsel, is an astonishing example of bad faith, sanctionable to the highest degree.

### (2) Ms. Pauleon's Deleted Email Account

Ms. Pauleon was the Eastwyck property manager at the time of Ms. Frazier's shooting, yet throughout almost the entirety of this litigation the

defendant has not accurately identified her role (which was ascertainable through payroll records) or what happened to her email account. In its response to the plaintiffs' Motion to Compel ESI, the defendant first stated that Ms. Pauleon's email was "deactivated." Def.'s Resp. to Pls.' Mot. to Compel ESI at 7 [Doc. No. 139]. In a follow-up email to the plaintiffs' counsel, the defense counsel stated his client had confirmed Ms. Pauleon's email had been deleted "in the normal course of business." July 6 – 9, 2021 emails between opposing counsel at 5 [Doc. No. 155-1]. On July 9, 2021, the defendant "certified" via a brief and an unverified letter from Ms. Prekelezaj that the accounts of Mr. Payne, Ms. NarCisse, and Ms. Pauleon were deleted. Def.'s Certification at 2 [Doc. No. 151]. Citing to a letter from Ms. Prekelezaj, the defendant represented that when an employee is terminated, the defendant "will request Go Daddy delete the email account for the employee (if one exists) for various reasons, including the cost of services." *Id*. Although the defendant could not find a confirmation of the deletion of Ms. Pauleon's account, it asserted that it was deleted upon her termination. *Id*. However, at the sanctions hearing, Ms. Prekelezaj testified that the defendant found out that it could reuse an email without deleting it, so Ms. Pauleon's account was recreated for and reassigned to a new property manager, Ms. Goolsby. Sanctions Hr'g Tr. I at 59:22 – 60:5 [Doc. No. 217]. The forensic examiner

then confirmed that Ms. Goolsby's account, which was Ms. Pauleon's account, was deleted and unrecoverable. *Id.* at 104:13-20.

There is no doubt that the emails of the property manager at the time of Ms. Frazier's death are relevant to this litigation. There is also no doubt that the defendant affirmatively deleted those emails when it deleted Ms. Goolsby's account, well after it knew of its duty to preserve such evidence. Although the defendant has attempted to pass off the deletion of Ms. Goolsby's account as a standard business practice, it has produced no policies supporting this alleged policy. Moreover, the defendant *did not follow* the alleged policy in regard to Ms. Pauleon's emails because it "had found out there was another way" to reuse emails without deleting them. *Id.* at 59:24 – 60:3. However, despite learning it could re-use email accounts without deleting them and despite already obtaining representation in regard to anticipated litigation, the *defendant deleted Ms. Goolsby's account*.

The defendant has offered no credible reason for deleting Ms. Pauleon's/Ms. Goolsby's emails. By its own admission, it could continue to reuse accounts without deleting them. By its own actions of hiring the defense counsel, it was on notice of potential litigation. It did not follow its own professed policy of email deletion, and it spent the majority of this litigation claiming to be unsure of what happened to these emails. Given the context of

the defendant's behavior in this matter and the number of purposeful, affirmative actions that the defendant took in regard to Ms. Pauleon's email after it reasonably anticipated future litigation,  the court concludes that the defendant hid and then destroyed Ms. Pauleon's emails to prevent their disclosure in this litigation. Accordingly, sanctions for spoliation in bad faith are warranted.

### (3)    The Gmail Accounts

The court also concludes that the defendant's actions and evolving narrative in regard to the various Gmail accounts used by the defendant indicates bad faith. As with the rest of its emails, the defendant did not attempt to secure access to the accounts or prevent spoliation after it reasonably anticipated this litigation. Instead, the defendant asserted that it lost access to the leasing office Gmail account prior to June 7, 2020, and then changed its narrative to assert that it lost access to the leasing office Gmail account when it sold the property in January 2021. At the forensic inspection hearing, the defense counsel "agreed" that the account should be searched but stated that his client did not have the password and assumed that the company that purchased Eastwyck is using the account now. Forensic Inspection Hr'g Tr. at 26:3-20 [Doc. No. 218]. Rather than proactively taking efforts to secure access to the account, the defense counsel stalled and said

323

his client wanted permission from the current Eastwyck owners before it tried to reset the Gmail password and suggested that the parties send a *joint* subpoena asking the new owners for access to the account. *Id.* at 26:14 – 27:1.

In her Third Declaration, the defendant's 30(b)(6) witness represented that she attempted to access the password for this account as well as the individual Eastwyck Gmail accounts but was unsuccessful. *See generally* Third Prekelezaj Decl. [Doc. No. 185-2]. She further represented that Ms. Rhodes visited Eastwyck's leasing office with the permission of the current property owner, but she could not locate password records for the leasing office Gmail account. *Id.* at 16 – 17. The forensic inspector did not contact Google to attempt to access the leasing office Gmail account and instead informed the plaintiffs "that it is highly unlikely that this will succeed and . . . the account is lost forever."[158] Pls.' Reply re: Pls.' Second Mot. for Sanctions at 7 [Doc. No. 200]; *see also* Draper Expert Rpt. at 6 ¶ 24 [Doc. No. 189-1] (" . . . these Gmail accounts have become unmanaged and inaccessible.").

---

[158] At the sanctions hearing, the plaintiffs argued that they still do not know in regard to the leasing office Gmail account: what passwords the defendant attempted to use, what passwords Mr. Draper attempted to use, whether anyone at Contour has a phone number ending in the recovery number digits or received a recovery email, and whether the defendant has an 18-character email account. Sanctions Hr'g Tr. I at 14:17 – 15:4 [Doc. No. 217].

Although at first glance, it might appear that the defendant simply did not know about these accounts, was—as its counsel asserts—a poor record keeper, and simply lost access to these accounts as a matter of negligence, such a determination ignores the defendant's affirmative obligation to know what documents it possesses and preserve them. As the district court persuasively stated in *Tarlton v. Cumberland Cty. Corr. Facility*, 192 F.R.D. 165, 170 (D.N.J. 2000):

> The client is charged with knowledge of what documents it possesses. It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing it was all they had. Under the federal rules, the burden does not fall on plaintiff to learn whether, how, and where defendant keeps relevant documents.

The defendant was represented by two different law firms in this matter, with the most recent firm responding to the plaintiffs' demand letter as early as December 2019, more than a year before the defendant sold Eastwyck and the computers that allegedly contained the leasing office Gmail account password. The court has addressed a few highlights of current counsels' background in this order and has determined that it is more than far-fetched that counsel of such experience and pedigree did not understand their client's obligation to know what documents (and email accounts) it possessed and

used.[159] However, despite producing emails to the plaintiffs on September 25, 2020, including one referencing an individual Eastwyck Gmail account as well as the leasing office Gmail account, these attorneys argued before the court on behalf of the defendant that it was the *plaintiffs'* responsibility to request the defendant to search the specific email accounts, implying that the *plaintiffs' delay* led to the lost access.

To use an apt colloquialism: hogwash! As previously discussed, a Rule 34 request for documents includes, by implication, electronic data such as emails. When the defendant received the preservation of evidence letter, all of the Gmail accounts were operational, used for Eastwyck business, and contained communications that were undoubtedly material to this matter. The defendant, therefore, was under an obligation to maintain access to these accounts and has no excuse for not knowing of this obligation. While the defendant could not just delete the accounts as it could with its GoDaddy accounts, it effectively deleted them by terminating/separating all of the employees who had access to the accounts without securing the login information to the accounts. If one believes the defendant's own arguments

---

[159] As discussed at length above, the defense counsel also had an obligation to know and understand what documents and email accounts its client possessed and used prior to certifying the defendant's discovery responses. *See supra* Section III.A.1.

(which the court has some doubts about), it then took the most affirmative action of all in selling the property, *including the leasing office Gmail account*, after this litigation was underway.

Naturally, the defendant sought to pass off the lost access to the accounts as a colossal "oops!", and then pointed its finger at the plaintiffs for not asking for emails from those specific accounts earlier. However, given the context of the defendant's actions in this matter, the court does not find the defendant's explanations credible. If the defendant, in fact, accidentally or negligently lost access to the accounts, then the defendant should have immediately sought to obtain the relevant passwords and access to the account. Instead, however, the defendant chose to quibble on paper about why it could not access the accounts rather than supplement the record with evidence that it had, in fact, made some proactive effort to regain access. Apparently, it was not until the plaintiffs' arguments for sanctions gained momentum that the defendant attempted to access the accounts or visit the property, at which point it was, unfortunately "too late." With what appears to be fairly limited inquiry, even the defendant's forensic examiner has elected to throw his hands in the air and surmise that—conveniently—there is nothing more the defendant can do.

Because the defendant proactively divested itself of access to the Gmail accounts and then sought to stall and argue rather than seek to regain access to the accounts it was clearly under an obligation to preserve, the court finds the defendant acted with the intent to deprive the plaintiffs of access to these accounts sufficient to incur the most severe sanctions.

## C.   Rule 37(c)(1)

### 1.   Legal Standard

Federal Rule of Civil Procedure 26(e)(1)(A) requires a party who has responded to an interrogatory, request for production, or request for admission to supplement or correct its response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Federal Rule of Civil Procedure 37(c)(1) gives Rule 26(e)(1)(A) teeth, stating:

> If a party fails to provide information or identify a witness as required by Rule 26 . . . (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i) – (vi).

According to Rule 37(b)(2)(A)(i) – (vi), such sanctions can include:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part; and

(vi) rendering a default judgment against the disobedient party.

"An individual's discovery conduct should be found 'substantially justified under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1358 (citing *Devaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993)). A discovery mistake is harmless "if it is honest and is coupled with the other party having

sufficient knowledge that the material has not been produced." *Id.* (citing *Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1308 (N.D. Ga. 2003)). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.,* 318 F. App'x 821, 824 (11th Cir. 2009) (citing *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)). In determining whether sanctions should be imposed under Rule 37(c), courts typically consider the non-disclosing party's explanation, the importance of the evidence/disclosure, and the prejudice to the opposing party. *See Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.,* No. 21-12854 Non-Argument Calendar, 2022 U.S. App. LEXIS 19538, at *3 (11th Cir. July 15, 2022) (citing *Romero v. Drummond Co.,* 552 F.3d 1303, 1321 (11th Cir. 2008)).

## 2. Analysis

In this case, the plaintiffs seek sanctions for the defendant's failure to timely supplement its discovery responses with the defendant's missing employees, security documents, and the disclosure of Mr. Cooper. The defendant has argued that the plaintiffs filed their first motion for sanctions only six days after the employees and security documents were disclosed in

330

*Mayes*, which did not give the defendant time to remember to supplement here.

The defendant has clearly violated Rule 37(c) in regard to the undisclosed employees and security documents that it produced in *Mayes* but did not produce in this action. At the sanctions hearing, Ms. Prekelezaj testified that she found the documents in early summer 2021, when the parties were deeply engaged in litigation regarding missing information in this lawsuit. Sanctions Hr'g Tr. I at 85:22 – 86:2 [Doc. No. 217]. Although Ms. Prekelezaj testified that she "forgot" to notify the defense counsel in this case of that information/those documents, Second Prekelezaj Decl. ¶ 14 [Doc. No. 167-1], and that "[i]t didn't occur to [her] that [she] had to send files or findings that [she] was sending for one case over to the other attorneys for another case," Sanctions Hr'g Tr. I at 53:16-18 [Doc. No. 217], this is not a substantial justification for failing to amend and supplement the defendant's subpar discovery responses. The contentious nature of the dispute, the extensive discovery of which the defendant complained, Ms. Prekelezaj's personal involvement in attempting to track down missing information, and her attorney's requests for employee files in "any conversation we had" all should have reminded her of her duty to supplement the discovery in this action. Sanctions Hr'g Tr. I at 82:8-21 [Doc. No. 217]. Moreover, the

defendant, who (1) would have uncovered the missing employees if it had conducted a search of payroll records on Intuit as it previously (inaccurately) testified that it did; and (2) repeatedly testified that its employee list was complete, has not convinced the court that this was simply an honest mistake or that the plaintiffs had sufficient knowledge that the material had not been produced. In other words, the defendant has not met its burden of demonstrating that its failure to timely supplement the record was harmless (nor could it, as the entirety of this order makes clear). Accordingly, the court concludes that sanctions are due pursuant to Rule 37(c).[160]

### D.    Rule 37(b)

#### 1.    Legal Standard

Somewhat distinct from a party's duty to reasonably investigate and truthfully respond in discovery is the obligation of a party to obey a court order if such a court order is necessary. Federal Rule of Civil Procedure 37(b) governs the court's authority to sanction the defendant for not obeying a court order as follows:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey

---

[160] The court finds that the defense counsel's failure to disclose Charles Cooper to their client or the plaintiffs is better addressed pursuant to Rule 26(g) and the court's inherent authority.

an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Further,

Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 36(b)(2)(C).

## 2. Analysis

After reviewing the parties' arguments, the court concludes that the

defendant fell short of the mandates of the forensic inspection order by not

333

submitting the forensic inspector's report 14 days following the conclusion of his inspection, which was to occur no later than November 15, 2021. And, contrary to the defendant's argument that the report was not due until the *defendant* finished examining the data, the court order clearly required the forensic inspector to submit a report summarizing his process, findings, obstacles encountered, and other relevant information no later than 14 days following the conclusion of *his* inspection. *See* Aug. 13, 2021 Order at 4 ¶ 7 [Doc. No. 162].  According to the defendant, the forensic inspector gave the defense counsel access to the data on October 12, 2021 [Doc. No. 179 at 2]. Thus, Mr. Draper's report was due 14 days thereafter. However, it appears to the court that the report would not have been filed at the time of the hearing at all if the plaintiffs had not pointed out the defendant's tardiness in their brief.

In addition, the defendant did not produce "all responsive, non-privileged documents" along with a privilege log within 30 days of receiving the data from the forensic inspector. Although the defendant argued that the ESI order did not contemplate the volume of the emails the forensic inspection would produce, the court cautioned the defense counsel at the hearing that the forensic inspection would likely take more time than the week that the defense counsel proposed. *See supra* n.81. The defendant is

correct that it represented the document production was not yet complete in response to the plaintiffs' status report and request for clarification filed on November 10, 2021, but this reflects sloppy advocacy. Nowhere on the record is there a motion, consent or otherwise, for an extension.

In regard to what documents the defendant was required to turn over, the defendant is correct that the *plaintiffs* filed a status update and request for clarification in November asking for guidance on whether the defendant could withhold non-privileged documents that contained the search terms as non-responsive. The court—sensing that the defendant had misled it on some key issues but desiring to issue a meaningful order based on facts rather than intuition—did not provide the requested clarification at that time, preferring to thoroughly review the evolving motions for sanctions and the record before issuing any additional substantive rulings in the case. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 (11th Cir. 1997) ("When a party moves the court to compel discovery, the court should consider and rule on the objections filed by the resisting party. While it has the discretion to grant or deny the motion, it should not grant the motion in the face of well-developed, bona fide objections without a *meaningful explanation* of its decision.") (emphasis added). As reflected by the sheer depth and breadth of this order, that process has consumed an enormous amount of judicial

resources. However, the court now finds the defendant's professed concerns in its response to the plaintiffs' status update regarding a "document dump" on the plaintiffs to be inauthentic in light of the plaintiffs' continual representations to the defendant and the court that they desired all documents that contained the search terms (and, therefore, would not have a basis for contesting a voluminous production).[161] Nevertheless, the court will not sanction the defendant in regard to any documents withheld in anticipation of a court order regarding the same.

The court does not regard the defense counsel as incompetent; thus, it appears to the court that the defendant's actions and associated arguments related to the filing of the forensic expert's report, delay in production, and "confusion" about the scope of the production have been employed for

---

[161] The fact that the defendant needed further clarification on this after the forensic inspection hearing and the court order regarding the same is surprising to the court. The defense counsel *must* have understood (and presumably instructed their client) from the court's warning at the forensic inspection hearing that the court did not order a forensic inspection, complete with mandated search terms, in this matter simply to provide the defendant with an unqualified "second chance" at discovery responses; instead, the court ordered a forensic inspection because there was a strong showing that the defendant destroyed evidence and thwarted discovery. *See* Forensic Inspection Hr'g Tr. at 45:11-16 [Doc. No. 218]. Thus, the defendant should have been on notice that it was not afforded discretion to contest production as if no discovery infractions had occurred. Essentially, the fact that a forensic inspection was required at all was a strong signal that the defendant had lost the benefit of the doubt in this matter.

purposes of delay—a subtle and sometimes effective tactic when a business entity litigates against plaintiffs with more limited resources (or a plaintiffs' firm that will not receive compensation until the final resolution of the case). This is particularly true in regard to the delayed filing of the forensic inspector's report, which ultimately fell short of expectations and has required extensive follow-up by the plaintiffs.

The defendant, assisted by the defense counsel, has violated Rule 37(b), and both the defendant and the defense counsel may be sanctioned pursuant to the same.

### E.    The Court's Inherent Authority To Sanction

### 1.    Legal Standard

In addition to the sanctions allowed by the Federal Rules of Civil Procedure, district courts "possess an inherent power to impose sanctions for litigation misconduct that derives from their need to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Strang v. City of Albany*, 759 F. App'x 755, 759 (11th Cir. 2018) (citation and internal punctuation omitted). "The inherent power serves dual purposes of vindicating judicial authority without resorting to contempt of court sanctions and making the non-violating party whole." *Benjamin v. Experian*

*Info. Sols., Inc.*, Civil Action No. 1:20-cv-2466-RWS, 2022 U.S. Dist. LEXIS 97959, at *7 (N.D. Ga. Mar. 21, 2022) (citation and punctuation omitted). "The key to unlocking that inherent power is a finding of bad faith." *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (citing *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). Among other ways, a party demonstrates bad faith by delaying or disrupting the litigation, hampering enforcement of a court order, and making false statements during a deposition for a harassing or frivolous purpose. *Ibezim v. The GEO Grp., Inc.*, 786 F. App'x 975, 976 (11th Cir. 2019) (citation and quotation marks omitted); *Strang*, 759 F. App'x at 759. These are to be contrasted with simple recklessness or inconsistencies in a witness' testimony, which can be a starting point but standing alone are insufficient to make the finding of bad faith necessary to impose sanctions. *See Strang*, 759 F. App'x at 759 and *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017) ("[S]imple recklessness . . . can be a starting point but requires something more to constitute bad faith."). The court may consider a party's "pattern of conduct" when determining whether subjective bad faith exists, even when individual incidents could "suggest simple misunderstanding, negligence, or recklessness" if viewed in isolation. *Meyer v. Gwinnett Cty. Police Dep't*, No. 21-12851, 2022 U.S. App. LEXIS 18399, at *30 (11th Cir.

July 5, 2022) (citing *Jones v. Graham*, 709 F.2d 1457, 1462 (11th Cir. 1983)). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Purchasing Power*, 851 F.3d at 1225. "If a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may sanction the responsible party. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46 (1991) (citations omitted).

### 2.    Analysis

The court finds that the defendant's pattern of conduct throughout this litigation—in addition to many of its stand-alone actions—demonstrates bad faith sufficient to support the imposition of sanctions pursuant to the court's inherent authority. This bad faith has delayed and disrupted this litigation to the extent that—two years into this matter—the plaintiffs are no closer to a resolution on the merits than they were than when they started. And perhaps that was part of the defendant's goal: in that two-year timeframe, the defendant sold the instant property and likely divested itself of the majority (if not all) of its assets, potentially limiting the plaintiffs' recovery to that recoverable through the defendant's insurance policy. Moreover, the defendant's bad faith has undermined judicial authority in this action, causing the court to issue orders premised on false representations and

significantly delaying the administration of justice while the court has waded through almost every document on the docket in an effort to decipher the truth despite the defendant's manifold misrepresentations. Despite those efforts, it is now clear to the court that the truth regarding many of the key issues in this matter will never be known because the defendant has fired employees, permanently deleted email accounts, and sold the property without copying or retaining files or securing its computers. In addition, the defendant's remaining employees have provided testimony that contradicts each other and contradicts themselves in this case and in the *Mayes* case.

This order has described the court's basis for these findings in detail, but the court will attempt to summarize some of the larger, categorizable behaviors that contributed to this court's finding of bad faith. These behaviors are in addition to the defendant's spoliation of relevant email accounts, the defendant's incorrect, incomplete, and un-supplemented discovery responses, and the defendant's failure to timely abide by court orders discussed above.

### a) The Defendant Demonstrated a Pattern of Misrepresentations

As documented at length throughout this order, the defendant has obfuscated the truth in regard to even simple facts, such as who its employees were, what roles they held, when they were terminated, and what email

accounts they used. *See, e.g., supra* Section II.A.5.b). Moreover, as discrepancies between the discovery in this case and the discovery in *Mayes* reveal, the defendant has mangled and inconsistently approached things that are typically straightforward, such as what its policies are regarding the confidentiality and privacy of financial and employee records. *See supra* Section II.A.6.a) and c).

Two of the defendants' employees, one of which is the defendant's 30(b)(6) witness, have consistently proven that they are not credible. For instance, Ms. Prekelezaj testified that she searched for records along with Ms. Leonard when she did not, that she and Ms. Leonard searched records, such as paper records and payroll records, that they did not search, and that she spoke to employees in regard to discovery to whom she did not speak. *See supra* Section II.C.18.b)(4). Ms. Dia testified that she knew of no other cases involving an innocent shooting victim at Eastwyck despite verifying interrogatories in another case involving an innocent shooting victim at Eastwyck, that she had no knowledge of danger or crime at Eastwyck when her emails demonstrated that she had knowledge of extensive crime, and that no one ever asked to hire additional security at Eastwyck despite her correspondence with Mr. Payne denying his request to hire more security guards. *See supra* Section II.C.14.a)(6).

### b) The Defendant Employed Misleading Half-Truths

In its representations to the court and the plaintiffs, the defendant resorted to half-truths to avoid disclosing damaging facts. For instance, rather than straightforwardly recognizing, admitting, and seeking to mitigate spoliated GoDaddy email accounts, the defendant attempted to pass them off as "deactivated."[162] *See supra* Section II.C.5.f)(4). Moreover, the defendant needlessly listed attorney-client protected documents in response to discovery requests explicitly excluding such documents but—tellingly—did not similarly reference attorney work product documents related to undisclosed witness Charles Cooper. *See supra* n.30. Moreover, in its discussion of Detective Tappan's investigation of Ms. Frazier's death, the defendant creatively arranged the facts to leave the false impression that Mr. Murray, who was essentially a "dead-end," was the potential eyewitness. *See supra* Section II.C.16.a)(1)(b). And of course, it bears repeating that it is patently obvious to the court that the defendant's intent was to convince all parties, including the court, that Ms. Rhodes' critical pre-incident emails had

---

[162] Clearly, the defendant knew at the time that it made such representations that the accounts were permanently deleted. The court presumes that it used the misnomer "deactivated" to avoid a motion related to its spoliation of these accounts.

been searched when—in fact—the defendant permanently (and needlessly) deleted them. *See supra* Section II.C.14.a)(1).

### c) The Defendant Made Many Assertions Lacking a Factual Basis

Something that particularly concerns the court, and which has required a great deal of judiciary time, are the number of assertions that the defendant has made, both in briefs and at hearings, lacking any factual basis. For example, at the sanctions hearing, attorney Perniciaro asserted that when the plaintiffs asked about Wendel Johnson " . . . we looked. We looked multiple times. We looked for anything related to him and we couldn't find any documents – he never filled out an application. He never filled out a W-2 form. Never received a paycheck, as I mentioned. He didn't even show up on his wife's lease." Sanctions Hr'g Tr. II at 30:23 – 31:3 [Doc. No. 214]. However, Ms. Prekelezaj testified—and the defense counsel later conceded— that the defendant did not actually search for payroll records, including W-2 records, until Ms. Prekelezaj did so for *Mayes* sometime in the summer of 2021. *See supra* Section II.C.18.d)(12). Thus, as the court previously noted, it does not appear that the defendant engaged in the search for records (beyond Ms. Leonard's search of her Dropbox folder) concerning Mr. Johnson that attorney Perniciaro referenced at the hearing—at least not before summer

343

2021. *Id.* Similarly, at the sanctions hearing, attorney Perniciaro stated that the defense counsel "found" Mr. Cooper the night before and "he's available to be deposed." Sanctions Hr'g Tr. II at 28:17-22 [Doc. No. 214]. However, attorney Perniciaro's further comments at the hearing revealed that, in fact, the defense counsel had only talked to Mr. Cooper's neighbor and confirmed that Mr. Cooper still lived at Eastwyck. *Id.* at 28:23-25. Thus, it appears that the defense counsel had no idea when they made their statements whether Mr. Cooper was actually "available to be deposed."

Other examples of statements that the defendant made without any apparent factual basis include:

**The Defendant's Statement:** Ms. Pauleon's account was deleted in the normal course of business.[163]

**Truth:** After receiving the notice of litigation and preservation letter, Ms. Pauleon's account was converted to Ms. Goolsby's account and was deleted only after Ms. Goolsby was terminated.[164]

---

[163] Def.'s Certification at 2 [Doc. No. 151].

[164] *See supra* Section II.B.3.

**The Defendant's Statement:** There is no indication that tenants had [CEO Pete] Dedvukaj's email address to send complaints about safety or security issues at Eastwyck Village.[165]

**Truth:** The defendant did not search emails but, if they had, they would have found emails like those attached to the complaint in *Connor v. Contour* demonstrating Eastwyck residents emailing Pete Dedvukaj in regard to an on-going issue in a unit.[166]

**The Defendant's Statement:** The defendant asserted on June 7, 2021 that it had not had access to the leasing office Gmail account (eastwyckvillages@gmail.com) for approximately one year.[167]

**Truth:** The defendant had access to the account until it sold the property in 2021.[168]

---

[165] Def.'s Resp. to Pls.' Mot. to Compel Produc. of ESI at 6 [Doc. No. 139].

[166] April 9, 2019 email from Hunter to Pauleon, Dia, and Dedvukaj [Doc. No. 140-1].

[167] Def.'s Resp. to Pls.' Mot. to Compel at 8 [Doc. No. 139].

[168] Prekelezaj Ltr. [Doc. No. 151-1].

**The Defendant's Statement:** The defendant has no record of Ashelynn Burt- Jones or Jori Jones being employees.[169]

**Truth:** Both Ashelynn Burt-Jones and Jori Jones were employees.[170]

### d)    The Defendant Converted Speculation Into Fact

Just as the defendant made assertions with no basis in fact, the defendant also filled the record with speculations that it ultimately converted to factual statements with no apparent evidentiary basis. There is probably no better example of this than the defendant's explanation of what happened to the leasing office Gmail account. After it became clear that the defendant lost access to the leasing office Gmail account much more recently than the defendant initially asserted, attorney Perniciaro speculated in an email with the plaintiffs' counsel that the leasing office Gmail account was accessed through a computer at the office that remained logged in, "which explains why we don't have the password/access now." July 6 – 9, 2021 emails between opposing counsel at 6 [Doc. No. 155-1]. Subsequently, in a letter, Ms. Prekelezaj stated that the leasing office Gmail account "was likely accessed by employees using a single computer located at the property that remained

---

[169] Def.'s Resp. to Pls.' Mot. to Compel at 8 [Doc. No. 139].

[170] *See supra* Section II.A.5.b)(8).

logged into the email account and not requiring the employees repeatedly using a password or username." Prekelezaj Ltr. [Doc. No. 151-1]. Apparently, neither Ms. Prekelezaj nor the defense counsel knew for a fact that the account was accessed only by way of a stored password; however, Mr. Draper—after consulting with the defendant—stated in his report:

> The email and password for the "eastwcykvillages@gmail" account was accessed and managed on a local computer at the Eastwyck Villages office. That location was sold "turn-key" to the new owner, who also took possession of the local computers used to access the Gmail account. The new owner was contacted by Contour on several occasions in an attempt to access the computers, including a physical visit to the office where it was learned the computers were recycled and no longer available. Since the password and account information for this Gmail account were stored locally, the information is no longer available.

Draper Expert Rpt. at 5 – 6 ¶ 19 [Doc. No. 189-1]. Because the defendant's 30(b)(6) witness could not do more than repeat attorney Perniciaro's speculation about what happened to the password, the court concludes Mr. Draper's report represents the defendant's speculation rather than fact. This is obviously concerning to the court and antithetical to the just resolution of this matter.

### e)   Trickery and Wordplay Dominated the Defendant's Approach to Discovery

As the defense counsel should be aware (and should have counseled their client), "[i]t is a basic tenant that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'" *Rosenbaum v. Becker & Poliakoff, P.A.*, 708 F. Supp. 2d 1304, 1306 n.2 (S.D. Fla. 2010) (citing *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947)). "The intent of the Federal Rules [of Civil Procedure] was to 'make trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.'" *Id.* n.3 (citing *U.S. v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)). Accordingly, "[a] party responding to discovery requests 'should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in [discovery requests]." *Elite Mitigation Servs., LLC v. Westchester Surplus Lines Ins. Co.*, Case No. 5:19-cv-381-TKW/MJF, 2020 U.S. Dist. LEXIS 194735, at *4 – 5 (N.D. Fla. Apr. 6, 2020) (citing *Patrick v. Teays Valley Trs., LLC*, 297 F.R.D. 248, 258 (N.D.W.Va. 2013); *Moss v. Blue Cross & Blue Shield of Kan.*, 241 F.R.D. 683, 697 (D. Kan. 2007); and *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 310 (D. Kan. 1996)).

348

Despite the wealth of clear caselaw on this topic, at every stage of discovery the defendant played word games and employed trickery to avoid discharging its duties pursuant to the Federal Rules of Civil Procedure. As aforementioned, the defendant distressingly attempted to defend its decision to delete email accounts by arguing that the plaintiffs did not specify "emails" in their preservation of evidence letter, which unambiguously put the defendant on notice of their need to preserve such communications. *See supra* n.108. Similarly, the defendant's 30(b)(6) representative and employees constantly avoided responding to discovery requests truthfully and completely by improperly applying hyper-technical definitions rather than common-sense responses. For instance, Ms. Prekelezaj revealed in her deposition that the defendant did not search emails for complaints about criminal activity or crime-related incidents that occurred at the apartment complex where Ms. Frazier was shot because emails did not constitute *official* complaints. *See supra* Section II.C.5.c); Prekelezaj Dep. at 121:1-19 [Doc. No. 128-1]. On top of being overly-discriminating, this response ignored incident reports—which Ms. Dia testified were transmitted via emails—documenting things like assault, theft, or property damage. Dia Dep. at 56:8 – 60:8 [Doc. No. 127-1]. Moreover, in depositions, the defendant's employees chose to needlessly complicate the record by employing technical or internal terms

349

that they refused to define (such as Ms. Dia's non-sensical distinction between courtesy and security officers),[171] or, alternatively, by refusing to answer basic questions that they considered "beneath them" about the meaning of terms relevant to this matter (such as Mr. Dedvukaj's refusal to answer questions about his definition of "cash flow").[172]

### f) The Defendant's Failures Demonstrate a Pattern of Bad-Faith Behavior

As the above examples make clear, the defendant's manifold and pervasive misrepresentations have dominated and defined this matter. Moreover, it is also clear that the defendant did not—at any point in this litigation—show initiative to find the truth. For instance, the defendant did not make a meaningful attempt to recover access to the Gmail accounts for months after the plaintiffs highlighted their importance; did not take proactive steps to identify additional email addresses, such as the one security guard Thurman emailed from; did not ensure that it was providing consistent responses to what it provided in *Mayes*, despite understanding the plaintiffs were monitoring *Mayes*; and did not take a detail-oriented, truth-

---

[171] *See* Dia Dep. at 29:7 – 34:3 [Doc. No. 127-1].

[172] *See* Dedvukaj Dep. 85:18 – 93:20 [Doc. No. 160-13].

minded approach to the forensic inspection, despite the court's notice that this was its last chance to cooperate before serious sanctions were imposed. In regard to the forensic inspection, rather than seizing the opportunity to prove its commitment to the truth, the defendant unilaterally chose a date-limiter less than a month after Ms. Frazier's death, opted to withhold non-privileged documents containing court-ordered terms absent a court order clarifying that such documents needed to be turned over,[173] delayed filing the official forensic inspection report despite the court's unambiguous deadline regarding the same, and failed to proactively ensure that the plaintiffs' very valid questions regarding aliases had been answered. As a result, the plaintiffs' counsel had to follow up with the forensic inspector, and the court does not believe from the inspector's testimony at the sanctions hearing that the forensic inspection has been satisfactorily completed.

As noted at the outset of this order, the defendant's pattern of behavior reveals its intention to know as little about this matter and its documents as

---

[173] Although the court has previously represented that it will not sanction the defendant for not turning over all of the documents containing key terms identified in this litigation, it does find relevant in its discussion of bad faith the fact that the defendant apparently did not, as it represented it would, identify the non-privileged documents that it wanted to withhold in such a way as to give the plaintiffs an opportunity to respond. Forensic Inspection Hr'g Tr. at 31:16-21 [Doc. No. 218].

possible.[174] From a defense perspective, the court can see the utility of a strategy of ignorance: it is difficult for the plaintiffs to prove their case if the defendant knows nothing, has destroyed the most relevant evidence, has sold the property, including the physical documents housed there, and has terminated the employees who worked there. However, a strategy of willful ignorance and document destruction is proscribed by the Federal Rules of Civil Procedure, and the court finds that the defendant's bad-faith and contumacious behavior in pursuit of such a strategy is clearly sanctionable pursuant to the court's inherent authority.

---

[174] Although the court might have overlooked this absent the staggering amount of bad faith present in this case, it now appears that the defendant's strategy of ignorance in this litigation is indicative of how it runs its network of businesses. At the sanctions hearing, Ms. Prekelezaj testified that the defendant's employees were supposed to be using company-issued email accounts that were linked to the defendant's domain and to which the defendant had access. Sanctions Hr'g Tr. I at 57:3-13 [Doc. No. 217]. However, she also testified that property managers were typically the only property level employees who received company email addresses. *Id.* at 57:18-19. Given the defendant's conduct in this litigation, the court concludes that its failure to provide email addresses to employees who clearly needed an online communication tool was an intentional step meant to divest itself of liability and accountability.

### 3.    The Defense Counsels' Role in the Bad Faith Behavior

"Federal courts have the inherent power to impose sanctions on parties, lawyers, or both." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) (citations omitted). As with the defendant, the court must find subjective bad faith before imposing sanctions on the defense counsel, which "can be met either (1) with direct evidence of the attorney's subjective bad faith or (2) with evidence of conduct 'so egregious that it could only be committed in bad faith.'" *Hyde v. Irish*, 962 F.3d 1306, 1311 (11th Cir. 2020) (citing *Purchasing Power*, 851 F. 3d at 1224-25). The court has already found that the defense counsel violated Rule 26(g) by certifying inaccurate and incomplete discovery responses without a reasonable investigation, creating a sanctionable situation which they further compounded by—in bad faith—not disclosing Charles Cooper to their client or the court until cornered by the plaintiffs' independent sleuthing. However, the court also holds the defense counsel responsible, along with their client, for much of the comprehensive bad-faith behavior sanctionable under the court's inherent authority.

Although the court does not charge the defense counsel with all of their client's antics (such as Ms. Dia's and Ms. Prekelezaj's outright misrepresentations to the court), their apathy to and more-than-reckless

353

disregard of the truth in this matter has been disheartening to the court. It is absolutely indisputable that the defendant would not have been able to accomplish the degree of fraud on the court and the plaintiffs that the defendant's discovery represents without the defense counsels' assistance. From their shocking lack of vigilance in discovery to making arguments wholly devoid of legal or factual merit, the defense counsel have enabled their client's missteps to mushroom from containable error to the irredeemable matter that is currently before the court. The speculation, presentation of facts out-of-context, wordplay, and half-truths that saturated the defendant's briefs and discovery responses could not have been accomplished without the aid of counsel, who must have understood that their behavior crossed a line. And the line they crossed wasn't thin: the defense counsel unquestionably elevated the interest of their client over the integrity of the justice system in a manner explicitly decried by the Eleventh Circuit. *Malautea,* 987 F.2d at 1546 – 47 ("An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. . . . Too many attorneys, like the defense counsel in this case, have allowed the objectives of the client to override their ancient duties as officers of the court. In short, they have sold out to the client.").

The court is mindful that "[g]enerally, the inherent power to sanction an attorney for misconduct should be reserved for those cases in which the conduct is egregious, when an attorney or party acts in bad faith, vexatiously, wantonly, or for oppressive reasons, or for the willful disobedience of a court order." *Allen v. Blount* (*In re Cases*.), 2022 U.S. Dist. LEXIS 64208, at *18 (N.D. Fla. Feb 2, 2022) (citation omitted). Here, the court finds that the defense counsel engaged in an egregious pattern of deception and delay that far exceeded mere recklessness and can only be explained by bad faith; thus, the court concludes that the defense counsel—along with their client—are sanctionable pursuant to the court's inherent authority.

## IV.   Imposition of Sanctions

### A.   The Defendant

Having found that sanctions are warranted against the defendant under Rule 26(g), Rule 37(e), Rule 37(b), Rule 37(c), and the court's inherent authority, the court is now tasked with determining what sanctions are most appropriate in this matter. The plaintiffs have requested the court to strike the defendant's answer and require the defendant to pay the plaintiffs' attorney fees for the year and a half of litigation in which the defendant has prevented the plaintiffs from obtaining discovery. The defendant has made many objections to these sanctions, including that: (1) this could have been

settled by counsel rather than motions practice; (2) the requested sanction of a default judgment would be disproportionate to the defendant's discovery infractions; (3) poor recordkeeping should not result in civil liability; and (4) the primary legal issue for consideration, which it defines as Ms. Frazier's legal status on the property at the time of her death, has nothing to do with the discovery issues before the court. Instead of the plaintiffs' proposed sanctions, the defendant has proposed modest sanctions, such as reopening discovery to re-depose witnesses, conduct new depositions and subpoenaing Mr. Cooper.

### 1.    The Court Strikes the Defendant's Answer

After much analysis and careful review of the record, the court concludes that the plaintiffs' requested remedy of striking the defendant's answer is the only alternative available that will cure the harm the defendant's misconduct inflicted in this matter. As detailed extensively throughout this order, the truth is utterly unknowable at this juncture. The defendant destroyed its most relevant records, failed to disclose at least two-thirds of its Eastwyck employees, provided inconsistent and unreliable testimony, delayed in fulfilling unambiguous court orders and engaged in sundry other discovery infractions too numerous to list. Unfortunately, at this late juncture, it is apparent to the court that these failures and

infractions cannot be remedied: former employees have indicated they are unwilling to testify, the forensic examiner has certified that emails cannot be recovered, and the defendant's representative is apparently unknowledgeable and untrustworthy. Nor could they have been remedied between counsel without motions practice. When it came to discovery and disclosing its emails, the defendant continually represented itself as willing to voluntarily work with the plaintiffs to find the relevant information, failing to disclose how little involvement the defense counsel had in the process, how many very valid questions the plaintiffs' counsel had about the process the defendant was using, or how superficial their searches really were.[175] In other words, the defendant's actions in this matter showed that dialogue between opposing counsel was not productive or reliable.

Moreover, contrary to its arguments, the defendant's transgressions have affected all of the legal issues before the court. As illustrated by the excerpts from the defendant's summary judgment brief above, *see supra* n.34,

---

[175] A prime example of this was the defendant's attempt to convince the plaintiffs' counsel and the court that the plaintiffs' motion to compel ESI was moot. *See supra* Section II.C.5.f)(4). Clearly, it was not moot, as the subsequent forensic inspection produced tens of thousands of additional emails that were not located in the dubious search chaired by Ms. Prekelezaj that the defendant "voluntarily" conducted.

the defendant's litigation strategy in regard to Ms. Frazier's legal status relies upon the plaintiffs' lack of evidence. However, because the defendant destroyed evidence it should have preserved, did not pursue evidence that might have been dispositive (such as security guard Thurman's emails), and did not disclose a witness whose testimony might have been exceedingly relevant, this case—including Ms. Frazier's legal status—is now incapable of resolution on the merits.

The defendant's wrong-doing amounts to much more than "disorganized records" and "poor recordkeeping": as the court has previously articulated, it finds the defendant's actions in divesting itself of the majority of relevant evidence reflective of an intentional, bad-faith strategy of ignorance. As other courts have pointed out, "litigation is not a game," and the defendant's treatment of it as such (albeit a game without rules) has wrought havoc on this litigation. *Oliver v. Ameris Bank*, CV420-273, 2021 U.S. Dist. LEXIS 133025, at *1 (S.D. Ga. July 16, 2021). The *only* way that the court can ensure that the defendant does not profit from its infractions and preserve any semblance of justice in this matter is by striking the defendant's answer.

In levying this extreme sanction, the court is mindful that "[t]he dismissal of a party's complaint or answer, or striking its defenses, as a

sanction is a heavy punishment, appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) (citing *In re Sunshine Jr. Stores*, 456 F.3d at 1305-06) (punctuation omitted). "Also, the entry of default judgment 'is only appropriate where there has been a clear record of delay or contumacious conduct.'" *Smith v. Enter. United Partners, Inc.*, No. 1:11-CV-3576-SCJ-AJB, 2012 U.S. Dist. LEXIS 207086, at *5 – 6 (N.D. Ga. July 18, 2012) (citing *United States v. Varmado*, 342 F. App'x 437, 441 (11th Cir. June 29, 2009)). The court unquestionably finds such circumstances present here. *Ibezim v. The GEO Grp., Inc.*, 786 F. App'x 975, 976 (11th Cir. 2019) (citation and quotation marks omitted) ("A district court acts within its discretion when it fashions a sanction which is a direct response to the harm that the bad-faith conduct caused.").

In terms of authority for striking the defendant's answer, the court relies on its inherent authority as well as the sanctions available pursuant to Rule 37(e) and Rule 37(c)(1).[176] In relying on these authorities, the court explicitly reiterates that lesser sanctions will not suffice to cure the harm.

---

[176] Although the court finds the defendant unquestionably violated Rule 37(b), these violations are more deserving of sanctions in the context of the overall case (i.e., pursuant to the court's inherent authority) than as a stand-alone basis for case-ending sanctions.

*See Meyer v. Gwinnett Cty. Police Dep't*, No. 21-12851, 2022 U.S. App. LEXIS 18399, at *31 (11th Cir. July 5, 2022) (noting that the question the court must ask when considering sanctions under its inherent authority is whether any other sanction would cure the harm). In relying on all three authorities, the court recognizes the Supreme Court's guidance in *Chambers* that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers,* 501 U.S at 49. Although the court should ordinarily rely on the Federal Rules of Civil Procedure "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules," "the court may safely rely on its inherent power"— "if in the informed discretion of the court"—the "rules are [not] up to the task." *Id.* at 50. This is particularly true where conduct sanctionable under the Rules is "intertwined within conduct that only the [court's] inherent power could address." *Id.* at 51. While the court believes that the defendant's violations of Rule 37(e) and Rule 37(c)(1) are a sufficient basis for striking the answer, they do not encapsulate all of the bad faith behavior present in this case. Thus, the court believes that—in this case—the breadth and depth of the defendant's behavior also requires the imposition of sanctions pursuant to its inherent authority. *See id.* at 51 ("In circumstances . . . in which all of a litigant's conduct is deemed sanctionable, requiring a

court first to apply Rules . . . containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation . . ..").

### 2.    The Court Requires the Defendant to Pay the Plaintiffs' Attorney Fees

In addition to striking the answer, the court finds that justice mandates that the defendant pay the plaintiffs' attorney fees caused by the defendant's discovery infractions and bad faith efforts. In this regard, the court will stop short of the plaintiffs' request and will not require the defendant to pay for *all* of the plaintiffs' attorney fees incurred in this action. For instance, the court will not require the defendant to pay for the plaintiffs' time drafting the complaint, answering the notice of removal, filing initial disclosures, preparing the JPRDP, participating in depositions noticed by the defendant, drafting their initial discovery requests or responding to the defendant's discovery requests, drafting or conferring with opposing counsel regarding the motions to quash the defendant's subpoenas to T-Mobile and Ms. Frazier's healthcare providers, drafting or responding to issues surrounding the privacy and confidentiality of Ms. Frazier's phone or the criminal investigation file held by the DKPD, or time spent in relation to the

defendant's motion to compel [Doc. No. 93]. These issues were not reasonably related to the defendant's discovery infractions so as to require the payment of fees. However, the court WILL require the defendant to pay for any and all of the time spent by the plaintiffs' counsel in this matter that was (within reason) caused by, rendered useless because of, impacted by, or necessitated because of the defendant's misdeeds. This includes the time spent analyzing and preparing discovery requests subsequent to the defendant's insufficient initial responses; preparing for, conducting, and analyzing depositions made without the benefit of adequate discovery responses; preparing and filing a motion to amend the complaint based on the defendant's inaccurate discovery responses; analyzing the defendant's motion for summary judgment that was premised on the plaintiffs' lack of evidence (that the defendant destroyed or did not disclose); corresponding about, informing the court about, briefing about, or any other time spent in relation to the defendant's spoliated email accounts; investigating other litigation involving the defendant to find answers the plaintiffs could not find in this case; moving the court for sanctions; replying to sanctions motions; preparing for hearings or attending hearings related to the same; time spent in regard to any aspect of the forensic inspection; and time spent moving the court to compel the deposition of Mr. Dedvukaj. The court awards these attorney fees pursuant to Rule

26(g), Rule 37(c)(1), Rule 37(b), and the court's inherent authority, and finds that they are necessary to cure the harm caused to the plaintiffs by the defendant and to restore the authority of the court in this matter. The court finds that lesser sanctions will not suffice.

### B.    The Defense Counsel

In addition to sanctioning the defendant, the court finds that justice dictates an award of sanctions against the defense counsel, who served as willing accomplices and enablers in the bad faith and contumacious behavior the defendant displayed in this matter. As the plaintiffs' requests for sanctions gained momentum, the court has witnessed the defense counsel attempt to distance themselves from their client. Certainly, the court understands this approach: the defendant has engaged in a multitude of improper behavior in this litigation, and—as that behavior was unveiled—the likelihood of severe sanctions was more than probable. However, rather than attempting to sidestep liability at the last moment, the defense counsel should have heeded the numerous warning signals throughout this litigation that their client needed more guidance and acted sooner to right the ship. The defense counsel did not do so, further entrenching themselves and their client in legal arguments and factual positions that could not hold up to the

plaintiffs' investigation and the court's scrutiny. Moreover, the court discovered that the defense counsel alone made the decision not to disclose a witness to both their client and the plaintiffs. Accordingly, pursuant to both Rule 26(g) and the court's inherent authority,[177] the court holds both attorney Perniciaro and attorney Moffett jointly and severally liable, along with their client, for the plaintiffs' attorneys' fees tied to the discovery violations, as outlined above. The court finds that such an award is directly related to and rendered necessary by the defense counsels' poor conduct. Because the defense counsel continually failed to acknowledge, much less discharge, their responsibilities in discovery, they placed the plaintiffs and the court in the position of having to define their searches and compel their actions. For

---

[177] Federal Rule of Civil Procedure 26(g) requires the court to impose an appropriate sanction on "the signer [of discovery responses], the party on whose behalf the signer was acting, or both." In this case, it appears to the court that attorney Perniciaro certified the discovery responses by signing a signature block containing both his name and attorney Moffett's name. *See, e.g.*, Def.'s Resps. and Objs. to Pls.' First Interrogs. [Doc. No. 185-10]; Def.'s Resps. and Objs. to Pls.' First Req. for Produc. [Doc. No. 185-11]; Def.'s Resps. and Objs. to Pls.' Second Req. for Admission [Doc. No. 185-12]. While it is clear to the court that attorney Perniciaro did most of the substantive work on this matter, attorney Moffett clearly defended at least one deposition, and the transcript of the sanctions hearing—at which he appeared—demonstrates that attorney Perniciaro went to him for advice on this matter and that attorney Moffett took responsibility for attorney Perniciaro's errors. *See* Sanctions Hr'g Tr. II at 42:13 – 43:10 [Doc. No. 214]. Because the defense counsel clearly operated as a team, the court will not attempt to further apportion their liability.

instance, the plaintiffs—despite not knowing the identity of custodians and accounts—had to attempt to list email accounts for the defendant to search in their motions to compel the production of ESI and the forensic inspection. Moreover, the plaintiffs had to exercise constant vigilance to ensure that the defendant did a fraction of what it represented it had done.[178] The court, time and time again, presumed professionalism on the part of the defense counsel and relied on their misrepresentations when, in hindsight, it is clear that it should not have. This resulted in avoidable delays and more work for both the court and the plaintiffs' counsel. An award of attorney's fees to the plaintiffs related to these errors represents equity, not a windfall. Requiring the defense counsel to share this burden with their client represents the fair impact their contribution had on the ultimate outcome in this case.

In imposing these sanctions upon the defense counsel, the court notes that this is not a situation which can be attributed to a lack of knowledge about a particular area of the law or cured by continuing legal education. This is a situation about dishonesty, assisting in dishonesty, and attempting to mislead the court about dishonest activity. No amount of continuing legal

---

[178] For example, on July 6, 2021, the defense counsel represented that it completed its court-ordered email search despite only searching half of the accounts. July 6 – 9, 2021 emails between opposing counsel at 7 [Doc. No. 155-1].

education, seminars, reprimands, admonitions, fines, or other rehabilitative measures will cure or discourage this type of activity. The court has considered lesser sanctions, but it is appropriate for attorneys Moffett and Perniciaro to have to pay for some or all of the damage they have inflicted upon the plaintiffs.

## V.   Conclusion

In its response brief to the plaintiffs' second motion for sanctions, the defendant complained that the plaintiffs had demonstrated an "inability to litigate their legal claims on the merits." Def.'s Resp. in Opp'n to Pls.' Second Mot. for Sanctions at 1 [Doc. No. 193].  As this order makes clear, the court agrees: the plaintiffs have not been able to litigate their legal claims on the merits because the defendant's behavior and outright document destruction have so soiled and spoiled the facts that adjudication on the merits is impossible. For these reasons, as more fully articulated herein, the court GRANTS the plaintiffs' second motion for sanctions [Doc. No. 185] by STRIKING the defendant's answer and ORDERING the defendant and the

defense counsel, whom it finds jointly and severally liable along with their client, to pay the plaintiffs' attorneys fees as set forth in this order.[179]

Within 45 days, the plaintiffs are ORDERED to file a detailed affidavit and—if necessary—a supporting brief describing fees incurred as a result of the defendant's discovery infractions and other misdeeds covered in this order. In this filing, the plaintiffs should propose a reasonable hourly fee for their work. The defendant and the defense counsel will thereafter have 20 days to file any objections to the reasonableness of the amount of time expended and/or the proposed rate of payment. The plaintiffs will then have 10 days to reply to any such objection.

The court further ORDERS that discovery in this matter be re-opened for one month in regard to any lingering issues related to damages. Additional deadlines in this matter shall be governed by the scheduling order set forth at the outset of this matter [Doc. No. 14]. If the parties require a longer discovery period, they should notify the court by brief within five business days of this order.

---

[179] Correspondingly, the court DENIES the plaintiffs' motion to the extent that it requests the court to order the defendant and/or the defense counsel to pay *all* fees incurred since this litigation began.

Finally, to the extent that the defendant has attempted to improperly lodge motions for sanctions against the plaintiffs or the plaintiffs' counsel in its response briefs, such motions are DENIED as procedurally improper. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1222 (11th Cir. 1999) (noting that when a request for relief is embedded within an opposition filing, "the issue has not been raised properly.").

SO ORDERED this 15th day of December, 2022.

 /s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge