# EXHIBIT D

# Nautilus Insurance Company®

## An Arizona Stock Corporation

## EXCESS LIABILITY POLICY

**THIS POLICY IS NOT OBTAINED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.**

**THIS POLICY CONSISTS OF:**

- **Declarations**
- **Excess Policy Form**
- **Schedule of "Underlying Insurance"**
- **Applicable Forms and Endorsements**

Administrative Office:

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

_____                    _____
Secretary                                  President and CEO

Administrative Office:
7233 East Butherus Drive, Scottsdale, Arizona 85260
(480) 951-0905

JNE0944 (04/17)

# Nautilus Insurance Company ®

## An Arizona Corporation   ⓑ. a W. R. Berkley Company

## EXCESS LIABILITY POLICY DECLARATIONS

Policy No.:  AN060019                                    Renewal/Rewrite of:

| Named Insured and Mailing Address | Producer's Name and Address |
|---|---|
| Contour Eastwyck LLC<br>2892 Eastwyck Circle<br>Decatur, GA 30032 | R-T SPECIALTY, LLC<br>20 Church Street<br>Suite 1500<br>Hartford, CT 06103 |

POLICY PERIOD: From  11/16/2018  to  11/16/2019  At 12:01 A.M. Standard Time at the address of the Named Insured as stated herein

In consideration of the payment of premium, in reliance upon the statements herein or attached hereto and subject to all of the terms of this policy, the Company agrees with the Named Insured as follows:

THE NAMED INSURED IS:  ☐ Individual  ☐ Partnership  ☐ Corporation  ☐ Joint Venture  ☐ Other
                        ☐ Trust  ☒ Limited Liability Company

Item I:    Limits of Insurance:

Loss Event Limit:          $ 5,000,000

Policy Aggregate Limit:    $ 5,000,000

Item II:   Premium:

Deposit Premium        $ ▉

Terrorism Premium      $ ▉

Total Premium          $ ▉

Item III:  Minimum Retained Premium:
           If the insured cancels this policy, the Company will retain no less than $250 or 25% of the Total Premium, whichever is greater.

Item IV:   Forms attached at inception:
           See Schedule of Forms EU 00 05 10 14

_____
Authorized Representative

DNE 21 10 10 14

# SCHEDULE OF "UNDERLYING INSURANCE"

**Policy No.:**  AN060019

THE FOLLOWING SCHEDULE OF "UNDERLYING INSURANCE" IS INCORPORATED INTO AND MADE PART OF THE DECLARATIONS TO WHICH IT IS ATTACHED. IT IS ALSO AGREED THAT THE FOLLOWING "UNDERLYING INSURANCE" IS IN FORCE AS COLLECTIBLE INSURANCE FOR THE LIMITS OF INSURANCE STATED BELOW.

| SCHEDULE OF "UNDERLYING INSURANCE" | | | |
|---|---|---|---|
| **Commercial General Liability (1)** | | | |
| Company: Colony Insurance Company , 101 GL 0111990-00 | Policy Period: | From: 11/16/2018 | To: 11/16/2019 |
| Coverage: Occurrence | | | |
| Minimum Applicable Limits of Insurance | | | |
| Each Occurrence | $ 1,000,000 | | |
| General Aggregate | $ 2,000,000 | | |
| Products-Completed Operations Aggregate | $ Included | | |
| Personal & Advertising Injury - Each Offense | $ 1,000,000 | | |
| **Hired & Non-Owned Auto Liability** | | | |
| Company: Colony Insurance Company , 101 GL 0111990-00 | Policy Period: | From: 11/16/2018 | To: 11/16/2019 |
| Minimum Applicable Limits of Insurance | | | |
| Combined Single Limit | $ 1,000,000 | | |

# SCHEDULE OF FORMS

**Named Insured:**     Contour Eastwyck LLC                              **Policy No.:**      AN060019

| FORM NUMBER | | TITLE |
|---|---|---|
| JNE0944 | (04/17) | NIC Excess Liability Policy Jacket |
| DNE2110 | (10/14) | Nautilus Excess Liability Policy Declarations |
| DE2510 | (10/14) | Schedule of "Underlying Insurance" |
| EU0005 | (10/14) | Schedule of Forms |
| NE0031 | (04/10) | Excess Liability Policy |
| E915 | (07/13) | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| NI0019 | (01/16) | Service of Suit |
| AI0802 | (01/15) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| NE0062 | (10/14) | Exclusion - Employee Benefits Liability |
| NE0069 | (10/14) | Exclusion - Owned Auto |
| NE0074 | (10/14) | Exclusion - Employers Liability |
| NE0093 | (10/14) | Exclusion - Toxic Metals |
| NE0095 | (10/14) | Exclusion - Access or Disclosure of Confidential or Personal Information |
| NE0097 | (01/15) | Cap on Losses from Certified Acts of Terrorism |
| NE0098 | (01/15) | Exclusion of Punitive Damages Related to a Certified Acts of Terrorism |
| NE0100 | (04/15) | Exclusion - Unmanned Aircraft |

# EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the "Named Insured" shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section IV– Definitions** and relevant references in the text of this policy.

## SECTION I - EXCESS LIABILITY COVERAGE

1. **Insuring Agreement**

   a. We will pay on behalf of the "insured" the "ultimate net loss" in excess of the "underlying insurance limit" because of injury or damage caused by a "loss event" to which this insurance applies provided:

      (1) The aggregate amount of all limits of "Underlying Insurance", as shown in the Schedule of "Underlying Insurance", has been exhausted by payment of judgments, settlements, costs or expenses; and

      (2) The "loss event" occurs or is committed during the policy period.

      However, this insurance does not apply to:

      (a) Any sums for which the "insured" is legally liable, costs or expenses arising out of, caused by or contributed to by any injury or damage, whether such injury or damage is known or unknown:

         i. Which first occurred prior to the inception date of this policy; or

         ii. Which are, or are alleged to be, in the process of occurring or being committed as of the inception date of the policy even if the injury or damage continues to occur or continues to be committed during this policy period.

      (b) Any sums for which the "insured" is legally liable, costs or expenses arising out of or related to any injury or damage, whether known or unknown, which are in the process of settlement, adjustment or "suit" as of the inception date of this policy.

   b. Except to the extent any terms, definitions, limits of insurance, conditions or exclusions of the "controlling underlying insurance" are different from any terms, definitions, limits of insurance, conditions or exclusions of this policy, this policy will provide the same coverage for "ultimate net loss" as provided by the "controlling underlying insurance". If any terms, definitions, limits of insurance, conditions or exclusions of this policy are more restrictive than those of the "controlling underlying insurance", then this policy's terms, definitions, limits of insurance, conditions or exclusions will apply. However, under no circumstance will this policy provide broader coverage than that provided by the "underlying insurance".

   c. The amount we will pay for the "ultimate net loss" is limited as described in **Section II – Limits of Insurance**.

2. **Defense**

   a. We will have no duty to investigate or defend any claim or "suit". We will have the right and be given the opportunity to associate with any "insured" or "underlying insurer" in the investigation, settlement or defense of any claim or "suit" that may involve this insurance.

   b. At our discretion, we may investigate and settle any claim or "suit".

   c. If we exercise our rights as described in **2. a.** and **2.b.** above, we will pay, with respect to any claim we investigate or settle, or any "suit" against an "insured" we defend, the following supplementary payments:

      (1) All expenses we incur, including but not limited to attorney fees;

(2) The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds;

(3) All reasonable expenses incurred by the "insured" at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work;

(4) All costs taxed against the "insured" in the "suit";

(5) Prejudgment interest awarded against the "insured" on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer; and

(6) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**d.** If we exercise our rights as described in **2.a.** and **2. b.** above, we are under no obligation to continue any investigation, settlement or defense when we have used up the applicable limit of insurance in the payment of judgments or settlements.

## 3. Exclusions

The following exclusions apply in addition to any applicable exclusion contained in the "controlling underlying insurance".

This insurance does not apply to:

**a. Asbestos**

(1) Any injury or damage arising out of, resulting from, caused, or contributed to by any manufacturing, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to or testing for asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

(2) Any loss, cost or expenses arising out of, resulting from, caused, or contributed to by:

(a) The clean up or removal of asbestos or products and materials containing asbestos;

(b) Actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

(c) Disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

(d) The cost of compliance with any law or regulation regarding asbestos.

(3) Any obligation to share damages with or repay someone else in connection with **(1)** or **(2)** of this exclusion.

**b. Auto Coverage Exclusion**

Any loss, cost or expense payable under or resulting from any first party automobile physical damage coverage; any obligation under any automobile no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist act, law or obligation.

**c. Exterior Insulation And Finish System (EIFS)**

Any injury or damage arising out of, resulting from, caused, or contributed to by:

(1) The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

(a) Any "exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS); or any part thereof; or

(b) Any substantially similar system or any part thereof

including the application or use of conditioners, primers, accessories, flashing, coatings, caulking or sealants in connection with such a system;

**(2)** Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", is used on any part of that structure;

**(3)** Any obligation to share damages with or repay someone else in connection with **(1)** or **(2)** of this exclusion.

**d. Employment-Related Practices**

Injury to:

**(1)** A person arising out of and in the course of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person.

**(2)** The spouse, child, parent, brother or sister of that employee; or any other person; as a consequence of injury to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies whether the "insured" may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**e. Mold, Fungi or Bacteria**

**(1)** Any injury or damage arising out of, resulting from, caused, or contributed to by any actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any mold, "fungi" or bacteria on or within a building or structure, including it's contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**(2)** Any loss, cost or expenses arising out of resulting from, caused or contributed to by the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, mold, "fungi" or bacteria, by any "insured" or by any other person or entity.

**(3)** The cost or expense of compliance with any law or regulation regarding mold, "fungi" or bacteria.

**(4)** Any obligation to share damages with or repay someone else in connection with **(1), (2)** or **(3)** of this exclusion.

This exclusion does not apply to any mold, "fungi" or bacteria that are on, or contained in, a good or product intended for consumption.

**f. Lead**

**(1)** Any injury or damage arising out of, resulting from, caused, or contributed to by any manufacturing, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement, or handling of, exposure to, or testing for lead or products containing lead, whether or not the lead is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion, or found in any form whatsoever.

**(2)** Any loss, cost or expenses arising out of, resulting from, caused, or contributed to by:

   **(a)** The clean up or removal of lead or products and materials containing lead;

   **(b)** Actions as may be necessary to monitor, assess and evaluate the release or threat of lead or products and material containing lead;

(c) Disposal of lead substances, or the taking of such other action as may be necessary, to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare, or to the environment, which may otherwise result; or

(d) Compliance with any law or regulation regarding lead.

(3) Any obligation to share damages with or repay someone else in connection with **(1)** or **(2)** of this exclusion.

g. **Named Insured versus Named Insured**

Any injury or damages for which any "Named Insured" or its employees is legally liable and costs or expenses of any "Named Insured" or its employees arising out of, caused, or contributed to by any injury or damage claimed by any other "Named Insured" or its employees.

h. **Nuclear**

Any injury or damage arising out of, resulting from, caused, or contributed to by any "nuclear material", "waste material", "radioactive material", or the "hazardous properties" of "nuclear material", "radioactive material" or "waste material", or from any radiation or "radioactivity".

As used in this exclusion:

"Hazardous Properties" include radioactive, toxic or explosive properties of "nuclear material", "radioactive material" or "waste material".

"Nuclear Material" means "source material", "special nuclear material" or "by-product material".

"Radioactive Material" means any materials which are radioactive or caused by or exhibit "radioactivity"

"Radioactivity" means the property possessed by some elements of spontaneously emitting alpha or beta rays and sometimes also gamma rays by the disintegration of the nuclei of atoms.

"Source Material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereto.

"Waste Materials" means any waste material containing "by-product material" or any other by-product of any "nuclear material" or "radioactive material".

i. **Pollution**

(1) Any injury or damage based upon, arising out of, resulting from, caused by, or contributed to by the presence, discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, oil or other petroleum substances or derivatives, waste materials or other irritants, contaminants, pollutants or any substances, including asbestos and silica, which are or may be injurious to public health or the environment (herein called "hazardous substances") into or upon land, the atmosphere, or any water course or body of water.

(2) Any loss, cost or expense arising out of, resulting from, caused, or contributed to by:

(a) Clean up or removal of hazardous substances;

(b) Such actions as may be necessary to monitor, assess and evaluate the presence, discharge, disposal, escape, release, or threat of same, of hazardous substances;

(c) Disposal of hazardous substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare, or to the environment, which may otherwise result; or

(d) Any governmental direction or request that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants.

This exclusion applies whether or not such injury or damage arises out of, results from, is caused, or contributed to by "your product" or "your work".

As used in this exclusion:

"Your product" means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

"Your work" means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts, or equipment furnished in connection with such work or operations.

**j. Silica**

**(1)** Any injury or damages arising out of, resulting from, caused, or contributed to by the manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement, or handling of, exposure to, ingestion of, testing for, or failure to disclose the presence of, failure to warn or advise of silica, products containing silica, or products designed or used to protect from the inhalation, ingestion, contact with or any other exposure to silica, whether or not the silica is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion, or found in any form whatsoever.

**(2)** Any loss, cost or expense arising out of, resulting from, caused, or contributed to by any:

**(a)** Clean up or removal of silica or products and materials containing silica;

**(b)** Such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of silica or products and material containing silica;

**(c)** Disposal of silica substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare, or to the environment, which may otherwise result;

**(d)** Compliance with any law or regulation regarding silica;

**(e)** Existence, storage, handling or transportation of silica; or

**(f)** Any supervision, instructions, recommendations, warranties (express or implied), warnings or advice given, or which should have been given.

**(3)** Any obligation to share damages with or repay someone else in connection with **(1)** or **(2)** of this exclusion.

**k. Sublimited Coverage**

Any claim for injury or damage under a coverage that is subject to a limit of insurance that is less than the limit shown in the Schedule of "Underlying Insurance".

**l. War**

Any injury or damage due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion, or revolution.

**m. Beryllium**

**(1)** Any injury or damage related to actual, alleged, or threatened past, present, or future claims arising in whole or in part, either directly or indirectly, out of mining, the manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement, or handling of, exposure to, testing for, or failure to disclose the presence of beryllium, products containing beryllium, or products designed or used to protect from the inhalation, ingestion, contact with, or other exposure to beryllium whether or not the beryllium is or was at any time airborne as a fume, dust, powder, fiber, or particle contained in a product, carried on clothing, inhaled, transmitted in any fashion, or found in any form whatsoever.

**(2)** Any loss, cost or expense including, but not limited to, payment for investigation, defense, fines, penalties, or interest and other costs or expenses arising out of or related to any:

**(a)** Clean up or removal of beryllium or products and materials containing beryllium;

**(b)** Such actions as may be necessary to monitor, assess and evaluate the release, or threat of same, of beryllium or products and material containing beryllium;

(c) Disposal of beryllium substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare, or to the environment, which may otherwise result;

(d) Compliance with any law or regulation regarding beryllium;

(e) Existence, storage, handling, or transportation of beryllium; or

(f) Any supervision, instructions, recommendations, warranties (express or implied), warnings, or advice given or which should have been given.

**n. Absolute Unsolicited Communications**

Any injury or damage of any kind, including costs or expenses, allegedly or actually arising out of, related to, caused by, contributed to by, or in any way connected with "unsolicited communications" made by or on behalf of any "insured".

"Unsolicited communications" also includes, but is not limited to, actual or alleged violations of:

(1) The Telephone Consumer Protection Act (47 U.S.C. §227), including any amendment of, or addition to, such statute;

(2) The Controlling the Assault of Non-Solicited Pornography and Marketing Act (15 U.S.C. §7701, *et seq.*, including any amendment of, or addition to, such statute; or

(3) Any other statute, ordinance or regulation relating to the communication, distribution, or transmittal of unwanted content, information or material.

This exclusion also applies to liability, injury, or damage of any kind, including costs or expenses for which the "insured" is obligated, or is alleged to be obligated, to pay damages or defend any claim or "suit" by reason of the assumption of liability in a contract or agreement.

**o. Benzene**

(1) Any injury or damage of any kind, costs or expenses, actually or allegedly arising out of, related to, caused by, or contributed to by, or in any way connected with any manufacturing, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, or testing for benzene or products containing benzene whether or not the benzene is or was at any time airborne as a fume, dust, powder, fiber, or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion, or found in any form whatsoever.

(2) Any loss, cost or expenses actually or allegedly arising out of, related to, caused by, or contributed to by, or in any way connected with:

(a) The clean up or removal of benzene or products and materials containing benzene;

(b) Actions as may be necessary to monitor, assess and evaluate the release or threat of benzene or products and material containing benzene;

(c) Disposal of benzene or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

(d) The cost of compliance with any law or regulation regarding benzene.

(3) Any obligation to share damages with or repay someone else in connection with Paragraphs **(1)** or **(2)** of this exclusion.

**p. Professional Services**

Any injury or damage of any kind, including costs or expenses, arising out of, resulting from, caused, or contributed to by the rendering or failure to render any professional service. This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve, maps, drawings, opinions, reports, surveys, change orders, designs, or specifications;

(3) Engineering services, including related supervisory or inspection services;

(4) Medical, surgical, dental, x-ray, or nursing services, treatment, advice, or instruction;

(5) Any health or therapeutic service, treatment, advice, or instruction;

(6) Any service, treatment, advice, or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming;

(7) Optometry or optical, or hearing aid services, including the prescribing, preparation, fitting, demonstration, or distribution of ophthalmic lenses, and similar products, or hearing aid devices;

(8) Body piercing services;

(9) Services in the practice of pharmacy; but this exclusion does not apply if you are a retail druggist or your operations are those of a retail drugstore;

(10) Law enforcement or firefighting services;

(11) Real estate services;

(12) Insurance and financial services; and

(13) Handling, embalming, disposal, burial, cremation, or disinterment of dead bodies.

## SECTION II – LIMITS OF INSURANCE

1. Subject to Item **2.** and **3.** below, the Loss Event Limit shown in the Declarations is the most we will pay with respect to any one "loss event" to which this insurance applies.

2. The Policy Aggregate Limit shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. "Insureds";

b. Claims made, "suits" brought, or number of vehicles involved; or

c. Persons or organizations making claims or bringing "suits".

3. The Policy Aggregate Limit is the most we will pay for:

a. The sum of all "ultimate net loss", except "ultimate net loss" because of injury or damage arising out of the ownership, maintenance or use of an auto if such auto is not subject to an aggregate in the "underlying insurance"; and

b. Each "loss event" as regards "ultimate net loss" because of injury or damage arising out of the ownership, maintenance or use of an auto if such auto is not subject to an aggregate in the "underlying insurance".

The Policy Aggregate Limit, as described in Paragraph **3.** above, applies to the policy period, shown in the Declarations. Any extension of the policy period will be deemed part of the policy period that is being extended and therefore subject to the Policy Aggregate Limit.

## SECTION III – CONDITIONS

**1. Appeals**

If the "underlying insurer" or "insured" elects not to appeal a judgment in excess of the applicable "underlying insurance limit", we may do so at our own expense. We will be liable for taxable costs, pre- and postjudgment interest and disbursements.

**2. Bankruptcy**

**a. Bankruptcy Of Insured**

Bankruptcy or insolvency of the "insured" or of the "insured's" estate will not relieve us of our obligations under this policy.

**b. Bankruptcy Of Underlying Insurer**

Bankruptcy of the "underlying insurer" will not relieve us of our obligations under this policy.

However, this insurance will not replace the "underlying insurance" in the event of bankruptcy or insolvency of the "underlying insurer". This insurance will apply as if the "underlying insurance" were in full effect.

**3. Cancellation**

**a.** The first "Named Insured" shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing or delivering to the first "Named Insured" written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the first "Named Insured's" last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first "Named Insured" any premium refund due. If we cancel, the refund will be pro rata. If the first "Named Insured" cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**4. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first "Named Insured" shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**5. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified, in writing, as soon as practicable, of any act, "loss event" or an offense, regardless of the amount, which may reasonably be expected to result in a claim under this policy. To the extent possible, notice should include:

**(1)** How, when and where the act, "loss event" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the act, "loss event" or offense.

**b.** If a claim is made or "suit" is brought against any "insured", you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved "insured" must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this insurance may also apply.

**d.** No "insured" will, except at that "insured's" own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**6. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**7. Inspections And Surveys**

**a.** We have the right to:

**(1)** Make inspections and surveys at any time;

**(2)** Give you reports on the conditions we find; and

**(3)** Recommend changes.

**b.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

(1) Are safe or healthful; or

(2) Comply with laws, regulations, codes or standards.

Paragraphs **a.** and **b.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations on our behalf.

**8. Legal Action Against Us**

No person or organization has a right under this policy:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an "insured"; or

**b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an "insured"; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the "insured" and the claimant or the claimant's legal representative.

**9. Other Insurance**

**a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this policy.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

**10. Premium Audit**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** If this policy is auditable, the premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first "Named Insured". The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first "Named Insured", but not if such audit premium is less than the Minimum Premium shown in the Declarations.

**c.** The first "Named Insured" must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**11. Premiums**

The first "Named Insured" shown in the Declarations:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

**12. Representations Or Fraud**

By accepting this policy, you agree, represent and warrant that:

**a.** The statements in the Declarations are accurate and complete;

**b.** The statements and information contained in the application for insurance and any supplementary information are true and correct and that no facts have been suppressed or misstated;

**c.** This policy is being issued in full reliance upon the statements and representations made in the application and any supplementary information;

**d.** The application and any supplementary information are incorporated and made part of this policy by reference; and

**e.** This policy is void in any case of fraud and or misrepresentation by you as it relates to this policy or any claim under this policy.

### 13. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first "Named Insured", this insurance applies:

**a.** As if each "Named Insured" were the only "Named Insured"; and

**b.** Separately to each "insured" against whom claim is made or "suit" is brought.

### 14. Transfer Of Rights Of Recovery Against Others To Us

If the "insured" has rights to recover all or part of any payment we have made under this policy those rights are transferred to us. The "insured" must do nothing after loss to impair them. At our request, the "insured" will bring "suit" or transfer those rights to us and help us enforce them.

### 15. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named "insured".

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

### 16. No Duty To Notify If We Do Not Renew

If we decide not to renew this policy, we are under no obligation to mail or deliver to any "insured" notice of the nonrenewal.

### 17. Loss Payable

Liability under this policy shall not apply unless and until the "insured" or "insured's" "underlying insurer" has become obligated to pay the full and complete amount of the applicable "underlying insurance limit". Such obligation by the "insured" to pay part of the "ultimate net loss" shall have been previously determined by a final settlement or judgment after an actual trial or written agreement between the "insured", claimant, and us.

### 18. Maintenance Of Underlying Insurance

You must maintain the "underlying insurance" affording in total the coverage and limits as stated in the Schedule Of "Underlying Insurance" in full force and effect during this policy period, except for reduction of aggregate limits, where applicable, solely as a result of the payment of claims, settlement, or judgments for acts, occurrences or offenses which:

**a.** Take place during the policy period of this policy; and

**b.** Are for injury or damage, costs or expenses covered by this policy.

You must notify us in writing within thirty days if any company replaces or changes any terms or conditions of any of the "underlying insurance". You must notify us immediately of the exhaustion of any aggregate limits of the "underlying insurance".

Policies or coverages written on a claims-made policy form or endorsement do not meet the requirements of maintaining "underlying insurance".

Your failure to comply with the foregoing will not invalidate this policy, but in the event of such failure, we will be liable only to the extent that we would have been liable had you complied herewith.

## SECTION IV - DEFINITIONS

**1.** "Controlling underlying insurance" means the policy or policies that are indicated as such on the Schedule Of "Underlying Insurance".

**2.** "Exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS) means an exterior cladding or finish system used on any part of any structure and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat; and

**d.** A finish coat providing surface texture and color.

3. "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, wet or dry rot, scents or byproducts produced or released by fungi.

4. "Insured" means any person or organization qualifying as such under the "controlling underlying insurance".

5. "Loss Event" means the happening, situation or circumstance that initiates the application of the "underlying insurance" as designated in the Schedule of "Underlying Insurance".

6. "Named Insured" means the entity(ies) or individual(s) named in the Declarations.

7. "Suit" means a civil proceeding in which damages because of a "loss event" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the "insured" must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceedings in which such damages are claimed and to which the "insured" submits with our consent or the "underlying insurer's" consent.

8. "Ultimate net loss":

   a. Means the total sum, after reduction for recoveries or salvages collectible, that the "insured" becomes legally obligated to pay by reason of a judgment against the "insured" after actual trial, or alternative dispute resolution by written agreement of the "insured", the claimant or the claimant's legal representative and us;

   b. Includes the costs of attorneys fees in defending any claim or "suit" incurred by any "underlying insurer" if such costs are included within the limits of insurance of the "underlying insurance". However, these costs do not include salaries and expenses of employees or regular officials of the "underlying insurer" or the "insured"; and

   c. Includes all interest on judgments paid by the "insured" or any "underlying insurer".

9. "Underlying insurance" means the coverage(s) afforded under insurance policies, for the limits shown, as designated in the Schedule of "Underlying Insurance", and any renewals or replacements of those policies. Policies endorsements or coverages written on a claims-made policy form will not be considered "underlying insurance."

10. "Underlying insurance limit" means the sum of amounts applicable to any claim or "suit" from:

    a. "Underlying insurance", whether such "underlying insurance" is collectible or not;

    b. Other insurance; whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limits of Insurance; and

    c. Any applicable self-insured retention or deductible.

    "Underlying insurance limit" does not include limits of policies, coverages and endorsements written on a claims-made policy form.

11. "Underlying insurer" means any insurer who provides any policy or coverages of "underlying insurance".

12. "Unsolicited communications" means any form of communication, distribution, transmittal or publication of information or material, which the recipient has not specifically requested. This includes but is not limited to facsimile, electronic mail, postal mail, express mail, telephone, internet or web-based advertisement, instant message, SMS message or text message.

# U.S. TREASURY DEPARTMENT'S
# OFFICE OF FOREIGN ASSETS CONTROL (OFAC)
# ADVISORY NOTICE TO POLICYHOLDERS

## PLEASE READ THIS NOTICE CAREFULLY.

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorist organizations and narcotics traffickers as Specially Designated Nationals. This list can be located on the United States Treasury's web site: http://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

    Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Policy Number:**  AN060019

NI 00 19 01 16

**Effective Date:**   11/16/2018

# SERVICE OF SUIT

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other Officer specified for that purpose in the Statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the below named as the person to whom the said Officer is authorized to mail such process or a true copy thereof.

It is further agreed that service of process in such suit may be made upon Janet Shemanske, or her nominee of the Company at 7233 East Butherus Drive, Scottsdale, Arizona 85260 and that in any suit instituted against the Company upon this policy, it will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. Nothing herein shall constitute a selection or designation of forum, or a waiver of any of the Company's rights to select a forum or court, including any of the federal courts of the United States.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

Coverage for acts of terrorism, as defined in the Terrorism Risk Insurance Act, as amended, (the "Act"), is included in your policy. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Act. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism as defined in the Act is

█████████████ and does not include any charges for the portion of losses covered by the United States government under the Act.

Named Insured:      Contour Eastwyck LLC

Policy Number:       AN060019

Name of Insurer:    Nautilus Insurance Company

**Policy Number:** AN060019

**NE 00 62 10 14**

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION – EMPLOYEE BENEFITS LIABILITY

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

This insurance does not apply to any injury or damage, costs or expenses arising out of, resulting from, caused or contributed to by any act, error or omission of any "insured" or of any other person committed in the "administration" of an "employee benefit program".

As used in this exclusion:

1. "Administration" includes but is not limited to:

    a. Providing information to employees, including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

    b. Handling records in connection with the "employee benefit program"; or

    c. Effecting, continuing or terminating any employee's participation in any benefit included in the "employee benefit program".

2. "Employee benefit program" means a program providing some or all of the following benefits to employees:

    a. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts;

    b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans;

    c. Unemployment insurance, social security benefits, workers' compensation and disability benefits;

    d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

    e. Any other similar benefits.

All other terms and conditions remain unchanged.

**Policy Number:** AN060019

**NE 00 69 10 14**

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION – OWNED AUTO

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

This insurance does not apply to any injury or damage, costs or expenses arising out of, resulting from, caused or contributed to by the ownership, maintenance, use, loading or unloading or entrustment to others of any auto owned by you.

All other terms and conditions remain unchanged.

**Policy Number:** AN060019

**NE 00 74 10 14**

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION – EMPLOYERS LIABILITY

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

This insurance does not apply to injury, costs or expenses arising out of, resulting from, caused or contributed to by injury to:

1. An "employee" of the "insured" arising out of and in the course of:

   a. Employment by the "insured"; or

   b. Performing duties related to the conduct of the "insured's" business; or

2. The spouse, child, parent, brother or sister of that "employee"; or any other person; as a consequence of Paragraph **1.** above.

This exclusion applies whether the "insured" may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

To the extent coverage is provided by "underlying insurance" for liability assumed by the "insured" under an insured contract this exclusion does not apply to any liability assumed by an "insured".

As used in this exclusion, "employee" includes a leased worker.

All other terms and conditions remain unchanged.

**Policy Number:** AN060019                                      **NE 00 93 10 14**

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION – TOXIC METALS

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

**A.** The following exclusion is **added** to **3. Exclusions** of **Section I – Excess Liability Coverage**:

This insurance does not apply to:

**Toxic Metals**

1. Any injury or damage arising out of direct or indirect contact with, any exposure to, or the ingestion, inhalation, or absorption of any "toxic metals" in any form; or

2. Any loss, cost, or expense arising out of any:

   **a.** Request, demand, order, or requirement by or on behalf of any authority, governmental or otherwise, that any "insured" or others abate, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any "toxic metals"; or

   **b.** Claim or "suit" by or on behalf of any authority, governmental or otherwise, for damages because of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of any "toxic metals".

We will have no duty to investigate, defend or indemnify any "insured" in any action or proceeding alleging damages arising out of direct or indirect contact with, any exposure to, or the ingestion, inhalation, or absorption of any "toxic metals" in any form.

**B.** For the purpose of this endorsement, the following definitions are **added** to the **Definitions** section:

1. "Toxic metals" are individual metals and metal compounds that negatively affect people's health.  "Toxic metals" include, but are not limited to, arsenic, beryllium, "heavy metals", or hexavalent chromium.

2. "Heavy metals" are a group of elements between copper and bismuth on the periodic table of the elements having specific gravities greater than 4.0.  "Heavy metals" include, but are not limited to, cadmium, cobalt, copper, lead, manganese, mercury, molybdenum, strontium, vanadium, or zinc.

All other terms and conditions remain unchanged.

**Policy Number:**  AN060019

**NE 00 95 10 14**

**Effective Date:**  11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

The following is added to **3. Exclusions** of **Section I – Excess Liability Coverage:**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

Injury or damage arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by any "insured" or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

     Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Policy Number:**  AN060019

**NE 00 97 01 15**

**Effective Date:**  11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

**A.** Any endorsement addressing acts of terrorism (however defined) in any "controlling underlying insurance" does not apply to this excess insurance.  The following provisions addressing acts of terrorism apply with respect to this excess insurance.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

.

All other terms and conditions remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Policy Number:** AN060019

**NE 00 98 01 15**

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF PUNITIVE DAMAGES
# RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

Any endorsement addressing acts of terrorism (however defined) in any "controlling underlying insurance" does not apply to this excess insurance. The following provisions addressing acts of terrorism apply with respect to this excess insurance.

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.   The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

All other terms and conditions remain unchanged.

**Policy Number:** AN060019                                                    NE 01 00 04 15

**Effective Date:** 11/16/2018

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

**A.** The following exclusion is **added** to Paragraph **3. Exclusions** of **Section I – Excess Liability Coverage:**

This insurance does not apply to:

**Unmanned Aircraft**

Any injury or damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and loading or unloading.

This exclusion applies even if the claims against any "insured" allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that "insured", if the event which caused the injury or damage involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

As used in this exclusion, loading or unloading means the handling of property:

**1.** After it is moved from the place where it is accepted for movement into or onto an "unmanned aircraft";

**2.** While it is in or on an "unmanned aircraft"; or

**3.** While it is being moved from an "unmanned aircraft" to the place where it is finally delivered;

but loading or unloading does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the "unmanned aircraft".

**B.** The following definition is added to **Section IV – Definitions:**

"Unmanned aircraft" means an aircraft that is not:

**1.** Designed;

**2.** Manufactured; or

**3.** Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

All other terms and conditions remain unchanged.