**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| JANET HUDNALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| vs. | ) | |
| | ) | _____ |
| BECTON, DICKINSON, | ) | |
| AND COMPANY, and | ) | |
| C. R. BARD, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Janet Hudnall ("Plaintiff" or "Ms. Hudnall") submits the following Complaint against Defendants Becton, Dickinson, and Company ("BD") and C. R. Bard, Inc. ("Bard"):

## INTRODUCTION

1.     This is an employment case arising from Defendants' discrimination against Plaintiff because of her sex and disability and Defendants' retaliation against Plaintiff for making internal complaints to Defendants' human resources department and the President of her business unit concerning the discrimination she experienced.

2.     Plaintiff asserts discrimination claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. and the Americans with

1

Disabilities Act, as amended, 42 U.S.C. §12112. She seeks lost compensation and economic benefits of employment, reinstatement to her original position or front pay in lieu thereof, compensatory and punitive damages, and her reasonable attorney's fees and costs.

## PARTIES

3.      Plaintiff is a citizen of the State of Georgia and hereby submits herself to the jurisdiction of this Court.

4.      Defendant Becton, Dickinson and Company ("BD") is a New Jersey corporation, with its principal business office at 1 Becton Drive, Franklin Lakes, New Jersey 07417. BD is authorized to do business in Georgia, maintains offices within the Northern District of Georgia, regularly conducts business within the Northern District of Georgia, is subject to the jurisdiction of this Court, and may be served with process by personal service upon its registered agent in Georgia, C T Corporation System, at 289 S. Culver Street, Lawrenceville, Georgia 30046.

5.      Defendant C. R. Bard, Inc. is a New Jersey corporation, with its principal business office at 1 Becton Drive, Franklin Lakes, New Jersey 07417. Bard is authorized to do business in Georgia, maintains offices within the Northern District of Georgia, regularly conducts business within the Northern District of Georgia, is subject to the jurisdiction of this Court, and may be served with process

2

by personal service upon its registered agent in Georgia, C T Corporation System,

at 289 S. Culver Street, Lawrenceville, Georgia 30046.

6.      Defendants BD and Bard are affiliated companies, which share

resources, personnel, and human resources offices. Upon information and belief,

Defendant Bard is a subsidiary of BD and is wholly owned and operated by BD.

## JURISDICTION AND VENUE

7.      Plaintiff's claims present federal questions over which this Court has

jurisdiction pursuant to 28 U.S.C. §1331 and §1343(a), and 29 U.S.C. §626(c)(1).

8.      In addition, this Court has jurisdiction over Plaintiff's claims due to the

diversity of the Parties, pursuant to 28 U.S.C. §§1332 and 1348, because Plaintiff

and Defendant are citizens of different States, and the matter in controversy exceeds

the sum of $75,000.

9.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1)-(2),

(c)(2), and (d), as every act of which Plaintiff complains occurred in the Atlanta

Division of the United States District Court for the Northern District of Georgia and

as Defendants reside within the Atlanta Division of the United States District Court

for the Northern District of Georgia, within the meaning of 28 U.S.C. §1391(c)(2)

and (d).

## **FACTS**

10.   Plaintiff was at all relevant times an "employee" of Defendants as defined by Title VII, as amended, 42 U.S.C. §2000e *et seq*., and the Americans with Disabilities Act, as amended, 42 U.S.C. §12112.

11.   Defendants are each an "employer" within the meaning of Title VII, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII"), and the Americans with Disabilities Act, as amended, 42 U.S.C. §12112 (the "ADAAA").

12.   Plaintiff was employed by BD, by Bard, or by Bard and BD jointly.

13.   Ms. Hudnall has satisfied all administrative prerequisites to perfect her claims of discrimination and retaliation under Title VII and the ADAAA. Specifically, she has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and has received her Notice of Right to Sue letter for her claims under Title VII and the ADAAA.

14.   Ms. Hudnall is a woman. She is an accomplished marketing executive, with a depth of experience in the medical device industry, where she has successfully built teams and developed strategies that have resulted in significant gains for her employers.

15.   From 1998 to 2008, Ms. Hudnall was employed by Defendant Bard, where she was consistently promoted, eventually reaching the position of Senior

4

Marketing Manager. After leaving Bard in 2008, Ms. Hudnall was employed with other companies, in roles where she was responsible for the development and execution of global marketing strategies.

16.     Ms. Hudnall began her most recent employment with Defendants in 2017, when she became re-employed by Defendant Bard, as its Senior Director of Strategic Marketing.

17.     Soon after Ms. Hudnall's employment with Bard began in 2017, Bard was acquired by Defendant BD. Following the acquisition, Ms. Hudnall remained employed by Bard and/or BD until March 2022, when her employment was unlawfully terminated as described herein.

18.     Following BD's acquisition of Bard, Ms. Hudnall became Senior Director, Global Marketing – Endourology, in the Urology and Critical Care Business Unit ("UCC"). She worked in this role from February 2018 until January 2021.

19.     In January 2021, Ms. Hudnall was appointed to the role of Interim Global Platform Leader, Endourology.

20.     Ms. Hudnall has 24 years of experience in the medical device industry, 22 of which were in marketing. She has had global responsibility throughout her marketing career. She was eminently qualified for her position at BD UCC.

21.     When she became Interim Global Platform Leader, Ms. Hudnall reported directly to then-President of BD UCC, Johann Fernando.

22.     On or about May 17, 2021, following Mr. Fernando's departure from BD, supervision of Ms. Hudnall and her team was transferred to Marie Ha ("Ms. Ha").

23.     Shortly after Ms. Ha added Endourology to her scope of responsibilities, Ms. Hudnall's role as Interim Global Platform Leader was made permanent, and her promotion was announced to the entire UCC organization as well as to select individuals outside UCC.

24.     Ms. Ha was also previously employed by Bard, where she worked as the Country Manager in South Korea.

25.     In June 2018, Ms. Ha began working for BD UCC in Louisville, Colorado, as General Manager, TTM. When the Endourology Platform was transferred to Ms. Ha, in May 2021, her title was changed to Vice President/General Manager, TTM and Endourology.

**Ms. Ha's history of abusing subordinates**

26.     Prior to becoming Ms. Hudnall's supervisor, Ms. Ha had a long history of mistreating her subordinates. When she worked in South Korea, Ms. Ha's subordinates referred to her, tellingly, as the "Dragon Lady."

27.    When Ms. Ha transferred from South Korea to Colorado, Myria Crawford ("Ms. Crawford") was Defendants' Global Marketing Director for Targeted Temperature Management ("TTM") and was made Ms. Ha's direct subordinate.

28.    After her arrival in Colorado, Ms. Ha engaged in discriminatory and inappropriate conduct, which ultimately drove Ms. Crawford away from BD.

29.    Despite Ms. Crawford performing well in her position, Ms. Ha repeatedly berated and belittled Ms. Crawford, both publicly, in front of Ms. Crawford's subordinates, and in private.

30.    Ms. Crawford was, at all relevant times, a working mother.

31.    On one occasion, Ms. Ha told Ms. Crawford that, as a working mother, she was going to have to work four times harder than anyone else, because no one would believe that she was pulling her weight.

32.    On another occasion, Ms. Crawford had time blocked on her calendar, well in advance of the date because she would have to be away from the office to participate in an event at her daughter's school. On the evening before the appointment and well after normal business hours (at approximately 9:00 – 10:00 p.m.), Ms. Ha scheduled a meeting for approximately 8:00 a.m. the following

morning, during the time when Ms. Crawford would be away at the previously-scheduled school event.

33.    Upon seeing the new calendar entry, Ms. Crawford notified Ms. Ha that she would not be able to be present for the beginning of the meeting, due to the previously scheduled appointment, which she could not then back out of given the afterhours notice of the meeting, but that she would arrive for the meeting as soon as she could, likely during the 9 o'clock hour.

34.    When Ms. Crawford arrived in the meeting the next morning, Ms. Ha berated her and told her that her priorities were not right. Ms. Ha remarked that she (Ms. Ha) had never missed a work obligation because of her children and that Ms. Crawford needed to hire as much "help" at home as possible, to help her prioritize her work.

35.    Shortly before the COVID-19 pandemic began, Ms. Ha told Ms. Crawford that she had been in her position too long and that she needed to work on finding another job.

36.    During the COVID-19 pandemic, Ms. Ha's abuse of Ms. Crawford became more frequent and severe and was so apparent that two of Ms. Crawford's subordinates complained to Defendants' human resources department. As a result, eventually, Ms. Ha was assigned a career coach.

37.    Ms. Crawford spent several hours on the phone with the career coach explaining, in detail, Ms. Ha's abusive conduct and harmful management tactics; the coach was appalled.  The coach advised Ms. Crawford that she was going to work to improve the situation, but that it may take a few weeks.

38.    Ultimately, this coaching effort failed. While Ms. Ha improved her treatment of Ms. Crawford for a few weeks, she soon reverted to her abusive management tactics.

39.    In August or September 2020, a few months after Ms. Crawford spoke with the career coach, Ms. Ha reminded Ms. Crawford of their previous conversation about the length of time that Ms. Crawford had been in her role. Ms. Ha asked Ms. Crawford when she planned to leave the company; the implication was clear, if Ms. Crawford did not leave, she would be removed. Ms. Crawford resigned soon thereafter, in October 2020.

40.    Ms. Crawford was replaced by a male, Jean-Francois Mathieu ("Mr. Mathieu"). Mr. Mathieu remained in that role as of, at least, April 1, 2022.

41.    Ms. Ha's abuse of Ms. Crawford is evidence of Ms. Ha's sexist attitude toward her female direct reports and, by association, their subordinate teams.

## **Ms. Ha's abuse of Ms. Hudnall**

42.     On October 1, 2022, Rima Alameddine ("Ms. Alameddine") became President of BD UCC.

43.     Soon after Ms. Alameddine's arrival at UCC, Ms. Ha's treatment of Ms. Hudnall changed, and she began abusing Ms. Hudnall in much the same manner that she had abused Ms. Crawford.

44.     Throughout the course of her supervision of Ms. Hudnall, Ms. Ha micromanaged Ms. Hudnall, despite her previous success on the Endourology business.

45.     After Ms. Alameddine's arrival, Ms. Ha began frequently publicly undermining Ms. Hudnall, ignoring her, disparaging and chastising her, reassigning her responsibilities to others, and pitting her subordinates and other team members against one another. In short, Ms. Ha engaged in a campaign to terrorize Ms. Hudnall and make her feel irrelevant, so that she would resign and Ms. Ha could replace her with a male.

46.     Tellingly, Ms. Ha did not treat Mr. Mathieu, who was Ms. Hudnall's counterpart on the TTM Platform, in such a manner and, instead, allowed him authority to run his line of business with more autonomy.

10

47.     Ms. Ha also did not treat her other male direct reports in such a manner. Rather, she treated her male direct reports with respect and attempted to increase their visibility and reputation within Defendants. In addition to allowing Mr. Mathieu more autonomy than Ms. Hudnall, Ms. Ha often publicly heaped praise upon her other male direct reports, Chris Spriggs and Paul Walker, while refusing to recognize Ms. Hudnall or her team for their accomplishments in forums that mattered (*e.g.*, in front of senior management).

48.     Additionally, during the summer of 2021, Ms. Ha began grooming a male co-worker, Paul Walker, to replace Ms. Hudnall.

49.     Ms. Ha's abuse of Ms. Hudnall escalated after Ms. Alameddine's arrival to the point that it caused Ms. Hudnall to suffer medical problems.

50.     On October 22, 2021, Ms. Hudnall was presenting an overview of the Endourology business to Ms. Alameddine. During the meeting, Ms. Ha attempted to create a false narrative that the Endourology business was a "disaster" before she took over and that she was turning the business around. For instance, she claimed that the Endourology business only had 6% of the market and that it was losing market share. When Ms. Hudnall attempted to clarify that this was only a U.S. perspective, that the situation was different internationally, and that attempting to characterize the entire business with just a U.S. perspective was inappropriate

because the U.S. constituted less than 40% of Endourology's total global revenue, Ms. Ha was dismissive and waived her report off.

51.     Also, Ms. Ha later had a dinner scheduled with Ms. Hudnall and others. Ms. Hudnall arrived at the scheduled time for the dinner, but the rest of the group was an hour late because they had been in a meeting, to which Ms. Hudnall was not invited, that ran late. Ms. Hudnall attempted to contact Ms. Ha to ask where the group was, but Ms. Ha did not give her even the courtesy of a response.

52.     Ms. Ha did not limit her abuse to Ms. Hudnall. She also created an unnecessarily stressful and turbulent working environment for Ms. Hudnall's subordinates, whom Ms. Hudnall had selected for their positions and who were abused due to their association with Ms. Hudnall.

53.     After Ms. Ha's arrival in 2021, a few of Ms. Hudnall subordinates left her team. Two were lost to voluntary turnover, and another was promoted to a position in another Business Unit. Ms. Ha selected the replacements for each of these open positions, bypassing Ms. Hudnall in the decision-making process. In fact, over Ms. Hudnall's objections, Ms. Ha insisted on altering written job descriptions to add elements that were inappropriate for the positions described, selecting the persons to be interviewed, and selecting the persons ultimately hired. As a result, employees

were either placed in roles that they did not want or for which they were not qualified.

54.     In November 2021, Ms. Hudnall attempted to raise the issue of Ms. Ha's abuse directly with Ms. Ha. Ms. Hudnall told Ms. Ha that she was not comfortable with the manner in which she and her team were being treated and wished the relationship between herself and Ms. Ha to change. Unfortunately, this effort was not productive, and Ms. Ha's abuse of Ms. Hudnall escalated to the point that it caused Ms. Hudnall to suffer medical problems.

55.     On December 6, 2021, Ms. Ha directed Ms. Hudnall to present potentially controversial information to five members of BD UCC's Senior Management Team with only two hours' notice, which was clearly insufficient given the topic of the conversation. Then, during the meeting, Ms. Ha attempted to discredit Ms. Hudnall and chastised her in front of BD UCC's leaders. As a result of the situation created by Ms. Ha requiring Ms. Hudnall to present to UCC leadership with two hours' notice and of Ms. Ha's aggressive behavior during the meeting, Ms. Hudnall experienced an acute hypertensive event; her blood pressure spiked to an unsafe level far outside her normal range.

56.     Ms. Hudnall was forced to consult a physician, who barred her from engaging in an important business trip to Colorado, which was scheduled for the

next day, December 7. The physician was concerned that the increased altitude and pressure of the flight to Colorado would put Ms. Hudnall at risk of stroke.

57.    After her doctor told her that she could not travel, Ms. Hudnall informed Ms. Ha about the stress created by her behavior surrounding the December 6 meeting and told Ms. Ha that her doctor ordered her not to travel due to her medical condition. During the conversation, Ms. Ha did not express any form of remorse or even the slightest concern for Ms. Hudnall. Instead, Ms. Ha pressured Ms. Hudnall to follow up with the Senior Management Team about the previous day's meeting. After being reminded of the serious medical event Ms. Hudnall had just experienced, Ms. Ha stated, in reference to the update to the Senior Management Team, "it doesn't have to be perfect."

58.    As a result of Ms. Ha's behavior, Ms. Hudnall was diagnosed with and prescribed medication for hypertension, depression, and anxiety.

59.    During December 2021, Ms. Hudnall informed BD UCC's upper-level management of the health condition from which she was suffering as a result of Ms. Ha's behavior, including: Ms. Ha; Ms. Alameddine (via Ms. Ha); Ben Jackson, Vice President of Business Development; J.R. O'Farrell, Associate General Counsel, Commercial; Syed Naveed, Vice President of R&D; and Calvin Klitz, Vice

President of Human Resources ("Mr. Klitz"). Thereafter, Ms. Ha's bullying and abuse continued unabated.

60. In January 2022, another of Ms. Hudnall's subordinates, John Sangiorgio, resigned. Mr. Sangiorgio had repeatedly complained to Ms. Hudnall about the team environment and the chaos that Ms. Ha created, and he stated concern that he saw no path to the team being empowered, as it had been before Ms. Ha was assigned to the business, or operating effectively under her.

61. During his exit interview with one of Defendants' human resources personnel, Nicole Vanderwolf ("Ms. Vanderwolf"), Mr. Sangiorgio informed Defendants that he was resigning because of the way in which Ms. Ha treated Ms. Hudnall and, by extension, her team of subordinates. Ms. Vanderwolf repeatedly pressured Mr. Sangiorgio to say that he was resigning due to Ms. Hudnall's conduct, instead. Mr. Sangiorgio refused to make such an accusation, told Ms. Vanderwolf that Ms. Hudnall was an excellent supervisor, and made clear that he was resigning because of Ms. Ha's behavior.

62. On February 2, 2022, Ms. Hudnall completed the Workday process concerning Mr. Sangiorgio's resignation; based on their conversations, Ms. Hudnall cited "Company Environment" as the primary reason for his resignation. Shortly thereafter, Ms. Vanderwolf, called and pressured Ms. Hudnall to change this

selection, stating that she could only list the cause as "Company Environment" if she was willing to discuss with Mr. Klitz and others what she meant.

63.    On February 2, 2022, following the call with Ms. Vanderwolf, Ms. Hudnall called Mr. Klitz to follow up on her call with Ms. Vanderwolf. At the time, Mr. Klitz was aware of Ms. Hudnall's recent medical issues, and during the call, Ms. Hudnall told him of the problems she had been experiencing with Ms. Ha's abusive conduct. Mr. Klitz encouraged Ms. Hudnall to discuss the matter with Ms. Alameddine, other Senior Management Team members, and AccessHR.

64.    Despite the serious issues that Ms. Hudnall raised during their February 2, 2022 conversation, Mr. Klitz only spent approximately ten minutes talking with her during this call; however, he said that Ms. Hudnall could contact him at any time, if needed, and stated that there was no need to schedule a meeting or call in advance.

65.    On February 22, 2022, Ms. Hudnall sent Mr. Klitz a message requesting a follow-up conversation, but he did not respond to the request.

66.    Ms. Hudnall followed the direction provided by Mr. Klitz in the February 2 conversation and discussed the matter, in detail, with Ms. Alameddine on February 14, 2022. During that meeting, which lasted approximately an hour, Ms. Hudnall told Ms. Alameddine about Ms. Ha's pattern of abusive conduct, providing her with several examples of Ms. Ha's behavior, and specifically told Ms.

Alameddine that Ms. Ha's conduct had caused her to suffer from hypertension, including the acute hypertensive episode. Ms. Hudnall asked Ms. Alameddine for reasonable accommodations, including taking action to correct Ms. Ha's behavior or assisting Ms. Hudnall in finding another position within BD. Ms. Hudnall had similar conversations with an AccessHR representative, Ernie Pastor, and with Mr. Naveed on February 24, 2022. Mr. Pastor acknowledged that Ms. Ha's behavior was inappropriate and not acceptable.

67.     On March 3, 2022, Ms. Hudnall had a follow-up conversation with Mr. Klitz. Yet again, despite the serious issues discussed, he provided her only approximately ten minutes of his time. During this conversation, Ms. Hudnall again requested reasonable accommodations, including taking action to correct Ms. Ha's behavior or assisting Ms. Hudnall in finding another position within BD.

68.     The very next day, March 4, 2022, Ms. Hudnall was called into a meeting with Ms. Ha and Ms. Vanderwolf. During the meeting, she was informed that she was being fired, for cause, for "behavioral" reasons, including her recent conversations with Ms. Alameddine and Mr. Klitz, during which she complained about Ms. Ha's discriminatory misconduct, complained about the impact Ms. Ha's conduct was having on her health, and requested reasonable accommodations.

69.     Prior to her termination, Ms. Hudnall had always received positive performance reviews, including from Ms. Ha only a few months before.

70.     Like Ms. Crawford, following the termination of her employment, Ms. Hudnall was replaced males. She was initially replaced, on an interim basis, by Paul Walker. In July 2022, Ms. Ha hired another male, Matthew Chapman, as a permanent replacement for Ms. Hudnall.

**COUNT ONE**
**Sex Discrimination in Violation of Title VII**
*Against all Defendants*

71.     Paragraphs 1 through 70 are hereby incorporated as though each of the factual allegations is restated herein.

72.     The above-pled discriminatory conduct toward Plaintiff, including, but not limited to, Defendants' discriminatory discharge of Plaintiff based on sex constitute unlawful sex discrimination against Plaintiff in the terms and conditions of her employment in violation of Title VII.

73.     Defendants violated Plaintiff's rights under Title VII by terminating her employment because of her sex.

74.     Defendants violated Ms. Hudnall's right to be free from sex discrimination in employment by subjecting Ms. Hudnall to disparate treatment in a manner that adversely affected the terms and conditions of her employment.

75.     Defendants violated Ms. Hudnall's right to be free from sex discrimination in employment via the actions of Ms. Alameddine and Mr. Klitz, each of whom was in a position of authority to take responsive action to stop the violations of Ms. Hudnall's rights as described herein and knew about the violations of Ms. Hudnall's rights, yet he failed to act, thereby acquiescing to the discriminatory conduct and causing the discrimination against Ms. Hudnall to persist and worsen. Ms. Almandine's and Mr. Klitz's failure to act in the face of known violations of Ms. Hudnall's rights amounted to deliberate indifference.

76.     Defendants violated Ms. Hudnall's right to be free from sex discrimination in employment by subjecting her to severe and pervasive harassment based on sex and creating a hostile work environment. This harassment included subjecting her to verbal abuse, frequently publicly undermining her, ignoring her, disparaging and chastising her, reassigning her responsibilities to others, and pitting her subordinates and other team members against one another, and interfering with her ability to perform her job. Defendants did not subject similarly-situated male employees to such conditions of employment.

77.     Defendants' interference with Plaintiff's ability to execute her job duties violated Plaintiff's rights under Title VII, and Defendants' termination of Plaintiff, based upon her sex, also gives rise to Defendants' liability under Title VII.

78.     Plaintiff's sex was a "motivating factor" in Defendants' treatment of Plaintiff and in Defendants' decision to terminate her employment, even if there are legitimate non-discriminatory reasons that also motivated these actions.

79.     Defendants' above-pled discriminatory conduct toward Plaintiff constitutes sex discrimination in violation of Title VII.

80.     Defendants undertook their conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover compensatory and punitive damages against Defendants.

81.     Defendants' conduct described above has directly and proximately caused, and continues to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

82.     As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered damages including lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

83.     Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees and costs, and punitive damages, as well as front pay and other equitable relief, and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

## COUNT TWO
### Retaliation in violation of Title VII
*Against all Defendants*

84.     Paragraphs 1 through 70 are hereby incorporated as though each of the factual allegations is restated herein.

85.     During her employment with Defendants, Plaintiff engaged in statutorily protected activity by, among other things, opposing, objecting to, and complaining against sex discrimination in violation of Title VII, including but not limited to: complaining to Ms. Ha about Ms. Ha's mistreatment of Plaintiff; and complaining to Ms. Alameddine, Mr. Klitz, Mr. Naveed, and Mr. Pastor about Ms. Ha's mistreatment of Plaintiff and the impact of Ms. Ha's abuse on Plaintiff's health.

86.     Title VII, as amended, prohibits Defendants from retaliating against Plaintiff because she opposed, objected to, and complained against sex discrimination prohibited by Title VII.

87.     During Plaintiff's employment with Defendants, Defendants subjected her to retaliation because she opposed, objected to, and complained against illegal

sex discrimination. Defendants retaliated against Plaintiff by taking various retaliatory actions against her including, but not limited to: continuing to subject her to Ms. Ha's sexually discriminatory harassment and abuse; and discharging Plaintiff from her employment on the basis of her exercise of federally protected rights as compared with employees who did not engage in similar statutorily protected activity.

88.   The above-pled actions of Defendants constitute unlawful retaliation against Plaintiff in violation of Title VII.

89.   Defendants lack any legitimate justification for subjecting Plaintiff to the adverse employment actions complained of above, and/or any such purported legitimate justifications are mere pretext for retaliation.

90.   The actions of Defendants in subjecting Plaintiff to the adverse actions complained of above were willful, deliberate, and intended to cause Plaintiff harm, and/or were committed with reckless disregard for the harm caused to Plaintiff, and were in derogation of her federally protected rights.

91.   As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

92.    Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees and costs, and punitive damages, as well as front pay and other equitable relief, and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

**COUNT THREE**
**Discrimination in violation of the ADAAA**
*Against all Defendants*

93.    Paragraphs 1 through 70 are hereby incorporated as though each of the factual allegations is restated herein.

94.    Following her diagnosis with hypertension, depression, and anxiety in 2021 and continuing through the date of her termination, Plaintiff was at all times a "qualified person with a disability," within the meaning of the ADAAA, as amended.

95.    Plaintiff's hypertension, depression, and anxiety substantially limited one or more of her major life activities, including, without limitation, working.

96.    In December 2021, Plaintiff notified Defendants' upper-level management of her hypertension, which she was suffering as a result of Ms. Ha's behavior, including: Ms. Ha; Ms. Alameddine (via Ms. Ha); Ben Jackson, Vice President of Business Development; J.R. O'Farrell, Associate General Counsel, Commercial; Syed Naveed, Vice President of R&D; and Mr. Klitz, Vice President of Human Resources. Thereafter, Ms. Ha's bullying and abuse continued unabated.

97.    In February and March 2022, Plaintiff repeatedly notified Defendants of and complained to Defendants' human resources personnel and upper-level managers about the abuse she was suffering by Ms. Ha and the impact of Ms. Ha's abuse on her health, including complaints to Mr. Klitz, Ms. Alameddine, Mr. Pastor, and Mr. Naveed. During these conversations, Ms. Hudnall also made repeated requests of Defendants' human resources personnel and upper-level managers for reasonable accommodations, including taking action to correct Ms. Ha's behavior or assisting Plaintiff in finding another position with Defendants.

98.    Following Plaintiff's complaints about Ms. Ha's behavior and the impact on her health and Plaintiff's requests for reasonable accommodations, Defendants: failed to respond to Plaintiff's requests for reasonable accommodations or engage in any process to identify possible reasonable accommodations; did not intervene in Ms. Ha's abuse of Plaintiff and continued to subject Plaintiff to Ms. Ha's abusive, discriminatory, and harassing conduct; and shortly after Plaintiff complained and requested accommodations, terminated Plaintiff's employment.

99.    Defendants continued subjecting Plaintiff to Ms. Ha's abuse while treating non-disabled, similarly-situated employees more favorably.

100.    Defendants terminated Plaintiff's employment because of her disabilities, in violation of the Americans with Disabilities Act, as amended.

24

101.   Plaintiff's disabilities were a "motivating factor" in Defendants' decision to terminate her employment, even if there are legitimate non-discriminatory reasons that also motivated these actions.

102.   The actions of Defendants in subjecting Plaintiff to the adverse actions complained of above were willful, deliberate, and intended to cause Plaintiff harm, and/or were committed with reckless disregard for the harm caused to Plaintiff and were in derogation of her federally protected rights.

103.   As a direct and proximate result of Defendants' violations of the ADAAA, as amended, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

104.   As a result of the above-pled violations of the ADAAA, as amended, Plaintiff is entitled to recover lost wages and economic benefits of her employment, compensatory damages for emotional distress, and punitive damages, as well as front pay and other equitable relief, and all other legal and equitable relief provided for by the ADAAA, as amended, and all statutes providing for relief for violations of the ADAAA.

**<u>COUNT FOUR</u>**
**Retaliation in violation of the ADAAA**
*Against all Defendants*

105.   Paragraphs 1 through 70 are hereby incorporated as though each of the factual allegations is restated herein.

106.   During her employment with Defendants, Plaintiff engaged in statutorily protected activity by, among other things, opposing, objecting to, and complaining against disability discrimination in violation of the ADAAA, including but not limited to: complaining to Ms. Ha about Ms. Ha's mistreatment of Plaintiff; complaining to Ms. Alameddine, Mr. Klitz, Mr. Naveed, and Mr. Pastor about Ms. Ha's mistreatment of Plaintiff and the impact of Ms. Ha's abuse on Plaintiff's health; and requesting reasonable accommodations from, at least, Ms. Alameddine and Mr. Klitz.

107.   The ADAAA prohibits Defendants from retaliating against Plaintiff because she opposed, objected to, and complained against disability discrimination prohibited by the ADAAA.

108.   During Plaintiff's employment with Defendants, Defendants subjected her to retaliation because she opposed, objected to, and complained against illegal disability discrimination. Defendants retaliated against Plaintiff by taking various retaliatory actions against her including, but not limited to: continuing to subject her

to Ms. Ha's discriminatory harassment and abuse; and discharging Plaintiff from her employment on the basis of her exercise of federally protected rights as compared with employees who did not engage in similar statutorily protected activity.

109.   The above-pled actions of Defendants constitute unlawful retaliation against Plaintiff in violation of the ADAAA.

110.   Defendants lack any legitimate justification for subjecting Plaintiff to the adverse employment actions complained of above, and/or any such purported legitimate justifications are mere pretext for retaliation.

111.   The actions of Defendants in subjecting Plaintiff to the adverse actions complained of above were willful, deliberate, and intended to cause Plaintiff harm, and/or were committed with reckless disregard for the harm caused to Plaintiff, and were in derogation of her federally protected rights.

112.   As a direct and proximate result of Defendants' violations of the ADAAA, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

113.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees and costs, and punitive damages, as well as front pay and other equitable relief, and all other legal and equitable relief provided for by the ADAAA and all statutes providing for relief for violations of the ADAAA.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Ms. Hudnall demands a TRIAL BY JURY and the following

relief:

(a)     declare that Defendant has violated Plaintiff's rights under the federal statutes

listed above;

(b)     permanently enjoin Defendant from violating, in the future, Plaintiff's rights

under any of the federal statutes listed above;

(c)     award Plaintiff full back pay, including all lost pay and benefits, raises, cost

of living increases, retirement benefits, and all other lost benefits and

compensation reducible to a dollar amount;

(d)     award Plaintiff prejudgment interest as required by law;

(e)     award Plaintiff compensatory damages for emotional pain and suffering in an

amount to be determined by the enlightened conscience of a jury;

(f)     award Plaintiff front pay, including all lost future pay and benefits, raises, cost

of living increases, retirement benefits, and all other lost benefits and

compensation reducible to a dollar amount;

(g)     award Plaintiff punitive damages sufficient to punish Defendant for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

(h)     award Plaintiff reasonable attorneys' fees and expenses; and

(i)     grant such additional relief as may be just.

Respectfully submitted this 10th day of February, 2023.

**BUCKLEY BALA WILSON MEW, LLP**

*/s/ Edward D. Buckley*
Edward D. Buckley
GA Bar No. 092750
edbuckley@bbwmlaw.com
J. Kyle Brooks
GA Bar No. 773561
kbrooks@bbwmlaw.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101