## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| CECIL & CAMPBELL ADVISORS,<br>LLC, a Georgia limited liability company, | ) <br>) <br>) | |
| Plaintiff, | ) | Civil Action No. |
| v. | ) | _____ |
| | ) | |
| JARED YOUNG, NYJ HOLDINGS,<br>LLC, a Georgia limited liability company,<br>and CANOPY REAL ESTATE<br>PARTNERS, LLC, a Georgia limited liability<br>company, | ) <br>) <br>) <br>) <br>) | JURY TRIAL<br>DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

NOW COMES Cecil & Campbell Advisors, LLC, Plaintiff in this matter, and

for its Complaint against Defendants Jared Young, NYJ Holdings, LLC and Canopy

Real Estate Partners, LLC, shows the Court the following:

1.      Cecil & Campbell Advisors, LLC ("C&C") operates as a real estate

brokerage firm in the metro Atlanta, Georgia area.  C&C is focused on markets in

Georgia and throughout the Southeast U.S.  The partnership was founded in 2017.

C&C is owned and operated by Kacey Cecil and Chris Campbell, two experienced

real estate brokers with over twenty-five years of experience between them.

2.      NYJ Holdings, LLC ("NYJH") is, on information and belief, a sole member-managed limited liability company based in Atlanta, Georgia, whose sole member/manager is Jared Young ("Young").   NYJH may be served with the Summons and Complaint in this matter by service upon its registered agent Jared Young at its registered office address 605 Spalding Dr., Atlanta, GA, 30328.

3.      Young is a resident of Atlanta, Georgia.  He resides at 605 Spalding Drive, Atlanta, Georgia 30328, where he may be personally served with the Summons and Complaint in this matter.  Young is a graduate of Georgia Tech, where he studied and majored in information technology.  Young is a licensed real estate broker in Georgia, but on information and belief, he is not licensed in other states such as Florida.

4.      Canopy Real Estate Partners, LLC ("Canopy Real Estate Partners" or "Canopy") operates as a real estate brokerage firm in the metro Atlanta, Georgia area.  It was formed by NYJH on September 29, 2022.  Its principal place of business is 605 Spalding Drive, Atlanta, GA, 30328.  It also maintains an office located at 1 Concourse Pkwy, Suite 800, Atlanta, GA 30328.  It may be served with the Summons and Complaint in this matter by service upon its registered agent NYJH or its managing member Jared Young, at its registered office address, 605 Spalding Drive, Atlanta, GA, 30328.

5.      As of 2018, when Young first interviewed for work as a real estate agent with C&C, he had no meaningful experience in the fields of industrial and office leasing and sales.  On February 1, 2019, Cecil & Campbell Advisors, LLC entered into an Independent Contractor Agreement for Real Estate Agent services (the "Agreement") with NYJH.  A true and correct copy of the Agreement is attached as **Exhibit A**.  As noted above, NYJH is a company formed by or on behalf of Young, which is controlled by Young.

6.      The Agreement provides in paragraph 8 subpart a. as follows:

> a. Contractor shall not, after the termination or expiration of this Agreement, for any reason use, permit, suffer or tolerate the use, to his advantage or the advantage of others, of any information gained from the files or business of CCA.  Contractor further agrees that the sales plans, programs, materials, manuals, rosters, forms, contracts, agreements, brochures, and other training, listing, and sales materials provided hereunder by CCA, irrespective of the origin or ultimate source, are and shall remain the exclusive property of CCA. Contractor shall not utilize or divulge such materials in connection with any business hereafter carried on by Contractor, whether alone or in conjunction with others. All such materials shall be returned promptly to CCA upon termination or expiration of this Agreement. Following termination or expiration of this Agreement, subject to subparagraph D hereof, Contractor shall be free to continue his real estate business with competing real estate operations or to establish his own brokerage operation alone or in concert with others. Contractor hereby agrees to refrain, however, from all representations, advertisements, actions, and business activities that may mislead others in the real estate business and/or the public to believe he is still a part of, affiliated with or sponsored in some way by CCA organization if such is not the case.

7.      The Agreement provides in paragraph 8 subpart b. as follows:

b.   Contractor acknowledges that he has obtained knowledge of confidential matters, trade secrets, techniques, accounting procedures, and other methods developed by, through, and in CCA System which are owned by CCA, as part of CCA System, without which information Contractor could not efficiently, effectively, and profitably operate or conduct his business ("Confidential Information"). Contractor further acknowledges that such Confidential Information was unknown to him prior to his affiliation with CCA organization and that the methods developed for CCA System are unique and novel. Contractor agrees that he will take all necessary steps, at his own expense, to protect such Confidential Information and that he will not divulge same, either during the term or following termination or expiration of this Agreement, without the prior written consent of CCA. Contractor hereby acknowledges the exclusive rights of CCA to its real estate system, its method of operation and its distinguishing characteristics, including but not limited to its service marks, trademarks, trade names, membership marks, certification marks, copyrights, designs, slogans, logos, names or other advertising copy now or hereafter displayed, used or becoming a part of CCA System.

8.   The Agreement provides in paragraph 8 subpart c. as follows:

c.   Contractor hereby acknowledges the difficulty of measuring economic loss which would occur as a result of the breach of any of the covenants of this Paragraph 8, the immediate and irreparable harm that such a breach would cause, and that there would be no adequate remedy at law.  Contractor agrees that any of the covenants contained herein may be enforced by injunction and/or restraining order. Contractor further agrees that CCA, as the owner of federal and state registrations for CCA marks referenced herein, shall have a direct right to enforce any of the covenants contained in this Paragraph 8 through appropriate legal proceedings, if necessary. In the event CCA and/or CCA is required to retain an attorney to enforce any of the covenants of this Paragraph 8 or to institute legal proceedings incident to such enforcement, Contractor agrees to pay, in addition to all other sums for which Contractor may be found liable, reasonable attorneys' fees, court costs, and litigation expenses incurred by CCA.

9.   The Agreement provides in paragraph 8 subpart d. as follows:

d.   During the term of the Agreement and for twenty-four (24) months following the termination the Agreement for any reason (the "Non-Solicitation Period"), in order to protect CCA's Confidential Information, Contractor agrees that he shall not directly or indirectly, individually or on behalf of any person other than CCA, aid or endeavor to solicit or induce any of CCA's known clients and/or such clients' affiliates in order to, directly or indirectly, solicit, sell or assist anyone in the sale of or provide services relating to any of CCA's services or services similar to those sold by CCA to any person, company, firm, or corporation who is or was a customer of CCA with whom Contractor or those employees reporting to Contractor, had Material Contact during the last year of the Agreement. For the purposes of this Agreement, and this Non-Solicitation Period, Material Contact shall be defined as personal contact or the supervision of those who have direct personal contact with a customer or potential customer.

10.   The Agreement provides in paragraph 8 subpart e. as follows:

4

e.   Contractor agrees not to solicit, sell or assist in the sale or provide service to any such customers on behalf of Contractor or any other person, firm, company, or corporation.

11.    As an agent for C&C, Young was provided with a username for accessing C&C's licensed database platform for storing property, customer and lead information (the "Database").  Access to this Database of C&C information was protected by the use of username and password-based access to the C&C system.

12.    During Young's earliest years working as an agent for C&C pursuant to the Agreement, he was not profitable, when taking into consideration the total amount of time and expense C&C incurred on his behalf in order to properly train him as a real estate agent.  However, in the final approximately 18 months of his tenure, he became a productive part of the C&C team.  His compensation increased as a result.

13.    On or about early 2018, C&C began investing time, effort and money into a confidential software development project.  To date, C&C has expended in excess of $250,000 on the project.  Internally, the software tool of this project has been referred to as the "Broker Brain."  This project was originally the brainchild of C&C partner Kacey Cecil.  Although the tool's development is virtually complete, it has yet to be publicly released.

14.    During his time with C&C, Young had access to confidential business information of C&C relating to the Broker Brain project.

15.    Despite the increase in compensation, Young's ambition and greed took over.  At a meeting he had with C&C partner Kacey Cecil on December 29, 2022, while working on several deals for C&C, Young demanded a 33% ownership interest in C&C. Mr. Cecil refused to acquiesce to this demand, but did offer him a 15% ownership interest to stay with C&C.  Young did not respond favorably to this counteroffer.

16.    Young announced to Cecil that he was leaving C&C on January 3, 2023.  Mr. Cecil wished him well, and reminded Young that under the terms of the Agreement, among other things, Young is not permitted to take any of C&C's information with him, including customer information.  Young stated at the time words to the effect of "I would never do that or anything to intentionally harm the company and want to leave on a good note."

17.    Unbeknownst to Cecil, on or about December 27, 2022, Young accessed the Database and, using a data extraction tool having an IP address in the Commonwealth of Virginia, downloaded C&C's property, customer and lead data from the Database, which effectively represented all of the C&C business, system and customer data aggregated by Cecil and others over the life of C&C's business, and the life of Cecil's career. This data extraction was not authorized by C&C, and was not for any C&C business purpose. Instead, upon information and belief, Young extracted the C&C data to aid him in his effort to start his own company.

6

18.    On or about January 4, 2023, C&C discovered Young's unauthorized and abusive copying of the Database. Cecil confronted Young about it on or about January 6, 2023.  At first, Young lied to Cecil about having made unauthorized copies of the data in the Database.  Ultimately, he confessed in front of witnesses. However, he never returned the data he had taken to C&C.

19.    After Young apologized for stealing data from the Database, he assured C&C that it would not have a problem like this again. He said that C&C would not ever bump into him again because he would be working in other markets where C&C is not involved.

20.    Young's new company is called Canopy Real Estate Partners.  Young actually formed Canopy in <u>September</u> of 2022, while working as a real estate agent for C&C.  Upon information and belief, Canopy is owned and operated by Young. Among other things, Young created a web site for Canopy which went live in 2022 or in January 2023.   Canopy's web site identifies Young as the "Managing Principal."

21.    Among other things, the Canopy web site states:

Industrial real estate has entered a new era as almost every sub asset class has begun the process of aggregation to large institutional organizations.  For a local owner user or investor, it can become a disorienting process when approached about a possible sale of a property.  <u>With our Marketlink™ platform, we've worked hard to simplify connecting sellers with the absolute best buyers in the</u>

marketplace for any type of given industrial asset in every primary and secondary market in the Southeast.

https://www.canopyrep.com/.

22.     The description of Marketlink above corresponds to the description of the Broker Brain tool.  Broker Brain even included a functional market "link" button. Young has told certain employees of C&C that, since leaving C&C, he has built his own "Broker Brain" market link tool, and that he was able to do so in less than a week.  This means that Canopy's Marketlink platform was created based on Young's knowledge of C&C's business information relating to the Broker Brain project. Without the information Young obtained while at C&C, he would not have had the head start that he used in order to expedite the development of the Marketlink platform.

23.     Although Canopy is a start-up business, its web site also states that it already has over $300 million in sales, serves 28 different markets in ten states, has over 300 active buyers.

Canopy In Numbers

$300M+          28

SALES*          MARKETS
                SERVED

300+            10

ACTIVE BUYERS   STATES
                SERVED

*Lifetime transactions with principal participation

https://www.canopyrep.com/.   Upon information and belief, all of the foregoing information on the Canopy web site is literally false, misleading to customers and potential customers, and is instead based on business information about C&C that Young learned while working as a real estate agent for C&C.

24.     The Canopy web site also shows that Canopy is active in the following markets, including markets such as metro Atlanta and various parts of Georgia and Florida -- markets Young served in while working for C&C:



https://www.canopyrep.com/.  Other than certain markets shown above in Georgia and Florida, upon information and belief, the statement that "we're active throughout the Southeast" and the pinpointed cities on the map above falsely represent to consumers the scope and extent of Canopy's business activity, in order to make Canopy appear larger and more successful than it actually is.  Moreover, because Young is the only principal of Canopy, and is licensed only in Georgia, Canopy and its web site are falsely advertising that Canopy can lawfully represent potential clients in real estate deals outside of Georgia.

25.    Upon information and belief, Young is and has been using the C&C information he obtained from the Database to advance the business of Canopy. Among other things, on behalf of Canopy, he is presently soliciting C&C property contacts, customer contacts and prospective customer contacts he obtained from the Database in violation of the Agreement.  For example:

(a)     On the Canopy web site, under the heading "Our Clients," the web site lists seven different companies and displays each of their logos.  However, each of these seven companies are companies that Young communicated with <u>while he was working on behalf of C&C</u>, not Canopy. His communication with them and/or work on their behalf for Canopy represents a violation of the aforementioned provisions of the Agreement.  Additionally, due to the infancy of Canopy, upon information and belief, the characterization of these seven companies as Canopy "clients" is literally false and misleading.

(b)     On behalf of Canopy, Young sent out an email to customers, prospective customers, properties, buyers and sellers of C&C entitled "New Contact Info/Company Launch" comprising the following launch announcement:

## Company Launch Announcement

**I'm pleased to announce the launch of Canopy Real Estate Partners. We are on a mission to be a deeply focused industrial and office investment sales firm, creating opportunity for local owners and investors by connecting them to buyers with the most aggressive capital available in the market through simple processes and innovative platforms.**

# Three Favors to Ask:

## #1          ## #2          ## #3

**Update My Contact Info:**

**Jared Young**
Managing Principal

**e: jared@canopyrep.com**
**o:** 404.954.0766
**m:** 706.273.8786
**a:** 1 Concourse Pkwy
Ste 800
Atlanta, GA 30328
**w: canopyrep.com**

**Follow Us On LinkedIn**

**Acquisition Criteria Update:**

If you are active in any of our target markets below, let's catch up to update your current acquisition criteria and get some deals done this year.

**Schedule 15 Min Meeting**

**Email**

**Call Now**

(c)     on behalf of Canopy, Young has on multiple occasions reached out to C&C business contacts that he worked on potential deals with which at C&C to see if he can continue to assist them with potential deals.

## COUNT I

## Georgia Computer Systems Protection Act – Computer Theft O.C.G.A. § 16-9-90, *et seq.*

26.    C&C incorporates by reference all preceding paragraphs of the Complaint.

27.   As described above, Defendants Young and NYJH violated the provisions of the Georgia Computer Systems Protection Act ("GCSPA") by committing the crime of computer theft in regards to the extraction of data from the Database. Young, in his capacity as an individual and as the acting member and manager of NYJH, used his login credentials and password to access and use the C&C computer network for the purpose of the Database extraction with knowledge that such use was without authority. Moreover, Young, in his capacity as an individual and as the acting member and manager of NYJH, acted with the specific intention of taking or appropriating C&C's property – the data in the Database. These actions were also in violation of the Agreement.

28.   By reason of these violations of the provisions of O.C.G.A. § 16-9-93, C&C has been injured and suffered damages.  C&C is entitled to recover the direct and consequential damages sustained as a result of the computer theft. As detailed above, these damages include, but are not limited to, reimbursement of the time and resources expended investigating the theft and damages resulting from Young's and NYJH's use of the stolen data, in an amount to be determined at trial.

29.   Additionally, C&C is entitled to attorneys' fees and costs of this action, pursuant to O.C.G.A. § 16-9-93(g)(1).

## COUNT II
## Violation of the Computer Fraud and Abuse Act

## 18 U.S.C. §1030, *et seq.*

30.     C&C incorporates by reference all preceding paragraphs of the Complaint.

31.     The C&C computer network accessed by Young and NYJH is used in and/or affecting interstate commerce or communication.

32.     Specifically, Young and NYJH, knowingly and with intent to defraud, accessed the C&C computer network, exceeded the scope of Young's authorized access to use the C&C computer network for C&C business purposes, and by means of such conduct, furthered the intended fraud and obtained valuable C&C business data in the process, in violation of 18 U.S.C. §1030(a)(2)(C) and (a)(4).

33.     As a result of the actions complained of herein, C&C has suffered damage and/or loss and as such, seeks to recover compensatory damages and injunctive relief and/or other equitable relief in order to prevent Young and Canopy from further use of C&C's stolen data, and to compensate C&C for Young and Canopy's use of the C&C stolen data.

## COUNT III
## Breach of Contract by NYJH

34.     C&C incorporates by reference all preceding paragraphs of the Complaint.

14

35.     As the member-manager of NYHJ, Young has used information obtained from the files and business of C&C, including property and customer lead information, number of buyers and gross sales, as well as markets served, among other data, to advance the business of Canopy, in violation of Section 8 of the Agreement.

36.     As the member-manager of NYHJ, Young has used confidential information about the Broker Brain obtained from the files and business of C&C to advance the business of Canopy in violation of Section 8 of the Agreement by aiding in the assistance and development of the competing Marketlink platform.

37.     As the member-manager of NYHJ, Young has solicited real estate business from one or more leads, properties, customers and/or potential customers of C&C to advance the business of Canopy in violation of Section 8 of the Agreement.

38.     As the member-manager of NYHJ, Young has solicited, sold or assisted in the sale of real estate to advance the business of Canopy, and has engaged in the provision of real estate business-related services to advance the business of Canopy, in violation of the non-competition provision of Section 8 of the Agreement.

39.     As a proximate result of NYJH's breach of the Agreement, C&C seeks relief including without limitation compensatory damages against NYJH for the actions described herein.

40.     Consistent with the terms of the Agreement, C&C also seeks to recover its attorney's fees and expenses of litigation from NYJH for its breach of the Agreement.

41.     Consistent with the terms of the Agreement, C&C also seeks injunctive relief barring NYJH and its privies, including Young and Canopy, from: (a) engaging in any further actions on behalf of Canopy or any other real estate brokerage other than C&C; (b) the use of C&C business information; and (c) communication with properties, potential sellers, potential buyers and other business contacts of C&C, which would constitute a breach of contract.

## COUNT IV
## Reformation

42.     C&C incorporates by reference all preceding paragraphs.

43.     To the extent the Court determines that the covenant not to compete, non-solicitation provision, and/or non-disclosure provisions within the Agreement are not reasonably limited in scope (e.g., as to time, geographical area, or scope of activity), the Agreement calls for the Court to use its "blue pencil" to reform the terms of the Agreement so that they are reasonable, and enforce the Agreement on said terms. Thus, if necessary, Plaintiff requests that this Court reform any portion of the Agreement as needed to be in compliance with Georgia law.

44.     Independent of the terms of the Agreement, NYJH is an "employee"

within the meaning of OCGA 13-8-51. As such, Plaintiff further requests that this Court, if necessary, reform any portion of the Agreement as needed to be in compliance with Georgia law. *See, e.g.*, OCGA 13-8-53(d).

## COUNT V
## Breach of Fiduciary Duty

45.     C&C incorporates by reference all preceding paragraphs.

46.     As a real estate agent operating on behalf of and in the paid employment of C&C, working closely with Cecil to learn C&C's business and to develop as an agent for that purpose, Young and NYJH owed C&C fiduciary duties of the utmost loyalty, good faith and fair dealing.

47.     By undertaking the actions complained of herein dated before and up through Young's December 29, 2023 resignation from C&C, which actions were undertaken to the detriment of C&C and to better enable Canopy to compete against C&C, Young and NYJH breached the aforementioned fiduciary duties.

48.     As the proximate result of these breaches, C&C has been damaged, and Young and NYJH have been unjustly enriched. C&C therefore seeks to recover compensatory damages from Young and NYJH and/or disgorgement of any ill-gotten gains of Canopy, Young and NYJH by virtue of the breach of fiduciary duty.

## COUNT VI
## False Advertising Under 15 U.S.C. §1125(a)

49.     C&C incorporates by reference all preceding paragraphs.

50.     The creation of the Canopy web site pages by Young and NYJH and the deployment of the Canopy web site by Young and NYJH constitute advertising and promotion on the part of all Defendants within the meaning of the Lanham Act. Indeed, this is among the most common ways that real estate firms advertise and promote their businesses to consumers.

51.     The false statements relating to the nature, characteristics, qualities and geographic origin of Canopy's services and commercial activities shown above at paragraphs 23, 24 and 25(a) were at all times literally false, misleading and had the capacity to deceive consumers.  Upon information and belief, one or more of these statements did deceive consumers.

52.     Upon information and belief, , the false statements shown above at paragraphs 23, 24 and 25(a) have had a material effect on purchasing decisions by one or more consumers, *e.g.*, properties, buyers and sellers.

53.     As paragraphs 23, 24 and 25(a) above show, the misrepresented nature of the scope of Canopy's service business affects interstate commerce. First, the misrepresentations appear on a web site that is visible in every U.S. state, district and territory.  Second, the misrepresentations relate to Canopy's false delivery of real estate services in states other than Georgia and Florida.  Third, the misrepresentations relate to Canopy's lawful right to conduct real estate brokerage services outside of Georgia, the only state in which Young is licensed.

54.     As a competitor of Canopy that actually has the sales, accomplishments and market presence that Canopy falsely claims to have on its web site, C&C has been injured and is likely to be further injured by these false statements made by the Defendants.

55.     As a result of the false advertising of these Defendants, C&C is entitled to compensatory damages and/or disgorgement of Canopy's profits.

## COUNT VII

## Violation of the Georgia Uniform Deceptive Trade Practices Act
## O.C.G.A. §10-1-370, *et seq.*

56.     C&C incorporates by reference all preceding paragraphs.

57.     The false statements relating to the nature, characteristics, qualities and geographic origin of Canopy's services and commercial activities shown above at paragraphs 23 and 24 were at all times literally false, misleading and had the capacity to deceive consumers.

58.     The false statement identified in paragraphs 23 and 24 constitutes one or more deceptive representations and/or deceptive designations of geographic origin in connection with Canopy's scope of real estate services.

59.     Moreover, the false statements identified in paragraph 23 above represents that Canopy's services have approval, characteristics, uses, benefits, or quantities that they do not have, and/or that Canopy has approval, status, and connection that it does not have.

19

60.     As a competitor of Canopy, C&C is likely to be damaged by Canopy's deceptive and false representations.  As a result, under the principles of equity, C&C seeks an injunction against Canopy and the other Defendants, who were involved in active participation and concert with Canopy,  disgorging Canopy's profits and ordering Canopy to cease and desist from further false and deceptive statements about its business and services.

61.     Canopy, through its agents Young and NYHJ, willfully engaged in the foregoing trade practice knowing it to be deceptive at the time.

62.     C&C is entitled to, and does seek an order compelling the Defendants to pay C&C's costs and attorney's fees incurred in bringing this action, pursuant to OCGA 10-1-373.

## COUNT VIII
## Unfair Competition

63.     C&C incorporates by reference all preceding paragraphs.

64.     The actions complained of in the foregoing Counts I-III, and V-VII constitute a pattern of behavior engaged in and ratified by Defendant Canopy for the purpose and effect of permitting it to compete unfairly against C&C.

65.     As a result of this unfair competition, C&C is entitled to recover compensatory damages and/or disgorgement of Canopy's profits. C&C is further entitled to injunctive relief barring Defendant Canopy from further unfair competition.

20

## COUNT IX

### Attorneys' Fees and Expenses of Litigation, O.C.G.A. § 13-6-11

66.     C&C incorporates by reference all preceding paragraphs.

67.     As alleged in this Complaint, Young and NYJH acted in bad faith when they intentionally stole and used C&C business information. Young, NYJH and Canopy further acted in bad faith, and have put C&C to undue burden and expense, by using the C&C business information and making false and deceptive statements on their web site.

68.     Pursuant to O.C.G.A. § 13-6-11, C&C is entitled to recover its litigation expenses, including reasonable attorneys' fees, from the Defendants, with such amounts to be proven at trial.

## COUNT X

### Punitive Damages, O.C.G.A. § 51-12-5.1

69.     C&C incorporates by reference all preceding paragraphs.

70.     Defendants' actions as set forth in this Complaint (in Counts I, V and VIII) show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

71.     To punish, penalize and deter the Defendants and others from committing such offensive conduct, C&C is entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount determined based on the enlightened conscience

of the factfinder.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants as follows:

1. That judgment be entered in favor of Plaintiff against each Defendant, shown in greater detail below;

2. That judgment be entered against Defendants Young and NYJH for violating the Georgia Computer Protection Act and the federal Computer Fraud and Abuse Act;

3. That judgment be entered against Defendant NYJH for breach of contract;

4. That judgment be entered against Defendants NYJH and Young for breach of fiduciary duty;

5. That the Agreement be reformed, if necessary, to comply with Georgia law;

6. That judgment be entered against the Defendants for false advertising in violation of the Lanham Act;

7. That judgment be entered against the Defendants for violation of the Georgia Uniform Deceptive Trade Practices Act;

8. That judgment be entered against Defendant Canopy for unfair competition;

9.  That judgment be entered against the Defendants on Plaintiff's claim for expenses of litigation, including attorney's fees, pursuant to OCGA §13-6-11;

10. That compensatory damages be awarded to Plaintiff against Defendant Young;

11. That compensatory damages be awarded to Plaintiff against Defendant NYJH;

12. That compensatory damages be awarded to Plaintiff against Defendant Canopy;

13. That Defendants and any other party in active concert or participation with one or more of the Defendants be enjoined from further violations of the Georgia Computer System Protection Act, the Computer Fraud and Abuse Act, from further breach of the Agreement, from further false advertising and deceptive trade practices, and from further acts of unfair competition;

14. That the Defendants be ordered to reimburse Plaintiff for its expenses of litigation, including costs and attorney's fees;

15. That punitive damages be imposed pursuant to Counts I, V and VIII above; and

16. That the Court order such other relief as it deems just and appropriate under the circumstances.

23

Respectfully submitted this 10th day of February, 2023.

By:    ***/s/ Steven G. Hill***
        Steven G. Hill
        GA Bar No. 354658
        John N. Mahaffey
        GA Bar No. 222671
        **HILL, KERTSCHER & WHARTON, LLP**
        3625 Cumberland Blvd, SE, Suite 1050
        Atlanta, Georgia 30339
        Telephone: (770) 953-0995
        Facsimile:  (770) 953-1358
        Email:  sgh@hkw-law.com
        Email:  jm@hkw-law.com

        ***Attorneys for Plaintiff Cecil & Campbell Advisors, LLC***