**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| NATALIE BOLLING, individually and on behalf of all others similarly situated<br><br>     Plaintiffs,<br><br>  v.<br><br>MERCEDES-BENZ USA, LLC and MERCEDES-BENZ GROUP AG,<br><br>     Defendants. | Case No.:_____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Natalie Bolling, by and through undersigned counsel, and on behalf of herself and all others similarly situated, alleges as follows against Mercedes-Benz USA, LLC ("MBUSA" or "Mercedes-Benz USA") and Mercedes-Benz Group AG (formerly Daimler Aktiengesellschaft, DaimlerChrysler, and Daimler-Benz) ("MB Group") (collectively, "Mercedes"), based upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1. In the mid-2000s automobile manufacturers began increasing the size of sunroofs so that, on some vehicles, the glass sunroof stretches across much of the entire roof of a vehicle. These expanded sunroofs are often referred to as "panoramic."

2. Panoramic sunroofs are typically comprised of a movable panel that opens like a window on the automobile roof, allowing air and light to enter the cabin.

3. While aesthetically pleasing and popular, panoramic sunroofs pose significant engineering challenges where glass (with various seals, drain tubes, frame, tracks, motors, and mechanisms) replaces what was formerly sheet metal on the roof structure.  Panoramic sunroofs add mass at the top of the vehicle, raise the vehicle's center of gravity, create opportunities for water

1

infiltration, and must maintain structural integrity when the vehicle is subjected to the bumps, jolts, vibrations, and temperature variations of normal passenger vehicle traffic.

4.      Mercedes has failed to satisfactorily meet the engineering challenges presented by panoramic sunroofs.  Mercedes vehicles with panoramic sunroofs suffer from a design, manufacturing and/or materials defect whereby their panoramic sunroofs will spontaneously shatter under normal driving conditions creating a safety hazard for the vehicle occupants and surrounding traffic.

5.      The shattering events are typically sudden and loud, startling drivers who compare it to the sound of a gunshot or bomb, after which glass fragments rain down upon the occupants of the vehicle. Sunroof explosions have occurred while Mercedes vehicles are being driven at highway speeds and while parked or in an otherwise stationary position.

6.      The alleged defect may be present in every Mercedes vehicle equipped with a panoramic sunroof, as more specifically defined in paragraph 97 below (the "Class Vehicles"). The defect may be a product of Mercedes' panoramic sunroof design, or alternatively, the defect may result from part of the manufacturing process, or the materials used during production.

7.      Mercedes has known about the propensity of its panoramic sunroofs to spontaneously shatter for more than a decade. As early as 2006, Mercedes received reports from consumers, NHSTA, and its own dealerships that its panoramic sunroofs were not withstanding the stresses created by ordinary driving conditions.

8.      Plaintiff is informed and believes, and based thereon alleges, that before Plaintiff purchased her Class Vehicle, and since 2011 if not before, Mercedes knew about the defect through sources not available to consumers, including, among other things, pre-release testing data, early consumer complaints to Mercedes and its dealers, testing conducted in response to those consumer complaints, high failure rates of the sunroofs, the data demonstrating the inordinately high volume of replacement part sales, warranty claims and data and resulting analysis thereof, customer surveys, and

other aggregate data from Mercedes dealers about the problem.

9.      Nevertheless, Mercedes does not warn current or potential drivers of the danger(s) associated with the panoramic sunroof.

10.     Mercedes continues to sell and lease thousands of its vehicles with defective panoramic sunroofs to consumers.

11.     Mercedes does not disclose any known or potential defect nor the known or potential danger(s) of the panoramic sunroof to current or potential Mercedes vehicle consumers.

12.     While Mercedes is not the only automobile manufacturer that has encountered this problem, several other manufacturers have issued safety recalls due to their panoramic sunroofs' propensity to spontaneously shatter and/or taken corrective action to alter their sunroof designs, manufacturing methods, and/or sunroof materials.  Mercedes has not done so, despite numerous accounts of instances of this happening to Mercedes drivers.

13.     Mercedes is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Mercedes conducts tests, including pre-sale durability testing, on incoming components, including the sunroofs, to verify the parts are free from defect and align with Mercedes's specifications. Thus, Mercedes knew or should have known that there was an appreciable chance of the sunroof shattering under normal driving conditions.  Mercedes knew or should have known the sunroofs were defective and prone to put drivers in a dangerous position.

14.     Additionally, Mercedes should have learned of this widespread defect from the sheer number of reports received from consumers and/or dealerships. On information and belief, Defendant Mercedes' customer relations department, which interacts with individual dealerships to identify potential common defects, has received reports regarding the defect. Mercedes' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty

coverage is being requested, parts sales reports, and warranty claims data.

15.     Mercedes' warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. On information and belief, it is Mercedes' policy that when a repair is made under warranty the dealership must provide Mercedes with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Mercedes, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

16.     The existence of the defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class Members known of the defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

17.     Reasonable consumers, like Plaintiff, expect that a vehicle's sunroof is safe, will function in a manner that will not pose a safety risk, and is free from defects. Plaintiff and Class Members further reasonably expect that Mercedes will not sell or lease vehicles with known safety defects, such as the defective sunroof, and will disclose any such defects to its consumers when it learns of them. They did not expect Mercedes to fail to disclose the defect and to conceal the defect, and to then continually deny its existence.

18.     Plaintiff, on behalf of herself and all those similarly situated, brings claims for consumer fraud, breach of warranty, common law fraud, and unjust enrichment. Plaintiff seeks damages, injunctive and declaratory relief, interest, costs and reasonable attorneys' fees.

## **PARTIES**

19.     Plaintiff Natalie Bolling is a resident of Little Elm, Texas.  At the time she purchased her Mercedes vehicle at issue, and at the time of the incident where her panoramic sunroof spontaneously shattered, she was a resident of Pellham, Alabama.

20.     Defendant Mercedes-Benz USA, LLC ("MBUSA" or "Mercedes-Benz USA") is a Delaware limited-liability corporation whose principal place of business is located at 1 Mercedes-Benz Drive, Sandy Springs, GA 30328. MBUSA is a Mercedes-Benz Group-owned distributor for passenger cars in the United States.

21.     Defendant Mercedes-Benz Group AG ("MB Group") is a foreign corporation headquartered in Stuttgart, Baden-Wurttemberg, Germany. MB Group was formerly named Daimler Aktiengesellschaft, DaimlerChrysler, and Daimler-Benz.  MB Group is engaged in the business of designing, engineering, manufacturing, testing, marketing, supplying, selling, and distributing motor vehicles, including the Class Vehicles, in the United States.

22.     MBUSA and MB Group (collectively "Mercedes"), through its various entities, designs, manufactures, markets, distributes, and sells Mercedes automobiles in multiple locations in the United States and worldwide. Mercedes also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Class Vehicles.

23.     Mercedes is and was at all relevant times doing business in a continuous manner through a chain of distribution and dealers throughout the United States, including within the State of Alabama, by selling, advertising, promoting and distributing Mercedes-Benz motor vehicles.

24.     Through its wholly owned subsidiaries and/or agents, Mercedes markets its products in a continuous manner in the United States, including in the State of Alabama.

25.     MB Group is the parent of, controls, and communicates with Mercedes-Benz USA, LLC concerning virtually all aspects of the Class Vehicles distributed in the United States.

26.     Mercedes-Benz USA, LLC acts as the sole distributor for Mercedes- Benz vehicles in the United States, purchasing those vehicles from MB Group in Germany for sale in this country.

27.     The relationship between MB Group and Mercedes-Benz USA, LLC is governed by a General Distributor Agreement that gives MB Group the right to control nearly every aspect of

Mercedes-Benz USA, LLC's operations – including sales, marketing, management, policies, information governance policies, pricing and warranty terms.

28.   MB Group owns 100% of the shares of Mercedes-Benz USA, LLC.

## JURISDICTION AND VENUE

29.   This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 (hereinafter, "CAFA"), codified as 28 U.S.C. § 1332(d)(2)(b). One or more of the Plaintiffs or members of the class are diverse from Mercedes. Further, Plaintiff alleges that the matter in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs, and that the number of class members is greater than 100.

30.   Subject-matter jurisdiction also arises under Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*.

31.   The Court has personal jurisdiction over Mercedes because Defendant Mercedes-Benz USA, LLC maintains its principal place of business in this District and regularly conducts business in this District, and Defendants cause products to be sold in this District.

32.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. Mercedes-Benz USA, LLC maintains its principal place of business in this District, and Defendants caused their automobiles to be offered for sale and sold to the public in this District.

## FACTUAL ALLEGATIONS

### A.   The Mercedes Panoramic Sunroof Defect

33.   Mercedes manufactures, markets, and distributes mass produced automobiles in the United States under the Mercedes brand name.

34.   The Mercedes automobile models that are the subject of this case are referred to collectively as the "Class Vehicles." Plaintiff anticipates amending the Class Vehicles definition upon

Mercedes identifying in discovery all of its vehicles manufactured and sold with the panoramic sunroof feature.

35.     Starting in the early 2000s, Mercedes introduced vehicles with an optional upgrade of a factory-installed panoramic sunroof. The panoramic sunroof designs in all of the Class Vehicles are substantially similar in design, materials and/or manufacture.

36.     These sunroofs are wider and longer than traditional sunroofs, covering most of the vehicle's roof.

37.     Mercedes generally markets the panoramic sunroofs as an optional feature and charges over a thousand dollars for the upgrade.

38.     Panoramic sunroofs are made of tempered or laminated glass that attaches to tracks, which in turn are set within a frame attached to the vehicle.

39.     Most panoramic sunroofs, including those offered by Mercedes, include a retractable sunshade.

40.     The panoramic sunroofs in all of Mercedes' models are substantially similar in design, materials and/or manufacture.

41.     Panoramic sunroofs are not wear items and are reasonably expected to last the life of the vehicle.  Mercedes sunroofs are not preforming their expected function under ordinary conditions as they spontaneously explode while in routine operation.

42.     Panoramic sunroofs, like these, present manufacturing, design, and safety challenges for manufacturers because the large sections of glass take up much of the surface area of the vehicle's roof.

43.     One of the challenges is the material make-up of the glass. Some manufacturers, such as Volvo, Honda, and Tesla, have used a *laminated* glass – two panes fused by a sheet plastic -- on their sunroofs, the same required for windshields, which holds its form even when shattered and

reduces the risk of ejections.  Other manufacturers, however, including Mercedes, have reportedly used *tempered* glass on panoramic sunroofs, the kind used inside the cabin and rear windows.  And while unlike regular windowpane glass, tempered glass is designed to break into small pieces, not shards, it can explode suddenly, causing thousands of small glass pieces to rain down at once.

44.     In the automotive industry, tempered or toughened glass is made generally in the same manner: a piece of annealed glass is shaped and cut as to original equipment manufacturing ("OEM") standards. The glass is heated and then rapidly cooled, i.e., tempered. The tempering process creates an outer layer of compression shrink-wrapped around the middle of the glass that is constantly pressing outwards, otherwise known as causing tension or tensile force. The compressive and tensile layers can create a stronger piece of glass as compared to non-tempered glazing. However, if the compressive layer is compromised during the manufacturing process or otherwise, the entire piece of glass fails catastrophically, and often explosively.

45.     The problems with panoramic sunroofs are compounded by the use of thinner glass by automakers, including Mercedes. Mercedes uses thinner glass in panoramic sunroofs to save weight and thus improve fuel efficiency because Mercedes, like other automobile manufacturers, are under mandates to improve fuel efficiency.

46.     Thinner glass, however, is very difficult to temper properly (especially when thicknesses are 4mm or less) as the compressive layers are thinner, increasing the probability for the glass to be compromised and result in catastrophic failure. A scratch or flaw created during the manufacturing process can result in progressive damage such that once the damage creeps into the compressive layer the entire sunroof shatters.

47.     Additionally, the tempered glass used in Mercedes sunroofs in the Class Vehicles features a ceramic paint applied prior to tempering. Automotive ceramic paint or ceramic enamels are composed of fine powders of low melting glass frit fluxes (ground glass), pigments, and other additive

oxides, sulfides, or metals. After application of the ceramic enamel, the glass is then tempered, as described above. These ceramic enamels are applied on the top around the edges of panoramic sunroof glazing and serve aesthetic and functional purposes. The ceramic paint area appears as a "black band" along the edge of the glass.

48.   Ceramic enamels are known "adulterants" in automotive glass tempering and these adulterants significantly weaken the structural strength and integrity of the Class Vehicles' tempered panoramic sunroof glazing. Among other factors, ceramic enamels compromise glass strength because: (1) the enamels have different thermal expansion coefficients than the glass substrates (the glass and the paint expand at different rates), resulting in residual stress between the ceramic enamel and the glass substrate and (2) the glass frit will ion exchange with the glass substrate lessening or eliminating the compressive layer above the tensile region thereby significantly weakening it.

49.   The ceramic paint area was relatively small in conventional sunroofs, but ceramic paint areas have become larger with the advent of panoramic sunroofs and the result is that the glass has become progressively weaker – more likely to spontaneously burst or explode – and, for the unsuspecting driver and passengers, more dangerous.

50.   In 2013, the Korea Automobile Testing & Research Institute ("KATRI"), a vehicle safety testing institute, concluded that the enamel used for ceramic paint areas in panoramic sunroofs like those installed in Mercedes vehicles impairs the strength of the glass, making the glass not only less durable than the usual toughened glass, but also less durable than ordinary glass.

51.   Following KATRI's report, an Informal Working Group on Panoramic Sunroof Glazing was established by the United Nations Economic Commission for Europe to evaluate the safety of panoramic sunroofs. The Working Group is chaired by a representative from KATRI and was assembled to assess whether to amend the UN regulations on safety glazing. At the end of June 2016, the Working Group confirmed that conventional automotive glass enamels weaken the

mechanical strength of panoramic sunroof glazing.

52.    Another challenge presented by the panoramic sunroofs is the need to ensure the sunroof glass is fastened to the vehicle with a sufficient degree of tightness. Mercedes seeks to fasten the sunroof in a manner that reduces road and wind noise, as well as to make the sunroofs less susceptible to leaking rainwater. The sunroof may be weakened during the manufacturing process or with the application of pressure during normal driving conditions, as flexing and vibration caused during ordinary driving can impose stress and ultimately lead to shattering the glass.

53.    Errors during the manufacturing or installation process can lead to a subsequent failure. Panoramic sunroof glass can be easily damaged during the automated assembly procedure. The damage can result in subsequent fracture of the glass, leading to an unexpected explosion. In 2012 Hyundai issued a recall of its panoramic sunroofs following the discovery of such a manufacturing defect.  Similarly, Volkswagen issued a safety recall in 2014 when its production process resulted in the sunroof steel frame was manufactured out of tolerance.

54.    In the Mercedes models at issue, the panoramic sunroofs have a propensity to shatter under normal driving conditions. In other words, they are unable to withstand the stress – pressures and flexing that the sunroof frame and vehicle demand – present under ordinary driving conditions. The consequence is that under ordinary driving conditions, and in some instances when the vehicle is parked or not otherwise in motion, the glass spontaneously shatters.

### B.  Mercedes' Knowledge of the Defect

55.    Mercedes has long known that its panoramic sunroofs are prone to unexpected and dangerous shattering.

56.    In 2006, the National Highway Traffic Safety Administration ("NHTSA") launched an investigation surrounding panoramic sunroofs and complaints that they were spontaneously shattering. Mercedes participated in that investigation and provided requested data to NHTSA. Even though the

Mercedes R-Class had only been introduced in the United States a few months prior to the start of the investigation, Mercedes had already received a claim that the panoramic sunroof installed therein had spontaneously shattered. Mercedes reported to the NHTSA that the incident was processed under warranty and that Mercedes would be providing warranty coverage for these kinds of claims. Rolf Scherer (Mercedes' General Manager, Engineering Services) wrote:

> The standard New Vehicle Limited Warranty for all peer subject vehicles cover defects in material or workmanship for 48,000 miles or 4 years whichever come first. Extended Limited Warranties can also be purchased for coverage up to 100,000 miles. Glass breakage of the panoramic glass roof is covered under the New Vehicle and Extended Limited Warranties described above.

57.     Mercedes as a regular practice of monitoring NHTSA's website for emerging problems with its vehicles. Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

58.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id.* Thus, Mercedes knew or should have known of the many complaints about the panoramic sunroof defect logged by NHTSA Office of Defects Investigation ("ODI"). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Mercedes to the panoramic sunroof defect.

59.    Since the introduction of panoramic sunroofs, NHTSA has continued to bring awareness to the issues and danger associated with shattering sunroofs through complaints and investigations.

60.    There are multiple reports of spontaneously shattering Mercedes' sunroofs on the NHTSA website.  These reports date back well before 2010 and include some of the following:

### 2006 E-Class

I was driving my Mercedes E350 on the highway at 60 mph when I heard an explosion. The sunroof had exploded while I was driving and showered glass shards into the interior. Most of the glass landed in the rear of the vehicle. We could not find any rocks or the like inside the vehicle afterwards. Anyone who had been in the back seat would have been injured by the very sharp glass fragments. Although I was extremely startled, I was able to keep control of the vehicle.

### 2007 C-Class

The contact owns a 2007 Mercedes-Benz C280. The contact stated while driving approximately 70 MPH, there was a loud sound coming from the vehicle. The contact pulled over safely and noticed that the sunroof had shattered. The vehicle was taken to a local dealer but was not repaired. The manufacturer was notified of the failure; however, no assistance was provided.

### 2008 C-Class

My sunroof on my Mercedes 2008 C350 exploded. I was merging on I220 N, there was no traffic. Before I could [get] accelerated onto the interstate, I heard an explosion. I did not know what had happen[ed] and then glass started falling on me.

61.    These reports continue with Mercedes' more recent model years.

### 2016 C-Class

Back panel of panorama sunroof cracked and shattered while pulling into our drive. Body shop indicated railings holding the tempered glass in place shifted for some reason. Mercedes refuses to repair even though the car is only seven months old. Defect is a safety hazard. Fortunately, incident happened in our driveway.

### 2018 C-Class

The sunroof spontaneously exploded out of nowhere. Sounded like a shotgun blast.

### 2019 E-Class

My husband and I were driving on the interstate in Indianapolis, Indiana yesterday, November 22, 2021 and out of the clear blue our sunroof exploded on our 2019 Mercedes Benz E300W4. This was not due to being hit by something and we were not near an overpass. It exploded from the center outward. This experience scared me to death as I tried to maintain control of our vehicle in the multi lanes of traffic. Glass fell

from the sunroof into our back seat which was another concern. Thankfully, we didn't have our grandchildren with us. We immediately headed to the... Indianapolis Mercedes dealership where I got the car for service. They told us that it was not covered under warranty due to the damage being glass. They then told us to contact our insurance company for help. They were absolutely no help to us and seemed to brush us off as quick as they could. We are scheduled to have the sunroof repaired next week, however, now I'm a week without a car to drive, and the cost of the repair is estimated to be upward of $2,000.

<u>2019 C-Class</u>

The panorama sunroof explode, No other cars near me, no rock hit it no big bump in the road, it just exploded… Was traveling at normal highway speed, and it sounded like the car had exploded, very scary, and if the inside cover had not been close would have had glass shards rain down on me and possible [sic] get in my eyes… Mercedes needs to address this problem right away before people get into accidents when this happens.

<u>2020 CLA-Class</u>

The contact stated while driving approximately 75 MPH, he heard an explosion and saw that the panoramic sunroof had shattered. The contact stated no warning light was illuminated. The contact was injured by the glass with small cuts on arms and hands. The contact did not seek medical attention. The contact took the vehicle to a local dealer, where it was diagnosed with needing the sunroof to be replaced. The vehicle was not repaired. The manufacturer had been informed... of the failure. The failure mileage was approximately 16,868.

62.     Mercedes is also aware that other manufacturers – whose vehicles have similarly designed panoramic sunroofs, used similar materials, and have similar shattering problems – have voluntarily initiated safety recalls to notify drivers of the danger and repair shattered sunroofs free of cost. Yet, Mercedes has not done so.

63.     Unlike wear and tear items on a vehicle like brake pads, tires, or batteries, sunroofs are expected to last the life of the vehicle, regardless of mileage or time. Panoramic sunroofs must withstand a number of foreseeable conditions and stresses attributable to the ordinary driving environment. They must be able to withstand all forces created by vehicle movement during ordinary travel, including potholes, speed bumps, cornering, poor quality roads/freeways, and foreseeable impacts by road debris. Vehicles are often operated outside and are therefore subjected to a wide temperature spectrum and must be able to withstand sudden thermal shocks (i.e a car wash on a hot

day). The expectation is that panoramic sunroofs would not fail due to those types of conditions or stresses, absent a defect.

64.     Mercedes claims its sunroofs shatter as a result of impact from roadway objects, but this explanation is incomplete, speculative and pretextual.  Rocks or other objects thrown up by cars and trucks on the roadway typically would lack the directional force to shatter the sunroof.   Driver reports specifically contradict Mercedes' position.  And Mercedes' proffered justification ignores the science behind progressive fractures, fails to recognize that surface flaws created during manufacturing can grow progressively over time until the flaw eventually penetrates through the compressive layer, and that these dangerous explosions can be largely (if not entirely) avoided by the selection of an alternative material like laminated glass.

**C.      The Dangers Posed to Occupants of Class Vehicles**

65.     NHTSA and responsible automobile manufacturers have acknowledged that the spontaneous failure of panoramic sunroofs endangers drivers, passengers, and others on the road.

66.     Panoramic sunroofs are an expensive, optional feature that can cost over one thousand dollars in the purchase or lease price and over a thousand dollars (if not many thousands of dollars) to replace.

67.     A reasonable person considering whether to purchase or lease a Mercedes vehicle would want to be informed about the panoramic sunroof defect so that he or she could opt against paying the increased price for the optional feature or simply forego purchasing or leasing the vehicle altogether.

68.     When the Mercedes panoramic sunroofs shatter, they usually make a sudden and extremely loud noise, immediately followed by shards of glass raining down onto the driver and passengers. Drivers report that the falling shards of glass have cut them and their passengers and have also caused damage to the interior and exterior of the vehicles. Drivers have also reported near-miss

accidents due to being startled or distracted by the shattering.

69.     Other vehicle manufacturers concur that this is a serious safety issue. When Nissan initiated a safety recall for shattering panoramic sunroofs, for example, it acknowledged that drivers "could be injured by falling glass," and that "[i]f the glass panel were to break while the vehicle is in motion, it could cause driver distraction, increasing the risk of a crash."

70.     And when Hyundai initiated its recall, it too acknowledged that the shattering of panoramic sunroofs "relates to motor vehicle safety," including by posing a risk of cutting vehicle occupants. Hyundai went on to state that the shattering sunroof "may cause driver distraction if the panoramic sunroof glass panel were to break while the vehicle is in motion" and "broken safety glass inside the vehicle may pose a risk of minor cutting injury to vehicle occupants".

71.     Similarly, in connection with the Hyundai recall, NHTSA wrote that the breaking of the panoramic sunroof could lead "to personal injury or a vehicle crash." In connection with an Audi recall, NHTSA wrote that "should the sunroof's glass break while the vehicle is in use, the falling glass could cut and injure the driver or passengers [and] could also distract the driver, increasing the risk of a crash."

**D.    Mercedes Refuses to Warn Drivers**

72.     Despite the high number of complaints and the danger posed by the defect, Mercedes continues to conceal its existence from current drivers and potential customers alike. Although Mercedes has a duty to alert potential customers to the existence of the Defect at the point of sale as this fact would be material to the potential customer's purchasing decision, Mercedes chooses to intentionally conceal or, at best, omit the existence of the defect to consumers considering the purchase of a Mercedes vehicle. Mercedes similarly fails to warn drivers who experience a shattering event of the existence of the Defect and the danger of a shattering event reoccurring after those drivers bring their vehicles in for repair. Mercedes knows of the defect yet continues to profit from the sale and

lease of vehicles to unwitting consumers.

73.    Mercedes continues to conceal the defect, even though it knows that the defect is not reasonably discoverable by drivers unless they experience a failure and are exposed to the attendant safety risks, including injury from the falling glass and driver distraction when the defect manifests, which can lead to a collision.

74.    Mercedes remains silent even as it continues to receive complaints from concerned drivers. Certainly, the information could be disclosed in Mercedes' direct advertising materials and/or in materials provided to consumers by Mercedes at time of purchase. Yet, Mercedes refuses to do so.

75.    As a result of Mercedes' inaction and silence, consumers are unaware that they purchased or leased a vehicle that has a defective sunroof and continue to drive these unsafe vehicles. Additionally, drivers who have experienced an exploding sunroof and bring their vehicles to a dealership for repairs are not told that identical (and therefore equally defective, though that aspect is not disclosed) sunroofs are to be installed as replacements in their vehicles.

76.    Some manufacturers who have had vehicles with similar panoramic sunroof problems—Audi, Hyundai, and Nissan—have voluntarily initiated safety recalls as a result, notifying drivers of the danger and offering to repair the sunroofs free of cost.

E.    **Mercedes' Warranty Process is Deceptive**

77.    Mercedes advertises that the basic warranty for new Mercedes vehicles is for "4 years/50,000 Miles." Mercedes warrants to "make any repairs or replacements necessary to correct defects    in    materials    or    workmanship[.]"    (https://www.mbusa.com/content/dam/mb-nafta/us/owners/maintenance-landing/New_Vehicle_Warranty.pdf; last accessed on [December 21, 2022]).

78.    Plaintiff and Class Members experienced damage from the sunroof defect within the warranty periods of their vehicles. Plaintiff and Class Members reasonably expected that any and all

damage that resulted from the sunroof defect would be covered under the warranty, and that they would not be charged for such repairs.

79.     Mercedes also represented to NHTSA that these kinds of claims were covered under its warranty terms.

80.     Mercedes has systematically denied coverage with respect to the defective sunroofs. Plaintiff and numerous Class Members have been forced to incur substantial repair bills and other related damages, including being forced to make claims under their automotive insurance policies and incurring substantial deductibles.

## PLAINTIFF'S EXPERIENCE

81.     On April 2, 2021, Plaintiff Natalie Bolling purchased a used, certified preowned 2019 Mercedes Benz, LT GLE43C4 Coupe bearing VIN Number 4JGED6EB6KA149089, with a stated mileage of 25,937, from Mercedes-Benz of Birmingham for her own personal, family, and household use.  Her total purchase price for the vehicle at the time of sale was in excess of $82,000.

82.     Mercedes-Benz of Birmingham is an authorized Mercedes-Benz dealership located in the Birmingham, Alabama metropolitan area, with two campuses, one in Hoover, and one in Irondale.

83.     The Mercedes-Benz vehicle Plaintiff purchased has a panoramic sunroof, which was inspected as part of the Certified Pre-Owned process.  The inspection report performed by the dealer shortly before the sale to Plaintiff reported her vehicle's "Panorama Roof Function and Roller Shade" condition as "OK-Passed," her "Sliding Roof Function Drains and Headliner" as "OK-Passed" and the dealer noted the "Inspect Glass Roof for Scratches/Corrective Action" as "OK-Passed."  Thus, based on an inspection by the dealer, no defects or infirmities in the structural integrity or operation of the panoramic sunroof were identified in her purchased vehicle or disclosed to Plaintiff.

84.     Passenger safety and reliability were factors in Plaintiff's decision to purchase her vehicle. Before making her purchase, Plaintiff reviewed written materials and information provided

to her about the vehicle and spoke to a dealer representative.  None of those sources disclosed to her the existence of a defect with the panoramic sunroof, such that the sunroof might suddenly and spontaneously shatter under normal driving conditions.  Plaintiff believed her vehicle would be safe, reliable, and free of defects.

85.     On February 18, 2022, Ms. Bolling was driving her 2019 Mercedes GLE43 Coupe on Interstate 65 northbound with her fiancée, heading towards downtown Birmingham, Alabama and to the airport to catch a late-afternoon flight.  On that day, the weather was cold, clear and sunny.  As she normally did, Plaintiff was driving with the panoramic sunroof's retractable shade extended back, exposing the entire glass sunroof to the vehicle's interior compartment.  The road conditions were dry.  A mile or so before Exit 254 (Alford Avenue), Plaintiff was driving in the far left lane of a four-lane interstate when suddenly, she heard a loud, exploding-type sound, almost like a shotgun blast inside her car.  Plaintiff was confused, alarmed, and afraid someone had shot at them from close by.  She did not immediately realize what had happened, but seconds later, glass shrapnel from the sunroof rained into the passenger compartment, covering her and her fiancée with glass, which covered their hair, clothes, shoes, and skin.  The car began shaking as if it had a flat tire, but it was resulting from wind coming into the interior through the hole where the sunroof had been.  While there were no cars directly in front of Plaintiff in the left lane, there were several cars to her right and behind her on the busy interstate.  Still shocked and confused, Plaintiff had to cross several lanes of traffic with her hair covered in glass in order to exit the Interstate and avoid being hit by other fast-moving traffic.  Plaintiff managed to cross the lanes of traffic and exited at Exit 254 (Alford Avenue).  She parked her vehicle at the first gas station on the right-hand side of the exit and immediately got out of the car and tried to remove the glass pieces from her hair, clothing, and shoes.  Plaintiff then called the Mercedes dealership to tow the vehicle as it was undriveable.

86.     Below are photographs of Ms. Bolling's shattered sunroof from her 2019 Mercedes

vehicle:

 

87.     Shortly after the incident, Plaintiff's vehicle was towed to the nearest Mercedes-Benz of Birmingham location, which was the Hoover campus.

88.     During the time that her car was at the dealership, Plaintiff spoke with a service department representative who admitted that this same situation had happened on several prior occasions, where customers reported panoramic sunroofs spontaneously shattering.

89.     Plaintiff explained to several individuals associated with Mercedes that she was not aware of any outside influence or object having impacted the vehicle prior to the spontaneous explosion.

90.     Ultimately, MBUSA investigated her incident and refused to cover her repair under warranty, claiming that her sunroof was shattered as a result of an outside influence.

91.     MBUSA had no factual basis to conclude that Plaintiff's sunroof shattered based on an outside influence.  Its conclusion in that regard was speculative, pretextual, and intended solely to provide MBUSA with a justification to deny Plaintiff a repair covered under warranty in order to save money.

92.     On information and belief, MBUSA has systematically concluded, as a pattern and practice, without facts and based solely on speculation and as a pretext for denying claims, that other panoramic sunroofs that have spontaneously shattered like Plaintiff's have shattered due to an unknown and unspecified outside influence.

93.     MBUSA's systematic denial of shattering sunroof claims directly contradicts its representations to NHTSA that these events were and would be covered under Mercedes' warranties.

94.     Ms. Bolling eventually had the sunroof replaced at a cost of $4,937.64.

95.     Mercedes' omissions were material to Plaintiff. Had Mercedes disclosed the panoramic sunroof defect at the point of sale, Plaintiff would have seen and been aware of those disclosures. Furthermore, had she known of the defect, she would not have purchased the vehicle, or she would have paid substantially less. In addition, she would not have suffered the economic damages she sustained. Plaintiff did not receive the benefit of the bargain.

96.     At all times, Plaintiff, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used, in the sense that she has not abused her vehicle or used it for purposes unintended by Mercedes. However, despite this normal and foreseeable driving, the defect has rendered her vehicle unsafe and unfit to be used as intended.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23, on their federal and state claims as purchasers and lessees of "Class Vehicles." Class Vehicles include all Mercedes-Benz models below that are equipped with factory- installed panoramic sunroofs:

      a.   2011-present C-Class

      b.   2014-present CLA-Class

      c.   2011-present E-Class

    d.   2011-present GL-Class/GLS-Class[1]

    e.   2011-present GLK-Class/GLC-Class[2]

    f.   2012-present M-Class/GLE Class[3]

    g.   2015-2017 Mercedes Maybach S-600

    h.   2011-2012 R-Class

    i.   2011-present S-Class

    j.   2011-2019 SL-Class; and

    k.   2013-2020 SLK-Class/SLC-Class

98.    Plaintiff brings this action seeking certification of the following Classes:

**National Damages Class under Fed. R. Civ. P. 23(b)(3)**: All persons within the United States who purchased or leased a Class Vehicle through the date of class certification (the "National Damages Class," or together with the Nation Injunctive Class, the "National Classes").

**National Injunctive Class under Fed**. R. Civ. P. 23(b)(2): All persons within the United States who purchased or leased a Class Vehicle through the date of class certification (the "National Injunctive Class," or together with the National Damages Class, the "National Classes").

**Alabama Sub-Class under Fed. R. Civ. P. 23(b)(2) and 23(b)(3)**: All persons in the State of Alabama who purchased or leased a Class Vehicle through the date of class certification (the "Alabama Sub-Class").

99.    Excluded from the proposed class is Mercedes; any affiliate, parent, or subsidiary of Mercedes; any entity in which Mercedes has a controlling interest; any officer director, or employee of Mercedes; any successor or assign of Mercedes; any judge to whom this case is assigned; members of the judge's staff; and anyone who purchased a Class Vehicle for the purpose of resale.

100.    Members of the proposed classes are readily ascertainable because the class definitions are based upon objective criteria.

---

[1] In 2016, the GL-Class was renamed to GLS-Class as per the revised nomenclature adopted by Mercedes.
[2] In 2015, the GLK-Class was replaced by the GLC-class as per the revised nomenclature adopted by Mercedes.
[3] In 2015, the M-Class was renamed to the GLE-class as per the revised nomenclature adopted by Mercedes.

101.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Mercedes sold thousands of Class Vehicles, including a substantial number in the United States as well as in Alabama. The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the thousands to hundreds of thousands and are geographically disbursed throughout the United States. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The number of members of the Classes is presently unknown to Plaintiff but may be ascertained from Defendants' books and records and/or from information and records in the possession of Defendants' third-party retailers and distributors. Members of the Classes may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

102.    **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, but are not limited to, the following:

    a.  Whether the panoramic sunroofs in the Class Vehicles are designed or manufactured defectively or use defective materials such that the sunroofs have a propensity to spontaneously and dangerously shatter;

    b.  Whether Mercedes knew or should have known that its panoramic sunroofs are defectively designed, manufactured or use materials such that they have a propensity to spontaneously shatter, and if so, when it discovered this issue;

    c.  Whether the knowledge of a sunroof's propensity to shatter would be important to a reasonable person, for example, because it poses an unreasonable safety hazard;

d.   Whether Mercedes failed to disclose to or concealed from potential consumers the existence of the sunroofs' propensity to spontaneously and dangerously shatter under ordinary driving conditions;

e.   Whether Mercedes breached its express warranty obligations;

f.   Whether Mercedes breached its implied warranty obligations in that, for example, the Class Vehicles would be fit for their ordinary purposes;

g.   Whether Mercedes has a pattern and practice of attributing damages claimed by Plaintiff and Class Members to causes other than the complained-of defect;

h.   Whether Mercedes should be required to notify Class Members about the panoramic sunroofs' propensity to spontaneously shatter;

i.   Whether Mercedes should be required to cease its practice of providing the same or substantially similar replacement sunroofs as the defective sunroofs;

j.   Whether the Court may enter an injunction requiring Mercedes to cease its practice of replacing shattered panoramic sunroofs with identically defective replacement sunroofs;

k.   Whether this Court should grant other declaratory relief requested herein;

l.   Whether Mercedes has a duty to disclose to Plaintiff and Class Members the true character, quality and nature of the Class Vehicles and the sunroof defect;

m.   Whether Mercedes' conduct, as alleged herein, violates the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*.;

n.   Whether Mercedes' conduct, as alleged herein, violates the consumer protection laws of Alabama; and

o.   Whether Mercedes' conduct, as alleged herein, entitles Plaintiff and Class Members to restitution under federal law and the laws of their respective states.

103. **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Classes because, among other things, all members of the Classes were injured in the same way through Defendants' uniform misconduct, as described above.

104. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class Representative because her interests do not conflict with the interests of the other Class Members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and she will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff.

105. **Declaratory and Injunctive Relief – Federal Rule of civil Procedure 23(b)(2).** The elements of Rule 23(b)(2) are met here. Defendants will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable and serious safety risk as a result of the defective panoramic sunroofs. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as requested in the Prayer for Relief below, with respect to the members of the Classes as a whole.

106. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class

action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## TOLLING OF THE STATUTES OF LIMITATIONS

107. **Discovery Rule.** Plaintiff and the Class Members' claims cannot accrue until discovery that the panoramic sunroofs installed in their Class Vehicles were prone to spontaneous failure. While Mercedes knew and concealed the fact that the panoramic sunroofs installed in the Class Vehicles have a defect that causes spontaneous failure, Plaintiff and the Class members could not and did not discover this fact through reasonable diligence.

108. **Active Concealment Tolling.** Any statutes of limitations are tolled by Mercedes' knowing and active concealment of the fact that the panoramic sunroofs installed in the Class Vehicles were defective. Mercedes kept Plaintiff and the Class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on their part. The details of Mercedes' efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and Class. Plaintiff and Class members could not have reasonably discovered the fact that the panoramic sunroofs installed in their Class Vehicles were defective.

109. **Estoppel.** Mercedes was and is under a continuous duty to disclose to Plaintiff and Class the true character, quality, and nature of the panoramic sunroofs installed in the Class Vehicles. At all relevant times, and continuing to this day, Mercedes knowingly, affirmatively, and actively concealed the true character, quality, and nature of the panoramic sunroofs installed in the Class Vehicles. The details of Mercedes' efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and Class members. Plaintiff reasonably relied upon Mercedes' silence as to the defect, which was abetted by its active concealment. Based on the foregoing, Mercedes is estopped from relying on any statutes of limitation in defense of this action.

110.    **Equitable Tolling.** Mercedes took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and leased Class Vehicles with defective panoramic sunroofs. The details of Mercedes' efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and class members. When Plaintiff learned about this material information, she exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing her and their claims. Mercedes fraudulently concealed its above-described wrongful acts. Therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## CAUSES OF ACTION

### Count I
### Breach of Express Warranty

(Plaintiff individually, and on behalf of the National Classes, and, in
the Alternative, the Alabama Sub-Class)

111.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

112.    In connection with the purchase or lease of its new vehicles, Mercedes provided an express New Vehicle Limited Warranty for a period of four years or 50,000 miles, whichever occurs first.  In connection with the sale of Certified Pre-Owned Mercedes vehicles at authorized dealers, Mercedes honors the full New Vehicle Limited Warranty for any remaining portion of the warranty period, and additionally provides vehicle coverage for another 12 months or up to 100,000 total accumulated miles, whichever comes first.

113.    This warranty covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Mercedes vehicle supplied by Mercedes subject to the exclusions listed or, if the part is covered by one of the separate coverages described in the following sections of this warranty, that specific coverage applies instead of the basic coverage.

114.    Mercedes provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Mercedes' warranties are express warranties under the laws of Alabama and other states.

115.    The parts affected by the defect, including the panoramic sunroofs, were manufactured and distributed by Mercedes in the Class Vehicles and are covered by the warranties Mercedes provided to all purchasers and lessors of Class Vehicles.

116.    In response to an investigation by NHSTA in 2006 related to the shattering of panoramic sunroofs, Mercedes conceded that its New Vehicle Limited Warranty and Extended Limited Warranties provide coverage for panoramic sunroofs that break or shatter.   The formal response letter dated July 13, 2006, and authored by Rolf Scherer (Mercedes-Benz General Manager, Engineering Services) states:

> The standard New Vehicle Limited Warranty for all peer subject vehicles cover defects in material or workmanship for 48,000 miles or 4 years whichever come first. Extended Limited Warranties can also be purchased for coverage up to 100,000 miles.  Glass breakage of the panoramic glass roof is covered under the New Vehicle and Extended Limited Warranties described above.

117.    Despite making the above-reference representation to the NHSTA and the clear language of the policy that provides coverage for the panoramic sunroof, Mercedes has systematically denied claims where a panoramic sunroof has spontaneously shattered, including Plaintiff's claim.

118.    Mercedes breached these warranties by selling and leasing Class Vehicles with the panoramic sunroof defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties with free repairs or replacements during the applicable warranty periods.

119.    Mercedes further breached these warranties by not correcting the defect. Although Mercedes warranted that it would correct defects in materials and workmanship in the Class Vehicles, Mercedes instead replaced shattered sunroofs in the Class Vehicles with identical defective sunroofs

and thus has not corrected the defect as required. Mercedes has failed and refused to conform the panoramic sunroofs in the Class Vehicles to the express warranty. Mercedes' conduct has voided any attempt to disclaim liability for its actions.

120.    Mercedes' conduct described in this Complaint constitutes a breach of express warranties under UCC § 2-313, as adopted in whole or in substance by statutes in all 50 states and the District of Columbia, including Ala. Code § 7-2-313, et seq.:

> Alaska Stat. § 45.02.313, et seq.; Ariz. Rev. Stat. § 47-2313, et seq.; Ark. Code § 4-2- 313, et seq.; Cal. Com. Code § 2313, et seq.; Colo. Rev. Stat. § 4-2-313, et seq.; Conn. Gen. Stat. § 42a-2-313, et seq.; 6 Del. C. § 2-313, et seq.; D.C. Code § 28:2-313, et seq.; Fla. Code § 672.313, et seq.; Haw. Rev. Stat. § 490:2-313, et seq.; Idaho Code § 28-2- 313, et seq.; Ind. Code § 26-1-2-313, et seq.; Iowa Code § 554.2313, et seq.; Kan. Stat. § 84-2-313, et seq.; Ky. Rev. Stat. § 355.2-313, *et seq.*; La. Rev. Stat § 9:2800.53(6) , *et seq.*; 11 M.R.S.A. § 2-313, *et seq.*; Md. Code Ann., Com. Law § 2-313, *et seq.*; Mass. Code 106, § 2-313, *et seq.*; Mich. Comp. Laws 440.2313, *et seq.*; Minn. Stat. § 336.2- 313, *et seq.*; Miss. Code § 75-2-313, *et seq.*; Mo. Rev. Stat. § 400.2-313, *et seq.*; Mont. Code § 30-2-313, *et seq.*; Neb. U.C.C. § 2-313, *et seq.*; Nev. Rev. Stat. § 104.2313, *et seq.*; N.H. Rev. Stat. § 382-A:2-313, *et seq.*; N.M. Stat. § 55-2-313, *et seq.*; N.C. Gen. Stat. § 25- 2-313, *et seq.*; N.D. Cent. Code § 41-02-30, *et seq.*; Ohio Rev. Code § 1302.26, *et seq.*; Okla. Stat. Tit. 12A, § 2-313, *et seq.*; Or. Rev. Stat. § 72.3130, *et seq.*; R.I. Gen. Laws § 6A-2-313, *et seq.*; S.C. Code § 36-2-313, *et seq.*; S.D. Codified Laws § 57A-2-313, *et seq.*; Tenn. Code § 47-2- 313, *et seq.*; V.T.C.A., Bus. & C. § 2.313, *et seq.*; Utah Code § 70A-2- 313, *et seq.*; Vt. Stat. Tit. 9A, § 2-313, *et seq.*; Va. Code § 8.2-313, *et seq.*; Wash. Rev. Code § 62A.2-313, *et seq.*; W. Va. Code § 46-2-313, *et seq.*; Wis. Stat. § 402.313, *et seq.*; and Wyo. Stat. § 34.1-2-313, *et seq.*

121.    Plaintiff and Class Members notified Mercedes of the breach within a reasonable time or else they were not required to do so, because affording Mercedes a reasonable opportunity to cure its breach of written warranty would have been futile. Mercedes also knew of the defect and chose to conceal it and to fail to comply with its warranty obligations.

122.    Mercedes' attempt to disclaim or limit these express warranties vis-à- vis consumers is unconscionable and unenforceable under these circumstances. Mercedes' warranty limitation is

unenforceable because it knowingly sold a defective product without informing consumers about the defect.

123.   Mercedes' attempt to limit its express warranty in a manner that would result in replacing its defectively designed panoramic sunroofs with identical defective sunroofs causes the warranty to fail of its essential purpose and renders the warranty null and void.

124.   The time limits contained in Mercedes' warranty period were and are also unconscionable and inadequate to protect Plaintiff and Class Members. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Mercedes. A gross disparity in bargaining power exists between Mercedes and the Class Members, and Mercedes knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before the end of the vehicles' useful lives.

125.   Plaintiff and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of those obligations as a result of Mercedes' conduct described herein.

126.   As a direct and proximate cause of Mercedes' breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and the Class Members have also incurred and will continue to incur costs for repair and replacement of defective panoramic sunroofs and damage resulting from the spontaneous shattering of such sunroofs.

127.   Accordingly, recovery by Plaintiff and the other Class Members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class Members, seek all remedies as allowed by law.

128.     Plaintiff and Class Members are entitled to legal and equitable relief against Mercedes, including damages, consequential damages, specific performance, attorneys' fees, costs of suit, and such further relief as the Court may deem proper. Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**Count II**
**Breach of Implied Warranty of Merchantability**
(Plaintiff individually, and on behalf of the National Classes and, in the
Alternative, the Alabama Sub-Class)

129.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

130.     Mercedes is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code § 7-2-104(1) and "sellers" of motor vehicles under Ala. Code § 7-2-103(1)(d).

131.     With respect to leases, Mercedes is and was at all times relevant times a "lessor" of motor vehicles under Ala. Code § 7-2A-103(1)(p).

132.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code § 7-2-105(1) and Ala. Code § 7-2A-103(1)(h). In connection with the purchase or lease of its new vehicles, Mercedes provided an express New Vehicle Limited Warranty for a period of four years or 50,000 miles, whichever occurs first.

133.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code § 7-2-314.

134.     Mercedes' conduct described in this Complaint constitutes a breach of implied warranties under UCC § 2-314, as adopted in whole or in substance by statutes in all 50 states and the District of Columbia, including Ala. Code § 7-2-314, et seq.

135.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

Specifically, the Class Vehicles were fitted with defective panoramic sunroofs having the propensity to spontaneously and dangerously explode under ordinary driving conditions.

136.   Mercedes was and is in actual or constructive privity with Plaintiff and Class Members.

 a.   Plaintiff and the Class Members had and continue to have sufficient direct dealings with Mercedes and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Mercedes' authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, i.e., Plaintiff and the Class Members.

 b.   Alternatively, privity is not required to assert this claim because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Mercedes and its dealers, franchisees, representatives, and agents.

 c.   By extending express written warranties to end-user purchasers and lessees, Mercedes brought itself into privity with Plaintiff and Class Members.

137.   At all relevant times, Alabama law (and the corresponding statues of all 50 states and the District of Columbia) imposed upon Mercedes a duty to ensure that the sunroofs installed in the Class Vehicles were fit for the ordinary purposes for which panoramic sunroofs are used and that they pass without objection in the trade under the contract description.

138.   Federal law prohibits Mercedes from disclaiming implied warranties on the Class Vehicles where a written warranty was provided for that product.

139.   Mercedes did not inform Plaintiffs or Class Members of the Defect prior to sale of the Class Vehicles.

140.    Mercedes has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

141.    The sunroofs installed in the Class Vehicles were defective at the time they left Mercedes' possession. Mercedes knew of this defect at the time the purchase and lease transactions occurred. Thus, the sunroofs installed in the Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

142.    Mercedes failed to inform Plaintiff and Class Members of the defective condition of the panoramic sunroofs. The failure to warn Plaintiff and Class Members of this defective condition constitutes a further breach by Mercedes of the implied warranties of merchantability.

143.    Plaintiff and Class Members used the sunroofs installed in the Class Vehicles in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Mercedes or by operation of law in light of Mercedes' unconscionable conduct.

144.    Mercedes had actual knowledge of, and received timely notice regarding, the defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

145.    In addition, Mercedes received, on information and belief, numerous consumer complaints and other notices from customers advising of the defect associated with the sunroofs installed in the Class Vehicles.

146.    By virtue of the conduct described herein, Mercedes breached the implied warranty of merchantability.

147.    As a direct and proximate result of Mercedes' breach of warranties, Plaintiff and Class Members suffered economic damage, including loss attributable to the diminished value of their Class

Vehicles, loss of use of their Class Vehicles and other tangible property, as well as the monies spent and to be spent to repair and/or replace their sunroofs.

148.    Plaintiff and Class Members are entitled to legal and equitable relief against Mercedes, including damages, consequential damages, specific performance, attorney fees, costs of suit, and such further relief as the Court may deem proper.

149.    As a direct and proximate result of Mercedes' breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in amount to be proven at trial.

**Count III**
**Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, et seq.**

(Plaintiff individually, and on behalf of the National Classes and, in the
Alternative, the Alabama Sub-Class)

150.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

151.    The Magnuson-Moss Warranty Act, 15 U.S.C. §2301(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

152.    Plaintiff and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301(3).

153.    Mercedes is a "supplier" and "warrantor" within the meanings of 15 U.S.C. §§ 2301(4)-(5).

154.    Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(7).

155.    Mercedes provided a written warranty for each Class Vehicle. Mercedes' express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. §2301(7).

156.    Mercedes breached the express warranties by:

    a.  Offering a 48 month/50,000 mile New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    b.  Selling and leasing Class Vehicles with panoramic sunroofs that were defective in material and workmanship, requiring repair or replacement within the warranty periods; but

    c.  Refusing to honor the express warranties by not repairing or replacing the panoramic sunroofs free of charge and/or performing repairs with similarly defective sunroofs.

157.   Mercedes breached the implied warranties including that the Class Vehicles were in a merchantable condition and fit for the ordinary purpose for which vehicles are used as all Class Vehicles were fitted with defective panoramic sunroofs having the propensity to spontaneously and dangerously explode under ordinary driving conditions.  This defective condition was present at the time the Class Vehicles were sold and no disclaimer was made by Mercedes to inform Plaintiff and Class Members of the defect prior to sale.

158.   Plaintiff and Class Members own or lease Class Vehicles that experienced spontaneous panoramic sunroof shattering during the period of express or implied warranty coverage.

159.   Despite Mercedes' warranty, Mercedes has not repaired or replaced these shattered panoramic sunroofs at no charge to the consumers. In fact, Mercedes has denied claims made under its warranty(ies) by consumers whose Class Vehicle panoramic sunroof shattered.

160.   Mercedes' breach of express and/or implied warranty(ies) has deprived Plaintiff and Class Members of the benefit of their bargain.

161.   Plaintiff and Class Members have had sufficient dealings with either Mercedes or its franchisees, representatives, and agents to establish any required privity of contract. Nonetheless,

privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Mercedes and its dealers and specifically of Mercedes' express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements with the Class Vehicles. The warranty agreements were designed for and intended to benefit the consumers only.

162.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

163.    Mercedes has been afforded reasonable opportunity to cure its breaches of warranty, including when Plaintiff brought her Class Vehicle in for repair of the defective panoramic sunroof.

164.    Pursuant to the provisions of 15 U.S.C. § 2310(e), Plaintiff and Class Members have all sufficiently notified Mercedes, thus providing Mercedes with reasonable opportunity to correct its business practices and cure its breach of warranties under the MMWA.

165.    Mercedes has not cured the breach of warranty described above and continues to deny warranty coverage when Plaintiff and Class Members present their vehicles for repair after their Class Vehicles' panoramic sunroofs spontaneously shattered.

166.    Resorting to any informal dispute settlement procedure or affording Mercedes another opportunity to cure its breach of warranty is unnecessary and futile. Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Mercedes has repeatedly failed to disclose the panoramic sunroof defect or provide repairs at no cost and, therefore, has indicated no desire to participate in such a process at this time. Any requirement under the MMWA or otherwise that Plaintiff submit to any informal dispute settlement procedure or

otherwise afford Mercedes a reasonable opportunity to cure its breach of warranty(ies) is excused and/or has been satisfied.

167.    As a direct and proximate result of Mercedes' warranty(ies) breach, Plaintiff and Class Members sustained damages and other losses to be determined at trial. Mercedes' conduct damaged Plaintiff and Class Members, who are entitled to recover damages, specific performance, costs, attorneys' fees, and other appropriate relief.

## Count IV
## Fraudulent Concealment

(Plaintiff individually, and on behalf of the National Classes and, in the
Alternative, the Alabama Sub-Class)

168.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

169.    Mercedes has known as early as the NHSTA investigation in 2006, that its panoramic sunroofs have a propensity to shatter under ordinary driving conditions in a manner that creates an unreasonably dangerous condition for vehicle occupants.

170.    Mercedes' knowledge has been confirmed and reinforced over the course of the last 15 years with ongoing reports from consumers, dealerships, and NHSTA that Mercedes panoramic sunroofs continue to spontaneously explode, causing a startling shotgun noise and pieces of glass to rain down on the vehicle occupants.  Mercedes has also known that safer, reasonable alternatives exist that can prevent this hazard.

171.    Despite this knowledge, Mercedes never told Plaintiff or the Class Members that the panoramic sunroofs in the Class Vehicles may spontaneously shatter during ordinary driving conditions.

172.    Mercedes made material omissions concerning a recently existing or past fact. Mercedes did not fully and truthfully disclose to its customers the true nature of the latent defect, which was not readily discoverable until after the Class Vehicles were purchased and the defect

36

manifested. A reasonable consumer would not have expected a latent defect in a new vehicle and especially not one that creates a dangerous condition, a risk of accident or renders the vehicle unsuitable for transportation after the defect manifests.

173.    Mercedes made these omissions with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

174.    The facts concealed, suppressed, and not disclosed by Mercedes to Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles at all or at the offered price.

175.    The facts concealed, suppressed, and not disclosed by Mercedes to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles, whether at all or at the offered price. Moreover, the existence of the sunroof defect and the extent of the failures was not known or reasonably discoverable by Plaintiffs or Class Members.

176.    Mercedes had a duty to disclose the true quality and reliability of the Class Vehicles because the knowledge of the Defect and its details were known and/or accessible only to Mercedes; it had superior knowledge and access to the relevant facts; and Mercedes knew the facts were neither known to nor reasonably discoverable by Plaintiffs and Class Members, Mercedes also had a duty to disclose because it made numerous affirmative representations about the quality and reliability of its vehicles, including references as to the quality and functionality of the Class Vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of these vehicles.

177.    Had Plaintiff and the Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less in doing

so. Thus, Plaintiff and the other Class Members were fraudulently induced to purchase or lease Class Vehicles containing the defect.

178.    Plaintiff and the Class Members reasonably relied on Mercedes' material omissions and suffered damages as a result. Mercedes' fraudulent conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiff and the Class Members are entitled to an award of punitive damages.

### Count V
### Unjust Enrichment

(Plaintiff individually, and on behalf of the National Classes and, in the
Alternative, the Alabama Sub-Class)

179.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

180.    This count is pled in the alternative to Plaintiff's consumer warranty claims.

181.    Plaintiff and Class Members lack an adequate remedy at law.

182.    As the intended and expected result of its conscious wrongdoing, Mercedes has profited and benefitted from Plaintiff's and Class Members' purchases and leases of Class Vehicles containing a dangerous panoramic sunroof defect.

183.    Mercedes has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiff and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Mercedes represented and which an ordinary consumer expects. Plaintiff and the Class Members reasonably expected that when they purchased or leased a Class Vehicle, it would not contain a latent defect that poses a safety risk.

184.    Mercedes has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiff and the Class rightfully belonging to them.

185.     Equity and good conscience militate against permitting Mercedes to retain these profits and benefits from its wrongful conduct. They should accordingly be disgorged or placed in a constructive trust so that Plaintiff and Class members can obtain restitution.

**Count VI**
**Violation of Alabama's Deceptive Trade Practices Act (Ala. Code §8-19-5, *et seq*.)**

(Plaintiff individually, and on behalf of the National Classes and, in the
Alternative, the Alabama Sub-Class)

186.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

187.     Plaintiff Natalie Bolling brings this claim on behalf of herself and the Alabama Class.

188.     Plaintiff, the Alabama Class, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

189.     The Class Vehicles and/or the defective sunroofs installed in them are "goods" within the meaning of Ala. Code § 8-19-3(3).

190.     Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

191.     Mercedes violated the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, ("Alabama DTPA") by selling Class Vehicles with the Defect.

192.     The Alabama DTPA, declares several specific additions to be unlawful, including:

a.     "Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b.     "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and

c.     "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

Ala. Code § 8-19-5

39

193.    In the course of Mercedes' business, they willfully failed to disclose the Defect in the Class Vehicles as described above. Mercedes also actively concealed the Defect by failing to disclose the Defect when Mercedes learned of its existence. Accordingly, Mercedes engaged in unfair and deceptive acts or practices.

194.    Mercedes knowingly misrepresented the Class Vehicles as fit for the purpose for which they were intended, when, in fact, Mercedes knew the Class Vehicles were defective, dangerous, and unable to safely perform as advertised. Indeed, Defendants misrepresented the panoramic sunroofs in the Class Vehicles as functional, safe, and suitable for their intended purpose, when, in fact, they were and are not.

195.    These acts and practices have deceived Plaintiff and are likely to, and did, deceive the public. In failing to disclose the Defect and suppressing material facts from Plaintiff and the Class Members, Mercedes breached its duties to disclose these facts.

196.    The omissions and acts of concealment by Mercedes pertained to information that was material to Plaintiff and Class Members, as it would have been to all reasonable consumers.

197.    Mercedes' conduct, as described hereinabove, constitutes violations of the Alabama DTPA. Mercedes' conduct violates at least the following enumerated Alabama DTPA provisions:

- Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services. Ala. Code § 8-19-5(2).

- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have. Ala. Code § 8-19-5(5).

- Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. Ala. Code § 8-19-5(7).

- Knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service. Ala. Code § 8-19-5(13).

- Intentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies. Ala. Code § 8-19-5(21).

- Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce. Ala. Code § 8-19-5(27).

198.    Mercedes knew or should have known that its conduct violated the Alabama DTPA.

199.    Plaintiff and the Alabama Class have suffered injury in fact and actual damages as a direct and proximate result of Mercedes' material omissions and misrepresentations. Had Plaintiff and the Alabama Class known Class Vehicles suffered from the Defect, they would not have purchased the Class Vehicles, would have paid less for them, or would have avoided the extensive repair costs associated therewith.

200.    Under these circumstances, Ala. Code § 8-19-10 provides for:

(1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or

(2) Up to three times any actual damages, in the court's discretion based upon, among other relevant factors, the amount of actual damages awarded, the frequency of the unlawful acts or practices, the number of persons adversely affected thereby, and the extent to which the unlawful acts or practices were committed intentionally; and

(3) In the case of any successful action or counterclaim to enforce the foregoing liability or in which injunctive relief is obtained, the costs of the action or counterclaim, together with a reasonable attorney's fee.

201.    Plaintiff and the Alabama Class are entitled to equitable and monetary relief under the Alabama DTPA, as well as punitive damages and attorneys' fees pursuant to Ala. Code § 8-19-10.

202.    Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in Ala. Code § 8-19-10(f) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the rules Enabling Act, 28 U.S.C. § 2072; *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the Classes request that the Court enter a judgment awarding the following relief:

1.    An order certifying the proposed classes and appointing Plaintiff's counsel to represent the classes;

2.    An order awarding Plaintiff and Class Members their actual damages, punitive damages, and/or any other form of monetary relief provided by law;

3.    An order awarding Plaintiff and Class Members restitution, disgorgement, or other equitable relief as the Court deems proper;

4.    An order requiring Mercedes to adequately disclose and repair the defective panoramic sunroofs;

5.      An order awarding Plaintiff and Class Members pre-judgment and post-judgment interest as allowed under the law;

6.      An order awarding Plaintiff and Class Members reasonable attorneys' fees and costs of suit, as allowed by law; and

7.      An order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury all issues so triable under the law.

Dated: February 14, 2023                    Respectfully submitted,


                                            */s/ Brent Irby*
                                            Brent Irby
                                            IRBY LAW LLC (GA # 224232)
                                            The Highland Building
                                            2201 Arlington Ave. S.
                                            Birmingham, AL 35205
                                            205-936-8281
                                            brent@irbylaw.net


                                            ***Attorneys for Plaintiff and the Putative Class***