**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Cornerstone Foodservice Group, Inc. and Commercial Stainless Fabricators, Inc., <br><br>        Plaintiffs, <br><br> v. <br><br> Jason S. Womack and JW Industrial Holdings, LLC, <br><br>        Defendants. | CIVIL ACTION FILE NO. _____ <br><br> JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiffs Cornerstone Foodservice Group, Inc. ("Cornerstone" or "Buyer") and Commercial Stainless Fabricators, Inc. (the "Company") bring this action against Defendants Jason S. Womack ("Womack" or "Seller") and JW Industrial Holdings, LLC ("JW Industrial"). Womack's fraud and/or intentional misrepresentations caused Cornerstone extreme harm. Cornerstone, a collection of innovative foodservice brands, sought to expand its foodservice portfolio by purchasing the Company from Womack pursuant to a Stock Purchase Agreement (the "SPA"), dated April 6, 2022. As part of the SPA, the parties entered into additional agreements, including a Lease Agreement between JW Industrial and the Company. The Lease Agreement includes the construction of additional space

at the Company's current location, which was to be completed within one calendar year of April 6, 2022.  Based upon extensive diligence by Cornerstone and representations made by Womack, Cornerstone believed that the Company was viable, profitable, and had sustainable and lucrative client relationships. Cornerstone also believed that the Property was suitable for the business and in compliance with law. Shortly after acquisition, Cornerstone began to discover that Womack's representations and warranties were false and/or intentionally misrepresented, and that the Company, for all intents and purposes, was worth almost nothing.  Cornerstone and the Company have also learned that JW Industrial did not acquire the proper permits for the Company's building, the building was not suitable for the business, and JW Industrial will not complete the expansion within the allotted time, impacting the Company's industrial capacity and profit potential.  In support, Cornerstone alleges as follows:

## THE PARTIES

1.      Cornerstone is a collection of innovative foodservice brands that is incorporated in Delaware and has as its principal place business Naperville, Illinois.  Accordingly, Cornerstone is a citizen of Delaware and Illinois.

2.      The Company is a stainless steel fabrication company.  The company is a citizen of Georgia.

3.      Womack is an individual and Citizen of the state of Georgia and the former owner of the Company, prior to its sale to Cornerstone.

4.      JW Industrial is a limited liability corporation.  On information and belief, Womack is the only member.  As such, JW Industrial is a citizen of Georgia.  JW Industrial owns the property at 4986 Canton Road, Marietta, Georgia 30066.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## BACKGROUND

7.      This action arises from Womack's sale of the Company to Cornerstone, and the false, fraudulent and/or intentional misrepresentations and warranties Womack made to Cornerstone to induce Cornerstone to purchase the Company and enter into the Lease Agreement.

8.     The Company is a stainless steel fabrication company that manufactures and installs custom metal fabrication and millwork such as, but not limited to, counters, chef tables, shelves, sneeze guards, electrical, and refrigeration for the foodservice industry.  The Company offers turnkey projects using professional engineers, metal and millwork tradespeople, and installation crews.  It is located at 4986 Canton Road, Marietta, Georgia 30066.

**Womack Presented the Company as a Perfect Fit for Cornerstone**

9.     In or around December 2020, Cornerstone and Womack began to discuss the possibility of Cornerstone purchasing the Company.  These discussions were temporarily halted due to the COVID-19 pandemic.  In or around September 2021, Womack and Cornerstone reengaged in discussions about Cornerstone's acquisition of the Company.

10.     Cornerstone was particularly excited about the potential acquisition of the Company because of Cornerstone's desire to vertically integrate mill and metal work into its portfolio—work that Cornerstone usually contracted out to third parties.  The Company also brought its own long-term customer relationships and a significant number of open purchase orders ("open orders").

11.     Today, Cornerstone still relies on third parties and has been unable to vertically integrate the Company into its portfolio because of Womack's false warranties and representations.

12.     As part of the negotiations, Cornerstone performed customary due diligence for an acquisition of this size and type, which consisted of extensive requests for details on the business.  This diligence also included:  multiple rounds of third-party legal diligence; a third-party environmental review; information technology diligence; third-party diligence with safety consultants related to Occupational Safety and Health Administration requirements; third-party accounting diligence; and visiting the Company's plant and meeting with Womack and other Company employees.

13.     Cornerstone's due diligence team included experienced employees and third-party consultants and advisors who had assisted Cornerstone in due diligence on a number of other recent acquisitions.

**The SPA**

14.     After much negotiation, Cornerstone agreed to acquire all of the issued and outstanding capital stock of the Company from Womack for $7,250,000.[1]  On April 6, 2022, Womack and Cornerstone entered into the SPA.

15.     As inducement for Cornerstone to enter into the SPA, Womack made specific representations and warranties to Cornerstone in the SPA.  The representations and warranties, contained in Article 3 of the SPA, were related to and accompanied by certain disclosure schedules, agreements, financial statements, and other exhibits incorporated by reference into the SPA.

16.     Womack represented and warranted, among other things:

   a.  Attached to the SPA were true, correct and complete copies of the following financial statements of the Company (the "Financial

---

[1]     Pursuant to the SPA, the Purchase Price was:

(a) $7,250,000, plus (b) Estimated Cash, plus (c) the amount (if any) by which the Estimated Net Working Capital exceeds the Target Net Working Capital, minus (d) the amount (if any) by which the Estimated Net Working Capital is less than the Target Net Working Capital, minus (e) the amount of Debt of the Company as of the Closing, minus (f) the Transaction Expenses, minus (g) the Accrued Employee Obligations, plus (h) the Seller Earnout Payment (if any).

SPA § 2.2.

Statements"):  (i) unaudited balance sheet as of June 30, 2020 and June 30, 2021, and related statements of income and cash flows for the 12 months then ended, and (ii) unaudited balance sheet as of December 31, 2021, and related statements of income and cash flows for the six months then ended.  The Financial Statements were prepared in accordance with the Accounting Methods applied on a consistent basis throughout the periods covered thereby and presented fairly, in all material respects, the financial condition of the Company as of such dates and the results of operations for the periods specified.[2]  SPA § 3.6(a).

b.  That the Company had conducted its business only in the ordinary course of business consistent with past practices during the period from June 30, 2021 through the Closing Date.  SPA § 3.7(b).

c.  The Company had not done any of the following during the period from June 30, 2021 through the Closing Date:  delayed or postponed the payment of accounts payable or other Liabilities; made any capital expenditures or commitments therefore either involving more than

---

[2]  "Accounting Methods" is defined in the SPA as United States generally accepted accounting principles ("GAAP").  SPA, art. 1, p. 5.

$25,000 (individually or in the aggregate) or outside the ordinary course of business; or made any changes in any employee compensation, benefits, severance or termination agreement other than routine salary increases in the ordinary course of business.  SPA § 3.7(c)(ii), (vi), (xi).

d. Except as set forth on Schedule 3.9 (which only related to OSHA matters that are not at issue here), the Company had complied in all material respects with all applicable laws, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or notice had been filed or commenced against the Company alleging any failure to so comply.  SPA § 3.9.

e. The Company had no Liabilities other than (i) Liabilities set forth on the face of the most recent balance sheet included in the Financial Statements, and (ii) Liabilities that had arisen after the date thereof in the ordinary course of business (none of which resulted from, arose out of, related to, was in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law). SPA § 3.10.

f.  The Company had timely collected or withheld and timely paid all

Taxes required to have been withheld and paid in connection with any

amounts paid or owing to any employee, independent contractor,

creditor, stockholder, or other Person, as required under applicable

Tax laws.  All Persons who were classified as independent contractors

were properly so classified.  SPA § 3.11(b).

g.  Except as set forth on Schedule 3.13(a), (i) the Company exclusively

owned and possessed all right, title and interest in and to, or had a

license or other right to use, all Intellectual Property that is used in or

necessary for the operation of its business (collectively, the "Company

Intellectual Property"), free and clear of all Liens other than Permitted

Liens; and (ii) all Company Intellectual Property would be available

for use by the Company after the Closing Date on the same terms and

conditions to those under which the Company owned or used the

Company Intellectual Property prior to the Closing Date.  SPA

§ 3.13(a).

h.  All buildings, structures, fixtures, building systems and equipment,

and all components thereof included in the Leased Real Property were

in good condition and repair (ordinary wear and tear excepted) and

sufficient for the operation of the Company's business.  None of the Leased Real Property, buildings, structures, fixtures, building systems and equipment, or the use thereof, violated any applicable laws in any material respect.  The Company had obtained and was and during the previous three years had been in compliance in all material respects with all permits, licenses, and other authorizations required for the occupation, development or buildout of, and any construction on, the Leased Real Property.  SPA ¶ 3.14.

i.  Womack had included a schedule with any written or oral contract, agreement, or other arrangement for, among other things (i) the performance of services for, or delivery of goods or materials to, the Company (other than the open purchase orders entered into in the ordinary course of business), and (ii) the employment of any Person on a full-time, part-time, consulting or other basis, including any collective bargaining agreement or other similar contract.  SPA § 3.18(b), (c).

j.  The Company owned or leased all machinery, equipment, computers and related equipment, furniture, vehicles, and other tangible assets necessary for the conduct of its business as currently conducted.  Each

such tangible asset was in good operating condition and repair (ordinary wear and tear excepted), and was suitable for the purposes for which it was used.  During the previous three years, the Company had not sold or licensed any material assets necessary for the conduct of the Company's business except sales of inventory in the ordinary course of business or to the extent that such assets were replaced. Except as set forth on Schedule 3.21, the inventory of the Company was merchantable and fit for the purpose for which it was procured or manufactured, and none of which was slow-moving, obsolete, damaged, or defective.  Except as set forth on Schedule 3.21, no inventory located at the Leased Real Property (or otherwise in the possession of the Company) was owned or leased by any Person other than the Company, and no inventory of the Company was located anywhere other than the Leased Real Property.  SPA § 3.21.

k.  Except as set forth on Schedule 3.24, neither Womack nor any direct, officer, employee, or affiliate of the Company (i) was involved in any business arrangement or relationship with the Company in the past twenty-four months, or (ii) owned any asset which was used in the business of the Company.  SPA § 3.24.

l. The Company had provided a list of all employees of the Company and the following information for each employee: name, position, base compensation and bonus compensation earned in the year ended December 31, 2021, and current base compensation and bonus program. The Company complied, in all material respects, with all applicable laws respecting labor and employment matters (including any applicable laws concerning COVID-19 related health and safety issues). The Company had no Liability and was not otherwise liable for the payment of any compensation, damages, Taxes, fines, penalties, interest, or other amounts, however designated, for failure to comply with any of the foregoing laws, and there were no pending or threatened claims or complaints before the Occupational Safety and Health Administration (or any comparable state or local safety or health administration or other entity) brought by, involving or affecting any of the employees or contractors of the Company. At all times since May 7, 2021, the Company complied in all material respects with the Occupational Safety and Health Act of 1970 and any comparable state or local law applicable to the Company. The Company had not received any retirement or termination notice with

respect to any current employee of the Company and, to the Company's Knowledge, no current employee had any plans to retire or terminate his or her employment with the Company. The qualifications for employment of all such employees under applicable immigration laws was reviewed by the Company and a properly completed Form I-9 was on file with the Company for each employee. Every Person who provided service to the Company had been properly classified by the Company as an employee or independent contractor in compliance with applicable law. SPA § 3.25.

17.    The SPA also provides for a post-closing adjustment of the Purchase Price:

a.  Within ninety days after the Closing Date, Cornerstone was to prepare and deliver to Womack a statement setting forth Cornerstone's calculation of Net Working Capital and Cash (the "Closing Statement"). SPA § 2.5(a).

b.  Within thirty days of Cornerstone's delivery of the Closing Statement to Womack, Womack could give Cornerstone a written notice stating either (i) Womack's acceptance, without objection, of the Closing Statement or (ii) Womack's objections to the Closing Statement and

Womack's calculation of Net Working Capital and Cash as of the Effective Time (the "Objection Notice").  SPA § 2.5(b).

c.  If Womack delivered an Objection Notice within such thirty day period, Cornerstone and Womack were to negotiate in good faith to resolve such dispute.  If they failed to resolve all of the issues in the Objection Notice within thirty days after Cornerstone received the Objection notice, (i) Womack and Cornerstone were to retain a firm of certified public accountants mutually acceptable to Womack and Cornerstone (the "Independent Auditors") to make the determination of the Net Working Capital and Cash in accordance with the terms of this Agreement, and (ii) Womack and Cornerstone would each provide the Independent Auditors with their respective calculations of the Net Working Capital and Cash.  The determination of the Net working Capital and Cash by the Independent Auditors would be conclusive and binding upon the parties and would constitute the Final Net Working Capital and the Final Cash, respectively.  SPA § 2.5(c).

## Indemnification in the SPA

18.  As part of the SPA, Cornerstone bargained for and Womack agreed:

All of the representations and warranties contained in this Agreement will survive the Closing and continue in full force

and effect until the later of (a) twelve (12) months following the Closing or (b) completion of the first audit of the Company following the Closing provided it occurs no later than May 31, 2023, except that the Fundamental Representations and Warranties will survive the Closing and continue in full force and effect indefinitely.  The covenants and agreements of the parties contained in this Agreement will survive the Closing until the date by which such covenant or agreement is required to be performed and, if no term is specified, until the expiration of the applicable statute of limitations relating thereto. Notwithstanding the preceding sentences, if notice of any claimed breach of a representation, warranty, covenant or agreement is given on or prior to the expiration of the applicable survival period provided herein, then such representation, warranty, covenant or agreement will continue to survive until such matter is resolved.

SPA § 7.1.[3]

19.    As previously noted, the SPA was entered into on April 6, 2022. Accordingly, all representations and warranties are still in effect.  In addition, as described below, Cornerstone provided notice to Womack of the breaches of his

---

[3]    "Fundamental Representations and Warranties" are defined in the SPA as,

the representations and warranties set forth in Section 3.1 (Organization, Power and Authorization), Section 3.2 (Binding Effect and Noncontravention), Section 3.3 (Brokers), Section 3.6(b) (Debt), Section 3.8 (Title to Assets), Section 3.11 (Tax Matters), Section 3.16 (Employee Benefits) to the extent related to Taxes (including, without limitation, 280G), and Section 3.24 (Affiliate Transactions).

SPA, art. 1, pp. 4-5.

representations and warranties in the SPA, and Cornerstone's claims therefore will survive until resolved.

20.     Moreover, Cornerstone bargained for and Womack agreed that:

> Seller will indemnify, defend and hold harmless Buyer, the Company and their respective affiliates, officers, directors, managers, employees, agents and representatives (collectively, the "Buyer Indemnitees") from and against any Damages that any of the Buyer Indemnitees incur as a result of (a) the breach or inaccuracy of any of the representations and warranties made by Seller in this Agreement, (b) the breach of any covenant made by the Seller in this Agreement, (c) any Debt of the Company as of the Closing Date, any Transaction Expenses or any Accrued Employee Obligations, (d) any Indemnified Taxes, or (e) either PPP Loan or the EIDL.

SPA § 7.2.

21.     While the indemnification provisions in the SPA include limitations on the amounts that Cornerstone can recover for breaches of certain representations and warranties, breaches of Fundamental Representations and Warranties are exempt from a portion of those limitations, and breaches resulting from Womack's fraud and/or intentional misrepresentations are exempt from all of those limitations:

> Subject to the immediately following sentence, (a) Seller will have no obligation to indemnify the Buyer Indemnitees under Section 7.2(a) until the total of all Damages arising thereunder exceeds $100,000 in the aggregate (at which point Seller will be obligated to indemnify the Buyer Indemnitees from and against all Damages in excess of such amount), and (b) the maximum amount of Damages for which the

Buyer Indemnitees will be entitled to indemnification under Section 7.2(a) will be 20% of the Aggregate Consideration.  <u>The foregoing limitations will not apply to (i) the breach of the Fundamental Representations and Warranties</u>, (ii) for purposes of clarification, the obligations of Seller under Sections 7.2(b)-(e), or (iii) <u>Damages resulting from fraud or intentional misrepresentation on the part of Seller</u>.  <u>Except in the event of fraud or intentional misrepresentation on the part of Seller, the maximum amount of Damages for which the Buyer Indemnitees will be entitled to indemnification under Section 7.2(a) for any breach of the Fundamental Representations and Warranties will be equal to the Aggregate Consideration</u>.

SPA § 7.6 (emphasis added).

22.     Pursuant to the SPA,

"Damages" means all damages, losses, Liabilities, obligations, costs, expenses, feels, penalties, fines, dues, Taxes, monetary settlements, or any actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, and Liens, including court costs and reasonable attorneys' fees and expenses (without giving effect to any material adverse effect or other materiality or similar qualification); provided, however, "Damages" will exclude punitive damages except to the extent actually paid to a third party.

SPA, art. 1, p .3.

## Additional Instruments

23.     Additional instruments and certificates were delivered as part of the

SPA, including the Seller Employment Agreement, the Escrow Agreement, and the

Lease Agreement.  These documents are all part of the "Transaction Documents"

defined in the SPA.  SPA, art. 1, p. 8; *see also* SPA § 5.2 (listing Buyer's Closing

Deliveries, including the aforementioned agreements).

24.     These additional instruments and certificates were therefore part of

the entire transaction, and Cornerstone and the Company would not have entered

these additional instruments but for Womack and JW Industrial's inducement as

part of the entire transaction.

25.     Pursuant to the Seller Employment Agreement ("Employment

Agreement"):

    a.   Womack would be employed by the Company full-time for twelve

       months to be followed by twelve months as a part-time employee.

       Employment Agreement § 2(a)-(b).

    b.   Womack was to serve as an executive of the Company and would

       report to the Chief Executive Officer of Cornerstone.  *Id.* § 3(a).

    c.   The Employment Agreement gave the Company the right to terminate

       Womack for cause upon written notice.  *Id.* § 5(a)(ii).

26.     The Company entered the Lease Agreement with JW Industrial, also

on April 6, 2022.

a.  On information and belief, Womack owns the property at 4986

Canton Road, Marietta, Georgia 30066 through his ownership of JW

Industrial.

b.  JW Industrial represented and warranted that as of the Effective Date

of the Lease Agreement the Leased Premises materially complied

with all applicable Legal Requirements.  In the event of a breach of

this representation and warranty, the Company was to provide written

notice to JW Industrial no later than one year following the Effective

Date, and JW Industrial was responsible for making the repair,

replacement or alteration necessary to bring the Leased Premises into

compliance, at Landlord's sole cost and expense.  Lease Agreement

§ 3.08(b).

c.  The Lease Agreement commits the Company to renting space from

Womack for a period of sixty months.  *Id.* § 1.02.

d.  Article 13 of the Lease Agreement commits JW Industrial to have

undertaken and Substantially Completed the expansion of the building

by approximately 25,000 square feet ("Expansion Space") within one

calendar year following the Effective Date of the Lease Agreement.

e. "Substantially Complete" is defined as the date upon which JW Industrial certifies (i) the Expansion Space has been completed in substantial accordance with the plans and specifications therefor subject only to completion of punch list items which do not materially interfere with the utilization of the Expansion Space for the purposes for which it was intended, and (ii) a temporary certificate of occupancy (or similar approval which is necessary to permit the lawful use and operation of the Building) is granted by the applicable governmental authority; provided, however, that JW Industrial shall cause the applicable governmental authority to grant a final certificate of occupancy within a reasonable time following Substantial Completion. *Id.* § 13.01.

f. In the event of a Landlord Default of Article 13, the Company may initiate the remedies set forth in Section 10.04 and may also take over the construction of the Expansion Space, the cost of which shall be covered by JW Industrial pursuant to Section 10.04. *Id.* § 10.05.

27. The Escrow Agreement was between Womack, Cornerstone, and Wilmington Trust, National Association ("Escrow Agent").

a. As part of the Escrow Agreement, Cornerstone agreed to transfer $500,000 of the Purchase Price to the Escrow Agent ("Escrow Property").  Escrow Agreement § 1.1.

b. The purpose of the Escrow Agreement was to create an "escrow account to be held by Escrow Agent to provide a source of funds for the payment of amounts which may in the future become due to Buyer pursuant to the Purchase Agreement."  *Id.* § A.

c. The Escrow Property can be disbursed pursuant to, *inter alia*, a joint written instruction or in compliance with a judgment or order from any court.  *Id.* § 1.3.

d. As part of the Escrow Agreement, if Cornerstone sought indemnification under the SPA, it would give written notice of its indemnification claims to the Escrow Agent.  *Id.* § 1.4(a).

**Discovery of Fraud and/or Intentional Misrepresentation in the SPA**

28.    Cornerstone entered the SPA in good faith, and Cornerstone has fully performed its obligations under the SPA.

29.    After the SPA was signed on April 6, 2022, Cornerstone began to discover that Womack had fraudulently and/or intentionally misrepresented key

facts about the Company in the SPA and during the course of negotiations that were not known and could not have been known to Cornerstone.

30.     As described herein, Womack:  underreported labor costs and violated applicable laws (by, among other things, employing undocumented persons); misappropriated company funds; failed to disclose increased compensation he provided to employees; failed to properly report car allowances for income tax purposes; and underreported the costs of running the business, including the cost of technology licenses and the condition (and required repairs) of crucial Company equipment.  All of these actions were to the extreme detriment of Cornerstone.

### *Use of non-employees for Company work*

31.     After closing, Cornerstone discovered that Womack had relied on the labor of five undocumented persons to fulfill the material manufacturing obligations of the Company.

32.     On information and belief, Womack paid these workers in way that was hidden on the Company's financial statements and through JW Industrial (owned by Womack).

33.     These undocumented workers were approximately twenty percent of the Company's manufacturing workforce and performed tasks crucial to the Company's business.

34.     Prior to closing, another Company employee, who understood the critical importance of these workers to the Company's business, asked Womack if he had informed Cornerstone about the Company's reliance on undocumented workers.  Womack told that employee that he would handle it and that it was "totally under control."

35.     Womack never told Cornerstone that the Company relied on undocumented workers for key portions of its manufacturing process.  Cornerstone only found out about the issue because, after closing, the same Company employee who urged Womack to discuss the matter with Cornerstone learned that Womack had not done so and he informed Cornerstone.

36.     Failure to properly record the costs for the employees materially overstated the Company's profitability.   Moreover, Womack knew that the Company could not fulfill its production commitments without those workers who were skilled and would be difficult to replace.

37.     Womack's non-disclosure of the use of undocumented, non-employees is a breach of the representations and warranties by Womack in the SPA, including Sections 3.9, 3.10, 3.11(b), 3.18(c), 3.24, and 3.25.

38.     Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA constitutes fraud and/or intentional misrepresentation.

39.     Upon discovery of the use of undocumented persons to fulfill the obligations of the Company, Cornerstone confronted Womack.  In response, Womack stated that they were his employees and that it was nothing for Cornerstone to worry about even though the workers had been key to the Company's business.

### Misappropriation of Company funds

40.     After Cornerstone acquired the Company, Cornerstone discovered that Womack had misappropriated funds from the Company's Truist bank account.  A review of the account revealed that Womack had misappropriated more than $150,000.  While Company receivables continued to flow into the Truist bank account during the period that Womack misappropriated funds, none of the $150,000 that Womack misappropriated was legitimately connected to the business or otherwise covered by the SPA or ancillary agreements between Cornerstone, the Company, and/or Womack.

41.     This misappropriation of funds took place after the Closing Date.

42.     When confronted with the fact that he had misappropriated Company funds for his personal gain, Womack doubled down, responding in a December 1, 2022 email that he was told by Company employees that the Truist bank account belonged to him.  On information and belief, Womack's claim is false.[4]

43.     Regardless, the SPA is clear that the Truist bank account belongs to the Company and was included in the acquisition of the Company by Cornerstone. *See* SPA § 3.28.

44.     Womack's misappropriation of Company funds gives rise to a claim of unjust enrichment and conversion.

### *Failure to obtain necessary product licenses and maintain equipment*

45.     After closing, Cornerstone discovered that Womack had failed to maintain proper licenses for necessary computer software and failed to maintain equipment crucial to the Company's business.

46.     The SPA stated that the annual cost to the Company of licenses for "off-the-shelf software programs" was $5,000.  SPA § 3.13(c).

47.     To date, Cornerstone has discovered that at least eight employees used personal software licenses needed to complete their duties of employment.

---

[4]     On October 17, 2022, Womack was terminated from the Company for cause, pursuant to his Employment Agreement.

48.     The personal software licenses are for Microsoft Office, without which many Company employees could not perform their core functions.

49.     Further, to date, Cornerstone has discovered six engineers used Solid Edge, a 3D modeling software, without licenses.

50.     Prior to closing, the Company sought to remedy this situation by instructing employees to share trial licenses of essential software.

51.     On information and belief, Womack had previously been fined for unauthorized use of computer software by a software company.

52.     Womack was aware of the Company's failure to obtain these licenses and failed to disclose it to Cornerstone.

53.     Because Womack failed to maintain these licenses, the Company had to acquire them after closing at significant, unanticipated cost.  The Solid Edge license cost approximately $20,000 annually, and the license for Microsoft Office cost approximately $4,500 annually.

54.     Womack's failure to disclose that the Company did not possess necessary licenses or other rights to use all Intellectual Property required for the operation of its business is a breach of the representations and warranties in the SPA, including Section 3.13(a), and resulted in Womack materially overstating the Company's profitability.

55.     Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA also gives rise to claim of fraud and/or intentional misrepresentation.

56.     Shortly after closing, Cornerstone began to discover that key pieces of the Company's equipment were in poor or non-working condition.  This equipment includes:  two Company trucks, including the primary truck that was not operational immediately following closing; compressors; a brake press; and the single laser that the Company uses to create its products.

57.     The condition of the equipment, including the laser central to the Company's operations, significantly impaired the Company's efficiency.  To resolve these issues, Cornerstone had to provide unanticipated additional capital.

58.     After closing, Cornerstone learned that Womack did not perform regular maintenance on the Company's equipment, including the laser, even after other Company employees informed him that Company equipment could and should be better maintained.  Womack simply ignored this advice.

59.     Womack was well aware of the condition of the Company's equipment, failed to disclose the condition of the equipment, and fraudulently and/or intentionally misrepresented the condition of the equipment to Cornerstone

during the course of negotiations and in the SPA, in violation of Section 3.21.  This also resulted in Womack materially overstating the Company's profitability.

60.     Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA also gives rise to claim of fraud and/or intentional misrepresentation.

### *Undisclosed employee payments and costs*

61.     On or after closing, Cornerstone began to uncover a number of costs and payments related to Company employees that Womack fraudulently and/or intentionally misrepresented to Cornerstone.

62.     First, Cornerstone discovered that an engineer crucial to the Company's business had to wait for the government to process his immigration paperwork.  In the interim, the Company used a third-party contractor to obtain the services of this employee legally.

63.     That employment arrangement increased the hourly costs of the employee for the Company.  Despite that, Womack failed to disclose the increased cost and the Company's reliance on an alternative employment arrangement.

64.     Second, four employees of the Company received pay increases immediately prior to Cornerstone's acquisition of the Company that were not disclosed to Cornerstone.

65.     Cornerstone confronted Womack about these pay increases, and he recognized that they should have been disclosed and offered to pay for the increases himself.

66.     Third, Womack provided three employees with car allowances as part of their compensation packages, but failed to report the allowances for income tax purposes.  Cornerstone was not notified of the failure to report this income prior to acquiring the Company.

67.     Finally, Cornerstone discovered that Womack had previously paid one key employee by signing over checks the Company received for scrap metal, leaving the employee with the expectation of higher pay.  Further, the scrap metal checks were not properly recorded for payroll tax purposes or disclosed to Cornerstone.

68.     While Womack had ceased paying the same employee via scrap metal checks, he had started to provide him with a "work in progress bonus" that was not disclosed to Cornerstone, leaving the employee to believe that his pay was cut following acquisition of the Company by Cornerstone.

69.     Womack knew about these increased costs and alternative payment arrangements, and his failure to disclose them to Cornerstone was a breach of the representations and warranties in the SPA, including Sections 3.9, 3.10, 3.11(b),

and 3.25, and resulted in Womack materially overstating the Company's profitability.

70.     Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA also gives rise to a claim of fraud and/or intentional misrepresentation.

### *False representations of the Company's business*

71.     In the course of negotiating the SPA, Womack provided Financial Statements that showed debts owed by the Company to its common vendors, as well as the value of orders placed with the Company.

72.     After closing, Cornerstone discovered that Womack fraudulently and/or intentionally misrepresented the value of open orders with the Company.

73.     Womack kept Company records that did not reflect the Company's inventory or work in progress.  When other Company employees tried to address this issue with Womack—in an attempt to better the Company's business practices—Womack disregarded their suggestions.

74.     Womack represented to Cornerstone that the open orders were valued at $3,309,649.68.  However, (i) many of the open orders were misstated, with a net negative value of over $242,000; (ii) more than $89,000 worth of orders were canceled by the Company's customers; and (iii) more than $286,000 worth of open

orders with the Company were more than nine months old and highly unlikely to be completed (and, to date, have not been).  On information and belief, Womack overstated the open orders by more than $670,000.

75.    The Company was also forced to cancel more than $800,000 in orders due to the labor and production capability issues resulting from Womack's fraud and/or intentional misrepresentations.

76.    Cornerstone learned after closing that Womack billed and collected payment for jobs he had not produced.  Cornerstone was therefore forced to complete these orders after closing.

77.    In addition to fraud and/or intentional misrepresentations of the outstanding orders, Womack also failed to disclose the many unpaid accounts of the Company's common vendors.

78.    On information and belief, Womack was aware of these outstanding invoices and failed to satisfy them prior to Cornerstone's acquisition of the Company.

79.    After closing, Cornerstone discovered that a broad majority of Company vendors were cash only due to Womack's history of slow and delayed payments.  Womack was aware of this cash only status, but failed to disclose it to Cornerstone prior to closing.  Cornerstone has also discovered that Womack often

did not have the capital to pay vendors and suppliers and he would use a Company employee's credit card to make raw material purchases for the Company and then pay the employee back at a later date. In fact, Womack kept the employee's credit card number on file in order to use it to pay for essential materials.

80.     As a result, Cornerstone was required to keep more capital in the Company to satisfy the Company's vendors and continue to receive crucial supplies and materials.

81.     Womack's failure to disclose the financial health of the Company was intentional and designed to induce Cornerstone to agree to the SPA.

82.     As a result, Cornerstone acquired a Company that is worth far less than was represented by Womack, if it is worth anything at all.

83.     On information and belief, Womack was well aware that the Financial Statements and information provided to Cornerstone were inaccurate, and his failure to provide Cornerstone with accurate financial information is a breach of the representations and warranties in the SPA, including Sections 3.6(a) and 3.7. This also resulted in Womack materially overstating the Company's profitability.

84.     Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA also gives rise to a claim of fraud and/or intentional misrepresentation.

### *False representations of the Company's Leased Real Property*

85.     Womack represented and warranted that the building the Company rented, including all buildings structures, and facilities, were in good condition and repair and sufficient for the operation of the Company's Business.  SPA § 3.14.

86.     Womack also represented that the Leased Real Property did not violate any applicable laws in any material respect.  SPA § 3.14.

87.     In December 2022, the Leased Real Property experienced a serious problem with the septic tank system.  During a rainstorm, the septic tank system flooded, resulting in a sewage backup in the building, including into some office spaces.

88.     Cornerstone had the septic tank system serviced, including emptying the septic tank.

89.     On or about December 20, 2022, Cornerstone informed Womack of the problem with the septic tank system and requested that he address the issue.

90.     Womack responded the same day and informed Cornerstone that it was the Company's responsibility.

91.     Within two weeks of the septic tank system service, the septic tank system flooded again, and again Cornerstone had to pay for the system to be serviced.

92.     Since that time, the septic tank system has flooded two additional times and has required service at Cornerstone's expense.  Cornerstone has also had to rent portable facilities, and has scheduled additional pumping of the septic tank system in an effort to avoid further sewage backups and to provide the minimum required facilities to keep the plant open and working.

93.     Cornerstone corresponded again with Womack, who indicated that he would find a way to resolve the issue with the septic tank system.  To date, Womack has not communicated any resolution.

94.     The Company moved to its current location in the summer of 2021, and, on information and belief, the septic tank system was an issue prior to closing. The issue was not sufficiently addressed by Womack nor was it disclosed to Cornerstone prior to closing.

95.     As a result of the continued flooding of the septic tank system, and the accompanying sewage backup in the building, the Leased Real Property is becoming unworkable for the Company due to the smell and general unsanitary conditions.  The regular backup of the septic tank system has also caused mold and other air quality issues in the building.

96.     The Leased Real Property is located in Cobb County.  Cornerstone and the Company recently discovered that, in its application for a construction

permit and site approval for an on-site sewage management system, JW Industrial represented that the Leased Real Property was a "commercial warehouse."

97.    At the time that JW Industrial and Womack submitted the septic tank system permit application, the Leased Real Property was used for manufacturing purposes, and it has continued to be used for manufacturing purposes since the application was submitted.

98.    The use of the Leased Real Property therefore violates applicable laws and the Company was not in compliance in all material respect with all permits at the time of the transaction.  Moreover, Womack's failure to acquire the proper septic tank system permit is directly related to the issues with the septic tank system at the Leased Real Property.

99.    Womack knew that the septic tank system was inadequate for the purposes of the business.  This is further evidenced by the fact that Womack, through JW Industrial, recently applied and received approval for a new septic tank system at the building site.

100.   After Closing, Cornerstone discovered that the skylights in the building leak when it rains.

101.   On information and belief, Womack knew about the skylight leaks prior to closing, but he did not disclose this to Cornerstone.

102.   After closing, Cornerstone also discovered that the roof of the building leaks into the parts room, negatively impacting the Company's materials and production.

103.   On information and belief, Womack knew about the roof leak prior to closing, but did not disclose it to Cornerstone.

104.    Given Womack's knowledge of these facts, his breach of the representations and warranties in the SPA also gives rise to a claim of fraud and/or intentional misrepresentation.

**Womack's Fraud and/or Intentional
Misrepresentation Was Material and Caused Extensive Damage**

105.   Because of Womack's deceit, the value of the Company was materially inflated.

106.   Had Womack disclosed the operational, financial, and legal issues facing the Company before April 6, 2022, Cornerstone would not have signed the SPA, given the material and detrimental qualitative and quantitative impact of these issues on the Company.

107.    Indeed, because Cornerstone cannot use the labor of individuals who are not employed by the Company (and who do not have authorization to work in the United States), Cornerstone has lost significant expertise that it was relying on based on Womack's representations and warranties.

108.   As a result, Cornerstone has been left with unfilled positions central to the Company's work and, even when Cornerstone has been able to fill these crucial positions, it has generally been with people with less experience and/or at a higher cost.  In particular, finding competent employees to oversee the manufacturing of electrical and refrigeration continues to be an issue at the Company.

109.   Further, the workforce shortage resulting from the discovery of the Company's reliance on the labor of undocumented persons has resulted in a decline in productivity and forced the Company to invest substantial resources, into recruiting, training, and preventing turnover (so as not to exacerbate already existing workforce issues).

110.   The Company's workforce shortage—a direct result of Womack's fraud and/or intentional misrepresentations—has caused the Company to lose at least a million dollars in business to date.  Further, the Company has experienced lost engineering costs and lost revenue.  The workforce shortage has also decreased customer confidence and negatively impacted many of the Company's long-term business relationships.

111.   The failure to disclose the Company's reliance on the labor of undocumented persons, coupled with the failure of Womack and the Company to report certain alternative payments for taxation purposes, have exposed the

Company to legal liability.  Cornerstone had no reason to suspect this type of legal exposure at the time of acquisition.

112.   In addition, Womack's failure to maintain licenses, along with employees' use of personal software and equipment, resulted in understatement of the expenses necessary to legally operate the Company's business and exposed the Company to potential fines from various software companies.

113.   The condition of the Company's assets, including equipment central to the Company's operations, has caused significant damage.  The substandard condition of the equipment has cost at least $90,000 in repairs just for the Company to be able to complete outstanding orders.

114.   The Company's equipment has also been plagued by downtime, further risking customer deadlines and damaging ongoing customer relationships.

115.   All of these damages are compounded by the fraudulent and/or intentionally misrepresented Financial Statements and representations of the Company's future business.

116.   The septic tank system has caused significant issues at the Company. This includes decreased efficiency due to the need to attend to the septic tank system backup and spillage of solid human waste; additional and unanticipated expenditures for professional cleaners; and habitability issues.

117.   What's more, Womack and JW Industrial's misrepresentation of the facility type on the septic tank system permit application reveals that the Leased Real Property was not in compliance with applicable laws at the time of the transaction.

118.   Womack knew that all of the aforementioned warranties and representations were false when made, but he concealed the truth from Cornerstone to induce Cornerstone to pay the Purchase Price for the Company.

119.   Cornerstone incurred significant expenses to consummate the transaction.

120.   Based on the information Cornerstone has learned since the acquisition, the Company is worth only a fraction of the price Womack fraudulently induced Cornerstone to agree to, if anything, and Cornerstone has been forced to sink significant capital into the Company.

121.   Cornerstone estimates the losses caused by Womack's contractual breaches and fraud and/or intentional misrepresentation to be well in excess of the Purchase Price, rescissory damages, and other damages to be determined at trial.

122.   Because of Womack's fraud and/or intentional misrepresentations, Cornerstone has also suffered reputational damage, strained relationships with suppliers and customers alike, and ongoing complications with staffing and

equipment at the Company.  These issues have also damaged Cornerstone's overall brand reputation, including by causing longer lead times that have slowed Cornerstone's ability to create sales for another company in its portfolio.

### Cornerstone's Service of Direct Claim Notice

123.   The SPA includes a limitation on indemnification, but that limitation does not apply to breaches of the Fundamental Representations and Warranties, Indemnified Taxes, or "Damages resulting from fraud or intentional misrepresentation on the part of Seller."  SPA § 7.6.  Cornerstone specifically bargained, and Womack agreed, to exempt fraud and intentional misrepresentation from the limitations cap.

124.   On December 13, 2022, Cornerstone served on Womack a Direct Claim Notice, pursuant to SPA § 7.5, outlining Womack's intentional misrepresentations, fraud, and other violations of the SPA, and including a reasonably detailed description of the applicable Damages.

125.   Womack responded, through counsel, on December 22, 2022, offering only a blanket denial of Cornerstone's claims and demand for indemnification, and stating that he would "not expend the time providing a point-by-point recitation regarding why the assertions in your letter are faulty, both factually and legally."

## Cornerstone's Request for Price Adjustment

126.   Within ninety days of closing, Cornerstone provided Womack with a Closing Statement, pursuant to Section 2.5 of the SPA.

127.   On October 13, 2022, Womack provided Cornerstone with some additional information related to the Closing Statement.

128.   On November 1, 2022, Cornerstone provided Womack with a revised Closing Statement.  In that revised statement, Cornerstone requested that Womack authorize payment of $344,179.56, in accordance with the SPA.  Cornerstone, again, provided Womack with an opportunity to provide additional information that could lead to a reduction in the amount he owed under the Closing Statement.

129.   Womack responded to Cornerstone on December 1, 2022.  In his December email, Womack made false statements about Cornerstone's representations regarding the Company's Truist bank account.  In response, Cornerstone reminded Womack that, pursuant to Section 3.28 of the SPA, the Truist bank account belongs to the Company and was included with the SPA.

130.   Womack's December 1, 2022 response also made additional adjustments to the Closing Statement.  These adjustments were impermissible under the SPA and did not comport with GAAP, as required by the SPA.

131.   In Cornerstone's December 23, 2022 response to Womack's December 1, 2022 email, Cornerstone attached a final Closing Statement incorporating some of Womack's adjustments and disregarding the adjustments that were incorrect and inconsistent with the SPA.

132.   Based on the Closing Statement, and pursuant to the SPA, Womack owes Cornerstone $283,596.02.

133.   To date, Womack has not paid this amount to Cornerstone and has not authorized payment of this amount from the Escrow Property.

134.   Cornerstone acted in good faith to address Womack's objections to the Closing Statement.

135.   By contrast, Womack has engaged in dilatory tactics that have significantly slowed the Purchase Price adjustment outlined in the SPA.  This includes Womack's failure to respond to Cornerstone's initial Closing Statement within the thirty days specified in the SPA.  SPA § 2.5(b).

136.   Pursuant to Section 2.5(c) of the SPA, Cornerstone and Womack should have already retained Independent Auditors because they were unable to resolve issues related to the Closing Statement within thirty days of Cornerstone's receipt of Womack's Objection Notice.

137.   In its December 23, 2022 email, Cornerstone informed Womack that if he did not authorize payment on the Closing Statement by December 30, 2022, Cornerstone would invoke Section 2.5 of the SPA and retain Independent Auditors.

138.   Womack did not respond to Cornerstone's December 23, 2022 email. On January 16, 2023, Cornerstone wrote to Womack again about the Closing Statement.  Cornerstone demanded that Womack respond by January 20, 2023, and inform Cornerstone whether Womack agreed with the Closing Statement attached to the December 23, 2022 email or, if not, whether Womack agreed to the retention of Grant Thornton LLP as Independent Auditors, pursuant to Section 2.5(c) of the SPA.

139.   On January 25, 2023, Womack sent Cornerstone a response contesting Cornerstone's Closing Statement.  In his response, Womack did not agree to the retention of Independent Auditors, as required by the SPA.

## Discovery of Fraud in and Breach of the Lease Agreement

140.   Pursuant to the Lease Agreement, JW Industrial (owned by Womack) represented and warranted that the Leased Premises materially complied with all applicable Legal Requirements.

141.   Womack and JW Industrial misrepresented the use of the Leased Premises in the septic tank system application, and never sought to correct it.

142.   The septic tank system therefore does not comply with all applicable Legal Requirements.

143.   On information and belief, JW Industrial's failure to obtain the proper permit for the septic tank system has led directly to the issues with the septic tank system at the Leased Premises, noted *supra*.

144.   JW Industrial recently received approval for a new septic tank system, further evincing that the existing septic tank system does not comply with Legal Requirements.

145.   Pursuant to the Lease Agreement, JW Industrial was to have substantially completed the Expansion Space by April 6, 2023, including obtaining a temporary certificate of occupancy.

146.   On information and belief, JW Industrial will not complete the Expansion Space by the deadline.

147.   To date, JW Industrial has not completed the basic structure, has not constructed any interior, and will not be able to substantially complete the Expansion Space by the deadline.

## CLAIMS FOR RELIEF

### Count I
### Fraud (damages) as to Womack (SPA)

148.   Cornerstone repeats and realleges all previous allegations as if they had been set forth in full herein.

149.   In the SPA, Womack represented and warranted that the Company was financially stable and that the equipment, staffing, and other aspects of the Company crucial to its business (and the reason Cornerstone sought to add the Company to its portfolio) were solid and accounted for.

150.   Specifically, Womack represented and warranted that the Company had:  provided true, correct, and complete copies of its Financial Statements; not made any significant expenditures during the course of negotiations; complied with all applicable laws, including the legal requirement to check the immigration status of employees and the requirement to report all income for payroll tax purposes; acquired all licenses needed to conduct the business; kept all machinery,

equipment, computers, and related equipment in good operating condition and repair; and disclosed all alternative work arrangements and salary increases.

151.   These provisions were supported by due diligence, during which Womack presented false and/or incomplete information about all aspects of the Company.  Despite his obligation to do so, and despite his knowledge that his representations were false, Womack did not disclose any of the equipment, workforce, or financial issues plaguing the Company.

152.   Womack's concealment materially inflated the value of the Company and was intended to and did induce Cornerstone to sign and close the agreement that is memorialized in the SPA.

153.   Cornerstone, at all times, acted in justifiable reliance on Womack's representations and warranties.

154.   Cornerstone would never have entered into the SPA had it known Womack was lying and misrepresenting the Company's performance.

155.   Womack procured the SPA by fraud, causing Cornerstone to suffer damages in an amount materially exceeding the cap for breach of contract. Cornerstone's damages include a Company with a value that is significantly less than has been represented, and may be close to nothing; the deprivation of the benefit of its bargain; Cornerstone's enormous out-of-pocket and opportunity costs

mitigating the fallout from Womack's' fraud; and injury to Cornerstone's relationships with suppliers and customers, alike.

## Count II
### Fraud (rescission) as to Womack (SPA)

156. Cornerstone repeats and realleges all previous allegations as if they had been set forth in full herein.

157. In the SPA, Womack falsely represented and warranted that the Company was financially stable and that the equipment, staffing, and other aspects of the Company crucial to its business (and the reason Cornerstone sought to add the Company to its portfolio) were solid and accounted for.

158. Specifically, Womack represented and warranted that the Company had: provided true, correct, and complete copies of its Financial Statements; not made any significant expenditures during the course of negotiations; complied with all applicable laws, including the legal requirement to check the immigration status of employees and the requirement to report all income for payroll tax purposes; acquired all licenses needed to conduct the business; kept all machinery, equipment, computers, and related equipment in good operating condition and repair; and disclosed all alternative work arrangements and salary increases.

159. These provisions were supported by due diligence, during which Womack presented intentionally false and/or incomplete information about all

aspects of the Company. Despite his obligation to do so, and despite his knowledge or belief that his representations were false, Womack did not disclose any of the equipment, workforce, or financial issues plaguing the Company.

160.   Womack's concealment inflated the value of the Company and was intended to and did induce Cornerstone to sign and close the agreement that is memorialized in the SPA.

161.   Cornerstone, at all times, acted in justifiable reliance on Womack's representations and warranties.

162.   Cornerstone would never have entered into SPA had it known Womack was misrepresenting the Company's performance.

163.   Accordingly, Womack is liable to Cornerstone for fraudulent inducement, and Cornerstone is entitled to rescind the SPA, or to receive rescissory damages if rescission proves impractical.

## Count III
### Unjust Enrichment as to Womack (in the alternative)

164.   Cornerstone repeats and realleges all previous allegations as if they had been set forth in full herein.

165.   In the alternative, Cornerstone is entitled to recovery from Womack for unjust enrichment.

166.   As alleged herein, Womack was enriched by the profits reaped from the SPA.

167.   As alleged herein, Cornerstone was impoverished by agreeing to pay the Purchase Price for all of the outstanding shares of the Company.  The Company was worth far less than represented; Cornerstone obtained assets of less value than the consideration it paid; Cornerstone was deprived of the benefit of its bargain; and Cornerstone has incurred significant consequential damages.

168.   The enrichment of Womack is a result of the false representations and warranties, factual omissions, and deliberate concealment of Womack, without which Cornerstone would not have entered into the SPA.

169.   Cornerstone's impoverishment is directly related, dollar for dollar, to Womack's unjust enrichment.

170.   Womack lacks any justification for his unjust enrichment, and to the extent that Womack is found not liable for breach of the SPA, Cornerstone has no remedy at law.

## Count IV
## Breach of Contract for Breach of § 3.6(a) of the SPA as to Womack (in the alternative)

171.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

172.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

173.   In Section 3.6(a) of the SPA, Womack represented and warranted that,

> [a]ttached to Schedule 3.6(a) are true, correct and complete copies of the following financial statements of the Company (the "Financial Statements"):  (i) unaudited balance sheet as of June 30, 2020 and June 30, 2021 and related statements of income and cash flows for the 12 months then ended, and (ii) unaudited balance sheet as of December 31, 2021 and related statements of income and cash flows for the six (6) months then ended.  The Financial Statements have been prepared in accordance with the Accounting Methods applied on a consistent basis throughout the periods covered thereby and present fairly, in all material respects, the financial condition of the Company as of such dates and the results of operations for the periods specified.

174.   Womack represented and warranted that he had provided true, correct, and complete copies of the Company's Financial Statements, prepared in accordance with GAAP.

175.   As described herein, Womack:  underreported labor costs (including failing to disclose the Company's unlawful reliance on undocumented persons);

failed to disclose increased compensation he provided to employees; failed to properly disclose car allowances; and underreported the costs of running the business, including the cost of technology licenses and the condition (and required repairs) of crucial Company equipment.

176.   Accordingly, Womack breached Section 3.6(a) of the SPA, and, Cornerstone is entitled to money damages in an amount to be proven at trial.

<u>**Count V**</u>
**Breach of Contract for Breach of § 3.7 of the SPA as to Womack (in the alternative)**

177.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

178.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

179.   In Section 3.7 of the SPA, Womack represented and warranted that the Company had "not done any of the following":  "delayed or postponed the payment of accounts payable or other Liabilities"; "made any capital expenditures or commitments therefore either involving more than $25,000 (individually or in the aggregate) or outside the ordinary course of business"; or "made any changes in any employee compensation, benefits, severance or termination agreement other

than routine salary increases in the ordinary course of business."  SPA § 3.7(ii),

(vi), (xi).

180.   As described herein, Womack postponed payment of invoices to the

Company's vendors.  And Womack made changes to employee compensation,

including raising employee salaries.

181.   Accordingly, Womack breached Section 3.7 of the SPA, and

Cornerstone is entitled to money damages in an amount to be proven at trial.

<u>**Count VI**</u>
**Breach of Contract for Breach of § 3.9 of the SPA as to Womack (in the alternative)**

182.   Cornerstone repeats and realleges all previous allegations as if they

had been set forth herein.

183.   Cornerstone is entitled to damages as proved under the SPA because

Womack's violation of the representations and warranties in the SPA.

184.   In Section 3.9 of the SPA, Womack represented and warranted that,

> [e]xcept as set forth on Schedule 3.9, the Company has
> complied in all material respects with all applicable laws, and
> no action, suit, proceeding, hearing, investigation, charge,
> complaint, claim, demand or notice has been filed or
> commenced against the Company alleging any failure to so
> comply.

185.   As described herein, Womack unlawfully relied upon the labor of

undocumented persons in order to carry out the work of the Company.  Womack

did not disclose the fact that the workforce consisted of a number of undocumented persons, whose wages were not reported to the Internal Revenue Service or any other government agency, in clear violation of applicable law.  Womack also failed to disclose alternative forms of compensation he paid to employees, including scrap metal checks and car allowances that were not properly reported for payroll tax purposes.

186.   Accordingly, Womack breached Section 3.9 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## Count VII
### Breach of Contract for Breach of § 3.10 of the SPA as to Womack (in the alternative)

187.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

188.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

189.   In Section 3.10 of the SPA, Womack represented and warranted,

> [t]he Company has no Liabilities other than (a) Liabilities set forth on the face of the most recent balance sheet included in the Financial Statements, and (b) Liabilities that have arisen after the date thereof in the ordinary course of business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law).

190.   As described herein, Womack failed to disclose the Company's violation of applicable laws, including labor and tax laws based on the Company's reliance on undocumented persons to fulfill the Company's obligations.  As a consequence of Womack's actions and failure to disclose, Cornerstone was required to engage immigration attorneys in an effort to assist the five undocumented workers, as well as two additional employees, at a cost of approximately $15,000.  Further, Womack also failed to disclose his alternative payments to certain Company employees—including scrap metal checks and car allowances—for tax purposes.

191.   Accordingly, Womack breached Section 3.10 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

<u>**Count VIII**</u>
**Breach of Contract for Breach of § 3.11(b) of the SPA as to Womack (in the alternative)**

192.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

193.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

194.   In Section 3.11(b) of the SPA, Womack represented and warranted that,

[t]he Company has timely collected or withheld and timely paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractors, creditor, stockholder, or other Person, as required under applicable Tax laws. All Persons who have been classified as independent contractors were properly so classified.

195. As described herein, Womack repeatedly failed to withhold and timely pay all taxes in connection with any amounts paid or owing to any employee, and failed to disclose this failure to Cornerstone. This includes Womack's undisclosed alternative payments in the form of car allowances and scrap metal checks, and Womack's reliance on undocumented persons for Company work.

196. Accordingly, Womack breached Section 3.11(b) of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## Count IX
### Breach of Contract for Breach of § 3.13(a) of the SPA as to Womack (in the alternative)

197. Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

198. Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

199.   In Section 3.13(a) of the SPA, Womack represented and warranted that,

> [e]xcept as set forth on Schedule 3.13(a), (i) the Company exclusively owns and possesses all right, title and interest in and to, or has a license or other right to use, all Intellectual Property that is used in or necessary for the operation of its business (collectively, the "Company Intellectual Property"), free and clear of all Liens other than Permitted Liens; and (ii) all Company Intellectual Property will be available for use by the Company after the Closing Date on the same terms and conditions to those under which the Company owned or used the Company Intellectual Property prior to the Closing Date. The Company has not interfered with, infringed upon or misappropriated any Intellectual Property rights of any Person, and the Company has not received any notice alleging any of the foregoing.  To the Knowledge of the Company, no Person has interfered with, infringed upon or misappropriated any Company Intellectual Property, and the Company has not given any notice alleging any of the foregoing.

200.   As described herein, the Company did not have a license for crucial software, including Microsoft Office and Solid Edge, and Womack required Company employees to use their own licenses for employment-related tasks.

201.   Accordingly, Womack breached Section 3.13(a) of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## Count X
## Breach of Contract for Breach of § 3.14 of the SPA as to Womack (in the alternative)

202.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

203.   Cornerstone is entitled to damages as proved under the SPA because Womack's violations of the representations and warranties in the SPA.

204.   In Section 3.14, Womack represented and warranted that "[a]ll buildings, structures, fixtures, building systems and equipment" of the Leased Real Property "are in good condition and repair . . . and sufficient for the operation of the Company's business."   Section 3.14 provides that, "[n]one of the Leased Real Property, buildings, structures, fixtures, building systems and equipment, or the use thereof, violates any applicable laws in any material respect."  Womack also represented and warranted that "[t]he Company has obtained and is and during the previous three (3) years has been in compliance in all material respects with all permits, licenses and other authorizations required for the occupation, development and buildout of, and any construction on, the Leased Real Property."

205.   As described herein, Womack knew that the septic tank system was not adequate for the building and failed to obtain the proper permit for the septic tank system from Cobb and Douglas Public Health, as required by law.

206.   As described herein, Womack also knew that the building's roof and skylights leaked and were not sufficient for the operation of the Company's business.

207.   Accordingly, Womack breached Section 3.14 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## **Count XI**
## **Breach of Contract for Breach of § 3.18(c) of the SPA as to Womack (in the alternative)**

208.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

209.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

210.   In Section 3.18(c), Womack represented and warranted that he had attached a schedule that listed "each of the following contracts, agreements, or other arrangements to which the Company is a party or by which any of its assets or property is bound," including "agreement for the employment of any Person on a full-time, part-time, consulting or other basis, including any collective bargaining agreement or other similar contract." SPA § 3.18(c).

211.   As described herein, Womack failed to include on that list the work of five undocumented persons who performed a significant percentage of the

Company's work, and who Cornerstone could not rely upon following acquisition of the Company without violating various laws and regulations.

212.    Accordingly, Womack breached Section 3.18(c) of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

**Count XII**
**Breach of Contract for Breach of § 3.21 of the SPA as to Womack (in the alternative)**

213.    Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

214.    Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

215.    In Section 3.21 of the SPA, Womack represented and warranted that,

> [t]he Company owns or leases all machinery, equipment, computers and related equipment, furniture, vehicles, and other tangible assets necessary for the conduct of its business as currently conducted.  Each such tangible asset is in good operating condition and repair (ordinary wear and tear excepted), and is suitable for the purpose for which it used. During the previous three (3) years, the Company has not sold or licensed any material assets necessary for the conduct of the Company's business except sales of inventory in the ordinary course of business or to the extent that such assets have been replaced.  Except as set forth on Schedule 3.21, the inventory of the Company is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is slow-moving, obsolete, damaged, or defective.  Except as set forth on Schedule 3.21, no inventory located at the Leased Real Property (or otherwise in the possession of the Company) is owned or

leased by any Person other than the Company, and no inventory of the Company is located anywhere other than the Leased Real Property.

216.   As described herein, Womack's representations and warranties were false.  Indeed, equipment central to the Company's business, including trucks, compressors, a brake press, and the Company's only laser were in knowing disrepair, resulting in significant expense for the Company.

217.   Accordingly, Womack breached Section 3.21 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## <u>Count XIII</u>
### Breach of Contract for Breach of § 3.24 of the SPA as to Womack (in the alternative)

218.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

219.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

220.   In Section 3.24, Womack represented and warranted that, except as set forth in Schedule 3.24, "Seller nor any director, officer, employee or affiliate of the Company (a) has been involved in any business arrangement or relationship with the Company within the past 24 months, or (b) owns any asset which is used in the business of the Company."  SPA § 3.24.

221.   As described herein, Womack arranged and provided compensation for five undocumented persons who performed a significant percentage of the Company's work, which Womack did not disclose to Cornerstone.

222.   Accordingly, Womack breached Section 3.24 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

### Count XIV
**Breach of Contract for Breach of § 3.25 of the SPA as to Womack (in the alternative)**

223.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

224.   Cornerstone is entitled to damages as proved under the SPA because Womack's violation of the representations and warranties in the SPA.

225.   In Section 3.25 of the SPA, Womack represented and warranted that,

> Schedule 3.25 contains a list of all employees of the Company and the following information for each employee:  name, position, base compensation and bonus compensation earned in the year ended December 31, 2021, and current base compensation and bonus program.  The Company complies and has complied, in all material respects, with all applicable laws respecting labor and employment matters (including any applicable laws concerning COVID-19 related health and safety issues).  The Company has no Liability and is not otherwise liable for the payment of any compensation, damages, Taxes, fines, penalties, interest, or other amounts, however designated, for failure to comply with any of the foregoing laws, and there are no pending or threatened claims or complaints before the Occupational Safety and Health Administration (or any

comparable state or local safety or health administration or other entity) brought by, involving or affecting any of the employees or contractors of the Company. At all times since May 7, 2021, the Company has complied in all material respects with the Occupational Safety and Health Act of 1970 and any comparable state or local law applicable to the Company. The Company has not received any retirement or termination notice with respect to any current employee of the Company and, to the Company's Knowledge, no current employee has any plans to retire or terminate his or her employment with the Company. The qualifications for employment of all such employees under applicable immigration laws have been reviewed by the Company and a properly completed Form I-9 is on file with the Company for each employee. Every Person who has provided service to the Company has been properly classified by the Company as an employee or independent contractor in compliance with applicable law.

226. As described herein, Womack's representations and warranties were false. Womack failed to disclose that the Company's regular operations relied on labor from undocumented persons who were never identified by Womack. In short, the list was incomplete and designed to hide the fact that these persons did not qualify for employment in the United States under applicable immigration and employment laws. Moreover, Womack failed to disclose the compensation of a number of employees, including salary increases and scrap metal checks. And, by failing to properly report car allowances and scrap metal checks for the purpose of payroll taxes, Womack failed to comply with all applicable labor and employment laws.

227.   Accordingly, Womack breached Section 3.25 of the SPA, and Cornerstone is entitled to money damages in an amount to be proven at trial.

## Count XV
### Declaratory Judgment as to Womack (Escrow Agreement)

228.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

229.   Womack has not indemnified Cornerstone for the Damages caused by its breaches of the SPA.

230.   Cornerstone provided notice to the Escrow Agent on February 13, 2023.

231.   Womack will dispute Cornerstone's right to disbursement of the Escrow Property under the Escrow Agreement.  Declaratory relief will terminate some or all of the controversy between the parties.

232.   Accordingly, an actual, justiciable controversy exists among the parties regarding Cornerstone's right to the immediate release of the Escrow Property.

233.   In accordance with 28 U.S.C. § 2201, Cornerstone seeks a judicial determination by this Court of its entitlement to release of the Escrow Property under the Escrow Agreement.

## <u>Count XVI</u>
## **Declaratory Judgment as to Womack (SPA § 2.5)**

234.   Cornerstone repeats and realleges all previous allegations as if they had been set forth herein.

235.   Each contract includes a duty of good faith and fair dealing in its performance and enforcement.  *See* Restatement (Second) of Contracts § 205.

236.   As alleged herein, it is a contractual obligation implied within the SPA that Womack would perform in good faith under the contract.

237.   Womack has not provided any response to Cornerstone's request for a Purchase Price adjustment or to appoint Grant Thornton LLP as Independent Auditors.

238.   Womack has breached his obligations of good faith and fair dealing under the SPA.

239.   As a result, Womack has deprived Cornerstone of the benefit of its bargain and Cornerstone has suffered significant damages.

240.   Womack has and will continue to dispute, through silence or otherwise, Cornerstone's entitlement to the adjusted Purchase Price and the process set forth in the SPA for receiving and/or confirming that adjusted Purchase Price. Declaratory relief will terminate some or all of the controversy between the parties.

241.   Accordingly, an actual, justiciable controversy exists among the parties regarding Cornerstone's right to adjustment of the Purchase Price.

242.   In accordance with 28 U.S.C. § 2201, Cornerstone seeks a judicial determination by this Court of its entitlement to adjustment of the Purchase Price in the amount of $283,596.02, as stated in Cornerstone's December 23, 2022 email to Womack.

243.   In the alternative, and for the reasons noted above, Cornerstone is entitled to the appointment of Grant Thornton LLP to act as Independent Auditors, pursuant to the SPA.

## Count XVII
### Fraud (damages) as to JW Industrial (Lease Agreement)

244.   The Company repeats and realleges all previous allegations as if they had been set forth herein.

245.   On information and belief, Womack controls and operates JW Industrial.

246.   JW Industrial had knowledge of Womack's fraudulent representations and warranties to Cornerstone, and JW Industrial knew the Lease Agreement was part and parcel of Womack's fraud.

247.   The Company would not have entered the Lease Agreement but for its connection to the SPA, and the fraudulent inducement by Womack related to the SPA.

248.   JW Industrial was a participant in Womack's fraud, causing the Company to suffer damages to be proven at trial.

## Count XVIII
### Breach of Contract for Breach of § 3.08(b) of the Lease Agreement as to JW Industrial (in the alternative)

249.   The Company repeats and realleges all previous allegations as if they had been set forth herein.

250.   The Company is entitled to damages as proved under the Lease Agreement because JW Industrial's violation of the representations and warranties in the Lease Agreement.

251.   In Section 3.08(b), JW Industrial represented and warranted that, "as of the Effective Date the Leased Premises . . . materially comply with all applicable Legal Requirements[.]"  Lease Agreement § 3.08(b).

252.   As described herein, JW Industrial did not obtain the proper permit for the septic tank system from Cobb and Douglas Public Health, as required by law.

253.   Accordingly, JW Industrial breached Section 3.08(b) of the Lease Agreement, and the Company is entitled to money damages in an amount to be proven at trial.

**Count XIX**
**Declaratory Judgment as to JW Industrial (Lease Agreement)**

1.   The Company repeats and realleges all previous allegations as if they had been set forth herein.

2.   JW Industrial has not substantially completed the Expansion Space and will not substantially complete the Expansion Space by April 6, 2023.

3.   JW Industrial will dispute that it has not substantially completed Expansion Space by April 6, 2023, and cannot substantially complete the Expansion Space by that date.  Declaratory relief will terminate some or all of the controversy between the parties.

4.   Accordingly, an actual, justiciable controversy exists among the parties regarding the JW Industrial's breach of the Lease Agreement.

5.   In accordance with 28 U.S.C. § 2201, the Company seeks a judicial determination by this Court that JW Industrial breached the Lease Agreement by failing to substantially complete the Expansion Space by April 6, 2023.

## Count XX
### Unjust Enrichment as to Womack

6.      The Company and Cornerstone repeat and reallege all previous allegations as if they had been set forth in full herein.

7.      As alleged herein, Womack was enriched by the funds that he misappropriated from the Company's Truist bank account after the Closing Date.

8.      As alleged herein, the Company and Cornerstone were impoverished by Womack's misappropriation of the Company's funds in the Truist bank account.

9.      The Company's and Cornerstone's impoverishment is directly related, dollar for dollar, to Womack's unjust enrichment.

10.      Womack lacks any justification for his unjust enrichment.

## Count XXI
### Conversion as to Womack

11.      The Company and Cornerstone had a possessory interest in the funds in the Truist bank account.

12.      Womack interfered with the Company's and Cornerstone's possessory interest in the funds in the Truist bank account by using those funds for Womack's own benefit.

13.     As a result of Womack's conversion of the Company's and Cornerstone's funds, Cornerstone has been damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Cornerstone prays for judgment in its favor and against Womack as follows:

A. As to Counts I and II, entry of a judgment for money damages, rescission, or rescissory damages for Womack's fraudulent inducement;

B. As to Count III, entry of judgment for rescission, damages, rescissory damages, disgorgement, or any other remedy just and proper for Womack's unjust enrichment;

C. As to Count IV, entry of judgment for indemnification and damages for Womack's breach of Section 3.6(a) of the SPA;

D. As to Count V, entry of judgment for indemnification and damages for Womack's breach of Section 3.7 of the SPA;

E. As to Count VI, entry of judgment for indemnification and damages for Womack's breach of Section 3.9 of the SPA;

F.  As to Count VII, entry of judgment for indemnification and damages for Womack's breach of Section 3.10 of the SPA;

G. As to Count VIII, entry of judgment for indemnification and damages for Womack's breach of Section 3.11(b) of the SPA;

H. As to Count IX, entry of judgment for indemnification and damages for Womack's breach of Section 3.13(a) of the SPA;

I. As to Count X, entry of judgment for indemnification and damages for Womack's breach of Section 3.14 of the SPA;

J. As to Count XI, entry of judgment for indemnification and damages for Womack's breach of Section 3.18(c) of the SPA;

K. As to count XII, entry of judgment for indemnification and damages for Womack's breach of Section 3.21 of the SPA;

L. As to count XIII, entry of judgment for indemnification and damages for Womack's breach of Section 3.24 of the SPA;

M. As to count XIV, entry of judgment for indemnification and damages for Womack's breach of Section 3.25 of the SPA;

N. As to Count XV, a judicial determination of Cornerstone's entitlement to release of the Escrow Property under the Escrow Agreement;

O. As to count XVI, a judicial determination of Cornerstone's entitlement to adjustment of the Purchase Price in the amount of $283,596.02, or,

in the alternative, the appointment of Grant Thornton LLP as Independent

Auditors;

P.  As to Count XVII, entry of a judgment for money damages,

rescission, or rescissory damages for Womack's fraudulent inducement;

Q. As to Count XVIII, entry of judgment for breach and damages for JW

Industrial's breach of Section 3.08(b) of the Lease Agreement;

R. As to Count XIX, a judicial determination of JW Industrial's breach

of the Lease Agreement;

S. As to Count XX, damages for Womack's unjust enrichment;

T. As to Count XXI, damages for Womack's conversion;

U. Compensatory damages;

V. Punitive damages;

W. Costs and expenses, including attorneys' fees, incurred in this action;

X. Pre- and post-judgment interest; and

Y. Such other and further relief as the Court may deem just and proper.

Dated:  February 14, 2023

*Of Counsel:*

Timothy D. Katsiff (*pro hac vice forthcoming*)
Aliza Karetnick (*pro hac vice forthcoming*)
J. Chesley Burruss (*pro hac vice forthcoming*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
(215) 665-8500 (Telephone)
(215) 864-8999 (Facsimile)
katsifft@ballardspahr.com
karetnicka@ballardspahr.com
burrussc@ballardspahr.com

/s/ *Keisha O. Coleman*
Keisha O. Coleman
Georgia Bar No. 844720
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1600
Atlanta, GA 30309
(678) 420-9300 (Telephone)
(678) 420-9301 (Facsimile)
colemank@ballardspahr.com

*Attorneys for Plaintiff Cornerstone
Foodservice Group, Inc.*