# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
10155 Eagle Drive
Covington, GA 30014-3804

Date: September 15, 2022

Armoni I. McCree

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Armoni I. McCree (BNC#: 21B0560C72911)                              Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Armoni I. McCree (BNC#: 21B0560C72911)                          Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (877) 626-9909.

Social Security
3554 Covington Highway
Decatur, GA 30032-9803

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

Kristen Glover
Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|

Armoni I. McCree                              Supplemental Security Income
(Claimant)

_____                    21B0560C72911
(Wage Earner)                                (Beneficiary Notice Control Number)
                                             *Social Security Number removed for your protection*

## JURISDICTION AND PROCEDURAL HISTORY

On December 18, 2020, the claimant filed an application for supplemental security income, alleging disability beginning August 24, 2020.  The claim was denied initially on September 30, 2021, and upon reconsideration on April 13, 2022.  Thereafter, the claimant filed a written request for hearing received on April 20, 2022 (20 CFR 416.1429 *et seq.*).  On August 30, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic.  All participants attended the hearing by telephone.  The claimant agreed to appear by telephone before the hearing and confirmed such agreement at the start of the hearing (12B).  The claimant is represented by Kathleen Flynn, an attorney, and Brynne Holt, an attorney, who appeared at the hearing.  Kim E. Bennett, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since December 18, 2020, the date the application was filed.

See Next Page

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

See Next Page

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since December 18, 2020, the application date (8D, 9D) (20 CFR 416.971 *et seq.*).**

**2.   The claimant has the following severe impairments:  gunshot wound; depression; anxiety; and post-traumatic stress disorder (PTSD) (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

Regarding listing 1.21, the claimant does not have a soft tissue injury or abnormality under continuing surgical management that is documented by evidence confirming continuing surgical management directed toward saving, reconstructing, or replacing the affected part of the body, that the surgical management has been, or is expected to be, ongoing for a continuous period of at least 12 months, and that the maximum benefit from therapy has not been achieved.

See Next Page

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a moderate limitation. He alleged that he has problems with memory, understanding, and following instructions (3E, 4E, 7E).  During mental status exams in October and November 2020, he evidenced at least average intellect, and his short-term memory appeared intact (4F).  During the June 2021, psychological consultative exam, while not on medication, his remote memory was average, and his immediate memory and recent memory were mildly to moderately impaired (6F).  During the July 2021 medical consultative exam, he had normal short-term and long-term memory (7F).  During psychiatric assessments in 2022, he had no impairment in memory (10F, 14F).

In interacting with others, the claimant has a moderate limitation.  He alleged that he does not like crowds, and that he has problems getting along with others (3E, 4E, 7E).  During mental status exams in October and November 2020, he made good eye contact and was cooperative (4F).  During the June 2021 psychological consultative exam, while not on medication, he averted eye contact (6F).  During the July 2021 medical consultative exam, he was cooperative (7F).  During psychiatric assessments in 2022, he was cooperative (10F, 14F).

In concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  He alleged that he has problems completing tasks, concentrating, and following instructions (3E, 4E, 7E).  During mental status exams in October and November 2020, his attention appeared intact (4F).  During the June 2021 psychological consultative exam, while not on medication, his concentration was moderately impaired (6F).  During the July 2021 medical consultative exam, he was alert and oriented to time, place, and person (7F).  During psychiatric assessments in 2022, his attention and concentration were not impaired (10F, 14F).

In adapting or managing oneself, the claimant has a moderate limitation.  He alleged that he has problems handling stress and changes in routine (3E, 4E, 7E).  During mental status exams in October and November 2020, his affect was euthymic, and his grooming, hygiene, insight, and judgment were good (4F).  During the June 2021 psychological consultative exam, he had adequate hygiene (6F).  During the July 2021 medical consultative exam, he had a depressed affect, but he had normal judgment and appeared to have good hygiene (7F).  During psychiatric assessments in 2022, his affect was euthymic, he was well groomed with good hygiene, and his insight and judgment were normal (10F, 14F).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

See Next Page

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. To satisfy the "paragraph C" criteria, the mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2. The criterion in C2 is satisfied when the evidence shows that, despite diminished symptoms and signs, the claimant has achieved only marginal adjustment. This means the claimant must have minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.

The "paragraph C" criteria are not met because the claimant has more than minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. There is no evidence in the record establishing changes or increased demands have led to exacerbation of symptoms and signs and to deterioration in his functioning. He had mostly normal mental status exams and no psychiatric hospitalizations (4F, 6F, 8F, 10F, 14F).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he can never climb ropes, ladders, or scaffolds; can frequently climb ramps and stairs, balance, stoop, crouch, crawl, and kneel; and is limited to simple and routine tasks with simple work-related decisions, no interaction with the public, occasional interaction with coworkers and supervisors, and occasional routine workplace changes.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other

symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant made the following allegations regarding the limiting effects of his impairments. He alleged disability due to back pain, depression, anxiety, and PTSD (1E). In function reports, he alleged that he can lift only 20 pounds, and that he has problems standing, sitting, performing postural activities, reaching, with memory, completing tasks, concentrating, understanding, following instructions, getting along with others, and handling stress and changes in routine (3E, 4E, 7E). He testified that he cannot work due to poor attention span and focus; that counseling and medication have not helped his mental health; that the bullet in his back affects his ability to move, sleep, and sit and stand for long periods; that he can stand no longer than 10 minutes, sit upright 10 to 15 minutes, and lift and carry 5 to 10 pounds; that he cannot bend or squat; that he cannot reach his arms out to his sides; that he has trouble sleeping; that he wakes up with cold sweats and has panic attacks; that his depression makes him sluggish and causes him not to take care of his hygiene; that he does not shower every day; that his PTSD makes him sensitive to loud noise; that he does not get along with anyone; and that his memory is "okay."

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In August 2020, the claimant presented to the emergency room for a gunshot wound to the back (1F/10). On exam, he had a ballistic wound to the right flank with edema over the lower thoracic spine. A provider noted that a secondary exam showed no neurological deficits (1F/11).

In October 2020, the claimant presented to his primary care provider complaining of persistent back discomfort and anxiety following his gunshot wound. He was nervous and anxious (2F/9). On exam, he had tenderness at the site of the retained bullet. He reported minimal symptoms of depression. The provider referred him to surgery for removal of the retained bullet and started him on medication for depression and anxiety (2F/10).

In October 2020, the claimant also presented to a psychiatrist for depression and anxiety that started after the gunshot incident. He reported that he had difficulty sleeping, but that he felt rested enough to finish his schoolwork (4F/16). On exam, he made good eye contact. His responses were well thought out and evidenced at least average intellect. He was cooperative and polite. He articulated his thoughts well. His affect was euthymic. He did not appear depressed or anxious. The provider noted that his symptoms reflected adjustment disorder and did not meet full criteria for major depressive disorder or PTSD (4F/17).

The claimant returned the next month for a follow up. The provider noted that he was attending college and studying graphic design. He reported that his mood was "pretty good." He reported that he still had intermittent periods of "rocky" mood but overall felt improved. He stated that he felt "happier." He endorsed good appetite and sleep. He did not endorse symptoms suggestive

of PTSD. He mentioned that he might be moving to Georgia in November or December. The provider noted that he should continue his current treatment and have his new psychiatrist call or request records if he planned to continue care (4F/10). On exam, his hygiene and grooming were good. He was alert and oriented to person, place, time, and situation. His insight and judgment were good. His short-term memory appeared intact (4F/12). His attention appeared intact. His affect was appropriate. He made normal eye contact and was cooperative (4F/13).

In June 2021, the claimant presented for a psychological consultative exam. He reported that he discontinued treatment when he moved from Alabama to Georgia, and that he was not taking prescription medication, only over-the-counter pain medication two to three times weekly. He endorsed symptoms of depression, anxiety, and PTSD. He had adequate hygiene. He averted eye contact. His concentration was moderately impaired. His remote memory was average. His immediate memory and recent memory were mildly to moderately impaired. He had a Full-Scale IQ score of 64, which the examiner noted was reflective of distractibility and decreased ability to cope with physical pain. The examiner noted that it was unclear whether his increased symptomatology that day was due physical pain or an upward trend in his depression, but the examiner also noted he had discontinued anti-depressants. The examiner diagnosed him with major depressive disorder, single episode, moderate/severe, and with PTSD (6F).

In July 2021, the claimant presented for a medical consultative exam. He was cooperative. He was alert and oriented to person, place, and time with a depressed affect. He had normal short-term and long-term memory. He had normal judgment. He appeared to have good hygiene. The physical exam was unremarkable except for difficulty squatting and bending and slightly reduced range of motion of the lumbar spine and with abduction of the shoulders bilaterally (7F).

In October 2021, the claimant presented for a mental health assessment. He presented with an anxious mood, cooperative, and oriented to person, place, time, and situation. He reported symptoms of trauma after being shot. He was seeking therapy and open to medication (8F/13).

The claimant returned the next month for outpatient therapy. He reported that "everything is going OK." He endorsed difficulty sleeping, PTSD, anxiety, and depression (9F/6).

In February 2022, the claimant presented for a psychiatric diagnostic assessment. On exam, he was cooperative. His affect was euthymic. He was alert and oriented. He had no impairment in memory, attention, and concentration. His insight and judgment were normal (10F/18).

The claimant returned next month for therapy. He was receptive and communicative with normal speech. His articulation was coherent. He engaged with no apparent cognitive distortions. He continued to make progress towards goals with increased coping skills (10F/3).

In March 2022, the claimant also presented for an orthopedic consultative exam. He declined back, shoulder, hip, and ankle range of motion tests due to reported back pain. He declined to take off his shoes for foot exam. He declined to perform straight leg raise. He had a normal gait. Grip strength was 5/5. His effort was poor. He declined to squat, stand on toes and heels, and tandem walk due to reported back pain. He had no difficulty getting on and off the exam table.

See Next Page

He declined to lie down due to reported back pain.  Office staff observed him removing his hoodie from over his head without difficulty.  He declined many other parts of the exam (11F).

In May 2022, the claimant presented to a psychiatrist for a telehealth appointment.  He felt that his symptoms were not controlled.  He endorsed frequent panic attacks (14F/22).  On exam, he was well groomed with good hygiene.  He was cooperative.  He reported that he felt depressed and anxious.  His affect was euthymic (14F/23).  His memory, attention, and concentration were not impaired (14F/24).  His insight and judgment were normal (14F/25).

In July 2022, the claimant returned to his psychiatrist.  He requested a change in medications (14F/12).  On exam, he was well groomed with good hygiene (14F/14).  He was cooperative.  He reported that he felt depressed and irritable.  His affect was euthymic (14F/15).  He was alert and oriented.  His memory, attention, and concentration were not impaired (14F/16).  His insight and judgment were normal (14F/17).  The provider increased his medication and advised him to follow up in two months and to be more socially active (14F/18).

As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because he alleged an inability to work due to poor attention and focus, but his mental status exams showed no impairment in attention and concentration (4F, 10F, 14F), except for the psychological consultative exam, when he was not on medication, at which time he had moderately impaired concentration (6F).  He testified that his memory was okay, and this is consistent with normal mental status exam findings regarding his memory (4F, 10F, 14F).  He alleged that he has problems getting along with others, but during exams, he was cooperative and made good eye contact, and his affect was euthymic (4F, 8F, 10F, 14F).  He alleged significant limitations lifting, reaching, standing, walking, sitting, and performing postural activities, but after sustaining his gunshot wound, he received little treatment for his back pain.  There is no evidence of treatment for his back pain in 2021 or 2022.  He mostly took over-the-counter medication for pain (6F).  During the July 2021 medical consultative exam, which was the first physical exam in the record since his application date, he only had difficulty squatting and bending and only slightly reduced range of motion of the lumbar spine and with abduction of the shoulders bilaterally; however, the remainder of the exam was unremarkable, including muscle strength and gait (7F).  After this exam, there was no evidence of another physical exam until the orthopedic consultative exam, in which he mostly declined to participate, but he had no difficulty getting on and off the exam table, and office staff observed him removing his hoodies from over his head without difficulty before he started the exam (11F).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources.  The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

State agency medical consultant Phillip Matar, M.D., opined that the claimant can perform light work, can frequently climb ramps and stairs, balance, kneel, crouch, and crawl, and can occasionally climb ladders, ropes, and scaffolds, and stoop (2A).  State agency medical consultant W. Render, M.D., opined that his physical impairments are not severe (4A).  The

undersigned finds their opinions not persuasive generally. They are neither supported by their summaries of the record nor consistent with the record, which demonstrates that the claimant is limited to and can perform medium work.  In August 2020, the claimant suffered a gunshot wound to the back.  An exam the day of the shooting revealed no neurological deficits (1F/11).  During an exam in October 2020, he tenderness at the site of the retained bullet (2F/10).  There is no evidence of treatment for his back pain in 2021 or 2022.  He mostly took over-the-counter medication for pain (6F).  During the July 2021 medical consultative exam, which was the first physical exam in the record since his application date, he only had difficulty squatting and bending and only slightly reduced range of motion of the lumbar spine and with abduction of the shoulders bilaterally; however, the remainder of the exam was unremarkable, including muscle strength and gait (7F).  After this exam, there was no evidence of another physical exam until the orthopedic consultative exam, in which he mostly declined to participate, but he had no difficulty getting on and off the exam table, and office staff observed him removing his hoodies from over his head without difficulty before he started the exam (11F).  Thus, the undersigned finds their opinions not persuasive generally.

The State agency psychological consultants opined that the claimant can remember short and simple instructions and many detailed instructions; can carry out simple instructions but will struggle to carry out detailed instructions; can make simple work-related decisions; has moderate social limitations; and will have difficulty dealing with complex changes in the work setting (2A, 4A).  The undersigned finds their opinions partly persuasive, as they are partly supported by their summaries of the record and partly consistent with the record, which demonstrates a limitation to simple and routine tasks and simple work-related decision, like they found, but their findings about social limitations and dealing with complex changes is vague.  The claimant alleged that he has problems completing tasks, concentrating, understanding, following instructions, getting along with others, and handling stress and changes in routine (3E, 4E, 7E).  During most mental status exams, however, his memory, attention, and concentration were intact, he was cooperative and made good eye contact, his affect was euthymic, and his insight and judgment were good (4F, 7F, 8F, 10F, 14).  During the psychological consultative exam, when he was not taking medication, he had adequate hygiene, but he averted eye contact.  His remote memory was average.  His immediate memory and recent memory were mildly to moderately impaired (6F).  Thus, the undersigned finds their opinions partly persuasive.

The psychological consultative examiner opined that the claimant's concentration and memory were moderately to markedly impaired to address simple instructions, that he has moderate-to-marked impairment meeting production norms, and that he has marked impairment socially (6F).  The undersigned finds this opinion not persuasive, as it is neither supported by the exam nor consistent with the record, which does not support marked limitations.  In addition, the claimant was not on medication at the time of the exam.  During the exam, he had adequate hygiene.  His concentration was moderately impaired, his remote memory was average, and his immediate memory and recent memory were mildly to moderately impaired (6F).  During most other mental status exams, his memory, attention, and concentration were intact, he was cooperative and made good eye contact, his affect was euthymic, and his insight and judgment were good (4F, 7F, 8F, 10F, 14).  Thus, the undersigned finds this opinion not persuasive.

See Next Page

Medical consultative examiner Jessie Al-Amin, M.D., opined that the claimant may lift as tolerated, has no problems with over-the-shoulder activities, can handle objects without difficulty, may have difficulty with prolonged sitting, standing, and walking, has no difficulty climbing stairs, and might have problems stooping and bending (7F). The undersigned finds this opinion somewhat persuasive, as it is somewhat supported by the exam and consistent with the record; however, the limitations are vague and not supported by an explanation. The exam was unremarkable except for difficulty squatting and bending and slightly reduced range of motion of the lumbar spine and with abduction of the shoulders bilaterally (7F). There is no evidence of treatment for his back pain in 2021 or 2022. He mostly took over-the-counter medication for pain (6F). Thus, the undersigned finds this opinion somewhat persuasive.

The orthopedic consultative examiner opined that the claimant might not have limitations, as he did not exhibit any pain behaviors when entering the office and removed his hoodie overhead without difficulty (11F). The undersigned finds this opinion moderately persuasive, as it is supported by the examiner's explanation and the claimant's failure to participate in the exam; however, the lack of limitations is inconsistent with the complete record, which warrants a limitation to medium work. In August 2020, the claimant suffered a gunshot wound (1F). During an exam in October 2020, he had tenderness at the site of the retained bullet (2F/10). There is no evidence of treatment for his back pain in 2021 or 2022. He mostly took over-the-counter medication for pain (6F). During the July 2021 medical consultative exam, which was the first physical exam in the record since his application date, he only had difficulty squatting and bending and only slightly reduced range of motion of the lumbar spine and with abduction of the shoulders bilaterally; however, the remainder of the exam was unremarkable, including muscle strength and gait (7F). Thus, the undersigned finds this opinion moderately persuasive.

Treating provider Shahina Mirza, M.D., opined that the claimant has poor or marked to extreme limitations in nearly all areas of mental functioning (13F). The undersigned finds this opinion not persuasive, as it is neither supported by this provider's records nor consistent with the complete record. During a May 2022 exam with Dr. Mirza, the claimant was well groomed with good hygiene. He was cooperative. His affect was euthymic (14F/23). His memory, attention, and concentration were not impaired (14F/24). His insight and judgment were normal (14F/25). During a July 2022 exam with Dr. Mirza, he was well groomed with good hygiene (14F/14). He was cooperative. His affect was euthymic (14F/15). He was alert and oriented. His memory, attention, and concentration were not impaired (14F/16). His insight and judgment were normal (14F/17). During a mental status exam in October 2020, he made good eye contact. His responses were well thought out and evidenced at least average intellect. He was cooperative and polite. He articulated his thoughts well. His affect was euthymic. He did not appear depressed or anxious (4F/17). During an exam the next month, his hygiene and grooming were good. His insight and judgment were good. His short-term memory appeared intact (4F/12). His attention appeared intact. His affect was appropriate. He made normal eye contact and was cooperative (4F/13). Thus, the undersigned finds this opinion not persuasive.

In sum, the claimant's gunshot wound limits him to medium work with no more than frequent postural activities and no climbing ropes, ladders, or scaffolds; however, the minimal treatment and mostly normal exam findings during the consultative exams, to the extent he participated, do not warrant further limitations. His mental impairments limit him to simple and routine tasks,

simple work-related decisions, no interaction with public, occasional interaction with coworkers and supervisors, and occasional routine workplace changes.  The limitations are based mostly on his subjective allegations, as he had relatively normal mental status exam findings except for some moderate findings with memory, attention, and concentration during the psychological consultative exam, at which time he was not taking medication.

**5.     The claimant has no past relevant work (8D) (20 CFR 416.965).**

**6.     The claimant was born on October 5, 2000, and he was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.     The claimant has at least a high school education (20 CFR 416.964).**

**8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.28.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a hand packager (DOT # 920.587-018, SVP 2, medium) with about 81,000 jobs nationally and  a packager, machine (DOT # 920.685-078, SVP 2, medium) with about 79,000 jobs nationally.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**10.  The claimant has not been under a disability, as defined in the Social Security Act, since December 18, 2020, the date the application was filed (20 CFR 416.920(g)).**

<u>**DECISION**</u>

Based on the application for supplemental security income filed on December 18, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Kristen Glover*
_____
Kristen Glover
Administrative Law Judge

September 15, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1A | Initial Disability Determination by State Agency, Title XVI | | 2021-09-30 | 1 |
| T1I | 2A | Disability Determination Explanation-DI INITIAL:PRT/RFC-MD | | 2021-09-30 | 12 |
| T1I | 3A | Fee-Authorization to Charge/Collect Fee | | 2021-11-02 | 4 |
| T1I | 4A | Disability Determination Explanation-DI RECON:PRT/RFC-MD | | 2022-04-13 | 12 |
| T1I | 5A | Reconsideration Disability Determination by State Agency, Title XVI | | 2022-04-13 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1B | T16 Notice of Disapproved Claim | | 2021-09-30 | 5 |
| T1I | 2B | SSA-1696 - Claimant's Appointment of a Representative-KATHLEEN FLYNN | | 2021-10-26 | 4 |
| T1I | 3B | Fee Agreement for Representation before SSA | | 2021-10-26 | 1 |
| T1I | 4B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-10-28 | 7 |
| T1I | 5B | Fee Agreement for Representation before SSA | | 2021-10-28 | 3 |
| T1I | 6B | T16 Disability Reconsideration Notice | | 2022-04-13 | 3 |

| T1I | 7B | T16 Disability Reconsideration Notice | 2022-04-13 | 3 |
| T1I | 8B | Request for Hearing by ALJ | 2022-04-21 | 3 |
| T1I | 9B | Request for Hearing Acknowledgement Letter | 2022-04-25 | 15 |
| T1I | 10B | Outgoing ODAR Correspondence | 2022-04-25 | 16 |
| T1I | 11B | Objection to Video Hearing | 2022-05-11 | 1 |
| T1I | 12B | COVID Hearing Agreement Form | 2022-05-11 | 2 |
| T1I | 13B | Hearing Notice | 2022-05-20 | 25 |
| T1I | 14B | Outgoing ODAR Correspondence | 2022-06-01 | 16 |
| T1I | 15B | Acknowledge Notice of Hearing | 2022-06-02 | 2 |
| T1I | 16B | Notice Of Hearing Reminder | 2022-08-02 | 6 |
| T1I | 17B | T2 Notice of Disapproved Claim | 2021-01-11 | 4 |
| T1I | 18B | SSA-1696 - Claimant's Appointment of a Representative | 2022-08-29 | 4 |
| T1I | 19B | Fee Agreement for Representation before SSA | 2022-08-29 | 1 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1D | Lead Protective Filing Worksheet | | 2020-12-18 | 3 |
| T1I | 2D | Application for Supplemental Security Income Benefits | | 2021-01-06 | 6 |
| T1I | 3D | Detailed Earnings Query | | 2022-06-01 | 3 |
| T1I | 4D | Summary Earnings Query | | 2022-06-01 | 1 |
| T1I | 5D | Detailed Earnings Query | | 2022-06-01 | 3 |
| T1I | 6D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-06-01 | 1 |

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 7D | Detailed Earnings Query | | | 2022-08-25 | 3 |
| T1I | 8D | Summary Earnings Query | | | 2022-08-25 | 1 |
| T1I | 9D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022-08-25 | 1 |
| T1I | 10D | Certified Earnings Records | | | 2022-08-25 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 1E | Disability Report - Adult | | | to 2021-01-06 | 6 |
| T1I | 2E | Disability Report - Field Office | | | to 2021-01-06 | 3 |
| T1I | 3E | Function Report - Adult | | Armoni I Mccree | to 2021-01-18 | 10 |
| T1I | 4E | Function Report - Adult | | Armoni I Mccree | to 2021-01-22 | 10 |
| T1I | 5E | Disability Report - Appeals | | | to 2021-10-27 | 6 |
| T1I | 6E | Disability Report - Field Office | | | to 2021-10-27 | 2 |
| T1I | 7E | Function Report - Adult | | Armoni I Mccree | to 2021-12-17 | 8 |
| T1I | 8E | Disability Report - Appeals | | | to 2022-04-21 | 6 |
| T1I | 9E | Disability Report - Field Office | | | to 2022-04-21 | 2 |
| T1I | 10E | Exhibit List to Rep PH2E | | | to 2022-06-01 | 11 |
| T1I | 11E | Correspondence regarding efforts to obtain evidence | | | 2022-07-22 to | 2 |
| T1I | 12E | Resume of Vocational Expert | | | 2022-08-02 to | 1 |
| T1I | 13E | Education Records - Non Medical | | | 2015-08-10 to | 13 |
| T1I | 14E | Exhibit List to Rep PH2E | | Covington Oho | to 2022-08-25 | 5 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 1F | Hospital Records | | University Of South Alabama Trama Medical Center | 2020-08-24 to 2020-08-24 | 23 |
| T1I | 2F | Office Treatment Records | | Diagnostic&Medical Clinic | 2020-08-31 to 2020-10-01 | 17 |
| T1I | 3F | Hospital Records | | University Of South Alabama Trama Medical Center | 2020-08-25 to 2020-10-19 | 113 |
| T1I | 4F | Office Treatment Records | | Altapointe Health Systems Inc | 2020-10-14 to 2020-11-09 | 31 |
| T1I | 5F | Medical Report/General | | | to 2021-01-07 | 1 |
| T1I | 6F | CE Psychology | | Unified Behavioral Health Llc - CE | to 2021-06-11 | 7 |
| T1I | 7F | CE Internal Medicine | | Jessie Louise Muse Al Amin Md - CE | to 2021-07-12 | 13 |
| T1I | 8F | Progress Notes | | Dekalb Mental Health Community Service Board | 2021-10-21 to 2021-10-26 | 23 |
| T1I | 9F | Progress Notes | | Dekalb Mental Health Community Service Board | 2020-10-05 to 2021-11-30 | 31 |
| T1I | 10F | Progress Notes | | Dekalb Mental Health Community Service Board | 2021-10-21 to 2022-03-04 | 70 |
| T1I | 11F | CE Orthopedic | | Robysina Louise James Md | to 2022-03-23 | 11 |
| T1I | 12F | Emergency Department Records | | University Of South Alabama | 2009-06-09 to 2020-08-25 | 146 |

| | | | | | |
|---|---|---|---|---|---|
| T1I | 13F | Medical Opinion - Mental | Dr. Shahina Mirza | 2022-07-05 to 2022-07-05 | 9 |
| T1I | 14F | Progress Notes | Dekalb Community Service Board | 2022-03-31 to 2022-07-05 | 26 |