# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 200
550 Government Street
Mobile, AL 36602-9910

Date: September 09, 2022

Kenneth Lanard Bryant
110 Canyon Lake Ct
Atlanta, GA 30349

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Kenneth Lanard Bryant (BNC#: 21VQ397K29637)                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Kenneth Lanard Bryant (BNC#: 21VQ397K29637)                    Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (877) 828-1694.

Social Security
Bldg 2400 Suite 122
3800 Camp Creek Pkwy
Atlanta, GA 30331-9819

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

Kevin Boucher
Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|
| | Period of Disability, Disability Insurance Benefits, and Supplemental Security Income |
| Kenneth Lanard Bryant | |
| (Claimant) | |
| | 21VQ397K29637 |
| (Wage Earner) | (Beneficiary Notice Control Number) |
| | *Social Security Number removed for your protection* |

## JURISDICTION AND PROCEDURAL HISTORY

On May 26, 2020, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on May 27, 2020. In both applications, the claimant alleged disability beginning March 19, 2020. These claims were denied initially on January 19, 2021, and upon reconsideration on September 15, 2021. Thereafter, the claimant filed a written request for hearing received on October 1, 2021 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). On July 8, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing, and confirmed such agreement at the start of the hearing. (Ex. 14B and 18B). The claimant is represented by attorneys Kathleen Flynn and Erica Dempsey. Ms. Dempsey attended the hearing. Tyra Watts, an impartial vocational expert, also appeared and testified at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 404.935(a) and 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through September 30, 2025. (Ex. 10D). Thus,

the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from March 19, 2020, through the date of this decision.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

See Next Page

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.**

**2.   The claimant has not engaged in substantial gainful activity since March 19, 2020, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).**

The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity.  The earnings records show minimal earnings in 2021. (Ex. 8D).  The claimant receives Department of Veterans Affairs (VA) benefits for service-connected disability for 100% combined evaluation as of December 1, 2021.  (Ex. 11D).

**3.    The claimant has the following severe impairment:  spine disorder (20 CFR 404.1520(c) and 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant also has hypertension, which when considered singly and in combination with the claimant's other impairments, does not cause more than a minimal limitation in the ability to perform basic work activity.  This impairment is stable with conservative treatment and is not expected to lead to any permanent work restriction.  (Ex. 4F, 8F, 10F, 11F, 13F, 15F, 20F, 23F and 25F).  Therefore, it is nonsevere.

The claimant's medically determinable mental impairments of anxiety, depression, and post traumatic stress disorder (PTSD), considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

In making this finding, the undersigned has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria.  The claimant has no limitation in understanding, remembering or applying information; no limitation in interacting with others; mild limitation in concentrating, persisting or maintaining pace; and mild limitation in adapting or managing oneself.

The VA records note the claimant receives treatment for mental health with a non-VA psychiatrist.  (Ex. 8F, 10F, 15F, 20F, and 25F).  The claimant has been treated by E. Clifford Beal, M.D., since at least March 2019.  (Ex. 3F, 7F, 12F, and 19F).  Dr. Beal completed several forms on October 19, 2021 and June 10, 2022.  In the Medical Assessment of Ability to Do Work-Related Activities (Mental) forms, he said the claimant has fair ability to follow rules, relate to coworkers, and use judgment; and poor/none ability to deal with the public, interact with a supervisor, deal with work stress, function independently, maintain attention and concentration, adjust to simple job instructions, behave in an emotionally suitable manner, relate predictably in social situations, and demonstrate reliability.  (Ex. 18F and 22F).

Dr. Beal also completed several forms addressing the criterial of listings 12.04, 12.06 and 12.15.  With regard to listing 12.04 for depressive disorder, Dr. Beal said the claimant has depressed mood, diminished interest in almost all activities, sleep disturbance, decreased energy, difficulty concentrating or thinking, flight of ideas, distractibility, involvement in activities that have a high probability of painful consequences that are not recognized.  When asked to describe the extent of the functional limitations, Dr. Beal noted the claimant's condition is chronic.  He reports feeling very numb and emotionless, crying spells, sleep disturbances, flashbacks, panic attacks, depressed mood, mood changes, nightmares and visual hallucinations.  Dr. Beal indicated that the claimant's condition is disabling, preventing him from engaging in gainful employment.  He said objective findings include depressed mood, overwhelmed, anxiety, stress, and sullen mood.  He said the claimant's condition has remained the same.  (Ex. 18F)

With regard to listing 12.06 for anxiety disorder, Dr. Beal said the claimant has restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension and sleep disturbance.  As for obsessive-compulsive disorder (OCD), the claimant has involuntary, time-consuming preoccupation with intrusive, unwanted thoughts.  With regard to listing 12.15 for PTSD, Dr. Beal said the claimant has had exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of the traumatic event; avoidance of external reminders of the event; disturbance in mood and behavior, and increases in arousal and reactivity.  Dr. Beal opined that the claimant has marked limitations in all areas of the "paragraph B" criteria on all 3 forms.  (Ex. 18F and 22F).

Dr. Beal's opinions in Ex. 18F and 22F are not persuasive, as rating the claimant's mental issues all as marked is not supported by the record, including his own treatment records.  While the claimant reports various mental health symptoms over the course of treatment, his conditions have been generally stable with increased symptoms noted related to situational issues.

In addition, on December 10, 2020, Dr. Beal completed a Mental Impairment Questionnaire, which noted the most recent mental status exam at the time on November 2, 2020 showed normal appearance, behavior, thought process and flow of mental activity, thought content, recent and remote memory, and insight/judgment/impulse control.  Dr. Beal noted the claimant had a sullen mood on exam and that he previously reported visual hallucinations.  Dr. Beal said the claimant's ability to understand, remember and carry out simple instructions and make simple work-related decisions was normal.  The claimant's ability to get along with the public, supervisors and coworkers was also normal.  His ability to deal with changes in the work setting was normal.  Dr. Beal said the claimant is unlikely to decompensate or become unable to function under stress.  (Ex. 7F/13-15).  This opinion is persuasive, as it is consistent with and supported by the medical evidence of record.  It also contradicts Dr. Beal's finding in Ex. 18F and 22F that the earliest date the same level of severity existed was September 24, 2018.

Some of the PHQ-9 screenings note reports of having little interest in activities, feeling down/depressed/hopeless, feeling tired or having little energy, trouble concentrating, and problems sleeping and nightmares.  However, there are also several PHQ-9 screenings by Dr. Beal where the claimant denies these problems.  (Ex. 3F, 7F, 12F, and 19F).  Fatigue was specifically noted only prior to the alleged onset date.  (Ex. 3F).  He denies problems sleeping at multiple visits, noting his treatment his helpful.  No concentration problems and distractibility are noted on mental status exams when specifically referenced.  Hopelessness was only endorsed on one mental status exam.  (Ex. 19F).  The claimant also has a "better," euthymic, or normal mood at multiple visits.  (Ex. 3F, 7F, 12F and 19F).

Many of the issues reported by Dr. Beal in Ex. 18F and 22F are only reported sporadically.  For example, the claimant's mood was described as sullen only twice on June 1, 2020 and November 2, 2020.  (Ex. 3F and 7F).  Irritability was reported prior to the alleged onset date.  (Ex. 3F).  His mood was not described as irritable in mental status exams in 2021 and 2022.  (Ex. 19F).  There are no reports of OCD symptoms in Dr. Beal's records.  (Ex. 3F, 7F, 12F, and 19F).  The mental status exams do not note the presence of obsessions in terms of thought content and process.

See Next Page

(Ex. 19F).  In June 2022, the claimant reported he stopped working in April 2021 and has not experienced agitation since then.  (Ex. 25F).

On February 25, 2020, the claimant reported getting overwhelmed at work dealing with his actual work and the personalities of the people he works with.  Prazosin was added at this visit help with sleep/nightmares.  His condition was described as stable.  (Ex. 3F).  The claimant's condition was described as stable at his April 30, 2020 and June 1, 2020 visits.  (Ex. 3F).  On August 6, 2020, the claimant said he has been seeing a black butterfly occasionally for the past couple of months.  However, the mental status exam was unremarkable and his condition was stable.  On November 10, 2020, Dr. Beal noted the claimant reported having only 1 "happy" day since his last visit.  He denied any side effects to his medications.  The mental status exam noted a sullen mood, but was otherwise unremarkable.  His condition was described as stable again.  (Ex. 7F).  However, at the November 24, 2020 consultative exam, the claimant's mood and affect were appropriate and the claimant did not appear depressed or anxious.  No evidence of problems with memory were noted.  The claimant also said he stopped working due to back pain.  (Ex. 6F).

On February 2, 2021, the claimant reported that the increase in his medications at the last visit has helped.  His mood was "better," although he reported having nightmares about 4 nights per week.  He also reported seeing a black butterfly about twice a week but it did not cause him distress.  He was not interested in changing his medication regimen.  Dr. Beal said his condition is stable and improving some.  Although the claimant previously reported difficulty dealing with personalities at work, he said he missed going to group therapy because it was very helpful and he was looking forward to coming back once the pandemic restrictions loosen up.  (Ex. 12F).

The claimant reported having random crying spells on May 11, 2021.  His mood was depressed with congruent affect, but the mental status exam was otherwise unremarkable.  The PHQ-9 screening was 0 at this time.  (Ex. 12F and 19F).  On July 12, 2021, the claimant reported he still had flashbacks and episodes of panic attacks associated with his PTSD.  The mental status exam noted anxious mood and stressed affect, but was otherwise unremarkable.  (Ex. 12F and 19F).  Dr. Beal noted the claimant reported feeling numb and emotionless at only one visit on August 16, 2021.  At that time, he reported having occasional crying spells when he feels overwhelmed.  The mental status exam noted depressed, numb, overwhelmed mood, but was otherwise unremarkable.  (Ex. 12F and 19F).

On November 10, 2021, the claimant said he was having difficulty sleeping due to back pain and nightmares.  However, he reported medication efficacy was good.  He denied side effects.  (Ex. 19F).  On December 6, 2021, the claimant reported he was still having nightmares, but was sleeping for 5 hours when he has the nightmares instead of 3.  He was continued on Prazosin and Ambien.  The claimant said his flashbacks, concentration and memory have gotten worse and he finds himself daydreaming from time to time.  Even at this visit, no concentration or memory problems were noted on mental status exam.  (Ex. 12F and 19F).

The claimant received inpatient treatment voluntarily from April 30, 2022-May 10, 2022.  His family reported he was in town for a funeral and was acting erratically since the funeral.  On admission, he was evasive and drowsy and had poor insight/judgment.  His mental status exam

improved by discharge.  He was diagnosed with brief psychotic disorder.  He was started on Risperidone, which was helping in decreasing his disorganized thinking and removed/resolved his paranoia.  (Ex. 24F).

The claimant saw his primary care provider, Darrell Murray, M.D., 10 days later on May 20, 2022 for a testosterone injection.  He had no other complaints and specifically denied depression, anxiety, panic attacks, insomnia, use of psychotropic medication, or history of psychiatric problems.  (Ex. 23F).

The most recent visit with Dr. Beal of record was on May 24, 2022.  He reported having a brief psychotic episode in South Carolina and being hospitalized.  However, he reported good sleep, good medication efficacy, good medication compliance, and no side effects.  He bought a new car and can now drive.  His primary care provider started him on Cyclobenzaprine and he has been sleeping better with that.  The mental status exam showed he was fully oriented, appropriately dressed and groomed, with euthymic mood.  He had appropriate speech and thought content/process.  Dr. Beal said his memory was impaired, but he had no cognitive deficits (including abstraction, concentration problems, distractibility, delayed cognitive functioning, and concrete thoughts).  (Ex. 19F).

The claimant also underwent a consultative psychological exam with John Muller, Ph.D., on January 8, 2021.  The claimant reported he is prescribed 3 psychiatric medications by Dr. Beal, which he finds beneficial in helping him deal with insomnia, depression and anxiety.  Up until the pandemic, he was attending a group session on a weekly basis.  The claimant said he can take care of his hygiene independently, take his medications, prepare a simple meal, do his laundry, clean his room and go to the store.  He uses a computer occasionally for casual surfing and email but he does not engage in social media or video games.  He was attending church up until the pandemic.  He goes to the grocery store but only to get a couple of items.  He engages in no other social activity outside of the house.  He described himself as somewhat introverted and has never been one to have a lot of friends.  Yet, he acknowledged getting along very well with his fellow enlisted and commanding sergeants while serving in the Navy.  He also indicated that he can get along with people as long as he feels he is getting respect and appreciation.  He cannot identify any job that he lost specifically due to an interpersonal issue.  (Ex. 9F).

On mental status exam, the claimant was friendly and cooperative.  There was no difficulty building rapport.  His thought processes are oriented times 4.  He maintained fair eye contact but spoke in a normal voice.  No thought content suggestive of any psychosis was evident.  He also denied any history of perceptual abnormalities.  He reported himself to be "very moody," indicating there are times that he can feel contented but never for more than a day at a time.  He claimed he has not felt happy in many years.  At times, his affect was euthymic, other times he had a sad, concerned look on his face as he spoke about his perceived problems.  He remembered 1/3 items after 5 minutes, but he recalled what he ate for dinner the night before and important dates regarding his military history and education.  He had difficulty performing serial threes from 20 down and was able to do so by only two positions before making mistakes.  However, he could spell the word "world" forwards and backwards correctly.  His judgment was intact. (Ex. 9F).

Dr. Muller diagnosed the claimant with major depressive disorder, single episode, mild, in partial remission, late onset.  He said the claimant alleges a combination of physical and emotional issues.  He has been unsuccessful in holding several jobs since his discharge from the Navy in 2011.  He did not serve in direct combat but nonetheless claims to have vague nightmare activity of his military service in general.  Dr. Muller saw insufficient evidence to warrant a PTSD diagnosis.  He said the claimant spoke of vaguely feeling depressed more often than not.  For the last 2 years he has received beneficial psychiatric care and his symptoms are diminished in intensity but not totally eliminated.  Although the claimant rarely goes out of his way to socialize with others, there is no allegation or indication that he cannot cooperate on a superficial level with people with whom he might encounter at work.  He does appear to frustrate easily and he may have difficulty taking constructive criticism or dealing with adversarial social situations.  He complained of experiencing chronic pain that would probably keep him from performing at a rapid pace.  Depression might contribute to his diminished pace and task completion.  (Ex. 9F).

Dr. Muller's opinion is persuasive, as the claimant is described as avoiding conflict but otherwise has no limitations, and thus is consistent with the record.  Dr. Muller said the claimant appeared to frustrate quickly, so he "may" have difficulty with criticism or adversarial social situations.  This statement is vaguely stated and thus not persuasive.  Dr. Muller's statement about how pain could contribute to pace and task completion is not persuasive, as this is outside his area of expertise.  Dr. Muller indicated that PTSD was not established by the exam, and this has been noted in the VA records as well.  (Ex. 20F/355 and 25F/42).

The state agency psychologists found the claimant has no limitations in understanding, remembering or applying information and interacting with others and mild limitation in concentrating, persisting or maintaining pace, and adapting or managing oneself.  (Ex. 1A, 2A, 7A and 8A).  Their opinions are essentially the same even though anxiety was noted to be severe at the initial level.  The "paragraph B" ratings do not reflect finding a severe mental impairment.  These opinions are consistent with the record and thus are persuasive.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

Additionally, any diagnosis, ailment, or condition not specifically setout herein or not identified by a medically acceptable source as being expected to last for 12 months is both not severe and acute in nature or otherwise quickly resolved and is not expected to lead to any permanent work restriction.

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The claimant's spine disorder does not meet the requirements of listing 1.15 because the record does not establish that the claimant has (A) radicular distribution of symptoms consistent with

compromise of the affected nerve root(s), and (B) radicular distribution of neurological signs present during physical examination, and (C) findings on imaging consistent with compromise of a nerve root in the lumbosacral spine, and (D) impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of:  1) a need for an assistive devise that requires both hands (a walker, bilateral canes, bilateral crutches, or seated mobility device), or 2) an inability to use one upper extremity for fine and gross movements and a need to use an assistive device with the other upper extremity for mobility, or 3) an inability to use both upper extremities for fine and gross movements.

Darrell Murray, the claimant's treating physician, found the claimant does not meet listing 1.15 because paragraphs B, C and D were not met.  (Ex. 16F).

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders/ropes/scaffolds.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleges his ability to work is limited by PTSD, major depressive disorder, insomnia, anxiety disorder, and back injury.  (Ex. 3E).  The claimant reported his medications cause fatigue and drowsiness during the day, insomnia at night, and headaches.  (Ex. 9E). However, the record does not document ongoing complaints of these or other medication side effects.

See Next Page

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because they are inconsistent with his medical treatment history, physical exam findings, and imaging studies.  The treatment notes do not show the serious symptoms and dysfunction that would be expected were the claimant as limited as alleged.  He has some treatment for musculoskeletal pain that has been conservative in and imaging showed mild issues.  He has had minimal abnormal exam findings but tenderness and spasms has been noted at times.  The claimant has had orthopedic surgery consultations, but no surgery has been recommended.

Due to the claimant's spine disorder, he is limited to medium work with frequent climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and occasional climbing ladders/ropes/scaffolds.

The claimant had a cervical MRI in April 2018 showed a 1 mm broad-based disc bulge at C6-7 without significant compromise of the central canal and neural foramina.  (Ex. 1F).  However, the record since the alleged onset date does not document any ongoing neck or upper extremity pain.  The claimant also fractured his ankle prior to the alleged onset date, but had negative ankle x-rays in 2019.  (Ex. 2F/33 and 17F/34-35).

The claimant went to the ER at the VA on July 24, 2020 and was diagnosed with back pain.  The physical exam showed he had bilateral paraspinal muscle tenderness to palpation but no midline spinal tenderness to palpation, step offs, or deformities.  He had normal hip/knee flexion and no focal neurological deficits.  He returned to the ER for acute on chronic low back pain on September 5, 2020.  He denied weakness or numbness.  The physical exam showed paralumbar tenderness and spasm.  He had 5/5 strength and normal sensation.  He was diagnosed with lower back pain/spasm and was switched to Robaxin from Flexeril for muscle relaxation.  He was also told he could take NSAIDs as needed for pain.  (Ex. 8F and 10F).

The claimant was seen in the primary care clinic at the VA on October 6, 2020.  He reported recent ER visits for chronic lower back pain, but now reported he has intermittent pain and spasm.  He reported having physical therapy and injection in 2019.  He tried NSAIDs and muscle relaxers.  He was not interested in getting care for his back through the VA.  He was diagnosed with chronic low back pain and it was noted that he prefers to follow up with a non-VA provider.  (Ex. 8F, 10F and 15F).  The lumbar x-ray from October 15, 2020 was normal.  (Ex. 5F).

The claimant underwent a consultative exam with Tiffany Lee, M.D. on November 24, 2020.  He reported his lower back pain initially started while he was in the Navy.  He went to the ER at the VA in July 2020 and September 2020 for low back pain and muscle spasms.  He was given a short course of pain medications.  His current complaint was 5/10 low back pain.  He told Dr.

Lee that he has been wearing his prescribed back brace daily since 2018.  He worked in a warehouse until March 2020 when his back pain prevented him from doing his job.  (Ex. 6F).

The physical exam of the upper/lower extremities revealed no bony deformity, muscular atrophy, redness, heat, cyanosis, clubbing, or edema.  Crepitus was noted.  His hands had normal range of movement dexterity.  No redness, heat, or swelling of any joint was noted in the upper or lower extremity.  He raised his arms overhead at 100%.  He was able to stand on toes and heels and squat ¼ the distance to the floor.  The back exam revealed decreased range of movement of the dorsolumbar spine with tenderness to palpation of the lumbar paraspinal muscles.  The seated straight leg raise (SLR) was decreased bilaterally.  The remainder of the range of motion examination is within normal limits.  The claimant had 5/5 grip strength and upper/lower extremity strength bilaterally.  Cerebellar function was intact.  He ambulated with a normal gait and station.  He was able to heel and toe walk and change positions from sitting to standing without assistance.  Dr. Lee opined that he should avoid activities that require distance walking, unprotected heights, excessive bending, heavy lifting, pushing/pulling, or operating machinery using his upper and lower extremities until further evaluation has been completed and treatment options considered.  (Ex. 6F).

The claimant requested treatment with an orthopedist at the VA in December 2020.  He underwent lumbar x-rays on January 6, 2021, which showed mild multilevel lumbar spondylosis, no acute radiographic findings, and straightening of the normal lumbar lordosis (may be positional or related to muscle spasm).  (Ex. 10F/45 and 15F/42, 75).  He had an orthopedic surgery consult on February 24, 2021.  He reported low back pain with no numbness in the lower extremities and no weakness.  His gait was stable without assistive devices.  He had 5/5 strength and a negative SLR.  He was diagnosed with chronic low back pain with right S1 radiculopathy.  Lumbar x-rays at this visit showed mild multilevel degenerative disc disease.  (Ex. 11F and 15F).

The claimant had a lumbar MRI on March 2, 2021, which showed mild multilevel degenerative disc disease without evidence of significant degenerative joint disease with consequent mild spinal canal stenosis at the L4-5 level and with consequent neural foraminal stenosis.  (Ex. 11F/45-46 and 15F/73-74).  On May 13, 2021, Dr. Murray noted the claimant continued to report chronic back pain.  He brought his MRI to Dr. Murray, who said the first line treatment is activity.  He advised the claimant to start doing a light walk daily to prevent stiffness.  (Ex. 13F).

The claimant had a follow up orthopedic surgery consultation on May 19, 2021 to review the MRI.  The provider said the MRI showed no significant foraminal stenosis or canal stenosis to require surgical treatment.  Physical therapy, injections, and other specialty services could be recommended through the PIP; however, the claimant was discharged from orthopedic services unless radicular pain or weakness were occurring.  (Ex. 11F and 15F).  The claimant was diagnosed with low back and right buttock pain that he rated 5/10 on June 3, 2021.  No musculoskeletal physical exam findings were provided at this visit.  He was seen at the VA ER on July 6, 2021 for complaints of atraumatic low back pain.  He had a normal gait.  (Ex. 11F and 15F).

The claimant saw Dr. Murray on July 15, 2021 for increased back pain rated at a 10/10.  Dr. Murray asked if he has been seen by pain management at the VA, and the claimant said he has

not been evaluated by VA spine specialists due to administrative charges at the VA.  He reported chronic back and shoulder pain on review of systems and was diagnosed with lumbar spondylosis and bilateral shoulder joint pain.  He was prescribed Mobic.  The physical exam showed normal range of motion.  (Ex. 13F and 14F).

The claimant went to the ER at the VA the following day on July 16, 2021 for complaints of myalgias that were different from his usual low back pain, nausea and diarrhea.  The physical exam reported that no deformities were visualized/palpated on exam.  No focal neurological deficits were noted.  His labs were unremarkable.  (Ex. 15F).

The claimant went to the ER for low back pain that radiates into his hips on November 7, 2021.  He denied any numbness or tingling.  X-rays of the lumbar spine showed mild degenerative change at L4-S1 and symmetric sacroiliac joints in the hips.  (Ex. 25F/15, 59).  The physical exam showed decreased range of motion, 3/5 strength, tight muscle tone, and tender mid and lower back.  He had 5/5 sensation and no focal neurological deficits.  He was diagnosed with lumbar radiculopathy with spasm of the back.  He was treated with a Toradol injection and  told to return if any symptoms worsen.  (Ex. 25F).  He returned to the ER on November 25, 2021 and the physical exam showed mild nonlocalized tenderness to the lumbar and low thoracic region and moderate limitation in lateral twisting and forward flexion.  The neurological exam was normal and the upper back was nontender.  (Ex. 25F).

The remainder of the records include office visits with Dr. Murray for follow ups and testosterone injections.  On December 7, 2021, the claimant said he has more energy and a great mood when he is on testosterone.  The physical exam normal curvature of the back with no tenderness, full range of motion in the extremities, and normal gait.  The claimant voiced no complaints on December 28, 2021; January 1, 2022; January 25, 2022; and April 21, 2022.  The review of systems was negative for any pain or mental symptoms at these visits.  (Ex. 23F).

As noted above, the claimant was hospitalized from April 30, 2022-May 10, 2022 for mental complaints.  The physical exams noted no focal neurological deficits.  (Ex. 24F).  The claimant saw Dr. Murray 10 days later for a testosterone injection on May 20, 2022.  Dr. Murray again noted he had no complaints.  He specifically denied depression, anxiety, panic attacks, insomnia, use of psychotropic medication, or history of psychiatric problems.  The physical exam showed normal curvature of the back with no tenderness.  He had full range of motion in the extremities.  He had a steady gait with no neurological deficits and no muscle pain.  The claimant also had no complaints at his June 7, 2022 visit for testosterone injection.  (Ex. 23F).

The limitation to medium work with the postural restrictions above account for the claimant's spine disorder as seen on imaging studies; his complaints of musculoskeletal pain and radicular symptoms; and the exam findings noting tenderness to palpation, muscle spasms, and decreased range of motion at some visits.  However, the evidence does not warrant further restrictions, as treatment has been conservative.  The imaging studies of record show generally mild findings.  The most recent MRI was reviewed by an orthopedist and no surgical intervention was recommended.  The claimant also showed the MRI to Dr. Murray, non-VA his primary care provider, who said first line treatment would consist of activity.  The treatment notes routinely describe him as having a normal/steady gait, 5/5 strength, and no focal motor or sensory deficits.

See Next Page

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

At the initial level, the state agency medical consultant limited the claimant to medium work. (Ex. 1A and 2A). This opinion is less restrictive than warranted by the record thus is less than persuasive. On reconsideration, the state agency medical consultant also limited the claimant to medium work but with occasional climbing ladders/ramps/stairs and frequent climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (Ex. 7A and 8A). This opinion is consistent with the record thus is persuasive.

Dr. Lee's opinion in Ex. 6F is less than persuasive as it is not specific in its description. For example, using the terms "excessive" or "heavy" does not provide limitations in vocationally relevant terms. In addition to being vaguely stated, it appears to be temporary, as Dr. Lee said he showed avoid various activities "until further evaluation has been completed and treatment options considered."

On October 11, 2021, Dr. Murray completed a pain evaluation and noted he has lower back and bilateral shoulder pain that is a 10/10. He has had the pain since June 2021. Dr. Murray said the claimant's pain or other symptoms are constantly severe enough to interfere with attention and concentration needed to perform simple tasks. He said he did not think the claimant can work. Dr. Murray completed a physical capabilities evaluation (PCE) and opined that the claimant can sit for 30 minutes at a time, up to 2 hours; stand/walk 30 minutes at a time, up to 3 hours; needs the ability to rest, recline or lie down at his discretion throughout the normal workday; lift/carry 20 pounds occasionally and 10 pounds frequently; bend, squat, climb, and crawl occasionally; stoop frequently; and reach continuously. He does not take any medications that would interfere with the ability to work. Dr. Murray said the earliest date these limitations apply is June 2021. He will be absent more than 2 days a month. Dr. Murray said the claimant was unable to bend to touch toes or sit for more than 30 minutes during the exam. His lower back pain has increased since June 2021. (Ex. 16F).

Although Dr. Murray limited his opinion in the pain evaluation and PCE to June 2021 on, his opinions are not persuasive for any period. For example, the record shows he saw Dr. Murray for low back and bilateral shoulder pain once. He continued to see Dr. Murray and various providers at the VA for chronic low back pain, however, he was treated conservatively. While the physical exams do note limited range of motion, muscle spasm and tenderness at times, he consistently has normal gait, strength, and sensation. Dr. Murray's more recent records note the claimant voiced no complaints.

Dr. Murray's opinion that the claimant does not meet listing 1.15 is persuasive because it is consistent with the record.

The claimant receives VA disability and the record shows the claimant has service-connected ratings of 10% for tinnitus, 10% for tinea corporis, 50% for sleep apnea, 30% for pseudofolliculitis barbae, 10% for hypertension, 10% for mitral regurgitation, 70% for major depressive disorder recurrent with anxious distress (previously rated as acquired psychiatric condition to include PTSD, major depressive disorder, and anxiety disorder), and 10% for tinea pedis.  The claimant's overall or combined rating is 100%.  (Ex. 15F/80-88).  The undersigned is mindful that the claimant has been found disabled by the VA and is currently receiving disability payments from that agency.  However, SSA makes determinations of disability according to Social Security law, therefore a determination of disability by another agency is not binding on this proceeding (20 CFR 404.1504, 404.1520b(c), 416.904 and 416.920b(c)).  The undersigned has also considered the various VA decisions in the record and notes that claimant's current service-connected disability rating is 100%.  However, the VA does not make a function-by-function assessment of an individual's capabilities (i.e., determine the claimant's residual functional capacity) or determine whether the claimant is able to perform either his past relevant work or other work that exists in significant numbers in the national economy as is required by the Regulations.  The standard for VA disability is different, and that finding is not persuasive in support of disability under the Agency's regulations.  However, the undersigned has also considered the objective supporting evidence contained in the VA records in determining the residual functional capacity in accordance with the Agency's regulations (20 CFR 404.1504, 404.1513(a)(1)-(4)), 416.904, and 416,913(a)(1)-(4) and finds that it does not support a determination of disability under the Agency's regulations.

The undersigned has considered the third party function report completed by the claimant's mother in Ex. 4E but does not find it persuasive with respect to an opinion about functional limitations because it is a non-critical assessment of the claimant and is not consistent with the objective evidence of record.

**6.   The claimant is capable of performing past relevant work as a warehouse worker and security guard.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

At the hearing, the vocational expert was asked to classify the claimant's past work by skill and exertional level.  She responded that the claimant has worked as a warehouse worker (DOT 922.687-058, medium, SVP 2, performed at heavy) and security guard (DOT 372.667-034, light, SVP 3).

The vocational expert stated that an individual with the claimant's age, education, work experience, and residual functional capacity above could perform the claimant's past work as a warehouse worker and security guard.  Since these job were performed within the past 15 years; were of long enough duration to allow the claimant to fully learn all duties of the job; and were performed at the level of substantial gainful activity, the undersigned finds that they qualify as past relevant work.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed.

See Next Page

Kenneth Lanard Bryant (BNC#: 21VQ397K29637)                Page 15 of 16

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

The claimant was born on July 26, 1980 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563 and 416.963). The claimant has at least a high school education (20 CFR 404.1564 and 416.964). Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.29. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as dining room attendant (DOT 222.387-030, medium, SVP 2), with approximately 100,900 positions in the national economy; stubber (DOT 222.687-034, medium, SVP 2), with approximately 31,800 positions in the national economy; and stacker (DOT 222.587-046, medium, SVP 2), with approximately 71,240 positions in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

See Next Page

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**7.   The claimant has not been under a disability, as defined in the Social Security Act, from March 19, 2020, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).**

<u>**DECISION**</u>

Based on the application for a period of disability and disability insurance benefits filed on May 26, 2020, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on May 27, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Kevin Boucher*
_____
Kevin Boucher
Administrative Law Judge

September 09, 2022
_____
Date

# LIST OF EXHIBITS

---

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1A | T16 Initial Disability Determination Explanation | | 2021-01-19 | 19 |
| Y13 | 2A | T2 Initial Disability Determination Explanation | | 2021-01-19 | 19 |
| Y13 | 3A | T16 Initial Disability Determination Transmittal | | 2021-01-19 | 1 |
| Y13 | 4A | T2 Initial Disability Determination Transmittal | | 2021-01-19 | 1 |
| Y13 | 5A | T2 Recon Disability Determination Transmittal | | 2021-09-15 | 1 |
| Y13 | 6A | T16 Recon Disability Determination Transmittal | | 2021-09-15 | 1 |
| Y13 | 7A | T16 Recon Disability Determination Explanation | | 2021-09-15 | 11 |
| Y13 | 8A | T2 Recon Disability Determination Explanation | | 2021-09-15 | 11 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1B | T2 Notice of Disapproved Claim | | 2021-01-19 | 4 |
| Y13 | 2B | T16 Notice of Disapproved Claim | | 2021-01-19 | 5 |
| Y13 | 3B | Request for Reconsideration | | 2021-07-09 | 2 |
| Y13 | 4B | T16 Disability Reconsideration Notice | | 2021-09-15 | 3 |

| Y13 | 5B | T2 Disability Reconsideration Notice | | 2021-09-15 | 5 |
| Y13 | 6B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-10-01 | 4 |
| Y13 | 7B | Fee Agreement for Representation before SSA | | 2021-10-01 | 1 |
| Y13 | 8B | Request for Hearing by ALJ | | 2021-10-05 | 2 |
| Y13 | 9B | Request for Hearing Acknowledgement Letter | | 2021-10-22 | 15 |
| Y13 | 10B | Request for Hearing Acknowledgement Letter | | 2021-11-18 | 20 |
| X78 | 11B | Transfer Request for Hearing | | 2022-02-17 | 6 |
| X78 | 12B | Hearing Notice | | 2022-04-21 | 14 |
| X78 | 13B | Amended Notice of Hearing | | 2022-04-21 | 10 |
| X78 | 14B | Acknowledge Notice of Hearing | | 2022-05-31 | 1 |
| X78 | 15B | Notice Of Hearing Reminder | | 2022-06-10 | 4 |
| X78 | 17B | Fee Agreement for Representation before SSA, Flynn & Dempsey | | 2022-06-30 | 1 |
| X78 | 16B | SSA-1696 - Claimant's Appointment of a Representative, Erica Dempsey, Esquire | | 2022-06-30 | 4 |
| X78 | 18B | Representative Correspondence re: Agree to Phone Hearing & Contact Info | | 2022-07-01 | 1 |

## **Non-Disability Development**

| Component | No. | Description | Received | Dates | Pages |
| --- | --- | --- | --- | --- | --- |
| Y13 | 1D | Application for Disability Insurance Benefits | | 2020-05-27 | 7 |
| Y13 | 2D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2020-05-27 | 7 |

| Y13 | 3D | Detailed Earnings Query | | | 2022-02-02 | 4 |
| Y13 | 4D | Summary Earnings Query | | | 2022-02-02 | 1 |
| Y13 | 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022-02-02 | 1 |
| Y13 | 6D | Certified Earnings Records | | | 2022-02-02 | 3 |
| X78 | 7D | Detailed Earnings Query | | | 2022-07-05 | 4 |
| X78 | 8D | Summary Earnings Query | | | 2022-07-05 | 1 |
| X78 | 9D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022-07-05 | 1 |
| X78 | 10D | Certified Earnings Records | | | 2022-07-05 | 3 |
| X78 | 11D | VA Disability Rating Verification | | | 2022-07-07 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
| --- | --- | --- | --- | --- | --- | --- |
| Y13 | 1E | Disability Report - Field Office | | | to 2020-05-27 | 3 |
| Y13 | 2E | Work History Report | | | to 2020-05-27 | 11 |
| Y13 | 3E | Disability Report - Adult | | | to 2020-05-27 | 8 |
| Y13 | 4E | 3rd Party Function Report - Adult | | Janethere Bryant, Mother | to 2020-06-12 | 12 |
| Y13 | 5E | Function Report - Adult | | Kenneth Bryant | to 2020-06-12 | 12 |
| Y13 | 6E | Work History Report | | | to 2020-07-05 | 13 |
| Y13 | 7E | Disability Report - Field Office | | | to 2021-07-09 | 3 |
| Y13 | 8E | Disability Report - Field Office | | | to 2021-10-05 | 3 |
| Y13 | 9E | Disability Report - Appeals | | | to 2021-10-05 | 8 |
| Y13 | 10E | Exhibit List to Rep PH2E | | | to 2022-02-02 | 11 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Y13 | 11E | Exhibit List to Rep PH2E | | | to 2022-02-03 | 22 |
| X78 | 12E | Report of Contact re: Rep agrees to phone hearing | | Oho | to 2022-03-15 | 1 |
| X78 | 13E | Correspondence regarding efforts to obtain evidence | | Kathleen Flynn | to 2022-06-08 | 2 |
| X78 | 14E | Resume of Vocational Expert | | Tyra Bernard-Watts, Ph.D. | to 2022-06-23 | 7 |
| X78 | 15E | Correspondence regarding efforts to obtain evidence | | Kathleen Flynn | to 2022-07-07 | 2 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 1F | Office Treatment Records | | Ortho Sport & Spine | 2018-04-02 to 2018-06-18 | 22 |
| Y13 | 2F | HIT MER | | Veterans Affairs (Va) | 2019-03-19 to 2020-05-27 | 51 |
| Y13 | 3F | Progress Notes | | E Clifford Beal Md | 2019-03-21 to 2020-06-01 | 98 |
| Y13 | 4F | Medical Records covering the period | | D L Murray Md PC | 2019-09-12 to 2020-08-17 | 31 |
| Y13 | 5F | Radiology Report | | Emory University Hospital Midtown | to 2020-10-15 | 2 |
| Y13 | 6F | Consultative Examination Report | | Tiffany Strawbridge Lee Md | to 2020-11-24 | 8 |
| Y13 | 7F | Progress Notes | | E Clifford Beal Md | 2020-08-06 to 2020-12-11 | 15 |
| Y13 | 8F | HIT MER | | Federal Jhie | 2020-05-28 to 2021-01-04 | 39 |
| Y13 | 9F | Consultative Examination Report | | John S. Muller, PhD | to 2021-01-08 | 6 |

| Y13 | 10F | HIT MER | Federal Jhie #2 | 2020-07-20 to 2021-01-19 | 47 |
|---|---|---|---|---|---|
| Y13 | 11F | HIT MER | Federal Jhie #3 | 2021-01-19 to 2021-07-09 | 59 |
| Y13 | 12F | Medical Evidence of Record | E Clifford Beal Neuropsychiatry | 2020-12-01 to 2021-07-12 | 50 |
| Y13 | 13F | Office Treatment Records | Murray Medical Wellness Center | 2020-10-12 to 2021-07-15 | 16 |
| Y13 | 14F | Medical Records | Murray Medical Wellness Center | to 2021-07-15 | 7 |
| Y13 | 15F | HIT MER | Federal Jhie #4 | 2020-10-01 to 2021-07-26 | 88 |
| Y13 | 16F | Physical RFC Assessment | D L Murray Md PC | to 2021-10-11 | 8 |
| Y13 | 17F | Hospital Records | Atlanta Vamc | 2012-07-19 to 2021-10-12 | 260 |
| Y13 | 18F | Mental RFC Assessment | E Clifford Beal Md | to 2021-10-20 | 9 |
| X78 | 19F | Progress Notes | E Clifford Beal Md | 2021-08-16 to 2022-05-24 | 57 |
| X78 | 20F | Office Treatment Records Part 1 of 2 | Vamc | 2012-07-19 to 2021-07-14 | 1144 |
| X78 | 21F | Office Treatment Records Part 2 of 2 | Vamc | 2012-07-19 to 2021-07-14 | 1104 |
| X78 | 22F | Medical Assessment of Ability to Do Work-Related Activities (Mental) & Medical Evaluation | E Clifford Beal Md | to 2022-06-10 | 10 |

| X78 | 23F | Office Treatment Records | | Murray Medical Wellness Center | 2021-12-07 to 2022-06-07 | 30 |
|---|---|---|---|---|---|---|
| X78 | 24F | Inpatient Hospital Records | Subsequent to hearing | Medical University Of South Carolina | 2022-04-30 to 2022-05-10 | 347 |
| X78 | 25F | Office Treatment Records | Subsequent to hearing | Atlanta Vamc | 2021-10-28 to 2022-06-27 | 120 |