# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
4100 Old Milton Pkwy
Alpharetta, GA 30005-4442

Date: July 27, 2022

Kathy J. Lee

# Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

Form HA-L76-OP2 (03-2010)
**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Kathy J Lee (BNC#: 21LD317F41787)                    Page 2 of 3

## Time Limit To File An Appeal

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

## What Else You May Send Us

You or your representative may send us a written statement about your case. You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

## How An Appeal Works

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

## The Appeals Council May Review My Decision On Its Own

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

## When There Is No Appeals Council Review

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under

Form HA-L76-OP2 (03-2010)

Kathy J Lee (BNC#: 21LD317F41787)                              Page 3 of 3

special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If you disagree with my decision, you should file an appeal within 60 days.

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1–800–772–1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1–800–325–0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (877) 803–6320.

> Social Security
> 4365 Shackleford Rd
> Norcross, GA 30093–2931

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

> Tracy Henry
> Administrative Law Judge

Enclosures:
Decision Rationale

cc:   Kathleen Flynn
      315 W. Ponce De Leon
      Avenue, Suite 940
      Decatur, GA 30030

Form HA–L76–OP2 (03–2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

**IN THE CASE OF**                                **CLAIM FOR**

                                                  Period of Disability, Disability
                                                  Insurance Benefits, and Supplemental
Kathy J. Lee                                      Security Income
(Claimant)

(Wage Earner)                                     (Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

On August 10, 2017, the claimant filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income.  In both applications, the claimant alleged disability beginning July 15, 2015.  These claims were denied initially on April 10, 2018, and upon reconsideration on September 14, 2018.  Thereafter, the claimant filed a written request for hearing received on July 24, 2019 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*).  On May 9, 2022, the undersigned held a telephone hearing (20 CFR 404.936 (c)/416.143 (c) because of the extraordinary circumstances presented by the Coronavirus Disease 2019 (COVID–19) Pandemic. The claimant was represented by Brynne Holt, an attorney.  Wayne Blake, an impartial vocational expert, also appeared and testified by telephone at the hearing.

The record was held open after the hearing so the claimant could submit additional evidence. However, the claimant's representative noted the records they planned to obtain were predated the alleged onset date of disability and therefore not relevant (20E). They asked that the undersigned proceed with a decision (20E).

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

See Next Page

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2018.  Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from July 15, 2015, through the date of this decision.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five–step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self–employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922, Social Security Rulings (SSRs) 85–28 and 16–3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she

is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96–8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the

claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.**

**2.  The claimant has not engaged in substantial gainful activity since July 15, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

**3.  The claimant has the following severe impairments: major depressive disorder, generalized anxiety disorder, adjustment disorder, attention-deficit hyperactivity disorder, bipolar disorder, borderline personality disorder, posttraumatic stress disorder, and alcohol/polysubstance abuse (20 CFR 404.1520(c) and 416.920(c)). The claimant has the following non-severe impairments: vitiligo, hypothyroidism, and status-post fractured elbow. The claimant has the following non-medically determinable impairment: scoliosis.**
The claimant's non-severe impairments do not significantly limit her ability to perform basic work-related activities. She sought no ongoing treatment for vitiligo and hypothyroidism. The evidence shows that, although the claimant fractured her elbow, she recovered and did well thereafter.  Although the claimant asserts that she has scoliosis, the medical record does not establish a diagnosis of this impairment.

**4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

At the hearing, the claimant's representative asserted the claimant had a generalized anxiety disorder, major depressive disorder, adjustment disorder and psychotic features and that her conditions met listings 12.04 and 12.06. Her representative asserted the claimant's conditions meet the listings because she has depression and anxiety characterized by depressed mood, appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating and irritability.  In support of her assertions, she referenced exhibit 6F, Viewpoint Health records. Granted, the overall record documents instances where the claimant reports symptoms consistent with her diagnosis of mental impairments, it does not reflect persistent, ongoing problems.  The record is more reflective of a condition that waxes and wanes and is impacted by her

substance use as discussed later herein.  Although her mental status examinations at times reflected that she presented as delusional, depressed, and paranoid with a flat affect, she also appeared calm, cooperative, fully oriented, alert, and attentive.  On February 22, 2018, the claimant reported she was putting in applications for work with her laptop (9F pg. 7). A notation from July 16, 2018, indicated the claimant completed her online orientation for the internet security certificate course at Georgia Tech (9F pg. 43). On September 5, 2018, the claimant denied insomnia (12F pg. 17). A notation from January 16, 2019 indicated the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 19).

The claimant denied depressed mood, loss of appetite, difficulty sleeping, and changes to her appetite on January 23, 2019 (18F pg. 16). On February 11, 2019, the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 13). On May 29, 2019, the claimant denied depressed mood, difficulty sleeping, and loss of appetite (18F pg. 7). A notation from July 10, 2019, indicated the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 5). The claimant denied loss of appetite, changes in appetite, sleep disturbance, and depressed mood on October 9, 2019 (18F pg. 2). On December 8, 2019, the claimant denied loss of appetite, changes in appetite, sleep disturbance, depressed mood, and difficulty sleeping (20F pg. 17). A notation from June 12, 2020, showed the claimant denied loss of appetite, changes in appetite, sleep disturbance, and depressed mood (20F pg. 14). The claimant denied difficulty sleeping, sleep disturbance, loss of appetite, and changes in appetite on September 14, 2020 (20F pg. 10). On January 10, 2021, the claimant denied loss of appetite, changes in appetite, and sleep disturbance (20F pg. 6). On April 5, 2021, the claimant denied loss of appetite, changes in appetite, sleep disturbance, difficulty sleeping, and irritability (20F pgs. 2, 3). The claimant denied irritability on March 21, 2022 (32F pg. 3).

In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied in regard to listings 12.04 and 12.06. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation.
One record from Viewpoint Health showed the claimant was putting in applications with her laptop, which showed she could understand and apply information (9F pg. 7). Another record from Georgia Regional Hospital showed the claimant worked as a tutor and worked at a church (12F pg. 13). In a function report, the claimant reported she prepared meals, shopped in stores,

Kathy J Lee (BNC#: 21LD317F41787)                          Page 6 of 14

drove a car, paid bills, and handled a savings account (5E pgs. 4, 5). Another record from Northside Hospital showed the claimant was independent with her activities of daily living (29F pg. 338). In interacting with others, the claimant has a moderate limitation.  One record showed the claimant lived in a rooming house (9F pg. 4). She reported she worked at a church (12F pg. 13). In one function report, the claimant indicated she shopped in stores and spent time with others (5E pgs. 5, 6). Other records from Viewpoint Health and La Maestra Community Health Centers showed the claimant maintained friendships. Moreover, the claimant appeared calm and cooperative with normal speech in rate and rhythm during examinations. (6F)(15F).

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  One record from Viewpoint Health showed the claimant was putting in applications with her laptop (9F pg. 7). Another record from Georgia Regional Hospital showed the claimant worked as a tutor and worked at a church (12F pg. 13). In one function report, the claimant declared she prepared meals, shopped in stores, drove a car, paid bills, and handled a savings account (5E pgs. 4, 5). Another record from Northside Hospital showed she was independent with her activities of daily living (29F pg. 338). As for adapting or managing oneself, the claimant has experienced a moderate limitation because one function report indicated the claimant prepared meals, shopped in stores, paid bills, and handled a savings account (5E pgs. 4, 5). One record from Ridgeview Institute showed she could take care of self-care needs (22F pg. 3). Another record from Northside Hospital showed she was independent with her activities of daily living (29F pg. 338).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied. The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence failed to establish the presence of the "paragraph C" criteria.  That is, the record does not support finding that claimant has a minimal capacity to adapt to changes in her environment or to demands not already part of her daily life. For instance, medical records from Viewpoint Health and Ridgeview Institute showed the claimant maintained friendships and could take care of her self-care needs (6F)(22F).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

See Next Page

**5.  After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:** no exposure to hazards, such as high exposed places or moving mechanical parts.  She can understand, remember, and carryout simple instructions and make simple work-related decisions; sustain an ordinary routine without special supervision; and work at a consistent pace throughout the workday but not at a production rate pace where each task must be completed within a strict time deadline.  The claimant can tolerate occasional interaction with co-workers and supervisors and no interaction with the public.  The claimant must work primarily with objects rather than people.  She can tolerate occasional changes in a routine work setting.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

In the initial disability report, the claimant asserted that chronic neck pain, anxiety, depression, attention-deficit hyperactivity disorder, and posttraumatic stress disorder limited her ability to work (1E pg. 2). In another disability report, the claimant declared her condition had worsened to the point she experienced paranoia (8E pg. 2). She noted she heard voices and that she had trust issues that affected her ability to function normally (8E pg. 2). Another disability report indicated the claimant experienced ongoing difficulties with her conditions (10E pg. 3). In the initial function report, the claimant declared she was limited in her ability to stand, reach, sit, kneel, talk, hear, remember,

complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others (5E pg. 7).

In the most recent function report, the claimant indicated she was limited in her ability to sit, talk, hear, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others (7E pg. 10). At the hearing, the claimant stated she has ongoing mental health problems such as depression and anxiety. She stated she has trouble maintaining self–care and that her medications are constantly being adjusted. The claimant stated she experiences panic attacks and has memory loss. She explained people and expectations trigger her panic attacks. She stated she experiences racing thoughts and has difficulty sleeping. She stated she is chronically fatigued and experiences neck pain. She testified she worries a lot and experiences absent mindedness. As discussed above, the claimant's representative asserted the claimant met listings 12.04 and 12.06. Her representative stressed the claimant's depression and anxiety are characterized by depressed mood, appetite disturbance, sleep disturbance, decreased energy, difficulty concentrating, and irritability.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the foregoing contentions concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant contends she became disabled and unable to work on July 15, 2015. However, the overall record leading up to that date and thereafter, does not support finding that her condition is so limiting that a conclusion of disability is warranted for the reasons described herein.  The claimant has a history of polysubstance use during the period at issue, and the record suggests that she is highly functioning when not using any substances.  On January 27, 2015, the claimant apologized for not telling her provider about continuing to use crystal meth (2F pg. 1). However, there is evidence that she continued to use drugs despite being advised to stop.  On February 10, 2017, the claimant appeared in no acute distress (5F pg. 6). A notation from April 3, 2017 indicated the claimant used alcohol and meth, which showed she was not in remission at that time (4F pg. 5). On October 18, 2017, the claimant's activity was within normal limits as was her behavior (6F pg. 15). The claimant appeared alert and attentive with a grossly intact memory (6F pg. 16). On October 20, 2017, the claimant's activity and behavior were within normal limits (6F pg. 38).  She appeared alert and attentive with a grossly intact memory (6F pg. 39). A notation from November 1, 2017 indicated the claimant was alert and attentive with a grossly intact memory (6F pg. 52).  Her activity and behavior were within normal limits (6F pg. 52).

See Next Page

On December 14, 2017, the claimant denied anxiety and fatigue (5F pg. 2)(7F pg. 10). At that time, the claimant appeared in no acute distress (5F pg. 2). In February 2018, the claimant reported working part–time and applying for jobs. On February 12, 2018, the claimant reported she was doing some part–time gigs (9F pg. 5).  On February 22, 2018, the claimant stated she had not found a job but was submitting applications (9F pg. 7). On March 9, 2018, she denied any psychiatric problems or symptoms (10F pg. 1). She specifically denied depressive or anxiety symptoms (10F pg. 1). At that time, she reported she had not found a job yet (10F pg. 1). A notation from March 22, 2018 indicated the claimant had been accepted into a cyber–security certificate program, which would enhance her employability (9F pg. 13).

On April 24, 2018, the claimant acknowledged she planned to start the Georgia Tech program in June and looked forward to stimulating her road to a career (9F pg. 20).  On July 11, 2018, her provider noted the claimant had normal motor strength in her upper and lower extremities (7F pg. 3). A notation from July 16, 2018 indicated the claimant completed her online orientation for the internet security certificate course at Georgia Tech, which showed she possessed the ability to understand and apply information and focus, concentrate, and pay attention (9F pg. 43). Another notation from July 16, 2018 indicated the claimant showed no signs of depression or of having a thought disorder (10F pg. 8). Her provider noted the claimant's behavior was not bizarre, and that there were no indications that hallucinations or delusions were present (10F pg. 8).

The claimant was admitted at Emory from September 3, 2018 until September 5, 2018 (14F pg. 1). The claimant also was admitted at Georgia Regional Hospital from September 5, 2018 until September 7, 2018, because of mental health problems (12F pg. 1). Notably, during her second admission the claimant reported she worked as a tutor (12F pg. 5).  A notation from September 10, 2018 indicated the claimant wanted to buy a virtual reality game to increase her exercise/physical activity (13F pg. 21). The claimant was admitted again from November 20, 2018 until November 22, 2018 (12F pg. 69). However, her admission appears related substance use, such as alcohol, cocaine, meth and marijuana (12F pg. 69). The claimant admitted to meth use on December 5, 2018, which showed she continued to use drugs (13F pg. 32). A notation from January 16, 2019, indicated the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 19). The claimant denied depressed mood, loss of appetite, difficulty sleeping, and changes to her appetite on January 23, 2019 (18F pg. 16).

On February 11, 2019, the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 13). On February 13, 2019, the claimant's mood and affect were normal (16F pg. 83). A CT of her head at that time revealed no evidence of an acute intracranial abnormality (16F pg. 100). On May 14, 2019, the claimant was cooperative, oriented x 4, and alert (29F pg.

338). A notation from May 20, 2019 indicated the claimant experienced some anxiety (29F pg. 303). However, she admitted she had not taken her medication in five days, (16F pg. 8)(29F pg. 303). On May 29, 2019, the claimant denied depressed mood, difficulty sleeping, and loss of appetite (18F pg. 7). A notation from July 10, 2019 indicated the claimant denied loss of appetite, changes in appetite, and sleep disturbance (18F pg. 5). She denied anxiety on July 11, 2018 (7F pg. 2). At that time, the claimant had normal motor strength in her upper and lower extremities (31F pg. 40). On October 9, 2019, the claimant denied anxiety and having a depressed mood (18F pg. 2).

A notation from December 8, 2019 indicated the claimant denied anxiety or having a depressed mood (20F pg. 17). At that time, the claimant denied loss of appetite, changes in appetite, sleep disturbance, depressed mood, and difficulty sleeping (20F pg. 17). On June 12, 2020, the claimant denied anxiety or having a depressed mood (20F pg. 14). At that time, the claimant denied loss of appetite, changes in appetite, and sleep disturbance (20F pg. 14). The claimant denied difficulty sleeping, sleep disturbance, loss of appetite, and changes in appetite on September 14, 2020 (20F pg. 10). In addition, the claimant denied loss of strength and memory loss (20F pg. 11). The claimant was admitted from December 18, 2020 until December 19, 2020 (21F pg. 2). However, her condition at that time appeared related to or exacerbated by family issues and having car trouble (29F pg. 20). On January 10, 2021, the claimant denied loss of appetite, changes in appetite, and sleep disturbance (20F pg. 6).

The claimant denied neck pain on April 5, 2021 (20F pg. 2). The claimant continued to use meth as recently as September 6, 2021 (24F pg. 4). A notation from September 17, 2021 indicated the claimant denied attention–deficit, anxiety, and depressed mood (31F pg. 15).  The claimant was admitted from October 8, 2021 until October 18, 2021 (22F pg. 1).  At discharge, her provider noted the claimant was able to function, ambulate, and perform self–care needs (22F pg. 3). Her provider noted the claimant had eaten and slept well and got along well with peers (22F pg. 3). Her provider indicated her mood was appropriate and that she had no delusions (22F pg. 3). Her provider indicated the claimant had a clear thought process and no assaultive behaviors (22F pg. 3). On October 23, 2021, the claimant had a normal mood (23F pg. 6). A notation from December 9, 2021 indicated the claimant felt better (31F pg. 8). She reported she felt better on January 31, 2022 (31F pg. 6). A notation from February 4, 2022 indicated the claimant was trying to work exercise back into her daily routine (30F pg. 9). The claimant reported she felt better on February 7, 2022 (31F pg. 3).

On March 4, 2022, the claimant reported she was doing yoga (32F pg. 31). The claimant acknowledged she was open to part–time work on April 13, 2022 (33F pg. 2). Taken together, the foregoing evidence tended to show that at most, the claimant had some non–exertional limitations.  Of note, the above residual

functional capacity includes a limitation on hazards to address the claimant's assertions of fatigue. When making this determination, the undersigned also considered the medical opinions of record.  The State agency assessments are generally considered persuasive regarding the claimant's ability to perform simple tasks, limited ability to interact with others, distractibility, and challenges with adaptation in the work environment; all of which are accommodated in the above residual functional capacity.  Their findings relate to their specialty, are consistent with claimant's treatment records, in particularly those discussed above, and they have knowledge of the process the Social Security Administration uses to determine whether an individual is disabled (1A)(2A)(5A)(6A).

In a mental impairment questionnaire dated July 11, 2018, Young Kang, M.D., noted the claimant was diagnosed with several mental health impairments and experienced moderate and marked limitations (8F pgs. 1, 2, 3). On January 31, 2022, Dr. Kang noted the claimant had severe anxiety, depression and experienced marked and extreme limitations (27F pgs. 3, 5, 6, 8, 10, 12). The same day Dr. Kang completed a physical capacities evaluation and noted the claimant had numerous physical limitations (28F). Therein, he also noted the claimant struggled with anxiety, panic attacks, major depression, and attention–deficit hyperactivity disorder and would be absent from work more than two days a month (28F pg. 5).  However, the various opinions of Dr. Kang are not considered persuasive for several reasons. For instance, he completed check–the–box forms and provided little explanation as to why the claimant had the limitations, he opined she had.

In addition, his opinions are inconsistent with the following treatment records. Notably, on July 11, 2018, her provider noted the claimant had normal motor strength in her upper and lower extremities (7F pg. 3). A notation from September 10, 2018 indicated the claimant wanted to buy a virtual reality game to increase her exercise/physical activity, which showed she had no significant physical functional limitations (13F pg. 21). On May 29, 2019, the claimant denied a depressed mood (18F pg. 7). On January 23, 2019, the claimant denied having a depressed mood, and she was in no acute distress (18F pg. 16). The claimant denied having a depressed mood on May 29, 2019 (18F pg. 7). At that time, the claimant had normal motor strength in her upper and lower extremities (31F pg. 40). A notation from December 8, 2019 indicated the claimant denied anxiety or having a depressed mood (20F pg. 17).

On June 12, 2020, the claimant denied anxiety or having a depressed mood (20F pg. 14). A notation from September 14, 2020 indicated the claimant had no neck pain (20F pg. 10). At that time, the claimant denied loss of strength and memory loss (20F pg. 11). A notation from September 17, 2021 indicated the claimant denied attention–deficit, anxiety and depressed mood (31F pg. 15). On October 23, 2021, the claimant had a normal mood (23F pg. 6). A notation from December 9, 2021 indicated the claimant felt better (31F pg. 8).

Kathy J Lee (BNC#: 21LD317F41787)                    Page 12 of 14

She reported she felt better on January 31, 2022 (31F pg. 6). The claimant reported she felt better on February 7, 2022 (31F pg. 3). On March 4, 2022, the claimant reported she was doing yoga, which tended to show she had no significant functional physical limitations (32F pg. 31).

**6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a writer of technical publications. The work as a writer of technical publications is classified as skilled in nature and sedentary in exertional demand according to the Dictionary of Occupational Titles, code 131.267-026, and as actually performed. However, the claimant is unable to perform past relevant work as actually or generally performed given the residual functional capacity.

**7.  The claimant was born on February 21, 1982, and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).**

**9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations,

section 204.00 in the Medical–Vocational Guidelines provides a framework for decisionmaking (SSR 85–15).

The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the undersigned asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations at SVP 2 such as: (1) Document Preparer, which is classified as unskilled in nature and sedentary in exertional demand according to DOT 249.587–018, which has 26,900 jobs nationally; (2) Collator Operator, which is classified as unskilled in nature and light in exertional demand according to DOT 208.685–010, which has 44,100 jobs nationally; (3) Folding Machine Operator, which is classified as unskilled in nature and light in exertional demand according to DOT 208.685–014, which has 22,100 jobs nationally; (4) Microfilm Mounter, which is classified as unskilled in nature and light in exertional demand according to DOT 208.685–022, which has 19,600 jobs nationally; (5) Laundry Worker, which is classified as unskilled in nature and medium in exertional demand according to DOT 361.684–014, which has 13,000 jobs nationally; (6) Upholstery Cleaner, which is classified as unskilled in nature and medium in exertional demand according to DOT 780.687–058, which has 8,700 jobs nationally;
and (7) Linen Room Attendant, which is classified as unskilled in nature and medium in exertional demand according to DOT 222.587–030, which has 63,000 jobs nationally.
Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. To the extent, the vocational expert's testimony is inconsistent with or not addressed in the DOT, the undersigned relies on the vocational expert's testimony and experience.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical–Vocational Guidelines.

11. **The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

## DECISION

See Next Page

Kathy J Lee (BNC#: 21LD317F41787)                    Page 14 of 14

Based on the application for a period of disability and disability insurance
benefits filed on August 10, 2017, the claimant is not disabled under sections
216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on August 10,
2017, the claimant is not disabled under section 1614(a)(3)(A) of the Social
Security Act.

/s/ Tracy  Henry
_____
Tracy Henry
Administrative Law Judge

July 27, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| X83 | 1A | DDE–T2 IN PRT2 , MRFC2 BY DDS PhD | | 2018-04-10 | 13 |
| X83 | 2A | DDE–T16 IN PRT2 , MRFC2 BY DDS PhD | | 2018-04-10 | 13 |
| X83 | 3A | Initial Disability Determination by State Agency, Title XVI | | 2018-04-10 | 2 |
| X83 | 4A | Initial Disability Determination by State Agency, Title II | | 2018-04-10 | 2 |
| X83 | 5A | DDE–T2 IN PRT1/2 , MRFC1/2 BY DDS PsyD | | 2018-09-06 | 20 |
| X83 | 6A | DDE–T2 RC PRT1/2 , MRFC1/2  BY DDS PsyD | | 2018-09-06 | 20 |
| X83 | 7A | Reconsideration Disability Determination by State Agency, Title II | | 2018-09-14 | 1 |
| X83 | 8A | Reconsideration Disability Determination by State Agency, Title XVI | | 2018-09-14 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| X83 | 1B | T2 Notice of Disapproved Claim | | 2018-04-10 | 5 |
| X83 | 2B | T16 Notice of Disapproved Claim | | 2018-04-10 | 5 |

| | | | | |
|---|---|---|---|---|
| X83 | 3B | Request for Reconsideration*– WET SIGNATURE | 2018–06– 14 | 2 |
| X83 | 4B | Request for Reconsideration– *SUMMARY | 2018–06– 14 | 3 |
| X83 | 5B | T2 Disability Reconsideration Notice | 2018–09– 14 | 4 |
| X83 | 6B | T16 Disability Reconsideration Notice | 2018–09– 14 | 4 |
| X83 | 7B | Request for Hearing by ALJ–*WET SIGNATURE | 2019–07– 24 | 2 |
| X83 | 8B | Request for Hearing by ALJ–SUMMARY OF STATEMENTS | 2019–07– 24 | 2 |
| X83 | 9B | Statement of Good Cause for Untimely Filing | 2019–08– 08 | 2 |
| X83 | 10B | Appointment of Representative– *HARRY BRENNER W/FEE (25% OR $6K) | 2019–08– 19 | 4 |
| X83 | 11B | Withdrawal/Revocati on of Representation / Harry Brenner, Atty (Waives Fee) | 2019–11– 26 | 1 |
| X83 | 12B | Report of Contact | 2020–05– 26 | 1 |
| X83 | 13B | Outgoing ODAR Correspondence | 2020–05– 26 | 1 |
| X83 | 14B | COVID Hearing Agreement Form | 2021–03– 24 | 8 |
| X83 | 15B | Hearing Notice | 2021–03– 24 | 17 |
| X83 | 16B | Report of Contact | 2021–03– 24 | 1 |
| X83 | 17B | Report of Contact | 2021–06– 08 | 1 |
| X83 | 18B | Notice Of Hearing Reminder | 2021–06– 09 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| X83 | 19B | Outgoing ODAR Correspondence | | 2021–07–01 | 6 |
| X83 | 20B | Report of Contact / Missed Hearing, Authorization, In Person Hearing, Healthcare Providers | | 2021–07–07 | 1 |
| X83 | 21B | SSA–1696 – Claimant's Appointment of a Representative | | 2021–12–17 | 6 |
| X83 | 22B | Fee Agreement for Representation before SSA | | 2021–12–17 | 1 |
| X83 | 23B | Hearing Notice | | 2022–02–15 | 35 |
| X83 | 24B | Representative Correspondence | | 2022–03–25 | 1 |
| X83 | 25B | Notice Of Hearing Reminder | | 2022–04–11 | 8 |
| X83 | 26B | Notice Of Hearing Reminder | | 2022–04–19 | 6 |
| X83 | 27B | SSA–1696 – Claimant's Appointment of a Representative | | 2022–05–06 | 5 |
| X83 | 28B | Fee Agreement for Representation before SSA | | 2022–05–06 | 1 |
| X83 | 29B | SSA–1696 – Claimant's Appointment of a Representative | | 2022–05–06 | 5 |

## Non–Disability Development

| Compone nt | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| X83 | 1D | Application for Supplemental Security Income Benefits | | 2017–08–21 | 6 |

| X83 | 2D | Application for Disability Insurance Benefits | 2017–08–21 | 7 |
|------|------|------|------|------|
| X83 | 3D | Detailed Earnings Query | 2019–08–24 | 3 |
| X83 | 4D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2019–08–24 | 1 |
| X83 | 5D | Summary Earnings Query | 2019–08–24 | 1 |
| X83 | 6D | Certified Earnings Records–*DLI 03/31/2018 | 2019–08–24 | 2 |
| X83 | 7D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021–06–08 | 1 |
| X83 | 8D | Detailed Earnings Query | 2021–06–08 | 4 |
| X83 | 9D | Summary Earnings Query | 2021–06–29 | 1 |
| X83 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2021–06–29 | 1 |
| X83 | 11D | Certified Earnings Records | 2021–06–29 | 3 |
| X83 | 12D | Detailed Earnings Query | 2021–07–02 | 5 |
| X83 | 13D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022–04–11 | 1 |
| X83 | 14D | Detailed Earnings Query | 2022–04–11 | 4 |
| X83 | 15D | Summary Earnings Query | 2022–04–11 | 1 |
| X83 | 16D | Certified Earnings Records | 2022–04–18 | 3 |

## Disability Related Development

| Compone nt | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| X83 | 1E | Disability Report – Adult | | Lee, Kathy J. | to 2017–08–21 | 9 |
| X83 | 2E | Disability Report – Field Office | | SSA Field Office | to 2017–08–21 | 3 |
| X83 | 3E | Work History Report | | Lee, Kathy J. | to 2017–08–21 | 9 |
| X83 | 4E | Recent Medical Treatment | | Lee, Kathy J. | to 2017–09–25 | 4 |
| X83 | 5E | Function Report – Adult | | Lee, Kathy J | to 2018–01–17 | 13 |
| X83 | 6E | Disability Report – Field Office | | SSA Field Office | to 2018–06–14 | 3 |
| X83 | 7E | Function Report – Adult | | Lee, Kathy J | to 2018–08–07 | 13 |
| X83 | 8E | Disability Report – Appeals | | Lee, Kathy J. | to 2019–06–14 | 10 |
| X83 | 9E | Disability Report – Field Office | | SSA Field Office | to 2019–07–25 | 2 |
| X83 | 10E | Disability Report – Appeals | | Lee, Kathy J. | to 2019–08–20 | 12 |
| X83 | 11E | Exhibit List to Rep PH2E | | Atl North | to 2019–08–24 | 11 |
| X83 | 12E | Claimant Correspondence | | Lee, Kathy J | to 2019–08–24 | 25 |
| X83 | 13E | Questionnaire | | | to 2021–06–25 | 7 |
| X83 | 14E | Resume of Vocational Expert | | | to 2021–07–06 | 1 |
| X83 | 15E | Statement of Claimant or Other Person | | US Department Of Edcuation | 2022–01–25 to 2022–01–25 | 3 |
| X83 | 16E | Resume of Vocational Expert | | | 2022–04–12 to | 7 |
| X83 | 17E | Misc Disability Development and Documentation | | | 2022–04–07 to | 2 |
| X83 | 18E | Report of Contact | | J Mcteer Field Office 620 | 2022–04–26 to | 1 |

| X83 | 19E | Report of Contact | | J. Jeeter | 2022–05–04 to | 1 |
| X83 | 20E | Representative Correspondence / Close Record | Subsequent to hearing | Kathleen Flynn, Atty | to 2022–05–16 | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| X83 | 1F | Office Treatment Records | | Logan Heights Family Health Center– National Avenue | 2012–03–29 to 2014–05–08 | 41 |
| X83 | 2F | Progress Notes | | Mid City Community Clinic Medical Records Dept | 2014–12–15 to 2015–01–27 | 19 |
| X83 | 3F | Office Treatment Records | | Scripps Mercy Hospital | 2014–04–29 to 2015–05–07 | 40 |
| X83 | 4F | Office Treatment Records | | Randy Cronic, Md | to 2017–04–13 | 11 |
| X83 | 5F | Office Treatment Records | | River Parc Internal Medicine | 2017–02–01 to 2017–12–14 | 14 |
| X83 | 6F | Office Treatment Records | | View Point Health – Norcross | 2017–10–18 to 2018–01–16 | 75 |
| X83 | 7F | Progress Notes | | River Parc Internal Medicine | 2017–02–01 to 2018–07–11 | 21 |
| X83 | 8F | Misc Medical Records | | Dr. Young W. Kang, Md | to 2018–07–11 | 5 |

| X83 | 9F | Office Treatment Records | Viewpoint Health | 2018–02–12 to 2018–07–16 | 44 |
| X83 | 10F | Office Treatment Records | New Focus Addiction Behavioral Health Inc | 2018–03–09 to 2018–07–16 | 11 |
| X83 | 11F | Progress Notes | Aff–Wellstreet Mtv | to 2017–02–03 | 3 |
| X83 | 12F | Inpatient Hospital Records | Georgia Regional Hospital | 2018–09–05 to 2018–11–22 | 79 |
| X83 | 13F | Office Treatment Records | Viewpoint Health | 2018–01–16 to 2019–02–12 | 153 |
| X83 | 14F | Emergency Room/Observation Records | Emory St. Josephs | 2018–09–03 to 2018–09–05 | 151 |
| X83 | 15F | Office Treatment Records | La Maestra Community Health Centers | 2015–03–25 to 2015–05–30 | 36 |
| X83 | 16F | Emergency Department Records | Gwinnett Medical Centers | 2019–02–13 to 2019–05–20 | 120 |
| X83 | 17F | Hospital Records – ER/Inpatient | Northside Hospital | 2018–11–18 to 2018–12–05 | 190 |
| X83 | 18F | Progress Notes | Young Kang, Md | 2018–11–18 to 2019–10–09 | 24 |
| X83 | 19F | Hospital Records | Emory St. Josephs Hospital | 2018–09–03 to 2020–12–21 | 33 |

| X83 | 20F | Progress Notes | Young Kang, M.D. | 2019–12–08 to 2021–04–05 | 23 |
|---|---|---|---|---|---|
| X83 | 21F | Emergency Department Records | Northside Gwinnett Hospital | 2020–12–18 to 2020–12–19 | 63 |
| X83 | 22F | Inpatient Hospital Records | Ridgeview Institute Monroe | 2021–10–08 to 2021–10–18 | 190 |
| X83 | 23F | Emergency Department Records | Wellstar Atlanta Medical Center South | to 2021–10–23 | 33 |
| X83 | 24F | Office Treatment Records | Dekalb Community Service Board | 2021–11–19 to 2021–11–29 | 34 |
| X83 | 25F | Progress Notes | Mid–City Community Clinic | 2014–12–15 to 2015–01–27 | 13 |
| X83 | 26F | Office Treatment Records | Georgia Regional Hospital | 2018–09–05 to 2018–11–22 | 68 |
| X83 | 27F | Medical Opinion – Mental | Dr. Young Kang | to 2022–01–31 | 14 |
| X83 | 28F | Office Treatment Records | Dr. Young Kang | to 2022–01–31 | 5 |
| X83 | 29F | Medical Evidence of Record | Northside Hospital Duluth | 2019–02–13 to 2020–12–19 | 411 |
| X83 | 30F | Medical Evidence of Record | Dekalb Community Service Board | 2022–01–14 to 2022–02–15 | 32 |
| X83 | 31F | Medical Evidence of Record | River Parc Internal Medicine | 2018–03–01 to 2022–02–24 | 139 |

| X83 | 32F | Medical Evidence of Record | Dekalb Csb | 2022-03-04 to 2022-03-21 | 34 |
| X83 | 33F | Progress Notes | Dekalb Community Service Board | 2022-04-13 to 2022-04-13 | 5 |
| X83 | 34F | Medical Evidence of Record | Uc San Diego Medical Center No Recs | 2022-01-01 to 2022-04-07 | 2 |