# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
10155 Eagle Drive
Covington, GA 30014-3804

Date: October 05, 2022

Allison Montine Leighty

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Allison Montine Leighty (BNC#: 21VX305E09921)                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Allison Montine Leighty (BNC#: 21VX305E09921)                    Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (877) 873-9106.

Social Security
9180 Covington By Pass
Covington, GA 30014-8710

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

L. Ellis Davis
Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

**IN THE CASE OF**                                    **CLAIM FOR**

Allison Montine Leighty                              Supplemental Security Income
(Claimant)

_____                            21VX305E09921
(Wage Earner)                                        (Beneficiary Notice Control Number)
                                                     *Social Security Number removed for your protection*

## JURISDICTION AND PROCEDURAL HISTORY

On April 7, 2019, the claimant filed an application for supplemental security income, alleging disability beginning January 8, 2011.  The claim was denied initially on March 12, 2020, and upon reconsideration on July 31, 2020.  Thereafter, the claimant filed a written request for hearing received on September 30, 2020 (20 CFR 416.1429 *et seq.*).  The claimant appeared and testified at a hearing held on September 13, 2022, in Covington, GA. The claimant's main representative is Kathleen Flynn, an attorney, but was represented at the hearing by attorney Erica Dempsey.  Joey Kilpatrick, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since April 7, 2019, the date the application was filed.

## APPLICABLE LAW

See Next Page

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it

or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since April 7, 2019, the application date (20 CFR 416.971 *et seq.*).**

**2.   The claimant has the following severe impairments: autism spectrum disorder; depression; bipolar disorder; anxiety disorder; personality disorder; and obesity (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant's alleged obstructive sleep apnea is not a medically determinable impairment. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment (SSR 96-4p). Here, the limited physical examination evidence, which showed normal respiratory findings, does not support the existence of this impairment, and there is no indication that the claimant has been diagnosed with this condition as a result of a sleep study (Ex. 25F).

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

Despite the claimant's combined impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, 12.08, and 12.10. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation. In a function report, the claimant wrote that she followed spoken instructions well if given one at a time, but that written instructions were overwhelming (Ex. 4E at 9). Mental status examinations from the claimant's treating providers showed orientation to person, time, and place; coherent thought process; grossly intact memory; and average estimated intellectual functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58).

In interacting with others, the claimant has a moderate limitation. In a function report, the claimant wrote that she had difficulties getting along with her online gaming friends (Ex. 4E at 9). She wrote that she visited with neighbors, spent time with her family, and engaged in online gaming (Ex. 4E at 8). She wrote that she had a hard time following rules and did not do well with authority figures (Ex. 4E at 10). Mental status examinations from the claimant's treating providers showed cooperative interpersonal functioning and normal rate and volume of speech (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58).

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. In a function report, the claimant wrote that her ability to pay attention varied and that she did not finish what she started (Ex. 4E at 9). Mental status examinations from the claimant's treating providers showed focused or intact attention and concentration; coherent thought process; and alert level of consciousness (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58). The claimant testified that she is able to play video games for extended periods.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. In a function report, the claimant wrote that she did not handle stress or changes in routine well (Ex. 4E at 10). Mental status examinations from the claimant's treating providers showed calm and relaxed psychomotor activity; good judgment and insight; euthymic mood; normal affect; appropriate thought content; no hallucinations; and no suicidality or homicidality (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58). The claimant reported stable mood, normal sleep, no suicidal ideation, and no psychosis (Ex. 10F at 8, 15).

See Next Page

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 416.967(b), except she can occasionally climb, balance, stoop, kneel, crouch, or crawl; should not stand for longer than 1 hour at a time without sitting, nor sit for longer than 2 hours at a time without standing; is limited to simple tasks with few workplace changes; can concentrate for 2-hour blocks at a time; and should have only occasional interaction with supervisors, coworkers, and the public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

See Next Page

In her initial disability report, the claimant wrote that she was limited in her ability to work due to chronic anxiety disorder; major depressive disorder; bipolar disorder; borderline personality disorder, Asperger syndrome; and morbid obesity (Ex. 1E at 1). In function reports, the claimant and her mother wrote that her conditions affected her abilities to lift, squat, bend, stand, walk, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others (Ex. 3E; 4E). In a later disability report, the claimant wrote that she had obstructive sleep apnea (Ex. 5E at 2). In a later disability report, she reported no changes in her conditions (Ex. 7E).

At the September 2022 hearing, the claimant testified that she lives with her parents and does not drive much. She said that she has never worked. She said that she cannot clean herself after a bowel movement. The claimant said that she cannot stand for more than five minutes before her feet, knees, and back hurt. She said that she first saw Ms. Haupt, a nurse practitioner and friend/acquaintance of her mother, this year, and that Ms. Haupt wrote down what she told her on the questionnaire forms. The claimant testified that she has difficulty socializing with others and will get kicked out of groups online. She reported multiple side effects of her medications. She said that she has difficulty focusing. The claimant said that her energy is not good and she often stays in her room.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent with the medical evidence of record.

The medical evidence of record shows that, in May 2019, the claimant was seen by Shahzad Hashmi, M.D., a psychiatrist (Ex. 7F at 13). She reported current stability in symptoms and moods (Ex. 7F at 10). She reported cutting herself with a razor two weeks because she felt sad, but said she was feeling better (Ex. 7F at 10). She said that was interested in friends who were pregnant (Ex. 7F at 10). The claimant denied side effects from medication, as well as aggression, paranoia, or depression (Ex. 7F at 10). She reported good sleep and normal appetite (Ex. 7F at 10). She denied delusions, hallucinations, or suicidal ideation (Ex. 7F at 10). A mental status examination showed alertness and orientation times four; normal psychomotor activity; normal speech; average estimated intellectual functioning; normal memory; pleasant and euthymic mood; normal affect; coherent thought process; normal thought content; denial of homicidality and suicidality; and neat grooming (Ex. 7F at 11).

In June 2019, the claimant followed up with Dr. Hashmi (Ex. 7F at 6). She said that she had been depressed because she had been refusing her injection due to injection site pain (Ex. 7F at 6). The claimant reported normal appetite; no aggression, paranoia, or depression; good sleep; no side effects from medication; and no suicidal ideation, delusions, or hallucinations (Ex. 7F at 6). A mental status examination showed alertness and orientation times four; normal psychomotor

activity; normal speech; average estimated intellectual functioning; normal memory; pleasant and euthymic mood; normal affect; coherent thought process; normal thought content; denial of homicidality and suicidality; and neat grooming (Ex. 7F at 7).

In July 2019, the claimant told Dr. Hashmi that she had been doing better and feeling less depressed, despite not having had an injection for three weeks (Ex. 10F at 38). She reported having problems controlling her impulses (Ex. 10F at 38). The claimant reported normal appetite and sleep, and denied aggression, paranoia, depression, suicidal ideation, delusions, hallucinations, or medication side effects (Ex. 10F at 38). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 10F at 39).

In August 2019, the claimant followed up with Dr. Hashmi (Ex. 10F at 33). She reported stealing from her mother to pay for online gaming (Ex. 10F at 33). The claimant reported normal appetite and sleep, and denied aggression, paranoia, depression, suicidal ideation, delusions, hallucinations, or medication side effects (Ex. 10F at 33). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; depressed mood; blunted affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 10F at 34).

In October 2019, the claimant told Dr. Hashmi that she felt good, with no current symptoms or anxiety or depression (Ex. 10F at 21). She reported refusing to shower because all of her friends were online and she did not care to smell (Ex. 10F at 21). She reported cutting herself after a recent online fight (Ex. 10F at 21). The claimant reported normal appetite and sleep, and denied aggression, paranoia, depression, suicidal ideation, delusions, hallucinations, or medication side effects (Ex. 10F at 21). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; depressed mood; blunted affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 10F at 22).

In December 2019, the claimant's mother told Dr. Hashmi that she felt furious over the claimant's behavior and that she and the claimant's father were "at the end of their rope" because of her actions (Ex. 10F at 14). The claimant reported stable mood, normal sleep, no suicidal ideation, and no psychosis (Ex. 10F at 14). A mental status examination showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average

estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 10F at 15).

In February 2020, the claimant told Dr. Hashmi that she had been doing better (Ex. 10F at 7). She stated that her medication helped keep her stable and helped with her depressive symptoms (Ex. 10F at 7). The claimant reported stable mood, normal sleep, no suicidal ideation, and no psychosis (Ex. 10F at 7). A mental status examination showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 10F at 8).

In April 2020, the claimant told Dr. Hashmi that she was tolerating her medications well without side effects (Ex. 12F at 11). She said that she was social and handling stress well (Ex. 12F at 11). She reported normal appetite, good sleep, and no suicidal ideations, delusions, or hallucinations (Ex. 12F at 11). A mental status examination showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 12F at 11-12).

In August 2020, the claimant told Dr. Hashmi that she had not been good (Ex. 16F at 38). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; mood congruent affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 16F at 39).

In October 2020, the claimant told Dr. Hashmi that she had "been doing much better" (Ex. 16F at 29). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 16F at 30).

In June 2021, the claimant was seen by Dr. Hashmi for a refill of her medications (Ex. 22F at 56). A mental status examination showed normal gait and station; normal musculoskeletal strength and tone; alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal

See Next Page

rate and volume of speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; congruent affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 22F at 57-58).

In September 2021, the claimant was admitted to Ridgeview Institute Monroe after stealing thousands of dollars from her parents and engaging in self-harming behaviors (Ex. 21F at 2). The claimant stated that she was compliant with her medications, "but also made statements indicating being out of some medications and not liking to take other medications" (Ex. 21F at 2). A mental status examination on admission showed casual clothes; neat hygiene; cooperative attitude; normal motor activity; normal rate, rhythm, and tone of speech; euthymic mood; congruent affect; orientation to time, place, and person; normal thought processes and thought content; no perceptual disturbances; intact judgment; intact insight; intact attention and concentration; intact fund of information and intelligence; intact short-term and long-term memory; and average estimated intellectual functioning (Ex. 21F at 12-14). She was resistant to making attempts to identify coping skills and changing behaviors (Ex. 21F at 2). The claimant minimized the effect her actions would have on her family and did not want to take responsibility for her actions (Ex. 21F at 2). She stopped attending group and did not return calls and was administratively discharged for nonattendance (Ex. 21F at 2).

In May 2022, the claimant was seen by Sandra Haupt, N.P., a primary care provider, to establish care (Ex. 25F at 4). The claimant's mother provided many of the details of the office visit (Ex. 25F at 4). A physical examination showed BMI of 61; normal pulmonary effort; no respiratory distress; normal cardiovascular findings; normal musculoskeletal range of motion; no edema in the bilateral legs; normal range of motion of the cervical spine; no focal neurological deficit; normal attention; anxious mood; tangential speech; paranoid thought content; normal cognition and memory; and impulsive judgment (Ex. 25F at 5).

In August 2022, the claimant was seen again by Ms. Haupt (Ex. 25F). She complained of right knee pain that hurt when she went upstairs (Ex. 25F). Her mother provided much of the details of the office visit (Ex. 25F at 1). A physical examination showed BMI of 63; normal pulmonary effort; no respiratory distress; normal cardiovascular findings; normal musculoskeletal range of motion; swelling, effusion, and tenderness of the left knee; normal range of motion of the cervical spine; no focal neurological deficit; 5 out of 5 upper and lower grip strength; normal attention; anxious mood; labile affect; tangential speech; hyperactive behavior; and impulsive judgment (Ex. 25F at 1-2).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

In March 2021, Robert Heidrich, Psy.D., a medical expert, reviewed the evidence of record and responded to medical interrogatories (Ex. 15F). Dr. Heidrich opined that the claimant would have mild limitations in understanding, remembering, and carrying out complex instructions; and

in making judgments on complex work-related decisions (Ex. 15F at 2). He wrote that she would have mild impairment in interacting appropriately with coworkers, supervisors, and the public; and in responding appropriately to usual work situations and to changes in a routine work setting (Ex. 15F at 3). Dr. Heidrich wrote that the claimant would have mild limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself (Ex. 15F at 7). He wrote, "The claimant may be capable of simple or repetitive tasks. However, inattention and mood instability may be a concern and ongoing psychotherapy and medications would be advised" (Ex. 15F at 10). The assessment of Dr. Heidrich is considered moderately persuasive, as it is supported by his citation to the claimant's treatment history, diagnoses, and performance in therapy (Ex. 15F). It is also consistent with the objective mental status examination findings of the claimant's treating providers, which generally showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58).

In May 2021, Dr. Hashmi submitted a letter regarding the "functional limitations imposed by emotional disability" and listed multiple symptoms that the claimant reported (Ex. 12E at 3). This opinion is found mildly persuasive, as it is not supported by his own treatment records. Dr. Hashmi's own largely unremarkable mental status examinations generally showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58). It is also not supported by his treatment records showing the claimant reported stable mood; normal sleep; no suicidal ideation; and no psychosis; as well as significant improvement with medication (Ex. 10F at 8; 14; 16F/ 29). This assessment is also not consistent with the objective findings of Crystal Hamilton, the claimant's social worker, who repeatedly noted neat grooming; normal muscle tone and strength; normal gait and station; alert level of consciousness; cooperative interpersonal functioning; calm psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; congruent mood; coherent thought process; appropriate thought content; and no reported suicidality or hallucinations (Ex. 22F at 17, 21, 31, 37, 42, 52-53, 61, 66). Dr. Hashmi's physical limitations are not supported by his own records, which repeatedly showed normal gait and station; normal musculoskeletal strength and tone (Ex. 10F at 22, 34, 39; 16F at 30, 39; 22F at 57-58). The physical limitations are not consistent with the limited physical examination findings of Ms. Haupt in 2022 (Ex. 25F).

In September 2022, Dr. Hashmi completed multiple questionnaires concerning the claimant functioning (Ex. 27F at 1). Among other statements, Dr. Hashmi indicated that the claimant had "poor" or no ability to understand, remember, or make social judgments (Ex. 27F at 1). He wrote

that the claimant had extreme limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintain pace; and adapting or managing herself (Ex. 27F at 3, 7, 9, 12). These questionnaires are found only mildly persuasive, as it is not supported by his own treatment records. Dr. Hashmi's own largely unremarkable mental status examinations generally showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58). It is also not supported by his treatment records showing the claimant reported stable mood; normal sleep; no suicidal ideation; and no psychosis; as well as significant improvement with medication (Ex. 10F at 8; 14; 16F at 29). These assessments are also not consistent with the objective findings of Ms. Hamilton, the claimant's social worker, who repeatedly noted neat grooming; normal muscle tone and strength; normal gait and station; alert level of consciousness; cooperative interpersonal functioning; calm psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; congruent mood; coherent thought process; appropriate thought content; and no reported suicidality or hallucinations (Ex. 22F at 17, 21, 31, 37, 42, 52-53, 61, 66).

In August 2022, Ms. Haupt, who had treated the claimant only twice, completed a residual functional capacity questionnaire and pain questionnaire (Ex. 24F). Ms. Haupt wrote that the claimant could sit for 4 hours total and stand "not at all" during an 8-hour workday (Ex. 24F at 3). She wrote that the claimant needed the freedom to rest, recline, or lie down at her discretion throughout a workday; could lift/carry 10 pounds occasionally and up to 5 pounds frequently; could perform no fine manipulation with the bilateral upper extremities; could not use her feet for repetitive movements; needed to elevate her legs above her heart several times a day; could never squat, climb, crawl, or stoop; and would miss work more than two days per month (Ex. 24F). Ms. Haupt's assessments are found only mildly persuasive, as they are not supported by her limited objective findings of normal musculoskeletal range of motion; no respiratory distress; normal cardiovascular findings; no focal neurological deficit; 5 out of 5 upper and lower grip strength; and on occasion, knee swelling (Ex. 25F at 1-2, 5). Her diagnosis of osteoarthritis is not based on any imaging studies and is not supported by her own diagnosis of only "acute pain of right knee" (Ex. 25F). Ms. Haupt's assessments are also not consistent with the objective findings of Dr. Hashmi, who repeatedly noted normal gait and station and normal muscle strength and tone (Ex. 10F at 22, 34, 39; 16F at 30, 39; 22F at 57). The undersigned notes as well that, at the hearing, the claimant acknowledged Ms. Haupt was an acquaintance of her mother.

In August 2022, Ms. Hamilton completed multiple questionnaire indicating extreme limitations in most areas of functioning; and poor or no ability to understand, remember, or make social adjustments (Ex. 23F at 1). These are found to be only mildly persuasive, as they are not supported by Ms. Hamilton's own treatment records, which repeatedly showed neat grooming; normal muscle tone and strength; normal gait and station; alert level of consciousness; cooperative interpersonal functioning; calm psychomotor activity; normal rate and volume of

speech; average estimated intellectual functioning; good judgment and insight; focused attention and concentration; grossly intact memory; euthymic mood; congruent mood; coherent thought process; appropriate thought content; and no reported suicidality or hallucinations (Ex. 22F at 17, 21, 31, 37, 42, 52-53, 61, 66). These assessments are also not consistent with the objective findings of Dr. Hashmi, the claimant's treating psychiatrist, which generally showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58).

The assessments of the state agency consultants, who found mild to moderate mental limitations and no severe physical impairments, are found moderately persuasive (Ex. 1A; 3A). The finding of no severe physical impairment is not consistent with the claimant's diagnosis of morbid obesity, despite the fact that the physical examination evidence has been largely unremarkable (Ex. 10F at 22, 34, 39; 16F at 30, 39; 22F at 57; 25F).). The mental limitations are consistent with the treatment evidence of record, which generally showed alert level of consciousness; orientation to person, place, and time; neat grooming; cooperative interpersonal functioning; calm and relaxed psychomotor activity; normal rate and volume of speech; average estimated intellectual functioning; grossly intact memory; euthymic mood; normal range and variability of affect; coherent thought process; appropriate thought content; no hallucinations; no suicidality or homicidality; and normal sensory functioning (Ex. 7F at 7, 11; 10F at 8, 15, 22, 34, 39; 12F at 11-12; 16F at 30, 39; 21F at 12-14; 22F at 57-58).

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the objective mental and physical examination findings and the testimonial evidence of record.

**5.    The claimant has no past relevant work (20 CFR 416.965).**

**6.    The claimant was born on January 8, 1995 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963)**
**7.    The claimant has a limited education (20 CFR 416.964).**

**8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of

exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the following:

- <u>Delivery Route Clerk</u> (DOT 222.587-038): Light; Unskilled (SVP 2); 125,000 positions in the national economy.
- <u>Garment Sorter</u> (DOT 222.687-014): Light; Unskilled (SVP 2); 118,000 positions in the national economy.
- <u>Mail Sorter</u> (DOT 209.687-026): Light; Unskilled (SVP 2); 96,000 positions in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The expert testified that his testimony related to 1 hour standing, 2 hours sitting, and contact with supervisors and others is based on his education, training, and experience.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**10.   The claimant has not been under a disability, as defined in the Social Security Act, since April 7, 2019, the date the application was filed (20 CFR 416.920(g)).**

## <u>DECISION</u>

Allison Montine Leighty (BNC#: 21VX305E09921)                    Page 14 of 14

Based on the application for supplemental security income filed on April 7, 2019, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *L. Ellis Davis*
_____
L. Ellis Davis
Administrative Law Judge

October 05, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1A | Disability Determination Explanation-T16 INITIAL DDE SIGNED BY DDS MD'S | | 2020-03-12 | 12 |
| T1I | 2A | Initial Disability Determination by State Agency, Title XVI | | 2020-03-12 | 1 |
| T1I | 3A | Disability Determination ExplanationT16 RECON DDE SIGNED BY DDS MD'S | | 2020-07-31 | 13 |
| T1I | 4A | Reconsideration Disability Determination by State Agency, Title XVI-T16 RECON | | 2020-07-31 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1B | T16 Notice of Disapproved Claim | | 2020-03-12 | 5 |
| T1I | 2B | Request for Reconsideration | | 2020-05-13 | 3 |
| T1I | 3B | T16 Disability Reconsideration Notice | | 2020-07-31 | 6 |
| T1I | 4B | Request for Hearing Acknowledgement Letter | | 2020-10-01 | 14 |
| T1I | 5B | Request for Hearing by ALJ | | 2020-10-01 | 4 |
| T1I | 6B | Outgoing ODAR Correspondence | | 2020-10-27 | 7 |
| T1I | 7B | Hearing Notice | | 2020-11-06 | 18 |
| T1I | 8B | Notice Of Hearing Reminder | | 2021-02-10 | 1 |
| T1I | 9B | Hearing Notice | | 2022-06-29 | 22 |

| T1I | 10B | SSA-1696 - Claimant's Appointment of a Representative - Kathleen Flynn, Esq. | 2022-08-01 | 4 |
| T1I | 11B | Fee Agreement for Representation before SSA - Kathleen Flynn, Esq. | 2022-08-01 | 1 |
| T1I | 12B | Notice Of Hearing Reminder | 2022-08-16 | 8 |
| T1I | 13B | Fee Agreement for Representation before SSA - Erica Dempsey, Esq. | 2022-08-01 | 1 |
| T1I | 14B | SSA-1696 - Claimant's Appointment of a Representative - Erica Dempsey, Esq. | 2022-08-01 | 4 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1I | 1D | Lead Protective Filing Worksheet | | 2019-04-07 | 3 |
| T1I | 2D | Application for Supplemental Security Income Benefits | | 2019-04-07 | 5 |
| T1I | 3D | Detailed Earnings Query | | 2020-10-27 | 1 |
| T1I | 4D | Summary Earnings Query | | 2020-10-27 | 1 |
| T1I | 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2020-10-27 | 1 |
| T1I | 6D | Certified Earnings Records | | 2020-10-27 | 1 |
| T1I | 7D | Summary Earnings Query | | 2021-02-17 | 1 |
| T1I | 8D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2021-02-17 | 1 |
| T1I | 9D | Detailed Earnings Query | | 2021-02-17 | 1 |
| T1I | 10D | Certified Earnings Records | | 2021-02-17 | 1 |
| T1I | 11D | Detailed Earnings Query | | 2022-09-07 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| T1I | 12D | Summary Earnings Query | | 2022-09-07 | 1 |
| T1I | 13D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-09-07 | 1 |
| T1I | 14D | Certified Earnings Records | | 2022-09-07 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 1E | Disability Report - Adult | | | to 2019-05-08 | 8 |
| T1I | 2E | Disability Report - Field Office | | FO | to 2019-05-08 | 2 |
| T1I | 3E | 3rd Party Function Report - Adult | | | to 2019-06-07 | 10 |
| T1I | 4E | Function Report - Adult | | | to 2019-06-07 | 11 |
| T1I | 5E | Disability Report - Appeals | | | to 2020-05-13 | 9 |
| T1I | 6E | Disability Report - Field Office | | FO | to 2020-05-13 | 2 |
| T1I | 7E | Disability Report - Appeals | | | to 2020-10-01 | 8 |
| T1I | 8E | Disability Report - Field Office | | FO | to 2020-10-01 | 2 |
| T1I | 9E | Authorization for Source to Release Information to SSA | | E827 | to 2020-10-01 | 1 |
| T1I | 10E | Resume of Vocational Expert | | Sandra M Wells-Brown, Edd | to 2021-01-25 | 7 |
| T1I | 11E | Proffer Correspondence | Subsequent to hearing | Oho | to 2021-04-28 | 2 |
| T1I | 12E | Claimant Correspondence-Letters from Parents & Dr Hashmi | Subsequent to hearing | Leighty, Chris And Susan | to 2021-05-07 | 3 |
| T1I | 13E | Proffer Correspondence | Subsequent to hearing | Oho | to 2021-06-04 | 2 |

| T1I | 14E | Claimant Correspondence - Request for Supplemental Hearing | Subsequent to hearing | Leighty, Allison M | to 2021-06-14 | 2 |
| T1I | 15E | Correspondence regarding efforts to obtain evidence | | Kathleen Flynn, Esq. | to 2021-08-19 | 3 |
| T1I | 16E | Report of Contact | | Oho - Covington, Ga | to 2022-07-30 | 1 |
| T1I | 17E | Education Records - Non Medical | | Eastside High School | to 2022-08-03 | 2 |
| T1I | 18E | Resume of Vocational Expert | | Joey Kilpatrick, Md | to 2022-08-18 | 3 |
| T1I | 19E | Report of Contact | | Oho - Covington, Ga | to 2022-08-24 | 1 |
| T1I | 20E | Misc Disability Development and Documentation | | Susan Leightly, Mother | to 2022-09-03 | 5 |
| T1I | 21E | Claimant Correspondence | During hearing | Susan Leighty, Mother | to 2022-09-13 | 1 |
| T1I | 22E | Authorization for Source to Release Information to SSA | | | | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1I | 1F | Office Treatment Records | | Dr Kaylin Lane | 2010-09-08 to 2014-09-29 | 34 |
| T1I | 2F | Office Treatment Records | | Salveo Integrative Health | 2016-01-04 to 2016-08-11 | 45 |
| T1I | 3F | Office Treatment Records | | Salveo Integrative Health | 2016-08-15 to 2016-12-28 | 59 |
| T1I | 4F | Office Treatment Records | | Covington Women's Health Special | 2018-03-26 to 2018-06-11 | 10 |
| T1I | 5F | Office Treatment Records | | Salveo Integrative Health | 2017-01-05 to 2018-08-23 | 55 |

| | | | | | | |
|---|---|---|---|---|---|---|
| T1I | 6F | Progress Notes | | Emory Internal Medicine Of Newton | 2017-02-01 to 2018-11-28 | 62 |
| T1I | 7F | Office Treatment Records | | Salveo Integrative Health | 2018-09-20 to 2019-06-13 | 34 |
| T1I | 8F | Office Treatment Records | | Salveo Integrative Health | 2015-09-17 to 2019-06-17 | 64 |
| T1I | 9F | Medical Source - No MER Available | | Emory Health Care | to 2020-01-28 | 9 |
| T1I | 10F | Office Treatment Records | | Salveo Integrative Health | 2017-08-24 to 2020-02-20 | 63 |
| T1I | 11F | Medical Source - No MER Available | | Southeastern Lung Care PC. | to 2020-06-03 | 3 |
| T1I | 12F | Office Treatment Records | | Salveo Integrative Health | 2017-08-24 to 2020-06-11 | 34 |
| T1I | 13F | Request for Medical Interrogatory | Subsequent to hearing | Oho | to 2021-03-01 | 11 |
| T1I | 14F | Request for Medical Interrogatory-BARCODE | Subsequent to hearing | Oho | to 2021-03-01 | 1 |
| T1I | 15F | Response to Medical Interrogatory | Subsequent to hearing | Robert K Heidrich Psyd | to 2021-03-11 | 10 |
| T1I | 16F | Office Treatment Records | Subsequent to hearing | Salveo Integrative Health | 2020-08-13 to 2021-04-01 | 46 |
| T1I | 17F | Hospital Records | | Childrens Healthcare Of Atlanta | 2011-03-29 to 2011-04-03 | 9 |
| T1I | 18F | Outpatient Hospital Records | | Augusta University Medical Center | 2011-07-01 to 2013-05-10 | 32 |
| T1I | 19F | Office Treatment Records | | Lisa Miller, Md - Pediatrics | 2011-12-19 to 2014-04-04 | 23 |
| T1I | 20F | Office Treatment Records | | Emory Clinic | to 2018-03-02 | 4 |
| T1I | 21F | Hospital Records | | Ridgeview Institute Monroe | 2021-09-13 to 2021-09-24 | 68 |

| | | | | | |
|---|---|---|---|---|---|
| T1I | 22F | Office Treatment Records | Salveo Integrative Health | 2021-04-01 to 2022-08-18 | 77 |
| T1I | 23F | Medical Evidence of Record | Crystal Hamilton Salveo Integrative Health | to 2022-08-03 | 12 |
| T1I | 24F | Office Treatment Records | Piedmont Physician Group At Bateman - Sandra Haupt, Fnpc | to 2022-08-18 | 5 |
| T1I | 25F | Office Treatment Records | Sandra Haupt Np Piedmont At Bateman | 2022-05-24 to 2022-08-18 | 6 |
| T1I | 26F | Office Treatment Records | Hashmi Salveo, Md - Intergrative Health | to 2022-09-06 | 3 |
| T1I | 27F | Office Treatment Records | Hashmi Salveo, Md - Integrated Health | to 2022-09-12 | 13 |
| T1I | 28F | Medical Evidence of Record | Piedmont Physicians At Bateman Sandra Haupt Np | 2022-09-26 to 2022-09-26 | 1 |