# EXHIBIT

# 2

**BEDARD LAW GROUP, P.C.**

JOHN H. BEDARD, JR.
*Licensed Only In GA and TN*

RONALD S. CANTER
OF COUNSEL
*Licensed Only In DC, FL, MD, PA, VA*

4855 RIVER GREEN PARKWAY
SUITE 310
DULUTH, GEORGIA 30096
678.253.1871
www.bedardlawgroup.com

MICHAEL K. CHAPMAN
*Licensed Only In GA*

JONATHAN K. AUST
*Licensed Only In GA and NC*

DAVID A. KLEBER
*Licensed Only In GA*

## PETITION TO SET ASIDE CIVIL INVESTIGATIVE DEMAND DATED OCTOBER 18, 2022

## BY PETITIONER

**NATIONAL CREDIT SYSTEMS, INC.**

**November 9, 2022**

**Filed This Date Via E-mail**

**ExecSec@cfpb.gov**
**Enforcement@cfpb.gov**

Attn: Executive Secretary
Consumer Financial Protection Bureau
1700 G. Street NW
Washington, DC 20552

## PROCEDURAL INTRODUCTION

This petition is made pursuant to Section 1052(f) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") and 12 C.F.R. 1080.6(e) within 20 days following service of the Civil Investigative Demand dated October 18, 2022 (received on October 21, 2022) hereinafter referred to as the "CID."

### Certification of Good Faith Pursuant to 12 C.F.R. §1080.6(e)(1).

The Petitioner respectfully challenges the enforceability of 12 C.F.R. §1080.6 for the reasons described below. Notwithstanding, and without waiving its challenge, the undersigned counsel certifies that he has made a good faith effort to resolve the issues identified herein with the Bureau's enforcement attorney handling this CID, Sarah Baldwin, on October 31, 2022 at approximately 4pm Eastern Standard Time via telephone. No matters contained in this petition were resolved by agreement. This petition is made in good faith



Executive Secretary
Page **2** of **7**

based on case law which fairly bears upon the issues raised in this petition. The petition is not made for the purpose of delay or with contumacious intent.

**Compliance Period Return Date Pursuant to 12 C.F.R. §1080.6(f).**

Petitioner respectfully challenges the enforceability of 12 C.F.R. §1080.6 for the reasons described below. Notwithstanding, and without waiving its challenge, Petitioner expressly challenges the entirety of the CID. To the extent any portion of this petition is denied, Petitioner respectfully requests 21 days from the date of service of the order on Petitioner as the new return date for the CID.

**Compliance with 12 C.F.R. §1080.6(c)(3).**

Petitioner respectfully challenges the enforceability of 12 C.F.R. §1080.6 for the reasons described below. Notwithstanding, and without waiving its challenge, Petitioner addresses the requirement to have raised these issues at the meet and confer stage of the process.

12 C.F.R. §1080.6(c)(3) states:

> (3) Petitions. The Bureau will not consider petitions to set aside or modify a civil investigative demand unless the recipient has meaningfully engaged in the meet and confer process described in this subsection and will consider only issues raised during the meet and confer process.

Petitioner meaningfully participated in the meet and confer process on Monday, October 31, 2022, via telephone and with the consent of the Enforcement Attorney. A representative of Petitioner, Joel Lackey, participated in the call along with the undersigned and three representatives of the Bureau. The call lasted approximately 120 minutes. During the call, Petitioner raised objections to numerous provisions of the CID and the parties thereafter engaged in meaningful and productive discussion of each. No agreement was reached on any subject, save and except the Bureau's commitment to review Petitioner's forthcoming negotiated request to modify the CID. Petitioner has complied with §1080.6(c)(3). During the meet and confer conference call, Ms. Baldwin confirmed her agreement that the Petitioner has satisfied its obligations under 12 C.F.R. §1080.6(c)(3).



Executive Secretary
Page **3** of **7**

## FACTUAL INTRODUCTION

This investigation began with the service of a Civil Investigative Demand dated October 18, 2022. Petitioner received the CID on October 21, 2022. A copy of the CID is attached hereto as Exhibit A. The parties conducted a meet and confer pursuant to 12 C.F.R. 1080.6(c) on October 31, 2022, and reached agreement on certain objections to the CID, subject to the Petitioner's written modification requests and the Bureau's subsequent approval. Agreement was not reached on two important issues – the inadequate Notification of Purpose Pursuant to 12 C.F.R. §1080.5 contained in the CID and the unconstitutional structure of the Bureau's funding mechanism.

## ARGUMENT

## I.    THE BUREAU'S CONSTITUTIONAL DEFECT PROHIBITS ITS EXERCISE OF ENFORCEMENT AUTHORITY AND THE CID SHOULD BE SET ASIDE IN ITS ENTIRETY.

### A.  <u>The Bureau's Director Is Not Accountable To Congress Through Appropriations.</u>

The Bureau exercises its regulatory and enforcement powers absent meaningful financial oversight or control from Congress. Dodd-Frank authorizes the Director to unilaterally requisition up to 12% of the Federal Reserve System's operating expenses – totaling well over half *billion* dollars[1] – without congressional approval. 12 U.S.C. § 5497(a). Congress is also prohibited from reviewing the Bureau's use of these funds. 12 U.S.C. § 5497(a)(2)(C).

Dodd-Frank removed a critical democratic check on potential abuses of power by eliminating congressional appropriations oversight of the Bureau's financial resources. *See,* U.S. Const., art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). In the case of the Bureau, the "power of the purse" – Congress's "ultimate weapon of enforcement is unavailable." *United States v. Richardson,* 4 18 U.S. 166, 178 n. 11  (1974). This power serves the "fundamental and

---

[1] The Bureau's funding was c a p p e d  a t  $734.0 million for 2022. *See,*
https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy22.pdf (last accessed November 7, 2022).



Executive Secretary
Page **4** of **7**

comprehensive purpose" of assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Personnel Mgmt. v. Richmond,* 496 U.S. 414, 427-28 (1990).

Congress may not abdicate its most important constitutional check against executive power. *See, New York v. United States,* 505 U.S. 144, 182 (1992) (the separation of powers does not depend on "whether or not the encroached-upon branch approves the encroachment"). By insulating the Bureau from congressional appropriations oversight, Congress has impermissibly restrained its ability to hold the Executive branch accountable. This abdication violates the Constitution's separation of powers principle.

The 5th Circuit Court of Appeals agrees with this conclusion.  See attached Exhibit "B".  The 5th Circuit recently found the Bureau's funding apparatus to be unconstitutional and, as a consequence, set aside the Bureau's Payday Lending Rule.  Cmty. Fin. Servs. Ass'n of Am. v. Consumer Fin. Prot. Bureau, No. 21-50826, 2022 U.S. App. LEXIS 29060 (5th Cir. Oct. 19, 2022)  According to the 5th Circuit, the "Bureau's perpetual insulation from Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau 'no longer dependent and, as a result, no longer accountable' to Congress and ultimately, to the people."  [quoting All Am. Check Cashing, 33. F.4th at 232 (Jones, J., concurring)], *Id, at 31-32,*41*.  The 5th Circuit further articulated the dangers associated with Congress's abdication of its Constitutional spending power, "By abandoning its 'most complete and effectual' check on 'the overgrown prerogatives of the other branches of the government'—indeed, by enabling them in the Bureau's case—Congress ran afoul of the separation of powers embodied in the Appropriations Clause." [quoting The Federalist No. 58 (J. Madison)], *Id*., at 32, *42.

Standing alone, the Constitutional violation is inadequate to warrant setting aside the CID.  To warrant setting aside the CID, the Constitutional violation must have inflicted harm on the Petitioner.  Cmty. Fin. Servs. Ass'n of Am., at 38, *49.  Like the case before the 5th Circuit, that showing is "straightforward" here as well.  *Id*., at 38, *49.  Drawing the connection between the Constitutional violation and the harm suffered by the plaintiff, the 5th Circuit reasoned, "Because the funding employed by the Bureau to promulgate the Payday Lending Rule was wholly drawn through the agency's unconstitutional funding scheme, there is a linear nexus between the infirm provision (the Bureau's funding



Executive Secretary
Page **5** of **7**

mechanism) and the challenged action (promulgation of the rule)." _Id_., at 38, *49-50.  But for the unconstitutional funding used by the Bureau to promulgate the challenged Payday Lending Rule, the plaintiff would not have been harmed.  As a result, the 5th Circuit vacated entirely the Payday Lending Rule.  A similar nexus exists between the Bureau's unconstitutional funding provision and harm suffered by the Petitioner.  But for the infirm funding provision, the Bureau could not have issued the CID to the Petitioner and the Petitioner would not be obligated to respond.


## II.    CONCLUSION

The double-insulated funding mechanism of the Bureau violates the Appropriations Clause.  That violation creates direct nexus to significant concrete harm suffered by the Petitioner which, but for the Bureau's unconstitutional spending, the CID would not have been issued.  As the product of the Bureau's unconstitutional spending, the Payday Lending Rule was vacated and set aside as unenforceable.  For the same reason, so too must the CID issued to the Petitioner be vacated and set aside as the product of the Bureau's unconstitutional spending.  The Petitioner requests that the CID be set aside in toto.

Very truly yours,

_John H. Bedard, Jr._

John H. Bedard, Jr.
Bedard Law Group, P.C.



Executive Secretary
Page **6** of **7**

# EXHIBIT

# "A"

Sarah Baldwin
Consumer Financial Protection Bureau
ATTENTION: Office of Enforcement
1700 G Street, NW
Washington, DC 20552



CERTIFIED MAIL

7018 3090 0001 3638 2867



neopost
10/18/2022
US POSTAGE $09.60⁰

ZIP 20552
041L11231833

Joel Lackey
National Credit Systems, Inc.
(c/o CT Corporation System)
289 S Culver St.
Lawrenceville, GA 30046-4805

 **Consumer Financial
Protection Bureau**

1700 G Street NW, Washington, D.C. 20552

October 18, 2022

<u>Via USPS Certified Mail</u>

Joel Lackey
National Credit Systems, Inc.
(c/o CT Corporation System)
289 S Culver St.
Lawrenceville, GA 30046-4805

Re: Civil Investigative Demand served on **Joel Lackey, National Credit Systems, Inc.,** on **October 18, 2022**

Dear Mr. Lackey:

Attached is a Civil Investigative Demand (CID) issued to you by the Consumer Financial Protection Bureau (Bureau) under 12 C.F.R. § 1080.6 and § 1052(c) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5562. The Bureau is currently seeking information for a non-public investigation, the purpose of which is explained on the attached CID cover sheet. Please note:

1. **Contact Bureau counsel, Sarah Baldwin / (202) 480-6912 / sarah.baldwin@cfpb.gov, as soon as possible to schedule an initial meeting that is required to be held within 10 calendar days of receipt of this CID.** During this meeting, you must discuss and attempt to resolve all issues regarding the CID, including timely compliance. The rules require that you make available at this meeting personnel with the knowledge necessary to resolve issues; such individuals may include, for example, information-technology professionals. Please be prepared to discuss your planned compliance schedule, including any proposed changes that might reduce your cost or burden while still giving the Bureau the information it needs.

2. **You must retain, and suspend any procedures that may result in the destruction of, documents, information, or tangible things that are in any way relevant to the investigation as described in the CID's Notification of Purpose.** You are required to prevent the destruction of relevant material irrespective of whether you believe such material is protected from future disclosure or discovery by privilege or otherwise. *See* 18 U.S.C. §§ 1505, 1519.

Please contact Bureau counsel as soon as possible to set up an initial meeting, which must be held within 10 calendar days of receipt of this CID.  We appreciate your cooperation.

Sincerely,

*/s/ Sarah Baldwin*

Sarah Baldwin
Enforcement Attorney


Attachment



United States of America
Consumer Financial Protection Bureau

# Civil Investigative Demand

**To**
Joel Lackey
National Credit Systems, Inc.
(c/o CT Corporation System)
289 S Culver St
Lawrenceville, GA 30046

This demand is issued pursuant to Section 1052 of the Consumer Financial Protection Act of 2010 and 12 C.F.R. Part 1080 to determine whether there is or has been a violation of any laws enforced by the Consumer Financial Protection Bureau.

## Action Required (choose all that apply)

☐ Appear and Provide Oral Testimony

| Location of Investigational Hearing | Date and Time of Investigational Hearing |
|---|---|
| | |
| | Bureau Investigators |

☑ Produce Documents and/or Tangible Things, as set forth in the attached document, by the following date **11/21/2022**

☑ Provide Written Reports and/or Answers to Questions, as set forth in the attached document, by the following date **11/21/2022**

## Notification of Purpose Pursuant to 12 C.F.R. § 1080.5

The purpose of this investigation is to determine whether debt collectors, or associated persons, in connection with collecting debt and furnishing information to consumer reporting agencies (CRAs) have: (1) made false or misleading representations to consumers, made prohibited communications to consumers or third parties, collected or attempted to collect amounts from consumers that could not lawfully be collected, in a manner that is unfair, deceptive or abusive, in violation of the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§ 5531, 5536, and/or in a manner that violates the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., principally §§ 1692d-g; (2) furnished inaccurate information to CRAs while knowing or having reasonable cause to believe the information was inaccurate or after having been notified by consumers that furnished information was inaccurate, failed to correct furnished information that it determined was inaccurate, failed to follow required procedures upon receiving notices of dispute, and failed to establish and implement appropriate policies and procedures, and/or failed to perform other duties of a furnisher, in a manner that violates the FCRA, 15 U.S.C. § 1681 et seq., principally § 1681s-2(a), (b), and Regulation V, 12 C.F.R. Part 1022, principally Subpart E; (3) failed to follow required procedures for notice and validation of debts in a manner that violates the FDCPA, 15 U.S.C. § 1692 et seq., principally § 1692g; and (4) engaged in any other conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt from consumers in a manner that is unfair or unconscionable, in violation of the FDCPA, 15 U.S.C. § 1692 et seq., principally 15 U.S.C. §§1692d and 1692f, and/or in a manner that is unfair or abusive in violation of the CFPA, 12 U.S.C. §§ 5531, 5536. The purpose of this investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

| Custodian / Deputy Custodian | Bureau Counsel |
|---|---|
| David Rubenstein/Michael Snider<br>Consumer Financial Protection Bureau<br>1700 G Street NW<br>ATTN: Office of Enforcement<br>Washington, DC 20552 | Tracee Plowell/Sarah Baldwin<br>Consumer Financial Protection Bureau<br>1700 G Street NW<br>ATTN: Office of Enforcement<br>Washington, DC 20552 |

| Date Issued | Signature | |
|---|---|---|
| 10/18/2022 | David M. Rubenstein | Digitally signed by David M. Rubenstein<br>Date: 2022.10.18 08:08:09 -04'00' |
| | **Name / Title**   David Rubenstein, Deputy Enforcement Director | |

## Service

The delivery of this demand to you by any method prescribed by the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562, is legal service. If you fail to comply with this demand, the Bureau may seek a court order requiring your compliance.

## Travel Expenses

Request a travel voucher to claim compensation to which you are entitled as a witness before the Bureau pursuant to Section 1052 of the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5562.

## Right to Regulatory Enforcement Fairness

The CFPB is committed to fair regulatory enforcement. If you are a small business under Small Business Administration standards, you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

## Paperwork Reduction Act

This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

**CIVIL INVESTIGATIVE DEMAND FOR
PRODUCTION OF DOCUMENTS, WRITTEN REPORTS, AND
ANSWERS TO INTERROGATORIES**

## I.   Requests.

### Interrogatories

1. Identify all Persons who participated in responding to this CID and the specific tasks performed by each Person.

2. Describe the complete organizational structure of the Company, Identifying all of its parents, wholly or partially owned subsidiaries, affiliates, unincorporated divisions, joint ventures, and franchises. For each entity, state the following:

   a. The legal name and principal place of business;
   b. The date and jurisdiction where the entity is incorporated or organized;
   c. All names under which the entity has done business;
   d. The types of business in which the entity engages, including whether their business includes Debt Buying, Debt Collection Activities, or Consumer Reporting Activities;
   e. Each state in which the entity has done business and the time period during which it has done business in that state;
   f. The address of all offices, places of business, and places where the entity has any physical presence;
   g. The names and percentages of ownership of all Persons holding ownership in the entity; and
   h. The identity of all officers, managers, and directors of the entity, and when each began employment.

3. Describe the Company's Debt Collection Activities, including the following:

   a. The types and sources of Debt collected;
   b. The identity of each Original Creditor or Debt Buyer for which the Company collects Debt;
   c. The documentation and information that the Company receives from the Client in the process of onboarding a Debt, Including any documentation relating to the Original Creditor;
   d. Whether the Company collects Debt in the Original Creditor's name or in the Company's name;
   e. The types of Debt collection services provided by the Company to the Person for whom it is collecting the debt (e.g. reports of attempted collections, reports of amounts collected);
   f. The number of Persons who collect Debt on behalf of the Company as well as their locations and status (e.g., employee, independent contractor, subcontractor);
   g. The Company's use of independent contractors, subcontractors, vendors, and other third parties that engage in Debt collection on behalf of the Company;

h. The collection methods and techniques used by the Company (e.g., written notices, letters, telephone calls, in-person collection visits, lawsuits), including:

    i. The sequence, frequency, and implementation of such methods and techniques, as well as Persons who implement them (e.g., employee, contractor, in-house attorney, outside counsel, any other third parties, etc.) and at what stage of delinquency they do so;

    ii. The identity of each version or template of any written communications the Company mailed to Consumers in the course of its Debt Collection Activities (the Company must assign a unique identifier to each version or template for use in responding to Requests for Written Reports 2(j), 3(g), and 4(i), below), and for each version identified:

        1. when during the Debt collection process it is provided to the Consumer (e.g., whether it is the first communication from the Company to the Consumer);

        2. whether it follows a prior oral or written communication from the Company with the Consumer, and if so, how soon after that prior communication the written communication is provided; and

        3. whether it is provided by the Company to the Consumer before or after a lawsuit is filed against the Consumer); and

i. A description of how employees, managers, independent contractors, subcontractors, vendors, and other third parties, including outside lawyers and law firms, are compensated for Debt Collection Activities, including the amounts and types of compensation (i.e., salary or base pay, commissions, bonuses, and any other payments or incentives).

4. Describe any steps the Company takes before collecting on a Debt to ensure the Company has a reasonable basis to represent to the Consumer that the Consumer owes the Debt.

5. Describe the Company's policies, procedures, and practices, including unwritten policies, procedures, and practices, relating to disputes received from Consumers about the validity of a Debt or portion thereof, including the Company's policies, procedures, and practices relating to:

a. How the Company determines whether a dispute is about the validity of a Debt and the basis for such determination, including any codes or data fields used in the Company's databases or systems to classify a dispute as being about the validity of a Debt;

b. How the Company obtains and provides to the Consumer verification that the Consumer owes a Debt after receipt of an oral or written dispute about the validity of the Debt or portion thereof, including whether the Company's policies, procedures, and practices differ depending on whether the dispute is received within or beyond 30 days from the date the Consumer receives notice of the Debt under 15 U.S.C. § 1692g(a) and whether the dispute is

submitted orally or in writing; and

    c.  How the Company obtains and provides to the Consumer a copy of a judgment against the Consumer after receipt of an oral or written dispute about the validity of the Debt or portion thereof, including whether the Company's policies, procedures, and practices differ depending on whether the dispute is received within or beyond 30 days from the date the Consumer receives notice of the Debt under 15 U.S.C. § 1692g(a).

6.  Describe the Company's policies, procedures, and practices, including unwritten policies, procedures, and practices, relating to compliance with 15 U.S.C. § 1681s-2(a)(1)-(3), (6), (8)(E), 15 U.S.C. § 1681s-2(b)(1)-(2), and 12 C.F.R. § 1022.42, -43, Including the Company's policies, procedures, and practices relating to:

    a.  The accuracy and integrity of the information relating to Consumers that it furnishes to a CRA;

    b.  How the Company creates, maintains, implements, and updates its policies and procedures regarding the accuracy and integrity of the information related to Consumers that it furnishes to a CRA, including how the Company gives consideration to the guidelines set forth in Appendix E to 12 C.F.R. part 1022;

    c.  How the Company investigates, resolves, and provides Consumers with the results of investigations of both Indirect Disputes and Direct Disputes, including steps taken by the Company to investigate Indirect Disputes and Direct Disputes, whether and how the Company undertakes the review of documents provided by the disputing Consumers, any deadlines for investigation of such Indirect Disputes and Direct Disputes, and whether and how the Company undertakes reviews of exception reports provided by Consumer Reporting Agencies;

    d.  How the Company ensures that, when it receives a dispute from a Consumer about the completeness or accuracy of any information it furnished to a CRA, it does not furnish the information to any CRA without notice that such information is disputed by the Consumer; and

    e.  How the Company corrects information that it previously furnished to a CRA upon discovering that the information is inaccurate.

7.  For each policy, procedure, or practice identified in response to Document Requests Nos. 4-6, provide the following information:

    a.  A brief description of the policy, procedure, or practice;

    b.  The Bates number(s) of the Document(s) that reflect or describe the policy, procedure, or practice;

    c.  The date the policy, procedure, or practice went into effect; and

    d.  If applicable, the date on which the policy, procedure, or practice became ineffective or was superseded and Identify the policy, procedure, or practice that superseded or replaced it.

8.  Describe all training the Company provides to its employees, contractors, and agents regarding Debt Collection Activities and Consumer Reporting Activities.

9. Identify each Person who is or has been responsible, either directly or indirectly, for each of the activities below, and for each, describe his or her roles and responsibilities:

   a. Creating, updating, evaluating, or ensuring compliance with the Company's policies and procedures relating to Debt Collection Activities or Debt Buying;

   b. Creating updating, evaluating, or ensuring compliance with the Company's policies and procedures relating to Consumer Reporting Activities;

   c. Creating, updating, evaluating, or ensuring compliance with the Company's policies and procedures relating to Consumer disputes and complaints;

   d. Training or overseeing the Company's employees, contractors, and agents with responsibilities relating to Debt Collection Activities;

   e. Training or overseeing the Company's employees, contractors, and agents with responsibilities relating to Consumer Reporting Activities;

   f. Training or overseeing the Company's employees, contractors, and agents with responsibilities relating to Consumer disputes and complaints;

   g. Managing the Company's call centers;

   h. Evaluating or approving the purchase of Debt Portfolios;

   i. Overseeing the development and maintenance of databases maintained by the Company relating to Debt Collection Activities, Debt Buying or Consumer Reporting Activities, including records of communications with Consumers; and

   j. Furnishing information to CRAs.

10. Identify the Company's current and former employees and contractors during the Applicable Period who had responsibilities relating to Debt Buying, Debt Collection Activities, or Consumer Reporting Activities, including the intake, investigation, or resolution of Consumer complaints and disputes. For each, provide the following information:

   a. The period of time during which the individual was employed by or otherwise performed work for the Company;

   b. The individual's position(s) and a brief description of their responsibilities, including how they related to Debt Buying, Debt Collection Activities, or Consumer Reporting Activities;

   c. The entity that employed the individual and the location(s) where they were employed;

   d. If applicable, the reason(s) for their ceasing work for the Company, including whether they were involuntarily terminated; and

   e. The individual's last known home address, e-mail address, and all telephone numbers.

11. State the Dispute Address used by the Company.

12. Identify all CRAs to which the Company furnishes information, the type of information the Company reports to each, and the number of reports the Company made to each CRA during each year of the Applicable Period.

13. Identify any investigation or inquiry conducted during the Applicable Period by or on behalf of any governmental agency or private Consumer protection entity (e.g., Better Business Bureau) relating to the Company's Debt Buying, Debt Collection Activities, or Consumer Reporting Activities. For each, provide the following information:

    a. The identity of the entity that conducted the investigation or inquiry;
    b. The dates such investigation or inquiry commenced and ended;
    c. The nature and subject of the investigation or inquiry; and
    d. The final outcome.

14. Identify all databases used by the Company relating to Debt Buying, Debt Collection Activities, or Consumer Reporting Activities. For each, provide the following information:

    a. The database system name and version, commercial software name and version (if different), and technology platform;
    b. The dates during which each database is or was in use;
    c. The names and descriptions of the data fields contained in the database;
    d. The data type (e.g., date/time; integer; text) in each data field;
    e. The purposes for which the database is used in Debt Buying, Debt Collection Activities, or Consumer Reporting Activities;
    f. The process by which the database is used in Debt Buying, Debt Collection Activities, or Consumer Reporting Activities;
    g. A description of each category of persons who has access to any part(s) of the database, the identity of the part(s) to which each category of persons has access and for what purposes;
    h. The timeframe for which information in each data field is stored or maintained;
    i. A description of how the database is populated with data and information and by whom;
    j. A description of how the database interacts with other systems the Company uses, such as file systems, other databases, etc.;
    k. A description of any processes used to assure the accuracy of data included in each database, including any internal controls, internal audits, or quality assurance programs performed on the database;
    l. Whether the database holds attachments, such as image, audio, or PDF files, and a description of those attachments;
    m. A description of the reporting capabilities of the database;
    n. A description of any regular or standard reports generated from the database and the frequency with which such reports are generated;
    o. Whether the data stored in the database can be exported to Microsoft Excel, a .csv file, or other readily available spreadsheet or database programs; and

p.  A description of the frequency with which the database is archived or backed up and the method by which it is accomplished.

15. Provide a data dictionary containing the following data elements for each data field in each database referenced in Interrogatory No. 14:

| Data Element Terms | Data Element Definitions |
|---|---|
| Field Name | Unique name |
| Definition | Description of the meaning of the data element |
| Data Type | Type of data (e.g., date, numeric, text, memo, floating point, etc.) |
| Data Size | Maximum field length that will be accepted |
| Data Format | Format of data (e.g., YYYYMMDD, MM/DD/YYYY) |
| Field Constraints: Data Element is a required field (Y/N) | Required fields (Y) must be populated |
| Enumeration (if applicable) | If a field can only take certain values or codes (e.g., A, B, or C), list those values and an explanation of their meaning |
| Special, Dummy, Test Values | Include a narrative description (e.g., for calls to 555-555-5555, describe that number as being used for internal testing, or for dates populated as 1/1/1900, specify what that value means) |
| Formula | If the field is calculated, provide the formula for the calculation. |

16. Identify and describe all types of reports that the Company has generated from the E-OSCAR system, including archive reports and dispute response notification reports. For each type of report, in addition to the identifying information, provide the following information:

a.  The name of the type of report and its purpose;
b.  The procedures used to generate the report;
c.  The individual(s) responsible for generating the report;
d.  The frequency with which the Company generates the report; and
e.  The Company's policies governing retention or destruction of the report.

17. If, for any Request for Documents, there are Documents that would be responsive to this CID but are unavailable because they were destroyed, mislaid, transferred, deleted, altered, or over-written, Identify the Documents and describe the date and circumstances of their unavailability.

**Requests for Written Reports**

1.  In a Microsoft Excel spreadsheet or .csv file, Identify each Consumer complaint

or dispute the Company received during the Applicable Period and for each, provide the following information, with the information responsive to each subpart in a separate column:

    a. A unique identifier for the Debt that was the subject of the complaint or dispute;

    b. The date the Company received the complaint or dispute;

    c. For disputes, whether the dispute was a Direct Dispute or an Indirect Dispute;

    d. The nature of the complaint or dispute (i.e., the Consumer's asserted basis for disputing the validity or amount of the Debt), including any notes in the Company's systems or databases describing the nature of the complaint or dispute;

    e. The result of any investigation by the Company of the complaint or dispute, including any notes in the Company's systems or databases describing the result of the investigation;

    f. A Yes/No (Y/N) indicator for whether the Company modified information furnished to a CRA in response to the complaint or dispute;

    g. A Y/N indicator for whether the Company deleted information furnished to a CRA in response to the complaint or dispute;

    h. The date the complaint or dispute was resolved;

    i. The date the results of the investigation were communicated to the consumer; and

    j. A list of all fields or codes in the Company's systems or databases relating to the complaint or dispute, including any fields or codes used to describe the nature of the complaint or dispute and the result of any investigation.

2. In a Microsoft Excel spreadsheet or .csv file, Identify each Debt for which the Company received a **written notification** from the Consumer that the Debt, or any portion thereof, was disputed, **within thirty days** of the Consumer's receipt of the written notice of the Debt from the Company under 15 U.S.C. § 1692g(a). For each such Debt, provide the following information, with the information responsive to each subpart in a separate column:

    a. A unique identifier for the Debt that was the subject of the dispute;

    b. The date that the Company received the written notification from the Consumer that the Debt, or any portion thereof, was disputed;

    c. All codes or data fields describing the nature or substance of the dispute;

    d. A Y/N indicator for whether the Company obtained verification of the Debt or a copy of a judgment against the Consumer;

    e. If the answer to subpart (d) is "Y," the date on which the Company received such verification or judgment;

    f. If the answer to subpart (d) is "Y," the date on which the Company mailed a copy of such verification or judgment to the Consumer;

    g. A Y/N indicator for whether, after receiving the Consumer's dispute, the Company determined that the Consumer owed the Debt or the disputed portion thereof;

      h. A Y/N indicator for whether the Company, after receiving the Consumer's dispute, determined that the Consumer did not owe the Debt or the disputed portion thereof;

      i. The dates of all communications with the Consumer subsequent to the Company's receipt of the Consumer's written dispute, set forth in separate columns;

      j. For each communication identified in subpart (i), the applicable letter code and version number identified in response to Interrogatory No. 3(h)(ii) above, with the letter code and version number set forth in separate columns;

      k. The dates of all instances in which the Company furnished information about the Debt to a CRA subsequent to the Company's receipt of the Consumer's written dispute, set forth in separate columns;

      l. For each instance of furnishing identified in response to subpart (k), a Y/N indicator for whether the Company informed the CRA that the Debt was disputed; and

      m. Any notes associated with the Debt.

3. In a Microsoft Excel spreadsheet or .csv file, Identify each Debt for which the Company received a **written notification** from the Consumer that the Debt, or any portion thereof, was disputed, **more than thirty days** after the Consumer's receipt of the written notice of the Debt from the Company under 15 U.S.C. § 1692g(a). For each such Debt, provide the following information, with the information responsive to each subpart in a separate column:

      a. A unique identifier for the Debt that was the subject of the dispute;

      b. The date that the Company received the written notification from the Consumer that the Debt, or any portion thereof, was disputed;

      c. All codes or data fields describing the nature or substance of the dispute;

      d. A Y/N indicator for whether the Company obtained verification of the Debt or a copy of a judgment against the Consumer;

      e. If the answer to subpart (d) is "Y," the date on which the Company received such verification or judgment;

      f. The dates of all communications with the Consumer subsequent to the Company's receipt of the Consumer's written dispute, set forth in separate columns;

      g. For each communication identified in subpart (f), the applicable letter code and version number identified in response to Interrogatory No. 3(h)(ii) above, with the letter code and version number set forth in separate columns;

      h. A Y/N indicator for whether, after receiving the Consumer's dispute, the Company determined that the Consumer owed the Debt or the disputed portion thereof;

      i. A Y/N indicator for whether, after receiving the Consumer's dispute, the Company determined that the Consumer did not owe the Debt or the disputed portion thereof;

      j. The dates of all instances in which the Company furnished information about the Debt to a CRA subsequent to the Company's receipt of the

Consumer's written dispute, set forth in separate columns;

k. For each instance of furnishing identified in response to subpart (j), a Y/N indicator for whether the Company informed the CRA that the Debt was disputed; and

l. Any notes associated with the Debt.

4. In a Microsoft Excel spreadsheet or .csv file, Identify each Debt for which the Company received an **oral notification** from the Consumer that the Debt, or any portion thereof, was disputed. For each such Debt, provide the following information, with the information responsive to each subpart in a separate column:

a. A unique identifier for the Debt that was the subject of the dispute;

b. The date that the Company received the oral notification from the Consumer that the Debt, or any portion thereof, was disputed;

c. All codes or data fields indicating the nature or substance of the dispute;

d. A Y/N indicator for whether the Company obtained verification of the Debt or a copy of a judgment against the Consumer;

e. If the answer to subpart (d) is "Y," the date on which the Company received such verification or judgment;

f. A Y/N indicator for whether, after receiving the Consumer's dispute, the Company determined that the Consumer owed the Debt or the disputed portion thereof;

g. A Y/N indicator for whether, after receiving the Consumer's dispute, the Company determined that the Consumer did not owe the Debt or the disputed portion thereof;

h. The dates of all communications with the Consumer subsequent to the Company's receipt of the Consumer's oral dispute, set forth in separate columns;

i. For each communication identified in subpart (h), the applicable letter code and version number identified in response to Interrogatory No. 3(h)(ii) above, with the letter code and version number set forth in separate columns;

j. The dates of all instances in which the Company furnished information about the Debt to a CRA, subsequent to the Company's receipt of the Consumer's written dispute, set forth in separate columns;

k. For each instance of furnishing identified in response to subpart (j), a Y/N indicator for whether the Company informed the CRA that the Debt was disputed; and

l. Any notes associated with the Debt.

5. In a Microsoft Excel spreadsheet or .csv file, Identify each Debt for which the Company furnished information to a CRA prior to or without an initial communication with the Consumer. For each such Debt, provide the following information, with the information responsive to each subpart in a separate column:

a. A unique identifier assigned by the Company to each Debt on the

      spreadsheet or csv. file;

b. The date the Company initially furnished any information about the Debt to a CRA;

c. If Company furnished negative information about the Debt to CRA (i.e., delinquency, late payment, or default), the date the Company initially furnished such negative information;

d. If the Company furnished negative information about the Debt to a CRA, the type of negative information initially furnished (i.e., delinquency, late payment, or default);

e. A Y/N indicator for whether the Company sent an initial communication about the Debt to the Consumer;

f. If the answer to subpart (e) is "Y," the date of the Company's initial communication with the Consumer;

g. The dates of all subsequent communications with the Consumer, set forth in separate columns; and

h. A Y/N indicator for whether the Consumer disputed the validity of the Debt or portion thereof;

i. If the answer to subpart (h) is "Y," all codes or data fields describing the nature or substance of the dispute;

j. If the answer to subpart (h) is "Y," a Y/N indicator for whether the Company obtained verification of the Debt or a copy of a judgment against the Consumer;

k. If the answer to subpart (h) is "Y," a Y/N indicator for whether the Company determined that the Consumer owed the Debt or the disputed portion thereof;

l. A Y/N indicator for whether the Company determined that the Consumer did not owe the Debt or the disputed portion thereof; and

m. Any notes associated with the Debt.

6. In a Microsoft Excel spreadsheet or .csv file, Identify every legal action filed against the Company for violation of the Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA), or any other federal consumer financial law, or any state law regarding Debt Buying, Debt Collection Activities, or Consumer Reporting Activities, and for each, provide the following information, with the information responsive to each subpart in a separate column:

a. The parties;

b. The case number;

c. The name and location of the court or adjudicative body;

d. The date the action was filed;

e. The subject matter of the claims asserted;

f. A Y/N indicator as to whether the suit was filed as a class action;

g. A Y/N indicator as to whether the court certified a class;

h. The date of final disposition or, if applicable, an indication that the case is "ongoing;" and

i. The final outcome of the case.

7.  In a Microsoft Excel spreadsheet or .csv file, list every instance where the Company made a telephone call relating to Debt collection during the Applicable Period, and for each, provide the following information, with the information responsive to each subpart in a separate column:

    a.  Any unique Consumer identifier assigned by the Company to the telephoned Consumer;
    b.  The Consumer's name (last, first, middle);
    c.  The Consumer's street address most recently provided to the Company;
    d.  The city of the Consumer's most recent address;
    e.  The state of the Consumer's most recent address;
    f.  The zip code of the Consumer's most recent address;
    g.  The Consumer's home phone number;
    h.  The Consumer's mobile phone number;
    i.  The Consumer's work phone number;
    j.  The Consumer's account or identification number assigned by the Company;
    k.  The date and time of the telephone call;
    l.  The telephone number called;
    m.  The duration of the telephone call;
    n.  The operator name and/or identifier associated with the telephone call;
    o.  Any unique identifier associated by the Company to the call; and
    p.  Any notes or comments associated with the call.

8.  In a Microsoft Excel spreadsheet or .csv file, Identify all instances in which any Consumer listed in the report produced in response to Request for Written Report No. 7 notified the Company in writing that the Consumer wished the Company to cease communicating with the Consumer, and the date and time of each such instance. In a separate column, provide the date on which the Company ceased communicating with the Consumer.

9.  In a comma-delimited or tab-delimited text file, provide an archive report generated from the E-OSCAR system that contains all data available from the E-OSCAR system relating to all Automated Credit Dispute Verifications (ACDVs) submitted to the Company in the 120 days preceding November 21, 2022 (Report Date), including all data in the following fields for each such ACDV:

    a.  Account number;
    b.  Consumer name;
    c.  Social security number;
    d.  Response code;
    e.  Dispute code 1;
    f.  Dispute code 2;
    g.  FCRA relevant information;
    h.  Whether images are associated with the ACDV;
    i.  Date dispute submitted;
    j.  Date dispute resolved; and
    k.  Dispute response due date.

10. In a comma-delimited or tab-delimited text file, provide a dispute response notification report generated from the E-OSCAR system that contains all data available from the E-OSCAR system relating to all ACDVs submitted in the 120 days immediately preceding the Report Date.

11. In a comma-delimited or tab-delimited text file, for each other type of report that can be generated by the Company from the E-OSCAR system, provide a written report that contains all data available from the E-OSCAR system for each field of the report for the maximum time period allowed by the E-OSCAR system.

## Requests for Documents

1. The Articles of Incorporation, Partnership Agreement, or other origination Documents, for each entity identified in response to Interrogatory No. 2.

2. All non-identical organizational charts or other Documents showing for each entity identified in response to Interrogatory No. 2:

   a. How each entity relates to the Company's other entities; and
   b. The hierarchy of officers, directors, managers, or supervisors of each entity, including the date(s) each Document represents.

3. Audited financial statements for the Company for the Applicable Period and the most recent unaudited financial statements for 2022. These statements should include balance sheets, profit and loss statements, and cash flow statements, and accompanying notes.

4. All Documents constituting, communicating, or describing the Company's policies and procedures relating to its Debt Collection Activities, including all e-mails, manuals, training materials, presentations, memoranda, and written guidance or instructions constituting, communicating, or describing:

   a. Policies and procedures identified in response to Interrogatory No. 5;
   b. Policies and procedures relating to compliance with any state or federal laws or regulations governing Debt Collection Activities, including the FDCPA and the CFPA;
   c. Policies and procedures for investigating, disciplining, or terminating employees, contractors, or agents employed or used by the Company, suspected or determined to have failed to comply with any state or federal laws or regulations governing Debt Collection Activities or the Company's policies and procedures to ensure compliance with those laws;
   d. Policies and procedures relating to the manner in which the Company communicates with Consumers relating to Debt collection, including form of communication, and when and where (home, work, other locations) Consumers may be contacted by

telephone;

e. Policies and procedures relating to how the Company processes, investigates, evaluates, responds to, and resolves a written or oral notification from any Consumer or any Person on behalf of a Consumer indicating that:
   i. the Company has contacted the wrong Person;
   ii. the Consumer has already been sued on the Debt;
   iii. the Consumer requests further information or documentation regarding the Debt;
   iv. the Consumer disputes the Debt or any portion of the Debt;
   v. the Consumer disputes the accuracy or completeness of any information provided in validation of the Debt;
   vi. the Consumer refuses to pay the Debt;
   vii. the Consumer is unable to pay the Debt;
   viii. the Consumer has requested that the Company cease all further communications with the Consumer;
   ix. the Consumer has requested that the Company cease all further communications with third parties;
   x. the Consumer has requested that the Company cease all further communications at the Consumer's place of employment;
   xi. the Consumer has requested that the Company contact his or her attorney instead of the Consumer;
   xii. the alleged Debt has been discharged in bankruptcy;
   xiii. the alleged Debt was covered by an Original Creditor's Debt-protection product;
   xiv. the alleged Debt is beyond the applicable statute of limitations period;
   xv. the Consumer disputes the accuracy or completeness of any information the Company furnished to a CRA; and
   xvi. the Consumer or Person acting on behalf of the Consumer has made any other complaint or dispute relating to the Debt or information the Company furnished about the Debt;

f. Policies and procedures relating to how the Company monitors and audits collections calls or other oral communications with Consumers;

g. Policies and procedures relating to how the Company monitors written correspondence with Consumers relating to Debt collection;

h. Policies and procedures relating to how the Company manages any Debt collection litigation conducted by the Company, including monitoring of outside counsel in connection with such litigation;

i. Policies and procedures relating to how the Company determines whether a particular Debt is beyond the applicable statute of limitations;

j. Policies and procedures relating to how the Company determines whether the statute of limitations has run prior to the initiation of legal action against the Consumer for alleged nonpayment of Debt; and

k. Policies and procedures relating to how the Company calculates and collects interest or fees, including attorney's fees, in excess of the amount owed at the time of Consumer's default to the Original Creditor.

5. All Documents constituting, communicating, or describing the Company's policies and procedures relating to its Consumer Reporting Activities, including all e-mails, manuals, training materials, presentations, memoranda, and written guidance or instructions constituting, communicating, or describing:

   a. Policies and procedures identified in response to Interrogatory No. 6;
   b. Policies and procedures relating to compliance with any state or federal laws or regulations governing Consumer Reporting Activities, including the FCRA and the Furnisher Rule, 12 C.F.R. §§ 1022.40–1022.43; and
   c. Policies and procedures for investigating, disciplining, or terminating employees, contractors, or agents employed or used by the Company, suspected or determined to have failed to comply with any state or federal laws or regulations governing Consumer Reporting Activities or the Company's policies and procedures to ensure compliance with those laws.

6. All Documents constituting, communicating, or describing the Company's policies and procedures relating to its Debt Buying.

7. To the extent not produced in response to Document Requests Nos. 4-5, Documents sufficient to show any practice identified in response to Interrogatories Nos. 5 or 6.

8. All versions of scripts, talk offs, talking points, or other written instructions that the Company uses or has used in communications with Consumers to collect Debt, including but not limited to, scripts used by employees, independent contractors, subcontractors, vendors, or other third parties for interacting with Consumers during collection communications, for contacting third parties, and for responding to requests for verification of Debts.

9. All templates, models, or form letters used for communications with Consumers, including Notices of Debt required by § 1692g(a) of the FDCPA, verifications of a Debt required by § 1692g(b) of the FDCPA, and communications with Consumers who have disputed the accuracy or completeness of any information the Company has furnished to a CRA.

10. All templates, models, or form letters used for communications with third parties regarding Debts, including communications with CRAs or letters regarding location information, disputes, garnishment, or litigation.

11. All communications with a CRA relating to the accuracy or completeness of any information the Company furnished to a CRA.

12. All Documents relating to the Company's compliance or non-compliance with the FDCPA, the FCRA, the Furnisher Rule, 12 C.F.R. §§ 1022.40–1022.43, Subpart E to 12 C.F.R. Part 1022, or state and federal laws prohibiting unfair, deceptive, or abusive acts and practices, including audits, reports from internal or external

auditors, meeting minutes, presentations, e-mails, and whistleblower complaints.

13. All regularly-generated reports relating to Debt Collection Activities, including reports relating to the number of accounts with delinquencies or in default, and reports relating to the effectiveness of the Debt collection efforts of the employees, independent contractors, or other third parties working for the Company.

14. All regularly-generated reports relating to Consumer complaints or disputes about the Company's Consumer Reporting Activities, including reports relating to the type, frequency, or distribution of such complaints or disputes, reports relating to the accuracy or completeness of information the Company furnished to a CRA, and reports relating to the resolution of such complaints or disputes.

15. All reports the Company has generated from the E-OSCAR system relating to Consumer disputes about information the Company furnished about a Consumer to a CRA.

16. All Documents relating to, indicating, or reflecting the Company's contact or attempted contact with a Consumer at his or her place of employment, by phone, e-mail, text message, or in person, including complete logs for each account for which the Company contacted or attempted to contact a Consumer at his or her place of employment. If logs contain abbreviations or shorthand, provide a dictionary or glossary sufficient to interpret all such abbreviations or shorthand.

17. All Documents relating to, indicating, or reflecting the Company's contact or attempted contact with a Consumer's references, by phone, e-mail, text message, or in person, including complete logs for each account for which the Company contacted or attempted to contact a Consumer's references. If logs contain abbreviations or shorthand, provide a dictionary or glossary sufficient to interpret all such abbreviations or shorthand.

18. All recordings or transcripts of telephone calls, in whatever format stored, between the Company and a Consumer, other than at his or her place of employment, during the Applicable Period made in the process of collecting or attempting to collect Debt or obtaining or attempting to obtain location information for the debtor.

19. All image files held by E-OSCAR that are associated with your responses to Requests for Written Report Nos. 9-11, and a tab-delimited text file associating each image file with its corresponding entry in your responses to Requests for Written Report Nos. 9-11.

20. Unique versions of all form communications that provide the Dispute Address and were sent to Consumers with respect to whom the Company furnishes information to a CRA.

21. For each Debt identified in response to Request for Written Report No. 2 for

which the Company responds to subpart (d) with "Y," documents sufficient to show that the Company mailed to the Consumer a copy of the verification of the Debt or a copy of a judgment.

22. For each Debt identified in response to Request for Written Report No. 3 for which the Company responds to subpart (d) with "Y," a copy of the verification of the Debt or copy of a judgment obtained by the Company. If the Company has not retained a copy of the verification of the Debt or a copy of a judgment, documents sufficient to show that the Company obtained verification of the Debt or a copy of a judgment.

23. For each Debt identified in response to Request for Written Report No. 4 for which the Company responds to subpart (d) with "Y," a copy of the verification of the Debt or copy of a judgment obtained by the Company. If the Company has not retained a copy of the verification of the Debt or a copy of a judgment, documents sufficient to show that the Company obtained verification of the Debt or a copy of a judgment.

24. All contracts and agreements, including notes and records of all oral contracts and agreements, and subsequent communications modifying or terminating such contracts and agreements, entered into between the Company and any Original Creditors or Debt Buyers.

25. All contracts and agreements, including notes and records of all oral contracts and agreements, and subsequent communications modifying or terminating such contracts and agreements, entered into between the Company and any third-party Debt Collectors, including lawyers and law firms that file suit and collect Debt on the Company's behalf.

26. All policies and procedures concerning the Company's Document retention policies.

27. All Documents relied upon in preparing your answers to the Interrogatories or identified in response to any of the Interrogatories.

## II.   Definitions.

A.   "**And**" and "**or**" must be construed both conjunctively and disjunctively.

B.   "**Any**" includes "**all**" and "**all**" includes "**any**."

C.   "**CID**" means the Civil Investigative Demand, including the Requests, Definitions, and Instructions.

D.   "**CFPB**" or "**Bureau**" means the Consumer Financial Protection Bureau.

E.   "**Client**" means any person who places Debts with the Company for the purpose of engaging in Debt Collection Activities or Consumer Reporting Activities.

F.      **"Communication"** means the transmittal of information by any means, including, but not limited to emails, PowerPoint presentations, written reports, letters sent by courier or postal mail, faxes, meeting agendas, meeting minutes, messages sent by slack or other comparable software and documents posted to an intranet or extranet. Communications are a subset of Documents, and accordingly a request for Documents shall be deemed to encompass Communications.

G.      **"Company"** or **"you"** or **"your"** means National Credit Systems, Inc., and any successor in interest.

H.      **"Consumer"** means "any natural person obligated or allegedly obligated to pay any debt," as set forth in 15 U.S.C. § 1692a(3).

I.      **"Consumer Reporting Activities"** means all activities related in any way to the furnishing of Company account information relating to Consumers to one or more Consumer Reporting Agencies, either directly, or by a third-party debt collector or Debt Buyer.

J.      **"CRA"** means "any person which, for monetary fees, dues, or on a nonprofit basis, regularly engages in whole or in part the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports," as set forth in 15 U.S.C. § 1681a(f).

K.      **"Credit"** means "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or service and defer payment for such purchase," as set forth in 12 U.S.C. § 5481(7).

L.      **"Debt"** means "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment," as set forth in 15 U.S.C. § 1692a(5).

M.      **"Debt Buyer"** means a Person who purchases a Debt Portfolio.

N.      **"Debt Buying"** means the purchasing of a Debt Portfolio.

O.      **"Debt Collection Activities"** means all activities related in any way to efforts to collect Debt either directly or indirectly.

P.      **"Debt Collector"** means "any person who uses any instrumentality of interstate commerce or the mails in any business, the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another," as set forth in 15 U.S.C. § 1692a(6).

Q.     **"Debt Portfolio"** means a collection of accounts or portfolios of accounts that are delinquent or allegedly in default and sold to a Debt Buyer.

R.     **"Deputy Enforcement Director"** refers to a Deputy Assistant Director of the Office of Enforcement.

S.     **"Direct Dispute"** means "a dispute submitted directly to a furnisher (including a furnisher that is a debt collector) by a consumer concerning the accuracy of any information contained in a consumer report and pertaining to an account or other relationship that the furnisher has or had with the consumer," as set forth in 12 C.F.R. § 1022.41(b).

T.     **"Dispute Address"** means the address of the Company at which it accepts Direct Dispute notices from Consumers.

U.     **"Document"** means any written matter of every type and description, including electronically stored information. "Document" includes any non-identical copy (such as a draft or annotated copy) of another document.

V.     **"Each"** includes **"every,"** and **"every"** includes **"each."**

W.     **"Electronically Stored Information,"** or **"ESI,"** means the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise) of any electronically created or stored information, including but not limited to e-mail, instant messaging, videoconferencing, SMS, MMS, or other text messaging, and other electronic correspondence (whether active, archived, unsent, or in a sent or deleted-items folder), word-processing files, spreadsheets, databases, unorganized data, document metadata, presentation files, and sound recordings, regardless of how or where the information is stored, including if it is on a mobile device.

X.     **"Enforcement Director"** refers to the Assistant Director of the Office of Enforcement.

Y.     **"Identify"** means to provide: (a) for natural persons, their name, title or position, present business affiliation, present business address, e-mail address, and telephone number, or if a present business affiliation or present business address is not known, the last known business address, home address, e-mail address, and telephone number; (b) for businesses or other organizations, the name, address, identities of officers, directors, or managers of the business or organization, and contact persons with e-mail addresses and telephone numbers, where applicable; and (c) for documents, the title, date, authors, recipients, Bates numbers, if applicable, type of document or some other means of identifying the document, and the present or last known location or custodian.

Z.     **"Including"** means including but not limited to.

AA.   **"Indirect Dispute"** means Consumer disputes that are sent to the Company by

a Consumer Reporting Agency.

BB.    **"Original Creditor"** means a person who offers or extends credit creating a consumer debt or to whom a debt was owed prior to default.

AA.    **"Person"** means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

## III. Instructions.

A.    **Sharing of Information:** This CID relates to a nonpublic, law-enforcement investigation being conducted by the Bureau. The Bureau may make its files available to other civil and criminal federal, state, or local law-enforcement agencies under 12 C.F.R. §§ 1070.43(b)(1) and 1070.45(a)(5). Information you provide may be used in any civil or criminal proceeding by the Bureau or other agencies. As stated in 12 C.F.R. § 1080.14, information you provide in response to this CID is subject to the requirements and procedures relating to the disclosure of records and information set forth in 12 C.F.R. pt. 1070.

B.    **Meet and Confer:** As stated in 12 C.F.R. § 1080.6(c), you must contact Enforcement Attorney **Sarah Baldwin** at sarah.baldwin@cfpb.gov, (202) 480-6912, as soon as possible to schedule a meeting (telephonic or in person) to discuss your response to the CID. The meeting must be held within 10 calendar days after you receive this CID or before the deadline for filing a petition to modify or set aside the CID, whichever is earlier.

C.    **Applicable Period for Responsive Materials:** Unless otherwise directed, the applicable period for the request is from January 1, 2018 until the date of this CID.

D.    **Privilege Claims:** If any material responsive to this CID is withheld on the grounds of privilege, you must make the privilege claim no later than the date set for the production of the material. As stated in 12 C.F.R. § 1080.8(a), any such claim must include a schedule of the documents, information, or tangible things withheld that states, for each:

      1.    its type, specific subject matter, and date;

      2.    the names, addresses, positions, and organizations of all authors and direct or indirect recipients;

      3.    the specific grounds for claiming the privilege;

      4.    the request to which the privileged document, information, or thing is responsive; and

      5.    its Bates number or range.

In addition, the person who submits the schedule and the attorney stating the grounds for the privilege must sign it. A person withholding material solely based on a claim of privilege must comply with the requirements of 12 C.F. R. § 1080.8 rather than file a petition for an order modifying or setting aside a demand under 12 C.F.R. § 1080.6(e). Please follow the enclosed Document Submission Standards for further instructions about producing redacted privileged documents.

E.      **Document Retention:** Until you are notified otherwise, you are required to retain all documents and other tangible things that you used or relied on in responding to this CID. In addition, you must retain, and suspend any procedures that may result in the destruction of documents, information, or tangible things that are in any way relevant to the investigation, as described in the CID's Notification of Purpose. You are required to prevent the destruction of relevant material irrespective of whether you believe such material is protected from future disclosure or discovery by privilege or otherwise. See 18 U.S.C. §§ 1505, 1519.

F.      **Modification Requests:** If you believe that the scope of the search or response required by this CID can be narrowed consistent with the Bureau's need for documents or information, you are encouraged to discuss such possible modifications, including modifications of the requirements of these instructions, with Enforcement Attorney **Sarah Baldwin** at sarah.baldwin@cfpb.gov,(202) 480-6912. Modifications must be agreed to in writing by the Enforcement Director or a Deputy Enforcement Director. 12 C.F.R. § 1080.6(d).

G.      **Petition for Order Modifying or Setting Aside Demand:** Under 12 U.S.C. § 5562(f) and 12 C.F.R. § 1080.6(e), you may petition the Bureau for an order modifying or setting aside this CID. To file a petition, you must send it by e-mail to the Bureau's Executive Secretary at ExecSec@cfpb.gov, copying the Enforcement Director at Enforcement@cfpb.gov, within 20 calendar days of service of the CID or, if the return date is less than 20 calendar days after service, before the return date. The subject line of the e-mail must say "Petition to Modify or Set Aside Civil Investigative Demand." If a request for confidential treatment is filed, you must file a redacted public petition in addition to the unredacted petition. All requests for confidential treatment must be supported by a showing of good cause in light of applicable statutes, rules, Bureau orders, court orders, or other relevant authority.

H.      **Certification:** The person to whom the CID is directed or, if it is directed to an entity, any person having knowledge of the facts and circumstances relating to the production, must certify that the response to this CID is true and complete. This certification must be made on the form declaration included with this CID.

I.      **Scope of Search:** This CID covers materials and information in your possession, custody, or control, including but not limited to documents in the possession, custody, or control of your attorneys, accountants, other agents or consultants, directors, officers, and employees.

J.      **Document Production:** The Bureau encourages the electronic production of all material responsive to this CID; please follow the enclosed Document Submission

Standards and submit the production following the enclosed Extranet Guide.

For all packages destined for Bureau offices, please contact Enforcement Attorney **Sarah Baldwin** at sarah.baldwin@cfpb.gov, (202) 480-6912 for the mailing or Internet protocol address.

Please provide any tracking numbers by e-mail or telephone to Enforcement Attorney **Sarah Baldwin** at sarah.baldwin@cfpb.gov,(202) 480-6912.

K.      **Document Identification:** Documents that may be responsive to more than one request of this CID need not be submitted more than once. All documents responsive to this CID must be accompanied by an index that identifies: (i) the name of each custodian of each responsive document; (ii) the corresponding Bates number or range used to identify that person's documents; and (iii) the request or requests to which each document responds.

L.      **Sensitive Personally Identifiable Information:** If any material called for by these requests contains sensitive personally identifiable information, or sensitive health information of any individual, please contact Enforcement Attorney **Sarah Baldwin** at sarah.baldwin@cfpb.gov, (202) 480-6912 before sending those materials to discuss ways to protect the information during production. You must encrypt electronic copies of such materials with encryption software acceptable to the Bureau. When submitting encrypted material, you must provide the encryption key, certificate, or passcode in a separate communication.

For purposes of this CID, sensitive personally identifiable information includes an individual's Social Security number alone or an individual's name, address, or phone number in combination with one or more of the following: date of birth, Social Security number, driver's-license number or other state-identification number, or a foreign country equivalent, passport number, financial-account number, credit-card number, or debit-card number. Sensitive health information includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

M.      **Information Identification:** Each request for a written report or interrogatory in this CID must be answered separately and fully in writing under oath. All information submitted must clearly and precisely identify the request or requests to which it is responsive.

N.      **Submission of Documents in lieu of Reports or Answers:** Documents in existence before your receipt of this CID that contain the information requested in any interrogatory may be submitted as part of or in lieu of an answer to the interrogatory. If you submit documents as part of or in lieu of an answer, you must clearly indicate the specific request to which the documents are responsive, and you must clearly identify the specific portion of the documents that are responsive, including page, paragraph, and line numbers, as applicable.

O.      **Declaration Certifying Records of Regularly Conducted Business Activity:** Attached is a Declaration Certifying Records of Regularly Conducted Business Activity, which may limit the need to subpoena you to testify at future proceedings to establish the admissibility of documents produced in response to this CID. Please execute this Declaration and provide it with your response.

P.      All references to "**year**" or "**annual**" refer to the calendar year. Where information is requested "for each year," provide it separately for each year; where yearly data is not available, provide responsive information for the calendar year to date, unless otherwise instructed.

Q.      **Duty to Estimate:** If you are unable to answer any interrogatory fully, supply such information as is available. Explain why such answer is incomplete, the efforts you made to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way to make an estimate, provide an explanation.

## CERTIFICATE OF COMPLIANCE

I, _____, pursuant to 28 U.S.C. §
1746, declare that:

1. I have confirmed that a diligent search has been made for all responsive documents
   and information in the possession, custody, or control of National Credit
   Systems, Inc.

2. All of the documents and information identified through the search described in
   paragraph 1 above required by the Civil Investigative Demand dated October 18,
   2022 that are within the possession, custody, or control of National Credit
   Systems, Inc. have been submitted to the Bureau custodian or deputy custodian
   identified in this Civil Investigative Demand.

3. If a document or tangible thing responsive to this Civil Investigative Demand has
   not been submitted, an interrogatory or a portion of an interrogatory has not been
   fully answered, or a report or a portion of a report has not been completed, a claim
   of privilege in compliance with 12 C.F.R. § 1080.8 has been submitted.

4. National Credit Systems, Inc. has reviewed all responsive answers, reports, other
   documents and tangible things (collectively "Responses"), and has designated as
   confidential all those Responses, and only those Responses, that meet the
   definition of confidential as that term is used for purposes of the Freedom of
   Information Act, 5 U.S.C. § 552(b)(4).

5. All answers and reports prepared in response to the Civil Investigative Demand
   dated October 18, 2022 are true and complete.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on

_____.

_____

Signature

## DECLARATION CERTIFYING RECORDS OF
## REGULARLY CONDUCTED BUSINESS ACTIVITY
### Pursuant to 28 U.S.C. § 1746

I, _____, pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by _____ as _____

   and by reason of my position am authorized and qualified to certify the

   authenticity of the records produced by National Credit Systems, Inc. and

   submitted with this Declaration.

2. The documents produced and submitted with this Declaration by National Credit

   Systems, Inc., which are numbered _____ through _____, are true

   copies of records of regularly conducted activity that were:

   a. made at or near the time of the occurrence of the matters set forth, by, or

      from information transmitted by, a person with knowledge of those

      matters;

   b. kept in the course of the regularly conducted business activity; and

   c. made by the regularly conducted business activity as a regular practice.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on

_____.

_____
Signature

**CONSUMER FINANCIAL PROTECTION BUREAU | JULY 2021**

# Civil Investigative Demand Document Submission Standards

CFPB Office of Enforcement



cfpb   Consumer Financial
Protection Bureau

# CID Document Submission Standards

This document describes the technical requirements for producing electronic document collections to the Bureau of Consumer Financial Protection ("the Bureau")'s Office of Enforcement. All documents shall be produced in complete form, in color when necessary to interpret the document, unredacted unless privileged, and shall not be edited, cut, or expunged. These standards must be followed for all documents you submit in response to the CID. Any proposed file formats other than those described below must be discussed with the legal and technical staff of the Bureau's Office of Enforcement prior to submission.

# A. Transmittal Instructions

1) A cover letter should be included with each production.  The following information should be included in the letter:
   a) Name of the party making the production and the date of the CID to which the submission is responsive.
   b) List of each piece of media (hard drive, thumb drive, DVD or CD) included in the production (refer to the media by the unique number assigned to it, see ¶ 4)
   c) The Bates Range (and any gaps therein)
   d) The specification(s) or portions thereof of the CID to which the submission is responsive.
2) Documents created or stored electronically MUST be produced in their original electronic format, not converted to another format such as PDF.
3) Transmittal Methods
   a) Extranet
      The Extranet is the Bureau's secure file transfer solution that is used to receive productions from third parties via a web-based FTPS protocol utility. Instructions on how to access the Extranet and corresponding credentials are provided upon request. When utilizing the Extranet, the following policies must be adhered to:
      i) Directories: The system does not support uploading directories (folders). To upload a directory, please compress (or zip) and upload the zipped container.
      ii) Size: Maximum 2 GB per file or container. Larger productions should be split across multiple 2 GB zipped containers.
      iii) Quantity: There is no limit to how many files or containers can be uploaded simultaneously.
      iv) File types: A list of prohibited file types is available in Appendix B.
   b) Physical Media
      The Bureau recognizes that some conditions of environment or data format may restrict production eligibility for transmittal via the Extranet. Such productions may be produced on CD, DVD, USB thumb drive, or hard drive; use the media requiring the least number of deliverables.
      i) Magnetic media shall be carefully packed to avoid damage and must be clearly marked on the outside of the shipping container:
         (1) "MAGNETIC MEDIA – DO NOT USE METAL DETECTOR"
         (2) "MAY BE OPENED FOR POSTAL INSPECTION"
      ii) CD-R CD-ROMs should be formatted to ISO 9660 specifications;
      iii) DVD-ROMs for Windows-compatible personal computers are acceptable;

      iv) USB 2.0 thumb drives for Windows-compatible personal computers are acceptable;

      v) USB 3.0 or USB 3.0/eSATA external hard disk drives, formatted in a Microsoft Windows-compatible file system (FAT32 or NTFS), uncompressed data are acceptable.

      vi) Physical media should be delivered via overnight delivery service or courier, NOT via US Postal Service.

      vii) Label all media with the following:

          (1) Production date

          (2) Bates range

          (3) Disk number (1 of X), if applicable

          (4) Name of producing party

          (5) A unique production number identifying each production

4) All productions must be produced free of computer viruses.  Infected productions may affect the timing of your compliance with the CID.

5) All physical produced media must be encrypted. Encryption format must be agreed upon prior to production.

    a) Data deliveries should be encrypted at the disc level.

    b) Decryption keys should be provided separately from the data delivery via email or phone.

6) Passwords for documents, files, and compressed archives should be provided separately either via email or in a separate cover letter from the data.

# B.  Delivery Formats

## 1) General ESI Standards

Before submitting any Electronically Stored Information ("ESI") or any other documents submitted in electronic form that do not conform completely to the listed specifications, you must confirm with the Bureau that the proposed formats and media types that contain such ESI will be acceptable.  You are encouraged to discuss your specific form of submission, and any related questions with the Bureau as soon as is practicable and not later than the Meet and Confer required pursuant to 12 C.F.R. § 1080.6(c).

All productions must follow the specifications outlined below:

De-duplication
De-duplication of documents should be applied across custodians (global); each custodian should be identified in the Custodian field in the metadata load file separated

by semi-colon. The first name in the Custodian list should represent the original holder of the document.

Bates Numbering Documents
The Bates number must be a unique, sequential, consistently formatted identifier, i.e., an alpha prefix unique to each producing party along with a fixed length number, i.e., ABC0000001. This format must remain consistent across all productions. The number of digits in the numeric portion of the format should not change in subsequent productions, nor should hyphens or other separators be added or deleted.

Document Retention / Preservation of Metadata
The recipient of this CID should use reasonable measures to maintain the original native source documents in a manner so as to preserve the metadata associated with these electronic materials as it existed at the time of the original creation.

Email Threading
The use of email threading for review is encouraged, but production of relevant email threads must include both inclusive and non-inclusive individual emails and attachments unless otherwise agreed to during the Meet & Confer.

2) **Native and Image Production**
In general, and subject to the specific instructions below: (1) produce electronic documents in their complete native/original format along with corresponding bates-labeled single page TIFF images (with the exception of large spreadsheets and/or text files, those files should be processed and a placeholder TIFF image indicating that they were produced natively provided); (2) scan and process all paper documents into single page TIFF images, OCR the images, and apply bates numbers to each page of the image; (3) produce fully searchable document level text for every produced document; and (4) produce metadata for every produced document in a data file that conforms to the specific instructions below.

a) Metadata File
All produced documents, regardless of their original file format, must be produced with the below-described metadata fields in a data file (.DAT).
i) The first line of the .DAT file must be a header row identifying the field names.
ii) The .DAT file must use the default delimiters (see **Table 1**)
iii) Date fields should be provided in the format: mm/dd/yyyy
iv) All attachments should sequentially follow the parent document/email.

      v) All documents shall be produced in both their native/original form and as a corresponding bates-labeled single page TIFF image; provide the link to the original/native document in the NATIVELINK field.

     vi) Produce extracted metadata for each document in the form of a .DAT file, and include the fields in **Table 2** (fields should be listed but left blank if not applicable):

b) Document Text

Searchable text of the entire document must be provided for every record, at the document level.

      i) Extracted text must be provided for all documents that originated in electronic format.

      Note: Any document in which text cannot be extracted must be OCR'd.

     ii) For documents redacted on the basis of any privilege, provide the OCR text for unredacted/unprivileged portions.

    iii) The text should be delivered as multi-page ASCII text files with the files named the same as the Bates_Begin field. Text files can be placed in a separate folder or included with the .TIFF files.

c) Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

      i) Native file documents must be named per the BATES_BEGIN number (the original file name should be preserved and produced in the FILENAME metadata field).

     ii) The full path of the native file must be provided in the .DAT file in the NATIVELINK field.

d) Images

      i) Images should be single-page, Group IV TIFF files, at 300 dpi.

     ii) File names should be titled per endorsed bates number.

    iii) Color should be preserved when necessary to interpret the document.

    iv) Bates numbers should be endorsed on the lower right corner of all images.

     v) For documents partially redacted on the basis of any privilege, ensure the redaction box is clearly labeled "REDACTED".

e) Image Cross Reference File

      i) The image cross-reference file is needed to link the images to the database. It is a comma-delimited file consisting of seven fields per line. There must be a line in the cross-reference file for every image in the database.

    ii) See **Table 3** and **Table 4** for Image Cross Reference File fields and an example file.

**3) PDF File Production**

When approved, Adobe PDF files may be produced in lieu of TIFF images for scanned paper productions (metadata must also be produced in accordance with the instructions above):

a) PDF files should be produced in separate folders named by the Custodian.

b) All PDFs must be unitized at the document level, i.e. each PDF should represent a discrete document; a single PDF cannot contain multiple documents.

c) All attachments should sequentially follow the parent document.

d) All PDF files must contain embedded text that includes all discernible words within the document, not selected text only. This requires all layers of the PDF to be flattened first.

e) If PDF files are Bates endorsed, the PDF files must be named by the Bates range

f) The metadata load file listed in 2.a. should be included.

**4) Transactional Data**

If transactional data must be produced, further discussion must be had to ensure the intended export is properly composed. If available, a data dictionary should accompany the production; if unavailable, a description of fields should accompany transactional data productions. The following formats are acceptable:

- MS Access
- XML
- CSV
- TSV
- Excel (with prior approval)

**5) Audio/Video/Electronic Phone Records**

These instructions refer to the production of stand alone audio files such as those from call recording systems. Audio files that are attached to emails should be processed normally.

Audio files must be produced in a format that is playable using Microsoft Windows Media Player. Types of audio files that will be accepted include:

- Nice Systems audio files (.aud). AUD files offer efficient compression and would be preferred over both NMF and WAV files.
- Nice Systems audio files (.nmf).

- WAV Files
- MP3, MP4
- WMA
- AIF

Produced audio files must be in a separate folder compared to other data in the production. Additionally, the call information (metadata) related to each audio recording must be produced if it exists. The metadata file must be produced in delimited text format (DAT, CSV, or TXT), using a tab or pipe delimiter. Field names must be included in the first row of the metadata file. Please note that the field names are case sensitive and should be created as listed below. The metadata must include, if available, the fields listed in **Table 5**.

The filename is used to link the metadata to the produced audio file. The file name in the metadata and the file name used to identify the corresponding audio file must match exactly.

Video files must be produced in a format that is playable using Microsoft Windows Media Player along with any available metadata. If it is known that the video files do not contain associated audio, indicate this in the accompanying transmittal letter. Types of video files accepted include:
- MPG
- AVI
- WMV
- MOV
- FLV

# C.  Production of Partially Privileged Documents

If a portion of any material called for by this CID is withheld based on a claim of privilege, those portions may be redacted from the responsive material as long as the following conditions are met.

a) If originally stored as native electronic files, the image(s) of the unredacted portions are submitted in a way that preserves the same appearance as the original without the redacted material (i.e., in a way that depicts the size and location of the redactions).  The OCR text will be produced from the redacted image(s).  Any redacted, privileged material should be clearly labeled to show the redactions on the

tiff image(s).  Any metadata not being withheld for privilege should be produced in the DAT file; any content (e.g., PowerPoint speaker notes, Word comments, Excel hidden rows, sheets or columns) contained within the native and not being withheld for privilege should be tiffed and included in the production.

b) If originally in hard copy form, the unredacted portions are submitted in a way that depicts the size and location of the redactions; for example, if all of the content on a particular page is privileged, a blank, sequentially numbered page should be included in the production where the responsive material, had it not been privileged, would have been located.

# APPENDIX A: TABLES

**TABLE** 1:   DAT FILE DELIMITERS

| Comma | ¶ | ASCII character (020) |
|---|---|---|
| Quote | þ | ASCII character (254) |
| Newline | ® | ASCII character (174) |

**TABLE** 2:   DAT FILE FIELDS

| Field Name | Description |
|---|---|
| **Required Fields** ||
| BATES_BEGIN | First Bates number of native file document/email |
| BATES_END | Last Bates number of native file document/email<br>**The BATES_END field should be populated for single page documents/emails |
| ATTACH_BEGIN | First Bates number of attachment/family range |
| ATTACH_END | Last Bates number of attachment/family range |
| ATTACH_NAME | Populates parent records with original filenames of all attached records, separated by semi-colons. |
| PRIV | Indicate "YES" if document has a Privilege claim |
| ROG_NUM | Indicate Interrogatory number(s) document is responsive to. (ROG ##)<br>**semi-colon should be used to separate multiple entries |
| DR_NUM | Indicate Document Request (DR ##) or Written Report number (WR ##) document is responsive to.<br>**semi-colon should be used to separate multiple entries |
| RECORDTYPE | Email: Populate field as "E-Mail"<br>Email Attachment: Populate field as "Attachment (E-mail)"<br>Loose Native: Populate field as "E-Document"<br>Other Attachment: Populate field as "Attachment"<br>Scanned Paper: Populate field as "Paper" |
| CUSTODIAN | Individual(s) or department(s) from which the record originated<br>**semi-colon should be used to separate multiple entries |
| FILENAME | Email: Filename of loose email or subject of non-loose email<br>Non-email: original file name |
| PGCOUNT | Number of pages in document/email |
| MD5HASH | The 32 digit value representing each unique document |

| | |
|---|---|
| SOURCE | Email: Path to email container and email container name<br>Non-email: Original path to source archive folder or files |
| FOLDERPATH | Email: Folder path within email container<br>Non-email: Folder path to file |
| DATE_CREATED | The date and time the electronic file was created<br>** format example: "04/20/2021 5:15 PM" or "04/20/2021 17:15" |
| DATE_MOD | Date and time an electronic file was last modified<br>** format example: "04/20/2021 5:15 PM" or "04/20/2021 17:15" |
| PRINT_DATE | Date and time the document was last printed<br>** format example: "04/20/2021 5:15 PM" or "04/20/2021 17:15" |
| FILE_SIZE | Size of native file document/email in KB |
| FILE_EXT | The file extension representing the email or native file document |
| AUTHOR | Email:  (empty)<br>Non-email: Author of the document |
| SUBJECT(EDOC) | Subject metadata from electronic files (non-email) |
| TITLE | Title metadata from electronic files (non-email) |
| COMPANY | Company (organization) metadata from electronic files |
| NATIVELINK | Hyperlink to the email or native file document<br>**The linked file must be named per the BATES_BEGIN<br>Number |
| TEXTPATH | Contains path to OCR/Extracted text file that is titled after the document BATES_BEGIN |
| Additional Fields for Email Productions | |
| TO | Recipient(s) of email<br>**semi-colon should be used to separate multiple entries |
| FROM | Sender of email |
| CC | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| EMAIL_SUBJECT(EMAIL) | "Subject" line of the email |
| DATE_SENT | Date and time that the email message was sent. |
| DATE_RECVD | Date and time that the email message was received. |
| TIME_ZONE | Time Zone processed in |
| PARENT_ID | Populated only for email attachments, this field will display the Image Tag field value of the attachment record's parent. |

**TABLE 3:**   IMAGE CROSS REFERENCE FILE FIELDS

| Field Title | Description |
|---|---|
| ImageID | The unique designation use to identify an image. |
| | *Note: This imageID key must be a unique and fixed length number. This number will be used in the.DAT file as the ImageID field that links the database to the images. The format of this image key must be consistent across all productions. We recommend that the format be an eight digit number to allow for the possible increase in the size of a production.* |
| VolumeLabel | Optional |
| ImageFilePath | The full path to the image file. |
| DocumentBreak | The letter "Y" denotes the first page of a document.  If this field is blank, then the page is not the first page of a document. |
| FolderBreak | Leave empty |
| BoxBreak | Leave empty |
| PageCount | Optional |
| | *This file should not contain a header row.* |

**TABLE 4:**   IMAGE CROSS REFERENCE FILE SAMPLE

IMG0000001,OPTIONALVOLUMENAME,E:\001\IMG0000001.TIF,Y,,,3
IMG0000002,OPTIONALVOLUMENAME,E:\001\IMG0000002.TIF,,,,
IMG0000003,OPTIONALVOLUMENAME,E:\001\IMG0000003.TIF,,,,
IMG0000004,OPTIONALVOLUMENAME,E:\001\IMG0000004.TIF,Y,,,1
IMG0000005,OPTIONALVOLUMENAME,E:\001\IMG0000005.TIF,Y,,,2
IMG0000006,OPTIONALVOLUMENAME,E:\001\IMG0000006.TIF,,,,

**TABLE 5:**   AUDIO METADATA FIELDS

| Field Name | Description |
|---|---|
| AgentName | Name of agent/employee |
| AgentId | Unique identifier of agent/employee |
| Group | Name for a collection of agents |
| Supervisor | Name of the Agent's supervisor |
| Site | Location of call facility |
| DNIS | Dialed Number Identification Service, identifies the number that was originally called |
| Extension | Extension where call was routed |
| CallDirection | Identifies whether the call was inbound, outbound, or internal |
| CallType | Purpose of the call |

| Duration | Duration of call |
|---|---|
| CustomerId | Customer's identification number |
| CustomerCity | Customer's city of residence |
| CustomerState | Customer's state of residence |
| CallDateTime | Date and start time of call (MM/DD/YYYY HH:MM:SS) |
| CustomerName | Name of person called |
| FileName | Filename of audio file |
| BatesBegin | Unique number of the audio file |
| CalledPartyNumber | The call center or phone number called |
| CallSize | File size of audio file |
| CallService | Call service code |
| MD5Hash | The 32 digit value representing each unique document |
| DocReq | Document request number to which the file is responsive |
| Custodian | Individual(s) or department(s) from which the recording originated |
| FolderPath | Folder path of the audio file in the original source |
| Source | Original path to where the source file resided |
| Timezone | The time zone of the original call |
| GroupID | A unique group identifier for grouping multiple calls |
| Codec | Encoding/decoding of the audio digital stream |
| Bitrate | The number of bits that are conveyed or processed per unit of time |

| Supported Date Format | Example |
|---|---|
| mm/dd/yyyy hh:mm:ss am/pm | 01/25/1996 10:45:15 am |

# APPENDIX B:  PROHIBITED FILE TYPES FOR EXTRANET

| | | |
|---|---|---|
| .ade | .mar | .vbe |
| .adp | .mas | .vbs |
| .app | .mat | .vsmacros |
| .asp | .mau | .vss |
| .bas | .mav | .vst |
| .bat | .maw | .vsw |
| .cer | .mda | .ws |
| .chm | .mdb | .wsc |
| .cmd | .mde | .wsf |
| .com | .mdt | .wsh |
| .cpl | .mdw | |
| .crt | .mdz | |
| .csh | .msc | |
| .dll | .msi | |
| .exe | .msp | |
| .fxp | .mst | |
| .gadget | .ops | |
| .hlp | .pcd | |
| .hta | .pif | |
| .inf | .prf | |
| .ins | .prg | |
| .isp | .pst | |
| .its | .rar | |
| .js | .reg | |
| .jse | .scf | |
| .ksh | .scr | |
| .lnk | .sct | |
| .mad | .shb | |
| .maf | .shs | |
| .mag | .tmp | |
| .mam | .url | |
| .maq | .vb | |

# What is the CFPB Extranet?

The Consumer Financial Protection Bureau (CFPB) Extranet enables organizations to securely upload files and receive a file transfer receipt.

## How does it work?

1. If you would like to send your productions to the Bureau via the Extranet, you will need to notify the paralegal or other deputy custodian assigned to your matter in advance. The paralegal will request contact information for any individuals in your organization that require access to the Extranet. This information is needed in order to set up your Extranet accounts.

2. Once the Extranet Support team sets up the account, they will send an e-mail with instructions to activate the account.

3. Once activated, files may be uploaded at https://extranet.cfpb.gov.

4. Choose the folder relevant to your Matter. Files cannot be uploaded to the root folder.

5. Be sure to choose the correct files to upload. Once you upload files, you won't be able to view, modify, or remove them.

6. Choose files to upload by selecting the "Upload" button or by using drag-and-drop functionality.

7. Uploaded files are transferred to another CFPB server every 20 minutes. After this happens, you will receive a file transmission receipt e-mail and the files will be removed from the Extranet.

8. If there is a problem receiving a file, it will be noted in the file transmission receipt.



## What else do I need to know?

### Account expiration

Accounts expire 6 months after the creation date per CFPB's cybersecurity regulations. Accounts can be re-created quickly by the CFPB's Paralegal or other point of contact.

### Multi-factor authentication

Extranet access requires the use of a one-time passcode for each login. Passcodes can be sent via e-mail, voice message, or text.

### Upload policies

Size: Maximum 2 GB per file

Quantity: There is no limit to how many files can be uploaded simultaneously

File types: A list of prohibited file types is available on the 'CFPB Help' page (find the link at the top right of the page)



Consumer Financial
Protection Bureau

Directories: The system does not support uploading directories (folders). To upload a directory, please compress (or zip) the directory and upload the compressed file. Please do not encrypt the zip files, as the pipe is already encrypted.

## Automatic log-out

Your account will be logged out after 10 minutes of inactivity.

## Password policies

Length: 12 or more characters

Complexity: must contain a digit, a symbol, an uppercase letter and a lowercase letter

## Supported browsers

Microsoft Internet Explorer 8 through 11 (Compatibility View is not supported)

Google Chrome 33.x and above

Apple Safari 5.x and 6.x running on OS X only

Mozilla Firefox 24.x and above

## Having trouble?

Please contact your Deputy Custodian or point of contact if you have any problems accessing the system. If necessary, he or she will coordinate assistance with the CFPB's technical support team.

## Helpful links

Add, edit or remove delivery methods for receiving one-time passcodes:

https://login.extranet.cfpb.gov/updateprofile

## Change your password:

https://login.extranet.cfpb.gov/changepassword



Consumer Financial
Protection Bureau

# Login and upload flow

**1** Login screen
**Enter username and password**

**2** Login screen
**Enter one-time passcode**

**3** Root folder
**Select folder**

**4** Selected folder
**Select "Upload"**



**5** File browser
**Select file(s) for upload**

**6** Selected folder
**Upload any additional files**

**7** **Wait for files to transfer to CFPB internal servers**



This can take up to 20 minutes

**8** Transfer receipt
**Review transfer receipt**



**Note:** After your files have been transferred to the CFPB's internal servers, they are no longer viewable on the Extranet website.


Consumer Financial
Protection Bureau



### § 1081.405   Decision of the Director.

(a) Upon appeal from or upon further review of a recommended decision, the Director will consider such parts of the record as are cited or as may be necessary to resolve the issues presented and, in addition, will, to the extent necessary or desirable, exercise all powers which he or she could have exercised if he or she had made the recommended decision. In proceedings before the Director, the record shall consist of all items part of the record below in accordance with § 1081.306; any notices of appeal or order directing review; all briefs, motions, submissions, and other papers filed on appeal or review; and the transcript of any oral argument held. Review by the Director of a recommended decision may be limited to the issues specified in the notice(s) of appeal or the issues, if any, specified in the order directing further briefing. On notice to all parties, however, the Director may, at any time prior to issuance of his or her decision, raise and determine any other matters that he or she deems material, with opportunity for oral or written argument thereon by the parties.

(b) Decisional employees may advise and assist the Director in the consideration and disposition of the case.

(c) In rendering his or her decision, the Director will affirm, adopt, reverse, modify, set aside, or remand for further proceedings the recommended decision and will include in the decision a statement of the reasons or basis for his or her actions and the findings of fact upon which the decision is predicated.

(d) At the expiration of the time permitted for the filing of reply briefs with the Director, the Office of Administrative Adjudication will notify the parties that the case has been submitted for final Bureau decision. The Director will issue and the Office of Administrative Adjudication will serve the Director's final decision and order within 90 days after such notice, unless within that time the Director orders that the adjudication proceeding or any aspect thereof be remanded to the hearing officer for further proceedings.

(e) Copies of the final decision and order of the Director shall be served upon each party to the proceeding, upon other persons required by statute, and, if directed by the Director or required by statute, upon any appropriate State or Federal supervisory authority. The final decision and order will also be published on the Bureau's Web site or as otherwise deemed appropriate by the Bureau.

### § 1081.406   Reconsideration.

Within 14 days after service of the Director's final decision and order, any party may file with the Director a petition for reconsideration, briefly and specifically setting forth the relief desired and the grounds in support thereof. Any petition filed under this section must be confined to new questions raised by the final decision or final order and upon which the petitioner had no opportunity to argue, in writing or orally, before the Director. No response to a petition for reconsideration shall be filed unless requested by the Director, who will request such response before granting any petition for reconsideration. The filing of a petition for reconsideration shall not operate to stay the effective date of the final decision or order or to toll the running of any statutory period affecting such decision or order unless specifically so ordered by the Director.

### § 1081.407   Effective date; stays pending judicial review.

(a) Other than consent orders, which shall become effective at the time specified therein, an order to cease and desist or for other affirmative action under section 1053(b) of the Dodd-Frank Act becomes effective at the expiration of 30 days after the date of service pursuant to § 1081.113(d)(2), unless the Director agrees to stay the effectiveness of the order pursuant to this section.

(b) Any party subject to a final decision and order, other than a consent order, may apply to the Director for a stay of all or part of that order pending judicial review.

(c) A motion for stay shall state the reasons a stay is warranted and the facts relied upon, and shall include supporting affidavits or other sworn statements, and a copy of the relevant portions of the record. The motion shall address the likelihood of the movant's success on appeal, whether the movant will suffer irreparable harm if a stay is not granted, the degree of injury to other parties if a stay is granted, and why the stay is in the public interest.

(d) A motion for stay shall be filed within 30 days of service of the order on the party. Any party opposing the motion may file a response within five days after receipt of the motion. The movant may file a reply brief, limited to new matters raised by the response, within three days after receipt of the response.

(e) The commencement of proceedings for judicial review of a final decision and order of the Director does not, unless specifically ordered by the Director or a reviewing court, operate as a stay of any order issued by the

Director. The Director may, in his or her discretion, and on such terms as he or she finds just, stay the effectiveness of all or any part of an order pending a final decision on a petition for judicial review of that order.

Dated: June 4, 2012.

Richard Cordray,

*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2012–14061 Filed 6–28–12; 8:45 am]

BILLING CODE 4810-AM-P

## BUREAU OF CONSUMER FINANCIAL PROTECTION

### 12 CFR Part 1080

[Docket No.: CFPB–2011–0007]

RIN 3170–AA03

### Rules Relating to Investigations

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule.

**SUMMARY:** After considering the public comments on its interim final rule for the Rules Relating to Investigations, the Bureau of Consumer Financial Protection (Bureau), pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), is making revisions to its procedures for investigations under section 1052 of the Dodd-Frank Act.

**DATES:** The final rule is effective June 29, 2012.

**FOR FURTHER INFORMATION CONTACT:** Peter G. Wilson, Office of the General Counsel, Consumer Financial Protection Bureau, 1700 G Street NW., Washington, DC 20552, (202) 435–7585.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) was signed into law on July 21, 2010. Title X of the Dodd-Frank Act established the Bureau of Consumer Financial Protection (Bureau) to regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Dodd-Frank Act transferred to the Bureau the consumer financial protection functions formerly carried out by the Federal banking agencies, as well as certain authorities formerly carried out by the Department of Housing and Urban Development (HUD) and the Federal Trade Commission (FTC). As required by section 1062 of the Dodd-Frank Act, 12 U.S.C. 5582, the Secretary of the Treasury selected a

designated transfer date and the Federal banking agencies' functions and authorities transferred to the Bureau on July 21, 2011.

The Dodd-Frank Act authorizes the Bureau to conduct investigations to ascertain whether any person is or has been engaged in conduct that, if proved, would constitute a violation of any provision of Federal consumer financial law. Section 1052 of the Dodd-Frank Act sets forth the parameters that govern these investigations. 12 U.S.C. 5562. Section 1052 became effective immediately upon transfer on July 21, 2011 and did not require rules to implement its provisions. On July 28, 2011, the Bureau issued the interim final rule for the Rules Relating to Investigations (Interim Final Rule) to provide parties involved in Bureau investigations with clarification on how to comply with the statutory requirements relating to Bureau investigations.

## II. Summary of the Final Rule

Consistent with section 1052 of the Dodd-Frank Act, the final rule for the Rules Relating to Investigations (Final Rule) describes a number of Bureau policies and procedures that apply in an investigational, nonadjudicative setting. Among other things, the Final Rule sets forth (1) the Bureau's authority to conduct investigations, and (2) the rights of persons from whom the Bureau seeks to compel information in investigations.

Like the Interim Final Rule, the Final Rule is modeled on investigative procedures of other law enforcement agencies. For guidance, the Bureau reviewed the procedures currently used by the FTC, the Securities and Exchange Commission (SEC), and the prudential regulators, as well as the FTC's recently proposed amendments to its nonadjudicative procedures. In light of the similarities between section 1052 of the Dodd-Frank Act and section 20 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. 41 *et seq.*, the Bureau drew most heavily from the FTC's nonadjudicative procedures in constructing the rules.

The Final Rule lays out the Bureau's authority to conduct investigations before instituting judicial or administrative adjudicatory proceedings under Federal consumer financial law. The Final Rule authorizes the Director, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement to issue civil investigative demands (CIDs) for documentary material, tangible things, written reports, answers to questions, or oral testimony. The

demands may be enforced in district court by the Director, the General Counsel, or the Assistant Director of the Office of Enforcement. The Final Rule also details the authority of the Bureau's investigators to conduct investigations and hold investigational hearings pursuant to civil investigative demands for oral testimony.

Furthermore, the Final Rule sets forth the rights of persons from whom the Bureau seeks to compel information in an investigation. Specifically, the Final Rule describes how such persons should be notified of the purpose of the Bureau's investigation. It also details the procedures for filing a petition for an order modifying or setting aside a CID, which the Director is authorized to rule upon. And it describes the process by which persons may obtain copies of or access to documents or testimony they have provided in response to a civil investigative demand. In addition, the Final Rule describes a person's right to counsel at investigational hearings.

## III. Legal Authority

As noted above, section 1052 of the Dodd-Frank Act outlines how the Bureau will conduct investigations and describes the rights of persons from whom the Bureau seeks information in investigations. This section became effective immediately upon the designated transfer date, July 21, 2011, without any requirement that the Bureau first issue procedural rules. Nevertheless, the Bureau believes that the legislative purpose of section 1052 will be furthered by the issuance of rules that specify the manner in which persons can comply with its provisions.

Section 1022 of the Dodd-Frank Act authorizes the Director to prescribe rules as may be necessary or appropriate for the Bureau to administer and carry out the purposes and objectives of Federal consumer financial laws and to prevent evasion of those laws. 12 U.S.C. 5512. The Bureau believes that the Final Rule will effectuate the purpose of section 1052 and facilitate compliance with Bureau investigations.

## IV. Overview of Public Comments on the Interim Final Rule

After publication of the Interim Final Rule on July 28, 2011, the Bureau accepted public comments until September 26, 2011. During the comment period, the Bureau received seven comments. Two of the comments were submitted by individual consumers. Four trade associations and a mortgage company also submitted comments. The trade associations represent credit unions, banks, consumer credit companies, members of

the real estate finance industry, and other financial institutions.

The commenters generally support the Interim Final Rule. Most sections of the Interim Final Rule received no comment and are being finalized without change. The comments did, however, contain questions and recommendations for the Bureau.

Several of the commenters expressed concern that the Interim Final Rule appeared to provide staff-level Bureau employees with unchecked authority to initiate investigations and issue CIDs, or that the Interim Final Rule otherwise did not provide sufficient oversight for particular actions.

A number of commenters expressed concern about sections of the Interim Final Rule that relate to CIDs. One trade association recommended that a statement of "the purpose and scope" of a Bureau investigation—in addition to a notification of the nature of the conduct constituting the alleged violation under investigation and the applicable provisions of law—be included in CIDs. A commenter suggested that the Bureau require a conference between CID recipients and the Assistant Director of the Office of Enforcement to negotiate the terms of compliance with the demand. Three of the trade associations noted concern with the statement that extensions of time are disfavored for petitions to modify or set aside CIDs. Two commenters questioned who would rule on such petitions without a confirmed Director. One trade association commented that witnesses should be permitted to object to questions demanding information outside of the scope of the investigation during an investigational hearing pursuant to a CID for oral testimony.

A number of commenters expressed concern about maintaining the confidentiality of demand material, sharing information with other State and Federal agencies, and the duties of the custodians of those materials. For example, one trade association and the mortgage company recommended that investigations should remain confidential in all circumstances. Another trade association asserted that the Bureau is not permitted to engage in joint investigations with State attorneys general.

The Bureau reviewed all of the comments on its Interim Final Rule thoroughly and addresses the significant issues they raise herein. Although most sections of the Interim Final Rule received no comment and are being finalized without change, the Bureau has made several changes to the Interim Final Rule based on the comments it received. The comments and these

changes are discussed in more detail in parts V and VI of the **SUPPLEMENTARY INFORMATION.**

## V. General Comments

Some comments on the Interim Final Rule were not directed at a specific section but rather concerned issues of general applicability. The Bureau addresses those comments in this section and addresses comments related to specific sections of the Interim Final Rule in part VI.

One commenter asked the Bureau to specify who would rule on petitions to set aside or modify CIDs while the Bureau lacked a Director. This commenter also asked who would review requests to the Attorney General under § 1080.12 for authority to immunize witnesses and to order them to testify or provide other information. The President appointed a Director of the Bureau on January 4, 2012. Therefore, both questions posed by this commenter are moot. The Director or any official to whom the Director has delegated his authority pursuant to 12 U.S.C. 5492(b) will rule on petitions to set aside or modify CIDs. Furthermore, the Bureau has revised § 1080.12 to clarify that only the Director has the authority to request approval from the Attorney General for the issuance of an order immunizing witnesses.

A commenter asserted that section 1052(c)(1) of the Dodd-Frank Act prohibits the Bureau from issuing CIDs after the institution of any proceedings under Federal consumer financial laws, including proceedings initiated by a State or a private party. The commenter argued that a CID should be accompanied by a certification that the demand will have no bearing on any ongoing proceeding. Section 1052(c)(1) provides, in relevant part, that "the Bureau may, before the institution of any proceedings under the Federal consumer financial law, issue in writing, and cause to be served upon such person, a civil investigative demand." The language "before the institution of any proceeding under Federal consumer financial law" refers to the institution of proceedings by the Bureau. It does not limit the Bureau's authority to issue CIDs based upon the commencement of a proceeding by other parties.

Another commenter requested that the Bureau exempt all credit unions from Bureau investigations. The Bureau believes that granting an exemption from the Bureau's enforcement authority through the Final Rule would be inappropriate and that there is an insufficient record to support such an exemption.

A commenter recommended that covered persons be allowed to recover attorneys' fees and costs incurred by defending against an investigation that is shown to be without merit. The Dodd-Frank Act does not provide the right to recover fees and costs by defending against an investigation. Further, as explained below, the Bureau believes that the procedures for petitioning to modify or set aside a CID set forth in § 1080.6(d) of the Interim Final Rule (now 1080.6(e) of the Final Rule) provide sufficient protections to a recipient of a demand it believes lacks merit.

## VI. Section-by-Section Summary

### Section 1080.1   Scope

This section describes the scope of the Interim Final Rule. It makes clear that these rules only apply to investigations under section 1052 of the Dodd-Frank Act. The Bureau received no comment on § 1080.1 of the Interim Final Rule and is adopting it as the Final Rule without change.

### Section 1080.2   Definitions

This section of the Interim Final Rule defines several terms used throughout the rules. Many of these definitions also may be found in section 1051 of the Dodd-Frank Act.

A commenter questioned the breadth of the definition of the term "Assistant Director of the Division of Enforcement." The commenter argued that because that term was defined to include "any Bureau employee to whom the Assistant Director of the Division of Enforcement has delegated authority to act under this part," the Interim Final Rule could give Bureau employees inappropriately broad authority to take certain actions, such as issuing CIDs.

The Bureau has revised the Final Rule in response to these comments. The Final Rule identifies those with authority to take particular actions under each section of the Final Rule. Sections 1080.4 (initiating and conducting investigations) and 1080.6 (civil investigative demands) of the Final Rule clarify that the authority to initiate investigations and issue CIDs cannot be delegated by the identified officials. The Final Rule also changes the defined term "Division of Enforcement" to "Office of Enforcement" to reflect the Bureau's current organizational structure.

### Section 1080.3   Policy as to Private Controversies

This section of the Interim Final Rule states the Bureau's policy of pursuing investigations that are in the public

interest. Section 1080.3 is consistent with the Bureau's mission to protect consumers by investigating potential violations of Federal consumer financial law. The Bureau received no comments on § 1080.3 of the Interim Final Rule and is adopting it as the Final Rule without change.

### Section 1080.4   Initiating and Conducting Investigations

This section of the Interim Final Rule explains that Bureau investigators are authorized to conduct investigations pursuant to section 1052 of the Dodd-Frank Act.

A commenter observed that this section of the Interim Final Rule did not explicitly provide a procedure for senior agency officials to authorize the opening of an investigation. The commenter argued that only senior agency officials should decide whether to initiate investigations. The commenter questioned whether staff-level employees could open investigations and issue CIDs without sufficient supervision, and noted that the FTC's analogous rule specifically lists the senior officials to whom the Commission has delegated, without power of redelegation, the authority to initiate investigations.

A commenter also expressed concern that the FTC's analogous rule explicitly provides that FTC investigators must comply with the laws of the United States and FTC regulations. According to the commenter, such language is necessary to ensure that the Bureau complies with the Right to Financial Privacy Act (RFPA) to the extent that statute applies to the Bureau. The commenter also believes that this language is needed to guard against investigations undertaken for what the commenter characterized as the impermissible purpose of aiding State attorneys general or State regulators. The commenter suggested that the Bureau add a statement to this section of the Interim Final Rule similar to the FTC's rule requiring compliance with Federal law and agency regulations.

The Final Rule clarifies that only the Assistant Director or any Deputy Assistant Director of the Office of Enforcement has the authority to initiate investigations. The Bureau has significant discretion to determine whether and when to open an investigation, and the public benefits from a process whereby the Bureau can open and close investigations efficiently. But the Bureau did not intend its rules to be interpreted so broadly as to suggest that any staff-level employee could unilaterally open an investigation or issue a CID. The Final

Rule also provides that Bureau investigators will perform their duties in accordance with Federal law and Bureau regulations.

*Section 1080.5   Notification of Purpose*

This section of the Interim Final Rule specifies that a person compelled to provide information to the Bureau or to testify in an investigational hearing must be advised of the nature of the conduct constituting the alleged violation under investigation and the applicable provisions of law. This section of the Interim Final Rule implements the requirements for CIDs described in section 1052(c)(2) of the Dodd-Frank Act.

Commenters noted that although the Dodd-Frank Act and the FTC Act both require CIDs to state "the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation," the two agencies' implementing regulations on this topic differ. Both agencies' regulations require a statement of the nature of the conduct at issue and the relevant provisions of law, but the FTC rule also requires that the recipient of the CID be advised of "the purpose and scope" of the investigation. Commenters argued that the Bureau should add this phrase to its rule because excluding it would lead to requests for materials outside the *scope* of an investigation. One commenter argued that only senior agency officials should authorize investigations to ensure that CIDs are relevant to the purpose and scope of the Bureau's investigations.

The language in § 1080.5 of the Interim Final Rule mirrors the language of the Dodd-Frank Act, which provides that "[e]ach civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation." The Bureau believes that the information covered by this statutory language provides sufficient notice to recipients of CIDs. As discussed above, § 1080.4 (initiating and conducting investigations) of the Final Rule limits the authority to open investigations to the Assistant Director or any Deputy Assistant Director of the Office of Enforcement. Similarly, § 1080.6 of the Final Rule (civil investigative demands) limits the authority to issue CIDs to the Director of the Bureau, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement. Thus, one of these identified officials will review and approve the initiation of all investigations and the issuance of all

CIDs. In addition, to the extent recipients of CIDs consider the demands to be for an unauthorized purpose or outside the scope of the investigation, they will have an opportunity to negotiate the terms of compliance pursuant to § 1080.6(c) of the Interim Final Rule (now § 1080.6(d) of the Final Rule) or to petition to set aside or modify the demand pursuant to § 1080.6(d) of the Interim Final Rule (now § 1080.6(e) of the Final Rule).

The Bureau therefore adopts this section of the Interim Final Rule as the Final Rule without change.

*Section 1080.6   Civil Investigative Demands*

This section of the Interim Final Rule lays out the Bureau's procedures for issuing CIDs. It authorizes the Assistant Director of the Office of Enforcement to issue CIDs for documentary material, tangible things, written reports, answers to questions, and oral testimony. This section of the Interim Final Rule details the information that must be included in CIDs and the requirement that responses be made under a sworn certificate. Section 1080.6 of the Interim Final Rule also authorizes the Assistant Director of the Office of Enforcement to negotiate and approve the terms of compliance with CIDs and grant extensions for good cause. Finally, this section of the Interim Final Rule describes the procedures for seeking an order to modify or set aside a CID, which the Director is authorized to rule upon.

One commenter argued that § 1080.6(a) permits almost any Bureau employee to issue CIDs without sufficient supervision. The commenter stated that this lack of oversight is problematic and does not reflect Congress' intent when it enacted the Act.

Section 1080.6(a) of the Final Rule limits the authority to issue CIDs to the Director, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement. This change to the Final Rule balances the efficiency of the Bureau's investigative process with appropriate supervision and oversight.

A commenter suggested that the Bureau require a conference between the CID recipient and the Assistant Director of the Office of Enforcement within ten days of service of the CID to negotiate and approve the terms of compliance. The commenter envisioned a conference analogous to a discovery planning conference under the Federal Rules of Civil Procedure, during which the parties could discuss requests for information, appropriate limitations on

the scope of requests, issues related to electronically stored information (ESI), issues related to privilege and confidential information, and a reasonable time for compliance. The commenter stated that this type of conference would better ensure prompt and efficient production of material and information related to the investigation.

The Bureau agrees that a conference between the parties within ten calendar days of serving a CID is likely to improve the efficiency of investigations, and § 1080.6(c) of the Final Rule provides for such a conference. The Final Rule does not, however, adopt the suggestion that the Assistant Director of the Office of Enforcement preside over all such conferences.

Several commenters also noted concern with the statement in § 1080.6(d) of the Interim Final Rule disfavoring extensions of time for petitioning for an order modifying or setting aside CIDs. One commenter argued that the 20-day period to file petitions, for which extensions of time are disfavored, is inconsistent with the "reasonable" period of time for compliance with the CID set forth in § 1080.6(a). The commenter also argued that this timeframe leaves a short period for the CID recipient to decide which documents are privileged or otherwise protected and to file a petition articulating privilege and scope objections. Another commenter noted that the analogous FTC rules do not include a provision disfavoring extensions for petitions to modify or set aside a CID. These commenters recommended that the Bureau delete the sentence related to disfavoring extensions. One commenter recommended that the rules be corrected to provide an independent review if a covered person believes a CID is without merit.

Like the Interim Final Rule, the Final Rule includes a provision disfavoring extensions of time for petitions to modify or set aside a CID. The Bureau believes its policy of disfavoring extensions is appropriate in light of its significant interest in promoting an efficient process for seeking materials through CIDs. By disfavoring extensions, the Bureau means to prompt recipients to decide within 20 days whether they intend to comply with the CID. The Final Rule also clarifies that this 20-day period should be computed with calendar days.

The Bureau notes that § 1080.6(d) of the Interim Final Rule (now § 1080.6(e) of the Final Rule) only provides the due date for a petition for an order modifying or setting aside a CID. It does not require recipients to comply fully

with CIDs within 20 days. In addition, the Final Rule provides several options to recipients of CIDs that need additional time to respond. For example, the recipient may negotiate for a reasonable extension of time for compliance or a rolling document production schedule pursuant to § 1080.6(c) of the Interim Final Rule (now § 1080.6(d) of the Final Rule).

Section 1080.6(e) of the Final Rule clarifies that recipients of CIDs should not assert claims of privilege through a petition for an order modifying or setting aside a CID. Instead, when privilege is the only basis for withholding particular materials, they should utilize the procedures set forth in § 1080.8 (withholding requested material) of the Final Rule. Section 1080.6(e) of the Final Rule also lays out the authority of Bureau investigators to provide to the Director a reply to a petition seeking an order modifying or setting aside a CID. Specifically, the Final Rule states that Bureau investigators may provide the Director with a statement setting forth any factual and legal responses to a petition. The Bureau will not make these statements or any other internal deliberations part of the Bureau's public records. Section 1080.6(g) of the Final Rule clarifies that the Bureau, however, will make publicly available both the petition and the Director's order in response. Section 1080.6(g) of the Final Rule also clarifies that if a CID recipient wants to prevent the Director from making the petition public, any showing of good cause must be made no later than the time the petition is filed. The Final Rule also adds a provision clarifying how the Bureau will serve the petitioner with the Director's order.

Finally, the Bureau believes the procedures for petitions to modify or set aside a CID set forth in the Final Rule adequately protect a covered person who believes a CID is without merit, and that an additional independent review is unnecessary.

Section 1080.7   Investigational Hearings

This section of the Interim Final Rule describes the procedures for investigational hearings initiated pursuant to a CID for oral testimony. It also lays out the roles and responsibilities of the Bureau investigator conducting the investigational hearing, which include excluding unauthorized persons from the hearing room and ensuring that the investigational hearing is transcribed, the witness is duly sworn, the transcript is a true record of the testimony, and the

transcript is provided to the designated custodian.

A commenter argued that the Bureau is not authorized to conduct joint investigations with State attorneys general under the Dodd-Frank Act and, correspondingly, State attorneys general cannot attend an investigational hearing as a representative of an agency with whom the Bureau is conducting a joint investigation. The commenter argued that Congress distinguished between State attorneys general and State regulatory agencies in section 1042 of the Dodd-Frank Act and that State attorneys general are therefore not "agencies" with whom the Bureau can partner. The commenter also asserted that the Bureau cannot share a copy of the transcript of an investigational hearing with another agency without the consent of the witness.

Another commenter argued that representatives of agencies with which the Bureau is conducting a joint investigation may be present at an investigational hearing only with the witness's consent. This commenter stated that the Bureau should recognize in the rules that a witness who does not consent to the presence of a representative of another agency at an investigational hearing should not be presumed guilty.

The Dodd-Frank Act states that the Bureau "may engage in joint investigations and requests for information, as authorized under this title." This statutory language permits the Bureau to engage in joint investigations with State or Federal law enforcement agencies, including State attorneys general, with jurisdiction that overlaps with the Bureau's. The Bureau's disclosure rules also permit the Bureau to share certain confidential information, including investigational hearing transcripts, with Federal or State agencies to the extent the disclosure is relevant to the exercise of an agency's statutory or regulatory authority. See 12 CFR 1070.43(b). In addition, neither the Dodd-Frank Act nor the rules require the consent of the witness to permit a representative of an agency with which the Bureau is conducting a joint investigation to be present at the hearing. Consent is required only when people other than those listed in the rule are included.

Thus, the Bureau adopts § 1080.7 of the Interim Final Rule as the Final Rule without change.

Section 1080.8   Withholding Requested Material

This section of the Interim Final Rule describes the procedures that apply when persons withhold material

responsive to a CID. It requires the recipient of the CID to assert a privilege by the production date and, if so directed in the CID, also to submit a detailed schedule of the items withheld. Section 1080.8 also sets forth the procedures for handling the disclosure of privileged or protected information or communications.

The Bureau received no comment on § 1080.8 of the Interim Final Rule and is adopting it as the Final Rule without substantive change.

Section 1080.9   Rights of Witnesses in Investigations

This section of the Interim Final Rule describes the rights of persons compelled to submit information or provide testimony in an investigation. It details the procedures for obtaining a copy of submitted documents or a copy of or access to a transcript of the person's testimony. This section of the Interim Final Rule also describes a witness's right to make changes to his or her transcript and the rules for signing the transcript.

Section 1080.9 of the Interim Final Rule lays out a person's right to counsel at an investigational hearing and describes his or her counsel's right to advise the witness as to any question posed for which an objection may properly be made. It also describes the witness's or counsel's rights to object to questions or requests that the witness is privileged to refuse to answer. This section of the Interim Final Rule states that counsel for the witness may not otherwise object to questions or interrupt the examination to make statements on the record but may request that the witness have an opportunity to clarify any of his or her answers. Finally, this section of the Interim Final Rule authorizes the Bureau investigator to take all necessary action during the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language.

A commenter noted that under the Interim Final Rule witnesses could not object during an investigational hearing on the ground that a question was outside the scope of the investigation. The commenter argued that a covered person's inability to raise such objections might allow "a fishing expedition." The commenter recommended amending § 1080.9(b) to allow objections based on scope.

Section 1052(c)(13)(D)(iii) of the Dodd-Frank Act states, in relevant part:

[a]n objection may properly be made, received, and entered upon the record when it is claimed that such person is entitled to

refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination, but the person shall not otherwise object to or refuse to answer any question, and such person or attorney shall not otherwise interrupt the oral examination.

Thus, to the extent the scope objection was grounded in a witness's constitutional or other legal right, it would be a proper objection.

The Final Rule clarifies that counsel may confer with a witness while a question is pending or instruct a witness not to answer a question only if an objection based on privilege or work product may properly be made. The Final Rule also describes counsel's limited ability to make additional objections based on other constitutional or legal rights. The Final Rule provides that if an attorney has refused to comply with his or her obligations in the rules of this part, or has allegedly engaged in disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language during an investigational hearing, the Bureau may take further action, including action to suspend or disbar the attorney from further participation in the investigation or further practice before the Bureau pursuant to 12 CFR 1081.107(c). The Final Rule also includes other nonsubstantive changes, including clarifying that the 30-day period that the witness has to sign and submit his or her transcript should be computed using calendar days.

### Section 1080.10   Noncompliance With Civil Investigative Demands

This section of the Interim Final Rule authorizes the Director, the Assistant Director of the Office of Enforcement, and the General Counsel to initiate an action to enforce a CID in connection with the failure or refusal of a person to comply with, or to obey, a CID. In addition, they are authorized to seek civil contempt or other appropriate relief in cases where a court order enforcing a CID has been violated.

The Bureau received no comment on § 1080.10 of the Interim Final Rule and is adopting it as the Final Rule without substantive change.

### Section 1080.11   Disposition

This section of the Interim Final Rule explains that an enforcement action may be instituted in Federal or State court or through administrative proceedings when warranted by the facts disclosed by an investigation. It further provides that the Bureau may refer investigations to appropriate Federal, State, or foreign government agencies as appropriate. This section of the Interim Final Rule

also authorizes the Assistant Director of the Office of Enforcement to close the investigation when the facts of an investigation indicate an enforcement action is not necessary or warranted in the public interest.

One commenter indicated that the Bureau's authority to refer investigations to other law enforcement agencies should be limited to circumstances when it is expressly authorized to do so by the Dodd-Frank Act, an enumerated consumer financial law, or other Federal law, because of potential risks to the confidentiality of the investigatory files.

The Bureau's ability to refer matters to appropriate law enforcement agencies is inherent in the Bureau's authority and is a corollary to the Bureau's statutorily recognized ability to conduct joint investigations. The documentary materials and tangible things obtained by the Bureau pursuant to a CID are subject to the requirements and procedures relating to disclosure of records and information in part 1070 of this title. These procedures for sharing information with law enforcement agencies provide significant and sufficient protections for these materials.

The Bureau has amended § 1080.11 to clarify that the Assistant Director and any Deputy Assistant Director of the Office of Enforcement are authorized to close investigations.

The Bureau adopts § 1080.11 of the Interim Final Rule with the changes discussed above.

### Section 1080.12   Orders Requiring Witnesses To Testify or Provide Other Information and Granting Immunity

This section of the Interim Final Rule authorizes the Assistant Director of the Office of Enforcement to request approval from the Attorney General for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004. The Interim Final Rule also sets forth the Bureau's right to review the exercise of these functions and states that the Bureau will entertain an appeal from an order requiring a witness to testify or provide other information only upon a showing that a substantial question is involved, the determination of which is essential to serve the interests of justice. Finally, this section of the Interim Final Rule describes the applicable rules and time limits for such appeals.

A commenter questioned whether this section of the Interim Final Rule would permit any Bureau employee to request that the Attorney General approve the issuance of an order granting immunity

under 18 U.S.C. 6004 and requiring a witness to testify or provide information. The commenter noted that the Dodd-Frank Act authorizes the Bureau, with the Attorney General's permission, to compel a witness to testify under 18 U.S.C. 6004 if the witness invokes his or her privilege against self-incrimination. The commenter argued that this section should delegate the authority to seek permission to compel testimony to a specific individual to provide accountability and ensure that information is not disclosed to the Attorney General in a manner that violates the Right to Financial Privacy Act. The commenter noted that the FTC's analogous rule specifically lists the senior agency officials who are authorized to make such requests to the Attorney General, and identifies a liaison officer through whom such requests must be made. The commenter also suggested that § 1080.12(b) of the Interim Final Rule, which provides that the Assistant Director's exercise of this authority is subject to review by the "the Bureau," specify who will conduct this review.

The Final Rule provides that only the Director of the Bureau has the authority to request approval from the Attorney General for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004. This change addresses the concern that requests for witness immunity would be made without oversight. Limiting this authority to the Director provides sufficient accountability.

### Section 1080.13   Custodians

This section of the Interim Final Rule describes the procedures for designating a custodian and deputy custodian for material produced pursuant to a CID in an investigation. It also states that these materials are for the official use of the Bureau, but, upon notice to the custodian, must be made available for examination during regular office hours by the person who produced them.

A commenter suggested that the Bureau should detail the particular duties of custodians designated under this section and that, without an enumerated list of duties, the custodian would not have any responsibilities regarding CID materials. The commenter noted that the FTC Act requires the custodian to take specific actions, while the Dodd-Frank Act does not. The commenter suggested specifying a series of custodial duties, including (1) taking and maintaining custody of all materials submitted pursuant to CIDs or subpoenas that the Bureau issues,

including transcripts of oral testimony taken by the Bureau; (2) maintaining confidentiality of those materials as required by applicable law; (3) providing the materials to either House of Congress upon request, after ten days notice to the party that owns or submitted the materials; (4) producing any materials as required by a court of competent jurisdiction; and (5) complying at all times with the Trade Secrets Act.

Section 1052 of the Dodd-Frank Act sets forth the duties of the Bureau's custodian. Sections 1052(c)(3) through (c)(6) of the Dodd-Frank Act give the custodian responsibility for receiving documentary material, tangible things, written reports, answers to questions, and transcripts of oral testimony given by any person in compliance with any CID. Section 1052(d) of the Dodd-Frank Act, as well as the Bureau's Rules for Disclosure of Records and Information in part 1070 of this title, outline the requirements for the confidential treatment of demand material. Section 1052(g) addresses custodial control and provides that a person may file, in the district court of the United States for the judicial district within which the office of the custodian is situated, a petition for an order of such court requiring the performance by the custodian of any duty imposed upon him by section 1052 of the Dodd-Frank Act or by Bureau rule. These duties and obligations do not require additional clarification by rule.

The Final Rule clarifies that the custodian has the powers and duties of both section 1052 of the Dodd-Frank Act and 12 CFR 1070.3.

The Bureau adopts § 1080.13 of the Interim Final Rule with the changes discussed above.

## Section 1080.14 Confidential Treatment of Demand Material and Non-Public Nature of Investigations

Section 1080.14 of the Interim Final Rule explains that documentary materials, written reports, answers to questions, tangible things, or transcripts of oral testimony received by the Bureau in any form or format pursuant to a CID are subject to the requirements and procedures relating to disclosure of records and information in part 1070 of this title. This section of the Interim Final Rule also states that investigations generally are non-public. A Bureau investigator may disclose the existence of an investigation to the extent necessary to advance the investigation.

A commenter recommended that the Bureau revise this section to mandate that Bureau investigations remain confidential. The commenter noted the

potential reputation risk to an entity if an investigation is disclosed to the public. In addition, the commenter argued that failing to conduct investigations confidentially will increase litigation risk. One commenter recommended that the Bureau issue a public absolution of a company if the Bureau does not maintain the confidentiality of an investigation.

Section 1080.14 of the Interim Final Rule provides that investigations generally will not be disclosed to the public, but permits Bureau investigators to disclose the existence of an investigation when necessary to advance the investigation. The Interim Final Rule does not contemplate publicizing an investigation, but rather disclosing the existence of the investigation to, for example, a potential witness or third party with potentially relevant information when doing so is necessary to advance the investigation. This limited exception sufficiently balances the concerns expressed by the commenter with the Bureau's need to obtain information efficiently.

Thus, the Bureau adopts § 1080.14 of the Interim Final Rule as the Final Rule without change.

## VII. Section 1022(b)(2) Provisions

In developing the Final Rule, the Bureau has considered the potential benefits, costs, and impacts, and has consulted or offered to consult with the prudential regulators, HUD, the SEC, the Department of Justice, and the FTC, including with regard to consistency with any prudential, market, or systemic objectives administered by such agencies.[1]

The Final Rule neither imposes any obligations on consumers nor is expected to have any appreciable impact on their access to consumer financial products or services. Rather, the Final Rule provides a clear, efficient mechanism for investigating compliance with the Federal consumer financial laws, which benefits consumers by creating a systematic process to protect them from unlawful behavior.

[1] Section 1022(b)(2)(A) of the Dodd-Frank Act addresses the consideration of the potential benefits and costs of regulation to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services; the impact on depository institutions and credit unions with $10 billion or less in total assets as described in section 1026 of the Dodd-Frank Act; and the impact on consumers in rural areas. Section 1022(b)(2)(B) addresses consultation between the Bureau and other Federal agencies during the rulemaking process. The manner and extent to which these provisions apply to procedural rules and benefits, costs and impacts that are compelled by statutory changes rather than discretionary Bureau action is unclear. Nevertheless, to inform this rulemaking more fully, the Bureau performed the described analyses and consultations.

The Final Rule imposes certain obligations on covered persons who receive CIDs in Bureau investigations. Specifically, as described above, the Final Rule sets forth the process for complying with or objecting to CIDs for documentary material, tangible things, written reports or answers to questions, and oral testimony. Most obligations in the Final Rule stem from express language in the Dodd-Frank Act and do not impose additional burdens on covered persons.

To the extent that the Final Rule includes provisions not expressly required by statute, these provisions benefit covered persons by providing clarity and certainty. In addition, the Final Rule vests the Bureau with discretion to modify CIDs or extend the time for compliance for good cause. This flexibility benefits covered persons by enabling the Bureau to assess the cost of compliance with a civil investigative demand in a particular circumstance and take appropriate steps to mitigate any unreasonable compliance burden.

Moreover, because the Final Rule is largely based on section 20 of the FTC Act and its corresponding regulations, it should present an existing, stable model of investigatory procedures to covered persons. This likely familiarity to covered persons should further reduce the compliance costs for covered persons.

The Final Rule provides that requests for extensions of time to file petitions to modify or set aside CIDs are disfavored. This may impose a burden on covered entities in some cases, but it may also lead to a more expeditious resolution of matters, reducing uncertainty. Furthermore, the Final Rule has no unique impact on insured depository institutions or insured credit unions with less than $10 billion in assets as described in section 1026(a) of the Dodd-Frank Act. Nor does the Final Rule have a unique impact on rural consumers.

A commenter suggested that the Bureau conduct a nonpublic study of the impact of complying with a CID on the entities who have been subjected to them by other agencies, with specific focus on those that were found not to have violated the law. As the commenter implicitly recognizes, such data does not currently exist and thus was not reasonably available to the Bureau in finalizing the Interim Final Rule. Moreover, as explained above, most of the costs associated with complying with a CID result from the Dodd-Frank Act, which authorizes the Bureau to issue such demands.

A commenter asserted that disfavoring extensions of petitions to

modify or set aside CIDs will require the recipient to conduct a full review of the demanded material within the normal 20-day period in order to comply with the deadline for filing a petition. Under the Final Rule, recipients of a CID are not required to comply fully within twenty days; rather, they are required simply to decide whether they will comply with the demand at all. The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have the discretion to negotiate and approve the terms of satisfactory compliance with CIDs and, for good cause shown, may extend the time prescribed for compliance. Thus, the Final Rule provides reasonable steps to mitigate compliance burden while simultaneously protecting the Bureau's law enforcement interests.

Another commenter stated that the four interim final rules that the Bureau promulgated together on July 28, 2011 failed to satisfy the rulemaking requirements under section 1022 of the Dodd-Frank Act. Specifically, the commenter stated that "the CFPB's analysis of the costs and benefits of its rules does not recognize the significant costs the CFPB imposes on covered persons." The Bureau believes that it appropriately considered the benefits, costs, and impacts of the Interim Final Rule pursuant to section 1022. Notably, the commenter did not identify any specific costs to covered persons that are not discussed in Part C of the SUPPLEMENTARY INFORMATION to the Interim Final Rule.

## VIII. Procedural Requirements

As noted in publishing the Interim Final Rule, under the Administrative Procedure Act, 5 U.S.C. 553(b), notice and comment is not required for rules of agency organization, procedure, or practice. As discussed in the preamble to the Interim Final Rule, the Bureau confirms its finding that this is a procedural rule for which notice and comment is not required. In addition, because the Final Rule relates solely to agency procedure and practice, it is not subject to the 30-day delayed effective date for substantive rules under section 553(d) of the Administrative Procedure Act, 5 U.S.C. 551 et seq. Because no notice of proposed rulemaking is required, the requirements of the Regulatory Flexibility Act, 5 U.S.C. 601(2) do not apply. Finally, the Bureau has determined that this Final Rule does not impose any new recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of

information requiring approval under 44 U.S.C. 3501. et seq.

## List of Subjects in 12 CFR Part 1080

Administrative practice and procedure, Banking, Banks, Consumer protection, Credit, Credit unions, Investigations, Law enforcement, National banks, Savings associations, Trade practices.

For the reasons set forth in the preamble, the Bureau of Consumer Financial Protection revises part 1080 to Chapter X in Title 12 of the Code of Federal Regulations to read as follows:

## PART 1080—RULES RELATING TO INVESTIGATIONS

Sec.
1080.1  Scope.
1080.2  Definitions.
1080.3  Policy as to private controversies.
1080.4  Initiating and conducting investigations.
1080.5  Notification of purpose.
1080.6  Civil investigative demands.
1080.7  Investigational hearings.
1080.8  Withholding requested material.
1080.9  Rights of witnesses in investigations.
1080.10  Noncompliance with civil investigative demands.
1080.11  Disposition.
1080.12  Orders requiring witnesses to testify or provide other information and granting immunity.
1080.13  Custodians.
1080.14  Confidential treatment of demand material and non-public nature of investigations.

**Authority:** Pub. L. 111–203, Title X, 12 U.S.C. 5481 et seq.

### §1080.1  Scope.

The rules of this part apply to Bureau investigations conducted pursuant to section 1052 of the Dodd-Frank Act, 12 U.S.C. 5562.

### §1080.2  Definitions.

For the purposes of this part, unless explicitly stated to the contrary:

*Bureau* means the Bureau of Consumer Financial Protection.

*Bureau investigation* means any inquiry conducted by a Bureau investigator for the purpose of ascertaining whether any person is or has been engaged in any conduct that is a violation.

*Bureau investigator* means any attorney or investigator employed by the Bureau who is charged with the duty of enforcing or carrying into effect any Federal consumer financial law.

*Custodian* means the custodian or any deputy custodian designated by the Bureau for the purpose of maintaining custody of information produced pursuant to this part.

*Director* means the Director of the Bureau or a person authorized to

perform the functions of the Director in accordance with the law.

*Documentary material* means the original or any copy of any book, document, record, report, memorandum, paper, communication, tabulation, chart, log, electronic file, or other data or data compilation stored in any medium, including electronically stored information.

*Dodd-Frank Act* means the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010, as amended, Public Law 111–203 (July 21, 2010), Title X, codified at 12 U.S.C. 5481 et seq.

*Electronically stored information (ESI)* means any information stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

*Office of Enforcement* means the office of the Bureau responsible for enforcement of Federal consumer financial law.

*Person* means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

*Violation* means any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law.

### §1080.3  Policy as to private controversies.

The Bureau shall act only in the public interest and will not initiate an investigation or take other enforcement action when the alleged violation is merely a matter of private controversy and does not tend to affect adversely the public interest.

### §1080.4  Initiating and conducting investigations.

The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have the nondelegable authority to initiate investigations. Bureau investigations are conducted by Bureau investigators designated and duly authorized under section 1052 of the Dodd-Frank Act, 12 U.S.C. 5562, to conduct such investigations. Bureau investigators are authorized to exercise and perform their duties in accordance with the laws of the United States and the regulations of the Bureau.

### §1080.5  Notification of purpose.

Any person compelled to furnish documentary material, tangible things, written reports or answers to questions, oral testimony, or any combination of

such material, answers, or testimony to the Bureau shall be advised of the nature of the conduct constituting the alleged violation that is under investigation and the provisions of law applicable to such violation.

§ 1080.6 Civil investigative demands.

(a) *In general.* In accordance with section 1052(c) of the Act, the Director of the Bureau, the Assistant Director of the Office of Enforcement, and the Deputy Assistant Directors of the Office of Enforcement, have the nondelegable authority to issue a civil investigative demand in any Bureau investigation directing the person named therein to produce documentary material for inspection and copying or reproduction in the form or medium requested by the Bureau; to submit tangible things; to provide a written report or answers to questions; to appear before a designated representative at a designated time and place to testify about documentary material, tangible things, or other information; and to furnish any combination of such material, things, answers, or testimony.

(1) *Documentary material.* (i) Civil investigative demands for the production of documentary material shall describe each class of material to be produced with such definiteness and certainty as to permit such material to be fairly identified, prescribe a return date or dates that will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction, and identify the custodian to whom such material shall be made available. Documentary material for which a civil investigative demand has been issued shall be made available as prescribed in the civil investigative demand.

(ii) Production of documentary material in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

(2) *Tangible things.* (i) Civil investigative demands for tangible things shall describe each class of tangible things to be produced with such definiteness and certainty as to permit such things to be fairly identified, prescribe a return date or

dates which will provide a reasonable period of time within which the things so demanded may be assembled and submitted, and identify the custodian to whom such things shall be submitted.

(ii) Submissions of tangible things in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the tangible things required by the demand and in the possession, custody, or control of the person to whom the demand is directed have been submitted to the custodian.

(3) *Written reports or answers to questions.* (i) Civil investigative demands for written reports or answers to questions shall propound with definiteness and certainty the reports to be produced or the questions to be answered, prescribe a date or dates at which time written reports or answers to questions shall be submitted, and identify the custodian to whom such reports or answers shall be submitted.

(ii) Each reporting requirement or question in a civil investigative demand shall be answered separately and fully in writing under oath. Responses to a civil investigative demand for a written report or answers to questions shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person responsible for answering each reporting requirement or question, to the effect that all of the information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to the custodian.

(4) *Oral testimony.* (i) Civil investigative demands for the giving of oral testimony shall prescribe a date, time, and place at which oral testimony shall be commenced, and identify a Bureau investigator who shall conduct the investigation and the custodian to whom the transcript of such investigation shall be submitted. Oral testimony in response to a civil investigative demand shall be taken in accordance with the procedures for investigational hearings prescribed by §§ 1080.7 and 1080.9 of this part.

(ii) Where a civil investigative demand requires oral testimony from an entity, the civil investigative demand shall describe with reasonable particularity the matters for examination and the entity must designate one or more officers, directors, or managing

agents, or designate other persons who consent to testify on its behalf. Unless a single individual is designated by the entity, the entity must designate the matters on which each designee will testify. The individuals designated must testify about information known or reasonably available to the entity and their testimony shall be binding on the entity.

(b) *Manner and form of production of ESI.* When a civil investigative demand requires the production of ESI, it shall be produced in accordance with the instructions provided by the Bureau regarding the manner and form of production. Absent any instructions as to the form for producing ESI, ESI must be produced in the form in which it is ordinarily maintained or in a reasonably usable form.

(c) *Meet and confer.* The recipient of a civil investigative demand shall meet and confer with a Bureau investigator within 10 calendar days after receipt of the demand or before the deadline for filing a petition to modify or set aside the demand, whichever is earlier, to discuss and attempt to resolve all issues regarding compliance with the civil investigative demand. The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement may authorize the waiver of this requirement for routine third-party civil investigative demands or in other circumstances where he or she determines that a meeting is unnecessary. The meeting may be in person or by telephone.

(1) *Personnel.* The recipient must make available at the meeting personnel with the knowledge necessary to resolve any issues relevant to compliance with the demand. Such personnel could include individuals knowledgeable about the recipient's information or records management systems and/or the recipient's organizational structure.

(2) *ESI.* If the civil investigative demand seeks ESI, the recipient shall ensure that a person familiar with its ESI systems and methods of retrieval participates in the meeting.

(3) *Petitions.* The Bureau will not consider petitions to set aside or modify a civil investigative demand unless the recipient has meaningfully engaged in the meet and confer process described in this subsection and will consider only issues raised during the meet and confer process.

(d) *Compliance.* The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to negotiate and approve the terms of satisfactory compliance with civil investigative demands and, for good

cause shown, may extend the time prescribed for compliance.

(e) *Petition for order modifying or setting aside demand—in general.* Any petition for an order modifying or setting aside a civil investigative demand shall be filed with the Executive Secretary of the Bureau with a copy to the Assistant Director of the Office of Enforcement within 20 calendar days after service of the civil investigative demand, or, if the return date is less than 20 calendar days after service, prior to the return date. Such petition shall set forth all factual and legal objections to the civil investigative demand, including all appropriate arguments, affidavits, and other supporting documentation. The attorney who objects to a demand must sign any objections.

(1) *Statement.* Each petition shall be accompanied by a signed statement representing that counsel for the petitioner has conferred with counsel for the Bureau pursuant to section 1080.6(c) in a good-faith effort to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement. If some of the matters in controversy have been resolved by agreement, the statement shall specify the matters so resolved and the matters remaining unresolved. The statement shall recite the date, time, and place of each such meeting between counsel, and the names of all parties participating in each such meeting.

(2) *Extensions of time.* The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to rule upon requests for extensions of time within which to file such petitions. Requests for extensions of time are disfavored.

(3) *Bureau investigator response.* Bureau investigators may, without serving the petitioner, provide the Director with a statement setting forth any factual and legal response to a petition for an order modifying or setting aside the demand.

(4) *Disposition.* The Director has the authority to rule upon a petition for an order modifying or setting aside a civil investigative demand. The order may be served on the petitioner via email, facsimile, or any other method reasonably calculated to provide notice of the order to the petitioner.

(f) *Stay of compliance period.* The timely filing of a petition for an order modifying or setting aside a civil investigative demand shall stay the time permitted for compliance with the portion challenged. If the petition is denied in whole or in part, the ruling will specify a new return date.

(g) *Public disclosure.* All such petitions and the Director's orders in response to those petitions are part of the public records of the Bureau unless the Bureau determines otherwise for good cause shown. Any showing of good cause must be made no later than the time the petition is filed.

## § 1080.7   Investigational hearings.

(a) Investigational hearings, as distinguished from hearings in adjudicative proceedings, may be conducted pursuant to a civil investigative demand for the giving of oral testimony in the course of any Bureau investigation, including inquiries initiated for the purpose of determining whether or not a respondent is complying with an order of the Bureau.

(b) Investigational hearings shall be conducted by any Bureau investigator for the purpose of hearing the testimony of witnesses and receiving documentary material, tangible things, or other information relating to any subject under investigation. Such hearings shall be under oath or affirmation and stenographically reported, and a transcript thereof shall be made a part of the record of the investigation. The Bureau investigator conducting the investigational hearing also may direct that the testimony be recorded by audio, audiovisual, or other means, in which case the recording shall be made a part of the record of the investigation as well.

(c) In investigational hearings, the Bureau investigator shall exclude from the hearing room all persons except the person being examined, his or her counsel, the officer before whom the testimony is to be taken, any investigator or representative of an agency with which the Bureau is engaged in a joint investigation, and any individual transcribing or recording such testimony. At the discretion of the Bureau investigator, and with the consent of the person being examined, persons other than those listed in this paragraph may be present in the hearing room. The Bureau investigator shall certify or direct the individual transcribing the testimony to certify on the transcript that the witness was duly sworn and that the transcript is a true record of the testimony given by the witness. A copy of the transcript shall be forwarded promptly by the Bureau investigator to the custodian designated in section 1080.13.

## § 1080.8   Withholding requested material.

(a) Any person withholding material responsive to a civil investigative demand or any other request for

production of material shall assert a claim of privilege not later than the date set for the production of material. Such person shall, if so directed in the civil investigative demand or other request for production, submit, together with such claim, a schedule of the items withheld which states, as to each such item, the type, specific subject matter, and date of the item; the names, addresses, positions, and organizations of all authors and recipients of the item; and the specific grounds for claiming that the item is privileged. The person who submits the schedule and the attorney stating the grounds for a claim that any item is privileged must sign it.

(b) A person withholding material solely for reasons described in this subsection shall comply with the requirements of this subsection in lieu of filing a petition for an order modifying or setting aside a civil investigative demand pursuant to section 1080.6(e).

(c) Disclosure of privileged or protected information or communications produced pursuant to a civil investigative demand shall be handled as follows:

(1) The disclosure of privileged or protected information or communications shall not operate as a waiver with respect to the Bureau if:

(i) The disclosure was inadvertent;

(ii) The holder of the privilege or protection took reasonable steps to prevent disclosure; and

(iii) The holder promptly took reasonable steps to rectify the error, including notifying a Bureau investigator of the claim of privilege or protection and the basis for it.

(2) After being notified, the Bureau investigator must promptly return, sequester, or destroy the specified information and any copies; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if he or she disclosed it before being notified; and, if appropriate, may sequester such material until such time as a hearing officer or court rules on the merits of the claim of privilege or protection. The producing party must preserve the information until the claim is resolved.

(3) The disclosure of privileged or protected information or communications shall waive the privilege or protection with respect to the Bureau as to undisclosed information or communications only if:

(i) The waiver is intentional;

(ii) The disclosed and undisclosed information or communications concern the same subject matter; and

(iii) They ought in fairness to be considered together.

## § 1080.9 Rights of witnesses in investigations.

(a) Any person compelled to submit documentary material, tangible things, or written reports or answers to questions to the Bureau, or to testify in an investigational hearing, shall be entitled to retain a copy or, on payment of lawfully prescribed costs, request a copy of the materials, things, reports, or written answers submitted, or a transcript of his or her testimony. The Bureau, however, may for good cause deny such a request and limit the witness to inspection of the official transcript of the testimony. Upon completion of transcription of the testimony of the witness, the witness shall be offered an opportunity to read the transcript of his or her testimony. Any changes by the witness shall be entered and identified upon the transcript by the Bureau investigator with a statement of the reasons given by the witness for making such changes. The transcript shall then be signed by the witness and submitted to the Bureau unless the witness cannot be found, is ill, waives in writing his or her right to signature, or refuses to sign. If the signed transcript is not submitted to the Bureau within 30 calendar days of the witness being afforded a reasonable opportunity to review it, the Bureau investigator, or the individual transcribing the testimony acting at the Bureau investigator's direction, shall sign the transcript and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with any reasons given for the failure to sign.

(b) Any witness compelled to appear in person at an investigational hearing may be accompanied, represented, and advised by counsel as follows:

(1) Counsel for a witness may advise the witness, in confidence and upon the initiative of either counsel or the witness, with respect to any question asked of the witness where it is claimed that a witness is privileged to refuse to answer the question. Counsel may not otherwise consult with the witness while a question directed to the witness is pending.

(2) Any objections made under the rules in this part shall be made only for the purpose of protecting a constitutional or other legal right or privilege, including the privilege against self-incrimination. Neither the witness nor counsel shall otherwise object or refuse to answer any question. Any objection during an investigational hearing shall be stated concisely on the record in a nonargumentative and nonsuggestive manner. Following an objection, the examination shall proceed and the testimony shall be taken, except for testimony requiring the witness to divulge information protected by the claim of privilege or work product.

(3) Counsel for a witness may not, for any purpose or to any extent not allowed by paragraphs (b)(1) and (2) of this section, interrupt the examination of the witness by making any objections or statements on the record. Petitions challenging the Bureau's authority to conduct the investigation or the sufficiency or legality of the civil investigative demand shall be addressed to the Bureau in advance of the hearing in accordance with § 1080.6(e). Copies of such petitions may be filed as part of the record of the investigation with the Bureau investigator conducting the investigational hearing, but no arguments in support thereof will be allowed at the hearing.

(4) Following completion of the examination of a witness, counsel for the witness may, on the record, request that the Bureau investigator conducting the investigational hearing permit the witness to clarify any of his or her answers. The grant or denial of such request shall be within the sole discretion of the Bureau investigator conducting the hearing.

(5) The Bureau investigator conducting the hearing shall take all necessary action to regulate the course of the hearing to avoid delay and to prevent or restrain disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language. Such Bureau investigator shall, for reasons stated on the record, immediately report to the Bureau any instances where an attorney has allegedly refused to comply with his or her obligations under the rules in this part, or has allegedly engaged in disorderly, dilatory, obstructionist, or contumacious conduct, or contemptuous language in the course of the hearing. The Bureau will thereupon take such further action, if any, as the circumstances warrant, including actions consistent with those described in 12 CFR 1081.107(c) to suspend or disbar the attorney from further practice before the Bureau or exclude the attorney from further participation in the particular investigation.

## § 1080.10 Noncompliance with civil investigative demands.

(a) In cases of failure to comply in whole or in part with Bureau civil investigative demands, appropriate action may be initiated by the Bureau, including actions for enforcement.

(b) The Director, the Assistant Director of the Office of Enforcement, and the General Counsel of the Bureau are authorized to:

(1) Institute, on behalf of the Bureau, an enforcement proceeding in the district court of the United States for any judicial district in which a person resides, is found, or transacts business, in connection with the failure or refusal of such person to comply with, or to obey, a civil investigative demand in whole or in part if the return date or any extension thereof has passed; and

(2) Seek civil contempt or other appropriate relief in cases where a court order enforcing a civil investigative demand has been violated.

## § 1080.11 Disposition.

(a) When the facts disclosed by an investigation indicate that an enforcement action is warranted, further proceedings may be instituted in Federal or State court or pursuant to the Bureau's administrative adjudicatory process. Where appropriate, the Bureau also may refer investigations to appropriate Federal, State, or foreign governmental agencies.

(b) When the facts disclosed by an investigation indicate that an enforcement action is not necessary or would not be in the public interest, the investigational file will be closed. The matter may be further investigated, at any time, if circumstances so warrant.

(c) The Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement are authorized to close Bureau investigations.

## § 1080.12 Orders requiring witnesses to testify or provide other information and granting immunity.

The Director has the nondelegable authority to request approval from the Attorney General of the United States for the issuance of an order requiring a witness to testify or provide other information and granting immunity under 18 U.S.C. 6004.

## § 1080.13 Custodians.

(a) The Bureau shall designate a custodian and one or more deputy custodians for material to be delivered pursuant to a civil investigative demand in an investigation. The custodian shall have the powers and duties prescribed by 12 CFR 1070.3 and section 1052 of the Act, 12 U.S.C. 5562. Deputy custodians may perform all of the duties assigned to custodians.

(b) Material produced pursuant to a civil investigative demand, while in the custody of the custodian, shall be for the official use of the Bureau in accordance with the Act; but such material shall upon reasonable notice to the custodian

be made available for examination by the person who produced such material, or his or her duly authorized representative, during regular office hours established for the Bureau.

### § 1080.14  Confidential treatment of demand material and non-public nature of investigations.

(a) Documentary materials, written reports, answers to questions, tangible things or transcripts of oral testimony the Bureau receives in any form or format pursuant to a civil investigative demand are subject to the requirements and procedures relating to the disclosure of records and information set forth in part 1070 of this title.

(b) Bureau investigations generally are non-public. Bureau investigators may disclose the existence of an investigation to potential witnesses or third parties to the extent necessary to advance the investigation.

Dated: June 4, 2012.

**Richard Cordray,**

*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2012–14047 Filed 6–28–12; 8:45 am]

**BILLING CODE 4810–AM–P**

---

## BUREAU OF CONSUMER FINANCIAL PROTECTION

### 12 CFR Part 1082

**[Docket No. CFPB–2011–0005]**

**RIN 3170–AA02**

### State Official Notification Rule

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Final rule.

---

**SUMMARY:** The Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 (Dodd-Frank Act) requires the Bureau of Consumer Financial Protection (Bureau) to prescribe rules establishing procedures that govern the process by which State Officials notify the Bureau of actions undertaken pursuant to the authority granted to the States to enforce the Dodd-Frank Act or regulations prescribed thereunder. This final State Official Notification Rule (Final Rule) sets forth the procedures to govern this process.

**DATES:** The Final Rule is effective June 29, 2012.

**FOR FURTHER INFORMATION CONTACT:** Veronica Spicer, Office of Enforcement, Consumer Financial Protection Bureau, 1700 G Street NW., Washington, DC 20552, at (202) 435–7545.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 (Dodd-Frank Act) was signed into law on July 21, 2010. Title X of the Dodd-Frank Act established the Bureau to regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. Section 1042 of the Dodd-Frank Act, 12 U.S.C. 5552, governs the enforcement powers of the States under the Dodd-Frank Act. Under section 1042(a), a State attorney general or regulator (State Official) may bring an action to enforce Title X of the Dodd-Frank Act and regulations issued thereunder. Prior to initiating any such action, the State Official is required to provide notice of the action to the Bureau and the prudential regulator, if any, pursuant to section 1042(b) of the Dodd-Frank Act. Section 1042(b) further authorizes the Bureau to intervene in the State Official's action as a party, remove the action to a Federal district court, and appeal any order or judgment.

Pursuant to section 1042(c) of the Dodd-Frank Act, the Bureau is required to issue regulations implementing the requirements of section 1042. On July 28, 2011, the Bureau promulgated the State Official Notification Rule (Interim Final Rule) with a request for comment. The comment period for the Interim Final Rule ended on September 26, 2011. After reviewing and considering the issues raised by the comments, the Bureau now promulgates the Final Rule establishing a procedure for the timing and content of the notice to be provided by State Officials pursuant to section 1042(b) of the Dodd-Frank Act, 12 U.S.C. 5552(b).

## II. Summary of the Final Rule

Like the Interim Final Rule, the Final Rule implements a procedure for the timing and content of the notice required by section 1042(b), sets forth the responsibilities of the recipients of the notice, and specifies the rights of the Bureau to participate in actions brought by State Officials under section 1042(a) of the Dodd-Frank Act. In drafting the Final Rule, the Bureau endeavored to create a process that would provide both the Bureau and, where applicable, the prudential regulators with timely notice of pending actions and account for the investigation and litigation needs of State regulators and law enforcement agencies. In keeping with this approach, the Final Rule provides for a default notice period of at least ten calendar days, with exceptions for emergencies and other extenuating circumstances,

and requires substantive notice that is both straightforward and comprehensive. The Final Rule further makes clear that the Bureau can intervene as a party in an action brought by a State Official under Title X of the Dodd-Frank Act or a regulation prescribed thereunder, provides for the confidential treatment of non-public information contained in the notice if a State so requests, and provides that provision of notice shall not be deemed a waiver of any applicable privilege. In addition, the Final Rule specifies that the notice provisions do not create any procedural or substantive rights for parties in litigation against the United States or against a State that brings an action under Title X of the Dodd-Frank Act or a regulation prescribed thereunder.

## III. Legal Authority

Section 1042(c) of the Dodd-Frank Act authorizes the Bureau to prescribe regulations implementing the requirements of section 1042(b). In addition, the Bureau has general rulemaking authority pursuant to section 1022(b)(1) of the Dodd-Frank Act to prescribe rules to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws and to prevent evasions thereof.

## IV. Overview of Comments Received

In response to the Interim Final Rule, the Bureau received several comments. Four letters were received from associations representing the financial industry, two letters were received from financial industry regulators and supervisors, and one letter was received from an individual consumer. The Bureau also received a comment letter from a financial industry regulator in response to its **Federal Register** notification of November 21, 2011, regarding the information collection requirements associated with the Interim Final Rule pursuant to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All of the comments are available for review on *www.regulations.gov.*

The financial industry associations' comments fell into several general categories. Several comments expressed concerns about the Bureau's ability to maintain confidentiality for notification materials received by the Bureau. Other commenters requested clarity as to the type of actions for which the Bureau requires notification. One commenter requested that the Bureau require uniform interpretation by States of all Federal law within the Bureau's jurisdiction.

## CERTIFICATE OF COMPLIANCE WITH RFPA

The Right to Financial Privacy Act of 1978 (RFPA) does not apply to the disclosure of financial records or information to the Consumer Financial Protection Bureau "in the exercise of its authority with respect to a financial institution." 12 U.S.C. § 3413(r). This Civil Investigative Demand is also issued in connection with an investigation within the meaning of section 3413(h)(1)(A) of the RFPA. Therefore, in accordance with section 3403(b) of the RFPA, the undersigned certifies that, to the extent applicable, the provisions of the RFPA have been complied with as to the Civil Investigative Demand issued to National Credit Systems, Inc., to which this Certificate is attached.

The information obtained will be used to determine whether the persons named or referred to in the attached Civil Investigative Demand are in compliance with laws administered by the Consumer Financial Protection Bureau. The information may be transferred to another department or agency consistent with the RFPA.

Under the RFPA, good faith reliance on this Certificate relieves the recipient and its employees and agents of any liability to customers in connection with the requested disclosures of financial records of these customers. *See* 12 U.S.C. § 3417(c).


David M.    Digitally signed by David M.
            Rubenstein
Rubenstein  Date: 2022.10.18 08:08:32
            -04'00'
David Rubenstein
Consumer Financial Protection Bureau
Deputy Director, Office of Enforcement

**CONSUMER FINANCIAL PROTECTION BUREAU**
**1700 G Street NW, Washington, D.C. 20552**

**Notice to Persons Supplying Information**

You have been asked to supply information or speak voluntarily, or directed to provide sworn testimony, documents, or answers to questions in response to a Civil Investigative Demand (CID) from the Consumer Financial Protection Bureau (Bureau). This notice discusses certain legal rights and responsibilities. Unless stated otherwise, the information below applies whether you are providing information voluntarily or in response to a CID.

## A.   False Statements; Perjury

*False Statements.* Section 1001 of Title 18 of the United States Code provides as follows:

> [W]hoever, in any matter within the jurisdiction of the executive ... branch of the Government of the United States, knowingly and willfully—**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact; **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or **(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title . . . [or] imprisoned not more than 5 years . . . , or both.

*Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly or that any written testimony, declaration, deposition, or certificate by him subscribed, is true willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

## B.   The Fifth Amendment; Your Right to Counsel

*Fifth Amendment.* Information you provide may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Bureau or any other agency. If you are an individual, you may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to criminal liability, including fine, penalty or forfeiture.

*Right to Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. For further information, you should consult Bureau regulations at

12 C.F.R. § 1080.9(b).

## C.     Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to CID.* If you fail to comply with the CID, the Bureau may seek a court order requiring you to do so. If such an order is obtained and you still fail to supply the information, you may be subject to civil and criminal sanctions for contempt of court.

*Persons Requested to Supply Information Voluntarily.* There are no sanctions for failing to provide all or any part of the requested information. If you do not provide the requested information, the Bureau may choose to send you a CID or subpoena.

## D.     Privacy Act Statement

The information you provide will assist the Bureau in its determinations regarding violations of federal consumer financial laws. The information will be used by and disclosed to Bureau personnel and contractors or other agents who need the information to assist in activities related to enforcement of federal consumer financial laws. The information may also be disclosed for statutory or regulatory purposes, or pursuant to the Bureau's published Privacy Act system of records notice, to:

- a court, magistrate, administrative tribunal, or a party in litigation;
- another federal or state agency or regulatory authority;
- a member of Congress; and
- others as authorized by the Bureau to receive this information.

This collection of information is authorized by 12 U.S.C. §§ 5511, 5562.



Executive Secretary
Page **7** of **7**

# EXHIBIT

# "B"

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2022

Lyle W. Cayce
Clerk

No. 21-50826

_____

COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA,
LIMITED; CONSUMER SERVICE ALLIANCE OF TEXAS,

*Plaintiffs—Appellants*,

*versus*

CONSUMER FINANCIAL PROTECTION BUREAU; ROHIT CHOPRA,
*in his official capacity as Director, Consumer Financial Protection Bureau*,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-295

_____

Before WILLETT, ENGELHARDT, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

"An elective despotism was not the government we fought for; but one which should not only be founded on free principles, but in which the powers of government should be so divided and balanced . . . , as that no one could transcend their legal limits, without being effectually checked and restrained by the others." THE FEDERALIST NO. 48 (J. Madison) (quoting Thomas Jefferson's *Notes on the State of Virginia* (1781)). In particular, as George Mason put it in Philadelphia in 1787, "[t]he purse & the

sword ought never to get into the same hands." 1 THE RECORDS OF THE
FEDERAL CONVENTION OF 1787, at 139–40 (M. Farrand ed. 1937). These
foundational precepts of the American system of government animate the
Plaintiffs' claims in this action. They also compel our decision today.

Community Financial Services Association of America and Consumer
Service Alliance of Texas (the "Plaintiffs") challenge the validity of the
Consumer Financial Protection Bureau's 2017 Payday Lending Rule. The
Plaintiffs contend that in promulgating that rule, the Bureau acted arbitrarily
and capriciously and exceeded its statutory authority. They also contend that
the Bureau is unconstitutionally structured, challenging the Bureau
Director's insulation from removal, Congress's broad delegation of authority
to the Bureau, and the Bureau's unique, double-insulated funding
mechanism. The district court rejected these arguments.

We agree that, for the most part, the Plaintiffs' claims miss their mark.
But one arrow has found its target: Congress's decision to abdicate its
appropriations power under the Constitution, i.e., to cede its power of the
purse to the Bureau, violates the Constitution's structural separation of
powers. We thus reverse the judgment of the district court, render judgment
in favor of the Plaintiffs, and vacate the Bureau's 2017 Payday Lending Rule.

## I.

### A.

In response to the 2008 financial crisis, Congress enacted the
Consumer Financial Protection Act, 12 U.S.C. §§ 5481–5603. The Act
created the Bureau as an independent regulatory agency housed within the
Federal Reserve System. *See id.* § 5491(a). The Bureau is charged with
"implement[ing]" and "enforce[ing]" consumer protection laws to
"ensur[e] that all consumers have access to markets for consumer financial

products and services" that "are fair, transparent, and competitive." *Id.*
§ 5511(a).

Congress transferred to the Bureau administrative and enforcement
authority over 18 federal statutes which prior to the Act were overseen by
seven different agencies. *See id*. §§ 5512(a), 5481(12), (14). Those statutes
"cover everything from credit cards and car payments to mortgages and
student loans." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020). In
addition, Congress enacted a sweeping new proscription on "any unfair,
deceptive, or abusive act or practice" by certain participants in the
consumer-finance industry. 12 U.S.C. § 5536(a)(1)(B). "Congress
authorized the [Bureau] to implement that broad standard (and the 18 pre-
existing statutes placed under the agency's purview) through binding
regulations." *Seila Law*, 140 S. Ct. at 2193 (citing 12 U.S.C. §§ 5531(a)–(b),
5581(a)(1)(A), (b)).

Congress placed the Bureau's leadership under a single Director to be
appointed by the President with the advice and consent of the Senate. 12
U.S.C. § 5491(b)(1)–(2). The Director serves a term of five years, with the
potential of a holdover period pending confirmation of a successor. *Id.*
§ 5491(c)(1)–(2). The Act originally limited the President's ability to remove
the Director, *id*. § 5491(c)(3), but the Supreme Court invalidated that
provision while this litigation was pending, *see Seila Law*, 140 S. Ct. at 2197.

The Director is vested with authority to "prescribe rules and issue
orders and guidance, as may be necessary or appropriate to enable the Bureau
to administer and carry out the purposes and objectives of the Federal
consumer financial laws, and to prevent evasions thereof." 12 U.S.C.
§ 5512(b)(1). This includes rules "identifying as unlawful unfair, deceptive,
or abusive acts or practices" committed by certain participants in the
consumer-finance industry. *Id*. § 5531(b).

The Bureau's funding scheme is unique across the myriad independent executive agencies across the federal government. It is not funded with periodic congressional appropriations. "Instead, the [Bureau] receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Seila Law*, 140 S. Ct. at 2194. Each year, the Bureau simply requests an amount "determined by the Director to be reasonably necessary to carry out the" agency's functions. *Id.* § 5497(a)(1). The Federal Reserve must then transfer that amount so long as it does not exceed 12% of the Federal Reserve's "total operating expenses." *Id.* § 5497(a)(1)–(2). For the first five years of its existence (i.e., 2010–2014), the Bureau was permitted to exceed the 12% cap by $200 million annually so long as it reported the anticipated excess to the President and congressional appropriations committees. *Id.* § 5497(e)(1)–(2).

**B.**

In 2016, Director Richard Cordray, who was appointed by President Barack Obama, proposed a rule to regulate payday, vehicle title, and certain high-cost installment loans (the "Payday Lending Rule"). After a public notice-and-comment period, Director Corday finalized the Payday Lending Rule in November 2017, during the first year of the Trump administration. *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017). The rule became effective on January 16, 2018, and had a compliance date of August 19, 2019. *Id.*

The Rule had two major components, each limiting a practice the Bureau deemed "unfair" and "abusive." *See id.* First, the "Underwriting Provisions" prohibited lenders from making covered loans "without reasonably determining that consumers have the ability to repay the loans according to their terms." 12 C.F.R. § 1041.4 (2018); 82 Fed. Reg. at 54472.

The Underwriting Provisions have since been repealed and are not at issue in this appeal. *See* 85 Fed. Reg. 44382 (July 22, 2019).

Second, and relevant here, the "Payment Provisions" limit a lender's ability to obtain loan repayments via preauthorized account access. *See* 12 C.F.R. § 1041.8. The Bureau determined that absent a new and specific authorization, it is "unfair and abusive" for lenders to attempt to withdraw payments for covered loans from consumers' accounts after two consecutive withdrawal attempts have failed due to a lack of sufficient funds. *Id*. § 1041.7; 82 Fed. Reg. at 54472. The Payment Provisions accordingly prohibit lenders from initiating additional payment transfers from consumers' accounts after two consecutive attempts have failed for insufficient funds unless "the additional payment transfers are authorized by the consumer." 12 C.F.R. § 1041.8(b)(1), (c)(1).

The Payment Provisions cast a wide net. So long as the purpose of the attempted transfer is to collect payment due on a covered loan, the two-attempt limit applies to "any lender-initiated debt or withdrawal of funds from a consumer's account." *Id*. § 1041.8(a)(1). This includes checks, debit and prepaid card transfers, preauthorized electronic fund transfers, and remotely created payment orders. *See id*.; 82 Fed. Reg. at 54910.

In April 2018, the Plaintiffs sued the Bureau on behalf of payday lenders and credit access businesses, seeking an "order and judgment holding unlawful, enjoining, and setting aside" the Payday Lending Rule. The Plaintiffs alleged that the rule exceeded the Bureau's statutory authority and otherwise violated the Administrative Procedure Act (APA). They further alleged that the rule was invalid because the Act's for-cause removal provision, self-funding mechanism, and delegation of rulemaking authority each violated the Constitution's separation of powers.

No. 21-50826

Around this time, the Bureau, now led by Acting Director Mick Mulvaney, announced that it intended to engage in notice-and-comment rulemaking to reconsider the Payday Lending Rule. Due to that ongoing effort, the parties filed a joint request to stay both the litigation and the rule's effective date. The district court entered a stay pending further order of the court. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 2018 WL 6252409, at *2 (W.D. Tex. Nov. 6, 2018).

While the Bureau engaged in rulemaking, President Trump nominated and the Senate confirmed Kathleen Kraninger as Director, replacing Acting Director Mulvaney. In early 2019, the Bureau issued a proposed rule rescinding the Underwriting Provisions but leaving the Payment Provisions intact. 84 Fed. Reg. 4252. In July 2020, following the Supreme Court's decision in *Seila Law*, the Bureau finalized its revised rule. 85 Fed. Reg. 44382. The Bureau simultaneously issued a separate "Ratification," in which it "affirm[ed] and ratifie[d] the [P]ayment [P]rovisions of the 2017 [Payday Lending] Rule." 85 Fed. Reg. 41905-02.

In August 2020, the district court lifted the stay, and the Plaintiffs amended their complaint to challenge, among other things, the Bureau's ratification of the Payment Provisions. Thereafter, the parties filed cross-motions for summary judgment. The district court granted summary judgment for the Bureau on each of the Plaintiffs' claims. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 558 F. Supp. 3d 350 (W.D. Tex. 2021). The court concluded, *inter alia*, that: (1) the promulgating Director's insulation from removal did not render the Payment Provisions void ab initio, *id.* at 358; (2) the Bureau's "ratification of the Payment Provisions was a solution tailored to the constitutional injury sustained by the [Plaintiffs]," *id.* at 365; (3) the "Payment Provisions [were] consistent with the Bureau's statutory authority and not arbitrary and capricious," *id.*; (4) the Bureau's self-funding mechanism did not violate the Appropriations Clause because it was

expressly authorized by statute, *id.* at 367; and (5) there was no nondelegation issue because the Bureau was vested with an "intelligible principle" to guide its discretion, *id.*

The Plaintiffs now appeal. We allowed the Third-Party Payment Processors Association, a national non-profit association of payment processors and their banks, to appear as amicus curiae in support of the Plaintiffs' arbitrary-and-capricious challenge.

## II.

We "review a district court's judgment on cross motions for summary judgment de novo, addressing each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Constitutional issues are also reviewed de novo. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

The Plaintiffs raise four overarching issues on appeal. They contend that the Payment Provisions of the Payday Lending Rule are invalid because: (1) the rule's promulgation violated the APA; (2) the rule was promulgated by a Director unconstitutionally insulated from presidential removal; (3) the Bureau's rulemaking authority violates the nondelegation doctrine; and (4) the Bureau's funding mechanism violates the Appropriations Clause of the Constitution. We address each argument in turn.

## A.

The APA instructs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). The Plaintiffs lodge two arguments under the APA. First, they contend that the Bureau exceeded its statutory authority by declaring more than two successive preauthorized withdrawals to be "unfair" and "abusive." Second, they assert that the Payment Provisions are arbitrary and capricious in their entirety or, alternatively, as applied to two specific contexts—installment loans and debit and prepaid card payments.

## 1.

The Act grants the Bureau broad authority to prescribe rules prohibiting "unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(b). This authority is not without limitation, however. Congress included specific definitions that govern when an act or practice may be deemed "unfair," *id.* § 5531(c)(1), or "abusive," *id.* § 5531(d). And unless those definitions are met, the Bureau "shall have no authority" to regulate conduct on either ground. *See id.* § 5531(c)–(d).

In devising the Payment Provisions, the Bureau assessed the statutory definitions and determined that it was both "unfair" and "abusive" for lenders to attempt additional withdrawals from consumers' accounts after two consecutive attempts failed due to insufficient funds unless the lender acquired "new and specific authorization." 12 C.F.R. § 1041.7; *see also* 82 Fed. Reg. at 54472. The Plaintiffs assert that the Bureau lacked authority to regulate the number of unsuccessful withdrawal attempts because this practice falls outside the Act's definitions of "unfair" and "abusive."

No. 21-50826

Our review begins (and ends) with unfairness.[1]  Under the Act, an act or practice is "unfair" if "the Bureau has a reasonable basis to conclude that [1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by the countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  The Bureau evaluated each element in its 2017 rulemaking record and concluded that the proscribed practice satisfied all three.  The Plaintiffs challenge only the first two elements on appeal.

As to the first, the Bureau determined that lenders' excessive withdrawal attempts cause or are likely to cause consumers substantial injury in the form of repeated fees, including insufficient fund fees, overdraft fees, and lender-imposed return fees.  82 Fed. Reg. at 54732–34.  It also found that "consumers who experience two or more consecutive failed lender payment attempts appear to be at greater risk of having their accounts closed by their account-holding institution."  *Id.* at 54734.  The Plaintiffs do not dispute the occurrence or substantiality of these injuries.  Rather, they challenge the Bureau's finding that the proscribed practice either causes or is likely to cause them.  The Plaintiffs assert that "[c]onsumers' banks—not lenders—cause failed-payment fees or bank-account closures" because they are the ones who "impose, collect, or otherwise control [them]."

We are unpersuaded.  The presence of an "independent causal agent[]" does not "erase the role" lenders play in bringing about the contemplated harm.  *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010).

---

[1] Because we ultimately conclude that the Bureau acted within its statutory authority in deeming the proscribed practice unfair, we do not address the alternative ground of abusiveness.  *See* 12 U.S.C. § 5531(b) (authorizing the Bureau to prescribe rules regulating practices that are "unfair," "abusive," or both).

Though not the "most proximate cause," a lender's repeated initiation of unsuccessful payment transfers is both a but-for and a proximate cause of any resulting fees or closures. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015) ("[The fact] that a company's conduct was not *the most* proximate cause of an injury generally does not immunize liability from foreseeable harms.").

The Plaintiffs also challenge the Bureau's finding that these injuries are not reasonably avoidable by consumers. Few courts have meaningfully addressed this second element of "unfairness" under the Act. *E.g.*, *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *20–21 (M.D. Pa. Aug. 4, 2017); *CFPB v. D & D Mktg.*, No. CV 15-9692, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 916–17 (S.D. Ind. 2015). In doing so, these courts relied on our sister circuits' interpretations of "reasonably avoidable" from the analogous standard in the Federal Trade Commission Act (FTCA). *See* 15 U.S.C. § 45(n).[2] We do the same.[3]

To determine whether an injury was "reasonably avoidable" under the FTCA, courts generally "look to whether the consumers had a free and informed choice." *Neovi*, 604 F.3d at 1158; *accord Am. Fin. Servs. Ass'n v.*

---

[2] Section 45(n) provides that the Federal Trade Commission "shall have no authority . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."

[3] Looking to the FTCA for guidance, we remain mindful of one important distinction: The Act requires only that the Bureau have "a *reasonable basis* to conclude that" the proscribed practice "is not reasonably avoidable by consumers," 12 U.S.C. § 5531(c)(1) (emphasis added), while the FTCA includes no such qualifier, *see* 15 U.S.C. § 45(n). In other words, while we find the standards to be analogous, the Bureau is perhaps afforded more deference in its determination than would be afforded under the FTCA.

*FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985). "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365–66 (11th Cir. 1988)). The Plaintiffs contend that consumers can reasonably avoid injury associated with successive withdrawal attempts by (1) "not authorizing automatic withdrawals," (2) "sufficiently funding [their] account[s]," (3) "negotiating revised payment options," (4) "invoking [their] rights under federal law to issue stop-payment orders or rescind account access," or (5) "declining to take out the loan" and "pursuing alternative[] sources of credit."

Each of these concerns was raised during the public comment period of the Bureau's rulemaking process. *See, e.g.*, 82 Fed. Reg. at 54736–37. The Bureau found none of them sufficient to constitute a reasonable means of avoiding injury. *Id.* at 54737. The rulemaking record prefaces that many borrowers resort to payday loans because they are in financial distress and lack other viable options for financing. *Id.* at 54571, 54735. Addressing the Plaintiffs' first point, the Bureau explained that since "leveraged payment mechanisms" are "a central feature of these loans," borrowers typically do not have the ability to shop for loans without them. *Id.* at 54737. The Bureau also found that simply funding their accounts is not a reasonable means for borrowers to avoid injury because "[m]any borrowers [do] not have the funds" after two unsuccessful withdrawal attempts, and "subsequent [withdrawals] can occur very quickly, often on the same day, making it difficult to ensure funds are in the right account before the [next withdrawal] hits." *Id.* For the same reason, the Bureau found negotiating repayment

options to be too slow a solution to mitigate against fees incurred on additional withdrawal attempts. *See id.* at 54736–37.

Regarding the Plaintiffs' fourth point, the Bureau explained that costs, "[c]omplexities in payment processing systems[,] and the internal procedures of consumers' account-holding institutions, combined with lender practices, often make it difficult for consumers to stop payment or revoke authorization effectively." *Id.* Finally, the Bureau concluded that "the suggestion that a consumer can simply decide not to participate in the market is not . . . a valid means of reasonably avoiding the injury." *Id.* at 54737. By that logic, the Bureau reasoned, "no market practice could ever be determined to be unfair." *Id.*

The Bureau's explanations are fully fleshed out in the Payday Lending Rule's 519-page rulemaking record, where they are supported by a variety of data and industry-related studies. Reviewing that record as it undergirds the Payment Provisions, we find the Bureau had "a reasonable basis to conclude" that the harms associated with three or more unsuccessful withdrawal attempts are "not reasonably avoidable by consumers." 12 U.S.C. § 5531(c)(1). Because the proscribed practice thus satisfies the elements of an "unfair" practice under the Act, we conclude that the Bureau acted within its statutory authority in promulgating the Payment Provisions.

**2.**

Next, the Plaintiffs contend that the Payment Provisions are arbitrary and capricious, either as a whole or as applied. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Still, we must ensure that an agency "examine[s] the relevant data and articulate[s] a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). A rule is arbitrary and capricious if the agency relied on "impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA Appeal Grp. v. U.S. EPA*, 355 F.3d 817, 824 (5th Cir. 2003).

Here, the Plaintiffs first contend that the Payment Provisions are arbitrary and capricious in their entirety because they rest on stale data from four-to-five years prior to their promulgation, and the Bureau failed to consider the provisions' important countervailing effects. As to the first point, the Plaintiffs forfeited their stale data argument by failing to raise it in the district court. *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 398 (5th Cir. 2021). And forfeiture aside, the Bureau offered a reasoned explanation in its 2017 rulemaking record for relying on data collected from 2011–2012. *See* 82 Fed. Reg. at 54722, 54729.

As to the second point, the only countervailing effect the Plaintiffs allege the Bureau failed to consider is "the increased likelihood that a loan will enter into collections sooner than it would have (if it would have at all)." But the Bureau persuasively responds that "[i]f the borrower is unable to obtain the funds, it is unclear why the borrower (or the lender) would be better off if the lender could initiate failed withdrawal attempts—and, in the process, pile additional fees onto the borrower—before the loan enters collections." Even if the Payment Provisions' limit on repeated withdrawal attempts might send some loans to collections sooner, that possibility is not so "important" that the Bureau had to consider it specifically. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (explaining "an agency rule would be arbitrary

and capricious if the agency . . . entirely failed to consider an important aspect of the problem").

Turning to their as-applied challenge, the Plaintiffs assert that the Payment Provisions are arbitrary and capricious as applied to debit and prepaid card payments and as to separate installments of multi-payment installment loans. Amicus joins them with respect to debit and prepaid cards. Together, they contend that the Payment Provisions "arbitrarily treat[] debit and prepaid card payments the same as check and [account clearinghouse] payments, even though the former do not give rise to the fees that, in the Bureau's assessment, justify the Rule."

The Bureau acknowledged in the rulemaking record that debit and prepaid card transactions "present somewhat less risk of harm to consumers," but it declined to exclude them for several reasons. 82 Fed. Reg. at 54750. For one, the Bureau found that though failed debit and prepaid card transactions may not trigger insufficient fund fees, "some of them do trigger overdraft fees, even after two failed attempts." *Id.* And as with other payment-transfer methods, consumers would still be subject to "return payment fees and late fees charged by lenders." *Id.* at 54723, 54734. The Bureau also explained that a carve out for these transactions "would be impracticable to comply with and enforce." *Id.* at 54750. These considerations suffice to establish a "rational connection between the facts found and choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). Therefore, the Payment Provisions are not arbitrary and capricious as applied to debit and prepaid card transfers.[4]

---

[4] The Plaintiffs also contend that "the denial of [Advance Financial's] rulemaking petition seeking amendment of the [Payday Lending] Rule to exclude debit and prepaid card payments was arbitrary and capricious." But just as it was not arbitrary and capricious for the Bureau initially to include these payment types within the rule, it was not arbitrary

No. 21-50826

Similarly, we cannot say that the Bureau acted arbitrarily and capriciously by extending the Payment Provisions' two-attempt limit across all scheduled installment payments on the same loan. The Plaintiffs contend that the Bureau failed to support its decision with "reasoned analysis or record evidence." But again, the rulemaking record proves otherwise. Citing its own study, the Bureau explained that a third withdrawal attempt, even as applied to a different scheduled payment, would still likely fail "even if two weeks or a month has passed." 82 Fed. Reg. at 54753. The Bureau also found that "the tailoring of individualized requirements for each discrete payment practice would add considerable complexity to the rule." *Id.* Further, the Bureau determined that distinguishing between re-presentments of the same payment and new presentments for new installments would invite evasion by lenders. The Bureau referenced a rule imposed by the National Automated Clearinghouse Association (NACHA), a self-governing private organization, that is similar to the Payment Provisions (except that it only applies after three attempts). *See id.* at 54728–29. The Bureau noted that the NACHA rule's distinction between attempts to collect a new payment and re-initiation of a prior one had led companies to manipulate data fields so that it would appear as if a withdrawal attempt was for a new installment. *See id.* at 54728 n.985 & 54729.

In sum, we conclude that the Payment Provisions are not arbitrary and capricious, either in their entirety or in their two contested applications. As Plaintiffs fail to show that the Payday Lending Rule's promulgation violated

---

and capricious for the Bureau to deny a rulemaking petition asking for their exemption. This is especially true considering the "extremely limited and highly deferential" standard under which we review an agency's "[r]efusal[] to promulgate rules." *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007) (internal quotation marks omitted) (quoting *Nat'l Customs Brokers & Forwarders Ass'n. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)).

the APA, summary judgment in favor of the Bureau on this claim was warranted.

**B.**

The Plaintiffs next contend that the Payment Provisions must be invalidated because the Payday Lending Rule was initially promulgated by a director who was unconstitutionally shielded from removal.

**1.**

The Act states that the Bureau's Director may be removed only "for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). In *Seila Law*, the Court held that this limitation on the President's removal power violated the Constitution's separation of powers. 140 S. Ct. at 2197. But the Court declined to find that the Director's unconstitutional insulation from removal rendered the remainder of the Act invalid. *Id.* at 2208–11. Instead, the Court concluded that the infirm removal provision was severable and remanded the case for a determination of the appropriate relief. *Id.* at 2211.

Like *Seila Law*, *Collins v. Yellen*, 141 S. Ct. 1761 (2021), involved a challenge to actions taken by an independent agency, the Federal Housing Finance Agency (FHFA), that was headed by a single officer removable only for cause. *See* 141 S. Ct. at 1784. The *Collins* petitioners asserted that the FHFA Director's for-cause removal protection violated the separation of powers, and therefore the agency actions at issue "must be completely undone." *Id.* at 1787. The Court agreed that the for-cause removal provision was unconstitutional, finding *Seila Law* "all but dispositive." *Id.* at 1783. But it refused to hold that an officer's insulation from removal, by itself, rendered all agency action taken under that officer void. *Id.* at 1787–88. Unlike cases "involv[ing] a Government actor's exercise of power that the actor did not lawfully possess," the Court explained, a properly appointed officer's

insulation from removal "does not strip the [officer] of the power to undertake the other responsibilities of his office." *Id.* at 1788 & n.23. Thus, to obtain a remedy, the challenging party must demonstrate not only that the removal restriction violates the Constitution but also that "the unconstitutional removal provision inflicted harm." *Id.* at 1788–89.

While the Plaintiffs acknowledge *Collins*, they argue the case is distinguishable on several grounds. None are persuasive.

First, they assert that *Collins* applies only to retrospective relief. But *Collins* did not rest on a distinction between prospective and retrospective relief. As the Sixth Circuit recently explained, *Collins*'s remedial inquiry "focuse[d] on whether a 'harm' occurred that would create an entitlement to a remedy, rather than the nature of the remedy, and our determination as to whether an unconstitutional removal protection 'inflicted harm' remains the same whether the petitioner seeks retrospective or prospective relief." *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022).[5]

The Plaintiffs also contend that *Collins* "does not apply to rulemaking challenges." This distinction is similarly without a difference. To the contrary, in *Collins*, the Court explicitly stated that "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23. Because the Bureau's Director's "other responsibilities" include rulemaking, *see* 12 U.S.C. §§ 5511(a), 5512(b), *Collins* is directly on point, and the Plaintiffs

---

[5] *Collins* originally involved claims for both prospective and retrospective relief. 141 S. Ct. at 1780. By the time the case reached the Supreme Court, the challengers' claims for prospective relief were moot. *Id.* Therefore, the Court articulated its remedial analysis in terms of retrospective relief. *See id.* at 1788–89.

must demonstrate that the unconstitutional removal provision caused them harm.

### 2.

Joining the issue, the Plaintiffs assert that "even if *Collins* does inform the analysis here, its framework plainly requires setting aside the [Payment Provisions]" because the Plaintiffs have made a sufficient showing of harm. As noted above, after *Collins*, a party challenging agency action must show not only that the removal restriction transgresses the Constitution's separation of powers but also that the unconstitutional provision caused (or would cause) them harm. 141 S. Ct. at 1789. The Court chose to remand *Collins*'s remedy question and stopped short of articulating a precise statement as to how a party may prove harm. *See id.* at 1788–89. Instead, the *Collins* majority concluded with several hypotheticals:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director . . . could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.*

We distill from these hypotheticals three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor.  This is borne out by the concurring Justices' opinions as well.  *See id.* at 1792–93 (Thomas, J., concurring); *id.* at 1801 (Kagan, J., concurring in part); *id.* at 1803 n.1 (Sotomayor, J., concurring in part and dissenting in part).  As Justice Kagan emphasized, "plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head *affected the complained-of decision*."  *Id.* at 1801 (Kagan, J., concurring in part) (emphasis added).

It is thus not enough, as the Plaintiffs would have us hold, for a challenger to obtain relief merely by establishing that the unconstitutional removal provision prevented the President from removing a Director he wished to replace.  As we read *Collins*, to demonstrate harm, the Plaintiffs must show *a connection* between the President's frustrated desire to remove the actor and the agency action complained of.  *See id.* at 1789.  Without this showing, the Plaintiffs could put themselves in a better place than otherwise warranted, by challenging decisions either with which the President agreed, or of which he had no awareness at all.  *Id.* at 1802 (Kagan, J., concurring in part).

Applying *Collins*'s framework, we conclude the Plaintiffs fail to show that the Act's removal provision inflicted a constitutional harm.  Though they state "[i]t is uncontested that, but for the later-invalidated removal restriction, President Trump would have replaced [Director] Cordray before he finalized the [Payday Lending Rule]," their only support for this assertion consists of a few carefully selected statements from Director Cordray's book, *see, e.g.*, Richard Cordray, Watchdog: How Protecting

Consumers Can Save Our Families, Our Economy, and
Our Democracy 185 (2020) ("[T]he threat that I would be fired as soon
as President Trump took office loomed over everything."), and an online
article, *see* Kate Berry, *In Tell-All, Ex-CFPB Chief Cordray Claims Trump
Nearly Fired Him*, American Banker (Feb. 27, 2020) https://www.
americanbanker.com/news/in-tell-all-ex-cfpb-chief-cordrayclaims-trump-
nearly-fired-him (stating "President Trump was advised to hold off on firing
Corday because the Supreme Court had not yet weighed in on [the] 'for
cause' provision").

These secondhand accounts of President Trump's supposed
intentions are insufficient to establish harm. The Director's subjective belief
that his firing might be imminent does not in itself substantiate that the
President would have removed the Director but for the unconstitutional
removal provision. Regardless, the record before us plainly fails to
demonstrate any nexus between the President's purported desire to remove
Cordray and the promulgation of the Payday Lending Rule or, specifically,
the Payment Provisions. In short, nothing the Plaintiffs proffer indicates
that, but for the removal restriction, President Trump would have removed
Cordray *and* that the Bureau would have acted differently as to the rule.

Because the Plaintiffs have failed to demonstrate harm, we need not
address the Bureau's alternative argument that any alleged harm was cured
by Director Kraninger's ratification of the Payment Provisions. *See CFPB v.
CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022) (finding "it unnecessary to
consider ratification" where the challenger could not establish harm).
Summary judgment in favor of the Bureau on this claim was proper.

## C.

We next consider the Plaintiffs' argument that the Bureau's
rulemaking authority violates the Constitution's separation of powers by

running afoul of the nondelegation doctrine.[6] The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1. Inherent in "that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion). "Under the nondelegation doctrine, Congress may not constitutionally delegate its legislative power to another branch of government." *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998) (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

But the Supreme Court has long delimited this general principle: "So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Touby v. United States*, 500 U.S. 160, 165 (1991) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see also Gundy*, 139 S. Ct. at 2129 (explaining that "[t]hose standards . . . are not demanding").

Through the Act, Congress gave the Bureau authority "to prescribe rules . . . identifying as unlawful unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5531(b). This constituted a delegation of legislative power because "the lawmaking function belongs to Congress." *Loving v. United States*, 517 U.S. 748, 758 (1996). The question is whether Congress

---

[6] For the first time on appeal, the Plaintiffs also argue that Congress violated the nondelegation doctrine by delegating its appropriations power to the Bureau. This argument is distinct from the Plaintiffs' Appropriations Clause challenge, which was raised in the district court and which we address *infra* in II.D. Because the Plaintiffs did not raise their appropriations-based nondelegation argument in the district court, it is forfeited on appeal. *See Rollins*, 8 F.4th at 398.

also "supplied an intelligible principle to guide the [Bureau's] discretion." *Gundy*, 139 S. Ct. at 2123.

The Plaintiffs assert that "[t]here is no intelligible principle" behind the Bureau's "vague and sweeping" rulemaking authority. We disagree. In the Act, Congress articulated its general policy preferences, established the Bureau as the agency to apply them, and set boundaries—albeit broad ones— on the Bureau's rulemaking authority. *Am. Power & Light Co.*, 329 U.S. at 105. Given that the Supreme Court "has over and over upheld even very broad delegations," *Gundy*, 139 S. Ct. at 2129, the Act's delegation of rulemaking authority to the Bureau passes muster.

Congress's general policy is distilled in the Bureau's purpose and objectives. 12 U.S.C. § 5511(a)–(b). The Bureau's "purpose" is "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). That purpose is accompanied by five "objectives" toward which "[t]he Bureau is authorized to exercise its authorit[y.]" *Id.* § 5511(b). One of those is to "ensur[e] that . . . consumers are protected from unfair, deceptive, or abusive acts and practices." *Id.* § 5511(b)(2). In line with that objective, Congress empowered the Bureau to "prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(b). Congress then circumscribed that authority by

No. 21-50826

including specific criteria that must be met before the Bureau can label a practice "unfair" or "abusive." *See id.* § 5531(c)–(d).[7]

Far from an "open-ended delegation" that offers "no guidance whatsoever," *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022) (emphasis omitted), Congress's grant of rulemaking authority to the Bureau was accompanied by a specific purpose, objectives, and definitions to guide the Bureau's discretion. This was more than sufficient to confer an "intelligible principle." *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474–75 (2001) (compiling the various directives the Supreme Court has deemed sufficient to constitute an "intelligible principle").

## D.

Finally, the Plaintiffs contend that the Payday Lending Rule is invalid because the Bureau's funding structure violates the Appropriations Clause of the Constitution and the separation of powers principles enshrined in it. Though the constitutionality of the Bureau has been heavily litigated, this issue has yet to be definitively resolved. In *Seila Law*, the Supreme Court determined that the Act's presidential removal restriction violated the Constitution's separation of powers, but the Court did not confront whether

---

[7] We discussed the statutory elements of "unfairness" *supra* in II.A.1. It was unnecessary to address "abusiveness" there. *See supra* n.1. For reference here, an act or practice is "abusive" if it

> (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; *or* (2) takes unreasonable advantage of—(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d).

the Bureau's unique funding scheme does. 140 S. Ct. at 2197. And a majority of this court recently concluded that the issue was not properly before us in another case challenging the Bureau's structure and authority. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 220 & n.2 (5th Cir. 2022) (en banc). However, JUDGE JONES, in a magisterial separate opinion joined by several of our colleagues, disagreed and addressed the parties' Appropriations Clause challenge. *See id.* at 221 (Jones, J., concurring). Methodically analyzing the question, she concluded that the Bureau's funding mechanism contravenes the Constitution's separation of powers. *Id.* at 242.

The issue is squarely raised here. We reach the same conclusion.

### 1.

Our "system of separated powers and checks and balances established in the Constitution was regarded by the Framers as 'a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" *Morrison v. Olson*, 487 U.S. 654, 693 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). "If there is one aspect of the doctrine of Separation of Powers that the Founding Fathers agreed upon, it is the principle, as Montesquieu stated it: 'To prevent the abuse of power, it is necessary that by the very disposition of things, power should be a check to power.'" *United States v. Cox*, 342 F.2d 167, 190 (5th Cir. 1965) (Wisdom, J., concurring) (quoting BARON DE MONTESQUIEU, THE SPIRIT OF THE LAWS bk. XI, ch. IV (1772)). On that foundation, the Framers erected the three branches of government—legislative, executive, and judicial—and endowed each with "the necessary constitutional means and personal motives to resist encroachments of the others." THE FEDERALIST NO. 51 (J. Madison); *see* U.S. CONST. art. I, § 1; *id.* art. II, § 1, cl. 1; *id.* art. III, § 1.

Drawing on the British experience, the Framers "carefully separate[d] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021).[8]   The Framers' reasoning was twofold.  First, they viewed Congress's exclusive "power over the purse" as an indispensable check on "the overgrown prerogatives of the other branches of the government."  THE FEDERALIST NO. 58 (J. Madison).  Indeed, "the separation of purse and sword was the Federalists' strongest rejoinder to Anti-Federalist fears of a tyrannical president."  JOSH CHAFETZ, CONGRESS'S CONSTITUTION, LEGISLATIVE AUTHORITY AND THE SEPARATION OF POWERS 57 (2017).

The Framers also believed that vesting Congress with control over fiscal matters was the best means of ensuring transparency and accountability to the people.  *See* THE FEDERALIST NO. 48 (J. Madison) ("[T]he legislative department alone has access to the pockets of the people.").[9]  As

---

[8] As Alexander Hamilton explained, the powers of "the sword and the purse" should never be placed

> in either the Legislative or Executive, singly; neither one nor the other shall have both; because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny. But when the purse is lodged in one branch, and the sword in another, there can be no danger.

2 THE WORKS OF ALEXANDER HAMILTON 61 (Henry Cabot Lodge ed., 1904). George Mason expressed the same sentiment, advising his colleagues at the Philadelphia Convention that "[t]he purse & the sword ought never to get into the same hands." 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 139–40 (M. Farrand ed. 1937).

[9] *See also* 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 149–50 (M. Farrand ed. 1937) (statement of James McHenry) ("When the Public Money is lodged in its Treasury there can be no regulation more consist[e]nt with the Spirit of Economy and free Government that it shall only be drawn forth under appropriation by Law and this part of the proposed Constitution could meet with no opposition as the People who give their Money ought to know in what manner it is expended.").

James Madison explained, the "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." THE FEDERALIST NO. 58 (J. Madison).[10]

The text of the Constitution reflects these foundational considerations. First, even before enumerating how legislation becomes law (i.e., passage by both houses of Congress and presentment to the President for signature), the Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives . . . ." U.S. CONST. art. I, § 7, cl. 1. It then grants the general authority "[t]o lay and collect Taxes" and spend public funds for various ends—the first power positively granted to Congress by the Constitution. *Id.* art. I, § 8, cl. 1. Importantly though, that general grant of spending power is cabined by the Appropriations Clause and its follow-on, the Public Accounts Clause: "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." *Id.* art. I, § 9, cl. 7.

---

[10] Indeed, popular accountability for the expenditure of public funds was so important that an earlier draft of the Constitution restricted the power to originate appropriations to the House of Representatives: "[A]ll Bills for raising or Appropriating Money, and for fixing the Salaries of the Officers of the Government of the United States shall originate in the first Branch of the Legislature of the United States, and shall not be altered or amended by the second Branch; and that no money shall be drawn from the public Treasury but in Pursuance of Appropriations to be originated by the first Branch." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 129–34 (M. Farrand ed. 1937). Although not carried forward in the Appropriations Clause as ratified, this procedure is well-established in Congressional custom, which requires general appropriations bills to originate in the House of Representatives. CLARENCE CANNON, CANNON'S PROCEDURE IN THE HOUSE OF REPRESENTATIVES 20, § 834 (4th ed. 1944).

The Appropriations Clause's "straightforward and explicit command" ensures Congress's *exclusive* power over the federal purse. *OPM v. Richmond*, 496 U.S. 414, 424 (1990). Critically, it makes clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425. Of equal importance is what the clause "takes away from Congress: the option *not* to require legislative appropriations prior to expenditure." Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1349 (1988). Given that the executive is forbidden from unilaterally spending funds, the actual exercise by Congress of its power of the purse is imperative to a functional government. The Appropriations Clause thus does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority "to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *All Am. Check Cashing*, 33 F.4th at 231 (Jones, J., concurring).

The Appropriations Clause thus embodies the Framers' objectives of maintaining "the necessary partition among the several departments," The Federalist No. 51 (J. Madison), and ensuring transparency and accountability between the people and their government. The clause's role as "a bulwark of the Constitution's separation of powers" has been repeatedly affirmed. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.); *see id.* ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority.") (citations omitted); *see also, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 704 (9th Cir. 2019) ("The Appropriations Clause is a vital instrument of separation of powers . . . ."); *City of Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) (discussing the power of the purse as an important aspect of the separation

of powers created by "[t]he founders of our country"); *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) ("The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them."). As Justice Story said:

> The object is apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity, in the disbursements of the public money . . . . If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure. The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation.

2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (3d ed. 1858). Justice Scalia similarly observed that, while the requirement that funds be disbursed in accord with Congress's dictate and Congress's alone may be inconvenient, "clumsy," or "inefficient," it "reflect[s] 'hard choices . . . consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked.' " *NLRB v. Noel Canning*, 573 U.S. 513, 601–02 (2014) (Scalia, J., concurring) (quoting *INS v. Chadha*, 462 U.S. 919, 959 (1983)). In short, the Appropriations Clause expressly "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

### 2.

All that in mind, we turn to the Bureau's structure. The Bureau "wields vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law*, 140 S. Ct. at 2191. "The agency has the authority to conduct investigations, issue subpoenas

and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Id.* at 2193. The Bureau "may seek restitution, disgorgement, and injunctive relief, as well as civil penalties of up to $1,000,000 (inflation adjusted) for each day that a violation occurs." *Id.* Unlike nearly every other administrative agency, Congress placed this "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director" rather than a multimember board or commission. *All Am. Check Cashing*, 33 F.4th at 221–22 (Jones, J., concurring); *see* 12 U.S.C. § 5491(b).

Most anomalous is the Bureau's self-actualizing, perpetual funding mechanism. While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not. *See* 12 U.S.C. § 5497(a). Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount "determined by the Director to be reasonably necessary to carry out" the Bureau's functions.[11] *Id.* The Federal Reserve must grant that request so long as it does not exceed 12% of the Federal Reserve's "total operating expenses." 12 U.S.C. § 5497(a)(1)–(2).[12] The funds siphoned by

---

[11] As noted, in addition to the funds it draws from the Federal Reserve, the Bureau is empowered to impose significant monetary penalties through administrative adjudications and civil actions. 12 U.S.C. § 5565(a)(2). Those penalties, when levied, are deposited into a "Civil Penalty Fund," expenditures from which are restricted "for payments to the victims of activities for which civil penalties have been imposed under the Federal consumer financial laws." *Id.* § 5497(d)(1)–(2). "To the extent that such victims cannot be located or such payments are otherwise not practicable, the Bureau may use such funds for the purpose of consumer education and financial literacy programs." *Id.* § 5497(d)(2). As Civil Penalty Fund balances cannot be used to defray the Bureau's general expenses, they do not factor into our analysis here.

[12] This is no insubstantial amount. In fiscal year 2022, for example, the Bureau could demand up to $734 million from the Federal Reserve. Consumer Financial Protection Bureau, *Annual performance plan and report, and budget overview* (Feb. 2022), https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy22.pdf.

the Bureau, in effect, reduce amounts that would otherwise flow to the general fund of the Treasury, as the Federal Reserve is required to remit surplus funds in excess of a limit set by Congress. *See* 12 U.S.C. § 289(a)(3)(B).

The Bureau thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Seila Law*, 140 S. Ct. at 2194; *see* 12 U.S.C. § 5497(a).[13] So Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded *indirect control* by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process—a double insulation from Congress's purse strings that is "unprecedented" across the government. *All Am. Check Cashing*, 33 F.4th at 225 (Jones, J., concurring). And where the Federal Reserve at least remains tethered to the Treasury by the requirement that it remit funds above a statutory limit, Congress cut that tether for the Bureau, such that the Treasury will never regain one red cent of the funds unilaterally drawn by the Bureau.

This novel cession by Congress of its appropriations power—its very obligation "to maintain the boundaries between the branches," *id.* at 231— is in itself enough to give grave pause. But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books. Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains "a separate fund, . . . the 'Bureau of

---

[13] The Federal Reserve is funded through interest earned on the securities it owns and assessments the agency levies on banks within the Federal Reserve system. Federal Reserve, The Fed Explained: What the Central Bank Does, at 4 (2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf; *see also* 12 U.S.C. § 243.

Consumer Financial Protection Fund,'" which "shall be maintained and established at a Federal [R]eserve bank." 12 U.S.C. § 5497(b)(1). This fund is "under the control of the Director," and the monies on deposit are permanently available to him without any further act of Congress. *Id.* § 5497(c)(1). Thus, *contra* the Federal Reserve, *id.* § 289(a)(3)(B), the Bureau may "roll over" the self-determined funds it draws *ad infinitum.*

To underscore the point, the Act explicitly states that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies." *Id.* § 5497(c)(2). To underscore it again, Congress expressly renounced its check "as a restriction upon the disbursing authority of the Executive department," *Cincinnati Soap*, 301 U.S. at 321, by legislating that "funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." *Id.* § 5497(a)(2)(C).

So the Bureau's funding is double-insulated on the front end from Congress's appropriations power. And Congress relinquished its jurisdiction to review agency funding on the back end. In between, Congress gave the Director its purse containing an off-books charge card that rings up "[un]appropriated monies." Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it.[14]     The Bureau's perpetual insulation from

_____

[14] JUDGE JONES emphasized the perpetual nature of the funding mechanism and opined that an appropriation must be time-limited. *See All Am. Check Cashing*, 33 F.4th at 238 ("[T]he separation of powers idea underlying the Framers' assignment of fiscal matters to Congress requires a time limitation for appropriations to the executive branch."). We need not decide whether perpetuity of funding alone would be enough to render the Bureau's funding mechanism unconstitutional. Rather, the Bureau's funding

Congress's appropriations power, including the express exemption from
congressional review of its funding, renders the Bureau "no longer
dependent and, as a result, no longer accountable" to Congress and,
ultimately, to the people. *All Am. Check Cashing*, 33 F.4th at 232 (Jones, J.,
concurring); *see id.* at 234 (detailing examples showing that the Bureau's
"lack of accountability is not just a theoretical worry"). By abandoning its
"most complete and effectual" check on "the overgrown prerogatives of the
other branches of the government"—indeed, by enabling them in the
Bureau's case—Congress ran afoul of the separation of powers embodied in
the Appropriations Clause. *See* The Federalist No. 58 (J. Madison).

The constitutional problem is more acute because of the Bureau's
capacious portfolio of authority. "It acts as a mini legislature, prosecutor,
and court, responsible for creating substantive rules for a wide swath of
industries, prosecuting violations, and levying knee-buckling penalties
against private citizens." *Seila Law*, 140 S. Ct. at 2202 n.8. And the
"Director's newfound presidential subservience exacerbates the
constitutional problem[] arising from the [Bureau's] budgetary
independence." *All Am. Check Cashing*, 33 F.4th at 234 (Jones, J.,
concurring). An expansive executive agency insulated (no, double-insulated)
from Congress's purse strings, expressly exempt from budgetary review, and
headed by a single Director removable at the President's pleasure is *the
epitome* of the unification of the purse and the sword in the executive—an
abomination the Framers warned "would destroy that division of powers on
which political liberty is founded." 2 The Works of Alexander
Hamilton 61 (Henry Cabot Lodge ed., 1904).

---

scheme—including the perpetual funding feature—is so egregious that it clearly runs afoul
of the Appropriations Clause's requirements.

The Bureau's arguments to the contrary are unconvincing. First, it contends that there is no constitutional infirmity because its funding scheme was enacted by Congress. In essence, the Bureau contends that because Congress spun the agency's funding mechanism into motion when it passed the Act, voila!—the Appropriations Clause is satisfied. The Bureau's argument misreads not only Supreme Court precedent but also the plain text of the Appropriations Clause.

Start with the clause's text: "No money shall be drawn from the Treasury, but *in Consequence of Appropriations* made by law." U.S. CONST. art I, § 9, cl. 7 (emphasis added). A law alone does not suffice—an *appropriation* is required. Otherwise, why not simply travel under the general procedures for enacting legislation provided elsewhere in Article I? The answer is that spending only "in Consequence of Appropriations made by law" is additive to mere enabling legislation; appropriations are required to meet the Framers' salutary aims of separating and checking powers and preserving accountability to the people. The Act itself tacitly admits such a distinction in its decree that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be . . . appropriated monies." 12 U.S.C. § 5497(c)(2). We take Congress at its word. But that is the rub.

The Bureau relies on the Supreme Court's statement that the Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Richmond*, 496 U.S. at 424 (quoting *Cincinnati Soap*, 301 U.S. at 321). But neither *Richmond* nor *Cincinnati Soap* purported definitively to map the contours of the Appropriations Clause. Regardless, Congress's mere enactment of a law, by itself, does not satisfy the clause's requirements. Otherwise, the Bureau's position means that no federal statute could ever violate the Appropriations Clause because Congress, by definition, enacts them. As discussed *supra*, our Constitution's structural separation of powers teaches us that cannot be so.

*Cf. New York v. United States*, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.").

The converse argument, that Congress can alter the Bureau's perpetual self-funding scheme anytime it wants, curing any infirmity, is likewise unavailing. "Congress is always capable of fixing statutes that impinge on its own authority, but that possibility does not excuse the underlying constitutional problems. Otherwise, no law could run afoul of Article I." *All Am. Check Cashing*, 33 F.4th at 238 (Jones, J., concurring); *cf. PHH Corp. v. CFPB*, 881 F.3d 75, 158 (D.C. Cir. 2018) (en banc) (Henderson, J., dissenting) ("[A]n otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future."), *abrogated on other grounds by Seila Law*, 140 S. Ct. 2183.

The Bureau also contends that because every court to consider its funding structure has deemed it constitutionally sound, we should too.[15] But carefully considering those decisions, we must respectfully disagree with their conclusion. Those courts found the constitutional scale tipped in the Bureau's favor based largely on one factor: a handful of other agencies are also self-funded. For instance, the D.C. Circuit emphasized that "Congress has consistently exempted financial regulators from appropriations: The Federal Reserve, the Federal Deposit Insurance Corporation, the Office of

---

[15] *See, e.g.*, *PHH Corp.*, 881 F.3d at 95–96; *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020); *CFPB v. Think Finance LLC*, No. 17-cv-127, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Services, Inc.*, 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014).

the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing Finance Agency all have complete, uncapped budgetary autonomy." *PHH Corp.*, 881 F.3d at 95.

   Such a comparison, focused only on whether other agencies possess a degree of budgetary autonomy, mixes apples with oranges. Or, more accurately, with a grapefruit. Even among self-funded agencies, the Bureau is unique. The Bureau's perpetual self-directed, double-insulated funding structure goes a significant step further than that enjoyed by the other agencies on offer. And none of the agencies cited above "wields enforcement or regulatory authority remotely comparable to the authority the [Bureau] may exercise throughout the economy." *All Am. Check Cashing*, 33 F.4th at 237 (Jones, J., concurring); *see also* William Simpson, *Above Reproach: How the Consumer Financial Protection Bureau Escapes Constitutional Checks & Balances*, 36 Rev. Banking & Fin. L. 343, 367–69 (2016).[16] Taken together, the Bureau's express insulation from congressional budgetary review, single Director answerable to the President, and plenary regulatory authority combine to render the Bureau "an innovation with no foothold in

---

[16] Neither is the Bureau's structure comparable to mandatory spending programs such as Social Security. The Bureau self-directs how much money to draw from the Federal Reserve; the Social Security Administration (SSA) exercises no similar discretion. *Compare* 12 U.S.C. § 5497(a)(1) (creating Bureau funding mechanism) *with* 42 U.S.C. § 415 (setting parameters for Social Security benefit levels). Quite to the contrary, SSA pays amounts Congress has determined to beneficiaries whom Congress has identified. *See* 42 U.S.C. § 415 (identifying amounts); 42 U.S.C. § 402 (identifying eligible individuals). The Executive Branch's power over "automatic" Social Security spending is therefore purely ministerial. Furthermore, Congress retains control over the SSA via the *agency's* annual appropriations. *See, e.g.*, Social Security Administration, Justification of Estimates for Appropriations Committees | Fiscal Year 2023 (2022), https://www.ssa.gov/budget/FY23Files/FY23-JEAC.pdf. Other benefits payments, including Medicare and Medicaid, the Supplemental Nutrition Assistance Program, and Temporary Assistance for Needy Families, are administered similarly by agencies subject to annual appropriations set by Congress.

history or tradition." *Seila Law*, 140 S. Ct. at 2202.  It is thus no surprise that the Bureau "brought to the forefront the subject of agency self-funding, a topic previously relegated to passing scholarly references rather than front-page news."  Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1735 (2013).

> We cannot sum up better than Judge Jones did:
>
> [T]he [Bureau]'s argument for upholding its funding mechanism admits no limiting principle.  Indeed, if the [Bureau]'s funding mechanism is constitutional, then what would stop Congress from similarly divorcing other agencies from the hurly burly of the appropriations process? . . . [T]he general threat to the Constitution's separation of powers and the particular threat to Congress's supremacy over fiscal matters are obvious.  Congress may no more lawfully chip away at its own obligation to regularly appropriate money than it may abdicate that obligation entirely.  If the [Bureau]'s funding mechanism survives this litigation, the camel's nose is in the tent.  When conditions are right, the rest will follow.

*All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring).  The Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers.

### 3.

That leaves the question of remedy.  Though *Collins* is not precisely on point, we follow its framework because, though that case involved an unconstitutional removal provision, we read its analysis as instructive for separation-of-powers cases more generally.  *See Collins*, 141 S. Ct. at 1787–88; *cf. All Am. Check Cashing*, 33 F.4th at 241 (Jones, J., concurring) (finding *Collins* "inapt" for determining a remedy for the Bureau's "budgetary independence").

No. 21-50826

Collins clarified a dichotomy between agency actions that involve "a Government actor's exercise of power that the actor did not lawfully possess" and those that do not. 141 S. Ct. at 1787–88. Examples of the former include actions taken by an unlawfully appointed official, see Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018); a legislative officer's exercise of executive power, see Bowsher v. Synar, 478 U.S. 714, 727–36 (1986); and the President's exercise of legislative power, see Clinton v. City of New York, 524 U.S. 417, 438 (1998). The remedy in those cases, invalidation of the unlawful actions, flows "directly from the government actor's lack of authority to take the challenged action in the first place." All Am. Check Cashing, 33 F.4th at 241 (Jones, J., concurring).

In contrast, the Court found the separation of powers problem posed by an official's unlawful insulation from removal to be different. Collins, 141 S. Ct. 1787–88. Unlike the above examples, such a provision "does not strip" a lawfully appointed government actor "of the power to undertake the other responsibilities of his office." Id. at 1788. Thus, as discussed supra in II.B., to obtain a remedy, a plaintiff must prove more than the existence of an unconstitutional provision; she must prove that the challenged action actually "inflicted harm." Id. at 1789.

Into which category does the Bureau's promulgation of the Payday Lending Rule fall, given the agency's unconstitutional self-funding scheme? The answer turns on the distinction between the Bureau's power to take the challenged action and the funding that would enable the exercise of that power. Put differently, Congress plainly (and properly) authorized the Bureau to promulgate the Payday Lending Rule, see 12 U.S.C. §§ 5511(a), 5512(b), as discussed supra in II.A–C. But the agency lacked the wherewithal to exercise that power via constitutionally appropriated funds. Framed that way, the Bureau's unconstitutional funding mechanism "[did] not strip the [Director] of the power to undertake the other responsibilities

of his office," *Collins*, 141 S. Ct. at 1788 & n.23, but it deprived the Bureau of the lawful money necessary to fulfill those responsibilities. This is a distinction with more than a semantical difference, as it leads us to conclude that, consistent with *Collins*, the Plaintiffs are not entitled to *per se* invalidation of the Payday Lending Rule, but rather must show that "the unconstitutional . . . [funding] provision inflicted harm." *Id.* at 1788–89.

However, making that showing is straightforward in this case. Because the funding employed by the Bureau to promulgate the Payday Lending Rule was wholly drawn through the agency's unconstitutional funding scheme,[17] there is a linear nexus between the infirm provision (the Bureau's funding mechanism) and the challenged action (promulgation of the rule). In other words, without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule. Plaintiffs were thus harmed by the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue. Indeed, the Bureau's unconstitutional funding structure not only "affected the complained-of decision," *id.* at 1801 (Kagan, J., concurring in part), it literally *effected* the promulgation of the rule. Plaintiffs are therefore entitled to "a rewinding of [the Bureau's] action." *Id.*

In considering other violations of the Constitution's separation of powers, the Supreme Court has rewound the unlawful action by granting a new hearing, *see Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018), or invalidating

---

[17] It is fairly apparent that the Bureau financed its rulemaking efforts with funds requisitioned via its unconstitutional funding mechanism. *Cf. supra* n.11. A Bureau report indicates that it spent over $9 million for "Research, Markets & Regulations" during the fiscal quarter in which the rule was issued. *See* Consumer Protection Financial Bureau, CFO update for the first quarter of fiscal year 2018 (2018), https://files.consumerfinance.gov/f/documents/cfpb_cfo-update_fy2018Q1.pdf. More granular information does not appear to be publicly available, perhaps a direct consequence of the Bureau's unprecedented budgetary independence and lack of Congressional oversight.

an order, *see NLRB v. Noel Canning*, 573 U.S. 513, 521, 557 (2014); *see also* 5 U.S.C. § 706(2)(A) (providing that, under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law"). In like manner, we conclude that the district court erred in granting summary judgment to the Bureau and in denying the Plaintiffs a summary judgment "holding unlawful, enjoining and setting aside" the challenged rule. Accordingly, we render judgment in favor of the Plaintiffs on this claim and vacate the Payday Lending Rule as the product of the Bureau's unconstitutional funding scheme.

## III.

The Bureau did not exceed its authority under either the Act or the APA in promulgating its 2017 Payday Lending Rule. The issuing Director's unconstitutional insulation from removal does not in itself invalidate the rule, and the Plaintiffs fail to demonstrate cognizable harm from that injury. Nor does the Bureau's rulemaking authority transgress the nondelegation doctrine. We therefore AFFIRM the district court's entry of summary judgment in favor of the Bureau in part.

But Congress's cession of its power of the purse to the Bureau violates the Appropriations Clause and the Constitution's underlying structural separation of powers. The district court accordingly erred in granting summary judgment in favor of the Bureau and denying judgment in favor of the Plaintiffs. We therefore REVERSE the judgment of the district court on that issue, RENDER judgment in favor of the Plaintiffs, and VACATE the Bureau's Payday Lending Rule.

AFFIRMED in part; REVERSED in part; and RENDERED.