# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JUSTIN L. ROBERSON,<br><br>    Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC; EQUIFAX INFORMATION SERVICES, LLC; AND TRANS UNION LLC.<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. **FCRA, 15 U.S.C. § 1681** *et seq.* |

Plaintiff Justin L. Roberson ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* against Defendants Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and Trans Union LLC ("Trans Union") (referenced collectively as "Defendants").

## I.    INTRODUCTION

1.    Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* by the Defendants. Plaintiff contends Defendants failed to follow reasonable procedures to assure maximum

possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

## II.   <u>JURISDICTION AND VENUE</u>

2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3.     Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## III.   <u>PARTIES</u>

4.     Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5.     Plaintiff is a natural person who resides in Fairburn, Georgia.

6.     Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

7.      Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).  On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

8.      Defendant Equifax is a "consumer reporting agency, as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309.

9.      Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661.

10.     During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Georgia and conducted business in the State of Georgia on a routine and systematic basis.

11.     Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

12.     During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

13.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## IV.   FACTUAL BACKGROUND

14.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

15.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

16.     Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

17.     The FCRA is intended to ensure consumer reporting agencies ("CRAs") exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because CRAs have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

18.     Defendants, the three major consumer reporting agencies (at times referred to collectively as "the CRAs," and individually as a "CRA") in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

19.     Defendants regularly purchase and obtain consumer bankruptcy information to include in consumer reports.

20.     Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the

consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

21.     Defendants obtain consumer information from various sources. Some consumer information is sent directly to Defendants by furnishers, and other information is independently gathered by Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

22.     Defendants regularly seek out and procure consumer bankruptcy filing and discharge information, with the intention of including it in the consumer reports Defendants sell to third parties for a profit.

23.     The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

6

24.     Defendants' unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

25.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its own files.

26.     The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions.

27.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debts, payment history, and date of delinquencies contained in Defendants' reports.

28.     The information Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

29.     FICO Scores are calculated using information contained in Defendants' consumer reports.

30.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

31.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

  a.   "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower the consumer's FICO Score will be.

  b.   The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that the consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact the consumer's credit score.

32.     Lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

33.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

34.     Defendants regularly provide information that allows lenders to calculate the "total amount of debt" a consumer owes based on the total debt reported by Defendants.

35.     A consumer's income, however, is not included in his or her consumer report; only his or her "amount of debt" is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in the consumer's credit score but is a factor in credit decisions.

36.     The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for the consumer to obtain credit and favorable credit terms (e.g., higher interest rates and lower credit limits).

37.     A consumer who has obtained a bankruptcy discharge and has an account that is inaccurately reporting with outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting with a zero-dollar balance.

38.     Defendants are aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have

been reaffirmed or successfully challenged in an adversary proceeding, are discharged.

39.     However, Defendants also know that it is rare for a pre-petition debt to be reaffirmed or successfully challenged in an adversary proceeding.

40.     Further, Defendants know that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket sheet.

41.     Additionally, information indicating whether a specific debt was reaffirmed or successfully challenged through an adversary proceeding (rather than discharged) can be easily retrieved from the same sources from which Defendants independently obtain consumer bankruptcy case information.

42.     Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

43.     Despite the availability of accurate consumer information, Defendants regularly report inaccurate information about accounts after consumers receive a Discharge Order.

44.     Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about

consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

45.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendants frequently report information regarding pre-bankruptcy debts based on information they know is incomplete or inaccurate.

46.     After a bankruptcy is discharged, Defendants also routinely rely on furnisher data, even though the furnisher has ceased updating an account upon the filing of a bankruptcy and the account information is "stale" (*i.e.*, not updated by the furnisher for more than 90 days).

47.     Consequently, Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to Defendants, already included in Defendants' credit files, contained in public records that Defendants regularly access, or sourced through Defendants' independent and voluntary efforts.

48.     Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

49.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, information provided by furnishers, and data contained in Defendants' own files.

50.     Defendants also know that failing to report the effect of a discharge on consumer account tradelines, while reflecting a bankruptcy on a credit report, would reasonably be understood to declare to the world that that the consumer had been in bankruptcy but had not received a discharge of a particular account. This not only inaccurately reflects an outstanding debt, but also would reasonably suggest to a consumer and those reviewing the consumer's credit report that the consumer was guilty of a bad act for which he/she did not deserve a discharge of a particular debt.[1]

51.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

52.     Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures. More specifically, Defendants are on continued notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

---

[1] Indeed, a bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 287 (1991), and will not be provided to someone who filed bankruptcy in bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious injury. 11 U.S.C. §§ 727(a), 523(a).

*Allegations Specific to the Credit Reporting of Plaintiff by the CRAs*

53.     Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about May 18, 2022, in the United States Bankruptcy Court for the Northern District of Georgia (Case No. 22-53803).

54.     Plaintiff received an Order of Discharge on or about August 29, 2022.

55.     Thereafter, Plaintiff was not personally liable for any of his dischargeable debts. Upon entry of Plaintiff's Discharge Order, all of Plaintiff's dischargeable debts had zero-dollar balances.

56.     Defendants prepared one or more consumer reports concerning Plaintiff after he was discharged from Chapter 7 Bankruptcy.

57.     In Plaintiff's consumer reports, Defendants included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged in the Public Records section of Plaintiff's consumer reports.

58.     Defendants also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

59.     Defendants obtained notice of Plaintiff's bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data

regarding the individual tradelines reported by Defendants in Plaintiff's consumer reports.

60.   Defendants know that consumers file Chapter 7 bankruptcies to eliminate debt they cannot afford and that the "default rule" is that all debts in a Chapter 7 are discharged unless excepted by the bankruptcy code (student loans, child support, etc.).

61.   Defendants should have reported **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy and/or with a zero-dollar balance.

62.   Defendants failed to report **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 bankruptcy and/or with a zero-dollar balance.

### *Allegations Specific to Defendant Equifax*

63.   Equifax inaccurately reported Plaintiff's 1st Franklin Financial Account (the "Franklin Account"), starting with 8908**** and opened in June 2021, which pre-dated Plaintiff's bankruptcy filing.

64.   The Franklin Account was included in Plaintiff's bankruptcy and discharged on or about August 29, 2022. Therefore, the Franklin Account should have been reported as discharged in bankruptcy and/or with a zero-dollar balance.

65.     However, Equifax inaccurately reported the discharged Franklin Account as a "Charged-Off" account.

66.     Equifax did not indicate that the Franklin Account was discharged in bankruptcy or report the Franklin Account with a zero-dollar balance, despite reporting Plaintiff's bankruptcy in the public records section of Plaintiff's consumer report and reporting other pre-bankruptcy accounts as "Bankruptcy Chapter 7" and/or with zero-dollar balances.

67.     The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates that there is a balance and/or past due balance owed on the account before or after the "charge-off."

68.     The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

69.     According to Equifax, a "charge-off" means that the lender has written the account off as a loss and the account is closed to future charges; the timeframe is generally between 120 and 180 days after a consumer becomes delinquent; and a "charge-off" means that the consumer is still legally obligated to pay the debt.

15

70.     1st Franklin Financial furnished information to Equifax that indicated Plaintiff's debt was included or discharged in bankruptcy, and/or had a zero-dollar balance after the bankruptcy discharge, but Equifax rejected or otherwise overrode the data it received.

71.     Alternatively, Equifax knew from past experiences that 1st Franklin Financial furnished inaccurate information regarding discharged debts or has historically failed to employ reasonable procedures to ensure it properly updates consumer debts after a Chapter 7 Bankruptcy is discharged.

72.     Nevertheless, Equifax blindly relied on the information provided by 1st Franklin Financial even though this information conflicted with or was contradicted by information contained in Equifax's records, as well as Equifax's knowledge regarding Plaintiff's bankruptcy and discharge.

73.     Equifax's reliance on the furnisher was therefore unreasonable.

74.     Equifax inaccurately reported that Plaintiff owed a balance that he did not actually owe, and also reported inaccurate account statuses and/or payment histories.

75.     Equifax inaccurately reported the Franklin Account as a "Charge-Off" after the Franklin Account was discharged in Chapter 7 Bankruptcy and therefore had a zero-dollar balance.

76.     Equifax's reporting of the Franklin Account is patently false and therefore inaccurate.

77.     If not patently false, Equifax's reporting of the Franklin Account is materially misleading and therefore inaccurate.

*Allegations Specific to Defendants Trans Union and Experian*

78.     Defendants    Trans    Union    and    Experian    inaccurately reported Plaintiff's Regional Finance Account (the "Regional Account"), starting with   202000****   and   opened   in   April   2022,   which   pre-dated   Plaintiff's bankruptcy filing.

79.     The Regional Account was discharged in Plaintiff's bankruptcy on or about August 29, 2022.   Therefore, the Regional Account should have been reported as discharged in bankruptcy and/or with a zero-dollar balance.

80.     However, Defendant Experian inaccurately reported the discharged Regional Account as having a balance of $8,345, instead of a zero-dollar balance.

81.     Similarly,   Defendant   Trans   Union   inaccurately   reported   the discharged Regional Account as having a balance of $8,345, instead of a zero-dollar balance.

82.     Defendants Trans Union and Experian knew that the Regional Account had not been updated since prior to Plaintiff's Chapter 7 filing.

83.     Defendants Trans Union and Experian did not indicate that the Regional Account was discharged in bankruptcy or report the Regional Account with a zero-dollar balance, despite reporting Plaintiff's bankruptcy in the public records section of Plaintiff's consumer report and reporting other pre-bankruptcy accounts as having a status of "Bankruptcy," and with zero-dollar balances.

84.     The Regional Account was essentially frozen in time by Defendants based on a pre-bankruptcy balance and status on Defendant Experian's December 7, 2022 consumer report and Defendant Trans Union's December 7, 2022 consumer report. Consequently, Defendants Trans Union and Experian inaccurately reported the actual balance, status, and payment obligations on the Regional Account.

85.     Defendants Trans Union and Experian do not have reasonable procedures in place to detect and correct pre-Chapter 7 debts which continue to report balances after Defendants Trans Union and Experian report a discharge.

86.     Defendants Trans Union and Experian do not have reasonable procedures in place to detect and correct or suppress pre-Chapter 7 debts reporting balances, where Defendants Trans Union and Experian are aware that the furnisher has ceased all account updates after the bankruptcy was filed.

## *Plaintiff's Disputes to Defendants Trans Union and Experian*

87.    On or about December 13, 2022, Plaintiff sent a certified letter (the "Experian Dispute Letter") to Experian disputing Experian's inaccurate reporting of his pre-bankruptcy debts.

88.    On or about December 13, 2022, Plaintiff also sent a certified letter (the "Trans Union Dispute Letter") to Trans Union disputing Trans Union's inaccurate reporting of his pre-bankruptcy debts.

89.    The Trans Union and Experian Dispute Letters specifically advised Defendants Trans Union and Experian that they were reporting pre-bankruptcy debts with a balance despite the accounts being discharged in bankruptcy.

90.    Upon information and belief, Experian received Plaintiff's Experian Dispute Letter.

91.    Upon information and belief, Trans Union received Plaintiff's Trans Union Dispute Letter.

92.    Experian failed to correct Plaintiff's consumer report and continued to report the Regional Account as having an outstanding $8,345.00 balance and status of "Open."

93.    Trans Union failed to correct Plaintiff's consumer report and continued to report the Regional Account as having an outstanding $8,345.00 balance and an open status.

94.     Defendants Experian and Trans Union were unreasonable in failing to consider the fact that since Regional Finance ceased updating the Regional Account after Plaintiff's bankruptcy was filed, Regional Finance was an unreliable furnisher in this instance.

95.     Defendants Trans Union and Experian inaccurately reported that Plaintiff owed a balance that he did not actually owe, and also reported inaccurate account statuses.

96.     Defendants Trans Union and Experian inaccurately reported the Regional Account with a balance owed after the Regional Account was discharged in Chapter 7 Bankruptcy and therefore had a zero-dollar balance.

97.     Defendants Trans Union and Experian failed to indicate that the Regional Account had a zero-dollar balance and was discharged in Chapter 7 Bankruptcy.

98.     Defendants Trans Union's and Experian's reporting of the Regional Account is patently false and therefore inaccurate.

99.     If not patently false, Defendants Trans Union's and Experian's reporting of the Regional Account is materially misleading and therefore inaccurate.

*Plaintiff's Damages*

100.   Upon information and belief, had Defendants Trans Union and Experian accurately reported the Regional Account with a zero balance, Plaintiff's credit scores and/or DTI would have been better.

101.   Upon information and belief, had Defendant Equifax accurately reported the Franklin Account with a zero balance, Plaintiff's credit scores and/or DTI would have been better.

102.   Defendants' reporting debts which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

103.   The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

104.   The inaccurate reporting by Defendants suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the Regional Account and/or the Franklin Account.

105.   After Plaintiff's bankruptcy discharge, Plaintiff applied for two separate credit cards with Ally Financial, Inc. Although Plaintiff was approved for one of the cards, his application for the other card, which would have come with

benefits such as cash back on all purchases, was denied by Ally Financial, Inc due to the inaccurate reporting of the Franklin Account and the Regional Account.

106.   Trans Union's and Experian's inaccurate reporting of the Regional Account, along with additional information belonging to Plaintiff, was published to Ally Financial, Inc. by Defendants Trans Union and Experian during the process of Plaintiff's credit applications and/or credit offers.

107.   Equifax's inaccurate reporting of the Franklin Account, along with additional information belonging to Plaintiff, was published to Ally Financial, Inc. by Defendant Equifax during the process of Plaintiff's credit applications and/or credit offers.

108.   As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

109.   As a direct result of Defendants' inaccurate reporting, Plaintiff also suffers actual damages in the form of attorney's fees incurred and postage expenses related to Defendants' inaccurate reporting.

110.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, headaches, reputational harm, violation of privacy, humiliation,

stress, anger, frustration, shock, embarrassment, anxiety, and stress-induced panic attacks.

## V.   COUNT I
### Defendant Equifax's Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

111.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

112.   The FCRA requires CRAs, like Equifax, to maintain and follow reasonable procedures to assure the maximum possible accuracy of consumer information. 15 U.S.C § 1681e(b).

113.   Equifax negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after a consumer like Plaintiff received a Discharge Order.

114.   Equifax independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported the same in Plaintiff's consumer reports.

115.   When Equifax procured and published Plaintiff's bankruptcy information, it had an obligation to ensure it followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

116.   Equifax knew or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Equifax knew or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

117.   These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Equifax from which Equifax is on notice of its unreasonable procedures concerning the reporting of discharged debts.

118.   Additionally, Equifax possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

119.   Despite knowledge of these legal obligations, Equifax willfully and consciously breached its known duties and deprived Plaintiff of his rights under the FCRA.

120.   In this case, Equifax inaccurately reported an account that Equifax knew pre-dated Plaintiff's Chapter 7 Bankruptcy and Discharge Order, as evidenced by the information it published in Plaintiff's consumer report, including Plaintiff's bankruptcy case number, court, date of filing and date of discharge.

121.   Equifax is also on notice from other tradelines reported by Equifax that indicate Plaintiff's accounts were included in and discharged in bankruptcy.

122.   Equifax received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers.

123.   Equifax knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

124.   Yet in this case, Equifax reported the Franklin Account, which pre-dated Plaintiff's bankruptcy, as a "Charge-Off" account without any indication the account was discharged or had a zero balance.

125.   Equifax violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/report, and by also failing to report accurate information when Equifax knew or should have known the information Equifax is reporting is inaccurate, and/or otherwise contradicted by information known by Equifax, reported to Equifax, and/or reasonably available to Equifax.

126.   Equifax's violations of 15 U.S.C. § 1681e(b) were willful.

127.   Alternatively, Equifax's violations of 15 U.S.C. § 1681e(b) were negligent.

128.   Equifax's inaccurate reporting damaged Plaintiff's creditworthiness.

129.   Plaintiff suffers actual damages, including economic losses, a decreased credit score, loss of credit opportunities, credit denials, and other financial harm caused by Equifax's inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

130.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, loss of sleep, headaches, anger, frustration, shock, embarrassment, and anxiety.

131.   Equifax is a direct and proximate cause of Plaintiff's damages.

132.   Equifax is a substantial factor in Plaintiff's damages.

133.   Therefore, Equifax is liable for actual and statutory damages, punitive damages, attorneys' fees, and costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq.*

## VI.   COUNT II
### Defendants Trans Union's and Experian's Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b), 1681(i)

134.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

135.   The FCRA requires CRAs, like Defendants Trans Union and Experian, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

136.   Defendants Trans Union and Experian negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of the information they reported about Plaintiff's pre-bankruptcy debts after Plaintiff received a Discharge Order.

137.   Defendants Trans Union and Experian independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily included it in Plaintiff's consumer reports.

138.   When Defendants Trans Union and Experian voluntarily procured and reported Plaintiff's bankruptcy information, they had an obligation to follow reasonable procedures to ensure they reported the bankruptcy discharge and its effect(s) with maximal accuracy.

139.   Defendants Trans Union and Experian received notice of Plaintiff's bankruptcy discharge through public records, their own files, and information provided by data furnishers.

140.   Individual furnishers of account information also notified Defendants Trans Union and Experian of Plaintiff's bankruptcy, as evidenced by other

tradelines in Plaintiff's consumer report that are labeled as included and discharged in bankruptcy.

141.   Defendants Trans Union and Experian had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information they published in Plaintiff's consumer reports, including Plaintiff's bankruptcy case number, court, date of filing, and date of discharge.

142.   But despite knowledge of Plaintiff's bankruptcy, Defendants Trans Union and Experian inaccurately reported the Regional Account, which pre-dated Plaintiff's Chapter 7 Bankruptcy, with a status other than "Bankruptcy" and a balance greater than zero.

143.   Defendants Trans Union and Experian knew or should have known of their obligations under the FCRA, especially those pertaining to reporting discharged debt with a zero-dollar balance.

144.   These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and exemplified in prior cases involving Defendants Trans Union and Experian from which Defendants Trans Union and Experian are on notice of their unreasonable procedures concerning the reporting of discharged debts.

145.   Additionally, Defendants Trans Union and Experian possess or could easily obtain substantial written materials that detail CRAs' duties and obligations

28

under the FCRA, including those arising after a consumer files for Chapter 7 Bankruptcy.

146.   Despite knowledge of these legal obligations, Defendants Trans Union and Experian willfully and knowingly breached their duties in violation of 15 U.S.C. § 1681e(b). Accordingly, Defendants Trans Union and Experian deprived Plaintiff of his rights as a consumer under the FCRA.

147.   Not only did Defendants Trans Union and Experian have prior notice of their unreasonable procedures for reporting discharged debts, but they also possessed information from which they should have known the information reported about Plaintiff was inaccurate.

148.   Defendants Trans Union and Experian knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

149.   Defendants Trans Union and Experian know that discharged pre-petition debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

29

150.   Yet in this case, Defendants Trans Union and Experian reported the Regional Account, which pre-dated Plaintiff's bankruptcy, with a balance owed (instead of a zero-dollar balance) after it was discharged.

151.   Defendants Trans Union and Experian intentionally ignored the fact that Regional Finance ceased updating the Regional Account after Plaintiff's bankruptcy, which was unreasonable.

152.   Defendants Trans Union and Experian know that the Regional Account has not been updated since Plaintiff's Chapter 7, and that the reported balance, payment obligation, and status are therefore inaccurate, outdated, and have been superseded by Plaintiff's Chapter 7 discharge. Defendants Trans Union and Experian violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file/consumer report.

153.   Defendants Trans Union and Experian also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendants Trans Union and Experian knew or should have known the information they were reporting is inaccurate, and/or otherwise contradicted by information known by Defendants Trans Union and Experian, reported to Defendants Trans Union and Experian, and reasonably available to Defendants Trans Union and Experian.

154.   Even after Plaintiff notified Defendants Trans Union and Experian of the inaccurate information they included in Plaintiff's credit file regarding pre-bankruptcy debts, Defendants Trans Union and Experian continued to inaccurately report the Regional Account with an outstanding balance.

155.   Defendants Trans Union's and Experian's inaccurate reporting was particularly egregious because they had the ability to independently confirm that the Regional Account was discharged by reviewing their own records or accessing readily available public records.

156.   In around 2009, Defendants Trans Union and Experian implemented their own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols., Inc.,* No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

157.   Defendants Trans Union's and Experian's bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7, even when the furnisher does not update the accounts as discharged.

158.   In other words, Defendants Trans Union's and Experian's automated bankruptcy scrub assumes Trans Union's and Experian's notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendants Trans Union and Experian will override data reported

31

by a furnisher according to Defendants Trans Union's and Experian's assumptions and algorithms.

159.   However, Defendants Trans Union and Experian have intentionally chosen to disregard knowingly inaccurate open balances and payment obligations of certain types of pre-bankruptcy accounts in Defendants Trans Union's and Experian's software programming of their automated "bankruptcy scrubs" they have been employing for well over a decade.

160.   Defendants Trans Union's and Experian's violations of 15 U.S.C. § 1681e(b) were willful.

161.   Alternatively, Defendants Trans Union's and Experian's violations of 15 U.S.C. § 1681e(b) were negligent.

162.   When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information or delete the disputed information from the consumer's credit file within thirty (30) days after receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

163.   When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

164.   Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA must "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

165.   Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendants Trans Union and Experian also violated the FCRA by failing to perform a reasonable reinvestigation of his pre-bankruptcy accounts, even after Plaintiff notified them of the inaccurate information in Plaintiff's credit file.

166.   Defendants Trans Union's and Experian's violations of 15 U.S.C. § 1681i include, but are not limited to the following:

    (a) Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

    (b) Failing to consider all relevant information while investigating Plaintiff's dispute.

167.   Instead of reasonably reinvestigating Plaintiff's dispute, Defendants Trans Union and Experian continued to report the discharged Regional Account with an outstanding balance after Plaintiff's bankruptcy discharge.

168.   Defendants Trans Union's and Experian's inaccurate reporting damaged Plaintiff's creditworthiness.

169.   Plaintiff suffers actual damages, including economic losses, a decreased credit score, loss of credit opportunities, credit denials, and other financial harm caused by Defendants Trans Union's and Experian's inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the Regional Account was discharged in bankruptcy.

170.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, loss of sleep, headaches anger, frustration, shock, embarrassment, and anxiety.

171.   Defendants Trans Union and Experian are a direct and proximate cause of Plaintiff's damages.

172.   Defendants Trans Union and Experian are a substantial factor in Plaintiff's damages.

173.   Therefore, Defendants are liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681 *et seq*.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants for the following:

(a)   Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. §§ 1681e(b) and 1681i;

(b)   An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)   An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)   An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(e)   An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)   Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VIII.  <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 22nd day of February 2023.

**CONSUMER ATTORNEYS**
<u>By: s/Jenna Dakroub</u>
Jenna Dakroub
Bar Number: 385021
8245 N. 85th Way
Scottsdale, AZ 85258
Telephone: (602) 807-1525
Fax: (718) 715-1750
E: jdakroub@consumerattorneys.com
*Attorneys for Plaintiff Justin L. Roberson*