# EXHIBIT  D

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JOSEPH A. PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | _____ |
| SIFI NETWORKS AMERICA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BEN BAWTREE-JOBSON

1.      My name is Ben Bawtree-Jobson.  I am over the age of eighteen and am otherwise competent to testify to the facts set forth in this Declaration.  All statements contained in this Declaration are true and correct and are based upon my personal knowledge.

2.      I am the Chief Executive Officer for SiFi Networks America, LLC ("SiFi").  In this capacity, I am familiar with the organizational structure of SiFi.

3.      SiFi Networks America, LLC, is a Delaware limited liability company with its principal place of business in Delaware.

4.      SiFi Networks America, LLC's sole member is SiFi Networks America Limited, a private limited company incorporated under the laws of the United Kingdom with its principal place of business in London, England.

5.     As of January 27, 2023, the date the above-captioned lawsuit was filed, and as of the date of this Declaration, SiFi has no members that are citizens of the state of Georgia.

6.     Attached as Exhibit 1 to this Declaration, is a true and accurate copy of the Employment Agreement between SiFi and Plaintiff.

7.     Attached as Exhibit 2 to this Declaration is a true and accurate copy of the demand letter, sent by Plaintiff's counsel to me on or around November 29, 2022.

8.     I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on February 22, 2023 in the United States.

_____
Ben Bawtree Jobson

# EXHIBIT 1



## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made as of October 4, 2021 between SiFi Networks America LLC, a Delaware limited liability company ("Company"), and Joseph A. Patton, an individual residing at 730 Fowler Mill Road, Bogart, GA 30622 ("Employee" or "you").

WHEREAS, Company desires to employ Employee in the position of a President of Wholesale Sales and Employee desires to be employed by Company in such capacity;

NOW THEREFORE, the parties agree as follows with the intent to be legally bound.

1.    Employment.   Company hereby employs Employee, and Employee accepts employment with Company, upon the terms and subject to the conditions set forth in this Agreement.

2.    Start Date: Employee will commence employment with Company on NOvember 1, 2021 ("Start Date"). *Immigration*: Before and in order to start work, Employee must provide acceptable documentation of identity and authorization to work in the USA.

3.    Position and duties.   Your title will be President of Wholesale Sales, reporting to the CEO, and you will work remotely, attending meetings at SiFi offices as necessary to meet with members of the team. Your primary role will be to develop a highly successful team to secure new clients for the Company and its affiliates and subsidiaries and nurture existing clients to maximize revenue generating opportunities across Company's and its affiliates' and subsidiaries' assets. Your title, reporting relationships, and duties and responsibilities may be changed from time to time in the discretion of management.

4.    Compensation and Benefits.

    a.    Base Compensation. Employee's annual base salary will be two hundred, fifty thousand dollars ($250,000)  ("Base Compensation") payable monthly on a prorated basis on the last day of each calendar month  in accordance with Company's general payroll practices minus withheld taxes and appropriate payroll deductions.

    b.    Incentive Compensation. In addition to the Base Compensation, you will receive commission ("Commission") based on the closing of customer contracts as follows:
        i.        Two one-hundredths of one percent (0.02%) of aggregate customer contract monthly revenue multiplied by the total term (in months) until the earlier of (x) customer contract expiration, or (y) the date of the customer's first fixed termination right for convenience under such customer contract.
        ii.   Commission is paid at the end of the fiscal quarter during which it was earned.
        iii.  You shall be included upon your starting date in the Keyman bonus program which in general, provides for the pro rata sharing of one percent (1.00%) of the profit generated from a sale event of the business between those in the Keyman bonus

SiFi Networks America, LLC 103 Foulk Road, Suite 500, Wilmington, DE 19803
www.sifinetworks.com

program at such time, provided you do not resign or are terminated for cause or voluntarily terminate your employment prior to any such event.

    c.    <u>Benefits</u>.

    iv.  Employee will be given fifteen (15) days Paid Time Off, exclusive of Federal Holidays.

    v.  Employee will be entitled to Paid Sick Leave in accordance with applicable federal law and the laws of the state of the Employee's primary residence.

    vi.  The Company is investigating company healthcare plans, which Employee will be given the option to transfer into once this is established. In the interim, healthcare insurance premium expenses can be reimbursed up to One Thousand Five Hundred Dollars ($1,500) per month.

    vii.  In the event Company implements a 401(k) plan, you shall be entitled to a monthly contribution from the Company in the amount of One Thousand, One Hundred Dollars ($1,100).

    viii.  Up to two (2) round-trip tickets to fly from the USA to the UK once per annum may be provided by the Company.

5.    <u>Expense Reimbursement</u>

    The Company will reimburse Employee for all reasonable and necessary business expenses Employee incurs in the course of performing Employee's duties and responsibilities, including reimbursement at the IRS rate for all authorized business miles driven in Employee's own vehicle, provided Employee submits adequate supporting documentation for all such expenses.

6.    <u>Term and termination</u>.

    a.    <u>Employment at-will</u>.  Employee acknowledges and agrees that no provision contained in this Agreement will entitle Employee to remain in the employ of Company or affect the right of Company to terminate Employee's employment hereunder at any time for any reason.  In the event Company terminates Employee without cause but for convenience, Employee shall continue to be paid any earned but unpaid Commission and Base Compensation for a period of up to but not exceeding twenty-four (24) months from the Start Date. There shall be a three hundred and sixty (360) day notice period for any termination for convenience.

    b.    <u>Duration</u>.  The term of Employee's employment with Company shall continue from the date hereof without interruption until the earlier event of (i) termination by Company or (ii) Employee's resignation, death, or permanent disability.

    "Permanent disability" means a physical or mental disability which, in the reasonable and in good faith determination of the Company, renders the Employee unable to perform the duties of Employee's position for more than one hundred eighty (180) days total in any twelve (12) month period.

    c.    <u>Termination in other circumstances</u>.  If Employee's employment with Company is terminated as a result of Employee's resignation, death, or permanent disability, or by Company for "Cause,"; Employee or Employee's estate, as the case may

be, will be entitled to receive Employee's base salary, Commission earned through the termination date, and benefits through the date of termination and Employee's right to receive any other compensation or benefits hereunder will terminate as of the date of such termination.

7.  Confidential information.

a.  Company information.  Employee agrees that at all times of Employee's employment and thereafter, to hold in strictest confidence, and not to use (or attempt to use), except for the benefit of Company, and not to disclose to any person or entity without written authorization of Company, any Confidential Information of Company.

"Confidential Information" means any and all confidential or proprietary knowledge, data, or information of the Company whether having existed, now existing, or to be developed during Employee's employment.  By way of illustration but not limitation, Confidential Information includes (a) trade secrets, inventions, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and any other proprietary technology and all proprietary rights therein; (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including their identities, customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company, and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of Company could use to the competitive disadvantage of Company.  Employee further understand that Confidential Information does not include any of the foregoing items that have become publicly known and made generally available publicly through no wrongful act of the Employee.

b.  Promptly after termination of Employee's employment with Company for any reason, Employee or Employee's personal representative shall return to Company, or at Company's option destroy, any confidential information which is in tangible form (including all memoranda, notes, drawings, drafts, plans, records, reports, computer files, disks, tapes, printouts, software, and all other documents and data constituting, containing, or otherwise relating to any confidential information) and which is then in Employee's possession or control.

SiFi Networks America, LLC 103 Foulk Road, Suite 500, Wilmington, DE 19803
www.sifinetworks.com

8.    <u>Non-Solicitation of clients and employees; non-competition.</u>  Employee agrees that Employee shall not, during Employee's employment with Company and for the longer period of (i) as long as Employee receives compensation from the Company or (ii) twelve (12) months, in each case immediately following the termination of Employee's employment with Company for any reason (whether voluntarily or involuntarily), either directly or indirectly, on Employee's behalf or in the service or on behalf of others:

a.    Solicit any client or customer to transact business with a competitive enterprise or to reduce or refrain from doing any business with Company, or (ii) interfere with or damage (or attempt to interfere with or damage) any relationship between Company and a client or customer, and Employee shall not contact or approach any person or entity for either purpose or authorize or knowingly approve the taking of such actions by any other person or entity; or

b.    Solicit any employee of Company (whether or not such person is a full-time employee and whether or not such employment is at-will or contract-based) to leave their employment with Company, to become employed or engaged by any other person or entity, or to engage in any activity that would cause any such employee to violate any agreement with Company, and Employee shall not approach any such employee for such purpose or knowingly approve the taking of such action by any other person or entity; or

c.    Whether alone or in conjunction with any other person or entity, or as a partner, officer, director, consultant, agent, employee, stockholder, manager, or member, directly or indirectly engage in any business or activity involving in any manner last-mile fiber optic deployment conducted or operated in the continental United States, or any other location where Company, any subsidiary of Company, or any other Company affiliate is conducting business or actively planning to conduct business.

For purposes of this Section 8, "solicit" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging, or requesting any person or entity in any manner to take or refrain from taking any action.

For purposes of this Section 8, a "client" or "customer" means (a) any person or entity which at the time of determination is, or was within two (2) years prior to such time, a person or entity with whom Company had a client, customer, municipality, local government or regulatory entity or other strategic relationship (whether or not such strategic relationship has been memorialized in a writing), or (b) any person or entity which at the time of determination (i) had contacted or had been contacted (within the previous six (6) month period) by Company regarding the purchase or installation of Company's products or services, or (ii) who became known to Employee in connection with Employee's relationship with or employment by Company, as a prospective client or customer of Company.

Employee acknowledges and agrees that Company may provide a copy of this Section 8 to any person or entity (a) which Employee may directly or indirectly own, manage, operate, finance, join, control, or participate in the ownership, management, operation, financing, or control of, or (b) with which Employee may be connected as an officer, director, manager, member, employee, partner, principal, agent, representative, consultant, or otherwise, or in connection with which Employee may use or permit Employee's name to be used; provided, however, that this provision shall not apply after expiration of the time periods set forth herein or with respect to any activities,

persons, or entities excluded by the terms hereof. Employee agrees to provide the names and addresses of any of such person or entity as Company may request from time to time.

9. Representations and warranties of Employee. Employee represents and warrants to Company that Employee's employment with Company and the signing and delivery of this Agreement, and the fulfillment of the terms of this Agreement, (a) will not constitute a breach of any agreement or other instrument to which Employee is a party or by which Employee is legally bound, and (b) does not require the consent of any person or entity. Employee further represents, acknowledges, and agrees that Employee's employment with Company resulted solely from Employee's decision to contact Company directly regarding potential employment, and not from any prior contact by Company to Employee while Employee was employed by Employee's former employer. Employee agrees that Employee will not contact any employee of Employee's former employer for the purpose of inducing or soliciting such employee to become an employee of Company, and that if Employee is contacted by an employee of Employee's former employer regarding potential employment with Company, Employee will not engage in any discussion of potential employment other than to notify the employee of the requirements imposed upon him by this Agreement and to refer such employee to the person in charge of hiring personnel at Company.

10. Notices. All notices, consents, requests, demands, and other communications required or permitted hereunder (a) will be in writing; (b) will be sent by messenger, certified or registered U.S. mail, or a reliable express delivery service (with a copy sent by one of the foregoing means), charges prepaid as applicable, to the appropriate address(es) set forth below; and (c) will be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by a receipt executed by the addressee (or a responsible person in Employee's home or office), the records of the person delivering such communication or a notice to the effect that such addressee refused to claim or accept such communication, if sent by messenger, U.S. mail, or express delivery service. All such communications will be sent to the following addresses, or to such other addresses as any party may inform the others by giving five (5) business days' prior notice:

If to Company:                        If to Employee:

SiFi Networks America, LLC            Joe Patton
103 Foulk Road, Suite 500             730 Fowler Mill Road
Wilmington, DE 19803                  Bogart, GA 30622
NOTICES@SiFiNetworks.com              Cell: (678) 523-0341
                                      Email: joepatton7@gmail.com

11. Miscellaneous. This Agreement (a) may be amended only by a writing signed by each of the parties; (b) may not be assigned, pledged, or otherwise transferred by Employee, whether by operation of law or otherwise; (c) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (d) contains the entire agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (e) will be governed by, and construed and enforced first in accordance with the laws of the State of Delaware or if the State of Delaware law is not applicable then the laws of the state of Employee's primary residence, in either case without giving effect to any conflict of law rules of the applicable state law; and (f) is binding upon, and will inure to the benefit of, the parties and their respective heirs, successors, and permitted assigns.

12. No waiver. The waiver by a party of any breach or violation of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach or violation

hereof.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such provision will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.   More specifically, if any court determines that any of the covenants set forth in Section 8 are overbroad under applicable law in time, geographical scope, or otherwise, the parties to this Agreement specifically agree and authorize such court to rewrite this Agreement to reflect the maximum time, geographical, and/or other restrictions permitted under applicable law to be reasonable and enforceable.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SIFI NETWORKS AMERICA, LLC

_____
Ben Bawtree-Jobson, CEO

10/4/2021

_____
Joseph A. Patton, Employee

10/4/2021

# EXHIBIT 2



3562 Habersham at Northlake
Building J, Suite 200
Tucker, Georgia 30084

Tel:  (404) 373-4008
Fax:  (888) 709-5723
Poolehuffman.com

November 29, 2022

**BY CERTIFIED MAIL, FIRST-CLASS MAIL, AND E-MAIL**
legal@sifinetworks.com

SiFi Networks America, LLC
Attn: Ben Bawtree-Jobson, CEO
103 Foulk Road
Suite 500
Wilmington, DE 19803

    **Re:**   **Notice of representation of Joseph Patton, demand, and notice to preserve evidence**

Dear Mr. Bawtree-Jobson:

    We are writing to you on behalf of our client, Joseph Patton, who was terminated from his position with SiFi Networks America, LLC ("SiFi"), on or about July 22, 2022. We are writing to advise you of our client's demand for payment and, if a resolution is not reached, intent to pursue claims against your company for breach of contract, fraudulent inducement, and related damages.

    As you know, on October 4, 2021, our client signed an employment contract with SiFi, and officially started working with SiFi on November 1, 2021. A copy of the signed contract is attached as Exhibit 1. As you also know, Mr. Patton left a prior position where he was very well compensated and had exceptionally good benefits. Mr. Patton made the move to SiFi based on certain promises and representations from you and your company about its business, its plans for the future, the commissions structure, and other related matters. One of the representations was that Mr. Patton would be designated in the "key man" group, estimated at a value of about $1,000,000, to entice him to leave the roughly $750,000 in stock and options he had been offered by his previous employer. Of course, Mr. Patton was never compensated as a member of the key man group during his time of employment with SiFi.

    Of particular importance here, Mr. Patton was told—and SiFi has claimed in its marketing materials, web site, and in public appearances by management—that

SiFi owned all the assets that it was engaged in the business of installing in the United States, but this representation turned out to be entirely false. Instead, SiFi apparently would negotiate a contract with a municipality to install the networks' infrastructure, and then recruit a third-party funding company to provide financial backing for the project, which we understand was primarily APG, the largest pension fund in Europe. Sifi's process was then to spin off a single purpose entity to own the assets, which would in turn be wholly owned and controlled by the funding company, *not* by SiFi, who would merely provide ongoing management under a services contract. SiFi therefore knew that it did not own the assets, and its intentional, fraudulent misrepresentation to Mr. Patton about its ownership of the physical assets of the networks was designed to induce him to leave his prior position and join SiFi.

In addition to the above, shortly after joining SiFi, Mr. Patton realized that there were significant challenges with current staff, especially George Tempelman. Ms. Tempelman was apparently exceptionally difficult to work with and caused a lot of problems for Mr. Patton and his sales team. She was so bad for ongoing business operations that Mr. Patton recommended that she be terminated. However, instead of termination, Ms. Tempelman was *promoted*—to Mr. Patton's position—shortly after SiFi terminated Mr. Patton without justification. Another issue that Mr. Patton brought to management's attention was the potential conflict and related legal issues involved in the creation of Maven, a new company controlled by SiFi owner Mike Harris, who we understand was involved in a relationship with Ms. Tempelman. Moreover, within a few weeks of Mr. Patton's termination a contract that his team had been working diligently to close with WISP.net was completed, and within a few months of his termination SiFi closed the T-Mobile contract, which his team had also been aggressively pursuing. Had Mr. Patton not been terminated, he would have stood to receive a commission on both deals estimated at about $250,000.

We have reviewed your termination letter to Mr. Patton and do not find its allegation that he was being terminated with cause to be credible. Mr. Patton received only limited critiques while he worked for SiFi, and performed all tasks asked of him inside and outside the contract, except for one request—setting certain targets for his personnel, which he responded to with a rationale as to declining to do so for some members of his team. Mr. Patton was prepared to discuss that rationale on multiple occasions, but senior leaders failed to attend scheduled calls for that purpose. He was never the subject of any adverse

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 3 of 8

disciplinary investigation or decision. Mr. Patton certainly never received any significant feedback about performance being not up to par, and it certainly cannot be said that the closing of the two deals shortly after his termination was not the result of Mr. Patton and his team's work over the prior months. Mr. Patton's concerns that he brought to management about the startup of Maven, as well as Ms. Tempelman's personal relationship with Mr. Harris and her inability to work with Mr. Patton, appears to have been the catalyst for SiFi's desire to remove him and promote her, along with the effect of eliminating Mr. Patton's commission interests.

On behalf of Mr. Patton, we are authorized to demand a lump sum payment of **$1,312,500** in full and final settlement of all of Mr. Patton's claims against SiFi. This figure represents salary compensation for Mr. Patton from the date of termination through the end of the contract on November 1, 2023, an estimated $250,000 in commissions from the two contracts that were closed shortly after his wrongful termination by SiFi, and $750,000 in additional damages related to the lost benefits Mr. Patton was fraudulently induced to leave behind. If SiFi refuses to resolve Mr. Patton's claims, we will file a lawsuit against the company for breach of contract and fraud and seek to recover all the above damages plus additional damages for legal fees, punitive damages, and other costs.

Concurrent with this demand, we are notifying you of SiFi's obligation to preserve documents, tangible things, and Electronically Stored Information ("ESI") potentially relevant to the issues in this matter, including but not limited to all communications between and among SiFi employees, managers, directors, investors, and any third parties, for the period August 1, 2021, through the present. As you know, this is commonly referred to as a "litigation hold." As used below, "You" means SiFi, as well as any affiliated entities, and their predecessors, successors, parents, subsidiaries, divisions and affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions.

You must act immediately. Much of the information subject to disclosure or responsive to discovery in this matter is stored on Your current and former computer systems and other media and devices—including personal digital assistants, voice-messaging systems, online repositories and cell phones. ESI should be afforded the broadest possible meaning and includes—by way of

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 4 of 8

example and not as an exclusive list—potentially relevant information
electronically, magnetically, optically, or otherwise stored as:

- Digital communications (e.g., e-mail, voice mail, instant messaging);
- E-Mail Server Stores (e.g., Microsoft Exchange .EDB or .PST)
- Word processed documents (e.g., Word files and drafts);
- Spreadsheets and tables (e.g., Excel worksheets);
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data);
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Sound Recordings (e.g., .WAV and .MP3 files);
- Video and Animation (e.g., .AVI and .MOV files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data; and
- Backup and Archival Files or Tapes (e.g., Veritas, Zip, .GHO).

ESI resides not only in areas of electronic, magnetic, and optical storage
media reasonably accessible to You, but also in areas You may deem not
reasonably accessible. You are obliged to preserve potentially relevant evidence
from all sources of ESI, even if you do not anticipate producing such ESI.

You should cease and desist any document management practice that would
destroy information relevant to this case, including, but not limited to, server
backup tape rotation; purging of email repositories by age, capacity or other
criteria; using encryption utilities or devices; electronic data shredding; scheduled
destruction of back up media; overwriting, erasing, re-imaging or destruction of
drives; drive hardware exchanges; sale, gift or destruction of computer systems;
running antivirus and other metadata destruction utilities; and disk defragmentation
and maintenance routines. You must act immediately to preserve potentially
relevant documents and ESI, including, without limitation, information with the

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 5 of 8

earlier of a Created or Last Modified date on or after August 1, 2021 through the present.

Preservation requires action. Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence it contains and constitute unlawful spoliation of evidence.

Document and ESI preservation is the obligation of each and every custodian of documents. You must preserve all documents and ESI relevant to the matters in this action.

The demand that You preserve both accessible and inaccessible ESI is reasonable and necessary. When discovery begins, You will be required to identify all sources of ESI it declined to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may order production of the ESI, even if it is not reasonably accessible. Accordingly, You must preserve ESI that it deems inaccessible so as not to preempt the court's authority. As an appropriate and cost-effective means of preservation, You should remove from service and securely sequester the systems, media, and devices housing potentially relevant ESI of the people involved in the subject matter of this letter.

In the event You deem it impractical to sequester systems, media, and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices of those named above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. "Forensically sound ESI preservation" means duplication of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete image of the original. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including deleted evidence within "unallocated

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 6 of 8

clusters" and "slack space." Failure to use such methods poses a significant threat of spoliation and data loss. Be advised that a conventional copy, backup or "Ghosting" of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data existing in, e.g., unallocated clusters and slack space.

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained—i.e., native format. Accordingly, You should preserve ESI in such native forms, and You should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields. Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files.

With respect to servers used to manage e-mail—e.g., Microsoft Exchange—and network storage, often called a "network share," the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server. If You are uncertain whether the preservation method it plans to employ is one that we will accept as sufficient, please immediately contact me.

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 7 of 8

Though we expect that You will act immediately to preserve data on office workstations and servers, You should also determine if any home or portable systems or devices may contain potentially relevant data. To the extent that You have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, You must preserve the contents of systems, devices and media used for these purposes, including not only potentially relevant data from portable and home computers, but also from portable USB drives, CDR/DVD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage. Similarly, if You used online or browser-based e-mail accounts or services—such as Gmail, Yahoo Mail or the like—to send or receive potentially relevant messages and attachments, the contents of these account mailboxes, including Sent, Deleted and Archived Message folders, should be preserved.

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like. You must preserve passwords, keys, and all other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI.

Paper preservation of ESI is inadequate. As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, You should preserve both forms.

Nothing in this demand for preservation of ESI should be understood to diminish Your concurrent obligation to preserve documents, tangible things and other potentially relevant evidence.

We are willing to work with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved. Alternatively, if you promptly disclose the preservation protocol You intend to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not

SiFi Networks, LLC
Mr. Ben Bawtree-Jobson
November 29, 2022
Page 8 of 8

currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to the court.

We are available to discuss reasonable preservation steps. You should not, however, defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions. Please confirm that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

We look forward to your response to this demand on or before December 30, 2022.

Best regards,

Todd J. Poole

Attachments