UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHARLES CROCKETT,

  Plaintiff,

-VS-

EQUIFAX INFORMATION
SERVICES, LLC

  Defendant.

_____/

CASE NO.:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, CHARLES CROCKETT, sues Defendant, EQUIFAX INFORMATION SERVICES, LLC ("Equifax") and alleges the following:

### Introduction

1. This is an action alleging Defendant violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (FCRA) by producing and selling credit reports inaccurately reporting Plaintiff as "deceased", and thereby failing to follow policies and procedures to ensure the maximum possible accuracy of the credit report it produced and sold.

2. The FCRA creates a private right of action against a consumer reporting agency for the negligent, 15 U.S.C. § 1681o, or willful, 15 U.S.C. § 1681n, violation

1

of any duty imposed by the FCRA. *Alexander v. Certegy Check Servs.*, No. 8:16-CV-859-17JSS, 2016 U.S. Dist. LEXIS 180072, at *5 (M.D. Fla. Dec. 29, 2016) (*citing Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir. 2015)).

3.Plaintiff seeks entry of judgment, actual damages, statutory damages, punitive damages, costs, and attorneys' fees. 15 U.S.C. §§ 1681n and 1681o.

## Jurisdiction, Venue and Parties

4.Jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

5.The Plaintiff is a natural person and resident of Franklin County in the State of Ohio. He is a "consumer" as defined by 15 U.S.C. § 1681a(c).

6.Venue is proper in this District as Equifax's principal address is in this District, Equifax transacts business within this District, and most of the violations described in this Complaint occurred in this District.

7.Equifax is a corporation headquartered at 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.

8.Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). Equifax is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

9. Equifax disburses such consumer reports to third parties under contract for monetary compensation.

**Factual Allegations**

10. Plaintiff believes that at least since January of 2019, Equifax has marked Plaintiff as "deceased" on his Equifax credit report.

11. Plaintiff learned about the "deceased" reporting and when around December of 2022, Plaintiff attempted to secure credit for a loan. During the application process he was denied for a deceased notation on his credit file.

12. Shortly thereafter, Plaintiff called Equifax to dispute the reporting and to inform them he believed they were mixing him up with his deceased father Charles Leroy Crockett.

13. Plaintiff obtained a copy of his Equifax credit report dated December 20, 2022. Upon review of his Equifax credit report, Equifax continued to report him "deceased" with a date of death being March 1, 2009.

14. Oddly enough, Plaintiff's other account was contradictorily reporting Plaintiff as being alive and "pays on time."

15. It is hard to understand how Equifax could report an individual as both "deceased" and paying his credit account on time, as this clearly makes no sense and

is *per se* inaccurate. Plaintiff believes he was denied a Citibank line of credit on May 24, 2021.

16. As a result of the major inaccuracy continuing to be on his Equifax credit report, on December 29, 2022, Plaintiff mailed a detailed written dispute letter to Equifax concerning the inaccurate reporting. Plaintiff made Equifax aware that he believed the Defendant was mixing him up with his deceased father, Charles Leroy Crockett who passed away on March 1, 2009. Plaintiff included an image of his driver's license to confirm his identity. Additionally, Plaintiff included images of his electrical bill with AEP Ohio, showing his name on the bill and payments being made on the account. Further, Plaintiff provided a copy of his father's death certificate.

17. Plaintiff mailed his detailed dispute letter to Equifax via USPS Certified Mail 70211970000128476410.

18. After disputing over the phone and mailing a written dispute letter, Plaintiff received an undated postcard in the mail from Equifax stating, "We have removed the death notice on the credit file."

19. Leery in trusting Equifax, Plaintiff obtained his Equifax credit report on January 27, 2023. Upon his review, Equifax was no longer reporting him as "deceased".

20. During the relevant time period Plaintiff was denied the ability to obtain credit.

21. Equifax had good reason to know that Plaintiff was not "deceased". Equifax was also aware that Plaintiff was making on-time payments for his other open line of credit with non-parties Huntington National Bank during the relevant time.

22. Despite this, Equifax willingly chose to continue reporting that Plaintiff was "deceased" when Equifax fully knew he was alive.

23. As a result of Equifax's conduct, Plaintiff has suffered damages in the form of denial of applying for credit, credit defamation, personal defamation, and emotional distress including but not limited to anger, worry, frustration, embarrassment, fear, and sleeplessness. Plaintiff has been physically affected by Equifax's misreporting.

## COUNT I
**Violation of the Fair Credit Reporting Act as to Defendant Equifax**

24. Plaintiff re-alleges and reincorporates paragraphs 1 through 23 above.

25. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff. Despite Equifax believing that Plaintiff was dead, it published his

credit report (containing the "customer deceased") to furnishers. Moreover, Equifax has records of timely payments on his open account. No other furnisher ever reported to Equifax that Plaintiff was deceased. Moreover, Equifax while reporting Plaintiff as deceased, it also was reporting that Plaintiff opened a new account with Huntington National Bank on May 30, 2021. Equifax also sold Plaintiff's credit report to Citibank on May 24, 2021, while reporting Plaintiff as deceased.

26. The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

27. The FCRA requires that Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b. Equifax, despite having access to the Social Security Death Index, it refuses to cross-check individuals for accuracy of deceased reporting.

28. Equifax places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

29. Equifax does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the

consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

30. Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

31. Indeed, Equifax employs no procedures at all which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

32. Even in instances where other data on the face of the consumer's report indicates that he is not deceased, Equifax employs no procedures which assure that a consumer with a "deceased" mark on his report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

33. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

34. Equifax has received and documented thousands of disputes from consumers complaining that Equifax's credit reports have them erroneously marked as "deceased."

35. Nevertheless, Equifax employs no procedures which assure that a consumer marked as "deceased" on Equifax's reports is, in fact, deceased.

36. Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

37. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

38. For years after a consumer's actual death, Equifax will continue to sell for profit credit reports about that consumer.

39. Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

40. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

41. Equifax profits from the sale of reports on the deceased.

42. Equifax has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

43. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed,

identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

44. Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

45. Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

46. Indeed, Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

47. For consumers who are deceased, there exists no permissible purpose under the FCRA for Equifax to ever sell their credit reports, absent a court order.

48. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer,

information that can be used to commit identity theft or for other fraudulent purposes.

49. At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

50. At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein. Equifax's conduct, action and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n. In the alternative, it was negligent entitling Plaintiff to recover actual damages under 15 USC § 1681o. Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681n and/or § 1681o.

WHEREFORE, Plaintiff respectfully requests that this Court award statutory, actual and punitive damages against Equifax to Plaintiff, award Plaintiff her attorney fees and the costs of this action pursuant to 15 U.S.C. § 1681n and/or § 1681o; and grant all such additional relief as the Court deems appropriate.

**DATED** this 28th day of February 2023.

                                            Respectfully submitted,

                                            **/s/Octavio Gomez**
                                            Octavio "Tav" Gomez
Florida Bar #:0338620
Georgia Bar #: 617963
Pennsylvania #: 325066
The Consumer Lawyers PLLC
412 E. Madison St, Ste 916
Tampa, FL 33602
Cell: (813)299-8537
Facsimile: (844)951-3933
Primary Email: Tav@theconsumerlawyers.com
Secondary Email: Lisa@theconsumerlawyers.com
*Attorney for Plaintiff*