IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ELQUINTON DENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO: |
| v. | ) | _____ |
| | ) | |
| EXPERIAN INFORMATION | ) | |
| SOLUTIONS, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

# COMPLAINT

PLAINTIFF ELQUINTON DENSON files this Complaint and states as follows:

1. In February 2023, Mr. Denson was applying for credit so that he could pay for essentials to support his family, among other things. For much of that time, Defendant Experian Information Solutions, Inc. ("Experian") was reporting Mr. Denson as "deceased" on his credit reports. But Mr. Denson was not deceased.

2. By reporting Mr. Denson as "deceased," Experian made it nearly impossible for him to access loans or other credit because "deceased" consumers have no credit scores.

3. Making matters worse, when Mr. Denson disputed the "deceased" reporting on February 10, 2023, Experian sent him dispute results that same day, but failed to correct the erroneous "deceased" notation.

4. Mr. Denson brings this action against Experian for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b) as Defendant regularly conducts business in this district and division and a substantial part of the events giving rise to the claims occurred in this district and division.

7. Defendant has contracted to supply services or things in Georgia. It sells consumer reports in Georgia and produces consumer reports on Georgia residents. It also gathers and maintains substantial public records data from Georgia.

## PARTIES

8. Mr. Denson is a resident of Georgia. He is a natural person and a "consumer" as protected and governed by the FCRA, 15 U.S.C. § 1681a(c).

9. Defendant is a consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

### Defendant's Practices

10. The FCRA requires that when a CRA prepares a credit report, it must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

11. As part of the requirement to follow reasonable procedures to assure maximum possible accuracy, the Federal Trade Commission has instructed that CRAs must maintain procedures to avoid reporting information with "obvious logical inconsistencies." *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations*, Federal Trade Commission, 2011 WL 3020575, at *61 (2011).

12. This includes, for example, a requirement that CRAs should establish procedures to avoid reporting information from its furnishers that appears "implausible or inconsistent." *Id.*

13. One of the most harmful types of credit reporting inaccuracies occurs where CRAs report that a living consumer is deceased.

14. Defendant places a "deceased" notation on consumers' reports when it is advised from any of its many data furnishing sources that a consumer is deceased.

15.     The furnishing sources identify "deceased" consumers by marking the status of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro 2.

16.     Defendant does not request or require a death certificate from any of its data sources that advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

17.     Defendant does not request or require any proof from any data source that advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

18.     Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

19.     Defendant recognizes that the "deceased" notification is a very unusual note on a credit file.  This is especially true where other creditors are not reporting the consumer as deceased, and instead are reporting that the consumer is actively participating in the credit markets.

20.     In some cases, Defendant, to assure accuracy, sends letters and/or other communications to consumers when suspicious or unreliable information is furnished about such consumers to be placed in their credit files, such as when

consumers have a freeze or fraud alert on their report, or in accordance with certain state laws.

21.     Defendant has no similar procedure to notify consumers (or next of kin or executors or administrators of the consumer's estate) when an "X" deceased code is furnished to Defendant by a furnisher to be placed in the consumer's credit file.

22.     Defendant regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased.

23.     Defendant does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased by a furnisher is also on the Death Master File before selling a credit report about such consumer, or at any time.

24.     Defendant only uses the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

25.     Defendant does not apply any procedures whatsoever to assure that a consumer with a "deceased" mark on his/her report as a result of a furnisher reporting an "X" code is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

26.     Defendant does not apply any procedures whatsoever to reconcile obvious illogical and inconsistent information where one data furnisher reports a consumer as deceased, but the consumer's other creditors report open and active account activity.

27.     In other words, even where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not apply any procedures that assure a consumer with a "deceased" mark on his/her credit report is, in fact, deceased before placing the "deceased" status on that consumer's file.

28.     Even when the purportedly deceased consumer communicates directly with Defendant, Defendant still applies no procedures to assure that the consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" status on that consumer's file.

29.     Even consumers who dispute the erroneous "deceased" status on their Defendant credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

30.     Defendant has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report.

31. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, or other proofs of death, before accessing the deceased consumer's credit information or report.

32. Defendant has no similar death certificate, executorship paper, or any other proof requirement for their data sources which report a consumer as deceased.

33. Once a "deceased" mark is placed on a consumer's file, Defendant will not calculate and will not provide a credit score for that consumer. Essentially, the "deceased" status code entirely shuts down a consumer's credit file.

34. Defendant knows that its procedures, or lack thereof, are causing inaccurate credit reports that report living consumers as deceased.

35. Defendant knows that living consumers are turned down for credit specifically because it reports them as "deceased."

36. Defendant has long been on notice that its procedures for ensuring the maximum possible accuracy of the "deceased" status code are inadequate.

37. For more than a decade Defendant has faced numerous lawsuits due to it falsely reporting that consumers are deceased.

38. In 2015, Defendant entered into a settlement with a multistate group of Attorneys General where it agreed to develop best practices for identifying and

preventing inaccurate reporting when a consumer disputes a report stating that he/she is deceased.

39. Despite this settlement agreement, Defendant continues to repeatedly falsely label living consumers as deceased.

40. Defendant has received thousands of disputes from consumers who dispute that Defendant falsely labeled them as deceased.

41. Despite federal law, FTC guidance, government enforcement actions, numerous lawsuits, and thousands of consumer disputes, Defendant continues to falsely label consumers as deceased, including Plaintiff.

### Plaintiff's Experience

42. In February 2023, Mr. Denson learned that Defendant had been labeling him as "deceased," and it had been doing so since January 2023.

43. Plaintiff is not deceased.

44. Defendant knew, or should have known, that Plaintiff was not deceased.

45. For example, many of Plaintiff's creditors were reporting to Defendant that Plaintiff had active credit accounts.  Deceased individuals typically do not have active credit accounts.

46. Moreover, Plaintiff had received no death certificate for Plaintiff, nor was Plaintiff listed in the Social Security Administration's Death Master File.

47. At a minimum, Defendant had conflicting information in its possession showing Plaintiff was not deceased when it labeled him as deceased.

48. On February 10, 2023, Plaintiff contacted Defendant to dispute the inaccurate "deceased" notation.

49. Defendant received Plaintiff's dispute.

50. Upon information and belief, Defendant conducted a reinvestigation of its "deceased" notation.

51. On the same day Plaintiff disputed, Defendant informed Plaintiff that it had completed its reinvestigation.

52. Unfortunately for Plaintiff, Defendant failed to correct the "deceased" notation at that point.

53. As a result of its failure to correct the erroneous "deceased" notation, Experian caused Plaintiff significant damage.

54. As just one example, on or about February 14, 2023, Defendant furnished a consumer report to JPMCB that reported Plaintiff as "deceased."

55. As another example, Defendant furnished a consumer report to Bank of America that reported Plaintiff as "deceased."

56. Both potential creditors denied Plaintiff's applications.

57. As a result of Defendant's failure to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer actual damages, including

economic loss, lost opportunity to receive credit, damage to reputation, reduction in credit score, invasion of privacy, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

## FIRST CLAIM FOR RELIEF

### (15 U.S.C. § 1681e(b))

58. Plaintiff realleges Paragraph Nos. 1-57 as if fully set forth herein.

59. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports furnished regarding Plaintiff.

60. Defendant furnished inaccurate reports about Plaintiff stating that he was deceased, when he was not deceased.

61. Before issuing reports stating that Plaintiff was deceased, Defendant possessed information showing that he was not deceased.

62. Before issuing reports stating that Plaintiff was deceased, Defendant could have taken reasonable steps to verify the accuracy of the "deceased" notation.

63. Defendant knew or should have known about its obligations under the FCRA. These obligations are well established in the plain language of the FCRA, in the promulgations of the Federal Trade Commission, and in well-established case law.

64. Defendant obtained or had available substantial written materials that apprised it of its duties under the FCRA.

65. Despite knowing of these legal obligations, Defendant acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

66. As a result of these FCRA violations, Plaintiff has suffered, and continues to suffer, actual damages, lost opportunities to receive credit, economic loss, damage to reputation, reduction in credit score, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

67. The violations by Defendant were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

68. Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. §1681o(a) or, alternatively, 15 U.S.C. 1681o(a).

## SECOND CLAIM FOR RELIEF

### (15 U.S.C. § 1681i)

69. Plaintiff realleges Paragraph Nos. 1-57 as if fully set forth herein.

70. The FCRA requires CRAs to "conduct a reasonable reinvestigation" to reinvestigate the accuracy and completeness of information disputed by consumers. 15 U.S.C. § 1681i(a).

71. Defendant willfully violated Section 1681i(a) of the FCRA by failing to conduct a reasonable reinvestigation and failing to remove inaccurate information from Plaintiff's consumer report following his dispute.

72. Defendant knew or should have known about its obligations under the FCRA. These obligations are well established in the plain language of the FCRA, in the promulgations of the Federal Trade Commission, and in well-established case law.

73. Defendant obtained or had available substantial written materials that apprised it of its duties under the FCRA.

74. Despite knowing of these legal obligations, Defendant acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

75. As a result of these FCRA violations, Plaintiff has suffered, and continues to suffer, actual damages, lost opportunities to receive credit, economic loss, damage to reputation, reduction in credit score, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

76. The violations by Defendant were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. §1681o(a) or, alternatively, 15 U.S.C. 1681o(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

   a. An award of actual, statutory and punitive damages for Plaintiff;

   b. An award of pre-judgment and post-judgment interest as provided by law;

   c. An award of attorneys' fees and costs; and

   d. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

**PLAINTIFF hereby demands a jury trial on all claims for which he has a right to a jury.**

DATED: March 1, 2023

        By: <u>/s/ Andrew Weiner</u>
            Andrew L. Weiner
            Georgia Bar No. 808278
            Jeffrey B. Sand
            Georgia Bar No. 181568
            WEINER & SAND LLC
            800 Battery Avenue SE
            Suite 100
            Atlanta, GA  30339
            (404) 254-0842 (Tel.)
            (866) 800-1482 (Fax)
            aw@wsjustice.com
            js@wsjustice.com

            COUNSEL FOR PLAINTIFF