# EXHIBIT I

**CARLTON
FIELDS**

ATTORNEYS AT LAW

One Atlantic Center
1201 West Peachtree Street | Suite 3000
Atlanta, Georgia 30309-3455
404.815.3400 | fax 404.815.3415
www.carltonfields.com

Jason A. Morris
Attorney at Law
404-815-2724  Direct Dial
jmorris@carltonfields.com

Atlanta
Florham Park
Hartford
Los Angeles
Miami
New York
Orlando
Tallahassee
Tampa
Washington, DC
West Palm Beach

July 20, 2022

D. Austin Bersinger                                          ***Via E-mail Only***
Barnes & Thornburg LLP                            ***austin.bersinger@btlaw.com***
Prominence in Buckhead
3475 Piedmont Road, N.E., Suite 1700
Atlanta, GA 30305-3327
(404) 846-1693

| Re: | Insured: | **Rhodium International Trading USA, Inc. ("Rhodium Trading")** |
|---|---|---|
| | Policy No.: | **GLMB-123147 ("Policy")** |
| | Invoice No.: | **SIRITUSA1035 ("Invoice")** |
| | Buyer: | **Longview Resources (Labuan) Ltd.** |
| | Claim No: | **22970** |

Dear Mr. Bersinger,

We represent FCIA Management Company, Inc., now known as the FCIA Trade Credit & Political Risk Division of Great American Insurance Company ("FCIA"), with respect to Claim No. 22970 (the "Claim") made by Rhodium Trading under the Policy. We understand that Barnes & Thornburg are representing Yit Chee Wah, also known as Steven Yit, in his capacity as the Liquidator of Rhodium Trading. However, as we do not know whether Barnes & Thornburg's representation extends to Mr. Yit's firm, FTI Consulting, we are copying the representatives from FTI Consulting with whom we previously communicated regarding the Policy. We have also copied Rhodium Trading's broker, Marsh, as well as the prior Rhodium Trading representatives to whom we were previously instructed to send communications regarding this Claim.

The purpose of this letter is to provide you with FCIA's coverage position regarding Rhodium Trading's claim for trade credit insurance coverage for the above-referenced Invoice. This letter follows FCIA's previous correspondence with Rhodium Trading dated August 12, 2021, August 26, 2021, November 18, 2021, February 8, 2022, and April 28,

Barnes & Thornburg LLP
July 20, 2022
Page 2

2022. FCIA hereby denies Rhodium Trading's Claim for the reasons set forth below and those set forth in FCIA's prior correspondence.

## The Policy

Great American Insurance Company issued Comprehensive Credit Insurance Policy (MultiBuyer Limits) GLMB-123147 to Rhodium Trading for the policy period effective August 1, 2019, through August 1, 2020 (the "Policy"). The Policy provides comprehensive credit insurance for agricultural commodities, ferrous and non-ferrous metals, and coal on form GLMB (1) (11/02) with a $27,900,000.00 limit of liability (plus interest as specified in the Interest Coverage Endorsement). The Insured Percentage is 90% and the Waiting Period is 90 days.

The Policy's Insuring Agreement (ARTICLE 1) obligates Great American to indemnify Rhodium Trading in accordance with the provisions of ARTICLE 6. PROOF AND PAYMENT OF CLAIMS AND RECOVERIES, for Loss on an Insured Transaction caused by the Default of the Buyer which remains unpaid for the duration of the Waiting Period.

Under ARTICLE 2. REQUIREMENTS OF AN INSURED TRANSACTION, each shipment and sale of products must be:

1. shipped to a Buyer during the policy period. Shipment begins when the products are placed en route to the Buyer on the order of Rhodium Trading or any of Rhodium Trading's agents; and

2. in conformity with the applicable export laws and regulations and the import laws and regulations of the Buyer's country; and

3. payable in U.S. dollars or in another Contract Currency; and

4. evidenced by a Buyer Obligation payable to Rhodium Trading in the United States or in another Payment Country; and

5. within the maximum payment terms permitted and in accordance with the terms of the applicable Credit Limit and the Eligible Country Endorsement.

Under ARTICLE 3. EXCLUSIONS, Paragraph A., the Policy bars coverage for any Loss that does not meet each requirement of an Insured Transaction.

Barnes & Thornburg LLP
July 20, 2022
Page 3

Under ARTICLE 6, PROOF AND PAYMENT OF CLAIMS AND RECOVERIES, Paragraph B., Rhodium Trading must submit a complete and satisfactory proof of Loss to Great American on the form provided by Great American:

1.  no earlier than the expiration date of the Waiting Period, but not later than 240 days after Default; or

2.  within 30 days from the date of a request by us for its submission.

Under ARTICLE 8. DEFINITIONS,

"Buyer" means the entity with whom Rhodium Trading has contracted for the sale of products, or for letter of credit transactions, the Issuing Bank.

"Buyer Obligation" means:

1.  the agreement of the Buyer to pay the Contract Price, together with interest, if any, thereon.  The agreement shall be valid and enforceable, when obtained, under the laws of the Buyer's country and of a state, territory, or possession of the United States and shall be set forth in a negotiable instrument (such as a promissory note, draft or bill of exchange) or open account documents (written purchase order, invoice and shipping documents).  The purchase order, contract of sale, invoice and shipping documents must indicate Rhodium Trading's name and the name of the Buyer; or

2.  the agreement of the Issuing Bank to pay a Letter of Credit naming Rhodium Trading as beneficiary, under which Rhodium Trading has presented documents in conformity with the requirements of the Letter of Credit and which documents have been accepted by the Issuing Bank.

"Insured" means the entity named in the Declarations.

"Loss" means:

1.  the amount of the Default on the Buyer Obligation, including interest, if any, accrued and unpaid, and computed at the rate and in the manner specified in the Interest Coverage endorsement, less:

    a.  discounts or other similar allowances; and

    b.  any amount which Rhodium Trading has received prior to our claim payment from any source as or towards payment of the amount in Default; and

Barnes & Thornburg LLP
July 20, 2022
Page 4

        c.      any amount which Rhodium Trading has received prior to our claim payment from return of product, or from realization of any security on the Insured Transaction; and

        d.      any amount which the Buyer would have been entitled to take into account by way of payment, set-off or counterclaim; and

        e.      any expenses saved by Rhodium Trading by non-payment of any agent's commissions or Rhodium Trading's non-fulfilment of the contract of sale or purchase order;

2.      In the event the Buyer becomes the subject of proceedings under any laws relating to bankruptcy, insolvency, or relief of debt, the amount of the Default on the Buyer Obligation shall not exceed the amount of the Buyer Obligation that has been allowed in the proceedings.

3.      For purposes of calculating a Loss, all Monies received after the date of Default on an Insured Transaction or the date when payment was due and unpaid on any uninsured debt, whichever is earlier, to the date of claim payment shall be applied in chronological order of Due Dates, regardless of any designation as to application by the Buyer, or other entity from whom such Monies are received.

The foregoing discussion regarding the Policy's terms is provided for reference in connection with the discussion that follows. The Policy's precise terms control and are set forth in the Policy itself. This letter does not alter the Policy's terms in any way. Please refer to the Policy itself for complete terms, including definitions, limitations, and exclusions.

## <u>Background</u>

There is one invoice at issue in this Claim:

| *Invoice Number* | *Contract No.* | *Amount* | *Due Date* | *Hereinafter* |
|---|---|---|---|---|
| SIRITUSA1035 | SRITUSA1650-851 | $1,697,982.77 | Oct. 2, 2020 | "Invoice" |

According to Purchase Contract PRITUSA1649-851, dated May 5, 2020, Rhodium Trading agreed to purchase 304.400 metric tons of LME Registered Grade A Copper Cathodes from Quant Impex for a price of $5,250.00 per metric ton, or a total of $1,598,100.00. Quant Impex's invoice, also issued on May 5, 2020, indicates that the goods were shipped from Puerto Angamos, Chile to Shanghai, China.

According to Sales Contract SRITUSA1650-851, dated May 5, 2020, Rhodium Trading agreed to sell 304.400 metric tons of LME Registered Grade A Copper Cathodes to Longview Resources (Labuan) Ltd (the "Buyer") at a price of $5,578.13 per metric ton, or a total of $1,697,982.77. The Invoice, also issued on May 5, 2020, indicates that the goods were shipped on April 10, 2020, nearly a month earlier, via the *Sine Maersk* vessel, loading in Puerto Angamos, Chile and discharging in Shanghai, China.

Barnes & Thornburg LLP
July 20, 2022
Page 5

The copy bill of lading Rhodium Trading provided with the Claim is dated April 10, 2020. It states that the goods were clean on board the *Sine Maersk* vessel as of April 10, 2020, but, contrary to Article 8-B of the Policy, the bill of lading does not include the names of Rhodium Trading or the Buyer. The bill of lading indicates the goods were loaded in Puerto Angamos, Chile to be discharged in Shanghai, China. The *Sine Maersk* vessel report, downloaded and last updated on May 14, 2020, indicates that the vessel was in port in Puerto Angamos, Chile on April 10, 2020. However, the documents do not reflect whether the vessel arrived in Shanghai, China.

At the time of the above-described transaction, Rhodium Trading's affiliates had issued numerous invoices to the Buyer and its affiliates, some of which were overdue.

### *Overdue invoice from the Buyer to Rhodium Trading's affiliate*

As of May 5, 2020 the Buyer owed at least the following *overdue* funds to Rhodium Trading's affiliate:

| Invoice No. | Amount Overdue | Original Due Date | Days Overdue |
|---|---|---|---|
| SIDMCC1594 | €1,020,092.46 | April 10, 2020 | 25 |

Thus, as of May 5, 2020, the date that Rhodium Trading entered into the underlying transaction with the Buyer, the Buyer had already failed to timely pay an invoice issued by Rhodium Trading's affiliate in the amount of at least €1,020,092.46, not including any interest.

### *Additional outstanding invoices from the Buyer to Rhodium Trading's affiliates*

Also, as of May 5, 2020, Rhodium Trading's affiliates had the following receivables that, although not overdue, were nevertheless outstanding from the Buyer:

| Invoice No. | Amount | Invoice Date | Total Current A/R |
|---|---|---|---|
| SIRITL1259 | $879,749.49 | Dec. 6, 2019 | $879,749.49 |
| SIRITL1260 | $908,395.97 | Dec. 6, 2019 | $1,788,145.46 |
| SIRITL1261 | $4,421,017.10 | Dec. 6, 2019 | $6,209,162.56 |
| SIREL1328 | $1,673,561.76 | Jan. 20, 2020 | $7,882,724.32 |
| SIRHLIT1032 | $2,065,262.91 | Feb. 25, 2020 | $9,947,987.23 |
| SI-RTA1839 | $2,446,480.00 | Apr. 7, 2020 | $12,394,467.23 |

Thus, as of May 5, 2020, in addition to the overdue funds set forth in the preceding section, the Buyer also owed Rhodium Trading's affiliates an additional $12,394,467.23.

In total, as of the date Rhodium Trading and the Buyer entered the underlying transaction, the Buyer's payables just to Rhodium Trading's affiliates were at least $12,394,467.23 and €1,020,092.46 plus any applicable interest, of which €1,020,092.46 was overdue.

Barnes & Thornburg LLP
July 20, 2022
Page 6

### *Overdue invoices from the Buyer's affiliate to Rhodium Trading's affiliates*

In addition, as of May 5, 2020, an affiliate of the Buyer, Longview Resources (SG) Pte Ltd., which is also a buyer under the Policy, owed at least the following *overdue* funds to Rhodium Trading's affiliates:

| Invoice No. | Amount Overdue | Original Due Date | Days Overdue |
|---|---|---|---|
| RIT-SI1369 | $200,403.32 | December 26, 2019 | 130 |
| Unknown | €170,386.18 | February 28, 2020 | 67 |
| Unknown | $57,362.05 | March 6, 2020 | 60 |
| Unknown | €42,784.05 | March 6, 2020 | 60 |
| Unknown | $51,151.48 | March 6, 2020 | 60 |
| SIRITUK1036 | €4,219,266.33 | March 16, 2020 | 50 |
| Unknown | €3,883,320.01 | March 16, 2020 | 50 |
| Unknown | €5,218,935.43 | March 16, 2020 | 50 |
| Unknown | €5,908,245.00 | March 20, 2020 | 46 |
| Unknown | €407,000.00 | March 20, 2020 | 46 |
| Unknown | €572,672.42 | March 20, 2020 | 46 |
| Unknown | $597.76 | March 20, 2020 | 46 |
| SIHK1667 | €172,098.00 | April 17, 2020 | 18 |
| SIHK1668 | €447,800.00 | April 17, 2020 | 18 |

The yellow shading indicates an obligation that was more than 90 days overdue, which is in violation of Article 3-C-2 of the Policy.  *See infra.*

Therefore, as of the date that Rhodium Trading and the Buyer entered into the underlying transaction, the Buyer's affiliate, Longview Resources (SG) Pte Ltd., was overdue on payments, and thus had failed to make payment in accordance with its contractual obligations to Rhodium Trading's affiliates, in amounts of at least €21,042,507.42 and $309,514.61, of which $200,403.32 was more than 90 days overdue. These amounts do not include any applicable interest.

### *Additional outstanding invoices from the Buyer's affiliate to Rhodium Trading's affiliates*

Also, as of May 5, 2020, Rhodium Trading's affiliates had the following receivables that, although not overdue, were nevertheless outstanding from the Buyer's same affiliate, Longview Resources (SG) Pte Ltd.:

| Invoice No. | Amount | Invoice Date | Total Current A/R |
|---|---|---|---|
| SIDMCC1612 | $2,503,071.25 | Dec. 6, 2019 | $2,503,071.25 |
| RIT-SI1409 | $2,128,847.56 | Dec. 6, 2019 | $4,631,918.81 |
| SIREL1332 | $410,705.91 | Jan. 26, 2020 | $5,042,624.72 |
| SIREL1337 | $2,598,948.76 | Feb. 11, 2020 | $7,641,573.48 |
| SIREL1330 | $3,223,157.41 | Feb. 12, 2020 | $10,864,730.89 |
| SIRHLIT1048 | $1,972,980.00 | Mar. 19, 2020 | $12,837,710.89 |
| SI6544 | $5,091,006.98 | Apr. 21, 2020 | $17,928,717.87 |

Barnes & Thornburg LLP
July 20, 2022
Page 7

Thus, in addition to the overdue funds set forth in the preceding section, as of May 5, 2020, the Buyer's affiliate owed Rhodium Trading's affiliates $17,928,717.87.  In total, the Buyer's affiliate's payables were at least $18,238,232.48 and €21,042,507.42, plus any applicable interest.

### Total outstanding funds owed to Rhodium Trading's affiliates from the Buyer and its affiliates

Based on the amounts discussed above, as of May 5, 2020, the Buyer and its affiliate Longview Resources (SG) Pte Ltd. had failed to pay, in accordance with their contractual obligations to Rhodium Trading's affiliates, at least €22,062,599.88 and $309,514.61, plus any applicable interest.  In addition, although not overdue, the Buyer and its affiliate Longview Resources (SG) Pte Ltd. together owed Rhodium Trading's affiliates an additional $30,323,185.10 in payables.

As a result, on the day that Rhodium Trading entered into the underlying transaction with the Buyer, the Buyer and its affiliate Longview Resources (SG) Pte Ltd. were indebted to Rhodium Trading's affiliates in the total amounts of at least $30,632,699.71 and €22,062,599.88, plus any applicable interest, much of it in *overdue* funds, including $200,403.32 that *were more than 90 days* overdue.

### FCIA's efforts to obtain additional information from Rhodium Trading

By letter dated August 12, 2021, to Cheam Hing Lee, Ojas Doshi, and Michael Wyer, all of whom FCIA at the time understood to be authorized representatives of Rhodium Trading, FCIA explained that there were additional materials required by Article 6-D, including "a complete and satisfactory proof of Loss."  FCIA explained that the requirement would remain unsatisfied until Rhodium Trading had provided the information requested in the letter, including:

- Documents demonstrating the full chain of ownership of the underlying goods from the very beginning of the formation of the subject transaction to the present, including proof of payment from Rhodium Trading to its immediate supplier for the underlying goods, any netting agreements, any records on any electronic trading platform demonstrating the transactions, and any confirmation of payment or similar acknowledgment Rhodium Trading received from its supplier;

- A written statement specifying, in detail, how the unit price, quantity, delivery term, and shipment period were determined by Rhodium Trading and its supplier for the goods underlying the Invoice;

- A written statement specifying, in detail, how the unit price, quantity, delivery term, and shipment period were determined by Rhodium Trading and the Buyer;

- Documents demonstrating the full chain of ownership of the subject receivable from the very beginning of the formation of the subject transaction to the present,

Barnes & Thornburg LLP
July 20, 2022
Page 8

- If the subject receivable had been purchased, sold, satisfied, transferred, exchanged, or otherwise assigned by anyone to anyone at any time following the sale of the subject goods to the Buyer, the transaction date, the seller, the purchaser, and the consideration paid for the receivable for each such transaction, as well as documents supporting the same;

- All documents exchanged by Rhodium Trading, any of its affiliates, or the loss payee that relate to or demonstrate any payments of or relating to the Invoice or its underlying financing, including all applicable finance agreements and any documents purporting to assign any right under any such agreement, the Invoice, the receivable, or the Policy;

- All monthly bank statements for Rhodium Trading from January 1, 2019 to the present;

- All correspondence between the Buyer, or any of its affiliates, agents, or representatives, and Rhodium Trading, or any of its affiliates, agents, or representatives regarding the Invoice or any other invoice issued by the Rhodium Resources Group to the Longview Resources Group that was overdue at any time since January 1, 2019; and

- All documents related to any communications between Rhodium Trading's affiliates or agents, and the shipping company's affiliates or agents regarding the shipment of the underlying goods.

FCIA expressly reserved all rights, including all rights under Endorsement No. 6, which places certain temporal limitations on Rhodium Trading's ability to bring a formal legal action regarding the Claim.

Subsequently, as part of our investigation into the Claim, we retained Charles Taylor Adjusting ("Charles Taylor") to conduct on-site visits at Rhodium Trading's Singapore premises. We learned from Charles Taylor that during its investigation, Rhodium Trading repeatedly denied Charles Taylor's requests for information due to unspecified confidentiality concerns. We also learned from Charles Taylor that Rhodium Trading represented to Charles Taylor that the hard drive of Rhodium Trading's former Global Head of Operations, Vivian Chin, had become corrupted such that Rhodium Trading could not retrieve internal correspondence between the trading and operations departments with respect to the Claim's underlying transactions.

By letter dated November 18, 2021, FCIA, through the undersigned counsel, notified Rhodium Trading of its duty to cooperate under Article 7-1 of the Policy:

Insured's Records. We or our representative may at any time during normal business hours audit and take copies of any records in your control connected with this insurance. You shall, at our request, promptly supply any information in your control, or take reasonable steps to obtain any information or records in the control of any third party.

Barnes & Thornburg LLP
July 20, 2022
Page 9

The November 18 letter explained that, despite FCIA's entitlement to the requested information, we were willing to work with Rhodium Trading to address reasonable confidentiality concerns, and to that end, we requested that Rhodium Trading identify the specific documents that it believed were entitled to confidentiality protection. In addition, we requested that Rhodium Trading make every effort to determine whether the information from Ms. Chin's hard drive could be recovered, and, if not, whether the information was available from another source. FCIA then, as before, reserved all rights, including all rights under Endorsement No. 6.

By emails dated December 16 and 17, 2021, from Rhodium Trading's broker, Rhodium Trading provided its responses to FCIA's September 24, 2021 requests for information. Rhodium Trading's responses were inadequate for several reasons, including that Rhodium Trading outright refused to answer some of the requests, Rhodium Trading asserted that it had already produced the information Rhodium Trading deemed "relevant," implying that there were additional documents that it was continuing to withhold, and Rhodium Trading continued to invoke the previously-described vague and undefined confidentiality concerns.

By letter dated February 8, 2022, FCIA notified Rhodium Trading that it was in breach of its duty to cooperate under the Policy for Rhodium Trading's refusal to supply information requested by FCIA and its investigators. FCIA provided Rhodium Trading with thirty days to provide all of the information previously requested but not provided, to provide a written statement to FCIA of responsive information that Rhodium Trading is withholding, to identify any documents Rhodium Trading claims is protected by confidentiality, to request that any third-parties who allegedly have a confidentiality interest to waive that interest, and to provide FCIA with a copy of all such waiver requests. We specifically noted the outstanding requests wherein Rhodium Trading had provided deficient responses, including the listed requests set forth above in this letter. FCIA informed Rhodium Trading that it continued to reserve all rights, including all rights under Endorsement No. 6.

By letter dated March 11, 2022, Rhodium Trading again refused to provide further documentation. However, for the first time, Rhodium Trading offered to produce information to FCIA that it claimed was confidential on the conditions that Rhodium Trading and FCIA first enter into a confidentiality agreement and that the relevant third-parties provide written approval to share the requested information. Among other things, Rhodium Trading agreed to produce its bank records from January 1, 2019 to the present. Rhodium Trading did not provide a draft agreement or otherwise suggest a framework for such an agreement. In addition, and in response to FCIA's request for "All documents related to any communications between Rhodium Trading, its affiliates, or its agents, and the shipping company, its affiliates, or its agents regarding the shipment of the underlying goods," Rhodium Trading stated:

> RITUSA is a commodities trader in the middle of the sales chain, RITUSA was not involved in arranging the shipment of the goods traded. Unless there was a dispute or issues with the goods or vessel during the shipment

Barnes & Thornburg LLP
July 20, 2022
Page 10

en route to RITUSA's buyer, RITUSA would not have any correspondence with the shipping company.

In relation to the Invoice, there were no disputes or issues during the shipment of the goods.  As such, RITUSA would not have the requested documents.

We subsequently learned that the High Court of Singapore had ordered the liquidation of Rhodium Trading and that the court appointed FTI Consulting as the liquidator.

By letter to FTI Consulting dated April 28, 2022, FCIA expressed willingness to enter into a confidentiality agreement with Rhodium Trading and noted that it had previously, as a sign of good faith, supplied Rhodium Trading with a proposed confidentiality agreement.  FCIA also provided FTI Consulting with an additional but final thirty days to:

- Provide the information that FCIA first requested on August 12, 2021, that has not been provided;

- For each request where Rhodium Trading is withholding information *responsive* to the request, provide a written statement describing the information that is being withheld and the basis for the same; and

- Provide copies of Rhodium Trading's written request from those entities claiming a confidentiality interest in the information requested by FCIA.

Once again, FCIA reserved all rights, including all rights under Endorsement No. 6.

We received a response on May 20, 2022, by letter from FTI Consulting sent via email.   FTI Consulting's letter did not provide us with an executed copy of the confidentiality agreement or any other proposed agreement.  Nor did the letter include a statement of responsive materials being withheld or copies of requests to waive confidentiality. FTI Consulting answered FCIA's requests for information but only from its own knowledge, rather than from the knowledge of the insured.  Moreover, even though Rhodium Trading previously agreed to provide bank statements that FCIA had repeatedly requested, FTI Consulting refused to produce them, unilaterally declaring the request to be "too wide" and to seek "irrelevant" documents.  FTI Consulting further declared other requests to be "unnecessary" and an inefficient use of the liquidator's time.  The letter reflected FTI Consulting's position that only requests to determine whether trades are "legitimate" are reasonable and relevant, despite the Policy's clear terms requiring the insured to provide FCIA with requested information.

Through our investigation, we have learned that, in a pending lawsuit filed against Rhodium Trading's parent company, Antanium Resources Pte. Ltd. ("Antanium Resources") and many of its subsidiaries (collectively, the "Rhodium Group"), another trade credit insurer has publicly accused the Rhodium Group of fraud and other nefarious

Barnes & Thornburg LLP
July 20, 2022
Page 11

conduct in connection with transactions that are strikingly similar to the transaction underlying this Claim.

According to that insurer's lawsuit, another subsidiary of Antanium Resources, Rhodium Resources USA, Inc. ("Rhodium USA") falsely represented to the insurer during the underwriting process that Rhodium USA had a Georgia address to induce the insurer to issue trade credit policies under false pretenses.  The lawsuit also alleges that Rhodium USA falsely represented to the insurer that Antanium Resources and Rhodium USA were in the process of expanding already existing U.S. operations and establishing a physical presence in the U.S.  The lawsuit further alleges that, during the underwriting process, Rhodium USA misrepresented the nature of its business by falsely representing that it engaged in the physical trading of commodities and adhered to its written credit and risk management procedures.  The lawsuit asserts that many, if not all, of the transactions underlying the insured's trade credit insurance claims are sham transactions and part of an intricate fraudulent scheme to defraud lenders and trade credit insurers.  In addition, the plaintiff alleges that most, if not all, of the alleged underlying transactions involve related parties and were thus not made at arm's length.

We note that the entity sued in the above-described litigation—Rhodium USA—is the same entity that initially applied with FCIA for identical trade credit insurance that FCIA ultimately issued to Rhodium Trading.  Based on the information available to us at this point, Rhodium Trading similarly represented to FCIA that it was looking to expand its U.S. operations and that it had a physical presence in Georgia.  We also believe Rhodium Trading falsely represented that its business was based on the physical trading of goods, whereas it has become clear in the claim adjustment process that Rhodium Trading's core business, if legitimate at all, actually involved the mere trading of paper contracts and perhaps the right to receive payments pursuant to those contracts, not the actual physical shipment and physical trade of underlying goods.  In this connection, we point out that we have seen no evidence that the alleged underlying transaction for this Claim actually transpired, and Rhodium Trading's continued refusal, or inability, to provide information that would establish the authenticity of the transactions supports that the transactions underlying the Claim may be fraudulent.

FCIA's concerns regarding potential fraudulent conduct by Rhodium Trading are heightened by FCIA's dealings with Rhodium Trading during FCIA's adjustment of the first trade credit insurance claim Rhodium Trading made with FCIA.  In that claim, which Rhodium Trading made shortly before making the Claim now at issue, Rhodium Trading requested coverage for invoices issued to Agritrade International PTE Ltd. ("Agritrade").  The Agritrade claim, however, involved numerous circumstances that give rise to continuing concerns about Rhodium Trading, its business, and its claims.

For example, through the Agritrade claim, Rhodium Trading originally sought $3,450,960 from FCIA in connection with Invoice SIRITUSA1007, despite Rhodium Trading's own insurance broker's having assured FCIA that Rhodium Trading had already released FCIA with respect to that invoice.  Rhodium Trading eventually admitted that it should not have filed an insurance claim on that invoice, but that admission came only

Barnes & Thornburg LLP
July 20, 2022
Page 12

after Rhodium Trading engaged legal counsel in the U.S. to pursue the claim and only after FCIA repeatedly objected to the claim.

The Agritrade claim also involved numerous inconsistencies that cannot be seen as anything other than misrepresentations.  For example, before Rhodium Trading made its Agritrade claim, the following occurred:

- In a May 14, 2020 letter signed by the company's Global Head of Corporate Finance & Treasury, Rhodium Trading stated to FCIA that Rhodium Trading "no longer has any outstanding receivables due from Agritrade" with respect to the invoices issued to Agritrade; and

- Rhodium Trading's July 31, 2020 AR Aging Report submitted to FCIA by Rhodium Trading indicated that no accounts receivable were outstanding from Agritrade as of July 31, 2020.

Those statements are irreconcilable with the following subsequent statements:

- In a February 25, 2021 email to FCIA, Rhodium Trading's parent company stated, "These receivables/debts remain unpaid and owed to Rhodium today;" and

- In a May 27, 2021 letter, Rhodium Trading stated that "receivables in the sum of US$5,698,628.43 are due from Agritrade" and that "the receivables under the remaining four invoices have not been purchased, sold, satisfied, transferred, exchanged or otherwise assigned to anyone else."

In short, in connection with Rhodium Trading's Agritrade claim, FCIA was told that (1) no money was owed on Agritrade invoices, (2) Antanium Resources was owed the entirety of Agritrade invoices, and (3) Rhodium Trading, not Antanium Resources, was owed the entirety of Agritrade invoices.  Those positions are not reconcilable and amount to misrepresentations regarding whether a Loss was incurred by an insured under the Policy.

Other misrepresentations occurred with respect to whether Rhodium Trading had released FCIA for the Agritrade invoices.  Prior to Rhodium Trading's submission of its Agritrade claim, FCIA received assurances that Rhodium Trading had released FCIA from liability:

- In a March 4, 2020 email to FCIA, Rhodium Trading stated, through its broker, that it had "dropped our exposure by under 50% in less than a month showing our commitment to you as our underwriting partner to minimize the insured debt;"

- In a March 9, 2020 email to FCIA, Rhodium Trading stated, through its broker, that it would execute a release of liability "once all amounts have been 'repurchased' by Rhodium from White Oak;"

- In a May 13, 2020 email, Rhodium Trading stated, through its broker, that "Rhodium ha[s] released FCIA from liability as of 5/6/2020;"

Barnes & Thornburg LLP
July 20, 2022
Page 13

- In response to FCIA's May 12, 2020 request that it receive confirmation from a Rhodium Trading officer once all receivables were sold to a third party and no amounts remained outstanding, Rhodium Trading's Global Head of Corporate Finance & Treasury stated, in a signed letter dated May 14, 2020, that the company "no longer has any outstanding receivables due from Agritrade" with respect to the Agritrade invoices;

- In a June 8, 2020 email to FCIA, Rhodium Trading requested, through its broker, an updated country schedule for trade claim insurance "now that Agritrade International has been closed out;"

- During renewal negotiations, Rhodium Trading emphasized, through its broker, that Rhodium Trading "bought back a $10mm claim;" and

- In a December 10, 2020 email to FCIA, the broker told FCIA that it had made it clear to Rhodium Trading that FCIA had been released regarding any claim associated with Agritrade.

Those representations stand in stark contrast to statements Rhodium Trading and its representatives subsequently made in seeking coverage for the Agritrade claim:

- On December 10, 2020, Rhodium Trading filed an insurance claim for the entirety of the Agritrade invoices; and

- In its May 27, 2021 letter, Rhodium Trading stated that White Oak Trade Finance, LLC ("White Oak") "has released FCIA from its obligation to pay" White Oak, "but FCIA is still obliged under the Policy to cover receivables that continue to be due from Agritrade and outstanding to our client."

Thus, in connection with the Agritrade claim, Rhodium Trading and its representatives represented to FCIA both that (1) FCIA had been released by Rhodium Trading from any liability with respect to the Agritrade invoices and (2) FCIA was liable for coverage because White Oak, not Rhodium Trading, had released FCIA from liability. Here again, by taking irreconcilable positions, Rhodium Trading misrepresented material facts.

The misrepresentations related to the Agritrade claim did not end there. Originally, by written letter dated May 14, 2020, in response to FCIA's request for such notification "[u]pon the final sale to a third party of all receivables due from Agritrade International (Pte) Ltd/Singapore," Rhodium Trading stated that it "no longer has any outstanding receivables due from Agritrade International (Pte) Ltd." Subsequently, in an email dated February 25, 2021, SeowHong Tay, who we understand was authorized to speak for Rhodium Trading, stated that Antanium Resources, not Rhodium Trading, "paid off Whiteoak" and that "Whiteoak surrendered their rights to be loss payee back to" Antanium. Three months later, by letter dated May 27, 2021, Rhodium Trading took the position that it satisfied its funding loans to White Oak and White Oak then re-assigned the receivables back to Rhodium Trading.

Barnes & Thornburg LLP
July 20, 2022
Page 14

As a result, Rhodium Trading and its affiliates represented that (1) Rhodium Trading paid off White Oak's loans and received an assignment of the loss payee rights under the Policy, (2) Antanium Resources paid off White Oak's loans and received an assignment of the loss payee rights under the Policy, and (3) Antanium Resources paid off White Oak's loans and then sold the receivables to a third party.  Here again, through irreconcilable statements, Rhodium Trading misrepresented material facts regarding the claim.

These events amount to a pattern of misrepresentations.  They raise significant concerns regarding Rhodium Trading, its business, and the additional trade credit insurance claims that Rhodium Trading has made, including the Claim at issue here.

Finally, with respect to the Claim at issue, we have become aware of evidence suggesting that both the Buyer and Rhodium Trading have significant ties to each other and an individual named Richard Maurer, who at the time of the underlying transaction was the largest individual shareholder of the Buyer.  For example, Maurer's company, the Bolt-Hole Group, Inc., which appears to own the Buyer, was originally incorporated as Rhodium USA, *the same company at issue in the other insurance carrier's fraud suit*, on November 23, 2013, according to records available with the Georgia Secretary of State. At the time of incorporation, Maurer was listed as the CFO/Secretary and Srinivas Koneru, who was previously the largest shareholder of Rhodium Trading, was listed as the CEO. Rhodium USA did not change its name to Bolt-Hole Group, Inc., until July 18, 2017, according to records kept by the Georgia Secretary of State.  We note that in applications to FCIA, both the Buyer and Rhodium Trading identified their address as 12600 Deerfield Parkway, Suite 100, Alpharetta, GA 30004.  Also, another company, Triterras, Inc., was founded by Srinivas Koneru and is partially owned by Maurer, according to Triterras, Inc.'s website and acquisition records.

We note the existence of this evidence despite Rhodium Trading's representation to FCIA in response to our request for information for another claim by Rhodium Trading that "[t]here is no related-party relationship between Rhodium Group and Longview Group, or any affiliations between the parties' officers, affiliates or controlling shareholders."

Our evaluation of these facts and circumstances follows.

## Claim Evaluation

FCIA denies the Claim for numerous reasons, including as set forth below.

First, there is no coverage for the Claim because the Invoice is not the product of an "Insured Transaction," for multiple reasons.

To begin, the underlying goods were not "shipped to a Buyer during the policy period."  Rhodium Trading admitted that the Buyer did not receive the goods at the discharge port; rather, the Buyer allegedly purchased the goods from Rhodium Trading

and then sold the goods "to another buyer."  Nor were the underlying goods "placed en route to the Buyer on the order of" Rhodium Trading or its agent, as Rhodium Trading admitted that it "was not involved in arranging the shipment of the goods traded." Rhodium Trading further admitted that it had no correspondence with the shipper.  In addition, the evidence reflects that the underlying goods were not allegedly purchased and sold by Rhodium Trading until *twenty-five days* after the goods had already been shipped from the departure port.  Rhodium Trading provides no evidence that the underlying goods ever arrived at Shanghai, China.  As such, the goods were not shipped to the Buyer by order of Rhodium Trading or its agent.

Next, Rhodium Trading has not established "a Buyer Obligation payable to you in the United States or in another Payment Country."  The Policy expressly requires "a negotiable instrument" or a "purchase order, contract of sale, invoice and shipping documents" that "must indicate your name and the name of the Buyer."  As Rhodium Trading has not provided a negotiable instrument or a purchase order (or other correspondence initiating the transactions), shipping documents containing the names of Rhodium Trading and the Buyer, original shipping documents (rather than merely a copy of a bill of lading), or documents sufficient to demonstrate that Rhodium Trading ever had title to the underlying goods, these transactions are not "evidenced by a Buyer Obligation" as the Policy requires for a transaction to be an "Insured Transaction."

Based on the lack of evidence establishing that Rhodium Trading ever had title to the underlying goods, it appears the alleged purchase agreement may be a commodity futures contract that may not be "valid and enforceable" under the laws of the United States.  In any event, absent documentation evidencing title to the underlying goods, the alleged purchase agreement does not involve the "sale of products" as required to qualify as an "Insured Transaction."

For all of the foregoing reasons, the Invoice was not the product of an "Insured Transaction," and, accordingly, Rhodium Trading has not established that the alleged loss falls within the insuring agreement.  For the same reasons, coverage is precluded by Article 3-A.

Second, Article 3-C-2 precludes coverage for the Claim.  Article 3-C-2 precludes coverage "for any loss . . . if, on the date of entering into the Insured Transaction, any amount owing from the Buyer to you on any transaction is overdue: . . . more than 90 days if the Buyer is located in any other country [other than the United States or Canada]." On May 5, 2020, the Buyer's affiliate was more than 90 days overdue to the Rhodium Group in an amount exceeding $200,000.  Accordingly, Article 3-C-2 applies to bar coverage for the Claim.

Third, Article 3-D-2 precludes coverage for the Claim.  That provision states:

We will not apply to the Deductible or indemnify you for any loss: . . .

D.      if, on the date of entering into the Insured Transaction: . . .

Barnes & Thornburg LLP
July 20, 2022
Page 16

> 2.  you have knowledge or information of any circumstances that may reasonably be expected to result in a loss, unless approved by us in writing[.]

Rhodium Trading and the Buyer entered into the underlying transaction on May 5, 2020, the date of Sales Contract SRITUSA1650-851 and the subject Invoice.  Based on the information provided, and as recounted above in detail, Rhodium Trading, through its officers, owners, and directors, knew the following on that date:

- The Buyer had failed to make timely payment in accordance with its contractual obligations to Rhodium Trading's affiliates in the total amount of at least €1,020,092.46 plus any applicable interest;

- The Buyer's affiliate, Longview Resources (SG) Pte Ltd., had failed to make payment in accordance with its contractual obligations to Rhodium Trading's affiliates in amounts of at least €21,042,507.42 and $309,514.61, plus any applicable interest; and

- In total, the Buyer and its affiliate, Longview Resources (SG) Pte Ltd., were indebted to Rhodium Trading's affiliates in amounts of at least $30,632,699.71 and €22,062,599.88, of which €22,062,599.88 and $309,514.61 had not been paid by their due dates and of which $200,403.32 was more than 90 days overdue.

Despite its knowledge regarding non-payment by the Buyer—the exact type of risk insured under the Policy—Rhodium Trading did not obtain written approval from FCIA before entering into the underlying transaction on May 5, 2020.  Accordingly, Article 3-D-2 applies to bar coverage for the Claim.

Fourth, Rhodium Trading has breached its duties to cooperate as set forth in Articles 4 and 7 of the Policy:

ARTICLE 4.  AGREEMENTS OF THE INSURED

You agree:

***

C.  to take all reasonable and customary measures to prevent or minimize Loss, including: . . .

> 4.     any other measures which may be required by us.

***

ARTICLE 7.  GENERAL CONDITIONS

Barnes & Thornburg LLP
July 20, 2022
Page 17

***

I. Insured's Records.  We or our representative may at any time during normal business hours audit and take copies of any records in your control connected with this insurance.  You shall, at our request, promptly supply any information in your control, or take reasonable steps to obtain any information or records in the control of any third party.

Policy, Arts. 4-C, 7-I.  In its August 12, 2021 letter, FCIA first noted that the following categories of items were necessary for Rhodium Trading to complete its proof of Loss:

- Documents demonstrating the full chain of ownership of the underlying goods from the very beginning of the formation of the subject transaction to the present, including proof of payment from Rhodium Trading to its immediate supplier for the underlying goods, any netting agreements, any records on any electronic trading platform demonstrating the transactions, and any confirmation of payment or similar acknowledgment Rhodium Trading received from its supplier;

- A written statement specifying, in detail, how the unit price, quantity, delivery term, and shipment period were determined by Rhodium Trading and its supplier for the goods underlying the Invoice;

- A written statement specifying, in detail, how the unit price, quantity, delivery term, and shipment period were determined by Rhodium Trading and the Buyer;

- Documents demonstrating the full chain of ownership of the subject receivable from the very beginning of the formation of the subject transaction to the present,

- If the subject receivable had been purchased, sold, satisfied, transferred, exchanged, or otherwise assigned by anyone to anyone at any time following the sale of the subject goods to the Buyer, the transaction date, the seller, the purchaser, and the consideration paid for the receivable for each such transaction, as well as documents supporting the same;

- All documents exchanged by Rhodium Trading, any of its affiliates, or the loss payee that relate to or demonstrate any payments of or relating to the Invoice or its underlying financing, including all applicable finance agreements and any documents purporting to assign any right under any such agreement, the Invoice, the receivable, or the Policy;

- All monthly bank statements for Rhodium Trading from January 1, 2019 to the present;

- All correspondence between the Buyer, or any of its affiliates, agents, or representatives, and Rhodium Trading, or any of its affiliates, agents, or representatives regarding the Invoice or any other invoice issued by the Rhodium Resources Group to the Longview Resources Group that was overdue at any time since January 1, 2019; and

Barnes & Thornburg LLP
July 20, 2022
Page 18

- All documents related to any communications between Rhodium Trading's affiliates or agents, and the shipping company's affiliates or agents regarding the shipment of the underlying goods.

FCIA requested these documents again on August 26, 2021, November 18, 2021, February 8, 2022, and once again on April 28, 2022. Nevertheless, the documents have not been provided, despite their clear materiality to FCIA's evaluation of the Claim for the reasons set forth in detail above and in FCIA's prior correspondence.

FCIA expressly invoked Rhodium Trading's duties to cooperate and quoted the Policy's cooperation provisions in its November 18, 2021, February 8, 2022, and April 28, 2022 letters, stating that Rhodium Trading would be in breach of the Policy if it did not provide the requested information. Despite these notifications, Rhodium Trading has not provided the requested information, much of it first requested more than eleven months ago on August 12, 2021. As such, Rhodium Trading is in breach of its duties to cooperate under the Policy, and FCIA has been materially prejudiced by Rhodium Trading's breach.

Fifth, there is no coverage for the Claim due to the voluminous and material misrepresentations and omissions made by Rhodium Trading to FCIA during the underwriting process, pre-claim process, or claims process for the Agritrade Claim, as set forth in detail above. Moreover, as noted, FCIA is concerned that Rhodium Trading may have made additional material misrepresentations and omissions to FCIA during the underwriting process, pre-claim process, or claims process for the instant Claim but presently lacks sufficient evidence to determine whether any such additional material misrepresentations and omissions concerning this Claim were actually made. To the extent that Rhodium Trading has made such additional material misrepresentations, we reserve our rights to assert this defense in the future if circumstances so warrant.

Sixth, Rhodium Trading has not established that it incurred a Loss in the amount claimed. Despite FCIA's repeated requests, Rhodium Trading has not provided sufficient documentation, such as bank statements, proof of payment, or netting agreements, reflecting that Rhodium Trading actually paid money, or provided items of equivalent value, in exchange for the underlying goods in an amount of $1,697,982.77 without receiving reimbursement by a third-party. Rather, Rhodium Trading has provided documents indicating that it initially paid for part of the goods with a telegraphic transfer payment. While Rhodium Trading claims that it paid for the remainder of the alleged goods with a netting agreement, Rhodium Trading refuses to provide the agreement. Rhodium Trading has refused to provide bank records and other requested documents that would enable FCIA to verify that Rhodium Trading actually paid for the alleged underlying goods without receiving reimbursement by a third party. The documents available to us indicate that Rhodium Trading borrowed $1,182,135.60 from White Oak in connection with the Invoice, significantly less than the $1,598,100.00 that Rhodium Trading claims it paid for the underlying goods from its alleged supplier. Rhodium Trading's inability to prove that it ever had title to the underlying goods raises questions about whether Rhodium Trading actually paid funds to the alleged supplier of the goods, and Rhodium Trading's refusal to provide the documents requested by FCIA fails to

Barnes & Thornburg LLP
July 20, 2022
Page 19

demonstrate that Rhodium Trading actually incurred a Loss.  For all of these reasons, Rhodium Trading has not established that it incurred a Loss in the amount claimed.

Seventh, Rhodium Trading's proof of Loss for the Claim remains incomplete, despite the passage of almost fourteen months since the Claim was filed, and more than eleven months since FCIA's original August 12, 2021 letter requesting a complete and satisfactory proof of Loss.  Because more than thirty days have passed since the date of FCIA's request, FCIA denies the insurance claim pursuant to Article 6-B.

Eighth, Article 3-G will apply to bar coverage for the Claim if it is determined that the Buyer and Rhodium Trading are affiliates or subsidiaries.  According to our investigation, there are pervasive and significant connections between and among the chief stakeholders of the Buyer and Rhodium Trading.  However, at this time, we lack sufficient information to conclude with certainty that the two entities are affiliates or subsidiaries.  We reserve our rights to assert this defense in the future if circumstances so warrant.

Ninth, we understand that Rhodium Trading's affiliates, as of December 2021, owed no less than $13,223,000.00 to the Buyer and its affiliates.  Although Rhodium Trading asserted a blanket denial that there were any potential set-offs with respect to the Invoice, we continue to reserve our rights with respect to this issue, should it be determined that the money allegedly owed under the Invoice can be set off.

## Conclusion and Reservation of Rights

For all of the above reasons, and those set forth in FCIA's prior correspondence, FCIA denies coverage for the Claim in its entirety.

This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the Policy, or any other policies of insurance issued by FCIA or any affiliate.  FCIA expressly reserves all rights, at law or in equity, under the Policy, including the right to assert additional grounds for the denial or limitation of coverage.

In this connection, FCIA emphasizes that it does not waive any rights available to it under Endorsement No. 6, which states, among other things:

No action may be brought against the Insurer prior to 60 days after submission of a complete, accurate and satisfactory proof of Loss and unless a written demand is made on the Insurer 30 days prior to bringing such action.  No action of any kind may be brought against the Insurer more than 2 years after the date of Default.

FCIA will rely on this contractual limitations provision if there is ever a formal proceeding related to this claim.

Barnes & Thornburg LLP
July 20, 2022
Page 20


Accordingly, all of FCIA's rights remain fully reserved.  Any actions taken by Rhodium Trading, White Oak, or any of its or their representatives, which are inconsistent with the information set forth herein are taken at the entity's or person's sole risk.  As such, FCIA shall not be estopped from taking any action consistent with its full and complete reservation of rights.

Please feel free to contact me if you would like to discuss this matter or any of this letter's contents.

Best regards,

CARLTON FIELDS, P.A.

Jason A. Morris

**cc: (email only)**

Andrew Baldauf, *andrew.baldauf@marsh.com*

Daniel Carrier, *daniel.m.carrier@marsh.com*

Matthew Conigliaro, *mconigliaro@carltonfields.com*

Roberto Crispino, *roberto.crispino@fticonsulting.com*

Dennis Dalati, *dennis.dalati@marsh.com*

Nicholas Garofalo, *nicholas.garofalo@marsh.com*

Jin Rui Ho, *jinrui.ho@fticonsulting.com*

Cheam Hing Lee, *cheam@rhodiumresources.com*

Shuna Rao, *shuna.rao@fticonsulting.com*

Michael Wyer, *michael.wyer@rhodiumresources.com*