# MASTER SERVICES AGREEMENT

This Agreement, effective as of August 22, 2022 ("**Effective Date**") between Snaptech, LLC, a Georgia limited liability company ("**Snaptech**"), and **QuantumRhino, Inc** for itself and its affiliated companies, if any ("Company"), in consideration of the covenants of this Master Services Agreement (the "**Agreement**"), and intending to be legally bound, hereby agree as follows:

WITNESSETH

WHEREAS, Snaptech wishes to provide certain professional services to Company; and

WHEREAS, Company wishes to procure such services from Snaptech, for good and valuable consideration.

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

1. SCOPE OF WORK. Company agrees to retain Snaptech on a non-exclusive basis to provide a variety of professional services as-needed for various ongoing tasks, projects, and/or assignments, which may include software development, project based software development, devops engineering, architecture, cloud configuration and management, mobile app development, off-shore software development, project management, business management, architecting/designing software, management consultation, business strategy, collaborating on 3rd party software contracts, and ad-hoc consultancy services, when requested ("**Services**"), as set forth in SOW A which is attached hereto and is incorporated herein by reference, and any additional SOWs for future work as agreed upon between the parties (which shall be numbered SOW B, SOW C, etc.). Company shall assign an employee (the "**Company Project Manager**" identified in SOW A or a future SOW) to manage and/or coordinate the project requirements, and/or assignment and delivery for any resources provided by Snaptech. The Company Project Manager shall be responsible for regularly monitoring execution progress, timely review of software PRs, and any other documentation provided by any Snaptech personnel as well as the review and advanced written approval of any out-of-pocket expenses associated with them. Snaptech shall assign an employee (the "Snaptech Project Manager" identified in SOW A or a future SOW) as a primary contact point for Company.

2. TERM. This Agreement shall commence on the Effective Date and shall terminate upon the one-year anniversary of the Effective Date. This Agreement shall automatically renew for successive one-year periods (each, a "**Renewal Term**"), unless one party notifies the other in writing at least 30 days prior to the end of the Initial Term or any Renewal Term that it does not wish to renew this Agreement. "**Term**" shall mean the Initial Term and any Renewal Terms.

3. ACCEPTANCE AND DELIVERY.

   a. Work Product. Snaptech consultants will commit and push any software changes to the upstream Code Repository as identified in SOW A or a future SOW. Work Product and work effort will occur on the basis of tickets created and assigned to Snaptech in an agreed upon Project Management Platform ("**PMP**") as identified in SOW A or a future SOW. Work related to tickets after the end of each billing cycle will be considered complete for the purposes of billing. Delivery will occur as a combination of pushing software to the Code Repository and providing an invoice statement documenting the hours worked. Company will advise Snaptech within 15-days of the invoice statement date if there are any issues related to amounts billed and identify the PMP work ticket associated; if there is no such notification, the Work Product associated will be considered accepted after 15-days from the invoice statement date.

   b. Project Work Product. For independently delivered project-based development occurring outside the Company's PMP systems the terms of transfer for Work Product and adjustments to payment arrangements may be specified and governed by a project-specific SOW.

4. PAYMENT FOR SERVICES.

   (a) Company agrees to compensate Snaptech in accordance with the fee schedule set forth in SOW A or a future SOW, and Snaptech agrees to provide any applicable services as set forth in SOW A or a future SOW. Fees for services rendered by Snaptech are provided under a $175/hour blended agency rate and are based primarily on the type of skill, mix of personnel and/or resources, and total time spent. For services where time-keeping is a defined requirement a written record of the time expended will be made within 48 hours of the time worked and is approximate. Although time expended may be the primary criterion for determining the amount of fees for certain software services, Snaptech reserves the right to reasonably adjust fees where there are extenuating factors that include one or more of the following: the novelty and complexity of an issue that demands extended exclusive focus, rare/specialty skill required in the transfer of intellectual property, the use of licensed pre-fabricated Snaptech intellectual property ("Background Technology") that the Company directly approves, industry-specific expertise contributed in architecting software solutions, customary fees for similar services, and/or deadline constraints imposed by the Company or by unforeseen circumstances.

Snaptech fees begin to accrue from the time services are first provided and the Company agrees to compensate for those utilized services under the terms of this Agreement even if there is a discrepancy between the Effective Date of this Agreement and the date services are first performed. Past due fees for any services performed outside of a retainer are subject to interest on any outstanding balance of the lesser of 1.5% per month or the maximum amount permitted by law.

Snaptech reserves the right to adjust hourly rates annually, generally effective on January 1st. In the event of a change the Company will be provided a minimum of 30-days advanced written notice. Services performed after the effective date of the new rates will be charged at

the new applicable rates. Snaptech generally issues invoices for any fees and reimbursements on a bi-monthly basis and billed against a sufficient retainer to cover expended hours between invoices unless other payment terms are specified in SOW A or a future SOW. Invoices will include detail that most Snaptech clients find sufficient, however, in the event additional detail is desired, the invoice detail requirements may be specified within a SOW for future work.

(b) All reimbursable travel by Snaptech consultant personnel related to this Agreement, defined to be any requirement by Company to be physically present at a location in excess of 35 miles in one direction from Snaptech offices, must be necessary, cost effective, and authorized in advance by the Company Project Manager, in accordance with Company' expense guidelines.  Company will reimburse Snaptech's approved business expenses at cost.

5. INDEPENDENT CONTRACTOR. The parties expressly understand and agree that any Snaptech consultant personnel providing Services to Company are independent contractors and shall not be considered for any purpose to be an employee of Company and that Company will issue a 1099 to Snaptech related to all Services provided by Snaptech personnel as required by the IRS. With the sole exception of payment of the agreed upon fees as outlined in Section 3, Company is not responsible for any other compensation, nor for employee benefits and/or matters relating thereto (including but not limited to the withholding and/or payment of federal, state and local income and other payroll taxes) nor for Workers' Compensation, disability benefits or any other legal requirements of a similar nature.

6. LIMITED RELATIONSHIP.  Neither this Agreement, nor the provision of Services under this Agreement, nor ongoing discussions and correspondence by the parties concerning the Services or any other matter, will constitute or imply any promise or intention to guarantee any number of billable hours or any number of allocated personnel, or to make any purchase or use of products, facilities or services by either party or their affiliated companies or any commitment by either party or its affiliated companies with respect to this or any other present or future transaction.  Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

7. PROPRIETARY RIGHTS

(a) Company shall have the royalty-free right to use in its business, and to use, make, have made, sell, have sold, import, and have imported products, processes, business methods, and/or services derived from any inventions, discoveries, concepts and/or ideas conceived or made by Snaptech (whether or not patentable) and billed under this agreement as well as any improvements thereto or know-how related thereto or feedback thereto which are conceived or made by Snaptech with the use or assistance of Company' facilities, materials, or personnel.

(b) To the extent that Snaptech incorporates any of its pre-existing technology or know-how into a Work Product ("Background Technology"), Snaptech hereby grants to Company a non-exclusive, perpetual, worldwide, transferable and sublicensable right and license to use such Background Technology solely as needed in connection with Company's use of the Work Product.

8. WARRANTY AND INDEMNIFICATION.  Snaptech hereby represents and warrants the following: (a) Snaptech has the right to enter into this Agreement and to grant the rights granted; (b) that the Work Product and/or Services provided hereunder, or the use of any of the foregoing, do not infringe any patent, utility model, industrial design, copyright, trade secret, trademark or any other third party right; (c) that the Work Product will not contain malicious code or copyleft open source code; (d) all work performed under this Agreement shall be done in a professional and workmanlike manner with skilled and qualified personnel. Company retains the right to terminate any Snaptech consultant personnel in its sole discretion and is responsible for all fees incurred prior to such an action. Snaptech may submit replacement personnel to Company if Company so requests or in order to meet the obligations of SOW A or a future SOW.  Snaptech will at all times defend, indemnify and hold harmless Company and its officers, agents, employees, successors, assignees and licensees from and against any and all claims, damages, liabilities, costs and expenses, including reasonable attorneys' fees, arising out of (x) any breach or alleged breach by Snaptech of any representation, warranty or agreement made by Snaptech herein; (y) the use or dissemination of any materials furnished by Snaptech hereunder; or (z) any acts done by Snaptech in connection with Snaptech's services hereunder; or (zz) any gross negligence or willful misconduct of a candidate placed by Snaptech into Company's business.

9. LIMITATION OF LIABILITIES.  IN NO EVENT SHALL Snaptech BE LIABLE FOR ANY CLAIM RELATING TO THIS AGREEMENT IN EXCESS OF THE FEES AND EXPENSES PAID BY COMPANY TO Snaptech HEREUNDER IN THE MONTH PRIOR TO THE DATE A CLAIM AROSE.  IN NO EVENT SHALL Snaptech BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, EVEN IF Snaptech HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10. TERMINATION.  Either party may terminate this Agreement upon 15 day's written notice which must include an effective date of termination.  Snaptech shall be paid for all work which was created on behalf of the Company prior to such notice of termination as well as that which is completed by Snaptech before the effective date of said termination. As an alternative to continuing ongoing work, in the event of a written notice to terminate by either party, Snaptech may choose at its discretion to refund unspent retainer funds in lieu of continuing an engagement until the effective date of termination. A final invoice will be issued by Snaptech on, or about, the effective termination date against the existing retainer funds. In the event the retainer does not have sufficient funds an invoice will be issued that is Due on Receipt. Upon completion of the project and/or assignments or upon any termination of this Agreement, Snaptech agrees that Snaptech, Snaptech's employees, subcontractors and agents shall turn over to Company the Work Product and any other deliverables in their then current condition (whether completed or in progress) and shall immediately commit any software in its current condition to an upstream Code Repository provided by Company, return to Company all documents, data, access cards, computer hardware, and materials and copies thereof supplied to Snaptech in connection with this Agreement. Any use of

email accounts, PMP accounts, access to software systems, VPN networks, business networks, and building access will cease immediately by any Snaptech consultant personnel upon termination of this Agreement and any copies of software or source code related to this Agreement shall be destroyed after committing any software in its latest condition to an upstream Code Repository provided by Company.

Further, any software or source code that has not been worked on in the past 30 days, as measured by the date of the last commit containing software changes on the upstream Code Repository provided by Company, shall be destroyed after verifying that any software in its latest condition is committed and pushed to an upstream Code Repository provided by Company.

11. TAXES. Snaptech shall have sole responsibility for payment of all federal, state and local taxes or contributions imposed or required under unemployment insurance, social security and income tax laws and for filing all required tax forms with respect to any amounts paid by Company to Snaptech hereunder and any amounts paid by Snaptech to its employees or subcontractors.

12. GENERAL PROVISIONS.

(a) Entire Agreement. This Agreement, together with all SOWs and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. For the avoidance of doubt, this Agreement expressly replaces and supersedes all previous SOWs entered into by the parties prior to the Effective Date of this Agreement.

(b) Waiver. Failure by either party at any time to enforce any obligation by the other party, to claim a breach of any term of this Agreement, or to exercise any power agreed to hereunder will not be construed as a waiver of any right, power or obligation under this Agreement, will not affect any subsequent breach, and will not prejudice either party as regards any subsequent action.

(c) Severability. If any term or provision of this Agreement should be declared invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, the remaining terms and provisions of this Agreement shall remain unimpaired and in full force and effect.

(e) Assignment. Snaptech may not assign any of Snaptech's rights or obligations under this Agreement without the Company's prior written consent. Any assignment in violation of this provision shall be void ab initio. This Agreement shall be binding upon the respective successors, assigns, heirs, and representatives as the case may be, of Snaptech and Company.

(f) Modification. No modification, waiver or amendment of any term or condition of this Agreement shall be effective unless and until it shall be reduced to writing and signed by both of the parties hereto or their legal representatives.

(g) Survival. The provisions of this Agreement that by their nature and content are intended to survive the performance hereof shall so survive the completion and termination of this Agreement. Without limiting the generality of the foregoing, Sections 3 through 16 of this Agreement shall so survive.

(h) Governing Law, Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia without reference to its conflicts of laws principles. Any disputes arising from or related to the subject matter of this Agreement shall be heard in a court of appropriate jurisdiction in the City of Atlanta and the parties hereby consent to the personal jurisdiction and venue of these courts.

13. MULTIPLE COUNTERPARTS. This Agreement may be executed in two (2) or more identical counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute the same Agreement when a duly authorized representative of each party has signed a counterpart. Each party agrees that the delivery of this Agreement by facsimile or electronic delivery will have the same force and effect as delivery of original signatures.

Doc ID: 8380b6e35efab373788f2baab700e44d62eb70c9

IN WITNESS WHEREOF, each party represents that it has caused this Agreement to be executed on its behalf as of the Effective Date first above written by a representative empowered to bind that party with respect to the undertakings and obligations contained herein.

| | |
|---|---|
| **Snaptech, LLC,** a Georgia limited liability company, with a principle place of business, and ability to receive legal notices, at:<br><br>Snaptech, LLC<br>c/o Matthew Erwin<br>6000 Lake Forrest Dr<br>Suite 260<br>Atlanta, GA 30328<br><br>**Or digitally at:**<br>legal@snap.tech | **QuantumRhino, Inc.** with a principle place of business, and ability to receive legal notices, at:<br><br>QuantumRhino, Inc.<br>c/o Marin Ursu<br>10115 E. Bell Road, Suite 107-501<br>Scottsdale, AZ 85260<br><br>**Or digitally at:**<br>Marin.ursu@quantumrhino.com |
| Authorized By:<br><br>*[signature]*<br><br>Name/Title:  Matthew Erwin | Authorized By:<br><br>*[signature]*<br><br>Name/Title:  Marin Ursu |
| **Matthew D. Erwin**  \|  Owner<br>**Snaptech** \| Dream. Actualize. Repeat.<br>**www.snap.tech**<br><br>6000 Lake Forrest Drive NE \| STE 260<br>Atlanta, GA 30328<br><br>*office:*  678.622.5004<br>*cell:*     678.733.0136 | Marin Ursu<br>Managing Partner + CIO<br>QuantumRhino.com<br>10115 E. Bell Road, Suite 107-501<br>Scottsdale, AZ 85260<br><br>**E:** Marin.Ursu@quantumrhino.com<br>**C:** 917.586.8923 |

# SOW A
## SERVICES AND FEES

**Engagement**:

Retainer set at $120000.00 for the period of 08/22/2022 through 11/18/2022. Agency rate will be $175.00/hour and any billable cost of personnel necessary will be translated/normalized to this single rate and a statement of used time against the retainer. Statements will be issued bi-monthly.

Snaptech management goals are for efficiency and will architect and utilize personnel in a manner designed to maximize productivity against the budget for the month and is not on a basis of fixed personnel, fixed hours, or fixed work week restrictions. Given the time sensitive nature of this work effort the personnel assigned will be self-motivated senior software engineers who can elastically delegate, parallelize into multiple resources, or flatten into a single focused resource as needed to be responsive to the actively changing demands of the business and minimization of training/handoff overhead between people.

Given that a bridge period may occur in the future between retainer renewal agreements necessitating non-retainer based work to avoid any gaps in personnel availability to perform work or support the QuantumRhino platform:

> Written notice will be provided by Snaptech to the Company when approximately 10% of the retainer is remaining and upon depletion of the retainer the prevailing rate for any ad hoc work requested will be handled as NET15 until such time as a written renewal or discontinuance is executed by both parties.

Retainer funds for this SOW may be transferred using one of the following options:

> Option 1: 100% at execution of this SOW
> Option 2: 40k at execution of this SOW, 40k after 30 days, 40k after 60 days

| | |
|---|---|
| **Snaptech Project Manager**: | Nathaniel Erwin |
| **Company Project Manager**: | Dan Durbin |
| **Project Management Platform ("PMP")**: | Github |
| **Code Repository**: | Github |



Audit Trail

| | |
|---|---|
| **TITLE** | QuantumRhino-SnapTech MSA+SOW |
| **FILE NAME** | QuantumRhino - Sn... + SOW A[57].docx |
| **DOCUMENT ID** | 8380b6e35efab373788f2baab700e44d62eb70c9 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

**SENT**  08 / 22 / 2022  10:18:31 UTC-7  
Sent for signature to Matthew Erwin (legal@snap.tech) from marin.ursu@quantumrhino.com  
IP: 70.190.69.193

**VIEWED**  08 / 23 / 2022  10:47:21 UTC-7  
Viewed by Matthew Erwin (legal@snap.tech)  
IP: 45.25.41.176

**SIGNED**  08 / 23 / 2022  11:00:45 UTC-7  
Signed by Matthew Erwin (legal@snap.tech)  
IP: 45.25.41.176

**COMPLETED**  08 / 23 / 2022  11:00:45 UTC-7  
The document has been completed.

Powered by HELLOSIGN