# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 200
550 Government Street
Mobile, AL 36602-9910

Date: July 08, 2022

Carol Lynn Venables

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Carol Lynn Venables (BNC#: 21V8302H77107)          Page 2 of 3

## Time Limit To File An Appeal

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

## What Else You May Send Us

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

## How An Appeal Works

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

## The Appeals Council May Review My Decision On Its Own

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

## When There Is No Appeals Council Review

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under

Form HA-L76-OP2 (03-2010)

Carol Lynn Venables (BNC#: 21V8302H77107)                Page 3 of 3

special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1–800–772–1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1–800–325–0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (866) 331–2215.

> Social Security
> 6665 Park Place
> Morrow, GA 30260–9800

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

> David R Murchison
> Administrative Law Judge

Enclosures:
Decision Rationale

cc:    John David Moore
       Affleck & Gordon, P C
       211 Perimeter Center
       Parkway, Suite. 1050
       Atlanta, GA 30346

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

<u>**IN THE CASE OF**</u>                              <u>**CLAIM FOR**</u>

Carol Lynn Venables                        Supplemental Security Income
(Claimant)

(Wage Earner)                               (Social Security Number)

<u>**JURISDICTION AND PROCEDURAL HISTORY**</u>

On November 4, 2020, the claimant filed an application for supplemental security income, alleging disability beginning September 13, 2009.  The claim was denied initially on January 29, 2021, and upon reconsideration on August 9, 2021.  Thereafter, the claimant filed a written request for hearing received on September 1, 2021 (20 CFR 416.1429 *et seq.*).  On June 17, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID–19) Pandemic.  All participants attended the hearing by telephone.  The claimant agreed to appear by telephone before the hearing, and confirmed such agreement at the start of the hearing (Exhibit B12B).  The claimant is represented by Allison Affleck.  Charles E. Wheeler, an impartial vocational expert, was also present and testified (Exhibit B16E).

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

During the hearing, the claimant, through her representative, amended her alleged onset date to November 4, 2020, the date she protectively filed her application for Supplemental Security Income benefits.

<u>**ISSUES**</u>

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

See Next Page

Carol Lynn Venables (BNC#: 21V8302H77107)          Page 2 of 17

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since November 4, 2020, the date the application was filed.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

See Next Page

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96–8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

See Next Page

After careful consideration of the entire record, the undersigned makes the following findings:

**1.  The claimant has not engaged in substantial gainful activity since November 4, 2020, the application date (20 CFR 416.971 *et seq.*).**

**2.  The claimant has the following severe impairments: obesity, hypertension, type II diabetes mellitus, bipolar disorder, major depressive disorder in partial remission, and post-traumatic stress disorder (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The Administrative Law Judge considered thoracic spine degenerative changes, uterine fibroids, and insomnia as  possible "severe" impairments, but the same have not been established as causing significant work-related limitations for a continuous period of twelve months during the time at issue.  The evidence documents treatment for sporadic physical complaints, with often normal or minimally abnormal review of systems and physical examinations.  No basic work activity was proven to have been significantly limited by any of these impairments, whether considered individually or in combination.

The Administrative Law Judge considered Baker's cyst on right knee as a possible severe impairment (Exhibit B7F, p. 2); however, there is no evidence of treatment for symptoms associated with a Baker's cyst during the current adjudicative period.  The claimant's physical exams have often been normal or minimally abnormal.  Therefore, the Administrative Law Judge finds no evidence to support that it is a severe impairment.

The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

No single medically determinable impairment or combination thereof, had the specific or equivalent severity of medical findings necessary to establish presumptive disability under the evaluative standards found in Appendix 1, Subpart P, Regulations No. 4 during the period of adjudication.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04,

12.05, and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria ("paragraph A or B" criteria of listing 12.05) are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a mild limitation.  The evidence documents ongoing treatment of major depressive disorder, in partial remission, and PTSD, with psychotropic medications.  Her mental status examinations have often been normal or minimally abnormal.  The claimant's intellectual function has been estimated as Average.  She  lives alone and cares for her personal needs independently.  She drives short distances to doctor appointments and she is able to go out alone.  She can prepare simple meals.  She checks her messages, returns phone calls, and checks her emails daily.  She scrolls the internet and she plays online video games.  She performs light household chores.  She does not need special reminders to take care of personal needs and grooming.  She shops in stores, by phone, and by computer.   She is able to pay bills, count change, handle a savings account and use a checkbook/money order.  She goes to the doctor, pharmacy and store once or twice a month and she does not need anyone to accompany her.  She usually finishes what she started.  She follows written instructions sometimes well and other times she has to reread.  She does not follow spoken instructions as well as written instructions.

In interacting with others, the claimant has a moderate limitation.  She testified that she has a good relationship with her daughter who visits weekly and her grandson.  She checks her messages, returns phone calls and she checks her emails.  She only leaves her apartment once or twice a month to get to trash or to her car.  She drives and is able to go out alone.  She shops in stores, by phone, and by computer.  She shops for what is needed (toiletries, household items, electronics, etc.), which takes a few minutes and sometimes hours.  She spends time with others in person, on the phone, by email, and through texting and video chat.  She goes to the doctor, pharmacy and store once or twice a month.  She does not need anyone to accompany her.  She avoids people. (Exhibit B10E, B7F and Hearing Testimony).

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  The evidence documents ongoing treatment of major depressive disorder, in partial remission, and PTSD, with psychotropic medications.  Her mental status exam have often been normal or minimally abnormal.  The claimant's intellectual function has been estimated as Average.  She testified lives alone and cares for her personal needs independently.  She drives short distances to doctor's appointments and she is able to go out alone.

She can prepare simple meals.  She checks her messages, returns phone calls and she checks her emails daily.  She scrolls the internet and she plays online video games.  She performs light household chores.  She does not need special reminders to take care of personal needs and grooming.  She shops in stores, by phone, and by computer.  She shops for what is needed (toiletries, household items, electronics, etc.), which takes a few minutes and sometimes hours.  She is able to pay bills, count change, handle a savings account and use a checkbook/money order.  She goes to the doctor, pharmacy and store once or twice a month and she does not need anyone to accompany her.  She usually finishes what she started eventually.  She follows written instructions sometimes well and other times she has to reread. (Exhibit B10E, B7F and Hearing Testimony).

As for adapting or managing oneself, the claimant has experienced a moderate limitation.
The claimant testified that she lives alone and cares for her personal needs independently.  She drives herself short distances to doctor's appointments and she can prepare simple meals.  She has a good relationship with her daughter who visits weekly and her grandson.  She checks her messages, returns phone calls and she checks her emails.  She scrolls the internet and she plays online video games.  She performs light household chores.  In a Function Report, the claimant indicated that she has no problems with personal care.  She does not need special reminders to take care of personal needs and grooming.  She sets an alarm to reminder her to take medicine.  She prepares her own meals, such as sandwiches, snack food, frozen food, instant food, etc., daily.  She noted that she cleans as needed, washing clothes may once a month.  She does not need encouragement to do these things.  She only leaves her apartment once or twice a month to get to trash or to her car.  She drives and is able to go out alone.  She shops in stores, by phone, and by computer.  She shops for what is needed (toiletries, household items, electronics, etc.), which takes a few minutes and sometimes hours.  She is able to pay bills, count change, handle a savings account and use a checkbook/money order.  Her hobbies include online games, watching TV and listening to music.  She does these things daily and well.  She spends time with others in person, on the phone, by email, and through texting and video chat.  She goes to the doctor, pharmacy and store once or twice a month.  She does not need anyone to accompany her.  She usually finishes what she started eventually.  She follows written instructions sometimes well and other times she has to reread.  The claimant's intellectual function has been estimated as Average (Exhibit B10E, B7F, and Hearing Testimony).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria (criteria of listing 12.05) are not satisfied.

See Next Page

The undersigned has also considered whether the "paragraph C" criteria of 12.04, and 12.15 are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except she can occasionally climb, stoop, balance and kneel.  She can never crouch or crawl.  She is unable to tolerate exposure to dangerous heights or machinery.  She is unable to operate automotive equipment.  She is limited to understanding, remembering, and carrying out simple instructions.  She is unable to perform production pace work.  She can have occasional interaction with the general public and co-workers.  She is limited to work with no more than occasional changes in the work setting.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence,

the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

In a Disability Report the claimant alleges manic depression, post-traumatic stress disorder (PTSD), anxiety attacks, panic disorder, bipolar disorder, insomnia, obesity, prediabetes, hypertension, baker's cyst, and diastolic dysfunction. She lists her height as 5'7" and weight as 255 pounds (Exhibit B4E, p. 2).

At the hearing held on June 17, 2022, the claimant testified she is 58 years old. She has a bachelor's degree. She does not have a full-time or part-time job now. She was receiving back alimony, but that ran out in May and she now has zero income. She worked for Paragon Systems as an armed security guard at the FAA building. Her duties were to answer the phone, write reports, and check the premises to make sure doors were locked and no that no one was in the building. She could sit or walk. There was no specified assignment that she had to do. She had to have a license to carry a firearm. She stopped doing that work because she was having trouble requalifying for the weapons permit because she was suicidal at that time. She and her counselor at Kaiser at that time decided that it was best for her not to have a firearm.

The claimant testified that she is 5'7" and she weighs 240 pounds. Her doctor recommended she be on an exercise program., but she did not do that. She has pain on her right side and back pain. She has Baker's cyst on her right knee. She is supposed to wear a knee brace on her right leg when she walks or exercises, but it is uncomfortable and she does not exercise. She has trouble with high blood pressure and takes medication for it. She takes a lot of different medication, so she cannot say if her side effects are from high blood pressure medication. She has zero energy throughout the day and spends a lot of days just sleeping and lying around. She takes medication for diabetes. She does not have trouble getting her medication. At Kaiser Permanente, she has a medical financial award and all of her doctor's appointments and medications are free of charge. At the Clayton Behavior Health Center, she is on a program where she can get her treatment and medications free at the clinic.

The claimant testified that she drives herself to appointments, which are only four miles from her house, and that she does not really leave her house very much. She only ventures out once or twice a month. She tries to run all her errands if she has to go out.

The claimant testified that she lives by herself. She does not have any trouble caring for herself. Her daughter comes by to check on her at least once a week. The last time she was hospitalized was in 2016 or 2017. She goes to Clayton Medical Center once every three months. She was in therapy twice a month, every two weeks, but it was too much for her so she stopped going to counseling. She has been trying to see if they can do video conference sessions

or by phone.   During the day, she sleeps, watches TV, plays video games online and she visits with her daughter, talking or video chatting on the phone when she is not there.  She does not volunteer and she has no pets.  She does not think she could do her past job as a security guard if it did not require a firearm because she is almost 100 pound heavier.  She would not be able to patrol the building as she did before.  She thinks her medications have caused weight gain and the fact that she does not exercise and has not exercised in over five years. She is registered to vote and she votes from time to time.

When questioned by her representative, the claimant testified that she naps on and off throughout the day.   Then she will wake and turn on the television. She will check her messages to see if her daughter or anyone else has called. She returns phone calls and she checks her emails.  Then she usually goes back to sleep again.  She repeats this throughout the day.  There are times when she sleeps 12 to 14 hours solid without waking up, and other days when she is up and down throughout the day and she cannot get to sleep.  She is more alert late at night.  She usually goes to bed in the morning when most people are getting up to start their day.  On average, she sleeps at least  six or more hours during the daytime.  She does not think she could do a job where she worked from home because she is easily distracted.  If she was working from home, she would probably be watching TV, playing video games, or doing something she is not supposed to do.  Her sleep would affect her work during the day.  She would be distracted by the light on her phone and get up to check a message. She might get on Facebook to see who has posted a new story or what is going on in other people's lives and reach out to someone who may have had a loss or some good news and respond to them.

The claimant testified that she may run her vacuum across the floor once a month or every other month.  It has been two to three months since she has dusted anything.  She dusts every few months.  She wears the same clothes every day, so she does not have to do laundry.  She only does laundry once a month. If she has to go out, she will shower and change her clothes.

The medical evidence documents that on January 6, 2021, Christopher E. Armour, M.D., saw the claimant for follow-up of blood pressure.  She reported that her blood pressure elevates when upset or angry.  On review of systems, she denied ophthalmic, cardiovascular, and neurological symptoms.  On exam, the claimant's blood pressure was 123/74 and BMI 39.25.  Her physical exam was unremarkable, with normal cardiovascular, pulmonary, and neurological exams.  She was assessed with labile hypertension; severe obesity (BMI 39–39.9, adult); bipolar disorder, unspecified type.  Her blood pressure medication was not changed.  She was given a letter documenting normal blood pressures in office and it was recommended to allow blood pressure to decrease when initially recorded as high.  She was noted to be taking Lurasidone (Latuda) 40 mg for bipolar disorder.  She was also given exercise counseling (Exhibits B3, pp. 6–7, and B4F, pp. 7–9).

See Next Page

On February 4, 2021, treatment records from Clayton Community Mental Health Center document the claimant was seen for reauthorization of services.  She presented with diagnoses of major depressive disorder and post–traumatic stress disorder (PTSD).  She was noted to have no hospitalizations, crises group admissions, or ER/Crises Team interventions within the last 18 months.  She is noted to have a Baker's cyst on the right knee.  She was noted to live alone and have two adult children and one grandchild.  She reported her social support as daughter, first husband, and God.  Her leisure activities include online games, reading, and watching TV.  She reported her strengths to include, "I'm the best grandma."  "I'm the best mother" (Exhibit B7F, pp. 1–3).  On mental status exam, the claimant was well groomed, calm and cooperative.  Her speech was clear and mood/affect euthymic and full range.  Her though process was logical and thought content within normal limits, with no suicidal/homicidal ideations, paranoia, phobias or hallucinations.  Her memory was intact and cognition within normal limits.  She was oriented to time, place, person and situation.  Her intelligence was estimated as Average (Exhibit B7F, pp. 13–14 and 36–37).  The claimant was diagnosed with bipolar I disorder, unspecified, and PTSD.  In summary, she was noted to have received treatment for the past four years with medication.  Per visit today, there had been no recent suicidal ideations or major crisis over the past few years.  She continued to be compliant with her mental health treatment and medication, as well as with her physical health (Exhibit B7F, p. 15).

On June 3, 2021, treatment records from Clayton Community Mental Health Center document that on exam the claimant's appearance was neat and gait and station within normal limits.  On mental status exam, she was alert and oriented to personal, place and time.  She was cooperative and calm with normal speech.  Her intellectual ability was estimated as Average.  Her memory was grossly intact.  Her mood was euthymic and affect tearful.  Her though process was coherent and thought content normal.  She denied hallucinations, suicidality and homicidality.  No signs of acute distress were noted or reported.  She was continued on Prozac 60 mg and Latuda 40 mg.  Follow up in three months (Exhibit B7F, pp. 45–47).

On July 1, 2021, treatment records from Afrin Rahman, M.D., with Kaiser Permanente, document that the claimant's HGA1c was high at 6.6 on June 1, 2021.  She reported that she started doing exercise since she received her lab results.  She opted to start low–dose Metformin 500 mg one tab daily.  She was further instructed to continue lifestyle changes and attend diabetic education class.  She was diagnosed with type II diabetes mellitus, hypertension, and insomnia.  She was given refills of medications and instructed to follow up in four to six weeks (Exhibit B8F, p. 7).

On September 2, 2021, treatment records from Clayton Community Mental Health Center document the claimant's BMI was 38.65.  She reported, "I am

See Next Page

doing good." She reported that she was medication compliant, with no side effects. She was sleeping well at night and her appetite was adequate. Her active medication was listed as Latuda 40 mg, on tablet at night with meals, and Prozac 20 mg, three capsules once a day. She presented for follow up with physician. She was alert and oriented times four, calm and cooperative. Her affect was pleasant. She was well groomed and dressed for weather and situation. Her hygiene was good. She denied suicidal ideation, homicidal ideation, as well as auditory and visual hallucinations. She stated she was sleeping and eating well, and taking her medication as prescribed. She was continued on Prozac 60 mg and Latuda 40 mg and instructed to follow up in three months. (Exhibit B7F, pp. 31 and 54–57).

On September 15, 2021, treatment records from Dr. Rahman, with Kaiser Permanente, document the claimant presented for an annual checkup and sugar reading review. Her active medications were noted as Trazodone 50 mg in the evening, Metoprolol Tartrate, Metformin, Spironolactone, Latuda and Prozac. On review of systems, she denied malaise, unplanned weight loss/gain, sleep disturbance, anxiety, depression, problems–concentrating, irritability, mood swings, suicidal ideation, blurred or loss of vision, dry eyes, photophobia or scotomata. On exam, her blood pressure was documented as 137/73 and BMI 38.53. Her physical exam was unremarkable. She was assessed with insomnia, hypertension, type II diabetes mellitus, screening for hepatitis C (non–reactive), dietary surveillance and counseling, exercise counseling, severe obesity equivalent (BMI 35–39.9 with co–morbidity), vaccination for influenza, and screening exam for breast cancer. Her pap smear was normal (Exhibits B8F, pp. 16–19, and B9F, pp. 6–8, 11 and 28).

On December 8, 2021, treatment records from Clayton Community Mental Health Center document that on exam, the claimant's general appearance was neat and her gait and station were within normal limits. On mental status exam, she was alert and oriented to person, place and time. She was cooperative and calm. Her speech was normal and estimated intelligence Average. Her memory was grossly intact. Her affect was normal and mood congruent. Her thought process was coherent and thought content normal. She denied hallucinations, suicidality and homicidality. There was no sign of acute distress and none noted or reported (Exhibits B10F, pp. 10–11).

On February 2, 2022, treatment records from Clayton Community Mental Health Center document the claimant reported, "I feel pretty good." Her 11-years-old grandson was at her house with her daughter and he had been with her for five days. She reported she was compliant with medications with no side effects. She reported mild depression and anxiety, "it's getting better." She denied intermittent crying spells, worrying, tearfulness, or sadness. Her mood was happy and excited. Her sleep was sporadic, as she was busy having fun with her grandson. Her appetite was adequate. She denied suicidal and homicidal ideation, hallucinations, and paranoia. She enjoyed reading and listening to

gospel music (Exhibit B11F, p. 1).  On mental status exam, she was alert and oriented to person, place and time.  She was cooperative and calm.  Her speech was normal and estimated intelligence Average.  Her memory was grossly intact.  Her mood was euthymic and affect normal.  Her thought process was coherent and thought content normal.  She denied hallucinations, suicidality and homicidality.  There was no sign of acute distress and none noted or reported.  She was continued on Prozac 60 mg and Latuda 40 mg and instructed to follow up in three months.  The claimant was diagnosed with bipolar I disorder, current or most recent episode unspecified, and PTSD.  Examination of facial, oral, extremities, and trunk were unremarkable (Exhibit B11F, pp. 3–7).

On February 22, 2022, progress notes from Kaiser Permanente document the claimant was noted to have post–menopausal bleeding.  She underwent endometrial biopsy.  On March 24, 2022, A telehealth visit with OB/GYN documents that the claimant was seen to discuss her biopsy results.  She was doing well and was without acute complaints.  Her biopsy was noted as insufficient for evaluation and additional sampling with D&C was recommended with possibly hysteroscopy (Exhibit B12F, p. 16–17).  Her blood pressure was documented as 119/67 and BMI as 38.52 (Exhibit B12F, pp. 7–11).  On April 4, 2022, progress notes document the claimant's blood pressure was initially elevated at 151/83, but later within normal range at 125/79 (Exhibit B12F, pp. 22 and 36).  She was obese with her height documented as 5'7" and weight as 242 pounds.  She reported intermittent rib pain in the right upper quadrant for two weeks.  She reported that she thought she might have stretched and pulled something.  Her physical exam was essentially normal, except for chest wall tenderness present.  Radiographs showed no acute displaced rib fractures.  Degenerative changes were present throughout the thoracic spine, with mild S–shaped curvature of the thoracolumbar spine noted.  She was assessed with chest wall pain (Exhibit B12F, pp. 22–25 and 34–36).

On May 11, 2022, treatment records from John P. Estrada, M.D., with Kaiser Permanente, document that the claimant was seen for preoperative exam.  Her blood pressure was documented as 128/69 and BMI 37.59.  Her problems were listed to include obesity (BMI 35–39.9), type II diabetes, and bipolar disorder, unspecified type.  She reported that she still had bleeding about to times per month.  The plan was hysteroscopy to evaluate the lining of her uterus.  On review of systems, she reported she was feeling well, with no dyspnea or chest pain on exertion.  Her medications were documented as Tizanidine, Metoprolol Tartrate, Metformin, Spironolactone, and Trazodone.  She denied shortness of breath, abdominal pain, changes in bowel habits, urinary tract symptoms and neurological complaints.  On exam, she appeared well, alert and oriented to time, person, and place.  She had normal thought content, speech, affect, mood and dress.  She was assessed with abnormal uterine bleeding.  The plan was hysteroscopy to evaluate uterine cavity.  There are no records documenting the findings of the hysteroscopy (Exhibit B13F).

See Next Page

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with clinical evidence, which often documents normal or minimally abnormal physical exams findings and mental status examination findings.  The claimant has further denied medical side effects.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

The Administrative Law Judge finds totally unpersuasive the treating source residual functional capacity assessment dated November 9, 2021, as it is contradicted by virtually every mental status examination in the treating source notes, as set forth above.  It is totally conclusory.  Furthermore, there is no evidence of mental hospitalizations during the adjudicative period (Exhibit B14F).

The Administrative Law Judge finds persuasive the opinions of state agency physicians Arthur Lesesne, M.D., and Javier Torres, M.D., to the extent that the claimant can do a range of medium exertional level work  (Exhibits B2A and B4A).  The medical evidence documents that the claimant has been treated sporadically for physical complaints with her review of systems and clinical physical examinations being documented as normal or minimally abnormal. She has further denied medical side effects.

The Administrative Law Judge finds mildly persuasive mental opinions of state agency psychologists Irma Best, Ph.D., and S. Propper Ph.D., to the extent that there are no disabling functional limits, but the opinions in Exhibit B4A at page 16, with respect to the 20% supposition, are not persuasive as contrary to results of the multitude of often normal or minimally abnormal mental status exam findings from the treating sources, as set forth above (Exhibits B2A and B4A).

The claimant has described being able to perform activities of daily living, including living alone and caring for her personal needs independently.  She

testified to driving herself short distances to doctor's appointment and cooking simple microwavable meals.

There have been no hospitalizations for the claimant for physical and/or mental health conditions since the alleged onset of disability.  Nothing in the record suggests that the claimant's physical or mental impairments have been incapable of being alleviated or controlled with the proper and regular use of prescription medications.  In fact, the record discloses that prescription medications have proven successful in assisting the claimant in maintaining control of impairments and mitigating any accompanying symptomatology.  Treatment records document repeatedly that the claimant has reported, "I am doing good."  The record contains no evidence of  side effects of medication.

The undersigned has considered the claimant's obesity under the guidelines mandated by Social Security Ruling 19–2p and as indicated in Appendix 1, Subpart P, Regulations No. 4 under "Listings"1.00(Q.).  The Administrative Law Judge finds that the claimant's obesity has warranted  multiple postural limitations, and those are found in her residual functional capacity.

While the claimant may experience some degree of pain and other symptoms because of severe impairments, the evidence does not support that the claimant experiences the level of symptomatology to the extent alleged. The evidence does not support the claimant's allegations of totally incapacitating pain and other symptomatology.  The record fails to document persistent, reliable manifestations of a disabling loss of functional capacity by the claimant resulting from her reported symptomatology.  A claimant's limited use of pain medication, failure to sustain any consistent medical regimen of treatment, lack of hospitalizations, or other significant treatment for pain and other symptoms is evidence that supports a finding pain and other symptoms are not disabling. The medical evidence does not reasonably support a finding that the claimant's pain and other symptoms are so intense and chronic that work activity at all levels of exertion would be precluded.

All of the above factors lead the undersigned to a conclusion that the claimant's alleged physical and/or mental symptoms and conditions are not of a disabling degree.

**5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).**

The vocational expert testified that the claimant's past relevant work as a security guard (DOT Code 372.667–034) is classified as light in exertion and semi–skilled (SVP–3).  As required by SSR 82–62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period. The claimant is

unable to perform past relevant work as actually or generally performed, as she is limited, inter alia, to unskilled work.

**6.  The claimant was born on September 29, 1963, and was 57 years old, which is defined as an individual of advanced age, on the date the application was filed (20 CFR 416.963).**

**7.  The claimant has at least a high school education (20 CFR 416.964).**

**8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.15.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of

representative unskilled (SVP–1 and SPV–2) occupations at the medium level of exertion, such as follows:  laundry worker (DOT Code 361.684–0140) SPV–2 of which there are approximately 96,000 jobs in the national economy; cleaner (DOT Code 919.687–014) (SVP–1) of which there are approximately 51,000 jobs in the national economy; dishwasher (DOT Code 318.687–010) (SVP–2) of which there are approximately 107,000 jobs in the national economy.

Pursuant to SSR 00–4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, as supplemented by the expert's education, training, experience and research.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above–cited rule.

**10. The claimant has not been under a disability, as defined in the Social Security Act, since November 4, 2020, the date the application was filed (20 CFR 416.920(g)).**

## DECISION

Based on the application for supplemental security income filed on November 4, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ David R. Murchison
_____

David R Murchison
Administrative Law Judge

July 08, 2022
_____

Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1A | ALJ Hearing Decision | | 2019–04–25 | 19 |
| Y13 | B2A | Disability Determination Explanation | | 2021–01–29 | 17 |
| Y13 | B3A | Disability Determination Transmittal | | 2021–01–29 | 1 |
| Y13 | B4A | Disability Determination Explanation | | 2021–08–07 | 22 |
| Y13 | B5A | Disability Determination Transmittal | | 2021–08–09 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1B | SSA–1696 – Claimant's Appointment of a Representative | | 2020–11–30 | 8 |
| Y13 | B2B | Fee Agreement for Representation before SSA | | 2020–11–30 | 1 |
| Y13 | B3B | T16 Notice of Disapproved Claim | | 2021–01–29 | 5 |
| Y13 | B4B | Request for Reconsideration | | 2021–02–20 | 3 |
| Y13 | B5B | T16 Disability Reconsideration Notice | | 2021–08–09 | 6 |

| Y13 | B6B | Request for Hearing Acknowledgement Letter | | 2021-09-23 | 15 |
| Y13 | B7B | Request for Hearing Acknowledgement Letter | | 2021-10-12 | 20 |
| Y13 | B8B | Objection to Video Hearing | | 2021-10-13 | 1 |
| X78 | B9B | Transfer Request for Hearing | | 2022-02-17 | 6 |
| X78 | B10B | Hearing Notice | | 2022-03-23 | 14 |
| X78 | B11B | Notice Of Hearing Reminder | | 2022-05-20 | 4 |
| X78 | B12B | Acknowledge Notice of Hearing | | 2022-05-27 | 1 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1D | Application for Supplemental Security Income Benefits | | 2020-11-17 | 10 |
| Y13 | B2D | DIBWIZ | | 2022-01-12 | 3 |
| Y13 | B3D | Certified Earnings Records | | 2022-01-12 | 3 |
| Y13 | B4D | Summary Earnings Query | | 2022-01-12 | 1 |
| Y13 | B5D | DISCO DIB Insured Status Report | | 2022-01-12 | 2 |
| Y13 | B6D | Detailed Earnings Query | | 2022-01-12 | 2 |
| Y13 | B7D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-01-12 | 1 |
| X78 | B8D | Detailed Earnings Query | | 2022-06-15 | 2 |
| X78 | B9D | Summary Earnings Query | | 2022-06-15 | 1 |

| | | | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| X78 | B10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 2022–06–15 | 1 |
| X78 | B11D | Certified Earnings Records | | | 2022–06–15 | 3 |

### Disability Related Development

| Compone nt | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | B1E | Exhibit List to Rep PH2E | | | to 2020–01–05 | 11 |
| Y13 | B2E | Disability Report – Field Office | | | to 2020–11–17 | 2 |
| Y13 | B3E | Work History Report | | | to 2020–11–17 | 7 |
| Y13 | B4E | Disability Report – Adult | | | to 2020–11–17 | 9 |
| Y13 | B5E | 3rd Party Function Report – Adult | | Aishia Hood | to 2020–12–20 | 8 |
| Y13 | B6E | Function Report – Adult | | Claimant | to 2020–12–29 | 8 |
| Y13 | B7E | Progress Notes | | Clayton County Mental Health | 2020–11–30 to 2021–02–04 | 36 |
| Y13 | B8E | Disability Report – Field Office | | | to 2021–02–20 | 2 |
| Y13 | B9E | Disability Report – Appeals | | | to 2021–02–20 | 7 |
| Y13 | B10E | Function Report – Adult | | Claimant | to 2021–04–13 | 8 |
| Y13 | B11E | Work History Report | | | to 2021–04–19 | 4 |
| Y13 | B12E | Disability Report – Field Office | | | to 2021–09–08 | 2 |
| Y13 | B13E | Disability Report – Appeals | | | to 2021–09–08 | 6 |
| Y13 | B14E | Exhibit List to Rep PH2E | | | | 22 |

| X78 | B15E | Report of Contact re: Rep agrees to phone hearing | Oho | to 2022–03–15 | 1 |
| X78 | B16E | Resume of Vocational Expert | Charles Wheeler | to 2022–05–24 | 3 |
| X78 | B17E | Correspondence regarding efforts to obtain evidence | Allison Affleck | to 2022–06–07 | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | B1F | Progress Notes | | Clayton Community Service Board Mhc | 2017–12–06 to 2020–11–04 | 172 |
| Y13 | B2F | HIT MER | | Kaiser Permanente | 2009–05–07 to 2020–11–17 | 12 |
| Y13 | B3F | HIT MER | | Kaiser Permanente #2 | 2008–12–08 to 2021–01–06 | 20 |
| Y13 | B4F | Progress Notes | | Kaiser Permanente | to 2021–01–06 | 16 |
| Y13 | B5F | HIT MER | | Kaiser Permanente #3 | 2009–03–19 to 2021–02–20 | 5 |
| Y13 | B6F | Progress Notes | | Fayette County Dept Of Emergency Serivces | to 2021–06–18 | 7 |
| Y13 | B7F | Progress Notes | | Clayton Center | 2011–06–13 to 2021–09–02 | 63 |

| Y13 | B8F | Progress Notes | Kaiser Permanente – Southwood Medical Center | 2021–07–01 to 2021–09–15 | 23 |
|-----|-----|----------------|---------------------------------------------|--------------------------|----|
| Y13 | B9F | Office Treatment Records | Kaiser Permanente | 2021–09–15 to 2021–11–22 | 34 |
| Y13 | B10F | Progress Notes | Clayton Center | to 2021–12–08 | 16 |
| X78 | B11F | Progress Notes | Clayton Center | to 2022–02–22 | 14 |
| X78 | B12F | Progress Notes | Kaiser Permanente – Southwood Medical Center | 2022–02–22 to 2022–04–14 | 44 |
| X78 | B13F | Emergency Department Records | Kaiser Permanente – Southwood Medical Center | to 2022–05–11 | 15 |
| X78 | B14F | RESIDUAL FUNCTIONAL CAPACITY | Clayton Center | to 2021–11–09 | 2 |