IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| D.B. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION FILE NO.: |
| | : | |
| YEASMIN ENTERPRISES, INC. d/b/a | : | |
| Ramada Plaza by Wyndham; and | : | |
| BLUE LAGOON HOSPITALITY, LLC | : | |
| d/b/a Ramada Plaza by Wyndham; | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Matthew B. Stoddard
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com

**Attorneys for Plaintiff**

1

## TABLE OF CONTENTS

Introduction.................................................................................................3

Procedural Issues.........................................................................................3

D.B. Is Trafficked for Sex at The Hotel…...................................................5

COUNT 1:  TVPRA Claims…………………………………………….......7

COUNT 2:  State Law RICO Claims……………………..………………15

COUNT 3:  Premises and Nuisance Claims…………………………...18

Proximate Cause and Damages....................................................................20

Prayer for Relief...........................................................................................23

## INTRODUCTION

1.      From approximately January 31, 2018, until approximately December 18, 2020, a Ramada Plaza by Wyndham hotel located at 5010 Old National Highway, College Park, Fulton County, GA (the "hotel") was owned and operated by Defendant Yeasmin Enterprises ("Yeasmin").

2.      From approximately December 18, 2020 until present, the hotel was owned and operated by Defendant Blue Lagoon Hospitality ("Blue Lagoon").

3.      From approximately August 1, 2020 until approximately June 1, 2021 (a period spanning through both owners), D.B. was repeatedly trafficked for sex at the hotel by Ashanti Cole ("Cole").

## PROCEDURAL ISSUES

4.      Plaintiff D.B. is a resident and citizen of Macon, Georgia who consents to the jurisdiction of this Court.

5.      Given the nature of the case, D.B. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed D.B.'s full name to defense counsel or will immediately upon identification of defense counsel.  When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for D.B. to

proceed anonymously.  Upon information and belief, Defendants will consent to D.B. proceeding without publicly disclosing her names.

6.  Defendant Yeasmin is as an administratively dissolved for-profit corporation that can be served through "any person, who, as an agent or officer of such corporation, was subject to be[ing] served as its officer or agent at the time of dissolution." O.C.G.A. § 14-4-161(b).  One such person is Mahammad M Rohoman who may be found at one of the following addresses:

> a.  310 Acreview Drive, Apt #6C, Alpharetta GA
>
> b.  5555 Roswell Road Apt Q13, Atlanta GA
>
> c.  145 Northwood Drive NE, Apt C1, Atlanta GA

7.  Defendant Yeasmin was properly served with process in this matter.

8.  Defendant Yeasmin is subject to the jurisdiction and venue of this Court.

9.  Defendant Blue Lagoon can be served through its registered agent Amin Virani at 1790 Sugarloaf Club Drive, Duluth, GA 30097.

10.  Defendant Blue Lagoon was properly served with process in this matter.

11.  Defendant Blue Lagoon is subject to the jurisdiction and venue of this Court.

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act which is a law of the United States.

13.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in College Park, Fulton County, Georgia which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## D.B. IS TRAFFICKED FOR SEX AT THE HOTEL

14.     In June of 2020, D.B. was a fifteen-year-old minor living with her mother who began chatting online with Cole.

15.     After several online Instagram interactions, D.B. agreed to meet Cole in person.

16.     Cole sent an Uber to retrieve D.B. and bring her back to Cole's home.

17.     At Cole's home, Cole told D.B. she would be his girlfriend.

18.     After a few months of living with Cole, Cole beat D.B. and told her she would be selling her body for sex, that Cole would be keeping the money, and that if D.B. did not agree there would be continued beatings and additional violence.

19.     Cole took D.B. to the hotel and again told her that she would be required to have sex with men in exchange for money, and that the money would go to Cole.

20.     Between approximately August of 2020 and approximately April of 2021, D.B. spent weeks at a time at the hotel being sold for sex by Cole.

21.     Cole threatened violence on D.B. if D.B. did not continue to perform sex work at the hotel.

22.     Cole would often choke and slap D.B.

23.     Cole carried a gun and would threaten D.B. with the gun.

24.     Cole hit D.B. in the ear causing significant lifelong hearing impairment out of this ear.

25.     Cole raped D.B. at the hotel.

26.     D.B. was sexually assaulted hundreds of times while at the hotel by various "Johns."

27.     Cole took the commercial sex act proceeds.

28.     For the duration of the stays, Cole used a portion of the proceeds from the commercial sex acts to book lodging at the hotel for the next night.

29.     Upon information and belief, Cole would use Defendants' WIFI network to post advertisements for D.B. to perform sex acts, and men would thereafter rape D.B. because of these advertisements.  Upon information and belief, Cole paid for use of Defendants WIFI network either through the room rental fees or a separate charge.

30.    Cole would not let the cleaning staff clean the rooms where D.B. was performing commercial sex acts.  Instead, either Cole or D.B. (at Cole's direction) would ask Defendants' cleaning staff for towels and sheets.  These requests for towels and sheets were made multiple times each day, and Defendants' staff always complied.

## COUNT 1: TVPRA CLAIMS

31.    Defendants' conduct, and likely Defendants' employees, remained the same under both owners.

32.    Defendant(s) "knowingly benefited" from D.B.'s trafficking because:

a.    Cole rented rooms at the hotel;

b.    Cole used the hotel WIFI network;

c.    Defendant(s) collected revenue from the room rentals and the use of the WIFI network; and

d.    D.B. was advertised for sex through the WIFI network and forced to have sex in the rooms.

33.    Defendant(s) took part in a common undertaking involving risk or profit with the trafficker(s) because:

a.    Plaintiff's trafficker(s) would pay in cash for one night at a time, booking the next night's stay before check-out time;

b.     Defendant(s) directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

d.     Defendant(s) were directly renting rooms to the same trafficker(s) – Plaintiff's trafficker(s);

e.     Defendant(s) had commercial dealings with Plaintiff's trafficker(s) and then continued to rent rooms to Plaintiff's trafficker(s).

f.     Defendant(s) had a continuous business relationship with Plaintiff's trafficker(s) such that Defendant(s) established a pattern of conduct with those trafficker(s).

g.     After renting the room for the first night, Plaintiff's trafficker(s) had prior commercial dealings with Defendant(s) and then reinstated those dealings.

h.     Defendant(s) associated with Plaintiff's trafficker(s) in an effort to force Plaintiff to serve Defendant(s)' business objectives.

i.     Defendant(s) owned, operated, and maintained the hotel in question.

34.     Plaintiff's trafficker's undertaking with Defendant(s) violated the TVPRA with respect to Plaintiff because:

a.     Cole recruited D.B. to participate in commercial sex acts at Defendants' hotel by, among other reasons, stating that he would take care of her and then making her work as a prostitute;

b.     Cole harbored D.B. at Defendants' hotel for the purpose of D.B. participating in commercial sex acts at the property;

c.     Cole transported D.B. to Defendants' hotel for the purpose of D.B. participating in commercial sex acts at the hotel;

d.    Cole maintained D.B. at Defendants' hotel for the purpose of D.B. participating in commercial sex acts at the hotel;

e.    The commercial sex acts occurred at Defendants' hotel in rooms rented by Cole;

f.    Cole used force, threats of force, fraud, and coercion to cause D.B. to participate in commercial sex acts at Defendants' hotel;

g.    Cole threatened D.B. with violence and used this tactic to cause D.B. to engage in commercial sex acts at Defendants' hotel;

h.    Cole de-frauded D.B. by falsely telling her that he would take care of her, and then forcing her to work as a prostitute for him at Defendants' hotel;

i.    Cole coerced D.B. to participate in commercial sex acts at Defendant's property by threatening D.B. with physical harm if she did not continue to engage in commercial sex acts at Defendants' hotel;

j.    Cole knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited D.B. to engage in commercial sex acts in the hotel rooms that Cole rented from Defendant(s);

k.    Buyers came to Defendants' hotel, purchased the "right" to have sex with D.B. from Cole, and then the buyers raped D.B. in Defendants' hotel;

l.    Cole was aware that D.B. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendants' hotel;

m.    Cole utilized Defendant(s)' wireless internet connection to post advertisements of D.B. for the commercial sex acts; and

n.    Other actions to be proven at trial.

35.    The venture in which Defendants participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of credit cards to post online advertisements through websites for selling D.B. in commercial sex acts, the use of the internet to post sex advertisements, the use of interstate highways to transport D.B. to the hotels by her trafficker(s) (and her associates), and other reasons to be proven at trial.

36.    Defendant(s) had actual or constructive knowledge that the undertaking violated the TVPRA, i.e., Defendants had actual or constructive knowledge that D.B. was being trafficked for sex. *See* Fed. R. Civ. P. 9(b)("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, *LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

37.    Defendant(s) directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its hotel at all relevant times, giving Defendant(s) specific and direct knowledge of sex trafficking, including the sex trafficking that victimized D.B., and other crimes at the hotel during the relevant period.

38.    D.B.'s victimization followed a pattern that was readily observable and should have been obvious to Defendants' employees based on information available to the public at large and to the hotel industry.

39.    Defendant(s) knew or should have known of the existence and prevalence of sex trafficking at budget motels and its illegality because of industry knowledge such as:

    a.    the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000.

    b.    the implementation of the Tourism Child Protection Code of Conduct (the "Code") by End Child Prostitution and Trafficking (ECPAT-USA) which outlines well-established best practices for the hospitality industry to combat sex trafficking, and identifies six simple steps hotels can take to prevent child sex trafficking.

    c.    extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking

    d.    extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and

    e.    the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

40.    Defendant(s) had actual knowledge of the publicly available online reviews from Google, My Business, Priceline, Trip Advisor, etc. in which customers

reported allegations of prostitution, sex trafficking, and other illicit activities

occurred at the Hotel including reviews that state:

a) The worst hotel ever. . .Not safe at all. . .Full of drug dealer and prostitutes. . .

b) [Lots of] teens and grownups. . .doing drugs. . .

c) . . .i've never felt so unsafe in a hotel in my life. . .

d) . . .three men tried to bang [my mother's] door down. . .the front desk person just allowed these three men to just stay downstairs. . .

e) . . .at least thirty cars had been broken into. . .they told us they had a security guard 24/7. . .corporate won't do anything. . .this place is shady

f) Feared for my life, seriously. . .couple of gangers looking guys out front with billy clubs. . .

g) This hotel has the absolutely WORST security!  I'd be shocked if they had security at all. . .

h) ATTEMPTED ROBBERY!!!. . .we decided to leave for safety. . .This location is UNSAFE.

i) Don't book here. . .crime is heavy. . .security is busy socializing than actually surveying. . .

j) There were freaks walking around the Motel that looked like they were not staying there. . .parking lot was over run with similar types

k) . . .my wife was nearly mugged in the parking lot

l) Random people hang out around the hotel. . .

m) . . .we found a used needle in the bathroom

n) Area was very sketchy.  Lots of riffraff floating round inside and out. . .

41.    Upon information and belief, Defendant(s) had actual or constructive knowledge of law enforcement activity reporting widespread prostitution, sex trafficking, and other illicit activities occurring at Defendant's hotel.

42.    Upon information and belief, based on the numerous arrests, investigations, and police reports, Defendant(s) knew or should have known of the sex trafficking and prostitution ventures operating out of its hotel prior to Plaintiff's sex trafficking.

43.    Regarding D.B., Defendant(s) observed the vast majority of the evidence that the Department of Homeland Security ("DHS") posts as guidelines to identify and prevent of sex trafficking for hotel staff to be vigilant in observing including:

a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b.  persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

    f.   the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

    g.   extended stay with few or no personal possessions in the room;

    h.   excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

    i.   the same person reserves multiple rooms;

    j.   a room is rented hourly, less than a day, or for an atypical extended stay;

    k.   attempts to sell items to or beg from patrons or staff;

    l.   cars in the parking lot regularly parked backward, so the license plates are not visible;

    m.  loitering and solicitation of male patrons; and

    n.   persons asking staff or patrons for food or money.[1]

44.     Regarding D.B., Defendant(s) observed the vast majority of the evidence that the organization End Child Prostitution and Trafficking (ECPAT-USA) has listed as specific indicators of human trafficking that hotel staff should recognize to combat trafficking including: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists

---

[1] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).

on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings.[2]

## COUNT 2:  STATE LAW RICO CLAIMS

45.    Defendant(s) violated Georgia's Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO") when it acquired and maintained, directly and indirectly, an interest in money through a pattern of racketeering activity at the hotel. O.C.G.A. § 16-14-4(a)

46.    Defendant(s) also violated Georgia RICO when it conspired and endeavored to acquire and maintain, directly and indirectly, an interest in money through a pattern of racketeering activity at the hotel. O.C.G.A. § 16-14-4(c).

47.    Defendant(s) knowingly and willfully joined a conspiracy at the hotel, which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly from the hotel.

---

[2]    *See*    ECPAT-USA,    *Human    Trafficking    Indicators*,    available    at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

48.     Defendant(s)'s acts of racketeering had the same or similar accomplices, including, but not limited to the sex traffickers and buyers.  Defendant, as a party to the crime, and as co-conspirators, while having and exercising control over the use of the hotel, devised an unlawful scheme designed to maximize profits to the detriment of guests and invitees —no matter the means or the cost.

49.     Defendant(s) engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions by keeping a place of prostitution and by pimping in violation of Georgia law. O.C.G.A. §16-14-3(5)(A)(vii) (both keeping a place of prostitution and pimping are predicate acts under Georgia RICO); *see also* O.C.G.A. § 16-6-10 (keeping a place of prostitution); O.C.G.A. § 16-6-11(5) (pimping).

50.     While sex trafficked out of Defendant(s)' hotel, countless men paid money to have sex with D.B. in the hotel rooms Defendant(s) rented to D.B.'s trafficker(s) and associates.

51.     Defendant(s) kept a place of prostitution by receiving money and by acting individually, as parties to the crime, and as co-conspirators, while having and exercising control over the hotel, which offered seclusion or shelter for the practice of prostitution, knowingly granting  and permitting the use of that location for the

purpose of prostitution, in violation of O.C.G.A. § 16-6-10. This constitutes racketeering activity. O.C.G.A. § 16-14- 3(5)(A)(vii).

52.    Defendant(s) was also "pimping" by receiving proceeds and profits derived from prostitution and aiding and abetting the trafficker(s) in the commission of the plan to force others into commercial sex acts.

53.    While Defendant(s) had control over the use the hotel, which offered seclusion or shelter for the practice of prostitution, it knowingly granted and permitted its use for the purpose of prostitution.

54.     Defendant(s) engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

55.    The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

56.    Defendant(s)'s acts of racketeering had the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

57.    Defendant(s)'s acts of racketeering had the same or similar victims, including, but not limited to, Plaintiff D.B. and other victims who were engaging in sexual acts in exchange for money at the hotel.

58.     The racketeering violations committed by Defendant(s) involved transactions affecting D.B., and as a result, Plaintiff's injuries flow directly from the pattern of racketeering violations committed by Defendant(s).

59.     Upon information and belief, management level employees were involved and participated in the racketeering violations.

## COUNT 3:  PREMIES AND NUISANCE CLAIMS

60.     At all relevant times, Defendant(s) owed a duty to invitees of the hotel, including D.B., to exercise ordinary care in keeping the premises and approaches of the hotel safe. *See* O.C.G.A. § 51-3-1.

61.     At all relevant times, Defendant(s) had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at its property. *See* O.C.G.A. § 44-1-4.

62.     Defendant(s) had actual and constructive knowledge of criminal activity at the premises that made the repeated rapes of D.B. foreseeable to Defendant(s).

63.     Defendant(s) knew or should have known the steps to take to prevent the hotel from being used as a venue for sex trafficking, including D.B.'s minor sex trafficking, but negligently failed to remedy, prevent or report the sex trafficking.

64.     Defendant(s) was negligent and said negligence proximately caused

Plaintiff D.B.'s injuries in the following ways:

<ol type="a" start="1">
<li>Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;</li>

<li>Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;</li>

<li>Negligently failing to provide appropriate and effective security personnel during D.B.'s minor sex trafficking at the hotel;</li>

<li>Negligently failing to properly inspect and maintain the premises;</li>

<li>Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the hotel;</li>

<li>Negligently failing to properly retain, hire, train, and supervise said employees;</li>

<li>Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;</li>

<li>Negligently failing to respond to online reviews and publicly available information;</li>

<li>Negligently failing to prevent loitering, pandering, prostitution and trespassing;</li>

<li>Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;</li>

<li>Negligently failing to inspect, patrol, or appropriately monitor the property;</li>

<li>Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols,</li>
</ol>

inspections, physical, and  other landscaping adjustments, and other measures available;

m.   Negligently failing to remediate a long history of crime at the Hotel and the area nearby;

n.   Negligently failing to warn invitees of known hazards at the property;

o.   Negligently representing to invitees that the property was safe; and

p.   Other negligent acts that violated Georgia common law to be proved at trial.

65.   Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendant(s) and one or more or all above stated acts was the proximate causes of the injuries sustained by D.B.

66.   Defendant(s) is liable for the minor sex trafficking of Plaintiff D.B.

**PROXIMATE CAUSE AND DAMAGES**

67.   D.B.'s sex trafficking and victimization at the hotel was a foreseeable and preventable result of Defendant(s) actions and inactions including failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its hotel and failing to prevent D.B.'s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

68.   As a direct and proximate result of Defendant(s)' actions, D.B. suffered

substantial physical, emotional, and psychological harm and other damages.

69.     Defendants are jointly and severally liable with each other and the trafficker and any other non-party actors who participated in the trafficking for the indivisible injuries that were proximately caused to D.B.

70.     Defendants are liable for D.B.'s damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under the TVPRA and other federal law. *See* 18 U.S.C. § 1595(a) (a victim "may recover damages and reasonable attorneys fees"); *see also Barry v. Edmunds*, 116 U.S. 550, 562 (1886) ("it is a well-established principle of the common law. . .that a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant. . ."); 18 U.S.C. § 2255(a) (minor victim may recover "actual damages. . .reasonable attorney's fees. . .[and] punitive damages. . .")

71.     Plaintiff D.B. brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

    a.     Personal injuries;

    b.     Past, present and future pain and suffering;

     c.     Disability;

     d.     Disfigurement;

     e.     Mental anguish;

     f.     Loss of the capacity for the enjoyment of life;

     g.     Loss of earning capacity;

     h.     Lost wages;

     i.     Diminished capacity to labor;

     j.     Incidental expenses;

     k.     Past, present and future medical expenses;

     l.     Permanent injuries;

     m.     Attorney's fees;

     n.     Punitive damages; and

     o.     Consequential damages to be proven at trial.

72.    Punitive damages should be imposed upon Defendants without limitation or cap for its actions which are explained more fully above.

73.    Defendants is also liable for paying Plaintiff's attorneys' fees and litigation expenses pursuant to the TVPRA.

74.    Defendants are also liable for treble damages under Georgia RICO laws.

75.     Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendants, and one or more or all of the above stated acts were the proximate cause of the injuries and damages sustained by the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against the Defendant and for the following:

1)     That process and summons issue requiring each Defendant to appear as provided by law to answer the allegations of the Complaint;

2)     Plaintiff be awarded actual damages in amounts to be shown at trial;

3)     Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from each Defendant;

4)     Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)     Punitive damages be imposed upon each Defendant;

7)     Treble damages be imposed upon each Defendant;

8)     Plaintiff be provided with a trial by jury; and

9)     Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

[signature on next page]

This 6th day of March, 2023.

/s/ Matthew B. Stoddard
Matthew B. Stoddard
Ga. Bar No.: 558215
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com