# EXHIBIT A



**A3M / ALL**
**Transmittal Number: 26337273**
**Date Processed: 02/06/2023**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Nicole Vandeveer<br>TrueBlue, Inc.<br>1015 A St<br>Tacoma, WA 98402-5122 |
| **Electronic copy provided to:** | Garrett Ferencz<br>Dani Covarrubias<br>Pam Gamboa<br>Michelle Isaacson |

| | |
|---|---|
| **Entity:** | PeopleScout, Inc.<br>Entity ID Number  2500111 |
| **Entity Served:** | PeopleScout, Inc. |
| **Title of Action:** | Jeffrey Kitchens vs. Peoplescout, Inc. |
| **Matter Name/ID:** | Jeffrey Kitchens vs. PeopleScout, Inc. (12086637) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Gwinnett County State Court, GA |
| **Case/Reference No:** | 23-C-00791-S4 |
| **Jurisdiction Served:** | Georgia |
| **Date Served on CSC:** | 02/06/2023 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Smith Law, LLC<br>678-889-5191 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

CLERK OF STATE COURT
GWINNETT COUNTY, GEORG
**23-C-00791-S**
**2/3/2023 3:22 P**
TIANA P. GARNER, CLER

## IN THE STATE COURT OF GWINNETT COUNTY

### STATE OF GEORGIA

# Jeffrey Kitchens,

_____

_____

PLAINTIFF

VS.

# PeopleScout, Inc.,

_____

_____

DEFENDANT

23-C-00791-S4

CIVIL ACTION
NUMBER:_____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

William J. Smith
Smith Law, LLC
3611 Braselton Hwy., Ste. 202
Dacula, GA 30019

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This **3rd** _____ day of **February** _____, 20**23** .

Tiana P. Garner
Clerk of State Court

By _____
Deputy Clerk

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

SC-1 Rev. 2011

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of  Gwinnett State Court  County

| For Clerk Use Only | 23-C-00791-S4 |
|---|---|
| Date Filed _____ <br> **MM-DD-YYYY** | **Case Number** _____ |

**Plaintiff(s)**
Kitchens, Jeffrey

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**
PeopleScout, Inc.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney**  William Julian Smith     **State Bar Number** 710280     **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
Case Number              Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

CLERK OF STATE COU[RT]
GWINNETT COUNTY, GEORG[IA]
23-C-00791-S[4]
2/3/2023 3:22 P[M]
TIANA P. GARNER, CLE[RK]

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **JEFFREY KITCHENS,** | |
| **Plaintiff,** | **CIVIL ACTION NO.** |
| **v.** | 23-C-00791-S4 |
| **PEOPLESCOUT, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

### COMPLAINT

Plaintiff Jeffrey Kitchens ("Plaintiff" or "Kitchens") hereby brings this civil action for damages against defendant PeopleScout, Inc. ("Defendant" or "PeopleScout" or "the Company") further stating as follows:

### NATURE OF ACTION

1.

This Action seeks to recover damages for unpaid commissions, together with prejudgment interest and attorneys' fees as permitted by law, and all other damages permitted by law.

### PARTIES, JURISDICTION, AND VENUE

2.

Kitchens is an individual and resident of the state of Georgia.

3.

PeopleScout is a for-profit corporation incorporated in the state of Delaware and with a principal place of business in the state of Illinois.

4.

PeopleScout is generally subject to the jurisdiction of courts in Georgia because it regularly does business throughout Georgia and maintains a registered agent in Gwinnett County, Georgia.

1

5.

Service on PeopleScout may be effectuated by serving its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

6.

This Court has subject matter jurisdiction over the claims brought herein because this is a civil action for money damages arising out of unpaid commissions, and exclusive jurisdiction is not vested in the superior courts for these types of actions. O.C.G.A. § 15-7-4(a)(2).

7.

Venue in Gwinnett County is proper because the office of PeopleScout's registered agent is in Gwinnett County. O.C.G.A. § 14-2-510(b)(1).

## FACTS RELEVANT TO ALL COUNTS

8.

According to PeopleScout's website, "PeopleScout is the world's largest [Recruitment Process Outsourcing ("RPO")] provider managing talent acquisition solutions that span the global economy[.]" https://www.peoplescout.com/ (accessed on 01/19/23 at 1:20 pm EDT).

9.

Kitchens started working for PeopleScout on January 25, 2021 as the Director of Business Development and Sales for North America. In that role, Kitchens solicited clients for PeopleScout's service offerings and aided in implementing those offerings for PeopleScout's clients.

10.

Kitchens was paid a salary of $160,000.00 plus commissions.

11.

In early 2021, former Senior Vice President of Business Development George Tate ("Tate") drafted the PeopleScout Sales Team 2021 Incentive Plan ("the Plan"). See (Tate Affidavit (attached hereto as **Exhibit "1"**) at ¶ 5). A true and accurate copy of the Plan is attached hereto as **Exhibit "2"** and to the Tate Affidavit as **Exhibit "A"**.

12.

Part of Tate's job was to recruit a sales team and incentivize them to make sales and drive revenue for the Company. (Tate Aff. ¶ 3).

13.

One of the main ways Tate recruited and incentivized the members of the sales team was through commissions payments. Tate wanted to offer commissions that were competitive, linked to each salesperson's performance, and potentially lucrative for the salesperson because Tate believed that this would incentivize the salesperson to make more sales, which would in turn drive revenue for the Company. Tate drafted the Plan with these goals in mind. (Tate Aff. ¶¶ 4, 5).

14.

The Plan offered a tiered commission structure with commissions between 2.0% and 5.5%. This is reflected on Page 2 of the Plan. (Tate Aff. ¶ 6; Ex. 2 p. 2).

15.

Around May of 2021, Tate asked Kitchens if he would be willing to try to procure all of Waste Management's ("WM") RPO work (hereafter, "the WM Deal" or "the Deal"). (Tate Aff. ¶ 7).

16.

At the time, PeopleScout was already handling some of WM's RPO work, but most of it was being handled by a competitor (Cielo). Also, the existing deal between PeopleScout and WM

was set to expire. Tate's goal was for PeopleScout to completely take all of WM's RPO work from Cielo. (Tate Aff. ¶ 8).

17.

Senior Vice President of Client Delivery Chris Gould told Tate that he (Gould) needed a salesperson working the WM Deal who could secure the business. (Tate Aff. ¶ 9).

18.

The WM Deal was worth $13 million per year over three years for a total of $39 million. (Tate Aff. ¶ 9).

19.

Tate believed Kitchens was an excellent salesman who could close the WM Deal, so he told Gould that Kitchens was the right person for the job. Tate then asked Kitchens whether he was willing to work the Deal. (Tate Aff. ¶ 9).

20.

Because PeopleScout was already handling some of the RPO work for WM, the WM Deal was classified under the Plan as a "Renewal"—a contract with an existing client that is set to expire and that is being proposed as an extension/new contract. Renewals were not eligible for commissions under the Plan. (Tate Aff. ¶ 10; Ex. 2 p. 7).

21.

Kitchens did not want to work the WM Deal unless he could get paid a commission on the Deal. So, Tate went to Gould and then-CEO of PeopleScout Brannon Lacey and told them that if Kitchens agreed to work the WM Deal and was able to close it, then PeopleScout should pay him a commission that was calculated according to the ARR Commission Table on Page 2 of the Plan. (Tate Aff. ¶ 11).

4

22.

Gould and Lacey agreed to this arrangement, so Tate told Kitchens that if he worked the WM Deal and was able to close it, PeopleScout would pay him a commission on the WM Deal that was calculated according to the ARR Commission Table on Page 2 of the Plan. Kitchens agreed to work the WM Deal after Tate told him this. (Tate Aff. ¶ 11).

23.

Gould, Lacey, and Tate did not agree to make the WM Deal (or Renewals generally) subject to the Plan. Rather, they simply agreed to pay Kitchens a commission on the WM Deal and to calculate it according to the ARR Commission Table on Page 2 of the Plan. (Tate Aff. ¶ 12).

24.

Kitchens had discretion to either work or not work the WM Deal regardless of whether the Company agreed to pay him a commission on it, but he decided to work the WM Deal after Tate told him that PeopleScout would pay him a commission on the Deal that was calculated according to the ARR Commission Table on Page 2 of the Plan. (Tate Aff. ¶¶ 11, 13).

25.

Ultimately, the WM Deal did close. It was verbally agreed to around October of 2021, and the written contract was formally executed around December of 2021. Kitchens' work was instrumental in getting the Deal closed. (Tate Aff. ¶ 14).

26.

The WM Deal was worth $13 million in 2022, $13 million in 2023, and $13 million in 2024. According to the ARR Commission Table set forth on Page 2 of the Plan (which is how Tate, Gould, and Lacey agreed that Kitchens' commission on the WM Deal would be calculated), in each of these three years, Kitchens should have been paid a 3% commission on the first $5

million ($150,000.00), a 3.5% commission on the next $2 million ($70,000.00), a 4% commission on the next $2 million ($80,000.00), and a 5.5% commission on the final $4 million ($220,000.00). Thus, Kitchens should have been paid $520,000.00 per year in commissions on the WM Deal from 2022 through 2024 for a total of $1,560,000.00 over that three-year period.

27.

Throughout Kitchens' employment, commissions had been paid on deals at the end of each month starting with the first full month that PeopleScout received revenue from the deal in question. These commissions were direct deposited into Kitchens' bank account together with his regular salary and reflected on his paystub with his regular salary.

28.

Pursuant to this prior course of dealing, Kitchens expected to receive his first payment on the WM Deal on the last payday of February 2022, which fell on Friday, February 25th.

29.

Lacey left PeopleScout voluntarily in August of 2021. In December of 2021, several other members of PeopleScout's Executive Team (including Tate) were separated from PeopleScout.

30.

In early 2022, several weeks before Kitchens' first commissions payment for the WM Deal was to be paid, Senior Vice President Jessie McGowan told Kitchens that PeopleScout would not pay him any commission on the WM Deal. Kitchens protested, but to no avail.

31.

On February 25, 2022, Kitchens' pay was direct deposited into his bank account that morning, but no commissions for the WM Deal were included. Later that afternoon, Kitchens was terminated.

32.

To date, Kitchens has been paid nothing in commissions on the WM Deal.

## COUNT 1

33.

Kitchens restates and incorporates by reference Paragraphs 8-32 of this Complaint as if fully set forth and restated herein.

34.

PeopleScout's oral promise to pay Kitchens a commission if he worked and closed the WM Deal, and Kitchens' act of working and closing the WM Deal, created a valid and binding oral contract that PeopleScout has breached.

35.

PeopleScout breached this oral contract in bad faith.

36.

PeopleScout orally promised Kitchens that he would be paid a commission on the WM Deal that was to be calculated according to the ARR Commission Table on Page 2 of the Plan if he was able to close it. Kitchens was able to close the WM Deal.

37.

Kitchens agreed to work, did work, and eventually closed the WM Deal in full reliance on PeopleScout's promise to pay him commission on the WM Deal. In so doing, Kitchens expended time and energy on the WM Deal that he would have otherwise expended on other deals that fell under the Plan and for which he would have been paid a commission under the Plan. In other words, Kitchens forwent his right to work other deals and earn commissions on them to work the WM Deal.

7

38.

Injustice can be avoided only by enforcing the promise made to Kitchens related to the WM Deal.

39.

Kitchens is entitled to prejudgment interest at the rate of 7% per annum beginning on the date that the funds were first due and payable, or beginning at the time of PeopleScout's breach. O.C.G.A. §§ 7-4-2(a)(1)(A); 7-4-15; 13-6-13.

## COUNT 2

40.

Kitchens restates and incorporates by reference Paragraphs 8-32 of this Complaint as if fully set forth and restated herein.

41.

Kitchens trusted PeopleScout to make good on its promise to pay him a commission on the WM Deal if he was able to close the Deal. This trust is what prompted him to work the Deal.

42.

The facts and circumstances surrounding the promises that PeopleScout made to Kitchens related to the WM Deal created a confidential and/or fiduciary relationship between the parties.

43.

This confidential relationship and/or fiduciary relationship between the parties related to the WM Deal required PeopleScout to exercise good faith towards Kitchens related to the WM Deal.

44.

PeopleScout breached its confidential and/or fiduciary duty to Kitchens by failing to exercise good faith towards Kitchens related to the WM Deal. This breach resulted in Kitchens suffering economic harm in the form of unpaid commissions. Kitchens has also suffered non-economic harm consisting of (inter alia) emotional distress, mental anguish, loss of enjoyment, etc., because of this breach.

## COUNT 3
## LITIGATION EXPENSES UNDER O.C.G.A. § 13-6-11

### 45.

Kitchens restates and incorporates by reference Paragraphs 8-32 of this Complaint as if fully set forth and restated herein.

### 46.

Without any valid explanation, PeopleScout refused to pay Kitchens for earned commissions on the WM Deal, and fired Kitchens because he complained about not being paid these commissions.

### 47.

On June 18, 2022, after Kitchens had sent an offer of compromise related to the subject commissions, someone from PeopleScout's legal department called Tate and asked whether he had ever promised Kitchens that he would be paid a commission on the WM Deal. Tate told the person that he had, that Lacey and Gould had agreed with him, and that PeopleScout should still be in possession of the minutes from the meeting wherein the three of them agreed to this. Tate also told this person that Gould (who still worked at PeopleScout at the time) could confirm that this agreement had been reached.

### 48.

Prior to filing this Action, Kitchens' counsel provided PeopleScout with the Tate Affidavit in an effort to foster settlement.

49.

To date, PeopleScout has failed and refused to pay Kitchens any commissions on the WM Deal.

50.

Thus, PeopleScout has acted in bad faith, has been stubbornly litigious, and/or has caused Kitchens unnecessary trouble and expense. So, Kitchens is entitled to recover his litigation expenses (including his reasonable attorneys' fees) from PeopleScout pursuant to O.C.G.A. § 13-6-11.

## COUNT 4
## PUNITIVE DAMAGES UNDER O.C.G.A. § 51-12-5.1

51.

Kitchens restates and incorporates by reference Paragraphs 8-32 of this Complaint as if fully set forth and restated herein.

52.

If a jury finds, by clear and convincing evidence, that PeopleScout's breach of the confidential and/or fiduciary relationship that it owed to Kitchens related to the WM Deal shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, then Kitchens is entitled to an award of punitive damages.

## DEMAND FOR JURY TRIAL

53.

10

Kitchens demands a trial by jury as to all issues so triable.

**WHEREFORE, Plaintiff prays for relief as follows:**

(1) For a trial by jury;

(2) As to Count 1, for a verdict and judgment awarding past, present, and future economic damages in the amount of $1,560,000.00 (before net present value reduction);

(3) As to Count 1, for prejudgment interest on the damage award calculated at 7% per annum beginning on the date that the funds were first due and payable, or beginning at the time of PeopleScout's breach;

(4) As to Count 2, for a verdict and judgment awarding past, present, and future economic damages in the amount of $1,560,000.00 (before net present value reduction), as well as damages for Kitchens' non-economic harm in an amount to be determined by the enlightened conscience of the jury;

(5) As to Count 3, for a verdict and judgment awarding reasonable litigation expenses (including, without limitation, reasonable attorneys' fees) under O.C.G.A. § 13-6-11 and any other applicable statute or controlling decision;

(6) As to Count 4, for a verdict and judgment awarding punitive damages in an amount to be determined by the enlightened conscience of the jury; and

(7) For such other and further relief as the Court deems just and proper.

Date: February 3, 2023.                          Respectfully submitted,

                                                 SMITH LAW, LLC

                                    By:    */s/ William J. Smith*
                                           William J. Smith
                                           Georgia Bar No. 710280

william@smithlaw-llc.com
Louise N. Smith
Georgia Bar No. 131876
louise@smithlaw-llc.com
*Attorneys for Plaintiff*

3611 Braselton Highway, Suite 202
Dacula, GA 30019
T: (678) 889-5191 (Main)
T: (678) 889-2264 (William Direct)
T: (678) 889-2898 (Louise Direct)
F: (844) 828-5615

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2023, I have caused or will cause service of this

COMPLAINT to issue upon the Defendant as required by law by serving Defendant's registered

agent at the following address:

Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA 30092

Respectfully submitted,

By:  */s/ William J. Smith*
William J. Smith
Georgia Bar No. 710280
*Attorney for Plaintiff*

# EXHIBIT 1

AFFIDAVIT OF

Personally appeared before the undersign

oaths in this State, came George Tate, who, havin

My name is George Tate. I am over eig

affidavit. The statements made within this affi

authorize this the use of this affidavit for any pur

2. From January through December of 202

Business Development at PeopleScout, Inc. ("Peo

3. Part of my job in this role was to recruit

and drive revenue for the Company.

4. One of the main ways I recruited and in

through commissions payments. I wanted to offe

8.      At the time, PeopleScout was already hand

was being handled by a competitor (Cielo). Also,

was set to expire. We didn't just want to renew

but completely take all of WM's RPO work from

9.      Senior Vice President of Client Delivery

working the WM Deal who could secure the bu

over three years for a total of $39 million), and

believed he could close it. So I told Chris that Jef

Jeff whether he was willing to work it.

10.      Because PeopleScout was already handlin

was classified under the Plan as a "Renewal"—a

and that is being proposed as an extension

and to calculate it according to the ARR Commi

told Jeff that we were making the WM Deal subj

he'd get a commission on the WM Deal that wa

Table on Page 2 of the Plan if he was able to clos

13.     Jeff had discretion to either work or not

Company agreed to pay him a commission on it.

14.     Ultimately, the WM Deal did close. It was

the written contract was formally executed

instrumental in getting the deal closed.

15.     Before the Executive Team was let go i

end-of-year records in Salesforce showed that t

revenue for 2022 was $13 million.

19. We had the best year in the Company'

let Jeff go.

By my signature below, I affirm und

in this affidavit are true and correct to the bes

FURTHER AFFIANT SAYETH NAUGHT.

Sworn to and subscribed before me this

13th day of September 2022

Notary Public

# EXHIBIT "A"



# PeopleScout Sales Team
# 2021 Incentive Plan
### Effective FY2021

## Plan Overview

The plan was developed to support PeopleScout's 2021 tactical and strategic plans and key business objectives by attracting and motivating qualified employees for all sales-related positions. The plan is designed to ensure that the total commission opportunity for each Employee is competitive and directly linked to an individual's performance.

Deals that qualify for commissions under this plan include Recruitment Process Outsourcing, Recruiter On Demand, Managed Service Provider, and other projects for PeopleScout service offerings in which a sales process including client meetings, proforma, proposal, and contract were created and whereby the sales person contributed materially to the sales process.

## Overview of Plan Measures

## Measure 1: Monthly Sales Commission

### Description:

Each month, eligible Sales Team members can earn a commission based upon actual revenue. The commission period starts with the first full month of revenue.

Services in North America can be broken out into three broad categories for commission purposes: Annual Recurring Revenue (ARR) deals, Recruiter on demand (ROD) or Projects/pilots (non-ARR deals), and Direct Hire. Commissions rates are outlined below.

**Category 1:** Annual Recurring Revenue (ARR)

#### Pay Curve Mechanics:

There are four revenue tiers in your pay curve to provide incremental payouts for incremental performance. Each Revenue tier is calculated separately.

#### Calculation:

Monthly ARR Commissions = Actual Revenue * Commission %

#### ARR Commission Table:

| Revenue Tiers | Commission % |
|---|---|
| $0-$5,000,000 | 3.00% |
| $5,000,001-$7,000,000 | 3.50% |
| $7,000,001-$9,000,000 | 4.00% |
| >$9,000,001 | 5.50% |

#### Segment Profit Margin Kicker:

Eligible Sales Team members may receive an additional bonus of 25% of actual commissions earned when the Segment Profit Margin of each ARR deal calculated after 12 months is above 40.0%. The additional commissions will be paid on the final commission payment.

#### Calculation:

Additional Commissions = Actual Commissions Earned * Segment Profit Margin Kicker 25%

**Category 2:** Recruiter on Demand (ROD) and Projects/Pilots (non-ARR deals)

#### Pay Curve Mechanics:

There are four revenue tiers in your pay curve to provide incremental payouts for incremental performance. Each Revenue tier is calculated separately.

#### ROD and non-ARR Commission Table:

| Revenue Tiers | Commission % |
|---|---|
| $0-$2,000,000 | 2.00% |
| $2,000,0001-$2,500,000 | 2.25% |
| $2,500,001-$3,000,000 | 2.50% |
| >$3,000,001 | 2.75% |

**Category 3:** Direct Hire

#### Calculation:

Monthly Commission = Segment profit * 10% commission rate

**Crediting:** Commission period begins after the first full month of revenue (or the month following Go Live). Monthly Payouts are calculated based on actual Revenue recognized in a month during the Commissionable Period and will be paid the following month.

## Measure 2: Annual Sales Bonus

**Description:**

Each year, eligible Sales Team members may receive an Annual Bonus based upon revenue achievement.

Eligible Sales Team members may receive an annual bonus of Circle of excellence (COE) trip when 130% of quota is met and an annual bonus of $20,000 when 150% of quota is met.

**Crediting:**  Annual payouts are calculated and paid the following February when all other annual bonuses are paid.

Calculation Example

**Employee A:** Quota set at $3M for first year, $4M for second year

**Measure 1: Category 1:** Annual Recurring Revenue (ARR) Commission calculation (Excluding Kicker):

| Employee A Year 1 Deals | Actual Revenue per Deal per Month | | | | Total Revenue - Year 1 Deals | Actual Revenue per Month - Year 1 Deals | Commission % - Year 1 Deals | | | | Monthly ARR Commissions - Year 1 Deals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deal 1 | Deal 2 | Deal 3 | Deal 4 | | | 3.0% | 3.5% | 4.0% | 5.5% | |
| Month 1 | $80,000 | | | | $80,000 | $80,000 | $80,000 | | | | $2,400 |
| Month 2 | $95,000 | | | | $175,000 | $95,000 | $95,000 | | | | $2,850 |
| Month 3 | $75,000 | $75,000 | | | $325,000 | $150,000 | $150,000 | | | | $4,500 |
| Month 4 | $85,000 | $75,000 | | | $485,000 | $160,000 | $160,000 | | | | $4,800 |
| Month 5 | $100,000 | $76,000 | | | $661,000 | $176,000 | $176,000 | | | | $5,280 |
| Month 6 | $102,000 | $76,000 | | | $839,000 | $178,000 | $178,000 | | | | $5,340 |
| Month 7 | $105,000 | $76,000 | $125,000 | | $1,145,000 | $306,000 | $306,000 | | | | $9,180 |
| Month 8 | $110,000 | $85,000 | $125,000 | | $1,465,000 | $320,000 | $320,000 | | | | $9,600 |
| Month 9 | $110,000 | $85,000 | $125,000 | | $1,785,000 | $320,000 | $320,000 | | | | $9,600 |
| Month 10 | $110,000 | $85,000 | $105,000 | | $2,085,000 | $300,000 | $300,000 | | | | $9,000 |
| Month 11 | $120,000 | $72,000 | $105,000 | $265,000 | $2,647,000 | $562,000 | $562,000 | | | | $16,860 |
| Month 12 | $105,000 | $72,000 | $110,000 | $265,000 | $3,199,000 | $552,000 | $552,000 | | | | $16,560 |
| Month 13 | | $70,000 | $112,000 | $265,000 | $3,646,000 | $447,000 | $447,000 | | | | $13,410 |
| Month 14 | | $70,000 | $115,000 | $242,000 | $4,073,000 | $427,000 | $427,000 | | | | $12,810 |
| Month 15 | | | $113,000 | $242,000 | $4,428,000 | $355,000 | $355,000 | | | | $10,650 |
| Month 16 | | | $125,000 | $242,000 | $4,795,000 | $367,000 | $367,000 | | | | $11,010 |
| Month 17 | | | $125,000 | $280,000 | $5,200,000 | $405,000 | $205,000 | $200,000 | | | $13,150 |
| Month 18 | | | $125,000 | $280,000 | $5,605,000 | $405,000 | | $405,000 | | | $14,175 |
| Month 19 | | | | $280,000 | $5,885,000 | $280,000 | | $280,000 | | | $9,800 |
| Month 20 | | | | $220,000 | $6,105,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 21 | | | | $220,000 | $6,325,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 22 | | | | $220,000 | $6,545,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 23 | | | | | $6,545,000 | $0 | | | | | $0 |
| Month 24 | | | | | $6,545,000 | $0 | | | | | $0 |
| | | | | | | Total Revenue per commission % | $5,000,000 | $1,545,000 | $0 | $0 | |

| Employee A Year 2 Deals | Actual Revenue per Deal per Month | | | | Total Revenue - Year 2 Deals | Actual Revenue per Month - Year 2 Deals | Commission % - Year 2 Deals | | | | Monthly ARR Commissions - Year 2 Deals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deal 1 | Deal 2 | Deal 3 | Deal 4 | | | 3.0% | 3.5% | 4.0% | 5.5% | |
| Month 1 | | | | | $0 | $0 | $0 | | | | $0 |
| Month 2 | $120,000 | | | | $120,000 | $120,000 | $120,000 | | | | $3,600 |
| Month 3 | $120,000 | | | | $240,000 | $120,000 | $120,000 | | | | $3,600 |
| Month 4 | $120,000 | $220,000 | | | $580,000 | $340,000 | $340,000 | | | | $10,200 |
| Month 5 | $95,000 | $220,000 | | | $895,000 | $315,000 | $315,000 | | | | $9,450 |
| Month 6 | $95,000 | $220,000 | $280,000 | | $1,490,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 7 | $95,000 | $220,000 | $280,000 | | $2,085,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 8 | $95,000 | $220,000 | $280,000 | | $2,680,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 9 | $100,000 | $220,000 | $300,000 | $300,000 | $3,600,000 | $920,000 | $920,000 | | | | $27,600 |
| Month 10 | $100,000 | $220,000 | $300,000 | $300,000 | $4,520,000 | $920,000 | $920,000 | | | | $27,600 |
| Month 11 | $100,000 | $250,000 | $300,000 | $300,000 | $5,470,000 | $950,000 | $480,000 | $470,000 | | | $30,850 |
| Month 12 | $100,000 | $250,000 | $250,000 | $300,000 | $6,370,000 | $900,000 | | $900,000 | | | $31,500 |
| Month 13 | | $70,000 | $112,000 | $300,000 | $6,852,000 | $482,000 | | $482,000 | | | $16,870 |
| Month 14 | | $70,000 | $115,000 | $300,000 | $7,337,000 | $485,000 | | $148,000 | $337,000 | | $18,660 |
| Month 15 | | | $113,000 | $300,000 | $7,750,000 | $413,000 | | | $413,000 | | $16,520 |
| Month 16 | | | $125,000 | $300,000 | $8,175,000 | $425,000 | | | $425,000 | | $17,000 |
| Month 17 | | | $125,000 | $300,000 | $8,600,000 | $425,000 | | | $425,000 | | $17,000 |
| Month 18 | | | $125,000 | $300,000 | $9,025,000 | $425,000 | | | $400,000 | $25,000 | $17,375 |
| Month 19 | | | | $300,000 | $9,325,000 | $300,000 | | | | $300,000 | $16,500 |
| Month 20 | | | | $300,000 | $9,625,000 | $300,000 | | | | $300,000 | $16,500 |
| Month 21 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 22 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 23 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 24 | | | | | $9,625,000 | $0 | | | | | $0 |
| | | | | | | Total Revenue per commission % | $5,000,000 | $2,000,000 | $2,000,000 | $625,000 | |

**Plan Terms**

1. <u>Plan Period.</u> The Plan Period is defined as (i) the 2021 Fiscal Year in its entirety for Incentives that are paid or calculated on an annual basis, (ii) the fiscal quarter for Incentives that are paid or calculated on a quarterly basis, or (iii) the fiscal month for Incentives that are paid or calculated on a monthly basis.

2. <u>Incentive.</u> An Incentive is any bonus, commission, or other supplemental payment, that is paid in addition to the Employee's usual base compensation as described in this Plan.

3. <u>Eligible Employee.</u> An Eligible Employee is an Employee who, as of the Payment Date, holds the title(s) described above and meets the eligibility criteria set forth below.

4. <u>Eligibility Criteria.</u> The Company has complete discretionary authority to determine who is eligible to potentially earn an Incentive under the Plan. Because a key purpose of this Plan is to encourage Employee loyalty, teamwork and continued employment, and to induce efficient and faithful service by Employees, to be eligible to earn any Incentive under this Plan, an Employee must, at a minimum satisfy all four of the following requirements:
   a. Be (i) a regular full-time or part-time Employee of the Company for the entire Plan Period, (ii) continuously employed through the Payment Date, (iii) actively at work on the Payment Date and (iv) recorded by the Company in its central record system as an Employee of record for 20 fiscal days during the Plan Period to be eligible for any Incentive. However, to the extent required by law, or, if not required by law, in the sole discretion of the Company, the Company shall or may authorize a partial payment to an individual who, during the Plan Period, is on a Company approved leave of absence, dies, or terminates employment due to disability. Such partial payments shall be pro-rated for the portion of the Plan Period in which the individual was an eligible Employee or actively at work. For purposes of this Plan, "disability" shall mean that the Employee has qualified for benefits under the Company's long-term disability plan or is "disabled" as defined by applicable law.
   b. Refrained from engaging in any dishonest, misleading, or illegal act related to their sales duties or job performance.
   c. Be in full compliance with all Company policies, procedures, and agreements, including but not limited to, the Company's Code of Business Conduct and Ethics, Fraud Prevention Policy, and all applicable employment and noncompetition, non-solicitation and confidentiality agreements.
   d. In the case of Incentives that are calculated and paid based on sales, in addition to being employed by the Company on the Payment Date, the Employee must be recorded by the Company in its central record system as the Employee of record for 20 days during the measurement period to be eligible for an Incentive.
   e. If an Employee who is eligible for a sales Incentive Plan leaves the Company and is re-hired after 60 days from termination date in the same year, they will be considered a new Employee and will start on their eligible Plan from the re-hire date. If the Employee is re-hired within 60 days from the termination day, the Regional Vice President will need to approve the continuation of the book of business they had prior to their termination date.

5. <u>Payment Date.</u> An Incentive shall be paid no later than 60 days after the end of the Plan Period.

6. <u>Commissions Splits.</u> Commission splits will be considered with SVP approval before the pursuit of any deal. All commissions will be paid (based on the approved split) to both sales representatives.

7. <u>Incentive Calculation.</u> Following each Plan Period, the Company will determine, in its sole discretion, whether an Incentive will be paid to an Eligible Employee based on achievement of the targets as outlined in the "Measures" section above during the full Plan Period. Eligible Employees must use the appropriate process for the Employee's position to report new customers within 2 months of a recognized sale to be eligible for an Incentive. Failure to do so will result in the Incentive not being paid. For Incentives paid on customer assignments, the Company reserves the right to adjust the amount of commissions payable to an Employee for any single Account with Commissions greater than $10,000 per month.

   a. <u>Fiscal Year or Fiscal Quarter Plan Period Incentives.</u> If an eligible Employee changes positions during the Plan Period, the Incentive will be prorated based on an actual employment in the eligible position.

   b. <u>Monthly Plan Period Incentives.</u> If an eligible Employee changes positions during the Plan Period, the eligible Employee will be eligible for an Incentive based on the eligible position in which the Employee held for the majority of the month. If the eligible Employee held two different eligible positions for the same amount of time, the Incentive will be based on the position held in the second half of the month.

8. <u>Repayment.</u> If the Company discovers after an Incentive is paid, that an Employee was in violation of Employee's employment agreement, non-competition agreement, or the Company's Code of Business Conduct and Ethics, the Employee shall be obligated to return the payments for the Plan Period in which the violation occurred to the fullest extent permitted by any applicable state law.

9. <u>Adjustments to Incentive Payments for Failure to Comply with Company Policy:</u> The Company expects all Employees to comply fully with all Company policies, procedures and pricing guidelines. Any Incentives obtained through fraudulent means or through conduct that fails to adhere to such policies, procedures and pricing guidelines, including but not limited to the following policies: Fraud Prevention, Code of Business Conduct and Ethics, Conflict of Interest, Employee and Workplace Conduct, Anti-Bribery and Corruption, Anti-Substance Abuse, Harassment, Discrimination and Retaliation, Anti-Human Trafficking and Modern Slavery (whether in existence as of the effective date or later adopted), shall not be deemed earned and may result in adjustment to an Employee's Incentives. For example, an adjustment may occur if a salesperson provides misleading information to a client or withholds material information from a client, resulting in a client complaint and crediting or offset to the client. The Company reserves the right to offset such an adjustment from an Employee's future Incentives or to seek repayment from the Employee to the fullest extent permitted by applicable law. The Company will make any determination for any such adjustment in its sole discretion.

10. <u>Not a Contract of Employment.</u>  All employment with the Company is "at will" which means that the Employee and/or the Company has the right to terminate employment at any time, for any reason, with or without cause. Nothing contained in this Plan is, or should be interpreted or construed to be, a contract of employment for any set term, or in any way alter the at-will status of an Employee's employment with the Company.

11. <u>Withholdings and Deductions.</u>  All Incentives will be subject to appropriate state, federal and local taxes and retirement Plan elections prior to disbursement to an Employee.

12. <u>No Waiver of Rights.</u>  A waiver by the Company of the breach of any of the provisions of this Plan by Employee shall not be deemed a waiver by the Company of any subsequent breach, nor shall recourse to any remedy hereunder be deemed a waiver of any other or further relief or remedy provided for herein. No waiver shall be effective unless made in writing and signed by the President of the Company.

13. <u>Plan Modification or Termination.</u>  The Company may, in its sole discretion, at the direction of the Chief Executive Officer, interpret, change, or discontinue this Plan at any time without prior notice. In no event will any Employee be deemed to have a vested right to payment of an Incentive under this Plan. By accepting an Incentive, the Employee acknowledges receipt of, and understands and agrees to, this Plan, and understands that a copy of the Plan is available upon request. The Employee further acknowledges that the Plan set forth is the entire understanding between the Employee and the Company regarding Incentives hereunder and supersedes all prior oral and written agreements on that subject.

14. <u>Native Currency.</u>  All Incentive calculations whether monthly, quarterly or annually are based on the native country currency.

15. <u>Impact of Write-Offs for Customer Level Commissions.</u> While the Company pays commissions following the month of sales recognition in advance of the date they are earned, commissions are not considered earned until the Company is paid in full. If a customer fails to pay, the Company has the right to adjust future commissions. Any adjustment will not exceed the amount originally paid to the employee.

16. <u>Impact of Low Segment Profit Margin for Customer Level Commissions.</u> The company reserves the right to adjust commissions, past and future, when the actual segment profit margin on an account is below 10%.

17. <u>Plan Subject to Change.</u>  This Plan supersedes all previous commission Plans or arrangements between Company and Employee.  Since business needs can change substantially during the course of the fiscal year, this Plan, and any assigned targets, territories, accounts, commission rates, or bonus amounts are subject to change at any time at Company's sole discretion without prior written notice.

## Incentive Plan Metrics & Definitions

**\*These are general definitions and do not pertain to all incentive plans.**

**Sales:** Recognized revenue for client orders or an additional line of business orders.

**Annual Recurring Revenue (ARR):** The amount of the Contract Value of a deal that will occur on a yearly basis.

**Big Deal Exception Process:** Process triggered by deal size over $4M Annual Recurring Revenue. Deal Exception Process to be led by SVP of Sales and President.

**Quota:** The annual objective for new business signings for the sales employee.

**Territory:** A list of target accounts that the individual will be responsible for during the Plan year.

**Annual Contract Value (ACV):** The annual financial value of client contract. This should reflect an accurate value of revenue that the Company will book over twelve-month period.

**Client Go Live:** The date on which the Company begins the delivery of the services outlined in the contract.

**Order:** Defined by the PeopleScout finance team, an order will include any required contracts, addenda, amendments, purchase orders, statements of work and any other document deemed necessary to complete a client transaction.

**Renewals:** Defined as a client contract that will be expiring, or has expired, that is being proposed as an extension/new contract to a client. Sales Employees are not eligible to earn commissions on these transactions.

**Gross Profit:** Sales minus Cost of Sales.  For incentives calculated on Gross Profit, it doesn't include Bad Debt Write-Offs & Sales Credits processed outside of POS.  Those are done as manual entries based on reporting from Credit & Collections.

**Cost of Sales:** Wages paid to workers, payroll taxes & benefits, transportation paid, other worker expenses, workers' comp accrual and worker tax credits.

**Segment Profit:** Gross Profit minus Salaries Wages & Benefits and Operating Expenses.

**Salaries Wages & Benefits:** Salaries, benefits, payroll taxes and bonuses of permanent employees.

**Operating Expenses:** Costs associated with day to day business activities, include items such as advertising, communications, and supplies.

**Commissionable Sales:** Sales multiplied by Split %.

**Split %:** Percent of Sales that is incentive eligible, percent is determined and assigned by leadership.

**Commissionable Period:** The first twelve months of actual revenue per new account.

**Period:** Fiscal month, fiscal quarter, fiscal year, or fiscal months to date as noted in plan document.

**YTD:** Year to Date.

# EXHIBIT 2



# PeopleScout Sales Team
# 2021 Incentive Plan

Effective FY2021

## Plan Overview

The plan was developed to support PeopleScout's 2021 tactical and strategic plans and key business objectives by attracting and motivating qualified employees for all sales-related positions.  The plan is designed to ensure that the total commission opportunity for each Employee is competitive and directly linked to an individual's performance.

Deals that qualify for commissions under this plan include Recruitment Process Outsourcing, Recruiter On Demand, Managed Service Provider, and other projects for PeopleScout service offerings in which a sales process including client meetings, proforma, proposal, and contract were created and whereby the sales person contributed materially to the sales process.

## Overview of Plan Measures

## Measure 1: Monthly Sales Commission

### Description:

Each month, eligible Sales Team members can earn a commission based upon actual revenue. The commission period starts with the first full month of revenue.

Services in North America can be broken out into three broad categories for commission purposes: Annual Recurring Revenue (ARR) deals, Recruiter on demand (ROD) or Projects/pilots (non-ARR deals), and Direct Hire. Commissions rates are outlined below.

### Category 1: Annual Recurring Revenue (ARR)

#### Pay Curve Mechanics:

There are four revenue tiers in your pay curve to provide incremental payouts for incremental performance. Each Revenue tier is calculated separately.

#### Calculation:

Monthly ARR Commissions = Actual Revenue * Commission %

#### ARR Commission Table:

| Revenue Tiers | Commission % |
|---|---|
| $0-$5,000,000 | 3.00% |
| $5,000,001-$7,000,000 | 3.50% |
| $7,000,001-$9,000,000 | 4.00% |
| >$9,000,001 | 5.50% |

#### Segment Profit Margin Kicker:

Eligible Sales Team members may receive an additional bonus of 25% of actual commissions earned when the Segment Profit Margin of each ARR deal calculated after 12 months is above 40.0%. The additional commissions will be paid on the final commission payment.

#### Calculation:

Additional Commissions = Actual Commissions Earned * Segment Profit Margin Kicker 25%

### Category 2: Recruiter on Demand (ROD) and Projects/Pilots (non-ARR deals)

#### Pay Curve Mechanics:

There are four revenue tiers in your pay curve to provide incremental payouts for incremental performance. Each Revenue tier is calculated separately.

#### ROD and non-ARR Commission Table:

| Revenue Tiers | Commission % |
|---|---|
| $0-$2,000,000 | 2.00% |
| $2,000,0001-$2,500,000 | 2.25% |
| $2,500,001-$3,000,000 | 2.50% |
| >$3,000,001 | 2.75% |

### Category 3: Direct Hire

#### Calculation:

Monthly Commission = Segment profit * 10% commission rate

**Crediting:** Commission period begins after the first full month of revenue (or the month following Go Live). Monthly Payouts are calculated based on actual Revenue recognized in a month during the Commissionable Period and will be paid the following month.

## Measure 2: Annual Sales Bonus

**Description:**

Each year, eligible Sales Team members may receive an Annual Bonus based upon revenue achievement.

Eligible Sales Team members may receive an annual bonus of Circle of excellence (COE) trip when 130% of quota is met and an annual bonus of $20,000 when 150% of quota is met.

**Crediting:**  Annual payouts are calculated and paid the following February when all other annual bonuses are paid.

## Calculation Example

**Employee A:** Quota set at $3M for first year, $4M for second year

**Measure 1: Category 1:** Annual Recurring Revenue (ARR) Commission calculation (Excluding Kicker):

| Employee A Year 1 Deals | Actual Revenue per Deal per Month | | | | Total Revenue - Year 1 Deals | Actual Revenue per Month - Year 1 Deals | Commission % - Year 1 Deals | | | | Monthly ARR Commissions - Year 1 Deals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deal 1 | Deal 2 | Deal 3 | Deal 4 | | | 3.0% | 3.5% | 4.0% | 5.5% | |
| Month 1 | $80,000 | | | | $80,000 | $80,000 | $80,000 | | | | $2,400 |
| Month 2 | $95,000 | | | | $175,000 | $95,000 | $95,000 | | | | $2,850 |
| Month 3 | $75,000 | $75,000 | | | $325,000 | $150,000 | $150,000 | | | | $4,500 |
| Month 4 | $85,000 | $75,000 | | | $485,000 | $160,000 | $160,000 | | | | $4,800 |
| Month 5 | $100,000 | $76,000 | | | $661,000 | $176,000 | $176,000 | | | | $5,280 |
| Month 6 | $102,000 | $76,000 | | | $839,000 | $178,000 | $178,000 | | | | $5,340 |
| Month 7 | $105,000 | $76,000 | $125,000 | | $1,145,000 | $306,000 | $306,000 | | | | $9,180 |
| Month 8 | $110,000 | $85,000 | $125,000 | | $1,465,000 | $320,000 | $320,000 | | | | $9,600 |
| Month 9 | $110,000 | $85,000 | $125,000 | | $1,785,000 | $320,000 | $320,000 | | | | $9,600 |
| Month 10 | $110,000 | $85,000 | $105,000 | | $2,085,000 | $300,000 | $300,000 | | | | $9,000 |
| Month 11 | $120,000 | $72,000 | $105,000 | $265,000 | $2,647,000 | $562,000 | $562,000 | | | | $16,860 |
| Month 12 | $105,000 | $72,000 | $110,000 | $265,000 | $3,199,000 | $552,000 | $552,000 | | | | $16,560 |
| Month 13 | | $70,000 | $112,000 | $265,000 | $3,646,000 | $447,000 | $447,000 | | | | $13,410 |
| Month 14 | | $70,000 | $115,000 | $242,000 | $4,073,000 | $427,000 | $427,000 | | | | $12,810 |
| Month 15 | | | $113,000 | $242,000 | $4,428,000 | $355,000 | $355,000 | | | | $10,650 |
| Month 16 | | | $125,000 | $242,000 | $4,795,000 | $367,000 | $367,000 | | | | $11,010 |
| Month 17 | | | $125,000 | $280,000 | $5,200,000 | $405,000 | $205,000 | $200,000 | | | $13,150 |
| Month 18 | | | $125,000 | $280,000 | $5,605,000 | $405,000 | | $405,000 | | | $14,175 |
| Month 19 | | | | $280,000 | $5,885,000 | $280,000 | | $280,000 | | | $9,800 |
| Month 20 | | | | $220,000 | $6,105,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 21 | | | | $220,000 | $6,325,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 22 | | | | $220,000 | $6,545,000 | $220,000 | | $220,000 | | | $7,700 |
| Month 23 | | | | | $6,545,000 | $0 | | | | | $0 |
| Month 24 | | | | | $6,545,000 | $0 | | | | | $0 |
| | | | | | | Total Revenue per commission % | $5,000,000 | $1,545,000 | $0 | $0 | |

| Employee A Year 2 Deals | Actual Revenue per Deal per Month | | | | Total Revenue - Year 2 Deals | Actual Revenue per Month - Year 2 Deals | Commission % - Year 2 Deals | | | | Monthly ARR Commissions - Year 2 Deals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deal 1 | Deal 2 | Deal 3 | Deal 4 | | | 3.0% | 3.5% | 4.0% | 5.5% | |
| Month 1 | | | | | $0 | $0 | $0 | | | | $0 |
| Month 2 | $120,000 | | | | $120,000 | $120,000 | $120,000 | | | | $3,600 |
| Month 3 | $120,000 | | | | $240,000 | $120,000 | $120,000 | | | | $3,600 |
| Month 4 | $120,000 | $220,000 | | | $580,000 | $340,000 | $340,000 | | | | $10,200 |
| Month 5 | $95,000 | $220,000 | | | $895,000 | $315,000 | $315,000 | | | | $9,450 |
| Month 6 | $95,000 | $220,000 | $280,000 | | $1,490,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 7 | $95,000 | $220,000 | $280,000 | | $2,085,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 8 | $95,000 | $220,000 | $280,000 | | $2,680,000 | $595,000 | $595,000 | | | | $17,850 |
| Month 9 | $100,000 | $220,000 | $300,000 | $300,000 | $3,600,000 | $920,000 | $920,000 | | | | $27,600 |
| Month 10 | $100,000 | $220,000 | $300,000 | $300,000 | $4,520,000 | $920,000 | $920,000 | | | | $27,600 |
| Month 11 | $100,000 | $250,000 | $300,000 | $300,000 | $5,470,000 | $950,000 | $480,000 | $470,000 | | | $30,850 |
| Month 12 | $100,000 | $250,000 | $250,000 | $300,000 | $6,370,000 | $900,000 | | $900,000 | | | $31,500 |
| Month 13 | | $70,000 | $112,000 | $300,000 | $6,852,000 | $482,000 | | $482,000 | | | $16,870 |
| Month 14 | | $70,000 | $115,000 | $300,000 | $7,337,000 | $485,000 | | $148,000 | $337,000 | | $18,660 |
| Month 15 | | | $113,000 | $300,000 | $7,750,000 | $413,000 | | | $413,000 | | $16,520 |
| Month 16 | | | $125,000 | $300,000 | $8,175,000 | $425,000 | | | $425,000 | | $17,000 |
| Month 17 | | | $125,000 | $300,000 | $8,600,000 | $425,000 | | | $425,000 | | $17,000 |
| Month 18 | | | $125,000 | $300,000 | $9,025,000 | $425,000 | | | $400,000 | $25,000 | $17,375 |
| Month 19 | | | | $300,000 | $9,325,000 | $300,000 | | | | $300,000 | $16,500 |
| Month 20 | | | | $300,000 | $9,625,000 | $300,000 | | | | $300,000 | $16,500 |
| Month 21 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 22 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 23 | | | | | $9,625,000 | $0 | | | | | $0 |
| Month 24 | | | | | $9,625,000 | $0 | | | | | $0 |
| | | | | | | Total Revenue per commission % | $5,000,000 | $2,000,000 | $2,000,000 | $625,000 | |

**Plan Terms**

1. <u>Plan Period.</u> The Plan Period is defined as (i) the 2021 Fiscal Year in its entirety for Incentives that are paid or calculated on an annual basis, (ii) the fiscal quarter for Incentives that are paid or calculated on a quarterly basis, or (iii) the fiscal month for Incentives that are paid or calculated on a monthly basis.

2. <u>Incentive.</u> An Incentive is any bonus, commission, or other supplemental payment, that is paid in addition to the Employee's usual base compensation as described in this Plan.

3. <u>Eligible Employee.</u> An Eligible Employee is an Employee who, as of the Payment Date, holds the title(s) described above and meets the eligibility criteria set forth below.

4. <u>Eligibility Criteria.</u> The Company has complete discretionary authority to determine who is eligible to potentially earn an Incentive under the Plan. Because a key purpose of this Plan is to encourage Employee loyalty, teamwork and continued employment, and to induce efficient and faithful service by Employees, to be eligible to earn any Incentive under this Plan, an Employee must, at a minimum satisfy all four of the following requirements:
   a. Be (i) a regular full-time or part-time Employee of the Company for the entire Plan Period, (ii) continuously employed through the Payment Date, (iii) actively at work on the Payment Date and (iv) recorded by the Company in its central record system as an Employee of record for 20 fiscal days during the Plan Period to be eligible for any Incentive. However, to the extent required by law, or, if not required by law, in the sole discretion of the Company, the Company shall or may authorize a partial payment to an individual who, during the Plan Period, is on a Company approved leave of absence, dies, or terminates employment due to disability. Such partial payments shall be pro-rated for the portion of the Plan Period in which the individual was an eligible Employee or actively at work. For purposes of this Plan, "disability" shall mean that the Employee has qualified for benefits under the Company's long-term disability plan or is "disabled" as defined by applicable law.
   b. Refrained from engaging in any dishonest, misleading, or illegal act related to their sales duties or job performance.
   c. Be in full compliance with all Company policies, procedures, and agreements, including but not limited to, the Company's Code of Business Conduct and Ethics, Fraud Prevention Policy, and all applicable employment and noncompetition, non-solicitation and confidentiality agreements.
   d. In the case of Incentives that are calculated and paid based on sales, in addition to being employed by the Company on the Payment Date, the Employee must be recorded by the Company in its central record system as the Employee of record for 20 days during the measurement period to be eligible for an Incentive.
   e. If an Employee who is eligible for a sales Incentive Plan leaves the Company and is re-hired after 60 days from termination date in the same year, they will be considered a new Employee and will start on their eligible Plan from the re-hire date. If the Employee is re-hired within 60 days from the termination day, the Regional Vice President will need to approve the continuation of the book of business they had prior to their termination date.

5. <u>Payment Date.</u> An Incentive shall be paid no later than 60 days after the end of the Plan Period.

6. <u>Commissions Splits.</u> Commission splits will be considered with SVP approval before the pursuit of any deal. All commissions will be paid (based on the approved split) to both sales representatives.

7. <u>Incentive Calculation.</u> Following each Plan Period, the Company will determine, in its sole discretion, whether an Incentive will be paid to an Eligible Employee based on achievement of the targets as outlined in the "Measures" section above during the full Plan Period. Eligible Employees must use the appropriate process for the Employee's position to report new customers within 2 months of a recognized sale to be eligible for an Incentive. Failure to do so will result in the Incentive not being paid. For Incentives paid on customer assignments, the Company reserves the right to adjust the amount of commissions payable to an Employee for any single Account with Commissions greater than $10,000 per month.

   a. <u>Fiscal Year or Fiscal Quarter Plan Period Incentives.</u> If an eligible Employee changes positions during the Plan Period, the Incentive will be prorated based on an actual employment in the eligible position.

   b. <u>Monthly Plan Period Incentives.</u> If an eligible Employee changes positions during the Plan Period, the eligible Employee will be eligible for an Incentive based on the eligible position in which the Employee held for the majority of the month. If the eligible Employee held two different eligible positions for the same amount of time, the Incentive will be based on the position held in the second half of the month.

8. <u>Repayment.</u> If the Company discovers after an Incentive is paid, that an Employee was in violation of Employee's employment agreement, non-competition agreement, or the Company's Code of Business Conduct and Ethics, the Employee shall be obligated to return the payments for the Plan Period in which the violation occurred to the fullest extent permitted by any applicable state law.

9. <u>Adjustments to Incentive Payments for Failure to Comply with Company Policy:</u> The Company expects all Employees to comply fully with all Company policies, procedures and pricing guidelines. Any Incentives obtained through fraudulent means or through conduct that fails to adhere to such policies, procedures and pricing guidelines, including but not limited to the following policies: Fraud Prevention, Code of Business Conduct and Ethics, Conflict of Interest, Employee and Workplace Conduct, Anti-Bribery and Corruption, Anti-Substance Abuse, Harassment, Discrimination and Retaliation, Anti-Human Trafficking and Modern Slavery (whether in existence as of the effective date or later adopted), shall not be deemed earned and may result in adjustment to an Employee's Incentives. For example, an adjustment may occur if a salesperson provides misleading information to a client or withholds material information from a client, resulting in a client complaint and crediting or offset to the client. The Company reserves the right to offset such an adjustment from an Employee's future Incentives or to seek repayment from the Employee to the fullest extent permitted by applicable law. The Company will make any determination for any such adjustment in its sole discretion.

10. <u>Not a Contract of Employment.</u>  All employment with the Company is "at will" which means that the Employee and/or the Company has the right to terminate employment at any time, for any reason, with or without cause. Nothing contained in this Plan is, or should be interpreted or construed to be, a contract of employment for any set term, or in any way alter the at-will status of an Employee's employment with the Company.

11. <u>Withholdings and Deductions.</u>  All Incentives will be subject to appropriate state, federal and local taxes and retirement Plan elections prior to disbursement to an Employee.

12. <u>No Waiver of Rights.</u>  A waiver by the Company of the breach of any of the provisions of this Plan by Employee shall not be deemed a waiver by the Company of any subsequent breach, nor shall recourse to any remedy hereunder be deemed a waiver of any other or further relief or remedy provided for herein. No waiver shall be effective unless made in writing and signed by the President of the Company.

13. <u>Plan Modification or Termination.</u>  The Company may, in its sole discretion, at the direction of the Chief Executive Officer, interpret, change, or discontinue this Plan at any time without prior notice. In no event will any Employee be deemed to have a vested right to payment of an Incentive under this Plan. By accepting an Incentive, the Employee acknowledges receipt of, and understands and agrees to, this Plan, and understands that a copy of the Plan is available upon request. The Employee further acknowledges that the Plan set forth is the entire understanding between the Employee and the Company regarding Incentives hereunder and supersedes all prior oral and written agreements on that subject.

14. <u>Native Currency.</u>  All Incentive calculations whether monthly, quarterly or annually are based on the native country currency.

15. <u>Impact of Write-Offs for Customer Level Commissions.</u> While the Company pays commissions following the month of sales recognition in advance of the date they are earned, commissions are not considered earned until the Company is paid in full. If a customer fails to pay, the Company has the right to adjust future commissions. Any adjustment will not exceed the amount originally paid to the employee.

16. <u>Impact of Low Segment Profit Margin for Customer Level Commissions.</u> The company reserves the right to adjust commissions, past and future, when the actual segment profit margin on an account is below 10%.

17. <u>Plan Subject to Change.</u>  This Plan supersedes all previous commission Plans or arrangements between Company and Employee.  Since business needs can change substantially during the course of the fiscal year, this Plan, and any assigned targets, territories, accounts, commission rates, or bonus amounts are subject to change at any time at Company's sole discretion without prior written notice.

## Incentive Plan Metrics & Definitions

**\*These are general definitions and do not pertain to all incentive plans.**

**Sales:** Recognized revenue for client orders or an additional line of business orders.

**Annual Recurring Revenue (ARR):** The amount of the Contract Value of a deal that will occur on a yearly basis.

**Big Deal Exception Process:** Process triggered by deal size over $4M Annual Recurring Revenue. Deal Exception Process to be led by SVP of Sales and President.

**Quota:** The annual objective for new business signings for the sales employee.

**Territory:** A list of target accounts that the individual will be responsible for during the Plan year.

**Annual Contract Value (ACV):** The annual financial value of client contract. This should reflect an accurate value of revenue that the Company will book over twelve-month period.

**Client Go Live:** The date on which the Company begins the delivery of the services outlined in the contract.

**Order:** Defined by the PeopleScout finance team, an order will include any required contracts, addenda, amendments, purchase orders, statements of work and any other document deemed necessary to complete a client transaction.

**Renewals:** Defined as a client contract that will be expiring, or has expired, that is being proposed as an extension/new contract to a client. Sales Employees are not eligible to earn commissions on these transactions.

**Gross Profit:** Sales minus Cost of Sales.  For incentives calculated on Gross Profit, it doesn't include Bad Debt Write-Offs & Sales Credits processed outside of POS.  Those are done as manual entries based on reporting from Credit & Collections.

**Cost of Sales:** Wages paid to workers, payroll taxes & benefits, transportation paid, other worker expenses, workers' comp accrual and worker tax credits.

**Segment Profit:** Gross Profit minus Salaries Wages & Benefits and Operating Expenses.

**Salaries Wages & Benefits:** Salaries, benefits, payroll taxes and bonuses of permanent employees.

**Operating Expenses:** Costs associated with day to day business activities, include items such as advertising, communications, and supplies.

**Commissionable Sales:** Sales multiplied by Split %.

**Split %:** Percent of Sales that is incentive eligible, percent is determined and assigned by leadership.

**Commissionable Period:** The first twelve months of actual revenue per new account.

**Period:** Fiscal month, fiscal quarter, fiscal year, or fiscal months to date as noted in plan document.

**YTD:** Year to Date.