Exhibit H

## General Civil and Domestic Relations Case Filing Information Form

☑ **Superor** or ☐ **State Court of** _Clayton_ _____ **County**

| **For Clerk Use Only** | |
|---|---|
| **Date Filed** _01-20-2023_ | **Case Number** _2023CV00437-11_ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**

WELLNESS AROUND THE WORLD CHIROPRACTIC, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

STATE FARM FIRE AND CASUALTY COMPANY

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** _Dean, Douglas_     **Bar Number** _130988_     **Self-Represented** ☐

### Check one case type and, if applicable, one sub-type in one box.

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
**Case Number**                **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 26343474**
**Date Processed: 02/07/2023**

| | |
|---|---|
| **Primary Contact:** | State Farm Enterprise SOP<br>Corporation Service Company- Wilmington, DELAWARE<br>251 Little Falls Dr<br>Wilmington, DE 19808-1674 |

| | |
|---|---|
| **Entity:** | State Farm Mutual Automobile Insurance Company<br>Entity ID Number  3461675 |
| **Entity Served:** | State Farm Mutual Automobile Insurance Company |
| **Title of Action:** | Wellness Around The World Chiropractic, LLC vs. State Farm Mutual Automobile Insurance Company |
| **Matter Name/ID:** | Wellness Around The World Chiropractic, LLC vs. State Farm Mutual Automobile Insutance Company (13583781) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Clayton County Superior Court, GA |
| **Case/Reference No:** | 2023CV00437-11 |
| **Jurisdiction Served:** | Georgia |
| **Date Served on CSC:** | 02/07/2023 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Lawson, Reid, & Dean, LLC<br>229-271-9323 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

CIVIL ACTION NUMBER  2023CV00437-11

WELLNESS AROUND THE WORLD
CHIROPRACTIC, LLC

_____

**PLAINTIFF**

**VS.**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY
COMPANY

_____

**DEFENDANTS**

### SUMMONS

TO: STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Douglas Dean**
**Lawson, Reid & Dean, LLC**
**P.O. Box 5005**
**Cordele, Georgia 31010**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 20th day of January, 2023.**

Clerk of Superior Court

_____
Chanae Clemons, Clerk
Clayton County, Georgia

⚛ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
CLAYTON COUNTY, GEORGIA

**2023CV00437-11**
Robert L. Mack
**JAN 20, 2023 05:09 PM**

*[signature]*

Chanae Clemons, Clerk
Clayton County, Georgia

IN THE SUPERIOR COURT OF CLAYTON COUNTY
STATE OF GEORGIA

WELLNESS AROUND THE WORLD
CHIROPRACTIC, LLC,

   Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and
STATE FARM FIRE AND CASUALTY
COMPANY,

   Defendants.

CIVIL ACTION FILE NO. _____

**JURY TRIAL DEMANDED**

---

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF

COMES NOW WELLNESS AROUND THE WORLD CHIROPRACTIC, LLC ("Plaintiff" or "Wellness"), in the above-captioned civil action and files this complaint against STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY (collectively, "State Farm"), and, in support thereof, shows this Court the following:

### PRELIMINARY STATEMENT

Wellness Around the World is a Chiropractic practice which provides, amongst other services, rehabilitative and pain management treatment to patients who have been injured in motor vehicle accidents.  Wellness is owned by Dr. Roger Holloway, a Georgia licensed chiropractor.  Dr. Holloway is African-American as are most of the patients seen at his practice.  Unfortunately, the race of Dr. Holloway and his patients has made his practice the target of a racially motivated profit scheme employed by State Farm all across the country, which scheme State Farm executives secretly call "Filling the Cups."  The scheme involves using accusations of fraud against minority claimants and doctors as a mean of intimidation and driving down claim expense.  As against minority doctors in

particular, State Farm "fills the cups" with an invented accusation of fraud it calls "predetermined treatment."

Because its owner is black and its patients are black and Wellness Around the World's treatment is a growing source of claims expense, State Farm has now targeted Plaintiff with this scheme.  Plaintiff therefore brings this action for Declaratory Relief to declare its rights under Georgia's Motor Vehicle Accident Reparations Act and to protect Plaintiff from insecurity with regard to the propriety of State Farm's bad faith conduct.

## JURISDICTION AND VENUE

1.

Plaintiff is a Chiropractic and Wellness practice with five (5) locations in and around the greater Atlanta area, including 150 Medical Way, Ste. F1, Riverdale, Georgia 30274.

2.

Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company are foreign corporations authorized to do business in the State of Georgia.  State Farm is engaged in the business of selling automobile insurance policies to the general public and to residents of Georgia, which policies are governed by, among other laws, the Georgia Motor Vehicle Reparations Act ("the Act").

3.

Defendant State Farm Mutual Automobile Insurance Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

4.

Defendant State Farm Fire and Casualty Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

5.

This Court has personal jurisdiction over Defendants.

6.

This Court has subject matter jurisdiction over the matters set forth in this Complaint.

7.

Venue is appropriate in this Court.

8.

Process and service are appropriate and valid in all respects

9.

This Complaint is timely.

10.

The Complaint is valid procedurally and otherwise.

## THE ACT

11.

The Georgia Motor Vehicle Accident Reparations Act (the "Act") requires that all Georgia car insurance policies include liability coverage, but Medical Payments Coverage Benefits ("MPC Benefits") are optional.  O.C.G.A. § 33-34-2 et seq.

12.

The Act requires that all Georgia car insurance policies include liability coverage, but MPC Benefits are optional.  See O.C.G.A. § 33-34-2 et seq.

13.

Georgia's MPC is a no-fault insurance that ensures injured victims of motor vehicle accidents have an efficient mechanism to receive and pay for the medically necessary healthcare services they require resulting from an auto accident.

14.

The Act defines MPC insurance as "any coverage in which the insurer agrees to reimburse the insured and others for reasonable and necessary medical expenses . . . incurred as a result of bodily injury or death caused by a motor vehicle accident, without regard to the insured's liability for the accident." O.C.G.A. § 33-34-2(1).

15.

Georgia law requires insurers such as State Farm to adjust claims on their individual merits promptly and fairly. See, e.g., O.C.G.A. § 33-4-6.

16.

In addition to the MPC statute, State Farm's Georgia automobile insurance policies (that include MPC Benefits) obligate State Farm to pay MPC Benefits for "reasonable expenses for medical services" that are "necessary to achieve medical maximum improvement" and that are "incurred because of bodily injury that is sustained by an insured and caused by a motor vehicle accident." The medical expenses must be incurred "within three years immediately following the date of the accident."

**THE SCHEME**

17.

State Farm is currently the number one Auto insurer in the U.S. in terms of net worth, earned premium, and policies in place.

18.

The State Farm property-casualty (P-C) group of companies, which includes the Defendant entities, reported a combined underwriting gain of $1.7 billion in 2018 on earned premium of $65.2 billion. The 2018 underwriting gain, combined with investment and other income of $4.7 billion, resulted in a P-C pre-tax operating gain of $6.3 billion.

19.

The net worth for the State Farm group ended the year at $100.9 billion.

20.

State Farm's total revenue, which includes premium revenue, earned investment income and realized capital gains (losses) was $81.7 billion for 2018, and its net income was $8.8 billion in 2018.

21.

The State Farm auto insurance entities represented 65 percent of the P-C companies' combined net written premium. Earned premium for its auto insurance business was $42.7 billion. Incurred claims and loss adjustment expenses were $31.2 billion and all other underwriting expenses totaled $10.4 billion. The auto insurance business underwriting gain in 2018 was $1.1 billion.

22.

The State Farm entities receive in excess of 30,000 auto accident claims across the country *every single day*.

23.

State Farm owns nearly 20% of the private passenger auto insurance market in Georgia.

24.

Despite its having been founded nearly a hundred years ago, most of State Farm's explosive growth into the ubiquitous corporate behemoth it is today has occurred over just the past 25 years.

25.

State Farm's relatively recent and swift expansion can be traced back to an intentional shift in its core business strategy, which entailed abandoning traditional notions of good faith upon which the entire idea of insurance is premised, and instead rebuilding a claims operation/culture designed to generate enormous revenue by manufacturing ways to avoid paying claims.

26.

This corporate strategy was sold to State Farm by the notorious global consulting firm, McKinsey & Company, in the mid-1990's, and steadily developed and incorporated by State Farm into its present-day claims operations across the country.

27.

The initial McKinsey consultation involved a massive review of State Farm's closed claim files and resulted in recommendations as to how State Farm might have acted differently in the handling of those claims so as to have kept more money for itself.

28.

Using euphemistic terms to describe in retrospect claims payments State Farm could have avoided, McKinsey identified a massive "opportunity" to stop "leakage" and reduce "exposure" specifically within State Farm's claims handling operation. "Leakage" was payments which could have been avoided with the strategy McKinsey was peddling.

29.

The overall idea of the McKinsey strategy was that State Farm could reap *billions* of dollars in additional revenue *every year* by treating each claim as a <u>competition</u> for claim dollars in which State Farm fought to keep as much money for itself as possible.

30.

McKinsey famously described its revolutionary claims philosophy as a "zero-sum economic game" and winning the game in each claim very simply meant finding every way possible to avoid paying money.

31.

Although McKinsey evaluated numerous types of coverages State Farm offered, the largest "opportunity" to win the zero-sum game, according to McKinsey, lay in the handling of what were characterized as "Minor Impact, Soft Tissue" or "MIST" claims.

32.

So-called MIST claims were auto accident injury claims involving less than total property damage, injuries which were not readily identifiable by a diagnostic test, and treatment which was most often provided by chiropractors.

33.

McKinsey identified that such claims represent the overwhelming majority of auto accident injury claims which occur across the entire United States, including of course, the overwhelming majority of the tens of thousands of claims State Farm receives every day.

34.

A vast segment of the expenses associated with MIST claims were/are directly attributable to chiropractors, as they are the specialists who are the most frequent treaters of nonfatal auto accident injuries across the country.

35.

McKinsey advised that chiropractic treatment in so-called MIST claims would be particularly vulnerable to the zero-sum game strategy because, by McKinsey's analysis, the credibility of chiropractic findings was critical to the value of such cases, and that credibility could be undermined in virtually every claim involving less than catastrophic property damage with the McKinsey approach to claims handling.

36.

Successfully undermining the credibility of chiropractic treatment would have the dual effect of driving down payments directly to chiropractors and decreasing the value of third-party BI and UM claims supported by chiropractic findings and treatment.

37.

McKinsey advised that because "soft tissue" injuries, those most commonly suffered in "MIST" claims and treated by chiropractors, are not readily identifiable by diagnostic tests such as x-ray or MRI, any evaluation of the severity or even existence of such injuries is often dependent on the personal credibility of the claimant and their doctor.

38.

McKinsey therefore laid out, and State Farm has over the past two decades honed to perfection, a multi-faceted business and litigation strategy of driving down claim expenses in so-called MIST claims by undermining the credibility of chiropractors and chiropractic treatment in general with accusations of fraud.

39.

The basic concept taken by State Farm from its initial McKinsey consultation was the idea of a "fraud funnel" designed to push as many "MIST" claims as possible into a position where they could be denied and/or devalued on the premise that fraud is present somewhere within the claim.

40.

Over the past 25 years, through a program first called "ACE" (for Advancing Claims Excellence), then through formalized procedures called Standard Claims Processes ("SCP"), and more recently through a secret scheme its executives call "Filling the Cups," State Farm has built its entire claims culture around the fraud funnel.

41.

As predicted by McKinsey, in order to accommodate the massive influx of "fraudulent" claims, State Farm was required to significantly increase the size and scope of its "Special Investigation Units" around the country. These SIU's are State Farm's fraud units and they employ claims handlers and investigators who focus entirely on injecting fraud allegations into claims.

42.

The most critical component of weaponizing fraud allegations so as to maximize the scheme's profitability was and remains its targeted use against minorities, immigrants, and low-income populations, as these groups are the most vulnerable to the claim.

### "FILLING THE CUPS"

43.

In February of 2022, a high ranking S.I.U. executive publicly revealed in a sworn declaration State Farm's secret scheme of funneling claims of minorities and immigrants into the fraud unit as a means of manufacturing massive claim expense avoidance. A copy of the Declaration of Carla Campbell-Jackson, Ph.D. is attached as Exhibit "A".

44.

As revealed by Dr. Campbell-Jackson, State Farm's S.I.U. executives from across the country meet weekly via videoconference to review statistics and "discuss ways of increasing the number of claims sent to the SIU in an effort to 'Fill the Cups.'"

45.

Filling the Cups is a euphemism for the strategy first sold to State Farm by McKinsey and thereafter baked over time into State Farm's entire culture of claims handling whereby the company automatically treats claims of minorities and immigrants and low-income claimants as fraudulent as a means of intimidation and avoiding payments the company is obligated to make.

46.

As revealed by Dr. Campbell-Jackson, State Farm at its highest executive levels demand automatic referral to State Farm's fraud units of claims which emanate from "inner city" neighborhoods in large metropolitan areas under the pretense that such claims present "high risk for fraud," and Dr. Campbell-Jackson confirmed that indeed, most claims sent to the SIU and denied during her tenure involved African-American and minority groups.

47.

According to Dr. Campbell-Jackson, company-wide SIU Leadership Meetings are regularly held, which meetings include the leaders of State Farm's "Multi-Claim Investigation Units" from across the country.

48.

State Farm's MCIU's are sub-sections of the SIUs and are dedicated specifically to targeting multi-claim generating entities, such as doctor's offices.

49.

At one meeting of State Farm's top SIU/MCIU executives from around the country, the subject of "Filling the Cups" was on the agenda and State Farm representatives shared SIU/MCIU statistics reflecting "how much State Farm saved by SIU/MCIU denying claims."

50.

At another company-wide meeting, a high-ranking State Farm SIU executive exhorted SIU Section Managers that, "We must fill the cups."

51.

In another company-wide meeting, State Farm crowed to its gathered SIU/MCIU top brass that, "We hit a home run in Filling the Cups" and that the MCIU had enabled State Farm to avoid $1.5 *billion* in claims expense in 2015 *alone*.

52.

Dr. Campbell-Jackson confirmed that one way State Farm "Fills the Cups" is by maintaining lists of physicians frequented by minority policy holders and claimants and scrutinizing claims from such physicians for fraud opportunities.

53.

State Farm has designed an entire system of claims handling, spearheaded by its SIU/MCIU's around the country, which manufacture pretextual justifications for injecting allegations of fraud into claims most likely to involve minorities, immigrants, and low-income claimants in urban areas of the country.

54.

As applied to minority chiropractors in metropolitan areas, the false fraud allegation most frequently manufactured by State Farm is an allegation of "non-individualized" care based on alleged "patterns" in the doctors past records, which patterns alone supposedly demonstrate that every treatment provided to any individual patient was "predetermined" and therefore fraudulent.

55.

Over the past 20 years, State Farm has filed and/or threatened massive federal lawsuits against doctors who are themselves minorities or immigrants and/or whose patients are, in the metropolitan areas of Georgia and virtually every other state in the country, which lawsuits allege fraud based on supposedly "predetermined treatment protocols" identified by its MCIU.

56.

State Farm has incongruously argued in these cases that the "predetermined treatment protocol" it alleges cannot be seen in any one chart, but that every chart nonetheless reflects entirely fraudulent treatment and therefore denial of all claims supposedly reflecting the "protocol" can be justified without any individual consideration of its actual merits.

57.

By inventing the "predetermined treatment protocol" as a basis for alleging fraudulent treatment in all of a doctor's records which can supposedly only be identified by looking at all of them at once, State Farm essentially created an end-run around the requirements of every auto insurance statute in the country requiring that claims be handled in good faith on their individual merits, such as Georgia's requirements under O.C.G.A. § 33-4-6.

58.

The mere filing of and/or threatening to file federal fraud lawsuits against minority medical providers has provided a massive return on investment for State Farm in the form of onerous "settlements" from providers across the country forced to capitulate or face crippling legal expenses and reputational destruction.

59.

Upon information and belief, scores of doctors across the country have been bullied by State Farm's accusation of predetermined treatment into pre-suit and post-suit settlements with State Farm in which they have agreed to pay massive amounts of money, stop billing State Farm directly for the treatment of State Farm insureds, and withdraw all pending claims the provider may have.

## STATE FARM IS LOOKING TO FILL THE CUPS WITH WELLNESS AROUND THE WORLD CHIROPRACTIC

60.

State Farm utilizes the services of "nationally retained counsel" for the purpose of threatening and filing federal fraud lawsuits premised on alleged "predetermined treatment protocols."

61.

One such "nationally retained counsel" is the law firm of Holland & Knight and its "Insurance Fraud and Recovery" team, including its Partner, Andrew Loewenstein, Esquire, whom State Farm

regularly retains to pursue the predetermined treatment protocol allegation against medical providers in Georgia.

62.

By way of example, In <u>State Farm v. Proactive Spine and Relief Center, Inc.</u>, No. 19-cv-04866-AT (N.D. Ga.), State Farm hired Mr. Loewenstein and the "fraud recovery team" at Holland & Knight to threaten a federal lawsuit alleging inappropriate patterns in the medical provider's treatment of auto accident patients and, when the pre-suit "negotiation" failed, to follow through on the threat and file suit. (<u>Id.</u>, ECF No. 24, pg 16).

63.

When State Farm targets a new medical provider in Georgia, it invariably deploys Holland & Knight and Mr. Loewenstein to make first contact with the provider.

64.

This first contact, just as in the <u>Proactive</u> case, involves Mr. Lowenstein or one of his partners stating to the targeted doctor that State Farm has identified "issues of concern" and requesting a meeting to "resolve our client's concerns".

65.

The "issues of concern" however always involve State Farm's bogus claim of "predetermined treatment protocols" based on supposed patterns identified in the doctor's past treatment records, which patterns State Farm contends give it the right to file a massive federal lawsuit alleging fraud in hundreds of claims and demanding often millions of dollars in damages.

66.

On January 22, 2022, Mr. Loewenstein delivered one of State Farm's canned pre-suit letters to Plaintiff, announcing as State Farm has in all other similar instances that State Farm has "issues of

concern" and requesting a meeting to "attempt to resolve" them. A copy of Mr. Loewenstein's letter is attached as Exhibit "B".

67.

Dr. Holloway thereafter attended the requested meeting but it proved unsuccessful in "resolving" State Farm's alleged issues to State Farm's satisfaction.

68.

In January of 2023, State Farm and Mr. Loewenstein instructed counsel for Plaintiff that "we should move swiftly" if the controversy between State Farm and Plaintiff is to be resolved and, when he did not receive a response, Mr. Loewenstein followed up to confirm that Dr. Holloway is "no longer interested in resolving this matter".

69.

Just as in the Proactive Spine and Relief Center matter, State Farm is threatening an imminent federal lawsuit against Wellness Around the World Chiropractic alleging fraud in the treatment of hundreds of past patients based on the knowingly bogus theory of "predetermined treatment."

70.

Since 2017, Plaintiff has treated approximately 150 patients with Medical Payments Coverage under a State Farm insurance policy and/or whose treatment State Farm partially reimbursed through third party, uninsured, or underinsured motorists claims.

71.

The actual treatments provided to all of these patients have been reasonable and necessary and within the scope and standard of chiropractic care in Georgia.

72.

There are no patterns within the actual treatments provided to these patients which are unusual in comparison to other chiropractors treating auto accident patients in Georgia and given the similar mechanisms of injury, similar injuries complained of, and the limited scope of chiropractic practice.

73.

State Farm has no evidence based in science or medical literature which establishes patterns which *should* be exhibited in a retrospective audit of chiropractic treatments provided to auto accident patients.

74.

In point of fact, even the chiropractor State Farm has utilized in more than 35 cases to support accusations of fraud against chiropractors around the country admitted recently under oath not only that there are no studies or literature identifying any baseline of "appropriate" patterns in chiropractic treatment of auto accident patients, but also that "it's not a question that science has assessed" and the entire premise "sounds more like a question that a lawyer would ask."

75.

State Farm's expert said the quiet part out loud: Any inferences to be drawn from alleged patterns in a chiropractor's treatments of auto accident patients are merely State Farm's lawyers manufacturing pretextual justification for federal fraud lawsuits like the one State Farm filed against Proactive Spine and Relief Center and are currently threatening against Wellness Around the World.

76.

The complete lack of scientific merit to State Farm's allegation is besides the point, however, given the liberal pleading standard for fraud under the Federal Rules of Civil Procedure and the devastating impact the mere filing of such a lawsuit has on any medical provider targeted therewith.

77.

If State Farm were to file its threatened federal lawsuit, Plaintiff would have no opportunity to challenge the merits of State Farm's accusation of fraud based on treatment patterns in Plaintiff's past records without suffering calamitous financial and reputational ruin in the process.

78.

This is because a doctor or practice's innocence of State Farm's fraud charge can never truly be litigated, as the reputational damage from being accused in federal court of massive criminal fraud, combined with the crippling expense of attempting to justify on a case-by-case basis the treatment of potentially hundreds of patients, makes it all but impossible for any doctor to defend State Farm's lawsuit through trial.

79.

The defense of a State Farm federal fraud lawsuit based on allegedly anomalous patterns routinely runs to multiple hundreds of thousands of dollars, as it involves the production, organization, and analysis of hundreds of thousands of pages of medical and claim records, extensive expert review, and dozens of hours of depositions.

80.

Even more financially crushing is the fact that State Farm's Standard Claims Processes require that whenever it files an affirmative fraud action against a doctor, a Tax Identification Number ("TIN") Block is imposed within State Farm's system, preventing any further payments from being made to the targeted doctor's offices throughout the pendency of the litigation. State Farm further uses the existence of the lawsuit to deny in third-party claims consideration of any treatment provided or injuries diagnosed by the targeted doctor, while sending letters to patients and their attorneys which announce that State Farm has sued the doctor for fraud in federal court.

81.

Critically, just as Mr. Loewenstein did in the lawsuit against Proactive Spine and Relief Center, State Farm also includes in each of its federal fraud lawsuits a count for *declaratory judgment* that it is excused from paying any pending or later submitted bills of the targeted doctor because the past patterns alone justify denial of individual claims without further consideration.

82.

State Farm uses the mere existence of this declaratory judgment count to deny all pending bills as well as any submitted after the filing of the lawsuit.

83.

The net effect of the federal fraud lawsuit threatened against Plaintiff by State Farm would be to completely destroy its ability to exist, as Plaintiff would incur hundreds of thousands of dollars in legal fees while its patient base erodes and its patients would naturally look elsewhere to other doctors whose treatment has not been branded "fraudulent" by the world's largest automobile insurance company. While this expense and erosion are occurring, Plaintiff would be denied all payments from State Farm for pending bills which, given State Farm's market dominance, will necessarily be a huge portion of any practice's income.

84.

Plaintiff therefore brings this action for declaratory relief as it represents the only opportunity Plaintiff has to challenge the merits of State Farm's false, racially motivated accusation of inappropriate patterns in its records and avoid the destruction of its practice which will occur if State Farm's lawsuit were to be filed.

## COUNT ONE:  DECLARATORY JUDGMENT

85.

Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

86.

Pursuant to O.C.G.A. § 9-4-2, Plaintiff seeks a declaration that:

(a)     Regardless of what patterns of treatment might be reflected in past records of a medical provider, past patterns alone cannot justify a finding that treatment provided to any one patient was unreasonable or unnecessary;

(b)     Regardless of what patterns might be reflected in a medical provider's past treatment records, such patterns cannot be used by an insurer to avoid its obligation under O.C.G.A. § 33-4-6 to adjust claims on their individual merits promptly and fairly;

(c)     State Farm may not deny any pending or future bills from Plaintiff based solely on alleged patterns in Plaintiff's past records; and

(d)     State Farm is not entitled to claw back any monies paid for past treatment provided by Plaintiff based solely on alleged patterns in Plaintiff's past treatment records.

87.

The above facts or circumstances show that Plaintiff is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to its rights, and which future action without direction from the Court might reasonably jeopardize its interest.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award the following relief:

(1)     That summons issue and Defendants be served as provided by law;

(2)     Declaratory judgment be awarded in favor of Plaintiff;

(3)     That Plaintiff be awarded reasonable attorney fees, costs, and expenses;

(4)     That this Court grant a trial by a jury of twelve on all issues so triable; and

(5)     This Court grants such other and further relief as this Honorable Court deems equitable and just.

Respectfully submitted this 20th day of January 2023.

LAWSON, REID, & DEAN, LLC

BY: *Douglas Dean*

Douglas H. Dean
Attorney for Plaintiff
Georgia Bar No. 130988
601 East 14th Avenue (31015)
P.O. Box 5005
Cordele, Georgia  31010
(229) 271-9323 Office
(229) 271-9324 Facsimile
*douglas.dean@lawsonreidlaw.com*

IN THE SUPERIOR COURT OF CLAYTON COUNTY
STATE OF GEORGIA

✒ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
CLAYTON COUNTY, GEORGIA

2023CV00437-11

Robert L. Mack

JAN 20, 2023 05:09 PM

Chanae Clemons, Clerk
Clayton County, Georgia

WELLNESS AROUND THE WORLD
CHIROPRACTIC, LLC,

    Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and
STATE FARM FIRE AND CASUALTY
COMPANY,

    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION FILE NO. _____

## **VERIFICATION**

Personally appeared before the undersigned officer duly authorized to administer oaths,

Dr. Roger Holloway, as principal of Plaintiff Wellness Around the World Chiropractic, LLC, who

upon oath, states that the information and allegations contained in the foregoing Verified Complaint

for Declaratory Relief are true and accurate to the best of his knowledge.

This 20th day of January 2023.

By: _____ (Seal)
    Dr. Roger Holloway for
    Wellness Around the World Chiropractic, LLC

Sworn and subscribed to before me
this 20th day of January 2023:

_____
Notary Public
My commission expires: 04/25/2026

Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CONNECTORS REALTY ) 
GROUP CORPORATION and DARRYL ) 
WILLIAMS, ) 
           ) 
        Plaintiffs, ) 
           )    No.     19-cv-00743
    v.           ) 
           )    Honorable Charles P. Kocoras
STATE FARM FIRE & CASUALTY ) 
COMPANY, ) 
           ) 
        Defendant. ) 
           ) 

## DECLARATION OF CARLA CAMPBELL-JACKSON, PH.D.

Carla Campbell-Jackson, Ph.D., does declare and swear as follows:

1. I am over the age of 18 years and have personal knowledge of the following matters set forth in this Declaration to which, if called as a witness, I could competently testify.

2. I have received a Doctorate in Organizational Leadership in 2013 from University of Phoenix. I have received a Masters of Business Administration Degree from Illinois State University in 2003. I have received a Bachelors Degree in Communications in 1987 from Drake University. I am an African American (Black) female.

3. I began working for State Farm Insurance Company ("State Farm") as a College Intern in approximately 1986 in Des Moines, Iowa. In approximately 1988 I was hired by State Farm as Claim Representative in Chicago, Illinois. In approximately 1993 I was promoted to the position of Human Resources Representative in Chicago, Illinois. In approximately 1995 I was promoted to the position of Auto Claims Supervisor in Chicago, Illinois. In approximately 1998 I was promoted to the position of Superintendent/Team Manager in Auto Claims. In

EXHIBIT " E "

approximately 2003 I moved to Auto Claims Central as a Claims Manager. In approximately 2009 I was promoted to the position of Section Manager for Auto Claims in Kalamazoo, Michigan. In 2014 State Farm assigned me to the position of Claims Section Manager in the Special Investigations Unit ("SIU"), Kalamazoo, Michigan, primarily for the states of Michigan, Illinois, Missouri, Indiana and Iowa ("my Section"). I had never asked to be an SIU Section Manager, but, instead it was State Farm on its own that moved me to that position. My employee ratings with State Farm were always exceptional until State Farm became alarmed by my expressing that the SIU Claims denial process was being used to target and deny minority claims as set forth further below.

4. During the period 2014-2016 I also held the voluntary, unpaid, position of First Vice President and, subsequently, President of the Bloomington-Normal Chapter of the National Association for the Advancement of Colored People (NAACP).

5. As an SIU Claims Section Manager I was informed by State Farm that my duties included, but were not limited to, the following:

A. Review claim files from claims originating in my Section;

B. Review claims determinations made by SIU Claim Specialists/Representatives and submitted to me from their respective SIU Claims Team Managers in my Section;

C. Handle customer complaints;D. Handle human resources issues related to employees;

E. Coach and develop leaders and employees;

F. Participate in Claim Committee Reviews with the Team Managers and Internal Claims Consultants;

G. Attend SIU Conferences, meetings and weekly Huddles; and

H. Other duties as assigned.

6. In 2014 Claims Manager Celeste C. Dodson met with me telephonically when I first started in the position of Claims Section Manager in the Special Investigations Unit. She told me not to question the claims decisions of the Team Managers of the SIU that were sent to me for review because she stated that the Team Managers were more experienced with the SIU Claims denial process. I said, "Why would I not question the claims decisions?" Celeste responded by asking, "Do you want to be a civil rights advocate or an SIU Section Manager?" During this conversation Ms. Dodson explained that a part of my role as SIU Section Manager was to make sure that the SIU employees must "Fill the Cup(s)." This was the very first time that I heard the term "Fill the Cup(s)." She said we would review the SIU statistics during our weekly huddles.

7. Approximately once per week Ms. Dodson would hold and facilitate a recurring SIU Section Manager "huddle," *i.e.,* a meeting via videoconference, where we would review the statistics regarding referral of claims to the SIU and discuss ways of increasing the number of claims sent to SIU in an effort to "Fill the Cup(s)." Section Managers that reported to Dodson SIU Division included Beth O'Connor, Carla Campbell-Jackson, Carlos Diaz, Cortes Williams, Dave Banks, Gregory Law and Nicole Campbell Redd. During the huddles Ms. Dodson would show statistical comparisons of how many claims were coming into each Section in the Dodson SIU Division. She would also encourage us to take action to increase the number of claims into SIU. For example, Ms. Dodson and the Section Managers would discuss the concept of "Shaking Hands and Kissing Babies," by which they meant to encourage front line claim representatives (Property Damage and Bodily Injury Claim Representatives) to submit claims to SIU. Often Ms. Dodson encouraged the SIU Section Managers to have their employees attend Property Damage and Bodily Injury Team meetings to encourage submissions of claims to SIU. During the huddles and in personal one-on-one meetings with me, Ms. Dodson discussed the

3

various neighborhoods where she said there was a high propensity for the submission of fraudulent claims, including the inner cities of Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including, but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the North Side of St. Louis. She referred to these neighborhoods as "inner city" and/or "high risk for fraud" neighborhoods. During one of the huddles I suggested that maybe no fraud existed in a particular inner city neighborhood. Ms. Dodson interrupted me and said "Oh, yes, there is fraud in those areas." On many occasions during the one-on-one huddles with Ms. Dotson, I verbally shared my concerns about the high number of minority claims being sent to, and denied by, SIU. When I shared these concerns Ms. Dodson dismissed my concerns and repeated that claims from inner city neighborhoods had "high fraudulent activity."

8. In the course of reviewing the claims files that were routed to me for review, I noted that the preponderance of denied claims were those of policyholders and claimants that were African-American and minority groups. I came to this conclusion by reviewing the names, addresses and agents of these policyholders. For example, the majority of the claims that I reviewed were from policyholders and claimants that had Afro-centric names. I found that often when insureds and claimants would call to complain about State Farm, and those calls were routed to me to handle, the claimants would tell me their race and that they felt that State Farm was discriminating against them by denying their claims simply based on their race and neighborhood. These callers were African-Americans, Hispanics, West Asians, and Middle Easterners.

9. During my tenure as SIU Claims Section Manager, most the Claims determinations that were sent to me for review from the SIU Team Managers were from predominantly African

4

American and other minority inner city neighborhoods, including from the inner cities of Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including, but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the North Side of St. Louis. I do not recall receiving either Claims determinations or Claims denials from non-predominantly minority neighborhoods.

10. An Enterprise-led SIU Leadership Meeting was held October 27-29, 2014 at the Hilton Hotel in Nashville, Tennessee, attended by all SIU and Multi-Claim Investigations Unit ("MCIU") leaders from across the United States. (The Multi-Claim Investigations Unit was an investigations unit to which purportedly fraudulent claims were sent from multiple-claim generating entities, such as doctor's offices and automobile repair shops.) Each attendee enjoyed a private room and/or suite and elaborate accommodations at the hotel that included meals, hors d'oeuvres, snacks, drinks and music. In addition to all of the SIU and MCIU leaders being present, this conference was also attended and hosted by Vice President of Operations, Kelly Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers and several Claims Consultants (some of whom were being groomed for role of Vice President of Operations.) At this meeting the subject of "Filling Cups" was on the agenda and was discussed in detail. State Farm representatives shared the results from the SIU/MCIU statistics, as well as stated how much State Farm saved by SIU/MCIU denying claims.

11. Another SIU Enterprise-Led meeting was held on August 12, 2015 at a building leased by State Farm adjacent to the Chicago Marriott Suites in Downers Grove, Illinois, a Chicago suburb, where we were housed. At that meeting SIU Claims Manager Celeste Dodson reviewed SIU statistics and data with SIU Section Managers. She reviewed each Section's data and told SIU Section Managers that "We must 'Fill the cups.'"

12. Additionally, on or about January 26, 2016 another SIU/MCIU Enterprise-Led meeting was held in Dallas, Texas at the City-Line Building. Specifically, the attendees were told by State Farm representatives that, "We hit a home run in Filling the Cups." This meeting was attended by all of the SIU and MCIU Section Managers, Operations Vice President Shyama Terry, Vice President of Operations, Kelly Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers and several Claims Consultants (some of whom were being groomed for role of Vice President of Operations.) At this meeting the subject of "Filling Cups" was discussed in detail. State Farm shared the results from the SIU/MCIU statistics, as well as stated how much State Farm saved by SIU/MCIU denying claims. The attendees were told by a representative of State Farm that there were 30,049 cause of loss, *i.e.*, claims, sent to SIU as a result of Filling the Cups. State Farm representatives told the attendees that savings to State Farm for claims not paid, *i.e.*, denied, in the SIU for the year 2015 was $135,551,132.72 and that 2015 savings for State Farm for claims not paid, *i.e.*, denied, in the MCIU was $1.5 billion. The attendees were told by representatives of State Farm that this savings helps State Farm to grow and keeps its premiums low.

13. TAC (commonly known as Technology Analytics for Claims) was a software application utilized by State Farm and managed by Jeff Legner, Section Manager of SIU Analytics. TAC was employed as another method to identify claims that could plausibly be considered fraudulent and sent to SIU to "Fill the Cups." Dennis Schulkins was the Claims Manager responsible for TAC.

14. I was told by experienced SIU Section Mangers and SIU Claims Managers that Patricia "Pat" Parr-Armelegos was instrumental in the formation of SUI and MCIU. In addition,

6

SIU Claims Specialist Tony Guy made a disparaging comment to Paul Lehmann, SIU Team Manager, about the minority customer base for an African American State Farm agent.

15. State Farm created and maintained a list of certain attorneys, physicians and body shops frequented by minority policyholders and claimants. State Farm scrutinized the claims from these attorneys by providing low-ball settlement offers. State Farm scrutinized the claims from these physicians and repair shops by denying significant portions of the medical bills and repair bills.

16. State Farm can easily access information relating to "Fill the Cup(s)" through its system-wide use of Microsoft Outlook and Microsoft MSWord.

17. Referrals to the SIU sent to me for review were made by State Farm Claims Representatives from auto and homeowners' lines of State Farm's business, *i.e.* State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

18. Ms. Dodson told me during my one-on-one huddles with her that she wanted me to increase the number of purportedly fraudulent claims coming into my section. She informed me that my Section had the lowest number of purportedly fraudulent claims. These comments were made during my performance reviews and were likely correlated to my performance ratings and salary increases.

19. As soon as I noticed a trend regarding the denial of claims by SIU from predominantly African American and other minority inner city neighborhoods, I shared my concerns with Ms. Dodson at the next one-on-one huddle with Ms. Dodson and did so at every one-on-one huddle with Ms. Dodson from the beginning of 2015 through May, 2016, about the preponderance of SIU claims involving African Americans, Hispanics, Asians and other minority customers. After sharing these concerns with Claims Manager Celeste Dodson, Claim

7

Consultant Juliann Klokkenga and even Human Resources Vice-President Rich Garcia, State Farm began to retaliate unrelentingly by rating me unfairly on my performance reviews. I typically received superior, exceptional, and Level 3 ratings (which was the highest rating possible) until I expressed my concerns about State Farm discriminating against minority employees and customers. Ultimately, State Farm relieved me of my duties.

20. I even offered State Farm leaders specific policyholders' names and claim numbers that were denied. Specifically, on February 24, 2016, I sent Claim Consultant Juliann Klokkenga an email with a list of claim numbers and names--expressing my concerns regarding State Farm's propensity to deny minority group members' claims. She called me on the telephone and said that all claims are handled on their merits.

21. However, while Ms. Klokkenga and State Farm say that "all claims are handled on their merits," my experience proves otherwise. In actuality, a preponderance of claims that I reviewed that "Filled the Cups" were from African American and other minorities, were prejudged as non-meritorious, and often were denied. If each claim was handled "on its merits," then what would have been the need for the "Fill the Cups" process? Why does one need a "Fill the Cups" process to "handle a claim on its merits?" State Farm Claim Representatives were trained in State Farm's contractual obligations under its policies so as to be able to handle a claim on its merits. So, absent the "Fill the Cups" process, State Farm would have handled each claim on its merits as a matter of course. Based on my experience, "Fill the Cups" accomplished just the opposite and disenfranchised many African Americans and other minorities by not paying their legitimate claims. "Fill the Cups" was simply a means of denying payment of millions of dollars to African American and other minority policyholders and claimants.

22.  I also telephoned and wrote to all the state Departments Of Insurance ("DOI") for each of the states in my Section regarding African American and other minority claims denials by State Farm. The departments from Illinois and Indiana responded in writing and met me in person at the Peoria Public Library where I expressed my concerns about the number of African American and other minority claims denials by State Farm.  In a letter from the Michigan Department of Insurance and Consumer Services dated June 14, 2017, the Department stated, "We do appreciate you bringing your concerns to our attention and will be monitoring the complaint activity against State Farm over the next several months."

23.  At a meeting on Monday, May 9, 2016, attended by Human Resources Vice President of Operations Rich Garcia and Claims Vice President of Operations Kelly Bever, I was informed by Rich Garcia and Kelly Bever that State Farm was terminating me.  I informed them that this termination solely was being done in retaliation for me expressing my concerns over State Farm's discrimination, racism and retaliation against minority employees and minority claimants.  I said that it was not until I began expressing my concerns about State Farm's discrimination against African American and minority employees and African American and minority State Farm policyholders did State Farm decide to terminate me.  While at State Farm, I was one of the most decorated employees at the organization (including earning a Bachelors, MBA, Ph.D., CPCU, CLLP, AIS, AIC and AIM).  I was selected for the highly coveted "Spirit of State Farm Award."  Rich Garcia then offered me $175,315.00 in exchange for a Confidential Separation and Release Agreement (including a non-disclosure clause).  I immediately told him that my morals and ethics would not allow me to accept "hush money."  I further informed Rich Garcia that State Farm's behavior was racist, discriminatory and retaliatory--simply because I raised concerns related to State Farm's racism and discrimination against minority employees

9

and minority customers. My integrity and values did not allow me to participate in the disenfranchisement and discrimination against African American and other minority employees and customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/19/2022

Carla Campbell-Jackson, Ph.D.

# Exhibit B

# Holland & Knight

777 South Flagler Drive | Suite 1900, West Tower | West Palm Beach, FL 33401 | T 561.833.2000 | F 561.650.8399
Holland & Knight LLP | www.hklaw.com

Andrew M. Loewenstein
+1 561-650-8354
Andrew.Loewenstein@hklaw.com

January 20, 2022

**VIA FEDEX**

**Wellness Around the World Chiropractic, LLC**
**c/o Roger Holloway, Registered Agent**
535 Engine Run
Stockbridge, GA, 30281

   Re:  Issues of Concern relating to Wellness Around the World Chiropractic, LLC

Dear Dr. Holloway:

   We have been retained by State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company ("State Farm") to contact you regarding issues of concern State Farm has identified in the review of claims submitted by Wellness Around the World Chiropractic, LLC. To date, my efforts to reach you via phone have been unsuccessful. Please contact me, or if you are represented have your counsel do so, to schedule a meeting to further discuss these issues and attempt to resolve our clients' concerns. We look forward to hearing from you. Thank you.

Sincerely yours,

HOLLAND & KNIGHT LLP

*Andrew M. Loewenstein*

Andrew M. Loewenstein

AML

LVM
1/26/2022

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

# SUPERIOR COURT OF CLAYTON COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER  2023CV00437-11

WELLNESS AROUND THE WORLD
CHIROPRACTIC, LLC

_____
**PLAINTIFF**

                                                **VS.**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY
COMPANY

_____
**DEFENDANTS**

## SUMMONS

TO: STATE FARM FIRE AND CASUALTY COMPANY

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Douglas Dean**
> **Lawson, Reid & Dean, LLC**
> **P.O. Box 5005**
> **Cordele, Georgia 31010**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 20th day of January, 2023.**

Clerk of Superior Court

_____
Chanae Clemons, Clerk
Clayton County, Georgia

## AFFIDAVIT OF SERVICE

✉ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
CLAYTON COUNTY, GEORGIA

**2023CV00437-11**
834679
**Robert L. Mack**

**FEB 13, 2023 08:10 AM**

Charese Clemons, Clerk
Clayton County, Georgia

| Case:<br>2023CVV00437-11 | Court:<br>SUPERIOR COURT | County:<br>CLAYTON, GA |
|---|---|---|
| Plaintiff / Petitioner:<br>WELLNESS AROUND THE WORLD CHIROPRACTIC, LLC | | Defendant / Respondent:<br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY |
| Received by:<br>Phoenix Legal | | For:<br>Lawson, Reid & Dean, LLC |
| To be served upon:<br>Corporation Service Co. C/O State Farm Fire and Casualty | | |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Barry Smith- Corporation Service Co. C/O State Farm Fire and Casualty, COMPANY: 2 SUN CT 400, PEACHTREE CORNERS, GA 30092

**Manner of Service:** Registered Agent, Feb 7, 2023, 11:54 am EST

**Documents:** Verified Complaint for Declaratory Relief, Summons (State Farm Fire and Casualty Co.

**Additional Comments:**
1) Successful Attempt: Feb 7, 2023, 11:54 am EST at COMPANY: 2 SUN CT 400, PEACHTREE CORNERS, GA 30092 received by Barry Smith- Corporation Service Co. C/O State Farm Mutual Auto AND State Farm Fire and Casualty. Age: 35; Ethnicity: African American; Gender: Male; Weight: 200; Height: 6'0"; Hair: Black; Relationship: Registered Agent ;

_____  2/10/23
Frank James                         Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

Subscribed and sworn to before me by the affiant who is
personally known to me.

_____

Notary Public
2/10/23

Date            Commission Expires

KRISTA MEADOWS
NOTARY PUBLIC
FULTON COUNTY, GEORGIA
MY COMMISSION EXPIRES
AUGUST 04, 2026

**AFFIDAVIT OF SERVICE**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
CLAYTON COUNTY, GEORGIA

2023CV00437-11

8346796   Robert L. Mack

FEB 13, 2023 08:10 AM

Chance Clemons, Clerk
Clayton County, Georgia

| Case: | Court: | County: |
|---|---|---|
| 2023CVV00437-11 | SUPERIOR COURT | CLAYTON, GA |

| Plaintiff / Petitioner: | Defendant / Respondent: |
|---|---|
| WELLNESS AROUND THE WORLD CHIROPRACTIC, LLC | STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY |

| Received by: | For: |
|---|---|
| Phoenix Legal | Lawson, Reid & Dean, LLC |

| To be served upon: |
|---|
| Corporation Service Co. C/O State Farm Mutual Auto |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Barry Smith- Corporation Service Co. C/O State Farm Mutual Auto, COMPANY: 2 SUN CT 400, PEACHTREE CORNERS, GA 30092

**Manner of Service:** Registered Agent, Feb 7, 2023, 11:57 am EST

**Documents:** Verified Complaint for Declaratory Relief, Summons (State Farm Mutual Auto. Ins. Co.)

**Additional Comments:**
1) Successful Attempt: Feb 7, 2023, 11:57 am EST at COMPANY: 2 SUN CT 400, PEACHTREE CORNERS, GA 30092 received by Barry Smith-Corporation Service Co. C/O State Farm Mutual Auto AND State Farm Fire and Casualty. Age: 35; Ethnicity: African American; Gender: Male; Weight: 200; Height: 6'0"; Hair: Black; Relationship: Authorized Agent ;

_____   2/10/23
Frank James                Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

*Subscribed and sworn to before me by the affiant who is personally known to me.*

_____
Notary Public
2/10/23

_____
Date            Commission Expires

