# Exhibit "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JANE DOE 1

       Plaintiff,

v.

RED ROOF INNS, INC., VARAHI
HOTEL, LLC, FMW RRI NC, LLC,
WESTMONT HOSPITALITY GROUP,
INC., RRI III, LLC, WHG SU ATLANTA,
LP, SUB-SU HOTEL GP, LLC, CHOICE
HOTELS INTERNATIONAL, INC.,
WYNDHAM HOTELS & RESORTS,
INC., MICROTEL INNS AND SUITES
FRANCHISING, INC., KUZZINS
BUFORD, LLC, RAMADA WORLDWIDE
INC., JEET & JJ LLC, NEWTEL V
CORPORATION, CPLG HOL, LLC,
CPLG PROPERTIES, LLC, COREPOINT
LODGING, INC., LQ MANAGEMENT,
LLC, LA QUINTA WORLDWIDE, LLC,
HAMENT DESAI, VAD PROPERTY
MANAGEMENT, LLC, VANTAGE
HOSPITALITY GROUP, INC., 2014 SE
OWNER 5-EMORY, LLC, LAXMI
DRUID HILLS HOTEL, LLC, JHM
HOTELS MANAGEMENT, INC., AURO
HOTELS MANAGEMENT, LLC,
HILTON FRANCHISE HOLDINGS,
LLC, HILTON DOMESTIC OPERATING
COMPANY, INC., HILTON
WORLDWIDE HOLDINGS, INC. and
JOHN DOES 1-10.

       Defendants.

Civil Action No.
1:19-cv-03840

JURY TRIAL DEMANDED,
Pursuant to Fed. R. Civ. P. 38

## [AMENDED] COMPLAINT

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................... 1

**THE PARTIES** ......................................................................... 5

    **I. Plaintiff** ........................................................................... 5

    **II. Defendants** ..................................................................... 5

        **A. The Red Roof (Smyrna) Defendants** ........................... 5

        **B. The Red Roof (Atlanta) Defendants** ........................... 8

        **C. The Suburban Extended Stay Defendants** .................... 9

        **D. The Microtel Defendants** ......................................... 11

        **E. The Ramada Defendants** .......................................... 13

        **F. The La Quinta Defendants** ....................................... 15

        **G. The Americas Best Defendants** ................................. 18

        **H. The Hampton Inn (NDH Atlanta) Defendants** ............. 19

        **I. The John Doe Defendants** ........................................ 21

**JURISDICTION & VENUE** ...................................................... 22

**FACTUAL ALLEGATIONS** ...................................................... 22

    **I. Sex Trafficking** .............................................................. 22

    **II. Metro Atlanta Has Long Been Known As A Sex
    Trafficking Hub** ............................................................... 24

    **III. Hotels Are Complicit In Sex Trafficking** ......................... 26

        **A. Hotels Are a Critical Part of the Sex Trafficking Industry** ........ 26

        **B. The Presence of Sex Trafficking and Measures to Prevent
        It Have Been Known in the Hotel Industry for Decades** ............. 29

        **C. Defendants Chose to Ignore or Participate in Sex
        Trafficking Rather than Take Steps to Prevent It** ...................... 32

    **IV. The Defendants Participated In The Sex Trafficking of**

**Jane Doe 1** ............................................................ **35**

**A. The Red Roof (Smyrna) Defendants Participated in a
Sex Trafficking Venture Whose Victims Included Jane
Doe 1, and They Knew or Should Have Known They
Were Benefitting Financially From Such a Venture** ................... **36**

    **i. The Red Roof (Smyrna) Sex Trafficking Venture** .................. **36**

    **ii. Red Roof (Smyrna) management and employees knew
of and facilitated the sex trafficking venture at that
hotel, and they specifically facilitated the trafficking of
Jane Doe 1** ................................................... **37**

    **iii. Red Roof Defendants knew of, or should have known of,
the sex trafficking venture at the Red Roof (Smyrna)** ............ **39**

**B. The Red Roof (Atlanta) Defendants Participated in a Sex
Trafficking Venture Whose Victims Included Jane Doe 1,
And They Knew or Should Have Known They Were
Benefitting Financially From Such a Venture** .............................. **51**

    **i. The Red Roof (Atlanta) Sex Trafficking Venture** ................... **51**

    **ii. Red Roof (Atlanta) management and employees knew of
and facilitated the sex trafficking venture at that hotel,
and they specifically facilitated the trafficking of
Jane Doe 1** ................................................... **52**

    **iii. The Red Roof (Atlanta) Defendants knew of, or should
have known of, the sex trafficking venture at the Red
Roof (Atlanta)** ............................................... **54**

**C. The Suburban Extended Stay Defendants Participated in
A Sex Trafficking Venture Whose Victims Included Jane
Doe 1, and They Knew or Should Have Known They Were
Benefitting Financially From Such a Venture** .............................. **57**

  **i.** **The Suburban Extended Stay (Chamblee) Sex Trafficking Venture** ..................................................... **57**

  **ii.** **Suburban Extended Stay (Chamblee) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1** ........................................... **58**

  **iii.** **The Suburban Extended Stay Defendants knew of, or should have known of, the sex trafficking venture at the Suburban Extended Stay (Chamblee)** ...................................... **61**

**D.** **The Microtel Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew Or Should Have Known They Were Benefitting Financially From Such a Venture** ................................................... **65**

  **i.** **The Microtel (Atlanta) Sex Trafficking Venture** .................... **65**

  **ii.** **Microtel (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1** ....... **65**

  **iii.** **The Microtel Defendants knew of, or should have known of, the sex trafficking venture at the Microtel (Atlanta)** ........ **69**

**E.** **The Ramada Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew Or Should Have Known They Were Benefitting Financially From Such a Venture** ................................................... **65**

  **i.** **The Ramada (Alpharetta) Sex Trafficking Venture** ............... **71**

  **ii.** **Ramada (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1** ....... **72**

  **iii.** **The Ramada Defendants knew of, or should have known**

of, the sex trafficking venture at the Ramada (Alpharetta)...    **74**

**F. The La Quinta Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew Or Should Have Known They Were Benefitting Financially From Such a Venture**.................................................    **76**

   **i.  The La Quinta (Alpharetta) Sex Trafficking Venture** ...........    **76**

   **ii. La Quinta (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1**.......    **77**

   **iii. The La Quinta Defendants knew of, or should have known of, the sex trafficking venture at the La Quinta (Alpharetta)…**    **79**

**G. The Americas Best Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew Or Should Have Known They Were Benefitting Financially From Such a Venture**.................................................    **81**

   **i.  The Americas Best (Atlanta) Sex Trafficking Venture** ..........    **81**

   **ii. Americas Best (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1**.......    **82**

   **iii. The Americas Best Defendants knew of, or should have known  .. of, the sex trafficking venture at the Americas Best (Atlanta)** ....................................................................    **84**

**H. The Hampton Inn (NDH Atlanta) Defendants Participated in a Sex Trafficking .. Venture Whose Victims Included Jane Doe 1, and They Knew Or Should Have Known They Were Benefitting Financially From Such a Venture**.................................................    **92**

   **i.  The Hampton Inn (NDH Atlanta) Sex Trafficking Venture..**    **92**

ii.  Hampton Inn (NDH Atlanta) management and employees
knew of and facilitated the sex trafficking venture at that hotel,
andthey specifically facilitated the trafficking of Jane Doe 1..    93

iii. The Hampton Inn (NDH Atlanta) Defendants knew of, or
should have known .......of, the sex trafficking venture at the
Hampton Inn (NDH Atlanta) ...............................................    95

PLAINTIFFS CLAIMS..................................................................    97

Trafficking Victims Protection Reauthorization Act Claims
(allegations common to Counts 1-24).......................................    97

COUNT ONE - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Perpetrator Claim – 18 U.S.C. §§ 1591(a)(1), 1595(a)
(Against Red Roof (Smyrna) Defendants)................................    99

COUNT TWO - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Perpetrator Financial Beneficiary Claim
18 U.S.C. §§ 1591(a)(2), 1595(a)
(Against Red Roof (Smyrna) Defendants)................................    100

COUNT THREE - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Negligent Beneficiary Claim - 18 U.S.C. §§ 1595(a)
(Against Red Roof (Smyrna) Defendants)................................    103

COUNT FOUR - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), 1595(a)
(Against Red Roof (Atlanta) Defendants) ...............................    106

COUNT FIVE - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Perpetrator Financial Beneficiary Claim
18 U.S.C. §§ 1591(a)(2), 1595(a)
(Against Red Roof (Atlanta) Defendants) ...............................    107

COUNT SIX - Trafficking Victim Protection Reauthorization Act –
Sex Trafficking Negligent Financial Beneficiary Claim
18 U.S.C. §1595(a)

(Against Red Roof (Atlanta) Defendants) .................................................. 110

COUNT SEVEN - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), 1595(a)
    (Against Suburban Extended Stay Defendants....................................... 113

COUNT EIGHT - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Perpetrator Financial Beneficiary Claim
    18 U.S.C. §§ 1591(a)(2), 1595(a)
    (Against Suburban Extended Stay Defendants) ...................................... 114

COUNT NINE - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Negligent Financial Beneficiary Claim
    18 U.S.C. §1595(a)
    (Against Suburban Extended Stay Defendants) ...................................... 117

COUNT TEN - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), § 1595(a)
    (Against La Quinta Defendants)................................................................ 120

COUNT ELEVEN - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Perpetrator Financial Beneficiary Claim
    18 U.S.C. §§ 1591(a)(2), 1595(a)
    (Against La Quinta Defendants)................................................................ 122

COUNT TWELVE - Trafficking Victim Protection Reauthorization Act –
    Sex Trafficking Negligent Financial Beneficiary Claim
    18 U.S.C. § 1595(a)
    (Against La Quinta Defendants)................................................................ 124

COUNT THIRTEEN - Trafficking Victim Protection Reauthorization
    Act – Sex Trafficking Perpetrator Claim
    18 U.S.C. §§ 1591(a)(1), 1595(a)
    (Against Microtel Defendants)................................................................. 127

COUNT FOURTEEN - Trafficking Victim Protection Reauthorization
    Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
    18 U.S.C. §§ 1591(a)(2), 1595(a)

1824208.1

(Against Microtel Defendants).................................................... 129

**COUNT FIFTEEN - Trafficking Victim Protection Reauthorization**
    **Act – Sex Trafficking Perpetrator Financial Beneficiary Claim**
    **18 U.S.C. §1595(a)**
    (Against Microtel Defendants).................................................... 131

*You may choose to look the other way, but you can never say again that you did not know." — William Wilberforce[1]*

# INTRODUCTION

1.     Sex trafficking is modern day slavery.  Sex trafficking victims are coerced through a combination of deceit, forced drug dependency, and sexual, physical, and psychological abuse to engage in commercial sex acts to enrich sex trafficking ventures.

2.     Jane Doe 1 is one of many victims of the conspicuous and open sex trafficking that occurred at Defendants' hotels.

3.     Defendants were essential to the success of these evil ventures. Defendants' hotels provided the locations where victims were forced to engage in commercial sex acts with numerous—often more than 10 and sometimes more than 20—buyers a day.

4.     Jane Doe 1 and other sex trafficking victims were also beaten, raped, physically and mentally abused, exploited, and psychologically tormented at Defendants' hotels

---

[1] In 2008, the Trafficking Victims Protection Act was renamed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 in honor of Wilberforce, "an English politician and social reformer whose campaign to suppress the slave trade led to the passage by Parliament of the Slavery Abolition Act of 1833, ending the institution of slavery in the British Empire." *Am. Civil Liberties Union of Massachusetts v. Sebelius*, 697 F. Supp. 2d 200, 201 n.3 (D. Mass. 2010).

5.     Hotel sex trafficking is the most common sex trafficking venture in Atlanta.  Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone.  Defendants have received and retained some of those illicit profits.

6.     In the transactional cycle of hotel sex trafficking, traffickers pay for a location at which they can offer human beings for sale; buyers pay the traffickers to use these human beings for their pleasure; traffickers pay with the money from the buyers; and the cycle repeats.  Each of Defendants' hotels hosted one or more hotel sex trafficking ventures.

7.     Defendants—hotels, owners, hotel management, and hotel brand franchisors—should have known of the open and conspicuous sex trafficking that took place at their hotels.

8.     In many instances Defendants knew sex trafficking was taking place in their hotels.  In fact, several Defendants' agents and employees actively participated in sex trafficking ventures and were rewarded for doing so.  This included aiding Jane Doe 1's traffickers and others, by, among other things, acting as lookouts, notifying traffickers if police were present, and ensuring that victims did not escape their traffickers.  For example:

   a.     Traffickers paid several Red Roof Inn employees—including a former general manager—cash for providing tips that helped the

sex traffickers avoid being caught by law enforcement.  Even

when Cobb County police notified the hotel's management about

this practice, Red Roof Inn did nothing;

b.    Employees at the Suburban Extended Stay received cash

payments from sex traffickers to act as police lookouts and to call

them if a victim "[did] something crazy";

c.    Employees at the La Quinta Inn allocated rooms to victims and

traffickers near the hotel's back door so that buyers could come

and go more discretely even providing extra key cards to allow

buyers easy access to the hotel.  When La Quinta employees

learned a sex trafficking victim was beaten by a trafficker for

hours at the hotel, leaving blood on the walls of the room, the La

Quinta employees did nothing.

d.    At some hotels, employees not only received monetary payments,

the sex traffickers they helped actually forced victims to have sex

with them.  For example, at the Ramada, Jane Doe 1 was forced

by her trafficker to have sex with each of three Ramada

employees ***every*** day that she was trafficked at the hotel.

9.    In some instances, sex trafficking was fully integrated into a hotel's

daily business operations.  For example,

     a.    at the Microtel, a single trafficker controlled the entire third floor of the hotel, using it exclusively for sex trafficking; and

     b.    when Jane Doe 1 was trafficked at the Red Roof Inn in Smyrna, sex trafficking was so rampant that a typical night included multiple traffickers using the hotel to traffic multiple victims each, constituting a significant portion, if not the majority, of the occupancy at that hotel.

10.    Any of the Defendants—whether a hotel owner, management, franchisor, or one of their agents or employees—could have helped save Jane Doe 1 from being trafficked for sex. None of them did.

11.    Instead, hotel sex trafficking ventures flourished at Defendants' hotels.

12.    Plaintiff was trafficked at Defendants' hotels from 2011–2016. At every level of hotel location and chain operation and management, Defendants participated in, facilitated, condoned, or ignored the rampant sex trafficking that was occurring at their facilities.

13.    Jane Doe 1 is only one of many victims who were trafficked at Defendants' hotels. Some of those victims have filed their own cases against Defendants.[2] Those victims, and others, are witnesses to the sex trafficking

---

[2] Two of those victims are referred to in this Amended Complaint as Jane Doe 2 and Jane Doe 3, as identified in their respective lawsuits.

of Plaintiff at Defendants' hotels and to Defendants' participation and complicity in sex trafficking.

14.     Jane Doe 1 brings this action against Defendants to recover for the immense harm they have caused her.

## THE PARTIES

### I.    <u>Plaintiff</u>

15.     Jane Doe 1, proceeding pseudonymously,[3] is a citizen of the United States of America and a resident of the State of Georgia.

### II.   <u>Defendants</u>

16.     Whenever reference is made in this Amended Complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

### A.    The Red Roof (Smyrna) Defendants

17.     At all times relevant to this Complaint, Defendants Varahi Hotel, LLC ("Varahi-RRI"), FMW RRI NC, LLC ("FMW"), Westmont Hospitality Group,

---

[3] Plaintiff's motion for a protective order and leave to proceed pseudonymously is pending before the Court.

Inc. ("Westmont"), Red Roof Inns, Inc. ("Red Roof Inn"), and John Does Nos. 1–10 (collectively, the "Red Roof (Smyrna) Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 ("Red Roof Inn (Smyrna)"), from which they benefited financially.

18.    Varahi-RRI is a Georgia limited liability company with its principle place of business at 2200 Corporate Plaza, Smyrna, Georgia, 30080.  Varahi may be served with process by serving its registered agent Bharat Patel at 2200 Corporate Plaza, Smyrna, Georgia, 30080.

19.    FMW RRI is a Delaware limited liability company with its principle place of business in Houston, Texas.  FMW RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

20.    Westmont is a Texas corporation with its principle place of business in Houston, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  Westmont may be served with

process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

21. Westmont operates the hotels it has an ownership interest in, and its business strategy is to align its ownership and management of its properties. It purports to have developed and implemented unique business models in order "to ensure the best returns."[4] According to Westmont, "Westmont takes responsibility for overseeing the asset management of the hotels including financial accounting, sales and marketing, IT and human resources."[5]

22. FMW was the title holder of the Red Roof Inn (Smyrna) until roughly December 2012. Westmont exerts complete control over FMW, which is the agent of and/or alter-ego of, Westmont.

23. Red Roof Inns is a Delaware corporation with its principle place of business in New Albany, Ohio. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia resulting in injuries in Georgia. Red Roof Inns may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

---

[4] *See* Westmont Hospitality Group website excerpt, attached hereto as Exhibit 1, at 1.

[5] *Id.*

24.     Red Roof Inns plays a key role in the operation of each of the franchise locations bearing the Red Roof Inn brand.  In a recent article, its president Andrew Alexander noted, "Our relationship with our franchisees is as close as you can get."  Alexander further stated in the article that franchisees have "direct access to him and other leaders at the company, something that's unheard of at larger franchising companies."[6]

## B.     The Red Roof (Atlanta) Defendants

25.     At all times relevant to this Complaint, Defendants RRI III, LLC ("RRI III"), Red Roof Inn, Westmont, and John Does Nos. 1–10 (collectively, the "Red Roof (Atlanta) Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Red Roof Plus+ located at 1960 N. Druid Hills Road NE, Atlanta, Georgia, 30329 ("Red Roof (Atlanta)").

26.     RRI III is a Delaware limited liability company with its principle place of business in Houston, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of

---

[6] Judy Maxwell, *Asian American Hoteliers Raise the Red Roof*, Asian Hospitality, (Nov. 19, 2018), https://www.asianhospitality.com/asian-american-hoteliers-raise-the-red-roof/ (last visited Nov. 20, 2019), attached hereto as Exhibit 2, at 2.

Georgia resulting in injuries in Georgia. RRI III may be served with process by serving its registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

27.   RRI III was the title holder of the Red Roof Inn (Smyrna) from roughly 2011–2019. Westmont exerts complete control over RRI III, which is the agent of and/or alter-ego of, Westmont.

### C.   The Suburban Extended Stay Defendants

28.   At all times relevant to this Complaint, Defendants WHG SU Atlanta LP ("WHG SU"), SUB-SU Hotel GP, LLC ("SUB-SU"), Westmont, Choice Hotels International, Inc. ("Choice Hotels"), and John Does Nos. 1–10 (collectively, the "Suburban Extended Stay Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Suburban Extended Stay located at 2050 Peachtree Industrial Court, Chamblee, Georgia, 30341 (the "Suburban Extended Stay (Chamblee)"), from which they benefited financially.[7]

---

[7] The Suburban Extended Stay where Jane Doe 1 was trafficked is currently a HomeTown Studios hotel, a brand of Red Roof Inns, Inc. However, during the time of her trafficking, the hotel was a Suburban Extended Stay, a brand of Choice Hotels.

29.     WHG SU is a Delaware limited partnership with its principle place of business in Houston, Texas.  WHG SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

30.     SUB-SU is a Delaware limited liability company with its principle place of business in Houston, Texas.  SUB-SU is a general partner of WHG SU and is liable for the debts of WHG SU.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  SUB-SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor, Tallahassee, Florida, 32301.

31.     WHG SU is the title holder of the Suburban Extended Stay (Chamblee).  SUB-SU is the general partner of WHG SU.  Westmont exerts complete control over WHG SU and SUB-SU, who are agents of, and/or the alter-egos of, Westmont.

32.     Choice Hotels is a Delaware corporation with its principle place of business in Rocksville, Maryland.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia,

and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Choice Hotels may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, #300, Norcross, Georgia, 30092.

### D. The Microtel Defendants

33. Wyndham Hotels & Resorts, Inc. ("Wyndham"), Microtel Inns and Suites Franchising, Inc. ("Microtel Franchising"), Kuzzins Buford, LLC ("Kuzzins Buford") and John Does Nos. 1–10 (collectively, the "Microtel Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Microtel Inn & Suites by Wyndham, 1840 Corporate Boulevard NE, Atlanta, Georgia 30329 (the "Microtel (Atlanta)"), from which they benefited financially.

34. Wyndham is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Wyndham may be served with process by serving its registered agent for service at 811 Church Road, #105, Cherry Hill, NJ 08002.

35. Wyndham is the world's largest hotel franchisor. It licenses its hotel brands, including Microtel, Ramada, and La Quinta, to franchisees who pay Wyndham royalty and other fees based on a percentage of their gross room revenue.

36. Wyndham establishes standards and provides its franchisees property-based operational training and turn-key property management, and it boasts of its substantial experience in hotel management training and its operating best practices.

37. Wyndham develops strong consultative relationships with its franchisees and nurtures those relationships, continually assessing its franchisees' needs, providing solutions to meet those needs, and partnering with them to grow their business, and in turn the revenue Wyndham receives from them.

38. Wyndham manages over 400 of its hotels, including over 300 La Quinta hotels. Wyndham also operates customer service centers for its franchisees.

39. Microtel Inns and Suites Franchising, Inc. ("Microtel") is a Georgia corporation with its principal place of business in Parsippany, New Jersey. Microtel may be served with process by serving its registered agent for service, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30006.

1824208.1

40.     Microtel is a wholly-owned subsidiary of U.S. Franchise Systems, Inc., which is wholly-owned subsidiary of Wyndham Hotel Group, LLC, which is a wholly-owned subsidiary of Wyndham.  Wyndham exercises complete control over Microtel.

41.     Microtel is the Wyndham entity that enters into franchise agreements with Microtel Inn & Suites franchisees, and it is an agent of, and/or the alter-ego of, Wyndham.

42.     Kuzzins Buford, LLC is a Georgia limited liability company with its principal place of business in Needham, Massachusetts.  Kuzzins Buford may be served with process by serving its registered agent for service, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

### E.     The Ramada Defendants

43.     Wyndham, Ramada Worldwide Inc. ("Ramada"), Jeet & JJ LLC ("Jeet"), Newtel V Corporation ("Newtel"), and John Does Nos. 1–10 (collectively, the "Ramada Defendants") owned, managed, supervised, operated,  oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Ramada Limited Suites, n/k/a Ramada by Wyndham, 3020 Mansell Road, Alpharetta, Georgia 30022 (the "Ramada (Alpharetta)"), from which they benefited financially.

44.     Ramada, f/k/a Ramada Franchise Systems, Inc., is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia resulting in injuries in Georgia. Ramada may be served with process by serving its registered agent for service, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30006.

45.     Ramada is a wholly-owned subsidiary of Wyndham Hotel Group, LLC, which is a wholly-owned subsidiary of Wyndham. Wyndham exercises complete control over Ramada.

46.     Ramada is the Wyndham entity that enters into franchise agreements with Ramada branded hotel franchisees, and it is an agent of, and/or the alter-ego of, Wyndham.

47.     Jeet is a Georgia limited liability company with its principal place of business in Alpharetta, Georgia. Jeet may be served with process by serving its registered agent for service, Jigar Thakkar, 3020 Mansell Road, Alpharetta, Georgia 30022.

48.     Newtel is a Georgia corporation with its principal place of business in Alpharetta, Georgia. It may be served with process by serving its registered

agent for service, Yogesh P. Patel, 2885 Abbottswell Drive, Alpharetta,

Georgia 30022.

### F.   The La Quinta Defendants

49.   At all times relevant to this Complaint, Defendants CPLG HOL, LLC

("CPLG HOL"), CPLG Properties, LLC ("CPLG-LQ"), CorePoint Lodging, Inc.

("CorePoint"), LQ Management, LLC ("LQ Management"), La Quinta

Worldwide, LLC ("La Quinta Worldwide"), and John Does Nos. 1–10

(collectively, the "La Quinta Defendants") owned, managed, supervised,

operated, oversaw, controlled the operation of, and were inextricably

connected to the renting of rooms at the La Quinta Inn located at 1350 North

Point Dr., Alpharetta, Georgia, 30022 ("La Quinta (Alpharetta)"), from which

they benefitted financially.

50.   The La Quinta Defendants controlled the training and policies

implemented at the La Quinta (Alpharetta).

51.   CPLG HOL is a Delaware limited liability company with its principle

place of business in Irving, Texas.  CPLG HOL was formally known as LQ

Operating Lessee, which was formally known as BRE/LQ Operating Lessee,

Inc. It regularly conducts business in the State of Georgia, derives

substantial revenue from services rendered in Georgia, and has committed

tortious acts or omissions both within Georgia, and outside of Georgia

resulting in injuries in Georgia. CPLG HOL may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

52. CPLG-LQ is a Delaware limited liability company with its principle place of business in Irving, Texas. CPLG was formally known as LQ Properties, LLC, which was formally known as BRE/LQ Properties, LLC. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. CPLG may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

53. CorePoint Lodging, Inc. ("CorePoint") is a Maryland corporation with its principle place of business in Irving, Texas and is Wyndham's largest franchisee. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. CorePoint may be served with service of process by serving its registered agent Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

1824208.1

54.   CPLG-LQ is the title holder of the La Quinta (Alpharetta). CPLG HOL is a management company responsible for the La Quinta (Alpharetta). CorePoint is Wyndham's largest franchisee and is the franchisee for La Quinta (Alpharetta). CPLG HOL and CPLG-LQ are agents of, and/or the alter-ego of, CorePoint.

55.   LQ Management is a Delaware limited liability company with its principle place of business in Parsippany, New Jersey.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  LQ Management may be served with service of process by serving its registered agent at Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia, 30006.

56.   La Quinta Worldwide is a Nevada limited liability company with its principle place of business in Irving, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  La Quinta Worldwide may be served with service of process by serving its registered agent

Corporate Creations Network, Inc. at 8275 South Eastern Avenue #200, Las

Vegas, Nevada, 89123.

### G. The Americas Best Defendants

57.     At all times relevant to this Complaint, Defendants Hament Desai

("Desai"), VAD Property Management, LLC, ("VAD"), Vantage Hospitality

Group, Inc. ("Vantage"), and John Does Nos. 1–10 (collectively, the "Americas

Best Defendants") owned, managed, supervised, operated, oversaw,

controlled the operation of, and/or were inextricably connected to the renting

of rooms at the Americas Best Value Inn by Vantage located at 1641

Peachtree Street NE, Atlanta, Georgia, 30309 ("Americas Best (Atlanta)"),

from which they benefitted financially.

58.     Desai is a citizen of the United States of America and is a resident of

the State of Georgia. He may be served with service of process by serving him

personally at 5605 Lake Island Dr., Atlanta, Georgia, 30327.

59.     VAD is a Georgia limited liability company with its principle place of

business in Atlanta, Georgia. VAD may be served with service of process by

serving its registered agent Bansari Desai at 5605 Lake Island Drive, NW,

Atlanta, Georgia, 30327.

60.     Vantage is a Florida corporation with its principle place of business in

Coral Springs, Florida.  It regularly conducts business in the State of

1824208.1

Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  Vantage may be served with service of process by serving its registered agent Bernard T. Moyle at 2900 N. University Drive, Suite 46, Coral Springs, Florida, 33065.

### H.  The Hampton Inn (NDH Atlanta) Defendants

61.    At all times relevant to this Complaint, Defendants 2014 SE Owner 5-Emory, LLC ("SE Owner"), LAXMI Druid Hills Hotel, LLC ("LAXMI"), JHM Hotels Management, Inc. ("JHM"), Auro Hotels Management, LLC ("Auro"), Hilton Franchise Holdings, LLC ("Hilton Franchise"), Hilton Domestic Operating Company, Inc. ("Hilton Domestic"), Hilton Worldwide Holdings, Inc. (Hilton), and John Does 1–10 (collectively, "Hampton Inn (NDH Atlanta) Defendants"),  owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Hampton Inn, 1975 North Druid Hills Road NE, Atlanta, Georgia 30329 ("Hampton Inn (NDH Atlanta)").

62.    From around 2016 to around 2018, SE Owner owned the Hampton Inn (NDH Atlanta).  SE Owner is Delaware limited liability company with its principle place of business at 875 Third Avenue, New York, New York 10022. SE Owner may be served with service of process by serving its registered

agent Cogency Global Inc., 900 Old Roswell Parkway, Suite 310, Roswell, Georgia 30076.

63.    From around 2013 to around 2016, LAXMI owned the Hampton Inn (NDH Atlanta).  LAXMI is a Georgia limited liability company with its principle place of business at 60 Point Circle, Greenville, South Carolina 29615.  LAXMI may be served with service of process by serving its registered agent Incorporated, Business Filings, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

64.    JHM is a South Carolina limited liability company with its principle place of business at 60 Pointe Circle, Greenville, South Carolina, 29615. JHM may be served with service of process by serving its registered agent Business Filings Incorporated, 289 S. Culver Street, Lawrenceville, Georgia 30046.

65.    Auro is a South Carolina limited liability company with its principle place of business at 60 Pointe Circle, Greenville, South Carolina, 29615. Auro may be served with service of process by serving its registered agent Incorporated, Business Filings, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

66.    Hilton Franchise is a Delaware corporation with its principle place of business in McLean, Virginia.  It regularly conducts business in the State of

Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Hilton Franchise may be served with service of process by serving its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delware 19808.

67.     Hilton Domestic is a Delaware corporation with its principle place of business in McLean, Virginia. Hilton Domestic Operating Company, Inc., may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

68.     Hilton Worldwide Holdings, Inc. ("Hilton Worldwide") is a Delaware corporation with its principle place of business in Tysons, Virginia. Hilton Worldwide may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

69.     Hilton Franchise and Hilton Domestic are agents, and/or alter egos, of Hilton.

### I.     The John Doe Defendants

70.     Defendants John Does Nos. 1–10 are additional owners, operators, managers, management companies, security companies, or related companies

of the hotel locations identified in this Amended Complaint.  Defendants

John Does Nos. 1–10 will be named and served with the summons and

Amended Complaint once their identity is known.

## JURISDICTION & VENUE

71.    This Court has subject matter jurisdiction over this lawsuit pursuant to

28 U.S.C. § 1331 because Plaintiff asserts claims arising under18 U.S.C.

1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims

form part of the same case or controversy as her federal law claim.

72.    Defendants are subject to personal jurisdiction in this district and

division.

73.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to the claims asserted

in this action occurred in the judicial district where this action is brought.

## FACTUAL ALLEGATIONS

I.    <u>**Sex Trafficking**</u>

74.    Human sex trafficking is modern-day slavery.  Its victims, mostly

women and children, are enslaved in the commercial sex industry for little or

no money.

75.    Sex trafficking is the use of force, fraud, or coercion to recruit, harbor, transport, or obtain persons for the purpose of inducing them to engage in a commercial sex act.

76.    The business of human sex trafficking is organized and violent. Victims are locked up, drugged, beaten, terrorized, and raped repeatedly. This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to control their victims.  Victims are methodically "broken" and controlled by their trafficker through coercive trauma bonding, among other techniques, resulting in an inability of the trafficking victim to act independently of a trafficker, including failing to take advantage of potential opportunities to escape.

77.    The business of human sex trafficking is organized and violent. Victims are locked up, drugged, beaten, terrorized, and raped repeatedly. This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to control their victims.  Victims are so afraid of and intimidated by their traffickers that they rarely speak out against traffickers, and they rarely take advantage of any opportunities to escape their traffickers.

78.    Beginning more than two decades ago, a nationwide effort commenced to name, recognize, and raise the awareness of the evils of sex and labor

trafficking.  That effort resulted in the passage of the Trafficking Victims

Protection Act in 2000, and the United Nations' adoption of the Palermo

Protocol, to prevent, suppress, and punish trafficking in persons.

## II.    Metro Atlanta Has Long Been Known As A Sex Trafficking Hub

79.    According to a study commissioned by the U.S. Department of Justice,

Atlanta has one of, if not the, largest illegal sex trafficking economies in the

country.  It is also one of the most profitable cities in the country for sex

traffickers.  In 2007, Atlanta's sex trafficking economy was worth $290

million annually, and traffickers reported average *weekly* earnings of roughly

$33,000.[8]

80.    Sex trafficking in Atlanta has been front-page news since at least 2001,

when the Atlanta Journal-Constitution published Jane Hansen's

---

[8] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta
Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime-
law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/
(last visited Nov. 20, 2019); *see also* Meredith Dank, et.al, *Estimating the Size
and Structure of the Underground Commercial Sex Economy in Eight Major
US Cities*, Urban Institute, (March 12, 2014), 30–32,  *available at*
https://www.urban.org/research/publication/estimating-size-and-structure-
underground-commercial-sex-economy-eight-major-us-cities (last visited Aug.
3, 2019).

groundbreaking series, *Selling Atlanta's Children*.[9]  And the FBI has ranked

Atlanta as one of the worst cities in the country for child sex trafficking.[10]

81.    Years before Jane Doe 1 was trafficked, Defendants knew or should

have known of the widespread national epidemic of hotel sex trafficking and

Atlanta's well-publicized reputation as the country's "epicenter for human

trafficking, and particularly child sex trafficking,"[11] that sex trafficking in

---

[9] Hansen's series is attached as Exhibit 3.  Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001. *See also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html (last visited Nov. 20, 2019)

[10] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, *Exploiting Americans on American Soil: Domestic Trafficking Exposed*, The Federal Bureau of Investigation, (June 7, 2005), *available at* https://archives.fbi.gov/archives/news/testimony/exploiting-americans-on-american-soil-domestic-trafficking-exposed (last visited Nov. 20, 2019).

[11] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Nov. 20,

1824208.1

Atlanta was an "epidemic of tragic proportions,"[12] and that trafficking was prevalent in hotels in Atlanta.

## III. Hotels Are Complicit In Sex Trafficking

82.     Numerous participants in the hotel industry—like Defendants—have decided to participate in sex trafficking ventures to reap the profit generated by the forced sexual servitude of victims like Jane Doe 1.  As a result, these actors in the hotel industry play a central role in perpetuating sex trafficking.

### A.     Hotels Are a Critical Part of the Sex Trafficking Industry

83.     Without the complicity of hotels, where illicit sexual encounters are taken off the street and cloaked in the anonymity of a hotel's customers, the sex trafficking industry would be significantly disrupted.  This obvious fact has been noted by experts and justices of the United States Supreme Court.

---

2019) (" Atlanta . . . has been an epicenter for human trafficking, and particularly child sex trafficking.  There are varying reports, some identifying Atlanta as the number one city for child sex trafficking, others ranking it somewhat lower.  I think that it's actually hard to quantify those numbers, but it is clear that whatever the number, it is way too high.").

[12] Nina Hickson, *An Epidemic of Tragic Proportions*, Atlanta Journal-Constitution, June 11, 2000, attached hereto as Exhibit 4.  *See also* Letitia Campbell, *Selling Our Children: Atlanta Does Battle Against the Sex Trafficking of Kids*, Sojourners Magazine, https://www.questia.com/magazine/1G1-234920022/selling-our-children-atlanta-does-battle-against (last visited Nov. 20, 2019) (discussing Judge Hickson's editorial and noting the creation of a large and well-established coalition of advocates in Atlanta publicizing sex trafficking in the city).

1824208.1

In 2015, Justice Antonin Scalia, joined in dissent by Chief Justice John

Roberts and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal
> activity ranging from drug dealing and prostitution to human
> trafficking. Offering privacy and anonymity on the cheap, they
> have been employed as . . . rendezvous sites where child sex
> workers meet their clients on threat of violence from their
> procurers.

*City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015).

84.    Ninety-two percent of the calls received by the National Human

Trafficking Hotline involving hotels and motels reported sex trafficking, and

another two percent reported a combination of sex and labor trafficking.[13]  A

2012 study found that 63 percent of trafficking incidents occurred in hotels.[14]

And the Polaris Project found that "75% of [trafficking] survivors responding

to Polaris's survey reported coming into contact with hotels at some point

---

[13] *Human Trafficking and the Hotel Industry*, Polaris Project,
https://polarisproject.org/sites/default/files/human-trafficking-hotel-industry-
recommendations.pdf (last visited Nov. 20, 2019).

[14] Jon Conte, *et al.*, *Inhospitable to Human Trafficking Program Evaluation*,
at 2, Businesses Ending Slavery and Trafficking, (July 2014),
https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluatio
n.11_without_appendix.pdf  at 5 (last visited Nov. 20, 2019).

during their exploitation . . . .  Unfortunately, 94% also disclosed that they
never received any assistance, concern, or identification from hotel staff."[15]

85.     ***Attorneys for the hotel industry*** estimated and reported to hotel
industry representatives that eight out of ten human trafficking arrests occur
in or around hotels.[16]

86.     A number of hotels in Atlanta, including the Defendants' hotels,
accommodate, facilitate, and participate in the sex trafficking of women, men,
and children in Atlanta.  Victims, including Jane Doe 1, were and are rotated
through these hotels in a cycle of exploitation, sometimes staying at one hotel
for weeks or months.

87.     A significant percentage of the revenue generated in Atlanta's sex
trafficking economy is funneled directly to hotels via the daily rental of the
hotel rooms needed to harbor, exploit, and sell victims, including Jane Doe
1.[17]

---

[15] *Hotels and Motels Recommendations*, The Polaris Project,
https://polarisproject.org/hotels-motels-recommendations (last visited Nov.
20, 2019).

[16] Rich Keating, *Human Trafficking: What Is It and How It Impacts the
Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference
2013, Washington, D.C.,
http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 at 6
(last visited Nov. 20, 2019).

[17] Dank *et al.*, *supra* note 8, at 123 (finding that, in Atlanta, "most [sex]
transactions occur in hotels and motels."); *id.* at 224 (noting the

**B.    The Presence of Sex Trafficking and Measures to Prevent It Have Been Known in the Hotel Industry for Decades**

88.    Recognizing the pervasiveness of sex trafficking in the hospitality industry, End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States *in 2004*.[18]  And while ECPAT focuses primarily on child sex trafficking, many of the steps it advocates are designed to prevent all forms of sex trafficking.

89.    The Code is well-known in the hospitality industry.  It identifies six steps companies can take to prevent child sex trafficking:

>    (1) establish corporate policy and procedures against sexual exploitation of children;

>    (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

"overwhelming use of hotels and motels" and finding that "[h]otel and motel rooms were a primary expense for many sex workers . . . .  Sex workers noted that often, hotel and motel staff members and managers knew that sex was being traded in their venues but did not attempt to stop the work"); *see also id.* (graph at 224 showing that the most common location for commercial sex acts to occur, at 66.7 percent, is at hotels and motels); *id.* at 103 ("Despite the thousands of dollars that are made in a week, there are operational costs associated with the business."); *id.* at 191 ("The costs of operating and facilitating sex work varied greatly across pimps, though this study identifies some common costs.  Pimps routinely covered costs associated with employee housing, transportation, employee appearance and personal appearance, advertisements, and hotels and motels."); *id.* at 203 n.65 ("Hotels were the most common location of in-calls for respondents.").

[18] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited Nov. 20, 2019).

(3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(6) report annually on the company's implementation of Code-related activities.

90. ECPAT is only one of several organizations that have sought for years to help hotels address the scourge of sex trafficking and other human trafficking at hotels.

91. The Department of Homeland Security ("DHS") identifies a number of warning signs that indicate the presence of human trafficking at hotels. According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises such as:

    a.    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b.    persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m.  loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

1824208.1

31

     p.     persons taking cash or receipts left on tables.[19]

92.    Hotel industry participants, including Defendants, were repeatedly

warned not to turn a blind eye to sex trafficking. For example, at a 2013

hotel industry presentation, representatives for the industry were informed,

among other things, to "Make sure hotel not complicit," "Manager not looking

the other way," and "No pay off for silence or lack of curiosity."[20]

## C.    Defendants Chose to Ignore or Participate in Sex Trafficking Rather than Take Steps to Prevent It

93.    Defendants review hotel performance, room occupancy, and

profitability like all businesses. When revenue is down, Defendants

investigate individual hotel locations and take remedial action. However,

Defendants intentionally turn a blind eye to safety and security issues at

their hotels when revenue is up, even when Defendants knew or should have

known part of those profits were derived from sex trafficking ventures.

94.    The indicia of human trafficking and effective preventative measures

are widely known and available to all in the hospitality industry, including

Defendants. For years, Defendants have known what signs to look for and

which policies to implement in order to prevent, identify, and deter sex

---

[19] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Nov. 20, 2019).

[20] Keating, *supra* n.16 at 19.

trafficking in their hotels and to ensure they were not profiting from sex trafficking, as required by federal law. But they refused to take these steps so that they could continue to profit from the sex trafficking ventures in which they participated.

95.    For example, Defendants knew of the Code (*see supra* ¶ 88) and were urged to sign the Code and commit to taking action against sex trafficking in their hotels.

96.    By no later than 2010, Red Roof Inn knew of the Code, but to this day it has refused to sign it. Indeed, Red Roof Inn has never taken any steps to publicly address or even comment on the frequent sex trafficking at its hotels.

97.    By no later than 2010, La Quinta knew of the Code, but to this day it has refused to sign it. Indeed, La Quinta has never taken any steps to publicly address or even comment on the frequent sex trafficking at its hotels.

98.    In 2010 more than 4,200 individuals signed a petition to encourage Choice Hotels to sign the Code. In response, Choice Hotels made a statement that it would agree to take steps to fight sex trafficking in its hotels.[21]

---

[21] *Tell Choice Hotels to Prevent Child Prostitution in Their Hotels*, Change.org, https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels (last visited Nov. 20, 2019).

Though it met with ECPAT representatives in 2010 to develop an optional

training, Choice Hotels did not sign the Code until 2015.[22]

99.    By no later than 2010, Vantage Hospitality knew of the Code.  Vantage

signed the Code in December 2014 after a string of sex trafficking incidents

in its hotels, but has since removed its name as a signatory.

100.   Hilton signed the Code in 2011, following a "child-trafficking scandal."[23]

However, as shown by the acceptance of trafficking at the hotels in this

lawsuit, Hilton's adoption of the Code was an empty gesture.

101.   In 2011, Wyndham's predecessor entity, Wyndham Worldwide

Corporation, signed the Code.  However, as shown by the acceptance of

trafficking at the hotels in this lawsuit, Wyndham's adoption of the Code was

an empty gesture.

## IV.    The Defendants Participated In The Sex Trafficking Of Jane Doe 1

102.   As described in more detail below, from 2011 to 2016, Jane Doe 1 was

forced to engage in commercial sex acts at Defendants' hotels by various sex

---

[22] Choice Hotels, *Human Rights Policy,*
https://www.choicehotels.com/about/responsibility/human-rights-policy (last
visited Nov. 20, 2019).

[23] Manu Bhandari, *Hilton Worldwide Responds to Child-Trafficking Scandal,*
Washington Business Journal, (Oct. 31, 2010)
https://www.bizjournals.com/washington/news/2010/10/31/hilton-responds-to-
child-trafficking.html (last visited Nov. 20, 2019).

traffickers that conspired with, and/or were aided and abetted by, Defendants.

103.   During this period, Jane Doe 1 was bought and sold for drugs and money, and her "ownership" was transferred between different traffickers.

104.   The money obtained from Jane Doe 1's forced commercial sex acts was retained by her traffickers and used to pay Defendants for their hotel rooms and other services in furtherance of the sex trafficking ventures occurring at their hotels.

105.   Because the revenue generated by Jane Doe 1's forced commercial sex acts was not retained by her, but instead distributed among her traffickers, Defendants, and other co-conspirators and accomplices, she remained financially dependent on her traffickers for food, clothing, and other basic necessities.

106.   Further, while imprisoned against her will at Defendants' hotels, Jane Doe 1 suffered tremendous harm, including violent beatings, psychological abuse, sexual abuse, controlled and forced drug use, and threats of further violence and abuse.

1824208.1

### A.    The Red Roof (Smyrna) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture

#### i.    The Red Roof (Smyrna) Sex Trafficking Venture

107.  There was a well-established sex trafficking venture at the Red Roof (Smyrna), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Red Roof (Smyrna) Sex Trafficking Venture").

108.  The Red Roof Defendants received a percentage of the revenue generated by the operation of the Red Roof (Smyrna), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

109.  The Red Roof Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Red Roof (Smyrna), as well as the training of its managers and employees.

110.  The Red Roof Defendants knew or should have known that sex trafficking was a constant occurrence at the Red Roof (Smyrna).

ii.　　　Red Roof (Smyrna) management and employees knew of
and facilitated the sex trafficking venture at that hotel, and
they specifically facilitated the trafficking of Jane Doe 1

111.　During more than 20 separate stays at the Red Roof (Smyrna) between

2011 and 2016, Plaintiff was trafficked for sex by various traffickers.  At

times, Plaintiff would stay at the Red Roof (Smyrna) for more than two

weeks.

112.　When Plaintiff was trafficked at the Red Roof (Smyrna), the hotel often

put her and other trafficking victims in the same set of rooms in the back of

the building.

113.　Jane Doe 1 and Jane Doe 2 were trafficked at the Red Roof (Smyrna)

together by the same traffickers and separately by different traffickers.

Jane Doe 1 and Jane Doe 3 were also trafficked at the Smyrna Red Roof Inn

at the same time but by different traffickers.

114.　While Plaintiff was trafficked at the Red Roof (Smyrna) she, and other

trafficking victims, exhibited numerous well-known and visible signs of a sex

trafficking victim, including physical deterioration, malnourishment, poor

hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact

with others, lack of control and possession of money, physical evidence of

beatings by her trafficker, and monitoring by her traffickers.

115.　While Plaintiff was trafficked at the Red Roof (Smyrna) her room, and

the rooms of other victims, evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that she stayed for extended periods, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

116. Red Roof Inn had a policy to physically enter a room and inspect the room if housekeeping had not been in the room for three days. However, Red Roof Inn did not enforce its own policy. While Plaintiff was being trafficked at the Red Roof (Smyrna), housekeeping frequently did not enter her room for weeks at a time.

117. While Plaintiff was trafficked at the Red Roof (Smyrna), the number of daily male visitors to the room was obviously indicative of sex trafficking. As many as 20 men visited Plaintiff's room each day, each for short periods of time.

118. While Plaintiff was trafficked at the Red Roof (Smyrna), on average, 10 to 12 other traffickers, each with 1 to 5 victims, were also at the hotel. There were often more than 100 buyers at the hotel each day.

119. Sex trafficking at the Red Roof (Smyrna) was flagrant and well known

to the management and staff at the hotel. Multiple Red Roof (Smyrna) employees participated in, assisted, and facilitated the sex trafficking that occurred at the hotel, including soliciting Plaintiff for sex. For example, employees would call traffickers to warn when law enforcement were present at or coming to the hotel. Employees would also warn traffickers to stop or slow down the traffic to a particular room if it had been too busy, or caution them if other guests complained.

120. Also, these employees often called Plaintiff's traffickers while Plaintiff was being victimized to warn them when the police were at the hotel or coming to the hotel.

121. Jane Doe 1, and other sex trafficking victims, were often made to answer the room phones in case a buyer called and therefore spoke to the Red Roof (Smyrna) staff calling to give this kind of information.

122. The Red Roof (Smyrna) employees received cash from traffickers for providing tips that helped traffickers evade law enforcement.

123. Cobb County police informed management at the Red Roof (Smyrna) that sex traffickers paid at least one then-current employee and a former general manager to act as lookouts.

### iii. <u>Red Roof Defendants knew of, or should have known of, the sex trafficking venture at the Red Roof (Smyrna)</u>

124. For many years and continuing to the present day, the Red Roof (Smyrna) has had a policy, prominently displayed at the front desk and the night window to the front office, stating, "NO REFUNDS AFTER 15 MINUTES."

 

125. There is no legitimate reason for the Red Roof (Smyrna) to have such a policy. Rather, the policy sought to prevent buyers who rented rooms at the hotel to have sex with victims of sex trafficking from seeking a refund when they were done with the victim.

126. Red Roof Inn knew or should have known about this policy because it was featured prominently in numerous publicly-available online reviews and because Red Roof Inn routinely audited and inspected the Red Roof (Smyrna).

1824208.1

127. Red Roof Inn employees, including Jay Moyer and Vicky Lam, visited the Red Roof (Smyrna) multiple times a year.

128. The policy ensures that Red Roof Inns will be paid money by buyers for room rentals in exchange for allowing the illegal commercial sex acts at the hotel, including the sex trafficking of Plaintiff and others.

>    a. *Publicly available online reviews confirm Red Roof Defendants knew, or should have known, of the sex trafficking venture and other criminal activity at the Red Roof (Smyrna)*

129. Publicly available online reviews of the Red Roof (Smyrna), of which the Red Roof Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel. Among the reviews reporting prostitution and other crime were:[24]

>    a. A July 7, 2013 review, stating:
>
>    **Prostitutes everywhere** . . . . There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window. It was hard to sleep to say the least. The only security I felt was the fact our dog was with us. Don't stay here!!!
>
>    b. A May 17, 2016 review, stating:
>
>    Ok to start do not stay here. . . . **There were drug**

[24] The reviews quoted, among others, are attached hereto as Exhibit 5 (emphasis added). Emphasis, where present, is added.

> **dealers (fake thugs), prostitution, and for two days
> straight there were police leaving the premises.** …
> The 1st day of me checking in I found blood on the
> bathroom door, walls and floor.

130.   In some cases, a person identifying himself as "Bob P," a Red Roof

(Smyrna) manager, responded to the online reviews, confirming that the Red

Roof Inn Defendants actually knew of commercial sex acts at the location

and, at a minimum, should have known of the commercial sex trafficking

occurring there.

131.   On information and belief, "Bob P" is Bharatkumar R. Patel, the

manager of Varahi-RRI.

132.   Among other reviews to which a person identifying himself as "Bob P,

General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" responded

were:[25]

> a.   An August 12, 2014 review, stating:
>
> **PROSTITUTION – COCK ROACHES – AND DOG
> POOP!** Deluxe ROOM
> DO NOT GO THERE!!!!! My worst experience ever! Saw
> prostitution, dogs pooping outside, loitering, dead
> cockroaches in my room.  I askd thm 2 come get it up th
> clerk said he could "bring me a broom!"[] NOT! . . . I
> wouldn't send my enemy here! Unless you want crackheads
> and prostitutes and don't mind . . . .

---

[25] *Id.* (emphasis added).

1824208.1

In response, "Bob P" wrote:

> I am wrinting deep apology for prostitution came in our property. I just hire new security person for watch night for any one who make any kind of problem.this will not happen again.

    b.    But a review from August 8, 2015, the very next year, confirms nothing had changed:

> DO NOT stay here! . . . **There were shady people hanging out outside of our room door at all hours of the night and there was open prostitution occurring on the property.** I was traveling alone with my teenage daughter and felt extremely unsafe at this location.

This time, "Bob P" apologized that "people wear [sic] hanging out in the hallway" and said, "I will hire security man for night. i will make sure it will not happen again."

133.   Other times, someone identifying himself as "Bob P, General Manager at the Red Roof Inn Atlanta – Smyrna/Ballpark" would respond to reviews without mentioning the respective reviewers' complaints in specific terms. Among the reviews receiving this kind of general response were:[26]

    a.    An August 29, 2014 review, stating:

> This hotel is unsanitary and a hotbed for criminal activity. . . . Dirty pillow cases, blood on the floor, bugs, cigarette burns everywhere, **prostitutes, and drug activity right outside our door**, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less.

---

[26] *Id.* (emphasis added).

1824208.1

    b.    A September 7, 2014 review, stating:

> **Nothing but a dope and prostitution den!!** The room was nasty. . . . Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car.

    c.    A second September 17, 2014 review, stating:

> I am in the room right now scared! . . . I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars?  Im a dime baby you no im worth more than that!"  Then the traffic throughout the day . . . . **its a drug and prostitute headquarters.**  Im a young male well over 6ft tall and fear for my safety

    d.    An August 8, 2015 review, stating:

> DO NOT STAY HERE.  Terrible place to stay. . . . Went to get clean towels from desk and was informed I need to go back to my room and bring them my used towels before I could receive new ones. . . . **Prostitutes and drug dealers roam the parking lot.  There are at least 5 people on the parking lot all hours of the night**.

134.  Consumer-generated online reviews, scores, and/or ratings were included as a component or components in Red Roof Inn's internal evaluation metrics on hotel performance.

135.  Because of the way Red Roof Inn considered consumer generated reviews in its performance metrics and required individual hotel's

management to review and respond to certain reviews, Red Roof Inn knew or should have known of these reviews.

136.   Red Roof Inn employees, including a Vice President of Operations, monitor each hotel.  For the Red Roof (Smyrna), those employees included Moyer and Lam.

137.   Moyer, Lam, and others closely monitored the revenue, occupancy, and online reviews of the Red Roof (Smyrna).

138.   It was common for Red Roof Inn employees, including Moyer and Lam, to call the Red Roof (Smyrna) regarding particular reviews online.

139.   It was common for Red Roof Inn employees, including for Moyer and Lam, to respond directly to guests regarding particular reviews.

140.   When informed that revenue numbers were down because employees were trying to "clean up" the Red Roof (Smyrna), Moyer and other Red Roof Inn employees responded with directives like, "you need to sell rooms," "be alert but sell," and "you need to get your numbers up."

> b.    *Law enforcement activity at the Red Roof (Smyrna)*
> *demonstrates the Red Roof Defendants knew, or*
> *should have known, of the sex trafficking venture at*
> *that hotel*

141.   A series of law enforcement operations over the last decade at the Red Roof (Smyrna) has made or should have made the pervasiveness of

1824208.1

45

commercial sex trafficking and other crime there obvious to the Red Roof Inn

Defendants.  Notable incidents include:

a.    A December 2010 prostitution sting conducted by the Metro

Atlanta Child Exploitation Task Force and the Marietta Police

Department, during which law enforcement rescued a 16-year old

trafficking victim;[27]

b.    A March 2011 Cobb County Police arrest report remarking that

the "location is known for problems with drugs and prostitution"

and was a "hotbed of illegal activities";

c.    A July 2011 report of theft at the hotel, in which the victim

reported "a pimp and a prostitute" stole her property "because

she refused to work for [the pimp]";

d.    Police responding to a dispute between a guest and a Red Roof

(Smyrna) employee at the hotel in April 2012 that arose because

the hotel refused to refund a guest after he demanded that the

hotel return his money because, among other things, he was

"harassed by prostitutes" while there; and

---

[27] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting*, Marietta Daily
Journal, (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-
prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last
visited Nov. 20, 2019).

1824208.1

      e.      A December 2014 arrest of a man, charged with buying sex from a 16-year old trafficking victim and then grabbing the girl by her hair, dragging her to the room's bathroom, and attempting to drown her in the bathtub.[28]

142.  Red Roof Inn required the other Red Roof Defendants to comply with the safety and security provisions "as designated" by Red Roof Inn which include reporting every safety and security issue at the hotel.

        *c.    The sex trafficking venture at the Red Roof (Smyrna) was otherwise open and obvious*

143.  Nonprofit and religious groups routinely and regularly visited (and still visit) the Red Roof (Smyrna) to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

144.  In 2014, a website was created entitled "Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia" with the web address of www.redroofie.blogspot.com.  The site, which was publicly available,

---

[28] *See, e.g.,* Police: Marietta Man Tried to Kill 16-year-old, Marietta Daily Journal, (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited Nov. 20, 2019).

discussed the prostitution and other crime occurring at the Red Roof
(Smyrna).[29]

145.   The site's "About" page stated, among other things:

> This blog is intended to aid fellow travelers by providing
> information about the condition of Red Roof Inn, Smyrna,
> Georgia before stopping off there for the night. . . . This Inn has
> been a subject of drug busts and prostitution sting operations by
> the local police (see blog posts July 1, 2014).

*Id.*

146.   The Red Roof Defendants knew or should have known about this
publicly available website.

147.   Another website publicizing crime, particularly commercial sex
trafficking, at the Red Roof (Smyrna), existed previously.[30]  Among other
things, that site included articles identifying known traffickers staying at the
hotel and quoted an employee "admit[ing] that much of the information
contained in" an article published on the site "regarding sex trafficking

---

[29] Screen captures of the site, www.redroofie.blogspot.com (last visited Nov.
20, 2019), are attached as Exhibit 6.

[30] This website is no longer available online.  The articles referenced from
that site are not attached to the complaint because personal identifying
information contained in the articles could present a safety threat to
Plaintiff.  Plaintiff will produce these articles to the Court in camera if
necessary and will provide them to Defendants subject to a protective order.

occurring in their rooms is true" and "confirm[ing] that the national Red Roof

Corporate office is aware of the situation, as well as the franchise owner."

148.    The website published an article that, among other things:

    a.    Asked, "What will it take for Red Roof Corporate (614-744-2600)

        to pull the franchise rights from this owner?"

    b.    Stated, "Concerned citizens should call the Cobb County elected

        officials as well as the Red Roof Corporate offices right away,"

        providing contact information for Red Roof Inn, Red Roof Inn's

        communications department, and Red Roof Inn's public relations

        agency.

149.    On information and belief, Red Roof Inn received numerous phone calls

reporting sex trafficking and other criminal activity occurring at the Red Roof

(Smyrna).

150.    The same site published another article that, among other things,

stated:

    a.    "This hotel is used for prostitution and has been this way for

        many years.  Any day of the week, dozens of girls are trafficked

        out of this location, some of whom look underage, even as young

        as 12."

1824208.1

    b.    "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

151.   A hospitality industry consultant and anti-trafficking advocate sent these articles directly to Red Roof Inn's president and CEO, Andrew Alexander, and personally informed Alexander of the ongoing commercial sex trafficking occurring at the Red Roof (Smyrna).

152.   Among other things, this hospitality industry consultant also informed Alexander of the name of a specific trafficker who regularly stayed at the hotel and told Mr. Alexander that this trafficker is listed on the Georgia Sex Offender Registry with a lengthy criminal history of sex crimes involving minors.

153.   Mr. Alexander's only response was to have Red Roof Inn's general counsel question the advocate in search for the name of the organization that published the articles online.

154.   As a result, Red Roof Inn's general counsel was sent the same information and asked when the company would take action to address the open sex trafficking at the Red Roof (Smyrna). However, Red Roof Inns never responded to repeated entreaties to stop sex trafficking at the Red Roof

(Smyrna).

155.   Though Red Roof Inn's franchise agreements allow it to terminate its agreements and pull its brand name from a location because of criminal activity, including commercial sex trafficking,[31] Red Roof Inn has not taken such action with respect to the Red Roof (Smyrna).

156.   Instead, despite Red Roof Inn's CEO and General Counsel being explicitly told sex trafficking was occurring at the Red Roof (Smyrna),[32] as well as the well documented and publicized instances of sex trafficking, prostitution, and other crime at that hotel, Red Roof Inn continues to promote the Red Roof (Smyrna) as "one of the best budget hotels in Smyrna, GA."[33]

---

[31] *E.g., NC Motel Loses Franchise after Trafficking Allegations,* Fox 8, (Sept. 17, 2015), https://myfox8.com/2015/09/17/nc-motel-loses-franchise-after-trafficking-allegations/ (last visited Nov. 20, 2019); Courtney Francisco, *Feds: Teen Sex Trafficking at CLT Motel,* WCCP Charlotte, (Dec. 3, 2015), https://www.wccbcharlotte.com/2015/12/03/feds-teen-sex-trafficking-at-clt-motel/ (last visited Nov. 20, 2019).

[32] Red Roof Inn is well aware that its hotels are frequently used for sex trafficking as public reporting documents sex trafficking ventures operating at no fewer than 30 other Red Roof Inn hotels around the country.

[33] Red Roof Inn Atlanta – Smyrna/Ballpark, Red, https://www.redroof.com/property/ga/smyrna/RRI088 (last visited Nov. 20, 2019), attached hereto as Exhibit 7.

1824208.1

### B. The Red Roof (Atlanta) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture

#### i. The Red Roof (Atlanta) Sex Trafficking Venture

157.   There was a well-established sex trafficking venture at the Red Roof (Atlanta) comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Red Roof (Atlanta) Sex Trafficking Venture").

158.   The Red Roof (Atlanta) Defendants received a percentage of the revenue generated by the operation of the Red Roof (Atlanta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

159.   The Red Roof (Atlanta) Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Red Roof (Atlanta), as well as the training of its managers and employees.

160.   The Red Roof (Atlanta) Defendants knew or should have known that sex trafficking was a regular and ongoing occurrence at the Red Roof (Atlanta).

    ii.    <u>Red Roof (Atlanta) management and employees knew of</u>
<u>and facilitated the sex trafficking venture at that hotel, and</u>
<u>they specifically facilitated the trafficking of Jane Doe 1</u>

161.  During more than 20 separate stays at the Red Roof (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers.

162.  Between 2011 and 2014, Plaintiff was trafficked with Jane Doe 2 at the Red Roof (Atlanta).

163.  While Plaintiff was trafficked at the Red Roof (Atlanta) she, and other trafficking victims, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

164.  While Plaintiff was trafficked at the Red Roof (Atlanta) her room, and the rooms of other victims, evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms. The rooms also contained multiple cell phones.  And despite the fact that stayed for extended periods, she had very few personal items or possessions in the room.  She also frequently requested an excessive amount of towels from housekeeping.

1824208.1

165.   While Plaintiff was trafficked at the Red Roof (Atlanta), the number of daily male visitors to the room was obviously indicative of sex trafficking.  As many as 20 men visited Plaintiff's room each day, each for short periods.

166.   Sex trafficking at the Red Roof (Atlanta) was flagrant and well known to the management and staff at the hotel.  On information and belief, Red Roof (Atlanta) employees participated in, assisted, and facilitated the sex trafficking that occurred at the hotel by warning traffickers when law enforcement was present, or to stop or slow down the traffic to a particular room if other guests complained.

      iii.    <u>The Red Roof (Atlanta) Defendants knew of, or should have known of, the sex trafficking venture at the Red Roof (Atlanta)</u>

167.   Red Roof Inn routinely audited and inspected, at times anonymously, the Red Roof (Atlanta).  The ongoing sex trafficking activity would have been apparent to those inspectors.

168.   Red Roof Inn employees, including Jay Moyer, visited the Red Roof (Atlanta) multiple times a year.  The ongoing sex trafficking activity would have been apparent to these employees.

169.   Additionally, publicly available online reviews of the Red Roof (Atlanta), of which the Red Roof Inn Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel.  Among

the reviews reporting prostitution and other crime were:

a.  A July 2012 review, stating:

> I was surprised, however, at all of the open drug dealing going on in the rooms and parking lot. . . . I complained upon checkout.  They had a practiced look of surprise on their faces but I do not believe for a minute that the staff does not know what is going on in this hotel.

b.  A July 2012 review, stating:

> Prostitution sting.  During the stay, there was a prostitution sting.  The next night at 2:00 AM, a prostitute knocked on my door wanting to know if I wanted "company."

c.  A 2014 review, stating:

> Dirty orgy smell in both rooms I had.  Smoke like smell only drowned out by the semen and bleach.  Weird activity late at night.  Pimp next door wasn't happy with his ladies take for the night apparently.

d.  A May 2016 review, stating:

> . . . it was pretty obvious that the local prostitutes were visiting a room a few doors down.  Something I know RRI is pretty familiar with.

e.  An August 2016 review, stating:

> Within the first hour, my brother and his friend were approached by prostitutes who wanted them to come with them.

f.      A 2016 review, stating:

> If prostitutes and drugs are what your looking for this is
> your spot. . . . Passed out vomitus covered people in parking
> lot 2 days out of three.  Seman splattered on mirror. . . .
> Felt so bad for the "working women" with their personal
> items in garbage bags that I gave away 3 tote bags.

g.      A November 2016 review, stating:

> The hotel was being used by prostitutes and Shady
> characters were always coming and going.

h.      A December 2016 review, stating:

> Drug dealers and pimps hanging around outside . . . .

i.      A January 2017 review, stating:

> If you enjoy the smell of marijuana coming from 10% of the
> rooms and prostitutes setting up shop next to you then
> this is the place for you!

j.      A 2017 review, stating:

> . . . A hooker/drug dealer was set up 2 doors down and had
> many visitors during the day/night. . . .

k.      A 2017 review, stating:

> . . . This place is Disgusting there are hookers that are
> staying here and that is not the least of my worries. . . .
> There is also lots of drug use here someone just overdosed. I
> found crack on the floor . . . .

l.      An October 2018 review, stating:

> People that paid for rooms there looked like addicts and
> sex workers.

m.    A 2019 review, stating:

>    . . . I saw a drug deal, it looks like another room had
>    suspicious women coming in and out and multiple men
>    going in . . . .

170.   General Managers identifying themselves as Ella Bowen and Robert

Allen responded directly to many of the reviews identifying ongoing

prostitution and drug activity at the hotel

171.   On information and belief, Red Roof Inn also received guest complaints

about the Red Roof (Atlanta) relating to prostitution, commercial sex

trafficking, and other criminal activity there.

> **C.   The Suburban Extended Stay Defendants Participated in
> a Sex Trafficking Venture Whose Victims Included Jane
> Doe 1, and They Knew or Should Have Known They Were
> Benefitting Financially From Such a Venture**

>>    i.    <u>The Suburban Extended Stay (Chamblee) Sex Trafficking
>>    Venture</u>

172.   There was a well-established sex trafficking venture at the Suburban

Extended Stay (Chamblee) comprising traffickers, the hotel's employees,

management, owners, and franchisor, as well as others involved in the sex

trafficking of victims at that hotel, including Jane Doe 1 (the "Suburban

Extended Stay (Chamblee) Sex Trafficking Venture").

1824208.1

173. The Suburban Extended Stay Defendants received a percentage of the revenue generated by the operation of the Suburban Extended Stay (Chamblee), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

174. The Suburban Extended Stay Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Suburban Extended Stay (Chamblee), as well as the training of its managers and employees.

175. The Suburban Extended Stay Defendants knew or should have known that sex trafficking was a frequent and ongoing occurrence at the Suburban Extended Stay (Chamblee).

      ii. <u>Suburban Extended Stay (Chamblee) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

176. During more than 20 separate stays at the Suburban Extended Stay (Chamblee) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers. The length of a single stay at the Suburban Extended Stay sometimes lasted more than two weeks.

177. Plaintiff and Jane Doe 2 were trafficked at the Suburban Extended Stay (Chamblee) together by the same traffickers and separately by different

1824208.1

traffickers.

178.   Multiple employees at the Suburban Extended Stay (Chamblee) were paid by Plaintiff's traffickers to work as lookouts to assist and facilitate Plaintiff's trafficking.

179.   Two employees at the Suburban Extended Stay (Chamblee) were paid by Plaintiff's trafficker, and they were instructed by the trafficker to call him if "anything crazy is going on" and to "look out for my girl here and let me know if she does something crazy."

180.   Plaintiff's traffickers regularly spoke to these two employees on the phone in the hotel room to discuss the employees' payments for their assistance.

181.   These employees routinely asked Plaintiff's trafficker if he would like a room in the "usual spot."

182.   These employees would also call the room to warn Plaintiff's traffickers if there were police at the hotel and, if so, whether they needed to temporarily stop the flow of buyers to the room.

183.   A third employee of the Suburban Extended Stay (Chamblee) also worked for Plaintiff's traffickers.  On one occasion, Jane Doe 2 asked this third male employee for a ride or the use of his cell phone to call a cab so that she could escape.  The man told her he could not give her a ride.

1824208.1

184.   Instead, the employee told the trafficker that the victim had tried to get his help to escape.  That night, Plaintiff's trafficker came to the victim's room and ruthlessly beat Jane Doe 2 for confiding in the employee and trying to escape, saying, "You think somebody is going to help you? None of these people are going to help you."

185.   While Jane Doe 1 was trafficked at the Suburban Extended Stay (Chamblee) she, and other sex trafficking victims, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

186.   While trafficked at the hotel, the rooms Jane Doe 1 occupied, as well as those of other sex trafficking victims, evidenced numerous well-known and visible signs of sex trafficking.  Frequently the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.  Additionally, she requested excessive amounts of towels from housekeeping.

1824208.1

187.   While Plaintiff was trafficked at the Suburban Extended Stay (Chamblee) the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 20 men a day visited Plaintiff's room, each for short periods.  Plaintiff was aware that several other trafficking victims were at the Suburban Extended Stay (Chamblee) being trafficked each night Plaintiff there.  It is likely that at least 50 buyers came to the Suburban Extended Stay (Chamblee) to purchase sex each day Plaintiff was trafficked there.

<blockquote>

iii.   <u>The Suburban Extended Stay Defendants knew of, or should have known of, the sex trafficking venture at the Suburban Extended Stay (Chamblee)</u>

</blockquote>

188.   As discussed above, the evidence of sex trafficking at the Suburban Extended Stay (Chamblee) was open and obvious.  Choice Hotels—its franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

189.   However, this sex trafficking activity and the involvement of the hotel's management and employees was not the only evidence that made the Suburban Extended Stay Defendants aware of the sex trafficking venture at that hotel.

        a.     *Publicly available online reviews confirm Suburban Extended Stay Defendants knew, or should have known, of the sex trafficking venture and other criminal activity at the Suburban Extended Stay (Chamblee)*

190.   Publicly available online reviews of the Suburban Extended Stay, of which the Suburban Extended Stay Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel.  Upon information and belief, Choice Hotels, as well as the other Suburban Extended Stay Defendants, monitored online reviews related to this hotel.

191.   Among the reviews reporting prostitution and other crime were:

      a.    A June 12, 2014 review, stating:

        Disgusting.  Hotel. . . . 2 working prostitutes and many drug dealers.

      b.    A second June 16, 2014 review, stating:

        Great if your [sic] looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps.  If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. . . . I was offered, and I quote, "that hard, that soft, ice, boy, Cali bud" of course, the proper medical tools for administering said chemicals, and I even happened across no less than 3 partially used portions of what I am pretty sure was crack just lying around in the breezeways, waiting for anybody to pick up and check out! So if drugs are your thing, this may be your favorite new home away from home.

1824208.1

    c.      A June 3, 2015 review, stating:

> [D]uring our 2 week stay I noticed 4 different police officers responding to calls in the building. I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is frequently used for selling drugs and prostitution . . . .

192.   In addition to the consumer-generated, publicly available online reviews, Choice Hotels receives reports and complaints directly from customers about its many hotel locations, including the Suburban Extended Stay (Chamblee).

193.   Choice Hotels knew the content of the complaints it received from guests, including complaints from guests at the Suburban Extended Stay (Chamblee).

194.   On information and belief, Choice Hotels received guest complaints about the Suburban Extended Stay (Chamblee) related to prostitution, commercial sex trafficking, and other criminal activity there.

195.   Choice Hotels's policy is or was to refer, without action or comment, guest complaints directly back to hotel management for resolution. Choice Hotels's rules and regulations also require each individual hotel's management to respond to all guest complaints and to maintain those responses for review by Choice Hotels.

1824208.1

          **b.** *Law enforcement activity at the Suburban Extended Stay (Chamblee) demonstrates the Suburban Extended Stay Defendants knew, or should have known, of the sex trafficking venture at that hotel*

196. Between 2010 and 2016, at least seventeen people were found dead at the Suburban Extended Stay (Chamblee), according to records of the Chamblee Police Department.

197. Multiple law enforcement operations, conducted by the DeKalb County Vice Unit and other agencies, led to prostitution-related arrests at the location. For example:

    a. In July 2010, a 20-year old woman arrested for prostitution and drugs told officers with the DeKalb County Vice Unit she was prostituting to make money for her boyfriend;

    b. In June 2012, after the DeKalb County Vice Unit conducted an operation for the express purpose of "deter[ing] prostitution on going [sic] at this hotel," they arrested two individuals on drug charges. One, a sex offender, was also charged with failing to register;

    c. In January 2014, an 18-year old was arrested for prostitution, and a 26-year old was arrested and charged with pimping and drug crimes. The teenager told DeKalb County Vice Unit officers

that she had traveled to Atlanta from Wisconsin to live at the

Suburban Extended Stay with this man, who, she told officers,

kept at least half the revenue from her prostitution.

> c. *The sex trafficking venture at the Suburban Extended Stay (Chamblee) was otherwise open and obvious*

198. Nonprofit and religious groups routinely and regularly visited (and still

visit) the Suburban Extended Stay (Chamblee) to provide food and rescue

information to the sex trafficking victims they encounter at the hotel.

## D. The Microtel Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially from such a Venture

### i. The Microtel (Atlanta) Sex Trafficking Venture

199. There was a well-established sex trafficking venture at the Microtel

(Atlanta), comprising traffickers, the hotel's employees, management,

owners, and franchisor, as well as others involved in the sex trafficking of

victims at that hotel, including Jane Doe 1 (the "Microtel (Atlanta) Sex

Trafficking Venture").

200. The Microtel Defendants received a percentage of the revenue

generated by the operation of the Microtel (Atlanta), including a percentage

of the revenue generated for the rate charged on the rooms in which Plaintiff

and other victims were trafficked.

201. The Microtel Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Microtel (Atlanta), as well as the training of its managers and employees.

202. The Microtel Defendants knew or should have known that sex trafficking was a constant occurrence at the Microtel (Atlanta).

ii. <u>Microtel (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

203. During more than 20 separate stays at the Microtel (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex at the hotel by various traffickers. The length of a single stay at the Microtel (Atlanta) sometimes lasted two weeks.

204. Plaintiff and Jane Doe 2 were trafficked at the Microtel both together by the same traffickers and separately by different traffickers.

205. Employees at the Microtel participated in, assisted, and facilitated Plaintiff's sex trafficking. Jane Doe 1 and Jane Doe 3 were trafficked at the Microtel at the same time but by different traffickers.

206. Microtel employees at the front desk were paid daily in drugs or money to permit the trafficking and to act as lookouts for Plaintiff's traffickers.

207. Microtel employees frequently called Plaintiff's trafficker to alert him if police were at the Microtel.

208.  Plaintiff's traffickers frequently used the hotel's computer in the lobby to post advertisements online for sex with Jane Doe 1 and Jane Doe 2 or made Plaintiff post similar advertisements.  The computer was in full view of the lobby and the hotel's employees.  Other traffickers also openly and obviously used the hotel's computer for this purpose.

209.  For several years, including while Plaintiff was trafficked at the Microtel (Atlanta), a single sex trafficker completely controlled the third floor of the hotel (the "Microtel Trafficker").

210.  Management and employees at the Microtel refused to allow anyone to rent a room on the third floor if they did not have permission from the Microtel Trafficker.

211.  The Microtel Trafficker had seven or more victims—several of whom were minors—living on the third floor of the Microtel.  The Microtel Trafficker also lived there, as did multiple relatives and other associates.

212.  Women being trafficked by the Microtel Trafficker each had their own room on the third floor.  If they required another room to meet buyers in, they only had to go to the front desk and say "[the Microtel Trafficker] told me to get another room."  These victims never needed identification to get another room and only paid in cash.

213.  The Microtel Trafficker also used the banquet room of the Microtel for

photo shoots for advertisements to post online for commercial sex at the Microtel. At least one of these photo shoots was videotaped and the video posted online by the Microtel Trafficker.

214. The sex trafficking at the Microtel (Atlanta) was flagrant. The Microtel Trafficker often walked through the hotel with several women surrounding him. He was frequently violent with the victims at the hotel. He was also violent with buyers at the hotel, including beating one man, stripping his clothes off, and making him leave the hotel naked.

215. Microtel housekeeping staff frequently came to the third floor to bring numerous extra towels. They were often denied entrance to the rooms because the Microtel Trafficker imposed a rule at the hotel that only allowed the housekeeping staff entrance to a room if one of the victims was present.

216. Microtel employees were frequently paid in cash by the Microtel Trafficker or his associates on the third floor.

217. At times hotel employees were also paid in drugs by the Microtel Trafficker. Microtel employees also saw sex trafficking victims hand over cash to the Microtel Trafficker, for instance while the staff was smoking marijuana with the Microtel Trafficker.

218. While Plaintiff was trafficked at the Microtel (Atlanta), she exhibited numerous well-known and visible signs of a sex trafficking victim, including

1824208.1

68

physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

219.    While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.

220.    While Plaintiff was trafficked at the Microtel (Atlanta), the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 30 men a day visited Plaintiff's room, each for short periods.

iii.    <u>The Microtel Defendants knew of, or should have known of, the sex trafficking venture at the Microtel (Atlanta)</u>

221.    As discussed above, the evidence of sex trafficking at the Microtel (Atlanta) was open and obvious.  Wyndham and Microtel—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

1824208.1

222. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Microtel Defendants aware of the sex trafficking venture at that hotel.

223. Numerous publicly available reviews of the Microtel (Atlanta), of which Wyndham and Microtel should have known, reported prostitution at the hotel, including:

a. A September 5, 2011 review:

One morning at 5:00AM two men had a foul-mouthed shouting match over a woman and had to be thrown out of the hotel. We suspect this type of behavior is common as the hotel is in close proximity to a strip joint and a night club. ***There are many different people coming and going at all hours, which we makes us suspect prostitution.*** This is the worst experience my wife and I have had at a hotel.

(Emphasis added).

b. An April 21, 2013 review:

In operation to service the Pink Pony
Unfortunately for the normal traveler, this hotel is next to the Pink Pony. During day time hours this isn't such a big deal, but if you are trying to leave for a 5 am flight with your three small children and ***have to wait for the prostitutes to clear the hallway*** . . . well, it is not exactly a family friendly establishment.

(Emphasis added).

    c.  A July 2014 review:

> I want to believe that ***some of the stragglers hanging around the hotel were pimps & prostitutes***.  Definitely need new management there.  I had the room booked for two nights but only stayed one due to all this that was going on, Never, ever, ever again would I stay at this hotel. I'm still itching thinking about it!!!

(Emphasis added).

224.  In addition to the consumer-generated, publicly available online reviews, Wyndham and Microtel received reports and complaints directly from customers about its many hotel locations, including about the Microtel (Atlanta).

225.  On information and belief, Wyndham and Microtel received guest complaints about the Microtel (Atlanta) related to prostitution, commercial sex trafficking, and other criminal activity there.

226.  Despite their knowledge of the ongoing sex trafficking venture at the Microtel (Atlanta), neither Wyndham nor Microtel sought to remove their brands from the hotel because they continued to profit from that venture.

    **E.**    **The Ramada Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

      i.    <u>The Ramada (Alpharetta) Sex Trafficking Venture</u>

227.   There was a well-established sex trafficking venture at the Ramada (Alpharetta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Ramada (Alpharetta) Sex Trafficking Venture").

228.   The Ramada Defendants received a percentage of the revenue generated by the operation of the Ramada (Alpharetta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

229.   The Ramada Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Ramada (Alpharetta), as well as the training of its managers and employees.

230.   The Ramada Defendants knew or should have known that sex trafficking was a constant occurrence at the Ramada (Alpharetta).

      ii.     <u>Ramada (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

231.   During more than 20 separate stays at the Ramada (Alpharetta) between 2011 and 2016, Plaintiff was trafficked for sex at the hotel by various traffickers.  The length of a single stay at the Ramada (Alpharetta) sometimes lasted two weeks.

232.   Between 2011 and early 2014, Plaintiff and Jane Doe 2 were trafficked together at the Ramada Inn.

233.   Employees at the Ramada (Alpharetta) participated in, assisted, and facilitated Plaintiff's sex trafficking, including soliciting Plaintiff for sex.

234.   A group of employees, thought to be related, lived at the Ramada (Alpharetta) while Plaintiff was trafficked there.  Two of the male employees, plus a third—a front desk attendant—reached an agreement with Jane Doe 1's traffickers that required her to have sex with each of the three employees *every day* that she was trafficked at the hotel.  At times this requirement occurred each day during a two week stay.

235.   During these forced sexual encounters, one of these man would regularly come to Plaintiff's room with a TV remote control and announce loudly at the door that Plaintiff's "remote was broken" and that he was there to fix it.  This meant the man was there for sex.

236.   Frequently, these employees would attempt to have sex with Jane Doe 1 more than once in a day.  Plaintiff's trafficker allowed her to refuse more than one sexual encounter with these men during a day.  When this happened, the employees would bring items that other guests left in their rooms and attempt to barter the items for sex with Plaintiff.

237. In exchange for daily sex, the Ramada management and employees kept Plaintiff's traffickers informed of police activity at the hotel and when to slow or stop buyer traffic to the room.

238. While Plaintiff was trafficked at the Ramada Inn, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

239. While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

240. While Plaintiff was trafficked at the Ramada (Alpharetta), the foot traffic of men to the room was obviously indicative of sex trafficking. As many as 20 men a day visited Plaintiff's room, each for short periods of time.

1824208.1

### iii. The Ramada Defendants knew of, or should have known of, the sex trafficking venture at the Ramada (Alpharetta)

241. As discussed above, the evidence of sex trafficking at the Ramada (Alpharetta) was open and obvious. Wyndham and Ramada—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

242. Ramada made its franchisees, including at the Ramada (Alpharetta), agree that Ramada could conduct unlimited unannounced quality inspections of the hotel and its operations.

243. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Ramada Defendants aware of the sex trafficking venture at that hotel.

244. Publicly available reviews of the Ramada (Alpharetta), of which Ramada should have known, reported prostitution at the hotel, including:

a. A review from April 2014:

> I was scared and looked through eye piece from the door, a man (supposedly a pimp) and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady, I then called the desk and no one bothered to answer . . . . later, that morning, complained about the incident and the desk manager doesnt respond properly, poor communication . . . . I wont recommend this to any one!!!

    b.  Another review from around 2014:

        this place is used by prostitutes and the owners know it but don't do anything about since its money from them.

    c.  A review from September 15, 2015 reported the availability of condoms in the lobby:

            Actually have condoms in with the snacks in the hotel lobby. Oh my god!.

245.  In addition to the consumer-generated, publicly available online reviews, Wyndham and Ramada received reports and complaints directly from customers about its many hotel locations, including the Ramada (Alpharetta).

246.  On information and belief, Wyndham and Ramada received guest complaints about the Ramada (Alpharetta) related to prostitution, commercial sex trafficking, and other criminal activity there.

247.  Wyndham and Ramada made its franchisees agree that the results of paper and electronic customer satisfaction surveys, as well as unsolicited feedback from guests, may be included in determining a hotel's quality assurance score.

248.  There are also multiple police incident reports related to prostitution at the Ramada (Alpharetta).

1824208.1

249.   Although Wyndham and Ramada explicitly retained the right to terminate their franchise agreement with the Ramada (Alpharetta) if it was operated in a manner that endangers the health and safety of its guests, and despite its knowledge of the ongoing sex trafficking venture at the Ramada (Alpharetta), neither Wyndham nor Ramada sought to remove their brands from the hotel because they continued to profit from that venture.

**F.   The La Quinta Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially from such a Venture**

i.   <u>The La Quinta (Alpharetta) Sex Trafficking Venture</u>

250.   There was a well-established sex trafficking venture at the La Quinta (Alpharetta), comprising traffickers, the hotel's employees, management, and owners, as well as others involved in the sex trafficking of victims at that hotel (the "La Quinta (Alpharetta) Sex Trafficking Venture").

251.   The La Quinta Defendants received a percentage of the revenue generated by the operation of the La Quinta (Alpharetta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

252.   The La Quinta Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the LaQuinta (Alpharetta), as

well as the training of its managers and employees.

253.  The La Quinta Defendants knew or should have known that sex trafficking was a constant occurrence at the La Quinta (Alpharetta).

    ii.  <u>La Quinta (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

254.  Jane Doe 1 was trafficked at the La Quinta Inn on around 20 separate occasions by multiple traffickers from 2011 to 2013.

255.  Plaintiff and Jane Doe 2 were trafficked at the La Quinta together by the same traffickers and separately by different traffickers.

256.  Employees and management at the La Quinta Inn participated in, assisted, and facilitated Plaintiff's sex trafficking.  They intentionally rented rooms to Jane Doe 1 and her traffickers near the back door of the hotel so that buyers could come and go without other guests noticing.  La Quinta (Alpharetta) staff told Plaintiff and her traffickers to "use the back door" to hide the number of men visiting the room each day from other guests.

257.  The employees gave Plaintiff and her traffickers extra key cards so that numerous buyers could easily access the hotel undetected by other guests each day.  Extra key cards were left outside the back door so that buyers could let themselves into the hotel from the back without being noticed.

258.   La Quinta (Alpharetta) employees knew of an incident when Plaintiff was nearly beaten to death by her trafficker for hours at the La Quinta (Alpharetta).  Jane Doe 1's trafficker videotaped himself viciously beating and raping Plaintiff for hours, leaving blood on the walls of the room.  Hotel employees could hear Jane Doe 1's trafficker violently beating and raping Jane Doe 1 in the room, but they did nothing to help.

259.   While at the La Quinta (Alpharetta), commercial sex trafficking victims, including but not limited to Plaintiff, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings, and monitoring by male companions.

260.   Rooms at the La Quinta (Alpharetta) where victims, including Jane Doe 1, were trafficked frequently had trash cans with numerous more used condoms a day and multiple cell phones in the room.  Victims stayed for extended periods with very few personal items or possessions in their rooms and frequently requested housekeeping items like towels multiple times a day.

1824208.1

261.   While Plaintiff was trafficked at the La Quinta Inn the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men a day visiting Plaintiff's room for short periods.

    iii.   <u>The La Quinta Defendants knew of, or should have known of, the sex trafficking venture at the La Quinta (Alpharetta)</u>

262.   As discussed above, the evidence of sex trafficking at the La Quinta (Alpharetta) was open and obvious, including the violent beatings of sex trafficking victims, including Jane Doe 1.  La Quinta sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

263.   However, this sex trafficking activity and the involvement of the hotel's management and employees was not the only evidence that made the La Quinta Defendants aware of the sex trafficking venture at that hotel.

264.   Publicly available online reviews of the La Quinta (Alpharetta), of which the La Quinta Defendants knew or should have known, reported blood stained sheets and other problems at the hotel.  Upon information and belief, La Quinta, as well as the other La Quinta Defendants, monitored online reviews related to this hotel.

265.   Among the reviews of concerns at the La Quinta (Alpharetta) are multiple reports of blood-stained sheets, including:

a. A September 10, 2012 review, stating

when I was about to lay down I noticed blood on the bed skirt of the bed, and on the floor near the head of the bed.

I had a room with two beds, and looked at the other bed and there was blood on that bed skirt too.

b. A June 2013 review, stating

When I checked the bed, the pillowcase had blood on it. I took off all cases And another pillow had blood under the case. I've stayed at many La Quinta Hotels and have never had an experience like this. The others in our group's rooms were also disgusted by issues they found. Should be closed down.

c. A July 2013 review, stating,

We opened the bed, and found what appeared to be blood stains on the bottom sheet. . . .

The next evening, the room had been cleaned but the replacement comforter had what appeared to be fresh blood stains on it.

266.  In addition to the consumer-generated, publicly available online reviews, La Quinta received reports and complaints directly from customers about its many hotel locations around the world, including about the La Quinta (Alpharetta).

267.  La Quinta knew the content of the complaints it received from guests, including complaints from guests at the La Quinta (Alpharetta)

268.  On information and belief, La Quinta received guest complaints about the La Quinta (Alpharetta) related to prostitution, commercial sex trafficking, and other criminal activity there.

**G.    The Americas Best Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

i.    The Americas Best (Atlanta) Sex Trafficking Venture

269.  There was a well-established sex trafficking venture at the Americas Best (Atlanta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Americas Best (Atlanta) Sex Trafficking Venture").

270.  The Americas Best Defendants received a percentage of the revenue generated by the operation of the Americas Best (Atlanta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

271.  The Americas Best Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Americas Best (Atlanta), as well as the training of its managers and employees.

272. The Americas Best Defendants knew or should have known that sex trafficking was a constant occurrence at the Americas Best (Atlanta).

    ii.    <u>Americas Best (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

273. During more than 20 separate stays at the Americas Best (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers for up to a week at a time.

274. Management and employees at the Americas Best knew of, participated in, assisted, and facilitated Plaintiff's sex trafficking.

275. One employee who lived at the hotel facilitated Plaintiff's trafficking and worked as a lookout for Plaintiff's trafficker. This employee was paid by being allowed to demand sex from one of the other victims trafficked with Jane Doe 1 and Jane Doe 2.

276. Plaintiff was frequently trafficked at Americas Best (Atlanta) with four to five other trafficking victims.

277. Jane Doe 1 and Jane Doe 2 were trafficked at the Americas Best (Atlanta) together. When one was with a buyer in their room, the other hid in the bathroom until the buyer was finished having sex.

278.  While Plaintiff was trafficked there, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

279.  While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.

280.  While Plaintiff was trafficked at the Americas Best (Atlanta) the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 20 men a day visited Plaintiff's room, each for short periods.

   iii. <u>The Americas Best Defendants knew of, or should have known of, the sex trafficking venture at the Americas Best (Atlanta)</u>

281.  As discussed above, the evidence of sex trafficking at the Americas Best (Atlanta) was open and obvious.

282.   However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Americas Best Defendants aware of the sex trafficking venture at that hotel. Vantage actively monitors the operations of Americas Best (Atlanta) and its other member hotels.

        *a.*     *Vantage controls its hotels and undertakes the responsibility of training employees and owners of Americas Best (Atlanta), inspecting its hotels and monitoring criminal activity at Americas Best (Atlanta)*

283.   Vantage holds itself out to be a "membership organization."  Instead of franchisees, the company is controlled by its own members, who vote on the standards and programs that govern the daily operation of hotels, including the Americas Best (Atlanta).  Brand members, including Desai, meet annually to vote on "brand standards."  If the vote passes, Vantage, as a corporation, imposes the brand standards as operating procedures upon each hotel, including Americas Best (Atlanta).  The brand standards enforced by Vantage upon Americas Best (Atlanta) encompass all aspects of hotel management, including every reservation and booking at the hotel as well as safety and security standards.

284.   Vantage members, including Desai, by their vote on polices as members, use Vantage to exert control over all hotels under the Americas

Best Value Inn brand. Brand member hotels, including Americas Best, are required to adhere to Vantage brand standards. By voting on policies Vantage will make binding upon each hotel, the members explicitly relinquish control over their hotel to Vantage.

285. Vantage controls the training and required polices for Americas Best (Atlanta) where Plaintiff was trafficked. Vantage was responsible for and provided training to the employees at the Americas Best (Atlanta). Vantage provided Americas Best (Atlanta) employees with training on every aspect of the day to day operations of the hotel.

286. Vantage monitored and oversaw operations at each hotel to keep rooms rented and to ensure adherence to policies and deadlines set by Vantage. Vantage corporate employees remain in regular communication with its member hotels, including Americas Best (Atlanta), about these policies.

287. The Vantage Resource Guide contains *required* policies of Vantage, including those concerning operating standards, fees, reservation programs (including the many reservations handled by Vantage directly), guest comments and complaints, inspections, rewards programs, technology, and other matters.

288. Vantage inspectors have the right, and necessary control, to require safety and security issues to be remedied as Vantage sees fit. Vantage also

undertakes the duty to train its hotel member employees on safety and security issues.

289.   Some of Vantage's training programs purport to provide training to hotel employees regarding how to look for or detect human trafficking, including sex trafficking.  Vantage employees who have provided this training have admitted that the training is "on a light level" and not "in-depth training."  In fact, the training Vantage provided was wholly inadequate and not provided to all its members.

290.   Though Vantage knew the measures to take to ensure it was not profiting from sex trafficking, Vantage failed to ensure its own trainings and brand requirements were followed at Americas Best (Atlanta) where Plaintiff was openly trafficked for sex.

291.   Vantage employees who inspect and train hotel employees have testified, when asked if Vantage inspectors would want to know about criminal activity at individual Americas Best Value Inn locations, "Of course, because their reputation – you know, *we've got to monitor our properties and what they're doing* and stuff, for sure."[34]

---

[34] Deposition transcript as excerpted in Plaintiff's Opposition to Defendant Vantage Hospitality Group, Inc.'s Motion for Summary Judgment at 15 (emphasis added) in *Jane Doe #1 v. Vantage Hospitality Group, Inc., et al.*,

1824208.1

292.   Vantage employees are assigned member hotels to monitor, including monitoring reviews and setting up online news alerts reporting criminal activity at the hotel.  These alerts notified Vantage of several criminal incidents at Americas Best (Atlanta) during the years Plaintiff was trafficked at the hotel.

293.   Vantage sent inspectors to examine operations at Americas Best (Atlanta).  The ongoing sex trafficking activity would have been apparent to those inspectors.

294.   When Vantage inspected Americas Best (Atlanta), the inspections were extensive and included inspections evaluating the safety and security measures at the hotel.  After the inspection, Vantage issued an "action plan" to the Americas Best (Atlanta) with a summary of the inspection, a list of items or defects Vantage required the hotel to cure, and a deadline for completion.  The failure to meet these deadlines could result in the imposition of penalties, including loss of the brand.

295.   Vantage has admitted its obligation to be informed about criminal activity at its brand members' hotel locations.  Yet despite rampant sex trafficking occurring at Americas Best (Atlanta) in the years Plaintiff was

Cir. Ct. for Wicomico Cty., Md., No. C-22-CV-17-000073 (filed March 12, 2018).

1824208.1

trafficked, Vantage was apparently oblivious to the entire issue of human trafficking until the end of 2013. Vantage's Chief Operating Officer ("COO") Bernard Moyle has testified that prior to December 2013 meeting, "within our corporation we had not really heard much about [human trafficking] at all."[35]

296. Since 2008, federal law has made businesses liable if they should have known of their business's participation in a sex trafficking venture. Yet from 2008 until 2013, Vantage did nothing to determine whether it was profiting from sex trafficking, including Plaintiff's sex trafficking at Americas Best (Atlanta). Vantage's COO has testified the company was unaware of the issue. During that time, Vantage profited from a number of known and publicized instances of sex trafficking at Americas Best Value Inns.

297. In fact, Vantage's supposed ignorance of the issue of human trafficking is all the more incredible because sex trafficking *at Americas Best Value Inns* was its own national phenomenon at the time, including when Plaintiff was trafficked at America's Best (Atlanta).

298. For example, in May 2013, a man was arrested on felony human trafficking charges after holding a woman against her will and forcing her to

---

[35] *Id.* at 21.

1824208.1

have sex for money at the Americas Best Value Inn in Rockdale County.[36]

299.   One month later—at the **same** Americas Best Value Inn in Rockdale County—two women were arrested for sex trafficking a 14-year-old girl for weeks at the hotel.[37]

300.   Between 2010 and 2014, there were numerous arrests relating to sex trafficking and prostitution at no less than five other Americas Best Value Inns, including one location that was determined by the government to be a nuisance and was closed.

301.   Despite testifying that Vantage must monitor crime on its properties, Vantage did nothing to address open sex trafficking at America's Best (Atlanta) while Plaintiff was openly trafficked at the hotel.

> b.   *Publicly available online reviews confirm Americas Best Defendants knew, or should have known, of the sex trafficking venture and other criminal activity at Americas Best (Atlanta)*

---

[36] Alice Queen, *Man Faces Human Trafficking Charge*, The Citizens (May 6, 2013), https://www.rockdalenewtoncitizen.com/news/man-faces-human-trafficking-charge/article_36fe2c8d-71d2-519a-bdcc-af6d21b18b2d.html (last visited Nov. 20, 2019).

[37] Staff Reports, *Two Ga. Women Charged With Pimping 14-year-old*, Gwinnett Daily Post (June 4, 2013), https://www.gwinnettdailypost.com/news/state/two-ga-women-charged-with-pimping--year-old/article_bf32d697-73a9-554c-82fd-985ee03ae3ff.html (last visited Nov. 20, 2019).

1824208.1

302.   Vantage employees also monitored reviews and complaints from third-party websites on behalf of Americas Best (Atlanta).  It stayed in ongoing communication with VAD and/or Desai regarding the appropriate responses to guest reviews and complaints, including ***requiring*** Americas Best Atlanta or Desai to issue refunds to guests with specific complaints.

303.   Many of the publicly-available reviews reported prostitution and other crime at the hotel, including the following representative sample:

    a.    A review from March 2011, stating:

> . . . make sure that people who shouldn't be on the property stay off it look like some young girls were trying to do their thing out there and that's not good . . . .

    b.    A review from July 2013, stating:

> **Robbery** First, asked non smoking got smoking. Second, bug the size of a huge centipede came out while my other guest was using the restroom.  Then at 8:30 am a girl was held up at gunpoint(by a shotgun and machine gun) and ha her car stolen in broad daylight.  Very very sketchy part of town.

    c.    A review from May 2014 described man attempting to recruit a guest at the hotel into trafficking:

> I HAVE NEVER BEEN TO A HOTEL WHERE I WAS SO UNCOMFORTABLE IN MY LIFE . . . I WAS PROPOSITIONED TO GO TO ROOM 208 WHEN I GOT THERE FROM SOME MAN WHO ASKED ME WAS I LOOKING TO GET PAID . . . I WAS SO DISGUSTED AND THE MEN IN MY FAMILY WERE VERY UPSET . . . THERE WERE DRUG TRANSACTIONS GOING ON IN OUR FACES AND PEOPLE ACTUALLY

COMING UP TO US WITH DRUG PROPOSITIONS . . . .

d.   A review from May 2014, stating:

**Worst hotel I have ever stayed in.**  Very very unsafe feeling hotel. Prostitutes and sketchy drug addicts hanging around in parking lot and stairwells.  Very loud place. Bass coming from cars in parking lot all night.  People screaming and banging around all night in their rooms.

e.   A review from June 2014, stating:

I stayed one night in this hotel. AWFUL. . . . working girl traffic day and night . . . .

f.   A review from October 2014, stating:

It was not Pleasant. . . . the hotel is nothing like in the photos. It was more like a local hang out for drug dealers and prostitutes. . .

g.   A review from August 2016, stating:

**Worst place ever.**  If you like Semen stains on your headboard. Pee stains running down the wall.  Cigarette burns on top of the microwave of a non smoking room.  Prostitutes outside of your door.  Rude and completely ignorant hotel managers.  This is your kind of dump.  This is the worst place I have ever stayed.

304.  Vantage monitored these reviews and other complaints made directly to Vantage about Americas Best (Atlanta).  Vantage knew the content of the complaints it received from guests about Americas Best (Atlanta), including complaints of prostitution, drugs, and other criminal activity.

305.  Instead of responding directly, when Vantage received a complaint about Americas Best, it forwarded the complaint to VAD or Desai.  If VAD

and Desai failed to respond to the complaint in a timely manner, Vantage then followed up with VAD and Desai to demand a timely response. A failure to issue a timely response by VAD or Desai could result in the assessment of a penalty fee against VAD or Desai or could ultimately result in a revocation of the brand.

306. Though Vantage had knowledge from the law enforcement activity, complaints, reviews, and inspections of what Vantage should have known was sex trafficking, Vantage chose to profit from, rather than stop, Plaintiff's repeated trafficking at Americas Best (Atlanta).

**H. The Hampton Inn (NDH Atlanta) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

i. The Hampton Inn (NDH Atlanta) Sex Trafficking Venture

307. There was a well-established sex trafficking venture at the Hampton Inn (NDH Atlanta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the Hampton Inn (NDH Atlanta) Sex Trafficking Venture").

308. The Hampton Inn (NDH Atlanta) Defendants received a percentage of the revenue generated by the operation of the Hampton Inn (NDH Atlanta)

1824208.1

including a percentage of the revenue generated for the rate charged on the

rooms in which Plaintiff and other victims were trafficked.

309.   The Hampton Inn (NDH Atlanta) Defendants controlled the policies

and standards applicable to and enforced (or not enforced) at the Hampton

Inn (NDH Atlanta), as well as the training of its managers and employees.

310.   The Hampton Inn (NDH Atlanta) Defendants knew or should have

known that sex trafficking was a constant occurrence at the Hampton Inn

(NDH Atlanta).

> ii.    <u>Hampton Inn (NDH Atlanta) management and employees
> knew of and facilitated the sex trafficking venture at that
> hotel, and they specifically facilitated the trafficking of
> Jane Doe 1</u>

311.   During roughly 20 separate stays at the Hampton Inn (NDH Atlanta)

between 2011 and 2016, Plaintiff was trafficked for sex at the Hampton Inn

by various traffickers.

312.   Jane Doe 1 and Jane Doe 2 were trafficked at the Hampton Inn

together by the same traffickers and separately by different traffickers. When

together, when one was with a buyer in their room, the other hid in the

bathroom until the buyer was finished having sex.

313.   Management and employees at the Hampton Inn (NDH Atlanta)

participated in, assisted, and facilitated Plaintiff's sex trafficking.

314.   A male front desk employee at the Hampton Inn worked as a lookout for Plaintiff's traffickers and provided discounted rooms for Plaintiff's trafficking in exchange for drugs and money.  The employee also called the room to alert Plaintiff's trafficker if the police were at the hotel or if the frequent buyers coming to the room were noticed by other guests.

315.   Each day Plaintiff was trafficked at the Hampton Inn, this employee came directly to the room Plaintiff was trafficked in and asked Plaintiff's trafficker if the group were staying or leaving.  If they were staying, the man would be paid with drugs or money inside the room or while standing at the door.  Plaintiff was frequently ordered by her trafficker to get the drugs or money out of the bedside table and hand it to the employee.

316.   A female front desk employee also worked as a lookout for Plaintiff's trafficker.  This employee was paid primarily in drugs for her lookout work.

317.   While Plaintiff was trafficked at the Hampton Inn, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

318. While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

319. While Plaintiff was trafficked at the Hampton Inn, the foot traffic of men to the room was obviously indicative of sex trafficking. As many as 20 men a day visiting Plaintiff's room, each for short periods.

      iii.    <u>The Hampton Inn (NDH Atlanta) Defendants knew of, or should have known of, the sex trafficking venture at the Hampton Inn (NDH Atlanta)</u>

320. As discussed above, the evidence of sex trafficking at the Hampton Inn (NDH Atlanta) was open and obvious. Hilton Franchise, Hilton Domestic, and Hilton—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

321. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the

Hampton Inn (NDH Atlanta) Defendants aware of the sex trafficking venture at that hotel.

322. Hilton Franchise, Hilton Domestic, and Hilton received reports and complaints directly from customers about its many hotel locations, including the Hampton Inn (NDH Atlanta).

323. On information and belief, Hilton Franchise, Hilton Domestic, and Hilton received guest complaints about the Hampton Inn (NDH Atlanta) related to prostitution, commercial sex trafficking, and other criminal activity there.

324. And while Hilton Franchise, Hilton Domestic, and Hilton provide training to its own direct employees regarding the dangers and risks of sex trafficking, it fails to provide or require that training for its franchisees and their employees.

325. There is no difference between a corporate-owned hotel and a franchisee with regard to the risks for sex trafficking or its victims. Yet Hilton refused to require its franchisees to have systems in place to prevent sex trafficking, although it could have done so pursuant to its franchise agreement.

326. And despite its knowledge of the ongoing sex trafficking venture at the Hampton Inn (NDH Atlanta), Hilton Franchise, Hilton Domestic, and Hilton

1824208.1

never sought to remove their brands from the hotel because they continued to profit from that venture.

## PLAINTIFF'S CLAIMS

### Trafficking Victims Protection Reauthorization Act Claims
### (allegations common to Counts 1-24)

327. The Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2003 amended Title 18 of the U.S. Code by adding 18 U.S.C. § 1595, a new section that provided human trafficking victims a civil cause of action "against the perpetrator" of certain trafficking crimes, including sex trafficking in violation of 18 U.S.C. § 1591.

328. Under the TVPRA (18 U.S.C. §§ 1591(a)(1) and 1595(a)), Defendants may be held liable—criminally and civilly—*as perpetrators of sex trafficking* for knowingly recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting by any means a person, knowing or in reckless disregard of the fact that means of force, fraud, or coercion were used to cause a person to engage in commercial sex acts.

329. Under the TVPRA (18 U.S.C. §§ 1591(a)(2) and 1595(a)), Defendants may also be held liable—criminally and civilly—*as perpetrators of sex trafficking* for benefitting financially from participation in a venture,

1824208.1

knowing or in reckless disregard of the fact, that means of force, fraud, coercion, or the combination of such means would be used to cause a person to engage in commercial sex acts.

330. The William Wilberforce TVPRA of 2008 amended the cause of action created by 18 U.S.C. § 1595(a) to expand liability beyond the "perpetrator" of trafficking crimes, to also cover "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person **knew or should have known** has engaged in an act in violation of this chapter[.]"

331. Thus, since 2008, Defendants have known that they could be held civilly liable for benefitting financially from participation in a venture which they knew or should have known involved a violation of the TVPRA.

332. As discussed above, at minimum, Defendants should have known from the open and obvious signs of sex trafficking at their hotels that such illegal acts were occurring.

## COUNT ONE
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Red Roof (Smyrna) Defendants)

333.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

334.   Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

335.   The Red Roof (Smyrna) Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Red Roof (Smyrna), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

336.   The Red Roof (Smyrna) Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud,

coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

337. The Red Roof (Smyrna) Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

338. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

339. The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

340. The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWO
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
## 18 U.S.C. §§ 1591(a)(2), 1595(a)
## (Against Red Roof (Smyrna) Defendants)

341.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

342.   Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

343.   The Red Roof (Smyrna) Defendants violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Red Roof (Smyrna) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna)  property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof

(Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

344. The Red Roof (Smyrna) Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

345. The Red Roof (Smyrna) Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna) , knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

346. The Red Roof (Smyrna) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

347. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

348. The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

349. The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT THREE
**Trafficking Victim Protection Reauthorization Act – Sex Trafficking
Negligent Financial Beneficiary Claim
18 U.S.C. § 1595(a)
(Against Red Roof (Smyrna) Defendants)**

350. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

351. Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of the Red Roof (Smyrna) Sex Trafficking Venture in

1824208.1

which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or *should have known* violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Red Roof (Smyrna). Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

352. Jane Doe 1 also brings this claim against the Red Roof (Smyrna) Defendants as a victim of the Red Roof (Smyrna) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or *should have known* violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna), knowing or in

reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

353. The Red Roof (Smyrna) Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Red Roof (Smyrna).

354. This venture, in which the Red Roof (Smyrna) Defendants participated, was in or affecting interstate commerce.

355. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

356. The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

1824208.1

357. The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FOUR
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Red Roof (Atlanta) Defendants)

358. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

359. Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

360. The Red Roof (Atlanta) Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

1824208.1

361.  The Red Roof (Atlanta) Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

362.  The Red Roof (Atlanta) Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

363.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

364.  The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

365.   The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FIVE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Red Roof (Atlanta) Defendants)

366.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

367.   Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

368.   The Red Roof (Atlanta) Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Red Roof (Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Atlanta)  property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained,

advertised, maintained, patronized, or solicited persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

369. The Red Roof (Atlanta) Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

370. The Red Roof (Atlanta) Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Atlanta) , knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to

cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

371.   The Red Roof (Atlanta) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

372.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

373.   The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

374.   The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SIX
**Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
18 U.S.C. § 1595(a)
(Against Red Roof (Atlanta) Defendants)**

375.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

376.  Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of the Red Roof (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Red Roof (Atlanta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

377.  Jane Doe 1 also brings this claim against the Red Roof (Atlanta) Defendants as a victim of the Red Roof (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted

financially or by receiving something of value and which they knew or
**should have known** violated 18 U.S.C. § 1591(a)(2) by providing the room in
which Jane Doe 1 was trafficked, providing the Red Roof (Atlanta) property
and facilities as a venue for the ongoing sex trafficking venture, providing
assistance to her trafficker, or by knowingly assisting, supporting, or
facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting,
supporting, or facilitating persons who knowingly recruited, enticed,
harbored, transported, provided, obtained, advertised, maintained,
patronized, or solicited persons at the Red Roof (Atlanta), knowing or in
reckless disregard of the fact that means of force, threats of force, fraud,
coercion, or the combination of such means would be used to cause those
persons to engage in commercial sex acts at the Red Roof (Atlanta), and by
attempting and conspiring to do the same. Jane Doe 1 was one of those
persons caused to engage in commercial sex acts.

378. The Red Roof (Atlanta) Defendants benefitted financially or by
receiving something of value from their participation in this venture from
renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by, on
information and belief, receiving money and other things of value for other
services provided to Jane Doe 1's sex traffickers, and by receiving money and

other things of value from the sex trafficking of other victims at the Red Roof (Atlanta).

379.  This venture, in which the Red Roof (Atlanta) Defendants participated, was in or affecting interstate commerce.

380.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

381.  The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

382.  The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SEVEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Suburban Extended Stay Defendants)

383.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

384.   Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

385.   The Suburban Extended Stay Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

386.   The Suburban Extended Stay Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised,

maintained, patronized, and solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

387. The Suburban Extended Stay Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

388. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

389. The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

390. The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

## COUNT EIGHT
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Suburban Extended Stay Defendants)

391.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

392.   Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

393.   The Suburban Extended Stay Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Suburban Extended Stay (Chamblee) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that

1824208.1

means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

394. The Suburban Extended Stay Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

395. The Suburban Extended Stay Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts

at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

396. The Suburban Extended Stay Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

397. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

398. The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

399. The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT NINE

## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
## 18 U.S.C. § 1595(a)
## (Against Suburban Extended Stay Defendants)

400.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

401.  Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of the Suburban Extended Stay (Chamblee) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Suburban Extended Stay (Chamblee).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

402.  Jane Doe 1 also brings this claim against the Suburban Extended Stay Defendants as a victim of the Suburban Extended Stay (Chamblee) Sex

Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

403. The Suburban Extended Stay Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by, receiving money and other things of value for other services provided to Jane

Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Suburban Extended Stay (Chamblee).

404.   This venture, in which the Suburban Extended Stay Defendants participated, was in or affecting interstate commerce.

405.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

406.   The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

407.   The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

# COUNT TEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against La Quinta Defendants)

408.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set forth herein.

409.   Jane Doe 1 brings this claim against the La Quinta Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

410.   The La Quinta Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at La Quinta (Alpharetta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

411.   The La Quinta Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the La Quinta (Alpharetta), knowing or

in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

412. The La Quinta Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

413. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

414. The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

415. The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT ELEVEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against La Quinta Defendants)

416.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set forth herein.

417.   Jane Doe 1 brings this claim against the La Quinta Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

418.   The La Quinta Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the La Quinta (Alpharetta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the La Quinta (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud,

1824208.1

coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

419. The La Quinta Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

420. The La Quinta Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the La Quinta (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and

by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

421. The La Quinta Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

422. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

423. The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

424. The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWELVE
**Trafficking Victim Protection Reauthorization Act – Sex Trafficking
Negligent Financial Beneficiary Claim
18 U.S.C. § 1595(a)
(Against La Quinta Defendants)**

425.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set

forth herein.

426.   Jane Doe 1 brings this claim against the La Quinta Defendants as a

victim of the La Quinta (Alpharetta) Sex Trafficking Venture in which they

participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or **_should have known_**

violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring,

transporting, providing, obtaining, advertising, maintaining, patronizing, or

soliciting persons that were caused by means of force, threats of force, fraud,

coercion, or the combination of such means to engage in commercial sex act at

the La Quinta (Alpharetta).  Jane Doe 1 was one of those persons caused to

engage in commercial sex acts.

427.   Jane Doe 1 also brings this claim against the La Quinta Defendants as

a victim of the La Quinta (Alpharetta) Sex Trafficking Venture in which they

participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known***
violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1
was trafficked, providing the La Quinta (Alpharetta) property and facilities
as a venue for the ongoing sex trafficking venture, providing assistance to her
trafficker, or by knowingly assisting, supporting, or facilitating a violation of
18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons
who knowingly recruited, enticed, harbored, transported, provided, obtained,
advertised, maintained, patronized, or solicited persons at the La Quinta
(Alpharetta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the La
Quinta (Alpharetta), and by attempting and conspiring to do the same. Jane
Doe 1 was one of those persons caused to engage in commercial sex acts.

428. The La Quinta Defendants benefitted financially or by receiving
something of value from their participation in this venture from renting the
hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money
and other things of value for other services provided to Jane Doe 1's sex
traffickers, and by receiving money and other things of value from the sex
trafficking of other victims at the La Quinta (Alpharetta).

1824208.1

429.   This venture, in which the La Quinta Defendants participated, was in or affecting interstate commerce.

430.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

431.   The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

432.   The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT THIRTEEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Microtel Defendants)

433.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

434.   Jane Doe 1 brings this claim against the Microtel Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

435.   The Microtel Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Microtel (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

436.   The Microtel Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Microtel (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

437.   The Microtel Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

438.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

439.   The Microtel Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

440.   The Microtel Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

**COUNT FOURTEEN**
**Trafficking Victim Protection Reauthorization Act – Sex Trafficking**
**Perpetrator Financial Beneficiary Claim**
**18 U.S.C. §§ 1591(a)(2), 1595(a)**
**(Against Microtel Defendants)**

441.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

442.   Jane Doe 1 brings this claim against the Microtel Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

443.   The Microtel Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Microtel (Atlanta) Sex

Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Microtel (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Microtel (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

444. The Microtel Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

445. The Microtel Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Microtel (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting,

or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting,

supporting, or facilitating persons who knowingly recruited, enticed,

harbored, transported, provided, obtained, advertised, maintained,

patronized, or solicited persons at the Microtel (Atlanta), knowing or in

reckless disregard of the fact that means of force, threats of force, fraud,

coercion, or the combination of such means would be used to cause those

persons to engage in commercial sex acts at the Microtel (Atlanta), and by

attempting and conspiring to do the same.  Jane Doe 1 was one of those

persons caused to engage in commercial sex acts.

446.   The Microtel Defendants' actions related to Jane Doe 1 were in or

affecting interstate commerce.

447.   Jane Doe 1 has suffered substantial physical, emotional, and

psychological harm and other damages as a direct and proximate result of the

Microtel Defendants participating in these acts, and conspiring with, aiding,

and abetting others participating in these acts.

448.   The Microtel Defendants are liable to Jane Doe 1 for her damages in an

amount to be proven at trial, including reasonable attorneys' fees and

punitive damages.

449.   The Microtel Defendants, and all Defendants, are jointly and severally

liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FIFTEEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
## 18 U.S.C. § 1595(a)
## (Against Microtel Defendants)

450.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

451.   Jane Doe 1 brings this claim against the Microtel Defendants as a victim of the Microtel (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Microtel (Atlanta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

452.   Jane Doe 1 also brings this claim against the Microtel Defendants as a victim of the Microtel (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known***
violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1
was trafficked, providing the Microtel (Atlanta) property and facilities as a
venue for the ongoing sex trafficking venture, providing assistance to her
trafficker, or by knowingly assisting, supporting, or facilitating a violation of
18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons
who knowingly recruited, enticed, harbored, transported, provided, obtained,
advertised, maintained, patronized, or solicited persons at the Microtel
(Atlanta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Microtel
(Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was
one of those persons caused to engage in commercial sex acts.

453.   The Microtel Defendants benefitted financially or by receiving
something of value from their participation in this venture from renting the
hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money
and other things of value for other services provided to Jane Doe 1's sex
traffickers, and by receiving money and other things of value from the sex
trafficking of other victims at the Microtel (Atlanta).

1824208.1

454. This venture, in which the Microtel Defendants participated, was in or affecting interstate commerce.

455. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

456. The Microtel Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

457. The Microtel Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SIXTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Ramada Defendants)

458. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

459. Jane Doe 1 brings this claim against the Ramada Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

460. The Ramada Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

461. The Ramada Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

462. The Ramada Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

463. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

1824208.1

138

Ramada Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

464. The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

465. The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

**COUNT SEVENTEEN**
**Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim**
**18 U.S.C. §§ 1591(a)(2), 1595(a)**
**(Against Ramada Defendants)**

466. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

467. Jane Doe 1 brings this claim against the Ramada Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

468. The Ramada Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Ramada (Alpharetta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Ramada (Alpharetta) property and facilities as a

venue for the ongoing sex trafficking venture, providing assistance to her
trafficker, or by knowingly assisting, supporting, or facilitating a violation of
18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons
who knowingly recruited, enticed, harbored, transported, provided, obtained,
advertised, maintained, patronized, or solicited persons at the Ramada
(Alpharetta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Ramada
(Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1
was one of those persons caused to engage in commercial sex acts.

469. The Ramada Defendants knowingly benefitted financially from these
acts by receiving money from renting the hotel rooms in which Jane Doe 1
was trafficked for sex.

470. The Ramada Defendants also violated 18 U.S.C. § 1591(a)(2) by
knowingly aiding and abetting others that benefitted financially by providing
the room in which Jane Doe 1 was trafficked, providing the Ramada
(Alpharetta) property and facilities as a venue for the ongoing sex trafficking
venture, providing assistance to her trafficker, or by knowingly assisting,
supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including
assisting, supporting, or facilitating persons who knowingly recruited,

1824208.1

140

enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

471. The Ramada Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

472. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

473. The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

474. The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT EIGHTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Ramada Defendants)

475.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

476.   Jane Doe 1 brings this claim against the Ramada Defendants as a victim of the Ramada (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Ramada (Alpharetta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

477.   Jane Doe 1 also brings this claim against the Ramada Defendants as a victim of the Ramada (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Ramada (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

478. The Ramada Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Ramada (Alpharetta).

1824208.1

143

479.   This venture, in which the Ramada Defendants participated, was in or affecting interstate commerce.

480.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

481.   The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

482.   The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT NINETEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Americas Best Defendants)

483.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set forth herein.

484.   Jane Doe 1 brings this claim against the Americas Best Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

1824208.1

485.   The Americas Best Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Americas Best (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

486.   The Americas Best Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

487.   The Americas Best Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

488.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

1824208.1

Americas Best Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

489.   The Americas Best Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

490.   The Americas Best Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Americas Best Defendants)

491.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set forth herein.

492.   Jane Doe 1 brings this claim against the Americas Best Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

493.   The Americas Best Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Americas Best (Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1

1824208.1

was trafficked, providing the Americas Best (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

494. The Americas Best Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

495. The Americas Best Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Americas Best (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including

1824208.1

assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

496. The Americas Best Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

497. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

498. The Americas Best Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

499. The Americas Best Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY-ONE
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking
## Negligent Financial Beneficiary Claim
## 18 U.S.C. § 1595(a)
## (Against Americas Best Defendants)

500.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set

forth herein.

501.   Jane Doe 1 brings this claim against the Americas Best Defendants as

a victim of the Americas Best (Atlanta) Sex Trafficking Venture in which

they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known***

violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring,

transporting, providing, obtaining, advertising, maintaining, patronizing, or

soliciting persons that were caused by means of force, threats of force, fraud,

coercion, or the combination of such means to engage in commercial sex act at

the Americas Best (Atlanta).  Jane Doe 1 was one of those persons caused to

engage in commercial sex acts.

502.   Jane Doe 1 also brings this claim against the Americas Best

Defendants as a victim of the Americas Best (Atlanta) Sex Trafficking

Venture in which they participated and from which they knowingly

benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Americas Best (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

503. The Americas Best Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Americas Best (Atlanta).

1824208.1

504.   This venture, in which the Americas Best Defendants participated, was in or affecting interstate commerce.

505.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

506.   The Americas Best Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

507.   The Americas Best Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY-TWO
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Hampton Inn (NDH Atlanta) Defendants)

508.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

509.   Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

510.   The Hampton Inn (NDH Atlanta) Defendants violated 18 U.S.C.
§ 1591(a)(1) by knowingly harboring and maintaining persons at the
Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact
that means of force, threats of force, fraud, coercion, or the combination of
such means would be used to cause those persons to engage in commercial
sex acts at Hampton Inn (NDH Atlanta), and by attempting and conspiring to
do the same.  Jane Doe 1 was one of those persons caused to engage in
commercial sex acts.

511.   The Hampton Inn (NDH Atlanta) Defendants also violated 18 U.S.C.
§ 1591(a)(1) by knowingly aiding and abetting other perpetrators that
recruited, enticed, harbored, transported, provided, obtained, advertised,
maintained, patronized, and solicited persons at the Hampton Inn (NDH
Atlanta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Hampton
Inn (NDH Atlanta), and by attempting and conspiring to do the same.  Jane
Doe 1 was one of those persons caused to engage in commercial sex acts.

512.   The Hampton Inn (NDH Atlanta) Defendants actions in violation of 18
U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

513.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

514.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

515.   The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

### COUNT TWENTY-THREE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

516.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

517.   Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

518.   The Hampton Inn (NDH Atlanta) Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the

Hampton Inn (NDH Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

519. The Hampton Inn (NDH Atlanta) Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

520. The Hampton Inn (NDH Atlanta) Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue

for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

521.   The Hampton Inn (NDH Atlanta) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

522.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

523.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

524.   The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY-FOUR
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

525.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

526.   Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of the Hampton Inn (NDH Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Hampton Inn (NDH Atlanta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

527.  Jane Doe 1 also brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of the Hampton Inn (NDH Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

528.  The Hampton Inn (NDH Atlanta) Defendants benefitted financially or by receiving something of value from their participation in this venture from

renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Hampton Inn (NDH Atlanta).

529.  This venture, in which the Hampton Inn (NDH Atlanta) Defendants participated, was in or affecting interstate commerce.

530.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

531.  The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

532.  The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act
### (Allegations Common to Counts 25 - 38)

533.  Each Defendant acquired or maintained, directly or indirectly, an interest in money through a pattern of racketeering activity.

### A.    Acts of Racketeering Activity

#### i.    Sex Trafficking in Violation of Federal Law

534.  As set forth in the Counts above, Defendants have each violated 18 U.S.C. § 1591 by participating in the sex trafficking of Jane Doe 1 and others. This constitutes racketeering activity.

#### ii.    Sex Trafficking in Violation of State Law

535.  Committing, attempting to commit, and soliciting, coercing, or intimidating another person to commit the crime of trafficking a person for sexual servitude in violation of Georgia law is racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vi); O.C.G.A. § 16-5-46.

536.  A person commits the offense of trafficking an individual for sexual servitude when that person knowingly:

a.    subjects an individual to or maintains an individual in sexual servitude;

      b.     recruits, entices, harbors, transports, provides, solicits, patronizes, or obtains by any means an individual for the purpose of sexual servitude; or

      c.     benefits financially or by receiving anything of value from the sexual servitude of another.

O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(B).

537.  "Sexual Servitude" means any sexually explicit conduct or performance involving sexually explicit conduct that is induced or obtained by coercion or deception and for which anything of value is directly or indirectly given, promised to, or received by any individual.  O.C.G.A § 16-5-46(a)(8)(A).

538.  As alleged above, Jane Doe 1 and other victims were subjected to and maintained in sexual servitude by Defendants, individually, as parties to the crime, and as co-conspirators, in violation of O.C.G.A. § 16-5-46(c)(1), when they were coerced into performing or conducting sexually explicit conduct for which something of value, directly or indirectly, was given, promised to, or received by someone.

539.  Defendants also violated O.C.G.A. § 16-5-46(c)(2) by, individually, as parties to the crime, and as co-conspirators, harboring, recruiting, enticing, transporting, providing, soliciting, or patronizing Jane Doe 1 and other victims for the purpose of sexual servitude.

540. Defendants also violated O.C.G.A § 16-5-46(c)(3) by benefitting financially and by receiving things of value from the sexual servitude of Jane Doe 1 and other victims.

541. Specifically, as alleged above, Jane Doe 1 was <u>trafficked</u> for sexual servitude:

    a.    at the Red Roof (Smyrna) by the Red Roof (Smyrna) Defendants and various traffickers;

    b.    at the Red Roof (Atlanta) by the Red Roof (Atlanta) Defendants and various traffickers;

    c.    at the Suburban Extended Stay (Chamblee) by the Suburban Extended Stay Defendants and various traffickers;

    d.    at the La Quinta (Alpharetta) by the La Quinta Defendants and various traffickers;

    e.    at the Microtel (Atlanta) by the Microtel Defendants and various traffickers;

    f.    at the Ramada (Alpharetta) by the Ramada Defendants and various traffickers;

    g.    at the Americas Best (Atlanta) by the Americas Best Defendants and various traffickers; and

    h.    at the Hampton Inn (NDH Atlanta) by the Hampton Inn (NDH

        Atlanta) Defendants.

542.  Defendants' agents participated in violations of O.C.G.A. § 16-5-46, alleged above, while acting within the scope of their authority and on behalf of Defendants.  The conduct of Defendants' agents constituted a pattern of illegal activity that each Defendant or its agents knew or should have known was occurring.

    iii.   <u>False Imprisonment</u>

543.  Defendants, individually, as parties to the crime and as co-conspirators, also falsely imprisoned Jane Doe 1 and other victims by, as alleged above, confining and detaining them without legal authority, contrary to their will and in violation of their personal liberty, in violation of O.C.G.A. §16-5-41.  This constitutes racketeering activity.  O.C.G.A. §§ 16-14-3(5)(A)(vi).

544.  Specifically, as alleged above, Jane Doe 1 was falsely imprisoned:

    a.    at the Red Roof (Smyrna) by traffickers and the Red Roof

        (Smyrna) Defendants, acting individually, as parties to the crime,

        and as co-conspirators;

    b.    at the Red Roof (Atlanta) by traffickers and the Red Roof

        (Atlanta) Defendants, acting individually, as parties to the crime,

        and as co-conspirators;

    c.      at Suburban Extended Stay (Chamblee) by traffickers and the Suburban Extended Stay Defendants, acting individually, as parties to the crime, and as co-conspirators;

    d.      at the La Quinta (Alpharetta) by traffickers and the La Quinta Defendants, acting individually, as parties to the crime, and as co-conspirators;

    e.      at the Microtel (Atlanta) by traffickers and the Microtel Defendants, acting individually, as parties to the crime, and as co-conspirators;

    f.      at the Ramada (Alpharetta) by traffickers and the Ramada Defendants, acting individually, as parties to the crime, and as co-conspirators;

    g.      at the Americas Best (Atlanta) by traffickers and the Americas Best Defendants, acting individually, as parties to the crime, and as co-conspirators; and

    h.      at the Hampton Inn (NDH Atlanta) by traffickers and the Hampton Inn (NDH Atlanta) Defendants, acting individually, as parties to the crime, and as co-conspirators.

    iv.    <u>Battery</u>

545.   Traffickers at Defendants' hotels regularly committed the offense of battery, intentionally causing visible bodily harm to their victims, including Jane Doe 1, in violation of O.C.G.A. § 16-5-23.1.  This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(v).  Defendants engaged in this racketeering activity as parties to the crime and co-conspirators by alerting traffickers to victims' efforts to escape, refusing to report batteries committed by traffickers to law enforcement, and permitting traffickers to remain in their hotels, continue trafficking their victims, and committing further acts of battery.

v.      Keeping a Place of Prostitution

546.   While Jane Doe 1 and other victims were confined and detained against their will as alleged above, they were prostituted by being forced to perform sexual acts in exchange for money or other items of value.

547.   Defendants kept a place of prostitution by, acting individually, as parties to the crime, and as co-conspirators, while having and exercising control over the use of a place which offered seclusion and shelter for the practice of prostitution, knowingly granting and permitting the use of that location for the purpose of prostitution, in violation of O.C.G.A. § 16-6-10. This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

548.   Specifically,

a.   While the Red Roof (Smyrna) Defendants had control over the use of the Red Roof (Smyrna), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

b.   While the Red Roof (Atlanta) Defendants had control over the use of the Red Roof (Atlanta), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

c.   While the Suburban Extended Stay Defendants had control over the use of the Suburban Extended Stay (Chamblee), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

d.   While the La Quinta Defendants had control over the use of the La Quinta (Alpharetta), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

e.   While the Microtel Defendants had control over the use of the Microtel (Atlanta), a place which offered seclusion or shelter for

the practice of prostitution, they knowingly granted and

permitted its use for the purpose of prostitution;

f.    While the Ramada Defendants had control over the use of the

Ramada (Alpharetta), a place which offered seclusion or shelter

for the practice of prostitution, they knowingly granted and

permitted its use for the purpose of prostitution;

g.    While the Americas Best Defendants had control over the use of

the Americas Best (Atlanta), a place which offered seclusion or

shelter for the practice of prostitution, they knowingly granted

and permitted its use for the purpose of prostitution; and

h.    While the Hampton Inn (NDH Atlanta) Defendants had control

over the use of the Hampton Inn (NDH Atlanta), a place which

offered seclusion or shelter for the practice of prostitution, they

knowingly granted and permitted its use for the purpose of

prostitution.

vi.    <u>Pimping</u>

549.  Defendants engaged in pimping when, individually, as parties to the

crime, and as co-conspirators, they knowingly aided and abetted others in the

commission of prostitution in violation of O.C.G.A. § 16-6-11(5).  This

constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

1824208.1

vii. <u>Pandering</u>

550. Defendants engaged in pandering, when, individually, as parties to the crime, and as co-conspirators, they knowingly assembled Jane Doe 1 and other victims at a fixed place for the purpose of being solicited by others to perform an act of prostitution in violation of O.C.G.A. § 16-6-12. This constitutes racketeering activity. O.C.G.A. § 16-14-3(5)(A)(vii).

551. Specifically,

  a.  Knowing that persons were being assembled at the Red Roof (Smyrna) to perform sexual acts for money or other items of value, the Red Roof (Smyrna) Defendants aided and abetted the commission of those acts;

  b.  Knowing that persons were being assembled at the Red Roof (Atlanta) to perform sexual acts for money or other items of value, the Red Roof (Atlanta) Defendants aided and abetted the commission of those acts;

  c.  Knowing that persons were being assembled at the Suburban Extended Stay (Chamblee) to perform sexual acts for money or other items of value, the Suburban Extended Stay Defendants aided and abetted the commission of those acts;

d.  Knowing that persons were being assembled at the La Quinta
(Alpharetta) to  perform sexual acts for money or other items of
value, the La Quinta Defendants aided and abetted the
commission of those acts;

e.  Knowing that persons were being assembled at the Microtel
(Atlanta) to  perform sexual acts for money or other items of
value, the Microtel Defendants aided and abetted the commission
of those acts;

f.  Knowing that persons were being assembled at the Ramada
(Alpharetta) to  perform sexual acts for money or other items of
value, the Ramada Defendants aided and abetted the commission
of those acts;

g.  Knowing that persons were being assembled at the Americas
Best (Atlanta) to perform sexual acts for money or other items of
value, the Americas Best Defendants aided and abetted the
commission of those acts; and

h.  Knowing that persons were being assembled at the Hampton Inn
(NDH Atlanta) to perform sexual acts for money or other items of
value, the Hampton Inn (NDH Atlanta) Defendants aided and
abetted the commission of those acts.

1824208.1

552.   The conduct in violation of the Georgia RICO Act in which each Defendant participated by committing an act of racketeering activity or an overt act continued to within five years of the filing of this action.

### B.     The Acts of Racketeering Activity Formed a Pattern

553.   Each of the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

554.   The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

555.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

556.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar results, in that they obtained money or facilitated the obtaining of money, directly or indirectly, through a pattern of racketeering activity.

1824208.1

557.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar accomplices, including but not limited to sex traffickers, hotels, hotel management, and hotel chain management.

558.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar victims, including but not limited to Jane Doe 1 and other victims who were forced to engage in sexual acts in exchange for money at Defendants' hotels, were falsely imprisoned at those hotels and were the victim of other acts of racketeering activity committed at those hotels.

559.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar methods of commission, including but not limited to harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

560.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada,

Americas Best, and Hampton Inn (NDH Atlanta) Defendants were further interrelated by distinguishing characteristics, including but not limited to:

    a.   warning sex traffickers when law enforcement was present or making inquiries; and

    b.   allowing and assisting traffickers to force persons to perform sex acts in exchange for money on a repeated and ongoing basis.

**COUNT TWENTY-FIVE**
**Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)**
**(Against Red Roof (Smyrna) Defendants)**

561.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-124, 70-106, 107-156, 333-357, and 533-560 above as if fully set forth herein.

562.  The Red Roof (Smyrna) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

563.  The Red Roof (Smyrna) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Red Roof (Smyrna) Sex Trafficking Conspiracy").

1824208.1

564.   Each of the Red Roof (Smyrna) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

565.   Each of the Red Roof (Smyrna) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Red Roof (Smyrna) Sex Trafficking Conspiracy, including those alleged above.

566.   The acts committed by the participants in the Red Roof (Smyrna) Sex Trafficking Conspiracy number in the thousands.

567.   Upon information and belief, the Red Roof (Smyrna) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

568.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants violations of Georgia RICO.

569.   The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

570.   The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire

want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT TWENTY-SIX
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a)
### (Against Red Roof (Smyrna) Defendants)

571.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-124, 70-106, 107-156, 333-357, and 533-560 above as if fully set forth herein.

572.   As set forth above in paragraphs 533-560, the Red Roof (Smyrna) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

573.   The conduct in violation of the Georgia RICO Act in which the Red Roof (Smyrna) Defendants participated continued to within five years of the filing of this action.

574.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants violations of Georgia RICO.

575.   The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

576.   The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT TWENTY-SEVEN
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Red Roof (Atlanta) Defendants)

577.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, 358-382, and 533-560 above as if fully set forth herein.

1824208.1

578. The Red Roof (Atlanta) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

579. The Red Roof (Atlanta) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Red Roof (Atlanta) Sex Trafficking Conspiracy").

580. Each of the Red Roof (Atlanta) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

581. Each of the Red Roof (Atlanta) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Red Roof (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

582. The acts committed by the participants in the Red Roof (Atlanta) Sex Trafficking Conspiracy number in the thousands.

583. Upon information and belief, the Red Roof (Atlanta) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

584.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants violations of Georgia RICO.

585.   The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

586.   The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT TWENTY-EIGHT
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Red Roof (Atlanta) Defendants)

587.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, 358-382, and 533-560 above as if fully set forth herein.

1824208.1

588.  As set forth above in paragraphs 533-560, the Red Roof (Atlanta) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

589.  The conduct in violation of the Georgia RICO Act in which the Red Roof (Atlanta) Defendants participated continued to within five years of the filing of this action.

590.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants violations of Georgia RICO.

591.  The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

592.  The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

593.   Because the Red Roof (Atlanta) Defendants acted with the specific

intent to cause harm, there is no limitation regarding the amount that may

be awarded as punitive damages.

## COUNT TWENTY-NINE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Suburban Extended Stay Defendants)

594.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 28-32, 70-106, 172-198, 383-407, and 533-560 above as if

fully set forth herein.

595.   The Suburban Extended Stay Defendants violated O.C.G.A. § 16-14-

4(c) by conspiring to acquire money through a pattern of racketeering activity

in violation of O.C.G.A § 16-14-4(a).

596.   The Suburban Extended Stay Defendants knowingly and willfully

joined a conspiracy which contained a common plan or purpose to commit two

or more acts of racketeering activity, through which an interest in and control

of money would be acquired and maintained, either directly or indirectly (the

"Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy").

597.   Each of the Suburban Extended Stay Defendants also individually

violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a)

by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

598.  Each of the Suburban Extended Stay Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy, including those alleged above.

599.  The acts committed by the participants in the Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy number in the thousands.

600.  Upon information and belief, the Suburban Extended Stay Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

601.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants violations of Georgia RICO.

602.  The Suburban Extended Stay Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

603.  The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious

indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Suburban Extended Stay Defendants)

604.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, 383-407, and 533-560 above as if fully set forth herein.

605.  As set forth above in paragraphs 533-560 the Suburban Extended Stay Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

606.  The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants participated continued to within five years of the filing of this action.

607.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants violations of Georgia RICO.

608.   The Suburban Extended Stay Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

609.   The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

610.   Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-ONE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against La Quinta Defendants)

611.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, 408-432, and 533-560 above as if fully set forth herein.

1824208.1

612.   The La Quinta Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

613.   The La Quinta Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "La Quinta (Alpharetta) Sex Trafficking Conspiracy").

614.   Each of the La Quinta Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

615.   Each of the La Quinta Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the La Quinta (Alpharetta) Sex Trafficking Conspiracy, including those alleged above.

616.   The acts committed by the participants in the La Quinta (Alpharetta) Sex Trafficking Conspiracy number in the thousands.

617.   Upon information and belief, the La Quinta Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

618.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants violations of Georgia RICO.

619.   The La Quinta Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

620.   The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-TWO
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against La Quinta Defendants)

621.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, 408-432, and 533-560 above as if fully set forth herein.

1824208.1

622.  As set forth above in paragraphs 533-560 the La Quinta Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

623.  The conduct in violation of the Georgia RICO Act in which the La Quinta Defendants participated continued to within five years of the filing of this action.

624.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants violations of Georgia RICO.

625.  The La Quinta Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

626.  The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

627.  Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

1824208.1

## COUNT THIRTY-THREE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Microtel Defendants)

628.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-226, 433-457, and 533-560 above as if fully set forth herein.

629.   The Microtel Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

630.   The Microtel Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Microtel (Atlanta) Sex Trafficking Conspiracy").

631.   Each of the Microtel Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

632.   Each of the Microtel Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Microtel (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

633.   The acts committed by the participants in the Microtel (Atlanta) Sex Trafficking Conspiracy number in the thousands.

634.   Upon information and belief, the Microtel Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

635.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants violations of Georgia RICO.

636.   The Microtel Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

637.   The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-FOUR
## Georgia Racketeer Influenced and Corrupt Organizations Act
## O.C.G.A. § 16-14-4(a)
## (Against Microtel Defendants)

638.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-226, 433-457, and 533-560 above as if fully set forth herein.

639.   As set forth above in paragraphs 533-560, the Microtel Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

640.   The conduct in violation of the Georgia RICO Act in which the Microtel Defendants participated continued to within five years of the filing of this action.

641.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants violations of Georgia RICO.

642.   The Microtel Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

643.   The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

644.   Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-FIVE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Ramada Defendants)

645.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 227-249, 458-482, and 533-560 above as if fully set forth herein.

646.   The Ramada Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

1824208.1

647. The Ramada Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Ramada (Alpharetta) Sex Trafficking Conspiracy").

648. Each of the Ramada Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

649. Each of the Ramada Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Ramada (Alpharetta) Sex Trafficking Conspiracy, including those alleged above.

650. The acts committed by the participants in the Ramada (Alpharetta) Sex Trafficking Conspiracy number in the thousands.

651. Upon information and belief, the Ramada Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

652. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants violations of Georgia RICO.

653. The Ramada Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

654. The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-SIX
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Ramada Defendants)

655. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 227-249, 458-482, and 533-560 above as if fully set forth herein.

656. As set forth above in paragraphs 533-560, the Ramada Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

1824208.1

657.   The conduct in violation of the Georgia RICO Act in which the Ramada Defendants participated continued to within five years of the filing of this action.

658.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants violations of Georgia RICO.

659.   The Ramada Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

660.   The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

661.   Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-SEVEN
## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Americas Best Defendants)

662.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, 483-507, and 533-560 above as if fully set forth herein.

663.   The Americas Best Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

664.   The Americas Best Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Americas Best (Atlanta) Sex Trafficking Conspiracy").

665.   Each of the Americas Best Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

666.   Each of the Americas Best Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the

Americas Best (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

667. The acts committed by the participants in the Americas Best (Atlanta) Sex Trafficking Conspiracy number in the thousands.

668. Upon information and belief, the Americas Best Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

669. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants violations of Georgia RICO.

670. The Americas Best Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

671. The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

1824208.1

193

# COUNT THIRTY-EIGHT
## Georgia Racketeer Influenced and Corrupt Organizations Act
## O.C.G.A. § 16-14-4(a)
## (Against Americas Best Defendants)

672.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, 483-507, and 533-560 above as if fully set forth herein.

673.   As set forth above in paragraphs 533-560, the Americas Best Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

674.   The conduct in violation of the Georgia RICO Act in which the Americas Best Defendants participated continued to within five years of the filing of this action.

675.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants violations of Georgia RICO.

676.   The Americas Best Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

677.   The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

678.   Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-NINE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Hampton Inn (NDH Atlanta) Defendants)

679.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, 307-326, and 508-560 above as if fully set forth herein.

680.   The Hampton Inn (NDH Atlanta) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

681.   The Hampton Inn (NDH Atlanta) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control

of money would be acquired and maintained, either directly or indirectly (the "Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy").

682.  Each of the Hampton Inn (NDH Atlanta) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

683.  Each of the Hampton Inn (NDH Atlanta) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy, including those alleged above.

684.  The acts committed by the participants in the Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy number in the thousands.

685.  Upon information and belief, the Hampton Inn (NDH Atlanta) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

686.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants violations of Georgia RICO.

687.  The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

1824208.1

688.   The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

689.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, 307-326, and 508-560 above as if fully set forth herein.

690.   As set forth above in paragraphs 533-560 the Hampton Inn (NDH Atlanta) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

1824208.1

691.   The conduct in violation of the Georgia RICO Act in which the Hampton Inn (NDH Atlanta) Defendants participated continued to within five years of the filing of this action.

692.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants violations of Georgia RICO.

693.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

694.   The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

695.   Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-ONE
### Negligence
### (Against Red Roof (Smyrna) Defendants)

696.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24 and 70-106 above as if fully set forth herein.

697.   At all relevant times to this cause of action the Red Roof (Smyrna) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Red Roof (Smyrna).

698.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants supervisory control over the Red Roof (Smyrna).

699.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had supervisory control and authority over employees, contractors and others at the Red Roof (Smyrna).

700.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Red Roof (Smyrna).

701.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Smyrna).

1824208.1

199

702.  At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Red Roof (Smyrna).

703.  At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Smyrna).

704.  At all relevant times, the Red Roof (Smyrna) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Red Roof (Smyrna) safe from unlawful acts on the premises.

705.  The Red Roof (Smyrna) Defendants negligently failed to keep the Red Roof (Smyrna) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, Red Roof (Smyrna) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the the Red Roof (Smyrna), including Jane Doe 1.

706.  As a direct and proximate result of the actions and/or inactions of Red Roof (Smyrna) Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

707.  The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

708.  Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-TWO
### Negligence
### (Against Red Roof (Atlanta) Defendants)

709.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, and 157-171 above as if fully set forth herein.

710.  At all relevant times to this cause of action the Red Roof (Atlanta) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Red Roof (Atlanta).

711.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants supervisory control over the Red Roof (Atlanta).

712.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had supervisory control and authority over employees, contractors and others at the Red Roof (Atlanta).

713.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Red Roof (Atlanta).

714.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Atlanta).

715.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Red Roof (Atlanta).

716.  At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants did, in fact, exercise their authority and discretion regarding

whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Atlanta).

717.  At all relevant times, the Red Roof (Atlanta) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Red Roof (Atlanta) safe from unlawful acts on the premises.

718.  The Red Roof (Atlanta) Defendants negligently failed to keep the Red Roof (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, Red Roof (Atlanta) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the the Red Roof (Atlanta), including Jane Doe 1.

719.  As a direct and proximate result of the actions and/or inactions of Red Roof (Atlanta) Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

720.  The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to

consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

721. Because the Red Roof (Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT FORTY-THREE
### Negligence
### (Against Suburban Extended Stay Defendants)

722. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, and 172-198 above as if fully set forth herein.

723. At all relevant times to this cause of action the Suburban Extended Stay Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Suburban Extended Stay (Chamblee).

724. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had supervisory control over Suburban Extended Stay (Chamblee).

725. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had supervisory control and authority over employees, contractors and others at Suburban Extended Stay (Chamblee).

726. At all relevant times to this cause of action, the Suburban Extended Stay Defendants were aware of, and had reasonable opportunity to be aware

of, the frequency and types of criminal activity occurring at Suburban Extended Stay (Chamblee).

727. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Suburban Extended Stay (Chamblee).

728. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to Suburban Extended Stay (Chamblee).

729. At all relevant times to this cause of action, the Suburban Extended Stay Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Suburban Extended Stay (Chamblee).

730. At all relevant times, the Suburban Extended Stay Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep Suburban Extended Stay (Chamblee) safe from unlawful acts on the premises.

731. The Suburban Extended Stay Defendants negligently failed to keep Suburban Extended Stay (Chamblee) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in

breach of their duty of care. By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Suburban Extended Stay Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Suburban Extended Stay (Chamblee), including Jane Doe 1.

732. As a direct and proximate result of the actions and/or inactions of the Suburban Extended Stay Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

733. The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

734. Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

1824208.1

## COUNT FORTY-FOUR
### Negligence
### (Against Microtel Defendants)

735.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 33-42, 70-106, and 199-226 above as if fully set forth herein.

736.   At all relevant times to this cause of action the Microtel Defendants

owned and/or managed and/or operated and/or oversaw and/or controlled the

operation of the Microtel (Atlanta).

737.   At all relevant times to this cause of action, the Microtel Defendants

had supervisory control over the Microtel (Atlanta).

738.   At all relevant times to this cause of action, the Microtel Defendants

had supervisory control and authority over employees, contractors and others

at the Microtel (Atlanta).

739.   At all relevant times to this cause of action, the Microtel Defendants

were aware of, and had reasonable opportunity to be aware of, the frequency

and types of criminal activity occurring at the Microtel (Atlanta).

740.   At all relevant times to this cause of action, the Microtel Defendants

had authority and discretion regarding whether and how to take certain

measures to provide for the safety and security of invitees at the Microtel

(Atlanta).

741.   At all relevant times to this cause of action, the Microtel Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Microtel (Atlanta).

742.   At all relevant times to this cause of action, the Microtel Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Microtel (Atlanta).

743.   At all relevant times, the Microtel Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Microtel (Atlanta) safe from unlawful acts on the premises.

744.   The Microtel Defendants negligently failed to keep the Microtel (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Microtel Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Microtel (Atlanta), including Jane Doe 1.

745.   As a direct and proximate result of the actions and/or inactions of the Microtel Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

746.   The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

747.   Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-FIVE
### Negligence
### (Against the Ramada Defendants)

748.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, and 227-249 above as if fully set forth herein.

749.   At all relevant times to this cause of action, the Ramada Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Ramada (Alpharetta).

1824208.1

750.   At all relevant times to this cause of action, the Ramada Defendants had supervisory control over the Ramada (Alpharetta).

751.   At all relevant times to this cause of action, the Ramada Defendants had supervisory control and authority over employees, contractors and others at the Ramada (Alpharetta).

752.   At all relevant times to this cause of action, the Ramada Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Ramada (Alpharetta).

753.   At all relevant times to this cause of action, the Ramada Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Ramada (Alpharetta).

754.   At all relevant times to this cause of action, the Ramada Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Ramada (Alpharetta).

755.   At all relevant times to this cause of action, the Ramada Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Ramada (Alpharetta).

1824208.1

756.   At all relevant times, the Ramada Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Ramada (Alpharetta) safe from unlawful acts on the premises.

757.   The Ramada Defendants negligently failed to keep the Ramada (Alpharetta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Ramada Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Ramada (Alpharetta), including Jane Doe 1.

758.   As a direct and proximate result of the actions and/or inactions of the Ramada Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

759.   The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

760. Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-SIX
### Negligence
### (Against the Americas Best Defendants)

761. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, and 269-306 above as if fully set forth herein.

762. At all relevant times to this cause of action the Americas Best Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Americas Best (Atlanta).

763. At all relevant times to this cause of action, the Americas Best Defendants had supervisory control over the Americas Best (Atlanta).

764. At all relevant times to this cause of action, the Americas Best Defendants had supervisory control and authority over employees, contractors and others at the Americas Best (Atlanta).

765. At all relevant times to this cause of action, the Americas Best Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Americas Best (Atlanta).

1824208.1

766.   At all relevant times to this cause of action, the Americas Best Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Americas Best (Atlanta).

767.   At all relevant times to this cause of action, the Americas Best Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Americas Best (Atlanta).

768.   At all relevant times to this cause of action, the Americas Best Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Americas Best (Atlanta).

769.   At all relevant times, the Americas Best Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Americas Best (Atlanta) safe from unlawful acts on the premises.

770.   The Americas Best Defendants negligently failed to keep the Americas Best (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Americas Best

Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Americas Best (Atlanta), including Jane Doe 1.

771.   As a direct and proximate result of the actions and/or inactions of the Americas Best Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

772.   The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

773.   Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT FORTY-SEVEN
### Negligence
### (Against the Hampton Inn (NDH Atlanta) Defendants)

774.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-69, 70-106, and 307-326 above as if fully set forth herein.

1824208.1

775. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Hampton Inn (NDH Atlanta).

776. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had supervisory control over Hampton Inn (NDH Atlanta).

777. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had supervisory control and authority over employees, contractors and others at Hampton Inn (NDH Atlanta).

778. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at Hampton Inn (NDH Atlanta).

779. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Hampton Inn (NDH Atlanta).

780. At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had authority and discretion regarding whether and

how to direct others to take certain measures to provide for the safety and security of invitees to Hampton Inn (NDH Atlanta).

781.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Hampton Inn (NDH Atlanta).

782.   At all relevant times, the Hampton Inn (NDH Atlanta) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep Hampton Inn (NDH Atlanta) safe from unlawful acts on the premises.

783.   The Hampton Inn (NDH Atlanta) Defendants negligently failed to keep Hampton Inn (NDH Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Hampton Inn (NDH Atlanta) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Hampton Inn (NDH Atlanta), including Jane Doe 1.

784.   As a direct and proximate result of the actions and/or inactions of the Hampton Inn (NDH Atlanta) Defendants, Jane Doe 1 suffered substantial

physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

785. The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

786. Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-EIGHT
### Negligence
### (Against the La Quinta Defendants)

787. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, and 250-268 above as if fully set forth herein.

788. At all relevant times to this cause of action the La Quinta Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the La Quinta (Alpharetta).

789. At all relevant times to this cause of action, the La Quinta Defendants had supervisory control over the La Quinta (Alpharetta).

790.   At all relevant times to this cause of action, the La Quinta Defendants had supervisory control and authority over employees, contractors and others at the La Quinta (Alpharetta).

791.   At all relevant times to this cause of action, the La Quinta Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the La Quinta (Alpharetta).

792.   At all relevant times to this cause of action, the La Quinta Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the La Quinta (Alpharetta).

793.   At all relevant times to this cause of action the La Quinta Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the La Quinta (Alpharetta).

794.   At all relevant times to this cause of action the La Quinta Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the La Quinta (Alpharetta).

795.   At all relevant times, the La Quinta Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the La Quinta (Alpharetta) safe from unlawful acts on the premises.

796.   The La Quinta Defendants negligently failed to keep the La Quinta (Alpharetta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the La Quinta Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the La Quinta (Alpharetta), including Jane Doe 1.

797.   As a direct and proximate result of the actions and/or inactions of the La Quinta Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

798.   The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

799. Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for judgment as follows:

A.   That the Court award Plaintiffs damages on all counts in an amount to be proven at trial;

B.   That Plaintiffs recover punitive damages pursuant to federal common law and O.C.G.A. § 51-12-5.1;

C.   That Plaintiffs recover three times their actual damages pursuant to O.C.G.A. § 16-14-6(c);

D.   That Plaintiffs recover their reasonable attorneys' fees pursuant to 18 U.S.C. § 1595(a) and O.C.G.A. § 16-14-6(c), as well as the costs of investigation and litigation pursuant to O.C.G.A. § 16-14-6(c); and

E.   That this Court award Plaintiffs such other and further relief as may be just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted this 21st day of November, 2019.

*/s/ John E. Floyd*

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA  30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile

Attorneys for Plaintiff Jane Doe 1

1824208.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2019, the foregoing AMENDED

COMPLAINT was filed with the Clerk of Court using the EM/ECF system

which will send e-mail notification to all counsel of record.

This 21st day of November, 2019.

*/s/ John E. Floyd*
John E. Floyd
Georgia Bar No. 266413

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA  30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile