# Exhibit "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ATAIN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION FILE NO.: |
| v. | ) ) | _____ |
| VARAHI HOTEL, LLC, and Jane Doe 1, | ) ) ) | |
| Defendants. | ) ) | |

## ATAIN SPECIALTY INSURANCE COMPANY'S
## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Atain Specialty Insurance Company ("Atain") hereby files its Complaint for Declaratory Judgment against Varahi Hotel, LLC and Jane Doe 1 stating as follows:

## NATURE OF THE ACTION

1.  This is an insurance coverage action in which Atain seeks declaratory judgment under 28 U.S.C. § 2201 that it does not have an obligation to defend and/or indemnify Varahi Hotel, LLC for any liability arising out of a lawsuit filed by Jane Doe 1 alleging sex trafficking and forced labor occurring at its hotel from

2009 to 2016 (the "Underlying Lawsuit").[1]  A true and correct copy of Jane Doe 1's Complaint is attached as Exhibit A[2].

## THE PARTIES & JURISDICTION

2.     Atain is a Michigan corporation with its principal place of business in Farmington Hills, Michigan.  Atain is a citizen of Michigan.

3.      Varahi Hotel, LLC ("Varahi") is a Georgia limited liability company with a principal office address of 2200 Corporate Plaza, Smyrna, Georgia, 30080. Varahi may be served through its registered agent, Bharat Patel, at 2200 Corporate Plaza, Smyrna, Georgia, 30080.   All of Varahi's members are residents and citizens of the state of Georgia.

3.      Jane Doe 1 is the Plaintiff in the Underlying Lawsuit proceeding pseudonymously and is a citizen of the State of Georgia.

4.     This Court has personal jurisdiction over the Defendants by virtue of their sufficient minimum contacts with the forum.

---

[1] The Underlying Lawsuit is styled as *Jane Doe 1 v. Red Roof Inns, Inc.; Varahi Hotel, LLC; FMW RRI NC, LLC; Westmont Hospitality Group, Inc.; WHG SU Atlanta LP; Sub-SU Hotel GP, LLC; Choice Hotels International, Inc.; LQ Properties, LLC, CPLG Properties, LLC; BRE/LQ Properties, LLC; La Quinta Worldwide, LLC; Extended Stay America, Inc.; ESA Management, LLC; ESA P Portfolio, LLC; ESA P Portfolio Operating Lessee, LLC; John Does 1-10*, Case 1:19-cv-03840-WMR, in the United States District Court for the Northern District of Georgia, Atlanta Division.

[2] The Complaint is attached as Exhibit A without the original accompanying exhibits due to size.

2

5.     Complete diversity of citizenship exists because Atain is a Michigan citizen and Varahi's members and Jane Doe 1 are Georgia citizens.

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Georgia, including the Underlying Lawsuit, and, the Defendants are subject to the Court's personal jurisdiction in the Northern District of Georgia.

8.     This action is brought pursuant to 28 U.S.C. § 2201 and seeks declaratory relief as to Atain's obligations owed to Varahi with respect to the Underlying Lawsuit under Atain's Policy issued to Global Management & Investment Corporation ("Global Management").  Varahi has sought coverage under Global Management's Policy.  Atain is uncertain as to its duties, rights, and obligations and files this declaratory judgment action to resolve questions of coverage under the insurance policy, including its duty to defend and/or indemnify Varahi.  Jane Doe 1 was named as a defendant to ensure Atain complete relief.  An

actual and justiciable dispute over those duties, rights, and obligations exists between the parties.

## ATAIN'S INSURANCE POLICY

9.      Atain incorporates by reference the allegations contained in Paragraphs 1 through 8, as if more fully set forth herein at length.

10.     Atain issued Commercial General Liability Policy No. CIP250491 to Global Management for the policy period April 1, 2015 to December 6, 2015 providing certain coverage subject to the Policy's terms, conditions, and exclusions (the "Policy"). The Policy provides a $1 million dollar per occurrence limit. A true and correct copy of the Policy is attached as Exhibit B.

11.     The Policy's Declarations page names Global Management as the only Named Insured on the Policy. Ex. B, Policy, UNLPF-D-1 (11-04). The Policy's Additional Insured Endorsement names "ALL PERSONS OR ORGANIZATIONS AS REQUIRED BY WRITTEN CONTRACT WITH THE INSURED" as additional insureds. Ex. B, Policy, AF 000 859 (07/2012). No written contract or agreement exists between Global Management and Varahi.

12.     The Policy's insuring agreement states:

4

## SECTION I – COVERAGES
## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.      **Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        **(1)**    The amount we will pay for damages is limited as described in Section **III** – Limits of Insurance; and

        **(2)**    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

* * *

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        **(1)**    The "bodily injury" or property damage" is caused by an "occurrence" that takes place in the coverage territory";

        **(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)**    Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew

5

that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Ex. "B", Policy, CG 00 01 04 13, p. 1 of 16.

13. The Policy defines "occurrence" as follows:

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Ex. "B", Policy, CG 00 01 04 13, p. 15 of 16.

14. Additionally, the Policy's Physical-Sexual Abuse Exclusion provides:

**VII. PHYSICAL-SEXUAL ABUSE EXCLUSION**

This insurance does not apply to any "occurrence," suit, liability claim, demand or causes of action arising out of or resulting from the physical abuse, sexual abuse or licentious, immoral or sexual behavior, whether or not intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, or omission by:

a. The insured or the insured's employees;
b. Patrons of the insured's business;
c. Agents of the insured;
d. "Volunteer workers;"
e. Subcontractor or employee of any subcontractor;
f. "Independent contractor" or employee of any "independent contractor;" or

6

    g.    "Leased worker."

For the purposes of this endorsement:

    1.    ***"Independent contractor" means*** one that contracts to do work or perform a service for another and that retains control over the means or methods used in doing the work or preforming the service. "Independent contractor" includes, but is not limited to, subcontractors and any employees of a subcontractor, any employee of an independent contractor, any employees of the insured, agents, representatives, volunteers, spouses, family members or the insured or ***any Additional Insureds added to this policy.***

Ex. "B", Policy, AF000899 03-14 (emphasis supplied).

15.    The Policy's Medical Payments coverage form further provides:

    **2.**    **Exclusions**

We will not pay expenses for "bodily injury";

          * * *

    **c.**    **Injury On Normally Occupied Premises**
        To a person injured on that part of premises you own or rent that the person normally occupies.

Ex. B, Policy, CG 00 01 04 13, p. 8 of 16.

16.    The Policy also contains an Expected or Intended Injury Exclusion which provides:

    **2.**    **Exclusions**

This insurance does not apply to:

7

a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Ex. B, Policy, CG 00 01 04 13, p. 2 of 16.

17. The Policy's coverage for Personal and Advertising Injury contains the following relevant exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

\* \* \*

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured."

Ex. B, Policy, CG 00 01 04 13, p. 6 of 16.

18. The Policy defines "personal and advertising injury" as follows:

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

8

Ex. B, Policy, CG 00 01 04 13, p. 15 of 16.

19.    Finally, the Policy's Known Injury or Damage Exclusion Personal and

Advertising Injury states:

**Known Injury Or Damage**

This insurance does not apply to "personal and advertising injury" arising from an offense:

**a.**    That occurs during the policy period and, prior to the policy period, an insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, knew that the "personal and advertising injury" had occurred prior to the policy period, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "personal and advertising injury" occurred, then any continuation, change or resumption of such offense during or after the policy period will be deemed to have been known prior to the policy period; or

**b.**    That occurs during the policy period and was, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, includes continuation, change or resumption of that "personal and advertising injury" after the end of the policy period.

A personal and advertising injury arising from an offense will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim:

(1)    Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;
(2)    Receives a written of verbal demand or claim for damages because of the "personal and advertising injury"; or
(3)    ***Becomes aware by an other means that "personal and advertising injury" has occurred or has begun to occur***.

Ex. B, Policy, AF 000 873 (07/2012) (emphasis supplied).

## THE INCIDENT AND UNDERLYING LAWSUITS

20.    Atain incorporates by reference the allegations contained in Paragraphs 1 through 19, as if more fully set forth herein at length.

21.    Jane Doe 1 filed the Underlying Lawsuit against Varahi and numerous other defendants on August 26, 2019.  Ex. A, Complaint ¶¶ 21-44.

22.    In the Underlying Lawsuit, Jane Doe 1 contends that various hotel managers and owners, including Varahi, were involved in and/or benefited from sex-trafficking at their hotels (the "Incident").  *Id*. at ¶¶ 19-20.

23.    On November 21, 2019, Jane Doe 1 filed an Amended Complaint which names new party Defendants and includes new negligence claims against the Defendants (the "Amended Complaint").  A true and correct copy of the Amended Complaint as Exhibit C.

24.    The Amended Complaint implicates Bharatkumar R. Patel (identified as "Bob P") in his personal capacity as Varahi's manager.  *Id*. at ¶¶ 106-127.

10

25.     Specifically, the Amended Complaint alleges that "Bob P" self-identified as general manager at Red Roof Inn Atlanta – Smyrna/Ballpark. *Id*. at ¶ 132.

26.     "Bob P" is alleged to have read and responded to numerous online reviews of the Red Roof Inn that complained about prostitution at the hotel. *Id*. at ¶¶ 132-135.

27.     Jane Doe 1 therefore alleges that Varahi "knew or should have known about the online reviews and police incidents regarding rampant prostitution and related crime at the hotel." *Id*. at ¶ 135.

28.     Based on these allegations, Jane Doe 1 asserts claims for a violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Georgia Racketeer Influenced and Corrupt Practices Act ("RICO"), negligence, and joint and several liability against several defendants, including Varahi. *Id*. at ¶¶ 327-799.

## **THE RESERVATION OF RIGHTS**

29.     Based on the allegations in the Underlying Lawsuit, Atain doubted that coverage was available under the Policy for the Underlying Lawsuit.

30.     First, Varahi is not entitled to coverage because it is not a Named Insured nor Additional Insured under the Policy.

11

31.    Next, as the Incident alleges and seeks damages against Varahi arising out of numerous physical and sexual abuse, the Physical-Sexual Abuse exclusion and Criminal Acts exclusions bar coverage for the Underlying Lawsuit.

32.    Moreover, Jane Doe 1's Amended Complaint also alleges that Varahi's manager knew that she was being trafficked prior to Atain's Policy being effective.  Thus, Atain avers that the claims made in the Underlying Lawsuit do not fall within the Policy's insuring agreement (no "occurrence"), and/or the claims are barred by the Policy's Known Injury or Damage and/or intentional acts exclusions.

33.    Notwithstanding Atain's coverage position, Atain agreed to defend Varahi under a Reservation of Rights a letter dated December 13, 2019.  A true and correct copy of the December 13, 2019 letter is attached as Exhibit D.

34.    The Reservation of Rights letter expressly reserved the right to bring a declaratory judgment action to determine Atain's coverage obligations, and the right to seek reimbursement for the payment of expenses.  Ex. D, Reservation of Rights, pp. 2, 10.

35.    Atain now seeks a declaration concerning its obligations to defend Varahi and indemnify Varahi for the allegations in the Underlying Lawsuits.

## COUNT I – DECLARATORY RELIEF
## (NO DUTY TO DEFEND OR INDEMNIFY)

36.     Atain incorporates by reference the allegations contained in Paragraphs 1 through 35, as if more fully set forth herein at length.

37.     First, the Policy's Declarations page names Global Management as the only Named Insured on the Policy.  However, no written contract or agreement exists between Global Management and Varahi.  Therefore, Varahi is neither a Named Insured nor an Additional Insured on the Policy.

38.     Second, even if Varahi was an insured under the Policy, which it is not, the Policy's Physical-Sexual Abuse Exclusion unambiguously excludes coverage for any occurrence, suit, liability claim, demand, or causes of action arising out of or resulting from the physical abuse, sexual abuse or licentious, immoral or sexual behavior.

39.     Third, the Policy's Injury on Normally Occupied Premises explicitly excludes coverage for bodily injury to a person injured on any part of premises owned or rented by an insured.

40.     Fourth, the Policy only provides coverage for "bodily injury" cased by an "occurrence", and excludes coverage for any expected or intended from the standpoint of the insured.

13

41.    Fifth, the Policy's Knowing Violation of Rights of Another expressly bars coverage for injury caused with the knowledge that the act would violate the rights of another and would inflict personal injury.

42.    Sixth, the Policy's Criminal Acts exclusion removes coverage for personal injury arising out of a criminal act committed by or at the direction of any insured.

43.    Finally, the Policy's Known Injury or Damage Exclusion excludes coverage for bodily injury that the insured becomes aware has occurred or has begun to occur prior to the Policy's effective date.

44.    Atain therefore asks this Court to declare that it has no obligation to defend and/or indemnify Varahi for the Underlying Lawsuit.

## **PRAYER FOR RELIEF**

45.    WHEREFORE, Atain hereby respectfully requests this Court enter a judgment in its favor and against the Defendant:

     a)    Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as Varahi is neither a Named Insured nor an Additional Insured;

     b)    Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as

14

the Policy's Physical-Sexual Abuse Exclusion bars coverage;

c)   Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as the Policy's Injury on Normally Occupied Premises Exclusion bars coverage;

d)   Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as the allegations made against Varahi are not an "occurrence" and/or are barred by the Policy's Expected or Intended Injury Exclusion;

e)   Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as the Policy's Knowing Violation of Rights of Another Exclusion bars coverage;

f)   Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as the Policy's Criminal Acts Exclusion bars coverage;

g)   Declaring Atain has no obligation to defend and/or indemnify Varahi for any liability arising out of the claims or allegations raised in the Underlying Lawsuit as the Policy's Known Injury or Damage Exclusion bars coverage;

h)   Awarding Atain the costs it incurred in defending Varahi in the Underlying Lawsuit, even though it had no duty to defend;

15

     i)     Awarding Atain the costs incurred in bringing this declaratory judgment action; and

     j)     Atain respectfully requests such further relief as this Court may deem appropriate.

Dated this 13th day of April 2020.

**WOOD, SMITH, HENNING & BERMAN LLP**
1230 Peachtree Street, Suite 925
Atlanta, Georgia 30309
Telephone: 470-552-1152
Fax: 470-552-1151
rzelonka@wshblaw.com
slytle@wshblaw.com

*/s/ Richard E. Zelonka, Jr.*
Richard E. Zelonka, Jr.
Georgia Bar No. 142152

*Counsel for Plaintiff*
*Atain Specialty Insurance Company*

16

# Exhibit A

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

| | | |
|---|---|---|
| JANE DOE 1 | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 1:19-CV-3840 |
| RED ROOF INNS, INC.; VARAHI HOTEL, LLC; | ) | |
| FMW RRI NC, LLC; WESTMONT HOSPITALITY | ) | |
| GROUP, INC.; WHG SU ATLANTA LP; ET AL. | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    RED ROOF INNS, INC.
C/O Registered Agent for Service
Corporation Service Company,
40 Technology Parkway South, Suite 300
Norcross, Georgia, 30092

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Jonathan S. Tonge, Esq.
Andersen, Tate & Carr, P.C.
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia  30097
(770)822-0900; jtonge@atclawfirm.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JAMES N. HATTEN
*CLERK OF COURT*

Date:     08/26/2019                                    s/Beverly Gutting
                                                   *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:19-CV-3840

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:


  

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE 1, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. |
| RED ROOF INNS, INC.; VARAHI | * | |
| HOTEL, LLC; FMW RRI NC, LLC; | * | |
| WESTMONT HOSPITALITY | * | |
| GROUP, INC.; WHG SU | * | |
| ATLANTA LP; SUB-SU HOTEL GP, | * | |
| LLC; CHOICE HOTELS | * | |
| INTERNATIONAL, INC.; LQ | * | |
| PROPERTIES, LLC; CPLG | * | |
| PROPERTIES, LLC; BRE/LQ | * | |
| PROPERTIES, LLC; LA QUINTA | * | |
| WORLDWIDE, LLC; | * | |
| EXTENDED STAY AMERICA, | * | |
| INC.; ESA MANAGEMENT, | * | |
| LLC; ESA P PORTFOLIO, LLC; | * | |
| ESA P PORTFOLIO OPERATING | * | |
| LESSEE, LLC; JOHN DOES 1-10, | * | |
| | * | |
| Defendants. | * | |

## **COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff Jane Doe 1, by and through the undersigned

counsel, and files this, her Complaint for Damages against Defendants,

alleging as follows:

*"You may choose to look the other way, but you can never say again that you did not know."* — *William Wilberforce*[1]

## I.    INTRODUCTION

### 1.

Sex trafficking is the total dehumanization of a person for the profit and pleasure of others. It is an evil venture that requires the complicity of three groups to exist: buyers, sellers, and a venue.

### 2.

Without buyers, the sex trafficking venture ceases to exist. Without sellers, the sex trafficking venture ceases to exist. Without a venue, or crime scene, the sex trafficking venture ceases to exist.

### 3.

Defendants, for a fee, provided the crime scene, a private and anonymous venue at Defendants' hotels for buyers to obtain commercial sex

---

[1] In 2008, the Trafficking Victims Protection Act was renamed the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA") in honor of Wilberforce, "an English politician and social reformer whose campaign to suppress the slave trade led to the passage by Parliament of the Slavery Abolition Act of 1833, ending the institution of slavery in the British Empire." *Am. Civil Liberties Union of Massachusetts v. Sebelius*, 697 F. Supp. 2d 200, 201 n.3 (D. Mass. 2010).

2

acts from Plaintiff after the sellers had brutally beaten, tortured, raped, physically and mentally abused, exploited, psychologically tormented, coerced through controlled drug use, kidnapped, and falsely imprisoned her at Defendants' hotels. This is the transactional cycle that defines "hotel sex trafficking."

4.

Hotel sex trafficking is the most common sex trafficking venture, particularly in Atlanta.[2] Sellers pay the venue for a location, the crime scene, to offer up a human being for sale; buyers pay the sellers to use that human being for their pleasure; sellers pay the venue with the money from the buyers; and the cycle repeats.

5.

Defendants were knowingly complicit in the sex trafficking of Plaintiff. Defendants' agents, employees, and representatives did not just look the other way—though they did that, too—Defendants' agents, employees, and representatives were paid *for years* by Plaintiff's traffickers to act as lookouts, evade the police, and ensure that Plaintiff could not escape from Defendants' hotels.

---

[2] *See* paragraphs 49–56, supra, showing a majority of sex trafficking incidents studied occurred at or involved hotels.

3

6.

For that kind of repetitive, longstanding, endemic, and pervasive hotel sex trafficking venture to exist, the companies and people who benefit financially from the hotel or the venture must also be complicit.

7.

At the bottom of the venture, sex traffickers force a woman, man, or child to engage in commercial sex acts by violence, threats, fraud, or other coercion. For example, in this case sex acts were procured by violent and frequent beatings, psychological threats, abuse, torture, financial servitude, and tightly controlled drug use.

8.

Above the sex trafficker, hotel employees must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

9.

Above the hotel employees, hotel management must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

10.

Above hotel management, the hotel's owner must ignore, condone, facilitate, or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

11.

Above the hotel owner, a hotel brand must ignore, condone, facilitate or participate in the endemic sex trafficking ventures at the hotel, as Defendants did in this case.

12.

Any single person or entity above could have stopped the endemic hotel sex trafficking ventures that exploited Plaintiff, at least at Defendants' own hotels. But no one did.

13.

If the Defendant hotel brands instituted and required basic training and enforced a meaningful policy against sex trafficking, including pulling the brand from repeat problem hotels, sex trafficking would not have been pervasive at Defendants' hotels in this lawsuit.

14.

If the Defendant hotel owners supervised their managers, employees, agents, and properties, instituted and required basic training, and enforced a

meaningful policy against sex trafficking, sex trafficking would no longer be
pervasive at Defendants' hotels in this lawsuit.

15.

If the Defendants' hotel managers reasonably supervised their
employees and properties, reported conduct that was readily apparent or
actually known to the police, and enforced a meaningful policy against sex
trafficking, sex trafficking would no longer be pervasive at Defendants' hotels
in this lawsuit.

16.

If Defendants' hotel employees were properly trained and reported
conduct that was readily apparent or actually known to the police and
enforced a meaningful policy against sex trafficking, sex trafficking would no
longer be pervasive at Defendants' hotels in this lawsuit.

17.

Finally, and obviously, if Defendants' agents and employees did not
actively participate in sex trafficking, sex trafficking would not be pervasive
at Defendants' hotels in this lawsuit.

18.

The hotel sex trafficking of Plaintiff relied upon the near-total
alignment of every link in that chain to exist, particularly in the longstanding

and pervasive manner in which it existed while Plaintiff was trafficked at Defendants' hotels in this lawsuit.

19.

At every level, Defendants participated in the sex trafficking venture by renting the room, received a benefit from the room rental, developed and maintained business models that attracted and fostered sex trafficking, all while Defendants knew or should have known sex trafficking was occurring at their hotels. In fact, Defendants often willingly chose to ignore or participate in the sex trafficking of Plaintiff at their hotels, rather than do anything about it. The reason is simple: Defendants calculated it was more profitable to facilitate, or at best turn a blind eye to, rampant sex trafficking at their hotels, than to try and stop it.

20.

Plaintiff was trafficked from 2011–2016 at Defendants' hotels. She was trafficked by different traffickers, affiliated with each other, and with many other trafficking victims. Some of those victims have also filed cases against Defendants. Those victims, and others, are witnesses to the sex trafficking of Plaintiff at Defendants' hotels and the complicity of Defendants in that sex trafficking venture.

## II.   JURISDICTION, PARTIES, AND VENUE

21.

The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1367 because this action arises under 18 U.S.C. §§ 1589, 1591 and 1595(a).

22.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

23.

Plaintiff, having moved to proceed anonymously,[3] is a citizen of the United States of America and a resident of the State of Georgia.  She is a "victim" of sex trafficking within the meaning of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 22 U.S.C. § 7102(15), 18 U.S.C. § 1591(a), and is "victim" of a "severe form of trafficking." 22 U.S.C. § 7102(14).

---

[3] Contemporaneously with her complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the complaint, which are intimate and personal in nature, as well as for her own personal safety. That motion is pending. Jane Doe 1 will provide her identity to counsel for Defendants upon the resolution of that motion and agreement upon a protective order.

24.

At all times relevant to this Complaint, Defendants Varahi Hotel, LLC,

FMW RRI NC, LLC, Westmont Hospitality Group, Inc., Red Roof Inns, Inc.

and John Does Nos. 1-10 (collectively, the "Red Roof Defendants") owned,

managed, supervised, operated, oversaw, controlled the operation of, and

were inextricably connected to the renting of rooms at the Red Roof Inn

located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 ("Smyrna Red Roof

Inn"), from which they benefited financially.

25.

Varahi Hotel, LLC ("Varahi") owns, manages, supervises, operates, and

controls the Smyrna Red Roof Inn under the Red Roof Inn brand. Varahi is a

Georgia limited liability company with its principle place of business at 2200

Corporate Plaza, Smyrna, Georgia, 30080. Varahi may be served with service

of process by serving its registered agent Jaymen Chavda at 8800 Roswell

Road, Building C, Suite 230, Atlanta, Georgia, 30350.

- a) Varahi controls and oversees the training, policies, supervision,
  operation, management, security, and employees at the Smyrna
  Red Roof Inn.

- b) Varahi participated in Plaintiff's sex trafficking and knowingly
  benefitted by receiving money from Plaintiff's trafficker for

9

lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, Varahi participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

26.

FMW RRI NC, LLC ("FMW") owned, managed, supervised, operated, and controlled the Smyrna Red Roof Inn under the Red Roof Inn brand. FMW is a Delaware limited liability company with its principle place of business in Houston, Texas. FMW may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a) FMW controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn.

b) FMW participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for

the rental of hotel rooms in which Plaintiff was subsequently and
openly sold for sex as many as 20 times per day. Through these
and other actions, FMW participated in a venture it knew or
should have known engaged in the sex trafficking of Plaintiff.

27.

Westmont Hospitality Group, Inc. ("Westmont") owned, managed,
supervised, operated, and controlled the Smyrna Red Roof Inn under the Red
Roof Inn brand. Westmont also owns, manages, supervises, operates, and
controls HomeTown Studios,[4] f/k/a Suburban Extended Stay at 2050
Peachtree Industrial Court, Chamblee, Georgia, 30341 (the "Suburban
Extended Stay).[5] Westmont is a Texas corporation with its principle place of
business in Houston, Texas. Westmont may be served with service of process
by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th
Street, Suite 1300, Austin, Texas, 78701.

---

[4] The Suburban Extended Stay where Plaintiff was trafficked is currently a
HomeTown Studios hotel, a brand of Red Roof Inns, Inc. However, during the
time of Plaintiff's trafficking, the hotel was a Suburban Extended Stay, a
brand of Choice Hotels.

a)  Westmont owned, operated, managed, supervised, and controlled the Smyrna Red Roof Inn and the Suburban Extended Stay while Plaintiff was trafficked at both hotels.

b)  Westmont operates the hotels it has an ownership interest in, including the Smyrna Red Roof Inn and the Suburban Extended Stay. Westmont's business strategy is to align its ownership and management of its properties, with Westmont controlling the operation of the properties, including the Smyrna Red Roof Inn and the Suburban Extended Stay.[6]

c)  Westmont developed and implemented unique business models for both the Smyrna Red Roof Inn and the Suburban Extended Stay, in order "to ensure the best returns."[7]

d)  According to Westmont, "Westmont takes responsibility for overseeing the asset management of the hotels, including financial accounting, sales and marketing, IT and human resources."[8]

---

[6] *See* Westmont Hospitality Group website, Exhibit 1.
[7] *Id.*
[8] *Id.*

e)     Westmont controlled and oversaw the training, policies,
       supervision, operation, management, security, and employees at
       the Smyrna Red Roof Inn and the Suburban Extended Stay.

f)     Westmont participated in Plaintiff's sex trafficking and
       knowingly benefitted by receiving money from Plaintiff's
       trafficker for lookout work and other illegal services provided to
       Plaintiff's trafficker, and by receiving money from Plaintiff's
       trafficker for the rental of hotel rooms in which Plaintiff was
       subsequently and openly sold for sex as many as 20 times per
       day. Through these and other actions, Westmont participated in
       a venture it knew or should have known engaged in the sex
       trafficking of Plaintiff.

28.

Red Roof Inns, Inc. ("RRI") manages, supervises, operates, and controls
the Smyrna Red Roof Inn. RRI is a Delaware corporation with its principle
place of business in New Albany, Ohio. RRI may be served with service of
process by serving its registered agent Corporation Service Company at 40
Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a)     RRI controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the Smyrna Red Roof Inn.

b)     RRI maintains integral involvement in each of the franchise locations bearing the Red Roof Inn brand. In a recent article, RRI president Andrew Alexander noted, "Our relationship with our franchisees is as close as you can get." Alexander further stated in the article that franchisees have "direct access to him and other leaders at the company, something that's unheard of at larger franchising companies."[9]

c)     RRI participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these

---

[9] Exhibit 2, Judy Maxwell, *Asian American Hoteliers Raise the Red Roof*, Asian Hospitality, (Nov. 19, 2018), https://www.asianhospitality.com/asian-american-hoteliers-raise-the-red-roof/ (last visited Aug. 18, 2019).

and other actions, RRI participated in a venture it knew or

should have known engaged in the sex trafficking of Plaintiff.

29.

At all times relevant to this Complaint, Defendants WHG SU Atlanta

LP, SUB-SU Hotel GP, LLC, Westmont, Choice Hotels International, Inc.,

and John Does Nos. 1-10 (collectively, the "Suburban Extended Stay

Defendants") owned, managed, supervised, operated, oversaw, controlled the

operation of, and were inextricably connected to the renting of rooms at the

Suburban Extended Stay located at 2050 Peachtree Industrial Court,

Chamblee, Georgia, 30341, from which they benefited financially.

30.

WHG SU Atlanta LP ("WHG") owns, manages, supervises, operates,

and controls the Suburban Extended Stay. WHG is a Delaware limited

partnership with its principle place of business in Houston, Texas. WHG may

be served with service of process by serving its registered agent Capitol

Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth,

Georgia, 30096.

    a)    WHG controls and oversees the training, policies, supervision,

           operation, management, security, and employees at the Suburban

           Extended Stay.

b)  WHG participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, WHG participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

31.

SUB-SU Hotel GP, LLC (SUB-SU) owns, manages, supervises, operates, and controls the Suburban Extended Stay. SUB-SU is a Delaware limited liability company with its principle place of business in Houston, Texas. SUB-SU is a general partner of WHG and is liable for the debts of WHG. SUB-SU may be served with service of process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor, Tallahassee, Florida, 32301.

a)  SUB-SU controls and oversees the training, policies, supervision, operation, management, security, and employees at the Suburban Extended Stay.

16

b)   SUB-SU participated in Plaintiff's sex trafficking and knowingly

benefitted by receiving money from Plaintiff's trafficker for

lookout work and other illegal services provided to Plaintiff's

trafficker, and by receiving money from Plaintiff's trafficker for

the rental of hotel rooms in which Plaintiff was subsequently and

openly sold for sex as many as 20 times per day. Through these

and other actions, SUB-SU participated in a venture it knew or

should have known engaged in the sex trafficking of Plaintiff.

32.

Choice Hotels International, Inc. ("Choice") owns, manages, supervises,

operates, and controls the Suburban Extended Stay. Choice is a Delaware

corporation with its principle place of business in Rocksville, Maryland.

Choice may be served with service of process by serving its registered agent

Corporation Service Company at 40 Technology Parkway South, #300,

Norcross, Georgia, 30092.

a)   Choice controlled and oversaw the training, policies, supervision,

operation, management, security, and employees at the Suburban

Extended Stay.

b)   Choice participated in Plaintiff's sex trafficking and knowingly

benefitted by receiving money from Plaintiff's trafficker for

17

lookout work and other illegal services provided to Plaintiff's

trafficker, and by receiving money from Plaintiff's trafficker for

the rental of hotel rooms in which Plaintiff was subsequently and

openly sold for sex as many as 20 times per day. Through these

and other actions, Choice participated in a venture it knew or

should have known engaged in the sex trafficking of Plaintiff.

33.

At all times relevant to this Complaint, Defendants LQ Properties,

LLC, CPLG Properties, LLC, BRE/LQ Properties, LLC, La Quinta

Worldwide, LLC, and John Does Nos. 1-10 (collectively, the "La Quinta

Defendants") owned, managed, supervised, operated, oversaw, controlled the

operation of, and were inextricably connected to the renting of rooms at the

La Quinta Inn located at 1350 North Point Dr., Alpharetta, Georgia, 30022

("La Quinta Inn"), from which they benefited financially.

34.

LQ Properties, LLC, ("LQ") owns, manages, supervises, operates, and

controls the La Quinta Inn. LQ is a Delaware limited liability company with

its principle place of business in Irving, Texas. LQ may be served with

service of process by serving its registered agent Corporation Service

18

Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a)  LQ controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b)  LQ participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, LQ participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

35.

CPLG Properties, LLC, ("CPLG") owns, manages, supervises, operates, and controls the La Quinta Inn. CPLG is a Delaware limited liability company with its principle place of business in Irving, Texas.  CPLG may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

Case 1:23-cv-02824-WMR Document 1-5 Filed 06/28/23 Page 20 of 113

a) CPLG controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b) CPLG participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, CPLG participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

36.

BRE/LQ Properties, LLC, ("BRE/LQ") owns, manages, supervises, operates, and controls the La Quinta Inn. BRE/LQ is a Delaware limited liability company with its principle place of business in Irving, Texas. BRE/LQ may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

a) BRE/LQ controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b) BRE/LQ participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, BRE/LQ participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

37.

La Quinta Worldwide, LLC ("La Quinta Worldwide") owns, manages, supervises, operates, and controls the La Quinta Inn. La Quinta Worldwide is a Nevada limited liability company with its principle place of business in Irving, Texas. La Quinta Worldwide may be served with service of process by serving its registered agent Corporate Creations Network, Inc. at 8275 South Eastern Avenue #200, Las Vegas, Nevada, 89123.

a) La Quinta Worldwide controlled and oversaw the training, policies, supervision, operation, management, security, and employees at the La Quinta Inn.

b) La Quinta Worldwide participated in Plaintiff's sex trafficking and knowingly benefitted by receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in w7hich Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, La Quinta Worldwide participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

c) La Quinta Worldwide is subject to the jurisdiction of this Court because it regularly transacts business in Georgia, owns and operates dozens of hotels in Georgia, including the La Quinta Inn, contracts to supply services in Georgia, caused indivisible injuries to Plaintiff in Georgia, and participated in illegal sex trafficking ventures at the La Quinta Inn.

38.

At all times relevant to this Complaint, Defendants Extended Stay America, Inc. ("ESA"), ESA Management, LLC ("ESA Management"), ESA P Portfolio, LLC, f/k/a BRE/ESA P Portfolio, LLC ("ESA Portfolio"), ESA P Portfolio Operating Lessee, LLC ("ESA Operating"), and John Does Nos. 1-10 (collectively, the "ESA Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Extended Stay America located at 1050 Hammond Drive, NE, Atlanta, Georgia, 30328 ("Atlanta ESA"), from which they benefited financially.

39.

ESA owns, manages, supervises, operates, and controls the Atlanta ESA. ESA is a Delaware corporation that regularly conducts business in the State of Georgia with its principal place of business in Fort Lauderdale, Florida and is subject to the jurisdiction of this Court. ESA may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 160 Greentree Dr. Ste. 101, Dover, Delaware, 19904.

a)    ESA controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

    b)    ESA participated in Plaintiff's sex trafficking and knowingly

benefitted by, on information and belief, receiving money from

Plaintiff's traffickers for lookout work and other illegal services

provided to Plaintiff's traffickers, and by receiving money from

Plaintiff's trafficker for the rental of hotel rooms in which

Plaintiff was subsequently and openly sold for sex as many as 20

times per day. Through these and other actions, ESA participated

in a venture it knew or should have known engaged in the sex

trafficking of Plaintiff.

40.

ESA Management owns, manages, supervises, operates, and controls

the Atlanta ESA. ESA Management is a Delaware limited liability company

that regularly conducts business in the State of Georgia with its principal

place of business in Charlotte, North Carolina, and is subject to the

jurisdiction of this Court. ESA Management may be served with service of

process by serving its registered agent for service, National Registered

Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

    a)    ESA Management controls and oversees the training, policies,

supervision, operation, management, security, and employees at

the Atlanta ESA.

24

b)   ESA Management participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 20 times per day. Through these and other actions, ESA Management participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

41.

ESA Portfolio owns, manages, supervises, operates, and controls the Atlanta ESA. ESA is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina and is subject to the jurisdiction of this Court. ESA Portfolio may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

a)   ESA Portfolio controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

25

b) ESA Portfolio participated in Plaintiff's sex trafficking and knowingly benefitted by, on information and belief, receiving money from Plaintiff's trafficker for lookout work and other illegal services provided to Plaintiff's trafficker, and by receiving money from Plaintiff's trafficker for the rental of hotel rooms in which Plaintiff was subsequently and openly sold for sex as many as 10 times per day. Through these and other actions, ESA Portfolio participated in a venture it knew or should have known engaged in the sex trafficking of Plaintiff.

42.

ESA Operating owns, manages, supervises, operates, and controls the Atlanta ESA. ESA Operating is a Delaware limited liability company that regularly conducts business in the State of Georgia with its principal place of business in Charlotte, North Carolina and is subject to the jurisdiction of this Court. ESA Operating may be served with service of process by serving its registered agent for service, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia, 30046.

a) ESA Operating controls and oversees the training, policies, supervision, operation, management, security, and employees at the Atlanta ESA.

b)  ESA Operating participated in Plaintiff's sex trafficking and

knowingly benefitted by, on information and belief, receiving

money from Plaintiff's trafficker for lookout work and other

illegal services provided to Plaintiff's trafficker, and by receiving

money from Plaintiff's trafficker for the rental of hotel rooms in

which Plaintiff was subsequently and openly sold for sex as many

as 20 times per day. Through these and other actions, ESA

Operating participated in a venture it knew or should have

known engaged in the sex trafficking of Plaintiff.

43.

Defendants John Does Nos. 1-10 are additional owners or operators of

the hotel locations in this Complaint, employees of the owners or operators,

management companies or employees of the management companies,

managers or employees of the managers, security companies or employees of

the security companies or security personnel of the hotel locations in this

complaint. Defendants John Does Nos. 1-10 will be named and served with

the summons and complaint once their identity is known.

44.

Whenever reference is made in this complaint to any act, deed, or

conduct of the Defendants, the allegation is that the Defendants engaged in

the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## III.  The Sex Trafficking of Jane Doe 1

45.

From 2011 to 2016, Plaintiff was forced to engage in commercial sex acts at Defendants' hotels by various sex traffickers after being advertised on www.backpage.com. Plaintiff suffered violent beatings, controlled and forced drug use, manipulation, threats, fraud, and coercion. Plaintiff was physically, sexually, mentally, and verbally abused by her traffickers. Plaintiff was bought and sold for drugs and money and her "ownership" was transferred between different traffickers in Atlanta.

46.

Plaintiff's traffickers retained the money from the commercial sex acts, keeping Plaintiff financially dependent on her traffickers for food, clothing, and other basic necessities of life.

47.

A number of hotels in Atlanta, including the Defendants in this

lawsuit, accommodate, facilitate, and participate in the sex trafficking of

women, men, and children in Atlanta. Victims, including Plaintiff, were and

are rotated through these hotels in a never-ending cycle of exploitation,

staying at one hotel for as little as a few hours or at times for more than a

month.

48.

Without the complicity of hotels, where illicit sexual encounters are

taken off the street and cloaked in the anonymity of a hotel's customers, the

sex trafficking industry would be hugely disrupted. This obvious fact has

been noted by experts[10] and justices of the United States Supreme Court. In

---

[10] Hotel/Motel-Based, National Human Trafficking Hotline,
https://humantraffickinghotline.org/sex-trafficking-
venuesindustries/hotelmotel-based (last visited Aug. 3, 2019) ("Hotels and
motels are a common venue for sex trafficking, due to ease of access for
buyers, ability to pay in cash and maintain secrecy through finances, and
lack of facility maintenance or upkeep expenses."); *see also* Avni Ahuja, *Sex
Trafficking Prevention in Georgia: Equipping Hotel Workers with the Proper
Resources*, The Roosevelt Institute, (2017), *available at
http://rooseveltinstitute.org/wp-content/uploads/2017/05/715_Final-3-
2.pdf* (last visited Aug. 3, 2019) ("Hotels and motels represent a
disproportionate site of sex trafficking due to the privacy and anonymity they
offer to traffickers, customers, and victims.").

2015, Justice Antonin Scalia, joined in dissent by Chief Justice John Roberts

and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal activity
> ranging from drug dealing and prostitution to human trafficking.
> Offering privacy and anonymity on the cheap, they have been employed
> as . . . rendezvous sites where child sex workers meet their clients on
> threat of violence from their procurers.

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2457 (2015).

49.

Ninety-two percent of the calls received by the National Human

Trafficking Hotline involving hotels and motels reported sex trafficking and

two percent reported a combination of sex and labor trafficking.[11]

50.

The Polaris Project found that "75% of survivors responding to Polaris'

survey reported coming into contact with hotels at some point during their

exploitation . . . Unfortunately, 94% also disclosed that they never received

any assistance, concern, or identification from hotel staff."[12]

---

[11] *Human Trafficking and the Hotel Industry*, Polaris Project,
https://polarisproject.org/sites/default/files/human-trafficking-hotel-industry-
recommendations.pdf (last visited Aug. 3, 2019).
[12] *Hotels and Motels Recommendations*, The Polaris Project,
https://polarisproject.org/hotels-motels-recommendations (last visited Aug. 8,
2019).

51.

According to a 2012 BEST Alliance study, 63 percent of trafficking
incidents studied occurred in hotels.[13]

52.

Attorneys for the hospitality industry estimated and reported to
hospitality industry representatives that eight out of ten human trafficking
arrests occur in or around hotels.[14]

53.

Years before Plaintiff was trafficked, Defendants knew or should have
known of the widespread national epidemic of hotel sex trafficking.

54.

The longstanding complicity of hotels in sex trafficking is common
throughout the country, but it is particularly pervasive in Atlanta, which the

---

[13] Jon Conte, et. al, *Inhospitable to Human Trafficking Program Evaluation*,
at 2, Businesses Ending Slavery and Trafficking, (July 2014),
https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluatio
n.11_without_appendix.pdf (last visited Aug. 3, 2019).
[14] Rich Keating, *Human Trafficking: What It Is and How It Impacts the
Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference
2013, Washington, D.C.,
http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last
visited Aug. 6, 2019).

FBI has ranked as one of the worst cities in the country for child sex trafficking.[15]

55.

According to a study commissioned by the U.S. Department of Justice, Atlanta has one of, if not the, largest illegal sex trafficking economies in the country, and is also one of the most profitable cities in the country for sex traffickers.  In 2007, Atlanta's sex trafficking economy was worth $290 million annually and traffickers reported average *weekly* earnings of roughly $33,000.[16]

---

[15] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, *Exploiting Americans on American Soil: Domestic Trafficking Exposed*, The Federal Bureau of Investigation, (June 7, 2005), *available at* https://archives.fbi.gov/archives/news/testimony/exploiting-americans-on-american-soil-domestic-trafficking-exposed (last visited Aug. 3, 2019).

[16] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Aug. 8, 2019); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12 2014), 30-32,  *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Aug. 3, 2019).

56.

A large percentage of the cash flow in Atlanta's sex trafficking economy

is funneled directly to hotels via the daily rental of the hotel rooms needed as

a venue in which to harbor, exploit, and sell victims, including Plaintiff.[17]

57.

Years before Plaintiff was trafficked, Defendants knew of Atlanta's

well-publicized reputation as the country's "epicenter for human trafficking,

and particularly child sex trafficking,"[18] that sex trafficking in Atlanta was

---

[17] *Id.* at 123 (Finding that, in Atlanta, "most [sex] transactions occur in hotels
and motels."), at 224 (Noting the "overwhelming use of hotels and motels"
and finding that "[h]otel and motel rooms were a primary expense for many
sex workers . . . . Sex workers noted that often, hotel and motel staff members
and managers knew that sex was being traded in their venues but did not
attempt to stop the work."); *see also id.*, (Graph at 224 showing the most
common location for commercial sex acts to occur, 66.7 percent, is at hotels
and motels.); *see also id.* at 103 ("Despite the thousands of dollars that are
made in a week, there are operational costs associated with the business."),
*see also id.* at 191 ("The costs of operating and facilitating sex work varied
greatly across pimps, though this study identifies some common costs. Pimps
routinely covered costs associated with employee housing, transportation,
employee appearance and personal appearance, advertisements, and hotels
and motels."); *see also id.* at 203 n.65 ("Hotels were the most common location
of in-calls for respondents.").
[18] Sally Yates, Remarks at Justice Department Event Marking National
Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available
at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-
quillian-yates-delivers-remarks-justice-department (last visited Aug. 3, 2019)
(" Atlanta . . . has been an epicenter for human trafficking, and particularly
child sex trafficking. There are varying reports, some identifying Atlanta as
the number one city for child sex trafficking, others ranking it somewhat

an "epidemic of tragic proportions,"[19] and of the prevalence of sex trafficking in hotels in Atlanta.

58.

Sex trafficking in Atlanta has been front-page news since at least 2001, when the Atlanta Journal-Constitution published Jane Hansen's groundbreaking series, *Selling Atlanta's Children*.[20]

---

lower. I think that it's actually hard to quantify those numbers, but it is clear that whatever the number, it is way too high.").

[19] Exhibit 3, Nina Hickson, *An Epidemic of Tragic Proportions*, Atlanta Journal-Constitution, June 11, 2000. *See also* Letitia Campbell, *Selling Our Children: Atlanta Does Battle Against the Sex Trafficking of Kids*, Sojourner's Magazine, https://www.questia.com/magazine/1G1-234920022/selling-our-children-atlanta-does-battle-against (last visited Aug. 3, 2019) (discussing Judge Hickson's editorial and noting the creation of a large and well-established coalition of advocates in Atlanta publicizing sex trafficking in the city).

[20] Hansen's series is attached as Exhibit 4. Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001, at 1A; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001, at 1A; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. "We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl," Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001. *See also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html.

59.

Hansen's reporting was part of a larger nationwide conversation that named, recognized, and raised the awareness of the evils of sex and labor trafficking at the turn of the century. That recognition culminated nationally in the passage of the Trafficking Victims Protection Act in 2000 and globally with the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

60.

Recognizing the pervasiveness of sex trafficking in the hospitality industry, End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[21]

61.

The Code is well-known in the hospitality industry. It identifies six steps companies can take to prevent child sex trafficking:

> (1) establish corporate policy and procedures against sexual exploitation of children;

> (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

[21] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited Aug. 6, 2019).

(3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(6) report annually on the company's implementation of Code-related activities.

62.

Defendants knew of the Code and were urged to sign the Code and commit to taking action against sex trafficking in their hotels.

63.

For example, in 2010 more than 4,200 individuals signed a petition to encourage Choice Hotels to sign the Code. In response, Choice Hotels made a statement that it would agree to take steps to fight sex trafficking in its hotels.[22] Though it met with EPCAT representatives in 2010 to develop an optional training, Choice Hotels did not sign the Code until 2015.[23]

---

[22] *Tell Choice Hotels to Prevent Child Prostitution in Their Hotels*, Change.org, https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels (last visited Aug. 6, 2019).
[23] Choice Hotels, *Human Rights Policy*, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Aug. 6, 2019).

64.

RRI knew of the Code in 2010, but has never signed the Code.

65.

RRI has never taken any steps to publicly address or even comment on

the frequent sex trafficking at its hotels.

66.

For years, Defendants have known what signs to look for and which

policies to implement in order to identify sex trafficking in their hotels and to

ensure they were not profiting from sex trafficking, as required by federal

law.

67.

The Department of Homeland Security ("DHS") identifies a number of

warning signs that indicate the presence of human trafficking at hotels.

According to DHS, housekeeping, room service, maintenance, concierge,

bellman, front desk, food and beverage, security, and valet staff at hotels all

can and should be vigilant in observing indicia of human trafficking on the

hotel premises such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue,
sleep deprivation, untreated illness, injuries, and/or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion);

(i) the same person reserves multiple rooms;

(j) a room is rented hourly, less than a day, or for an atypical extended stay;

(k) attempts to sell items to or beg from patrons or staff;

(l) cars in the parking lot regularly parked backward, so the license plates are not visible;

(m) loitering and solicitation of male patrons;

(n) waiting at a table or bar and picked up by a male (trafficker or customer);

(o) persons asking staff or patrons for food or money; and (p) persons taking cash or receipts left on tables.[24]

---

[24] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Aug. 6, 2019).

68.

The indicia of human trafficking and effective preventative measures
are widely known and available to all in the hospitality industry, including
Defendants. Hotels and brands that do not identify and report evidence of
human trafficking on hotel properties do so despite knowing that
preventative training and resources are widely available. These hotels and
brands elect not to engage in preventative policies and practices and instead
consciously gamble that they will make more money from sex trafficking than
they will be held civilly liable for under the law.

69.

The motivation for Defendants' willful blindness and continuing failure
to act is simple—sex trafficking is profitable for Defendants. Defendants
know the obvious dangers associated with sex trafficking and the remedial
safety precautions they should take to curtail it, but they choose to ignore the
signs of and solutions to sex trafficking because doing so makes them money.

70.

Defendants review hotel performance, room occupancy, and
profitability like all businesses. When revenue is down, Defendants quickly
investigate individual hotel locations and take swift remedial action.
However, Defendants intentionally turn a blind eye to safety and security

39

issues at their hotels when revenue is up—even when Defendants knew or should have known part of those profits were derived from providing a venue for, or being actively involved in, the crime of sex trafficking. This overt policy of willful blindness to sex trafficking by hotel brands like RRI and Choice communicates the perverse but clear message to hotel owners and employees that the *more* sex trafficking allowed at a hotel—resulting in higher profits—the *less* likely RRI and Choice are to investigate.

71.

At a 2013 presentation to the hospitality industry, hotel industry representatives were informed, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[25]

72.

Defendants in this case failed to follow even those three very basic guidelines. As a result, Plaintiff was trafficked for years at Defendants' hotels, causing her substantial and lifelong injuries, while Defendants grossly profited from Plaintiff's unceasing and involuntary sexual servitude.

---

[25] Keating, *supra* n.14.

## IV.  The Sex Trafficking of Jane Doe 1 at the Smyrna Red Roof Inn

### 73.

Plaintiff was trafficked at the Smyrna Red Roof Inn on a regular basis from 2011 to 2016 by multiple traffickers. While she was trafficked at the Smyrna Red Roof Inn, Plaintiff stayed there with her various traffickers and other victims, for weeks at a time.

### 74.

The Smyrna Red Roof Inn frequently kept Plaintiff and other trafficking victims in the same set of rooms, often in the back building.

### 75.

While Plaintiff was trafficked at the Smyrna Red Roof Inn she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

### 76.

While Plaintiff was trafficked at the Smyrna Red Roof Inn her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked

would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

77.

RRI had a policy to physically enter a room and inspect the room if housekeeping had not been in the room for three days. However, RRI did not enforce this policy. While Plaintiff was being trafficked at the Smyrna Red Roof Inn, housekeeping frequently did not enter the room for weeks at a time.

78.

While Plaintiff was trafficked at the Red Roof Inn the number of daily male visitors to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room each day for short periods. Plaintiff was aware that several other trafficking victims were at the Smyrna Red Roof Inn being trafficked each night while Plaintiff was at the hotel. At a bare minimum, at least 50 buyers came to the Smyrna Red Roof Inn to purchase sex each day.

79.

Multiple Smyrna Red Roof Inn employees participated in, assisted, and facilitated Plaintiff's sex trafficking and worked as lookouts for Plaintiff's and other victim's traffickers for several years.

80.

These employees often stood guard for Plaintiff's traffickers and protected their activities. They often called Plaintiff's traffickers while Plaintiff was being victimized and warned Plaintiff's traffickers that the police were at the hotel or coming to the hotel, or to stop the frequent traffic to the room if it had been too busy for a time, or cautioned them if other guests were complaining.

81.

Plaintiff frequently spoke to these employees when they called to provide this information because she was usually made to answer the phone in case a buyer called.

82.

These employees were paid in cash by sex traffickers when they provided tips that helped the sex traffickers evade being caught.

83.

After providing a tip, the employees were paid in cash outside the view of the front office cameras. Plaintiff frequently saw a Smyrna Red Roof Inn employee receive cash from Plaintiff's trafficker for his tips and lookout work.

84.

Cobb County police informed management at the Smyrna Red Roof Inn that one current employee and a former general manager were paid by sex traffickers to act as lookouts so that women could be trafficked at the hotel.

85.

The then-current employee continued to work at the Smyrna Red Roof Inn for approximately six more months.

86.

Plaintiff told one of the complicit Smyrna Red Roof Inn employees—a third employee—she was being trafficked at the Smyrna Red Roof Inn.

87.

The Red Roof Defendants received a percentage of the revenue generated by the operations of the Smyrna Red Roof Inn, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

88.

The Red Roof Defendants knew or should have known that sex

trafficking was a constant occurrence at the Smyrna Red Roof Inn.

89.

The wider community is aware of the Smyrna Red Roof Inn's

reputation as a haven for sex trafficking. Nonprofit and religious groups

routinely and regularly visit the Smyrna Red Roof Inn to provide food and

rescue information to the sex trafficking victims they encounter at the hotel.

90.

The Red Roof Defendants did nothing in response to a litany of known,

documented, and publicized incidents of sex trafficking and related crimes at

the Smyrna Red Roof Inn.

91.

During all the years Plaintiff was trafficked at the Smyrna Red Roof

Inn, a well-known prostitute and dancer was a permanent resident at the

Smyrna Red Roof Inn and frequently had buyers come to her room for

commercial sex acts.

92.

In December 2010, the Metro Atlanta Child Exploitation Task Force

and the Marietta Police Department conducted a prostitution sting involving

the Smyrna Red Roof Inn.  As part of the sting, a 16-year-old victim was

rescued from the Smyrna Red Roof Inn, and an 18-year-old was arrested on

prostitution charges.[26]

93.

The Red Roof Defendants knew or should have known about the 2010

sting, the rescue of a minor at the hotel, and the ensuing media reports.

94.

On March 2, 2011, Cobb County Police arrested a wanted person at the

Smyrna Red Roof Inn and reported that the "location is known for problems

with drugs and prostitution."

95.

On March 4, 2011, Cobb County Police arrested a wanted person at the

Smyrna Red Roof Inn and reported that the area was a "hotbed of illegal

activities."

---

[26] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting*, Marietta Daily
Journal, (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-
prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last
visited July 31, 2019).

96.

On July 18, 2011, police responded to a theft call at the Smyrna Red Roof Inn where the victim reported her items were stolen "by a pimp and a prostitute, because she refused to work for [the pimp]."

97.

On April 18, 2012, police responded to a dispute at the Smyrna Red Roof Inn between a guest and a Smyrna Red Roof Inn employee. The guest demanded his money back from the Smyrna Red Roof Inn for, among other things, being "harassed by prostitutes." The Smyrna Red Roof Inn refused.

98.

On May 11, 2012, Cobb County Police arrested multiple suspects on drug charges at the Smyrna Red Roof Inn and reported that the hotel was known "to be a location known for the drug trade and other illicit activity."

99.

On June 28, 2012, a woman responded to an online advertisement for an escort and met another woman named "Daisy" at the Smyrna Red Roof Inn. The hotel staff allowed "Daisy" to pay for a room at the Smyrna Red Roof Inn in the woman's name. The woman performed commercial sex acts for two buyers before "Daisy" confiscated the money and left the woman at the Smyrna Red Roof Inn, where she called the police.

100.

On March 6, 2013, a 19-year-old woman was arrested at the Smyrna

Red Roof Inn for prostitution and drugs. Cobb County Police reported the

operation was "in reference to complaints of suspected prostitution occurring

in the area. These complaints were being reported by business owners, patrol

officers working the area and the general public."

101.

Publicly-available online reviews of the Smyrna Red Roof Inn,

including reviews from TripAdvisor.com, reported widespread prostitution

and crime occurring at the hotel. The reviews quoted below are attached

hereto as Exhibit 5.

102.

A July 2013 review of the Smyrna Red Roof Inn stated,

**Prostitutes everywhere** . . . There were prostitutes at a couple of
doors too. Around midnight we heard loud yelling and looked out our
window. Seven (yes seven!) cop cars were directly in front of our room
and were arresting someone as a prostitute stood 5 feet from our
window. It was hard to sleep to say the least. The only security I felt
was the fact our dog was with us. Don't stay here!!!

103.

On October 1, 2013, Cobb County Police investigated a complaint of

drug activity at the Smyrna Red Roof Inn and reported the "hotel is also

known to be a high drug area." After kicking a room door in and finding four men in a room rented by a woman not on the premises and evidence of "drug activity" inside the room, the staff of the Smyrna Red Roof Inn determined that the unknown men inside the room were welcome guests of the hotel. Cobb County Police reported,

> Apparently the staff at Red Roof changed their minds because originally, they wanted to know who was residing in their room and that if [the registered guest] was not inside, then it was time for a criminal trespass warning. After we checked the room and saw that there was no one injured inside, the front desk decided to allow the subjects to stay inside the room without having [the registered guest] present.

104.

On May 2, 2014, a man was robbed by a woman after arranging to meet him at a gas station and then go to the Smyrna Red Roof Inn. Cobb County Police reported that,

> [W]hen he was not looking, she ran out of the room and got in her Audi and started the engine. He stated that he stood behind the car in an attempt to keep her from leaving. He stated that she hit him with the car and sped away. When I asked [the man] why he did not call the police, *he stated that the girl at the front desk told him not to call.* I next spoke with the on-duty receptionist. She was able to provide the information [in] reference to the suspect . . . The receptionist did not want to provide her name.

105.

An August 2014 review of the Smyrna Red Roof Inn stated,

49

**PROSTITUTION – COCK ROACHES – AND DOG POOP!"**
**DELUXE ROOM** DO NOT GO THERE!!!!!" My worst experience ever!
Saw prostitution, dogs pooping outside, loitering, dead cockroaches in
my room. I askd thm 2 come get it up th clerk said he could "bring me a
broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want
crackheads and prostitutes and don't mind . . .

106.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2014 review.

In the reply, "Bob P" wrote, "I am writing deep apology for prostitution came

in our property. I just hire new security person for watch night for any one

who make any kind of problem.this will not happen again."

107.

On information and belief, "Bob P" is Bharatkumar R. Patel, the

manager of Varahi Hotel.

108.

An August 2014 review stated,

It's true...you get what you pay for. The comments that were registered
are accurate. Apparently, some people LIVE at this motel. It seems
that it is for transient individuals, as I saw people just hanging out,
sitting around, smoking. I can't say definitively that there were
prostitutes on the premises, but some sure did look like ones.

50

109.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2014

review.[27]

110.

An August 2014 review of the Smyrna Red Roof Inn stated,

This hotel is unsanitary and a hotbed for criminal activity. My family
and I were on the last leg of our vacation when this "motel" was
recommended to us by hotels.com. We were stopping in Atlanta for a
day to see the aquarium and Coca Cola factory before returning home
to Savannah. We booked over the phone for one night after being
assured that this was a pretty good hotel. Not so. We were sorely
disappointed upon arrival. Dirty pillow cases, blood on the floor, bugs,
cigarette burns everywhere, prostitutes, and drug activity right outside
our door, which had no lock because apparently it had been kicked in
by the police. The desk clerk couldn't have cared less. We left and drove
5 hours home in the middle of the night! I will never recommend this
place ever!!!

111.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2014 review.

---

[27] Only responses that mention the reviewers' complaints in specific terms
are included herein. Responses noted without quotation were general and
vague responses that are common on TripAdvisor because the hotel brands
require hotel owners to respond to all negative reviews. Those responses are
evidence of the Red Roof Defendants' actual knowledge of the review.

112.

A September 2014 review of the Smyrna Red Roof Inn stated,

**Nothing but a dope and prostitution den!!** The room was nasty.
The television didn't work. Kind of scary with men hanging out in lobby
while checking in. The parking lot was filled with young people
drinking and smoking dope. I believe it should be condemned! Avoid at
all costs. You would be better off sleeping in your car.

113.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this September 2014

review.

114.

A September 2014 review of the Smyrna Red Roof Inn stated,

I am in the room right now scared! Im waiting for the sun to come up so
I can leave! This is where georgia's tax dollars are spent! I watched as a
young girl did the 2 fingers to her eyes and a point to guy across to
other building only to push him a min later and say"10 dollars? Im a
dime baby you no im not worth more than that!" Then the traffic
throughout the day.... its a drug and prostitute headquarters. Im a
young male well over 6ft tall and fear for my safety! I smoke cigarettes
religiously and have quit and made a promise to never do it again
because I had to stand outside and witness these acts and wonder if I
would be jumped! This place has changed my life for the better for the
fact I want to be nothing like these people! I hear running along outside
of my door and a bottle broken on what sounded like a car... I have laid
ontop of my clothes in this filthy room waiting for the sun! This is a
true nightmare! Im a tough guy only to feel like im the new guy in jail!
I am greatful for the life I have and would recommend staying here if
your about to go all robin willams! [. . .] oh and now I hear shamika
making a quick buck in the next room, classy! The roof is red and so are

the sheets! [. . .] Im starving from the thc in the air, [. . .] Just waiting for the gun fire as I already planned my emergency plan over and over in my head! [. . .] wish me the best in the next hour as I use all my strength to grab all my bags and run for the truck, I did not sign up for this! [. . .] Hey red roof inn you tried! You just gotta know when to light the flame and let it burn!

### 115.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to the September 2014 review.

### 116.

On December 6, 2014, a man was arrested at the Smyrna Red Roof Inn after engaging in commercial sex acts with a 16-year-old trafficking victim at the Smyrna Red Roof Inn. After the 16-year-old performed commercial sex acts for the man, he grabbed the girl by the hair, dragged her into the bathroom, turned on the water, and attempted to drown the trafficking victim. This incident was reported in the media shortly thereafter.[28]

---

[28] *See, e.g., Police: Marietta Man Tried to Kill 16-year-old*, Marietta Daily Journal, (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited Aug. 2, 2019).

117.

The Red Roof Defendants knew or should have known about the

December 6, 2014 child sex trafficking and attempted murder incident at the

Smyrna Red Roof Inn.

118.

A July 2015 review of the Smyrna Red Roof Inn stated

Bed bugs crawling on top of the bedding, prostitutes roaming the
facility, drug deals taking place in the walkways, loitering in the office
people sitting , with a nice facelift on the facility , new coat of paint and
furniture, with a nice contrast of poorly patched walls, rusting bathtub,
nasty lavatory, unsavory characters every where [sic], not
recommended for anyone. If it were possible to give less than 1 star I
would needless to say, this review was captured in less than 15 minutes
at the establishment. BEWARE!!

119.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to the July 2015 review.

120.

An August 2015 review of the Smyrna Red Roof Inn stated,

DO NOT STAY HERE. Terrible place to stay. [. . .] Stayed 2 nights
when arrived back to room at midnight discovered the maid hadn't
even came to our room. Went to get clean towels from desk and was
informed I need to go back to my room and bring them my used towels
before I could receive new ones. Sheets had holes and burn spots in
them. [. . .] Prostitutes and drug dealers roam the parking lot. There
are at least 5 people on the parking lot all hours of the night..

54

121.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

122.

An August 2015 review of the Smyrna Red Roof Inn stated,

DO NOT stay here! The website advertises "newly renovated rooms",
but my "newly renovated" room included bedding with blood stains on
it and bed bugs. Additionally, the toilet seat in the bathroom didn't
even fit the toilet...some "renovations" this place has done. There were
shady people hanging out outside of our room door at all hours of the
night and there was open prostitution occurring on the property. I was
traveling alone with my teenage daughter and felt extremely unsafe at
this location. This hotel is a transient hotel and I would have been
better off buying a tent from the Target behind the hotel and sleeping
in the tent instead of staying even 1 night in this dump. To top it all off,
I was charged for 3 nights instead of the 1 night I shamefully stayed
and they refused to refund my money for the nights I did not stay.

123.

A person identified as "Bob P, General Manager at Red Roof Inn

Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

In the reply, "Bob P" stated that he apologized that "people wear hanging out

in hallway. I will hire security man for night. i will make sure it will not

happen again."

124.

An August 2015 review of the Smyrna Red Roof Inn stated,

Ok so I get there, she tells me system down I seen people just hanging out in lobby. Just sitting smelled really funny, housekeepers steal and look real shady. Needs more cameras lots of prostitution going on and I know the staff know. They will call peoples room when the police come and say don't answer. I seen this happen to me . . . . This hotel is a trap spot for $60 do not put your life at risk! BaD AREA!!!!!!

125.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to this August 2015 review.

126.

A September 2015 review of the Smyrna Red Roof Inn stated,

I recently stayed here during my trip to Atlanta for the Auburn v/s Louisville Football game. I booked 3 rooms. I was approached from 2 officers informing us that we needed to place all our belongings inside and lock our vehicles because this is a high drug area & prostitution area.

127.

A person identified as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" read and responded to this September 2015 review.

128.

A May 2016 review of the Smyrna Red Roof Inn stated,

Ok to start do not stay here. I stayed here thinking smryna was a great area to stay in well this placed showed me otherwise. There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises. I was scared at night. Check in was

horrible I had a disagreement with the front desk agent (didn't bother to get his name) he acted as if he didn't want me to stay there. The 1st day of me checking in I found blood on the bathroom door, walls and floor.

### 129.

Red Roof Defendants knew or should have known about the online reviews and police incidents regarding rampant prostitution and related crime at the hotel.

### 130.

RRI knew or should have known about the online reviews discussing prostitution and crime at the hotel. RRI hosts TripAdvisor reviews of the Smyrna Red Roof Inn, including the reviews quoted above, on its own website.[29]

### 131.

RRI knows what it publishes on its own website.

### 132.

In fact, RRI closely monitors online reviews from TripAdvisor, including the reviews quoted above. Online review scores and ratings make up an essential part of RRI's evaluation metrics on hotel performance.

---

[29] Exhibit 6, showing "trip-advisor-section" of the Smyrna Red Roof Inn web site, hosted by RRI, *available at* https://www.redroof.com/property/ga/smyrna/RRI088#trip-advisor-section.

133.

Each hotel is monitored by employees of RRI, principally by a Vice President of Operations. For the Smyrna Red Roof Inn, those persons included Jay Moyer and Vicky Lam.

134.

Moyer, Lam, and others closely monitored the revenue, occupancy, and online reviews of the Smyrna Red Roof Inn.

135.

It was common for Moyer, Lam, and other RRI employees to call the Smyrna Red Roof Inn regarding particular reviews online.

136.

It was common for Moyer, Lam, and other RRI employees to respond directly to guests regarding particular reviews.

137.

The Red Roof Defendants knowingly accepted and relied upon money derived from criminal enterprises occurring at the hotel, including sex trafficking. Despite knowing its origins, RRI actively thwarted attempts to reduce the income that flowed through the hotel from criminal enterprises. In the past, some employees made attempts to reduce the rampant crime at the Smyrna Red Roof Inn. Whenever they did so, occupancy and revenue

numbers fell. The drop in revenue quickly prompted remedial calls and visits from Moyer and other RRI employees to the Smyrna Red Roof Inn. When informed that the revenue numbers were down because the employees were trying to "clean up" the Smyrna Red Roof Inn, Moyer and other RRI employees reprimanded the employees with such directives as, "you need to sell rooms," "be alert but sell," and "you need to get your numbers up."

138.

The response from management made clear to the employees that profits and revenue were more important than safety and security, as such, efforts to reduce crime at the Smyrna Red Roof Inn were largely abandoned.

139.

For many years, including the years Plaintiff was trafficked and continuing to the present day, the Smyrna Red Roof Inn has had a policy, prominently displayed on the front desk and the night window in the front office, that there are "NO REFUNDS AFTER 15 MINUTES."

59



140.

There is no legitimate reason for the Smyrna Red Roof Inn to have such a policy. The policy exists so that commercial sex acts cannot be accomplished quickly at the Smyrna Red Roof Inn without also paying for a room at the Smyrna Red Roof Inn. In other words, the Smyrna Red Roof Inn has a policy that *allows* commercial sex acts in its rooms, but only for a fee—the full price of a daily room rental.

141.

Numerous publicly-available online reviews reference the NO REFUNDS AFTER 15 MINUTES policy, which was strictly enforced. The following review from August 2014, attached hereto as Exhibit 7, is representative of those reviews.

I have stayed at the red roof inn in many locations and I was shocked to see the shape and ambiance of this one. It is true, drug dealers and thugs in the hallway and the parking lot. No exaggeration. The sign, "no refunds after 15 min" is a clear indication that there is something really wrong going on here. I went to my room and I stayed for literally 5 minutes. Room had a very strong uncomfortable smell. In general, the room was awful. Front desk clerk was hesitant to give my money back arguing that I stayed more than 15 minutes. He checked the invoice and was very clear for him that I check-in 10 minutes before. He stopped arguing. The brand red roof inn changed for me since. If I ever book red roof inn, I will read the reviews before.

142.

The Red Roof Defendants created and enforced the NO REFUNDS AFTER 15 MINUTES policy to ensure that the Red Roof Defendants received money from room rentals in exchange for providing a venue for the illicit commercial sex acts the Red Roof Defendants facilitated and encouraged at the hotel, including the sex trafficking of Plaintiff and others.

143.

RRI knew or should have known about the NO REFUNDS AFTER 15 MINUTES policy because it was featured prominently in numerous publicly-available online reviews and because RRI routinely audited and inspected the Smyrna Red Roof Inn and any audit or inspection should have and would have revealed the policy prominently displayed in all capital letters in multiple locations around the office, including on top of the front desk.

144.

The fact that the policy has been in place for so many years—*and is
still in place*—is evidence that RRI knows of, approves of, and has ratified the
NO REFUNDS AFTER 15 MINUTES policy. The reason is simple. The policy
ensures that RRI will be paid money for room rentals in exchange for
allowing the illegal commercial sex acts that RRI facilitates and encourages
at the hotel, including the sex trafficking of Plaintiff and others.

145.

During the years Plaintiff was trafficked, RRI audited and inspected
the hotel several times a year. Other RRI employees, including Moyer and
Lam, visited the hotel for inspections and meetings with hotel management
multiple times a year.

146.

RRI auditors inspected the condition of the hotel, the documentation of
employees, and whether the security cameras were operational, among other
things.

147.

In 2014, a website was created entitled "Red Roofie Blog: Avoid Red
Roof Inn Smyrna Georgia" with the web address of
www.redroofie.blogspot.com.  The site was created for the sole purpose of

warning the public about the rampant prostitution and unhindered crime occurring at the Smyrna Red Roof Inn.

148.

The Red Roofie Blog "About" page states,

This blog is intended to aid fellow travelers by providing information about the condition of Red Roof Inn, Smyrna, Georgia before stopping off there for the night. This place should be avoided and especially if you have children due to the drug activities and unsanitary conditions. This Inn has been a subject of drug busts and prostitution sting operations by the local police (see blog posts July 1, 2014). The manager is well aware of the conditions, but has done nothing to rectify them.

For two years, he has posted the same response to reviews saying 'renovations' are underway but nothing has been renovated and it has become obvious his review responses are just a 'smoke' screen. Even the drug dealers living there long-term and the pets staying as guests deserve better and cleaner conditions than what is provided for them in the $179 week special.

If you happen to prepay unknowingly, you will never get your money back nor an apology. You will be expected to sleep in unclean, marijuana smoke filled rooms, with bugs crawling on you at night. If you are scheduled to take a drug test anytime soon, you for sure would fail after staying here. These conditions may appeal to some people, so in that case this is the place for you. Red Roofie doesn't judge. However, it is not indicative of what people expect from the Red Roof brand image. Also, all people deserve to be treated respectfully which they are not by the manager and his wife at the Red Roof Inn, Smyrna, Georgia location. Corporate Red Roof seem to be turning their head the other way, but Red Roofie wants to get the word out, so you don't end up wasting 50 bucks or having a creepy night.[30]

---

[30] *See* Exhibit 8, www.redroofie.blogspot.com (last visited Aug. 14, 2019).

149.

Red Roof Defendants knew or should have known about the publicly-available website, created for the purpose of alerting the public to the dangers of rampant prostitution and unhindered crime occurring at the Smyrna Red Roof Inn.

150.

Incredibly, another website also focused on publicizing crime, particularly sex trafficking, at the Smyrna Red Roof Inn ("Trafficking Site"). The site was taken offline in 2019.[31]

151.

Several articles on the Trafficking Site stated that sex trafficking occurred openly at the Smyrna Red Roof Inn and identified known traffickers at the hotel, including one of Plaintiff's traffickers.

152.

One article ("Article 1") stated that an employee of the Red Roof Inn told the website

---

[31] This website and the articles quoted below are no longer available online and are not attached to the complaint because of personally identifying information contained in the articles that could present a safety threat to Plaintiff. Plaintiff can provide these articles to the Court in camera if necessary and will provide them to Defendants subject to a protective order.

he had read [the website's] most recent article on the Red Roof in Smyrna and admitted that much of the information contained in the article regarding sex trafficking occurring in their rooms is true . . . [the employee] also confirmed that the national Red Roof Corporate office is aware of the situation, as well as the franchise owner.

This article was publicly available online for years. This employee admission is evidence that the Red Roof Defendants did in fact know about sex trafficking occurring at the Smyrna Red Roof Inn.

### 153.

Other news websites published the story regarding the Smyrna Red Roof Inn employee's admission that the Red Roof Defendants knew of rampant sex trafficking at the Smyrna Red Roof Inn.

### 154.

Red Roof Defendants knew or should have known that the Smyrna Red Roof Inn employee had publicly admitted that the Red Roof Defendants knew about sex trafficking at the Smyrna Red Roof Inn.

### 155.

Article 1 stated that, "investigators recently filmed the manager of this Red Roof joking around with" a known sex trafficker "outside the manager's office. [The employee's] admission now further confirms the Red Roof is aware of what is going on."

156.

Article 1 stated, "What is it going to take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?"

157.

Article 1 stated, "Concerned citizens should call the Cobb County elected officials as well as the Red Roof Corporate offices right away," and provided contact information for contacting RRI, RRI's communications department, and RRI's public relations agency.

158.

On information and belief, RRI received numerous phone calls and complaints reporting sex trafficking and other criminal activity occurring at the Smyrna Red Roof Inn.

159.

Another article on the Trafficking Site ("Article 2") was entitled "Red Roof Runs Rampant."

160.

Article 2 stated,

The Red Roof Inn in Smyrna (2200 Corporate Plaza, Smyrna, GA 30080), located next to the new Braves stadium construction, is a hotbed of trafficking activity! This hotel is used for prostitution and has been this way for many years. Any day of the week, dozens of girls are

trafficked out of this location, some of whom look underage, even as young as 12.

161.

Article 2 stated, "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

162.

Article 2 also identified one of Plaintiff's traffickers as having trafficked women and children at the Smyrna Red Roof Inn and stated that Plaintiff's trafficker "has been living at this Red Roof in the room (#201) above the manager's office. Investigators have photographically documented [Plaintiff's and other traffickers] frequently hanging out and laughing with the hotel manager for extended periods of time."

163.

Article 2 stated, "Why has Red Roof not pulled their name from this franchise? Is this what they want us to expect from a Red Roof? Contact the Red Roof Corporate office (614-744-2600) . . . ."

164.

Red Roof Defendants knew or should have known about every article on the Trafficking Site that reported details of sex trafficking at the Smyrna Red Roof Inn, including employee and management complicity in sex trafficking at the Smyrna Red Roof Inn, and knowledge of sex trafficking at the Smyrna Red Roof Inn by Red Roof Defendants.

165.

In fact, Red Roof Defendants did know about these articles. They were sent directly to the president of RRI.

166.

A high-ranking hospitality industry executive and anti-trafficking advocate arranged a one-on-one phone call with RRI president and CEO, Andrew Alexander. On the call, she personally informed Mr. Alexander of the ongoing sex trafficking venture occurring at the Smyrna Red Roof Inn, in which Plaintiff was trafficked, and informed Mr. Alexander of the name of one of Plaintiff's traffickers and the fact that this person was a known sex trafficker with a lengthy criminal history related to sex crimes involving minors.

167.

Mr. Alexander received the articles documenting the Smyrna Red Roof
Inn hotel sex trafficking venture and of the complicity of the staff. He was
further told the sex trafficker was on the Georgia Sex Offender Registry.[32] All
of this information was easily verifiable and readily available to the public.

168.

Mr. Alexander's only response was to have an attorney search for the
name of the organization that published the articles online.

169.

RRI did nothing further in response to receiving this information.

170.

RRI's franchise agreements allow the company to terminate its
agreements and pull its brand from a hotel location on the basis of criminal
activity, including sex trafficking, at a hotel.

171.

In September 2015, RRI terminated its franchise agreement with a
hotel in Charlotte, North Carolina after the hotel was the subject of media

---

[32] O.C.G.A. § 42-1-12.

scrutiny following a prostitution sting that uncovered child sex trafficking at the hotel during the 2012 Democratic National Convention.[33]

172.

However, RRI pulled its brand from the Charlotte hotel only after the FBI attempted to seize the property.[34]

173.

Following the widespread media reports and attempted seizure, RRI finally stated,

> Red Roof Inn has terminated its franchise agreement with the Inn located at 3300 Queen City Road, Charlotte, NC. Once we were made aware of the situation, swift and immediate action was taken to terminate this franchisee's agreement with the brand. This property is no longer part of the Red Roof brand. Red Roof is contacting current guests as well as those with prior reservations to ensure that they will be accommodated at the nearest Red Roof Inn or another Inn of their choice. Red Roof is working with Federal Authorities."[35]

---

[33] *Feds Look into Sex Trafficking at Charlotte Hotel*, Associated Press, (Sept. 18, 2015), https://www.citizen-times.com/story/news/2015/09/18/feds-look-sex-trafficking-charlotte-hotel/72386068/ (last visited Aug. 5, 2019).

[34] *NC Motel Loses Franchise after Trafficking Allegations*, Fox 8, (Sept. 17, 2015), https://myfox8.com/2015/09/17/nc-motel-loses-franchise-after-trafficking-allegations/ (last visited Aug. 5, 2019).

[35] Courtney Francisco, *Feds: Teen Sex Trafficking at CLT Motel*, WCCP Charlotte, (Dec. 3, 2015), https://www.wccbcharlotte.com/2015/12/03/feds-teen-sex-trafficking-at-clt-motel/.

174.

Nonetheless, RRI retained the profits it had made from what it then definitively knew was child sex trafficking at the Charlotte hotel.

175.

Similarly, despite specific knowledge by RRI's president and CEO of a sex trafficking operation occurring at the Smyrna Red Roof Inn, and documented and publicized instances of rampant crime and sex trafficking at the hotel from at least 2010 to the present, RRI keeps profiting from the illegal activity and sex trafficking at the Smyrna Red Roof Inn and continues to promote the Smyrna Red Roof Inn as "one of the best budget hotels in Smyrna, GA."[36]

176.

Though Plaintiff's claims are not solely dependent on the general knowledge of RRI of a national sex trafficking epidemic occurring at its properties, RRI knew or should have known its properties and the policies governing those properties were being utilized nationwide to make Red Roof

---

[36] Exhibit 9, Red Roof Inn Atlanta – Smyrna/Ballpark, Red, https://www.redroof.com/property/ga/smyrna/RRI088 (last visited Aug. 8, 2019).

Inns an attractive location for sex traffickers to exploit women, men, and children.

177.

RRI knew or should have known about sex trafficking from which it profited in its hotels nationwide, including its hotels in Atlanta and Smyrna, Georgia, in Charlotte, North Carolina,[37] Houston, Texas,[38] Champaign, Illinois,[39] Newark, New Jersey,[40] St. Louis, Missouri,[41] St. Charles,

---

[37] Joe Marusak, *Feds Oversee Sale of Former Charlotte Red Roof Inn that Harbored Teen Sex Trafficking*, The Charlotte Observer, (Aug. 2, 2016), https://www.charlotteobserver.com/news/local/crime/article93210577.html (last visited Aug. 8, 2019).
[38] Maria Salazar, *Houston Attorney Sues Hotels in Sex Trafficking Case Involving 15-year-old Girl*, Fox 26, (May 15, 2019), http://www.fox26houston.com/good-day/morning-news/houston-attorney-sues-hotels-in-a-sex-trafficking-case-involving-a-15-year-old (last visited Aug. 8, 2019).
[39] Erick Payne, *Two People Face Charges for Involvement in Trafficking Ring*, WCIA, (July 25, 2018), https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/ (last visited Aug. 8, 2019).
[40] Carl Hamilton & Josh Shannon, *Indictment: Alleged Sex Traffickers Held Abducted Teen at Newark Motel*, Newark Post, (Feb. 26, 2018), https://www.newarkpostonline.com/news/indictment-alleged-sex-traffickers-held-abducted-teen-at-newark-motel/article_484c66f0-bab7-5cf9-a175-2d989728b25f.html (last visited Aug. 8, 2019).
[41] Joe Currier, *Man Charged with Sex Trafficking at Red Roof Inn in St. Louis*, St. Louis Post-Dispatch, (June 30, 2017), https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html (last visited Aug. 8, 2019).

Missouri,[42] Toledo, Ohio,[43] Flint, Michigan,[44] Louisville, Kentucky,[45] Sioux

Falls, South Dakota,[46] Rockville, Maryland,[47] Milwaukee, Wisconsin,[48]

---

[42] Alana Broe, *Sex, Drugs, and Res Gestae: The Eighth Circuit Says Evidence is "Inextricably Related" to Sex Trafficking*, Matters, (2018), https://www.traffickingmatters.com/sex-drugs-and-res-gestae-the-eighth-circuit-says-evidence-is-inextricably-related-to-sex-trafficking/ (last visited Aug. 8, 2019).

[43] Allison Dunn, *Victim: 'Father Figure' Haynes Manipulated her in Sex-Trafficking Case*, Toledo Blade, (March 26, 2019), https://www.toledoblade.com/local/courts/2019/03/26/victim-testifies-in-pastor-anthony-haynes-sex-trafficking-case/stories/20190326115 (last visited Aug. 8, 2019).

[44] Roberto Acosta, *Mother Accused of Sex Trafficking 6-year-old Daughter Appears in Court*, MLive, (July 15, 2019), https://www.mlive.com/news/flint/2019/07/mother-accused-of-sex-trafficking-6-year-old-daughter-appears-in-court.html (last visited Aug. 8, 2019).

[45] *Cincinnati Man Pleads Guilty to Sex Trafficking by Force, Fraud, and Coercion*, Department of Justice, (Nov. 14, 2014) https://www.justice.gov/opa/pr/cincinnati-man-pleads-guilty-sex-trafficking-force-fraud-and-coercion (last visited Aug. 8, 2019).

[46] Press Release, *Two From Minneapolis Sentenced for Sex Trafficking*, Department of Justice, (June 9, 2015), https://www.justice.gov/usao-sd/pr/two-minneapolis-sentenced-sex-trafficking (last visited Aug. 8, 2019).

[47] Kevin Lewis, *Teenage Prostitution Ring Busted, Pimp Claims to Also Work as School Bus Driver*, CBS Austin, (March 4, 2016), https://cbsaustin.com/news/offbeat/teenage-prostitution-ring-busted-pimp-claims-to-also-work-as-school-bus-driver-03-04-2016-154655883 (last visited Aug. 8, 2019).

[48] Amani Booker, *2 Face Federal Sex Trafficking Charges*, Milwaukee Journal Sentinel (June 16, 2010), http://archive.jsonline.com/news/crime/96508359.html/ (last visited Aug. 8, 2019).

Scranton, Pennsylvania,[49] Baltimore, Maryland,[50] Amherst, New York,[51]

Woodbury, Minnesota,[52] Joliet, Illinois,[53] Milford, Connecticut,[54] Nashville,

---

[49] Joseph Kohut, *Scranton Sex Trafficking Cases Move Forward*, Pocono Record, (Dec. 4, 2016), https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward (last visited Aug. 8, 2019).

[50] *2 Charged with Human Trafficking at Jessup Red Roof Inn*, CBS Baltimore, (July 23, 2019), https://baltimore.cbslocal.com/2019/07/23/2-charged-with-human-trafficking-at-jessup-red-roof-inn/ (last visited Aug. 8, 2019).

[51] Matt Chandler, *Alleged Underage Sex Trafficking in Amherst*, Buffalo Business First, (Dec. 17, 2012), https://www.bizjournals.com/buffalo/news/2012/12/17/alleged-underage-sex-trafficking-in.html (last visited Aug. 8, 2019).

[52] Katie Kather, *13 Men Charged in Woodbury Sex-with-Minors Sting*, Twin Cities Pioneer Press, (Sept. 21, 2015) https://www.twincities.com/2015/09/21/13-men-charged-in-woodbury-sex-with-minors-sting/ (last visited Aug. 8, 2019).

[53] Felix Sarver, *Joliet Hotel Among Meeting Places in Rappers' Sex Trafficking Ring*, The Herald-News, (Jan. 18, 2016) https://www.theherald-news.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/ (last visited Aug. 8, 2019).

[54] Jonathan Shugarts, *Suspected Waterbury Sex Trafficker Facing Charges*, Republican American, (Jan. 17, 2019), https://www.rep-am.com/news/2019/01/17/suspected-waterbury-sex-trafficker-facing-charges-3/ (last visited Aug. 8, 2019).

Tennessee,[55] Lubbock, Texas,[56] Secaucus, New Jersey,[57] Burlingame,

California,[58] Ann Arbor, Michigan,[59] Enfield, Connecticut,[60] Tinicum,

---

[55] *23-Year-Old Nashville Man Faces 18 Charges after Prostitution Sting at Donelson Hotel*, End Slavery Tennessee, (June 24, 2014), https://www.endslaverytn.org/news/23yearoldnashvillemanfaces18chargesaft erprostitutionstingatdonelsonhotelnewsarticle (last visited Aug. 8, 2019).
[56] *5 Arrested in Online Prostitution Sting Operations*, KCBD 11, (Aug. 1, 2013), https://www.kcbd.com/story/23023825/5-arrested-in-online-prostiution-sting-operations/(last visited Aug. 8, 2019).
[57] Jonathan Lin, *Man Charged with Promoting Prostitution at Red Roof Inn in Secaucus*, NJ.com, (Feb. 5, 2014), https://www.nj.com/jjournal-news/2014/02/man_charged_with_promoting_pro.html (last visited Aug. 8, 2019).
[58] Jason Green, *Berkely Man Gets Life Sentence for Prostituting Teen*, The Mercury News, (July 21, 2017), https://www.mercurynews.com/2017/07/21/berkeley-man-gets-life-sentence-for-prostituting-teen/ (last visited Aug. 8, 2019).
[59] Patrick Dunn, *A Road Back from Walking the Streets*, Ann Arbor Observer, (April, 2014), https://annarborobserver.com/articles/a_road_back_from_walking_the_streets .html#.XUg6Tm9KjZk (last visited Aug. 8, 2019).
[60] David Owens, *Hartford Man Sentenced to Prison for Sex Trafficking of 15-year-old Girl*, The Morning Call, (Nov. 14, 2016), https://www.mcall.com/hc-sex-trafficking-teenager-prison-1115-20161114-story.html (last visited Aug. 8, 2019).

Pennsylvania,[61] Lafayette, Indiàna,[62] Savannah, Georgia,[63] Farragut,

Tennessee,[64] Ridgeland, Connecticut,[65] and Woburn, Massachussetts,[66] and

Philadelphia, Pennsylvania,[67] among other locations.[68]

---

[61] Tim Logue, *Chester Man Gets Life in Jail for Sex Trafficking*, Daily Times,
(Dec. 19, 2014), https://www.delcotimes.com/news/chester-man-gets-life-in-
jail-for-sex-trafficking/article_03bf3c6e-62cc-5fa6-b531-0ac7ab630e85.html
(last visited Aug. 8, 2019).

[62] Joseph Paul, *Men Accused of Promoting Prostitution in Lafayette*, Journal
& Courier, (Dec. 27, 2016),
https://www.jconline.com/story/news/crime/2016/12/27/men-accused-
promoting-prostitution-lafayette/95870334/ (last visited Aug. 8, 2019).

[63] *Man, Woman Charged with Pimping Women out of Pooler Hotel*, WTOC,
(Dec. 29, 2014), https://www.wtoc.com/story/27724967/man-woman-charged-
with-pimping-women-out-of-pooler-hotel/ (last visited Aug. 8, 2019).

[64] *Farragut Man Faces Federal Sex Trafficking Charges*, WBIR 10, (April 7,
2015) https://www.wbir.com/article/news/farragut-man-faces-federal-sex-
trafficking-charges/93434205 (last visited Aug. 8, 2019).

[65] Katie Eubanks, *Sex Trafficking Victim Shares Story*, Clarion Ledger, (April
16, 2015) https://www.clarionledger.com/story/news/2015/04/16/sex-
trafficking-victim-shares-story/25919625/ (last visited Aug. 8, 2019).

[66] Eric T. Berkman, *Alleged Sex Trafficker Can't be Compelled to Unlock
Phone*, LeagalNews.com, (Aug. 18, 2017),
http://legalnews.com/detroit/1446866 (last visited Aug. 8, 2019).

[67] Sam Wood, *Pimp 'Gucci Prada' Gets Life for Forcing Child into
Prostitution*, The Philadelphia Inquirer, (Dec. 18, 2014),
https://www.inquirer.com/philly/news/new_jersey/Pimp_Gucci_Prada_gets_lif
e_for_forcing_child_into_prostitution.html (last visited Aug. 8, 2019).

[68] This list was compiled from a simple Google search of "red roof inn" and
"sex trafficking." It is inconceivable that any national brand could possibly
*avoid* knowing about these well-publicized incidents while at the same time
monitoring and managing its brand reputation online, as RRI spends millions
of dollars doing each year.

76

178.

Via the terms of its franchise agreement, RRI contractually required

itself to know about each and every safety and security issue at the Smyrna

Red Roof Inn and required the other Red Roof Defendants to comply with the

safety and security provisions "as designated" by RRI. The Red Roof Inn

franchise agreement between RRI and the other Red Roof Defendants states:

> Franchisee shall promptly report to Franchisor all incidents involving
> safety, security, public relations or serious injury to persons or property
> that occur at, or involve, the Inn and shall consult with Franchisor
> before speaking to or corresponding with the media about any such
> incident. Franchisee shall otherwise comply with those portions of the
> safety, security and public relations provisions as designated by
> Franchisor in the Manual.

179.

RRI should have known what it contractually obligated itself to know.

180.

RRI should have known it was profiting from the sex trafficking of

Plaintiff.

181.

The collusion of the Red Roof Inn employees with Plaintiff's traffickers,

in combination with management's blatant disregard for warning signs and

gross failure to act, laid the foundation for criminal enterprises to flourish at

their hotels, including sex trafficking. By failing to address or curtail the

criminal activity, and instead, knowingly accepting and relying upon money earned from these criminal enterprises, the Red Roof Inn Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## V. The Sex Trafficking of Jane Doe 1 at the Suburban Extended Stay

182.

Plaintiff was trafficked at the Suburban Extended Stay on a regular basis from 2011 to 2016 by multiple traffickers.

183.

Multiple employees at the Suburban Extended Stay were paid by Plaintiff's traffickers to work as lookouts to assist and facilitate Plaintiff's trafficking.

184.

Two employees at the Suburban Extended Stay were paid in cash when Plaintiff's trafficker arrived at the hotel.

185.

These two employees would then be instructed by the trafficker to call

him if "anything crazy is going on" and to "look out for my girl here and let

me know if she does something crazy."

186.

These employees asked Plaintiff's trafficker if he would like a room in

the "usual spot."

187.

Plaintiff's traffickers regularly spoke to these two employees on the

phone in the hotel room to discuss the employees' payments for their

assistance.

188.

These employees would call the room where Plaintiff was being

trafficked and warn Plaintiff's traffickers if there were police at the hotel and,

if so, whether they needed to temporarily stop the flow of buyers to the room.

189.

A third employee of the Suburban Extended Stay also worked for

Plaintiff's traffickers.

190.

On one occasion, another trafficking victim of Plaintiff's trafficker asked this third male employee for a ride or the use of his cell phone to call a cab so that she could escape. The man told her he could not give her a ride. The employee then told the trafficker that the victim had tried to get his help to escape. That night, the victim's trafficker (also Plaintiff's trafficker) came to the victim's room and ruthlessly beat her for confiding in the employee and trying to escape, saying, "You think somebody is going to help you? None of these people are going to help you."

191.

While Plaintiff was trafficked at the Suburban Extended Stay she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

192.

While Plaintiff was trafficked at the Suburban Extended Stay her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked

would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

193.

While Plaintiff was trafficked at the Suburban Extended Stay the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room for short periods each day. Plaintiff was aware that several other trafficking victims were at the Suburban Extended Stay being trafficked each night while Plaintiff was at the hotel. At a bare minimum, at least 50 buyers came to the Suburban Extended Stay to purchase sex each day Plaintiff was trafficked.

194.

The Suburban Extended Stay Defendants received a percentage of the revenue generated by the operations of the Suburban Extended Stay, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

81

195.

The Suburban Extended Stay Defendants knew or should have known that sex trafficking was a constant occurrence at the Suburban Extended Stay.

196.

The Suburban Extended Stay Defendants did nothing in response to a litany of known, documented, and publicized incidents of sex trafficking and related crimes at the Suburban Extended Stay.

197.

Publicly-available online reviews of the Suburban Extended Stay reported widespread prostitution and crime occurring at the hotel. These reviews are attached hereto as Exhibit 10.

198.

A review from January 2012 stated,

**A place of horror, if you want to know what hell is like stay here.** I can understand why there no improvements most of people that I see are crackheads rough looking thugs or prostitutes and they don't use computers. front desk is rude, does nothing about putting the customer first. there are always people hanging out in the parking lot full of alcohol no telling what else. you don't go outside at night here for fear of your own safety from the thugs thet make up most of the clients.

199.

A review from August 2012 stated,

lots of people hanging out.. I was in the room for 5 minutes and requested a refund. I'm still waiting on the refund and it has been 2 months. Manger said that she would mail the refund, still waiting. Have spoken with the mangsr several times, still waiting. I think this hotel is a hangout spot for Drug dealers and Crackheads.

200.

A review from May 2014 stated,

Marijuana Smoke, [. . .] Drug dealers next door, Cops circling the premises, The staff is rude, Cum stained sheets and Telephones with no cords, If you want to live a Herpe, drug free wait, if you just want to LIVE, do not stay here.

201.

A review from June 2014 stated,

Disgusting. Hotel. [. . .] 2 working prostitutes and many drug dealers. I am stuck here.

202.

A review from June 2014 stated,

Great if your looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps. If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. I wasn't here for even an hour before I was in a rigorous habit of using all available door locks AS SOON as I entered my room. I will admit, if you are looking to get high (on pretty much anything other than hallucinogenic drugs such as mushrooms and LSD) during your stay, this may just be the best place you could possibly come across in the area. I was offered, and I quote, "that hard, that soft, ice, boy, Cali bud" of course, the proper medical tools for administering said chemicals, and I even happened across no less than

83

3 partially used portions of what I am pretty sure was crack just lying around in the breezeways waiting for anybody to pick up and check out! So if drugs are your thing, this may be your favorite new home away from home.

203.

A review from June 2015 stated,

The building and surrounding areas aren't much better. The hall ways are dirty, including the elevator which has a broken hand rail. In addition, during our 2 week stay I noticed 4 different police offficers responding to calls in the building. I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is frequently used for selling drugs and prostitution... DISGUSTING again!

204.

A review from November 2015 stated,

No matter how much you complain nothing will get done, all the review's in the world could be left on here and management or corporate will do anything about it. There a choice property so the only person you can even complain to is a 800 number and they only document what you say and forward it to the hotel, a lot of good that will do. They have so many bad reviews and complaints but still open.

205.

The Suburban Extended Stay Defendants knew or should have known about the online reviews describing prostitution, sex trafficking, and related criminal activity occurring at the Suburban Extended Stay.

84

206.

The Suburban Extended Stay Defendants knew or should have known that the rampant criminal activity taking place at the Suburban Extended Stay created a violent and deadly environment.

207.

Between 2010 and 2016, sixteen people killed themselves or attempted to kill themselves at the Suburban Extended Stay, according to records from the Chamblee Police Department.

208.

Between 2010 and 2016, at least seventeen people were found dead at the Suburban Extended Stay, according to records of the Chamblee Police Department.

209.

Sex trafficking and prostitution were a routine occurrence at the Suburban Extended Stay.

210.

On July 22, 2010, a 20-year-old was arrested for prostitution and drugs at the Suburban Extended Stay as part of a sting operation conducted by the Dekalb County Vice Unit. The woman stated she was prostituting to make money for her boyfriend.

211.

On April 21, 2011, a 31-year-old was arrested for prostitution at the
Suburban Extended Stay as part of a sting operation conducted by the
Dekalb County Vice Unit.

212.

On June 20, 2012, the Dekalb County Vice Unit conducted an operation
at the Suburban Extended Stay solely "to deter prostitution on going [sic] at
this hotel." As part of the operation, two individuals, one sex offender, were
arrested on drug charges and for failing to register as a sex offender.

213.

On January 2, 2013, a 19-year-old and a 24-year-old were arrested for
prostitution and drugs at the Suburban Extended Stay as part of a sting
operation conducted by the Dekalb County Vice Unit.

214.

On January 21, 2014, an 18-year old was arrested for prostitution and
a 26-year-old male was arrested for pimping and drugs at the Suburban
Extended Stay as part of a sting operation conducted by the Dekalb County
Vice Unit. The 18-year-old stated that she had traveled to Atlanta from
Wisconsin to live at the Suburban Extended Stay with the man. At the

Suburban Extended Stay, she worked as a prostitute; the man kept half of the proceeds from her prostitution.

215.

The Suburban Extended Stay Defendants knew or should have known of the open and rampant criminal activity, including prostitution and sex trafficking, occurring at the Suburban Extended Stay.

216.

The wider community is also aware of the Suburban Extended Stay's reputation as a haven for sex trafficking. Nonprofit and religious groups routinely and regularly visit the Suburban Extended Stay to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

217.

Choice sent inspectors to examine the Suburban Extended Stay, at times anonymously.

218.

Choice controls the training and policy standards for the Suburban Extended Stay. Choice was responsible for training the owners and general managers of the Suburban Extended Stay, as required by Choice's franchise agreement.

219.

However, Choice failed to implement and enforce any of its own policies or training procedures that were intended to protect guests at the Suburban Extended Stay from rampant criminal activity, including the sex trafficking of Plaintiff.

220.

Choice knew or should have known about the extensive prostitution and sex trafficking, including Plaintiff's sex trafficking, that was occurring at the Suburban Extended Stay.

221.

In spite of its knowledge, Choice did not require managers or employees of the Suburban Extended Stay to participate in any training related to sex trafficking.

222.

Choice did not enforce any policies related to sex trafficking at the Suburban Extended Stay.

223.

Choice did not provide checklists, escalation protocols, prevention information to management staff or employees, or track performance indicators or metrics on human trafficking prevention.

224.

Choice did not tell management and staff at the Suburban Extended
Stay to escalate or report known or reported instances of sex trafficking to
Choice's attention.

225.

In fact, Choice did the opposite. It is Choice's policy to refer, without
action or comment, guest complaints directly back to hotel management for
resolution. Choice's rules and regulations require individual hotel
management to respond to all guest complaints and to maintain those
responses for review by Choice.

226.

Choice runs an extensive customer service and complaint department,
receiving reports and complaints directly from customers about its many
hotel locations around the world.

227.

Choice knew the content of the complaints it received from guests,
including the guests at the Suburban Extended Stay.

228.

Choice rules and regulations require hotel management to respond to
complaints—which have been received by Choice and sent by Choice to hotel

management—within 48 hours. Hotel management must resolve the complaint issues within seven days.

229.

Though Choice knows the content of the complaints it receives, Choice takes no action to resolve a complaint, regardless of the content.

230.

Choice does not follow-up with hotel management to ensure action was taken to resolve complaints. Choice does not contact the police in response to reports of criminal activity at its hotels.

231.

Only if Choice is contacted by the same guest *a second time* will Choice modify its standard protocol of simply referring the complaint back to hotel management without comment.

232.

Even then, if the hotel management responded to the first complaint by checking the appropriate administrative box, Choice refuses to take any further action.

233.

If hotel management did not respond the first time, Choice will then evaluate and attempt to resolve the complaint.

234.

On information and belief, Choice directly received numerous phone calls and complaints about the vast criminal activity that was occurring at the Suburban Extended Stay, including prostitution and sex trafficking.

235.

However, Choice continued to follow its deficient complaint procedure— and failed to require any trainings or take any other preventative measures—because Choice actively tries to remain willfully blind to the rampant sex trafficking occurring at its hotels, including the Suburban Extended Stay.

236.

Choice knew it benefitted financially from sex trafficking at its hotels, including the Suburban Extended Stay. But rather than make any attempts to curtail criminal activity, Choice consciously distanced itself from any corrective measures, knowing it would continue to profit from sex trafficking at its hotels, including the Suburban Extended Stay.

237.

Specifically, Choice ignored complaints and reports of crime, prostitution, and sex trafficking, and continued to profit from the criminal activity occurring at those locations by encouraging and permitting hotel

management and staff, who they knew or should have known were complicit in sex trafficking, to "resolve" customer complaints themselves.

238.

The Suburban Extended Stay Defendants' agents, representatives, and employees did not properly resolve complaints and known instances of sex trafficking, including Plaintiff's.

239.

The collusion of the Suburban Extended Stay employees with Plaintiff's traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or curtail the criminal activity, and instead, knowingly accepting and relying upon monies earned from these criminal enterprises, the Suburban Extended Stay Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VI.   The Sex Trafficking of Jane Doe 1 at the La Quinta Inn

240.

Plaintiff was trafficked at the La Quinta Inn on a regular basis by multiple traffickers from 2011 to 2013.

241.

The La Quinta Defendants received a percentage of the revenue generated by the operations of the La Quinta Inn, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

242.

Employees at the La Quinta Inn participated in, assisted, and facilitated Plaintiff's sex trafficking.

243.

Employees intentionally rented rooms to Plaintiff and her traffickers near the back door of the hotel so that buyers could come and go without other guests noticing. The employees told Plaintiff and her traffickers to "use the back door" to hide the number of men visiting the room each day from other guests.

244.

The employees gave Plaintiff and her traffickers extra key cards so that numerous buyers could easily access the hotel each day. Extra key cards were left outside the back door so that buyers could let themselves into the hotel from the back without being noticed.

245.

La Quinta Inn employees knew of an incident where Plaintiff was nearly beaten to death by her trafficker for roughly six hours at the La Quinta Inn. Plaintiff's trafficker videotaped himself viciously beating Plaintiff for hours, leaving blood all over the room and the walls. Hotel employees knew Plaintiff's trafficker was violently beating Plaintiff in the room but did nothing to help.

246.

While Plaintiff was trafficked at the La Quinta Inn she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

247.

While Plaintiff was trafficked at the La Quinta Inn her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked would contain an extraordinary number of used condoms, multiple cell phones were in the room, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

248.

While Plaintiff was trafficked at the La Quinta Inn the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men visiting Plaintiff's room for short periods in a day.

249.

The La Quinta Inn Defendants control the training and policies for the La Quinta Inn where Plaintiff was trafficked.

250.

The collusion of the La Quinta Inn employees with Plaintiff's traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or

95

curtail the criminal activity, and instead, knowingly accepting and relying upon money earned from these criminal enterprises, the La Quinta Inn Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VII.  The Sex Trafficking of Jane Doe 1 at the Atlanta ESA

251.

Plaintiff was trafficked at the Atlanta ESA from 2011–2016.

252.

The ESA Defendants received a percentage of the revenue generated by the operations of the Atlanta ESA, including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

253.

Employees at the Atlanta ESA knew of, participated in, assisted, and facilitated Plaintiff's sex trafficking.

254.

On information and belief, employees were paid by Plaintiff's traffickers to allow open sex trafficking Atlanta ESA, including Plaintiff's

trafficking, and to act as lookouts to assist the traffickers in evading the police.

255.

While another trafficking victim was trafficked at the Atlanta ESA, she confided in an employee who worked at the front desk that she was being trafficked.

256.

Sex trafficking at the Atlanta ESA was so pervasive and condoned that upon learning that the other victim was being trafficked, the front desk employee revealed that he kept lingerie outfits behind the counter for sale. The employee pulled out bags of outfits and tried to sell the lingerie to the victim.

257.

Any reasonable oversight or supervision of the Atlanta ESA by the ESA Defendants would have revealed the existence of an illicit commercial enterprise where a front desk employee sold lingerie to sex trafficking victims at the hotel.

258.

ESA Defendants knew or should have known about the pervasive sex trafficking at the Atlanta ESA, including its employee's role in that sex trafficking.

259.

While Plaintiff was trafficked at the Atlanta ESA she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

260.

While Plaintiff was trafficked at the Atlanta ESA her room evidenced numerous well-known and visible signs of sex trafficking. Frequently the trash cans in the rooms in which Plaintiff was trafficked would contain an extraordinary number of used condoms, she stayed for extended periods with very few personal items or possessions in the room, and she frequently requested excessive items from housekeeping while preventing housekeeping from entering the room.

261.

The ESA Defendants control the training and policies for the Atlanta ESA where Plaintiff was trafficked.

262.

The collusion of the Atlanta ESA employees with sex traffickers, in combination with management's blatant disregard for warning signs and gross failure to act, laid the foundation for criminal enterprises to flourish at their hotels, including sex trafficking. By failing to address or curtail the criminal activity, and instead, knowingly accepting and relying upon monies earned from these criminal enterprises, the ESA Defendants knowingly benefitted or received something of value from their facilitation of or participation in a venture that they knew or should have known engaged in sex trafficking.

## VIII. CAUSES OF ACTION

### Trafficking Victims Protection Reauthorization Act

263.

In 2003, the TVPRA was amended to provide victims with a civil cause of action "against the perpetrator" of a violation of the TVPRA. 18 U.S.C. § 1595 (2003).

264.

In 2008, another cause of action was added to § 1595, allowing victims to sue not only a perpetrator who violates the criminal provisions of the TVPRA, but also making civilly liable "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter[.]" 18 U.S.C. § 1595 (emphasis added).

265.

Thus, since 2008, Defendants have known that if they did not take steps to determine whether they profited from what they should have known was sex trafficking, they would be held civilly liable for damages as a result of their willful blindness.

## COUNT ONE
### Perpetrator Claim:
### Sex Trafficking in Violation of 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against All Defendants)

266.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

267.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1591(a)(1) by 18 U.S.C. § 1595(a).

268.

In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Defendants knowingly harbored and maintained Plaintiff at Defendants' hotels and benefitted from her labor or services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, or the combination of such means would be used to force Plaintiff to engage in commercial sex acts in Defendants' hotels.

269.

In violation of 18 U.S.C. §§ 1591(a)(1) and 1595(a), Defendants protected and warned Plaintiff's trafficker of detection by the police, hotel guests, or any other threat to the continued sex trafficking of Plaintiff, thereby keeping her in bondage and ensuring the sex trafficking venture continued.

270.

Defendants' actions related to Plaintiff were in or affecting interstate commerce.

271.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' harboring of, and active participation in, Plaintiff's sex trafficking at Defendants' hotels.

272.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT TWO
### Perpetrator Financial Beneficiary Claim:
### Sex Trafficking in Violation of 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against All Defendants)

273.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

274.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1591(a)(2) by 18 U.S.C. § 1595(a).

275.

In violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a), Defendants assisted, supported, and facilitated Plaintiff's sex trafficking and benefitted

from her labor or services, knowing or in reckless disregard of the fact that means of force, fraud, coercion, or the combination of such means would be used to force Plaintiff to engage in commercial sex acts in Defendants' hotels.

276.

Defendants benefitted financially from Plaintiff's sex trafficking by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked.

277.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' support and facilitation of the sex trafficking venture to which Plaintiff was subjected.

278.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT THREE
### Financial Beneficiary Claim:
### Sex Trafficking in Violation of 18 U.S.C. § 1595(a)
### (Against All Defendants)

279.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

280.

Plaintiff is authorized to bring this civil claim against all Defendants by 18 U.S.C. § 1595(a).

281.

In violation of 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture with Plaintiff's traffickers that Defendants knew or should have known engaged in a violation of the TVPRA.

282.

Defendants benefitted financially from Plaintiff's sex trafficking by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked and by receiving money from Plaintiff's sex traffickers for illegal assistance in the sex trafficking venture.

283.

Defendants knew or should have known the money they received for the hotel rooms came from allowing Plaintiff's traffickers to use Defendants' hotel rooms as venue for commercial sex acts that were compelled by force, fraud or coercion.

284.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' participation in her trafficker's sex trafficking venture.

285.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT FOUR
### Perpetrator Claim:
### Forced Labor in Violation of 18 U.S.C. §§ 1589, 1595(a)
### (Against All Defendants)

286.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

287.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1589(a) by 18 U.S.C. § 1595(a).

288.

In violation of 18 U.S.C. §§ 1589(a) and 1595(a), Defendants knowingly obtained forced sexual services from Plaintiff by means of force, threats of force, physical restraint, or threats of physical restraint in violation of 18 U.S.C. § 1589(a)(1); serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2); and a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, she would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4).

289.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589(a).

290.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT FIVE
## Perpetrator Financial Beneficiary Claim:
## Forced Labor in Violation of 18 U.S.C. §§ 1589(b), 1595(a)
## (Against All Defendants)

291.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

292.

Plaintiff is authorized to bring this civil claim against all Defendants for a direct violation of 18 U.S.C. § 1589(b) by 18 U.S.C. § 1595(a).

293.

In violation of 18 U.S.C. §§ 1589(b) and 1595(a), Defendants knowingly benefitted from participation in a venture, knowing or in reckless disregard of the fact, that the venture was engaged in the providing or obtaining of Plaintiff's labor or services by means of force, threats of force, physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that if she did not perform such labor or services, she would suffer serious harm or physical restraint.

294.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589(b).

295.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

## COUNT SIX
### Financial Beneficiary Claim:
### Forced Labor in Violation of 18 U.S.C. § 1595(a)
### (Against All Defendants)

296.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

297.

Plaintiff is authorized to bring this civil claim against all Defendants by 18 U.S.C. § 1595(a).

298.

In violation of 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture with Plaintiff's traffickers that Defendants knew or should have known engaged in a violation of the TVPRA, specifically,

in the providing or obtaining of Plaintiff's labor or services by means of force, threats of force, physical restraint, serious harm or threats of serious harm, and/or a scheme, plan, or pattern intended to cause Plaintiff to believe that if she did not perform such labor or services, she would suffer serious harm or physical restraint.

299.

Defendants benefitted financially from this venture by receiving money from renting the hotel rooms in which Plaintiff was sex trafficked and by receiving money from Plaintiff's sex traffickers for illegal assistance in the sex trafficking venture.

300.

Defendants knew or should have known the money they received for the hotel rooms came at the cost of Plaintiff's forced labor in violation of 18 U.S.C. § 1589.

301.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' violation of the TVPRA.

302.

Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and punitive damages.

**COUNT SEVEN**
**Georgia Racketeer Influenced and Corrupt Practices Act**
**O.C.G.A. § 16-14-1, *et seq.***
**(Against all Defendants)**

303.

Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

304.

Defendants, through a pattern of racketeering activity and money derived therefrom, acquired or maintained, directly or indirectly, an interest in and/or control of the enterprise that trafficked Plaintiff for sex at Defendants' hotels, as described above, in violation of O.C.G.A. § 16-14-4(a) and (b).

305.

The association in fact of Defendants, their agents and employees, and Plaintiff's traffickers for the purpose of sex trafficking Plaintiff was an enterprise under Georgia law.

306.

Defendants were and are associated with the enterprise that sex trafficked Plaintiff.

307.

Defendants aided and abetted the enterprise that sex trafficked Plaintiff.

308.

Each and every Defendant directly or indirectly participated in and profited from the enterprise's sex trafficking of Plaintiff at each of Defendants' hotels.

309.

As described above, Defendants were knowingly complicit in the sex trafficking of Plaintiff, and provided a venue for the sex trafficking enterprise, in exchange for money in the form of bribes and room rentals.

310.

In addition to Defendants, there are various persons and entities who are employed by and/or associated with the sex trafficking enterprise of Plaintiff, including, but not limited to, various individual employees and agents of Defendants and Plaintiff's traffickers who participated, directly or indirectly, in the enterprise's criminal sex trafficking scheme. These

individuals performed multiple predicate acts within the scope of their employment on behalf of Defendants.

311.

Defendants and their agents and employees engaged in hundreds of acts of racketeering activity in furtherance of the sex trafficking scheme, which occurred over a period of years at Defendants' hotels.

312.

Each time Plaintiff was forced to engage in a commercial sex act with a buyer at one of Defendants' hotels, she did so under threat of serious violence and other harms, or after being physically beaten or raped.

313.

Defendants conspired to conduct or participate, directly or indirectly, in the affairs of the sex trafficking enterprise through a pattern of racketeering activity, including, but not limited to:

a) Assault and aggravated assault in violation of O.C.G.A. §§ 16-5-20 and 16-5-21 when Defendants, through their interest in the sex trafficking enterprise, profited from and concealed the assault and battery of Plaintiff, when she was beaten or threatened repeatedly at Defendants' hotel locations by her trafficker in order to force Plaintiff to have sex with buyers at Defendants

112

hotels, in violation of Article 2 of Chapter 5 of Title 16 of the Code of Georgia;

b) Kidnapping and false imprisonment in violation of O.C.G.A. § 16-5-40 and § 16-5-41 when Defendants, through their interest in the sex trafficking enterprise, participated in and concealed the kidnapping and false imprisonment of Plaintiff by keeping her trapped at Defendants' hotels under the control of her trafficker and preventing her escape or rescue by acting as informants for Plaintiff's trafficker;

c) Prostitution, keeping a place of prostitution, pimping, and pandering in violation of O.C.G.A. §§ 16-6-9 through 16-6-12 when Defendants, through their interest in the sex trafficking enterprise, participated in the forced prostitution of Plaintiff each time Plaintiff was forced to engage in a commercial sex act at Defendants' hotels, which occurred hundreds of times;

d) Money laundering in violation of 18 U.S.C. §§ 1956 and 1957 when Defendants accepted and derived more than $10,000 in the form of direct payments from Plaintiff's traffickers for lookout work and money for room rentals that Defendants knew were the proceeds of a criminal offense, the sex trafficking of Plaintiff;

113

e) Sex trafficking in violation of 18 U.S.C. § 1591, as alleged in Counts 1–3 above when Defendants, through their interest in the sex trafficking enterprise, violated the TVPRA each time Plaintiff was forced to engage in commercial sex acts at Defendants' hotels, which occurred hundreds of times;

f) Labor trafficking in violation of 18 U.S.C. § 1589, as alleged in Counts 4–6 above when Defendants, through their interest in the sex trafficking enterprise, violated the TVPRA each time Plaintiff engaged in forced labor at Defendants' hotels, which occurred hundreds of times.

314.

Defendants' predicate acts were related to one another and formed a pattern of racketeering activity in that the acts were a constant and continuous exploitation of Plaintiff over the course several years of sex and labor trafficking at Defendants' hotels.

315.

Defendants' predicate acts demonstrated criminal conduct of a continuing and longstanding enterprise.

114

316.

Plaintiff diligently sought medical and mental health assistance and attempted to investigate her claims with the help of several rescue organizations after she was rescued from the sex trafficking venture. Plaintiff received counseling and treatment from health care professionals and counselors. However, the nature of injuries from sex trafficking are ongoing and take years to uncover in the best circumstances when resources are available and the trafficker is incarcerated. Most of Plaintiff's traffickers are not incarcerated. The necessity of constantly concealing herself from sex traffickers—even to this day—and the continuous fear of reprisal, continues to interfere with Plaintiff receiving the safe, effective, and continuous medical attention required to uncover her injuries. Defendants, meanwhile, continue to conceal their knowledge, acceptance, facilitation, and profit from sex trafficking. The clandestine nature of Defendants' involvement in Plaintiff's sex trafficking prevented the discovery of the pattern of Defendants' racketeering activities until, at the earliest, in 2016 when a Smyrna Red Roof Inn employee admitted online knowledge of sex trafficking by the Red Roof Defendants, after which Plaintiff undertook investigative efforts to uncover all Defendants' involvement in her sex trafficking.

317.

Plaintiff was injured and suffered substantial harm by Defendants' overt acts committed in furtherance of the sex trafficking enterprise.

318.

Plaintiff has suffered substantial physical, emotional, and psychological injuries and other damages as a direct and proximate result of Defendants' pattern of racketeering activity.

319.

Plaintiff is entitled to recover actual and compensatory damages in an amount to be proven at trial including attorneys' fees, costs of investigation, punitive damages, treble damages, and equitable relief pursuant to O.C.G.A. § 16-14-6.

## Joint and Several Liability

320.

Defendants caused indivisible injuries to Plaintiff and are jointly and severally liable for Plaintiff's damages.

## Demand for Jury Trial

321.

Plaintiff is entitled to and hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

(a)    Enter judgment against Defendants on all counts, jointly and severally, in such amounts as will fully and adequately compensate Plaintiff for the damages she has suffered, in an amount to be determined at trial;

(b)    Award Plaintiff treble damages against Defendants, jointly and severally, for Defendants' violation of Georgia law;

(c)    Award Plaintiff punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury, for Defendants' violation of federal and Georgia laws;

(d)    Award Plaintiff pre-judgment and post-judgment interest;

(e)    Award Plaintiff the actual expenses of litigation and investigation, including reasonable attorneys' fees;

(f)    Award Plaintiff equitable and such other and further relief as the Court deems just and proper.

Respectfully submitted, this 26th day of August, 2019.

ANDERSEN, TATE & CARR, P.C.

/s/ Jonathan S. Tonge
Jonathan S. Tonge
Georgia State Bar No. 303999

117

jtonge@atclawfirm.com
Patrick J. McDonough
Georgia State Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia State Bar No. 140808
thundred@atclawfirm.com
Attorneys for Plaintiff Jane Doe 1

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile
3569442_1.docx

# Exhibit B

# GENERAL CHANGE ENDORSEMENT

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

| Name of Insurance Company(ies) | | |
|---|---|---|
| Atain Specialty Insurance Company   Atain Spec Insurance Company   100.0% GenLiab | | |

|  | Inception Date | Expiration Date |
|---|---|---|
|  | 4/1/2015 | 12/6/2015 |
| Endorsement Effective<br>11/26/2015 | Policy Number<br>CIP250491 | Endorsement #<br>2 |
| Named Insured<br>Global Management and Investment | Countersigned By | |

(Authorized Representative)

IN CONSIDERATION OF THE PREMIUM PREVIOUSLY CHARGED, IT IS HEREBY UNDERSTOOD AND AGREED THAT THE POLICY IS AMENDED AS FOLLOWS:

THE NEW EXPIRATION DATE IS NOW 12/06/2015.

All other terms and conditions remain unchanged.

## COMMON POLICY
## DECLARATIONS
# ATAIN SPECIALTY INSURANCE COMPANY
## FARMINGTON HILLS, MICHIGAN
## PRIMARY FACILITY POLICY

__NEW__

**Policy Number**

**CIP250491**

**Item 1. Named Insured** and Mailing Address:

GLOBAL MANAGEMENT AND INVESTMENT

285 COUNTRY CLUB DRIVE

STOCKBRIDGE                    GA       30281

Agent Name and Address:

BURNS & WILCOX, LTD.
2325 LAKEVIEW PARKWAY
SUITE 500
ALPHARETTA             GA   30009

| **Item 2.** Policy Period | From: 04/01/2015 | To: 11/26/2015 |
|---|---|---|

**12:01 A.M. Standard Time at the address of the Named Insured as stated herein.**

**Item 3.   Retroactive Date:** ___None___

**Item 4.   Business Description:** ___HOTEL/MOTEL___

**Item 5.**   In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts for which a premium is indicated. Where no premium is shown, there is no coverage. This premium may be subject to adjustment.

| Coverage Part(s) | Premium |
|---|---|
| Commercial Property Coverage Part | $ NOT COVERED |
| Commercial General Liability Coverage Part | $ 34,442.00 |
| Professional Liability Coverage Part | $ NOT COVERED |
| Non-Profit Organization Liability Coverage Part | $ NOT COVERED |
| Commercial Inland Marine | $ NOT COVERED |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
| State Tax | $ 1,417.68 |
| Stamping Fee | $ |
| Policy Fee | $ 1,000.00 |
| Inspection Fee | $ |
| **Total** | $  36,859.68 |

Minimum & Advance Premium          100.0000%
Minimum Earned Premium          25   % of the original premium

**Item 6.**   Forms and endorsements applicable to all Coverage Parts: _____

SEE SCHEDULE OF FORMS AND ENDORSEMENTS

**BURNS & WILCOX LTD.**

Countersigned  _04/20/2015_   _BHJ_                        _AEB_               By _____

DATE          UNDERWRITER                  PROCESSOR              COUNTERSIGNED

UNLPF-D-1 (11-04)

# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER: | EFFECTIVE DATE: | NAMED INSURED: |
|---|---|---|
| CIP250491 | 04/01/2015 | GLOBAL MANAGEMENT AND INVESTMENT |

```
SOFAE   09-10         SCHEDULE OF FORMS

COMMERCIAL FORMS

UNLPFD1 11-04        COMMON DECLARATIONS
AF100 07-12          POLICY JACKET
AF3380 07-12         FRAUD AND MISREPRESENTATION ENDORSEMENT
AF3550 07-12         MINIMUM EARNED PREMIUM & CANCELLATION
AF900 07-12          SERVICE OF SUIT ENDORSEMENT
BW61 04-07           SCHEDULE OF LOCATIONS
IL0017 11-98         COMMON POLICY CONDITIONS

STATE FORMS

BWGA227 06-06        GA-SURPLUS LINES DISCLOSURE

GENERAL LIABILITY

UNLPFSD1L 09-11      COMMERCIAL GL SUPPLEMENTAL DEC
AF000839 07-12       EMPLOYEES/SUBCON/INDEP CON/TEMP WORKERS/LEASED WORKERS/VOLUNTEERS
AF000848 07-12       PROPERTY ENTRUSTED EXCLUSION
AF000859 07-12       AI-SCHEDULED PERSON/ORG
AF000860 07-12       LIABILITY FOR GUESTS' PROPERTY PRM COV FORM
AF000873 07-12       KNOWN INJ/DAMAGE EXCL- PERS & ADV INJ
AF000899 03-14       AMENDMENT-AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION
AF001007 11-13       COMBINED COVERAGE AND EXCLUSION ENDORSEMENT
AF001396 07-12       INFRINGEMENT, MISAPPROPRIATION
AF001401 07-12       DAMAGE TO PREMISES RENTED TO YOU LIMITATION
AF001707 03-13       AMENDMENT OF NONPAYMENT/CANCELLATION CONDITION
AF001729 11-13       EXCLUSION - STATE OF MISSOURI
AF33509 07-12        REMOVAL OF ASSAULT & BATTERY EXCLUSION FROM COMBINED COV & EXCL ENDT
AF3378 01-15         AMENDMENT OF SECTION IV
AF3400 07-12         ABSOLUTE SILICA DUST EXCL
AF98001 07-12        PUNITIVE DAMAGE EXCLUSION
BW58 12-05           TOTAL LIQUOR LIABILITY EXCLUSION
CG0001 04-13         COMMERCIAL GENERAL LIABILITY COVERAGE FORM
CG0300 01-96         DEDUCTIBLE LIABILITY
CG2107 05-14         EXCL-DISCLOSURE PERSONAL INFO
CG2132 05-09         COMMUNICABLE DISEASE EXCL
CG2167 12-04         FUNGI OR BACTERIA EXCLUSION
CG2173 01-15         EXCLUSION OF CERTIFIED ACTS OF TERRORISM
CG2404 05-09         WAIVER OF TRANSFER OF RIGHTS
CG2412 11-85         BOATS
CG2426 04-13         AMENDMENT OF INSURED CONTRACT DEFINITION
```

ADDITIONAL FORMS

AF001089 - HIRED AUTO AND NON-OWNED AUTO LIABILITY
INSURANCE COVERAGE

## COMMERCIAL LINES POLICY



# ATAIN

## SPECIALTY INSURANCE COMPANY

30833 Northwestern Hwy., Ste. 220, Farmington Hills, MI 48334

This Policy may contain one or more of these coverages:

**COMMERCIAL PROPERTY**
**COMMERCIAL LIABILITY**
**CRIME**
**INLAND MARINE**
**COMMERCIAL AUTO**
**DIRECTORS & OFFICERS**
**LIABILITY**

**AF100 (07/ 12)**

IN WITNESS WHEREOF, the company has caused this policy to be signed by its President and its Secretary and countersigned on the declarations page by a duty authorized representative of the company.



Secretary

President

(Attach Declarations Page, Coverage Parts, Schedules and Endorsements, if any, here)

ENDORSEMENT

## This Endorsement Changes the Policy - Please Read it Carefully

## FRAUD AND MISREPRESENTATION ENDORSEMENT

This policy was issued based on the information supplied on an application and other correspondence, including your claims or loss history. This information is attached to and considered to be part of this policy.

You should review this information carefully because the truth of this information was of paramount importance in influencing our decision to issue this policy.

You, for all the insureds under this policy, do warrant the truth of such information to the best of your and their knowledge at the inception date of this policy.

If such information is false or misleading, it may cause denial of coverage or voiding of the policy.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: CIP250491

Named Insured: GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date: 04/01/2015

**Endorsement Serial No. AF-3380 (07/12)**

**This Endorsement Changes The Policy. Please Read It Carefully.**

MINIMUM EARNED PREMIUM AND CANCELLATION CLAUSE

This endorsement modifies insurance provided under the following Coverage Forms:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL INLAND MARINE COVERAGE FORM
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
COMMERCIAL PROPERTY COVERAGE PART
GARAGE COVERAGE FORM
GARAGEKEEPERS LEGAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

The minimum premium for this policy is [ 25 %] of the annual written premium, and such minimum earned premium is not subject to short rate or pro-rata adjustment in the event of cancellation by the insured. It is understood and agreed that cancellation for non-payment of premium shall be deemed a request by the insured for cancellation of this policy. In such case, the terms of the minimum earned premium and cancellation clause apply.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number:  CIP250491

Named Insured:  GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date:  04/01/2015

AF 3550

07/2012

THIS ENDORSEMENT FORMS A PART OF THE POLICY TO WHICH ATTACHED, EFFECTIVE ON THE INCEPTION DATE OF THE POLICY UNLESS OTHERWISE STATED HEREIN (THE FOLLOWING INFORMATION IS REQUIRED ONLY WHEN THIS ENDORSEMENT IS ISSUED SUBSEQUENT TO PREPARATION OF THE POLICY.)

ENDORSEMENT EFFECTIVE:  04/ 01/ 2015     ISSUED TO: GLOBAL MANAGEMENT AND INVESTMENT

ENDORSEMENT:                          BY:

POLICY NUMBER:  CIP250491

COUNTERSIGNED BY:  _____
                                    AUTHORIZED REPRESENTATIVE)

## SERVICE OF SUIT ENDORSEMENT

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United Sates of America or Canada and will comply with all requirements necessary to give such Court Jurisdiction and all matters arising hereunder shall be determined in accordance with the law and the practice of such Court.

It is further agreed that service of process in such suit may be made upon the Claims & Litigation Director,, Atain Specialty Insurance Company, Kaufman Financial Center, 30833 Northwestern Highway, Farmington Hills, MI 48334, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or by the final decision of the Appellate Court in the event of an appeal.

The above-named is authorized and directed to accept service of process on behalf of the Company in any such suit and/ or upon the request of the Insured to give a written undertaking to the Insured that it or they will enter a general appearance upon the Company's behalf in the event such a suit shall be Instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America or province of Canada, which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon who may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**AF 900 (07/ 12)**

# SCHEDULE OF LOCATIONS

Policy  CIP250491

Effective date:  04/ 01/ 2015
**12:01 A.M. Standard Time**

**Named Insured:**  GLOBAL MANAGEMENT AND INVESTMENT

| Prem. No. | Bldg. No. | Designated Premises (Address, City, State, Zip Code) | Occupancy |
|---|---|---|---|
| 1 | 1 | 5280 PEACHTREE INDUSTRIAL BLVD., CHAMBLEE, GA 30341 | HOTEL/ MOTEL |
| 2 | 1 | 3421 WRIGHTSBORO RD., AUGUSTA, GA 30909 | HOTEL/ MOTEL |
| 3 | 1 | 2820 CHAMBLEE TUCKER RD., ATLANTA, GA 30341 | HOTEL/ MOTEL |
| 4 | 1 | 2822 CHAMBLEE TUCKER RD., ATLANTA, GA 30341 | HOTEL/ MOTEL |
| 5 | 1 | 1435 MONTREAL RD., TUCKER, GA 30084 | HOTEL/ MOTEL |
| 6 | 1 | 2200 CORPORATE PLAZA, SMYRNA, GA 30080 | HOTEL/ MOTEL |
| 7 | 1 | 1351 DOGWOOD DR. SW, CONYERS, GA 30012 | HOTEL/ MOTEL |
| 8 | 1 | 2859 PANOLA RD., LITHONIA, GA 30058 | HOTEL/ MOTEL |
| 9 | 1 | 480 HOLIDAY CIRCLE, FORSYTH, GA 31029 | HOTEL/ MOTEL |

Case 1:23-mi-99999-UNA   Document 718-5   Filed 03/08/23   Page 149 of 457
Case 1:20-cv-01582-WMR   Document 1-2   Filed 04/13/20   Page 149 of 457

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Hart Forms & Services
Reorder No. 14-B234

   Copyright, Insurance Services Office, Inc., 1998

# SURPLUS LINES DISCLOSURE - GEORGIA

## FREQUENTLY ASKED QUESTIONS ABOUT YOUR SURPLUS LINES POLICY

Your broker has placed the insurance you requested in the "surplus lines market" with one or more surplus lines insurers. By definition, such surplus lines insurers are not licensed in the state, but this does not mean that the transaction is not regulated. The surplus lines market is an insurance marketplace that is established for the purpose of insuring unique or hard to place risks. Some of the rules that apply to surplus lines insurance policies and surplus lines insurance companies differ from those that govern coverage obtained from insurance companies licensed in your state. In order for you to better understand the surplus lines market and the rights you have in a surplus lines transaction, the following material is provided.

Please read this brochure carefully, and should you have any questions after reading the material, do not hesitate to ask your broker. If you wish further information, please contact the Regulatory Services Division, Room 604 West Tower, 2 Martin Luther King, Jr. Drive, Atlanta, Georgia 30334 or (404) 656-2074 or toll free at (800) 656-2298 (request Regulatory Services Division).

### WHAT IS A SURPLUS LINES POLICY?

A surplus lines policy is a policy placed with an insurer that is not licensed (or 'admitted') in this state, but is nonetheless eligible to provide insurance on property or liability insurance protection to citizens of this state through specially licensed agents or brokers known as surplus lines brokers.

### WHY AM I GETTING COVERAGE FROM A SURPLUS LINES INSURER?

Your agent or broker may have been unable to obtain the coverage you requested from insurance companies licensed in this state, but was able to obtain coverage from an eligible surplus lines insurance company. The reason for your agent or broker's action is that the risk or property for which you sought coverage may be unique or have certain risk characteristics that caused licensed insurers to decline to write the policy. In circumstances where licensed insurers will not write the risk, your broker is authorized by state law or regulation to obtain the coverage from a "surplus lines" insurer.

### SINCE THE SURPLUS LINES INSURER IS UNLICENSED, IS THE TRANSACTION UNREGULATED?

Surplus lines transactions are regulated by state law which requires that surplus lines policies be procured only by specially licensed brokers. These are called surplus lines brokers and they are authorized to transact business with certain unlicensed insurers that meet financial and other eligibility standards set by the state. These insurers are known as surplus lines insurers. Your agent may have worked with a licensed surplus lines broker in securing your policy. Alternatively, your agent may hold a surplus lines broker's license.

### IS MY SURPLUS LINES POLICY COVERED BY THE STATE GUARANTY OR INSOLVENCY FUND?

No. There is no guaranty fund for coverage for surplus lines policies. The guaranty fund, which provides payments in the event that your insurance company becomes insolvent, only covers policies of licensed insurers.

**HOW IS THE RATE OR PRICE OF A SURPLUS LINES POLICY DETERMINED?**

The rate or premium charged for a surplus lines policy is determined by the surplus lines insurer. As unlicensed insurers, surplus lines insurers do not file their rates or premiums with the state for review or approval.

**DOES THE GEORGIA DEPARTMENT OF INSURANCE REVIEW OR APPROVE THE TERMS AND CONDITIONS OF THIS POLICY?**

Pursuant to O.C.G.A. §33-5-21.1 policies of surplus lines insurers are not reviewed or approved by the Georgia Department of Insurance.

**CAN MY POLICY BE RENEWED OR EXTENDED?**

Your surplus lines policy may or may not be renewed or extended when the policy expires. An extension of the policy coverage will be dependent upon the continued unavailability of the policy coverage from insurers licensed in this state and the willingness of the surplus lines insurer to continue to accept the risk. Since a surplus lines policy is generally not subject to the same notice requirements as a policy issued by a licensed insurer, notice of a premium increase for a new policy term or the company's intent not to extend the policy at the same terms and conditions might not be provided until close to the date in which the policy expires. Therefore, you should keep in contact with your agent or broker, particularly as the expiration of the policy term nears, to ascertain the status of the policy and to assure continuity of coverage.

**PRIMARY FACILITY**
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**SUPPLEMENTAL DECLARATIONS**

These Supplemental Declarations form a part of policy number       CIP250491

## LIMITS OF INSURANCE

| | |
|---|---|
| General Aggregate Limit (other than Products/ Completed Operations) | $ 2,000,000 |
| Products/ Completed Operations Aggregate Limit | $ INCLUDED |
| Personal and Advertising Injury Limit | $ 1,000,000 |
| Each Occurrence Limit | $ 1,000,000 |
| Damage to Premises Rented to You Limit | $ 100,000 |
| Medical Expense Limit | $ 5,000    any one person |

## BUSINESS DESCRIPTION AND LOCATION OF PREMISES

Form of business:

☐ Individual    ☐ Joint Venture    ☐ Partnership    ☐ Organization (other than Partnership or Joint Venture)    ☐ Corporation    ☒ LLC

Business description:   HOTEL/ MOTEL

Location of all premises you own, rent or occupy:    SEE SCHEDULE OF LOCATIONS

## PREMIUM

| Classification | Code No. | *Premium Basis | PR/ Co | Rate All Other | Advance Premium Pr/ Co | All Other |
|---|---|---|---|---|---|---|
| HOTELS AND MOTELS-WITHOUT POOLS OR BEACHES-LESS THAN FOUR STORIES INCLUDING PRODUCTS/ COMPLETED OPERATIONS | 45192 | S) 5,711,600 | INCL | 5.75 | INCL | 32842 |
| LIABILITY FOR GUEST PROPERTY | 99999 | FLAT | INCL | 1.0 | INCL | 100 |
| HIRED AUTO AND/ OR NON-OWNED AUTO LIABILITY ENDORSEMENT | 42008 | FLAT | INCL | 500 | INCL | 500 |
| BLANKET ADDITIONAL INSURED | 99999 | FLAT | -- | 500 | - | 500 |
| BLANKET WAIVER OF SUBROGATION | 99999 | FLAT | -- | INCL | - | 500 |

GL TOTAL:    $34,442

## FORMS AND ENDORSEMENTS (other than applicable forms and endorsements shown elsewhere in the policy)

Forms and endorsements applying to this Coverage Part and made part of this policy at time of issue:

SEE SCHEDULE OF FORMS AND ENDORSEMENTS

DEDUCTIBLE: $   SEE CG0300      Per Claim

*(a) Area, (c) Total Cost, (m) Admission, (p) Payroll, (s) Gross Sales, (u) Units, (o) Other

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMERCIAL LIABILITY DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS COMPLETE THE ABOVE NUMBERED POLICY.

UNLPF-SD-1L (09-11)

# EMPLOYEES, SUBCONTRACTORS, INDEPENDENT CONTRACTORS, TEMPORARY WORKERS, LEASED WORKERS OR VOLUNTEERS

This endorsement modifies insurance provided under the following Coverage Forms:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM –
COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR

I.  Exclusion **e.**, **Employer's Liability** in Part **2**, **Exclusions** of **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** is replaced by the following:

**e.  Employer's Liability**

1.  "Bodily injury" to an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", "volunteer worker" of any insured or any person performing work or services for any insured arising out of and in the course of employment by or service to any insured for which any insured may be held liable as an employer or in any other capacity;

2.  Any obligation of any insured to indemnify or contribute with another because of damages arising out of "bodily injury" to an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", "volunteer worker" of any insured or any person performing work or services for any insured arising out of and in the course of employment by or service to any insured for which any insured may be held liable as an employer or in any other capacity;

3.  "Bodily injury" sustained by the spouse, parent, brother, sister, companion or offspring of an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", "volunteer worker" of any insured or any person performing work or services for any insured as a consequence of "bodily injury" to such an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker" "leased worker", "volunteer worker" of any insured or any person performing work or services for any insured in the course of his or her employment by or service to any insured; or

4.  Contractual liability as defined in Section I - Exclusions, item 2 b. of the Commercial General Liability Coverage Form CG 0001.

For the purposes of this endorsement, "independent contractor" means one that contracts to do work or perform a service for another and that retains control over the means or methods used in doing the work or performing the service. "Independent contractor" includes, but is not limited to, subcontractors and any employees of a subcontractor, any employee of an independent contractor, any "employees" of any insured, agents, representatives, volunteers, spouses, family members of any insured or any Additional Insureds added to this policy.

For the purposes of this endorsement, "Employee" is defined as follows:

"Employee" includes a "leased worker".

This exclusion applies to all causes of action arising out of "bodily injury" to any "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", "volunteer worker" or any person performing work or services for any insured because of "bodily injury" including care and loss of services.

II.  Exclusion **f. Employers Liability** in Part **2**, **Exclusions** of SECTION 1 - COVERAGES, BODILY INJURY AND PROPERTY DAMAGE LIABILITY in the **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM - COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR** form is replaced by the following:

f. Stop Gap — Employers Liability

1.  "Bodily injury" to an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", volunteer of any insured or any person performing work or services for any insured arising out of and in the course of employment by or service to any insured for which any insured may be held liable as an employer or in any other capacity;

2.  Any obligation of any insured to indemnify or contribute with another because of damages arising out of "bodily injury" to an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", volunteer of any insured or any person performing work or services for any insured arising out of and in the course of employment by or service to any insured for which any insured may be held liable as an employer or in any other capacity;

3.  "Bodily injury" sustained by the spouse, parent, brother, sister, companion or offspring of an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", volunteer of any insured or any person performing work or services for any insured as a consequence of "bodily injury" to such an "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", volunteer or any person performing work or services for any insured in the course of his employment by or service to any insured; or

4.  Contractual liability as defined in Section I - Exclusions, item 2 b. of the Owners And Contractors Protective Liability Coverage Form CG 0009.

For the purposes of this endorsement, "independent contractor" means one that contracts to do work or perform a service for another and that retains control over the means or methods used in doing the work or performing the service. "Independent contractor" includes, but is not limited to, subcontractors and any employees of any subcontractor, any employee of an independent contractor, any "employees" of any insured, agents, representatives, volunteers, spouses, family members of any insured or any Additional Insureds added to this policy.

For the purposes of this endorsement, "Employee" is defined as follows:

"Employee" includes a "leased worker".

This exclusion applies to all causes of action arising out of "bodily injury" to any "employee", subcontractor, employee of any subcontractor, "independent contractor", employee of any "independent contractor", "temporary worker", "leased worker", volunteer or any person performing work or services for any insured by any person or organization for damages because of "bodily injury", including care and loss of services.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number:  CIP250491

Named Insured:  GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date:  04/01/2015

_____
Authorized Representative

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROPERTY ENTRUSTED EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/ 01/ 2015 | 11/ 26/ 2015 |
| Endorsement Effective | Policy Number | |
| | CIP250491 | |
| Named Insured   GLOBAL MANAGEMENT AND INVESTMENT | | |

As respects the business operations shown on the Declarations page, this insurance does not apply to "property damage" to property of others:

1. Entrusted to you for safekeeping; or
2. On premises owned by or rented to you; or
3. That is a watercraft tied to your pier, slip or mooring.

All other terms and conditions of this policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

| Name of Additional Insured Person(s) Or Organization(s): | Location(s) of Covered Operations |
|---|---|
| ALL PERSONS OR ORGANIZATIONS AS REQUIRED BY WRITTEN CONTRACT WITH THE INSURED. | |

A. **SECTION II -WHO IS AN INSURED** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such a person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

   **1.** Your acts or omissions; or

   **2.** The acts or omissions of those acting on your behalf;

   in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

   A person's or organizations status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

   This insurance does not apply to:

   **Additional Insured Contractual Liability**

   " Bodily injury" or "property damage" for which the "additional insured(s)" are obligated to pay damages by reason of the assumption of liability in a contract or agreement.

   **Finished Operations or Work**

   " Bodily injury" or "property damage" occurring after:

   (1) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   (2) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization.

   **Negligence of Additional Insured**

   "Bodily injury" or "property damage" directly caused by or resulting from the negligence of the "additional insured(s)".

   ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

This endorsement is effective on the inception date of the policy unless otherwise stated below. (The information below is required only when this endorsement is issued subsequent to preparation of the policy).

Policy Number:  CIP250491

Named Insured:  GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective date:

AF 000 859
07/ 2012                    Included copyrighted material of ISO Properties, INC.              Page 1 of 1
                                    with its permission

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# LIABILITY FOR GUESTS' PROPERTY - PREMISES COVERAGE FORM

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date 04/01/2015 | Expiration Date 11/26/2015 |
|---|---|---|
| Endorsement Effective | Policy Number CIP250491 | |
| Named Insured   GLOBAL MANAGEMENT AND INVESTMENT | | |

A.   The following changes are made to **SECTION 1 - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

   1.   **Insuring Agreement, a.** is amended and the following is added:

   We will pay those sums that you become legally obligated to pay as damages because of "property damage" to any property, other than that excluded, belonging to your registered guests while the property is in:
   **(1)** The "premises"; or
   **(2)** Your possession.

   2.   **2. Exclusions, j.** is amended and the following added:
   Paragraph **(4)** does not apply to "property damage" to property of your registered guests.

   3.   **2. Exclusions** is amended and the following Exclusion is added:

   **Damage to Registered Guests Property**

   This insurance does not apply to "property damage":
   **(1)** Resulting from any dishonest or criminal act committed by any insured;
   **(2)** You assume under any written agreement.  However, this exclusion does not apply to any written agreement entered into with a registered guest before the "occurrence" of any loss, destruction or damage that increases to any amount not exceeding $1,000 or any lesser amount for which you may otherwise be liable under any statue;
   **(3)** Resulting from the spilling, upsetting or leaking of any food or liquid;
   **(4)** Resulting from seizure or destruction of the property by order of government authority;
   **(5)** Resulting from insects, animals, wear or tear, gradual deterioration or inherent vice;
   **(6)** To property while in your care and custody for laundering, cleaning, serive or repair
   **(7)** To samples or articles of registered guests carried or held for sale or for delivery after sale;

      **(8)** To any "auto" or "mobile equipment" including its equipment, accessories and any property contained in or on a "auto" or "mobile equipment" ;

      **(9)** To money, notes, securities, stamps, letters of credit, tickets,accounts, bills, deeds, or evidence of debt.

**B.**     **Section III - LIMITS OF INSURANCE** is amended and the following is added:

    Subject to 5. above, the most we will pay under **COVERAGE A** for "property damage" to property of your registered guests is the Limit of Insurance shown below for this coverage:

    $ 1,000         Per occurrence
    $ 10,000       Aggregate

    The Per Guest Limit is the most we will pay as damages sustained and expenses incurred in the defense and adjustment of claims and "suits" asserted in any one "occurrence". All claims for damages made by one guest because of "property damage" in any one event or series of related events shall be deemed to be one claim.

    The Aggregate Limit is the most, subject to the Per Guest Limit, we will pay as damages for "property damage" sustained and expenses incurred in the defense and adjustment of all claims and "suits" regardless of how many persons assert claims or "suits" against you.

    The Each occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insureds. These Limits of Insurance are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy. Payments under these Limits of Insurance are part of and erode in policy General Aggregate Limit of Insurance shown in the Declarations.

    A deductible of $250 each claim shall apply to each claim or "suit" made by each guest unless another deductible is shown by endorsement.

**C.**     The following changes are made to **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:**

    **1.**   The following is added to **2. Duties In The Event Of occurrence, Offense, Claim Or Suit**:

      If you have reason to believe that any loss or destruction of, or damage to Covered Property involves a violation of law, you must notify the police.

    **2.**   The following is added to **4. Other Insurance:**

      This insurance for you liability for property of registered guests does not apply to damages recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the damages, this insurance will apply to that part of the damages not recoverable or recovered under the other insurance.

**D.**     **SECTION V - DEFINITIONS, 17** is amended as follows

    **1.** "Property damage" is amended and the following is added:
      However, "property damage" does not include the loss of use of registered guests' property.

    **2.** The following definition is added:
      "Premises" means the interior of that portion of any building at a location shown in the Declarations that you occupy in conducting your business.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KNOWN INJURY OR DAMAGE EXCLUSION PERSONAL AND ADVERTISING INJURY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/01/2015 | 11/26/2015 |
| Endorsement Effective | Policy Number | |
| | CIP250491 | |
| Named Insured   GLOBAL MANAGEMENT AND INVESTMENT | | |

The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I - COVERAGES COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Known Injury Or Damage**

This insurance does not apply to "personal and advertising injury" arising from an offense:

**a.** That occurs during the policy period and, prior to the policy period, an insured listed under Paragraph **1.** of **SECTION II - WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, knew that the "personal and advertising injury" had occurred prior to the policy period, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "personal and advertising injury" occurred, then any continuation, change or resumption of such offense during or after the policy period will be deemed to have been known prior to the policy period; or

**b.** That occurs during the policy period and was, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of **SECTION II - WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, includes any continuation, change or resumption of that "personal and advertising injury" after the end of the policy period.

A "personal and advertising injury" arising from an offense will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of **SECTION II - WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim:

**(1)** Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "personal and advertising injury"; or

**(3)** Becomes aware by an other means that "personal and advertising injury" has occurred or has begun to occur.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT - AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
| --- | --- | --- |
| | | 11/ 26/ 2015 |
| Endorsement Effective | Policy Number CIP250491 | |
| Named Insured GLOBAL MANAGEMENT AND INVESTMENT | Countersigned By | |

(Authorized Representative)

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions**, paragraph **(g.) Aircraft, Auto Or Watercraft** is deleted and replaced with the following:

**g.** **Aircraft, Auto Or Watercraft**

This insurance does not apply to:

**(1)** "Bodily injury" or "property damage " arising out of or in connection with any aircraft or watercraft unless as outlined below;

**(2)** "Bodily injury" or "property damage" arising out of or in connection with any  "auto" unless as outlined below; or

**(3)** "Bodily injury" or "property damage" arising out of or in connection with the "loading or unloading" of any aircraft, "auto" or watercraft by any insured unless as outlined below.

This exclusion applies to "bodily injury" or "property damage" arising out of any aircraft, "auto" or watercraft, whether or not owned, maintained, used, rented, leased, hired, loaned, borrowed or entrusted to others or provided to another by any insured.

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, entrustment, permitting, training or monitoring of others by an insured.

This exclusion applies even if the claims against any insured allege direct or vicarious liability.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own, rent or on any premises or in the water while being worked upon;

**(2)** A watercraft you do not own that is:
   **(a)** Less than 26 feet long; and
   **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or any insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

**(5)** "Bodily injury" or "property damage" arising out of:
   **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or
   **(b)** The operation of any of the machinery or equipment listed in Paragraph **f. (2)** or **f. (3)** of the definition of "mobile equipment"; or

**(6)** "Bodily injury" or "property damage" arising out of maintenance, service or repair of an "auto" by the Named Insured or their employees on the property of the insured or on the premises of others.

AF000899 03-14

# COMBINED COVERAGE AND EXCLUSION ENDORSEMENT
### This Endorsement Changes the Policy. Please Read it Carefully.

This endorsement modifies insurance provided under the following coverage parts if those coverage parts are included in your policy:

> **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
> **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART**
> **GARAGE COVERAGE FORM**
> **LIQUOR LIABILITY COVERAGE FORM**

## I. ASBESTOS EXCLUSION

This insurance does not apply to:

A) "Bodily Injury" or "Property Damage", in whole or in part, either directly or indirectly, arising out of, based upon, or attributable to any of the following:

1. Asbestos or any asbestos related injury or damage;

2. Any alleged act, error, omission or duty involving asbestos, its use, exposure, presence, existence, detention, removal, elimination or avoidance; or

3. The use, exposure, presence, existence, detention, removal, elimination or avoidance of asbestos in any environment, building or structure; and

B) The investigation, settlement or defense of any claim, "suit" or proceeding against the Insured alleging any actual or threatened injury or damage which arises out of or would not have occurred but for asbestos related "Bodily Injury" or "Property Damage", as described above.

## II. TOTAL LEAD EXCLUSION

The following exclusion is hereby added to **COVERAGE A., BODILY INJURY AND PROPERTY DAMAGE LIABILITY** under Paragraph **2.**, **Exclusions** and **COVERAGE B., PERSONAL AND ADVERTISING INJURY LIABILITY** under Paragraph **2.**, **Exclusions**, of the Comprehensive General Liability form and is added in general as an exclusion to other coverage forms that constitute a portion of your policy.

This insurance does not apply to:

a. "Bodily Injury", "Property Damage", or Personal and Advertising Injury "arising, whether in whole or in part, and whether directly or indirectly, out of lead, including, but not limited to, lead contained or incorporated in any material or product;

b. Any loss, cost, or expense arising out of any:

(1) Request, demand, order, writ, injunction or judgment that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, prevent, abate or in any way respond to, or assess the presence or effect of any kind of lead; or

(2) Claim or "suit" for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, preventing, abating or in any way responding to, or assessing the presence or effect of any kind of lead.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

Case 4:20-cv-01362-WMR Document 1-2 Filed 04/13/20 Page 162 of 457

The following special conditions are made a part of any applicable coverage form or endorsement that forms a part of your policy and you warrant and agree that:

1. You have a written formal contract with such independent contractors, in force at the time of such injury or damage, verifying insurance of the types provided by this policy with the limits of insurance for such insurance equal to or greater than the limits of insurance provided by this policy; and you collect such evidence of insurance from the independent contractors before they enter the job site; and

2. Such independent contractors name you as an additional insured on their Commercial General Liability insurance policy for damages because of Bodily Injury", Property Damage"or Personal and Advertising Injury"arising out of or caused by the work, activities or operations of the independent contractor, including your supervision, review or inspection of the independent contractor; and

3. Such independent contractors have agreed, in writing, to hold you harmless from all liability, including attorney fees, arising from their acts, errors or omissions; and

4. Such independent contractors Commercial General Liability coverage is primary and our policy shall be excess of the insurance maintained by the independent contractors policy, notwithstanding the language of the Other Insurance provisions of the independent contractors policy.

Failure to comply with any of the above conditions does not alter the coverage provided by this policy. However, should you fail to comply with any of the above conditions, any subcontractors hired by any Insured will be considered your employees for premium computation purposes. You will be charged an additional premium with the entire cost of labor charged by such subcontractors used as payroll and assigned to the applicable class for the work performed.

IV. **EMPLOYMENT- RELATED PRACTICES EXCLUSION**

A. The following exclusion is added to Paragraph **2.**, Exclusions of **COVERAGE A-BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I-Coverages)**, of the Commercial General Liability form and is added in general as an exclusion to other coverage forms that constitute a portion of your policy:

This insurance does not apply to:

Bodily Injury"to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of Bodily Injury"to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

(1)    Whether the Insured may be liable as an employer or in any other capacity; and

(2)    To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B.    The following exclusion is added to Paragraph **2.**, Exclusions of **COVERAGE B-PERSONAL AND ADVERTISING INJURY LIABILITY (Section I-Coverages)**:

This insurance does not apply to:

Personal and Advertising Injury"to:

(1)    A person arising out of any:

    (a)    Refusal to employ that person;

    (b)    Termination of that person's employment; or

    (c)    Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation  or discrimination directed at that person; or

(2)    The spouse, child, parent, brother or sister of that person as a consequence of personal injury"to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1)    Whether the Insured may be liable as an employer or in any other capacity; and

(2)    To any obligation to share damages with or repay someone else who must pay damages because of injury.

**V.    NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**

1.    The insurance does not apply:

A.    Under any Liability Coverage to Bodily Injury"or Property Damage."

    (1)    With respect to which an Insured"under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2)    Resulting from the hazardous properties"of nuclear material"and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law

amendatory thereof, or (b) the Insured"is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency therof, under any agreement entered into by the United States of America, or any agency therof, with any person or organization.

B.    Under any Medical Payments coverage, to expenses incurred with respect to Bodily Injury"resulting from the hazardous properties"of nuclear material"and arising out of the operation of a nuclear facility"by any person or organization.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

C. Under any Liability Coverage, to Bodily Injury" or Property Damage" resulting from hazardous properties" of nuclear material", if:

(1) The nuclear material" (a) is at any nuclear facility" owned by, operated by or on behalf of, an insured" or (b) has been discharged or dispersed therefrom;

(2) The nuclear material" is contained in spent fuel" or waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured"; or

(3) The Bodily Injury" or Property Damage" arises out of the furnishing by an insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to Property Damage" to such nuclear facility" and any property thereat.

2. As used in this endorsement:

Hazardous properties" includes radioactive, toxic or explosive properties.

Nuclear material" means source material", special nuclear material" or by-product material".

Source material", special nuclear material" and by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor".

Waste" means any waste material (a) containing by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material" content, and (b) resulting from the operation by any person or organization of an nuclear facility" included under the first two paragraphs of the definition of nuclear facility".

Nuclear facility" means:

(a) Any nuclear reactor",

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel" or (3) handling, processing or packaging waste",

(c) Any equipment or device used for the processing, fabricating or alloying of special nuclear material" if at any time the total amount of such material in the custody of the insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste",

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

Property Damage" includes all forms of radioactive contamination of property.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

VI.     **EXCLUSION (Malpractice and Professional Services)**

The following exclusion is added to Part **2. Exclusions** of SECTION I - COVERAGES, **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and Part **2. Exclusions** of **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** of the **COMMERCIAL GENERAL LIABILITY FORM**:

This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" including payment for loss or defense costs in connection with any claim made against any insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render any professional service by, but not limited to, any Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Agent Broker, or any other service that is of a professional nature.

VII.    **PHYSICAL-SEXUAL ABUSE EXCLUSION**

This insurance does not apply to any "occurrence", suit, liability, claim, demand or causes of action arising out of or resulting from the physical abuse, sexual abuse or licentious, immoral or sexual behavior, whether or not intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, or omission by:
a.      The insured or the insured's employees;
b.      Patrons of the insured's business;
c.      Agents of the insured;
d.      "Volunteer workers";
e.      Subcontractor or employee of any subcontractor;
f.      "Independent contractor" or employee of any "independent contractor"; or
g.      "Leased worker".

For the purposes of this endorsement:
1.      "Independent contractor" means one that contracts to do work or perform a service for another and that retains control over the means or methods used in doing the work or performing the service. "Independent contractor" includes, but is not limited to, subcontractors and any employees of a subcontractor, any employee of an independent contractor, any employees of the insured, agents, representatives, volunteers, spouses, family members or the insured or any Additional Insureds added to this policy.
2.      "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a temporary worker". "Temporary worker" means a person who is furnished to you to substitute for a permanent employee on leave or to meet seasonal or short term workload conditions.
3.      "Volunteer worker" means a person who is not your employee, and who donates her or her work and acts at the direction of and within the scope of duties determined by you and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

VIII.   **TOTAL POLLUTION EXCLUSION WITH HOSTILE FIRE EXCEPTION**

Exclusion **f.** under Paragraph **2.**, **Exclusions**, of **Coverage A.-Bodily Injury and Property Damage Liability (Section I-Coverages)** is hereby deleted.  The following exclusion is hereby added to **Coverage A., Bodily Injury and Property Damage Liability** under Paragraph **2.**, **Exclusions** and to **Coverage B., Personal and Advertising Injury Liability** under **Paragraph 2., Exclusions**.

This insurance does not apply to:

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

(1) "Bodily Injury", "Property Damage", "Personal and Advertising Injury" caused by or arising out of in whole or in part, the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to "Bodily Injury" or "Property Damage" arising out of heat, smoke, or fumes from a hostile fire unless that hostile fire occurred or originated:

(a) At any premises, site, or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste; or

(b) At any premises, site or location on which any Insured or any contractors or subcontractors working directly or indirectly on any Insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants".

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order, writ, injunction or judgment that any "Insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, prevent, abate or in any way respond to, or assess the presence or effect of any kind of "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the presence or effect of any kind of "pollutants".

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed. Pollutants also includes carbon dioxide and any other substance that contributes to climate change.

## IX.   ASSAULT AND BATTERY EXCLUSION

This insurance does not apply to "bodily injury" or "property damage", in whole or in part, either directly or indirectly, or in any way arising out of any of the following:

1. Assault and Battery committed by any Insured, any employee of any Insured or any other person;

2. The failure to suppress or prevent Assault and Battery by any person in 1. above;

3. resulting from or allegedly related to the negligent hiring, supervision or training of any employee of the Insured; or

4. Assault or Battery, whether or not caused by or arising out of negligent, reckless or wanton conduct of the Insured, the Insured's employees, patrons or other persons lawfully or otherwise on, at or near the premises owned or occupied by the Insured, or by any other person.

For the purposes of this exclusion, Assault and Battery includes, but is not limited to, the use of reasonable force or self-defense by any party, person, insured or employee of any insured.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

Furthermore for this Exclusion, **SECTION I - COVERAGES COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Section **2. Exclusions**, Paragraph **a. Expected Or Intended Injury** is replaced by the following:

**a.**     **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

**X.**     **TENDERING OF APPLICABLE LIMIT OF INSURANCE**

The **COMMERCIAL GENERAL LIABILITY COVERAGE FORM CG 0001** is amended as follows:

**SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, Insuring Agreement, 1, a. (2)** is deleted in its entirety and replaced with the following:

**(2)**     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or when we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit" under Coverages **A** or **B** or medical expenses under Coverage **C**.

The last paragraph of **SECTION I - COVERAGES, SUPPLEMENTARY PAYMENTS – COVERAGES A AND B** is deleted in its entirety and replaced with the following:

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:
   **a.**     We have used up the applicable limit of insurance in the payment of judgments or settlements; or
   **b.**     When we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit" under Coverages **A** or **B** or medical expenses under Coverage **C**; or
   **c.**     The conditions set forth above, or the terms of the agreement described in paragraph **f.** above, are no longer met.

The **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM – COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR FORM CG 0009** is   amended as follows:

**SECTION I - COVERAGES BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Insuring Agreement, 1, a. (2)** is deleted in its entirety and replaced with the following:

**(2)**     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements, or tendered the applicable   limit of insurance to any person or organization that has a financial interest in any  claim or "suit."

The last paragraph of **SECTION I - COVERAGES, SUPPLEMENTARY PAYMENTS** is deleted in its entirety and replaced with the following:

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:
   **a.**     We have used up the applicable limit of insurance in the payment of judgments or settlements; or
   **b.**     When we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit;" or
   **c.**     The conditions set forth above, or the terms of the agreement described in paragraph **f.** above, are no longer met.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

The **GARAGE COVERAGE CA 0005** is amended as follows:

The last paragraph of **1. a. "Garage Operations" – Other Than Covered Autos"** of **A COVERAGE** of **SECTION II – LIABILITY COVERAGE** is deleted in its entirety and replaced with the following:

We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the applicable Liability Coverage Limit of Insurance – "Garage Operations" – Other Than Covered "Autos" has been

exhausted by payment of judgments or settlements or when we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit".

The last paragraph of **2. "Garage Operations" – Covered Autos"** of **A COVERAGE** of **SECTION II – LIABILITY COVERAGE** is deleted in its entirety and replaced with the following:

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the applicable Liability Coverage Limit of Insurance – "Garage Operations" – Covered "Autos" has been exhausted by payment of judgments or settlements or when we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit".

Paragraph **(6)** of Section **4. Coverage Extensions, a. Supplementary Payments** is deleted in its entirety and replaced with the following:

**(6)**    All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance, when we have used up the applicable limit of insurance in the payment of judgments or settlements or when we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit".

The **LIQUOR LIABILITY COVERAGE FORM CG 00 33** is amended as follows:

**SECTION I – LIQUOR LIABILITY COVERAGE, 1. Insuring Agreement, 1, a. (2)** is deleted in its entirety and replaced with the following:

**(2)**    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or when we tender the applicable limit of insurance to any person or organization that has a financial interest in a claim or "suit" under this Coverage Part.

XI.    **ANTI-STACKING AND NONDUPLICATION OF LIMITS OF INSURANCE**

If any Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same claim for expenses or damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable Limit of Insurance available under any one Coverage Form, Coverage Part or policy.

This endorsement does not apply to any Coverage Form, Coverage Part or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

This endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of
the policy).

Policy Number: CIP250491

Named Insured: GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date:

_____
Authorized Representative

Endorsement Serial No. AF 001 007 11 13
Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1994, 1997, 2007

ENDORSEMENT

**This Endorsement Changes the Policy - Please Read it Carefully**

# INFRINGEMENT, MISAPPROPRIATION
# AND UNFAIR COMPETITION EXCLUSION

It is hereby agreed that this policy shall not apply to any "claim," "suit," or liability for:

A.     Any infringement upon or dilution of copyright, trademark, patent, title, slogan, service mark, service  name or trade dress;

B.     Any invasion or infringement of or interference with the right of privacy or publicity including, but not limited to, intrusion, public disclosure of private facts, unwarranted or wrongful publicity, false light or the use of name or likeness for profit;

C.     Plagiarism or misappropriation of information, trade secrets, ideas or style of doing business;

D.     "Unfair competition" as defined by statute or common law, whether or not pertaining to and alleged in conjunction with a claim of plagiarism, misappropriation of information or ideas, "piracy," infringement of copyright, title, slogan, trademark, trade name, trade dress, service mark or service name.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein. (The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number:   CIP250491

Named Insured:  GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date:  04/ 01/ 2015

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DAMAGE TO PREMISES RENTED TO YOU LIMITATION – FIRE LEGAL LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date 04/01/2015 | Expiration Date 11/26/2015 |
|---|---|---|
| Endorsement Effective | Policy Number CIP250491 | |
| Named Insured GLOBAL MANAGEMENT AND INVESTMENT | | |

A.  The following language ("Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits of Insurance.") of Paragraph **2. Exclusions** under **SECTION I COVERAGES – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted.

B.  The following language ("Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** –Limits of Insurance.") of **Exclusion j.**, **Damage To Property** of Paragraph **2.**, **Exclusions** of **SECTION I  COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted.

C.  Reference in the Declarations to **Damage To Premises Rented To You Limit** is changed to read **Fire Damage Limit**.

D.  Paragraph **6.** of **SECTION III – LIMITS OF INSURANCE**, is deleted and replaced with the following:

   **6.**  Subject to **5.** above, the **Fire Damage Limit** is the most we will pay under Coverage **A** for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

AF 001 401 07/12                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/ 01/ 2015 | 11/ 26/ 2015 |
| Endorsement Effective | Policy Number | |
| | CIP250491 | |
| Named Insured:   GLOBAL MANAGEMENT AND INVESTMENT | | |

**AMENDMENT OF NONPAYMENT CANCELLATION CONDITION**

Wherever a Cancellation Condition for nonpayment of premium is found in the policy, the following is added:

If the insured failed to pay premium charged on a prior policy we issued and payment was due during the current renewal policy term, we may cancel this policy by mailing or delivering to the first Named Insured and mortgagee, if any, written notice of cancellation at least ten (10) days before the effective date of cancellation.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - STATE OF MISSOURI

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM-COVERAGE FOR
OPERATIONS OF DESIGNATED CONTRACTOR
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE FORM
GARAGE LIABILITY COVERAGE FORM
PROFESSIONAL LIABILITY COVERAGE PART
NON-PROFIT DIRECTORS AND OFFICERS & EMPLOYMENT PRACTICES LIABILITY COVERAGE
PARTS**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/ 01/ 2015 | 11/ 26/ 2015 |
| Endorsement Effective | Policy Number CIP250491 | |
| Named Insured GLOBAL MANAGEMENT AND INVESTMENT | Countersigned By | |

(Authorized Representative)

The following is added to the **Exclusion** section of the above policy forms:

This insurance does not apply nor shall there be any duty to defend or indemnify any "occurrence", "suit", liability, claim, demand or cause of action arising, ongoing or taking place in the State of Missouri.

This exclusion applies to any insured domiciled, having a mailing address, principal place of business or conducts more than 10% of operations in the State of Missouri.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# REMOVAL OF ASSAULT AND BATTERY EXCLUSION FROM COMBINED COVERAGE AND EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMBINED COVERAGE AND EXCLUSION ENDORSEMENT AF 001 007

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/01/2015 | 11/26/2015 |
| Endorsement Effective | Policy Number | |
| | CIP250491 | |
| Named Insured   GLOBAL MANAGEMENT AND INVESTMENT | | |

This insurance is amended as follows:

The **ASSAULT AND BATTERY EXCLUSION**, in the Combined Coverage and Exclusion Endorsement AF 001 007, is deleted.

_____
Authorized Representative          Date

**AF 33509  07/12**                                                                 **Page 1 of 1**

ENDORSEMENT

**This Endorsement Changes The Policy. Please Read It Carefully.**

# AMENDMENT OF SECTION IV - CONDITIONS
# ADDITIONAL CONDITIONS - SECTION IV - CONDITIONS

This endorsement modifies insurance provided under the following Coverage Forms:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/ COMPLETED OPERATIONS COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM -
COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR**

**A.** The following changes are made to the **COMMERCIAL GENERAL LIABILITY COVERAGE** and the **PRODUCTS/ COMPLETED OPERATIONS COVERAGE FORMS:**

**I.** The following is added to **Condition 4. - Other Insurance** in **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** of the **COMMERCIAL GENERAL LIABILITY COVERAGE** and the **PRODUCTS/ COMPLETED OPERATIONS COVERAGE FORMS:**

**Excess Provision - Vendors**

The coverage afforded the insured under this Coverage Form will be excess over any valid and collectible insurance available to the insured as an additional insured under a policy issued to a manufacturer or distributor for products manufactured, sold, handled or distributed.

**II.** **Paragraph 5. Premium Audit** is replaced by the following:

**5.** **Premium Audit**

  **a.** We will compute all premiums for this Coverage Form in accordance with our rules and rates.

  **b.** The Minimum and Advance Premium shown on the Common Declarations page is the Advance Premium for the full policy term applicable to this policy. At the close of each audit period, we will compute the Earned Premium for that period. Audit Premiums are due and payable to us on notice to the first Named Insured. If the Audit Premium is less than the Minimum and Advance Premium, the Minimum and Advance Premium will apply with no return to you. For purposes of this policy, the terms Advance Premium, Audit Premium, Earned Premium and Minimum Premium are defined as follows:
  **Advance Premium** - The premium that is stated on the Common Declarations page and payable in full by the first Named Insured at the inception of the policy.
  **Audit Premium** - The premium that is developed by calculating the difference between the Advance Premium and the Earned Premium.
  **Earned Premium** - The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the policy period.
  **Minimum Premium** - The lowest premium for which this insurance will be written for the policy period.

  **c.** In no event will the final premium retained by us be less than the Minimum and Advance Premium shown on the Common Declarations of this policy. If no other premium is designated specifically as a Minimum and Advance Premium, the Minimum and Advance Premium shown on the Common Declarations is the Minimum and Advance. Such minimum is subject to the short rate or pro rate adjustment according to policy provisions in case of cancellation of the policy.

**d.** The policy is also subject to a Minimum Earned Premium of __25__ % of the Minimum and Advance premium shown on the Common Declarations of this policy. Such Minimum Earned Premium is not subject to pro rate or short rate adjustment in the event of cancellation by you and we shall retain no less than the Minimum Earned premium regardless of the policy term. Cancellation of the policy for non-payment of premium shall be deemed a request by you for cancellation of this policy thereby invoking the Minimum Earned Premium, unless short rate calculation earns for us.

**III.** The following Condition is added to **SECTION IV - CONDITIONS:**

**Premium Financing/ Cancellation of Financed Policy**

**a.** When we receive notification that the premium for this policy has been advanced by a premium financed company, we will acknowledge receipt of the premium finance agreement to the finance company on our form, when requested, but we will not amend or extend this policy.

**b.** When we otherwise become aware that you financed all or part of this policy's premium, regardless or whether or not we receive a notice of premium financing, we will not be bound, as respects coverage we provide, by the terms of your finance agreement. This policy alone governs coverage.

**c.** When you sign a premium finance agreement, by the terms of the agreement, you may be giving the premium finance company the right, under certain conditions, to cancel this policy on your behalf.  When we receive notice of cancellation from the finance company, we will recognize their request for termination of this insurance and we will pay any return premium due as directed by the premium finance company.  In the absence of statutes to the contrary, non-payment to a premium finance company shall be considered the same as if the first Named Insured canceled the policy.  The return premium will be calculated on a short rate basis.  The premium finance company will usually require the payment of any return premium be made directly to them and we will honor that request unless applicable law requires otherwise.  Any requested termination date set by the premium finance company that conflicts with other policy provisions or other operation of law, is subject to both the policy provisions and applicable law. You must resolve any resulting premium difference directly with the finance company.

**d.** The Minimum Earned Premium described in Condition **5.**, Item **d.** above may not be financed as it is not refundable.

All other terms and conditions of this policy remain unchanged.

**B.** The following changes are made to the **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM - COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR:**

**I.** The following changes are made to **SECTION IV - CONDITIONS:**

**a.** Paragraph **9. Premiums** is replaced by the following:

**9. Premiums**

The "contractor" or the first Named Insured:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

**b.** Paragraph **10. Premium Audit** is replaced by the following:

**10. Premium Audit**

    **a.** We will compute all premiums for this Coverage Form in accordance with our rules and rates.

    **b.** The Minimum and Advance Premium shown on the Common Declarations page is the Advance Premium for the full policy term applicable to this policy. At the close of each audit period, we will compute the Earned Premium for that period. Audit Premiums are due and payable to us on notice to the first Named Insured. If the Audit Premium is less than the Minimum and Advance Premium, the Minimum and Advance Premium will apply with no return to you. For purposes of this policy, the terms Advance Premium, Audit Premium, Earned Premium and Minimum Premium are defined as follows:
**Advance Premium** - The premium that is stated on the Common Declarations page and payable in full by the first Named Insured at the inception of the policy.
**Audit Premium** - The premium that is developed by calculating the difference between the Advance Premium and the Earned Premium.
**Earned Premium** - The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the policy period.
**Minimum Premium** - The lowest premium for which this insurance will be written for the policy period.

    **c.** In no event will the final premium retained by us be less than the Minimum and Advance Premium shown on the Common Declarations of this policy. If no other premium is designated specifically as a Minimum and Advance Premium, the Minimum and Advance Premium shown on the Common Declarations is the Minimum and Advance. Such minimum is subject to the short rate or pro rate adjustment according to policy provisions in case of cancellation of the policy.

    **d.** The policy is also subject to a Minimum Earned Premium of _25___ % of the Minimum and Advance premium shown on the Common Declarations of this policy. Such Minimum Earned Premium is not subject to pro rate or short rate adjustment in the event of cancellation by you and we shall retain no less than the Minimum Earned premium regardless of the policy term. Cancellation of the policy for non-payment of premium shall be deemed a request by you for cancellation of this policy thereby invoking the Minimum Earned Premium, unless short rate calculation earns for us more than the Minimum Earned Premium. If no percentage appears above, then the Minimum Earned Premium percentage as shown on the Common Declarations page will apply.

    **e.** The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

**II.** The following Condition is added to **SECTION IV - CONDITIONS:**

Premium Financing/ Cancellation of Financed Policy

    **a.** When we receive notification that the premium for this policy has been advanced by a premium financed company, we will acknowledge receipt of the premium finance agreement to the finance company on our form, when requested, but we will not amend or extend this policy.

    **b.** When we otherwise become aware that you financed all or part of this policy's premium, regardless or whether or not we receive a notice of premium financing, we will not be bound, as respects coverage we provide, by the terms of your finance agreement. This policy alone governs coverage.

---

c.  When you sign a premium finance agreement, by the terms of the agreement, you may be giving the premium finance company the right, under certain conditions, to cancel this policy on your behalf. When we receive notice of cancellation from the finance company, we will recognize their request for termination of this insurance and we will pay any return premium due as directed by the premium finance company. In the absence of statutes to the contrary, non-payment to a premium finance company shall be considered the same as if the first Named Insured canceled the policy. The return premium will be calculated on a short rate basis. The premium finance company will usually require the payment of any return premium be made directly to them and we will honor that request unless applicable law requires otherwise. Any requested termination date set by the premium finance company that conflicts with other policy provisions or other operation of law, is subject to both the policy provisions and applicable law. You must resolve any resulting premium difference directly with the finance company.

d.  The Minimum Earned Premium described in Condition **5.**, Item **d.** above may not be financed as it is not refundable.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: CIP250491

Named Insured: GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date:

# ABSOLUTE SILICA OR SILICA-RELATED DUST EXCLUSION

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ABSOLUTE SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
> GARAGE COVERAGE FORM

**A.** The following **Exclusion** is added to Part **2. Exclusions** of SECTION 1 - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY and COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**, Part **2. Exclusions** of SECTION 1 - COVERAGES, BODILY INJURY AND PROPERTY DAMAGE LIABILITY of the **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM** and **B. Exclusions** of SECTION II - LIABILITY COVERAGE of the GARAGE COVERAGE FORM:

**Absolute Silica Or Silica-Related Dust Exclusion**

"Bodily injury", "property damage", or "personal and advertising injury" arising out of the mining, manufacture, handling, use, ingestion, inhalation, absorption, distribution, sale, existence, abatement, "enclosure", "encapsulation" or removal of "silica" or "silica-related dust" in any form.

We have no duty to defend you or to investigate any "occurrence", "offense" or "suit" against you, which arises out of "silica", or "silica-related dust" in any form.  If you investigate or defend any such "occurrence", "offense" or "suit", we have no duty to pay the expenses of the investigation or defense, nor do we have any duty to reimburse you.

Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of silica or silica-related dust; or

Any loss, cost or expense arising out of any claim or suit on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of silica or silica-related dust.

**B.** This Endorsement shall not serve to increase our Limits of Insurance, as described in **SECTION III - LIMITS OF INSURANCE** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** and the **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM** and Part **C. Limit of Insurance** in **SECTION II - LIABILITY COVERAGE** of the **GARAGE COVERAGE FORM**.

**C.** For the purpose of this endorsement, the following **DEFINITIONS** are added:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.
2. "Silica-related dust" means a mixture or combination of "silica" and other dust or particles.
3. "Encapsulant" means a substance applied directly to the surface of a material or substance to prevent the discharge, dispersal, release or escape of any part of that material or substance, either by creating a membrane over the surface or by penetrating the material or substance and binding its components together.
4. "Encapsulation" means the coating of the surface of a material or substance with an "encapsulant" to prevent the discharge, dispersal, release or escape of any part of that material or substance.
5. "Enclosure" means those procedures and operations (excluding "encapsulation") required to construct an airtight, impermeable wall, ceiling or other permanent barrier around the surface of a material or substance to prevent the discharge, dispersal, release or escape of any part of that material or substance.

---

All other terms, conditions and exclusions included in this policy are applicable to this Endorsement and will remain unchanged.

This Endorsement is effective on the inception date of this policy unless otherwise stated herein.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy).

Policy Number:  CIP250491

Named Insured:  GLOBAL MANAGEMENT AND INVESTMENT

Endorsement Effective Date: 04/ 01/ 2015

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PUNITIVE DAMAGE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**
**GARAGE COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date 04/ 01/ 2015 | Expiration Date 11/ 26/ 2015 |
|---|---|---|
| Endorsement Effective | Policy Number CIP250491 | |
| Named Insured   GLOBAL MANAGEMENT AND INVESTMENT | | |

The following exclusion is added to the **Exclusion** section of each of the above Coverage Forms:

**PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION**

This insurance does not apply to punitive or exemplary damages, fines or penalties. If a covered "suit" is brought against the Insured, seeking both compensatory and punitive or exemplary damages, fines, or penalties, then we will afford defense to such action, without liability, for such punitive or exemplary damages, fines or penalties.

# TOTAL LIQUOR LIABILITY EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Number | Inception Date | Expiration Date |
|---|---|---|
| | 04/ 01/ 2015 | 11/ 26/ 2015 |
| Endorsement Effective | Policy Number | |
| | CIP250491 | |
| Named Insured GLOBAL MANAGEMENT AND INVESTMENT | | |

Exclusion **c. Liquor Liability** in **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted in its entirety and replaced by the following:

**c.      Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)**      Causing or contributing to the intoxication of any person;

**(2)**      The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)**      Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

## COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed in Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

 Copyright, Insurance Services Office, Inc., 2012

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 Copyright, Insurance Services Office, Inc., 2012

f. **Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

Copyright, Insurance Services Office, Inc., 2012

(2) Any loss, cost or expense arising out of any:

    (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    (b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

Copyright, Insurance Services Office, Inc., 2012

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

Copyright, Insurance Services Office, Inc., 2012

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

      **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

   **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

   **a. Knowing Violation Of Rights Of Another**

     "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   **b. Material Published With Knowledge Of Falsity**

     "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

   **c. Material Published Prior To Policy Period**

     "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

   **d. Criminal Acts**

     "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   **e. Contractual Liability**

     "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   **f. Breach Of Contract**

     "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   **g. Quality Or Performance Of Goods - Failure To Conform To Statements**

     "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   **h. Wrong Description Of Prices**

     "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

Copyright, Insurance Services Office, Inc., 2012

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Copyright, Insurance Services Office, Inc., 2012

## COVERAGE C - MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", in cluding actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

Copyright, Insurance Services Office, Inc., 2012
CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

Copyright, Insurance Services Office, Inc., 2012

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by;

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

Copyright, Insurance Services Office, Inc., 2012

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Copyright, Insurance Services Office, Inc., 2012

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Copyright, Insurance Services Office, Inc., 2012

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

       (1) Power cranes, shovels, loaders, diggers or drills; or

       (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

       (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

       (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

Copyright, Insurance Services Office, Inc., 2012

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

  **(a)** Snow removal;

  **(b)** Road maintenance, but not construction or resurfacing; or

  **(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  **a.** False arrest, detention or imprisonment;

  **b.** Malicious prosecution;

  **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

  **f.** The use of another's advertising idea in your "advertisement"; or

  **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

  **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

  **(1)** Products that are still in your physical possession; or

  **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    **(a)** When all of the work called for in your contract has been completed.

    **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.** Does not include "bodily injury" or "property damage" arising out of:

  **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

  **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

  **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

  For the purposes of this insurance, electronic data is not tangible property.

Copyright, Insurance Services Office, Inc., 2012

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)** You;

            **(b)** Others trading under your name; or

            **(c)** A person or organization whose business or assets you have acquired; and

        **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes:

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)** The providing of or failure to provide warnings or instructions.

    **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

    **a.** Means:

        **(1)** Work or operations performed by you or on your behalf; and

        **(2)** Materials, parts or equipment furnished in connection with such work or operations.

    **b.** Includes:

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

        **(2)** The providing of or failure to provide warnings or instructions.

 Copyright, Insurance Services Office, Inc., 2012 **CG 00 01 04 13**

POLICY NUMBER: `CIP250491`

**COMMERCIAL GENERAL LIABILITY**
CG 03 00 01 96

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | | |
|---|---|---|---|
| | PER CLAIM | or | PER OCCURRENCE |
| Bodily Injury Liability | $ | | $ |
| OR | | | |
| Property Damage Liability | $ | | $ |
| OR | | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ 500 | | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT**  (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

**A.** Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

**B.** You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

   **a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   **b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

   **(1)** "Bodily injury";

   **(2)** "Property damage"; or

   **(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence".

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage", person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

1

CG 03 00 01 96                    Copyright, Insurance Services Offices, Inc., 1994

Hart Forms & Services
Reorder No. 14-2180

**a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

　**(1)** "Bodily injury";

　**(2)** "Property damage"; or

　**(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

**1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**2.** Your duties in the event of an "occurrence", claim, or "suit"

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

 Copyright, Insurance Services Office, Inc., 1994

COMMERCIAL GENERAL LIABILITY
CG 21 07 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I –Coverage A –Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

      © Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 21 32 05 09

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

2. Exclusions

This insurance does not apply to:

Communicable Disease

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

a. Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

b. Testing for a communicable disease;

c. Failure to prevent the spread of the disease; or

d. Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to: Communicable Disease

"Personal and advertising injury" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

a. Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

b. Testing for a communicable disease;

c. Failure to prevent the spread of the disease; or

d. Failure to report the disease to authorities.

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Copyright, ISO Properties, Inc., 2003
INSURED

COMMERCIAL GENERAL
LIABILITY
CG 21 73 01 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:
This insurance does not apply to:
**TERRORISM**
"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

POLICY NUMBER: CIP250491

COMMERCIAL GENERAL LIABILITY
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

| Name Of Person Or Organization: |
|---|
| ANY PERSON OR ORGANIZATION WITH WHOM THE INSURED HAS AGREED TO WAIVE RIGHTS OF RECOVERY, PROVIDED SUCH AGREEMENT IS MADE IN WRITING AND PRIOR TO THE LOSS. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV - Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

POLICY NUMBER: CIP250491

CG 24 12 11 85

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BOATS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Description of Watercraft:**

**Additional Premium:**

INCL

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1. Exclusion g. of COVERAGE A (Section I) does not apply to any watercraft owned or used by or rented to the insured shown in the Schedule.

2. WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization legally responsible for the use of any such watercraft you own, provided the actual use is with your permission.

**CG 24 12 11 85**

Copyright, Insurance Services Office, Inc., 1984

Hart Forms & Services
Reorder No. 14-9166

Case 1:20-cv-02382-WMR   Document 1-2   Filed 04/13/20   Page 69 of 75

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL  LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

 Copyright, Insurance Services Office, Inc., 2012

# ATAIN SPECIALTY INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HIRED AUTO AND
# NON-OWNED AUTO LIABILITY INSURANCE COVERAGE

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**AMENDMENT – AIRCRAFT, AUTO OR WATERCRAFT EXCLUSION AF 000 899**

(This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below)

| Endorsement Number | Inception Date 4/1/2015<br>Expiration Date 4/1/2016 |
|---|---|
| Endorsement Effective<br>Inception | Policy Number<br><br>CIP250491 |
| Named Insured<br><br>Global Management and Investment | Countersigned By |

(Authorized Representative)

This endorsement is subject to all of the provisions of the Commercial General Liability Coverage Part, except as otherwise provided in this endorsement. All number and letters used to designate paragraphs in this endorsement are specific to this endorsement only. They do not reference paragraphs in the Commercial General Liability Coverage Part. Insurance is provided only with respect to those coverages for which a specific Limit of Insurance and Premium are shown.

## SCHEDULE

| Coverage | Limits of Insurance | | Premium |
|---|---|---|---|
| **Hired Auto Liability Insurance** | $ 1,000,000 | Each Occurrence Limit | $ |
| **Non-owned Auto Liability Insurance** | $ 1,000,000 | Each Occurrence Limit | $ |
| | $ 1,000,000 | Aggregate Limit | $ 500.00 |
| Information to complete this Schedule, if not shown above, will be shown in the Declarations | | | |

**A.** **Hired Auto Liability**
The insurance provided under **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business.

**B.** **Non-owned Auto Liability**
The insurance provided under **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, applies to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" by any person in the course of your business.

**C.** **Changes In Exclusions**

With respect to the insurance provided by this endorsement:

**1.** The following exclusions under **SECTION I –COVERAGES, COVERAGE A BODILY INJURY AND PROERTY DAMAGE LIABILITY**, **2. Exclusions**, do not apply:

    **a.**  Contractual Liability;

    **b.**  Liquor Liability;

    **c.**  Employer's Liability;

    **d.**  Aircraft, Auto Or Watercraft;

    **e.**  Mobile Equipment;

    **f.**  Damage To Property;

    **g.**  Damage To Your Product;

    **h.**  Damage To Your Work;

    **i.**  Damage To Impaired Property or Property Not Physically Injured; and

    **j.**  Recall of Products, Work Or Impaired Property

**2.**      **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, **2. Exclusions**, is amended and the following are added:

    This insurance does not apply to:

    **a.**  "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

        **(1)**  That the insured would have in the absence of the contract or agreement; or

        **(2)**  Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

    **b.**  "Bodily injury" to:

        **(1)**  An "employee" of the insured arising out of the and in the course of:
            **(a)**  Employment by the insured; or
            **(b)**  Performing duties related to the conduct of the insured's business; or

        **(2)**  The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

    This exclusion applies:

        **(1)**  Whether the insured may be liable as an employer or in any other capacity; and

        **(2)**  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

    This exclusion does not apply to:

        **(1)**  Liability assumed by the insured under an "insured contract"; or

        **(2)**  "Bodily injury" to domestic "employees" not entitled to workers compensation benefits.

    **c.**  "Property damage" to:

        **(1)**  Property owned or being transported by, or rented or loaned to the insured; or

        **(2)**  Property in the care, custody or control of the insured.

**D.** **Who Is An Insured**

For the purposes of this endorsement only, **SECTION II – WHO IS AN INSURED**, is deleted and replaced by the following:

**WHO IS AN INSURED**

**1.** Each of the following is an insured under this insurance to the extent set forth below:

    **a.** You.

    **b.** Any other person using a "hired auto" with your permission in the course of your business.

    **c.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

    **d.** Any other person or organization, but only with respect to their liability because of acts or omissions of any insured under Paragraph **a.**, **b.** or **c.** above.

**2.** None of the following is an insured:

    **a.** Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-"employee" of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-"employee" as a consequence of such "bodily injury", or for any obligation to share damages with or repay someone else who must pay damages because of the injury;

    **b.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or member of his or her household;

    **c.** Any person while employed in or otherwise engaged in performing duties related to the conduct of an "auto business" other than an "auto business" you operate;

    **d.** The owner or lessee (of whom you are a sublessee)of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee;

    **e.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**E.** **Limits Of Insurance**:

For the purposes of this endorsement only, **SECTION III – LIMITS OF INSURANCE**, is deleted and replaced by the following:

**LIMITS OF INSURANCE**

Regardless of the number of 'hired autos", "non-owned autos", insureds, premiums paid, claims made or vehicles involved in the "occurrence", the most we will pay for all damages resulting from any one "occurrence" is the applicable Limit of Insurance shown in the Schedule of this endorsement or in the Declarations.

The Aggregate Limit is the most, subject to the Each Occurrence Limit, we will pay as damages for "bodily injury" or "property damage" sustained and expenses incurred in the defense and adjustment of all claims and "suits" regardless of how many persons assert claims or "suits" against you.

The Each Occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insureds. These Limits of Insurance are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy. Payments under these Limits of Insurance are part of and erode the policy General Aggregate Limit of Insurance shown in the Declarations.

**F.    Changes In Conditions**

For the purpose of this endorsement only, the **Other Insurance** Provision of the **Commercial General Liability Conditions** Section is deleted and replaced by the following:

**OTHER INSURANCE**

This insurance is excess over any primary insurance covering the "hired auto" or "non-owned auto".

**G.    Additional Definitions**

For the purpose of this endorsement only, the following definitions are added to the **Definitions** Section:

**1.**    "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

**2.**    "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire rent or borrow from any of your "employee's", your partners or your "executive officers", or members of their households.

**3.**    "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JANE DOE 1

      Plaintiff,

v.

RED ROOF INNS, INC., VARAHI
HOTEL, LLC, FMW RRI NC, LLC,
WESTMONT HOSPITALITY GROUP,
INC., RRI III, LLC, WHG SU ATLANTA,
LP, SUB-SU HOTEL GP, LLC, CHOICE
HOTELS INTERNATIONAL, INC.,
WYNDHAM HOTELS & RESORTS,
INC., MICROTEL INNS AND SUITES
FRANCHISING, INC., KUZZINS
BUFORD, LLC, RAMADA WORLDWIDE
INC., JEET & JJ LLC, NEWTEL V
CORPORATION, CPLG HOL, LLC,
CPLG PROPERTIES, LLC, COREPOINT
LODGING, INC., LQ MANAGEMENT,
LLC, LA QUINTA WORLDWIDE, LLC,
HAMENT DESAI, VAD PROPERTY
MANAGEMENT, LLC, VANTAGE
HOSPITALITY GROUP, INC., 2014 SE
OWNER 5-EMORY, LLC, LAXMI
DRUID HILLS HOTEL, LLC, JHM
HOTELS MANAGEMENT, INC., AURO
HOTELS MANAGEMENT, LLC,
HILTON FRANCHISE HOLDINGS,
LLC, HILTON DOMESTIC OPERATING
COMPANY, INC., HILTON
WORLDWIDE HOLDINGS, INC. and
JOHN DOES 1-10.

      Defendants.

Civil Action No.
1:19-cv-03840

JURY TRIAL DEMANDED,
Pursuant to Fed. R. Civ. P. 38

## [AMENDED] COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

THE PARTIES .................................................................................... 5

   I.  Plaintiff ................................................................................. 5
   II. Defendants .......................................................................... 5
      A. The Red Roof (Smyrna) Defendants ............................... 5
      B. The Red Roof (Atlanta) Defendants ............................... 8
      C. The Suburban Extended Stay Defendants ..................... 9
      D. The Microtel Defendants .................................................. 11
      E. The Ramada Defendants ................................................... 13
      F. The La Quinta Defendants ................................................ 15
      G. The Americas Best Defendants ........................................ 18
      H. The Hampton Inn (NDH Atlanta) Defendants ............. 19
      I.  The John Doe Defendants ................................................ 21

JURISDICTION & VENUE ............................................................... 22

FACTUAL ALLEGATIONS ............................................................... 22

   I.  Sex Trafficking ...................................................................... 22

   II. Metro Atlanta Has Long Been Known As A Sex
      Trafficking Hub .................................................................... 24

   III. Hotels Are Complicit In Sex Trafficking ............................ 26

      A. Hotels Are a Critical Part of the Sex Trafficking Industry ......... 26

      B. The Presence of Sex Trafficking and Measures to Prevent
         It Have Been Known in the Hotel Industry for Decades ............. 29

      C. Defendants Chose to Ignore or Participate in Sex
         Trafficking Rather than Take Steps to Prevent It ....................... 32

   IV. The Defendants Participated In The Sex Trafficking of

**Jane Doe 1** ............................................................... **35**

A. **The Red Roof (Smyrna) Defendants Participated in a
   Sex Trafficking Venture Whose Victims Included Jane
   Doe 1, and They Knew or Should Have Known They
   Were Benefitting Financially From Such a Venture** ................... **36**

   i.   **The Red Roof (Smyrna) Sex Trafficking Venture** .................. **36**

   ii. **Red Roof (Smyrna) management and employees knew
   of and facilitated the sex trafficking venture at that
   hotel, and they specifically facilitated the trafficking of
   Jane Doe 1** .................................................................. **37**

   iii. **Red Roof Defendants knew of, or should have known of,
   the sex trafficking venture at the Red Roof (Smyrna)** ............ **39**

B. **The Red Roof (Atlanta) Defendants Participated in a Sex
   Trafficking Venture Whose Victims Included Jane Doe 1,
   And They Knew or Should Have Known They Were
   Benefitting Financially From Such a Venture** ............................. **51**

   i.   **The Red Roof (Atlanta) Sex Trafficking Venture** .................. **51**

   ii. **Red Roof (Atlanta) management and employees knew of
   and facilitated the sex trafficking venture at that hotel,
   and they specifically facilitated the trafficking of
   Jane Doe 1** .................................................................. **52**

   iii. **The Red Roof (Atlanta) Defendants knew of, or should
   have known of, the sex trafficking venture at the Red
   Roof (Atlanta)** ............................................................. **54**

C. **The Suburban Extended Stay Defendants Participated in
   A Sex Trafficking Venture Whose Victims Included Jane
   Doe 1, and They Knew or Should Have Known They Were
   Benefitting Financially From Such a Venture** ............................. **57**

i.  The Suburban Extended Stay (Chamblee) Sex
    Trafficking Venture ................................................... 57

ii. Suburban Extended Stay (Chamblee) management and
    employees knew of and facilitated the sex trafficking
    venture at that hotel, and they specifically facilitated the
    trafficking of Jane Doe 1 ........................................... 58

iii. The Suburban Extended Stay Defendants knew of, or
     should have known of, the sex trafficking venture at the
     Suburban Extended Stay (Chamblee) ...................................... 61

D. The Microtel Defendants Participated in a Sex Trafficking
   Venture Whose Victims Included Jane Doe 1, and They
   Knew Or Should Have Known They Were Benefitting
   Financially From Such a Venture .................................................. 65

i.  The Microtel (Atlanta) Sex Trafficking Venture .................... 65

ii. Microtel (Atlanta) management and employees knew of
    and facilitated the sex trafficking venture at that hotel, and
    they specifically facilitated the trafficking of Jane Doe 1 ....... 65

iii. The Microtel Defendants knew of, or should have known
     of, the sex trafficking venture at the Microtel (Atlanta) ........ 69

E. The Ramada Defendants Participated in a Sex Trafficking
   Venture Whose Victims Included Jane Doe 1, and They
   Knew Or Should Have Known They Were Benefitting
   Financially From Such a Venture .................................................. 65

i.  The Ramada (Alpharetta) Sex Trafficking Venture ............... 71

ii. Ramada (Alpharetta) management and employees knew of
    and facilitated the sex trafficking venture at that hotel, and
    they specifically facilitated the trafficking of Jane Doe 1 ....... 72

iii. The Ramada Defendants knew of, or should have known

1824208.1

of, the sex trafficking venture at the Ramada (Alpharetta)...    74

F.  **The La Quinta Defendants Participated in a Sex Trafficking
    Venture Whose Victims Included Jane Doe 1, and They
    Knew Or Should Have Known They Were Benefitting
    Financially From Such a Venture**...................................    76

    i.   **The La Quinta (Alpharetta) Sex Trafficking Venture** ...........    76

    ii.  **La Quinta (Alpharetta) management and employees knew of
         and facilitated the sex trafficking venture at that hotel, and
         they specifically facilitated the trafficking of Jane Doe 1**.......    77

    iii. **The La Quinta Defendants knew of, or should have known
         of, the sex trafficking venture at the La Quinta (Alpharetta)**…  79

G.  **The Americas Best Defendants Participated in a Sex Trafficking
    Venture Whose Victims Included Jane Doe 1, and They
    Knew Or Should Have Known They Were Benefitting
    Financially From Such a Venture**...................................    81

    i.   **The Americas Best (Atlanta) Sex Trafficking Venture** ..........    81

    ii.  **Americas Best (Atlanta) management and employees knew of
         and facilitated the sex trafficking venture at that hotel, and
         they specifically facilitated the trafficking of Jane Doe 1**.......    82

    iii. **The Americas Best Defendants knew of, or should have
         known .. of, the sex trafficking venture at the Americas Best
         (Atlanta)** ....................................................................    84

H.  **The Hampton Inn (NDH Atlanta) Defendants Participated in a
    Sex Trafficking .. Venture Whose Victims Included Jane Doe 1,
    and They Knew Or Should Have Known They Were Benefitting
    Financially From Such a Venture**...................................    92

    i.   **The Hampton Inn (NDH Atlanta) Sex Trafficking Venture..**    92

ii. Hampton Inn (NDH Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, andthey specifically facilitated the trafficking of Jane Doe 1..    93

iii. The Hampton Inn (NDH Atlanta) Defendants knew of, or should have known ....... of, the sex trafficking venture at the Hampton Inn (NDH Atlanta) .................................................    95

**PLAINTIFFS CLAIMS** ....................................................................    **97**

Trafficking Victims Protection Reauthorization Act Claims (allegations common to Counts 1-24) ........................................    97

**COUNT ONE - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim – 18 U.S.C. §§ 1591(a)(1), 1595(a) (Against Red Roof (Smyrna) Defendants)** ................................................    **99**

**COUNT TWO - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim 18 U.S.C. §§ 1591(a)(2), 1595(a) (Against Red Roof (Smyrna) Defendants)** ................................................    **100**

**COUNT THREE - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Beneficiary Claim - 18 U.S.C. §§ 1595(a) (Against Red Roof (Smyrna) Defendants)** ................................................    **103**

**COUNT FOUR - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), 1595(a) (Against Red Roof (Atlanta) Defendants)** ................................................    **106**

**COUNT FIVE - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim 18 U.S.C. §§ 1591(a)(2), 1595(a) (Against Red Roof (Atlanta) Defendants)** ................................................    **107**

**COUNT SIX - Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim 18 U.S.C. §1595(a)**

(Against Red Roof (Atlanta) Defendants) ................................................. 110

COUNT SEVEN - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), 1595(a)
   (Against Suburban Extended Stay Defendants....................................... 113

COUNT EIGHT - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Perpetrator Financial Beneficiary Claim
   18 U.S.C. §§ 1591(a)(2), 1595(a)
   (Against Suburban Extended Stay Defendants) ...................................... 114

COUNT NINE - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Negligent Financial Beneficiary Claim
   18 U.S.C. §1595(a)
   (Against Suburban Extended Stay Defendants) ...................................... 117

COUNT TEN - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Perpetrator Claim - 18 U.S.C. §§ 1591(a)(1), § 1595(a)
   (Against La Quinta Defendants)................................................................. 120

COUNT ELEVEN - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Perpetrator Financial Beneficiary Claim
   18 U.S.C. §§ 1591(a)(2), 1595(a)
   (Against La Quinta Defendants)................................................................. 122

COUNT TWELVE - Trafficking Victim Protection Reauthorization Act –
   Sex Trafficking Negligent Financial Beneficiary Claim
   18 U.S.C. § 1595(a)
   (Against La Quinta Defendants)................................................................. 124

COUNT THIRTEEN - Trafficking Victim Protection Reauthorization
   Act – Sex Trafficking Perpetrator Claim
   18 U.S.C. §§ 1591(a)(1), 1595(a)
   (Against Microtel Defendants)................................................................. 127

COUNT FOURTEEN - Trafficking Victim Protection Reauthorization
   Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
   18 U.S.C. §§ 1591(a)(2), 1595(a)

1824208.1

(Against Microtel Defendants)...................................................... 129

**COUNT FIFTEEN - Trafficking Victim Protection Reauthorization
Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
18 U.S.C. §1595(a)**
(Against Microtel Defendants)...................................................... 131

*You may choose to look the other way, but you can never say again that you did not know." — William Wilberforce*[1]

## INTRODUCTION

1.    Sex trafficking is modern day slavery.  Sex trafficking victims are

coerced through a combination of deceit, forced drug dependency, and sexual,

physical, and psychological abuse to engage in commercial sex acts to enrich

sex trafficking ventures.

2.    Jane Doe 1 is one of many victims of the conspicuous and open sex

trafficking that occurred at Defendants' hotels.

3.    Defendants were essential to the success of these evil ventures.

Defendants' hotels provided the locations where victims were forced to

engage in commercial sex acts with numerous—often more than 10 and

sometimes more than 20—buyers a day.

4.    Jane Doe 1 and other sex trafficking victims were also beaten, raped,

physically and mentally abused, exploited, and psychologically tormented at

Defendants' hotels

---

[1] In 2008, the Trafficking Victims Protection Act was renamed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 in honor of Wilberforce, "an English politician and social reformer whose campaign to suppress the slave trade led to the passage by Parliament of the Slavery Abolition Act of 1833, ending the institution of slavery in the British Empire." *Am. Civil Liberties Union of Massachusetts v. Sebelius*, 697 F. Supp. 2d 200, 201 n.3 (D. Mass. 2010).

5.      Hotel sex trafficking is the most common sex trafficking venture in Atlanta.  Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone.  Defendants have received and retained some of those illicit profits.

6.      In the transactional cycle of hotel sex trafficking, traffickers pay for a location at which they can offer human beings for sale; buyers pay the traffickers to use these human beings for their pleasure; traffickers pay with the money from the buyers; and the cycle repeats.  Each of Defendants' hotels hosted one or more hotel sex trafficking ventures.

7.      Defendants—hotels, owners, hotel management, and hotel brand franchisors—should have known of the open and conspicuous sex trafficking that took place at their hotels.

8.      In many instances Defendants knew sex trafficking was taking place in their hotels.  In fact, several Defendants' agents and employees actively participated in sex trafficking ventures and were rewarded for doing so.  This included aiding Jane Doe 1's traffickers and others, by, among other things, acting as lookouts, notifying traffickers if police were present, and ensuring that victims did not escape their traffickers.  For example:

      a.      Traffickers paid several Red Roof Inn employees—including a former general manager—cash for providing tips that helped the

sex traffickers avoid being caught by law enforcement. Even
when Cobb County police notified the hotel's management about
this practice, Red Roof Inn did nothing;

b.      Employees at the Suburban Extended Stay received cash
payments from sex traffickers to act as police lookouts and to call
them if a victim "[did] something crazy";

c.      Employees at the La Quinta Inn allocated rooms to victims and
traffickers near the hotel's back door so that buyers could come
and go more discretely even providing extra key cards to allow
buyers easy access to the hotel. When La Quinta employees
learned a sex trafficking victim was beaten by a trafficker for
hours at the hotel, leaving blood on the walls of the room, the La
Quinta employees did nothing.

d.      At some hotels, employees not only received monetary payments,
the sex traffickers they helped actually forced victims to have sex
with them. For example, at the Ramada, Jane Doe 1 was forced
by her trafficker to have sex with each of three Ramada
employees *every* day that she was trafficked at the hotel.

9.      In some instances, sex trafficking was fully integrated into a hotel's
daily business operations. For example,

a. at the Microtel, a single trafficker controlled the entire third floor of the hotel, using it exclusively for sex trafficking; and

b. when Jane Doe 1 was trafficked at the Red Roof Inn in Smyrna, sex trafficking was so rampant that a typical night included multiple traffickers using the hotel to traffic multiple victims each, constituting a significant portion, if not the majority, of the occupancy at that hotel.

10. Any of the Defendants—whether a hotel owner, management, franchisor, or one of their agents or employees—could have helped save Jane Doe 1 from being trafficked for sex. None of them did.

11. Instead, hotel sex trafficking ventures flourished at Defendants' hotels.

12. Plaintiff was trafficked at Defendants' hotels from 2011–2016. At every level of hotel location and chain operation and management, Defendants participated in, facilitated, condoned, or ignored the rampant sex trafficking that was occurring at their facilities.

13. Jane Doe 1 is only one of many victims who were trafficked at Defendants' hotels. Some of those victims have filed their own cases against Defendants.[2] Those victims, and others, are witnesses to the sex trafficking

---

[2] Two of those victims are referred to in this Amended Complaint as Jane Doe 2 and Jane Doe 3, as identified in their respective lawsuits.

of Plaintiff at Defendants' hotels and to Defendants' participation and complicity in sex trafficking.

14. Jane Doe 1 brings this action against Defendants to recover for the immense harm they have caused her.

## THE PARTIES

### I. <u>Plaintiff</u>

15. Jane Doe 1, proceeding pseudonymously,[3] is a citizen of the United States of America and a resident of the State of Georgia.

### II. <u>Defendants</u>

16. Whenever reference is made in this Amended Complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

### A. The Red Roof (Smyrna) Defendants

17. At all times relevant to this Complaint, Defendants Varahi Hotel, LLC ("Varahi-RRI"), FMW RRI NC, LLC ("FMW"), Westmont Hospitality Group,

---

[3] Plaintiff's motion for a protective order and leave to proceed pseudonymously is pending before the Court.

Inc. ("Westmont"), Red Roof Inns, Inc. ("Red Roof Inn"), and John Does Nos. 1–10 (collectively, the "Red Roof (Smyrna) Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 ("Red Roof Inn (Smyrna)"), from which they benefited financially.

18.   Varahi-RRI is a Georgia limited liability company with its principle place of business at 2200 Corporate Plaza, Smyrna, Georgia, 30080.  Varahi may be served with process by serving its registered agent Bharat Patel at 2200 Corporate Plaza, Smyrna, Georgia, 30080.

19.   FMW RRI is a Delaware limited liability company with its principle place of business in Houston, Texas.  FMW RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

20.   Westmont is a Texas corporation with its principle place of business in Houston, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  Westmont may be served with

1824208.1

process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

21.     Westmont operates the hotels it has an ownership interest in, and its business strategy is to align its ownership and management of its properties. It purports to have developed and implemented unique business models in order "to ensure the best returns."[4]  According to Westmont, "Westmont takes responsibility for overseeing the asset management of the hotels including financial accounting, sales and marketing, IT and human resources."[5]

22.     FMW was the title holder of the Red Roof Inn (Smyrna) until roughly December 2012.  Westmont exerts complete control over FMW, which is the agent of and/or alter-ego of, Westmont.

23.     Red Roof Inns is a Delaware corporation with its principle place of business in New Albany, Ohio.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia resulting in injuries in Georgia.  Red Roof Inns may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

---

[4] *See* Westmont Hospitality Group website excerpt, attached hereto as Exhibit 1, at 1.

[5] *Id.*

1824208.1

7

24.     Red Roof Inns plays a key role in the operation of each of the franchise
locations bearing the Red Roof Inn brand.  In a recent article, its president
Andrew Alexander noted, "Our relationship with our franchisees is as close
as you can get."  Alexander further stated in the article that franchisees have
"direct access to him and other leaders at the company, something that's
unheard of at larger franchising companies."[6]

### B.     The Red Roof (Atlanta) Defendants

25.     At all times relevant to this Complaint, Defendants RRI III, LLC ("RRI
III"), Red Roof Inn, Westmont, and John Does Nos. 1–10 (collectively, the
"Red Roof (Atlanta) Defendants") owned, managed, supervised, operated,
oversaw, controlled the operation of, and/or were inextricably connected to
the renting of rooms at the Red Roof Plus+ located at 1960 N. Druid Hills
Road NE, Atlanta, Georgia, 30329 ("Red Roof (Atlanta)").

26.     RRI III is a Delaware limited liability company with its principle place
of business in Houston, Texas.  It regularly conducts business in the State of
Georgia, derives substantial revenue from services rendered in Georgia, and
has committed tortious acts or omissions both within Georgia and outside of

---

[6] Judy Maxwell, *Asian American Hoteliers Raise the Red Roof*, Asian
Hospitality, (Nov. 19, 2018), https://www.asianhospitality.com/asian-
american-hoteliers-raise-the-red-roof/ (last visited Nov. 20, 2019), attached
hereto as Exhibit 2, at 2.

1824208.1

Georgia resulting in injuries in Georgia. RRI III may be served with process by serving its registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

27.     RRI III was the title holder of the Red Roof Inn (Smyrna) from roughly 2011–2019. Westmont exerts complete control over RRI III, which is the agent of and/or alter-ego of, Westmont.

### C.     The Suburban Extended Stay Defendants

28.     At all times relevant to this Complaint, Defendants WHG SU Atlanta LP ("WHG SU"), SUB-SU Hotel GP, LLC ("SUB-SU"), Westmont, Choice Hotels International, Inc. ("Choice Hotels"), and John Does Nos. 1–10 (collectively, the "Suburban Extended Stay Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Suburban Extended Stay located at 2050 Peachtree Industrial Court, Chamblee, Georgia, 30341 (the "Suburban Extended Stay (Chamblee)"), from which they benefited financially.[7]

---

[7] The Suburban Extended Stay where Jane Doe 1 was trafficked is currently a HomeTown Studios hotel, a brand of Red Roof Inns, Inc. However, during the time of her trafficking, the hotel was a Suburban Extended Stay, a brand of Choice Hotels.

1824208.1

9

29.    WHG SU is a Delaware limited partnership with its principle place of business in Houston, Texas.  WHG SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 3675 Crestwood Parkway, Suite 350, Duluth, Georgia, 30096.

30.    SUB-SU is a Delaware limited liability company with its principle place of business in Houston, Texas.  SUB-SU is a general partner of WHG SU and is liable for the debts of WHG SU.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  SUB-SU may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 515 East Park Avenue, 2nd Floor, Tallahassee, Florida, 32301.

31.    WHG SU is the title holder of the Suburban Extended Stay (Chamblee).  SUB-SU is the general partner of WHG SU.  Westmont exerts complete control over WHG SU and SUB-SU, who are agents of, and/or the alter-egos of, Westmont.

32.    Choice Hotels is a Delaware corporation with its principle place of business in Rocksville, Maryland.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia,

and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Choice Hotels may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, #300, Norcross, Georgia, 30092.

### D. The Microtel Defendants

33. Wyndham Hotels & Resorts, Inc. ("Wyndham"), Microtel Inns and Suites Franchising, Inc. ("Microtel Franchising"), Kuzzins Buford, LLC ("Kuzzins Buford") and John Does Nos. 1–10 (collectively, the "Microtel Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the Microtel Inn & Suites by Wyndham, 1840 Corporate Boulevard NE, Atlanta, Georgia 30329 (the "Microtel (Atlanta)"), from which they benefited financially.

34. Wyndham is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Wyndham may be served with process by serving its registered agent for service at 811 Church Road, #105, Cherry Hill, NJ 08002.

1824208.1

11

35.     Wyndham is the world's largest hotel franchisor.  It licenses its hotel brands, including Microtel, Ramada, and La Quinta, to franchisees who pay Wyndham royalty and other fees based on a percentage of their gross room revenue.

36.     Wyndham establishes standards and provides its franchisees property-based operational training and turn-key property management, and it boasts of its substantial experience in hotel management training and its operating best practices.

37.     Wyndham develops strong consultative relationships with its franchisees and nurtures those relationships, continually assessing its franchisees' needs, providing solutions to meet those needs, and partnering with them to grow their business, and in turn the revenue Wyndham receives from them.

38.     Wyndham manages over 400 of its hotels, including over 300 La Quinta hotels.  Wyndham also operates customer service centers for its franchisees.

39.     Microtel Inns and Suites Franchising, Inc. ("Microtel") is a Georgia corporation with its principal place of business in Parsippany, New Jersey. Microtel may be served with process by serving its registered agent for service, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30006.

1824208.1

40.     Microtel is a wholly-owned subsidiary of U.S. Franchise Systems, Inc.,
which is wholly-owned subsidiary of Wyndham Hotel Group, LLC, which is a
wholly-owned subsidiary of Wyndham.  Wyndham exercises complete control
over Microtel.

41.     Microtel is the Wyndham entity that enters into franchise agreements
with Microtel Inn & Suites franchisees, and it is an agent of, and/or the alter-
ego of, Wyndham.

42.     Kuzzins Buford, LLC is a Georgia limited liability company with its
principal place of business in Needham, Massachusetts.  Kuzzins Buford may
be served with process by serving its registered agent for service, Corporation
Service Company, 40 Technology Parkway South, Suite 300, Norcross,
Georgia 30092.

### E.     The Ramada Defendants

43.     Wyndham, Ramada Worldwide Inc. ("Ramada"), Jeet & JJ LLC
("Jeet"), Newtel V Corporation ("Newtel"), and John Does Nos. 1–10
(collectively, the "Ramada Defendants") owned, managed, supervised,
operated,  oversaw, controlled the operation of, and were inextricably
connected to the renting of rooms at the Ramada Limited Suites, n/k/a
Ramada by Wyndham, 3020 Mansell Road, Alpharetta, Georgia 30022 (the
"Ramada (Alpharetta)"), from which they benefited financially.

44.     Ramada, f/k/a Ramada Franchise Systems, Inc., is a Delaware
corporation with its principal place of business in Parsippany, New Jersey.  It
regularly conducts business in the State of Georgia, derives substantial
revenue from services rendered in Georgia, and has committed tortious acts
or omissions both within Georgia, and outside of Georgia resulting in injuries
in Georgia.  Ramada may be served with process by serving its registered
agent for service, Corporate Creations Network, Inc., 2985 Gordy Parkway,
1st Floor, Marietta, Georgia 30006.

45.     Ramada is a wholly-owned subsidiary of Wyndham Hotel Group, LLC,
which is a wholly-owned subsidiary of Wyndham.  Wyndham exercises
complete control over Ramada.

46.     Ramada is the Wyndham entity that enters into franchise agreements
with Ramada branded hotel franchisees, and it is an agent of, and/or the
alter-ego of, Wyndham.

47.     Jeet is a Georgia limited liability company with its principal place of
business in Alpharetta, Georgia.  Jeet may be served with process by serving
its registered agent for service, Jigar Thakkar, 3020 Mansell Road,
Alpharetta, Georgia 30022.

48.     Newtel is a Georgia corporation with its principal place of business in
Alpharetta, Georgia.  It may be served with process by serving its registered

1824208.1

agent for service, Yogesh P. Patel, 2885 Abbottswell Drive, Alpharetta, Georgia 30022.

### F. The La Quinta Defendants

49. At all times relevant to this Complaint, Defendants CPLG HOL, LLC ("CPLG HOL"), CPLG Properties, LLC ("CPLG-LQ"), CorePoint Lodging, Inc. ("CorePoint"), LQ Management, LLC ("LQ Management"), La Quinta Worldwide, LLC ("La Quinta Worldwide"), and John Does Nos. 1–10 (collectively, the "La Quinta Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and were inextricably connected to the renting of rooms at the La Quinta Inn located at 1350 North Point Dr., Alpharetta, Georgia, 30022 ("La Quinta (Alpharetta)"), from which they benefitted financially.

50. The La Quinta Defendants controlled the training and policies implemented at the La Quinta (Alpharetta).

51. CPLG HOL is a Delaware limited liability company with its principle place of business in Irving, Texas. CPLG HOL was formally known as LQ Operating Lessee, which was formally known as BRE/LQ Operating Lessee, Inc. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia, and outside of Georgia

1824208.1

15

resulting in injuries in Georgia. CPLG HOL may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

52. CPLG-LQ is a Delaware limited liability company with its principle place of business in Irving, Texas. CPLG was formally known as LQ Properties, LLC, which was formally known as BRE/LQ Properties, LLC. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. CPLG may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

53. CorePoint Lodging, Inc. ("CorePoint") is a Maryland corporation with its principle place of business in Irving, Texas and is Wyndham's largest franchisee. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. CorePoint may be served with service of process by serving its registered agent Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

54.     CPLG-LQ is the title holder of the La Quinta (Alpharetta). CPLG HOL is a management company responsible for the La Quinta (Alpharetta). CorePoint is Wyndham's largest franchisee and is the franchisee for La Quinta (Alpharetta). CPLG HOL and CPLG-LQ are agents of, and/or the alter-ego of, CorePoint.

55.     LQ Management is a Delaware limited liability company with its principle place of business in Parsippany, New Jersey.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  LQ Management may be served with service of process by serving its registered agent at Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia, 30006.

56.     La Quinta Worldwide is a Nevada limited liability company with its principle place of business in Irving, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  La Quinta Worldwide may be served with service of process by serving its registered agent

Corporate Creations Network, Inc. at 8275 South Eastern Avenue #200, Las Vegas, Nevada, 89123.

### G. The Americas Best Defendants

57. At all times relevant to this Complaint, Defendants Hament Desai ("Desai"), VAD Property Management, LLC, ("VAD"), Vantage Hospitality Group, Inc. ("Vantage"), and John Does Nos. 1–10 (collectively, the "Americas Best Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Americas Best Value Inn by Vantage located at 1641 Peachtree Street NE, Atlanta, Georgia, 30309 ("Americas Best (Atlanta)"), from which they benefitted financially.

58. Desai is a citizen of the United States of America and is a resident of the State of Georgia. He may be served with service of process by serving him personally at 5605 Lake Island Dr., Atlanta, Georgia, 30327.

59. VAD is a Georgia limited liability company with its principle place of business in Atlanta, Georgia. VAD may be served with service of process by serving its registered agent Bansari Desai at 5605 Lake Island Drive, NW, Atlanta, Georgia, 30327.

60. Vantage is a Florida corporation with its principle place of business in Coral Springs, Florida. It regularly conducts business in the State of

1824208.1

18

Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Vantage may be served with service of process by serving its registered agent Bernard T. Moyle at 2900 N. University Drive, Suite 46, Coral Springs, Florida, 33065.

### H. The Hampton Inn (NDH Atlanta) Defendants

61. At all times relevant to this Complaint, Defendants 2014 SE Owner 5-Emory, LLC ("SE Owner"), LAXMI Druid Hills Hotel, LLC ("LAXMI"), JHM Hotels Management, Inc. ("JHM"), Auro Hotels Management, LLC ("Auro"), Hilton Franchise Holdings, LLC ("Hilton Franchise"), Hilton Domestic Operating Company, Inc. ("Hilton Domestic"), Hilton Worldwide Holdings, Inc. (Hilton), and John Does 1–10 (collectively, "Hampton Inn (NDH Atlanta) Defendants"), owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Hampton Inn, 1975 North Druid Hills Road NE, Atlanta, Georgia 30329 ("Hampton Inn (NDH Atlanta)").

62. From around 2016 to around 2018, SE Owner owned the Hampton Inn (NDH Atlanta). SE Owner is Delaware limited liability company with its principle place of business at 875 Third Avenue, New York, New York 10022. SE Owner may be served with service of process by serving its registered

1824208.1

agent Cogency Global Inc., 900 Old Roswell Parkway, Suite 310, Roswell, Georgia 30076.

63.   From around 2013 to around 2016, LAXMI owned the Hampton Inn (NDH Atlanta).  LAXMI is a Georgia limited liability company with its principle place of business at 60 Point Circle, Greenville, South Carolina 29615.  LAXMI may be served with service of process by serving its registered agent Incorporated, Business Filings, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

64.   JHM is a South Carolina limited liability company with its principle place of business at 60 Pointe Circle, Greenville, South Carolina, 29615. JHM may be served with service of process by serving its registered agent Business Filings Incorporated, 289 S. Culver Street, Lawrenceville, Georgia 30046.

65.   Auro is a South Carolina limited liability company with its principle place of business at 60 Pointe Circle, Greenville, South Carolina, 29615. Auro may be served with service of process by serving its registered agent Incorporated, Business Filings, 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

66.   Hilton Franchise is a Delaware corporation with its principle place of business in McLean, Virginia.  It regularly conducts business in the State of

1824208.1

Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Hilton Franchise may be served with service of process by serving its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delware 19808.

67. Hilton Domestic is a Delaware corporation with its principle place of business in McLean, Virginia. Hilton Domestic Operating Company, Inc., may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

68. Hilton Worldwide Holdings, Inc. ("Hilton Worldwide") is a Delaware corporation with its principle place of business in Tysons, Virginia. Hilton Worldwide may be served with service of process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

69. Hilton Franchise and Hilton Domestic are agents, and/or alter egos, of Hilton.

## I. The John Doe Defendants

70. Defendants John Does Nos. 1–10 are additional owners, operators, managers, management companies, security companies, or related companies

of the hotel locations identified in this Amended Complaint. Defendants John Does Nos. 1–10 will be named and served with the summons and Amended Complaint once their identity is known.

## JURISDICTION & VENUE

71.   This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims form part of the same case or controversy as her federal law claim.

72.   Defendants are subject to personal jurisdiction in this district and division.

73.   Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## FACTUAL ALLEGATIONS

**I.**   **Sex Trafficking**

74.   Human sex trafficking is modern-day slavery. Its victims, mostly women and children, are enslaved in the commercial sex industry for little or no money.

75.     Sex trafficking is the use of force, fraud, or coercion to recruit, harbor, transport, or obtain persons for the purpose of inducing them to engage in a commercial sex act.

76.     The business of human sex trafficking is organized and violent. Victims are locked up, drugged, beaten, terrorized, and raped repeatedly. This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to control their victims.  Victims are methodically "broken" and controlled by their trafficker through coercive trauma bonding, among other techniques, resulting in an inability of the trafficking victim to act independently of a trafficker, including failing to take advantage of potential opportunities to escape.

77.     The business of human sex trafficking is organized and violent. Victims are locked up, drugged, beaten, terrorized, and raped repeatedly. This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to control their victims.  Victims are so afraid of and intimidated by their traffickers that they rarely speak out against traffickers, and they rarely take advantage of any opportunities to escape their traffickers.

78.     Beginning more than two decades ago, a nationwide effort commenced to name, recognize, and raise the awareness of the evils of sex and labor

trafficking. That effort resulted in the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

## II.    Metro Atlanta Has Long Been Known As A Sex Trafficking Hub

79.    According to a study commissioned by the U.S. Department of Justice, Atlanta has one of, if not the, largest illegal sex trafficking economies in the country. It is also one of the most profitable cities in the country for sex traffickers. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[8]

80.    Sex trafficking in Atlanta has been front-page news since at least 2001, when the Atlanta Journal-Constitution published Jane Hansen's

---

[8] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Nov. 20, 2019); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014), 30–32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Aug. 3, 2019).

1824208.1

groundbreaking series, *Selling Atlanta's Children*.[9]  And the FBI has ranked

Atlanta as one of the worst cities in the country for child sex trafficking.[10]

81.    Years before Jane Doe 1 was trafficked, Defendants knew or should

have known of the widespread national epidemic of hotel sex trafficking and

Atlanta's well-publicized reputation as the country's "epicenter for human

trafficking, and particularly child sex trafficking,"[11] that sex trafficking in

---

[9] Hansen's series is attached as Exhibit 3.  Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, The Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001. *See also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html (last visited Nov. 20, 2019)

[10] Chris Swecker testimony to the Commission on Security and Cooperation in Europe United States Helsinki Commission, *Exploiting Americans on American Soil: Domestic Trafficking Exposed*, The Federal Bureau of Investigation, (June 7, 2005), *available at* https://archives.fbi.gov/archives/news/testimony/exploiting-americans-on-american-soil-domestic-trafficking-exposed (last visited Nov. 20, 2019).

[11] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Nov. 20,

1824208.1

25

Atlanta was an "epidemic of tragic proportions,"[12] and that trafficking was prevalent in hotels in Atlanta.

### III.  Hotels Are Complicit In Sex Trafficking

82.  Numerous participants in the hotel industry—like Defendants—have decided to participate in sex trafficking ventures to reap the profit generated by the forced sexual servitude of victims like Jane Doe 1.  As a result, these actors in the hotel industry play a central role in perpetuating sex trafficking.

### A.  Hotels Are a Critical Part of the Sex Trafficking Industry

83.  Without the complicity of hotels, where illicit sexual encounters are taken off the street and cloaked in the anonymity of a hotel's customers, the sex trafficking industry would be significantly disrupted.  This obvious fact has been noted by experts and justices of the United States Supreme Court.

---

2019) (" Atlanta . . . has been an epicenter for human trafficking, and particularly child sex trafficking.  There are varying reports, some identifying Atlanta as the number one city for child sex trafficking, others ranking it somewhat lower.  I think that it's actually hard to quantify those numbers, but it is clear that whatever the number, it is way too high.").

[12] Nina Hickson, *An Epidemic of Tragic Proportions*, Atlanta Journal-Constitution, June 11, 2000, attached hereto as Exhibit 4.  *See also* Letitia Campbell, *Selling Our Children: Atlanta Does Battle Against the Sex Trafficking of Kids*, Sojourners Magazine, https://www.questia.com/magazine/1G1-234920022/selling-our-children-atlanta-does-battle-against (last visited Nov. 20, 2019) (discussing Judge Hickson's editorial and noting the creation of a large and well-established coalition of advocates in Atlanta publicizing sex trafficking in the city).

1824208.1

In 2015, Justice Antonin Scalia, joined in dissent by Chief Justice John

Roberts and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal
> activity ranging from drug dealing and prostitution to human
> trafficking. Offering privacy and anonymity on the cheap, they
> have been employed as . . . rendezvous sites where child sex
> workers meet their clients on threat of violence from their
> procurers.

*City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015).

84.    Ninety-two percent of the calls received by the National Human

Trafficking Hotline involving hotels and motels reported sex trafficking, and

another two percent reported a combination of sex and labor trafficking.[13]  A

2012 study found that 63 percent of trafficking incidents occurred in hotels.[14]

And the Polaris Project found that "75% of [trafficking] survivors responding

to Polaris's survey reported coming into contact with hotels at some point

---

[13] *Human Trafficking and the Hotel Industry*, Polaris Project,
https://polarisproject.org/sites/default/files/human-trafficking-hotel-industry-
recommendations.pdf (last visited Nov. 20, 2019).

[14] Jon Conte, *et al.*, *Inhospitable to Human Trafficking Program Evaluation*,
at 2, Businesses Ending Slavery and Trafficking, (July 2014),
https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluatio
n.11_without_appendix.pdf  at 5 (last visited Nov. 20, 2019).

during their exploitation . . . .  Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[15]

85.    ***Attorneys for the hotel industry*** estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels.[16]

86.    A number of hotels in Atlanta, including the Defendants' hotels, accommodate, facilitate, and participate in the sex trafficking of women, men, and children in Atlanta.  Victims, including Jane Doe 1, were and are rotated through these hotels in a cycle of exploitation, sometimes staying at one hotel for weeks or months.

87.    A significant percentage of the revenue generated in Atlanta's sex trafficking economy is funneled directly to hotels via the daily rental of the hotel rooms needed to harbor, exploit, and sell victims, including Jane Doe 1.[17]

---

[15] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations (last visited Nov. 20, 2019).

[16] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference 2013, Washington, D.C., http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 at 6 (last visited Nov. 20, 2019).

[17] Dank *et al.*, *supra* note 8, at 123 (finding that, in Atlanta, "most [sex] transactions occur in hotels and motels."); *id.* at 224 (noting the

## B. The Presence of Sex Trafficking and Measures to Prevent It Have Been Known in the Hotel Industry for Decades

88. Recognizing the pervasiveness of sex trafficking in the hospitality industry, End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States *in 2004*.[18] And while ECPAT focuses primarily on child sex trafficking, many of the steps it advocates are designed to prevent all forms of sex trafficking.

89. The Code is well-known in the hospitality industry. It identifies six steps companies can take to prevent child sex trafficking:

> (1) establish corporate policy and procedures against sexual exploitation of children;
>
> (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

---

"overwhelming use of hotels and motels" and finding that "[h]otel and motel rooms were a primary expense for many sex workers . . . . Sex workers noted that often, hotel and motel staff members and managers knew that sex was being traded in their venues but did not attempt to stop the work"); *see also id.* (graph at 224 showing that the most common location for commercial sex acts to occur, at 66.7 percent, is at hotels and motels); *id.* at 103 ("Despite the thousands of dollars that are made in a week, there are operational costs associated with the business."); *id.* at 191 ("The costs of operating and facilitating sex work varied greatly across pimps, though this study identifies some common costs. Pimps routinely covered costs associated with employee housing, transportation, employee appearance and personal appearance, advertisements, and hotels and motels."); *id.* at 203 n.65 ("Hotels were the most common location of in-calls for respondents.").

[18] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited Nov. 20, 2019).

(3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(6) report annually on the company's implementation of Code-related activities.

90.    ECPAT is only one of several organizations that have sought for years to help hotels address the scourge of sex trafficking and other human trafficking at hotels.

91.    The Department of Homeland Security ("DHS") identifies a number of warning signs that indicate the presence of human trafficking at hotels. According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises such as:

    a.    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b.    persons who lack freedom of movement or are constantly monitored;

c.      persons who have no control over or possession of money or ID;

d.      persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.      requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.      the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.      extended stay with few or no personal possessions in the room;

h.      excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.      the same person reserves multiple rooms;

j.      a room is rented hourly, less than a day, or for an atypical extended stay;

k.      attempts to sell items to or beg from patrons or staff;

l.      cars in the parking lot regularly parked backward, so the license plates are not visible;

m.      loitering and solicitation of male patrons;

n.      waiting at a table or bar and picked up by a male (trafficker or customer);

o.      persons asking staff or patrons for food or money; and

     p.     persons taking cash or receipts left on tables.[19]

92.    Hotel industry participants, including Defendants, were repeatedly warned not to turn a blind eye to sex trafficking. For example, at a 2013 hotel industry presentation, representatives for the industry were informed, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[20]

## C.    Defendants Chose to Ignore or Participate in Sex Trafficking Rather than Take Steps to Prevent It

93.    Defendants review hotel performance, room occupancy, and profitability like all businesses. When revenue is down, Defendants investigate individual hotel locations and take remedial action. However, Defendants intentionally turn a blind eye to safety and security issues at their hotels when revenue is up, even when Defendants knew or should have known part of those profits were derived from sex trafficking ventures.

94.    The indicia of human trafficking and effective preventative measures are widely known and available to all in the hospitality industry, including Defendants. For years, Defendants have known what signs to look for and which policies to implement in order to prevent, identify, and deter sex

---

[19] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Nov. 20, 2019).

[20] Keating, *supra* n.16 at 19.

trafficking in their hotels and to ensure they were not profiting from sex trafficking, as required by federal law.  But they refused to take these steps so that they could continue to profit from the sex trafficking ventures in which they participated.

95.     For example, Defendants knew of the Code (*see supra* ¶ 88) and were urged to sign the Code and commit to taking action against sex trafficking in their hotels.

96.     By no later than 2010, Red Roof Inn knew of the Code, but to this day it has refused to sign it.  Indeed, Red Roof Inn has never taken any steps to publicly address or even comment on the frequent sex trafficking at its hotels.

97.     By no later than 2010, La Quinta knew of the Code, but to this day it has refused to sign it.  Indeed, La Quinta has never taken any steps to publicly address or even comment on the frequent sex trafficking at its hotels.

98.     In 2010 more than 4,200 individuals signed a petition to encourage Choice Hotels to sign the Code.  In response, Choice Hotels made a statement that it would agree to take steps to fight sex trafficking in its hotels.[21]

---

[21] *Tell Choice Hotels to Prevent Child Prostitution in Their Hotels*, Change.org, https://www.change.org/p/tell-choice-hotels-to-prevent-child-prostitution-in-their-hotels (last visited Nov. 20, 2019).

Though it met with ECPAT representatives in 2010 to develop an optional training, Choice Hotels did not sign the Code until 2015.[22]

99.   By no later than 2010, Vantage Hospitality knew of the Code.  Vantage signed the Code in December 2014 after a string of sex trafficking incidents in its hotels, but has since removed its name as a signatory.

100.   Hilton signed the Code in 2011, following a "child-trafficking scandal."[23] However, as shown by the acceptance of trafficking at the hotels in this lawsuit, Hilton's adoption of the Code was an empty gesture.

101.   In 2011, Wyndham's predecessor entity, Wyndham Worldwide Corporation, signed the Code.  However, as shown by the acceptance of trafficking at the hotels in this lawsuit, Wyndham's adoption of the Code was an empty gesture.

## IV.   **The Defendants Participated In The Sex Trafficking Of Jane Doe 1**

102.   As described in more detail below, from 2011 to 2016, Jane Doe 1 was forced to engage in commercial sex acts at Defendants' hotels by various sex

---

[22] Choice Hotels, *Human Rights Policy*, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Nov. 20, 2019).

[23] Manu Bhandari, *Hilton Worldwide Responds to Child-Trafficking Scandal,* Washington Business Journal, (Oct. 31, 2010) https://www.bizjournals.com/washington/news/2010/10/31/hilton-responds-to-child-trafficking.html (last visited Nov. 20, 2019).

traffickers that conspired with, and/or were aided and abetted by, Defendants.

103.   During this period, Jane Doe 1 was bought and sold for drugs and money, and her "ownership" was transferred between different traffickers.

104.   The money obtained from Jane Doe 1's forced commercial sex acts was retained by her traffickers and used to pay Defendants for their hotel rooms and other services in furtherance of the sex trafficking ventures occurring at their hotels.

105.   Because the revenue generated by Jane Doe 1's forced commercial sex acts was not retained by her, but instead distributed among her traffickers, Defendants, and other co-conspirators and accomplices, she remained financially dependent on her traffickers for food, clothing, and other basic necessities.

106.   Further, while imprisoned against her will at Defendants' hotels, Jane Doe 1 suffered tremendous harm, including violent beatings, psychological abuse, sexual abuse, controlled and forced drug use, and threats of further violence and abuse.

1824208.1

**A. The Red Roof (Smyrna) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

     i.    <u>The Red Roof (Smyrna) Sex Trafficking Venture</u>

107.   There was a well-established sex trafficking venture at the Red Roof (Smyrna), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Red Roof (Smyrna) Sex Trafficking Venture").

108.   The Red Roof Defendants received a percentage of the revenue generated by the operation of the Red Roof (Smyrna), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

109.   The Red Roof Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Red Roof (Smyrna), as well as the training of its managers and employees.

110.   The Red Roof Defendants knew or should have known that sex trafficking was a constant occurrence at the Red Roof (Smyrna).

ii.   <u>Red Roof (Smyrna) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

111.   During more than 20 separate stays at the Red Roof (Smyrna) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers.  At times, Plaintiff would stay at the Red Roof (Smyrna) for more than two weeks.

112.   When Plaintiff was trafficked at the Red Roof (Smyrna), the hotel often put her and other trafficking victims in the same set of rooms in the back of the building.

113.   Jane Doe 1 and Jane Doe 2 were trafficked at the Red Roof (Smyrna) together by the same traffickers and separately by different traffickers. Jane Doe 1 and Jane Doe 3 were also trafficked at the Smyrna Red Roof Inn at the same time but by different traffickers.

114.   While Plaintiff was trafficked at the Red Roof (Smyrna) she, and other trafficking victims, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

115.   While Plaintiff was trafficked at the Red Roof (Smyrna) her room, and

1824208.1

the rooms of other victims, evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that she stayed for extended periods, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

116. Red Roof Inn had a policy to physically enter a room and inspect the room if housekeeping had not been in the room for three days. However, Red Roof Inn did not enforce its own policy. While Plaintiff was being trafficked at the Red Roof (Smyrna), housekeeping frequently did not enter her room for weeks at a time.

117. While Plaintiff was trafficked at the Red Roof (Smyrna), the number of daily male visitors to the room was obviously indicative of sex trafficking. As many as 20 men visited Plaintiff's room each day, each for short periods of time.

118. While Plaintiff was trafficked at the Red Roof (Smyrna), on average, 10 to 12 other traffickers, each with 1 to 5 victims, were also at the hotel. There were often more than 100 buyers at the hotel each day.

119. Sex trafficking at the Red Roof (Smyrna) was flagrant and well known

to the management and staff at the hotel. Multiple Red Roof (Smyrna) employees participated in, assisted, and facilitated the sex trafficking that occurred at the hotel, including soliciting Plaintiff for sex. For example, employees would call traffickers to warn when law enforcement were present at or coming to the hotel. Employees would also warn traffickers to stop or slow down the traffic to a particular room if it had been too busy, or caution them if other guests complained.

120.  Also, these employees often called Plaintiff's traffickers while Plaintiff was being victimized to warn them when the police were at the hotel or coming to the hotel.

121.  Jane Doe 1, and other sex trafficking victims, were often made to answer the room phones in case a buyer called and therefore spoke to the Red Roof (Smyrna) staff calling to give this kind of information.

122.  The Red Roof (Smyrna) employees received cash from traffickers for providing tips that helped traffickers evade law enforcement.

123.  Cobb County police informed management at the Red Roof (Smyrna) that sex traffickers paid at least one then-current employee and a former general manager to act as lookouts.

1824208.1

iii.   Red Roof Defendants knew of, or should have known of, the
       sex trafficking venture at the Red Roof (Smyrna)

124.   For many years and continuing to the present day, the Red Roof

(Smyrna) has had a policy, prominently displayed at the front desk and the

night window to the front office, stating, "NO REFUNDS AFTER 15

MINUTES."

 

125.   There is no legitimate reason for the Red Roof (Smyrna) to have such a

policy.  Rather, the policy sought to prevent buyers who rented rooms at the

hotel to have sex with victims of sex trafficking from seeking a refund when

they were done with the victim.

126.   Red Roof Inn knew or should have known about this policy because it

was featured prominently in numerous publicly-available online reviews and

because Red Roof Inn routinely audited and inspected the Red Roof (Smyrna).

127.   Red Roof Inn employees, including Jay Moyer and Vicky Lam, visited the Red Roof (Smyrna) multiple times a year.

128.   The policy ensures that Red Roof Inns will be paid money by buyers for room rentals in exchange for allowing the illegal commercial sex acts at the hotel, including the sex trafficking of Plaintiff and others.

> a.   *Publicly available online reviews confirm Red Roof Defendants knew, or should have known, of the sex trafficking venture and other criminal activity at the Red Roof (Smyrna)*

129.   Publicly available online reviews of the Red Roof (Smyrna), of which the Red Roof Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel.  Among the reviews reporting prostitution and other crime were:[24]

a.   A July 7, 2013 review, stating:

> **Prostitutes everywhere** . . . . There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window.  It was hard to sleep to say the least.  The only security I felt was the fact our dog was with us.  Don't stay here!!!

b.   A May 17, 2016 review, stating:

> Ok to start do not stay here. . . . **There were drug**

---

[24] The reviews quoted, among others, are attached hereto as Exhibit 5 (emphasis added).  Emphasis, where present, is added.

**dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises.** … The 1st day of me checking in I found blood on the bathroom door, walls and floor.

130.   In some cases, a person identifying himself as "Bob P," a Red Roof (Smyrna) manager, responded to the online reviews, confirming that the Red Roof Inn Defendants actually knew of commercial sex acts at the location and, at a minimum, should have known of the commercial sex trafficking occurring there.

131.   On information and belief, "Bob P" is Bharatkumar R. Patel, the manager of Varahi-RRI.

132.   Among other reviews to which a person identifying himself as "Bob P, General Manager at Red Roof Inn Atlanta – Smyrna/Ballpark" responded were:[25]

a.   An August 12, 2014 review, stating:

**PROSTITUTION – COCK ROACHES – AND DOG POOP!** Deluxe ROOM
DO NOT GO THERE!!!!! My worst experience ever! Saw prostitution, dogs pooping outside, loitering, dead cockroaches in my room.  I askd thm 2 come get it up th clerk said he could "bring me a broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want crackheads and prostitutes and don't mind . . . .

---

[25] *Id.* (emphasis added).

In response, "Bob P" wrote:

> I am wrinting deep apology for prostitution came in our
> property. I just hire new security person for watch night for
> any one who make any kind of problem.this will not happen
> again.

    b.    But a review from August 8, 2015, the very next year, confirms
nothing had changed:

> DO NOT stay here! . . . **There were shady people
> hanging out outside of our room door at all hours of
> the night and there was open prostitution occurring
> on the property.** I was traveling alone with my teenage
> daughter and felt extremely unsafe at this location.

This time, "Bob P" apologized that "people wear [sic] hanging out
in the hallway" and said, "I will hire security man for night. i will
make sure it will not happen again."

133.  Other times, someone identifying himself as "Bob P, General Manager
at the Red Roof Inn Atlanta – Smyrna/Ballpark" would respond to reviews
without mentioning the respective reviewers' complaints in specific terms.
Among the reviews receiving this kind of general response were:[26]

    a.    An August 29, 2014 review, stating:

> This hotel is unsanitary and a hotbed for criminal activity.
> . . . Dirty pillow cases, blood on the floor, bugs, cigarette
> burns everywhere, **prostitutes, and drug activity right
> outside our door**, which had no lock because apparently
> it had been kicked in by the police. The desk clerk couldn't
> have cared less.

---

[26] *Id.* (emphasis added).

b.  A September 7, 2014 review, stating:

> **Nothing but a dope and prostitution den!!** The room was nasty. . . . Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car.

c.  A second September 17, 2014 review, stating:

> I am in the room right now scared! . . . I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars?  Im a dime baby you no im worth more than that!"  Then the traffic throughout the day . . . . **its a drug and prostitute headquarters.**  Im a young male well over 6ft tall and fear for my safety

d.  An August 8, 2015 review, stating:

> DO NOT STAY HERE.  Terrible place to stay. . . . Went to get clean towels from desk and was informed I need to go back to my room and bring them my used towels before I could receive new ones. . . . **Prostitutes and drug dealers roam the parking lot.  There are at least 5 people on the parking lot all hours of the night**.

134.  Consumer-generated online reviews, scores, and/or ratings were included as a component or components in Red Roof Inn's internal evaluation metrics on hotel performance.

135.  Because of the way Red Roof Inn considered consumer generated reviews in its performance metrics and required individual hotel's

1824208.1

44

management to review and respond to certain reviews, Red Roof Inn knew or should have known of these reviews.

136.   Red Roof Inn employees, including a Vice President of Operations, monitor each hotel.  For the Red Roof (Smyrna), those employees included Moyer and Lam.

137.   Moyer, Lam, and others closely monitored the revenue, occupancy, and online reviews of the Red Roof (Smyrna).

138.   It was common for Red Roof Inn employees, including Moyer and Lam, to call the Red Roof (Smyrna) regarding particular reviews online.

139.   It was common for Red Roof Inn employees, including for Moyer and Lam, to respond directly to guests regarding particular reviews.

140.   When informed that revenue numbers were down because employees were trying to "clean up" the Red Roof (Smyrna), Moyer and other Red Roof Inn employees responded with directives like, "you need to sell rooms," "be alert but sell," and "you need to get your numbers up."

> b.    *Law enforcement activity at the Red Roof (Smyrna) demonstrates the Red Roof Defendants knew, or should have known, of the sex trafficking venture at that hotel*

141.   A series of law enforcement operations over the last decade at the Red Roof (Smyrna) has made or should have made the pervasiveness of

commercial sex trafficking and other crime there obvious to the Red Roof Inn

Defendants.  Notable incidents include:

a.  A December 2010 prostitution sting conducted by the Metro
    Atlanta Child Exploitation Task Force and the Marietta Police
    Department, during which law enforcement rescued a 16-year old
    trafficking victim;[27]

b.  A March 2011 Cobb County Police arrest report remarking that
    the "location is known for problems with drugs and prostitution"
    and was a "hotbed of illegal activities";

c.  A July 2011 report of theft at the hotel, in which the victim
    reported "a pimp and a prostitute" stole her property "because
    she refused to work for [the pimp]";

d.  Police responding to a dispute between a guest and a Red Roof
    (Smyrna) employee at the hotel in April 2012 that arose because
    the hotel refused to refund a guest after he demanded that the
    hotel return his money because, among other things, he was
    "harassed by prostitutes" while there; and

---

[27] Katy Ruth Camp, *Six Women Arrested in Prostitution Sting*, Marietta Daily
Journal, (Dec. 22, 2010), www.mdjonline.com/news/six-women-arrested-in-
prostitution-sting/article_a1a08727-b64a-5b5f-8b67-5b38927d16b9.html (last
visited Nov. 20, 2019).

    e.    A December 2014 arrest of a man, charged with buying sex from a 16-year old trafficking victim and then grabbing the girl by her hair, dragging her to the room's bathroom, and attempting to drown her in the bathtub.[28]

142.   Red Roof Inn required the other Red Roof Defendants to comply with the safety and security provisions "as designated" by Red Roof Inn which include reporting every safety and security issue at the hotel.

        *c.*    *The sex trafficking venture at the Red Roof (Smyrna) was otherwise open and obvious*

143.   Nonprofit and religious groups routinely and regularly visited (and still visit) the Red Roof (Smyrna) to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

144.   In 2014, a website was created entitled "Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia" with the web address of www.redroofie.blogspot.com. The site, which was publicly available,

---

[28] *See, e.g.,* Police: Marietta Man Tried to Kill 16-year-old, Marietta Daily Journal, (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html (last visited Nov. 20, 2019).

discussed the prostitution and other crime occurring at the Red Roof (Smyrna).[29]

145.   The site's "About" page stated, among other things:

> This blog is intended to aid fellow travelers by providing information about the condition of Red Roof Inn, Smyrna, Georgia before stopping off there for the night. . . . This Inn has been a subject of drug busts and prostitution sting operations by the local police (see blog posts July 1, 2014).

*Id.*

146.   The Red Roof Defendants knew or should have known about this publicly available website.

147.   Another website publicizing crime, particularly commercial sex trafficking, at the Red Roof (Smyrna), existed previously.[30]  Among other things, that site included articles identifying known traffickers staying at the hotel and quoted an employee "admit[ing] that much of the information contained in" an article published on the site "regarding sex trafficking

---

[29] Screen captures of the site, www.redroofie.blogspot.com (last visited Nov. 20, 2019), are attached as Exhibit 6.

[30] This website is no longer available online.  The articles referenced from that site are not attached to the complaint because personal identifying information contained in the articles could present a safety threat to Plaintiff.  Plaintiff will produce these articles to the Court in camera if necessary and will provide them to Defendants subject to a protective order.

occurring in their rooms is true" and "confirm[ing] that the national Red Roof Corporate office is aware of the situation, as well as the franchise owner."

148. The website published an article that, among other things:

    a.    Asked, "What will it take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?"

    b.    Stated, "Concerned citizens should call the Cobb County elected officials as well as the Red Roof Corporate offices right away," providing contact information for Red Roof Inn, Red Roof Inn's communications department, and Red Roof Inn's public relations agency.

149. On information and belief, Red Roof Inn received numerous phone calls reporting sex trafficking and other criminal activity occurring at the Red Roof (Smyrna).

150. The same site published another article that, among other things, stated:

    a.    "This hotel is used for prostitution and has been this way for many years. Any day of the week, dozens of girls are trafficked out of this location, some of whom look underage, even as young as 12."

1824208.1

49

b.  "Private investigators recently observed a young woman being
    trafficked repeatedly at the Red Roof in Smyrna over a 3 day
    period while her 7 week old baby slept at the foot of the bed in
    which she was entertaining 'client' after 'client.'"

151.  A hospitality industry consultant and anti-trafficking advocate sent
these articles directly to Red Roof Inn's president and CEO, Andrew
Alexander, and personally informed Alexander of the ongoing commercial sex
trafficking occurring at the Red Roof (Smyrna).

152.  Among other things, this hospitality industry consultant also informed
Alexander of the name of a specific trafficker who regularly stayed at the
hotel and told Mr. Alexander that this trafficker is listed on the Georgia Sex
Offender Registry with a lengthy criminal history of sex crimes involving
minors.

153.  Mr. Alexander's only response was to have Red Roof Inn's general
counsel question the advocate in search for the name of the organization that
published the articles online.

154.  As a result, Red Roof Inn's general counsel was sent the same
information and asked when the company would take action to address the
open sex trafficking at the Red Roof (Smyrna).  However, Red Roof Inns never
responded to repeated entreaties to stop sex trafficking at the Red Roof

(Smyrna).

155.   Though Red Roof Inn's franchise agreements allow it to terminate its agreements and pull its brand name from a location because of criminal activity, including commercial sex trafficking,[31] Red Roof Inn has not taken such action with respect to the Red Roof (Smyrna).

156.   Instead, despite Red Roof Inn's CEO and General Counsel being explicitly told sex trafficking was occurring at the Red Roof (Smyrna),[32] as well as the well documented and publicized instances of sex trafficking, prostitution, and other crime at that hotel, Red Roof Inn continues to promote the Red Roof (Smyrna) as "one of the best budget hotels in Smyrna, GA."[33]

---

[31] *E.g., NC Motel Loses Franchise after Trafficking Allegations,* Fox 8, (Sept. 17, 2015), https://myfox8.com/2015/09/17/nc-motel-loses-franchise-after-trafficking-allegations/ (last visited Nov. 20, 2019); Courtney Francisco, *Feds: Teen Sex Trafficking at CLT Motel,* WCCP Charlotte, (Dec. 3, 2015), https://www.wccbcharlotte.com/2015/12/03/feds-teen-sex-trafficking-at-clt-motel/ (last visited Nov. 20, 2019).

[32] Red Roof Inn is well aware that its hotels are frequently used for sex trafficking as public reporting documents sex trafficking ventures operating at no fewer than 30 other Red Roof Inn hotels around the country.

[33] Red Roof Inn Atlanta – Smyrna/Ballpark, Red, https://www.redroof.com/property/ga/smyrna/RRI088 (last visited Nov. 20, 2019), attached hereto as Exhibit 7.

## B. The Red Roof (Atlanta) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture

### i. The Red Roof (Atlanta) Sex Trafficking Venture

157. There was a well-established sex trafficking venture at the Red Roof (Atlanta) comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Red Roof (Atlanta) Sex Trafficking Venture").

158. The Red Roof (Atlanta) Defendants received a percentage of the revenue generated by the operation of the Red Roof (Atlanta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

159. The Red Roof (Atlanta) Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Red Roof (Atlanta), as well as the training of its managers and employees.

160. The Red Roof (Atlanta) Defendants knew or should have known that sex trafficking was a regular and ongoing occurrence at the Red Roof (Atlanta).

1824208.1

52

ii. <u>Red Roof (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

161. During more than 20 separate stays at the Red Roof (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers.

162. Between 2011 and 2014, Plaintiff was trafficked with Jane Doe 2 at the Red Roof (Atlanta).

163. While Plaintiff was trafficked at the Red Roof (Atlanta) she, and other trafficking victims, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

164. While Plaintiff was trafficked at the Red Roof (Atlanta) her room, and the rooms of other victims, evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that stayed for extended periods, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

1824208.1

165.   While Plaintiff was trafficked at the Red Roof (Atlanta), the number of daily male visitors to the room was obviously indicative of sex trafficking.  As many as 20 men visited Plaintiff's room each day, each for short periods.

166.   Sex trafficking at the Red Roof (Atlanta) was flagrant and well known to the management and staff at the hotel.  On information and belief, Red Roof (Atlanta) employees participated in, assisted, and facilitated the sex trafficking that occurred at the hotel by warning traffickers when law enforcement was present, or to stop or slow down the traffic to a particular room if other guests complained.

### iii.   The Red Roof (Atlanta) Defendants knew of, or should have known of, the sex trafficking venture at the Red Roof (Atlanta)

167.   Red Roof Inn routinely audited and inspected, at times anonymously, the Red Roof (Atlanta).  The ongoing sex trafficking activity would have been apparent to those inspectors.

168.   Red Roof Inn employees, including Jay Moyer, visited the Red Roof (Atlanta) multiple times a year.  The ongoing sex trafficking activity would have been apparent to these employees.

169.   Additionally, publicly available online reviews of the Red Roof (Atlanta), of which the Red Roof Inn Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel.  Among

1824208.1

the reviews reporting prostitution and other crime were:

a.  A July 2012 review, stating:

> I was surprised, however, at all of the open drug dealing going on in the rooms and parking lot. . . . I complained upon checkout. They had a practiced look of surprise on their faces but I do not believe for a minute that the staff does not know what is going on in this hotel.

b.  A July 2012 review, stating:

> Prostitution sting. During the stay, there was a prostitution sting. The next night at 2:00 AM, a prostitute knocked on my door wanting to know if I wanted "company."

c.  A 2014 review, stating:

> Dirty orgy smell in both rooms I had. Smoke like smell only drowned out by the semen and bleach. Weird activity late at night. Pimp next door wasn't happy with his ladies take for the night apparently.

d.  A May 2016 review, stating:

> . . . it was pretty obvious that the local prostitutes were visiting a room a few doors down. Something I know RRI is pretty familiar with.

e.  An August 2016 review, stating:

> Within the first hour, my brother and his friend were approached by prostitutes who wanted them to come with them.

f.   A 2016 review, stating:

> If prostitutes and drugs are what your looking for this is
> your spot. . . . Passed out vomitus covered people in parking
> lot 2 days out of three.  Seman splattered on mirror. . . .
> Felt so bad for the "working women" with their personal
> items in garbage bags that I gave away 3 tote bags.

g.   A November 2016 review, stating:

> The hotel was being used by prostitutes and Shady
> characters were always coming and going.

h.   A December 2016 review, stating:

> Drug dealers and pimps hanging around outside . . . .

i.   A January 2017 review, stating:

> If you enjoy the smell of marijuana coming from 10% of the
> rooms and prostitutes setting up shop next to you then
> this is the place for you!

j.   A 2017 review, stating:

> . . . A hooker/drug dealer was set up 2 doors down and had
> many visitors during the day/night. . . .

k.   A 2017 review, stating:

> . . . This place is Disgusting there are hookers that are
> staying here and that is not the least of my worries. . . .
> There is also lots of drug use here someone just overdosed. I
> found crack on the floor . . . .

l.   An October 2018 review, stating:

> People that paid for rooms there looked like addicts and
> sex workers.

m.  A 2019 review, stating:

> . . . I saw a drug deal, it looks like another room had
> suspicious women coming in and out and multiple men
> going in . . . .

170. General Managers identifying themselves as Ella Bowen and Robert

Allen responded directly to many of the reviews identifying ongoing

prostitution and drug activity at the hotel

171. On information and belief, Red Roof Inn also received guest complaints

about the Red Roof (Atlanta) relating to prostitution, commercial sex

trafficking, and other criminal activity there.

### C. The Suburban Extended Stay Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture

i.  <u>The Suburban Extended Stay (Chamblee) Sex Trafficking Venture</u>

172. There was a well-established sex trafficking venture at the Suburban

Extended Stay (Chamblee) comprising traffickers, the hotel's employees,

management, owners, and franchisor, as well as others involved in the sex

trafficking of victims at that hotel, including Jane Doe 1 (the "Suburban

Extended Stay (Chamblee) Sex Trafficking Venture").

173. The Suburban Extended Stay Defendants received a percentage of the revenue generated by the operation of the Suburban Extended Stay (Chamblee), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

174. The Suburban Extended Stay Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Suburban Extended Stay (Chamblee), as well as the training of its managers and employees.

175. The Suburban Extended Stay Defendants knew or should have known that sex trafficking was a frequent and ongoing occurrence at the Suburban Extended Stay (Chamblee).

> ii. Suburban Extended Stay (Chamblee) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1

176. During more than 20 separate stays at the Suburban Extended Stay (Chamblee) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers. The length of a single stay at the Suburban Extended Stay sometimes lasted more than two weeks.

177. Plaintiff and Jane Doe 2 were trafficked at the Suburban Extended Stay (Chamblee) together by the same traffickers and separately by different

traffickers.

178. Multiple employees at the Suburban Extended Stay (Chamblee) were paid by Plaintiff's traffickers to work as lookouts to assist and facilitate Plaintiff's trafficking.

179. Two employees at the Suburban Extended Stay (Chamblee) were paid by Plaintiff's trafficker, and they were instructed by the trafficker to call him if "anything crazy is going on" and to "look out for my girl here and let me know if she does something crazy."

180. Plaintiff's traffickers regularly spoke to these two employees on the phone in the hotel room to discuss the employees' payments for their assistance.

181. These employees routinely asked Plaintiff's trafficker if he would like a room in the "usual spot."

182. These employees would also call the room to warn Plaintiff's traffickers if there were police at the hotel and, if so, whether they needed to temporarily stop the flow of buyers to the room.

183. A third employee of the Suburban Extended Stay (Chamblee) also worked for Plaintiff's traffickers. On one occasion, Jane Doe 2 asked this third male employee for a ride or the use of his cell phone to call a cab so that she could escape. The man told her he could not give her a ride.

1824208.1

184.   Instead, the employee told the trafficker that the victim had tried to get his help to escape.  That night, Plaintiff's trafficker came to the victim's room and ruthlessly beat Jane Doe 2 for confiding in the employee and trying to escape, saying, "You think somebody is going to help you? None of these people are going to help you."

185.   While Jane Doe 1 was trafficked at the Suburban Extended Stay (Chamblee) she, and other sex trafficking victims, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

186.   While trafficked at the hotel, the rooms Jane Doe 1 occupied, as well as those of other sex trafficking victims, evidenced numerous well-known and visible signs of sex trafficking.  Frequently the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.  Additionally, she requested excessive amounts of towels from housekeeping.

1824208.1

187.   While Plaintiff was trafficked at the Suburban Extended Stay (Chamblee) the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 20 men a day visited Plaintiff's room, each for short periods.  Plaintiff was aware that several other trafficking victims were at the Suburban Extended Stay (Chamblee) being trafficked each night Plaintiff there.  It is likely that at least 50 buyers came to the Suburban Extended Stay (Chamblee) to purchase sex each day Plaintiff was trafficked there.

iii.   <u>The Suburban Extended Stay Defendants knew of, or should have known of, the sex trafficking venture at the Suburban Extended Stay (Chamblee)</u>

188.   As discussed above, the evidence of sex trafficking at the Suburban Extended Stay (Chamblee) was open and obvious.  Choice Hotels—its franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

189.   However, this sex trafficking activity and the involvement of the hotel's management and employees was not the only evidence that made the Suburban Extended Stay Defendants aware of the sex trafficking venture at that hotel.

1824208.1

a. *Publicly available online reviews confirm Suburban Extended Stay Defendants knew, or should have known, of the sex trafficking venture and other criminal activity at the Suburban Extended Stay (Chamblee)*

190. Publicly available online reviews of the Suburban Extended Stay, of which the Suburban Extended Stay Defendants knew or should have known, reported widespread prostitution and crime occurring at the hotel. Upon information and belief, Choice Hotels, as well as the other Suburban Extended Stay Defendants, monitored online reviews related to this hotel.

191. Among the reviews reporting prostitution and other crime were:

a. A June 12, 2014 review, stating:

Disgusting. Hotel. . . . 2 working prostitutes and many drug dealers.

b. A second June 16, 2014 review, stating:

Great if your [sic] looking for new drug dealers. . . . Getting to sleep at night can be a challenge, especially if you are not comfortable being surrounded by felons, thieves, drug dealers (the bad drugs to boot) and also prostitutes and some pimps. If you are a female traveling without a male companion, or if you are not carrying a firearm, it would be foolish to stay here. . . . I was offered, and I quote, "that hard, that soft, ice, boy, Cali bud" of course, the proper medical tools for administering said chemicals, and I even happened across no less than 3 partially used portions of what I am pretty sure was crack just lying around in the breezeways, waiting for anybody to pick up and check out! So if drugs are your thing, this may be your favorite new home away from home.

1824208.1

    c.    A June 3, 2015 review, stating:

> [D]uring our 2 week stay I noticed 4 different police officers responding to calls in the building.  I was also informed by a business owner very similar to the Suburban Extended Stay that the hotel is "ghetto" and is frequently used for selling drugs and prostitution . . . .

192.   In addition to the consumer-generated, publicly available online reviews, Choice Hotels receives reports and complaints directly from customers about its many hotel locations, including the Suburban Extended Stay (Chamblee).

193.   Choice Hotels knew the content of the complaints it received from guests, including complaints from guests at the Suburban Extended Stay (Chamblee).

194.   On information and belief, Choice Hotels received guest complaints about the Suburban Extended Stay (Chamblee) related to prostitution, commercial sex trafficking, and other criminal activity there.

195.   Choice Hotels's policy is or was to refer, without action or comment, guest complaints directly back to hotel management for resolution.  Choice Hotels's rules and regulations also require each individual hotel's management to respond to all guest complaints and to maintain those responses for review by Choice Hotels.

> b. *Law enforcement activity at the Suburban Extended Stay (Chamblee) demonstrates the Suburban Extended Stay Defendants knew, or should have known, of the sex trafficking venture at that hotel*

196. Between 2010 and 2016, at least seventeen people were found dead at the Suburban Extended Stay (Chamblee), according to records of the Chamblee Police Department.

197. Multiple law enforcement operations, conducted by the DeKalb County Vice Unit and other agencies, led to prostitution-related arrests at the location. For example:

a. In July 2010, a 20-year old woman arrested for prostitution and drugs told officers with the DeKalb County Vice Unit she was prostituting to make money for her boyfriend;

b. In June 2012, after the DeKalb County Vice Unit conducted an operation for the express purpose of "deter[ing] prostitution on going [sic] at this hotel," they arrested two individuals on drug charges. One, a sex offender, was also charged with failing to register;

c. In January 2014, an 18-year old was arrested for prostitution, and a 26-year old was arrested and charged with pimping and drug crimes. The teenager told DeKalb County Vice Unit officers

that she had traveled to Atlanta from Wisconsin to live at the Suburban Extended Stay with this man, who, she told officers, kept at least half the revenue from her prostitution.

     *c.*    *The sex trafficking venture at the Suburban Extended Stay (Chamblee) was otherwise open and obvious*

198.   Nonprofit and religious groups routinely and regularly visited (and still visit) the Suburban Extended Stay (Chamblee) to provide food and rescue information to the sex trafficking victims they encounter at the hotel.

**D.**    **The Microtel Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially from such a Venture**

     i.    <u>The Microtel (Atlanta) Sex Trafficking Venture</u>

199.   There was a well-established sex trafficking venture at the Microtel (Atlanta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Microtel (Atlanta) Sex Trafficking Venture").

200.   The Microtel Defendants received a percentage of the revenue generated by the operation of the Microtel (Atlanta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

201. The Microtel Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Microtel (Atlanta), as well as the training of its managers and employees.

202. The Microtel Defendants knew or should have known that sex trafficking was a constant occurrence at the Microtel (Atlanta).

ii. Microtel (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1

203. During more than 20 separate stays at the Microtel (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex at the hotel by various traffickers. The length of a single stay at the Microtel (Atlanta) sometimes lasted two weeks.

204. Plaintiff and Jane Doe 2 were trafficked at the Microtel both together by the same traffickers and separately by different traffickers.

205. Employees at the Microtel participated in, assisted, and facilitated Plaintiff's sex trafficking. Jane Doe 1 and Jane Doe 3 were trafficked at the Microtel at the same time but by different traffickers.

206. Microtel employees at the front desk were paid daily in drugs or money to permit the trafficking and to act as lookouts for Plaintiff's traffickers.

207. Microtel employees frequently called Plaintiff's trafficker to alert him if police were at the Microtel.

1824208.1

208.   Plaintiff's traffickers frequently used the hotel's computer in the lobby to post advertisements online for sex with Jane Doe 1 and Jane Doe 2 or made Plaintiff post similar advertisements.  The computer was in full view of the lobby and the hotel's employees.  Other traffickers also openly and obviously used the hotel's computer for this purpose.

209.   For several years, including while Plaintiff was trafficked at the Microtel (Atlanta), a single sex trafficker completely controlled the third floor of the hotel (the "Microtel Trafficker").

210.   Management and employees at the Microtel refused to allow anyone to rent a room on the third floor if they did not have permission from the Microtel Trafficker.

211.   The Microtel Trafficker had seven or more victims—several of whom were minors—living on the third floor of the Microtel.  The Microtel Trafficker also lived there, as did multiple relatives and other associates.

212.   Women being trafficked by the Microtel Trafficker each had their own room on the third floor.  If they required another room to meet buyers in, they only had to go to the front desk and say "[the Microtel Trafficker] told me to get another room."  These victims never needed identification to get another room and only paid in cash.

213.   The Microtel Trafficker also used the banquet room of the Microtel for

1824208.1

67

photo shoots for advertisements to post online for commercial sex at the Microtel. At least one of these photo shoots was videotaped and the video posted online by the Microtel Trafficker.

214. The sex trafficking at the Microtel (Atlanta) was flagrant. The Microtel Trafficker often walked through the hotel with several women surrounding him. He was frequently violent with the victims at the hotel. He was also violent with buyers at the hotel, including beating one man, stripping his clothes off, and making him leave the hotel naked.

215. Microtel housekeeping staff frequently came to the third floor to bring numerous extra towels. They were often denied entrance to the rooms because the Microtel Trafficker imposed a rule at the hotel that only allowed the housekeeping staff entrance to a room if one of the victims was present.

216. Microtel employees were frequently paid in cash by the Microtel Trafficker or his associates on the third floor.

217. At times hotel employees were also paid in drugs by the Microtel Trafficker. Microtel employees also saw sex trafficking victims hand over cash to the Microtel Trafficker, for instance while the staff was smoking marijuana with the Microtel Trafficker.

218. While Plaintiff was trafficked at the Microtel (Atlanta), she exhibited numerous well-known and visible signs of a sex trafficking victim, including

physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

219.   While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.

220.   While Plaintiff was trafficked at the Microtel (Atlanta), the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 30 men a day visited Plaintiff's room, each for short periods.

      iii.   <u>The Microtel Defendants knew of, or should have known of, the sex trafficking venture at the Microtel (Atlanta)</u>

221.   As discussed above, the evidence of sex trafficking at the Microtel (Atlanta) was open and obvious.  Wyndham and Microtel—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

1824208.1

222. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Microtel Defendants aware of the sex trafficking venture at that hotel.

223. Numerous publicly available reviews of the Microtel (Atlanta), of which Wyndham and Microtel should have known, reported prostitution at the hotel, including:

    a. A September 5, 2011 review:

> One morning at 5:00AM two men had a foul-mouthed shouting match over a woman and had to be thrown out of the hotel. We suspect this type of behavior is common as the hotel is in close proximity to a strip joint and a night club. ***There are many different people coming and going at all hours, which we makes us suspect prostitution.*** This is the worst experience my wife and I have had at a hotel.

(Emphasis added).

    b. An April 21, 2013 review:

> In operation to service the Pink Pony
> Unfortunately for the normal traveler, this hotel is next to the Pink Pony. During day time hours this isn't such a big deal, but if you are trying to leave for a 5 am flight with your three small children and ***have to wait for the prostitutes to clear the hallway*** . . . well, it is not exactly a family friendly establishment.

(Emphasis added).

c. A July 2014 review:

> I want to believe that ***some of the stragglers hanging around the hotel were pimps & prostitutes***. Definitely need new management there. I had the room booked for two nights but only stayed one due to all this that was going on, Never, ever, ever again would I stay at this hotel. I'm still itching thinking about it!!!

(Emphasis added).

224. In addition to the consumer-generated, publicly available online reviews, Wyndham and Microtel received reports and complaints directly from customers about its many hotel locations, including about the Microtel (Atlanta).

225. On information and belief, Wyndham and Microtel received guest complaints about the Microtel (Atlanta) related to prostitution, commercial sex trafficking, and other criminal activity there.

226. Despite their knowledge of the ongoing sex trafficking venture at the Microtel (Atlanta), neither Wyndham nor Microtel sought to remove their brands from the hotel because they continued to profit from that venture.

**E.    The Ramada Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

i.    <u>The Ramada (Alpharetta) Sex Trafficking Venture</u>

227.   There was a well-established sex trafficking venture at the Ramada (Alpharetta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Ramada (Alpharetta) Sex Trafficking Venture").

228.   The Ramada Defendants received a percentage of the revenue generated by the operation of the Ramada (Alpharetta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

229.   The Ramada Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Ramada (Alpharetta), as well as the training of its managers and employees.

230.   The Ramada Defendants knew or should have known that sex trafficking was a constant occurrence at the Ramada (Alpharetta).

ii.   <u>Ramada (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

231.   During more than 20 separate stays at the Ramada (Alpharetta) between 2011 and 2016, Plaintiff was trafficked for sex at the hotel by various traffickers.  The length of a single stay at the Ramada (Alpharetta) sometimes lasted two weeks.

232.   Between 2011 and early 2014, Plaintiff and Jane Doe 2 were trafficked together at the Ramada Inn.

233.   Employees at the Ramada (Alpharetta) participated in, assisted, and facilitated Plaintiff's sex trafficking, including soliciting Plaintiff for sex.

234.   A group of employees, thought to be related, lived at the Ramada (Alpharetta) while Plaintiff was trafficked there.  Two of the male employees, plus a third—a front desk attendant—reached an agreement with Jane Doe 1's traffickers that required her to have sex with each of the three employees *every day* that she was trafficked at the hotel.  At times this requirement occurred each day during a two week stay.

235.   During these forced sexual encounters, one of these man would regularly come to Plaintiff's room with a TV remote control and announce loudly at the door that Plaintiff's "remote was broken" and that he was there to fix it.  This meant the man was there for sex.

236.   Frequently, these employees would attempt to have sex with Jane Doe 1 more than once in a day.  Plaintiff's trafficker allowed her to refuse more than one sexual encounter with these men during a day.  When this happened, the employees would bring items that other guests left in their rooms and attempt to barter the items for sex with Plaintiff.

1824208.1

237. In exchange for daily sex, the Ramada management and employees kept Plaintiff's traffickers informed of police activity at the hotel and when to slow or stop buyer traffic to the room.

238. While Plaintiff was trafficked at the Ramada Inn, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

239. While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms. The rooms also contained multiple cell phones. And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room. She also frequently requested an excessive amount of towels from housekeeping.

240. While Plaintiff was trafficked at the Ramada (Alpharetta), the foot traffic of men to the room was obviously indicative of sex trafficking. As many as 20 men a day visited Plaintiff's room, each for short periods of time.

1824208.1

74

### iii. The Ramada Defendants knew of, or should have known of, the sex trafficking venture at the Ramada (Alpharetta)

241. As discussed above, the evidence of sex trafficking at the Ramada (Alpharetta) was open and obvious. Wyndham and Ramada—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

242. Ramada made its franchisees, including at the Ramada (Alpharetta), agree that Ramada could conduct unlimited unannounced quality inspections of the hotel and its operations.

243. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Ramada Defendants aware of the sex trafficking venture at that hotel.

244. Publicly available reviews of the Ramada (Alpharetta), of which Ramada should have known, reported prostitution at the hotel, including:

    a. A review from April 2014:

> I was scared and looked through eye piece from the door, a man (supposedly a pimp) and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady, I then called the desk and no one bothered to answer . . . . later, that morning, complained about the incident and the desk manager doesnt respond properly, poor communication . . . . I wont recommend this to any one!!!

b. Another review from around 2014:

> this place is used by prostitutes and the owners know it but
> don't do anything about since its money from them.

c. A review from September 15, 2015 reported the availability of
condoms in the lobby:

> Actually have condoms in with the snacks in the
> hotel lobby. Oh my god!.

245. In addition to the consumer-generated, publicly available online
reviews, Wyndham and Ramada received reports and complaints directly
from customers about its many hotel locations, including the Ramada
(Alpharetta).

246. On information and belief, Wyndham and Ramada received guest
complaints about the Ramada (Alpharetta) related to prostitution,
commercial sex trafficking, and other criminal activity there.

247. Wyndham and Ramada made its franchisees agree that the results of
paper and electronic customer satisfaction surveys, as well as unsolicited
feedback from guests, may be included in determining a hotel's quality
assurance score.

248. There are also multiple police incident reports related to prostitution at
the Ramada (Alpharetta).

1824208.1

76

249.   Although Wyndham and Ramada explicitly retained the right to terminate their franchise agreement with the Ramada (Alpharetta) if it was operated in a manner that endangers the health and safety of its guests, and despite its knowledge of the ongoing sex trafficking venture at the Ramada (Alpharetta), neither Wyndham nor Ramada sought to remove their brands from the hotel because they continued to profit from that venture.

**F.   The La Quinta Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially from such a Venture**

i.   <u>The La Quinta (Alpharetta) Sex Trafficking Venture</u>

250.   There was a well-established sex trafficking venture at the La Quinta (Alpharetta), comprising traffickers, the hotel's employees, management, and owners, as well as others involved in the sex trafficking of victims at that hotel (the "La Quinta (Alpharetta) Sex Trafficking Venture").

251.   The La Quinta Defendants received a percentage of the revenue generated by the operation of the La Quinta (Alpharetta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

252.   The La Quinta Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the LaQuinta (Alpharetta), as

well as the training of its managers and employees.

253.   The La Quinta Defendants knew or should have known that sex
trafficking was a constant occurrence at the La Quinta (Alpharetta).

### ii. <u>La Quinta (Alpharetta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

254.   Jane Doe 1 was trafficked at the La Quinta Inn on around 20 separate
occasions by multiple traffickers from 2011 to 2013.

255.   Plaintiff and Jane Doe 2 were trafficked at the La Quinta together by
the same traffickers and separately by different traffickers.

256.   Employees and management at the La Quinta Inn participated in,
assisted, and facilitated Plaintiff's sex trafficking.  They intentionally rented
rooms to Jane Doe 1 and her traffickers near the back door of the hotel so
that buyers could come and go without other guests noticing.  La Quinta
(Alpharetta) staff told Plaintiff and her traffickers to "use the back door" to
hide the number of men visiting the room each day from other guests.

257.   The employees gave Plaintiff and her traffickers extra key cards so that
numerous buyers could easily access the hotel undetected by other guests
each day.  Extra key cards were left outside the back door so that buyers
could let themselves into the hotel from the back without being noticed.

1824208.1

258.   La Quinta (Alpharetta) employees knew of an incident when Plaintiff was nearly beaten to death by her trafficker for hours at the La Quinta (Alpharetta).  Jane Doe 1's trafficker videotaped himself viciously beating and raping Plaintiff for hours, leaving blood on the walls of the room.  Hotel employees could hear Jane Doe 1's trafficker violently beating and raping Jane Doe 1 in the room, but they did nothing to help.

259.   While at the La Quinta (Alpharetta), commercial sex trafficking victims, including but not limited to Plaintiff, exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, physical injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings, and monitoring by male companions.

260.   Rooms at the La Quinta (Alpharetta) where victims, including Jane Doe 1, were trafficked frequently had trash cans with numerous more used condoms a day and multiple cell phones in the room.  Victims stayed for extended periods with very few personal items or possessions in their rooms and frequently requested housekeeping items like towels multiple times a day.

261.   While Plaintiff was trafficked at the La Quinta Inn the foot traffic of men to the room was obviously indicative of sex trafficking, with as many as 20 men a day visiting Plaintiff's room for short periods.

      iii.    <u>The La Quinta Defendants knew of, or should have known of, the sex trafficking venture at the La Quinta (Alpharetta)</u>

262.   As discussed above, the evidence of sex trafficking at the La Quinta (Alpharetta) was open and obvious, including the violent beatings of sex trafficking victims, including Jane Doe 1.  La Quinta sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

263.   However, this sex trafficking activity and the involvement of the hotel's management and employees was not the only evidence that made the La Quinta Defendants aware of the sex trafficking venture at that hotel.

264.   Publicly available online reviews of the La Quinta (Alpharetta), of which the La Quinta Defendants knew or should have known, reported blood stained sheets and other problems at the hotel.  Upon information and belief, La Quinta, as well as the other La Quinta Defendants, monitored online reviews related to this hotel.

265.   Among the reviews of concerns at the La Quinta (Alpharetta) are multiple reports of blood-stained sheets, including:

1824208.1

    a.  A September 10, 2012 review, stating

        when I was about to lay down I noticed blood on the bed
        skirt of the bed, and on the floor near the head of the bed.

        I had a room with two beds, and looked at the other bed
        and there was blood on that bed skirt too.

    b.  A June 2013 review, stating

        When I checked the bed, the pillowcase had blood on it. I
        took off all cases And another pillow had blood under the
        case.  I've stayed at many La Quinta Hotels and have never
        had an experience like this.  The others in our group's
        rooms were also disgusted by issues they found. Should be
        closed down.

    c.  A July 2013 review, stating,

        We opened the bed, and found what appeared to be blood
        stains on the bottom sheet. . . .

        The next evening, the room had been cleaned but the
        replacement comforter had what appeared to be fresh blood
        stains on it.

266.  In addition to the consumer-generated, publicly available online

reviews, La Quinta received reports and complaints directly from customers

about its many hotel locations around the world, including about the La

Quinta (Alpharetta).

267.  La Quinta knew the content of the complaints it received from guests,

including complaints from guests at the La Quinta (Alpharetta)

268.   On information and belief, La Quinta received guest complaints about the La Quinta (Alpharetta) related to prostitution, commercial sex trafficking, and other criminal activity there.

### G.   The Americas Best Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture

i.   The Americas Best (Atlanta) Sex Trafficking Venture

269.   There was a well-established sex trafficking venture at the Americas Best (Atlanta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the "Americas Best (Atlanta) Sex Trafficking Venture").

270.   The Americas Best Defendants received a percentage of the revenue generated by the operation of the Americas Best (Atlanta), including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

271.   The Americas Best Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Americas Best (Atlanta), as well as the training of its managers and employees.

272.   The Americas Best Defendants knew or should have known that sex trafficking was a constant occurrence at the Americas Best (Atlanta).

   ii. <u>Americas Best (Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

273.   During more than 20 separate stays at the Americas Best (Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex by various traffickers for up to a week at a time.

274.   Management and employees at the Americas Best knew of, participated in, assisted, and facilitated Plaintiff's sex trafficking.

275.   One employee who lived at the hotel facilitated Plaintiff's trafficking and worked as a lookout for Plaintiff's trafficker.  This employee was paid by being allowed to demand sex from one of the other victims trafficked with Jane Doe 1 and Jane Doe 2.

276.   Plaintiff was frequently trafficked at Americas Best (Atlanta) with four to five other trafficking victims.

277.   Jane Doe 1 and Jane Doe 2 were trafficked at the Americas Best (Atlanta) together.  When one was with a buyer in their room, the other hid in the bathroom until the buyer was finished having sex.

1824208.1

278.   While Plaintiff was trafficked there, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

279.   While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking.  Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.

280.   While Plaintiff was trafficked at the Americas Best (Atlanta) the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 20 men a day visited Plaintiff's room, each for short periods.

      iii.   <u>The Americas Best Defendants knew of, or should have known of, the sex trafficking venture at the Americas Best (Atlanta)</u>

281.   As discussed above, the evidence of sex trafficking at the Americas Best (Atlanta) was open and obvious.

282. However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the Americas Best Defendants aware of the sex trafficking venture at that hotel. Vantage actively monitors the operations of Americas Best (Atlanta) and its other member hotels.

> a. *Vantage controls its hotels and undertakes the responsibility of training employees and owners of Americas Best (Atlanta), inspecting its hotels and monitoring criminal activity at Americas Best (Atlanta)*

283. Vantage holds itself out to be a "membership organization." Instead of franchisees, the company is controlled by its own members, who vote on the standards and programs that govern the daily operation of hotels, including the Americas Best (Atlanta). Brand members, including Desai, meet annually to vote on "brand standards." If the vote passes, Vantage, as a corporation, imposes the brand standards as operating procedures upon each hotel, including Americas Best (Atlanta). The brand standards enforced by Vantage upon Americas Best (Atlanta) encompass all aspects of hotel management, including every reservation and booking at the hotel as well as safety and security standards.

284. Vantage members, including Desai, by their vote on polices as members, use Vantage to exert control over all hotels under the Americas

Best Value Inn brand. Brand member hotels, including Americas Best, are required to adhere to Vantage brand standards. By voting on policies Vantage will make binding upon each hotel, the members explicitly relinquish control over their hotel to Vantage.

285. Vantage controls the training and required polices for Americas Best (Atlanta) where Plaintiff was trafficked. Vantage was responsible for and provided training to the employees at the Americas Best (Atlanta). Vantage provided Americas Best (Atlanta) employees with training on every aspect of the day to day operations of the hotel.

286. Vantage monitored and oversaw operations at each hotel to keep rooms rented and to ensure adherence to policies and deadlines set by Vantage. Vantage corporate employees remain in regular communication with its member hotels, including Americas Best (Atlanta), about these policies.

287. The Vantage Resource Guide contains *required* policies of Vantage, including those concerning operating standards, fees, reservation programs (including the many reservations handled by Vantage directly), guest comments and complaints, inspections, rewards programs, technology, and other matters.

288. Vantage inspectors have the right, and necessary control, to require safety and security issues to be remedied as Vantage sees fit. Vantage also

undertakes the duty to train its hotel member employees on safety and security issues.

289.   Some of Vantage's training programs purport to provide training to hotel employees regarding how to look for or detect human trafficking, including sex trafficking.  Vantage employees who have provided this training have admitted that the training is "on a light level" and not "in-depth training."  In fact, the training Vantage provided was wholly inadequate and not provided to all its members.

290.   Though Vantage knew the measures to take to ensure it was not profiting from sex trafficking, Vantage failed to ensure its own trainings and brand requirements were followed at Americas Best (Atlanta) where Plaintiff was openly trafficked for sex.

291.   Vantage employees who inspect and train hotel employees have testified, when asked if Vantage inspectors would want to know about criminal activity at individual Americas Best Value Inn locations, "Of course, because their reputation – you know, **we've got to monitor our properties and what they're doing** and stuff, for sure."[34]

---

[34] Deposition transcript as excerpted in Plaintiff's Opposition to Defendant Vantage Hospitality Group, Inc.'s Motion for Summary Judgment at 15 (emphasis added) in *Jane Doe #1 v. Vantage Hospitality Group, Inc., et al.*,

292. Vantage employees are assigned member hotels to monitor, including monitoring reviews and setting up online news alerts reporting criminal activity at the hotel. These alerts notified Vantage of several criminal incidents at Americas Best (Atlanta) during the years Plaintiff was trafficked at the hotel.

293. Vantage sent inspectors to examine operations at Americas Best (Atlanta). The ongoing sex trafficking activity would have been apparent to those inspectors.

294. When Vantage inspected Americas Best (Atlanta), the inspections were extensive and included inspections evaluating the safety and security measures at the hotel. After the inspection, Vantage issued an "action plan" to the Americas Best (Atlanta) with a summary of the inspection, a list of items or defects Vantage required the hotel to cure, and a deadline for completion. The failure to meet these deadlines could result in the imposition of penalties, including loss of the brand.

295. Vantage has admitted its obligation to be informed about criminal activity at its brand members' hotel locations. Yet despite rampant sex trafficking occurring at Americas Best (Atlanta) in the years Plaintiff was

---

Cir. Ct. for Wicomico Cty., Md., No. C-22-CV-17-000073 (filed March 12, 2018).

1824208.1

trafficked, Vantage was apparently oblivious to the entire issue of human trafficking until the end of 2013.  Vantage's Chief Operating Officer ("COO") Bernard Moyle has testified that prior to December 2013 meeting, "within our corporation we had not really heard much about [human trafficking] at all."[35]

296.   Since 2008, federal law has made businesses liable if they should have known of their business's participation in a sex trafficking venture.  Yet from 2008 until 2013, Vantage did nothing to determine whether it was profiting from sex trafficking, including Plaintiff's sex trafficking at Americas Best (Atlanta).  Vantage's COO has testified the company was unaware of the issue.  During that time, Vantage profited from a number of known and publicized instances of sex trafficking at Americas Best Value Inns.

297.   In fact, Vantage's supposed ignorance of the issue of human trafficking is all the more incredible because sex trafficking *at Americas Best Value Inns* was its own national phenomenon at the time, including when Plaintiff was trafficked at America's Best (Atlanta).

298.   For example, in May 2013, a man was arrested on felony human trafficking charges after holding a woman against her will and forcing her to

---

[35] *Id.* at 21.

have sex for money at the Americas Best Value Inn in Rockdale County.[36]

299.   One month later—at the ***same*** Americas Best Value Inn in Rockdale

County—two women were arrested for sex trafficking a 14-year-old girl for

weeks at the hotel.[37]

300.   Between 2010 and 2014, there were numerous arrests relating to sex

trafficking and prostitution at no less than five other Americas Best Value

Inns, including one location that was determined by the government to be a

nuisance and was closed.

301.   Despite testifying that Vantage must monitor crime on its properties,

Vantage did nothing to address open sex trafficking at America's Best

(Atlanta) while Plaintiff was openly trafficked at the hotel.

> b.   *Publicly available online reviews confirm Americas Best*
> *Defendants knew, or should have known, of the sex*
> *trafficking venture and other criminal activity at*
> *Americas Best (Atlanta)*

---

[36] Alice Queen, *Man Faces Human Trafficking Charge*, The Citizens (May 6, 2013), https://www.rockdalenewtoncitizen.com/news/man-faces-human-trafficking-charge/article_36fe2c8d-71d2-519a-bdcc-af6d21b18b2d.html (last visited Nov. 20, 2019).

[37] Staff Reports, *Two Ga. Women Charged With Pimping 14-year-old*, Gwinnett Daily Post (June 4, 2013), https://www.gwinnettdailypost.com/news/state/two-ga-women-charged-with-pimping--year-old/article_bf32d697-73a9-554c-82fd-985ee03ae3ff.html (last visited Nov. 20, 2019).

1824208.1

302.   Vantage employees also monitored reviews and complaints from third-party websites on behalf of Americas Best (Atlanta).  It stayed in ongoing communication with VAD and/or Desai regarding the appropriate responses to guest reviews and complaints, including *__requiring__* Americas Best Atlanta or Desai to issue refunds to guests with specific complaints.

303.   Many of the publicly-available reviews reported prostitution and other crime at the hotel, including the following representative sample:

  a.   A review from March 2011, stating:

  . . . make sure that people who shouldn't be on the property stay off it look like some young girls were trying to do their thing out there and that's not good . . . .

  b.   A review from July 2013, stating:

  **Robbery** First, asked non smoking got smoking. Second, bug the size of a huge centipede came out while my other guest was using the restroom.  Then at 8:30 am a girl was held up at gunpoint(by a shotgun and machine gun) and ha her car stolen in broad daylight.  Very very sketchy part of town.

  c.   A review from May 2014 described man attempting to recruit a guest at the hotel into trafficking:

  I HAVE NEVER BEEN TO A HOTEL WHERE I WAS SO UNCOMFORTABLE IN MY LIFE . . . I WAS PROPOSITIONED TO GO TO ROOM 208 WHEN I GOT THERE FROM SOME MAN WHO ASKED ME WAS I LOOKING TO GET PAID . . . I WAS SO DISGUSTED AND THE MEN IN MY FAMILY WERE VERY UPSET . . . THERE WERE DRUG TRANSACTIONS GOING ON IN OUR FACES AND PEOPLE ACTUALLY

COMING UP TO US WITH DRUG PROPOSITIONS . . . .

d.   A review from May 2014, stating:

**Worst hotel I have ever stayed in.**  Very very unsafe feeling hotel. Prostitutes and sketchy drug addicts hanging around in parking lot and stairwells.  Very loud place. Bass coming from cars in parking lot all night.  People screaming and banging around all night in their rooms.

e.   A review from June 2014, stating:

I stayed one night in this hotel. AWFUL. . . . working girl traffic day and night . . . .

f.   A review from October 2014, stating:

It was not Pleasant. . . . the hotel is nothing like in the photos. It was more like a local hang out for drug dealers and prostitutes. . .

g.   A review from August 2016, stating:

**Worst place ever.**  If you like Semen stains on your headboard. Pee stains running down the wall.  Cigarette burns on top of the microwave of a non smoking room.  Prostitutes outside of your door.  Rude and completely ignorant hotel managers.  This is your kind of dump.  This is the worst place I have ever stayed.

304.   Vantage monitored these reviews and other complaints made directly to Vantage about Americas Best (Atlanta).  Vantage knew the content of the complaints it received from guests about Americas Best (Atlanta), including complaints of prostitution, drugs, and other criminal activity.

305.   Instead of responding directly, when Vantage received a complaint about Americas Best, it forwarded the complaint to VAD or Desai.  If VAD

1824208.1

92

and Desai failed to respond to the complaint in a timely manner, Vantage then followed up with VAD and Desai to demand a timely response. A failure to issue a timely response by VAD or Desai could result in the assessment of a penalty fee against VAD or Desai or could ultimately result in a revocation of the brand.

306. Though Vantage had knowledge from the law enforcement activity, complaints, reviews, and inspections of what Vantage should have known was sex trafficking, Vantage chose to profit from, rather than stop, Plaintiff's repeated trafficking at Americas Best (Atlanta).

**H. The Hampton Inn (NDH Atlanta) Defendants Participated in a Sex Trafficking Venture Whose Victims Included Jane Doe 1, and They Knew or Should Have Known They Were Benefitting Financially From Such a Venture**

      i.    <u>The Hampton Inn (NDH Atlanta) Sex Trafficking Venture</u>

307. There was a well-established sex trafficking venture at the Hampton Inn (NDH Atlanta), comprising traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in the sex trafficking of victims at that hotel, including Jane Doe 1 (the Hampton Inn (NDH Atlanta) Sex Trafficking Venture").

308. The Hampton Inn (NDH Atlanta) Defendants received a percentage of the revenue generated by the operation of the Hampton Inn (NDH Atlanta)

including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff and other victims were trafficked.

309.  The Hampton Inn (NDH Atlanta) Defendants controlled the policies and standards applicable to and enforced (or not enforced) at the Hampton Inn (NDH Atlanta), as well as the training of its managers and employees.

310.  The Hampton Inn (NDH Atlanta) Defendants knew or should have known that sex trafficking was a constant occurrence at the Hampton Inn (NDH Atlanta).

    ii.    <u>Hampton Inn (NDH Atlanta) management and employees knew of and facilitated the sex trafficking venture at that hotel, and they specifically facilitated the trafficking of Jane Doe 1</u>

311.  During roughly 20 separate stays at the Hampton Inn (NDH Atlanta) between 2011 and 2016, Plaintiff was trafficked for sex at the Hampton Inn by various traffickers.

312.  Jane Doe 1 and Jane Doe 2 were trafficked at the Hampton Inn together by the same traffickers and separately by different traffickers. When together, when one was with a buyer in their room, the other hid in the bathroom until the buyer was finished having sex.

313.  Management and employees at the Hampton Inn (NDH Atlanta) participated in, assisted, and facilitated Plaintiff's sex trafficking.

314.   A male front desk employee at the Hampton Inn worked as a lookout for Plaintiff's traffickers and provided discounted rooms for Plaintiff's trafficking in exchange for drugs and money.  The employee also called the room to alert Plaintiff's trafficker if the police were at the hotel or if the frequent buyers coming to the room were noticed by other guests.

315.   Each day Plaintiff was trafficked at the Hampton Inn, this employee came directly to the room Plaintiff was trafficked in and asked Plaintiff's trafficker if the group were staying or leaving.  If they were staying, the man would be paid with drugs or money inside the room or while standing at the door.  Plaintiff was frequently ordered by her trafficker to get the drugs or money out of the bedside table and hand it to the employee.

316.   A female front desk employee also worked as a lookout for Plaintiff's trafficker.  This employee was paid primarily in drugs for her lookout work.

317.   While Plaintiff was trafficked at the Hampton Inn, she exhibited numerous well-known and visible signs of a sex trafficking victim, including physical deterioration, malnourishment, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, lack of control and possession of money, physical evidence of beatings by her trafficker, and monitoring by her traffickers.

318.   While trafficked at the hotel, the rooms Jane Doe 1 occupied evidenced numerous well-known and visible signs of sex trafficking. Frequently, the trash cans in the rooms would contain an extraordinary number of used condoms.  The rooms also contained multiple cell phones.  And despite the fact that Jane Doe 1 stayed for extended periods at times, she had very few personal items or possessions in the room.  She also frequently requested an excessive amount of towels from housekeeping.

319.   While Plaintiff was trafficked at the Hampton Inn, the foot traffic of men to the room was obviously indicative of sex trafficking.  As many as 20 men a day visiting Plaintiff's room, each for short periods.

      iii.    <u>The Hampton Inn (NDH Atlanta) Defendants knew of, or should have known of, the sex trafficking venture at the Hampton Inn (NDH Atlanta)</u>

320.   As discussed above, the evidence of sex trafficking at the Hampton Inn (NDH Atlanta) was open and obvious.  Hilton Franchise, Hilton Domestic, and Hilton—the hotel's franchisor—sent inspectors to examine this hotel, at times anonymously, and the ongoing sex trafficking activity would have been apparent to those inspectors.

321.   However, this sex trafficking activity and the involvement of the hotels management and employees was not the only evidence that made the

Hampton Inn (NDH Atlanta) Defendants aware of the sex trafficking venture at that hotel.

322.   Hilton Franchise, Hilton Domestic, and Hilton received reports and complaints directly from customers about its many hotel locations, including the Hampton Inn (NDH Atlanta).

323.   On information and belief, Hilton Franchise, Hilton Domestic, and Hilton received guest complaints about the Hampton Inn (NDH Atlanta) related to prostitution, commercial sex trafficking, and other criminal activity there.

324.   And while Hilton Franchise, Hilton Domestic, and Hilton provide training to its own direct employees regarding the dangers and risks of sex trafficking, it fails to provide or require that training for its franchisees and their employees.

325.   There is no difference between a corporate-owned hotel and a franchisee with regard to the risks for sex trafficking or its victims.  Yet Hilton refused to require its franchisees to have systems in place to prevent sex trafficking, although  it could have done so pursuant to its franchise agreement.

326.   And despite its knowledge of the ongoing sex trafficking venture at the Hampton Inn (NDH Atlanta), Hilton Franchise, Hilton Domestic, and Hilton

never sought to remove their brands from the hotel because they continued to profit from that venture.

## PLAINTIFF'S CLAIMS

### Trafficking Victims Protection Reauthorization Act Claims
### (allegations common to Counts 1-24)

327.   The Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2003 amended Title 18 of the U.S. Code by adding 18 U.S.C. § 1595, a new section that provided human trafficking victims a civil cause of action "against the perpetrator" of certain trafficking crimes, including sex trafficking in violation of 18 U.S.C. § 1591.

328.   Under the TVPRA (18 U.S.C. §§ 1591(a)(1) and 1595(a)), Defendants may be held liable—criminally and civilly—*as perpetrators of sex trafficking* for knowingly recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting by any means a person, knowing or in reckless disregard of the fact that means of force, fraud, or coercion were used to cause a person to engage in commercial sex acts.

329.   Under the TVPRA (18 U.S.C. §§ 1591(a)(2) and 1595(a)), Defendants may also be held liable—criminally and civilly—*as perpetrators of sex trafficking* for benefitting financially from participation in a venture,

1824208.1

knowing or in reckless disregard of the fact, that means of force, fraud, coercion, or the combination of such means would be used to cause a person to engage in commercial sex acts.

330. The William Wilberforce TVPRA of 2008 amended the cause of action created by 18 U.S.C. § 1595(a) to expand liability beyond the "perpetrator" of trafficking crimes, to also cover "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter[.]"

331. Thus, since 2008, Defendants have known that they could be held civilly liable for benefitting financially from participation in a venture which they knew or should have known involved a violation of the TVPRA.

332. As discussed above, at minimum, Defendants should have known from the open and obvious signs of sex trafficking at their hotels that such illegal acts were occurring.

## COUNT ONE
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Red Roof (Smyrna) Defendants)

333.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

334.  Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

335.  The Red Roof (Smyrna) Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Red Roof (Smyrna), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

336.  The Red Roof (Smyrna) Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud,

1824208.1

coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

337. The Red Roof (Smyrna) Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

338. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

339. The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

340. The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

## COUNT TWO
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Red Roof (Smyrna) Defendants)

341. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

342. Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

343. The Red Roof (Smyrna) Defendants violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Red Roof (Smyrna) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof

1824208.1

(Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

344.   The Red Roof (Smyrna) Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

345.   The Red Roof (Smyrna) Defendants  also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna) , knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

346.  The Red Roof (Smyrna) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

347.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

348.  The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

349.  The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

### COUNT THREE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Red Roof (Smyrna) Defendants)

350.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24, 70-156, and 327-332 above as if fully set forth herein.

351.  Jane Doe 1 brings this claim against the Red Roof (Smyrna) Defendants as a victim of the Red Roof (Smyrna) Sex Trafficking Venture in

which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Red Roof (Smyrna). Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

352. Jane Doe 1 also brings this claim against the Red Roof (Smyrna) Defendants as a victim of the Red Roof (Smyrna) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Smyrna) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Smyrna), knowing or in

1824208.1

reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Smyrna), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

353.   The Red Roof (Smyrna) Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Red Roof (Smyrna).

354.   This venture, in which the Red Roof (Smyrna) Defendants participated, was in or affecting interstate commerce.

355.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

356.   The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

1824208.1

357.   The Red Roof (Smyrna) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FOUR
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Red Roof (Atlanta) Defendants)

358.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

359.   Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

360.   The Red Roof (Atlanta) Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Red Roof (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

361. The Red Roof (Atlanta) Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

362. The Red Roof (Atlanta) Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

363. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

364. The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

365.   The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FIVE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Red Roof (Atlanta) Defendants)

366.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

367.   Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

368.   The Red Roof (Atlanta) Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Red Roof (Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Atlanta)  property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained,

advertised, maintained, patronized, or solicited persons at the Red Roof
(Atlanta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Red Roof
(Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was
one of those persons caused to engage in commercial sex acts.

369.  The Red Roof (Atlanta) Defendants knowingly benefitted financially
from these acts by receiving money from renting the hotel rooms in which
Jane Doe 1 was trafficked for sex.

370.  The Red Roof (Atlanta) Defendants  also violated 18 U.S.C. § 1591(a)(2)
by knowingly aiding and abetting others that benefitted financially by
providing the room in which Jane Doe 1 was trafficked, providing the Red
Roof (Atlanta) property and facilities as a venue for the ongoing sex
trafficking venture, providing assistance to her trafficker, or by knowingly
assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1),
including assisting, supporting, or facilitating persons who knowingly
recruited, enticed, harbored, transported, provided, obtained, advertised,
maintained, patronized, or solicited persons at the Red Roof (Atlanta) ,
knowing or in reckless disregard of the fact that means of force, threats of
force, fraud, coercion, or the combination of such means would be used to

1824208.1

110

cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

371. The Red Roof (Atlanta) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

372. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

373. The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

374. The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SIX

**Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim**
**18 U.S.C. § 1595(a)**
**(Against Red Roof (Atlanta) Defendants)**

375.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, and 327-332 above as if fully set forth herein.

376.  Jane Doe 1 brings this claim against the Red Roof (Atlanta) Defendants as a victim of the Red Roof (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Red Roof (Atlanta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

377.  Jane Doe 1 also brings this claim against the Red Roof (Atlanta) Defendants as a victim of the Red Roof (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted

financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Red Roof (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Red Roof (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Red Roof (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

378. The Red Roof (Atlanta) Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by, on information and belief, receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and

other things of value from the sex trafficking of other victims at the Red Roof (Atlanta).

379.  This venture, in which the Red Roof (Atlanta) Defendants participated, was in or affecting interstate commerce.

380.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

381.  The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

382.  The Red Roof (Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

# COUNT SEVEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Suburban Extended Stay Defendants)

383.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

384.   Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

385.   The Suburban Extended Stay Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

386.   The Suburban Extended Stay Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised,

maintained, patronized, and solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

387.  The Suburban Extended Stay Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

388.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

389.  The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

390.  The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT EIGHT
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
## 18 U.S.C. §§ 1591(a)(2), 1595(a)
## (Against Suburban Extended Stay Defendants)

391.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

392.   Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

393.   The Suburban Extended Stay Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Suburban Extended Stay (Chamblee) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that

1824208.1

means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

394.   The Suburban Extended Stay Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

395.   The Suburban Extended Stay Defendants  also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts

1824208.1

118

at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

396. The Suburban Extended Stay Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

397. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

398. The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

399. The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT NINE
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking
### Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Suburban Extended Stay Defendants)

400.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, and 327-332 above as if fully set forth herein.

401.   Jane Doe 1 brings this claim against the Suburban Extended Stay Defendants as a victim of the Suburban Extended Stay (Chamblee) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or *should have known* violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Suburban Extended Stay (Chamblee).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

402.   Jane Doe 1 also brings this claim against the Suburban Extended Stay Defendants as a victim of the Suburban Extended Stay (Chamblee) Sex

Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Suburban Extended Stay (Chamblee) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Suburban Extended Stay (Chamblee), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Suburban Extended Stay (Chamblee), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

403. The Suburban Extended Stay Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by, receiving money and other things of value for other services provided to Jane

1824208.1

121

Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Suburban Extended Stay (Chamblee).

404.   This venture, in which the Suburban Extended Stay Defendants participated, was in or affecting interstate commerce.

405.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

406.   The Suburban Extended Stay Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

407.   The Suburban Extended Stay Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against La Quinta Defendants)

408.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set forth herein.

409.   Jane Doe 1 brings this claim against the La Quinta Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

410.   The La Quinta Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at La Quinta (Alpharetta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

411.   The La Quinta Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the La Quinta (Alpharetta), knowing or

in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

412. The La Quinta Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

413. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

414. The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

415. The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

## COUNT ELEVEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
## 18 U.S.C. §§ 1591(a)(2), 1595(a)
## (Against La Quinta Defendants)

416.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set forth herein.

417.   Jane Doe 1 brings this claim against the La Quinta Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

418.   The La Quinta Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the La Quinta (Alpharetta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the La Quinta (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud,

coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

419. The La Quinta Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

420. The La Quinta Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the La Quinta (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and

by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

421. The La Quinta Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

422. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

423. The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

424. The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWELVE
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking
## Negligent Financial Beneficiary Claim
## 18 U.S.C. § 1595(a)
## (Against La Quinta Defendants)

425.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, and 327-332 above as if fully set forth herein.

426.   Jane Doe 1 brings this claim against the La Quinta Defendants as a victim of the La Quinta (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the La Quinta (Alpharetta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

427.   Jane Doe 1 also brings this claim against the La Quinta Defendants as a victim of the La Quinta (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the La Quinta (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the La Quinta (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the La Quinta (Alpharetta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

428.  The La Quinta Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the La Quinta (Alpharetta).

429.   This venture, in which the La Quinta Defendants participated, was in or affecting interstate commerce.

430.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

431.   The La Quinta Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

432.   The La Quinta Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT THIRTEEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Microtel Defendants)

433.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

1824208.1

434.   Jane Doe 1 brings this claim against the Microtel Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

435.   The Microtel Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Microtel (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

436.   The Microtel Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Microtel (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

437.   The Microtel Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

1824208.1

131

438.  Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

439.  The Microtel Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

440.  The Microtel Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FOURTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Microtel Defendants)

441.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

442.  Jane Doe 1 brings this claim against the Microtel Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

443.  The Microtel Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Microtel (Atlanta) Sex

Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Microtel (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Microtel (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Microtel (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

444. The Microtel Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

445. The Microtel Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Microtel (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting,

1824208.1

133

or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting,

supporting, or facilitating persons who knowingly recruited, enticed,

harbored, transported, provided, obtained, advertised, maintained,

patronized, or solicited persons at the Microtel (Atlanta), knowing or in

reckless disregard of the fact that means of force, threats of force, fraud,

coercion, or the combination of such means would be used to cause those

persons to engage in commercial sex acts at the Microtel (Atlanta), and by

attempting and conspiring to do the same.  Jane Doe 1 was one of those

persons caused to engage in commercial sex acts.

446.  The Microtel Defendants' actions related to Jane Doe 1 were in or

affecting interstate commerce.

447.  Jane Doe 1 has suffered substantial physical, emotional, and

psychological harm and other damages as a direct and proximate result of the

Microtel Defendants participating in these acts, and conspiring with, aiding,

and abetting others participating in these acts.

448.  The Microtel Defendants are liable to Jane Doe 1 for her damages in an

amount to be proven at trial, including reasonable attorneys' fees and

punitive damages.

449.  The Microtel Defendants, and all Defendants, are jointly and severally

liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT FIFTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking
### Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Microtel Defendants)

450.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-206, and 327-332 above as if fully set forth herein.

451.   Jane Doe 1 brings this claim against the Microtel Defendants as a victim of the Microtel (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or *should have known* violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Microtel (Atlanta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

452.   Jane Doe 1 also brings this claim against the Microtel Defendants as a victim of the Microtel (Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known***
violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1
was trafficked, providing the Microtel (Atlanta) property and facilities as a
venue for the ongoing sex trafficking venture, providing assistance to her
trafficker, or by knowingly assisting, supporting, or facilitating a violation of
18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons
who knowingly recruited, enticed, harbored, transported, provided, obtained,
advertised, maintained, patronized, or solicited persons at the Microtel
(Atlanta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Microtel
(Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was
one of those persons caused to engage in commercial sex acts.

453. The Microtel Defendants benefitted financially or by receiving
something of value from their participation in this venture from renting the
hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money
and other things of value for other services provided to Jane Doe 1's sex
traffickers, and by receiving money and other things of value from the sex
trafficking of other victims at the Microtel (Atlanta).

454.    This venture, in which the Microtel Defendants participated, was in or affecting interstate commerce.

455.    Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

456.    The Microtel Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

457.    The Microtel Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SIXTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Ramada Defendants)

458.    Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

459.    Jane Doe 1 brings this claim against the Ramada Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

460.   The Ramada Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Ramada (Alpharetta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

461.   The Ramada Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

462.   The Ramada Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

463.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

1824208.1

138

Ramada Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

464. The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

465. The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT SEVENTEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Ramada Defendants)

466. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

467. Jane Doe 1 brings this claim against the Ramada Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

468. The Ramada Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Ramada (Alpharetta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Ramada (Alpharetta) property and facilities as a

1824208.1

venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

469. The Ramada Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

470. The Ramada Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Ramada (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited,

1824208.1

140

enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

471. The Ramada Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

472. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

473. The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

474. The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

## COUNT EIGHTEEN
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
## 18 U.S.C. § 1595(a)
## (Against Ramada Defendants)

475.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 199-226, and 327-332 above as if fully set forth herein.

476.   Jane Doe 1 brings this claim against the Ramada Defendants as a victim of the Ramada (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **should have known** violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Ramada (Alpharetta).  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

477.   Jane Doe 1 also brings this claim against the Ramada Defendants as a victim of the Ramada (Alpharetta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Ramada (Alpharetta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Ramada (Alpharetta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Ramada (Alpharetta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

478. The Ramada Defendants benefitted financially or by receiving something of value from their participation in this venture from renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Ramada (Alpharetta).

1824208.1

143

479.   This venture, in which the Ramada Defendants participated, was in or affecting interstate commerce.

480.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

481.   The Ramada Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

482.   The Ramada Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT NINETEEN
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
### 18 U.S.C. §§ 1591(a)(1), 1595(a)
### (Against Americas Best Defendants)

483.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set forth herein.

484.   Jane Doe 1 brings this claim against the Americas Best Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

485. The Americas Best Defendants violated 18 U.S.C. § 1591(a)(1) by knowingly harboring and maintaining persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at Americas Best (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

486. The Americas Best Defendants also violated 18 U.S.C. § 1591(a)(1) by knowingly aiding and abetting other perpetrators that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

487. The Americas Best Defendants actions in violation of 18 U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

488. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the

1824208.1

Americas Best Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

489.   The Americas Best Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

490.   The Americas Best Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Americas Best Defendants)

491.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set forth herein.

492.   Jane Doe 1 brings this claim against the Americas Best Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

493.   The Americas Best Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the Americas Best (Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1

was trafficked, providing the Americas Best (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Americas Best (Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Americas Best (Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

494.   The Americas Best Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

495.   The Americas Best Defendants  also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Americas Best (Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including

assisting, supporting, or facilitating persons who knowingly recruited,
enticed, harbored, transported, provided, obtained, advertised, maintained,
patronized, or solicited persons at the Americas Best (Atlanta), knowing or in
reckless disregard of the fact that means of force, threats of force, fraud,
coercion, or the combination of such means would be used to cause those
persons to engage in commercial sex acts at the Americas Best (Atlanta), and
by attempting and conspiring to do the same. Jane Doe 1 was one of those
persons caused to engage in commercial sex acts.

496. The Americas Best Defendants' actions related to Jane Doe 1 were in or
affecting interstate commerce.

497. Jane Doe 1 has suffered substantial physical, emotional, and
psychological harm and other damages as a direct and proximate result of the
Americas Best Defendants participating in these acts, and conspiring with,
aiding, and abetting others participating in these acts.

498. The Americas Best Defendants are liable to Jane Doe 1 for her
damages in an amount to be proven at trial, including reasonable attorneys'
fees and punitive damages.

499. The Americas Best Defendants, and all Defendants, are jointly and
severally liable for damages arising from the indivisible injuries they caused
Plaintiff.

1824208.1

## COUNT TWENTY-ONE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking
### Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Americas Best Defendants)

500.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 57-60, 70-106, 269-306, and 327-332 above as if fully set

forth herein.

501.   Jane Doe 1 brings this claim against the Americas Best Defendants as

a victim of the Americas Best (Atlanta) Sex Trafficking Venture in which

they participated and from which they knowingly benefitted financially or by

receiving something of value and which they knew or ***should have known***

violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring,

transporting, providing, obtaining, advertising, maintaining, patronizing, or

soliciting persons that were caused by means of force, threats of force, fraud,

coercion, or the combination of such means to engage in commercial sex act at

the Americas Best (Atlanta).  Jane Doe 1 was one of those persons caused to

engage in commercial sex acts.

502.   Jane Doe 1 also brings this claim against the Americas Best

Defendants as a victim of the Americas Best (Atlanta) Sex Trafficking

Venture in which they participated and from which they knowingly

1824208.1

benefitted financially or by receiving something of value and which they

knew or ***should have known*** violated 18 U.S.C. § 1591(a)(2) by providing

the room in which Jane Doe 1 was trafficked, providing the Americas Best

(Atlanta) property and facilities as a venue for the ongoing sex trafficking

venture, providing assistance to her trafficker, or by knowingly assisting,

supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including

assisting, supporting, or facilitating persons who knowingly recruited,

enticed, harbored, transported, provided, obtained, advertised, maintained,

patronized, or solicited persons at the Americas Best (Atlanta), knowing or in

reckless disregard of the fact that means of force, threats of force, fraud,

coercion, or the combination of such means would be used to cause those

persons to engage in commercial sex acts at the Americas Best (Atlanta), and

by attempting and conspiring to do the same. Jane Doe 1 was one of those

persons caused to engage in commercial sex acts.

503. The Americas Best Defendants benefitted financially or by receiving

something of value from their participation in this venture from renting the

hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money

and other things of value for other services provided to Jane Doe 1's sex

traffickers, and by receiving money and other things of value from the sex

trafficking of other victims at the Americas Best (Atlanta).

1824208.1

504.   This venture, in which the Americas Best Defendants participated, was in or affecting interstate commerce.

505.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

506.   The Americas Best Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

507.   The Americas Best Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY-TWO
## Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Claim
## 18 U.S.C. §§ 1591(a)(1), 1595(a)
## (Against Hampton Inn (NDH Atlanta) Defendants)

508.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

509.   Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(1).

510.   The Hampton Inn (NDH Atlanta) Defendants violated 18 U.S.C.
§ 1591(a)(1) by knowingly harboring and maintaining persons at the
Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact
that means of force, threats of force, fraud, coercion, or the combination of
such means would be used to cause those persons to engage in commercial
sex acts at Hampton Inn (NDH Atlanta), and by attempting and conspiring to
do the same.  Jane Doe 1 was one of those persons caused to engage in
commercial sex acts.

511.   The Hampton Inn (NDH Atlanta) Defendants also violated 18 U.S.C.
§ 1591(a)(1) by knowingly aiding and abetting other perpetrators that
recruited, enticed, harbored, transported, provided, obtained, advertised,
maintained, patronized, and solicited persons at the Hampton Inn (NDH
Atlanta), knowing or in reckless disregard of the fact that means of force,
threats of force, fraud, coercion, or the combination of such means would be
used to cause those persons to engage in commercial sex acts at the Hampton
Inn (NDH Atlanta), and by attempting and conspiring to do the same.  Jane
Doe 1 was one of those persons caused to engage in commercial sex acts.

512.   The Hampton Inn (NDH Atlanta) Defendants actions in violation of 18
U.S.C. § 1591(a)(1) were in or affecting interstate commerce.

513.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

514.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

515.   The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

### COUNT TWENTY-THREE
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Perpetrator Financial Beneficiary Claim
### 18 U.S.C. §§ 1591(a)(2), 1595(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

516.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

517.   Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of their violations of 18 U.S.C. § 1591(a)(2).

518.   The Hampton Inn (NDH Atlanta) Defendants  violated 18 U.S.C. § 1591(a)(2) by knowingly benefitting financially from taking part in the

1824208.1

153

Hampton Inn (NDH Atlanta) Sex Trafficking Venture by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

519. The Hampton Inn (NDH Atlanta) Defendants knowingly benefitted financially from these acts by receiving money from renting the hotel rooms in which Jane Doe 1 was trafficked for sex.

520. The Hampton Inn (NDH Atlanta) Defendants also violated 18 U.S.C. § 1591(a)(2) by knowingly aiding and abetting others that benefitted financially by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue

1824208.1

154

for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same. Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

521. The Hampton Inn (NDH Atlanta) Defendants' actions related to Jane Doe 1 were in or affecting interstate commerce.

522. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants participating in these acts, and conspiring with, aiding, and abetting others participating in these acts.

523. The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

524. The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

## COUNT TWENTY-FOUR
### Trafficking Victim Protection Reauthorization Act – Sex Trafficking Negligent Financial Beneficiary Claim
### 18 U.S.C. § 1595(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

525. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, and 307-332 above as if fully set forth herein.

526. Jane Doe 1 brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of the Hampton Inn (NDH Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or *should have known* violated 18 U.S.C. § 1591(a)(1) by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting persons that were caused by means of force, threats of force, fraud, coercion, or the combination of such means to engage in commercial sex act at the Hampton Inn (NDH Atlanta). Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

1824208.1

527.   Jane Doe 1 also brings this claim against the Hampton Inn (NDH Atlanta) Defendants as a victim of the Hampton Inn (NDH Atlanta) Sex Trafficking Venture in which they participated and from which they knowingly benefitted financially or by receiving something of value and which they knew or **_should have known_** violated 18 U.S.C. § 1591(a)(2) by providing the room in which Jane Doe 1 was trafficked, providing the Hampton Inn (NDH Atlanta) property and facilities as a venue for the ongoing sex trafficking venture, providing assistance to her trafficker, or by knowingly assisting, supporting, or facilitating a violation of 18 U.S.C. § 1591(a)(1), including assisting, supporting, or facilitating persons who knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited persons at the Hampton Inn (NDH Atlanta), knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or the combination of such means would be used to cause those persons to engage in commercial sex acts at the Hampton Inn (NDH Atlanta), and by attempting and conspiring to do the same.  Jane Doe 1 was one of those persons caused to engage in commercial sex acts.

528.   The Hampton Inn (NDH Atlanta) Defendants benefitted financially or by receiving something of value from their participation in this venture from

1824208.1

157

renting the hotel rooms in which Jane Doe 1 was trafficked for sex, by receiving money and other things of value for other services provided to Jane Doe 1's sex traffickers, and by receiving money and other things of value from the sex trafficking of other victims at the Hampton Inn (NDH Atlanta).

529.   This venture, in which the Hampton Inn (NDH Atlanta) Defendants participated, was in or affecting interstate commerce.

530.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants' participation in this venture, and conspiring with, aiding, and abetting the participation of others in this venture.

531.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages.

532.   The Hampton Inn (NDH Atlanta) Defendants, and all Defendants, are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff.

1824208.1

## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act
### (Allegations Common to Counts 25 - 38)

533.  Each Defendant acquired or maintained, directly or indirectly, an interest in money through a pattern of racketeering activity.

### A.    Acts of Racketeering Activity

#### i.    Sex Trafficking in Violation of Federal Law

534.  As set forth in the Counts above, Defendants have each violated 18 U.S.C. § 1591 by participating in the sex trafficking of Jane Doe 1 and others. This constitutes racketeering activity.

#### ii.    Sex Trafficking in Violation of State Law

535.  Committing, attempting to commit, and soliciting, coercing, or intimidating another person to commit the crime of trafficking a person for sexual servitude in violation of Georgia law is racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vi); O.C.G.A. § 16-5-46.

536.  A person commits the offense of trafficking an individual for sexual servitude when that person knowingly:

a.    subjects an individual to or maintains an individual in sexual servitude;

1824208.1

b.     recruits, entices, harbors, transports, provides, solicits, patronizes, or obtains by any means an individual for the purpose of sexual servitude; or

c.     benefits financially or by receiving anything of value from the sexual servitude of another.

O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(B).

537.   "Sexual Servitude" means any sexually explicit conduct or performance involving sexually explicit conduct that is induced or obtained by coercion or deception and for which anything of value is directly or indirectly given, promised to, or received by any individual.  O.C.G.A § 16-5-46(a)(8)(A).

538.   As alleged above, Jane Doe 1 and other victims were subjected to and maintained in sexual servitude by Defendants, individually, as parties to the crime, and as co-conspirators, in violation of O.C.G.A. § 16-5-46(c)(1), when they were coerced into performing or conducting sexually explicit conduct for which something of value, directly or indirectly, was given, promised to, or received by someone.

539.   Defendants also violated O.C.G.A. § 16-5-46(c)(2) by, individually, as parties to the crime, and as co-conspirators, harboring, recruiting, enticing, transporting, providing, soliciting, or patronizing Jane Doe 1 and other victims for the purpose of sexual servitude.

540. Defendants also violated O.C.G.A § 16-5-46(c)(3) by benefitting financially and by receiving things of value from the sexual servitude of Jane Doe 1 and other victims.

541. Specifically, as alleged above, Jane Doe 1 was <u>trafficked</u> for sexual servitude:

    a.    at the Red Roof (Smyrna) by the Red Roof (Smyrna) Defendants and various traffickers;

    b.    at the Red Roof (Atlanta) by the Red Roof (Atlanta) Defendants and various traffickers;

    c.    at the Suburban Extended Stay (Chamblee) by the Suburban Extended Stay Defendants and various traffickers;

    d.    at the La Quinta (Alpharetta) by the La Quinta Defendants and various traffickers;

    e.    at the Microtel (Atlanta) by the Microtel Defendants and various traffickers;

    f.    at the Ramada (Alpharetta) by the Ramada Defendants and various traffickers;

    g.    at the Americas Best (Atlanta) by the Americas Best Defendants and various traffickers; and

1824208.1

h.  at the Hampton Inn (NDH Atlanta) by the Hampton Inn (NDH
Atlanta) Defendants.

542.  Defendants' agents participated in violations of O.C.G.A. § 16-5-46,
alleged above, while acting within the scope of their authority and on behalf
of Defendants.  The conduct of Defendants' agents constituted a pattern of
illegal activity that each Defendant or its agents knew or should have known
was occurring.

      iii.  <u>False Imprisonment</u>

543.  Defendants, individually, as parties to the crime and as co-conspirators,
also falsely imprisoned Jane Doe 1 and other victims by, as alleged above,
confining and detaining them without legal authority, contrary to their will
and in violation of their personal liberty, in violation of O.C.G.A. §16-5-41.
This constitutes racketeering activity.  O.C.G.A. §§ 16-14-3(5)(A)(vi).

544.  Specifically, as alleged above, Jane Doe 1 was falsely imprisoned:

a.  at the Red Roof (Smyrna) by traffickers and the Red Roof
(Smyrna) Defendants, acting individually, as parties to the crime,
and as co-conspirators;

b.  at the Red Roof (Atlanta) by traffickers and the Red Roof
(Atlanta) Defendants, acting individually, as parties to the crime,
and as co-conspirators;

1824208.1

c.    at Suburban Extended Stay (Chamblee) by traffickers and the Suburban Extended Stay Defendants, acting individually, as parties to the crime, and as co-conspirators;

d.    at the La Quinta (Alpharetta) by traffickers and the La Quinta Defendants, acting individually, as parties to the crime, and as co-conspirators;

e.    at the Microtel (Atlanta) by traffickers and the Microtel Defendants, acting individually, as parties to the crime, and as co-conspirators;

f.    at the Ramada (Alpharetta) by traffickers and the Ramada Defendants, acting individually, as parties to the crime, and as co-conspirators;

g.    at the Americas Best (Atlanta) by traffickers and the Americas Best Defendants, acting individually, as parties to the crime, and as co-conspirators; and

h.    at the Hampton Inn (NDH Atlanta) by traffickers and the Hampton Inn (NDH Atlanta) Defendants, acting individually, as parties to the crime, and as co-conspirators.

iv.    <u>Battery</u>

545. Traffickers at Defendants' hotels regularly committed the offense of battery, intentionally causing visible bodily harm to their victims, including Jane Doe 1, in violation of O.C.G.A. § 16-5-23.1. This constitutes racketeering activity. O.C.G.A. § 16-14-3(5)(A)(v). Defendants engaged in this racketeering activity as parties to the crime and co-conspirators by alerting traffickers to victims' efforts to escape, refusing to report batteries committed by traffickers to law enforcement, and permitting traffickers to remain in their hotels, continue trafficking their victims, and committing further acts of battery.

v.     <u>Keeping a Place of Prostitution</u>

546. While Jane Doe 1 and other victims were confined and detained against their will as alleged above, they were prostituted by being forced to perform sexual acts in exchange for money or other items of value.

547. Defendants kept a place of prostitution by, acting individually, as parties to the crime, and as co-conspirators, while having and exercising control over the use of a place which offered seclusion and shelter for the practice of prostitution, knowingly granting and permitting the use of that location for the purpose of prostitution, in violation of O.C.G.A. § 16-6-10. This constitutes racketeering activity. O.C.G.A. § 16-14-3(5)(A)(vii).

548. Specifically,

1824208.1

a.  While the Red Roof (Smyrna) Defendants had control over the
    use of the Red Roof (Smyrna), a place which offered seclusion or
    shelter for the practice of prostitution, they knowingly granted
    and permitted its use for the purpose of prostitution;

b.  While the Red Roof (Atlanta) Defendants had control over the use
    of the Red Roof (Atlanta), a place which offered seclusion or
    shelter for the practice of prostitution, they knowingly granted
    and permitted its use for the purpose of prostitution;

c.  While the Suburban Extended Stay Defendants had control over
    the use of the Suburban Extended Stay (Chamblee), a place
    which offered seclusion or shelter for the practice of prostitution,
    they knowingly granted and permitted its use for the purpose of
    prostitution;

d.  While the La Quinta Defendants had control over the use of the
    La Quinta (Alpharetta), a place which offered seclusion or shelter
    for the practice of prostitution, they knowingly granted and
    permitted its use for the purpose of prostitution;

e.  While the Microtel Defendants had control over the use of the
    Microtel (Atlanta), a place which offered seclusion or shelter for

the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

f.   While the Ramada Defendants had control over the use of the Ramada (Alpharetta), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution;

g.   While the Americas Best Defendants had control over the use of the Americas Best (Atlanta), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution; and

h.   While the Hampton Inn (NDH Atlanta) Defendants had control over the use of the Hampton Inn (NDH Atlanta), a place which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted its use for the purpose of prostitution.

vi.   <u>Pimping</u>

549.   Defendants engaged in pimping when, individually, as parties to the crime, and as co-conspirators, they knowingly aided and abetted others in the commission of prostitution in violation of O.C.G.A. § 16-6-11(5).  This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

vii.   <u>Pandering</u>

550.   Defendants engaged in pandering, when, individually, as parties to the crime, and as co-conspirators, they knowingly assembled Jane Doe 1 and other victims at a fixed place for the purpose of being solicited by others to perform an act of prostitution in violation of O.C.G.A. § 16-6-12. This constitutes racketeering activity.  O.C.G.A. § 16-14-3(5)(A)(vii).

551.   Specifically,

   a.   Knowing that persons were being assembled at the Red Roof (Smyrna) to  perform sexual acts for money or other items of value, the Red Roof (Smyrna) Defendants aided and abetted the commission of those acts;

   b.   Knowing that persons were being assembled at the Red Roof (Atlanta) to  perform sexual acts for money or other items of value, the Red Roof (Atlanta) Defendants aided and abetted the commission of those acts;

   c.   Knowing that persons were being assembled at the Suburban Extended Stay (Chamblee) to  perform sexual acts for money or other items of value, the Suburban Extended Stay Defendants aided and abetted the commission of those acts;

Case 1:20-cv-00892-WMR   Document 137   Filed 02/09/20   Page 170 of 237

d.   Knowing that persons were being assembled at the La Quinta (Alpharetta) to  perform sexual acts for money or other items of value, the La Quinta Defendants aided and abetted the commission of those acts;

e.   Knowing that persons were being assembled at the Microtel (Atlanta) to  perform sexual acts for money or other items of value, the Microtel Defendants aided and abetted the commission of those acts;

f.   Knowing that persons were being assembled at the Ramada (Alpharetta) to  perform sexual acts for money or other items of value, the Ramada Defendants aided and abetted the commission of those acts;

g.   Knowing that persons were being assembled at the Americas Best (Atlanta) to perform sexual acts for money or other items of value, the Americas Best Defendants aided and abetted the commission of those acts; and

h.   Knowing that persons were being assembled at the Hampton Inn (NDH Atlanta) to perform sexual acts for money or other items of value, the Hampton Inn (NDH Atlanta) Defendants aided and abetted the commission of those acts.

1824208.1

552. The conduct in violation of the Georgia RICO Act in which each Defendant participated by committing an act of racketeering activity or an overt act continued to within five years of the filing of this action.

## B. The Acts of Racketeering Activity Formed a Pattern

553. Each of the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

554. The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

555. The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

556. The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar results, in that they obtained money or facilitated the obtaining of money, directly or indirectly, through a pattern of racketeering activity.

1824208.1

557.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar accomplices, including but not limited to sex traffickers, hotels, hotel management, and hotel chain management.

558.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar victims, including but not limited to Jane Doe 1 and other victims who were forced to engage in sexual acts in exchange for money at Defendants' hotels, were falsely imprisoned at those hotels and were the victim of other acts of racketeering activity committed at those hotels.

559.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada, Americas Best, and Hampton Inn (NDH Atlanta) Defendants had the same or similar methods of commission, including but not limited to harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

560.   The acts of racketeering activity committed by the Red Roof (Smyrna), Red Roof (Atlanta), Suburban Extended Stay, La Quinta, Microtel, Ramada,

Americas Best, and Hampton Inn (NDH Atlanta) Defendants were further interrelated by distinguishing characteristics, including but not limited to:

    a.    warning sex traffickers when law enforcement was present or making inquiries; and

    b.    allowing and assisting traffickers to force persons to perform sex acts in exchange for money on a repeated and ongoing basis.

## COUNT TWENTY-FIVE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Red Roof (Smyrna) Defendants)

561.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-124, 70-106, 107-156, 333-357, and 533-560 above as if fully set forth herein.

562.  The Red Roof (Smyrna) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

563.  The Red Roof (Smyrna) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Red Roof (Smyrna) Sex Trafficking Conspiracy").

1824208.1

564.   Each of the Red Roof (Smyrna) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

565.   Each of the Red Roof (Smyrna) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Red Roof (Smyrna) Sex Trafficking Conspiracy, including those alleged above.

566.   The acts committed by the participants in the Red Roof (Smyrna) Sex Trafficking Conspiracy number in the thousands.

567.   Upon information and belief, the Red Roof (Smyrna) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

568.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants violations of Georgia RICO.

569.   The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

570.   The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire

want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT TWENTY-SIX
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(a)
### (Against Red Roof (Smyrna) Defendants)

571. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-124, 70-106, 107-156, 333-357, and 533-560 above as if fully set forth herein.

572. As set forth above in paragraphs 533-560, the Red Roof (Smyrna) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

573. The conduct in violation of the Georgia RICO Act in which the Red Roof (Smyrna) Defendants participated continued to within five years of the filing of this action.

574.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Smyrna) Defendants violations of Georgia RICO.

575.   The Red Roof (Smyrna) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

576.   The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT TWENTY-SEVEN
## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Red Roof (Atlanta) Defendants)

577.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, 358-382, and 533-560 above as if fully set forth herein.

1824208.1

578.   The Red Roof (Atlanta) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

579.   The Red Roof (Atlanta) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Red Roof (Atlanta) Sex Trafficking Conspiracy").

580.   Each of the Red Roof (Atlanta) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

581.   Each of the Red Roof (Atlanta) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Red Roof (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

582.   The acts committed by the participants in the Red Roof (Atlanta) Sex Trafficking Conspiracy number in the thousands.

583.   Upon information and belief, the Red Roof (Atlanta) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

1824208.1

584.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants violations of Georgia RICO.

585.   The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

586.   The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Red Roof (Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT TWENTY-EIGHT**
**Georgia Racketeer Influenced and Corrupt Organizations Act**
**O.C.G.A. § 16-14-4(a)**
**(Against Red Roof (Atlanta) Defendants)**

587.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, 157-171, 358-382, and 533-560 above as if fully set forth herein.

1824208.1

588. As set forth above in paragraphs 533-560, the Red Roof (Atlanta) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

589. The conduct in violation of the Georgia RICO Act in which the Red Roof (Atlanta) Defendants participated continued to within five years of the filing of this action.

590. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Red Roof (Atlanta) Defendants violations of Georgia RICO.

591. The Red Roof (Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

592. The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

593.   Because the Red Roof (Atlanta) Defendants acted with the specific

intent to cause harm, there is no limitation regarding the amount that may

be awarded as punitive damages.

### COUNT TWENTY-NINE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Suburban Extended Stay Defendants)

594.   Jane Doe 1 repeats and incorporates the allegations set forth in

paragraphs 1-16, 28-32, 70-106, 172-198, 383-407, and 533-560 above as if

fully set forth herein.

595.   The Suburban Extended Stay Defendants violated O.C.G.A. § 16-14-

4(c) by conspiring to acquire money through a pattern of racketeering activity

in violation of O.C.G.A § 16-14-4(a).

596.   The Suburban Extended Stay Defendants knowingly and willfully

joined a conspiracy which contained a common plan or purpose to commit two

or more acts of racketeering activity, through which an interest in and control

of money would be acquired and maintained, either directly or indirectly (the

"Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy").

597.   Each of the Suburban Extended Stay Defendants also individually

violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a)

by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

598.   Each of the Suburban Extended Stay Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy, including those alleged above.

599.   The acts committed by the participants in the Suburban Extended Stay (Chamblee) Sex Trafficking Conspiracy number in the thousands.

600.   Upon information and belief, the Suburban Extended Stay Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

601.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants violations of Georgia RICO.

602.   The Suburban Extended Stay Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

603.   The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious

indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Suburban Extended Stay Defendants)

604. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, 172-198, 383-407, and 533-560 above as if fully set forth herein.

605. As set forth above in paragraphs 533-560 the Suburban Extended Stay Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

606. The conduct in violation of the Georgia RICO Act in which the Suburban Extended Stay Defendants participated continued to within five years of the filing of this action.

607.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Suburban Extended Stay Defendants violations of Georgia RICO.

608.   The Suburban Extended Stay Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

609.   The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

610.   Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-ONE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against La Quinta Defendants)

611.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, 408-432, and 533-560 above as if fully set forth herein.

1824208.1

612.  The La Quinta Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

613.  The La Quinta Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "La Quinta (Alpharetta) Sex Trafficking Conspiracy").

614.  Each of the La Quinta Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

615.  Each of the La Quinta Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the La Quinta (Alpharetta) Sex Trafficking Conspiracy, including those alleged above.

616.  The acts committed by the participants in the La Quinta (Alpharetta) Sex Trafficking Conspiracy number in the thousands.

617.  Upon information and belief, the La Quinta Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

1824208.1

182

618.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants violations of Georgia RICO.

619.   The La Quinta Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

620.   The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-TWO
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against La Quinta Defendants)

621.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, 250-268, 408-432, and 533-560 above as if fully set forth herein.

1824208.1

622.   As set forth above in paragraphs 533-560 the La Quinta Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

623.   The conduct in violation of the Georgia RICO Act in which the La Quinta Defendants participated continued to within five years of the filing of this action.

624.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the La Quinta Defendants violations of Georgia RICO.

625.   The La Quinta Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

626.   The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

627.   Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-THREE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Microtel Defendants)

628.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-226, 433-457, and 533-560 above as if fully set forth herein.

629.   The Microtel Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

630.   The Microtel Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Microtel (Atlanta) Sex Trafficking Conspiracy").

631.   Each of the Microtel Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

1824208.1

632. Each of the Microtel Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Microtel (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

633. The acts committed by the participants in the Microtel (Atlanta) Sex Trafficking Conspiracy number in the thousands.

634. Upon information and belief, the Microtel Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

635. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants violations of Georgia RICO.

636. The Microtel Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

637. The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-FOUR
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Microtel Defendants)

638.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 33-42, 70-106, 199-226, 433-457, and 533-560 above as if fully set forth herein.

639.   As set forth above in paragraphs 533-560, the Microtel Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

640.   The conduct in violation of the Georgia RICO Act in which the Microtel Defendants participated continued to within five years of the filing of this action.

641.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Microtel Defendants violations of Georgia RICO.

642.   The Microtel Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

643.   The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

644.   Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-FIVE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Ramada Defendants)

645.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 227-249, 458-482, and 533-560 above as if fully set forth herein.

646.   The Ramada Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

647.   The Ramada Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Ramada (Alpharetta) Sex Trafficking Conspiracy").

648.   Each of the Ramada Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

649.   Each of the Ramada Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Ramada (Alpharetta) Sex Trafficking Conspiracy, including those alleged above.

650.   The acts committed by the participants in the Ramada (Alpharetta) Sex Trafficking Conspiracy number in the thousands.

651.   Upon information and belief, the Ramada Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

652.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants violations of Georgia RICO.

653.   The Ramada Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

654.   The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-SIX
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Ramada Defendants)

655.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, 70-106, 227-249, 458-482, and 533-560 above as if fully set forth herein.

656.   As set forth above in paragraphs 533-560, the Ramada Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

1824208.1

657.   The conduct in violation of the Georgia RICO Act in which the Ramada Defendants participated continued to within five years of the filing of this action.

658.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Ramada Defendants violations of Georgia RICO.

659.   The Ramada Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

660.   The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

661.   Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-SEVEN
## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Americas Best Defendants)

662.  Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, 483-507, and 533-560 above as if fully set forth herein.

663.  The Americas Best Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

664.  The Americas Best Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Americas Best (Atlanta) Sex Trafficking Conspiracy").

665.  Each of the Americas Best Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

666.  Each of the Americas Best Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the

Americas Best (Atlanta) Sex Trafficking Conspiracy, including those alleged above.

667. The acts committed by the participants in the Americas Best (Atlanta) Sex Trafficking Conspiracy number in the thousands.

668. Upon information and belief, the Americas Best Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

669. Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants violations of Georgia RICO.

670. The Americas Best Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

671. The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

1824208.1

## COUNT THIRTY-EIGHT
## Georgia Racketeer Influenced and Corrupt Organizations Act
## O.C.G.A. § 16-14-4(a)
## (Against Americas Best Defendants)

672.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, 269-306, 483-507, and 533-560 above as if fully set forth herein.

673.   As set forth above in paragraphs 533-560, the Americas Best Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

674.   The conduct in violation of the Georgia RICO Act in which the Americas Best Defendants participated continued to within five years of the filing of this action.

675.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Americas Best Defendants violations of Georgia RICO.

676.   The Americas Best Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

1824208.1

677.   The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

678.   Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT THIRTY-NINE
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act O.C.G.A. § 16-14-4(c)
### (Against Hampton Inn (NDH Atlanta) Defendants)

679.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, 307-326, and 508-560 above as if fully set forth herein.

680.   The Hampton Inn (NDH Atlanta) Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A § 16-14-4(a).

681.   The Hampton Inn (NDH Atlanta) Defendants knowingly and willfully joined a conspiracy which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control

1824208.1

195

of money would be acquired and maintained, either directly or indirectly (the "Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy").

682.   Each of the Hampton Inn (NDH Atlanta) Defendants also individually violated O.C.G.A § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

683.   Each of the Hampton Inn (NDH Atlanta) Defendants committed acts of racketeering activity and overt acts in furtherance of its individual endeavors and the Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy, including those alleged above.

684.   The acts committed by the participants in the Hampton Inn (NDH Atlanta) Sex Trafficking Conspiracy number in the thousands.

685.   Upon information and belief, the Hampton Inn (NDH Atlanta) Defendants' conduct in violation of O.C.G.A § 16-14-4 has not terminated.

686.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants violations of Georgia RICO.

687.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

688.   The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY
### Georgia Racketeer Influenced and Corrupt Organizations Act
### O.C.G.A. § 16-14-4(a)
### (Against Hampton Inn (NDH Atlanta) Defendants)

689.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-106, 307-326, and 508-560 above as if fully set forth herein.

690.   As set forth above in paragraphs 533-560 the Hampton Inn (NDH Atlanta) Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

691.   The conduct in violation of the Georgia RICO Act in which the Hampton Inn (NDH Atlanta) Defendants participated continued to within five years of the filing of this action.

692.   Jane Doe 1 has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hampton Inn (NDH Atlanta) Defendants violations of Georgia RICO.

693.   The Hampton Inn (NDH Atlanta) Defendants are liable to Jane Doe 1 for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

694.   The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

695.   Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-ONE
### Negligence
### (Against Red Roof (Smyrna) Defendants)

696.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-24 and 70-106 above as if fully set forth herein.

697.   At all relevant times to this cause of action the Red Roof (Smyrna) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Red Roof (Smyrna).

698.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants supervisory control over the Red Roof (Smyrna).

699.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had supervisory control and authority over employees, contractors and others at the Red Roof (Smyrna).

700.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Red Roof (Smyrna).

701.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Smyrna).

1824208.1

199

702.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Red Roof (Smyrna).

703.   At all relevant times to this cause of action, the Red Roof (Smyrna) Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Smyrna).

704.   At all relevant times, the Red Roof (Smyrna) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Red Roof (Smyrna) safe from unlawful acts on the premises.

705.   The Red Roof (Smyrna) Defendants negligently failed to keep the Red Roof (Smyrna) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, Red Roof (Smyrna) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the the Red Roof (Smyrna), including Jane Doe 1.

706. As a direct and proximate result of the actions and/or inactions of Red Roof (Smyrna) Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

707. The wrongful actions of the Red Roof (Smyrna) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

708. Because the Red Roof (Smyrna) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-TWO
### Negligence
### (Against Red Roof (Atlanta) Defendants)

709. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 25-27, 70-106, and 157-171 above as if fully set forth herein.

710. At all relevant times to this cause of action the Red Roof (Atlanta) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Red Roof (Atlanta).

1824208.1

Case 1:20-cv-00893-WMR Document 175 Filed 04/10/23 Page 210 of 232

711.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants supervisory control over the Red Roof (Atlanta).

712.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had supervisory control and authority over employees, contractors and others at the Red Roof (Atlanta).

713.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Red Roof (Atlanta).

714.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Atlanta).

715.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Red Roof (Atlanta).

716.    At all relevant times to this cause of action, the Red Roof (Atlanta) Defendants did, in fact, exercise their authority and discretion regarding

whether and how to take certain measures to provide for the safety and security of invitees at the Red Roof (Atlanta).

717.  At all relevant times, the Red Roof (Atlanta) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Red Roof (Atlanta) safe from unlawful acts on the premises.

718.  The Red Roof (Atlanta) Defendants negligently failed to keep the Red Roof (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, Red Roof (Atlanta) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the the Red Roof (Atlanta), including Jane Doe 1.

719.  As a direct and proximate result of the actions and/or inactions of Red Roof (Atlanta) Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

720.  The wrongful actions of the Red Roof (Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to

consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

721. Because the Red Roof (Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-THREE
### Negligence
### (Against Suburban Extended Stay Defendants)

722. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 28-32, 70-106, and 172-198 above as if fully set forth herein.

723. At all relevant times to this cause of action the Suburban Extended Stay Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Suburban Extended Stay (Chamblee).

724. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had supervisory control over Suburban Extended Stay (Chamblee).

725. At all relevant times to this cause of action, the Suburban Extended Stay Defendants had supervisory control and authority over employees, contractors and others at Suburban Extended Stay (Chamblee).

726. At all relevant times to this cause of action, the Suburban Extended Stay Defendants were aware of, and had reasonable opportunity to be aware

of, the frequency and types of criminal activity occurring at Suburban Extended Stay (Chamblee).

727.   At all relevant times to this cause of action, the Suburban Extended Stay Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Suburban Extended Stay (Chamblee).

728.   At all relevant times to this cause of action, the Suburban Extended Stay Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to Suburban Extended Stay (Chamblee).

729.   At all relevant times to this cause of action, the Suburban Extended Stay Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Suburban Extended Stay (Chamblee).

730.   At all relevant times, the Suburban Extended Stay Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep Suburban Extended Stay (Chamblee) safe from unlawful acts on the premises.

731.   The Suburban Extended Stay Defendants negligently failed to keep Suburban Extended Stay (Chamblee) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in

breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Suburban Extended Stay Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Suburban Extended Stay (Chamblee), including Jane Doe 1.

732.   As a direct and proximate result of the actions and/or inactions of the Suburban Extended Stay Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

733.   The wrongful actions of the Suburban Extended Stay Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

734.   Because the Suburban Extended Stay Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-FOUR
### Negligence
### (Against Microtel Defendants)

735.   Jane Doe 1 repeats and incorporates the allegations set forth in
paragraphs 1-16, 33-42, 70-106, and 199-226 above as if fully set forth herein.

736.   At all relevant times to this cause of action the Microtel Defendants
owned and/or managed and/or operated and/or oversaw and/or controlled the
operation of the Microtel (Atlanta).

737.   At all relevant times to this cause of action, the Microtel Defendants
had supervisory control over the Microtel (Atlanta).

738.   At all relevant times to this cause of action, the Microtel Defendants
had supervisory control and authority over employees, contractors and others
at the Microtel (Atlanta).

739.   At all relevant times to this cause of action, the Microtel Defendants
were aware of, and had reasonable opportunity to be aware of, the frequency
and types of criminal activity occurring at the Microtel (Atlanta).

740.   At all relevant times to this cause of action, the Microtel Defendants
had authority and discretion regarding whether and how to take certain
measures to provide for the safety and security of invitees at the Microtel
(Atlanta).

741.   At all relevant times to this cause of action, the Microtel Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Microtel (Atlanta).

742.   At all relevant times to this cause of action, the Microtel Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Microtel (Atlanta).

743.   At all relevant times, the Microtel Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Microtel (Atlanta) safe from unlawful acts on the premises.

744.   The Microtel Defendants negligently failed to keep the Microtel (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Microtel Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Microtel (Atlanta), including Jane Doe 1.

1824208.1

745.   As a direct and proximate result of the actions and/or inactions of the Microtel Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

746.   The wrongful actions of the Microtel Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

747.   Because the Microtel Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

### COUNT FORTY-FIVE
### Negligence
### (Against the Ramada Defendants)

748.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 43-48, and 227-249 above as if fully set forth herein.

749.   At all relevant times to this cause of action, the Ramada Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Ramada (Alpharetta).

1824208.1

750.   At all relevant times to this cause of action, the Ramada Defendants had supervisory control over the Ramada (Alpharetta).

751.   At all relevant times to this cause of action, the Ramada Defendants had supervisory control and authority over employees, contractors and others at the Ramada (Alpharetta).

752.   At all relevant times to this cause of action, the Ramada Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Ramada (Alpharetta).

753.   At all relevant times to this cause of action, the Ramada Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Ramada (Alpharetta).

754.   At all relevant times to this cause of action, the Ramada Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Ramada (Alpharetta).

755.   At all relevant times to this cause of action, the Ramada Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Ramada (Alpharetta).

1824208.1

756.   At all relevant times, the Ramada Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Ramada (Alpharetta) safe from unlawful acts on the premises.

757.   The Ramada Defendants negligently failed to keep the Ramada (Alpharetta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Ramada Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Ramada (Alpharetta), including Jane Doe 1.

758.   As a direct and proximate result of the actions and/or inactions of the Ramada Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

759.   The wrongful actions of the Ramada Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

760. Because the Ramada Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-SIX
### Negligence
### (Against the Americas Best Defendants)

761. Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 57-60, 70-106, and 269-306 above as if fully set forth herein.

762. At all relevant times to this cause of action the Americas Best Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Americas Best (Atlanta).

763. At all relevant times to this cause of action, the Americas Best Defendants had supervisory control over the Americas Best (Atlanta).

764. At all relevant times to this cause of action, the Americas Best Defendants had supervisory control and authority over employees, contractors and others at the Americas Best (Atlanta).

765. At all relevant times to this cause of action, the Americas Best Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the Americas Best (Atlanta).

1824208.1

212

766. At all relevant times to this cause of action, the Americas Best Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Americas Best (Atlanta).

767. At all relevant times to this cause of action, the Americas Best Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the Americas Best (Atlanta).

768. At all relevant times to this cause of action, the Americas Best Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Americas Best (Atlanta).

769. At all relevant times, the Americas Best Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the Americas Best (Atlanta) safe from unlawful acts on the premises.

770. The Americas Best Defendants negligently failed to keep the Americas Best (Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care. By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Americas Best

1824208.1

Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Americas Best (Atlanta), including Jane Doe 1.

771.   As a direct and proximate result of the actions and/or inactions of the Americas Best Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

772.   The wrongful actions of the Americas Best Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

773.   Because the Americas Best Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT FORTY-SEVEN
### Negligence
### (Against the Hampton Inn (NDH Atlanta) Defendants)

774.   Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 61-69, 70-106, and 307-326 above as if fully set forth herein.

1824208.1

775.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the Hampton Inn (NDH Atlanta).

776.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had supervisory control over Hampton Inn (NDH Atlanta).

777.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had supervisory control and authority over employees, contractors and others at Hampton Inn (NDH Atlanta).

778.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at Hampton Inn (NDH Atlanta).

779.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Hampton Inn (NDH Atlanta).

780.   At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants had authority and discretion regarding whether and

how to direct others to take certain measures to provide for the safety and security of invitees to Hampton Inn (NDH Atlanta).

781.  At all relevant times to this cause of action, the Hampton Inn (NDH Atlanta) Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at Hampton Inn (NDH Atlanta).

782.  At all relevant times, the Hampton Inn (NDH Atlanta) Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep Hampton Inn (NDH Atlanta) safe from unlawful acts on the premises.

783.  The Hampton Inn (NDH Atlanta) Defendants negligently failed to keep Hampton Inn (NDH Atlanta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the Hampton Inn (NDH Atlanta) Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the Hampton Inn (NDH Atlanta), including Jane Doe 1.

784.  As a direct and proximate result of the actions and/or inactions of the Hampton Inn (NDH Atlanta) Defendants, Jane Doe 1 suffered substantial

physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

785.    The wrongful actions of the Hampton Inn (NDH Atlanta) Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

786.    Because the Hampton Inn (NDH Atlanta) Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT FORTY-EIGHT**
**Negligence**
**(Against the La Quinta Defendants)**

787.    Jane Doe 1 repeats and incorporates the allegations set forth in paragraphs 1-16, 49-56, 70-106, and 250-268 above as if fully set forth herein.

788.    At all relevant times to this cause of action the La Quinta Defendants owned and/or managed and/or operated and/or oversaw and/or controlled the operation of the La Quinta (Alpharetta).

789.    At all relevant times to this cause of action, the La Quinta Defendants had supervisory control over the La Quinta (Alpharetta).

790.   At all relevant times to this cause of action, the La Quinta Defendants had supervisory control and authority over employees, contractors and others at the La Quinta (Alpharetta).

791.   At all relevant times to this cause of action, the La Quinta Defendants were aware of, and had reasonable opportunity to be aware of, the frequency and types of criminal activity occurring at the La Quinta (Alpharetta).

792.   At all relevant times to this cause of action, the La Quinta Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the La Quinta (Alpharetta).

793.   At all relevant times to this cause of action the La Quinta Defendants had authority and discretion regarding whether and how to direct others to take certain measures to provide for the safety and security of invitees to the La Quinta (Alpharetta).

794.   At all relevant times to this cause of action the La Quinta Defendants did, in fact, exercise their authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the La Quinta (Alpharetta).

795.   At all relevant times, the La Quinta Defendants owed a duty of care to their invitees, including Jane Doe 1, to keep the La Quinta (Alpharetta) safe from unlawful acts on the premises.

796.   The La Quinta Defendants negligently failed to keep the La Quinta (Alpharetta) safe and negligently failed to adequately and properly protect their invitees, including Jane Doe 1, in breach of their duty of care.  By way of example, and not in any way limiting the number of ways Jane Doe 1 may prove their breach of their duty of ordinary care, the La Quinta Defendants negligently failed to train their employees to observe and report any potential threats to the safety of invitees at the La Quinta (Alpharetta), including Jane Doe 1.

797.   As a direct and proximate result of the actions and/or inactions of the La Quinta Defendants, Jane Doe 1 suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

798.   The wrongful actions of the La Quinta Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Jane Doe 1 for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

1824208.1

799.   Because the La Quinta Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for judgment as follows:

A.   That the Court award Plaintiffs damages on all counts in an amount to be proven at trial;

B.   That Plaintiffs recover punitive damages pursuant to federal common law and O.C.G.A. § 51-12-5.1;

C.   That Plaintiffs recover three times their actual damages pursuant to O.C.G.A. § 16-14-6(c);

D.   That Plaintiffs recover their reasonable attorneys' fees pursuant to 18 U.S.C. § 1595(a) and O.C.G.A. § 16-14-6(c), as well as the costs of investigation and litigation pursuant to O.C.G.A. § 16-14-6(c); and

E.   That this Court award Plaintiffs such other and further relief as may be just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

1824208.1

Respectfully submitted this 21st day of November, 2019.

/s/ *John E. Floyd*

Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Trinity Hundredmark
Georgia Bar No. 140808
thundred@atclawfirm.com

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia  30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com

1824208.1

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA 30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile

Attorneys for Plaintiff Jane Doe 1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2019, the foregoing AMENDED

COMPLAINT was filed with the Clerk of Court using the EM/ECF system

which will send e-mail notification to all counsel of record.

This 21st day of November, 2019.

<u>/s/ John E. Floyd</u>
John E. Floyd
Georgia Bar No. 266413

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W.
Suite 3900
Atlanta, GA  30309
(404) 881-4100- Telephone
(404) 881-4111 – Facsimile

# Exhibit D



1230 Peachtree Street NE • Suite 925 • Atlanta, GA • 30309
tel (470) 552-1150 • fax (470) 552-1151 • wshblaw.com

Richard E. Zelonka, Jr.

**direct dial** (470) 552-1152
**email** rzelonka@wshblaw.com

December 13, 2019

<u>VIA FEDEX OVERNIGHT</u>

Varahi Hotel, LLC
c/o Jaymen Chavda
2200 Corporate Plaza
Smyrna, Georgia 30080

|  |  |  |
|---|---|---|
| RE: | INSURED: | GLOBAL MANAGEMENT AND INVESTMENT |
|  | POLICY NO.: | CIP250491 |
|  | POLICY PERIOD: | April 1, 2015 to December 6, 2015 |
|  | CLAIM NO.: | 33540 |
|  | WSHB FILE NO.: | 10739.0105 |

## <u>RESERVATION OF RIGHTS</u>

Dear Mr. Chavda:

We represent Atain Specialty Insurance Company ("Atain"), which issued Policy No. CIP250491 to Global Management and Investment ("Global Management") for the policy period April 1, 2015 to December 6, 2015 (the "Policy"). We understand that Varahi Hotel, LLC owns a Red Roof Inn hotel located at 2200 Corporate Plaza in Smyrna, Georgia (the "Property").

Atain is in receipt of four lawsuits filed against Varahi by Jane Doe 1 through Jane Doe 4 alleging sex trafficking and forced labor occurring at various hotels in the Atlanta area, including the subject Property from 2009 to 2016. Only Jane Doe 1's Complaint asserts allegations occurring during Atain's policy period (the "Incident"). Jane Doe 1's Complaint specifically alleges a violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), a violation of Georgia' Racketeer Influenced and Corrupt Practices Act ("RICO"), and joint and several liability against several Defendants, including Varahi (the "Lawsuit").[1] We have confirmed with Dan Cheek of Insurance Office of America, your insurance claims advocate, that Varahi is not seeking coverage from Atain for the lawsuits filed by Jane Doe 2 and 4. If this is incorrect, you must advise us immediately.

---

[1] The Lawsuit is styled as *Jane Doe 1 v. Red Roof Inns, Inc.; Varahi Hotel, LLC; FMW RRI NC, LLC; Westmont Hospitality Group, Inc.; WHG SU Atlanta LP; Sub-SU Hotel GP, LLC; Choice Hotels International, Inc.; LQ Properties, LLC, CPLG Properties, LLC; BRE/LQ Properties, LLC; La Quinta Worldwide, LLC; Extended Stay America, Inc.; ESA Management, LLC; ESA P Portfolio, LLC; ESA P Portfolio Operating Lessee, LLC; John Does 1-10,* Case 1:19-cv-03840-WMR, in the United States District Court for the Northern District of Georgia, Atlanta Division.

**WOOD SMITH**
**HENNING & BERMAN LLP**

Varahi Hotel, LLC
December 13, 2019
Page 2

The purpose of this letter is to inform you that Atain is currently investigating the Lawsuit and/or the Incident and reserving its rights to limit or deny coverage for the claim, in whole or in part, under the law and the terms, conditions, exclusions, and endorsements of the Policy. This reservation of rights includes, but is not limited to, the Policy provisions specified below. Atain is reserving rights, but is not suggesting that any allegations regarding this dispute have any factual basis or legal merit.

To be clear, Atain is not denying coverage at this time, but, instead, is advising you that Varahi does not appear to be an insured under the Policy and that there may be Policy provisions which limit or bar coverage for the Lawsuit. Atain is therefore reserving all rights under the Policy to deny coverage for any and all potential claims against you as Atain continues its investigation and as additional relevant facts become known. Neither Atain's reservation of rights nor continued investigation is, or should be considered to be, a waiver or estoppel of any of Atain's rights under the Policy or applicable law, especially considering the limited facts available to Atain at this time.

We understand that Great American Insurance Group and Western World Insurance Group have retained C. Shane Keith at Hawkins Parnell & Young, LLP to represent you in the Jane Doe 1 Lawsuit.[2] Still, Atain writes to remind you of Varahi's duties and obligations under the Policy. Atain is willing to participate in that defense at this time and will liaise with the other carriers to discuss Atain's participation. Atain, however, expressly reserves the right to recoup any defense costs incurred from you should it be determined that there is no coverage for the Jane Doe 1 Lawsuit.

**Notwithstanding Atain's reservation of rights, it is imperative that you provide a copy of any future demand or lawsuit so that Atain can properly evaluate its obligations under the Policy.**

I.    FACTUAL BACKGROUND

We understand that Global Management offers property management services to hotels and motels. Global Management appears to run the Property on Varahi's behalf. We further understand that there was no formal management or operating agreement between Global Management and Varahi in place at the time of the subject Incident. We ask that you please provide a copy of any contract between Global Management and Varahi that was in place from 2011 to 2016. Otherwise, Atain will presume no contract exists.

On August 26, 2019, Jane Doe 1 filed the Lawsuit alleging that Varahi participated in her sex trafficking and knowingly benefitted by receiving money from her trafficker. The Lawsuit seeks compensatory and punitive damages, treble damages, and attorneys fees. Of note, the Complaint implicates Bharatkumar R. Patel (referred to as "Bob P") in his personal capacity as Varahi's manager. Complaint, ¶¶ 106-127. Specifically, the Complaint identifies "Bob P, [as] General Manager at Red Roof Inn

---

[2] We also understand that you retained Michael B. Weinstein at MBW Law, LLC as personal counsel in the Jane Doe 2 and Jane Doe 4 lawsuits and that you are not seeking a defense from Atain for the Jane Doe 2 or Jane Doe 4 lawsuits.

**WOOD SMITH**
**HENNING & BERMAN LLP**

Varahi Hotel, LLC
December 13, 2019
Page 3

Atlanta – Smyrna/Ballpark." *Id.* at ¶ 107. Bob P is alleged to have read and responded to numerous online reviews of the Red Roof Inn concerning prostitution at the hotel. *Id.*, ¶¶ 106-127. Thus, Jane Doe 1 claims that "Red Roof Defendants knew or should have known about the online reviews and police incidents regarding rampant prostitution and related crime at the hotel." *Id.* at ¶ 129.

On November 21, 2019, Jane Doe 1 filed an Amended Complaint which names new party Defendants and includes new negligence claims against the Defendants (the "Amended Complaint"). The Amended Complaint asserts numerous claims against Red Roof Inn and Varahi, which Jane Doe 1 refers to collectively as the "Red Roof Smyrna Defendants".

Again, we understand that Mr. Keith has appeared on Varahi's behalf and will be responding to the Amended Complaint.

## II.    POLICY DETAILS

Atain issued Commercial General Liability Policy No. CIP250491 to Global Management for the policy period April 1, 2015 to December 6, 2015 (the "Policy"). Subject to its terms, conditions, and exclusions, the Policy's limits are: $1,000,000 (each occurrence) and $2,000,000 (general aggregate limit). The Policy describes the Insured as "Hotel / Motel."

## III.    COVERAGE ANALYSIS

As discussed above, Atain's investigation into the Incident is ongoing, and has hired defense counsel to assist in the investigation and to represent your interests out of the abundance of caution. Thus, Atain may not have information concerning each and every issue that may impact coverage for potential claims. Based on the available information, the following provisions of the Policy may limit or bar coverage for Varahi in connection with the Incident and/or allegations in the Complaint. Atain reserves the right, however, to rely upon all terms, conditions, and exclusions of the Policy.

### A.    Varahi Is Not a Named Insured or Additional Insured on the Policy

The Policy lists "Global Management and Investment" as the only Named Insured on the Policy. Common Policy Declarations, UNLPF-D-1 (11-04). The Policy defines "you" as "the Named Insured shown in the Declarations" page. Policy, CG 00 01 04 13, p. 1 of 16. The Policy further states that if the "insured" is:

> **d.**    An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors.

*Id.* at p. 9 of 16. The Policy repeatedly refers to "you" and "your" throughout, which is identified to mean the Named Insured shown in the Declarations. Here, Global Management is the Named Insured on the Policy and coverage is therefore limited to Global Management, along with its directors and employees for acts in the scope of

WOOD SMITH
HENNING & BERMAN LLP

Varahi Hotel, LLC
December 13, 2019
Page 4

their employment.  *Id.* at pp. 9-10 of 16.  Varahi is not a Named Insured nor was it explicitly added or endorsed onto the Policy as a Named Insured.  Atain must therefore reserve its rights to deny coverage to the extent Varahi is not an insured under the Policy.

Atain recognizes that the Policy includes a blanket additional insured endorsement that provides additional insured coverage under certain circumstances, none of which apply here.  The Policy provides additional insured coverage:

ALL PERSONS OR ORGANIZATIONS AS REQUIRED BY WRITTEN CONTRACT WITH THE INSURED.

Policy, AF 000 859 (07/2012).  As discussed above, we understand there is no contract between Global Management and Varahi, much less one that would require Global Management to obtain insurance and name Varahi as an additional insured.  Atain must therefore reserve its rights to deny coverage as Varahi does not appear to be a Named Insured or Additional Insured under the Policy.

### B.    The Policy Covers Bodily Injury Caused by An Occurrence

As an initial matter, the Policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Policy, CG 00 01 04 13, p. 1 of 16.  To trigger the Policy's insuring agreements, the "bodily injury" or "property damage" must be caused by an "occurrence" during the Policy period.  *Id.*  "Bodily injury" is defined as an "injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  *Id.* at p. 13 of 16.

The Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *Id.* at p. 15 of 16.  While the Policy does not define "accident," Georgia courts have found it to mean "an event happening without any agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens."  *Am. Empire Surplus Lines Ins. Co. v. Hathaway*, 288 Ga. 749, 751 (2011) (citing Black's Law Dictionary, 15 (6th Ed. 1990)).  In an insurance policy, Georgia courts define an "accident" as "an unexpected happening rather than one occurring through intention or design."  *City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 231 Ga. App 206, 208 (1998).

Based on the known facts of this matter, the incurrence at issue here appears to fall within the Policy's definition of an "occurrence."  Questions remain, however, as to whether the Incident occurred during the Policy period.  Atain, therefore, reserves its rights as its investigation is ongoing.

### C.    The Policy Only Provides Coverage For Unknown Bodily Injury Caused By An Occurrence During the Policy Period

Next, Atain writes to advise you that coverage is limited to "bodily injury" caused by an "occurrence" during the Policy Period.  The Policy expressly does not cover

Varahi Hotel, LLC
December 13, 2019
Page 5

known "occurrences" or "bodily injury" Varahi or Global Management knew about prior to the Policy incepting.  The Policy provides:

> **b.** This insurance applies to "bodily injury" and "property damage" only if:
>
> **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> **(2)** The "bodily injury" or "property damage" occurs during the policy period; and
>
> **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or presumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

Policy, CG 00 01 04 13, p. 1 of 16.  As discussed above, only Jane Doe 1's Lawsuit asserts allegations occurring during Atain's policy period as the allegations contained in Jane Doe 2 and Jane Doe 4 predate Atain's policy period.  However, Jane Doe 1 contends that Varahi and its management were involved in the sex trafficking beginning in 2011.  Moreover, Jane Doe 1 claims that "Bob P." knew that she was being trafficked on the Property and that he responded to online complaints prior to Atain's Policy.  To the extent these allegations are taken as true, Atain reserves its rights under this Policy provision accordingly.

**D.    Physical-Sexual Abuse Exclusion**

Jane Doe 1's allegations in the Complaint also trigger the Policy's Physical-Sexual Abuse Exclusion.  This exclusion provides:

> This insurance does not apply to any "occurrence," suit, liability, claim, demand or causes of action arising out of or resulting from the physical abuse, sexual abuse or licentious, immoral or sexual behavior, whether or not intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, or omission by:
>
> a.    The insured or the insured's employees;
>
> b.    Patrons of the insured's business;
>
> c.    Agents of the Insured;
>
> d.    "Volunteer workers";

**WOOD SMITH**
**HENNING & BERMAN LLP**

Varahi Hotel, LLC
December 13, 2019
Page 6

e. Subcontract or employee of any subcontractor;

f. "Independent contractor" or employee of any "independent contractor"; or

g. "Leased worker."

For the purposes of this endorsement:

1. "Independent contractor" means one that contracts to do work or perform a service for another and that retains control over the means or methods used in doing the work or preforming the service. "Independent contractor" includes, but is not limited to, subcontractors and any employees of a subcontractor, any employee of an independent contractor, any employees of the insured, agents, representatives, volunteers, spouses, family members or the insured or ***any Additional Insureds added to this policy***.

Policy, AF 001 007 (11-13) (emphasis supplied). As discussed above, we understand that no written contract between Global Management and Varahi exists, much less one that would require Global Management to obtain insurance and name Varahi as an additional insured. Moreover, the entire thrust of the Jane Doe 1 Lawsuit is that she was a victim of sex trafficking, and that Varahi (and/or Global Management) was complicit in her trafficking and/or benefited from her abuse. As such, these allegations fall squarely within the Policy's Physical-Sexual Abuse Exclusion, and Atain reserves its rights accordingly.

## E. Injury on Normally Occupied Premises Exclusion

The Policy provides an exclusion stating that Atain will not pay expenses for "bodily injury" to "a person injured on that part of premises you own or rent that the person normally occupies." Policy, CG 00 01 04 13, p. 8 of 16. To the extent Ms. Doe's Complaint alleges injuries on any premises owned by Varahi that Ms. Doe normally occupies, Atain reserves its right to limit or deny coverage accordingly.

## F. The Policy's Expected or Intended Injury Exclusion May Bar Jane Doe 1's RICO Claims

Jane Doe 1's Amended Complaint alleges that the Defendants violated Georgia's RICO statute by conspiring to "acquire money through a pattern of racketeering activity" and seeks punitive damages as a result. The Lawsuit also seeks damages for Varahi's criminal conduct in violation of numerous federal statues. Moreover, Jane Doe 1 claims that Varahi, its management, or employees participated in her alleged trafficking. These claims necessarily require intentional conduct of Varahi or its management and appear to implicate the Policy's Expected or Intended Injury

WOOD SMITH
HENNING & BERMAN LLP

Varahi Hotel, LLC
December 13, 2019
Page 7

Exclusion:[3]

> This insurance does not apply to:

> **a.** **Expected Or Intended Injury**

> > "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Policy, CG 00 01 04 13 p. 2 of 16. To the extent Jane Doe 1 seeks damages for Varahi's (or its management's) intentional conduct, Atain reserves its rights under this exclusions.

> **G.** **The Policy's Coverage for Personal and Advertising Injury and Potential Exclusions**

Next, the Policy has a separate coverage grant for "personal and advertising injury." Policy, CG 00 01 04 13 p. 6 of 16. The Policy's "personal and advertising injury" section contains the following exclusions:

> **2.** **Exclusions**

> This insurance does not apply to:

> **a.** **Knowing Violation of Rights Of Another**

> > "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violated the rights of another and would inflict "personal and advertising injury".

> > \* \* \*

> **d.** **Criminal Acts**

> > "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured."

*Id.* at 6 of 16. Finally, the Policy contains a **Known Injury Or Damage Exclusion Personal And Advertising Injury** endorsement which states:

> This insurance does not apply to "personal and advertising injury" arising from an offense :

> **a.** That occurs during the policy period and, prior to the policy period, an insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, knew that the "personal and

---

[3] Conspiracy, however, requires intent to agree and intent to realize a criminal objective. *Jenkins v. State*, 159 Ga. App. 183 (1981).

Varahi Hotel, LLC
December 13, 2019
Page 8

advertising injury" had occurred prior to the policy period, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "personal and advertising injury" occurred, then any continuation, change or resumption of such offense during or after the policy period will be deemed to have been known prior to the policy period; or

**b.**    That occurs during the policy period and was, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim, includes continuation, change or resumption of that "personal and advertising injury" after the end of the policy period.

A personal and advertising injury arising from an offense will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of **SECTION II – WHO IS AN INSURED** or an "employee" authorized by you to give or receive notice of an offense or claim:

**(1)**    Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

**(2)**    Receives a written of verbal demand or claim for damages because of the "personal and advertising injury"; or

**(3)**    Becomes aware by an other means that "personal and advertising injury" has occurred or has begun to occur.

Policy, AF 000 873 (07/2012).  As discussed above, Jane Doe 1's Complaint and Amended Complaint contain numerous allegations of criminal acts including sex trafficking, forced labor, violations of the TVPRA (a criminal statute), and a violation of Georgia's RICO Act.    Moreover, the Jane Doe 1 Lawsuit alleges that Varahi's employees and management participated in the trafficking and/or knew it was going on at the hotel prior to Atain's Policy incepting.  Thus, Atain must reserve its rights under the Policy's "personal and advertising injury" exclusions accordingly.

**H.**    **Atain's Policy Limits and Potential Excess Judgment**

Notwithstanding any of the coverage issues cited above, the Policy has a $1,000,000 per occurrence limit for general liability, subject to the Policy's relevant terms, conditions, exclusions, and endorsements.  Due to the nature of the potential claims at issue, it is possible that further claims may be made against Varahi seeking damages in excess of your Limits of Insurance.  Consequently, Atain must advise you that the most Atain will pay with respect to the claim and/or any other future claim or lawsuit arising out of and/or related to the Incident is $1,000,000.  This provision provides:

Varahi Hotel, LLC
December 13, 2019
Page 9

### SECTION III – LIMITS OF INSURANCE

1.     The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.**     Insureds;

    **b.**     Claims made or "suits" brought; or

    **c.**     Persons or organizations making claims or bringing "suits".

Policy, CG 00 01 04 13, p. 10 of 16. The Declarations provide a $1,000,000 per occurrence limit for Commercial General Liability claims. *See* Supplemental Declarations, UNLPF-SD-1L (09-11). Thus, Atain's obligations will be limited to the Policy's $1,000,000 limits, regardless of the number of claims. Atain must therefore reserve its rights under the Policy's Liability Coverages limits.

### I.     Atain's Obligations May Be Limited By Other Insurance

If other insurance is available to Varahi, Atain's obligations may be limited by the Policy's Other Insurance provision. The Policy provides:

**4.**     **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.**     **Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b.**     **Excess Insurance**

**(1)**     This insurance is excess over:

    **(a)**     Any of the other insurance, whether primary, excess, contingent or on any other basis.

* * *

    **(b)**     Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and complete operations, for which you have been added as an additional insured.

**(2)**     When this insurance is excess, we will have no duty to defend under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a

WOOD SMITH
HENNING & BERMAN LLP

Varahi Hotel, LLC
December 13, 2019
Page 10

duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

Policy, CG 00 01 04 13, p. 12 of 16. As discussed above, Atain understands that Varahi has other insurance available for the Jane Doe 1 Lawsuit and is currently being defended by other carriers. So that Atain may complete its coverage analysis, Atain asks that you provide us with any and all insurance that you believe may provide coverage for the Incident and/or the Lawsuit. In the interim, Atain must reserve its rights under the Policy's Other Insurance provision.

**J.     The Policy's Punitive Damage Exclusion**

The Policy contains a Punitive Damage Exclusion. The Policy explicitly states that "[t]his insurance does not apply to punitive or exemplary damages, fines or penalties." Policy, AF98001 (07/2012). Therefore, any punitive damages potentially alleged as to Varahi are excluded under the Policy, and Atain reserves its rights accordingly.

**IV.     COMPLETE RESERVATION OF RIGHTS**

Atain is continuing its investigation of the loss, as well as its analysis of the coverage issues under the Policy regarding the loss. Based on the Policy's provisions, including but not limited to those discussed above, Atain reserves its rights available to it under the Policy and applicable law, including but not limited to the right to investigate, deny coverage in part or whole, seek a judicial determination in a declaratory judgment action, and seek reimbursement of any non-covered attorneys' fees and costs. In addition, Atain reserves the right to supplement or amend this reservation of rights letter upon the discovery of additional facts, subject to the Policy's terms, conditions, exclusions, and endorsements, including those not discussed in this letter.

WOOD SMITH
HENNING & BERMAN LLP

Varahi Hotel, LLC
December 13, 2019
Page 11

     This letter is based on the facts and information supplied to Atain to date, along with the Policy's and applicable law. Nothing in this letter, or Atain's continuing investigation, or actual or possible payment(s) of any portion of the loss or expenses, shall constitute a waiver or estoppel of Atain's rights to rely upon any of the terms, conditions, exclusions, and endorsements of the Policy.

     Should you believe there is additional information Atain should consider in connection with coverage under the Policy, please provide that information at your earliest convenience. Further, it is imperative that you forward us copies of any future demands or suit papers, so that Atain may evaluate its obligations under the Policy. Should you have any questions about the issues raised in this letter, please do not hesitate to contact us.

Sincerely yours,

WOOD, SMITH, HENNING & BERMAN, LLP

Richard E. Zelonka, Jr.

REZ/PJR

cc:    Michael B. Weinstein (*mike.weinstein@mbwlaw.net*)
       Dan Cheek (*dan.cheek@ioausa.com*)
       Bob Patel (*bobp@globalhotelgroup.net*)

Case 1:23-mi-99999-UNA   Document 718-5   Filed 03/08/23   Page 456 of 457
Case 1:20-cv-01582-WMR   Document 1-6   Filed 04/13/20   Page 1 of 2

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record.  (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

ATAIN SPECIALTY INSURANCE COMPANY,

## DEFENDANT(S)

VARAHI HOTEL, LLC, and JANE DOE 1,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED
PLAINTIFF_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED
DEFENDANT____Cobb County, GA____
(IN  U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF  LAND INVOLVED

## (c) ATTORNEYS (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

Richard E. Zelonka, Jr., Wood Smith Henning & Berman, 1230 Peachtree Street, Suite 925, Atlanta, GA 30309, 470-552-1150, rzelonka@wshblaw.com

## ATTORNEYS (IF KNOWN)

Jonathan S. Tonge, Andersen, Tate & Carr, 1960 Satellite Blvd., Suite 4000, Duluth, GA 30097, 770-822-0900, jtonge@atclawfirm.com

## II.  BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 U.S. GOVERNMENT PLAINTIFF
- [ ] 2 U.S. GOVERNMENT DEFENDANT
- [x] 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)
- [ ] 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|
| [ ] 1 | [ ] 1 | CITIZEN OF THIS STATE | [ ] 4 | [x] 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| [ ] 2 | [ ] 2 | CITIZEN OF ANOTHER STATE | [ ] 5 | [x] 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| [ ] 3 | [ ] 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 6 | [ ] 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

- [x] 1 ORIGINAL PROCEEDING
- [ ] 2 REMOVED FROM STATE COURT
- [ ] 3 REMANDED FROM APPELLATE COURT
- [ ] 4 REINSTATED OR REOPENED
- [ ] 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)
- [ ] 6 MULTIDISTRICT LITIGATION - TRANSFER
- [ ] 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT
- [ ] 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE -  DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 2201 - Complaint for Declaratory Judgment

### (IF COMPLEX, CHECK REASON BELOW)

- [ ] 1. Unusually large number of parties.
- [ ] 2. Unusually large number of claims or defenses.
- [ ] 3. Factual issues are exceptionally complex
- [ ] 4. Greater than normal volume of evidence.
- [ ] 5. Extended discovery period is needed.
- [ ] 6. Problems locating or preserving evidence
- [ ] 7. Pending parallel investigations or actions by government.
- [ ] 8. Multiple use of experts.
- [ ] 9.  Need for discovery outside United States boundaries.
- [ ] 10. Existence of highly technical issues and proof.

## CONTINUED ON REVERSE

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT  $_____   APPLYING IFP_____   MAG. JUDGE (IFP)_____

JUDGE_____   MAG. JUDGE_____   NATURE OF SUIT_____   CAUSE OF ACTION_____
*(Referral)*

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [x] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT
- [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [ ] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896 ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23    DEMAND $ _____

JURY DEMAND [x] YES [ ] NO (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE _____ William M. Ray, II _____    DOCKET NO. ____ 1:19-CV-03840 ____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [x] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [ ] 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case [ ] IS [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

_____    04/13/2020
SIGNATURE OF ATTORNEY OF RECORD    DATE