### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| VALERIE NEWELL and JAMES NEWELL, | CIVIL ACTION FILE NO. |
| Plaintiffs, | |
| v. | ———————————— |
| TRULIANT FEDERAL CREDIT UNION, and FEDERAL HOME LOAN MORTGAGE CORPORATION, | |
| Defendants. | |

### COMPLAINT FOR DAMAGES
### AND JURY TRIAL DEMAND

Plaintiffs Valerie and James Newell bring this Complaint against their former mortgage lender, defendant Federal Home Loan Mortgage Corporation ("Freddie Mac"), and its mortgage servicing agent, Truliant Federal Credit Union ("Truliant"), and respectfully show as follows:

### I. OUTLINE OF THE CASE

1.

After a fire destroyed the Newells' home Truliant received the Newells' hazard insurance money. Truliant was contractually bound to release the funds where "restoration or repair [was] economically feasible," and the

-1-

"Lender's security [was] not lessened," but it failed to do make such an analysis or to invite the Newells to discuss the matter. Instead of honoring its obligation to disburse the funds, Truliant dithered. Nearly three months after the fire, without warning or apparent concern for the consequences of its decision, Truliant, applied the Newells' funds toward retiring their mortgage. Truliant's unilateral act put the Newells in extremis. Without sufficient funds for living expenses and reconstruction, they were forced to liquidate their savings and retirement accounts. Performing much of their own labor, and reduced to camping in a small trailer for ten months, they experienced physical and emotional misery. The financial cost to the Newells of the delay caused by the defendants' misapplication of their insurance is well over $100,000. The defendants are liable for breach of their contractual and fiduciary duties to the Newells, including expenses of litigation, general damages, statutory damages under RESPA, and, due to their  indifference to the Newells' predicament, punitive damages.

## II. The Home

2.

The Newells seek relief regarding the below-described parcel of residential

realty located in Henry County, Georgia (the or their "Home") with a street

address of 121 Ashemoor Court, McDonough, Georgia 30253, and which is

more particularly described as follows:

> ALL THAT TRACT OR PARCEL OF LAND, WITH HOUSE AND ALL
> OTHER IMPROVEMENTS LOCATED THEREON, LYING AND
> BEING IN LAND LOT 63 OF THE 7TH DISTRICT OF HENRY
> COUNTY, GEORGIA, BEING LOT 3 OF ASHEMOOR SUBDIVISION,
> AS SHOWN ON A PLAT OF SURVEY PREPARED BY STANTON
> SURVEYING COMPANY, DATED APRIL 21, 1987, UPDATED JUNE
> 1, 1987 AND OCTOBER 5, 1987, RECORDED IN PLAT BOOK 15,
> PAGE 113, HENRY COUNTY RECORDS. THE DESCRIPTION OF
> SAID PROPERTY AS CONTAINED ON SAID PLAT OF SURVEY IS
> HEREBY INCORPORATED HEREIN AND BY REFERENCE MADE A
> PART HEREOF.

### III. THE PARTIES

3.

Plaintiff Valerie Newell ("Valerie") is a citizen of the state of Georgia.

4.

Plaintiff James Newell ("James"), Valerie's husband, is a citizen of the

state of Georgia.

5.

Defendant Truliant Federal Credit Union ("Truliant"), is a federally

chartered credit union headquartered in North Carolina, but with branches in

South Carolina and Virginia.

6.

Truliant may be served in care of its President and Chief Executive Officer, Todd Hall, his successor, or any other corporate officer or authorized agent at its principal executive office at 3200 Truliant Way, Winston-Salem, Forsyth County, North Carolina 27103.

7.

Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac") is a "body corporate" chartered by Congress.[1]

8.

Freddie Mac may be served in care of its chief executive officer, Michael J. DeVito, his successor, or any other corporate officer or authorized agent at its principal executive office at 8200 Jones Branch Drive, McLean, Fairfax County, Virginia, 22102-3107.

## IV. Jurisdiction and Venue

9.

Because Freddie Mac is properly a party to this action, this matter

---

[1] Freddie Mac has the power "to sue and be sued, [and to] complain and defend, in any State, Federal, or other court." 12 U.S.C. §§ 1452(a)(1), 1452(c)(7).

"involves claims that arise under the laws of the United States" by operation
of law; therefore, this Court has jurisdiction over the matter pursuant to 28
U.S.C. § 1331, which grants the district courts of the United States original
jurisdiction over all such civil actions.[2]

10.

This Court's jurisdiction is also invoked under 28 U.S.C. §1332(a) in that
the amount in controversy exceeds $75,000 — exclusive of interest and costs
— and there exists complete diversity among the parties.

11.

This Court's exercise of personal jurisdiction over the named defendants
would not violate the Due Process Clause of the Fourteenth Amendment to the
United States Constitution because the defendants purposefully established
minimum contacts in Georgia and have had "continuous and systematic
general business contacts" with Georgia such that the maintenance of this

---

[2] Under 12 U.S.C. § 1452(f) "all civil actions to which [Freddie Mac] is a
party shall be deemed to arise under the laws of the United States, and the
district courts of the United States shall have original jurisdiction of all such
actions, without regard to amount or value."

action does not offend traditional notions of fair play and substantial justice.[3]

12.

This Court's exercise of personal jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution because this cause of action "arise[s] out of or relate[s] to" the defendants' contacts with Georgia;[4] the defendants purposefully availed themselves of the benefits of Georgia, and therefore can be said to have reasonably anticipated being haled into Georgia;[5] and, granting jurisdiction comports with "fair play and substantial justice."[6]

13.

Venue is proper in the Northern District of Georgia, Atlanta Division, under 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

---

[3] *E.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 1873  (1984).

[4] *E.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

[5] See *Burger King Corp.*, 471 U.S. at 472.

[6] *Id.*

## V. Factual Allegations

November 2018: *Truliant and the
Newells enter into a loan agreement*.

14.

The Newells have lived in their Home since 1994.

15.

The Newells obtained a purchase money mortgage loan to finance the purchase price of the Home.

16.

On November 27, 2018, the Newells and Truliant entered into an agreement (the "Loan Agreement") whereby Truliant agreed to lend the Newells $136,000 (the "Loan" or the "Loan Amount") to refinance their existing mortgage loan.

17.

To evidence the Loan, the Newells signed a promissory note in favor of Truliant in the face amount of $136,000 (the "Note").[7]

---

[7] Attachment "A."

18.

In consideration for the Loan, the Newells agreed to repay Truliant amortized monthly installment payments of principal and interest accruing at an annual rate of 5.875% over a 30-year term.

19.

The monthly installment payments consisted of principal and interest totaling $804.49 plus additional escrow amounts for such items as hazard insurance and ad valorem property taxes.

20.

The first monthly installment payment under the Loan Agreement was due to be paid on February 1, 2019.

21.

To secure repayment of the Loan, the Newells executed and delivered a Security Deed conveying legal title to their Home to Mortgage Electronic Registration Systems, Inc. as nominee for Truliant (the "Security Deed").[8]

22.

The Security Deed represented both a muniment of title and a written

---

[8] Attachment "B."

contract between the Newells and Truliant.

23.

The Security Deed was recorded on December 6, 2018, and indexed at

Deed Book 16195, Page 93 of the Henry County, Georgia, deed records.

24.

Because the Loan was secured by a first lien "on residential real property

designed principally for the occupancy of from one to four families," and was

"intended to be sold by the originating lender to the … Federal Home Loan

Mortgage Corporation," the Loan was, at all times relevant to this Complaint,

a "federally related mortgage loan" as such term is defined under 12 U.S.C. §

2602(1).

*Truliant's Insurance Requirements*

25.

Section 5 of the Security Deed states, in pertinent part, as follows:

> **5. Property Insurance**. Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance.…
>
> In the event of loss, Borrower shall give prompt notice to the
> insurance carrier and Lender. Lender may make proof of loss if not

made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, **any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened**. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2. [Emphasis supplied.]

26.

Section 7 of the Security Deed states, in pertinent part, as follows:

**7. Preservation, Maintenance and Protection of the Property; Inspections**. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly

repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

27.

No term under the Loan Agreement, Security Deed, or Note, grants any party the absolute or uncontrolled discretion to make any decision authorized under the Loan Agreement.

28.

A closing document dated November 27, 2018, and captioned "HAZARD INSURANCE AUTHORIZATION REQUIREMENTS," (the "Insurance Terms Sheet") identified nine different terms that constituted Truliant's "policies and procedures, and minimum requirements, for the Hazard Insurance [policy]" required to insure the Home under Section 5 of the Security deed.

29.

The Newells procured a hazard insurance policy (Number H3S-258-619400-40 8 1 — the "Liberty Policy") from Liberty Mutual General

Insurance Company ("Liberty Mutual").

30.

The Liberty Policy conformed with Truliant's policies and procedures, and the minimum requirements, for the Hazard Insurance policy stipulated under Section 5 of the Security deed (¶ 25, *supra*).

31.

The Liberty Policy provided up to $148,300 in coverage for the Newells' dwelling — with an "Expanded Replacement Cost" endorsement.

32.

The Expanded Replacement Cost endorsement provided an additional 20% benefit under the policy in the event of market price increases due to non-inflationary factors.

33.

The Liberty Policy also included an "Inflation Protection" endorsement which provided for an increase in the limits of liability for Dwelling, Structure, Personal Property, and Loss of Use coverages as established by a published inflation index.

34.

At all times relevant to this Complaint, Truliant "serviced" the Loan by receiving scheduled periodic payments and making payments of principal and interest and such other payments, such as escrow funds for insurance and taxes with respect to the installments it received from the Newells.

35.

At all times relevant to this Complaint, Truliant was a "*servicer*" of a "*federally-related mortgage loan*" as these terms are defined under RESPA, 12 U.S.C. §§ 2605(i)(2) and(i)(3).[9]

36.

In November 2018 the Home had a fair market value of approximately $173,500.

37.

According to Truliant's own records, the percentage ratio of the Loan Amount to the fair market value of the Home was 78.386% ($136,000 ÷

---

[9] "Loan servicing" in this context means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

$173,500 x 100).

> *December 2018:  Truliant assigns the*
> *Loan to Freddie Mac but continues to*
> *service the Loan as Freddie Mac's agent.*

38.

On December 10, 2018, Truliant sold the Loan and assigned the Note and Security Deed to Freddie Mac.

39.

After transferring ownership of the Loan Truliant continued to act as Freddie Mac's servicing agent.

40.

As a "Seller / Servicer" of a Freddie-Mac-owned loan, Truliant initially acted in a "ministerial" capacity without having to exercise substantial judgment or discretion for the reasons discussed in the following ¶¶ 41–42.

41.

Truliant was contractually obligated to service the Loan in accordance with standards established by the related purchase documents and by its servicing agreement with Freddie Mac.

42.

Truliant's servicing agreement with Freddie Mac included the *Freddie Mac Single-Family Seller / Servicer Guide* (the "Servicing Guide") and its specific loan-servicing guidelines (the "Guidelines").[10]

43.

Through the purchasing and servicing contracts and the Guidelines, Freddie Mac, as principal, established and maintained sufficient control over Truliant at all times relevant to this Complaint to create a principal-agent or employer-employee relationship.

44.

The Guidelines authorize Freddie Mac to supervise and inspect the work of Truliant and to disqualify or suspend Truliant without cause.[11]

45.

At all times relevant to this Complaint, Freddie Mac authorized Truliant to act for it in connection with the Loan, or later ratified Truliant's actions on its

---

[10] http://www.freddiemac.com/singlefamily/guide/ (last viewed Mar. 3, 2023).

[11] Guidelines Section 2301.2 Disqualification or suspension of the Seller or the Servicer (03/02/16).

behalf.

46.

Between February 2019 and March 2021, the Newells made timely and conforming monthly installment payments to Truliant via direct debit from their bank account.

47.

During the same period the Newells otherwise fully complied with their obligations under the Loan Agreement.

48.

As of December 1, 2020, the unpaid principal balance ("UPB") of the Loan was $132,633.10.

*December 13, 2020: Fire*
*destroys the Newells' Home*

49.

On December 13, 2020, a fire originating in their back porch destroyed the Newells' Home.

50.

In shock from losing their home and their property, the Newells promptly

filed a total-loss insurance claim under the Liberty Policy (¶ 29, *supra*).

51.

By December 18, 2020, Liberty Mutual had promptly adjusted the

Newells' claim and determined that the replacement cost for the Home was

$267,411.88.

52.

The insurance coverage *ostensibly* available to the Newells was

$160,233.20 — approximately $105,678.68 below the then-estimated

replacement cost of the Home.

53.

However, the insurance coverage was also subject to enhancement under

the Expanded Replacement Cost and Inflation Protection endorsements to the

Liberty Policy (¶¶ 32–33, *supra*).

54.

The Newells also received additional funds from Liberty Mutual for

personal property (content) loss and were prepared to (and eventually did)

allocate much of that cash towards reconstruction of their Home.

55.

The Newells also had access to savings and a retirement pension plan with a cash value of no less than $109,986.23 — i.e., a sum more than sufficient to cover the difference between the available insurance proceeds and the then-estimated replacement cost of their Home.

56.

The Newells consulted with different contractors about their rebuilding options.

57.

The Newells determined that, given the cost of demolition, clean-up, and satisfaction of the Loan, if they attempted to liquidate their Home in its burned-out condition, they would not be left with sufficient funds to apply towards a down payment for another home.

58.

The Newells concluded it would be more economically feasible to rebuild their Home than to attempt to liquidate what was left of it.

*December 20, 2020 – March 10, 2021:*
*Truliant takes control of the Insurance*
*Proceeds… and then dithers.*

59.

On December 20, 2020, a week after the fire, Liberty Mutual prepared a joint check for $160,233.20 payable to the Newells and to Truliant, and transmitted the check to the Newells pursuant to the loss-payee terms of the Liberty Policy.

60.

In accordance with Section 5 of the Security Deed, the Newells endorsed the Liberty Mutual check and transmitted it to Truliant to hold during the "repair and restoration period" (¶ 25, *supra*).

61.

Shortly after the Newells transmitted the endorsed Liberty Mutual check, Truliant deposited it into a Truliant savings account that the Newells could monitor on-line but from which they could not withdraw any portion of the funds without Truliant first transferring them to the Newells' checking account.

62.

Truliant was in sole possession and control of the Newells' Insurance Proceeds totaling $160,233.20 that were earmarked specifically for the repair of the Newells' home.

63.

On December 23, 2020, the Newells were advised by their Liberty Mutual adjuster that rebuilding their home should take approximately six months, and that insurance coverage for temporary living expenses would last them through June 21, 2021.

64.

Under the Servicing Guidelines (¶¶ 40–43, *supra*), a servicer of a Freddie Mac loan is required, "upon notification of loss or damage to the Mortgaged Premises," to "monitor and coordinate the claim process with the Borrower and the insurer."[12]

65.

The Guidelines require the servicer to "take appropriate action to" do the following:

---

[12] Guidelines Section 8202.11.

- Verify the extent of the loss or damage

- Ensure judicious disbursement of insurance proceeds for the necessary repairs

- Protect the priority of the Mortgage by obtaining, where necessary, waivers of materialman's or mechanic's liens

- Document completion of the repairs.[13]

66.

Under the Guidelines, when the borrower is current on their loan, and "[w]hen the Mortgaged Premises has suffered a loss, the Servicer must" release the insurance proceeds as follows:

> The servicer "[m]ay release insurance proceeds up to the greater of a) $40,000 b) 10% of [the Unpaid Principal Balance or "UPB"] or c) The amount by which the release funds exceed the sum of the UPB, accrued interest and advances on the Mortgage."[14]

67.

An amount representing 10% of the Newells' UPB (i.e., 10% of $132,633) was $13,263.

---

[13] Guidelines Section 8202.11 pp. 8202–21.

[14] Id. pp. 8222–23.

68.

The amount by which the released insurance funds ($160,233) exceeded the sum of the Loan's UPB, accrued interest and advances on the Mortgage ($132,633) was $27,600.

69.

Because the Newells were current on the Loan, Truliant was obligated under the Guidelines to release to them $40,000 to help them to rebuild.

70.

The Newells were willing and able to continue to make (and in fact did make) their installment payments on the Loan during the rebuilding process.

71.

On or about February 4, 2021 (53 days after the fire), Valerie communicated by email with Alma Munoz, a "Member Assist Specialist," and employee of Truliant, to inquire about the unexplained delay in the release of the Newells' insurance proceeds necessary to begin demolition and reconstruction.

72.

On or about February 12, 2021, Valerie transmitted the insurance repair

estimate to Munoz at her request.

73.

On February 18, 2021, Munoz advised Valerie by email that Truliant had "everything we need."

74.

Munoz further advised Valerie that:

> According to the documents the company hasn't started building correct? If they haven't and need some of the funds please have them provide an invoice of how much they will need to start in order for me to release part of the funds and cut a check out.

75.

On February 19, 2021, the Newell's general contractor, Joshua Harris, communicated directly with Munoz to request a draw payment to cover his first invoice for "labor permitting and equipment rolloffs."

76.

In response to Harris's request, Munoz emailed back "[t]hank you for sending the invoice, once I have the okay from my insurance department I will inform you what the next step will be."

77.

On February 23, 2021 (72 days after the fire), frustrated with Truliant's slow-walking their request for insurance proceeds, the Newells paid Harris $10,000 out of their own pockets to complete the demolition of their Home.

78.

On February 23, 2021, the Newells emailed Munoz to advise of the $10,000 payment they had made and to request reimbursement from their insurance proceeds.

79.

Truliant failed to release the insurance funds required to reimburse the Newells for the $10,000 outlay.

80.

On February 26, 2021 (75 days after the fire), Valerie emailed Munoz and advised:

> Alma It has been 14 days since my contractor requested a release of funds to begin work on rebuilding my house. I cannot understand why it has taken this long and communication from you except to ask for the repeat information which was already sent in a previous email. And now we are moving into the weekend and do not have funds released. I am completely baffled why I would have to pay thc contractor out of my own money when my insurance company has already approved and released the funds to me and my bank.

Furthermore, I have been informed by my insurance company, Liberty Mutual, to keep track of all funding delays so if I run out of temporary housing funds, Truliant will have to pick up the bill for not releasing funds in a timely manner.

81.

Truliant did not send an agent to inspect the Home.

82.

Truliant performed no analysis to determine whether restoration or repair was economically feasible.

83.

Truliant performed no analysis to determine whether Freddie Mac's security was lessened by proceeding with reconstruction.

84.

Truliant did not express any concern about the Newells' home being underinsured.

85.

Freddie Mac's security interest in the Home was never challenged or threatened.

86.

The pattern of correspondence between the Newells and Truliant — i.e., with the Newells requesting Truliant release their insurance funds and Truliant failing to explain its reticence to release the funds — continued until March 10, 2021 (87 days after the fire).

*March 10, 2021: Truliant misapplies
the Newells' insurance money.*

87.

On March 10, 2021, Valerie accessed her on-line banking account to confirm whether Truliant had transferred the initial $10,000 draw to the Newell's checking account as promised.

88.

The Newells were shocked to discover that Truliant had, without consulting with them and without warning, transferred $132,000 of their insurance proceeds *to itself*, and satisfied the Loan.

89.

Truliant hadn't advised the Newells of its intentions to apply their insurance proceeds to paying off the Loan.

-26-

90.

All that remained in the Newells' savings account was approximately $28,000 — an amount grossly insufficient to complete the rebuilding.

91.

On March 11, 2021, a Truliant employee, Lori Gauldin, advised Valerie by telephone that Truliant had unilaterally applied the insurance proceeds towards satisfying the Loan, and not to rebuilding the Newells' home.

92.

In the March 11, 2021 conversation, Gauldin further advised that because the Home was a total loss "the home had to be paid off because there was no longer any value in the house," and that would actually be "beneficial" because the Newells could get a construction loan and build "with less constraints."

93.

Truliant's misapplication of the Newells' insurance funds was actually the opposite of "beneficial."

94.

Valerie responded to Gauldin's March 11th communication by email:

Why would you take the money and pay off the loan? Now I have no money to rebuild my house! That insurance check was made out JOINTLY so I should have had a say in if I wanted to pay off the loan or rebuild, what am I supposed to do now?!?!?! I have builders at my home but no money to pay them. Truliant has done nothing but cause me stress throughout this entire process.

95.

Because James was laid off and involuntarily retired due to the COVID pandemic, the Newells could not qualify for a construction loan.

96.

By delaying its decision to not release the funds for nearly three months, Truliant effectively deprived the Newells of available insurance benefits for temporary housing during the rebuilding process.

97.

Had Truliant bothered to discuss a concern with the possible insufficiency of insurance proceeds with the Newells, the Newells would have demonstrated that:

- They would have been entitled to (and later in 2022 did secure) additional insurance coverage (approximately $48,000 under their Extended Protection Endorsement and Inflation

-28-

Protection Endorsement) once their existing funds were exhausted;

- They could (and later did) secure an additional $109,986.23 by liquidating James's pension; and,

- They could (and later did) apply benefits from their contents policy toward rebuilding their Home.

*March 2021 – October 2022: The Newells*
*struggle to rebuild their lives.*

98.

Truliant's misapplication of the Newells' insurance funds had a profound effect on the Newells.

99.

The rebuilding of the Newells' home should have taken six months and been complete by July of 2021.

100.

Because the Newells had to scratch and scrape for funds, perform much of their own labor, and then experienced COVID-induced supply-chain disruptions and inflation, they were unable to move back into their home until

October of 2022.[15]

## 101.

Being forced to rebuild their lives on their own over the next 20 months had a negative effect on the Newells' health, and on their personal, social, and professional lives.

## 102.

Over the next approximately 20 months, Valerie experienced profound anxiety and worry, and was treated medically for "major depressive disorder, migraine without aura, and primary insomnia."

## 103.

Unable to spend funds on any unnecessary items, the Newells began the process of rebuilding and acting as their own general contractors and laborers — an experience that continues to this day.

## 104.

Had the rebuilding of the Newell's home commenced promptly and been properly funded with their insurance proceeds, the prevailing market per-square-foot prices for material and labor in the Atlanta metro area (in mid-

---

[15] To date, the Newells' Home remains habitable but unfinished. See ¶¶ 113–116, *infra*.

2021) would have been approximately $125 — which would have yielded a cost to rebuild of $240,250.

105.

On June 13, 2021, the Newells purchased a used camper for $8,000 and parked it in their yard in anticipation of the termination of their temporary housing benefits.

106.

From December 15, 2021, until October 2022, the Newells lived in an un-heated, un-air-conditioned, refrigerator-less, 147-square-foot trailer, with three dogs and a cat.

107.

The Newells spent most of their free time and waking hours rebuilding their home.

108.

The Newells showered at their gym, and ate canned food.

109.

Extreme inflation in construction materials began to eat away at the Newells' savings in late 2021, which required them to penny-pinch even

-31-

more.

110.

By late September 2022, the Newells had been working mornings and evenings before and after work as well as every weekend to get their home into a condition that would allow them to move into it.

111.

In order to get a certificate of occupancy, the Newells had to drain the rest of their savings to build a deck.

112.

By October 2022 the Newells were able to receive a certificate of occupancy to allow them to vacate their camper and move into their still-unfinished home.

113.

The Newells have yet to complete the actual rebuilding of their home back to its original state.

114.

To date, the Newells have spent approximately $208,800 to rebuild their Home to its current state.

115.

To date, the Newells have personally contributed the equivalent of $43,500 of their own labor towards the rebuilding of their Home to its current state.

116.

The remaining cost to complete the rebuilding of the Home's original state is estimated to be $58,430.

117.

The anticipated actual cost of completion is expected to be $310,730.

118.

The delay in reconstruction caused by the defendants resulted in an inflationary factor that increased what should have been a $240,250 cost of completion to a $310,730 cost of completion — a difference of $70,480.

119.

The Newells incurred other consequential damages as a result of Truliant's misapplication of their insurance funds unrelated to their cost of completion in an amount exceeding $30,287.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM
**(Breach of Contract)**

120.

The allegations in ¶¶ 14–119 are incorporated herein.

*Freddie Mac is vicariously liable*
*for the acts or failures to act of Truliant.*

121.

At all times relevant to this action, any act (or failure to act) of Truliant described in this Complaint was performed with the authorization of Freddie Mac and otherwise within the scope of its agency for Freddie Mac; and, therefore, Freddie Mac is vicariously liable for any act (or failure to act) of Truliant for which Truliant is found to be liable to the Newells.

122.

Alternatively, any act (or failure to act) of Truliant described in this Complaint that was not allegedly performed within the actual scope of its agency for Freddie Mac, or without the initial authorization of Freddie Mac, has nevertheless been ratified by Freddie Mac; and, therefore, Freddie Mac

-34-

is vicariously liable for any such act (or failure to act) of Truliant for which Truliant is found to be liable to the Newells.

123.

When the Newells entered into the Loan Agreement with Truliant they reasonably assumed — and correctly so — that they were contracting with a private credit union with a presence in three states, and not with a government agency.

124.

Truliant's subsequent assignment of the Loan Agreement to Freddie Mac was not an act over which the Newells had any control.

125.

The Newells did not contemplate that, when they refinanced their home mortgage, they were or potentially could be contracting with an agency of the federal government.

126.

By taking the assignment of the Loan Agreement and ownership of the Loan, Freddie Mac became a contracting party in privity with the Newells.

127.

Although Freddie Mac is under the temporary conservatorship of the Federal Housing Finance Agency ("FHFA") no statutory or other legal authority establishes Freddie Mac as an agency of the federal government.

128.

The act of making and servicing a home mortgage loan does not represent governmental activity.

129.

Assuming for the sake of argument that Freddie Mac is considered to be an agency of the federal government (which the Newells deny), any liability to which Freddie Mac may be exposed would present no risk to the "public treasury" due to the duties of indemnification owed by Freddie Mac's servicers, including Truliant.

130.

The duties owed by Truliant to the Newells, as discussed in ¶¶ 146 – 156 *infra*, are so vitally important that they are non-delegable, and thus duties for which Freddie Mac, as principal, cannot seek to avoid responsibility.

*Breach of agreement to
allow rebuilding and repair*

131.

By applying insurance proceeds to the satisfaction of the Loan without bothering to inquire into whether the Newells were capable of rebuilding their Home with available insurance benefits and their own resources, the defendants directly or vicariously breached express and implied contractual duties to the Newells.

132.

The defendants directly or vicariously breached the Loan Agreement in the ways discussed in the following ¶¶ 133–143.

133.

The Newells gave prompt notice of the Fire Loss to their insurance carrier and to Truliant, and otherwise complied with their obligations under the Security Deed.

134.

The Newells were willing and able to continue making their installment payments on the Loan.

135.

Restoration of the Newells' home was economically feasible.

136.

Freddie Mac's security was not impaired by the fire.

137.

The defendants were not authorized to unilaterally cut off the Newells'
right to use the Insurance Proceeds.

138.

The defendants breached their contractual duty under Section 5 of the
Security Deed to apply the Newells' Insurance Proceeds "to restoration or
repair of the [Newells' Home]" because neither of the two conditions set
forth in Section 5 of the Security Deed — i.e., restoration being economically
infeasible or the security being impaired — were met.

*Breach of covenant of good faith by
refusing to timely disburse insurance funds*

139.

In Georgia, the covenant of good faith applies where "the manner of
performance [ of a contractual provision] is left more or less to the discretion

of one of the parties to the contract," in which case that party "is bound to the exercise of good faith."[16]

140.

The implied covenant of good faith and fair dealing does not authorize a party to exercise their discretion in an arbitrary fashion.[17]

141.

Even though the defendants are authorized by contract to exercise certain discretion in the servicing of the Loan, the parties never stipulated that such discretion was "absolute or uncontrolled."

142.

The primary purpose of the Loan Agreement was to provide the Newells with the benefit of a long-term mortgage loan which would permit them to spread the payment of the purchase price of their Home over a long period of

---

[16] See *Knaack v. Henley Park Homeowners Ass'n*, 365 Ga. App. 375, 384–85, (2022) (citing *Hunting Aircraft, Inc. v. Peachtree City Airport Auth*., 281 Ga. App. 450, 451–52 (2006)).

[17] But *cf. Hunting Aircraft v. Peachtree City Airport Auth*., 281 Ga.App. 450, 453 (2006) (holding that where "an agreement *by its express terms* grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision," and there can be no breach of the agreement predicated on the decision).

time while the defendants would have the security provided by the Security Deed.

143.

By forcing the Newells to pay off the Loan in advance without first determining whether "restoration or repair is economically feasible" the defendants abused their discretion, frustrated the primary purpose of the Loan Agreement, and breached their duty of good faith performance.

144.

The Newells are entitled to recover actual and general damages from the defendants for breach of their contract with the defendants in an amount to be proven at trial.

## SECOND CLAIM
### (Negligence)

145.

The allegations in ¶¶ 14–144 are incorporated herein.

146.

At all times relevant to this Complaint, the defendants owed a general duty of care to the Newells to not subject them to an unreasonable risk of harm (the

"Duty of Care").[18]

147.

By exercising exclusive control over the Insurance Proceeds, Truliant was no longer performing the routine, ministerial duties of a mortgage loan servicer.

148.

By taking control of the Insurance Proceeds, Truliant undertook a legal duty of care with regard to the Newells to apply the funds in a manner that would not subject the Newells to an unreasonable risk of harm.

149.

Truliant's Duty of Care also included satisfying the duties imposed by the stipulations in Section 5 of the Security Deed to determine whether "restoration or repair is economically feasible," or whether Freddie Mac's "security is not lessened."

---

[18] See *Weller v. Blake*, 315 Ga. App. 214, 219 (2012) (holding that there is a "general duty one owes to all the world not to subject them to an unreasonable risk of harm") (quoting *Gutierrez v. Hilti, Inc.*, 349 Ga. App. 752, 754 (2019)).

150.

Under the plain language of Section 5 of the Security Deed — "if the restoration or repair is economically feasible" — and in light of the purpose of the Loan Agreement, Truliant was required to consider the economic factors affecting *all parties* to the Loan Agreement in determining economic feasibility.

151.

Truliant had no right to make decision about allocation of the insurance funds in an arbitrary manner.

152.

Truliant's Duty of Care also included honoring the stipulations in Section 5 of the Security Deed that it undertake prompt inspections.

153.

Truliant's Duty of Care also included honoring the standards established under Freddie Mac's, servicing guidelines, including those identified at ¶¶ 64–66, *supra* (the "Guidelines").

154.

Truliant, as the servicer of a federally related mortgage loan, also owed a

general Duty of Care to the customers whose loans it services under the Real

Estate Settlement Procedures Act ("RESPA"), and specifically out of

implementing Regulation X, 12 C.F.R. § 1024 *et seq*.[19]

155.

The purpose of Regulation X is, in part, to establish servicer's duties with

regards to federally related mortgage loans.

156.

The Newells, as borrowers of a federally-related residential mortgage, are

within the class of persons that RESPA and Regulation X were intended to

protect.

157.

The defendants violated their own guidelines, and thus their Duty of Care,

by failing to "monitor and coordinate the [insurance] claim process" with the

Newells and their insurer."[20]

---

[19] See, e.g., Preamble to Regulation X, 48-49 (78 FR 10695, Feb. 14, 2013) available at https://tinyurl.com/yckky3xy (last viewed Mar. 2, 2023).

[20] Guideline Section 8202.11.

158.

The defendants violated their own guidelines, and thus their Duty of Care, by failing to "take appropriate action to… verify the extent of" the Newells' "loss or damage."[21]

159.

The defendants violated their own guidelines, and thus their Duty of Care, by failing to "[e]nsure judicious disbursement of insurance proceeds for the necessary repairs."[22]

160.

Given that the Newells were current on their loan, the defendants violated their own guidelines, and thus their Duty of Care, by failing to release the Newells' "insurance proceeds up to the greater of a) $40,000 b) 10% of [the Unpaid Principal Balance or "UPB"] or c) The amount by which the release funds exceed the sum of the UPB, accrued interest and advances on the Mortgage."[23]

---

[21] Guideline Section 8202.11 pp. 8202-21.

[22] *Id*.

[23] *Id*. at 8222–23.

161.

By applying the Insurance Proceeds to satisfying the Loan and not towards rebuilding the Newells' home it was reasonably foreseeable that the Newells would suffer a financial detriment and experience a personal hardship that any person in a comparable situation would experience.

162.

The defendants' application of the Insurance Proceeds to the satisfaction of the Loan proximately caused the Newells' predictable injuries and damages.

163.

The defendants knew or should have known that the foregoing actions, or failures to act, would cause the Newells harm.

164.

By applying the Insurance Proceeds to the satisfaction of the Loan the defendants failed to exercise reasonable competence.

165.

For the reasons discussed above, the defendants breached their Duty of Care to the Newells and were negligent.

166.

The defendant's negligence proximately caused the Newells to sustain

actual damages including but not limited to financial loss, anxiety, and mental

distress.

167.

As a direct and foreseeable result of the defendants' negligence, the

Newells suffered damages, including but not limited to the imposition of

additional costs and fees, and emotional distress.

168.

The Newells are entitled to recover actual and general damages from The

defendants in an amount to be proven at trial.

### THIRD CLAIM
### (Breach of Fiduciary Duty)

169.

The allegations in ¶¶ 14 – 168 are incorporated herein.

170.

By entering into the Loan Agreement, the Newells entrusted Truliant, and

by extension its principal Freddie Mac, with significant financial

responsibility and authority.

171.

As of December 2020, and as an entity in exclusive control of the Insurance Proceeds, Truliant, and by extension its principal Freddie Mac, was no longer acting in a conventional or ministerial role as the servicer of a mortgage loan.

172.

Truliant and Freddie Mac were acting as agents for the Newells with respect to the Newells' insurance claim.

173.

Truliant and Freddie Mac were also effectively acting as a trustee — for the benefit of the Newells — over a constructive trust consisting of the Insurance proceeds.

174.

The Newells had financial dependence on Truliant and Freddie Mac due to the defendants' control over their insurance disbursements.

175.

By holding the Newells' Insurance Proceeds, the defendants were situated

as to exercise a controlling  influence over the will, conduct, and interest of the Newells.

176.

The Newells were in a relationship with the defendants that was "marked by [a] great disparity of position and influence between" them.[24]

177.

The defendants stood in a confidential relationship with the Newells and thus owed the Newells a higher, fiduciary duty of the utmost good faith and loyalty.

178.

The defendants, as fiduciaries of the Newells, had the obligation to exercise for and on behalf of the Newells, skill, loyalty, and absolute good faith.

179.

The defendants were required to use their best skill and judgment to promote the interest of the Newells.

_____

[24] See *Doe v. Saint Joseph's Catholic Church*, 313 Ga. 558, 563–64 (2022) (holding that "a relationship marked by [a] great disparity of position and influence between the parties" can amount to a fiduciary relationship).

180.

However, the defendants elevated their interests over those of the Newells and thereby damaged the Newells.

181.

The defendants acquired an interest in the insurance proceeds that was adverse to the interest of *their* principals, the Newells.

182.

The defendants therefore breached the fiduciary duty they owed the Newells.

183.

As a direct and foreseeable result of the defendants' breach of their fiduciary duty, the Newells suffered damages, including but not limited to the imposition of additional costs and fees, and emotional distress.

184.

The Newells are entitled to recover actual, general, and punitive damages from the defendants, for breach of fiduciary duty in an amount to be proven at trial.

## FOURTH CLAIM
## (Punitive Damages)

185.

The allegations in ¶¶ 14 – 184 are incorporated herein.

186.

The defendants' conduct as described in this Complaint was undertaken with conscious indifference to the consequences of the Newells' rights and well being.

187.

Pursuant to O.C.G.A. § 51-12-5.1, the Newells are entitled to recover punitive damages from the defendants to deter the repetition of similar conduct in the future.

188.

Pursuant to O.C.G.A. § 51-12-5.1 and other applicable law, the Newells are entitled to recover from the defendants punitive damages in an amount sufficient to deter similar future conduct, and in an amount to be determined at trial by the enlightened conscience of an impartial jury.

**FIFTH CLAIM**
**(Prejudgment Interest)**

189.

The allegations in ¶¶ 14 – 144 are incorporated herein.

190.

To the extent that any recovery under a theory of breach of contract is sustained by the court or the finder of fact, and that it is determined that an amount ascertained represents the damages at the time of the breach of contract by any defendant, the Newells are entitled to the addition of legal interest from that time of the breach until recovery in accordance with O.C.G.A. § 13-6-13 and other applicable law.

**SIXTH CLAIM**
**(Nominal Damages)**

191.

The allegations in ¶¶ 14 – 184 are incorporated herein.

192.

"The law infers some damage from the invasion of a property right and if no evidence is given of any particular amount of loss, declares the right by

awarding what it terms nominal damages."[25]

193.

With respect to the Newells' claims for Breach of Contract, Negligence, and Breach of Fiduciary Duty, if they are able only to prove a less than substantial measure of actual damages, or their damages are not susceptible of reasonable certainty of proof as to their extent, the Newells are entitled to recover nominal damages in vindication of their having brought this action "upon a good cause."

### SEVENTH CLAIM
### (Expenses of Litigation
### Under O.C.G.A. § 13-6-11)

194.

The allegations in ¶¶ 14 – 184 are incorporated herein.

195.

The Newells have incurred and will continue to incur attorney's fees and other expenses of litigation to prosecute the state-law claims asserted in this action.

---

[25] See *Dierkes v. Crawford Orthodontic Care, P.C.*, 284 Ga. App. 96, 100 (2007) (quoting *Callahan v. Panfel*, 195 Ga. App. 891, 893 (1990)).

196.

The defendants' conduct giving rise to this Complaint was undertaken in bad faith.

197.

The defendants' conduct giving rise to this Complaint has caused the Newells unnecessary trouble and expense.

198.

The defendants have been stubbornly litigious.

199.

The defendants' actions have no legal justification.

200.

The Newells are entitled to recover all costs of the prosecution of this action, including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11.

**EIGHTH CLAIM**
**(Mis-allocation of payments**
**Under 12 U.S.C. § 2605(k)(1)(C))**

201.

The allegations in ¶¶ 14–184 are incorporated herein.

202.

As the "servicer" of a "federally-related mortgage loan" (¶ 35, *supra*)
Truliant owed a duty to the Newells to "take timely action to respond to" the
Newells' "requests to correct errors relating to allocation of payments, … or
other standard servicer's duties," under 12 U.S.C. § 2605(k)(1)(C).

203.

By failing to satisfy the Newells' contractor's $10,000 invoice upon
demand, or to reimburse the Newells for having paid it, the Newells were
damaged, and Truliant breached the duty imposed on it by 12 U.S.C. §
2605(k)(1)(C).

204.

In addition, by applying the Newells' insurance proceeds towards
satisfying the Loan, the Newells were damaged, and Truliant breached the
duty imposed on it under 12 U.S.C. § 2605(k)(1)(C).

205.

As a result of Truliant's failure to comply with 12 U.S.C. § 2605 the
Newells are entitled to recover their actual damages from Truliant, all costs of
the action, and attorney's fees as this Court "may determine to be reasonable

under the circumstances."

## VII. DEMAND FOR JUDGMENT

WHEREFORE, Valerie and James Newell  request judgment from this

Court according to the relief sought, including:

(a)      On the First Claim for Breach of Contract: a judgment, joint and
several, against Freddie Mac and Truliant for actual and
consequential damages for breach of contract in an amount to be
proven at trial;

(b)      On the Second Claim for Negligence: a judgment, joint and several,
against Freddie Mac and Truliant for actual and general damages in
an amount to be proven at trial;

(c)      On the Third Claim for Breach of Fiduciary Duty: a judgment, joint
and several, against Freddie Mac and Truliant for actual, general,
and punitive damages for breach of fiduciary duty in an amount to
be proven at trial;

(d)      On the Fourth Claim for Expenses of Litigation Under
O.C.G.A. § 13-6-11: a judgment, joint and several, against Freddie
Mac and Truliant for the Newells' expenses of litigation in an
amount to be proven at trial;

(e)      On the Fifth Claim for Punitive Damages:  a judgment, joint and
several, against Freddie Mac and Truliant in an amount sufficient to
deter similar future conduct, and in an amount to be determined at
trial by the enlightened conscience of an impartial jury;

(f)      On the Sixth Claim for Prejudgment Interest: a judgment, joint and
several, against Freddie Mac and Truliant for the Newells'
Prejudgment Interest from that time of the breach until recovery in
accordance with O.C.G.A. § 13-6-13;

(g)     <u>On the Seventh Claim for Nominal Damages</u>: a judgment, joint and several, against Freddie Mac and Truliant for nominal damages in vindication of their having brought this action upon a good cause;

(h)     <u>On the Eighth Claim for Servicing Errors under 12 U.S.C. § 2605(k)(1)(C)</u>: a judgment against Truliant for the Newells' actual damages, all costs of the action, and attorney's fees as this Court "may determine to be reasonable under the circumstances";

(i)     For all costs of the prosecution of this matter;

(j)     For **TRIAL BY JURY** on all issues so triable; and,

(k)     For such other and further relief as the Court may deem equitable and just in the premises.

Respectfully submitted this ___9th___ day of __March__, 2023.

315 W. Ponce de Leon Ave.               RICHARD S. ALEMBIK, PC
Ste. 250
Decatur, GA 30030-5100                  By:/s/ Richard S. Alembik
(404) 373-0205                             Richard S. Alembik
(404)795-8999 FAX                          Georgia State Bar No. 008770
general_mailbox@alembik.com                Attorney for Plaintiffs

# NOTE

*Freddie # 630 552479*

Loan Number: ⬛⬛⬛⬛619

MIN: 100282250100626199

NOVEMBER 27, 2018
[Date]

WINSTON-SALEM
[City]

NORTH CAROLINA
[State]

121 Ashemoor Ct, MCDONOUGH, GEORGIA 30253

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 136,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is TRULIANT FEDERAL CREDIT UNION, A FEDERAL CREDIT UNION

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of      5.875      %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st   day of each month beginning on FEBRUARY 1 2019     .  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on JANUARY 1, 2049     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PO BOX 26000, WINSTON-SALEM, NORTH CAROLINA 27114

or at a different place if required by the Note Holder.

### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 804.49

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE–Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01

Page 1 of 3

DocMagic *eForms*
www.docmagic.com



**Attachment "A" -- Page 1 of 3**

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)   Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)   Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)   Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)   No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)   Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10.   UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

**Attachment "A" -- Page 2 of 3**

the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
James A Newell                                    -Borrower

PAY TO THE ORDER OF _____
WITHOUT RECOURSE

Truliant Federal Credit Union

_____
Cindy Pearson, Operations Manager
Mortgage Lending

Loan Originator: Janna Burton, NMLSR ID 1614421
Loan Originator Organization: Truliant Federal Credit Union,
NMLSR ID 411251

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01

Page 3 of 3

*DocMagic eForms*
*www.docmagic.com*

**Attachment "A" -- Page 3 of 3**

Smith, Welch, Webb White LLC
Attorney at Law
P.O. Box 10
McDonough, GA 30253

BK: 16195 PG: 93-110
Filed and Recorded
Dec-06-2018 10:21:43AM
DOC#: D2018-032630
BARBARA A. HARRISON
CLERK OF SUPERIOR COURT Henry County GA.

After Recording Return To:
TRULIANT FEDERAL CREDIT UNION
PO BOX 25508
WINSTON-SALEM, NORTH CAROLINA 27114
Loan Number: 5010062619

RECEIVED IN OFFICE
HENRY COUNTY
CLERK OF SUPERIOR COURT
2018 DEC -4 AM 10:

702018. 0599

[Space Above This Line For Recording Data]

# SECURITY DEED

**MIN:** 100282250100626199                                    **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**   **"Security Instrument"** means this document, which is dated    NOVEMBER 27, 2018            , together with all Riders to this document.
**(B)**   **"Borrower"** is   James A Newell a married man, and Valerie D Newell a married woman

Borrower is the grantor under this Security Instrument.
**(C)**   **"MERS"** is  Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.
**(D)**   **"Lender"** is   TRULIANT FEDERAL CREDIT UNION

Lender is a   FEDERAL CREDIT UNION                                          organized
and existing under the laws of NORTH CAROLINA                                    .
Lender's address is      PO BOX 25508, WINSTON-SALEM, NORTH CAROLINA 27114

**(E)**   **"Note"** means the promissory note signed by Borrower and dated      NOVEMBER 27, 2018       .
The Note states that Borrower owes Lender   ONE HUNDRED THIRTY-SIX THOUSAND AND 00/100
                                    Dollars (U.S. $ 136,000.00               ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
JANUARY 1, 2049                  .

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011 1/01

Page 1 of 13

*DocMagic eForms*
*www.docmagic.com*

**Attachment "B" -- Page 1 of 14**

BK: 16195 PG: 94

(F)  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(G)  **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H)  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify] Acknowledgment Waiver Rider |

(I)  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K)  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L)  **"Escrow Items"** means those items that are described in Section 3.
(M)  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N)  **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O)  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P)  **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q)  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the         COUNTY       of        Henry      :
               [Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]

**Attachment "B" -- Page 2 of 14**

BK: 16195 PG: 95

SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.
A.P.N.: 071B03006000

which currently has the address of                    121 Ashemoor Ct
                                                      [Street]

        MCDONOUGH                    , Georgia        30253        ("Property Address"):
        [City]                                        [Zip Code]

    TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    **UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

    1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01                                                          *DocMagic eForms*
                            Page 3 of 13                                 *www.docmagic.com*

**Attachment "B" -- Page 3 of 14**

BK: 16195 PG: 96

time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds,

---

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01

*DocMagic eForms*
*www.docmagic.com*

**Attachment "B" -- Page 4 of 14**

BK: 16195 PG: 97

Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires,

**Attachment "B" -- Page 5 of 14**

BK: 16195 PG: 98

Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**Attachment "B" -- Page 6 of 14**

BK: 16195 PG: 99

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

---

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01

Page 7 of 13

*DocMagic EForms*
*www.docmagic.com*

**Attachment "B" -- Page 7 of 14**

BK: 16195 PG: 100

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

---

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01

*DocMagic* *eFrms*
*www.docmagic.com*

Page 8 of 13

**Attachment "B" -- Page 8 of 14**

BK: 16195 PG: 101

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

BK: 16195 PG: 102

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

**Attachment "B" -- Page 10 of 14**

BK: 16195 PG: 103

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate

---

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01

*DocMagic eForms*
*www.docmagic.com*

https://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=72826774&key1=16195&key2=93&county=75&countyname=HENRY&userid=1150&appid...   11/14

BK: 16195 PG: 104

payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

25. **Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. **Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

BK: 16195 PG: 105

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____ (Seal)
James A Newell                  -Borrower

_____ (Seal)
Valerie D Newell                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

Notary Public, _Henry_____ County

*(Notary seal: BIANCA DAVIS, NOTARY, My Comm. Expires: November 13, 2022, HENRY COUNTY, GEORGIA, PUBLIC)*

Loan Originator: Janna Burton, NMLSR ID 1614421
Loan Originator Organization: Truliant Federal Credit Union, NMLSR ID 411251

GEORGIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3011  1/01
                          Page 13 of 13

DocMagic *eForms*
www.docmagic.com

BK: 16195 PG: 106

**EXHIBIT "A"**

All that tract or parcel of land, with house and all other improvements located thereon, lying and being in Land Lot 63 of the 7th District of Henry County, Georgia, being Lot 3 of Ashemoor Subdivision, as shown on a plat of survey prepared by Stanton Surveying Company, dated April 21, 1987, updated June 1, 1987 and October 5, 1987, recorded in Plat Book 15, Page 113, Henry County Records. The description of said property as contained on said plat of survey is hereby incorporated herein and by reference made a part hereof.

Legal Description

702018.0599/40

**Attachment "B" -- Page 14 of 14**