**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Anthony Russell, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Mercedes-Benz Group AG;<br>Mercedes-Benz USA, LLC,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony Russell, individually and on behalf of the other members of the below-defined Pennsylvania and nationwide classes (collectively, the "Class"), hereby alleges against Defendants Mercedes-Benz USA, LLC and Mercedes-Benz Group AG (collectively "Mercedes-Benz" or "Defendants"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    INTRODUCTION

1.    Plaintiff Anthony Russell brings this action on behalf of all persons who purchased or leased certain Mercedes-Benz vehicles equipped with uniform and

uniformly defective rear subframes which were designed, manufactured, distributed, warranted, marketed, and sold by Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG ("MBG").

2.     Mercedes-Benz installed the defective subframes in many of its vehicles, including but not limited to the following:

a.     2010-2022 Mercedes-Benz C-Class,

b.     2010-2022 Mercedes-Benz E-Class,

c.     2010-2015 Mercedes-Benz GLK-Class,

d.     2010-2022 Mercedes-Benz CLS-Class,

e.     2010-2020 Mercedes-Benz SLK/SLC-Class,

f.     2016-2022 Mercedes-Benz GLC-Class, and

g.     2010-2022 Mercedes-Benz SL-Class (together, the "Class Vehicles").

3.     The Class Vehicles' rear subframes presents a dangerous safety defect (the "Rear Subframe Defect") that causes the rear subframes, attached components, and nearby parts to prematurely rust or corrode. This defect (a) adversely affects the drivability of the Class Vehicles; (b) causes corrosion of other components on the underside of the Class Vehicles, including the brake lines, suspension springs, exhaust system, gas lines, and rear axle; and (c) can cause the rear subframes to fail

while the Class Vehicles are in motion, resulting in a sudden, unexpected loss of control for the driver.

4.     Upon information and belief, the subframes in all Class Vehicles are substantially the same from a mechanical engineering standpoint.   The rear subframes in all Class Vehicles have a substantially similar design or manufacturing defect that causes water and salt to collect on the interior of the subframe, corroding it from the inside out, and/or all the rear subframes in all the Class Vehicles have been treated with an inadequate type or amount of rust coating.

5.     The flawed design or manufacturing of the rear subframes can cause the Class Vehicles to prematurely experience severe corrosion, especially near the attachment points for the suspension components, including the control arms.

6.     "Control arms" is a general term that refers to the components connecting the rear subframe to other parts of the suspension and steering system, including the rear wheels.   The control arms and the subframe are the main stabilizing forces of a vehicle's suspension and are essential to the Class Vehicles handling and drivability.

7.     Corrosion on the rear subframe makes the component and its attached suspension parts structurally unstable and prone to failure.   When the rear subframe of a Class Vehicle fails, the rear suspension of the vehicle becomes destabilized.   A

corroded rear subframe is especially likely to break or crack when the driver hits a pothole or when road conditions force the driver to brake suddenly.

8.    When a rear subframe fails while a Class Vehicle is in motion, it can cause: (a) the rear of the vehicle to fishtail, especially while braking; (b) the vehicle to suddenly veer to one side, potentially into a parallel lane of traffic; and/or (c) complete or partial loss of control for the driver.   Additionally, when the rear subframe fails at its connection to one of the control arms, the control arm can detach and cause serious, hazardous damage to nearby components, including the gas tank, torsion bar (also called the "stabilizer bar"), and wheels.

9.    Owners and Lessees of Class Vehicles can also experience corrosion of the rear suspension springs, rear brake lines, exhaust system, gas lines, and/or rear axle, all of which are located near the rear subframe in the back of the vehicle.  This corrosion can cause serious mechanical issues, which include for example, leaking in the rear brake lines, which can compromise the efficacy of a Class Vehicle's brakes.

10.    The defective subframes in the Class Vehicles pose a material safety risk, and therefore render the vehicles unfit for their intended purpose.  Because of this risk, Mercedes-Benz authorized dealers and independent mechanics often advise Class Vehicle owners with rear subframe corrosion not to drive their Class Vehicles,

especially at high speeds.  Many Class Vehicle owners are then left with vehicles that are too dangerous to drive, especially at typical highway speeds.

11.    Upon information and belief, subframe corrosion in the Class Vehicles happens "from the inside out," making it very difficult for even a professional mechanic, much less a layperson, to diagnose the issue during a routine inspection. This means the subframe can be severely corroded and near the point of failure before the issue is discovered.  Underbody shields also block portions of the subframe from view and therefore create another barrier to corrosion detection.

12.    Mercedes-Benz has been aware, or should have been aware, of the risk of excessive rear subframe corrosion on the Class Vehicles since at least 2009. This is based on the standard pre-sale design and testing information collected by reasonably prudent vehicle manufacturers.

13.    Furthermore, Mercedes-Benz has been aware of the Rear Subframe Defect for at least five years based on consumer complaints alone.  There have been dozens of complaints to the National Highway Transportation Safety Administration ("NHTSA") alone regarding the rear subframe corrosion in Class Vehicles.  The earliest available complaint was published on January 23, 2018.

14.    In the past, when customers who experienced the Rear Subframe Defect contacted Mercedes-Benz, it renounced all knowledge of the problem and refused to

fully reimburse owners for the repairs and subframe replacement. The repairs typically cost between $2,500 to over $7,000, depending on the severity of the corrosion.

15.    As a result of the Defendants' alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, as the Class Vehicles have manifested, and continue to manifest, the Rear Subframe Defect and are rendered unsafe to drive.

16.    Despite having knowledge of the Rear Subframe Defect since at least 2009, Mercedes-Benz has not admitted to the Rear Subframe Defect.  Mercedes failed to send notice to Class Vehicle owners regarding the possibility of rear subframe corrosion.

17.     Mercedes Benz's notice of the defect, in the form of a warranty extension covering certain Class Vehicles (the "Extended Warranty"), is not adequate to warn Class Members of the serious safety risks posed by rear subframe corrosion, including the partial loss of control while driving, nor does it give them notice of the need to have their vehicles inspected, or provide funding to do so.

18.    Moreover, the Extended Warranty is insufficient to remedy Plaintiff's and Class Members' economic damages, including for loss of resale value of the Class Vehicle, repair and/or replacement of adjacent vehicle parts damaged by the

Rear Subframe Defect, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Rear Subframe Defect (*i.e.*, towing costs, rental car fees, etc.).

19. Plaintiff and Class Members have suffered actual damages, in that they (a) were deprived of the benefit of their bargain at point-of-sale by paying for a vehicle without a Subframe Defect and receiving a defective vehicle; and/or (b) incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Subframe Defect; and/or (c) were or will be forced to stop or limit using their vehicles prematurely or sell them at sharp discounts. Mercedes-Benz's recently-announced Extended Warranty does not adequately reimburse Plaintiff and Class Members for their economic damages.

20. On behalf of himself and all others similarly situated, Plaintiff seeks: (a) actual damages, (b) statutory damages, (c) exemplary and/or punitive damages, (d) declaratory relief, (e) injunctive relief, (f) pre-and post-judgment interest, and (g) attorneys' fees and costs.

## II. PARTIES

### A. Plaintiff

21. Plaintiff Anthony Russell resides in Philadelphia, Pennsylvania.

22.     Mr. Russell owns a 2013 Mercedes Benz C300 4Matic, which he leased in 2012 from Mercedes-Benz of West Chester, a Mercedes-Benz dealership in West Chester, Pennsylvania.   Mr. Russell later purchased his vehicle in 2015 from Mercedes-Benz of Fort Washington, a Mercedes-Benz dealership in Fort Washington, Pennsylvania.

23.     Mr. Russell's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the VIN WDDGF8AB2DR245949.

24.     Mr. Russell purchased the Class Vehicle for his personal, family, and household use.

25.     Mr. Russell expected his Class Vehicle to be of good and merchantable quality and not defective.   He had no reason to know, or expect, that the subframe of the Class Vehicle would prematurely corrode, making the vehicle dangerous to operate.   Nor was Mr. Russell aware from any source prior to his purchase of the Class Vehicle of the immense expense he would incur should he choose to replace the defective subframe.

26.     Prior to purchasing his Class Vehicle, Mr. Russell saw advertisements for the vehicle that promoted its reliability and durability. Mercedes-Benz did not disclose the Rear Subframe Defect through any of these avenues.

27.    Since purchasing the Class Vehicle, Mr. Russell has brought his vehicle to be serviced and inspected at least as often as recommended by Mercedes-Benz at his local dealership, Mercedes-Benz of Fort Washington.

28.    Mr. Russell has stored his Class Vehicle primarily in an indoor garage when not in use.

29.    Mr. Russell purchased his Class Vehicle expecting it to be durable and long-lasting.  Had Mercedes-Benz disclosed the Rear Subframe Defect, Mr. Russell would not have purchased his Class Vehicle, or certainly would have paid less for it.

30.    Mr. Russell first became aware of the Rear Subframe Defect in mid-November 2022, when the subframe of his Class Vehicle failed as he was driving, causing the vehicle to pull left when he applied the brakes.  At that time, Mr. Russell also began to hear a noise that sounded like his brakes were crunching.

31.    These issues arose only a week after Mr. Russell had his Class Vehicle inspected at a Pep Boys in Philadelphia, Pennsylvania.

32.    Roughly a week after first experiencing the Rear Subframe Defect-related issues with his Class Vehicle, Mr. Russell brought his vehicle to Mercedes-Benz of Fort Washington.  After an inspection, the dealership informed Mr. Russell that his subframe was significantly corroded and starting to crack.  The dealership

quoted him thousands of dollars in repair costs resulting from the Rear Subframe Defect. At the time the mechanic diagnosed the corrosion, the Class Vehicle had 91,322 miles.

33.    Plaintiff, individually and on behalf of the other Class Members notified Mercedes-Benz of the Rear Subframe Defect and its corresponding breach of warranty through a notice letter dated March 8, 2023 and delivered by United States Certified Mail to Mercedes-Benz's headquarters in Sandy Springs, Georgia. Mercedes-Benz was also provided notice of the Subframe Defect through numerous complaints made against it directly and through its dealers as well as its own internal engineering knowledge.

### B.    Defendants

#### 1.    Defendant Mercedes-Benz Group AG

34.    Defendant Mercedes-Benz Group AG is a German corporation with its principal place of business in Stuttgart, Germany.

35.    Prior to February 1, 2022, MBG was named Daimler AG.

36.    At all times relevant herein, MBG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

37.    Upon information and belief, MBG was principally responsible for designing the Class Vehicles, including the defective rear subframes.

38.     Upon information and belief, MBG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Rear Subframe Defect.  MBG has been directly involved in assisting, directing, and controlling MBUSA, and MBUSA's authorized dealers' handling of Class Member complaints regarding the rear subframe defect.

39.     MBG has held MBUSA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles.  It established MBUSA as its wholly-owned subsidiary company.  It named MBUSA with its official "Mercedes-Benz" title.  It provided MBUSA with marketing and technical materials avoiding any distinction between MBUSA and MBG, and instead representing MBUSA as nothing less than MBG's presence in the United States for purposes of selling and leasing "Mercedes-Benz" brand vehicles and providing related services.

40.    Based on the foregoing actions, Plaintiff and Class Members justifiably relied on MBUSA's representations and omissions regarding the Class Vehicles that were the responsibility of MBG in, for example, MBG's design of the Class Vehicles, and were injured because of their purchase of defective Class Vehicles.

### 2.    Defendant Mercedes-Benz USA, LLC

41.    Defendant Mercedes-Benz USA, LLC is a Delaware corporation with its principal place of business in Sandy Springs, Georgia.

42.    Prior to July 2015, MBUSA's principal place of business was in Montvale, New Jersey.

43.    MBUSA is a wholly owned subsidiary of MBG.

44.    At all times relevant herein, MBUSA has been and has acted as an agent of MBG and subject to MBG's control.

45.    At all times relevant herein, MBUSA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## III.   JURISDICTION

### A.   Subject Matter Jurisdiction

46.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: the amount in controversy exceeds $5,000,000, and Defendant MBG is a citizen of a foreign country and is thus diverse from all Plaintiff and Class Members.  In addition, Defendant MBUSA is a citizen of Georgia, and is therefore diverse from Plaintiff. 28 U.S.C. § 1332(d)(2)(A).

### B.   Personal Jurisdiction: MBG

47.    This Court has personal jurisdiction over MBG because MBG has sufficient contacts in this District that relate to the causes of action pleaded against MBG.

48.    By headquartering its wholly owned subsidiary MBUSA in this District, and using MBUSA as its channel for marketing, distributing, warranting, selling and leasing the MBG-designed Class Vehicles in the District and the United States, MBG itself has continuously and deliberately taken affirmative steps to make MBG-designed vehicles and replacement parts available to consumers in the District and the rest of Georgia, including Plaintiff and Class Members; created continuing

obligations between MBG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

49.    On information and belief, MBG employees and representatives regularly visit MBUSA, thereby continuously conducting business in this District.

50.    Further, MBG's wholly owned subsidiary MBUSA is at home in this District, and MBUSA's contacts in this District can be attributed to MBG.

51.    Plaintiff's claims here arise out of MBG's contacts with this District, particularly in that Plaintiff and the Class could not even have purchased their Class Vehicles if not for MBG's intentional acts of designing the Class Vehicles (including their defective rear subframes) and exporting them for sale to customers in this District and the United States as a whole, including Plaintiff and Class Members.

52.    The facts averred in the preceding paragraphs demonstrate a strong relationship between MBG and this District, and create a sufficient basis to render the exercise of jurisdiction over MBG by this Court permissible under traditional notions of fair play and substantial justice.

**C.    Personal Jurisdiction: MBUSA**

53.    This Court has personal jurisdiction over MBUSA because MBUSA is authorized to do business in this District, conducts substantial business in the

District, has its principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District.

54.     Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over MBUSA permissible under traditional notions of fair play and substantial justice.

## IV.   VENUE

55.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

56.     Additionally, Defendants have marketed, advertised, sold, and leased Class Vehicles within this District, transact business within the District, MBUSA has its principal place of business in this District, and some of the events establishing the claims occurred in this District.

## V.   APPLICABLE LAW

57.     Plaintiff seeks damages and equitable relief on behalf of himself and the Class Members as a nationwide class under Georgia law.  Georgia law should govern the claims of the nationwide class because Mercedes-Benz's acts, practices, and omissions regarding the Rear Subframe Defect were directed and emanated from MBUSA's headquarters in Georgia since its relocation to the state in July of 2015.

Moreover, Georgia has a significant interest in regulating the conduct of a corporation whose principal place of business within the United States is in Georgia.

58.     In the alternative, New Jersey law should govern the nationwide class, because New Jersey has a significant relationship to both the misconduct at issue here and the parties to this litigation, as MBUSA was headquartered in New Jersey prior to 2015, Mercedes-Benz made many of the false representations as to the Rear Subframe Defect from MBUSA headquarters in New Jersey, as well as designed, tested, and sold many of the defective Class Vehicles during the time it was headquartered in New Jersey.

59.     In the alternative, Class Members seek damages and equitable relief under each Class Member's respective state's laws, which are substantially similar with respect to these facts and claims, or which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiff's claims.

## VI.   FACTUAL ALLEGATIONS

### A.   Technical Details of the Subframe Defect

#### 1.   Mechanical Purpose of a Vehicle Subframe

60.     Many vehicles, including the Class Vehicles, have a rear subframe that is located on the back undercarriage and spans the width of the car in between the

two rear wheels.  The rear subframe faces the exterior of the vehicle and is partially covered by a splash shield but is otherwise exposed to the elements.

61.     A rear subframe (also called a "suspension cross-member" or "rear axle carrier") is an integral component of a vehicle's structure.  It attaches to the unibody of the vehicle and provides stiff mounting points for suspension and driveline components.  The rear subframe is essential to holding the rear suspension and rear wheels securely to the vehicle.

62.     The wheels of a vehicle encounter significant road forces, which they transfer to the suspension.  The subframe must be stiff and durable because it stabilizes the vehicle's suspension when it encounters these transferred road forces. The rear subframes of many vehicles, including the Class Vehicles, are therefore made out of steel.

63.     The rear subframe is attached to the wheels with control arms, also made out of steel.  These control arms ensure that the wheels and suspension components are adequately attached to the body of the vehicle, so that when the vehicle is in drive and the wheels are propelled forward, the body of the car moves with it in a smooth and stable fashion.

64.     The rear subframe of the Class Vehicles serves as an attachment point for the following control arms on both the left and right sides of the rear subframe:

    a.      The strut rods (alternately called the "rear arm," "rear lateral arm," "upper control arm," "rear upper control arm," "front lateral arm," "suspension control arm," "camber arm," or "camber strut");

    b.      The front lateral arms (alternately called the "front arms," "strut rods," "torque arms," "front upper control arms," "upper control arms," "suspension control arms," or "struts");

    c.      The rear lateral arms (alternately called the "rear lateral arms," "front lateral arms," "radius arms," "rear lower control arms," or "suspension control arms");

    d.      The track bars (alternately called the "lower links," "trailing arms," "ft lower control arms," "trailing arm bushings," "suspension control arms," or "pushing struts"); and

    e.      The lower control arms (alternately called the "spring control arms").

65.    The control arms of the rear subframes on the Class Vehicles are close to several other essential vehicle components, including the rears wheels, gas tank, brake lines, suspension springs, rear axle and exhaust system.

66.    In addition to providing stability to the rear of the vehicle, the rear subframe plays an important role in crash safety, especially in the case of an accident where there is impact on only one side of the vehicle's rear body.  During such a collision, the rear subframe partially absorbs the impact and channels the collision forces to the side of the vehicle not involved in the impact.  The rear subframe

therefore helps to absorb some of the collision forces before they can reach the passenger cabin.

**2.    Formation of Rust and Corrosion in a Vehicle Subframe**

67.    Rust is an iron oxide produced in a process called corrosion. Corrosion occurs when iron or an iron alloy, such as steel, is exposed to oxygen and water. Road salt accelerates rust formation by acting as a catalyst.

68.    Rust can be mild (surface rust) or so extensive that it causes holes to form in the metal (rust-through).  Rust-through compromises the structural integrity of the metal, leading to perforation and breakage in metal vehicle components.

69.    Corrosion in the rear subframes of the Class Vehicles can take many years to develop, and its initial stages begin when the vehicle is first exposed to normal environmental conditions like precipitation, humidity, salt air, road salt, and temperature fluctuations.

70.    Vehicle components, including rear subframes, are typically constructed using high-quality carbon steel. This material is inherently susceptible to rust and corrosion.  Consequently, the steel must be adequately coated with a properly applied anti-corrosion agent in order to withstand normal environmental conditions without experiencing corrosion and perforation.  A properly designed rear

subframe constructed of carbon steel must be coated with anti-corrosion agents sufficient to withstand normal environmental conditions.

71.     Vehicle components made of steel must also be designed with adequate drainage to prevent water from becoming trapped or pooling on or in the component, leading to premature corrosion.  A properly designed rear subframe constructed of carbon steel must have adequate drainage in order to prevent rust and corrosion.

72.     The rear subframes of the Class Vehicles are constructed of carbon steel and are therefore susceptible to corrosion if not properly coated and designed.

### 3.     Mechanical Consequences of Subframe Corrosion

73.     A non-defective rear subframe should last the life of a vehicle without needing replacement.  For instance, in its European markets, every Mercedes-Benz vehicle comes with a 30-year corrosion warranty, which guarantees that if the body of a Mercedes-Benz vehicle "is perforated due to corrosion from the inside out anytime within 30 years, Mercedes-Benz will repair the damage at one of its workshops, at no cost to the owner."  Mercedes-Benz has offered this warranty in Europe for the past 25 years.

74.     The rear subframe is mounted underneath the vehicle, making it difficult to see unless specifically inspected.  Even if inspected, the rear subframe is made of tubular carbon steel and, upon information and belief, rusts from the inside

out. This means a typical visual inspection of exterior rust will not reveal the corrosion until the subframe is close to failure. Therefore, the defect is difficult to see, even in a meticulously maintained vehicle, and even by a trained mechanic. Thus, the Class Vehicles provide little to no warning before becoming dangerously unstable.

75. A common failure point for the rear subframes of Class Vehicles is the mounting point for the control arms or the track bar. These points often experience heavy corrosion, becoming weak and sometimes detaching from the subframe.

76. A failure of the rear subframe where it meets suspension components, such as a control arm or track bar, is dangerous because the attached suspension components hold the drive wheels in place and in proper alignment. When a suspension component becomes detached from the subframe, it can drastically change the geometry of the suspension.

77. A sudden failure of a subframe suspension attachment point is particularly detrimental to drivability because without robust attachment points from the vehicle to the wheel, the wheel moves forward separately from the body of the vehicle.

78. A failure of a suspension attachment point on the subframe is more likely when the vehicle is in motion, because the component is exerting force on the

attachment point.  The higher the acceleration, the higher the force being exerted and, thus, greater likelihood of failure.

79.     If the vehicle is in motion when the subframe fails at the attachment point, the driver's ability to control the vehicle and bring it to a safe stop is compromised.  The steering, braking and acceleration of the vehicle becomes unpredictable.  In particular, vehicles with broken rear subframes tend to fishtail or veer to one side unexpectedly while being driven.

80.     A subframe failure while a Class Vehicle is in motion can also cause the tire adjacent to the detached control arm to jam and burst, making the vehicle suddenly uncontrollable.

81.     Vehicles with subframe corrosion can also experience corrosion of the brake lines.  When a vehicle's brake lines corrode, they may crack and begin to leak brake fluid.  Compromised brake lines can cause the driver to lose total or partial use of their brakes.

82.     Vehicles with subframe corrosion also experience corrosion of the rear suspension springs, a critical component of a vehicle's suspension system.

83.     Additionally, subframe corrosion can impact the exhaust system, gas lines, and/or rear axle, requiring the replacement of these components.

84.    One of the most serious consequences of a compromised subframe is that, in the event of a crash, it is unable to absorb and evenly distribute the force from the impact. When that force is not evenly distributed, it can cause the vehicle to collapse.

85.    A vehicle with a perforated rear subframe cannot be safely driven unless the subframe is replaced. This is a time-intensive process that involves removing the rear suspension, rear drivetrain, and rear wheels from the vehicle, and then assembling it all onto the new subframe.

86.    The cost of a rear subframe replacement, including parts and labor, is in the thousands of dollars, although costs can easily exceed that threshold if the Rear Subframe Defect has caused damage to other parts of the vehicle, such as the rear brake lines, suspension components, exhaust system, rear axle, tires, gas lines, or gas tank.

87.    Plaintiff and Class Members were also injured at point of sale by not receiving the benefit of their bargain, *i.e.* vehicles without a Rear Subframe Defect.

88.    Class Vehicles with corroded rear subframes experience significant diminution in resale value unless the rear subframe is repaired, at the expense of the owner.

89.     No reasonable consumer would purchase a Class Vehicle, if they knew it was likely to become unsafe and/or inoperable due to corrosion of the rear subframe in less than 12 years, even when meticulously maintained.

**B.     Mercedes-Benz's Knowledge of the Subframe Defect**

90.     As early as 2009, Mercedes-Benz was aware of the Rear Subframe Defect, should have been aware of the Rear Subframe Defect through exercise of reasonable care, and/or was negligent in failing to be aware of the Rear Subframe Defect, based on, among others, the following sources:

    a.     Pre-lease design, manufacturing, engineering, and testing data;

    b.     Detailed data gathered by Mercedes-Benz about a large number of Rear Subframe Defect repairs by authorized Mercedes-Benz dealers;

    c.     Consistent consumer complaints collected by NHTSA about the Rear Subframe Defect;

    d.     Service bulletins sent by Mercedes-Benz to its dealerships displaying knowledge of the Rear Subframe Defect in the Class Vehicles;

    e.     Knowledge Mercedes-Benz had of the large number of replacement rear subframes ordered from Mercedes-Benz;

    f.     Consistent consumer complaints made directly to Mercedes-Benz about the Rear Subframe Defect;

    g.     Consistent consumer complaints made in online vehicle owner forums;

h.     Actions taken by MBG in foreign markets to remedy the Rear Subframe Defect; and

i.     Mercedes-Benz service center employees' familiarity with and knowledge of the Rear Subframe Defect.

### 1. Mercedes-Benz's Knowledge of the Rear Subframe Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data

91.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Mercedes-Benz would have gained comprehensive and exclusive knowledge about the Class Vehicle's rear subframes, particularly the basic engineering principles behind the rear subframes' construction and materials, as well as the expected conditions and uses the rear subframes would encounter in ordinary customer use.

92.    An adequate pre-release analysis of the design, engineering, and manufacture of the rear subframes in the Class Vehicles would have revealed to Mercedes-Benz that the rear subframes were defective and would experience severe, premature corrosion when exposed to normal road conditions.

93.    Due to the well-known threat of corrosion to the safety, stability, and longevity of vehicles, manufacturers conduct a wide variety of pre-sale tests to ensure that both component parts, and the vehicle as a whole, are able to stand up to corrosive road conditions.  These tests include:

a.    An initial "weathering test" of the anti-corrosion coatings to be used on the subframe, which involves putting a sample of coated metal into a "weathering chamber" and exposing it to a variety of simulated environmental conditions.  Engineers then assess the impact of those conditions on the integrity of the coatings.  Automakers typically test multiple coatings to determine which is most resistant to corrosion. Mercedes-Benz did perform or should have performed such a test on the Class Vehicles.

b.    A corrosion test of individual vehicle components, during which engineers leave an individual component part in an enclosed booth and cycle through the process of exposing the part to a corrosive agent, typically by spraying the part with the corrosive agent, letting it dry, and then repeating the process several times.  Mercedes-Benz did perform or should have performed such a test on the rear subframes in the Class Vehicles.

c.    A general corrosion test of the entire vehicle under driving conditions, in which engineers drive a vehicle through a corrosive environment (heavy salt, water, etc.) and monitor the vehicle for corrosion during a set time period following exposure.  Mercedes-Benz did perform or should have performed such a test on the Class Vehicles.

d.    A "soap test" in which engineers spray a corrosive agent on the exterior of the vehicle, which has the effect of accelerating corrosion with the goal of simulating the long-term effects of exposure to corrosive agents on the vehicle.  Mercedes-Benz did perform or should have performed such a test on the Class Vehicles.

94.    A reasonably prudent vehicle manufacturer should have conducted the above tests, or a substantially similar battery of tests, to ensure that its vehicles' rear subframes were adequately protected against corrosion.  Plaintiff expects discovery

to reveal whether Mercedes-Benz performed these tests and knew about the Rear Subframe Defect but chose to sell the Class Vehicles in a defective state, or whether it was negligent in failing to perform these tests.

> **2. Mercedes-Benz Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations**

95. In addition to complaints made directly to Mercedes-Benz, many Class Vehicle owners lodged complaints about the Rear Subframe Defect with NHTSA beginning as early as 2018.

96. Federal law requires automakers like Mercedes-Benz to be in close contact with NHTSA regarding potential auto defects, and imposes a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHSTA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

97. Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding automobiles as part of the automakers' on-going obligation to identify potential defects in their vehicles, including safety-related defects, such as the severe, premature corrosion of essential structural components like the rear subframe.  Many of the NHTSA complaints also expressly state that Mercedes-Benz was directly informed of the issue.

98.     From its monitoring of the NHTSA database, Mercedes-Benz knew or should have known of the many complaints about the rear subframe rust, corrosion, and failure logged by NHTSA, and the content, consistency, and large number of those complaints alerted, or should have alerted, Mercedes-Benz to the Rear Subframe Defect.

99.     NHTSA's complaint database is currently publicly available. To the extent that it was not publicly available in previous years, Mercedes-Benz, as a vehicle manufacturer, had contemporaneous and on-going access to the NHTSA consumer complaint data. A sampling of the publicly available complaints lodged with NHTSA to which Plaintiff has been able to gain access includes both the complaint quoted above, as well as the following:

a.      "Right rear trailing arm mount became detached from sub frame. Sheet metal on rear suspension sub frame ripper / tore so that rear trailing arm is only attached to lower part of mount, and not attached to vehicle. No accident, but vehicle is extremely unstable to drive when heavy breaking could occur! Vehicle veers suddenly to the right! Concern besides instability is that loose trailing link could puncture fuel tank less than an inch away. First noticed while driving on I-4 when a vehicle changed into my lane abruptly, and I had to forcefully apply brakes." January 23, 2018, NHTSA database, NHTSA ID No. 11064613.

b.      "My vehicle started to pull left when braking. Had all brakes replaced and pulling conitnued. After further review, found out that the rear cross member / sub-frame was rotted on the driver side. When braking, the rear driver side wheel shifts. You can see the rear caliper move up. The problem is that the subframe is so rotted that it shifts the arms coming

off of it (either trailing or torque arm), causing a dangerous shift in the brake/wheel. Called Mercedes customer support and all they offered was a small discount on the full repair cost, which of course is already overpriced. My vehicle is 8 years old, garage kept, original owners, and only has about 45,000 miles on it. Nothing else on the car is rotted. This is obviously a quality control issue by the manufacturer. Upon further review, this is a common problem for 2008-2015 Mercedes vehicles." August 10, 2020, NHTSA database, NHTSA ID No. 11344308.

c.    "Problem started to become apparent when the car begins to move from a stop. A clunking sound was heard near the rear right wheel of the vehicle. Issue became more prominent on the highway. When braking at speeds over 40mph the rear end would waver and the car would start to fishtail. The problem was determined to be the rear subframe of the vehicle. The subframe was completely rusted where it is connected to a torsion link. Rust was bad enough that the part of the subframe connected to this suspension link failed completely and broke away from the rest of the subframe. This is a 9-year-old car and the problem occurred at 73,000 miles." January 14, 2021, NHTSA database, NHTSA ID No. 11388175.

d.    "Mercedes dealer inspected the car. Found the rear sub-frame severely rusted at welds. He advised this was an unsafe condition and needed to be repaired soon. Service writer said this was an unsafe condition. One of the welds is almost completely failing. There is an actual safety hazard if the subframe fails completely. This condition has been occurring over a period of years. There is no recall on this type of problem. It has been well reported on many internet sites." January 27, 2021, NHTSA database, NHTSA ID No. 11390387.

e.    "I took my car in for its annual service on January 21, 2021, and was told that the rear subframe and brake lines were so badly rusted that the car was unsafe to drive. The entire subframe and rear left and right brake lines had to be replaced at a cost of $5,300 (Mercedes Benz USA gave me a "good will" discount so I paid less than that amount). I am the original owner of this vehicle and I take meticulous care of it. It is

parked in a garage, receives every recommended maintenance check at the same mechanic (euro motorcars bethesda, md) and has low mileage for its age. Only one year and 7,000 miles had elapsed between the car's last service and the discovery of the corrosion. In other words, in just one year the subframe of the car corroded to the extent that it was so unsafe to drive that according to the mechanic I am lucky that I did not get into an accident. I have owned many cars throughout my life for upwards of 10 years and none of them have had rust corrosion issues. I have to believe that there was something defective with the materials Mercedes Benz used on this vehicle's subframe. The NHTSA database shows that another person with the same vehicle (who coincidentally seems to have purchased his car at the same dealership where I purchased mine - euro motorcars bethesda) also filed a complaint for the exact same issue. How many other owners have had this problem but don't know that they can file a safety complaint with the NHTSA?" February 16, 2021, NHTSA database, NHTSA ID No. 11396413.

f.   "1. The (rh) rear suspension forward link attach point on the rear suspension cross-member (Mercedes-Benz p/n: 204-350-01-41), separated from the sub frame due to internal corrosion of the suspension cross-member. Part available for inspection. 2. When part failed, the rh rear wheel alignment was no-longer fixed; some loss of vehicle steering control was experienced, especially during braking and also turning. 3. Numerous reports of similar episodes of this failure are reported in owners' and maintainers' forums. The dealer service department was familiar with this suspension cross-member part failure. 5. This vehicle passed a Maryland state safety inspection performed by the seller of the vehicle 6 months and 5000 mi prior to the part failure. 6. Part failed with no warning, during normal driving on secondary roads." May 24, 2021, NHTSA database, NHTSA ID No. 11418391.

g.   "The rear drivers side had a loud chunking/clanking noise while driving and the vehicle was unable to control and break when in motion. Driving was impossible as the breaking component was a total failure and car could not be controlled while traveling down 45-50mph zone. I reduced my speed to 20-25 mph by letting off on the gas to get better

control of the car if breaking would need to be suddenly made. I relied on the shoulder to pull off if any sudden breaking was needed. The car was immediately take to be reviewed by a specialized Mercedes Benz mechanic and further inspection proved that the rear subframe on the driver's (left) side was corroded and broken. The connecting arms are rusted, corroded and rendered the car inoperative. I notified my insurance company as well as car manufacturers corporate office. I researched this issue further and discovered that this reoccurring issue with this make and model. There are a pheletera of recounting of this same issue on various message boards to validate the same issues and callouts i found. The car was taken to the dealership that it was purchased and further inspection showed that the left side subframe/subframe arms were corroded with rust and broken. The brake lines and fuel tank were equally rusted and corroded. The service manager confirmed that this is defect of the car but it had been part of a recall. I had the car towed for 2nd opinion to another dealership service department to access the car and this callout further validated the corrosion and rust was wide spread and has rendered the car inoperable unless these damages were fixed." October 6, 2021, NHTSA database, NHTSA ID No. 11434828.

h.     "Rusted Rear Subframe presenting a safety hazard. Possible separation of suspension link could lead to loss of control. Brought the 2014 Mercedes Benz E350 (85000 miles) in to the local dealership today for spark plug replacement. Technician performed a visual inspection of the underside of the vehicle and found that the rear subframe had rusted completely through making the care unsafe to drive. Car has been driven in Maryland since new and never exposed to any extraordinary corrosive elements that you might find on roads in colder climates. Car is in otherwise excellent shape with no other visible rust and has never been involved in an accident. The failure of a major suspension component like this on a car in otherwise excellent condition leads me to believe that there is a defect in the manufacturing of the rear subframe component. A quick Google search shows that other Mercedes vehicles suffer from this same problem. NHTSA ID Number: 11456512 also reports the same problem on the same model car. I have not had the problem repaired yet as I am deciding on next steps.

Replacement estimate is approximately $4000. If I have the work done, I will retain the old subframe for inspection by NHTSA."  April 19, 2022, NHTSA database, NHTSA ID No. 11461357.

i.      "The car was brought in for scheduled maintenance and they told me that my rear sub frame rusted out and had snapped. Car is only 7 years old, always garaged, basically a main part rusted out. Mercedes prides itself on durability and safety. There were no warning lights, alarms, nothing. Whenever I braked the rear end of the car would slide to the left and I had to try and adjust accordingly. Prior to bringing the car in for its maintenance I was reluctant to drive it on highways and at higher speeds. Now that I am aware of the problem, had the rear of the car given out while I was on a highway, I had the potential to roll over and possibly blown up had the gas tank been impacted. I researched the issue on Google and found many instances of others having the same issue, with the same part, luckily no one appears to have been killed as yet. As I mentioned this was never picked up during all the scheduled maintenance work, nor state inspections, all handled by this dealership. The dealership is in the process of replacing the part and all work associated with that replacement. I don't know if they kept the part or tossed it out, but will ask. No one else has seen the car or rusted part other than the dealership. I'm also sending you a copy of the letter I sent to the dealership and Mercedes-Benz Home Office."  March 7, 2022, NHTSA database NHTSA ID No. 11456512.

### 3.      Mercedes-Benz Knew of the Rear Subframe Defect as Evidenced by its Own Technical Services Bulletins

100.   On May 11, 2018, Mercedes-Benz sent out a service bulletin to its dealers within the United States, advising service technicians to check the rear subframe of certain model years for corrosion as follows:

"As part of the maintenance procedure, the rear axle carrier is checked for corrosion (sheet metal perforation, hold formation, rust-through damage), in

particular, in the area of the mounting supports for the suspension struts such as the tie rod … and thrust arm[.]"

101.   In Mercedes-Benz nomenclature "rear axle carrier" is another term for the rear subframe.

102.   The service bulletin further specifies that it is intended to augment existing guidance on subframe maintenance and was issued "[d]ue to recent events." The maintenance document does not specify which events Mercedes-Benz was responding to with the bulletin.

103.   The bulletin lists model numbers 171, 172, 203, 204, 205, 207, 209, 212, 218, 231, and 253, which correspond to the following vehicles:

    a.    SLK-Class, model years 2004-2010

    b.    SLK/SLC-Class, model years 2011-2020

    c.    C-Class, model years 2001-2007

    d.    C-Class, model years 2008-2015

    e.    C-Class, model years 2015-2022

    f.    GLK-Class, model years 2010-2015

    g.    E-Class Coupe and Cabriolet, model years 2010-2017

    h.    CLK-Class, model years 2003-2009

    i.    E-Class Sedan and Wagon, model years 2010-2016

j.     CLS-Class, model years 2010-2018

k.     SL-Class, model years 2013-2020

l.     GLC-Class, model years 2016-2022

104.   The service bulletin shows that Mercedes-Benz was aware of the Rear Subframe Defect in many of the Class Vehicles.  Rather than issuing a recall for this dangerous safety defect, Mercedes-Benz instead did the bare minimum by merely notifying its dealers to do a cursory check for subframe corrosion.

**4.    Mercedes-Benz Knew of the Rear Subframe Defect Based on its Receipt of a Large Number of Orders for Replacement Subframes**

105.   Upon information and belief, Mercedes-Benz also knew or should have known about the Rear Subframe Defect because of the excessively large number of replacement rear subframes ordered from Mercedes-Benz, which should have alerted Mercedes-Benz that this was a defect affecting a large number and wide range of its vehicles.

106.   Upon information and belief, Mercedes-Benz service centers use Mercedes-Benz replacement parts that they order directly from Mercedes-Benz. Therefore, Mercedes-Benz would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement rear subframes.  The ongoing high sales of rear subframes was (or should have been)

known to Mercedes-Benz, and alerted Mercedes-Benz that its rear subframes were defective and causing Class Vehicles' rear subframes to develop severe, premature corrosion.

> **5. Mercedes-Benz Was Made Directly Aware of the Rear Subframe Defect Based on a Large Number of Class Member Complaints to Mercedes-Benz**

107.   Mercedes-Benz also knew or should have known about the Rear Subframe Defect because numerous consumers complained directly to Mercedes-Benz about the defect.  The large number of complaints, and the consistency of their descriptions of the Rear Subframe Defect, including the near-uniform corrosion points and incidents of sudden, unexpected loss of control for drivers, should have alerted Mercedes-Benz to this serious safety defect, which impacts a wide range of vehicles.

108.   The full universe of complaints made directly to Mercedes-Benz about the Rear Subframe Defect is information presently in the exclusive custody and control of Mercedes-Benz and is not yet available to Plaintiff prior to discovery. However, on information and belief, many Class Vehicle owners complained directly to Mercedes-Benz and Mercedes-Benz dealerships about the rear subframe failures their vehicles experienced.  For example, some instances of these direct-to-

Mercedes-Benz complaints are described in Class Vehicle owners' complaints logged with NHTSA or posted on online vehicle owner forums:

a. "I have a 2011 C class that I've owned and loved for several years—it was my first car and up until recently I was a huge fan of MB. After hearing clunking noises and experiencing strong leftward pull when braking—so strong that my car nearly swerved off the highway—I took it to my local dealer. They found that the rear subframe had rusted through and snapped, effectively detaching my left rear wheel from the car. It's not exactly an "old" car, has 87k miles on it, and has been diligently dealer-serviced and regularly washed throughout its whole life with no accidents or bodywork. I don't live in the snow belt, but apparently there's a flat spot on the subframe where water + road salt can accumulate, causing rust. … After MBUSA refused to pay for my subframe replacement (quoted at $4,200 by the dealer), I was left with no choice but to engage a plaintiff's attorney and prepare to sue what had previously been my favorite car company 🙁🙁" Posted on Reddit in r/Mercedes_Benz on December 16, 2018.

b. "The contact owns a 2010 Mercedes- Benz E 350. The contact stated that while driving there was an undetermined abnormal noise detected. The vehicle was taken to an independent mechanic where it was informed the sub frame was corroded The independent dealer was contacted. The vehicle was diagnosed or repaired. The manufacturer was notified electronically however no response was provided. The failure mileage was approximately 171,000." September 28, 2021,NHTSA database, NHTSA ID No. 11436456.

c. "The contact's wife owns a 2014 Mercedes-Benz E-350. The contact stated that while driving at various speeds, the rear of the vehicle was swerving. The contact stated while the brake pedal was depressed, the rear of the vehicle shifted. No warning light was illuminated. The vehicle was taken to the dealer where it was diagnosed that the rear subframe was rusted and needed to be replaced. The vehicle was repaired. The manufacturer was notified of the failure, but no assistance was provided. The contact was awaiting a response. The failure mileage

- 36 -

was approximately 72,000."  December 10, 2022, NHTSA database, NHTSA ID No. 11501098.

d.    "Took my 2011 E350 4Matic to an independent shop recently for some work. When I went to pick up the car, I find out from the mechanic that the rear sub-frame is rotting (see pics). I am told that this is a fairly common problem in the the C-class (W204, I believe) but starting to show up in W212s. Anyways, I call MBUSA and ask if they have any recall program. Am told no. I then went to NHTSA website and filed a complaint. Understand that if issue is not fixed, the problem will continue to get worse and should the rear subframe detach from the wheel, can lead to shrapnel puncturing the gas tank. Wanted other W212 owners to know. Haven't heard anything from NHTSA yet, but will keep everyone posted. Next time, your car is up on the lift, have the tech check out your subframe condition - and file complaint with NHTSA if you car is experiencing a similar condition."  Posted on mbworld.org on December 19, 2022.

6.    **Mercedes-Benz Knew of the Rear Subframe Defect Based on Class Member Complaints on Public Online Forums**

109.    In addition to complaint made directly to Mercedes and collected by the NHSTA, many Class Vehicle owners posted complaints about the Rear Subframe Defect on public online forums.   The following is a small sampling of such complaints:

a.    "2011 c300 rear subframe rot. My car is currently at the dealer for service b, trans service and airbag recall. They called and told me the rear subframe is rotted and unsafe to drive. They quoted over $5000 to replace it, the brake lines which are also about to fail, motor and trans mounts and diff seals. The car is very clean and ive never seen any indication of rust so far but i did know about the diff seals."  Posted on mbworld.org on October 28, 2019.

b.      "I recently had the rear subframe on my wife's 2010 C300w4 fail and literally start to fall apart after a service visit to an authorized MB dealer. It started to exhibit some serious handling issues and when I jacked up the right rear and removed the tire, I found a crack next to one of the aluminum suspension struts mounting flange. Being out of warranty and with 94k I realized there was little MB would do. I'd worked for 2 Mercedes Benz dealers over 40 years and sold millions of dollars worth of cars, but I knew what the answer would probably be. I just didn't realize how bad the problem was. The dealer had the factory rep look at problem who said that MB would not cover it. I elected to have a friend's MB Certified body shop do the work at a cost of $4000.; the dealer wouldn't give me an exact cost but was suggesting somewhere around $5500-$6000. From just looking at the subframe it was difficult to see the extent of the damage but upon removal of the old unit, it was surprising how much rust had taken place from the inside. The entire flange holding one of the links completely fell out!" Posted on benzworld.org on Mar 24, 2020.

"I bought a Certified used 2011 E350 from a dealership in Maryland in 2014 and the car is a lemon. It has been serviced at the same dealership as purchased every 7-10k miles and currently has 80k. My brakes failed and I was just told the Subframe is Rusted Through. The car was serviced in November where the technician supposedly checked the entire car including brake lines and subframe. They claim that the Rust must have happened in the last 9 months because the tech would have noticed it! REALLY??? We had no snow last year, so no salt on the roads and the car is garage kept. Sounds to me like MB isn't making cars like they used to! I checked my Subaru and they offer a 10-year corrosion warranty STANDARD! And the extended warranty that MB sold me won't cover the brake lines because of rust(sounds like Continental knows more about MB then me) 'corrosion warranty' Now I am stuck with a car that is 'too dangerous to drive' and the dealership with its hand in my pocket. Any others out there with a similar problem?" Posted on benzworld.org on Aug 21, 2020.

c.      "2014 C300 Sport. I've gotten my car regularly inspected by both Huntington Long Island Mercedes as well as a shop that only does

Mercedes in Brooklyn - was told it was in great shape. Runs beautifully etc. After getting my usual NY state inspection last week, I was asked to follow the mechanic to look under the car at the rust under the rear chassis. It was insane. Pitted out- I wish I had added an extra coat of rust proofing as soon as I got the car. I do park outside, but I never expected this. I have had thorough inspections numerous times since buying the car in 2019, and nothing was seen or mentioned. Therefore it all must have occurred in the last few years - and was missed by both official Mercedes mechanics and mechanics that specialize in Mercedes." Posted on mbworld.org on September 16, 2022.

110.   This small sampling of complaints from vehicle owner forums shows consumers have been vocal in complaining about the Rear Subframe Defect and the serious safety risks it causes.  A multi-billion-dollar automaker like Mercedes-Benz undoubtedly had and has a marketing department that monitors such sites and should reasonably have been aware of the Rear Subframe Defect in the Class Vehicles.

**7.    Mercedes Publicly Acknowledged Premature Rear Subframe Corrosion in its European Markets and Has Committed to Remedying the Defect in Those Markets.**

111.   In the November 2022 edition of Auto Motor Sport, a German-language publication, Mercedes-Benz acknowledges that there have been "isolated complaints" regarding corrosion on the rear axles of certain Class Vehicles.

112.   The article states that Mercedes has "decided, as a gesture of goodwill, to assume the repair costs for replacing the rear axle due to corrosion."

113.   A statement from the Kraftfahrt-Bundesamt ("KBA"), Germany's regulatory body for motor vehicles, states that the corrosion issue impacts the rear axle and rear axle carrier (aka, the rear subframe).

114.   The following Class Vehicles are identified by the article as susceptible to corrosion of the rear axle or rear axle carrier (rear subframe): SLK (R171), GLK, E-Class W212, and the C-Class of the W205 series.

115.   Upon information and belief, the corrosion-related defect described in November 2022 Auto Motor Sports Article is the same as the Rear Subframe Defect.

116.   Moreover, the Rear Subframe Defect is a material, serious safety issue, as evinced by numerous accounts of the rear subframes of Class Vehicles failing while the vehicle in is motion, causing the driver to lose control of the vehicle; the failure of many Class Vehicles to pass mandatory state safety inspections; and the many accounts of experienced mechanics warning Class Members not to drive their Class Vehicles due to safety concerns.

### C.   Mercedes-Benz's Inadequate Warranty Extension

117.   On information and belief, on February 10, 2023, Mercedes-Benz began disseminating the Extended Warranty Notice to its authorized dealerships. For instance, on February 10, 2023, a copy of the Extended Warranty Notice dated February 10, 2023 was posted on a Mercedes Benz's owner forum.

118.   The Extended Warranty covers only a small portion of the Class Vehicles and is therefore insufficient.

119.   The Extended Warranty provides insufficient notice to Class Members that their vehicles are at risk of dangerous corrosion.

120.   The Extended Warranty does not inform Class Members that they should have their vehicles inspected for corrosion, nor does it provide any funding for the inspections.

121.   The Extended Warranty also fails to provide reimbursement for many, and in some cases all, of the costs incurred by Plaintiff and Class Members as a result of the Rear Subframe Defect, including:

a.    rear subframe replacements completed by Mercedes-Benz-certified mechanics or independent mechanics and/or using non-Mercedes-Benz parts;

b.    replacement or repair of parts damaged as a result of rear subframe failures while in motion, including a Class Vehicles' gas tank, torsion bar, and wheels;

c.    ancillary costs incurred as a result of the Rear Subframe Defect, including towing costs, rental car fees, and inspection fees; and

d.    loss of resale value by Class Members who sold their Class Vehicles at a diminished value due to the Rear Subframe Defect prior to the release of the Extended Warranty on February 10, 2023.

122.   The Extended Warranty is also notably insufficient to remedy the serious safety concerns posed by the Rear Subframe Defect because it:

a.   covers only the replacement of rear subframes that are perforated due to corrosion.  By the time corrosion has caused the steel of a rear subframe to become perforated, the part is already dangerously unstable and close to failure.

b.   does not provide adequate warning to Class Members as to the safety implications of rear subframe corrosion or acknowledgment that a defect exists.  Therefore, many Class Members will likely continue unknowingly driving vehicles with dangerously corroded rear subframes until they are at the point of failure.

c.   does not establish an inspection program which would allow Class Members to have their Class Vehicles checked for corrosion at an authorized Mercedes dealership free of cost.  As detailed above, a standard yearly inspection is often not enough to detect even advanced subframe corrosion.

d.   does not reimburse Class Members for the replacement of their rear subframes before they pose a serious safety risk, and therefore puts drivers at risk.

e.   does not offer a program that allows Class Vehicle owners to have their non-corroded subframes coated with an anti-corrosion compound free of charge.

123.   In addition, it is likely that Mercedes-Benz will not have the supply of parts necessary to promptly replace Class Members' defective rear subframes.  This shortage has caused Plaintiff and Class Members to have to wait at least weeks for a repair at their local authorized Mercedes-Benz dealership.

124.   In sum, Mercedes-Benz's proposed Extended Warranty does not adequately remedy the serious safety risks of the Rear Subframe Defect or adequately reimburse Plaintiff and Class Members for past or future economic injuries.

**D.    Mercedes-Benz's Marketing and Concealment**

125.   Mercedes-Benz manufactured and sold the Class Vehicles with the Rear Subframe Defect, while willfully concealing the serious safety and reliability impacts of the defect, as well as the inferior quality and limited longevity of the Class Vehicles' rear subframes.

126.   Mercedes-Benz directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, and through other mass media.

127.   Mercedes-Benz regularly releases advertisements and marketing materials touting the reliability of its vehicles and the brand's commitment to safety. The following are a few examples of such widely circulated advertisements and marketing materials:

a.    A 2010 advertisement for the Mercedes-Benz E-Class: "just like its predecessor, the new E-Class is an extremely safe vehicle."

b.    A 2012 advertisement for the Mercedes-Benz E-Class: "a world you can't predict demands a car you can trust."

    c.     A July 28, 2014 press release for the Mercedes-Benz C-Class states "the Sedan complies not only with all current national laws but also with all rating requirements, as well as meeting the more stringent internal Mercedes-Benz safety standards based on what actually happens during accidents."

    d.     In a 2015 promotional video for the Mercedes-Benz C-Class, the company emphasizes its commitment to "passive safety" stating that Mercedes-Benz "development engineers" are able to "detect and eliminate any possible weak points."  The video also touts a testing process intended to show that the "body and chassis" of the C-Class can endure "the most extreme loads."

    e.    In a 2016 advertisement, Mercedes-Benz states that "for 130 years we have been doing everything possible to make your Mercedes even safer."

    f.    On October 20, 2022, Mercedes-Benz published a press release stating "[t]he company is pursuing a clear goal: to achieve accident-free driving by 2050."

128.   Mercedes-Benz also regularly released marketing materials touting the quality and longevity of its materials, including its use of technology meant to prevent corrosion:

    a.    In a 2010 advertisement for its C-Class vehicles, Mercedes-Benz touted the "strength of its steel," "the integrity of its design," and its ability to handle "extreme situations."

    b.    In a press release published on April 13, 2010, Mercedes-Benz detailed the corrosion protection technology used on its vehicles' wheel rims. In particular, Mercedes-Benz emphasized its use of "a very special paint structure which provides reliable protection against corrosion." The press release goes on to state that "Mercedes-Benz has played a

decisive role in developing reliable anti-corrosion systems for high-sheen wheels and is currently considered to be a pioneer in this area." Mercedes-Benz details the testing process used to ensure that the wheel paintwork is resistant to corrosion, which includes no less than seven different laboratory tests which it considers "the toughest of test methods – a series of ultimate tests for wheel coatings."  Once the coatings have passed the laboratory tests, they are then subjected to a variety of real-world corrosion tests before being approved for use in the production of Mercedes-Benz vehicles.

c.     In a press release published on March 7, 2011, Mercedes-Benz described the technology used to prevent corrosion on its vehicles: "Long-term corrosion prevention for the bodywork is based on fully galvanized sheet metal panels. Structure areas of the body which are subjected to high stresses are protected with cavity-fill preserving agent. Sheet metal panel laminations and beads are completely filled with adhesive, whilst systematic sealing of the weld seams and edges with a PVC joint prevents corrosion from occurring. Generous underbody paneling composed of plastic laminate protects the bodywork and engine against stone chipping, moisture and dirt. Axle components, which are also subjected to a great deal of stone chipping damage, are protected by plastic paneling."  Body, quality and production: Master of quality in the executive segment, published on March 7, 2011.

d.     In a press release published July 15, 2008, Mercedes details the corrosion protection on its GLK-Class vehicles in a section titled "Effective corrosion protection for a long vehicle life": "Effective corrosion protection is particularly crucial in the case of SUV models and off-roaders. This is exactly why all GLK models feature a series of precisely harmonized protective mechanisms[.]"

129.   None of Mercedes-Benz's advertisements warned customers that their vehicles were likely to experience severe, premature corrosion of the rear subframe that would impact their ability to safely drive the Class Vehicles.

130.   Plaintiff and Class Members were exposed to Mercedes-Benz's long-term, national multimedia marketing campaign, which focused on the safety and reliability of Mercedes-Benz vehicles, as well as the advanced technology used by Mercedes-Benz to keep the Class Vehicles corrosion-free.   Plaintiff and Class Members justifiably chose to purchase their Class Vehicles based on Mercedes-Benz's misleading marketing, which concealed the true, defective nature of the Class Vehicles' rear subframes.

131.   Further, Mercedes-Benz knowingly misled Class Members about the defective, unsafe nature of the Class Vehicles.  As detailed above, upon information and belief, Mercedes-Benz has been aware of the Rear Subframe Defect since at least 2009 and likely earlier.

132.   Despite Mercedes-Benz's knowledge of the Rear Subframe Defect and up until the February 10, 2023 release of the Extended Warranty, it told Class Members who complained to customer service about the Rear Subframe Defect that it was not aware of any defect, was not responsible for the defect, and that, absent a warranty, it was not responsible for full reimbursement for the repair.

### E.    Fraudulent Concealment Allegations

133.   Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals

at Mercedes-Benz responsible for disseminating false and misleading marketing materials regarding the Class Vehicles.  Mercedes-Benz necessarily is in possession of all of this information.

134.   Plaintiff's claims arise out of Mercedes-Benz's fraudulent concealment of the Rear Subframe Defect and the serious safety issues it causes, and its representations about the world-class quality and safety of the Class Vehicles.

135.   To the extent that Plaintiff's claims arise from Mercedes-Benz's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases his claims.  Plaintiff alleges that at all relevant times, including specifically prior to and at the time he purchased his Class Vehicles, Mercedes-Benz knew, or was reckless in not knowing, of the Rear Subframe Defect; Mercedes-Benz was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its active concealment of it; and Mercedes-Benz never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

136.   Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Mercedes-Benz:

    a.    **Who**: Mercedes-Benz actively concealed the Rear Subframe Defect from Plaintiff and Class Members while simultaneously touting the safety and world-class quality of the Class Vehicles.  Plaintiff is

unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mercedes-Benz responsible for such decisions.

b.  **What**: Mercedes-Benz knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Rear Subframe Defect starting no later than 2009.  Mercedes-Benz concealed the defect and made representations about the safety, world-class quality, and other attributes of the Class Vehicles.

c.  **When**: Mercedes-Benz concealed material information regarding the Rear Subframe Defect at all times and made representations about the world-class quality, sophistication and state-of-the-art safety of the Class Vehicles, starting no later than 2009, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day.  Mercedes-Benz still has not disclosed the truth about the defect in the Class Vehicles to anyone outside of Mercedes-Benz.  Mercedes-Benz has never taken any action to inform consumers about the true nature of the defect in Class Vehicles.

d.  **Where**: Mercedes-Benz concealed material information regarding the true nature of the Rear Subframe Defect in every communication it had with Plaintiff and Class Members and made representations about the world-class quality and state-of-the-art safety of the Class Vehicles.  Plaintiff is aware of no document, communication, or other place or thing, in which Mercedes-Benz disclosed the truth about the Rear Subframe Defect in the Class Vehicles to anyone outside of Mercedes-Benz.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Mercedes Benz's website.

e.  **How**: Mercedes-Benz concealed the Rear Subframe Defect from Plaintiff and Class Members and made representations about the world-class quality and state-of-the-art safety of the Class Vehicles. Mercedes-Benz actively concealed the truth about the existence and nature of the Rear Subframe Defect from Plaintiff and Class Members

at all times, even though it knew about the Rear Subframe Defect and knew that information about the Rear Subframe Defect would be important to a reasonable consumer, and Mercedes-Benz promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.  **Why**: Mercedes-Benz actively concealed material information about the Rear Subframe Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the world-class quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles.  Had Mercedes-Benz disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment Tolling

137.   Mercedes-Benz has known of the Rear Subframe Defect in the Class Vehicles since at least 2009, and certainly well before Plaintiff and Class Members purchased their Class Vehicles, and yet concealed from or failed to disclose to Plaintiff, Class Members, and the public  the full and complete nature of the Rear Subframe Defect, even when directly asked about it by Class Members during communications with Mercedes-Benz, Mercedes-Benz Customer Care, Mercedes-Benz dealerships, and Mercedes-Benz service centers.  Mercedes-Benz continues to conceal the defect to this day.

138.   Any applicable statute of limitation has been tolled by Mercedes-Benz's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B.   Estoppel**

139.   Mercedes-Benz was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. Mercedes-Benz actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the world-class quality and state-of-the-art safety of the Class Vehicles.  Plaintiff and Class Members reasonably relied upon Mercedes-Benz's knowing misrepresentations and active concealment of these facts.  Based on the foregoing, Mercedes-Benz is estopped from relying on any statutes of limitation in defense of this action.

**C.   Discovery Rule**

140.   The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Rear Subframe Defect.

141.   However, Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after a professional

inspection revealed significant corrosion of the rear subframe.  As alleged, because the corrosion occurs "from the inside out" the defect would not have been apparent even to a trained mechanic until the rear subframe was dangerously corroded, near total failure, and rendered the Class Vehicle unsafe to operate.  Even then, Plaintiff and Class Members had no reason to know the corrosion in the rear subframes was caused by a defect in the Class Vehicles because of Mercedes-Benz's active concealment of the Rear Subframe Defect.  Thus, Plaintiff and Class Members were not reasonably able to discover the Rear Subframe Defect until after they had purchased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Rear Subframe Defect caused their rear subframes to corrode to the point where their vehicles were no longer able to be operated safely and, in some cases, where they failed while the vehicle was in motion, causing the driver to partially or fully lose control of the vehicle.

## VIII.  CLASS ALLEGATIONS

142.   Plaintiff brings this lawsuit as a class action on behalf of himself and all other similarly situated individuals as a nationwide class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4).  This action satisfies

the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

143.  Plaintiff brings this class action as a nationwide class on behalf of himself and all other similarly situated members of the proposed class (the "Class Members"), defined as follows:

> All residents of the United States and its territories who are current or former owners of a Class Vehicle. A "Class Vehicle" is a vehicle of any of the following models/model years:
>
> 2010-2022 Mercedes-Benz C-Class
>
> 2010-2022 Mercedes-Benz E-Class
>
> 2010-2015 Mercedes-Benz GLK-Class
>
> 2010-2022 Mercedes-Benz CLS-Class
>
> 2010-2020 Mercedes-Benz SLK/SLC-Class
>
> 2016-2022 Mercedes-Benz GLC-Class
>
> 2010-2022 Mercedes-Benz SL-Class
>
> Excluded from the Class are: (1) employees of MBG and MBUSA; (3) any judge assigned to this case and their respective families; (4) government entities; and (5) claims for personal injuries.

**A.    Numerosity**

144.  Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.

145.   The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  Class Members are readily identifiable from information and records in Mercedes-Benz's possession, custody, or control, as well as from records kept by state Departments of Motor Vehicles.

**B.      Typicality**

146.   The claims of Plaintiff are typical of the claims of Class Members in that the Plaintiff, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by Mercedes-Benz.  Plaintiff, like all Class Members, has been damaged by Mercedes-Benz's misconduct in that he purchased a vehicle he would not have purchased, or for which he would have paid less, and incurred or will incur the cost of service relating to and caused by the Rear Subframe Defect and/or have experienced diminished ability to use his Class Vehicle for its intended purpose, and/or have experienced diminution in resale value as a result of the Rear Subframe Defect.  Furthermore, the factual bases of Mercedes-Benz's misconduct are common to the Plaintiff and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiff and all Class Members.

### C.   Adequate Representation

147.   Plaintiff will fairly and adequately represent and protect the interests of the Class Members.   Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive vehicles.

148.   Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the financial resources to do so.   Neither Plaintiff nor his counsel has interests adverse to those of the Class.

### D.   Predominance of Common Issues

149.   There are numerous questions of law and fact common to Plaintiff and Class Members, the answers to which will advance the resolution of the litigation as to all Class Members and which predominate over any individual question.   These common legal and factual issues include:

    a.    whether the rear subframe in the Class Vehicles is defective;

    b.    whether and when Mercedes-Benz knew or should have known about the Rear Subframe Defect, and, if so, how long Mercedes-Benz knew or should have known of the Defect;

    c.     whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

d.    whether Mercedes-Benz had and/or has a duty to disclose the defective nature of the Class Vehicle to Plaintiff and Class Members;

e.    whether Mercedes-Benz omitted and failed to disclose material facts about the Class Vehicles;

f.    whether Mercedes-Benz's concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing Class Vehicles;

g.    whether Mercedes-Benz represented, through its words and conduct, that the Class Vehicle had characteristics, uses, or benefits that they did not actually have;

h.    whether Mercedes-Benz represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

i.    whether Mercedes-Benz advertised the Class Vehicles with the intent not to sell them as advertised;

j.    whether Mercedes-Benz's affirmative misrepresentations about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding, and were therefore fraudulent;

k.    whether Mercedes-Benz's affirmative misrepresentations about the true defective nature of the Class Vehicles were and are deceptive;

l.    whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.    whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that the rear subframes in Class Vehicles are defective and/or not merchantable;

n. whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

o. whether Mercedes-Benz should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Rear Subframe Defect in Class Vehicles; and

p. whether Mercedes-Benz is obligated to inform Class Members of their right to seek full reimbursement for having paid to diagnose and repair the defective rear subframes at either a Mercedes-Benz dealership or independent mechanic, including corrosion to nearby vehicle components (suspension springs, brake lines, etc.) and damage to the Class Vehicles caused by rear subframe failure while in motion, or for those Class Members who did not retain their Class Vehicles, for the diminution in value of the Class Vehicles upon resale.

### E. Superiority

150. Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Mercedes-Benz's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

151. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Mercedes-Benz's misconduct. Absent a class action, Class Members will

continue to incur damages, and Mercedes-Benz's misconduct will continue without remedy.

152.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the court and the litigants and will promote consistency and efficiency of adjudication.

## IX.   CLAIMS FOR RELIEF: NATIONWIDE CLAIMS

**First Cause of Action**

***Breach of Express Warranty***

**(against MBUSA only)**

153.   MBUSA is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles under O.C.G.A. § 11-2-104(1), and a "seller" of motor vehicles, and specifically the Class Vehicles under O.C.G.A. § 11-2-103(1)(d).

154.   The Class Vehicles are and were at all relevant times "goods" within the meaning of O.C.G.A. §§ 11-2-105 and 11-9-102(a)(45).

155.   Plaintiff and Class Members bought Class Vehicles manufactured, marketed to them, and intended to be purchased by consumers such as them, by MBUSA.

156.   MBUSA expressly warranted the Class Vehicles against defects, including the Rear Subframe Defect within the meaning of O.C.G.A. § 11-2-313(1).

157.   Specifically, Class Vehicles were sold to Plaintiff and Class Members with a new vehicle 48-month and 50,000-mile express warranty.

158.   Pursuant to Page 11 of the 2014 Service and Warranty Booklet for CLS-Class and E-Class vehicles, MBUSA warranted to the original and each subsequent owner that they "will make any repairs or replacements necessary, to correct defects in material or workmanship arising during the warranty period."  The warranty further states that "[MBUSA's] intention is to repair under warranty, without charge to you, anything that goes wrong with your vehicle during the warranty period which is our fault."  Upon information and belief, this language is substantively the same in all warranties covering the Class Vehicles.

159.   In addition to any remaining portion of the new vehicle warranty, Class Vehicles that Plaintiff and Class Members purchased certified pre-owned were covered by the standard Mercedes-Benz Certified Pre-Owned Limited Warranty, which runs for one year and unlimited miles.  The Certified Pre-Owned Limited Warranty covers a vehicle's brake system and suspension (including "upper and lower control arms" and "coil springs").

160.   MBUSA's express warranties formed a basis of the bargain that was reached when Class Members purchased their Class Vehicles.

161.   As described above, the rear subframe in the Class Vehicles is defective.

162.   As described above, the Rear Subframe Defect was manifest at the time the Class Vehicles were produced and results in the development of corrosion, the early stages of which begin prior to the expiration of the warranty period.

163.   The Rear Subframe Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Class Members.

164.   MBUSA breached its express warranties by supplying the Class Vehicles to Plaintiff and Class Members with the Rear Subframe Defect.

165.   MBUSA knew of the Rear Subframe Defect, and that this defect poses a serious safety risk to consumers like Plaintiff and Class Members, when it expressly warranted against the defect, wrongfully and fraudulently concealed material facts regarding the defect, and induced Plaintiff and Class Members to purchase the Class Vehicles under false and/or fraudulent pretenses.

166.    MBUSA is obligated, under the terms of its express warranties, to make repairs and/or replacements to permanently correct the Rear Subframe Defect for Plaintiff and Class Members.

167.    MBUSA breached the express warranty to repair the Rear Subframe Defect in the Class Vehicles, because it failed to repair the inadequately corrosion-proofed subframes on the Class Vehicles, such that the vehicles did not exhibit severe rust corrosion and perforation, and because it failed to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

168.    As more fully detailed above, MBUSA was provided with appropriate notice and has been on notice of the Rear Subframe Defect and of its breach of express written warranties from various sources.

169.    The Class Vehicles were under express warranty when they exhibited the Rear Subframe Defect.  Although Plaintiff's and many Class Members' Class Vehicles did not require a subframe replacement until after the expiration of the warranty period, the Class Vehicles were sold by Mercedes-Benz with the Rear Subframe Defect and should have been repaired under the express warranty.

170.   Plaintiff gave MBUSA a reasonable opportunity to cure its failures with respect to its warranties, and MBUSA failed to do so in a manner that properly compensated all Class Members for the economic damages they have incurred or will incur as a result of the Rear Subframe Defect.

171.   Affording MBUSA a reasonable opportunity to cure its breach of written warranties was and is unnecessary and futile here.  When Plaintiff and other Class Members provided such notice and sought relief under the warranty, MBUSA refused to provide it, representing that the vehicles were displaying normal "wear and tear," and charged them to replace the defective rear subframes, as well as other parts damaged due to corrosion.  While MBUSA did issue the Extended Warranty on February 10, 2023, the Extended Warranty fails to reimburse many Class Members fully or at all for damages incurred as a result of the Rear Subframe Defect.

172.   To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiff and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiff and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

173.   Any attempt by MBUSA to limit or disclaim the express warranties in a manner that would exclude coverage of the Rear Subframe Defect is unconscionable as a matter of law because the relevant purchase transactions were tainted by MBUSA's concealment of material facts.  MBUSA knew when it first made these warranties and their limitations that the Rear Subframe Defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect.  Thus, any such effort by MBUSA to disclaim, or otherwise limit, its liability for the Rear Subframe Defect is null and void.

174.   As a direct and proximate result of MBUSA's breach of express warranties, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of needed present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

175.  Plaintiff seeks against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages.

**Second Cause of Action**

*Breach of Implied Warranty*

**(against MBUSA only)**

176.   When it sold the Class Vehicles, MBUSA extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold.

177.   Persons who purchased a Class Vehicle from MBUSA are entitled to the benefit of their bargain: a vehicle with a subframe that has been properly designed and manufactured to resist corrosion stemming from exposure to normal road conditions, and that does not render the vehicle too dangerous to operate.

178.   MBUSA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use; and (2) not of a merchantable quality.

179.   Had MBUSA disclosed the existence of the Rear Subframe Defect at the time of sale, it could not have sold the Class Vehicles, or could not have sold them at the same price.

180.   To the extent that Plaintiff and Class Members lack privity of contract with MBUSA, no privity is required because:

a.   Plaintiff and Class Members were intended third-party beneficiaries of the transactions between MBUSA and its network of authorized dealerships.   MBUSA's authorized dealers were not intended to be the ultimate consumers of the Class Vehicles.  Rather, the warranty agreements were designed

for and intended to benefit the ultimate purchasers of the Class Vehicles; and

b.  The Rear Subframe Defect poses a serious safety risk to the Class Vehicles' owners, operators, and passengers, as well as other drivers on road, and therefore renders the Class Vehicles a source of danger to several or many people.

181.  As a direct and proximate result of MBUSA's breach of the implied warranty of merchantability, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determine at trial.

182.  Plaintiff seeks against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages.

**Third Cause of Action**

***Breach of Express Warranty – Magnuson-Moss Warranty Act***

**(against MBUSA only)**

183.  Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

184.   Defendant MBUSA is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

185.   The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

186.   MBUSA provides Plaintiff and Class Members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

187.   MBUSA breached the express warranty by refusing to replace or repair, free of charge, any defective vehicle component, including the defective rear subframe or other suspension components impacted by the Rear Subframe Defect. The Extended Warranty does not cure MBUSA's breach because it fails to reimburse Class Members for some or all of the economic damages incurred as a result of the Rear Subframe Defect.

188.   At the times MBUSA sold the Class Vehicles, it knew of the Rear Subframe Defect and offered an express warranty with no intention of honoring said warranty with respect to known defects.

189.   Additionally, pursuant to 15 U.S.C. § 2304(d)(1), "the warrantor may not assess the consumer for any costs the warrantor or his representatives incur in connection with the required remedy of a warranted consumer product. . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable

time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor."

190.   MBUSA refuses to acknowledge the existence of the Rear Subframe Defect or to reimburse Class Members for the repair of their defective rear subframes.  Despite repeated demands by Plaintiff and Class Members that MBUSA pay for replacement rear subframes, other necessary repairs caused by the Rear Subframe Defect, and associated incidental costs, MBUSA refuses to do so.  Rather, MBUSA issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, and does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics.  MBUSA's refusal to pay for all expenses incurred by Class Members as a result of the Rear Subframe Defect violates 15 U.S.C. § 2304(d)(1).

191.   MBUSA was afforded a reasonable opportunity to cure its breach of the express warranty but failed to do so.

192.   As a direct and proximate result of MBUSA's breach of its express written warranties, Plaintiff and Class Members received goods that are

unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

193.   Plaintiff seeks against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages, as permitted under the Magnuson Moss Warranty Act.  15 U.S.C. § 2310(d).

**Fourth Cause of Action**

*Breach of Implied Warranty – Magnuson-Moss Warranty Act*

**(against MBUSA only)**

194.   Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

195.   Defendant MBUSA is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

196.   The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

197.   MBUSA extended an implied warranty to Plaintiff and Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers defects in its

Class Vehicles and its Class Vehicles' suspension systems, including the rear subframe.

198.   MBUSA breached this implied warranty by selling Class Vehicles with the Rear Subframe Defect, which were neither merchantable nor fit for their intended purpose.

199.   As a direct and proximate result of MBUSA's breach of the implied warranty under the Magnuson-Moss Act, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

200.   Plaintiff seeks against MBUSA equitable relief, declaratory relief, actual damages, attorneys' fees and expenses, and punitive damages, as permitted under the Magnuson Moss Warranty Act.  15 U.S.C. § 2310(d).

## Fifth Cause of Action

### *Fraud by Concealment*

201.   Mercedes-Benz concealed and suppressed material facts concerning the quality of the Class Vehicles.

202.   Mercedes-Benz is liable for both fraudulent concealment and non-disclosure.  *See, e.g.,* Restatement (Second) of Torts §§ 550-51 (1977).

203.   Mercedes-Benz concealed and suppressed material facts concerning the quality of the rear subframes in the Class Vehicles, including the rear subframes' susceptibility to corrosion when exposed to normal environmental conditions.

204.   Mercedes-Benz concealed and suppressed material facts concerning the Rear Subframe Defect, which causes the rear subframe on the Class Vehicles to experience severe and premature corrosion.  The corrosion happens "from the inside out," beginning on the interior of the subframe, and is difficult to see until the subframe is perforated and close to collapsing.  Mercedes-Benz knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Rear Subframe Defect prior to purchasing or leasing the vehicles.  Mercedes-Benz furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective subframes, which Mercedes-Benz falsely represented as being damaged as the result of normal "wear and tear,"

all the while concealing the true nature of the Defect from Plaintiff and Class Members. When Plaintiff and Class Members complained of the Defect, Mercedes-Benz further denied the very existence the Rear Subframe Defect and the dangers it poses to passengers or drivers of Class Vehicles.

205. Mercedes-Benz committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of Mercedes-Benz vehicles that the Class Vehicles were safe, high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Mercedes-Benz's and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

206. Plaintiff and Class Members, directly or indirectly, were exposed to Mercedes-Benz's advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' safety and reliability, as well as the advanced technology used by Mercedes-Benz to keep the Class Vehicles corrosion free, as well as Mercedes-Benz's omission of the truth

about the defective nature of the Class Vehicles' rear subframes, influenced Plaintiff and Class Members' decisions to purchase or lease Class Vehicles. If Mercedes-Benz had instead chosen to disclose the truth, Plaintiff and Class Members would have seen those disclosures. Indeed, Plaintiff and Class Members would have had multiple opportunities to receive information about the defect if Mercedes-Benz chose to disclose it, including at dealerships, on Mercedes-Benz's website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

207. Mercedes-Benz had a duty to disclose the Rear Subframe Defect in the Class Vehicles because the defect was known and/or accessible only to Mercedes-Benz; Mercedes-Benz had superior knowledge and access to the facts; and Mercedes-Benz knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members. Mercedes-Benz also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, longevity, and usability. Even when faced with complaints regarding the Defect, Mercedes-Benz misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as

to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the severe, premature corrosion of their rear subframes to Mercedes-Benz.

208.   The omitted and concealed facts were material because they directly impact the safety, longevity, value, appeal, and usability of the Class Vehicles purchased by Plaintiff and Class Members.  Whether a manufacturer's product is as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

209.   Mercedes-Benz actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid expensive recalls that would hurt the brand's image, and did so at the expense of Plaintiff and Class Members.

210.   On information and belief, Mercedes-Benz has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding the Rear Subframe Defect in the Class Vehicles.  Although MBUSA released the Extended Warranty on February 10, 2023, which is insufficient to remedy the injuries suffered by Plaintiff and Class Members, it continues to deny the existence of the Rear Subframe Defect.

211.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Class Vehicles, or would have paid less for them.  Plaintiff's and Class Members' actions were justified because they had no way of knowing that the Class Vehicles were susceptible to severe, premature corrosion of the rear subframe and nearby components.  Rather, Mercedes-Benz was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

212.   Because of the concealment and/or suppression of the facts, Plaintiff, and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Rear Subframe Defect that Mercedes-Benz failed to disclose and paid out-of-pocket to replace the defective rear subframe or experienced significant diminution of their Class Vehicle's value.  Had they been aware of the concealed Rear Subframe Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their vehicles or would not have purchased them at all.

213.   As a direct and proximate result of Mercedes-Benz's concealment and/or suppression of the facts, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have

suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

214.  Mercedes-Benz's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff and Class Members' rights and well-being to enrich Mercedes-Benz.  MBUSA's conduct warrants an assessment of punitive damages against MBUSA in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

215.  Plaintiff and Class Members seek an order enjoining Mercedes-Benz's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.  In addition, Plaintiff and Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit.  Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

216.  Plaintiff brings this claim on behalf of himself and the Nationwide Class, as there are no true conflicts among various states' laws of fraudulent

concealment.   In the alternative, Plaintiff brings this claim on behalf of the State Class.

## Sixth Cause of Action
### *Unjust Enrichment*

217.   Mercedes-Benz has been unjustly enriched by Plaintiff and Class Members through Plaintiff's and Class Members' purchasing and/or leasing Class Vehicles from Mercedes-Benz and purchasing replacement parts and services from Mercedes that Plaintiff and Class Members would not have purchased but for the Rear Subframe Defect and Mercedes-Benz's concealment of the same.

218.   Specifically, Mercedes-Benz receives and appreciates a direct financial benefit from the sale of its Class Vehicles to end consumers, including Plaintiff and Class Members.   Mercedes-Benz primarily sells the Class Vehicles to dealerships, which then sell them to end consumers.   The sale of Mercedes-Benz's Class Vehicles to end consumers results in revenues which are either paid directly to Mercedes-Benz or used by the intermediaries to pay Mercedes-Benz for its vehicles.

219.   Plaintiff and Class Members unknowingly conferred a benefit on Mercedes-Benz of which Mercedes-Benz had knowledge, since Mercedes-Benz was aware of the defective nature of its Class Vehicles' rear subframes and the resultant severe, premature corrosion, but failed to disclose this knowledge and misled

Plaintiff and the Class Members regarding the nature, quality, and safety of the subject Class Vehicles while profiting from this deception.

220.   The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Mercedes-Benz to retain the benefit of revenue that it unfairly obtained from Plaintiff and Class Members.   This revenue included the premium price Plaintiff and Class Members paid for the Class Vehicles and the unreimbursed cost of the parts and services bought from Mercedes-Benz used to replace the heavily corroded, defective rear subframes and to remedy other damage caused by the Rear Subframe Defect.

221.   Plaintiff and the other Class Members, having been damaged by Mercedes-Benz's conduct, are entitled to recover or recoup damages and/or restitution as a result of the unjust enrichment of Mercedes-Benz to their detriment.

222.   Plaintiff brings this claim on behalf of himself and the Nationwide Class, as there are no true conflicts among various states' laws of unjust enrichment. In the alternative, Plaintiff bring this claim on behalf of the State Classes.

**Seventh Cause of Action**

*Violations of Georgia's Uniform Deceptive Trade Practices Act*

*O.C.G.A. §§ 10-1-370, et seq..*

223.   \Mercedes-Benz, Plaintiff, and Class Members are each a "person" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

224.   The UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

225.   By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members, Mercedes-Benz engaged in deceptive trade practices in violation of the Georgia UDTPA, because Mercedes-Benz represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (*i.e.*, safe, reliable, etc.) when they were of another.  *See* O.C.G.A. § 10-1-372(5), (7), & (9).

226.   Mercedes-Benz advertised the Class Vehicles (as safe, reliable, etc.) with the intent not to sell them as advertised, in violation of the Georgia UDTPA. *See* O.C.G.A. § 10-1-372(9).

227.   Mercedes-Benz's unfair and deceptive acts or practices occurred repeatedly in Mercedes-Benz's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

228.   Mercedes-Benz knew, by 2009 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' rear subframes suffered from a defect, would exhibit severe, premature corrosion and damage to nearby vehicle components, could collapse while a Class Vehicle was in motion, and were not safe or suitable for their intended use.

229.   By 2009 at the latest, Mercedes-Benz had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in the Class Vehicles. Furthermore, Mercedes-Benz actively concealed these defects from consumers by denying the existence of the defects to Class Members who contacted Mercedes-Benz about corrosion in their rear subframes and failing to offer Class Members full reimbursement for the replacement of their defective rear subframes.

230.   Mercedes-Benz did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of the Rear Subframe Defect. Despite issuing the Extended Warranty, Mercedes-Benz still refuses to acknowledge the existence of the Rear Subframe Defect.

231.   Mercedes-Benz was under a duty to Plaintiff and Class Members to disclose the Rear Subframe Defect, as well as the dangers of driving a vehicle with a corroded rear subframe and the associated costs that would have to be expended in order to repair the Class Vehicles due to the Rear Subframe Defect, because Mercedes-Benz:

   a.   Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy or lease Class Vehicles;

   b.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing

   c.   Intentionally concealed the foregoing from Plaintiff; and/or

d.  Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

232.  Despite possessing information to the contrary, Mercedes-Benz failed to disclose and actively concealed the Rear Subframe Defect while continuing to market the Class Vehicles as safe, world-class, and reliable. The deception made reasonable consumers believe that Class Vehicles were of high-quality, built with top-of-the-line safety technology, and designed and made by a company that stood behind its vehicles once they were on the road.

233.  Mercedes-Benz knew or should have known that its conduct violated the Georgia UDTPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the severe, premature rear subframe corrosion in the Class Vehicles, Mercedes-Benz knowingly and intentionally concealed material facts and breached its duty not to do so.

234.  The facts Mercedes-Benz concealed from Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Rear Subframe Defect to be an undesirable quality, as Plaintiff and Class Members did. Had Plaintiff and Class Members known

that the Class Vehicles had the Rear Subframe Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

235.   Plaintiff, like all objectively reasonable consumers, did not expect the rear subframes in their Class Vehicles to experience extreme corrosion, such that they became dangerous to operate, in some cases causing the rear suspension to collapse while in motion, and requiring significant, costly repairs.

236.   As a direct and proximate result of Mercedes-Benz's misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

237.   Mercedes-Benz's violations present a continuing risk to Plaintiff, Class Members and to the general public. Mercedes-Benz's unlawful acts and practices complained of herein affect the public interest.

238.   As a direct and proximate result of Mercedes-Benz's violations of the Georgia UDTPA, Plaintiff and Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

239.   Plaintiff seeks an order enjoining Mercedes-Benz's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA. *See* O.C.G.A. § 10-1-373.

**Eighth Cause of Action**

***Violations of New Jersey's Consumer Fraud Act***

***N.J. Stat. Ann. §§ 56:8-1, et seq..***

240.   Plaintiff, Class Members, MBUSA, and MBG are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).507.

241.   The Class Vehicles and the defective rear subframes installed in them are "merchandise" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(c).

242.   The New Jersey CFA prohibits unfair trade practices, encompassing "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." *See* N.J. Stat. Ann. § 56:8-2. The New Jersey CFA also prohibits schemes not to sell items as advertised. *See* N.J. Stat. Ann. § 56:8-2.2.

243.   At all relevant times material hereto, Mercedes-Benz conducted trade and commerce in New Jersey and elsewhere.

244.   The New Jersey CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes. *See* N.J. Stat. Ann. § 56:8-2.13.

245.   Mercedes-Benz has engaged in unlawful, deceptive practices in the sale of the defective rear subframes in the Class Vehicles as alleged in more detail elsewhere herein, including: (1) selling the Class Vehicles despite knowing that the rear subframes were prone to extreme, premature corrosion; (2) refusing to fully reimburse Plaintiff and Class Members for the replacement of their dangerously corroded rear subframes and related costs; and (3) failing to disclose and/or concealing this known defect.

246.   Mercedes-Benz knew of the Rear Subframe Defect prior to the sale of the Class Vehicles, and likely as early as 2009.

247.   Mercedes-Benz did not address the Rear Subframe Defect until February 10, 2023, when it issued an insufficient Extended Warranty that covers only some of the vehicles affected by the Rear Subframe Defect, fails to cover the replacement of parts other than the rear subframe or necessary incidental expenses, does not guarantee reimbursement for individuals who had their rear subframes

replaced at independent mechanics, does not provide for inspection of the Class Vehicles, and does not adequately warn consumers about the dangers of Rear Subframe Defect. Despite issuing the Extended Warranty, Mercedes-Benz still refuses to acknowledge the existence of the Rear Subframe Defect.

248.   Mercedes-Benz knowingly and intentionally omitted and failed to disclose material facts to Plaintiff and Class Members with respect to the Rear Subframe Defect, including the fact that, with normal use, the rear subframe would fail and/or malfunction as described elsewhere herein, and/or denying and/or misleading them as to the true cause of the Rear Subframe Defect.

249.   Mercedes-Benz intended to deceive Plaintiff and Class Members and intended that Plaintiff and Class Members rely on Mercedes-Benz's misrepresentations, omissions, and acts of concealment, so that Plaintiff and Class Members would purchase the Class Vehicles equipped with defective rear subframes at a substantial out-of-pocket cost to them.

250.   Mercedes-Benz's conduct as described herein is unethical, oppressive, or unscrupulous in that Mercedes-Benz often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them. Mercedes-Benz frequently blamed Class Members for the Rear Subframe Defect, labeling the condition normal "wear and tear." Mercedes-Benz

refused to fully reimburse Class Members and Plaintiff for the cost of replacing their defective subframes and other components damaged due to the Rear Subframe Defect.

251.   Plaintiff and Class Members, like all objectively reasonable consumers, did not expect the rear subframes in their Class Vehicles to severely and prematurely corrode, even with regular maintenance, and to put them at risk of losing control of their vehicle if the rear subframe fails while the vehicle is in motion.

252.   Mercedes-Benz had a duty to disclose the Rear Subframe Defect to Plaintiff and Class Members, as well as the associated costs to replace the defective rear subframes because Mercedes-Benz:

a.    Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff; and/or

d.    Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

253.   Had Mercedes-Benz disclosed all material information regarding the defective rear subframes to Plaintiff and Class Members, they would not have purchased their Class Vehicles or would have paid less for them.

254.   Plaintiff provided any notice that could possibly have been required, as detailed more fully above, and Mercedes-Benz has long been on notice of the Rear Subframe Defect and of its violation of the New Jersey CFA from various sources.

255.   As a direct and proximate result of Mercedes-Benz's misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

256.   Plaintiff seeks an order enjoining Mercedes-Benz's unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. *See* N.J. Stat. Ann. § 56:8-19. In addition, Plaintiff and Class Members seek an award of punitive damages as to MBUSA only.

### X.   CLAIM FOR RELIEF: PLAINTIFF'S STATE OF RESIDENCE

### Ninth Cause of Action

*Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 Pa. Cons. Stat. §§ 201-1, et seq.*

257.   Plaintiff, Class Members, MBUSA and MBG are "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL").  73 Pa. Cons. Stat. § 201-2(2).

258.   Mercedes-Benz engaged in "trade" or "commerce" in the State of Pennsylvania within the meaning of the Pennsylvania UTPCPL.  73 Pa. Cons. Stat. §201-2(3).

259.   The Pennsylvania UTPCL makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." 73 Pa. Cons. Stat. § 201-3(a).

260.   As alleged above, Mercedes-Benz made material statements about the quality, reliability and safety of the Class Vehicles and/or the defective rear subframes installed in them that were either false or misleading.  Mercedes-Benz's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe," "the best or nothing," "state-of-the-art," and "sophisticated," despite its knowledge of the Rear Subframe Defect or its failure to reasonably investigate it.  These material statements had the capacity, tendency, or

- 87 -

effect of misleading consumers in violation of the Pennsylvania UTPCL. *See* 73 Pa. Cons. Stat. § 201-2(4)(v), (vii).

261.   Mercedes-Benz advertised the Class Vehicles (as safe, high-quality, etc.) with the intent not to sell them as advertised. *See* 73 Pa. Cons. Stat. § 201-2(4)(ix).

262.   Mercedes-Benz willfully and knowingly withheld the information about the propensity of the Class Vehicles' rear subframes to experience severe, premature corrosion.

263.   As detailed above, the Rear Subframe Defect manifests during the warranty period.  Mercedes-Benz failed to remedy or prevent the Rear Subframe Defect through measures taken within the Class Vehicles' warranty periods and failed to partially or fully reimburse Plaintiff and Class Members for costs related to the Rear Subframe Defect.  Mercedes-Benz therefore failed to comply with the terms of the warranties it provided to Plaintiff and Class Members upon purchase of the Class Vehicles. *See* 73 Pa. Cons. Stat. § 201-2(4)(xiv).

264.   Mercedes-Benz failed to inform Plaintiff and Class Members who purchased their vehicles new that the Class Vehicles had not been adequately rustproofed, if at all, and the nature and extent, if any, of the warranty applicable to that rustproofing. *See* 73 Pa. Cons. Stat. § 201-2(4)(xx)(b).

265.    Mercedes-Benz's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to deceive consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety, grade, quality, longevity, usability, and reliability of Class Vehicles and/or the defective rear subframes installed in them, the quality of Mercedes-Benz's brands, and the true value of the Class Vehicles.  *See* 73 Pa. Cons. Stat. § 201-2(4)(xxi).

266.    Mercedes-Benz willfully and knowingly misrepresented material facts regarding the Class Vehicles and/or the defective rear subframes installed in them with an intent to mislead Plaintiff and Class Members.

267.    Mercedes-Benz knew or should have known that its conduct violated the Pennsylvania UTPCL.

268.    Mercedes-Benz owed Plaintiff a duty to disclose the true quality, safety and reliability of the Class Vehicles and/or the defective rear subframes installed in them because Mercedes-Benz:

    a.    Knew the Rear Subframe Defect (and its safety risks) was a material fact that would affect Plaintiff's or Class Members' decisions to buy or lease Class Vehicles;

    b.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

c.      Intentionally concealed the foregoing from Plaintiff; and/or

d.      Made incomplete representations about the quality, safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

269.    Mercedes-Benz's failure to disclose and active concealment of the problems and risks posed by the Rear Subframe Defect in Class Vehicles were material to Plaintiff and Class Members.   A vehicle made by a reputable manufacturer of safe, high-quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of poor-quality, unsafe vehicles that conceals defects rather than promptly remedying them.

270.    Plaintiff and Class Members suffered ascertainable loss caused by Mercedes-Benz' misrepresentations and their failure to disclose material information.  Had he been aware of the Rear Subframe Defect in the Class Vehicles, rendering his vehicle dangerous to drive and necessitating a large expenditure to return his vehicle to a safe condition, Plaintiff either would have paid less for his vehicle or would not have purchased it at all.  Plaintiff did not receive the benefit of his bargain as a result of Mercedes-Benz's misconduct.

271.    Because Mercedes-Benz fraudulently concealed the Rear Subframe Defect in Class Vehicles, the value of the Class Vehicles has greatly diminished.  In

addition, the presence of a rear subframe that is susceptible to severe corrosion and failure while in motion makes the Class Vehicles less valuable and attractive to potential purchasers in the used market, thereby further diminishing Class Vehicles' value.

272.   As a direct and proximate result of Mercedes-Benz's unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience corrosion in the Class Vehicles' rear subframe, leading to serious safety risks for a Class Vehicle's driver and passengers, and requiring out-of-pocket repair costs.

273.   Plaintiff and Class Members risk irreparable injury as a result of Mercedes-Benz's acts and omissions in violation of the Pennsylvania UTPCL, and these violations present a continuing risk to Plaintiff, Class Members, as well as to the general public.  Mercedes-Benz's unlawful acts and practices complained of herein affect the public interest.

274.   As a direct and proximate result of Mercedes-Benz's misconduct, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return

their Class Vehicle to a safe condition, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

275. Thus, pursuant the Pennsylvania UTPCL, Plaintiff seek an order enjoining Mercedes-Benz's unfair, unlawful, and/or deceptive practices, declaratory relief, actual damages or $100, whichever is greater, treble damages, and attorneys' fees and expenses, as permitted under Pennsylvania law. *See* 73 Pa. Cons. Stat. § 201-9.2(a).

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, respectfully requests that this Court enter judgments against Mercedes-Benz, as follows:

   a.   an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiff as a named representative of the Class, and designating the undersigned as Class Counsel;

   b.   a declaration that the rear subframes in Class Vehicles have a defect that causes severe, premature corrosion and that poses a serious safety risk to consumers, and that this defect requires disclosure;

   c.   a declaration that Mercedes-Benz must, at its own expense, notify owners of Class Vehicles of the Rear Subframe Defect;

   d.   a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Rear Subframe Defect is void;

e.     an order enjoining Mercedes-Benz to reassess all prior claims, both in and out of warranty, related to rear subframe rust and corrosion and to reimburse Class Members for money spent out of pocket for replacement of their defective rear subframes and associated costs, regardless of whether those costs fall within the limitations of the Extended Warranty;

f.     an order enjoining Mercedes-Benz, upon a Class Member's request, to pay the cost of regular inspections to determine whether the Rear Subframe Defect is present, whether rust has compromised the safety of any other components in the rear underbody of the vehicle, with any coverage disputes adjudicated by a special master;

g.     an order enjoining Mercedes-Benz from further deceptive distribution and sales practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the Rear Subframe Defect;

h.     an award to Plaintiff and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial against both MBUSA and MBG, and punitive damages as to MBUSA only;

i.     an order requiring Mercedes-Benz to disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten revenue it received from the sale of the Class Vehicles, or make full restitution thereof to Plaintiff and Class Members;

j.     an award of attorneys' fees and costs, as allowed by law;

k.     an award of pre-judgment and post-judgment interest, as provided by law;

l.     leave to amend this Complaint to conform to the evidence obtained in discovery or produced at trial; and

m.      such other relief as may be appropriate under the circumstances.

## XII.  JURY DEMAND

Plaintiff, on behalf of himself and the putative Class, demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

Dated:        March 9, 2023        _____

Ketan A. Patel (State Bar Number 121099)
**CORPUS LAW PATEL, LLC**
P.O. Box 724713
Atlanta, Georgia 31139
T: (678) 597-8020
kp@corpus-law.com

Alan M. Feldman (*Pro Hac Vice*
application forthcoming)
Edward S. Goldis (*Pro Hac Vice*
application forthcoming)
Zachary Arbitman (*Pro Hac Vice*
application forthcoming)
**FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
afeldman@feldmanshepherd.com
egoldis@feldmanshepherd.com
zarbitman@feldmanshepherd.com

Kimberly A. Justice (*Pro Hac Vice*
application forthcoming)
**FREED KANNER LONDON & MILLEN
LLLC**
923 Fayette Street
Conshohocken, PA 19428

- 94 -

T: (610) 234-6487
kjustice@fklmlaw.com

*Attorneys for Plaintiff and the Putative
Class*