IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ELECTRICAL CONTRACTOR, INCORPORATED,<br><br>     Plaintiff,<br><br>v.<br><br>GRANGE INSURANCE COMPANY,<br><br>     Defendant. | CASE NO. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Electrical Contractor, Incorporated ("ECI") files this Complaint for breach of contract, declaratory judgment, bad faith, and attorney's fees, and demand for jury trial against Grange Insurance Company ("Grange"), and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiff ECI is a Georgia for-profit corporation with its principal place of business in Georgia at 8141 Technology Dr., Suite D, Covington, Newton County, Georgia.

2.     Defendant Grange is an Ohio corporation with its principal place of business in Ohio.

1

3.	Grange is registered with the Georgia Secretary of State to transact business in Georgia and does in fact transact business in Georgia. Grange may be served through its registered agent Linda Banks, 289 S Culver St, Lawrenceville, Georgia, 30046.

4.	Grange has agents registered in Newton County, Georgia, and regularly transacts business in Newton County, Georgia.

5.	This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.	This Court has personal jurisdiction over all parties in this action because the parties regularly transact business in Georgia.

7.	Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

I.	**BACKGROUND**

8.	ECI provides electrical work for construction projects.

9.	Carroll Daniel Construction ("CDCC") hired ECI to perform electrical work at the construction of East Forsyth High School (the "Project"). [A true and correct copy of the CDCC/ECI Subcontract is attached hereto as **Exhibit A**.].

10. CDCC hired a different subcontractor, All Systems, Inc., to install Trane HVAC units on the Project. [A true and correct copy of the CDCC/All Systems Subcontract is attached hereto as **Exhibit B**.].

11. Each Trane HVAC unit contains a drip pan affixed under the unit to prevent water infiltration into the unit.

12. The drip pans are an integral part of the units.

13. All Systems' scope of work included the installation of the Trane HVAC units, including the drip pans under the units. Exhibit A, at 1.

14. ECI's scope of work included running flex conduit for electrical wiring through the bottom of the roof-mounted Trane HVAC units. Exhibit B, at 1.

15. ECI's scope of work also included providing power to the rest of the high school and generating power to the Trane HVAC units' electrical connection points. *Id.*

16. ECI had no contractual responsibility for the Trane HVAC units other than terminating power to those units. *See generally*, Exhibit B.

17. ECI's scope of work also did not include the HVAC units or their integrated drip pans. *Id.*

18. When the HVAC units arrived on site at the Project, they were placed in a staging area where pre-wiring could be performed before the units were placed on the roof.

19. While the units were in staging before being placed on the roof, ECI completed the necessary electrical wiring to ultimately connect the units to the building power, and ran the wiring through a conduit and out of the unit through a designated cavity in the unit.

20. Generally, when the units are placed on the roof, ECI will guide the conduit, which is hanging through and out of the designated cavity in the unit, through the curb and cavity on the roof, permitting ECI to run the wiring into the building and connect it to the main power. This process did not occur on the Project.

21. Once the crane arrived on-site to lift the units onto the roof, ECI discovered that the units were being placed on a metal sheet, which obstructed the cavity where ECI planned to run the conduit through the roof.

22. The metal sheet on which the units were being placed was not part of the units.

23. ECI did not install and was not responsible for installing the metal sheets on the curb.

24. ECI did not transport and was not responsible for transporting the units from the staging area onto the roof.

25. Rather than a clear pathway to run the conduit through the roof that ECI expected when it was time to set the units, ECI had no avenue to run the conduit through the roof due to the metal sheet.

26. Without another option, ECI was forced to pull the conduit back into the unit until it could cut a pathway through the metal sheet on which the unit was placed to provide an avenue to drop the conduit and connect it to main power.

27. In cutting through the metal sheet, ECI accidentally and unintentionally cut through the drip pans on certain units.

28. Approximately ninety-seven (97) units were installed on the roof. Of the ninety-seven (97), the drip pans were accidentally and unintentionally cut on only twenty-seven (27) units.

29. Trane discovered the damage to the Trane HVAC unit drip pans during its factory startup.

30. CDCC informed ECI of the damage, and it was determined that ECI had inadvertently caused the damage to the unit drip pans.

31. Trane refused to warrant the Trane HVAC units because of the drip pan damage. [A true and correct copy of Trane's email to CDCC wherein Trane

communicates its refusal to warrant the Trane HVAC units is attached hereto as **Exhibit C**.].

32. The Trane HVAC units had to be replaced with undamaged units.

33. CDCC forced ECI to pay for the replacement units in the form of change orders to the original subcontract.  [True and correct copies of the May 25, 2021 Change Order and the November 4, 2021 Change Order are attached hereto as **Exhibits D and E**, respectively.  A true and correct copy of a list of approved change orders for the Project and their amounts is attached hereto as **Exhibit F**.].

34. ECI was also forced to incur costs associated with rerunning electrical wiring through the replacement Trane HVAC units and relocating the damaged units.

## II.     THE GRANGE POLICY

35. During the time period relevant to the facts above, ECI maintained an insurance policy with Grange.

36. Specifically, ECI maintained a Commercial General Liability Policy, Policy No. CPP 2811818-00 (the "Policy" or "Grange Policy"), with Grange for a Policy Period of June 26, 2020 to June 26, 2021. [A true and correct copy of the Policy is attached hereto as **Exhibit G**.]

37. The Policy contains a $1,000,000 per occurrence policy limit.

38. The Policy Insuring Agreement provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.
>
> . . .
>
> This insurance applies to . . . "property damage" only if:
>
> 1. The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> 2. The . . . "property damage" occurs during the policy period; and
>
> 3. Prior to the policy period, no insured . . . and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the . . . "property damage" had occurred, in whole or in part. . . .

Exhibit G, at 124.

39. The Policy defines "property damage" as follows:

> "Property damage" means:
>
> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

7

Exhibit G, at 138.

40. The Policy defines "Occurrence" as: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*

41. The Policy also contains certain exclusions that Grange asserts limit or bar coverage:

> **Expected or Intended Injury**
> "[P]roperty damage" expected or intended from the standpoint of the insured. . . .
>
> . . .
>
> **Contractual Liability**
> . . . "[P]roperty damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> (1) That the insured would have in the absence of the contract or agreement; or
>
> (2) Assumed in a contract or agreement that is an "insured contract", provided the . . . "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of . . . "property damage", provided:
>
>> (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

>> (b) Such attorneys fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.
>
> **Damage to Property**
> "Property damage" to:
>
> . . .
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any real property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> . . .
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".
>
> . . .
>
> **Damage to Your Work**
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
>
> **Damage To Impaired Property Or Property Not Physically Injured**

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Exhibit G, at 125, 127–28.

42. The Policy defines "Products-completed operation hazard" to include:

> [A]ll . . . "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> (1) Products that are still in your physical possession; or
>
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
>> (a) When all of the work called for in your contract has been completed.
>>
>> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

>> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Exhibit G, at 138.

> 43. The Policy defines "Your work" to mean:
>
>> Work or operations performed by you or on your behalf; and
>>
>> Materials, parts or equipment furnished in connection with such work or operations.
>>
>> Includ[ing]:
>>
>> Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
>>
>> The providing of or failure to provide warnings or instructions.

Exhibit G, at 139.

> 44. The Policy contains the following definition of "Impaired property":
>
>> "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Exhibit G, at 136.

### III.  THE POLICY PROVIDES COVERAGE FOR DAMAGES THAT ECI INCURRED AS A RESULT OF THE DAMAGED DRIP PANS

45. ECI is the "Named Insured" under the Policy.

46. ECI was obligated to incur damages as a result of the damage to the drip pans.

47. The physical damage to the drip pans and Trane HVAC units constitutes "property damage" under the Policy.

48. The "property damage" to the drip pans was caused by an "occurrence" that took place during the Policy period.

49. Specifically, at some point during the Policy period, ECI accidently and inadvertently damaged the drip pans while cutting a conduit pathway through the metal sheet on which Trane HVAC units were placed by another contractor.

50. CDCC Superintendent James Chance completed daily reports that provided a detailed description of what occurred at the Project every day.

51. Work on the roof was performed in sequential order, beginning with sequence 1 and ending with sequence 6.

52. According to the July 2020 reports, All Systems placed sequences 2, 3, and 4 of the Trane HVAC units on the roof on July 13, July 14, and July 15, 2020. [True and correct copies of the July 13, July 14, and July 15, 2020 daily reports are collectively attached hereto as **Exhibit H**.].

53. ECI performed the work of cutting through the metal sheet beneath the units after All Systems placed the units on the roof.

54. Sequences 2, 3, and 4 contained the majority of the units that ECI accidentally damaged. [A true and correct copy of the Overall Roof Plan – HVAC for the Project is attached hereto as **Exhibit I**. A true and correct copy of the Overall Roof Plan – HVAC for the Project that includes sequence labels is attached hereto as **Exhibit J**.].

55. The remaining units that were accidentally damaged were, on information and belief, in sequence 6. According to the sequence of the work on the roof, units in sequence 6 were placed on the roof after sequences 2, 3, and 4, and therefore, were necessarily placed on the roof during the Grange policy period.

56. The drip pan damages do not fall within any exclusions in the Policy.

57. The drip pan damages were not expected or intended from the standpoint of ECI.

58. Neither ECI nor any subcontractor working on ECI's behalf performed work or operations on the drip pans or the Trane HVAC units at the time the damages occurred.

59. Alternatively, the drip pan damages fall within the Products-completed operation hazard carve out in the Policy.

60. The Policy provides primary coverage to ECI for the drip pan damages.

IV. **GRANGE HAS WRONGFULLY REFUSED TO PROVIDE COVERAGE FOR THE DRIP PAN DAMAGES**

61. ECI submitted a claim with Grange for the damages it incurred as a result of the drip pan damage and replacement.

62. On April 14, 2021, Grange issued a Reservation of Rights letter. [A true and correct copy of the April 14, 2021 Reservation of Rights Letter is attached hereto as **Exhibit K**.].

63. In the April 14, 2021 Reservation of Rights Letter, Grange incorrectly concludes that "faulty work cannot be characterized as accidental[] . . . [or] damage to tangible property." Exhibit K, at 1–2.

64. Grange also concludes that "there would have to be physical damage to the RTU's" for there to have been property damage under the Policy, despite the fact that it describes the loss as "the alleged damages to the RTU's" earlier in the letter. *Id.*

65. Grange states that "the property damage must have occurred after the June 25, 2020 effective date of the [P]olicy" and that Grange "advised [ECI's] agent to notify [ECI's] prior insurance carrier of [the loss,]" despite the fact that Grange designates the date of loss as November 1, 2020. *Id.*

66. Grange then provides a laundry list of exclusions that "may apply": "the Expected or Intended Exclusion A, the Contractual Liability Exclusion B, the Damage to Property Exclusion J, the Damage to Your Work Exclusion L and the Damage to Impaired Property Exclusion M[.]" *Id.* at 2.

67. On May 18, 2021, Grange issued a supplemental Reservation of Rights letter. [A true and correct copy of the May 18, 2021 Reservation of Rights Letter is attached hereto as **Exhibit L**.].

68. In the May 18, 2021 Reservation of Rights Letter, Grange summarily and incorrectly concludes that "the damages alleged to the RTUs are not 'property damage' as defined in the Policy and may not have resulted from an 'occurrence.'" Exhibit L, at 4.

69. Grange further concludes that "some or all of the damages alleged may have occurred outside a policy period[,]" despite the fact that the Date of Loss was designated in that same letter as November 1, 2020. *Id.*

70. Grange also claims that "the damages clearly fall within exclusion J(6) and possibly exclusions J(5) and m." *Id.*

71. ECI also maintained a policy with The Travelers Commercial General Insurance Policy, Policy No. DT-CO-6J489503-IND-19 (the "Travelers Policy"), which immediately preceded the Grange Policy and had a policy period that ran from June 25, 2019 to June 25, 2020.

72. Grange discussed the loss with Travelers, and Grange incorrectly determined that the damage to the Trane HVAC units occurred within the Travelers Policy period, not the Grange Policy period.  [A true and correct copy of an email chain dated from March 9, 2021 to April 21, 2021 regarding the loss is attached hereto as **Exhibit M**.].

73. Grange insufficiently investigated the loss prior to its denial of the claim.

74. Grange never informed ECI that it would be on-site at the Project to investigate the claim.

75. Grange insufficiently investigated when the damage to the units occurred prior to its denial of the claim.

76. Grange wrongfully denied ECI's claim or otherwise refused to pay ECI for damages that ECI was obligated to incur and did incur as a result of the drip pan damages.

## COUNT I: BREACH OF CONTRACT

77. ECI repeats and realleges the allegations set forth in paragraphs 1 through 76 of this Complaint as if fully restated herein.

78. Grange has a contractual duty to pay ECI for damages that ECI was obligated to incur and did incur as a result of the drip pan damages.

79. ECI timely notified Grange of the drip pan damages and complied with all other conditions to receive payment under the Policy.

80. Grange breached its duty to pay ECI by denying ECI's claim and refusing to pay ECI for the damages that ECI incurred as a result of the drip pan damages.

81. ECI suffered damages as a result of Grange's breach.

82. These damages include the damages that ECI was obligated to incur as a result of the damage to the drip pans for which ECI is entitled to reimbursement under the Policy.

## COUNT II: DECLARATORY JUDGMENT

83. ECI repeats and realleges the allegations set forth in paragraphs 1 through 82 of this Complaint as if fully restated herein.

84. ECI seeks a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201.

85. An actual controversy of a judicial nature exists between ECI and Grange regarding Grange's obligation to pay ECI for the damages that ECI was obligated to incur as a result of the drip pan damages.

86. Damages that ECI was obligated to incur and did incur as a result of the drip pan damages are covered by the Policy.

87. ECI timely notified Grange of the damages and complied with all other conditions to receive payment under the Policy.

88. Grange contends that the damages are not covered by the Policy and has refused to pay ECI pursuant to the Policy.

89. ECI seeks a declaration that Grange is obligated to pay ECI for the damages ECI incurred as a result of the drip pan damages.

## COUNT III: BAD FAITH

90. ECI repeats and realleges the allegations set forth in paragraphs 1 through __ of this Complaint as if fully restated herein.

91. ECI suffered a loss which is covered by the Policy.

92. ECI made a demand for payment under the Policy.

93. Grange refused to pay ECI for the damages within sixty (60) days of ECI's demand for payment.

94. Grange's refusal to pay for the damages was in bad faith.

95. Grange is liable to ECI for the covered damages, as well as statutory damages and attorney's fees under O.C.G.A. § 33-4-6.

## DEMAND FOR JURY TRIAL

ECI hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, ECI prays for relief as follows:

a. ECI requests that this Court enter judgment in favor of ECI and against Grange on all of ECI's claims;

b. ECI requests that this Court hold that Grange has breached its contractual obligations to ECI by failing to pay ECI for the damages ECI incurred as a result of the drip pan damages and award ECI damages for Grange's breach;

c. ECI requests that this Court issue a declaration that Grange is obligated to pay ECI for damages that ECI incurred as a result of the drip pan damages;

d. ECI requests that the Court hold that Grange's refusal to pay ECI has been in bad faith and award ECI statutory damages and attorney's fees pursuant to O.C.G.A. § 33-4-6; and

e. ECI requests such other and further relief as this Court deems just and proper.

Respectfully submitted, this 13th day of March, 2023.

/s/*D. Austin Bersinger*
D. Austin Bersinger
Georgia Bar No. 144792
Christopher J. Daniels
Georgia Bar No. 113177
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, Georgia 30326-1092
Tel. (404) 264-4082
Fax (404) 264-4033
Email: austin.bersinger@btlaw.com
Email: cdaniels@btlaw.com

*Attorneys for Plaintiff Electrical Contractor, Incorporated*