FILED 8/11/2016 3:11:34 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

IN THE SUPERIOR COURT FOR THE COUNTY OF DEKALB
STATE OF GEORGIA

|  |  |  |
|---|---|---|
| STATE OF GEORGIA | ) | |
| | ) | |
| VS. | ) | CRIMINAL ACTION FILE NO. |
| | ) | 13CR4448-3 |
| CHAZREL J. BURTON | ) | |
|     DEFENDANT | ) | |

        TRANSCRIPT OF PRETRIAL, PLEA, AND SENTENCE PROCEEDINGS IN THE ABOVE-CAPTIONED CASE, HELD BEFORE THE HONORABLE CLARENCE F. SEELIGER, SUPERIOR COURT JUDGE, ON THE 15TH DAY OF APRIL, 2016, IN COURTROOM 7A OF THE DEKALB COUNTY COURTHOUSE, DECATUR, GEORGIA.

APPEARANCES OF COUNSEL:

    TIA PATTERSON, ASSISTANT DISTRICT ATTORNEY, ON BEHALF OF THE STATE.

    ELIZABETH VILA ROGAN, ESQ., ON BEHALF OF THE DEFENDANT.

FAYE A. DAVIS
OFFICIAL COURT REPORTER
STONE MOUNTAIN JUDICIAL CIRCUIT

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2          (WHEREUPON THE COURT COMMENCED AT 1:41 P.M., AFTER

 3     WHICH THE FOLLOWING PROCEEDINGS TOOK PLACE.)

 4          THE COURT:  ALL RIGHT.  LET'S SEE.  FIRST OF ALL, THIS

 5     IS THE CHAZ J. BURTON CASE.  IT IS A FORMAL PRETRIAL.  I AM

 6     ALSO PRESIDING THIS WEEK, WHICH MEANS THAT I MAY HAVE TO

 7     INTERRUPT IN ORDER TO GET A SEARCH WARRANT OR SOMETHING

 8     ALONG THAT LINE, SO I HOPE IT WON'T IMPEDE US TOO MUCH.

 9          FIRST OF ALL, LET ME JUST ASK, BEFORE YOU MAKE YOUR

10     OPENING STATEMENT, CAN YOU TELL ME HOW MANY WITNESSES YOU

11     INTEND TO CALL?

12          MS. PATTERSON:  I HAVE ONE WITNESS, YOUR HONOR.

13          THE COURT:  ONE WITNESS?

14          MS. PATTERSON:  YES.

15          THE COURT:  DO YOU INTEND TO CALL ANY WITNESSES?

16          MS. ROGAN:  YES, JUDGE.  I HAVE ONE WITNESS AND THEN,

17     OBVIOUSLY, MR. BURTON WOULD LIKE TO MAKE A STATEMENT AND

18     HIS MOTHER, AND WE CAN DO THAT UNDER OATH OR NOT.  BUT I DO

19     HAVE ONE WITNESS WHO I WILL CALL AS A FORMAL WITNESS.

20          THE COURT:  OKAY.  ALL RIGHT.  I WILL ASK

21     MS. PATTERSON, WOULD YOU GIVE ME THE STATE'S VERSION OF

22     WHAT HAS TRANSPIRED WITH MR. BURTON AND WHAT YOUR

23     RECOMMENDATION WOULD BE IN CASE THERE IS A PLEA.

24          MS. PATTERSON:  YES, YOUR HONOR.  MR. BURTON IS

25     CHARGED WITH 12 SEPARATE COUNTS:  THREE COUNTS OF CRIMINAL
```

1        ATTEMPT TO COMMIT MURDER, THREE COUNTS OF AGGRAVATED

2        ASSAULT, ONE COUNT OF CRUELTY TO CHILDREN IN THE FIRST

3        DEGREE, ONE COUNT OF CRIMINAL DAMAGE TO PROPERTY IN THE

4        FIRST DEGREE, ONE COUNT OF ROBBERY BY SUDDEN SNATCHING, AND

5        THREE COUNTS OF POSSESSION OF A FIREARM DURING THE

6        COMMISSION OF A CRIME.

7             WERE THIS CASE TO PROCEED TO TRIAL, THE STATE EXPECTS

8        THE EVIDENCE IN THIS CASE TO SHOW THAT ON JUNE 26TH, 2013,

9        AT ABOUT 12:45 P.M. ON A WEDNESDAY AFTERNOON, THE

10       DEFENDANT, CHAZREL BURTON, ROBBED COREY HUNTER, THE VICTIM

11       IN THIS CASE, OUTSIDE THE CHASE BANK AT NORTH HAIRSTON AND

12       MEMORIAL DRIVE.  THEY HAD A BRIEF CONVERSATION, AFTER WHICH

13       THE DEFENDANT SNATCHED THE GOLD-PLATED CHAIN FROM AROUND

14       MR. HUNTER'S NECK AND PROCEEDED TO RUN AWAY.

15            MR. JERMAINE HARRISON, ONE OF OUR SHOOTING VICTIMS IN

16       THE CASE, WITNESSED THIS ROBBERY.  ABOUT TEN MINUTES LATER,

17       MR. HARRISON, ALONG WITH HIS WIFE, NINA HARRISON, WHO ARE

18       IN THE COURTROOM TODAY, AND THEIR TWO-YEAR-OLD SON EVAN

19       HARRISON, ARRIVED AT THE KROGER, WHICH IS LOCATED IN THE

20       SAME SHOPPING PLAZA AS THE CHASE BANK.  MS. HARRISON WAS

21       DRIVING THE VEHICLE, AND EVAN WAS SITTING IN THE CAR SEAT

22       THAT WAS POSITIONED IN THE MIDDLE OF THE BACK SEAT AREA.

23            AS THE HARRISONS PULLED UP TO THE ENTRANCE OF THE

24       KROGER, MR. HARRISON IMMEDIATELY RECOGNIZED THE DEFENDANT

25       AS THE INDIVIDUAL WHO COMMITTED THE ROBBERY JUST MINUTES

1    BEFORE.  HE WAS WEARING THE SAME CLOTHING AS WELL AS A

2    DISTINCTIVE BLACK RAIDERS BALLCAP.  MR. HARRISON DECIDED TO

3    CONFRONT THE DEFENDANT IN A GOOD SAMARITAN EFFORT TO DETAIN

4    HIM FOR AUTHORITIES FOR THE ROBBERY.  THERE WAS A SECURITY

5    GUARD LOCATED AT THE FRONT ENTRANCE OF THE KROGER, AND

6    MR. HARRISON TOLD THAT SECURITY GUARD TO CALL THE POLICE.

7         THERE WAS A BRIEF STRUGGLE AS THE DEFENDANT RESISTED

8    AND DENIED THE ACCUSATIONS OF THE ROBBERY.  AND ONCE

9    MR. HARRISON REALIZED THAT THE ENCOUNTER WAS GETTING A

10   LITTLE BIT MORE HEATED THAN EXPECTED, HE PROMPTLY

11   DISENGAGED HIMSELF AND STARTED WALKING AWAY.  AND AS HE IS

12   WALKING AWAY, HE IS CAPTURED ON THE KROGER SURVEILLANCE

13   VIDEO, AS WELL AS THE DEFENDANT, AND I WOULD LIKE TO

14   PUBLISH THAT VIDEO FOR THE COURT, IF I MAY.

15        THE COURT:  GO AHEAD.

16        (WHEREUPON THE VIDEO WAS PLAYED IN OPEN COURT.)

17        MS. PATTERSON:  THERE IS NO AUDIO IN THIS RECORDING.

18   AND IF I DIRECT YOUR ATTENTION TO THE LOWER PORTION, THE

19   MIDDLE PORTION OF THE SCREEN, RIGHT HERE WHERE YOU SEE THE

20   VEHICLE, THAT IS THE DEFENDANT -- I'M SORRY, THE VICTIM,

21   MR. HARRISON, AND THE DEFENDANT.

22        I HAVE ONE MORE VIDEO, YOUR HONOR.  IT IS AT A

23   DIFFERENT ANGLE, SLIGHTLY DIFFERENT ANGLE, STILL SHOWING

24   THE VEHICLE PARKED DIRECTLY IN FRONT OF THE KROGER PARKING

25   LOT.

```
 1        (WHEREUPON THE VIDEO WAS PLAYED IN OPEN COURT.)

 2        MS. PATTERSON:  AND HERE IS THE DEFENDANT.  AS THE

 3   COURT CAN SEE CLEARLY IN THE VIDEO, IT SHOWS THAT

 4   MR. HARRISON IS CLEARLY WALKING AWAY WITH HIS BACK TO THE

 5   DEFENDANT AS HE STARTS TO GET BACK INTO THE PASSENGER SIDE

 6   OF THE CAR WHERE MS. HARRISON WAS TEMPORARILY PARKED AT THE

 7   FRONT ENTRANCE OF THE KROGER.  THE VIDEO ALSO SHOWS THE

 8   DEFENDANT BEGAN TO WALK AWAY, AS WELL, WITH HIS BACK TURNED

 9   TO MR. HARRISON AFTER THE BRIEF ENCOUNTER IN FRONT OF THE

10   KROGER.  AGAIN, THE PARTIES HAVE CLEARLY DISENGAGED FROM

11   THEIR PHYSICAL ALTERCATION AND ARE WALKING AWAY FROM EACH

12   OTHER.

13        HOWEVER, AS YOU CAN SEE IN THE VIDEO THAT WAS JUST

14   PUBLISHED, THE DEFENDANT STARTS TO CALMLY WALK AWAY AND

15   THEN WHIPS AROUND WITH A GUN IN HIS RIGHT HAND AND STARTS

16   TO FIRE HIS .9-MILLIMETER HANDGUN IN A VERY COOL,

17   COLLECTIVE MANNER.  THE VIDEO CLEARLY SHOWS HIM SHOOTING AS

18   HE WALKED ACROSS THE FRONT OF THE CAR, NOT RUNNING, BUT

19   WALKING.  THE DEFENDANT UNLOADED A FULL MAGAZINE OF

20   .9-MILLIMETER AMMUNITION AT A VEHICLE PARKED DIRECTLY IN

21   FRONT OF THE KROGER, FIFTEEN ROUNDS OF LEAD AND BRASS

22   FLYING AROUND IN PUBLIC.  THIS OCCURRED DIRECTLY IN FRONT

23   OF THE KROGER GROCERY STORE IN BROAD DAYLIGHT WITH MULTIPLE

24   PATRONS GOING IN AND OUT.  AS YOU CAN SEE FROM THE VIDEO,

25   THAT PARKING LOT WAS EXTREMELY FULL AND VERY BUSY THAT DAY.
```

1       HE SHOT NOT ONLY AT MR. HARRISON, BUT AT THE ENTIRE

2       VEHICLE, AT MS. HARRISON AS SHE IS IN THE DRIVER'S SEAT --

3       AND AT TWO-YEAR-OLD EVAN HARRISON.

4            THE BULLET CASINGS CORROBORATE WHAT IS CAPTURED ON THE

5       VIDEO.  AND I WOULD LIKE TO PRESENT THE COURT WITH SOME OF

6       THE PHOTOS IN THIS CASE.  THESE PHOTOS HAVE ALREADY BEEN

7       PRESENTED TO THE DEFENSE PRIOR TO THE BEGINNING OF THIS

8       HEARING.  I WOULD LIKE TO SHOW YOU THESE PHOTOS, YOUR

9       HONOR, TO INDICATE THE BOLDNESS OF THE DEFENDANT'S ACTIONS.

10           THE STATE PRESENTS WHAT HAS BEEN MARKED AS EXHIBIT

11      1(A).  THIS IS JUST A STILL SHOT OF THAT SAME VIDEO, YOUR

12      HONOR, TO INDICATE THE CLOSE PROXIMITY OF THE DEFENDANT TO

13      THE VICTIM'S CAR.  AS YOU CAN SEE, HE IS --

14           THE COURT:  YOU NEED TO EXPLAIN SOMETHING TO ME.  WHO

15      IS GETTING IN THE CAR IN FRONT OF THE KROGER?

16           MS. PATTERSON:  YES.

17           THE COURT:  IS THAT THE DEFENDANT?

18           MS. PATTERSON:  RIGHT HERE, YOUR HONOR, THAT IS

19      MR. HARRISON.  HE IS ATTEMPTING TO FLEE OUT OF THE VEHICLE

20      AS HE JUST WALKED OUT OF KROGER IN ORDER TO ENTER THE

21      PASSENGER SIDE OF THE VEHICLE.  THIS MAN STANDING HERE WITH

22      HIS ARM OUTSTRETCHED IS THE DEFENDANT (INDICATING).

23           THE COURT:  OKAY.

24           MS. PATTERSON:  AND I HAVE PRESENTED THIS PICTURE IN

25      ORDER TO SHOW THE CLOSE PROXIMITY OF THE DEFENDANT TO THE

1    VICTIM'S VEHICLE.

2         THE STATE PRESENTS WHAT HAS BEEN PREVIOUSLY MARKED AS

3    EXHIBIT 1(B).  THIS IS ANOTHER PICTURE, AS YOU CAN SEE, OF

4    THE DEFENDANT WITH HIS ARM OUTSTRETCHED WITH THE GUN IN HIS

5    HAND.

6         THE COURT:  ARE YOU ALLEGING THE DEFENDANT IS FIRING

7    AT THE VICTIM?  IS THAT CORRECT?

8         MS. PATTERSON:  CORRECT, YOUR HONOR.  IN THE DIRECTION

9    OF THE VEHICLE, WHICH IS OCCUPIED BY MS. HARRISON AND EVAN.

10        THE COURT:  ALL RIGHT.  EXPLAIN IT TO ME ONE MORE

11   TIME.  WHERE THE DEFENDANT IS, HE IS IN THE WHITE SHIRT ON

12   THIS SIDE OF THE VEHICLE (INDICATING)?

13        MS. PATTERSON:  NO, YOUR HONOR, THAT IS MR. HARRISON.

14        THE COURT:  THAT'S MR. HARRISON.  THE DEFENDANT --

15        MS. PATTERSON:  THE DEFENDANT IS HERE IN BLACK.

16        THE COURT:  OKAY.

17        MS. PATTERSON:  AND THE VICTIM'S VEHICLE IS RIGHT

18   HERE.  AND HE IS POINTING IN THE AREA OF THE VEHICLE

19   (INDICATING).

20        THE COURT:  ALL RIGHT.

21        MS. PATTERSON:  AS WELL AS THE FRONT ENTRANCE OF THE

22   KROGER.

23        THE COURT:  ALL RIGHT.  GO THROUGH THE SEQUENCE AGAIN.

24   YOU SAY THEY WERE BOTH IN THE VEHICLE?

25        MS. PATTERSON:  YES, YOUR HONOR.

1          THE COURT:  AND THEN WHATEVER HAPPENED BETWEEN THEM,

2     THEY DIRECTED OUTSIDE THE VEHICLE?

3          MS. PATTERSON:  YES, YOUR HONOR.  IF I MAY CLARIFY.

4          THE COURT:  YES, GO AHEAD.

5          MS. PATTERSON:  EXHIBIT 1(A), STATE'S EXHIBIT 1(A),

6     WHAT HAD OCCURRED, THEY WERE BOTH NEAR THE FRONT ENTRANCE

7     OF THE KROGER, AND THAT IS WHEN MR. HARRISON RECOGNIZED THE

8     DEFENDANT.  THERE WAS A BRIEF STRUGGLE THAT TOOK PLACE

9     BETWEEN THEM IN FRONT OF THE KROGER.  HOWEVER, AFTER

10    MR. HARRISON REALIZED IT WAS GETTING A LITTLE MORE HEATED

11    THAN HE LIKED, HE THEN WALKED BACK TO HIS VEHICLE, THE

12    PASSENGER SIDE OF THE VEHICLE BECAUSE, REMEMBER, HIS WIFE

13    WAS DRIVING.

14         THE COURT:  OKAY.

15         MS. PATTERSON:  AT THAT TIME, THE DEFENDANT WAS

16    WALKING OUT OF KROGER AT THE SAME TIME.  SO SIMULTANEOUSLY,

17    THEY WERE WALKING WITH THEIR BACKS TOWARDS EACH OTHER.  AS

18    MR. HARRISON WENT TO THE CAR, THE DEFENDANT WAS WALKING

19    AROUND THE CAR.  BUT AS HE CONTINUES TO WALK AROUND THE

20    CAR, HE QUICKLY TURNS BACK AROUND, POINTS THE GUN AT THE

21    VEHICLE, AND UNLOADS HIS .9-MILLIMETER GUN 15 TIMES.

22         THE COURT:  HOW MANY SHOTS ARE YOU SAYING THAT THE

23    DEFENDANT FIRED AT THAT POINT?

24         MS. PATTERSON:  THERE WERE 15 SHELL CASINGS FOUND,

25    YOUR HONOR.  IF I MAY PUBLISH STATE'S EXHIBIT NO. 3.  THESE

1    ARE SOME OF THE POSITIONINGS OF THE SHELL CASINGS THAT WERE

2    DISCOVERED RIGHT THERE IN FRONT OF THE KROGER.

3         AS WELL AS STATE'S EXHIBIT NO. 4.

4         I WILL GO ON TO THEN PUBLISH STATE'S EXHIBIT NO. 2 SO

5    THAT YOUR HONOR CAN GET A CLEAR PICTURE OF THE LOCATION OF

6    THE VEHICLE IN PROXIMITY TO THE KROGER.

7         STATE'S EXHIBIT NO. 5 SHOWS THE VEHICLE RIDDLED WITH

8    BULLETS.  THE VEHICLE HAD 17 DEFECTS, AND THREE OF THE

9    WINDOWS WERE SHATTERED.  AS YOU CAN SEE FROM THE EARLIER

10   EXHIBITS, BULLETS WERE ALSO STREWN ACROSS THE KROGER

11   PARKING LOT, BEHIND THE CAR, WHERE PEOPLE WERE ALL AROUND

12   IN BROAD DAYLIGHT.

13        THE COURT:  I MAY HAVE MISSED THIS.  WAS THERE ANYONE

14   IN THE CAR?

15        MS. PATTERSON:  AT THIS POINT, THERE IS NO ONE IN THE

16   CAR.  BUT WHEN THE DEFENDANT WAS SHOOTING, THERE WAS INDEED

17   PEOPLE IN THE CAR.  MS. HARRISON WAS IN THE VEHICLE, SHE

18   WAS IN THE DRIVER'S SEAT.  SHE WAS IN THE DRIVER'S SEAT.

19        THE COURT:  TELL ME AGAIN, WHAT IS THE SEQUENCE AGAIN?

20        MS. PATTERSON:  OKAY.  ONCE THE DEFENDANT TURNS AROUND

21   AND BEGINS UNLOADING HIS .9-MILLIMETER HANDGUN STRIKING THE

22   VEHICLE 17 TIMES, MS. HARRISON IS SITTING RIGHT HERE

23   (INDICATING).

24        THE COURT:  THAT'S AFTER THE SHOTS WERE FIRED?

25        MS. PATTERSON:  NO, SIR.

```
 1              THE COURT:  THAT'S WHY I ASKED YOU.  WAS ANYONE IN THE

 2      VEHICLE WHEN THE SHOTS ARE BEING FIRED?

 3              MS. PATTERSON:  EXACTLY, YOUR HONOR, YES.

 4      MS. HARRISON IS SITTING IN THE DRIVER'S SEAT IN BROAD

 5      DAYLIGHT.

 6              THE COURT:  OKAY.  ALL RIGHT.

 7              MS. PATTERSON:  CAN BE EASILY SEEN BY THE DEFENDANT.

 8      SHE IS SITTING RIGHT HERE, RIGHT WHERE THIS WINDOW IS

 9      COMPLETELY GONE (INDICATING).

10              THE COURT:  WAS SHE INJURED?

11              MS. PATTERSON:  THE TWO-YEAR-OLD CHILD -- YOUR HONOR,

12      IF I MAY PUBLISH STATE'S EXHIBIT 7.  THEIR TWO-YEAR-OLD

13      CHILD EVAN IS SITTING RIGHT HERE IN THE CAR SEAT, IN THE

14      MIDDLE OF THE CAR SEAT.  NOT BEHIND THE PASSENGER SEAT, NOT

15      BEHIND THE DRIVER'S SEAT, HE IS IN THE MIDDLE.  HE IS ALSO

16      VISIBLE IN PLAIN VIEW.

17              STATE'S EXHIBIT 8 ALSO SHOWS A CLEARER PICTURE OF

18      EVAN'S CAR SEAT WHERE IT WAS LOCATED IN THE VEHICLE.  HE

19      WAS ALSO IN THAT CAR WHEN THE DEFENDANT SHOT.

20              THE COURT:  SLOW DOWN.  YOU ARE SAYING MS. HARRISON

21      WAS IN THE CAR?

22              MS. PATTERSON:  YES, SIR.

23              THE COURT:  AND THE CHILD WAS IN THE CAR?

24              MS. PATTERSON:  YES, YOUR HONOR.

25              THE COURT:  HOW OLD WAS THE CHILD?
```

1          MS. PATTERSON:  THE CHILD WAS TWO YEARS OLD AT THE

2     TIME.

3          THE COURT:  WERE EITHER ONE OF THEM INJURED?

4          MS. PATTERSON:  YES, YOUR HONOR, THE CHILD WAS

5     INJURED.  HE WAS SHOT IN THE ABDOMEN, HIS LIVER WAS

6     INJURED.  HE HAD A LACERATED LIVER.

7          IF I MAY, YOUR HONOR, PRESENT STATE'S EXHIBIT NO. 9.

8     THIS IS A PICTURE OF EVAN'S CAR SEAT, THE CAR SEAT THAT HE

9     WAS OCCUPYING ON THAT DAY.  THIS HERE, THIS DISCOLORATION

10    HERE, THAT IS THE BLOOD FROM THE GUNSHOT WOUND THAT HE

11    SUFFERED THAT DAY TO HIS ABDOMEN.

12         AFTER EMPTYING HIS ENTIRE 15-ROUND MAGAZINE, THE

13    DEFENDANT FLED THE SCENE.  AS YOU CAN SEE IN THE VIDEO, HE

14    IS RUNNING AROUND THE PARKING LOT TRYING TO HIDE HIMSELF,

15    AND HE DOES EVENTUALLY FLEE AND GET AWAY.  MIRACULOUSLY,

16    MS. HARRISON DID NOT GET HIT.  HOWEVER, AS YOU SAW IN

17    STATE'S EXHIBIT 9, THE BABY, EVAN, WHO WAS TWO YEARS OLD AT

18    THE TIME, HE WAS STRUCK BY THE DEFENDANT'S HAILSTORM OF

19    BULLETS AS HE HELPLESSLY SAT IN HIS CAR SEAT.

20         TWO-YEAR-OLD EVAN SUFFERED A GUNSHOT WOUND TO HIS

21    ABDOMEN.  AND THE STATE HAS PRESENTED THE BLOOD THAT WAS

22    FOUND IN HIS CAR SEAT.  HE SUFFERED A LACERATED LIVER.  THE

23    BULLETS SEVERED HIS HEPATIC ARTERY, THE ARTERY THAT

24    SUPPLIES BLOOD TO THE LIVER.  HE HAD HEMORRHAGIC SHOCK, AN

25    INTRA-ABDOMINAL HEMORRHAGE, A DIAPHRAGM INJURY, AND A

1    HEMOTHORAX.  THAT HEMOTHORAX IS WHEN BLOOD IS BETWEEN THE

2    CHEST WALL AND LUNG.  HE ALSO SUFFERED ACUTE RESPIRATORY

3    FAILURE.

4         EVAN, A TWO-YEAR-OLD LITTLE BOY, WENT THROUGH THREE

5    SURGERIES IN ONE-WEEK TIME TO REPAIR THE DAMAGE CAUSED BY

6    THE DEFENDANT IN THIS CASE.  IF UNTREATED, HE WOULD HAVE

7    BLED OUT.  AFTER THE FIRST SURGERY, HE SUFFERED ABDOMINAL

8    COMPARTMENT SYNDROME, WHICH, IF NOT TREATED, WOULD HAVE

9    BEEN FATAL.

10        HE UNDERWENT A FOURTH SURGERY ON NOVEMBER 14TH, 2014,

11   IN ORDER TO REMOVE SCAR TISSUE FROM THE WOUND.  THE STATE

12   PRESENTS EXHIBIT 12.  THIS IS A PICTURE OF EVAN'S ABDOMINAL

13   CAVITY WHERE THE SCAR TISSUE WAS PRESENT.  BASICALLY, THE

14   SCAR TISSUE WAS BLOCKING HIS INTESTINES, PREVENTING HIS

15   WASTE FROM LEAVING, REMOVING THE WASTE FROM HIS BODY.

16        ONCE EVAN WAS RELEASED, ONCE HE WAS REMOVED FROM

17   INTENSIVE CARE, HE HAD TO UNDERGO EXTENSIVE PHYSICAL

18   THERAPY IN ORDER TO LEARN HOW TO WALK AGAIN.  HE WAS TWO

19   YEARS OLD, HE HAD NOT TOO LONG LEARNED HOW TO WALK, AND NOW

20   HE HAD TO START BACK COMPLETELY OVER.

21        AND THE STATE PRESENTS STATE'S EXHIBIT NO. 10.  THIS

22   IS A PICTURE OF LITTLE EVAN STILL LEARNING HOW TO WALK

23   AGAIN IN HIS PHYSICAL THERAPY.

24        THE STATE PRESENTS EXHIBIT NO. 11, ANOTHER PICTURE OF

25   LITTLE EVAN LEARNING TO WALK.

1          EVAN EXPERIENCES SPEECH AND DEVELOPMENTAL DELAYS TO

2     THIS DAY AND WILL LIKELY NEVER DEVELOP AT A NORMAL RATE OF

3     A CHILD HIS AGE.

4          AT THIS TIME, YOUR HONOR, MS. HARRISON, EVAN'S MOTHER,

5     IS IN THE COURTROOM, AND SHE WISHES TO ADDRESS YOUR HONOR

6     ON BEHALF OF HERSELF AND MR. HARRISON, EVAN'S FATHER, WHO

7     IS ALSO PRESENT IN THE COURTROOM TODAY, WITH A STATEMENT

8     CONCERNING THE SEVERE IMPACT OF THIS EVENT IN THEIR LIVES,

9     AS WELL AS THEIR SON EVAN, WHO IS NOW FOUR YEARS OLD.

10         THE COURT:  ALL RIGHT.  LET ME MAKE SURE I GET THIS

11    CLEAR.  NO ONE ELSE WAS INJURED EXCEPT THE CHILD?

12         MS. PATTERSON:  CORRECT, YOUR HONOR, MIRACULOUSLY.

13    MIRACULOUSLY, NO ONE ELSE WAS INJURED.

14         THE COURT:  YOU MADE THAT POINT.  ALL RIGHT.  ANYTHING

15    FURTHER?  DO YOU HAVE A RECOMMENDATION AT THIS POINT?

16         MS. PATTERSON:  I DO HAVE FURTHER EVIDENCE AFTER

17    MS. HARRISON ADDRESSES THE COURT, IF I MAY, YOUR HONOR.

18    BUT IF IT PLEASE THE COURT, SHE WOULD LIKE TO ADDRESS THE

19    COURT.

20         THE COURT:  I WOULD LIKE TO GIVE THE DEFENSE AN

21    OPPORTUNITY TO RESPOND.

22         MS. PATTERSON:  SURE, YOUR HONOR.

23         THE COURT:  AND THEN YOU CAN PRESENT YOUR EVIDENCE.

24         MS. PATTERSON:  SURE, YOUR HONOR, I CAN CONTINUE.

25    MR. HARRISON WAS ABLE TO IDENTIFY THE DEFENDANT FROM A

1    PHOTO LINEUP.  THE DEFENDANT'S MOTHER CALLED THE POLICE THE

2    NEXT DAY, INDICATING THAT THE DEFENDANT WAS TO TURN HIMSELF

3    IN.  HOWEVER, IT WASN'T UNTIL A WEEK AFTER FLEEING FROM THE

4    SCENE, AFTER COUNTY RESOURCES WERE TIED UP LOOKING FOR HIM,

5    A COUNTYWIDE, METRO WIDE MANHUNT, THAT THE DEFENDANT,

6    PRESUMABLY UPON HIS MOTHER'S URGING, TURNED HIMSELF IN TO

7    POLICE.

8         THE DEFENDANT DOES NOT HAVE A PRIOR CRIMINAL RECORD.

9    HOWEVER, THE DEFENDANT IS INVOLVED IN AN OPEN CASE BEFORE

10   YOUR HONOR IN THE CASE OF 16CR1733.  IN THAT CASE, THE

11   DEFENDANT IS CHARGED WITH THREE COUNTS OF VIOLATION OF

12   STREET GANG TERRORISM AND PREVENTION ACT, AGGRAVATED

13   ASSAULT, AND RIOT IN A PENAL INSTITUTION.

14        ON MARCH 25TH, 2015, WHILE IN CUSTODY OF DEKALB COUNTY

15   FOR THE CHARGES STEMMING FROM THIS CASE, THE DEFENDANT

16   INITIATED AN ALTERCATION WITH ANOTHER INMATE, WHICH LED TO

17   A FIGHT WHERE THE DEFENDANT STRIKES THE OTHER INMATE IN THE

18   HEAD WITH A DINNER TRAY.  THE DEFENDANT ADMITTED TO THE

19   DEKALB COUNTY POLICE DEPARTMENT THAT HE WAS A GANGSTER

20   DISCIPLE AND THAT HE CHOSE TO FIGHT THAT DAY IN ORDER TO

21   SUPPORT HIS FELLOW GANG MEMBERS.  THE DEFENDANT HAS A

22   PROPENSITY OF VIOLENCE AND MAKES A VOLUNTARY DECISION TO

23   AFFILIATE WITH A VIOLENT AND DANGEROUS ORGANIZATION.

24        THE STATE'S RECOMMENDATION IN THIS CASE, CONCERNING

25   THE DISTURBING FACTS, CONCERNING THE VIOLENT NATURE OF THE

1    DEFENDANT, IS 40 YEARS, 30 YEARS INCARCERATED WITH THE

2    BALANCE PROBATED.  THE MAXIMUM SENTENCE THE DEFENDANT FACES

3    IN THIS CASE IS 155 YEARS OF INCARCERATION WITH A MINIMUM

4    OF 16 YEARS INCARCERATION.

5        THE STATE ANTICIPATES THAT THE DEFENSE WILL PRESENT

6    EVIDENCE OF AN ALLEGED DEPRESSION AND MENTAL HEALTH ISSUE

7    FOR THE DEFENDANT, AND THAT AS A RESULT OF A FLASHBACK OF

8    HIS PRIOR LIFE EXPERIENCES, HE ULTIMATELY SNAPPED IN FRONT

9    OF THE KROGER STORE AFTER THE BRIEF ALTERCATION WITH

10   MR. HARRISON.  HOWEVER, IT IS THE STATE'S UNDERSTANDING

11   THAT THE DEFENDANT HAS NOT BEEN CLINICALLY DIAGNOSED WITH

12   SCHIZOPHRENIA NOR BIPOLAR DISORDER.

13       THE STATE IS OF THE BELIEF THAT IN SOME ODD WAY, THE

14   DEFENDANT SEEMS TO BLAME THE ACTIONS OF MR. HARRISON FOR

15   THESE EVENTS WHEN THE DEFENDANT MADE A CONSCIOUS DECISION

16   FOR HIS ACTIONS THAT DAY.

17       HE IS A HIGH SCHOOL GRADUATE, WHO NOT ONLY DID WELL IN

18   HIGH SCHOOL BUT WAS ABLE TO BECOME STUDENT BODY PRESIDENT

19   AT STONE MOUNTAIN HIGH SCHOOL BEFORE GRADUATING AND

20   ATTENDING WEST GEORGIA COLLEGE, WHERE HE MAJORED IN

21   ECONOMICS.  HE THEN WENT ON TO JOIN THE UNITED STATES NAVY.

22       THIS DEFENDANT HAS SHOWN THAT HE IS FULLY CAPABLE OF

23   MAKING INTELLIGENT DECISIONS IN LIFE AND WAS ABLE TO HAVE

24   CONTROL OVER HIS ACTIONS TO NAVIGATE HIS WAY THROUGH LIFE

25   EXPERIENCES THAT OTHER DEFENDANTS IN THIS CRIMINAL SYSTEM

1        WOULD HAVE BEEN VERY PRIVILEGED TO HAVE EVER DREAMED OF.

2            THE STATE WOULD SUBMIT TO THE COURT THAT THE DEFENDANT

3        IS NOT A VICTIM SUFFERING WITH MENTAL ILLNESS, THAT HE IS

4        INSTEAD A VIOLENT PREDATOR THAT HAS NO REMORSE FOR HIS

5        ACTIONS.  HE WASN'T SCARED, HE WAS ANGRY THAT DAY.  HIS

6        ACTIONS WERE UNJUSTIFIABLE.  THIS CASE WAS CENTIMETERS AWAY

7        FROM MURDER, AND THE DEFENDANT DID NOTHING ELSE THAN

8        INSTILL TERROR IN THE LIVES OF MS. HARRISON AND EVERY OTHER

9        WITNESS TO THE SHOOTING ON JUNE 26.  HE DECIDED TO TEACH

10       JERMAINE AND HIS FAMILY A LESSON, DON'T MESS WITH HIM.  HE

11       IS NOT A VICTIM STRUGGLING WITH MENTAL ILLNESS; HE IS A

12       VIOLENT PREDATOR.

13           THANK YOU, YOUR HONOR.  AT THIS TIME, MAY MS. HARRISON

14       COME UP AND PRESENT TO THE COURT HER IMPACT STATEMENT?

15           THE COURT:  NO.  I WOULD RATHER HEAR FROM THE STATE

16       AND DEFENSE, AND I WILL HEAR EVIDENCE FROM BOTH SIDES.

17           MS. PATTERSON:  YES, YOUR HONOR.

18           THE COURT:  GO AHEAD, MA'AM.

19           MS. ROGAN:  GOOD AFTERNOON, YOUR HONOR.  I APOLOGIZE

20       FOR THE MESS-UP THIS MORNING.

21           THIS IS A HORRIFIC CASE, JUDGE, AND I'M NOT GOING TO

22       TRY TO SUGARCOAT WHAT HAPPENED TO THE HARRISONS THAT DAY.

23       IT WAS -- IT WAS A TRAGEDY OF ENORMOUS PROPORTIONS, AND IT

24       IS A MIRACLE THAT EVAN DID NOT DIE OF HIS INJURIES.  THIS

25       IS A VERY SAD CASE.  THERE ARE NOT GOING TO BE ANY WINNERS

1    AT THE END OF THIS.

2         I DO HAVE A PRESENTATION TO MAKE, AND I HAVE AN EXPERT

3    WITNESS TO CALL.  THE D.A.'S CHARACTER -- MISCHARACTERIZED

4    OUR ARGUMENT A BIT, BUT I HOPE TO ELUCIDATE THE COURT AS TO

5    WHAT INFORMATION WE ARE TRYING TO PRESENT TO THE COURT.

6         AND JUST BY WAY OF BACKGROUND, JUDGE, I SPENT MOST OF

7    MY CAREER DOING DEATH PENALTY CASES, AND I SPENT A LOT OF

8    TIME AROUND DEFENDANTS WHO HAD MENTAL HEALTH ISSUES, AND AS

9    SOON AS I BECAME INVOLVED IN THIS CASE, I REALIZED RIGHT

10   AWAY THAT THIS WAS NOT A CASE OF WHO HAD DONE IT OR EVEN

11   WHAT HAD HAPPENED, BUT IT WAS A CASE OF WHY THIS HAD

12   HAPPENED.

13        THERE WAS SO MANY REASONS WHY THIS CASE DID NOT ADD

14   UP, BECAUSE CHAZ BURTON SITS BEFORE YOU AS A MAN WITH NO

15   CRIMINAL HISTORY, AS MS. PATTERSON STATED.  HE IS A HIGH

16   SCHOOL GRADUATE WHO WAS PRESIDENT OF HIS CLASS SENIOR YEAR.

17   HE WENT TO WEST GEORGIA COLLEGE.  I WOULD LIKE TO

18   INTRODUCE, IF I COULD, SOME -- IF THIS IS THE APPROPRIATE

19   TIME, I HAVE SOME EXHIBITS THAT I HAVE PREVIOUSLY SHOWN THE

20   PROSECUTION.  HIS CLASS PICTURE FROM THE CLASS OF 2010 AT

21   STONE MOUNTAIN HIGH SCHOOL, UNIVERSITY OF WEST GEORGIA

22   TRANSCRIPT.  I ALSO HAVE, JUDGE, RECORDS FROM THE NAVY, THE

23   U.S. NAVY WHERE HE DID ACTUALLY ENLIST, AND HE WAS

24   DIAGNOSED WITH A SEVERE DEPRESSIVE DISORDER, AND HE WAS

25   DISCHARGED BECAUSE OF HIS PSYCHIATRIC CONDITION.  AND THIS

1    WAS MONTHS BEFORE THIS HAPPENED, NOT YEARS BEFORE THIS,

2    JUST A FEW MONTHS BEFORE THIS HAPPENED.

3        GIVEN WHAT I KNEW ABOUT HIS PAST AND HIS PEACEFUL PAST

4    AND HIS UPBRINGING, AND MORE THAN ANYTHING, JUDGE, THE FACT

5    THAT AFTER WHAT APPEARED FROM THE VIDEOS I HAD SEEN TO BE A

6    STRUGGLE OUTSIDE THE KROGER BETWEEN MR. BURTON AND MR.

7    HARRISON, WHO IS HERE IN THE COURTROOM, MR. BURTON DID GO

8    INTO THE PARKING LOT, TURNED, AND SHOOTS 15 TIMES AT A

9    PARKED CAR.  THAT SET UP ALARM BELLS FOR ME, JUDGE, BASED

10   ON WHAT I KNOW ABOUT ABUSED VICTIMS AND MENTAL HEALTH

11   ISSUES.  THAT'S OVERKILL, AND THAT TOLD ME THAT SOMETHING

12   MORE WAS GOING ON HERE.

13       AND I ENLISTED THE HELP OF DR. MARTI LORING, WHO IS

14   HERE TODAY, AND I WILL PRESENT HER TESTIMONY IN A MOMENT TO

15   TRY TO GET TO THE ROOT OF WHAT HAD CAUSED THIS

16   UNCHARACTERISTIC VIOLENT OUTBURST FOR APPARENTLY NO REASON.

17   OVERKILL IS A CLEAR SIGN, IN MY EXPERIENCE, OF A REACTION

18   TO TRAUMA.  AND SO I WANTED TO GET TO THE BOTTOM OF IT,

19   JUDGE, BECAUSE THIS IS NOT A CASE WHERE WE THOUGHT WE

20   NEEDED TO TAKE IT TO TRIAL, TO DRAG THE FAMILY THROUGH

21   THAT, TO ESTABLISH THAT THIS INCIDENT HAPPENED.  WE ARE NOT

22   DISPUTING THAT AT ALL.  IT IS ON VIDEO, IT IS VERY CLEAR

23   WHAT HAPPENED.  IT IS CLEAR HOW MANY SHOTS WERE FIRED.  IT

24   IS CLEAR THAT THIS CHILD WAS TRAGICALLY INJURED.  IT IS

25   CLEAR HE HAD A VERY ROUGH RECOVERY AND MAY BE IMPAIRED IN

1    THE FUTURE.  AND IT IS CLEAR THAT HIS FAMILY WAS INCREDIBLY

2    TRAUMATIZED BY THIS.  THAT'S NOT THE ISSUE TODAY, JUDGE.

3    THE ISSUE IS WHAT IS THE APPROPRIATE SENTENCE FOR

4    MR. BURTON, GIVEN WHAT I HOPE YOU WILL LEARN IN THE NEXT

5    FEW MINUTES FROM DR. LORING.

6        THE COURT:  COUNSELOR, DO YOU BELIEVE YOUR CLIENT IS

7    COMPETENT TO ENTER A PLEA?

8        MS. ROGAN:  I DO, JUDGE.  I DO, JUDGE.  THERE IS

9    DEFINITELY MENTAL HEALTH ISSUES, JUDGE, AND THEY HAVE TO

10   DEAL WITH TRAUMA FROM CHILDHOOD SEXUAL ABUSE.  THEY ARE NOT

11   MENTAL HEALTH ISSUES OF THE SORT THAT RENDER HIM

12   INCOMPETENT TO KNOW WHAT IS GOING ON TODAY.  I HAVE NEVER

13   HAD ANY CONCERNS ABOUT THAT.  THIS IS, JUDGE, AN ARGUMENT

14   IN MITIGATION OF SENTENCE RATHER THAN A LEGAL DEFENSE TO

15   THE CHARGES.

16       I'LL TELL YOU, JUDGE, BEFORE YOU WERE ASSIGNED THIS

17   CASE AND BEFORE I GOT INVOLVED, MR. BURTON HAD AN ATTORNEY

18   WHO WAS ACTUALLY TRYING TO MAKE A SELF-DEFENSE ARGUMENT.  I

19   HAPPENED TO BE IN THE COURTROOM AT ONE POINT REGARDING

20   BOND, AND HE WAS ACTUALLY ARGUING THIS WAS SELF-DEFENSE.

21   AND WITHOUT EVER BEING -- JUST HEARING WHAT I WAS HEARING

22   IN THE COURTROOM AND LOOKING AT THE VIDEO, I SAID TO

23   MYSELF, THIS IS NOT A SELF-DEFENSE CASE IN A LEGAL SENSE.

24   BUT IT IS A CASE WHERE THERE IS MITIGATION AS TO HIS MENTAL

25   STATE AT THE TIME HE COMMITTED THIS OFFENSE THAT I THINK IS

```
1        PERTINENT TO THE APPROPRIATE PUNISHMENT, IF THAT MAKES

2        SENSE.  AND I HAVE TO, ONCE AGAIN, ANALOGIZE IT TO THE

3        DEATH PENALTY CASES.  THERE IS SELDOM A GUILT ISSUE IN A

4        DEATH PENALTY CASE.  THE ISSUE IS WHAT IS THE APPROPRIATE

5        SENTENCE FOR WHAT HAPPENED.  AND PART OF MY WORK AS A

6        DEFENSE ATTORNEY IN THAT FIELD WAS TO PERSUADE EITHER A

7        PROSECUTOR, A JUDGE, OR A JURY THAT THERE WERE ASSETS TO

8        THE DEFENDANT, HIS LIFE, HIS BACKGROUND, HIS EXPERIENCES

9        THAT MITIGATED AGAINST THE DEATH SENTENCE BUT IN FAVOR OF A

10       SENTENCE LESS THAN THAT BECAUSE OF THE VERY FACTORS THAT

11       RELATE TO THE COMMISSION OF THE CRIME, IF I'M MAKING MYSELF

12       CLEAR.  I HOPE I AM.  THAT IS THE WORK THAT WE UNDERTOOK IN

13       DEATH PENALTY CASES.  WE ARE NOT TRYING TO DIFFUSE WHAT

14       HAPPENED, WE ARE NOT TRYING TO DENY THAT SOME CRIME

15       HAPPENED, BUT WE WERE TRYING TO CONVEY THAT THERE WAS MERCY

16       TO BE BESTOWED ON SOMEONE WHO HAD REACTED IN A WAY THAT

17       THEY WOULD NOT OTHERWISE HAVE REACTED TO A SITUATION.  AND

18       IT IS NOT BLAMING MR. HARRISON.  IT IS NOT IN ANY WAY

19       BLAMING MR. HARRISON, AND I HOPE THAT BOTH I AND DR. LORING

20       CAN CONVEY THAT TO YOU.  THIS IS ALL ABOUT WHAT IS GOING ON

21       IN CHAZ BURTON'S HEAD, AND THAT'S WHAT IS REALLY

22       SIGNIFICANT HERE BECAUSE HE IS THE ONE WHO IS BEFORE THE

23       COURT TO BE SENTENCED, IF THAT BECOMES THE OUTCOME OF THIS

24       CASE, AND IT NEEDS TO INCLUDE THE REASONS WHY HE REACTED

25       THIS WAY, WHY HE OVERACTED SO DRAMATICALLY AND SO
```

```
 1        HORRIFICALLY AND CAUSED THIS INJURY AND THIS SUFFERING TO

 2        THE FAMILY.  SO IF I COULD CALL DR. MARTI LORING TO THE

 3        STAND NOW, I WOULD LIKE TO PRESENT SOME EVIDENCE.

 4             THE COURT:  I WOULD RATHER THE STATE PRESENT THEIRS

 5        FIRST.

 6             MS. ROGAN:  VERY GOOD.

 7             THE COURT:  AND THEN WE WILL HEAR FROM YOU.

 8             MS. ROGAN:  ALL RIGHT.  THANK YOU, JUDGE.

 9             THE COURT:  MS. PATTERSON.

10             MS. PATTERSON:  YES, YOUR HONOR.  THE STATE CALLS

11        MS. HARRISON.

12                          NINA HARRISON,

13   HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

14   FOLLOWS:

15                       DIRECT EXAMINATION

16             THE DEPUTY:  PLEASE STATE YOUR NAME.

17             THE WITNESS:  MY NAME IS NINA HARRISON, N-I-N-A,

18        H-A-R-R-I-S-O-N.

19   BY MS. PATTERSON:

20        Q    THANK YOU, MS. HARRISON.  IF YOU CAN, JUST PULL THE

21   MICROPHONE A LITTLE BIT CLOSER.

22        A    OKAY.

23        Q    THANK YOU.  MS. HARRISON, IF YOU COULD PLEASE DESCRIBE

24   TO THE COURT THE IMPACT THAT THE EVENTS ON JUNE 26TH HAD ON YOUR

25   LIFE AND YOUR HUSBAND'S LIFE, PLEASE?
```

1    A    YES, MA'AM.  GOOD AFTERNOON, YOUR HONOR.  I AM EVAN

2    HARRISON'S MOTHER, AND ON BEHALF OF EVAN, OUR FAMILY AND

3    FRIENDS, I THANK YOU FOR ALLOWING US A CHANCE TO SHARE HOW THE

4    DEFENDANT'S ACTIONS HAVE IMPACTED OUR LIVES.

5         I THANK MY HEAVENLY FATHER JEHOVAH EVERY DAY FOR

6    SPARING MY SON'S LIFE AND MINE AND MY HUSBAND'S LIFE.  I CAN

7    RECALL THAT IMMEDIATELY AFTER THE SHOTS STOPPED THAT DAY TURNING

8    TO EVAN AND SAYING, "IT IS OKAY.  THE BAD MAN IS GONE."  ONLY TO

9    REALIZE THAT I WAS COMFORTING HIM NOT ONLY BECAUSE HE WAS SCARED

10   AND CONFUSED BUT BECAUSE HE WAS IN PAIN.  HE HAD BLOOD ON HIS

11   SHIRT THAT I HAD FIRST THOUGHT WAS FROM GLASS SHARDS.  NO MOTHER

12   WANTS TO THINK THAT HER BABY HAS BEEN SHOT.  HOWEVER, UPON THE

13   REALIZATION, I JUMPED OUT OF THE CAR AND SCREAMED IN BITTER

14   ANGUISH, "I CAN'T BELIEVE HE SHOT MY BABY."

15        WHEN I THINK BACK TO THE MINUTES AND HOURS AFTER THE

16   DEFENDANT SHOT EVAN, I REMEMBER SAYING TO MYSELF, IF HE CAN JUST

17   MAKE IT THROUGH THIS FIRST NIGHT, HE WILL HAVE A FIGHTING

18   CHANCE.  AND, THANKFULLY, EVAN DID MAKE IT THROUGH THAT FIRST

19   NIGHT, BUT HIS RECOVERY WAS FAR FROM EASY ROAD.  HIS SMALL,

20   TWO-YEAR-OLD, PURE, INNOCENT BODY HAD ENDURED THREE SURGERIES IN

21   A WEEK AND A HALF IN A MEDICALLY INDUCED COMA, AND AN ADDITIONAL

22   WEEK AND A HALF IN A HOSPITAL LEARNING TO WALK AGAIN, AND

23   DRINKING LIQUIDS FROM A THICKENER INCLUDED IN THE LIQUID TO

24   PREVENT HIM FROM CHOKING.

25        THE FOLLOWING YEAR WAS A FOURTH SURGERY TO REMOVE SCAR

1    TISSUE FROM THE INITIAL DAMAGE.  AND THE DOCTORS HAVE TOLD US

2    THAT THERE IS ALWAYS A CHANCE THAT THAT SCAR TISSUE WILL RETURN.

3    SO ANY COMPLAINTS FROM EVAN OF STOMACH PAIN AUTOMATICALLY

4    RESULTS IN OUR IMMEDIATE CONCERN, NOT THAT HE HAS GOT A STOMACH

5    VIRUS LIKE MOST CHILDREN COULD FROM SOMEONE AT SCHOOL, BUT

6    CONCERNED THAT THE SCAR TISSUE IS BACK.

7         IN ADDITION, THE DOCTORS EXPLAINED THAT THERE COULD BE

8    DEVELOPMENTAL DELAYS BECAUSE EVAN LOST SO MUCH BLOOD.  AND THIS

9    HAS PROVED TRUE, AS EVAN HAS BOTH A COMMUNICATION AND

10   COMPREHENSION DELAY FOR WHICH HE RECEIVES THERAPY TWICE A WEEK.

11   LOUD NOISES LIKE TOILETS FLUSHING, LAWN MOWERS, MOTORCYCLES

12   PASSING, FIREWORKS SEND HIM INTO A CRYING PANIC.

13        NO FAMILY SHOULD HAVE TO ENDURE THIS.  AND THE

14   DEFENDANT CLEARLY SHOWED NO REGARD FOR EVAN'S LIFE WHEN HE

15   LOOKED INTO OUR CAR AND MADE THE DECISION TO UNLOAD HIS WEAPON.

16   IN A MATTER OF SECONDS, THE DEFENDANT'S CHOICE FOREVER ALTERED

17   THE LIFE OF MY INNOCENT BABY BOY WHO SAT HELPLESS IN HIS CAR

18   SEAT THAT HORRIFIC JUNE MORNING.  THANK YOU.

19        Q    THANK YOU, MS. HARRISON.

20        MS. PATTERSON:  DOES THE COURT HAVE ANY QUESTIONS OF

21   MS. HARRISON, YOUR HONOR?

22        THE COURT:  WHERE IS YOUR CHILD NOW IN DEVELOPMENT?

23        MS. HARRISON:  I HAVE DOCUMENTATION THAT SHOWS THAT

24   EVEN THOUGH HE IS ALMOST FIVE YEARS OLD, HIS EXPRESSIVE AND

25   RECEPTIVE LANGUAGE, AS WELL AS COMPREHENSION, HE IS

1      FUNCTIONING ON A THREE-YEAR-OLD LEVEL.

2           THE COURT:  IS HE MAKING PROGRESS?

3           MS. HARRISON:  YES, SIR.

4           THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.

5           MS. HARRISON:  YES, SIR.

6           MS. PATTERSON:  THANK YOU, MS. HARRISON.  YOU MAY COME

7      DOWN.  NO FURTHER WITNESSES FROM THE STATE, YOUR HONOR.

8           THE COURT:  ALL RIGHT.  YES, MA'AM, GO AHEAD.

9           MS. ROGAN:  THANK YOU.  THANK YOU, JUDGE.  I WOULD

10     LIKE TO CALL DR. MARTI LORING TO THE STAND.

11                     MARTI LORING, LCSW, PH.D.,

12     HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13     FOLLOWS:

14                      DIRECT EXAMINATION

15          THE DEPUTY:  STATE YOUR NAME FOR THE RECORD AND SPELL

16     IT FOR THE COURT REPORTER.

17          THE WITNESS:  DR. MARTI, M-A-R-T-I, LORING,

18     L-O-R-I-N-G.

19     BY MS. ROGAN:

20     Q    GOOD AFTERNOON, DR. LORING.  COULD YOU TELL THE COURT

21     BRIEFLY WHAT YOUR PROFESSIONAL AND EDUCATIONAL BACKGROUND IS?

22     A    YES.  I'M A CLINICAL SOCIAL WORKER AND A CLINICAL

23     SOCIOLOGIST.  I'M THE DIRECTOR OF THE CENTER FOR MENTAL HEALTH

24     AND HUMAN DEVELOPMENT IN ATLANTA.  AND IN TERMS OF MY

25     EDUCATIONAL BACKGROUND, I HAVE A MASTER'S IN CLINICAL SOCIAL

1    WORK AND A PH.D. IN CLINICAL SOCIOLOGY, SOCIAL PSYCHOLOGY.

2         Q    ALL RIGHT.  THANK YOU.  HAVE YOU PUBLISHED JOURNALS OR

3    BOOKS IN YOUR FIELD?

4         A    YES, MA'AM, I HAVE.

5         Q    ALL RIGHT.  CAN YOU TELL US ABOUT SOME OF THOSE THAT

6    MIGHT BE PERTINENT TO WHAT YOU DID IN THIS CASE?

7         A    YES, MA'AM.  I HAVE WRITTEN BOOKS DESCRIBING TRAUMA,

8    THE CAUSES OF TRAUMA, HOW IT CAN BE OVERCOME, OR, IF IT IS NOT,

9    HOW IT WILL CONTINUE TO FOLLOW SOMEONE THROUGH THEIR LIVES AND

10   MANIFEST ITSELF IN VARIOUS WAYS WHEN THEY ARE YOUNG ADULTS OR

11   ADULTS WHEN IT IS NOT TENDED TO DURING THE TIME OR SHORTLY AFTER

12   WHEN IT BECAME PTSD.  THAT'S UNDERLYING A GREAT DEAL OF WHAT I

13   HAVE WRITTEN ABOUT, THE DIFFERENT KINDS OF TRAUMA AND ABUSE IN

14   THE FORM OF THREE BOOKS AND A NUMBER OF PROFESSIONAL ARTICLES

15   THAT WERE PUBLISHED.

16        MS. ROGAN:  JUDGE, I HAVE A COPY OF DR. LORING'S CV.

17        WOULD YOU LIKE TO REVIEW IT?  OR CAN I ENTER THAT INTO

18        EVIDENCE RIGHT NOW?

19        THE COURT:  YOU CAN ENTER IT INTO EVIDENCE.  I WILL

20        REVIEW IT.

21        MS. ROGAN:  OKAY.  THANK YOU.  ALL RIGHT.

22        Q    (BY MS. ROGAN)  DR. LORING, CAN YOU TELL US HOW YOU

23   BECAME INVOLVED IN THE CASE OF STATE VERSUS CHAZREL BURTON?

24        A    I WAS TELEPHONED BY MR. BURTON'S ATTORNEY, YOURSELF,

25   AND ASKED IF I WOULD BE WILLING TO EVALUATE HIM BECAUSE YOU WERE

```
 1   HAVING DIFFICULTY PUTTING ALL THE PIECES OF THE PICTURE TOGETHER

 2   AND UNDERSTANDING THE WHYS OF WHAT HAPPENED.

 3        Q    DID YOU SAY THE WHYS?

 4        A    YES.

 5        Q    OF WHAT HAPPENED?

 6        A    YES.  THE WHYS OF WHAT HAPPENED.  YOU WERE HAVING

 7   TROUBLE UNDERSTANDING, THIS JUST DIDN'T MAKE SENSE TO YOU, AND

 8   YOU ASKED ME IF I COULD EVALUATE MR. BURTON AND SEE IF I COULD

 9   HELP YOU REACH MORE UNDERSTANDING ABOUT HIM AND THE INCIDENT

10   ITSELF.

11        Q    ALL RIGHT.  AND DID YOU UNDERTAKE THAT EVALUATION?

12        A    YES, MA'AM, I DID.

13        Q    CAN YOU TELL THE COURT WHAT THAT PROCESS CONSISTED OF?

14             MS. PATTERSON:  YOUR HONOR, IF I MAY OBJECT VERY

15        BRIEFLY.  I DON'T KNOW WHETHER OR NOT MS. ROGAN INTENDS TO

16        TENDER DR. LORING AS AN EXPERT OF ANY --

17             MS. ROGAN:  I WILL DO SO.  THAT WAS THE PURPOSE FOR MY

18        INTRODUCING HER CV.  I REALIZE THIS IS LESS FORMAL THAN A

19        TRIAL, SO IF NECESSARY, I WILL NOW FORMALLY REQUEST THAT

20        SHE BE RECOGNIZED AS AN EXPERT IN THE FIELD OF TRAUMA.

21             MS. PATTERSON:  AND THE STATE HAS AN ISSUE WITH THAT

22        BECAUSE I'M NOT SURE IF MS. LORING IS PRESENTED AS A

23        PSYCHIATRIST OR WHETHER OR NOT SHE HAS THE ABILITY TO

24        PRESCRIBE MEDICINE OR DIAGNOSE CLINICALLY.

25             MS. ROGAN:  OKAY.  I CAN CLARIFY THAT.
```

1          THE COURT:  OKAY.

2      Q   (BY MS. ROGAN)   DR. LORING, DO YOU HAVE CREDENTIALS

3  OR LICENSING TO MAKE DIAGNOSES OF MENTAL HEALTH DISORDERS?

4      A   YES, MA'AM.  I'M LICENSED IN THE STATE OF GEORGIA AS A

5  MASTER'S OF CLINICAL SOCIAL WORKER AND CERTIFIED ACROSS THE

6  COUNTRY AS A CLINICAL SOCIOLOGIST.  IN THE STATE OF GEORGIA THE

7  LICENSING LAW ALLOWS ME TO DO PSYCHOSOCIAL EVALUATIONS, AT WHICH

8  I MAKE DIAGNOSES RELATING TO A WIDE RANGE OF MENTAL HEALTH

9  ISSUES, ONE OF WHICH IS POST-TRAUMATIC STRESS DISORDER.

10          THE COURT:  ALL RIGHT.  LET ME ASK.  ARE YOU A

11      TREATING PROFESSIONAL?

12          DR. LORING:  I HAVE BEEN IN THE PAST, YOUR HONOR.  I'M

13      TOO BUSY RIGHT NOW.  BUT, YES, YOUR HONOR, I HAVE IN THE

14      PAST BEEN A TREATING PROFESSIONAL.

15          THE COURT:  HOW MANY CASES OF PTSD HAVE YOU EVALUATED?

16          DR. LORING:  APPROXIMATELY 3,000, JUDGE, IN GEORGIA

17      AND ACROSS THE COUNTRY.

18          THE COURT:  SHE IS QUALIFIED.

19          MS. ROGAN:  THANK YOU, JUDGE.

20      Q   (BY MS. ROGAN)   ALL RIGHT.  COULD YOU CONTINUE WITH

21  THE PROCESS YOU UNDERTOOK AT MY REQUEST?

22      A   YES, MA'AM.  AND JUST TO CLARIFY, YOU REQUESTED AN

23  EVALUATION, AND BEING THE EXPERT PROFESSIONAL ATTORNEY THAT YOU

24  ARE, YOU HAD NO PART IN THE PROCESS THAT I CHOSE TO USE.

25      Q   THAT'S CORRECT.  THANK YOU.

1          A      THANK YOU.  I EVALUATED MR. BURTON OVER A PERIOD OF

2    TIME, INTERVIEWING HIM.  WHILE I INTERVIEWED HIM, I USED SOME

3    TRAUMA TOOLS TO HELP ME UNDERSTAND WHETHER THEY SHOW THAT HE WAS

4    TRAUMATIZED OR NOT, WHETHER THEY INDICATED THAT HE APPEARED TO

5    BE A MALINGERER OR FAKING IT OR NOT.  I ALSO INTERVIEWED A

6    NUMBER OF INDIVIDUALS, PARTICULARLY THE FAMILY MEMBERS WHO KNEW

7    HIM DURING PERIODS OF TIME WHEN, OF COURSE, I HAD NOT.  AND I

8    REVIEWED RECORDS.  ONE SUCH RECORD, FOR EXAMPLE, JUDGE, WAS HIS

9    ADMITTANCE TO THE NAVY AND THEIR FINDING THAT HE HAS THE

10   PRONOUNCED DEPRESSION FOR WHICH THEY DISCONTINUED HIS SERVICE IN

11   THE NAVY.  SO IT WAS DOCUMENTED, AS WELL.  I REVIEWED POLICE

12   REPORTS, THE PHOTOS OF THE INCIDENT, POLICE INTERVIEWS, ALL

13   THOSE KINDS OF DOCUMENTS I ALSO REVIEWED.

14          SO INTERVIEWS WITH THE CLIENT, INTERVIEWS WITH

15   COLLATERAL WITNESSES, REVIEWED DOCUMENTS, AND USED THE TRAUMA

16   TOOLS TO DISCERN WHETHER HE APPEARED AT THE TIME OF THE

17   INCIDENT, BEFORE, AFTER, TO HAVE EXPERIENCED POST-TRAUMATIC

18   STRESS DISORDER AND IF SO, WHAT KIND OF SYMPTOMS DID HE

19   EXPERIENCE.

20          THE COURT:  LET ME JUST ASK THE QUESTION ABOUT THE

21      RECORDS.  WHAT KIND OF DISCHARGE DID HE RECEIVE FROM THE

22      NAVY?  GENERAL DISCHARGE, HONORABLE, DO YOU KNOW?

23          DR. LORING:  NO.

24          MS. ROGAN:  WE HAVE THE DOCUMENTS HERE, JUDGE.  IT WAS

25      A GENERAL DISCHARGE, BUT IT WAS DUE TO HIS PSYCHIATRIC

1      CONDITION.

2            THE COURT:  VERY WELL.

3            DR. LORING:  THANK YOU.

4      Q    (BY MS. ROGAN)   CONTINUE, THEN.  WERE YOU ABLE TO

5  MAKE ANY CONCLUSIONS ABOUT MR. BURTON'S MENTAL HEALTH STATUS?

6      A    YES, MA'AM.  AND THAT'S THE GOAL OF WHAT I WOULD DO.

7  WITH GREAT RESPECT FOR THE FAMILY AND FOR THE YOUNG CHILD, MY

8  ROLE IS TO TRY TO UNDERSTAND, TO REACH CONCLUSIONS, AND TO COME

9  TO UNDERSTAND THE SITUATION, THE CRIME INVOLVED, WHICH IS WHAT I

10  WAS ABLE TO DO, YES, MA'AM.

11      Q    ALL RIGHT.  AND WHAT WERE YOUR FINDINGS, DR. LORING?

12      A    THAT MR. BURTON EXPERIENCED POST-TRAUMATIC STRESS

13  DISORDER STARTING AT A YOUNG AGE IN HIS LIFE, AROUND NINE WHEN

14  HE WAS SEXUALLY ABUSED.  AND AS FINE A MOTHER AS HE HAD, YOU

15  KNOW, PARENTS DON'T ALWAYS KNOW WHEN THESE KINDS OF THINGS

16  OCCUR, NOR DO THEY KNOW WHAT TO DO ABOUT THEM OFTENTIMES.  SO IN

17  MR. BURTON'S CASE, HIS TRAUMA, HIS POST-TRAUMATIC STRESS

18  DISORDER WENT UNTREATED.

19            IN ADDITION, WHEN HE WAS ABOUT FIVE, MR. BURTON

20  EXPERIENCED SOME VERY SEVERE BULLYING, WHICH SOME FAMILY MEMBERS

21  BECAME AWARE OF WHEN HE GOT OFF OF THE SCHOOL BUS, AROUND THE

22  SAME AGE RANGE, HAVING HAD TWO OF HIS TEETH KNOCKED OUT BY A

23  BULLY ON THE SCHOOL BUS.  THAT WAS ONE INCIDENT, BUT THERE WERE

24  OTHER INCIDENTS OF BULLYING WHICH THE SCHOOL APPARENTLY HAD

25  DIFFICULTY CONTROLLING.

1          AS MR. BURTON GREW OLDER, HE STILL CARRIED THAT

2    TRAUMA, THE PTSD, WITH HIM.  AND WHEN HE SUCCESSFULLY JOINED THE

3    NAVY, HE BECAME VERY DEPRESSED BECAUSE HE WASN'T ABLE TO FULFILL

4    THE JOB REQUIREMENTS OF BEING IN THE NAVY, THE SYMPTOMS OF

5    TRAUMA INTERFERED WITH THAT.  HE WOULD EXPERIENCE DISASSOCIATION

6    WHERE HE WOULD BECOME SO ANXIOUS THAT HE WOULDN'T BE ABLE TO

7    LISTEN TO HIS ORDERS OR OBEY THEM QUICKLY AND EFFICIENTLY.  HE

8    WOULD FEEL VERY LOW SELF-ESTEEM.  IN FACT, HE WAS MAD AT HIMSELF

9    BECAUSE HE WASN'T ABLE TO PERFORM, ALTHOUGH NO ONE HAD TOLD HIM

10   PREVIOUSLY WHY HE WOULD HAVE SUCH DIFFICULTY.

11          IN SCHOOL HE WORKED VERY HARD AND WAS ABLE TO DO QUITE

12   WELL.  BUT UNDER THE PRESSURE OF BEING IN THE NAVY, HE FELL

13   APART, AND HE WASN'T ABLE TO FULFILL HIS RESPONSIBILITIES.  AND

14   THAT HAPPENED JUST MONTHS BEFORE THIS VERY TRAGIC INCIDENT

15   OCCURRED.

16       Q    AND JUST TO CLARIFY HIS PERFORMANCE IN SCHOOL, I KNOW

17   YOU LISTED VARIOUS DOCUMENTS THAT YOU REVIEWED.  DID YOU REVIEW

18   SCHOOL RECORDS FOR MR. BURTON?

19       A    YES, MA'AM, I DID.

20       Q    ALL RIGHT.  AND DO YOU RECALL HOW FAR THEY WENT BACK?

21       A    OH, WAY BACK TO SECOND AND THIRD GRADE, I BELIEVE.

22   SOME OF THEM EVEN FURTHER BACK.

23       Q    DID MR. BURTON EXPERIENCE ANY OTHER TYPES OF TRAUMA

24   REGARDING HIS FATHER?

25       A    YES, MA'AM.  AND THANK YOU FOR MENTIONING THAT.  HIS

1    FATHER, MR. BURTON'S FATHER, DIED WHEN HE WAS VERY YOUNG, EIGHT

2    OR NINE.  AND FAMILIES, AGAIN, MEANING WELL, TRIED TO DO WHAT

3    WAS MOST RESPECTFUL TO HIS FATHER AND WAS BEST FOR MR. BURTON.

4    THEY TOOK HIM TO THE FUNERAL, AND THEY DESCRIBED HIM,

5    MR. BURTON, BECOMING PARALYZED WHILE LOOKING INTO THE CASKET

6    WHERE HIS DEAD FATHER LAID.  HE WAS UNABLE TO MOVE, UNABLE TO

7    SPEAK FOR SOME TIME AFTERWARDS, HAD TO BE CARRIED AWAY.

8           ONE OF THE SYMPTOMS OF PTSD, POST-TRAUMATIC STRESS

9    DISORDER, AS YOU WELL KNOW, JUDGE, ARE FLASHBACKS, FLASHBACKS

10   OCCURRING DURING THE REST OF HIS LIFE, HIS EARLY TEENAGE YEARS,

11   LATER TEENAGE YEARS, AND INTO HIS YOUNG ADULTHOOD.  MR. BURTON

12   WOULD HAVE FLASHBACKS NOT ONLY TO THE SEXUAL ABUSE HE

13   ENCOUNTERED IN CLOSE PHYSICAL PROXIMITY TO THIS ABUSER, BUT ALSO

14   TO HIS FATHER LYING IN THE COFFIN AND FEELING VERY HELPLESS AND

15   DEPRESSED AT THAT SIGHT WHICH HE WAS NOT ABLE TO GET OUT OF HIS

16   MIND.

17          HE HAD OTHER TRAUMA SYMPTOMS THROUGHOUT HIS LIFE,

18   JUDGE.  THE INABILITY TO SLEEP PROPERLY.  FLASHBACKS WITH

19   PERIODS OF DISASSOCIATION WHERE HE HAD DIFFICULTY CONCENTRATING

20   OR ATTENDING TO WHAT HE WAS ASKED TO DO, LIKE IN THE NAVY.

21   PANIC ATTACKS IN HIS FAMILY, FROM HIS GRANDMOTHER TO HIS MOTHER,

22   TO MR. BURTON'S PANIC ATTACKS, RUN RAMPANT.  AND I DON'T WANT TO

23   EMBARRASS THE FAMILY IN ANY WAY, BUT THERE ARE INCIDENTS WHERE

24   ONE FAMILY MEMBER BECAME SO PANICKED THAT SHE BEGAN BARKING LIKE

25   A DOG AND COULDN'T SPEAK FOR PERIODS OF TIME.  SO WE ARE TALKING

1    ABOUT VERY SEVERE PANIC.

2            I'M JUST THINKING OF OTHER PTSD SYMPTOMS.  TO BE

3    TOUCHED OR GRABBED, AS NO ONE COULD KNOW, OF COURSE, BUT THAT

4    WOULD PRECIPITATE MR. BURTON HAVING A PANIC ATTACK AND AN ACUTE

5    EPISODE OF PTSD.  HE HAD CHRONIC PTSD WHICH, JUST LIKE ANY OTHER

6    ANY CHRONIC CONDITION, WENT THROUGH HIS LIFE, BUT HE ALSO

7    EXPERIENCED ACUTE PTSD WHERE HE WOULD BE TRIGGERED AND WOULD

8    REACT WITH SOME OF THE TRAUMA SYMPTOMS I MENTIONED, AS WELL AS

9    FEAR OF ADDITIONAL HARM EVER SINCE THE CHILDHOOD INCIDENT OF

10   VERY ROUGH AND PAINFUL SEXUAL ABUSE.

11           THE COURT:  LET ME ASK YOU A QUESTION.  BEFORE THIS

12        CASE TOOK PLACE, THIS INCIDENT TOOK PLACE, WAS THERE ANY

13        INSTANCES WHERE HE HAD BEEN DIAGNOSED WITH PTSD BEFORE

14        THAT?

15           DR. LORING:  HE WAS -- JUDGE, HE WAS TREATED FOR

16        TRAUMA BY A COUNSELOR WHO BELIEVED THAT HE HAD PTSD, AND

17        THIS WAS IN HIS EARLY TEENS.  SO THERE WAS THAT TIME IN

18        WHICH HE DID GET COUNSELING DUE TO EXPERIENCING TRAUMA, BUT

19        WHEN HE LEFT THAT RATHER QUICKLY, THERE WAS NO ADDITIONAL

20        THERAPY.  UNFORTUNATELY, TRAUMA VICTIMS OFTEN SHY AWAY FROM

21        THERAPY BECAUSE THEY WOULD RATHER NOT THINK ABOUT THE

22        PAINFUL PAST, AND TO GO TO THERAPY, YOU HAVE TO TALK ABOUT

23        IT, WHICH BRINGS BACK THE PAIN THEY PREFER TO AVOID.

24           THE COURT:  LET ME ASK YOU ANOTHER QUESTION.  ARE YOU

25        SAYING SOMEONE WITH PTSD, THE CONDITION HE HAS, COULD BE

1          GENETIC?  YOU SAID FAMILY MEMBERS HAD PANIC ATTACKS AND THE

2          LIKE.  ARE YOU SAYING THERE IS A GENETIC SOURCE OF THIS OR

3          WAS THIS ENVIRONMENTAL?

4               DR. LORING:  JUDGE, I BELIEVE THAT IT WAS PRIMARILY

5          ENVIRONMENTAL, THAT HIS SEXUAL ABUSE, UNTREATED, HIS SEVERE

6          BULLYING, WHICH WASN'T STOPPED AS ONE WOULD WISH IT WOULD

7          HAVE BEEN, THAT THOSE ARE THE CAUSES OF HIS PTSD.  AND

8          THANK YOU FOR HELPING ME CLARIFY, JUDGE.

9               I THINK TO WITNESS THE PANIC IN HIS FAMILY, TO WITNESS

10         SOMEONE BECOMING SO PANICKED AND TERRIFIED THAT THEY WOULD

11         BARK LIKE A DOG AS OPPOSED TO SPEAKING PROPERLY, THOSE WERE

12         THINGS THAT WERE ENVIRONMENTAL ALSO THAT HE SAW AND

13         EXPERIENCED HIMSELF.  UNFORTUNATELY, WE DON'T HAVE THE

14         RESEARCH TO SUPPORT AT THIS TIME A LITTLE GENETIC --

15         EXCLUSIVELY GENETIC BASIS FOR PTSD OR EVEN PANIC, BUT I

16         WOULD SAY THE ENVIRONMENTAL INFLUENCES WOULD EXPLAIN, YES,

17         JUDGE.  THANK YOU.

18              THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS?

19              MS. ROGAN:  YES.

20         Q    (BY MS. ROGAN)  WAS THERE SOMETHING ABOUT THE

21    INCIDENT THAT HAPPENED IN JUNE OF 2013 THAT MAY HAVE TRIGGERED A

22    FLASHBACK OR A TRAUMATIC OUTBURST FOR MR. BURTON?

23         A    YES, MA'AM.

24         Q    OKAY.  CAN YOU EXPLAIN TO THE COURT WHAT YOUR

25    ASSESSMENT IS OF WHAT HAPPENED AT THE TIME OF THE INCIDENT?

1       A    JUDGE, BEING VERY CAREFUL TO ACKNOWLEDGE THAT NO ONE

2   COULD HAVE KNOWN THAT TO HAVE GRABBED A HOLD OF MR. BURTON,

3   WOULD HAVE LED TO HIM REACTING WITH TRAUMA, NO ONE COULD HAVE

4   KNOWN THAT.  BUT, IN FACT, I BELIEVE THAT CLINICALLY THAT'S WHAT

5   HAPPENED, THAT THE GRABBING HOLD OF, THE CLOSE PHYSICAL

6   PROXIMITY, THE SCUFFLE, LED HIM TO HAVING FLASHBACKS OF SIMILAR

7   EXPERIENCES WHEN HE WAS SEXUALLY ABUSED AS A CHILD.  AND THEN

8   THE OVERREACTION ON MR. BURTON'S PART OF WHAT HARM HE THOUGHT

9   WOULD COME TO HIM WHILE EXPERIENCING TRAUMA, IS JUST LIKE MANY

10  OF OUR SOLDIERS FEARING HARM, AFTER THEY COME BACK HOME, FROM

11  LOUD NOISES AND OTHER THINGS THAT REMIND THEM OF TRAUMA WHEN

12  THEY ARE BACK IN BATTLE.  BUT THAT IS WHAT TRIGGERED HIS EXTREME

13  REACTION WITH VERY SAD, WITH SAD CONSEQUENCES, TRAGIC

14  CONSEQUENCES.

15      Q    COULD I JUST CLARIFY A LITTLE FURTHER FOR THE COURT.

16  WHEN YOU TALKED ABOUT THE STRUGGLE, WERE YOU ABLE TO REVIEW SOME

17  VIDEOTAPE THAT I PROVIDED TO YOU OF THE INCIDENT?

18      A    YES, MA'AM.

19      Q    ALL RIGHT.  AND COULD YOU DESCRIBE TO THE COURT THE

20  ACTUAL PHYSICAL ALTERCATION BECAUSE WE DID NOT SEE THAT ON THE

21  CLIP THAT THE D.A. SHOWED.

22      A    IT LOOKED TO ME, AND WHAT I REVIEWED, LIKE THERE IS A

23  REAL PHYSICAL STRUGGLE BETWEEN MR. HARRISON AND MR. BURTON WHERE

24  BODIES WERE, YOU KNOW, LIKE FALLING, WHERE PEOPLE WERE BEING

25  CRUSHED.  IT LOOKED LIKE QUITE AN ALTERCATION TO ME.

1        Q    WAS THERE A TIME WHEN MR. BURTON WAS ON THE GROUND?

2        A     IT APPEARED TO ME THAT THERE WAS.  IT APPEARED TO ME

3    AT ONE POINT THAT I SAW HIM ON THE GROUND.

4        Q    MS. PATTERSON BROUGHT UP THE PSYCHIATRIC CONDITIONS OF

5    SCHIZOPHRENIA AND BIPOLAR DISORDER.  WOULD YOU BE ABLE TO

6    EXPLAIN TO THE COURT AND TO US WHAT THOSE PSYCHIATRIC CONDITIONS

7    ENTAIL?

8        A    YES, MA'AM.  BIPOLAR DISORDER, THERE ARE DIFFERENT

9    TYPES OF BIPOLAR DISORDER, BUT CERTAINLY IS A RANGE OF BEING

10   VERY HIGH, TO THE POINT OF NOT EVEN BEING AWARE OF WHAT IS GOING

11   ON BECAUSE A PERSON IS SO MANICKY, TO BEING VERY LOW, VERY,

12   BEING VERY DEPRESSED.

13        CURRENT RESEARCH AND CURRENT DIAGNOSTIC MODES INDICATE

14   YOU DON'T HAVE TO JUST GO UP AND DOWN AS FORMERLY THOUGHT.  YOU

15   CAN STAY UP A LOT OF TIME AND YOU CAN STAY DOWN AND DEPRESSED A

16   LOT OF THE TIME, OR YOU CAN GO BACK AND FORTH, OR THE DEPRESSION

17   CAN COME UPON YOU OR THE MANICNESS.

18        WITH THE SCHIZOPHRENIC DISORDER, WE SEE THAT AS

19   SOMETIMES SHOWING A BREAK FROM REALITY, AN INABILITY TO MAKE

20   SOUND JUDGMENTS ABOUT WHAT IS IN FRONT OF YOU, YOU KNOW, HOW YOU

21   ARE ACTING, WHETHER THERE REALLY ARE VOICES OR THINGS YOU ARE

22   SEEING, HALLUCINATIONS, AUDITORY AND VISUAL.  THAT IS THE TIME

23   OF WHEN SOMEONE IS HAVING AN EXPERIENCE OF SCHIZOPHRENIA THEY

24   CAN BELIEVE THINGS THAT ARE GOING ON THAT ACTUALLY ARE NOT.

25        BOTH OF WHICH ARE DIFFERENT FROM POST-TRAUMATIC STRESS

1  DISORDER WHERE FLASHBACKS CAN LEAVE ONE FEELING ENDANGERED BUT

2  IS NOT THE SAME THING AS VISUAL, AUDITORY HALLUCINATIONS WHERE

3  VOICES ARE BEING HEARD OR THINGS BEING SEEN, STRANGE ANIMALS OR

4  THE LIKE.

5       Q    AND IF YOU COULD, DR. LORING, COULD YOU JUST EXPLAIN

6  IN ONE OR TWO SENTENCES, WHAT WERE YOUR CONCLUSIONS AFTER

7  EVALUATING MR. BURTON?

8       A    CLINICALLY, I BELIEVE THAT MR. BURTON SUFFERED FROM

9  POST-TRAUMATIC STRESS DISORDER DURING HIS LIFE, THAT AT THE TIME

10 OF THE INCIDENT, TRIGGERED BY THE ALTERCATION WITH MR. HARRISON,

11 THAT MR. BURTON EXPERIENCED AN ACUTE EPISODE OF POST-TRAUMATIC

12 STRESS DISORDER AND FELT ENDANGERED, FELT PANICKED AND

13 FRIGHTENED OF IMMINENT HARM TO HIMSELF, WHICH WAS WITHIN HIM DUE

14 TO THE PTSD.

15      Q    AND, FINALLY, WHAT IS THE TYPE OF TREATMENT THAT WOULD

16 BE SUITABLE FOR SOMEONE WHO SUFFERS FROM THAT CONDITION?

17      A    THERE ARE TWO TYPES OF TREATMENT.  ONE IS PSYCHOTROPIC

18 MEDICATION.  ZOLOFT, FOR EXAMPLE, CAN BE VERY HELPFUL IN

19 DECREASING THE SYMPTOMS OF PTSD, MAKING ONE LESS LIKELY TO BE

20 TERRIFIED, TO BE TRIGGERED.  AND, IN FACT, THAT'S HOW THE

21 VETERAN'S ADMINISTRATION TREATS THE SOLDIERS WHO RETURN FROM

22 COMBAT OR OTHER TYPE EXPERIENCES THAT ARE LIKE THAT WITH PTSD.

23           A SECOND TYPE OF TREATMENT INVOLVES COGNITIVE THERAPY

24 WHERE A PERSON IS TALKED WITH AT LENGTH ABOUT WHAT KINDS OF

25 THINGS DO YOU REACT TO WITH SUCH TERROR.  AND IT HELPS TO

1    DISCUSS IT, HELPS TO RETHINK IT.  NOW IS NOT THE PAST.  YOU ARE

2    NO LONGER A NINE-YEAR-OLD CHILD BEING SEXUALLY ABUSED, YOU ARE

3    AN ADULT, AND THIS IS A DIFFERENT SITUATION.  A LOT OF

4    DISCUSSIONS TO SEPARATE OUT THE PAST EVENTS FROM CURRENT EVENTS.

5         AND A THIRD METHOD OF TREATMENT IS VARIOUS TYPES OF

6    RELAXATION OR DE-ANXIETY KINDS OF EXPERIENCES, LESSENING ANXIETY

7    WHERE A PERSON CAN COME TO THE POINT OF WHEN THEY ARE GRABBED A

8    HOLD OF, THEY DON'T HAVE FLASHBACKS.  OR IF THEY START, THEY CAN

9    SAY TO THEMSELVES, COGNITIVELY, MAKING A PROPER DECISION, WAIT,

10   THIS IS NOT THE PAST, I'M NOT BEING SEXUALLY ACCOSTED, THERE IS

11   NO DANGER HERE.  THEY CAN ACTUALLY LEARN TO DO THIS IN THEIR OWN

12   MIND AND THEN MAKE A PROPER COGNITIVE DECISION INVOLVING HOW

13   THEY ARE GOING TO HANDLE THE SITUATION.

14        JUDGE, I WOULD ALSO NOTE THAT THOSE THREE TYPES OF

15   TREATMENT MAY BE COMBINED WITH WARTIME OR OTHER TYPES OF TRAUMA

16   VICTIMS AND CAN BE VERY HELPFUL IN TREATING THEM AND HELPING

17   THEM TO ANALYZE AND AVOID THIS AUTOMATIC BEHAVIOR WHEN THE

18   TRAUMA IS TRIGGERED.

19        THE COURT:  I DO HAVE A QUESTION.  HE HAS HAD THIS

20        CONDITION FOR A WHILE, AND HE ALSO HAD A GUN, AN EFFECTIVE

21        GUN THAT SHOOTS 15 SHELLS, SOMEWHERE AROUND IN THERE.  WHY

22        DID HE HAVE A GUN?  WHAT WAS IN HIS MIND, IN YOUR VIEW, TO

23        TRIGGER HIS POSSESSION OF A FIREARM?  I BELIEVE THE

24        ALLEGATION WAS THAT HE ATTEMPTED AN ARMED ROBBERY EARLIER,

25        THE DAY BEFORE, AND THEN, WHEN HE HAD A CONFRONTATION WITH

1      MR. HARRISON AS A WITNESS, THEY HAD A STRUGGLE AND IT BROKE

2      UP, AND THEN HE TURNED AROUND AND FIRED 15 TIMES AT THE

3      VEHICLE WITH EVAN GETTING SHOT.  SO EXPLAIN IT, IF YOU CAN.

4           DR. LORING:  YES.  THANK YOU, JUDGE.  IN MY

5      EXPERIENCE, IT IS PEOPLE WITH PTSD, WITH A HISTORY OF

6      UNTREATED SEXUAL ABUSE, UNTREATED BULLYING, AND GENERALIZED

7      FEAR, OFTEN CARRY WEAPONS, UNTIL I GET A HOLD OF THEM.  OF

8      COURSE, IF I HAD HAD MR. BURTON IN TREATMENT, THAT WOULD

9      HAVE BEEN A CONCERN OF MINE, BUT NO ONE HAD HIM IN

10     TREATMENT.  BUT THE VERY THING --

11          THE COURT:  WELL, WE DID HAVE A DIAGNOSIS OF

12     DEPRESSION.

13          DR. LORING:  YES, JUDGE, YOU ARE ABSOLUTELY CORRECT.

14     BUT THE PROBLEM IS THAT -- I'M SPEAKING IN GENERAL, THAT

15     PEOPLE WHO HAVE THIS TRAUMA AND WHO ARE, BY DEFINITION, ARE

16     FEARFUL OF BEING HARMED, IN MY EXPERIENCE, THEY OFTEN CARRY

17     A WEAPON OF SOME SORT BECAUSE THEY ARE AFRAID OF BEING

18     HARMED.  AND, THEREFORE, WHEN I'M DOING TREATMENT, JUDGE,

19     AND I HAVE SOMEONE WHO I SAW HAD PTSD, ONE OF MY FIRST

20     QUESTIONS IS, YOU KNOW, DO YOU HAVE A WEAPON NOW OR DO YOU

21     CARRY A WEAPON, SINCE THAT SO OFTEN HAS HAPPENED IN MY

22     EXPERIENCE.  AND ONE OF MY GOALS BECOMES PUTTING AN END TO

23     THAT.

24          AND SINCE MR. BURTON TALKED WITH ME, THE FACT THAT HE

25     WAS ALSO FRIGHTENED ABOUT BEING HARMED, THAT WAS WHY --

1        BASED ON MY GENERAL EXPERIENCE, THAT WAS MY UNDERSTANDING

2        OF WHY HE WAS CARRYING A WEAPON.  THANK YOU, JUDGE.

3            THE COURT:  DO YOU HAVE ANY OTHER QUESTIONS?

4            MS. ROGAN:  YOUR HONOR, I JUST WANTED TO INTRODUCE DR.

5        LORING'S REPORT.  I HAVE ALREADY SHARED THIS SOME MONTHS

6        AGO WITH THE STATE.  I WOULD JUST LIKE TO HAND UP ALL OF

7        THE EXHIBITS NOW THAT WE DISCUSSED.

8            THE COURT:  ALL RIGHT.  ANY OBJECTION TO ANY OF THESE

9        DOCUMENTS?

10           MS. PATTERSON:  NO, YOUR HONOR.

11           MS. ROGAN:  AND THAT CONCLUDES MY QUESTIONING OF DR.

12       LORING.

13           THE COURT:  ALL RIGHT.  THANK YOU, DOCTOR.  YOU MAY

14       STEP DOWN.

15           DR. LORING:  THANK YOU, JUDGE.

16           MS. PATTERSON:  YOUR HONOR, IF THE STATE MAY HAVE AN

17       OPPORTUNITY TO CROSS-EXAMINE?

18           THE COURT:  YEAH.  BUT I'M GOING TO TAKE THESE THINGS

19       WITH ME AND BREAK FOR TEN MINUTES, AND I'LL BE BACK.  WE

20       WILL RECONVENE AT FIVE MINUTES TILL 3:00.

21           (WHEREUPON A RECESS WAS HAD AT 2:44 P.M., AFTER WHICH

22       COURT RECOMMENCED AT 2:55 P.M.)

23           THE COURT:  WE ARE READY NOW TO PROCEED.  YOU HAD

24       CROSS-EXAMINATION, MA'AM?

25           MS. PATTERSON:  YES, SIR.

1                   THE COURT:  YOU MAY PROCEED.

2                   MS. PATTERSON:  THANK YOU.

3                          CROSS-EXAMINATION

4      BY MS. PATTERSON:

5           Q    GOOD AFTERNOON, DR. LORING.

6           A    GOOD AFTERNOON.

7           Q    MY NAME IS TIA PATTERSON.  I REPRESENT THE STATE IN

8      THIS CASE.

9           A    HOW ARE YOU?

10          Q    I JUST HAVE A FEW QUESTIONS FOR YOU, OKAY?

11          A    PLEASE.

12          Q    NOW, IT IS MY UNDERSTANDING THAT YOU COUNSELED THE

13     DEFENDANT WHILE HE WAS IN THE JAIL?

14          A    NO, MA'AM.  AND THANK YOU FOR THE OPPORTUNITY TO BE

15     MORE CLEAR ABOUT THAT.  I EVALUATED HIM.  AND I CAN'T COUNSEL

16     WITH HIM AND EVALUATE HIM, I HAVE TO DO ONE OR THE OTHER.  SO I

17     EVALUATED HIM WHILE HE WAS IN JAIL.

18          Q    OKAY.  SO HOW MANY TIMES HAVE YOU MET WITH THE

19     DEFENDANT?

20          A    EXCUSE ME.  EXCUSE ME.  I'M LOOKING FOR A PARTICULAR

21     PIECE OF PAPER.  I WILL GIVE YOU AN APPROXIMATE NUMBER.

22          Q    DID YOU PROVIDE A COMPREHENSIVE REPORT IN THIS CASE?

23     I BELIEVE IT WAS SUBMITTED BY THE DEFENSE ATTORNEY?

24          A    YES, MA'AM.

25          Q    OKAY.  IF YOU WERE ABLE TO REVIEW THAT REPORT, WOULD

1    THAT REFRESH YOUR MEMORY?

2        A    ABOUT THE EXACT NUMBER OF TIMES, I'M SURE IT WOULD.

3    THANK YOU VERY MUCH.

4            MS. PATTERSON:  YOUR HONOR, MAY I APPROACH?

5            DR. LORING:  THANK YOU.

6        Q    (BY MS. PATTERSON)   YOU'RE WELCOME.

7        A    WOULD YOU BE SO KIND TO REPEAT THE QUESTION FOR ME?

8        Q    YES, CERTAINLY.  ABOUT HOW MANY TIMES HAVE YOU HAD AN

9    OPPORTUNITY TO MEET WITH THE DEFENDANT IN THIS CASE?

10       A    FIVE TIMES.  AND THANK YOU FOR YOUR ASSISTANCE.

11       Q    AND ABOUT HOW MANY HOURS IN TOTAL WAS THAT?

12       A    I WOULD HAVE TO LET YOU BRING THAT BACK AGAIN SO I

13   WILL FIND IT ON THE PAGE.

14       Q    I'LL BRING IT BACK.

15       A    THANK YOU SO VERY MUCH.  NINE HOURS.

16       Q    THANK YOU.

17       A    THANK YOU, ONCE AGAIN.

18       Q    SO NINE HOURS IN TOTAL YOU SPENT WITH THE DEFENDANT IN

19   YOUR COUNSELING?

20       A    THAT WOULD BE CORRECT, YES, MA'AM.

21       Q    AND I BELIEVE EARLIER WE ADDRESSED THE ISSUE OF

22   WHETHER OR NOT YOU WERE ABLE TO CLINICALLY DIAGNOSE INDIVIDUALS

23   WITH DISORDERS OR DEPRESSION DISORDERS, AND YOU HAVE ANNOUNCED,

24   YES; IS THAT CORRECT?

25       A    I THINK WE TALKED EARLIER ABOUT WHETHER I WAS

1    QUALIFIED TO DO A PSYCHOSOCIAL EVALUATION AND DIAGNOSIS, WHETHER

2    IT WAS DEPRESSION OR ANYTHING, AND I SAID, YES.

3         Q    OKAY.  AND HAVE YOU DIAGNOSED INDIVIDUALS WITH

4    DEPRESSION AND OTHER MENTAL HEALTH DISORDERS IN THE PAST?

5         A    YES, MA'AM.

6         Q    OKAY.  AND SO YOU HAVE THE ABILITY TO DO THAT WHEN YOU

7    WERE WITH THE DEFENDANT IN THIS CASE?

8         A    I HAVE BOTH THE ABILITY AND THE LAWFUL PERMISSION TO

9    DO SO, YES, MA'AM.

10        Q    SURE.  DID YOU DIAGNOSE THE DEFENDANT IN THIS CASE

11   WITH ANY TYPE OF DISORDER?

12        A    I THOUGHT HE SUFFERED FROM POST-TRAUMATIC STRESS

13   DISORDER.

14        Q    DID YOU CLINICALLY DIAGNOSE HIM AS ONE THAT SUFFERS

15   FROM POST-TRAUMATIC STRESS DISORDER?

16        A    WILL YOU FORGIVE ME?  I HESITATE AT THE WORD,

17   CLINICALLY, BECAUSE -- OF COURSE, YOU WOULD NOT KNOW THAT.  BUT

18   USUALLY WHEN YOU REFER TO CLINICAL DIAGNOSIS WHEN YOU DO A

19   TREATMENT LIKE PSYCHOTHERAPY.

20        Q    UH-HUH.

21        A    AND AS I SAID, I DID NOT DO PSYCHOTHERAPY WITH HIM.  I

22   DID A PSYCHOSOCIAL EVALUATION, AND MY DIAGNOSIS WAS

23   POST-TRAUMATIC STRESS DISORDER.

24        Q    OKAY.  SO THERE WAS NO TREATMENT HERE, THEN?  THERE

25   WAS NO TREATMENT ON YOUR BEHALF?

1        A    I DID NO TREATMENT OF MR. BURTON.  I EVALUATED HIM

2    ONLY.

3        Q    SO YOU DID NOT DIAGNOSE HIM AS BIPOLAR?

4        A    I DID NOT FEEL THAT HE WAS SUBSTANTIALLY BIPOLAR,

5    THOUGH HE CERTAINLY HAD MOOD SWINGS.

6        Q    AND YOU DID NOT DIAGNOSE HIM AS SCHIZOPHRENIC?

7        A    NO, MA'AM, I DID NOT.

8        Q    SO UPON YOU MAKING YOUR EVALUATION, IT WAS FOR

9    POST-TRAUMATIC STRESS DISORDER AND THAT DISORDER ONLY?

10       A    OH, NO, MA'AM.  I WOULD NEVER DO THAT.  IF I EVALUATE

11   SOMEONE, I NEVER KNOW IF ANYTHING IS GOING TO BE WRONG WITH

12   THEM, IF THEY ARE GOING TO BE FAKING IT ENTIRELY OR IF THEY ARE

13   GOING TO HAVE A DISORDER.  AND IF THEY ARE GOING TO HAVE A

14   DISORDER, I DON'T KNOW WHAT THAT WOULD BE UNTIL I FINISH WITH

15   THE EVALUATION.

16       Q    CORRECT.  AND AT THE COMPLETION OF YOUR EVALUATION,

17   AND YOUR DIAGNOSIS WAS?

18       A    I BELIEVE HE WAS SUFFERING FROM POST-TRAUMATIC STRESS

19   DISORDER, BOTH CHRONIC DURING HIS LIFETIME AND ACUTE AT THE TIME

20   OF THE INCIDENT.

21       Q    I UNDERSTAND THAT EARLIER THAT YOU MENTIONED THAT AS A

22   RESULT OF HIS EXPERIENCE GROWING UP, HE RECEIVED COUNSELING IN

23   HIS TEEN YEARS?

24       A    BRIEFLY, YES, MA'AM.

25       Q    OKAY.  DID YOU KNOW IF HE SOUGHT ANY COUNSELING OTHER

1    THAN THAT OR IF HE SOUGHT ANY COUNSELING SINCE HE HAS MET YOU?

2         A    I BELIEVE THERE ARE TWO ANSWERS, MA'AM.  NO, I DO NOT

3    BELIEVE HE SOUGHT COUNSELING AFTER THAT WHICH, UNFORTUNATELY, IS

4    TYPICAL OF PTSD VICTIMS, BECAUSE WHEN THEY TALK ABOUT THE

5    EVENTS, THEY BECOME SO MUCH MORE TRAUMATIZED THAT THEY TEND TO

6    AVOID THE THINGS THAT REMIND THEM; IT IS CALLED AVOID TRAUMATIC

7    FUSE.  AND SINCE MY EVALUATION, HE HAS BEEN INCARCERATED, SO. .

8    .

9         Q    BUT AT THAT TIME WHEN YOU SAID THAT HE WAS DISCHARGED

10   FROM THE NAVY BECAUSE HE WAS SUFFERING FROM DEPRESSION, THERE

11   WAS NO TREATMENT OR COUNSELING AT THAT TIME?

12        A    NOT TO MY UNDERSTANDING.  MY UNDERSTANDING HAD TO DO

13   WITH HIM BEING MORE WITHDRAWN AND DEPRESSED.

14        Q    WAS HE EVER TAKING MEDICATION?

15        A    NOT TO MY KNOWLEDGE.  PEOPLE WHO HAVE BEEN DISCHARGED

16   FROM THE ARMED SERVICES AND DEPRESSION IS PART OF THE DIAGNOSIS,

17   WE WOULD OFTEN HOPE THAT THERE WILL BE SOMEONE -- AND THIS IS

18   NOT TO BLAME ANYONE WHO COULD HAVE KNOWN HOW DEPRESSED HE WAS --

19   BUT IN THE MENTAL HEALTH FIELD, WE HOPE THAT THERE WOULD BE

20   SOMEONE IN THE FAMILY OR SOMEONE IN THE CHURCH COMMUNITY OR

21   OTHERS WHO WILL PLAY A PART IN, YOU KNOW, SOMEONE GETTING

22   TREATMENT BECAUSE BOTH WITH DEPRESSION AND WITH TRAUMA, YOU

23   KNOW, PEOPLE TEND TO ISOLATE MORE AND TRY TO ESCAPE THE PAIN

24   RATHER THAN GOING FORTH TO GET COUNSELING AS AN ACTIVE MEASURE

25   OF DEALING WITH IT.  AND, UNFORTUNATELY, THAT DIDN'T HAPPEN IN

1    THIS CASE.

2         Q    SPEAKING OF FAMILY MEMBERS.  YOU STATED EARLIER THAT

3    THERE WERE OTHER FAMILY MEMBERS WITHIN THIS FAMILY WHO MAYBE

4    EXPERIENCED PANIC AND DEPRESSION.  DID YOU INTERVIEW ANY OF

5    THOSE FAMILY MEMBERS?

6         A    YES, MA'AM.

7         Q    WHO DID YOU INTERVIEW?

8         A    I INTERVIEWED HIS MOTHER AND GRANDMOTHER, WHO WERE

9    MOST HELPFUL.

10        Q    YOU STATED THAT HE WAS DISCHARGED FROM THE NAVY

11   BECAUSE OF DEPRESSION.  DID YOU INTERVIEW ANYONE FROM THE NAVY?

12        A    NO, MA'AM.  I REVIEWED THE RECORDS INDICATING THAT IT

13   WAS A GENERAL DISCHARGE FOR THE PSYCHIATRIC REASONS.

14        Q    AND YOU STATED THAT YOU HAD AN OPPORTUNITY TO VIEW THE

15   KROGER SURVEILLANCE VIDEO.  DID YOU DO THAT BEFORE IT WAS SHOWN

16   HERE IN COURT THIS AFTERNOON?

17        A    YES, MA'AM.

18        Q    OKAY.

19        A    AS WELL AS THE OTHER PIECE THAT WAS MENTIONED.

20        Q    OKAY.  SO YOU SPOKE WITH HIS FAMILY.  DID YOU SPEAK

21   WITH MR. HARRISON OR MS. HARRISON, THE OTHERS INVOLVED IN THAT

22   VIDEO ON THAT DAY?

23        A    NO, MA'AM, I DID NOT.

24        Q    SO IT WOULD BE A TRUE STATEMENT, THEN, THAT THE

25   ACCOUNTS THAT OCCURRED ON JUNE 26TH IS BASED SOLELY ON THE

1    DEFENDANT'S VERSION OF EVENTS?

2         A    NO, MA'AM.  I ALSO VIEWED THE TAPES.  THE ATTORNEY WAS

3    KIND ENOUGH TO SHOW ME THE TAPES, SO I GOT TO REVIEW THEM AS

4    WELL.  AND I NEED YOU TO KNOW THAT I DON'T JUST LISTEN TO WHAT

5    HE WOULD SAY HAPPENED.  I USED THE TRAUMA TOOLS TO EXPLORE AND

6    TO WATCH HIM, TO EVALUATE HIS REACTIONS TO HIS DESCRIPTIONS OF

7    WHAT HE SAID.  SO I'M TRAINED MORE THAN TO JUST ACCEPT WHAT

8    SOMEONE SAYS BUT TO LOOK FOR POSSIBLE MALINGERING OR FAKING, NOT

9    TELLING THE TRUTH.

10        Q    OKAY.  SO WITH THAT UNDERSTANDING, HOW ARE YOU ABLE

11   TO -- JUST FOR CLARIFICATION, HOW ARE YOU ABLE TO DETERMINE THAT

12   HIS ACTIONS ON JUNE 26TH WHERE HE STRUCK THE CAR 15 TIMES WITH

13   BULLETS, HOW CAN YOU DETERMINE THAT THOSE ACTIONS WERE A RESULT

14   OF THE INCIDENT FROM -- OR THE ALLEGED TRAUMA FROM HIS

15   CHILDHOOD?

16        A    MA'AM, BECAUSE THERE IS A QUESTION, THE WORD, FAULT, I

17   JUST WANT TO BE REAL CLEAR.  I'M NOT HERE TO POINT FINGERS OR TO

18   ESTABLISH ANYONE'S FAULT OR ANYTHING LIKE THAT.  I'M JUST HERE

19   TO TRY TO GIVE YOU AN UNDERSTANDING.  AND BECAUSE MR. BURTON HAD

20   SUCH SEVERE TRAUMA SYMPTOMS, WHEN HE WAS PUSHED TO DISCUSS

21   THINGS THAT WERE FRIGHTENING AND TRAUMATIC TO HIM, IT BECAME

22   CLEAR TO ME THAT HIS FEARFULNESS, TRAUMA, ANXIETY WERE

23   ASSOCIATED WITH THE THINGS THAT I ALREADY MENTIONED, I WON'T

24   MAKE YOU LISTEN AGAIN.  BUT DURING THAT INCIDENT, THE TRAGIC

25   SHOOTING AT THE CAR AND OTHER INCIDENTS DURING HIS LIFE, THAT

1    HIS REACTION OF TRAUMA, TO BEING SEXUALLY ABUSED, TO BEING

2    BULLIED AND HAVING HIS TEETH KNOCKED OUT, THOSE KINDS OF THINGS,

3    THAT THOSE WERE CHARACTERISTIC OF HIM WHEN HE HAD ACUTE TRAUMA,

4    THAT IT WAS LESS ABOUT MAKING A COGNITIVE DECISION THAN BEING

5    TERRIFIED, SEEING HIMSELF AS FACING HARM AND BEHAVING IN A

6    PANICKED FASHION.

7         Q    OKAY.  I HAVE TWO MORE QUESTIONS, AND THEN I'M DONE.

8    AFTER LISTENING TO YOUR TESTIMONY, IT SEEMS THAT THE DEFENDANT

9    ALLEGEDLY HAD SUFFERED FROM DEPRESSION SINCE HE WAS A TEENAGER.

10   AND IN YOUR EXPERIENCE OVER THE COURSE OF THAT MANY YEARS

11   DEALING WITH DEPRESSION, IS IT USUAL OR IS IT COMMON FOR PEOPLE

12   TO BE ABLE TO WALK OUT AND GO TO THE GROCERY STORE IN PUBLIC AND

13   COMMIT CERTAIN ACTS, SUCH AS A ROBBERY THAT OCCURRED EARLIER

14   THAT DAY, AS WELL AS THIS HORRENDOUS INCIDENT THAT OCCURRED JUST

15   MOMENTS LATER, ALL BEFORE LUNCH?  IS THAT SOMETHING THAT'S VERY

16   TYPICAL OR SOMETHING THAT YOU SEE VERY OFTEN?

17        A    I AM UNABLE TO UNCOUPLE HIS POST-TRAUMATIC STRESS

18   DISORDER FROM HIS DEPRESSION.  I WOULDN'T WANT TO DO THAT

19   BECAUSE THEY BOTH CO-EXIST, THEY SIT SIDE BY SIDE.  SO I'M GOING

20   TO ANSWER THE QUESTION, THINKING OF HIM HAVING THE CHRONIC

21   TRAUMA AND THE CHRONIC DEPRESSION, YOU ARE RIGHT.  AND THEN, IS

22   IT POSSIBLE FOR HIM TO BEHAVE IN WHAT APPEARED TO BE A NORMAL

23   FASHION, DOING SOME OF THE THINGS THAT YOU MENTIONED, SOME OF

24   THE EXAMPLES THAT YOU DESCRIBED?  IN MY EXPERIENCE -- AND,

25   UNFORTUNATELY, MANY PEOPLE WHO HAVE PTSD AND SEVERE DEPRESSION

1    TEND TO HIDE IT, DISGUISE IT, EVEN DO WHAT THEY CALL ACTING OUT,

2    WHERE SOME OF THEIR BEHAVIORS DETRACT FROM SOMEONE SEEING HOW

3    DEPRESSED AND TRAUMATIZED THEY REALLY ARE.  AND THAT'S WHY THE

4    SECOND THING, JUDGE, I WOULD DO IF I HAD BEEN EVALUATING OR

5    TREATING HIM BACK THEN IS, YOU KNOW, I WOULD FIND OUT WHERE HE

6    WAS SPENDING HIS TIME AND WHAT HE WAS DOING BECAUSE SOME OF THE

7    THINGS THAT YOU MENTIONED WOULD NOT BE UNUSUAL FOR SOMEONE WHO

8    IS DEPRESSED AND TRAUMATIZED, AND IT WOULD NEED TO BE CAUGHT SO

9    THEY COULD BE DEALT WITH PROPERLY.

10        Q    OKAY.  MY LAST QUESTION, AND I PROMISE.  WOULD YOU SAY

11    THAT IT WAS -- IT WOULD BE USUAL OR UNUSUAL FOR SOMEONE

12    STRUGGLING FROM A DEPRESSIVE ORDER TO COMMIT A ROBBERY OR SNATCH

13    PROPERTY FROM SOMEONE'S NECK?

14        A    FOR SOMEONE WHO IS EXPRESSING DEPRESSION AND PTSD, THE

15    WAY THEY CAN BEHAVE CAN BE ANYTHING FROM HARMING THEMSELVES,

16    SUICIDE, TO ROBBERY, TO SHOPLIFTING, TO STAYING IN BED 24 HOURS

17    A DAY AND NOT DOING, YOU KNOW, WHAT THEY NEED TO DO, TO FAILING

18    OUT OF THE NAVY BECAUSE THEY CAN'T LISTEN TO AND OBEY ORDERS.

19    HOW DOES THAT WORK WITH SOMEONE'S SYSTEM OF DISASSOCIATION, NOT

20    BEING ABLE TO PAY ATTENTION, ANXIETY, LOW SELF-ESTEEM, AND WHERE

21    THOSE ACTIONS CAN TAKE A PERSON CAN REALLY VARY.  THE THINGS YOU

22    MENTIONED ARE ONE PLACE.  THAT'S WHY THEY REALLY DO NEED

23    TREATMENT AND HELP.

24        Q    THANK YOU, DOCTOR.

25        A    THANK YOU, MA'AM.

1          MS. ROGAN:  IF I COULD JUST FOLLOW UP, JUDGE.  I HAVE

2      JUST A COUPLE OF QUESTIONS.

3                      REDIRECT EXAMINATION

4  BY MS. ROGAN:

5      Q    DR. LORING, YOU ALLUDED TO THIS, AND I JUST WANT TO

6  CLARIFY.  DOES SOMEONE WITH PTSD MANIFEST THOSE SYMPTOMS AT ALL

7  TIMES AS THEY GO ABOUT THEIR DAILY LIVES?

8      A    NO, MA'AM.  ESPECIALLY MEN, THEY OFTEN TRY TO HIDE THE

9  SYMPTOMS.  THEY SOMETIMES THINK OF THEM AS UNMANLY TO APPEAR

10  FEARFUL OR ANXIOUS.  SO THE SYMPTOMS ARE OFTEN DISGUISED,

11  ALTHOUGH THE PERSON THEMSELVES KNOW HOW BADLY THEY FEEL.  SO,

12  NO, THEY DON'T WALK AROUND WITH THE SYMPTOMS LIKE WORN ON THE

13  COAT SLEEVE.  SADNESS, AS YOU CAN SEE THAT TERM, YOU CAN SEE ON

14  THEIR SLEEVE.  THEY OFTEN HIDE THE SYMPTOMS AS BEST THEY CAN.  I

15  FIND IT ESPECIALLY AMONG MEN.

16      Q    AND CAN YOU JUST EXPLAIN, DOCTOR, WHAT A TRIGGER IS

17  WITH PTSD?

18      A    YES, MA'AM.  SOMEONE WHO HAS PTSD, WHETHER IT IS A

19  LAWYER OR A JUDGE, A DOCTOR, A SURGEON, MR. BURTON, THEY ARE

20  PTSD, AND THEY ARE HIDING IT SUCCESSFULLY; OTHERS DON'T SEEM TO

21  KNOW IT.  AND SOMETHING HAPPENS THAT SETS IT OFF OR TRIGGERS IT,

22  CAUSES SOME OF THE SYMPTOMS TO FLY OUT, AND THEY CAN'T KEEP THEM

23  HIDDEN ANYMORE.  WE THINK OF THE EVENT THAT CAUSED THE SYMPTOMS

24  TO SHOW UP AS TRIGGERING THOSE SYMPTOMS, STIMULATING THEM.

25  THOUGH THEY WERE ALWAYS THERE, THEY MAY HAVE BEEN SUCCESSFULLY

1    HIDDEN PRIOR TO THAT EVENT FOR SOME PERIOD OF TIME.

2         Q    ALL RIGHT.  TO GET BACK TO THE VIDEO YOU WERE

3    DESCRIBING HAVING SEEN.  DID THAT VIDEO SHOW A PHYSICAL STRUGGLE

4    WHERE MR. HARRISON WAS ON TOP OF MR. BURTON ON THE GROUND?

5         A    THAT'S HOW IT APPEARED TO ME.  AND THROUGH NO FAULT OF

6    MR. HARRISON WHATSOEVER, OR NO ONE COULD HAVE KNOWN THIS MUCH,

7    REALLY, EXCEPT PERHAPS MR. BURTON AND HIS FORMER THERAPIST, BUT

8    WHAT THAT TRIGGERS, WHAT THAT STIMULATED WAS SOME OF THE SAME

9    HELPLESSNESS AND TERROR THAT MR. BURTON FELT WHEN HE WAS BEING

10   SEXUALLY ABUSED, WHICH HAS NOTHING TO DO WITH MR. HARRISON, BUT

11   WITHIN MR. BURTON'S RETAINED MEMORIES CAUSED FLASHBACKS TO THAT

12   TIME.  AND THAT'S WHERE THE PAIN IS, WHEN CERTAINLY HE WAS GOING

13   TO BE HARMED, WHICH DID NOT FIT THAT SITUATION BUT DID FIT THE

14   SITUATION BACK DURING THE SEXUAL ABUSE WHEN THE TRAUMA

15   ORIGINATED.

16        Q    OKAY.  THANK YOU.  THAT'S ALL.

17             THE COURT:  ALL RIGHT, MA'AM, YOU MAY COME DOWN.

18             DR. LORING:  SIR?

19             THE COURT:  YOU MAY COME DOWN.

20             DR. LORING:  THANK YOU, JUDGE.

21             THE COURT:  YES, MA'AM.  DOES EITHER SIDE HAVE ANY

22        OTHER WITNESSES?

23             MS. PATTERSON:  NO, YOUR HONOR.

24             MS. ROGAN:  JUDGE, I DON'T HAVE ANOTHER WITNESS.  I

25        HAVE A STATEMENT THAT MR. BURTON'S MOTHER WOULD LIKE TO

```
 1         MAKE AT THE APPROPRIATE TIME, AS WELL AS THE STATEMENT

 2         MR. BURTON WOULD LIKE TO MAKE.  I DON'T KNOW IF YOU WANT TO

 3         HEAR THEM NOW OR AFTER WE DISCUSS OUR RECOMMENDATION.  I

 4         WOULD LIKE TO PRESENT THEM NOW, IF THAT'S ALL RIGHT WITH

 5         THE COURT.

 6              THE COURT:  OKAY.  WELL, YOU HAVE TALKED TO YOUR

 7         CLIENT ABOUT HIS RIGHT TO REMAIN SILENT AND HIS RIGHT TO

 8         TESTIFY?

 9              MS. ROGAN:  I HAVE, JUDGE.

10              THE COURT:  IF HE IS GOING TO TESTIFY AND BE UNDER

11         OATH, IF HE IS, HE COULD BE SUBJECT TO CROSS-EXAMINATION.

12              MS. ROGAN:  I UNDERSTAND THAT.  AND THIS MAY BETTER.

13         IF WE ENTER A PLEA, IT MIGHT BETTER AWAIT THAT TIME.  IT

14         WAS MORE OF A STATEMENT EXPRESSING HIS REMORSE.

15              THE COURT:  I UNDERSTAND.

16              MS. ROGAN:  BUT WE DON'T NEED TO PUT HIM UNDER OATH AT

17         THIS TIME.

18              THE COURT:  WELL, I THINK I UNDERSTAND THE POSITION OF

19         THE PARTIES.

20              MS. ROGAN:  ALL RIGHT.

21              THE COURT:  I DO NOT KNOW IF YOU NEED TO MAKE ANY

22         FURTHER CLOSING ARGUMENT.  IF YOU DO, IT WOULD HAVE TO BE

23         BRIEF, I WOULD THINK.

24              MS. ROGAN:  YES.  YES, IT WOULD BE VERY BRIEF.  I

25         DON'T WANT TO GO OVER EVERYTHING YOU HAVE HEARD.  I THINK
```

1        YOU CAN WELL UNDERSTAND THE INFORMATION WE HAVE PROVIDED

2        AND THE ARGUMENT THAT WE SEEK TO MAKE.

3            I JUST WANT TO SAY IN CLOSING, I HAVE BEEN WORKING FOR

4        SOME TIME ON TRYING TO NEGOTIATE A DISPOSITION,

5        PARTICULARLY THAT WOULD BE SOMETHING OTHER THAN ATTEMPTED

6        MURDER, BUT RATHER AGGRAVATED ASSAULT, ONLY INSOFAR AS

7        THE -- BECAUSE OF THE MENTAL STATE AND THE EMOTIONAL

8        REACTION THAT MR. BURTON WAS HAVING AT THE TIME, I DIDN'T

9        BELIEVE THAT HE FORMED AN INTENT TO COMMIT MURDER AND THAT,

10       THEREFORE, DID NOT QUALIFY AS AN ATTEMPTED MURDER.  MY

11       NEGOTIATIONS FAILED.  I DID, HOWEVER, PROVIDE THE STATE

12       WITH ALL OF THE INFORMATION THAT YOU HAVE NOW HEARD TODAY.

13           BE THAT AS IT MAY, WE ARE HERE IN WHAT WOULD BE A

14       BLIND PLEA, SO I HAVE NO ABILITY TO NEGOTIATE ANYTHING LESS

15       THAN ATTEMPTED MURDER.  AND I JUST WANT TO EMPHASIZE AGAIN

16       THAT IN MY VIEW, I THINK THE APPROPRIATE PENALTY WOULD BE,

17       YOU KNOW, SOME PUNISHMENT IN TERMS OF INCARCERATION

18       COMBINED WITH SOME MANDATED PSYCHIATRIC TREATMENT AND HELP

19       FOR THIS CONDITION WHICH I BELIEVE HAS PLAGUED MR. BURTON

20       FOR MANY YEARS AND TRAGICALLY MANIFESTED ITSELF IN A

21       TERRIBLE WAY.

22           I'M NOT IN A POSITION TO GET INTO THE PENDING CHARGE,

23       BUT HE DOES HAVE ANOTHER PENDING AGGRAVATED ASSAULT CHARGE

24       FROM THE JAIL, AND MY UNDERSTANDING IS, JUDGE, THAT IT WAS

25       ACTUALLY A SIMILAR SITUATION, WHERE HE WAS JUMPED AND FELT

1    THREATENED.  I'M NOT PRIVY TO THE STATEMENTS THAT

2    MS. PATTERSON MADE ABOUT HIM ALIGNING HIMSELF WITH THE

3    GANGSTER DISCIPLES, THAT IS TOTALLY NEW TO ME AND TOTALLY

4    CONTRARY WITH EVERYTHING THAT I HAVE LEARNED ABOUT

5    MR. BURTON DURING THE 18 MONTHS THAT I HAVE BEEN

6    REPRESENTING HIM.  BUT THAT'S A SEPARATE ISSUE.

7        I JUST WANTED TO EMPHASIZE -- AND I DID, ACTUALLY,

8    HAVE ONE MORE PIECE OF EVIDENCE I WANTED TO INTRODUCE,

9    JUDGE, WHICH IS THE LETTER THAT I SENT TO THE D.A.'S OFFICE

10   THAT WAS, AT THAT TIME, A PROFFER TO RESOLVE THE CASE WITH

11   A PLEA WHERE I DESCRIBE IN BRIEF TERMS MR. BURTON'S

12   SITUATION AND DR. LORING'S FINDINGS, AND MY RECOMMENDATION

13   WAS -- AT THE TIME WAS FOR A PERIOD OF FIVE YEARS TO BE

14   FOLLOWED BY A YEAR OF INTENSIVE SUPERVISION ON PROBATION

15   AND MANDATED MENTAL HEALTH TREATMENT.  I REALIZE FIVE IS

16   NOT AN APPROPRIATE SENTENCE, AND I'M NOT GOING TO ASK YOU

17   TO IMPOSE FIVE.  BUT I DO SINCERELY BELIEVE A TERM MORE

18   LIKE 15 RATHER THAN 30, UNDER THE CIRCUMSTANCES OF THIS

19   CASE, WITH AN UNDERSTANDING THAT WHEN HE IS RELEASED FROM

20   PRISON, HE GET THE TREATMENT THAT HE NEEDS TO DEAL WITH

21   THIS ONGOING PTSD HE SUFFERS FROM.  HE IS NOT GOING TO GET

22   TREATED IN PRISON, JUDGE, AND THE LONGER IT GOES UNTREATED,

23   THE WORSE IT IS FOR HIM AND FOR THOSE WHO INADVERTENTLY

24   TRIGGER HIS REACTIONS.

25        SO THAT'S MY REQUEST, IS THAT THE JUDGE COME UP WITH A

1    SENTENCE THAT REFLECTS THE NEED FOR PUNISHMENT AND

2    RETRIBUTION.  AND I FULLY UNDERSTAND THE VICTIMS' DESIRES

3    IN THAT REGARD, BUT THAT ALSO BALANCES THE NEED TO HELP

4    MR. BURTON COPE WITH THIS SITUATION AND PREVENT ANYTHING

5    LIKE THIS FROM HAPPENING AGAIN.  THANK YOU, JUDGE.

6        MS. PATTERSON:  YOUR HONOR, IF I MAY CLOSE IN THIS

7    MATTER?

8        THE COURT:  JUST A MOMENT.

9        MS. PATTERSON:  THANK YOU.

10       (WHEREUPON A BRIEF PAUSE WAS HAD.)

11       THE COURT:  YES, MA'AM.

12       MS. PATTERSON:  YES, YOUR HONOR.  LET'S NOT FORGET

13   HERE THAT THERE WASN'T ONE VIOLENT ACT THAT OCCURRED ON

14   THIS DAY, THERE WERE TWO VIOLENT ACTS.  FIRST THERE WAS A

15   ROBBERY, AND THEN THERE WAS A SHOOTING, A VIOLENT SHOOTING,

16   15 TIMES AT A VEHICLE, ALL OCCURRING ON THE SAME DAY BEFORE

17   LUNCHTIME.

18       HOW THE DEFENDANT IN THIS CASE CAN CLAIM THAT HE IS

19   ANY TYPE OF VICTIM HERE IS VERY SURPRISING.  HE WAS THE

20   AGGRESSOR IN BOTH SITUATIONS, AND I THINK THAT'S PRETTY

21   CLEAR TO THE COURT FROM THE EVIDENCE SHOWN HERE TODAY.

22       AFTER HEARING FROM DR. LORING, HEARING HER INFORMATION

23   ON THE SYMPTOMS OF POST-TRAUMATIC STRESS DISORDER, MY GOD,

24   IT SEEMS ALMOST EVERYONE IN THE WORLD COULD BE DIAGNOSED

25   WITH POST-TRAUMATIC STRESS DISORDER.  AND THE FACT THAT SHE

1    WAS SO HERALD IN THE FACT THAT THE DEFENDANT IS FACING A

2    DANGER TO HIMSELF, WHAT ABOUT THE DANGER HE IS TO OTHER

3    INDIVIDUALS, PARTICULARLY TO THE HARRISONS AND EVAN IN THIS

4    CASE.  I DON'T THINK THAT THERE WAS ANY OTHER MENTION ABOUT

5    THAT IN HER TESTIMONY AT ALL.

6        I DON'T BELIEVE THAT THERE WAS ANY CORRELATION

7    PRESENTED BY DR. LORING OF HIS CHILDHOOD EVENTS AND ACTIONS

8    THAT TOOK PLACE ON JUNE 26TH.  I DON'T THINK THERE WAS ANY

9    CORRELATION OF HOW HIS CHILDHOOD EVENTS AFFECTED HIS

10   BEHAVIOR ON THAT DAY.  HOW DO WE KNOW BEYOND THE DEFENDANT

11   TELLING DR. LORING HIMSELF WHAT SPECIFIC MEMORY WAS

12   TRIGGERED ON THAT DAY?  WE DON'T KNOW.

13       THE DEFENDANT WAS CHARACTERIZED BY DR. LORING AS BEING

14   HELPLESS.  THE TRUE INDIVIDUAL WHO IS HELPLESS IS THE

15   HARRISON FAMILY, PARTICULARLY TWO-YEAR-OLD EVAN, WHO WAS

16   STRAPPED IN A CAR SEAT COMPLETELY HELPLESS IN THAT INSTANT.

17       THIS DEFENDANT ASKS FOR MERCY, AND IN THIS CASE, THE

18   AMOUNT OF YEARS HE COULD FACE IS 155.  THE STATE IS ONLY

19   ASKING FOR 30 INCARCERATED.  IF THAT'S NOT MERCY, YOUR

20   HONOR, WHAT IS?  FIVE YEARS THAT AT ONE POINT WAS

21   COMMUNICATED BY THE DEFENSE IS SIMPLY INAPPROPRIATE.  IT IS

22   A SLAP IN THE FACE.  SO THE STATE WOULD LIKE FOR THE COURT

23   TO JUST REMEMBER THAT WHEN DETERMINING SENTENCING IN THIS

24   CASE.  THANK YOU.

25       THE COURT:  THIS CASE IS FRUSTRATING FOR A LOT OF

1    REASONS.  WHEN I WENT THROUGH THE RECORDS THAT THE DOCTOR

2    TESTIFIED, I GOT A COPY OF THE NAVAL RECORDS OF WHY HE WAS

3    DISCHARGED, AND I READ IT.  HE WAS DISCHARGED -- HE SERVED

4    IN THE NAVY APPROXIMATELY, IT LOOKS LIKE THREE MONTHS

5    BEFORE HE WAS DISCHARGED FROM THE NAVY.  HE HAD A

6    PSYCHIATRIC AND MEDICAL AND PTSD EVALUATION.  HE WAS SET ON

7    JANUARY OF 2012 WHICH WAS ABOUT FOUR MONTHS BEFORE THIS

8    INCIDENT TOOK PLACE THAT IS BEFORE THE COURT.  HE WAS

9    DIAGNOSED WITH DEPRESSIVE DISORDER, ANTISOCIAL PERSONALITY

10   DISORDER, AND BORDERLINE PERSONALITY DISORDER.  HE WAS

11   UNDENIABLY PSYCHOLOGICALLY AFFECTED BY, BUT, AS COUNSEL HAS

12   SAID, HE IS COMPETENT, AND HE WAS COMPETENT AT THE TIME

13   THIS TOOK PLACE.

14        THE SECOND THING THAT BOTHERS ME, IF HE DOES HAVE THIS

15   KIND OF PSYCHIATRIC CONDITION, HOW IN THE WORLD HE GOT A

16   HOLD OF AN AUTOMATIC PISTOL WITH THAT KIND OF WEAPON?  HE

17   SHOT 16 TIMES, AND GOD HELP ME, I CAN'T IMAGINE WHY ANYONE

18   ELSE -- THE CHILD WAS HURT AND WHY NO ONE ELSE WAS HURT.

19   IT IS INCREDIBLE.

20        I'M SYMPATHETIC TO THE PSYCHIATRIC CONDITION OF

21   MR. BURTON, BUT THE FACT OF THE MATTER IS, HE HAD A GUN

22   THAT COULD HAVE ENDANGERED AN ENTIRE COMMUNITY, AND I DON'T

23   KNOW HOW HE GOT THE GUN, I DON'T KNOW HOW HE ACQUIRED IT,

24   AND CERTAINLY HE HAD THE WHEREWITHAL TO FIRE IT.  AND HE

25   USED IT TWICE THAT DAY, FOR AN ARMED ROBBERY AND, SECONDLY,

1   ON THIS HORRIBLE ASSAULT, REALLY, ON THE COMMUNITY THAT HE

2   DID IN THAT KROGER PARKING LOT.

3       IF HE WOULD DECIDE TO ENTER A PLEA, I WOULD SENTENCE

4   HIM TO 40 YEARS TO SERVE 25.  HE WOULD HAVE TO DO 25 YEARS

5   OF INCARCERATION.  HE WOULD RECEIVE CREDIT FOR THE TIME

6   THAT HE HAS BEEN IN JAIL, AND THAT'S BEEN TWO YEARS, SO HE

7   WILL GET SOME CREDIT FOR THAT.

8       I DON'T KNOW WHAT WE ARE GOING TO DO WITH MR. BURTON,

9   BUT AS THE POINT WAS MADE BY THE PROSECUTOR, WE HAVE LOTS

10  OF PEOPLE WANDERING AROUND THIS SOCIETY WITH PTSD, AND WE

11  HAVE LOTS OF PEOPLE WHO HAVE GUNS.  WHEN THE TWO -- WHEN

12  PSYCHIATRIC CONDITIONS AND GUNS GET TOGETHER, PEOPLE DIE.

13  THANK GOD IN THIS CASE, THE CHILD SURVIVED AND IS DOING

14  WELL.  BUT THAT'S WHAT I WOULD DO IF HE SHOULD DECIDE TO

15  ENTER A PLEA.

16      MS. ROGAN:  ALL RIGHT.  THANK YOU, JUDGE.  IF I COULD

17  JUST CORRECT ONE PART OF YOUR RECITATION.  THE NECKLACE

18  SNATCHING WAS NOT EVER ALLEGED TO HAVE BEEN AN ARMED

19  ROBBERY, IT WAS A SUDDEN SNATCHING.

20      THE COURT:  I MISSED THAT.

21      MS. ROGAN:  OKAY.  SO THERE WAS NO DISPLAY OF A GUN AT

22  THAT TIME.

23      THE COURT:  OKAY.  BUT THE GUN WAS STILL USED IN THE

24  COURSE OF THE MOST SERIOUS INCIDENT THAT WE ARE TALKING

25  ABOUT.

1          MS. ROGAN:  ABSOLUTELY.  ABSOLUTELY IT WAS.

2          THE COURT:  SO THAT'S WHAT I WOULD DO.  I WILL LET

3     COUNSEL TALK.

4          MS. ROGAN:  WE WILL DISCUSS IT.

5          THE COURT:  BEG YOUR PARDON?

6          MS. ROGAN:  WE WILL DISCUSS IT RIGHT NOW.

7          THE COURT:  ALL RIGHT.  I'LL BE BACK IN 15 MINUTES,

8     AND PLEASE LET ME KNOW WHAT YOUR INTENTIONS ARE.

9          MS. ROGAN:  THANK YOU, JUDGE.

10         MS. PATTERSON:  THANK YOU, YOUR HONOR.

11         (WHEREUPON A RECESS WAS HAD AT 3:26 P.M., AFTER WHICH

12    COURT RECOMMENCED AT 4:02 P.M.)

13         THE COURT:  I DO CALL THE CASE OF THE STATE VERSUS

14    CHAZREL JAMAL BURTON AND ASK HIM TO COME FORWARD.  OKAY.

15    MR. BURTON, I'M ABOUT TO PRONOUNCE SENTENCE.  DID YOU WANT

16    TO MAKE A STATEMENT TO ANYONE BEFORE I DO THAT?

17         THE DEFENDANT:  YES, YOUR HONOR.  FIRST OF ALL, I WANT

18    TO SAY THANK GOD THAT EVAN IS ALIVE TODAY.  AND THIS IS A

19    TOUGH SITUATION FOR ME, AND I'M PRETTY SURE IT WAS

20    TERRIBLE, HORRIBLE FOR THE HARRISON FAMILY.  I REGRET MY

21    ACTIONS DEEPLY AND TRULY.  THIS HAS NOT JUST AFFECTED ME

22    AND EVAN AND THE HARRISON FAMILY BUT NUMEROUS OTHER PEOPLE,

23    OTHERS INVOLVED IN THIS SITUATION, YOUR HONOR.

24         SO TO THE HARRISON FAMILY, I HOPE YOU ACCEPT MY

25    APOLOGY.  YOU KNOW, IT IS NOT JUST SOMETHING THAT I'M

```
 1        SAYING BECAUSE OF CIRCUMSTANCES, BUT I HAVE BEEN REGRETTING

 2        THIS AND THINKING ABOUT THIS AND MARINATING ON THIS FOR

 3        THREE YEARS NOW, AND IT IS HARD FOR ME TO LIVE WITH MY

 4        ACTIONS, YOU KNOW, THAT CAUSED YOU GUYS PAIN, SPECIFICALLY

 5        TO LITTLE EVAN.

 6             AND, MS. HARRISON, I WANT YOU TO KNOW THAT I TRULY

 7        NEVER HAD ANY INTENTIONS TO HARM YOU, TRUTHFULLY I NEVER

 8        EVEN REALLY SEEN YOU UNTIL TODAY.  SO I WANT YOU TO KNOW

 9        THAT MY ACTIONS WERE NEVER TO TAKE YOU OFF OF THIS EARTH OR

10        TO HURT YOU IN ANY TYPE OF WAY.  UNFORTUNATELY, THEY WERE A

11        RESULT OF THINGS BETWEEN ME AND MR. HARRISON.  AND TO HIM,

12        I WANT TO APOLOGIZE, AS WELL, BECAUSE MY REACTION WAS

13        TOTALLY UNCALLED FOR, AND I JUST HOPE YOU CAN FORGIVE ME,

14        YOU KNOW.  AND DON'T LET EVAN GROW UP TO HATE ME FOR WHAT

15        HAPPENED TO HIM.  I WANT TO APOLOGIZE TO DEKALB COUNTY FOR

16        THIS WHOLE SITUATION, AS WELL.  AND MOST IMPORTANT OF ALL,

17        MY MOTHER.  YOU KNOW, THIS IS GOING TO BE SOMETHING THAT

18        SHE HAS GOT TO DEAL WITH AND BE STRONG AND, YOU KNOW,

19        SOLDIER THROUGH FOR THE NEXT 25 YEARS.

20             SO, I JUST RESPECT -- JUST REGRET -- I HAVE LOST THAT

21        WORD, I'M SORRY.  EXPRESS MY REGRET IS WHAT I WAS TRYING TO

22        SAY.  EXPRESS MY REGRET AND REMORSE FOR THE SITUATION, AND

23        LET IT BE KNOWN THAT I APOLOGIZE, AND THAT I AM SINCERELY

24        AND DEEPLY TRULY REMORSEFUL AND REGRETFUL ABOUT THE

25        SITUATION.
```

1            THE COURT:  ALL RIGHT.  THANK YOU, SIR.  ALL RIGHT.

2       THIS IS THE CASE OF THE STATE VERSUS CHAZREL J. BURTON.

3       I'LL ASK THAT HE BE SWORN.

4                      CHAZREL JAMAL BURTON,

5       HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

6       FOLLOWS:

7            THE DEPUTY:  STATE YOUR NAME.

8            THE DEFENDANT:  CHAZREL JAMAL BURTON.

9            THE COURT:  MR. BURTON, ARE YOU ABLE TO HEAR AND

10      UNDERSTAND WHAT I'M SAYING TO YOU?

11           THE DEFENDANT:  YES, YOUR HONOR.

12           THE COURT:  ARE YOU UNDER THE INFLUENCE OF ANY

13      ALCOHOL, DRUGS, OR ANY OTHER SUBSTANCE?

14           THE DEFENDANT:  NO.

15           THE COURT:  HAS YOUR LAWYER EXPLAINED TO YOU WHAT YOU

16      ARE CHARGED WITH TODAY?

17           THE DEFENDANT:  YES.

18           THE COURT:  DO YOU UNDERSTAND BY ENTERING THIS PLEA

19      THAT YOU ARE GIVING UP YOUR RIGHT NOT TO INCRIMINATE

20      YOURSELF, YOUR RIGHT TO HAVE A JURY TRIAL, YOUR RIGHT TO

21      THE PRESUMPTION OF INNOCENCE IN YOUR FAVOR, YOUR RIGHT TO

22      QUESTION YOUR ACCUSERS AND TO OFFER ANY EVIDENCE YOU MAY

23      HAVE AS TO YOUR INNOCENCE, YOUR RIGHT TO SUBPOENA

24      WITNESSES THAT COULD TESTIFY FOR YOU, AND YOUR RIGHT TO

25      APPEAL THIS CONVICTION?  DO YOU UNDERSTAND THAT YOU ARE

1          GIVING UP ALL OF THOSE RIGHTS?

2                    THE DEFENDANT:  YES, YOUR HONOR.

3                    THE COURT:  ARE YOU AN AMERICAN CITIZEN?

4                    THE DEFENDANT:  YES, YOUR HONOR.

5                    THE COURT:  OKAY.  NOW, HAS THE DISTRICT ATTORNEY,

6          YOUR LAWYER, POLICE OFFICER, OR ANYONE ELSE MADE ANY

7          THREATS OR PROMISES TO INFLUENCE YOU TO PLEAD GUILTY?

8                    THE DEFENDANT:  NO, YOUR HONOR.

9                    THE COURT:  HOW DO YOU PLEAD TO THE CHARGES?

10                   THE DEFENDANT:  GUILTY.

11                   THE COURT:  HAVE YOU HAD AN OPPORTUNITY TO DISCUSS

12         THIS CASE THOROUGHLY WITH YOUR ATTORNEY, MS. ROGAN?

13                   THE DEFENDANT:  YES, YOUR HONOR.

14                   THE COURT:  DO YOU AUTHORIZE MS. ROGAN TO ENTER A PLEA

15         OF GUILTY ON YOUR BEHALF IN OPEN COURT TODAY?

16                   THE DEFENDANT:  YES, YOUR HONOR.  YES.

17                   THE COURT:  YOU HAVE HAD A PRETRIAL IN THIS CASE, AN

18         EXTENSIVE PRETRIAL, AND I HAVE INDICATED WHAT I WOULD DO IN

19         THE SENTENCING OF THIS CASE.  BUT, MS. ROGAN, DO YOU HAVE

20         ANYTHING ELSE?

21                   MS. ROGAN:  NO.  OTHER THAN WHAT I HAVE ALREADY

22         ARGUED, JUDGE.  I WOULD LIKE TO JUST READ A STATEMENT FROM

23         MR. BURTON'S MOTHER, IF I COULD.  SHE IS HERE IN THE

24         COURTROOM, BUT SHE IS JUST TOO BROKEN UP TO MAKE A

25         STATEMENT HERSELF.  BUT SHE ASKED ME TO MAKE THIS BRIEF

1    STATEMENT.

2         AS CHAZ'S MOTHER, I HUMBLY ASK THE COURT TO HAVE MERCY

3    ON HIM.  HE MADE A HORRIBLE MISTAKE ON JUNE 26TH, 2013.  HE

4    HAS NEVER BEEN IN TROUBLE BEFORE, AND I HUMBLY ASK THE

5    COURT TO HAVE MERCY ON HIM AND TO GIVE HIM A CHANCE TO MAKE

6    IT RIGHT BY GETTING THE MENTAL HELP HE NEEDS.

7         I SINCERELY ASK THE HARRISON FAMILY FOR FORGIVENESS.

8    I CAN'T IMAGINE WHAT THEY HAVE BEEN THROUGH.  I PRAY AND

9    ASK GOD DAILY FOR THE HEALING OF LITTLE EVAN'S BODY AND FOR

10   HIS FAMILY TO HAVE HEART FOR FORGIVENESS.  I HUMBLY ASK THE

11   COURT TO GIVE CHAZ A SECOND CHANCE AND GET HELP AND MAKE A

12   BETTER LIFE FOR HIMSELF.  THANK YOU, JUDGE.

13        THE COURT:  ALL RIGHT.  HAS YOUR CLIENT EXECUTED THE

14   PLEA WAIVER SHEET?

15        MS. ROGAN:  HE HAS, JUDGE.

16        THE COURT:  ALL RIGHT.  WOULD YOU HAVE HIM INITIAL IT

17   NEXT TO HIS SIGNATURE, PLEASE.

18        (WHEREUPON THE DEFENDANT COMPLIES WITH THE REQUEST.)

19        MS. ROGAN:  WOULD YOU LIKE TO INITIAL NEXT TO EACH

20   ANSWER OR JUST NEXT TO HIS SIGNATURE?

21        THE COURT:  JUST NEXT TO HIS SIGNATURE.

22        MS. ROGAN:  OH, OKAY.

23        THE COURT:  YES.

24        MS. ROGAN:  THANK YOU, JUDGE.

25        THE COURT:  ANYTHING FURTHER FROM THE STATE?

1       MS. PATTERSON: YES, YOUR HONOR. MR. BURTON, YOU HAVE

2    ENTERED A GUILTY PLEA TO FELONY CHARGES TODAY. SHOULD YOU

3    WISH TO FILE A PETITION FOR HABEAS CORPUS, YOU HAVE FOUR

4    YEARS TO DO SO. THAT IS TO CHALLENGE THE

5    CONSTITUTIONALITY, LEGALITY, AND/OR VOLUNTARINESS OF THE

6    PLEA THAT YOU HAVE MADE HERE TODAY. DO YOU UNDERSTAND?

7       THE DEFENDANT: YES.

8       MS. PATTERSON: THANK YOU. NOTHING FURTHER FROM THE

9    STATE, YOUR HONOR.

10      THE COURT: MR. BURTON, I DO ACCEPT YOUR PLEA AS BEING

11    FREELY AND VOLUNTARILY MADE. I DO SENTENCE YOU IN

12    ACCORDANCE WITH WHAT I HAVE INDICATED, THAT WOULD BE

13    40 YEARS TO SERVE 25 YEARS. YOU WILL RECEIVE CREDIT FOR

14    THE TIME YOU HAVE BEEN INCARCERATED, WHICH I UNDERSTAND IS

15    JUNE THE 26TH. IS THAT WHEN HE WAS ARRESTED?

16      MS. ROGAN: THAT'S CORRECT, JUDGE.

17      THE COURT: JUNE THE 26TH, 2013?

18      MS. ROGAN: 2013, YES.

19      THE COURT: AND HE WILL RECEIVE CREDIT FOR THAT TIME.

20    MR. BURTON, A LOT HAS BEEN SAID IN THIS CASE. ALL I CAN

21    SAY IS I HOPE YOU DO WELL. YOU MAY HAVE A SEAT.

22      THE DEFENDANT: THANK YOU, YOUR HONOR.

23      MS. ROGAN: THANK YOU, JUDGE.

24      MS. PATTERSON: YOUR HONOR, I DON'T BELIEVE JUNE WAS

25    THE ARREST DATE BECAUSE IT IS MY UNDERSTANDING THE

1        DEFENDANT TURNED HIMSELF IN A WEEK LATER.

2             THE COURT:  OKAY.  WHAT DO YOU HAVE AS THE ARREST

3        DATE?

4             MS. PATTERSON:  JULY 3RD.

5             THE COURT:  THAT WILL BE FINE.

6             MS. PATTERSON:  2013.

7             MS. ROGAN:  THANK YOU.

8             (WHEREUPON THE PROCEEDINGS WERE CONCLUDED AT 4:10

9        P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## *CURRICULUM VITA*

**Marti Loring, LCSW, PHD, B.C.E.T.S. (Board Certified Expert in Traumatic Stress)**
**Post Office Box 2322**
**Decatur, Georgia 30031**

### EDUCATION

**Emory University Graduate School, Atlanta, Georgia, 1978-1985, Ph.D. (Sociology).**

**Bryn Mawr College Graduate School of Social Work and Social Research, Bryn Mawr, Pennsylvania, 1966-1968, MSS.**

**Vassar College, Poughkeepsie, New York, 1962-1966, BA.**

### AWARDS AND MEMBERSHIPS

**American Sociological Association**

**American Professional Society on the Abuse of Children (APSAC)**

**Invited Member, The American Academy of Experts in Traumatic Stress, 1997 – Present.**

**Board Certified Expert in Traumatic Stress (B.C.E.T.S.); and Forensic Interviewing (child and adult)**

**Licensed Clinical Social Worker, Georgia, 1985 – Present.**

**Certified Clinical Sociologist, 1990-Present.**

**Lifetime Achievement Award, The National Association of Social Workers, Georgia Chapter, September 11, 1997.**

**Outstanding Social Worker, The National Association of Social Workers, Georgia Chapter, 1989.**

### CLINICAL/PROFESSIONAL EXPERIENCE

**Director, Center for Mental Health and Human Development; Atlanta, GA, 1980-Present (expert- <u>trauma</u>: Battered person syndrome; emotional/physical/sexual abuse and trauma; coercion; human development; forensic interviewing; child sex abuse; sex abusers; anger management; social history; mitigation; family dynamics/home studies; traumatic rape and false sexual abuse allegations: Training- trauma, crisis intervention, abuse, trauma debriefing).**

**Forensic Consultant, 1990-Present: Trauma expert witness; trauma mitigation specialist; adult/child physical/emotional/sexual abuse specialist; home study evaluator; forensic interview specialist.**



DEFENDANT'S EXHIBIT

PENGAD-Bayonne, N.J.

065

**CURRICULUM VITA/LORING/2**

United States Army, Consultant for rape trauma, 2011.

Consultant for Family Violence Unit of Georgia Department of Human Resources.  Division of Family and Children Services, 1995-1996 (coordination and team development among community agencies, child sex abuse specialist).

Coordinator, Olympic Family Trauma Project Team, Atlanta, Georgia, 1995-1997 (developed and coordinated trauma and crisis team during the Olympics).

Trauma Coordinator, Grady Hospital Department of Psychiatry: Clinical Faculty, Emory University School of Medicine, Abuse Expert, Atlanta, Georgia, 1972-80 (consulted with Dekalb Rape Crisis Center ).

December Depression Hotline Coordinator, WSB-TV and Community Corporations/Agencies Coalition, Atlanta, Georgia, 1985-1991 (developed and coordinated a telephone crisis service during the December holidays).

Consultant to the National Association of Social Workers, Georgia Chapter, for the Democratic National Convention Medical Team Project, 1988.

Catholic Social Services, Family and child trauma therapist, Atlanta, Georgia, 1988-1990.

The Bridge Family Center, Atlanta, Georgia, 1986-1987 (sex abusers' counselor, child sex abuse specialist, trauma group coordinator, family therapist).

The Council on Battered Women, Atlanta, Georgia, 1984-1986 (Group therapist, public relations and community coordinator).

Assisted in the formation and training of the Dekalb Rape Crisis Center.

## EDITORIAL MATERIAL

Associate Editor, The Journal of Aggression, Maltreatment, and Trauma, 2000-Present (emotional, physical, adult and child sexual abuse and maltreatment, experimental interviewing, forensic interviewing).

Co-editor, Bullying Behavior: Current Issues, Interventions, and Research, The Haworth Maltreatment and Trauma Press, NY, 2003.

**CURRICULUM VITA/LORING/3**

## TEACHING EXPERIENCE

Assistant Professor, Department of Mental Health and Human Services, Georgia State University, Atlanta, Georgia, 1990-1997.

Instructor, Department of Psychiatry, Emory University School of Medicine, Atlanta, Georgia 1972-1980.

Temporary and Adjunct Faculty, 1987-2003: Georgia Perimeter College, Atlanta, Georgia; Georgia State University, Atlanta, Georgia; Oglethorpe University, Atlanta, Georgia; Mercer University, Atlanta, Georgia; Atlanta University School of Social Work.

## COURSES TAUGHT

| | |
|---|---|
| Growth and Development | Personality |
| The Psychology of Management | Human Services |
| Introduction to Sociology | Psychopathology |
| Human Service Practice | Deviance |
| Ethics | Emotional Abuse |
| Marriage and the Family | Criminology |
| Social Problems | Trauma/Sexual Abuse |
| Family Violence | The Family |
| Violence and Society | Social Work |
| Forensic Interviewing | |

## PAPERS PRESENTED

"Fear of Failure and Success," Georgia Association of Disability Examiners, Atlanta, Georgia, April 12, 1991.

"Reduction of Maladaptive Behavior in Emotionally Abusive Relationships," Association for Behavior Analysis, Atlanta, Georgia, May 14, 1991.

"Human Rights: Working Together to End Violence Against Women Worldwide," Amnesty International USA, Atlanta, Georgia, November 7, 1991.

**CURRICULUM VITA/LORING/4**

"The Loss and Restructuring of Wholeness in Emotional Abuse," The National Association for Women in Psychology, Atlanta, Georgia, March 12, 1993.

"Physical and Emotional Abuse," Council on Battered Women, Atlanta, Georgia, April 5, 1993.

"The Force Called Hope" National Association of Social Workers, Atlanta, Georgia, September 24, 1993.

"Service Delivery Systems for the Aging," Georgia Association of Homes and Services for the Aging, Atlanta, Georgia, January 15, 1994.

"Utilizing a Hotline for Crisis Intervention," Dekalb Rape Crisis Center, Atlanta, Georgia, March 17, 1994.

"The Expert Witness," Annual Conference of the National Organization of Forensic Social Work, Atlanta, Georgia, April 12, 1994.

"The Effective Domestic Violence Expert Witness," Florida Coalition Against Domestic Violence, Tampa, Florida May 4, 1994.

"The Expert Witness," Georgia State University, Atlanta, Georgia, July 7, 1995.

"Forensics," Georgia Association of Lawyers, Georgia State University, Atlanta, Georgia, May 22, 1995.

"Trauma of Emotional Abuse," Medical Staff, Grady Hospital, Atlanta, Georgia, January 24, 1996.

"Interviewing Skills With A Battered Person," Georgia Indigent Defense Council, Atlanta, Georgia, May 30-June1, 1996.

"Post-Traumatic Stress Disorder," Savannah Area Family Emergency Shelter, Inc., Savannah Georgia, September 3, 1996.

Master Class "Trauma:  Forensic Interviewing and Intervention Skills," NASW-GA Chapter's 8th Annual Conference, Atlanta, Georgia, September 20, 1996.

"Abuse," Southern Center for Human Rights, Atlanta, Georgia, October 19, 1996.

Mock Trial (Expert Witness on Family Violence), National Association of Forensic Social Work, Reno, Nevada, November 7, 1996.

"Emotional Abuse: Trauma in Recovery" (Long Distance Learning for 5 city coverage in Georgia), University of Georgia, Athens, Georgia, May 20, 1997.

CURRICULUM VITA/LORING/5


"Emotional Abuse," National Association of Social Workers, August, Georgia, June 7, 1997.

"Family Violence Leadership Summit: Violence Against Women and Children," City of Atlanta, Georgia, July 24, 1997.

"Intervention with Battered Women," Council on Battered Women, Atlanta, Georgia, September 7, 1997.

"Identification and Treatment of Emotional Abuse," The University of Georgia School of Social Work, Georgia, September 17, 1997.

"Emotional Abuse," Georgia Association of Social Workers, September 18, 2000.

"Family Violence and Abuse," University of Georgia, March 7, 2001.

"Family Violence," The Emotional Abuse Institute Bi-annual Master Lecture, Atlanta, Georgia, 1998-2003.

"Hope in the Twentieth Century," GASW,  Conference, Atlanta, Georgia, 2003.

"Mitigation and Forensic Interviewing," EJI national conference, Perdido Beach, Florida, October 9, 2005.

"Trauma and Abuse: Forensic Interviewing, Therapy, Emotional/Sexual Abuse, Social Histories," Texas Community Coalition, Dallas, Texas, March 3, 2008.

"The Trauma of Rape and the Problem of False Sexual Abuse Allegations," The United States Army, Germany, 2011.

"The Golden Age of Bullying: Bullying Hurts Physically and Emotionally," The Augusta Unit of the National Association of Social Workers, Augusta, Georgia, March 1, 2012.

"Emotional Abuse and Intimate Coercion," Mercer University, Macon, Georgia, November 11, 2014.

"Intimate Coercion in Family Violence," IVAT, San Diego, Calfornia, August 15, 2015.

<u>PUBLICATIONS</u>

Loring, M.T., & Powell, B. (1988).  Gender, Race, and DSM-III:  A study of the Objectivity of Psychiatric Behavior.  <u>Health and Social Behavior</u>, <u>29</u> (1), 1-71.

Wimberley, E., & Loring, M.T. (1991).  Improving Scholarly Productivity in Human Services. <u>Human Service Education</u>, <u>11</u> (1), 17-22.

**CURRICULUM VITA/LORING/6**

Loring, M.T., & Wimberley, E. (1993).  The Time-Limited Hotline.  Social Work,  38(3), 344-346.

Loring, M.T., Clark, S., & Frost, C. (1994).  A Model of Therapy for Emotionally Abused Women.  Psychology: A Journal of Human Behavior, 31(2), 1-16.

Smith, R.W., & Loring, M.T. (1994).  The Trauma of Emotionally Abused Men.  Psychology: A Journal of Human Behavior, 31(2), 1-16.

Loring, M.T. (1994).  Emotional Abuse.  Lexington MA:  Lexington Press.

Loring, M.T., Smith, R.W., & Thomas, K. (1994).  Utilization of a Time-Limited Holiday Hotline by Older Adults.  The Gerontologist, 34, 557-560.

Loring, M.T., Smith, R.W. (1994).  Health Care Barriers and Interventions for battered Women.  Public Health Reports, 109, 328-338.

Loring, M.T. (1997).  Stories From the Heart: Emotional Abuse Case Studies.  New York, Gordon and Breach Science Publishers.

Loring, M.T. (1997). The Erosion of Trust in the Workplace. In J. Cangemi (Ed.), Leadership in the Twenty-First Century, Moscow, University of Moscow Press.

Loring, M.T., Smith, R.W., & Bolden, T. (1997).  Distal Coercion:  Case Studies.  Psychology:  A Journal of Human Behavior, 34(1), 10-14.

Loring, M.T., & Bedoin, Pati. (2000).  Victim-Perpetrators:  Types of Coercion in Family Violence.  The Journal of Emotional Abuse:  Interventions, Research & Theories of Psychological Maltreatment, trauma & Nonphysical Aggression, Vol 2(1)

Loring, M.T. (2003).  Pet Abuse as a Form of Family Violence.  The Journal of  Emotional Abuse:  Interventions, Research & Theories of Psychological Maltreatment, Trauma & Nonphysical Aggression, Vol 3(2).

Loring, M.T. (2005). The Erosion of Trust in the Workplace. In J. Cangemi (Ed.),  Developing Trust in Organizations, p,177-188,  Boston, McGraw Hill.

Loring, M.T., Geffner, R., Marsh, J. (2007). Animal Abuse and Family Violence, Linkages, Research, and Implications for Professional Practice, Binghamton, NY:  Haworth Press.

Loring, M.T., Scardaville, M. (2015). Intimate Coercion:Recognition and Recovery. Maryland: Rowman & Littlefield Publishers.

**CURRICULUM VITA/LORING/7**

<u>**RESEARCH**</u>
**Loring, M.T., & Walker, J.F. The Role of Trauma in False Sexual Abuse Allegations: Red Flags and Forensic Interviewing in Sexual Abuse Allegations, 2011-2013.**

**"Trauma, Cocaine Use, and Post-Incident Bizarre Behavior in Family Violence," 2011-2012.**

**"Red Flags in Child Sex Abuse Allegations: Decreasing False Reporting by Utilizing History and Current Conditions During Forensic Interviews of Children," 2010.**

**"Trauma and Abuse: Impact on Human Behavior," 2008-2012.**

**"Post-incident Bizarre Behavior," 2005-2012.**

**"Precursors of Relational Trauma and Violence," Emil T Foundation Grant, 2000- 2003.**

**"Precursors of Violent/Illegal Behavior by Abused Persons; Coercion and Duress," 1997-2000.**

**"Coercion in the Process of Victim-perpetration," General Research Funds, 1998-2000.**



**THE CENTER**
FOR MENTAL HEALTH AND
HUMAN DEVELOPMENT, INC.
*and The Emotional Abuse Institute*

MARTI TAMM LORING, LCSW, PH.D.
EXECUTIVE DIRECTOR

BOARD OF DIRECTORS

PATI BEAUDOIN, ED.D.
TAMARA A. BOLDEN-HINES
WEI YIN CHUNG
YUEN FU
JAQUELINE R. JOHNSON
JOAN PETERS
KIKI THOMAS, MSW, PH.D.

**PSYCHOSOCIAL EVALUATION**

**CHAZREL (CHAZ) BURTON**

## INTRODUCTION

This evaluator is a licensed clinical social worker in Georgia and a clinical sociologist who is certified in the United States. This evaluator has taught in colleges, including a position on the faculty of Emory University Medical School, has written two books regarding trauma and abuse, and has both written several articles about trauma and serves on the editorial board of a nationally recognized professional trauma journal. Currently Director of the Center for Mental Health and Human Development in Atlanta, Georgia, this evaluator has evaluated over one thousand traumatized individuals during her thirty years in practice and testified over one hundred and fifty times in courts in AL, GA, FL, NH, Maryland, AZ, MA, and Germany (for the United States Army). Please see attached CV for additional information.

A psychosocial evaluation involves exploration of the individual's mental functioning, family history, traumatic life events, life successes and failures, family relationships, and behaviors at the time of an incident. A genogram (family tree) may be developed to map traumatic events and family tendencies that could be inherited; a lifetime trauma chart can be developed to illustrate a history of trauma and its impact;

DEFENDANT'S
EXHIBIT
2

PENGAD-Bayonne, N.J.

Pg. 2-

a psychosocial evaluation report describes the genogram and trauma chart, as well as their relevance to behavior at the time of an incident. Trauma tools are used to determine the extent and impact of trauma, as well as to search for possible malingering (false presentation or lying).

## METHODS OF EVAUATION

Chaz Burton was interviewed at the Dekalb County Jail on the following dates for a total of nine hours: 8/7/14, 9/17/14, 9/26/14/ 10/2/14/ 11/26/14. Also interviewed were Pastor Isaiah Robertson (his youth pastor), Tracy Brite (his mother), Faye Brite (his grandmother), Kendar Brite (his uncle), Frank Jackson (his grandfather). Records reviewed include: School and medical records from the first grade through high school; military records from the United States Dept. of the Navy; Dekalb County Police Department Initial Report and Additional Narrative of the incident on 6/26/13 at Kroger parking lot at 965 N. Hairston Rd.; a surveillance video showing the altercation between the victim's father and Chaz Burton. Also, the following trauma tools were utilized to explore possible trauma and its impact on Chaz Burton: Clinician-administered Post-traumatic Stress Disorder Scale (CAPS) and the Trauma Symptom Checklist.

## THE GENOGRAM

A genogram is a family tree that reveals some problems (drug and alcohol use, sadness/depression, anxiety) of family members, as well as problems between individuals. In the genogram of Chaz Burton, squares represent males and circles indicate females. In the key, various symbols are described so that a large yellow square is alcohol problems; lower right corner green square is sadness or depression; brown upper left corner is a nervous breakdown; red lower left corner is drug dependence; blue upper right corner is trauma; a red jagged line between two people is sexual abuse; a dotted line separated by a sideways equal sign means abandonment; a jagged blue line is bullying.

As can be seen in the genogram, Chaz Burton has experienced problems with alcohol and drugs during his lifetime. He also has depression and trauma. He was discharged from the United States Navy for a depressive disorder. Chaz was



Pg. 3-

sexually abused as a child by a man who shoved him face down and put his hand inside Chaz's bottom. It was this face, memory, and flashback that he saw in the physical altercation with the victim's father during the incident. As can be seen in the genogram, Chaz was also molested by a teenage female who forced multiple episodes of intercourse. Chaz suffered from ongoing sadness/depression and trauma as a result of this abuse. Unlike those who enjoy drinking and taking drugs, Chaz has used alcohol and Xanax, with occasional other drugs, to self-medicate his depression and anxiety symptoms.

Sadness/depression is frequent among his mother, grandmother, and aunts on his mother's side of the family (with whom he spent most of his life). He spent a great deal of time with his grandmother, Faye, who has an anxiety, panic, delusional disorder and takes psychotropic medications; for some time, she would only bark like a dog, rather than speaking. Part of Chaz's ongoing depression and anxiety is due to his lack of relationship with his father who emotionally abandoned Chaz as a young child and was murdered when Chaz was eight years old; Chaz was unable to move while staring down into the coffin at his father during the funeral.

Also, as seen in the genogram, bullying has been a major influence in Chaz's life, leading to panic reactions (like his mother and grandmother experience), as well as feelings of helplessness and fearfulness. As represented in the genogram, Chaz witnessed neighborhood violence in Boston and then, after his move to Stone Mountain at twelve years old, again saw physical attacks and shootings in his neighborhood- some of these witnessed incidents involved drive-by and other car-related shootings.

## THE TRAUMA CHART

On the trauma chart of Chaz Burton, bullying is noted. His grandmother described Chaz, at five years old, getting off the school bus with two teeth knocked out, one stuck in his throat and the other tooth grasped in his hand. The grandmother believes that Chaz was unprotected by his mother, who had been depressed and traumatized by the murder first of a boyfriend and then the murder of Chaz's father. The grandmother described her as either yelling at Chaz or lost in



Pg. 4-

her own world. The chart reflects Chaz's traumatic reaction to the murder of his father when Chaz's hopes for a relationship with him died as well, and those attending the funeral noticed Chaz staring down into the coffin at his father, seemingly unable to move until carried off. Chaz shakes and cries at this memory.

He was raped at nine years old by a man who shoved him down and entered his bottom. This was the flashback Chaz described experiencing during the physical altercation when the victim's father's body touched his during the incident. After bullying- punching that was encouraged by a counselor to toughen Chaz up- he began cutting his arms with a sharp object and wearing long sleeve shirts to hide his scars. He also took all of his mother's medicine in an attempt to kill himself at eleven years old, as well as using alcohol and marijuana to self-medicate.

The trauma chart shows that, at age twelve, an adolescent female forced intercourse with Chaz over a period of time, threatening to tell his mother when he occasionally resisted. The shootings he witnessed (at least four) are represented on the chart. When fourteen years old, Chaz became more traumatized and depressed while listening to his mother repeatedly discussing her own death, although there were no physical reasons to expect ill health (his mother was depressed, as well). Chaz asked for counseling but, as with many trauma victims, didn't want to continue and was allowed to stop the counseling he so desperately needed. However, he managed to do well in high school and became the student body president at Stone Mountain High School before graduating and attending one semester of West Georgia College where he majored in economics. Unable to sleep or eat properly, too anxious to concentrate or focus his attention, experiencing flashbacks and thoughts that intruded into his mind during studying- Chaz continued to use alcohol to self-medicate until he joined the United States Navy and went to boot camp.

He was discharged due to a depressive disorder. As with many sexually abused young men, Chaz believed that he was worthless and a failure. His grandfather described the change in him after his return from the Navy: Chaz was

Pg. 5-

a recluse, couldn't talk or joke with his cousins like before, stayed in his room without eating, seemed lost and depressed. The chart shows his return to Atlanta, getting a telecommunications job that ended after a few months, and continuing to self-medicate up to and including the incident.

## IMPRESSIONS

Family members and Pastor Isaiah described Chaz as a youth who was lost and depressed, who had problems with concentration and focus. Pastor reported times when Chaz looked dazed and withdrawn, staring into space, but always respectful. And his mother acknowledged that Chaz seemed lost and sad much of his life. It is unclear to this evaluator why there was not intervention in the form of counseling, hospitalization, or other psychiatric assistance at some point during his life. It appears that Chaz- in school and with his family- made extraordinary efforts to fit in and behave respectfully. It was not until West Georgia College and the United States Army that others recognized his anxiety and depression that prevented adequate functioning. Even then, it appears no treatment or follow-up occurred.

Chaz Burton has severe Post-traumatic Stress Disorder as indicated by the Clinician-administered PTSD Scale (CAPS). In addition, his trauma symptoms (as reflected on the Trauma Symptom Checklist) include flashbacks, intrusive thoughts, and hypervigilance (quick to be startled). These tools indicated that his fearfulness and high anxiety cause panic reactions in which he fears for his safety.

## THE INCIDENT

At the time of the tragic incident in which a young child was wounded, Chaz Burton had ingested vodka and Xanax to self-medicate. While not denying any of the charges, Chaz is unable to remember taking someone's necklace. His experience of the physical altercation with the victim's father was clouded with Post-traumatic Stress Disorder (PTSD) as he described a flashback where he saw the face of the man who had, earlier in his life, approached him in a similar fashion and sexually molested him. Chaz Burton also remembered leaving the victim's father and looking back, seeing him approach the front, passenger side of the car.

Pg. 6-

Panicked, Chaz reported to this evaluator that he believed the victim's father was getting a gun from the car and, when his hand came up, that there was a gun that would be used to shoot him (Chaz). Looking back, he acknowledged this was related to having witnessed shootings in which people grabbed guns from the passenger side of a car.

Crying while discussing the incident, Chaz finds it shocking that he harmed a child, when he is known in the family for loving and being gentle with the young cousins. Chaz stated that he wishes it had been him (Chaz) who had been hurt and not a child.

## RECOMMENDATIONS

Chaz Burton would do well with psychotropic medications prescribed by an expert in trauma and panic disorder. Mandatory counseling would greatly benefit him since his own shame and guilt, depression and self-cutting, is indicative of PTSD and a depressive disorder. Trauma victims, like soldiers and accident victims, often do not seek counseling because of the pain involved with remembering the trauma; avoided traumatic memories is one symptom of PTSD.

His mother and grandmother seem depressed, as well, and his grandmother uses food to cope with her depression (she weighs about 400 pounds). It would be valuable at some point for Chaz Burton, receiving medication and counseling, to live in a group setting away from depressed family members, where supervision and encouragement were available. Attending alcohol and drug rehabilitation groups, like AA, would provide group support.

## NOTES

This evaluator has not identified the adolescent female or the man, both of whom molested Chaz Burton. Because of their positions in his family, he fears being ostracized should their identities be discovered. This evaluator is aware of their identities. At the times of the molestations, family members noticed changes in his behavior that are characteristic of sexually abused children, but it appears that no one explored or investigated his deepening depression, shame, and anxiety.

Pg. 7-

_____

Marti Loring, LCSW, PhD, BCETS

_____

Date



## CHAZ BURTON GENOGRAM

KEY

## CHAZ BURTON TRAUMA CHART

| | |
|---|---|
| **5 Y/O** | **KICKED IN FACE ON SCHOOL BUS- KNOCKED OUT 2 FRONT TEETH** |
| **8 Y/O** | **FATHER MURDERED (CHAZ COULD NOT WALK AWAY FROM CASKET)** |
| **9 Y/O** | **RAPED BY MALE (SELF-BLAME/SADNESS)** |
| **10 Y/O** | **YMCA COUNSELOR CALLED HIM 'WEAK' AND ENCOURAGED KIDS TO PUNCH HIM** |
| **11 Y/O** | **CHAZ STARTED CUTTING ON HIS ARMS** |
| **11 Y/O** | **ATTEMPTED SUICIDE BY DRUG OVERDOSE- USED MARIJUANA AND ALCOHOL FOR TRAUMA/SADNESS** |
| **12 Y/O** | **ADOLESCENT FEMALE MOLESTED HIM** |
| **12 Y/O** | **MOVED FROM BOSTON TO STONE MOUNTAIN GA- BULLIED- WITNESSED SHOOTINGS FROM CARS** |
| **14 Y/O** | **MOTHER TALKS A LOT ABOUT HER DYING** |
| **15 Y/O** | **CHAZ DRANK HEAVILY- FELT DEPRESSED AND EXHIBITED TRAUMA SYMPTOMS** |
| **16 Y/O** | **CHAZ ASKED FOR COUNSELING, WENT TO ONE SESSION, AFRAID TO RETURN, ALLOWED TO STOP** |
| **17 Y/O** | **HIGH SCHOOL STUDENT GOVERNMENT PRESIDENT** |
| **18 Y/O** | **WEST GA COLLEGE- ECONOMICS MAJOR- DEPRESSED- USED DRUGS/ALCOHOL- DROPPED OUT** |
| **20 Y/O** | **JOINED THE US NAVY- WENT TO BOOT CAMP** |
| **21 Y/O** | **DISCHARGED FROM NAVY DUE TO DEPRESSION** |
| **21 Y/O** | **GOT A JOB- IT ENDED- SELF-MEDICATED/INCIDENT** |

Class of 2010

DEFENDANT'S
EXHIBIT
3
081



**UNIVERSITY** *of* **West Georgia**

**Office of the Registrar**
Carrollton, Georgia 30118-4600
*Division of Student Affairs and Enrollment Management*

```
Fice #001601
Certification Date:11-OCT-13

An academic certification for:
Burton, Chazrel J.  SSN: ***-**-3409

As of the above date, we are certifying the following academic information:

Current Enrollment:
Not Enrolled.

Past Enrollment:
Term                   Term Dates                    Hrs      Half/Full
=====================  ============================  ========  =========
Fall Semester 2010     Aug 12, 2010 to Dec 11, 2010  11 Sem   Half-time
Spring Semester 2011   Jan 01, 2011 to May 07, 2011  12 Sem   Full-time

This student's current major: Pre-Economics (BBA)
This student's current classification: Freshman
This student's last permanent address and phone number:

Burton, Chazrel Jaquan
4704 Clarion Pass
Stone Mountain, GA 30083-6201
678 9935662

This certification is valid only when it bears the embossed seal of the
University of West Georgia. If you need to discuss this information, call
the Registrar's Office at (678) 839-6438.

Our certification system is designed to expedite the sharing of academic
information with many agencies and companies. We appreciate your accepting
this certification since hand processed special forms slow our response.
*** END OF CERTIFICATION ***
```





DEFENDANT'S
EXHIBIT
4
082



**DEPARTMENT OF THE NAVY**
RECRUIT TRAINING COMMAND
3355 ILLINOIS STREET
GREAT LAKES, IL 60088-3127

1910
Ser LGL/5645
1 4 JAN 13

From:  Commanding Officer, Recruit Training Command
To:    Commander, Navy Personnel Command (PERS 832)

Subj:  SEAMAN RECRUIT (SR) CHAZREL J. BURTON, USN, 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; REPORT OF
       ADMINISTRATIVE SEPARATION

Ref:   (a) MILPERSMAN 1910-600
       (b) BUPERSINST 1900.8D
       (c) MILPERSMAN 1910-130
       (d) MILPERSMAN 1910-700

Encl:  (1) Administrative Separation Processing – Notification of 3 Jan 13
       (2) Recruit Evaluation Unit Administrative Separation Recommendation
           of 21 Dec 12
       (3) DD Form 2807 of 10 Jul 10

1.  Per references (a) through (d), enclosures (1) through (3) and the
following information are forwarded:

    a.  Reason for processing:  Defective Enlistments and Inductions –
Erroneous Enlistment as evidenced by a physical or mental condition that
existed prior to entry into the naval service.

    b.  Basic Record of data:

        (1)  Active duty start date:  7 November 2012.

        (2)  Date of current enlistment:  7 November 2012.

        (3)  End Active Obligated Service:  6 November 2020.

        (4)  Race:  Black or African American.

        (5)  Marital status and dependents:  Single with 0 dependents.

        (6)  Months on board:  1 month.

        (7)  Deployment status:  Not deployed.

        (8)  Member pending orders:  No.

        (9)  Age:  21 years old.

        (10) Total service:  1 month (active) / 0 days (inactive).

        (11) Participated in Montgomery GI Bill:  N/A.

        (12) Specialized training:  None.

    c.  Involvement with civil authorities:  None known.

    d.  Summary of military offenses:  None.



For Official Use Only – Privacy Sensitive:  Any misuse or unauthorized disclo
                        result in both civil and criminal penalties.

Subj:   SEAMAN RECRUIT (SR) CHAZREL J. BURTON, USN, 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; REPORT OF
        ADMINISTRATIVE SEPARATION

    e.  through g.  Not applicable.

    h.  MILPERSMAN 1910-702 Screening requirements.

        (1) Did member serve in an imminent danger zone in the 2-year period
prior to notification of separation processing?  No.

        (2) Was member's record screened for PTSD/TBI as a contributing factor
as per MPM 1910-702?  Not applicable.

        (3) Was PTSD/TBI determined to be a contributing factor?
Not applicable.

    i.  Psychiatric, medical and/or PTSD/TBI evaluation:  On 21 January 2012,
SR Burton was diagnosed with depressive disorder, 311, EPTS; antisocial
personality disorder, 301.7, EPTS; and borderline personality disorder,
301.83, EPTS.

    j.  Most recent NAVPERS 1070/613, Administrative Remarks (Page 13),
counseling and warning issued by parent or processing command regardless of
reason for processing:  None.

    k.  Comments of the Commanding Officer:  As evidenced by the listed
enclosures, an erroneous enlistment has occurred.  SR Burton's disqualifying
psychiatric conditions affect his potential for performance of expected
duties and responsibilities while on active duty and pose a risk if he is
retained in the naval service.

    l.  Per reference (d), I direct Customer Service Desk, Great Lakes, to
separate the subject named member from the naval service within 10 working
days after receipt of this letter.  Per reference (b), the DD Form 214 will
include the following:

        BLK 23:  DISCHARGED
        BLK 24:  UNCHARACTERIZED
        BLK 25:  MILPERSMAN 1910-130
        BLK 26:  JFC
        BLK 27:  RE-4

    m.  POC for discussion of this case is Tasha J. Asberry, YN2, USN.  She
can be reached at DSN/COMM phone number:  792-4791/(847) 688-4791, Ext. 232
or E-mail:  tasha.asberry@navy.mil.

                                            JOHN T. DYE

Copy to:
DONCAF (29A)
PSD RTC Great Lakes

2

For Official Use Only - Privacy Sensitive:  Any misuse or unauthorized disclosure may
result in both civil and criminal penalties.

| ADMINISTRATIVE SEPARATION PROCESSING NOTIFICATION PROCEDURE | DATE: 3 Jan 13 |
|---|---|
| From: Commanding Officer, Recruit Training Command, Great Lakes, IL | UIC: 0763A |
| To:   SR CHAZREL J. BURTON, USN | |

| REASON(S) FOR ADMINISTRATIVE SEPARATION PROCESSING | MILPERSMAN REF |
|---|---|
| 1) Defective Enlistments and Inductions - Erroneous Enlistment as evidenced by a physical or mental condition that existed prior to entry into the naval service | 1910-130 |
| 2) | |
| 3) | |
| 4) | |

The least favorable characterization of service possible is General (Under Honorable Conditions).

If your separation is approved it will result in discharge, suspended discharge, release from active duty to a reserve component, transfer from the selected reserve to the individual ready reserve (IRR), or release from custody or control of the U.S. Navy

| YOU ARE ENTITLED TO THE BELOW RIGHTS (INITIAL APPROPRIATE BLOCK) | ELECT | WAIVE |
|---|---|---|
| To consult with qualified counsel.  You may consult with civilian counsel retained at your own expense.  (Nonlawyer counsel may be appointed as determined by the commanding officer) | | CJB |
| To submit a written statement for consideration by Separation Authority. | | CJB |
| To obtain copies of documents that will be forwarded to the Separation Authority supporting the basis for the proposed separation.  (Classified documents will be summarized in unclassified form). | | CJB |
| To request an Administrative Board, if you have 6 or more years of total active and/or Reserve military service. (Failure to appear without good cause constitutes a waiver to be present at the Administrative Board). | N/A | N/A |
| To representation at the Administrative Board by qualified counsel, if you have 6 or more years of total active and/or Reserve military service. | N/A | N/A |
| To representation at the Administrative Board by civilian counsel at your own expense, must have 6 or more years of total active and/or Reserve military service. | N/A | N/A |
| If applicable – to request transfer to the Fleet Reserve/Retired/Retired Reserve List understanding that you have the right to an administrative board to recommend retirement in your current or a reduced paygrade.  If you waive such board, a reduction to a reduced paygrade upon transfer may be directed if you are being processed for misconduct, security, or homosexual conduct. | N/A | N/A |
| To General Court-Martial Convening Authority (GCMCA) review, if you have less than 6 years of total active and/or Reserve military service.  GCMCA staff members' cases must be forwarded to another officer having GCMCA or Navy Personnel Command (NAVPERSCOM) (PERS-832) for review.  If elected, GCMCA or higher assumes separation authority responsibility. | | CJB |

# ADDITIONAL NOTICE

For members on active duty not in civilian confinement:  You are advised that separation proceedings in your case will be suspended for a period of 2 days from the date this notice is delivered to you personally in order to give you a reasonable opportunity to exercise the rights set forth herein.  Failure to respond will constitute a waiver of all rights and processing may continue in your absence.

For members who are reservists not on active duty: You are advised that separation proceedings in your case will be suspended for a period of 30 days from the date this notice is delivered to you personally or received at your designated mailing address in order to give you a reasonable opportunity to exercise the rights set forth herein. Failure to respond will constitute a waiver of all rights and processing may continue in your absence.  If your separation involves transfer to the IRR, you are advised that the characterization of service upon transfer to the IRR also will constitute the tentative characterization of service upon discharge at the completion of the naval service obligation, unless you take affirmative action to affiliate with a drilling unit of the Selected Reserve; and you participate satisfactorily as a drilling member of the Selected Reserve for a period of time which, when added to any prior satisfactory service during this period of obligated service, equals the period of obligated service.  If you submit evidence of completion of the above, the Separation Authority may assign a more favorable characterization of service.  If you do not submit such evidence, the characterization of service is the same as the characterization of service upon transfer from active duty to the Selected Reserve to the IRR.  If you are in Records Review (non-drilling) status, you are entitled to Permissive (no-cost) orders to attend any administrative board hearing to which you may be entitled.

For members subject to reimbursement: You are advised that you may be subject to a reimbursement requirement for recoupment of advance education assistance costs, bonuses, or special pays.

For members in civil confinement: You are advised that separation proceedings in your case will be suspended for a period of 30 days from the date this notice is delivered to you personally or received at your confinement address in order to give you a reasonable opportunity to exercise the rights set forth herein.  Failure to respond will constitute a waiver of rights and processing may continue in your absence.  If you are eligible and have elected an Administrative Board, and you are unable to make arrangements which would allow you to appear in person before the Board, the proceedings will continue in your absence; in this event, however, you may be represented before the Board by your counsel.  *The below named counsel has been appointed your military counsel for consultation and/or representation for this action.*

| NAME OF MILITARY COUNSEL | ADDRESS OF MILITARY COUNSEL | PHONE |
|---|---|---|
|  |  |  |

| CIVILIAN CONVICTION APPEAL INFORMATION (RESPONDENT INITIAL APPROPRIATE BLOCK) | YES | NO | N/A |
|---|---|---|---|
| Do you intend to file an appeal? |  |  | CJB |
| Do you request separation before your appeal is decided or the time for appeal has passed? |  |  | CJB |

| COMMAND CERTIFICATION | SIGNATURE | DATE |
|---|---|---|
| Commanding Officer or "By direction" | J. A. PIERCE, LNA (SW/AW), USN, By direction | 3 Jan 13 |

| MEMBER CERTIFICATION |  |  |
|---|---|---|
| I acknowledge receipt of this notice | x Chazeel Jaquan Burton | 3 JAN 13 |
| My response to this notice is complete | x Chazeel Jaquan Burton | 3 JAN 13 |
| COUNSEL CERTIFICATION (if applicable) |  |  |



| REPORT OF MEDICAL EXAMINATION | 1. DATE OF EXAMINATION *(YYYYMMDD)* 20100710  2012 0710 | 2. SOCIAL SECURITY NUMBER 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 |
| --- | --- | --- |

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 USC 504, 505, 507, 532, 978, 1201, 1202, and 4346; and E.O. 9397.
**PRINCIPAL PURPOSE(S):** To obtain medical data for determination of medical fitness for enlistment, induction, appointment and retention for applicants and members of the Armed Forces. The information will also be used for medical boards and separation of Service members from the Armed Forces.
**ROUTINE USE(S):** None.
**DISCLOSURE:** Voluntary; however, failure by an applicant to provide the information may result in delay or possible rejection of the individual's application to enter the Armed Forces. For an Armed Forces member, failure to provide the information may result in the individual being placed in a non-deployable status.

| 3. LAST NAME - FIRST NAME - MIDDLE NAME (SUFFIX) BURTON CHAZREL JAQUAN | 4. HOME ADDRESS *(Street, Apartment Number, City, State and ZIP Code)* 326 REDWOOD LANE PRAIRIE VIEW, TX 77446 | 5. HOME TELEPHONE NUMBER *(Include Area Code)* 678-993-5662 |
| --- | --- | --- |

| 6. GRADE CIVILIAN | 7. DATE OF BIRTH *(YYYYMMDD)* 19920101 | 8. AGE (20) | 9. SEX Female ☐  Male ☒ | 10.a. RACIAL CATEGORY *(X one or more)* American Indian or Alaska Native ☐  Black or African American ☒  Native Hawaiian or Other Pacific Islander ☐  Asian ☐  White ☐ | b. ETHNIC CATEGORY Hispanic/Latino ☐  Not Hispanic/Latino ☒ |
| --- | --- | --- | --- | --- | --- |

| 11. TOTAL YEARS GOVERNMENT SERVICE a. MILITARY  b. CIVILIAN 0 | 12. AGENCY *(Non-Service Members Only)* DN | 13. ORGANIZATION UNIT AND UIC/CODE |
| --- | --- | --- |

| 14.a. RATING OR SPECIALTY *(Aviators Only)* | b. TOTAL FLYING TIME | c. LAST SIX MONTHS |
| --- | --- | --- |

| 15.a. SERVICE Army ☐  Navy ☒  Marine Corps ☐  Air Force ☐  Coast Guard ☐ | b. COMPONENT Active Duty ☒  Reserve ☐  National Guard ☐ | c. PURPOSE OF EXAMINATION Enlistment ☒  Commission ☐  Retention ☐  Separation ☐  Medical Board ☐  Retirement ☐  U.S. Service Academy ☐  ROTC Scholarship Program ☐  Other ☐ | 16. NAME OF EXAMINING LOCATION, AND ADDRESS *(Include ZIP Code)* HOUSTON MEPS 701 San Jacinto Houston, TX 77052-2309 |
| --- | --- | --- | --- |

**CLINICAL EVALUATION** *(Check each item in appropriate column. Enter "NE" if not evaluated.)*

| | Normal | Abnormal | NE |
| --- | --- | --- | --- |
| 17. Head, face, neck, and scalp | ✓ | | |
| 18. Nose | ✓ | | |
| 19. Sinuses | ✓ | | |
| 20. Mouth and throat | ✓ | | |
| 21. Ears - General *(Int. and ext. canals/Auditory acuity under item 71)* | ✓ | | |
| 22. Drums *(Perforation)* | ✓ | | |
| 23. Eyes - General *(Visual acuity and refraction under items 61 - 63)* | ✓ | | |
| 24. Ophthalmoscopic | ✓ | | |
| 25. Pupils *(Equality and reaction)* | ✓ | | |
| 26. Ocular motility *(Associated parallel movements, nystagmus)* | ✓ | | |
| 27. Heart *(Thrust, size, rhythm, sounds)* | ✓ | | |
| 28. Lungs and chest *(Include breasts)* | ✓ | | |
| 29. Vascular system *(Varicosities, etc.)* | ✓ | | |
| 30. Anus and rectum *(Hemorrhoids, Fistulae) (Prostate if indicated)* | ✓ | | |
| 31. Abdomen and viscera *(Include hernia)* | ✓ | | |
| 32. External genitalia *(Genitourinary)* | ✓ | | |
| 33. Upper extremities | ✓ | | |
| 34. Lower extremities *(Except feet)* | ✓ | | |
| 35. Feet *(See Item 35 Continued)* | ✓ | | |
| 36. Spine, other musculoskeletal | ✓ | | |
| 37. Identifying body marks, scars, tattoos | ✓ | | |
| 38. Skin, lymphatics | ✓ | | |
| 39. Neurologic | ✓ | | |
| 40. Psychiatric *(Specify any personality deviation)* | ✓ | | |
| 41. Pelvic *(Females only)* | | | |
| 42. Endocrine | ✓ | | |

**44. NOTES:** *(Describe every abnormality in detail. Enter pertinent item number before each comment. Continue in item 73 and use additional sheets if necessary.)*

31. Tattoos See Tom B
34. Bunion mild (L) 1st MT Phalangial asymptomatic not considered limiting activity

**43. DENTAL DEFECTS AND DISEASE** *(Please explain. Use dental form if completed by dentist. If abnormality noted, explain in Item 44.)*
Acceptable ✓
Not Acceptable   Class ____

**35. FEET (Continued) (Circle category)**
N - Normal Arch (circled)   1 - Mild   A - Asymptomatic (circled)   087
C - Pes Cavus   2 - Moderate   S - Symptomatic
P - Pes Planus   3 - Severe

| LAST NAME - FIRST NAME - MIDDLE NAME (SUFFIX) | | DNH | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| BURTON, CHAZREL JAQUAN | | | C33-74-3409 |

## LABORATORY FINDINGS

| 45. URINALYSIS | | 46. URINE HCG | 47. H/H | 48. BLOOD TYPE |
|---|---|---|---|---|
| a. Albumin | | | | |
| b. Sugar | | | | |

| TESTS | RESULTS | | | | SECOND SPECIMEN ID LABEL |
|---|---|---|---|---|---|
| | FIRST TEST | CODE | SECOND TEST | CODE | |
| 49. HIV | | | | | 033743409 |
| 50. DRUGS | | | | | |
| 51. ALCOHOL | NEG | N | | | 41177336   Initial: |
| 52. OTHER | | | | | 20120710 |
| a. PAP SMEAR | | | | | ( YYYYMMDD ) |
| b. EKG | | | | | |
| c. CXR | | | | | |

## MEASUREMENTS AND OTHER FINDINGS

| 53. HEIGHT | 54. WEIGHT | 55.a. MIN WGT - MAX WGT | 55.b. ACTUAL BF % - MAX BF % | 56. TEMPERATURE | 57. PULSE |
|---|---|---|---|---|---|
| 75.00 | 166 lbs. | — . 216 | | | 90 |

| 58. BLOOD PRESSURE | | | 59. RED/GREEN (Army Only) | 60. OTHER VISION TEST: | |
|---|---|---|---|---|---|
| a. 1ST | b. 2ND | c. 3RD | | a. COLOR HAIR | b. COLOR EYES |
| SYS. 140 | SYS. | SYS. | | Black | Right: ?  Left: Brown |
| DIAS. 90 | DIAS. | DIAS. | | | |

| 61. DISTANT VISION | | 62. REFRACTION BY AUTOREFRACTION OR MANIFEST | 63. NEAR VISION | |
|---|---|---|---|---|
| Right 20/ 100 | Corr. to 20/ 20 | By - 2.75 S. +1.75 CX    90 | Right 20/ 25 Corr. to 20/ 20 | by Glasses |
| Left 20/ 100 | Corr. to 20/ 20 | By - 2.75 S. +1.50 CX    86 | Left 20/ 20 Corr. to 20/ | by |

| 64. HETEROPHORIA (Specify distance) | | | | | | | |
|---|---|---|---|---|---|---|---|
| ESº | EXº | R.H. | L.H. | Prism div. | Prism Conv CT : | NPR | PD |

| 65. ACCOMMODATION | | 66. COLOR VISION (Test used and result) | 67. DEPTH PERCEPTION (Test used and score) AFVT | |
|---|---|---|---|---|
| Right | Left | PIP  Pass — ○  /14 | Uncorrected | Corrected  PassF |

| 68. FIELD OF VISION | 69. NIGHT VISION (Test used and score) | 70. INTRAOCULAR TENSION | |
|---|---|---|---|
| | | O.D. | O.S. |

| 71a. AUDIOMETER | Unit Serial Number  Q90612756 | 71b. Unit Serial Number | | 72a. READING ALOUD TEST | |
|---|---|---|---|---|---|
| Date Calibrated (YYYYMMDD)  20120128 | | Date Calibrated (YYYYMMDD) | | | |

| HZ | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | HZ | 500 | 1000 | 2000 | 3000 | 4000 | 6000 | SAT | UNSAT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Right | 05 | 05 | 05 | 05 | 05 | 50 | Right | | | | | | | 72b. VALSALVA | |
| Left | 05 | 05 | 05 | 05 | 05 | 50 | Left | | | | | | | SAT | UNSAT |

73. NOTES (Continued) AND SIGNIFICANT OR INTERVAL HISTORY (Use additional sheets if necessary.)

71a. E.I, Shumelen. JW        #'s 61-63, 66, 67 Glasses

Date of test: JUL 1 0 2012

| M | D | U | C | H | H | PURPOSE |
|---|---|---|---|---|---|---|
| N | N | N | N | N | N | OT |

Date of result: 20120712

DESIGNED USING MRS, USMEPCOM; OUSD(P&R)
OVERPRINT/EXCEPTION APPROVED, MAY 7, 2001
Page 088f 4 Pages

| LAST NAME - FIRST NAME - MIDDLE NAME (Suffix) | DNR | SOCIAL SECURITY NUMBER |
|---|---|---|
| **BURTON, CHAZREL JAQUAN** | | **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** |

| 74.a. EXAMINEE/APPLICANT *(check one)* | 75. I have been advised of my disqualifying condition. I have been advised to see my private medical care | |
|---|---|---|
| ✓ IS QUALIFIED FOR SERVICE IN SPF  DNR | provider within 24-48-72 hours/30 days / Routine Follow-up (circle one) for further evaluation and/or treatment. | |
| | a. SIGNATURE OF EXAMINEE | b. DATE *(YYYYMMDD)* |
| IS NOT QUALIFIED FOR SERVICE | | |

**b. PHYSICAL PROFILE**

| P | U | L | H | E | S | X | PROFILER INITIALS | DATE *(YYYYMMDD)* |
|---|---|---|---|---|---|---|---|---|
| / | / | / | / - | I | / | | | JUL 10 12 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**76. SIGNIFICANT OR DISQUALIFYING DEFECTS**

| ITEM NO. | MEDICAL CONDITION/DIAGNOSIS | ICD CODE | PROFILE SERIAL | RBJ DATE *(YYYYMMDD)* | QUALI-FIED | DIS-QUALI-FIED | EXAMINER INITIALS | WAIVER RECEIVED | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | SERVICE | DATE *(YYYYMMDD)* |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**77. SUMMARY OF DEFECTS AND DIAGNOSES** *(List diagnoses with item numbers)(Use additional sheets if necessary.)*

**78. RECOMMENDATIONS - FURTHER SPECIALIST EXAMINATIONS INDICATED** *(Specify) (Use additional sheets if necessary.)*

**79. MEPS WORKLOAD** *(For MEPS use only)*

| WKID | ST | DATE *(YYYYMMDD)* | INITIAL | WKID | ST | DATE *(YYYYMMDD)* | INITIAL |
|---|---|---|---|---|---|---|---|
| 1 | P | 20120710 | MB | | | | |
| | P | 20120710 | | | | | |

**80. MEDICAL INSPECTION DATE**

| | HT | WT | %BF | MAX WT | HCG | QUAL | DISQ | PHYSICIAN'S SIGNATURE | |
|---|---|---|---|---|---|---|---|---|---|
| 20120710 | 75.0 | 180 | | 216 | | ✓ | | Michael S. LEWITISON | I.D. |
| | | | | | | | | | |
| | | | | | | | | | |

| 81.a. TYPED OR PRINTED NAME OF PHYSICIAN OR EXAMINER | b. SIGNATURE | |
|---|---|---|
| | | 20120710 |

| 82.a. TYPED OR PRINTED NAME OF PHYSICIAN OR EXAMINER | b. SIGNATURE |
|---|---|
| | |

| 83.a. TYPED OR PRINTED NAME OF DENTIST OR PHYSICIAN *(Indicate which)* | b. SIGNATURE |
|---|---|
| | |

| 84.a. TYPED OR PRINTED NAME OF REVIEWING OFFICER/APPROVING AUTHORITY | b. SIGNATURE | |
|---|---|---|
| Walter J. Doyy, M.A. | | 20120710 |

**85. This examination has been administratively reviewed for completeness and accuracy.**

| a. SIGNATURE | b. GRADE | c. DATE *(YYYYMMDD)* |
|---|---|---|
| Malu A. Buder | GS-6 | 20120710 |

| 86. WAIVER GRANTED *(If yes, date and by whom)* | | 87. NUMBER OF ATTACHED SHEETS |
|---|---|---|
| YES | | |
| NO | | 089 |

DESIGNED USING MIRS, USMEPCOM; OUSD(P&R)
OVERPRINT/EXCEPTION APPROVED, MAY 7, 2001

# REPORT OF MEDICAL HISTORY

(This information is for official and medically confidential use only and will not be released to unauthorized persons.)

Form Approved
OMB No. 0704-0413
Expires Oct 31, 2006

The public reporting burden for this collection of information is estimated to average 10 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorate of Information Operations and Reports (0704-0413), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no persons shall be subject to any penalty for failing to comply with a collection of information if it does not display a current valid OMB control number.

**PLEASE DO NOT RETURN YOUR FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM AS INDICATED ON PAGE 2.**

## PRIVACY ACT STATEMENT

**AUTHORITY:** 10 USC 504, 505, 507, 532, 978, 1201, 1202, and 4346; and E.O. 9397.
**PRINCIPAL PURPOSES(S):** To obtain medical data for determination of medical fitness for enlistment, induction, appointment and retention for applicants and members of the Armed Forces. The information will also be used for medical boards and separation of Service members for the Armed Forces.
**ROUTINE USE(S):** None.
**DISCLOSURE:** Voluntary; however, failure by an applicant to provide the information may result in delay or possible rejection of the individual's application to enter the Armed Forces. For an Armed Forces member, failure to provide the information may result in the individual being placed in a non-deployable status.

**WARNING:** The information you have given constitutes an official statement. Federal law provides severe penalties (up to 5 years confinement or a $10,000 fine or both), to anyone making a false statement. If you are selected for enlistment, commission, or entrance into a commissioning program based on a false statement, you can be tried by military courts-martial or meet an administrative board for discharge and could receive a less than honorable discharge that would affect your future.

| 1. LAST NAME, FIRST NAME, MIDDLE NAME (SUFFIX) | 2. SOCIAL SECURITY NUMBER | 3. TODAY'S DATE (YYYYMMDD) |
|---|---|---|
| **BURTON** CHAZREL JAQUAN | 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 | 20100710 |

| 4.a. HOME ADDRESS (Street, Apartment No., City, State, ZIP Code) | 5. EXAMINING LOCATION AND ADDRESS (Include ZIP Code) |
|---|---|
| 326 REDWOOD LANE PRAIRIE VIEW, TX 77446 | Houston Meps 701 San Jacinto Houston, TX 77052-2309 |

b. HOME TELEPHONE (Include Area Code)
678-993-5662

**X ALL APPLICABLE BOXES:**

7.a. POSITION (Title, Grade, Component)
CIVILIAN

| 6.a. SERVICE | b. COMPONENT | c. PURPOSE OF EXAMINATION | |
|---|---|---|---|
| [X] Army | [ ] Coast Guard | [X] Active Duty | [X] Enlistment |
| [X] Navy | | [ ] Reserve | [ ] Commission |
| [ ] Marine Corps | | [ ] National Guard | [ ] Retention |
| [ ] Air Force | | | [ ] Separation |
| | | [ ] Medical Board | [ ] Other (Specify) |
| | | [ ] Retirement | |
| | | [ ] U.S. Service Academy | |
| | | [ ] ROTC Scholarship Program | |

b. USUAL OCCUPATION
Cook

| 8. CURRENT MEDICATIONS (Prescription and Over-the-counter) | 9. ALLERGIES (Including insect bites/stings, foods, medicine or other substance) |
|---|---|
| NONE | NONE |

Mark each item "YES" or "NO".

| HAVE YOU EVER HAD OR DO YOU NOW HAVE: | YES | NO | 12. (Continued) | YES | NO |
|---|---|---|---|---|---|
| 10. a. Tuberculosis | ○ | ⊘ | f. Foot trouble (e.g., pain, corns, bunions, etc.) | ⊘ | ○ |
| b. Lived with someone who had tuberculosis | ○ | ⊘ | h. Impaired use of arms, legs, hands, or feet | ○ | ⊘ |
| c. Coughed up blood | ○ | ⊘ | h. Swollen or painful joint(s) | ○ | ⊘ |
| d. Asthma or any breathing problems related to exercise, weather, pollens, etc. | ○ | ⊘ | i. Knee trouble (e.g., locking, giving out, pain or ligament injury, etc.) | ○ | ⊘ |
| e. Shortness of breath | ○ | ⊘ | j. Any knee or foot surgery including arthroscopy or the use of a scope to any bone or joint | ○ | ⊘ |
| f. Bronchitis | ○ | ⊘ | k. Any need to use corrective devices such as prosthetic devices, knee brace(s), back support(s), lifts or orthotics, etc. | ○ | ⊘ |
| g. Wheezing or problems with wheezing | ○ | ⊘ | l. Bone, joint, or other deformity | ○ | ⊘ |
| h. Been prescribed or used an inhaler | ○ | ⊘ | m. Plate(s), screw(s), rod(s) or pin(s) in any bone | ○ | ⊘ |
| i. A chronic cough or cough at night | ○ | ⊘ | n. Broken bone(s) (cracked or fractured) | ○ | ⊘ |
| j. Sinusitis | ○ | ⊘ | 13. a. Frequent indigestion or heartburn | ○ | ⊘ |
| k. Hay fever | ○ | ⊘ | b. Stomach, liver, intestinal trouble, or ulcer | ○ | ⊘ |
| l. Chronic or frequent colds | ○ | ⊘ | c. Gall bladder trouble or gallstones | ○ | ⊘ |
| 11. a. Severe tooth or gum trouble | ○ | ⊘ | d. Jaundice or hepatitis (liver disease) | ○ | ⊘ |
| b. Thyroid trouble or goiter | ○ | ⊘ | e. Rupture/hernia | ○ | ⊘ |
| c. Eye disorder or trouble | ○ | ⊘ | f. Rectal disease, hemorrhoids or blood from the rectum | ○ | ⊘ |
| d. Ear, nose, or throat trouble | ○ | ⊘ | g. Skin diseases (e.g. acne, eczema, psoriasis, etc.) | ⊘ | ○ |
| e. Loss of vision in either eye | ○ | ⊘ | h. Frequent or painful urination | ○ | ⊘ |
| f. Worn contact lenses or glasses | ⊘ | ○ | i. High or low blood sugar | ○ | ⊘ |
| g. A hearing loss or wear a hearing aid | ○ | ⊘ | j. Kidney stone or blood in urine | ○ | ⊘ |
| h. Surgery to correct vision (RK, PRK, LASIK, etc.) | ○ | ⊘ | k. Sugar or protein in urine | ○ | ⊘ |
| 12. a. Painful shoulder, elbow or wrist (e.g. pain, dislocation, etc.) | ○ | ⊘ | l. Sexually transmitted disease (syphilis, gonorrhea, chlamydia, genital warts, herpes, etc.) | ○ | ⊘ |
| b. Arthritis, rheumatism, or bursitis | ○ | ⊘ | 14. a. Adverse reaction to serum, food, insect stings or medicine | ○ | ⊘ |
| c. Recurrent back pain or any back problem | ○ | ⊘ | b. Recent unexplained gain or loss of weight | ○ | ⊘ |
| d. Numbness or tingling | ○ | ⊘ | c. Currently in good health (If no, explain in Item 29 on page 2) | ⊘ | ○ |
| e. Loss of finger or toe | ○ | ⊘ | d. Tumor, growth, cyst, or cancer | ○ | ⊘ |

**DD FORM 2807-1, OCT 2003**

DoD exception to SF 93 approved by ICMR, August 3, 2000.

Page 1 of 4 Pages

DESIGNED USING MIRS, USAPPC; OUSD(P&R)
OVERPRINT/EXCEPTION APPROVED, MAY 7, 2001

| LAST NAME, FIRST NAME, MIDDLE NAME (SUFFIX) | SOCIAL SECURITY NUMBER |
|---|---|
| BURTON, CHAZREL JAQUAN | 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 |

Mark each item "YES" or "NO".

| HAVE YOU EVER HAD OR DO YOU NOW HAVE: | YES | NO |
|---|---|---|
| 15. a. Dizziness or fainting spells | ○ | ☑ |
| b. Frequent or severe headache | ○ | ☑ |
| c. A head injury, memory loss or amnesia | ○ | ☑ |
| d. Paralysis | ○ | ☑ |
| e. Seizures, convulsions, epilepsy or fits | ○ | ☑ |
| f. Car, train, sea, or air sickness | ○ | ☑ |
| g. A period of unconsciousness or concussion | ○ | ☑ |
| h. Meningitis, encephalitis, or other neurological problems | ○ | ☑ |
| 16. a. Rheumatic fever | ○ | ☑ |
| b. Prolonged bleeding (as after an injury or tooth extraction, etc.) | ○ | ☑ |
| c. Pain or pressure in the chest | ○ | ☑ |
| d. Palpitation, pounding heart or abnormal heartbeat | ○ | ☑ |
| e. Heart trouble or murmur | ○ | ☑ |
| f. High or low blood pressure | ○ | ☑ |
| 17. a. Nervous trouble of any sort (anxiety or panic attacks) | ○ | ☑ |
| b. Habitual stammering or stuttering | ○ | ☑ |
| c. Loss of memory or amnesia, or neurological symptoms | ○ | ☑ |
| d. Frequent trouble sleeping | ○ | ☑ |
| e. Received counseling of any type | ○ | ☑ |
| f. Depression or excessive worry | ○ | ☑ |
| g. Been evaluated or treated for a mental condition (If yes, fully explain in Item 29 below.) | ○ | ☑ |
| h. Attempted suicide | ○ | ☑ |
| i. Used illegal drugs or abused prescription drugs | ○ | ☑ |
| 18. FEMALES ONLY. Have you ever had or do you now have: | | |
| a. Treatment for a gynecological (female) disorder | ○ | ○ |
| b. A change of menstrual pattern | ○ | ○ |
| c. Any abnormal PAP smears | ○ | ○ |
| d. First day of last menstrual period (YYYYMMDD). | | |
| e. Date of last PAP smear (YYYYMM). | | |

Mark each item "YES" or "NO".  For items 19 - 28, every item marked "YES" must be fully explained in Item 29 below.

| HAVE YOU EVER HAD OR DO YOU NOW HAVE: | YES | NO |
|---|---|---|
| 19. Have you been refused employment or been unable to hold a job or stay in school because of: | | |
| a. Sensitivity to chemicals, dust, sunlight, etc. | ○ | ☑ |
| b. Inability to perform certain motions | ○ | ☑ |
| c. Inability to stand, sit, kneel, lie down, etc. | ○ | ☑ |
| d. Other medical reasons (If yes, give reasons.) | ○ | ☑ |
| 20. Have you ever been treated in an Emergency Room? (If yes, for what?) | ○ | ☑ |
| 21. Have you ever been a patient in any type of hospital? (If yes, specify when, where, why, and name of doctor and complete address of hospital.) | ○ | ☑ |
| 22. Have you ever had, or have you been advised to have any operations or surgery? (If yes, describe and give age at which occurred.) | ○ | ☑ |
| 23. Have you ever had any illness or injury other than those already noted? (If yes, specify when, where, and give details.) | ④ | ○ |
| 24. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illnesses? (If yes, give complete address of doctor, hospital, clinic, and details.) | ○ | ☑ |
| 25. Have you ever been rejected for military service for any reason? (If yes, give date and reason for rejection.) | ○ | ☑ |
| 26. Have you ever been discharged from military service for any reason? (If yes, give date, reason, and type of discharge; whether honorable, other than honorable, for unfitness or unsuitability.) | ○ | ☑ |
| 27. Have you ever received, is there pending, or have you ever applied for pension or compensation for any disability or injury? (If yes, specify what kind, granted by whom, and what amount, when, why.) | ○ | ☑ |
| 28. Have you ever been denied life insurance? | ○ | ☑ |

29. EXPLANATION OF "YES" ANSWER(S) (Describe answer(s), give date(s) of problem, name of doctor(s) and/or hospital(s), treatment given and current medical status.)

11.F. I've worn glasses since I was 11 years of age.

12.F. bunion on left big toe

23. Chicken pocks

13.G. Ecema when I was a baby

M#PI6. Suspend for tardiness, for only one day of school suspen

Tracy S. Brite
Mother
4704 Clinon Pass
+ Stone Mountain, GA 30083
678-993-5662

NOTE: HAND TO THE DOCTOR OR NURSE, OR IF MAILED, MARK ENVELOPE "TO BE OPENED BY MEDICAL PERSONNEL ONLY."

DD FORM 2807-1, OCT 2003

DoD exception to SF 93 approved by ICMR, August 3, 2000.

Page 2 of 4 Page

DESIGNED USING MIRS; GSMEPCOM: DUSD(P&R) OVERPRINT/EXCEPTION APPROVED, MAY 7, 200

| LAST NAME, FIRST NAME, MIDDLE NAME (SUFFIX) | SOCIAL SECURITY NUMBER |
|---|---|
| BURTON, CHAZREL JAQUAN | 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 |

**30. EXAMINER'S SUMMARY AND ELABORATION OF ALL PERTINENT DATA** *(Physician/practitioner shall comment on all positive answers in questions 8 - 29. Physician/practitioner may develop by interview any additional medical history deemed important, and record any significant findings here.)*

a. COMMENTS

① glasses - good VA O & c c

② said to have eczema type rash as baby (related by parents); resolved ē medical RX

③ slight bunion deformity - not symptomatic (R) 1st metatarsal - no difficulty or limitation wearing boots or shoes no athletic limitations

④ uncomplicated chickenpox age 4

40 1-15-1-Σ
Omaha 5

Areas - in house - school suspension 10th grade - tardiness
#6 h
otherwise negative

Psychological Consult required

| QUESTIONING REVEALS | YES | NO | DETAILS |
|---|---|---|---|
| MARIJUANA USE | | ✓ | |
| OTHER DRUG ABUSE | | ✓ | |
| ALCOHOL ABUSE | | ✓ | |

EXAMINEE. I certify the information on this form is true and complete to the best of my knowledge and belief, and no person has advised me to conceal or falsify any information about my physical and mental history. I further understand that I may be requested to provide medical documentation regarding issues within my medical history. I authorize any of the doctors, hospitals, clinics or insurance company(ies) to furnish the Department of Defense medical authority a complete transcript of my medical record for purposes of processing my application for military service.

*Chazrel Burton* EXAMINEE SIGNATURE  DATE

| b. TYPED OR PRINTED NAME OF EXAMINER | c. SIGNATURE | d. DATE SIGNED (YYYYMMDD) |
|---|---|---|

**DD FORM 2807-1, OCT 2003**   DoD exception to SF 93 approved by ICMR, August 3, 2000.

Page 3 of 4 Pages
092
DESIGNED USING MIRS, USMEPCOM; OUSD(P&R)
OVERPRINT/EXCEPTION APPROVED, MAY 7, 2001

Standard Form 86
Revised December 2010
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

**QUESTIONNAIRE FOR**
**NATIONAL SECURITY POSITIONS**

Form approved:
OMB No. 3206-0005

## CERTIFICATION

My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service.

| | Social Security Number |
| --- | --- |
| | 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 |
| Signature  (Sign in ink) | Date *(mm/dd/yyyy)* |
| *Chazeel Jaquan Burton* | 7 – 18 – 2012 |

093

# THE ROGAN LAW FIRM

## ELIZABETH VILA ROGAN

**Attorney at Law**
1800 Peachtree Street NE
Suite 300
Atlanta, Georgia 30309

evr@TheRoganLawFirm.com
Admitted: GA, NY, DC, CT

(404) 549-9938
(404) 352-5636 (FAX)

October 6, 2015

A.D.A. Helen Peters
DeKalb County District Attorney's Office
556 McDonough Street
Decatur, GA 30030

Re: State v. Chazrel Burton, Indictment No. 13-CR-4448-3

Dear Helen:

*The following confidential proffer is presented on behalf of Chazrel Burton for purposes of plea negotiations only. It is offered in good faith as an effort to resolve the matter of all criminal charges pending against Mr. Burton, without need for a jury trial.*

On June 26, 2013, an unimaginable tragedy occurred when Chazrel Burton, a meek, mild-mannered young man with no prior criminal history, apparently "snapped" following a physical altercation in front of a Kroger store in Stone Mountain, GA.

On that day, Chaz had been approached by Jermaine Harrison, a good Samaritan who believed that he had seen Chaz snatch a necklace. The two exchanged words and engaged in a physical struggle, which was captured on video, in which Mr. Harrison jumped Chaz and forced him face down to the ground, provoking a wildly inappropriate overreaction by Mr. Burton.



Rather than brush off the encounter and continue to walk away from the scene, Chaz suddenly turned back towards the Harrison's car, unleashing a terrifying volley of gunshots into the parked car. His seemingly inexplicable actions forever changes the lives of the Harrison family, the horrified witnesses, and Chaz's own family.

In light of Chaz's background as a productive citizen: a college student who had been student president of his high school class, who had no criminal history, and an aspiring member of the Armed Forces, combined with the evident overreaction and unnecessary resort to violence at the time of the incident, undersigned counsel undertook a psychological evaluation of Chaz Burton to try to understand what caused his outburst. Counsel hired Dr. Marti Loring, an expert in trauma and mental health, to evaluate Chaz. Dr. Loring's findings are attached to this letter.

Following a series of meetings with Chaz, interviews with family members and an extensive review of Chaz's medical, educational and social history, Dr. Loring discovered that Chaz Burton suffers from inherited depression and anxiety; he self-medicates with drugs and alcohol. Chaz was bullied as a child, abandoned by his caregivers and experienced the effects of violence with the murder of his father when Chaz was 8 years old. Most pertinently, Chaz was the victim of sexual abuse during childhood and adolescence. His trauma from that abuse, in particular the sexual assault by an adult male relative when he was 9 years old, triggered flashbacks and a Post-Traumatic Stress reaction when he perceived an assault by Mr. Harrison outside the Kroger. Chaz had tried to seek stability and access to medical care by joining the Navy in July 2012. Unfortunately, his deep-seated depression and latent mental health issues disqualified him from the service; he spiraled into a deeper depression when he was discharged in January 2013, just a few months before the incident involving the Harrisons. In addition

www.TheRoganLawFirm.com

to his deteriorated mental state at that time of the shooting, Chaz was also self-medicating and was under the influence of vodka and Xanax.

Regrettably, Chaz has experienced more difficulty within the walls of the DeKalb County jail, when he got drawn into a petty dispute on April 29, 2015, that turned violent when Chaz once again felt threatened by another man.

There is no question that Chazrel Burton deserves punishment for his legally unjustifiable act of violence against the Harrison family two years ago, as well as for his overreaction to a perceived threat in the jail in April. However, mere warehousing in prison without appropriate treatment and counseling for his deep-seated problems will only exacerbate his tendencies to overreact dangerously.

We believe that a reasonable term of imprisonment of no more than five (5) years in a facility where he can get much-needed mental health treatment, followed by a lengthier period of intensive supervision and mandated mental health treatment, would satisfy the interests of the State in removing an immediate threat to the public but would also ensure that a similar violent overreaction would not occur in the future. Chaz Burton is not beyond redemption and recovery; he just needs the tools to deal with demons not of his making that afflict him and affect his behavior.

Thank you for your consideration of this plea proposal. I look forward to the opportunity to speak with you in more detail about the terms of a mutually agreeable resolution in this case.

Sincerely,

*Elizabeth Vila Rogan*

Elizabeth Vila Rogan
Counsel for Chazrel Burton

Encl/

C E R T I F I C A T E

STATE OF GEORGIA,
COUNTY OF DEKALB:


       I, FAYE A. DAVIS, DO HEREBY CERTIFY THAT THE FOREGOING

PROCEEDINGS, PAGES NUMBERED 2 THROUGH 64, TAKEN DOWN BY ME AS AN

OFFICIAL COURT REPORTER FOR THE SUPERIOR COURT OF DEKALB COUNTY,

CONSTITUTE A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD

BEFORE SAID COURT IN THE MATTER THEREIN STATED.

       THIS CERTIFICATION IS EXPRESSLY WITHDRAWN AND DENIED

UPON THE DISASSEMBLY OR PHOTOCOPYING OF THE FOREGOING

TRANSCRIPT, OR ANY PART THEREOF, UNLESS SAID DISASSEMBLY OR

PHOTOCOPYING IS DONE BY THE UNDERSIGNED OFFICIAL COURT REPORTER

AND ORIGINAL SIGNATURE AND SEAL ARE ATTACHED THERETO.

       THIS, THE 11TH DAY OF AUGUST, 2016.


FAYE A. DAVIS, RPR CCR

CERTIFIED COURT REPORTER, B-671

SUPERIOR COURT OF DEKALB COUNTY