## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

-----------------------------------------------------------------------

ALBERT JOSEPH RAGUSEO, JR.,

                                      Plaintiff,

vs.

EQUIFAX INFORMATION
SERVICES, LLC; EXPERIAN
INFORMATION SOLUTIONS, INC;
and TRANS UNION, LLC,

                                Defendants.

-----------------------------------------------------------------------

Civil Action No.:

**JURY TRIAL**
**DEMANDED**

## COMPLAINT

Albert Joseph Raguseo, Jr. ("Plaintiff" or "Mr. Raguseo), a living, breathing consumer, brings this Complaint against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); and Trans Union, LLC ("Trans Union") (collectively, the "credit bureau defendants") (all defendants collectively, "Defendants"), states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Defendant Equifax is a CRA as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).

5.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

8.     The preservation of one's good name and reputation is also at the heart
of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the
> establishment of all sorts of computerized data banks, the individual is
> in great danger of having his life and character reduced to impersonal
> "blips" and key-punch holes in a stolid and unthinking machine which
> can literally ruin his reputation without cause, and make him
> unemployable or uninsurable, as well as *deny him the opportunity to*
> *obtain a mortgage or buy a home. We are not nearly as much concerned*
> *over the possible mistaken turn-down of a consumer for a luxury item*
> *as we are over the possible destruction of his good name without his*
> *knowledge and without reason. * * * [A]s Shakespeare said, the loss of*
> *one's good name is beyond price and makes one poor indeed* (emphasis
> added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec.
36570 (1970)].

9.     The FCRA also requires CRAs to conduct a reasonable reinvestigation
to determine whether information disputed by consumers is inaccurate and record
the current status of the disputed information, or delete the disputed information,
before the end of the 30-day period beginning on the date on which the CRA receives
the notice of dispute from the consumer. This mandate exists to ensure that consumer
disputes are handled in a timely manner and that inaccurate information contained

within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

11.     This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Plaintiff against Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq., as described herein.

## **THE PARTIES**

12.     Plaintiff Albert Joseph Raguseo, Jr. ("Plaintiff" or "Mr. Raguseo) is a natural person who resides in the State of New Jersey, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.     Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company resides in the State of Georgia and in the Northern District.

14.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating,

and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.     Defendant Experian Information Solutions, LLC ("Experian") is a limited liability company that conducts business in the State of Georgia and in the Northern District.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Defendant Trans Union, LLC ("Trans Union") is a limited liability company that conducts business in the State of Georgia and in the Northern District.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21.     Plaintiff mailed multiple written disputes regarding inaccurate information in his Equifax credit report to Equifax located in Fulton County; Atlanta, Georgia.

22.     Defendant Equifax received Plaintiff's multiple written disputes in Fulton County; Atlanta, Georgia.

23.     Upon receipt of Plaintiff's disputes, Defendant Equifax forwarded such disputes via Automated Consumer Dispute Verification electronic forms. Upon completion of its investigations pursuant to 15 U.S.C. § 1681s-2(b), the furnisher responded to Defendant Equifax's electronic communications, which originated from Atlanta, Georgia, by sending its results electronically to Defendant Equifax in Fulton County; Atlanta, Georgia

24.     Defendant Equifax then processed the dispute results at its National Consumer Assistance Center in Atlanta, Georgia, and mailed Plaintiff its final dispute results from Atlanta, Georgia.

## **FACTS**

## The Credit Bureau Defendant's Practices Concerning the Sale of Credit Reports on the "Deceased"

25.     Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants like Equifax, Experian, and Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants Equifax, Experian, and Trans Union, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

28.     Defendants Equifax, Experian, and Trans Union routinely place a "deceased" notation or marking on credit reports when they are advised by any of their many data furnishing sources (such as banks and debt collectors) that a given consumer is deceased.

29.     Defendants Equifax, Experian, and Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an

electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30.     Defendants Equifax, Experian, and Trans Union do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31.     Defendants Equifax, Experian, and Trans Union do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

32.     Defendants Equifax, Experian, and Trans Union do not independently verify with any source or furnisher that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

33.     In some cases, in order to assure accuracy, Defendants Equifax, Experian, and Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants Equifax,

Experian, and Trans Union do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

34.     Defendants Equifax, Experian, and Trans Union regularly receive the "Death Master File" from the Social Security Administration, including weekly and/or monthly updates, listing by social security number those consumers that the government believes to be deceased. But Defendants Equifax, Experian, and Trans Union do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

35.     Defendants Equifax, Experian, and Trans Union will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

36.     Defendants Equifax, Experian, and Trans Union do not employ any procedures at all to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

37.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants Equifax, Experian, and Trans Union do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

38.    Even in instances where the purportedly deceased consumer communicates directly with Defendants Equifax, Experian, and Trans Union, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

39.    Once a "deceased" mark is placed upon a consumer's report, Defendants Equifax, Experian, and Trans Union will not calculate and will not provide a credit score for that consumer.

40.    Upon Defendants Equifax, Experian, and Trans Union's reports with a "deceased" mark sold to third parties, Defendants Equifax, Experian, and Trans Union never calculate or provide a credit score for that consumer and instead reports that consumer's credit score as "N/A."

41.    Defendants Equifax, Experian, and Trans Union know that third party credit issuers require a credit score in order to process a given credit application.

42.     Defendants Equifax, Experian, and Trans Union know that consumers without credit scores are unable to secure any credit from most credit issuers.

43.     Defendants Equifax, Experian, and Trans Union know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

44.     Defendants Equifax, Experian, and Trans Union have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

45.     Defendants Equifax, Experian, and Trans Union have received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

46.     Defendants Equifax, Experian, and Trans Union know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers (and their dates of birth and social security numbers) are not on the Death Master File and are, in fact, alive.

47.     Nevertheless, Defendants Equifax, Experian, and Trans Union do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is, in fact, deceased.

48.     Even consumers who dispute the erroneous "deceased" status on their Equifax, Experian, and Trans Union credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

49.     Defendants Equifax, Experian, and Trans Union do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

50.     Nor do Defendants Equifax, Experian, and Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

51.     For years after a consumer's actual death, Defendants Equifax, Experian, and Trans Union will continue to sell credit reports about that consumer.

52.     Defendants Equifax, Experian, and Trans Union will only remove a deceased consumer's file from their respective credit reporting databases when it is

no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

53.    Defendants Equifax, Experian, and Trans Union charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

54.    Defendants Equifax, Experian, and Trans Union profit from the sale of reports on deceased consumers.

55.    Defendants Equifax, Experian, and Trans Union have in their credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

56.    Defendants Equifax, Experian, and Trans Union know that truly deceased consumers do not apply for credit.

57.    Defendants Equifax, Experian, and Trans Union know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants Equifax, Experian, and Trans Union to be a common and major source of identity theft.

58.    Defendants Equifax, Experian, and Trans Union know that identity theft and credit fraud are serious and widespread problems in our society.

59.     Defendants Equifax, Experian, and Trans Union warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

60.     Defendants Equifax, Experian, and Trans Union have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

61.     Defendants Equifax, Experian, and Trans Union sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

62.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their credit reports, absent a court order.

63.     Defendants Equifax, Experian, and Trans Union know that such reports contain a vast amount of personal identifying and credit account information on the

supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## USAA Denies Plaintiff Credit Due to Defendants Inaccurate Credit Reporting on March 17, 2021

64.     On or about March 17, 2021, Plaintiff sought to obtain insurance from USAA and submitted a credit application.

65.     Shortly thereafter, in or about March 17, 2021, USAA denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

66.     Specifically, Defendants were reporting deceased on his credit report.

67.     Plaintiff takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. Plaintiff believes and understands that his credit record with his creditors is good, so Plaintiff could not imagine how his credit application had been denied.

## Plaintiff's Sees Equifax Reporting Deceased on March 17, 2021

68.     On or about March 17, 2021, Plaintiff sees that Equifax is reporting a deceased notation in Plaintiff's credit report.

ComenityCapital/BO
Partial Acct # xxxxx6094
Account Status: Consumer Deceased

**Plaintiff's Sees Trans Union Reporting Deceased on March 17, 2021**

69.     On or about March 17, 2021, Plaintiff sees Trans Union reporting a deceased notation in Plaintiff's credit report.

COMENITYCAPITALBANK/BOSC
Account Number #578097609258****
Account Status: Consumer Deceased

**Plaintiff's Sees Experian Reporting Deceased on March 19, 2021**

70.     On or about March 19, 2021, Plaintiff sees Experian reporting a deceased notation in Plaintiff's credit report.

**Home Depot Denies Plaintiff Credit Due to Inaccurate Credit Reporting on March 20, 2021**

71.     On or about March 20, 2021, Plaintiff sought to a store credit card from Home Depot and submitted a credit application.

72.     Shortly thereafter, in or about March 20, 2021, Home Depot denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

73.     Specifically, Defendant was reporting deceased on his credit report.

74.     Plaintiff takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month.

Plaintiff believes and understands that his credit record with his creditors is good, so Plaintiff could not imagine how his credit application had been denied.

### Plaintiff's First Disputes with Defendants Equifax, Experian, and Trans Union on March 25, 2021

75.    On or about March 25, 2021, extremely shocked, surprised, and embarrassed at Defendants' inaccurate reporting, Plaintiff called and disputed online to Defendants Equifax, Experian, and Trans Union, disputing the deceased notations that was reporting in his credit reports. Plaintiff requested that Defendants Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and send his corrected copies of his credit reports.

### METHOD - The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

76.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

77.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated

consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

78.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

79.     Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

80.     Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

81.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

82.     These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

83.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

84.     The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

85.     Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

## The Credit Bureau's Responses to Plaintiff's Disputes

86.     Upon receiving Plaintiff's written disputes in March 2021, Equifax, Experian, and Trans Union sent ACDVs to the following furnisher regarding the following credit account Plaintiff disputed:

- **Comenity Bank/ BOSC**
  **Account Number #578097609258****

**Responsibility: Consumer Deceased**

87.    Experian removed the deceased notation from Plaintiff's credit report, completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff.

88.    Trans Union changed the reporting from "deceased" to "undesignated" on Plaintiff's credit report, completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff.

89.    Equifax failed to properly reinvestigate and delete the deceased notation on disputed credit account, which continued to appear on Plaintiff's Equifax credit report.

**Wells Fargo Card Services Denies Plaintiff Credit Due to Defendants Inaccurate Credit Reporting on April 16, 2021**

90.    On or about April 16, 2021, Plaintiff sought to obtain a Wells Fargo credit card and submitted a credit application.

91.    Shortly thereafter, in or about April 16, 2021, Wells Fargo Card Services denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

92.    Specifically, Defendants were reporting deceased on his credit report.

93.     Plaintiff takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. Plaintiff believes and understands that his credit record with his creditors is good, so Plaintiff could not imagine how his credit application had been denied.

## Capital One Denies Plaintiff Credit Due to Defendants Inaccurate Credit Reporting on April 16, 2021

94.     On or about April 16, 2021, Plaintiff sought to obtain a Capital One credit card and submitted a credit application.

95.     Shortly thereafter, in or about April 16, 2021, Capital One denied Plaintiff's credit application based upon the contents of Plaintiff's credit report.

96.     Specifically, Defendants were reporting deceased on his credit report.

97.     Plaintiff takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. Plaintiff believes and understands that his credit record with his creditors is good, so Plaintiff could not imagine how his credit application had been denied.

## Plaintiff's Sees Equifax Reporting Deceased on May 12, 2021

98.     On or about May 12, 2021, Plaintiff sees that Equifax is reporting a deceased notation in Plaintiff's credit report.

ComenityCapital/BO
Partial Acct # xxxxx6094
Account Status: Consumer Deceased

## Plaintiff's Disputes with Defendant Equifax on May 15, 2021

99.    On or about May 15, 2021, extremely shocked, surprised, and embarrassed at Defendant's inaccurate reporting, Plaintiff mailed a written dispute to Defendant Equifax, via certified mail, disputing the deceased notations that was reporting in his credit reports. Plaintiff requested that Defendant Equifax reinvestigate the disputed information, correct the reporting, and send his corrected copies of his credit reports.

100.   Plaintiff's May 15, 2021 dispute specifically included his full name, date of birth, Social Security number, driver's license, Social Security card, and current address so that the credit bureaus would be able to properly identify his and locate his credit files.

## Equifax's Response to Plaintiff's May 15, 2021 Dispute

101.   Defendant Equifax updated the information to no longer report as deceased.

## CLAIMS FOR RELIEF

### COUNT I

### 15 U.S.C. § 1681e(b)

### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

102.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-101 as if fully stated herein.

103.   The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

104.   On multiple occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

105.   Despite actual and implied knowledge that Plaintiff is not dead, Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

106.   Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure

maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

107.   As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

108.   Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

109.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

**(Second Claim for Relief Against Defendant Equifax)**

110.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-101 as if fully stated herein.

111.   The FCRA mandates that Defendant Equifax conducts an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act impose a 30-day time limitation for the completion of such an investigation. *Id.*

112.   The FCRA provides that if Defendant Equifax conducts an investigation of disputed information and confirm that the information is in fact inaccurate, or is unable to verify the accuracy of the disputed information, Equifax is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

113.   On multiple occasions during 2021, Plaintiff sent written disputes to Defendant Equifax, pleading with Equifax to comply with its statutory reinvestigation obligations and correct and/or delete specific items in his credit file that are patently inaccurate, misleading, and highly damaging to his and his ability to obtain credit, namely, references to his being "deceased."

114.   Either Defendant Equifax conducted no investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file, namely, the deceased notations.

115.   Defendant Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

116.   As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

117.   Defendant Equifax's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

118.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a.  Determining that Defendants negligently and/or willfully violated the FCRA;

b.  Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

119.    Plaintiff demands a trial by jury.


Dated:        March 16, 2023

/s/ Joseph P. McClelland
Joseph P. McClelland
LAW FIRM OF JOSEPH P.
MCCLELLAND, LLC
Georgia Bar No: 483407
235 East Ponce de Leon Avenue,
Suite 215
Decatur, GA 30030
Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com

ATTORNEY FOR PLAINTIFF