**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| STEVEN AVERBACH,<br><br>   Plaintiff,<br><br><br>   v.<br><br><br>MERCEDES-BENZ USA, LLC and<br>MERCEDES-BENZ GROUP AG,<br><br>   Defendants. | No. _____<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**CLASS ACTION** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiff Steven Averbach ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class" as defined below), by and through his attorneys, allege as follows against Defendants Mercedes-Benz USA, LLC and Mercedes-Benz Group AG (collectively, "Mercedes" or "Defendants").

**SUMMARY OF THE ACTION**

1.     Plaintiff Averbach bring this action individually and on behalf of all current and former owners and lessees of the following model year ("MY") Mercedes vehicles: C-Class, model years 2010 to 2022; CLS-Class, model years 2010 to 2022; E-Class, model years 2010 to 2022; G-Class, model years 2010 to

2022; GLK-Class, model years 2010 to 2015; SL-Class, model years 2010 to 2022; and SLC/SLK-Class, model years 2010 to 2020 (the "Class Vehicles"). As discussed in more detail below, the Class Vehicles contain defective subframes designed, manufactured, distributed, warranted, marketed, and sold by Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG ("MBG") (collectively, "Mercedes).

2.     The Class Vehicles' rear subframes have a dangerous safety defect ("Rear Subframe Defect") that causes the rear subframes, attached components, and nearby parts to prematurely rust or corrode, which (a) adversely affects the drivability of the Class Vehicles; (b) causes corrosion of other components on the underside of the Class Vehicles, including brake lines, suspension springs, and rear axle; and (c) can cause the rear subframes to fail while the Class Vehicles are in motion, resulting in a sudden, unexpected loss of control for the driver.

3.     The defective subframes in the Class Vehicles pose a material safety risk, and therefore render the vehicles unfit for their intended purpose. Because of this risk, Mercedes authorized dealers and independent mechanics often advise Class Vehicle owners with rear subframe corrosion not to drive their Class Vehicles, especially at high speeds. Many Class Vehicle owners are therefore left with vehicles that are too dangerous to drive, especially at typical highway speeds.

4.     Because of the undisclosed Defect, Plaintiff and Class Members were deprived of the benefit of their bargains in purchasing the Mercedes vehicles at issue. Plaintiff accordingly seeks relief both for himself and for other owners or lessees of these vehicles.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.§ 1367.

6.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Mercedes is headquartered and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, Mercedes advertises in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

7.     This Court has personal jurisdiction over Mercedes because it is headquartered in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Georgia and throughout the United States.

**PARTIES**

A.     **Plaintiff Averbach.**

8.     Plaintiff Steven Averbach is a citizen of Florida, and a current resident of Cape Coral, Florida.

9.     Plaintiff owns a 2010 Mercedes-Benz GLK 350, which he purchased certified preowned in on January 12, 2020 from a private and local seller in Cape Coral, Florida. Plaintiff's Class Vehicle has a Vehicle Identification Number of WDCGG8HB8AF460479. Prior to the purchase of the vehicle, Plaintiff received a 100-point inspection from Mercedes-Benz of West Palm Beach, a Mercedes dealership located in West Palm Beach, Florida.

10.     Plaintiff Averbach purchased the Class Vehicle for his personal, family, and household use. He has stored the vehicle primarily in an indoor garage when not in use.

11.     In August 2021, Plaintiff Averbach nearly suffered a fatal accident while driving his Class Vehicle. Plaintiff brought his Class Vehicle into a Firestone

Complete Auto Care in Cape Coral, Florida believing that the vehicle's tires were misaligned. Firestone attendants informed Plaintiff Averbach that his subframe was significantly corroded and would need to be replaced "soon." Plaintiff Averbach visited Cape Coral Foreign Cars, in Cape Coral, Florida, who had quoted repair expenses at approximately $1,700 around August 16, 2021.

12.     As a result of the subframe defect, Plaintiff Averbach has been left with a vehicle that is not fit for its intended purpose. Because the extensive subframe corrosion makes the vehicle hazardous to drive, particularly on the highway, Plaintiff Averbach has limited his use of the Class Vehicle, now primarily used by Plaintiff's daughter.

13.     Plaintiff Averbach wrote a letter to Mercedes regarding the subframe issue. Mercedes denied Plaintiff Averbach any assistance or remedy, leaving Mr. Averbach to pay for the full cost of repairs himself.

14.     Had Mr. Averbach been aware of the subframe defect at the time he purchased his vehicle, he would have paid less for the vehicle than he did or would not have bought it. Mr. Averbach has been injured as a result of Mercedes' conduct as described herein.

**B.      Defendants**

15.     Defendant Mercedes-Benz Group AG ("MBAG") is a German corporation with its principal place of business in Stuttgart, Baden-Württemberg, Germany. MBAG is engaged in the business of designing, manufacturing, warranting, marketing, advertising, selling, and servicing Mercedes-Benz vehicles around the world including through a network of dealerships in the United States.

16.     Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware corporation with its principal place of business in Sandy Springs, Georgia. MBUSA operates as a wholly-owned U.S. sales and marketing subsidiary of Defendant MBAG. It distributes, advertises, markets, sells, warrants and services Mercedes vehicles in the United States.

17.     The design, manufacture, distribution, service, repair, modification and installation of the control arms, along with the subframe, and other components within the Class Vehicles were controlled exclusively by Mercedes and their agents and affiliates.

18.     There exists, and at all relevant times existed, a unity of ownership between MBAG, MBUSA, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

19.     MBUSA communicates with MBAG concerning virtually all aspects of the Mercedes products. MBUSA distributes, sells, warrants and services within the United States, including appropriate repairs for defects and whether Mercedes will repair defective parts and assemblies.

20.     MBUSA and MBAG jointly develop sales and marketing materials, advertisements, owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles, as well as Technical Service Bulletins that Mercedes issues to authorized dealerships in order to address known defects.

## FACTUAL ALLEGATIONS

### A.     The Mechanical Purpose of a Vehicle Subframe

21.     Many vehicles, including the Class Vehicles, have a rear subframe that is located on the back undercarriage and that spans the width of the vehicle in between the two rear wheels. The rear subframe faces the exterior of the vehicle and is partially covered by a splash shield, but is otherwise exposed to the elements.

22.     A subframe (also called a "suspension cross-member" or "axle carrier") is an integral component of a vehicle's structure. It attaches to the unibody of the vehicle and provides stiff mounting points for suspension and driveline components.

The rear subframe is essential to holding the rear suspension and rear wheels securely to the vehicle.

23.    The wheels of a vehicle encounter significant road forces, which they transfer to the suspension. The subframe must be stiff and resilient because it stabilizes the vehicle's suspension when it encounters these transferred road forces. The rear subframes of many vehicles, including the Class Vehicles, are therefore made out of steel.

24.    The rear subframe is attached to the wheels with control arms, which are also made out of steel. These control arms ensure that the wheels and suspension components are adequately attached to the body of the vehicle, so that when the vehicle is in drive and the wheels are propelled forward, the body of the car moves with it in a smooth and stable fashion.

25.    The rear subframe of the Class Vehicles serves as an attachment point for the following control arms on both the left and right sides of the rear subframe:

a.    The strut rods (alternately called the "rear arm," "rear lateral arm," "upper control arm," "rear upper control arm," "ft lateral arm," "suspension control arm," "camber arm," or "camber strut");

b.    The front lateral arms (alternately called the "front arms," "strut rods," "torque arms," "front upper control arms," upper control arms,"

"suspension control arms," or "struts");

    c.    The rear lateral arms (alternately called the "rear lateral arms," "ft lateral arms," "radius arms," "rear lower control arms," or "suspension control arms");

    d.    The track bars (alternately called the "lower links," "trailing arms," "ft lower control arms," "trailing arm bushings," "suspension control arms," or "pushing struts"); and

    e.    The lower control arms (alternately the "spring control arms").

26.    The control arms of the rear subframes on the Class Vehicles are in close proximity to a number of other essential vehicle components, including the rears wheels, gas tank, brake lines, suspension springs, rear axle and exhaust system.

27.    In addition to providing stability to the rear of the vehicle, the rear subframe plays an important role in crash safety, particularly in the case of an accident where there is impact on only one side of the vehicle's rear body. In such a collision, the subframe partially absorbs the impact and channels the impact forces to the side of the vehicle not involved in the impact. The Rear Subframe therefore helps to absorb some of the collision forces before they can reach the passenger cabin.

**B.     Rust Formation and Corrosion**

28.     Rust is an iron oxide produced in a process called corrosion, which occurs when iron or an iron alloy, such as steel, is exposed to oxygen and water. Road salt accelerates rust formation by acting as a catalyst.

29.     Rust can be mild (or surface rust) or so extensive that it causes holes to form in the metal (rust-through). The latter compromises the structural integrity of the metal, leading to perforation and breakage in metal vehicle components.

30.     Corrosion of the severity present in the rear subframes of the Class Vehicles can take many years to develop, and its initial stages begin when the vehicle is first exposed to normal environmental conditions like precipitation, humidity, salt air, road salt, and temperature fluctuations.

31.     Vehicle components, including rear subframes, are typically constructed using high-quality carbon steel, which is inherently susceptible to rust and corrosion. Therefore, the steel must be adequately coated with a properly applied anti-corrosion agent in order to withstand normal environmental conditions without experiencing corrosion and perforation. A properly designed rear subframe constructed of carbon steel must be coated with anti-corrosion agents sufficient to withstand normal environmental conditions.

32.     Vehicle components made of steel must also be designed with adequate drainage to prevent water from becoming trapped or pooling on or in the component, leading to premature corrosion. A properly designed rear subframe constructed of carbon steel must have adequate drainage in order to prevent rust and corrosion.

33.     The rear subframes of the Class Vehicles are constructed of carbon steel and are therefore susceptible to corrosion if not properly coated and designed.

### C.     Mechanical Consequences of Subframe Corrosion

34.     A non-defective rear subframe should last the life of a vehicle without needing replacement. For instance, in its European markets, every Mercedes vehicle comes with a 30-year corrosion warranty, which guarantees that if the body of a Mercedes vehicle "is perforated due to corrosion from the inside out anytime within 30 years, Mercedes-Benz will repair the damage at one of its workshops, at no cost to the owner." Mercedes has offered this warranty in Europe for the past 25 years.

35.     The subframe is mounted underneath the vehicle, making it difficult to see unless specifically inspected. Even if inspected, the subframe is made of tubular carbon steel and, upon information and belief, rusts from the inside out, meaning a typical visual inspection of exterior rust will not reveal the corrosion until the subframe is close to failure. Therefore, the defect is difficult to see, even in a

meticulously maintained vehicle, and even by a trained mechanic. As a result, the Class Vehicles provide little to no warning before becoming dangerously unstable.

36.     A common failure point for the subframes of Class Vehicles is the mounting point for the control arms or the track bar. These points often experience heavy corrosion, becoming weak and sometimes detaching from the subframe.

37.     A failure of the subframe where it meets suspension components, such as a control arm or track bar, is dangerous because the attached suspension components hold the drive wheels in place and in proper alignment. When a suspension component becomes detached from the subframe, it can drastically change the geometry of the suspension.

38.     A sudden failure of a subframe suspension attachment point is particularly detrimental to drivability because without robust attachment points from the vehicle to the wheel, the wheel moves forward separately from the body of the vehicle.

39.     A failure of a suspension attachment point on the subframe is more likely when the vehicle is in motion, because the component is exerting force on the attachment point. The higher the acceleration, the higher the force being exerted and, thus, greater likelihood of failure.

40.     If the vehicle is in motion when the subframe fails at the attachment point, the driver's ability to control the vehicle and bring it to a safe stop is compromised. The steering, braking, and acceleration of the vehicle becomes unpredictable. In particular, vehicles with broken subframes tend to fishtail or veer to one side unexpectedly while being driven.

41.     A subframe failure while a Class Vehicle is in motion can also cause the tire to jam and burst, rendering the vehicle suddenly uncontrollable.

42.     In some cases, a detached control arm can strike the gas tank of the vehicle, damaging it.

43.     Vehicles with subframe corrosion can also experience corrosion of the brake lines. When a vehicle's brake lines corrode, they may crack and begin to leak brake fluid. Compromised brake lines can cause driver to lose total or partial use of their brakes.

44.     Vehicles with subframe corrosion also experience corrosion of the rear suspension springs, a critical component of a vehicle's suspension system.

45.     In addition, subframe corrosion can impact the exhaust system and/or rear axle requiring the replacement of these components.

46.     One of the most serious consequences of a comprised subframe is that, in the event of a crash, it is unable to absorb and evenly distribute the force from the impact. When that force is not evenly distributed, it can cause the vehicle to collapse.

47.     A vehicle with a perforated subframe cannot be safely driven unless the subframe is replaced, a time-intensive process that involves removing the rear suspension, rear drivetrain, and wheels from the vehicle, and then assembling it all onto the new subframe.

48.     The cost of a rear subframe replacement, including parts and labor, is between $3,500 and $7,000, although costs can easily exceed that threshold if the Rear Subframe Defect has caused damage to other parts of the vehicle, such as the rear brake lines, suspension components, exhaust system, rear axle, tires, or fuel tank.

49.     Plaintiff and Class Members were also injured at point of sale by not receiving the benefit of their bargain: vehicles without a Subframe Defect.

50.     Class Vehicles with corroded subframes experience significant diminution in resale value unless the rear subframe is repaired.

51.     No reasonable consumer would purchase a Class Vehicle if they knew that it was likely to become unsafe and/or inoperable due to corrosion of the rear subframe in less than ten years, even when meticulously maintained.

**D.     Mercedes' Knowledge of the Subframe Defect**

52.     As early as 2009, and likely earlier, Mercedes was aware of the Rear Subframe Defect, should have been aware of the Rear Subframe Defect through exercise of reasonable care, and/or was negligent in failing to be aware of the Rear Subframe Defect, based on, among others, the following sources:

    a.  Pre-release design, manufacturing, engineering, and testing data;

    b.  Detailed data gathered by Mercedes about large number of Rear Subframe Defect repairs by authorized Mercedes dealers;

    c.  Numerous and consistent consumer complaints collected by NHTSA about the Rear Subframe Defect;

    d.  Service bulletins sent by Mercedes to its dealerships evincing knowledge of ongoing issues with rear subframes in the Class Vehicles;

    e.  Knowledge Mercedes had of the large number of replacement rear subframes ordered from Mercedes;

    f.  Numerous and consistent consumer complaints made directly to Mercedes about the Rear Subframe Defect;

    g.  Numerous and consistent consumer complaints made on online vehicle owner forums;

h.  Actions taken by MBG in foreign markets to remedy the Rear Subframe Defect; and

i.  Mercedes service center employees' familiarity with and knowledge of the Rear Subframe Defect.

**E.    Mercedes' Marketing and Concealment.**

53.    Mercedes manufactured and sold the Class Vehicles with the Rear Subframe Defect, while willfully concealing the serious safety and reliability impacts of the defect, as well as the inferior quality and limited longevity of the Class Vehicles' rear subframes.

54.    Mercedes directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, and through other mass media.

55.    None of Mercedes' advertisements warned customers that their vehicles were likely to experience severe, premature corrosion of the rear subframe that would impact their ability to drive the Class Vehicles.

56.    Plaintiff and Class Members were exposed to Mercedes' long-term, national multimedia marketing campaign, which focused on the safety and reliability of Mercedes vehicles, as well as the advanced technology used by Mercedes to keep the Class Vehicles corrosion-free. Plaintiff and Class Members justifiably chose to

purchase their Class Vehicles based on Mercedes' misleading marketing that concealed the true, defective nature of the Class Vehicles' rear subframes.

57.    Despite Mercedes' knowledge of the defect, it told Class Members who complained to customer service about the Rear Subframe Defect that it was not aware of any defect, was not responsible for the defect, and that, absent a warranty, it was not responsible for full reimbursement for the repair.

58.    As a consequence of Mercedes' actions and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, lost use of their Class Vehicles for extended periods of time, been exposed to dangerous conditions from loss of control while driving, and incurred lost time and out-of-pocket costs. Class Vehicles also have suffered a diminution in value due to the Defect.

59.    Had Plaintiff and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

**TOLLING OF STATUTES OF LIMITATIONS**

60.    Mercedes has known of the Rear Subframe Defect in the Class Vehicles since at least 2009, and well before Plaintiff and Class Members purchased their Class Vehicles, and yet concealed from or failed to disclose to Plaintiff, Class Members, and the public the full and complete nature of the Rear Subframe Defect,

even when directly asked about it by Class Members during communications with Mercedes, Mercedes Customer Care, Mercedes dealerships, and Mercedes service centers. Mercedes continues to conceal the defect to this day.

61.     Any applicable statute of limitations has been tolled by Mercedes' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing

## CLASS ACTION ALLEGATIONS

62.     This action is brought and may be maintained as a class action, pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

63.     The Class is defined as follows:

> All persons in the United States who bought or leased, other than for resale, a Class Vehicle.

64.     In addition, state subclasses are defined as follows:

Florida Subclass

> All persons who bought or leased, other than for resale, a Class Vehicle in the state of Florida.

65.     Excluded from the Class are Mercedes, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

66.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of Mercedes and is obtainable by Plaintiff only through the discovery process, publicly available sales information shows that Mercedes sold or leased hundreds of thousands of each model of Class Vehicles nationwide during the class period. Members of the Class can be readily identified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Mercedes in connection with its sales and leases of Class Vehicles.

67.   **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class and predominate over any individual questions. These common legal and factual questions include, but are not limited to:

    a.   Whether Mercedes engaged in the conduct alleged herein;

    b.   Whether Class Vehicles are unfit for their ordinary purpose;

    c.   Whether Mercedes placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

    d.   Whether Mercedes knew or should have known of the Defect, and if so, for how long;

    e.   When Mercedes became aware of the Defect in the Class Vehicles;

f.     Whether Mercedes knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.     Whether Mercedes' conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.     Whether Plaintiff and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.     Whether Plaintiff and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.     Whether Plaintiff and Class Members are entitled to damages, including punitive damages (as to MBUSA only), as a result of Mercedes' conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.     Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

68.    **Typicality**: Plaintiff's claims are typical of the claims of the Class because the Plaintiff purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiff and Class Members sustained economic harm in the same manner by Mercedes' uniform course of conduct alleged herein. Plaintiff and Class Members have the same or similar claims against Mercedes relating to the conduct alleged herein, and the same conduct on the part of Mercedes gives rise to all the claims for relief.

69. **Adequacy**: Plaintiff is an adequate representative of the Class, as his interests do not conflict with those of any other Class Member. Plaintiff has retained counsel competent and experienced in complex class action litigation—including consumer warranty and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

70. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on highly technical and economic issues bound up with the claims. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

71. **Injunctive Relief**: Mercedes has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**CLAIMS FOR RELIEF**

**COUNT I**

**Breach of the Implied Warranty of
Merchantability Plaintiff, Individually and on
Behalf of the Class or, Alternatively, the Florida
Subclass**

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

73.     Mercedes is a "merchant" as defined under the UCC.

74.     The Class Vehicles are "goods" as defined under the UCC.

75.     A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. Mercedes impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

76.     The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. The Class Vehicles were not merchantable in that the Defect renders the vehicle completely inoperable, which may also leave drivers and passengers

stranded, unexpectedly, in perilous locations. The Defect therefore renders the Class Vehicles unfit to provide safe and reliable transportation.

77.    The Defect was present in the Class Vehicles when they were placed into the stream of commerce and inevitably manifests well before the end of the useful life of the vehicles.

78.    Mercedes was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Mercedes and its authorized dealers, Class Members taking their vehicle to its dealers, and the instant lawsuit.

79.    Plaintiff and the other Class Members have had sufficient direct dealings with either Mercedes or its agents, including its authorized dealerships, to establish privity of contract between Mercedes on the one hand and Plaintiff and each Class Member on the other hand. Mercedes directly communicated with Plaintiff and Class Members through its agents, including its authorized dealerships, during the sales process. In addition, Mercedes directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. Mercedes also provided its warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members relied on Mercedes' direct representations regarding the

high quality, durability, reliability, dependability, and functionality of its vehicles in making their purchasing decision.

80.     Regardless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Mercedes and its dealers, and specifically of Mercedes' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Mercedes was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiff and not dealers. Mercedes also understood Plaintiff's and consumers' requirements—including that Class Vehicles would provide reliable transportation, function in a manner that does not pose a safety hazard, and be free from known defects—and expectation that a vehicle manufacturer would disclose any such defects prior to sale. Mercedes delivered the Class Vehicles to Plaintiff and other Class Members to meet those requirements.

81.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Mercedes to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable.

Mercedes' warranties were adhesive and did not permit negotiations. Mercedes possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Mercedes concealed and did not disclose this Defect, and Mercedes did not remedy the Defect prior to sale (or afterward).

82.     As a direct and proximate result of the breach of these warranties, Plaintiff and Class Members were injured and are entitled to damages.

## COUNT II

### Breach of Express Warranty

**Plaintiff, Individually and on Behalf of the Class or, Alternatively, the Florida Class**

83.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

84.     Mercedes is a "merchant" as defined under the Uniform Commercial Code (UCC).

85.     The Class Vehicles are "goods" as defined under the UCC.

86.     Mercedes provides a Limited Warranty with every Class Vehicle that expressly warrants that Mercedes will repair any defects in materials and/or workmanship free of charge during the applicable warranty period. The Defect is a defect in materials and/or workmanship and therefore should have been repaired for free under the Limited Warranty.

87.     Mercedes failed to perform its written warranty obligations as part of a uniform pattern and practice that extended to all of its dealerships.

88.     The warranties formed the basis of the bargain that was reached when Plaintiff and Class Members purchased or leased their Class Vehicles. Plaintiff and Class Members experienced the Defect within the warranty period. Despite the existence of the express warranty and multiple repair attempts, Mercedes failed to inform Plaintiff and Class Members of the Defect and failed to adequately repair the Defect.

89.     Plaintiff and the other Class Members have had sufficient direct dealings with either Mercedes or its agents, including its authorized dealerships, to establish privity of contract between Mercedes on the one hand and Plaintiff and each Class Member on the other hand. Mercedes directly communicated with Plaintiff and Class Members through its agents and dealerships. In addition, Mercedes directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. Mercedes also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on Mercedes' direct representations regarding the high quality, durability, reliability, dependability, and functionality of Mercedes vehicles in making their purchasing decision.

90.     Regardless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Mercedes and its dealers, and specifically of Mercedes' express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Mercedes was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiff and not dealers. Mercedes also understood Plaintiff and consumers requirements, including that Class Vehicles would provide reliable transportation, that they will function in a manner that does not pose a safety hazard, that they would be free from known defects, and that a vehicle manufacturer would disclose any such defects prior to sale. Mercedes delivered the Class Vehicles to Plaintiff and other Class Members to meet those requirements.

91.     As a result of Mercedes' breach of its express warranty, Plaintiff and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses, and for maintenance and service expenses to temporarily fix the Defect as well as towing, roadside assistance,

and alternative transportation costs that they otherwise would not have incurred but for the Defect.

92. Mercedes was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Mercedes and its authorized dealers, Class Members taking their vehicles to its dealers, and this lawsuit.

93. Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Mercedes' conduct described herein.

94. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Mercedes to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiff and Class Members have presented their Class Vehicles to Mercedes' authorized dealers on numerous occasions and Mercedes has failed to remedy the Defect. As a result, Plaintiff and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

95.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Mercedes to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Mercedes' warranties were adhesive and did not permit negotiations. Mercedes possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Mercedes concealed and did not disclose this Defect, and Mercedes did not remedy the Defect prior to sale (or afterward).

### COUNT III

### Violations of the Magnuson–Moss Warranty Act ("MMWA") 15 U.S.C. §§ 2301–2312

### On Behalf of Plaintiff, Individually and on Behalf of the Florida Class

96.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

97.    Plaintiff is a "consumer" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

98.    Mercedes is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

99.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

100.   15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

101.   Mercedes' express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

102.   Mercedes breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that cause the vehicles to be inoperable, which renders the vehicles unfit for their intended use and unsafe. Mercedes refused to honor its warranties by failing to effectively repair or replace the defective components.

103.   Plaintiff and the other Class Members have had sufficient direct dealings with either Mercedes or its agents, including its authorized dealerships, to establish privity of contract between Mercedes on the one hand and Plaintiff and each Class Member on the other hand. Mercedes directly communicated with Plaintiff and Class Members through its agents and dealerships. In addition, Mercedes directly communicated with Plaintiff and Class Members via its television, print, and online advertisements. Mercedes also issued vehicle warranties directly to Plaintiff and Class Members. Plaintiff and other Class Members also relied on Mercedes' direct representations regarding the high quality, durability, reliability,

dependability, and functionality of Mercedes vehicles in making their purchasing decision.

104.   Regardless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Mercedes and its dealers, and specifically of Mercedes' express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements, such as the Limited Warranty, were designed for and intended to benefit consumer end-users only. Furthermore, Mercedes was aware that the Class Vehicles were ultimately intended for use by consumers such as Plaintiff and not dealers. Mercedes also understood Plaintiff and consumers requirements, including that Class Vehicles would provide reliable transportation, that they will function in a manner that does not pose a safety hazard, that they would be free from known defects, and that a vehicle manufacturer would disclose any such defects prior to sale. Mercedes delivered the Class Vehicles to Plaintiff and other Class Members to meet those requirements.

105.   Plaintiff and Class Members have afforded Mercedes a reasonable opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as Mercedes has failed to remedy the Defect.

106.   At the time of sale or lease of each Class Vehicle, Mercedes knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure under the MMWA and/or afford Mercedes a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

107.   Plaintiff and the Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Mercedes is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class Members have not re-accepted their Class Vehicles by retaining them.

108.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.

109.   Plaintiff individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT IV

### Violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq*

### On Behalf of Plaintiff, Individually and on Behalf of the Florida Class

110.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

111.   The Florida Deceptive and Unfair Trade Practices Act was created to protect Florida consumers from unfair methods of competition and deceptive, unconscionable, and unfair business practices.

112.   Plaintiff and Florida Subclass members are individuals who purchased or leased Class Vehicles for personal purposes.

113.   Mercedes marketed and advertised the Class Vehicles to consumers in Florida. In addition, Mercedes, among other things, sold the Class Vehicles in Florida, shipped Class Vehicles to Florida, and otherwise conducted business related to the Class Vehicles in Florida.

114.   Mercedes' conduct constituted, among other things, the following prohibited fraudulent, deceptive, unconscionable and unfair business practices: (a) misrepresenting that the Class Vehicles have characteristics, uses, or benefits, which they do not have; (b) misrepresenting that the Class Vehicles are of a particular

standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) were immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm that greatly outweighs any possible utility from the conduct.

115.   Mercedes' conduct was fraudulent and deceptive because the omissions had the capacity or tendency to deceive and, in fact, did deceive, reasonable consumers, including Plaintiff.

116.   Mercedes' conduct actually and proximately caused an ascertainable loss of money or property to Florida Plaintiffs (as set forth above) and members of the Florida Subclass. Absent Mercedes' unfair and fraudulent conduct, Florida Plaintiffs and Florida Subclass members would have behaved differently and would not have purchased or leased the Class Vehicles. Mercedes' omissions induced Plaintiff and Florida Subclass members to purchase or lease the Class Vehicles they would not otherwise have purchased or leased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated individuals, requests that this Court enter an Order against Mercedes providing for the following:

A.    Certification of the proposed Class and/or Subclasses,

appointment of Plaintiff and his counsel to represent the Class, and provision of notice to the Class;

B.    An order permanently enjoining Mercedes from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Equitable relief, including in the form of buyback of the Class Vehicles;

E.    Costs, restitution, damages, including punitive damages (as to MBUSA only), penalties, and disgorgement in an amount to be determined at trial;

F.    An Order requiring Mercedes to pay pre- and post-judgment interest as provided by law;

G.    An award of reasonable attorneys' fees and costs as permitted by law; and

H.    Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated: March 17, 2023

Respectfully submitted,

By: _____

Ketan A. Patel (State Bar Number 121099)
CORPUS LAW PATEL, LLC
P.O. Box 724713
Atlanta, Georgia 31139
Telephone: (678) 597-8020
kp@corpus-law.com

Jonathan Shub (pro hac vice forthcoming)
Benjamin Johns (pro hac vice forthcoming)
SHUB LAW FIRM LLC
134 Kings Hwy. E., 2nd Fl.
Haddonfield, New Jersey 08033
Telephone: (856) 772-7200
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com


Troy M. Frederick (pro hac vice forthcoming)
Beth A. Frederick (pro hac vice forthcoming)
FREDERICK LAW GROUP, PLLC
836 Philadelphia Street
Indiana, Pennsylvania 15701
Telephone: (724) 801-8555

*Attorneys for Plaintiff*