**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Southern Division**

_____

MAXIM HEALTHCARE STAFFING            )
SERVICES, INC.,                      )
                                     )
          *Plaintiff,*               )
                                     )
v.                                   )          No. _____
                                     )
JEROME CHARLES,                      )
                                     )
          *Defendant.*               )
                                     )
_____

**PLAINTIFF MAXIM HEALTHCARE STAFFING SERVICES INC.'S
MOTION FOR *EX PARTE* TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Maxim Healthcare Staffing Services, Inc. ("Maxim"), moves this Court, pursuant to Fed. R. Civ. P. 65, for entry of an *ex parte* temporary restraining order ("TRO") enjoining Defendant Jerome Charles ("Charles") on an immediate basis from continuing to possess, disclose, or utilize Maxim's confidential and proprietary information. As more fully described and set forth within Maxim's Memorandum in Support of its Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction, filed contemporaneously herewith, a temporary restraining order—followed by a preliminary injunction—is the only adequate remedy to preserve the status quo and prevent immediate irreparable harm to Maxim.[1]

_____

[1] Maxim files contemporaneously with this Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction a Motion for Expedited Discovery related to the issues described herein. With permission from the Court, Maxim intends to supplement its Memorandum in Support of Its Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction with information learned through expedited discovery and in advance of the preliminary injunction hearing.

1

Injunctive relief is available when the plaintiff is likely to succeed on the merits, the damage is irreparable, and the remedy at law is inadequate. *Montgomery v. Hous. Auth. Of Balt. City*, 731 F. Supp. 2d 439, 441 (D. Md. 2010). Here, Maxim can show all elements to enable the Court to grant injunctive relief. After entering into an Employment Agreement with Maxim, Charles misappropriated significant amounts of confidential and trade secret information from Maxim, and then went to work for Maxim's direct competitor, SnapNurse, Inc. ("SnapNurse"). (*See* Verified Compl., Doc. 1 at ¶¶ 48-52).

In the days and weeks preceding the termination of his employment with Maxim, Charles improperly accessed, downloaded, and emailed over 90 documents containing Maxim's confidential and trade secret information to his personal email account. (*Id.*). The documents and information within these emails include, but are not limited to: confidential and proprietary internal training materials and current sales strategies; contracts containing terms, pricing, and current client contact information; information about individuals who applied for jobs through Maxim; Maxim's client lists, including Excel documents containing current information pertaining to thousands of Maxim's clients nationwide; and Maxim's current prospective client lists containing information pertaining to Maxim's prospective clients nationwide. (*Id.* at ¶ 51). Following this misappropriation, Charles then engaged in direct competition against Maxim through his employment with SnapNurse while in possession of Maxim's trade secret information.

As Maxim's memorandum of points and authorities explains, Maxim satisfies all of the required elements for injunctive relief here. First, Maxim is likely to succeed on the merits of its claims against Charles: (1) violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 et seq. ("DTSA"); (2) violations of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-201 et seq. ("MUTSA"); (3) violations of the Virginia Uniform Trade Secrets Act,

Va. Code § 59.1-336 ("VUTSA"); (4) breach of contract under Maryland Law; and (5) conversion. As the accompanying filings and evidence show, Charles' conduct violates the restrictive covenants within his Employment Agreements with Maxim, and involves the misappropriation and actual, threatened, and/or inevitable disclosure of Maxim's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 *et seq.*; the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1201 *et seq.*; and the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 *et seq*.  Hence, Maxim can establish substantial likelihood of success on the merits.

Second, Maxim will suffer irreparable harm absent injunctive relief.  Therefore, a temporary restraining order and follow-on preliminary injunctive relief is necessary to prevent Charles from using or disclosing Maxim's confidential information, violating his Employment Agreement, and continuing to cause irreparable harm, injury, and damage to Maxim.  *See Brightview Grp., LP v. Teeters,* 441 F. Supp. 3d 115, 141 (D. Md. 2020) (concluding wrongful use of confidential and proprietary information to launch a new business amount to irreparable harm); *NaturaLawn of Am., Inc. v. W. Grp., LLC,* 484 F. Supp. 2d 392, 401 (D. Md. 2007) (noting that use of a company's proprietary information to attract the company's customers constitutes irreparable harm).

Third, balance of the equities favors Maxim, because Maxim has established the likelihood of immediate irreparable harm though the likely further misappropriation, use, disclosure, or dissemination of one or more trade secrets and confidential, proprietary information were this injunction not issued, and Maxim has established that little to no harm will occur to Charles.

4858-6280-5577.7

Fourth, this injunction is in the public interest because the injunction furthers the public policies reflected in the DTSA, MUTSA, and VUTSA, and the tort and common law claims. This injunction protects the interests of Maxim and the public in lawful competition and protection of confidential, proprietary, and trade secret information.

Lastly, no bond or only a nominal bond should be required here because the facts reflect Charles will suffer little, if any, damage as a result of a TRO and preliminary injunction.

**WHEREFORE**, Maxim asks this Court to grant its Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction, and enter an Order:

1.     Enjoining Charles from using, accessing, or disclosing Maxim's confidential information and trade secrets; and

2.     Compelling Charles to return and delete all documents, files, and other materials he transmitted to himself or otherwise improperly retained from his employment with Maxim without proper authority and containing and/or comprising Maxim's confidential information or trade secrets, whether stored electronically or in hard copy, without retaining any copies thereof.

4

Respectfully submitted,

*/s/ Michael J. Schrier*
Michael J. Schrier, Esq.
D. Md. Bar No. 15967
Husch Blackwell LLP
1801 Pennsylvania Ave., NW, Suite 1000
Washington, DC 20006
T: (202) 378-2313
F: (202) 378-2319
michael.schrier@huschblackwell.com

William E. Corum (*Pro Hac Vice Application forthcoming*)
Tyler Hibler (*Pro Hac Vice Application forthcoming*)
Megan Scheiderer (*Pro Hac Vice Application forthcoming*)
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
T: (816) 983-8000
F: (816) 983-8080
william.corum@huschblackwell.com
tyler.hibler@huschblackwell.com
megan.scheiderer@huschblackwell.com

Counsel for Maxim Healthcare Staffing Services, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2023, the above and foregoing document was filed electronically using the Court's CM/ECF system.  The CM/ECF system will send the document and a notification of such filing (NEF) to all counsel of record.

In addition, and a true and correct copy of the above and foregoing was served upon Defendant Jerome Charles via Certified U.S. Mail at:

4777 Balmoral Street
White Plains, Maryland 20695

I also certify that a copy of the above and foregoing was sent to Defendant's last known email address at:

Jcharles1288@gmail.com

*/s/ Michael J. Schrier*
**Attorney for Plaintiff**

4858-6280-5577.7

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| MAXIM HEALTHCARE STAFFING ) | |
| SERVICES, INC. ) | |
| 7227 Lee Deforest Drive ) | |
| Columbia, Maryland 21046, ) | |
| ) | |
| *Plaintiff,* ) | Civil Action No. _____ |
| ) | |
| v. ) | |
| ) | |
| JEROME CHARLES ) | |
| 4777 Balmoral Street ) | |
| White Plains, Maryland 20695, ) | |
| ) | |
| *Defendant.* ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

**MAXIM HEALTHCARE STAFFING SERVICES, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR EX PARTE**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Maxim Healthcare Staffing Services, Inc. ("Maxim") submits this Memorandum in Support of its Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction against Defendant Jerome Charles ("Charles").[1] As set forth below, the facts underlying Maxim's request for a temporary restraining order, to be followed by a preliminary injunction, are clear and compelling. Charles misappropriated Maxim's confidential information and trade secrets contemporaneously with his acceptance of employment at SnapNurse, Inc. ("SnapNurse"),

---

[1] Maxim files contemporaneously with this Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction a Motion for Expedited Discovery related to the issues described herein. With permission from the Court, Maxim intends to supplement its Memorandum in Support of Its Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction at the Preliminary Injunction phase of this case with information learned through expedited discovery and in advance of the preliminary injunction hearing.

1

Maxim's direct competitor.  In the days and weeks before announcing his resignation from Maxim, and through his last day worked, Charles improperly accessed and emailed documents and information containing Maxim's current training materials, current client contracts, current pricing information, current and prospective client lists containing thousands of contacts, and current and prospective candidate lists to his personal email account in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 *et seq.* ("DTSA"), the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-201 *et seq.* ("MUTSA"), the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 ("VUTSA"), and the restrictive covenants contained within his Employment Agreement.

This misappropriation of Maxim's trade secrets and confidential information by Charles, who began working for Maxim's direct competitor following the conclusion of his employment with Maxim, will cause immediate irreparable damage to Maxim's goodwill and legitimate business interests if left unrestrained.

## TABLE OF CONTENTS

**Page**

**EXHIBIT LIST** ..................................................................................................... **II**

**TABLE OF AUTHORITIES** ...........................................................................**III**

**I.     INTRODUCTION** .................................................................................**5**

**II.    FACTUAL BACKGROUND** ..................................................................**6**

     A.    MAXIM HEALTHCARE STAFFING SERVICES, INC. ..................................... 6
     B.    MAXIM'S EMPLOYMENT OF CHARLES............................................... 7
     C.    RESTRICT COVENANTS WITHIN CHARLES' EMPLOYMENT AGREEMENT ................ 9
          1.    Confidentiality and the return of documents. ............................. 9
          2.    Charles' covenant to not compete............................................ 10
     D.    CHARLES' RESIGNATION FROM MAXIM AND BREACH OF HIS LEGAL DUTIES...... 11

**III.   LEGAL STANDARD** .........................................................................**13**

**IV.    ARGUMENT** ....................................................................................**14**

     A.    MAXIM IS LIKELY TO SUCCEED ON THE MERITS. ................................. 14
          1.    Maxim is likely to succeed on its DTSA, MUTSA, and VUTSA claims because Charles misappropriated Maxim's protected confidential and trade secret information. ..................................................... 15
          2.    Maxim is likely to succeed on its breach of contract claim and conversion claim against Charles. .................................................. 19
     B.    MAXIM HAS SHOWN A LIKELIHOOD OF IRREPARABLE HARM............................. 21
     C.    MAXIM HAS SHOWN THE BALANCE OF HARDSHIPS WEIGHS IN ITS FAVOR.......... 22
     D.    AN INJUNCTION IS IN THE PUBLIC INTEREST. ....................................... 22

**V.     EX PARTE TEMPORARY RESTRAINING ORDER**............................**22**

**VI.    SECURITY BOND PURSUANT TO FED. R. CIV. P. 65** ...........................**23**

**VII.   CONCLUSION** ................................................................................**24**

**CERTIFICATE OF SERVICE** ................................................................**26**

## EXHIBIT LIST

1.  Exhibit A – 2016 Employment Agreement

2.  Exhibit B – 2017 Employment Agreement

3.  Exhibit C – SnapNurse Job Posting

4.  Exhibit D – December 16, 2022 Charles Letter

5.  Exhibit E – December 16, 2022 SnapNurse Letter

6.  Exhibit F – December 30, 2022 SnapNurse Letter

7.  Exhibit G – Misappropriation Emails

8.  Exhibit H – Declaration of Attorney Tyler Hibler

9.  Exhibit I – Information Security Policy 4.6.4

10. Exhibit J – Relevant Code of Conduct Policy

4895-2408-0201.3

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airfacts Inc. v. de Amezaga*,
   909 F.3d 84 (4th Cir. 2018) ........................................................ 17

*Albert S. Smyth Co. Inc. v. Motes*,
   CCB-17-677, 2018 WL 3635024 (D. Md. July 31, 2018)............... 19, 21

*Ameritox, LTD v. Savelich*,
   92 F. Supp. 3d 389 (D. Md. 2015)............................................... 22

*Avtex Syss., Inc. v. Peiffer*,
   21 F.3d 568 (4th Cir. 1994) ........................................................ 20

*Bond v. PolyCycle, Inc.*,
   732 A.2d 970 (Md. App. 1999)................................................... 20

*Brightview Grp. LP v. Teeters*,
   441 F. Supp. 3d 115 (D. Md. 2020) ..................................... 19, 20, 23, 24

*Carroll Co. v. Sherwin-Williams Co.*,
   848 F. Supp. 2d 557 (D. Md. 2012)............................................. 21

*Gibbons v. Bank of America Corp.*,
   2012 WL 94569 (D. Md. Jan. 11, 2012)...................................... 22

*Hearn Insulation & Improvement Co. v. Carlos Bonilla* ,
   No. AW 09-009, 2010 WL 3069953 (D. Md. Aug. 5, 2010) ........... 21

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) ................................................ 15, 24, 26

*Hughes Network Sys. v. InterDigital Commc'ns Corp.*,
   17 F.3d 691 (4th Cir. 1994) ........................................................ 16

*Interstate Ins. Co. v. Logan*,
   109 A.2d 904 (Md. 1954) ........................................................... 22

*LeJeune v. Coin Acceptors, Inc.*,
   849 A.2d 451 (Md. 2004) ...................................................... 19, 20

*MCS Services Inc. v. Jones*,
   WMN-10-1042, 2010 WL 3895380 (D. Md. Oct. 1, 2010).............. 19

4895-2408-0201.3

*Md. Physician's Edge, LLC v. Behram*,
  No. 17-2756, 2019 WL 4573417 (D. Md. Sep. 20, 2019) ........................................... 20

*Montgomery v. Hous. Auth.*,
  731 F. Supp. 2d 439 (D. Md. 2010) ........................................................................ 16

*Motor City Bagels, LLC v. Am. Bagel Co.*,
  50 F. Supp. 2d 460 (D. Md. 1999) .......................................................................... 17

*NaturaLawn of Am., Inc. v. W. Grp., LLC*,
  484 F. Supp. 2d 392 (D. Md. 2007) ........................................................................ 23

*Profiles, Inc. v. Bank of Am. Corp.*,
  453 F. Supp. 3d 742 (D. Md. 2020) ........................................................................ 16

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
  575 F.3d 342 (4th Cir. 2009) .................................................................................. 16

*Telesystems, Inc. v. Spotswood*,
  No. CV RDB 05-1532, 2005 WL 8174397 (D. Md. June 29, 2005) ......................... 23

*US Dep't of Lab. V. Wolf Run Mining Co.*,
  452 F.3d 275 (4th Cir. 2006) .................................................................................. 16

*Wachovia Ins. Servs., Inc. v. Hinds*,
  No. WDQ-07-2114, 2007 WL 6624661 (D. Md. Aug. 30, 2007) ........................... 16

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................. 16

*Zahodnick v. Int'l Bus. Machs. Corp.*,
  135 F.3d 911 (4th Cir. 1997) .................................................................................. 22

## Statutes

18 U.S.C. § 1832 ........................................................................................................ 2, 16
18 U.S.C. § 1836 ...................................................................................................... 17, 20
18 U.S.C. § 1839 ...................................................................................................... 18, 19
Md. Code, C.L. § 11-1201 ............................................................................................. 18
Md. Code, C.L. § 11-201 ........................................................................................... 2, 16
Va. Code § 59.1-336 ............................................................................................... 2, 16, 18

## Rules

Fed.R.Civ.P. 65 ............................................................................................... 16, 24, 25, 26

iv

## I.    INTRODUCTION

On October 31, 2022, Charles announced his resignation from Maxim as a Business Development Manager.  In the days preceding his resignation announcement to the last day he worked on November 11, 2022, Charles used his Maxim computer server credentials to access, download, and email Maxim's confidential and trade secret information to his personal email account.  An analysis of Charles' Maxim email account and computer completed on January 5, 2023, revealed Charles misappropriated Maxim's current training materials, current business and marketing strategies, current client contracts, current pricing information for clients, current and prospective customer lists, and prospective candidate lists while in active discussions with SnapNurse to begin work as SnapNurse's Vice President of Business Development and immediately after receiving his new hire paperwork from SnapNurse via email.  Just days after this misappropriation, Charles began working for SnapNurse in the same business development role and in the same territory where he provided business services while employed by Maxim.

The scope of confidential documents and trade secrets Charles took from Maxim provide a playbook for establishing a competing staffing company.  This includes Maxim's current internal training materials to develop a sales force, documents reflecting business development opportunities and strategies, pricing data and calculators, contracts, information and data related to thousands of client contacts nationwide, and information and data related to current and prospective job candidates.

These unlawful activities threaten to irreparably harm Maxim by impeding its ability to compete fairly in the marketplace, and cause damage to Maxim's goodwill and legitimate business relationships.  Charles will most certainly continue to utilize, and profit from, his misappropriation of Maxim's trade secrets and confidential information unless restrained. Therefore, a temporary restraining order ("TRO") and preliminary injunction are both warranted and necessary to

4895-2408-0201.3

discontinue Charles' breach of his Employment Agreement, and to prevent the disclosure and use of Maxim's confidential information and trade secrets.

Thus, Maxim respectfully requests this Court grant Maxim's Motion for Temporary Restraining Order and Preliminary Injunction to (i) enjoin Charles from using, accessing, and/or disclosing Maxim's confidential information and trade secrets; and (ii) compel Charles to return and delete all documents, files, and other materials containing and/or compromising Maxim's confidential information or trade secrets, whether stored electronically or in hard copy, without retaining any copies thereof.

## II.   FACTUAL BACKGROUND

### A.   MAXIM HEALTHCARE STAFFING SERVICES, INC.

Maxim is an industry leader in the highly competitive business of recruiting and staffing medical personnel on a temporary or permanent basis to healthcare facilities across the nation. (*See* Complaint [Doc. 1] at ¶8).  Since 1988, Maxim has connected the nation's top talent to a variety of healthcare partners by staffing medical professionals such as nurses, allied health professionals, locum tenens, travel nurses, medical coders, and others with its clients.  (Compl. ¶ 9).  Maxim's healthcare staffing and workforce management clients include, but are not limited to, hospitals, nursing homes, government facilities, school districts, and other medical and healthcare facilities.  (Compl. ¶ 10).  Among other clients, Maxim also contracts with numerous federal agencies to provide healthcare staffing and workforce management solutions.  (Compl. ¶ 10).  Maxim assists clients across the nation and has physical offices in 33 states, including Maryland and Virginia.  (Compl. ¶ 11).

Maxim's business is centered on relationships.  (Compl. ¶ 12).  Maxim must build and maintain relationships with clients and candidates for placements to be successful.  (Compl. ¶ 12). Maxim's success is largely due to its reputation in the staffing and workforce management

4895-2408-0201.3

industry, and the hard-earned goodwill it has developed over time with clients and top talent. (Compl. ¶ 12).  Maxim invests considerable time and resources to develop, maintain, and foster its client relationships.  (Compl. ¶ 13).  This investment includes providing Maxim's trained and trusted internal employees with access to its client relationships so that the employees can sustain and build upon Maxim's goodwill.  (Compl. ¶ 13).

Through the expenditure of significant capital and effort over decades of business, Maxim developed and maintains confidential and trade secret information which provides it with a distinct advantage over competitors in the industry.  (Compl. ¶ 14).  This confidential and trade secret information includes, but is not limited to, information related to Maxim's: financial affairs; sales and marketing strategies; contract terms; compliance matrices; pricing and costs; workflow briefs; project management reports; customer and prospective contact information; customer and prospective customer staffing requirements; customer margin tolerances; forms for acquiring and recording information; financial controls; management practices; and procedures and processes related to training, client marketing and development, and the recruitment of talent.  (Compl. ¶ 14).

This information, as well as other confidential and trade secret information of Maxim, is not available through proper means to the public or Maxim's competitors.  (Compl. ¶ 15).  It is also reasonably safeguarded by Maxim through password-protected computers; company-specific and password-protected intranet platforms; information security policies; a code of conduct; and employment agreements that include nondisclosure and other restrictive covenants.  (Compl. ¶ 15; *see also* Information Security Policy 4.6.4, attached as Exhibit I; Relevant Code of Conduct Policy, attached as Exhibit J).

**B.     MAXIM'S EMPLOYMENT OF CHARLES**

In January 2016, Maxim hired Charles as a Healthcare Recruiter in its Virginia Beach, Virginia office, located at 293 Independence Boulevard, Suite 405, Virginia Beach, Virginia

4895-2408-0201.3

23462. (Compl. ¶ 16).  In this position, Charles worked closely with Maxim's clients and had access to Maxim's confidential information and trade secrets, including information pertaining to Maxim's current and prospective clients and employees.  (Compl. ¶ 17).  Charles was responsible for, among other things, recruiting, attracting, and screening qualified and diverse healthcare and educational professionals for placement with Maxim's clients.  (Compl. ¶ 18).  Charles also had access to applications for employment and personal information about candidates, including their contact information, prior job and education history, and positions applied.  (Compl. ¶ 18).  Charles was also responsible for developing, managing, and maintaining relationships with Maxim's clients and achieving growth in client accounts.  (Compl. ¶ 19).  As a result, Charles had access to current and prospective client lists; current customer pricing information; current customer contracts; current customer staffing demands and needs; current project management reports; current customer margin tolerance; and current business strategies regarding emerging markets and clients.  (Compl. ¶ 19).

In May 2017, Maxim promoted Charles to Business Development Manager.  (Compl. ¶ 21).  In this position, Charles was responsible for the overall development and execution of the marketing and business development strategies for Northern Virginia.  (Compl. ¶ 22).  Charles analyzed opportunities in his region and developed customized business plans to maximize potential referrals.  (Compl. ¶ 22).  Charles also was charged with building, developing, and executing an effective recruitment strategy to ensure client demand was met.  (Compl. ¶ 22).  Charles also developed, maintained and managed client relationships, and collaborated with clients to better understand their needs and educate them on Maxim's services.  (Compl. ¶ 23).

In both positions with Maxim, Charles received extensive access to Maxim's confidential and trade secret information, including Maxim's prospective and current client lists.  (Compl. ¶ ¶

8

24, 25).  These lists contain detailed points of contact, client requirements, client demands and needs, and pricing information.  (Compl. ¶ 25).  Charles also had access to Maxim's prospective candidate lists.   These lists, similarly, contain detailed information about prospective job candidates, including but not limited to contact information, prior job and education  history, and job interests.  (Compl. ¶ 26).  These lists are used by Maxim to identify highly skilled and qualified personnel to staff client sites.  (Compl. ¶ 26).

### C.  RESTRICTIVE COVENANTS WITHIN CHARLES' EMPLOYMENT AGREEMENT

Charles entered into a legally enforceable, written Employment Agreement with Maxim on January 18, 2016, and then reaffirmed these covenants on April 19, 2017, when he was promoted to Business Development Manager.  (Compl. ¶¶ 27-38).  A true and accurate copy of Charles' Employment Agreements are attached hereto as Exhibits A and B ("Employment Agreement").[2]

Charles stipulated that the restrictions in the Employment Agreement, including the post-employment restrictions, were reasonable and necessary to preserve Maxim's legitimate and protectable interest in, among other things, its trade secrets, confidential information, and goodwill with customers and employees.  (2016 Employment Agreement, attached as Exhibit A; 2017 Employment Agreement, attached as Exhibit B).

### 1.  Confidentiality and the return of documents.

By signing the agreement, Charles acknowledged that, in his employment with Maxim "and in performance of this Agreement, [Charles would] acquire certain non-public trade secrets, confidential information and information concerning customer or client relationships of Maxim, the public disclosure of which would cause financial loss and irreparable injury to Maxim."

---

[2] The applicable language within the 2016 and 2017 Employment Agreements regarding Charles' restrictive covenants and duty to return documents is identical.

(Ex. A, Whereas Clause; Ex. B, Whereas Clause). Charles agreed to not divulge Maxim's "Confidential Information" or "Trade Secrets," except as required by the proper performance of his duties for Maxim or as authorized by law. (Ex. A ¶ 4; Ex. B ¶ 4).

The Employment Agreement defines "Confidential Information" to include "information not generally known by Maxim's competitors or the general public concerning Maxim, including but not limited to: its financial affairs, sales and marketing strategy, acquisition plan pricing and costs; its customers' names, addresses, telephone numbers, contact persons, staffing requirements, margin tolerances regarding pricing, and the names, addresses, telephone numbers, skill sets, availability and wage rates of its temporary medical personnel." (Ex. A ¶ 4; Ex. B ¶ 4).

The Employment Agreement defines "Trade Secrets" to include "information that Maxim takes measures to keep secret and that gives Maxim an advantage over its competitors, and includes but is not limited to: sales, recruiting, pricing and marketing techniques, sales and recruiting manuals, forms for acquiring and recording information, financial controls, and management practices, procedures, and processes." (Ex. A ¶ 4; Ex. B ¶ 4).

Charles also agreed that upon termination of his employment with Maxim, for whatever reason, he would return all records, papers, and other property, whether on paper, computer discs, or other forms, belonging or pertaining to Maxim. (Ex. A ¶ 8; Ex. B ¶ 8).

## 2. Charles' covenant to not compete.

Charles also agreed not to compete against Maxim for an 18-month period following the termination of his employment. This provision of his Employment Agreement states:

> [Charles] agrees that upon the termination of his/her employment, whether by Maxim or [Charles] and whether with or without cause, for a period of eighteen (18) month thereafter, [Charles] shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of Maxim's Business in which [Charles] performed work during the two (2) year period preceding his/her termination

10

> of employment, within a radius of fifty (50) miles of the office in which [Charles] worked at the time [Charles'] employment terminated *or* any other office in which [Charles] worked during the two (2) years preceding termination of employment, or as much geographic territory as a court of competent jurisdiction deems reasonable.

(Ex. A ¶ 5; Ex. B ¶ 5).

Charles acknowledged and agreed that "irreparable damage" will result to Maxim in the event of a violation of the covenants contained in his Employment Agreement, and that it would be difficult to ascertain damages arising from a breach thereof.  (Ex. A ¶ 10; Ex. B ¶ 10).

### D.    CHARLES' RESIGNATION FROM MAXIM AND BREACH OF HIS LEGAL DUTIES

On or about October 31, 2022, Charles announced his resignation from employment with Maxim, with his last day of employment being November 11, 2022.  (Compl. ¶ 39).  While the exact date is unknown, in mid-November 2022, Charles began working for SnapNurse as Vice President of Business Development.  (Compl. ¶ 40).  On or about November 28, 2022, Maxim learned that Charles was working for SnapNurse.  (Compl. ¶ 41).[3]

Maxim and SnapNurse are direct competitors in the recruiting and staffing of medical personnel on a temporary or permanent basis to medical and healthcare facilities.  (Compl. ¶ 42). SnapNurse's website claims that SnapNurse is "America's emerging leader in healthcare staffing," and states that SnapNurse has helped "facilities across the country by placing thousands of on-demand nurses and allied professionals."  (*See* www.snapnurse.com; Compl. ¶ 43).  Upon information and belief, SnapNurse provides staffing services, in direct competition with Maxim, in northern Virginia and the surrounding areas.  (Compl. ¶ 44). This includes engaging in business within the 50-mile restricted area outlined within Paragraph 5 of Charles' Employment Agreement.

---

[3] On January 12, 2023 at approximately 5:15 p.m. EST, SnapNurse, through its counsel, informed Maxim that Charles was no longer employed by SnapNurse as of that date. (Compl. ¶ 54).

SnapNurse employed Charles as a Vice President of Business Development—a position that is substantially similar to the position he held with Maxim.  (*See* Compl. ¶ 45).  According to a job posting by SnapNurse, the Vice President of Business Development is responsible for the overall development and execution of marketing and business development strategies. (SnapNurse Job Posting, attached as Exhibit C; Compl. ¶ 45).  The role is also responsible for: developing new leads and contacts; preparing business strategies by analyzing target market and industry trends; qualifying leads and developing program strategies to win business and achieve sales goals; increasing overall sales volume; managing and developing a sales pipeline; and managing sales processes.  (Ex. C; Compl. ¶ 45).

On December 16, 2022, Maxim sent Charles a letter reminding him of the post-employment obligations contained in his Employment Agreement.  (Dec. 16, 2022, Charles Letter, attached as Exhibit D; Compl. ¶ 46).  Charles did not directly respond to Maxim's December 16, 2022, letter.  (Compl. ¶ 46).  Maxim also sent SnapNurse a letter on the same day describing Charles' post-employment obligations to Maxim.  (Dec. 16, 2022, SnapNurse Letter, attached as Exhibit E).  In response to this letter, SnapNurse said: "Charles confirmed to SnapNurse that he does not possesses any confidential, proprietary, or trade secret information belonging to Maxim."  (Dec. 30, 2022, Letter from SnapNurse, attached as Exhibit F).

Contrary to SnapNurse's representation, on January 3, 2023, after completing a forensic analysis, Maxim first discovered Charles misappropriated Maxim's confidential and trade secret information just before ending his employment with Maxim.  (Misappropriation Emails, attached as Exhibit G).  Between September 1, 2022, to November 7, 2022, Charles accessed Maxim's password-protected intranet, downloaded Maxim's confidential and proprietary information without permission or authorization and beyond the scope of his employment for Maxim, and sent

12

the documents and information to his personal email account (jcharles1288@gmail.com).  (Ex. G; Compl. ¶ 50).  The documents Charles misappropriated during this period include, but are not limited to:

1.      Confidential and proprietary internal training materials and sales strategies;

2.      Contracts which contain terms, pricing, and client contact information;

3.      Information about individuals who applied for jobs through Maxim, including contact information and job qualifications;

4.      Maxim's pricing information; and

5.      Maxim's client lists, including Excel documents containing information pertaining to over 5,379 current and prospective clients nationwide.

(Compl. ¶ 51).[4]  Maxim did not authorize Charles' theft of Maxim's confidential and trade secret information, nor has Charles returned this information.  (Compl. ¶¶ 52-53).

On January 12, 2023, SnapNurse, through its counsel, affirmed Charles misappropriated Maxim's confidential information and trade secrets, indicated it did not know the extent of disclosure of Maxim's information and documents within SnapNurse by Charles, and could not confirm, as of that date, that Maxim's confidential information and trade secrets were not uploaded to SnapNurse's computer systems or network. (Compl. ¶ 55; Decl. Hibler, attached as Ex. H).

## III.    LEGAL STANDARD

A temporary restraining order ("TRO") "preserve[s] the status quo only until a preliminary injunction hearing can be held."  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999); *Gen. Parts Distribution, LLC v. St. Clair*, No. 11-cv-03556-JFM, at *4 (D. Md. Dec. 14, 2011).  Similarly, preliminary injunctive relief preserves the status quo and prevents "irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to

---

[4]  Maxim is not attaching its confidential and trade secret information identified in Exhibit G to this publicly filed Memorandum.  But these documents will be presented for an *in camera* review during the hearing for an *ex parte* temporary restraining order and, as necessary, accompanied by a proper sealing motion/order.

4895-2408-0201.3

render a meaningful judgment on the merits." *Wachovia Ins. Servs., Inc. v. Hinds,* No. WDQ-07-2114, 2007 WL 6624661, at *9 (D. Md. Aug. 30, 2007). A TRO is distinguished from a preliminary injunction only by the duration of the relief it provides and the notice that must be given to the nonmoving party. *US Dep't of Lab. V. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006) (*comparing* Fed. R. Civ. P.65(a) and 65(b)).

The standard for obtaining a TRO is the same as the standard for obtaining a preliminary injunction. *Gen. Parts Distribution, LLC,* No. 11-cv-03556-JFM, at *4; *Montgomery v. Hous. Auth.*, 731 F. Supp. 2d 439, 441 (D. Md. 2010). A plaintiff is entitled to a TRO or preliminary injunction by showing that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing to *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). The decision whether to issue a TRO or preliminary injunction is committed to the sound discretion of the trial court. *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *accord* Fed. R. Civ. P. 65.

## IV.   ARGUMENT

### A.   MAXIM IS LIKELY TO SUCCEED ON THE MERITS.

To obtain preliminary injunctive relief, the plaintiff bears the burden to show that it is likely to succeed on at least one of its claims. *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020). Here, Maxim brings numerous meritorious causes of actions against Charles; however, for the purpose of this motion, Maxim will rely upon its likely success on the following claims: (1) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 *et seq.* ("DTSA"); (2) violation of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-201 *et seq.* ("MUTSA"); (3) violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336

14

("<u>VUTSA</u>"); (4) breach of contract under Maryland Law; and (5) conversion.  Each of these claims are easily established when there is clear and unmistakable proof that an employee steals confidential and trade secret information then resigns and accepts employment at a direct competitor in the same market.

      1.      **Maxim is likely to succeed on its DTSA, MUTSA, and VUTSA claims because Charles misappropriated Maxim's protected confidential and trade secret information.**

The DTSA, MUTSA, and VUTSA  protect against the wrongful disclosure of confidential and trade secret information. To prevail on a misappropriation claim under the DTSA, the plaintiff must allege (1) it owns a trade secret, which was subject to reasonable measure of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce.  18 U.S.C. § 1836(b)(1).  Similarly, under the MUTSA and the VUTSA, a plaintiff must establish that (1) it possessed a valid trade secret, (2) the defendant acquired its trade secrets, and (3) the defendant knew or should have known that the trade secret was acquired by improper means.  *Airfacts Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (analyzing MUTSA); *see Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 478 (D. Md. 1999) ("[T]he same analysis would apply under either Virginia or Maryland law as both states have adopted trade secret statutes which closely track the Uniform Trade Secrets Act.").

First, the information Charles wrongfully obtained and currently possesses is trade secret information under the DTSA, MUTSA, and VUTSA.  Under the DTSA:

> [T]he term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives

> independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable through
> proper means by, another person who can obtain economic value
> from the disclosure of use of the information.

18 U.S.C. § 1839(3).

Under both the MUTSA and the VUTSA, trade secret means

> [A] formula, pattern, compilation, program, device, method,
> technique, or process that: (1) Derives independent economic value,
> actual or potential, from not being generally known to, and not being
> readily ascertainable by proper means by, other persons who can
> obtain economic value from its disclosure or use; and (2) Is the
> subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e); Va. Code § 59.1-336.

In the days before Charles resigned, and up to his last day worked, Charles accessed Maxim's password-secured intranet, downloaded Maxim's confidential and proprietary information, and sent the documents and information to his personal email account (jcharles1288@gmail.com).  (Ex. G; Compl. ¶¶ 50-51).  These documents include, but are not limited to, training materials, current and prospective client contracts, and pricing information. (Compl. ¶ 51).  Notably, Charles stole the detailed contact information of over 5,379 current and prospective clients, the detailed and current information of prospective employees who submitted applications, including the names, contact information, and prior job and education history, and Maxim's training materials developed to garner, recruit, and maintain business and employees. (Ex. G; Compl. ¶ 51).  Charles is still in possession of Maxim's confidential and trade secret information.  (Compl.¶ 53).

The information Charles unlawfully misappropriated derives independent economic value from their confidentiality.  Courts within this district have routinely found that business plans, pricing and cost information, and customer lists for companies operating in competitive sales

4895-2408-0201.3

industries derive independent economic value from their confidentiality. *Albert S. Smyth Co. Inc. v. Motes*, CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (finding documents containing customer lists, pricing sheets, and business strategies to be trade secrets); *see MCS Services Inc. v. Jones*, WMN-10-1042, 2010 WL 3895380, at *7 (D. Md. Oct. 1, 2010) (finding customer lists have independent economic value where company exerted resources to create lists and company's competitors could use list to undercut company's prices); *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d 451, 463-64 (Md. 2004) (finding pricing information that disclosed an employer's manufacturing costs and profit margins were trade secrets because of the "unique, competitive nature of the currency acceptor industry").

Maxim took reasonable measures to protect its confidential and trade secret information. As Maxim has shown, its confidential and trade secret information is not available to the public. Maxim protects its confidential and trade secret information through password-protected computers; company-specific and password-protected intranet platforms; information security policies; a code of conduct; and employment agreements that include nondisclosure and other restrict covenants. (Compl. ¶ 15; Ex. A; Ex. B).

Second, Charles knowingly, deliberately, and maliciously misappropriated Maxim's confidential and trade secret information. The DTSA, MUTSA, VUTSA, contain virtually identical definitions of misappropriation. The DTSA defines misappropriation as when a person "either (i) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, or (ii) uses or discloses the trade secret after acquiring it through improper means." *See Brightview Grp. LP v. Teeters*, 441 F. Supp. 3d 115, 132 (D. Md. 2020) (citing 18 U.S.C. § 1839)). "Thus, a claim for misappropriation lies simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use

of the trade secret." *Id.* Simply put, "*acquisition* alone is enough to give rise" to a misappropriation claim. *Behram*, 2019 WL 4573417 at *5 (emphasis added). In Maryland, misappropriation "mirrors the DTSA's definition." *Id.* And the Maryland state and federal courts have also made "clear that acquisition alone is enough to give rise" to a misappropriation claim under both the MUTSA and VUTSA. *Md. Physician's Edge, LLC v. Behram*, No. 17-2756, 2019 WL 4573417, at *5 (D. Md. Sep. 20, 2019) (citing *Bond v. PolyCycle, Inc.*, 732 A.2d 970, 977 (Md. App. 1999) (analyzing the MUTSA). Similarly, Virginia's definition of misappropriation also "closely tracks" the DTSA. *Avtex Syss., Inc. v. Peiffer*, 21 F.3d 568, 574 (4th Cir. 1994).

As Maxim has shown, Charles intentionally accessed, downloaded, and transferred Maxim's confidential documents to his personal email account contemporaneously with his acceptance of a job offer at SnapNurse, and without business justification for doing so. In fact, Charles accessed, downloaded, and misappropriated documents that relate to clients outside the northern Virginia market. (Compl. ¶¶ 50-51). These documents were clearly acquired by Charles through improper means, thereby constituting a misappropriation. *See*, *e.g.*, *LeJeune v. Coin Acceptors, Inc.*, 849 A.2d at 466-67 (holding, under the MUTSA, that transferring files to a personal computer for future personal use is misappropriation). And, Charles has failed to return these documents to Maxim upon termination of his employment with Maxim, as required by Section 4 of his Employment Agreement. (Compl. ¶ 34).

Lastly, for the DTSA claim, the information Charles misappropriated is "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Maxim is a national business that recruits and provides medical personnel to facilities across the nation. (Compl. ¶ 8). In fact, Maxim has offices in 33 physical offices nationwide, including but not limited to Maryland and Virginia. (Compl. ¶ 11). These facts show that the purported information relates to services

18

4895-2408-0201.3

used and intended for use in interstate commerce, including but not limited to Maxim's nationwide

client list, contracts for clients nationwide, and pricing information. *See, e.g.*, *Albert S. Smyth*

*Co.*, 2018 WL 3635024 at *3 (finding allegations that plaintiff does business over the internet

sufficient for interstate commerce element of DTSA).

> ### 2. Maxim is likely to succeed on its breach of contract claim and conversion claim against Charles.

Though the Employment Agreements entered into between Maxim and Charles are

enforceable, Charles has and will continue to breach these covenants unless he is enjoined. "To

prevail in an action for breach of contract, a plaintiff must prove that the defendant owed a

contractual obligation and that the defendant breached that obligation." *Carroll Co. v. Sherwin-*

*Williams Co.*, 848 F. Supp. 2d 557, 563 (D. Md. 2012).

It cannot be disputed that Charles and Maxim entered into an enforceable agreement.

*Hearn Insulation & Improvement Co. v. Carlos Bonilla*, No. AW-09-009, 2010 WL 3069953, at

*6 (D. Md. Aug. 5, 2010) (an agreement is binding and enforceable if it is supported by

consideration.) In the context of an employment agreement, "continued employment of an at-will

employee for a significant period constitutes sufficient consideration." *Id.* In this case, Charles

first executed an Employment Agreement with Maxim in 2016, and reaffirmed the same agreement

in 2017 in connection with a promotion. After signing the 2017 Employment Agreement, Charles

remained employed with Maxim for nearly 6 years.

Under the Employment Agreement, Charles is bound to both a nondisclosure of

confidential and trade secret information provision and a return-of-property provision. (Ex. A; Ex.

B; Compl. ¶¶ 27-38). As discussed herein, Charles breached the foregoing covenants.

As discussed in Section IV(A)(1), *supra*, there can be no dispute that Charles removed

Maxim's confidential and trade secret information immediately before resigning from Maxim.

4895-2408-0201.3

This is enough to show that the Court should grant Maxim's TRO and preliminary injunction.  *See Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 915 (4th Cir. 1997) (affirming the district court's injunction and conclusion that nondisclosure agreements were breach by former employee retaining confidential materials after termination of his employment).  In addition, to this date, Charles still possesses Maxim's confidential and trade secret information. (Compl. ¶ 53).  For this reason, Maxim believes Charles is using Maxim's confidential and trade secret information for his own economic competitive advantage, or utilized said information for the advantage of SnapNurse during the course of his employment with SnapNurse.  (Compl. ¶ 53).  This is a direct violation of the enforceable Employment Agreement between Maxim and Charles.  Therefore, even if the Court finds that Charles has not established a violation of the DTSA, MUTSA, and/or VUTSA for purposes of this current motion (which he has), then the Court should find that Maxim is likely to succeed on its breach of contract claim.  *Ameritox, LTD v. Savelich*, 92 F. Supp. 3d 389, 404 (D. Md. 2015).

Additionally, Maxim is likely to succeed on its conversion claim.  A claim for conversion is "any distinct act or ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it."  *Gibbons v. Bank of America Corp.*, 2012 WL 94569, at *9 (D. Md. Jan. 11, 2012) (citing *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954)).  As already thoroughly briefed, Charles accessed, downloaded, and sent himself Maxim's confidential and trade secret information while in the process of obtaining and securing a position with a direct competitor.  (Ex. G; Compl. ¶¶ 50-53).  And, Charles still possesses and controls Maxim's confidential and trade secret information.  (Compl. ¶ 53).  Thus, Maxim's conversion claim is also likely to succeed.  *See Gibbons*, 2012 WL 94569, at *9.

20

**B.      MAXIM HAS SHOWN A LIKELIHOOD OF IRREPARABLE HARM.**

Maxim will suffer irreparable harm absent injunctive relief.  "[T]he potential for the loss of trade secrets . . . demonstrates irreparable harm because [a] trade secret once lost is, of course, lost forever."  *Telesystems, Inc. v. Spotswood*, No. CV RDB 05-1532, 2005 WL 8174397, at *5 (D. Md. June 29, 2005).

Clients and job candidates are both are critical to Maxim's success.  For this reason, Maxim expends considerable time, resources, and know-how to create and develop its confidential and trade secret information in order to secure its position in the market.  Specifically, Maxim has developed information regarding its clients, contacts for those clients, pricing information, client needs and preferences, and similar information for job candidates.   This information was underhandedly accessed and misappropriated by Charles just days before he announced his resignation and immediately prior to his last day worked.  (Compl. ¶¶ 50-51).

Maxim will experience irreparable harm unless Charles is enjoined during the pendency of this lawsuit from possessing and utilizing Maxim's confidential and proprietary information.  *See Brightview Grp., LP v. Teeters,* 441 F. Supp. 3d 115, 141 (D. Md. 2020) (concluding wrongful use of confidential and proprietary information to launch a new business amount to irreparable harm); *NaturaLawn of Am., Inc. v. W. Grp., LLC,* 484 F. Supp. 2d 392, 401 (D. Md. 2007) (noting that use of a company's proprietary information to attract the company's customers constitutes irreparable harm).  Not only will Maxim lose the value and revenue of future services, but Maxim will suffer irreparable harm that may not be compensable by damages, through the loss of its trade secrets and the unfair competitive advantage Charles, and potentially his former employer SnapNurse, have obtained through his misappropriation.  This requested relief does nothing more than compel Charles to honor his contractual obligations while seeking to ameliorate, to the extent possible, the impact of Charles' unlawful conduct.

### C.     MAXIM HAS SHOWN THE BALANCE OF HARDSHIPS WEIGHS IN ITS FAVOR.

Without injunctive relief, Maxim will be irreparable harmed, as briefed above.

On the other hand, Charles will suffer nominal harm, if any at all, if the Court grants
Maxim's Motion for TRO and preliminary injunction.  Maxim is not preventing Charles from
earning a livelihood by enforcing the Employment Agreement he voluntarily entered into in
consideration of employment, and Maxim is not presently asking this Court to issue an order
precluding Charles from working.  Rather, Maxim is merely ensuring its confidential information,
trade secrets, and goodwill are protected, and that Charles honors his contractual and legal
obligations by not possessing, accessing, or disclosing Maxim's confidential and proprietary
information during the pendency of this action. This prohibitory injunction merely "preserve[s]
the status quo." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999);
*Gen. Parts Distribution, LLC v. St. Clair*, No. 11-cv-03556-JFM, at *4 (D. Md. Dec. 14, 2011).

### D.     AN INJUNCTION IS IN THE PUBLIC INTEREST.

Injunctive relief in this circumstance is also in the public interest.  Employers have an
interest in enforcing their agreements and protecting their trade secrets to foster innovation.  *See*
*Brightview*, 441 F. Supp. 3d at 142 ("The public interest favors the protection of trade secrets, and
the prevention of unfair business practices.").  It is well established that restrictive covenants "play
an important role in the growth of a business that depends upon the developments of goodwill
through effective customer service." *Intelus U.S. Corp v. Barton*, 7 Supp. 2d 635, 638, 642 (D.
Md. 1998).  Therefore, it is in the public interest to enforce the legal and contractual obligations
Charles assumed while employed with Maxim.

## V.     EX PARTE TEMPORARY RESTRAINING ORDER

Federal Rule of Civil Procedure 65(b) provides that a Court may issue a TRO without
notice to the adverse party if "facts in an affidavit or a verified complaint clearly show that

4895-2408-0201.3

immediate and irreparable injury, loss, or damage will result to the movant" and the "movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).  Notice is not required in this matter.

As described and set forth within the contemporaneously filed declaration of Maxim's attorney, Maxim will suffer immediate and irreparable harm if Charles is not immediately enjoined.  (Decl. Hibler, attached as Ex. H).  Charles took Maxim's confidential and trade secret information and is still in possession of the same.  Charles has already accepted employment with one of Maxim's direct competitors, SnapNurse, while in possession of this information. And, the threat exists that Charles will exponentially increase the harm caused by his misappropriation if he accepts future employment at another one of Maxim's competitors.

In addition, Maxim has attempted to notify Charles.  On December 16, 2022, Maxim sent Charles a letter to his last known address reminding him of his post-employment obligations. Charles never responded.  (Exhibit D; Compl. ¶ 46).  Maxim has also been in contact with SnapNurse, but Charles is no longer employed there.  Though Maxim has Charles' last known mailing address, Maxim has no way of guaranteeing that this address is current, that Charles will be located in time for the hearing, or whether or not Charles is represented in this matter.  On the date of this filing, Maxim notified Charles via his last known email address and mailing address of this Motion and the other documents contemporaneously filed.

Therefore, the Court should grant Maxim's *ex parte* TRO to ensure that Maxim will not continue to suffer irreparable harm, injury, or damage.

## VI.    SECURITY BOND PURSUANT TO FED. R. CIV. P. 65

This Court should require a minimal bond, if any, because the facts reflect Charles will suffer little, if any, damage as a result of a TRO and preliminary injunction.  Under the Federal Rules of Civil Procedure 65, the Court may issue a TRO "if the movant gives security in an amount

that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The determination of the precise amount to be posted as a bond rests in the Court's discretion.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 (4th Cir. 1999).  When the risk of harm to the enjoined party is remote, a nominal bond is sufficient.  *Id.* at 421 n.3.  Here, the security bond amount should be nominal as it is only requesting that Charles abide by the Employment Agreement, return and destroy copies of the misappropriated trade secrets and contractually protected confidential information, and be prohibited from using or disclosing this information.  However, if the Court determines that the security bond should be more than nominal, than Maxim respectfully requests that the security bond be limited to the amount Charles would have earned with Maxim in a one-month period of employment.  *See, e.g.*, *Occupational Health Ctrs. of the Sw., P.A. v. Toney*, No. ELH-17-0975, at *36-37 (D. Md. Apr. 28, 2017) (setting bond for less than the employee's yearly salary).

## VII.   CONCLUSION

For the reasons set forth herein, Maxim is entitled to a TRO and preliminary injunction to address Charles' misappropriation of trade secrets and substantial breaches of his Employment Agreement and post-employment duties owed to Maxim.  The Court should grant its Motion for a Temporary Restraining Order and Preliminary Injunction, and enter and Order:

1.     Enjoining Charles from using, accessing, or disclosing Maxim's confidential information and trade secrets; and

2.     Compelling Charles to return and delete all documents, files, and other materials he transmitted to himself or otherwise improperly retained from his employment with Maxim without proper authority and containing and/or comprising Maxim's confidential information or trade secrets, whether stored electronically or in hard copy, without retaining any copies thereof.

4895-2408-0201.3

Respectfully Submitted,

/s/ Michael J. Schrier
Michael J. Schrier, Esq.
D. Md. Bar No. 15967
Husch Blackwell LLP
1801 Pennsylvania Ave., NW, Suite 1000
Washington, DC 20006
T: (202) 378-2313
F: (202) 378-2319
michael.schrier@huschblackwell.com

William E. Corum (*Pro Hac Vice Application Forthcoming*)
Tyler Hibler (*Pro Hac Vice Application Forthcoming*)
Megan Scheiderer (*Pro Hac Vice Application Forthcoming*)
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
T: (816) 983-8000
F: (816) 983-8080
william.corum@huschblackwell.com
tyler.hibler@huschblackwell.com
megan.scheiderer@huschblackwell.com

Counsel for Maxim Healthcare Staffing Services, Inc.

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2023, the above and foregoing document was filed electronically using the Court's CM/ECF system. The CM/ECF system will send the document and a notification of such filing (NEF) to all counsel of record.

In addition, and a true and correct copy of the above and foregoing was served upon Defendant Jerome Charles via Certified U.S. Mail at:

4777 Balmoral Street
White Plains, Maryland 20695

I also certify that a copy of the above and foregoing was sent to Defendant's last know email address at:

Jcharles1288@gmail.com

*/s/ Michael J. Schrier*
**Attorney for Plaintiff**

4895-2408-0201.3