

fisherphillips.com

**Nashville**
424 Church Street
Suite 1700
Nashville, TN 37219

(615) 488-2900 | Tel
(615) 488-2928 | Fax

**Writer's Direct Dial:**
(615) 488-2901

**Writer's E-mail:**
jshelton@fisherphillips.com

March 3, 2023

**VIA EMAIL ONLY**

Husch Blackwell LLP
Attn: Tyler Hibler
4801 Main Street, Suite 1000
Kansas City, MO 64112
tyler.hibler@huschblackwell.com

       **Re:**     **Maxim Healthcare Staffing Services, Inc. v. Jerome Charles**

Dear Tyler:

There are multiple facets to this correspondence. One, I am writing to update you on efforts by SnapNurse to determine if Mr. Charles saved any Maxim information/documents to SnapNurse's systems or used, shared, or copied any such information/documents during his short period of employment at SnapNurse. Two, I am hopeful that this correspondence helps to facilitate resolution of Maxim's attempt to engage in vastly overbroad and unreasonable third-party discovery of SnapNurse via the recently issued subpoenas and our communications thus far related to same.

**The Beginning of Jerome Charles' Employment with SnapNurse**

Mr. Charles' first day of employment with SnapNurse was November 28, 2022. SnapNurse was aware of his contractual obligations to Maxim and structured his employment accordingly. SnapNurse instructed him not to solicit any Maxim customers or personnel, and his SnapNurse duties were established with his noncompete provision in mind. Recognizing that he had worked out of Maxim's Falls Church, Virginia office, SnapNurse assigned him to conduct sales activity well outside the fifty (50) mile radius from the Maxim Falls Church office. Finally, SnapNurse instructed Mr. Charles in his offer letter and onboarding to abide by his obligations to protect and not use Maxim's confidential, proprietary, and trade secret information.

**Summary of Our Communications Through February 10, 2023**

You first reached out to SnapNurse regarding Mr. Charles in mid-December 2022 by sending a certified letter to its registered agent for service of process. Your letter noted his contractual obligations and asserted that Maxim "believed" that Mr. Charles was violating "his contractual and common law obligations to Maxim by virtue of his employment with SnapNurse." The letter did not include any assertions of specific violative conduct other than stating that it was

**Fisher & Phillips LLP**

Atlanta • Baltimore • Bethesda • Boston • Charlotte • Chicago • Cleveland • Columbia • Columbus • Dallas • Denver • Detroit • Fort Lauderdale • Gulfport
Houston • Irvine • Kansas City • Las Vegas • Los Angeles • Louisville • Memphis • Nashville • New Jersey • New Orleans • New York • Orlando • Philadelphia
Phoenix • Pittsburgh • Portland • Sacramento • San Diego • San Francisco • Seattle • Tampa • Washington, DC

March 3, 2023
Page 2

your "understanding that Mr. Charles' position with SnapNurse requires him to directly engage in services that are competitive with Maxim's services within the restricted territory."  You asked for a response from SnapNurse by December 30, 2022.

I responded to your letter with correspondence delivered to you via email on December 30, 2022.  I opened the letter with the following statement:

> *SnapNurse understands the importance of conducting business in a fair and ethical manner, and it does not seek or intend to engage in unfair competitive business practices. To that end, we appreciate Maxim reaching out to discuss its concerns regarding Mr. Charles' employment with SnapNurse. We are hopeful that we can put those concerns to rest, and we certainly welcome an open dialogue regarding any unresolved questions or concerns.*

I then relayed the points conveyed two paragraphs above.  My letter ended with an invitation for further dialogue if you/Maxim had any questions.

I did not hear from you again until January 9, 2023 at 5:06 p.m.  For the first time, you shared in an email that Maxim had discovered that Mr. Charles emailed confidential and proprietary Maxim documents to himself in October and November 2022 prior to his Maxim resignation.  You noted Maxim's rightful concern about Mr. Charles' actions, and you stated Maxim's intent to pursue legal action against Mr. Charles.  You then went on to state that while Maxim did not intend to initiate legal action against SnapNurse at that time, it was concerned that documents and information taken by Mr. Charles could be located on SnapNurse's systems. Your letter ended with an invitation to discuss the issues by telephone.

I responded to your email the next day (January 10, 2023) at 11:00 a.m.  I explained that I had been in a mediation all day on January 9, 2023, that I was scrambling to catch up, and that I would be back in touch later in the day recognizing the time sensitive nature of the issue.  We eventually scheduled a call for 5:30 p.m. that day.  During our call, we discussed more about what Maxim had discovered by way of Mr. Charles' pre-departure conduct.  I am not purporting to quote you, but my notes reflect that you articulated the following three goals of Maxim:

1. Maxim wanted its information back.
2. Maxim wanted everything deleted everywhere.
3. Maxim did not want Mr. Charles working for SnapNurse in light of his conduct.

I contacted you the next day (January 11, 2023) via email at 4:57 p.m. asking if you could talk by phone.  We connected that evening, and I explained that you would hear from me further the next day.  I did not explicitly say that SnapNurse was going to terminate Mr. Charles, but I alluded to the likelihood of such decision.

On January 12, 2023, I emailed you at 4:17 p.m.  I reiterated that SnapNurse was committed to conducting business in a fair and ethical manner, and I thanked you for bringing your concerns to SnapNurse's attention and providing it an opportunity to review and respond.  I communicated that SnapNurse had terminated Mr. Charles.

March 3, 2023
Page 3

I then explained what SnapNurse intended to do to make sure that it did not possess any of the Maxim information/documents that Mr. Charles sent to his personal email:

> *Our next step is to start the process of ensuring that SnapNurse does not possess any of the Maxim information/documents that Mr. Charles sent to his personal email.  Specifically, SnapNurse will soon be undertaking efforts to determine if Mr. Charles saved/placed any of Maxim's documents/information on SnapNurse's system.  Upon completion of that review, we will update you.  To the extent anything is found, it will be permanently deleted and we will confirm such deletion to you.  However, if you want a copy of anything found before it is deleted, please let me know.  Also, if you want to provide a listing of the 90 or so documents that you said Mr. Charles emailed to himself in the October/November 2021 timeframe, SnapNurse will also conduct targeted searches for any such documents.  While we don't necessarily think we need such a listing to accomplish an effective search, I wanted to make that offer in case you like that idea.  I'm not sure how long these efforts will take, but please know SnapNurse is moving on this expeditiously.*

I also explained my personal situation in that I was leaving that same afternoon for a week in London to visit my daughter and what you could in terms of communications during the week I would be gone:

> *For purposes of continued communications regarding this matter, I'm leaving later this afternoon for a week in London (my daughter lives/works there).  While I'll effectively be inaccessible the rest of today, I'm not entirely checking out for the week (I will be back in the office next Friday, 1/20).  So while I might be delayed in responding (I'll be 6 hours ahead of you), I will try to respond within a day if you email about anything.  Also, you'll note that I'm cc'ing Amanda Thompson on this email.  Amanda is the in-house attorney at SnapNurse that I've been working with on this matter. Please copy Amanda on any emails to me while I'm out.  It's possible that Amanda might respond to you directly before you hear from me, and if she does, you have permission to continue whatever dialogue she initiates.*

In closing, I shared the following: "Again, SnapNurse appreciates the open communication about this matter. Please reach out with any thoughts on the above."

By January 23, 2023, I had heard nothing further from you.  I therefore emailed you that day to remind you that I was back from my trip and "to see if you had any follow up thoughts regarding what I had conveyed in my 1/12 email."  You responded that day, thanking me for my email and stating that you were "conferring with [your] client regarding this matter and will follow up in the near future with more information."  You also said that you wanted native file formats with metadata intact for any Maxim documents/data/information discovered during SnapNurse's search of its systems as well as the preservation of information regarding where it was stored and who accessed it.

March 3, 2023
Page 4

Over two weeks passed, and I did not hear from you until February 10, 2023.  In the context of our discussions regarding two other former Maxim employees hired recently by SnapNurse, you shared with me – for the first time – that Maxim had filed suit against Mr. Charles on January <u>17</u>, 2023.

To be clear, your February 10, 2023 email was the first time that I, or SnapNurse leadership, knew that Maxim filed a lawsuit against Mr. Charles.  Notably, the litigation had been filed a week prior to our January 23, 2023 emails, yet you failed to share that information with me during our exchange that day.  Further, you did not disclose that you had also filed on January 17, 2023 a motion requesting expedited third-party discovery from SnapNurse.  Finally, even though the court granted your motion for expedited discovery on January 18, 2023, you did not share that with me until your February 10th email.

### Efforts Taken by SnapNurse Regarding Mr. Charles' Conduct Vis-à-vis Maxim's Information

SnapNurse has undertaken efforts to determine whether Mr. Charles used any Maxim information/documents during his employment with SnapNurse and/or put such information/documents on SnapNurse's system.  In that regard, SnapNurse has focused on four areas: (1) his SnapNurse issued laptop; (2) anything he saved on the SnapNurse system; (3) his SnapNurse email activity; and (4) search terms more generally across SnapNurse's system.

- **Mr. Charles' SnapNurse Laptop**

SnapNurse terminated Mr. Charles at approximately 12:15 p.m. on January 12, 2023.  At around the same time, SnapNurse cut off his access to the Company's systems.  At that point, Mr. Charles was working remotely and was still in possession of his SnapNurse laptop.

SnapNurse arranged for the laptop to be returned to a company by the name of Firstbase, a third-party vendor SnapNurse utilizes for various IT related issues.  The laptop remained untouched until it was sent to SnapNurse's offices in Atlanta to be stored pending engagement of a forensic expert.  It remained untouched in Atlanta until it was given to Greg Fordham (of Fordham Forensics) so that it could be forensically imaged.  The following is a summary of Mr. Fordham's analysis.

While our knowledge about what happened to the machine is very limited, what we do know is that around 9:30pm EST on January 12, 2023, it appears a new operating system was installed, apparently a restoration using the Lenovo recovery partition.  Since very few remnants remain, and those that do are most likely from very limited data resident in a master file table record, a secure installation could have been performed.

Mr. Charles' user profile is no longer there, and there is no evidence of any other devices having been attached.  Other than Microsoft Office and the Windows operating system being installed, there are no other applications installed even though within the few remaining remnants it is appears that a Google Chromium browser had been installed previously.

Efforts to carve freespace to try and recover deleted Office and PDF data files returned only ten unworking document fragments and two that worked.  Also, a search of the freespace for the word "Maxim" returned zero hits.

March 3, 2023
Page 5

The two documents referenced in the prior paragraph are attached.  One is a blank one-page PDF document with a blue-green background.  The second is a spreadsheet.  We do not believe that the spreadsheet is anything Maxim related, and the Properties indicates that it was created by a SnapNurse employee on December 6, 2022.

At this point, we are not accusing Mr. Charles of doing anything to the laptop at around 9:30pm EST on January 12, 2023.  We just do not know for sure.  However, the laptop was still in his possession at that date/time.

In sum, we found nothing to indicate that any Maxim information or documents reside on Mr. Charles' SnapNurse laptop.

If you would like to speak with Mr. Fordham to ask any questions about what he did and what he found, we will make him available to you for a video conference discussion.  We are also willing to provide a sworn verification from Mr. Fordham.  Further, if you want us to provide the forensic image of the laptop to a forensics neutral, we are willing to discuss this possibility.

- **Documents Mr. Charles Saved to SnapNurse's Drive**

SnapNurse utilizes Google drive for its employees.  So, if a SnapNurse employee is going to save/store something on SnapNurse's "system," it would be on the corporate Google drive.

SnapNurse has identified and reviewed all the content Mr. Charles stored on the corporate Google drive.  Upon review, we have flagged two documents which we believe Mr. Charles took from Maxim or where Maxim information was utilized by Mr. Charles to create the documents.  Both documents are spreadsheets which we are attaching.  The spreadsheets are titled "List of potential clients (Stephen) 12.13.PA.WV" and "Steph's Copy of Jerome's Potential Clients."  The references to "Stephen" and "Steph" in the titles of the spreadsheets are to Stephen Chinn.  Mr. Chinn is a sales development representative who worked some with Mr. Charles.

Upon investigation of the Google Workspace event logs for the two documents, SnapNurse has determined that Mr. Charles and Mr. Chinn were the only employees who accessed or did anything with them.  Further, SnapNurse has searched Google drive activities company-wide and did not find anything to suggest that any other employees made a copy of these documents or created any new files on the Google drive via copy and paste of information in these documents.

The two spreadsheets have been removed from SnapNurse's Google drive and SnapNurse stands ready to permanently delete the documents when/if you ask for that to happen.  As counsel, I will retain copies until and unless you tell me this matter is 100% concluded and ask me to permanently delete them as well.

The above-described review of Mr. Charles' activity on the SnapNurse Google drive has been handled by SnapNurse employee, Jake Lee, the Company's Head of Cyber Security.  We are willing to provide a sworn verification from Mr. Lee confirming the above representations if that is of interest to you.

I have been in communication with Mr. Lee throughout his review.  Those communications are obviously privileged, and nothing herein is intended as a waiver of the attorney-client privilege.

March 3, 2023
Page 6


We do have concerns that Mr. Charles and/or Mr. Chinn might have placed some of the information on the two attached spreadsheets into Salesforce and/or Salesloft.  We are diligently attempting to get to the bottom of that issue.   Rest assured that SnapNurse does not want any such information, and it will remove anything that came from the spreadsheets.  Further, and as discussed more below, SnapNurse has not entered into any business that flowed from Mr. Charles' efforts during his short time with SnapNurse.  So, even if Mr. Charles attempted to utilize any ill-gotten information to secure any business, he was not successful in doing so.

- **Mr. Charles' Email Activity**

To determine whether there might have been any Maxim documents/information utilized by Mr. Charles via email, SnapNurse has reviewed all of his available email activity.  Upon that initial review, nothing was seen that related to Maxim or suggested that Mr. Charles might have been using Maxim's information/documents.  We are going to further review the emails one final time, and I will provide an update to you soon.  If there is anything questionable, we probably will simply run it by you for your/Maxim's input.  Once the review is complete, we are willing to provide a sworn verification confirming what was done if that is of interest to you.

- **Searches for Maxim Documents**

In my email to you on January 12, 2023, I invited you to provide me with a list of the ninety (90) or so documents that Maxim said Mr. Charles emailed to himself in the October/November 2021 timeframe so that SnapNurse might conduct targeted searches for any such documents.  You never provided me that list.  However, in the document request that accompanied the 30(b)(6) deposition subpoena, No. 21 included seventy-seven (77) requested search terms.  While it is not clear whether the search terms reflect the titles for any of the ninety-some documents Maxim says that Mr. Charles emailed to himself before leaving Maxim, I am presuming that seventy-five (75) of them might very well be such titles (the first two listed search terms do not appear to me to be titles of documents).  Accordingly, SnapNurse is in the process of running those search terms through its system.  I will update you soon on the results of that process.  As offered with respect to the other efforts, we are willing to provide a sworn verification of the searching if that is of interest to you.

**Mr. Charles' Sales Activity at SnapNurse**

Mr. Charles was employed with SnapNurse for a very short period.  He joined SnapNurse just after Thanksgiving, and the Christmas and New Years' holidays obviously occurred in the brief window prior to his termination on January 12, 2023.  We understand that Maxim is likely curious as to whether SnapNurse has done any business because of Mr. Charles' efforts during his employment.  The short answer is no.

He did report that a former Maxim customer (Skyline Terrace) had reached out to him.  He insisted that he did not initiate the contact.  While that business did sign a staffing agreement with SnapNurse after it reached out to Mr. Charles, no work or business was or has been conducted with Skyline.  And Maxim has SnapNurse's commitment that it will not do any business or work with Skyline.

In sum, Maxim has lost no business to SnapNurse because of Mr. Charles, SnapNurse has not gained any business because of Mr. Charles, and SnapNurse does not anticipate

March 3, 2023
Page 7

pursuing or closing any business going forward that would be the result of Mr. Charles' limited efforts during his short employment with SnapNurse.

**Requested Discovery from SnapNurse**

On Friday afternoon, February 17, 2023 at 4:35 p.m., you emailed me a copy of a draft subpoena for 30(b)(6) deposition topics (twenty-six (26) designated topics) and requested documents (twenty-nine (29) requests and many with sub-parts). In that email you also asked to depose Jamie Barber, Mr. Charles' SnapNurse manager. For deposition dates, you asked for dates between March 20-28, 2023.

I responded to your email on Monday afternoon, February 20, 2023. I acknowledged receipt of your email, noted that I would be working on this, and suggested a call on Friday of that week. You replied on Wednesday afternoon, February 22, 2023, providing additional potential deposition dates and indicating that you would proceed to unilaterally set dates if I did not provide dates by the next day at noon.

I responded the next day, February 23, 2023 at 10:21 a.m. as follows:

> *Based on my initial review of what you sent, suffice it to say that we have multiple issues with what you are requesting. We're not going to agree on any dates yet. We first need to meet to discuss our issues once I've had a chance to really go through and fully consider everything. If you are going to unilaterally set them, we will need to add that to the list of topics to discuss further.*

You responded a few minutes later asserting that nothing precluded me from providing dates. You indicated that you would move forward issuing subpoenas for the two depositions, and you asked if I would accept service on behalf of SnapNurse and Ms. Barber. I replied that evening:

> *I'm authorized to accept service for SnapNurse and Ms. Barber.*
>
> *I'm not refusing to provide dates. I just believe you are putting the cart ahead of the horse. For example, I don't even know who I would be putting up for 30b6 topics until we work through issues and objections I'm clearly going to have in light of the overbroad requests I've seen thus far.*
>
> *In terms of Ms. Barber, while I'm not yet agreeing that she will sit for a deposition, she is located in Atlanta. Also, please provide a list of topics you intend to cover with Ms. Barber. I realize that it's not a 30b6, but under the circumstances, I believe it's a very reasonable request.*
>
> *Finally, please respond on Friday morning to my attached email regarding Jerome Charles' deposition. I will be disappointed to learn if it has already been scheduled as that would have been a simple question for you to promptly answer.*

March 3, 2023
Page 8


You responded the next day, February 24, 2023.  Regarding my request that you provide a list of topics, you said she "will be asked questions which are relevant to the claims and defenses raised in the lawsuit," and you offered to send me a copy of the Complaint.  You also said you were moving forward with subpoenas.

In the midst of these communications, I reached out to you and Mr. Charles' attorney on February 23, 2023 at 10:24 a.m. asking for permission to attend Mr. Charles' deposition and requesting information regarding the deposition details (i.e., when and where).  You responded the next day (February 24, 2023) at 10:08 a.m. saying the deposition was taking place on March 3, 2023 in Washington, D.C.  You said you did not consent to my presence but would consider any additional information I cared to provide.  I replied a few minutes later stating my belief that the rationale for my request was obvious – "all one need to do is look at the content of the discovery requests which you have sent thus far to SnapNurse and the extent of the discovery requested."

You emailed back the same day, pointing me to Guideline 6.1 of the Discovery Guidelines for D. Md.  You also stated: "it appears you wish to attend for the purpose of obstructing the discovery process. That too is improper, as only the deponent, counsel representing a party, or an unrepresented party may ask questions during, or otherwise participate in the process of, the deposition."  Our dialogue on this issue ended with my email response that afternoon:

> *Your assertion that I appear to wish to attend for the purpose of obstructing the discovery process is unfounded, untrue, and not appreciated.  I asked to attend because of what I've already communicated, and nothing has implicated that such attendance would be an obstruction.  If you intend to ask Mr. Charles questions about his SnapNurse employment and that implicate SnapNurse's confidential information, I'm on the record now as stating that it is improper for you to do so without SnapNurse's attorney present.*

Your office emailed me two subpoenas on Friday, February 24, 2023.  One subpoena was for a 30(b)(6) deposition on March 16, 2023 with twenty-six (26) designated topics.  The subpoena also included twenty-nine (29) document requests (many with sub-parts).  The second subpoena was to depose Jamie Barber on March 15, 2023.

We continue to have objections to what Maxim has requested as it appears to be a clear overreach.  However, before focusing on objections, we are requesting that you review the information that we have provided herein as well as the things we have offered to do.  Upon your review and consideration, I would suggest that we meet via telephone to discuss any questions you have, and anything offered that you would like to accept.  My hope is that the information conveyed herein, as well as the suggestions offered, will result in significant changes to the pending discovery requests.  In that regard, while I will not turn this letter into a legal brief type document, I am sure you are aware of the caselaw holding that SnapNurse's non-party status is afforded special weight when reviewing the reasonableness of such discovery requests.

Again, I hope this correspondence fosters productive dialogue soon.  However, at a minimum, we would need to discuss the 30(b)(6) notice as required by the rule – i.e., "Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."

March 3, 2023
Page 9


Please let me know if/when you would like to schedule a call.

Sincerely,

Joseph P. Shelton
For FISHER & PHILLIPS LLP

Enclosures