# HUSCH BLACKWELL

Tyler C. Hibler
Partner

4801 Main Street, Suite 1000
Kansas City, MO 64112
Direct: 816.983.8325
Fax: 816.983.8080
tyler.hibler@huschblackwell.com

March 9, 2023

**VIA E-MAIL**

Joseph P. Shelton
Regional Managing Partner
Fisher & Phillips LLP
424 Church Street, Suite 1700
Nashville, Tennessee 37219-2301
E-Mail: jshelton@fisherphillips.com

      Re:    Maxim Healthcare Staffing Services, Inc. v. Jerome Charles
              Case No. 8:23-cv-00115

Dear Mr. Shelton:

      Maxim remains interested in working with SnapNurse to facilitate a thorough search of SnapNurse's systems to ensure misappropriated information and documents do not remain within SnapNurse's possession.  Upon reviewing your March 3, 2026 letter, Maxim believes we may be able to reach common ground on several issues raised.  However, Maxim will still require the requested depositions of SnapNurse and Jamie Barber to address other substantive aspects of Maxim's lawsuit against Jerome Charles, and to fully discover the actions taken by Mr. Charles before, during, and after his employment with SnapNurse.  This is especially true given the progression of facts surrounding Mr. Charles' misappropriation of Maxim's confidential and proprietary information, and his use of that information at SnapNurse.

      Within your letter you provide an incomplete narrative concerning the progression of this matter and Maxim's communications with SnapNurse.  To ensure an accurate record is presented, I will first address omissions from your recitation of the factual history of this dispute.  I will then respond to the specific representations and offers made by SnapNurse concerning its search for Maxim's confidential and proprietary information.

    I.    **Maxim's Communications with SnapNurse**

      On December 16, 2022, SnapNurse was informed in writing that Maxim believed Mr. Charles was violating his contractual and common law obligations to Maxim.  (Exhibit A,

**HUSCH BLACKWELL**

Mr. Joseph P. Shelton
March 9, 2023
Page 2

December 16, 2022 correspondence). A copy of Mr. Charles' Employment and Mutual Arbitration Agreements were provided to SnapNurse on that date, and Maxim requested additional information from SnapNurse regarding Mr. Charles' employment. This included a request about actions undertaken by SnapNurse to prevent the disclosure of Maxim's confidential, proprietary, or trade secret information by Mr. Charles.

Fourteen days later, on December 30, 2022, SnapNurse responded to Maxim by stating SnapNurse reviewed Mr. Charles' Employment and Arbitration Agreements prior to his hiring, that it understood Mr. Charles' post-employment obligations to Maxim, and that SnapNurse has not engaged in "any conduct" that interferes with Mr. Charles' performance of his obligations to Maxim. (Exhibit B, December 30, 2022 correspondence). SnapNurse also represented that, "Mr. Charles confirmed to SnapNurse that he does not possess any confidential, proprietary, or trade secret information belonging to Maxim." (Exhibit B). That representation was false, and Mr. Charles recently testified that he never informed SnapNurse that he did not possess Maxim's confidential, proprietary, or trade secret information.

SnapNurse also claimed that Mr. Charles understood that he was not to disclose or use Maxim's confidential or proprietary information in the performance of his duties at SnapNurse. (Exhibit B). That statement was also untrue, as evidenced by statements in your March 3, 2023 letter confirming Mr. Charles uploaded Maxim's information to SnapNurse's computers and disclosed Maxim's information during his employment with SnapNurse.

On January 9, 2023, I sent an email to your attention notifying you that following the receipt of your December 30, 2022 letter, Maxim discovered information indicating Mr. Charles misappropriated numerous confidential and proprietary documents in the days preceding his departure from Maxim. (Exhibit C, January 9, 2023 correspondence). This misappropriation coincided with Mr. Charles' recruitment by SnapNurse, his acceptance of employment at SnapNurse, and his receipt of onboarding documentation from SnapNurse.

Notably, on January 9, 2023, Maxim informed SnapNurse that Maxim planned to seek discovery concerning Mr. Charles' misappropriation of Maxim's confidential and proprietary information, and requested that SnapNurse "take proactive measures to preserve documents and information relevant to this dispute." This included a request to preserve emails, metadata, and other electronically stored information detailing Mr. Charles' activity on SnapNurse's computers and systems. (Exhibit C). We now know that electronically stored information was deleted from a SnapNurse computer assigned to Mr. Charles on January 12, 2023—three days after Maxim's preservation request.

On January 10, 2023, a telephone call occurred between our offices, but your description of that call varies from my notes, which reflect that:

**HUSCH BLACKWELL**

Mr. Joseph P. Shelton
March 9, 2023
Page 3

1) Maxim communicated its desire for its information to be returned;

2) Maxim wanted to ensure its confidential and proprietary information was removed from SnapNurse's systems, if it had been uploaded to said systems; and

3) Maxim was concerned about Mr. Charles working at SnapNurse, Maxim's direct competitor, in light of his misappropriation of documents.

Neither I, nor Maxim, stated that Mr. Charles had to be fired from his employment with SnapNurse. Indeed, the next day, a follow-up call occurred wherein you alluded to the fact that Mr. Charles would be separated from his employment with SnapNurse. In response, I informed you that it was my client's intention to proceed with filing a lawsuit against Mr. Charles regardless of his employment status with SnapNurse, in light of the scope of his misappropriation of Maxim's documents and information.

On January 12, 2023, you provided an email indicating Mr. Charles' employment with SnapNurse was terminated.

On January 17, 2023, Maxim filed a lawsuit against Mr. Charles, which included a request for a temporary restraining order, injunctive relief, and expedited discovery designed to determine the scope of harm caused to Maxim by Mr. Charles' conduct. On January 24, 2023, the Court heard arguments concerning Maxim's request for a temporary restraining order and expedited discovery. An order approving expedited discovery was entered on January 24, 2023—not January 18, 2023 as stated in your letter—and a temporary restraining order was entered on January 27, 2023.

Maxim propounded written discovery upon Mr. Charles on January 27, 2023 and requested dates for Mr. Charles' deposition—which occurred on March 3, 2023 due to scheduling conflicts with Mr. Charles' counsel.

On February 10, 2023, Maxim notified SnapNurse of its desire to take the deposition of a SnapNurse corporate representative and Mr. Charles' direct supervisor—as permitted under the order approving expedited discovery. (Exhibit D, February 10, 2023 correspondence). Within that email, I informed you that "in an effort to facilitate [the 30(b)(6)] deposition, we will be sending over documents outlining the proposed deposition topics and document requests." I also indicated that my firm would be providing a proposed protective order for your review. Finally, I requested information regarding any search performed by SnapNurse, stating:

> *In addition, can you please advise of any search performed by SnapNurse of its systems to identify, locate, and preserve any documents believed to have been taken from Maxim? If such a*

**HUSCH BLACKWELL**

Mr. Joseph P. Shelton
March 9, 2023
Page 4

> *search has been performed, can you provide the protocols utilized in connection with the search, including key words/terms, and the results of the search.*

You responded on February 10, 2023 at 5:11 p.m. by requesting a call. I responded on Monday, February 13, 2023, and a call was conducted on February 14, 2023. During that call, I again informed you that Maxim wished to conduct the depositions referenced with my February 10, 2023 email, and you indicated that SnapNurse would oppose Maxim's attempt to conduct formal discovery. You did not provide the results of any searches performed by SnapNurse to locate Maxim's information at that time.

On February 17, 2023, you were provided with a draft subpoena outlining deposition topics and document requests directed to SnapNurse in connection with this lawsuit. (Exhibit E, February 17, 2023 correspondence). Within this letter, you were asked to provide dates for the requested depositions, and you were invited to confer regarding the proposed topics and document requests:

> *Please review the topics and requests outlined on Exhibits A and B of the draft subpoena and provide a date/location SnapNurse's corporate representative is available to provide testimony between March 20 and March 28, 2023. If you have any objections to these requests that you would like to discuss, I am available to confer via telephone next Tuesday after 10:00 a.m. CST. Once a date is provided, we will issue a formal notice and subpoena.*

In addition, on February 17, 2023, you were provided with a copy of a proposed protective order addressing the disclosure of confidential information:

> *During our prior communications we also discussed the potential need for a protective order. Utilizing the approved form from the District of Maryland as a template, we have prepared the attached protective order that we plan to propose for submission in this case. This includes an attorney-eyes only designation to protect the disclosure of information which could cause competitive harm to the discloser if a market competitor of the discloser were to review such documents or information.*

Three days later, on February 20, 2023, you acknowledge receipt of my February 17, 2023 email, and stated that you would be in a position to talk on Friday, February 24, 2023 about Maxim's deposition requests. (Exhibit F, February 22, 2023 email chain). On February 22, 2023, I responded by noting that dates for the deposition were needed in earnest, and that I was available

Mr. Joseph P. Shelton
March 9, 2023
Page 5

to confer with you later that week, after normal business hours, or during the weekend regarding Maxim's requested discovery. (Exhibit F). I also notified you that there was a conflict associated with the availability of counsel for Mr. Charles, and provided alternative dates for the depositions. Finally, I indicated that if dates were not provided by February 23, 2023, we would proceed with setting the depositions for March 15 and 16.

On February 23, 2023, you responded by noting that "we are not going to agree on any dates yet." (Exhibit G, February 2023 email chain). Again, no information regarding SnapNurse's search of its systems, the wiping of Mr. Charles' computer, or the fact that Mr. Charles had utilized Maxim's confidential and proprietary information during his employment with SnapNurse was provided by you within that correspondence.

On February 23, 2023, I again followed up regarding your refusal to provide deposition dates. (Exhibit G). I also noted an ongoing willingness by Maxim to confer regarding the scope of the 30(b)(6) deposition topics and documents requests. You were then informed of Maxim's plan to proceed with issuing subpoenas for these depositions, and I inquired if you were authorized to accept service on behalf of the deponents.

You responded on February 23, 2023 at 9:28 p.m. by stating that you were authorized to accept service on behalf of SnapNurse and Jamie Barber. (Exhibit H, February 24, 2023 email chain). While you represented that you were not refusing to provide deposition dates, you again failed to provide dates for these depositions and stated that "I'm not yet agreeing [Ms. Barber] will sit for a deposition." I followed up the next morning indicating that Maxim made numerous attempts to obtain dates for these depositions, and that in light of the ongoing failure by SnapNurse and Ms. Barber to provide dates for their depositions, we would proceed with scheduling the depositions based upon the availability of the parties. (Exhibit H).

You were served with subpoenas for the deposition on Friday, February 24, 2023 via email. Hard copies of the subpoenas were also mailed to your office address, along with a check for Ms. Barber's witness fee.

A week later you sent your March 3, 2023 letter. I responded on Monday, March 6, 2023 by noting that while Maxim was still evaluating the contents of your 9-page letter, I was available to confer regarding the subpoenas issued to SnapNurse and Ms. Barber on Tuesday March 7, 2023.

A call was conducted between you and I on March 7, 2023. During that call, I informed you that I was planning to speak with my client regarding the information contained within your March 3, 2023 letter, but I believed the 30(b)(6) deposition and Ms. Barber's deposition still needed to occur. I again invited you to confer regarding 30(b)(6) deposition topics and document requests, but you declined my invitation. I also inquired about the feasibility of the March 15 and

**HUSCH BLACKWELL**

Mr. Joseph P. Shelton
March 9, 2023
Page 6

16 deposition dates, and asked if other dates would work better. Once again, you did not provide dates for these deposition in response to my inquiry. (Exhibit I, March 7, 2023 correspondence).

### II.  Mr. Charles' SnapNurse Laptop

Maxim was informed by SnapNurse on March 3, 2023 that Mr. Charles' SnapNurse computer had a new operating system installed on January 12, 2023—three days after Maxim requested SnapNurse preserve electronic data.

Within your letter you offer to provide a sworn verification from Greg Fordham of Fordham Forensics regarding his review and analysis of the SnapNurse computer utilized by Mr. Charles. We certainly welcome the production of such a sworn verification.

In addition, you also reference the possibility of providing a forensic image of Mr. Charles' laptop to a forensics neutral. The parties are currently using Digital Mountain as a forensics neutral in the lawsuit between Maxim and Mr. Charles. We request that both a forensic image and the actual computer used by Mr. Charles be provided to Digital Mountain for analysis. This includes an analysis of what, if any, information can be recovered following the installation of a new operating system. We are willing to confer with you to determine the protocol associated with an independent forensic analysis of Mr. Charles' computer. Please let us know if you agree with this request.

### III.  SnapNurse's Drive

Within your March 3, 2023 letter, you indicate a search of SnapNurse's "system" revealed documents that were created by Mr. Charles using Maxim's information. You also reference that at least one other Maxim employee accessed the documents identified. Further, you note that Mr. Charles, or another SnapNurse employee, may have placed information taken from Maxim into SnapNurse's Salesforce and/or Salesloft databases. However, a search of Salesforce and/or Salesloft has not been completed.

What is not provided in your letter is an explanation of the protocol utilized by SnapNurse to search its systems, the unfiltered results of those searches, and information regarding any data storage locations beyond Google drive that may have been available to Mr. Charles.

SnapNurse offers to provide a sworn verification regarding its search for Maxim's documents on its system, and we welcome the production of such a verification. However, in addition, Maxim requests a forensics neutral—such as Digital Mountain—be permitted to conduct a review of SnapNurse's systems for information and/or documents that were misappropriated from Maxim. We are willing to work with you regarding a protocol associated with this review.

**HUSCH BLACKWELL**

Mr. Joseph P. Shelton
March 9, 2023
Page 7

### IV. Mr. Charles' Email Activity

It appears a review of Mr. Charles' email activity is ongoing. Do you have an update?

Maxim requests that all emails sent to and/or from Mr. Charles' SnapNurse email address be made available for review by Maxim's counsel pursuant to an "attorneys' eyes only" designation, as identified within the protective order in this case. Due to the limited temporal scope of Mr. Charles' employment, this would encompass under 10 weeks of email communications. This review will ensure Maxim is afforded an opportunity to fully evaluate potential disclosures of its confidential information, and other conduct by Mr. Charles that may be in violation of his legal obligations to Maxim, while also balancing SnapNurse's interest in protecting its own confidential information. Maxim agrees to permit counsel for SnapNurse to withhold the production of any emails containing attorney-client communications, so long as sufficient information is provided to allow Maxim to assess any such claim of privilege.

### V. Searches for Maxim Documents

Your assumption regarding document request No. 21 reflecting search terms is correct. Please provide an update if a search utilizing those terms has been completed—including the files, databases, and systems searched and any protocols utilized to conduct the search. We again welcome the production of a sworn verification.

In addition, we were recently informed that Mr. Charles disclosed information obtained from Maxim to SnapNurse employees Ashka Patel and Therese Hendrix. He also utilized Maxim's information to create a gross profit calculator, a payrate sheet with suggested payrates, and a list of acronyms for allied health positions while employed at SnapNurse. Please include these individuals and documents within any search conducted to locate information or documents obtained from Maxim that may be within SnapNurse's possession or control.

### VI. Conclusion

While we continue to believe a SnapNurse 30(b)(6) deposition and the deposition of Ms. Barber are needed to address substantive aspects of Maxim's claims against Mr. Charles, if SnapNurse agrees to the inspections and email productions requested above it will narrow Maxim's topics and document requests. Providing sworn verifications which specifically outline the protocols utilized to conduct the searches performed by SnapNurse, a detailed description of search results, and an agreement to produce all data/documents identified through searches for Maxim's review will also eliminate the need to conduct questioning on several of the topics identified within Maxim's 30(b)(6) notice/subpoena.

We remain willing to confer with you regarding the deposition subpoenas served upon SnapNurse and Ms. Barber. However, at this time, we plan to proceed with the depositions on

Mr. Joseph P. Shelton
March 9, 2023
Page 8

March 15 and 16. If an agreement is reached on the issues outlined above, we will plan to proceed on the following topics and requests identified within the 30(b)(6) deposition notice/subpoena (subject to additional conferral):

- **Topics**

    1-11, 13-17, 20-26

- **Requests**

    1-15, 17, 19-20, 22-25, 27-29

If an agreement is not reached, we plan to proceed with all of the topics and document requests identified within the 30(b)(6) deposition notice/subpoena.

We plan to proceed with the deposition of Ms. Barber even if an agreement between Maxim and SnapNurse is reached regarding searches for Maxim's documents and information, as she was Mr. Charles' direct supervisor, was a primary point of contact in his recruitment to SnapNurse, and possesses relevant information associated with the actions and conduct of Mr. Charles while employed by SnapNurse.

It is my hope, and the hope of Maxim, that SnapNurse will agree to the reasonable proposals outlined above and confer with Maxim to identify the topics and document requests that remain at issue within the outstanding 30(b)(6) deposition notice/subpoena.

Sincerely,

HUSCH BLACKWELL LLP

Tyler C. Hibler

TCH/mlm
Exhibits