IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Southern Division

MAXIM HEATHCARE STAFFING SERVICES, INC.,

    Plaintiff,

v.                                                        Case No. 8.23-cv-00115-PX

JEROME CHARLES,

    Defendant.

                                            /

**OBJECTIONS TO PLAINTIFF'S THIRD PARTY
DISCOVERY REQUESTS TO NON-PARTY SNAPNURSE**

Non-Party SnapNurse, Inc., by and through its undersigned counsel, pursuant to Fed.R.Civ.P. 26, 30, and 45, hereby objects to Plaintiff's third-party discovery requests -- consisting of Rule 45 subpoenas to produce documents, for a (30)(b)(6) deposition notice, and a notice to depose SnapNurse employee Jamie Barber (hereinafter collectively "Requests") -- as described in more detail below.

**I.  BACKGROUND**

    **A.  Defendant Jerome Charles' Employment with SnapNurse**

Defendant Jerome Charles' first day of employment with SnapNurse was November 28, 2022. Prior to SnapNurse, Mr. Charles worked for Plaintiff Maxim. SnapNurse was aware of his contractual obligations to Maxim and structured his employment accordingly. SnapNurse instructed him not to solicit any Maxim customers or personnel, and his SnapNurse duties were established with his noncompete provision in mind. Recognizing that he had worked out of Maxim's Falls Church, Virginia office, SnapNurse assigned him to conduct sales activity well outside the territory of his Maxim non-compete (i.e., a fifty (50) mile radius from the Maxim

1

Falls Church office). Finally, SnapNurse instructed Mr. Charles in his offer letter and onboarding to abide by his obligations to protect and not use Maxim's confidential, proprietary, and trade secret information.

In email on the evening of January 9, 2023, Maxim's counsel shared with SnapNurse's counsel – for the first time – that Maxim had discovered that Mr. Charles emailed confidential and proprietary Maxim documents to himself in October and November 2022 prior to his Maxim resignation. On the early afternoon of January 12, 2023, SnapNurse terminated Mr. Charles' employment with SnapNurse because of the information Maxim had conveyed regarding Mr. Charles' conduct in sending himself Maxim information.

**B. <u>Communications Between Maxim and SnapNurse Regarding Jerome Charles Prior to This Lawsuit.</u>**

Maxim first reached out to SnapNurse regarding Jerome Charles in mid-December 2022 by sending a certified letter to its registered agent for service of process. The letter noted his contractual obligations to Maxim and asserted that Maxim believed that Mr. Charles was violating "his contractual and common law obligations to Maxim by virtue of his employment with SnapNurse." The letter did not include any assertions of specific violative conduct other than stating that it was Maxim's "understanding that Mr. Charles' position with SnapNurse requires him to directly engage in services that are competitive with Maxim's services within the restricted territory." Maxim's letter asked for a response from SnapNurse by December 30, 2022.

SnapNurse's counsel responded to Maxim's letter with correspondence delivered via email on December 30, 2022. SnapNurse's letter opened with the following statement:

> *SnapNurse understands the importance of conducting business in a fair and ethical manner, and it does not seek or intend to engage in unfair competitive business practices. To that end, we appreciate Maxim reaching out to discuss its concerns regarding Mr. Charles' employment with SnapNurse. We are hopeful that we can put those concerns to rest, and we certainly welcome an open dialogue regarding any unresolved questions or concerns.*

The letter then explained that SnapNurse instructed Mr. Charles not to solicit any Maxim customers or personnel and that his SnapNurse duties were established with his noncompete provision in mind.  Specifically, because Mr. Charles had worked out of Maxim's Falls Church, Virginia office, SnapNurse assigned him to conduct sales activity well outside the fifty (50) mile radius from the Maxim Falls Church office.  The letter also noted that SnapNurse had instructed Mr. Charles in his offer letter and onboarding to abide by his obligations to protect and not use Maxim's confidential, proprietary, and trade secret information.  The letter ended with an invitation for further dialogue if Maxim had any questions.

The next communication from Maxim to SnapNurse was a letter sent by Maxim's counsel via email on January 9, 2023 at 5:06 p.m.  For the first time, Maxim shared it had discovered that Mr. Charles emailed confidential and proprietary Maxim documents to himself in October and November 2022 prior to his Maxim resignation.  The letter noted Maxim's rightful concern about Mr. Charles' actions and stated Maxim's intent to pursue legal action against him. The letter went on to state that while Maxim did not intend to initiate legal action against SnapNurse at that time, it was concerned that documents and information taken by Mr. Charles could be located on SnapNurse's systems.  The letter ended with an invitation to discuss the issues by telephone.

SnapNurse's counsel responded the next day (January 10, 2023) in the morning and a call was scheduled for 5.30 p.m. CT the same day.  Additional communications took place between Maxim and SnapNurse's respective counsel on January 11, 2023, including a telephone call that evening wherein SnapNurse's counsel alluded to the likelihood that SnapNurse was going to terminate Mr. Charles.

On January 12, 2023, SnapNurse's counsel emailed Maxim's counsel, reiterating that SnapNurse was committed to conducting business in a fair and ethical manner and thanking Maxim for bringing its concerns to SnapNurse's attention and providing it an opportunity to review and respond.  The email communicated that SnapNurse had terminated Mr. Charles.

The email then explained what SnapNurse intended to do to make sure that it did not possess any of the Maxim information/documents that Mr. Charles sent to his personal email:

> *Our next step is to start the process of ensuring that SnapNurse does not possess any of the Maxim information/documents that Mr. Charles sent to his personal email.  Specifically, SnapNurse will soon be undertaking efforts to determine if Mr. Charles saved/placed any of Maxim's documents/information on SnapNurse's system.  Upon completion of that review, we will update you.  To the extent anything is found, it will be permanently deleted and we will confirm such deletion to you.  However, if you want a copy of anything found before it is deleted, please let me know.  Also, if you want to provide a listing of the 90 or so documents that you said Mr. Charles emailed to himself in the October/November 2021 timeframe, SnapNurse will also conduct targeted searches for any such documents.  While we don't necessarily think we need such a listing to accomplish*

> *an effective search, I wanted to make that offer in case you like that idea. I'm not sure how long these efforts will take, but please know SnapNurse is moving on this expeditiously.*

The email also explained the personal situation of SnapNurse's counsel in that he was leaving that same afternoon for a week in London to visit his daughter and stated what Maxim's attorney could in terms of communications during the week SnapNurse's counsel would be gone:

> *For purposes of continued communications regarding this matter, I'm leaving later this afternoon for a week in London (my daughter lives/works there). While I'll effectively be inaccessible the rest of today, I'm not entirely checking out for the week (I will be back in the office next Friday, 1/20). So while I might be delayed in responding (I'll be 6 hours ahead of you), I will try to respond within a day if you email about anything. Also, you'll note that I'm cc'ing Amanda Thompson on this email. Amanda is the in-house attorney at SnapNurse that I've been working with on this matter. Please copy Amanda on any emails to me while I'm out. It's possible that Amanda might respond to you directly before you hear from me, and if she does, you have permission to continue whatever dialogue she initiates.*

The email closed with the following: "Again, SnapNurse appreciates the open communication about this matter. Please reach out with any thoughts on the above."

No further communications occurred until January 23, 2023. On that date, SnapNurse's counsel emailed Maxim's counsel "to see if you had any follow up thoughts regarding what I had conveyed in my 1/12 email." Maxim's counsel responded that day, stating that he was

"conferring with [his] client regarding this matter and will follow up in the near future with more information." Maxim's counsel also said that he wanted native file formats with metadata intact for any Maxim documents/data/information discovered during SnapNurse's search of its systems as well as the preservation of information regarding where it was stored and who accessed it.

No further communications occurred for the next two plus weeks. On February 10, 2023, and in the context of discussions regarding two other former Maxim employees hired recently by SnapNurse, Maxim's counsel shared with SnapNurse's counsel – for the first time – that Maxim had filed suit against Mr. Charles on January 17, 2023.

Notably, the litigation had been filed a week prior to the above-described January 23, 2023 emails, yet Maxim's counsel failed to share that information with SnapNurse's counsel during their exchange that day. Further, Maxim's counsel did not disclose that Maxim had also filed on January 17, 2023 a motion requesting expedited third-party discovery from SnapNurse. Finally, even though the court granted the motion for expedited discovery on January 18, 2023, this was not shared with SnapNurse until the email from Maxim's counsel on February 10.

C. **Communications Between Maxim and SnapNurse Regarding Requested Third Party Discovery.**

On Friday afternoon, February 17, 2023 at 4:35 p.m. CT, Maxim's counsel emailed SnapNurse's counsel a copy of a draft subpoena for 30(b)(6) deposition topics (twenty-six (26) designated topics) and requested documents (twenty-nine (29) requests and many with sub-parts). The email also included a request to depose Jamie Barber, Mr. Charles' SnapNurse manager. For deposition dates, the email asked for dates between March 20-28, 2023.

SnapNurse's counsel responded on Monday, February 20, 2023, noting that he would be working on the matter and suggesting a call on Friday of that week. Maxim's counsel replied on Wednesday afternoon, February 22, 2023, providing additional potential deposition dates and indicating that he would proceed to unilaterally set dates if SnapNurse's attorney did not provide dates by the next day at noon. SnapNurse's counsel responded the next morning, February 23, 2023 as follows:

> *Based on my initial review of what you sent, suffice it to say that we have multiple issues with what you are requesting. We're not going to agree on any dates yet. We first need to meet to discuss our issues once I've had a chance to really go through and fully consider everything. If you are going to unilaterally set them, we will need to add that to the list of topics to discuss further.*

Maxim's counsel responded asserting that nothing precluded SnapNurse's counsel from providing dates, indicating that Maxim would move forward issuing subpoenas for the two depositions, and asked if SnapNurse's counsel would accept service on behalf of SnapNurse and Ms. Barber. SnapNurse replied that same evening:

> *I'm authorized to accept service for SnapNurse and Ms. Barber.*

> *I'm not refusing to provide dates. I just believe you are putting the cart ahead of the horse. For example, I don't even know who I would be putting up for 30b6 topics until we work through issues and objections I'm clearly going to have in light of the overbroad requests I've seen thus far.*

> *In terms of Ms. Barber, while I'm not yet agreeing that she will sit for a*

7

> *deposition, she is located in Atlanta. Also, please provide a list of topics you intend to cover with Ms. Barber. I realize that it's not a 30b6, but under the circumstances, I believe it's a very reasonable request.*
>
> *Finally, please respond on Friday morning to my attached email regarding Jerome Charles' deposition. I will be disappointed to learn if it has already been scheduled as that would have been a simple question for you to promptly answer.*

Maxim's counsel responded the next day, February 24, 2023. Regarding the request for a list of topics for Jamie Barber's deposition, Maxim's counsel said she "will be asked questions which are relevant to the claims and defenses raised in the lawsuit," and he offered to send a copy of the Complaint. Maxim's counsel also said he was moving forward with subpoenas.

In the midst of these communications, SnapNurse's counsel reached out to Maxim and Mr. Charles' attorneys on February 23, 2023, asking for permission to attend Mr. Charles' deposition and requesting information regarding the deposition details (i.e., when and where). Maxim's counsel responded the next day saying the deposition was taking place on March 3, 2023 in Washington, D.C. The email stated that Maxim's counsel did not consent to the presence of SnapNurse's counsel at the deposition but would consider any additional information he cared to provide. SnapNurse's counsel replied a few minutes later stating his belief that the rationale for the request was obvious – "all one need to do is look at the content of the discovery requests which you have sent thus far to SnapNurse and the extent of the discovery requested."

The response from Maxim's counsel pointed to Guideline 6.1 of the Discovery Guidelines for D. Md. and stated: "it appears you wish to attend for the purpose of obstructing the discovery process. That too is improper, as only the deponent, counsel representing a party,

or an unrepresented party may ask questions during, or otherwise participate in the process of, the deposition." The dialogue on this issue ended with the following email from SnapNurse's counsel:

> *Your assertion that I appear to wish to attend for the purpose of obstructing the discovery process is unfounded, untrue, and not appreciated. I asked to attend because of what I've already communicated, and nothing has implicated that such attendance would be an obstruction. If you intend to ask Mr. Charles questions about his SnapNurse employment and that implicate SnapNurse's confidential information, I'm on the record now as stating that it is improper for you to do so without SnapNurse's attorney present.*

Maxim emailed two subpoenas on Friday, February 24, 2023. One subpoena was for a 30(b)(6) deposition on March 16, 2023 with twenty-six (26) designated topics. The subpoena also included twenty-nine (29) document requests (many with sub-parts). The second subpoena was to depose Jamie Barber on March 15, 2023. Hard copies of the discovery followed in the mail. (While correspondence from Maxim's counsel dated March 9, 2023 stated that a check was included for Ms. Barber's witness fee, SnapNurse's counsel did not see a check in the envelope – which has since been thrown away in the trash. However, SnapNurse does **not** contest the validity of the subpoena for Ms. Barber on that basis. This clarification is merely noted for accuracy regarding what SnapNurse acknowledges was received.)

### D. Efforts Taken by SnapNurse Regarding Mr. Charles' Conduct Vis-à-vis Maxim's Information.

9

SnapNurse has been working to determine whether Mr. Charles used any Maxim information/documents during his employment with SnapNurse and/or put such information/documents on SnapNurse's system. In that regard, SnapNurse has focused on four areas: (1) his SnapNurse issued laptop; (2) anything he saved on the SnapNurse system; (3) his SnapNurse email activity; and (4) search terms more generally across SnapNurse's system. These efforts were detailed in a letter from SnapNurse's counsel to Maxim's counsel on March 3, 2023 (and a follow up email the same day) and are described below. To the extent there has been additional communications or information learned since the exchanges on March 3, that is specifically noted below.

- **Mr. Charles' SnapNurse Laptop**

SnapNurse terminated Mr. Charles at approximately 12:15 p.m. on January 12, 2023. At around the same time, SnapNurse cut off his access to the Company's systems. At that point, Mr. Charles had been working remotely and was still in possession of his SnapNurse laptop.

SnapNurse arranged for the laptop to be returned to a company by the name of Firstbase, a third-party vendor SnapNurse utilizes for various IT related issues. The laptop remained untouched until it was sent to SnapNurse's offices in Atlanta to be stored pending engagement of a forensic expert. It remained untouched in Atlanta until it was given to Greg Fordham (of Fordham Forensics) so that it could be forensically imaged. The following is a summary of Mr. Fordham's analysis.

At around 9:30pm EST on January 12, 2023, it appears a new operating system was installed on the laptop, apparently a restoration using the Lenovo recovery partition. Since very few remnants remain, and those that do are most likely from very limited data resident in a

10

master file table record, a secure installation could have been performed. As of the date and time noted above, Mr. Charles was still in possession of the laptop (although he had been terminated at approximately 12.15 that day).

Mr. Charles' user profile is no longer there, and there is no evidence of any other devices having been attached. Other than Microsoft Office and the Windows operating system being installed, there are no other applications installed even though within the few remaining remnants it appears that a Google Chromium browser had been installed previously.

Efforts to carve freespace to try and recover deleted Office and PDF data files returned only ten unworking document fragments and two that worked. Also, a search of the freespace for the word "Maxim" returned zero hits.

SnapNurse provided Maxim with the two documents referenced in the prior paragraph. One was a blank one-page PDF document with a blue-green background. The second was a spreadsheet. SnapNurse does not believe that the spreadsheet was anything Maxim related, and the Properties indicates that it was created by a SnapNurse employee on December 6, 2022.

In sum, SnapNurse found nothing to indicate that any Maxim information or documents were residing on Mr. Charles' SnapNurse laptop.

SnapNurse offered the following to Maxim regarding this issue: (i) an invitation to speak with Mr. Fordham by video conference to ask any questions about what he did and what he found, (ii) a willingness to provide a sworn verification from Mr. Fordham confirming the above, and (iii) a willingness to discuss the possibility of providing the forensic image of the laptop to a forensics neutral.

On March 9, 2023, Maxim responded to this summary and indicated that it would welcome a sworn verification from Mr. Fordham.  SnapNurse will work on that.  Maxim also indicated it would like the forensic image of the laptop as well as the actual laptop to be provided to the forensics neutral being utilized in the lawsuit with Jerome Charles.  Regarding the laptop, Maxim would like the forensics neutral to conducts its own analysis and install a new operating system to see what, if anything, could be recovered after such installation.  SnapNurse is willing to consider these requests as part of its anticipated continued discussions with Maxim.

- **Documents Mr. Charles Saved to SnapNurse's Drive**

SnapNurse utilizes Google drive for its employees.  So, if a SnapNurse employee is going to save/store something on SnapNurse's "system," it would be on the corporate Google drive.

SnapNurse has identified and reviewed all the content Mr. Charles stored on the corporate Google drive.  Upon review, SnapNurse has flagged two documents which it believes contain information Mr. Charles took from Maxim.  Both documents are spreadsheets which SnapNurse has provided to Maxim.  The spreadsheets are titled "List of potential clients (Stephen) 12.13.PA.WV" and "Steph's Copy of Jerome's Potential Clients."  The references to "Stephen" and "Steph" in the titles of the spreadsheets are to SnapNurse employee Stephen Chinn.  Mr. Chinn is a sales development representative who worked some with Mr. Charles.

Upon investigation of the Google Workspace event logs for the two documents, SnapNurse has determined that Mr. Charles and Mr. Chinn were the only employees who accessed or did anything with them.  Further, SnapNurse has searched Google drive activities company-wide and did not find anything to suggest that any other employees made a copy of

12

these documents or created any new files on the Google drive via copy and paste of information in these documents.

The two spreadsheets have been removed from SnapNurse's Google drive and SnapNurse stands ready to permanently delete the documents when/if Maxim asks for that to happen. SnapNurse's counsel is retaining copies for purposes of this matter.

The above-described review of Mr. Charles' activity on the SnapNurse Google drive has been handled by SnapNurse employee, Jake Lee, the Company's Head of Cyber Security. SnapNurse offered to provide a sworn verification from Mr. Lee confirming the above representations if that was of interest to Maxim.

SnapNurse does have concerns that Mr. Charles and/or Mr. Chinn might have placed some of the information on the two attached spreadsheets into Salesforce and/or Salesloft. SnapNurse is working diligently to get to the bottom of that issue. SnapNurse has stated it does not want any such information, and it will remove anything that came from the spreadsheets. Further, and as discussed more below, SnapNurse has not entered into any business that flowed from Mr. Charles' efforts during his short time with SnapNurse. So, even if Mr. Charles attempted to utilize any ill-gotten information to secure any business, he was not successful in doing so.

In its March 9, 2023 correspondence, Maxim stated that the above information did not explain "the protocol utilized by SnapNurse to search its systems, the unfiltered results of those searches, and information regarding any data storage locations beyond Google drive that may have been available to Mr. Charles." SnapNurse is willing to have further dialogue regarding these points, although further clarification will be needed from Maxim.

13

Maxim's March 9 correspondence expressed an interest in a declaration from Mr. Lee regarding his above-described efforts. SnapNurse will work on that. Maxim also requested that a forensics neutral do its own review of SnapNurse's systems. Admittedly, that initially strikes SnapNurse as unnecessarily invasive. However, SnapNurse is at least willing to have further dialogue on exactly what Maxim is requesting before reaching a final decision on that issue.

- **Mr. Charles' Email Activity**

The information in this section is a mixture of information previously relayed to Maxim on March 3 as well as more up to date information considering SnapNurse's continued review of Mr. Charles' email activity and information shared by Maxim in its March 9 letter.

SnapNurse has been reviewing Mr. Charles' SnapNurse email activity to determine whether there might have been any Maxim documents/information utilized by Mr. Charles via email. SnapNurse is concerned that there was at least some Maxim information/documentation shared by Mr. Charles. SnapNurse is diligently working through that review and will update Maxim in the coming week.

In the March 9 letter, Maxim requests that its counsel be given access to all of Mr. Charles' SnapNurse email activity under an "attorney's eyes only" designation. While SnapNurse is not yet providing a definitive "no" to that request, SnapNurse believes further discussion on that request is premature until SnapNurse has completed its own review and provided Maxim with a detailed update of SnapNurse's efforts.

- **Searches for Maxim Documents**

In a January 12, 2023 email, SnapNurse's counsel invited Maxim's counsel to provide a list of the ninety (90) or so documents that Maxim said Mr. Charles emailed to himself in the October/November 2021 timeframe so that SnapNurse might conduct targeted searches for any such documents. Maxim did not provide that list. However, in the document requests that accompanied the 30(b)(6) deposition subpoena, Request No. 21 included seventy-seven (77) requested search terms. While it was not clear whether the search terms reflected the titles for any of the ninety-some documents Maxim says that Mr. Charles emailed to himself before leaving Maxim, SnapNurse presumed that seventy-five (75) of them might very well be such titles (the first two listed search terms did not appear to be titles of documents). Accordingly, SnapNurse ran those search terms through its system.

Upon its initial search, there was only one "hit" based on the searching. That hit was for "Indeed Recruiting." However, SnapNurse believed it was a generic name match. Further, the date and timestamp related to the hit pre-dates Mr. Charles' employment. SnapNurse therefore does not believe it is Maxim related but has invited further review if Maxim is concerned that it might constitute Maxim information.

Given some concerns that SnapNurse is seeing based on its continued review of Mr. Charles' email activity as well as information conveyed by Maxim in its March 9 correspondence (page 7, second paragraph of Section V), SnapNurse is currently evaluating whether additional searching might be necessary. SnapNurse will update Maxim in the coming week.

SnapNurse has offered to provide a sworn verification of the searching it has conducted. Maxim has expressed an interest in that. Once the searching is complete, we intend to provide the verification if Maxim still wants it.

15

### E. Mr. Charles' Sales Activity at SnapNurse

Mr. Charles was employed with SnapNurse for a very short period. He joined SnapNurse just after Thanksgiving, and the Christmas and New Years' holidays obviously occurred in the brief window prior to his termination on January 12, 2023. SnapNurse understands that Maxim is likely curious as to whether SnapNurse has done any business because of Mr. Charles' efforts during his employment. The short answer is no.

Mr. Charles did report to SnapNurse that a former Maxim customer (Skyline Terrace) had reached out to him. He insisted that he did not initiate the contact. While that business did sign a staffing agreement with SnapNurse after it reached out to Mr. Charles, no work or business was or has been conducted with Skyline. And Maxim has SnapNurse's commitment that it will not do any business or work with Skyline.

In sum, Maxim has lost no business to SnapNurse because of Mr. Charles, SnapNurse has not gained any business because of Mr. Charles, and SnapNurse does not anticipate pursuing or closing any business going forward that would be the result of Mr. Charles' limited efforts during his short employment with SnapNurse.

The above information was provided by SnapNurse to Maxim in the letter on March 3. The commitment by SnapNurse remains the same. Further, if Maxim believes that Mr. Charles testified in his deposition to anything that is contrary to or in conflict with the above summary (or anything else described in this document), SnapNurse requests that Maxim share that information so that SnapNurse can further evaluate and address it.

## F. Status of the Third-Party Discovery Requests Vis-à-vis the Parties' Communications.

Maxim's March 9 correspondence ended with its position regarding the pending third-party discovery requests to SnapNurse. In particular, Maxim stated that if SnapNurse agreed to all the requests made in the letter and provided all the requested sworn declarations, then Maxim would eliminate 3 of the 26 30(b)(6) deposition topics and 4 of the 29 document requests. Short of that agreement and receipt of the requested declarations, Maxim stated its intent to proceed with all twenty-six 30(b)(6) deposition topics and all twenty-nine document requests. Further, Maxim said it was planning to proceed with the deposition of Jamie Barber regardless of any concessions. While Maxim offered to confer regarding the topics and document requests, SnapNurse's deadline to object to the document requests is today, Friday March 10 – i.e., one day after receiving the March 9 letter (which was sent via email at 2.52 p.m. CT).

Given what has been described above, it is not realistic to reach an agreement on all the requests and provide the declarations by today much less before the unilaterally noticed deposition dates of March 15 and 16, 2023. Accordingly, SnapNurse is submitting these objections to meet its deadline to do so.

Beyond the objections, there is the practical reality that the requested discovery is premature in that SnapNurse is still in the process of reviewing a number of issues that go right to the heart of what Maxim is requesting – i.e., did Mr. Charles use Maxim's information/documents during his time with SnapNurse; if so, how was it used; and has SnapNurse ensured that no Maxim information/documents remain with SnapNurse. Rest assured that SnapNurse is committed to obtaining the answers to those questions. SnapNurse is not

17

saying that Maxim has no right to seek such answers through formal discovery if Maxim has legitimate and good faith questions after hearing and seeing what SnapNurse has done on its own. But that issue needs to be evaluated after SnapNurse has completed the work that it has been doing and is continuing to do.

**II.     OBJECTIONS**

The above information and summary are crucial to understanding SnapNurse's objections to the Requests. While SnapNurse will continue to work with Maxim as described above, SnapNurse does object to the Requests at this time to the extent that they are unreasonably broad in scope, unduly burdensome, of a harassing nature, vague and ambiguous, and seek information that is not relevant to SnapNurse's role as a non party in the litigation.

It is noteworthy that SnapNurse is a non-party to the litigation. Despite that fact, the Requests are the very sort of requests that are directed to a defendant in a case like this. The fact that SnapNurse is a non-party and a competitor is also an important factor to consider in these objections.

While this is not intended as a legal brief with a full citation of case law, the following summarizes the heart of SnapNurse's objections at this time:

> Although the Federal Rules favor liberal discovery, *Adkins v. Christie*, 488 F.3d 1324, 1331(11th Cir. 2007), district courts have broad discretion to limit discovery where the information sough is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C). In short, a district court may limit discovery when the burden of compliance outweighs its likely benefit or relevance. *Cent. Ga. Anesthesia Servs., P.C. v. Equitable Assurance Soc'y of*

*U.S.*, No. 5:06-cv-25 (CAR), 2007 WL 2128184, *2 (M.D.Ga. Jul. 25, 2007) (quoting Fed.R.Civ.P. 26(b)(2)(i) & (iii)).

Non-party status is a factor courts may consider when analyzing whether a subpoena is unduly burdensome.  *E.g., Aeritas, LLC v. Delta Airlines, Inc.*, No 1:13-cv-346-RWS-WEJ, 2013 WL 454452, at *2 (N.D. Ga. Feb. 7, 2013; *see also Zukoski v. Philadelphia Elec. Co.*, No, CIV.A. 93-4780, at *3 (E.D.Pa. Nov. 14, 1994) ("It is a generally accepted rule that standards for non-party discovery require a stronger showing of relevance than for party discovery.")  The burden on the non-party is particularly great when the party issuing the subpoena seeks private information.  *See Wheeles v. Human Res. Sys., Inc.*, 179 F.R.D. 635, 639 (S.D.Ala. Jun. 12, 1998)

*Pinehaven Plantation Properties, LLC v. Mountcastle Family LLC*, No. 1:12-CV-62, 2013 WL 6734117 (M.D. Ga. Dec. 19, 2013)

In closing, SnapNurse remains committed to continue its efforts described above and to continue its communications with Maxim regarding all the pending issues.  SnapNurse therefore hopes that Maxim will not attempt to compel compliance with the Requests on March 15 and 16, 2023.  However, if it does so, SnapNurse notes that the proper forum for such motion is the federal court in the Northern District of Georgia, Atlanta Division (i.e., where SnapNurse is headquartered and where Jamie Barber is located).

Date:  March 10, 2023

                                        /s/ Joseph Shelton
                                        Joseph P. Shelton
                                        Georgia Bar No. 640630
                                        Tennessee Bar No. 037426
                                        FISHER & PHILLIPS LLP

FP 46549468.1

424 Church Street, Suite 1700<br>
Nashville, TN 37219<br>
Telephone: (615) 488-2901<br>
Email: jshelton@fisherphillips.com

*ATTORNEYS FOR NON-PARTY SNAPNURSE*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this 10th day of March, 2023, emailed a copy of the foregoing upon the attorneys for Plaintiff Maxim.

    /s/ Joseph Shelton
*Attorney for SnapNurse*

20

FP 46549468.1