EXHIBIT A

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of ___DeKalb_____ County

| For Clerk Use Only | |
|---|---|
| 2/16/2023 | 23A00741 |
| **Date Filed** _____ | **Case Number** _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**
Bankers Insurance Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**
Galloway, Johnson, Tompkins, Burr & Smith, APLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** ___Michael E. Pérez_____    **State Bar Number** __572127____    **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
       **Case Number**                            **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____    **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20
**STATE COURT OF
DEKALB COUNTY, GA.**
**2/16/2023 1:07 PM**
**E-FILED**
**BY: Monica Gay**

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

**BANKERS INSURANCE COMPANY**

      **Plaintiff,**

                               **CIVIL ACTION FILE NO.** 23A00741

**v.**

**GALLOWAY, JOHNSON, TOMPKINS,**
**BURR & SMITH. APLC**               **JURY TRIAL DEMANDED**

      **Defendant.**

## COMPLAINT

Plaintiff Bankers Insurance Company by and through undersigned counsel, hereby files this Complaint against Defendant Galloway, Johnson, Tompkins, Burr & Smith, APLC, and alleges:

### Parties, Jurisdiction, Venue

1.      Plaintiff Bankers Insurance Company ("Bankers") is a Florida corporation.

2.      Defendant Galloway, Johnson, Tompkins, Burr & Smith, APLC (the "Galloway Firm") is a Louisiana corporation doing business in DeKalb County, Georgia.

3.      On or about July 24, 2013, State National Insurance Company ("SNIC") issued in Florida a commercial liability insurance policy (the "Policy") to Cajun Contractors, Inc. ("Cajun Contractors"), a Florida-based general contractor. A true and correct copy of the commercial liability insurance policy is attached here as **Exhibit 1**.

4.      Pursuant to a Quota Share Reinsurance Agreement effective September 1, 2009 (the "Reinsurance Agreement"), Bankers is the reinsurer for SNIC as to certain contractors general liability and miscellaneous coverages, including the Policy.  In this regard, Bankers accepted and

1

obligated itself to 100% of SNIC's liability under, among others, the Policy.  Among other things, Bankers agreed under the Reinsurance Agreement as follows:

> [Bankers] shall assume and be liable for and pay on behalf of [SNIC], 100% of all losses incurred in connection with the risks covered by this Agreement, including, but not limited to, judgments (including interest thereon) and settlements in connection therewith. [Bankers] shall also be liable for 100% of and pay on behalf of [SNIC] all costs, expenses, and fees (including, but not limited to, attorney's fees) incurred by [SNIC] in connection with the investigation or settlement or contesting the validity of claims or losses covered under this Agreement (this shall include but, of course, is not limited to, costs, expenses and fees resulting from a declaratory judgment or injunctive action brought by an insured or other person).

5.      On or about May 2017, in accordance with its obligations under the Reinsurance Agreement, Bankers retained the Galloway Firm to represent and defend Cajun Contactors, Inc. in a lawsuit styled *Laguerre v. Peachtree Property Sub, LLC et al.*, Case No. 17A64087, in the State Court of DeKalb County, State of Georgia (the "Laguerre Lawsuit"), and to provide Bankers legal advice and assistance in connection with the Laguerre Lawsuit.

6.      The Galloway Firm is a foreign corporation with its principal place of business in New Orleans, Louisiana. At all times relevant to this Complaint, the Galloway Firm was engaged in providing legal services in Georgia. This Court has personal jurisdiction over the Galloway Firm because it is authorized to and transacts business in Georgia, it has an office located at 990 Hammond Drive, Suite 210, Atlanta, Georgia 30328, and it maintains a registered agent for service of process in Georgia. The Galloway Firm's registered agent in Georgia is Todd LaDouceur, 990 Hammond Drive, Suite 210, Atlanta, Georgia 30328, where Summons and this Complaint may be served upon it.

7.      Venue is proper in DeKalb County, Georgia, pursuant to O.C.G.A.  § 14-2-510(b)(4) as this is an action for torts, wrong, or injury done, in DeKalb County, Georgia, and the

Galloway Firm transacts business in DeKalb County, Georgia, to wit, representing Cajun Contractors in a lawsuit in DeKalb County State Court.

### The Incident That Gave Rise to the Underlying Lawsuit

8.      On or about March 23, 2015, Cajun Contractors entered into a contract with FO Peachtree Property, LLC—owner of the Crown Plaza Atlanta-Midtown (the "Hotel")—to perform construction work to the pool deck of the Hotel.

9.      On or about July 20, 2015, while Cajun Contractors was performing construction work (through their subcontractor, R&R Construction and Renovations, Inc. ("R&R")) at the Hotel, a metal pipe fell from the rooftop pool deck, allegedly striking a taxi attendant, Max Laguerre ("Laguerre") in the head, face and arm (the "Pipe Incident").

10.      On April 20, 2017, Laguerre filed the Laguerre Lawsuit against Cajun Contractors and the corporate entities that owned the Hotel (the "Hotel Defendants"), for damages Laguerre sustained as a result of the Pipe Incident, including but not limited to "mental anguish, loss of enjoyment of life . . . medical expenses, past and future, lost wages and the ability to labor . . . physical pain, mental and psychological suffering and anguish, inconvenience, and other injuries as proven at the trial of this matter." A true and correct copy of the Complaint in the Laguerre Lawsuit is attached here as **Exhibit 2**.

11.      On or about May 3, 2017, Cajun Contractors served a Notice of Claim. As a result, and pursuant to its obligations and duties under the Reinsurance Agreement, Bankers accepted coverage for the claim and undertook its duty to defend Cajun Contractors pursuant to the Policy, which contains coverage limits of $1 million per occurrence.

12.     The Laguerre Lawsuit was the first one in which Bankers defended an insured in Georgia state court. Accordingly, when it accepted coverage for the claim, Bankers sought counsel well-versed in and experienced with Georgia law to represent Cajun Contractors.

### The Galloway Firm

13.     The Galloway Firm is comprised of attorneys licensed and working from offices located in Louisiana, Georgia, Mississippi, Texas, Missouri, and Florida.

14.     Bankers had a prior existing relationship with the Galloway Firm, particularly Directors of the Galloway Firm reside in the firm's Tampa, Florida Office.  Indeed, prior to the Laguerre Lawsuit, Bankers had retained the Galloway Firm to defend its insureds in many actions brought in the state courts of Florida, Louisiana, and Texas.

15.     At the time Bankers accepted to defend Cajun Contractors in the Laguerre Lawsuit, Bankers inquired of the Galloway Firm's interest in representing Cajun Contractors.

16.     The Galloway Firm represented to and assured Bankers it had attorneys residing and licensed in Georgia, all of whom were well-versed and experienced in Georgia law and in defending the type of claims alleged in the Laguerre Lawsuit, and were very familiar with the local jurisdiction and the dynamics thereof in which the Laguerre Lawsuit was filed, DeKalb County, Georgia.

17.     Relying on those representations and assurances, Bankers retained the Galloway Firm to represent Cajun Contractors in the Laguerre Lawsuit. The Galloway Firm assigned attorneys Todd LaDouceur, Esq. (represented by the Galloway Firm to be a resident in the Pensacola, Florida, and Atlanta, Georgia offices) and Tony C. Jones, Esq. (represented by the Galloway Firm to be a resident in the Atlanta, Georgia office) as the lead attorneys for Cajun Contractors.

18.     Attorney LaDouceur has been licensed to practice law in Georgia since 1996, and describes himself as an "aggressive, skilled trial lawyer and counselor" who has tried "well over a hundred cases before a jury, judge, or arbitrator[.]" A true and correct copy of Attorney LaDouceur's website profile is attached here as **Exhibit 3**.

19.     Attorney Jones has been licensed to practice law in Georgia since 2009, and describes himself as one whose "practice and depth of experience" makes him a "sound advocate in any dispute, big or small." A true and correct copy of Attorney Jones's website profile is attached here as **Exhibit 4**.

20.     Throughout the Laguerre Lawsuit, Bankers sought and received from the Galloway Firm professional legal advice and assistance.

21.     Bankers and Cajun Contractors relied on Attorney LaDouceur's, Attorney Jones's, and the Galloway Firm's purported expertise in legal disputes of this nature.

22.     At all times mentioned, Attorney LaDouceur and Attorney Jones were the agents and employees of the Galloway firm, and were at all times acting within the purpose and scope of their agency and employment. The Galloway Firm is responsible for the acts of its principals, employees, partners, associates, of counsel attorneys, and other agents—including but not limited to all acts committed by Attorney LaDouceur and Attorney Jones as identified herein—under the doctrine of respondeat superior and other applicable Georgia law.

23.     Although the Galloway Firm represented the more senior attorney LaDouceur would share responsibility for the representation of Cajun Contractors, his actual participation in the defense was minimal, leaving the case to be handled by the far junior attorney Jones.  Indeed, Attorney LaDouceur did not spend significant time at the Galloway Firm's Atlanta office and did not even attend the ultimate trial of the action before the DeKalb County jury.

24.     Bankers paid the fees of the Galloway Firm in defending Cajun Contractors in, and providing professional legal advice to Bankers and Cajun Contractors in connection with, the Laguerre Lawsuit.

## The Galloway Firm's Defense

25.     From the onset of the Laguerre Lawsuit through trial, the Galloway Firm asserted as Cajun Contractors's principal defense that Cajun Contractors could not be held liable for Laguerre's injuries (or would, at most, be held responsible for only a small portion thereof) because Cajun Contractors did not commit any independent acts of negligence, and could not be held responsible for the negligent acts committed by the Hotel Defendants, as well as those committed by Cajun Contractors's subcontractor, R&R.

26.     Based on its principal theory, the Galloway Firm filed a "Notice of Non-Party Fault" pursuant to O.C.G.A. § 51-12-33, a procedural tool under Georgia law, with which Bankers was previously unfamiliar, in which the jury is directed to apportion fault to the non-party named therein. The Galloway Firm named R&R as the non-party at fault.

27.     Maintaining the position that Cajun Contractors would not be liable for any independent acts of negligence, nor for any negligent acts of the Hotel Defendants or R&R, the Galloway Firm conducted very limited discovery to ascertain the basis for Laguerre's alleged damages and his theories of liability against Cajun Contractors.

28.     Indeed, while Laguerre retained two medical experts to testify as to the extent of Laguerre's traumatic brain injury and retained a separate expert to testify to the safety procedures Cajun Contractors allegedly neglected to follow, the Galloway Firm did not retain, nor even consult with, a single expert to rebut the testimony of the experts retained by Laguerre.

**Settlement Offers, Disclosures of Laguerre's
Alleged Injuries, and the Galloway Firm's Recommendations**

29.     On or about January 24, 2018, Laguerre served all defendants in the Laguerre Lawsuit an Offer of Judgment in the amount of $250,000, for global resolution of his claims— well within the limits of the Policy. *See* January 24, 2018 Offer of Judgment attached hereto as **Exhibit 5**. In advising Bankers on the January 24, 2018, Offer of Judgment, attorney Jones stated: "Assuredly, there is absolutely no basis for accepting this offer[.]" A true and correct copy of the March 12, 2018 litigation update is attached hereto as **Exhibit 6**.

30.     On or about April 24, 2018, Laguerre served Cajun Contractors (via Bankers) in the Laguerre Lawsuit an Offer of Judgment in the amount of $75,000, for resolution of his claims solely against Cajun Contractors—again, well within the limits of the Policy. *See* April 24, 2018 Offer of Judgment attached here as **Exhibit 7**.[1]

31.     Attorney Jones advised against accepting either of Laguerre's offers, despite both offers triggering O.C.G.A. § 9-11-68, a Georgia-specific statute that makes a defendant liable for a plaintiff's attorneys' fees where the "plaintiff recovers a final judgment in an amount greater than 125 percent of" the amount offered in the Offer of Judgment. Instead, after receiving the $75,000 offer, Attorney Jones suggested Bankers make a counter-offer in the amount of just $25,000. When Laguerre summarily rejected the counter-offer, Attorney Jones advised Bankers increase the offer to $50,000. That counter-offer was likewise rejected.

32.     On or about June 19, 2018, Laguerre's counsel represented to Attorney Jones that Laguerre would accept $125,000 for global settlement for all claims. When communicating this offer to Bankers, Attorney Jones stated "[o]f course, both her settlement offer and the desired

---

[1] On the same day, Laguerre served the Hotel Defendants an identical Offer of Judgment for $75,000, for resolution of all claims thereagainst.

settlement range are higher than our current evaluation of the Plaintiff." A true and correct copy of the June 19, 2018, correspondence is attached here as **Exhibit 8.**

33.     On or about March 28, 2019, Laguerre served on the Galloway Firm a settlement demand pursuant to *Southern General Ins. Co. v. Holt,* 416 S.E.2d 274, 262 Ga. 267 (1992), in which he demanded the policy limits of $1 million. In this demand, Laguerre's counsel outlined in detail the extent of Laguerre's injuries, which then allegedly included "blunt trauma to the head, hemorrhaging, and lacerations," "open fracture of the upper right nasal bone" requiring surgery, and "headaches once or twice a week . . . dizziness, anxiety, occasional nightmares, depression, episodes of altered consciousness and cognitive impairment consistent with post-concussional syndrome." Laguerre's counsel further warned that should Bankers "fail to satisfy the terms of this Time-Limited Demand, [Bankers] will be subjecting its insured to liability in excess of the limited liability insurance coverage" and Bankers would be "liable to the [Cajun Contractors] for negligent handling of the claim and/or bad faith failure to protect the insured" and, therefore, "fully liable to satisfy the judgment."   A true and correct copy of the March 28, 2019 settlement demand is attached here as **Exhibit 9**.

34.     By this demand, Laguerre's counsel notified the Galloway Firm that Laguerre "suffered a traumatic brain injury as a result of the blunt force trauma to his head from the falling pipe," that Laguerre "is in the very small percentage of concussion patients whose traumatic brain injury is permanent" requiring "medical management for the rest of his life from this injury," and that Dr. Angela Ashley—Laguerre's treating neurologist—was prepared to testify as to the severity of these injuries. *Id*.

35.     Based on this, Laguerre's counsel warned the Galloway Firm as follows:

[A] jury in Dekalb County, Georgia will comfortably award Mr. Laguerre an amount well into the 7-figure range for his pain and suffering alone [and]

> [c]ombined with Mr. Laguerre's emotional distress and permanent structural brain changes, the verdict in this case can easily exceed [Cajun Contractors's] policy limits.

*Id.* Laguerre's counsel likewise warned the Galloway Firm that it would be seeking punitive damages and attorneys' fees. *Id.*

36.   Despite this, when conveying this offer to Bankers, Attorney Jones merely stated "[o]bviously, this is <u>not</u> a million dollar case. His damages remain at $40,000 . . . We will begin preparing a response declining their offer." A true and correct copy of the March 28, 2019, correspondence is attached here as **Exhibit 10**.

37.   In response to this settlement demand alleging a "traumatic brain injury," Bankers immediately asked Attorney Jones: "Do we need to schedule and [sic] IME?" A true and correct copy of this April 8, 2019, correspondence is attached here as **Exhibit 11**.

38.   Attorney Jones recommended against conducting an Independent Medical Examination ("IME") and went on to explain that Dr. Ashley, Plaintiff's expert who provided the traumatic brain injury diagnosis, "has a known reputation as a 'Plaintiff's doc for hire down here.'" *Id.*

39.   Relying on Attorney Jones's advice and expertise, Bankers declined Laguerre's settlement offer.

40.   On May 8, 2019, the Galloway Firm provided Bankers with its "Pre-Trial Report." In it, the Galloway Firm noted Dr. Ashley's diagnosis of a severe traumatic brain injury and "that Plaintiff will suffer from a permanent brain disability for the rest of his life." The Galloway Firm went on to advise Bankers that: (1) "[i]t will be next to impossible for [Laguerre] to prove [lost wages] at trial" (2) "there is no evidence to support [Laguerre's] claim of punitive damages, and

(3) "on [Bankers's] worst day, it is our expectation that their liability **will not exceed $120,000**." A true and correct copy of the May 8, 2019, Pre-Trial Report is attached here as **Exhibit 12**.

41.     This advice was expressly based on the Galloway Firm's repeated assumption and "expectation" that the jury would only apportion, at most, "30% of fault to Cajun" under the Notice of Non-Party Fault. This being an area unique to Georgia law, in rejecting Laguerre's demands for settlement of the claim against Bankers's insured within the limits of the Policy, Bankers relied on the Galloway Firm's repeated expectations and advice regarding its assessment of damages and, as important, the limited apportionment of those damages to Cajun Contractors.

42.     The Galloway Firm came to its conclusions regarding the damages the jury may award without fully understanding or discovering evidence to support Laguerre's theories of liability against Cajun Contractors, consulting an independent medical expert regarding Laguerre's alleged damages, retaining a medical expert to refute Dr. Ashley's findings, conducting an IME on Laguerre related to his alleged damages, or engaging in any reasonable due diligence of Laguerre's alleged damages.

43.     Prior to trial, the Galloway Firm never recommended the retention of and never retained any medical experts to review or provide opinions regarding the diagnosis and anticipated testimony of Plaintiff's medical experts, Dr. Angela Ashley and Dr. David Owens, and never performed an IME of Laguerre to confirm or call into question his claimed injuries or the diagnosis of Drs. Ashley or Owens.

44.     Despite these failures, the Galloway Firm continued to advise Bankers it had limited exposure and advised against substantially increasing offers of settlement.

45.     Relying on the Galloway Firm's expertise, assessment of the claims, and recommendations, Bankers last settlement offer to Laguerre before trial was $150,000.

**The Hotel Defendants' Indemnification Demands and $1,000,000 Settlement**

46.     After being served with the complaint naming them as co-defendants, the Hotel

Defendants filed their Answer denying they were liable to Laguerre and asserted a cross-claim

against Cajun Contractors asserting various claims for indemnification and contribution under

common law and pursuant to a contractual indemnification provision contained in the contract

between Cajun Contractors and the Hotel Defendants.

47.     On or about April 1, 2019, the Hotel Defendants tendered a request for defense and

indemnity on Cajun Contractors pursuant to the indemnity provision of the contract between them

and Cajun Contractors.  As part of that tender, the Hotel Defendants asked Cajun Contractors to

respond to Laguerre's settlement demands and to take steps to effectuate a "global settlement" on

their behalf.  A true and correct copy of the Hotel Defendants' April 1, 2019, demand is attached

here as **Exhibit 13**.

48.     On the recommendation and advice of the Galloway Firm, Cajun Contractors did

not accept the Hotel Defendants' tender.

49.     On June 12, 2019, with trial set to commence in mere days, the Hotel Defendants

renewed their indemnification demand and further wrote:

> In light of the severity of the injuries claimed in this lawsuit, we hereby demand
> that they make any and all aggressive efforts to settle this case at or within your
> limits and secure a full and final release of our clients prior to trial.
>
> We have been advised your last offer of $150,000 has not settled this case.  What
> steps have you taken to try and get this case resolve (sic) before June 17, 2019.  It
> is clear a more substantial offer should be extended and more substantial effort
> should be made to conclude this matter.  We note Dekalb County is a liberal and
> plaintiff friendly venue making trial risk and could expose my client to an excess
> verdict for a claim that clearly rests within your limits.
>
> A true and correct copy of the Hotel Defendant's June 12, 2019, letter is here attached as

**Exhibit 14.**

50.     The Galloway Firm continued to downplay and disregard the level of concern expressed by the Hotel Defendants and continued to recommend Bankers deny the Hotel Defendants' tender or increase the monetary offer to reach a global settlement between the $150,000 last offered by Bankers and the $1,000,000 last demanded by Laguerre.

51.     On June 17, 2019, the Hotel Defendants notified Galloway Johnson that after having been refused indemnification and because no global settlement had been reached, "on June 14, 2019, the Hotel Defendants entered into an agreement to settle the Plaintiff's claims set forth in the Complaint for $1,000,000." A copy of the Hotel Defendants' June 17, 2019, letter is attached here as **Exhibit 15**.

52.     The Hotel Defendants went on to demand from Cajun Contractors payment of the full $1,000,000, plus costs, pursuant to the indemnification provision of the contract between the parties.

### The Trial of the Laguerre Lawsuit

53.     On June 17, 2019, trial began in the Laguerre Lawsuit. Attorney LaDouceur did not attend trial.  Rather, Attorney Jones was the lead trial counsel for Cajun Contractors and was assisted by another Galloway Firm attorney with fewer than four years of experience as an attorney.

54.     At trial, Dr. Angela Ashley testified that Laguerre suffered from a severe traumatic brain injury, and that he would suffer severe neurological symptoms for the rest of his life.

55.     At trial, Dr. David Owens—the doctor who interpreted Laguerre's brain scans— testified that Laguerre's diffusor tensor imaging showed that Laguerre's brain had multiple areas of abnormal volume loss.

56.     Because it had not ever retained any medical experts to even review Laguerre's medical records or claims of injury, the Galloway Firm did not present for Cajun Contractors at trial any medical experts (or any experts at all) to challenge Laguerre's claimed injuries or the medical testimony of Dr. Angela Ashley and Dr. David Owens.

57.     Instead, to challenge the damages for traumatic brain injury Laguerre claimed, the Galloway Firm relied on attempting to show the jury Dr. Ashley had a "reputation" as a "Plaintiff's doctor for hire" and Dr. Owens charged a fee of $5,000 to testify at trial.

58.     The Galloway Firm also relied heavily on the fact that Laguerre failed to visit Dr. Ashley for "3 years, 3 months, and 6 days" after the Pipe Incident (a fact that Attorney Jones repeated excessively during trial), despite Dr. Ashley's medical testimony given during her deposition prior to, and then presented at, trial that such a delay did not affect her diagnosis of TBI, but in fact, bolstered her medical opinion the TBI was "permanent."

## Charge Conference and Verdict Form

59.     At the charge conference, Laguerre's counsel requested the Court include a jury instruction requiring the jury to determine whether R&R was an "employee" of Cajun Contractors (thereby exposing Cajun Contractors to the full extent of the damages apportioned to R&R as a matter of law) *prior to* apportioning damages to R&R individually pursuant to O.C.G.A. § 51-12-33.

60.     Such an instruction is improper under Georgia law as it completely nullifies the purpose of invoking apportionment to non-parties under O.C.G.A. § 51-12-33, which the Galloway Firm had invoked and so heavily relied upon in advising Bankers on the potential amount of damages for which Cajun could be found liable.

61.     Although Attorney Jones initially objected to the instruction requested by Laguerre's counsel, he ultimately accepted the court's proposed verdict form including the

13

vicarious liability question ***prior to*** the apportionment question, without objection, telling the court the instructions and verdict form question were "fine."  Attorney Jones never thereafter renewed his objection to the jury instructions or verdict form and, therefore, waived and failed to preserve the error for appeal.

**The Jury Returned a Multi-Million Verdict Against Cajun Contractors**

62.     On June 20, 2019, after only 2 hours of deliberation, the jury entered a verdict in favor of Laguerre, awarding him $5 million dollars in compensatory damages, as well as punitive damages in the amount of $500,336.00 (the $336.00 is a thinly-veiled rebuke of Attorney Jones's repeated argument during trial that Laguerre waited "3 years, 3 months and 6 days" to see Dr. Ashley about his alleged brain injuries).[2]

63.     Because, based on the jury instruction and verdict form to which Attorney Jones agreed, the jury determined R&R was an "employee" of Cajun Contractors prior to apportioning fault between Cajun Contractors and R&R individually, the jury apportioned 100% of fault to Cajun Contractors, making Cajun Contractors liable for the entirety of the Judgment. A true and correct copy of the Judgment entered is attached here as **Exhibit 16**.

64.     On January 30, 2020, the Court entered an order awarding Laguerre his reasonable attorneys' fees ($1,050,000.00) and costs ($45,196.47) under Georgia's Offer of Judgment statute, based on Laguerre's recovery through final judgment of an amount greater than 125% of the $75,000 demanded in the April 24, 2018, Offer of Judgment to settle all claims against Cajun Contractors.

65.     The Galloway Firm's appeal of the jury's verdict in the Laguerre Lawsuit was ultimately unsuccessful.

---

[2] The punitive damage award was reduced to $250,000 per Georgia statute.

66.     In the end, Cajun Contractors (and therefore Bankers), was found liable for a judgment in excess of $7.3 million.

**Bankers Paid the Judgment on Behalf of Cajun Contractors**

67.     Throughout the Laguerre Lawsuit and trial, Cajun Contractors repeatedly demanded that Bankers settle the Laguerre Lawsuit within the $1 million policy limits. After the judgment was entered, Cajun Contractors notified Bankers that it was investigating a potential bad-faith action against Bankers for failure to settle the Laguerre Lawsuit within the policy limits.

68.     Laguerre's counsel likewise repeatedly threatened, both before and after trial, to seek bad-faith damages against Bankers as a third-party and/or via assignment from Cajun Contractors, which claim would necessarily be brought under Florida law governing the Policy. Given Bankers did not settle the case in reliance on the Galloway Firm's expertise and advice, a bad-faith claim against Bankers was certain.

69.     Accordingly, in February of 2021, to avoid bad-faith claims from Cajun Contractors and/or Laguerre and to stop the running of post-judgment interest, Bankers paid Laguerre $6,423,000 in satisfaction of the Judgment.

70.     In accordance with O.C.G.A. § 9-11-9.1(a), the Affidavit of Tricia "CK" Hoffler, Esq., a duly licensed attorney and an expert competent to testify as to the acts and omissions of the Galloway Firm, is attached and incorporated here as **Exhibit 17.**

71.     All conditions precedent to bringing this action have occurred, been satisfied, or have been waived.

**COUNT I – LEGAL MALPRACTICE**

72.     Bankers hereby adopts, re-alleges and incorporates by reference paragraphs 1 through 71 of this Complaint as if fully set forth here.

73.     At all times relevant hereto, a tripartite- attorney-client relationship existed between Cajun Contractors, Bankers, and the Galloway Firm.

74.     While representing Cajun Contractors in, and providing legal advice and assistance to Bankers in connection with, the Laguerre Lawsuit, the Galloway Firm had a duty to exercise that degree of care, skill, and diligence as would ordinarily be possessed and exercised by attorneys who represent clients and provide legal advice and assistance under the same or similar circumstances in Georgia or elsewhere.

75.     The acts and omissions of the Galloway Firm's agents and employees, specifically Attorney LaDouceur and Attorney Jones, breached the required care, skill, and diligence, constituting negligence, by, among other things, negligently and carelessly handling the legal representation and advising and providing assistance to Bankers in connection with it.  The acts of negligence include, without limitation:

  a.  Failing to investigate, discover, retain qualified experts on, and advise Bankers and Cajun Contractors on Laguerre's theories of liability against Cajun Contractors;

  b.  Failing to reasonably investigate and retain qualified experts to evaluate Laguerre's claimed injuries, including but not limited to his claim of traumatic brain injury;

  c.  Failing to notify Cajun Contractors and/or Bankers of the potential liability associated with the special damages pled by Laguerre (including those resulting from a traumatic brain injury), and instead consistently advising Bankers that Laguerre's damages were less than $50,000;

  d.   Failing to retain an expert to evaluate and testify at trial to rebut the findings of Drs. Ashley and Owens;

e.  Consistently advising Bankers to refuse Laguerre's settlement offers within the Policy limits—asserting that Bankers' potential exposure "on its worst day" could not exceed $120,000—despite not taking any reasonable steps to assess the damages Laguerre alleged;

f.  Failing to reasonably advise Bankers and Cajun Contractors regarding the Hotel Defendants' indemnification demand and thereby exposing Cajun Contractors to the entirety of the Hotel Defendants' $1,000,000 settlement with Laguerre; and,

g.  Waiving objections to the improper jury instructions and verdict form and agreeing to jury instructions and a verdict form that did not require any allocation of fault to the subcontractor, R&R.

76.    As a direct and proximate result of the Galloway Firm's breach of the applicable standard of care and negligence, Bankers has suffered special damages in an amount to be proved at trial, including but not limited to, the judgment for more than $6.4 million dollars that it was required to satisfy.

## COUNT II – BREACH OF FIDUCIARY DUTY

77.    Bankers hereby adopts, re-alleges and incorporates by reference paragraphs 1 through 76, as though fully set forth here.

78.    The Galloway Firm owed Bankers a fiduciary duty to exercise the utmost good faith and to apply its best skill, zeal, and diligence in representing its beneficial insured, Cajun Contractors.

79.    The Galloway Firm breached its fiduciary duty by, as described above and among other things, failing to investigate the viability and/or extent of Laguerre's damages, and

consistently advising Bankers to reject Laguerre's settlement demands without first conducting a reasonable investigation into the viability and/or extent of Laguerre's damages.

80.     As a direct and proximate result of the Galloway Firm's breach of its fiduciary duty, Bankers has suffered special damages in an amount to be proven at trial, including but not limited to, the judgment for more than $6.4 million that Bankers was required to satisfy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands:

(a) That Summons issue requiring the Defendant to be and appear in this Court within the time provided by law to answer this Complaint;

(b) That the Court enter a judgment in favor of Plaintiff and against Defendant for compensatory damages, attorney's fees and expenses, and costs of Court;

(c) That Plaintiff receives a trial by jury on all issues; and

(d) That this Court grant such other further relief as the Court deems just and proper.

**Bankers Hereby Demands a Jury Trial on All Counts So Triable.**

This 16th day of February, 2023.

**THE PEREZ LAW FIRM, LLC**

/s/ Michael E. Pérez
Michael E. Pérez
Georgia Bar No. 527127
***Attorney for Plaintiff Bankers Insurance Company***

3575 Piedmont Road, N.E.
Building 15-L130
Atlanta, Georgia 30305
T: (404) 480-4286
F: (470) 780-6925
E: michael@perezfirmllc.com

STATE COURT OF
DEKALB COUNTY, GA.
2/16/2023 1:07 PM
E-FILED
BY: Monica Gay

**BARTETT LOEB HINDS & THOMPSON, PLLC**

E. Colin Thompson*
Florida Bar No. 0684929
Ethan J. Loeb*
Florida Bar No. 0668338
Christina Dodds*
Texas Bar No. 03813520

***Attorneys for Plaintiff Bankers Insurance Company***

*\*Pro Hac Vice Applications forthcoming*

100 North Tampa Street, Suite 2050
Tampa, FL. 33602
T: (813) 223-3888
F: (813) 228-6422
E: colint@blthlaw.com
E: ethanl@blthlaw.com
E: cdodds@blthlaw.com

1900 L. Don Dodson Drive
Bedford, Texas 76021
800-627-0000

5355489
5/04/17

## COMMERCIAL LINES POLICY
## DECLARATIONS PAGE

**Policy Number:**

BIC  09 0480000610 5 01
5030 00000 SNIC PPP2

AMENDED
Effective:  4/03/15

Date of Issue:  5/04/17     Page 1 of  1

| Policy Period | | Inception Date | Agent | Agent's Phone |
|---|---|---|---|---|
| From:  7/24/14 To:  7/24/15  12:01 a.m., Standard Time | | 7/24/13 12:01 AM | 00 0100010 | (850) 476-2733 |

LUCAS COMMERCIAL INSURANCE INC
PO BOX 174
CANTONMENT FL 32533

CAJUN CONTRACTORS INC  CAJUN
DEVELOPERS INC
PO BOX 5310
NAVARRE FL 32566-0310

BRYANM

### BUSINESS DESCRIPTION

RGC Including Light Commercial Work

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

### COVERAGES

This policy consists of the following coverage parts for which premium is indicated.  This premium may be subject to adjustment.

| | | |
|---|---|---|
| Commercial Property Coverage Part | $ | N/A |
| Commercial General Liability Coverage Part | $ | 7,031.00 |
| Employment Benefits Liability Coverage Part | $ | |
| Commercial Crime Coverage Part | $ | N/A |
| Commercial Inland Marine Coverage Part | $ | 100.00 |
| Managing Agent Fee | $ | 25.00 |
| Terrorism Premium (Certified Acts) | $ | 0.00 |
| Total Assessments | $ | 72.00 |
| TOTAL PREMIUM | $ | 7,228.00 |

### FORMS AND ENDORSEMENT(S) made a part of this policy at time of issue*:

BICOM99.101 0608     SCL 150 1009     SCIM99.001 1009     IL 00 03 0908
IL 00 17 1198

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

_____ Bedford, Texas      5/04/17
Countersigned by Authorized Representative                    Date

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE
PART DECLARATIONS, COVERAGE FORMS(S) AND FORMS AND ENDORSEMENTS, IF ANY,
ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Requests for service and questions regarding coverage should be directed to your agent. In the event of an emergency where you are unable to contact your agent, you may contact us directly at the following number 1-800-627-0000.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© ISO Properties, Inc., 2006



**EXHIBIT 1**
Insured

09  0480000610 5 01

**Addl  Insured**
<NONE>



Insured

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                              5/04/17
5030 00000 SNIC PPP2

# STATE NATIONAL INSURANCE COMPANY
## BEDFORD TEXAS

_____

# STATE NATIONAL INSURANCE COMPANY
_____

Questions regarding this policy or any claims associated with it may be directed to:

**P.O Box 33060**
**St. Petersburg, Florida  33733-8060**
**Toll Free  1.800.627.0000 or**
**Tel.  727.823.4000**



I

IN WITNESS WHEREOF, WE HAVE CAUSED THIS POLICY TO BE EXECUTED AND ATTESTED, AND, IF REQUIRED BY STATE LAW, THIS POLICY SHALL NOT BE VALID UNLESS COUNTERSIGNED BY OUR AUTHORIZED REPRESENTATIVES.

**SECRETARY**                    **PRESIDENT**



5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                    5/04/17
 5030  00000  SNIC  PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

### 2. Cancellation Of Policies In Effect

#### a. For 90 Days Or Less

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

**(a)** A material misstatement or misrepresentation; or

**(b)** A failure to comply with the underwriting requirements established by the insurer.

#### b. For More Than 90 Days

If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** The policy was obtained by a material misstatement;

**(3)** Failure to comply with underwriting requirements established by the insurer within 90 days of the effective date of coverage;

**(4)** A substantial change in the risk covered by the policy; or

**(5)** The cancellation is for all insureds under such policies for a given class of insureds.

If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(b)** 45 days before the effective date of cancellation if we cancel for any of the other reasons stated in Paragraph **2.b.**

**B.** Paragraph **3.** of the **Cancellation** Common Policy Condition is replaced by the following:

**3.** We will mail or deliver our notice to the first Named Insured at the last mailing address known to us.

© Insurance Services Office, Inc., 2011



**Page 1 of 2**

I

**C.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any premium refund due shall be mailed within 10 working days of receipt of your audit.

The cancellation will be effective even if we have not made or offered a refund.

**D.** The following is added and supersedes any other provision to the contrary:

**Nonrenewal**

**1.** If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

**2.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

© Insurance Services Office, Inc., 2011

5355489
5/04/17

State National Insurance Company

Policy Number

Date

09 0480000610 5 01
5030 00000 SNIC PPP2

5/04/17

# QUICK REFERENCE
## COMMERCIAL GENERAL LIABILITY COVERAGE PART
### CL 175 (2-86)
### READ YOUR POLICY CAREFULLY

The Commercial General Coverage Part in your policy consists of Declarations, a Coverage Form (either CG 00 01 or CG 00 02), Common Policy Conditions and Endorsements, if applicable. Following is a Quick Reference indexing of the principal provisions contained in each of the components making up the Coverage Part, listed in sequential order, except for the provisions in the Declarations which may not be in the sequence shown.

**DECLARATIONS**

  Named Insured and Mailing Address

  Policy Period

  Description of Business and Location of Premises

  Limits of Insurance

  Forms and Endorsements applying to the Coverage Part at time of issue

**COVERAGE FORM (CG 00 01 or CG 00 02)**

  SECTION I – COVERAGES

    Coverage A – Bodily Injury And Property Damage Liability

      Insuring Agreement

      Exclusions

    Coverage B – Personal And Advertising Injury Liability

      Insuring Agreement

      Exclusions

    Coverage C – Medical Payments

      Insuring Agreement

      Exclusions

    Supplementary Payments

  SECTION II – WHO IS AN INSURED

  SECTION III – LIMITS OF INSURANCE

  SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

  Bankruptcy

  Duties In The Event Of Occurrence, Claim Or Suit

  Legal Action Against Us

  Other Insurance

  Premium Audit

  Representations

  Separation Of Insureds

  Transfer Of Rights Of Recovery Against Others To Us

  When We Do Not Renew (applicable to CG 00 02 only)

  Your Right To Claim And "Occurrence" Information (applicable to CG 00 02 only)

  SECTION V – EXTENDED REPORTING PERIODS (applicable to CG 00 02 only)

  SECTION VI – DEFINITIONS (SECTION V in CG 00 01)

**COMMON POLICY CONDITIONS (IL 00 17)**

  Cancellation

  Changes

  Examination Of Your Books And Records

  Inspections And Surveys

  Premiums

  Transfer Of Your Rights And Duties Under This Policy

**ENDORSEMENTS (If Any)**



Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1982, 1984, 1986
Page 1 of 1

I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                     5/04/17
5030 00000 SNIC PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.,
Exclusions** of **Section I - Coverage A -- Bodily
Injury And Property Damage Liability** and Para-
graph **2., Exclusions** of **Section I - Coverage B -
Personal And Advertising Injury Liability:**

**1.** This insurance does not apply to "bodily injury" ,
"property damage" or "personal and advertising in-
jury" arising out of the rendering of or failure to
render any professional services by you or on your
behalf, but only with respect to either or both of the
following operations:

  **a.** Providing engineering, architectural or survey-
  ing services to others in your capacity as an
  engineer, architect or surveyor; and

  **b.** Providing , or hiring independent professionals
  to provide, engineering, architectural or survey-
  ing services in connection with construction
  work you perform.

This exclusion applies even if the claims against any
insured allege negligence or other wrongdoing in the
supervision, hiring, employment, training or
monitoring of others by that insured, if the
"occurrence" which caused the "bodily injury" or
"property damage", or the offense which caused the
"personal and advertising injury", involved the
rendering of or failure to render any professional
services by you or on your behalf with respect to the
operations described above.

**2.** Subject to Paragraph **3.** below, professional ser-
vices include:

  **a.** Preparing, approving, or failing to prepare or
  approve, maps, shop drawings, opinions, re-
  ports, surveys, field orders, change orders, or
  drawings and specifications; and

  **b.** Supervisory or inspection activities performed
  as part of any related architectural or engineer-
  ing activities.

**3.** Professional services do not include services with-
in construction means, methods, techniques, se-
quences  and procedures employed by you in con-
nection  with your operations in your capacity as a
construction contractor.



© Insurance Services Office, Inc., 2012          **Page 1 of 1**

I

09 0480000610 5 01 5355489
5/04/17

State National Insurance Company

Policy Number | Date

09 0480000610 5 01 | 5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PROTECTIVE SAFEGUARD ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE

The following is added to the **COMMERCIAL INLAND MARINE CONDITIONS FORM:**

**PROTECTIVE SAFEGUARD**

We will not pay for loss or damage to Covered Property caused by or resulting from theft unless Covered Property is located in a "building" or in a "motor vehicle" and there is evidence of marks of forcible entry into the "building" or "motor vehicle" while all of its doors, windows and other openings are closed and locked. A locked tool box or tool carrier of sound construction, permanently mounted to a "motor vehicle" bed or chassis is considered part of an entirely enclosed body.

In the event the "building" or "motor vehicle" is not entirely enclosed, any Covered Property must be secured to the "building" or "motor vehicle" by means of a permanently mounted chain, metal

cable or locking device which is attached to the "building" or "motor vehicle" for coverage to apply.

No claim for loss by theft shall be valid hereunder unless there is evidence by marks of forcible entry or the entire "motor vehicle" is stolen.

"Building" means a walled and roofed structure, other than a gas or liquid storage tank, that is principally above ground and affixed to a permanent site, including a manufactured home on a permanent foundation.

"Motor Vehicle" means a land motor vehicle, trailer or semitrailer licensed for travel on public roads.



Page 1 of 1

I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                          5/04/17
5030 00000 SNIC PPP2

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.



© Insurance Services Office, Inc., 2008

I

0120250908
5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                     5/04/17
5030  00000  SNIC  PPP2

This endorsement changes
the policy
**- PLEASE READ THIS CAREFULLY-**

# CERTIFIED TERRORISM LOSS

1. The following definitions are added.

    a. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:

        1) to be an act of terrorism;

        2) to be a violent act or an act that is dangerous to human life, property, or infrastructure;

        3) to have resulted in damage:

            a) within the United States; or

            b) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

        4) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy of affect the conduct of the United States Government by coercion; and

        5) to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

    b. "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2. The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

    This exclusion does not apply to "certified terrorism loss".

3. The following provision is added.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a Program Year (January 1 though December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a Program Year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4. The following provisions are added.

    a. Neither the "terms" of this endorsement nor the "terms" on any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1) exclusions that address war, military action, or nuclear hazard; or

        2) any other exclusion; and

    b. the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by the Coverage Part under:

        1) exclusions that address war, military action, or nuclear hazard; or
        2) any other exclusion.



Copyright, American Association of Insurance Services, Inc. 2008
Page 1 of 1

I

5355489
5/04/17

State National Insurance Company


09 0480000610 5 01                                              5/04/17
5030 00000 SNIC PPP2


This endorsement changes
the policy
- PLEASE READ THIS CAREFULLY-


# CERTIFIED TERRORISM LOSS DISCLOSURE OF PREMIUM AND FEDERAL SHARE OF INSURED LOSSES

(The entries required to complete this endorsement will be shown
below, on the "declarations", or on the "schedule of coverages".)


## SCHEDULE


Certified Terrorism Loss Premium  $ 0.00


Additional information, if any, concerning terrorism premium:


1) The portion of "your" premium that is attributed to coverage for "certified terrorism loss" is shown in the Schedule above.

2) Coverage for "certified terrorism loss", to the extent that such coverage is provided by this policy or Coverage Part, will be partially reimbursed by the United States Government, Department of Treasury under a federal program. Under that program, the United States pays 85% of insured losses for "certified terrorism loss" that exceeds the statutorily established deductible that "we" retain. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed one hundred billion dollars in a Program Year (January 1 through December eq), the Treasury will not make payment for any portion of the amount of such losses that exceeds one hundred billion dollars.

   If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded on hundred billion dollars in a Program Year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a Program Year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.


Copyright, American Association of Insurance Services, Inc. 2008



I

5355489
5/04/17

State National Insurance Company

Policy Number                                                                              Date

09 0480000610 5 01                                                                    5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CG 03 00 01 96

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

   PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement effective                12:01 A.M. standard time | Policy No. |
|---|---|
| Named Insured | Countersigned by |

(Authorized Representative)

### SCHEDULE

| Coverage | Amount and Basis of Deductible | | |
|---|---|---|---|
| | PER CLAIM | or | PER OCCURRENCE |
| Bodily Injury Liability | $ | | $ |
| OR | | | |
| Property Damage Liability | $ | | $ |
| OR | | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ | | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage," however caused):

**A.** Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

**B.** You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the

basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

**1.** **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

   **a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person be-



Copyright, Insurance Services Office, Inc., 1994

I

cause of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

   **(1)** "Bodily injury";

   **(2)** "Property damage"; or

   **(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence."

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury," a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage," person includes an organization.

**2. PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

   **a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   **b.** Under Property Damage Liability Coverage,

to all damages because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

   **(1)** "Bodily injury";

   **(2)** "Property damage"; or

   **(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence," regardless of the number of persons or organizations who sustain damages because of that "occurrence."

**C.** The terms of this insurance, including those with respect to:

   **1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

   **2.** Your duties in the event of an "occurrence," claim, or "suit"

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

0062250908
5355489
5/04/17

State National Insurance Company

09 0480000610 5 01
5030 00000 SNIC PPP2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

5/04/17

# AMENDATORY ENDORSEMENT
## FLORIDA

1. Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

**Cancellation and Nonrenewal** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

"We" may cancel or not renew this policy by written notice to "you" at the address shown in the policy. "Our" notice will state the specific reasons for cancellation or nonrenewal. Proof of delivery or mailing is sufficient proof of notice.

"We" may cancel or not renew this policy on the basis of property insurance claims that are the result of an act of God only if "we" can show, by claims frequency or otherwise, that "you" have failed to take action reasonably necessary as requested by "us" to prevent further damage to "your" property.

"We" may cancel or not renew this policy on the basis of a single property claim which is the result of water damage, only if "we" can demonstrate that "you" have failed to take action reasonably requested by "us" to prevent a future similar occurrence of damage to the insured property.

"We" may cancel or not renew this policy on the basis of filing of claims for partial loss caused by sinkhole activity or clay shrinkage only if the total of claim payments for this policy exceeds the current policy limits of coverage for property damage, or if "you" have failed to repair the structure in accordance with the engineering recommendations upon which any payment or policy proceeds were based.

a. If this policy has been in effect for 90 days or less, "we" may cancel for any reason.

1) If this policy is issued to cover one-to four-family dwellings used for residential purposes, condominium associations, apartment buildings, or any personal property incidental to residential occupancies and immediately prior to the date of the cancellation notice, the insurance on "your" property was provided for at least five years by "us" and/or by one or more insurers affiliated with "us", "we" will give "you" notice at least ten days before the cancellation is to be effective if "we" cancel for nonpayment of premium. If we cancel for any other reason, "we" will give you notice at least 180 days in advance of cancellation.

2) For policies other than those described in 1) above, "we" will give "you" notice at least ten days before the cancellation is to be effective if "we" cancel for nonpayment of premium, material misstatement or misrepresentation, or failure to comply with the underwriting requirements that "we" have established. If we cancel for any other reason, "we" will give "you" notice at least 20 days before the cancellation is to be effective.

b. If the policy has been in effect for more than 90 days, or if it is a renewal of a policy issued by "us":

1) "we" may cancel or not renew this policy only at the anniversary date unless one or more of the following reasons apply:

a) the premium has not been paid when due;

b) there has been material misstatement or misrepresentation;

c) there has been failure to comply with underwriting requirements that "we" established within 90 days of the policy effective date;



Copyright, American Association of Insurance Services, Inc., 2008
**Page 1 of 3**

I

d) there has been a substantial change in the risk covered; or

e) there has been cancellation for all insureds for a given class of insureds.

2) "We" will give "you" notice at least ten days before the cancellation is to be effective if "we" cancel for nonpayment of premium.

3) If this policy is issued to cover one-to four-family dwellings used for residential purposes, condominium associations, apartment buildings, or any personal property incidental to residential occupancies, and:

a) "we" cancel for nonpayment of premium which results from failure of the mortgagee to pay the premium when due, "we" will reinstate the policy retroactive to the date of cancellation if the premium is received not more than 90 days after the due date. By Florida statute, the mortgagee is required to reimburse "you" for any penalty or fee imposed by "us" and paid by "you" for reinstating the policy.

b) if, immediately prior to the date of the notice, the insurance on "your" property has been provided for less than five years by "us" and/or by one or more insurers affiliated with "us" and "we" cancel for any reason other than nonpayment of premium or nonrenew, "we" will give "you" notice at least 100 days before the cancellation or nonrenewal is to be effective, unless the effective date of the cancellation or nonrenewal would be between June 1 and November 30.

For cancellation or nonrenewal that would be effective between those dates, notice must be given the earlier of 100 days in advance of cancellation or nonrenewal or by June 1.

c) if, immediately prior to the date of the notice, the insurance on "your" property has been provided for at least five years by "us" and/or by one or more insurers affiliated with "us" and "we" cancel for any reason other than nonpayment of premium or nonrenew, "we" will give "you" notice at least 180 days before the cancellation or nonrenewal is to be effective.

4) For policies other than those described in 3) above, "we" will give "you" notice at least 45 days before the cancellation or nonrenewal is to be effective if "we" cancel or nonrenew for any reason other than nonpayment of premium.

"Your" return premium, if any, will be refunded within 15 working days after the effective date of cancellation unless the final policy premium is determined by audit. If the final policy premium is determined by audit, an audit will be performed and premium refunded within 90 days from the date of cancellation. If an audit cannot be completed within that time, "we" will accept audit information that "you" provide and refund any return premium within ten working days after "we" receive the necessary audit information from "you". If "we" are unable to obtain audit information due to "your" lack of cooperation, the deposit premium will be considered fully earned. In all cases, if the return premium is \$5.00 or less, "we" will only provide a refund if "you" specifically request the refund. Payment or tender of unearned premium is not a condition of cancellation.

2. Under Common Policy Conditions, the following condition is added:

**Renewal** -- If "we" decide to renew this policy, "we" will give "you" written notice of the renewal premium at least 45 days prior to the renewal date.

3. Under Common Policy Conditions, Inspections is deleted and replaced by the following:

Copyright, American Association of Insurance Services, Inc., 2008

5355489
5/04/17

**Inspections** -- "We" have the right, but are not obligated, to inspect "your" property and operations. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report is not an agreement that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.



0902250908
5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                                5/04/17
5030 00000 SNIC PPP2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# AMENDATORY ENDORSEMENT
## FLORIDA

1. Under Loss Payment, Your Losses is amended to include the following:

    If "we" have agreed in writing to the settlement of a claim, "we" will pay for that loss within 20 days after such settlement is reached.

2. Under Other Conditions, Misrepresentation, Concealment, Or Fraud is deleted and replaced by the following:

    **Misrepresentation, Concealment, Or Fraud** -- This coverage may be voided if, before or after a loss:

    a. an insured has willfully concealed or misrepresented:

        1) any material fact or circumstance concerning this insurance; or
        2) an insured's interest herein if material.

        This means "we" would not have issued the policy at the premium charged if "we" had known the facts "you" concealed or misrepresented.

    b. there has been fraud or false swearing by an insured with respect to this insurance or the subject thereof.

3. In all coverage forms except Cold Storage Locker Coverage, Motor Truck Cargo Legal Liability Coverage, Riggers' Legal Liability Coverage, and Warehouse Legal Liability Coverage, under Other Conditions, paragraph b. of Suit Against Us is deleted and replaced by the following:

    b. the suit has been brought within five years after "you" first have knowledge of the loss.



Copyright, American Association of Insurance Services, Inc., 2008
**Page 1 of 1**

I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                         5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2. The negligent:

   a. Employment;

   b. Investigation;

   c. Supervision;

   d. Reporting to the proper authorities, or failure to so report; or

   e. Retention;

   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above.



© ISO Properties, Inc., 1997
**Page 1 of 1**

I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                                    5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ABSOLUTE LEAD CONTAMINATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.  SECTION I - COVERAGES. 2. Exclusions** is amended to include the following:

**Lead Contamination**

**A.** This insurance does not apply to:

1. "Bodily Injury", "Property Damage", "Personal Injury", and "Advertising Injury" arising directly or indirectly out of, resulting from, caused or contributed by or in any way related to lead, exposure to lead, or lead containing material, good, product, soil, liquid or structure.

2. "Bodily Injury", "Property Damage", "Personal Injury", and "Advertising Injury" whether caused directly or indirectly by the actual, alleged, threatened discharge, dispersal, release, leakage, leaching, friability, flaking, escape, ingestion, inhalation or presence of lead.

3. "Bodily Injury, "Property Damage", "Personal Injury", and "Advertising Injury" arising directly or indirectly out of, resulting from, caused or contributed by or in any way related to:

   a. The use of lead in constructing or manufacturing any material, good, product, or structure.
   b. The removal of lead from any material, good, product, soil, liquid or structure.
   c. The removal of any material, good, product, or structure containing lead.
   d. Manufacture, transportation, storage, or disposal of lead for materials, goods, products, soil, liquids or structures containing lead.
   e. Inhaling, ingesting or physical exposure to lead or materials, goods, products or structures containing lead.
   f. The alleged or threatened inhalation, ingestion, or physical exposure to lead or materials, goods, products, soil, liquid or structures containing lead.

4. Any sums that any insured or other entity must pay or repay or reimburse because of any:

   a. Request, demand, order, statutory or regulatory requirement, direction, or determination that any insured or others test, investigate, monitor, clean-up, remove, dispose of, study, contain, treat, modify, alter, improve, repair, encapsulate, control, transport, store, or take any other action regarding lead; or
   b. Claim or suit for damages arising out of or relating in any way to any request, demand, order, statutory or regulatory requirement, direction or determination that any insured or other test for, investigate, monitor, clean-up, remove, dispose of, study, contain, treat, modify, alter, improve, repair, encapsulate, control, transport, store, or take any other action regarding lead.

Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc., 1997



Page 1 of 2

I

**B.** Lead means the metal in any form whether or not the lead was at any time:

1. Airborne as a fiber, particle, or dust;

2. Contained in or formed a part of a material, good, product, soil, liquid, structure, or other real or personal property;

3. Carried or transmitted on clothing or other real or personal property or by any other means;

4. Contained in or a part of:

   a. Any building;

   b. Any building material;

   c. Any building product; or any component part of any building, building material, insulation product;

   d. Any soil; or Any liquid

   e. Any liquid

5. Inhaled or ingested; or

6. Transmitted by any other means.

Includes copyrighted material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc., 1997

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(BROAD FORM)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, trans- ported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2007





I

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material";

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

5355489
5/04/17

State National Insurance Company

Policy Number                                                            Date

09 0480000610 5 01                                                      5/04/17
  5030 00000 SNIC PPP2

This endorsement forms a part of the policy to which attached, effective on the inception date of
the policy unless otherwise stated herein.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PUNITIVE OR EXEMPLARY DAMAGE EXCLUSION

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This policy does not apply to a claim of or indemnification for punitive or exemplary damages.
If a suit shall have been brought against the insured for a claim falling within the coverages
provided under the policy, seeking both compensatory and punitive or exemplary damages, then
the company will afford a defense to such action.  The company shall not have an obligation to
pay for any costs, interests or damages attributable to punitive or exemplary damages.

ALL TERM AND CONDITIONS REMAIN UNCHANGED.



I

5355489
5/04/17

State National Insurance Company

POLICY NUMBER:
09 0480000610 5 01                                          5/04/17
 5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was com-
puted based on rates in effect at the time the policy
was issued. On each renewal, continuation, or anni-
versary of the effective date of this policy, we will
compute the premium in accordance with our rates
and rules then in effect.



© ISO Properties, Inc., 2007
**Page 1 of 1**

I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                    5/04/17
5030  00000  SNIC PPP2

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY**

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

### Definitions Amended --

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1. The following exclusion is added under Perils Excluded, item 1.:

   ### Virus or Bacteria --

   "We" do not pay for loss, cost, or expense caused by, resulting from. or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

   a. any contamination by any virus, bacterium, or other microorganism; or

   b. any denial of access to property because of any virus, bacterium, or other microorganism.

2. Superseded **Exclusions** -- The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

### Other Terms Remain in Effect -

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.



I

5355489
5/04/17

State National Insurance Company

**Policy Number**

**Date**

09 0480000610 5 01
5030 00000 SNIC PPP2

5/04/17

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

---

**Terrorism Premium (Certified Acts) $**

**This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):**

**Additional information, if any, concerning the terrorism premium:**

---

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

## A. Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

## B. Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

## C. Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© ISO Properties, Inc., 2007

**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                            5/04/17
5030 00000 SNIC PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage A - Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

  This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I - Coverage B - Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006
**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                         5/04/17
5030 00000 SNIC PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Copyright, Insurance Services Office Inc., 1998
**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                      5/04/17
  5030  00000 SNIC PPP2

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© ISO Properties, Inc., 2007

**Page 1 of 1**



I

State National Insurance Company

09 0480000610 5 01                                         5/04/17
5030 00000 SNIC PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

   **1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

   **2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

   **1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

   **2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

   **3.** A reinforced or unreinforced base coat;

   **4.** A finish coat providing surface texture to which color may be added; and

   **5.** Any flashing, caulking or sealant used with the system for any purpose.

© ISO Properties, Inc., 2003
**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                             5/04/17
5030  00000  SNIC  PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, Exclusions of **Section I - Coverage A - Bodily Injury And Property Damage Liability**:

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2.**, Exclusions of **Section I - Coverage B - Personal And Advertising Injury Liability**:

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2004
**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                                      5/04/17
5030 00000 SNIC PPP2

# QUICK REFERENCE
# COMMERCIAL INLAND MARINE COVERAGE PART

### READ YOUR POLICY CAREFULLY

The Commercial Inland Marine Coverage Part in your policy consists of Declarations, one or more Coverage Forms, Commercial Inland Marine Conditions, Common Policy Conditions and Endorsements, if applicable. Following is a Quick Reference indexing of the principal provisions contained in each of the components making up the Coverage Part, listed in sequential order, except for the provisions in the Declarations which may not be in the sequence shown.

**DECLARATIONS**

Named Insured and Mailing Address
Policy Period
Description of Business
Limits of Insurance
Form and Endorsements applying to the Coverage Part
    at time of issue

**COVERAGE FORM(S)**

COVERAGE
  Covered Property (If Applicable)
  Property Not Covered
  Covered Causes of Loss
  Additional Coverage - Collapse (If Applicable)
  Coverage Extensions (If Applicable)

EXCLUSIONS
  Earthquake (If Applicable)
  Governmental Action
  Nuclear Hazard (If Applicable)
  War And Military Action
  Water (If Applicable)
  Other Exclusions (If Applicable)

LIMITS OF INSURANCE

LOSS CONDITIONS
  Abandonment
  Appraisal
  Duties in the Event Of Loss
  Insurance Under Two or More Coverages
  Loss Payment

Other Insurance
Pair, Sets or Parts
Recovered Property
Reinstatement of Limit After Loss
Transfer of Rights of Recovery Against Others to Us

GENERAL CONDITIONS
  Concealment, Misrepresentation or Fraud
  Control of Property
  Legal Action Against Us
  No Benefit to Bailee
  Policy Period, Coverage Territory
  Valuation

DEDUCTIBLE (If Applicable)

ADDITIONAL CONDITIONS

DEFINITIONS

**COMMON POLICY CONDITIONS (IL 00 17)**

  Cancellation
  Changes
  Examination of Your Books and Records
  Inspections and Surveys
  Premiums
  Transfer of Your Rights and Duties Under This Policy
  Nonrenewal

**ENDORSEMENTS (If Any)**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc. 2007. © ISO Properties, Inc.



I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                      5/04/17
  5030  00000  SNIC  PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT - EMPLOYER'S LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Exclusion **e. Employer's Liability** of item **2. Exclusions, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** of **SECTION I - COVERAGES** is replaced by the following:

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of an insured, or a person hired to do work for or on behalf of an insured, that arises out of and in the course of:

    **(a)** Employment by an insured; or

    **(b)** Performing duties related to the conduct of an insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether an insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by an insured under an "insured contract".

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc. with its permission © ISO Properties, Inc.                    Page 1 of 1



I

0730250908
5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                    5/04/17
5030  00000  SNIC  PPP2

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **9.** of the **Definitions** Section is replaced by the following:

**9.** "Insured contract" means:

  **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

  **b.** A sidetrack agreement;

  **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

  **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

  **e.** An elevator maintenance agreement;

  **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

  **(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

  **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

  **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2004
**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                                    5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - LAND SUBSIDENCE OR UPLIFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" claims or "suits" resulting from, attributable to, contributed to, aggravated by, or caused by the subsidence or uplift of land as a result of earthquake, landslide, mudflow, earth sinking, earth rising, earth shifting, earth expansion or earth contraction, whether combined with water or not.

We do not insure for such loss regardless of:

**(1)** the cause of the excluded event; or

**(2)** other causes of the loss; or

**(3)** whether other causes acted concurrently or in any sequence with the earth movement to produce the loss; or

**(4)** whether the earth movement occurs suddenly or gradually, involves isolated or widespread damage, arises from natural of external forces; or occurs as a result of any combination of these.

All other terms and conditions of this policy remain unchanged.



Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc. with its permission © ISO Properties, Inc.          Page 1 of 1

I

09  0480000610  5  01                                          5/04/17
5030  00000  SNIC  PPP2

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CONTRACTORS COMMERCIAL GENERAL LIABILITY COVERAGE EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## 1. INCREASED MEDICAL PAYMENTS LIMIT

Paragraph **7.** under **SECTION III – LIMITS OF INSURANCE** is replaced by the following:

Subject to Paragraph **5.** above, the Medical Expense Limit indicated below is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.  The Medical Expense Limit is the greater of:
   a. $10,000; or
   b. the Medical Expense Limit shown in the Declarations.

This provision does not apply if Coverage **C** Medical Payments (Section **I** – Coverages) is not provided by this policy or is excluded by any endorsement to this policy.

## 2. BROADENED BODILY INJURY AND INCIDENTAL MEDICAL MALPRACTICE COVERAGE

The following definition is amended in **SECTION V - DEFINITIONS**:

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. This includes mental anguish, mental injury, shock, fright or death, resulting from bodily injury, sickness or disease, or damages for care, loss of services or death claimed by any person or organization resulting at any time from the "bodily injury".

"Bodily injury" also includes injury arising out of the rendering or failure to render, during the policy period, the following services:
   a. medical, surgical, paramedical, dental, x-ray or nursing service or treatment or the furnishing of food or beverages in connection therewith;
   b. the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or
   c. necessary first aid.

This insurance does not apply to any insured engaged in the business or occupation of providing any of the services described under **a.**, **b.**, or **c.** above except an employee of yours who provides medical, paramedical, surgical, dental, x-ray or nursing services.

## 3. INCREASED SUPPLEMENTARY PAYMENTS

Under **SUPPLEMENTARY PAYMENTS – COVERAGES A AND B** (Section **I** – Coverages), subparagraphs **b.** and **d.** of Paragraph **1.** are replaced by the following:
   b. Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.
   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



Page 1 of 7

I

## 4. LEGAL LIABILITY

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages):

**A.** The paragraph immediately following exclusion **2. j. (6), Exclusions, Damage To Property** is replaced in it's entirety with:

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, rented to you or temporarily occupied by you with the permission of the owner, or to the contents of premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

**B.** The last paragraph of **2. Exclusions** is replaced in it's entirety with:

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with the permission of the owner, or to the contents of premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

Under **SECTION III – LIMITS OF INSURANCE:**

**C.** Paragraph **6.** is replaced in it's entirety with:

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you or temporarily occupied by you with the permission of the owner, including the contents of such premises rented to you for a period of seven or fewer consecutive days. The Damage To Premises Rented To You Limit is the greater of:
   **a.** $300,000; or
   **b.** the Damage To Premises Rented To You limit shown in the Declarations.

These provisions do not apply if coverage for Damage To Premises Rented To You is

excluded under Coverage **A** (Section I – Coverages) or by endorsement to this policy.

## 5. LIBERALIZATION CLAUSE

If we adopt a change in our policy form language or underwriting rules during the policy period, whose applicability is intended for business operations or risk groups identical or similar to that contained within this policy, and which would broaden your coverage without an additional premium charge, your policy will automatically be provided with the additional coverage as of the date we implement the revision in your state, provided that this implementation date falls within the policy period stated in the Declarations.

Insurance for such additional coverage does not apply and the Company shall have no duty to defend any loss, claim or "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" arising out of an "occurrence" which would not have been covered but for the additional coverage, and which first took place prior to the implementation date of the additional coverage.

## 6. PRIMARY AND NONCONTRIBUTORY INSURANCE

Except as otherwise provided herein, it is agreed that such insurance as is afforded by this policy for the benefit of the persons or organizations qualifying as additional insured in the *Automatic Additional Insured – Construction Contracts* section of this endorsement, made a part of this policy, shall be primary insurance, and without right of contribution from any valid and collectable insurance in force for said persons or organizations. Such insurance for these persons or organizations providing them liability coverage for their construction contract or agreement with you shall be excess and without right of contribution to this policy, but only:

**A.** if you are obligated to pay damages for "bodily injury", "property damage", or "personal and advertising injury" by reason of the assumption of liability in a written contract with that person or organization; and

**B.** if such claim, loss, liability or "suit" is determined to be a result of the performance of your ongoing operations related to this

contract; and the contract was executed prior to any known or reported "bodily injury", "property damage", or "personal and advertising injury" occurring as a result of these operations.

## 7. AUTOMATIC ADDITIONAL INSURED – CONSTRUCTION CONTRACTS

A. **Section II – Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

1. "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

   a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   b. Supervisory, inspection, architectural or engineering activities.

2. "Bodily injury" or "property damage" occurring after:

   a. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   b. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

## 8. WAIVER OF TRANSFER OF RIGHTS OF RECOVERY

Under **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS:**

Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** is replaced in it's entirety with:

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

We agree to waive any right of recovery we may have against any person or organization with whom you have agreed by written contract prior to an "occurrence" to waive such rights because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard".

## 9. UNINTENTIONAL FAILURE TO DISCLOSE ALL HAZARDS

This insurance shall not be prejudiced by your failure to disclose all existing hazards prior to the inception date of the policy, provided such failure or any omission you might have made when applying for coverage under this policy were not intentional.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



I

## 10. KNOWLEDGE OF OCCURRENCE

The following is added to condition **2. Duties In The Event Of Occurrence, Offense, Claim Or Suit** (Section **IV** – Commercial General Liability Conditions):

**e.** Knowledge of an occurrence by your agent, servant or employee is not knowledge by you unless the owner or any of your partners, "executive officers", directors, insurance managers, or legal representatives directly knew of an occurrence, or received notice of an occurrence from your agent, servant or employee.

## 11. EXTENDED PROPERTY DAMAGE – USE OF REASONABLE FORCE

Under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section **I** – Coverages):

Paragraph **2. a. Exclusions, Expected Or Intended Injury** is replaced in it's entirety with:

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

## 12. REPAIR AND REPLACEMENT OF DEFECTIVE SYSTEMS AND EQUIPMENT

The following is added to **SECTION I – COVERAGES:**

**COVERAGE D SYSTEM OR EQUIPMENT LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "property damage" to or arising out of "your work". We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "system or equipment occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages from "system or equipment occurrence" is limited to:

(a) \$25,000 Each Occurrence

(b) \$50,000 Aggregate

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under a. above.

**b.** This insurance applies to "property damage" only if:

(1) The "property damage" is caused by a "system or equipment occurrence" that takes place in the "coverage territory"; and

(2) The "property damage" is to systems, equipment or appliances, installed by you or on your behalf during the course of construction, and arising out of "your work" that you sell, transfer title to, or otherwise part with during the policy period, or a defect in the system, equipment or appliance which causes it to malfunction or not function once your ongoing operations on it are completed by you; and

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A**, **B** or **D**.

**2. Exclusions**

In addition to all of the exclusions applicable to Coverage **A** Bodily Injury and Property Damage Liability contained in this policy, the following additional exclusions apply to Coverage **D** System or Equipment Liability as well.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

5355489
5/04/17

This insurance does not apply to:

**a. Normal Customer Service Expenses**

Any and all expenses incurred by you for any customer care program that you provide to the buyer(s) of a "residence".

**b. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your work" after it has been put to its intended use.

**c. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property"

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**d. Offsite Operations Of Subcontractors**

"Bodily injury" or "property damage" arising out of operations that are performed by any subcontractors at a location other than your worksite, regardless of whether such operations are performed for you or on your behalf.

**3. Supplementary Payments**

The Supplementary Payments section of this policy is amend to read **SUPPLEMENTARY PAYMENTS – COVERAGES A, B and D.**

**4. Conditions**

Irrespective of any policy language to the contrary, Paragraph **8. Transfer of Rights Of Recovery Against Others To Us** (Section **IV** – Commercial General Liability Conditions), reads as follows with regard to Coverage **D**, System Or Equipment Liability only:

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**5. Definitions**

As respects **SECTION V – DEFINITIONS**, the following definitions are added or amended with regard to Coverage **D**, System Or Equipment Liability only:

"Residence" means any single family dwelling, free-standing or attached to another single-family dwelling in a duplex type arrangement, whose construction you have undertaken by virtue of a written contract agreement.

"System or equipment occurrence" means the failure of a household appliance, building system component or piece of equipment, installed by you or on your behalf in a "residence" as part of your ongoing operations, during the policy period.

The failure of the appliance, system or equipment can take the form of either total or partial failure, but must occur after the appliance, system or equipment has been accepted by the owner of the "residence", and before a certificate of occupancy has been issued or closing of the property has taken place.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

I

Definition **17.** "Property Damage" is amended for Coverage **D** only, as follows:

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it; or

  **c.** The necessary repair or replacement of "your work" as a result of a "system or equipment occurrence".

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Definition **22.** "Your Work" is amended for Coverage **D** only, as follows:

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf at any jobsite in accordance and in compliance with a written contract; and

    **(2)** Materials, parts or equipment furnished, including your purchase price for the components, materials, parts, equipment, system, products or appliances installed by you or on your behalf, in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions; and

    **(3)** The cost of replacing or repairing those items identified in **a. (2)** above determined to be defective; provided

      **(a)** These items were accepted by the contracted owner of the "residence" prior to completion by you of all your operations at the jobsite; and

      **(b)** These items had either been tested by you prior to acceptance and found to free of defect, or had not been tested by you prior to acceptance; and

      **(c)** You had not received final payment for all of your operations at the jobsite prior to the "system or equipment occurrence".

  **c.** Does not include:

    **(1)** Labor costs incurred and profit added by you in the repair or replacement of the defective items in **b. (3)** above; or

    **(2)** The cost of subcontracted work (labor and profit only) for repair or replacement work performed on your behalf, as respects the defective items in **b. (3)** above.

## 14. LIMITED FUNGI OR BACTERIA COVERAGE

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

    This insurance does not apply to:

    **a.** "Personal and advertising injury" arising out of a "fungi or bacteria incident".

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

09 0480000610 5 01

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

B. Coverage provided by this insurance for "bodily injury" or "property damage", arising out of a "fungi or bacteria incident", is subject to the Fungi and Bacteria Liability Aggregate Limit as described in Paragraph C. of this endorsement. This provision B. does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

C. The following are added to Section III – Limits Of Insurance:

1. Subject to Paragraphs 2. and 3. of Section III – Limits of Insurance, as applicable, the Fungi and Bacteria Liability Aggregate Limit $25,000. is the most we will pay under Coverage A for all "bodily injury" or "property damage" and Coverage C. for Medical Payments arising out of one or more "fungi or bacteria incidents". This provision C.1. does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

2. Paragraphs 5., the Each Occurrence Limit, Paragraph 6., the Damage To Premises Rented To You Limit, and Paragraph 7., the Medical Expense Limit, of Section III – Limits Of Insurance continue to apply to "bodily injury" or "property damage" arising out of a "fungi or bacteria incident" but only if, and to the extent that, limits are available under the Fungi and Bacteria Liability Aggregate Limit.

D. The following definitions are added to the Definitions Section:

1. "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

2. "Fungi or bacteria incident" means an incident which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

All of the provisions and exclusions of the policy not otherwise amended also apply to this endorsement.

Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



I

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                                    5/04/17
5030  00000  SNIC  PPP2

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DEFINITION - EMPLOYEE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** The following definitions under **SECTION V - DEFINITIONS** are replaced in their entirety by the following:

"Employee" means a person who works or performs a service for salary, wages, or any substitute for salary or wages, as compensation for such work or service in any manner for you, under a contract of hire which may be express or implied, oral or written, where you, as the employer, has the right or power to control or direct the employee in any way. "Employee" includes a person hired by the month, week, day, hour or any other period. "Employee" includes "leased worker" and "temporary worker". "Employee" does not include an "independent contractor", either "uninsured" or otherwise.

"Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. A "leased worker" does not include a "temporary worker".

"Temporary worker" means a person who is furnished to you to substitute for an "employee" on leave or to meet seasonal or short-term workload conditions.

**B.** The following definitions are added to **SECTION V - DEFINITIONS:**

"Independent contractor" means a person or organization that, in the exercise of an independent employment agreement, contracts to do work or perform a service for another, retaining control over the means or methods used in performing the work or service. "Independent contractor" includes, but is not limited to, any person, entity, company, association or organization that you identify as, or you refer to as, or you treat in your business dealings as, or you intend to be, or you tell us is, an "independent contractor".

"Uninsured" means not insured by valid and in-force Workers Compensation and Employers Liability Insurance. "Uninsured" also means not insured by Commercial General Liability Insurance with limits of liability and coverage equal to or greater than that provided by the policy to which this form is attached, for legal liability arising out of business operations or "completed operations", including premises owned, maintained, rented, leased or used.



Page 1 of 1

I

0250413
5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                        5/04/17
5030 00000 SNIC PPP2

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - COVERAGES
## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

b. The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Service Office, Inc., 2012



I

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

## f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".



(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

### g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

### h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

### i. War

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### j. Damage to Property

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

© Insurance Services Office, Inc., 2012

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products–completed operations hazard".

### k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

### l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products–completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

### m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

### n. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

### o. Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury".

### p. Electronic Data

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

### q. Recording And Distribution Of Material Or Information In Violation Of Law

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or



(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you

with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

#### a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury"

#### b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

#### c. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

#### d. Criminal Acts

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

#### e. Contractual Liability

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

#### f. Breach Of Contract

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

#### g. Quality Or Performance Of Goods - Failure To Conform To Statements

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

#### h. Wrong Description Of Prices

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

© Insurance Services Office, Inc., 2012

## i. Infringement Of Copyright, Patent, Trademark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

## j. Insureds In Media And Internet Type Businesses

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

## k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

## l. Unauthorized Use Of Another's Name Or Product

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

## m. Pollution

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

## n. Pollution-related

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

## o. War

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## p. Recording And Distribution Of Material Or Information In Violation Of Law

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.



© Insurance Services Office, Inc., 2012                    **Page 7 of 16**

I

## COVERAGE C - MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;
provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

#### a. Any Insured

To any insured, except "volunteer workers".

#### b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

#### c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

#### d. Workers' Compensation And Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

#### e. Athletics Activities

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

#### f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

#### g. Coverage A Exclusions

Excluded under Coverage A.

### SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II - WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.



© Insurance Services Office, Inc., 2012

I

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by;

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company)

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization.However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

### SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:
   a. Insureds;
   b. Claims made or "suits" brought; or
   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:
   a. Medical expenses under Coverage C;
   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and
   c. Damages under Coverage B.

 © Insurance Services Office, Inc., 2012

5355489
5/04/17

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses; and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.



© Insurance Services Office, Inc., 2012

I

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

### b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I - Coverage **A -** Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

### c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

## 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

## 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

## 9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   **c.** All other parts of the world if the injury or damage arises out of:

      **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but who is away for a short time on your business; or

      **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.



9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

0250413
5355489
5/04/17

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:
   (a) Snow removal;
   (b) Road maintenance, but not construction or resurfacing; or
   (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;
   b. Malicious prosecution;
   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
   f. The use of another's advertising idea in your "advertisement"; or
   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
      (1) Products that are still in your physical possession; or
      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
         (a) When all of the work called for in your contract has been completed.
         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

         Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include "bodily injury" or "property damage" arising out of:
      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;
      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or
      (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.



As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012

5355489
5/04/17

State National Insurance Company

**Policy Number**

09 0480000610 5 01
 5030 00000 SNIC PPP2

**Date**

5/04/17

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                              5/04/17
5030 00000 SNIC PPP2

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ABSOLUTE ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A. SECTION I - COVERAGES. 2. Exclusions**
is amended to include the following:

**Asbestos**

A. This insurance does not apply to:

1. "Bodily Injury", "Property Damage", "Personal Injury", and "Advertising Injury" arising directly or indirectly out of, resulting from, caused or contributed by or in any way related to asbestos, exposure to asbestos, or asbestos containing material, good, product, or structure.

2. "Bodily Injury", "Property Damage", "Personal Injury", and "Advertising Injury" whether caused directly or indirectly by the actual, alleged, threatened discharge, dispersal, release, leakage, leaching, friability, flaking, escape, or presence of asbestos.

3. "Bodily Injury, "Property Damage", "Personal Injury", and "Advertising Injury" arising directly or indirectly out of, resulting from, caused or contributed by or in any way related to:

    a. The use of asbestos in constructing or manufacturing any material, good, product, or structure.

    b. The removal of asbestos from any material, good, product, or structure.

c. The removal of any material, good, product, or structure containing asbestos

d. Manufacture, transportation, storage, or disposal of asbestos for materials, goods, products, or structures containing asbestos.

e. Inhaling, ingesting or physical exposure to asbestos or materials, goods, products or structures containing asbestos.

f. The alleged or threatened inhalation, ingestion, or physical exposure to asbestos or materials, goods, products, or structures containing asbestos.

4. Any sums that any insured or other entity must pay or repay or reimburse because of any:

    a. Request, demand, order, statutory or regulatory requirement, direction, or determination that any insured or others test, investigate, monitor, clean-up, remove, dispose of, study, contain, treat, modify, alter, improve, repair, encapsulate, control, transport, store, or take any other action regarding asbestos; or

    b. Claim or suit for damages arising out of or relating in any way to any request, demand, order, statutory or regulatory requirement, direction or determination that any insured or other test for, investigate, monitor, clean-up, remove, dispose of, study, contain, treat, modify, alter, improve, repair, encapsulate, control, transport, store, or take any other action regarding asbestos.

Includes copyrighted material of Insurance Services Office, Inc. with its permission Copyright, Insurance Services Office, Inc., 1997

**Page 1 of 2**



I

**B.** Asbestos means the mineral in any form whether or not the asbestos was at any time:

1. Airborne as a fiber, particle, or dust;

2. Contained in or formed a part of a material, good, product, structure, or other real or personal property;

3. Carried or transmitted on clothing or by any other means;

4. Contained in or a part of:

   a. Any building;

   b. Any building material;

   c. Any insulation product; or any component part of any building, building material, or insulation product.

5. Inhaled or ingested; or

6. Transmitted by any other means.

Includes copyrighted material of Insurance Services Office, Inc. with its permission Copyright, Insurance Services Office, Inc., 1997

5355489
5/04/17

State National Insurance Company

09  0480000610  5  01                                    5/04/17
5030  00000  SNIC  PPP2

THIS COVERAGE FORM CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CONTRACTOR'S SPECIAL COVERAGE

Various provisions in this Coverage Form restrict and enhance coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F. — Definitions.**

## SCHEDULE OF COVERAGES

| Coverage | Limit of Insurance | Deductible |
|---|---|---|
| Accounts Receivables | $ 1,000 | 0 |
| Business Personal Property Floater | $ 5,000 | $ 500 |
| Computer Systems Coverage | $ 2,500 | $ 500 |
| Installation Floater | $ 1,000 | 0 |

## A. Coverage

"We" will pay for direct physical loss or damage to Covered Property caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Form, means the type of property described in this section **A.1.**, and limited in section **A.2.**, Property Not Covered.

#### a. Accounts Receivables —

(1) "We" will pay:

(a) All amounts due from "your" customers that "you" are unable to collect;

(b) Interest charges on any loan required to offset amounts "you" are unable to collect pending "our" payment of these amounts;

(c) Collection expenses in excess of "your" normal collection expenses that are made necessary by loss or damage; and

(d) Other reasonable expenses that "you" incur to re-establish "your" records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to "your" records of accounts receivable at the premises described in the policy declarations.

(2) The most "we" will pay under this Coverage for loss or damage in any one occurrence at the premises described in the policy declarations is $1,000.

Copyright, Bankers Financial Corporation. Includes copyrighted material of
Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

Page 1 of 10



I

(3) Section **B. Exclusions** of this Coverage Form does not apply to this Coverage except for:

  (a) Paragraph **1.c.**, Government Action;

  (b) Paragraph **1.d.**, Nuclear Hazard;

  (c) Paragraph **1.f.**, War And Military Action;

  (d) Paragraph **2.f.**, Dishonesty;

  (e) Paragraph **2.g.**, False Pretense;

  (f) Paragraph **2.h.**, Pollutants;

  (g) Paragraph **2.i.**, Neglect;

  (h) Paragraph **3.a.**, Negligent Work; and

  (i) Section **B.5.**, **Special Exclusions**, paragraph **B.5.a.**, Accounts Receivable.

b. **Business Personal Property** — means "your" personal property located anywhere in the "coverage territory", used in the "your" business, and consisting of the following:

  (1) Furniture and Fixtures;

  (2) Machinery and equipment;

  (3) "Stock";

  (4) Contractors tools and equipment owned by "you" and typically used by "you" in "your" "operations" at a "jobsite";

  (5) "Your" use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions;

    (a) Made a part of the "building" or structure "you" occupy but do not own; and

    (b) "You" acquired or made at "your" expense but cannot legally remove;

  (6) Leased personal property for which "you" have a contractual responsibility to insure, unless otherwise insured.

The most "we" will pay under this Coverage for loss or damage in any one occurrence is $5,000.

c. **Computer Systems Coverage** — means "computer equipment", "data" and "media" owned by "you", and similar property of others in "your" care, custody or control at the premises described in the policy declarations, or in any "building" owned by "you" or used by "you" with permission of the owner.

The most "we" will pay under this Coverage

for loss or damage in any one occurrence at the described premises or "building" is $2,500.

d. **Installation Floater -** provides the following coverage at any one premises of installation:

Property owned by "you" or for which "you" are legally liable, the installation of which has been contracted for with "you", but only while at the premises of installation awaiting, during, and after installation until accepted by the property owner, "your" interest ceases, the installation or construction project has been completed for more than 30 days, the covered property has been put to its intended use, "you" abandon the installation or construction project (with no intent to complete it), or the policy to which this Coverage Form is attached expires or is cancelled, whichever occurs first.

The most "we" will pay for loss under this Coverage is $1,000 at any one premises of installation or in any one occurrence of disaster, regardless of the number of installation premises.

2. **Property Not Covered -**

Covered Property does not include:

a. Contraband, or property in the course of illegal transportation or trade.

b. With respect to Accounts Receivables only:

  (1) Records of accounts receivable in storage away from the premises described in the policy declarations.

c. With respect to Business Personal Property only:

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. ©ISO Properties, Inc.

(1) Accounts, bills, currency, deeds, food stamps or other evidences of debt, "money", notes or securities;

(2) Animals;

(3) "Computer equipment", "data" or "media";

(4) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs, trees, shrubs or plants;

(5) "Jobsite" machinery, tools and equipment with a per item value in excess of $1,000 as of coverage inception. If the replacement value of any one item under this coverage is in excess of $1,000 at the time this coverage becomes effective, "we" have no obligation to pay any loss or damage to that particular item that would have otherwise been covered under this policy;

(6) Valuable papers and records of any type, including the cost to research, replace or restore the information on valuable papers and records, which may include but are not limited to those which exist on electronic or magnetic media; or

(7) Vehicles or self-propelled machines (including aircraft or watercraft) that:

(a) Are licensed for use on public roads;

(b) Are operated principally away from the described premises; or

(c) Are held for sale.

d. With respect to Computer Systems Coverage only:

(1) Property leased or rented to others while away from the premises described in the policy Declarations;

(2) Accounts, bills, evidences of debt, valuable papers, abstracts, records, deeds, manuscripts or other documents, unless converted to "data" and then only in that form;

(3) Portable personal computers, including laptops, notebooks, personal digital assistants and similar portable information equipment, when located

away from the premises described in the policy Declarations; or

(4) "Stock" in Trade.

e. With respect to Installation Floater only:

(1) Machinery, tools, equipment or similar property that will not become a permanent part of "your" installation or construction project;

(2) "Buildings", structures or land. However, "we" do cover property that is part of "your" installation or construction project and is in connection with any "building" or structure; or

(3) Trees, shrubs, plants or lawns.

3. **Covered Causes Of Loss** – means risk of direct physical loss unless the loss is excluded in Section **B. Exclusions** of this Coverage Form.

**B. Exclusions**

1. "We" will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes to or aggravates the loss, whether concurrently or in any sequence to the loss.

a. **Ordinance Or Law** - The enforcement of any ordinance or law.

b. **Earth Movement** (other than "catastrophic ground cover collapse" or "sinkhole loss"), but if "earth movement" results in fire or explosion, "we" will pay for the loss or damage caused by that fire or explosion.

c. **Government Action** — Seizure or destruction of property by order of governmental authority, unless the action is taken at the time of a fire to prevent its spread.

d. **Nuclear Hazard** — Nuclear reaction or radiation, or radioactive contamination, however caused. But if nuclear reaction or radiation, or radioactive contamination results in fire, "we" will pay for the loss or damage caused by that fire.

e. **Utility Services** — The failure of power or other utility service supplied to the described premises, however caused, if

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. ©ISO Properties, Inc.



I

the failure occurs away from the described premises. But if the failure of power or other utility service results in a Covered Cause of Loss, "we" will pay for the loss or damage caused by that Covered Cause of Loss.

f. **War And Military Action,** including undeclared or civil war, warlike action by a military force, insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. **Water,** meaning:

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings.

But if water, as described in **(1)**, **(2)**, **(3)** or **(4)** above results in fire, explosion or sprinkler leakage, "we" will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

2. "We" will not pay for loss or damage caused by or resulting from any of the following:

a. **Artificially Generated Electrical Current,** including electric arcing, that disturbs electrical devices, appliances or wires. But if artificially generated electrical current results in fire, "we" will pay for the loss or damage caused by that fire.

b. **Other Types Of Loss**

(1) Wear and tear, including marring or scratching;

(2) Rust, corrosion, mold, "fungi", decay, rotting, deterioration, inherent vice, hidden or latent

defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, vermin, rodents or other animals;

(6) Mechanical, structural, or electrical breakdown or malfunction, including rupture or bursting caused by centrifugal force, and including a breakdown or malfunction resulting from a structural, mechanical, or reconditioning process. But if mechanical breakdown results in elevator collision, "we" will pay for the loss or damage caused by that elevator collision;

(7) The following causes of loss to Business Personal Property:

(a) Dampness or dryness of atmosphere; or

(b) Changes in or extremes of temperature.

c. **Explosion** of steam boilers, steam pipes, steam turbines or steam engines, owned or leased by "you", or operated under "your" control.

d. **Continuous Or Repeated Seepage Or Leakage Of Water** that occurs over a period of 14 days or more.

e. **System Leaks** – Water or other liquids, gases, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) "You" do your best to maintain heat in the "building" or structure; or

(2) "You" drain the equipment and shut off the supply if the heat is not maintained.

f. **Dishonesty** – Dishonest, fraudulent or criminal act by "you", any of "your" partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

representatives or anyone to whom "you" entrust the property for any purpose:

(1) Acting alone or in collusion with others; or

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by "your" employees (including leased employees); but theft by employees (including leased employees) is not covered.

g. **False Pretense -** Voluntary parting with any property by "you" or anyone else to whom "you" have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

h. **Pollutants** – Discharge, dispersal, seepage, migration, release or escape of "pollutants". This includes any request, demand, order or statutory or regulatory requirement that "you" test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

This exclusion does not apply to damage to glass caused by chemicals applied to the glass.

i. **Neglect** by "you" to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. "We" will not pay for loss or damage caused by or resulting from any of the following, but if any of these excluded causes of loss results in a Covered Cause of Loss, "we" will pay for the loss or damage caused by that Covered Cause of Loss:

a. **Negligent work** — Faulty, inadequate or defective:

(1) Design, specification, workmanship, repair or maintenance of part or all of any Covered Property; or

(2) Materials used in repair, construction, renovation or remodeling of Covered Property.

b. **Collapse;**

c. **Theft,** but "we" will pay for:

(1) Loss or damage that occurs due to looting at the time and place of a riot

or civil commotion; or

(2) Damage to any Covered Property resulting from the breaking in or exiting of burglars. This exclusion is further modified by Special Exclusions **5.b.(2)**, Protective Safeguards in this Coverage Form.

4. **Missing Property** – "We" will not pay for any missing property where the only proof of loss is unexplained or mysterious disappearance of covered property discovered on taking inventory, or any other instance where there is no physical evidence to show what happened to the covered property, or to prove its factual existence.

5. **Special Exclusions**

The following provisions apply only to the specified coverages:

a. **Accounts Receivables**

"We" will not pay for:

(1) Loss or damage caused by or resulting from electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

(a) Programming errors or faulty machine instructions; or

(b) Faulty installation or maintenance of data processing equipment or component parts.

But "we" will pay for direct loss or damage caused by lightning.

(2) Loss or damage caused by or resulting from errors or omissions in processing or copying. But if errors or omissions in processing or copying results in fire or explosion, "we" will pay for the direct loss or damage caused by the fire or explosion.

b. **Business Personal Property**

(1) **Fragile articles** – "We" will not pay for fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

(a) Glass used in windows, doors, offices, or "building" glass; or

(b) Containers of property held for sale.

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



I

**(2) Protective safeguards** – "We" will not pay for loss or damage to Covered Property caused by or resulting from theft unless Covered Property is located in a "building" or "motor vehicle" while all of its doors, windows and other openings are closed and locked. A locked tool box or tool carrier of sound construction, permanently mounted to a "motor vehicle" bed or chassis is considered part of an entirely enclosed body.

In the event the "building" or "motor vehicle" is not entirely enclosed, any Covered Property must be secured to the "building" or "motor vehicle" by means of a permanently mounted chain, metal cable or locking device which is attached to the "building" or "motor vehicle" for coverage to apply.

No claim for loss by theft shall be valid hereunder unless there is visible evidence by marks of forcible entry on either the "building" or "motor vehicle", or unless the entire "motor vehicle" is stolen.

**c. Computer Systems Coverage**

**(1) Contamination or Deterioration** – "We" will not pay for loss caused by contamination or deterioration including corrosion, decay, "fungi", mildew, mold, rot, rust, or any quality, fault, or weakness in the covered property that causes it to damage or destroy itself.

**(2) Loss Of Use** – "We" will not pay for loss caused by or resulting from loss of use, delay, or loss of market.

**(3) Temperature/Humidity** – "We" will not pay for loss caused by dryness, dampness, humidity, or changes in or extremes in temperature.

**(4) Virus/Harmful Code** – "We" will not pay for loss caused by virus, harmful code or similar instruction introduced into or enacted on a computer system (including "data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

**(5) Gradual Deterioration** "We" will not pay for loss caused by any gradual deterioration of the Covered Property.

**d. Installation Floater**

**(1)** "We" will not pay for loss caused by:
- **(a)** An act, defect, error or omission (negligent or not) relating to:
  - **i.** design or specifications;
  - **ii.** workmanship or construction; or
  - **iii.** repair, renovation or remodeling; or
- **(b)** A defect, weakness, inadequacy, fault or unsoundness in materials.

But if a defect, error or omission as described above results in a Covered Cause of Loss, "we" will cover the loss or damage to Covered Property.

**(2)** "We" will not pay for loss or damage caused by any testing process or occurring while the property is being worked upon and resulting therefrom unless fire or explosion ensues and then only for the loss or damage caused by such ensuing fire or explosion;

**C. Limits Of Insurance**

The most "we" will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Schedule Of Coverages on the first page of this Coverage Form.

**D. Deductibles**

1. "We" will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the applicable Deductible shown in the Schedule Of Coverages on the first page of this Coverage Form. "We" will then pay the amount of loss or damage in excess of the applicable Deductible up to the applicable Limit of Insurance shown in the Schedule Of Coverages on the first page of this Coverage Form.

2. No deductible applies to Accounts Receivables or Installation Floater coverage.

3. Each applicable deductible for Covered Property applies independently in the event of any one occurrence.

4. The application of the Business Personal Property Floater deductible under this Coverage Form satisfies any deductible

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

requirement for Contractor's Tool Coverage – Small Tool Floater that may be otherwise provided by this policy.

## E. Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Inland Marine Conditions:

### 1. Duties In The Event Of Loss

"You" must see that the following are done in the event of loss or damage to Covered Property:

a. Notify the police if a law may have been broken.

b. Give "us" prompt notice of the loss or damage. Include a description of the property involved.

c. As soon as possible, give "us" a description of how, when and where the loss or damage occurred.

d. Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, "we" will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

e. At "our" request, give "us" complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss sustained.

f. As often as may be reasonably required, permit "us" to inspect the property proving the loss or damage and examine "your" books and records.

g. Send "us" a signed, sworn proof of loss containing the information "we" request to investigate the claim. "You" must do this within 60 days after "our" request. "We" will supply "you" with the necessary forms.

h. Submit to examination under oath in matters connected with the loss as often as "we" reasonably request, and give "us"

sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

i. Cooperate with "us" in performing all acts required by this coverage.

j. Resume all or part of "your" "operations" as quickly as possible.

k. "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

l. "You" may not abandon the property to "us" without "our" written consent.

### 2. Other Insurance

Any other available coverage, if any, otherwise provided in this policy is in addition to and excess over the coverage contained within this Coverage Form If two or more of this policy's coverages apply to the same loss, "we" will not pay more than the actual amount of the loss.

### 3. Loss Payment

a. In the event of loss or damage covered by this Coverage Form, at "our" option, "we" will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

"We" will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



I

ordinance or law regulating the construction, use or repair of any property.

c. "We" will give notice of "our" intentions within 30 days after "we" receive the sworn proof of loss.

d. "We" will not pay you more than "your" financial interest in the Covered Property.

e. "We" will not pay you more than the applicable limit of insurance described in the Schedule of Coverages in this Coverage Form.

f. If more than one coverage of this policy insure the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

g. "You" may have another policy subject to the same "terms" as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable limit under this policy bears to the limit of all policies covering on the same basis.

h. If there is another policy covering the same loss, other than that described in g. above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable limit.

i. "We" may adjust losses with the owners of lost or damaged property if other than "you". If "we" pay the owners, such payments will satisfy "your" claims against "us" for the owners' property. "We" will not pay the owners more than their financial interest in the Covered Property.

j. "We" may elect to defend "you" against suits arising from claims of owners of property. "We" will do this at "our" expense.

k. "We" will pay for covered loss or damage within 30 days after "we" receive the sworn proof of loss, if "you" have complied with all of the terms of this Coverage Form and:

   (1) "We" have reached agreement with "you" on the amount of loss; or

   (2) An appraisal award has been made.

4. **Conformity With Statute** – When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform with that law.

5. **Valuation**

"We" will determine the value of Covered Property in this Coverage Form in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

b. "Stock" "you" have sold but not delivered at the selling price less discounts and expenses "you" otherwise would have had.

c. As respects Business Personal Property only, exclusive of b. above, value for Covered Property in the event of loss or damage will be at replacement cost with no deduction for depreciation.

d. As respects Computer Systems Coverage only:

   (1) The value of "computer equipment" will be:

       (a) The cost of replacing the equipment with new property functionally identical to the damaged equipment if replaced; or

       (b) Actual cash value if the property is not repaired or replaced.

       In the event of partial damage to an item of "computer equipment", "we" will not pay more than the cost of reasonably restoring the property to its condition immediately prior to the loss.

   (2) The value of "data" will be the actual cost to reproduce. If the "data" is not replaced or reproduced, "we" will pay the cost of the value of the "media" with no stored "data".

   (3) The value of "media" will be the cost to repair or replace the "media" with substantially identical property.

e. As respects Installation Floater only:

   (1) The actual cost to repair, replace or

rebuild the Covered Property with materials of like kind and quality. The actual cost may include material, labor, reasonable overhead and profit, and delivery charges.

(2) The amount "you" actually incur to repair, replace or rebuild the Covered Property, subject to the applicable limit of insurance on this Coverage Form.

f. **Pair Or Set** – The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

g. **Loss To Parts** – The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

In no event will "we" pay more than the applicable "Limit of Insurance" for Covered Property in the Schedule Of Coverages on the first page of this form.

6. **Estates** – This provision applies only if the insured is an individual.

a. **Your Death** – On "your" death, "we" cover the following as an insured:

(1) the person who has custody of "your" property until a legal representative is qualified and appointed; or

(2) "your" legal representative.

This person or organization is an insured only with respect to property covered by this coverage.

b. **Policy Period Is Not Extended** – This coverage does not extend past the policy period indicated on the Declarations.

## F. Definitions

1. "Building" means a walled and roofed structure, other than a gas or liquid storage tank, which is principally above ground and on a permanent foundation. "Building" also includes a manufactured home on a permanent foundation, or a "jobsite" trailer enclosed within chain-link fencing of at least eight feet in height at the work "jobsite", set on a temporary foundation with it's wheels

removed from the trailer and stored at a separate location.

2. "Catastrophic ground cover collapse" means geological activity that results in all of the following:

a. The abrupt collapse of the ground cover;

b. A depression in the ground cover clearly visible to the naked eye;

c. Structural damage to the Covered Property, including the foundation; and

d. The insured Covered Property being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that Covered Property.

Business Personal Property coverage applies if there is a loss resulting from a catastrophic ground cover collapse. Structural damage consisting merely of the settling or cracking of a foundation, structure, or "building" does not constitute a loss resulting from a catastrophic ground cover collapse.

3. "Computer equipment" means:

a. "Your" programmable electronic equipment that is used to store, retrieve and process "data". It includes their component parts and air conditioning, fire suppression equipment and electrical equipment used exclusively in "your" computer "operations"; and

b. Associated peripheral equipment that provides communication including input and output functions such as printing or auxiliary functions such as "data" transmission

"Computer equipment" does not include "data" and "media".

4. "Coverage territory" means Covered Property wherever located within, or in legal transit between, the United States of America (including its territories and possessions), Puerto Rico, and Canada.

5. "Data" means:

a. Electronic information stored on "media"; and

b. Programming records used for electronic data processing or electronically controlled equipment.

6. "Earth movement" means any movement or vibration of the earth's surface (other than "catastrophic ground cover collapse" or

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.



"sinkhole loss"), including but not limited to earthquake, landslide, mudflow, mine subsidence, or the sinking, rising or shifting of earth.

7. "Fungi" means any type or form of fungus, including mold, mildew, wet or dry rot, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

8. "Jobsite" means any location, project, or work site where "you" are in the process of construction, installation, erection, repair, or moving.

9. "Media" means electronic data processing, recording or storage media such as software, films, tapes, discs, drums or cells.

10. "Money" means currency, coins and bank notes in current use and having a face value, and travelers checks, register checks and money orders held for sale to the public.

11. "Motor vehicle" means a land motor vehicle, trailer or semitrailer licensed for travel on public roads.

12. "Operations" means "your" business activities occurring at the described premises or anywhere in the "coverage territory".

13. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

14. "Sinkhole loss" means structural damage to the Covered Property, including the foundation, caused by sinkhole activity. Business Personal Property coverage applies only if there is a structural damage to the Covered Property, or to the "building" containing the Covered Property, caused by a sinkhole activity.

As used in this definition, sinkhole activity means settlement or the systematic weakening of the earth supporting such Covered Property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

15. "Stock" means merchandise held in storage or for sale or awaiting installation, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

All of the provisions and exclusions of the policy not otherwise amended also apply to this Coverage Form.

Copyright, Bankers Financial Corporation. Includes copyrighted material of Insurance Services Office, Inc., with its permission. © ISO Properties, Inc.

5355489
5/04/17

State National Insurance Company

09 0480000610 5 01                                           5/04/17
5030 00000 SNIC PPP2

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CONTRACTORS SPECIAL CONDITIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A. SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended to include the following:

**10. Contractors Special Condition**

  **a.** You will require certificates of insurance from all independent contractors engaged by you or on your behalf providing evidence of:

    **(1)** Commercial general liability insurance providing coverage that is equal to or broader than, and providing a Per Occurrence Limit of at least $500,000; and

    **(2)** Workers compensation insurance in compliance with the statutes of the applicable states.

  **b.** You will also require that all your subcontractors and independent subcontractors name you as an additional insured on their commercial general liability insurance coverage.

Failure to comply with this condition will not alter the coverage provided by this policy. However, should you fail to comply, independent contractors or subcontractors will be considered your "employees, and an appropriate premium charge will be made accordingly. The entire cost of all work sublet will be considered as payroll for the work performed by such independent contractor or subcontractor.

**11. Home Warranty Program Provisions**

By accepting this policy, you agree to:

  **a.** Provide and maintain an "authorized home warranty program" covering all residential building units sold by you subject to this insurance; and

  **b.** Comply fully with all requirements and conditions of such "authorized home warranty program".

**B. SECTION V - DEFINITIONS** is amended to include the following:

"Authorized home warranty program" means a home warranty program or other similar program approved by us and scheduled by endorsement to this coverage form.

**Includes copyrighted material of Insurance Services Office, Inc. with its permission**

Copyright, Insurance Services Office, Inc.,  1997

**Page 1 of 1**



I

5355489
5/04/17

State National Insurance Company
1900 L. Don Dodson Drive
Bedford, Texas 76021
1-800-627-0000

**Policy Number**

09 0480000610 5 01
5030 00000 SNIC PPP2

**Date of Notice**

5/04/17

# PRIVACY STATEMENT

To our Customers: As your insurance company, we recognize our obligation to keep information about you secure and confidential. Most of the information we use in evaluating your application and servicing your policy comes to us directly from you. In addition, we may collect nonpublic personal information from your application and from any of your transactions with State National Insurance Company or other companies. Depending on your insurance coverage, we may also collect information about you from third parties, such as other people proposed for coverage under your policy or the state Motor Vehicle Department concerning your driving report. We may also receive information about you from a consumer reporting agency.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law. In some cases this may mean information can be disclosed to third parties without your authorization; however, we maintain physical, electronic and procedural safeguards that comply with state and federal regulations to guard your nonpublic personal information. Information about you is given to those of our employees who need it in order to provide you with products, benefits or services.

You have the right to obtain access to certain information and the right to request correction of information you feel is inaccurate.

To have a copy of our detailed privacy policy mailed to you or to access your information, write: Privacy Compliance, State National Insurance Group, PO Box 15707, St. Petersburg, FL 33733.

Important Notice:

In compliance with requirements of the Fair Credit Reporting Act (Public Law 91-508), we advise that as part of our routine procedure for reviewing applications for certain types of insurance or renewals of certain policies, we may procure a consumer report including information as to the consumer's character, general reputation, personal characteristics or mode of living. If such information is for an individual and is primarily for personal, family or household purposes, such information may be obtained through personal interviews with neighbors, friends or others with whom the consumer is acquainted. Upon request to our company, in the manner as noted above, we will provide in writing a complete and accurate disclosure of the nature and scope of the consumer report requested or advise that no investigation was conducted.



I

1900 L. Don Dodson Drive
Bedford, Texas 76021
800-627-0000

5355489
5/04/17

## COMMERCIAL GENERAL LIABILITY
### COVERAGE PART
### DECLARATIONS PAGE

1 of 2

| Policy Number: |
|---|
| BIC  09 0480000610 5 01 |
| 5030 00000 SNIC PPP2 |

AMENDED

Date of Issue:   5/04/17

### Effective Date:

From:   7/24/14 To:   7/24/15 12:01 a.m., Standard Time

### LIMITS OF INSURANCE

| | |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Damage to Premises Rented to You (any one premises ) | $ 100,000 |
| Medical Expense Limit (any one person) | $ 5,000 |
| Personal and Advertising Injury Limit (any one person or organization ) | $1,000,000 |
| General Aggregate Limit | $2,000,000 |
| Products /Completed Operations Aggregate Limit | $2,000,000 |
| Property Damage Liability Deductible Per Claim | $ 1,000 |

### RETROACTIVE DATE (CG 00 02 only)

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive Date, if any, shown here:

### DESCRIPTION OF BUSINESS

Form of Business:  ☐ Individual     ☐ Partnership     ☒ Organization (Other than Individual or Partnership) ☐ LLC
Business Description*:  RGC Including Light Commercial Work

### FORMS AND ENDORSEMENTS

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

| | | | |
|---|---|---|---|
| CG 21 46 0798 | BGL 99.215 0508 | BGL99.347 1209 | BICCG 9905 0310 |
| CG 03 00 0196 | CG 22 79 0413 | BGL 99.178 0308 | CG 21 47 1207 |
| BGL 99.300 0308 | CG 02 20 0312 | CG 00 01 0413 | BGL 99.306 0308 |
| IL 00 21 0908 | BGL 99.334 0107 | BXXX99.206 0210 | CL 175 0286 |
| CG 00 68 0509 | IL 09 85 0108 | CG 21 49 0999 | CG 21 70 0108 |
| CG 21 86 1204 | CG 21 96 0305 | CG 24 26 0704 | BGL 99.219 0608 |

Forms and Endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORMS AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
© ISO Properties, Inc., 2006



Insured

1900 L. Don Dodson Drive
Bedford, Texas 76021
800-627-0000

5355489
5/04/17

**COMMERCIAL GENERAL LIABILITY**  **2 of 2**
**COVERAGE PART**
**DECLARATIONS PAGE**

| Policy Number: |
| --- |
| BIC  09 0480000610 5 01 |
| 5030 00000 SNIC PPP2 |

AMENDED

Date of Issue:      5/04/17

| Effective Date: |
| --- |

From:   7/24/14 To:   7/24/15 12:01 a.m., Standard Time

ALL PREMISES YOU OWN, RENT, OR OCCUPY
| Location | Address of All Premises You Own, Rent or Occupy |
| --- | --- |
| 1 | 2313 HIGHWAY 87, NAVARRE, FL 32566-3212 |

CLASSIFICATION & PREMIUM

| Location | Classification | Code No. | Premium Basis | Rate Prem/Ops | Prod/CO | Advance Premium Prem/Ops | Prod/CO |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | Carpentry - Residential Only. Includes Framing, Woodwork, Trim, Wooden Doors, Cabinet Installation, Shelving And Rough Carpentry Work. No Roofing Or Exterior Work On Buildings Exceeding 3 Stories. | 91340 | 144000 | 16.139 | 27.969 | 2324 | 4028 |
| 1 | Contractors - Executive Supervisors Or Executive Superintendents | 91580 | 25000 | 21.157 | .000 | 529 | 0 |

Subtotal Premium                                    $6,881

Other GL Coverages
GL Coverage Extension                          $150
Other Subtotal                                       $150

Total Advance Premium                          $7,031

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE
COMMON POLICY CONDITIONS, COVERAGE FORMS AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM
A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.



Insured

5250908
1900 L. Don Dodson Drive
Bedford, Texas 76021
800-627-0000

5355489
5/04/17

**1 of 2**

| COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS* | |
|---|---|

**Policy Number:**

BIC  09 0480000610 5 01
5030 00000 SNIC PPP2          AMENDED

Date of Issue:   5/04/17

**Effective Date:**

From:   7/24/14  To:  7/24/15   12:01 a.m., Standard Time

**DESCRIPTION OF BUSINESS**

Form of Business:      ( ) Individual   ( ) Partnership  (X) Organization (Other than Individual or Partnership)   ( ) LLC
Business Description: RGC Including Light Commercial Work

**COVERAGES**

| Coverage Description | Deductible | Limit of Insurance | Rate Per $100 | Premium |
|---|---|---|---|---|
| Contractors Special Coverage | | 1000000 | | 100 |

Premium for this Coverage Part  $    100

**FORMS AND ENDORSEMENTS** (other than applicable Forms and Endorsements shown elsewhere in the policy)

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue*:

| BCIM99.269 0909 | CI 175 0309 | BCIM99.361 0798 | CL 06 00 0108 |
|---|---|---|---|
| CL 06 05 0108 | CL 0700 1006 | | |

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERGE PART DECLARATIONS, COVERAGE FORM(S) AND
FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

*Information omitted is shown on the policy Declarations.



Insured

1900 L. Don Dodson Drive
Bedford, Texas 76021
800-627-0000

5355489
5/04/17

**2 of 2**

| **Policy Number:** | COMMERCIAL INLAND MARINE COVERAGE PART DECLARATIONS* | |

BIC   09 0480000610 5 01
      5030 00000 SNIC PPP2                    AMENDED

Date of Issue:   5/04/17

| **Effective Date:** |

From:   7/24/14 To:   7/24/15 12:01 a.m., Standard Time

ALL PREMISES YOU OWN, RENT, OR OCCUPY
Location                 Address of All Premises You Own, Rent or Occupy
    1                    2313 HIGHWAY 87, NAVARRE, FL 32566-3212



Insured

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

MAX LAGUERRE,                          )
                                       )
            Plaintiff,                 )
                                       )        17A64087
                                       )   Civil Action File No. _____
v.                                     )   JURY TRIAL DEMANDED
                                       )
PEACHTREE PROPERTY SUB, LLC,           )
DOING BUSINESS AS CROWNE PLAZA )
HOTEL ATLANTA-MIDTOWN;                 )
FO PEACHTREE PROPERTY, LLC,            )
DOING BUSINESS AS CROWNE PLAZA )
HOTEL ATLANTA-MIDTOWN;                 )
AWH PARTNERS, LLC, DOING               )
BUSINESS AS CROWNE PLAZA HOTEL )
ATLANTA-MIDTOWN; CAJUN                 )
CONTRACTORS, INC.; CAJUN               )
BUILDERS, INC., CAJUN                  )
DEVELOPMENT, LLC, AND JOHN             )
DOES 1 THROUGH 5,                      )
                                       )
                                       )
                                       )
            Defendants.                )
_____)

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

The Complaint of the Plaintiff respectfully alleges the following:

### PARTIES AND JURISDICTION

1.

Plaintiff Max Laguerre is a resident of the State of Georgia.

2.

Defendant PEACHTREE PROPERTY SUB, LLC, DOING BUSINESS AS

CROWNE PLAZA HOTEL ATLANTA ("Defendant PPS, LLC") is a foreign limited

liability company, authorized to transact business in the State of Georgia, with a principal

**EXHIBIT 2**

place of business at 1040 Avenue of the Americas, 9th Floor, New York, NY 10018. Defendant PPS, LLC may be served with second original summons and complaint through its registered agent: United Corporate Services, Inc., 4228 First Avenue, Suite 10, Tucker, Georgia 30084.

3.

Defendant PPS, LLC is subject to the jurisdiction of this Court.

4.

Defendant PPS, LLC is subject to the venue of this Court.

5.

Defendant PPS, LLC has been properly served with process in this action.

6.

Defendant FO PEACHTREE PROPERTY, LLC, DOING BUSINESS AS CROWNE PLAZA HOTEL ATLANTA ("Defendant FPP, LLC") is a foreign limited liability company, authorized to transact business in the State of Georgia, with a principal place of business at 1040 Avenue of the Americas, Suite 9B, New York, NY 10019. Defendant FPP, LLC may be served with second original summons and complaint through its registered agent: United Corporate Services, Inc., 4228 First Avenue, Suite 10, Tucker, Georgia 30084.

7.

Defendant FPP, LLC is subject to the jurisdiction of this Court.

8.

Defendant FPP, LLC is subject to the venue of this Court.

9.

Defendant FPP, LLC has been properly served with process in this action.

10.

Defendant AWH PARTNERS, LLC, DOING BUSINESS AS CROWNE PLAZA HOTEL ATLANTA ("Defendant AWH") (Defendant PPS, LLC, FPP, LLC, and AWH will be collectively referred to hereinafter as "Defendants PPS, LLC" or "the PPS, LLC Defendants") is a foreign limited liability company with a principal place of business at 1040 Avenue of the Americas, 9th Floor, New York, NY 10018. Defendant AWH may be served with second original summons and complaint via Georgia's Long Arm Statute through its registered agent: United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, DE 19904.

11.

Defendant AWH is subject to the jurisdiction of this Court.

12.

Defendant AWH is subject to the venue of this Court.

13.

Defendant AWH has been properly served with process in this action.

14.

Defendant CAJUN CONTRACTORS, INC. is a foreign corporation with a principal place of business at 2691 Stormy Circle, Navarre, Florida 32566. Defendant Cajun Contractors, Inc. may be served with second original summons and complaint through its registered agent via Georgia's Long-Arm Statute as follows: Troy L. Bossier, 2691 Stormy Circle, Navarre, Florida 32566.

15.

Defendant CAJUN CONTRACTORS, INC is subject to the jurisdiction of this Court.

16.

Defendant CAJUN CONTRACTORS, INC is subject to the venue of this Court.

17.

Defendant CAJUN CONTRACTORS, INC. has been properly served with process in this action.

18.

Defendant CAJUN BUILDERS, INC. is a foreign corporation with a principal place of business at 2691 Stormy Circle, Navarre, Florida 32566. Defendant Cajun Builders, Inc. may be served with second original summons and complaint via Georgia's Long-Arm Statute through its President: Troy L. Bossier, 2691 Stormy Circle, Navarre, Florida 32566.

19.

Defendant CAJUN BUILDERS, INC. is subject to the jurisdiction of this Court.

20.

Defendant CAJUN BUILDERS, INC. is subject to the venue of this Court.

21.

Defendant CAJUN BUILDERS, INC. has been properly served with process in this action.

22.

Defendant CAJUN DEVELOPMENT, LLC (Cajun Development, LLC, Cajun Builders, Inc., and Cajun Contractors, Inc. will be collectively referred to hereinafter as "Defendant Cajun" or the "Cajun Defendants") is a foreign limited liability company with a principal place of business at 2691 Stormy Circle, Navarre, Florida 32566. Defendant Cajun Development, LLC may be served with second original summons and complaint via Georgia's Long-Arm Statute through its President: Troy L. Bossier, 2691 Stormy Circle, Navarre, Florida 32566.

23.

Defendant CAJUN DEVELOPMENT, LLC. is subject to the jurisdiction of this Court.

24.

Defendant CAJUN DEVELOPMENT, LLC is subject to the venue of this Court.

25.

Defendant CAJUN DEVELOPMENT, LLC has been properly served with process in this action.

26.

Upon information and belief, Defendants John Doe 1 through 5 are residents of the State of Georgia and are subject to the venue and jurisdiction of this Court. Defendant Does are the individuals who were working on a construction project on the Premises at issue. At all times relevant hereto, Defendants John Doe 1 throught 5 were acting within the course and scope of their employment with Defendant Cajun

Contractors, Inc., Defendant Cajun Builders, Inc. and Defendant Cajun Development, LLC, such that these corporate defendants are liable for their negligent actions and omissions.

## OPERATIVE FACTS

### 27.

Plaintiff reasserts and re-alleges paragraphs 1-26, above, as though they were fully set forth herein.

### 28.

At all times herein, Defendants PPS, LLC (Defendants PPS, LLC (Defendant PPS, LLC, Defendant FPP, LLC and Defendant AWH) owned, operated, controlled and managed the Crowne Plaza Hotel Atlanta, located at 590 West Peachtree Street, NW, Atlanta, Georgia 30308 (hereinafter referred to as the "Property," "Hotel" or "Premises").

### 29.

At all times herein, Defendants PPS, LLC had a contract with the Cajun Defendants to perform a construction project on the Premises.

### 30.

Crowne Plaza Hotel is an established hotel in Atlanta, Georgia.

### 31.

On July 20, 2015, at approximately 3:30 p.m., Mr. Laguerre, who is a taxi cab driver, was waiting outside of his taxi cab at the taxi stand in front of the hotel.

### 32.

Mr. Laguerre and other taxi cab drivers waited at the taxi stand in order to readily provide transportation to guests of the hotel.

33.

While he was waiting outside of the hotel, without warning, a metal pipe fell from the roof of the hotel where the pool is located.

34.

The metal pipe hit Mr. Laguerre's face, nose, and body, even though Mr. Laguerre attempted to shield his face with his hands and arms.

35.

Mr. Laguerre was immediately injured, suffering from lacerations, contusions, a broken nose, a wrist injury, and a head injury, amongst others.

36.

Prior to the incident, Mr. Laguerre did not know that there was a loose pipe on the roof of the hotel.

37.

The Defendants did not warn Mr. Laguerre about the dangerous, loose pipe.

38.

As a result of the incident, Mr. Laguerre suffered from permanent, debilitating injuries.

39.

Mr. Laguerre had no prior knowledge of the dangers associated with being present on the Property, and he had no reason to believe a pipe would fall from the hotel and onto his body on or about July 20, 2015.

## ALLEGATIONS OF NEGLIGENCE AS TO DEFENDANTS PPS, LLC, FPP, LLC, and AWH

40.

Plaintiff reasserts and re-alleges paragraphs 1-39, above, as though they were fully set forth herein.

41.

At all times mentioned herein, Defendants PPS, LLC (Defendant PPS, LLC, Defendant FPP, LLC and Defendant AWH) had exclusive control over and management of said property, and Defendants PPS, LLC had a legal duty to keep its premises in a condition and state safe for its invitees and licensees.

42.

Defendants PPS, LLC had a nondelegable legal duty to have due regard for the safety of their invitees and licensees, including Max Laguerre, by taking adequate measures to keep the Premises safe and/or warn its invitees and licensees about the unsafe nature of its Property.

43.

Prior to the time when Plaintiff was injured on July 20, 2015, Defendants PPS, LLC knew of, or by the exercise of due care for the safety of its invitees and licensees, including Max Laguerre, should have known of the dangerous and unsafe condition, specifically the loose pipe, on its Premises and that the failure to warn of or correct said condition(s) was likely to result in injuries to invitees and/or licensees such as Mr. Laguerre.

44

More specifically, at all relevant times, Defendants PPS, LLC owed certain civil duties to Max Laguerre. Notwithstanding, Defendants breached at least the following duties, proximately causing the injuries to Max Laguerre:

a.   Violation of O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b.   Failing to warn, post warning signs or warning markings regarding dangerous conditions, specifically the falling pipe, on the premises;

c.   Failing to inspect, examine, monitor, maintain, repair, abate, and correct some or all of the defective conditions, specifically a loose pipe on the roof, on the Premises;

d.   Failing to properly train and supervise their employees in regard to the maintaining the Premises in safe condition for its invitees and/or licensees;

e.   Negligently retaining, entrusting, hiring, training and supervising said employees, and agents regarding preventing harm to its licensees and invitees;

f.   Failing to comply with national and local standards regarding safety of Premises; and,

g.   By committing other negligent and reckless acts and omissions as may be shown by the evidence and proven at trial.

45.

Defendants' PPS, LLC breaches of certain duties owed to Max Laguerre constitute negligence per se.

46.

Defendants PPS, LLC had knowledge, both actual and constructive, of the need to properly inspect, construct, maintain, manage, repair, abate, correct, examine, and monitor the Property in order to keep it in a safe condition.

47.

Defendants PPS, LLC had knowledge, both actual and constructive, that a loose pipe on top of the building could fall and injure invitees and licensees, such as Mr. Laguerre.

48.

Defendant PPS, LLC had knowledge, both actual and constructive, that there was a loose pipe on top of the building could fall and injure invitees and licensees, such as Mr. Laguerre.

49.

If Defendants PPS, LLC did not know about the dangerous pipe, upon the exercise of due care, specifically proper inspection and properly scheduled maintenance, Defendants would have discovered the dangerous condition.

50.

Defendants PPS, LLC knew that the pipe, as it existed on July 20, 2015, violated applicable building, fire, or safety codes.

51.

Defendants' PPS, LLC failure to maintain the premises in a safe condition, specifically the failure to secure or remove a loose pipe from the building where it could fall and harm invitees and licensees such as Plaintiff, created an unreasonable risk of

injury to its invitees and licensees, including Mr. Laguerre.

52.

Defendants' PPS, LLC failure to inspect the premises to ensure it was in safe condition, specifically the failure inspect the building to ensure that a loose pipe would not fall from the building, created an unreasonable risk of injury to its invitees and licensees, including Mr. Laguerre.

53.

Defendants PPS, LLC knew of, or with the exercise of due care to its invitees and licensees, including Mr. Laguerre, should have known of, the dangerous and hazardous conditions, specifically the loose pipe, existing at the hotel, and knew that or should have known the failure to properly construct, renovate, maintain, repair, inspect, and manage the premises created an unreasonable risk of injury to Mr. Laguerre.

54.

Defendants PPS, LLC had actual knowledge of the dangerous and hazardous conditions, specifically the loose pipe, existing at the hotel, due to the direct knowledge of its employees and agents.

55.

Defendants PPS, LLC negligently failed to maintain a policy, procedure, or system of inspecting, investigating, reporting, and warning invitees and licensees, including Mr. Laguerre, about the negligently maintained property and its dangerous conditions.

56.

Defendants PPS, LLC negligently represented to its invitees and licensees, including Mr. Laguerre, that the property at issue was properly maintained.

57.

Plaintiff Laguerre's injuries were a reasonably foreseeable result of Defendants PPS, LLC'S above-described negligence.

58.

Defendants' PPS, LLC negligence was a cause in fact and proximate cause of the Plaintiff's injuries.

59.

Plaintiff sustained serious injuries, mental anguish, loss of enjoyment of life, and other damages, including, but not limited to medical expenses, past and future, lost wages and the ability to labor, all of which were foreseeable and directly and proximately caused by the Defendants PPS, LLC's breach of duties owed to Plaintiff and the negligence of Defendants.

60.

But for the negligence of Defendants PPS, LLC, Plaintiff would not have suffered serious injury, physical pain, mental and psychological suffering and anguish, inconvenience, and other injuries as proven at the trial of this matter.

61.

Defendants PPS, LLC admits fault for causing Plaintiff's injuries and damages.

62.

Plaintiff was not contributorily negligent.

63.

At all relevant times hereto, Plaintiff exercised ordinary care for his own safety under the conditions and circumstances then existing.

64.

Each of the foregoing acts and omissions on the part of Defendants PPS, LLC constitutes an independent act of negligence and one or more or all of the above-stated acts or omissions were the direct and proximate causes of the injuries suffered by Plaintiff. But for said tortious acts, Plaintiff would not have suffered injuries and damages. Defendants PPS, LLC is liable for the personal injuries of Plaintiff and all damages recoverable under Georgia law.

65.

As a result of Defendants PPS, LLC's negligence, Plaintiff incurred reasonable, necessary, and continuing medical expenses.

66.

As a result of Defendants PPS, LLC's negligence, Plaintiff will incur future medical expenses.

## ALLEGATIONS OF NEGLIGENCE AS TO JOHN DOES 1 THROUGH 5 AND CAJUN DEFENDANTS

67.

Plaintiff reasserts and re-alleges paragraphs 1-66, above, as though they were fully set forth herein.

68.

At all times relevant, Defendants John Doe 1 through 5 owed a duty of to exercise ordinary and reasonable care to Plaintiff.

69.

Defendants John Doe 1 through 5 breached their duty of reasonable care by failing to secure the pipe on the roof of the building and causing the pipe to fall and hit Plaintiff.

70.

Defendants John Doe 1 through 5's failure to secure the pipe that fell from the building and hit Plaintiff was negligent.

71.

At all relevant times herein, Defendants John Doe 1 through 5 were acting within the scope of employment with the Cajun Defendants, rendering the Cajun Defendants responsible for Defendants John Doe 1 through 5's negligence pursuant to the theories of *respondeat superior*, vicarious liability and agency principles.

72.

At all relevant times herein, the Cajun Defendants retained the right to direct and control the time and manner of executing work and/or interfered to assume control of the work of the John Doe defendants, rendering the Cajun Defendants liable for the John Doe defendants' negligence.

73.

At all times relevant, the Cajun Defendants owed a duty to exercise ordinary and reasonable care to Plaintiff.

74.

At all relevant times herein, the Cajun Defendants knew that the construction project conducted on a roof top of a high rise hotel building involved an increased risk and peculiar danger that required special precautions in order to avoid injuries to third parties.

75.

The Cajun Defendants' failure to implement safety rules, precautions, and procedures, to train, and to supervise its employees and/or subcontractors for the construction project related to the subject incident in order to ensure the work was performed safely was a breach of their duty of care and is negligence per se.

76.

The Cajun Defendants are liable for negligently hiring, screening, supervising, training and retaining Defendants John Doe 1 through 5, despite knowing their propensities for negligent conduct.

77.

The Cajun Defendants also liable for negligently supervising, training and retaining Defendants John Doe 1 through 5, specifically failing to train and supervise Defendants John Doe 1 through 5 to utilize proper safety policies and procedures to avoid causing injuries to third persons such as Plaintiff while working at on the subject Premises.

78.

Each of the Defendants' above-described acts and omissions were a breach of their duty of ordinary care, were negligent and caused Plaintiff to suffer from injuries and damages.

79.

Plaintiff Laguerre's injuries were a reasonably foreseeable result of the Cajun Defendants and Defendants John Doe 1 through 5's above-described negligence.

80.

Defendants John Doe 1 through 5's and the Cajun Defendants' negligence was a cause-in-fact and proximate cause of the Plaintiff's injuries.

81.

Plaintiff sustained serious injuries, mental anguish, loss of enjoyment of life, and other damages, including, but not limited to medical expenses, past and future, lost wages and the ability to labor, all of which were foreseeable and directly and proximately caused by the Cajun Defendants and Defendants John Doe 1 through 5's breach of duties owed to Plaintiff and the negligence of Defendants John Doe 1 through 5 and the Cajun Defendants.

82.

But for the negligence of the Cajun Defendants and Defendants John Doe 1 through 5, Plaintiff would not have suffered serious injury, physical pain, mental and psychological suffering and anguish, inconvenience, and other injuries as proven at the trial of this matter.

83.

Defendants John Doe 1 through 5 and the Cajun Defendants admit fault for causing Plaintiff's injuries and damages.

84.

Plaintiff was not contributorily negligent.

85.

At all relevant times hereto, Plaintiff exercised ordinary care for his own safety under the conditions and circumstances then existing.

86.

Each of the foregoing acts and omissions on the part of the Cajun Defendants and John Does 1 throught 5 constitutes an independent act of negligence and one or more or all of the above-stated acts or omissions were the direct and proximate causes of the injuries suffered by Plaintiff. But for said tortious acts, Plaintiff would not have suffered injuries and damages. The Cajun Defendants and John Doe 1 through 5 are liable for the personal injuries of Plaintiff and all damages recoverable under Georgia law.

87.

As a result of the Cajun Defendants' and John Doe 1 through 5's negligence, Plaintiff incurred reasonable, necessary, and continuing medical expenses.

88.

As a result of the Cajun Defendants' and John Doe 1 through 5's negligence, Plaintiff will incur future medical expenses.

## ATTORNEY'S FEES AS TO ALL DEFENDANTS

89.

Plaintiff re-alleges and incorporates herein the allegations contained in Paragraphs 1 through 79 above as if fully reinstated.

90.

As Defendants have been stubbornly litigious, Plaintiff is entitled to reasonable attorneys' fees and expense of this litigation pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays and demands as follows:

    a.   That Summons issue, as provided by law, requiring Defendants to appear and answer Plaintiff's Complaint;

    b.   That service be had upon Defendants as provided by law;

    c.   That Defendants timely and adequately respond to Interrogatories, Request for Production of Documents and Request to Admit, served herewith;

    d.   That the Court award and enter a judgment in favor of Plaintiff, against Defendants, in an amount to compensate Plaintiff for all damages including, but not limited to, all special, compensatory, economic, and other allowable damages, in accordance with the enlightened conscience of an impartial jury, as permitted under Georgia law, plus cost and interest;

    e.   That the Plaintiff has a trial by a jury of twelve as to all issues; and

f.   That the Plaintiff has such other and further relief as the Court may

deem just and proper.

Respectfully submitted,

DIXON DAVIS, LLC
/s/ S.K. Rod Dixon
SK Rod Dixon
Georgia Bar No. 223395
/s/ Quynh-Huong "Betty" Nguyen Davis
Quynh-Huong Nguyen Davis
Georgia Bar No. 141293
Attorneys for the Plaintiff

1349 W. Peachtree St.
Suite 1995
Atlanta, GA 30309
(404) 593-2620 (telephone)
(404) 478-7240 (fax)

STATE COURT OF
DEKALB COUNTY, GA.
4/20/2017 4:23:03 PM
E-FILED
BY: Assunta Wells

# GALLOWAY
Galloway Johnson Tompkins Burr & Smith





## Todd M. LaDouceur
### Director

118 East Garden Street
Pensacola, Florida 32502
tladouceur@gallowaylawfirm.com
Download: vCard   Resume

Office: 850-436-7000
Cell Phone: 850-554-3148
Fax: 850-436-7099
Additional Offices: Atlanta,
Mobile

in Connect on LinkedIn

| OVERVIEW | PRACTICES / INDUSTRIES | EDUCATION / ADMISSIONS | ASSOCIATIONS | NEWS |

Todd LaDouceur is an aggressive, skilled trial lawyer and counselor. He believes that disputes are resolved when the opposition respects his clients' positions and resolve. Over the past thirty years, Todd has helped thousands of clients resolve problems short of lawsuits by recognizing business and insurance realities and costs. If negotiating fails, Todd understands that a well-planned, cost-effective approach to litigation yields the best results. Having tried well over a hundred cases before a jury, judge, or arbitrator, Todd has mastered the courtroom skills that help a client decide to "go to the mat" or seek a reasonable settlement. Litigating matters from traffic court to the United States Supreme Court in Florida, Georgia, and Mississippi, Todd has the experience to navigate the state and federal legal systems, making the whole process less costly and more manageable. Todd partners with his clients as their participation and insights are invaluable to a positive result.

Todd's training and experience coupled with a relentless drive have resulted in successful outcomes for hundreds of clients including professionals, corporations, service companies, trucking companies, employers, commercial property owners, developers, contractors, engineers, and a myriad of other businesses and individuals, as well as their underwriters and insurance companies.

Undoubtedly, military service has chiseled Todd's ability to remain calm under pressure. As a U.S. Naval Academy graduate and a commissioned officer in three branches of service, the Army, Navy and Marines – effective leadership is a hallmark of his character. A degree in Aerospace Engineering with an emphasis in planetary orbital mechanics allows him to quickly unravel and deftly handle the most complex and intricate cases. From construction defects to business disputes to engineering failures, no case is too difficult. Being a Marine Flyer and NASA veteran – attention to detail and planning precision/execution are second nature. These traits transfer directly to the effective practice of law.

Todd has been married to his wife, Maria, for 33 years and has two adult sons. He is an active private pilot and scuba diver and enjoys traveling with his family.

**Representative Matters**

- In 2021 alone, achieved multiple successful jury trial outcomes for insurers in first-party Hurricane *Michael* state court cases involving catastrophic damages.
- Represented a local office supplier in a complex commercial asset purchase by a national chain retailer.
- Successfully settled a negligent security shooting case brought in Metro Atlanta.
- Currently handling multiple shooting and death cases brought against an apartment complex owner and managers.

Martindale-Hubbell®
DISTINGUISHED™
Peer Rated for High
Professional Achievement  2022

**EXHIBIT 3**





**Atlanta Office**
990 Hammond Drive, Suite 575
Atlanta, Georgia 30328
Office: (678) 951-1500
Fax: (404) 527-6201
E-mail: tjones@gallowayjohnson.com

### EDUCATION:

- University of Michigan Law School, J.D.
- Morehouse College, B.A., *magna cum laude*

### BAR ADMISSIONS:

- State of Georgia
- Georgia Court of Appeals
- Georgia Supreme Court
- U.S. District Court: Northern District of Georgia

### PROFESSIONAL ASSOCIATIONS:

- LEAD Atlanta
- Outstanding Atlanta
- President, Emerging 100 of Atlanta
- American Red Cross Minority Recruitment Advisory Board
- American Bar Association
- Gate City Bar Association
- Atlanta Volunteer Lawyers Foundation

# Tony C. Jones │ Associate

Tony C. Jones represents businesses and individuals in a wide array of commercial, tort and insurance litigation matters. The diversity of Tony's practice has afforded him the opportunity to represent entrepreneurs, franchisees, closely held and family owned businesses, healthcare companies and professionals, trucking companies, property management companies, hotels, restaurants, real estate developers, construction companies, technology companies, and insurers in all phases of dispute resolution.

Tony is well regarded for his work in the Atlanta community. Tony has been selected for, and is a member of, Outstanding Atlanta and LEAD Atlanta. He serves as the President of the Emerging 100 of Atlanta, a Board Member on the American Red Cross's Minority Recruitment Advisory Board, and is a Founding Board Member of the Resurgence Hall Charter School. Tony is the inaugural recipient of the Terrell J. Slayton Member of the Year Award from the Emerging 100 of Atlanta. In 2014 and 2016, Tony was recognized by Who's Who in Black Atlanta as a Counselors at Law Section Honoree.

Prior to joining Galloway, Johnson, Tompkins, Burr & Smith, Tony worked with both regional and international law firms in complex commercial litigation and tort matters. The breadth of Tony's practice and his depth of experience has made him a sound advocate in any dispute, big or small.

### PRACTICE AREAS:

- Construction
- Insurance Defense
- Mass Tort & Class Action
- Real Estate
- Professional Liability
- Trucking & Transportation
- Hospitality, Entertainment & Leisure

**GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH**

**EXHIBIT 4**

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| MAX LAGUERRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. 17A64087 |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| PEACHTREE PROPERTY SUB, LLC, | ) | |
| DOING BUSINESS AS CROWNE PLAZA | ) | |
| HOTEL ATLANTA-MIDTOWN; | ) | |
| FO PEACHTREE PROPERTY, LLC, | ) | |
| DOING BUSINESS AS CROWNE PLAZA | ) | |
| HOTEL ATLANTA-MIDTOWN; | ) | |
| AWH PARTNERS, LLC, DOING | ) | |
| BUSINESS AS CROWNE PLAZA HOTEL | ) | |
| ATLANTA-MIDTOWN; CAJUN | ) | |
| CONTRACTORS, INC.; CAJUN | ) | |
| BUILDERS, INC., CAJUN | ) | |
| DEVELOPMENT, LLC, AND JOHN | ) | |
| DOES 1 THROUGH 5, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S O.C.G.A. § 9-11-68 OFFER OF JUDGMENT TO DEFENDANTS IN THE AMOUNT OF $250,000.00

COMES NOW Plaintiff and makes this Offer of Judgment to the Defendants pursuant to

O.C.G.A. § 9-11-68(b) and states as follows:

### 1. PARTY MAKING THE PROPOSAL (OFFEROR):

Plaintiff MAX LAGUERRE.

### 2. PARTY TO WHOM THE OFFER IS MADE (OFFEREE):

All Defendants.

**EXHIBIT 5**

### 3. CLAIM TO BE RESOLVED:

This offer is to fully satisfy all claims presented in this matter against the Offerees identified in Paragraph 2 above, including all claims for injuries arising out of the incident that occurred on or about July 20, 2015, which is the subject of the above-styled civil action. However, the Plaintiff shall not be barred from making any claims to the extent any other insurance coverage is available which covers Plaintiff's claims.

### 4. TOTAL AMOUNT OF OFFER:

Two hundred and fifty thousand dollars and zero cents ($250,000.000) to be paid by the Defendants.

### 5. RELEVANT CONDITIONS:

This offer is conditioned upon the following:

a.      The Defendants must accept this offer in writing before the expiration of the offer;

b.      The settlement drafts totaling two hundred and fifty thousand dollars and zero cents ($250,000.00) payable to "Max Laguerre & Dixon Davis, LLC" will be delivered to Plaintiff's counsel within thirty (30) days of the Defendants' acceptance of this offer;

c.      Prior to disbursement of any settlement funds from Plaintiff's counsel's trust account, the Plaintiff will compromise and/or fully satisfy any and all claims for medical expenses, hospital liens, and/or attorney's liens arising out of the subject incident that occurred on July 20, 2015. Plaintiff will deliver to Defendants a properly executed general release.

### 6. ATTORNEYS' FEES OR OTHER EXPENSES:

This offer specifically includes any and all claims for attorneys' fees and litigation

expenses.

## 7. PUNITIVE DAMAGES:

Plaintiff's offer includes any claims for punitive damages.

## 8. TERM OF OFFER:

This offer will remain open for thirty (30) days.

SIGNATURE WILL APPEAR ON THE FOLLOWING PAGE

This 24TH  day of January, 2018.

Quynh-Huong Nguyen Davis
Georgia Bar No. 141293
Attorney for the Plaintiff

Dixon Davis LLC
1349 West Peachtree St. NW
Suite 1995
Atlanta, GA 30309
(404) 593-2620 (telephone)
betty@dixonfirm.com

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MAX LAGUERRE,                                    )
                                                 )
Plaintiff,                                       )
                                                 )        Civil Action File No. 17A64087
v.                                               )        JURY TRIAL DEMANDED
                                                 )
PEACHTREE PROPERTY SUB, LLC,                     )
DOING BUSINESS AS CROWNE PLAZA                   )
HOTEL ATLANTA-MIDTOWN;                           )
FO PEACHTREE PROPERTY, LLC,                      )
DOING BUSINESS AS CROWNE PLAZA                   )
HOTEL ATLANTA-MIDTOWN;                           )
AWH PARTNERS, LLC, DOING                         )
BUSINESS AS CROWNE PLAZA HOTEL                   )
ATLANTA-MIDTOWN; CAJUN                           )
CONTRACTORS, INC.; CAJUN                         )
BUILDERS, INC., CAJUN                            )
DEVELOPMENT, LLC, AND JOHN                       )
DOES 1 THROUGH 5,                                )
                                                 )
Defendants.                                      )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January, 2018, a copy of the **PLAINTIFF'S O.C.G.A. § 9-11-68 OFFER OF JUDGMENT TO DEFENDANTS IN THE AMOUNT OF $250,000.00** was served upon all parties by depositing a copy of same in the United States Mail, VIA CERTIFIED MAIL WITH RETURN RECEIPT REQUESTED in a properly addressed envelope with adequate postage thereon to ensure delivery to:

Russell A. Britt, Esq.
R. David Ware, Esq.
Joseph M. Cianflone, Esq.
*Hall Booth Smith P.C.*

191 Peachtree Street NE
Suite 2900
Atlanta, GA 30303

Todd M. Ladouceur, Esq.
Tony C. Jones, Esq.
*Galloway, Johnson, Tompkins, Burr & Smith, P.L.C.*
990 Hammond Drive, Suite 575
Atlanta, GA 30328

This 24th day of January, 2018.

/s/_____
Quynh-Huong "Betty" Nguyen Davis
Georgia Bar No. 141293
Attorney for Plaintiff

**Dixon Davis, LLC**
1349 West Peachtree Street NW
Two Midtown Plaza
Suite 1995
Atlanta, GA 30309
(404) 593-2620 (Telephone)
(678) 253-0237 (Facsimile)
betty@dixonfirm.com



Galloway Johnson Tompkins Burr & Smith

Texas | Louisiana | Mississippi | Alabama | Florida | Georgia | Missouri

TONY C. JONES
Director
Licensed in Georgia
Phone: (678) 951-1500
tjones@gallowaylawfirm.com

BENJAMIN J. WELCH
Associate
Licensed in Georgia
Phone: (678) 951-1500
bwelch@gallowaylawfirm.com

990 Hammond Drive NE, Suite 575
Atlanta, Georgia 30328
Tel: (678) 951-1500
Fax: (678) 951-1510
www.gallowaylawfirm.com

March 12, 2018

David R. Cribb, CPCU
Claim Technical Specialist
Bankers Insurance Company
P.O. Box 33061
Saint Petersburg, FL 33733
drcribb@BankersInsurance.com

> **Re:**   ***Max Laguerre v. Peachtree Property Sub, LLC, et al.***
> **Claim No.:  SNIC-17-1648-011**
> **DeKalb County Superior Court Civil Action No.:  17A64087**
> **Our File No.:  AT4473-0002**

Dear David:

Please accept this correspondence as our most recent update of this claim and summary of the Deposition of Plaintiff taken today, March 12, 2018.

### BACKGROUND

Max Ronald Laguerre was born on ▮▮▮▮▮▮▮ in Haiti. His U.S. social security number is ▮▮▮5870. He became a US citizen eight years ago, after having lived in Queens, NY (3 years), then Brooklyn (8-10 years), and, finally, Jonesboro, Georgia in 1999. Mr. Laguerre is married with two adult children and a teenager, all of whom reside with him.

Mr. Laguerre earned his associate's degree in environmental control technology (HVAC) from New York City College in 1996. He didn't work in this field when he finished, but he

**EXHIBIT 6**

admits to doing construction jobs from time-to-time starting a few years ago. He now has a home based business, Beslo, in the area of home improvement. He get his work through a management company based in New York, Reliant. He has contracts with Reliant, so when they have "reac" inspections for apartments and buildings, he'll perform that work for them. This is his only source of work now. His company makes around $140K annually.

The last time he drove a cab was three years ago, and he left the cab industry altogether a few months after this incident.  At the time of this incident, he worked for US Taxi for approximately 3-4 years. He earned his fare in trips, not through the company, so he could drive as much or as little as he wanted. He likens his role to that of an independent contractor. Prior to joining US Taxi, he drove the same Chevy Astro for Checker Cab (4 years) and Lenox Cab.

## INCIDENT

He claims his head, nose, and right forearm were injured in the incident. He says he never injured his head, nose, or right forearm before the incident, nor did he experience frequent headaches or any respiratory issues prior to the incident.

The incident happened on July 20, 2015 at apprx. 10AM. He recalls it as a Monday. He left his house around 6:30AM, not having to report to a specific location.  He says that the Crowne Plaza was his first stop, which is apprx. 25 miles from his house.  He says there's a taxi stand in front of the hotel. He was standing by the car, talking to his friend Herve. Herve's car was parked in front of his. He didn't know any of the other taxi drivers there. He knows Herve as they're both from Haiti and once worked for the same cab company. He says he was facing his car, talking to Herve, and he heard something above him, then he looked up and saw a pipe falling and raised his arm to cover his face. Part of the pipe hit Herve's car, and at least some of it struck him in the forearm and face.  He can't describe what the "sound" sounded like. Someone from the hotel (security) called EMS.  Security from the hotel came out to check on him.

He says that, at the emergency room, they x-rayed his arm and nose. They gave him a prescription for a pain killer that he doesn't recall. He then saw his own doctor, Dr. Ramesh (Jonesboro), who referred him to a specialist, Dr. Kunkes. He says he didn't find out the results from either of his x-rays until he saw a specialist. Dr. Kunkes told him he had a contusion on his nose and some deviation. Dr. Kunkes gave him some medication and asked him to return. He saw Dr. Kunkes apprx. 4-5 times before he recommended surgery.

## POST-INCIDENT STATUS

He confirms the surgery helped his breathing issue and he no longer has any issues with his nose. He says he still has headaches once or twice per week. He confirmed that his arm was never broken and he has not had any problems with his arm since the swelling subsided.  His medical expenses are capped at $30,625.68. He drove 5-6 days around the time of the incident and would set his own schedule, but estimates his lost wages based on what he earned daily at the time. He claims to have tax returns for the years 2014-2015, but cannot recall the name of the accountant that prepared those returns. He first contacted a lawyer the week of this incident.

## SETTLEMENT DISCUSSIONS AND PRELIMINARY EVALUATION

Following the deposition of Plaintiff Laguerre, his attorney confirmed a global settlement offer of $250,000 to all defendants. Assuredly, there is absolutely no basis for accepting this offer based on the evidence adduced to date, but the Plaintiff's attorney is interested in obtaining a counter-offer prior to the taking of the Defendants' 30(b)(6) depositions in Detroit, Michigan and Pensacola, Florida.

Though our own 30(b)(6) witness has yet to be deposed, it is clear from the written discovery exchanged and produced to date that the insured's subcontractor, R&R Mechanical, Inc., performed the work on the roof of the hotel that culminated in the pipe falling to the ground, striking Mr. Laguerre. Unfortunately for the insured, however, its subcontract is completely silent on the issue of indemnity and insurance coverage, rendering a contractual indemnity or third-party claim on account thereof, a nullity.[1] A copy of the subcontract is attached. Nevertheless, we will be asking the jury to apportion fault to R&R Mechanical, Inc. pursuant to our Notice of Non-Party Fault and Intent to Apportion.

With that said, and for settlement purposes, I recommend that we confer with counsel for the Peachtree Defendants to assess the possibility of filing a global offer of judgment against the Plaintiff. In Georgia, if the Plaintiff does not receive a verdict for 75% of the offer (or more), the Plaintiff is required to pay our attorneys' fees from the date of rejection or expiration of the offer. If you approve of this strategy, please let us know and we will promptly consult counsel for the Peachtree Defendants to assess these possibilities. Should they elect not to participate in the filing of a global offer of judgment, I recommend that we strongly consider filing one independently in an amount not to exceed the Plaintiff's medical expenses.

With kind regards, I remain,

Very truly yours,

Tony C. Jones

---

[1] Common law indemnity has been abolished in the State of Georgia, making contractual indemnity the only meaningful way to transfer this risk. Further, in the absence of an insurance mandate in the contract, it is unclear if insurance was obtained for this $7,500 job.

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| MAX LAGUERRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. 17A64087 |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| PEACHTREE PROPERTY SUB, LLC, | ) | |
| DOING BUSINESS AS CROWNE PLAZA | ) | |
| HOTEL ATLANTA-MIDTOWN; | ) | |
| FO PEACHTREE PROPERTY, LLC, | ) | |
| DOING BUSINESS AS CROWNE PLAZA | ) | |
| HOTEL ATLANTA-MIDTOWN; | ) | |
| AWH PARTNERS, LLC, DOING | ) | |
| BUSINESS AS CROWNE PLAZA HOTEL | ) | |
| ATLANTA-MIDTOWN; CAJUN | ) | |
| CONTRACTORS, INC.; CAJUN | ) | |
| BUILDERS, INC., CAJUN | ) | |
| DEVELOPMENT, LLC, AND JOHN | ) | |
| DOES 1 THROUGH 5, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S O.C.G.A. § 9-11-68 OFFER OF JUDGMENT TO DEFENDANT CAJUN CONTRACTORS, INC. IN THE AMOUNT OF $75,000.00**

COMES NOW Plaintiff and makes this Offer of Judgment to the Defendant CAJUN

CONTRACTORS, INC. pursuant to O.C.G.A. § 9-11-68(b) and states as follows:

**1. PARTY MAKING THE PROPOSAL (OFFEROR):**

Plaintiff MAX LAGUERRE.

**2. PARTY TO WHOM THE OFFER IS MADE (OFFEREE):**

CAJUN CONTRACTORS, INC.

**3. CLAIM TO BE RESOLVED:**

**EXHIBIT 7**

This offer is to fully satisfy all claims presented in this matter against the Offerees identified in Paragraph 2 above, including all claims for injuries arising out of the incident that occurred on or about July 20, 2015, which is the subject of the above-styled civil action. However, the Plaintiff shall not be barred from making any claims to the extent any other insurance coverage is available which covers Plaintiff's claims.

## 4. TOTAL AMOUNT OF OFFER:

Seventy-five thousand dollars and zero cents ($75,000.000) to be paid by Cajun Contractors, Inc.

## 5. RELEVANT CONDITIONS:

This offer is conditioned upon the following:

a.        The Defendant must accept this offer in writing before the expiration of the offer;

b.        The settlement drafts totaling seventy five thousand dollars and zero cents ($75,000.00) payable to "Max Laguerre & The Davis Injury Firm, LLC" will be delivered to Plaintiff's counsel within thirty (30) days of the Defendant's acceptance of this offer;

c.        Prior to disbursement of any settlement funds from Plaintiff's counsel's trust account, the Plaintiff will compromise and/or fully satisfy any and all claims for medical expenses, hospital liens, and/or attorney's liens arising out of the subject incident that occurred on July 20, 2015.  Plaintiff will deliver to Defendant a properly executed general release.

## 6. ATTORNEYS' FEES OR OTHER EXPENSES:

This offer specifically includes any and all claims for attorneys' fees and litigation expenses.

## 7. PUNITIVE DAMAGES:

Plaintiff's offer includes any claims for punitive damages.

**8.  TERM OF OFFER:**

This offer will remain open for thirty (30) days.

This 24TH  day of April, 2018.

_/s/_

Quynh-Huong "Betty" Nguyen Davis
Georgia Bar No. 141293
Attorney for Plaintiff

**THE DAVIS INJURY FIRM, LLC**
1447 Peachtree St. NE
Suite 540
Atlanta, GA 30309
(404) 593-2620 (Telephone)
(678) 253-0237 (Facsimile)
betty@bettydavislaw.com

## IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MAX LAGUERRE,                                )
                                             )
Plaintiff,                                   )
                                             )        Civil Action File No. 17A64087
v.                                           )        JURY TRIAL DEMANDED
                                             )
PEACHTREE PROPERTY SUB, LLC,                 )
DOING BUSINESS AS CROWNE PLAZA               )
HOTEL ATLANTA-MIDTOWN;                       )
FO PEACHTREE PROPERTY, LLC,                  )
DOING BUSINESS AS CROWNE PLAZA               )
HOTEL ATLANTA-MIDTOWN;                       )
AWH PARTNERS, LLC, DOING                     )
BUSINESS AS CROWNE PLAZA HOTEL               )
ATLANTA-MIDTOWN; CAJUN                       )
CONTRACTORS, INC.; CAJUN                     )
BUILDERS, INC., CAJUN                        )
DEVELOPMENT, LLC, AND JOHN                   )
DOES 1 THROUGH 5,                           )
                                             )
Defendants.                                  )
_____          )

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April, 2018, a copy of the **PLAINTIFF'S O.C.G.A. § 9-11-68 OFFER OF JUDGMENT TO DEFENDANT CAJUN CONTRACTORS, INC. IN THE AMOUNT OF $75,000.00** was served upon all parties by depositing a copy of same in the United States Mail, VIA CERTIFIED MAIL: 9415-5118-9922-0560-8211-21 WITH RETURN RECEIPT REQUESTED in a properly addressed envelope with adequate postage thereon to ensure delivery to:

Todd M. Ladouceur, Esq.
Tony C. Jones, Esq.
***Galloway, Johnson, Tompkins, Burr & Smith, P.L.C.***
990 Hammond Drive, Suite 575
Atlanta, GA 30328

This 24th day of April, 2018.

___/s/_____

Quynh-Huong "Betty" Nguyen Davis
Georgia Bar No. 141293
Attorney for Plaintiff

**THE DAVIS INJURY FIRM, LLC**
1447 Peachtree St. NE
Suite 540
Atlanta, GA 30309
(404) 593-2620 (Telephone)
(678) 253-0237 (Facsimile)
betty@bettydavislaw.com

**David Cribb**

| | |
|---|---|
| **From:** | Betsey Veras <BVeras@gallowaylawfirm.com> |
| **Sent:** | Tuesday, June 19, 2018 9:07 AM |
| **To:** | David Cribb; David Cribb |
| **Cc:** | Tony Jones |
| **Subject:** | Update: Max Laguerre v. Peachtree Property Sub, LLC, et al.; Claim No. SNIC-17-1648-011 |

Good morning Mr. Cribb,

Below is a status update from Mr. Jones.  If you have any questions, please feel free to contact our office.  Thank you.

_____
_____

I had a lengthy conference call with Plaintiff's counsel on Friday with regard to the possibility of settling this matter.

At this time, it is Plaintiff's counsel's position that a plausible settlement range is between $90,000 and $100,000. As for a current offer, she represented that she is willing to reduce her previous offer to $125,000 at this time. Of course, both her settlement offer and the desired settlement range are higher than our current evaluation of the Plaintiff.

For these reasons, a recommendation that we proceed with this week's deposition, also efforts to take the deposition of a representative of R&R, in furtherance of our notice of non-party fault pending against them.  At the conclusion of this week's depositions, I will report back noting the substance of those depositions and if any facts came to light during the course of these depositions.

As always, if you have any questions please don't hesitate to give me a call.


Tony C. Jones, Esq.



**Betsey Veras, Paralegal**
990 Hammond Drive
Suite 210
Atlanta, GA 30328
O: 678-951-1500 | F: 678-951-1510
BVeras@gallowaylawfirm.com



Galloway Johnson Tompkins Burr & Smith
TX | LA | MS | AL | FL | GA | MO
www.gallowaylawfirm.com

THIS MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT

1
**EXHIBIT 8**

OR PRIVILEGED COMMUNICATIONS. PLEASE DO NOT
FORWARD WITHOUT SPECIFIC PERMISSION.



1447 Peachtree St. NE
Suite 540D
Atlanta, GA 30309

**(404) 593-2620**

March 28, 2019

Tony Jones, Esq.
Galloway Johnson Tompkins Burr & Smith
990 Hammond Drive
Suite 210
Atlanta, Georgia 30328

### Via Certified Mail Tracking No. 9414-7118-9956-0689-7302-52

      Re:   *Max Laguerre vs. Peachtree Property Sub, LLC, et. al.*
            Civil Action File Number 17A64087
            Dekalb County State Court

### OFFER TO SETTLE TORT CLAIM MADE PURSUANT TO *SOUTHERN GENERAL INSURANCE COMPANY V. HOLT*, 416 S.E.2d 274, 262 Ga. 267 (1992)

Dear Tony,

      As you know, I have the pleasure of representing Max Laguerre in the above-referenced matter. I am writing you this letter to present you with a time-limited demand to your clients, Cajun Contractors, Inc., Cajun Builders, Inc., and Cajun Development, LLC (hereinafter collectively referred to as "Cajun" or the "Cajun Defendants"), to settle all of Mr. Laguerre's claims in exchange for the policy limits of **One Million Dollars ($1,000,000.00)**. This offer will be open for ten (10) days from the date of your receipt of this letter. If we do not receive written acceptance of this demand within ten (10) days of the date of the receipt of this letter, which shall be conclusively determined by the date on the green return receipt, this offer will stand automatically withdrawn. Shall the green return receipt not contain a date, then the date of receipt will be conclusively determined by using the tracking feature on usps.com for the certified mail number associated with this correspondence.

      Please be advised that this letter is for the purposes of settlement only and is inadmissible for evidentiary purposes.

      Pursuant to <u>Southern General Insurance Company v. Holt</u>, 416 S.E.2d 274, 262 Ga. 267 (1992), we are providing to you a reasonable opportunity to settle Mr. Lageurre's claims against

March 28, 2019
Laguerre Demand
Page 2 of 10

your insured arising out of the above-referenced motor vehicle collision for an amount within the policy limits to the extent provided in the attached limited liability release.

We hereby incorporate all of the pleadings, discovery responses and depositions in this case in this demand as though they are fully set forth herein.

This demand is expressly made to give the Cajun Defendants, through their insurer, State National Insurance Company, an unequivocal opportunity to fully, finally and fairly resolve this matter so that all parties can avoid the trouble and expense of additional litigation. Should State National Insurance Company fail to satisfy the terms of this Time-Limited Demand, State National Insurance Company will be subjecting its insured to liability in excess of the limited liability insurance coverage. In that event, State National Insurance Company shall be liable to the Cajun Defendants for negligent handling of the claim and/or bad faith failure to protect the insured. In such event, State National Insurance Company will be fully liable to satisfy the judgment. Furthermore, Mr. Laguerre fully intends to seek the costs of litigation and attorney's fees under O.C.G.A. § 13-6-11, MDC Blackshear, L.L.C. v. Littell, 273 Ga. 169, 537 S.E.2d 356 (2000).

## LIABILITY AND DAMAGES

Plaintiff hereby incorporates as though fully set forth herein the pleadings, discovery responses, court orders, deposition testimony of the parties, and Plaintiff's expert affidavits with regard to the circumstances of this case, including liability, Mr. Laguerre's injuries and damages, and punitive damages.

**I.      Liability**

As you can tell from the deposition testimony and pleadings in this case, liability as to Cajun is clear. The deposition testimony of Cajun Defendants as to liability includes the following dispositive admissions:

- Cajun accepts responsibility for what happened to injure Plaintiff. 30(b)(6) Bossier Dep. at 48-49 ("Yes, we accept responsibility . . . and we have to take care of it.").

- Cajun admits that the only efforts Cajun made to protect the public from hazards on its pool deck work site were to (1) have a conversation with R&R, and (2) not unlock the door to the job site, which had been locked by the hotel. Id. at 180.

- Cajun does not assign any blame to any of their subcontractors for causing Plaintiff's injuries. Id. at 55.

March 28, 2019
Laguerre Demand
Page 3 of 10

- Cajun has no knowledge of any facts that would suggest that Plaintiff is responsible for causing his own injuries.  Id. at 57-59, 170-71.

- Other than accepting responsibility itself, Cajun has no contentions on who is responsible for the metal pipe falling and striking Plaintiff in the head.  Id. at 59.

It is also important for you to note the following key findings on liability that the Court made in its Order Denying Cajun's Motion for Summary Judgment on Plaintiff's claims:

- The Court rejected the Cajun Defendants' contention that they did not owe a duty of care to Plaintiff.  The Court found that Plaintiff's claims were made pursuant to the vicarious liability of non-party RYR and pursuant to the duties of care imposed by the Cajun Defendants' alleged control of the premises.

- The Court rejected the Cajun Defendants' argument that Plaintiff only presented "mere speculation" as to the proximate cause of Plaintiff's injuries.  The Court noted that the record shows **no dispute** as to the cause-in-fact of Plaintiff's injuries being an 8-foot metal pipe that fell from the pool deck that the Cajun Defendants were contracted to demolish.   The Court further found that there is **no dispute** that the pipe fell as a result of RYR's demolition work.

- The Court further allowed Plaintiff's theory that RYR was an employee or servant of the Cajun Defendants to proceed, finding that Plaintiff presented evidence, as outlined by Plaintiff's expert, Gary Vernon, that RYR would have been considered employees of Cajun under OSHA standards and that the record showed that there are questions of fact as to whether the Cajun Defendants maintained full direction and control over RYR's work on the pool deck.

- The Court also found that Plaintiff presented sufficient facts to show that he did not have knowledge about the pipe, and that the evidence in the record showed that the Cajun Defendants could have had constructive knowledge and superior knowledge of the pipe, either by virtue of an RYR employee having been in the area where the hazardous condition was or by showing that a reasonable inspection prior to the demolition would have revealed the pipe.

- The Court noted that Georgia law could impose a duty of care upon the Cajun Defendants, as a general contractor working on a site, to keep the premises safe as an occupier of the premises, with the duty of care being equal to that of the owner of the premises.  The Court further suggested that that duty of care could include the duty to constantly monitor the site for risk of danger to others or to erect barriers to prevent others from traveling into areas where they may be exposed to danger.   Such

March 28, 2019
Laguerre Demand
Page 4 of 10

responsibility may extend even to portions of the site being worked upon by subcontractors.

**II.     Damages**

**A.     Mr. Laguerre's Injuries**

As the Cajun Defendants are aware, Mr. Laguerre suffers from permanent injuries as a result of the subject incident, including but not limited to:

- At the scene, responding paramedics noted **blunt trauma to the head, hemorrhaging, and lacerations** that were possibly dangerous, along with a **wrist injury**.

- The emergency room doctor diagnosed Mr. Laguerre with a **wrist sprain, nasal bone fracture, and head injury**.

- Mr. Laguerre's primary care physician noted arm pain and bleeding in Mr. Laguerre's nose and diagnosed Mr. Laguerre with a **contusion and deviated septum**, giving Mr. Laguerre a referral to an ear, nose and throat doctor.

- An ENT diagnosed Mr. Laguerre with an **open fracture of the upper right nasal bone** with breathing problems, a deviated septum, hypertrophy of nasal turbinates, and rhinitis. Mr. Laguerre underwent a septoplasty and turbinate reduction **surgery**.

- After the incident, Mr. Laguerre began having **headaches once or twice a week,** which have continued to the present date. Each time Mr. Laguerre gets a headache, he takes over the counter pain medication and goes to sleep for a few hours. Mr. Laguerre further testified that **he did not have headaches prior to the subject incident**; in fact, Mr. Laguerre stated that, prior to the subject incident, he could go for an entire year without any headaches.

- Dr. Angela Ashley, Mr. Laguerre's treating neurologist, will testify that Mr. Laguerre's continued symptoms (even as of more than 3 years post-injury) of **headaches every 2 or 3 days (some that are relieved by Advil and sleep; others persist no matter what), dizziness, anxiety, occasional nightmares, depression, episodes of altered consciousness and cognitive impairment** are consistent with **post-concussional syndrome.** Dr. Ashley is also following Mr. Laguerre for **possible PTSD** from the incident.

March 28, 2019
Laguerre Demand
Page 5 of 10

- Dr. Ashley administered cognitive testing.  Mr. Laguerre scored in the **low to very low range in processing speed and reaction time**.  He also was tested to have **mild to moderate anxiety** and **moderate to severe depression**.

- Dr. Ashley will testify that Mr. Laguerre suffered a **traumatic brain injury** as a result of the blunt force trauma to his head from the falling pipe.

- Dr. Ashley will testify that because Mr. Laguerre's symptoms have lasted for more than 3 years, he is in the very small percentage of concussion patients whose traumatic brain injury is **permanent**.  While his symptoms may be successfully managed through medical treatment and medications, he will likely require medical management for the rest of his life from his injury.

### B.    The DTI Scan

In addition to the clinical diagnoses and impressions from Mr. Laguerre's treating providers, Mr. Laguerre underwent diffusion tensor imaging of his brain and an MRI with neuroquant, which revealed **multiple areas of volume loss**.  Dr. David Owens, a neuroradiologist who read Mr. Laguerre's brain scans, will testify that the **abnormal findings** in the scans were **consistent with trauma** of the type that he sustained from the falling pipe.  Such objective findings on the scans corroborate Mr. Laguerre's injuries.

As you can see, Mr. Laguerre has suffered from significant, debilitating, and permanent injuries that have required and will continue to require extensive medical treatment as a result of the subject incident.  Prior to the incident, Mr. Laguerre did not have headaches or emotional distress and anxiety.  Presently, Mr. Laguerre experiences frequent headaches, occasional nightmares, and anxiety as a result of being hit in the head by the falling metal pipe.

### C.    Medical Expenses

The special medical damages in this case are the following:

### MEDICAL EXPENSES

| | |
|---|---|
| Grady EMS | $1,884.50 |
| Atlanta Medical Center | $11,013.25 |
| South Fulton Emergency Physicians | $1,180.00 |
| Diagnostic Imaging Specialists | $435.00 |
| Clayton Healthcare | $258.00 |
| Kunkes Ear Nose & Throat | $1,744.93 |
| Spivey Station Surgery Center | $13,260.00 |
| Riverdale Anesthesia Associates | $870.00 |

March 28, 2019
Laguerre Demand
Page 6 of 10

| | |
|---|---|
| Restoration Neurology | $6,125.00 |
| **Total Medical Expenses:** | **$35,590.68** |

### D.   Lost Wages

In addition to medical expenses, Mr. Laguerre lost two weeks of work due to the injuries that your insured caused. At the time, Mr. Laguerre earned an average of $334.00 per day and worked seven days a week as a taxicab driver. Mr. Laguerre was unable to drive his taxicab from July 20, 2015 to August 7, 2016 when he had significant pain in his arm and was not allowed to drive because he was taking pain medications. Thus, Mr. Laguerre lost approximately **$5,678.00** in cab fares.

### E.   Pain and Suffering

Mr. Laguerre has suffered significantly as a result of the subject incident. Mr. Laguerre, who was 50-years-old at the time of the subject incident, will likely continue to suffer from chronic, severe weekly headaches for the rest of his life, which is predicted to be at least another 25 years. A jury in Dekalb County, Georgia, will comfortably award Mr. Laguerre an amount well into the 7-figure range for his pain and suffering alone. Combined with Mr. Laguerre's emotional distress and permanent structural brain changes, **the verdict in this case can <u>easily</u> exceed the Cajun Defendants' policy limits**.

### F.   Recent Verdicts

When evaluating Mr. Laguerre's case, please note the following verdicts involving traumatic brain injuries, which will allow you to assess the likelihood that Cajun will be subject to a verdict in excess of the State National Insurance policy limits:

- <u>Sandford v. Warnock</u>, State Court of Douglas County, Georgia. On February 23, 2017, a Douglas County jury awarded $14,550,000.00 to a victim of a motor vehicle collision who sustained traumatic brain injuries.
- <u>McCoy v. JPMCC,</u> State Court of Fulton County, Georgia. On March 25, 2019, a Fulton County jury awarded $8,000,000.00 to a woman who hit her head on a low hanging pipe in a parking garage and suffered from a traumatic brain injury. The plaintiff suffered from severe head pain, requiring medications that have debilitating side effects. Notably, the plaintiff in this case did not have any findings on imaging done of her brain and had no other signs of a concussion.
- In a case that settled pre-trial in Cobb County, Georgia, attorney Susan Langlais represented a plaintiff who sustained a traumatic brain injury and had a claim with Cincinnati Insurance Company. During mediation, the parties settled the claim for $4,000,000.00.

March 28, 2019
Laguerre Demand
Page 7 of 10

- <u>Wicker v. American Family Insurance Company</u>, State Court of Dekalb County, Georgia. On February 12, 2015, a jury awarded $3,500,000.00 to a woman who suffered from a mild traumatic brain injury that caused daily headaches, sensitivity to light, and cognitive deficits as a result of a motor vehicle collision.
- <u>Corbitt v. South Georgia Medical Center</u>, State Court of Lowndes County, Georgia. On January 25, 2017, a jury awarded $10,000,000.00 to a plaintiff, who was a surgeon, who suffered from a traumatic head injury when he fell off of a four-legged stool that shot out from under him while he was writing out an order after performing a surgery.
- <u>Williams v. Papa John's</u>, State Court of Dekalb County, Georgia. On April 25, 2016, a jury awarded $11,000,000.00 to a plaintiff who suffered from a traumatic brain injury as a result of a motor vehicle collision.

These cases, amongst others that I have attached hereto for your reference, clearly show that cases involving traumatic brain injuries similar to Mr. Laguerre's injuries, have rendered verdicts in the millions.

## III.   Punitive Damages

Mr. Laguerre seeks punitive damages against the Cajun Defendants to the fullest extent allowable under Georgia law. As you know, Georgia law allows a jury to award punitive damages where the defendant's conduct is so wanton or reckless that a reasonable person can foresee that there is a strong probability that the defendant's negligence will harm another person, even if the defendant hopes or expects no harm to ensue, and that the risk created by the defendant's behavior is not justified by the end to be attained. Specifically, Georgia courts have allowed the failure to comply with mandatory code and safety provisions, including OSHA, to form the basis of clear and convincing evidence for punitive damages. <u>Windermere, Ltd. v. Bettes</u>, 211 Ga. App. 177, 178–79, 438 S.E.2d 406, 408 (1993); <u>Schoenbaum Co., LLC v. Lenox Pines, LLC</u>, 262 Ga. App. 457, 472, 585 S.E.2d 643, 656 (2003).

Here, the record is clear that the Cajun Defendants' lack of safety policies and procedures with regard to the construction project rose to a level of willful misconduct, wantonness, recklessness and an entire want of care that would support Plaintiff's claim for punitive damages in this case. Not only will Plaintiff's expert, Gary Vernon, testify that the Cajun Defendants clearly violated OSHA standards and mandatory building codes, a reasonably prudent person could also absolutely foresee that a demolition project on a rooftop of a tall building would result in falling objects and debris that would seriously injure people below – exactly the way the pipe injured Mr. Laguerre in this case. Nonetheless, prior to engaging in the construction project at the hotel, the Cajun Defendants did **nothing** to protect employees, visitors, guests, or the public from the dangerous, overhead construction project, despite admitting the foreseeability of dangerous objects and debris falling from the hotel.

March 28, 2019
Laguerre Demand
Page 8 of 10

The record shows the following facts:

- Before beginning the work on the pool deck, the Cajun Defendants did not implement any safety precautions to protect employees, guests, or visitors from the hazards from the pool deck project. Further, the Cajun Defendants did not have any site-specific safety plans for the renovation of the pool deck or a public hazard control plan. See 30(b)(6) Bossier Dep. at 24, 145.

- The Cajun Defendants had zero communications with the hotel Defendants about safety and did not have any safety meetings with the hotel concerning the project. See 30(b)(6) Bossier Dep. at 107-108.

- Nor did the Cajun Defendants put up any warnings outside of the building or investigate to make sure that warning signs were placed anywhere on the premises regarding the construction project. See 30(b)(6) Bossier Dep. at 34-35, 77.

- Cajun did not go to the hotel and have them move the taxi stand because of the construction, even though they recognized the danger of it being located underneath the elevated construction site. See 30(b)(6) Bossier Dep. at 51.

- Cajun did not put up netting to protect from falling objects from the construction site, claiming it is the subcontractor's job to provide that. See 30(b)(6) Bossier Dep. at 88.

- Cajun admits that there were no barriers, catch platforms, enclosures or perimeter debris netting to protect the public from hazards from the job site. See 30(b)(6) Bossier Dep. at at 148-49.

- When Cajun hired R&R for the pool deck project, R&R **did not have a construction license**, but was only allowed to do construction work operating under Cajun's license. See 30(b)(6) Bossier Dep. at 153.

- Cajun never asked R&R about its qualifications to do the type of work they were hiring R&R to do. See 30(b)(6) R&R Dep. at 170-71. The pool deck renovation project was the only hotel for which R&R had ever performed remodeling work. Id. at 16. R&R has never done any other roof construction than the Crowne Plaza pool deck project. Id. at 148 ("We never do a roof construction."). R&R normally does not do exterior work and has never done any other demolition exterior work. Id. at 148-49. R&R had never done any pool jobs. Id. at 149 ("We are not specialists in pools at all").

- Cajun never provided any training to R&R. See 30(b)(6) R&R Dep. 169.

March 28, 2019
Laguerre Demand
Page 9 of 9

As you can see, Cajun's conduct was reckless and is subject to the highest degree of culpability under Georgia law.  In addition to his special damages and pain and suffering, Mr. Laguerre fully intends to seek the maximum amount of punitive damages, or **$250,000.00**, against Cajun.

## <u>MATERIAL TERMS OF SETTLEMENT</u>

You should now have all of the materials and information you need to fully evaluate Mr. Laguerre's claims.  Pursuant to <u>Southern General Insurance Company v. Holt</u>, 416 S.E.2d 274, 262 Ga. 267 (1992), and on behalf of Max Laguerre, we are providing a reasonable opportunity to settle the claims against your insured under the following terms, as well as those set forth in the attached limited liability release:

(1) This offer shall expire at 5:00 p.m. ten (10) days from your receipt of this offer.  The 10-day period shall be conclusively established by the green return-receipt-requested postcard provided by the United States postal service. Shall the green return receipt not contain a date, then the date of receipt will be conclusively determined by using the tracking feature on usps.com for the certified mail number associated with this correspondence.
(2) If we do not receive a timely written acceptance, this offer will be withdrawn and deemed rejected.
(3) Payment in the amount of **One Million Dollars ($1,000,000.00)** must be made payable to Max Laguerre and the Davis Injury Firm, LLC within ten (10) days after your written acceptance of this offer to settle.  Timely payment is an essential element of acceptance.
(4) The Cajun Defendants will be released from liability subject to the release attached.
(5) The type of release offered is the attached limited liability release.
(6) The claims released by accepting this offer are all claims against your above-referenced insured, subject to the terms of the attached release.
(7) We will be happy to comply with any request for additional documents or information, but such a request will not extend the deadline set forth in this demand.

Sincerely,

Betty Nguyen Davis
Encl.

## LIMITED RELEASE PURSUANT TO O.C.G.A. § 33-24-41.1

Max Laguerre ("the UNDERSIGNED"), for and in consideration of the sum of one million dollars ($1,000,000.00) , to the UNDERSIGNED, in hand paid, receipt and sufficiency of which is hereby acknowledged, does hereby and for the heirs, executors, administrators, successors and assigns of the UNDERSIGNED acquit, remise, release, and forever discharge:

(1)     State National Insurance Company ("INSURANCE CARRIER") with regard to Policy No. 090480000610501; from all liability for any claims of the of the UNDERSIGNED based on injuries to the UNDERSIGNED (not including property damage), all hospital bills, doctor bills, drug bills, and other medical expenses, that belong to the UNDERSIGNED or which may hereafter accrue to the UNDERSIGNED on account of or resulting from the incident, casualty or event which occurred on or about July 20, 2015, at the Crowne Plaza Hotel located at 590 West Peachtree Street NW, Atlanta, Georgia ("INCIDENT"); and

(2)     Cajun Contractors, Inc., Cajun Builders, Inc., and Cajun Development, LLC, ("LIMITED RELEASEE"), from any and all claims, demands, rights, and causes of action of whatsoever kind and nature, including but not limited to, all known and unknown bodily and personal injuries of the UNDERSIGNED, all hospital bills, doctor bills, drug bills, and other medical expenses, that belong to the UNDERSIGNED or which may hereafter accrue to the UNDERSIGNED on account of or resulting from the INCIDENT, except to the extent other insurance coverage is available which covers the claim or claims of the UNDERSIGNED against the LIMITED RELEASEES.

All parties acknowledge that the payment referenced herein does not make whole nor fully compensate the UNDERSIGNED for losses sustained as a result of the INCIDENT.

This Limited Release is entered into pursuant to O.C.G.A. § 33-24-41.1, and its force and effect shall be as contemplated by that statute. This Limited Release does not release INSURANCE CARRIER with regard to other insurance policies issued to LIMITED RELEASEE or to any other person or entity, including the UNDERSIGNED, and the UNDERSIGNED maintains all rights to pursue recovery with regard to insurance policies not identified by policy number herein.

This Limited Release shall not release any persons or entities not specifically named.

All parties deny liability, and all parties retain their right to deny liability in any future action.

The UNDERSIGNED understands that the injuries sustained are or may be permanent and progressive and that recovery is uncertain and indefinite. The UNDERSIGNED has relied wholly upon his or her own the judgment, belief and knowledge as to the nature, extent, effect and duration of said injuries and liability, if any, and such is made without reliance upon any statement or representation of any other person. The UNDERSIGNED acknowledges that no promise, inducement, or agreement not herein expressed has been made and that this Limited Release contains the entire agreement between the parties. The UNDERSIGNED is 18 years of age or older, of sound mind and laboring under no disabilities. The foregoing representations are made in order for the parties released hereby to rely upon them in effecting this Limited Release.

The UNDERSIGNED acknowledges prior receipt of this Limited Release and that it is notice in writing of lack of consent of the LIMITED RELEASEE to this settlement and that the this Limited Release does not preclude the LIMITED RELEASEE from asserting claims against the UNDERSIGNED.

The UNDERSIGNED agrees to take reasonable steps to satisfy or otherwise resolve valid and enforceable liens accrued as a result of the UNDERSIGNED's alleged injuries arising out of the INCIDENT.  The UNDERSIGNED agrees to effect necessary probate matters, if any, in due course.

This _____ day of _____, 20___.


_____ _
Max Laguerre


Sworn to and subscribed before me,
This _____ day of _____, 20___.

_____
Notary Public

# Case Information

|  |  |
|---|---|
| **State** | GA |
| **Contributing Attorney** | Rob Howell, Greg Voyles & Charlie Peeler |
| **Resolution** | Verdict |
| **Resolution Date** | 01/25/17 |
| **Resolution Amount** | $ 7,000,000 |
| **Mediation company** | Will Sanders |
| **Mediator** | Will Sanders |
| **Type Incident** | Civil (Slip & Fall, physician fell off rolling stool) |
| **Type Location** | Hospital |

**CaseMetrix™**

*"Data Driven Decisions"*

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

# Plaintiff Information

|  |  |
|---|---|
| **Gender / Race / Age** | Male / Caucasian / 47 |
| **Lost Wages** | $ 4,500,000 |
| **Medical Specials** | $ 38,000 |
| **Injuries** | **Catastrophic** (severe head injury, epilepsy, seizures, memory issues) / (Injections : No) **Head Physical Injury** (headaches) / () **Headp** () / (Injections : No) |
| **Prior Related Injuries** | No |

# Defendant Information

|  |  |
|---|---|
| **Liability Carrier(s) / Limits** | Zurich *($ 20,000,000)* |

# Court Information

|  |  |
|---|---|
| **Court** | State *Court of* LOWNDES, GA |
| **Judge** | John Edwards |

# Inquiries/Attorney Notes

A Lowndes County jury awarded $10 million ($7 million after apportionment) to a surgeon who sustained a head injury when he attempted to sit on a stool in the operating room and it rolled out from under him, causing him to fall onto the floor. The doctor is no longer able to practice medicine, as he sustained trauma-induced epilepsy, and he continues to suffer from seizures, cognitive and memory problems and migraine headaches.

We had to prove that the hard plastic casters on the stool were not suitable for the hard floor and we proved that South Georgia Medical Center employees had reported other instances of people falling from the stools.

The hospital's defense was that rolling stools roll, and he knew that you've got to be careful.

The jury awarded $10 million in damages but apportioned 30 percent of the liability to Dr. Corbitt.

The hospital offered zero on this case, so it didn't resolve at court ordered mediation.

A decision has been made not to appeal the verdict.

Dr. Corbitt, who was 47 at the time of the incident, had just completed a surgery and was sitting down on the four-legged stool to write orders when the stool shot out from under him and he fell backwards on the vinyl floor. Our doctor is a vascular surgeon and he has no memory of the incident.

Eyewitnesses said he laid on the floor for a while holding his head, and said 'I'm OK, I'm OK.' He even went out and spoke to the patient's family; however, he soon began feeling nauseous and experiencing double vision, and within hours was experiencing seizures. He spent a few days in the hospital and, after a couple of weeks tried to return to work, but kept having seizures. After being diagnosed with epilepsy, Dr. Corbitt had to give up his practice because he was scared for his patients.

Most of the expert testimony centered on basic safety standards calling for hard casters or wheels such as those on the stool to be used on carpets and soft surfaces, while soft rubber wheels are suitable for hard surfaces like the hospital floor.

There was testimony from the operating room director that a nurse had said the stools would "come out from

under you."

The defense portion of the order said Corbitt had "performed thousands of surgeries utilizing a rolling stool" and was well acquainted with their use.

The plaintiffs team cited lost wages of $4.5 million, Peeler said, and at closing he urged the jury to award between that sum and $13 million. The last demand prior to trial had been exactly $7 million and that's what the jury awarded.
The defense argued that there should be a defense verdict. Wednesday, the jury took about five hours to deliver its verdict.
They awarded $10 million in damages but apportioned 30 percent of the liability to Dr. Corbitt.

**CaseMetrix™**
*"Data Driven Decisions"*

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

## Case Information

| | |
|---|---|
| **State** | GA |
| **Contributing Attorney** | Contributed by defense counsel |
| **Resolution** | Lawsuit Filed |
| **Resolution Date** | 04/03/08 |
| **Resolution Amount** | $ 5,000,000 |
| **Type Incident** | Civil (Fall from Building/Structure, fell from a ladder) |
| **Type Location** | Construction Site |

**CaseMetrix**™

*"Data Driven Decisions"*

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

## Plaintiff Information

| | |
|---|---|
| **Gender / Race / Age** | Male / Caucasian / 30 |
| **Lost Wages** | $ 20,768 |
| **Medical Specials** | $ 306,832 |
| **Injuries** | **Head Physical Injury** (open, closed, fracture, facial, hematoma, hemorrhage, headaches, cut, concussion, scar, scars, pain, swelling) / () **Head Mental Health Disorders** (anxiety, depression, PTSD, other mental health disorder, brain swelling, part of skull removed, frontal lobectomy, skull restored) / () **Catastrophic** (severe head injury) / () |
| **Prior Related Injuries** | No |

## Defendant Information

| | |
|---|---|
| **Liability Carrier(s)/Limits** | Not Released *($ 0)* |
| **Liability Issues** | plaintiff's failure to use hard hat and imprper equipment |

## Court Information

| | |
|---|---|
| **Court** | State *Court of* HALL, GA |
| **Judge** | Charles Winn |

## Inquiries/Attorney Notes

Facts: Plaintiff fell from a ladder, which allegedly slipped when a person moved a crane bridge. The boom was moving when the plaintiff lost his balance and fell. The plaintiff fell off the ladder while inspecting a crane.

Injuries: Plaintiff sustained frontal brain contusions and hemorrhages, a traumatic brain injury requiring 2 brain surgeries, left frontal intracerebral hematomas, a lineal skull fracture in the mid frontal bone, skull fractures of the left frontal region, and underwent a craniectomy and left frontal lobectomy. Then, he had inpatient treatment and had a scar on his forehead. He was initially in ICU and underwent surgery. He had a closed head injury with brain swelling and a cath. In order to do his frontal lobectomy, a portion of his skull had to be removed. He wore a helmet from May to July. His skull was restored in rehab between May and June. He had a remarkable recovery. By August, he was able to drive, and by February, he had returned to work at full duty. He suffers from depression and the injury changed his demeanor. He has problems with anger management and he has a fear of losing his temper with his 3 kids. He also had custody of his minor brother. There was also a Workers' Comp lien.

Payment: Defendant paid $2,800,000 up front and there was a structured settlement for the rest. The case arose prior to tort reform. It includes the wife's loss of consortium claim.

## Case Information

| | |
|---|---|
| **State** | GA |
| **Contributing Attorney** | Keenan Nix, Chris Graddock & Darren Summerville |
| **Settled** | Verdict |
| **Resolution/Verdict Date** | 04/25/16 |
| **Resolution/Verdict Amount** | $ 11,000,000 |
| **Mediation company** | Henning Mediation & Arbitration Service, Inc. |
| **Mediator** | Gino Brogdon |

**CaseMetrix™**

*"Data Driven Decisions"*

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

## Plaintiff Information

| | |
|---|---|
| **Gender / Race / Age** | Female / African-American / 49 |
| **Medical Specials** | $ 225,000 |
| **Injuries** | **Catastrophic** (severe head injury, TBI traumatic brain injury with permanent sequelae:continues to endure nausea, dizziness, irritability, blurred vision, light sensitivity and headaches and problems with her memory, attention and concentration) / (Injections : No) **Shoulder** () / (Injections : No) **Neck** (herniation) / (Injections : No) **Headp** () / (Injections : No) **Head Mental Health Disorders** (anxiety, depression, PTSD, post-traumatic stress disorder, anxiety and depression.) / () **Headm** () / (Injections : No) **Head Physical Injury** (closed, concussion) / () **Shoulder/Clavicle** (torn rotator cuff) / () |
| **Prior Related Injuries** | No |
| **Vehicle Type** | Car/Pick-Up Truck |
| **Degree of Property Damage** | Totaled |

## Defendant Information

| | |
|---|---|
| **Defendant** | Corporation |
| **Defendant's citations** | 40-6-50 (Failure to maintain lane in divided highway) |
| **Liability Carrier(s)/Limits** | Chubb Federation *($ 52,000,000)* |
| **UM Carrier(s)/Limits** | () |

## Court Information

| | |
|---|---|
| **Court** | State *Court of* DEKALB, GA |
| **Judge** | Judge Mike Jacobs |

## Inquiries/Attorney Notes

JURY VERDICT: $11 million Dekalb jury verdict to a woman claiming permanent brain damage, traumatic brain injury and multiple other injuries from a crash with a Papa John's pizza delivery vehicle on a rain-slicked, winding road.

Following this accident, plaintiff was seen in the ER, had a diagnosis of neck sprain & was treated and released. Defense contested liability and accused plaintiff of faking a brain injury with no evidence to challenge plaintiff a board certified neurologist and neuropsychologist who had diagnosed a brain injury with permanent sequelae.

The highest settlement offer the defense made was about $220,000—the amount of Williams' medical bills—until three days before the trial was to begin, when they upped the offer to $1 million.
Williams, then 49, and her daughter were on their way home from church on March 2014 on Rogers Lake Road in southeast DeKalb County. Papa John's driver Robert Pollard, then 21, was coming in the other direction.
Williams' 2011 Hyundai Sonata was hit head-on by Pollard's 2004 Chevrolet Aveo. It had rained earlier and Pollard, who was cited for failure to maintain his lane, belatedly came up with the story that he had hydroplaned prior to being hit by Williams, but he never alleged that to the police.
The crash was severe and both cars were mangled with all three people suffering concussions. Williams sustained a concussion but was conscious and ambulatory when emergency assistance arrived, and she was taken to the Rockdale Medical Center emergency room complaining of headaches and dizziness. She was later released and almost immediately began to manifest classic signs of concussion and brain damage. Williams suffered head, brain, neck and shoulder injuries; underwent surgery for a torn rotator cuff; and continues to

endure nausea, dizziness, irritability, blurred vision, light sensitivity and headaches and problems with her memory, attention and concentration.

A mediation before M. Gino Brogdon at Henning Mediation and Arbitration Services failed to resolve the dispute as the highest offer at that time was $220,000.

The presentation of evidence took about 3½ days at trial. We called 2 witnesses: Angela Ashley with the Regional Medical Group testified that Williams displayed traumatic and diffuse brain injury, while California neurological testing expert Richard Perrillo confirmed major cognitive deficits across all domains, including post-traumatic stress disorder, anxiety and depression.

We put up no evidence of lost wages or future medical expenses. All we put up was $220,000 in special damages, and we argued for the value of permanent brain damage for the next 30 years. The jury embraced the evidence wholeheartedly.

The defense did not call any expert witnesses. On Monday, 4/25/16, the jury took about three hours to award Williams $11 million.

Read more: http://www.dailyreportonline.com/id=1202756034870/DeKalb-County-Collision-With-Pizza-Delivery-Car-Yields-11M-Verdict#ixzz472OPOgCM

**CaseMetrix™**

*"Data Driven Decisions"*

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

## Case Information

| | |
|---|---|
| **State** | GA |
| **Contributing Attorney** | Mark Link, Eric Hertz and Todd Johnson |
| **Resolution** | Verdict |
| **Resolution Date** | 02/27/14 |
| **Resolution Amount** | $ 6,400,000 |
| **Type Incident** | Criminal (Assault/Attack) |
| **Type Location** | Restaurant, nightclub, Sports/Entertainment Venue |

## Plaintiff Information

| | |
|---|---|
| **Gender / Race / Age** | Female / African-American / 24 |
| **Lost Wages** | $ 20,000 |
| **Medical Specials** | $ 56,000 |
| **Injuries** | **Head Mental Health Disorders** (other mental health disorder, short term memory loss) / () |
| | **Head Physical Injury** (facial, cut, concussion, scar, post-concussive syndrome; 1/5 inch permanent facial scar) / () |
| | **Back** (soft tissue) / () |
| **Prior Related Injuries** | No |

## Defendant Information

| | |
|---|---|
| **Liability Carrier(s)/Limits** | Sued defendant personally *()* |

## Court Information

| | |
|---|---|
| **Court** | Superior *Court of* COBB, GA |
| **Judge** | Reuben Green |

## Inquiries/Attorney Notes

The plaintiff, Shayla Stevens, sued Da Brat, whose real name is Shawntae Harris, for injuries sustained when Da Brat hit her over the head with a rum bottle at a 2007 Halloween party at Studio 72, a club owned by hip-hop promoter Jermaine Dupri. Da Brat served almost three years in prison for the attack.

Stevens was working as a VIP cocktail waitress the night of the incident. She walked past a line of people waiting to get into the VIP area in order to get drink orders. Harris saw her go past the bouncer and this apparently angered her. Harris managed to get past the bouncer and hit Stevens on the head.

Stevens claimed no future medicals. The plaintiff actually got a better paying job after the incident, because she was forced to give up her career-dreams of being a model due to the 1.5-inch permanent scar on her cheek. She also has short-term memory loss. Lay witnesses for the plaintiff included Stevens' former Falcons cheerleading coach and a business mentor, who both testified to changes in her mental capabilities.

Stevens was a great plaintiff. She's a former Atlanta Falcons cheerleader and she's very nice. It basically came down to the fact that Stevens is a nice person, and Harris isn't.
DaBrat (Harris) is the only person on the judgement. She had a prior assault incident in 2000.

**CaseMetrix**™
"Data Driven Decisions"

**www.case-metrix.com**
**Contact Kim White at:**
**(404) 849-6422**
**or email us at:**
**info@case-metrix.com**

JVR No. 1704220003, 2015 WL 13284525 (Ga.State Ct.) (Verdict and Settlement Summary)

Copyright (c) 2019 Thomson Reuters/West
Georgia State Court of DeKalb County.

WICKER v. AMERICAN FAMILY INSURANCE COMPANY;
JACKIE OWENS D/B/A FIRST CLASS PRODUCE; OWENS

2013-A-47336-3
DATE OF INCIDENT: July 22, 2012
DATE OF TRIAL/SETTLEMENT: February 12, 2015

TOPIC:

LIABILITY:

General: Truck Accident

Specific: Rear-End

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $3,500,000**

**Related Court Documents:**
Plaintiff's amended complaint: 2014 WL 12683387

Consolidated pretrial order: 2014 WL 12683385

Defendants' requests to charge: 2015 WL 13229592

Plaintiff's request to charge: 2015 WL 13229595

Verdict form: 2015 WL 13229556

Judgment: 2015 WL 13229402

Order vacating judgment and dismissing with prejudice: 2015 WL 13229399

**EXPERT-WITNESSES:**
Defendant:
Neuropsychologist: Burns, Thomas, Atlanta, GA
**ATTORNEY:**
Plaintiff:
Alwyn R. Fredericks, Cash, Krugler & Fredericks L.L.C., Atlanta, GA
Shane E. Bartlett, Cash, Krugler & Fredericks L.L.C., Atlanta, GA
Defendant:
Mitchel S. Evans, Fain, Major & Brennan P.C., Duluth, GA

WICKER v. AMERICAN FAMILY INSURANCE COMPANY;..., JVR No. 1704220003...

JUDGE: Wayne M. Purdom

RANGE AMOUNT: $2,000,000 - 4,999,999
STATE: Georgia
COUNTY: DeKalb

**PRIMARY INJURY: Brain Damage: Mild**
Fracture of One Hip; Headaches

**SUMMARY**
**PLAINTIFF:**
Sex: F

Age: Adult

**DEFENDANT:**
Sex: O

Organization Type: American Family Insurance Company

Sex: O

Organization Type: Jackie Owens d/b/a First Class Produce

Sex: M

Age: Adult

General Occupation: Truck Driver

Organization Type: Owens

**DAMAGES:**
Compensatory Pain & Suffering: $3,500,000

Total Compensatory Award: $3,500,000

Comparative Negligence Percentage: 0

**FACTS:**
Jewel Wick, an adult woman, reportedly suffered a **mild traumatic brain injury** with loss of consciousness which resulted in daily headaches, sensitivity to light and cognitive deficits, including memory loss, concentration and focus problems, difficulty finding words, and difficulty processing information, as well as a hip fracture, when her eastbound vehicle, stopped for a stop light, was struck from the rear by a commercial truck being driven at approximately 50-55 miles per hour by defendant Parker Thomas Owens, who was acting in the scope of his employment with defendant Jackie Owens d/b/a First Class Produce (First Class), which was insured by defendant American Family Insurance Company. The

**WICKER v. AMERICAN FAMILY INSURANCE COMPANY;..., JVR No. 1704220003...**

plaintiff claimed Owens operated the truck negligently by, among other things, failing to comply with a traffic control device, traveling at an unreasonable speed and failing to keep a proper lookout. Additionally, the plaintiff contended Owens had previously received a DUI citation for driving while under the influence of Oxycodone, and that First Class continued to let him drive a commercial vehicle despite knowing of his DUI. The defendants admitted liability, but disputed the nature and extent of the plaintiff's alleged injuries and damages. After a jury returned a $3.5 million verdict for the plaintiff, the parties reached a settlement agreement and consented to dismissal of the case.


Jury Verdict Research
COURT: State

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

3/27/2019                          Atlanta Lawyer Injured in Firm Parking Garage Awarded $8M Verdict | Daily Report



**DAILY REPORT** (/dailyreportonline/)
POWERED BY LAW.COM (/)

☰ Menu                                                                                      My Acc

🔍 Search (/dailyreportonline/search/)

SOURCE=HTTPS%3A%2F%2FWWW.
LAW

Publications (/publications/)   Law Topics (/topics/)   Surveys & Rankings (/rankings/)   Cases (/dailyreportonline/case-digests/)

News (/dailyreportonline/news/)

# Atlanta Lawyer Injured in Firm Parking Garage Awarded $8M Verdict

By Katheryn Tucker (/author/profile/Katheryn-Tucker/)   |   March 26, 2019 at 03:39 PM

f

in

🐦

✉

📄 (htt



**John Mabrey (left) and Matthew Stoddard (Photo: John Disney/ALM)**

An Atlanta jury returned an $8 million verdict for a young lawyer who hit her head on a low-hanging pipe in her firm's Midtown parking garage.

Her attorneys—John Mabrey of the Mabrey Firm and Matthew Stoddard of the Stoddard Firm—said she suffered a traumatic brain injury and had to leave the legal profession as a result.

"The defense called it a mild brain injury," Mabrey said. "I told the jury in closing arguments that a mild brain injury is someone else's brain injury." He added the injury was devastating to a "smart, young, up-and-coming attorney."

The jury's apportionment of some liability to the plaintiff in the accident reduces the recovery.

## Trending Stories

1  **Partner Compensation Changes at Morrison & Foerster Lead to Equity Partner Drop, PEP Surge (https://www.law.com/amer compensation-changes-at-morrison-foerster-lead-to-equity-partner-drop-pep-surge/)**

THE AMERICAN LAWYER (/AMERICANLAWYER/)

2  **The American Lawyer's 201 Dealmakers of the Year (https://www.law.com/amer american-lawyers-2019-dealmakers-of-the-year/)**

THE AMERICAN LAWYER (/AMERICANLAWYER/)

3  **READ: Bill Barr's 19-Page Memo Ripping Mueller Prob (https://www.law.com/natio bill-barrs-19-page-memo-ripping-mueller-probe/)**

NATIONAL LAW JOURNAL (/NATIONALLAWJOURNAL/)

4  **Dechert Associate's Death Ruled Accidental, Caused b Mix of Drugs (https://www.law.com/amer associates-death-ruled-accidental-caused-by-mix-of drugs/)**

THE AMERICAN LAWYER (/AMERICANLAWYER/)

5  **Mayer Brown Terminates Partner Over 'Inappropriate Personal Conduct' (https://www.law.com/amer**

Aja Diamond Moore—who has since married and changed her last name to McCoy—was practicing at Hunton & Williams when she hit her head on a low-hanging pipe after stepping out of her car in the parking garage for the Bank of America building on Dec. 10, 2013, according to summaries from both sides in the consolidated pretrial order. The pipe was little more than 5 feet above the sidewalk, next to the spot where she parked.

"Her cognitive skills are fine," Mabrey said. "It was the pain. The head pain is unpredictable and severe." He added that medications used to treat the pain have debilitating side effects.

brown-terminates-partner-over-inappropriate-personal-conduct/)

THE AMERICAN LAWYER (/AMERICANLAWYER/)



Mabrey and Stoddard presented video-recorded testimony from a paralegal for another firm who had hit her head on a low pipe over the parking space next to the one where McCoy parked. Both had backed into their parking spaces and couldn't see the low pipe from inside their cars.

Kenneth Jones and Jeffrey Daniel of Hall Booth Smith defended the parking garage, owned by a limited partnership called JPMCC. The defense attorneys could not be reached for comment.

The jury deliberated for about 3½ hours following a four-day trial before Fulton County State Court Judge John Mather, Mabrey said. The verdict totaled slightly more than $8 million. The biggest portion—$4.4 million—was for future lost wages. The jury awarded another $2.5 million for noneconomic damages. Another $500,000 was awarded for past lost wages. The remaining $212,000 was for medical expenses.

The jury apportioned 21.75 percent of the fault to McCoy and 78.25 percent to the parking garage, reducing the total award to $6.3 million.

Asked whether he had heard whether the defense plans to appeal, Mabrey said, "There will be no appeal." But he said he could not discuss why.

The defense said in the pretrial order that the low-hanging pipe was for a fire sprinkler and did not violate the building code at the time the garage was built in 1992. The defense also pointed out that McCoy did not lose consciousness and walked to her office at the law firm after the incident. Although emergency medical technicians came to her office, she refused an ambulance and only went to an emergency room later. The defense also noted that tests revealed no sign of concussion.

"There's no radiology imaging that would show this type of brain injury. It's microscopic," Mabrey said. "It's diagnosed by the patient's history."

Her neurologist provided helpful testimony about the extent of her pain and her efforts to recover, Mabrey said. Also helpful was the testimony of biomechanical and conspicuity experts, he said. The plaintiff's expert testified that, at the very least, instead of having the low pipe painted the same color as the walls, "paint it red and put a sign on it," Mabrey said. "Make it more conspicuous."

Mabrey said he also thought the defense expert was helpful to the plaintiff's side on cross-examination. When asked whether painting the pipe red would make it more conspicuous, the defense expert replied, "I need to do more research on that," according to Mabrey.

f SHARE     🐦 SHARE

### Katheryn Tucker

Katheryn Hayes Tucker is an Atlanta-based reporter covering legal news for the Daily Report and other ALM publications.



( /author/profile/Katheryn-Tucker/)

More from this author → (/author/profile/Katheryn-Tucker/)

### Dig Deeper

Personal Injury (/topics/personal-injury/)     Premises Liability (/topics/premises-liability/)

LEAN ADVISER LEGAL (/LEAN-ADVISER/STATIC/LEAN-ADVISER/?CMP=LARMLDC)

**Think Lean Daily Message**

**" The Post-Project Review, or wash-up meeting, is the time to face the client, with all candor, to analyze what went right and wrong, and why.... "**

**Learn More (/lean-adviser/static/lean-adviser/?cmp=LARMLDC)**

## Recommended Stories

### Complaint: Atlanta-Based Weather Channel Knew Storm Chasers Were Dangerous Before Fatal Accident (https://www.law.com/dailyreportonline/2019/03/27/complaint-weather-channel-knew-storm-chasers-were-dangerous-then-they-killed-someone-404-28221/)

ANGELA MORRIS | MARCH 27, 2019

A $125 million wrongful death lawsuit alleges The Weather Channel knew its storm chasers were reckless, dangerous drivers and did nothing about it.

### Fulton Jury Awards $43M to Man Shot, Robbed in CVS Parking Lot (https://www.law.com/dailyreportonline/2019/03/25/fulton-jury-awards-43m-to-man-shot-robbed-in-cvs-parking-lot/)

GREG LAND (/DAILYREPORTONLINE/AUTHOR/PROFILE/GREG-LAND/) | MARCH 25, 2019

Customers and employees had been robbed in the parking lot prior to the shooting.

### Gwinnett Jury Awards $13.8M to Mother of Baby Starved to Death in Cult Case (https://www.law.com/dailyreportonline/2018/11/15/gwinnett-jury-awards-13-8m-to-mother-of-baby-starved-to-death-in-cult-case/)

GREG LAND (/DAILYREPORTONLINE/AUTHOR/PROFILE/GREG-LAND/) | NOVEMBER 15, 2018

The jury said the Extended Stay America Hotel in Norcross bore 30 percent of the blame—worth $13.8 million of the total—for the abuse and starvation that led to the death of 15-month-old Alcenti McIntosh in 2014.

## Featured Firms

**Law Offices of Mark E. Salom**

2 OLIVER ST #608
BOSTON, MA 02109
857-444-6468 www.marksalomone.c

**Gary Martin Hays & Associat**

235 PEACHTREE ST NE #400
ATLANTA, GA 30303
800-898-4297 www.garymartinhays.

**Smith & Hassler**

225 N LOOP W #525
HOUSTON, TX 77008
(877) 777-1529 www.smithandhassle

Presented by Big

## David Cribb

| | |
|---|---|
| **From:** | Tony Jones <TJones@gallowaylawfirm.com> |
| **Sent:** | Thursday, March 28, 2019 7:12 PM |
| **To:** | David Cribb |
| **Subject:** | FW: Laguerre vs. PPS, et. al. |
| **Attachments:** | Holt Demand to Cajun 3-28-2019.pdf |

David:

Good afternoon! As discussed and expected, I have attached the Plaintiff's settlement demand, received this afternoon. Obviously, this is not a million dollar case. His damages remain at $40,000.00. However, this demand outlines their position (and the favorable testimony and jury verdicts that they cherry-picked for inclusion in the demand). I will be out of the office tomorrow and Monday, however, I'm all yours any time next week. We will begin preparing a response declining their offer. However, it is our goal that, after consultation with you and counsel for the hotel, we can include a counter-offer in our response. Thanks, David!

Sincerely,


**Tony C. Jones, Director**
990 Hammond DriveSuite 210
Atlanta, GA 30328
O: 678-951-1500 | F: 678-951-1510
TJones@gallowaylawfirm.com




TX | LA | MS | AL | FL | GA | MO
www.gallowaylawfirm.com


**THIS MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT
OR PRIVILEGED COMMUNICATIONS. PLEASE DO NOT
FORWARD WITHOUT SPECIFIC PERMISSION.**

**From:** Betty Davis [mailto:betty@bettydavislaw.com]
**Sent:** Thursday, March 28, 2019 2:04 PM
**To:** Tony Jones
**Cc:** Bethany Schneider
**Subject:** Laguerre vs. PPS, et. al.

Tony,

Please see attached the Plaintiff's time-limited demand to the Cajun Defendants in this matter.  We have also sent the original via certified mail.

Please do not hesitate to call me if you have any questions or concerns.  Thanks.


Betty Nguyen Davis

1

**EXHIBIT 10**

The Davis Injury Firm LLC
1447 Peachtree St. NE
Suite 540D
Atlanta, GA 30309
(404) 593-2620 (direct)
(678) 253-0237 (fax)
www.bettydavislaw.com

Confidentiality Note: This e-mail has been sent from a law firm. It may contain privileged and confidential information. You are hereby notified that any dissemination or duplication of this e-mail is prohibited and that there shall be no waiver of any privilege or confidence by your receipt of this transmission. If you have received this e-mail in error, please notify us by telephone at the number indicted above.
The following legend has been affixed pursuant to U.S. Treasury Regulations (IRS Circular 230) governing tax practice: Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of (a) avoiding tax penalties that may be imposed on the taxpayer or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

## David Cribb

| | |
|---|---|
| **From:** | Tony Jones <TJones@gallowaylawfirm.com> |
| **Sent:** | Monday, April 08, 2019 4:23 PM |
| **To:** | David Cribb |
| **Subject:** | RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781] |
| **Attachments:** | Brain MRIs from American Health Imaging DOS 10-26-18 (10734594xA8A8F).pdf; Dr. Angela Ashley Report DOS 10-26-18 (10733827xA8A8F).pdf |

Here you go! And just so you know, Angela Ashley, though smart and compelling, has a known reputation as a "Plaintiff's doc for hire" down here.

Lastly, I just had a great conversation with lead counsel for the hotel. I told him that I'm trying to get some authority from my folks with the goal of settling it well within that authority and he said that he is going to do the same. This is very promising.  I'll follow up with him towards the end of the week to see what number his folks have given him. Thanks!

**From:** David Cribb [mailto:David.Cribb@BankersInsurance.com]
**Sent:** Monday, April 08, 2019 3:18 PM
**To:** Tony Jones
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Tony,

Yes, we would like to see those records.

Thanks,

**From:** Tony Jones [mailto:TJones@gallowaylawfirm.com]
**Sent:** Monday, April 08, 2019 3:49 PM
**To:** David Cribb <David.Cribb@BankersInsurance.com>
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

David:

Good afternoon. Yes, we have the records—the TBI is referenced in the medical records as postconcusive syndrome. If you would like copies of these records or a chronology of same, I'm happy to provide. I do not think that an IME is necessary at this time given the actual diagnosis and scant records in support of same. Lastly, opposing counsel contacted me this morning and we're scheduled to talk "after 4:00PM". I'll report back following our call this afternoon/evening.

**From:** David Cribb [mailto:David.Cribb@BankersInsurance.com]
**Sent:** Monday, April 08, 2019 1:55 PM
**To:** Tony Jones
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Tony,

Do we have the medicals regarding the alleged TBI?
Do we need to schedule and IME?
Have you heard back from the hotel entities?

Thanks,

1

**EXHIBIT 11**

David

---

**From:** Tony Jones [mailto:TJones@gallowaylawfirm.com]
**Sent:** Monday, April 08, 2019 10:15 AM
**To:** David Cribb <David.Cribb@BankersInsurance.com>
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Thanks, David. We'll get it out this morning.

---

**From:** David Cribb [mailto:David.Cribb@BankersInsurance.com]
**Sent:** Monday, April 08, 2019 7:47 AM
**To:** Tony Jones
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Please send as soon as possible.

---

**From:** Tony Jones [mailto:TJones@gallowaylawfirm.com]
**Sent:** Friday, April 05, 2019 2:35 PM
**To:** David Cribb <David.Cribb@BankersInsurance.com>
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

David:

Good afternoon. As discussed, the response to Plaintiff's settlement demand has been both mailed and emailed. Also, I have attached the proposed tender to R&R. At your convenience, please give it a look and let me know if we have permission to send it out. Thanks, and have a great weekend!

Sincerely,

---

**From:** David Cribb [mailto:David.Cribb@BankersInsurance.com]
**Sent:** Thursday, April 04, 2019 1:40 PM
**To:** Tony Jones
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Tony,
My boss also noticed the 10 day time limit and requested I contact you for a timely response.
The attached response is approved, since it represents the nature of our request for further negotiations.
Thank you,
David

---

**From:** Tony Jones [mailto:TJones@gallowaylawfirm.com]
**Sent:** Thursday, April 04, 2019 11:49 AM
**To:** David Cribb <David.Cribb@BankersInsurance.com>
**Subject:** RE: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

David:

Good afternoon. I took a second look at the demand and, unusually, Plaintiff's counsel requested a response and acceptance of the offer within ten days (as opposed to the customary and statutory thirty days). As of yesterday, counsel for the hotel defendants remains out of the office. In an abundance of caution, and assuming I won't hear back from him by tomorrow, we have prepared the attached response to their "ten day request for one million dollars despite having only forty-thousand in special damages." Please let me know if it meets with your approval and if we may issue same. Thank you!

2

Sincerely,


**Tony C. Jones, Director**
990 Hammond DriveSuite 210
Atlanta, GA 30328
O: 678-951-1500 | F: 678-951-1510
TJones@gallowaylawfirm.com



TX | LA | MS | AL | FL | GA | MO
www.gallowaylawfirm.com


**THIS MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT
OR PRIVILEGED COMMUNICATIONS. PLEASE DO NOT
FORWARD WITHOUT SPECIFIC PERMISSION.**

---

**From:** Tony Jones
**Sent:** Tuesday, April 02, 2019 3:45 PM
**To:** 'drcribb@BankersInsurance.com'
**Subject:** FW: Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

David:

Counsel for the Peachtree Defendants did not return my call today. However, his assistant did manage to send over a second tender (which was fully expected) while I was out of the office yesterday. I have attached it here. I'll try to get him on the phone again tomorrow to request that he gets some settlement authority from his folks for inclusion in the offer we plan to extend to Plaintiff.

---

**From:** Machandra Story [mailto:MStory@hallboothsmith.com]
**Sent:** Monday, April 01, 2019 3:23 PM
**To:** Tony Jones
**Cc:** David Ware; Joe Cianflone
**Subject:** Laguerre v. Peachtree Property Sub, LLC et al. [IWOV-imanage.FID606781]

Please see attached correspondence sent to you on behalf of R. David Ware.

**Machandra Story**
*Legal Assistant*
**HALL BOOTH SMITH, P.C.**
191 Peachtree Street NE | Suite 2900 |Atlanta, GA 30303-1775
Direct Dial: 678-539-1566
Phone: 404.954.5000  ext.1276
Fax:  404.954.5020
mstory@hallboothsmith.com | www.hallboothsmith.com

CONFIDENTIALITY NOTICE: This e-mail communication, including any attached files was sent by or on behalf of the firm and may contain material that is proprietary, privileged, confidential, or otherwise legally exempt from disclosure. This Communication is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient or the person responsible for delivering this Communication to the intended recipient, you are prohibited from retaining, using, disseminating,

forwarding, printing, or copying this Communication. If you have received this Communication in error, please immediately notify the sender via return e-mail or telephone.

# GALLOWAY

Galloway Johnson Tompkins Burr & Smith

Texas | Louisiana | Mississippi | Alabama | Florida | Georgia | Missouri

**TONY C. JONES**
Director
Licensed in Georgia
Phone: (678) 951-1500
tjones@gallowaylawfirm.com

990 Hammond Drive NE, Suite 210
Atlanta, Georgia 30328
Tel: (678) 951-1500
Fax: (678) 951-1510
www.gallowaylawfirm.com

**CASEY L. SMARTT**
Associate
Licensed in Georgia
Phone: (678) 951-1500
csmartt@gallowaylawfirm.com

May 8, 2019

David R. Cribb, CPCU
Claim Technical Specialist
Bankers Insurance Company
P.O. Box 33061
Saint Petersburg, FL 33733
drcribb@BankersInsurance.com

> **Re:**   *Max Laguerre v. Peachtree Property Sub, LLC, et al.*
> **Claim No. SNIC-17-1648-011**
> **DeKalb County State Court; Civil Action File No.: 17A64087**
> **Our File No.: AT4473-0002**

Dear David:

Please accept this communication as our pre-trial report in the above-referenced matter. On May 6, 2019, we attended a court ordered Pre-Trial Conference. As a result of this Conference, this matter has been specially set for trial to commence on June 17, 2019.

## SYNOPSIS

Max R. Laguerre ("Plaintiff") was born on ▮▮▮▮▮▮ in Aquin, South of Haiti, though he currently enjoys U.S. citizenship today. He claims to have never been involved in any other lawsuits, that he's never been arrested, and that, prior to this incident, he had not seen a doctor for any reason in the last seven years.

On March 23, 2015, the Peachtree Defendants contracted with the Cajun Defendants for certain work on the Project. Specifically, Canjun contracted with FO Peachtree Property, LLC, to perform renovations to the entrance ceiling. The Project was later expanded to include renovations to the fitness center area and the second-floor pool deck. The Cajun Defendants subcontracted RYR Construction and Renovations, Inc. to perform the work. As part of the pool deck renovations, RYR demolished the existing pool cabanas that surrounded the pool area. In

**EXHIBIT 12**


Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 2

order to demolish the cabanas, the sub-contractors had to take the cabana roofs down one panel at a time. According to the Cajun Defendants' corporate representative, Troy Bossier, a pipe may have been on the roof of one of the cabanas, though he has no first-hand knowledge of this and can only surmise this through hindsight analysis of the incident. Further, it is Cajun's position that RYR was responsible for keeping the premises safe while they performed work on the pool deck area.

Plaintiff contends that, on July 20, 2015 at 9:58AM, he was standing in the taxi cab waiting area of the Crowne Plaza Atlanta-Midtown next to his taxi cab, talking to his friend Jean Benoit when, suddenly, a pipe fell from the hotel's roof and struck him in the head, face, and arm. According to Plaintiff, he held his arm up to try to prevent the pipe from hitting his face and head.

Mr. Laguerre contends that Jean Benoit witnessed the incident. Upon information and belief, Mr. Benoit is a fellow taxi driver. Mr. Laguerre also contends that Security Officers Willie Crawford and Nasir Ahmed of the hotel, as well as reporting police officers Somers, Moore, and Sgt. Albertini have knowledge of the incident. Additionally, RYR's corporate representative, Jose Munoz, and RYR employees, Victor Diaz, were working on the hotel pool deck when the pipe fell.

## LEGAL ANALYSIS

Plaintiff alleges that Cajun was negligent based on a premises liability theory, claiming that Cajun, along with the Peachtree Defendants, were negligent for their failure to keep the premises safe as is required by O.C.G.A. § 51-3-1. Plaintiff also alleges that Cajun was negligent in failing to enact any safety precautions to warn of or protect him from a known hazardous condition existing on the premises, thereby creating an unreasonable risk of injury.

To be successful, the Plaintiff must prove the elements of negligence; namely, the existence of a duty on the part of the defendant, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of the duty.[1] Under Georgia's premises liability statute, the landowner, occupier or controller of the land owes a duty to keep the premises in a reasonably safe condition and must use ordinary care to do so.[2] Even where a latent or obscured defect exists on the premises, and the premises owner has no actual knowledge of the defect, it will be inferred that the owner or occupier has constructive knowledge of the defect if a reasonable inspection of the premises, that is, one required in the exercise of ordinary care, would have revealed the defect.[3] The duty to inspect requires only that the premises owner exercise ordinary care under the circumstances, not extraordinary care.[4] The owner is not

---

[1] *Rasnick v. Krishna Hospitality, Inc.*, 289 Ga. 565 (2011).

[2] O.C.G.A §51-3-1.

[3] O.C.G.A. § 51-3-1; *Ferguson v. Premier Homes, Inc.*, 695 S.E.2d 56, 59 (Ga. App. 4/9/10).

[4] O.C.G.A. § 51-3-1; *Ferguson v. Premier Homes, Inc.*, 695 S.E.2d 56, 59 (Ga. App. 4/9/10).



**GALLOWAY**
Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 3

chargeable with negligence in failing to discover and remedy a danger on the property which he could not have discovered by the exercise of ordinary care, or which has not existed for a sufficient time to charge him with the duty of discovering it.[5]

Here, it is our argument that the Peachtree Defendants owned and operated the premises and thus, were responsible for keeping the premises safe under O.C.G.A. § 51-3-1. However, they are likely to argue that Cajun – as general contractor – was under control of the premises when the incident happened. As for causation, Plaintiff will have trouble at trial establishing that Cajun possessed superior knowledge of an alleged hazard as required by *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (1997). The only possible evidence as to causation is the testimony of RYR's corporate representative, Jose Munoz, that he may have seen something fall off of the roof. However, Mr. Munoz offered contradicting testimony when he stated he was not sure what, if anything, fell off the roof and could not affirmatively state where he was located on the roof. Troy Bossier, Cajun's corporate representative, testified that Cajun did not retain the right to direct or control the time and manner of executing work and/or interfere to assume control of the work of RYR. Further, no employee or representative of Cajun was present at the worksite the day the incident happened. According to RYR, the decision to shake the pool cabanas and walls to clear the area of debris was made by RYR, not Cajun.

In sum, though liability is clear as to RYR and the Peachtree Defendants, it is not so clear as to Cajun. First, we will be arguing that the Peachtree Defendants are liable for Plaintiff's injuries because they were the owners and operators of the Property and always maintained control over it. Second, we will be arguing that there is no direct evidence linking Cajun to the incident—instead, RYR, a non-party that the jury will be apportioning fault to, is the culprit. The Plaintiff will have to convince the jury that Cajun is responsible for RYR's conduct, and conceptually, this is a tall order.

## ALLEGED DAMAGES

Plaintiff seeks damages for: 1) lost wages; 2) past, present, and future medical expenses; 3) past and present pain and suffering; and 4) attorney's fees and court costs. As far as injuries are concerned, Plaintiff claims to have suffered injuries to his right arm, nose, face, head, and right wrist. He apparently was unable to drive because his arm was swollen for weeks and he claims to have suffered difficulty breathing due to a fracture of his nose. He claims to now suffer from weekly headaches and a fear of falling objects.

Immediately following the incident, Plaintiff was transported via ambulance to the ER at Atlanta Medical Center. There, Plaintiff was officially diagnosed with 1) a wrist sprain, 2) nasal bone fracture, and 3) head injury. Plaintiff followed up with his primary care physician, who diagnosed Plaintiff with a contusion and deviated septum and referred him to an Ear, Nose, and

---

[5] O.C.G.A. § 51-3-1; *Ferguson v. Premier Homes, Inc.*, 695 S.E.2d 56, 59 (Ga. App. 4/9/10).



**GALLOWAY**
Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 4

Throat ("ENT") doctor for treatment. The ENT doctor performed a septoplasty and turbinate reduction surgery.

Following the incident, Plaintiff treated at Atlanta Medical Center and Kunkes Ear, Nose, and Throat for a week. However, Plaintiff then waited until December 18, 2015 to seek follow-up treatment. Plaintiff began treating with Dr. Angela Ashley, a neurologist on October 26, 2018, nearly three years after the incident. Dr. Ashley diagnosed Plaintiff with a severe traumatic brain injury. Dr. Ashley has also opined that Plaintiff will suffer from a permanent brain disability for the rest of his life. It must be noted, however, that Dr. Ashley is a known "Plaintiff's expert" who often maintains a financial interest in the outcome of litigation in which she testifies. Further, despite this dubious diagnosis, the sum of Plaintiff's medical expenses remains unchanged.

His special damages, absent potential general damages for pain and suffering, total:

| Grady EMS | $1,884.50 |
|---|---|
| Atlanta Medical Center | $11,013.25 |
| South Fulton Emergency Physicians | $1,180.00 |
| Diagnostic Imaging Specialists | $435.00 |
| Clayton Healthcare | $258.00 |
| Kunkes Ear Nose & Throat | $1,744.93 |
| Spivey Station Surgery Center | $13,260.00 |
| Riverdale Anesthesia Associates | $870.00 |
| Restoration Neurology | $6,125.00 |
| **TOTAL** | **$36,770.68** |

Further, Plaintiff is also making a claim for lost wages. As a taxi driver, Plaintiff gets paid by fares and trips. Plaintiff alleges that he was unable to work for a period of two weeks after the incident, and estimates his lost wages to total **$5,678.00.** It will be next to impossible for him to prove this sum at trial.

The crux of Plaintiff's alleged damages are for future pain and suffering as a result of Plaintiff's head injury. In Georgia, pain and suffering is awarded in an amount to be determined by the "enlightened conscience of the jury."



David R. Cribb, CPCU
May 8, 2019
Page 5

In addition to Plaintiff's alleged special damages, he is also making a claim for punitive damages based upon what he alleges was Cajun's lack of safety policies and procedures. In Georgia, punitive damages are only recoverable if the plaintiff can prove Cajun's conduct – or that of its alleged employees – was intentional or willful. Here, there is no evidence to support Plaintiff's claim of punitive damages because Cajun did have general safety guidelines for its employees. Further, we will argue that RYR and the Peachtree Defendants were responsible for the safety of invitees in regards to the pool deck.

## MOTIONS

On April 26, 2019, all parties filed their Motions *in Limine*. We have filed written objections to Plaintiff's Motion *in Limine* Nos.: (1) to introduce OSHA and ANSI regulations in order to establish the standard of care; (3) to prevent Cajun from mentioning Plaintiff's gaps in treatment; (10) who referred Plaintiff to his medical doctors; and (12) introducing Plaintiff's medical records for purposes of impeachment. We await a ruling from the Court on our objections to Plaintiff's Motions *in Limine* Nos. (1), (3), (10), and (12).

## JURY VERDICT RESEARCH

Plaintiff allegedly received a deviated septum which required surgical intervention and he reportedly now suffers from Post-Traumatic Stress Disorder ("PTSD") as a result of the alleged "traumatic brain injury" he suffered when the pipe hit his head. Below is a sampling of comparable jury verdicts we found through our research.

1. Male | 31 | $1,945,000 | 2011 | County: Cobb

   Plaintiff was struck in the head by a large antenna that fell 300 feet from the top of a cellular tower. Plaintiff alleged that defendants were negligent in failing to properly tighten the brackets which secured the antenna to the tower, which resulted in the antenna falling from the cell tower just one day after it had been installed. Plaintiff claimed that he suffered a closed head injury that fully resolved, multiple facial fractures and a permanent loss of vision in one eye.

2. Male | 19 | $800,000 (settlement) | 2000 | County: Fulton

   Plaintiff was walking on a public sidewalk on a windy afternoon. As he passed the site where a new United States Post Office was being constructed, he was struck in the head by unsecured construction material which knocked him unconscious. The material was a



**GALLOWAY**
Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 6

4' x 8' or possibly a 3' x 4' piece of OSB plywood. Defendant was the general contractor for the construction project. Plaintiff suffered severe head injuries and alleged that the defendant construction company failed to properly train its employees and did not abide by OSHA standards in securing the worksite. Plaintiff only had $15,792.00 in past medical expenses, but factoring in his age, he had $3.1 million in future medical expenses and $9990,730.00 in future lost earning. The parties settled at mediation for $800,000.00

3. Female | Unknown Age | $40,000 (City of Atlanta Settlement) | 2014 | County: Fulton

Plaintiff fractured her tibia, which required surgery, after stepping on an improperly sized water meter cover on a residential street. The City of Atlanta argued that it was not the proximate cause of the plaintiff's injuries after she fell at home the day after the incident on the same injured ankle.

4. Female | 20 | $13,500 | 2009 | County: Fulton

Plaintiff was knocked to the ground when a speaker fell and struck her on the head. Plaintiff was treated at the scene by EMS. Plaintiff followed up later that same day at an emergency room, at which time she had complaints of headaches. She was diagnosed with a mild concussion and sent home with instructions of bed rest and pain medication as needed. Plaintiff alleged the contractor defendant failed to properly secure the speakers Plaintiff alleged the premise owner defendant failed to keep the premises and approaches safe for invitees and failed to warn of the dangerous condition.

5. Female | Unknown Age | $112,000 | 1991 | County: DeKalb

Plaintiff was shopping in Defendant Home Depot's store located on Memorial Drive in Decatur. They were looking at a display of telephones and related equipment when an aluminum extension ladder fell and struck plaintiff's head. Plaintiff alleged that defendant's employee had placed the ladder in a stack of ladders a few seconds prior to the accident and that the accident was caused by the negligence of defendant's employee. Defendant contended that the ladder fell due to the actions of another customer.

With this assessment of the verdict search in mind, we anticipate that a verdict range for this particular matter in liberal DeKalb County, Georgia is between $250,000 and $400,000.00. This is, of course, before apportionment. And we are asking the jury to apportion fault between the Peachtree Defendants, RYR, and Cajun. It is our expectation that the jury will apportion 30%



Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 7

of fault to Peachtree, 40% of fault to RYR, and 30% of fault to Cajun. As a result, on Cajun's worst day, it is our expectation that their liability will not exceed $120,000. However, as the Peachtree Defendants maintain a crossclaim for defense and indemnity against Cajun, an adverse finding as to Cajun will trigger these duties, potentially placing Cajun on the hook for any fault apportioned to the Peachtree Defendants, in addition to their attorneys fees.

## SETTLEMENT HISTORY & RECOMMENDATION

Plaintiff made an initial global settlement demand of $250,000 to all defendants. On June 20, 2018 we made an Offer of Judgment to Plaintiff in the amount of $50,000.00. Our Offer of Judgment went unanswered and on March 28, 2019, Plaintiff sent a settlement demand to both defendants in the amount of $1,000,000 each. On April 3, 2019, we responded on Cajun's behalf and indicated to Plaintiff that we would not be accepting his offer, but were willing to try and facilitate a global settlement counter-offer. It remains unlikely that the Peachtree Defendants are willing to offer a lot of money to settle this case due to their contractual indemnity claim against Cajun. However, they have since offered $25,000 and, two weeks ago, a global offer of $75,000 was made to Plaintiff. Plaintiff has yet to respond. However, with trial now looming, it is expected that a counter-offer will be forthcoming.

Plaintiff's damages are $42,448.68 when you combine his medicals with his lost wages claim. Liability between Cajun, the Peachtree Defendants, and non-party RYR is heavily disputed. In Georgia, the apportionment statute, O.C.G.A. § 51-12-33, requires the jury to divide responsibility for an injury among those that contribute to it, irrespective of whether the additional tortfeasor is a party to the lawsuit or not. On March 13, 2018, we filed our notice to seek apportionment for the non-party fault of RYR. However, because RYR is not an actual party to the case, the jury is unlikely to apportion the lion's share to them as they will not be in the courtroom and would only serve to give Plaintiff a "virtual" recovery. From a probability standpoint, at worst, a jury will find in Plaintiff's favor. And, as discussed, after apportionment, Cajun's exposure will likely not exceed $120,00000. On our best day, of course, we would obtain a complete defense verdict for Cajun. Lastly, we would budget the trial of this matter to cost approximately $22,500.00, inclusive of travel, lodging, expenses, and time billed.

## TRIAL

This matter has been filed in the State Court of DeKalb County and is pending before Judge Dax E. Lopez. DeKalb County is the fourth most populous county in Georgia, with a total population of 691,893. The population is made up of 54.3% African American, 33.26% white,



**GALLOWAY**
Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 8

9.8% Hispanic, and 5.12% Asian. In the 2016 Presidential election, 79.1% of DeKalb residents voted Democrat. Six of the seven total County Commissioners are Democrat. DeKalb County is also regarded as the most plaintiff-friendly jurisdiction in the State of Georgia. Judge Dax Lopez has been licensed to practice law in Georgia for seventeen years (17) and has been on the bench since 2010.

## **OTHER CONSIDERATIONS**

On April 8, 2019, we sent a tender of defense letter to RYR and its carriers, Travelers Casualty Insurance Company and Canopius U.S. Insurance, Inc. based upon the Certificate of Insurance ("COI") produced by RYR, in which Cajun Contractors, Inc. is listed as an additional insured. On April 16, 2019, Travelers Insurance contacted our office and informed us that they were the workers' compensation insurer for Cajun on the Project and thus, do not have any exposure or duty to defend Cajun at this time as this is not a workers' compensation case. On May 7, 2019, Canopius sent our office a letter stating that two of the parties named in the lawsuit, Cajun Builders, Inc. and Cajun Development, LLC, were not named as insureds on the COI and that no coverage is available. However, they did not mention Cajun Construction, Inc. who is now the only named Cajun defendant – Plaintiff dropped the other two Cajun entities in the Consolidated Pre-Trial Order –*is* named on the COI. Thus, with your permission, we will be sending a second tender letter to Canopius by the end of the week explaining that, as a named insured under the COI, Canopius has a duty to defend and indemnify Cajun Contractors, Inc. Also, with your permission, we would like to invite Canopius to monetarily contribute to any settlement of this matter.

Now, our practice at trial is for the handling Partner, Associate, and Paralegal to be present for the trial in its entirety. Though we feel substantially prepared for trial, we will now commence aggressive efforts to prepare for the trial of this matter and will promptly notify you of any developments that impact our continued preparation. We stand ready to discuss this matter with you further at your convenience.

Please contact us if you have any questions or wish discuss this update.



**GALLOWAY**
Galloway Johnson Tompkins Burr & Smith

David R. Cribb, CPCU
May 8, 2019
Page 9


With best regards, we remain,


Very truly yours,


Tony C. Jones
Casey L. Smartt

Texas | Louisiana | Mississippi | Alabama | Florida | Georgia | Missouri | **gallowaylawfirm.com**



H|B|S   HALL BOOTH SMITH, P.C.

**R. David Ware**
P: (404) 586-6619
E: dware@hallboothsmith.com

191 Peachtree St. NE, Suite 2900
Atlanta, Georgia 30303-1775
W: www.hallboothsmith.com
P: (404) 954-5000  F: (404) 954-5020

April 1, 2019

**VIA E-MAIL Only to TJones@gallowaylawfirm.com**

Tony C. Jones, Esq.
Galloway, Johnson, Tompkins, Burr & Smith, P.L.C.
990 Hammond Drive, Suite 575
Atlanta, GA 30328

Re:   <u>Max Laguerre v. Peachtree Property Sub, LLC et. Al</u>
State Court of Dekalb County
Case Number: 17A64087

Dear Tony:

As you know, our firm represents the Crowne Plaza Defendants in the above-referenced matter. Enclosed with this correspondence is a copy of Plaintiff's demand for our clients' policy limits pursuant to <u>Southern General Insurance Company v. Holt</u>, 262 Ga. 267 (1992). For reasons set forth below, we construe the demand to our clients as a demand to the Cajun defendants.

Please accept this correspondence as the Crowne Plaza Defendants' renewed tender to the Cajun Defendants for defense and indemnity pursuant to the Trade Contract executed by Troy Bossier. We ask that the Cajun Defendants respond to Plaintiff's demand and take steps to affect a global settlement of this matter without delay and within the time set forth in the attached demand.

Pursuant to the Court's order denying the various summary judgment motions, "[i]t is undisputed that the Crowne Plaza Defendants and the Cajun Defendants entered into a Trade Agreement, and subsequent change order, that contains an indemnification clause." (Order at p. 13). The Court also found that "there is no dispute that the cause-in-fact of Plaintiff's injuries was the eight-foot metal pipe that fell from the pool deck . . . [and that] there is no dispute that the pipe fell because of RYR's demolition work shook the structure where the pipe was laying." (Order at p. 6) As such, Cajun will be unable to deny the existence of a valid indemnity agreement with the Crowne Plaza Defendants and that its subcontractor was responsible for the incident that injured Plaintiff.

Moreover, Cajun will note the recent Georgia Supreme Court decision in <u>FDIC v. R. Charles Loudermilk, Sr., et al.</u>, which is enclosed with Plaintiff's demand. While the Crowne Plaza Defendants deny that a joint tortfeasor/concerted action theory can be charged to the jury under these facts, Cajun should note that the <u>Loudermilk</u> decision specifically preserves unto the



**EXHIBIT 13**

HALL BOOTH SMITH, P.C.

Tony C. Jones, Esq.
April 1, 2019
Page 2

Crowne Plaza Defendants a right of contribution from the Cajun Defendants should joint and several liability be found in this matter.

Thank you for your attention to this request. Please advise as to the Cajun Defendants' intentions with regard to same prior to the expiration of Plaintiff's demand, which is April 8, 2019.

Sincerely,

*/s/ R. David Ware*
.

R. David Ware

RDW
Enclosure (Plaintiff's Holt Demand)
xc:  Joe Cianflone, Esq.

67002779-1

 Gallagher Bassett Services, Inc.

June 12, 2019


State National Insurance Company
11101 Roosevelt Blvd N
St Petersburg, FL 33716
Attn: David R. Cribb

Galloway Law Firm
Attn: Tony C. Jones, Director
990 Hammond Drive, Suite 210
Atlanta, GA 30328
TJones@gallowaylawfirm.com


RE:   Insured:      Crowne Plaza - Atlanta
      Claimant:     Max Laguerre
      Date of loss: July 20, 2015
      GB claim#:    004476-000756-GB-01
      Your Insured: Cajun Contractors

Dear Mr. Cribb:

Gallagher Bassett Services is the third party administrator handling claims on behalf of Federal Insurance Company and its insured insured Crowne Plaza – Atlanta.

You previously agreed to defend and indemnify the Crowne Plaza based on the contractual risk transfer obligations of your insured Cajun Contractors. We were notified of a $1 million dollar primary limit.

In light of the severity of the injuries claimed in this lawsuit, we hereby demand that you make any and all aggressive efforts to settle this case at or within your limits and secure a full and final release for our clients prior to trial.

We have been advised your last offer $150,000 has not settled this case. What steps have you taken to try and get this case resolve before June 17, 2019? It is clear a more substantial offer should be extended and more substantial effort should be made to conclude this matter. We note Dekalb County is a liberal and plaintiff friendly venue making trial risky and could expose my client to an excess verdict for a claim that clearly rests within your limits.

If this matter does not settle before the June 17, 2019 trial date, our clients will be in no way responsible for an excess verdict, interest, or costs and fees associated with such excess verdict. Your failure to settle this matter and subject my client to possible excess verdict is an act of bad faith as well as breach of contract and will be asserted to the fullest extent of the law.

**EXHIBIT 14**

Page 2

Please provide a daily status as to the negotiation efforts to conclude this matter and secure a full release for our clients.

Please be governed accordingly.

Respectfully,

Lori Whitehead
Resolution Manager
(P) 717-610-3487
(E) lori_whitehead@gbtpa.com

Cc:

dware@hallboothsmith.com

dfletcher@chubb.com

Cajun Contractors Inc.
2313 Highway 87
Navarre FL 35266

Risk Management Consultant
Robert M. Currey & Associates, Inc.
One Beacon Street, 22nd Floor
Boston, MA 02108

## David Cribb

| | |
|---|---|
| **From:** | Fletcher, Deon A <dfletcher@chubb.com> |
| **Sent:** | Monday, June 17, 2019 6:12 PM |
| **To:** | David Cribb; bankers.7278032074@fax2mail.com |
| **Subject:** | Demand Letter Re: Laguerre v. Peachtree Partners, et al and Cajun Contractors, Inc., Your File #: 171648, Chubb Claim Ref #: 068516018095, D/L 7/20/15, Writing Company: Federal Insurance Company |
| **Attachments:** | Cajun Demand.pdf |

6/17/19       **Via Email & Fax Only**

To: David Cribb @ Bankers Insurance
Your Insured: Cajun Contractors, Inc., File # 171648

Good evening David,

As per our prior phone conversations regarding the above captioned matter involving your insured, Cajun Contractors, please see the attached copy of the demand letter on behalf of our insureds, which was sent from our defense attorney, David Ware, to your insured's defense attorney, Tony Jones, with respect to this case.

We hope that your company will act accordingly. Please contact me if there are any problems or questions. Thank you very much!

Deon



**Deon Fletcher**
Sr. Claims Specialist, North American Casualty Claims

600 Independence Parkway, P.O. Box 4700, Chesapeake, VA 23327-4700, USA
O 800-252-4670    F 800-664-1765
E dfletcher@chubb.com

June 17, 2019

**VIA E-MAIL Only to TJones@gallowaylawfirm.com**

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Tony C. Jones, Esq.

Galloway, Johnson, Tompkins, Burr & Smith, P.L.C.

990 Hammond Drive, Suite 575

1

**EXHIBIT 15**

Atlanta, GA 30328

Re: Max Laguerre v. Peachtree Property Sub, LLC et. al

State Court of Dekalb County

Case Number: 17A64087

Dear Tony:

As you know, our firm represents Peachtree Property Sub, LLC, Doing Business as Crowne Plaza Hotel Atlanta-Midtown; FO Peachtree Property, LLC, Doing Business As Crowne Plaza Hotel Atlanta Midtown, AWH Partners, LLC, Doing Business As Crowne Plaza Hotel Midtown ("the Hotel Defendants", hereinafter) in the above-referenced matter. The Hotel Defendants' tendered this lawsuit to Cajun Contractors, Inc. for defense and indemnity pursuant to the March 23, 2015 trade contract executed by Troy Bossier ("Trade Contract"). This tender was renewed in a letter to you dated April 1, 2019, based on the Plaintiff's demand for our clients' policy limits pursuant to Southern General Insurance Company v. Holt, 262 Ga. 267 (1992). Further, this matter was timely tendered to your client's insurer and a cross-claim was asserted against your client in the current litigation.

As you are aware, on June 14, 2019, the Hotel Defendants entered into an agreement to settle the Plaintiff's claims set forth in the Complaint for $1,000,000. The Hotel Defendants hereby demand that Cajun Contractors immediately provide payment in the amount of the $1,000,000 settlement proceeds. This settlement was necessitated as the result of negligence attributed to your client arising out of the work of your client and/or your client's subcontractor, RYR, who admitted fault. The Hotel Defendants' entitlement to payment is clear.

This demand is based on the indemnity agreement between FO Peachtree Property, LLC and Cajun Contractors, which, to date, Cajun Contractors has failed to fulfill. Paragraph 9 of the Trade Contract states, in relevant part:

"Contractor shall defend, indemnify and hold Owner harmless from and against any and all claims, damages, losses, liability and expenses, including without limitation attorney's fees, arising out of or resulting from the performance of the Work or the Contractor's failure to comply with the terms and provisions of the Contract, to the extent caused in whole or in part by any intentional, negligent or otherwise wrongful acts or omissions of Contractor or anyone for whose acts it may be liable including employees, subcontractors and consultants."

Please provide the date on which the Hotel Defendants can expect to receive this payment. By separate cover, we will provide you with the expenses our clients have incurred to date which are also the responsibility of your client.

Further, should Cajun Contractors' insurer continue its failure to indemnify the Hotel Defendants, we will have no option but to pursue a contribution action to recoup not

only the $1,000,000 due under the settlement agreement, but also attorney's fees and litigation costs incurred in obtaining the funds owed to the Hotel Defendants.

Finally, please forward this notice to Cajun Contractors' insurance carrier immediately, and RYR's if applicable.

Thank you for your attention to this request. I am available if you would like to schedule a call to discuss this letter in greater detail.

Sincerely,

R. David Ware

---

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

**IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA**

| | | |
|---|---|---|
| MAX LAGUERRE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | NO.: 17A64087 |
| v. | ) | |
| | ) | |
| CAJUN CONTRACTORS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**JUDGMENT**

On June 20, 2019, a jury returned a verdict of $5,000,000.00 in compensatory damages and $500,336.00 in punitive damages in favor of Plaintiff Max Laguerre.

Pursuant to O.C.G.A. §51-12-5.1(g), the punitive damages verdict is remitted to $250,000.00.

The Court therefore enters judgment in favor of Plaintiff, and against Defendant Cajun Contractors, Inc., in the amount of $5,250,000.00.

The Court retains jurisdiction over any motion for attorneys' fees, as well as over the Crowne Plaza Defendants' motion for summary judgment on its crossclaims for indemnification and contribution, which was held in abeyance by this Court's Order of March 13, 2019.

SO ORDERED, this 12th day of November, 2019.

_____
THE HONORABLE DAX LOPEZ
Judge, State Court of Dekalb County
State of Georgia

**EXHIBIT 16**

STATE OF _Maryland_

COUNTY OF _Montgomery_

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Tricia Purks ("CK") Hoffler, J.D., who after being duly sworn, deposes and states the following:

1.

I am a competent adult over the age of twenty-one years and suffer no legal disabilities. I am an attorney and have been continuously licensed to practice law since 1987. I have been licensed to practice law as a member of the State Bar of Georgia in good standing since 2011. I am also licensed to practice law in Washington, DC, Virginia (inactive) and Florida. I have retired from the practice of law in Pennsylvania, which was my first state of license. I am the sole owner of Hoffler & Associates, PC , dba The CK Hoffler Firm, which has had an office in Georgia since 2018. The primary focus of my law practice is catastrophic injury work, although I also specialize in commercial litigation, employment discrimination, opioid litigation, NIL (Name, Image and Likeness) representation, and international corporate work. I have been an active trial lawyer for close to 25 years.

2.

I graduated from Georgetown University Law Center in 1987 and was an Honors graduate from Smith College in 1984. My credentials are more fully outlined in my Curriculum Vitae attached hereto as **Exhibit A.**

3.

I make this affidavit for any lawful use or purpose. Specifically, this affidavit is given pursuant to O.C.G.A. § 9-11-9.1 for use in the above-referenced action and is based upon my

**EXHIBIT 17**

personal knowledge. I am familiar with the standard of skill, care and diligence normally possessed and utilized by attorneys in Georgia and elsewhere who represent clients in circumstances like those in which Defendant represented the underlying Defendant, Cajun Contractors, Inc. in *Laguerre v. Peachtree Property Sub, LLC et. al.*, Case No. 17A64087, as further described in the Complaint.  My affidavit is not intended to specify or address each error or ground for Plaintiff's malpractice claim against Defendant; rather, the purpose of this affidavit is to "set forth specifically at least one negligent act or omission" which exists and the factual basis for such claim in compliance with O.C.G.A. § 9-11-9.1.  I reserve the right to change or modify my opinions if further information is received which may impact the opinions I have given.

4.

The opinions I express in this affidavit are based upon the following:  (a) Complaint of  Bankers Insurance Company in this action to which this Affidavit is attached (the "Complaint"); (b) my assumption that certain allegations in the Complaint, as recited and summarized below, are true and correct; and (c) my education, training and experience as an attorney.

5.

For purposes of this affidavit, I assume the following statements to be true:

**The Incident That Gave Rise to the Underlying Lawsuit**

a.      On or about March 23, 2015, Cajun Contractors entered into a contract with FO Peachtree Property, LLC—owner of the Crown Plaza Atlanta-Midtown (the "Hotel")—to perform construction work to the pool deck of the Hotel.

- 2 -

b.    On or about July 20, 2015, while Cajun Contractors was performing construction work (through their subcontractor, R&R Construction and Renovations, Inc. ("R&R")) at the Hotel, a metal pipe fell from the rooftop pool deck, allegedly striking a taxi attendant, Max Laguerre ("Laguerre") in the head, face and arm (the "Pipe Incident").

c.    On April 20, 2017, Laguerre filed the Laguerre Lawsuit against Cajun Contractors and the corporate entities that owned the Hotel (the "Hotel Defendants"), for damages Laguerre sustained as a result of the Pipe Incident, including but not limited to "mental anguish, loss of enjoyment of life . . . medical expenses, past and future, lost wages and the ability to labor . . . physical pain, mental and psychological suffering and anguish, inconvenience, and other injuries as proven at the trial of this matter." A true and correct copy of the Complaint in the Laguerre Lawsuit is attached to the Complaint as Exhibit 2.

d.    On or about May 3, 2017, Cajun Contractors served a Notice of Claim. As a result, and pursuant to its obligations and duties under the Reinsurance Agreement, Bankers accepted coverage for the claim and undertook its duty to defend Cajun Contractors pursuant to the Policy, which contains coverage limits of $1 million per occurrence.

e.    The Laguerre Lawsuit was the first one in which Bankers defended an insured in Georgia state court. Accordingly, when it accepted coverage for the claim, Bankers sought counsel well-versed in and experienced with Georgia law to represent Cajun Contractors.

### The Galloway Firm

f.    The Galloway Firm is comprised of attorneys licensed and working from offices located in Louisiana, Georgia, Mississippi, Texas, Missouri, and Florida.

g.    Bankers had a prior existing relationship with the Galloway Firm, particularly

Directors of the Galloway Firm reside in the firm's Tampa, Florida Office. Indeed, prior to the Laguerre Lawsuit, Bankers had retained the Galloway Firm to defend its insureds in many actions brought in the state courts of Florida, Louisiana, and Texas.

h.      At the time Bankers accepted to defend Cajun Contractors in the Laguerre Lawsuit, Bankers inquired of the Galloway Firm's interest in representing Cajun Contractors.

i.      The Galloway Firm represented to and assured Bankers it had attorneys residing and licensed in Georgia, all of whom were well-versed and experienced in Georgia law and in defending the type of claims alleged in the Laguerre Lawsuit, and were very familiar with the local jurisdiction and the dynamics thereof in which the Laguerre Lawsuit was filed, DeKalb County, Georgia.

j.      Relying on those representations and assurances, Bankers retained the Galloway Firm to represent Cajun Contractors in the Laguerre Lawsuit. The Galloway Firm assigned attorneys Todd LaDouceur, Esq. (represented by the Galloway Firm to be a resident in the Pensacola, Florida, and Atlanta, Georgia offices) and Tony C. Jones, Esq. (represented by the Galloway Firm to be a resident in the Atlanta, Georgia office) as the lead attorneys for Cajun Contractors.

k.      Attorney LaDouceur has been licensed to practice law in Georgia since 1996, and describes himself as an "aggressive, skilled trial lawyer and counselor" who has tried "well over a hundred cases before a jury, judge, or arbitrator[.]" A true and correct copy of Attorney LaDouceur's website profile is attached to the Complaint as Exhibit 3.

l.      Attorney Jones has been licensed to practice law in Georgia since 2009, and

describes himself as one whose "practice and depth of experience" makes him a "sound advocate in any dispute, big or small." A true and correct copy of Attorney Jones's website profile is attached to the Complaint as Exhibit 4.

m.      Throughout the Laguerre Lawsuit, Bankers sought and received from the Galloway Firm professional legal advice and assistance.

n.      Bankers and Cajun Contractors relied on Attorney LaDouceur's, Attorney Jones's, and the Galloway Firm's purported expertise in legal disputes of this nature.

o.      At all times mentioned, Attorney LaDouceur and Attorney Jones were the agents and employees of the Galloway firm, and were at all times acting within the purpose and scope of their agency and employment. The Galloway Firm is responsible for the acts of its principals, employees, partners, associates, of counsel attorneys, and other agents—including but not limited to all acts committed by Attorney LaDouceur and Attorney Jones as identified herein—under the doctrine of respondeat superior and other applicable Georgia law.

p.      Although the Galloway Firm represented the more senior attorney LaDouceur would share responsibility for the representation of Cajun Contractors, his actual participation in the defense was minimal, leaving the case to be handled by the far junior attorney Jones. Indeed, Attorney LaDouceur did not spend significant time at the Galloway Firm's Atlanta office and did not even attend the ultimate trial of the action before the DeKalb County jury.

q.      Bankers paid the fees of the Galloway Firm in defending Cajun Contractors in, and providing professional legal advice to Bankers and Cajun Contractors in connection with, the Laguerre Lawsuit.

**The Galloway Firm's Defense**

r.        From the onset of the Laguerre Lawsuit through trial, the Galloway Firm asserted as Cajun Contractors's principal defense that Cajun Contractors could not be held liable for Laguerre's injuries (or would, at most, be held responsible for only a small portion thereof) because Cajun Contractors did not commit any independent acts of negligence, and could not be held responsible for the negligent acts committed by the Hotel Defendants, as well as those committed by Cajun Contractors's subcontractor, R&R.

s.        Based on its principal theory, the Galloway Firm filed a "Notice of Non-Party Fault" pursuant to O.C.G.A. § 51-12-33, a procedural tool under Georgia law, with which Bankers was previously unfamiliar, in which the jury is directed to apportion fault to the non-party named therein. The Galloway Firm named R&R as the non-party at fault.

t.        Maintaining the position that Cajun Contractors would not be liable for any independent acts of negligence, nor for any negligent acts of the Hotel Defendants or R&R, the Galloway Firm conducted very limited discovery to ascertain the basis for Laguerre's alleged damages and his theories of liability against Cajun Contractors.

u.        Indeed, while Laguerre retained two medical experts to testify as to the extent of Laguerre's traumatic brain injury and retained a separate expert to testify to the safety procedures Cajun Contractors allegedly neglected to follow, the Galloway Firm did not retain, nor even consult with, a single expert to rebut the testimony of the experts retained by Laguerre.

**Settlement Offers, Disclosures of Laguerre's**
**Alleged Injuries, and the Galloway Firm's Recommendations**

v.        On or about January 24, 2018, Laguerre served all defendants in the Laguerre Lawsuit an Offer of Judgment in the amount of $250,000, for global resolution of his claims—well within the limits of the Policy. *See* January 24, 2018 Offer of Judgment attached to the Complaint as **Exhibit 5**. In advising Bankers on the January 24, 2018, Offer of Judgment,

attorney Jones stated: "Assuredly, there is absolutely no basis for accepting this offer[.]" A true and correct copy of the March 12, 2018 litigation update is attached to the Complaint as Exhibit 6.

w.      On or about April 24, 2018, Laguerre served Cajun Contractors (via Bankers) in the Laguerre Lawsuit an Offer of Judgment in the amount of $75,000, for resolution of his claims solely against Cajun Contractors—again, well within the limits of the Policy. *See* April 24, 2018 Offer of Judgment attached to the Complaint as Exhibit 7.[1]

x.      Attorney Jones advised against accepting either of Laguerre's offers, despite both offers triggering O.C.G.A. § 9-11-68, a Georgia-specific statute that makes a defendant liable for a plaintiff's attorneys' fees where the "plaintiff recovers a final judgment in an amount greater than 125 percent of" the amount offered in the Offer of Judgment. Instead, after receiving the $75,000 offer, Attorney Jones suggested Bankers make a counter-offer in the amount of just $25,000. When Laguerre summarily rejected the counter-offer, Attorney Jones advised Bankers increase the offer to $50,000. That counter-offer was likewise rejected.

y.      On or about June 19, 2018, Laguerre's counsel represented to Attorney Jones that Laguerre would accept $125,000 for global settlement for all claims. When communicating this offer to Bankers, Attorney Jones stated "[o]f course, both her settlement offer and the desired settlement range are higher than our current evaluation of the Plaintiff." A true and correct copy of the June 19, 2018, correspondence is attached to the Complaint as Exhibit 8.

z.      On or about March 28, 2019, Laguerre served on the Galloway Firm a settlement demand pursuant to *Southern General Ins. Co. v. Holt,* 416 S.E.2d 274, 262 Ga. 267 (1992),

---

[1] On the same day, Laguerre served the Hotel Defendants an identical Offer of Judgment for $75,000, for resolution of all claims thereagainst.

in which he demanded the policy limits of $1 million. In this demand, Laguerre's counsel outlined in detail the extent of Laguerre's injuries, which then allegedly included "blunt trauma to the head, hemorrhaging, and lacerations," "open fracture of the upper right nasal bone" requiring surgery, and "headaches once or twice a week . . . dizziness, anxiety, occasional nightmares, depression, episodes of altered consciousness and cognitive impairment consistent with post-concussional syndrome." Laguerre's counsel further warned that should Bankers "fail to satisfy the terms of this Time-Limited Demand, [Bankers] will be subjecting its insured to liability in excess of the limited liability insurance coverage" and Bankers would be "liable to the [Cajun Contractors] for negligent handling of the claim and/or bad faith failure to protect the insured" and, therefore, "fully liable to satisfy the judgment." A true and correct copy of the March 28, 2019 settlement demand is attached to the Complaint as Exhibit 9.

aa.    By this demand, Laguerre's counsel notified the Galloway Firm that Laguerre "suffered a traumatic brain injury as a result of the blunt force trauma to his head from the falling pipe," that Laguerre "is in the very small percentage of concussion patients whose traumatic brain injury is permanent" requiring "medical management for the rest of his life from this injury," and that Dr. Angela Ashley—Laguerre's treating neurologist—was prepared to testify as to the severity of these injuries. *Id*.

bb    Based on this, Laguerre's counsel warned the Galloway Firm as follows:

[A] jury in Dekalb County, Georgia will comfortably award Mr. Laguerre an amount well into the 7-figure range for his pain and suffering alone [and] [c]ombined with Mr. Laguerre's emotional distress and permanent structural brain changes, the verdict in this case can easily exceed [Cajun Contractors's] policy limits.

*Id*. Laguerre's counsel likewise warned the Galloway Firm that it would be seeking punitive damages and attorneys' fees. *Id*.

- 8 -

cc.     Despite this, when conveying this offer to Bankers, Attorney Jones merely stated "[o]bviously, this is <u>not</u> a million dollar case. His damages remain at $40,000 . . . We will begin preparing a response declining their offer." A true and correct copy of the March 28, 2019, correspondence is attached to the Complaint as Exhibit 10.

dd.     In response to this settlement demand alleging a "traumatic brain injury," Bankers immediately asked Attorney Jones: "Do we need to schedule and [sic] IME?" A true and correct copy of this April 8, 2019, correspondence is attached to the Complaint as Exhibit 11.

ee.     Attorney Jones recommended against conducting an Independent Medical Examination ("IME") and went on to explain that Dr. Ashley, Plaintiff's expert who provided the traumatic brain injury diagnosis, "has a known reputation as a 'Plaintiff's doc for hire down here.'" *Id.*

ff.     Relying on Attorney Jones's advice and expertise, Bankers declined Laguerre's settlement offer.

gg.     On May 8, 2019, the Galloway Firm provided Bankers with its "Pre-Trial Report." In it, the Galloway Firm noted Dr. Ashley's diagnosis of a severe traumatic brain injury and "that Plaintiff will suffer from a permanent brain disability for the rest of his life." The Galloway Firm went on to advise Bankers that: (1) "[i]t will be next to impossible for [Laguerre] to prove [lost wages] at trial" (2) "there is no evidence to support [Laguerre's] claim of punitive damages, and (3) "on [Bankers's] worst day, it is our expectation that their liability ***will not exceed $120,000***." A true and correct copy of the May 8, 2019, Pre-Trial Report is attached to the Complaint as Exhibit 12.

hh.     This advice was expressly based on the Galloway Firm's repeated assumption and "expectation" that the jury would only apportion, at most, "30% of fault to Cajun" under the

Notice of Non-Party Fault. This being an area unique to Georgia law, in rejecting Laguerre's demands for settlement of the claim against Bankers's insured within the limits of the Policy, Bankers relied on the Galloway Firm's repeated expectations and advice regarding its assessment of damages and, as important, the limited apportionment of those damages to Cajun Contractors.

ii.     The Galloway Firm came to its conclusions regarding the damages the jury may award without fully understanding or discovering evidence to support Laguerre's theories of liability against Cajun Contractors, consulting an independent medical expert regarding Laguerre's alleged damages, retaining a medical expert to refute Dr. Ashley's findings, conducting an IME on Laguerre related to his alleged damages, or engaging in any reasonable due diligence of Laguerre's alleged damages.

jj.     Prior to trial, the Galloway Firm never recommended the retention of and never retained any medical experts to review or provide opinions regarding the diagnosis and anticipated testimony of Plaintiff's medical experts, Dr. Angela Ashley and Dr. David Owens, and never performed an IME of Laguerre to confirm or call into question his claimed injuries or the diagnosis of Drs. Ashley or Owens.

kk.     Despite these failures, the Galloway Firm continued to advise Bankers it had limited exposure and advised against substantially increasing offers of settlement.

ll.     Relying on the Galloway Firm's expertise, assessment of the claims, and recommendations, Bankers last settlement offer to Laguerre before trial was $150,000.

**The Hotel Defendants' Indemnification Demands and $1,000,000 Settlement**

mm.     After being served with the complaint naming them as co-defendants, the Hotel Defendants filed their Answer denying they were liable to Laguerre and asserted a cross-claim

against Cajun Contractors asserting various claims for indemnification and contribution under common law and pursuant to a contractual indemnification provision contained in the contract between Cajun Contractors and the Hotel Defendants.

nn.     On or about April 1, 2019, the Hotel Defendants tendered a request for defense and indemnity on Cajun Contractors pursuant to the indemnity provision of the contract between them and Cajun Contractors.   As part of that tender, the Hotel Defendants asked Cajun Contractors to respond to Laguerre's settlement demands and to take steps to effectuate a "global settlement" on their behalf.  A true and correct copy of the Hotel Defendants' April 1, 2019, demand is attached to the Complaint as Exhibit 13.

oo.     On the recommendation and advice of the Galloway Firm, Cajun Contractors did not accept the Hotel Defendants' tender.

pp.     On June 12, 2019, with trial set to commence in mere days, the Hotel Defendants renewed their indemnification demand and further wrote:

> In light of the severity of the injuries claimed in this lawsuit, we hereby demand that they make any and all aggressive efforts to settle this case at or within your limits and secure a full and final release of our clients prior to trial.
>
> We have been advised your last offer of $150,000 has not settled this case.  What steps have you taken to try and get this case resolve (sic) before June 17, 2019.  It is clear a more substantial offer should be extended and more substantial effort should be made to conclude this matter.  We note Dekalb County is a liberal and plaintiff friendly venue making trial risk and could expose my client to an excess verdict for a claim that clearly rests within your limits.

A true and correct copy of the Hotel Defendant's June 12, 2019, letter is attached to the Complaint as Exhibit 14.

qq.     The Galloway Firm continued to downplay and disregard the level of concern expressed by the Hotel Defendants and continued to recommend Bankers deny the Hotel

Defendants' tender or increase the monetary offer to reach a global settlement between the $150,000 last offered by Bankers and the $1,000,000 last demanded by Laguerre.

rr.     On June 17, 2019, the Hotel Defendants notified Galloway Johnson that after having been refused indemnification and because no global settlement had been reached, "on June 14, 2019, the Hotel Defendants entered into an agreement to settle the Plaintiff's claims set forth in the Complaint for $1,000,000." A copy of the Hotel Defendants' June 17, 2019, letter is attached to the Complaint as Exhibit 15.

ss.     The Hotel Defendants went on to demand from Cajun Contractors payment of the full $1,000,000, plus costs, pursuant to the indemnification provision of the contract between the parties.

### The Trial of the Laguerre Lawsuit

tt.     On June 17, 2019, trial began in the Laguerre Lawsuit. Attorney LaDouceur did not attend trial.  Rather, Attorney Jones was the lead trial counsel for Cajun Contractors and was assisted by another Galloway Firm attorney with fewer than four years of experience as an attorney.

uu.     At trial, Dr. Angela Ashley testified that Laguerre suffered from a severe traumatic brain injury, and that he would suffer severe neurological symptoms for the rest of his life.

vv.     At trial, Dr. David Owens—the doctor who interpreted Laguerre's brain scans— testified that Laguerre's diffusor tensor imaging showed that Laguerre's brain had multiple areas of abnormal volume loss.

ww.     Because it had not ever retained any medical experts to even review Laguerre's medical records or claims of injury, the Galloway Firm did not present for Cajun Contractors

at trial any medical experts (or any experts at all) to challenge Laguerre's claimed injuries or the medical testimony of Dr. Angela Ashley and Dr. David Owens.

xx.     Instead, to challenge the damages for traumatic brain injury Laguerre claimed, the Galloway Firm relied on attempting to show the jury Dr. Ashley had a "reputation" as a "Plaintiff's doctor for hire" and Dr. Owens charged a fee of $5,000 to testify at trial.

yy.     The Galloway Firm also relied heavily on the fact that Laguerre failed to visit Dr. Ashley for "3 years, 3 months, and 6 days" after the Pipe Incident (a fact that Attorney Jones repeated excessively during trial), despite Dr. Ashley's medical testimony given during her deposition prior to, and then presented at, trial that such a delay did not affect her diagnosis of TBI, but in fact, bolstered her medical opinion the TBI was "permanent."

### Charge Conference and Verdict Form

zz.     At the charge conference, Laguerre's counsel requested the Court include a jury instruction requiring the jury to determine whether R&R was an "employee" of Cajun Contractors (thereby exposing Cajun Contractors to the full extent of the damages apportioned to R&R as a matter of law) *prior to* apportioning damages to R&R individually pursuant to O.C.G.A. § 51-12-33.

aaa.     Such an instruction is improper under Georgia law as it completely nullifies the purpose of invoking apportionment to non-parties under O.C.G.A. § 51-12-33, which the Galloway Firm had invoked and so heavily relied upon in advising Bankers on the potential amount of damages for which Cajun could be found liable.

bbb.     Although Attorney Jones initially objected to the instruction requested by Laguerre's counsel, he ultimately accepted the court's proposed verdict form including the vicarious liability question *prior to* the apportionment question, without objection, telling the

- 13 -

court the instructions and verdict form question were "fine."  Attorney Jones never thereafter renewed his objection to the jury instructions or verdict form and, therefore, waived and failed to preserve the error for appeal.

### The Jury Returned a Multi-Million Verdict Against Cajun Contractors

ccc.    On June 20, 2019, after only 2 hours of deliberation, the jury entered a verdict in favor of Laguerre, awarding him $5 million dollars in compensatory damages, as well as punitive damages in the amount of $500,336.00 (the $336.00 is a thinly-veiled rebuke of Attorney Jones's repeated argument during trial that Laguerre waited "3 years, 3 months and 6 days" to see Dr. Ashley about his alleged brain injuries).[2]

ddd.    Because, based on the jury instruction and verdict form to which Attorney Jones agreed, the jury determined R&R was an "employee" of Cajun Contractors prior to apportioning fault between Cajun Contractors and R&R individually, the jury apportioned 100% of fault to Cajun Contractors, making Cajun Contractors liable for the entirety of the Judgment. A true and correct copy of the Judgment entered is attached to the Complaint as Exhibit 16.

eee.    On January 30, 2020, the Court entered an order awarding Laguerre his reasonable attorneys' fees ($1,050,000.00) and costs ($45,196.47) under Georgia's Offer of Judgment statute, based on Laguerre's recovery through final judgment of an amount greater than 125% of the $75,000 demanded in the April 24, 2018, Offer of Judgment to settle all claims against Cajun Contractors.

fff.    The Galloway Firm's appeal of the jury's verdict in the Laguerre Lawsuit was ultimately unsuccessful.

---

[2] The punitive damage award was reduced to $250,000 per Georgia statute.

ggg.    In the end, Cajun Contractors (and therefore Bankers), was found liable for a judgment in excess of $7.3 million.

**Bankers Paid the Judgment on Behalf of Cajun Contractors**

hhh.    Throughout the Laguerre Lawsuit and trial, Cajun Contractors repeatedly demanded that Bankers settle the Laguerre Lawsuit within the $1 million policy limits. After the judgment was entered, Cajun Contractors notified Bankers that it was investigating a potential bad-faith action against Bankers for failure to settle the Laguerre Lawsuit within the policy limits.

iii.    Laguerre's counsel likewise repeatedly threatened, both before and after trial, to seek bad-faith damages against Bankers as a third-party and/or via assignment from Cajun Contractors, which claim would necessarily be brought under Florida law governing the Policy. Given Bankers did not settle the case in reliance on the Galloway Firm's expertise and advice, a bad-faith claim against Bankers was certain.

jjj.    Accordingly, in February of 2021, to avoid bad-faith claims from Cajun Contractors and/or Laguerre and to stop the running of post-judgment interest, Bankers paid Laguerre $6,423,000 in satisfaction of the Judgment.

6.

It is my opinion, based upon my education, training and experience as an attorney, that the standard of care applicable to Georgia attorneys requires that, under the facts and circumstances discussed in the preceding paragraphs, attorneys Jones and LaDouceur and their law firm failed to meet the standard of care generally employed by attorneys who represent defendants in personal injury claims by:

a.    Failing to defend the Laguerre Lawsuit diligently at all stages of the litigation;

- 15 -

b.  Failing to retain a single expert to counter Plaintiff's experts, even after being questioned by their client on this issue;

c.  Failing to file a motion with the Court to attempt to secure an IME in the case;

d.  Consistently failing to recognize the significant exposure of their client in the pre-trial and trial phase of the case;

e.  Failing to recognize the significance of the alleged injuries of the Plaintiff;

f.  Failing to negotiate with the Plaintiff in good faith, when the Plaintiff's demand was infinitely reasonable, despite the inquiries of their client and the insistence of their co-defendants;

g.  Failing to properly assert Plaintiff's position relative to Georgia law involving Notice of Non-Party Fault;

h.  Failing to properly utilize and access the skills of senior lawyers at the law firm to manage the case and to participate at trial; and

i.  Failing to preserve the record appropriately at the charge conference as it relates to jury instructions.

7.

It is my opinion, based upon my education, training and experience as an attorney, my review of Plaintiff's Complaint in this action, and my belief and assumption that the statements contained in paragraph 5 above are true and correct, that Defendants' counsel fell below the applicable standard of care which significantly and importantly contributed to

the adverse outcome of the underlying case.

**FURTHER AFFIANT SAYETH NOT**.

Tricia Purks ("CK") Hoffler, J.D.

Sworn to and subscribed

Before me this _13th_ day of

_FEBRUARY_, 2023.

Notary Public
My commission expires: _09/25/2025_

Tricia "CK" Hoffler is the CEO of The CK Hoffler Firm, an Atlanta-based law firm that specializes in representing plaintiffs in trucking accidents, medical malpractice, wrongful death, catastrophic personal injury, civil rights litigation, commercial litigation, employment discrimination, opioid litigation, global commercial transactions and NIL representation (name, image and likeness). Ms. Hoffler is licensed in 5 states including Georgia, Florida, Virginia, DC and Pennsylvania. To date, Ms. Hoffler has tried and/or settled cases totaling over $850,000 million. An accomplished attorney, Ms. Hoffler was previously a partner at Edmond, Lindsay & Hoffler, LLP. and a partner at Gary, Williams *et al.* in Florida. While a partner at Gary, Williams *et al.*, she ran the commercial and international litigation practice for the Willie Gary for 12 years. She is also counsel to civil rights icon, The Reverend Jesse Jackson and has represented him, and the Rainbow Push and related organizations for the past 30 years. Ms. Hoffler has also lectured extensively throughout the nation and the world on trial strategies, winning trial techniques, personal injury, medical negligence, first amendment matters, employment discrimination, opioid litigation and commercial matters.

Ms. Hoffler brings a diverse set of skills and talents to the practice of law. She speaks French fluently and is proficient in Spanish and Portuguese.

Ms. Hoffler has managed several billion-dollar commercial cases, and in 2000, she co-led the trial team that won the largest medical negligence verdict ever in Roanoke, Virginia. She also co-led the trial team in 2012 and won the largest medical negligence verdict in Gwinnett County at that time. She has served as a trial lawyer on various other high-profile cases, including representation of the Roger Maris family against Anheuser-Bush in a breach of contract case that resulted in a $139 million-dollar verdict. Ms. Hoffler has also worked on significant civil rights and children's rights cases that have resulted in bringing much needed justice for American citizens. She served as counsel in a class action lawsuit on behalf of 4,800 African-American and Latino civil service workers against the State of New York. Better known as Simpson v. State of New York, this case resulted in a historic settlement for the plaintiffs in 2010 and forced the elimination of the "battery test" as a basis for promotion within the ranks of civil servants in New York.

Ms. Hoffler has extensive professional work experience throughout Africa, Europe and the Caribbean. She has represented foreign interests and foreign governments and lobbied on behalf of various foreign countries while in practice in Washington, DC. She developed a new privatization practice for her firm in foreign markets, and managed the general representation of diverse local, national and international corporations and foreign governments. She participated in her firm's efforts to advise a foreign government on reformation of its drug trafficking and money laundering laws. In addition, she has furnished advice and counsel to various African nations, including Angola, Guinea (Conakry) and Gabon, concerning election procedures and policies, and helped coordinate US Non-Governmental Organization (NGO) participation in elections. She also provided on-going legal counsel to numerous foreign government clients in their democratization process.

Ms. Hoffler was educated in Switzerland (College du Leman, University of Geneva), Canada (Branksome Hall) and the United States. She received her law degree from Georgetown University and her undergraduate degree from Smith College.

A service-oriented attorney, Ms. Hoffler's community involvement includes active participation in *pro bono* law clinics, extensive lecturing on First Amendment matters, women's issues, children's concerns and international matters. She was intricately involved in the merit retention efforts related to the Florida Supreme Court and successfully co-chaired Florida Supreme Court Justice Peggy Quince's campaign for merit retention.

Ms. Hoffler served on the boards of The Pine School (Stuart, Florida), Georgetown University

**EXHIBIT A**

Law Alumni Board  (Washington, DC), Planned Parenthood of South Florida (West Palm Beach, Florida) and Women in Philanthropy (Stuart, Florida - founding member), the Washington Urban League (Washington, DC), Norfolk Airport Authority (former Commissioner, Norfolk, Virginia), Places and Programs for Children, Inc. (Norfolk, Virginia), Old Dominion University Education Foundation (Norfolk, Virginia), and Contemporary Arts Center of Virginia (Virginia Beach, Virginia). She is also a very active member of the Georgia Association of Black Women Attorneys (GABWA) and hosts an informal shadowing program for lawyers throughout Georgia who she mentors. Ms. Hoffler is a frequent lecturer for various bar associations including the American Bar Association, GABWA, the Gate City Bar, the National Bar Association and ABOTA, to name a few. She's been an active member of the National Bar Association for close to 3 decades and is a Lifetime member.

Ms. Hoffler is a trailblazing trial lawyer and has received numerous accolades and awards for outstanding contributions to her profession and philanthropy.  Ms. Hoffler was named "Woman of the Year" for 2011/2012 by the National Association of Professional Women for her demonstrated excellence and dedication within her profession. She has also won numerous awards for excellence and her contributions as a lawyer. These awards include various National Bar Association Presidential Awards, the National Bar Association Governor's Award, the Gate City Bar Association A.T. Walden "Legacy" Award, the "Esquire Award" for the Small Firms and Solo Practitioners' Division of the National Bar Association, an award from the National Bar Judicial Council in recognition for commitment to service and outstanding fundraising in 2014, a Certificate of Silver Life Membership to the NAACP, the "Recognition of Support, Commitment, and Service" award from the Judicial Council of the National Bar Association, an award for Outstanding Service and Contributions to the Theological Scholarship Foundation of the Tidewater Metro Baptist Minister's Conference,  the "Majestic Leader" Award from The Lott Carey Baptist Foreign Mission Convention, and a feature in the March 2012 edition of *The Informer* to name a few. In July 2018, she received the prestigious Leah Ward Sears Award for Distinction in the Profession Founders Award from GABWA.  Ms. Hoffler also was honored by GABWA's Foundation in December 2018 when the Foundation created a scholarship in her name. In July 2019, she was elected President-Elect of the National Bar Association; in early October of 2019, Ms. Hoffler received the President's Award from the Caribbean Bar Association.  In late October 2019, Ms. Hoffler was inducted into the Gate City Bar Hall of Fame, and she was elected the Chairman of the Board of Rainbow Push Coalition--the first woman to ever serve in that capacity. A recently rated a "Super Lawyer" in 2022, Hoffler also received a the Randolph W. Thrower Lifetime Achievement Award from the Georgia Bar in 2022.

Ms. Hoffler served as the 78th President of the National Bar Association in July 2020 and has made regular media appearances on television and radio both domestically and internationally. She is a weekly guest host of her own  radio show on Atlanta's WAOK with Juandolyn Stokes entitled "Law and Legal". Ms. Hoffler also is a guest host each Wednesday on the Santita Jackson show entitled "Legal Q&A with CK". She has also appeared and provide legal and political commentary on CNN, ABC, Court TV, MSNBC and other entities in the Peacock Network, to name a few.  Soon she will host a pilot TV legal commentary show to be released in late 2022 or early 2023.

23A00741

No. _____

**Date Summons Issued and E-Filed**

2/16/2023

_____

/s/ Monica Gay

_____

Deputy Clerk

Deposit Paid $ _____

**STATE COURT OF DEKALB COUNTY**
**GEORGIA, DEKALB COUNTY**

**SUMMONS**

_____

Bankers Insurance Company

_____

Plaintiff's name and address

**vs.**

Galloway, Johnson, Tompkins, Burr & Smith, APLC

990 Hammond Drive, Suite 210, Atlanta, GA 30328

Defendant's name and address

[X] **JURY**

**TO THE ABOVE-NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of State Court, Suite 230, 2nd Floor, Administrative Tower, DeKalb County Courthouse, 556 N. McDonough Street, Decatur, Georgia 30030 and serve upon the plaintiff's attorney, to wit:

Michael E. Pérez; The Pérez Law Firm, LLC

Name

3575 Piedmont Road, NE, Bldg. 15-L130, Atlanta, GA 30305

Address

(404) 480-4299                                              572127

Phone Number                                              Georgia Bar No.

an **ANSWER** to the complaint which is herewith served upon you, within thirty (30) days after service upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. The answer or other responsive pleading can be filed via electronic filing through eFileGA via www.eFileGA.com or, if desired, at the e-filing public access terminal in the Clerk's Office at 556 N. McDonough Street, Decatur, Georgia 30030

_____          _____

Defendant's Attorney                                        Third Party Attorney

_____          _____

Address                                                            Address

_____          _____

Phone No.                        Georgia Bar No.          Phone No.                        Georgia Bar No.

**TYPE OF SUIT**

☐ Personal Injury ☐ Products Liability          Principal $ _____
☐ Contract ☐ Medical Malpractice
☒ Legal Malpractice ☐ Product Liability          Interest $  _____
☐ Other

                                                                Atty Fees $ _____

**Access to the e-filing site and the rules is available at www.dekalbstatecourt.net**
**To indicate consent to e-service check the box below.**
☒ **(Plaintiff consents to e-service pursuant to OCGA 9-11-5 (f). The email address for service appears in the complaint.**

E-file summons1-2016

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

**BANKERS INSURANCE COMPANY**

**Plaintiff,**

v.

**CIVIL ACTION FILE NO.**
**23A00741**

**GALLOWAY, JOHNSON, TOMPKINS,**
**BURR & SMITH. APLC**

**Defendant.**

### AFFIDAVIT OF SERVICE

PERSONALLY appeared before me, an officer duly qualified to administer oaths, ERIC D. ECHOLS, a permanent process server which, after being duly sworn, states the following:

1.

Affiant states that he is over 18 years of age, a citizen of the United States, and not related to the parties herein. The statements made in the affidavit are true and correct and are based upon my personal knowledge.  Affiant states that service was conducted as a permanent process server with the SUPERIOR COURT OF DEKALB COUNTY, and a copy of the Order authorizing me to service process in DeKalb County for STATE COURT OF DEKALB COUNTY is attached hereto (see Exhibit "A").

2.

I personally served MALIA COLEMAN, paralegal and the designated person to accept service for registered agent TODD LADOUCEUR on behalf of Defendant GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC, on Friday, February 17, 2023, at 12:25 p.m., located at 990 Hammond Drive, Suite 210, Atlanta, Fulton County, Georgia 30328, and served a copy of the following document(s) as provided by the court:

1. SUMMONS; and

2. COMPLAINT with Exhibit 1 to Exhibit 17 attached.

I declare under penalty of perjury that the foregoing is true and correct.

This ___*17*___ day of February 2023.

Eric D. Echols, CFI
Permanent Process Server
TFP Company
P. O. Box 6096
Marietta, GA 30065
770.579.0188

Sworn to and subscribed before

me this ___*17th*___ day of ___*Feb*___, 2023.

Notary Public Signature

My Commission Expires:

STEPHANIE CASTILLO
NOTARY PUBLIC
Cobb County
State of Georgia
My Comm. Expires Oct. 13, 2026

FILED 1/3/2023 2:40 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
### STATE OF GEORGIA

IN RE:

MOTION FOR APPOINTMENT AS          :          CIVIL ACTION FILE NUMBER:
PERMANENT PROCESS SERVER           :
                                   :
                                   :

PURSUANT TO O.C.G.A. §9-11-4(c)

### ORDER APPOINTING PERMANENT PROCESS SERVER
### FOR CALENDAR YEAR 2023

    The foregoing motion having been read and considered; it is HEREBY ORDERED that the following individual(s) is/are appointed as a permanent process server pursuant to O.C.G.A. §9-11-4(c):

PATRICIA ECHOLS
ERIC ECHOLS
CHRISTOPHER ARMSTRONG
CYNARA ARMSTRONG
MICHELLE ARMSTRONG

This appointment shall be effective until midnight December 31, 2023.

**IT IS SO ORDERED** this 3rd day of January, 2023.

Honorable LaTisha Dear Jackson
Chief and Administrative Judge
DeKalb County Superior Court
Stone Mountain Judicial Circuit

# EXHIBIT A

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC**<br><br>    **Defendant.** | **Civil Action File No.: 23A00741**<br>**The Honorable Kimberly Anderson** |

**VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION**

Pursuant to Georgia Uniform Superior Court Rule 4.4, I Ms. Christina Dodds (Applicant), hereby applies to this Honorable Court for admission to practice in the above-styled case *pro hac vice*. In support of this application, Applicant states as follows:

1.    I reside at:

    2506 Hillview Road
    Austin, TX 78703

2.    My business address is:

    Bartlett, Loeb, Hinds & Thompson, PLLC
    1101 West 34th Street, # 128
    Austin, TX 78705
    Phone: (512) 632-3849
    Email: cdodds@blhtlaw.com

3.    I have been retained to represent the following client(s)/plaintiff(s):

    Bankers Insurance Company
    11101 Roosevelt Boulevard North
    St. Petersburg, FL 33716

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2023 2:18 PM
E-FILED
BY: Patricia Nesbitt

4.      I am a member in good standing of the following jurisdictions:

Jurisdiction: Texas State Bar
Date admitted: 11/10/1988
Still admitted: Active
Bar/Registration No.: 03813520

Jurisdiction: Missouri State Bar
Date admitted: 10/10/1986
Still admitted: Inactive
Bar/Registration No.: 35934

Jurisdiction:  Supreme Court of Texas
Date admitted: 11/10/1988
Still admitted:  Yes
Bar/Registration No.:  03813520

Jurisdiction:  United States District Court – Western District of Texas
Date admitted: 06/12/1989
Still admitted:  Yes
Bar/Registration No.: 03813520

Jurisdiction:  United States District Court – Northern District of Texas
Date admitted: 03/03/1987
Still admitted:  Yes
Bar/Registration No.: 03813520

Jurisdiction:  United States Supreme Court
Date admitted:  March 19, 2012
Still admitted:  Yes
Bar/Registration No.:

5.      I have never been a member of the State Bar of Georgia.

6.      I have never been denied *pro hac vice* admission in Georgia.

7.      I have never had *pro hac vice* admission revoked in Georgia.

8.      I have never been sanctioned or formally disciplined by a Court in Georgia.

9.      I have never been the subject of any formal disciplinary proceedings.

10.     I have never been formally held in contempt, or otherwise sanctioned by a court in a

written order, for disobedience to its rules or others.

{00061457:1}                  -2-

11.     In the past two years, I have not filed for *pro hac vice* admission in Georgia.

12.     I have reviewed and am familiar with the Georgia Rules of Professional Conduct and all court rules relevant to practice before the court in which I am seeking admission.

13.     My local sponsor is:

> Michael E. Pérez
> Georgia Bar #: 572127
> The Pérez Law Firm, LLC
> 3575 Piedmont Road, Bldg. 15-L130
> Atlanta, GA 30305
> Phone: (404) 480-4299
> Email: michael@perezfirmllc.com

14.     When I file my application, I will forward a copy to the State Bar of Georgia along with a check or money order made payable to this State Bar of Georgia in the amount of $275.00, as I have not submitted the annual fee for this calendar year.


I, Christina Dodds, applicant in the foregoing Verified Application for *Pro Hac Vice* Admission, hereby verify the facts contained therein are true and accurate to this best of my knowledge.

This _____28ᵗʰ_____ day of **February, 2023**.

_____
**Applicant**


**Sworn to and acknowledged before me**

this _____ day of February, 2023.

_____
**Notary Public, State of Texas**

**My commission expires:** _____

HEATHER A. WILFONG
MY COMMISSION # HH 173467
EXPIRES: October 18, 2025
Bonded Thru Notary Public Underwriters

{00061457;1}                                                 -3-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date filed a true and complete copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION with the court's e-filing system and electronically served a copy of the same on the Defendant, as follows:

Galloway, Johnson, Tompkins, Burr & Smith, APLC
Todd LaDouceur, Registered Agent
990 Hammond Drive, Suite 210
Atlanta, GA 30328

I hereby certify that I have on this date served the Office of the General Counsel with a true and complete copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION by U.S.P.S. First Class Mail, with adequate postage applied to wit:

Office of the General Counsel
State Bar of Georgia
104 Marietta Street, NW, Suite 100
Atlanta, GA 30303
Attn: Pro Hac Vice

I have initiated this litigation but do not know who opposing counsel(s) is at this time. I will serve a copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION on opposing counsel as soon as possible and will notify the Office of the General Counsel of the same.

This __8th__ day of ~~February,~~ March 2023.

THE PEREZ LAW FIRM, LLC

Michael E. Pérez
Georgia Bar No. 572127
***Attorney for Plaintiff Bankers Insurance
Company***

3575 Piedmont Road, N.E.
Bldg. 15-L130
Atlanta, GA 30305
T: (404) 480-4299
F: (470) 780-6925
E: michael@perezfirmllc.com

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY** | |
| **Plaintiff,** | **Civil Action File No.: 23A00741** |
| **v.** | **The Honorable Kimberly Anderson** |
| **GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC** | |
| **Defendant.** | |

## VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION

Pursuant to Georgia Uniform Superior Court Rule 4.4, I, Mr. Edward Colin Thompson (Applicant), hereby applies to this Honorable Court for admission to practice in the above-styled case *pro hac vice*.  In support of this application, Applicant states as follows:

1.     I reside at:

   4707 Charleston Court
   Tampa, FL 33609

2.     My business address is:

   Bartlett, Loeb, Hinds & Thompson, PLLC
   100 North Tampa Street, Suite 2050
   Tampa, FL 33602
   Phone: (813) 223-3888
   Email: ColinT@blhtlaw.com

3.     I have been retained to represent the following client(s)/plaintiff(s):

   Bankers Insurance Company
   11101 Roosevelt Boulevard North
   St. Petersburg, FL 33716

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2023 2:18 PM
E-FILED
BY: Patricia Nesbitt

4.     I am a member in good standing of the following jurisdictions:

Jurisdiction: Florida Bar

Date admitted: 10/20/2003
Still admitted:  Active
Bar/Registration No.:  0684929

Jurisdiction: United States District Court – Northern District of Florida
Date admitted: 08/13/2007
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction: United States District Court – Middle District of Florida
Date admitted: 04/20/2004
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction: United States District Court – Southern District of Florida
Date admitted: 10/17/2005
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction:  United States Court of Appeals – 11th Circuit
Date admitted: 08/20/2007
Still admitted:  Yes
Bar/Registration No.:

5.     I have never been a member of the State Bar of Georgia.

6.     I have never been denied *pro hac vice* admission in Georgia.

7.     I have never had *pro hac vice* admission revoked in Georgia.

8.     I have never been sanctioned or formally disciplined by a court in Georgia.

9.     I have never been the subject of any formal disciplinary proceedings.

10.     I have never been formally held in contempt, or otherwise sanctioned by a court in a

written order, for disobedience to its rules or others.

11.     In the past two years, I have not filed for *pro hac vice* admission in Georgia.

12.    I have reviewed and am familiar with the Georgia Rules of Professional Conduct and all court rules relevant to practice before the court in which I am seeking admission.

My local sponsor is:

> Michael E. Pérez
> Georgia Bar No. 572127
> The Pérez Law Firm, LLC
> 3575 Piedmont Road, Bldg. 15-L130
> Atlanta, GA 30305
> Phone: (404) 480-4299
> Email: michael@perezfirmllc.com

13.    When I file my application, I will forward a copy to the State Bar of Georgia along with a check or money order made payable to this State Bar of Georgia in the amount of $275.00, as I have not submitted the annual fee for this calendar year.

I, Edward Colin Thompson, applicant in the foregoing Verified Application for *Pro Hac Vice* Admission, hereby verify the facts contained therein are true and accurate to this best of my knowledge.

This ____24th____ day of February, 2023.

_____
**Applicant**

**Sworn to and acknowledged before me**

this ___24th___ day of February, 2023.

_____
**Notary Public, State of Florida**

My commission expires: __10/18/25__.

HEATHER A. WILFONG
MY COMMISSION # HH 173467
EXPIRES: October 18, 2025
Bonded Thru Notary Public Underwriters

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date filed a true and complete copy of the foregoing

VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION with the court's e-filing system and

electronically served a copy of the same on the Defendant, as follows:

Galloway, Johnson, Tompkins, Burr & Smith, APLC
Todd LaDouceur, Registered Agent
990 Hammond Drive, Suite 210
Atlanta, GA 30328

I hereby certify that I have on this date served the Office of the General Counsel with

a true and complete copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE*

ADMISSION by U.S.P.S. First Class Mail, with adequate postage applied to wit:

Office of the General Counsel
State Bar of Georgia
104 Marietta Street, NW, Suite 100
Atlanta, GA 30303
Attn: Pro Hac Vice

I have initiated this litigation but do not know who opposing counsel(s) is at this time.

I will serve a copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION

on opposing counsel as soon as possible and will notify the Office of the General Counsel of

the same.

This __8th__ day of ~~February~~ March, 2023.

THE PEREZ LAW FIRM, LLC

Michael E. Pérez
Georgia Bar No. 572127
*Attorney for Plaintiff Bankers Insurance*
*Company*

3575 Piedmont Road, N.E.
Bldg. 15-L130
Atlanta, GA 30305
T: (404) 480-4299
F: (470) 780-6925
E: michael@perezfirmllc.com

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY** | |
| **Plaintiff,** | **Civil Action File No.: 23A00741** |
| **v.** | **The Honorable Kimberly Anderson** |
| **GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC** | |
| **Defendant.** | |

**VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION**

Pursuant to Georgia Uniform Superior Court Rule 4.4, I Mr. Ethan J. Loeb (Applicant),

hereby applies to this Honorable Court for admission to practice in the above-styled case *pro*

*hac vice.* In support of this application, Applicant states as follows:

1.    I reside at:

814 S. Delaware Avenue
Tampa, FL 33606

2.    My business address is:

Barlett, Loeb, Hinds & Thompson, PLLC
100 North Tampa Street, Suite 2050
Tampa, FL 33602
Phone: (813) 223-3888
Email: EthanL@blhtlaw.com

3.    I have been retained to represent the following client(s)/plaintiff(s):

Bankers Insurance Company
11101 Roosevelt Boulevard North
St. Petersburg, FL 33716

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2023 2:18 PM
E-FILED
BY: Patricia Nesbitt

4.     I am a member in good standing of the following jurisdictions:

Jurisdiction: Florida Bar

Date admitted: 09/25/2003
Still admitted:  Active
Bar/Registration No.:  668338

Jurisdiction: United States District Court – Northern District of Florida
Date admitted: 07/23/2004
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction: United States District Court – Middle District of Florida
Date admitted: 01/16/2004
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction: United States District Court – Southern District of Florida
Date admitted: 04/19/2012
Still admitted:  Yes
Bar/Registration No.:

Jurisdiction: United States Court of Appeals – 11th Circuit
Date admitted: 01/03/2004
Still admitted:  Yes
Bar/Registration No.:

5.     I have never been a member of the State Bar of Georgia.

6.     I have never been denied *pro hac vice* admission in Georgia.

7.     I have never had *pro hac vice* admission revoked in Georgia.

8.     I have never been sanctioned or formally disciplined by a court in Georgia.

9.     I have never been the subject of any formal disciplinary proceedings.

10.     I have never been formally held in contempt, or otherwise sanctioned by a court in a

written order, for disobedience to its rules or others.

11.     In the past two years, I have not filed for *pro hac vice* admission in Georgia.

12.     I have reviewed and am familiar with the Georgia Rules of Professional Conduct and all court rules relevant to practice before the court in which I am seeking admission.

13.     My local sponsor is:

> Michael E. Pérez
> Georgia Bar No. 572127
> The Pérez Law Firm, LLC
> 3575 Piedmont Road, Bldg. 15-L130
> Atlanta, GA 30305
> Phone: (404) 480-4299
> Email: michael@perezfirmllc.com

14.     When I file my application, I will forward a copy to the State Bar of Georgia along with a check or money order made payable to this State Bar of Georgia in the amount of $275.00, as I have not submitted the annual fee for this calendar year.

I, Ethan J. Loeb, applicant in the foregoing Verified Application for *Pro Hac Vice* Admission, hereby verify the facts contained therein are true and accurate to this best of my knowledge.

This _____ day of February, 2023.

_____
**Applicant**

**Sworn to and acknowledged before me**

this _____ day of February, 2023.

_____
**Notary Public, State of Florida**

**My commission expires:** _____

HEATHER A. WILFONG
MY COMMISSION # HH 173467
EXPIRES: October 18, 2025
Bonded Thru Notary Public Underwriters

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date filed a true and complete copy of the foregoing

VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION with the court's e-filing system and

electronically served a copy of the same on the Defendant, as follows:

Galloway, Johnson, Tompkins, Burr & Smith, APLC
Todd LaDouceur, Registered Agent
990 Hammond Drive, Suite 210
Atlanta, GA 30328

I hereby certify that I have on this date served the Office of the General Counsel with

a true and complete copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE*

ADMISSION by U.S.P.S. First Class Mail, with adequate postage applied to wit:

Office of the General Counsel
State Bar of Georgia
104 Marietta Street, NW, Suite 100
Atlanta, GA 30303
Attn: Pro Hac Vice

I have initiated this litigation but do not know who opposing counsel(s) is at this time.

I will serve a copy of the foregoing VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION

on opposing counsel as soon as possible and will notify the Office of the General Counsel of

the same.

This ___8th___ day of ~~February~~ March, 2023.

**THE PEREZ LAW FIRM, LLC**

Michael E. Pérez
Georgia Bar No. 572127
***Attorney for Plaintiff Bankers Insurance
Company***

{00061459:1}                                   4

3575 Piedmont Road, N.E.
Bldg. 15-L130
Atlanta, GA 30305
T: (404) 480-4299
F: (470) 780-6925
E: michael@perezfirmllc.com

**IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY** | |
| **Plaintiff,** | |
| **v.** | **Civil Action File No.: 23A00741** |
| **GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC** | |
| **Defendant.** | |

<u>**ORDER GRANTING APPLICATION FOR *PRO HAC VICE* ADMISSION**</u>

The Court having read and considered Attorney Christina Dodds' Verified Application for *Pro Hac Vice* Admission on behalf of Plaintiff Bankers Insurance Company, the same is hereby **GRANTED** and Christina Dodds shall be added as counsel for Plaintiff Bankers Insurance Company.

**IT IS SO ORDERED**, this _____ day of _____, 2023.

_____
Hon. Kimberly K. Anderson
Judge, State Court of DeKalb County

Order Prepared by:

**THE PEREZ LAW FIRM, LLC**

Michael E. Pérez
Georgia Bar No. 572127
***Attorney for Plaintiff***

3575 Piedmont Road, NE
Building 15, L130
Atlanta, GA 30305
T: 404.480.4299
F: 470.780.6925
E: michael@perezfirmllc.com

STATE COURT OF
DEKALB COUNTY, GA.
3/8/2023 2:18 PM
E-FILED
BY: Patricia Nesbitt

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY** | |
| **Plaintiff,** | |
| | **Civil Action File No.: 23A00741** |
| **v.** | |
| **GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC** | |
| **Defendant.** | |

## ORDER GRANTING APPLICATION FOR *PRO HAC VICE* ADMISSION

The Court having read and considered Attorney Ethan J. Loeb's Verified Application for *Pro Hac Vice* Admission on behalf of Plaintiff Bankers Insurance Company, the same is hereby **GRANTED** and Ethan J. Loeb shall be added as counsel for Plaintiff Bankers Insurance Company.

**IT IS SO ORDERED**, this _____ day of _____, 2023.

_____
Hon. Kimberly K. Anderson
Judge, State Court of DeKalb County

Order Prepared by:

**THE PEREZ LAW FIRM, LLC**

Michael E. Pérez
Georgia Bar No. 572127
*Attorney for Plaintiff*

3575 Piedmont Road, NE
Building 15, L130
Atlanta, GA 30305
T: 404.480.4299
F: 470.780.6925
E: michael@perezfirmllc.com

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **BANKERS INSURANCE COMPANY** | |
| **Plaintiff,** | |
| **v.** | **Civil Action File No.: 23A00741** |
| **GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, APLC** | |
| **Defendant.** | |

**ORDER GRANTING APPLICATION FOR *PRO HAC VICE* ADMISSION**

The Court having read and considered Attorney Edward Colin Thompson's Verified

Application for *Pro Hac Vice* Admission on behalf of Plaintiff Bankers Insurance Company,

the same is hereby **GRANTED** and Edward Colin Thompson shall be added as counsel for

Plaintiff Bankers Insurance Company.

**IT IS SO ORDERED**, this _____ day of _____, 2023.

_____
Hon. Kimberly K. Anderson
Judge, State Court of DeKalb County

Order Prepared by:

**THE PEREZ LAW FIRM, LLC**

Michael E. Pérez
Georgia Bar No. 572127
***Attorney for Plaintiff***

3575 Piedmont Road, NE
Building 15, L130
Atlanta, GA 30305
T: 404.480.4299
F: 470.780.6925
E: michael@perezfirmllc.com