## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

DINAH DANFORTH,         )
                                )
        Plaintiff,        )     CIVIL ACTION FILE
                                )     NO.:
v.                        )
                                )
UNUM LIFE INSURANCE   )
COMPANY OF AMERICA,   )
                                )
        Defendant.     )

## COMPLAINT

COMES NOW Plaintiff, Dinah Danforth ("Ms. Danforth"), and files this Complaint against Defendant Unum Life Insurance Company of America ("Unum"), showing the Court as follows:

## HISTORY, JURISDICTION AND PARTIES

1.

This is an action under the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001 et seq., to recover Long-Term Disability ("LTD") benefits under the terms of an employee welfare benefit plan (hereafter "the LTD Plan" or "the Plan") maintained by McKinsey & Company, and to clarify

and/or enforce Plaintiff's rights under the Plan.

2.

The Plan is an "Employee Welfare Benefit Plan" as defined by ERISA, 29 U.S.C. § 1002(1).  A copy of the Plan is attached as Exhibit A.

3.

Jurisdiction is based on ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

4.

Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 29 U.S.C. § 1132(e)(2) because Unum conducts business in Georgia and the breach of Unum's duties alleged herein occurred in Georgia.

5.

Unum is a Maine corporation authorized to do business in the State of Georgia.

6.

This Court has personal jurisdiction over Defendant Unum.

7.

Defendant Unum may be served through its registered agent for service, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia

30092.

8.

Ms. Danforth is a "participant" in the Plan, as defined by ERISA, 29 U.S.C. § 1002(7).

9.

The Plan is insured by a group policy of insurance issued by Defendant Unum.

10.

Unum has made all decisions concerning Plaintiff's claim for benefits and has handled all communications concerning Plaintiff's claim.

11.

On information and belief, all benefits under the Plan are paid from the general assets of Defendant Unum.

12.

Under the Plan, Unum promised to pay disability benefits as follows:

---

**When do disability benefits become payable?**
We will pay you a monthly benefit after the end of the elimination period when
we receive proof that you:

1.  are disabled due to sickness or injury; and

2.  require the regular attendance of a physician.

**What conditions must be met for benefit payments to continue?**
We will pay you as long as you remain disabled and require the regular at-
tendance of a physician.  But we will not pay any longer than the maximum
benefit period shown in the plan outline.

Also, you must give us proof of these facts, at your own expense, when we
ask for it.

---

13.

The Plan further defines "disability" as follows:

---

"Disability" and "disabled" mean that because of injury or sickness:

1.  you cannot perform each of the material duties of your regular occu-
    pation; or

2.  you, while unable to perform all of the material duties of your regular
    occupation on a full-time basis, are:

    a.  performing at least one of the material duties of your regular oc-
        cupation or another occupation on a part-time or full-time basis;
        and

    b.  earning currently at least 20% less per month than your indexed
        pre-disability earnings due to that same sickness or injury.

---

14.

In the event of disability, the Plan provides that Ms. Danforth's benefits would be 66 and 2/3% of her previous income per month, up to $35,000, less other sources of income, until age 65:

**Amount of Insurance**

- 66 2/3% of (benefit percentage) of basic monthly earnings not to exceed the maximum monthly benefit, less other income benefits.

  Note:  This benefit is subject to reductions for earnings as provided in the section titled "How is the benefit figured?"

- The maximum monthly benefit is $35,000.

- The minimum monthly benefit is the greater of:

  1.  $100.00; or

  2.  10% of the monthly benefit before deductions for other income benefits.

**Maximum Benefit Period**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 |
| 60 | 5 years |
| 61 | 4 years |
| 62 | 3 1/2 years |
| 63 | 3 years |
| 64 | 3 years |
| 65 | 2 years |
| 66 | 2 years |
| 67 | 2 years |
| 68 | 2 years |
| 69 and over | 1 year |

## **HISTORY OF CLAIM**

15.

The allegations of paragraphs 1 through 14 are hereby realleged as if set forth herein verbatim.

16.

Ms. Dinah Danforth graduated from Harvard Business School in 2019 and
went to work in her dream job, as a consultant for McKinsey & Company.

17.

By all reports, Ms. Danforth excelled in this extremely demanding job,
receiving favorable performance reviews up to the time she went out of work due to
medical disability.

18.

Ms. Danforth contracted COVID-19 in the fall of 2020.

19.

The acute phase of infection was relatively mild for Ms. Danforth. She was
not hospitalized. However, she did have a fever for several days and was extremely
fatigued, sleeping approximately 18 to 20 hours per day.

20.

When the fever broke, Ms. Danforth's fatigue remained. As of November
2020, Ms. Danforth continued to require excessive sleep each night (upwards of 14
hours per night) and was extremely fatigued during the day to the point of being
unable even to perform all her normal activities of daily living (such as showering,

getting dressed, preparing food for herself, etc.).

21.

Ms. Danforth reports that she only had enough energy to perform approximately 30 continuous minutes of very light physical activity twice per day, for a total of an hour per day.

22.

Ms. Danforth also reports suffering significant "brain fog" and cognitive impairment during and after her acute infection. She reports that tasks that required cognitive energy, as opposed to physical tasks, also exhausted her store of energy in the same way as physical activity and that her capacity for sustained mental effort was similarly limited in duration.

23.

In early 2021, Ms. Danforth was diagnosed with "long-COVID," a constellation of conditions and symptoms that linger and affect functionality long after the acute infection has disappeared.

24.

Over the next several months, Ms. Danforth reports that her symptoms of chronic fatigue and excessive sleep improved to only a very limited degree. By April 2021, she reports that she was capable of a couple hours of activity per day and was

"only" sleeping 12 to 14 hours per night.

25.

Ms. Danforth's improvement then plateaued. Nearly 2 years later, she remains severely limited in terms of her daily energy budget for either physical or mental tasks, and she continues to require over 12 hours of sleep per night.

26.

These limitations significantly restrict the amount of activity Ms. Danforth can do in a given day. She reports being able to do only a couple "big things" per day, such as going to a doctor's appointment, going out for a meal, or performing a cognitively demanding task like writing a personal statement for her disability claim.

27.

As a result of her severely limited physical and mental stamina, Ms. Danforth has remained unable to tolerate anything remotely approaching a full-time work schedule.

28.

Ms. Danforth filed a claim for disability benefits, including with her claim application significant objective evidence of impairment, including abnormal results from a cardiopulmonary exercise test (CPET) and a formal neuropsychological

evaluation.

29.

Ms. Danforth also submitted statements from several treating physicians, all of whom endorsed that Ms. Danforth was incapable of more than a couple hours of very light physical activity per day and thus was disabled.

30.

On May 24, 2021, Unum approved Ms. Danforth's LTD claim and began paying LTD benefits.

31.

Throughout all of 2021, Ms. Danforth remained incapable of sustaining physical or mental activity at even a fraction of a full-time work schedule.

32.

In early 2022, Unum decided to revisit Ms. Danforth's claim, gathering updated medical records and requesting forms be completed by her treating physicians.

33.

The additional medical records and the opinions of Ms. Danforth's treating physicians continued to tell a consistent story – that she remained disabled. For example, Ms. Danforth cardiologist and the primary treater of her long-COVID, Dr.

Alexis Cutchins, reported that Ms. Danforth "cannot do more than 1 task a day w/out exhaustion," that "getting dressed, driving to and from appointments causes severe fatigue," and that Ms. Danforth was "unable to tolerate exercise/exertion." Dr. Cutchins' updated records also stated Ms. Danforth was still "sleeping a lot, probably 12 hours a day," that she "can do one thing a day and rest the rest of the day," and that she was "Not back to baseline."

34.

Ms. Danforth's other treating physicians unanimously agreed and submitted statements and forms on her behalf as well.

35.

In other words, as of 2022, Ms. Danforth continued to be capable of only a few physical, mental, or emotional activities per day - a small fraction of a full-time work schedule - before becoming incapacitated by exhaustion.

36.

Rather than accept the unanimous opinions of Ms. Danforth's physicians, Unum arranged to have a medical review performed by its own employee-physician, Stephen J. Kirsch, M.D.

37.

Dr. Kirsch is licensed as an internal medicine physician. Upon

information and belief, Dr. Kirsch has no significant training or experience treating patients with long-COVID.

38.

Despite his lack of relevant training and experience and despite not having ever examined the patient, Dr. Kirsch contradicted her treating physicians by opining that "it appears reasonable Dinah Danforth currently has the functional capacity to perform the physical and cognitive demands" of her job, "on a full-time, sustained basis."

39.

On March 23, 2022, Dr. Kirsch sent a form to each of Ms. Danforth's treating providers stating his opinion and asking whether they agreed.

40.

Ms. Danforth's treating physicians unanimously responded that they *disagreed* with Dr. Kirsch.

41.

Through counsel, Ms. Danforth also responded to Dr. Kirsch's opinions, pointing out he had ignored the unanimous opinions of her treating physicians, disregarded her subjective symptom complaints, and failed to acknowledge several objective test results that supported the claim, all in the absence of any evidence to

suggest Ms. Danforth was lying or exaggerating about her symptoms.

42.

Ms. Danforth also provided the transcript of a detailed interview with Dr. Cutchins strongly refuting many of the rationales used by Dr. Kirsch to support his outlier opinion that Ms. Danforth was not disabled.

43.

Ignoring Ms. Danforth's response, Unum terminated Ms. Danforth's long-term disability benefits by letter dated May 5, 2022.

**Ms. Danforth's Appeal**

44.

On November 1, 2022, Ms. Danforth submitted her appeal of Unum's claim termination decision.

45.

Among other things, the appeal included the results of a 2-day cardiopulmonary exercise test (CPET), which objectively confirmed Ms. Danforth suffered from ventilatory dysfunction, post-exertional malaise, and dysautonomia.

46.

Based on the objective test results, the CPET provider, Betsy Keller, Ph.D., concluded that Ms. Danforth was metabolically incapable of producing enough

energy to perform her occupational work duties on a consistent, full-time basis and that attempting to perform her job would only exacerbate her symptoms and lead to a global decline in her functioning.

47.

Ms. Danforth's appeal also included additional detailed testimony from Dr. Cutchins refuting the bases on which Unum terminated benefits, several detailed witness statements, daily contemporaneous symptom journals documenting Ms. Danforth's symptoms for many weeks, and corresponding smart watch data confirming Ms. Danforth's subjective complaints of fatigue/inactivity, dysautonomia, and sleep dysfunction.

48.

On December 5, 2022, Unum shared with Ms. Danforth the appeal medical review performed by its in-house employee-physician, Scott Norris, M.D.

49.

By training and experience, Dr. Norris is a Family Medicine and Occupational Medicine doctor.

50.

On information and belief, Dr. Norris has not treated any patients since 2010.

51.

On information and belief, Dr. Norris has never treated a long-COVID patient.

52.

On information and belief, Dr. Norris is incapable of being fair and impartial in performing his medical reviews for Unum.

53.

It is well known in the disability insurance field that Unum uses Dr. Norris to support denials and terminations of LTD claims of every medical description. Dr. Norris is known to have opined on a wide range of medical conditions for Unum that are beyond the scope of his training and experience, including cardiovascular, rheumatological, vestibular, and oncologic disease, consistently offering Unum medical excuses to deny legitimate disability claims.

54.

In Dr. Norris's report relating to Ms. Danforth, he opined that "[t]he medical evidence does not support that [Ms. Danforth] was incapable of performing the physical/mental/cognitive demands of her sedentary level occupation as of 5/5/22."

55.

Dr. Norris erroneously asserted that Ms. Danforth's 2-day CPET results were undermined by Ms. Danforth's discontinuance of beta blockers, asserting that if she had tested while on these medications, they would have "mitigated the

dysautonomia" and "optimized [Ms. Danforth's] performance during this CPET testing protocol."

56.

Dr. Norris also asserted, erroneously and without foundation or relevant training or experience, that, even allowing for the discontinuation of beta blockers, the CPET results showed that Ms. Danforth could sustain full-time sedentary work.

57.

Dr. Norris's report also seemed to question whether Ms. Danforth had long-COVID at all, emphasizing that she had a mild acute infection, that she was not hospitalized, that there had been no confirmation of an ongoing infection, and that she had not undergone long-term cardiac monitoring.

58.

Dr. Norris also stated he was not convinced Ms. Danforth had Postural Orthostatic Tachycardia Syndrome (POTS), a form of dysautonomia, and criticized the methodology of Ms. Danforth's "tilt-table testing," widely agreed to be the gold standard for objectively confirming POTS.

59.

Dr. Norris' report constituted an implicit and explicit attack against Ms. Danforth's credibility. Without examining her, Dr. Norris had concluded that Ms.

Danforth was lying or exaggerating her symptoms and that her doctors and witnesses were either in on the ruse or had been duped.

60.

Dr. Norris explicitly claimed that Ms. Danforth's extremely limited daily activities (occasionally making breakfast or cooking dinner, going to doctor's appointments, occasionally going out for a meal) were somehow "inconsistent" with her subjective reports of disabling fatigue.

61.

As permitted by ERISA "full and fair review" claims regulations, Ms. Danforth provided her response to Dr. Norris's review by letters dated January 19 and January 24, 2023.

62.

Ms. Danforth's response included detailed written rebuttals by Betsy Keller, Ph.D., and Dr. Cutchins which, among other things, specifically refuted Dr. Norris's rationales for disregarding the CPET results.

63.

As Drs. Keller and Cutchins both discussed, beta blockers would not have had the effect Dr. Norris claimed. If anything, they could have made her CPET results worse by causing early onset fatigue due to a decrease in oxygen transport to the

muscles during the vigorous exercise of the test.

64.

Dr. Keller also addressed Dr. Norris's claim that the CPET showed Ms. Danforth had sufficient energy to perform her work as a consultant for McKinsey. Dr. Keller stated that Dr. Norris ignored the fact that Ms. Danforth's job required travel (i.e., it was not a "sedentary" occupation) and that the CPET demonstrated post-exertional symptom exacerbation, which would reduce Ms. Danforth's functional capacity for days following significant exertion to below the level necessary for even sedentary work.

65.

Dr. Cutchins is a de facto specialist in long-COVID, having followed dozens if not hundreds of these patients since the beginning of the pandemic. Based on this experience, Dr. Cutchins specifically addressed Dr. Norris's reasons for questioning the long-COVID diagnosis, noting that none of the facts he highlighted undermined her symptom complaints or weighed against her having long-COVID. In fact, Dr. Cutchins stated that most long-COVID patients had mild acute infections, that ongoing infection with the virus is not a prerequisite of long-COVID, and that long-term cardiac monitoring is unnecessary and irrelevant to Ms. Danforth's symptom complex.

66.

Ms. Danforth also provided several medical journal articles about long-COVID, which supported her and her treaters' testimony, a narrative response regarding the extent of her daily activities, and an updated tilt-table test that addressed Dr. Norris's concerns over methodology and again objectively confirmed POTS.

67.

On February 22, 2023, Unum upheld its decision to terminate Ms. Danforth's benefits.

**Unum's Violations of Full and Fair Review**

68.

Unum failed to strictly adhere to its obligations under ERISA's "full and fair review" claims regulation, 29 C.F.R. § 2560.503-1, in numerous ways, including, but not limited to, the following:

- Unum failed to ensure the impartiality and independence of the employee medical consultants it retained to review Ms. Danforth's claim;

- Unum failed to ensure the consultants retained to review Ms. Danforth's claim had appropriate training and experience in the field of

medicine relevant to this claim;

- Unum engaged in a selective review of the medical evidence; and

- In such other ways as will be proven in litigation.

69.

Unum's violations of ERISA's procedural requirements were significant and substantial, not harmless or de minimis.

70.

Based on the foregoing, the Court should review this matter *de novo*, without deference to Unum's benefit determination.

## COUNT I: BENEFITS DUE UNDER 29 U.S.C. § 1132(a)(1)(B)

71.

Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 70 above, as if set forth verbatim herein.

72.

Defendant Unum's refusal to pay LTD benefits beyond May 5, 2022, is wrong, unreasonable, violates the terms of the Plan, and is contrary to the weight of credible evidence in its file.

73.

Ms. Danforth is entitled to LTD benefits under the Plan retroactive to May 5,

2022, and continuing through the date of this Court's final judgment.

74.

Ms. Danforth is further entitled to interest on all past due amounts pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B).

75.

Ms. Danforth has retained counsel to represent her in this matter, and is entitled to an award of costs, including a reasonable attorney's fee, pursuant to ERISA 29 U.S.C. § 1132(g)(1).

76.

WHEREFORE, Ms. Danforth prays for relief in the following forms:

a) An order finding Defendant's termination of Plaintiff's benefits was *de novo* wrong and/or an abuse of discretion;

b) An award of long-term disability benefits retroactive to May 5, 2022, and continuing through the date of this Court's judgment, plus prejudgment interest and Plaintiff's reasonable expenses of litigation, including a reasonable attorney's fee;

c) A clarification of Plaintiff's rights under the plan, ordering Unum to continue paying disability benefits unless and until Ms. Danforth returns to work or unless and until there is evidence of significant

improvement in Ms. Danforth's medical conditions establishing that she can reliably and consistently resume full-time work as a consultant at McKinsey & Company; and

d) Such other and further relief as the Court may deem just and proper.

Respectfully submitted, this 22nd day of March, 2023.

                **EVANS WARNCKE ROBINSON, LLC**

By: * /s Jeffrey S. Warncke*
       Jeffrey S. Warncke
       Georgia Bar No. 737850
    */s Steven J. Mitchell*
       Steven J. Mitchell
       Georgia Bar No. 669018

Attorneys for Plaintiff
191 Peachtree Street NE
Suite 3980
Atlanta, Georgia 30303
P: 404.841.9400
F: 888.738.5949
E: j.warncke@ewrlawfirm.com
E: s.mitchell@ewrlawfirm.com