# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SHEVANNE PATTERSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | _____ |
| | ) | |
| ACCOUNTABLE HEALTHCARE STAFFING, INC., | ) | |
| | ) | |
| HEALTHCARE WORKFORCE LOGISTICS, LLC, | ) | |
| | ) | JURY TRIAL REQUESTED |
| SCOTTISH RITE CHILDREN'S MEDICAL CENTER, INC. | ) | |
| | ) | |
| Defendants. | ) | |

---

## **COMPLAINT**

COMES NOW Plaintiff Shevanne Patterson ("Ms. Patterson" or "Plaintiff"),
by and through undersigned counsel, and sets forth this Complaint against
Defendants Accountable Healthcare Staffing, Inc. ("Accountable"), Healthcare
Workforce Logistics, LLC ("HWL"), and Scottish Rite Children's Medical Center,

Inc. ("CHOA"), for unpaid wages and damages under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., ("FLSA"), for breach of contract, negligence, tortious interference, and for declaratory and injunctive relief, as set forth below.

## INTRODUCTION

This is an action for damages and injunctive relief to vindicate Plaintiff's rights under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), to enforce prohibitions against unfair competition and deceptive trade practices under applicable law, for breach of contract and implied contract, and for other violations of law. Plaintiff seeks declaratory and injunctive relief, damages, and attorneys' fees and costs.

## PARTIES

1.     Plaintiff is an individual residing in Brooklyn, New York, and a registered nurse specializing in pediatric intensive care unit ("PICU").

2.     Defendant Accountable is a Florida corporation licensed to do business in the State of Georgia, with its principal place of business at 999 Yamato Road, Suite 210, Boca Raton, FL 33431, and may be served through its registered agent, National Registered Agents, Inc., at 289 S. Culver Street, Lawrenceville, GA 30046-4805.

3.     Defendant HWL is a domestic limited liability company with its principal place of business at 2655 Northwinds Parkway, Alpharetta, GA 30009, and may be served through its registered agent, Jay D. Mitchell, at the foregoing address.

4.     Defendant CHOA is a Georgia nonprofit corporation with its principal place of business at 1001 Johnson Ferry Road NE, Atlanta, GA 30342, and may be served through its registered agent, CSC of Cobb County, Inc., at 192 Anderson Street SE, Suite 125, Marietta, GA 30060.

5.     At all relevant times, each Defendant has been an "employer" engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA.

6.     At all relevant times, each Defendant has been, and continues to be, an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A) because it "has employees engaged in commerce or in the production of goods for commerce or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person."

7.     On information and belief, at all relevant times, each Defendant has had an annual gross volume of sales or business done in excess of $500,000.

3

8.     At all relevant times, each Defendant has had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

9.     At all relevant times, each Defendant was an "employer" or joint employer of Plaintiff as that term is defined by 29 U.S.C. § 203(d).

10.    Each Defendant is governed by and subject to 29 U.S.C. § 206 and 29 U.S.C. § 207.

11.    This Court has personal jurisdiction over all Defendants.

## JURISDICTION AND VENUE

12.    This action is for failure to pay wages, interference, and retaliation against Plaintiff's rights arising under the protections provided by the FLSA, as well as deceptive trade practices and other pendant state law claims under statute and common law. Plaintiff seeks declaratory and injunctive relief, back pay, front pay, liquidated damages, compensatory damages, punitive damages, and attorneys' fees and costs, in addition to damages for other causes of action asserted below.

13.    This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331 and 28 § U.S.C. 1367.

14.    Venue is appropriate in this Court as upon information and belief the primary events complained of herein occurred within the geographic boundaries of

the U.S. District Court for the Northern District of Georgia, specifically including, but not limited to the premises of Defendant CHOA's principal place of business at 1001 Johnson Ferry Road NE, Atlanta, GA 30342. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## FACTUAL ALLEGATIONS

15.    During all times relevant to this action, Defendant Accountable was Plaintiff's employer or joint employer under the FLSA, pursuant to a personal services employment agreement dated September 15, 2021 (signed by Plaintiff on September 16), and captioned "Re: CHILDRENS HEALTHCARE OF ATLANTA SCOTTISH RITE HOSPITAL – Assignment Confirmation," under which Plaintiff was to be assigned to CHOA from September 26, 2021, to November 13, 2021 ("the Employment Agreement").

16.    On information and belief, Defendant CHOA entered into one or more contracts with Defendant Accountable and/or Defendant HWL under which Defendant Accountable and/or Defendant HWL were to convey Defendant CHOA's staffing criteria; screen candidates; supply staffing services to Defendant CHOA; and administer payroll, human resources, recruiting, and other employer of record functions.

17.    On information and belief, at all times relevant to this action, Defendants CHOA and HWL were employers or joint employers of Plaintiff.

18.    At all times during Plaintiff's employment, Plaintiff was classified as a nonexempt worker under the FLSA, entitled to minimum wage and overtime pay for all hours worked.

## BACKGROUND

19.    Plaintiff has been a registered nurse since approximately 2011.  Since approximately 2017, Plaintiff has specialized in PICU.

20.    Since approximately 2020, Plaintiff has earned a living as a traveling nurse through fixed-term assignments administered by healthcare staffing firms like Defendant Accountable to place nurses at their clients, generally healthcare facilities like CHOA.  Traveling nurses who wish to be placed on assignments can submit their profile to one or more healthcare staffing firms to be contacted for matching opportunities.

21.    Traveling assignments can vary based on the needs of the health care facility but are commonly approximately three months in duration and can be extended if the parties agree.  While in some situations an offer of a traveling assignment may involve short turnarounds, typically a traveling nurse is given at

least several weeks' notice before an assignment begins, to account for paperwork verification and logistical arrangements, given that the nurse will need to secure housing and make other arrangements.

22.    Further, a traveling assignment is typically limited to candidates of a specific specialty.  Plaintiff is only qualified for PICU assignments, which are competitive.

23.    Because traveling nurses typically do not take vacations during assignments, they often plan their assignments with breaks in between.  In Plaintiff's case, she had worked an extended assignment from November 2020 to August 2021 and, after that assignment had concluded, was looking for one more short-term assignment during the 2021 calendar year.

24.    To the best of Plaintiff's recollection, Plaintiff filled out a profile with Accountable in or about April 2020.  The profile was created in the spring of 2020 in hopes of securing a pediatric ICU assignment.  However due to low census of critically ill children and in the height of the COVID-19 pandemic, adult ICU and ER nurses were in demand and PICU nurses were not.

25.    On or about September 10, 2021, Plaintiff received a text message from a recruiter from Accountable named Latonia Rose ("Ms. Rose"), who signed her text

messages "Latonia travel recruiter w/Accountable Healthcare Staffing."  Ms. Rose initiated a text message conversation with Plaintiff about a potential assignment with CHOA that was slated to begin on September 26, 2021, and run until mid-November 2021.

26.    Ms. Rose spoke with Plaintiff on the phone.  Plaintiff specifically inquired about vaccination requirements for both COVID (she had an appointment to get a first dose in case it would be required for her assignment but would not have time to get a second dose before the start date) and flu (Plaintiff had previously had an adverse reaction to the flu vaccine and had been advised not to take in the future).

27.    Ms. Rose told Plaintiff that vaccination was not required for flu or for COVID.

28.    In reliance on Ms. Rose's representations, Plaintiff canceled her COVID vaccine appointment—given that it was not required, it would not make sense to get a first dose just before the assignment and then have to get a second dose mid-assignment, risking side effects both times.

29.    On September 14, 2021, Ms. Rose texted Plaintiff, "Your profile has been assigned to be reviewed by [a] screener, I anticipate an offer coming!" and requested that Plaintiff fill out an application.  Plaintiff promptly did so.

30.     Later that same day (September 14, 2021), Ms. Rose texted Plaintiff "I have the offer – 9/27 start date x 8 weeks, with your time off approved."  Plaintiff immediately responded, "Nice!  And where do I sign the vaccine exemption form?"

31.     In response on the same day (September 14, 2021), Ms. Rose and Plaintiff exchanged text messages regarding the vaccine; Ms. Rose stated, "so I am confirming this form/option now to ensure we have no misunderstandings once signed."  At one point, Ms. Rose asked, "do you have a religious or medical reason for the declination?"  Before Plaintiff had an opportunity to respond, Ms. Rose texted Plaintiff at 6:24 PM, presumably based on assurances from Defendant CHOA and/or Defendant HWL, "Vaccination is NOT required.  Declination is fine."

32.     The next day, September 15, 2021, after Ms. Rose made corrections to the pay package, Plaintiff accepted the offer.

33.     As the start date was quickly coming up, Plaintiff promptly submitted all required documents and information through Accountable's online platform; which notified Plaintiff of the percentage of the process that had been completed. Plaintiff also texted Ms. Rose with questions such as what types of scrubs she should buy.

34.    Once the online system confirmed that Plaintiff had submitted all required documents and confirmed clearance with Ms. Rose, Plaintiff booked travel to Atlanta and arranged housing.

35.    On September 23, 2021, after Plaintiff had already arrived in Atlanta, she received an email from Accountable stating that some documents were blurry and that she needed to submit her nursing school diploma and/or nursing school transcripts (which was not required by the platform earlier).  On Friday, September 24, the last business day before Plaintiff was to start work at CHOA, Ms. Rose texted Plaintiff about these documents, and Plaintiff asked "Why wasn't all of this sorted out from last week?  I was afraid this will happen."  Ms. Rose responded "I'm sorry. You're correct.  All of this should have been requested and cleared earlier in the week." Ms. Rose further explained that she was off from work.

36.    Ms. Rose told Plaintiff there was a possibility she would not be permitted to start on Monday due to the lack of a diploma verification.  Plaintiff responded "If I don't start on Monday that would be unfortunate.  You have no idea of all the running around I've been doing."

37.    Plaintiff arranged for her documents to be submitted in advance of the September 27 start date, but no one from CHOA was present to receive them.

38.     Further, and independently, Ms. Rose informed Plaintiff for the first time on Tuesday, September 28, Defendant CHOA "did not have the educator available to onboard" Plaintiff until October 4.

39.     On hearing this, Plaintiff asked Ms. Rose to ensure that Accountable would pay her housing, meal, and travel stipend for the week.  Ms. Rose called Plaintiff.  During the conversation, Plaintiff expressed concerns about the 3-month lease she had just arranged.  Plaintiff then asked Ms. Rose if she should try to rescind the lease.  Ms. Rose assured Plaintiff not to worry, telling Plaintiff that her contract was still valid.

40.     After the call, Ms. Rose subsequently sent an additional text message: "hey Shevanne, I spoke to [Accountable's] corporate secretary and legal officer] and he will be approving your meals as well.  As discussed, it will be paid out next Friday 10/8…so sorry this happened to begin with…[CHOA] came back with an added week, end date of 11/20 to make up the time.  I believe they would also extend, as they have other needs with later end dates."

41.     Concerned about the unprofessional administration of her contract based on the communications so far, Plaintiff informed Ms. Rose that she preferred

to stay with the 11/13 end date for the moment and was not interested in signing a new contract with these parties.

42.     On Friday October 1, 2021, at 3:09 PM, Plaintiff received, simultaneously, an onboarding email from CHOA HR Service Center Representative Lexi Owensby and a text from Ms. Rose stating, "I was told the facility would send first day info directly to you, and so I wanted to confirm if you have received these?"

43.     Plaintiff confirmed to Ms. Rose that CHOA had sent her the first day info.  When she reviewed Ms. Owensby's email in detail, it contained several onboarding instructions and stated that "you have met all our compliances to be cleared to start next week except for the flu vaccination for the 2021-22 flu season,"

44.     Plaintiff responded immediately "I have signed the flu declination form through my agency."

45.     Ms. Owensby responded "In order to work at ("CHOA") you must receive the flu vaccination for the 2021-22 flu season.  We do not accept flu declinations."

46.     Plaintiff responded at 3:52 PM, "I've only taken flu vaccine once in my 10 years of being a nurse.  I went into anaphylaxis shock and was advised by pmd not to take it moving forward.  Since then, I've always signed a flu declination form."

47.     CHOA did not respond further, and Plaintiff received no communication from Accountable to indicate that anything was amiss.

48.     Accordingly, Plaintiff believed that CHOA and Accountable had sorted out the vaccination issue, and showed up as scheduled at 7:00 AM on Monday, October 4, for orientation.  She worked at least eight hours of compensable time under the FLSA on Monday, October 4, 2021.

49.     During orientation, Plaintiff was surprised to receive another email from Ms. Owensby at 8:50 AM. on October 4, 2021.  Ms. Owensby stated that "At Children's Healthcare of Atlanta, we require all employees and contractors to receive the flu vaccination[.]"  The email went on to describe the exemption process that could take two weeks or greater and result in a delayed start.

50.     In an attempt to resolve the issue, Plaintiff sought out the exemption form, and contacted Ms. Rose.  Plaintiff arranged for a medical provider to sign off on her medical exemption.  Ms. Rose assured Plaintiff this would be acceptable, which was knowingly or recklessly false.  Plaintiff went to a clinic on Monday

afternoon after orientation, but the wait was over two hours, so she then went again in the morning and obtained the physician signoff in the morning of October 5, 2021, before showing up for orientation at noon.

51.     After having obtained the physician's certificate, Plaintiff sought to submit it right away, expecting to be cleared to work the next day or shortly thereafter given that the mistake had resulted from Defendants' actions.  She had already worked compensable time and incurred substantial expense in reliance on Defendants' actions.  Plaintiff also asked a member of the employee health team what ID number to use for the flu exemption form and asked the educator where she should report to the next day.

52.     The educator (first name Chana) told Plaintiff that she had noticed Plaintiff was not cleared to work yet.  Plaintiff had responded that she had submitted the exemption form.  Chana responded that until she had the flu shot, she could not start, and that CHOA would not accept the form, so Chana was confused as to why Plaintiff would have submitted an exemption form.  Ultimately, on Tuesday, October 5, 2021, after orientation, Chana told Plaintiff she would not be able to onboard.

53.     The next day, on Wednesday, October 6, in an email timestamped 8:47 AM, Ms. Owensby stated to Plaintiff, "Our Employee Health team reviews any flu

14

exemptions and makes the decision on if we except them.  The flu exemption process can take up to at least two weeks if not longer.  We except very few flu exemptions, which is why you might have been told that information.  I understand you are frustrated, and I apologize for that, but our flu requirement has been a requirement for several years now and your agency was aware of our flu requirement."

54.     Ms. Owensby's email was effectively a dismissal, as Plaintiff—who had a legitimate medical justification and had gone to great lengths to comply with documentation requirements of which she was never informed due to Defendants' actions—was faced with the prospect of staying in an unfamiliar city indefinitely and then being rejected.

55.     On October 6, 2021, Plaintiff called Accountable's President Travel Division, Adam Williams, to let him know her concerns.  Mr. Williams responded, "I completely understand."  Plaintiff was clear that she would need to be reimbursed for her time and mentioned the expenses incurred.  Mr. Williams responded, "don't worry about it, it won't be an issue, we will compensate you; I'll run it through Latonia and we'll figure out what we can do."

56.     Also on October 6, 2021, Ms. Rose texted Plaintiff, having learned of the cancellation from Mr. Williams.  Despite Ms. Rose's earlier instruction on

October 1 to interact with the facility directly, Ms. Rose stated, "I also understand you are communicating directly [with CHOA] which we can't do.  We have to go thru HWL as the Vendor."  This was the first time Plaintiff had heard of "HWL" and on information and belief, Ms. Rose's text referred to Defendant HWL, and signified that HWL was a critical component administering Plaintiff's employment relationship.

57.    Plaintiff responded: "Hi Latonia, I've been more than patient with this unorganized onboarding process.  I've submitted the necessary paperwork only to be told by CHOA 2 days prior to orientation that a flu vaccine is required which is a contraindication for me.  I inquired about my medical letter only to be given two different responses: It takes 2 weeks or longer for it to be reviewed by the employee health committee and it may not be approved, and I don't know why they told you to get a letter because we never approve them…I don't know why your agency didn't tell you that.  There have been too many miscommunications and blaming from both parties.  This is unacceptable and I did not sign up for this.  Please settle my apartment lease, reimburse me for transportation and housing and meal stipend for the week."

58.     Ms. Rose responded "it is unlike any of my previous experience with CHOA and we have worked with them for years.  I also understand how this is from your side and I am sorry.  I am getting with Adam [Williams]  after his calls to see what resolutions we have available."

59.     Later that day, Ms. Rose called Plaintiff and stated, contrary to the earlier text messages, that after speaking with Adam, "we won't be able to do anything for you" apparently because CHOA had not cleared Plaintiff to work.

60.     After Plaintiff objected, Ms. Rose emailed a letter to Plaintiff to give to property manager in Atlanta stating, "Shevanne Patterson was set to start a contract in Atlanta GA with Accountable Healthcare.  Her contract was cancelled due to no fault of her own. Please accept this letter to assist Shevanne with cancelling her lease."

61.     Plaintiff's property manager did not let her out of her lease, and Plaintiff incurred expenses for the full three months of rent.

62.     Plaintiff worked for approximately 15 hours of compensable time, was stranded in Atlanta when she was supposed to be working and was prevented from taking other assignments for approximately 2.5 weeks, spent approximately 20 hours of travel time, and was never paid any wages.

63.    Plaintiff did not want to cancel the assignment and only suggested that the assignment was not working out after CHOA informed her via the educator that she would not be able to onboard, and Lexi Owensby subsequently confirmed that at best, she would be subject to a two-week delay with uncertain results.

64.    Despite all of Defendant Accountable's promises over text and phone throughout, Plaintiff never received any reimbursement, stipend, or compensation despite having incurred expenses on rent, uniforms, travel, and meals.

65.    Because Plaintiff's landlord was unwilling to reduce her lease obligations, Plaintiff searched for alternative assignments in Atlanta, but was unable to find any more despite substantial efforts. Accordingly, Plaintiff returned to New York on October 18, 2021.   At that point, given Plaintiff's prior personal commitments starting in the end of November, Plaintiff did not have a realistic opportunity to obtain another assignment in 2021.

66.    Plaintiff's contract with Defendant Accountable was enforceable, and the cancelation of the contract Plaintiff is entitled to full payment on the contract.

67.    Plaintiff raised a dispute with Defendant Accountable per the Employment Agreement, via counsel, beginning on or about October 19, 2021, and then with all three Defendants on or about June 15, 2022.  Despite efforts, the parties

18

did not agree to resolve the dispute.  None of the Defendants proposed alternative dispute resolution.

68.    Defendants owe Plaintiff approximately $40,000 in wages, stipends, and travel reimbursements as agreed to under her contract from September 26, 2021, to November 13, 2021.  Had the Defendants honored Plaintiff's contract, her wages alone for that period would have totaled nearly $30,000, including regular earnings and overtime wages as agreed in the contract, while stipends and travel reimbursements would have added more than $10,000 to the total owed to Plaintiff.  As it turned out, Plaintiff found herself more than $8,200 out-of-pocket for expenses incurred in attempting to honor her end of the contract, due to travel, incidentals, and housing-related costs when she could not get out of her Atlanta lease.

69.    Defendants also owe Plaintiff $100,000 or more in front pay.  The termination of Plaintiff's contract due to Defendants' misleading, incompetent handling of her medically necessary flu vaccine exemption caused her additional harm beyond the immediate loss of compensation and expense reimbursements in 2021.  Plaintiff traveled to Atlanta as a skilled nurse, prepared to dedicate herself fully to her chosen specialty in the critically important field of pediatric intensive care nursing.  Upon completion of her work in Atlanta, she planned to move on to

other travel nursing assignments, buoyed by this additional professional experience and compensation history.  Instead, Plaintiff's terrible experience with Defendants shook her confidence in the travel nursing system and left her emotionally — and ultimately physically — unable to pursue her vocation.  If established industry players such as Defendants could leave her high and dry despite multiple written assurances to the contrary, how could Plaintiff be expected to invest her faith (and personal funds) in another travel nursing engagement?   Reeling from this professional trauma and the resulting stress, Plaintiff fell ill with an ailment that lagged well into 2022.  Her difficulties were compounded when she agreed to take the COVID-19 vaccine, having learned through bitter personal experience that the acute risk to her health might be the price she had to pay for access to professional opportunities.  Consistent with the medical history she had tried many times to explain to Defendants, Plaintiff experienced physical complications that left her unable to work in her chosen profession.  The experience in Atlanta showed Plaintiff that she had to choose between her own physical safety and her ability to make a living.  Stressed and traumatized by that experience, she made a decision about the COVID-19 vaccine that caused some of her worst fears to materialize, harming both her body and her career.  When Ms. Patterson was finally physically able to work

20

again, the work she could find involved a significant pay cut from her previous compensation and what her earnings should have been had her travel nursing career not been unjustly terminated. Had Defendants' actions not derailed her travel nursing career, Ms. Patterson could have earned between $110,000 and $246,000 in 2022, compared to her actual earnings of approximately $12,000.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF FAIR LABOR STANDARDS ACT
### (ALL DEFENDANTS)

70.    Plaintiff incorporates the foregoing relevant paragraphs under the "Parties" and "Factual Background" headings of the Complaint as if restated herein (specifically including but not limited to ¶¶ 5-11, 15-69, 48, 62).

71.    Defendant Accountable was Plaintiff's employer under the FLSA, and Defendants CHOA and HWL were Plaintiff's joint employers under the FLSA.

72.    Plaintiff worked compensable time under the FLSA.

73.    Defendants failed to compensate Plaintiff according to the minimum wage for compensable time worked in violation of the FLSA.

74.    Defendants' violations were willful.

## COUNT II
## VIOLATION OF FAIR LABOR STANDARDS ACT
## (ALL DEFENDANTS)

75.    Plaintiff incorporates the foregoing relevant paragraphs under the "Parties" and "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 5-11, 15-69, 48, 56, 62).

76.    Plaintiff worked compensable time under the FLSA for which she was never paid, resulting in her being paid less than the legally required minimum wage.

77.    Plaintiff incurred substantial business expenses for which she was never reimbursed, which resulted in Plaintiff being paid less than minimum wage and/or being deprived of overtime pay.

78.    Defendants, leveraging undisclosed contractor relationships, each falsely disclaimed responsibilities as an employer to Plaintiff.

79.    Defendants' actions interfered with Plaintiff's rights under the FLSA.

80.    Defendants withheld wages and expense reimbursement in retaliation for Plaintiff's asserting her rights under the FLSA.

22

## COUNT III
## BREACH OF CONTRACT
## (DEFENDANT ACCOUNTABLE)

81.     Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 24-69, 39, 40, 55).

82.     Defendant Accountable contracted with Plaintiff and was obligated to pay wages, stipends, and reimbursements in accordance with the Employment Agreement.

83.     Plaintiff satisfied all necessary conditions in the Employment Agreement to be entitled to payment.

84.     Defendant failed to pay Plaintiff in accordance with the Employment Agreement.

## COUNT IV
## PROMISSORY ESTOPPEL
## O.C.G.A. § 13-3-44(a)
## (DEFENDANT ACCOUNTABLE AND DEFENDANT CHOA)

85.     Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 25-40, 46-65, and 68-69).

86.     Defendants Accountable and CHOA made multiple promises on which they reasonably should have expected Plaintiff to rely, including but not limited to that a flu vaccine was not required for the CHOA assignment and that arrangements were in order for on Plaintiff's designated start date.

87.     Plaintiff relied upon Defendants' promises to her detriment.

88.     Plaintiff incurred substantial time and expense in reasonable reliance on Defendants' promise, and injustice can be avoided only by enforcing the promise.

## COUNT V
## MISREPRESENTATION
## VIOLATION OF O.C.G.A. § 51-6-2
## (DEFENDANT ACCOUNTABLE)

89.     Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 25-31, 33, 39, 40, 42, 50, 53, 55-59).

90.     Defendant Accountable misrepresented one or more material facts to Plaintiff.

91.     Defendant Accountable's misrepresentation was made either willfully or recklessly to induce Plaintiff to sign the Employment Agreement, to incur expense in connection with the placement, and to enter into housing contracts from which she could not easily extricate herself.

24

92.     Plaintiff acted upon Defendant Accountable's misrepresentation to her injury.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**VIOLATION OF O.C.G.A. § 23-2-52**
**(DEFENDANT ACCOUNTABLE AND/OR DEFENDANT CHOA)**

93.     Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 25-31, 33, 39, 40, 42, 50, 53, 55-59).

94.     Defendant CHOA and/or Defendant Accountable made false representations that Plaintiff was not required to get a flu vaccine or undergo any exemption process beyond signing a declination form to perform the Employment Agreement.

95.     Based on Defendant Accountable's representations on behalf of Defendant CHOA, Plaintiff was induced to act, including but not limited to, in purchasing supplies, traveling, securing housing, traveling to Atlanta where she lacked resources to secure alternative income, showing up at Defendant CHOA's worksite, and working compensable time.

96.     In justifiable reliance on Defendants' assurances, Plaintiff lost opportunities and incurred substantial expense.

## COUNT VII
## QUANTUM MERUIT
## VIOLATION OF O.C.G.A § 9-2-7
## (ALL DEFENDANTS)

97.    Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 15-18, 24-69).

98.    Plaintiff performed services of value in good faith.

99.    Defendants accepted the services and retained the benefit of the services.

100.   All parties understood that compensation would be paid to Plaintiff for the services.

101.   No compensation was paid to Plaintiff for the services.

## COUNT VIII
## DECEPTIVE TRADE PRACTICES
## VIOLATION OF O.C.G.A § 10-1-372
## (ALL DEFENDANTS)

102.   Plaintiff incorporates the foregoing relevant paragraphs under the "Factual Background" heading of the Complaint as if restated herein (specifically including but not limited to ¶¶ 15-17, 24-69, 56).

103.   Defendant CHOA and Defendant Accountable each made specific representations to Plaintiff and took actions as to Plaintiff's employment and sight placement that caused likelihood of confusion or misunderstanding as to affiliation, connection, association with, or certification by one another.

104.   On information and belief, Defendant HWL caused likelihood of confusion or misunderstanding as to its affiliation, connection, association with, or certification by Defendants CHOA and Accountable.

105.   All Defendants engaged in conduct that created a likelihood of confusion or misunderstanding constituting a deceptive trade practice under OCGA 10-1-372.

106.   Defendants' deceptive trade practices include, but are not limited to, concealing their background contractual relationships and in making purportedly authorized representations on behalf of one another which were later denied to be authorized.

107.   Defendants' deceptive trade practices have enabled them each to evade employer obligations and payment obligations to Plaintiff and those similarly situated to Plaintiff.

108.   Defendants' deceptive trade practices were willful.

27

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

That process issue;

That a trial by jury to all issues be had;

Judgment against Defendants for unpaid minimum wages, unpaid wages at regular hourly rate, and other compensation denied or lost to Plaintiff by reason of Defendants' unlawful acts;

Judgment against Defendants for any and all general, special, and, where applicable, liquidated and punitive damages as allowed by law under each, and every count and cause of action contained in this complaint;

An injunction issue preventing Defendants from deceptive trade practices;

For all costs of this action to be taxed against Defendants;

For all costs and attorney's fees to be awarded to Plaintiff;

That damages for lost wages, benefits, and other compensation, plus interest thereon at the statutory rate be awarded to Plaintiff;

28

That equitable relief as the Court deems appropriate be awarded to Plaintiff;

That witness fees, and all costs of this action be awarded to Plaintiff; and;

For any and all other and further relief as this Court may deem just and equitable under the circumstances.

Respectfully submitted, this 22nd day of March, 2023.

ATTORNEYS FOR PLAINTIFF

*/s/ Bonnie Shira Levine*
Bonnie Shira Levine
Georgia Bar No. 422055
VERSE LEGAL, LLC
135 Auburn Ave. NE, Suite 204
Atlanta, Georgia 30303
Tel: (404) 910-3732
bonnie@verselegal.com
*LEAD COUNSEL*

*/s/ Jackie Lee*
Jackie Lee
Georgia Bar No. 419196
LEE LAW FIRM, LLC
695 Pylant St. NE, Suite 105
Atlanta, Georgia 30306
Tel: (404) 301-8973
jackie@leelawga.com

29

## <u>FONT CERTIFICATION</u>

Pursuant to Local Rule 7.1 D I hereby certify that foregoing document was prepared using Times New Roman 14-point type as provided in Local Rule 5.1.


By:   <u>*/s/ Bonnie Shira Levine*</u>
Bonnie Shira Levine
Georgia Bar No. 422055
VERSE LEGAL, LLC
bonnie@verselegal.com

ATTORNEY FOR PLAINTIFF