# EXHIBIT A

# PURCHASE AND SALE AGREEMENT

## FOR THE PROPERTY

## LOCATED AT

## 2620 MALL OF GEORGIA BOULEVARD, BUFORD, GEORGIA

ARTICLE 1: PROPERTY/PURCHASE PRICE

1.1   Certain Basic Terms.

    (a)   Purchaser and Notice Address:

CWS Apartment Homes LLC,
a Delaware limited liability company
9606 N. MoPac Expwy, Suite 500
Austin, Texas 78759
Attn: Justin Leahy
Email: jleahy@cwscapital.com

With a copy to:

CWS Capital Partners LLC
14 Corporate Plaza, Suite 210
Newport Beach, CA 92660
Attn: Gary Carmell and Mary Ellen Barlow
Email: gcarmell@cwscapital.com;
mbarlow@cwscapital.com

and to:

Bocarsly Emden Cowan Esmail & Arndt, LLP
633 West 5th Street, 64th Floor
Los Angeles, CA 90071
Attention: Aaftab Esmail
Email: aesmail@bocarsly.com

    (b)   Seller and Notice Address:

Ariston MF Owner, LLC
c/o TPA Residential, LLC
1776 Peachtree Street NW, Suite 100
Atlanta, Georgia 30309
Attention: Elizabeth Amick
Email: EAmick@tpa-res.com

With a copy to:

Hartman Simons & Wood LLP
400 Interstate North Parkway SE, Suite 600
Atlanta, Georgia 30339
Attention: Peter M. Hartman, Esq.
Email: peter.hartman@hartmansimons.com

60018890.6

|       |                            |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |
|-------|----------------------------|-|
| and to: |                          | Hartman Simons & Wood LLP<br>400 Interstate North Parkway SE, Suite 600<br>Atlanta, Georgia 30339<br>Attention: John H. Lewis, Esq.<br>Email: john.lewis@hartmansimons.com |
| (c)   | Date of this Agreement:    | The latest date of execution by Seller and Purchaser, as shown on the signature page hereto. |
| (d)   | Purchase Price:            | $75,500,000.00 |
| (e)   | Initial Deposit:           | $750,000.00 |
| (f)   | Additional Deposit:        | $750,000.00 |
| (g)   | Extension Deposit:         | $500,000.00 |
| (h)   | Earnest Money:             | The Initial Deposit, if applicable, the Additional Deposit, and, if applicable, the Extension Deposit, together with any other deposits of earnest money made pursuant to the terms of this Agreement. The definition of "Earnest Money" includes any interest earned thereon. |
| (i)   | Due Diligence Period:      | The period ending on January 12, 2023. |
| (j)   | Existing Financing:        | That certain loan with CBRE Capital Markets, Inc., as lender ("Lender"), in the approximate existing principal amount as set forth in Paragraph 8.1(k) hereof, as evidenced by a Promissory Note, that certain Multifamily Deed to Secure Debt, Assignment of Rents dated December 22, 2021, recorded in Deed Book 59549, Page 479, in the Office of the Clerk of the Superior Court of Gwinnett County, Georgia, and other documents evidencing and securing such loan (collectively, the "Loan Documents"). |
| (k)   | Closing Date:              | The date that is fifteen (15) days after Purchaser's receipt of the Assumption Approval, but in no event later than April 30, 2023. |

60018890.6

| (l) | Escrow Agent: | Heritage Title Company of Austin, Inc.<br>200 W. 6th Street, Suite 1500<br>Austin, Texas 78701<br>Attention: John Bruce<br>Email: jbruce@heritage-title.com |
| --- | --- | --- |
| (m) | Title Company: | First American Title Insurance Company<br>3455 Peachtree Road NE, Suite 675<br>Atlanta, Georgia 30326<br>Attention: Jon Uhlir<br>Telephone No.: (404) 720-3049<br>Email: juhlir@firstam.com |
| (n) | Broker: | Cushman & Wakefield<br>1180 Peachtree Street, Suite 3100<br>Atlanta, Georgia 30309<br>Attention: Alex Brown |

1.2    Property.    Subject to the terms of this Purchase and Sale Agreement (the "Agreement"), Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the "Property"):

(a)    The real property described in **Exhibit A** (the "Land"), together with (i) the buildings and improvements thereon (the "Improvements"), (ii) all rights, benefits, privileges, easements, tenements, hereditaments and appurtenances thereunto belonging or in any wise pertaining thereto, and (iii) all of Seller's right, title and interest in and to any and all appurtenances, strips or gores, roads, easements, streets, alleys, drainage facilities, and rights-of-way bounding the Land; all utility capacity, utilities, water rights, licenses, permits, entitlements, and bonds, if any, and all other rights and benefits attributable to the Land; and all rights of ingress and egress thereto.

(b)    All of Seller's right, title and interest, if any, in and to all appliances, fixtures, furniture, equipment, furnishings, machinery, tools, supplies, inventory, carts, promotional materials, leasing materials, signs and other tangible personal property, if any, owned by Seller, including, without limitation, the personal property listed on the Personal Property List (hereinafter defined) (the "Personal Property") now or hereafter located on the Land, but excluding any items of personal property owned by tenants, any managing agent, or others, and, if the Personal Property includes computer hardware, any proprietary software installed therein.

(c)    All of Seller's interest, as landlord, in the "Leases," being all leases of the Improvements, and all leases which may be made by Seller after the date hereof and before Closing as permitted by this Agreement, including all amendments thereto, together with all prepaid rents, security deposits and other deposits.

(d)    Subject to the terms of Paragraph 4.4, all of Seller's right, title and interest in and to all maintenance, supply, service, laundry, cable television, telecommunication, telephone, utility and other similar agreements relating to the Land and/or the Improvements (the "Service

60018890.6

Contracts").

(e)     All of Seller's right, title and interest, if any, in and to all of the following items, to the extent assignable and without representation or warranty (the "Intangible Personal Property"): (A) licenses, approvals, authorizations and permits relating to the operation of the Property, (B) the right to use the name of the property in connection with the Property, including, without limitation, "Ivy at Ariston" (but not including the right to otherwise use the name "Ariston"), (C) all development rights, entitlements, trademarks, service marks, trade names, telephone numbers, logos, marks and other intangible property relating to the Property, (D) if still in effect, all guarantees and warranties received by Seller or its affiliates from any contractor, manufacturer, service provider or other person in connection with the design, construction or operation of the Property (the "Warranties"), (E) resident and tenant files for residents and tenants as of the Closing Date, (F) surveys, inspection reports, as-built drawings, architectural and civil plans and specifications and engineering drawings and reports, (G) other non-confidential and non-proprietary records owned by Seller and used in connection with the operation of the Land, the Improvements, or any part thereof, (H) all telephone numbers, websites, social media accounts and domain names associated exclusively with the Land and/or Improvements, including, but not limited to, the URL designated www.theivyariston.com, and all assignable user names and password account information necessary and controlling said websites and social media accounts (collectively, the "Domain"), and (I) all "SureDeposits" and other similar deposits and bonds; but, Intangible Personal Property shall specifically exclude any and all other trademarks, service marks and trade names of Seller's Affiliates (including "TPA Residential" and all derivations thereof), and with reservation by Seller's Affiliates to use such names in connection with other property owned by Seller's Affiliates.

(f)     All of Seller's right, title and interest in and to that certain Rate Cap Agreement (SOFR) dated as of December 22, 2021, between SMBC Capital Markets, Inc., as seller, and Seller, as buyer with respect to the Existing Financing (the "Cap Agreement").

   1.3     Earnest Money; Initial Deposit and Additional Deposit.

(a)     The Initial Deposit, in immediately available federal funds, evidencing Purchaser's good faith to perform Purchaser's obligations under this Agreement, shall be deposited by Purchaser with the Escrow Agent not later than the second business day after the execution of this Agreement by both Seller and Purchaser.  In the event that Purchaser fails to timely deposit the Initial Deposit with the Escrow Agent, this Agreement shall be of no force and effect.

(b)     Provided that this Agreement is not terminated prior to the expiration of the Due Diligence Period, then within one (1) business day following the expiration of the Due Diligence Period Purchaser will deposit with the Escrow Agent the Additional Deposit in good funds either by certified bank or cashier's check or by federal wire transfer.  The Escrow Agent shall hold the Earnest Money in accordance with the terms and conditions of this Agreement.

(c)     If Purchaser assumes the Existing Financing, Purchaser shall receive a credit against the Purchase Price in an amount equal to the outstanding principal balance of the Existing Financing as of the Closing Date.

60018890.6

(d)     At Closing, the Earnest Money shall be applied to the Purchase Price. Otherwise, the Earnest Money shall be delivered to the party entitled to receive the Earnest Money in accordance with the provisions of this Agreement.

1.4     Independent Contract Consideration.  Contemporaneously with the execution of this Agreement, Purchaser hereby delivers to Seller a check in the amount of One Hundred and No/100 Dollars ($100.00) ("Independent Contract Consideration"), which amount the parties bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable, and shall be retained by Seller notwithstanding any other provisions of this Agreement.

ARTICLE 2:  INSPECTIONS

2.1     Property Information.  Seller has made available to Purchaser, to the extent in Seller's possession or reasonable control, copies of, or access to with the right to copy, the following ("Property Information"):

(a)     Reports:

(i)      current Rent Roll Detail (to include deposits, resident balances, market rent, effective rent, rentable items, fees, move-in date, lease start date, and move-out date);

(ii)     availability Report with Current Pricing;

(iii)    Rentable Items Report;

(iv)    Lease Expiration Report;

(v)     renewal report (Prior twelve (12) months and future renewal report looking ninety (90) days out);

(vi)    prepaid and Aged Delinquency Report;

(vii)   boxscore / Activity Report (to include monthly leasing, traffic & renewal activity for last twelve (12) months);

(viii)  list of corporate units & affordable housing units (if any);

(ix)    unit amenity report;

(x)     list of evictions and skips for the last twelve (12) months;

(xi)    list of model units, shops, or down units;

(xii)   list of employee units with corresponding discounts;

(xiii)  Projected Occupancy Report;

5

60018890.6

(xiv)   Concession Burn-off Report;

(xv)   Demographic Report;

(xvi)   Turnover Report for prior twelve (12) months;

(xvii)   reasons for move-out for the last six (6) months;

(xviii)  historical occupancy for prior year;

(xix)   Lease Trade Out Report for new leases & renewals for last six (6) months;
and

(xx)   Unit Directory (unit addresses).

(b)   Financials:

(i)   prior year and trailing operating statements;

(ii)   Schedule of Replacements and Capital for prior two (2) years and YTD; and

(iii)   Prior year tax bills and all necessary correspondence.

(c)   Utility Information:

(i)   copies of utility bills for prior twelve (12) months (to include water, electric, gas, bulk trash/recycling, valet trash, internet, cable and phone bills);

(ii)   copy of a Resident Bill from 3rd party utility billing provider;

(iii)   Raw Meter Reads for Sub-Metered Properties for prior six (6) months;

(iv)   list of utility vendors with all account numbers; and

(v)   contact information of 3rd party billing company (to include name, phone number and email).

(d)   Title Commitment/Alta Survey:

(i)   copy of most recent Title Commitment; and

(ii)   certified ALTA Survey.

(e)   Insurance/Risk:

(i)   insurance loss history with the current insurer for such period as Seller may have owned the Property;

(ii)   incident reports for prior year;

6

(iii)    all pending government notices of building code, zoning, fire, etc. violations;

(iv)    all claims filed for defective products/class action lawsuits;

(v)    list of litigation, proceedings and investigations pending against Seller/Property; and

(vi)    flood certificates.

(f)    <u>Property Information</u>:

(i)    list of Personal Property (the "<u>Personal Property List</u>");

(ii)    copies of all assumable Service Contracts & list of national contracts;

(iii)    list of Revenue Share Programs;

(iv)    Standard Lease Form with Addendums & Rental Criteria;

(v)    all Certificates of Occupancy;

(vi)    Homeowners Association Documents (Declaration, By-Laws, Amendments & HOA Map);

(vii)    copies of the Warranties;

(viii)    employee staffing schedule & payroll (to include pay, position, and rental discount);

(ix)    copies of all business licenses and permits (business, pool/spa, hazmat, elevator, health, flammable liquid, A/C recovery, & sign);

(x)    list of payment options available to residents, including FLEX Pay, if applicable;

(xi)    copy of most recent termite inspection/bond;

(xii)    environmental reports; and

(xiii)    copy of the latest Zoning Report.

(g)    <u>Marketing</u>:

(i)    site map and/or floor levels (EPS or Native Files);

(ii)    digital floor plans with square footage (EPS or Native Files);

Case 1:23-mi-99999-UNA   Document 923-1   Filed 03/27/23   Page 9 of 67

(iii)   digital, high-resolution photos (to include exteriors, interiors, amenities, neighborhood and surrounding);

(iv)   competitive market survey;

(v)   signage vendor contact information (to include name, phone number and email);

(vi)   digital copy of all property signage;

(vii)   copies of 3D Virtual Tours to the extent available;

(viii)   leads for prior three (3) months;

(ix)   property brochure;

(x)   list of Domains that will be transferred; and

(xi)   main property phone number and fax number that new ownership will acquire.

(h)   <u>Resident Files</u>:

(i)   access to or copies of all tenant leases and amendments;

(ii)   access to or copies of screening results for both credit & criminal; and

(iii)   security deposit agreement.

(i)   <u>Maintenance/Fire Life Safety/Capex</u>:

(i)   Work Order Request Report for prior six (6) months;

(ii)   copies of Fire Inspection Reports for prior year (to include backflows, fire extinguishers, risers, fire hydrants, fire sprinkler systems, fire alarm & fire doors, if applicable);

(iii)   copies of invoices and letters of completion from 3rd party fire company stating all fire deficiencies have been corrected.  We need backup documentation as proof;

(iv)   service/maintenance log for elevators;

(v)   plans and specifications of the buildings (to include electrical, mechanical, fire sprinkler, architectural, plumbing and civil);

(vi)   stacking plan/tenant suite plan;

(vii)   copies of most recent dryer vent inspection; and

(viii)   copies of any preventative maintenance plans in place for HVACS.

8

60018890.6

(j)      Information Technology:

(i)      copies of contracts and user/instruction guides for smart TVs, FOB or access systems, smart locks, smart trinkets connected to thermostats/lights/appliances;

(ii)      IT survey to be provided by Purchaser.  Seller to cooperate and provide relative information in a timely manner;

(iii)      all documents comprising the Intangible Personal Property;

(iv)      all engineering studies, soil reports, environmental audits, and other such studies in possession of Seller or Seller's agents;

(v)      all repair and maintenance bills over $2,000 for the past twelve (12) months;

(vi)      capital expenditure history for the last twelve (12) months, plus year-to-date;

(vii)      copies of the Property's rules and regulations;

(viii)      Copies of all commitments, notes, escrow agreements, guarantees, indemnities, mortgages, deeds of trust, security deeds, deeds to secure debt, loan agreements, security agreements, amendments, modifications and other agreements evidencing or otherwise in any respect pertaining to the Existing Financing, including, but not limited to, the Cap Agreement (the "Loan Documents").

Except as otherwise expressly provided herein, Seller makes no representations or warranties as to the accuracy or completeness of the Property Information or as to any other materials or information provided or made available to Purchaser.  The Property Information and all other information, other than matters of public record, furnished to, or obtained through inspection of the Property by, Purchaser or Purchaser's Representatives (as hereinafter defined) will be treated by Purchaser and Purchaser's Representatives as confidential, and will not be disclosed to anyone other than (i) on a need-to-know basis to Purchaser's Representatives and the Title Company, who are instructed to maintain the confidentiality of such information and to destroy or return such information to Seller if the Closing does not occur, and (ii) as required by law or final court order; provided that, to the extent not prohibited by such law or final court order, Purchaser shall provide Seller with written notice before making any such disclosure.  Notwithstanding the foregoing, the confidentiality obligations set forth above shall not apply to, and Property Information shall not include, information that:  (i) is or becomes a matter of public knowledge through no fault of Purchaser or any of Purchaser's Representatives, including information which is or becomes publicly available, or generally available within the industry in which Seller operates; (ii) was in Purchaser's or any of Purchaser's Representatives' possession or known by it or any of Purchaser's Representatives prior to receipt from Seller; or (iii) was rightfully disclosed to Purchaser or any of Purchaser's Representatives by another person without restriction; or (iv) is independently developed by Purchaser or any of Purchaser's Representatives without access to such Property Information.   Notwithstanding the foregoing to the contrary, Purchaser and Purchaser's Representatives may retain copies of the Property Information if required by their internal document retention policies, if required by applicable laws, rules or regulations of governmental

9

or regulatory authorities, if it would be unreasonably burdensome to destroy or return such information (such as archived computer records), or for purposes of maintaining or defending any action relating to this Agreement.

2.2     Inspections. Subject to the rights of tenants and the provisions of Paragraph 2.3 below, Purchaser shall have the right to make a complete review and inspection of the physical, legal, economic and environmental condition of the Property and to review certain documents relating to the Property, including, without limitation, any leases and contracts affecting the Property, pest control matters, soil condition, asbestos, PCB, hazardous waste, toxic substance or other environmental matters, compliance with building, health, safety, land use and zoning laws, regulations and orders, plans and specifications, structural, life safety, HVAC and other building system and engineering characteristics, traffic patterns, and other non-proprietary information pertaining to the Property which it desires to review (excluding appraisals, internal valuations or other proprietary materials that may be in Seller's possession).

2.3     Conduct of Inspections.

(a)     Inspections in General. So long as this Agreement remains in effect, Purchaser, Purchaser's Affiliates (as defined in Paragraph 11.16), and each of their agents, officers, employees, consultants, partners, contractors, attorneys, accountants, prospective lenders, prospective investors, engineers, directors, and advisors (collectively, "Purchaser's Representatives") shall have the right to enter the Property (subject to the rights of tenants) for the purpose of making non-invasive physical inspections and non-invasive testing and to review certain documents relating to the Property ("Investigations") at Purchaser's sole risk, cost and expense, as provided herein. Purchaser and Purchaser's Representatives shall have the right to make a complete review and inspection of the physical, legal, economic and environmental condition of the Property, including, without limitation, the leases and contracts affecting the Property, pest control matters, soil condition, asbestos, PCB, hazardous waste, toxic substance or other environmental matters (including, but not limited to, a customary non-invasive phase I environmental site assessment and testing for the presence of humidity, moisture, carbon monoxide, methane and radon), compliance with building, health, safety, land use and zoning laws, regulations and orders, plans and specifications, structural, life safety, HVAC and other building systems and engineering characteristics, traffic patterns, and other non-proprietary information pertaining to the Property which it desires to review (excluding appraisals, internal valuations or other proprietary materials that may be in Seller's possession). Before any such entry, Purchaser shall provide Seller with a certificate of liability insurance naming Seller as an additional insured and with limits of at least Two Million Dollars ($2,000,000). All of such entries upon the Property shall be at reasonable times, during normal business hours, after at least twenty-four (24) hours prior written notice to Seller or Seller's agent, which notice shall be provided via email to Elizabeth Amick at eamick@tpa-res.com, shall not unreasonably interrupt or interfere with any construction, renovation, maintenance or other work being performed at the Property, and Seller and Seller's agent shall have the right to accompany Purchaser or Purchaser's Representatives during any activities performed by Purchaser or Purchaser's Representatives on the Property; provided that any entry upon the Property after the expiration of the Due Diligence Period (i) shall only be made after at least forty-eight (48) hours prior written notice in the manner aforesaid and (ii) shall not include any further testing without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Upon reasonable prior written notice and request

60018890.6

from Purchaser (it being acknowledged that notice by email to Elizabeth Amick at eamick@tpa-res.com shall be deemed sufficient for such purposes), Seller shall timely notify tenants of the Property and permit Purchaser and Purchaser's Representatives to inspect all apartments, subject to the rights of any tenants under their leases and the terms of the leases, if any, and except to the extent specifically prohibited in such tenants' leases.  If any inspection or test performed by Purchaser or Purchaser's Representatives (whether performed before or after the Effective Date) causes physical damage to any portion of the Property, Purchaser will restore the Property to substantially the same condition as existed immediately before the inspection or test; provided, however, such Purchaser's obligation to restore the Property shall not extend to: (i) any defects or conditions which exists on the Property and not as a result of the negligent actions of Purchaser or any of Purchaser's Representatives, except to the extent any such conditions are exacerbated by Purchaser or any of Purchaser's Representatives (and in such event, such Purchaser's obligation to restore the Property shall be limited to the extent of such exacerbation), (ii) any diminution in value resulting from the discovery by Purchaser or any of Purchaser's Representatives of any conditions which exist on the Property and not as a result of the negligent actions of Purchaser or any of Purchaser's Representatives, and (iii) any matters arising out of the negligence or willful misconduct of Seller or any of Seller's Representatives (item (i) through (iii), the "Excluded Items").  Purchaser shall indemnify, defend and hold harmless Seller and Seller's property manager, shareholders, consultants, partners, attorneys, accountants, engineers, directors, officers, lenders, advisors, tenants, agents, contractors, and employees ("Seller's Representatives") and the Property from and against any and all actual losses, costs, damages, claims, or liabilities, but expressly excluding any claims for indirect, consequential, special, exemplary, or punitive damages, arising out of or any physical damage or injury to persons or property caused by any entry or Investigations performed by Purchaser or Purchaser's Representatives, but not to the extent relating to any of the Excluded Items.  This indemnity shall survive the Closing or any termination of this Agreement.  In addition, Purchaser shall keep the Property free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Purchaser or Purchaser's Representatives with respect to any Investigations of the Property performed by Purchaser or Purchaser's Representatives.  If any such lien shall at any time be threatened or filed, Purchaser shall cause the same to be discharged within ten (10) business days after knowledge by Purchaser thereof by satisfying the same or, if Purchaser in its reasonable discretion and good faith determines that such liens should be contested, by obtaining a bond reasonably satisfactory to Seller.  Failure by Purchaser to discharge such lien or obtain such bond within the ten (10) business day period shall be a material breach of this Agreement and shall entitle Seller, at its option and in addition to any other remedy Seller may have at law, in equity or by contract, immediately to declare this Agreement be terminated.  Notwithstanding anything contained herein to the contrary, due to the COVID-19 (Coronavirus) pandemic and/or its derivative resulting affects, including, without limitation, (x) personal self-isolation, quarantine, shelter in place, or requirements to work from home, (y) restrictions or prohibitions on access to occupied apartment units when a tenant, family member, guest, visitor or other invitee are present and such person(s) does not provide consent to access the unit, or Seller conducting normal business activities, and/or (z) mandatory business closures (collectively, as applicable, the "COVID-19 Restrictions"), Purchaser and Purchaser's Representatives may not be permitted to enter any occupied unit on the Property subject to COVID-19 Restrictions.  As such, Purchaser and Purchaser's Representatives shall limit their inspections to units which are not subject to COVID-19 Restrictions and common areas of the Property and all such inspections of units shall

60018890.6

be subject to the rights of tenants and Lease terms. Purchaser agrees to follow and comply with Seller's reasonably required access guidelines and protocols pertaining to units which are subject to COVID-19 Restrictions, which include, without limitation, all applicable federal, state and municipal laws, rules, ordinances, directives and safety guidelines designed to protect the health and safety of a person and/or his or her family, guests, or other tenant-related invitees.

(b)     Environmental Inspections and Release.     Purchaser's inspections under Paragraph 2.3(a) may include a non-invasive Phase I environmental inspection of the Property, and testing for the presence of humidity, moisture, carbon monoxide, methane and radon at the Property (the "Phase I Inspection"), but no Phase II environmental inspection or other invasive inspection, boring, drilling or sampling of soil or materials, including without limitation construction materials (other than as part of the Phase I Inspection), shall be performed and no samples or other materials shall be submitted to any testing laboratory or similar facility without the prior written consent of Seller, which may be withheld in its sole and absolute discretion, and if consented to by Seller, the proposed scope of work and the party who will perform the work shall be subject to Seller's review and approval. The inspections under this Paragraph 2.3(b) shall be subject to the notice requirements and rights of tenants under their Leases. Effective as of the Closing, except for the Seller Warranties (as hereinafter defined), Purchaser, for itself and any entity affiliated with Purchaser, waives and releases Seller and Seller's Affiliates (hereafter defined) from and against any liability or claim related to the Property arising under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, and the Toxic Substance Control Act, all as amended, or any other cause of action based on any other state, local, or federal environmental law, rule or regulation. The provisions of this paragraph shall survive the Closing or any earlier termination of this Agreement. "Seller's Affiliates" means (a) any person that directly or indirectly owns an interest in Seller, or any person that controls, is controlled by or is under common control with, Seller, or (b) any entity in which Seller owns an economic interest; and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations.

(c)     Contact with Tenants and Governmental Authorities.  Except as provided below and without Seller's prior written consent thereto (which may be withheld in Seller's sole discretion), neither Purchaser nor any of Purchaser's Representatives shall contact (a) any tenant, current non-tenant lease applicant, guest, invitee, or employee of the Property, or any representative of any of them, except for any incidental contact in connection with the scheduling and performance of the Inspections, (b) any governmental authority having jurisdiction over the Property. Notwithstanding any provision of this Agreement to the contrary, Purchaser shall not contact any third-party service provider with respect to the Property without Seller's prior written consent and, at Seller's option, any such contact with a third-party service provider shall be conducted jointly with a representative of Seller. At Seller's option, Seller and/or Seller's representatives may be present for any such entry, inspection and communication with any such tenant or non-tenant lease applicant (and their representatives) or any governmental authority. Notwithstanding the foregoing to the contrary, Seller hereby consents to: (i) Purchaser and/or Purchaser's third party zoning consultant contacting the zoning department in the applicable jurisdiction for the sole purpose of obtaining such information as is reasonably necessary to provide a customary zoning report regarding the Property, (ii) Purchaser and/or Purchaser's third party environmental consultant contacting governmental authorities for the sole purpose of

12

obtaining such information as is reasonably necessary to prepare a Phase I Inspection report, and (iii) Purchaser and/or Purchaser's Representatives reaching out to any governmental authorities or quasi-governmental authorities if required by law, concerning whether there are any charges or assessments which are due and payable for water, sewer, sanitary services, garbage or other utilities or services for the Property, for purposes of transferring utility services, for purposes of obtaining crime reports, for purposes of determining the status and transferability (or procedure for issuance) of applicable permits and licenses, and for purposes of collecting information on assessed value and tax information. Purchaser's failure to comply with the terms of this paragraph shall constitute a material default by Purchaser under this Agreement.

2.4     Termination During Due Diligence Period.  If Purchaser determines, in its sole discretion, before the expiration of the Due Diligence Period that the Property is unacceptable for Purchaser's purposes for any reason or no reason whatsoever, Purchaser shall have the right to terminate this Agreement by giving to Seller notice of termination before the expiration of the Due Diligence Period. Provided Purchaser is not in default hereunder, Seller shall authorize the Escrow Agent to refund the Initial Deposit to Purchaser, and neither party shall have any further rights or liabilities hereunder except for those provisions which expressly survive the termination of this Agreement. In the event of any termination of this Agreement for any reason other than a default by Seller, Purchaser shall promptly destroy or return to Seller all originals and copies of all Property Information in Purchaser's (or its agents' or representatives') possession or control as and to the extent provided in Paragraph 2.1, and, at Seller's request, deliver to Seller, without any representation or warranty or any right of reliance, a copy of any final third party tests and inspections which have been made by or for Purchaser, excluding only market and economic feasibility studies and information covered by the attorney-client privilege or which constitutes attorney work product, regardless of whether such results shall have been obtained or such tests or inspections are conducted before or after the Effective Date. Purchaser's failure to terminate this Agreement before the expiration of the Due Diligence Period shall be deemed the complete and irrevocable waiver of Purchaser's right to terminate this Agreement pursuant to the terms of this Paragraph 2.4 and the satisfaction of the condition set forth in Paragraph 5.1(a), and Purchaser shall not thereafter be entitled to terminate this Agreement based upon this Paragraph 2.4 or Paragraph 5.1(a),

2.5     Purchaser's Reliance on its Investigations.  To the maximum extent permitted by applicable law and except for Seller's express representations and warranties in Paragraph 8.1, the warranty of title in the deed or any other documents delivered at the Closing and Seller's covenants contained in Article 4 ("Seller's Warranties"), this sale is made and will be made without representation, covenant, or warranty of any kind (whether express, implied, or, to the maximum extent permitted by applicable law, statutory) by Seller. Purchaser agrees to accept the Property on an "As is" and "Where is" basis, with all faults and any and all latent and patent defects, and without any representation or warranty, all of which Seller hereby disclaims, except for Seller's Warranties. Except for Seller's Warranties, no warranty or representation is made by Seller as to (a) fitness for any particular purpose, (b) merchantability, (c) design, (d) quality, (e) condition, (f) operation or income, (g) compliance with drawings or specifications, (h) absence of defects, (i) absence of hazardous or toxic substances, (j) absence of faults, (k) flooding, or (l) compliance with laws and regulations including, without limitation, those relating to health, safety, and the environment. Purchaser acknowledges that Purchaser has entered into this Agreement with the intention of making and relying upon its own investigation of the physical, environmental,

13

economic use, compliance, and legal condition of the Property and that Purchaser has not been induced by and has not relied upon any disclosures, representations or warranties (in each case whether express or implied or oral or written) made by Seller, any partner or owner of Seller, or any affiliate, agent, employee or other representative of any of the foregoing or by Broker or any other person or entity purporting to represent Seller with respect to the Property or any other matter affecting or relating to the transactions contemplated hereby, except for Seller's Warranties.  In addition, Purchaser expressly acknowledges that from and after the Date of this Agreement, Purchaser has not been and will not be induced by and has not relied and will not rely upon any disclosures, representations or warranties (in each case whether express or implied or oral or written) made by Seller, any partner or owner of Seller, or any affiliate, agent, employee or other representative of any of the foregoing or by Broker or any other person or entity purporting to represent Seller with respect to the Property or any other matter affecting or relating to the transactions contemplated hereby, except for Seller's Warranties or as may be expressly provided in any amendment to this Agreement.  Purchaser further expressly acknowledges and agrees that no person or entity (except for Seller with respect to Seller's Warranties) is entitled to make any disclosures, representations or warranties (in each case whether express or implied or oral or written) upon which Purchaser shall be entitled to rely, and that, Seller does not make any representations or warranties, whether express or implied or arising by operation of law, with respect to the Property or the transactions contemplated hereby, except for Seller's Warranties.

**CONSISTENT WITH THE FOREGOING AND SUBJECT SOLELY TO CLAIMS ON THE SELLER'S WARRANTIES, EFFECTIVE AS OF THE CLOSING DATE FOR THE PROPERTY, PURCHASER, FOR ITSELF AND ITS AGENTS, AFFILIATES, SUCCESSORS AND ASSIGNS, HEREBY ACQUIRES THE PROPERTY SUBJECT TO (AND AGREES TO ASSUME THE RISK THEREOF, IN FULL RELIANCE UPON ITS OWN INVESTIGATIONS) AND RELEASES AND FOREVER DISCHARGES, WAIVES AND EXONERATES SELLER, SELLER'S AFFILIATES, AND THE AGENTS, AFFILIATES, MEMBERS, PARTNERS, OFFICERS, DIRECTORS, MANAGERS, TRUSTEES, SUBSIDIARIES, PRINCIPALS, OWNERS, GENERAL PARTNERS, LIMITED PARTNERS, AS WELL AS THE SUCCESSORS AND ASSIGNS OF EACH OF SUCH PERSONS (COLLECTIVELY THE "RELEASEES") FROM ANY AND ALL LIABILITIES, OBLIGATIONS, RIGHTS, CLAIMS, CAUSES OF ACTION AND DEMANDS AT LAW OR IN EQUITY, CONTROVERSIES, DAMAGE, COSTS, LOSSES AND EXPENSES WHETHER KNOWN OR UNKNOWN AT THE TIME OF THIS AGREEMENT, WHICH PURCHASER HAS OR MAY HAVE IN THE FUTURE, ARISING OUT OF THE PROPERTY OR RELATING TO THE PROPERTY, THE PHYSICAL, ENVIRONMENTAL, ECONOMIC OR LEGAL CONDITION OF THE PROPERTY AND THE PROSPECTS, FINANCIAL CONDITION, OPERATION OR RESULTS OF OPERATIONS OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS IN TORT OR CONTRACT, ALL CLAIMS UNDER A WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) AND INCLUDING ANY WARRANTY OF MERCHANTABILITY, HABITABILITY OR GOOD AND WORKMANLIKE CONSTRUCTION AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED, AND ALL CLAIMS FOR INDEMNIFICATION OR CONTRIBUTION ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND**

LIABILITY ACT (42 U.S.C. SECTION 9601, ET SEQ.) OR ALL SIMILAR FEDERAL, STATE OR LOCAL STATUTE, RULE OR REGULATION, AND ANY OTHER BASIS FOR RECOVERY OR REIMBURSEMENT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) (COLLECTIVELY, THE "CLAIMS"). PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, EXONERATED, RELINQUISHED AND RELEASED SELLER AND ALL OTHER RELEASEES FROM AND AGAINST ANY AND ALL MATTERS AFFECTING PURCHASER AND/OR THE PROPERTY, OTHER THAN SELLER'S WARRANTIES. IN THIS CONNECTION AND TO THE GREATEST EXTENT PERMITTED BY LAW, PURCHASER HEREBY AGREES, REPRESENTS AND WARRANTS THAT PURCHASER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW KNOWN OR UNKNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CLAIMS WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED, AND PURCHASER FURTHER AGREES, REPRESENTS AND WARRANTS THAT THE WAIVERS AND RELEASES HEREIN AND THE PROVISIONS OF THIS PARAGRAPH 2.5 HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION AND THAT PURCHASER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CLAIMS (OTHER THAN CLAIMS ARISING FROM THE BREACH BY ONE OR MORE SELLER'S WARRANTIES). SELLER HAS GIVEN PURCHASER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR PURCHASER AGREEING TO THE PROVISIONS OF THIS PARAGRAPH 2.5.

The provisions of this Paragraph 2.5 shall survive indefinitely any closing or termination of this Agreement and shall not be merged into the closing documents.

### ARTICLE 3: TITLE AND SURVEY REVIEW

3.1     Title Review.   During the Due Diligence Period, Purchaser shall review the Existing Owner's Policy and the Existing Survey.  Purchaser may, at its expense, secure during the Due Diligence Period any title commitment or report from the Title Company ("Title Report") and/or order an update to the Existing Survey or a new survey (in each case, an "Updated Survey") desired by Purchaser with respect to the Property.  Furthermore, Purchaser shall have the right to request that the Title Company provide at Purchaser's sole cost and expense any reinsurance or endorsements Purchaser shall request with respect to such Title Report, provided that the issuance of such reinsurance or endorsements shall not be a condition to or delay the Closing.

3.2     Title Objections.   Purchaser may advise Seller in writing and in reasonable detail, not later than five (5) business days prior to the expiration of the Due Diligence Period (the "Title Review Period"), which exceptions to the Title Report or the underlying title documents referenced therein other than Permitted Exceptions (as hereinafter defined), if any, are not acceptable to Purchaser (the "Title Report Objections") and what matters in the Existing Survey or, if delivered to Purchaser prior to the expiration of the Title Review Period, the Updated Survey are not acceptable to Purchaser (the "Survey Objections") and, together with the Title Report Objections, the "Title Objections"), in each case, other than Permitted Exceptions.  Purchaser shall not, however, unreasonably express disapproval of any exceptions and prior to notifying Seller of any Title Objections shall endeavor in good faith to cause Title Company to modify and update the

60018890.6

Title Report to reflect its requested corrections and revisions.  Seller shall have five (5) business days after receipt of Purchaser's Title Objections to give Purchaser notice that (a) Seller will remove any exception which is the subject of a Title Objection from title or afford the Title Company necessary information or certifications to permit it to insure over such exceptions or (b) Seller elects not to cause such exceptions to be removed or insured over.  Seller's failure to provide timely notice to Purchaser as to any Title Objection shall be deemed an election by Seller not to remove or insure over the Title Objection.  If Seller so notifies or is deemed to have notified Purchaser that Seller will not remove or insure over any or all of the Title Objections, Purchaser shall have until before the expiration of the Due Diligence Period to determine whether (i) to waive such Title Objections which Seller has elected not to remove or insure over and proceed with the purchase and take the Property subject to such exceptions or (ii) to terminate this Agreement in which event the Earnest Money will be promptly returned to Purchaser.  Purchaser's failure, before the end of the Due Diligence Period, to give Seller notice to terminate this Agreement shall be deemed to be an election by Purchaser under clause (i) of the preceding sentence.

3.3     Permitted Exceptions.  "Permitted Exceptions" shall include and refer to:  all matters set forth in the Title Report or any update thereto or to the Existing Survey or any update thereto that are approved or deemed approved by Purchaser pursuant to the terms of this Agreement; all zoning and building laws, ordinances, maps, resolutions, and regulations of all governmental authorities having jurisdiction which affect the Property and the use, improvement or enjoyment thereof; parties in possession pursuant to the Leases; matters affecting title created by or with the consent of Purchaser; matters deemed to be permitted exceptions hereunder, including, but not limited to, the Condominium Conversion Agreement; liens to secure taxes and assessments not yet due and payable; and, customary utility easements.  Notwithstanding anything to the contrary contained in this Agreement, Seller shall remove at Seller's sole cost and expense on or prior to the Closing Date or otherwise cause the Title Company to insure over the following, none of which shall be treated as Permitted Exceptions (collectively, the "Mandatory Cure Liens"): (i) any existing mortgage, deed of trust or deed to secure debt in connection with financing obtained or voluntarily assumed by Seller that encumbers all or any portion of the Property, except for the recorded Loan Documents (including, without limitation, the deed to secure debt) relating to the Existing Financing if assumed by Purchaser, (ii) any other mechanics' liens or materialmen's liens arising by through or under Seller or its property manager that encumber the Property, (iii) any liens or encumbrances created by, through or under Seller or its property manager from and after the Effective Date without the prior written approval of Purchaser, (iv) any liens or encumbrances which Seller is obligated or has agreed to remove or cure pursuant to the terms of this Agreement (other than (y) liens arising from Purchaser's due diligence reviews or inspections hereunder, and (z) liens which Purchaser agrees to accept and receives a credit for at Closing), and (v) any other liens securing the payment of liquidated amounts other than current non-delinquent taxes (such liens described in this clause (v), collectively, "Involuntary Mandatory Cure Liens"); provided that Seller shall not be required to remove or cure any Involuntary Mandatory Cure Lien to the extent the amount exceeds $150,000.

3.4     Affidavits.  Seller shall have no obligation to execute any affidavits or indemnifications in connection with the issuance of Purchaser's title insurance policy, excepting only an owner's affidavit in the form attached hereto as **Exhibit B**, if requested by Purchaser, a "no changes affidavit" in the form customarily required by the Title Company, and such other affidavits and indemnifications which are required by the Title Company to remove or cure any

16

60018890.6

liens or encumbrances which Seller is obligated or has agreed to remove or cure pursuant to the terms of this Agreement.

3.5     <u>New Title and Survey Matters</u>. If, after the expiration of the Due Diligence Period (or after the expiration of the Title Review Period if the Updated Survey is not delivered to Purchaser by then), new title exceptions are revealed by any update of the Title Report or the Updated Survey, if delivered after the Title Review Period, or any update thereof (collectively, "New Matters"), Purchaser shall have the right to submit to Seller additional objection notices, provided that such new notices must be submitted by Purchaser on or prior to the date that is five (5) business days after Purchaser's receipt of such update, as applicable. If Purchaser timely notifies Seller in writing of such New Matters, Seller, in Seller's sole discretion, may, but shall have no obligation to, cure such New Matters on or prior to Closing; provided, however, Seller shall remove all Mandatory Cure Liens at Seller's sole cost and expense on or prior to the Closing Date. Seller shall be deemed to have given notice to Purchaser that Seller refuses to cure any such New Matters as of the fifth (5th) business day after receipt of Purchaser's notice, which Seller may so do in its sole discretion, unless within five (5) business days after receipt of notice from Purchaser, Seller shall deliver to Purchaser a notice indicating whether or not Seller will remove such New Matters. If such notice indicates that Seller will not remove said New Matters (or if Seller is deemed to refuse to remove said New Matters), Purchaser may (a) terminate this Agreement within three (3) business days after the earlier to occur of (i) receipt of such notice from Seller, or (ii) the date that Seller is deemed to have given notice that Seller refuses to remove such New Matters, and in either event the Earnest Money shall promptly be returned to Purchaser, and neither party shall have further rights or obligations pursuant to this Agreement, except for those provisions which expressly survive the termination of this Agreement; or (b) if Purchaser fails to so terminate, Purchaser shall be deemed to waive such New Matters and accept title subject thereto, in which event there shall be no reduction in the Purchase Price. If applicable, the Closing shall be extended to provide Seller and Purchaser with the full response periods provided in this Paragraph 3.5.

3.6     <u>Failure to Cure</u>. If Seller elects to cure any Title Objections or New Matters to which Purchaser objects pursuant to Paragraphs 3.2 or 3.5 above, and Purchaser does not terminate this Agreement, then it shall be a condition of Closing that such matters are in fact cured by Seller, and if not so cured, then, in addition to those rights and remedies Purchaser may have under Paragraph 9.2 of this Agreement, Purchaser shall have the right to terminate this Agreement and receive a return of the Earnest Money or waive said condition and proceed to Closing.

ARTICLE 4:  OPERATIONS AND RISK OF LOSS

4.1     <u>Ongoing Operations</u>. During the pendency of this Agreement, Seller shall, and shall cause its property manager to, carry on its business and activities relating to the Property, including construction, marketing, leasing, maintenance and operation of the Property, substantially in the same manner as it did before the Date of this Agreement. During the pendency of this Agreement, Purchaser shall be permitted, at Purchaser's sole cost and expense, and subject to compliance with Paragraph 2.3, to review the operations at the Property for purposes of verifying Seller's compliance with this Article 4. Seller shall cause all apartment units which are vacant as of the fifth (5th) day prior to the Closing Date to have been "made ready" for lease to new tenants by taking all customary "make ready" actions including, by way of example, cleaning

17

carpets, painting walls, and repairing and cleaning appliances. If Seller fails to put any such apartment units into "make ready" condition prior to the Closing Date, then Purchaser shall be entitled to a credit against the Purchase Price in the amount of $800 for each such apartment unit which is not put into "make ready" condition. Seller shall not remove any Personal Property, except as may be required for necessary repair or replacement (which repair and replacement shall be of equal quality, value, utility and quantity as existed as of the time of the removal), or otherwise in accordance with current inventory and management standards of Seller for its apartment properties, provided that any appliances, furniture, equipment, or other items of personal property so removed by Seller are promptly replaced by Seller, at its cost, with items of comparable value, quality and utility. Seller shall cause the property manager to maintain staffing at the Property in a manner generally consistent with its past practices. If Seller has the right to do so, Seller shall not consent to the transfer of any current employee away from the Property prior to Closing.

4.2    Performance under Leases and Service Contracts. During the pendency of this Agreement, Seller will perform in all material respects its obligations under the Leases and Service Contracts (as defined herein).

4.3    New Contracts and Leases. During the pendency of this Agreement, Seller will not, without the prior consent of Purchaser (which shall not be unreasonably withheld or delayed), enter into any lease or any other contract relating to the operation of the Property that will be an obligation affecting the Property subsequent to the Closing, except (a) residential Leases and amendments and renewals in each case in the ordinary course of business in accordance with Seller's market practice, and (b) contracts entered into in the ordinary course of business that are terminable without cause on 30-days' notice and without penalty or cancellation fee. Unless Purchaser agrees otherwise in writing, any new leases or renewals of existing Leases for such apartment units entered into by Seller during the pendency of this Agreement shall be on Seller's standard apartment lease form for the Property and shall be for terms of no less than three (3) months and no more than eighteen (18) months. Except in a manner consistent with then-current market rates and conditions (which may include rent and other terms to be determined by the use of recognized software [such as Yieldstar], including daily pricing), Seller shall not change rent rates, concessions and other terms of occupancy. Each such new lease or renewal entered into by Seller shall constitute a "Lease" for purposes of this Agreement.

4.4    Termination of Service Contracts. During the Due Diligence Period, Purchaser shall notify Seller which Service Contracts Purchaser wishes to assume at Closing. Failure to timely deliver such notice shall constitute Purchaser's binding election to assume all Service Contracts. Notwithstanding the foregoing, Purchaser shall assume all Service Contracts that are not terminable on thirty (30) days or less notice, and all Service Contracts that require the payment of a termination fee (unless Purchaser agrees to pay such termination fee) to the extent that Seller has provided Purchaser with copies of such Service Contracts during the Due Diligence Period. Purchaser shall pay any transfer or assignment fees or charges due in connection with its assumption of any Service Contracts. Notice of termination for all Service Contracts not assumed by Purchaser shall be given by Seller effective not later than the Closing Date. Notwithstanding the foregoing, Seller shall, at Seller's expense, terminate effective at Closing all property management agreements, brokerage agreements and listing agreements.

4.5    Damage or Condemnation. Risk of loss resulting from any condemnation or

18

eminent domain proceeding which is commenced or has been threatened before the Closing, and risk of loss to the Property due to fire, flood or any other casualty before the Closing, shall remain with Seller. If before the Closing, the Property or any portion thereof shall be materially damaged, or if the Property or any material portion thereof shall be subjected to a threat of condemnation, or shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, Seller shall promptly notify Purchaser in writing thereof ("Seller Notice") and Purchaser may terminate this Agreement by written notice to Seller given within five (5) business days after Purchaser's receipt of the Seller Notice, in which event the Earnest Money shall promptly be returned to Purchaser. If the Closing Date is within the aforesaid five (5) business day period, then Closing shall be extended to the next business day following the end of said five (5) business day period. If no such election is made, and in any event if the taking or damage is not material, (i) this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, (ii) no settlement shall be made with any insurance company with respect to such damage without Purchaser's prior written consent, not to be unreasonably withheld, and (iii) upon the Closing of this purchase, Seller shall assign, transfer and set over to Purchaser all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be made for such taking, (and, in the case of any award made prior to Closing, Seller shall give Purchaser a credit at Closing in the amount of such award), and Seller shall assign, transfer and set over to Purchaser any insurance proceeds that may thereafter be made for such damage or destruction, and Purchaser shall receive a credit for the amount of Seller's deductible under the applicable property or casualty insurance and any shortfall in insurance proceeds under such policies; provided, however, that any such assignment, transfer or credit of insurance or condemnation proceeds or deductible amounts shall be conditioned upon the obligation of Purchaser (which shall survive Closing) to repair and restore any damaged or condemned portions of the Property if and to the extent required by any applicable insurer, condemning authority or lender. For the purposes of this paragraph, the phrases "material portion", "material damage", "materially damaged", and "material taking" means (a) damage reasonably exceeding one and one-half percent (1.5%) of the Purchase Price to repair, or (b) taking of the Property which (i) removes any presently existing legal access to the Property, (ii) reduces the number of apartment units at the Property, (iii) reduces the number of parking spaces available at the Property, (iv) results in the Property not complying with applicable zoning and land use laws, or (v) has a value reasonably exceeding one percent (1%) of the Purchase Price.

4.6     Additional Deliveries. Within fifteen (15) calendar days after the end of each calendar month from and after the Date of this Agreement through Closing, Seller shall provide Operating Statements with respect to the Property and an updated Rent Roll in the same format as those delivered to Purchaser in accordance with this Agreement. In addition, within three (3) business days after request, Seller shall provide to Purchaser a current updated Rent Roll in the same format as that delivered to Purchaser in accordance with this Agreement and such other financial information and reports as Purchaser may reasonably request.

4.7     Exclusive. Seller acknowledges that Purchaser will incur material expenses in connection with its inspections and other diligence relating to the potential purchase of the Property. Therefore, Seller will not negotiate with or market the Property to any other parties, conduct any property tours, respond to any offers to purchase, or apply for any financing relating to the Property.

60018890.6

    4.8    Insurance. Seller shall keep the Property insured against loss or damage (including rental loss) by fire and all risks covered by Seller's insurance that is currently in force, provided that Seller may make adjustments in Seller's insurance coverage for the Property which are consistent with Seller's general insurance program for Seller's other apartment properties as in effect from time to time so long as Seller always maintains property insurance at least equal to the full replacement value of the Property and the requirements of the Loan Documents.

    4.9    Written Notice. Seller shall furnish Purchaser with a copy of all written notices received by Seller from any governmental authority of any violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property and all written notices of any pending or threatened litigation, action, suit, arbitration, investigation or proceeding relating to Seller or the Property, in each case promptly (but in any event within two (2) business days) following Seller's receipt thereof.

    4.10    Maintenance of Permits. Seller shall maintain in existence all licenses, permits and approvals that are now in existence with respect to the ownership, operation or improvement of the Property, and are of a continuing nature.

    4.11    Loan Documents. Seller shall comply, and shall cause its affiliates to comply, in all material respects with the terms of the Loan Documents. Neither Seller nor its affiliates will modify or amend any provisions of the Loan Documents. Seller shall promptly provide to Purchaser copies of all material notices given or received by Seller or its affiliates in connection with the Existing Financing.

    4.12    Assumption of Existing Financing. (a) Purchaser and Seller shall each use its commercially reasonable efforts to take such actions as may be reasonably required to apply to Lender for the approval of the sale of the Property to Purchaser and the assumption by Purchaser of the Existing Financing and to obtain the Assumption Approval (as defined below). For purposes hereof, "Assumption Approval" shall mean (i) Lender's unconditional approval in writing of the sale of the Property to Purchaser and the assumption by Purchaser of the Existing Financing, together with such modifications to the Loan Documents as may be required by Purchaser (including, without limitation, the release of Seller, as borrower, and any guarantor, from their respective obligations under the Loan Documents [including any guaranty and other obligation of such guarantor] to the extent contemplated by, and pursuant to, the terms, conditions and provisions of the Loan Documents with respect to the sale and transfer of the Property), and (ii) the finalization of all documents required in connection with the approval, assumption and modifications described above (including, without limitation, the approval of Lender to enter into and record the Condominium Conversion Agreement at Closing). If Purchaser is unable to obtain the Assumption Approval on or before April 15, 2023 (the "Assumption Approval Deadline"), then Purchaser shall have the right to elect (x) to terminate this Agreement by providing written notice thereof to Seller, in which event the Earnest Money will promptly be refunded to Purchaser, or (y) to proceed to consummate the transaction contemplated by this Agreement and to pay the Purchase Price in cash at Closing, as further provided in Paragraph 4.12(b) below. If Purchaser fails to give any written notice as provided in the immediately preceding sentence on or before the Assumption Approval Deadline, then for all purposes Purchaser shall be deemed to have elected clause (y) thereof. Notwithstanding the foregoing, Purchaser shall also have the right, in its sole and absolute discretion, to elect to proceed with the option contained in clause (y) hereof at any

time prior to the expiration of the Assumption Approval Deadline.

(b) If Purchaser duly elects to, or is deemed to have elected to, proceed to consummate the transaction contemplated by this Agreement and to pay the Purchase Price in cash at Closing, then notwithstanding any other provision of this Agreement to the contrary (i) all references in this Agreement to (A) Purchaser assuming the Existing Financing and (B) approvals required of Lender related to the assumption of the Existing Financing shall be deemed null and void; provided, however, Seller shall assign the Cap Agreement to Purchaser, and Purchaser shall assume Seller's obligations thereunder at Closing, (ii) Purchaser shall be obligated to pay the entire Purchase Price in cash at Closing (subject to the prorations and adjustments provided for herein other than the credit for the principal balance of the Existing Financing), (iii) in addition to the amounts otherwise payable by Purchaser pursuant to this Agreement, Purchaser shall be obligated to pay, and shall pay at Closing, all prepayment fees, premiums or penalties imposed by or due to Lender as a result of the prepayment of the Existing Financing, in an amount not to exceed, in the aggregate, 1% of the outstanding principal balance of the Existing Financing as of the Closing Date, and (iv) Seller shall pay off the Existing Financing in full as of Closing.

4.13   CC&R Estoppels.  Subject to receipt of a form estoppel certificate from Purchaser, Seller shall use commercially reasonable efforts, at Seller's sole cost and expense, to obtain and deliver to Purchaser, no later than five (5) business days prior to the Closing Date, an estoppel certificate (the "CC&Rs Estoppels") from the declarant, association or other relevant party for each of the declarations, restrictive covenants and other similar documents encumbering the Property or any portion thereof (the "CC&Rs").  Seller will submit the CC&Rs Estoppels to the relevant parties for execution on the form prepared by Purchaser within three (3) business days of Seller's receipt from Purchaser of such form of CC&Rs Estoppel.  A copy of each CC&Rs Estoppels shall be delivered to Purchaser promptly after such CC&Rs Estoppel is obtained from the relevant party.  If Purchaser does not receive a completed and executed CC&Rs Estoppel in the form submitted pursuant to this Paragraph 4.13 by the date which is five (5) business days prior to the Closing Date, then in lieu of such CC&Rs Estoppel, Seller shall deliver to Purchaser, no later than three (3) business days prior to the Closing Date, a certificate ("Seller's CC&Rs Estoppel") in the form of such CC&Rs Estoppel (with any necessary conforming changes). Obtaining a "clean" CC&Rs Estoppel or a "clean" Seller's CC&Rs Estoppel in connection with each of the CC&Rs shall be a Purchaser condition to Closing.

4.14   CC&Rs.  Seller will perform in a timely manner all of Seller's obligations under the CC&Rs and shall not enter into any amendment or modifications of any such CC&Rs.  Seller shall promptly provide to Purchaser copies of all material communications given or received by Seller with respect to the CC&Rs.

4.15   Warranties.  Seller shall use commercially reasonably efforts, at Seller's sole cost and expense, to cause all Warranties which are then in effect and assignable to be assigned to Purchaser prior to the Closing.  Such assignments shall be in form and content reasonably satisfactory to Purchaser.  Seller's obligation to cause the Warranties to be assigned to Purchaser shall include, without limitation, the obligation, at Seller's sole cost and expense, to use commercially reasonable efforts to obtain any necessary consents from the provider of any such Warranties to assign the Warranties to Purchaser.  Copies of the executed assignments and any necessary consents shall be delivered to Purchaser promptly after such assignments and consents

21

60018890.6

are obtained.  Notwithstanding the foregoing, Seller shall, at Seller's sole cost and expense, cause all warranties and guaranties in connection with the improvements at the Property relating to the roof, flashing, building skin, windows, sliding doors, storefronts, caulking, mechanical, electrical (including, without limitation, fixtures), plumbing, elevators, water-proofing, life-safety systems, fire protection systems, fire alarms, and all warranties and guaranties provided by the general contractor in connection with the improvements at the Property (collectively, the "Mandatory Warranties") to be assigned to Purchaser prior to Closing.  Such assignments shall be in form and content reasonably satisfactory to Purchaser.  Seller's obligation to cause such Mandatory Warranties to be assigned to Purchaser shall include, without limitation, the obligation, at Seller's sole cost and expense, to obtain any necessary consents from the provider of any such Mandatory Warranties to assign to such Mandatory Warranties to Purchaser (the "Mandatory Warranty Consents").  Copies of the executed assignments and any necessary consents shall be delivered to Purchaser promptly after such assignments and consents are obtained.  The assignment of the Mandatory Warranties to Purchaser and receipt of the Mandatory Warranty Consents shall be a Purchaser condition to Closing.

4.16    Cap Agreement.  Seller shall timely provide all necessary notices, information and payments as may be required to assign the Cap Agreement to Purchaser, and Seller shall, at Seller's sole costs and expense, obtain any approvals or consents, if any, which may be required in connection with such assignment (the "CA Approval").  The assignment of the Cap Agreement to Purchaser, the assumption of Seller's obligations thereunder by Purchaser, and receipt of the CA Approval shall be a Purchaser condition to Closing.

## ARTICLE 5:  CONDITIONS PRECEDENT

5.1    Purchaser's Conditions.    Notwithstanding anything in this Agreement to the contrary, Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)    Inspection.  Purchaser's inspection and approval, in Purchaser's sole and absolute discretion, within the Due Diligence Period, of all matters relating to the Property, pursuant to Paragraphs 2.2 and 2.4.

(b)    Performance.    Seller's performance or tender of performance in all material respects of its obligations under this Agreement and the material truth and accuracy of Seller's express representations and warranties in this Agreement as of the Closing Date, subject to Paragraph 9.3(b) below.

(c)    Assumption Approval.  Purchaser shall have received the Assumption Approval.

(d)    Casualty or Condemnation.    The Purchaser has not elected to terminate this Agreement pursuant to Paragraph 4.5.

(e)    Owner's Title Policy.  Title Company is unconditionally prepared to issue an ALTA Owner's Extended Coverage Title Insurance Policy, with liability equal to the Purchase Price, insuring Purchaser as the owner of fee simple title to the Land and Improvements, subject only to the Permitted Exceptions (the "Owner's Title Policy").

60018890.6

(f)     Estoppels.  Seller shall have obtained and provided to Purchaser the estoppels referenced in Paragraph 4.13.

(g)     Approvals.  Seller shall have obtained and provided to Purchaser the approvals referenced in Paragraphs 4.16 and 4.17.

(h)     Consents.  Seller shall have obtained and provided to Purchaser the Mandatory Warranty Consents as provided in Paragraph 4.15.

5.2     Seller Conditions.  Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)     Performance.  Purchaser's performance or tender of performance in all material respects of its obligations under this Agreement and the material truth and accuracy of Purchaser's express representations and warranties in this Agreement as of the Closing Date.

(b)     Assumption Approval.  Purchaser shall have received the Assumption Approval.

5.3     Failure or Waiver of Conditions Precedent.  In the event any of the conditions set forth in Paragraphs 5.1 or 5.2 are not fulfilled or waived, the party benefitted by such conditions may, without waiving any rights under Article 9, by written notice to the other party, terminate this Agreement, whereupon all rights and obligations hereunder of each party shall be at an end except those that expressly survive any termination.  Either party may, at its election, at any time or times on or before the date specified for the satisfaction of the condition, waive in writing the benefit of any of the conditions set forth in Paragraphs 5.1 and 5.2 above.  Notwithstanding the foregoing, Purchaser's failure to terminate this Agreement prior to the expiration of the Due Diligence Period shall be deemed the complete and irrevocable satisfaction of the condition set forth in Paragraph 5.1(a) above, and Purchaser shall not thereafter be entitled to terminate this Agreement based upon the alleged failure of such condition.  In the event this Agreement is terminated as a result of the failure of any condition set forth in Paragraph 5.1 or 5.2(b), Purchaser shall be entitled to a refund of the Earnest Money.  In any event, if such party elects to close escrow, such party shall waive any remaining unfulfilled conditions, and any liability on the part of the other party for breaches of representations, warranties and covenants, to the extent the same survive Closing, but only as to of which such party had actual knowledge as of the Closing.

ARTICLE 6: CLOSING

6.1     Closing.  The consummation of the transactions contemplated herein ("Closing") shall occur on the Closing Date at the offices of the Escrow Agent or pursuant to escrow arrangements reasonably satisfactory to Purchaser and Seller.  Upon completion of the deliveries pursuant to Paragraphs 6.2 and 6.3 below, satisfaction of the other conditions to Closing herein set forth and performance by each party of its obligations required to be performed prior to or at the Closing, the parties shall direct Title Company to make such deliveries and disbursements according to the terms of this Agreement.  Notwithstanding any other provision of this Agreement to the contrary, Purchaser may, by written notice to Seller given not later than ten (10) days prior to the Closing Date (the "Extension Notice"), extend the Closing Date on a one-time basis for up to thirty (30) days, with such extended Closing Date specified in the Extension Notice, in which

23

event the term "Closing Date" shall thereafter mean such extended Closing Date; provided, however, that as a condition to such option to extend the Closing Date Purchaser shall deposit with the Escrow Agent the additional sum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Extension Deposit") in good funds either by certified bank or cashier's check or by federal wire transfer, and the Extension Deposit shall thereupon be part of the Earnest Money. Purchaser's failure to deliver the Extension Deposit within one (1) business day after giving the Extension Notice shall render the Extension Notice null and void.

6.2     Seller's Deliveries in Escrow.  On or before the Closing Date, provided Purchaser shall not be in material default of this Agreement, Seller shall deliver in escrow to the Escrow Agent the following:

(a)     Deed.  A limited warranty deed (warranting title for acts by, through or under Seller) (the "Deed") in the form of **Exhibit C** attached hereto, executed and acknowledged by Seller, conveying to Purchaser Seller's title to the Property, subject only to the Permitted Exceptions.

(b)     Assignment of Leases and Contracts and Bill of Sale.  An Assignment of Leases and Contracts and Bill of Sale in the form of **Exhibit D** attached hereto, executed by Seller;

(c)     Condominium Conversion Agreement.  A Condominium Conversion Agreement in the form set forth on **Exhibit F** attached hereto (the "Condominium Conversion Agreement"), executed by Seller;

(d)     State Law Disclosures.  Such disclosures and reports as are required from a Seller by applicable state and local law in connection with the conveyance of real property;

(e)     Broker Affidavit.  A Broker Affidavit in a form reasonably satisfactory to Title Company, together with a Broker Lien Waiver executed by Broker.

(f)     FIRPTA.  A Foreign Investment in Real Property Tax Act affidavit executed by Seller;

(g)     Cap Agreement.  An assignment of Seller's right, title and interest in and to the CAP Agreement, duly executed;

(h)     Seller Affidavits.  An owner's affidavit and, if requested by Purchaser, a "no changes affidavit";

(i)     Rent Roll.  A Rent Roll as of a date no earlier than five (5) days prior to the Closing Date certified by Seller to its knowledge to be true and correct in all material respects as of the date of such Rent Roll;

(j)     Assumption Approval.  Such documents as may be required by Lender to be executed by Seller and its affiliates in connection with the Assumption Approval;

(k)     Georgia Affidavit.  A Georgia Seller's Withholding Affidavit in accordance with the requirements of O.C.G.A. Section 48-7-128 and a PT 61 Transfer Tax Form;

24

60018890.6

(l)     Service Contracts.  Evidence of Seller's termination of all Service Contracts, property management agreements, listing agreements and all brokerage agreements which Seller is required to terminate under Paragraph 4.4;

(m)     Closing Certificate.  A certificate ("Seller's Closing Certificate"), dated as of the Closing Date and duly executed by Seller, in the form of **Exhibit G** attached hereto, stating that the representations and warranties of Seller contained in this Agreement are true and correct as of the Closing Date (with appropriate modifications to reflect any changes therein or identifying any representation or wartanty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change, so long as such modification is not the result of a default by Seller hereunder or any circumstances within the control of Seller or its affiliates).  The inclusion of any change or exception in such certificate shall not prejudice Purchaser's rights under this Agreement with respect to the subject matter or such change or exception; and

(n)     Estoppels and Consents.  The originals of each of the CC&Rs Estoppels, the Seller's CC&Rs Estoppels, if applicable, the assignment of Warranties and Mandatory Warranties and any related consents and Mandatory Warranty Consents and the CA Approval.

(o)     Additional Documents.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.3     Purchaser's Deliveries in Escrow.  On or before the Closing Date, provided Seller shall not be in material default of this Agreement, Purchaser shall deliver in escrow to the Escrow Agent the following:

(a)     Purchase Price.  The Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, credits and adjustments, deposited by Purchaser with the Escrow Agent in immediate, same day federal funds wired for credit into the Escrow Agent's escrow account;

(b)     Assignment of Leases and Contracts and Bill of Sale.  An Assignment of Leases and Contracts and Bill of Sale in form of **Exhibit D** attached hereto, executed by Purchaser;

(c)     Condominium Conversion Agreement.   The Condominium Conversion Agreement, executed by Purchaser;

(d)     Assumption Approval.  Such documents as may be required by Lender to be executed by Purchaser in connection with the Assumption Approval;

(e)     State Law Disclosures.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property; and

(f)     Additional Documents.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.4     Closing Statements/Escrow Fees.  At the Closing, Seller and Purchaser shall

deposit with the Escrow Agent executed closing statements consistent with this Agreement in the form required by the Escrow Agent.

      6.5    <u>Possession</u>. Seller shall deliver possession of the Property to Purchaser at Closing.

      6.6    <u>Post-Closing Deliveries</u>.  Promptly after the Closing, Seller shall deliver to the Property or the offices of Purchaser's property manager:  the original Leases and lease files (or copies if no originals are available); originals of all contracts (or copies if no originals are available) and receipts for deposits; all keys, access cards, FOBs, combinations, access codes, alarm codes and similar items, if any, used in the operation of the Property; and, if in Seller's possession, a copy of any "as-built" plans and specifications of the Improvements and other Intangible Personal Property.

      6.7    <u>Notice to Tenants</u>.  Seller and Purchaser shall deliver to each tenant immediately after the Closing a notice regarding the sale in substantially the form of **Exhibit E** attached hereto, or such other form as may be required by applicable state law.

      6.8    <u>Closing Costs</u>.  Each party shall pay its portion of the following costs as indicated below:

      (a)    Update to Existing Survey – Purchaser.

      (b)    Owner's Title Policy, including any extended coverage and endorsements – Purchaser.

      (c)    Recording charges:

          (i)    Instruments to remove encumbrances that Seller agrees to or its obligated to remove – Seller.

          (ii)    Deed and Condominium Conversion Agreement – Seller.

      (d)    Transfer taxes – Seller.

      (e)    Appraisals, engineering studies, termite inspections, environmental inspections and other inspections and tests desired by Purchaser – Purchaser.

      (f)    Other – The Escrow Agent's escrow fee shall be evenly divided between the parties.

Each party shall pay its own attorneys' fees.  Any costs associated with any financing that Purchaser may obtain shall be borne solely by Purchaser.  Purchaser shall pay any escrow cancellation fee or other fees due upon a termination of this Agreement.  All other costs shall be borne according to local custom.

      6.9    <u>Close of Escrow</u>.  Upon satisfaction or completion of the foregoing conditions and deliveries, the parties shall direct the Escrow Agent to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Seller and Purchaser and in accordance with escrow instructions

60018890.6

by each party consistent with this Agreement.

## ARTICLE 7:  PRORATIONS

Prorations and adjustments with respect to the Property shall be made as of the Closing Date as set forth in this Article 7.

7.1    Prorations.  The day of Closing shall belong to Purchaser (*i.e.*, all income of the Property attributed to the day of Closing shall belong to Purchaser and all expenses of the Property attributed to the day of Closing shall be borne by Purchaser) and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing Date. In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited to Purchaser or charged to Purchaser as applicable and the portion thereof applicable to periods ending as of Closing shall be credited to Seller or charged to Seller as applicable.

(a)    Collected Rent.  All collected rent and other collected income (and any applicable state or local tax on rent) under Leases in effect on the Closing Date shall be prorated as of the Closing.  Uncollected rent and other uncollected income shall not be prorated.  Purchaser shall apply rent and other income from tenants that are collected after the Closing first to the obligations then owing to Purchaser for its period of ownership and to costs of collection, remitting the balance, if any, to Seller to the extent there are any delinquent rents at Closing, provided that rents collected by Purchaser after the Closing Date to which Seller is entitled shall be paid to Seller within thirty (30) days after receipt thereof by Purchaser.  Any prepaid rents for the period following the month including the Closing Date shall be paid over by Seller to Purchaser. Purchaser will make reasonable efforts, without suit or other collection proceedings, to collect any rents applicable to the period before Closing.  Seller may pursue collection as to any rent not collected by Purchaser prior to the Closing Date so long as the tenant is no longer an occupant at the Property.

(b)    Taxes and Assessments.    Real estate taxes and assessments imposed by governmental authority and any assessments imposed by private covenant constituting a lien or charge on the Property for the then current calendar year or other current tax period (collectively, "Taxes") not yet due and payable shall be prorated.  The applicable tax period for real estate taxes is the 2023 calendar year.  Such proration shall be based upon the conclusive assumption that the property owner will qualify for the maximum discount available for early payment, and shall not be re-prorated based upon the property owner's actual date of payment.  If the Closing occurs prior to the receipt by Seller of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Purchaser and Seller shall prorate Taxes for such calendar year or other applicable tax period based upon the 2022 assessed value of the Property and most recently available tax rates, multiplied by 105%.  Any refund or rebate of Taxes resulting from a tax abatement, or from a  tax protest, challenge or appeal (an "Appeal") for a tax year ending prior to the tax year in which Closing Date occurs shall belong to Seller, whether received before or after Closing, and Seller shall have the sole authority to prosecute such Appeals.  Any refund or rebate of Taxes, less costs incurred in connection therewith, resulting from an Appeal for the tax year in which the Closing Date occurs shall be prorated between the parties as of the Closing Date in the same manner as prescribed above, whether received before or after Closing, and notwithstanding

60018890.6

anything to the contrary contained in this Agreement, Purchaser shall have the right following the Closing to control all Appeals with respect to the tax year in which the Closing occurs and Seller shall cooperate with Purchaser in any protest or other Appeal arising therefrom. Purchaser will deliver to Seller the trim notice for 2023 real estate taxes promptly upon receipt. Any reasonable costs Purchaser incurs in connection with such protest or Appeal will be paid out of any refund or rebate of Taxes arising from such protest or other Appeal.

(c)     <u>Utilities</u>. Utilities, including water, sewer, electric, and gas, based upon the last reading of meters and invoices prior to the Closing shall be prorated. Seller shall endeavor to obtain meter readings on the day before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Seller shall pay at Closing the bills therefor for the period to the day preceding the Closing, and Purchaser shall pay the bills therefor for the period subsequent thereto. If the utility company will not issue separate bills, Purchaser will receive a credit against the Purchase Price for Seller's portion and will pay the entire bill prior to delinquency after Closing. If Seller has paid any utilities in advance, then Purchaser shall be charged its portion of such payment at Closing.

(d)     <u>Fees and Charges under Service Contracts, Licenses and Permits</u>. Fees and charges under such of the Service Contracts, licenses and permits as are being assigned to and assumed by Purchaser at the Closing, shall be prorated on the basis of the periods to which such fees and charges under said Service Contracts, licenses and permits relate, but specifically excluding door fees and similar upfront fees paid to the owner of the Property which shall be retained by Seller.

(e)     <u>Locator Fees</u>. Locator fees on residential Leases which are the obligation of the landlord shall be allocated between the parties as provided hereinbelow according to whether such obligations arise in connection with (i) Leases, whenever executed, with respect to which the tenant takes occupancy prior to the Closing Date ("<u>Existing LC Obligations</u>"), or (ii) Leases, whenever executed, with respect to which the tenant takes occupancy on or after the Closing Date ("<u>New LC Obligations</u>").

(i)     <u>Existing LC Obligations</u>. If, by Closing, Seller has not paid in full Existing LC Obligations, then Purchaser shall receive a credit for such remaining costs, and Purchaser shall be responsible for paying such Existing LC Obligations.

(ii)     <u>New LC Obligations</u>. At Closing, Purchaser shall reimburse Seller for the cost of New LC Obligations paid by Seller, and Purchaser shall assume all New LC Obligations; <u>provided</u>, <u>however</u>, Purchaser's share of such New LC Obligations shall not exceed the aggregate sum of $15,000.00.

(f)     <u>Existing Financing</u>. Escrow Agent shall credit Seller with the amount of any deposits held by the Lender in connection with the Existing Financing and which are assigned to Purchaser. Accrued but unpaid interest on the Existing Financing shall be credited to Purchaser.

(g)     <u>Final Adjustment After Closing</u>. If final prorations cannot be made at Closing for any item being prorated under this Paragraph 7.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available and applicable reconciliation with tenants have been completed, with final adjustment to be made as soon as

60018890.6

reasonably possible after the Closing but no later than ninety (90) days after the Closing (except as to real estate taxes for 2023, the final adjustment with respect to which shall take place not later than ninety (90) days after the later to occur of receipt of the trim notice or the final disposition of any Appeal thereof), to the effect that income and expenses are received and paid by the parties on an accrual basis with respect to their period of ownership.  In the event of any omission or mathematical error on the closing statement, or if the prorations, apportionments and computations shall prove to be incorrect for any reason, the same shall be promptly adjusted when determined and the appropriate party paid any monies owed.  Payments in connection with the final adjustment shall be due within ten (10) days of written notice.  Seller and Purchaser shall have reasonable access to, and the right to inspect and audit, the other's books to confirm the final prorations.  This paragraph shall expressly survive Closing.

7.2     Deposits.  All tenant security deposits and other refundable tenant deposits, as reflected on the final Rent Roll delivered to Purchaser (and interest thereon if required by law or contract to be earned thereon), and not theretofore applied to tenant obligations under the Leases in the ordinary course of business shall be transferred or credited to Purchaser at Closing or placed in escrow if required by law.  As of the Closing, Purchaser shall assume Seller's obligations related to such security deposits and other refundable tenant deposits to the extent turned over to Purchaser as aforesaid.  Purchaser will indemnify, defend, and hold Seller harmless from and against all demands and claims made by tenants arising out of the transfer or disposition of any security deposits and other refundable tenant deposits transferred to Purchaser at Closing and will reimburse Seller for all reasonable attorneys' fees incurred or that may be incurred as a result of any such claims or demands as well as for all loss, expenses, verdicts, judgments, settlements, interest, costs and other expenses incurred by Seller as a result of any such claims or demands by such tenants.

7.3     Utility Deposits.  Purchaser shall be responsible for making any deposits required with utility companies.

7.4     Sale Commissions.  Seller and Purchaser each represent and warrant to the other that it has not dealt with any real estate broker, sales person or finder in connection with this transaction other than Broker who represents Seller.  If this transaction is closed, Seller shall pay Broker in accordance with their separate agreement.  Broker is an independent contractor and is not authorized to make any agreement or representation on behalf of Seller.  Except as expressly set forth above, if any claim is made for broker's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement or the transactions contemplated hereby on behalf of, or by through or under either party, such party shall defend, indemnify and hold harmless the other from and against any such claim based upon any purported or actual statement, representation or agreement of such party.

ARTICLE 8:  REPRESENTATIONS AND WARRANTIES

8.1     Seller's Representations and Warranties.  As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to Purchaser that:

(a)     Organization and Authority.  Seller has been duly organized and is validly existing

29

as a limited liability company, in good standing in the State of Delaware and is qualified to do business in the state in which the Property is located. Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action. There is no agreement to which Seller is a party or to Seller's knowledge binding on Seller which is in conflict with this Agreement. There is no action or proceeding pending and served or, to Seller's knowledge, pending and not served or threatened against Seller or the Property, or any portion thereof, including condemnation proceedings, which (i) challenges or impairs Seller's ability to execute or perform its obligations under this Agreement, or (ii) affects the Property.

(c)     Rent Roll and Operating Statements. The Rent Roll provided or to be provided to Purchaser is or will be prepared by or for Seller in the ordinary course of its business in the same manner as it prepares or obtains such reports for its other properties and is or will be the Rent Roll used by Seller in connection with its ownership and operation of the Property. To Seller's knowledge, Rent Roll is or will be true, correct and complete in all material respects as of the date thereof. The Operating Statements provided or to be provided to Purchaser are or will be prepared by or for Seller in the ordinary course of business in the same manner as it prepares or obtains such reports for its other properties and are the Operating Statements used and relied upon by Seller in connection with its operation of the Property.

(d)     Service Contracts. To Seller's knowledge, the list of Service Contracts delivered or made available to Purchaser as part of the Property Information is true, correct, and complete as of the date of its delivery in all material respects. Neither Seller, nor, to Seller's knowledge, any other party, is in material default under any Service Contract.

(e)     Books and Records. All books, records and other information prepared by Seller or its property manager and provided to Purchaser by Seller were prepared by or for Seller in the ordinary course of its business and are the same books, records and other information used and relied upon by Seller in its operation of the Property.

(f)     Compliance with Law. Seller is not in actual receipt of any written notice, addressed specifically to Seller and sent by any governmental authority or agency having jurisdiction over the Property, that the Property or its use is in violation of any law, ordinance, or regulation, nor any written notice from any insurance company or Board of Fire Underwriters (or other organization exercising functions similar thereto) requesting the performance of any work or alteration in respect of the Property, except for any such matters which may have been previously cured by Seller.

(g)     Declaration. Seller has not received written notice of any default by Seller under any recorded covenants, restrictions or easements affecting the Property, which default remains uncured.

60018890.6

(h)     No Employees.  Seller has no employees at the Property.  The management agreement between Seller and its third-party management company, which is responsible for any workers at the Property, will be terminated as of Closing.

(i)     OFAC.

(i)     Sanctions Laws.  To Seller's knowledge, neither Seller nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers or directors: (i) is the subject of any sanctions or trade embargoes administered or enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State, the European Union, his Majesty's Treasury, the United Nations Security Council, or other relevant sanctions authority (collectively, "Sanctions"); (ii) is located, organized or ordinarily resident in a country or territory that is, or whose government is, the subject of Sanctions (currently, Crimea, North Korea, Cuba, Iran, Syria); or (iii) is owned or controlled by, or acting for or on behalf of, any person described in (i) and (ii) hereof.  No payment or other consideration provided by the Seller under this Agreement has been received, directly or indirectly, from any transactions or activities in violation of Sanctions, nor will the Seller engage, directly or indirectly, in any transaction or activity that would cause the Purchaser or any other party to this Agreement to violate Sanctions.

(ii)     ERISA.  Seller is not, and the Property to be sold hereunder does not, constitute an asset of, any (a) "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (b) "plan" (within the meaning of Section 4975 of the Code) or, (c) entity whose underlying assets include "plan assets" (within the meaning of 29 C.F.R. Section 2510-101, as modified by Section 3(42) of ERISA) by reason of a plan's investment in such entity, or (d) entity subject to any law regulating investments by "governmental plans" (within the meaning of Section 3(32) of ERISA).

(j)     Bankruptcy.  Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(k)     Existing Financing.  The Loan Documents are all of the documents and agreements relating to the Existing Financing now enforced or continuing to be binding on Seller or the Property.  Seller has delivered to Purchaser true, correct and complete copies of the Loan Documents, and no modifications have been made to any terms or provisions thereof.  There is no requirement, other than as set forth in the Loan Documents, that permits the holder of the Existing Financing to require its immediate payment in full or to change any term thereof by reason of the Closing of this transaction.  Seller has made all payments and performed all obligations due pursuant to the Loan Documents.  Neither Seller, nor to Seller's knowledge, any other party to the Existing Financing, is in default thereunder, nor, to Seller's knowledge, is there any event which, with the passage of time, the giving of notice, or both, would constitute a default thereunder.  As of the Effective Date, based upon the most recent statement received by Seller from Lender, the outstanding principal balance of the Existing Financing is approximately $53,812,000.  **Exhibit H**

31

sets forth a true and correct list of all sums held in reserve or escrow accounts by the Lender in connection with the Existing Financing.

(l)     Parties in Possession.  Except for any parties in possession pursuant to, and any rights of possession granted under the Leases, there are no parties in possession of any part of the Land or Improvements, and there are no other rights of possession which have been granted to any third party or parties.

(m)     No Options.  Seller is not obligated to sell the Property or any portion thereof to any party or entity other than Purchaser, nor do there exist any purchase options, rights of first refusal or other similar rights or options to purchase the Property, any portion thereof or any interest therein.

(n)     Special Assessments.  Seller has not received any written notice of any pending or threatened special assessments against the Property, except for any special assessments which are included in the tax bills provided by Seller pursuant to the terms of Paragraph 2.1.

(o)     Knowledgeable Party.  Elizabeth Amick is the individual associated with Seller's organization who has the most knowledge of the subject matter of Seller's representations and warranties provided in this Agreement. "Seller's knowledge" or similar phrases as used in this Agreement means the current actual knowledge of Elizabeth Amick, the person with overall asset management responsibility for the Property, after commercially reasonable inquiry of the property manager, but without any other duty of inquiry or investigation.  In no event shall Purchaser have any personal claim against the above-named individual as a result of the reference thereto in this Agreement, and Purchaser waives and releases all such claims which Purchaser now has or may later acquire against such individual in connection with the transaction contemplated in this Agreement.

8.2     Purchaser's Representations and Warranties.  As a material inducement to Seller to execute this Agreement and consummate this transaction, Purchaser represents and warrants to Seller that:

(a)     Organization and Authority.  Purchaser has been duly organized and is validly existing as a limited liability company, in good standing in the State of Delaware and is qualified to do business in the state in which the Property is located.  Purchaser has the full right and authority to, and has obtained any and all consents required to, enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action.  There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement.  There is no action or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

(c)     Sanctions Laws.  To Purchaser's knowledge, neither Purchaser nor any of its

32

60018890.6

affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers or directors: (i) is the subject of any sanctions or trade embargoes administered or enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State, the European Union, his Majesty's Treasury, the United Nations Security Council, or other relevant sanctions authority (collectively, "Sanctions"); (ii) is located, organized or ordinarily resident in a country or territory that is, or whose government is, the subject of Sanctions (currently, Crimea, North Korea, Cuba, Iran, Syria); or (iii) is owned or controlled by, or acting for or on behalf of, any person described in (i) and (ii) hereof.   No payment or other consideration provided by the Purchaser under this Agreement has been received, directly or indirectly, from any transactions or activities in violation of Sanctions, nor will the Purchaser engage, directly or indirectly, in any transaction or activity that would cause the Seller or any other party to this Agreement to violate Sanctions.

## ARTICLE 9:  DEFAULT AND DAMAGES

9.1     Default by Purchaser.  If Purchaser defaults in its obligation to purchase the Property from Seller pursuant to this Agreement, Purchaser agrees that Seller shall have the right to terminate the Agreement and obtain and retain, and to unilaterally instruct the Escrow Agent to deliver to Seller, the Earnest Money as liquidated damages to recompense Seller for time spent, labor and services performed, and the loss of its bargain.  Purchaser and Seller agree that it would be impracticable or extremely difficult to affix damages if Purchaser so defaults and that the Earnest Money, together with the interest thereon, represents a reasonable estimate of Seller's damages.  Seller agrees to accept the Earnest Money as Seller's total damages and sole and exclusive relief hereunder if Purchaser defaults in its obligation to close hereunder and Seller thereafter exercises its termination right.  If this Agreement is so terminated, Purchaser shall have no further right, title, or interest in or to the Property.

9.2     Default by Seller.  If Seller shall default in a material obligation under this Agreement, Purchaser's sole remedy shall be to elect one of the following:  (a) to terminate this Agreement, in which event Purchaser shall be entitled to the return of the Earnest Money and Purchaser shall have the right to recover from Seller its reasonable out-of-pocket costs and expenses incurred in connection with the transaction contemplated by this Agreement provided that such out-of-pocket costs and expenses which may in such event be recovered from Seller shall not exceed, in the aggregate, $250,000.00, and shall be based upon, and subject to the delivery of, written documentation of such costs and expenses reasonably acceptable to Seller, or (b) to bring a suit for specific performance, provided that any suit for specific performance must be brought within sixty (60) days of Seller's default, to the extent permitted by law, Purchaser hereby waiving the right to bring suit for specific performance at any later date.  As a condition precedent to any suit for specific performance, Purchaser must have been ready, willing and able to close as of the Closing Date; provided, however, for purposes of clarification, Purchaser shall not be required to have deposited the balance of the Purchase Price in escrow but shall have demonstrated that it has access to such funds.  Purchaser hereby waives any other rights or remedies.  In no event shall either party be liable to the other party for any punitive, speculative or consequential damages. This Agreement confers no present right, title or interest in the Property to Purchaser and Purchaser agrees not to file a lis pendens or other similar notice against the Property except in connection with, and after, the filing of a suit for specific performance.

60018890.6

.

9.3     Notice of Default.  Neither party shall have the right to declare a default by the other party because of a failure by such other party to perform, under the terms of this Agreement unless the other party shall fail to cure such failure to perform within three (3) business days after its receipt of written notice of such failure to perform.

9.4     Limitations.

(a)     Limitation Period.  Seller's warranties and representations contained in Paragraph 8.1 of this Agreement shall survive Purchaser's purchase of the Property only for a period commencing on the Closing Date and ending on that date which is nine (9) months after the Closing Date (the "Limitation Period").  Seller shall have no liability for breach of any such representation or warranty unless Purchaser's aggregate damages are reasonably estimated to exceed $25,000 (the "Basket") and Seller's aggregate liability for claims arising out of such representations and warranties shall not exceed $750,000 (the "Cap").  For purposes of clarification, the parties acknowledge and agree that if Purchaser's damages in the aggregate exceed the amount of the Basket, Seller shall not only be liable for claims accruing above $25,000, but shall be liable for all liabilities (i.e., "dollar one") up to the Cap.  Purchaser shall provide written notice to Seller prior to the expiration of the Limitation Period of any alleged breach of such warranties or representations.  Purchaser shall allow Seller thirty (30) days within which to cure such breach or settle such claim, or, if such breach or settlement cannot reasonably be cured or accomplished within thirty (30) days, an additional reasonable time period not to exceed an additional ninety (90) days, so long as such cure has been commenced within such thirty (30) days and is being diligently pursued.  If Seller fails to cure such breach or settle such claim after written notice and within such cure period, Purchaser's sole remedy shall be an action at law for actual damages as a consequence thereof, which must be commenced, if at all, within thirty (30) days after the later to occur of the expiration of the Limitation Period or the expiration of the cure period. The Limitation Period referred to herein shall apply to unknown as well as known breaches and claims.  Except as specifically provided in this paragraph, none of Seller's representations and warranties contained in this Agreement shall survive the Closing.  Purchaser specifically acknowledges that such termination of liability represents a material element of the consideration to Seller.  The limitation as to Seller's liability in this Paragraph 9.4(a) does not apply to (i) the obligations of the parties with respect to prorations and adjustments under Article 7, which shall survive until the parties' satisfaction of their respective obligations under Paragraph 7.1(g), (ii) and shall not in any manner limit Seller's liability or obligations pursuant to Paragraph 7.4 or 11.9, and (iii) any claims arising out of the willful misconduct or fraud of Seller.

(b)     Disclosure.  Notwithstanding any contrary provision of this Agreement, if Seller becomes aware during the pendency of this Agreement prior to Closing of any matters which make any of its representations or warranties untrue in any material respect, Seller shall promptly disclose such matters to Purchaser in writing.  In the event that Seller discloses any material and adverse matters which make any of Seller's representations and warranties untrue in any material respect or in the event that Purchaser's representative, Justin Leahy, receives actual knowledge during the pendency of this Agreement prior to Closing of any material and adverse matters which make any of Seller's representations or warranties untrue in any material respect, Seller shall bear no liability for such matters (provided that such untruth is not the result of Seller's breach of any express covenant set forth in this Agreement or as a result of the acts or omissions of Seller), but Purchaser shall have the right to elect in writing within five (5) days of Purchaser's representative,

34

Justin Leahy, receiving actual knowledge of such matter, (i) to waive such matters and complete the purchase of the Property without reduction of the Purchase Price in accordance with the terms of this Agreement, or (ii) as to any material and adverse matters first disclosed or discovered following the expiration of the Due Diligence Period, to terminate this Agreement, in which event the Earnest Money shall be returned to Purchaser, and neither party shall have any further rights or liabilities hereunder except for those provisions which expressly survive the termination of this Agreement. Purchaser's consent to the close of escrow pursuant to this Agreement shall waive any liability on the part of Seller for breaches of representations and warranties of which Purchaser's representative, Justin Leahy, had actual knowledge as of the Closing.

ARTICLE 10:  EARNEST MONEY PROVISIONS

10.1    <u>Investment and Use of Funds</u>.  The Escrow Agent shall invest the Earnest Money in government insured interest bearing accounts satisfactory to Purchaser and Seller, shall not commingle the Earnest Money with any funds of the Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made.  If the Closing under this Agreement occurs, the Escrow Agent shall apply the Earnest Money to the Purchase Price at Closing and deliver it to Seller.

10.2    <u>Termination</u>.  Except as otherwise expressly provided in this Agreement, upon not less than five (5) business days' prior written notice to the Escrow Agent and the other party, Escrow Agent shall deliver the Earnest Money to the party requesting the same; <u>provided, however</u>, that if the other party shall, within said five (5) business day period, deliver to the requesting party and the Escrow Agent a written notice that it disputes the claim to the Earnest Money, Escrow Agent shall retain the Earnest Money until it receives written instructions executed by both Seller and Purchaser as to the disposition and disbursement of the Earnest Money, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money shall be delivered in accordance with such notice, instruction, order, decree or judgment.

10.3    <u>Interpleader</u>.  Seller and Purchaser mutually agree that in the event of any controversy regarding the Earnest Money, unless mutual written instructions are received by the Escrow Agent directing the Earnest Money's disposition, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Escrow Agent's option, the Escrow Agent may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees.  Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

10.4    <u>Liability of Escrow Agent</u>.  The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Escrow Agent's mistake of law

60018890.6

respecting the Escrow Agent's scope or nature of its duties.  Seller and Purchaser shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred by Escrow Agent in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

ARTICLE 11:  <u>MISCELLANEOUS</u>

11.1    <u>Parties Bound</u>.  Except for an assignment pursuant to Paragraph 11.15, neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void.  Notwithstanding the foregoing, Purchaser shall have the right to assign this Agreement to (i) one or more affiliates of Purchaser, (ii) one or more entities in which Purchaser or an affiliate thereof is a direct or indirect partner, member, manager or shareholder or which is owned or controlled directly or indirectly by Purchaser or an affiliate thereof, and (iii) one or more tenant-in-common entities, provided the initial Purchaser is the initial property manager of the Property after the Closing; provided, in each case, Purchaser delivers written notice of such assignment to Seller at least five (5) days prior to the Closing Date.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties.  Notwithstanding any provision of this Paragraph 11.1 or this Agreement to the contrary, in the event of any assignment of this Agreement the original Purchaser shall be and remain liable for all obligations of "Purchaser" under this Agreement.

11.2    <u>Disclosures</u>.  Prior to Closing, neither Seller nor Purchaser shall make any public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written specific consent of the other; <u>provided</u>, <u>however</u>, that each of Seller and Purchaser may make disclosure of this Agreement to its lenders, potential lenders, investors, potential investors, advisors, creditors, officers, managers, members, employees and agents as necessary to perform its obligations hereunder.  After Closing, either party may disclose the transaction contemplated by this Agreement, but neither party may make any public announcement regarding the economic terms of the transaction without the prior written specific consent of the other.  In the event of a breach or threatened breach by Seller, Purchaser or their agents, consultants and/or lenders of this Paragraph 11.2, then in addition to any other remedy available hereunder the non-breaching party shall be entitled to an injunction restraining the breaching party from disclosing, in whole or in part, such confidential information.  The confidentiality provisions of this <u>Paragraph 11.2</u> shall not apply to any information which is published or becomes publicly available through no fault of either the Purchaser or Seller or to any disclosures made by a party as required by law (including, without limitation, applicable rules, regulations and governmental regulatory, disclosure, tax and reporting requirements), by court order, or in connection with any legal proceedings.

11.3    <u>Headings</u>.  The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.4    <u>Invalidity and Waiver</u>.  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be

36

deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

11.5   Governing Law.  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the State in which the Property is located.

11.6   No Third-Party Beneficiary.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third-party beneficiary, decree, or otherwise.

11.7   Entirety and Amendments.  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Purchaser, which shall not be superseded by this Agreement. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

11.8   Time.  Time is of the essence in the performance of this Agreement.

11.9   Attorneys' Fees.  Should either party employ attorneys to enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable fees, costs, charges and expenses, including reasonable attorneys' fees, expended or incurred in connection therewith.

11.10  Notices.  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 1.1 (including those designated as copies) to be effective. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered on the day deposited with such courier, (b) sent by email, in which case notice shall be deemed delivered upon transmission of such email, or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. The time to reply to any notice or other communication shall commence upon actual or deemed delivery. Refusal to accept delivery by any party or the inability to deliver any communication because of a changed address of which no notice has been given in accordance with this Paragraph 11.10 shall constitute delivery. The attorney for a party has the authority to send notices on behalf of such party.

11.11  Construction.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction — to the effect that any ambiguities are to be resolved against the drafting party — shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

11.12  Calculation of Time Periods.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where

60018890.6

the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday.  The last day of any period of time described herein shall be deemed to continue through and including the entire day.

11.13  Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement.  To facilitate execution of this Agreement, the parties may execute and exchange by email delivery, in electronic PDF form counterparts of the signature pages which shall be deemed originals for all purposes.

11.14  WAIVER OF JURY TRIAL.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.15  Section 1031 Exchange.  Either party may consummate the purchase or sale (as applicable) of the Property as part of a so-called like kind exchange (an "Exchange") pursuant to §1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that:  (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement; (b) the exchanging party shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary; and (c) neither party shall be required to take an assignment of the purchase agreement for the relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by the other party;.  Neither party shall by this Agreement or acquiescence to an Exchange desired by the other party have its rights under this Agreement affected or diminished in any manner or be responsible for compliance with or be deemed to have warranted to the exchanging party that its Exchange in fact complies with §1031 of the Code.

11.16  Confidentiality.  The Property Information (including summaries, compilations or analyses of the Property Information) and all other information other than matters of public record, furnished to, or obtained through inspection of the Property by, Purchaser or Purchaser's Affiliates will be treated by Purchaser and Purchaser's Affiliates as confidential, and will not be disclosed to anyone other than (i) on a need-to-know basis to Purchaser's Representatives and Purchaser's title company, who are instructed to maintain the confidentiality of such information and to destroy or return such information to Seller if the Closing does not occur, and (ii) as required by law or final court order; provided that, to the extent not prohibited by such law or final court order, Purchaser shall provide Seller with written notice before making any such disclosure.  Notwithstanding the foregoing, the confidentiality obligations set forth above shall not apply to, and Property Information as defined above shall not include, information that:  (i) is or becomes a matter of public knowledge through no fault of Purchaser or any of Purchaser's Representatives, including information which is or becomes publicly available, or generally available within the industry in which Seller operates; (ii) was in Purchaser's or any of Purchaser's Representatives' possession or known by it or any of Purchaser's Representatives prior to receipt from Seller; or (iii) was rightfully disclosed to Purchaser or any of Purchaser's Representatives by another person without restriction; or (iv) is independently developed by Purchaser or any of Purchaser's

60018890.6

Representatives without access to such Property Information. Notwithstanding the foregoing to the contrary, Purchaser and Purchaser's Representatives may retain copies of the Property Information if required by their internal document retention policies, if required by applicable laws, rules or regulations of governmental or regulatory authorities, if it would be unreasonably burdensome to destroy or return such information (such as archived computer records), or for purposes of maintaining or defending any action relating to this Agreement.  As used in this Agreement, the term "Purchaser's Affiliates" shall mean (x) any entity that directly or indirectly controls, is controlled by or is under common control with Purchaser, (y) any entity in which Purchaser owns an economic interest, and (z) any entity that directly or indirectly owns an interest in Purchaser; the term "control" meaning the power to direct the management of such entity through voting rights, ownership, or contractual obligations.  This Paragraph 11.16 will survive the Closing or a termination of this Agreement for a period of one (1) year.

    11.17   Limitation of Liability.  Notice is hereby given that all persons dealing with Seller shall look to the assets of Seller for the enforcement of any claim against Seller.  None of the officers, directors, employees, members, owners, partners or shareholders of Seller shall have any personal liability for any of the liability or obligations of Seller.   Notice is hereby given that all persons dealing with Purchaser shall look to the assets of Purchaser for the enforcement of any claim against Purchaser.  None of the officers, directors, employees, members, owners, partners or shareholders of Purchaser shall have any personal liability for any of the liability or obligations of Purchaser.

    11.18   Right of First Offer.  Effective as of the Closing Date, Purchaser grants to Seller a one-time right of first offer to repurchase the Property in the event of a future proposed sale of the entire Property by Purchaser on the terms and conditions and subject to the limitations set forth below (the "Right of First Offer").  In the event that Purchaser elects to market or sell the entire Property to any person other than Seller, any entity comprising Purchaser, any member, partner, owner or lender of Purchaser, or any affiliate thereof (such person being hereinafter referred to as the "Third Party"), then Purchaser shall endeavor to notify Seller in writing thereof (the "Sale Notice"); provided, however, any failure to provide the Sale Notice as provided herein shall not constitute a default by Purchaser under this Agreement, subject Purchaser to any liability or impair any future sale of the Property.  For a period ending five (5) business days after the Sale Notice is given (the "Offer Period"), Seller shall have the right to make an offer to purchase the entire Property ("Seller's Offer") on terms and conditions acceptable to Seller in its sole and absolute discretion.  Within five (5) business days after the end of the Offer Period, Purchaser shall be entitled to accept or reject, in Purchaser's sole and absolute discretion, Seller's Offer by written notice given to Seller.  If Purchaser fails to give a notice of acceptance or rejection to Seller's Offer within such five business day period, Seller's Offer shall be deemed rejected.  Notwithstanding anything to the contrary contained herein, (i) Purchaser shall be under no obligation to accept or respond to Seller's Offer, and Purchaser shall be entitled to sell the Property to any person, regardless of whether the terms thereof are more or less favorable than the terms of Seller's Offer; (ii) upon the rejection or deemed rejection of Seller's Offer, the Right of First Offer shall be null and void and of no further force or effect, and, upon Purchaser's request, Seller agrees to provide written confirmation of the termination of the Right of First Offer; (iii) the Right of First Offer shall be personal to Seller and cannot be assigned or exercised by anyone other than the original Seller named herein; (iv) in the event that the original Purchaser named herein assigns this Agreement, then the Right of First Offer shall not be binding on such original Purchaser, but shall

60018890.6

be binding only on the Purchaser named as grantee in the Deed; (v) the Right of First Offer shall be subject and subordinate to the rights of all existing and future holders of a lien against the Property; (vi) the Right of First Offer shall not be binding on any successors or assigns of Purchaser or any holder of a lien against the Property; and (vii) the Right of First Offer shall not apply to any sale of less than all of the Property, including, without limitation, to any tenant in common interest in the Property.  The provisions of this Section 11.18 shall survive the Closing.

11.19  <u>Rule Against Perpetuities</u>.  If the rule against perpetuities is applicable to this Agreement, then this Agreement shall remain in effect until 21 years after the death of the last to survive of the presently-living grandchildren of the of former President of the United States of America, George H.W. Bush.

[Signature Page Follows]

60018890.6

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written below.

**SELLER:**

**ARISTON MF OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: _____Jon Guven_____

Title: _____President_____

Dated as of: _____December 22nd_____, 2022


**PURCHASER:**

**CWS APARTMENT HOMES LLC,**
a Delaware limited liability company


By: _____

Name: _____

Title: _____

Dated as of: _____, 2022

S - 1

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written below.

**SELLER:**

**ARISTON MF OWNER, LLC,**
a Delaware limited liability company

By: _____
    Name: _____
    Title: _____

    Dated as of: _____, 2022

**PURCHASER:**

**CWS APARTMENT HOMES LLC,**
a Delaware limited liability company

By: _____
    Name: _Gary Carmell_
    Title: _President_

    Dated as of: _____December 21_, 2022

60018890.6

## JOINDER OF ESCROW AGENT

Escrow Agent has executed this Agreement in order to confirm that Escrow Agent shall hold the Earnest Money in escrow and shall disburse the Earnest Money pursuant to the provisions of Article 10 hereof.

**HERITAGE TITLE COMPANY OF AUSTIN, INC.**

for    By: _Debbie Lopez_
      Name: John P. Bruce
      Title: Executive Vice President

"Escrow Agent"

Date: _____December 22_____, 2022

Joinder of Escrow Agent - 1

60018890.6

**EXHIBITS**

A.      -      Legal Description

B.      -      Owner's Affidavit

C.      -      Deed

D.      -      Assignment of Leases and Contracts and Bill of Sale

E.      -      Notice to Tenants

F.      -      Condominium Conversion Agreement

60018890.6

## EXHIBIT A

## LEGAL DESCRIPTION

TRACT 1

ALL THAT TRACT OR PARCEL OF LAND LYING IN OR BEING IN LAND LOT 177 OF THE 7TH DISTRICT, GWINNETT COUNTY, GEORGIA, BEING KNOWN AS LOT 17, BLOCK A, UNIT 6 OF THE FINAL PLAT FOR MALL OF GEORGIA, DATED JULY 8, 1999, LAST REVISED MAY 29, 2019, AND RECORDED ON MAY 30, 2019 IN PLAT BOOK 145, PAGE 67-79, GWINNETT COUNTY GEORGIA RECORDS.

TRACT 2

TOGETHER WITH THOSE CERTAIN EASEMENTS AS SET FOR THE IN DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS BY AND BETWEEN MILL CREEK LAND, L.L.C. AND MALL OF GEORGIA, L.L.C., DATED SEPTEMBER 18, 1997, FILED FOR RECORD SEPTEMBER 23, 1997, AND RECORDED IN DEED BOOK 14779, PAGE 60, AFORESAID RECORDS, AS AFFECTED BY THAT CERTAIN AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS, DATED DECEMBER 15, 1998, FILED FOR RECORD JANUARY 29, 1999, AND RECORDED IN DEED BOOK 17657, PAGE 107, AFORESAID RECORDS; AS FURTHER AFFECTED BY THAT CERTAIN MALL OF GEORGIA AT MILL CREEK RECIPROCAL EASEMENT AGREEMENT, DATED DECEMBER 15, 1998, FILED FOR RECORD JANUARY 29, 1999, AND RECORDED IN DEED BOOK 17657, PAGE 183, AFORESAID RECORDS;

TRACT 3

FURTHER TOGETHER WITH THAT CERTAIN SANITARY SEWER EASEMENT BY AND BETWEEN GEORGIA WILDLIFE FEDERATION, INC., ARISTON MF OWNER, LLC AND GEORGIA PIEDMONT LAND TRUST, DATED JULY 12, 2019, FILED FOR RECORD JULY 16, 2019, AND RECORDED IN DEED BOOK 56736, PAGE 00033, AFORESAID RECORDS.

TRACT 4

FURTHER TOGETHER WITH THAT CERTAIN UTILITY, ACCESS AND PARKING EASEMENT AGREEMENT BY AND BETWEEN ARISTON MF OWNER, LLC, AND ARISTON GROUP, LLC, DATED JULY 12, 2019, FILED FOR RECORD JULY 16, 2019, AND RECORDED IN DEED BOOK 56736, PAGE 00055, AFORESAID RECORDS.

60018890.6

# EXHIBIT B

## OWNER'S AFFIDAVIT

### <u>AFFIDAVIT OF TITLE</u>

STATE OF GEORGIA     )
                     ) ss:

COUNTY   _____ )

The undersigned deponent, _____ ("Deponent"), having personally appeared before the undersigned notary public and first having been duly sworn according to law, deposes and says under oath as follows:

1.    Deponent is presently the _____ of _____, a _____ (the "Owner"), the owner of certain real estate, a description of which is set forth on <u>Exhibit A</u> attached hereto and made a part hereof (the "Property").

2.    To Deponent's knowledge, there are no title encumbrances affecting the Property, other than as set forth on <u>Exhibit B</u> attached hereto.

3.    The Owner is in open and exclusive possession of the Property, and there are no leases or tenancies affecting the Property other than as set forth on <u>Exhibit B</u> attached hereto and made a part hereof, and Deponent knows of no one claiming any adverse interest in the Property whatsoever.

4.    To Deponent's knowledge, there are no suits, judgments, bankruptcies or executions pending against the Owner in any court whatsoever that could in any way affect the title to the Property, or constitute a lien thereon, nor are there any loan deeds, security deeds, trust deeds, mortgages or liens of any nature whatsoever unsatisfied against the Property, or easements, licenses, agreements or other encumbrances affecting the title to the Property.

5.    Work, improvements and repairs have not been made to the Property by Owner, at Owner's direction or on Owner's behalf during the last ninety (90) days immediately preceding the date hereof, or, if any work, improvements and repairs have been made by, at the direction of, or on behalf of the Owner, the same are complete and there are no unpaid bills incurred for labor, services and materials used in making improvements or repairs on the Property or for the services of architects, surveyors or engineers with respect thereto.

6.    This affidavit is made to induce First American Title Insurance Company (the "Title Company") to issue its owner's policy insuring the party purchasing the Property, _____, a _____ ("Purchaser"), from Owner in the amount of the allocated purchase price of the Property; to induce the attorney certifying title so to certify; and to induce Purchaser to purchase the Property.

7.    That in consideration of the Title Company's willingness to insure the "Gap" (that period of time between the last search of the public records and the recording of the insured loan instruments), the Owner agrees to indemnify and hold harmless said Title Company against all loss, expense or liability due to any intervening matter which may be recorded prior to the insured instruments.

8.  I declare that I have examined the foregoing Affidavit and hereby certify that it is true, correct and complete.

Exhibit B - 1

60018890.6

Signed, sealed and delivered in
the presence of:

_____ [SEAL]
Name:_____

_____

Unofficial Witness

_____

Notary Public

My Commission Expires: _____

      [NOTARIAL SEAL]

Exhibit B - 2

## EXHIBIT C

## FORM OF DEED

THE STATE OF _____ §
                                     § KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____ §

**THAT THE UNDERSIGNED**, _____, a Delaware limited partnership ("Grantor"), for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration paid to Grantor by _____, a _____ ("Grantee"), with an address of _____, _____, the receipt and sufficiency of which are hereby fully acknowledged and confessed, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does hereby GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain tract of land situated in _____ County, _____, as more fully described on **Exhibit A** attached hereto and made a part hereof for all purposes, together with (a) all buildings and improvements located thereon, (b) all rights, benefits, privileges, easements, tenements, hereditaments and appurtenances there unto belonging or in any wise, pertaining thereto, and (c) all of Grantor's right, title and interest, if any, in and to any and all appurtenances, strips or gores, roads, easements, streets, alleys, drainage facilities, and rights-of-way bounding the Land; all utility capacity, utilities, water rights, licenses, permits, entitlements, and bonds, if any, and all other rights and benefits attributable to the Land; and all rights of ingress and egress thereto (all of which are hereinafter collectively called the "Property").

This conveyance is made and accepted subject only to the matters described on **Exhibit B** attached hereto and made a part hereof (the "Permitted Exceptions").

**TO HAVE AND TO HOLD** the Property, together with all rights and appurtenances pertaining thereto, unto Grantee and Grantee's successors and assigns forever, and Grantor does hereby bind itself and its successors and assigns to WARRANT and FOREVER DEFEND, all and singular, subject only to the Permitted Exceptions, the Property unto Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise.

All ad valorem taxes for the year in which the conveyance occurs have been prorated between Grantor and Grantee and Grantee shall be obligated to pay same for subsequent years.

[Signature Page Follows]

Exhibit C - 1

60018890.6

**DATED** effective as of the ____ day of _____, 202_.

**GRANTOR:**

Signed, sealed and delivered in the presence of:

**ARISTON MF OWNER, LLC**,
a Delaware limited liability company


_____
Unofficial Witness

By:_____
Print Name: _____
Title: _____


_____
Notary Public


My commission expires: _____


[NOTARY SEAL]

Exhibit C - 2

**EXHIBIT D**

**ASSIGNMENT OF LEASES AND CONTRACTS AND BILL OF SALE**

This instrument is executed and delivered as of the _____ day of _____, 202__, pursuant to that certain Purchase and Sale Agreement ("<u>Agreement</u>") dated _____, 2022, by and between ARISTON MF OWNER, LLC, a Delaware limited liability company ("<u>Seller</u>"), and _____ ("<u>Purchaser</u>"), covering the real property described in **Exhibit A** attached hereto ("<u>Real Property</u>").

       1.    <u>Sale of Personalty</u>.  For good and valuable consideration, Seller hereby sells, transfers, sets over and conveys to Purchaser the following (the "<u>Personal Property</u>"):

       (a)    <u>Tangible Personalty</u>.  All of Seller's right, title and interest, if any, in and to all appliances, fixtures, furniture, equipment, furnishings, machinery, tools, supplies, inventory, carts, promotional materials, leasing materials, signs and other tangible personal property, if any, owned by Seller, including, without limitation, the personal property listed on **Exhibit B** attached hereto, but excluding any items of personal property owned by tenants, any managing agent, or others, and, if such tangible personalty includes computer hardware, any proprietary software installed therein.

       (b)    <u>Intangible Personalty</u>.  All of Seller's right, title and interest, if any, in and to all of the following items, to the extent assignable and without representation or warranty: (A) licenses, approvals, authorizations and permits relating to the operation of the Property, (B) the right to use the name of the property (if any) in connection with the Real Property, including, without limitation, "Ivy at Ariston", (C) all development rights, entitlements, trademarks, service marks, trade names, telephone numbers, logos, marks and other intangible property relating to the Property, (D) if still in effect, all guarantees and warranties received by Seller or its affiliates from any contractor, manufacturer, service provider or other person in connection with the construction or operation of the Property, (E) resident and tenant files for residents and tenants as of the Closing Date, (F) surveys, inspection reports, as-built drawings, architectural and civil plans and specifications and engineering drawings and reports, (G) other non-confidential and non-proprietary records owned by Seller and used in connection with the operation of the Land, the Improvements, or any part thereof, (H) all telephone numbers, websites, social media accounts and domain names associated exclusively with the Land and/or Improvements, including, but not limited to, the URL designated www.theivyariston.com, and all assignable user names and password account information necessary and controlling said websites and social media accounts (collectively, the "<u>Domain</u>"), and (I) all "SureDeposits" and other similar deposits and bonds; but, Intangible Personal Property shall specifically exclude any and all other trademarks, service marks and trade names of Seller's Affiliates (including "<u>TPA Residential</u>" and all derivations thereof), and with reservation by Seller's Affiliates to use such names in connection with other property owned by Seller's Affiliates.

       2.    <u>Assignment of Leases and Contracts</u>.  For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Purchaser, and Purchaser hereby accepts the following (the "<u>Assigned Property</u>"):

Exhibit D - 1

(a)     Leases.  All of the landlord's right, title and interest in and to the tenant leases listed in **Exhibit B** attached hereto, together with all prepaid rents, security deposits and other deposits ("Leases");

(b)     Service Contracts.  All of Seller's right, title and interest in and to the service contracts described in **Exhibit C** attached hereto (the "Contracts").

3.     Assumption.  Purchaser hereby accepts and assumes the liability and obligations of Seller under the Leases and Contracts arising from and after the Closing Date and shall defend, indemnify and hold harmless Seller from and against any liability, damages, causes of action, expenses, and reasonable attorneys' fees incurred by Seller by reason of the failure of Purchaser to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Contracts arising on and after the Closing Date.  Seller shall defend, indemnify and hold harmless Purchaser from and against any liability, damages, causes of action, expenses, and reasonable attorneys' fees incurred by Purchaser by reason of the failure of Seller to fulfill, perform, discharge, and observe its obligations with respect to the Leases or the Contracts arising before the Closing Date.

4.     Agreement Applies.  The covenants, agreements, disclaimers, representations, warranties, indemnities and limitations provided in the Agreement with respect to the Real Property (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Purchaser and Seller and their respective successors and assigns.

5.     Disclaimer.  Except as set forth herein and in the Agreement, which provisions are hereby incorporated by this reference as if herein set out in full, the Personal Property and Assigned Property are conveyed by Seller and accepted by Purchaser AS IS, WHERE IS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF SELLER AND PURCHASER EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE REAL PROPERTY CONVEYED HEREUNDER, AND ALL OTHER REPRESENTATIONS AND WARRANTIES WHATSOEVER CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE OF THE STATE OR STATES WHERE THE REAL PROPERTY IS LOCATED.

6.     Limitation of Liability.  Notice is hereby given that all persons dealing with Seller shall look to the assets of Seller for the enforcement of any claim against Seller.  None of the trustees, officers, directors, employees, members, owners, partners or shareholders of Seller shall have any personal liability for any of the liability or obligations of Seller.  Notice is hereby given that all persons dealing with Purchaser shall look to the assets of Purchaser for the enforcement of any claim against Purchaser.  None of the trustees, officers, directors, employees, members, owners, partners or shareholders of Purchaser shall have any personal liability for any of the liability or obligations of Purchaser.

7.     Domain.  Seller agrees to undertake such commercially reasonable actions as may be reasonably requested by Purchaser to complete the transfer of the ownership of the Domain to

Purchaser or Purchaser's registrar, without cost to Seller, whether the registrant for the Domain is listed as Seller, a related or affiliated company of Seller, Seller's property management company, or a web hosting service or similar company utilized by Seller, to Purchaser by or before the 30th day after the date hereof.

       8.      <u>Execution in Counterparts</u>.  This instrument may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one instrument.  To facilitate execution of this instrument, the parties may execute and exchange by email delivery, in electronic PDF form counterparts of the signature pages which shall be deemed originals for all purposes.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned have caused this instrument to be executed as of the date written above.

**SELLER:**

**ARISTON MF OWNER, LLC,**
a Delaware limited liability company

By: _____
       Name: _____
       Title: _____

       Date: _____, 202__

**PURCHASER:**

_____,
a _____

By: _____
       Name: _____
       Title: _____

       Date: _____, 202__

Exhibit D - 4

**EXHIBIT E**

**NOTICE TO RESIDENTS**

**[Date]**

**[Project Name]**
**[Address]**
**[City/State/ZIP]**

Dear Resident:

Notice is hereby given to the tenants of [_____] (the "<u>Property</u>") that [Seller], the current owner of the Property, has sold the Property to _____ ("<u>Purchaser</u>") effective (date of takeover).  Purchaser has assumed all of the obligations of landlord under your lease, arising from and after such date, including any obligations with respect to your security deposit, if any, which has been transferred to Purchaser.

All future rental payments, including payments for any and all statements on hand, should be made payable    to    _____    and    delivered    or    mailed    to    the    on-site    office    at: _____.

If you have any questions, please contact the manager.

Very truly yours,

**SELLER:**

**ARISTON MF OWNER, LLC,**
a Delaware limited liability company

By:    _____
            Name: _____
            Title: _____

**PURCHASER:**

_____,
a _____

By:    _____
            Name: _____
            Title: _____

Exhibit E - 1

60018890.6

**EXHIBIT F**

**CONDOMINIUM CONVERSION AGREEMENT**

**RECORDING REQUESTED BY:**

_____

_____

_____

**WHEN RECORDED MAIL THIS
INSTRUMENT TO:**

_____

_____

_____

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

_____ Apartments

**PROHIBITION AGAINST
CONDOMINIUM CONVERSION AGREEMENT**

**THIS PROHIBITION AGAINST CONDOMINIUM CONVERSION AGREEMENT** (the
"Condominium Agreement") is made and entered into as of _____, 202_, by and
between _____ ("Purchaser") and _____ ("Seller").

## W I T N E S S E T H :

**WHEREAS**, Seller and Purchaser have entered into that certain Purchase and Sale Agreement
dated as of _____, 2022 (the "Sale Agreement") relating to the sale by Seller to
Purchaser of that parcel of real property located in _____ County, _____, and more
particularly described on **Exhibit A** attached hereto (the "Land"), together with certain apartment
buildings and related personal property and other rights located thereon and relating thereto (the
"Improvements" and the Land and the Improvements collectively referred to herein as the
"Property").

**WHEREAS**, as a condition to Seller conveying the Property to Purchaser and in consideration of
Seller accepting the purchase price and conveying the Property as set forth in the Sale Agreement
to Purchaser, Purchaser has agreed with Seller to execute and record this Condominium Agreement
providing for certain restrictions relating to the future use of the Property for a period of time after
the date of this Condominium Agreement as more fully set forth herein.

Exhibit F - 1

60018890.6

**NOW, THEREFORE**, in consideration of the mutual covenants and undertakings set forth herein, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Seller and Purchaser hereby agree as follows:

Section 1.     <u>Definitions and Interpretation</u>.     The following terms shall have the respective meanings assigned to them in this <u>Section 1</u> unless the context in which they are used clearly requires otherwise:

"<u>Condominium Conversion</u>" - Shall mean the filing or recording of any document providing for the conversion of the Property to a form of condominium ownership under the Georgia Condominium Act, O.C.G.A. Section 44-3-70, et. seq.

"<u>County</u>" - The county in which the Land is located.

"<u>Deed</u>" – Limited Warranty Deed.

"<u>Event of Default</u>" - As defined in <u>Section 11</u> hereof.

"<u>Improvements</u>" - As defined in the Recitals hereof.

"<u>Indemnified Parties</u>" - As defined in <u>Section 3</u> hereof.

"<u>Land</u>" - As defined in the Recitals hereof.

"<u>Property</u>" - As defined in the Recitals hereof.

"<u>Purchaser</u>" - As defined in the Preamble hereof.  In the event more than one person and/or entity executes this Condominium Agreement as Purchaser, each such person and/or entity which comprises Purchaser under this Condominium Agreement shall be jointly and severally liable for all of the obligations, covenants, liabilities and indemnifications of the Purchaser under this Condominium Agreement.

"<u>Seller</u>" - As defined in the Preamble hereof.

"<u>Term</u>" - As defined in <u>Section 7</u> herein.

"<u>Units</u>" - Shall mean any portion of the Property created in connection with any Condominium Conversion.

Section 2.     <u>Condominium Conversion Restriction</u>.     The Purchaser hereby acknowledges and agrees that during the Term of this Condominium Agreement:

(a)     The Property shall not be subject to any Condominium Conversion and neither shall any portion of the Property be converted to Units for sale in connection with a Condominium Conversion nor shall the title to any such Units be transferred to any party separately from all other Units (other than a leasehold interest to a tenant).

(b)     No part of the Property will at any time be owned or used as a cooperative housing corporation, common interest development or stock corporation.

Exhibit F - 2

60018890.6

For purposes of clarification, the creation of a tenant-in-common structure shall not be deemed to constitute a violation of the foregoing restrictions.

Section 3.   Indemnification.   For purposes hereof, "Indemnitor" shall mean the owner(s) of fee simple title to all or any portion of the Property at the time any of the provisions of Section 2 hereof are breached (the "Restrictions").  In the event any of the Restrictions are breached, Indemnitor agrees to indemnify, defend and hold harmless the Seller, and each of its members, partners, officers, directors, trustees, affiliates, parents, subsidiaries, shareholders, managers, beneficiaries, employees and agents (collectively, the "Indemnified Parties") from any and all demands, claims, including claims for personal injury, property damage or death, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever, whether in tort, contract or otherwise (including without limitation, court costs and reasonable attorneys' fees and disbursements) arising out of, or in any way relating to: (a) claims made or brought by any party or parties who acquire or contract to acquire any ownership interest in the Property following the date hereof, their agents, employees and successors and assigns in connection with or related to construction or design defect with respect to the Property or resulting effects thereof, to the extent such claims arise as a result of any such breach of the Restrictions by Indemnitor during the Term.  Indemnitor does now and shall at all times consent to the right of Indemnified Parties to reasonably approve and appoint defense counsel and to participate in or assume the defense of any claim.  Until any determination is made in any appropriate legal proceeding challenging the obligation of Indemnitor herein, Indemnitor's obligations under all the terms and provisions of this Section shall remain in full force and effect. Purchaser acknowledges that it is a sophisticated and experienced purchaser of real estate and has reviewed with its counsel the full meaning and effect of the foregoing indemnity.

Purchaser's Initials _____

Section 4.   Consideration.   In consideration of the Seller's acceptance of the purchase price for the Property from Purchaser, Purchaser has entered into this Condominium Agreement and has agreed to restrict the uses to which the Property can be put on the terms and conditions set forth herein.

Section 5.   Intentionally Deleted.

Section 6.   Intentionally Deleted.

Section 7.   Term.   This Condominium Agreement and all and several of the terms hereof shall become effective upon its execution and delivery and shall remain in full force and effect until **[insert date which is eight (8) years after issuance of the certificate of occupancy]** (the "Term").  Upon the termination of the Term of this Condominium Agreement, the parties hereto agree to execute, deliver and record appropriate instruments of release and discharge of the terms hereof; provided, however, that the execution and delivery of such instruments shall not be necessary or a prerequisite to the termination of this Condominium Agreement in accordance with its terms.  Notwithstanding the provisions of this Section 7, the Restrictions shall automatically cease to apply to any building located within the Property, if such building is completely destroyed by fire or other casualty or if the building is completely demolished (a "Destroyed Building") prior to the expiration of the Term.  Upon the termination of the Restrictions imposed by this

Exhibit F - 3

Condominium Agreement with respect to a Destroyed Building, such termination shall occur automatically without further action by any party.

Section 8.     Covenants to Run With the Land.  The Purchaser and Seller hereby subject the Property to the covenants, reservations and restrictions set forth in this Condominium Agreement.  The Purchaser and the Seller hereby declare their express intent that the covenants, reservations and restrictions set forth herein shall be deemed covenants running with the land and shall pass to and be binding upon the Purchaser's successors in fee title to the Property (Purchaser and each such successor owner, an "Owner"); provided, however, that on the termination of this Condominium Agreement said covenants, reservations and restrictions shall expire.  Each and every contract, deed or other instrument hereafter executed covering or conveying the Property or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to such covenants, reservations and restrictions, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instrument. Notwithstanding anything to the contrary contained herein, each Owner shall, upon the transfer of its interest in all or any portion of the Property, be relieved of all further liability under this Condominium Agreement with respect to the portion of the Property so conveyed, except for such liability as may have arisen during its period of ownership of the portions of the Property so conveyed as a result of breach of the Restrictions by such Owner prior to the termination of the Restrictions, and which remains unsatisfied.  Notwithstanding anything to the contrary contained herein:  (a) the Restriction shall not be binding on any lender holding a lien on all or any portion of the Property (a "Lender") and no Lender shall in any manner be responsible for any breach or failure to comply with the Restrictions by any prior Owner or any subsequent Owner or its borrower even if such Lender consented to such breach or failure (but for avoidance of doubt, it is expressly stipulated that each party acquiring any interest in the Property from a Lender and each subsequent Owner of such interest will be fully bound by the Restrictions, but not for any breach of the Restrictions which occurred prior to the acquisition of its interest in the Property); (b) if any Lender becomes the owner of all or any portion of the Property, the liability of such Lender shall be limited to its interest in the Property; and (c) upon the conveyance of its ownership interest in the Property, the transferor of such interest shall have no further obligations or liabilities under the Restrictions, except with respect to any breach of the Restrictions by such transferor during its period of ownership. Seller shall, from time to time, execute such estoppel certificates as may be reasonably requested by Purchaser or any of its successors, assigns and lenders.

Section 9.     Burden and Benefit.    The Purchaser and Seller hereby declare their understanding and intent that the burden of the covenants set forth herein touch and concern the Land in that the Purchaser's legal interest in the Property is rendered less valuable thereby.  The Purchaser and Seller hereby further declare their understanding and intent that the benefit of such covenants touch and concern the Land by enhancing and increasing the enjoyment and use of the Property by persons entitled to rent the apartments contained therein.

Section 10.     Uniformity: Common Plan.  The covenants, reservations and restrictions hereof shall apply uniformly to the entire Property in order to establish and carry out a common plan for the use of the Property.

Section 11.     Enforcement.  If an Indemnitor defaults in the performance or observance of any covenant, agreement or obligation of the Indemnitor set forth in this Condominium

Agreement, then the Seller or any of the Indemnified Parties may declare an "Event of Default" to have occurred hereunder, and, at any of said Parties option, it may take any one or more of the following steps: (a) by mandamus or other suit, action or proceeding at law or in equity, to require the Indemnitor to perform its obligations and covenants hereunder, or enjoin any acts or things which may be unlawful or in violation of the rights of the Seller hereunder; or (b) take such other action at law or in equity as may appear necessary or desirable to enforce the obligations, covenants and agreements of the Indemnitor hereunder.  All rights and remedies as set forth herein shall be cumulative and non-exclusive to the extent permitted by law.

Section 12.    Recording and Filing.  Seller shall cause this Condominium Agreement and all amendments and supplements hereto and thereto, to be recorded and filed in the real property records of the County.  The Seller shall pay all fees and charges incurred in connection with any such recording.

Section 13.    Attorneys' Fees.  In the event that a party to this Condominium Agreement brings an action against any other party to this Condominium Agreement by reason of the breach of any condition or covenant, representation or warranty in this Condominium Agreement, or otherwise arising out of this Condominium Agreement, the prevailing party in such action shall be entitled to recover from the other reasonable attorneys' fees to be fixed by the court which shall render a judgment, as well as the costs of suit.

Section 14.    Governing Law.  This Condominium Agreement shall be governed by the laws of the State of Georgia.

Section 15.    Amendments.  This Condominium Agreement shall be amended only with the express written consent of the Seller by a written instrument executed by the parties hereto or their successors in title, and duly recorded in the real property records of the County.

Section 16.    Notice.  Any notice required to be given hereunder shall be made in writing and shall be given by personal delivery, certified or registered mail, postage prepaid, return receipt requested, or by recognized overnight courier service (such as FedEx or UPS), at the addresses specified below, or at such other addresses as may be specified in writing by the parties hereto:

|  |  |
|---|---|
| TO SELLER: | Ariston MF Owner, LLC<br>c/o TPA Residential, LLC<br>1776 Peachtree Street NW, Suite 100<br>Atlanta, Georgia 30309<br>Attention: Elizabeth Amick |
| with a copy to: | Hartman Simons & Wood LLP<br>400 Interstate North Parkway SE, Suite 600<br>Atlanta, Georgia 30339<br>Attention: Peter M. Hartman, Esq. |

TO PURCHASER:      _____
                                       _____
                                       _____

With a copy to:       _____
                                       _____
                                       _____

Notice shall be deemed given three business days after the date of mailing, by certified mail, postage prepaid, return receipt requested, or, if personally delivered, when received, or one (1) business day after the date of deposit with a recognized courier service.

Section 17.   <u>Severability</u>.  If any provision of this Condominium Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining portions hereof shall not in any way be affected or impaired thereby.

Section 18.   <u>Multiple Counterparts</u>.   This Condominium Agreement may be simultaneously executed in multiple counterparts, all of which shall constitute one and the same instrument, and each of which shall be deemed to be an original.

Section 19.   <u>Joint and Several Liability of Purchaser</u>.  In the event more than one person and/or entity executes this Condominium Agreement as Purchaser, each such person and/or entity which comprises Purchaser under this Condominium Agreement shall be jointly and severally liable for all of the obligations, covenants, liabilities and indemnifications of the Purchaser under this Condominium Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed the Condominium Agreement as of the day and year first written above.

**SELLER:**

Signed, sealed and delivered in the presence of:

**ARISTON MF OWNER, LLC,**
a Delaware limited liability company

Unofficial Witness

By:_____

Print Name: _____

Title: _____

Notary Public

My commission expires: _____

[NOTARY SEAL]

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[SIGNATURES CONTINUED FROM PRECEDING PAGE]

**PURCHASER:**

Signed, sealed and delivered in the
presence of:

_____,

a _____

_____

Unofficial Witness

By:_____
Print Name: _____
Title: _____

_____

Notary Public

My commission expires: _____

[NOTARY SEAL]

**EXHIBIT A**

**[Legal Description of Land]**

## EXHIBIT G

## FORM OF SELLER'S CLOSING CERTIFICATE

### SELLER'S CLOSING CERTIFICATE

THIS CERTIFICATION is made as of _____ ____, 2023 by _____,
a _____ ("Seller"), in favor of _____, a
_____ ("Purchaser").

Seller hereby certifies to Purchaser that the representations and warranties of Seller set forth in that certain Purchase and Sale Agreement and Escrow Instructions dated as of _____, 2022, by and between Seller and Purchaser (as amended, the "Agreement") are true and correct as of the date hereof, except as to:

The rent roll attached hereto as **Exhibit A** replaces the rent roll referenced in the Agreement; and

**[If applicable:  The items disclosed on Exhibit B attached hereto.]**

The representations and warranties set forth in the Agreement, as updated by this certificate, will survive only for a period of twelve (12) months from the date hereof.

[remainder of page intentionally left blank]
[signature page next page]

60018890.6

**EXECUTED UNDER SEAL** as of the date first written above.

_____,

a _____

By:    _____
       Name: _____
       Title: _____




Exhibits to Seller's Closing Certificate

**Exhibit A** -- Updated Rent Roll

**Exhibit B** -- Seller Disclosures [if applicable]

**EXHIBIT H**

**RESERVE AND ESCROW ACCOUNTS HELD BY LENDER**

**[DOLLAR AMOUNTS AS OF 12/1/2022]**

Tax Escrow                          $231,780.06

Insurance Escrow                    $155,669.58

Other Escrow                        $291,501.06

60018890.6