# EXHIBIT B

CARGO AIRCRAFT CHARTER AGREEMENT

THIS CARGO AIRCRAFT CHARTER AGREEMENT ("Agreement") made and entered into as of this 7th day of May, 2015 ("Effective Date"), between UPS WORLDWIDE FORWARDING, INC., ("UPS"), a Delaware corporation having a mailing address at 1400 North Hurstbourne Parkway, Louisville, KY 40223 and NATIONAL AIR CARGO GROUP, INC. D/B/A NATIONAL AIRLINES ("Airline") a Delaware corporation having its principal place of business at 5955 T G Lee Blvd Suite 500 Orlando, FL 32822.

WITNESSETH

WHEREAS, UPS desires that the Airline, as an independent contractor, perform services required by UPS in its transportation of cargo by air, and Airline is willing to do so, on the terms set forth herein;

WHEREAS, the term UPS, where applicable, means not only UPS but also its parents United Parcel Service, Inc., United Parcel Service Co., and any affiliated companies, and the directors, officers, agents, and employees of those companies.

NOW, THEREFORE, in consideration of their mutual covenants set forth herein, UPS and Airline agree as follows:

ARTICLE 1 – OBLIGATIONS OF AIRLINE

Section 1.01.

(a)      Airline hereby charters to UPS, in accordance with the terms and conditions of this Agreement and any attachments hereto, adequately crewed, maintained, insured, and equipped aircraft ("Aircraft") for the carriage of UPS's cargo. The Aircraft types, number of each type of Aircraft, charter routings, schedules, and prices are as set forth in the attachments hereto and will be updated each year during the term of this Agreement as needed. Any flights undertaken with the Aircraft during the term of this Agreement shall be for the exclusive use of UPS, except as may be noted in Attachment II.

(b)      Notwithstanding anything to the contrary contained in this Agreement, Airline hereby agrees that this is an exclusive charter agreement, and that the use of the Aircraft for any purpose whatsoever other than for UPS's operations during the term of this Agreement for such Aircraft is a material breach of this Agreement.

(c)      Airline further consents to the jurisdiction of the Jefferson County, Kentucky, Circuit Court in any action for legal or equitable relief brought by UPS to enforce the exclusivity requirement of Section 1.01(b).  Further, because of the unique nature of the services provided for under this

Agreement, Airline consents to an order of specific performance according to the terms of this Agreement upon a showing of breach of the exclusivity requirement in Section 1.01(b) by Airline. In addition, Airline agrees to an award of damages in an amount double the daily guarantee listed in the current Attachment II for each affected Aircraft, as liquidated damages and not as punitive damages, upon a finding of breach of the exclusivity requirement in Section 1.01(b) by Airline. These liquidated damages shall apply for each Aircraft for each and every day of the agreed charter term in the current Attachment II that UPS does not have exclusive use of the Aircraft.

Section 1.02.   UPS agrees to tender and Airline agrees to accept dangerous goods for transportation upon Airline's Aircraft.

(a)     There shall be no special charges by Airline or additional sums due from UPS as a result of Airline's acceptance of transportation of dangerous goods.

(b)     Airline shall be and at all times remain in compliance with all applicable regulations pertaining to the acceptance, handling, transport, reporting, delivery of, or disposal of dangerous goods, at all times while in the possession of dangerous goods tendered to Airline by UPS, including but not limited to those applicable regulations promulgated by (i) the Department of Transportation ("DOT") and Federal Aviation Administration ("FAA") found in 14 CFR and 49 CFR; (ii) the International Air Transport Association (IATA), (iii) the International Civil Aviation Organization (ICAO), and (iv) any other applicable authority.

(c)     Prior to UPS offering to Airline dangerous goods for transportation upon Airline's Aircraft, a certified United Parcel Service Co. ("UPSCO") employee or assigned agent will have completed the acceptance requirements of 49 CFR Part 175.

(d)     Airline shall acknowledge acceptance of dangerous goods upon loading or storing such cargo upon its Aircraft.

(e)     An UPSCO assigned employee or agent shall furnish to Airline the necessary paperwork as provided for and in full compliance with 49 CFR.

(f)     Airline agrees to make a reasonable effort to expedite the acceptance of dangerous goods shipments and shall not unreasonably refuse any lawful shipment.

(g)     UPS hereby covenants and agrees that all dangerous goods tendered by UPS or UPSCO for transport on Airline's Aircraft shall be packaged, labeled, and manifested in accordance with all applicable local, state, and federal laws pertaining to the transportation of dangerous goods.

Section 1.03.   The charter price as set forth in the attachment hereto includes all of the operations specified by this Agreement including:

(a)     Fully qualified and licensed cockpit crews as necessary to fly the Aircraft [but in no event less than two (2) full crews per Aircraft during and for each day of the contract period provided

2

for in Attachment II hereto]. Airline shall be responsible for all crew expenses incurred, including but not limited to, positioning and depositioning of crews.

(b)   All compensation of the Airline's employees, including but not limited to, salaries and other benefits.

(c)   All insurance as set forth below in Article 3.

(d)   Preparation of all flight related documents.

(e)   An adequate number of certified and properly tooled (including lift and access equipment) mechanics and technicians to perform the complete overhaul, maintenance, and repair of the Aircraft as necessary to keep the Aircraft in airworthy condition. These certified mechanics and technicians must: (i) be fully qualified, and (ii) have a current and valid license.

(f)   Properly certified loadmasters as necessary to ensure the Airline's Aircraft is properly loaded for transportation of air cargo for the duration of Airline's flights provided in Attachment II herein. These certified loadmasters must: (i) be fully qualified and certified, and (ii) review UPS load procedures and identify any differences from Airline's load procedures prior to arrival for its first revenue flight. Airline will make reasonable efforts to (i) identify differences between the Airline's and UPS's load procedures, and (ii) accommodate, to the extent possible, UPS's load procedures for aircraft types that are on the UPS operations specifications. Airline's and UPS's load procedure differences should be discussed and agreed to at least fifteen (15) calendar days prior to Airline's first revenue flight.

(g)   Any taxes based upon ownership or use of the Aircraft or the net income, gross receipts, or gross income of Airline, any payroll taxes related to the compensation of Airline's employees, excluding however, U.S. Federal Excise Tax ("FET") on transportation of property provided for herein. Airline shall invoice UPS for the FET attributable to the transportation of such property and UPS shall pay the FET on transportation of the property provided for herein. The Airline shall not invoice any FET on flights that originate in the United States and terminate outside the United States, nor shall Airline invoice any excise taxes for flights that originate outside the United States and terminate in the United States. Airline shall invoice and list the amount of FET as a separate line item. UPS shall not be obligated to pay the FET on any transportation related item not provided for by this Agreement.

(h)   Should UPS desire additional services not contemplated in this Agreement, such services shall be priced by Airline at the time of such UPS written request for additional service.

(i)   In recognition that TIME IS OF THE ESSENCE in the performance of services contemplated herein, UPS and Airline agree, if Airline fails to fulfill its contract obligations or interrupts service, the guarantee may be reduced as outlined in Attachment II.

3

(j)     Airline will make reasonable commercial efforts to ensure that its Aircraft are free of deferred maintenance items (DMI) that may become due while performing its obligations.

(k)     Airline will make reasonable commercial efforts to ensure that its Aircraft are in a suitable operating condition (including but not limited to operational cargo doors, rollers, and cargo locks) for the performance of services contemplated herein.

(l)     Airline agrees to make commercially reasonable efforts to remedy its Aircraft that are out of service while performing obligations under this Agreement; including but not limited to replacement lift within its fleet (available basis only), loan/borrow of parts from other airlines including UPS, expediting materials needed to repair its Aircraft, and staffing for operating or repairing its Aircraft.

(m)     Airline agrees to provide UPS its Aircraft configurations for the specific tail numbers contemplated to perform services prior to the performance of such services. Airline will allow UPS to check conformity to UPS operational requirements prior to performance of services. If non-conformity exists (including but not limited to UPS containers will not load as configured in the Aircraft specifications, cargo door placement, or dimensions pose safety risk) as confirmed by the Airline prior to the contracted period specified in Attachment II and Airline cannot remedy the non-conformity in commercially reasonable time, then UPS may cancel for its convenience the remainder of the term stated in Attachment II, Sections B and C without penalty. Any actual block hours flown for UPS will be paid based on actual block hours flown times the rate per block hour (listed in Attachment II, Section C). UPS and Airline agree that these remedies are compensation for the interruption or potential interruption of service and are in addition to, and not in lieu of, any other remedies available under the Agreement.

(n)     Airline is responsible for ordering, delivering, and paying for its catering.

(o)     Airline is responsible for all personnel expenses related to positioning and depositioning of the Aircraft (including but not limited to hotels, flights, rentals, food, etc.).

(p)     Airline will make reasonable commercial efforts to ensure that weight and balance calculations, crew departure checklist, and aircraft blocking out are performed in a reasonable amount of time or as mutually agreed by Airline and UPS.

(q)     Airline is responsible for arranging the vendor to fuel the Aircraft for positioning into the UPS network. Fuel costs are further described in Section 2.02(a).

Section 1.04.   Airline warrants to UPS that it will perform its services in a safe manner and with reasonable skill in the agreed upon performance time, that it will pay all costs and expenses required for the performance of the services provided for herein, that it has the requisite federal, state, and local governmental authority, and all necessary corporate authority to enter into this Agreement. Airline further warrants that all services will be performed in accordance with all applicable airport regulations, applicable federal, state, and local government, foreign

4

government, and international organization operating laws, rules, regulations, directives, and requirements, including those of the FAA, the DOT, and the airport at which the services are performed.

Section 1.05.  Airline shall provide immediate telephone notification to the UPS Global Operations Center ("GOC") in Louisville, Kentucky:

(a)     of any accident or incident involving the Aircraft or cargo which results in any loss or damage to the Aircraft or cargo or to any other property, or which results in injury to, or the death of, any person which such death or injury is related in any way to the services provided by Airline, or

(b)     any event impacting the services to be provided by Airline or the serviceability of the Aircraft (including but not limited to crew, maintenance, weather, regulatory, other staffing, etc.) which affects the Airline's ability to meet the schedule departure time. The Airline will provide a single point of contact for communicating Aircraft status.

Section 1.06.   Airline shall cause their crews to communicate in a timely manner by radio to each UPS origin or destination gateway or the UPS GOC to inform UPS of "block out times" and "block in times." In the event of any delay whatsoever in performance, Airline's crew shall explain the reason for any such delay at the time of such radio communication. Airline shall immediately contact the GOC in the event of any anticipated delay, cancellation, or possible cancellation of any flight. Airline will make reasonable commercial efforts to work with UPS to implement data exchange, including but not limited to ACARS messaging/notifications, or third party aerial tracking of Aircraft operating for UPS.

Section 1.07.   Airline shall be solely responsible and shall at all times maintain the operational control and maintenance of the Aircraft.

Section 1.08.   Airline shall comply with all applicable Transportation Security Administration (TSA), local airport authority, and UPS security requirements.

Section 1.09.   Airline has full authority and control to determine what persons and cargo shall be carried on board the Aircraft, in accordance with Federal Aviation Regulations (FARS). To the extent permitted by FARS or other applicable law and regulations, the operator shall make all reasonable efforts to accommodate the requirements of UPS regarding persons to be carried on board the Aircraft.

Section 1.10.   Airline agrees that its pilots will be neatly uniformed and have proper identification.

Section 1.11.   Airline agrees to arrive as scheduled by UPS before its first revenue departure (but in no event later than five (5) hours prior to its first departure, unless otherwise agreed by UPS) to allow for UPS operations to accept the arriving Aircraft, perform a container check, and load the Aircraft for departure.

Section 1.12. Airline may cancel the operation of any flights upon notice to UPS if such cancellation is required because of events beyond Airline's control which affect Airline's ability to operate such flights, and no payment shall be required nor damages claimed for any flights so cancelled. Examples of events beyond the Airline's control (the "Uncontrollable Events") may be acts of God, severe weather conditions closing applicable airports, strikes, lock-outs, or other industrial disturbances, failure of public utilities, acts of the public enemy, wars, blockades, riots, epidemics, accidents to machinery or aircraft, unavailability of fuel, or inability to secure new landing slots. Partial trips shall be paid for on a pro rata basis as set forth in Attachment II if approved by UPS.

Section 1.13. Notwithstanding the terms and conditions of any agreements entered into by UPS (UPS Worldwide Forwarding, Inc. only) and Airline or any of its parents, subsidiaries, or affiliates, if Airline does not receive payment of any amount owed by UPS (UPS Worldwide Forwarding, Inc. only) within the time permitted by the applicable agreement, then the Airline may charge interest on the overdue amount at one point five percent (1.5%) per month, eighteen percent (18%) per annum until the date on which Airline receives payment in full.

### ARTICLE 2 – OBLIGATIONS OF UPS

Section 2.01.

(a)      In consideration of the duties and obligations of Airline as set forth herein, UPS agrees to pay Airline the price and with payments terms set forth in the attachments hereto. All invoices for services rendered hereunder shall be provided to UPS within seven (7) calendar days after the expiration or cancellation of the term set forth in Attachment II.

(b)      UPS may cancel the operation of any flights upon notice to Airline if such cancellation is required because of events beyond UPS's control which affect UPS's requirements for such flights, and no payment shall be required for any flights so cancelled. Examples of events beyond UPS's control (the "Uncontrollable Events") may be acts of God, severe weather conditions closing applicable airports, strikes, lock-outs, or other industrial disturbances (whether to UPS or any of its corporate affiliates), acts of the public enemy, wars, blockades, riots, epidemics, lightning, earthquakes, arrests, explosions, accidents to machinery or aircraft, failure of public utilities, unavailability of fuel, or inability to secure landing slots. It is understood that the settlement of any such strikes, lock-outs, or industrial disturbances shall be entirely within the discretion of UPS and nothing herein shall require the settlement of strikes, lock-outs, or industrial disturbances by acceding to the demand of the other party to the strikes, lock-outs, or industrial disturbance if such course is inadvisable in the discretion of UPS. Partial trips shall be paid for on a pro rata basis as set forth in Attachment II if approved by UPS.

(c)      Notwithstanding the terms and conditions of any agreements entered into by UPS and Airline or any of its parents, subsidiaries, or affiliates, if UPS does not receive payment of any amount owed by Airline or any of its parents, subsidiaries, or affiliates within the time permitted by the applicable agreement, then UPS may either: (i) charge interest on the overdue amount at

6

one point five percent (1.5%) per month, eighteen percent (18%) per annum or the maximum amount permitted by applicable law, until the date on which UPS receives payment in full, or (ii) subtract or set off such amount owed by Airline to UPS from any amounts owed by UPS to Airline.

(d)     In addition to the right to charge interest and the right to set off amounts owed UPS, if UPS does not receive payment of any amount owed by Airline within the time permitted by the applicable agreement, then UPS may request the immediate return of any loaned, leased, or sold Parts and shall comply within fifteen (15) calendar days.

(e)     UPS agrees to provide to Airline information about the types of Unit Load Devices (ULD) UPS has in its network and the types of aircraft that each ULD is compatible so that Airline can verify conformity in Section 1.03(m).

<u>Section 2.02</u>.   UPS shall arrange and pay for certain operational expenses incurred during the operation contemplated hereunder, less any Federal or Provincial Value Added Taxes (VAT), and any non-U.S. Federal Excise Taxes (FET) stated on Airline's invoice, as applicable, including:

(a)     All fuel, including the fuel required for positioning and depositioning of the Aircraft, provided however that the Airline:

    i.     Provides UPS with a copy of the Waiver For Use By Ultimate Purchasers Of Aviation-Grade Kerosene Used in Non-Taxable Uses (Attachment III), if Airline is exempt from Federal Excise Tax on Aviation Fuel.

    ii.     UPS will be responsible for fueling the Aircraft for depositioning from the UPS network.

        a.     Airline will provide to UPS a fuel differential report (the "Fuel Reconciliation", (accompanied by copies of the applicable flight log book pages) for each Aircraft. The departing fuel on board the Aircraft when first positioned for service in the UPS system (the "positioning in flight") as provided for herein, and the fuel on board after the Aircraft is positioned out of the UPS network after completing its last flight segment under this Agreement (the "position out flight"). Airline shall make reasonable efforts to minimize positioning and depositioning fuel costs.

        b.     Any positioning or depositioning from international gateways must be approved by UPS prior to positioning or depositioning flight.

        c.     UPS reserves the right to prorate positioning and depositioning fuel (whether to or from domestic or international origins or destinations) where an aggregate of seven (7) combined positioning and depositioning flight hours is exceeded.

7

iii.    Orders fuel at all UPS gateways in which case the local UPS representative will order the fuel and sign for the fueling. Airline agrees to and shall execute a document in the form of Attachment I hereto appointing UPS as the Airline's agent for the sole purpose of accepting billing and remitting payment for all fuel provided to Airline pursuant to this Agreement at UPS gateways. Upon execution of Attachment I, UPS shall accept the appointment as the Airline's agent for the sole purpose of accepting billing and remitting payment for fuel provided to Airline pursuant to this Agreement at UPS gateways.

iv.    Orders fuel directly from the fuel supplier or vendor only at locations that UPS does not have a local UPS representative, in which case, the Airline shall submit at least the following: (a) a copy of the original bill stating the date of fueling, (b) the flight number, (c) origin and destination cities, (d) the Aircraft registration number, (e) the amount of fuel dispensed into the Aircraft, and (f) the actual cost of the fuel charged by the fuel vendor to Airline. UPS shall reimburse Airline for the actual cost of the fuel as stated above. Notwithstanding anything to the contrary herein, UPS shall have no obligation whatsoever to pay any fuel bills not submitted by the Airline and received by UPS within ninety (90) calendar days from the date the fuel was dispensed into the Aircraft.

(b)    Landing fees and navigational and over flight fees, if applicable.

(c)    All Aircraft handling, including Aircraft marshalling, air start, ground power units, push back of aircraft, stairs, deicing, and cleaning of Aircraft lavatories.

(d)    Loading and unloading of cargo into and out of the Aircraft.

(e)    Aircraft parking fees.

(f)    All positioning and depositioning flight block hours shall fall within the minimum number of block hours guaranteed for the specified period whether to or from domestic or international destinations or origins not to exceed an aggregate of seven (7) hours combined positioning and depositioning flight time. If such block hour guarantee is not met, positioning and depositioning flight block hours will be paid at the regular block hour rate. If the block hour guarantee is exceeded, positioning and depositioning flight block hours will be paid at the block hour rate for "excess hours over fleet total" as listed in Attachment II, Section C herein.

(g)    All customs clearance, including customs and duties in relationship to cargo being carried, all Air AMS airway bill entries, transmissions, and fees in connection with Airline's flights provided in Attachment II.

(h)    Landing permits and overfly permits as required in connection with Airline's flights provided in Attachment II herein, provided that Airline will obtain such permits.

## ARTICLE 3 – INSURANCE AND INDEMNIFICATION

**Section 3.01.** Airline's Insurance. Airline shall procure and maintain at its expense Comprehensive General Liability Insurance, including bodily injury, property damage, premises, products and completed operations, hangarkeepers legal and contractual liability including war risks as necessary, in respect of all operations under this Agreement in an amount not less than Five Hundred Million Dollars (US$500,000,000) Combined Single Limit for any one occurrence, and in the aggregate where applicable, or such higher limits as may be carried. Airline shall also maintain all risk hull and hull war risk insurance in respect of the Aircraft and the operation thereof. As a condition precedent, Airline will furnish UPS a certificate of insurance (COI) containing details of such insurance no less than five (5) business days prior to commencement of Attachment II. Such COI shall include the following provisions:

(a)    UPS, its parent and affiliates and their officers, directors, agents, servants and employees shall be named as Additional Insureds (the "UPS Additional Insured's");

(b)    Insurers will provide a waiver of subrogation under hull, hull war and insurances in favor of UPS Additional Insured's to the extent of Airline's indemnification responsibilities hereunder;

(c)    That such liability insurance shall be primary without any right of contribution from any insurance carried by the UPS Additional Insureds;

(d)    A standard clause as to cross liability or severability of interests among parties appearing as UPS Additional Insureds so as to provide that the insurance shall operate in all respects as if a separate policy had been issued covering each Party insured;

(e)    State that the geographic limits shall cover all areas of operation of the Aircraft;

(f)    That the interest of the UPS Additional Insureds under such policies is insured regardless of any breach by Airline of any warranties. UPS Additional Insureds shall have no responsibility for premiums, and Airline's insurers shall waive any rights of set-off or counterclaim against UPS Additional Insureds with respect to outstanding premium due with respect to the Aircraft. If Airline fails to pay its premiums when due, on any or all of the required policies for any reason whatsoever, UPS may, at its sole discretion, pay such premiums and charge Airline, and Airline shall promptly reimburse UPS for such charges. If any of the required policies are cancelled and not simultaneously replaced, UPS shall have the right to immediately terminate this Agreement for Airline's default without further obligation, without limitation of any other remedies UPS may have at law or in equity, and without in any way relieving Airline of its undertakings hereunder. Airline certifies that all Aircraft used under this Agreement will have the required coverages and that such coverages shall not operate as a limitation on or in satisfaction of the indemnity provision herein;

(g)    Provide not less than thirty (30) calendar days written notice or such shorter notice period as shall be available under the war, hijacking, and kindred perils insurance shall be given to UPS

Additional Insureds of cancellation by insurers or adverse material alteration or reduction in the limits of coverage under the policies.

Section 3.02.   Airline shall also carry the following insurance in form and with insurers satisfactory to UPS:

(a)      Worker's Compensation Insurance as per statutory limits required for all states where operations are contemplated under this Agreement.

(b)      Employer's Liability, with a limit of not less than One Million Dollars (US$1,000,000) aggregate limit of liability, and in addition, not less than One Million Dollars (US$1,000,000) aggregate limit of liability per policy year for disease, including death at any time resulting therefrom, not caused by accident, or in either case such higher limits as may be carried per occurrence or otherwise required by law.

(c)      Cargo Legal Liability Insurance in the amount of Five Million Dollars (US$5,000,000) for all baggage, cargo, and mail in Airline's care, custody, and control.

Section 3.03.   Indemnification by Airline.  Airline hereby agrees to defend, indemnify, and hold harmless UPS and its officers, directors, agents, servants, and employees ("UPS Indemnitees") from and against any and all liabilities, claims, demands, suits, judgments, damages, losses, costs and expenses (including reasonable legal expenses including defense costs and costs of discovery and attorneys' fees) (each a "Claim") to the extent such Claim arises out of or is in connection with Airline's or its subcontractors performance or non-performance of this Agreement and which may be suffered by, accrued against, charged to, or recoverable from UPS Indemnitees by reason or on account of: (i) injury to or death of any third party persons (but excluding Airline Indemnitees and UPS Indemnitees), or (ii) loss of or damage to any Airline, UPS, or third party property (including all the property of Airline and including the Aircraft used in connection herewith, and including all the property of UPS, but excluding UPS baggage, cargo, and mail) arising out of this Agreement, except to the extent such loss or damage arises from the gross negligence or willful misconduct of UPS Indemnitees.

Section 3.04.   Indemnification by UPS.  UPS hereby agrees to defend, indemnify, and hold harmless Airline, its officers, directors, agents, servants and employees ("Airline Indemnitees") from and against all liabilities, claims, demands, suits, judgments, damages, losses, costs and expenses (including reasonable legal expenses including defense costs and costs of discovery and attorneys' fees) (each a "Claim") to the extent such Claim arises out of or is in connection with UPS's performance of this Agreement and which may be suffered by, accrued against, charged to, or recoverable from Vendor Indemnitees by reason or on account of: (i) loss or damage to any UPS baggage, cargo, and mail, or (ii) death or injury to any UPS Indemnitees arising out of this Agreement, unless such loss or damage arises from the gross negligence or willful misconduct of Airline Indemnitees.

Section 3.05.  Employee Claims.  Each Party assumes full responsibility for any and all liability on account of bodily injury to or death of any of its own employees occurring in the course of their employment, except to the extent such bodily injury or death is caused by the gross negligent or willful misconduct of the other Party.

Section 3.06.   Indirect, Special, Incidental, and Consequential Damages.   In no case pursuant to this Article 3 shall either Party be liable to or required to indemnify the other Party for any indirect, special, incidental, or consequential loss, damage, and/or expense (including but not limited to loss of profit or revenue; loss of use; cost of capital; cost of substitute equipment, facilities or services; and downtime costs).

Section 3.07.   Fines and Civil Penalties.   Airline shall be solely responsible for and hold UPS harmless for any and all fines or civil penalties levied by the FAA or any successor agency or other similar governing body due to the regulatory noncompliance by Airline or its subcontractors related to the performance or non-performance of this Agreement.

Section 3.08.   Security Clearance.

(a)      Notwithstanding anything contained in this Agreement seemingly to the contrary, UPS and Airline agree that to perform Airline's obligations under this Agreement, Airline Indemnitees may require unescorted access to secure areas of local airport or UPS property, such property being governed by the Transportation Security Administration ("TSA"), local airport authority, and UPS security regulations, rules, and procedures. Prior to entering secured areas of any airport or UPS site, Airline agrees to procure proper security clearances for each site, including any required airport or UPS issued badges, for all of Airline Indemnitees (including pilots, loadmasters, mechanics, technicians, and other necessary staffing required) requiring such access.

(b)      Airline agrees to indemnify and hold UPS harmless for all fines, fees, costs, civil penalties, or other charges, and for any losses, claims, expenses, and liabilities whatsoever, in each case, including but not limited to attorney fees, arising from:

      i.      UPS conducting criminal history record checks, as required by the TSA or local airport authority, for Airline Indemnitees to gain unescorted access to secure areas of local airport property;

      ii.      Airline Indemnitees violating TSA, local airport authority, or UPS security regulations, rules, or procedures;

      iii.      Claims by third parties arising from the conduct of Airline Indemnitees while in secure areas of local airport property; and

      iv.      Expenses relating to security escort services.

(c)      If Airline fails to procure proper security clearances for any of Airline Indemnitees (including pilots, loadmasters, mechanics, technicians, and other necessary staffing as required) for each site, then Airline may request (with 30 calendar days advanced written notice) that UPS provide security escort services. UPS will subcontract such security escort services and invoice the Airline actual cost (reasonable and customary) plus a 10% administration fee.

## ARTICLE 4 – RELIABILITY REQUIREMENTS

**Section 4.01.**   Except for causes beyond its reasonable control, Airline shall maintain a ninety-five percent (95%) on-time schedule reliability factor calculated with respect to the services contemplated hereunder. Airline will notify UPS of any delay, breakdown, or any other occurrence which affects any obligation of Airline hereunder as soon as reasonably possible.

## ARTICLE 5 – CHANGES IN OPERATION

**Section 5.01.**   Airline agrees that it will, at the direction of UPS, change routings, frequencies, or schedules to meet UPS's volume requirements, such request to be given to Airline by UPS in writing at least five (5) calendar days in advance of the effective date of any such change.  In such event, the Parties shall agree as to any increases or decrease in the price warranted by such changes. In the event Airline is unable to meet such changes within the required time period, UPS may cancel this Agreement as to that Aircraft, frequency, routing, guarantee, or schedule without penalty at the expiration of the above described notice period.

## ARTICLE 6 – TERM OF AGREEMENT

**Section 6.01.**   This Agreement shall be effective as of the date written above and shall remain in full force and effect until (a) terminated in accordance with Sections 6.02 or 6.03; (b) as the term of this Agreement may be modified in writing by UPS and Airline; or (c) until all obligations have been performed, discharged, or excused.

**Section 6.02.**   In the event Airline fails to comply with any of its duties, obligations, covenants, representations, or warranties hereunder (including the reliability requirements in Article 4), or in the event of: (a) the dissolution, liquidation, suspension of business, or immediate termination of existence of Airline; (b) the insolvency or bankruptcy of Airline; (c) the making by Airline of an assignment for the benefit of creditors; (d) the consent of Airline to the appointment of a trustee or receiver for Airline or a substantial part of its business; (e) the admission in writing of Airline of its inability to pay its debts as the debts mature; or (f) the institution by or against Airline of bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings, or any other proceedings for relief under any bankruptcy or similar federal, state, or local law for the relief of debtors; then UPS shall have the right to either request adequate assurances of full performance (and Airline to comply with such request) or terminate this Agreement immediately, and such termination shall not be deemed an exclusive remedy but shall be in addition to any other remedy UPS might have either at law, in equity, or as provided for in Section 1.01(b) above.

**Section 6.03.**  In the event UPS fails to comply with any of its duties, obligations, covenants, representations, or warranties hereunder, or in the event of: (i) the dissolution, liquidation, suspension of business, or immediate termination of existence of UPS; (ii) the insolvency or bankruptcy of UPS; (iii) the making by UPS of an assignment for the benefit of creditors; (iv) the consent of UPS to the appointment of a trustee or receiver for UPS or a substantial part of its business; (v) the admission in writing of UPS of its inability to pay its debts as the debts mature; or (vi) the institution by or against UPS of bankruptcy reorganization, arrangement, insolvency, or liquidation proceedings or any other proceedings for relief under any bankruptcy or similar federal, state, or local law for the relief of debtors; then the Airline shall have the right to terminate this Agreement immediately, and such termination shall not be deemed an exclusive remedy but shall be in addition to any other remedy the Airline might have either at law or in equity.

### ARTICLE 7 – NOTICES

**Section 7.01.**  All notices, approvals, requests, consents, and other communications given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when received if hand-delivered; sent by electronic mail or facsimile, or United States certified or registered mail (return receipt required); or UPS express service addressed as follows:

If to UPS:   UPS Worldwide Forwarding, Inc.
Attention: Fleet Development Leasing Manager
1400 North Hurstbourne Parkway – 2A
Louisville, KY 40223
Facsimile: (502) 329-6499

If to Airline:   NATIONAL AIR CARGO GROUP INC.
Attention: Doug Siemonsma
5955 TG Lee Blvd
Orlando, FL 32822
Facsimile: (407) 313-2255
Copy to: contracts@nationalairlines.aero

### ARTICLE 8 – ADVERTISING, NON-DISCLOSURE, AND CONFIDENTIALITY

**Section 8.01.**  Airline covenants and agrees with UPS, for the benefit of UPS and its parent and affiliates, that Airline will not make any use whatsoever of, or cause others to make or assist others in making any use whatsoever, of the corporate or trade name of UPS, United Parcel Service of America, Inc., or its affiliates, or any portion thereof, or any of their trademarks, or any portion thereof, in connection with any advertising, promotion, publicity, or other printed material without the written consent of an officer of UPS. Airline covenants and agrees that except as provided by the provisions of any law, order, rule, or regulation under which Airline is obligated regarding Airline's ordinary business operations, Airline shall make every reasonable effort not to publicly disclose or describe its business relationship with UPS.

**Section 8.02.**  UPS covenants and agrees with the Airline, for the benefit of Airline and its affiliates, that UPS will not make any use whatsoever of, or cause others to make or assist others in making any use whatsoever, of the corporate or trade name of Airline its affiliates, or any portion thereof, in connection with any advertising, promotion, publicity, or other printed material without the written consent of an officer of Airline. UPS covenants and agrees that except as provided by the provisions of any law, order, rule, or regulation under which UPS is obligated regarding UPS's ordinary business operations, UPS shall make every reasonable effort not to publicly disclose or describe its business relationship with Airline.

**Section 8.03.**  This Agreement contains information specifically for Airline and UPS, and nothing herein shall be divulged by either Party to any third person, firm, or corporation without the prior written consent of the other Party, which consent shall not be unreasonably withheld; except consent shall not be required for disclosure to the respective insurers and professional advisors of the Parties (who must likewise agree to be bound by this confidentiality clause) or to the extent required by government agencies and courts for official purposes (but such disclosure to government agencies and courts shall be made only upon sufficient written notice to the other Party so as to provide that Party with the ability to obtain a protective order).

## ARTICLE 9 – MISCELLANEOUS

**Section 9.01.**  **Entire Agreement and Amendments.** This Agreement, including the current attachments, represents the entire Agreement between the Parties and no other written or oral agreements have been made. Any modification to this Agreement, including any current attachments, shall be in writing and signed by an authorized representative of Airline and UPS.

**Section 9.02.**  **No Waiver.**  A waiver of any defaults hereunder shall not be deemed a waiver of any other or subsequent default.

**Section 9.03.**  **Assignment.** Neither Party may assign this Agreement, in whole or in part, without the prior written consent of the other Party, except that UPS may assign it to an affiliated company without the consent of the Airline.

**Section 9.04.**  **Survival.** Articles 3 and 8 and Sections 9.05 and 9.13 shall survive cancellation or expiration of this Agreement.

**Section 9.05.**  **Applicable Law.** This Agreement shall be governed by the laws of the Commonwealth of Kentucky. Airline agrees and consents to personal jurisdiction in the Jefferson Circuit Court in Louisville, Kentucky as venue for disputes arising under this Agreement.

**Section 9.06.**  **Compliance with Laws.** Both Parties agree that in the performance of this Agreement each will comply with all applicable statutes, rules, regulations, and orders of the United States or of any state or political subdivision, including, but not limited to, all federal, state, and local laws and regulations pertaining to safety and other conditions of employment.

2015 NCR GTA (Final Dated 05-07-15)                                                                   14

Section 9.07.   Legality of Provisions.   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and unenforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 9.08.   Section Headings and Captions.   All section headings and captions used in this Agreement are for convenient reference and shall not affect the interpretation of this Agreement.

Section 9.09.   Counterparts and Signatures. This Agreement may be executed in separate counterparts, each of which when so executed shall be deemed to be an original and which, taken together, shall constitute one and the same instrument. Electronic (.pdf or similar) or facsimile signatures are acceptable to both Parties and shall be deemed to be originals and binding upon both Parties.

Section 9.10.   Slots.  Any allocation of the navigable airspace ("Slot") allocated to Airline by the FAA or any other governing body, utilized by Airline to perform services under this Agreement shall be considered the property of UPS. Upon the request of UPS, Airline shall take any actions reasonably necessary to cause the transfer of any Slot to UPS or to another carrier designated by UPS, or shall exchange any such Slot with any other carrier as directed by UPS. Airline's obligations under this Section 9.10 shall include the filing of any document or other communication requested by UPS with the FAA or other governing body. UPS's obligation under this Section 9.10 is reimbursement of all fees and costs incurred by Airline in complying with this requirement, plus a ten percent (10%) administrative fee.

Section 9.11.   United States Dollars.  All amounts provided for in this Agreement or Attachments are in United States Dollars.

Section 9.12.   Authorizations.   Each Party hereby represents and warrants to the other that the execution, delivery, and performance of this Agreement and the transactions contemplated hereby have been duly authorized by all necessary corporate action, and this Agreement, when duly authorized, executed, and delivered by the other Party, will be a valid and binding obligation of each Party, respectively.

Section 9.13.   Data Protection.  Airline shall maintain a documented data breach action and response plan. If Airline discovers or is notified of a breach, or potential breach of data security, or any unauthorized access or use relating to UPS confidential information, Airline will promptly at its expense: (i) notify UPS, (ii) investigate the breach and take reasonable steps to mitigate the breach, (iii) perform any post-incident assessments to prevent future breaches of UPS confidential information. In the event of disclosure or loss of, or inability to account for any UPS confidential information, Airline shall be solely responsible for the costs of remedying any data incident caused by a data related breach.

Section 9.14.   English Language.    All correspondence, documents, including all maintenance documentation, and any other written matters in connection with this Agreement shall be in English.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in their names and on their behalf by their respective duly authorized officers, as of the Effective Date.

UPS WORLDWIDE FORWARDING, INC. (UPS)

By: _____

Its: ~~Vice President~~ ASST. TREASURER

Date: May ~~7~~ 2015    May 26, 2015

NATIONAL AIR CARGO GROUP, INC. D/B/A NATIONAL AIRLINES (Airline)

By: _____

Its: PRESIDENT

Date: May 7, 2015

ATTACHMENT I

Cargo Aircraft Charter Agreement

Effective Date: May 7, 2015

NATIONAL AIR CARGO ("Airline") hereby appoints UPS Worldwide Forwarding, Inc. ("UPS") as agent for Airline for the sole purpose of accepting billing and remitting payment for all fuel provided to Airline at UPS U.S. gateways during and in the course of Airline's operations provided for in that certain CARGO AIRCRAFT CHARTER AGREEMENT between Airline and UPS dated May 7, 2015 ("Agreement").

UPS hereby accepts Airline's appointment of UPS as its agent solely for the purposes stated herein. This appointment shall commence upon the first day of Airline's operations for UPS as provided for in the Agreement and shall terminate upon payment of the last fuel invoice tendered to UPS according to the terms and conditions of the Agreement.

UPS WORLDWIDE FORWARDING, INC. (UPS)

By: _____

Its: Vice President

Date: May 7, 2015

NATIONAL AIR CARGO GROUP, INC. D/B/A NATIONAL AIRLINES (Airline)

By: _____

Its: PRESIDENT

Date: May 7, 2015