## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Dermot Valentine Ellis, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services LLC, | ) | **COMPLAINT** |
| NewRez LLC d/b/a Shellpoint | ) | **WITH JURY TRIAL DEMAND** |
| Mortgage Servicing, and Wells | ) | |
| Fargo Bank, National Association, | ) | |
| | ) | |
| Defendants. | | |

## PRELIMINARY STATEMENT

1.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.     Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.     Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.     Defendants compile, maintain, and report information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general

reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5.     This action for damages is based on Defendants' false reporting on Plaintiff's credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

6.     Plaintiff, Dermot Valentine Ellis, is a natural person who resides in Gwinnett County, Georgia.

3

7.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

8.     Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability company formed under the laws of the State of Georgia and registered to do business in the State of Georgia. Equifax may be served with process via its registered agent, Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

10.     Defendant, NewRez LLC dba Shellpoint Mortgage Servicing (hereinafter "Shellpoint") is a limited liability company formed under the laws of the State of Delaware and registered to do business in the State of Georgia. Shellpoint may be served with process via its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

11.     Shellpoint regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer

transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

12.     Defendant, Wells Fargo Bank, National Association (hereinafter "Wells Fargo") is a corporation formed under the laws of the State of California and registered to do business in the State of Georgia. Shellpoint may be served with process via its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

13.     Wells Fargo regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

15.     This Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendants frequently and routinely

conduct business in the State of Georgia, including the conduct complained of herein.

16.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

17.     Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## **ALLEGATIONS OF FACT**

### **Plaintiff's Mortgage**

18.     On or about April 9, 2013, Plaintiff obtained a residential home loan from Wells Fargo Bank, N.A. for the original principal amount of $253,828.00 (the "Mortgage").

19.     The Mortgage is collateralized by residential real property located at 2440 Harbin Spring Cove, Dacula, Georgia 30019, as evidenced by the Security Deed recorded at Deed Book 52196, Page 288, in the Superior Court of Gwinnett County.

20.     Shellpoint became mortgage servicer for Wells Fargo.

**Plaintiff's Bankruptcy Case**

21.     On August 3, 2018, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 18-62910 (the "Bankruptcy Case").

22.     In Schedule D of his Bankruptcy Petition, Plaintiff listed Wells Fargo as a secured creditor with a claim for the Mortgage in the amount of $224,000.00 (the "Debt").

23.     On January 29, 2019, Plaintiff filed his Chapter 13 Plan in accordance with 11 U.S.C. § 1322, providing for the cure of any then-existing deficiency and the direct payment of all future Mortgage payments by Plaintiff to Shellpoint.

24.     As the Mortgage is secured only by a security interest in real property that is Plaintiff's principal residence, Plaintiff's Chapter 13 Plan cannot and will not discharge the Mortgage, and thus left Shellpoint's rights otherwise unaffected.

25.     On September 14, 2018, Wells Fargo filed a Proof of Claim in Plaintiff's Bankruptcy Case, claim number 12, representing it was owed $218,341.81.

26.     Defendants did not object to Plaintiff's Plan.

27.     On February 20, 2019, Plaintiff's Plan was confirmed.

7

28.     Defendants were served with a copy of the Order Confirming Plan on February 22, 2019, by the Bankruptcy Noticing Center.

29.     The Bankruptcy Case is currently pending and Plaintiff continues to substantially perform under the terms of his Confirmed Plan.

30.     The Mortgage has not been discharged and is not subject to discharge pursuant to 11 U.S.C. §§ 1322(b)(2) and 1328(a)(1). See, *Dukes v. Suncoast Credit Union* (*In re Dukes*)*,* 909 F.3d 1306 (11th Cir. 2018).

31.     As recently as December 16, 2022, Shellpoint advised the Bankruptcy Court and Plaintiff that Plaintiff's Mortgage was being serviced by Shellpoint and that Plaintiff's obligation is ongoing.

32.     Accordingly, Plaintiff has continued to make his post-filing Mortgage payments to Shellpoint, and Shellpoint has continued to service Plaintiff's Mortgage and accept his post-filing Mortgage payments.

### Effect of Consumer Reports Which Contain
### Inaccurate or Misleading Information

33.     Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for

the purpose of serving as a factor in establishing the consumer's eligibility for:

     i.     credit or insurance to be used primarily for personal, family, or household purposes;

     ii.     employment purposes; or

     iii.     any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

34.     The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

35.     The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

     a.     Eligibility for and terms for credit;

     b.     Potential for refinancing of existing credit;

     c.     Eligibility for leasing prospects;

     d.     Eligibility for utility services;

     e.     Eligibility for and the terms of insurance;

     f.     Employment or potential employment;

     g.     Accounts which are under collection or review;

      h.    Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

      i.    Standing with potential investors or servicers; and

      j.    Eligibility for individually-billed travel charge cards used by executive departments and agencies.

36.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

37.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on December 12, 2022).

38.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent

10

of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on December 12, 2022).

39.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

## *Credit Scoring*

40.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on December 12, 2022).

41.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

11

42.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on December 12, 2022).

43.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed December 12, 2022).

44.     Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed December 12, 2022).

45.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

46.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

47.     Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with incorrect, outdated payment information and as having a $0 balance, adversely affects Plaintiff's FICO score, as it excludes any recent positive payment history associated

with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

48.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

49.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP (last accessed December 12, 2022).

### *Credit-Based Insurance Scoring*

50.     Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

51.     Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

52.     Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at* https://perma.cc/B2VQ-452N (last accessed December 12, 2022). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

53.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

54.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed December 12, 2022).

55.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See     https://www.consumer.ftc.gov/articles/0152-credit-scores, *archived at* https://perma.cc/EB3D-54UP (last accessed December 12, 2022).

56.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed December 12, 2022).

57.     The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed December 12, 2022).

58.     There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

59.     The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO

17

credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

## The CDIA Metro 2 Credit Reporting Standards

### *The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

60.    The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed December 12, 2022).

61.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

18

62. Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

63. To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

64. The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

65. Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

66. In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See,      http://www.cdiaonline.org/about/index.cfm?unItemNumber=515      (last
accessed December 12, 2022).

67.    The Metro 2 Format Task Force is comprised of representatives from
Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro
2 Format Task Force's mission is to provide a standardized method for the reporting
of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

68.    In order to ensure compliance with the FCRA, and in furtherance of its
mission, the Metro 2 Format Task Force has developed an industry standard (the
"Metro2 standard") for reporting consumer accounts that "will ensure the integrity
and consistency of the credit information being reported."

69.    In the credit reporting industry, Metro 2 is widely known as the well-
established industry standard, uniformly adopted by furnishers and CRAs alike.

70.    As such, viewers/users of consumer reports both expect and rely on the
information contained in consumer reports to be reported in compliance with the
Metro 2 standards.

71.    A deviation from the Metro 2 standards results in a reported item being
incomplete and/or misleading to viewers/users of consumer reports.

72.     In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

73.     Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

74.     However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

75.     Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

76.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

77.    15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

78.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

79.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

80.    The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

81.     As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

82.     At all times relevant hereto, Equifax adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

83.     At all times relevant hereto, Equifax has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

84.     As an integral aspect of its duties under the FCRA, Shellpoint is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

85.     At all times relevant hereto, Shellpoint adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

86.     Furthermore, at all times relevant hereto, Shellpoint incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would

otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

87.     As an integral aspect of its duties under the FCRA, Wells Fargo is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

88.     At all times relevant hereto, Wells Fargo adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

89.     Furthermore, at all times relevant hereto, Wells Fargo incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

*The National CRAs and the Furnishers of Consumer Information Communicate
Metro 2 Compliant Notices of Consumer Disputes and Responses,
Respectively, Through the e-Oscar Reporting Platform*

90.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

91.    To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

92.    The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed December 12, 2022).

93.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

94.    The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

95.    If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the

25

furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

96.    The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed December 12, 2022).

97.    Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

98.    Equifax requires data furnishers that report to Equifax to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams* (last accessed December 12, 2022).

### *Viewers of Credit Reports Presume Compliance with the Metro 2 Standards; Departures from the Standards are, Therefore, Inherently Misleading*

99.    The CRRG and the Metro 2 guidelines have been uniformly adopted across the credit reporting industry.

100.   All entities which contribute to consumer reports have agreed to comply with the Metro 2 guidelines, which are "accepted by all consumer reporting agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

101.   Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer report will view the report in the light of the guidelines, presuming that the information reported is in compliance with industry standards.

102.   For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

103.   As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards, and interpret that information accordingly.

104.   Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

105.   Equifax has actual knowledge that entities reviewing consumer credit reports presume that Equifax has complied with the Metro 2 standards.

106.   Shellpoint has actual knowledge that entities reviewing consumer credit reports presume that Shellpoint has complied with the Metro 2 standards.

107.   Wells Fargo has actual knowledge that entities reviewing consumer credit reports presume that Wells Fargo has complied with the Metro 2 standards

108.   Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

109.   The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

110.   Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

### *The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

111.   As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

112.   Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

### *The Significance of the Consumer Information Indicator*

113.   Of particular importance in reporting under the Metro2 standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

114. Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

115. The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

116. While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

117. This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

118. The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be

visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

119.   Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

120.   These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

121.   Since the broadly adopted industry standard requires disclosure of a pending bankruptcy, the absence of such a disclosure inherently misleads a viewer into believing that the account is not included in bankruptcy.

*Reporting of Accounts with an Active, Confirmed
Chapter 13 Bankruptcy, under Metro 2*

122.   Upon confirmation of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report an account included in the debtor's bankruptcy as follows:

    a.      A **Consumer Information Indicator** ("CII") of "D" (or blank to maintain a "D" which was previously reported), indicating that the account is subject to a petition for Chapter 13 bankruptcy;

31

b. An **Account Status Code** reflecting the status at time of the petition;

c. A **Payment History** of "D" (indicating "no history available") for each month since the filing of the bankruptcy, plus actual history for prior months;

d. An **Amount Past Due** of zero;

e. A **Current Balance** reflecting the current balance as provided for under the terms of the Chapter 13 plan, rather than the original contract;

f. **Terms Duration & Terms Frequency** which incorporate any changes the contract terms provided for under the Chapter 13 plan;

g. The **Scheduled Monthly Payment Amount** reflecting the scheduled payment amount under the Chapter 13 plan, rather than under the original contract; and

h. A **Date of Account** Information of the current month's date (increasing with each month's reporting).

CRRG, FAQ 28(a)-(b), at 6-21 to 6-24.

## **Plaintiff's Equifax Consumer Report**

123.   On or about March 14, 2022, Plaintiff obtained a copy of his consumer report as published by Equifax.

124.   That report contained erroneous information as provided by Shellpoint, and as published and reported by Equifax.

125.   The relevant portion of the Shellpoint tradeline appeared in the March 14, 2022, Equifax report as follows:

Jan 31, 2022                                  $0.00
                                        In good standing

**Overview**

You have 0% left to pay on this loan.

Balance:                        Highest Balance:
$0.00

33

| | |
|---|---|
| Account Number | 578755052 |
| Account Status | **Open** |
| Open Date | **Jun 25, 2008** |
| Last Activity | **Jun 25, 2008** |
| Type | **Conventional Real Estate Mortgage** |
| Responsibility | **Joint Contractual Liability** |
| Remarks | **Bankruptcy Chapter 13** |
| Times 30/60/90 Days Late | **0/0/0** |
| Months Reviewed | **29** |
| Terms Count | **0** |
| Term Source Type | |
| High Balance | |
| High Credit | |
| Monthly Payment | **$0.00** |
| Current Payment Status | **Bankruptcy Or Wage Earner Plan** |
| Amount Past Due | |

**Creditor Information**

SHELLPOINT MORTGAGE
55 BEATTIE PLACE STE 600
GREENVILLE, SC 29601

(Remaining portion of tradeline omitted.)

126.   That report contained erroneous information as provided by Wells Fargo, and as published and reported by Equifax.

127.   The relevant portion of the Wells Fargo tradeline appeared in the March 14, 2022, Equifax report as follows

Mar 7, 2019                    **$0.00**
                          In good standing

**Overview**

You have 0% left to pay on this loan.

Balance:              Highest Balance:
$0.00

| | |
|---|---|
| Account Number | 9360356298448 |
| Account Status | **Open** |
| Open Date | **Apr 15, 2013** |
| Last Activity | **Aug 7, 2018** |
| Type | **Real Estate Mortgage** |
| Responsibility | **Individual** |
| Remarks | **Bankruptcy Chapter 13** |
| Times 30/60/90 Days Late | **0/0/0** |
| Months Reviewed | **67** |
| Terms Count | **0** |
| Term Source Type | |
| High Balance | |
| High Credit | |
| Monthly Payment | **$0.00** |

| | |
|---|---|
| Current Payment Status | **Bankruptcy Or Wage Earner Plan** |
| Amount Past Due | |

**Creditor Information**

WELLS FARGO HOME MOR
PO BOX 10335
DES MOINES, IA 503060335
(800) 288-3212

128.   Because   the   Mortgage   has   not   been   discharged   in   Plaintiff's
Bankruptcy Case (as the Bankruptcy Case has not been discharged at all) and the
Mortgage is not subject to discharge, and Plaintiff continues to make payments to

Shellpoint on the Mortgage, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

    a.    The Mortgage's balance is reported as $0, rather than the actual current balance of the account  (which, in conjunction with the notation of bankruptcy, creates the false impression that the account was discharged in bankruptcy); and

    b.    The tradeline was not reported in compliance with CDIA / Metro 2 standards.

129.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the Mortgage as set forth by the CDIA and Metro 2 and as adopted by Defendants, including, *inter alia*:

    a.    The Balance is reported as $0, rather than the current balance as provided for under the Chapter 13 plan, as required by Metro 2; and

    b.    The Scheduled Monthly Payment is reported as $0, rather than the monthly payment provided for under the Plan, as required by Metro 2.

130.   In a letter dated May 26, 2022, Plaintiff disputed the inaccurate and misleading information directly to Equifax and advised Equifax that the tradelines from Shellpoint and Wells Fargo were incorrectly reporting that the balance was $0 and the monthly payment was $0. The relevant portion of Plaintiff's dispute is reproduced below:

```
    My mortgages with Shellpoint Mortgage, 55 Beattie Place Ste.
600, Greenville, South Carolina 29601, account number 578755052;
and Wells Fargo Home Mor, PO Box 10335, Des Moines, Iowa
503060335, account number 936035629844 are reporting
incorrectly. My mortgages are included in my bankruptcy (case
number 18-62910, filed August 3, 2018) and are provided for by
my bankruptcy plan, but they are long-term debts that are not
subject to discharge. Further, my mortgages cannot have been
discharged, as my bankruptcy is ongoing, and thus none of my
debts have been discharged.
    I am disputing the following incorrect information that is
being reported in the tradeline for Shellpoint Mortgages: my
mortgage balance is not $0, and my monthly payment is not $0. I
am also disputing the following incorrect information that is
being reported in the tradeline for Wells Fargo Home Mor: my
mortgage balance is not $0, and my monthly payment is not $0. I
am including copies of documents filed in my bankruptcy that
show that the accounts are not closed. Please contact the
furnishers to confirm this information and update these
tradelines. Please forward the enclosed documents to assist the
furnishers with their review.
```

131.   The dispute letter provided Defendants with sufficient information to identify and correct the inaccurate reporting.

132.   In support of Plaintiff's dispute, and to assist Defendants' respective investigations, Plaintiff included with his dispute the following documents: a copy

of Plaintiff's Chapter 13 Plan showing the Mortgage as long-term debt and thus exempt from discharge under 11 U.S.C. § 1328(a)(1); and a copy of the Proof of Claim filed by Wells Fargo.

133.   Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Defendants of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Defendants' review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

134.   Upon information and belief, Equifax timely notified Defendants of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

135.   Alternatively, Equifax failed to notify Defendants of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

136.   Upon information and belief, Shellpoint received timely notice of Plaintiff's dispute from Equifax.

137.   Upon information and belief, Wells Fargo received timely notice of Plaintiff's dispute from Equifax

138.   Pursuant to 15 U.S.C. § 1681s-2(b), Shellpoint had a duty to conduct an investigation with respect to the disputed information, and to modify or delete that information appropriately.

139.   Equifax advised Plaintiff it either made changes to Plaintiff's credit report based upon information provided by Plaintiff, or it contacted the company reporting the information to Equifax requesting that it verify the accuracy of the information provided by Plaintiff.

140.   Equifax also advised Plaintiff that it provided the furnisher with "any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation".

141.   A reproduction of the relevant portion of the report describing the procedures to Plaintiff appears below:

**Were changes made to my credit report and what actions were taken?**

Please see the following page(s) for more detailed information on your specific results.

If we were able to make changes to your credit report based on the information you provided, we have done so.  Otherwise, we contacted the company reporting the information to Equifax for them to investigate your dispute.

In this situation:

- We request that the reporting company verify the accuracy of the information you disputed;

- We provide them with any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation; and

- We request that they send Equifax a response to your dispute and update their records and systems, as necessary.

142.   Equifax provided a reinvestigation report dated August 2, 2022 which

is reproduced below:

>>>   **The information you disputed has been updated. Account # - *8448 The results are:** WE VERIFIED THAT THIS ITEM BELONGS TO YOU. ADDITIONAL INFORMATION HAS BEEN PROVIDED FROM THE ORIGINAL SOURCE REGARDING THIS ITEM.   If you have additional questions about this item please contact:   **WFHM, PO BOX 10335, Des Moines, IA 50306 Phone: (800) 416-1472**

>>>   **The information you disputed has been verified as accurate, however, information unrelated to your dispute has been updated. Account # - *5052 The results are:** WE VERIFIED THAT THIS ITEM BELONGS TO YOU.   If you have additional questions about this item please contact:   **SHELLPOINT, 55 Beattie Pl Ste 600, Greenville, SC 29601-2165 Phone: (484) 594-1038**

143.   Plaintiff accessed his Equifax credit report on September 22, 2022.

144.   The September 22, 2022 Equifax credit report repeated the same errors

from Wells Fargo and Shellpoint which Plaintiff had disputed.

145.   Specifically, the Shellpoint tradeline appeared in the revised Equifax

report as follows:

## 3.1 SHELLPOINT MORTGAGE SERVICING (CLOSED)

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | xxxxx 5052 | Reported Balance | |
|---|---|---|---|
| Account Status | INCLUDED_IN_CHAPTER_13 | Available Credit | |

| | | | |
|---|---|---|---|
| High Credit | | Owner | JOINT_CONTRACTUAL_LIABILITY |
| Credit Limit | | Account Type | MORTGAGE |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | | Date Opened | Jun 25, 2008 |
| Amount Past Due | | Date Reported | Aug 02, 2022 |
| Actual Payment Amount | | Date of Last Payment | Jul 01, 2022 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 33 | Delinquency First Reported | Feb 01, 2018 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Conventional Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Aug 01, 2018 | | |

**Comments**

Bankruptcy chapter 13
Bankruptcy petition
Freddie mac account
Fixed rate

**Contact**

SHELLPOINT MORTGAGE SERVICING
55 BEATTIE PLACE STE 600
GREENVILLE, SC  29601
1-866-317-2347

146.   Specifically, the Wells Fargo tradeline appeared in the revised Equifax report as follows:

### 3.2 WELLS FARGO HOME MORTGAGE (CLOSED)

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| | | | |
|---|---|---|---|
| Account Number | xxxxxxxxx 8448 | Reported Balance | |
| Account Status | INCLUDED_IN_CHAPTER_13 | Available Credit | |
| | | | |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | | Date Opened | Apr 15, 2013 |
| Amount Past Due | | Date Reported | Mar 07, 2019 |
| Actual Payment Amount | | Date of Last Payment | Feb 01, 2019 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 67 | Delinquency First Reported | Feb 01, 2018 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Federal Housing Administration Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Aug 01, 2018 | | |

**Comments**

Consumer disputes – reinvestigation in progress

**Contact**

WELLS FARGO HOME MORTGAGE
PO BOX 10335
DES MOINES, IA  50306
1-800-288-3212

147.   Defendants' post-investigation reporting is, independently and jointly, false and misleading.

148.   Defendants' post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of

43

consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

149.   Plaintiff is informed and believes that the revised tradeline reflects any information provided by Defendants to Equifax in response to Plaintiff's dispute.

## INJURIES-IN-FACT

150.   Defendants' actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer report.

151.   The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

152.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

153.   The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than he otherwise would.

44

154.   Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third*

*Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

155.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

156.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than he otherwise would.

157.   Defendants' actions and omissions have caused Plaintiff's credit report to falsely indicate that Plaintiff's Mortgage is closed and has a balance of $0, suggesting that the account was discharged in Plaintiff's Bankruptcy Case, thereby denying Plaintiff the positive effect of the reporting of their Mortgage payments over the course of the Chapter 13.

158.   In point of fact, the FHA has a program for approving borrowers who are still making payments in a pending/active Chapter 13 Bankruptcy. U.S. Department of Housing and Urban Development, HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance (March 24, 2011) p. 4-C-13, available at *https://www.hud.gov/sites/documents/41551HSGH.PDF*.          See          also, *https://www.fha.com/fha_requirements_credit*.

159.   Consumers in bankruptcy often have high-interest mortgages due to the financial circumstances that led to bankruptcy in the first place; once the bankruptcy process has provided some stability, they may be eligible for more favorable terms if their credit otherwise supports it.

160.   Thus, complete and accurate reporting by CRAs and furnishers is of paramount importance.

161.   The existence of consumer reports which inaccurately report Plaintiff's Mortgage, and/or falsely suggest that Plaintiff's Mortgage has been discharged or is subject to discharge, make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

162.   For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just

47

Plaintiff's credit scores, and analyze Plaintiff's credit history, liabilities, and debts to determine creditworthiness. U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF* (January 16, 2018) archived at https://perma.cc/UE3H-N3BS.

163.   To obtain an FHA refinance of a potential mortgage, the lender must be able to verify Plaintiff's payments for a potential mortgage for the preceding 12 months. *Id*. at 409.

164.   In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

165.   Plaintiff's correct payment history would be included in Plaintiff's Equifax credit report if Defendants had conducted appropriate investigations of Plaintiff's disputes.

166.   However, because the Mortgage is falsely reported in Plaintiff's Equifax credit report as having a $0 balance, a $0 monthly payment, and being closed, Plaintiff will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating his payment history to a potential lender.

48

167.   Because Defendants failed to comply with their duties under the FCRA as detailed herein, Plaintiff will need to obtain and provide verification of the Mortgage, bank statements, and/or other documents to demonstrate his payment history for the previous 12 months.

168.   This requires Plaintiff to expend more time, effort, and money due to Defendants' failures to abide by their obligations under the FCRA.

## DAMAGES

## Actual Damages

169.   As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages.

170.   These damages include out-of-pocket expenses incurred as a result of Defendants' wrongful representations regarding the Mortgage, and Defendants' failures to abide by their obligations under the FCRA.

171.   Plaintiff has suffered a decrease in Plaintiff's credit scores as a result of Defendants' wrongful representations regarding the Mortgage, and Defendants' failures to abide by their obligations under the FCRA.

172.   Plaintiff has also experienced physical symptoms of aggravation, frustration, and stress including but not limited to headaches and loss of sleep due to

the fact that Defendants are thwarting Plaintiff from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

## **Statutory and Punitive Damages**

173.   At the time Defendants reported the information at issue in this matter, each Defendant had actual notice that the information it was reporting regarding Plaintiff and the Mortgage was false, deceptive, and misleading.

174.  For example, Plaintiff included corroborating documents with his dispute which was more than sufficient to establish that the disputed information was being reported inaccurately.

175.  Defendants would have further reason to doubt the accuracy of reporting Plaintiff's Mortgage in such a way as to indicate the Mortgage was discharged in bankruptcy (as described *supra*), because the *Bankruptcy Case itself* has not yet been discharged (a fact which is itself apparent from the face of Plaintiff's credit reports). Even if the Mortgage account was eligible for discharge (which it is not), it clearly could not have been discharged while the bankruptcy is still ongoing.

176.  Finally, Plaintiff is informed and believes that Shellpoint and Wells Fargo have previously provided Equifax with information containing these same (or substantially similar) errors on a multitude of occasions, thus placing Equifax on

notice of Shellpoint and Wells Fargo's unreliability, and deficiencies in Shellpoint's systems and procedures, which have repeatedly caused these errors to propagate in data provided by Shellpoint and elude correction upon dispute by consumers.

177.   Each Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

178.   Despite that, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage.

179.   Each Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

180.   Accordingly, Defendants' conduct was willful.

181.   As a result of Defendants' willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. §§ 1681e(b) and 1681i

## **Equifax Information Services, LLC**

182.   Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

183.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

184.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

185.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's disputes to Shellpoint and Wells Fargo, including the forwarding of any documents provided by Plaintiff in support of that dispute.

186.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

187.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

52

188.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

189.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

190.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting of the Mortgage.

191.   Plaintiff provided all the relevant information necessary for Equifax to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

192.   Equifax breached its duties as described herein.

193.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, Equifax would have reviewed and considered all of the information Plaintiff submitted in his dispute, and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

194.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, the Shellpoint tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

195.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable reinvestigation of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

196.   Equifax had all the information necessary to correct its reporting. Despite that, Equifax failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Equifax's reinvestigation procedures were not reasonable.

197.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

198.   Upon information and belief, Equifax has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

199.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum

possible accuracy of information concerning Plaintiff in his consumer reports, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

200.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Shellpoint and Wells Fargo of Plaintiff's dispute, by failing to provide Shellpoint and Wells Fargo with all the supporting information/documents included with Plaintiff's dispute, by failing to conduct a reasonable reinvestigation of Plaintiff's dispute, and by failing thereafter to appropriately modify information in Plaintiff's file and on his consumer reports, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

201.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

202.   Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

203.   Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### NewRez LLC dba Shellpoint Mortgage Servicing

204.   Plaintiff incorporates by reference paragraphs 1 through 203 as though fully stated herein.

205.   Pursuant to 15 U.S.C. § 1681s-2(a), Shellpoint is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

206.   Upon information and belief, Equifax timely notified Shellpoint of Plaintiff's dispute, and provided Shellpoint with all the relevant information that Plaintiff had submitted.

207.   Pursuant to 15 U.S.C. § 1681s-2(b), Shellpoint had a duty to investigate Plaintiff's dispute and accurately report its findings to Equifax.

208.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's

dispute, and may not merely be a *pro forma* record review that simply begs the question.

209.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

210.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

211.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Shellpoint was required to review and consider all relevant information submitted by Plaintiff to Equifax.

212.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of reporting the Mortgage as having a balance of $0 and a monthly payment of $0.

213.   Shellpoint breached its duties as described herein.

214.   If Shellpoint had conducted a reasonable investigation of Plaintiff's dispute, Shellpoint would have reviewed and considered all of the information Plaintiff submitted to Equifax in his dispute and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

215.   If Shellpoint had conducted a reasonable investigation of Plaintiff's dispute, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

216.   Due to Shellpoint's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

217.   Shellpoint had all the information necessary to correct its reporting. Despite that, Shellpoint failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Shellpoint's investigation procedures were not reasonable.

218.   The fact that Shellpoint had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Shellpoint recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

219.   Shellpoint willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's dispute from Equifax, by failing to appropriately modify the disputed

information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

220.   As a result of Shellpoint's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from Shellpoint under 15 U.S.C. §§ 1681n and 1681o.

221.   Shellpoint's actions and omissions were willful, rendering Shellpoint liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

222.   Plaintiff is entitled to recover costs and attorneys' fees from Shellpoint pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Wells Fargo Bank, N.A.

223.   Plaintiff incorporates by reference paragraphs 1 through 222 as though fully stated herein.

224.   Pursuant to 15 U.S.C. § 1681s-2(a), Wells Fargo is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

225.   Upon information and belief, Equifax timely notified Wells Fargo of Plaintiff's dispute, and provided Wells Fargo with all the relevant information that Plaintiff had submitted.

226.   Pursuant to 15 U.S.C. § 1681s-2(b), Wells Fargo had a duty to investigate Plaintiff's dispute and accurately report its findings to Equifax.

227.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

228.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

229.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

230.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Wells Fargo was required to review and consider all relevant information submitted by Plaintiff to Equifax.

231.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of reporting the Mortgage as having a balance of $0 and a monthly payment of $0.

232.   Wells Fargo breached its duties as described herein.

233.   If Wells Fargo had conducted a reasonable investigation of Plaintiff's dispute, Wells Fargo would have reviewed and considered all of the information Plaintiff submitted to Equifax in his dispute and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

234.   If Wells Fargo had conducted a reasonable investigation of Plaintiff's dispute, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

235.   Due to Wells Fargo's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

236.   Wells Fargo had all the information necessary to correct its reporting. Despite that, Wells Fargo failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that Wells Fargo's investigation procedures were not reasonable.

237.   The fact that Wells Fargo had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Wells Fargo recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

238.   Wells Fargo willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's dispute from Equifax, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

239.   As a result of Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from Wells Fargo under 15 U.S.C. §§ 1681n and 1681o.

240.   Wells Fargo's actions and omissions were willful, rendering Wells Fargo liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

241.   Plaintiff is entitled to recover costs and attorneys' fees from Wells Fargo pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

242.   Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in his favor and against Defendants, jointly and severally, for:

a)   Plaintiff's actual damages;

b)   Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)   Punitive damages pursuant to 15 U.S.C. § 1681n;

d)   Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)   Such other and further relief as may be just and proper.

Respectfully submitted this 24th day of March, 2023.

**BERRY AND ASSOCIATES**

*/s/ Chris Armor*
Matthew T. Berry
Georgia Bar No.: 055663
*matt@mattberry.com*
2751 Buford Highway, Suite 600
Atlanta, GA 30324


Christopher N. Armor
Georgia Bar No.: 614061
P.O. Box 451328
Atlanta, GA 31145
470-990-2568
chris.armor@armorlaw.com

*Plaintiff's Attorneys*

64