**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FELITA ALEXANDER,<br><br>　　Plaintiff,<br><br>v.<br><br>DEKALB COUNTY,<br><br>　　Defendant. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Felita Alexander ("Ms. Alexander" or "Plaintiff"), by and through undersigned counsel, and filed his Complaint against Defendant Dekalb County ("Defendant") and shows this Court as follows.

## <u>NATURE OF COMPLAINT</u>

1.

Ms. Alexander brings this action for damages and injunctive relief for Defendant's violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq* ("Title VII").

## JURISDICTION AND VENUE

### 2.

Ms. Alexander invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 12117.

### 3.

Defendant operates in this judicial District and Division. Additionally, the unlawful employment practices alleged in this Complaint were committed within this District and Division. In accordance with 28 U.S.C. § 1391, venue is appropriate in this Court.

## PARTIES

### 4.

Ms. Alexander is a female citizen of the United States of America and a resident of the state of Georgia and is subject to the jurisdiction of this Court.

### 5.

During the relevant time period, Ms. Alexander was employed by Defendant.

### 6.

Defendant is a county-level government entity that operates in this District.

### 7.

At all times material hereto, Defendant operated in this District.

8.

In accordance with Federal Rule of Civil Procedure 4, Defendant may be served through its Chief Executive Officer, Michael L. Thurmond, at 1300 Commerce Drive, Decatur, GA, 30030.

9.

During Ms. Alexander's employment with Defendant, Defendant continuously employed fifteen or more employees for each working day in each of twenty or more calendar weeks.

10.

Defendant is therefore an employer subject to jurisdiction under the ADA and Title VII.

## **ADMINISTRATIVE PROCEDURES**

11.

Ms. Alexander timely filed a Charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on July 14, 2022.

12.

The EEOC issued Ms. Alexander a Notice of Right to Sue on January 3, 2023 entitling an action to be commenced within ninety days of receipt of that notice.

13.

This action has been commenced within ninety days of receipt of the Notice of Right to Sue.

14.

All Conditions precedent to bringing this action have been satisfied and/or waived.

## **FACTS**

15.

Ms. Alexander began working for Defendant in September of 2021.

16.

Ms. Alexander left the employ of Defendant in November of 2021 and was rehired on December 27, 2021.

17.

Ms. Alexander was placed in the Code department on the Special Operations Team.

18.

Her manager was Hawthorne Herring.

19.

A couple of weeks after her placement in the Code department, Herring started to make sexual and romantic advances towards Ms. Alexander.

20.

Herring started to treat Ms. Alexander like she was his wife.

21.

Herring would bring Ms. Alexander breakfast or lunch.

22.

Herring would try to give Ms. Alexander money for food.

23.

Herring would consistently compliment Ms. Alexander's appearance, telling her she looked nice, good, or beautiful every time he saw her.

24.

Once, Ms. Alexander requested time off to help with her daughter's pregnancy because her daughter was experiencing complications.

25.

Herring told Ms. Alexander that he didn't know what kind of support system Ms. Alexander's daughter had, which was a probing question meant to determine

whether Ms. Alexander's father was in the picture or in a relationship with Ms. Alexander.

26.

Herring would consistently text and call Ms. Alexander outside of work hours flirtatiously, talking about non-work-related matters.

27.

When Herring would do so, he would usually also mention something work-related to make it seem like the call could be related to work.

28.

Herring's behavior worsened the longer Ms. Alexander worked there.

29.

Once, Ms. Alexander commented on needing a new car.

30.

Herring told Ms. Alexander "I am married but I wish I could help you buy a car."

31.

On or about March 3, 2022, Herring texted Ms. Alexander stating "Can I say, I like You!"

32.

On March 4, 2022, Herring texted Plaintiff "Lol, you make me really smile."

33.

Herring then texted Ms. Alexander "Let's do lunch soon" and said they should meet "just to laugh and talk."

34.

Instead of going to lunch with Herring alone, Ms. Alexander invited other employees who went to lunch together with her and Herring.

35.

On March 22, 2022, Herring texted Ms. Alexander saying "So now you stop talking to me" 12 minutes after he had sent a previous text that Ms. Alexander did not answer.

36.

Later that day, Herring referred to Ms. Alexander in texts as "my strong and confident person that I know."

37.

On March 28, 2022, Herring texted Ms. Alexander "you look nice, by the way."

38.

Herring told Ms. Alexander multiple times that he wishes he could take Ms. Alexander out to eat but he was married.

39.

Herring stared at Ms. Alexander multiple times and would raise his eyebrows or wink at her when she noticed.

40.

Herring told Ms. Alexander multiple times that he wished he was at her house eating dinner.

41.

One day in early April 2022, Herring saw that Ms. Alexander was Facetiming another man on her phone.

42.

Herring asked Ms. Alexander who it was.

43.

Ms. Alexander told him it was someone she had gone on a few dates with because she thought it might lessen Herring's interest in her.

44.

Herring became extremely agitated and went on a tirade about how the person was probably crazy and Ms. Alexander should stay away from him.

45.

After this incident, Herring became extremely interested in whether Ms. Alexander was with another man and where she was and his harassment became more severe and pervasive.

46.

Herring called Ms. Alexander more outside of work hours.

47.

He would constantly ask Ms. Alexander what she was doing.

48.

He would also constantly ask Ms. Alexander who she was with.

49.

Ms. Alexander stopped answering Herring's as often, as it was now clear that these calls were mostly not about work-related matters.

50.

Herring would now constantly try and keep up with Ms. Alexander, asking where she was and who she was with.

51.

On or about April 25, 2022, Ms. Alexander was diagnosed with polycystic ovary syndrome.

52.

Ms. Alexander was prescribed medication as a result of her diagnosis.

53.

Ms. Alexander's medication made her extremely weak when she first began taking it.

54.

Plaintiff was supposed to drive her son to Texas at that time.

55.

Plaintiff had informed Herring weeks before of this trip.

56.

However, because of Ms. Alexander's illness, caused by the treatment for her polycystic ovary syndrome, she did not drive to Texas.

57.

She therefore told her Herring on April 25, 2022 that she would be sick and not working because of the effects of the medication she was taking.

58.

Plaintiff informed Herring that she was still sick on April 26, 2022.

59.

Herring texted back "feel better."

60.

Plaintiff informed Herring that she was still sick and would not be driving to Texas on April 27, 2022.

61.

 Herring texted back "Morning, Understood, feel better."

62.

Ms. Alexander told Herring that she was still sick on April 28, 2022.

63.

Ms. Alexander called Herring and informed him she was still sick on Friday, April 29, 2022.

64.

On Monday, May 2, 2022, Plaintiff informed Herring that she was still sick but was starting to feel better.

65.

Herring texted back, in part, "I understand, getting adjusted can be difficult."

66.

Ms. Alexander continued to inform Herring that she was sick and was not coming in.

67.

However, on April 28, 2022, Herring reported Ms. Alexander as a no show.

68.

When Ms. Alexander discovered that this had occurred, Ms. Alexander wrote a complaint about this incident to Director Timothy Hardy, writing that Herring was aware she was out sick and that he knowingly lied.

69.

Ms. Alexander further reported Mr. Herring's sexual harassment, including the remarks that Herring constantly made about her being beautiful and his constant calls and texts.

70.

Hardy told Ms. Alexander that she would have to get employee relations involved but Ms. Alexander asked if Herring and her could talk first.

71.

Hardy told Ms. Alexander that it was hard to believe what Ms. Alexander was saying because Hardy had never had any reports of Herring harassing female employees before.

72.

Hardy asked Ms. Alexander for a doctor's note, which she provided.

73.

When Ms. Alexander talked to Herring, and asked why he did what he did, he said that he was sad all week because he hadn't seen Ms. Alexander.

74.

Herring also said he was worried about Ms. Alexander.

75.

Herring also said that he didn't know where Ms. Alexander was and was worried about that.

76.

Herring further said he was worried because he didn't know who Ms. Alexander was with.

77.

Ms. Alexander told Herring that she was not his wife and so he should not be worrying about her to that degree.

78.

Ms. Alexander told Herring that his recent behavior towards her had been unprofessional and unethical.

79.

Ms. Alexander also told him that she was a great communicator and that she was communicating to him, which Herring agreed with.

80.

Herring told Ms. Alexander that he was sorry for what he did.

81.

At that point, Ms. Alexander considered the situation over with and did not continue the complaint to employee relations.

82.

Later that same week, on May 5, 2022, Ms. Alexander was called into a meeting by Herring where she showed up to Herring and Hardy in the room.

83.

Herring and Hardy terminated Ms. Alexander.

84.

Herring said that he didn't have anything more to say on the matter and refused to explain why Ms. Alexander was being terminated.

85.

On Ms. Alexander's separation notice, the stated reason for termination was no longer needing her services.

86.

Upon information and belief, Herring said, at a team meeting that he had to fire Ms. Alexander because she filed a sexual harassment complaint.

87.

Ms. Alexander was never counseled on any performance issues by Herring.

88.

In fact, Herring praised Ms. Alexander quite frequently.

89.

On Tuesday, February 8, 2022, Herring texted Ms. Alexander "I just told Mr. Hardy about you case. I hope that you didn't mind. Too proud of you!!! Keep up the great work!!!"

90.

On or about March 3, 2022, Herring texted Plaintiff after she submitted a PowerPoint presentation, saying "Great PP…"

91.

 On March 4, 2022, Herring texted Ms. Alexander, stating "I am confident that you've done a great job!"

92.

Herring texted Ms. Alexander multiple times praising her presentation skills in March.

93.

However, when Ms. Alexander applied for unemployment, Defendant argued to the Department of Labor that Ms. Alexander was fired for failure to perform her job duties.

## COUNT I: RETALIATION UNDER TITLE VII

94.

Ms. Alexander reasserts and incorporates Paragraphs 15-93 as if set forth fully herein.

95.

Ms. Alexander's reports of harassment from Herring to Herring's supervisor, Hardy, constitute protected activity under Title VII.

96.

Ms. Alexander's termination is an adverse employment action. Defendant terminated Plaintiff because of her protected activity.

97.

The close temporal proximity between the protected activity and Ms. Alexander's termination.

98.

Defendant willfully and wantonly disregarded Plaintiff's rights, and Defendant's retaliation against Plaintiff was undertaken in bad faith.

99.

Accordingly, Defendant is liable for the damages Plaintiff has sustained as a result of Defendant's unlawful retaliation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant:

(a)        General damages for mental and emotional suffering caused by Defendant's misconduct;

17

(b)  Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(c)  Special damages for lost wages and benefits and prejudgment interest thereon;

(d)  Reasonable attorney's fees and expenses of litigation;

(e)  Trial by jury as to all issues;

(f)  Prejudgment and post judgment interest at the rate allowed by law;

(g)  Declaratory relief to the effect that Defendant has violated Plaintiff's statutory rights;

(h)  Injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendant from further unlawful conduct of the type described herein; and

Respectfully submitted, this 28th day of March, 2023.

**BARRETT & FARAHANY**

/s/ V. Severin Roberts
V. Severin Roberts
Georgia Bar No. 940504
Attorney for Plaintiff

P.O. Box 530092
Atlanta, GA 30353
(404) 214-0120
(404) 214-0125 facsimile
severin@justiceatwork.com