IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| L.B., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | NO. |
| v. | ) | |
| | ) | |
| T&S HOSPITALITY LLC. | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff in the above-styled action and hereby files her

Complaint as follows:

### **Introduction**

1.

This case involves the sex trafficking of Plaintiff L.B., who was trafficked

for sex at the "Super Inn" hotel located 301 Fulton Industrial Cir., SW, Atlanta,

GA 30336, which was owned and operated by Defendant T&S Hospitality LLC.

Plaintiff was trafficked for sex at the Super Inn for approximately three years from

2018 – 2020.  Plaintiff was trafficked by an abusive trafficker who brandished a

gun and repeatedly told Plaintiff he would kill her and her family if Plaintiff tried

to escape her trafficking. Given the nature of the case, Plaintiff is identified in this Complaint only by only her initials to prevent public disclosure of her name. Plaintiff's counsel has previously disclosed L.B.'s full name to Defendant and will do so formally for purposes of this case as soon as an appropriate protective order is in place.[1]

2.

During all relevant time periods, Defendant owned and operated the Super Inn hotel at 301 Fulton Industrial Cir., SW, Atlanta, GA 30336.

3.

Defendant knew or should have known of the rampant sex trafficking and prostitution at the Super Inn for years, before, during, and after Plaintiff's trafficking. Defendant knew or should have known, among other reasons, because:

    a.    Defendant was aware of this specific Plaintiff while she was trafficked for sex at the hotel;

    b.    Defendant's hotel manager, "Vinny" Patel, personally interacted with Plaintiff while she was being held at the hotel and trafficked

---

[1] Plaintiff will be filing a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of L.B. Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

for sex;

c.  Mr. Patel also interacted with numerous other sex trafficking victims (some of whom also filed lawsuits against Defendant) at the hotel;

d.  Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the hotel;

e.  Sex trafficking victims were often forced to open the hotel windows and lean outside to call out the price they were being sold for to buyers driving and standing in the hotel's parking lot;

f.  Sex trafficking victims were often forced to stand outside the hotel until they were bought by buyers who would come to the hotel looking to purchase victims;

g.  Sex trafficking victims had to walk into the hotel lobby and past the front desk when they went to their rooms with their buyers;

h.  Defendant was aware of other sex trafficking victims at the hotel before, during, and after Plaintiff;

i.  Defendant knew or should have known of the frequent and ongoing similar crime occurring at the hotel, and in particular on the second floor of the hotel which was predominantly rented to

3

sex traffickers and drug dealers;

j.     Defendant rented rooms on the second floor of the hotel to sex traffickers and drug dealers on an ongoing basis, and in some instances, for hundreds of nights consecutively;

k.     There were numerous online, public reports from hotel guests or community members to Defendant regarding sex trafficking and prostitution-related activities; and

l.     Defendant knew or should have known of rampant sex trafficking generally in the Fulton Industrial Boulevard area where the Super Inn was located, and Defendant knew or should have known of the rampant sex trafficking at the Super Inn specifically.

4.

Despite all of the above knowledge, Defendant negligently and recklessly failed to take appropriate and reasonable measures to prevent sex trafficking from occurring at its hotel, including Plaintiff's sex trafficking in particular.

5.

By negligently permitting its hotel to allow sex trafficking both before, during, and after Plaintiff's trafficking, Defendant was also causing a nuisance under Georgia law, and as a result of this nuisance, Plaintiff was harmed.

4

6.

At all times relevant to this Complaint, L.B. was an unwilling victim of sex trafficking at Defendant's hotel.

7.

At all times relevant to this Complaint, L.B. was sex trafficked as a result of force, fraud, and/or coercion.

8.

Defendant knew or should have known that its operation of the Super Inn violated the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, et seq., (the "TVPRA"), because (1) its operation of the hotel allowed the foreseeable sex trafficking that occurred there, including Plaintiff's, and (2) Defendant associated with and financially profited from its business with Plaintiff's sex trafficker and other sex traffickers at the hotel. Defendant benefitted financially from Plaintiff's sex trafficking because Defendant rented rooms to Plaintiff's trafficker which was used to traffic Plaintiff, and the money that was obtained from selling Plaintiff was then returned to the hotel to rent the rooms for additional nights so that Plaintiff's trafficking could continue. As such, Defendant is liable to Plaintiff for her damages under § 1595(a) of the TVPRA.

9.

Plaintiff brings this suit against Defendant to recover for the physical, emotional, and mental harm caused by her sexual exploitation at the hotel, which was permitted to occur as a direct and proximate result of Defendant's negligent, reckless, and willful failures to prevent prostitution, crime, violence, and sex trafficking from occurring at its hotel.

## Parties, Jurisdiction, and Venue

10.

L.B. is a citizen of the United States of America, is a resident of the State of Georgia, and consents to the jurisdiction of this Court.  L.B. was born in 1993 and was approximately 25, 26, and 27 years old at the time of her sex trafficking alleged herein.

11.

At all times relevant to this complaint, Defendant owned, managed, supervised, operated, oversaw, controlled the operation of, and rented rooms at the Super Inn, from which it benefited financially.

12.

Defendant is a Georgia Corporation with its principal place of business located at 301 Fulton Industrial Circle, Atlanta, GA 30336.  Defendant's registered

agent is Viral Patel, and the address of Defendant's registered agent's office is 2532

Citrine Cross, Lithia Springs, GA 30122, Douglas County, Georgia.

13.

Jurisdiction and venue are proper as to Defendant, and Defendant will be

properly served with process in this action.

14.

Whenever reference is made in this Complaint to any act, deed, or conduct of

Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by

or through one or more of its officers, directors, agents, employees, mangers, or

representatives who was actively engaged in the management, direction, control, or

transaction of the ordinary business and affairs of Defendant and its hotel.

## **Plaintiff's Sex Trafficking at the Super Inn**

15.

From approximately 2018–2020, Plaintiff was trafficked for sex at the Super

Inn.

16.

Plaintiff's trafficker kept Plaintiff at this hotel in particular because the hotel

and the surrounding Fulton Industrial Boulevard area were known to be common

locations for prostitution, sex crimes, and sex trafficking to occur.

17.

Plaintiff was illegally sold for sex at the hotel repeatedly.  Plaintiff was sold numerous times each day at the Super Inn.

18.

Plaintiff would often be forced by her trafficker to loiter around the hotel until she was approached by a buyer who come to the notorious Super Inn looking to purchase sex.

19.

After being approached by a buyer, Plaintiff would be required to enter the lobby of the hotel with the buyer and bring the buyer past the front desk before taking the buyer to Plaintiff and her trafficker's hotel room.

20.

Plaintiff's trafficker would often stand in the hallway, lobby, stairwell, or just outside the hotel, while Plaintiff was being sold.

21.

Plaintiff's trafficker was typically armed with a gun.

22.

Plaintiff, her trafficker, and the other sex trafficking victims at the hotel, regularly interacted with Defendant's employees, agents, and representatives during the time period in which Plaintiff was trafficked at the Super Inn.

23.

The hotel employees had a friendly relationship with Plaintiff's trafficker and other traffickers, and the hotel staff would interact with them often.

24.

While Plaintiff was being trafficked for sex at the Super Inn, she exhibited numerous well-known and visible signs of sex trafficking victims, of which Defendant knew or should have known. These included Plaintiff's inappropriate dress, loitering around the hotel, constantly taking different men to the hotel room for short periods of time, and Plaintiff's monitoring and control by her trafficker.

25.

Plaintiff's sex trafficker operated openly and brazenly at the Super Inn, as did other sex traffickers. In addition to the Plaintiff's trafficking, there were many other sex trafficking victims at the hotel at any given time and many different traffickers controlling those girls at the hotel.

26.

Due to the high number of victims being sold for sex at the hotel, a large number of buyers frequented the hotel each day.  Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the hotel.

27.

At the Super Inn, sex trafficking victims would often open the windows to their rooms and hang out the windows yelling to men outside who were coming to the hotel to buy sex. From the windows of the rooms, sex trafficking victims would yell out the price for sex, their room numbers and otherwise solicit buyers for sex from the windows of their rooms.  All of these buyers, who were not paying guests of the hotel, then had to walk by the front desk to meet these victims in their rooms and also walk by again a short time later on their way out.

28.

Yelling out of the hotel windows was not the only obvious way that buyers were solicited for sex at the Super Inn. Plaintiff and other victims also had to walk the street in front of the hotel or stand in the entryway of the hotel so that buyers driving up to the Super Inn could pick which sex trafficking victim they would like

to buy and then walk into the hotel—again, by the front desk—to purchase sex from victims, like L.B. at the hotel.

29.

The phenomena of women and girls standing in front of the hotel soliciting sex and advertising out of the windows of the Super Inn are well-documented not only in police reports (below) but also by buyers of sex in Atlanta who post anonymously about purchasing sex, most often in the Fulton Industrial Boulevard area. The following examples are illustrative and constitute only a small fraction of the full extent of postings about the Super Inn:





📄 07-01-15 19:09     #6841

**BigMoney21** ○
Senior Member
Posts: 1246

**The action on FIB**

Most of the girls and there pimps have taken a L from there due to a couple of guys got jumped on at that hotel behind Chevron. The only place you'll find some die hard chicks that's about that paper legit is airways and ==super inn== that's only because there pimps is not into that scamming business. Then again there is only just a few who's truly about business.

> 💬 Originally Posted by **Roland75** [View Original Post]
> *Drove through FIB yesterday around 6 pm. ==Only saw 1 BSW hanging around the entrance to the hotel across from the clubs.== Thick and cutish (5/10).*

⚠ Report Post     💬 Reply With Quote 💬₊



📄 08-12-15 04:29     #7002

**BigMoney21** ○
Senior Member
Posts: 1246

**Fib action**

I went on FIB thrice, the 1st time around 1 pm it was dead saw this trans with a face like Johnny Bravo a buddy of mines was eyeballing him I know what he wanted to get into tonight. I left went back on Metro and Came back on metro then left metro went to west lake seperate post. And came back on FIB at 11 pm saw plenty of action out and I'm not talking about crack heads. Mainly girls who smoked weed. Saw that one chick with a azz like black cherry ==at super inn she== was flirting with me and ==stepped to the side of the hotel showed me her backside and== she told me that she'll let me get a picture of it. I told her I will later which I did she told me I haven't phucked with her in months and what's up (of course FIB lame crap). I told her I'll just be back I left ==super inn== saw this one WSW who works off BP from time to time I just droves passed her especially after she gave me a piece of her mind 4 months ago. I saw this one young slim chick at airways who flagged me down and asked me to help her move some furniture it was a trap to get me to see her naked which I didn't mind. I just paid her $30 for a picture and left. Went on metro and then Lakewood while at Lakewood I saw this one tall slender was who was young that had quite a beautiful face working in Lakewood but she looked like she was going through something I just went back on Metro spike to a crack buddy of mines and then left. I went back on FIB saw that one chick with a azz like black cherry standing very close to FIB and she asked me to help her make some mulla I was like sure she can walk very fast for a thick chick. I met her near her room door and we got down to business she gave me a covered BJ and strated to ride covered. And after a good 15 mins I let loose she gave me some wipes and said oh the pics will came with $60 special and not 40. I wasn't worried, let me say this, this chick do has a handler and his gang affliated buddies always hang in the hallways while she has a date in the room. They normally comes out when you goes in. She's cool and handles her business without rushing, her room is messy and if you was too walk inside you'll noticed the bathroom door is gone. And she also has mirrors position so that she can see whatever you are doing in the restroom. I never had any problems with her nor her dude or his buddies. I left as usual everybody was in the hallway and by the way her skills are ok she need to watch porn so she can learn some sht she's entirely too thick to not know what to do with it.

⚠ Report Post     💬 Reply With Quote 💬₊



**10-29-15 07:24**                                                                                              #7216

Mr Tattoo
Senior Member

Posts: 2773

**Pretty Good Night On FIB last night**

Hit Fib last night around 8 pm since its was kind of warm outside ran into Jasmine I girl a dated a few times she was by the red roof inn we did a car date she gave me a good blowjob for $40 with condom so after drop her off at the hotel behind Mickey the's but I cruise a little more just checking out some more ladies it was quite a few out too around the super inn and a few on Wendell probably head back tonight cause it's this little slim petite black chick I want to get some service from but it seems lately the girls be out on FIB in the evening as long as the weather is decent.

⚠ Report Post                                                                          💬 Reply With Quote   💬+

**10-21-15 23:26**                                                                                              #7211

Mr Tattoo
Senior Member

Posts: 2773

**Fib tonight**

Hit Fib tonight around 8 seen my girl London walking down Wendell I stop and said what's up told her I love that blowjob from last night she said want another one I told her maybe Friday night cause I knew I was looking for a new chick tonight so hit the super inn seen a few chicks out nothing special so I hit Frederick drive seen a slim petite black chick with a sexy face ask her how much for blow she said 40 I told her 30 she said ok I told her I drive back around and when I did she was gone so I said oh well and drove around the area some more but didn't see nothing worth while so I left I had a few chances to get the dick wet but I didn't bite tonight but I'm going to get that slim chick fo sure hell I might head back later tonight around 2 am since it won't be that cold outside.

⚠ Report Post                                                                          💬 Reply With Quote   💬+



**10-20-15 23:00**                                                                                              #7210

Mr Tattoo
Senior Member

Posts: 2773

**Good night on FIB tonight**

Cruise to my favorite street the infamous FIB tonight around 8 pm weather was still kind of warm so I check the girls out at the super inn only saw 2 same ones I see all the time they pretty sexy but anyway I hit Wendell just for the hell of it and I be damn seen this sexy caramel black chick walking with some black booty shorts on her ass cheeks were just hanging out nice smooth legs and all so my dick rose up quick I had to turn around and get her ask her how much for blow she said $50 I told her $40 she agreed and hop in so we drove to Shirley drive and park in one of those empty parking lots it's a great spot cause police never goes up Shirley drive anyway now I was drinking earlier so I had quite a bit of alcohol in my system so usually I take longer to cum which I did but she didn't complain I think she was sucking my dick on and off for like 45 minutes while I was feeling all up and down her body and that fat ass of hers she was liking it cause she was moaning the entire time at first she was sucking my dick with a condom but it broke so she said fuck it and sucked me raw and OMG her head game was damn good so a manage to pop a fat nut off I shot it all over her face and after I gave her an extra $20 just for her excellent effort and not rushing me she said her name was London 30 years old say she just had a baby real cool chick and not on drugs just trying to make some money so I drop her off back on Wendell and headed home feeling good probably hit FIB tomorrow evening too.

FIB ain't nowhere near what it used to be but if your timing right you can still manage to have a goodtime with the right girl Happy Mongering my friends.

⚠ Report Post                                                                          💬 Reply With Quote   💬+



**11-03-15 08:22**                                                                 #7225

**Mr Tattoo**
Senior Member

Posts: 2773

> Originally Posted by **TopShooter** [View Original Post]
>
> *Rolled through FIB Saturday around midnight and head ==straight by Babes and the hotel across and spotted a nice size BSW with a nice bubble standing out with a umbrella with two more super thick SW with their asset showing I parks my whip and walked up to her and asked her let's talk she quoted me. 5 and I told her where can we chill we walked into the tell and in her room.== She didn't even ask for the gift she sat on the bed and I asked for BBBJ and she grabbed my tool saying that's all you want and began to go to town it was good that I had to sit dos she then prop the booty in the air and I pulled her tights down to see the redbone bun of her while she slurp about 20 min later I stood up and felt the completion coming and I told her to catch and she looked up and said come on and let all go on her face. She took like a champ but stroke the rest out instead of putting me back in her mouth I gave her the funds and left smoking a cigarette I ran into a SW that tried to snatch and run a while back and remembered smiling hey friend I just laughed and left.*

Sounds like it was your lucky night ==you went to the right spot on FIB at the== ==Super Inn== ==hotel by Fannies and babes that's were the best ones be most of the time.==

⚠ Report Post                                          💬 Reply With Quote   💬₊



**11-17-15 16:51**                                                                 #7249

**PhilMe 143**
Senior Member

Posts: 149

**Same time**

Yeah I see them everytime the club closes. They park their car in front of starship and want to try the one without the glasses that chick is always dressed up. I can never see them roll up and park though. They also never try to stop me as I roll by. Just didn't want to chance it at that time. Everytime I go over there I can expect to see those two.

> Originally Posted by **MrTattoo** [View Original Post]
>
> *Sounds like a good night too me, now I did hit FIB last night around midnight ==seen a few girls at the== ==super inn== but it's the same ones all the time, it's ==2 of them that be in the parking lot almost every night== nice thick young black girls, one of them wears glasses I'm going to hit FIB later tonight and try my luck.*

⚠ Report Post                                          💬 Reply With Quote   💬₊





30.

The above is just a small sample of reports by sex buyers made in 2015 about the Super Inn.  These types of reports continued on for years:



📄 09-23-16 13:52                                                                    #9

**SkyWookie** ○
Senior Member

Posts: 1317

**She looks like.**

> 🔁 Originally Posted by **BBLove** [View Original Post]
>
> *I usually toft and go check out the ones that interest me. However with this new subforum I thought I'd throw this out here. Has anybody seen this one? Just my type if she's real.*
>
> *http://atlanta.backpage.com/FemaleEs...-kind/42219901*

I'd swear she is the same girl I used to see once in a while, she looks just like a girl who used to work out of the ==super inn on FIB, she never walked, she worked out her window an==d apparently by ads, assuming its the same girl but she look just like her, she caught my attention last year as I was doing a drive around of the building, she was nice, she went by the name of amanda, she gave good service, I may have to contact her to feel out if its the same girl for sure.

⚠ Report Post                                                    💬 Reply With Quote   💬₊

---

07-22-18   15:43   View Post  |  View Thread

Forum:      Atlanta
Thread:     Streetwalker Reports
Posted By:  BJ4015

**Fib**

Went by fIB last night around 11, cruises around until 12. ==Saw a really cute girl walking up and down the road going to the super inn.== She wanted $60 for a car date. She was a skinny white girl with...



📄 03-17-18 00:03                                                                 #10470

**Bhpr021** ○
Senior Member

Posts: 78

**Busy tonight**

Drove through FIB. ==Probably 3 BSW along the street in front of Super Inn.== Something happened at the convenient store and there were 2 ambulances and a police car. A few older WSW along Mills and a younger WSW with pink dyed hair as well. One BSW along Mills.

"Patrol" car sitting down near some businesses further down the road.

⚠ Report Post                                                    💬 Reply With Quote   💬₊



📄 08-31-18 20:40                                                                 #10961

**FlyWhyteGuy007** ○
Senior Member

Posts: 470

> 🔁 Originally Posted by **BusterHymen** [View Original Post]
>
> *==I first saw Snow last year standing in front of that dive hotel she works out of.==* *I thought I hit the jackpot! Easily the cutest little thing out there. My hopes were dashed when I went to her room. More rules than you can count. Shitty attitude. Dead fish. Was the worst date I have had in a long time, and I have had some real stinkers, LOL.*
>
> *I couldn't even get off. Gave up and left. You have been warned!*

DAMN dude. Its been about 10 posts about her. She has to be the worst. I almost took a chance but when she told me 50 for 5 minutes ==she ate dust from my tires on that dirt road before the super inn.==

⚠ Report Post                                                    💬 Reply With Quote   💬₊



31.

Defendant knew or should have known that this open market for sex described above was indicative of sex trafficking at its hotel, including Plaintiff's trafficking.

32.

Based on the above, Super Inn employees knew or should have known Plaintiff was being trafficked for sex at the hotel.

## Defendant's Knowledge of Prior Crime at the Super Inn

33.

For many years prior to Plaintiff's trafficking, prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, sex crimes, and sex trafficking were all common occurrences at the Super Inn.

34.

Before and during Plaintiff's sex trafficking at the Super Inn, Super Inn employees knew or should have known about crime, prostitution, and sex trafficking occurring at the hotel.

35.

Prior to Plaintiff's sex trafficking at the Super Inn, Super Inn employees at the hotel knew or should have known that rooms at the Super Inn were frequently rented for short term use for commercial sex with guests, usually men, renting a room at the hotel, using it for a short period of time, and then leaving and not returning to the hotel.

36.

Prior to and during Plaintiff's trafficking at the Super Inn, the premises and its approaches were well known for crime, prostitution, and sex trafficking, which

is why Plaintiff's sex trafficker brought Plaintiff to the Super Inn to be sold for sex.

Defendant provided a busy market for just that type of illegal activity.

37.

Before, during, and after Plaintiff's sex trafficking, the Super Inn served as a

hotbed for dangerous illegal activity, violent, crime, prostitution, and sex trafficking.

One need look no further than the hotel's own online reviews:

(i)     November 2010 from Tripadvisor:

**Prostitute infested hotel!!!!!**

"First of all there are 4 strip clubs across the road from the hotel.
Secondly, there was about 5 prostitutes at the entrance of the hotel.
When we went into the lobby we asked the clerk if it was safe there and
he said, "of course, why do you ask?" and I said, "because there are
about 5 prostitues standing at the entrance" then he said, " NO, they
don't come on my property, you have nothing to worry about. They
aren't allowed in this hotel". We believed that until that night when we
saw him give the prostitutes a room key!!!!! The whole weekend stay
the prostitutes were cold I guess so they were prostituting from the
lobby of the hotel! Their pimps were outside bringing in the customers.
I saw this with my two very own eyes! They would go upstairs to have
sex with their customers then about 30 minutes later the customers
would leave, then the prostitutes would hand their pimps the money.
NO LIE!!!!! Horrible place and I can't believe that the actual hotel
management has turned this hotel into a prostitute house! Never go
here!"

(ii)    November 2011 from Tripadvisor:

**Don't stay here**

"Not only is it postitute infested. The hotel has roaches on the ceiling. It was not very clean and when asked for money back within going into room and coming out of the room I was told NO. Find someone else to stay."

(iii)     September 2014 from Tripadvisor:

**In shock**

"When my family and I pulled up to the entrance we had to wait for the prostitutes to move out of the road so we could get in the parking lot…"

(iv)     February 2015 from Tripadvisor:

**WARNING!! VERY Unsafe.  DO NOT book a room here.**

"My family's flight from ATL was cancelled due to a snowstorm in the Northeast. Delta booked us two rooms at this hotel for the night until we could get on our rescheduled flight the next day. Delta told us it's close to the airport but when we got into the taxi it ended up being over a 20 minute ride. As we pulled up all four of us were in complete shock!! This hotel is located in a back alley behind a strip club, next to a second strip club, and surrounded by multiple porn shops. The vibe and appearance of the building was extremely seedy and all of us felt unsafe to even step out of the taxi. We did but immediately regretted it. With the stares we got from the men and prostitutes coming in and out of the hotel I felt like fresh meat among a pack of wild dogs. The taxi driver stated he could not leave us here so we got back in the vehicle and drove back to the airport. We wasted $60 for the round trip ride but I'd rather sleep on the floor of the airport than stay in a place that made me SO uncomfortable. DO NOT BOOK A ROOM HERE!!"

(v)     July 2015 from Tripadvisor:

**Worst Hotel Ever!**

"This hotel is located by three(3) strip clubs and sex toy stores all around it. The inside and outside looks very dilapidated. I asked to look

at the room before signing for the room. After viewing the room, I refused to sign and they still charged my account even though we didn't stay at the hotel. The smell of marijuana was in the air and broken down vehicles in the parking lot. Questionable people were both inside the hotel as well as loitering in the parking area. I felt unsafe the little while I was there."

(vi)   July 2015 from Tripadvisor:

**STAY AWAY!**

"Hotel from hell! NOT FAMILY (or anyone) FRIENDLY! I booked this hotel online last minute after spending the day at Six Flags. Upon arrival, we were greeted by multiple prostitutes and their pimp/ drug dealer. The place is located in an alley with several strip clubs in sight. After making my way past the prostitutes, there was no one in the lobby. A prostitute informed us to knock on the door to get the office managers attention. Against my better judgment, I took the key and made my way past more prostitutes smoking pot in the main hallway/lobby. Once in the room, I found at least FIVE car air fresheners hanging throughout the room trying to cover the musty/smoky smell in my "non smoking" room. There was also cardboard wedged in between the window unit (not sure what purpose it served.) I immediately left the room and requested a refund. I was told to contact the website it was booked through for a refund. At NO point in my less than 15 minute stay did I feel safe. I also witnessed at least 2 drug deals in that short time. I should have read the reviews before I booked. The only way this place possibly has any good reviews is if the hookers or their "customers" were writing them."

(vii)   August 2017 from Tripadvisor:

**Super Inappropriate!**

"This is the worst hotel I have ever stayed. … I just want to warn that it's super inappropriate for children!!! There are at least three strip clubs right across the street, in which, prostitution is going on too and they end up at Super Inn. People were smoking pot in the hallways and

prostitutes just walking in and out. The hotel is filthy and don't even try to maintain it. … Personally, I did not sleep at all because the walls are so thin you could hear everything. They kept slamming the doors in the hallway ALL NIGHT!!!!! It didn't stop until 5 a.m. … Do not bring your children here!"

(viii)   March 2018 from Tripadvisor:

**Should have read the reviews!!!!!!!!!!**

"We arrived after 11 pm so didn't notice this hotel was surrounded by strip clubs...luckily we were fine once inside, but when my partner went outside for a smoke he was propositioned by a prostitute...the second time he went out there were 2 prostitutes fighting and the one was threatening that her pimp was going to come down (from the hotel)...one of them had a small board with nails as a weapon. My partner was too scared to try to intervene in the fight and just came in to warn us not to come out. When the coast was clear we packed up and left, not surprised nor even caring that there was no breakfast. I didn't realize how bad it was until the morning, despite the smell of weed, as I figured ah well, some motels allow smoking...this was not a cheap motel either...we could have stayed in a better chain for sure but I thought it wpuld be like a super 8 when I booked it...disappointed that this hotel is even allowed on booking.com. They should remove it! However, if you are a pimp/drug dealer/prostitute...this is a great location for you – enjoy!"

(ix)   June 2018 from Tripadvisor:

**Prostitution ring**

"Nasty i moved the sheets back and found things that are used for drug use ..so dirty i tried to post pics of the lube on base of lamp i mean alot if it ..my husbend booked room online not reading reviews as it was late and we were very tired worst place i ever seen and did not feel safe at all here!!!!"

(x)   April 2021 from Tripadvisor:

**Got a heads up of drugs and prostitution!**

"My family and I were on a trip to six flags and other hotels were booked or very expensive so we chose this hotel thinking it was close enough and my husband didnt see the reviews to get a heads up. When we got there people that knew the area told us not to stay there and said at night it gets bad of drug dealing and prostitution and told us we should leave especially with kids. So we told the desk and he gave us a refund with no issue knowing what goes on there."

38.

Defendant knew or should have known of other sex crimes at the hotel before, during, and after Plaintiff's sex trafficking, including crimes that very frequently involved women selling sex in front of the hotel, just like Plaintiff was made to do. Specifically, and based on publicly available information and police reports, Defendant knew or should have known of the following sex crimes, among others, occurring on their premises and approaches:

   a. On or about January 9, 2013, a woman was raped at the Super Inn by an unknown man who rented her a room at the hotel and gave her $100 after raping her.

   b. On or about January 27, 2013, a man was beaten with a baseball bat and robbed by a group of men after he followed a woman back to the Super Inn.

   c. On or about February 3, 2013, a woman identified as a "known prostitute" and who had been arrested *five separate times* for prostitution *at the Super Inn*, was again arrested there for loitering for

23

the purpose to engage in sexual acts for hire.

d.  On or about February 19, 2013, a man reported he was robbed at the Super Inn after arranging to purchase sex from a woman at the hotel.

e.  On or about February 21, 2013, a man was attacked and robbed in the front office of the hotel by a group of men after agreeing to purchase sex from a woman at the hotel.

f.  On or about April 2013, August 2013, August 2014, and September 2014, the same woman (who was 18 years old in the first incident) was cited for prostitution related activities.  Police noted about the Super Inn that "This officer had completed several business checks of this location and every time I patrolled the area *several females standing at the street entrance* would notice me on patrol in the area and would run back to the hotel and run upstairs." Police also cited this woman for flagging down vehicles and loitering outside the Super Inn to solicit sex.

g.  On or about April 16, 2013, the police cited two women for flagging down vehicles with male drivers in front of the hotel.  On or about July 27, 2013, the police cited the same two women for public indecency related to what they were wearing standing in front of the Super Inn.

h.  On or about June 29, 2013, a woman was charged with loitering for flagging down cars with male drivers in the entrance to the Super Inn.

i.  On or about July 24, 2013, a man and a woman were arrested for pandering and prostitution inside his vehicle in the parking lot of the Super Inn.

j.  On or about September 13, 2013, a woman was arrested for soliciting people for prostitution in front of the Super Inn."

k.  On or about November 9, 2013, an 18-year-old sex trafficking victim reported to police that at the Super Inn her pimp attempted to drug

her, grabbed her by the neck and stuck his hand down her throat.

l.  On or about August 2, 2014, a known prostitute was arrested at the Super Inn and police noted that he "noticed several *females loitering at the entrance to 301 Fulton Industrial Circle*. The area is a known drug and prostitution high crime zone. The females were dressed intimately to the point of being indecent."

m.  On or about August 17, 2014, three women at the Super Inn were arrested for loitering for sex because the police officer had had prior encounters with them. The officer noted that he "observed a group of approximately **seven known prostitutes** *loitering in and around the entrance of the Super Inn*. I watched as the females would attempt to flag vehicles down in the roadway and patrons of nearby businesses for the purposes of sexual acts for hire. The females were all dressed extremely provocative and exposing their bodies in a way as to solicit attention."

n.  On or about August 3, 2014, a known prostitute was charged with loitering for sex at the Super Inn.

o.  On or about September 4, 2014, a police officer observed multiple women waving cars down from the front of the Super Inn and one of the women got a car to stop and a man got out and went into the hotel with the woman.

p.  On or about September 12, 2014, two women were charged with loitering and public indecency at the Super Inn for "attempting to solicit passer-bys for the purposes of prostitution." One of the women was dressed only in pink panties from the waist down.

q.  On or about September 28, 2014, police investigated a tip that a man was pimping women and selling cocaine out of a room at the Super Inn.

r.  On or about October 8, 2014, police charged a woman "known in the area for drug usage and prostitution" after she *flagged down a car in front of the Super Inn*.  The officer noted that "This area is known for

high concentrations of prostitution activities."

s.  On or about November 14, 2014, police arrested a woman for loitering for to engage in sexual acts after the officer "*observed a group of known prostitutes loitering for sexual acts near the entrance of the Super Inn*."

t.  On or about March 17, 2015, a known prostitute was charged with soliciting rides after she was observed *flagging down vehicles in front of the Super Inn*.

u.  On or about March 29, 2015, a woman wanted for loitering for sexual acts was found in front of the Super Inn.

v.  On or about August 1, 2015, four women who were "known prostitutes that live inside the hotel" were arrested for loitering for sexual acts for hire and two others were charged with public indecency for complete or partial nudity in a public place. One of the women, who was 18 years old at the time, wore see-through apparel "exposing her butt and vaginal area" and another wore a see-through dress "exposing her butt."  *All four women were loitering in front of the Super Inn*.  The officer noted that the area "is known for its high drug and prostitution activities. The females are known prostitutes that live inside the hotel. On several different occasions, as well as today, I warned them not to loiter outside or in front of the business. *The females tend to loiter inside the lobby area and directly outside the building and hail vehicles as they drive by, to engage in a sex act of hire*."

39.

This is a small sample of the sex crimes occurring at the Super Inn in the years leading up to Plaintiff's trafficking there.  There are many, many other crimes also related to prostitution, gangs, and drug activity.

40.

Additionally, at least three other victims of sex trafficking have previously filed lawsuits against Defendant for their trafficking at the Super Inn.

41.

For example, Plaintiffs identified as H.H. and M.M. previously sued Defendant for their sex trafficking at the Super Inn that occurred in 2015.

42.

A Plaintiff identified as N.N. sued Defendant for her sex trafficking at the Super Inn that occurred in 2020.

43.

During part of the time that Plaintiff was trafficked at the Super Inn, N.N. was being trafficked at the Super Inn by a different trafficker.

44.

Defendant knew or should have known that these crimes—and the obvious open-air market for illegal sex that the hotel encouraged and condoned—were indicative of sex trafficking, including Plaintiff's sex trafficking.

45.

These crimes perpetrated against sex-trafficking victims, including Plaintiff, were negligently and recklessly allowed to occur by Defendant.

46.

Defendant knew or should have known of these and other instances of prostitution, crimes against women, dangerous illegal activity, drugs, violence, missing and runaway underage girls, sex crimes, and sex trafficking occurring at the hotel prior to, during, and after Plaintiff being trafficked for sex there.

47.

Despite the dangerous, illegal, and criminal activity at the hotel, the hotel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

48.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable and necessary steps to stop such illegal and dangerous activities from occurring.

49.

Additionally, the hotel negligently failed to provide proper training to its employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

50.

The hotel also negligently failed to provide proper training to its employees on what they were supposed to do if they saw or suspected that dangerous or illegal activity, prostitution, or sex trafficking was occurring at the hotel.

51.

The hotel also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, on how the staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so that the hotel could better deter or prevent crime in the future.

52.

The hotel also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

53.

Defendant knew or should have known that it was permitting the hotel to be used as a place of prostitution and sex trafficking.

## **Defendant's Knowledge of Sex Trafficking Generally**

54.

Defendant knew or should have known of the existence of sex trafficking

and its illegality more than 20 years ago, since the passage of the Trafficking

Victims Protection Act in 2000, and the United Nations' adoption of the Palermo

Protocol, to prevent, suppress, and punish trafficking in persons.

55.

Defendant knew or should have known that during the relevant period,

Atlanta was a hub of sex trafficking and that the crime was prevalent in the city,

including at the Super Inn. According to a well-publicized study commissioned by

the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex

trafficking economies in the country.[2]  In 2007, Atlanta's sex trafficking economy

was worth $290 million annually, and traffickers reported average *weekly* earnings

of roughly $33,000. Over the last two decades, sex trafficking has generated

---

[2] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta
Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--
law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/
(last visited April 1, 2021); *see also* Meredith Dank, et.al *Estimating the Size and
Structure of the Underground Commercial Sex Economy in Eight Major US Cities*,
Urban Institute, (March 12, 2014), 30-32, *available at*
https://www.urban.org/research/publication/estimating-size-and-structure-
underground-commercial-sex-economy-eight-major-us-cities (last visited April 1,
2021).

billions of dollars in illicit profits in metro Atlanta alone. Defendant has received

and retained some of those illicit profits through renting hotel rooms used for the

trafficking of Plaintiff and other victims.

56.

Defendant knew or should have known of the Atlanta area's well-publicized

reputation as an "epicenter for human trafficking, [] particularly child sex

trafficking,"[3] and as "the number one city for child sex trafficking."[4]

57.

Defendant knew or should have known that the hotel and the surrounding

Fulton Industrial Boulevard area were known to be common and notorious

locations for prostitution, sex crimes, and sex trafficking to occur.[5]  That is why

---

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and
Human Trafficking Prevention Month, (Jan. 29, 2015), *available at*
https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-
yates-delivers-remarks-justice-department (last visited April 1, 2021).
[4] *Id.*
[5] *See, e.g.*, Meredith Dank, et.al, *Estimating the Size and Structure of the
Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute,
(March 12, 2014) (Noting that "street-level prostitution . . . occurs along specific
tracks within more densely urban areas, particularly the Fulton Industrial area."),
123,  *available at* https://www.urban.org/research/publication/estimating-size-and-
structure-underground-commercial-sex-economy-eight-major-us-cities (last visited
July 26, 2022); Aaron Diamant, *Loophole Helps Cheap Hotels Serve as Save
Havens for Violent Crime,* WSB-TV 2, (May 20, 2016)
https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-

Plaintiff's trafficker sold her there.

58.

Defendant knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" City *of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

59.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving hotels and motels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[7] And the Polaris Project found

safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/. (Last visited July 26, 2022)

[6] *Human Trafficking and Hotels & Motels*, Polaris Project, https://polarisproject.org/human-trafficking-and-hotels-motels/ (last visited April 1, 2021).

[7] Jon Conte, *et al., Inhospitable to Human Trafficking Program Evaluation*, at 2, Businesses Ending Slavery and Trafficking, (July 2014),

that "75% of [trafficking] survivors responding to Polaris's survey reported

coming into contact with hotels at some point during their exploitation . . . .

Unfortunately, 94% also disclosed that they never received any assistance,

concern, or identification from hotel staff."

60.

Defendant knew or should have known that the organization called End

Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-

Protection Code of Conduct (the "Code") in the United States in 2004.[8]

61.

Defendant knew or should have known that the Code, which lays out well-

established best practices for the hospitality industry to identify, address, and deter

sex trafficking, identifies six reasonable and logical steps hotels and motels can

take:

    a.  establish corporate policy and procedures against sexual
        exploitation of children;

    b.  train employees in children's rights, the prevention of sexual
        exploitation and how to report suspected cases;

---

https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11
_without_appendix.pdf at 5 (last visited April 1, 2021).
[8] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at*
www.ecpatusa.org/code/ (last visited April 1, 2021).

    c.  include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

    d.  provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

    e.  support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

    f.  report annually on the company's implementation of Code-related activities.

62.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

63.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking.  DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

    a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or

unusual behavior;

b.  persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or an ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

35

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

64.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendant, for a fee, provided that market, a private and anonymous market for Plaintiff to be sold for sex at its hotel.

## Count I – Active Negligence

65.

Plaintiff incorporates the above paragraphs as if fully set forth herein.

66.

Defendant was actively negligent in permitting Plaintiff's trafficker to rent rooms at the hotel and to sell Plaintiff for sex there.

67.

Defendant knew or should have known that Plaintiff's trafficker sold Plaintiff for sex at the hotel.

68.

Among other things, Defendant knew or should have known that Plaintiff was being sold for sex based on interactions the hotel staff, including manager

"Vinny" Patel, had with Plaintiff and based upon all the observable circumstances surrounding Plaintiff's trafficking.

69.

Given what Defendant knew or should have known about Plaintiff's sex trafficking, a reasonable hotel operator using ordinary care would not have continued to rent rooms to Plaintiff's sex trafficker and, indeed, would have reported the illegal activity of which Plaintiff was a victim.

70.

Defendant failed to exercise ordinary care in its dealings with Plaintiff's sex trafficker and with Plaintiff, and Defendant's negligence was a cause in fact and a proximate cause of Plaintiff's substantial physical, emotional, and psychological harm and other damages.

71.

Defendant is liable to Plaintiff for all damages afforded under Georgia law.[9]

## **Count II – Negligence and Premises Liability**

72.

Plaintiff incorporates the above paragraphs as if fully set forth herein.

---

[9] As a victim of sex trafficking crimes, all of Plaintiff's claims herein are timely pursuant to O.C.G.A. § 9-3-99 and all other applicable Georgia law.

73.

Defendant knew or should have known that dangerous, violent, illegal activity including, prostitution, pimping, and sex trafficking were taking place and likely to occur at its hotel, and Defendant knew or should have known the steps to take to prevent the hotel from being used as a venue for Plaintiff's sex trafficking.

74.

Despite its knowledge of illegal activity at the hotel, including prostitution and other sex crimes in the months and years prior to Plaintiff's sex trafficking, Defendant negligently failed to implement appropriate measures to protect its invitees, licensees, and guests, including Plaintiff, from becoming victims of sex trafficking at the hotel.

75.

Defendant negligently failed to implement policies and procedures to prevent, identify, and deter violent crimes, crimes against women, sex crimes, pimping, prostitution, and sex trafficking in its hotel and to ensure it was not profiting from same.

76.

At all relevant times, Defendant controlled the operation and management of the hotel and had the legal duty to keep the premises in a state consistent with due regard for the safety of its invitees, licensees, and guests including Plaintiff.

77.

Defendant breached said duties and failed to act as a similarly situated hotel would in like circumstances.

78.

Prior to and including the time when Plaintiff was trafficked at the hotel, Defendant negligently maintained, inspected, secured, patrolled, and managed the hotel. Defendant had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, and manage the premises, but negligently failed to exercise ordinary care, thereby creating an unreasonable risk of injury to invitees, licensees, and guests, including Plaintiff.

79.

Defendant negligently failed to provide appropriate training, guidance, or instruction to its employees on how to prevent or deter dangerous or illegal activity, sex crimes, prostitution, or sex trafficking from occurring at the hotel.

80.

Defendant had actual and constructive knowledge of the dangerous and hazardous conditions existing at the hotel due to the knowledge of its employees and agents and due to the prior criminal activity and dangers associated with the property and surrounding high crime area, including specifically the danger and hazard of sex trafficking potentially occurring at the property.

81.

Plaintiff's sex trafficking was foreseeable to Defendant because Defendant knew or should have known about the actual events with Plaintiff, as well as the history of prostitution and sex trafficking at the hotel and other hotels in the surrounding Fulton Industrial Boulevard area and the history of criminal activity at and around the hotel and in the surrounding high-crime area. Thus, Defendant owed a duty to invitees, licensees, and/or guests to exercise ordinary care in keeping the premises and approaches safe from criminal activity, especially sex trafficking.

82.

Defendant breached the duty owed to Plaintiff by failing to exercise ordinary care to keep its premises safe and negligently permitting prostitution and other criminal activity, especially sex trafficking, to exist and remain at the hotel.

83.

Defendant knew, or in the exercise of ordinary care, should have known, of the dangerous and hazardous conditions existing on the premises, and the failure to maintain, inspect, secure, patrol, and manage the premises, and that these conditions were likely to, and did, result in prostitution and sex trafficking previously at the hotel and again to Plaintiff.

84.

Defendant was negligent and said negligence proximately caused Plaintiff's injuries in the following ways, to-wit:

a. Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b. Negligently failing to keep the premises in a state of good repair;

c. Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the hotel;

d. Negligently failing to properly inspect and maintain the premises;

e. Negligently failing to properly train and supervise its employees regarding recognition and deterrence of crime, including prostitution and sex trafficking at the hotel;

41

f.      Negligently failing to properly retain, hire, train, and supervise said employees;

g.      Negligently failing to ensure reasonable business policies, systems, and security were adequately followed and implemented;

h.      Negligently failing to respond to online reviews and publicly available information;

i.      Negligently failing to prevent loitering and trespassing;

j.      Negligently failing to identify, remove, and ban guests who were committing crime;

k.      Negligently failing to inspect, patrol, or appropriately monitor the property;

l.      Negligently failing to provide adequate security measures and personnel; and

m.      Negligently failing to remediate a long history of crime at the hotel and in the area nearby, including sex trafficking.

85.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendant and one or more or all the above stated acts were

42

the proximate causes of the injuries sustained by Plaintiff. Defendant is liable for Plaintiff's injuries sustained, pain and suffering, the expenses of treatment and all other elements of damages allowed under the laws of the State of Georgia, including all special, compensatory, incidental, consequential, economic, and punitive damages.

86.

Defendant is liable for the sex trafficking of Plaintiff and all injuries Plaintiff sustained as a result of same.

87.

Defendant's negligence discussed in this count was a cause in fact and a proximate cause of Plaintiff's substantial physical, emotional, and psychological harm and other damages.

## Count III – Nuisance

88.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

89.

The operation of the Super Inn hotel constituted a nuisance under Georgia law because the hotel negligently turned a blind-eye and permitted illegal activities to occur at the hotel including rampant prostitution, crimes against women, dangerous

illegal activity, drugs, violence, harboring missing and runaway underage girls, sex crimes, and sex trafficking.

90.

The Defendant was operating a nuisance hotel.  Although hotels are ordinarily legal, the operation, control, and activity of this hotel was being conducted in such a manner as to permit and allow illegal activity to occur at the hotel, thereby creating a nuisance.

91.

Upon information and belief, Plaintiff's trafficker kept Plaintiff at this nuisance hotel because they knew its reputation as a good location to sell Plaintiff for sex because this hotel was known to allow such activity to occur.

92.

Thus, as a direct result of this hotel being a nuisance, Plaintiff was sold for sex at this hotel and was harmed and damaged as a result of same.

93.

Defendant is liable for all damages arising under Georgia law as a result of this nuisance and the harm caused to Plaintiff.

## Count IV – Statutory Liability under 18 U.S.C. § 1595

94.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

95.

In violation of the TVPRA, Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known violated the TVPRA.

96.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated from the hotel rooms from which Plaintiff was trafficked.

97.

Defendant participated in a venture by knowingly owning and operating a hotel that generated revenue through room rentals, and Defendant knew or should have known that its hotel rooms were being used by sex traffickers for the purpose of trafficking victims for sex in violation of the TVPRA.

98.

Defendant knew or should have known that renting its rooms to Plaintiff's sex trafficker violated the TVPRA.

99.

Defendant participated in a venture by operating the Super Inn in such a manner that the hotel allowed sex trafficking to occur so that it could profit from the room revenue the illegal activity generated.

100.

Defendant knew or should have known that its operation of the hotel harbored victims of sex trafficking in violation of the TVPRA.

101.

Defendant participated in a venture by associating with, and renting rooms to, Plaintiff's sex trafficker at the Super Inn, providing Plaintiff's trafficker with the necessary venue for Plaintiff's sex trafficking, despite the fact that Defendant knew or should have known Plaintiff's sex trafficker was trafficking Plaintiff for sex at the hotel.

102.

Defendant knew or should have known that its association with, and renting rooms to, Plaintiff's sex trafficker violated the TVPRA.

103.

In the course of these ventures, numerous buyers paid to have sex with Plaintiff in Defendant's hotel rooms.

104.

The ventures in which Defendant participated was in or affecting interstate commerce.

105.

Defendant knew or should have known the ventures violated the TVPRA because Defendant and its agents and representatives had the opportunity to observe Plaintiff at the hotel, with and without her trafficker, the signs of sex trafficking exhibited by Plaintiff, her trafficker, her room and the frequent traffic of adult male buyers to the Plaintiff's hotel rooms.

106.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

107.

Plaintiff has suffered physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

108.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. §

1595(a).

109.

Defendant is jointly and severally liable for damages arising from the indivisible injuries it caused to Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## Count V – Attorneys' Fees and Expenses of Litigation Pursuant to O.C.G.A. § 13-6-11 for Bad Faith Conduct

110.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

111.

Defendant acted in bad faith, has been stubbornly litigious, or has caused Plaintiff unnecessary trouble and expense.

112.

Defendant has engaged in a long-running pattern of bad faith conduct both before and after Plaintiff's sex trafficking which demonstrates that Defendant has no regard for safety at its hotel and that it exerts a bad faith effort (or no effort) to prevent and deter dangerous illegal activities, crime, prostitution, and sex trafficking.

113.

Defendant engaged in a long running pattern of bad faith conduct, and it engaged in specific bad faith conduct toward Plaintiff, including failing to prevent Plaintiff's sex trafficking when Defendant knew or should have known of the same.

114.

Defendant is liable to Plaintiff for attorney's fees and expenses of litigation in an amount to be proven at trial.

**Damages**

115.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

116.

As a proximate and foreseeable result of Defendant's acts described herein, Plaintiff sustained personal injuries, physical abuses, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all

compensatory, special, economic, consequential, general, punitive, and all other

damages permissible under Georgia and federal law, including, but not limited to:

a)    Personal injuries;

b)    Past, present and future conscious pain and suffering;

c)    Loss of enjoyment of life;

d)    Medical expenses;

e)    Mental anguish and emotional distress;

f)    Incidental expenses;

g)    All special, compensatory, economic, punitive, and other damages

      permissible under Georgia and federal law; and

h)    Consequential damages to be proven at trial.

### 117.

Plaintiff is entitled to an award of punitive damages without limitation or

cap because the actions of Defendant and its employees were willful and wanton

and showed an entire want of care, which raises the presumption of a conscious

indifference to consequences.

### 118.

Defendant's actions evidence a species of bad faith, were and are stubbornly

litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to

recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendant, and for the following:

a) Process issue as provided by law;

b) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

c) Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d) Plaintiff be awarded a trial by jury; and

e) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 31st day of March, 2023.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Attorneys for Plaintiff

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680