# <u>EXHIBIT A</u>

Fulton County Superior Court
***EFILED***TV
Date: 2/27/2023 12:51 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| XGS ACQUISITION, LLC | |
| Petitioner, | |
| v. | CASE NO.: 2023CV376796 |
| ALLIED WORLD SURPLUS LINES INSURANCE COMPANY, | |
| Respondent. | |

## PETITION TO CONFIRM UNANIMOUS AAA ARBITRATION AWARD

Petitioner XGS Acquisition, LLC ("Acquisition"), respectfully petitions this

Court for an order and judgment confirming a unanimous American Arbitration

Association ("AAA") Commercial Arbitration Tribunal Final Award issued on

February 10, 2023 by a three-member panel, attached hereto as Exhibit A

("Award").[1]

Confirmation of an arbitration award "is intended to be summary." *Cullen v.*

*Paine, Webber, Jackson & Curtis, Inc.*, 863 F.2d 851, 854 (11th Cir. 1989). The

---

[1] Acquisition believes the Award is not in any way confidential.  However, out of an abundance of caution, Acquisition sought to confer with Allied to determine if it would assert any confidentiality concerns. Allied never responded.  Nonetheless, out of that same abundance of caution, Acquisition has attached only an excerpt of the Award.  Acquisition will file the complete award immediately upon a determination that Allied has no objection, or at the request of either the Court or Allied.

law "imposes a heavy presumption in favor of confirming arbitration awards." *Berger v. Welsh*, 326 Ga. App. 290, 292 (2014). And "[i]t is well established under both federal and Georgia law that judicial review of an arbitration is **among the narrowest known to the law.**" *Id.* at 291 (emphasis added). The governing statute "unequivocally tells courts to grant confirmation in all cases," absent an exceedingly narrow exception. *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 587 (2008).

## GOVERNING LAW

Because the parties' arbitration agreement "involves or affects interstate Commerce," the Federal Arbitration Act's substantive law applies. *Am. Gen. Fin. Servs. v. Jape,* 291 Ga. 637, 638 (2012); *see also* 9 U.S.C. § 2. However, Georgia procedural law, including the procedures of the Georgia Arbitration Act, govern the confirmation proceedings. *See Jape,* 291 Ga. at 640*; Green Tree Serv'g, LLC v. Jones*, 333 Ga. App. 184, 187 (2015) (holding that Georgia service rules apply to confirmation proceedings).

Under both the Federal and Georgia Arbitration Acts, this Petition must be treated as a motion. *See* 9 U.S.C. § 6; O.C.G.A. § 9-9-4(a). Thus, this Petition "shall be heard in the manner provided by law and rule of court for the making or hearing of motions." O.C.G.A. § 9-9-4(a)(2); see also 9 U.S.C. § 6 (similar); *Green Tree*, 333 Ga. App. at 187.

**PARTIES**

1.     Petitioner Acquisition is a limited liability company organized under the laws of the State of Delaware, with its registered address at 251 Little Falls Drive, Wilmington, DE 19808. Acquisition's principal place of business is currently 1707 Mount Vernon Road, Suite C, Atlanta, GA 30338.

2.     Respondent Allied World Surplus Lines Insurance Company ("Allied"), is a company organized under the laws of the State of Arkansas, with its registered address at 425 West Capitol Avenue, Suite 1800, Little Rock, AR 72201. Upon information and belief, Allied's principal place of business is 199 Water Street, New York, NY 10038.

**JURISDICTION AND VENUE**

3.     This action arises from the breach of a Buyer-Side Representation and Warranty Insurance Policy ("the Policy"), attached hereto as Exhibit B, which contains a mandatory arbitration provision in which the parties agreed to submit to arbitration "[a]ny dispute arising out of or in connection with this Policy." Exhibit B § 11. The Policy further confirms that "any party may enforce an arbitration award in a court of competent jurisdiction." Ex. B § 11.3(viii).

4.     The Court has subject matter jurisdiction over this Petition under Ga. Const. art. VI, § 4; O.C.G.A. § 15-6-8 and O.C.G.A. § 9-9-3, which give the Court

jurisdiction to "enter judgment on an award" rendered pursuant to "a provision in a
written contract to submit any controversy thereafter arising to arbitration."

5.      The Court of Appeals has held that "state courts have subject matter
jurisdiction over confirmation of arbitration awards" rendered under the Federal
Arbitration Act, such as this one.  *Galindo v. Lanier Worldwide, Inc.*, 241 Ga. App.
78, 80 (1999) (citing *Hilton Constr. Co. v. Martin Mech. Contractors, Inc.*, 251
Ga. 701 (1983)).

6.      The Court may exercise personal jurisdiction over Allied under
O.C.G.A. § 9-10-91(1) because Allied, directly and through its agents, transacted
business in and availed itself of the benefits of doing business in the State of
Georgia and, as such, the exercise of personal jurisdiction over Allied comports
with due process.

7.      Allied executed a contract with Acquisition, which, at the time, had its
principal place of business at 3060 Peachtree Street, Suite 300, Atlanta, GA 30305.
*See* Ex. B at 1 (listing Atlanta address for Acquisition as the "Named Insured").
Thus, as reflected on the face of the Policy, Allied knowingly entered into the
contract at issue with a Georgia named insured that conducted business in Georgia,
and thereafter accepted the premium payment from a Georgia company.[2] Before

---

[2] *See, e.g.*, *Power Guardian, LLC v. Directional Energy Corp.*, 904 F. Supp. 2d
1313, 1320–21 (M.D. Ga. 2012) (finding that the defendant transacted business in
Georgia where, *inter alia*, it entered into a contractual relationship with a Georgia

the parties executed the Policy, Allied and its agents negotiated with Acquisition and its agents in Georgia. Allied's Senior Vice President and lead underwriter for this deal resided in Georgia at the time. Further, Allied negotiated the Policy with Acquisition's Georgia-based attorneys at Carlton Fields, located at 1201 W. Peachtree Street NW, Suite 3000, Atlanta, Georgia 30309.

8.      Petitioners may serve this Petition on Respondents' counsel in the manner for serving a motion set out in O.C.G.A. § 9-11-5(b).  Service by this method is appropriate because this Petition should be treated as a motion.  *See* 9 U.S.C. § 6; O.C.G.A. § 9-9-6(a).  The Court of Appeals has approved service of a petition to confirm an arbitration award in the same manner as service of a motion. *See Green Tree*, 333 Ga. App. at 187.

9.      Venue is proper under O.C.G.A. § 9-9-4(b)(3), which provides for venue in the county "where any party resides or does business." Allied transacts business in Fulton County, as evidenced on the face of the Policy.

## FACTUAL AND PROCEDURAL BACKGROUND

10.      The Award arises out of an insurance coverage dispute. Acquisition

---

company, "exchanged electronic and personal communications with a Georgia company, engaged in face-to-face contract negotiations with a Georgia company, and accepted payment from a Georgia company."); *Evans v. Am. Surplus Underwriters Corp.*, 739 F. Supp. 1526, 1532 (N.D. Ga. 1989) (party availed itself of Georgia forum "when it knowingly entered a contractual relationship with a Georgia corporation").

purchased the Policy from Allied to insure the accuracy of the representations and warranties made by the seller in connection with Acquisition's purchase of a trucking company in 2015.

11.   Acquisition and Allied executed the Policy effective as of April 17, 2015.

12.   On April 11, 2019, Acquisition filed an arbitration demand with the AAA, timely and properly initiating arbitration.

13.   The AAA appointed David M. Brodsky, Esq. (Chair), Hon. William B. Chandler, III, and David Greenberger, Esq.

14.   The AAA Panel arbitrated the entirety of the dispute, without objection by Allied, and was exceptionally well qualified.

15.   The Chair, David M. Brodsky, Esq., is the principal of Brodsky ADR, LLC, and has amassed more than five decades of experience as a general counsel, federal prosecutor, private litigator, and professional neutral.  He has been elected by his peers both as a Fellow of the American College of Trial Lawyers and as a Fellow of the College of Commercial Arbitrators.  Mr. Brodsky is one of the most experienced and prominent arbitrators in the country.

16.   Hon. William B. Chandler III is a former judge on the Delaware Superior Court and a Vice Chancellor and Chancellor on the Delaware Court of Chancery, the latter of which is one of the most prestigious business courts in the

world.  Judge Chandler currently serves as a partner of the law firm of Wilson Sonsini Goodrich & Rosati, P.C.

17.     David I. Greenberger, Esq. is an experienced litigator and partner at the New York law firm Bailey Duquette.  A graduate of Cornell University and the Georgetown University Law Center, Mr. Greenberger has practiced law for 23 years and is an appointed member of the AAA Roster of Arbitrators for commercial and employment disputes.

18.     At the parties' request, the Panel bifurcated the arbitration into two Phases. The Panel issued a Partial Final Award on May 14, 2021, which denied Allied's motion to dismiss Acquisition's damages based on a "multiplied damages" Policy exclusion.

19.     The Panel held a week-long Final Evidentiary hearing from September 19-23, 2022.  Following the parties' agreement to extend its deadline to issue a Final Award, the Panel timely issued its final Award on February 10, 2023, granting relief to Acquisition.  See Ex. A.

## ARGUMENT

20.     For the reasons that follow, the Court should promptly confirm the Panel's Award under the Federal Arbitration Act, 9 U.S.C. §§ 9, 13 or as otherwise provided by law.

21.     The Federal Arbitration Act governs because the arbitration

7

agreement affected or involved interstate commerce.

22.   The Georgia Supreme Court and the Georgia Court of Appeals have both made clear that federal substantive law applies to a contract that affects interstate commerce. In *Jape*, the Supreme Court held that the Federal Arbitration Act "applies in state and federal courts to all contracts containing an arbitration clause that involves or affects interstate commerce." 291 Ga. at 638. In *Greenway Capital Corp. v. Schneider*, 229 Ga. App. 485 (1997), the Court of Appeals held that the Federal Arbitration Act applies "where the transaction involved interstate commerce." *Id.* at 486.

23.   Federal law also determines whether a contract affects interstate commerce. *See Greenway Capital*, 229 Ga. App. at 486. In *Joyner v. Raymond James Financial Services, Inc.,* 268 Ga. App. 835 (2004), the Court referred to 9 U.S.C. § 1 to determine whether the contract involved interstate commerce. *Id.* at 837 (citing 9 U.S.C. § 1). This statute defines commerce as, among other things, "commerce among the several states." *Id.* (quoting 9 U.S.C. § 1).

24.   The arbitration agreement meets 9 U.S.C. § 1's definition of interstate commerce. The parties to the arbitration agreements are companies from different states and whose underlying business involves interstate commerce.

25.   Under the Federal Arbitration Act, 9 U.S.C. § 9, when a party to an arbitration applies for an order confirming an award, "thereupon the court **must**

**grant"** such an order unless the award is vacated, modified, or correct." (emphasis added). "There is nothing malleable about 'must grant.'" *Berger v. Welsh*, 326 Ga. App. 290, 298 (2014). When a party to an arbitration applies for an order confirming an award, "thereupon the court **must grant** such an order unless the award is vacated, modified, or corrected." 9 U.S.C. § 9 (emphasis added). The statute "carries no hint of flexibility." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 587 (2008). Instead, the statute "unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed exceptions' applies." *Id.*

26.    "It is well established under both federal and Georgia law that judicial review of an arbitration is among the narrowest known to the law." *Berger*, 326 Ga. App. at 291. The law "places strict limits on the scope of a trial court's review of an arbitrator's award." *Brookfield Country Club, Inc. v. St. James-Brookfield, LLC*, 299 Ga. App. 614, 617 (2009). These limits "achieve the legislative purpose of allowing contracting parties to obtain an 'expeditious and final resolution of disputes by means that circumvent the time and expense associated with civil litigation." *Id.*

27.    Indeed, the Eleventh Circuit has warned that where "a party on the short end of an arbitration award attacks that award in court without any real legal basis for doing so, that party should pay sanctions." *B.L. Harbert Int'l, LLC v.*

*Hercules Steel Co.*, 441 F.3d 905, 913 (11th Cir. 2006), *abrogated on other grounds.*

28.     The Federal Arbitration Act "imposes a heavy presumption in favor of confirming arbitration awards." *Berger*, 326 Ga. App. at 292 (internal quotation omitted). "[A] court's confirmation of an arbitration award is usually routine or summary." *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 842 (11th Cir. 2011) (discussing the Federal Arbitration Act). Given the "extraordinary deference to arbitration awards," *Brookfield*, 299 Ga. App. at 617, the Court should confirm the award.

29.     Despite outreach by Acquisition, Allied has not paid the Award to date and has declined to provide any substantive response regarding its intentions to comply with the Final Award.

30.     The Award has not been vacated under 9 U.S.C. § 10 or modified or corrected under 9 U.S.C. § 11, and there would be no basis for such relief.

31.     Acquisition has timely brought this action within one year after the Award was issued. 9 U.S.C. § 9.

32.     Because Delaware law governs the Policy, *see* Ex. B ¶ 11.1, the Court is required to apply Delaware's applicable rates of interest for post-award pre-

judgment interest. [3]

33.    The statutory rate for pre-judgment interest under Delaware law is 5%
over the Federal Reserve discount rate, including any surcharge as of the time from
which the interest is due. *See* 6 Del. C. § 2301(a).  The federal discount rate on
February 10 was 4.75%, so the appropriate pre-judgment interest rate is 9.75%.[4]

34.    Acquisition is also entitled to post-judgment interest under O.C.G.A.
§ 7-4-12. Under O.C.G.A.§ 7-4-12, "[a]ll judgments in this state shall bear annual
interest upon the principal amount recovered at a prime rate equal to the prime rate
as published by the Board of Governors of the Federal Reserve System . . .  on the
day the judgment is entered plus 3 percent." That rate was 4.58% on February 10,
2023, so the appropriate post-judgment interest rate is 7.58%.[5]

35.    Post-judgment interest is mandatory. It "shall apply automatically to
all judgments in this state and the interest shall be collectable as a party of each

---

[3] "[S]tate law governs the availability and amount of prejudgment interest in
diversity cases involving the Federal Arbitration Act." *AIG Baker Sterling Heights,
LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1002 (11th Cir. 2007). "Although
Georgia courts adhere to the rule of *lex loci contractus,* parties by contract may
stipulate that the laws of another jurisdiction will govern the transaction." *Rayle
Tech, Inc. v. DEKALB Swine Breeders, Inc*., 133 F.3d 1405, 1409 (11th Cir. 1998)
(internal citation omitted). Here, the parties stipulated that the Policy was governed
by Delaware law. *See* Exhibit B § 11.1.

[4] https://www.wsj.com/market-data/bonds/keyinterestrates.

[5] *Id.*

judgment whether or not the judgment specifically reflects the entitlement."

O.C.G.A. § 7-4-12(c).

36.    Post-judgment interest accrues on judgments confirming arbitration awards just like any other judgment. The Federal Arbitration Act provides that a judgment on an award "shall have the same force and effect, in all respects, as, and be subject to all the provision of law relating to, a judgment in an action." 9 U.S.C. § 13. The Georgia Court of Appeals has affirmed that an arbitration confirmation judgment accrues post-judgment interest like any other judgment. *See Airtab, Inc. v. Limbach Co.*, 295 Ga. App. 720 (2009) (confirming trial court's inclusion of post-judgment interest in arbitration judgment). As the Court said in *Jamison v. West*, 191 Ga. App. 431 (1989), an award of post-judgment interest on an arbitration judgment is "inherent in the judgment whether or not specifically mentioned by the superior court." *Id.* at 432 (quotation omitted).

37.    Based on the foregoing, the Court should issue an order confirming the Award and direct that judgment be entered against Allied in the amount of $7,426,791, plus post-award, pre-judgment interest from February 10, 2023 though the entry of judgment, and post-judgment interest, consistent with the rates under the laws cited above. With respect to pre-judgment interest, the Court should add $1,983.87 per day to the total amount of the Award.

38.     Acquisition also requests an award of its expenses, including reasonable attorneys' fees, incurred in obtaining a judgment confirming the Award based on the terms of the Policy at issue.

39.     Acquisition is entitled to the attorneys' fees and costs associated with filing this motion because the Policy provides that the "costs and expenses of the arbitration shall be borne by the Insurer and Insured . . . based on the relative success of the Insurer and the Insured." Ex. A § 11.3(vi).

40.     The FAA allows the Court to award attorneys' fees and costs associated with this Award's confirmation because "the agreement providing for arbitration" contemplates that relief. *Nelson v. PJ Cheese, Inc.*, No. 4:20-cv-00242-JPB, 2021 WL 2493252, at *1 (N.D. Ga. June 17, 2021). In obtaining a judgment from this Court, Acquisition will have been the successful party.

## CONCLUSION

For these reasons, Acquisition respectfully requests that the Court promptly enter an Order and Judgment confirming the Award under the Federal Arbitration Act as set forth herein, and awarding pre- and post-judgment interest, expenses and reasonable attorney's fees.

Respectfully submitted, this 24th day of February, 2023.

*/s/ Jason J. Carter*
Jason J. Carter

Fredric J. Bold, Jr.
Zoe M. Beiner
**BONDURANT, MIXSON &
ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
Telephone (404) 881-4100
Facsimile (404) 881-4111
*carter@bmelaw.com*
*bold@bmelaw.com*
*beiner@bmelaw.com*
*Counsel for Petitioner XGS Acquisition,
LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this day I filed the foregoing **PETITION TO CONFIRM ARBITRATION AWARD** via first class mail and email to counsel for Respondents at:

> Joseph Mamounas
> Thomas Heisler
> Josh Mandel
> GreenbergTraurig
> 333 SE 2nd Avenue
> Miami, Florida 33131
> Telephone (305)-579-0500
> Facsimile (305)-579-0717
> *mamounasj@gtlaw.com*
> *heislert@gtlaw.com*
> *mandelj@gtlaw.com*

This 24th day of February, 2023.

/s/ *Jason J. Carter*
Jason J. Carter

EXHIBIT

A

# EXHIBIT A

# Filed Under Seal

EXHIBIT

B



Project Dos Equis
Policy No. 0309-5478

**ALLIED WORLD SURPLUS LINES INSURANCE COMPANY**
**199 Water Street, New York, NY 10038   Tel: (646) 794-0500   Fax: (646) 794-0611**

**BUYER-SIDE REPRESENTATION AND WARRANTY INSURANCE POLICY**
**Declarations**

| | | |
|---|---|---|
| **Item 1** | **Named Insured:** | XGS Acquisition, LLC<br>3060 Peachtree Street, Suite 300<br>Atlanta, GA 30305 |
| | **Insurer:** | Allied World Surplus Lines Insurance Company |
| **Item 1a** | **Additional Insured:** | Buyer Indemnified Persons (as such term is defined in the Acquisition Agreement).<br><br>Collectively, with the Named Insured, the "Insureds" |
| **Item 2** | **Acquisition Agreement:** | The Membership Interest Purchase Agreement, dated as of 13, 2015, made and entered into by and among Xpress Global Systems, LLC, a Georgia limited liability company, Xpress Holdings, Inc., a Nevada corporation, U.S. Xpress Enterprises, Inc., a Nevada corporation, and XGS Acquisition, LLC, a Delaware limited liability company. |
| **Item 3** | **Policy Period:** | Effective Date: April 17, 2015<br><br>Expiration Date: The date that is 3 years from the Closing Date (as defined in the Acquisition Agreement) except that, with respect to the Extended Representations, the date that is 6 years from the Closing Date.<br><br>For clarity, this Policy shall continue in full force and effect until the Expiration Date with respect to Losses (notwithstanding any earlier expiration of survival periods set forth in the Acquisition Agreement), as if the Expiration Date was substituted in the Acquisition Agreement for any earlier expiration. |
| **Item 4** | **Limit of Liability:** | US$10,000,000 in the aggregate for the Policy Period. |
| **Item 5** | **Retention:** | US$940,000 in the aggregate for the Policy. |
| **Item 6** | **Premium:** | US$350,000 |
| **Item 7** | **Broker Commission:** | 15% of the Premium, net of any taxes (paid by insurer) |
| **Item 8** | **Taxes:** | The Premium is exclusive of any applicable |



surplus lines or premium tax and any other applicable tax or surcharge. It is the Insured's responsibility to pay any applicable surplus lines or premium tax and any other applicable tax or surcharge.

**Appendix A**      **No Claims Declaration**

**Appendix B**      **Form of Assignment**

**Appendix C**      **Acquisition Agreement and Disclosure Schedules**

In Witness Whereof, the Insurer has caused this Policy to be executed and attested.

President                              Asst. Secretary



## TERMS AND CONDITIONS

**1    DEFINITIONS AND INTERPRETATION**

**Definitions**

In this Policy:

| | |
|---|---|
| **Acquisition Agreement** | means the agreement described in Item 2 of the Declarations together with all attachments and Disclosure Schedules (as such agreement may be amended from time to time in accordance with this Policy), an executed copy of which is attached as Appendix C. |
| **Actual Knowledge** | means (i) with respect to any fact or circumstance, actual personal knowledge of the Transaction Team Members of such fact or circumstance and (ii) with respect to a Breach, actual personal knowledge that a fact or circumstance constitutes a Breach;  for the avoidance of doubt, Actual Knowledge does not include constructive or imputed knowledge nor does it include any actual, constructive or imputed knowledge of any advisor or agent of the Named Insured, and the burden shall be on the Insurer to prove that any Transaction Team Member had Actual Knowledge of any fact, circumstance or Breach. |
| **Breach** | means a breach of or inaccuracy in any of the Representations and Warranties. |
| **Business Day** | means any day other than a Saturday, Sunday or public holiday on which banks are open for business in New York. |
| **Claim Notice** | means a notice delivered in accordance with Clause 7 of this Policy |
| **Closing** | has the meaning attributed to it in the Acquisition Agreement. |
| **Controlled Entity** | means any entity that, directly or indirectly and by reason of ownership or management, controls, is controlled by or is under common control with, any Insured. |
| **Defense Costs** | means the reasonable fees (including without limitation attorneys' fees, other professionals' fees, consultants' fees and experts' fees) and expenses (including without limitation the costs of bonds, without the obligation of the Insurer to furnish such bonds) incurred by the Insureds or any Controlled Entity in the investigation, defense or appeal of any Third Party Demand. |
| **Disclosure Schedules** | means the disclosure schedules delivered with respect to the Acquisition Agreement and attached at the end of Appendix C. |
| **Due Diligence Reports** | means:  (i) the Due Diligence Review, dated as of November 4, 2014, prepared by Carlton Fields Jorden Burt, P.A.. |

3



| | |
|---|---|
| **Effective Date** | means the effective date of the Policy stated in Item 3 of the Declarations. |
| **Expiration Date** | means the relevant expiration date of the Policy Period stated in Item 3 of the Declarations. |
| **Extended Representations** | means Sections 2.2 (Authorization and Validity), Section 2.3 (Capitalization), Section 2.6 (Title) and 2.14 (Taxes) of the Acquisition Agreement. |
| **Insureds** | means the entities stated in Item 1 and Item 1a of the Declarations. |
| **Insured Group** | means the Insureds and any Controlled Entity of any Insured. |
| **Insurer** | means the Insurer stated in Item 1 of the Declarations together with its permitted assigns. |
| **Limit of Liability** | means the amount set out in Item 4 of the Declarations. |
| **Loss** | has the meaning attributed to it in Clause 4 of this Policy. |
| **Most Favorable Jurisdiction** | means a jurisdiction where any act, error or omission giving rise to the Loss took place, any relief was awarded, or any Insured is incorporated/organized or has its principal place of business that most favors coverage under this Policy. |
| **No Claims Declaration** | means the No Claims Declaration executed on behalf of the Transaction Team Members on the Effective Date, an executed copy of which is attached as Appendix A. |
| **Policy** | means this buyer-side representation and warranty insurance policy including all schedules and appendices. |
| **Policy Period** | means the period of time stated in Item 3 of the Declarations, commencing on the Effective Date and ending on the relevant Expiration Date (all dates inclusive). |
| **Premium** | means the amount of Total Premium stated in Item 6 of the Declarations. |
| **Prosecution Costs** | means reasonable fees and expenses (including attorneys' fees and accountants' fees, consulting fees, experts' fees and premium for any appeal bond) incurred by the Insureds or any Controlled Entity in the investigation, adjustment, prosecution or appeal of a claim directly related to Breach or any claim against a Seller alleging fraud, including without limitation any claim seeking equitable or injunctive relief. |
| **Recovered Amounts** | means any amounts actually recovered or realized in relation to any Loss from any source during the Policy Period other than the Insurer, the Sellers or the Escrow Account (as defined in the Acquisition Agreement). For the avoidance of doubt, Recovered Amounts shall include any Tax Benefit and any |



amounts actually recovered from third parties (for example, under another insurance policy, contractual indemnity or otherwise) net of any costs of recovery (including without limitation the reasonable fees and expenses of counsel, consultants, advisors and any experts), taxes attributable to any payments made or received hereunder, payment of any deductible or retention under another insurance policy or increases in insurance premiums attributable to such Loss.

**Representations and Warranties**         means Article II of the Acquisition Agreement.

**Retention**         means the amount stated in Item 5 of the Declarations.

**Retention Dropdown Date**         means the date which is the twelve month anniversary of the Closing Date.

**Seller(s)**         means Xpress Holdings, Inc., a Nevada corporation and U.S. Xpress Enterprises, Inc., a Nevada corporation

**Tax Benefit**         means any refund of taxes paid or actual reduction in the amount of taxes that otherwise would have been paid, calculated on a with and without basis and assuming any tax attribute resulting from any Loss is the last such tax attribute on any tax return

**Third Party Demand**         means any demand, claim, complaint, proceeding or legal action made, brought or commenced against one or more Insureds or a Controlled Entity by any person (other than (a) a Controlled Entity of the Insureds or (b) the Insurer in connection with the issuance or execution of this Policy) in respect of which, if successful, the resulting payment would constitute a Loss.

**Transaction Team Members**         means Murad Karimi, David Panton and Larry Gildersleve.



1.1 **Interpretation**

(i) The headings of this Policy do not affect its interpretation.

(ii) Capitalized terms used in this Policy not otherwise defined herein shall have the respective meanings assigned to them in the Acquisition Agreement.

(iii) No party to this Policy shall have the benefit of any presumption regarding the interpretation or construction of this Policy based on which party drafted it.

(iv) Words importing the singular include the plural and vice versa, words importing a gender include every gender and references to persons include individuals, corporations, partnerships and other unincorporated associations.

(v) The word "including" or similar expression in this Policy shall be deemed to mean "including without limitation".

(vi) References in this Policy to the "Declarations", a "Clause" or an "Appendix" shall mean the Declarations, a Clause or an Appendix of or to this Policy unless otherwise stated.

(vii) "US$" and "United States Dollars" both refer to United States Dollars, the monetary unit of the United States of America.

## 2 CONDITIONS

2.1 The Insurer's obligations under this Policy shall be conditional upon:

(i) payment of the Premium to the Insurer in cleared funds, but in no event later than 10 Business Days after the Effective Date; and

(ii) execution and delivery to the Insurer of the No Claims Declaration on the Effective Date,

2.2 The Insurer may cancel this Policy for non-payment of Premium as set forth in Clause 2.1(i) of this Policy if, after sending notice thereof to the Insured in accordance with Clause 10.8, such non-payment is not rectified within ten (10) Business Days after receipt of such notice,  in which case:

(i) the Insurer shall have no liability under this Policy in respect of any Loss or otherwise; and

(ii) if the Insured has paid a portion Premium, the Insurer shall refund that portion of the Premium to the Insured.

## 3 INSURING PROVISIONS

3.1 **Insuring clause**

Subject to the terms, conditions and limitations of this Policy, the Insurer shall indemnify the Insureds for all Losses and pay all Losses for Third Party Demands resulting from a Breach.



3.2 **Action by the Insureds against the Sellers**

Loss shall, as appropriate, erode the Retention and/or be recoverable as Loss under this Policy notwithstanding that the Insureds have a right to claim against any Seller for such Loss pursuant to the Acquisition Agreement. The Insureds shall not be required to proceed against any Seller (or the Escrow Account) for recovery under the Acquisition Agreement for Losses.

3.3 **Reliance**

In entering into this Policy, the Insurer is relying upon the No Claims Declaration. Notwithstanding the foregoing, if the No Claims Declaration is inaccurate or untrue in any respect, then this Policy shall nonetheless remain in full force and effect and the only consequence shall be that any Loss as to which the No Claims Declaration is inaccurate or untrue shall not be covered hereunder to the extent of the Actual Knowledge of a Transaction Team Member that such No Claims Declaration was so inaccurate or untrue.

3.4 **Aggregate limit of liability**

The Limit of Liability is the limit of the Insurer's aggregate liability for all payments made by the Insurer in connection with this Policy for Loss.  The Retention is not part of the Limit of Liability.

4 **CALCULATION OF LOSS**

4.1 **Definition of Loss**

Subject to the other provisions of this Clause 4, Loss means the amount of:

(i) any loss, claim, liability, order, penalty, cost, settlement payment, deficiency, assessment, judgment, damage (including reasonably foreseeable consequential damages) or expense suffered or incurred by any of the Insureds to the extent arising from a Breach, including from a Third Party Demand; plus

(ii) any Defense Costs; plus

(iii) any Prosecution Costs; less

(iv) any Recovered Amounts

For purposes of determining the amount of any Loss hereunder, any qualifications as to materiality or any word formed from the word "material" set forth in the Representations and Warranties contained in the Acquisition Agreement shall be disregarded, except that the defined term "Material Adverse Effect," shall continue to be read in the Representations and Warranties.

4.2 **Exchange rates for non-US$ amounts**

In determining the amount of any Loss which is not assessed or agreed in United States Dollars (for the purposes of determining the extent to which the Retention or Limit of Liability is eroded by such Loss), such Loss shall be converted into United States Dollars at the spot rate of exchange (the closing mid-point) for the relevant currency as published in the Wall Street Journal on the date such Loss is agreed or determined by a final judgment by a competent court or arbitration panel.

4.3 **Recovering a Loss**

Any Loss payable by the Insurer shall only be in the form of a monetary payment and the Insurer shall not be obliged to seek, pursue or satisfy on behalf of the Insureds any non-monetary remedies or any injunctive, equitable or other non-monetary relief (except for Defense Costs and Prosecution Costs related thereto).



**5    RETENTION**

5.1    **Liability in excess of the Retention**

The Insurer shall only be liable for Loss once the Retention has been fully eroded. The Retention (as adjusted in accordance with Section 5.3 below) shall apply until such time as it has been fully eroded after which no Retention shall apply.

5.2    **Erosion of the Retention**

The Retention shall be eroded by Loss for which the Insurer would be liable under this Policy but for the Retention.

**6    EXCLUSIONS**

6.1    The Insurer shall not be liable to pay any Loss, nor shall the Retention be eroded, to the extent such Loss is:

(i)    arising out of any (a) Breach of which any Transaction Team Member had Actual Knowledge prior to the Effective Date, but only to the extent that such Transaction Team Member had Actual Knowledge of the nature, scope and magnitude of the consequences of such Breach and (b) material inaccuracy in the No Claims Declaration;

(ii)    for civil fines or penalties, to the extent only that such fines or penalties are prohibited at law from being insured, applying the applicable law of the Most Favorable Jurisdiction, provided, however, that the exclusion in this Section 6.1(ii) shall not apply to Defense Costs;

(iii)    for criminal fines or penalties, punitive or exemplary damages, except in each case, to the extent such damages (i) are insurable, applying the applicable law of the Most Favorable Jurisdiction; (ii) result from a Third Party Demand or (iii)constitute Defense Costs;

(iv)    for (a) the unfunded status or underfunding of any unfunded or underfunded benefit plans and (b) any withdrawal liabilities relating to any unfunded or underfunded benefit plans;

(v)    for multiplied damages, whether based on an alleged pricing multiple or otherwise

(vi)    any consequential or indirect loss or damages unless reasonably foreseeable;

(vii)    arising out of any covenant of the Seller in the Acquisition Agreement or any estimate, projection or forward-looking statement made in the Representations and Warranties;

(viii)    for any adjustment to the purchase price actually paid under Section 1.5 of the Acquisition Agreement;

(ix)    arising out of (a) the last sentence of Section 2.9 of the Acquisition Agreement ("All reserves on the Financial Statement for workers' compensation, automobile liability, and general liability claims are adequate to fully cover all liability with



respect to such claims.") or (b) arising out of Section 2.23 (Environmental Matters) of the Acquisition Agreement;

(x)     arising out of any matter relating to asbestos or Polychlorinated Biphenyls;

(xi)    arising out breaches related to the 2012 restructuring and employment practices liability;

(xii)   for any liability relating to or arising out of (i) the establishment of a 401(k) plan (the "New 401(k) Plan") at the target entity prior to closing; and (ii) transferring or roll-over of employee account balances into the New 401(k) Plan;

(xiii)  arising out of Section 2.32 (Disclosure by Member) of the Acquisition Agreement;

(xiv)   for transfer taxes;

(xv)    for taxes resulting from the Conversion (as defined in the Acquisition Agreement);

(xvi)   for liability relating to or arising out of any non-qualified deferred compensation plan or arrangement; and

(xvii)  for taxes of U.S. Xpress Enterprises, Inc. and any of its Affiliates other than Xpress Global Systems, LLC

6.2    If only part of a Loss is excluded under this Clause 6, the Loss that is not so excluded shall remain payable by the Insurer or shall erode the Retention as applicable.

6.3    For the avoidance of doubt, in no event shall Loss be recoverable under this policy which are Recovered Amounts.

**7     CLAIMS AND OTHER REPORTING PROVISIONS**

7.1    **General**

All claims under this Policy in respect of Loss and matters eroding the Retention must be dealt with in accordance with this Clause 7.

7.2    **Notification**

The Insureds shall deliver a Claim Notice to the Insurer, signed by an executive officer of the applicable Insured, as soon as reasonably practicable after any Transaction Team Member obtains Actual Knowledge of:

(i)     any Loss; or

(ii)    any fact or circumstance which would reasonably be expected to give rise to a Loss or otherwise erode the Retention;

provided that, subject to Section 7.4 of this Policy, failure to provide timely notice shall not excuse the Insurer from performance hereunder unless, and only to the extent that such failure materially and adversely affects the Insurer.

7.3    **Claim Notice contents**

(i)     The Claim Notice shall describe, to the extent known, the facts and circumstances relating to the claim in as much detail as reasonably practicable.



(ii)     A Claim Notice shall not be invalid for failing to provide all necessary facts and circumstances and other information relating to the claim so as to enable the Insurer to assess the claim; provided, however, the Insurer shall be entitled to reduce the amount of Loss that would otherwise be payable, or that would otherwise reduce the Retention, under this Policy to reflect the extent to which the Insurer's position has been materially and adversely affected by such failure and the Insurer has proven to the Insureds, in reasonable detail, such actual prejudice; provided, further, that the Insurer shall be required to promptly request additional information or clarification that the insurer needs regarding the information received from the Insurer, prior to reducing any such Loss and the Insurer shall be prohibited from reducing such Loss in the event that it fails to do so.

(iii)    Subject to Clause 7.4, nothing in this Clause 7.3 shall be construed or interpreted as preventing the Insureds from supplementing a Claim Notice as additional facts and circumstances become actually known to the Insureds.

**7.4    Late notification**

The Insurer shall not be liable for any Loss nor shall the Retention be eroded by more than 25% unless the respective Claim Notice has been delivered to the Insurer:

(i)      prior to the relevant Expiration Date to which the Claim Notice relates; or

(ii)     no later than 30 Business Days after the relevant Expiration Date to which the Claim Notice relates if the Insureds first became aware of the matter set out in the Claim Notice in the 30 Business Day period prior to such relevant Expiration Date.

**7.5    Loss subsequent to Claim Notice**

If a Claim Notice pursuant to Clause 7.2 is delivered to the Insurer by the Insureds within the periods stated in Clause 7.4, then any subsequent Loss arising out of the matters identified in such Claim Notice shall be deemed notified to the Insurer by that Claim Notice.

**7.6    Insurer's response**

As soon as reasonably practicable after the Insurer receives a Claim Notice, but in no event more than sixty (60) days thereafter, the Insurer shall respond by acknowledging or denying the claimed Loss or the claimed erosion of the Retention or if the Insurer is not in a position to determine on the information available a final cover position then the Insurer shall request such additional information as it may reasonably require from the Insureds. The Insurer shall use commercially reasonable efforts to respond to any Claim Notice in a manner which provides the Insureds sufficient time to satisfy any litigation deadlines of which the Insurer is made aware that relate to the subject matter of the Claim Notice.

**7.7    Cooperation Clause**

The Insurer, at its sole cost and expense, shall be entitled to participate fully in the defense negotiation and settlement of any Loss, such that the Insureds shall, and shall cause each of their Controlled Entities to, as applicable (without limitation):

(i)      to the extent reasonably permitted by the circumstance, not incur any defense costs without the prior written consent of the Insurer (such consent not to be unreasonably withheld, conditioned or delayed);

(ii)     not settle, compromise or discharge any Breach or Loss without the prior written consent of the Insurer (such consent not to be unreasonably withheld, conditioned or delayed); provided that such consent shall not be required with respect to any



    settlement, compromise or discharge that does not exceed 25% of the remaining Retention;

(iii)    to the extent reasonably practicable and upon the Insurer's reasonable written request, provide the Insurer with copies of all correspondence and documentation in the possession or control of the Insureds in connection with the claim at the Insurer's sole cost and expense and to the extent possible afford the Insurer sufficient time in which to review such documentation, provided the Insurer shall cooperate in good faith with the Insureds to ensure and preserve the privileged or confidential status of any information shared or communication in connection with this Policy;

(iv)    to the extent reasonably practicable and upon the Insurer's reasonable written request, grant the Insurer reasonable access to any documentation and information of the Insured Group relevant to the Loss and grant the Insurer reasonable access to the respective directors, officers, employees, counsel and other representatives of each member of the Insured Group during normal business hours and in reasonable locations;

(v)    keep the Insurer reasonably informed of proposed meetings with the Sellers or any other relevant third party in connection with any Loss and allow the Insurer to attend such meetings and, where it is impractical for the Insurer to attend provide the Insurer with the ability to attend such meeting via videoconference or other telecommunication methods;

(vi)    with respect to any Third Party Demand:

    (A) that is reasonably anticipated to exceed 50% of the then remaining Retention; or

    (B) in the event the Retention has been satisfied

    conduct all negotiations and proceedings in respect of any Third Party Demand with advisors consented to by the Insurer in writing (such consent not to be unreasonably withheld, conditioned or delayed); and

(vii)    provide the Insurer with such other information and assistance in connection with (a) any Loss, (b) any Third Party Demand or (c) any subrogation action per Clause 9 as the Insurer may reasonably request.

**7.8**    **[Intentionally Omitted]**

**7.9**    **No duty to defend**

The Insurer does not assume any duty to defend the Insureds with respect to any lawsuit.

**8**    **ADDITIONAL OBLIGATIONS OF THE INSURED**

**8.1**    **Mitigation and preservation of rights**

Subject to Section 3.2, the Insureds or any Controlled Entity of the Insureds, as applicable shall take all commercially reasonable steps to mitigate any Loss as required by law. The Insureds or any Controlled Entity of the Insureds, as applicable, shall take all commercially reasonable steps to preserve all rights against any other person in respect of any Loss and to preserve the Insurer's subrogation rights with respect thereto, subject to Sections 3.2 and 9.2.

**8.2**    **Maintenance of records**

Until the later of 60 Business Days after (i) the expiration of the Policy Period that is last to expire or (ii) the final resolution of all claims or disputes relating to this Policy, the Insureds



shall, and shall cause each of its Controlled Entities to, maintain all material documentation in its possession relating to the due diligence and consummation of the transaction documented in the Acquisition Agreement in accordance with the Insured's then existing record retention policy.

8.3 **Failure to comply**

Any inadvertent failure to comply with Clauses 7 (other than 7.4), 8.1 and 8.2 shall not relieve the Insurer of its obligations under this Policy, however, the Insurer shall be entitled to reduce the amount of Loss that would otherwise be payable, or that would otherwise reduce the Retention, under this Policy to reflect the extent to which the Insurer establishes that its position has been materially and adversely affected thereby.

8.4 **Reimbursements**

The Insureds shall reimburse to the Insurer any amount paid by the Insurer in connection with this Policy:

(i)     which is finally agreed or determined by an arbitrator or court did not constitute Loss or was excluded under this Policy; and/or

(ii)    any Recovered Amount which the Insureds or their Controlled Entities subsequently obtain.

Any such reimbursement shall be made promptly but in no event later than 20 Business Days after such agreement, determination or receipt. Notwithstanding anything to the contrary contained in this Section 8.4(ii), to the extent that the Policy limit is exceeded, the Insureds shall not be required to reimburse the Insurer as provided herein for any amounts in excess of the amount such Loss exceeded the Limit of Liability.

The Limit of Liability hereunder shall be replenished in an amount equal to any reimbursement paid to the Insurer pursuant to this Section 8.4.

9 **SUBROGATION**

9.1 **Right to subrogate**

If the Insurer makes any payment to the Insureds under this Policy then, subject to Clause 9.2, the Insurer shall be subrogated to the respective rights of recovery of any member of the Insured Group against any person or entity in respect of such Loss.

9.2 **Subrogation against the Sellers**

The Insurer shall only be entitled to exercise rights of subrogation against the Sellers if the Loss arose in whole or part out of the intentional and knowing fraud of the Sellers.

9.3 **Distribution of subrogation proceeds**

Any amounts recovered by the Insurer as a result of the exercise of subrogation rights shall be applied in the following order: first, to reimburse the Insurer for any costs and expenses incurred in connection with such recovery; secondly, to reimburse the Insureds for any Loss borne by them in excess of the Limit of Liability under this Policy; thirdly, to reimburse the Insurer in respect of any Loss which the Insurer has paid under this Policy; and fourthly, to reimburse the Insureds in respect of any Loss which the Insureds have retained by reason of the Retention.



Project Dos Equis
Policy No. 0309-5478

9.4   **Costs of defending claim**

The Insureds shall defend at their own expense and be liable for any counterclaim or Third Party Demand asserted in connection with any subrogation claim pursued by the Insurer, unless such counterclaim or Third Party Demand arises out of the same or reasonably related facts and allegations as the subrogation claim or would itself be or lead to a Breach.

## 10   OTHER PROVISIONS

10.1   **Acquisition Agreement**

The Insured shall not effect or give any waiver, consent, amendment or assignment under the Acquisition Agreement without first obtaining the consent of the Insurer (such consent not to be unreasonably withheld, conditioned or delayed) if such proposed waiver, consent, amendment or assignment would reasonably be expected to materially and adversely affect the Insurer's rights or liability under this Policy. The Insurer shall be entitled to withhold its consent or limit its liability under this Policy in respect of any such proposed waiver, consent, amendment or assignment which would reasonably be expected to materially and adversely affect the Insurer's rights or liability under this Policy.

10.2   **Renewal and Cancellation**

This Policy is non-renewable.

This Policy is non-cancellable, except in the event the Insured fails to pay the Premium within 10 Business Days after receiving written notice from the Insurer that the Premium has not been paid within the time period specified in Section 2.1(i).



10.3 **Assignment of Policy**

The Insured may without the prior written consent of the Insurer:

(i)     assign any or all of its interest in the proceeds of this Policy to a Controlled Entity of the Insured; or

(ii)    assign any of its rights or interest or transfer its obligations under this Policy to any person that acquires, directly or indirectly, more than 50% of the voting interest of the capital stock of the Insured or all or substantially all of the assets of the Insured.

The Insured may without the prior written consent of the Insurer assign any or all of its interest in the proceeds of this Policy to any bank(s) and/or holders of debt securities and/or financial institution(s) and/or hedge counterparties and/or any other person lending money or making other banking facilities available to any member of the Insured Group (including without limitation for purposes of creating a security interest herein or otherwise assigning as collateral), provided that the Insured delivers an assignment notice to the Insurer in the substance of the form set out in Appendix B.

Other than set out above, the Insured may not assign any of its rights or interest nor transfer its obligations under this Policy without the prior written consent of the Insurer (such consent not to be unreasonably withheld, conditioned or delayed).

The Insurer may without consent assign any of its rights or interests or transfer its obligations under this Policy to another insurer that is a Controlled Entity of the Insurer, provided that such other insurer's financial strength rating (Moody's or Standard & Poor's) is equal to or better than that of the Insurer at the time of such assignment.

Any purported assignment or transfer in violation of this Clause 10.4 will be null and void.

10.4 **Variation**

No term of this Policy may be amended or waived without a prior written endorsement or other instrument duly signed by the Insurer and the Named Insured.

10.5 **Entire Agreement**

This Policy constitutes the entire agreement between the Insurer and the Insured concerning the subject matter of this Policy and supersedes any previous agreement, oral or written, between the parties concerning the subject matter of this Policy.  Nothing in this Clause 10.6 shall exclude or limit any liability or any right which any party may have in respect of any statements made fraudulently or dishonestly prior to the date of this Policy.

10.6 **Counterparts**

This Policy may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each



such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

### 10.7 Invalidity

If any provision of this Policy is or becomes invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of any other provision shall not be affected or impaired in any way.

### 10.8 Notices

All Claims Notices and any other notice or communication under this Policy shall be made in writing and signed on behalf of the party giving it. It shall be served either by hand, by fax, email (for notices to the Insurer), recognized overnight courier or by mail and shall be deemed served:

    (i)    if by hand, when delivered;

    (ii)    if by fax or email, at the time of transmission (provided a subsequent copy is sent by registered mail or recognized overnight courier within 48 hours of the fax);

    (iii)    if by recognized overnight courier, on the Business Day after delivery to such courier, and

    (iv)    if by registered mail, 48 hours after mailing.

Each such notice or communication shall be delivered (x) if to the Named Insured, at the address or fax number stated in Item 1 of the Declarations and (y) if to the Insurer, at the address, fax number or email address set forth in the Declarations.

### 10.9 OFAC

If coverage for any Loss under this Policy is in violation of any United States of America economic or trade sanction, including sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), then coverage for that Loss shall be null and void.

### 10.10 Other Insurance

The Insureds shall, or, if applicable, to the extent practicable shall cause their respective Affiliates to, maintain or purchase insurance coverage for the acquired business in a commercially reasonable manner, as determined by the board of directors of the Insured. The Named Insured shall discuss with the Insurer, at Insurer's reasonable request, whether any bond, indemnity or other insurance policy is applicable or available with respect to the matters described in any Claim Notice. The Insureds shall be required to seek recovery under any other valid and collectible insurance policy for Loss covered by such other insurance policy; provided, however, that this obligation shall not preclude the Insureds from making a claim for Loss or Third Party Demand under this Policy. Nothing herein shall be construed to make this Policy subject to the terms, conditions or limitations of other insurance.

## 11   GOVERNING LAW AND ARBITRATION

### 11.1 Governing law

This Policy shall be governed by and construed in accordance with Delaware law, without giving effect to its conflict of laws, rules or principles.



**11.2   Dispute resolution**

Any dispute arising out of or in connection with this Policy which cannot be otherwise resolved by the Insurer and the Insureds, shall be referred to and finally resolved by binding arbitration conducted in accordance with the American Arbitration Association's ("AAA") then-prevailing Commercial Arbitration Rules except as modified herein; provided, however, that the Insurer and Insured acknowledge and agree that any related disputes which both actually or potentially impact this Policy shall be heard together and by the same panel of arbitrators and all matters decided simultaneously.

**11.3   Appointment of arbitrators**

It is agreed that:

(i)      the place of the arbitration shall be New York;

(ii)     the arbitral tribunal shall consist of three members, unless all parties agree otherwise;

(iii)    the arbitrator(s) shall be disinterested, shall have knowledge of the legal, financial, corporate and insurance issues relevant to the matters in dispute and shall otherwise be chosen in the manner provided in such commercial arbitration rules;

(iv)    the Insurer shall appoint one arbitrator and the Insured shall appoint one arbitrator. If either the Insurer or the Insured do not appoint an arbitrator within 20 Business Days of being required to do so by the other, the AAA shall appoint such arbitrator on behalf of such party;

(v)     the third arbitrator shall be the chairman and shall be appointed by agreement of the two party-appointed arbitrators within 20 Business Days of the second arbitrator being appointed.   If the third chairman is not so appointed within the 20 Business Day period, the AAA shall appoint the chairman with such qualifications;

(vi)    the costs and expenses of the arbitration shall be borne by the Insurer and the Insured as ordered by the arbitration tribunal, based on the relative success of the Insurer and the Insured.  Such legal costs and expenses will not be part of the Loss payable by the Insurer;

(vii)   any written arbitration demand can be delivered to a party as set forth in Section 10.9 herein; and

(viii)  any party may enforce an arbitration award in a court of competent jurisdiction.

**12   SERVICE OF SUIT CLAUSE**

Subject to the Insurer's and the Insureds' obligation to settle disputes by binding arbitration pursuant to Section 11 of this Policy, in the event of failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer, at the request of the Insureds, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Service of process in such suit may be made upon counsel, Legal Department, Allied World Surplus Lines Insurance Company, 1690 New Britain Avenue, Suite 101, Farmington, CT 06032, or his or her representative, and that in any suit instituted against the Insurer upon this Policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.



Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insureds or any beneficiary hereunder arising out of this Policy and hereby designates the above named Counsel as the person to whom such officer is authorized to mail such process or a true copy thereof.



**Appendix A**
**No Claims Declaration**

*[On the Insured's letterhead]*

Allied World Surplus Lines Insurance Company
199 Water Street
New York, NY 10038
Fax: (646) 794-0611

To Whom It May Concern:

**Project Dos Equis**
**Policy No. 0309-5478**

**No Claims Declaration**

1       On behalf of the Insureds, I acknowledge, solely in my capacity as an Authorized Representative of the Insureds, that this No Claims Declaration is required to be given in relation to the representation and warranty insurance policy, Policy No. 0309-5478 issued by Allied World Surplus Lines Insurance Company to the Insureds. Capitalized terms in this No Claims Declaration shall have the respective meanings assigned to them in the Policy.

2       The undersigned, solely in his capacity as an Authorized Representative of the Insureds, declares as follows:

(i)       The Acquisition Agreement, together with the schedules and exhibits attached thereto, and any agreements referred to therein, represents as of the date hereof the material documents executed and delivered by the parties thereof concerning the matters described therein;

3       I declare as follows:

(i)       I have read and understand the Acquisition Agreement and the Due Diligence Reports;

(ii)       I do not have Actual Knowledge of any Breach; and

(iii)       so far as I am aware, having made inquiry of each other Transaction Team Member, and having confirmed that each Transaction Team Member has read and understands the Acquisition Agreement and Due Diligence Reports, no Transaction Team Member has Actual Knowledge of any Breach.

I, on behalf of the Insureds, acknowledge that the Policy referenced above excludes any Loss to the extent arising out of the substantive content of any material inaccuracy in this No Claims Declaration or any disclosed Breach.

Sign Name:       _____

Print Name:       _____

Date:

# ◆ MOSAIC INVESTMENTS

1707 Mt. Vernon Road, Suite C
Atlanta, GA 30338
770 609 8195 • info@mosaic-inv.com

**Appendix A-1**

**No Claims Declaration**

Allied World Surplus Lines Insurance Company
199 Water Street
New York, NY 10038
Fax: (646) 794-0611

To Whom It May Concern:

**Project Dos Equis**
**Policy No. [•]**

**No Claims Declaration**

1       On behalf of the Insureds, I acknowledge, solely in my capacity as an Authorized Representative of the Insureds, that this No Claims Declaration is required to be given in relation to the representation and warranty insurance policy, Policy No. [•] issued by Allied World Surplus Lines Insurance Company to the Insureds. Capitalized terms in this No Claims Declaration shall have the respective meanings assigned to them in the Policy.

2       The undersigned, solely in his capacity as an Authorized Representative of the Insureds, declares as follows:

(i)       The Acquisition Agreement, together with the schedules and exhibits attached thereto, and any agreements referred to therein, represents as of the date hereof the material documents executed and delivered by the parties thereof concerning the matters described therein;

3       I declare as follows:

(i)       I have read and understand the Acquisition Agreement and the Due Diligence Reports;

(ii)       I do not have Actual Knowledge of any Breach; and

(iii)       so far as I am aware, having made inquiry of each other Transaction Team Member, and having confirmed that each Transaction Team Member has read and understands the Acquisition Agreement and Due Diligence Reports, no Transaction Team Member has Actual Knowledge of any Breach.

I, on behalf of the Insureds, acknowledge that the Policy referenced above excludes any Loss to the extent arising out of the substantive content of any material inaccuracy in this No Claims Declaration or any disclosed Breach.

Sign Name: _____
Print Name:       Murad Karimi
Date:       04/17/2015



**Form of Assignment**

[*Date*]

To:

Allied World Surplus Lines Insurance Company
199 Water Street
New York, NY 10038
Fax: (646) 794-0611

Dear Sirs,

Re: Representation and Warranty Insurance Policy No. 0309-5006 (the **Policy**)

We inform you that we have assigned to • (the **Finance Parties**) being represented by • as [facility agent/security trustee] (the **Facility Agent**) all our rights relating to payment of all and any proceeds received by or due to us under the Policy.

Payment of any proceeds under the Policy to the [Facility Agent] constitutes full discharge of your obligations in respect thereof to the Insured.

We kindly request that you confirm your receipt and acknowledgement of the above by returning signed copies of this notification to us and the [Facility Agent].

Yours sincerely

_____
[*Details*]

To: The Insured
To: The Facility Agent

We acknowledge receipt of the above letter and confirm that we will pay any and all proceeds payable by us to the Insureds under the Policy to such account as notified to us by the Facility Agent from time to time.

Payment of proceeds under the Policy to the Facility Agent constitutes full discharge of our obligations in respect thereof to the Insured.

_____
Signed by
For and on behalf of Allied World Surplus Lines Insurance Company

Date:



**Appendix C**

**Acquisition Agreement and Disclosure Schedules**

EXECUTION COPY

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**By and Among**

**XPRESS GLOBAL SYSTEMS, LLC**

**XPRESS HOLDINGS, INC.**

**U.S. XPRESS ENTERPRISES, INC.**

**and**

**XGS ACQUISITION, LLC**

**Dated as of April 13, 2015**

**TABLE OF CONTENTS**

**Page**

**ARTICLE I   SALE AND TRANSFER OF INTERESTS; CLOSING**..................1
   Section 1.1   Sale and Transfer of Interests...............1
   Section 1.2   Consideration........................1
   Section 1.3   Closing..........................2
   Section 1.4   Closing Deliveries.....................2
   Section 1.5   Adjustments and Procedures.................4
   Section 1.6   Conversion.........................6
   Section 1.7   Allocation of Purchase Price................6
**ARTICLE II   REPRESENTATIONS AND WARRANTIES OF THE MEMBER AND THE
   PARENT**..............................7
   Section 2.1   Organization and Good Standing..............7
   Section 2.2   Authorization and Validity.................7
   Section 2.3   Capitalization.......................7
   Section 2.4   Subsidiaries; Partnerships; Joint Ventures.........8
   Section 2.5   No Violation........................8
   Section 2.6   Title............................8
   Section 2.7   Finder's Fee........................8
   Section 2.8   Consents..........................8
   Section 2.9   Financial Statements....................8
   Section 2.10   Minute and Interests Record Books.............9
   Section 2.11   Properties; Encumbrances..................9
   Section 2.12   Condition and Sufficiency of Assets............9
   Section 2.13   No Undisclosed Liabilities.................9
   Section 2.14   Taxes...........................10
   Section 2.15   Intentionally Omitted...................11
   Section 2.16   No Materially Adverse Change...............11
   Section 2.17   Employee Benefits.....................11
   Section 2.18   Compliance with Legal Requirements; Governmental Authorizations ..13
   Section 2.19   Legal Proceedings; Orders.................14
   Section 2.20   Absence of Certain Changes and Events..........14
   Section 2.21   Contracts; No Defaults..................16
   Section 2.22   Insurance.........................17
   Section 2.23   Environmental Matters...................18
   Section 2.24   Labor Relations; Compliance................18
   Section 2.25   Intellectual Property...................19
   Section 2.26   Tractors and Trailers; Compliance.............19
   Section 2.27   Relationships with Related Persons............20
   Section 2.28   Bank Accounts.......................20
   Section 2.29   Receivables........................20
   Section 2.30   Inventory.........................21
   Section 2.31   Certain Practices.....................21
   Section 2.32   Disclosure by Member...................21
**ARTICLE III   REPRESENTATIONS AND WARRANTIES OF BUYER**.........21
   Section 3.1   Organization and Good Standing..............21
   Section 3.2   Authorization and Validity.................21
   Section 3.3   No Violation........................21
   Section 3.4   Finder's Fee........................22

Section 3.5      Consents..................................................................................22
Section 3.6      Investment Representations ...................................................22
Section 3.7      Buyer's Independent Investigation .........................................22
ARTICLE IV    ADDITIONAL AGREEMENTS.................................................22
Section 4.1      Certain Tax Matters................................................................22
Section 4.2      Certain Understandings..........................................................23
Section 4.3      No Funded Indebtedness........................................................24
Section 4.4      Lease Agreements..................................................................24
Section 4.5      Contribution ...........................................................................24
Section 4.6      Assignment and Assumption ..................................................24
Section 4.7      Further Assurances.................................................................24
Section 4.8      Compliance with Company's Existing Non-Compete Agreement ........24
Section 4.9      Removal of Member as Guarantor..........................................25
ARTICLE V    INDEMNIFICATION; REMEDIES .............................................25
Section 5.1      Survival...................................................................................25
Section 5.2      Indemnification and Payment of Damages by the Member
                 and the Parent .........................................................................25
Section 5.3      Tax Indemnification................................................................26
Section 5.4      Indemnification and Payment of Damages by Buyer .............26
Section 5.5      Procedure for Indemnification – Third Party Claims..............27
Section 5.6      Procedure for Indemnification – Other Claims.......................27
Section 5.7      Limitations on Claims.............................................................27
Section 5.8      Exclusive Remedy .................................................................29
ARTICLE VI   NONCOMPETITION ..................................................................30
Section 6.1      Consideration ........................................................................30
Section 6.2      Scope......................................................................................30
Section 6.3      Severability ...........................................................................30
Section 6.4      Relief......................................................................................30
ARTICLE VII  MISCELLANEOUS ....................................................................31
Section 7.1      Amendment and Waiver .........................................................31
Section 7.2      Assignment; Third-Party Rights.............................................31
Section 7.3      Notice.....................................................................................31
Section 7.4      Public Announcements ..........................................................32
Section 7.5      Entire Agreement ..................................................................32
Section 7.6      Transaction Expenses; Transfer Taxes ..................................32
Section 7.7      Further Assurances.................................................................32
Section 7.8      Severability ...........................................................................32
Section 7.9      Governing Law ......................................................................32
Section 7.10     Interpretation.........................................................................32
Section 7.11     Counterparts...........................................................................33
Section 7.12     Number and Gender...............................................................33
Section 7.13     Time of Essence ....................................................................33
Section 7.14     Waiver; Remedies Cumulative ..............................................33
Section 7.15     Consent to Jurisdiction..........................................................33

| Exhibit | Description |
|---------|-------------|
| A | Definitions |
| B | Form of Transition Services Agreement |
| C | Form of Member Release |
| D | Operating Agreement of Buyer |
| E | Form of Lease Agreement |

| | |
|---|---|
| F | Form of Oklahoma Sublease Agreement |
| G-1 | Form of Trademark Contribution Agreement |
| G-2 | Form of Bill of Sale |
| H | Member Disclosure Schedule |
| I | Escrow Agreement |

| **Schedule** | **Description** |
|---|---|
| 1.2(a) | Closing Payment Instructions |
| 1.4(a)(i) | Jurisdictions |
| 1.5(a)(iv) | Excluded Assets |
| 1.5(a)(v) | Excluded Liabilities |
| 2.3(a) | Capitalization |
| 2.3(b) | Liens |
| 2.4 | Subsidiaries |
| 2.5 | No Violation |
| 2.7 | Finder's Fee |
| 2.8 | Consents |
| 2.9 | Financial Statements |
| 2.11(a) | Real Property |
| 2.11(b) | Exceptions to Real Property |
| 2.11(c) | Material Assets |
| 2.11(d) | Sublet Real Property |
| 2.12 | Condition and Sufficiency of Assets |
| 2.13 | Undisclosed Liabilities |
| 2.14(a) | Exceptions to Tax Returns and Taxes Paid |
| 2.14(b) | List of Tax Returns; Information Regarding Audits |
| 2.14(c) | Potential Tax Liabilities |
| 2.16 | No Materially Adverse Change |
| 2.17(a) | Benefit Plans |
| 2.17(b) | ERISA Affiliates |
| 2.17(d) | Noncompliance of Benefit Plans |
| 2.18(a) | Compliance with Legal Requirements |
| 2.18(b) | Governmental Authorizations |
| 2.19(a) | Legal Proceedings |
| 2.19(c) | Orders |
| 2.20 | Absence of Certain Changes and Events |
| 2.21(a) | Material Contracts |
| 2.21(b) | Invalid/Unenforceable Contracts |
| 2.21(c) | Defaults or Conflicts under Material Contracts |
| 2.22(a) | Insurance Policies |
| 2.22(b) | Agreements Reflecting the Allocation of Insurance |
| 2.23 | Environmental Matters |
| 2.24 | Employee Severance and Similar Agreements |
| 2.25(a) | Company Intellectual Property |
| 2.25(b) | Excepted Company Intellectual Property |
| 2.25(c) | Employee Intellectual Property Agreements |
| 2.26(a) | Exception to Tractors and Trailers |
| 2.26(b) | Tractors and Trailers |
| 2.27 | Relationships with Related Persons |
| 2.28 | Bank Accounts |

2.29(a)          Accounts Receivable
2.29(b)          Status of Receivables
2.30             Inventory
4.3              Funded Indebtedness

<u>**MEMBERSHIP INTEREST PURCHASE AGREEMENT**</u>

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of April 13, 2015, is made and entered into by and among Xpress Global Systems, LLC, a Georgia limited liability company (the "Company"), Xpress Holdings, Inc., a Nevada corporation and the sole member of the Company (the "Member"), U.S. Xpress Enterprises, Inc., a Nevada corporation and the parent company of the Member (the "Parent"), and XGS Acquisition, LLC, a Delaware limited liability company ("Buyer"). The Company, the Member, the Parent, and the Buyer are sometimes individually referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used herein will have the meanings ascribed to such terms in Exhibit A attached hereto or as elsewhere defined in this Agreement.

<u>**RECITALS**</u>

WHEREAS, the Member owns, and is the holder of, all of the issued and outstanding equity interests of the Company; and

WHEREAS, Buyer desires to purchase from the Member, and the Member desires to sell and transfer to Buyer, one hundred percent (100%) of the outstanding membership interests of the Company (the "Interests"), subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, and covenants herein contained, and on the terms and subject to the conditions herein set forth, the Parties hereto, intending to be legally bound, hereby covenant and agree as follows:

**ARTICLE I**
**SALE AND TRANSFER OF INTERESTS; CLOSING**

Section 1.1     <u>Sale and Transfer of Interests</u>.

(a)     <u>Sale and Transfer</u>.  Subject to and upon the terms and conditions of this Agreement, at the Closing, the Member will sell and transfer the Interests to Buyer, and Buyer will purchase the Interests from the Member.

(b)     <u>Excluded Assets and Excluded Liabilities</u>.  Notwithstanding anything to the contrary contained in this Agreement, immediately prior to the Closing, Company shall assign the Excluded Liabilities and the Excluded Assets to the Member and the Member will retain sole responsibility for all such Excluded Liabilities and Excluded Assets.  Member shall enter into an assignment and assumption agreement with the Company effective immediately prior to the Closing to assume the Excluded Liabilities and Excluded Assets.

Section 1.2     <u>Consideration</u>.

(a)     <u>Purchase Price</u>.  The aggregate consideration for the Interests sold under Section 1.1 (the "Purchase Price") will be an amount equal to $33,207,740, subject to adjustment as provided in Section 1.5, plus the issuance by Buyer to Member of 100,000 Class A Units of Buyer, which shall represent a 10% interest in the Buyer and 50,000 redeemable preferred Class B Units of Buyer, which shall be non-voting units entitled to certain preferred distributions as described in Section 1.4(a)(vi) below (collectively, the "Units")  At or prior to the Closing, the Member will cause the Company to distribute any available cash to the Member to the extent that the Company's working capital at Closing is in excess of Benchmark Adjusted Working Capital. The Purchase Price will be paid to Member at Closing, by wire

transfer of immediately available funds in accordance with the instructions set forth on Schedule 1.2(a) of the Member Disclosure Schedule.

(b)    Post-Closing True-Up.  Within 75 days of Closing, following final determination of the Working Capital Adjustment Amount in accordance with Section 1.5(a)(viii), the Parties will jointly execute a written certification of the Purchase Price and the Working Capital Adjustment Amount will be paid by wire transfer of immediately available funds in accordance with the procedures set forth in Section 1.5(a)(viii).

Section 1.3    Closing.  Subject to and upon the terms and conditions of this Agreement, the closing of the purchase and sale of the Interests (the "Closing") will take place at the offices of Carlton Fields Jorden Burt, One Atlantic Center, 1201 W. Peachtree Street N.W., Suite 3000, Atlanta, Georgia 30309, and the offices of the Company at 1537 New Hope Church Road, Tunnel Hill Georgia 30755, or by email or facsimile contemporaneously with the execution and delivery of this Agreement. The Member and the Parent will deliver their executed signature pages in Georgia. The date on which the Closing occurs is referred to herein as the "Closing Date." The Closing shall be effective as of 11:59:59 p.m., Eastern Time, on the Closing Date (the "Effective Time").

Section 1.4    Closing Deliveries.

(a)    Documents to be Delivered by the Company and the Member.  The Company and the Member, as the case may be, will deliver or cause to be delivered the following documents to Buyer at the Closing, each in form and substance reasonably satisfactory to Buyer:

(i)    A certificate of the secretary or assistant secretary of the Company, certifying as to (A) a copy of the articles of organization of the Company certified by an appropriate authority of the jurisdiction of its organization and dated not earlier than thirty (30) days prior to the Closing Date, (B) a copy of the resolutions of the board of managers and members of the Company approving and authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which the Company is a party, and the consummation of the Contemplated Transactions, (C) incumbency and signatures of each of the Company's officers who is authorized to execute and deliver this Agreement and any of the other Transaction Documents, and (D) certificates of good standing and legal existence of the Company's predecessor in each jurisdiction set forth on Schedule 1.4(a)(i) of the Member Disclosure Schedule, dated not earlier than thirty (30) days prior to the Closing Date;

(ii)    A certificate of the secretary or assistant secretary of the Member, certifying as to (a) a copy of the Articles of Incorporation of the Member certified by an appropriate authority of the jurisdiction of its organization and dated not earlier than thirty (30) days prior to the Closing Date, (B) a copy of the resolutions of the Board of Directors of the Member approving and authorizing the execution, delivery, and performance of this Agreement and all other Transaction Documents to which the Member is a party, and the consummation of the Contemplated Transactions, and (C) incumbency and signatures of each of the Member's officers who is authorized to execute and deliver this Agreement and any of the other Transaction Documents;

(iii)    Copies of all third party Consents that are required under Material Contracts and Governmental Authorizations that the Company is required to obtain in order to effect the Contemplated Transactions, excluding Consents with respect to Leased Real Property and customer Contracts.

2

(iv)     A duly executed copy of a transition services agreement, in the form attached hereto as Exhibit B (the "Transition Services Agreement");

(v)     A general release of claims arising prior to the Closing against the Company, in the form attached hereto as Exhibit C (the "Member Release"), executed by the Member and the Parent;

(vi)     A duly executed copy of the operating agreement of Buyer, providing Member an amount equal to $5,000,000 in redeemable preferred Class B Units with a tenure of 5.5 years with a current cash pay coupon rate of five percent (5%), a preferred principal return of $400,000 annually and a liquidation preference of $5,000,000 (the "Preferred Equity") and ten percent (10%) of the Class A Units, attached hereto as Exhibit D (the "Operating Agreement");

(vii)     The minute books and record books of the Company;

(viii)     A duly executed copy of the Lease Agreement from Member's Affiliate;

(ix)     A duly executed copy of the Contribution Agreement;

(x)     Duly executed copies of Assignment and Assumption Agreements;

(xi)     Executed resignations of the managers and officers of the Company;

(xii)     A duly executed copy of the Oklahoma Sublease Agreement from Member's Affiliate;

(xii)     An Assignment and Assumption Agreement transferring the Excluded Liabilities and Excluded Assets to the Member; and

(xiii)     Such other documents as Buyer may reasonably request in connection with the Contemplated Transactions.

(b)     Documents to be Delivered by Buyer.  Buyer will deliver the following documents to the Member at Closing, each in form and substance satisfactory to the Member:

(i)     A certificate of the secretary or assistant secretary of Buyer, certifying as to (A) a copy of the resolutions of the board of managers of Buyer, approving and authorizing the execution, delivery, and performance of this Agreement and the other Transaction Documents to which it is a party and the consummation of the Contemplated Transactions, and (B) incumbency and signatures of each of the Buyer's officers who is authorized to execute and deliver this Agreement and such other Transaction Documents;

(ii)     Copies of all material third party Consents and Governmental Authorizations that Buyer is required to obtain in order to effect the Contemplated Transactions;

(iii)     An escrow agreement in favor of Member's consolidated group in a form acceptable to Member and otherwise adequately securing the Insurance Claims in an amount not to exceed $1,500,000, in the form attached hereto as Exhibit I;

(iv)     The Transition Services Agreement, executed by and on behalf of Buyer;

3

(v)       The Lease Agreement, executed by and on behalf of Buyer;

(vi)      A duly executed copy of the Operating Agreement;

(vii)     A duly executed copy of the Oklahoma Sublease Agreement; and

(viii)    Such other documents as the Member may reasonably request in connection with the Contemplated Transactions.

Section 1.5     <u>Adjustments and Procedures</u>.

(a)     <u>Definitions</u>.  The following terms will have the meanings set forth below:

(i)      "Adjusted Working Capital" means, as of a given date, an amount equal to (A) the current assets of the Company (excluding cash and Excluded Assets) set forth on the applicable balance sheet of the Company as of such date, minus (B) the current liabilities of the Company (excluding Debt, Tax accruals, purchase accounting adjustments, and Excluded Liabilities) set forth on the applicable balance sheet of the Company as of such date, in each case prepared in accordance with the standards required in Section 1.5(c).

(ii)     "Benchmark Adjusted Working Capital" means $1,850,000.00.

(iii)    "Closing Adjusted Working Capital" means an amount equal to (A) the Adjusted Working Capital reflected on the Closing Balance Sheet prepared pursuant to Section 1.5(c), plus (B) the amount of cash reflected on the Closing Balance Sheet.

(iv)    "Excluded Assets" means those assets set forth in Schedule 1.5(a)(iv) of the Member Disclosure Schedule.

(v)     "Excluded Liabilities" means those liabilities set forth in Schedule 1.5(a)(v) of the Member Disclosure Schedule.

(vi)    "Pre-Closing Adjusted Working Capital" means an amount equal to (A) the Adjusted Working Capital reflected on the Pre-Closing Balance Sheet prepared pursuant to Section 1.5(b), plus (B) the amount of cash reflected on the Pre-Closing Balance Sheet less the amount of any cash the Company expects to distribute at or prior to Closing.

(vii)    "Pre-Closing Working Capital Adjustment Amount" will be determined as follows:

(aa) if the Pre-Closing Adjusted Working Capital is greater than Benchmark Adjusted Working Capital, the Purchase Price will be increased by a dollar amount equal to the difference between the Pre-Closing Adjusted Working Capital and the Benchmark Adjusted Working Capital; or

(bb) if the Pre-Closing Adjusted Working Capital is less than the Benchmark Adjusted Working Capital, the Purchase Price will be decreased by a dollar amount equal to the difference between the Benchmark Adjusted Working Capital and the Pre-Closing Adjusted Working Capital; or

(cc) if the Pre-Closing Adjusted Working Capital is equal to the Benchmark Adjusted Working Capital, the Purchase Price will not be adjusted at the Closing in respect of the Pre-Closing Adjusted Working Capital.

(viii)   "Working Capital Adjustment Amount" will be determined as follows:

(aa) if Closing Adjusted Working Capital is greater than Pre-Closing Adjusted Working Capital, Buyer will pay to or on behalf of the Member in accordance with the instructions set forth on Schedule 1.2(a) of the Member Disclosure Schedule an amount equal to the difference between the Closing Adjusted Working Capital and the Pre-Closing Adjusted Working Capital; or

(bb) if Closing Adjusted Working Capital is less than the Pre-Closing Adjusted Working Capital, the Member will pay to or on behalf of the Buyer in accordance with the instructions provided by Buyer an amount equal to the difference between the Pre-Closing Adjusted Working Capital and the Closing Adjusted Working Capital; or

(cc)  if Closing Adjusted Working Capital is equal to the Pre-Closing Adjusted Working Capital, no payment will be required to be made pursuant to this Section 1.5(a)(viii).

(dd) In no event will any amount relating to the Closing Adjusted Working Capital or Pre-Closing Adjusted Working Capital be paid at Closing and any payments by the Member or by the Buyer hereunder relating to the Working Capital Adjustment Amount shall not be due or payable until final determination of the Closing Adjusted Working Capital as set forth herein.

(b)   Pre-Closing Balance Sheet Preparation.  The Member has prepared a balance sheet of the Company as of the latest practicable date before Closing (the "Pre-Closing Balance Sheet") in accordance with the standards required in Section 1.5(c) for the Closing Balance Sheet together with the Member's good faith estimate of any changes in estimated Working Capital between the date of the Pre-Closing Balance Sheet and the Closing Date and present to Buyer the Member's calculation of the Adjusted Working Capital as of such date.

(c)   Closing Balance Sheet Preparation and Adjustment Amount Determination. Member will prepare, or cause to be prepared, a balance sheet of the Company as of the Closing (the "Closing Balance Sheet") in accordance with GAAP and consistent with the methodology used by the Company in the preparation of the Interim Balance Sheet.  Member will then determine the Working Capital Adjustment Amount based upon the Closing Balance Sheet and will deliver the Closing Balance Sheet and its determination of the Working Capital Adjustment Amount (together with sufficient documentation and working papers to explain how such calculations were performed) to Buyer within thirty (30) days after the Closing Date.

(d)   Notice of Objections.  If, within thirty (30) days following delivery of the Closing Balance Sheet and Member's determination of the Working Capital Adjustment Amount, the Buyer has not given Member written notice of its objection ("Objection Notice") as to such calculation and determination, then the Working Capital Adjustment Amount calculated by Member will be binding and conclusive on the Parties and will be deemed finally determined for purposes of Section 1.2(b).

(e)      Resolution of Objections.   If the Buyer duly gives Member such Objection Notice, and if the Buyer and Member fail to resolve the issues set forth in such Objection Notice within thirty (30) days of Member's receipt of the Objection Notice, the Buyer and Member will submit the issues remaining in dispute to Cherry Bekaert, LLP, if Cherry Bekaert, LLP is not the then current auditor for Buyer, or Frazier and Deeter, LLC, if Cherry Bekaert, LLP is the then current auditor for Buyer, or such other independent accountants as the Buyer and Member may mutually identify (the "Independent Accountants") for resolution.  If issues are submitted to the Independent Accountants for resolution:

(i)      the Buyer and Member will each furnish, or cause to be furnished, to the Independent Accountants such work papers and other documents and information relating to the disputed issues as the Independent Accountants may request and are available to that Party or its agents;

(ii)      the Buyer and Member will each be afforded the opportunity to present to the Independent Accountants any material relating to the disputed issues and to discuss the issues with the Independent Accountants;

(iii)      the determination by the Independent Accountants, as set forth in a written notice to be delivered to both the Buyer and Member within sixty (60) days of the submission to the Independent Accountants of the issues remaining in dispute, will be final, binding, and conclusive on the Parties and will be used in the calculation of the Working Capital Adjustment Amount; and

(iv)      the Buyer, on one hand, and Member, on the other hand, will each bear fifty percent (50%) of the fees and costs of the Independent Accountants for such determination.

Section 1.6      Conversion. Prior to the Effective Time, the Member has taken all actions necessary in accordance with applicable Law to cause the Company to convert from a Georgia corporation to a Georgia limited liability company.

Section 1.7      Allocation of Purchase Price.  The Parties agree that the Purchase Price will be allocated among the assets of the Company for all purposes (including Tax and financial accounting) in accordance with Code § 1060 (the "Allocation").   A draft of an Allocation Schedule (the "Allocation Schedule") will be prepared by the Member and delivered to Buyer within sixty (60) days following the Closing Date. If the Buyer notifies Member in writing that it objects to one or more items reflected in the Allocation Schedule, the Member and Buyer will negotiate in good faith to resolve such dispute; *provided, however*, that if the Member and Buyer are unable to resolve any dispute with respect to the Allocation within (90) days following the Closing Date, such dispute will be resolved by the Independent Accountants in accordance with the same procedures as set forth in Section 1.5(e) above. The fees and expenses of such Independent Accountants will be borne equally by the Member and Buyer. Buyer and the Member will file all Tax Returns and information reports in a manner consistent with the Allocation Schedule. Any adjustments to the Purchase Price pursuant to Section 1.5 herein will be allocated in a manner consistent with the Allocation Schedule.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE MEMBER AND THE PARENT

The Member and the Parent, jointly and severally, hereby represent and warrant to Buyer as follows, except as set forth in the Member Disclosure Schedule, as of the date hereof:

Section 2.1     Organization and Good Standing.

(a)     The Company is duly organized, validly existing, and in good standing under the laws of the State of Georgia, with all requisite power and authority to carry on the business in which it is engaged, own the properties it owns, and execute, deliver, and perform this Agreement and the other Transaction Documents to which it is a party.  Prior to the Conversion, the Company was duly qualified to do business and was in good standing in each jurisdiction in which it was required to be so qualified except where failure to be so qualified would not have a Material Adverse Effect. A true, correct and complete list of the states and jurisdictions in which the Company as a corporation was so qualified to do business is set forth on Schedule 1.4(a)(i) of the Member Disclosure Schedule.

(b)     The Member has delivered to Buyer copies of the Organizational Documents of the Company as currently in effect.

Section 2.2     Authorization and Validity. The execution, delivery, and performance of this Agreement and the other Transaction Documents by the Company, the Member, and the Parent, and the consummation of the Contemplated Transactions, have been duly authorized, and no other proceedings or approvals are necessary to authorize the execution, delivery, and performance of this Agreement or consummation of the Contemplated Transactions by the Company, the Member, or the Parent.  This Agreement and each of the other Transaction Documents has been duly and validly executed and delivered by the Company, the Member, and the Parent (as appropriate) and constitutes legal, valid, and binding obligations of the Company, the Member, and the Parent (as appropriate), enforceable in accordance with their respective terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 2.3     Capitalization.

(a)     Schedule 2.3(a) of the Member Disclosure Schedule contains (i) a true and complete description of the number of authorized, issued, and outstanding equity interests and other securities of the Company, and (ii) a true and complete list of all holders of any record or beneficial equity interests and other securities of the Company.  All of the issued and outstanding equity interests of the Company, including the Interests, have been duly authorized and validly issued, and are fully paid and nonassessable.  Except for this Agreement and the other Transaction Documents, there are no outstanding warrants, options, Contracts, subscriptions, convertible or exchangeable securities, or other commitments pursuant to which the Company is or may become obligated to issue any equity interests of the Company or any other securities convertible, exchangeable, or exercisable for any such equity interests, and no equity securities of the Company are reserved for issuance for any purpose.

(b)     The Member beneficially owns and holds of record all of the Interests, free and clear of all Liens or other restrictions, other than Permitted Liens or as set forth on Schedule 2.3(b).  The Member is neither a party to, nor has Knowledge of, any Contracts or commitments relating to the voting, purchase, or sale of the Interests, other than this Agreement and the other Transaction Documents.

Section 2.4    Subsidiaries; Partnerships; Joint Ventures.  Except as set forth in Schedule 2.4 of the Member Disclosure Schedule, the Company does not have any subsidiaries and does not, directly or indirectly, beneficially own, and is not a party to or bound by any Contract to acquire, any capital stock of, or any other security, equity, ownership interest, debt investment or similar interest in, any other Person.

Section 2.5    No Violation.  Except as set forth in Schedules 2.5 or 2.8 of the Member Disclosure Schedule or, with respect to Section 2.5(d) and (e) as would not result in a Material Adverse Effect, neither the execution and performance of this Agreement and the other Transaction Documents, nor the consummation or performance of all of the transactions contemplated hereby or thereby (collectively, the "Contemplated Transactions") will, directly or indirectly (with or without notice or lapse of time or both) (a) contravene, conflict with, or result in a violation of (i) any provision of the Organizational Documents of the Company, or (ii) any resolution adopted by the board of managers or members of the Company; (b) contravene, conflict with, or result in a violation of any Legal Requirement or any Order to which the Company or Member may be subject; (c) contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Company or that otherwise relates to the business and operations of the Company; (d) contravene, conflict with, or result in a violation or Breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Material Contract other than for which a Consent permanently and irrevocably waiving such violation, Breach, default or other right or remedy that is identified on Schedule 2.8 of the Member Disclosure Schedule has been obtained prior to Closing; or (e) result in the imposition or creation of any material Lien upon or with respect to any of the assets owned by the Company or used in the business and operations of the Company.

Section 2.6    Title.  The Company has good and marketable title to, or a valid leasehold interest in, all of its assets, excluding the Excluded Assets, free and clear of any Liens except for Permitted Liens.

Section 2.7    Finder's Fee.  Except for the agreements between the Member and the Persons listed on Schedule 2.7 of the Member Disclosure Schedule, neither the Company nor the Member has incurred any obligation, contingent or otherwise, for any finder's, broker's, or agent's fee in connection with the Contemplated Transactions.

Section 2.8    Consents.  Except as set forth in Schedule 2.8 of the Member Disclosure Schedule or as would not result in a Material Adverse Effect, no Consent of, or filing with, any Person is required to authorize, or is required in connection with, the execution, delivery, and performance of this Agreement or the other Transaction Documents or the consummation by the Company or the Member of any of the Contemplated Transactions.

Section 2.9    Financial Statements.  Schedule 2.9 of the Member Disclosure Schedule sets forth (together with the related notes) (a) the unaudited balance sheet of the Company as at December 31, 2014 (the "Year-End Balance Sheet" and December 31, 2014 being the "Balance Sheet Date"), (b) the related statements of income for the fiscal year then ended (together with the Year-End Balance Sheet, the "Year-End Financial Statements"), (c) the unaudited balance sheet of the Company as at February 28, 2015 (the "Interim Balance Sheet"), and (d) the related statements of income and cash flows for the year-to-date period then ended (together with the Interim Balance Sheet, the "Interim Financial Statements"). The Year-End Financial Statements and the Interim Financial Statements (together, the "Financial Statements") fairly present in all material respects the financial condition and the results of operations and cash flows of the Company as at the respective dates of and for the periods referred to in such Financial

Statements, all in accordance with GAAP, subject, in the case of the Interim Financial Statements, to normal recurring year-end adjustments, in all cases, to the absence of notes, and deviations from GAAP set forth on Schedule 2.9 of the Member Disclosure Schedule.  The Financial Statements have been prepared from and are in accordance with the books and records of the Company, and represent bona fide transactions. All reserves on the Financial Statement for workers' compensation, automobile liability, and general liability claims are adequate to fully cover all liability with respect to such claims.

Section 2.10    Minute and Interests Record Books.  The minute books and equity interest record books of the Company, all of which have been made available to Buyer, are complete and current in all material respects.

Section 2.11    Properties; Encumbrances.

(a)    The Company does not own any real property.  Schedule 2.11(a) of the Member Disclosure Schedule contains a complete and accurate list of all real property leases of the Company (the "Leased Real Property").

(b)    Except as set forth on Schedule 2.11(b) of the Member Disclosure Schedule, the Company has valid and binding leaseholds in, all of the Leased Real Property.  All of the leases for the Leased Real Property are in full force and effect and no defaults exist thereunder or other events or circumstances now exist which with the notice or lapse of time or both would constitute a default under any such leases.

(c)    Except as set forth on Schedule 2.11(c) of the Member Disclosure Schedule or Liens that are Permitted Liens, all of the Company's owned material assets are free and clear of all Liens and are not, in the case of Leased Real Property, subject to any rights of way, building use restrictions, exceptions, variances, reservations, or limitations of any nature, except, with respect to all such assets, (i) mortgages or security interests shown in the Interim Financial Statements as securing specified liabilities or obligations, with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, and (ii) mortgages or security interests incurred in connection with the purchase of property or assets after the date of the Interim Balance Sheet (such mortgages and security interests being limited to the property or assets so acquired), with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists.

(d)    Except as set forth on Schedule 2.11(d) of the Member Disclosure Schedule, the Company has not leased or sublet, and no other Person is in possession of, or has the right of use or occupancy of any portion of, any of the Leased Real Property, and to the Member's Knowledge, no part of any of the Leased Real Property has been condemned, requisitioned, or otherwise taken by any Governmental Body and, to the Member's Knowledge, no such condemnation, requisition, or taking is threatened or contemplated.

Section 2.12    Condition and Sufficiency of Assets.  Except as set forth on Schedule 2.12 of the Member Disclosure Schedule, the buildings, structures, equipment, and other material tangible assets owned or leased by the Company, and those assets transferred to the Company pursuant to the Contribution Agreement, are in reasonable operating condition and repair, ordinary wear and tear excepted, and are adequate for the uses to which they are being put.  Excluding those assets provided pursuant to the Transition Services Agreement and the Excluded Assets, all of the assets owned or leased by the Company immediately prior to the Closing, together with those assets transferred to the Company pursuant to the Contribution Agreement, constitute all of the assets used in connection with the business of the Company immediately prior to Closing, and immediately after the Closing, will be sufficient for

the continued conduct and operation of the Company's business as it was conducted and operated immediately prior to the Closing.

Section 2.13    No Undisclosed Liabilities.  Except as set forth in Schedule 2.13 of the Member Disclosure Schedule, the Company has no Liabilities that are required to be recorded on a balance sheet prepared in accordance with GAAP, except for (a) Liabilities reflected or reserved against in the Interim Financial Statements, (b) Liabilities incurred after the date of the Interim Financial Statements in the Ordinary Course of Business, (c) Liabilities incurred pursuant to this Agreement, the Contemplated Transactions, or the Conversion, or (d) Liabilities disclosed in or arising out of matters disclosed in the Member Disclosure Schedule or which are the subject of other representations and warranties set forth in this Agreement.

Section 2.14    Taxes.

(a)    Tax Returns Filed and Taxes Paid.  The Company has filed or caused to be filed on a timely basis all federal income tax returns that are or were required to be filed by the Company.  The Company has filed or caused to be filed on a timely basis all other tax returns and all reports with respect to Taxes ("Tax Returns") that are or were required to be filed by the Company for the previous five (5) years, except for where the failure to file such Tax Returns (other than federal income tax returns) would not have a Material Adverse Effect.  All such Tax Returns filed by the Company are true, correct, and complete in all material respects.  The Company has paid, or made provision for the payment of, all Taxes that have or may have become due for all periods covered by such Tax Returns or otherwise, whether or not shown on a Tax Return, or pursuant to any assessment received by the Company, except such Taxes, if any, identified in Schedule 2.14(a) of the Member Disclosure Schedule as being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the Interim Financial Statements.  Except as provided in Schedule 2.14(a) of the Member Disclosure Schedule, the Company currently is not the beneficiary of any extension of time within which to file any Tax Return.

(b)    Delivery of Tax Returns and Information Regarding Audits and Potential Audits.  The Company and the Member have delivered to Buyer copies of all federal and state income Tax Returns filed during the years 2010, 2011, and 2012.  Schedule 2.14(b) of the Member Disclosure Schedule contains a complete and accurate list of all Tax Returns of the Company that have been audited or are currently under audit by a Governmental Body and accurately describes any deficiencies or other amounts that were paid or are currently being contested.  All deficiencies proposed as a result of such audits have been paid, reserved against, settled or are being contested in good faith by appropriate proceedings as described in Schedule 2.14(b) of the Member Disclosure Schedule.  The Member has delivered to Buyer copies of any examination reports, statements or deficiencies, or similar items with respect to such audits.  Neither the Member nor Max Fuller, Ray Harlin, or Lisa Pate has any reason to believe that any Governmental Body will assess any additional Taxes for any period for which Tax Returns have been filed.  Except as provided in Schedule 2.14(b) of the Member Disclosure Schedule, neither the Company nor the Member has received written notice from any Governmental Body alleging any amount of Taxes due or otherwise auditing, contesting or investigating any Taxes or Tax Returns that may be due from the Company or requesting any information from the Company.  Except as described in Schedule 2.14(b) of the Member Disclosure Schedule, the Company has not given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Company or for which the Company may be liable.

(c)    Specific Potential Tax Liabilities and Tax Situations.  Except as set forth in Schedule 2.14(c) of the Member Disclosure Schedule:

10

(i)        All Taxes that the Company is or was required by Legal Requirements to withhold, deduct, or collect have been duly withheld, deducted, and collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(ii)        There is no tax sharing agreement, tax allocation agreement, tax indemnity obligation, or similar written agreement, arrangement, understanding, or practice with respect to Taxes (including any advance pricing agreement, closing agreement, or other arrangement relating to Taxes) that will require any payment by the Company.

(iii)        The Company is not a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any ''excess parachute payment'' within the meaning of Code §280G (or any corresponding provision of state, local, or non-U.S. Tax law) and (ii) any amount that will not be fully deductible as a result of Code §162(m) (or any corresponding provision of state, local, or non-U.S. Tax law). The Company has not been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii). The Company (A) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was Member) or (B) has any Liability for the Taxes of any Person (other than the Member) under Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(iv)        The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(A)        change in method of accounting for a taxable period ending on or prior to the Closing Date;

(B)        ''closing agreement'' as described in Code §7121 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law) executed on or prior to the Closing Date;

(C)        intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local, or non-U.S. income Tax law);

(D)        installment sale or open transaction disposition made on or prior to the Closing Date; or

(E)        prepaid amount received on or prior to the Closing Date.

(v)        The Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

(vi)        The Company has not been a party to any ''reportable transaction,'' as defined in Code §6707A(c)(1) and Reg. §1.6011-4.

Section 2.15     [Intentionally Omitted]

Section 2.16   No Materially Adverse Change. Since the date of the Interim Balance Sheet and except as set forth in Schedule 2.16 of the Member Disclosure Schedule, there has not been any Materially Adverse Change and to the Member's Knowledge no event has occurred or circumstance exists that reasonably would be expected to result in a Materially Adverse Change, other than in connection with the Contemplated Transactions and Conversion.

Section 2.17   Employee Benefits.

(a)   Schedule 2.17(a) of the Member Disclosure Schedule sets forth a list of all Plans and Pension Plans (i) of which the Company or an ERISA Affiliate of the Company is or was a Plan Sponsor at any time during the six (6) years prior to the Closing Date, (ii) under which any employee or former employee of the Company has any present or future right to benefits, (iii) under which the Company or an ERISA Affiliate of the Company has or may have any Liability for present or future payment of benefits, (iv) in which the Company or an ERISA Affiliate of the Company contributes or has contributed at any time during the six (6) years prior to the Closing Date, or (v) in which the Company or an ERISA Affiliate of the Company otherwise participates or has participated at any time during the six (6) years prior to the Closing Date (collectively, the "Benefit Plans").

(b)   Schedule 2.17(b) of the Member Disclosure Schedule (i) sets forth a list of all ERISA Affiliates of the Company, and (ii) identifies each of the Benefit Plans (A) of which any such ERISA Affiliate is or was a Plan Sponsor at any time during the six (6) years prior to the Closing Date, (B) under which any such ERISA Affiliate has or may have any Liability for present or future payment of benefits, (C) in which any such ERISA Affiliate contributes or has contributed at any time during the six (6) years prior to the Closing Date, or (D) in which any such ERISA Affiliate otherwise participates or has participated at any time during the six (6) years prior to the Closing Date.

(c)   As applicable with respect to each Benefit Plan, the Company has delivered to Buyer copies of (i) each current Benefit Plan document, including any amendments, (ii) any summary plan description provided under a Benefit Plan, (iii) the most recent IRS determination letter, if any, and (iv) all other documents that set forth the material terms of any of the Benefit Plans.

(d)   Except as set forth in Schedule 2.17(d) of the Member Disclosure Schedule:

(i)   Each Benefit Plan has been maintained, operated, and administered in material compliance with its terms and the applicable provisions of ERISA, the Code, and other Legal Requirements.

(ii)   With respect to any Benefit Plan, no Proceedings or claims (other than routine claims for benefits in the Ordinary Course of Business or investigations by any Governmental Body) are pending or, to the Member's Knowledge, threatened.

(iii)   The execution, delivery, and performance by the Company of this Agreement and the Contemplated Transactions will not constitute an event under any Benefit Plan that will result in any payment (whether as severance pay or otherwise), acceleration, vesting, or increase in benefits with respect to any employee of the Company.

(iv)   Since the Balance Sheet Date, there has been no establishment or amendment of any Benefit Plan other than as required by applicable Legal Requirements or in the Ordinary Course of Business.

12

(v)     The Company has received no notice of any future material increase in premium costs of Benefit Plans that are insured or of any future material increase in benefit costs of such Benefit Plans.

(vi)    No Benefit Plan is a Title IV Plan.

(vii)   Neither the Company nor any ERISA Affiliate of the Company has filed a notice of intent to terminate any Benefit Plan or has adopted any amendment or taken any other action to terminate a Benefit Plan or to treat a Benefit Plan as terminated.

(viii)  Neither the Company nor any ERISA Affiliate of the Company has ever established, maintained, or contributed to or otherwise participated in, or had any obligation to maintain, contribute to, or otherwise participate in, any Multi-Employer Plan.

(ix)    Except to the extent required under ERISA § 601 et. seq. and Code § 4980B or as otherwise required in this Agreement, the Company does not provide health or welfare benefits to any retired or former employee and is not obligated to provide health or welfare benefits to any active employee following such employee's retirement or other termination of service.

(x)     With respect to any Benefit Plan, neither the Company nor any ERISA Affiliate has within the past six years incurred or reasonably expects to incur (A) any withdrawal liabilities as defined in ERISA § 4201 or (B) any actual or contingent liability under ERISA § 4204 (collectively, "Withdrawal Liability"), and no event has occurred which could result in Withdrawal Liabilities.  Neither Buyer nor its Affiliates (including the Company) will have any Withdrawal Liability, with respect to any Benefit Plan, as a result of the execution, delivery, and performance by Buyer, the Company, and the Member of this Agreement and the Contemplated Transactions.

Section 2.18    Compliance with Legal Requirements; Governmental Authorizations.

This Section 2.18 does not apply to matters relating to Environmental Laws, Benefit Plans, labor relations and employment, ERISA, and Taxes.

(a)     Since January 1, 2012, except as set forth in Schedule 2.18(a) of the Member Disclosure Schedule:

(i)     The Company is, and at all times has been, in compliance with and is not in default under or in violation of each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets, except for any non-compliance, defaults, or violations that, individually or in the aggregate, reasonably would not be expected to have a Material Adverse Effect.

(ii)    The Company has not received any notice or other communication (whether oral or written) from any Governmental Body regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature, except for any notice or other communication that, individually or in the aggregate, reasonably would not be expected to have a Material Adverse Effect.

(b)     Schedule 2.18(b) of the Member Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that is held by the Company or that otherwise relates to the business and operations of the Company or to any of the assets owned or used by the

Company.  Each Governmental Authorization listed on Schedule 2.18(b) of the Member Disclosure Schedule is valid and in full force and effect.  Except as set forth in Schedule 2.18(b) of the Member Disclosure Schedule:

(i)      Since January 1, 2012, the Company is, and at all times has been, in compliance in all material respects with all of the terms and requirements of each Governmental Authorization identified on Schedule 2.18(b) of the Member Disclosure Schedule;

(ii)      The Company has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

(iii)     All applications required to have been filed for the renewal of the Governmental Authorizations listed on Schedule 2.18(b) of the Member Disclosure Schedule have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies, except where the failure to file or timely file such Governmental Authorizations reasonably would not be expected to individually or in the aggregate have a Material Adverse Effect.

(c)      The Governmental Authorizations listed in Schedule 2.18(b) of the Member Disclosure Schedule collectively constitute all of the Governmental Authorizations necessary to permit the Company to lawfully conduct and operate its business and operations in the manner currently conducted and operated, and to permit the Company to own and use its assets in the manner in which it currently owns and uses such assets.

Section 2.19     Legal Proceedings; Orders.

(a)      Except as set forth in Schedule 2.19(a) of the Member Disclosure Schedule, there is no pending Proceeding that has been commenced by or against the Company or that otherwise relates to or may affect the business and operations of the Company or any of the assets owned or used by the Company, except for Proceedings that, individually or in the aggregate, reasonably would not be expected to have a Material Adverse Effect, or that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

(b)      To the Member's Knowledge, no Proceeding such as described in Section 2.19(a) has been threatened.

(c)      Except as set forth in Schedule 2.19(c) of the Member Disclosure Schedule:

(i)      there is no Order to which the Company, or any of the assets owned or used in the business and operations of the Company is subject; and

(ii)      the Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject.

Section 2.20     Absence of Certain Changes and Events.  Except in connection with the Contemplated Transactions, the Conversion, or as set forth in Schedule 2.20 of the Member Disclosure

Schedule, and to the Member's Knowledge, since January 1, 2014, there have not been any of the following occurrences:

(a)     purchase, redemption, retirement, or other acquisition by the Company of any equity securities, or declaration or payment of any dividend or other distribution or payment in respect of its equity securities, other than actions in the Ordinary Course of Business;

(b)     amendment to the Organizational Documents of the Company;

(c)     merger, consolidation with, or acquisition of the business and material assets of any other corporation or business organization;

(d)     increase by the Company of any bonuses, salaries, or other compensation to any officer, director, or employee that constitutes a material increase in such Person's bonus, salary or compensation, or entry into any employment, severance, or similar Contract with any officer, director, or employee other than in the Ordinary Course of Business;

(e)     adoption of, or increase in the payments to or benefits under, any Benefit Plan for or with any employees of the Company other than as required by applicable Legal Requirements or in the Ordinary Course of Business;

(f)     failure to pay or discharge any material Liability when due;

(g)     reduction or cancellation of any amounts owed to the Company, or settlement of any claims or Proceedings against the Company, other than in the Ordinary Course of Business;

(h)     damage to or destruction or loss of any asset owned by the Company, which, individually or in the aggregate reasonably would be expected to result in a loss exceeding $250,000 or reasonably would be expected to have a Material Adverse Effect;

(i)     entry into, termination of, or receipt of notice of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Company of at least $250,000, other than in the Ordinary Course of Business;

(j)     sale, lease, or other disposition of any asset owned by the Company or mortgage, pledge, or imposition of any other Lien on any asset or property of the Company, except in the Ordinary Course of Business;

(k)     labor unrest or union organizing activity;

(l)     entry into any Contract to provide goods and services in excess of $250,000 per year;

(m)     incur any indebtedness or other financial obligation that is not listed on the Closing Balance Sheet, or guaranty any indebtedness or other obligation of any other Person, or incur any Lien on any of its properties or assets, except for any guaranty terminated or Liens released at Closing;

(n)     write off any accounts receivable or provide discounts or other concessions to any customers except for those that are consistent with historical practices and in the Ordinary Course of Business;

(o)    failure to maintain its material assets and equipment in good repair and operating condition, ordinary wear and tear excepted;

(p)    entry into any Contract, transaction, or arrangement with the Member or any officer, director, or Affiliate of the Company, or any Affiliate or Related Person of any of the foregoing;

(q)    material change in the accounting methods used by the Company; or

(r)    agreement, whether oral or written, by the Company to do any of the foregoing.

Section 2.21    Contracts; No Defaults.

(a)    Schedule 2.21(a) of the Member Disclosure Schedule contains a true, correct and complete list of all Material Contracts.  For purposes of this Agreement, "Material Contract" means all Contracts that constitute any of the following types of Contracts to which the Company is a party or by which the Company or any of its assets is bound (excluding, however, any Contracts executed in connection with the Contemplated Transactions or the Conversion or financing arrangements that will be paid off at Closing):

(i)    Contracts that require performance of services or delivery of goods or materials to the Company of an amount or value in excess of $1,000,000 annually and are not terminable on less than sixty (60) days' notice;

(ii)    leases or other Contracts involving material real property;

(iii)    mortgages, indentures, loan or credit agreements, security agreements, and other agreements and instruments relating to the borrowing of money or extension of credit in amounts greater than $250,000;

(iv)    leases for machinery, equipment, motor vehicles, furniture, office equipment, or other personal property, having aggregate remaining lease payments in excess of $250,000;

(v)    collective bargaining agreements or other Contracts to or with any labor union or other employee representative of a group of employees;

(vi)    joint venture, partnership, or other Contracts (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other Person and which involve amounts of over $250,000;

(vii)    Contracts containing covenants that in any way purport to restrict the business activity of the Company or, to the Knowledge of the Member, any of its key employees, or limit the freedom of the Company or, to the Knowledge of the Member, any of its key employees, to engage in any line of business or to compete with any Person;

(viii)    Contracts providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods or services;

(ix)    guaranties, performance, bid or completion bonds, surety or appeal bonds, return of money bonds, and surety or indemnification agreements involving at least $250,000;

(x)    custom bonds and standby letters of credit involving at least $250,000;

16

(xi)    Contracts where the consequences of a Breach or default thereunder, or the termination, expiration, or cancellation thereof, would reasonably be expected to have a Material Adverse Effect;

(xii)    any Contract for capital expenditures in excess of $250,000;

(xiii)    any written warranty or other similar undertaking with respect to contractual performance extended by the Company other than in the Ordinary Course of Business;

(xiv)    any Contract between the Company and one or more Related Person(s);

(xv)    any Contract with any governmental agency, including federal and state Governmental Bodies; and

(xvi)    any amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)    Except as set forth in Schedule 2.21(b) of the Member Disclosure Schedule, each Material Contract identified or required to be identified in Schedule 2.21(a) of the Member Disclosure Schedule is in full force and effect and is valid and enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)    Except as set forth in Schedule 2.21(c) of the Member Disclosure Schedule:

(i)    The Company is in compliance in all material respects with all applicable terms and requirements of each Material Contract under which the Company has any obligation or liability or by which the Company or any of the assets owned or used by the Company is bound;

(ii)    The Company has not given to or received from any other Person any written notice or other written communication regarding any actual, alleged, possible, or potential violation or Breach of, or default under, any Material Contract; and

(iii)    neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions, will result in a violation or Breach of, or give the Company or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Material Contract in a manner that would result in a Material Adverse Effect.

(d)    The Material Contracts to which the Company is a party have been entered into without the commission of any act, alone or in concert with any other Person, or any consideration having been paid or promised, that is or would be in violation of any Legal Requirement.

17

Section 2.22    Insurance.

(a)    Schedule 2.22(a) of the Member Disclosure Schedule describes each policy of insurance to which the Company is a party.  The Company and the Member have delivered to Buyer true and complete copies of all policies of insurance to which the Company is a party since January 1, 2012.

(b)    Schedule 2.22(b) of the Member Disclosure Schedule describes:

(i)    any self-insurance arrangement by or affecting the Company, including any reserves established thereunder;

(ii)    any Contract, other than a policy of insurance or general risk allocation provision in transportation, customer, carrier, or intermodal agreements, for the transfer or sharing of any risk by the Company; and

(iii)    all obligations of the Company to third parties with respect to insurance (including such obligations under leases and service agreements but excluding general insurance provisions in transportation or carrier agreements) and identifies the policy under which such coverage is provided.

(c)    The insurance policies set forth on Schedule 2.22(a) of the Member Disclosure Schedule are valid and in full force and effect and all premiums with respect thereto due and payable prior to the Closing Date have been or will be paid by the Company.  None of the policies listed on Schedule 2.22(a) of the Member Disclosure Schedule will terminate as a result of the consummation of the Contemplated Transactions.

Section 2.23    Environmental Matters.  Except as set forth in Schedule 2.23 of the Member Disclosure Schedule:

(a)    The Company at all times has been operated in compliance with applicable Environmental Laws, which compliance includes but is not limited to the possession by the Company of all Governmental Authorizations required under applicable Environmental Laws for the operations and activities of the Company as such operations and activities are conducted on the date of this Agreement, and compliance with the terms and conditions thereof, except where any non-compliance with applicable Environmental Laws would not have a Material Adverse Effect.

(b)    The Company has not treated, stored, managed, disposed of, transported, handled, released, or used any Materials of Environmental Concern in material compliance with all applicable Environmental Laws, and to the Member's Knowledge, no third party has treated, stored, managed, disposed of, transported, handled, released or used any Materials of Environmental Concern on any premises used in the conduct of the Company's business except in material compliance with all applicable Environmental Laws.

(c)    There are no Environmental Claims pending or, to the Member's Knowledge, threatened against the Company.

(d)    There are no underground storage tanks located on any Leased Real Property.

(e)    The Company and the Member have delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by or on behalf of the Company pertaining to Materials of Environmental Concern or the treatment, storage, management,

disposal, transportation, handling, release or use of Materials of Environmental Concern, or concerning compliance by the Company, or any other Person for whose conduct the Company is or may be held responsible, with Environmental Laws.

Section 2.24    Labor Relations; Compliance.  The Company has not ever been a party to any collective bargaining or other labor Contract, and has never been part of a consolidated or controlled group of companies that was a party to any collective bargaining or other labor Contract.  Except as would not result in a Material Adverse Effect, (a) since January 1, 2012, the Company has complied in all material respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, occupational safety and health, and plant closing, and (b) there has not been, and, to the Member's Knowledge, there has not been threatened: (i) any strike, slowdown, lockout, picketing, work stoppage, or employee grievance process, (ii) any Proceeding against or affecting the Company relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable Governmental Body, organizational activity, or other labor or employment dispute against or affecting the Company or any of its premises, other than filings by former employees with the Equal Employment Opportunity Commission and similar state authorities, or (iii) any application for certification of a collective bargaining agent.  Except as set forth in Schedule 2.24 of the Member Disclosure Schedule, there are no Benefit Arrangements which would give rise to any severance, termination, change-in-control, or other similar payment to any employee of the Company as a result of the execution and delivery of this Agreement and the consummation of the Contemplated Transactions.

Section 2.25    Intellectual Property.

(a)    Schedule 2.25(a) of the Member Disclosure Schedule identifies all owned Intellectual Property and licensed Intellectual Property of the Company that is material to the business as currently conducted by the Company and each written license, sublicense, or agreement that the Company has granted to any other Person with respect to any Company Intellectual Property; provided, however, that Schedule 2.25(a) of the Member Disclosure Schedule is not required to identify any licenses, sublicenses, or agreements having a value of less than or equal to $5,000 or any licenses for commercially available software programs subject to a shrink wrap or click wrap license agreement to which the Company is the licensee (collectively, "Company Intellectual Property").

(b)    Except as set forth in Schedule 2.25(b) of the Member Disclosure Schedule, the Company Intellectual Property constitutes all the Intellectual Property used or necessary for the conduct of the business as it has been conducted by the Company, except as provided pursuant to the Transition Services Agreement.  Each item of Company Intellectual Property that has been owned, licensed or used by the Company up until the Closing Date will be owned, licensed to or available for use by the Company, except as provided pursuant to the Transition Services Agreement.

(c)    Except as set forth in Schedule 2.25(c) of the Member Disclosure Schedule, all current and former employees of the Company have executed written agreements with the Company that assign to the Company all rights to any inventions, improvements, discoveries or information and works of authorship prepared by such employee for the Company and relating to the Company's business, except where the failure to execute a written agreement would not have a Material Adverse Effect.

(d)    To the Member's Knowledge:  (i)  in the last three (3) years the Company has not infringed upon, misappropriated or otherwise violated any Intellectual Property rights of any other Person; (ii)  the Company does not currently infringe upon, misappropriate or otherwise violate, any Intellectual Property rights of any other Person; and (iii) during the past three (3) years, the Company has

not received any written claims or demands asserting that any Company Intellectual Property infringes any rights of any third party.

(e)     To the Member's Knowledge, the Company has taken commercially reasonable actions necessary to maintain and protect all of the Company Intellectual Property that is material to its business as presently conducted.

Section 2.26     Tractors and Trailers; Compliance.

(a)     Except as set forth in Schedule 2.26(a) of the Member Disclosure Schedule, as of the date two business days preceding the date hereof, each of the Tractors and Trailers owned, operated, or leased by the Company meets all applicable operating condition requirements of the DOT.

(b)     Schedule 2.26(b) of the Member Disclosure Schedule sets forth a list of all tractors and trailers that are owned, leased, or operated by the Company as of the date two business days preceding the date hereof (the "Tractors and Trailers").  The Company possesses (i) good and marketable title to its owned Tractors and Trailers; provided that, the certificates of title in respect of such Tractors and Trailers have not been transferred into the Company's name as of the date hereof, and (ii) a valid leasehold interest in its leased Tractors and Trailers, subject to Permitted Liens and consummation of the Assignment and Assumption Agreements with respect to such leased Tractors and Trailers.

(c)     The Company has been issued a "satisfactory" safety and fitness rating from the Federal Motor Carrier Safety Administration ("FMCSA"), or its predecessor the Federal Highway Administration ("FHWA"), and there is no Proceeding pending seeking to revoke or change such safety and fitness rating.

Section 2.27     Relationships with Related Persons.  Except as set forth on Schedule 2.27 of the Member Disclosure Schedule, other than by virtue of Member's ownership of the Interests, neither the Member, nor any director, officer, or employee of the Company, or any of their respective Related Persons and Affiliates, has (a) any interest in any of the properties or assets of or used by the Company or (b) any material equity or other material financial or profit interest in any Person that has had material business dealings with the Company.  Except as set forth in Schedule 2.27 of the Member Disclosure Schedule, neither the Member, nor any director or officer of the Company, or any of their Related Persons or Affiliates, is a party to any Contract with the Company.

Section 2.28     Bank Accounts.  Schedule 2.28 of the Member Disclosure Schedule sets forth a list of all banks or other financial institutions with which the Company has an account, lock box, safe deposit box, or borrowing authority, specifying with respect to each, the name and address of the bank or other financial institution, the account number, and the names of the Persons authorized as signatories thereon or to act or deal in connection therewith.

Section 2.29     Receivables.

(a)     Schedule 2.29(a) of the Member Disclosure Schedule contains a true, correct and complete list of all accounts receivable of the Company (including the aging of those receivables) as of the date of the Interim Balance Sheet and calculated in accordance with GAAP and during the period from that date through the closest practicable date prior to the date hereof, including collections, write downs and write offs of any such receivables (collectively, the "Receivables").  Except as set forth on Schedule 2.29(a) of the Member Disclosure Schedule, each of the Receivables (and all collections, write downs and write offs thereof) have been recorded in accordance with GAAP on the Interim Balance Sheet

20

or, after the date of the Interim Balance Sheet, noted in the books and records of account of the Company, including any reserves for bad debts;

(b)     Except as set forth on Schedule 2.29(b) of the Member Disclosure Schedule and in each case subject to the reserve for bad debts, allowance for doubtful accounts, or similar reserves on the Closing Balance Sheet, each of the Receivables: (i) represents a bona fide claim in favor of the Company against an obligor not affiliated with the Company for sales actually made or services actually performed by the Company, in the amount of such Receivable, on or before the respective date of the recording thereof; (ii) all of the goods delivered or services performed which gave rise to such Receivable were delivered or performed by the Company in accordance with applicable orders, contracts and customer requirements; (iii) to the Member's Knowledge, constitutes a valid Receivable of the Company that is not subject to any claims of set-off or other defenses or counterclaims other than normal discounts accrued in the Ordinary Course of Business and noted in the assets column of the Interim Balance Sheet or, if subsequent to the date of the Interim Balance Sheet, noted in the Company's books and records of account; and (iv) to the Member's Knowledge, should be collectible in accordance with the Company's normal collections practices.

Section 2.30    Inventory.  The Inventory of the Company consists of items of a quality and quantity usable or saleable in the Ordinary Course of Business.  All Inventory of the Company is valued in accordance with GAAP.   Such Inventory does not consist of, in any material amount, items that are obsolete or damaged.  As of the Closing Date, the Inventory is at levels consistent with the Ordinary Course of Business.  Schedule 2.30 of the Member Disclosure Schedule contains a complete list of the addresses of all warehouses and other facilities in which the Inventory of the Company is stored.

Section 2.31    Certain Practices.  To the Member's Knowledge, none of the Company or its managers, officers or employees, has, directly or indirectly given or agreed to give any material rebate, kickback, contribution or other payment, or any similar benefit, whether in money, other property or services, to any supplier, customer, governmental employee or other Person who was, is or may be in a position to help or hinder the Company or assist the Company in connection with any actual or proposed transaction, obtaining any permit or license, in each case in violation of any applicable Law.

Section 2.32    Disclosure by Member.  No representation or warranty contained in this Article II (as qualified by the Member Disclosure Schedule) contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained in this Article II (as qualified by the Member Disclosure Schedule), in light of the circumstances under which such statements were made, not misleading.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Member and the Parent as follows, as of the date hereof:

Section 3.1    Organization and Good Standing.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware with all requisite organizational power and authority to carry on the business in which it is engaged, own the properties it owns, and execute, deliver, and perform this Agreement and the other Transaction Documents to which it is a party.

Section 3.2    Authorization and Validity.  The execution, delivery, and performance of this Agreement and the other Transaction Documents by Buyer, and the consummation of the Contemplated

21

Transactions, have been duly authorized, and no other proceedings or approvals are necessary to authorize the execution, delivery, and performance of this Agreement by Buyer.  This Agreement has been, and each of the other Transaction Documents at or prior to the Closing will be, duly and validly executed and delivered by Buyer and constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 3.3      No Violation.   Neither the execution and performance by Buyer of this Agreement or the Transaction Documents nor the consummation or performance by Buyer of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time): (a) contravene, conflict with, or result in a violation of (i) any provision of the Organizational Documents of Buyer, (ii) any resolution adopted by the board of managers of Buyer, (iii) any Order applicable to Buyer, or (iv) any Legal Requirement applicable to Buyer; or (b) contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions.

Section 3.4      Finder's Fee.   Buyer has not incurred any obligation, contingent or otherwise, for any finder's, broker's, or agent's fee in connection with the Contemplated Transactions.

Section 3.5      Consents.   No Consent of, or filing with, any Governmental Body or any other Person is required to authorize, or is required in connection with, the execution, delivery, and performance by Buyer of this Agreement or consummation by Buyer of the Contemplated Transactions.

Section 3.6      Investment Representations.   Buyer is acquiring the Interests for its own account for investment and not with a view to the sale or distribution thereof or with any present intention of sale or distribution thereof.  Buyer understands and acknowledges that the Interests are not registered under the Securities Act and may not be sold, transferred, or otherwise disposed, except (a) pursuant to an effective registration statement under the Securities Act, (b) pursuant to Rule 144 or any successor rule under the Securities Act, and (c) upon an opinion of counsel knowledgeable in securities law matters to the effect that the proposed transfer is exempt from registration or qualification under the Securities Act and relevant state securities laws.  Buyer is an accredited investor as defined in Regulation D under the Securities Act.  Buyer has such Knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Interests; and Buyer understands and is able to bear any economic risks associated with such investment (including the necessity of holding the Interests for an indefinite period of time, inasmuch as the Interests have not been registered under the Securities Act).

Section 3.7      Buyer's Independent Investigation.   Buyer has undertaken an independent investigation, examination, analysis, and verification of the Company, the Interests, and the business, assets, liabilities, obligations, operations, financial condition, and prospects of the Company, including Buyer's own estimate of the value of the Company.  Buyer has had the opportunity to visit with the Company and meet with its respective Representatives to discuss the foregoing matters.  All materials and information requested by Buyer have been provided to Buyer to its reasonable satisfaction.  Buyer has undertaken the due diligence Buyer deems adequate regarding all matters relating to this Agreement and the Contemplated Transactions. Buyer is not aware of any (a) Breach of any representation or warranty made by the Member in this Agreement (as qualified by the Member Disclosure Schedule), (b) Breach by the Member of any of its covenants or obligations to be performed on or prior to the Closing Date, or (c) representation or warranty contained in Article II (as qualified by the Member Disclosure Schedule) containing an untrue statement of a material fact or omitting to state any material fact necessary in order

to make the statements contained in Article II (as qualified by the Member Disclosure Schedule), in light of the circumstances under which such statements were made, not misleading.

# ARTICLE IV
## ADDITIONAL AGREEMENTS

Section 4.1    Certain Tax Matters.

(a)    Tax Returns.  The Member will prepare or cause to be prepared, and file or cause to be filed, all Tax Returns or claims for refund of the Company for all taxable periods of the Company ending on or prior to the Closing Date (the "Pre-Closing Tax Returns").  Buyer will timely prepare and file (or cause to be prepared and filed) all Tax Returns of the Company for taxable periods ending after the Closing Date (the "Post-Closing Tax Returns").  The Member will timely pay or cause to be paid all Taxes relating to any periods prior to and including the Closing Date.  Buyer will timely pay or cause to be paid all Taxes relating to any Post-Closing Tax Returns.

(b)    Cooperation and Information.  The Member, the Company, and Buyer will provide each other with such cooperation and information as any of them reasonably may request of the other in filing any Tax Return, determining a liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information will include providing copies of relevant Tax Returns or portions thereof, together with related work papers and documents relating to rulings or other determinations by taxing authorities and making employees available on a mutually convenient basis to provide additional information and explanation of any information provided hereunder.  Notwithstanding anything to the contrary in this Agreement, each Party will retain all Tax Returns, work papers and all material records or other documents relating to Tax matters of the Company for the taxable period that includes the Closing Date and for all prior taxable periods until the date that is six (6) months after the expiration of the statute of limitations applicable to such Tax.

(c)    Contests.  Buyer will promptly notify the Member in writing of the proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on Buyer or the Company which, if determined adversely to the taxpayer or after the lapse of time, could be grounds for payment of Taxes or indemnification by the Member under this Agreement.  Such notice will contain factual information (to the extent known to Buyer or the Company) describing the asserted Tax liability in reasonable detail and will include copies of any notice or other document received from any taxing authority in respect of any such asserted Tax liability.  If Buyer fails to give the Member prompt notice of an asserted Tax liability as required by this section, then the Member will not have any obligation to indemnify for any loss arising out of such asserted Tax liability under this Agreement; provided, however, that failure to give such notification will not affect the indemnification provided hereunder except to the extent that the Indemnifying Party will have been prejudiced as a result of such failure (except that the Indemnifying Party will not be liable for any expenses incurred during the period in which the Indemnified Person failed to give such notice).  In the case of a Tax audit or administrative or judicial proceeding (a "Contest") that relates to periods ending on or before the Closing Date, the Member will have the sole right to direct and control the conduct of such Contest.  With respect to any Contest for any period beginning before the Closing Date and ending after the Closing Date, the Party which would bear the burden of the greater portion of the sum of the adjustments that may reasonably be anticipated for such period may elect to direct and control, through counsel of its own choosing, such Contest.  If the Member elects to direct any Contest or portion of a Contest, the Member will promptly notify Buyer of its intent to do so, and Buyer will cooperate and will cause the Company to fully cooperate in each phase of such Contest.  If the Member elects not to direct the Contest, Buyer will assume control of such Contest and such Contest will be subject to

indemnification in accordance with Article V hereof.  Buyer will keep the Member reasonably informed of the status of such Contest.  In any case, neither Buyer and the Company on the one hand, nor the Member, on the other hand, may settle or compromise any asserted liability without prior written consent of the other affected Party, which consent may not be unreasonably withheld, conditioned, or delayed.  In any event, any Party may participate, at their own expense, in the Contest.

Section 4.2    Certain Understandings.

(a)    Each Party is sophisticated and was advised by experienced counsel and, to the extent it deemed necessary, other advisors in connection with this Agreement.  Buyer acknowledges that it has performed a comprehensive due diligence investigation of the business and operations of the Company and conducted all due diligence it deemed necessary.

(b)    Each Party hereby acknowledges that (i) there are no representations or warranties by or on behalf of any Party or any Party's respective Affiliates or Representatives other than those expressly set forth in this Agreement or the other Transaction Documents that have been or will be delivered pursuant hereto, (ii) no Party has relied or will rely in respect of this Agreement or the Contemplated Transactions upon any document or written or oral information previously furnished to or discovered by it or its Representatives, other than this Agreement (including the Member Disclosure Schedule) and the Transaction Documents, and (iii) the Parties' respective rights and obligations with respect to this Agreement and the events giving rise thereto will be solely as set forth in this Agreement and the Transaction Documents.

(c)    The Company and the Member and each of their Affiliates and Representatives will not have or be subject to any liability to Buyer or any Affiliate of Buyer resulting from the distribution to Buyer or Buyer's use of, any information not contained in this Agreement or the Transaction Documents (it being understood that the information in any document or information provided to Buyer in connection with the Contemplated Transactions is "information not contained in this Agreement or the Transaction Documents").  Notwithstanding anything contained herein to the contrary, neither the Company nor the Member makes any representation, warranty, or covenant of any kind with respect to any projections, estimates, or budgets heretofore delivered to or made available to Buyer of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows, or future financial condition (or any component thereof) of the Company or the future business and operations of the Company.

Section 4.3    No Funded Indebtedness.  As of the date hereof, the Company will, and the Member will cause the Company to, pay all of the outstanding funded indebtedness of the Company, excluding leases and other obligations listed in Schedule 4.3 or included in Closing Adjusted Working Capital.

Section 4.4    Lease Agreements.  As of the date hereof, an Affiliate of the Member will enter into a Lease Agreement (the "Lease Agreement") with the Buyer regarding the use of the Company's facility at Tunnel Hill, Georgia in substantially the form of Exhibit E. As of the date hereof, an Affiliate of the Member will enter into a sublease agreement (the "Oklahoma Sublease Agreement") with the Buyer regarding the use of the Company's facility in Oklahoma City, Oklahoma in substantially the form of Exhibit F.

Section 4.5    Contribution.  Not later than one day prior to the Closing Date, the Company and U.S. Xpress Enterprises, Inc., a Nevada corporation, shall have entered into, and shall have performed their respective obligations under, a contribution agreement (the "Trademark Contribution Agreement"), which provides, among other things, for the contribution of certain Intellectual Property to the Company.

Not later than one day prior to the Closing Date, U.S. Xpress Leasing, Inc., a Tennessee corporation and wholly owned subsidiary of the Parent, shall execute a bill of (the "Bill of Sale"), which provides, among other things, for the sale of certain assets to the Company (together, the Trademark Contribution Agreement and the Bill of Sale will be referred to herein as the "Contribution Agreement"), in substantially the form of Exhibit G-1 and G-2 hereto.

Section 4.6    Assignment and Assumption.  As of the date hereof, the Company will enter into assignment and assumption agreements (each, an "Assignment and Assumption Agreement"), which will provide, among other things, for the assignment and assumption of certain legal obligations, including Tractor and Trailer leases.

Section 4.7    Further Assurances.  From time to time from and after the Closing, as and when reasonably requested by any Party hereto and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as the requesting Party may reasonably deem necessary to evidence and effectuate the transactions contemplated by this Agreement.

Section 4.8    Compliance with Company's Existing Non-Compete Agreement.  After Closing, Buyer will cause the Company to comply with all provisions, including the non-competition and non-solicitation provision (the "Company's Existing Non-Competition Agreement") of that certain Asset Purchase Agreement dated May 27, 2005, by and among Forward Air, Inc., a Tennessee corporation, the Company, the Member, and certain Affiliates of Member.  Furthermore, Buyer will not, and will cause its Affiliates not to, take any actions that would constitute a violation of the Company's Existing Non-Competition Agreement or impose any liability on the Member or any of its Affiliates.  From and after the Closing, Buyer and the Company will indemnify, defend, and hold harmless the Member and its Affiliates from and against any and all Damages they may suffer related to any violation of this Section 4.8 or the Company's Existing Non-Competition Agreement by the Company, Buyer, or any of their Affiliates.  A copy of the Company's Existing Non-Competition Agreement has been provided to Buyer.

Section 4.9    Removal of Member as Guarantor.  After Closing, Buyer will use its Best Efforts to remove Member and its Affiliates (other than the Company) as a guarantor under any agreement wherein Member or any such Affiliate guarantees the obligations of the Company (a "Member Guaranty"), including, but not limited to, any guaranty of Member or any such Affiliate under a contract or lease for Leased Real Property.

## ARTICLE V
## INDEMNIFICATION; REMEDIES

Section 5.1    Survival.  The representations and warranties of the Member and the Parent contained in this Agreement, except for Sections 2.2 (Authorization and Validity), 2.3 (Capitalization), 2.6 (Title), 2.14 (Taxes), 2.17 (Employee Benefits), and 2.23 (Environmental Matters) will terminate eighteen (18) months after the Closing Date (the "Basic Representation Survival Period").  The representations and warranties of the Member and the Parent contained in Sections 2.17 (Employee Benefits), and 2.23 (Environmental Matters) will terminate three (3) years after the Closing Date (the "Intermediate Representation Survival Period").  The representations and warranties of the Member and the Parent contained in Sections 2.2 (Authorization and Validity) and 2.14 (Taxes) will terminate upon the expiration of the relevant statute of limitation, plus ninety (90) days (the "Extended Representation Survival Period."  The representations and warranties of the Member and the Parent contained in Section 2.3 (Capitalization) and Section 2.6 (Title) will survive indefinitely (the "Unlimited Representation Survival Period." The Basic Representation Survival Period, the Intermediate Representation Survival Period, the Extended Representation Survival Period, and the Unlimited Representation Survival Period

will be referred to collectively herein as the "Survival Periods"). The obligations to indemnify and hold harmless any Buyer Indemnified Person or the Member or the Parent under this Article V will terminate when the applicable Survival Period set forth in this Section 5.1 terminates; provided, however, that such indemnification rights will not terminate with respect to any item as to which a Buyer Indemnified Person, the Member, or the Parent, as applicable, will have, before the expiration of the applicable Survival Period, previously made a claim pursuant to Sections 5.2, 5.3, 5.4, or 5.5 of this Agreement.

Section 5.2    Indemnification and Payment of Damages by the Member and the Parent. The Member and the Parent, jointly and severally, will indemnify, defend, and hold harmless Buyer, the Company, and their respective Representatives and Affiliates (collectively, the "Buyer Indemnified Persons") for, and will pay to the Buyer Indemnified Persons the amount of, any and all costs, losses, liabilities, obligations, claims, damages (but specifically excluding lost profits, diminution in value, incidental, consequential, and punitive damages unless such damages are actually awarded to a third party in connection with a Third Party Claim handled in accordance with Section 5.5), and out-of-pocket expenses, whether or not involving a Third Party Claim, and all interest, fines, penalties, reasonable attorneys' fees, and all reasonable amounts paid in investigation, defense, or settlement of any of the foregoing (collectively, "Damages"), arising from:

(a)    any Breach of any representation or warranty made by the Member or the Parent in this Agreement (as qualified by the Member Disclosure Schedule) or any of the other Transaction Documents;

(b)    any Breach by the Member of any of its covenants or obligations in this Agreement; and

(c)    the Excluded Liabilities, including any Damages arising out of any Insurance Claims when the aggregate of all such claims exceeds the reserve for Insurance Claims on the Closing Balance Sheet (it being understood that such claims may settle or otherwise be resolved at, above or below the reserve on the Closing Balance Sheet and not until the aggregate Insurance Claims exceeds the reserve on the Closing Balance Sheet will indemnification be triggered hereunder.).

Anything herein to the contrary notwithstanding, the Member and the Parent will have no obligation to indemnify or hold the Buyer Indemnified Persons harmless from any Damages to the extent the Damages arise out of, or are in any way related to, matters to which Buyer had Knowledge of any Breach of Member's or Parent's representations and warranties contained in this Agreement or any of the other Transaction Documents and failed to give Member or Parent notice as required by Section 7.3 prior to the Closing Date.

Section 5.3    Tax Indemnification. Except for Taxes attributable to the Conversion and subject to the last paragraph of Section 5.2, the Member and the Parent, jointly and severally, will indemnify, defend, and hold harmless the Buyer Indemnified Persons from and against any Damages on a dollar for dollar basis attributable to: (i) all Taxes (or the non-payment thereof) of the Company for all taxable periods ending before the Closing Date ("Pre-Closing Tax Period"); (ii) all Taxes of any member of an affiliated, consolidated, combined, or unitary group of which the Company (or any predecessor of the foregoing) is or was a member prior to the Closing Date, pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local, or non-U. S. Law, and (iii) any and all Taxes of any person (other than the Company) imposed on the Company as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing Date (collectively, the "Tax Claims").

The indemnification provided in this Section 5.3 is not subject to the limitations (including any deductibles or baskets) on liability of the Member and the Parent set forth in Section 5.7(a) or (b) hereof, provided, however, that Member's and Parent's indemnification obligations under this Section 5.3 will be subject to the Net Proceeds Cap as described in Section 5.7(a).

Section 5.4     Indemnification and Payment of Damages by Buyer.   Buyer will indemnify, defend, and hold harmless the Member and the Parent and their Representatives and Affiliates (including, without limitation, U.S. Xpress Leasing, Inc.) for, and will pay to the Member and the Parent the amount of, any Damages arising from:

(a)     any Breach of any representation or warranty made by Buyer in this Agreement or any other certificate or document delivered by Buyer pursuant to this Agreement;

(b)     any failure of Buyer to obtain the release of Member, the Parent or their Affiliates (other than the Company) under any Member Guaranty;

(c)     the Company's performance, failure to perform, Breach, or other liability under any Contract that is the subject of any Assignment and Assumption Agreement which arises from acts or omissions of the Company that occur on or after the Effective Time;

(d)     any Breach by Buyer or the Company of any of their covenants or obligations in this Agreement; and

(e)     Insurance Claims up to the reserve for Insurance Claims on the Closing Balance Sheet.

Section 5.5     Procedure for Indemnification – Third Party Claims.

(a)     In order for a Buyer Indemnified Person, the Member, or the Parent (together, the "Indemnified Person") to be entitled to any indemnification provided for under Section 5.2, Section 5.3 or Section 5.4 of this Agreement in respect of, or arising out of, a Third Party Claim, such Indemnified Person must notify the Party from whom indemnification is sought (the "Indemnifying Party") in writing of the Third Party Claim within ten (10) business days after receipt by the Indemnified Person of written notice of the Third Party Claim; provided, however, that failure to give such notification will not affect the indemnification provided hereunder except to the extent that the Indemnifying Party will have been prejudiced as a result of such failure (except that the Indemnifying Party will not be liable for any expenses incurred during the period in which the Indemnified Person failed to give such notice). Thereafter, the Indemnified Person will deliver to the Indemnifying Party, within five (5) business days after receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Person relating to the Third Party Claim.

(b)     If a Third Party Claim is made against an Indemnified Person, the Indemnifying Party will be entitled to participate in the related Proceeding and, if it so chooses, assume and control the defense of such Third Party Claim with counsel satisfactory to the Indemnified Person; provided, however, that the Indemnifying Party will not be entitled to assume and control the defense of such Proceeding if (i) the Indemnifying Party is also a party to such Proceeding and the Indemnified Person determines in good faith that joint representation would be inappropriate, or (ii) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Person of its willingness to appropriately defend such Proceedings and provide indemnification with respect to such Third Party Claim.   If the Indemnifying Party assumes the defense of such Third Party Claim, (x) it will be conclusively established for purposes of this Agreement that the Third Party Claim is within the scope of and subject to

27

indemnification; (y) no compromise or settlement of the Third Party Claim may be effected by the Indemnifying Party without the Indemnified Person's consent, unless the Indemnified Person is fully released with regard to such Third Party Claim and no further action is required on Indemnified Person's part; and (z) the Indemnified Person will have no liability with respect to any compromise or settlement of such Third Party Claim effected without its consent.

(c)      Notwithstanding the foregoing, if an Indemnified Person determines in good faith that there is a reasonable probability that a Third Party Claim may adversely affect it or its Affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Indemnified Person may, by notice to the Indemnifying Party, assume the exclusive right to defend, compromise, or settle such Third Party Claim at the sole cost and expense of the Indemnifying Party.

Section 5.6      <u>Procedure for Indemnification – Other Claims</u>.  A claim for indemnification for any matter not involving a Third Party Claim may be asserted by notice to the Party from whom indemnification is sought.

Section 5.7      <u>Limitations on Claims</u>.

(a)      The maximum aggregate liability of the Member and the Parent to the Buyer Indemnified Persons under Section 5.2 will not exceed $3,000,000 (the "General Cap"), and Buyer, on behalf of itself and the other Buyer Indemnified Persons, agrees not to seek, and will not be entitled to recover, any Damages under Section 5.2 in excess of the General Cap.  Notwithstanding the foregoing, the General Cap will not limit any recovery by the Buyer Indemnified Persons (i) in the case of fraud and (ii) in any action involving a Breach of Sections 2.2 (Authorization and Validity), 2.3 (Capitalization), or 2.6 (Title) (Section 5.7(a)(i) and (ii) are referred to as the "Special Cap Claims"), provided, Buyer, on behalf of itself and the other Buyer Indemnified Persons, agrees not to seek, and will not be entitled to recover, any Damages in excess of the net cash proceeds actually received by the Member or the Parent from the sale of the Interests for all claims relating to the Contemplated Transactions, including, without limitation, the Special Cap Claims and the Tax Claims (the "Net Proceeds Cap"), except for claims for fraud as to which there is no cap.

(b)      No Buyer Indemnified Persons will be entitled to recover any Damages pursuant to Section 5.2(a) unless the aggregate amount of all Damages for which Buyer Indemnified Persons would, but for this sentence, be entitled to receive indemnification pursuant to Section 5.2 exceeds $200,000 (the "Damage Threshold"), and then only for such Damages in excess of the Damage Threshold.  Notwithstanding the foregoing, the limitation in this Section 5.7(b) will not apply in the case of Special Cap Claims or the Tax Claims.

(c)      <u>Calculation of Damages</u>.

(i)      To the extent that any claim for indemnification for Damages under this Article V is covered by insurance held by the Indemnified Person, such Indemnified Person will use its commercially reasonable efforts to seek recovery from the applicable insurer, provided that the Indemnifying Party agrees to reimburse the Indemnified Person for any reasonable out-of-pocket costs incurred by the Indemnified Person in connection with such recovery.  Further, to the extent that any claim for indemnification for Damages under this Article V is covered by insurance held by the Indemnified Person, such Indemnified Person will be entitled to indemnification pursuant to this Article V only with respect to the amount of the Damages that are in excess of (x) the cash proceeds received by such Indemnified Person pursuant to such insurance, minus (y) any costs of collecting such proceeds.  If such Indemnified Person receives such net cash insurance proceeds prior to the time such claim is paid,

28

then the amount payable by the Indemnifying Party pursuant to such claim will be reduced by the amount of such proceeds.  If such Indemnified Person receives such net cash insurance proceeds after such claim has been paid, then upon the receipt by the Indemnified Person of any net cash proceeds pursuant to such insurance up to the amount of Damages incurred by such Indemnified Person with respect to such claim, such Indemnified Person will promptly repay any portion of such amount which was previously paid by the Indemnifying Party to such Indemnified Person in satisfaction of such claim.

(ii)     Any calculation of Damages for purposes of this Article V will be reduced to take account of any amounts actually recovered by the Indemnified Person pursuant to any indemnification by or under any indemnification agreements with any third party (net of any costs incurred to obtain such recovered amounts).  If such Indemnified Person receives such net recovery prior to the time such claim is paid, then the amount payable by the Indemnifying Party pursuant to such claim will be reduced by the amount of such net recovery.  If such Indemnified Person receives such net recovery after such claim has been paid, then upon the receipt by the Indemnified Person of any net recovery up to the amount of Damages incurred by such Indemnified Person with respect to such claim, such Indemnified Person will promptly repay any portion of such amount that was previously paid by the Indemnifying Party to such Indemnified Person in satisfaction of such claim.

(iii)     Member and the Parent will not be liable for any Damages that are asserted against or suffered by any Buyer Indemnified Person in connection with or as a result of any action taken or not taken by the Company at any time after the Closing Date or by Buyer Indemnified Persons (or any one of them).

(iv)     For the sole purpose of calculating any Damages (but not for determining whether or not any breach of a representation or warranty has occurred), if any such  representation or warranty in Article II or III is qualified by the word "material" or by any word formed from such word, then such representation or warranty will be construed as if the word "material" (and such word formed therefrom) were not included in the representation or warranty, except with respect to the defined term "Material Adverse Effect," which will be included and considered for determining whether or not any breach of a representation or warranty has occurred and for the purpose of calculating any Damages.

(d)     Company Conversion.  Notwithstanding anything herein to the contrary, Member and the Parent will not be liable for any Damages that are asserted against or suffered by any Buyer Indemnified Person in connection with or as a result of the Conversion.

(e)     Tax Treatment.  Any indemnification payments under this Article V will be treated, for Tax purposes, as adjustment to the Purchase Price.

(f)     Mitigation. Nothing herein will prevent an Indemnifying Party from asserting that the amount of such Damages incurred by an Indemnified Person for which indemnification is sought hereunder may take into account the Indemnified Person's failure to use commercially reasonable efforts to mitigate such Damages; it being understood that any such assertion will not be dispositive in determining the amount of such Damages.

Section 5.8     Exclusive Remedy.  The Parties acknowledge and agree that following the Closing, the indemnification provisions of this Article V will be the sole and exclusive remedy of the Buyer Indemnified Persons for any Breach by any Party of the representations and warranties in this Agreement or any of the other Transaction Documents and for any failure by any Party to perform and comply with any covenants and agreements thereunder. Notwithstanding the foregoing the Parties understand that Buyer is obtaining insurance to cover breaches by the Member and the Parent of their representations and warranties, the expense for which shall be borne solely by Buyer.  No Breach of any

representation, warranty, covenant, or agreements contained herein will give rise to any right on the part of any Party to rescind this Agreement or any of the Contemplated Transactions.  Notwithstanding anything to the contrary contained in this Agreement, no Party will have any liability under any provision of this Agreement for, and in no event will any amount in Article V be applied to, lost profits, diminution in value, incidental, consequential, and punitive damages unless such damages are actually awarded to a third party in connection with a Third Party Claim handled in accordance with Section 5.5.  Without limiting the generality or effect of the foregoing, as a material inducement to the other Parties hereto entering into this Agreement, and in light of, among other factors, the acknowledgements contained in Section 4.2, the Parties hereby waive, from and after the Closing, any claim or cause of action, known and unknown, foreseen and unforeseen, which they or any of their Affiliates may have against the other Parties hereto, including, without limitation, under the common law or federal or state securities laws, trade regulation laws or other laws, by reason of the Contemplated Transactions or the events or circumstances giving rise thereto, except for claims or causes of action brought under and subject to the terms and conditions of the provisions contained in this Article V. Notwithstanding anything herein to the contrary, including, without limitation, Section 5.7(a),  Buyer's and any Buyer Indemnified Person's primary remedy for any Breach by any Party of the representations and warranties in this Agreement or any of the other Transaction Documents and for any failure by any Party to perform and comply with any covenants and agreements thereunder will be: (a) to seek recovery from any insurance held or obtained by the Buyer and then (b) to the extent not paid by any such insurer, to demand payment from Member and, if such amount remains unpaid for a period of sixty (60) days following demand, Buyer may set-off any proceeds, including distributions (other than Tax distributions), payable to Member with respect to the Preferred Equity, subject to the limitations set forth in this Article V.

## ARTICLE VI
## NONCOMPETITION

Section 6.1     Consideration.  The Parties have negotiated the noncompetition provisions of this Agreement as an integral part of the Contemplated Transactions.  The Member acknowledges that it will receive substantial benefits from the payment of the Purchase Price and the performance of other obligations hereunder by Buyer and acknowledge that Buyer is willing to pay the Purchase Price and proceed with the Contemplated Transactions in part because of the Member's obligations under this Article VI. The Buyer recognizes that the Member and its Affiliates and Related Persons engage in a broad range of freight transportation and related activities, and that the Noncompetition Obligations hereunder will be construed strictly to limit only those activities specifically described.

Section 6.2     Scope.  In consideration of the Closing of this Agreement and the Contemplated Transactions, the Member agrees that neither it, nor any of its wholly owned subsidiaries, will, directly or indirectly, for a period of five (5) years following the Closing (a) engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, lend its name or any similar name to, lend its credit or advice to, any Competitive Business that engages in business in the United States, except investments in publicly traded companies that may constitute a Competitive Business (whether directly or indirectly) provided each such investment does not exceed 5% of the outstanding stock of any such company,  (b) whether for its own account or for the account of any other Person, after the Closing solicit Competitive Business from any Person that is or was a customer at any time of the Company, Buyer, or any company affiliated with the Company or Buyer, or (c) knowingly hire or solicit any person employed by the Company at Closing or encourage any such employee to leave such employment; provided that nothing in this Section 6.2(c) will apply to any such employee of the Company (i) whose employment by the Company is previously terminated prior to such hiring or solicitation, (ii) who is solicited as a result of, or hired following, a general solicitation for employment not specifically targeted to employees of the Company, or (iii) who is solicited by a headhunter, or hired following such solicitation, where the headhunter did not receive contact information from Member or its

wholly owned subsidiaries regarding such employee, or (iv) who first initiates contact with Member or its wholly owned subsidiaries seeking employment.  For the purposes of this Section 6.2, "Competitive Business" will mean operating a scheduled, less-than-truckload motor carrier and warehousing services business exclusively for, or directed in all material respects toward, the floor-covering industry.  The obligations of the Member under this Section 6.2 are referred to herein as the "Noncompetition Obligations."

Section 6.3    Severability.  The covenants set forth in this Article VI will be deemed and construed as a separate agreement independent of any other provisions of this Agreement or any other agreement between Buyer and the Member.  The existence of any claim or cause of action by the Member, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by Buyer of the covenants of this Article VI.

Section 6.4    Relief.  The Member acknowledges that the injury that would be suffered by Buyer as a result of a Breach of the provisions of this Article VI would be irreparable and that the award of monetary damages for such Breach would be an inadequate remedy.  Consequently, Buyer will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any Breach or threatened Breach or otherwise to specifically enforce any provision of this Article VI.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    Amendment and Waiver.  No provision of this Agreement may be amended, modified, supplemented, or waived except by an instrument in writing executed by all of the Parties hereto or, in the case of an asserted waiver, executed by the Party against which enforcement of the waiver is sought.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.

Section 7.2    Assignment; Third-Party Rights.  Neither this Agreement nor any right created hereby will be assignable by any Party hereto without prior written consent of the other Parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as will inure to a successor or permitted assignee pursuant to this Section 7.2.

Section 7.3    Notice.  Any notice or communication must be in writing and given by depositing the same in the United States mail, addressed to the Party to be notified, postage prepaid and registered or certified with return receipt requested, or by delivering the same by hand delivery (including by a nationally recognized overnight carrier) or by fax.  Such notice will be deemed received on the date on which it is delivered or faxed (with confirmation received).  For purposes of notice, the addresses of the Parties will be:

31

| | |
|---|---|
| If to the Member, the Parent, or the Company: | U.S. Xpress Enterprises, Inc. |
| | 4080 Jenkins Road |
| | Chattanooga, TN 37421 |
| | Fax:  (423) 510-4003 |
| | Attention:  Kelly L.S. Arnold |
| | |
| With a copy to: | Scudder Law Firm, P.C., L.L.O. |
| | 411 South 13th Street |
| | Second Floor |
| | Lincoln, NE  68508 |
| | Fax:  (402) 435-4239 |
| | Attention:  Heidi Hornung-Scherr |
| | |
| If to Buyer: | XGS Acquisition, LLC |
| | 3060 Peachtree Street, Suite 300 |
| | Atlanta, GA 30305 |
| | Attention: Mr. David Panton, Chairman |
| | |
| With a copy to: | Carlton Fields Jorden Burt, P.A. |
| | One Atlantic Center |
| | 1201 W. Peachtree St. N.W., Ste. 3000 |
| | Atlanta, Georgia 30309-3455 |
| | Fax:  (404) 815-3415 |
| | Attention:  Lawrence Gold |

Any Party may change its address for notice by written notice given to the other Parties in accordance with this Section 7.3.

Section 7.4    Public Announcements.  Prior to and after the Closing, no public release or announcement concerning the Contemplated Transactions or the Conversion will be issued or made by or on behalf of any Party without the prior written consent of the other Parties, except as may be required by Legal Requirements.

Section 7.5    Entire Agreement.  This Agreement supersedes all prior agreements between the Parties with respect to its subject matter and constitutes (together with the Member Disclosure Schedule, the Exhibits hereto, and the other Transaction Documents) a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter.

Section 7.6    Transaction Expenses; Transfer Taxes.  Except as otherwise expressly provided in this Agreement, each Party to this Agreement will bear its respective Transaction Expenses.  All transfer, documentary, sales, use, stamp, registration, and other such Taxes (except for Taxes imposed upon the Buyer or the Company or the income or capital gains of such Persons and their respective Affiliates other than the Member) and fees (including any penalties and interest) incurred as a result of the Contemplated Transactions will be paid fifty percent (50%) by Member and fifty percent (50%) by Buyer. Member, Buyer, and Company will cooperate in the execution of any such Tax Returns and other documentation.

Section 7.7    Further Assurances.  The Parties will cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and

things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement, the Contemplated Transactions, and the Conversion.  The Parties, from time to time after the Closing at the request of any other Party hereto, and without further consideration, will execute and deliver further instruments of transfer and assignment and take such other action as a Party may reasonably require to more effectively transfer and assign to, and vest in, Buyer, the Interests and all rights thereto and to otherwise consummate the Contemplated Transactions and the Conversion.

Section 7.8    Severability.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, such provision will be fully severable and this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; and the remaining provisions hereof will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

Section 7.9    Governing Law.  This Agreement will be governed by, and construed in accordance with, the substantive laws of the State of Tennessee without reference or regard to the conflicts of law rules thereof.

Section 7.10    Interpretation.  When a reference is made in this Agreement (including the Exhibits and the Member Disclosure Schedule) to an article, section, paragraph, clause, schedule or exhibit, such reference will be to an article, section, paragraph, clause, schedule, or exhibit of this Agreement unless otherwise indicated.  The headings contained herein and on the schedules and exhibits are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement or the schedules and exhibits.  Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  All capitalized terms used in any of the schedules or exhibits to this Agreement will have the definition ascribed thereto under this Agreement, unless expressly defined otherwise in such schedule or exhibit.  All references to immediately available funds or dollar amounts contained in this Agreement will mean United States dollars.  All references to GAAP contained in this Agreement will mean United States generally accepted accounting principles.  The headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.  The Parties acknowledge and agree that (a) each Party and its legal counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (b) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting Party, will not be employed in the interpretation of this Agreement, and (c) the terms and provisions of this Agreement will be constructed fairly as to all Parties hereto and not in favor of or against any Party, regardless of which Party was generally responsible for the preparation of this Agreement.

Section 7.11    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile transmission will constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile will be deemed to be their original signatures for all purposes.

Section 7.12    Number and Gender.  Whenever the context requires, references in this Agreement to the singular number will include the plural, the plural number will include the singular and words denoting gender will include the masculine, feminine, and neuter.

Section 7.13    Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 7.14    Waiver; Remedies Cumulative.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

Section 7.15    Consent to Jurisdiction. With respect to any action or claim arising out of or relating to this Agreement, the other Transaction Documents, the Contemplated Transactions, or the Conversion, the Parties hereto hereby expressly and irrevocably (a) agree and consent to be subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Tennessee (and in the absence of Federal jurisdiction, the Parties consent to be subject to the exclusive jurisdiction of the state courts located in Hamilton County, Tennessee), (b) agree not to bring any action related to this Agreement, the Contemplated Transactions, or the Conversion in any other court (except to enforce the judgment of such courts), (c) agree not to object to venue in such courts or to claim that such forum is inconvenient, and (d) agree that notice or the service of process in any proceeding will be properly served or delivered if delivered in the manner contemplated by Section 7.3.  Final judgment by such courts will be conclusive and may be enforced in any manner permitted by law.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

THE COMPANY:                                    BUYER:

Xpress Global Systems, LLC                      XGS Acquisition, LLC

By: _____                     By: _____
    Ray M. Harlin, Assistant Secretary          Name: _____
                                                 Title: _____


THE MEMBER:

Xpress Holdings, Inc.

By: _____
    Ray M. Harlin, Vice President


THE PARENT:

U.S. Xpress Enterprises, Inc.

By: _____
    Ray M. Harlin, President and Chief
    Financial Officer


SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound, have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

THE COMPANY:                                        BUYER:

Xpress Global Systems, LLC                          XGS Acquisition, LLC

By: _____                        By: _____
    Ray M. Harlin, Assistant Secretary              Name: Lawrence Gildersleve
                                                    Title: Vice-President

THE MEMBER:

Xpress Holdings, Inc.

By: _____
    Ray M. Harlin, Vice President

THE PARENT:

U.S. Xpress Enterprises, Inc.

By: _____
    Ray M. Harlin, President and Chief
    Financial Officer

SIGNATURE PAGE TO MEMBERSHIP INTEREST PURCHASE AGREEMENT

## EXHIBIT A

### Definitions

"<u>Adjusted Working Capital</u>" will have the meaning set forth in Section 1.5(a)(i) hereof.

"<u>Agreement</u>" will have the meaning set forth in the preamble of this Agreement.

"<u>Affiliate</u>" means, with respect to any Person, any other Person or group of affiliated Persons directly or indirectly controlling (including without limitation all directors and executive officers of such Person), controlled by or under direct or indirect common control with such Person.  For purposes of this definition, (i) a Person will be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such other Person, and (ii) a Related Person will be deemed to be an Affiliate of that Person.

"<u>Assignment and Assumption Agreement</u>" will have the meaning set forth in Section 4.6 hereof.

"<u>Balance Sheet Date</u>" will have the meaning set forth in Section 2.9 hereof.

"<u>Basic Representation Survival Period</u>" will have the meaning set forth in Section 5.1 hereof.

"<u>Benchmark Adjusted Working Capital</u>" will have the meaning set forth in Section 1.5(a)(ii) hereof.

"<u>Benefit Arrangements</u>" include each Plan, and all other material fringe benefit, cafeteria, welfare, and retirement plans and arrangements established, maintained, contributed to, or obligated to be contributed to by the Company or any ERISA Affiliate thereof, whether or not any such plan or arrangement is otherwise exempt from some or all of the provisions of ERISA.

"<u>Benefit Plan(s)</u>" will have the meaning set forth in Section 2.17(a) hereof.

"<u>Best Efforts</u>" will mean the commercially reasonable efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible; provided, however, that an obligation to use Best Efforts under this Agreement does not require the Person subject to that obligation to take actions that would result in a materially adverse change in the benefits to such Person of this Agreement and the Contemplated Transactions.

"<u>Breach</u>" will mean any inaccuracy in or breach of, or any failure to perform or comply with, any representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement.

"<u>Buyer</u>" will have the meaning set forth in the preamble of this Agreement.

"<u>Buyer Indemnified Persons</u>" will have the meaning set forth in Section 5.2 hereof.

"<u>Class B Units</u>" will have the meaning set forth in the Operating Agreement.

"<u>Closing</u>" will have the meaning set forth in Section 1.3 hereof.

"<u>Closing Adjusted Working Capital</u>" will have the meaning set forth in Section 1.5(a)(iii) hereof.

"Closing Balance Sheet" will have the meaning set forth in Section 1.5(c) hereof.

"Closing Date" will have the meaning set forth in Section 1.3 hereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Xpress Global Systems, LLC, a Georgia limited liability company, as well as its predecessor, Xpress Global Systems, Inc., a Georgia corporation.

"Company's Existing Non-Competition Agreement" will have the meaning set forth in Section 4.8 hereof.

"Competitive Business" will have the meaning set forth in Section 6.2 hereof.

"Consent" means any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"Contemplated Transactions" will have the meaning set forth in Section 2.5 hereof, except in all cases will exclude the Conversion.

"Contest" will have the meaning set forth in Section 4.1(c) of this Agreement.

"Contract" will mean any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

"Contribution Agreement" will have the meaning set forth in Section 4.5 hereof.

"Conversion" will mean the Company's conversion from a corporation to a limited liability company under the laws of the state of Georgia, the filing of the name change under the FMCSA, and all other procedures, filings, and transactions required to effect such conversion.

"Damage Threshold" will have the meaning set forth in Section 5.7(b) hereof.

"Damages" will have the meaning set forth in Section 5.2 hereof.

"Debt" means all indebtedness in respect of money borrowed, including, without limitation, all obligations under capitalized leases, all amounts outstanding under accounts receivable securitizations (including all obligations of special purpose entities utilized to effect such securitizations), all obligations under synthetic leases, all subordinated indebtedness, the deferred purchase price of any property or services, the aggregate face amount of all surety bonds, letters of credit, and bankers' acceptances, and (without duplication) all payment and reimbursement obligations in respect thereof whether or not matured, evidenced by a promissory note, bond, debenture or similar written obligation for the payment of money (including reimbursement agreements and conditional sales or similar title retention agreements), any past due interest amounts, or penalties related to any of the foregoing, other than trade payables and accrued expenses incurred in the Ordinary Course of Business.

"DOT" means the U.S. Department of Transportation, including the FHWA and FMCSA.

"Environmental Claim" means any investigation or written claim, action, cause of action, or notice by any Person alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal

injuries, or penalties), or any Lien or other restriction of any nature, arising out of, based on, or resulting from: (a) the presence, or release or threat of release into the environment, of any Materials of Environmental Concern at any location owned or operated by the Company; or (b) circumstances forming the basis of any violation or alleged violation of any Environmental Law applicable to the Company or the Company's business.

"Environmental Laws" means, as they exist on the date hereof, all applicable Legal Requirements relating to pollution or protection of human health (as relating to the environment or the workplace) and the environment (including ambient air, surface water, ground water, land surface or sub-surface strata), including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern, including, but not limited to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., each as may have been amended or supplemented, and any applicable environmental transfer statutes or Legal Requirements.

"ERISA" will mean the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"ERISA Affiliate" will mean, with respect to a Party, any other person that, together with that Party, would be treated as a single employer under Code § 414.

"Excluded Assets" will have the meaning set forth in Section 1.5(a)(iv) hereof.

"Excluded Liabilities" will have the meaning set forth in Section 1.5(a)(v) hereof.

"Extended Representation Survival Periods" will have the meaning set forth in Section 5.1 hereof.

"Financial Statements" will have the meaning set forth in Section 2.8 hereof.

"FHWA" will have the meaning set forth in Section 2.26(c) hereof.

"FMCSA" will have the meaning set forth in Section 2.26(c) hereof.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout all relevant periods.

"General Cap" will have the meaning set forth in Section 5.7(a) hereof.

"Governmental Authorizations" will mean all permits, authorizations, certificates, approvals, registrations, variances, exemptions, rights of way, franchises, privileges, immunities, grants, ordinances, licenses, and other rights of every kind and character relating to the business and operations of the Company or all or any of the assets of the Company.

"Governmental Body" means any (i) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or

body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Independent Accountants" will have the meaning set forth in Section 1.5(e) hereof.

"Indemnified Person" will have the meaning set forth in Section 5.4(a) hereof.

"Indemnifying Party" will have the meaning set forth in Section 5.4(a) hereof.

"Insurance Claims" means (i) those claims arising with respect to automobile liability, workers compensation, health care, general liability, and other claims covered by Seller's consolidated insurance and risk programs through the Effective Time and relating to the Company, and (ii) those potential claims described on Schedule 2.19(a), whether or not such claims are covered by insurance (it being understood that the reserve for Insurance Claims on the Closing Balance Sheet will be applied to Damages arising from such claims).

"Intangible Assets" " means all mailing lists, all customer lists, all prospect lists, all advertising materials used in the business and operations of the Company, all logos used in the business and operations of the Company, all telephone and facsimile numbers used in the business and operations of the Company, all know-how and trade secrets used in connection with or relating to the business and operations of the Company, and all other intangible assets of the Company used in the business and operations of the Company.

"Interests" will have the meaning set forth in the recitals of this Agreement.

"Interim Balance Sheet" will have the meaning set forth in Section 2.8 hereof.

"Interim Financial Statements" will have the meaning set forth in Section 2.8 hereof.

"Inventory" means all inventory reflected on the Closing Balance Sheet, including, without limitation, merchandise, raw materials, work-in-process, finished goods, replacement parts, and packaging, owned by the Company and manufactured, maintained, held or stored by or for the Company, as the case may be, at any location.

"IRS" means the Internal Revenue Service or any successor agency.

"Knowledge" means actual knowledge of an individual or the knowledge that such person, acting prudently, could be expected to discover or otherwise obtain in the course of conducting a reasonable investigation regarding the existence of an applicable fact or matter; and with respect to the Member, means the Knowledge of Ray Harlin, Lisa Pate, and Max Fuller; and with respect to Buyer means the Knowledge of David Panton, Murad Karimi, Adam Cohen, Jake LaJoie, Larry Gildersleve, or Edward Bolden.

"Law" means: (a) all laws, statutes, ordinances, regulations, decisions and orders of any Governmental Body and (b) all decisions and orders of any courts having the effect of law in an applicable jurisdiction.

"Lease Agreement" will have the meaning set forth in Section 4.4 hereof.

"Leased Real Property" will have the meaning set forth in Section 2.11(a) hereof.

"Legal Requirement" will mean for any Person any law, treaty, regulation, rule, order, judgment, or decree, or any other determination or requirement of a governmental authority or arbitrator applicable to or binding on such Person or any of its property or to which such Person or any of its property is subject.

"Liability" means any and all Debts, liabilities, obligations, and commitments, whether known or unknown, asserted or unasserted, fixed, absolute, or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising under any Law or out of any contract or tort based on negligence, strict liability, or otherwise).

"Lien" will mean any mortgage, lien, pledge, claim, charge, security interest, or encumbrance of any kind, including, without limitation, the interest of a vendor or lessor under any conditional sale agreement, capital lease obligation or other title retention agreement, or any agreement to create or grant any of the foregoing.

"Material Contract" will have the meaning set forth in Section 2.19(a) hereof.

"Material Software" means all software that is owned or used under license agreements by the Company in its business and operations, excluding however, all readily available "off the shelf" software used pursuant to "shrink wrap" licenses.

"Material Adverse Effect" or "Material Adverse Change" means any change, circumstance, or effect that has a materially adverse effect on the business, operations, financial condition of the Company taken as a whole, or the ability of the Company or the Member to consummate the Contemplated Transactions; provided, however, that Material Adverse Effect and Materially Adverse Change will not include any adverse changes or conditions as and to the extent such changes or conditions result from or relate to (i) general business or economic conditions, including such conditions related to the business of the Company, (ii) national or international political or social conditions, including any failure of the U.S. government to raise its debt ceiling or reduce its budget deficit or the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices, or upon any military installation, equipment, or personnel of the United States, (iii) financial, banking, or securities markets (including any disruption thereof any decline in prevailing interest rates or any market index), (iv) changes in GAAP, (v) changes in Legal Requirements issued by any Governmental Body, (vi) the taking of any action contemplated by this Agreement and the other Transaction Documents, or (vii) any event or circumstance that arises in material part from the action or inaction of Buyer; provided, however, that in the case of clause (i) above, such event, occurrence, fact, condition, development or change will not be excluded from the definition of "Material Adverse Effect" hereunder to the extent that such event, occurrence, fact, condition, development or change has had, or could reasonably be expected to have, a materially disproportionate effect on the Company.

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, hazardous materials, hazardous substances and hazardous wastes, medical waste, toxic substances, petroleum and petroleum products and by-products, asbestos-containing materials, PCBs, and any other chemicals, pollutants, substances or wastes, in each case so defined, identified, or regulated under any Environmental Law.

"Member" will have the meaning set forth in the preamble of this Agreement.

36941841.9

"Member Disclosure Schedule" or "Schedule" will mean the disclosure document delivered by the Member pursuant to the terms of this Agreement and attached hereto as Exhibit H.

"Member Guaranty" will have the meaning set forth in Section 4.9 hereof.

"Member Release" will have the meaning set forth in Section 1.4(a)(v) hereof.

"Multi-Employer Plan" will have the meaning set forth in ERISA § 3(37)(A).

"Net Proceeds Cap" will have the meaning set forth in Section 5.7(a).

"Noncompetition Obligations" will have the meaning set forth in Section 6.2 hereof.

"Objection Notice" will have the meaning set forth in Section 1.5(d) hereof.

"Oklahoma Sublease Agreement" will have the meaning set forth in Section 4.4 hereof.

"Operating Agreement" will have the meaning set forth in Section 1.4(a)(vi) hereof.

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, Governmental Body, or by any arbitrator.

"Ordinary Course of Business" will mean an action taken by a Person only if: (a) such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; (b) such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); and (c) such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors of such Person (or by any Person or group of Persons exercising similar authority).

"Organizational Documents" will mean (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the articles or certificate of organization or formation and the operating or members' agreement of a limited liability company; (c) the partnership agreement and any statement of partnership of a general partnership; (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (e) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to any of the foregoing.

"Party" and "Parties" will have the meanings set forth in the preamble of this Agreement.

"Pension Plan" will have the meaning given in ERISA § 3(2)(A).

"Permitted Lien" means (a) any Lien approved in writing by Buyer, (b) any Lien for Taxes or other governmental charges or assessments which are not delinquent or which are being contested in good faith through appropriate proceedings and adequate reserves to pay the same have been established in the Financial Statements to the extent required by GAAP, (c) any Lien of any landlord, carrier, warehouseman, mechanic or materialman and any like Lien arising in the Ordinary Course of Business for sums that are not delinquent or which are being contested in good faith through appropriate proceedings and adequate reserves to pay the same have been established in the Financial Statements to the extent required by GAAP, (d) Legal Requirements regulating the use or enjoyment of the applicable property, (e) with respect to Leased Real Property, Liens which encumber the fee interest in such property, rights of way, building use restrictions, exceptions, variances, reservations, or limitations that do

not materially impair the Company's use of Leased Real Property, (f) minor imperfections of title, if any, none of which materially detracts from the value or materially impairs the use of the property subject thereto, or materially impairs the operations of the Company, or (g) Liens securing Debt or operating leases that will be released at or prior to Closing.

"Person" means any individual, corporation, partnership, limited liability company, trust, joint venture, unincorporated association or other enterprise, or any governmental authority.

"Plan" will have the meaning given in ERISA § 3(3); provided that the Company's holiday, vacation and other similar staffing policies will not be considered Plans.

"Plan Sponsor" will have the meaning given in ERISA § 3(16)(B).

"Post-Closing Tax Returns" will have the meaning set forth in Section 4.1(a) hereof.

"Pre-Closing Adjusted Working Capital" will have the meaning set forth in Section 1.5(a)(vi) hereof.

"Pre-Closing Balance Sheet" will have the meaning set forth in Section 1.5(b) hereof.

"Pre-Closing Tax Returns" will have the meaning set forth in Section 4.1(a) hereof.

"Pre-Closing Working Capital Adjustment Amount" will have the meaning set forth in Section 1.5(a)(vii) hereof.

"Preferred Equity" will have the meaning set forth in Section 1.4(a)(vi) hereof.

"Proceeding" means any action, arbitration, mediation, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body, arbitrator, or mediator.

"Purchase Price" will have the meaning set forth in Section 1.2(a) hereof.

"Related Person" will have the following meaning:

(a) With respect to a particular individual: (i) each member of such individual's Family; (ii) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; and (iii) any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity). For purposes of this definition, the "Family" of an individual includes (A) the individual, (B) the individual's spouse, (C) any other natural person who is related to the individual or the individual's spouse within the second degree, and (D) any other natural person who resides with such individual.

(b) With respect to a specified Person other than an individual: (i) any Person that is an Affiliate of such specified Person; and (ii) any Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity).

"Representatives" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel, or other representative of that Person.

"Securities Act" means the Securities Act of 1933, as amended.

"Special Cap Claims" will have the meaning set forth in Section 5.7(a) hereof.

"Survival Periods" will have the meaning set forth in Section 5.1 hereof.

"Tax Claims" will have the meaning set forth in Section 5.3.

"Tax Returns" will have the meaning set forth in Section 2.14(a) hereof.

"Taxes" will mean any federal, state, local or foreign taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions, including, without limitation, all income tax, unemployment compensation, social security, payroll, sales and use, highway use, fuel, excise, privilege, property, ad valorem, franchise, license, school and any other tax or similar governmental charge or imposition under any Legal Requirement.

"Third Party Claim(s)" means any claim against any Indemnified Person by a third party, whether or not involving a Proceeding.

"Title IV Plan" means a Pension Plan that is subject to Title IV of ERISA, other than Multi-Employer Plans.

"Tractors and Trailers" will have the meaning set forth in Section 2.26(b) hereof.

"Trade Rights" means the stylized "X" as described in the Transition Services Agreement and no other trademarks, trade names, or service marks.

"Transaction Documents" means, collectively, this Agreement, all Exhibits hereto to be executed by one or more of the Parties at Closing, and all other documents and instruments executed by one or more of the Parties in connection with Closing, as any or all of the foregoing may be renewed, amended, extended, modified, supplemented, replaced or rearranged from time to time.

"Transaction Expenses" means all out-of-pocket costs and expenses that are incurred by the designated Party or Parties in connection with the negotiation and execution of this Agreement and the consummation of the Contemplated Transactions, including, without limitation, fees for the services of brokers, attorneys, accountants, consultants, and other like professionals.

"Transition Services Agreement" will have the meaning set forth in Section 1.4(a)(iv) hereof.

"Withdrawal Liability" will have the meaning set forth in Section 2.17(d)(x) hereof.

"Working Capital Adjustment Amount" will have the meaning set forth in Section 1.5(a)(viii) hereof.

"Year-End Balance Sheet" will have the meaning set forth in Section 2.9 hereof.

"Year-End Financial Statements" will have the meaning set forth in Section 2.9 hereof.

**EXHIBIT B**

<u>**Form of Transition Services Agreement**</u>

## TRANSITION SERVICES AGREEMENT

This **TRANSITION SERVICES AGREEMENT** (this "**Agreement**"), is entered into as of April 13 , 2015 (the "**Effective Date**"), by and among U.S. Xpress Enterprises, Inc., a Nevada corporation ("**U.S. Xpress**"), Xpress Global Systems, LLC, a Georgia limited liability company ("**Company**"), and XGS Acquisition, LLC, a Delaware limited liability company ("**Buyer**"). Each of the parties named above may be referred to herein as a "**Party**," and collectively as the "**Parties**."

**WHEREAS**, U.S. Xpress, Xpress Holdings, Inc., a Nevada corporation (the "**Member**"), the Company, and the Buyer are parties to that certain Membership Interest Purchase Agreement dated as of April 3, 2015 (the "**Purchase Agreement**"), pursuant to which, among other things, Buyer will purchase from the Member 100% of the Membership Interests of the Company to operate a scheduled, less-than-truckload motor carrier and warehousing services business exclusively for, or directed in all material respects toward, the floor-covering industry (the "**Business**").

**WHEREAS**, in order to provide for the orderly transition of the Business to the Company and as a condition precedent to the consummation of the transactions contemplated by the Purchase Agreement, the Company and Buyer have requested that U.S. Xpress provide to the Company, and U.S. Xpress has agreed to provide, or cause its respective Subsidiaries to provide (each, when providing a service, the "**Service Provider**"), certain transition services upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises, the covenants and agreements contained in this Agreement and the Purchase Agreement, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1**   **Defined Terms**. Capitalized terms used in this Agreement and not defined herein will have the meanings given to such terms in the Purchase Agreement.

**1.2**   **Specific Definition**.

(a)   "Subsidiary" will mean any Person, whether or not existing on the date hereof, in which a Person directly or indirectly through subsidiaries or otherwise, beneficially owns at least fifty percent (50%) of either the equity interests, or voting power of or in the equity securities of such Person.

## ARTICLE 2
## TRANSITION ASSISTANCE

**2.1**   **Transition Services**. Subject to the terms and conditions of this Agreement, U.S. Xpress will provide and cause its Subsidiaries to provide, and the Company will accept, the

services, functions and responsibilities identified in <u>Exhibit 1</u> attached hereto and in <u>Section 2.2(b)</u> hereof (as may be amended from time to time by the Parties as provided elsewhere in this Agreement) and made a part hereof (each a "**Transition Service**" and collectively referred to herein as the "**Transition Services**") on the terms and conditions, and for the periods, stipulated therein. The Service Provider will be responsible for providing all facilities, personnel and other resources required to provide the Transition Services, except as otherwise set forth herein and in <u>Exhibit 1</u> hereto. The Parties will cooperate in good faith to diligently transfer the Transition Services as soon as possible, and not later than the time periods set forth in <u>Exhibit 1</u>.

      **2.2**    **Provision of the Transition Services**. Service Provider will use commercially reasonable efforts to perform the Transition Services in a timely and accurate manner, but in no event will Service Provider be required to perform other than in a manner generally consistent with the historical provision of the Transition Services and with the same standard of care as historically provided by Service Provider (the "**Service Levels**"). The Transition Services will be further subject to the terms and conditions of any agreements between the Service Provider and any third party. Except as otherwise provided herein, the Service Provider makes no representations and warranties of any kind, implied or expressed, with respect to the Transition Services, including, without limitation, no warranties of merchantability or fitness for a particular purpose, each of which are specifically disclaimed.

      (a)    With respect to any Contract necessary for the financing of the assets associated with the Business that is to be assigned by U.S. Xpress, or one of its Affiliates, to Buyer or Company, but which Contract(s) may not presently be assigned due to the lack of consent to such assignment by the other party or parties thereto (the "**Non-Assigned Financing Contracts**"), U.S. Xpress agrees to cooperate with Buyer to facilitate the continued performance of the Non-Assigned Financing Contracts pending the completion of such assignments and to provide Transition Services in connection with the Non-Assigned Financing Contracts that will facilitate the continued performance of the Non-Assigned Financing Contracts until the consents to such assignments have been obtained. Buyer will cooperate with U.S. Xpress's attempts to assign the Non-Assigned Financing Contracts.

      (b)    The Company and Buyer hereby instruct U.S. Xpress, and U.S. Xpress hereby agrees, to deliver all remittances in respect of receivables of the Company (whether paid by check, by wire transfer of funds, or otherwise) to (i) if checks or instruments, lockbox number [NUMBER OF PNC LOCKBOX ACCOUNT] maintained by the Company at PNC Bank, National Association ("**PNC**"), (ii) otherwise, account number [NUMBER OF PNC DEPOSITORY ACCOUNT] maintained by the Company at PNC, or (iii) such other accounts (whether blocked accounts or depository accounts and any associated lockboxes) maintained by the Company as the Company, with the written consent of PNC delivered to U.S. Xpress, may direct. U.S. Xpress shall use best efforts to deliver such remittances within 24 hours of receipt thereof, provided that if remittances in respect of receivables are not delivered within 24 hours, U.S. Xpress will have no liability for damages resulting therefrom. All such remittances shall be the property of, as between U.S. Xpress and the Company, the Company.

(c)    In the event the Transition Services Representative appointed by the Company under <u>Section 2.7</u> hereof brings to the attention of the Transition Services Representative appointed by the Service Provider under <u>Section 2.7</u> hereof any failure by the Service Provider to meet, in whole or in part, a Service Level, the Transition Services Representative of the Service Provider will (i) investigate and notify the Transition Services Representative of the Company of the cause of the problem, (ii) use commercially reasonable efforts to correct the problem and to resume meeting the Service Levels and (iii) advise the Transition Services Representative of the Company of the status of the remedial efforts being undertaken with respect to such problems.  To the extent such failure results in a dispute between the Parties, the Transition Services Representatives will make commercially reasonable efforts to mutually resolve such dispute(s) within a reasonable period of time. If the Transition Services Representatives are unable to mutually resolve such dispute(s), the Company may give notice to the Service Provider in writing (the "**Failure Notice**") that a dispute has arisen.  Such dispute(s) will be referred to the Chief Financial Officers of the respective Parties for resolution.  The Parties will seek to resolve all such disputes expeditiously and in good faith.

**2.3    Additional Transition Services.** From time to time after the Effective Date, the Parties may identify and mutually agree upon additional Transition Services that Service Provider will provide to the Company in accordance with the terms of this Agreement and the Service Provider will provide such services in accordance with <u>Section 3.1</u>.  The Company will deliver to Service Provider a written description of the proposed change.  Service Provider may accept or reject any proposed services in its discretion.  In the event that the Parties agree upon any additional Transition Services, the Company will reimburse the Service Provider for all of its reasonable costs and expenses incurred by such Service Provider in rendering such additional Transition Services and such additional Transition Services will be subject to all of the terms and conditions of this Agreement that relate to Transition Services, except to the extent otherwise agreed in writing by the Parties.

**2.4    Ownership of Work Product and Intellectual Property.**

(a)    Upon payment in full of all amounts owed hereunder, the Company will be the sole and exclusive owner of all reports, deliverables, embodiments thereof and other work product produced specifically and directly for the Company in connection with the Transition Services (collectively, "**Work Product**"), provided, however, that any Work Product not directly related to the Company and/or Work Product that includes Confidential Information of U.S. Xpress or any of its Subsidiaries other than the Company is not and will not become the property of the Company.  Notwithstanding the foregoing, the Company acknowledges that the Work Product will often include data, ideas, notes, inventions, improvements, discoveries, analysis, techniques, technical information and know-how of the Service Provider, including copyrightable material, and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Service Provider, solely or in collaboration with others, during the term of this Agreement (the "**Service Provider Technology**").  Service Provider hereby reserves and does not transfer any right, title or interest in and to any and all Service Provider Technology that has been incorporated

3

into the Work Product. While the Company will own the Work Product in the unique and specific form in which it is delivered to the Company, all Service Provider Technology included in the Work Product or developed by Service Provider in the course of providing Transition Services will remain the Service Provider's exclusive property, provided that Service Provider hereby grants the Company a limited, non-exclusive, irrevocable, worldwide, royalty-free license to use such Service Provider Technology only to the extent necessary to use or otherwise enjoy the benefits of the Work Product during the Transition Period.

(b)     Notwithstanding the foregoing terms of Section 2.4(a), all procedures, methods, systems, strategies, Trade Rights, tools, equipment, software, hardware, information technology, facilities and other resources of the Service Provider used by the Service Provider in connection with the provision of Transition Services will be and remain the property of the Service Provider and, except as otherwise provided herein, will at all times be under the sole direction and control of the Service Provider.

(c)     All Intellectual Property of a Party and its Subsidiaries will remain owned by such Party and its Subsidiaries, including after the Effective Date.

**2.5     Warranty Disclaimer.   SERVICE PROVIDER PROVIDES THE TRANSITION SERVICES AND THE WORK PRODUCT "AS IS" AND WITHOUT WARRANTY OF ANY KIND, AND HEREBY DISCLAIMS ALL EXPRESSED OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PERFORMANCE, ACCURACY, RELIABILITY, AND NON-INFRINGEMENT. FURTHERMORE THE COMPANY ACKNOWLEDGES THAT NOTHING IN THIS AGREEMENT WILL GUARANTEE SERVICE PROVIDER ANY RIGHTS TO ANY UPDATES OR ENHANCEMENTS TO ANY SERVICE PROVIDER TECHNOLOGY OR ANY THIRD PARTY INTELLECTUAL PROPERTY LICENSED BY SERVICE PROVIDER.**

**2.6     Third Party Vendors**. The Service Provider will use its commercially reasonable efforts to provide the Company with the benefit of certain products and services offered by certain third party vendors to the Service Provider, including, but not limited to, the vendors and services listed in Exhibit 2. The services to be provided under this Section 2.6 are intended to include all services provided under Contracts to which Service Provider or an Affiliate of Service Provider (other than the Company) is a party immediately prior to Closing, and which (i) will not be assigned to the Company at or prior to Closing and (ii) are necessary for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing. However, such vendors may prohibit the Service Provider from providing such services to the Company, or may charge additional fees for extending such services to the Company. To the extent that the third party vendors notify the Service Provider that it will be charged additional fees for providing such services to the Company, the Service Provider agrees to notify the Company of such additional charges. At such time the Company may elect to (i) decline such services in accordance with Section 5.2, (ii) continue receiving such services from the Service

4

Provider and reimburse Service Provider for such additional charges (in addition to any other Service Costs to be charged for such services), or (iii) attempt to obtain such services directly from the third-party vendor, in which case the Service Provider agrees to use its commercially reasonable efforts to assist the Company in obtaining the services directly from the third party vendor. In addition, if the third party vendor agreement prohibits the Service Provider from providing services under such agreement to the Company, then the Service Provider will use its commercially reasonable efforts to assist the Company in obtaining such services directly from the third party vendor.

2.7 **Cooperation**. U.S. Xpress and the Company agree to each: (a) appoint and maintain one or more representatives who will use commercially reasonable efforts to achieve the overall intent of this Agreement (each, a "**Transition Services Representative**") and (b) use commercially reasonable efforts to supervise the activities of their respective officers, employees and Representatives with respect to the Transition Services.

2.8 **Compliance with Applicable Legal Requirements**. Each Party will, and will cause its respective employees to, comply in all material respects with all applicable Legal Requirements in connection with the utilization or provision of the Transition Services.

2.9 **Force Majeure; Delays**. Service Provider will not be responsible for any default or delay in the performance of its obligations hereunder if and to the extent such default or delay is caused, directly or indirectly, by strikes, lockouts or other labor difficulties, Legal Requirements, technology or communications failures, fires, floods, acts of God, extremes of weather, earthquakes, tornadoes, or similar occurrences, riots, insurrections, acts of terrorism or other hostilities, embargos or any other cause beyond the reasonable control of Service Provider (each, an "**Event of Force Majeure**"). Service Provider will use its commercially reasonable efforts to resume provision of Transition Services as soon as possible following such event and will be responsible for all costs of resuming such services; provided, however that Service Provider will not be required to restore any Transition Service if such would cause an unreasonable financial burden on Service Provider. The Company will not be obligated to pay the Service Provider for such Transition Services during the period when the Service Provider is not providing such Transition Services. Only the Service Provider can claim an Event of Force Majeure. If, due to an Event of Force Majeure, the Service Provider is unable to perform all or part of its obligations under this Agreement for a period of more than one (1) month after the occurrence of an Event of Force Majeure, then the Parties agree to negotiate in good faith to (a) resolve the Event of Force Majeure, if possible, (b) extend by mutual agreement the time period to resolve, eliminate, cure or overcome such Event of Force Majeure, or (c) terminate this Agreement.

2.10 **No Exclusivity or Requirements**. Nothing herein will prevent the Company from obtaining any of the Transition Services from any other person or from providing any Transition Services to itself using its own facilities and employees.

**2.11     Indemnification**.

(a)     Service Provider will indemnify, defend and hold harmless the Company, its Representatives and Affiliates from and against any and all Damages relating to, arising out of, or resulting from (i) Service Providers' gross negligence, willful misconduct or violation of Legal Requirements, (ii) any third party claims, proceedings or other actions against Service Provider, the Company or their Affiliates alleging a breach of any Contract by Service Provider or any of its Affiliates with such third party or (iii) any third party claims, proceedings or other actions against Service Provider, the Company or their Affiliates relating to, arising out of, or resulting from the use of technology or other Intellectual Property by any Service Provider in providing Transition Services, including in connection with third party infringement actions.

(b)     The Company will indemnify, defend and hold harmless the Service Provider, its Representatives, and Affiliates from and against any and all Damages relating to, arising out of, or resulting from (i) the Company's gross negligence, willful misconduct or violation of Legal Requirements, (ii) any third party claims, proceedings or other actions against the Company, any Service Provider or their Affiliates alleging a breach of any Contract by the Company with such third party, or (iii) any third party claims, proceedings or other actions against the Company, any Service Provider or their Affiliates relating to, arising out of, or resulting from the use by the Company of Transition Services or Work Product in a manner not permitted by this Agreement.

**2.12     Limitation of Liability**.  IN NO EVENT WILL ANY PARTY BE LIABLE TO THE OTHER OR TO ANY OTHER PARTY FOR ANY LOST PROFITS, DIMINUTION IN VALUE, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER A PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

**2.13.     Claims Management**.  During the Transition Period and thereafter until all Insurance Claims are settled or otherwise resolved, the Company, Buyer, and U.S. Xpress agree as follows:

(a)     The Company and Buyer will promptly (but not later than three business days following request from U.S. Xpress) remit, as directed by U.S. Xpress, fees, expenses, settlement, or other amounts relating to Insurance Claims until the aggregate amounts remitted equal the reserve amount on the Closing Balance Sheet.

(b)     U.S. Xpress will continue to manage the Insurance Claims in the same or substantially similar manner to the management of the Insurance Claims prior to Closing. U.S. Xpress will provide the Company periodic updates, not less frequently than monthly, of all

Insurance Claims.  Such periodic updates will include a summary of all Insurance Claims and a schedule of claims settled or otherwise resolved and related amounts.

## ARTICLE 3
## CONSIDERATION; COSTS AND EXPENSES

**3.1    Payment of Consideration**.  The Service Provider will provide the Transition Services listed on <u>Exhibit 1</u> at a monthly cost to the Company as follows: $20,000 for the first 30 days, $15,000 for the next 30 days, and $10,000 every 30 days or portion thereof thereafter (**"Service Costs"**).  The Company will pay Service Provider the Service Costs in accordance with the terms and conditions of this Agreement.  In addition, the Company agrees to reimburse Service Provider for all reasonable costs and expenses of third parties incurred by Service Provider necessary for the provision of Transition Services to the Company.

**3.2    Payment Terms**.  Payment for Service Costs are due on the fifth day of each month for the upcoming month's services (or the date hereof for the first month), and payment terms with respect to all other Service Costs and other expenses will be due upon the presentment of an invoice for such Service Costs or other expenses (in each case, **"Payment Due Date"**).  Invoiced amounts will be paid without set-off, reduction or delay.  In the event the Company does not pay the Services Costs by the Payment Due Date, the Service Provider may suspend the Transition Services until the Company has paid the Services Costs in full.

**3.3    Expenses**.  To the extent Service Provider makes any payment on behalf of the Company during the Transition Period (as defined below), the Service Provider will provide the Company an invoice for the amount paid, and such invoice will be paid by the Company within ten (10) business days of receipt.  To the extent Service Provider receives payment intended for the Company during the Transition Period, the Service Provider will forward payment to the Company within ten (10) business days of receipt.  In the event the Company does not pay the invoice within ten (10) business days of receipt, the Service Provider may suspend the Transition Services until the Company has paid the invoice in full.

**3.4    Taxes**.  Any and all sales Tax, transfer Tax, value-added Tax, goods and services Tax or similar Tax imposed on the Transition Services or expense reimbursements related thereto paid by the Service Provider on behalf of the Company will be separately stated on the relevant invoice and paid by the Company to the Service Provider who will be responsible for submitting such Taxes to the appropriate Tax authorities.  In the event the Company does not pay the amounts for Taxes within ten (10) business days of receipt of the relevant invoice, the Service Provider may suspend the Transition Services until the Company has paid the Taxes in full.

## ARTICLE 4
## CONFIDENTIAL INFORMATION

**4.1    Confidentiality**.    Each Party (a "**Non-Disclosing Party**") will maintain in confidence all confidential or proprietary information of, or concerning, the other Party (a "**Disclosing Party**"), its Representatives, Affiliates, members, systems and customers, including commercial, financial, and technical information, customer or client lists, programs, procedures, data, documents, computer information and databases (including, without limitation, operating software and any functionality, data structures, backend processing, and underlying database structure associated therewith), business plans, trade secrets, budget forecasts, business arrangements, information regarding specific transactions, financial information and estimates, and long-term plans and goals disclosed and/or obtained in each case related to the provision or receipt of the Transition Services ("**Confidential Information**") and will not disclose such Confidential Information to any third party except to those of its Representatives as are necessary in connection with the performance of such Non-Disclosing Party's obligations under this Agreement, and then strictly on a need-to-know basis.  It is agreed that U.S. Xpress and its Subsidiaries will not have to deliver any information that contains confidential or proprietary information unrelated to the Company.  In maintaining the confidentiality of Confidential Information, the Non-Disclosing Party will exercise the same degree of care that it exercises with its own confidential information, and in no event less than a reasonable degree of care.  The Non-Disclosing Party will ensure that each of its Representatives and Affiliates holds in confidence and makes no use of the Confidential Information for any purpose other than those permitted under this Agreement or otherwise required by any Legal Requirement.

**4.2    Exceptions**.  The obligation of confidentiality contained in this Article 4 will not apply to the extent that (a) the Non-Disclosing Party is required to disclose information by order or regulation of a Governmental Body or a court of competent jurisdiction; provided, however, that the Non-Disclosing Party will not make any such disclosure without first notifying the Disclosing Party and allowing the Disclosing Party a reasonable opportunity to seek injunctive relief from (or a protective order with respect to) the obligation to make such disclosure; (b) the Non-Disclosing Party can demonstrate that (i) the disclosed information was, at the time of such disclosure to the Non-Disclosing Party, already in (or thereafter enters) the public domain other than as a result of actions of the Non-Disclosing Party or its Representatives or Affiliates in violation hereof, or (ii) the disclosed information was rightfully known to the Non-Disclosing Party prior to the date of disclosure to the Non-Disclosing Party; or (c) the disclosed information was received by the Non-Disclosing Party on an unrestricted basis from a source unrelated to any Party and not under a duty of confidentiality to the Disclosing Party.

**4.3    Unauthorized Disclosure**.  The Non-Disclosing Party acknowledges and agrees that the Confidential Information constitutes proprietary information and trade secrets valuable to the Disclosing Party, and that the unauthorized use, loss or outside disclosure of such Confidential Information will be presumed to cause irreparable injury to the Disclosing Party. The Non-

Disclosing Party will notify the Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information by such Non-Disclosing Party.

**4.4** **Injunctive Relief**. The Parties acknowledge and agree that the remedies at law for any breach of this Article 4 are inadequate and that the Damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, the Parties acknowledge and agree that upon any breach, or threatened breach, by such Party of the terms and conditions of this Article 4, the other Party will be entitled to immediate injunctive relief and may obtain any order restraining any threatened or future breach. Nothing in this Section 4.4 will be deemed to limit, in any way, the remedies at law or in equity of the Parties for a breach by the other Party of any of the provisions of this Agreement.

## ARTICLE 5
## TERM AND TERMINATION

**5.1** **Term**. The term of this Agreement (the "**Transition Period**") will commence on the Effective Date and will be effective until the earlier of (i) 180 days after the Effective Date, provided, however, that if the Company still requires any Transition Services at the end of 180 days, the Company may request that Service Provider amend this Section 5.1 to extend the Transition Services and, upon Service Provider's agreement in its reasonable discretion, the Parties will agree in writing on amended Service Costs; (ii) the termination of this Agreement by mutual agreement of the Parties; and (iii) the date on which this Agreement is terminated upon breach as provided under Section 5.2 below. In addition, the Parties acknowledge and agree that the Company may determine from time to time that it does not require the Transition Services set out on Exhibit 1 hereto or that it does not require such Transition Services for the entire Transition Period. Accordingly, the Company may terminate any and all or any portion of the Transition Services that it is receiving, at any time and for any reason, upon written notice to U.S. Xpress; provided that all amounts due to U.S. Xpress hereunder are paid in full in accordance with Section 5.3.

**5.2** **Termination for Breach**. If any Party materially breaches any provision of this Agreement, the other Party may terminate this Agreement effective immediately (subject to the cure periods set forth below) upon written notice to the breaching Party. The following events will be deemed to be material breaches of this Agreement:

(a)     Failure by a Party to perform its obligations substantially in accordance with the terms and conditions of this Agreement, which failure is not remedied within ten (10) days after receipt of written notice thereof specifying the nature of such breach; or

(b)     If: (i) a Party files a voluntary bankruptcy or similar petition; (ii) an involuntary bankruptcy or similar petition is filed against a Party and is not withdrawn or dismissed within sixty (60) days of such filing; (iii) a Party makes an assignment for the benefit of creditors; (iv) a receiver is appointed for a Party; (v) a Party becomes insolvent; or (vi) a Party fails generally

9

to pay its debts as they become due, or admits in writing of the inability to pay its debts as they become due.

      **5.3**    **Effect of Termination or Expiration**.  Upon termination or expiration of this Agreement, and notwithstanding anything to the contrary, each Party will be released from all obligations, duties, Transition Services or other agreements hereunder arising after the date of such termination or expiration, except that such termination will not relieve:  (a) any Party from obligations incurred prior to such termination; (b) any Party from its obligations under Article 4; or (c) any Party from any liability for any breach of this Agreement, and the following provisions of this Agreement will survive such expiration or termination of this Agreement for any reason: Sections 1.1, 1.2, 2.4, 2.5, 2.11, 2.12, 2.13, Article 3, Article 4, 5.2, 5.3, and Article 6.

### ARTICLE 6
### MISCELLANEOUS

      **6.1**    **Amendment; Waiver**.  The Parties may mutually amend or waive any provision of this Agreement at any time.  No amendment or waiver of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the Parties.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  The Parties may at any time (a) extend the time for the performance of any of the obligations or other acts of the other Party or (b) waive compliance with any of the agreements of such other Party or conditions to its own obligations contained herein.  Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the Parties.  Waiver of any term or condition of this Agreement by a Party will not be construed as a waiver of any subsequent breach or waiver of the same term or condition by such Party, or a waiver of any other term or condition of this Agreement by such Party.  The failure of any Party to assert any of its rights hereunder will not constitute a waiver of any such rights.

      **6.2**    **Entire Agreement**.  This Agreement (including the Purchase Agreement and the other documents referred to therein) and the Exhibits attached hereto, constitute the entire agreement by and between U.S. Xpress, the Company and the Buyer with respect to the subject matter hereof.  This Agreement supersedes any prior agreements or representations by or between U.S. Xpress, the Company and the Buyer, whether written or oral, with respect to the subject matter hereof (other than the Purchase Agreement).  In the event there is any inconsistency or conflict between a provision of this Agreement (including any Exhibit hereto) and any provision of the Purchase Agreement, the provisions of the Purchase Agreement will control.

      **6.3**    **Severability**.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of

competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the body making the determination of invalidity or unenforceability will have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

**6.4     No Assignment**.  This Agreement will be binding upon and inure to the benefit of the Parties named herein and each of their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that any Party may assign its right to receive a payment entitled to be received by it pursuant to this Agreement; and provided, further, that Buyer and the Company may assign this Agreement to PNC and Brightwood Loan Services, LLC (**"Brightwood"**) in connection with loans provided by PNC or Brightwood to Buyer or the Company.

**6.5     No Third Party Rights**.  This Agreement will not confer any rights or remedies on any person other than the Parties and their respective successors and permitted assigns.

**6.6     No Joint Venture; Responsibility**.  Nothing contained herein will be deemed to create any joint venture or partnership among the Parties, and no Party will have any right by virtue of this Agreement to bind any other Party in any manner whatsoever.  In this regard, each Party will act and will be deemed and construed to act under this Agreement as an independent contractor and not as an agent of any other Party.  No employee of any Party will be considered an employee of any other Party in any form.  Nothing in this Agreement will be construed as:  (a) an assumption by Service Provider of any obligation to increase the sales or profits or otherwise to assume responsibility for the operations of the Company; (b) an assumption by Service Provider of any financial obligation of the Company; (c) an assumption by Service Provider of any responsibility for the work performed by outside suppliers employed directly by the Company at the suggestion or recommendation of Service Provider; or (d) the delegation of any function or authority of the Company.

**6.7     Fees and Expenses**.  Except as otherwise specifically provided to the contrary in this Agreement, including with respect to Service Costs, each of the Parties will bear its own costs and expenses (including legal fees and expenses, and all employee wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes relating to such employment) incurred in connection with this Agreement and the transactions contemplated hereby.

**6.8     Notices**.  All notices or other communications required or permitted to be given under this Agreement will be given to the Parties in the manner set forth in Section 7.3 of the Purchase Agreement.

11

**6.9**   **Construction of Certain Terms and Phrases**. Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply to this Agreement: (a) "either" and "or" are not exclusive and "include", "includes" and "including" are not limiting; (b) "hereof", "hereto", "hereby", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (c) "date hereof" refers to the date set forth in the initial caption of this Agreement; (d) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (e) definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (f) references to a contract or agreement mean such contract or agreement as amended or otherwise modified from time to time; (g) references to a person or entity are also to its permitted successors and assigns; (h) references to an "Article", "Section", "Exhibit" or "Schedule" refer to an Article or Section of, or an Exhibit or Schedule to, this Agreement; (i) references to "$" or otherwise to dollar amounts refer to the lawful currency of the United States; and (j) references to a law include any rules, regulations and delegated legislation issued thereunder. The language used in this Agreement will be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction will be applied against any Party.

**6.10**   **Governing Law; Jurisdiction; Waiver of Jury Trial**. This Agreement will be governed in all respects by the laws of the State of Tennessee as applied to agreements entered into and performed entirely in the State of Tennessee by residents thereof, without regard to any provisions thereof relating to conflicts of laws among different jurisdictions. Each of the Parties hereto irrevocably consents to the exclusive jurisdiction and venue of any court within Hamilton County, State of Tennessee, in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Tennessee for such persons and waives and covenants not to assert or plead any objection that they might otherwise have to such jurisdiction, venue and such process. Each Party agrees not to commence any legal proceedings related hereto except in such courts. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.10.

    **6.11**    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original but both of which together will constitute one and the same instrument. This Agreement may be executed by facsimile or .PDF signature.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, the Parties hereto have executed and delivered this Transition Services Agreement as of the date first written above.

COMPANY:

Xpress Global Systems, LLC

By: _____
Name: _____
Title: _____

U.S. XPRESS:

U.S. Xpress Enterprises, Inc.

By: _____
Name: Ray M. Harlin
Title: President

BUYER:

XGS Acquisition, LLC

By: _____
Name: _____
Title: _____

**SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT**

## EXHIBIT 1

### TRANSITION SERVICES

| Function | Item | Task | Time Period |
|---|---|---|---|
| Accounting | Taxes | Fuel/IFTA/Other | 90 days |
| Accounts Receivable | Incoming ACH acceptance company | United Tranz | 60 days |
| | Online credit cards | United Tranz | 60 days |
| Asset Management | Fixed assets system | Forklift, tractor, software | 180 days |
| Human Resources | Benefit File Feeds | USX Infinium | 60 days |
| | Performance Logs | On XGS website | 60 days |
| | Infinium/Qtops | | 60 days |
| | Workers' compensation data collection | | 60 days |
| | Storage of documents | | 90 days |
| | Human Resources Infinium data | History from Infinium | 60 days |
| Information Technology | Communications | Data Line management | 180 days |
| | Communications | Phone systems | 180 days |
| | Infinium Customer User Job | AP upload – CUJ00026 – allow upload into payables via spreadsheet | 180 days |
| | Window Servers | | 180 days |
| Operations | Maintenance/Tow agreements | | 30 days |
| | Maintenance Schedules | | 30 days |
| | Maintenance Breakdown | | 30 days |
| | Warranty information | | 30 days |
| | Fuel Desk | 24 hour – LHG | 30 days |
| | Advance Desk | 24 hour – LHG | 30 days |
| | Daily trailer maintenance, inspections, and repairs | | 30 days |
| | Equipment decals for trucks and trailers | | 30 days |
| | Cell phones | Driver phones, etc. | 30 days |
| Safety | USX as400 - screens 22 options used for,17,15,25,41 - resource history 15 screen | Reports, renewals, driver and dock safety notes (compliance) | 30 days |

|  | as 400 17 screen | Renewal screen for medical, CDLs, hazmat, and safety awards (dates) | 30 days |
|--|------------------|------------------------------------------------------------------------|---------|
|  | as 400 15 screen | Driver and dock employee safety notes | 30 days |
|  | Fleet Assist | Maintenance reports | 30 days |
|  | Tread1 | Monthly training | 30 days |
|  | OSHA 300 logs | Injuries reported to OSHA for overnight staying in the hospital and logging | 30 days |
|  | OSHA medical listings | Mandated medical list sent to SVC's yearly | 30 days |
| **Legal** | Legal assistance | For accidents, lawsuits, employment and other legal matters that arose prior to the Transition Period and limited to the transitioning of these services to another legal professional, not to exceed the historical time limitations and scope of legal services prior to the Transition Period. | 180 days |
| **Office** | Corporate office | Management team currently housed at corporate office | 120 days |

The following services should be transitioned prior to the Transition Period, and will be provided by the Service Provider on a limited basis if the transition has not occurred:

| Accounting | Fuel cards | US Bank, Comdata, T-Chek, FuelMan, and other similar services | 30 days |
|---|---|---|---|
| | Direct fuel vendors | Pilot, TCH, TA, Comdata, Love's | 30 days |
| | Comdata | Corporate T&E credit cards | 30 days |
| Asset Management | Company car maintenance and tracking | Lease | 30 days |
| | Company car maintenance and tracking | Maintenance | 30 days |
| | Company car maintenance and tracking | Fleet fuel card and maintenance | 30 days |
| | Company car maintenance and tracking | Maintenance card – preapproved PO up to $75, specific vendors | 30 days |
| Operations | Bulk fuel | | 30 days |
| | Comdata | ComChecks for Lumper, fuel, and other similar services | 30 days |

## **EXHIBIT 2**

### **THIRD PARTY VENDORS**

- AirClic
- AT&T/Sterling Commerce
- AT&T Mobility
- AT&T wired
- Barcom
- CDW Direct
- Cetaris
- DataDirect Technologies
- Hawkeye
- Hewlett Packard
- IBM
- iDashboards
- IEG
- Integrated Decision Support
- Liaison
- LT Tax
- Mainline
- Microsoft
- Midrange Performance Group
- Namescape
- NMC Technologies
- PC Miller
- Psynch
- Rand McNally
- Sage
- Software House Int.
- Symantec
- Verizon
- VMware
- VPN Sonic Wall
- Websense
- WRS

**EXHIBIT C**

**Form of Member Release**

## MEMBER AND PARENT RELEASE

Reference is made to that certain Membership Interest Purchase Agreement, dated April __, 2015, by and among Xpress Global Systems, LLC, a Georgia limited liability company (the "**Company**"), Xpress Holdings, Inc., a Nevada corporation and the sole member of the Company (the "**Member**"), U.S. Xpress Enterprises, Inc., a Nevada corporation and the parent company of the Member (the "**Parent**"), and XGS Acquisition, LLC, a Delaware limited liability company ("**Buyer**") (the "**Purchase Agreement**"). All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Purchase Agreement.

In connection with the Purchase Agreement and in consideration for the substantial benefits to be received by the undersigned, directly or indirectly, in connection therewith, the sufficiency of which is hereby acknowledged, the undersigned do hereby irrevocably release, remise and forever discharge the Company and each member, manager, director, officer, employee, agent, attorney and affiliate thereof, and all heirs, executors, personal representatives, successors and assigns of the foregoing (collectively, the "**Released Parties**") from and against any and all claims (monetary or otherwise), demands, lawsuits, attorneys' fees, costs, losses, liabilities and/or causes of action heretofore, now or hereafter arising against any of the Released Parties of any nature whatsoever (collectively, "**Claims**"), whether under contract, tort, or any other theory of legal liability, and whether presently known or unknown, accrued, liquidated or contingent arising as of or prior to the Closing Date; provided, however, that nothing contained herein will operate to release any obligations of Buyer, Member, or the Company arising either (a) under the Purchase Agreement, the Transition Services Agreement, the Transaction Documents, the consummation of the Contemplated Transactions or the Conversion, or any of the other documents executed in connection with the Closing or (b) as a result of fraud or willful misconduct by Buyer.

The undersigned represent and warrant to the Company that neither party has made any assignment of any claims being released hereby, and this release is being entered into freely and voluntarily without any undue influence or coercion. This release shall be governed by, and construed and enforced in accordance with, the laws of the State of Tennessee, without regard for the principles thereof relating to conflict of laws.

This Release is expressly contingent upon the Closing of the transaction contemplated by the Purchase Agreement.

**Xpress Holdings, Inc.**

By: _____
    Ray M. Harlin, Vice President

Date: April ___, 2015

**U.S. Xpress Enterprises, Inc.**

By: _____
    Ray M. Harlin, President and Chief
    Financial Officer

Date: April ___, 2015

**EXHIBIT D**

**<u>Operating Agreement of Buyer</u>**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## XGS ACQUISITION, LLC

THE INTERESTS CREATED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION IN SUCH STATES.   THE INTERESTS CREATED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**XGS ACQUISITION, LLC**

This **LIMITED LIABILITY COMPANY AGREEMENT** is made and entered into as of the 13th day of April, 2015 ("**Effective Date**"), by and among XGS ACQUISITION, LLC, a Delaware limited liability company (the "**Company**"), such other Persons who are listed on the signature pages hereof or who shall hereafter become parties to this Agreement pursuant to the terms of this Agreement as Members (all such other Persons also collectively being referred to in this Agreement as the "**Members**," and each individually as a "**Member**"), and Brightwood Capital SBIC II, LP ("**Brightwood**"), in its capacity as holder of the Warrant ("**Warrantholder**").

## RECITALS

A.      The Company was formed by filing a Certificate of Formation with the Secretary of State of Delaware effective as of October 24, 2014 (the "**Effective Date**").

B.      Pursuant to the Purchase Agreement (defined below), the Company has acquired 100% of the membership interests of Xpress Global Systems, LLC, a Georgia limited liability company (the "**Purchased Subsidiary**") from Xpress Holdings, Inc., a Nevada corporation.

C.      In order to further evidence, reflect and give effect to the foregoing, and to govern the affairs of the Company, the parties to this Agreement now desire to enter into this Agreement.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Warrantholder covenant and agree as set forth below:

## ARTICLE 1.
## DEFINITIONS

1.1.    **Definitions**.  For purposes of this Agreement, the following capitalized terms shall have the following respective meanings:

"**Act**" means the Delaware Limited Liability Company Act, as amended.

"**Additional Member**" means a Member other than the Members executing this Agreement who has acquired a Membership Interest pursuant to the terms of this Agreement.

"**Adjusted Capital Account Deficit**" means, with respect to any member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

36285064.14

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Adjusted Capital Contributions"** means,

(a)     with respect to a Class A Member or a Class C Member, as of any day, an amount equal to the difference between (i) the sum of the amount contributed by such Member in exchange for such Member's Units, less (ii) the aggregate distrubutions made to such Member pursuant to Sections 8.3(a)(vi), 8.4(a)(v), 8.4(a)(vii) and 8.4(a)(viii) of this Agreement on account of such Member's ownership of such Units; and

(b)     with respect to a Class B Member, as of any day, an amount equal to the difference between (i) the sum of the amount contributed by such Class B Member (or deemed contributed) in exchange for such Class B Member's Units, less (ii) the aggregate distrubutions made to such Member pursuant to Sections 8.3(a)(ii), 8.3(a)(v), and 8.4(a)(ii) of this Agreement on account of such Member's ownership of such Units.

**"Affiliate"** means, with respect to a specified Person, any other Person which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person.  For purposes of this definition, (a) the terms "controls," "controlled by" and "under common control with" means the possession, directly or indirectly or as a trustee or executor, of the power to direct or cause the direction of the affairs of management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person; and (b) any Person that beneficially owns or holds fifty percent (50%) or more of the outstanding voting securities or other securities convertible into voting securities of such Person shall be deemed to be an Affiliate of such Person; and (c) with respect to a specified Person, any other Person of which the specified Person beneficially owns or holds fifty percent (50%) or more of the outstanding voting securities or other securities convertible into voting securities shall be deemed to be an Affiliate of such specified Person. For the avoidance of doubt, no Warrantholder shall be deemed an Affiliate of the Company or of its Subsidiaries.  For the avoidance of doubt, each of the Sponsors will be considered an Affiliate of the Company for all purposes hereunder.

**"Agreement"** means this Limited Liability Company Agreement and as the same may hereafter be amended or restated from time to time in accordance with the terms hereof.

**"Available Cash From Operations"** means the gross cash proceeds from Company operations (including sales and dispositions of Property in the ordinary course of business, but excluding a Liquidity Event) less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Board consistent with the provisions of this Agreement.  Available Cash From Operations shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Available Cash from a Liquidity Event."

**"Available Cash from a Liquidity Event"** means the net cash proceeds from a Liquidity Event (excluding sales and dispositions of Property in the ordinary course of business), less any portion thereof used to establish reserves, all as determined by the Board. "Available Cash from a Liquidity Event" shall

2

include all principal and interest payments with respect to any note or other obligation received by the Company in connection with a Liquidity Event (other than in the ordinary course of business).

"**Board**" has the meaning set forth in Section 4.1.

"**Board Observers**" has the meaning set forth in Section 4.2.

"**Capital Account**" has the meaning ascribed to it under Section 8.1.

"**Capital Contribution**" means, with respect to any Member, the total amount of money and the initial Gross Asset Value of Property (other than money) contributed or deemed hereunder to have been contributed to the capital of the Company by such Member, whether as an initial Capital Contribution or as an additional Capital Contribution.

"**Certificate of Formation**" means the Certificate of Formation of the Company filed pursuant to the Act, as amended from time to time pursuant to the terms and conditions hereof.

"**Class A Members**" means those Members set forth on <u>Exhibit A</u> as Class A Members holding Class A Units (as defined in Section 3.1).

"**Class B Member(s)**" means US Xpress in its capacity as a Member holding Class B Units (as defined in Section 3.1).

"**Class B Adjusted Preferred Return**" means the sum equal to 12% per annum, determined on the basis of 365 or 366 days, as the case may be, for the actual number of days in the period in which the Class B Adjusted Preferred Return is being determined, cumulative from year to year, of the average daily balance of the aggregate Adjusted Capital Contributions of the Class B Member in respect of its Class B Units from time to time during the period in which the Class B Adjusted Preferred Return relates, commencing on the date five years and six months from the Effective Date.

"**Class B Paydown**" means the product of (a) the number of days occurring from the Effective Date through and including the date of any such Class B Paydown will occur, and (b) $1,100.00.

"**Class B Preferred Return**" means the sum equal to 5% per annum, determined on the basis of 365 or 366 days, as the case may be, for the actual number of days in the period in which the Class B Preferred Return is being determined, cumulative from year to year, of the average daily balance of the aggregate Adjusted Capital Contributions of the Class B Member in respect of its Class B Units from time to time during the period in which the Class B Preferred Return relates, commencing on the date of the Initial Capital Contribution by such Member.

"**Class B Redemption Amount**" means an amount equal to the Class B Adjusted Capital Contribution in respect of the Class B Units at any given time <u>plus</u> any Class B Preferred Return (or Class B Adjusted Preferred Return if applicable) accrued but not yet paid as of the date such Class B Redemption Amount is to be paid.

"**Class C Member(s)**" means those Members set forth on <u>Exhibit A</u> as Class C Members holding Class C Units (as defined in Section 3.1).

"**Class C Preferred Return**" means, with respect to each Class C Member, the sum equal to 10% per annum, determined on the basis of 365 or 366 days, as the case may be, for the actual number of days in the period in which the Class C Preferred Return is being determined, cumulative from year to year, of the

3

average daily balance of the aggregate Adjusted Capital Contributions of each such Class C Member in respect of its Class C Units from time to time during the period in which the Class C Preferred Return relates, commencing on the date of the Initial Capital Contribution by the applicable Class C Member.

"**Class D Member(s)**" means any Member holding Class D Units (as defined in Section 3.1).

"**Class E Units**" means any Class E Units issued or issuable upon exercise of a Warrant, and all Class E Units issued in respect of such Units, whether by division, combination, reclassification or distribution.

"**Code**" means the Internal Revenue Code of 1986, as amended, including effective date and transition rules (whether or not codified), and any successor thereto.  Any reference to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of succeeding law.

"**Company**" has the meaning set forth in the introductory paragraph.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for such Fiscal Year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Distribution**" means the payment or distribution of any money or Property by the Company to the Members, including any Tax Advances, from time to time, whether from earnings or profits, gains from the sale of assets or other Property or otherwise.

"**Entity**" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, or association or any foreign trust or foreign business organization.

"**Equity Incentive Plan**" means the Company's Equity Incentive Plan for the grant of Class D Units to the participants therein.

"**Fiscal Year**" of the Company means a calendar year ending on December 31.

"**Floor Amount**" means as to each Class D Unit, the excess, if any, as of immediately prior to the issuance of such Class D Unit of (a) the aggregate fair market value of all of the equity of the Company, on a deemed liquidation basis (for federal income tax purposes), as determined by the Board, over (b) the value of all Adjusted Capital Contributions of the Class A Member, Class B Members and Class C Members in the aggregate, as of immediately prior to such issuance.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) (other than pursuant to Code Section 708(b)(1)(B)); (D) in connection with the grant of a Class D Unit in the Company (other than a de minimis Class D Unit) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a member capacity in anticipation of being a Member; and (E) in connection with the issuance by the Company of a non-compensatory option (other than an option for a de minimis interest in the Company); provided, however, that adjustments pursuant to clauses (A), (B), and (D) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Board; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulation Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Profits" and "Losses" in Section 1.1, provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Board determines that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Independent Third Party**" means any Person who, prior to any transfer or sale of Membership Interests, does not own in excess of 5% of the Units on a fully-diluted basis, who is not an Affiliate of such 5% owner of Units and who is not the spouse, ancestor or descendant (by birth or adoption) of any such 5% owner.

"**Initial Capital Contribution**" means the initial contribution to the capital of the Company made by a Member pursuant to this Agreement as set forth in Section 3.2.

"**Liquidity Event**" means (a) any consolidation or merger of the Company with or into another Entity or a sale of all or substantially all of the Company's voting securities to a Person or Entity that was not a Member or Affiliate of a Member prior to such sale, (b) any sale, lease, exchange, or other transfer (in any transaction or series of related transactions and not in the ordinary course of business) to a third party of all or substantially all of the assets of the Company and or its Subsidiaries on a consolidated basis and based on value, (c) any initial public offering of the Company's equity interests, whether following a conversion of the Company into a corporation or otherwise, or (d) the dissolution of the Company pursuant to Article 12 of this

Agreement. Notwithstanding the above, the conveyance, transfer, or grant of security title to, or a security interest in, any goods, accounts, inventory, general intangibles, or other assets of the Company to secure the obligations of the Company shall not be a Liquidity Event.

"**Majority in Interest of the Class A Members**" means, as of any given point in time, such Member(s) who collectively hold Class A Units that represent more than 50% of the total number of Class A Units then outstanding.

"**Majority in Interest of the Class C Members**" means, as of any given point in time, such Member(s) who collectively hold Class C Units that represent more than 50% of the total number of Class C Units then outstanding.

"**Majority Vote**" means, (a) in the case of the Managers, the affirmative vote of a majority of the Managers then in office and comprising the Board, and (b) in the case of the Members, the affirmative vote of Members who hold more than fifty percent (50%) of the Class A Units and Class C Units combined.

"**Manager**" means any Person who shall become a manager of the Company pursuant to Article 4 hereof. The Managers shall have those duties and powers described in Article 4.

"**Member**" has the meaning set forth in the introductory paragraph, including a Member executing this Agreement, any permitted transferee of a Member or any Additional Member, including upon exercise of all or any portion of a Warrant, a Warrantholder. For clarity, no Warrantholder shall be a Member unless and until such Warrantholder has exercised all or any portion of a Warrant pursuant to its terms. Exhibit A sets forth the Members and their respective Capital Contributions and Membership Interests.

"**Membership Interest**" means a Member's entire interest in the Company, expressed as a relative percentage of ownership or number of Units, as the case may be, on Exhibit A, including such Member's rights in the Company's profits, losses and distributions pursuant to this Agreement and the Act and such other rights and privileges that a Member may enjoy by being a Member.

"**Permitted Transfer**" means any of the following transfers by a Member, as applicable:

(a)      transfers of Membership Interests held by a Warrantholder to a transferee in connection with an assignment or transfer of all or any portion of a Term Loan or transfers to a Warrantholder's Affiliate;

(b)      transfers of Membership Interests by a Member pursuant to and in compliance with Sections 11.3, 11.4, 11.5 or 11.6;

(c)      after the conversion of the Company to corporate form, the sale by a Member of shares of stock of the Company's successor corporation in connection with an underwritten public offering or into the public markets; and/or

(d)      pledges, hypothecations or other dispositions of any Membership Interests held by US Xpress to its lenders (or any collateral trustee or collateral agent for such lenders) as collateral or otherwise, and to any subsequent holder or holders of such Membership Interests upon foreclosure or other exercise of remedies with respect thereto.

"**Person**" means an individual or Entity.

"**PNC Bank**" means PNC Bank, National Association and its successors and assigns.

"**PNC Credit Agreement**" means that certain Revolving Credit and Security Agreement among PNC Bank, the Company and the Purchased Subsidiary, dated as of April 3, 2015, as at any time amended, restated, replaced, refinanced, supplemented or otherwise modified.

"**PNC Credit Documents**" means the PNC Credit Agreement, and each other security agreement, pledge, certificate, note or other agreement (other than this Agreement) entered into in connection with the PNC Credit Agreement, in each case, as amended, restated, modified or replaced pursuant to its terms.

"**Profits**" and "**Losses**" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code § 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "**Profits**" and "**Losses**" shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code § 705(a)(2)(B) or treated as expenditures under Code § 705(a)(2)(B) pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "**Profits**" and "**Losses**" shall be subtracted from such taxable income or loss;

(iii)     If the Gross Asset Value of any Company asset is adjusted pursuant to this Agreement, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account book depreciation and amortization (as determined under Treas. Reg. § 1.704-(b)(2)(iv)(*g*)) for such Fiscal Year; and

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code § 734(b) is required, pursuant to Treas. Reg. § 1.704-(b)(2)(iv)(*m)(4)*, to be taken into account in determining Capital Accounts as a result of a distribution other than in a liquidation of the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses.

"**Property**" means any property, real or personal, tangible or intangible (including goodwill), including cash and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**"Purchase Agreement"** means that certain Membership Interest Purchase Agreement dated as of the Effective Date by and among the Company, U.S. Xpress Enterprises, Inc., the Purchased Subsidiary, and US Xpress.

**"Put"** has the meaning set forth in the Warrant.

**"Qualified IPO"** has the meaning set forth in Section 11.7.

**"Sponsor(s)"** means, individually or collectively, as the context requires, (a) PCH Holdings Group, LLC, a Delaware limited liability company, or (b) Mosaic Investments, Inc., a Georgia corporation.

**"Sponsor Preferred Return"** means the sum equal to 10% per annum, determined on the basis of 365 or 366 days, as the case may be, for the actual number of days in the period in which the Sponsor Preferred Return is being determined, cumulative from year to year, of the average daily balance of the aggregate Adjusted Capital Contributions of the Sponsors in respect of their Class A Units from time to time during the period in which the Sponsor Preferred Return relates, commencing from the date of the Initial Capital Contribution by such Sponsor.

**"Target Distribution Balance"** means the amount that would be distributed to a Member if (a) the Company sold all of its assets for an aggregate purchase price equal to their aggregate book values (assuming for this purpose only that the book value of any asset that secures a liability that is treated as "nonrecourse" for purposes of Treasury Regulation Section 1.1001-2 is no less than the amount of such liability that is allocated to such asset in accordance with Treasury Regulation Section 1.704-2(d)(2)); (b) all liabilities of the Company were paid in accordance with their terms from the amounts specified in clause (a) of this sentence; (c) any Member that was obligated to contribute any amount to the Company pursuant to this Agreement or otherwise (including the amount a Member would be obligated to pay to any third party pursuant to the terms of any liability or pursuant to any guaranty, indemnity, or similar ancillary agreement or arrangement entered into in connection with any liability of the Company) contributed such amount to the Company; (d) all liabilities of the Company that were not completely repaid pursuant to clause (b) of this sentence were paid in accordance with their terms from the amounts specified in clause (c) of this sentence; and (e) the balance, if any, of any amounts held by the Company was distributed in accordance with Section 8.4 of this Agreement.

**"Taxable Year"** of the Company means a calendar year ending on December 31.

**"Termination Event"** means, with respect to any Member other than Sponsors, US Xpress or a Warrantholder, the termination of such Member's relationship to the Company or any of its affiliates, whether in the capacity of a Member, Manager, Officer, employee or consultant, for any reason (including death or disability).

**"Term Loan Agreement"** means the Term Loan and Security Agreement dated as of April 3, 2015, among the Purchased Subsidiary, the Company, the several banks and other financial institutions or entities from time to time parties thereto, as lenders, and Brightwood Loan Services LLC, as administrative agent and as collateral agent, as amended, restated, replaced or refinanced from time to time pursuant to its terms.

**"Term Loan Documents"** means the Term Loan Agreement, and each other security agreement, pledge, certificate, note or other agreement (other than this Agreement) entered into in connection with the Term Loan Agreement, in each case, as amended, restated, modified or replaced pursuant to its terms.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, or otherwise dispose of, whether for consideration or gratuitously.

"**Treasury Regulation**" or "**Regulation**" means, with respect to any referenced provision, such provision of the regulations of the United States Department of the Treasury or any successor provision.

"**Units**" has the meaning set forth in Section 3.1.

"**Unvested Units**" means with respect to a Member who is or was granted Class D Units pursuant to the Equity Incentive Plan or otherwise, the number of Class D Units or other securities held by such Member that as of the applicable time of determination remain subject to a risk of forfeiture, with such number of Class D Units to be determined by reference to the restricted unit or other award agreement between the Company and such Member and pursuant to the Equity Incentive Plan, if such Class D Units were issued pursuant to the Equity Incentive Plan. Furthermore, consistent with Section 13.1, the Board shall have the authority, without Member approval, to amend Exhibit A hereof from time to time to properly reflect a Member's Units, Vested Units, and Unvested Units.

"**US Xpress**" means Xpress Holdings, Inc., a Nevada corporation.

"**Vested Units**" means any Class D Units held by a Member which are not Unvested Units.

"**Warrant**" means that certain Unit Purchase Warrant originally issued to Brightwood, or its designee, of even date herewith, and any replacements or substitutes thereof, in each case, as amended, restated or modified from time to time pursuant to its terms.

"**Warrantholder**" means Brightwood, or its designee or transferee, as holder of a Warrant, prior to the full exercise of a Warrant, and/or as a holder of Class E Units upon exercise of a Warrant.

1.2.    **Interpretation.**   The terms defined in this Agreement shall include the plural as well as the singular as applicable. Capitalized terms used in this Agreement and not defined in this Article 1 shall have the meanings ascribed to such terms elsewhere in this Agreement. Some lower case terms that appear throughout this Agreement also appear above in this Article 1 and elsewhere in this Agreement as capitalized terms. Only when such terms appear as capitalized terms shall such terms have the meanings ascribed to such capitalized terms in this Agreement. Where the context of this Agreement requires, the use of a pronoun of one gender is to be deemed to include a pronoun of the appropriate gender or the neuter.

## ARTICLE 2.
## THE LIMITED LIABILITY COMPANY

2.1.    **Formation.**   The Company has been organized as a limited liability company by the filing of the Certificate of Formation with the Secretary of State of Delaware, in accordance with and pursuant to the Act. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.

2.2.    **Agreement; Effect of Inconsistencies with Act.**   It is the express intention of the parties that this Agreement shall be the sole agreement of the parties with respect to the subject matters set forth herein, and this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in

order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such amendment or interpretation. The Members and the Managers shall be entitled to rely on the provisions of this Agreement, and the Members and the Managers shall not be liable to the Company for any action or refusal to act taken in good faith reliance on the terms of this Agreement.

2.3.    **Name.**    The name of the Company is "XGS Acquisition, LLC."  The Company may conduct business under that name or any other name selected by the Board, from time to time, in accordance with applicable law.  The Board shall, on behalf of the Company, cause to be executed and filed any certificates, articles, fictitious business name statements, and the like, and any amendments or supplements thereto, as the Board considers appropriate or advisable.

2.4.    **Place of Business.**    The principal place of business of the Company shall be at such place within or outside of the State of Delaware as the Board may from time to time designate.  The Company may maintain offices and places of business at such other place or places as the Board may determine.

2.5.    **Registered Office; Registered Agent.**    The Company's registered agent and registered office in Delaware shall be that Person and location reflected in the Certificate of Formation as filed with the Secretary of State of the State of Delaware or such other Person or location as the Board may from time to time select upon the appropriate filings with the Secretary of State of Delaware.

2.6.    **The Members.**    The name and address of the Members are as set forth on Exhibit A.

2.7.    **Term.**    The term of the Company commenced upon the date of the filing of the initial Certificate of Formation with the Secretary of State of Delaware and shall continue until such time as the Company is dissolved pursuant to the terms hereunder or pursuant to the Act.

2.8.    **Company Purposes/Related Authorizations.**

(a)    General.    The Company has been formed for the purpose of (either directly or indirectly through one or more wholly or partially owned subsidiaries, joint ventures, trusts, co-investments or other similar arrangements) conducting the following activities:  (i) engaging in business or activities involving trucking, transportation and logistics; and (ii) and undertaking such additional activities as are related to or incidental to any of the foregoing provisions of this Section.

(b)    Related Actions.    Each of the parties to this Agreement acknowledges and agrees that the Company intends to be treated and classified for all U.S. federal (and applicable state and local) tax purposes as a partnership.  The Board shall be and hereby is authorized and empowered (without the need to obtain any additional consents of any other Person) to take any actions, and to execute, deliver and file documents, instruments, forms, or elections (including but not limited to any necessary or appropriate filings with the Internal Revenue Service) as shall be deemed by the Board to be necessary or appropriate in order to evidence, reflect or give effect to any of the matters described in this Section. Subject to compliance with the Loan Documents, the Board shall also be and hereby is authorized and empowered, for and on behalf of the Company, and without the need to obtain any further consents of any other Person, to enter into (on behalf of the Company) one or more financing arrangements (including but not limited to, loans, lines of credit, credit lines, sale/leaseback or similar transactions), on a secured and/or unsecured basis, as the Board shall determine, in its sole discretion, may be necessary or appropriate in order to finance any or all of the amounts required by the Company in connection with its activities (including but not limited to any amounts deemed by the Board in its discretion as shall be

10

necessary or appropriate in order to refinance any existing obligations of the Company and/or to fund distributions to the Members or otherwise). Any and all actions heretofore taken by the Board, any Manager and/or any officer of the Company in compliance with this Agreement on behalf of the Company in furtherance of the matters described in this Section are hereby approved, ratified, and adopted in full.

2.9. **Filings**. The Board shall take any and all actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity qualified to do business and in good standing in every jurisdiction where the character of the properties owned or leased by the Company or the nature of the business conducted by the Company makes such qualification necessary, including causing the Company to register as a foreign limited liability company with the appropriate offices of one or more states, as determined by the Board.

**ARTICLE 3.**
**CAPITAL CONTRIBUTIONS; UNITS**

3.1. **Company Units.** The Company's Membership Interests shall be represented by units (collectively, the "**Units**"), which are initially hereby designated into four (4) classes, the first of which shall be referred to as the "**Class A Units**" and the second of which shall be referred to as the "**Class B Units**" and the third of which shall be referred to as "**Class C Units**" and the fourth of which shall be referred to as "**Class D Units**." Pursuant to Section 3.3(e) below, the Board is also authorized to issue "**Class E Units**" at a future date, however, no Class E Units are outstanding as of the Effective Date. Each class of Units shall be ascribed such rights, privileges, preferences and duties as are ascribed to each such class pursuant to the terms of this Agreement or as authorized by the Board. Except as otherwise required pursuant to any non-waivable provision of applicable law or as otherwise set forth herein, it is acknowledged and agreed that the Class B Units and Class D Units shall be non-voting Membership Interests in all respects.

3.2. **Capital Contributions.** Each of the parties hereto agrees that each of the Persons identified as Members on Exhibit A attached hereto have made Initial Capital Contributions to the Company of cash and/or other consideration in the amounts set forth on Exhibit A. On and as of the Effective Date, the Membership Interests heretofore held by each Member shall be, and hereby are, represented by that number and classes of Units as is set forth opposite each of their respective names on such Exhibit A.

3.3. **Initial Issuances of Units.**

(a)   Class A Units. Each of the Members identified on Exhibit A as holding Class A Units shall be and hereby is admitted to the Company as a Member, and is hereby issued that number of Class A Units as is set forth opposite its name on Exhibit A, attached hereto.

(b)   Class B Units. Pursuant to the Purchase Agreement, US Xpress is hereby issued that number of Class B Units as is set forth opposite its name on Exhibit A, attached hereto. US Xpress is assigned an initial Capital Account balance as of the Effective Date in the amount set forth opposite its name on such Exhibit A attached hereto.

(c)   Class C Units. Each Class C Member identified on Exhibit A as holding Class C Units shall be and hereby is admitted to the Company as a Member, and is hereby issued the number of Class C Units set forth opposite its name on Exhibit A attached hereto.

(d)   Class D Units.

11

(i)       The Board is authorized to issue a number of Class D Units (or options to acquire such Class D Units) up to an aggregate amount representing a ten percent (10%) fully-diluted interest in the Company, pursuant to the provisions of the Equity Incentive Plan.  The Class D Units may be issued to Managers, employees, officers, consultants and other key service providers to the Company, in each case in accordance with the Equity Incentive Plan.  Any Class D Units issued pursuant to the provisions of this Section shall be issued pursuant to the terms of a Restricted Unit Purchase Agreement, Option Agreement or other award agreement (each, an "**Award Agreement**"), which Award Agreement shall set forth the rights, privileges, terms and conditions (such as vesting or other performance restrictions) relating to the Class D Units subject to such Award Agreement as shall be determined by the Board in accordance with the Equity Incentive Plan.  Each of the Members hereto acknowledges and agrees that a number of authorized Class D Units representing an aggregate of a ten percent (10%) fully diluted interest in the Company is reserved for issuance pursuant to this Section.  Any Class D Unit that is repurchased or cancelled by the Company pursuant to the terms of the Award Agreement pursuant to which such Unit was issued or otherwise, shall no longer be deemed to be outstanding for any purpose under this Agreement and may be reissued in accordance with this Section.

(ii)       Each Person receiving Class D Units shall make a timely election under Section 83(b) of the Code with respect to such Class D Units upon their issuance, in a manner reasonably prescribed by the Company.  The Company and each Person receiving such Class D Units hereby acknowledge and agree that such Person's Class D Units, and the rights and privileges associated with such Class D Units, collectively may constitute a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, or any successor United States Internal Revenue Service or United States Treasury Department regulation or other pronouncement applicable at the date of issuance of Class D Units.  The Company and each Person who receives such Class D Units hereby agree (i) that all such Persons may be treated as partners for federal income tax purposes immediately upon issuance of such Units and (ii) so long as Revenue Procedure 2001-43, 2001 2 C.B. 191 is effective, each recipient of a "profits interest" shall comply with the provisions of Revenue Procedure 2001-43, and neither the Company nor any such Person shall perform any act or take any position inconsistent with the application of Revenue Procedure 2001-43.

(iii)       Notwithstanding anything contained herein to the contrary, the Board shall have the sole authority to determine whether an outstanding Class D Unit qualifies as a "profits interest" for United States federal, state or local or foreign tax purposes based upon all of the facts and circumstances existing at the time and that are deemed relevant, in the Board' good faith discretion, to such determination.   Such determination shall be binding and conclusive for all purposes of this Agreement.

(e)       Warrant/Class E Units.  The Board is authorized to issue a number of Class E Units representing a five percent (5%) fully-diluted interest in the Company as set forth in the Warrant and Article 8 of this Agreement as well as the other rights and privileges set forth herein, pursuant to and upon exercise of the Warrant.  The Board is also authorized (subject to Section 13.1 hereof), without further approval of the Members, upon the exercise of the Warrant, to amend, restate or otherwise modify the provisions of this Agreement to the extent necessary to comply with the terms of the Warrant.

3.4.    **Future Capital Contributions**.  Except as otherwise provided in this Agreement, no Member or Warrantholder shall be obligated pursuant to this Agreement to make any additional Capital Contributions to the Company or to guarantee the obligations of the Company or any Subsidiary.

3.5.    **No Right of Partition**.  No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

36285064.14

3.6.    **Title to Assets**.  The assets of the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, or collectively, shall have any ownership interest in such assets or any portion thereof and legal title to such assets shall be held in the name of the Company.

3.7.    **Uncertificated Interests.**  The Units in the Company shall not be represented by any form of certificate.  This Agreement shall not be amended to provide that any Units in the Company shall at any time constitute securities under Article 8 of the Uniform Commercial Code of the applicable jurisdiction. None of the provisions of this Agreement may be amended in any way to provide for or permit the Company to issue certificated Units without the prior written consent of the Company's lenders (or, with respect to Units issued to US Xpress, US Xpress' lenders or any collateral trustee or collateral agent for such lenders), including, but not limited to, PNC Bank and Brightwood, and any such amendment executed without PNC Bank's and Brightwood's (or, with respect to Units issued to US Xpress, US Xpress' lenders or any collateral trustee or collateral agent for such lenders) consent shall be null and void. Without limitation to any other provision hereunder, the Members hereby authorize the Board to, from time to time, update this Agreement to reflect changes in the Members and/or the outstanding Units in the Company and/or Capital Accounts of such Members, in each case only to the extent such updates accurately reflect changes and events done in accordance with the terms and conditions of this Agreement.

3.8.    **No Withdrawal; No Interest**.  Except as otherwise provided in this Agreement, no Member shall demand or be entitled to receive a return of or interest on any portion of its Capital Contributions or Capital Account and no Member shall withdraw any portion of its Capital Contributions or Capital Account or receive any distributions from the Company as a return of capital on account of such Capital Contributions or Capital Account.

3.9.    **Safe Harbor Election.**  The Members agree that the Company is authorized to make an election, on behalf of itself and of all Members, to have the "Safe Harbor" of Section 3.03 of IRS Notice 2005-43 and Proposed Treasury Regulations § 1.83-3($l$) (or the corresponding provision in any Revenue Procedure or regulation issued in execution of the provisions of such Notice) (the "Safe Harbor") apply irrevocably with respect to all interests in the Company transferred in connection with the performance of services while such election remains in effect (such election, the "**Safe Harbor Election**").  The Safe Harbor Election confirms that the fair market value of any interest in the Company transferred in connection with the performance of services shall treated as being equal to the liquidation value of that interest.  The Safe Harbor Election shall be effective as of the date hereof and, to the extent so required, as of the date of the issuance of any interests in the Company transferred in connection with the performance of services. The Company and each Member agrees to comply with all requirements of the Safe Harbor with respect to all interests in the Company transferred in connection with the performance of services, whether such Members were admitted as Members or as transferees of previous Members. The Company shall comply with all record-keeping requirements and other administrative requirements with respect to the Safe Harbor as shall be required by proposed or final regulations relating thereto, to the extent the Board so determines in its sole and absolute discretion.

The Board shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to any interest transferred in connection with the performance of services. Further, the Board is hereby authorized and empowered, without further vote or action of the Members, to amend the Agreement as necessary to comply with or otherwise provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member. Any undertakings by the Members necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and to the extent so reflected shall be binding on each Member, respectively, provided, that

13

such amendments are not reasonably likely to have a material adverse effect on the rights and obligations of the Members.

Each Member agrees to cooperate with the Board to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the Board.

No transfer, assignment or other disposition of any interest in the Company by a Member shall be effective unless prior to such transfer, assignment or disposition the transferee, assignee or intended recipient of such interest shall have agreed in writing to be bound by the provisions of this Section 3.9 in form satisfactory to the Board.

**ARTICLE 4.**
**MANAGEMENT**

4.1.    **Management of Business.**  Except as otherwise provided hereunder, the business, property and affairs of the Company will be governed by, and all powers of the Company will be exercised by, or under the direction of the Company's managers (each a "**Manager**" and collectively, the "**Board**").  Except as specifically provided otherwise herein, the Board shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to enter into and perform all contracts and other undertakings which it may deem necessary or incidental to the purposes of the Company set forth in this Agreement.

4.2.    **Number, Election and Term of Office.**  The number of Managers of the Company shall be fixed from time to time by a Majority Vote of the Members; provided, that the initial number of Managers shall be fixed at five (5).   A Manager shall serve until his successor shall have been duly designated or until the earlier of his resignation, removal or death.  The initial Managers shall be David Panton, Murad Karimi, Jake Lajoie, Adam Cohen and Larry Gildersleve.

4.3.    **Compensation.**  Subject to Section 5.8, (a) a Manager may receive such compensation for his services as a manager as may be fixed by the Board from time to time, and (b) a Manager may also serve the Company in one or more capacities other than that of Manager and receive compensation for services rendered in those other capacities.

4.4.    **Committees of the Board.**  The Board may designate from among its members any standing committee or one or more other ad hoc committees, each consisting of one or more Managers, who serve at the pleasure of the Board.  Each committee shall have the authority set forth in the resolution establishing the committee or in any other resolution of the Board specifying, enlarging, or limiting the authority of the committee.

4.5.    **Liability of Members and Managers.**  Neither the Members nor any Manager shall be liable as Member or Manager for the liabilities of the Company except as set forth in this Agreement or pursuant to explicit non-waivable provisions of the Act.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Member or any Manager for liabilities of the Company.

4.6.    **Fiduciary Duties.**  The Members and the Company hereby agree that the duties and obligations imposed on the Members and Managers as such shall be those set forth in this Agreement, which is intended to govern the relationship between the Company, the Managers, and the Members, and no fiduciary or other duties shall be imposed or implied or shall exist between the Company, the

14

Managers, and the Members, or among any of them, notwithstanding any provisions of the Act or common law to the contrary, except as may be specifically and explicitly required by the provisions hereof or by non-waivable provisions of the Act.  In discharging its duties, any Member or Manager shall be fully protected in relying in good faith upon such information, opinions, reports or statements by any of its agents, or by any other Person, as to matters the Member or Manager reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.

4.7.   **Indemnification.** The Company shall indemnify, Members, Managers and Officers (each an "**Indemnified Person**") for all costs, losses, liabilities and damages paid or accrued by a such Indemnified Person in connection with the business of the Company or because such Indemnified Person is a Member, Manager, or Officer to the fullest extent provided for, or allowed by, the laws of the State of Delaware, provided, however, that (a) such Indemnified Person acted in good faith in a manner that such Indemnified Person believed was in or not opposed to the best interests of the Company, (b) such Indemnified Person's conduct did not constitute a knowing violation of law or willful misconduct, and (c) no Indemnified Person shall be entitled to indemnification under this Section 4.7 from any claim brought against such Indemnified Person (i) relating to a breach of this Agreement by such Indemnified Person, or (ii) by the Company or its Subsidiaries relating to or arising out of the Purchase Agreement or any other agreement, document or instrument entered into by the Company or its Subsidiaries pursuant to or in connection with the Purchase Agreement.  In addition, the Managers shall cause the Company to advance costs of participation in any legal proceedings to the Indemnified Person, subject to an undertaking from such Person to return such amounts if it is finally determined by a court of competent jurisdiction that such Person is not entitled to indemnification hereunder.  Subject to the provisions of this Section 4.7, the Managers may cause the Company to indemnify all other employees and agents of the Company for all costs, losses, liabilities and damages paid or accrued by the agent or employee in connection with the business of the Company or because such Person is an agent or employee, to the fullest extent provided for, or allowed by, the laws of the State of Delaware.

4.8.   **Authority of Managers to Bind the Company.** The Managers and agents of the Company authorized by the Managers, including, without limitation, the Officers of the Company, shall have the authority to bind the Company, but only as and to the extent authorized by the Board. Notwithstanding the foregoing, the Members hereby authorize and approve (a) that certain loan by PNC Bank to the Purchased Subsidiary in the original commitment amount of $17,500,000 pursuant to the terms of the PNC Credit Agreement (the "**PNC Loan**"), (b) that certain loan by Brightwood and the other lenders party to the Term Loan Agreement to the Purchased Subsidiary in the original principal amount of $14,000,000.00 (the "**Term Loan**" and together with the PNC Loan, the "**Loans**"), (c) the issuance of the Warrant to Brightwood in connection with the Term Loan, and (d) the Purchase Agreement, and hereby authorize and direct, ratify and confirm the execution, delivery and performance thereunder by the Company, acting through the Board and/or the duly authorized Officers or authorized persons of the Company, of all the agreements, instruments, certificates and documents to be entered into in connection with the Loans, the Warrant and the Purchase Agreement.

4.9.   **Protective Provisions**. So long as a Warrantholder holds any Warrant or any Class E Units, the Company shall not, and shall not permit or cause any of its Subsidiaries to, enter into any transaction (including, without limitation, any purchase, sale, lease or exchange of property, the rendering of any service, or the payment of or agreement to pay any management fees) with (a) any officer, director, manager, employee, consultant, equity holder or other Affiliate of the Company or any of its Subsidiaries except in the ordinary course of its business and upon fair and reasonable terms that are no less favorable to it than it would obtain in a comparable arm's length transaction with a Person other than an Affiliate of the Company or any of its Subsidiaries, or (b) the Sponsor(s) (or any officer, director, manager, partner, member or employee of a Sponsor), except as expressly permitted pursuant to Section 7.10 (Transactions

with Affiliates) of the Term Loan Agreement and Section 7.10 (Transactions with Affiliates) of the PNC Loan Agreement.

4.10.   **Observers.**   So long as the Warrantholder holds Warrants or five years from the date of this Agreement, whichever is longer, Brightwood shall have the right to designate one observer (the "**Lender Observer**"), and until the Class B Redemption Amount has been paid in full the Class B Member shall have the right to designate one observer (the "**Class B Observer**" and together with the Lender Observer, the "**Board Observer(s)**"), in each case, to attend, as a nonvoting observer, meetings of the Board (or similar governing body) of the Company and its Subsidiaries and each meeting of any committee thereof, which board meetings shall be held at least once per fiscal quarter (each, a "**Board Meeting**").   The Company shall provide the Board Observer(s) with (a) reasonable advance notice of all Board Meetings or notice of such Board Meetings at the same time such notice is delivered to the Managers, and (b) provide all documents and other written materials (including consents) delivered to the Managers, in connection with such meetings at the same time such notice and documents and other written materials are delivered to the Managers. The Company shall reimburse the Lender Observer for out-of-pocket expenses (including travel and lodging expenses) related to attendance at Board Meetings. The Board Observer(s) shall be subject to the same obligations of confidentiality as a Manager, except that the Board Observer(s) may disclose or communicate information to the administrative agent and any lender under the Term Loan agreement notwithstanding such obligations.   Notwithstanding the foregoing, the Company reserves the right to withhold any information and to exclude such representatives from any meeting or portion thereof if access to such information or attendance at such meeting would lead to a waiver of the attorney-client privilege between the Company and its counsel, provided that all other persons that are not Managers, Officers or employees of the Company or its Subsidiaries are also excluded from such meeting or information. The Company shall maintain directors and officers insurance in amounts not less than required by applicable law and acceptable to Brightwood and shall enter into individual indemnification agreements with each Board Observer in form and substance satisfactory to Brightwood.

## ARTICLE 5.
## MEETINGS OF THE BOARD OF MANAGERS

5.1.   **Regular Meetings.**   The Board shall, by prior resolution, hold regular meetings at such times as determined by the Board to be necessary but not less than once each calendar quarter.

5.2.   **Special Meetings.**   Special meetings of the Board may be called by or at the request of any Manager in office at that time.   The notice for any special meeting shall specify the purpose of such meeting.

5.3.   **Place of Meetings.**   Managers may hold their meetings at any place that the Board may establish from time to time.

5.4.   **Notice of Meetings.**   Unless waived in accordance with Section 5.5, the Company shall give at least forty-eight (48) hours prior written notice to each Manager and the Board Observer(s) of the date, time, and place of each meeting of the Board.   Notice of a meeting shall be deemed to have been given to any Manager and the Board Observer(s) in attendance at any prior meeting at which the date, time, and place of the subsequent meeting was announced.   Notice of any meeting hereunder may be given by (a) leaving such notice with the Manager or the Board Observer(s) at the residential or business address last provided via notice by such Manager or the Board Observer(s) to the Company in accordance with this Agreement, (b) mailing it, postage prepaid, and addressed to such Manager or the Board Observer at his residential or business address last provided via notice by such Manager or Board Observer to the Company in accordance with this Agreement, (c) facsimile telecommunication directed to

a number as last provided via notice by such Manager or Board Observer to the Company in accordance with this Agreement or (d) electronic mail to the electronic mail address of the Manager or the Board Observer as last provided via notice by such Manager or Board Observer to the Company in accordance with this Agreement. The Board Observer(s) will receive, concurrently with notice to the Managers, (i) notice of all Board Meetings, copies of Board meeting minutes and notices of all committee meetings, and (ii) any materials delivered to the Managers including drafts and final versions of any resolutions proposed to be adopted by written consent.

5.5.    **Waiver of Notice.**  A Manager or Board Observer may waive any notice required by the Act, the Certificate of Formation or this Agreement before or after the date and time of the matter to which the notice relates, by a written waiver signed by the Manager or Board Observer and delivered to the Company for inclusion in the minutes or filing with the Company's records.   Attendance by a Manager or Board Observer at a meeting shall constitute waiver of notice of the meeting, except where a Manager or Board Observer at the beginning of the meeting (or promptly upon his arrival) objects to holding the meeting or to transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

5.6.    **Quorum.**   At meetings of the Board, a majority of the Managers then in office shall constitute a quorum for the transaction of business.

5.7.    **Vote Required for Action.**  If a quorum is present when a vote is taken, a Majority Vote of the Managers will be the act of the Board, unless the vote of a greater number is required by the Act, the Certificate of Formation, or this Agreement.   A Manager who is present at a meeting of the Board when corporate action is taken is deemed to have assented to the action taken unless: (a) he objects at the beginning of the meeting (or promptly upon his arrival) to holding the meeting or transacting business at it; (b) his dissent or abstention from the action taken is entered in the minutes of the meeting; or (c) he delivers written notice of dissent or abstention to the presiding officer of the meeting before its adjournment or to the Company immediately after adjournment of the meeting.  The right of dissent or abstention is not available to a Manager who votes in favor of the action taken.

5.8.    **Major Actions to be Approved by the Class B Member.**  Notwithstanding anything in this Agreement to the contrary, but subject to Section 13.14, until payment in full of the Class B Redemption Amount, the Board may not approve, nor shall the Company or any of its subsidiaries take, any of the following actions without the prior approval of the Class B Member (the "**Major Actions**"):

(a)    amend, alter or repeal this Agreement, the Certificate of Formation or the Company's other organizational documents in any manner that would, directly or indirectly, adversely affect the rights of the holders of Class B Units;

(b)    enter into, or agree to enter into any transaction or series of related transactions constituting a Liquidity Event except to the extent the terms of the Liquidity Event will provide for full payment of the Class B Redemption Amount;

(c)    liquidate, dissolve or wind-up the Company except to the extent such a liquidation, dissolution and winding up of the Company will result in full payment of the Class B Redemption Amount;

(d)    increase the management or consulting fees (direct or indirect or however characterized) accrued or paid to Sponsors and their Affiliates, including for services as an officer or manager of the Company, for any annual period to an amount in the aggregate greater than the lesser of (i) five percent (5%) of EBITDA (as defined in the PNC Credit Agreement as in effect on the date hereof)

17

calculated for the immediately preceding twelve (12) month period and $600,000.00; provided that such management fees shall not be less than $400,000.00 in each fiscal year; or

        (e)      allow the Company to accrue or pay, agree to pay or assume the obligation to pay any costs, fees or expenses in excess of $3,000,000.00 related to the closing of the transactions consummated pursuant to (i) that certain Membership Interest Purchase Agreement, dated as of April 3, 2015 by and among the Company, Xpress Global Systems, LLC, Xpress Holdings, Inc., and U.S. Xpress Enterprises, Inc.; (ii) that certain Revolving Credit and Security Agreement, dated as of April 3, 2015, by and among the Company, Xpress Global Systems, LLC and PNC Bank, National Association; (iii) that certain Term Loan and Security Agreement, dated as of April 3, 2015, by and among the Company, Xpress Global Systems, LLC and Brightwood Loan Services, LLC, and the other lenders from time to time a party thereto; (iv) any investigation, diligence, negotiation, prior financing, or other activities in connection therewith, and (v) any documents or transactions associated with any of the foregoing .

     5.9.    **Action by Managers Without a Meeting.**  Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a written consent, describing the action taken, is signed by all Managers necessary to approve the action and delivered to the Company for inclusion in the minutes or filing with the Company's records.  The consent may be executed in one or more counterparts, and shall have the same force and effect as a vote of the Board taken at a duly convened meeting.

     5.10.   **Participation by Conference Telephone.**  Managers and the Board Observer(s) may participate in a meeting of the Board by means of conference telephone or similar communications equipment through which all persons participating may hear and speak to each other.  Participation in a meeting pursuant to this Section 5.10 shall constitute presence in person at the meeting.

     5.11.   **Adjournments.**  A meeting of the Board, whether or not a quorum is present, may be adjourned by a majority of the Managers present to reconvene at a specific time and place.  It shall not be necessary to give notice to the Managers of the reconvened meeting or of the business to be transacted, other than by announcement at the meeting that was adjourned.  At any such reconvened meeting at which a quorum is present, any business may be transacted that could have been transacted at the meeting that was adjourned.

## ARTICLE 6.
## OFFICERS

     6.1.    **Officers.**  The Company may, if the Board so determines, have such officers (each, an "**Officer**") as the Board shall from time to time elect.  Officers may, but need not, be affiliated with any Member.  Any individual may hold one or more office.

     6.2.    **Powers and Duties.**  Each Officer has only the authority and shall perform only the duties prescribed by the Board or as set forth in any employment or other agreement between such Officer and the Company.  An individual may simultaneously hold more than one office.  The Officers shall have authority over the daily operations of the Company and shall implement all decisions of the Board, subject to the express provisions of this Agreement and any employment or other agreement, if any, between any Officer and the Company.

     6.3.    **Expenses and Reimbursement.**  Costs and expenses incurred by the Board and/or the Company's Affiliates for and on behalf of the Company may be reimbursed by the Company to the extent approved by the Board.

6.4.    **Related Party Transactions.**   Subject to Section 4.9, when approved by the Board, the Company may employ and deal with any Member, Manager, Officer or any Affiliate of any of them for the performance of services or the purchase of goods or property or the leasing of same.

## ARTICLE 7.
## MEMBERS; MEETINGS OF THE MEMBERS

7.1.    **No Liability for Company Obligations.**   Except as otherwise required by any non-waivable provision of the Act or other applicable law, and except as provided in this Agreement or in other agreements between the Company and one (1) or more Members or their Affiliates: (a) no Member shall be personally liable or shall be required to become personally liable in any manner whatsoever for any debt, liability or other obligation of the Company or its Subsidiaries, whether such debt, liability or other obligation arises in contract (including any guarantee), tort or otherwise; and (b) no Member shall in any event have any liability whatsoever in excess of (i) the amount of its Capital Contributions, (ii) its share of assets and undistributed profits of the Company, if any, and (iii) the amount of any wrongful distribution to such Member, if, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of the Act.

7.2.    **List of Members.**   Upon written request of any Member or Warrantholder, the Company shall provide a list showing the names, addresses and Membership Interests of all Members and the other information required by the Act.

7.3.    **Representations and Warranties.**   Each Member hereby represents and warrants to the Company and each other Member, which representations and warranties shall survive the execution of this Agreement, as follows:

(a)    Due Incorporation or Formation; Authorization of Agreement.  That (i) if that Member is a corporation, it is duly incorporated, validly existing, and in good standing under the law of the state of its incorporation and is duly qualified and in good standing as a foreign corporation in the jurisdiction of its principal place of business (if not incorporated therein); (ii) if that Member is a limited liability company, it is duly formed or organized, validly existing, and in good standing under the law of the state of its organization and is duly qualified and in good standing as a foreign limited liability company in the jurisdiction of its principal place of business (if not formed or organized therein); (iii) if that Member is a partnership, trust, or other entity, it is duly formed, validly existing, and in good standing under the law of the state of its formation, and if required by law, is duly qualified to do business and in good standing in the jurisdiction of its principal place of business (if not formed therein), and the representations and warranties in clause (i), (ii) or (iii), as applicable, are true and correct with respect to each partner, trustee, or other member thereof; (iv) it has full corporate, limited liability company, partnership, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken; (v) it has duly executed and delivered this Agreement; and (vi) its authorization, execution, delivery, and performance of this Agreement does not conflict with any other agreement or arrangement to which it is a party or by which it is bound.

(b)    Investment.  It is acquiring its Membership Interests in the Company based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise. Its acquisition of Membership Interests in the Company is being made for its own account for investment, and not with a view to the sale or distribution thereof. In the case of each Member, such Member is a sophisticated

investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Membership Interests in the Company.

7.4.    **Meetings.**  Meetings of the Members, for any purpose or purposes, may be called by any Class A or Class C Member, but, except as set forth in this Agreement or as required by the Act, no meetings of the Members, including annual, regular or special meetings, are required.

7.5.    **Place of Meetings.**  The Member(s) calling any meeting may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members.  If no designation is made the place of meeting shall be the principal executive office of the Company.

7.6.    **Notice of Meetings.**  Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than two (2) nor more than ten (10) days before the date of the meeting.  Notice of a meeting shall be deemed to have been given to any Member in attendance at any prior meeting at which the date, time, and place of the subsequent meeting was announced.  Notice of any meeting hereunder may be given by (a) leaving such notice with the Member at the residential or business address last provided via notice by such Member to the Company in accordance with this Agreement, (b) mailing it, postage prepaid, and addressed to such Member at his residential or business address last provided via notice by such Member to the Company in accordance with this Agreement, (c) facsimile telecommunication directed to a number as last provided via notice by such Member to the Company in accordance with this Agreement or (d) electronic mail to the electronic mail address of the Member as last provided via notice by such Member to the Company in accordance with this Agreement.  Notice provided in accordance with this Section 7.6 shall be effective notwithstanding anything in the Act to the contrary.

7.7.    **Meeting of all Members.**  If all of the Members shall meet at any time and place, either within or outside of the State of Delaware, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting, any lawful action may be taken.

7.8.    **Quorum.**  The presence, in person or by proxy, of Members holding at least a majority (more than 50%) of the Membership Interests represented by Class A Units and Class C Units shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any such meeting, any Member so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

7.9.    **Voting.**  Each Member shall be entitled to vote its relative percentage of ownership of the Company evidenced by its Class A Units or Class C Units on any matter to be voted upon or consented to by the Members of the Company.  Except as set forth in this Agreement and except as required by law, Member approval, when required, will require approval of a Majority Vote of the Class A Units and Class C Units combined and there shall be no voting by classes.  Such vote may be taken at a meeting of the Members or by written consent.

7.10.    **Proxies.**  A Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such written proxy shall be delivered to the Company.

7.11.    **Action by Members Without a Meeting.**  Action required or permitted to be taken by the Members at a meeting may be taken without a meeting if the action is evidenced by one or more written consents describing the action that is taken, signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which

36285064.14

all Members entitled to vote thereon were present and voted. Action taken under this Section 7.11 is effective when all of the Members entitled to vote on such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

7.12. **Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

7.13. **Meeting by Telephone.** Members may also meet by conference telephone call if all Members can hear one another on such call and the requisite notice is given or waived.

**ARTICLE 8.**
**CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS**

8.1. **Capital Accounts.** A capital account for each Member (the "Capital Accounts") will be established on the Company's books and records and maintained in accordance with the following provisions:

(a)     To each Member's Capital Account there shall be added: (i) such Member's Capital Contributions; (ii) such Member's allocable share of income, gain and profit and any items in the nature of income or gain that are specially allocated to such Member pursuant to this Agreement; and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)     From each Member's Capital Account there shall be subtracted: (i) the amount of cash and the Gross Asset Value of any Company assets (other than cash and as determined by the Board) distributed to such Member (other than any payment of principal and/or interest to such Member pursuant to the terms of a loan made by the Member to the Company) pursuant to any provision of this Agreement; (ii) such Member's allocable share of losses, deduction and expense and any other items in the nature of expenses or losses that are specially allocated to such Member pursuant to this Agreement; and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)     In the event any Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations. In the event that the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Regulations, the Board may such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

(e)     Subject to applicable law, notwithstanding anything herein to the contrary, no Warrantholder shall be a "partner" of the Company for income tax purposes, nor shall any Warrantholder have a Capital Account or be allocated any Profits or Losses, in each case, unless and

21

until such Warrantholder exercises, in whole or in part, a Warrant. The Company will prepare its tax filings on this basis unless required by law to do otherwise.

8.2.    **Allocations.**

(a)    <u>Allocations of Profits and Losses</u>.

(i)    **Profits and Losses from Operations.** After giving effect to the special allocations set forth in Section 8.2(c), and subject to applicable law, the Company's Profits and Losses (and, if necessary, individual items of Profits and Loss) for each Fiscal Year from all operations and transactions, other than sales that result in Available Cash from a Liquidity Event, shall be allocated annually and at such other times as the Board may determine to all Class A Members and all Class D Members in accordance with the ratio that the number of Class A Units and Class D Units held by each Class A Member and each Class D Member bears to the aggregate number of all the Class A Units and Class D Units issued and outstanding.

(ii)    **Profits and Losses From a Liquidity Event.** After giving effect to the special allocations set forth in Section 8.2(c), and subject to applicable law, the Company's Profits and Losses (and, if necessary, individual items of Profits and Loss) for each Fiscal Year from Liquidity Events shall be allocated annually and at such other times as the Board may determine to the Members in such manner that the Capital Account balance of each Member shall, to the greatest extent possible, be equal to the amount, positive or negative, that would be distributed to such Member (in the case of a positive amount) or for which such Member would be liable to the Company under this Agreement (in the case of a negative amount), if (a) the Company were to sell the assets of the Company for their Gross Asset Values, (b) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liability), (c) the Company were to distribute the proceeds of sale pursuant to Section 8.4, and (d) the Company were to dissolve pursuant to Article 12, minus such Member's share of Company minimum gain (as set forth in Treas. Reg. § 1.704-2(b)(2)) and any other Member minimum gain, computed immediately prior to the hypothetical sale of assets. In the event any Unvested Units are not treated as Units for purposes of Section 8.4, then such Unvested Units shall not be treated as Units for purposes of this Section 8.2.

(b)    <u>Allocations upon a Transfer</u>. In the case of a Transfer of a Membership Interest during any Fiscal Year of the Company, the assigning Member and transferee shall each be allocated Profits or Losses based on the number of days each held the Membership Interest during that Fiscal Year.

(c)    <u>Special Allocations</u>. The following special allocations shall, except as otherwise provided, be made in the following order:

(i)    Nonrecourse deductions for any Taxable Year or other period shall be allocated (as nearly as possible) under Treasury Regulation Section 1.704-2 to the Members, pro rata in proportion to their respective Membership Interests.

(ii)    Any Member nonrecourse deductions for any Taxable Year or other period shall be allocated to the Member that made or guaranteed or is otherwise liable

with respect to the loan to which such Member nonrecourse deductions are attributable in accordance with principles under Treasury Regulation Section 1.704-2(i).

(iii)     In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 8.2(c)(iii) shall be made only if and to the extent that such member Holder would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 8.2(c)(iii) have been tentatively made as if this Section 8.2(c)(iii) were not in the Agreement.

(iv)     No allocation of loss or deduction shall be made to any Member if, as a result of such allocation, such Member would have a deficit in his Capital Account deficit unless all Members have an adjusted Capital Account deficit.  Any such disallowed allocation shall be made to the Members entitled to receive such allocation under Treasury Regulation Section 1.704-1(b)(2)(iv) in proportion to their respective Membership Interests.  If losses or deductions are reallocated under this Section 8.2(c)(iv), subsequent allocations of income and losses (and items thereof) shall be made so that, to the extent possible, the net amount allocated under this Section 8.2(c)(iv) equals the amount that would have been allocated to each Member if no reallocation had occurred under this Section 8.2(c)(iv).

(v)     For purposes of Section 752 of the Code and the Treasury Regulations thereunder, excess nonrecourse liabilities (within the meaning of Treasury Regulations Section 1.752-3(a)(3)) shall be allocated to the Members pro rata in proportion to their respective Membership Interests.

The allocations contained herein (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulation Sections 1.704-1 and 1.704-2. The Regulatory Allocations shall be taken into account in allocating Profits and Losses and other items of income, gain, loss and deduction among the Members so that to the extent possible, the aggregate of (i) the allocations made to each Member under this Agreement other than the Regulatory Allocations and (ii) the Regulatory Allocations made to each Member shall equal the net amount that would have been allocated to each Member had the Regulatory Allocations not occurred as necessary to effect the intent of Section 8.2(a).

(vi)     Preferred Return Allocations.

(A)     Class B Preferred Return.  All or a portion of the remaining items of Company income or gain, if any, shall be specially allocated to the Class B Members in proportion to and to the extent of the excess, if any, of (i) the cumulative Class B Preferred Return (or Class B Adjusted Preferred Return, if applicable) distributions each such Class B Member has received pursuant to Section 8.3(a)(i) and Section 8.4(a)(i) from the commencement of the Company to a date thirty (30) days after the end of such Fiscal Year, over (ii) the cumulative items of income and gain allocated to such Class B Member pursuant to this Section 8.2(c)(vi)(A) for all prior Fiscal Years.

(B)      Sponsor Preferred Return.  All or a portion of the remaining items of Company income or gain, if any, shall be specially allocated to Sponsors in proportion to and to the extent of the excess, if any, of (i) the cumulative Sponsor Preferred Return distributions Sponsors have received pursuant to Section 8.3(a)(iv), and Section 8.4(a)(v) from the commencement of the Company to a date thirty (30) days after the end of such Fiscal Year, over (ii) the cumulative items of income and gain allocated to Sponsor pursuant to this 8.2(c)(vi)(B) for all prior Fiscal Years.

(d)      **Alternative Allocations.**

(i)      For purposes of Sections 8.1 and 8.2, Unvested Units and that portion of a Member's Capital Account, if any, attributable to Unvested Units (as determined in the reasonable discretion of the Board) generally shall be taken into account; provided, however, that if the Board determines that an allocation under Section 8.1 or 8.2 would cause taxable income, gain, or loss to be allocated to the holders of the Unvested Units, or otherwise would be inconsistent with the interests of, the Company and/or any of its Members, taking into consideration all facts and circumstances relating to such allocation, then unless otherwise determined by the Board, Unvested Units and that portion of a Member Capital Account attributable to Unvested Units (as determined in the reasonable discretion of the Board) shall not be taken into account.

(ii)      It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) be determined and allocated consistently with the provisions of the Code, including Code Sections 704(b) and 704(c), and Section 8.2 shall be interpreted and applied in a manner consistent therewith.  If the Board deems it necessary in order to comply with the Code, the Board may, and hereby is, authorized and directed to allocate income, gain, loss, deduction, or credit (or items thereof) arising in any year differently than as provided for in other provisions of Section 8.2 if, and to the extent, (i) that allocating income, gain, loss, deduction, or credit (or item thereof) would cause the determinations and allocations of each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by the Code and any Regulations promulgated thereunder or (ii) such allocation would be inconsistent with a Member's interest in the Company taking into consideration all facts and circumstances.  Any allocation made pursuant to Section 8.2(d) ("**New Allocations**") shall be deemed to be a complete substitute for any allocation otherwise provided for in this Agreement, and no further amendment of this Agreement or approval by any Member shall be required to effectuate such New Allocation.  In making any New Allocation, the Board is authorized to act in reliance upon advice of counsel to the Company or the Company's regular certified public accountants that, in their opinions after examining the relevant provisions of the Code and any current or future proposed or final Regulations thereunder, the New Allocation is necessary in order to ensure that, in either the then-current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction, or credit (or items thereof) are determined and allocated in accordance with the Code and the Member's interests in the Company.  Furthermore, New Allocations shall include allocations deemed necessary by the Board to cause each member's Capital Account to equal each such member's Target Distribution Balance as of the end of the Fiscal Year to which such allocation relates.  New Allocations made by the Board in reliance upon the advice of counsel and accountants as described above shall be deemed to be made in the best interests of the Company and all of the Members consistent with the duties of the Board hereunder, and any such New Allocations shall

24

not give rise to any claim or cause of action by any member against the Company or any Manager.

(e)     **Code Section 704(c).** Except as otherwise provided in this Section 8.2(e) each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under Section 8.2. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the member so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of "Gross Asset Value" in Section 1.1). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of "Gross Asset Value" in Section 1.1, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Board in any manner that reasonably reflects the purpose and intention of this Agreement, provided that the Company shall elect to apply the allocation method permitted by the Regulations under Code Section 704(c), and provided, further, that any items of loss or deduction attributable to property contributed by a Member shall, to the extent of an amount equal to the excess of (A) the federal income tax basis of such property at the time of its contribution over (B) the Gross Asset Value of such property at such time, be allocated in its entirety to the such contributing member and the tax basis of such property for purposes of computing the amounts of all items allocated to any other member (including a transferee of the contributing member) shall be equal to its Gross Asset Value upon its contribution to the Company. Allocations pursuant to this Section 8.2(e) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(f)     **Restatement of Capital Accounts.** The Board may cause the Company to be revalued and the Capital Accounts of each Member shall be restated in accordance with the allocation provisions set forth in Section 8.2 to reflect such Member's proportionate interest in the Company based upon such revaluation (in the context of such revaluation and restatement, the values of all assets of the Company on the books of the Company shall be adjusted to equal their respective Gross Asset Values at the time of the revaluation, taking Code Section 7701(g) into account, as determined by the Board of Managers) at such times as the Board shall determine, including upon a Liquidity Event, provided that any such adjustment shall be made only if the Board reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company.

(g)     **Non-compensatory Options.** With respect to each non-compensatory option, as defined in Treasury Regulations Section 1.721-2(f), the Company shall comply with the requirements of Treasury Regulation Section 1.704-1-(b)(4)(ix). Without limiting the generality of the foregoing, while any non-compensatory option is outstanding, the Company shall comply with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and on exercise of any such non-compensatory option, the Company shall comply with Treasury Regulation Section 1.704-1(b)(2)(iv)(s).

8.3.    **Distributions of Available Cash From Operations.**

(a)    Subject to applicable law, to the requirement to make Tax Advances in accordance with Section 8.5, and to Sections 8.8 and 8.9, the Board will cause the Company to make distributions of Available Cash from Operations, if any, within 15 days after the end of each calendar quarter (or other more frequent basis as the Board may determine) in the following order and priority:

(i)    First, one hundred percent (100%) to the holder of the Class B Units (if then outstanding) until the Class B Member receives an amount equal to the difference (if a positive number), if any, of (A) the cumulative Class B Preferred Return (and Adjusted Class B Preferred Return if applicable) from the Effective Date to the end of such calendar quarter, and (B) the sum of all prior distributions to the Class B Member pursuant to this Section 8.3(a)(i) and Section 8.4(a)(i);

(ii)    Second, one hundred percent (100%) to the holder of the Class B Units (if then outstanding) until the Class B Member has received an amount equal to the difference (if positive) of the cumulative Class B Paydown actually received by the Class B Member from the Effective Date to the end of such calendar quarter, and (B) the sum of all prior distributions pursuant to this Section 8.3(a)(ii) and Section 8.4(a)(ii);

(iii)    Third, one hundred percent (100%) to the holders of Class C Units pro rata until the Class C Members receive an amount equal to the difference (if a positive number), if any, of (A) the cumulative Class C Preferred Return from the Effective Date to the end of such calendar quarter, and (B) the sum of all prior distributions to the Class C Members pursuant to this Section 8.3(a)(iii) and Section 8.4(a)(iii); and

(iv)    Fourth, one hundred percent (100%) to the Sponsors until the Sponsors receive an amount equal to the difference (if a positive number), if any, of (A) the cumulative Sponsor Preferred Return from the Effective Date to the end of such calendar quarter, and (B) the sum of all prior distributions to the Sponsors pursuant to this Section 8.3(a)(iv) and Section 8.4(a)(iv); and

(v)    Fifth, one hundred percent (100%) to the holder of Class B Units (if then outstanding), pro rata until the Class B Member's Adjusted Capital Contribution in respect of its Class B Units is equal to zero, at which point all such Class B Units shall be deemed to have been retired and no longer outstanding; and

(vi)    The balance, if any, as determined by the Board, (A) ten percent (10%) to US Xpress or its permitted successors and assigns in respect of its Class A Units, and (B) the remaining ninety percent (90%) to the Class A Members (other than US Xpress and its permitted successors and assigns), Class C Members and Class D Members to the extent of their Vested Units pro-rata in proportion to their Membership Interests.

8.4.    **Distributions of Available Cash from a Liquidity Event.**

(a)    Subject to applicable law, and Sections 8.8 and 8.9, Available Cash from a Liquidity Event shall be distributed, as soon as reasonably practicable, at such time and in such amounts as the Board may determine, in the following order and priority:

(i)    First, one hundred percent (100%) to the holder of the Class B Units until the Class B Member receives an amount equal to the difference (if a positive number), if any, of (A) the cumulative Class B Preferred Return (and the Class B Adjusted Preferred Return, if applicable) from the Effective Date through (and after the consummation of) the day of the

26

Liquidity Event and (B) the sum of all prior distributions to the Class B Member pursuant to Section 8.3(a)(i) and this Section 8.4(a)(i);

(ii)     Second, one hundred percent (100%) to the holder of the Class B Units (if then outstanding) until the Class B Member has received (A) (y) an amount equal to the difference (if positive) of the cumulative Class B Paydown actually received by the Class B Member from the Effective Date through (and after the consummation of) the day of the Liquidity Event, and (z) the sum of all prior distributions pursuant to Section 8.3(a)(ii) and Section 8.4(a)(ii) and (B) an amount such that the Class B Member's Adjusted Capital Contribution in respect of its Class B Units is equal to zero ( at which point all such Class B Units shall be deemed to have been retired and no longer outstanding);

(iii)     Third, one hundred percent (100%) to the holders of Class E Units pro rata until the Class E Members as a group have received an amount equal to five percent (5%) of the (A) total Available Cash from a Liquidity Event that is being distributed minus (B) amounts distributed to the holder of Class B Units pursuant to Section 8.4(a)(ii);

(iv)     Fourth, one hundred percent (100%) to the holders of Class C Units pro rata until the Class C Members receive (A) an amount equal to the difference (if a positive number), if any, of (y) the cumulative Class C Preferred Return from the Effective Date to the end of such calendar quarter, and (z) the sum of all prior distributions to the Class C Members pursuant to Sections 8.3(a)(iii) and Section 8.4(a)(iv),

(v)     Fifth, one hundred percent (100%) to the holders of Class C Units pro rata until the Class C Members receive an amount such that each Class C Member's Adjusted Capital Contribution in respect of its respective Class C Units is equal to zero;

(vi)     Sixth, one hundred percent (100%) to Sponsors pro rata until the Sponsors as a group receive an amount equal to the difference, if any, of (A) the cumulative Sponsor Preferred Return from the Effective Date to the end of such calendar quarter and (B) the sum of all prior distributions to Sponsors pursuant to Section 8.3(a)(iv) and this Section 8.4(a)(vi);

(vii)     Seventh, one hundred percent (100%) as follows: (A) ten percent (10%) to US Xpress or its permitted successors and assigns in respect of its Class A Units, and (B) the remaining ninety percent (90%) to the Class A Members (other than US Xpress and its permitted successors and assigns) pro-rata in proportion to their Membership Interests, until each Class A Member's Adjusted Capital Contributions is equal to zero; and

(viii)     The balance, if any, as determined by the Board, as follows:  (A) ten percent (10%) to US Xpress or its permitted successors and assigns in respect of its Class A Units, and (B) the remaining ninety percent (90%) to the Class A Members (other than US Xpress and its permitted successors and assigns), Class C Members and Class D Members (with respect to Vested Units only) pro-rata in proportion to their Units; provided that, notwithstanding any other provision in this Agreement, Vested Units shall begin to share in distributions pursuant to this Section 8.4(a)(viii) only from and after the point at which the aggregate amount of distributions to the Class A Members and the Class C Members pursuant to Sections 8.3(a)(vi) and Sections 8.4(a)(v), and 8.4(a)(vii) that have been made after the date of issuance of such Vested Units and with respect to Units that were outstanding immediately prior to the issuance of such Vested Units, are equal to the Floor Amount for such Vested Units.

(b)    For purposes of this Section 8.4, the Board shall determine whether Unvested Units and that portion of a Member's Capital Account, if any, attributable to Unvested Units (as determined in the reasonable discretion of the Board) shall be taken into account. Moreover, unless otherwise determined by the Board, distributions shall not be made with respect to Unvested Units and that portion of a Member's Capital Account, if any, attributable to Unvested Units (as determined in the reasonable discretion of the Board of Managers). In making its determination under this Section 8.4, the Board may consider whether a distribution under this Section 8.4 would cause taxable income, gain, or loss to be recognized by the holders of Unvested Units, or otherwise would be consistent with the interests of the Company and all of the Members taking into consideration all facts and circumstances relating to such distribution. It is understood and agreed that amounts payable by third parties to the Members in connection with a Liquidity Event (including, by way of example and not as a limitation, amounts payable in connection with a merger or share purchase) (i) must be paid to the Members in accordance with the preferences and priorities set forth in this Section 8.4; (ii) will be deemed to have been distributed among the Members as if the distributions set forth in this Section 8.4 were applied to such payments, and (iii) any agreement executed by the Company in connection with a Liquidity Event shall be consistent with subsection (i) immediately above; provided, however, that the Warrantholders shall be paid an amount equal to the greater of (A) the amount that would have been payable to the Warrantholders had they exercised the Warrants and acquired Class E Units immediately prior to the closing of such Liquidity Event regardless of whether such exercise actually occurred, or (B) the amount that would have been payable to the Warrantholders had they exercised the Put immediately prior to such Liquidity Event.

8.5.    **Tax Advance**. Notwithstanding the foregoing, the Company shall, to the extent of available funds (unless restricted or prohibited by applicable law or by agreements with third parties) make advances to the Members within 120 days after the end of each Fiscal Year in an amount that is deemed by the Board to be sufficient to pay the combined estimated federal and state income tax liability of the Members (including any Person treated as a Member for income tax purposes) resulting solely from inclusion of the operating results (but not from Available Cash from a Liquidity Event) of the Company on a cumulative basis over the entire existence of the Company on the personal tax returns of the Members (each such advance a "**Tax Advance**"). The amount of Tax Advance to be made shall be calculated by the Board as if all Members were natural persons resident in a jurisdiction in which any member of the Company then resides and which imposes, for the period with respect to which the Tax Advance is made, the highest state and local taxes on any such Member's income attributable to the Company as determined by the Board from time to time in its reasonable discretion. Any distribution made pursuant to this Section 8.5 shall be made among the Members in proportion to the amount of taxable income allocated to each Member for the period to which such distribution relates. Tax Advances shall be treated as advances against distributions pursuant to Sections 8.3(a)(iii), 8.3(a)(iv), 8.3(a)(vi), 8.4(a)(iv), 8.4(a)(vi) and 8.4(a)(viii).

8.6.    **Withholding**. All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to Members will be treated as amounts distributed to Members pursuant to this Section 8.6 for all purposes of this Agreement

8.7.    **Tax Matters Partners.** PCH Holdings Group, LLC will be the tax matters member (the "TMM") of the Company pursuant to Section 6231(a)(7) of the Code. At the request of a Member, the TMM shall take such action as may be necessary to cause, to the extent possible, such other Member to become a "notice partner" within the meaning of Section 6223 of the Code. The TMM shall provide the Members all notices and other written communications received by the TMM from the Internal Revenue Service or sent by the TMM to the Internal Revenue Service, relating to the Company. The Members shall (at the Company's expense) provide reasonable assistance to and shall reasonably cooperate with the

TMM as the TMM shall reasonably request in connection with the Internal Revenue Service (or other applicable tax authority) audit or other proceeding.

8.8.    **Class B Redemption.**    If no Liquidity Event has occurred within five years and six months following the Effective Date, or if such a Liquidity Event has occurred and the distributions to the Class B Member pursuant to Sections 8.3 and Section 8.4 above do not total the Class B Redemption Amount as of the date of such distribution, the Company shall have the option to continue to pay the Class B Preferred Return until any such Liquidity Event that results in a payment in full of the Class B Redemption Amount, or in the alternative, the Company may elect to pay the Class B Members the amount of the Class B Redemption Amount remaining; provided however, that if the Company elects to continue to pay the Class B Preferred Return, then the Class B Preferred Return shall increase to the Class B Adjusted Preferred Return and all distributions pursuant to Section 8.3 and Section 8.4 above, excepting only Tax Advances, shall be paid one hundred percent (100%) to the Class B Member until the Class B Redemption Amount has been paid in full.  Notwithstanding anything to the contrary in this Section 8.8, if at any time the Put is triggered pursuant to the provisions of the Warrant, and the Class B Redemption Amount has not yet been paid in full or the proceeds from the transaction or event that triggers the Put are not sufficient to satisfy the Class B Redemption Amount in full (as well as any Put payment requirements set forth in the Warrant), then the Class B Preferred Return will increase to the Class B Adjusted Preferred Return and all distributions pursuant to Section 8.3 and 8.4 above, excepting only Tax Advances, shall be paid one hundred percent (100%) to the Class B Member until the Class B Redemption Amount is paid in full.  Following the payment of the Class B Redemption Amount, all of the Class B Units will be redeemed and will no longer be issued and outstanding.

8.9.    **Restrictions on Distributions and other Payments.**    Notwithstanding anything to the contrary in this Article 8, Section 6.3 or any other provision of this Agreement, all distributions, and all payments and reimbursements to the Members, any Affiliates and/or the Board, including Tax Advances, shall be subject to all covenants and other restrictions imposed by the Company's lenders and the documentation executed and/or delivered in connection with any loan by any such lender, including, but not limited to, the PNC Credit Agreement and the Term Loan Agreement, that limit such distributions, payments and/or reimbursements to Members, and the Members acknowledge and agree to such covenants and restrictions.

**ARTICLE 9.**
**TAXES**

9.1.    **Elections.**    The Board may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company. Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Company shall not file any tax return or make any election that includes as a "partner" for income tax purposes any Person that is not a Member of the Company, without such Person's prior written consent.

**ARTICLE 10.**
**ACCOUNTING METHOD, BOOKS AND RECORDS; ACCOUNTS**

10.1.    **Accounting Method.**    Subject to Section 10.2, the Company will maintain its books and records on the accrual basis of accounting.

10.2.    **Books and Records.**    The Company shall keep, at the Company's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Act.  Such books of account will be the property of the

29

Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives. Such books of account will be maintained at the principal office of the Company, or at such other place as the Board shall determine. Without limiting the foregoing provisions of this Section 10.2, (a) each Member or its designated representative shall, upon reasonable notice to the Board, be permitted to visit and inspect the properties of the Company during reasonable business hours, be permitted to discuss the Company's business and finances with Officers during normal business hours following reasonable notice, have access to such financial books, records, and documents during reasonable business hours and may inspect and make copies of any of them at its own expense, and (b) the Board shall cause the Company to keep at its principal office the following:

     (a)    a current list of the full name and last known business address of each Member;

     (b)    a certified copy of the Certificate of Formation and all amendments thereto;

     (c)    copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

     (d)    a copy of this Agreement, as amended;

     (e)    copies of all written consents, resolutions, and actions of the Members and the Board;

     (f)    minutes of meetings of the Members and Board; and

     (g)    copies of any financial statements of the Company for the three (3) most recent years.

10.3.    **Reports to the Class B Member.**  At all times prior to the payment in full of the Class B Redemption Amount, the Board shall cause to be prepared and delivered to the Class B Member the following:

     (a)    copies of (i) annual financial statements within 120 days of the close of the Fiscal Year; and (ii) quarterly financial statements within 45 days of the end of each fiscal quarter;

     (b)    copies of all agendas and minutes of meetings of the Board or the Members;

     (c)    copies of all reports required by the terms of the PNC Loan Documents or the Term Loan Documents to be delivered to the lenders thereunder; and

     (d)    copies of all other records of the Company reasonably requested by the Class B Member.

10.4.    **Tax Returns.**  The Board shall prepare and deliver, or cause to be prepared and delivered, estimated Schedule K-1's for its Members' income tax returns as early as practicable and final Schedule K-1's not later than June 30 of the following year.

10.5.    **Bank Accounts; Checks, Notes and Drafts.**

36285064.14

(a)     Funds of the Company shall be deposited in an account or accounts of a type, in form and name and in such bank(s) or other financial institution(s) that are participants in federal insurance programs as selected by the Board.  The Board shall arrange for the appropriate conduct of such accounts.  Funds may be withdrawn from such accounts only for bona fide and legitimate Company purposes and may from time to time be invested in such short-term securities, money market funds, certificates of deposit, or other liquid assets as the Board deems appropriate.

(b)     The Members acknowledge that the Board may maintain Company funds in accounts, money market funds, certificates of deposit, other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation, or other depository insurance institutions and that the Board shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution.

(c)     Checks, notes, drafts, and other orders for the payment of money shall be signed by an Officer or such other persons as the Board from time to time may authorize.  When the Board so authorizes, however, the signature of any such person may be a facsimile.

### ARTICLE 11.
### DISPOSITION OF MEMBERSHIP INTEREST
### AND ADMISSION OF ASSIGNEES

11.1.   **Sponsor Transfer Rights.**   Subject to compliance with this Article 11 and the terms of the PNC Credit Agreement and the Term Loan Agreement, the Membership Interest held by any Sponsor shall be transferable either voluntarily or by operation of law in the sole discretion of such Sponsor.  Any Sponsor may dispose of all or a portion of its respective Membership Interest at any time, in whole or in part, on such terms as each Sponsor deems in its best interest.  Notwithstanding any provision of the Act to the contrary, upon the Transfer of a Sponsor's Membership Interest, the transferee shall be admitted as a Member upon the completion of the transfer so long as, prior to obtaining ownership or control over the Membership Interest, the transferee joins in and becomes bound to this Agreement through a valid written instrument.

11.2.   **Other Member Transfer Rights.**   Subject to Section 11.3 with respect to Class B Members and Class C Members (other than in respect of Permitted Transfers contemplated by clause (d) of the definition thereof), no other Member (irrespective of Class) shall be permitted to Transfer any portion of its Membership Interest, either voluntarily or by operation of law, without the Majority Vote of the Board, which may be withheld in its sole discretion, and any such attempted Transfer by the Members other than in accordance with this Agreement shall be, and is hereby declared, null and void ab initio; provided, that no consent of any Member or the Board shall be required in respect of a Permitted Transfer.

11.3.   **Right of First Refusal.**

(a)     <u>Third Party Offer</u>.  Any Class B Member or Class C Member who has received a bona fide offer from a third party prospective purchaser (a "**Qualified Purchaser**") to purchase all or a portion of the selling Member's Membership Interests (the "**Selling Member**"), before selling its Membership Interests, shall first offer the sale thereof to the Company pursuant to a written notice (the "**Transfer Notice**"), which Transfer Notice shall contain the same terms and conditions stated in such bona fide offer.

(b)     <u>Company's Acceptance of Offer</u>.  The Board shall determine whether the Company will accept the Selling Member's offer described above.  In the event that the Company does

31

not accept such offer by written notice forwarded no later than thirty (30) days following its receipt of the Transfer Notice, then the Selling Member shall offer such Membership Interests to all the other Members and the Warrantholders (the "**Remaining Equityholders**") upon the same terms and conditions stipulated in the Transfer Notice (such Transfer Notice, as delivered to the Remaining Equityholders, the "**Remaining Equityholders Transfer Notice**").

(c)     Remaining Equityholders' Right to Purchase.  The Remaining Equityholders shall have the right to purchase all, but not less than all, of the offered Membership Interests in such portions as they shall agree upon; but if they fail to agree, then each of them shall be entitled to purchase portions thereof proportionate to their relative Membership Interests (or, in respect of a Warrantholder, the Class E Units underlying such Warrantholder's Warrant).  If the Remaining Members do not exercise their purchase right by written notice forwarded no later than thirty (30) days after the date the Selling Member sent the Remaining Equityholders Transfer Notice (the "**Offer Acceptance Date**"), then the Selling Member may sell all or a portion of its Membership Interests to the Qualified Purchaser under the same terms and conditions as are set forth in the original bona fide offer.  The sale to the Qualified Purchaser must be consummated within sixty (60) days after the Offer Acceptance Date.  Evidence that the sale has been so consummated shall be supplied in writing by the Selling Member and the Qualified Purchaser to the Company and the Remaining Equityholders.  If the sale has not been consummated within such sixty (60) day period, the rights of the Company and the Remaining Equityholders to purchase shall again attach to the Membership Interests of the Selling Member and no sale may be made to any purchaser without again complying with the provisions of this Section 11.3.

(d)     Closing.  If the Company accepts the offer set forth in the Transfer Notice in accordance with Section 11.3(b), then the Selling Member and the Company shall close such purchase within thirty (30) days after the Company's acceptance of such offer.  If the Remaining Equityholders accept the offer set forth in the Remaining Equityholders Transfer Notice in accordance with Section 11.3(c), then the Selling Member and the Remaining Equityholders shall close such purchase(s) within thirty (30) days after the Offer Acceptance Date.  In either event, the closing shall be held at the Company's offices or at such other time or place as the parties to such purchase may agree.

11.4.    **Drag Along Rights.**

(a)     Exercise of Option.  In the event that Sponsors collectively decide to sell to an Independent Third Party all (but not less than all) of their Membership Interests, whether in a single transaction or a series of related transactions over time, the Company shall have the right to require that each other Member and Warrantholder sell all of its Membership Interests or Warrants or Class E Units, as applicable, on the same terms and conditions of the sale by Sponsors (the "**Drag-Along Option**"), except as provided below in Section 11.4(c)(v).  This right must be exercised by delivering written notice of the intent to exercise (the "**Drag-Along Notice**") to the other Members and the Warrantholder within ten (10) days after the Sponsors has entered into a letter of intent or other written commitment to sell its Majority Interest (the "**Offer Period**").

(b)     Obligations of Drag-Along Member(s).  Subject to Section 11.4(c), upon receipt of a Drag-Along Notice, the other Members and the Warrantholders shall be obligated to (a) sell all of their respective Membership Interests, Warrants or Class E Units, as applicable, free of any lien or encumbrance (other than encumbrances of this Agreement), in the transaction contemplated by the Drag-Along Notice on the same terms and conditions as Sponsors (including payment of their pro rata share of all costs associated with such transaction) except as set forth below in Section 11.4(c)(v), and (b) otherwise take all reasonably necessary action to cause the consummation of such transaction, including voting in favor of such transaction and not exercising any appraisal rights in connection therewith. Subject to Section 11.4(c), the other Members and the Warrantholders further agree to take all actions

32

(including executing documents) in connection with the consummation of the proposed transaction as may reasonably be requested by Sponsors, and each hereby appoints Sponsors, as its attorney-in-fact, solely to do the same on its behalf if such Member or Warrantholder has not done so within five (5) days after receiving written notice from Sponsors thereof.

(c)     Exceptions.  Notwithstanding the foregoing provisions of Section 11.4(b) or of Section 11.4(a),  each such other Member or Warrantholder will not be required to comply with Section 11.4 unless (solely in its capacity as a Member of the Company or as a Warrantholder, as applicable, and not as a Manager, Officer or employee):

(i)     any representations and warranties to be made by such other Member or Warrantholder in connection with the transaction are limited to representations and warranties related to authority, ownership and the ability to convey title to its Membership Interests or Warrants, as applicable;

(ii)     the other Members or Warrantholders, as applicable, shall not be liable for the inaccuracy of any representation or warranty or the breach of any covenant made by any other Person in connection with the transaction, other than the Company, and only then, subject to the limitations set forth in Section 11.4(c)(iii);

(iii)     the liability for indemnification, if any, of such other Members or Warrantholders, as applicable, in the transaction and for the inaccuracy of any representations and warranties made by the Company in connection with such transaction, is several and not joint with any other Person, is pro rata in proportion to the amount of consideration paid to such Member or Warrantholder in connection with such transaction, and in no event exceeds the amount of consideration actually paid to such other Member or Warrantholder in connection with such transaction, except with respect to claims related to fraud by such Member or Warrantholder; and

(iv)     the consideration in connection with such transaction allocated and payable to each Member is paid as if the proceeds of the transaction that is the subject of the Drag-Along Notice were distributed to the Members pursuant to Section 8.4;

(v)     solely as to the Warrantholders, the Warrantholders are paid an amount equal to the greater of (A) the amount that would have been payable to the Warrantholders if they had exercised the Warrants immediately prior to the closing of such transaction regardless of whether such exercise actually occurred and the entire proceeds of the transaction were distributed pursuant to Section 8.4, or (B) the amount that would have been payable to the Warrantholders had they exercised the Put immediately prior to such transaction;

(vi)     such Member or Warrantholder, as applicable, if not a paid employee of the Company or its Subsidiaries, is not required to be bound by any non-competition or similar restrictive covenant entered into in connection with such Drag-Along Transaction; and

(vii)     to the extent the consideration to be received consists of illiquid securities of the acquiring entity, the Company will undertake good faith efforts to negotiate for non-economic rights that are as nearly equivalent to the non-economic rights of other holders of illiquid securities in the acquiring entity

11.5.   **Purchase Upon Termination Event.**

(a)     Repurchase of Units.  Subject to Section 11.5(b), in the event of a Termination Event with respect to any Member (for clarity, excluding any Warrantholder), the Company (or its

designee) will have the option, but not the obligation, to purchase all of such Member's Membership Interest at any time within 180 days of the Termination Event.  If a Member dies or becomes disabled, the Member's executor, personal representative, administrator, guardian, conservator or other legal representative (the "**Estate**") may exercise all of such Member's rights for the purpose of settling such Member's estate or administering such Member's property.   The purchase price for the Member experiencing the Termination Event (the "**Terminated Member**") shall be its Fair Market Value.  The purchase price may be paid in full by the Company to the Terminated Member at the closing of any such purchase, or at the option of the Company (or its designee) the purchase price will be paid in equal quarterly installments (including principal and interest) over a five (5) year period (unless a shorter period is agreed to by the Board).  Interest shall accrue on any unpaid balance of the purchase price for the period outstanding at the applicable federal rate in effect on the date of the acquisition of the Terminated Member's Membership Interest.   For purposes of this Section 11.5, "**Fair Market Value**" means the amount the Member would have received had the Company's assets been sold in an arm's length transaction between a willing buyer and willing seller occurring on the date of valuation and otherwise taking into account all relevant factors determinative of value, the Company's liabilities paid, and the net proceeds distributed pursuant to Section 8.4, all as determined by the Board in good faith.  In the event the Terminated Member objects to the determination of Fair Market Value by the Board, then the Fair Market Value shall be determined by a majority of a board of appraisers, where the Terminated Member disputing the determination of Fair Market Value appoints one appraiser, the Board appoints one appraiser, and the two appraisers appoint the third appraiser.  The determination of the board of appraisers shall be final and binding on all parties, and the aggregate costs of the board of appraisers shall be split between the Company and the Terminated Member.

(b)     Repurchase of Class D Units.  The repurchase of any Member's Class D Units shall be governed in the first instance, by his or her employment or similar agreement with the Company or any Affiliate, if such Member is a party to any such agreement, or in the second instance, by the Equity Incentive Plan and the Award Agreement that granted the Class D Units to the Member if the Equity Incentive Plan or Award contains repurchase provisions applicable to such Member, or, if neither of the first two instances is applicable, then the provisions of Section 11.5(a) above shall apply to the Member's Class D Units.

11.6     **Tag-Along Rights.**

(a)     If any Sponsor desires to Transfer, directly or indirectly, Membership Interests, other than a Permitted Transfer, and the Company has not elected to exercise the Drag-Along Option (if applicable), then at least ten (10) business days prior to the closing of such transaction, the Sponsor(s) shall make an offer (an "**Equity Participation Offer**") to each Member (other than in respect of Unvested Units) and to the Warrantholders to include in the proposed transaction a portion of such Member's Membership Interests, or Warrants or Class E Units, as applicable, that represents the same percentage of Units (other than Unvested Units) held by such Member, or the Warrants (assuming exercise of the Warrants) or Class E Units held by the Warrantholders, as applicable, as the Units (assuming exercise, exchange and conversion of all securities exercisable, exchangeable or convertible for Units) proposed to be Transferred by the Sponsor(s) represent to all Units (assuming exchange, exchange and conversion of all securities exercisable, exchangeable or convertible for Units) owned by the Sponsor(s) (with pro rata cutbacks to the extent the transferee is unwilling to acquire all such Units, Warrants or Class E Units, as applicable).  Any Equity Participation Offer shall be subject to the same terms and conditions as applicable to the Sponsor(s) with respect to the class or series of Units proposed to be Transferred by such Sponsor, except as expressly set forth herein, and, as to the Warrantholders, shall take into account the exercise price of the Warrants proposed to be Transferred by Warrantholders.

34

(b)     Notwithstanding the foregoing or anything in Section 11 to the contrary, in connection with any Sale of the Company (as defined in the Warrant), the Equity Participation Offer shall provide the Warrantholders with the ability to sell all of the Warrants or Class E Units without regard to any percentage of Units being retained by the Sponsor(s).

(c)     For a Member or a Warrantholder to exercise its right to Transfer securities in any Equity Participation Offer, it must deliver written notice to the Sponsor(s) within ten (10) business days after its receipt of the applicable Equity Participation Offer specifying the securities (up to the maximum permissible number) that such Member or Warrantholder desires to Transfer in the Equity Participation Offer, as applicable, whereupon such Member or Warrantholder shall be obligated to Transfer such securities at the closing of such transaction if it occurs.  The failure of such Member or Warrantholder to deliver such written notice of exercise under this Section 11.6(c) within such ten (10) business day period shall be deemed to be an election by such Member or Warrantholder not to participate in such Transfer.  If such Member or Warrantholder timely elects to exercise its right to Transfer securities pursuant to this Section 11.6, it shall effect its participation in the proposed Transfer by delivering to the Sponsor(s) (to hold in trust as agent for it), at least one (1) business day prior to the date scheduled for such Transfer (i) one or more certificates or other instruments, as applicable, in proper form for transfer, which represent the number of Units, including Class E Units (if the Warrant has been exercised) which it has elected Transfer in accordance with this Section 11.6, and (ii) with respect to the Warrant, if the Warrant to be Transferred has not been exercised, the original Warrant (or a lost warrant affidavit) to be Transferred, and, in each case, subject to Section 11.6(d), executed copies (or signature pages thereof) of such other agreements, documents or certificates as the proposed transferee shall reasonably request.  If less than all of the Class E Units represented by the Warrants are to be Transferred by the Warrantholders pursuant to this Section 11.6, then the original Warrants with respect to the Class E Units to be Transferred shall be cancelled and the Company and such Warrantholders shall execute one or more new Warrants of like tenor reflecting the decrease in the number of Class E Units that may be purchased under such Warrants thereafter.

(d)     Notwithstanding anything to the contrary contained in this Section 11.6, the Sponsor(s) shall not consummate any transaction contemplated by any Equity Participation Offer and for which a Member or Warrantholder has timely elected to participate pursuant to Section 11.6, unless the transaction that is the subject thereof complies with the terms, restrictions and limitations set forth in Section 11.4(c) (including the limitations on indemnification and the allocation of consideration).

(e)     If the proposed transfer that is the subject of the Equity Participation Offer is not consummated within 60 days after delivery of the Equity Participation Offer, or there is any material change to the terms and conditions of the proposed Equity Participation Offer, the Sponsor(s), in order to effect the Transfer that is the subject of such Equity Participation Offer, shall be required to deliver a new Equity Participation Offer and to comply with all of the provisions of this Section 11.6 prior to any subsequent Transfer.

(f)     Notwithstanding anything to the contrary set forth in this Agreement, no party hereto shall, or shall permit its equity holders to, take or permit any action designed to avoid the transfer restrictions contained in this Section 11.6 by (i) making one or more transfers to one or more permitted transferees and then disposing of all or any portion of such party's interest in any such permitted transferee or (ii) effecting a transfer of Units or securities exercisable, convertible or exchangeable therefor, indirectly through a redemption, recapitalization, equity sale, merger, change of control or similar transaction (including, without limitation, permitting any owner of such Person's equity interest to effect any such transfer via a parent company level transaction).

11.7    **Class A and Class B Member Anti-Dilution Protection**.    So    long    as    this Agreement shall remain in effect, any issuance by the Company of additional Units or other securities which are ultimately convertible into or exercisable or exchangeable for Units (collectively, the "**New Units**"), to any Person, shall not dilute the ownership of US Xpress and its successor and assigns in its or their ownership of outstanding equity of the Company; except an issuance of New Units solely pursuant to a firm underwritten initial public offering registered under the Securities Act of 1933, as amended, for sale to the public, realizing at least $30 million in net cash proceeds for the Company (a "**Qualified IPO**") may dilute such Class A Units by the amount of New Units offered.  The anti-dilution protection provided in this Section 11.7 may be effected by the issuance of new Units to US Xpress at no consideration.  The Class A Units held by US Xpress will at all times prior to a Qualified IPO constitute at least ten percent (10%) of outstanding Units (other than Class B Units) in the Company.

**ARTICLE 12.**
**DISSOLUTION AND WINDING UP**

12.1.    **Dissolution.**    The Company shall be dissolved and its affairs wound up upon the Majority Vote of the Members (subject to Section 5.8), or as otherwise required by the law of the State of Delaware.  Notwithstanding any provision of the Act to the contrary, the Company shall continue and not dissolve as a result of the death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member or any other event that terminates the continued membership of a Member.

12.2.    **Effect of Dissolution.**    Upon dissolution, the Company shall cease carrying on its business, but the Company shall continue until (a) the winding up of the affairs of the Company is completed and (b) a Certificate of Cancellation (as defined in Section 12.4) has been filed with the Secretary of State of Delaware.

12.3.    **Distribution of Property on Dissolution.**    Upon the winding up of the Company, the Managers shall liquidate the Company's Property, if necessary or desirable.  Unless otherwise determined by the Manager(s), for purposes of this Article 12, Unvested Units and that portion of a Member's Capital Account attributable to Unvested Units (such portion as determined in the reasonable discretion of the Board) generally shall be taken into account; provided, however, that if the Board determines that a distribution under this Article 12 and/or related allocations would cause taxable income or gain to be recognized by holders of Unvested Units, or would be inconsistent with the interests of, the Company and/or its Members, taking into consideration all facts and circumstances related to such distribution, then unless otherwise determined by the Board, Unvested Units and that portion of a Member's Capital Account attributable to Unvested Units (such portion as determined in the reasonable discretion of the Board) shall not be taken into account. Upon the winding up of the Company, the Managers shall:

(a)    Sell or otherwise liquidate all of the Company's assets consistent with realization of full value of such assets and collection of any assets outstanding (except to the extent the Manager(s) (or if no Managers remain, a Person or Persons appointed by a Majority Vote of the Members) may determine to distribute any assets to the Members in kind),

(b)    Allocate any Profits or Losses resulting from such sales (or to extent such assets are distributed in kind, as provided in Section 12.3(e) below) to the Members in accordance with Section 8.2 of this Agreement,

(c)    Discharge all liabilities of the Company, including liabilities to the Members who are creditors, to the extent otherwise permitted by law, other than liabilities to the Members for

36

distributions, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company, and

(d)     Distribute the remaining assets to the Members, either in cash or in kind, as determined by the Board (or if no Managers remain, a Person or Persons appointed by a Majority Vote of the Members), with any assets distributed in kind being valued for this purpose at their fair market value, in accordance with Section 8.4 of this Agreement. Any such distributions shall be made in accordance with the time requirements set forth in Treasury Regulation § 1.704-1(b)(2)(ii)(*b*)(*2*).

(e)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by the Board in good faith (or if no Managers remain, a Person or Persons appointed by a Majority Vote of the Members). Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of this Agreement to reflect such deemed sale.

12.4.     **Winding Up and Certificate of Cancellation.**  The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property has been distributed to the Members. Upon the completion of winding up of the Company, the Managers or other Person designated by the Managers shall deliver a Certificate of Cancellation (the "**Certificate of Cancellation**") to the Secretary of State of the State of Delaware for filing. The Certificate of Cancellation shall set forth the information required by the Act.

**ARTICLE 13.**
**MISCELLANEOUS**

13.1.     **Amendments; Waivers.**

(a)     Except as set forth below or expressly set forth elsewhere in this Agreement, any and all amendments to and waivers of any provision of this Agreement may be made only with the written consent of the Board and a Majority Vote of the Members; provided however, that (i) no provision of this Agreement or the operative definitions thereof may be amended or waived (including by merger or otherwise) (A) if such amendment or waiver would have an adverse effect on any Member in a manner different than such amendment or waiver would have on all Members of such class, without the written consent of such Member, and (B) if such amendment or waiver would have an adverse effect on any class of Units, without the written consent of the holders of a majority of the class of Units adversely affected, (ii) so long as US Xpress (or its successor or assign) holds any Class A Units or Class B Units none of the following provisions or the operative definitions thereof shall be amended or waived (including by merger or otherwise) without the written consent of the holders of a majority of such Class A and Class B Units held by US Xpress and its successors and assigns: Sections 3.7, 5.8 (but only so long as Class B Units are outstanding), 8.3, 8.4, 8.5, 8.8 and this Section 13.1, and (iii) none of the following provisions or the operative definitions thereof shall be amended or waived (including by merger or otherwise) without the written consent of Brightwood: Sections 3.3(e), 3.4, 4.9, 4.10, 7.1, 8.1(e), 11.4, 11.6, 13.1, 13.13, and 13.14. In making any amendments, there shall be prepared and filed by, or for, the Board such documents and certificates as may be required under the Act and under the laws of any other jurisdiction applicable to the Company. Notwithstanding the foregoing, this Agreement may be amended by the Board, without the consent of any Member (i) to cure any ambiguity, to correct or supplement any provision hereof which may be inconsistent with any

37

other provision hereof, or to make any other provision with respect to matters or questions arising under this Agreement not inconsistent with the intent of this Agreement, and (ii) as provided elsewhere in this Agreement.

(b)     Notwithstanding the foregoing, (i) subject to compliance with Article 11, the Board may amend <u>Exhibit A</u> hereto from time to time to add information regarding additional Members and additional Membership Interests, and (ii) any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party.

(c)     The Company shall give prompt written notice of any amendment or waiver hereunder to any party that did not consent in writing thereto. Any amendment or waiver effected in accordance with this Section 13.1 shall be binding on each party and all of such party's successors and permitted assigns, whether or not any such party, successor or assignee entered into or approved such amendment or waiver.

13.2.    **Applicable Law.**   This Agreement is to be governed by, construed under and enforced and interpreted in accordance with the internal laws of the State of Delaware, without regard to any conflicts of laws doctrines.

13.3.    **Entire Agreement.**   This Agreement and the other agreements and documents referred to herein constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof.   No waiver of any provision hereof will be valid or binding on the parties hereto, unless such waiver is in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.

13.4.    **Severability.**   If any term or provision of this Agreement is held illegal, invalid or unenforceable, such illegality, invalidity or unenforceability will not affect the legality, validity or enforceability of the remainder of this Agreement.

13.5.    **Successors.**   Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Membership Interests, all the provisions hereof will inure to the benefit of and be binding upon the permitted successors, legal representatives and assigns of the parties hereto.

13.6.    **Counterparts.**   This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts will together constitute one and the same agreement.

13.7.    **Headings.**   Article, Section, and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

13.8.    **Company Property.**   The title to all real or personal property (or interests therein) now or hereafter acquired by the Company will be held by and vested in the Company, and not by or in any Member, individually.

13.9    **Rights of Creditors and Third Parties Under Agreement.**   This Agreement is entered into between the Company and the Members for the exclusive benefit of the Company, its Members and their permitted successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person (other than, (i) with respect to Sections 3.7 and 8.9, PNC

38

Bank and Brightwood and (ii) with respect to clause (d) of the definition of Permitted Transfer, Sections 3.7, 11.2 and this Section 13.9, any lenders to US Xpress (or any collateral trustee or collateral agent for such lenders) and any amendments to such definition or such Sections without the consent of such lenders or such collateral trustee or collateral agent shall be null and void).   Except and only to the extent provided for in this Agreement and by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and the Members with respect to any Capital Contribution or otherwise.

13.10.   **Notices.**   Any notice, election, demand, request, consent, approval, concurrence or other communication given or made under any provision of this Agreement shall be deemed to have been sufficiently given or made for all purposes only if it is in writing and it is: (a) delivered personally to the party to whom it is directed; (b) sent by first class mail or overnight express mail, postage and charges prepaid, addressed to the party to whom it is directed, at its address set forth on the Company's books and records; or (c) sent by facsimile or electronic mail addressed to the party to whom it is directed, at its address set forth on the books and records of the Company.   Any Member may change its address for purposes of this Agreement by giving the Company and any other Member, notice of such change in the manner provided herein for the giving of notices.   Except as otherwise expressly provided in this Agreement, any such notice, election, demand, request, consent, approval, concurrence or other communication (i) given or made in the manner indicated in clause (a) or (c) above shall be deemed to be given or made on the day on which it was delivered, and (ii) given or made in the manner indicated in clause (b) above shall be deemed to be given or made on the fifth business day after the day on which it was deposited in a regularly maintained receptacle for the deposit of the United States' mail, or in the case of overnight express mail, on the business day immediately following the day on which it was deposited in a regularly maintained receptacle for the deposit of overnight express mail.

13.11.   **Further Assurances.**   Each of the parties hereto does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by law or reasonably necessary or advisable to effectively carry out the purposes of this Agreement.

13.12   **Power of Attorney.**   Each Member hereby makes, constitutes and appoints the Board his/her/its true and lawful attorney-in-fact to, solely for the purpose of signing, executing, certifying, acknowledging, delivering, filing and recording (a) any amendments adopted by the Members in accordance with this Agreement, (b) any documents reasonably necessary for the admission or removal of any Member pursuant to the terms of this Agreement, and (c) the required disposition by any Member of its Membership Interest pursuant to Section 11.4, (d) any certificate, instruments and documents as may be required by or appropriate under the laws of any state in which the Company is or intends to do business; and (e) any certificates, instruments and documents that are reasonably necessary to make the elections permitted under Section 3.9 and Article 9 of this Agreement, subject to the other provisions hereof; but only, in each case, if the applicable Member has not executed or delivered the applicable document within five (5) business days after receiving a written request therefor.

13.13   **Warrantholder Business**.   The Company and each Member acknowledges that Lender Observer may be employed by or associated with Brightwood or its Affiliates, and that Brightwood and such Affiliates may be private equity, private funds lenders, and venture capital funds engaged in the business of loaning money or making investments in other companies, including companies that may be engaged in the same or similar business as the Company or its Subsidiaries or that are in the same or a similar industry as the Company ("Warrantholder's Business").   Notwithstanding the doctrine of corporate opportunity or any other limitation, nothing in this Agreement or in any document or agreement executed in connection herewith nor any aspect of any Observer's or Warrantholder's involvement with

the Company shall in any way (a) limit any Observer (in his capacities as employee, Affiliate or representative of any Warrantholder or any of its Affiliates, or otherwise) or any Warrantholder or any of its Affiliates from carrying on Warrantholder's Business (whether or not such activities include participating or making investments in businesses that are directly or indirectly competitive with the Company or any of its Subsidiaries) or (b) give the Company or any Member any right or interest in any present or future business, activity or prospective business opportunity of any Warrantholder or of any of its respective Affiliates.

13.14   **No Effect on Other Agreements**.   Notwithstanding anything contained herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any Warrantholder or any of its Affiliates in their capacities as lenders to the Company or any of its Subsidiaries pursuant to any agreement for the borrowing of money, including the Term Loan Agreement. Without limiting the generality of the foregoing, no Warrantholder or any of its Affiliates, in exercising its rights as lender or other creditor, including making a decision on whether to foreclose on any collateral security, shall have any duty to consider (a) its status as a Warrantholder or Member of the Company, (b) the interests of the Company or any of its Subsidiaries (except to the extent required by law) or (c) any duty it may have to any other Member or the Company, except as may be required under any loan documents to which it is a party.

**(Signatures on following page.)**

40

36285064.14

The parties hereto have signed this Agreement effective as of the date first written above.

**COMPANY:**  **XGS ACQUISITION, LLC**

By:_____
Name: Lawrence Gildersleve
Title: Vice-President

**SPONSORS:**  **PCH HOLDINGS GROUP, LLC**

By:_____
Name: David Panton
Title:  President

**MOSAIC INVESTMENTS INC.**

By:_____
Name:  Murad Karimi
Title: President

**CLASS B MEMBER:**  **XPRESS HOLDINGS INC.**

By:_____
Name:
Title:

**WARRANTHOLDER:**  **BRIGHTWOOD**

By:_____
Name:
Title:

*[signatures continue on following pages]*

Signature Page to XGS Acquisition, LLC
Limited Liability Company Agreement

**CLASS C MEMBERS:**                    **ARIS CAPITAL HOLDINGS, L.P.**

ARIS CAPITAL MANAGEMENT HOLDINGS,
LLC, its General Partner
By:_____
Name: Jason LaJoie
Title: Manager

**MOSAIC/XGS, LLC**

By:_____
Name: Murad Karimi
Title: President

Signature Page to XGS Acquisition, LLC
Limited Liability Company Agreement

**Signature Counterpart Page for Class D Members**

The Undersigned hereby acknowledges receipt of a copy of the Limited Liability Company Agreement dated as of _____, 2014 (the "LLC Agreement"), of XGS Acquisition, LLC, a Delaware limited liability company (the "Company") and by affixing his, her or its signature below (in the case of an entity, by its duly authorized officer), hereby acknowledges, confirms and agrees that the Undersigned has become a member of the Company, with all of the rights, privileges, powers and duties of a member of the Company as set forth in the LLC Agreement and further hereby agrees to be bound by all of the terms and conditions of the LLC Agreement as if the Undersigned were an original party thereto.

This ___ day of _____, 201_

_____
Signature of Member (if an individual)
Name: _____
         (Please Print)

_____
[Name of Member if an entity]

By: _____
Name:
Title:


Address of Member:

_____
_____
_____

**MEMBERS; INITIAL CAPITAL CONTRIBUTIONS; UNITS; PERCENTAGES**

| Class A Members | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Capital Account** | **Units** | **Percentage** | | **Post-Class B Redemption Fully-diluted Percentage** | |
| | | | Voting | Distribution | Voting | Distribution |
| Xpress Holdings Inc. [contact info] | $_____ | [_____] Class A Units[i] | 10% | 10% | 10% | 10% |
| Mosaic Investments, Inc. [contact info] | $_____ | Class A Units | | | | |
| PCH Holdings Group, LLC | $_____ | [_____] Class A Units | | | | |

| Class B Member | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Capital Account** | **Units** | **Percentage** | | **Post-Class B Redemption Fully-diluted Percentage** | |
| | | | Voting | Distribution | Voting | Distribution |
| Xpress Holdings Inc. [contact info] | $_____ | [_____] Class B Units[ii] | 0% | 10% | NA | NA |

| Class C Members | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Capital Account** | **Units** | **Percentage** | | **Post-Class B Redemption Fully-diluted Percentage** | |
| | | | Voting | Distribution | Voting | Distribution |
| Aris Capital Holdings, L.P. [contact info] | $_____ | [_____] Class C Units | | | | |
| Mosaic/XGS, LLC [contact info] | $_____ | Class C Units [_____] | | | | |
| | | | Total: 24% | Total: 24% | Total: 24% | Total: 24% |

| Class D Members | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Capital Account** | **Units** | **Percentage** | | **Post-Class B Redemption Fully-diluted Percentage** | |
| | | | Voting | Distribution | Voting | Distribution |
| Reserved Under Pool | N/A | [_____] Class D Units | 0% | 0% | 0% | 10% |

| Warrantholder | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Capital Account** | **Class E Units** | **Percentage** | | **Post-Class B Redemption Fully-diluted Percentage** | |
| | | | Voting | Distribution | Voting | Distribution |
| Brightwood Capital | NA | [_____] | | | | |

---

[i] Entitled to the anti-dilution protections of Section 11.7.
[ii] Entitled to receive the Class B Preferred Return and the Class B Paydown.

| SBIC II, LP | | Class E Units | 0% | 0% | 0% | 5% |
|---|---|---|---|---|---|---|

**EXHIBIT E**

**Form of Lease Agreement**

# LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is effective as of the ___ day of April, 2015 (the "Effective Date"), by and between Q & F Realty, LLC, a Tennessee limited liability company (the "Landlord") and Xpress Global Systems, LLC, a Georgia limited liability company (the "Tenant"). Landlord and Tenant may be referred to herein as a "Party," and together the "Parties."

## RECITALS

WHEREAS, pursuant to that certain Membership Interest Purchase Agreement dated as of April 3, 2015, by and among Tenant, Xpress Holdings, Inc., a Nevada corporation, U.S. Xpress Enterprises, Inc., a Nevada corporation, and XGS Acquisition, LLC, a Delaware limited liability company (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), the Parties have agreed to enter into this Lease; and

WHEREAS, capitalized terms used, but not defined herein, will have the meanings given to them in the Purchase Agreement.

NOW THEREFORE, in consideration of the mutual agreements, covenants, and other premises set forth herein, the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, desiring to be legally bound, hereby agree as follows:

## TERMS

1.      **Premises**.  Landlord hereby demises and leases to Tenant and Tenant hereby leases and takes from Landlord for the Term (as defined below) and upon the terms, covenants, conditions and provisions set forth in this Lease, that certain real property situated in the County of Whitfield, State of Georgia, marked "Leased Premises" on Exhibit A annexed hereto and made a part of this Lease and all the improvements thereon, including an approximately 66,100 square feet building commonly known as 1537 New Hope Church Road, Tunnel Hill Georgia 30755 (the "Leased Premises").  Tenant will also have access to a shared point of entrance and exit, a security gate, and scales, marked "Common Area" on Exhibit A annexed hereto and made a part of this Lease (the "Common Area").

2.      **Term**.  The term of this Lease will be for a five (5) year period commencing on the Effective Date and ending on the last day of the fifth (5th) Lease Year (as hereinafter defined), unless earlier terminated in accordance with the terms and provisions of this Lease or upon the mutual consent of the Parties (the "Term").  "Lease Year" will mean twelve (12) full calendar months of the Term beginning on the Effective Date; provided, however, that if the Effective Date occurs on a day that is other than the first or the last day of a month, the first Lease Year will include such twelve (12) full calendar months plus the period from the Effective Date to and including the day prior to the first full calendar month after the Effective Date.  Each subsequent Lease Year is the twelve (12) full calendar months immediately following the preceding Lease Year.

3.      **Rent**.

(a)      Annual Base Rent.  During the Term, Tenant will pay to Landlord annual base rent ("Annual Base Rent") in the amount of two hundred fifty-nine thousand ninety-eight dollars and 12/100 ($259,098.12), in twelve (12) equal monthly installments of twenty-one thousand five hundred ninety-one dollars and 51/100 ($21,591.51) each.  On the first (1st) day of the second (2nd) Lease Year and of each subsequent Lease Year, the monthly rental payments will be adjusted upwards if the cost of living index as

provided herein discloses an increase in the cost of living according to the United States Consumer Price Index for U.S. cities averaging all urban consumers – 1982-1984 = 100 ("CPI"). The CPI as represented by the United States Department of Labor, Bureau of Statistics, is agreed by the parties to stand at 234.722 as of March 24, 2015. Rent for the second (2ⁿᵈ) Lease Year will be adjusted upward by the percent by which said CPI has increased over 234.722. Rent for each subsequent Lease Year will be adjusted upward by the percent by which said CPI has increased over the last CPI Index increase. The monthly installments of Annual Base Rent will be due and payable on the first (1ˢᵗ) day of each calendar month, in advance, without any set off or deduction whatsoever, beginning on the Effective Date and continuing thereafter until the termination of this Lease; all monthly installments of Annual Base Rent and all Additional Rent (as defined below) will be paid to Landlord at the following address: Q & F Realty, 4080 Jenkins Road, Chattanooga, TN 37421, Attn: Janice Houser.

       (b)    <u>Additional Rent</u>. All charges due and payable by Tenant to Landlord under this Lease other than Annual Base Rent will be deemed Additional Rent (the "<u>Additional Rent</u>").

       (c)    <u>Rent</u>. The Annual Base Rent and Additional Rent will herein be collectively referred to as "<u>Rent</u>."

       (d)    <u>Late Rent</u>. In the event any Rent payment is not paid within ten (10) days of the date such Rent payment is due, a late charge equal to five percent (5%) of such Rent payment will be added thereto.

       (e)    <u>Net Lease</u>. This is an absolute net lease to Landlord. Notwithstanding anything to the contrary contained in this Lease, it is the intent of the Parties that the Rent payable under this Lease will be an absolute net return to Landlord and that Tenant will pay all costs and expenses relating to the ownership and operation of the Leased Premises and the business carried on therein, and as otherwise expressly provided in this Lease. Any amount of obligation relating to the Leased Premises that is not expressly declared (under this Lease) to be that of Landlord will be deemed to be an obligation of Tenant to be performed by Tenant, at Tenant's expense. It is the intention of the Parties that the obligations of Tenant hereunder will continue unaffected in all events, unless the requirement to pay or perform the same will have been specifically terminated pursuant to an express provision of this Lease, or other written agreement between the Parties.

    4.    <u>**Use of the Leased Premises**</u>. The Leased Premises will be used only for the operation of a less-than-truckload motor carrier and warehouse servicing directed, in all material respects, to the floor-covering industry and related and incidental purposes (the "<u>Permitted Use</u>") and for no other purpose whatsoever. Tenant will not, at any time, use or occupy, or suffer or permit anyone to use or occupy, the Leased Premises or the Common Area, or to do or permit anything to be done in the Leased Premises or the Common Area, in any manner that may (a) violate any Certificate of Occupancy (or comparable license or permit) for the Leased Premises or the Common Area; (b) cause, or be liable to cause, injury to all or any portion of the Leased Premises or the Common Area or any equipment, facilities, or systems therein; (c) constitute a violation of the laws and requirements of any public authority or the requirements of insurance bodies, including any covenant, condition, or restriction encumbering the Leased Premises or the Common Area; or (d) exceed the load bearing capacity of the floor of the Leased Premises or the Common Area. Use of the Common Area by the Tenant will not impair or interfere with the use of such area by any other tenant, including U.S. Xpress Enterprises, Inc. ("<u>U.S. Xpress</u>"), or interfere with U.S. Xpress's ability to use or access its leased property abutting the Common Area. No party will use the Common Area for parking.

    5.    <u>**Warranties of Title and Quiet Possession**</u>. Landlord hereby warrants that it is the fee simple owner of the Leased Premises and the Common Area and that no person, entity, or corporation other

2

than Tenant has the right to lease or occupy the Leased Premises. So long as Tenant performs the covenants and agreements to be performed by Tenant hereunder, Tenant will have peaceful and quiet use and possession of the Leased Premises and use in common with others of the Common Area during the Term without hindrance on the part of Landlord, and Landlord will defend Tenant in such peaceful and quiet possession under this Lease.

6. **Compliance with Laws**. Tenant will, at its own cost and expense, promptly observe and comply with all present and future laws, rules, regulations, requirements, and/or ordinances of governmental authorities having or claiming jurisdiction over the Leased Premises or the Common Area or the conduct of Tenant's business (the "Governmental Authorities").

7. **Environmental Laws**. Tenant will comply with any and all applicable Environmental Laws. In the event Tenant is notified of any investigation or violation of any Environmental Law arising from Tenant's activities in, on, or about the Leased Premises or the Common Area, Tenant will immediately deliver to Landlord a copy of such notice. Except in the ordinary course of business and in compliance with all applicable laws, Tenant agrees not to store, dispose of, or discharge in, on or under the Leased Premises or the Common Area any hazardous materials that are, or may become, regulated under applicable Environmental Laws. TENANT AGREES TO INDEMNIFY AND HOLD HARMLESS LANDLORD FROM ANY AND ALL DAMAGES, INCLUDING REASONABLE ATTORNEYS' FEES, ARISING FROM A BREACH OF THIS SECTION 7 OR OTHERWISE FROM A RELEASE AND/OR THREATENED RELEASE OF ONE OR MORE HAZARDOUS MATERIALS AND/OR SUBSTANCES BY TENANT, ITS AGENTS, EMPLOYEES, INVITEES AND/OR CUSTOMERS, OR FROM TENANT'S VIOLATION OF ANY FEDERAL, STATE AND/OR LOCAL LAW AND/OR ORDINANCE APPLICABLE TO THE ENVIRONMENT. The obligations of Tenant under this Section 7 will survive any termination of this Lease.

8. **Alterations and Improvements**. Tenant will not make or permit to be made any alterations, improvements, or additions to the Leased Premises or the Common Area ("Alterations") without obtaining Landlord's prior written consent. Any and all Alterations that are constructed, installed, or otherwise made by Tenant will be the property of Landlord unless otherwise agreed to in writing by the Parties. Upon the expiration or earlier termination of this Lease, all Alterations will remain the property of Landlord and will not be removed from the Leased Premises unless Landlord notifies Tenant in writing at the time of giving its consent to such Alterations that Tenant will be required to remove the same, in which event Tenant will remove all Alterations set forth in Landlord's notice on or before the expiration or earlier termination of this Lease, and will repair and restore any damage to the Leased Premises caused by such installation or removal. Tenant will indemnify Landlord against any damages, costs, or expenses that may arise from the construction, installation or removal of all Alterations.

9. **Mechanic's Liens**. Tenant will not create, suffer, or permit to be created or remain any encumbrance or any Lien or claim thereof (arising out of any work done or services, material, equipment or supplies furnished for or at the request of Tenant or by or for any contractor or subcontractor of Tenant, other than such furnished by Landlord, or otherwise), which is or may become a Lien upon the Leased Premises or the Common Area, or any part thereof. Within thirty (30) days of Tenant's receipt of actual notice of the filing of any such Lien or claim, Tenant will cause the same to be discharged of record by payment, deposit, bond, or otherwise. If Tenant fails to cause such Lien or claim to be discharged and removed from record within such thirty (30) day period, then, in addition to any remedy Landlord may have, Landlord may, but will not be obligated to, contest the Lien or claim or discharge it by payment, deposit, bond, or otherwise; and Landlord will be entitled to compel the prosecution of an action for the foreclosure of such Lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest and costs. Any amounts so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in connection therewith, together with interest at an interest rate equal

3

to four percent (4%) from the respective dates of Landlord's making of the payment or incurring of the cost or expense, will constitute Additional Rent payable by Tenant under this Lease and will be paid by Tenant to Landlord with the next installment of Rent then due under this Lease.

10.    **Maintenance and Repairs**.

(a)    During the Term, Tenant will maintain and keep the Leased Premises in the same condition and repair as at the Effective Date, reasonable wear and tear excepted.  Tenant will not permit any waste to the Leased Premises and will not use the Leased Premises or the Common Area for any purpose other than the Permitted Use.  In the event of (i) an emergency or (ii) if Tenant fails to perform or diligently prosecute any repairs or maintenance that Tenant is obligated to make in accordance with this Lease within thirty (30) days of written notice from Landlord requesting Tenant to make such repairs or perform such maintenance, then Landlord may, but will not be obligated to, undertake to complete such repairs for the account of and at the expense of Tenant, and the amount of any costs, payments, or expenses incurred by Landlord in connection with such cure will be deemed Additional Rent and payable by Tenant to Landlord within fifteen (15) days of demand from Landlord.

(b)    During the Term, Tenant will be responsible for (i) fifty percent (50%) of the cost of all maintenance, upkeep, upgrades, repairs and similar expenses of the Common Area, unless arising from damage caused by Tenant or its agents, employees, or invitees (in which case Tenant will pay one hundred percent (100%) of such costs), or unless arising from damage caused by U.S. Xpress or its agents, employees, or invitees (in which case Tenant shall have no responsibility for such costs) and (ii) fifty percent (50%) of Landlord's expense to connect the parcel, which includes the Leased Premises, the Common Area, and the U.S. Xpress abutting leased property to the city sewer system.  Tenant's obligations to pay expenses under this section will be deemed Additional Rent and payable by Tenant to Landlord within fifteen (15) days of demand from Landlord.

11.    **Insurance**.

(a)    During the Term, Tenant will maintain Commercial General Liability Insurance against claims occurring upon, in, or about the Leased Premises and the Common Area with a limit of $5,000,000 per occurrence.  Such insurance will name Landlord as an additional insured and will be issued by insurance companies authorized to do business in the State of Georgia with a financial rating of at least an A as rated in the most recent edition of AM Best's Insurance Reports and in business for the past five years.  Tenant will use commercially reasonable efforts to ensure that, prior to cancellation or nonrenewal of, or material change in, any policy or endorsements, Tenant's insurance companies furnish Landlord with thirty (30) days' advance written notice thereof.  Upon Landlord's written request, Tenant will furnish Landlord with ACCORD 25/27 certificates of insurance evidencing compliance with the foregoing insurance requirements, including the insurance carriers' promise to comply with the notice provision.

(b)    During the Term, Landlord will maintain property insurance covering buildings but excluding Tenant's personal property.  All costs relating to such insurance will be paid by Tenant as Additional Rent.

12.    **Indemnification**.

(a)    Tenant will defend, indemnify, and hold harmless Landlord, and with respect to 12(a)(i) U.S. Xpress, from any and all losses, liabilities, damages, injuries, costs, expenses, and claims of any and every kind, including reasonable attorneys' fees, to the extent incurred or suffered as a result of (i) any injury to persons or damage to or loss of property on or about the Leased Premises or the Common Area caused by Tenant, its employees, invitees, licensees, or by any other person entering the Leased

4

Premises or the Common Area under express or implied invitation of Tenant, or (ii) any breach of Tenant's representations and covenants contained in this Lease. Landlord will defend, indemnify, and hold harmless Tenant from any and all losses, liabilities, damages, injuries, costs, expenses, and claims of any and every kind, including attorneys' fees, to the extent incurred or suffered as a result of any breach of Landlord's representations and covenants contained in this Lease.

(b)       Each Party hereby waives any and all rights of recovery against the other Party directly or by way of subrogation or otherwise, and against the officers, partners, directors, employees, agents, and representatives of the other Party due to the negligence of the other Party or any such person for loss or damage to the property of the waiving Party or any other loss or damage where such loss or damage was to be covered by the policies of insurance required under this Lease (whether or not such insurance is in effect) or to the extent such loss or damage is actually covered by any other insurance carried by the waiving Party. Each Party will inform its respective insurance carrier of this waiver in the manner required with respect to policies issued by such carriers or otherwise arranged, to the extent necessary, so that the coverage afforded thereby is not adversely affected.

(c)       Subject to the waiver of subrogation provisions above, each Party hereby covenants and agrees to indemnify, defend, and hold the other Party (and under Section 12.1, above, U.S. Xpress) harmless from liability for any and all claims, liabilities, and costs (including reasonable attorneys' fees and expenses) arising in connection with any and all negligent acts or willful misconduct of the indemnifying Party, its agents, employees, contractors, invitees, and licensees.

13.    **Utilities**.    Tenant will pay for all utilities including, but not limited to, water, gas, electricity, sewage, and garbage disposal service and all other utility and utility connections used on or about the Leased Premises and fifty percent (50%) of such expenses on the Common Area as reasonably determined by Landlord.

14.    **Taxes**. Tenant will pay to Landlord as Additional Rent all real property taxes, assessments, and other governmental charges of any kind or nature which at any time during the term of this Lease may be assessed, levied, or imposed upon or with respect to the Leased Premises by any Governmental Authorities and fifty percent (50%) of such taxes, assessments, and governmental charges of any kind or nature on the Common Area as reasonably determined by Landlord (the "Real Estate Taxes"). Tenant will pay all taxes levied or imposed by all Governmental Authorities upon Tenant's furnishings, trade fixtures, equipment or other personal property located at the Leased Premises. Nothing contained in this Lease will require Landlord to pay any estate, inheritance, succession, capital levy, or transfer or sales tax to Tenant, nor to pay any taxes of any kind whatsoever that are based upon or measured by the income of Tenant. Nothing contained in this Lease will require Tenant to pay any income, estate, inheritance, succession, capital levy, or transfer or sales taxes to Landlord, nor to pay any taxes of any kind whatsoever other than the Real Estate Taxes. Under no circumstances shall either Party be liable for franchise taxes assessed against the other Party. Landlord will have the right to reasonably estimate the Real Estate Taxes for each tax year. Within thirty (30) days after the beginning of each tax year, Landlord will deliver to Tenant a written estimate of Tenant's obligations with respect to Real Estate Taxes for such tax year. On the first day of each calendar month following Tenant's receipt of such written estimate, and continuing until such time as Landlord delivers a subsequent written estimate, Tenant will pay to Landlord an amount equal to 1/12th of such estimate. Within ninety (90) days after the expiration of each tax year, Landlord will furnish Tenant a statement showing the actual Real Estate Taxes incurred during such calendar year, broken down by category, and showing the payments made by Tenant with respect to such tax year.  If the aggregate payments of Real Estate Taxes made by Tenant with respect to such tax year exceed the Real Estate Taxes for such calendar year, then Tenant will receive a credit for the excess against the next installment of Rent due to Landlord (or, if the Term has expired, Landlord will refund such overpayment to Tenant within thirty (30) days after the expiration of the Term); if said payments are less than said Real Estate Taxes for such

5

calendar year, Tenant will pay to Landlord the deficiency, without interest, within thirty (30) days thereafter.

15. **Condition of Leased Premises**. Tenant accepts the Leased Premises and the Common Area in its present "AS IS", "WHERE IS" condition. Tenant acknowledges that no representations have been made to Tenant with respect to the condition of the Leased Premises or the Common Area and that in entering into this Lease, Tenant has relied exclusively upon its own examination of the Leased Premises and the Common Area.

16. **Permits**. Tenant will, at its own cost and expense, obtain all necessary licenses and/or permits that may be required for the conduct of its business at the Leased Premises and will be responsible for fifty percent (50%) of any licenses and/or permits that may be required for the conduct of business on the Common Area as reasonably determined by Landlord.

17. **Default**. The following events will be deemed to be "Events of Default" by Tenant under this Lease:

(a) Tenant's failure to pay any Rent or any other amount due under this Lease when such amounts become due and the continuance of such failure for more than ten (10) days after written notice thereof from Landlord;

(b) Tenant fails to comply with any term, provision, or covenant of this Lease other than the payment of Rent, and has not cured such failure within thirty (30) days after written notice thereof is delivered to Tenant, or in the event that the failure cannot be cured within a thirty (30) day period, Tenant's failure to diligently prosecute the cure of such failure;

(c) Tenant (i) is dissolved; (ii) authorizes or makes an assignment for the benefit of creditors; (iii) generally does not pay its debts as they become due; (iv) admits in writing its inability to pay its debts generally; or (v) authorizes or commences (whether by the seeking of the entry of an order for relief or the appointment of a receiver, trustee, examiner, custodian, or other similar official therefor or for any substantial part of its property) any proceeding or voluntary case under any bankruptcy, reorganization, insolvency, dissolution, liquidation, adjustment, or arrangement of debt, receivership, or similar laws or if such proceedings are commenced or instituted against the Tenant, or if an order for relief or approving any petition commencing such proceedings is entered against the Tenant and the Tenant takes any action to authorize, approve, acquiesce, or consent to the commencement or institution of such proceedings, or such proceedings are not dismissed or stayed within sixty (60) days after the filing, commencement, or institution thereof; or

(d) Tenant does or permits to be done anything that creates a lien upon the Leased Premises or the Common Area which is not discharged (by payment, bonding or otherwise) within thirty (30) days after actual notice to Tenant of the filing thereof.

18. **Remedies in Event of Default**.

(a) Upon the occurrence of an Event of Default, Landlord will have the option to pursue any one or more of the following remedies without any notice or demand to Tenant whatsoever:

i. Terminate this Lease, in which event Tenant will immediately surrender the Leased Premises and the Common Area to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy it may have or possession or arrearages in rent, enter upon and take possession of the Leased Premises and the Common Area and expel or remove Tenant and any other person

6

who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor. Tenant agrees to pay to Landlord on demand the amount of all loss and damage that Landlord may suffer by reason of such termination, whether through inability to relet the Leased Premises on satisfactory terms or otherwise, including but not limited to the unpaid Rent that is accrued and unpaid as of the date on which the Lease is terminated, and Tenant shall remain responsible for the payment of all other Rent that would be due and payable under this Lease (had this Lease not been terminated) for the period of time from the date on which this Lease is terminated through the earlier of the Expiration Date or the date in which Landlord relets the Leased Premises to a new tenant, as the same would have become due and payable hereunder;

        ii.      Enter upon and take possession of the Leased Premises and the Common Area, with or without terminating this Lease, and expel or remove Tenant and any other person who may be occupying the Leased Premises or the Common Area or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor;

        iii.      Enter upon the Leased Premises and the Common Area, by force if necessary, without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to reimburse Landlord within fifteen (15) days of demand for any expenses that Landlord may incur in effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord will not be liable for any damages resulting to Tenant from such action;

        iv.      Relet the Leased Premises on such terms as Landlord deems advisable with or without terminating this Lease and do all things and take all actions as may be necessary or desirable, in Landlord's sole discretion, to accomplish such reletting. Landlord hereby agrees to use commercially reasonable efforts to mitigate its damages following an Event of Default through such reletting; or

        v.      Pursue any other remedy now or hereafter available under the laws of the state in which the Leased Premises are located.

In the event Landlord elects to re-enter or retake possession of the Leased Premises and the Common Area after an Event of Default, Tenant hereby waives notice of such re-entry or repossession and of Landlord's intent to re-enter or retake possession. Pursuit of any of the foregoing remedies will not preclude pursuit of any other remedies herein provided or provided by law, nor will pursuit of any other such remedy constitute a forfeiture or waiver of any Rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, provisions, and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default will not be deemed or construed to constitute a waiver of such default.

      19.    **Inspection**. Landlord may, but will not be obligated to, enter the Leased Premises and the Common Area at reasonable times, at reasonable intervals, and upon reasonable notice to Tenant (except in case of emergency) for the purpose of making inspection or the making of repairs to the Leased Premises and the Common Area.

      20.    **Assignment; Sublease**. Except as expressly provided herein, Tenant will not assign its interest under this Lease or sublet all or any part of the Leased Premises or the Common Area without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Any such purported assignment, sublease, or other transfer made without Landlord's consent will be void. The term "assignment" includes the following, whether accomplished directly or indirectly: (a) if Tenant is a partnership or limited liability company, the withdrawal or change, voluntarily, involuntarily, or by operation of Law, of a majority of the partners or members, or a transfer, direct or indirect, of a majority of

ownership interests, in the aggregate on a cumulative basis, or the dissolution of the partnership or limited liability company; and (b) if Tenant is a private corporation (i.e., whose stock is not publicly held and traded through an exchange or over the counter), the: (i) dissolution, merger, consolidation, or other reorganization of Tenant; (ii) sale or other transfer, directly or indirectly, of more than a cumulative aggregate of fifty percent (50%) of the voting shares of Tenant (other than to immediate family members by reason of gift or death); or (iii) sale, mortgage, hypothecation, or pledge, directly or indirectly, of more than a cumulative aggregate of fifty percent (50%) of Tenant's net assets; and (c) if Tenant is a publicly traded corporation, dissolution, merger, or consolidation or other reorganization of Tenant if the shareholders of Tenant, as existing immediately prior to such event, cease to control the policies and operations of Tenant or its successor created by such dissolution, merger, consolidation, or reorganization.

21.   **Condemnation; Damages**.  If the entire Leased Premises, or so much thereof as to render the balance unusable by Tenant for the Permitted Use is taken under power of eminent domain, or otherwise transferred in lieu thereof, this Lease will terminate and both Landlord and Tenant will have no further obligation or liability under this Lease.  If only a portion of the Leased Premises is taken so that this Lease is not terminated, rent payable hereunder will equitably abate as to the portion so taken.  If the Leased Premises is totally destroyed by fire or other casualty, or if the Leased Premises is so damaged by fire or other casualty that (in the reasonable opinion of a reputable contractor or architect designated by Landlord): (a) its repair or restoration requires more than one hundred eighty (180) days or (b) such repair or restoration requires the expenditure of more than fifty percent (50%) of the full insurable value of the Leased Premises immediately prior to the casualty, Landlord and Tenant will each have the option to terminate this Lease (by so advising the other, in writing), within ten (10) days after said contractor or architect delivers written notice of its opinion to Landlord and Tenant, but in all events prior to the commencement of any restoration of the Leased Premises by Landlord.  Additionally, if the damage (x) is less than the amount stated in (b) above, but more than twenty percent (20%) of the full insurable value of the Leased Premises, and (y) occurs during the last two years of the Term, then Landlord, but not Tenant, will have the option to terminate this Lease pursuant to the notice and within the time period established pursuant to the immediately preceding sentence.  If neither Landlord nor Tenant timely delivers a termination notice, this Lease will remain in full force and effect.  Landlord will have no liability to Tenant for, and Tenant will not be entitled to terminate this Lease by virtue of, any delays in completion of repairs and restoration following the damage described in clauses (a) or (b) or in clauses (x) and (y) of this <u>Section 21</u>.

22.   **Signage**.  Tenant will be authorized to place signage in, on, or about the Leased Premises with Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Tenant will remove all signs of Tenant upon the expiration or earlier termination of this Lease and immediately repair any damage to the Leased Premises caused by, or resulting from, such removal.

23.   **Amendment or Modification**.  This Lease may be amended or modified at any time and from time to time by agreement in writing signed by authorized representatives of the Parties.

24.   **Surrender of Leased Premises and the Common Area**.  At the expiration or earlier termination of this Lease, Tenant will quit and surrender the Leased Premises broom clean, in good condition.  Without limiting the generality of the foregoing, Tenant will, on or before the expiration or termination of this Lease, (a) remove all of Tenant's personal property and repair any damage caused by such removal; and (b) remove all trash and broom sweep the Leased Premises.  If any personal property of Tenant remains in the Leased Premises or the Common Area after the termination of this Lease, at the election of Landlord, (x) it will be deemed to have been abandoned by Tenant and may be retained by Landlord as its own property or (y) such property may be removed and disposed of by Landlord at the expense of Tenant.  Tenant's obligations under this <u>Section 24</u> will survive the expiration or earlier termination of this Lease.

25.     **Holdover**. If Tenant unlawfully holds possession of the Leased Premises or the Common Area after expiration or earlier termination of this Lease, then without limitation of Landlord's rights and remedies under this Lease at law or in equity, Tenant will pay to Landlord (a) monthly holdover rent equal to one hundred and fifty percent (150%) of the monthly installment of Annual Base Rent payable in the last month of the Term and (b) all Additional Rent as provided herein.

26.     **Brokers**. Each Party warrants and represents to the other Party that it has not worked or dealt with any real estate broker, firm, company, consultant, or person in connection with this Lease. Each Party will defend, indemnify, and hold harmless the other Party from and against all claims or other liabilities arising from any breach of the foregoing representation and warranty.

27.     **Estoppel Certificates**. Each Party agrees to periodically furnish, within ten (10) business days of request by the other Party, a certificate signed by the other Party certifying (to the extent same is true); (a) this Lease is in full force and effect and unmodified; (b) the Term has commenced and the Rent is then accruing under this Lease; (c) Tenant has accepted possession of the Leased Premises; (d) the date to which Rent has been paid; (e) no Rent has been paid more than thirty (30) days in advance of its due date; (f) the address for Notices to be sent to the certifying Party is as set forth in this Lease (or has been changed by Notice duly given and is as set forth in the certificate); (g) to the knowledge of the certifying Party, the other Party is not then in default under this Lease; and (h) such other factual matters as may be requested by such Party.

28.     **Subordination.**

(a)     This Lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to: (i) any lien or encumbrance now or hereafter placed on the Leased Premises or the Common Area that Landlord authorizes; (ii) all advances made under any such lien or encumbrance; (iii) the interest payable on any such lien or encumbrance; (iv) any and all renewals and extensions of any such lien or encumbrance; (v) any restrictive covenant affecting the Leased Premises or the Common Area; and (vi) the rights of any owners' association affecting the Leased Premises or the Common Area.

(b)     Tenant shall, within ten (10) days following written demand, execute a subordination, attornment, and non-disturbance agreement that Landlord or a holder of any lien or encumbrance on the Leased Premises or the Common Area may request that Tenant execute, provided that such agreement is made on the condition that this Lease and Tenant's rights under this Lease are recognized by the lien-holder.

29.     **Notice**. All notices, demands, requests, consents, certificates, and waivers required or permitted hereunder from either Party to the other will be in writing and sent by United States certified mail, return receipt requested, postage prepaid, or by recognized overnight courier, addressed as follows:

| | |
|---|---|
| If to Tenant: | Xpress Global Systems, LLC<br>1537 New Hope Church Road<br>Tunnel Hill, GA 30755<br>Attention:  Kelly Janvrin |
| With a copy to: | Carlton Fields Jorden Burt, P.A.<br>One Atlantic Center<br>1201 W. Peachtree St. N.W., Ste. 3000<br>Atlanta, Georgia 30309-3455<br>Fax: (404) 815-3415<br>Attention:  Lawrence Gold |

If to Landlord:          Q & F Realty, LLC
                                4080 Jenkins Road
                                Chattanooga, TN 37421
                                Fax: (423) 510-4003
                                Attention: Lisa Pate

Either Party may at any time, in the manner set forth for giving notices to the other, specify a different address to which notices to it will thereafter be sent. All notices will be effective upon receipt or rejection of receipt by the addressee. Notices from either Party may be given by such Party's agent or attorney.

30. **Miscellaneous**.

(a)    <u>No Offer; Contingency on Other Agreements</u>. The submission of this Lease for examination does not constitute an offer to lease, or a reservation of or option for the Leased Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease is contingent upon consummation of the transactions contemplated by the Purchase Agreement.

(b)    <u>No Waiver</u>. The failure of either Party to insist in any one or more instances upon the strict performance of any of the covenants, agreements, terms, provisions, or conditions of this Lease, or to exercise any election or option contained in this Lease, will not be construed as a waiver or relinquishment, or the future waiver or relinquishment or in any other instance a waiver or relinquishment of such covenant, agreement, term, provision, condition, election, or option. No waiver of any provision of this Lease will be effective unless set forth in a writing executed by the Parties.

(c)    <u>Partial Payment</u>. No payment by Tenant or receipt by Landlord of a lesser amount than the correct installment of Annual Base Rent due or full amount of Additional Rent then due will be deemed to be other than a payment on account, nor will any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

(d)    <u>Authority</u>. Each Party represents and warrants to the other Party: (i) the execution, delivery, and performance of this Lease have been duly approved by such Party, and that no further corporate action is required on the part of Landlord or Tenant to execute, deliver, and perform this Lease; (ii) the person(s) executing this Lease on behalf of such Party have all requisite authority to execute and deliver this Lease; and (iii) this Lease, as executed and delivered by such person(s), is valid, legal, and binding on such Party, and is enforceable against such Party in accordance with its terms, all subject to receipt of Landlord's consent to this Lease.

(e)    <u>Entire Agreement</u>. This Lease (i) contains the entire agreement of the Parties with respect to the subject matter which it covers; (ii) supersedes all prior or other negotiations, representations, understandings, and agreements both oral and written of, by or between the Parties, which will be deemed fully merged in this Lease; (iii) will be construed and governed by the laws of the State of Georgia; and (iv) may not be changed or terminated orally.

(f)    <u>Counterparts</u>. This Lease may be executed in any number of counterparts, each of which will be deemed to be an original and all of which will constitute one and the same instrument.

10

        (g)    <u>Captions</u>. The captions in this Lease are inserted only as a matter of convenience and for reference and in no way define, limit, construe, or describe the scope of this Lease or the meaning or intent of any provision of this Lease.

        (h)    <u>Successors/Assigns</u>. This Lease is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns. In the event that Landlord sells the Leased Premises, the new owner of the Leased Premises will become Landlord and will assume all obligations and responsibilities of Landlord under this Lease.

        (i)    <u>Choice of Law</u>. Any action brought to enforce or interpret this Lease will be brought exclusively in the courts located in the jurisdiction where the Leased Premises are located. Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same will not apply the presumption that the terms of this Lease will be more strictly construed against a Party by reason of the rule or conclusion that a document should be construed more strictly against the Party who, itself or through its agent, prepared the same, it being agreed that each Party has participated in the preparation of this Lease and that legal counsel was consulted by each responsible Party before the execution of this Lease.

        (j)    <u>Partial Invalidity</u>. If any provision of this Lease is declared invalid or unenforceable, the remainder of this Lease will continue in full force and effect.

        (k)    <u>Time</u>. Time is of the essence of this Lease with respect to the performance of each Party of all of its obligations hereunder.

        (l)    <u>WAIVER OF CONSEQUENTIAL AND PUNITIVE DAMAGES</u>. UNDER NO CIRCUMSTANCES WILL LANDLORD OR TENANT BE LIABLE TO THE OTHER PARTY FOR LOST OR ANTICIPATED PROFITS, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR ANY OTHER TYPE OF INDIRECT DAMAGES ARISING FROM OR RELATED TO THIS LEASE.

        (m)    <u>WAIVER OF TRIAL BY JURY</u>. LANDLORD AND TENANT KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER IN CONNECTION WITH ANY MATTER ARISING OUT OF OR CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE LEASED PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.

        (n)    <u>Third Party Beneficiaries</u>. There are no third party beneficiaries of this Lease, either expressed or implied.

        (o)    <u>No Recordation</u>. This Lease will not be recorded in whole or in memorandum form by either Party without the prior written consent of the other.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Parties have caused this Lease to be executed as of the day and year first above written.

**LANDLORD**
**Q & F Realty, LLC**

_____
By: _____
Its: _____

**TENANT**
**Xpress Global Systems, LLC**

_____
By: _____
Its: _____

SIGNATURE PAGE TO TUNNEL HILL LEASE

**EXHIBIT F**

**Form of Oklahoma Sublease Agreement**

# SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT (the **"Sublease"**) is made and entered into effective as of the ___ day of April, 2015 (the **"Effective Date"**), by and between **XPRESS GLOBAL SYSTEMS, LLC**, a Georgia limited liability company (hereinafter referred to as **"Sublessor"**) and **U.S. XPRESS, INC.**, a Nevada corporation (hereinafter referred to as **"Sublessee"**).

WHEREAS, Sublessor is the lessee of the real and personal property in that certain building located at 4402(b) S.W. 44th Street, Oklahoma City, Oklahoma 73149 (the **"Premises"**) pursuant to that certain Industrial Real Estate Lease dated March 21, 2002 (the **"Prime Lease"**), with Raptor Airport Road, LLC, as lessor (the **"Prime Lessor"**); and

WHEREAS, Sublessee desires to sublease from Sublessor certain office space at the Premises, and Sublessor desires to sublease said office space to Sublessee upon the terms and conditions contained herein.

NOW, THEREFORE, FOR AND IN CONSIDERATION OF the mutual covenants and agreements contained herein, Sublessor and Sublessee agree as follows:

1.   **Subleased Premises.** The premises affected by this Sublease shall be the offices commonly referred to as: the "USX Space" and the "Breakroom", consisting of approximately 280 square feet (the **"Subleased Premises"**), together with the non-exclusive right of access, in common with the Sublessor and others, to and from the Subleased Premises. A drawing of the Subleased Premises is attached hereto as <u>Exhibit A</u> and incorporated herein by reference. Sublessee hereby accepts the Subleased Premises as suitable for the purposes for which the same are leased, and accepts the same and each and every appurtenance thereof AS IS, WHERE IS AND WITH ALL FAULTS.

2.   **Rent**.

    a.   Base Rent:  The base rental amount shall be five hundred and 00/100 DOLLARS ($500.00) per month until Sublessee is required to procure access to its own network and, thereafter, the base rental amount shall be three hundred and 00/100 DOLLARS ($300.00) per month (the **"Base Rent"**).

    b.   Late Fee:  Should Sublessee at any time be in default for rental payments due and payable under the lease beyond the 10th day of the month, Sublessee shall be liable for additional rent in the amount of one percent (1%) of the Base Rent per month until such default has been corrected.

    c.   Additional Rent: Sublessee will be responsible for no other fees or expenses in connection with this Sublease.

3.   **Lease.**  For and by consideration of the payment of the Base Rent, Sublessor hereby subleases to Sublessee and Sublessee hereby subleases from Sublessor, the Subleased Premises more fully described in <u>Section 1</u> hereof. All rent is to be paid to Sublessor for the duration of this Sublease, or until notified in writing otherwise, at the following address:

Xpress Global Systems, LLC (Sublessor)
1537 New Hope Church Road
Tunnel Hill, Georgia, 30755
Attention: Kelly Janvrin

Sublessee agrees to pay the rental to Sublessor on the first (1st) day of each month for such month.   If Sublessee takes occupancy on other than the first (1st) day of the month or relinquishes occupancy on other than the last day of the month, the rent shall be prorated for the time the Subleased Premises is occupied by Sublessee.

4.    **Term.**  This Sublease shall commence on the Effective Date, and terminate on July 31, 2015, on the terms and conditions as set forth herein, unless sooner terminated as provided for in this Sublease.  This Sublease shall automatically renew for successive Lease Terms as such is defined in the Prime Lease, as amended from time to time, unless notice of intent not to renew is given by either party not less than thirty (30) days prior to such renewal. Notwithstanding the foregoing, either party may terminate this Sublease after giving the other party not less than ninety (90) days' written notice of such termination.  Sublessee hereby acknowledges and agrees that Sublessee shall have no right whatsoever to renew or extend the term of this Sublease or the Prime Lease, all such rights under the Prime Lease being reserved and retained by Sublessor, and Sublessee hereby waives and forever releases any such right.  This Sublease shall terminate and Sublessee shall quit the Subleased Premises without notice at the expiration of the Term of this Sublease or the Term as such is defined in the Prime Lease.  Any holding over by Sublessee after expiration shall not constitute a renewal or extension or give Sublessee any right in or to the Subleased Premises.

5.    **Indemnification.**  Sublessee shall indemnify, defend, protect and hold Sublessor harmless from any and all losses, damages, costs (including reasonable attorneys' fees), claims and liabilities to the extent arising from Sublessee's use of the Subleased Premises, the conduct of Sublessee's business, anything done or permitted by Sublessee to be done on or about the Premises, any breach or default in the performance of Sublessee's obligations under this Sublease, or any act or omission of Sublessee.  As used in this section, the term "Sublessee" and "Sublessor" shall include, as appropriate, Sublessee's and Sublessor's respective officers, directors, employees, agents, contractors and invitees.

6.    **Successors and Assigns.**  This Sublease shall bind and inure to the benefit of the successors, assigns, heirs, executors, administrations, and legal representatives of the parties hereto. Notwithstanding the foregoing sentence, Sublessee shall not assign this Sublease or any interest therein, nor sublet, encumber or assign the Subleased Premises or any part thereof, absent Sublessor's prior written consent, which consent may be granted or withheld by Sublessor in its reasonable discretion.

7.    **Notices.**  Any notices required or permitted hereunder shall be in writing and delivered either in person to the other party, or the other party's authorized agent, or by United States Certified Mail, return receipt requested, postage fully prepaid, or by express service, to the addressee set forth hereinafter, or to such other address as either party may designate in writing and delivered as herein provided:

Sublessor:     Xpress Global Systems, LLC
               1537 New Hope Church Road
               Tunnel Hill, Georgia, 30755
               Attention: Kelly Janvrin

with a copy:   Carlton Fields Jorden Burt, P.A.
               One Atlantic Center
               1201 W. Peachtree St. N.W., Ste. 3000
               Atlanta, Georgia 30309-3455
               Attention: Lawrence Gold

Sublessee:     U.S. Xpress, Inc.
               4080 Jenkins Road
               Chattanooga, Tennessee 37421
               Attention: Nick Lemm

with a copy:   U.S. Xpress Enterprises, Inc.
               4080 Jenkins Road
               Chattanooga, Tennessee 37421
               Attention: Kelly L.S. Arnold

8.  **Governing Law**. The interpretation, validity, and effect of this Sublease shall be governed in all respects by the laws of the State of Tennessee, without regard to conflicts of law provisions.

9.  **Prime Lease**.

    a.  Subordination. This Sublease is and shall be at all times subject and subordinate to the Prime Lease, and the terms and provisions thereof, and any mortgage or other security interests granted by the Prime Lessor.

    b.  Consent. In the event that the Prime Lease requires that the Sublessor obtain the consent of the Prime Lessor to sublet all or any portion of the Premises, then Sublessor shall request such consent. In the event that Sublessor is unable for any reason to obtain such consent, then Sublessor and Sublessee shall be released of any obligation under this Sublease, including (with respect to Sublessee) the obligation to pay Base Rent or additional rent, but no liabilities incurred by Sublessee prior to the date of such notification shall be discharged or cancelled as a result of such failure to obtain Prime Lessor's consent

*[Signature Page Follows]*

3

EXECUTED to be effective as of the Effective Date.

**SUBLESSOR**

XPRESS GLOBAL SYSTEMS, LLC

By: _____
Title: _____

**SUBLESSEE**

U.S. XPRESS, INC.

By: _____
Title: _____

SIGNATURE PAGE TO OKLAHOMA SUBLEASE AGREEMENT

**EXHIBIT G-1**

**Form of Trademark Contribution Agreement**

## CONTRIBUTION AGREEMENT

THIS CONTRIBUTION AGREEMENT (this "Agreement") is dated as of March ___, 2015 (the "Effective Date"), by and between U.S. Xpress Enterprises, Inc., a Nevada corporation ("U.S. Xpress"), and Xpress Global Systems, Inc., a Georgia corporation (the "Company").

### WITNESSETH:

WHEREAS, the Company is a wholly owned subsidiary of U.S. Xpress;

WHEREAS, U.S. Xpress currently holds certain intellectual property used by the Company;

WHEREAS, U.S. Xpress desires to contribute certain intellectual property to the Company; and

WHEREAS, the Company desires to accept the contribution of the intellectual property from U.S. Xpress.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed, the parties hereby agree as follows:

1.  U.S. Xpress represents and warrants the following:

    a.  That no third party or employee or independent contractor of U.S. Xpress has any claim, right (whether or not currently exercisable), or interest to or in any IP.

2.  U.S. Xpress hereby distributes, grants and assigns to the Company all of its worldwide common law and statutory right, title and interest in and to the IP.

3.  The Company hereby acquires and accepts from U.S. Xpress the IP.

4.  U.S. Xpress agrees that, upon reasonable request of the Company from time to time, it will execute and deliver all documents and do all other acts which may be reasonably necessary to perfect or record the foregoing transfer of the IP to the Company. U.S. Xpress hereby authorizes the Company, its successors and assigns, to take any appropriate action in connection with the IP (including, without limitation, all applications and registrations therefor), in the name of the Company.

5.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

6.    This Agreement may be executed in one or more counterparts, all of which, when taken together, will constitute one and the same instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

U.S. Xpress Enterprises, Inc.

By: _____
Name: _____
Title: _____

Xpress Global Systems, Inc.

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO DISTRIBUTION AND CONTRIBUTION AGREEMENT

## **SCHEDULE 1**

U.S. Trademark Serial No. 86-348,236 for MYXGS, published in the Official Gazette of the U.S. Patent and Trademark Office on December 23, 2014.

**EXHIBIT G-2**

**Form of Bill of Sale**

## BILL OF SALE

April __, 2015

U.S. Xpress Leasing, Inc., a Tennessee corporation ("Seller"), in consideration for $4,657,909.29 representing the fair market value of the Property (as defined below) and which will be recorded as a note payable in the books and records of Buyer, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby sell, transfer, assign, convey and deliver to Xpress Global Systems, Inc., a Georgia corporation ("Purchaser"), all of Seller's right, title and interest in and to the equipment, machinery and other personal property listed on Exhibit A attached hereto, together with all related additions, accessories, attachments, parts, manuals and warranty information (collectively, the "Property").

Seller represents and warrants that: (a) all of the Property is owned by and titled to Seller, (b) Seller is the sole owner and title holder of the Property and has good and marketable title thereto, and (c) the Property is being transferred to Purchaser free and clear of all liens, security interests, encumbrances and rights of others.

This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or other forms of electronic signatures shall be operative as original signatures.

*[Signature pages follow]*

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed as of the date first above written.

**U.S. XPRESS LEASING, INC.**


By:      _____
Name:   Ray M. Harlin
Title:    Assistant Secretary and Treasurer

ACCEPTED AS OF THIS __ DAY OF MARCH __ 2015.

**XPRESS GLOBAL SYSTEMS, INC.**


By: _____
Name: Ray M. Harlin
Title: Assistant Secretary

**EXHIBIT H**

**Member Disclosure Schedule**

**EXHIBIT I**

**Escrow Agreement**

**EXECUTION COPY**

**ESCROW AGREEMENT**

This Escrow Agreement dated this  day of April <u>10</u>, 2015 (the "Escrow Agreement"), is entered into by and among U.S. Xpress Enterprises, Inc. ("U.S. Xpress") and XGS Acquisition, LLC ("Buyer"), together with U.S. Xpress, the "Parties, and individually, a "Party"), and Wells Fargo Bank, National Association, a national banking association, as escrow agent ("Escrow Agent").

RECITALS

A.      The Parties, have entered into a Membership Purchase Agreement of even date (the "Purchase Agreement"), pursuant to which Buyer is acquiring 100% of the membership interests in Xpress Global Systems, LLC, a Delaware limited liability company ("XGS"); and

B.      In connection with the consummation of the transactions contemplated in the Purchase Agreement, Buyer has agreed to cause XGS to assume certain liabilities with respect to certain Insurance Claims (as more particularly described in the Purchase Agreement), up to a certain dollar amount set forth therein (the "Assumed Claims"); and

C.      In order to provide U.S. Xpress with security for the satisfaction by XGS of the Assumed Claims, Buyer has agreed to cause XGS to place into escrow the sum of $1,500,000, to be held in escrow and disbursed in accordance with the terms of this Escrow Agreement, and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement; and

D.      The Parties acknowledge that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under, the Purchase Agreement, that all references in this Escrow Agreement to the Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement; and

E.      All capitalized terms used in this Escrow Agreement and not expressly defined herein shall have the meanings ascribed to such terms in the Purchase Agreement. The Escrow Agent will not be responsible to determine or to make inquiry into any term, capitalized, or otherwise, not defined herein.

In consideration of the promises and agreements of the Parties and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

ARTICLE 1
ESCROW DEPOSIT

Section 1.1.    <u>Receipt of Escrow Property</u>.  Upon execution hereof, Buyer shall cause XGS to deliver to the Escrow Agent the amount of $1,500,000 (the "Escrow Property") in immediately available funds.

1

Section 1.2.    <u>Investments</u>.

(a)    The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrow Property and any investment income thereon as set forth in Exhibit A hereto, or as set forth in any subsequent written instruction signed by Buyer.  Any investment earnings and income on the Escrow Property shall not become part of the Escrow Property and shall be disbursed to Buyer as directed in writing by Buyer.

(b)    The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

Section 1.3.    <u>Disbursements to U.S. Xpress</u>.  The Escrow Agent shall disburse funds from the Escrow Property to U.S. Xpress, from time to time, on the  fifth (5th) Business Day following receipt of written notice from U.S. Xpress ("Release Notice"), substantially in the form of Exhibit D attached hereto, in such amounts as shall be set forth in each such notice. U.S. Xpress will simultaneously provide Buyer with a copy of each such Release Notice . Any unilateral disbursement direction of U.S. Xpress pursuant to this Section 1.3 shall be binding on the Escrow Agent and Buyer will have no right to object to the contents of the notice or to any disbursement by the Escrow Agent.  Buyer hereby irrevocably consents to any disbursement direction that U.S. Xpress may provide the Escrow Agent pursuant to this Section 1.3 and shall have no cause of action against the Escrow Agent with respect to any disbursement pursuant to this Sections 1.3."Business Day" shall mean any day other than a Saturday, a Sunday, a federal or state holiday, and any other day on which the Escrow Agent is closed.

Section 1.4.    <u>Disbursements to Buyer</u>.

(a)    If all of the Escrow Property has not been released to U.S. Xpress pursuant to Section 1.3 on the earlier of (i) the date on which Buyer has paid toward the Assumed Claims in cash (directly and through releases of the Escrow Property) an amount at least equal to the reserve for Insurance Claims on the Closing Balance Sheet, or (ii) the date on which all Assumed Claims are paid in full (the "Termination Date"), then the Parties  shall after the Termination Date, deliver to Escrow Agent a joint written direction executed by the Parties to release all remaining Escrow Property to Buyer. Escrow Agent shall release such remaining Escrow Property to Buyer within five (5) Business Days following Escrow Agent's receipt of such joint written direction.

(b)      If after the first quarter following the date hereof, the Buyer has reduced the Assumed Claims to $1,300,000 or less, $200,000 of cash from the Escrow Property shall  be released to the Buyer within two (2)_ Business Days following Escrow Agent's receipt of a joint written direction executed by the Parties and delivered to the Escrow Agent after the end of such quarter.  For each successive quarter, if the Assumed Claims are reduced by at least an additional $200,000, then an additional $200,000 of cash from the Escrow Property shall be released to the Buyer within two (2) Business Days following Escrow Agent's receipt of a joint written direction executed by the Parties after the end of such quarter.  This shall  continue each quarter until the balance of the Escrow Property is reduced to $0.   It will be a condition to each release under this Section 1.4(b) that the Parties determine that the result of (i) the remaining Escrow Property (after distribution of any pending Release Notice) minus (ii) the remaining balance of Assumed Claims, is greater than $200,000. Escrow Agent shall have no obligations to perform any calculations or make any determinations with respect to such condition.   The Parties acknowledge that U.S. Xpress will be entitled to withhold its written direction under this Section 1.4(b), if Buyer attempts to delay, contest, or prevent any release of Escrow Property to U.S. Xpress under Section 1.3 above.

Section 1.5.    Security Procedure For Funds Transfers.  The Escrow Agent shall confirm each funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to the Escrow Agent through a signed certificate in the form of Exhibit B-1 or Exhibit B-2 attached hereto, which upon receipt by the Escrow Agent shall become a part of this Escrow Agreement.  Once delivered to the Escrow Agent, Exhibit B-1 or Exhibit B-2 may be revised or rescinded only by a writing signed by an authorized representative of the Party.  Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it.  If a revised Exhibit B-1 or B-2 or a rescission of an existing Exhibit B-1 or B-2 is delivered to the Escrow Agent by an entity that is a successor-in-interest to such Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the Party under this Escrow Agreement.

The Parties understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the security procedure selected by such Party may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

Section 1.6.    Income Tax Allocation and Reporting.

(a)      The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Buyer, whether or not such income was disbursed during such calendar year.

(b)      Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request.   The Parties understand that if such tax reporting

documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  Buyer shall, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent.  The indemnification provided by this Section 1.6(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 1.7.    Termination.  This Escrow Agreement shall terminate on the earlier of (i) the Termination Date (as defined in Section 1.4(a) above) or (ii) upon the disbursement of all of the Escrow Property, including any interest and investment earnings thereon, except that the provisions of Sections 1.6(c), 3.1 and 3.2 hereof shall survive termination and the Escrow Agent is authorized and directed to disburse the Escrow Property in accordance with Section 1.3 or Section 1.4 of this Escrow Agreement.


ARTICLE 2
DUTIES OF THE ESCROW AGENT

Section 2.1.    Scope of Responsibility.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

4

Section 2.2.   <u>Attorneys and Agents</u>.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent.  The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

Section 2.3.   <u>Reliance</u>.  The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns.  The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.  Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent Exhibit B-1 and Exhibit B-2, which contain authorized signer designations in Part I thereof.

Section 2.4.   <u>Right Not Duty Undertaken</u>.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

Section 2.5.   <u>No Financial Obligation</u>.  No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

ARTICLE 3
PROVISIONS CONCERNING THE ESCROW AGENT

Section 3.1.   <u>Indemnification</u>.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 3.2.   <u>Limitation of Liability</u>.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT, PUNITIVE, OR

100758562.1

CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

Section 3.3.    Resignation or Removal.   The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of removal.   Such resignation or removal, as the case may be, shall be effective thirty (30) calendar days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.   If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 3.4.    Compensation.   The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit C, which compensation shall be paid by Buyer. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event.   If any amount due to the Escrow Agent hereunder is not paid within thirty (30) calendar days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.   The Escrow Agent shall have, and is hereby granted, a prior lien upon the Escrow Property with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Property.

Section 3.5.    Disagreements.   If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property, (ii) receives a written agreement executed by each of the parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the

6

Escrow Agent shall be authorized to disburse the Escrow Property in accordance with such final court order, arbitration decision, or agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

Section 3.6.    Merger or Consolidation.  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 3.7.    Attachment of Escrow Property; Compliance with Legal Orders.  In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

Section 3.8    Force Majeure.  The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

ARTICLE 4
MISCELLANEOUS

Section 4.1.    Successors and Assigns.  This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such

7

assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

Section 4.2.    Escheat.  The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

Section 4.3.    Notices.    All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to U.S. Xpress Enterprises, Inc.:

U.S. Xpress Enterprises, Inc.
4080 Jenkins Road
Chattanooga, TN 37421
Attention:  Kelly L.S. Arnold
Telephone:  (423) 510-4781
Fax:  (423) 510-4003
E-mail:  klsarnold@usxpress.com


If to XGS Acquisition, LLC:
3060 Peachtree Street, NW
Suite 300
Atlanta, Georgia 30305
Attention:  Mr. Larry Gildersleve
Telephone:  404-390-4910
E-mail: larry@pantonapitalholdings.com

If to the Escrow Agent:

Wells Fargo Bank, National Association
Karen Z. Kelly, Corporate, Municipal & Escrow Solutions
171 17th Street NW, 4th floor
Atlanta, GA 30363
Telephone: (404) 214-3914
Facsimile: (404) 214-5881
E-mail: Karen.z.kelly@wellsfargo.com

Section 4.4.    Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the state of Georgia.

Section 4.5.    Entire Agreement.  This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to the Escrow Property.

Section 4.6.    Amendment.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

Section 4.7.    Waivers.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 4.8.    Headings.   Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

Section 4.9.    Counterparts.    This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

Section 4.10    Publication; disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party to this Escrow Agreement.  The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as

9

any judicial, or administrative order, subpoena or discovery request, or is required by the terms of any contract to which it is a party, including any credit agreements or related loan documents, to disclose the terms and provisions of this Agreement to any third party, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so.  If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure.

[The remainder of this page left intentionally blank.]

10

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

U.S. XPRESS ENTERPRISES, INC.

By: _____

Name: Ray M. Harlin

Title: President and Chief Financial Officer


XGS Acquisition, LLC

By: _____

Name: Lawrence Gildersleve

Title:   Vice-President

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

U.S. Xpress Enterprises, Inc.

By: _____

Name: _____

Title: _____


XGS Acquisition, LLC

By: _____

Name:  Lawrence Gildersleve

Title:   Vice-President


WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

U.S. XPRESS ENTERPRISES, INC.

By: _____

Name: Ray M. Harlin

Title:   President and Chief Financial Officer


XGS Acquisition, LLC

By: _____

Name: Lawrence Gildersleve

Title:   Vice-President


WELLS FARGO BANK, NATIONAL ASSOCIATION, solely in its capacity as Escrow Agent hereunder

By: _____

Name: _____REDA SABALIAUSKAITE_____
              VICE PRESIDENT

Title: _____

<u>EXHIBIT A</u>

**Agency and Custody Account Direction**
**For Cash Balances**
**Wells Fargo Money Market Deposit Accounts**

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit A is attached.

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from time to time, all cash in the Account in the following money market deposit account of Wells Fargo Bank, National Association:

Wells Fargo Money Market Deposit Account (MMDA)

I understand that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $250,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $250,000.

I acknowledge that I have full power to direct investments of the Account.

I understand that I may change this direction at any time and that it shall continue in effect until revoked or modified by me by written notice to you.

100758562.1

<u>EXHIBIT B-1</u>

U.S. Xpress Enterprises, Inc. ("U.S. Xpress") certifies that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-1 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of U.S. Xpress, and that the option checked in Part III of this Exhibit B-1 is the security procedure selected by U.S. Xpress for use in verifying that a funds transfer instruction received by the Escrow Agent is that of U.S. Xpress.

U.S. Xpress has reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-1 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent.  By selecting the security procedure specified in Part III of this Exhibit B-1, U.S. Xpress acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by U.S. Xpress.

<u>NOTICE</u>:  The security procedure selected by U.S. Xpress will not be used to detect errors in the funds transfer instructions given by U.S. Xpress.  If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary.   If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.  Therefore, it is important that U.S. Xpress take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

**Part I**

**Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of** U.S. Xpress

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> | <u>Specimen Signature</u> |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

**Part II**

**Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

100758562.1

## Part III

### Means for delivery of instructions and/or confirmations

The security procedure to be used with respect to funds transfer instructions is checked below:

☐    *Option 1.  Confirmation by telephone call-back*.  The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.

      ☐ CHECK box, if applicable:
         If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☐    *Option 2.  Confirmation by e-mail*.  The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-1.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.  U.S. Xpress understands the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail.  U.S. Xpress further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

      ☐ CHECK box, if applicable:
         If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐    *Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation*.  The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If U.S. Xpress wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent.  If U.S. Xpress chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐    *Option 4.  Delivery of funds transfer instructions by password protected file transfer system with confirmation*.  Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above.  By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

**Dated this _____ day of _____, 2015.**

**By _____**
**Name:**
**Title:**

100758562.1

<u>EXHIBIT B-2</u>

XGS Acquisition, LLC ("Buyer") certifies that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-2 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of Buyer, and that the option checked in Part III of this Exhibit B-2 is the security procedure selected by Buyer for use in verifying that a funds transfer instruction received by the Escrow Agent is that of Buyer.

Buyer has reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-2 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent.  By selecting the security procedure specified in Part III of this Exhibit B-2, Buyer acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by Buyer.

<u>NOTICE</u>:  The security procedure selected by Buyer will not be used to detect errors in the funds transfer instructions given by Buyer.  If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary.  If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.  Therefore, it is important that Buyer take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

**Part I**

**Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of** Buyer

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> | <u>Specimen Signature</u> |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

**Part II**

**Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

100758562.1

_____ _____

_____

_____**Part III**

## **Means for delivery of instructions and/or confirmations**

The security procedure to be used with respect to funds transfer instructions is checked below:

☐   *Option 1.   Confirmation by telephone call-back*.  The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2.

☐   CHECK box, if applicable:
If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☐   *Option 2.   Confirmation by e-mail*.  The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-2.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2.  Buyer understands the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail.  Buyer further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods.  The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

☐   CHECK box, if applicable:
If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐   *Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation*.  The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If Buyer wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent.  If Buyer chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐   *Option 4.   Delivery of funds transfer instructions by password protected file transfer system with confirmation*.  Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above.  By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

**Dated this \_\_\_\_ day of _____, 2015.**

**By** _____
**Name:**
**Title:**

100758562.1

EXHIBIT C

**FEES OF ESCROW AGENT**

## Corporate Trust Services

Schedule of fees to provide escrow agent services
Project Dos Equis
Performance Escrow Account
Approximate size:  $1.5 million



| Acceptance fee | $1,500 |
|---|---|

A one-time fee for our initial review of governing documents, account set-up and customary duties and responsibilities related to the closing.  This fee is payable at closing.

| Annual administration fee | $3,500 |
|---|---|

An annual fee for customary administrative services provided by the escrow agent, including daily routine account management; investment transactions, cash transactions processing (including wire and check processing), disbursement of funds in accordance with the agreement, tax reporting for one entity, and providing account statements to  the parties. The administration fee is payable annually in advance per escrow account established. The first installment of the administrative fee is payable at closing.

| Out-of-pocket expenses | At cost |
|---|---|

Out-of- pocket expenses will be billed as incurred at cost at the sole discretion of Wells Fargo.

| Extraordinary services | Standard rate |
|---|---|

The charges for performing services not contemplated at the time of execution of the governing documents or not specifically covered elsewhere in this schedule will be at Wells Fargo's rates for such services in effect at the time the expense is incurred.

### Assumptions

This proposal is based upon the following assumptions with respect to the role of escrow agent:

- Number of escrow accounts to be established:  1
- Amount of escrow: $1.5 million
- Term of escrow: 18 months
- Number of tax reporting parties: 1
- Number of parties to the transaction:  3
- Number of cash transactions:  2 deposits / 5 disbursements

- ○ Wells Fargo will charge $100 per disbursement for each additional disbursement over 5
- Fees quoted assumes balances invested under the escrow agreement will be held in: Wells Fargo's Money Market Demand Account (MMDA)

### Terms and conditions

- The recipient acknowledges and agrees that this proposal does not commit or bind Wells Fargo to enter into a contract or any other business arrangement, and that acceptance of the appointment described in this proposal is expressly conditioned on (1) compliance with the requirements of the USA Patriot Act of 2001, described below, (2) satisfactory completion of Wells Fargo's internal account acceptance procedures, (3) Wells Fargo's review of all applicable governing documents and its confirmation that all terms and conditions pertaining to its role are satisfactory to it and (4) execution of the governing documents by all applicable parties.
- Should this transaction fail to close or if Wells Fargo determines not to participate in the transaction, any acceptance fee and any legal fees and expenses may be due and payable.
  - Legal counsel fees and expenses, any acceptance fee and any first year annual administrative fee are payable at closing.
  - Any annual fee covers a full year or any part thereof and will not be prorated or refunded in a year of early termination.
  - Should any of the assumptions, duties or responsibilities of Wells Fargo change, Wells Fargo reserves the right to affirm, modify or rescind this proposal.
- The fees described in this proposal are subject to periodic review and adjustment by Wells Fargo.
- Invoices outstanding for over 30 days are subject to a 1.5% per month late payment penalty.
  - This fee proposal is good for 90 days.

#### Important information about identifying our customers

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person (individual, corporation, partnership, trust, estate or other entity recognized as a legal person) for whom we open an account.*

*What this means for you: Before we open an account, we will ask for your name, address, date of birth (for individuals), TIN/EIN or other information that will allow us to identify you or your company. For individuals, this could mean identifying documents such as a driver's license.  For a corporation, partnership, trust, estate or other entity recognized as a legal person, this could mean identifying documents such as a Certificate of Formation from the issuing state agency.*

Date:  March 31, 2015

100758562.1

EXHIBIT D

FORM OF RELEASE NOTICE

To: Wells Fargo Bank, National Association
Attention: Corporate, Municipal & Escrow Solutions
171 17th Street NW, 4th floor
Atlanta, GA 30363
Facsimile: 404-214-5881
Email: Karen.z.kelly@wellsfargo.com

[DATE]

      Reference is made to that certain Escrow Agreement (the "Escrow Agreement") dated as of April __, 2015 between and among U.S. Xpress Enterprises, Inc. ("U.S.Xpress"), XGS Acquisition, LLC ("Buyer") and Wells Fargo Bank, N.A., solely in its capacity as Escrow Agent (the "Escrow Agent").

      Pursuant to Section 1.3 of the Escrow Agreement,  U.S. Xpress hereby directs Escrow Agent to disburse $_____ of the Escrow Property to U.S. Xpress on the fifth (5th) Business Day (as defined in the Escrow Agreement) following receipt of this Release Notice by the Escrow Agent, by wire transfer of immediately available funds in accordance with the wiring instructions attached to this Release Notice.

      U.S. Xpress confirms that it has provided, or will simultaneously herewith provide, a copy of this Release Notice to the Buyer.

      This __ day of _____ 201_.

      U.S Xpress Enterprises, Inc.

      By: _____
      Name:
      Title: _____

100758562.1



**ACQUISITION**

**by**

**XGS ACQUISITION, LLC**
**a Delaware Limited Liability Company**
**("BUYER")**

**of**

**ONE HUNDRED PERCENT (100%) OF THE MEMBERSHIP INTERESTS**

**in**

**XPRESS GLOBAL SYSTEMS, LLC**
**a Georgia Limited Liability Company**
**("COMPANY")**

**from**

**XPRESS HOLDINGS, INC.**
**a Nevada Corporation**
**("MEMBER")**

**CLOSING DATE:  April 13, 2015**

# DISCLOSURE SCHEDULES

# TABLE OF CONTENTS

| Document | PDF Page Number |
|---|:---:|
| Sch. 1.2(a) - Closing Payment Instructions | 6 |
| Sch. 1.4(a)(i) - Jurisdictions | 8 |
| Sch. 1.5(a)(iv) - Excluded Assets | 9 |
| Sch. 1.5(a)(v) - Excluded Liabilities | 10 |
| Sch. 2.3(a) - Capitalization | 11 |
| Sch. 2.3(b) - Liens | 12 |
| Sch. 2.4 - Subsidiaries | 13 |
| Sch. 2.5 - No Violation | 14 |
| Sch. 2.7 - Finder's Fee | 15 |
| Sch. 2.8 - Consents | 16 |
| Sch. 2.9 - Financial Statements | 19 |
| Sch. 2.11(a) - Real Property | 24 |
| Sch. 2.11(b) - Exceptions to Real Property | 27 |
| Sch. 2.11(c) - Material Assets | 28 |
| Sch. 2.11(d) - Sublet Real Property | 29 |
| Sch. 2.12 - Condition and Sufficiency of Assets | 31 |
| Sch. 2.13 - Undisclosed Liabilities | 32 |
| Sch. 2.14(a) - Exceptions to Tax Returns and Taxes Paid | 33 |
| Sch. 2.14(b) - List of Tax Returns; Information Regarding Audits | 34 |
| Sch. 2.14(c) -  Potential Tax Liabilities | 35 |
| Sch. 2.16 - No Materially Adverse Change | 36 |
| Sch. 2.17(a) - Benefit Plans | 37 |
| Sch. 2.17(b) - ERISA Affiliates | 133 |
| Sch. 2.17(d) - Noncompliance of Benefit Plans | 134 |
| Sch. 2.18(a) - Compliance with Legal Requirements | 135 |

100991151.1

| | |
|---|---|
| Sch. 2.18(b) - Government Authorizations | 136 |
| Sch. 2.19(a) - Legal Proceedings | 179 |
| Sch. 2.19(c) - Orders | 180 |
| Sch. 2.20 - Absence of Certain Changes and Events | 181 |
| Sch. 2.21(a) - Material Contracts | 182 |
| Sch. 2.21(b) - Invalid/Unenforceable Contracts | 184 |
| Sch. 2.21(c) - Defaults or Conflicts under Material Contracts | 185 |
| Sch. 2.22(a) - Insurance Policies | 186 |
| Sch. 2.22(b) - Agreements Reflecting the Allocation of Insurance | 188 |
| Sch. 2.23 - Environmental Matters | 189 |
| Sch. 2.24 - Employee Severance and Similar Agreements | 190 |
| Sch. 2.25(a) - Company Intellectual Property | 191 |
| Sch. 2.25(b) - Excepted Company Intellectual Property | 205 |
| Sch. 2.25(c) - Employee Intellectual Property Agreements | 206 |
| Sch. 2.26(a) - Exception to Tractors and Trailers | 207 |
| Sch. 2.26(b) - Tractors and Trailers | 208 |
| Sch. 2.27 - Relationships with Related Persons | 227 |
| Sch. 2.28 - Bank Accounts | 228 |
| Sch. 2.29(a) - Accounts Receivables | 230 |
| Sch. 2.29(b) - Status of Receivables | 285 |
| Sch. 2.30 - Inventory | 286 |
| Sch. 4.3 - Funded Indebtedness | 287 |

100991151.1

MEMBER DISCLOSURE SCHEDULES

Reference is made to the Membership Interest Purchase Agreement, dated as of April 13, 2015 (as the same may be amended and restated from time to time, the "Agreement"), made by and among XGS Acquisition, LLC, a Delaware limited liability company (the "Buyer"), Xpress Global Systems, LLC, a Georgia limited liability company (the "Company"), Xpress Holdings, Inc., a Nevada corporation (the "Member") and U.S. Xpress Enterprises, Inc., a Nevada corporation (the "Parent"). These schedules are the Disclosure Schedules delivered by the Member pursuant to, and referred to in, the Agreement (the "Disclosure Schedules"). Capitalized terms used, but not otherwise defined herein, have the respective meanings ascribed to those terms in the Agreement.

The section and subsection references in these Disclosure Schedules correspond to the section and subsection numbers in the Agreement. Disclosure of any fact or item in any section of these Disclosure Schedules with respect to a particular paragraph or section in the Agreement will, should the existence of the fact or item or its contents be reasonably apparent to any other paragraph or section, be deemed to be disclosed with respect to that other paragraph or section whether or not a specific cross-reference appears.

Unless otherwise specified, documents attached to any section of these Disclosure Schedules are incorporated in their entirety into that section of these Disclosure Schedules. These Disclosure Schedules and any documents attached to these Disclosure Schedules are qualified in their entirety by reference to specific provisions of the Agreement to which they relate, and are not intended to constitute, and will not be construed as constituting, any representation or warranty of Member, except as and to the extent expressly provided in the Agreement.

Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be reflected in these Disclosure Schedules. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. Disclosure of any fact or item in any section of these Disclosure Schedules will not constitute an admission against Member's interests or an admission of any obligation to a third party or liability under any applicable law or an acknowledgment that such fact or item is required by the Agreement to be disclosed herein. Disclosure of any fact or item in any section of these Disclosure Schedules will not necessarily mean that such item or fact is material to the business or financial condition of the Company and any of its Subsidiaries individually or taken as a whole, nor will such information be deemed to establish a standard of materiality or a basis for interpreting terms such as "materially," "materiality," "Material Adverse Effect" or any similar qualification in the Agreement.

Headings and subheadings (other than references to sections and subsections of the Agreement) in these Disclosure Schedules are for convenience of reference only and will not be deemed to expand or limit the scope of the information required to be disclosed in these Disclosure Schedules, to expand or limit the effect of the disclosures contained in these Disclosure Schedules or to otherwise affect the interpretation of the Agreement or these Disclosure Schedules. The descriptions of agreements and documents in these Disclosure Schedules are summaries only and are qualified in their entirety by the specific terms or such agreements or documents.

# Table of Contents

| Schedule | Description |
|---|---|
| 1.2(a) | Closing Payment Instructions |
| 1.4(a)(i) | Jurisdictions |
| 1.5(a)(iv) | Excluded Assets |
| 1.5(a)(v) | Excluded Liabilities |
| 2.3(a) | Capitalization |
| 2.3(b) | Liens |
| 2.4 | Subsidiaries |
| 2.5 | No Violation |
| 2.7 | Finder's Fee |
| 2.8 | Consents |
| 2.9 | Financial Statements |
| 2.11(a) | Real Property |
| 2.11(b) | Exceptions to Real Property |
| 2.11(c) | Material Assets |
| 2.11(d) | Sublet Real Property |
| 2.12 | Condition and Sufficiency of Assets |
| 2.13 | Undisclosed Liabilities |
| 2.14(a) | Exceptions to Tax Returns and Taxes Paid |
| 2.14(b) | List of Tax Returns; Information Regarding Audits |
| 2.14(c) | Potential Tax Liabilities |
| 2.16 | No Materially Adverse Change |
| 2.17(a) | Benefit Plans |
| 2.17(b) | ERISA Affiliates |
| 2.17(d) | Noncompliance of Benefit Plans |
| 2.18(a) | Compliance with Legal Requirements |
| 2.18(b) | Governmental Authorizations |
| 2.19(a) | Legal Proceedings |
| 2.19(c) | Orders |
| 2.20 | Absence of Certain Changes and Events |
| 2.21(a) | Material Contracts |
| 2.21(b) | Invalid/Unenforceable Contracts |
| 2.21(c) | Defaults or Conflicts under Material Contracts |
| 2.22(a) | Insurance Policies |
| 2.22(b) | Agreements Reflecting the Allocation of Insurance |
| 2.23 | Environmental Matters |
| 2.24 | Employee Severance and Similar Agreements |
| 2.25(a) | Company Intellectual Property |
| 2.25(b) | Excepted Company Intellectual Property |
| 2.25(c) | Employee Intellectual Property Agreements |
| 2.26(a) | Exception to Tractors and Trailers |
| 2.26(b) | Tractors and Trailers |
| 2.27 | Relationships with Related Persons |
| 2.28 | Bank Accounts |
| 2.29(a) | Accounts Receivable |
| 2.29(b) | Status of Receivables |
| 2.30 | Inventory |
| 4.3 | Funded Indebtedness |

**Schedule 1.2(a)**

**<u>Closing Payment Instructions</u>**

See attached document.

U.S. Xpress Enterprises, Inc.
Funds Flow - Xpress Global
4/13/2015

| Source | Amount | To | Wire Instructions/Other Payment Option | |
|---|---|---|---|---|
| **Total Wire Payments** | | | | |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 7,706,671.00 | **Wells Fargo** <br> ABL Paydown | Bank: | Wells Fargo, N.A. |
| | | | Address: | 420 Montgomery Street, San Francisco, CA |
| | | | Account Name: | |
| | | | ABA Number: | 121000248 |
| | | | Account Number: | 37235547964501789 |
| | | | Reference: | U.S. Xpress Enterprises, Inc. |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 45,633.50 | **Morgan Lewis** <br> Term Lender Legal Fees | Bank: | Wells Fargo, N.A. |
| | | | Account Name: | Morgan, Lewis & Bockius LLP |
| | | | ABA Number: | 121000248 |
| | | | Account Number: | 2100010985563 |
| | | | Invoice: | 3223431 |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 22,722,706.24 | **Wilmington Trust** <br> Term Loan Paydown | Bank: | Wilmington Trust, National Association |
| | | | Address: | |
| | | | Account Name: | U.S. Xpress Enterprises, Inc. |
| | | | ABA Number: | 031100092 (Manufacturers & Traders Trust Company) |
| | | | Account Number: | 108417-000 |
| | | | Attn: | Jennifer Anderson |
| | | | Date: | |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 143,745.91 <br> Includes Per Diem of $693.60 | **CapitalSource** <br> Equipment Payoff | Bank: | Wells Fargo, N.A. |
| | | | Address: | |
| | | | Account Name: | CapitalSource |
| | | | ABA Number: | 121000248 |
| | | | Account Number: | 4124524299 |
| | | | Reference: | U.S. Xpress Leasing Sch. 003 |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 56,093.14 <br> Includes Per Diem of $663.24 | **People's Capital and Leasing Corp.** <br> Equipment Payoff | Bank: | People's Bank |
| | | | Address: | |
| | | | Account Name: | People's Capital & Leasing Corp. |
| | | | ABA Number: | 221172186 |
| | | | Account Number: | 0017023761 |
| | | | Reference: | 2716-101-103 |
| | | | Date: | 04/10/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 226,920.02 <br> Includes Per Diem of $314.76 | **Navistar Financial Corporation** <br> Equipment Payoff | Bank: | Northern Trust |
| | | | Address: | |
| | | | Account Name: | Navistar Financial |
| | | | ABA Number: | 0710-0015-2 |
| | | | Account Number: | 12114 |
| | | | Reference: | U.S. Xpress Leasing, Inc. 05961859 |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 196,984.48 | **Daimler Truck Financial** <br> Equipment Payoff | Bank: | HSBC Bank |
| | | | Address: | 1301 E. Tower Road, Schaumburg, IL 60173 |
| | | | Account Name: | Mercedes-Benz Financial Services USA, LLC |
| | | | ABA Number: | 021001088 |
| | | | Account Number: | 001853538 |
| | | | Reference: | U.S. Xpress Leasing, Inc. Payoff |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 804,485.71 | **Paccar Financial** <br> Equipment Payoff | Bank: | Wells Fargo, N.A. |
| | | | Address: | |
| | | | Account Name: | PFC Exchange, LLC |
| | | | ABA Number: | 121000248 |
| | | | Account Number: | 4122177488 |
| | | | Reference: | USX Payoffs (Brockett) |
| | | | Date: | 04/13/15 |
| On behalf of: U.S. Xpress Enterprises, Inc. | $ 2,500.00 | **Taboada Rochlin LLP** <br> Term Loan Legal Fees | Bank: | Farmington Bank |
| | | | Address: | One Farm Glen Boulevard, Farmington, CT 06032 |
| | | | ABA Number: | 211170347 |
| | | | Account Number: | 20782986 |
| | | | Attn: | Rich Rochlin |
| | | | Date: | 04/13/15 |
| **Total Debt Payoff Wires:** | **$ 31,905,740.00** | | | |

**Schedule 1.4(a)(i)**

**<u>Jurisdictions</u>**

1.  Alabama
2.  Arkansas
3.  Arizona
4.  California
5.  Colorado
6.  Florida
7.  Georgia
8.  Illinois
9.  Kentucky
10. Louisiana
11. Massachusetts
12. Maryland
13. Michigan
14. Minnesota
15. Missouri
16. New Jersey
17. New Mexico
18. New York
19. North Dakota
20. Oklahoma
21. Oregon
22. Pennsylvania
23. Tennessee
24. Texas
25. Utah
26. Washington
27. Wisconsin

**Schedule 1.5(a)(iv)**

**<u>Excluded Assets</u>**

- Cash and cash equivalents (except petty cash)
- Deferred tax assets
- Tax records of the Parent and its subsidiaries
- Corporate records of the Parent and its subsidiaries
- Non-transferrable licenses

**Schedule 1.5(a)(v)**

<u>**Excluded Liabilities**</u>

- Deferred tax liabilities, including income taxes
- Insurance Claims accruals, including any Damages arising out of any Insurance Claims when the aggregate of all such claims exceeds the reserve for Insurance Claims on the Closing Balance Sheet

**Schedule 2.3(a)**

**<u>Capitalization</u>**

Member currently holds all authorized, issued and outstanding Interests of the Company. Prior to the Conversion, Member held 500 shares of the Company as represented on Certificate No. R20, which represented all authorized, issued, and outstanding stock of the Company that was converted to the Interests.

7

**Schedule 2.3(b)**

**<u>Liens</u>**

None.

## Schedule 2.4

## **Subsidiaries**

None.

**Schedule 2.5**

**<u>No Violation</u>**

Schedules 2.8 and 2.21(a) of these Disclosure Schedules are incorporated by reference herein to the extent such Material Contract requires Consent of, notice to, ratification by, or filing with any Person in consummation of the Contemplated Transactions.

**Schedule 2.7**

**Finder's Fee**

Reference is made to that certain Engagement Letter by and between SunTrust Robinson Humphrey and U.S. Xpress Enterprises, Inc. dated March 28, 2011 as amended by the Extension Letter dated September 10, 2013.

11

**Schedule 2.8**

**Consents**

- Providence Term Loan Agreement
- Wells Fargo ABL Credit Agreement

Customer consents (which will be obtained post-Closing with consent of Buyer):

| 1 | Newell Rubbermaid, Inc. | Addendum to the Master Transportation Services Agreement Adding Xpress Global Systems, Inc., as Carrier, April 9, 2012 |
|---|---|---|

Real Property landlord consents (which will be obtained post-Closing with consent of Buyer):

| | City, State | Lease Agreement |
|---|---|---|
| 1 | Baltimore/Hanover, MD | Lease Agreement dated December 31, 2003 by and between CLPF-1025 Airport 100 Way, L.P., successor-in-interest to The Realty Associates Fund VII, L.P., successor-in-interest to Principal Life Insurance Company and Xpress Global Systems, Inc. as amended by that First Amendment to Deed of Lease dated September 14, 2009, as amended by that Second Amendment to Deed of Lease dated January 21, 2011, as amended by that Third Amendment to Deed of Lease Agreement dated June 6, 2012, as amended by that Fourth Amendment to Deed of Lease Agreement dated October 15, 2013. |
| 2 | Denver/Aurora, CO | Lease Agreement dated March 29, 2013, by and between Prologis Park 70, Building #2, LLC and Xpress Global Systems, Inc. |
| 3 | Fresno, CA | Lease dated April 12, 1996 by and between EastGroup Properties, L.P., successor-in-interest to Spieker Properties, L.P. and Xpress Global Systems, Inc., successor-in-interest to CSI Crown, Inc. as amended by that First Amendment to Lease dated March 9, 2000, as amended by that Second Amendment to Lease dated September 10, 2001, as amended by that Third Amendment to Lease dated September 28, 2004, as amended by that Fourth Amendment to Lease dated September 8, 2009, as amended by that Fifth Amendment to Lease dated April 6, 2012, and amended by that Sixth Amendment to lease dated April 29, 2013, as amended by that Seventh Amendment to Lease dated January 13, 2014. |
| 4 | Hayward, CA | Lease Agreement dated November 25, 2002 by and between ProLogis A3 CAII LP, successor-in-interest of ProLogis and Xpress Global Systems, Inc., successor-in-interest to CSI/Crown, Inc. as amended by that Extension and Lease |

| | | Amendment Agreement dated January 18, 2006, as amended by that Extension Agreement dated October 31, 2008, as amended by that Third Amendment to Lease dated November 21, 2011. |
|---|---|---|
| 5 | Houston, TX | Lease Agreement dated October 24, 2006 by and between ProLogis Texas I LLC, successor-in-interest to ProLogis Development Services Incorporated and Xpress Global Systems, Inc. as amended by that First Amendment to Lease dated December 20, 2011. |
| 6 | Los Angeles/Anaheim, CA | Lease Agreement dated May 24, 2012 by and between CLPF-Anaheim Industrial, L.P. and Xpress Global Systems, Inc. |
| 7 | Oklahoma City, OK | Industrial Real Estate Lease dated March 21, 2002 by and between Raptor Airport Road L.L.C. and Xpress Global Systems, Inc., successor-in-interest to CSI Crown, Inc. as amended by that Lease Amendment Agreement undated 2003, as amended by that Lease Extension and Amendment Agreement dated April 23, 2007, as amended by that Lease Extension dated April 9, 2010, as amended by that Lease Extension dated August 1, 2013. |
| 8 | Portland, OR | Industrial/Warehouse Lease Agreement dated April 30, 2010 by and between American Property Management Corp. as agent for and on behalf of Weston Investment Co. LLC and Xpress Global Systems, Inc. |
| 9 | Rochester, NY | Lease Agreement dated August 1, 1997 by and between 1400 East Henrietta Road, Inc. and Xpress Global Systems, Inc., as successor-in-interest to CSI/Crown, Inc. as amended by that Lease Amendment No. 1 undated August, 2002, as amended by that Lease Amendment No. 2 dated December 9, 2005, as amended by that Lease Amendment No. 3 dated December 18, 2007, as amended by that Lease Amendment No. 4 dated September 9, 2010, as amended by that Lease Amendment No. 5 dated November 15, 2012. |
| 10 | Romulus, MI | Standard Form Industrial Building Lease dated September 20, 2013 by and between First Industrial, L.P. and Xpress Global Systems, Inc. |
| 11 | Sacramento/Rancho Cordova, CA | Standard Industrial/Commercial Multi-Tenant Lease – Gross dated October 19, 1995 by and between Cummings Trust, successor-in-interest to William C. Cummings, successor-in-interest to Buzz Oates Enterprises II and Xpress Global Systems, Inc., successor-in-interest to CSI Reeves, Inc., as amended by that Lease Amendment No. 1 dated April 25, 2006, as amended by that Lease Amendment No. 2 dated January 12, 2009, as amended by that Lease Amendment No. 3 dated January 1, 2011, as amended by that Lease Amendment No. 4 dated February 24, 2014. |
| 12 | Salt Lake City, UT | Standard Industrial/Commercial Multi-Tenant Lease – NET |

| | | dated April 23, 2007 by and between Price California Avenue, LLC, successor-in-interest to Sortech One, LLC and Xpress Global Systems, Inc. as amended by that First Amendment of Lease dated October 10, 2010, as amended by that Second Amendment of Lease dated February 5, 2013, as amended by that Third Amendment of Lease dated July 30, 2013, as amended by that Fourth Amendment of Lease dated November 1, 2013, as amended by that Fifth Amendment of Lease dated February 10, 2014. |
|---|---|---|

**Schedule 2.9**

**<u>Financial Statements</u>**

Attached are copies of the following Financial Statements:
- Year-End Financial Statements
- Interim Financial Statements

The Company generally follows GAAP in its preparation of the Financial Statements. However, the Company recognizes Revenue on its Financial Statements upon issuance of a manifest rather than on delivery.

The Year-End Financial Statements and the Interim Financial Statements give pro forma effect to the push-down of assets and liabilities held by other members of the Company's consolidated group. Such assets and liabilities are being transferred pursuant to the Contribution Agreement.

**Xpress Global Systems, Inc.**
**2015 STATEMENT OF OPERATIONS**
**(Unaudited)**

| | Year to Date 2015 | February | January |
|---|---|---|---|
| **Operating Revenue:** | | | |
| Revenue, before fuel surcharge | $ 15,795,258 | 7,835,950 | 7,959,308 |
| Total operating revenue | 15,795,258 | 7,835,950 | 7,959,308 |
| | | | |
| **Operating Expenses:** | | | |
| Salaries, wages and benefits | 5,370,015 | 2,549,780 | 2,820,235 |
| Fuel and fuel taxes | 986,660 | 485,971 | 500,689 |
| Vehicle rents | 355,979 | 176,451 | 179,528 |
| Vehicle rents - short term | 163,211 | 74,869 | 88,342 |
| Depreciation and amortization, net of loss on sale | 354,693 | 178,049 | 176,644 |
| Purchased transportation | 5,513,170 | 2,802,487 | 2,710,683 |
| Operating expense and supplies | 935,588 | 446,533 | 489,055 |
| Insurance premiums and claims | 251,468 | 104,161 | 147,307 |
| Operating taxes and licenses | 82,428 | 41,198 | 41,230 |
| Communications and utilities | 171,297 | 83,744 | 87,553 |
| General and other operating | 1,539,839 | 777,427 | 762,412 |
| Total operating expenses | 15,724,348 | 7,720,670 | 8,003,678 |
| | | | |
| **Income from Operations** | 70,910 | 115,280 | (44,370) |
| | | | |
| **EBITDA** | $ 425,603 | 293,329 | 132,274 |

**Xpress Global Systems, Inc.**
BALANCE SHEETS
(Unaudited)

| Assets | | February 28, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| **Current Assets:** | | | | |
| Cash and cash equivalents | $ | 7,000 | $ | 6,959 |
| Customer receivables, net of allowance | | 9,818,051 | | 9,097,479 |
| Prepaid insurance and licenses | | 382,307 | | 161,480 |
| Operating and installation supplies | | 93,605 | | 93,714 |
| Other current assets | | 949,265 | | 832,912 |
| Total current assets | | 11,250,228 | | 10,192,544 |
| | | | | |
| Property and equipment, at cost | | 15,108,969 | | 15,055,029 |
| Less accumulated depreciation and amortization | | (10,917,948) | | (10,836,417) |
| Net property and equipment | | 4,191,021 | | 4,218,612 |
| | | | | |
| **Other Assets:** | | | | |
| Goodwill, net | | 16,328,687 | | 16,328,687 |
| Other Intangible assets | | 4,494,229 | | 4,704,621 |
| Other | | 419,152 | | 433,779 |
| Total other assets | | 21,242,068 | | 21,467,087 |
| | | | | |
| **Total Assets** | $ | 36,683,317 | $ | 35,878,243 |

| Liabilities and Stockholders' Equity | | February 28, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| **Current Liabilities:** | | | | |
| Accounts payable | $ | 4,315,882 | $ | 5,371,869 |
| Accrued wages and benefits | | 2,179,106 | | 1,633,871 |
| Claims and insurance accruals | | 3,239,791 | | 3,360,588 |
| Other accrued liabilities | | 94,475 | | 80,507 |
| Total current liabilities | | 9,829,254 | | 10,446,835 |
| | | | | |
| **Deferred Income Taxes** | | 8,605,908 | | 8,578,280 |
| | | | | |
| **Deferred Building Rents** | | 375,809 | | 374,316 |
| | | | | |
| **Parent Company Account** | | 17,872,346 | | 16,478,812 |
| | | | | |
| **Total Liabilities and Parent Company Account** | $ | 36,683,317 | $ | 35,878,243 |

**Xpress Global Systems, Inc.**
STATEMENT OF OPERATIONS
(Unaudited)

| | Year Ended December 31, | |
| | 2014 | 2013 |
|---|---|---|
| **Operating Revenue:** | | |
| Revenue, before fuel surcharge | $ 110,599,294 | $ 107,060,974 |
| Total operating revenue | 110,599,294 | 107,060,974 |
| | | |
| **Operating Expenses:** | | |
| Salaries, wages and benefits | 33,989,359 | 33,511,275 |
| Fuel and fuel taxes | 9,212,889 | 9,928,336 |
| Vehicle rents | 2,162,444 | 1,472,647 |
| Vehicle rents - short term | 765,492 | 446,633 |
| Depreciation and amortization, net of loss on sale | 2,286,291 | 3,275,535 |
| Purchased transportation | 38,267,449 | 34,866,812 |
| Operating expense and supplies | 5,707,806 | 5,398,769 |
| Insurance premiums and claims | 1,818,105 | 1,826,539 |
| Operating taxes and licenses | 471,214 | 567,965 |
| Communications and utilities | 977,339 | 937,276 |
| General and other operating | 9,343,067 | 8,863,776 |
| Total operating expenses | 105,001,455 | 101,095,563 |
| | | |
| **Income from Operations** | 5,597,839 | 5,965,411 |
| | | |
| **EBITDA** | $ 7,884,130 | $ 9,240,946 |

**Xpress Global Systems, Inc.**
BALANCE SHEETS
(Unaudited)

| Assets | | December 31, 2014 | | December 31, 2013 |
|---|---|---:|---|---:|
| **Current Assets:** | | | | |
| Cash and cash equivalents | $ | 6,959 | $ | 15,937 |
| Customer receivables, net of allowance | | 9,097,479 | | 8,559,260 |
| Prepaid insurance and licenses | | 161,480 | | 603,708 |
| Operating and installation supplies | | 93,714 | | 113,951 |
| Other current assets | | 832,912 | | 700,968 |
| Total current assets | | 10,192,544 | | 9,993,824 |
| | | | | |
| Property and equipment, at cost | | 15,055,029 | | 15,583,053 |
| Less accumulated depreciation and amortization | | (10,836,417) | | (10,789,767) |
| Net property and equipment | | 4,218,612 | | 4,793,286 |
| | | | | |
| **Other Assets:** | | | | |
| Goodwill, net | | 16,328,687 | | 16,328,687 |
| Other Intangible assets | | 4,704,621 | | 5,966,975 |
| Other | | 433,779 | | 442,899 |
| Total other assets | | 21,467,087 | | 22,738,561 |
| | | | | |
| **Total Assets** | $ | 35,878,243 | $ | 37,525,671 |

| Liabilities and Stockholders' Equity | | December 31, 2014 | | December 31, 2013 |
|---|---|---:|---|---:|
| **Current Liabilities:** | | | | |
| Accounts payable | $ | 5,371,869 | $ | 5,308,198 |
| Accrued wages and benefits | | 1,633,871 | | 2,042,668 |
| Claims and insurance accruals | | 3,360,588 | | 2,698,867 |
| Other accrued liabilities | | 80,507 | | 91,972 |
| Total current liabilities | | 10,446,835 | | 10,141,705 |
| | | | | |
| **Deferred Income Taxes** | | 8,578,280 | | 6,523,197 |
| | | | | |
| **Deferred Building Rents** | | 374,316 | | 384,631 |
| | | | | |
| **Parent Company Account** | | 16,478,812 | | 20,476,138 |
| | | | | |
| **Total Liabilities and Stockholders' Equity** | $ | 35,878,243 | $ | 37,525,671 |

**Schedule 2.11(a)**

**Real Property**

| | City, State | Lease Agreement |
|---|---|---|
| 1 | Albuquerque, NM | Lease dated September 1, 2013 by and between G & A Ltd. Co. and Xpress Global Systems, Inc. |
| 2 | Baltimore/Hanover, MD | Lease Agreement dated December 31, 2003 by and between CLPF-1025 Airport 100 Way, L.P. and Xpress Global Systems, Inc., as amended from time to time. |
| 3 | Boston/South Easton, MA | Industrial Building Lease dated February 1, 2008 by and between Medical Distributors Realty Trust and Xpress Global Systems, Inc., as amended from time to time. |
| 4 | Denver/Aurora, CO | Lease Agreement dated March 29, 2013 by and between Prologis Park 70, Building #2, LLC and Xpress Global Systems, Inc. |
| 5 | Eagan, MN | Industrial Building Lease dated December 12, 2013 by and between Cobalt Industrial Reit, II and Xpress Global Systems, Inc. |
| 6 | Fresno, CA | Lease dated April 12, 1996 by and between EastGroup Properties, L.P. and Xpress Global Systems, Inc., as amended from time to time. |
| 7 | Hayward, CA | Lease Agreement dated November 25, 2002 by and between ProLogis-A3 CA II, L.P. and Xpress Global Systems, Inc., as amended from time to time. |
| 8 | Houston, TX | Lease Agreement dated October 24, 2006 by and between ProLogis Texas I LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 9 | Jacksonville, FL | Lease Agreement dated July 31, 2012 by and between Stone Mountain Industrial Park, Inc. and Xpress Global Systems, Inc. |
| 10 | Kent, WA | Lease dated June 30, 2010 by and between RREEF AMERICA REIT II CORP. OO and Xpress Global Systems, Inc., as amended from time to time. |
| 11 | Los Angeles/Anaheim, CA | Lease Agreement dated August 1, 2012 by and between CLPF-Anaheim Industrial, L.P. and Xpress Global Systems, Inc. |
| 12 | Louisville, KY | Lease dated August 19, 2008 by and between Kirk NationaLease Co. and Xpress Global Systems, Inc., as amended from time to time. |
| 13 | Louisville, KY | Lease dated August 11, 2009 by and between Dixie Real Properties, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 14 | Milwaukee/Menomonee Falls, WI | Lease dated June 19, 2012 by and between Schinner Brothers Property, LLC and Xpress Global Systems, Inc., as amended from time to time. |

| 15 | Mobile/Loxley, AL | Lease dated November 21, 2011 by and between D.W. Williams Family Limited Partnership and Xpress Global Systems, Inc., as amended from time to time. |
|----|-------------------|---|
| 16 | North Little Rock, AK | Warehouse Lease dated February 1, 2011 by and between RichJohn Development, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 17 | Oklahoma City, OK | Industrial Real Estate Lease dated March 21, 2002 by and between Raptor Airport Road L.L.C. and Xpress Global Systems, Inc., as amended from time to time. |
| 18 | Orlando, FL | Lease Agreement dated June 1, 2008 by and between Janice Gail Newman and Xpress Global Systems, Inc., as amended from time to time. |
| 19 | Phoenix, AZ | Commercial Lease dated March 12, 2001 by and between DCT Sky Harbor LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 20 | Pittsburgh/Coraopolis, PA | Office/Warehouse Lease dated February 15, 2005 by and between Greylock L.P. and Xpress Global Systems, Inc., as amended from time to time. |
| 21 | Portland, OR | Industrial/Warehouse Lease Agreement dated April 30, 2010 by and between Weston Investment Co. LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 22 | Rochester, NY | Lease Agreement dated August 1, 1997 by and between 1400 East Henrietta Road, Inc. and Xpress Global Systems, Inc., as amended from time to time. |
| 23 | Romulus, MI | Industrial Building Lease dated September 20, 2013 by and between First Industrial, L.P. and Xpress Global Systems, Inc., as amended from time to time. |
| 24 | Sacramento/Rancho Cordova, CA | Standard Industrial/Commercial Multi-Tenant Lease dated October 19, 1995 by and between Cummings Trust and Xpress Global Systems, Inc., as amended from time to time. |
| 25 | Salt Lake City, UT | Standard Industrial/Commercial Multi-Tenant Lease dated April 23, 2007 by and between Price California Avenue, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 26 | San Antonio, TX | Multi-Tenant Industrial Triple Net Lease dated November 24, 2014 by and between BRE/TX Industrial Properties, L.L.C. and Xpress Global Systems, Inc. |
| 27 | San Diego, CA | Standard Industrial Lease dated December 20, 1999 by and between Fenton Miramar Portfolio LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 28 | Spokane, WA | Standard Industrial Lease – Multi-Tenant dated October 23, 1996 by and between Lindley Property, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 29 | St. Louis/ Maryland Heights, MO | Lease dated June 15, 2006 by and between CRP-2 Mid South Industrial, LLC and Xpress Global Systems, Inc., as amended from time to time. |

| 30 | Tampa/Riverview, FL | Lease Agreement dated June 3, 2011 by and between EastGroup Properties, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 31 | Tulsa, OK | Commercial Industrial Lease dated November 1, 2012 by and between Industrial Developers of Oklahoma, LLC and Xpress Global Systems, Inc., as amended from time to time. |
| 32 | Tunnel Hill, GA | Lease Agreement by and between Q & F Realty, LLC and Xpress Global Systems, LLC |

At Closing, the Company will enter into Lease Agreements at the following locations:

| | City, State | Lease Agreement |
|---|---|---|
| 1 | Tunnel Hill, GA | Lease Agreement by and between Q & F Realty, LLC and Xpress Global Systems, LLC |
| 2 | Tunnel Hill, GA | License Agreement by and between U.S. Xpress, Inc. and Xpress Global Systems, LLC |

**Schedule 2.11(b)**

**Exceptions to Real Property**

None.

**Schedule 2.11(c)**

**Material Assets**

None.

**Schedule 2.11(d)**

**Sublet Real Property**

The following chart represents those locations where the Company has a written sublease agreement:

| | City, State | Sublease Agreement |
|---|---|---|
| 1 | Anaheim, CA | Sublease Agreement dated July 9, 2012 by and between Xpress Global Systems, Inc. and Masland Carpets, LLC. |
| 2 | Oklahoma City, OK | Sublease Agreement by and between Arnold Transportation Services, Inc. and Xpress Global Systems, Inc. |
| 3 | Guilderland Center, NY | Sublease Agreement dated June 28, 2006 by and between Xpress Global Systems, Inc. and American Carpet South Ltd. Warehousing Services Agreement dated January 1, 2009 by and between American Carpet South Ltd and Xpress Global Systems, Inc. |
| 4 | Phoenix, AZ | Agreement of Lease dated June 6, 2012 by and between Xpress Global Systems, Inc. and Global Syn Turf, Inc. |
| 5 | San Diego, CA | Sublease Agreement dated July 1, 2011 by and between Xpress Global Systems, Inc. and Step Ahead. |
| 6 | Albany/Guilderland Center, NY | Sublease Agreement dated March 14, 2004 by and between Northeastern Industrial Park, Inc. and Xpress Global Systems, Inc., as amended from time to time. |
| 7 | Dallas, TX | Sublease Agreement dated February 8 2012 by and among Schenker, Inc. and BAX Global, Inc. and Xpress Global Systems, Inc., as amended from time to time. |

At Closing, the Company will enter into Sublease Agreements at the following locations:

| | City, State | Sublease Agreement |
|---|---|---|
| 1 | Oklahoma City, OK | Sublease Agreement by and between Xpress Global Systems, LLC and U.S. Xpress, Inc. |
| 2 | Phoenix, AZ | Sublease Agreement by and between Xpress Global Systems, LLC and U.S. Xpress, Inc. |
| 3 | Aurora, CO | License Agreement by and between Xpress Global Systems, LLC and U.S. Xpress, Inc. |

| 4 | Markham, IL | Sublease Agreement by and between U.S. Xpress, Inc. and Xpress Global Systems, LLC |
|---|---|---|

**Schedule 2.12**

## Condition and Sufficiency of Assets

None.

**Schedule 2.13**

**<u>Undisclosed Liabilities</u>**

None.

**Schedule 2.14(a)**

**<u>Exceptions to Tax Returns and Taxes Paid</u>**

None.

**Schedule 2.14(b)**

**List of Tax Returns; Information Regarding Audits**

Member and the Company provided Buyer with copies of Tax Returns for the years 2010-2012 through Grant Thornton.

**Schedule 2.14(c)**

**Potential Tax Liabilities**

(c)(iii) Prior to 2011, the Company was a member in an Affiliated Group that filed a consolidated federal income Tax Return with the Parent as the parent of such group. Since 2011, the parent of the consolidated group is a holding company, New Mountain Lake Holdings, LLC. The change in the parent company was largely a formality brought about by an internal restructuring when the Parent went private and a change to the tax structure of New Mountain Lake Holdings, LLC.

(c)(iv)(A) The Company is currently finalizing a change in accounting method that will accelerate certain deductions in its consolidated filings from 2013 and reduce those in 2014.

(c)(iv)(A) Real property repairs were originally capitalized for tax purposes, but it was later determined such repairs were currently deductible after further analysis.

(c)(iv)(C) There are currently intercompany payables, receivables, and debt.

(c)(iv)(E) Prepaid receipts are not tracked differently for tax purposes than for book purposes, except the Company has accelerated the tax deduction for prepaid expenses where allowable, rather than capitalize and amortize the payments into expenses over the asset's respective life (like book does).

**Schedule 2.16**

**No Materially Adverse Change**

None.

Schedule 2.17(a)

**Benefit Plans**

- Xpre$$avings 401k Savings Plan
- U.S. Xpress Enterprises, Inc. Employee Benefit Plan
  - BCBST Medical Plan
  - Express Scripts RX Plan
  - Delta Dental Plan
  - VSP Vision Plan
  - Payflex Flexible Spending Account Medical
  - Payflex Flexible Spending Account Dependent
  - Unum Short Term Disability Plan
  - Unum Long Term Disability Plan
  - Unum Basic Life Plan
  - Unum Voluntary Life Plan
  - Reliance Short Term Disability Plan
  - Reliance Long Term Disability Plan
  - Reliance Basic Life Plan
  - Reliance Voluntary Life Plan
  - Allstate Critical Illness Plan
  - Allstate Accident Plan
  - Allstate Universal Life Plan

See attached documents.

# Xpre$$avings 401(k) Plan

# Table of Contents

Introduction ................................................................................................................ 3

Important Information About the Plan ...................................................................... 4

Joining the Plan ......................................................................................................... 6

Contributions to the Plan .......................................................................................... 7

Managing Your Account .......................................................................................... 12

Ownership of Your Account (Vesting) .................................................................... 14

Withdrawals ............................................................................................................. 17

Loans ........................................................................................................................ 20

Benefits .................................................................................................................... 24

Taxes on Distributions ............................................................................................. 26

Distribution Claim Procedures ................................................................................ 27

Legal Rights ............................................................................................................. 28

Additional Information ............................................................................................. 30

Vesting Addendum ................................................................................................... 31

Xpre$$avings 401(k) Plan

# Introduction

The Xpre$$avings 401(k) Plan ("Plan") was established effective as of January 1, 1993 to provide you with greater financial security.  The Plan is known as a defined contribution 401(k) profit sharing plan.  It has been established to help you provide for your future financial security through a combination of personal savings, current tax savings and contributions made by your Employer.

This Plan offers you an easy way to save for your retirement using pre-tax contributions which are directly deducted from your paycheck.  Neither the amount you choose to save, nor the earnings on those savings, is subject to federal taxation until you withdraw them from the Plan.

This Summary Plan Description -- or SPD -- will explain how the Plan works.  It describes your benefits and rights under the Plan, as it was amended and restated, effective as of July 1, 2009.

This SPD is only a summary of your benefits and rights under the Plan.  It is important that you understand that it cannot cover all of the details of the Plan or how the rules of the Plan apply to every person, in every situation.  You can find the specific rules of the Plan in the Plan document, which you may request from your Plan Administrator.

Every effort has been made to accurately describe the Plan.  If you find a difference between the information in this SPD and the information in the Plan document, your benefits will be determined based on the information found in the Plan document.

If in reading this SPD or the Plan document you find you have questions concerning your benefits under the Plan, please contact your Plan Administrator or Diversified Investment Advisors.

Xpre$$avings 401(k) Plan

# Important Information About the Plan

| | |
|---|---|
| **Plan Sponsor:** | U.S. Xpress Enterprises, Inc. ("Employer")<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br>423-510-3491<br>EIN: 62-1378182 |
| **Plan Name:** | Xpre$$avings 401(k) Plan |
| **Plan Number:** | 001 |
| **Plan Effective Date:** | The Plan was originally effective as of January 1, 1993. This SPD describes the Plan as amended and restated effective as of July 1, 2009 and as further amended as of January 1, 2010. |
| **Plan Year:** | January 1st - December 31st |
| **Plan Administrator:** | U.S. Xpress Enterprises, Inc.<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br>423-510-3491 |
| **Plan Trustee(s):** | State Street Bank & Trust Company<br>ONE LINCOLN STREET<br>BOSTON, MA 02111<br>617-786-3000 |
| **Agent for Service<br>of Legal Process*:** | U.S. Xpress Enterprises, Inc.<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br>423-510-3491 |

*Service of legal process may be made upon the Plan Trustee, if applicable, or the Plan Administrator.

| | |
|---|---|
| **Plan Funding:** | All assets of the Plan are held in trust.  The trust fund established by the Plan Trustee(s) will be the funding medium used for the accumulation of assets from which benefits will be distributed. |
| **Plan Recordkeeper:** | Diversified Investment Advisors ("Diversified")<br>440 Mamaroneck Avenue<br>Harrison, NY 10528 |

Xpre$$avings 401(k) Plan

**Participating**
**Employer(s):**

U.S. Xpress, Inc.
4080 Jenkins Road
Chattanooga,, TN 37421
EIN: 62-1255088

Arnold Transportation Services
9523 Florida Mining Blvd
Jacksonville, FL 32257
EIN: 23-1582737

Transportation Investments, Inc.
125 Riverview
Richland, MS 39228
EIN: 04-3643789

Xpress Global Systems, Inc.
1537 New Hope Church Road
Tunnel Hill, GA 30755
EIN: 62-1261869

5

Xpre$$avings 401(k) Plan

# Joining the Plan

## May I join the Plan?

Provided you are not an excluded employee, you may join the Plan once you satisfy the Plan's eligibility condition(s) described below.

You may not join the Plan if you are an excluded employee. You are an excluded employee if you are a leased employee, an owner operator, an independent contractor or an employee covered by a collective bargaining agreement.

## What happens if I become an excluded employee?

If you become an excluded employee, you will no longer be allowed to make or receive additional contributions under the Plan. You will, however, still have the ability to manage your account and keep certain rights and benefits.

## When can I become a participant in the Plan?

You may enter the Plan on the first of the month coinciding with or next following your completion of six months of service and your 18th birthday.

If you are a rehired employee, or you are returning from a qualified military service leave, and you were previously a participant in the Plan, you may join the Plan on your rehire date.

If you are a rehired employee, and you were not previously a participant in the Plan, your Plan Administrator will determine the date you may enter the Plan.

**NOTE:**  Service with certain predecessor organizations will be counted when determining whether you completed the service requirement. These predecessor organizations are as follows: Hall Systems, Inc., Xpress Global Systems, Inc., Victory Xpress, Inc., Cargo Movement Corp., PST Van Lines, Inc., U.S. Xpress, Inc., JTI, Arnold Transportation Services, Transportation Investments, Inc.

## How do I become a participant in the Plan?

You will become a participant in the Plan upon meeting the eligibility requirements indicated above. You must choose how you want your contributions to be invested. Please see the **"Managing your Account"** section for more information on how to choose your investment allocations.

Approximately one month prior to the date you are eligible to participate in the Plan, Diversified will mail you enrollment material. This material will explain the enrollment procedures. You may join the Plan by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801.

6

Xpre$$avings 401(k) Plan

If you do not join the Plan when you first become eligible, you may join on any business day thereafter, or as soon as administratively feasible.

## If I am married, may I designate someone other than my spouse as the beneficiary of my account?

Yes, but you must first submit the written consent of your spouse witnessed by either a notary public or Plan representative.

# Contributions to the Plan

## What are the tax advantages of being in the Plan?

Saving through the Plan provides you with tax advantages. You pay no current income taxes on contributions and on the earnings in your account while the money is in the Plan. Money in the Plan is not subject to federal taxation until it is actually distributed to you.

## May I elect to make contributions to the Plan?

Yes, you may make salary deferral contributions to the Plan. Salary deferral contributions are pre-tax contributions.

Your salary deferral contributions go directly into the Plan instead of your paycheck. Since these contributions do not show up as income on your W-2 form, the amount you contribute will not be subject to federal or, in most cases, state income taxes, until paid to you. However, you do pay Social Security (FICA) and certain other employment taxes on your contributions.

For example: If your salary is $20,000 per year and you elect to make contributions to the Plan totaling $1,000 during the Plan Year, you only pay income taxes on $19,000.

## How much of my salary may I contribute to the Plan?

You may contribute up to 75% of your salary, subject to the maximum dollar limit (see the question **"Are there any other limits to the amount of salary deferral contributions that I can make?"** for the applicable limit). To do this, you must elect to have a portion of your salary contributed to the Plan through payroll withholding. To make your salary deferral election, please visit Diversified Direct Online at www.divinvest.com or call Diversified Direct at 800-755-5801. Your salary deferral election will become effective no later than 30 days after you have completed the election and will remain in effect until you amend it.

In addition, Diversified's SaveXpress allows you to have your retirement savings contribution rate increased automatically each year by a set amount, at any point in the year you choose. To make your SaveXpress election, visit Diversified Direct Online at www.divinvest.com. Once elected, your contribution rate will be automatically increased each year by the amount you select, subject to the contribution limits above. You may turn SaveXpress off at any time.

## Are there any other limits to the amount of salary deferral contributions that I can make?

The total dollar amount that you can contribute as salary deferral contributions to 401(k) plans is limited by law.  Your total salary deferral contributions to all 401(k) plans (and 403(b) accounts) during a calendar year generally cannot exceed this maximum dollar amount.  For the 2010 calendar year, your salary deferral contributions cannot exceed $16,500.  After calendar year 2010, the salary deferral limit may increase for cost-of-living increases.  If you only participate in this Plan during the year, your Employer automatically limits your salary deferral contributions to the maximum dollar limit.  However, if you participated in another employer's 401(k) plan (or 403(b) account) as well as this Plan during the year, your total salary deferral contributions to both plans together may not exceed the maximum dollar limit.

Adverse tax consequences may apply if your total salary deferral contributions to all 401(k) plans (and 403(b) accounts) exceed the maximum annual dollar limit.  If you participated in more than one 401(k) plan (or 403(b) account) during a year, and you contributed more than the maximum dollar limit during such year, you may request that any excess salary deferral contributions made to this Plan, with earnings, be distributed to you by April 15th of the following year.  Your request should be made no later than March 1st of the following year.  If you think this limitation may apply to you, contact your Plan Administrator.

The maximum amount that certain "highly compensated employees" can contribute in a Plan Year may be further limited in order for the Plan to comply with IRS nondiscrimination rules. (For the definition of "highly compensated employee", see **Who is a highly compensated employee?"** at the end of this section.)

You may be allowed to make additional catch-up salary deferral contributions beginning in the calendar year in which you become age 50, or in any calendar year after 2001 if you are already age 50 or older.  For the 2010 calendar year, your catch-up contributions cannot exceed $5,500.  After calendar year 2010, the catch-up contribution limit may increase for cost-of-living increases.  You may make such catch-up contributions, if you have already contributed salary deferral contributions up to the maximum limit permitted by law, or you have reached other plan or IRS limits for that year.  To make catch-up salary deferral contributions, you must elect to have a portion of your salary contributed to the Plan through payroll withholding.  Please visit Diversified Direct Online at www.divinvest.com or call Diversified Direct at 800-755-5801 in order to make your initial catch-up salary deferral contribution election.  Unless you amend it, the election will remain in effect for each succeeding year.

8

## How often may I change the percentage of my salary deferral contributions and catch-up contributions?

You may change the percentage of your pre-tax salary deferral contributions and/or catch-up contributions at any time by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801.  Changes will be effective as of the next payroll period or as soon as administratively possible thereafter.

## May I stop making salary deferral contributions and catch-up contributions to the Plan?

Yes, you may stop making pre-tax salary deferral contributions and/or catch-up contributions at any time by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801.  Your change will be effective as of the next payroll period or as soon as administratively possible thereafter.  If you decide to start making salary deferral contributions and/or catch-up contributions again at a later date, you may begin making them by visiting Diversified Direct Online or by calling Diversified Direct. Contributions will be deducted as of the next payroll period or as soon as administratively possible thereafter.

## Does my Employer make contributions to the Plan?

Your Employer may make contributions to the Plan as follows:

**Matching Contributions.**  Your Employer may make a matching contribution on an annual basis for all participants who elect to make pre-tax salary deferral contributions to the Plan. The amount of the matching contribution, if any, will be determined each Plan Year and announced to all participants.

In order to receive the matching contributions:

You must be employed on the last day of the Plan Year.  This requirement does not apply if you terminate employment due to death, disability or normal retirement.

You must complete a year of service (1,000 hours) during the Plan Year.  This requirement does not apply if you terminate employment due to death, disability or normal retirement.

## What happens if I go on a qualified military service leave?

Generally, when you go on a qualified military service leave, you are no longer able to make salary deferral or catch-up salary deferral contributions until you return to work.  However, when you return to work, you will be given an opportunity to make up the contributions that you could have made while you were on such leave.  You will have a period of three times the period of military service to make up these contributions, not to exceed five years.

When you return from a qualified military service leave, your Employer is required to restore your account with any contributions that would have been made on your behalf, had you not

9

been absent due to the leave.  If you make the missed contributions you were not able to make due to your qualified military service leave, you will also be entitled to receive any applicable matching contributions.  Your Employer will make the applicable matching contributions within a reasonable period after you make up any missed contributions.

When determining the contributions to be restored to your account, your Employer will use the salary you would have received during the period of your leave, based on your rate of pay, or if not reasonably certain, your average salary during the 12-month period preceding your leave.

## May I make a rollover contribution to the Plan?

Yes, unless you are an excluded employee.  If you were a participant in another plan (for example, a qualified plan, governmental 457(b) plan or 403(b) account from a previous employer), you may elect that a direct rollover or a participant rollover contribution be made into this Plan from the other plan.  You generally have 60 days from the date of a distribution to contribute that amount to this Plan as a participant rollover contribution.  If you elect a direct rollover, that amount will be contributed directly to this Plan and may include after-tax contributions, provided the direct rollover is from a qualified Roth contribution program, or a 403(b) account or another qualified plan.  Please call Diversified Direct at 800-755-5801 if you want to make a rollover contribution.

## May I make a rollover contribution prior to meeting the Plan's eligibility requirements?

Yes, as long as you are not an excluded employee.

## What does it mean for a plan to become top heavy?

A plan is considered "top heavy" when more than 60% of the plan's assets have been allocated to key employees (e.g., certain owners, officers and other employees of the company as of a specific date).  Your Plan Administrator will notify you if the Plan becomes top heavy.

## What happens if the Plan becomes top heavy?

If the Plan becomes top heavy and you are not a key employee of the company, your Employer will be required to make a top heavy minimum contribution ("minimum contribution") to your account if one has not already been made.  The contribution your Employer must make to your account will equal the lesser of:

- 3% of your salary; or
- the same percentage as the largest allocation to a key employee.

Xpre$$avings 401(k) Plan

## What is the most that may be contributed to the Plan on my behalf?

The Internal Revenue Service (IRS) places a maximum limit on the amount of money (the "Annual Contributions") that may be contributed to your account each Plan Year. For your Plan, this limit applies to:

- your own contributions to the Plan (excluding catch-up contributions).

- your Employer's contributions to the Plan.

For the 2010 Plan Year, the maximum Annual Contributions to your account cannot exceed the lesser of $49,000 or 100% of your total salary. Total salary for this purpose includes any salary deferral contributions to 401(k) plans, Section 125 cafeteria plans, Section 132(f)(4) plans, governmental 457(b) plans, 403(b) accounts, simplified employee pension plans or simple retirement accounts.

**NOTE:** In general, for purposes of applying these limits (which may be adjusted in future years), contributions to all qualified defined contribution plans maintained by your Employer are counted.

If you are a "highly compensated employee", the IRS also places an annual limit on the amount of salary deferral contributions and matching contributions which may be made to your account. Contributions may be limited to an amount that enables the Plan to meet certain nondiscrimination tests.

In addition, in order to pass these tests (known as the ADP and ACP tests), your Employer may return or forfeit excess contributions to highly compensated employees. As an alternative your Employer may choose to make a 100% vested contribution to any or all of the members of the non-highly compensated group who have met the eligibility requirements for your Plan. Your Employer will notify you if your contributions exceed these limits and if they will need to be adjusted or refunded.

## Who is a highly compensated employee?

A highly compensated employee is one who:

- owns more than 5% of the Employer's company in the current or prior year; or
- receives salary from the Employer of over $110,000 (2010 Plan Year limit) in the prior year.

**NOTE:** The IRS may adjust the salary limit stated above in future years based on the cost-of-living index.

11

Xpre$$avings 401(k) Plan

## Is my total salary used to calculate contributions?

For the 2010 Plan Year, the IRS allows salary up to $245,000 to be used when calculating contributions.  This limit may be adjusted in future years based on the cost-of-living index.

Your salary used to calculate contributions will be your total salary (up to the maximum salary as described above) actually paid during the Plan Year, excluding moving expenses, fringe benefits, reimbursements or other expense allowances and welfare benefits and generally including any salary deferral contributions made to any salary deferral plan(s) of the Employer (e.g., to this 401(k) Plan or a Section 125 cafeteria plan).

The amount of your salary used to calculate any minimum contributions or maximum contribution amounts that may be contributed on your behalf is your total annual salary (again, up to the maximum salary as described above).

For your first year of participation in the Plan, your salary will be recognized for the entire Plan Year, regardless of the date you enter the Plan.

# Managing Your Account

## Who decides how the money in my account is invested?

You do.  When you become eligible to participate in the Plan you may select from a variety of professionally managed investment funds.  You will receive enrollment material that will include the following information for each fund:

- a description of the investment objectives;
- the risk and return characteristics;
- the type and diversification of the assets; and
- the investment manager.

To help you make your selection, investment education material will be made available to you through your Plan Administrator.  You may also visit Diversified Direct Online at www.divinvest.com for more information.  Diversified Direct at 800-755-5801 is also available to provide investment information to help you make investment decisions. Diversified is equipped to handle your calls and questions in over 140 languages through Language Line® service.  It also provides services for those who are hearing-impaired.  All calls are recorded for your protection.

Once you decide how you would like your contributions invested, you will need to call Diversified Direct at 800-755-5801.  Please note that your choices must be in whole percentages.

**NOTE**:  If you have not made your investment elections, all contributions made on your behalf will be invested in one of the T. Rowe Price Target Date Funds, based on the year in which you turn age 65 (please see the chart listed below).  This is known as the "Default

12

Xpre$$avings 401(k) Plan

Alternative."   Your employer has chosen to qualify the Default Alternative as a Qualified Default Investment Alternative ("DIA") established in accordance with the legal requirements under section 404(c)(5) of ERICA and regulations there under.   This means that the plan fiduciary would not be liable for any investment losses that result, notwithstanding that you did not affirmatively elect to invest in the Default Alternative.  This relief from liability applies whether or not the Plan is intended to be an ERICA 404(c) plan.  You have the right to direct any assets invested in the Default Alternative to other investment options available under the Plan, without financial penalty.

| Fund Name | Year in Which You Attain Age 65 |
|---|---|
| T. Rowe Price Retirement Income Adv Fund | 2002 and earlier |
| T. Rowe Price Retirement 2005 Adv Fund | 2003 to 2007 |
| T. Rowe Price Retirement 2010 Adv Fund | 2008 to 2012 |
| T. Rowe Price Retirement 2015 Adv Fund | 2013 to 2017 |
| T. Rowe Price Retirement 2020 Adv Fund | 2018 to 2022 |
| T. Rowe Price Retirement 2025 Adv Fund | 2023 to 2027 |
| T. Rowe Price Retirement 2030 Adv Fund | 2028 to 2032 |
| T. Rowe Price Retirement 2035 Adv Fund | 2033 to 2037 |
| T. Rowe Price Retirement 2040 Adv Fund | 2038 to 2042 |
| T. Rowe Price Retirement 2045 Adv Fund | 2043 to 2047 |
| T. Rowe Price Retirement 2050 Adv Fund | 2048 to 2052 |
| T. Rowe Price Retirement 2055 Adv Fund | 2053 and later |

Your Plan is intended to be a 404(c) plan as described in Section 404(c) of the Employee Retirement Income Security Act of 1974 ("ERICA").  This provision provides special rules for plans that permit participants to have control over their accounts (like yours).  Because you choose your own investments, you are responsible for any investment gains or losses that result from your investment decisions.  The Plan's fiduciaries (the Plan Administrator, etc.) are not liable if the value of your account declines because of investment losses based on your investment decisions.

## Is there any other information available?

Certain additional information is available to you directly from your Plan Administrator upon request.  The information for each investment fund includes:

- a description of the annual operating expenses;

- the most recent copies of financial statements, prospectuses (if applicable), reports and other information;

- a listing of assets comprising the portfolio of each designated investment fund holding "plan assets", its value, and information related to fixed-rate investment contracts (rate of return and maturity date); and

- a performance history and information regarding the value of shares or units in the investment fund and in your account.

Xpre$$avings 401(k) Plan

**How do I change the way my future contributions will be invested?**

You may change the way your contributions are invested by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801.  Changes received by Diversified before 4:00 p.m. Eastern Time will be effective the same day.  You may change the way your contributions are invested at any time.  Please note that your choices must be in whole percentages.  Confirmation of any changes you make will be sent to you within five business days.

**May I transfer money among the different investment funds?**

Yes, you may transfer money among the various investment funds by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801. Transfers received before 4:00 p.m. Eastern Time will be processed the same day.  You may transfer money among the various investment funds at any time.  Confirmation of your transfer will be sent to you within five business days.

**NOTE**:  Some investment funds may impose trading restrictions and/or redemption fees as a result of frequent trading activity.  If a prospectus is issued for any investment fund in which you invest, please read it carefully to determine if the fund imposes any trading restrictions or redemption fees.

# Ownership of Your Account (Vesting)

**What does vesting mean?**

Vesting means ownership of your account.  The portion of your account that is yours is called your vested account.

**How do I know which portion of my account is vested?**

You are always 100% vested in (i.e., has full ownership of) the following portions of your account:

- salary deferral contributions;

- catch-up contributions;

- prior voluntary after-tax contributions;

- rollover contributions; and

- any earnings on the above contributions.

14

Xpre$$avings 401(k) Plan

Matching contributions and minimum contributions, if any, become "vested" based on your number of years of service with your Employer.  The schedule below shows how your vested percentage is determined:

| Completed Years of Service | Vested Percentage |
|---|---|
| Less than 2 | 0% Vested |
| 2 | 20% Vested |
| 3 | 40% Vested |
| 4 | 60% Vested |
| 5 | 80% Vested |
| 6 or more | 100% Vested |

Prior matching contributions and minimum contributions, if any, become "vested" based on your number of years of service with your Employer.  The schedule below shows how your vested percentage is determined:

| Completed Years of Service | Vested Percentage |
|---|---|
| Less than 2 | 0 % Vested |
| 2 | 30% Vested |
| 3 | 65% Vested |
| 4 | 100% Vested |

**NOTE**:   When calculating your vested percentage, service with certain predecessor organizations will be counted.   These predecessor organizations are as follows:   Hall Systems, Inc., Xpress Global Systems, Inc., Victory Xpress, Inc., Cargo Movement Corp., PST Van Lines, Inc., U.S. Xpress, Inc., JTI, Arnold Transportation Services and Transportation Investments, Inc.

Your vested percentage is directly tied to your years of service.  You will be credited with a year of service if you complete 1,000 hours during a consecutive 12-month period ending on each December 31.   If you go on a qualified military service leave, for purposes of determining years of service, such period of leave will be counted upon your return to employment.

In addition, you will be 100% vested in matching contributions and minimum contributions, if any, and the earnings on such contributions if, while employed by your Employer,

- you attain the Plan's early retirement age of 55;

- you become permanently disabled; or

- you die.

15

You will be considered disabled if you furnish proof of the existence of a disability in the form and manner consistent with the requirements of the Social Security Administration to receive benefits. In other words, if you are not able to work in any substantially gainful activity because of any physical or mental impairment(s) that can be shown medically and those impairments are expected to result in death or to last for a continuous period of more than 12 months, you may be considered disabled under the Social Security Administration's guidelines. Furnishing a letter from the Social Security Administration stating that you are entitled to disability benefits would be sufficient proof of your disability.

## If I terminate service with my Employer, will I receive the total value of my account?

The answer to this question depends on why and when you terminate service. If you terminate employment under any of the circumstances listed above or you have six or more years of service, you will receive the total value of your account.

## Is my vesting affected if I become an excluded employee?

No. While you cannot participate in the Plan if you become an excluded employee, your vesting will not be affected. You will continue to be credited with years of service.

The vested percentage of your matching contributions and minimum contributions, if any, will increase as long as you continue working for your Employer.

## When I terminate employment, what will happen to the portion of my account that is not vested?

The portion of your account that is not yet vested will be considered a "forfeiture." You will not be entitled to any portion of your account that is not vested when you terminate employment. Forfeitures will be used in the following sequence:

- Offset Plan Expenses

- Reduce Any Employer Contributions

## What happens to my prior years of service if I am later reemployed with my Employer?

If you are reemployed, you will receive credit for all prior years of service.

## What happens to my forfeited money if I am later reemployed with my Employer?

If you return to work for the Employer before five consecutive one-year Breaks in Service, you may restore the forfeited portion of your account by repaying any payment you received at termination. Your account will automatically be restored if you did not receive a distribution and you are reemployed by your Employer.

16

A one-year Break in Service occurs when you do not complete more than 500 hours of service with your Employer during the applicable 12-month computation period.

Please see your Plan Administrator for further details, including the deadline by which you would need to repay any payment you received.

**What if a Qualified Domestic Relations Order ("QDRO") is issued against my account?**

Generally, your vested account may not be sold, used as collateral for a loan outside the Plan, given away, or otherwise transferred. In addition, with certain limited exceptions (e.g., an IRS levy), your creditors may not interfere with your account in any way. An exception to this general rule, however, is a QDRO. A QDRO is a decree or order issued by a court that makes you pay child support or alimony, or otherwise allocates a portion of your account to your spouse, former spouse, child or other dependent. If a QDRO is received by Diversified, all or a portion of your benefits may be used to satisfy such order. Diversified will determine if the decree or order issued by the court meets the requirements of a QDRO. Participants and beneficiaries can obtain a description of the procedures for QDRO determinations at no charge from Diversified, and should do so before having their legal counsel draft any domestic relations order.

# Withdrawals

**May I withdraw my voluntary after-tax contributions while I am still employed?**

Yes, you may withdraw all or part of any voluntary after-tax contributions. Here's how:

If the prior voluntary after-tax contributions you made after January 1, 1987 have increased in value, you may withdraw the actual dollar amount of these contributions, but you must also withdraw equal amounts of the taxable earnings.

**NOTE:** If you are under age 59 ½ when you make your withdrawal, a 10% penalty tax in addition to income taxes may apply if your withdrawal includes earnings. The Plan allows for penalty-free early withdrawals for military reservists called into active duty and you receive a qualified reservist distribution.

**May I make other withdrawals while I am employed?**

Yes, you may make other withdrawals as follows:

**Contributions available for withdrawal at any time**

You may withdraw all or a portion of your account balance at any time from the following sources.

Xpre$$avings 401(k) Plan

- prior voluntary after-tax contributions;

- rollover contributions

**NOTE:** If you are under age 59 1/2 when you make your withdrawal, a 10% penalty tax in addition to income taxes may apply if your withdrawal includes earnings. The plan allows for penalty-free withdrawals for military reservists called into active duty who receive qualified reservists called into active duty who receive qualified reservist distributions.

## **Age 59 1/2 or Older**

When you reach age 59 1/2, you may withdraw all or a portion of your vested account balance.

## **Hardship**

Your Plan allows you to make hardship withdrawals. A "hardship withdrawal" is a withdrawal made for an "immediate and heavy financial need," such as:

- unreimbursed medical expenses for you, a dependent, a properly designated primary beneficiary of your account under the Plan or a non-custodial child;

- purchase of your principal residence, excluding mortgage payments. Funds cannot be withdrawn to purchase a vacation home;

- post-secondary education (e.g., college), tuition and related educational fees and room and board expenses for the next 12 months for you, your spouse, your child, a properly designated primary beneficiary of your account under the Plan or your dependent;

- amounts necessary to prevent foreclosure or eviction from your principal residence (e.g., unpaid rent or mortgage payments);

- unreimbursed burial or funeral expenses for your deceased parent, spouse, child, a properly designated primary beneficiary of your account under the Plan or dependent;

- unreimbursed expenses for the repair of damage to your principal residence that qualifies for the casualty loss deduction under Code Section 165 (without regard to whether the loss exceeds 10% of adjusted gross income); or

- amounts for other expenses which the IRS may later define as a hardship withdrawal.

Xpre$$avings 401(k) Plan

The amount of the hardship withdrawal cannot exceed the exact amount needed to cover your financial need, plus any income taxes or penalties reasonably anticipated to result from the hardship withdrawal.  In addition, in order to receive approval for a hardship withdrawal, it must be determined by the Plan Administrator that your need for the withdrawal cannot reasonably be relieved by:

- stopping of salary deferral contributions under the Plan; or

- other distributions or nontaxable loans from plans maintained by the Employer or any other employer.

The Plan Administrator will determine whether you qualify for a hardship withdrawal using uniform and nondiscriminatory standards.  If the Plan Administrator determines that you qualify for a hardship withdrawal, you may withdraw the salary deferral contributions.

**Are there any restrictions relating to hardship withdrawals?**

Yes.  If you take a hardship withdrawal, you may not make any voluntary after-tax or pre-tax salary deferral contributions for six months from the date of your hardship withdrawal.

**How do I apply for a withdrawal?**

You can apply for a withdrawal by completing a withdrawal form.  Your Plan Administrator must receive the withdrawal form at least 30 days before you would like to receive your withdrawal.

**If I make a withdrawal, may I repay it?**

No, amounts withdrawn from the Plan may not be repaid.

**What are the tax effects of making a withdrawal?**

If you make a withdrawal from the Plan, you generally will have to pay income taxes on the money you withdraw.  Unless you are withdrawing money to make a direct rollover contribution to another qualified plan, governmental 457(b) plan, 403(b) account, or traditional IRA, your withdrawal is generally subject to the mandatory 20% federal income tax withholding.  Since hardship withdrawals are not eligible to be rolled over to another plan, they are subject to optional 10% federal income tax withholding.  Also, if you are under age 59 1/2 when you make your withdrawal, an additional 10% penalty tax may apply (unless you are a military reservist called into active duty and you receive a qualified reservist distribution).

**NOTE:**  You will not pay income tax on any prior voluntary after-tax contributions you withdraw from the Plan since these contributions were taxed before being contributed to the Plan.  The earnings on your voluntary after-tax contributions will be taxable.

Xpre$$avings 401(k) Plan

# Loans

### How do I apply for a loan?

If you are a participant, you may model and initiate a loan by visiting Diversified Direct Online at www.divinvest.com or by calling Diversified Direct at 800-755-5801.

### Personal Loans.
You may take a personal loan for any reason.

### Home Loans.
If you are applying for a loan for your principal residence with a loan period greater than five years, you will receive a home loan kit, which will explain the loan application process and includes a home loan application for your completion.  You must submit the completed application and the appropriate documentation within 30 days for review and approval, or your request will automatically be cancelled.

Once approved, your loan will be processed.  You will be notified if your loan request is denied.

### What are the conditions for the loan?

- You may not borrow less than $1,000.

- You must pay a loan set-up charge of $75 per loan.  This charge will be deducted from your account when your loan request is processed.

- A loan may be made from all contributions that are part of your vested account balance.

- You may only have one loan outstanding at a time.

- You must repay your loan within five years, unless you are using the loan to purchase your principal residence or you are on authorized leave for military service for a period which extends the maturity date of the loan beyond five years.  If you are using the loan to purchase your principal residence, the repayment period may be set for a loan term that will not exceed 15 years.

### What is the maximum loan amount I may borrow?

The maximum amount you may borrow is determined by your vested account balance. You may borrow up to the lesser of 50% of your vested account balance or $50,000. If you had an outstanding loan in the previous 12 months that was repaid in full, the amount of your highest outstanding loan balance will be deducted from the maximum amount you are allowed to borrow. For example, if you are applying for a loan of $50,000 this year and you had a prior loan whose highest outstanding loan balance in the last 12 months was $12,000, you would, assuming your vested account balance was sufficient, only be allowed to borrow

Xpre$$avings 401(k) Plan

up to $38,000.  However, if you currently have any active outstanding loans, defaulted loans and defaulted loans that are deemed distributions, you are prohibited from currently taking out any additional loans from your account until such existing loans are paid in full.

**How is the interest rate determined for my loan?**

The interest rate is based on the Prime Rate plus 1%.  Any changes in the Prime Rate will be reflected on the following business day.

In accordance with the Servicemembers Civil Relief Act (the "SCRA"), the interest rate on your loan(s) issued before your military service leave begins cannot exceed 6% during the period that you are on military leave provided you submit a written notice of your call to military service and a copy of your military orders and any order extending your military service to your Employer within 180 days after you terminate service or are released from military service.  See the question "**What happens to my loan if I am on a leave of absence?**"

In accordance with the SCRA, you have the right to waive the reduction in loan interest during your period of military service leave by providing a written waiver which specifies the loan(s) to which the waiver applies.  The waiver may be submitted at any time during or after your military service period and must be agreed to by the Plan Administrator.  Please contact your Plan Administrator for additional information on this option.

**How do I make loan repayments?**

If you are actively employed by your Employer, your loan repayments will be deducted from your payroll check (after taxes have been deducted).   The frequency of your loan repayments is based on your pay frequency.

If you are no longer employed by your Employer, and you still have money in your account, you may continue to make loan payments via coupon method.  Upon receipt of your request to continue payments, Diversified will issue a coupon book.  You may make your loan repayments monthly by money order, certified check, bank check or a fixed payment from your account.

Each loan repayment will be equal to the interest payable on the portion of the loan that is still outstanding (known as the loan principal) and an installment of the loan principal.  Your loan repayments will be deposited to your account according to your current investment elections in the Plan.

A loan repayment may not be treated as a new or current contribution to the Plan.

21

Xpre$$avings 401(k) Plan

**What happens to my loan if I am on a leave of absence?**

If you go out on an authorized (non-military) leave of absence, your loan repayments, which would otherwise be due during your leave, may be suspended for up to one year ("maximum suspension period"). Your loan repayments will be suspended if you go on authorized (non-military) leave of absence provided that (a) you go on leave without pay from your Employer, or (b) your rate of pay (after applicable employment tax withholdings) is insufficient to cover loan repayments. You will be permitted to prepay your loan(s) in full at any time.

Your loan will be reamortized over the remaining term of your loan at the earlier of your return to work or the end of the maximum suspension period. The suspension will not cause the loan to be treated as a taxable distribution, as long as (a) at the end of your authorized leave of absence (not to exceed the maximum suspension period), you resume making your loan repayments in substantially level payments (note that these repayments may not be less than the original loan repayment amounts); (b) you make such repayments at a frequency which is not less than the frequency required under the terms of the loan; and (c) the loan is fully repaid by the last date permitted under the Internal Revenue Code (i.e., 5 years from the date of the loan, unless your loan is a home loan with a longer maturity date).

If you go out on a military service leave, your loan repayments which are due during your military service leave will be suspended and the loan maturity date will be extended for the length of your military service leave. Your loan will be reamortized to the extended maturity date at the end of your military leave period. You will be permitted to prepay your loan(s) in full at any time.

The suspension will not cause the loan to be treated as a taxable distribution, as long as (a) when your military service leave ends, you resume making your loan repayments in substantially level payments (note that these repayments may not be less than the original loan repayment amounts); (b) you make such repayments at a frequency which is not less than the frequency required under the terms of the loan; and (c) the loan is fully repaid (including interest that accrues during the military service leave) by the end of the period equal to the original loan period plus the military service leave.

**Can a loan be defaulted?**

Yes, your entire loan will be in default if:

- you do not make a loan repayment by the end of the calendar quarter following the quarter in which the repayment was due (Note: If you do not make loan repayments due to an authorized military service leave or due to authorized (non-military) leave of absence, your loan will not be in default during the authorized maximum suspension period);
- you do not resume loan repayments when your authorized leave of absence ends (non-military or military) (Note: Your Plan Administrator will establish a reasonable time period when loan repayments must begin, which will not be less than 15 days from the date your leave of absence ends nor later than the timeframe described above);

22

Xpre$$avings 401(k) Plan

- there is still an outstanding balance on the loan's maturity date;
- you revoke (i.e., stop) your payroll deduction or it becomes invalid while you are still an active employee;
- you die;
- a lien is made against the loan collateral (in this case, your loan balance); or
- you terminate employment with your Employer, AND
  - you don't pay off the entire unpaid balance of the loan within a reasonable amount of time after termination (your Plan Administrator will establish a reasonable time period, which may not be less than 15 days from the date you terminate or later than the timeframe described above); or
  - you fail to continue to make repayments as described above.

If you default on your loan and you are still employed, but are not eligible to take an in-service withdrawal, your loan is considered a deemed distribution ("deemed loan"). A deemed loan is considered an outstanding loan and will continue to accrue interest for purposes of calculating the maximum amount you may borrow in the future. You may repay a deemed loan by money order, certified check or bank check.

## What happens if my loan is defaulted?

If your loan is defaulted or it is a deemed loan, you will have to pay income taxes on the amount that is defaulted or deemed distributed. In addition, if you are under age 59 1/2 when the loan defaults, an additional 10% penalty tax may apply.

If the outstanding loan balance at the time of default includes voluntary after-tax contributions, you will not pay income tax or the 10% penalty tax on those amounts.

The 10% penalty tax is waived for military reservists called into active duty who receive a qualified reservist distribution.

## What happens if the Plan terminates while I have an outstanding loan?

If the Plan terminates, your loan must be repaid. If you do not repay the loan, the outstanding loan balance will be in default and reported to the IRS as a distribution from the Plan. This means that you will have to pay income taxes on the balance.

If you have any questions about the loan program, please contact your Plan Administrator, visit Diversified Direct Online at www.divinvest.com or call Diversified Direct at 800-755-5801.

23

Xpre$$avings 401(k) Plan

# Benefits

## When may I retire under the Plan?

Your normal retirement date is your 65th birthday.

Your early retirement date is your 55th birthday.

## When will I begin to receive benefits from the Plan?

If you terminate service, you have the option to receive the total vested value of your account at any time.  The Plan is required by law to distribute your benefits no later than April 1st of the calendar year following the year in which you reach age 70 1/2.

However, if you are still working for your Employer at the time you reach age 70 1/2 (and you are not a 5% owner of your Employer), you may:

• delay payment of your benefits until the April 1st of the calendar year following the year you retire; or

• delay the rest of your benefit payments until the April 1st of the calendar year following the year you retire, if you had already begun to receive payment of your benefits.

## How will my account be paid to me?

Your account will be paid to you in one lump sum payment.

## May I elect a different payment option?

Yes, another payment option is available.  If your vested account balance is $5,000 or less, your account will automatically be paid to you in one lump sum payment.  If your vested account balance is over $5,000, the other payment option available to you is:

### Partial Cash Payments

You may elect to receive partial cash payments.  This means that you may receive part of your account balance while leaving the remainder of your account in the Plan.  You may receive partial cash payments from your account at any time, and as often as you like.  If you die before receiving all of your account, the balance in your account will be paid to your beneficiary in one lump sum payment.

Xpre$$avings 401(k) Plan

**What happens if I become disabled?**

If you become disabled, you will be fully vested in your account. Your disability retirement date will be the first day of the month following the date that you become disabled. Your account will be paid to you in one lump sum payment. You may, however, choose any other payment option listed above.

**Does the Plan provide for death benefits?**

Yes. If you die before your benefits begin under the Plan, your account will be paid to your beneficiary. Your beneficiary may choose any payment option listed above.

**Who will be the beneficiary of my death benefits?**

If you are married, you may not designate a beneficiary other than your spouse without your spouse's written consent.

You have the right to designate your beneficiary or beneficiaries at any time. If you fail to designate a beneficiary, if your beneficiary designation is not valid or if your beneficiary fails to survive you, then your benefits will be paid in the following order to: (1) your spouse; (2) your descendents; (3) your surviving parents in equal shares; and (4) your estate.

You can designate your beneficiary by completing a beneficiary form that is in your enrollment materials.

**<u>IMPORTANT NOTE:</u>** If you have designated your spouse as your beneficiary and you then get legally divorced, your designation of your spouse will be considered **not** valid unless you complete a new beneficiary form after the divorce redesignating your spouse as beneficiary.

**May a nonspouse beneficiary roll over a death benefit?**

Yes, effective January 1, 2007, a nonspouse designated beneficiary of a deceased participant may request a direct rollover to an "inherited IRA". An inherited IRA means that the title of the IRA account must identify it as an IRA with respect to a deceased individual and also identify the deceased individual and the beneficiary. The rules for determining the required minimum distributions under the Plan with respect to a nonspouse beneficiary also apply under the inherited IRA.

**If I terminate employment with my Employer for any reason, do I need to take my money immediately?**

It depends.

If your vested account balance is over $5,000, you may leave your money in the Plan, unless otherwise required by the Plan's minimum distribution requirements.

A special rule applies (known as a "mandatory distribution") if your vested account balance is over $1,000 but not more than $5,000, and you have not attained the later of age 62 or the

Xpre$$avings 401(k) Plan

normal retirement age under the Plan. In such case, if you do not make a timely distribution or direct rollover election, your entire vested account balance, including any prior rollover contributions, will automatically be rolled over to a traditional IRA serviced by Diversified. (In computing your vested account balance for purposes of any automatic rollover to an IRA, any loan default amount is not included.)  If your vested account balance is $1,000 or less, and you do not make a timely distribution or direct rollover election, your vested account balance will be paid directly to you by check as a mandatory distribution (subject to required 20% federal withholding and any applicable state withholding).

The IRA will be invested in the Money Market Fund of the Transamerica Partners Funds Group. This Fund has been designated to preserve principal and provide a reasonable rate of return and liquidity.  You may thereafter elect to transfer your monies from such IRA by completion of the appropriate form(s) provided by Diversified.  There are no administrative fees or sales charges associated with this account.

For additional information, please visit Diversified Direct Online at <u>www.divinvest.com</u> or call Diversified Direct at 800-755-5801.

# Taxes on Distributions

### What are the tax effects of taking my taxable money?

If you withdraw money from the Plan and you do not directly roll it over into another qualified plan, governmental 457(b) plan, 403(b) account or eligible IRA, you generally will have to pay income taxes on the money.  The amount you withdraw is generally subject to a mandatory 20% federal income tax.  **NOTE:**  Since hardship withdrawals are not eligible to be rolled over to another plan, they are subject to an optional 10% federal income tax withholding.  In addition, if you are under age 59 1/2 when you make the withdrawal, an additional 10% IRS penalty tax may apply (unless you are a military reservist called into active duty and you receive a qualified reservist distribution).

**Note:**  You will not pay income taxes on any prior voluntary after-tax contributions you withdraw from the Plan since these contributions were taxed before being contributed to the Plan.  The earnings on your voluntary after-tax contributions will be taxable.

### Is there a way to reduce or defer the taxes due on the taxable portion of my distribution?

Yes, there are ways to either reduce or defer the income taxes due on your distribution.  For example:

(1)  If you receive a taxable distribution from the Plan, you generally have 60 days from the date of the distribution to roll over all or a portion of that amount to an eligible IRA, another employer's qualified plan, a governmental 457(b) plan or to a 403(b) account.  If you roll over your account in any of these ways, you will not pay taxes on the money.  You will

Xpre$$avings 401(k) Plan

however, have to pay taxes when you begin to withdraw money from a traditional IRA or new employer's plan.

Under certain circumstances, all or a portion of your distribution may not qualify as a rollover contribution to a traditional IRA or another employer's qualified plan, governmental 457(b) plan or 403(b) account. In addition, most distributions will be subject to a mandatory 20% federal income tax. This tax will reduce the actual amount you receive in your distribution. For this reason, if you wish to roll over all or a portion of your distribution, you may want to take advantage of the direct rollover option described in (2) below.

(2)  If you roll over your distribution directly to an eligible IRA or another employer's qualified plan, governmental 457(b) plan or 403(b) account, no taxes will be taken out. Taxes will be payable, however, when you begin to receive payments.

Like the rollover (described in (1) above), all or a portion of your distribution may not qualify for a direct rollover to an eligible IRA, other qualified plan, governmental 457(b) plan, or 403(b) account.

(3)  If you qualify, you may also elect favorable income tax treatment, such as "10-year forward averaging" or "capital gains" method of taxation.

You will receive additional information regarding the special tax rules, rollover distributions and direct rollovers when you request a distribution.

# Distribution Claim Procedures

### How do I apply for benefits?

You ("you" includes your beneficiary throughout this section) may apply for benefits by submitting a request as previously described. Your request for benefits must be made at least 30 days before you want to receive your distribution.

### What if my claim is denied?

Your application for benefits is also known as your "claim for benefits". If your claim for benefits is wholly or partially denied, you will receive written notice of this decision no later than 90 days after the date you submitted your claim. This written notice will explain:

- why your claim was denied;

- the Plan provisions which led to your claim being denied;

- the additional information needed to process your request for benefits; and

27

Xpre$$avings 401(k) Plan

- the Plan's review procedures and applicable time limits, including a statement of your right to bring a civil action in accordance with Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## How may I appeal a claim denial?

If your claim for benefits is denied, you may appeal the decision. However, you must do so within 60 days of receiving the denial notice from your Plan Administrator. You and your representative (such as your attorney) are entitled to review any of the appropriate documents involved in the denial of your claim. All comments must be submitted in writing.

A final decision on your appeal will be made in writing no later than 60 days after receipt of the appeal. The Plan Administrator may request an extension of time to review your appeal, if there are special circumstances (e.g., a need to hold a hearing concerning the appeal). Such an extension will not be longer than 120 days counting from the date your appeal was received.

# Legal Rights

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ERISA provides that all Plan participants are entitled to:

## Receive Information About Your Plan and Benefits

- Examine, without charge, at the Plan Administrator's office and at other specified locations, all documents governing the Plan, including any insurance contracts and collective bargaining agreements, if applicable, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including any insurance contracts and collective bargaining agreements, if applicable, and copies of the latest annual report (Form 5500 Series) and an updated summary plan description. The Plan Administrator may charge a reasonable amount for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

- Obtain a statement telling you whether you have a right to retirement benefits from your Plan at normal retirement age (age 65) and if so, what your benefits would be at normal retirement age if you stop working now. If you do not have a right to retirement benefits, the statement will tell you how many more years you have to work to get a right to your retirement benefits. This statement must be requested in writing and is not required to be given more than once every 12 months. The Plan must provide the statement free of charge.

28

Xpre$$avings 401(k) Plan

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your Employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a retirement benefit or exercising your rights under ERISA.

## Enforce Your Rights

If your claim for a retirement benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights.

- For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

- If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in a federal court.

- If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.

The court will decide who should pay the court costs and legal fees. If you are successful, the court may order the person you sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees (for example, if the court finds your claim is frivolous).

## Assistance With Your Questions

If you have any questions about your Plan, you should contact your Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

Xpre$$avings 401(k) Plan

# Additional Information

### Who handles the administration of the Plan?

The Plan is administered by your Employer. As Plan Administrator, your Employer is generally responsible for Plan operations and has sole discretion to interpret Plan provisions. Note that Diversified has agreed to assume certain fiduciary responsibilities of the Plan Administrator in accordance with certain agreed upon administrative procedures between Diversified and your Employer.

Diversified performs some, but not all, of the recordkeeping services for your Plan. Diversified performs these functions at the direction of the Plan Administrator in accordance with the provisions of the Plan and the Plan funding documents. Diversified:

• receives the Plan contributions;

• credits your account for those contributions; and

• pays benefits to you and/or your beneficiaries.

### Who pays the cost of administering the Plan?

The costs of administering the Plan are shared between you and your Employer. In addition to the loan set-up charge, an annual Plan Service Fee ("PSF") of .15% will be accrued daily based on participants' account balances in all T. Rowe Price Retirement Adv Funds. The PSF will be deducted from the T. Rowe Price Retirement Adv Funds in which the participants' accounts are invested upon the earlier of: (i) the last business day of each month or (ii) the complete liquidation of a contribution type invested in an investment option. The daily accrual on non-business days at the end of a month will roll into the following month and be deducted on the last business day of such month.

### Can my Employer amend and/or terminate the Plan?

Your Employer may choose to amend and/or terminate the Plan at any time. If your Employer terminates the Plan (or a partial plan termination occurs), you will automatically become 100% vested in your account.

Upon full termination of the Plan, the Employer will direct the distribution of the assets to participants in a manner that is consistent with the provisions of the Plan. Distributions will be made in cash and if permitted by the Plan, in property or through the purchase of irrevocable nontransferable deferred commitments from Transamerica Financial Life Insurance Company (formerly known as AUSA Life Insurance Company, Inc.). Except as permitted by Internal Revenue Service regulations, the termination of the Plan shall not result in any reduction of protected benefits.

Xpre$$avings 401(k) Plan

**Is this Plan insured?**

No, this Plan is not insured. The assets of the Plan are held entirely separate from the assets of your Employer. All assets of the Plan are dedicated to the exclusive benefit of the Plan's participants. ERISA established a special federal agency, the Pension Benefit Guaranty Corporation (PBGC), to protect employees' benefits in certain pension plans when there is not enough money to cover benefits if a plan should terminate. By definition, benefits under this Plan are always equal to the value of the investments in the Plan. Thus, there is no need for insurance, nor is coverage available, for plans of this type.

# Vesting Addendum

If you were a participant in the Arnold Transportation Services 401(k) Plan who terminated prior to January 1, 2002, your contributions became "vested" based on your number of periods of service with your Employer. The schedule below shows how your vested percentage was determined:

| Completed Periods of Service | Vested Percentage |
|---|---|
| Less than 3 | 0% Vested |
| 3 | 20% Vested |
| 4 | 40% Vested |
| 5 | 60% Vested |
| 6 | 80% Vested |
| 7 or more | 100% Vested |

**TO OUR EMPLOYEES:**

We wish to announce that the Summary Plan Description for the Xpre$$avings 401(k) Plan ("Plan") has been modified, effective October 29, 2014 to change the Plan's default fund.  Therefore, in order to conform your Summary Plan Description to the Plan's modified provision, the following is substituted for the NOTE in the answer to the question **"Who decides how the money in my account is invested?"** in the Section entitled **Managing Your Account**:

"**NOTE:**  If you have not made your investment elections, all contributions made on your behalf will be invested in the applicable T. Rowe Price Retirement Funds, based on the year in which you turn age 65.  This is known as the "Default Alternative." Your employer has chosen to qualify the Default Alternative as a Qualified Default Investment Alternative ("QDIA") established in accordance with the legal requirements under Section 404(c)(5) of ERISA and regulations thereunder.  This means that the Plan fiduciary would not be liable for any investment losses that result, notwithstanding that you did not affirmatively elect to invest in the Default Alternative.  This relief from liability applies whether or not the Plan is intended to be an ERISA 404(c) plan."

Please attach this notice to your Summary Plan Description for future reference.

**U.S. Xpress Enterprises, Inc.**

# SUMMARY OF MATERIAL MODIFICATIONS
## TO THE
### XPRE$$AVINGS 401(k) Plan

The information in this Summary of Material Modifications is provided to inform you of a change in the provisions of the Xpre$$avings 401(k) Plan ("the Plan").

The Summary Plan Description ("SPD") of the Plan is hereby modified, effective January 1, 2014 (the "Effective Date"), to reflect the provisions of an amendment made to the Plan to permit Roth deferrals by eligible participants. The Effective Date above will apply to all other Roth deferral provisions of the Plan. **Except as otherwise discussed below, the same provisions that currently apply to pre-tax salary deferral contributions generally will apply to Roth deferrals.** The following new section is added to the SPD:

## "ROTH DEFERRALS

### What are Roth deferrals and when can I make these contributions to the Plan?

Effective January 1, 2014, you may irrevocably designate all or any part of your salary deferral contributions to the Plan as Roth deferrals, provided you have met the Plan's eligibility requirements.

Roth deferrals are similar to the pre-tax salary deferral contributions that are contributed on behalf of a participant to the Plan; however, Roth deferrals are "after-tax" deferrals that (1) you designate irrevocably as Roth deferrals at the time they are deferred, (2) your Employer treats as includible in your income at the time you would have received the amount in cash (had you not made the deferral election), and (3) are accounted for separately from all other amounts under the Plan. If you elect to make Roth deferrals, the deferrals will be made with money that you have already paid federal income taxes on (and, in some cases, state and local income taxes). Roth deferrals and, in most cases, earnings on them, will not be subject to federal income taxes when distributed to you. However, for a distribution of earnings to qualify for federal tax-free treatment, such a distribution must be a "qualified distribution" from your Roth deferral account. See the question "**What is a 'qualified distribution' from a Roth deferral account?**" below.

The decision whether to take advantage of the Roth deferral option is complicated and you should consider your financial and tax situation. Before electing how you would like to allocate your salary deferrals between pre-tax salary deferral contributions and Roth deferrals, we recommend that you consult with your tax or legal advisor.

### Is there a limit on how much of my salary I can contribute as a Roth deferral?

Yes. The total of your combined pre-tax salary deferral contributions and Roth deferrals may not exceed the maximum dollar limitation allowable under the law. In 2013, the maximum dollar limitation is $17,500. If you are age 50 or older at any time during 2013, your 2013 limit is increased to $23,000.

**What happens if I defer too much money or the Plan must return a portion of my Roth deferrals because of the special testing rules that apply to 401(k) plans?**

If you are required to receive money back from the Plan because you either deferred too much (see the question **"Is there a limit on how much of my salary I can contribute as a Roth deferral?"**), or because the Plan failed the special testing rules that apply to pre-tax salary deferral contributions and Roth deferrals, you will receive a return of excess contributions first from your pre-tax salary deferral contributions and then from Roth deferrals.  If Roth deferrals are returned to you, they will not be included in your income if they are timely distributed.  However, any earnings on returned Roth deferrals will be included in your income in the year that the deferrals are distributed to you.

**Are Roth deferrals eligible for an Employer matching contribution?**

Yes.   Roth deferrals are eligible for an Employer matching contribution in the same manner as pre-tax salary deferral contributions, but they do not increase the amount or rate of the maximum Employer matching contribution that can be made to the Plan.

**Are my Roth deferrals available for withdrawal while I am still employed?**

The conditions for the withdrawal of Roth deferrals while you are still employed are the same as those that apply to in-service withdrawals of pre-tax salary deferral contributions (see the **"Withdrawals"** section of your SPD for more details).

**Can I withdraw my Roth deferrals for reasons of hardship?**

The conditions for hardship withdrawals of Roth deferrals while you are still employed are the same as those that apply to in-service withdrawals of pre-tax salary deferral contributions (see the **"Withdrawals"** section of your SPD for more details).

**Can I take a loan from my Roth deferral account?**

Yes.  Your Roth deferral account is taken in consideration for purposes of calculating the maximum amount that you may borrow, and it is the last eligible account to be deducted from to satisfy the requested loan amount.  The conditions for loans from a Roth deferral account are the same as those that apply to loans from a pre-tax salary deferral contributions account (see the **"Loans"** section of your SPD for more details).

**What happens if my loan is defaulted?**

If your loan includes monies from a Roth deferral account and is defaulted or it is treated as a deemed distribution, the portion of the distribution attributable to the Roth deferral account will not be treated as a "qualified distribution" even if it occurs after you attain age 59 ½ and satisfy the five-taxable-year period of participation in your Roth deferral account.  You will have to pay income taxes on the earnings amount that is defaulted or deemed distributed.  In addition, if you are under age 59 ½ when the loan defaults, an additional 10% penalty tax may apply.  See this same question in the **"Loans"** section of your SPD for the impact of loan default on other types of contributions.

## What is a "qualified distribution" from a Roth deferral account?

A distribution from a Roth deferral account in the Plan is considered a "qualified distribution" if certain conditions are met. First, such distribution is made on or after the date on which you attain age 59½, or is made to your beneficiary (or to your estate) on or after your death, or is distributed to you due to your becoming disabled (as defined in the SPD). Second, such distribution must be paid from a Roth deferral account after a five-taxable-year period of participation in order for the distribution to be qualified. When counting the five taxable years, year number one is calculated as starting on the first day of the first taxable year in which you make a Roth deferral to the Plan.

If a distribution is a qualified distribution, neither your contributions nor the earnings will be includible in your gross income.

## Are there any special rules regarding direct rollovers of Roth deferrals?

Yes, there are some special rules that apply to direct rollovers of Roth deferrals. A direct rollover of a distribution from a Roth deferral account under this Plan can only be made to a Roth deferral account under another Roth plan that accepts rollovers from a Roth deferral account, or to a Roth IRA.

The Plan does not provide for a direct rollover (including any automatic rollover) of distributions from your Roth deferral account if the amount of those distributions that are "eligible rollover distributions" is less than $200 during a year. Additionally, any distribution from your Roth deferral account will not be taken into consideration when determining whether distributions from your other accounts are reasonably expected to total less than $200 during a year. However, eligible rollover distributions from your Roth deferral account are taken into consideration when determining whether the total amount of your account balances under the Plan exceed $1,000 for purposes of mandatory distributions from the Plan and the treatment of those distributions. (See the "**Benefits**" section of your SPD for the full explanation of "eligible rollover distributions" and for information regarding mandatory distributions and the automatic rollover provisions of this Plan.)"

If you have any questions regarding the information explained above, please contact the Plan Administrator. Any specific questions you have about how this type of contribution may affect you should be directed to your tax and/or legal advisor.

This explanation merely provides a summary of the provisions of Roth deferrals and not every limitation or detail is included. Every attempt has been made to provide concise and accurate information. If there is a discrepancy between this summary and the official Plan document, the Plan document shall apply.

Please attach this notice to your Summary Plan Description for future reference.

**U.S. Xpress Enterprises, Inc.**

3

**TO OUR EMPLOYEES:**

We wish to announce that the Summary Plan Description for the Xpre$$avings 401(k) Plan ("Plan") has been modified, effective October 1, 2012, to substitute the following language as the answer to the question, "**Who pays the costs of administering the Plan?**" in the Section entitled **Additional Information**:

"The costs of administering your Plan may be shared between you and your Employer. In addition, some of the costs of administering your Plan may be paid from Plan assets. Note that any Plan administrative fees that are actually deducted from your contributions or your account will be disclosed on your quarterly Plan benefit statement. Any Plan administrative fees are in addition to any expenses of the underlying investment options available under the Plan.

In addition, a plan service credit may be added to your account.  If applicable, this will lower the effective annual expense ratios of the investment fund(s) for which a plan service credit applies.  Any plan service credit will be disclosed on your quarterly Plan benefit statement."

Please attach this notice to your Summary Plan Description for future reference.

**U.S. Xpress Enterprises, Inc.**

**TO OUR EMPLOYEES:**

We wish to announce that the Summary Plan Description for the Xpre$$avings 401(k) Plan has been modified, effective August 30, 2011, as follows:

The following is substituted for the answer to the question, "**Who pays the costs of administering the Plan?**" in the Section entitled **Additional Information:**

The costs of administering the Plan are shared between you and your Employer.  In addition to the loan set-up charge, an annual Plan Service Credit ("PSC") of .01% will be accured daily based on your account balance in each of the investment options. The plan service credit will be credited to each of the investment funds in which your account is invested upon the earlier of: (i) the last business day of each month or (ii) the complete liquidation of a contribution type invested in the investment option.  The daily accrual on non-business days at the end of a month will roll into the following month and be credited on the last business day of such month.  See your Plan Administrator for more information about which investment funds the plan service credit will be applied to.

Please attach this notice to your Summary Plan Description for future reference.

**U.S. Xpress Enterprises, Inc.**

**TO OUR EMPLOYEES:**

We wish to announce that the Xpre$$avings 401(k) Plan ("Plan") has been amended, effective February 1, 2011, in order to credit prior Service with C&C Trucking of Duncan, Inc. for purposes of eligibility, allocation accrual and vesting as of October 4, 2010. Therefore, in order to conform your Summary Plan Description ("SPD") to reflect the Plan's amended provision, please note the following:

1. The following is substituted for the Note contained within the answer to the question "**When can I become a participant in the Plan?**" in the Section entitled **Joining the Plan**:

"**NOTE:** Service with certain predecessor organizations will be counted when determining whether you completed the service requirement. These predecessor organizations are as follows: Hall Systems, Inc., Xpress Global Systems, Inc., Victory Xpress, Inc., Cargo Movement Corp., PST Van Lines, Inc., U.S. Xpress, Inc., JTI, Arnold Transportation Services, Transportation Investments, Inc., and C&C Trucking of Duncan, Inc."

2. The following is substituted for the Note contained within the answer to the question "**How do I know which portion of my account is vested?**" in the Section entitled **Ownership of Your Account (Vesting)**:

"**NOTE:** When calculating your vested percentage, service with certain predecessor organizations will be counted. These predecessor organizations are as follows: Hall Systems, Inc., Xpress Global Systems, Inc., Victory Xpress, Inc., Cargo Movement Corp., PST Van Lines, Inc., U.S. Xpress, Inc., JTI, Arnold Transportation Services, Transportation Investments, Inc. and C&C Trucking of Duncan, Inc."

Please attach this notice to your SPD for future reference.

                                        **U.S. Xpress Enterprises, Inc.**

# Xpress Global Systems
# EMPLOYEE BENEFIT PLAN



## SUMMARY PLAN DESCRIPTION FOR DRIVERS

This is a Summary Plan Description of the Xpress Global Systems Employee Benefit Plan (called the "Plan" in this summary) as in effect January 1, 2014. If you have questions after reading the Summary, please contact the employee benefits department at 1-800-670-1915. As stated in the administrative information section of this Summary, the legal name of the Plan is the U.S. Xpress Enterprises, Inc. Employee Benefit Plan.

This Summary cannot modify the terms of the Plan document. If there are inconsistencies between the Summary and the Plan document, the Plan document will control. Xpress Global Systems (called the "Company" in this Summary) has the right to terminate its participation in the Plan and U.S. Xpress Enterprises, Inc. has the right to amend or terminate the Plan at any time. This version of the Summary Plan Description describes benefits provided to employees who are classified as Driver Employees by the Company. For Xpress Global Systems employees, the Plan is known as the Xpress Global Systems Employee Benefit Plan. There are other versions of the Summary Plan Description for the U.S. Xpress Enterprises, Inc. Employee Benefit Plan that apply to employees classified by the Company as Office Employees and for U.S. Xpress and Total Transportation employees.

This group health plan believes it is a "grandfathered health plan" under the Patient Protection and Affordable Care Act (the Affordable Care Act). As permitted by the Affordable Care Act, a grandfathered health plan can preserve certain basic health coverage that was already in effect when that law was enacted. Being a grandfathered health plan means that your plan may not include certain consumer protections of the Affordable Care Act that apply to other plans; for example, the requirement for the provision of preventive health services without any cost sharing. However, grandfathered health plans must comply with certain other consumer protections in the Affordable Care Act; for example, the elimination of lifetime limits on benefits.

Questions regarding which protections apply and which protections do not apply to a grandfathered health plan and what might cause a plan to change from grandfathered health plan status can be directed to the plan administrator at (800) 670-1915. You may also contact the Employee Benefits Security Administration, U.S. Department of Labor at 1-866-444-3272 or www.dol.gov/ebsa/healthreform. This website has a table summarizing which protections do and do not apply to grandfathered health plans.

## Eligibility

Any employee of the Company or an affiliated business that has adopted the Plan who is required to work at least 30 hours per week, and who receives W-2 compensation is eligible to participate in the Plan. A list of the affiliated business(s) that have adopted the Plan is at the end of this document. Coverage for benefits under the Plan begins on the 91st day of employment. For medical, dental and vision benefits, you may elect to cover your eligible dependents. Your eligible dependents are the following:

1.  Your legal spouse, as determined under the law of the state in which you are a resident. Domestic partners who are not legal spouses as described above are not eligible for medical benefits. You will need to provide proof of spousal status.

2.  Your or your legal spouse's biological child, legally adopted child (including children placed for adoption), step-child, eligible foster children or child for whom you or your legal spouse is the legal guardian provided that the child is less than 26 years old. If you have dependents, you'll need to provide proof of dependent status prior to enrolling them. Documentation may include the appropriate marriage license, birth certificate, or court order. You may also be required to provide documentation of their continued eligible status from time to time after they are initially enrolled for coverage.

3.  Your or your legal spouse's child for whom a qualified medical child support order has been issued.

4.  Your or your legal spouse's unmarried child (as described above) who is, and continues to be, both (i) incapable of self-sustaining employment by reason of mental retardation or physical handicap; and (ii) chiefly dependent upon you or your legal spouse for economic support and maintenance, provided that you furnish proof of such incapacity and dependent within 30 days of the child's attainment of the applicable limiting age and subsequently as may be required. In addition, the child must be a dependent enrolled in the Plan prior to attaining the applicable limiting age.

## Benefit Options

The Benefit Options under the Plan are: medical, dental & vision insurance, short and long-term disability, AD&D, and group term life. For all benefits, eligibility begins on the 91st day of full-time (at least 30 hours per week) employment.

## Enrollment and Elections

In order to participate in the Plan, you must complete the enrollment process during an enrollment period. During the enrollment process, you will select the benefits you would like to enroll in and agree to reduce your pay for each payroll period to pay for your share of the cost of the benefit elected.
The enrollment periods for the Plan are as follows:

1.  Initial (New Hire) Enrollment Period: The date you first satisfy the Plan's eligibility requirements. This is the first time you may complete the enrollment process.
2.  Regular Re-Enrollment Period: The re-enrollment period in the Fall of each year. At this time, an eligible employee or participant may add, change or revoke existing elections. New elections will be effective at the beginning of the following Plan Year (January 1st). The Plan Year is January 1 to December 31 of each year. If you wish to add Dependents during the re-enrollment period, you must submit Dependent Verification.
3.  Special Enrollment Period (Change of Election): The 30 day period following an approved Change in Status or a Change in Coverage Event. You must complete a Change in Status form and submit Dependent Verification (if applicable) to the Company within 30 days of the event.

2

By Submitting Dependent Verification, you are acknowledging that you understand the Plan's eligibility requirements and certifying that the dependent(s) whom you are enrolling satisfy those requirements. Falsification of any forms constitutes fraud or an intentional misrepresentation of material fact and may result in the cancellation of coverage and in your being financially and legally responsible for any claims paid for an ineligible dependent who was enrolled in the Plan.

Once you have made your election, you are not permitted to change it before the next regular re-enrollment period, unless you have experienced a qualifying "Change in Status" or other "Change in Cost/Coverage" event as described in the "Change in Elections" section below.

## Termination of Participation

Your participation will terminate:
- Upon termination of employment;
- Upon retirement;
- If you become permanently and totally disabled;
- If you transfer to an ineligible employment category; or
- Upon nonpayment of benefit premiums within designated timeframe.

Your participation will automatically stop if the Plan is terminated.

## Contributions

1. Each payroll period, your employer will reduce your taxable income by your share of the cost of the medical, dental, and vision coverage you have elected for the Plan Year. These are pre-tax deductions. Your contributions for AD&D and group term life, short and long-term disability benefits are deducted from your pay on a post-tax basis. Your employer will credit the amount to a separate account to pay for each benefit you select. Employees' share of the cost of benefits under the Plan is set forth in the Annual Benefit Guide and may be changed by the Company from time to time. If your share of the cost increases during a Plan Year, either due to an increase in the cost of the benefit or a decrease in the Company's contribution toward the cost, your contribution amount will be adjusted automatically. An amount credited to an account for one benefit cannot be used to pay for another benefit.
2. If the reduction amount exceeds the cost of the benefit, you will not receive money back at the end of the Plan Year.
3. If you need to go on leave for any reason, you will need to make arrangements to continue paying premiums for your insurance benefits. Payments should be mailed to:
   U.S. Xpress
   Attention: Benefits Department
   4080 Jenkins Rd
   Chattanooga, TN 37421
4. If you are enrolled in any Allstate Workplace Division supplemental products and you miss a monthly payment, you will then be set up as a self payment through Allstate.

## Description of Benefits

**Medical Benefits**   Medical benefits under the Plan (including prescription drug benefits) are provided on a self-insured basis by the Company, with claims paid from the general assets of the Company and by Employees' contributions. Claim payments are paid first from employee contributions and then, to the extent necessary, from the Company's general assets. The Company has a contract with Blue Cross Blue Shield of Tennessee, Inc. ("BCBST") to process claims for medical benefits under the Plan. Two coverage levels are available: standard plan and premium plan.  A detailed description of medical benefits is contained in the "Evidence of Coverage" document prepared by BCBST, which forms part of this Summary Plan Description. The Company has delegated to BCBST the exclusive discretionary authority to decide claims for medical benefits under the Plan, including the right to make final determinations on appeals of denied claims.

3

BCBST's authority includes the right to make factual determinations with regard to medical benefits provided under the Plan.

The Company has a contract with Express Scripts to process claims for prescription drugs under the Plan under a self-insured arrangement. A detailed evidence of coverage booklet may be obtained from the Human Resources department at any of the Company's major service centers, on the internet at http://usxhr.usxpress.com, or by calling the Benefits Department at (800) 670-1915. The Company has delegated to Express Scripts the exclusive discretionary authority to decide claims for prescription drug benefits under the Plan, including the right to make factual determinations with regard to prescription drug benefits under the Plan.

**Dental Benefits**   Dental benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Delta Dental Plan of Tennessee ("Delta Dental"). Premiums for dental coverage are paid solely by the covered employee. The Company does not contribute toward the cost of dental benefits. A detailed description of dental benefits is contained in the benefit description document prepared by Delta Dental, which forms part of this Summary Plan Description and is attached at the end of this Summary. Delta Dental has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether benefits are payable under the contract and the amount of such benefits.

**Vision Benefits**   Vision benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Vision Service Plan ("VSP"). Premiums for vision coverage are paid solely by the covered employee. The Company does not contribute toward the cost of vision benefits. A description of vision benefits is contained in the benefit description document prepared by VSP, which forms part of this Summary Plan Description and is attached at the end of this Summary. VSP has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits.

**Long-Term Disability Benefits**   Long-term disability ("LTD") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued Unum. A detailed description of the LTD benefits is contained in the separate certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. Premiums for LTD coverage are paid solely by the covered employee. Employee premiums are paid on an after-tax basis. Unum has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits. A brief summary of the LTD benefits is attached at the end of this Summary. A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Short-Term Disability Benefits**   Short-term disability ("STD") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Unum. A detailed description of the STD benefits is contained in the separate certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. The Company provides full-time employees with $200 of weekly STD pay (eligible on the 91st day of employment). Employees may purchase additional STD benefit from $50 per week to $950 (maximum of up to 60% of base salary). Premiums for STD coverage are paid solely by the covered employee. Employee premiums are paid on an after-tax basis. Unum has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits. As described in the certificate of insurance, benefits payable under the insurance contract will be reduced by any benefit payable under any state statutory disability benefit plan. A brief summary of the STD benefits is attached at the end of this Summary. A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

4

**Accidental Death and Dismemberment Benefits**   Accidental death and dismemberment ("AD&D") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Unum. AD&D coverage is available on a voluntary basis and premiums for AD&D coverage are paid entirely by the covered employee on an after-tax basis. A detailed description of AD&D benefits is contained in the certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. Unum has exclusive discretionary authority to determine eligibility for coverage under the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits.  A copy of the certificate of insurance coverage may be obtained from the Human Resources Department by calling the Benefits Department at (800) 670 1915.

**Group Term Life Benefits**   The Plan provides basic group term life insurance benefits as well as voluntary supplemental group term life insurance benefits on a fully-insured basis through contracts issued by Unum.  Premiums for $10,000 of basic group term life insurance on the employee's life are paid entirely by the Company. Basic group life insurance is effective beginning the 91st day of employment. Voluntary supplemental group term life insurance is available on a voluntary basis and premiums are paid entirely by the covered employee. Voluntary supplemental coverage is available for the employee as well as the employee's dependents. A detailed description of group term life benefits is contained in the certificate of insurance documents prepared by Unum, which form part of this Summary Plan Description. Unum has exclusive discretionary authority to determine eligibility for coverage under the insurance contracts and to determine whether any benefits are payable under the contracts and the amount of such benefits. Please note that voluntary supplemental coverage for the employees' spouses and dependents is not provided through the Plan's Internal Revenue Code section 125 provisions. Employee contributions are made on an after-tax basis. A brief summary of the basic and supplemental life benefits is attached at the end of this Summary. A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Changes in Elections**
Due to Internal Revenue Service regulations, your benefit elections must remain in effect until the beginning of the next Plan Year (the following January 1). As explained previously, each Fall, there will be a regular re-enrollment period during which you can make elections for the next Plan Year. The only times you are permitted to make an election change before the next Plan Year are:
- if there is a "Change in Status" and your election change complies with the Consistency Rule.
- if there is a qualified "Change in Cost / Coverage" event.
You must complete a Change in Status/ Election form within 30 days of the event(s) and the
    Company must approve the change.

**Change in Status Events:**
1.  **Change in employee's legal marital status:** Including marriage, divorce, death of spouse, legal separation, and annulment.
2.  **Change in number of dependents:** Including birth, adoption, placement for adoption, and death.
3.  **Change in employment status:** An employment status change of the employee or spouse. Commencement or termination of employment; strike or lockout; return from unpaid leave of absence; promotion or demotion change in worksite affecting benefits; employment status change with the consequence that the individual becomes (or ceases to be) eligible under the plan.
4.  **Dependent satisfies (or ceases to satisfy) eligibility requirements:** An event that causes a dependent to satisfy or cease to satisfy the requirements for coverage due to attainment of age.
5.  **Residence change:**  A change in the place of residence of an employee, spouse or tax dependent if the change in residence affects the eligibility for coverage.

**Consistency Rules:**

5

1. **General Consistency Rule:** In order to change an election due to a "Change in Status" the election change must be on account of and correspond with a change in status event that affects coverage eligibility of the employee, spouse or dependent under an employer's plan.
2. **Special Consistency Rule for loss of dependent eligibility:** If the change in status is the employee's divorce, annulment or legal separation from a spouse, the death of a spouse or dependent, or a dependent's ceasing to satisfy the eligibility requirements for coverage, then the employee can cancel accident or health insurance coverage for only the spouse or dependent, as applicable.
3. **Consistency Rule for gain of coverage eligibility under another employer plan:** If an employee, spouse or dependent gains eligibility for coverage under another employer's plan (or qualified benefit) as a result of a change in marital status or a change in employment status, then an employee's election under the plan to cease or decrease coverage for that individual under the plan corresponds with that change in status only if coverage for that individual becomes effective or is increased under the other employer's plan.

**Change in Cost/Coverage:**
1. **Significant Cost Increase:** If the cost of a benefit package option significantly increases during a Plan Year, you may revoke your elections and, in lieu thereof, elect to receive on a prospective basis coverage under another benefit package option providing similar coverage. Dropping coverage altogether is not allowed.
2. **Significant Curtailment of Coverage:** If the coverage under a benefit option is significantly curtailed or ceases during a Plan Year, affected employees may revoke their elections under that benefit option and make a new election for coverage under another benefit package option providing similar coverage. IRS regulations provide that coverage under an accident or health plan is significantly curtailed "only if there is an overall reduction in coverage provided to participants under the plan so as to constitute reduced coverage to participants generally". A single provider leaving a network of providers would not permit an election change.
3. **Addition or Elimination of Benefit Package Option:** If during a Plan Year, the Plan adds a new coverage option (or eliminates an existing option) affected employees may elect the newly-added option (or elect another option if an option has been eliminated) prospectively and make a corresponding election change with respect to other benefit options providing similar coverage.
4. **Change in Coverage of Spouse or Dependent Under Other Employer's Plan:** An employee may make a prospective election change that is on account of and corresponds with a change made under the plan of the spouse's, former spouse's or dependent's employer if; (1) an Internal Revenue Code section 125 plan or qualified benefits plan of the spouse's, former spouse's or dependent's employer permits participants to make election change that would be permitted under the regulations; or (2) the other employer's plan permits participants to make an election for a period of coverage that is different from the period of coverage under this Plan.
5. **FMLA Leaves:** An employee taking leave under FMLA may revoke an existing election of group health plan coverage and make such other election for the remaining portion of period of coverage as may be provided for under FMLA.
6. **HIPAA Special Enrollment Rights:** An employee may change his/her election for group health plan coverage under the Plan to the extent that the election change corresponds with special enrollment rights under HIPAA.
7. **COBRA:** An employee may increase his/her pre-tax contributions for coverage under the Plan if a COBRA event (or similar state law continuation coverage event) occurs with respect to the employee, the employee's spouse or dependent.
8. **Judgment, Decree or Orders (QMCSO):** If there is a judgment, decree, or order resulting from divorce, legal separation, annulment or change in legal custody that requires accident or health coverage for an employee's child or dependent foster child, then the employee may change his/her election to add or drop coverage consistent with the order.
9. **Entitlement to Medicare or Medicaid:** Medicare or Medicaid entitlement or loss of entitlement may allow an employee to make an election change.

6

TO: Participants in the U.S. Xpress Enterprises, Inc. Employee Benefit Plan

**Notice of Privacy Practices**

> **THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY**

As we work every day to operate your health plans, protecting the confidentiality of your personal health information has always been an important priority. We (the U.S. Xpress Enterprises, Inc. Employee Benefit Plan or "the Plan") are adopting policies to safeguard the privacy and security of your personal health information and comply with federal law (specifically, the Health Insurance Portability and Accountability Act, known as "HIPAA"). We are required to follow the terms of this Notice. The Plan reserves the right to change the terms of this Notice at any time. If the Plan makes changes, we will notify you and give you the opportunity to obtain a copy of the new Notice.

Note: This Notice covers you only if you are covered by the Plan.

This Notice explains:

- How your Protected Health Information may be used and disclosed, and
- What rights you have regarding your information

**How the Group Health Plan May Use Your Information**

The Plan may use and disclose certain health information called "protected health information" and we refer to it throughout this Notice as "PHI" or "health information" in accordance with HIPAA and as generally described in this Notice. Health information that Nissan receives about you as an employer is not PHI. Thus, your leave of absence records, Family and Medical Leave Act ("FMLA") leave information, drug testing results, workers' compensation files, disability, life insurance, and Occupational Safety and Health Act ("OSHA") records are not PHI and are not covered by this Notice.

Some of the people who administer the Plan work for U.S. Xpress Enterprises, Inc. Before your PHI can be used by or disclosed to these employees, the Plan Sponsor must certify that it has: (1) amended the Plan documents to explain how your PHI will be protected; (2) identified the U.S. Xpress Enterprise employees who need your PHI to carry out their duties to administer the Plan; and (3) separated the work of these employees from the rest of the workforce so that U.S. Xpress Enterprise, Inc. cannot use your PHI for employment-related purposes or to administer other benefit plans.

In order to manage your health plan effectively, the Plan is permitted by law to use and disclose your medical information (called "Protected Health Information") in the following ways without your authorization:

**For treatment.** So that you receive appropriate treatment and care, providers may use your Protected Health Information to coordinate or manage your health care services. For example, your physician send us information about your treatment plan so the Plan can arrange additional services.

**For payment.** To make sure that claims are paid accurately and you receive the correct benefits, the Plan may use and disclose your Protected Health Information to determine plan eligibility and responsibility for coverage and benefits. For example, the Plan may use your information

when it confers with other health plans to resolve a coordination of benefits issue.

**For health care operations.** To ensure quality and efficient plan operations, we may use your Protected Health Information in several ways, including plan administration, quality assessment and improvement, and review vendor performance. Your information could be used, for example, to assist in the evaluation of a vendor who supports us. We also may contact you to provide information about treatment alternatives or other health-related benefits and services available under the Plan.

The Plan may also disclose your Protected Health Information to U.S. Xpress Enterprise, Inc. (the plan sponsor) in connection with these activities subject to certain conditions.

- The Plan may disclose information to U.S. Xpress Enterprise that summarizes the claims experience of Plan participants as a group, but without identifying specific individuals, to get new benefit insurance or to change or terminate the Plan. For example, if U.S. Xpress Enterprise wants to consider adding or changing a particular benefit, it may receive this summary health information to assess the costs of those services.

- The Plan may also disclose limited health information to U.S. Xpress Enterprise in connection with the enrollment or disenrollment of individuals into or out of the Plan.

- As required by law, special protection is given to your genetic information. The Plan may not use or disclose your genetic information for underwriting purposes, which includes determining whether you are eligible for benefits, the premium for coverage, whether you are subject to pre-existing condition exclusion and other activities related to the creation, renewal or replacement of the coverage provided under the Plan. Genetic information includes genetic tests of an individual or family member, family member histories, and genetic services, including counseling, education and evaluation of genetic information.

**Other Permitted Uses and Disclosures**

Federal regulations allow us to use and disclose your Protected Health Information, without your authorization, for several additional purposes, in accordance with law.

- ➤ To our Business Associates (vendors)
- ➤ Public Health Reporting
- ➤ Reporting and notification of abuse, neglect or domestic violence
- ➤ Oversight activities of health oversight agency (court order or subpoena)
- ➤ Judicial and administrative proceedings
- ➤ Law enforcement
- ➤ Research, as long as certain privacy-related standards are installed
- ➤ To a coroner or medical examiner
- ➤ To organ, eye or tissue donation programs
- ➤ To avert a serious threat to health or safety
- ➤ Specialized government functions (e.g. Military and veterans' activities, national security and intelligence, federal protective services, medical suitability determinations, correctional institutions and other law enforcement custodial situations)
- ➤ Worker's compensation or similar programs established by law that provide benefits for work-related injuries or illness
- ➤ Other purposes required by law, provided that the use or disclosure is limited to the relevant requirements of such law.

8

In Special Situations:
We may disclose your Protected Health Information to a family member, relative, close personal friend, or any other person whom you identify, when that information is directly relevant to the person's involvement with your care or payment related to your care.

We may also use your Protected Health Information to notify a family member, your personal representative, another person responsible for your care, or certain disaster relief agencies of your location, general condition, or death. If you are incapacitated, there is an emergency, or you otherwise do not have the opportunity to agree to or object to this use or disclosure, we will do what in or judgment is in your best interest regarding such disclosure and will disclose only information that is directly relevant to the person's involvement with your health care.

The Plan will make other uses and disclosures only after you authorize them in writing. The Plan will obtain your authorization prior to using or disclosing Protected Health Information for marketing or before any sale of your Protected Health Information. You may revoke your authorization in writing at any time.

**Your Rights Regarding Protected Health Information**

You have the right to:

- ➢ Inspect and copy your Protected Health Information
- ➢ Amend or correct inaccurate information
- ➢ Receive an accounting of certain disclosures of your Protected Health Information made by us.
  - o However, you are not entitled to an accounting of several types of disclosures including, but not limited to:
    - Disclosures made for payment, treatment or health care operations
    - Disclosures you authorized in writing
    - Disclosures made more than six (6) years ago
- ➢ Be notified by the Plan if there is a breach of your unsecured Protected Health Information
- ➢ Receive a paper copy of this notice, even if you agreed to receive it electronically

**Right to Request Restrictions**

You may ask us to restrict how the Plan uses and discloses your Protected Health Information as it carries out payment, treatment, or health care operations. You may also ask the Plan to restrict disclosures to your family members, relatives, friends, or other persons you identify who are involved in your care or payment for your care. However, the Plan is not required to agree to these requests.

9

**Right to Request Confidential Communications**

You may request to receive your Protected Health Information by alternative means or an alternative location if you reasonably believe that other disclosure could pose a danger to you. For example, you may only want to have information sent by mail or to an address other than your home.

For more information about exercising these rights, contact the office below. **Complaints**

If you believe that your privacy rights have been violated, you may file a written complaint without fear of reprisal. Direct your complaint to the office listed below under "Contacting Us" or the Secretary of Health and Human Services, Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, DC 20201.

**About this Notice**

The Plan reserves the right to change the terms of this notice and to make the new notice provisions effective for all Protected Health Information we maintain. If the Plan  changes this notice, you will receive a new notice via mail.

**Contacting Us**

If you have any questions, or if you wish to exercise the rights described in this notice, please contact the U.S. Xpress office identified below, which will provide you with additional information. The contact is:

Tammie Vineyard
Benefits Manager
(800) 251-6291 ext.3426

**Effective Date of Notice**

September 23, 2013


*NOTICE OF RIGHTS TO CONTINUE GROUP HEALTH COVERAGE*
This section of the Summary Plan Description is your notice of continuation coverage rights under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  COBRA continuation coverage can become available to you and to your spouse and dependent children, if they are covered under the Plan when you would otherwise lose your group health coverage.  Under the Plan, COBRA continuation coverage rights apply to medical (including prescription drug), vision and dental benefits.  COBRA continuation coverage is a continuation of Plan coverage when coverage would otherwise end because of a life event known as a "qualifying event." Specific qualifying events are listed later in this notice. COBRA continuation coverage must be offered to each person who is a "qualified beneficiary."  A qualified beneficiary is someone who will lose coverage under the Plan because of a qualifying event. Depending on the type of qualifying event, employees, spouses of employees, and dependent children of employees may be qualified beneficiaries.  Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage.

If you are an employee covered under the Plan, you have a right to choose this continuation coverage if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part).  If you are the spouse of an employee covered by the Plan, you have the right to choose continuation coverage for yourself if you lose group health coverage under the Plan for any of the following four reasons:

10

1) The death of your spouse;
2) A termination of your spouse's employment (for reasons other than gross misconduct) or a reduction in your spouse's hours of employment
3) Divorce or legal separation from your spouse; or
4) Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by the Plan, he or she has the right to continuation coverage if group health coverage under the Plan is lost for any of the following five reasons:

1) The death of a parent;
2) A termination of a parent's employment (for reasons other than gross misconduct) or reduction in a parent's hours of employment;
3) Parent's divorce or legal separation;
4) A parent becomes entitled to Medicare; or
5) The dependent child ceases to be a "dependent child" under the U.S. Xpress Inc. Employee Benefit Plan.

Furthermore, a child born to, or placed for adoption with, the covered employee during the period of continuation coverage may also become covered as a qualified beneficiary.

Under the law, the employee or a family member has the responsibility to inform the Plan Administrator of a divorce, legal separation, or a child losing dependent status under the Plan within 60 days of the date of the event or the date in which coverage would end under the Plan because of the event, whichever is later. The Company has the responsibility to notify the Plan Administrator of the employee's death, termination, and reduction in hours of employment or Medicare entitlement.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage. Under the law, you have at least 60 days from the date you would lose coverage because of one of the events described above, or the date notice of your election rights is sent to you, whichever is later, to inform the Plan Administrator that you want continuation coverage. If you do not choose continuation coverage, your group health insurance coverage will end.

If you choose continuation coverage, the Company is required to give you coverage which, as of the time coverage is being provided, is similar to the coverage provided under the plan to similarly situated employees or family members. The law requires that you be afforded the opportunity to maintain continuation coverage for 36 months unless you lost group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months. This 18 months may be extended to 36 months if other events (such as a death, divorce, legal separation, or Medicare entitlement) occur during that 18-month period. If a second qualifying event occurs, you must make sure that the Plan Administrator is notified of the second qualifying event within 60 days of the second qualifying event.

The 18 months may be extended to 29 months for an individual, and his/her qualified dependents, if the individual is determined to be disabled (for Social Security disability purposes) at the time of the qualifying event or at any time during the first 60 days of continuation coverage, and the Plan Administrator is notified of that determination within 60 days of the date of the determination and before the end of the 19-month period. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled. In no event will continuation coverage last beyond 3 years from the date of the event that originally made a qualified beneficiary eligible to elect coverage.

However, the law also provides that your continuation coverage may be terminated before the end of the maximum period for any of the following five reasons:

(1) The Company no longer provides group health coverage to any of its employees
(2) You do not pay the premium for your continuation coverage on time

11

(3) You become covered under another group health plan after the date of your COBRA election, unless that plan contains any exclusions or limitations with respect to any pre-existing conditions you or your covered dependents may have

(4) You become entitled to Medicare after the date of your COBRA election

(5) You extended coverage for up to 29 months due to your disability and there has been a final determination that you are no longer disabled.

You do not have to show that you are insurable to choose continuation coverage.

**In order to protect your family's rights, you should keep the Plan Administrator informed of any changes in the addresses of family members.** You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

## Maternity and Newborn Coverage

Your Plan provides maternity and newborn infant coverage. Federal law generally prohibits this Plan from restricting benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section. Federal law also generally prohibits the Plan from requiring that a Provider obtain authorization to prescribe a length of stay in excess of the above periods. Please refer to the Covered Services section of the BlueCross BlueShield of Tennessee Evidence of Coverage document for details.

## Qualified Medical Child Support Order

In accordance with section 609(a) of ERISA, the Plan will provide health benefit coverage to a child of a participant in accordance with the terms of any medical child support order that the Plan Administrator determines to be a "qualified medical child support order." A qualified medical child support order is a judgment, decree or order issued by a court, which provides for child support or health benefit coverage relating to benefits under the Plan and which meets certain requirements regarding substance and form. Medical child support orders should be submitted to the Plan Administrator, who will promptly notify the involved individuals of its receipt of the order and of the Plan's procedure for determining whether the order is a qualified order. You may request a copy of the Plan's procedure for determining whether an order is a qualified medical child support order from the Human Resources Department.

## Certificate of Creditable Coverage

A certificate of creditable coverage is a document that reports the period of time that you and/or a dependent have had medical benefits coverage under the Plan without a significant break in coverage.

A certificate of creditable coverage will be provided automatically when your coverage or your dependent's coverage under the Plan terminates. You or your dependents also have the right to request a certificate of creditable coverage from the Plan at any time, as long as your request is made within 24 months after your coverage or your dependent's coverage under the Plan terminates. Requests should be directed to the Human Resources Benefits Department at 1-800-670-1915.

## Medicaid-Eligible Individuals

In determining whether an individual is eligible for health benefit coverage and is making benefit payments, the Plan will not take into account the fact that an individual is eligible for or is covered by Medicaid. In addition, the Plan will make benefit payments in accordance with any assignment of rights made by or on behalf of an individual as required by a state Medicaid program and in accordance with any state law which provides that the state has acquired rights to payment with respect to a participant.

## Mastectomy Benefit Coverage

Under Federal law, group health plans, insurance companies, and health maintenance organizations (HMOs) that provide coverage for medical and surgical benefits for mastectomy must also provide coverage for reconstructive surgery in a manner determined in consultation

with the attending physician and the patient. Required coverage includes reconstruction of the breast on which the mastectomy was performed, surgery and reconstruction of the other breast to produce a symmetrical appearance, and prostheses and treatment of physical complications at all stages of the mastectomy, including lymphedemas. These benefits are subject to the normal deductible and coinsurance provisions that apply to other benefits under your coverage.

### Statement of Rights

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan participants be entitled to:

**Receive Information About Your Plan and Benefits.**

Examine, without charge, at the Plan Administrator's office and at other specific locations all documents governing the Plan including insurance contracts and a copy of the latest annual report (Form 5500) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500) and updated summary plan description.  The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report.  The Plan Administrator is required by law to furnish you with a copy of this summary annual report.

**Continue Group Health Plan Coverage.**
Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event.  You or your dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage.

**Prudent Actions by Plan Fiduciaries.**
In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.  No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights.**
If your claim for a welfare benefit is denied or ignored, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court, provided that you have exhausted your administrative

13

appeal rights. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees.  If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees; for example, if it finds your claim is frivolous.

**Assistance With Your Questions.**
If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest Area Office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**Claims Procedures**

Specific claim procedures for medical benefits are set forth in the medical Evidence of Coverage document. Specific claim procedures for long-term disability benefits, accidental death and dismemberment benefits and group term life insurance benefits are set forth in the certificates of insurance that describe those benefits. The following claim procedures apply to dental and vision benefit claims. References to the insurance carrier refer to Delta Dental Plan of Tennessee for dental benefits and VSP for vision benefits.

If you are required to obtain pre-approval from your insurance carrier as a prerequisite to obtaining a benefit, you should follow the pre-approval procedures established by the insurance carrier.

If you contact your insurance carrier to obtain pre-approval but you fail to follow the pre-approval procedure for filing a pre-service claim, the insurance carrier is required to notify you of this failure and the proper procedure for filing the pre-service claim.  A pre-service claim is a benefit claim that requires some form of pre-approval by the insurance carrier. The notice is required to be provided to you as soon as possible but not later than 5 days after the failure, or, in the case of an urgent care claim (see below), within 24 hours of the failure. The notice may be given to you orally, unless you request a written notice.

You may designate a representative to act on your behalf in pursuing a benefit claim or appealing a denial of a benefit claim by contacting your insurance carrier.  Even if you have not formally designated a representative, your physician or licensed health care professional may act on your behalf as your authorized representative if the benefit claim is an urgent care claim (see below).

The period within which the insurance carrier is required to decide your claim depends upon the type of claim being made.  There are generally three types of claims that can be made under the Plan – a pre-service claim, an urgent care claim, and a post-service claim.

**Pre-Service Claim** – A pre-service claim is a claim for a benefit which requires some form of pre-approval by the insurance carrier.  The insurance carrier must decide a pre-service claim within 15 days.  This 15 day period may be extended for up to an additional 15 days if the insurance company determines the extension is necessary for reasons beyond its control.  The insurance carrier is required to notify a claimant in writing if there is an extension.

**Urgent Care Claim** – An urgent care claim is a pre-service claim where application of the normal period for deciding pre-service claims could jeopardize the life, health or ability to regain maximum function of the claimant, or would subject the claimant to severe pain that cannot be

adequately managed without the care or treatment that is being claimed.  The insurance carrier is required to decide an urgent care claim within 72 hours.

**Post-Service Claim** – A post-service claim is any claim that is not a pre-service claim.  It would include a claim in which the medical procedure has already occurred and the claimant is seeking payment of it or reimbursement for it.  The insurance carrier is required to decide a post-service claim within 30 days.  This 30 day period may be extended for up to an additional 15 days if the insurance carrier determines the extension is necessary for reasons beyond its control.  The insurance carrier is required to notify a claimant in writing if there is an extension.

In addition, some special rules apply where the insurance carrier has already approved an ongoing course of treatment over a period of time or number of treatments.  First, if the insurance carrier reduces or terminates coverage for the course of treatment before it otherwise would have ended, that reduction or termination is a benefit denial.  The insurance carrier must notify the claimant sufficiently in advance of the reduction or termination to allow the claimant to appeal the decision (see Appealing a Claim below) and to obtain a decision on the appeal.  Second, if the claimant requests an extension of the course of treatment at least 24 hours before the course of treatment ends and it is an urgent care situation (see Urgent Care Claim above), the insurance carrier must notify the claimant within 24 hours of its decision on the extension request.

If your claim is allowed, the insurance carrier will notify you who has been paid and the amount that has been paid, or will be paid, in the case of a pre-service claim.

If your claim is denied in whole or in part, you will receive a written notice which must include the following information:

1.    The specific reason or reasons for the denial of all or any portion of the claim.

2.    The specific provisions of the coverage certificate, subscriber contract, the Plan and any other document, on which the denial is based.  If the decision to deny benefits is based, in whole or in part, on a specific internal rule, guideline, protocol or similar criteria, either a copy of the document will be provided to you or you may request a copy of such document from the insurance carrier at no charge.  If the decision to deny benefits is based, in whole or in part, on an exclusion or limitation that the treatment is experimental or investigational, or that the treatment is not medically necessary, either an explanation that applies the appropriate terms to your medical circumstances, and which details the scientific or clinical judgment that led to the decision to deny benefits will be provided to you or you may request such an explanation from the insurance carrier at no charge.

3.    A description of any additional material or information necessary for you to complete the claim, and an explanation as to why such information or material is necessary.

4.    Information as to how you may submit the claim for review and the applicable time limits.

5.    A statement regarding your right to bring a civil suit under federal law should your appeal be denied.

In the case of an urgent care claim, the notice of denial may be provided to you orally within the 72 hour period, so long as a written notice is provided within 3 days thereafter.

You may appeal a claim denial by following the appeal procedure explained below.

<u>**Appealing a Claim**</u>
If you do not agree with the denial or partial denial of your claim or if you have questions concerning your claim, you are encouraged to contact the insurance carrier handling your claim.

If you wish to appeal a claim denial, you may need to complete a form provided and required by your insurance carrier to file your appeal.  In your appeal, you must state that you are requesting

an official review of your claim and the reason(s) why you do not agree with the denial or partial denial of your claims and any additional information pertinent to the claim. You should contact the insurance carrier to bring an appeal.

Except in the case of urgent care claims, the insurance carrier need not consider any telephone inquiry as a request for an official review of a denied claim. However, if the claim which is denied is an urgent care claim, you can request an expedited appeal by calling the insurance carrier handling your claim.

If you want to appeal a denied claim, the insurance carrier must allow you at least 180 days after you receive notice of a denial or partial denial to file the appeal. During the 180 days (or any longer period the insurance carrier may allow), you or your representative may review and obtain from the insurance carrier copies of all documents, records and information relating to your claim. If you wish, you or your representative may submit written issues, comments and additional justification as to why the claim should be allowed. The insurance carrier is required to provide you with the name of each medical or vocational expert whose advice was obtained in connection with your denied claim, regardless of whether the advice was relied upon.

When the insurance carrier reviews a denied claim, it may not afford any deference to the initial decision. The review will be conducted by an individual, committee or department identified in your subscriber contract or coverage certificate. If the benefit denial is based in whole or in part on a medical judgment, such as whether the procedure is experimental or is not medically necessary, the person reviewing the claim at the insurance carrier is required to consult with a health care professional who has appropriate training and experience in the particular field of medicine relating to your claim. This health care professional will be someone who was not consulted on the initial claim denial.

The review of a claim denial is required to be done by the insurance carrier within the following time frames:

**Pre-Service Claim**   If the denied claim was a pre-service claim (other than an urgent care claim) the insurance carrier is required to decide your appeal within 30 days.

**Urgent Care Claim**   If the denied claim was an urgent care claim, the insurance carrier is required to decide your appeal within 72 hours.

**Post-Service Claim**   If the denied claim was a post-service claim, the insurance carrier is required to decide your appeal within 60 days.

The insurance carrier is required to provide you with a written notice of the determination on review. If the denial of your claim is upheld (in whole or in part) the notice is required to include the following information:

1.     The specific reason or reasons for the adverse determination.

2.     The specific provisions of the subscriber contract, certificate of coverage, the Plan and any other document on which the adverse determination is based.

3.     A statement that you may obtain, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits. If any internal rule, guideline, protocol or similar guideline was relied upon in making the adverse determination, the insurance carrier must either provide it to you with the written notice or provide you with a copy of it free of charge upon request. If the adverse determination is based on medical necessity, experimental treatment or a similar exclusion, the insurance carrier must either provide an explanation of the scientific or clinical judgment for the adverse determination to you with the written notice, or provide it to you free of charge upon request.

4.      If the insurance carrier has any voluntary appeal procedures, information regarding those procedures.

Should you have any questions regarding the claims procedure, please contact the Human Resources Benefits Department.

---

| | |
|---|---|
| **Name of Plan:** | U.S. XPRESS Enterprises, Inc.  Employee Benefit Plan |
| **Plan Sponsor:** | U.S. XPRESS Enterprises, Inc. |
| **Plan Administrator:** | U.S. XPRESS Enterprises, Inc. |
| **Address:** | 4080 Jenkins Road<br>Chattanooga, TN 37421 |
| **Telephone:** | 423-510-3000 |
| **Employer ID:** | 62-1378182 |
| **Plan #:** | 501 |

**Agent for Service of Legal Process**: Vice President & General Counsel

| | |
|---|---|
| **Address:** | 4080 Jenkins Road<br>Chattanooga, TN 37421 |

**Service of Legal Process may be made on the Plan Administrator.**

| | |
|---|---|
| **Plan Year:** | Calendar Year |

**Type of Plan:** Welfare plan providing health (hospitalization, physician visits, prescription drugs, outpatient services and preventative services), dental, vision, long-term disability, AD&D and group term life. The Plan is also an Internal Revenue Code section 125 plan and an Internal Revenue Code section 129 plan.

**Funding:** Except for medical benefits, benefits are fully insured. Medical benefits are self-insured with claims paid from the general assets of the Company and employee contributions. Premiums for fully insured benefits are paid in whole or part by the Company out of its general assets and in part by the Employee's pre-tax or post-tax payroll deductions. The Plan Administrator provides a schedule of the applicable premiums during the initial and subsequent annual enrollment periods and on request for each of the component benefit programs, as applicable.

**Claims Administrators and Insurance Carriers:**

1.  Blue Cross Blue Shield of Tennessee, Inc.
    1 Cameron Hill Circle
    Chattanooga, TN  37402-2555
    (800) 565-9140

2.  PayFlex Systems USA, Inc.
    P.O. Box 3039
    Omaha, NE 68103-3039
    (800) 284-4885

3.  Delta Dental Plan of Tennessee
    240 Venture Circle
    Nashville, TN  37228
    (800) 223-3104

4.  Express Scripts
    N 19 W24130 Riverwood Drive
    Waukesha, WI  53188
    800-721-3501

5.  VSP
    3091 Governors Lake Drive, Suite 240
    Norcross, GA  30071
    (800) 877-7195

6.  Unum
    1 Fountain Square
    Chattanooga, TN 37402
    (877) 281-1746

7.  Allstate Workplace Division
    1776 American Heritage Life Drive
    Jacksonville, FL 32224
    1-800-521-3535

# Medical Coverage

| 2014 Medical Benefits Quick Reference Guide | | | | |
|---|---|---|---|---|
| **Tier** | **Standard Plan** | | **Premium Plan** | |
| WEEKLY PREMIUMS | | | | |
| | Weekly Rate | Non-Tobacco Discounted Rate | Weekly Rate | Non-Tobacco Discounted Rate |
| Employee Only | $47 | $27 | $103 | $83 |
| Employee + Child(ren) | $71 | $51 | $184 | $164 |
| Employee + Spouse* | $105 | $85 | $231 | $211 |
| Family* | $113 | $93 | $320 | $300 |
| COVERAGE HIGHLIGHTS | | | | |
| Physician Office Visits Non-Specialists Specialists | 100% after copay: $35 $45 | | 100% after copay: $30 $40 | |
| Preventive Care | No maximum for approved services 100% | | No maximum for approved services 100% | |
| Inpatient Hospital Services | 70% after deductible | | 80% after deductible | |
| Emergency Room | $475 copay, deductible & co-insurance | | $475 copay, deductible & co-insurance | |
| Outpatient Services | 70% after deductible | | 80% after deductible | |
| DEDUCTIBLE | | | | |
| Individual | $1,200 | | $600 | |
| Maximum/Family | $2,400 | | $1,200 | |
| ANNUAL OUT-OF-POCKET MAXIMUM | | | | |
| Individual | $6,000 | | $4,250 | |
| Maximum/Family | $9,000 | | $8,500 | |
| ANNUAL LIMIT | | | | |
| Individual | Unlimited | | Unlimited | |
| PRESCRIPTION DRUGS | *Prescription Drug Deductible $120* | | | |
| **At the Pharmacy** *(for to a 30-day supply)* | | | | |
| Generic | $10 copay | | $10 copay | |
| Preferred Brand | $35 copay | | $35 copay | |
| Non-Preferred Brand | $60 copay | | $60 copay | |
| Specialty | 10% up to $250 maximum copay | | | |
| **Through Mail-Order** *(for a 90-day supply)* | | | | |
| Generic | $25 copay | | $25 copay | |
| Preferred Brand | $87.50 copay | | $87.50 copay | |
| Non-Preferred Brand | $150 copay | | $150 copay | |

* Please remember that a spousal surcharge of $20 per week applies if your spouse has access to another employer-sponsored health plan, but chooses to remain on the XGS medical plan.

Please contact the Benefits Department for a complete copy of the Evidence of Medical Coverage.

**Delta Dental of Tennessee**
**Certificate of Coverage – Benefit Summary Page**
**Dual High Option Plan**

**Group Name:** US Xpress  **Group Number:** 7496
**Provider Network:** Delta Dental PPO (Point-of-Service)  **Benefit Year:** January 1 through December 31

**Deductible** - $50 Deductible per person total per Benefit Year limited to a maximum Deductible of $150 per family per Benefit Year.  The deductible does not apply to oral exams, preventive, x-rays, sealants, periodontal maintenance, full mouth debridement, cephalometric films, diagnostic casts, photos, and orthodontics.

**Covered Services –**

| | PPO Dentist | Premier Dentist | Non-participating Dentist |
|---|---|---|---|
| | Plan Pays | Plan Pays | Plan Pays* |
| **Diagnostic & Preventive** | | | |
| **Diagnostic and Preventive Services** - exams, cleanings, fluoride, and space maintainers | 100% | 100% | 100% |
| **Sealants** - to prevent decay of permanent teeth | 100% | 100% | 100% |
| **Brush Biopsy** - to detect oral cancer | 100% | 100% | 100% |
| **Radiographs** - X-rays | 100% | 100% | 100% |
| **Periodontal Maintenance** - cleanings following periodontal therapy | 100% | 100% | 100% |
| **Basic Services** | | | |
| **Emergency Palliative Treatment** - to temporarily relieve pain | 90% | 80% | 80% |
| **Minor Restorative Services** - fillings | 90% | 80% | 80% |
| **Endodontic Services** - root canals | 90% | 80% | 80% |
| **Periodontic Services** - to treat gum disease | 90% | 80% | 80% |
| **Oral Surgery Services** - extractions and dental surgery | 90% | 80% | 80% |
| **Other Basic Services** - misc. services | 90% | 80% | 80% |
| **Adjustments and Repairs** - to bridges and dentures | 90% | 80% | 80% |
| **Major Services** | | | |
| **Crown Repair** - to individual crowns | 60% | 50% | 50% |
| **Major Restorative Services** - crowns | 60% | 50% | 50% |
| **Anesthesia Services** - when medically necessary | 60% | 50% | 50% |
| **Relines and Rebase** - to dentures | 60% | 50% | 50% |

Customer Service Toll-Free Number: 800-223-3104
www.DeltaDentalTN.com
August 1, 2013

20

| | | | |
|---|---|---|---|
| **Implant Repair** - implant maintenance, repair, and removal | 60% | 50% | 50% |
| **Prosthodontic Services** - bridges, implants, and dentures | 60% | 50% | 50% |
| **Orthodontic Services** | | | |
| **Orthodontic Services** - braces | 50% | 50% | 50% |
| **Orthodontic Age Limit** - | Up to age 19 | Up to age 19 | Up to age 19 |

\* When you receive services from a Nonparticipating Dentist, the percentages in this column indicate the portion of Delta Dental's Nonparticipating Dentist Fee that will be paid for those services. The Nonparticipating Dentist Fee may be less than what your dentist charges and you are responsible for that difference.

➢ Oral exams (including evaluations by a specialist) are payable twice in any period of 12 consecutive months.
➢ Prophylaxes (cleanings) are payable twice in any period of 12 consecutive months.
➢ People with specific at-risk health conditions may be eligible for additional prophylaxes (cleanings) or fluoride treatment. The patient should talk with his or her dentist about treatment.
➢ Fluoride treatments are payable twice in any period of 12 consecutive months for people up to age 19.
➢ Space maintainers are payable once per area per lifetime for people up to age 15.
➢ Bitewing X-rays are payable once in any period of 12 consecutive months and full mouth X-rays (which include bitewing X-rays) are payable once in any three-year period, whether provided by a general dentist or specialist.
➢ Sealants are payable once per tooth per lifetime for the occlusal surface of first and second permanent molars up to age 16. The surface must be free from decay and restorations.
➢ Composite resin (white) restorations are Covered Services on posterior teeth.
➢ Implants and implant related services are payable once per tooth in any five-year period.

**Maximum Payment** - $2,000 per person total per Benefit Year on all services, except cephalometric film, photos, diagnostic casts, and orthodontics. $2,000 per person total per lifetime on cephalometric film, photos, diagnostic casts, and orthodontic services.

**Special Enrollment Notations** - Employees are eligible on the first of the month following 90 days of continuous employment.

Dependent Age Limit: <u>26</u>

Customer Service Toll-Free Number: 800-223-3104
www.DeltaDentalTN.com
August 1, 2013

21

---

**Delta Dental of Tennessee**
**Certificate of Coverage – Benefit Summary Page**
**Dual Low Option Plan**

---

**Group Name:** US Xpress  **Group Number:** 7496
**Provider Network:** Delta Dental PPO (Point-of-Service)  **Benefit Year:** January 1 through December 31

**Deductible** - $50 Deductible per person total per Benefit Year limited to a maximum Deductible of $150 per family per Benefit Year. The deductible does not apply to oral exams, preventive, x-rays, sealants, periodontal maintenance, full mouth debridement, and cephalometric films.

**Covered Services –**

| | PPO Dentist | Premier Dentist | Non-participating Dentist |
|---|---|---|---|
| | Plan Pays | Plan Pays | Plan Pays¹ |
| **Diagnostic & Preventive** | | | |
| Diagnostic and Preventive Services - exams, cleanings, fluoride, and space maintainers | 100% | 100% | 100% |
| Sealants - to prevent decay of permanent teeth | 100% | 100% | 100% |
| Brush Biopsy - to detect oral cancer | 100% | 100% | 100% |
| Radiographs - X-rays | 100% | 100% | 100% |
| Periodontal Maintenance - cleanings following periodontal therapy | 100% | 100% | 100% |
| **Basic Services** | | | |
| Emergency Palliative Treatment - to temporarily relieve pain | 50% | 50% | 50% |
| Minor Restorative Services - fillings and crown repair | 50% | 50% | 50% |
| Endodontic Services - root canals | 50% | 50% | 50% |
| Periodontic Services - to treat gum disease | 50% | 50% | 50% |
| Oral Surgery Services - extractions and dental surgery | 50% | 50% | 50% |
| Major Restorative Services - crowns | 50% | 50% | 50% |
| Other Basic Services - misc. services | 50% | 50% | 50% |
| Relines and Repairs - to bridges, dentures, and implants | 50% | 50% | 50% |
| **Major Services** | | | |
| Prosthodontic Services - bridges, implants, and dentures | 50% | 50% | 50% |

Customer Service Toll-Free Number: 800-223-3104
www.DeltaDentalTN.com
August 1, 2013

\* When you receive services from a Nonparticipating Dentist, the percentages in this column indicate the portion of Delta Dental's Nonparticipating Dentist Fee that will be paid for those services. The Nonparticipating Dentist Fee may be less than what your dentist charges and you are responsible for that difference.

- Oral exams (including evaluations by a specialist) are payable twice in any period of 12 consecutive months.
- Prophylaxes (cleanings) are payable twice in any period of 12 consecutive months.
- People with specific at-risk health conditions may be eligible for additional prophylaxes (cleanings) or fluoride treatment. The patient should talk with his or her dentist about treatment.
- Fluoride treatments are payable twice in any period of 12 consecutive months for people up to age 19.
- Space maintainers are payable once per area per lifetime for people up to age 15.
- Bitewing X-rays are payable once in any period of 12 consecutive months and full mouth X-rays (which include bitewing X-rays) are payable once in any three-year period, whether provided by a general dentist or specialist.
- Sealants are payable once per tooth per lifetime for the occlusal surface of first and second permanent molars up to age 16. The surface must be free from decay and restorations.
- Composite resin (white) restorations are Covered Services on posterior teeth.
- Implants and implant related services are payable once per tooth in any five-year period.

**Maximum Payment** - $1,000 per person total per Benefit Year on all services.

**Special Enrollment Notations** - Employees are eligible on the first of the month following 90 days of continuous employment.

Dependent Age Limit: 26

# Dental Coverage

Dental coverage is an important part of the overall health care benefits that are available to you.

The plan pays for diagnostic and preventive services (with no deductible) when you use participating dentists and covers many additional procedures when more extensive care is needed.

The plan is administered by Delta Dental, which has more than 196,000 dentists in its national network. To locate a provider near you, log on to www.deltadentaltn.com (choose the DeltaPremier option) or call (800) 223-3104.

| Dental Benefits | Dual Plans | |
|---|---|---|
| | High Plan | Low Plan |
| **Deductible:**<br>Individual<br>Family Limit | $50<br>$150 | $50<br>$150 |
| **Annual Maximum:**<br>Preventive Services included in Annual Maximum | $2,000<br>Yes | $1,000<br>Yes |
| COVERED SERVICES | | |
| Type I:   Preventive Care<br>Type II:   Basic Services<br>Type III:  Major Services<br>Type IV:  Orthodontia | 100%<br>90% after deductible<br>60% after deductible<br>50% | 100%<br>50% after deductible<br>50% after deductible<br>None |
| Orthodontia Lifetime Maximum: | $2,000 | None |
| Child Orthodontia Age Limit: | To age 19 | N/A |
| Out of Network Reimbursement Schedule: | Delta's Max Allowable Fee | Delta's Max Allowable Fee |
| Where Endo, Perio, and Oral Surgery are covered: | Basic Services | Basic Services |
| Waiting Periods for Services: | None | None |
| WEEKLY RATES | High Plan | Low Plan |
| Employee Only<br>Employee + Family | $6.09<br>$16.42 | $4.24<br>$11.43 |

# Vision Coverage

VSP is a single vision plan that offers you the savings of VSP's nationwide network as well as the flexibility to be reimbursed for services rendered at any eye care provider. With VSP's Open Access plan, you can be reimbursed for exams, frames, and lenses at ANY out of network provider up to the maximum reimbursement amounts listed below. For more information or to speak with a VSP representative, call (800) 877-7195.

After you enroll, watch for VSP ID cards to be sent to your home address on record.

| Vision Coverage | Description | Copay | Frequency |
|---|---|---|---|
| **Your Coverage with a VSP Doctor** | | | |
| WellVision Exam | • Focuses on your eyes and overall wellness | $20 | Every Calendar year |
| Prescription Glasses | | $20 | See frame and lenses |
| Frame | • $170 allowance for a wide selection of frames<br>• 20% off amount over your allowance | Included in Prescription Glasses | Every other calendar year |
| Lenses | • Single vision, lined bifocal, and lined trifocal lenses<br>• Polycarbonate lenses for dependent children | Included in Prescription Glasses | Every calendar year |
| Lens Options | • Scratch-resistant coating<br>• Standard progressive lenses<br>• Premium progressive lenses<br>• Custom progressive lenses<br>• Average 20-25% off other lens options | $0<br>$55<br>$95 - $105<br>$150 - $175 | Every calendar year |
| Contacts (instead of glasses) | • $150 allowance for contacts and contact lens exam (fitting and evaluation)<br>• 15% off contact lens exam (fitting and evaluation) | $0 | Every calendar year |
| Extra Savings and discounts | **Glasses and Sunglasses**<br>• 20% off additional glasses and sunglasses, including lens options, from any VSP doctor within 12 months of your last WellVision Exam<br><br>**Laser Vision Correction**<br>• Average 15% off the regular price or 5% off the promotional price; discounts only available from contracted facilities | | |
| Your Weekly Contribution | $1.74 Employee only            $2.63 Employee + 1            $4.58 Employee + family | | |
| **Your Coverage with Other Providers** | | | |

Visit vsp.com for details, if you plan to see a provider other than a VSP doctor.

Exam .................up to $65            Single Vision Lenses ..........up to $51            Lined Trifocal Lenses .........up to $104            Contacts.........up to $125
Frame ..............up to $88            Lined Bifocal Lenses ..........up to $76            Progressive Lenses ...........up to $186

VSP guarantees coverage from VSP doctors only. Coverage information is subject to change. In the event of a conflict between this information and your organization's contract with VSP, the terms of the contract will prevail.

## VSP's New Open Access
## Out of Network Benefit

**Use your benefit at any eyecare location.**
• Use your benefit anywhere.
• From malls and community settings to retail and medical settings, choose the location that's best for your circumstances.

**Choose any brand of glasses or contact lenses.**
• From affordable and high-end eyewear to popular name brands, you can select the eyewear that's just right for you.
• You are never limited to specific store brands or on-hand stock.

**With VSP Open Access, you have reimbursement choices.**
• You can pay the open access provider directly and submit to VSP for reimbursement, up to the open access schedule.
• You can also ask the open access providers to submit for reimbursement on your behalf. You won't need to pay your entire bill up front and will only be responsible for paying applicable copays, and any balance above the open access schedule.

25

**Xpress Global Systems Employee Benefit Plan**
**Brief Summary of Basic Life, Supplemental Life & AD&D,**
**Long-Term Disability and Short-Term Disability Benefits for Driver Employees**

## BASIC LIFE

- Xpress Global Systems provides a benefit of $10,000 on the 91st day of full-time employment. The amount of Basic Life, Supplement Life and AD&D will be reduced to $6500, or 65%, of the pre-age amount at age 65 and shall be further reduced to $5000, or 50%, of the pre-age amount at age 70 and terminates at retirement.

## SUPPLEMENTAL LIFE & AD&D

- In addition to the Life insurance coverage provided for you by Xpress Global Systems, you have the option of purchasing additional amounts of Life Insurance for yourself and your family. Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment. If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period. The amount of Life, Supplement Life and AD&D will be reduced to 65% of the pre-age amount at age 65 and shall be further reduced to 50% of the pre-age amount at age 70 and terminates at retirement.

- You will be allowed to purchase coverage in increments of $10,000 up to the lesser of $200,000 or 5 times your salary on yourself. You may also purchase coverage on your Spouse in increments of $5,000 up to the lesser of $200,000 (proof of good health required for amounts over $50,000) or the amount of life insurance on yourself. You are also eligible to purchase coverage for your children in the increments of $2,500 up to a maximum of $10,000 for dependent child(ren). Please note that the maximum coverage amount from live birth up to age six months is $2,500. Children may be covered up to age 19 or to age 26 if full-time student.

- Accidental Death & Dismemberment (AD&D) insurance is available in $10,000 units up to $200,000 or 5 times your salary, whichever is less on you and in $5,000 units for your spouse. AD&D is available for your dependent child(ren) in $2,500 units up to $10,000.

- If you decline coverage during the new hire process, and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

- Please refer to the Xpress Benefits Guide for pricing on these benefits.

## ADDITIONAL FEATURES INCLUDED

- Worldwide Emergency Travel
- Accelerated Death Benefit of 75% of Benefit Amount up to $500,000
- Waiver of Premium in Event of Total Disability
- Ability to port and/or convert supplementary life insurance plans within 30 days of leaving employment

## DRIVER SHORT TERM DISABILITY

A summary of the Short-Term Disability benefits included in this plan is as follows:

- Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment. If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period provided an EOI form is completed by the employee and approved by Unum.

26

- Benefits payable for Physician covered Non-Occupational disabilities

- Benefits begin on the 15th day of disability for either Accident or Sickness.

- Xpress Global Systems provides a company-paid $200 weekly benefit for full-time employees.

- Employees can purchase coverage in increments of $50 to a weekly maximum of $450 not to exceed 60% of weekly earnings

- The benefit is based on the average gross income for the 12 weeks immediately preceding the date of disability.

- The benefit will be payable as long as you are disabled up to 13 weeks.

- Maternity is covered the same as any other disability.

- If you decline coverage during the new hire process, and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

For the exact cost of this plan, please refer to the Xpress Benefits Guide.

## DRIVER LONG TERM DISABILITY

- Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment.  If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period provided an EOI form is completed by the employee and approved by Unum.

- Provides benefits for covered disabilities (Occupational and Non-Occupational)

- Eligible class:  Drivers

- Benefit is available in increments of $50 starting from $200 to $450 of weekly benefit not to exceed 60% of your covered monthly earnings to a maximum monthly benefit of $1,950 ($3,250 of covered monthly earnings).

- The benefit is based on the average gross income for the 12 weeks immediately preceding the date of disability.

- Benefit is payable after the 90 day elimination period is satisfied by a covered disability.  This elimination period begins first day of disability and includes any time covered by Short-Term Disability.

- 6/12/24 Pre-Existing condition limitation

- Benefit is payable, as long as you are disabled, up to two years.

- Partial & Residual coverage included (total disability is never required)

- If you decline coverage during the new hire process, and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

- The lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months. Only 24 months of benefits will be paid even if the disabilities:

27

- are not continuous; and/or
- are not related.

However, Unum will send you payments beyond the 24 month period if you meet one of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Unum will continue to send you payments during your confinement.

If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. If you are not confined to a hospital or institution but become confined for a period of at least 14 days within 90 days after the 24 month period for which you have received payments, Unum will send payments during the length of the confinement.

Under no circumstances will Unum pay beyond the maximum period of payment as Indicated in the BENEFITS AT A GLANCE section of your policy.

Unum will not apply the mental illness limitation to dementia if it is a result of:
- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

For the exact cost of this plan, please refer to the Xpress Benefits Guide.

**THIS IS NOT A CONTRACT**. This summary is not intended as a complete description of Unum's insurance coverage. The controlling provisions are provided in the policy, and this summary does not modify those provisions or the insurance in any way.

Coverage provided by Unum under Policy Number 294727-002.

## FULL DESCRIPTIONS IN CERTIFICATE OF INSURANCE

This summary of benefits is not a complete description of the Basic Life, Supplemental Life & AD&D, Long-Term Disability and Short-Term Disability benefits under the Plan.  Detailed descriptions are contained in the certificates of insurance for each benefit, which may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

# Xpress Global Systems
# EMPLOYEE BENEFIT PLAN



## SUMMARY PLAN DESCRIPTION FOR OFFICE EMPLOYEES

### Introduction

This is a Summary Plan Description of the Xpress Global Systems Employee Benefit Plan (called the "Plan" in this summary) as in effect January 1, 2014.  If you have questions after reading the Summary, please contact the employee benefits department at 1-800-670-1915. As stated in the administrative information section of this Summary, the legal name of the Plan is the U.S. Xpress Enterprises, Inc. Employee Benefit Plan.

This Summary cannot modify the terms of the Plan document. If there are inconsistencies between the Summary and the Plan document, the Plan document will control. Xpress Global Systems (called the "Company" in this Summary) has the right to terminate its participation in the Plan and U.S. Xpress Enterprises, Inc. has the right to amend or terminate the Plan at any time.  This version of the Summary Plan Description describes benefits provided to employees who are classified as Office Employees by the Company.  For Xpress Global System employees, the Plan is known as the Xpress Global Systems Employee Benefit Plan.  There may be other versions of the Summary Plan Description for the U.S. Xpress Enterprises, Inc. Employee Benefit Plan that apply to employees classified by the Company as Drivers and to U.S. Xpress and Total Transportation employees.

This group health plan believes it is a "grandfathered health plan" under the Patient Protection and Affordable Care Act (the Affordable Care Act).  As permitted by the Affordable Care Act, a grandfathered health plan can preserve certain basic health coverage that was already in effect when that law was enacted.  Being a grandfathered health plan means that your plan may not include certain consumer protections of the Affordable Care Act that apply to other plans; for example, the requirement for the provision of preventive health services without any cost sharing.  However, grandfathered health plans must comply with certain other consumer protections in the Affordable Care Act; for example, the elimination of lifetime limits on benefits.

Questions regarding which protections apply and which protections do not apply to a grandfathered health plan and what might cause a plan to change from grandfathered health plan status can be directed to the plan administrator at (800) 670-1915.  You may also contact the Employee Benefits Security Administration, U.S. Department of Labor at 1-866-444-3272 or www.dol.gov/ebsa/healthreform.  This website has a table summarizing which protections do and do not apply to grandfathered health plans.

## Eligibility

Any employee of the Company or an affiliated business that has adopted the Plan who is required to work at least <u>30</u> hours per week, and who receives W-2 compensation is eligible to participate in the Plan. A list of the affiliated business(es) that have adopted the Plan is at the end of this document. Coverage for benefits under the Plan begins on the 91st day of employment. The company will honor time worked as a contractor or temporary worker (for US Xpress) in determining the 90 days waiting period. In certain cases where an individual becomes an employee of the Company (or an affiliated business that has adopted the Plan) as a result of the Company's (or affiliated business's) acquisition of another business, the employee may be given credit for his or her service with the acquired business for purposes of determining the effective date of the employee's coverage under the Plan. For medical, dental and vision benefits, you may elect to cover your eligible dependents. Your eligible dependents are the following:

1. Your legal spouse, as determined under the law of the state in which you are a resident. Domestic partners who are not legal spouses as described above are not eligible for medical benefits. You will need to provide proof of spousal status.

2. Your or your legal spouse's biological child, legally adopted child (including children placed for adoption), step-child, eligible foster children or child for whom you or your legal spouse is the legal guardian, provided that the child is less than 26 years old. If you have dependents, you'll need to provide proof of dependent status prior to enrolling them. Documentation may include the appropriate marriage license, birth certificate, or court order. You may also be required to provide documentation of their continued eligible status from time to time after they are initially enrolled for coverage.

3. Your or your legal spouse's child for whom a qualified medical child support order has been issued.

4. Your or your legal spouse's unmarried child (as described above) who is, and continues to be, both (i) incapable of self-sustaining employment by reason of mental retardation or physical handicap; and (ii) chiefly dependent upon you or your legal spouse for economic support and maintenance, provided that you furnish proof of such incapacity and dependent within 30 days of the child's attainment of the applicable limiting age and subsequently as may be required. In addition, the child must be a dependent enrolled in the Plan prior to attaining the applicable limiting age.

## Benefit Options

The Benefit Options under the Plan are: medical, dental & vision insurance, short and long-term disability, AD&D, group term life, dependent care assistance benefits and medical reimbursement benefits. For all benefits, eligibility begins on the 91st day of full-time (at least 30 hours per week) employment.

## Enrollment and Elections

In order to participate in the Plan, you must complete the enrollment process during an enrollment period. During the enrollment process, you will select the benefits you would like to enroll in and agree to reduce your pay for each payroll period to pay for your share of the cost of the benefit elected. Office Employees who elect dependent care assistance and/or medical reimbursement benefits must indicate the amount they want to contribute to their dependent care and/or medical reimbursement benefit spending account for the Plan Year.

The enrollment periods for the Plan are as follows:

1. <u>Initial (New Hire) Enrollment Period:</u> The date you first satisfy the Plan's eligibility requirements. This is the first time you may complete the enrollment process.

2

2. <u>Regular Re-Enrollment Period:</u>  The re-enrollment period in the Fall of each year. At this time, an eligible employee or participant may add, change or revoke existing elections. New elections will be effective at the beginning of the following Plan Year (January 1st). The Plan Year is January 1 to December 31 of each year.  If you wish to add Dependents during the re-enrollment period, you must submit Dependent Verification.*

3. <u>Special Enrollment Period (Change of Election):</u>  The <u>30</u> day period following an approved Change in Status or a Change in Coverage Event.  You must complete a Change in Status form and submit Dependent Verification (if applicable) to the Company within **30** days of the event.*

\* By submitting Dependent Verification, you are acknowledging that you understand the Plan's eligibility requirements and certifying that the dependent(s) whom you are enrolling satisfy those requirements.  Falsification of any forms constitutes fraud or an intentional misrepresentation of material fact and may result in the cancellation of coverage and in your being financially and legally responsible for any claims paid for an ineligible dependent who was enrolled in the Plan. Once you have made your election, you are not permitted to change it before the next regular re-enrollment period, unless you have experienced a qualifying "Change in Status" or other "Change in Cost/Coverage" event as described in the "Change in Elections" section below.

## Termination of Participation

Your participation will terminate:
- Upon termination of employment;
- Upon retirement;
- If you become permanently and totally disabled;
- If you transfer to an ineligible employment category; or
- Upon nonpayment of benefit premiums within designated timeframe.

Your participation will automatically stop if the Plan is terminated.

## Contributions

1. Each payroll period, your employer will reduce your taxable income by your share of the cost of the medical, dental, vision, medical reimbursement and dependent care assistance benefits you have elected for the Plan Year. These are pre-tax deductions. Your contributions for AD&D and group term life, short and long-term disability benefits are deducted from your pay on a post-tax basis. Your employer will credit the amount to a separate account to pay for each benefit you select. Employees' share of the cost of benefits under the Plan is set forth in the Annual Benefit Guide and may be changed by the Company from time to time. If your share of the cost increases during a Plan Year, either due to an increase in the cost of the benefit or a decrease in the Company's contribution toward the cost, your contribution amount will be adjusted automatically. An amount credited to an account for one benefit cannot be used to pay for another benefit.

2. If the reduction amount exceeds the cost of the benefit, you will not receive money back at the end of the Plan Year.

3. If you need to go on leave for any reason, you will need to make arrangements to continue paying premiums for your insurance benefits.  Payments should be mailed to:
   U.S. Xpress Direct
   Attention: Benefits Department
   4080 Jenkins Rd
   Chattanooga, TN 37421

4. If you are enrolled in any Allstate Workplace Division supplemental products and you miss a monthly payment you will then be set up as a self payment through Allstate.

## Description of Benefits

**Medical Benefits**   Medical benefits under the Plan (including prescription drug benefits) are provided on a self-insured basis by the Company, with claims paid from the general assets of the Company and by Employees' contributions. Claim payments are paid first from employee contributions and then, to the extent necessary, from the Company's general assets. The Company

3

has a contract with Blue Cross Blue Shield of Tennessee, Inc. ("BCBST") to process claims for medical benefits under the Plan. Two coverage levels are available: standard plan and premium plan. A detailed description of medical benefits is contained in the "Evidence of Coverage" document prepared by BCBST, which forms part of this Summary Plan Description. The Company has delegated to BCBST the exclusive discretionary authority to decide claims for medical benefits under the Plan, including the right to make final determinations on appeals of denied claims. BCBST's authority includes the right to make factual determinations with regard to medical benefits provided under the Plan.

The Company has a contract with Express Scripts to process claims for prescription drugs under the Plan under a self-insured arrangement. A detailed evidence of coverage booklet may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915. The Company has delegated to Express Scripts the exclusive discretionary authority to decide claims for prescription drug benefits under the Plan, including the right to make factual determinations with regard to prescription drug benefits under the Plan.

**Dental Benefits**   Dental benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Delta Dental Plan of Tennessee ("Delta Dental"). Premiums for dental coverage are paid solely by the covered employee. The Company does not contribute toward the cost of dental benefits. A detailed description of dental benefits is contained in the benefit description document prepared by Delta Dental, which forms part of this Summary Plan Description and is attached at the end of this Summary. Delta Dental has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether benefits are payable under the contract and the amount of such benefits.

**Vision Benefits**   Vision benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Vision Service Plan ("VSP"). Premiums for vision coverage are paid solely by the covered employee. The Company does not contribute toward the cost of vision benefits. A description of vision benefits is contained in the benefit description document prepared by VSP, which forms part of this Summary Plan Description and is attached at the end of this Summary. VSP has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits.

**Long-Term Disability Benefits**   Long-term disability ("LTD") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Unum. A detailed description of the LTD benefits is contained in the separate certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. Premiums for LTD coverage are paid solely by the covered employee. Employee premiums are paid on an after-tax basis. Unum has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits. A brief summary of the LTD benefits is attached at the end of this Summary. A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Short-Term Disability Benefits**   Short-term disability ("STD") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Unum. A detailed description of the STD benefits is contained in the separate certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. The Company provides full-time employees with $200 of weekly STD pay (eligible on the 91st day of employment). Employees may purchase additional STD benefit from $50 per week to $950 (maximum of up to 60% of base salary). Employee premiums are paid on an after-tax basis. Unum has exclusive discretionary authority to determine eligibility for coverage under the terms of the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits. As described in the certificate of insurance, benefits payable under the insurance contract will be reduced by any benefit

4

payable under any state statutory disability benefit plan. A brief summary of the STD benefits is attached at the end of this Summary.  A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Accidental Death and Dismemberment Benefits**   Accidental death and dismemberment ("AD&D") benefits under the Plan are provided on a fully-insured basis through an insurance contract issued by Unum.  AD&D coverage is available on a voluntary basis and premiums for AD&D coverage are paid entirely by the covered employee on an after-tax basis. A detailed description of AD&D benefits is contained in the certificate of insurance document prepared by Unum, which forms part of this Summary Plan Description. Unum has exclusive discretionary authority to determine eligibility for coverage under the insurance contract and to determine whether any benefits are payable under the contract and the amount of such benefits. A copy of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Group Term Life Benefits** The Plan provides basic group term life insurance benefits as well as voluntary supplemental group term life insurance benefits on a fully-insured basis through contracts issued by Unum. Premiums for $10,000 of basic group term life insurance on the employee's life are paid entirely by the Company. Basic group life insurance is effective beginning the 91st day of employment.  Voluntary supplemental group term life insurance is available on a voluntary basis and premiums are paid entirely by the covered employee. Voluntary supplemental coverage is available for the employee as well as the employee's dependents. A detailed description of group term life benefits is contained in the certificate of insurance documents prepared by Unum, which form part of this Summary Plan Description. Unum has exclusive discretionary authority to determine eligibility for coverage under the insurance contracts and to determine whether any benefits are payable under the contracts and the amount of such benefits. Please note that voluntary supplemental coverage for the employees' spouses and dependents is not provided through the Plan's Internal Revenue Code section 125 provisions. Employee contributions are made on an after-tax basis.  A brief summary of the basic and supplemental life benefits is attached at the end of this Summary.  A copy of the certificate of the certificate of insurance coverage may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Dependent Care Assistance and Medical Reimbursement Benefits**   Dependent care assistance and medical reimbursement benefits are available to Office Employees. Office Employees who elect dependent care assistance and/or medical reimbursement benefits must specify the amount they would like to contribute for such benefits on a pre-tax basis. Enrollments in these benefits are only allowed during open enrollment following 90 days of employment. The Company has a contract with PayFlex Systems USA, Inc. to process claims for dependent care and medical reimbursement benefits.  A detailed description of dependent care assistance and medical reimbursement benefits is contained in the separate summary of dependent care and medical reimbursement benefits document, which forms part of this Summary Plan Description for Office Employees.  A copy of the detailed summary may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

## Changes in Elections

Due to Internal Revenue Service regulations, your benefit elections must remain in effect until the beginning of the next Plan Year (the following January 1).  As explained previously, each Fall, there will be a regular re-enrollment period during which you can make elections for the next Plan Year. The only times you are permitted to make an election change before the next Plan Year are:
- if there is a "Change in Status" and your election change complies with the Consistency Rule.
- if there is a qualified "Change in Cost / Coverage" event.
You must complete a Change in Status/ Election form within 30 days of the event(s) and the Company must approve the change.

5

**Change in Status Events**
1. **Change in employee's legal marital status**– Including marriage, divorce, death of spouse, legal separation, and annulment.
2. **Change in number of dependents**– Including birth, adoption, placement for adoption, and death.
3. **Change in employment status**– Employment status change of the employee or spouse. Commencement or termination of employment; strike or lockout; return from unpaid leave of absence; promotion or demotion, change in worksite affecting benefits; employment status change with the consequence that the individual becomes (or ceases to be) eligible under the plan.
4. **Dependent satisfies (or ceases to satisfy) eligibility requirements** –An event that causes a dependent to satisfy or cease to satisfy the requirements for coverage due to attainment of age.
5. **Residence change -** A change in the place of residence of an employee, spouse or dependent if the change in residence affects the eligibility for coverage.

**Consistency Rules**
1. **General consistency rule-** In order to change an election due to a "Change in Status" the election change must be on account of and correspond with a change in status event that affects coverage eligibility of the employee, spouse or dependent under an employer's plan.
2. **Special consistency rule for loss of dependent eligibility–** If the change in status is the employee's divorce, annulment or legal separation from a spouse, the death of a spouse or dependent, or a dependent's ceasing to satisfy the eligibility requirements for coverage, then the employee can cancel accident or health insurance coverage for only the spouse or dependent, as applicable.
3. **Consistency rule for gain of coverage eligibility under another employer plan-** If an employee, spouse or dependent gains eligibility for coverage under another employer's plan (or qualified benefit) as a result of a change in marital status or a change in employment status, then an employee's election under the plan to cease or decrease coverage for that individual under the plan corresponds with that change in status only if coverage for that individual becomes effective or is increased under the other employer's plan.

**Change in Cost/Coverage**
1. **Significant Cost Increase–** If the cost of a benefit package option significantly increases during a Plan Year, you may revoke your elections and, in lieu thereof, elect to receive on a prospective basis coverage under another benefit package option providing similar coverage. Dropping coverage altogether is not allowed.
2. **Significant Curtailment of Coverage–** If the coverage under a benefit option is significantly curtailed or ceases during a Plan Year, affected employees may revoke their elections under that benefit option and make a new election for coverage under another benefit package option providing similar coverage. IRS regulations provide that coverage under an accident or health plan is significantly curtailed "only if there is an overall reduction in coverage provided to participants under the plan so as to constitute reduced coverage to participants generally". A single provider leaving a network of providers would not permit an election change.
3. **Addition or Elimination of Benefit Package Option–** If during a Plan Year, the Plan adds a new coverage option (or eliminates an existing option) affected employees may elect the newly-added option (or elect another option if an option has been eliminated) prospectively and make a corresponding election change with respect to other benefit options providing similar coverage.
4. **Change in Coverage of Spouse or Dependent Under Other Employer's Plan -** An employee may make a prospective election change that is on account of and corresponds with a change made under the plan of the spouse's, former spouse's or dependent's employer if: (1) an Internal Revenue Code section 125 plan or qualified benefits plan of the spouse's, former spouse's or dependent's employer permits participants to make election change that would be permitted under the regulations; or (2) the other employer's plan permits participants to make an election for a period of coverage that is different from the period of coverage under this Plan.

6

5. **FMLA Leaves–** An employee taking leave under FMLA may revoke an existing election of group health plan coverage and make such other election for the remaining portion of period of coverage as may be provided for under FMLA.

6. **HIPAA Special Enrollment Rights–** An employee may change his/her election for group health plan coverage under the Plan to the extent that the election change corresponds with special enrollment rights under HIPAA.

7. **COBRA–** An employee may increase his/her pre-tax contributions for coverage under the Plan if a COBRA event (or similar state law continuation coverage event) occurs with respect to the employee, the employee's spouse or dependent.

8. **Judgment, Decree or Orders (QMCSO)-** If there is a judgment, decree, or order resulting from divorce, legal separation, annulment or change in legal custody that requires accident or health coverage for an employee's child or dependent foster child, then the employee may change his/her election to add or drop coverage consistent with the order.

9. **Entitlement to Medicare or Medicaid–** Medicare or Medicaid entitlement or loss of entitlement may allow an employee to make an election change.

TO: Participants in the U.S. Xpress Enterprises, Inc. Employee Benefit Plan

**Notice of Privacy Practices**

THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY

As we work every day to operate your health plans, protecting the confidentiality of your personal health information has always been an important priority. We (the U.S. Xpress Enterprises, Inc. Employee Benefit Plan or "the Plan") are adopting policies to safeguard the privacy and security of your personal health information and comply with federal law (specifically, the Health Insurance Portability and Accountability Act, known as "HIPAA"). We are required to follow the terms of this Notice. The Plan reserves the right to change the terms of this Notice at any time. If the Plan makes changes, we will notify you and give you the opportunity to obtain a copy of the new Notice.

Note: This Notice covers you only if you are covered by the Plan.

This Notice explains:

- How your Protected Health Information may be used and disclosed, and
- What rights you have regarding your information

**How the Group Health Plan May Use Your Information**

The Plan may use and disclose certain health information called "protected health information" and we refer to it throughout this Notice as "PHI" or "health information" in accordance with HIPAA and as generally described in this Notice. Health information that Nissan receives about you as an employer is not PHI. Thus, your leave of absence records, Family and Medical Leave Act ("FMLA") leave information, drug testing results, workers' compensation files, disability, life insurance, and Occupational Safety and Health Act ("OSHA") records are not PHI and are not covered by this Notice.

Some of the people who administer the Plan work for U.S. Xpress Enterprises, Inc. Before your PHI can be used by or disclosed to these employees, the Plan Sponsor must certify that it has: (1) amended the Plan documents to explain how your PHI will be protected; (2) identified the U.S. Xpress Enterprise employees who need your PHI to carry out their duties to administer the Plan; and (3) separated the work of these employees from the rest of the workforce so that U.S. Xpress Enterprise, Inc. cannot use your PHI for employment-related purposes or to administer other benefit plans.

7

In order to manage your health plan effectively, the Plan is permitted by law to use and disclose your medical information (called "Protected Health Information") in the following ways without your authorization:

**For treatment.** So that you receive appropriate treatment and care, providers may use your Protected Health Information to coordinate or manage your health care services. For example, your physician send us information about your treatment plan so the Plan can arrange additional services.

**For payment.** To make sure that claims are paid accurately and you receive the correct benefits, the Plan may use and disclose your Protected Health Information to determine plan eligibility and responsibility for coverage and benefits. For example, the Plan may use your information when it confers with other health plans to resolve a coordination of benefits issue.

**For health care operations**. To ensure quality and efficient plan operations, we may use your Protected Health Information in several ways, including plan administration, quality assessment and improvement, and review vendor performance. Your information could be used, for example, to assist in the evaluation of a vendor who supports us. We also may contact you to provide information about treatment alternatives or other health-related benefits and services available under the Plan.

The Plan may also disclose your Protected Health Information to U.S. Xpress Enterprise, Inc. (the plan sponsor) in connection with these activities subject to certain conditions.

- The Plan may disclose information to U.S. Xpress Enterprise that summarizes the claims experience of Plan participants as a group, but without identifying specific individuals, to get new benefit insurance or to change or terminate the Plan.  For example, if U.S. Xpress Enterprise wants to consider adding or changing a particular benefit, it may receive this summary health information to assess the costs of those services.

- The Plan may also disclose limited health information to U.S. Xpress Enterprise in connection with the enrollment or disenrollment of individuals into or out of the Plan.

- As required by law, special protection is given to your genetic information.  The Plan may not use or disclose your genetic information for underwriting purposes, which includes determining whether you are eligible for benefits, the premium for coverage, whether you are subject to pre-existing condition exclusion and other activities related to the creation, renewal or replacement of the coverage provided under the Plan.  Genetic information includes genetic tests of an individual or family member, family member histories, and genetic services, including counseling, education and evaluation of genetic information.

## Other Permitted Uses and Disclosures

Federal regulations allow us to use and disclose your Protected Health Information, without your authorization, for several additional purposes, in accordance with law.

- To our Business Associates (vendors)
- Public Health Reporting
- Reporting and notification of abuse, neglect or domestic violence
- Oversight activities of health oversight agency (court order or subpoena)
- Judicial and administrative proceedings
- Law enforcement

8

- ➢ Research, as long as certain privacy-related standards are installed
- ➢ To a coroner or medical examiner
- ➢ To organ, eye or tissue donation programs
- ➢ To avert a serious threat to health or safety
- ➢ Specialized government functions (e.g. Military and veterans' activities, national security and intelligence, federal protective services, medical suitability determinations, correctional institutions and other law enforcement custodial situations)
- ➢ Worker's compensation or similar programs established by law that provide benefits for work-related injuries or illness
- ➢ Other purposes required by law, provided that the use or disclosure is limited to the relevant requirements of such law.

9

In Special Situations:

We may disclose your Protected Health Information to a family member, relative, close personal friend, or any other person whom you identify, when that information is directly relevant to the person's involvement with your care or payment related to your care.

We may also use your Protected Health Information to notify a family member, your personal representative, another person responsible for your care, or certain disaster relief agencies of your location, general condition, or death. If you are incapacitated, there is an emergency, or you otherwise do not have the opportunity to agree to or object to this use or disclosure, we will do what in or judgment is in your best interest regarding such disclosure and will disclose only information that is directly relevant to the person's involvement with your health care.

The Plan will make other uses and disclosures only after you authorize them in writing. The Plan will obtain your authorization prior to using or disclosing Protected Health Information for marketing or before any sale of your Protected Health Information. You may revoke your authorization in writing at any time.

**Your Rights Regarding Protected Health Information**

You have the right to:

> ➢ Inspect and copy your Protected Health Information
> ➢ Amend or correct inaccurate information
> ➢ Receive an accounting of certain disclosures of your Protected Health Information made by us.
>   ○ However, you are not entitled to an accounting of several types of disclosures including, but not limited to:
>     • Disclosures made for payment, treatment or health care operations
>     • Disclosures you authorized in writing
>     • Disclosures made more than six (6) years ago
> ➢ Be notified by the Plan if there is a breach of your unsecured Protected Health Information
> ➢ Receive a paper copy of this notice, even if you agreed to receive it electronically

**Right to Request Restrictions**

You may ask us to restrict how the Plan uses and discloses your Protected Health Information as it carries out payment, treatment, or health care operations. You may also ask the Plan to restrict disclosures to your family members, relatives, friends, or other persons you identify who are involved in your care or payment for your care. However, the Plan is not required to agree to

10

these requests.

**Right to Request Confidential Communications**

You may request to receive your Protected Health Information by alternative means or an alternative location if you reasonably believe that other disclosure could pose a danger to you. For example, you may only want to have information sent by mail or to an address other than your home.

For more information about exercising these rights, contact the office below. **Complaints**

If you believe that your privacy rights have been violated, you may file a written complaint without fear of reprisal. Direct your complaint to the office listed below under "Contacting Us" or the Secretary of Health and Human Services, Hubert H. Humphrey Building, 200 Independence Avenue, SW, Washington, DC 20201.

**About this Notice**

The Plan reserves the right to change the terms of this notice and to make the new notice provisions effective for all Protected Health Information we maintain. If the Plan changes this notice, you will receive a new notice via mail.

**Contacting Us**

If you have any questions, or if you wish to exercise the rights described in this notice, please contact the U.S. Xpress office identified below, which will provide you with additional information. The contact is:

Tammie Vineyard
Benefits Manager
(800) 251-6291 ext.3426

**Effective Date of Notice**

September 23, 2013

**NOTICE OF RIGHTS TO CONTINUE GROUP HEALTH COVERAGE**

This section of the Summary Plan Description is your notice of continuation coverage rights under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). COBRA continuation coverage can become available to you and to your spouse and dependent children, if they are covered under the Plan when you would otherwise lose your group health coverage. Under the Plan, COBRA continuation coverage rights apply to medical (including prescription drug), vision and dental benefits and also apply on a limited basis to medical reimbursement benefits. COBRA continuation coverage is a continuation of Plan coverage when coverage would otherwise end because of a life event known as a "qualifying event." Specific qualifying events are listed later in this notice. COBRA continuation coverage must be offered to each person who is a "qualified beneficiary." A qualified beneficiary is someone who will lose coverage under the Plan because of a qualifying event. Depending on the type of qualifying event, employees, spouses of employees, and dependent children of employees may be qualified beneficiaries. Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage.

If you are an employee covered under the Plan, you have a right to choose this continuation coverage if you lose your group health coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part). If you

are the spouse of an employee covered by the Plan, you have the right to choose continuation coverage for yourself if you lose group health coverage under the Plan for any of the following four reasons:

1) The death of your spouse;
2) A termination of your spouse's employment (for reasons other than gross misconduct) or a reduction in your spouse's hours of employment;
3) Divorce or legal separation from your spouse; or
4) Your spouse becomes entitled to Medicare.

In the case of a dependent child of an employee covered by the Plan, he or she has the right to continuation coverage if group health coverage under the Plan is lost for any of the following five reasons:

1) The death of a parent;
2) A termination of a parent's employment (for reasons other than gross misconduct) or reduction in a parent's hours of employment;
3) Parent's divorce or legal separation;
4) A parent becomes entitled to Medicare; or
5) The dependent child ceases to be a "dependent child" under the U.S. Xpress Inc. Employee Benefit Plan.

Furthermore, a child born to, or placed for adoption with, the covered employee during the period of continuation coverage may also become covered as a qualified beneficiary.

Under the law, the employee or a family member has the responsibility to inform the Plan Administrator of a divorce, legal separation, or a child losing dependent status under the Plan within 60 days of the date of the event or the date in which coverage would end under the Plan because of the event, whichever is later.  The Company has the responsibility to notify the Plan Administrator of the employee's death, termination, and reduction in hours of employment or Medicare entitlement.

When the Plan Administrator is notified that one of these events has happened, the Plan Administrator will in turn notify you that you have the right to choose continuation coverage.  Under the law, you have at least 60 days from the date you would lose coverage because of one of the events described above, or the date notice of your election rights is sent to you, whichever is later, to inform the Plan Administrator that you want continuation coverage.  If you do not choose continuation coverage, your group health insurance coverage will end.

If you choose continuation coverage, the Company is required to give you coverage which, as of the time coverage is being provided, is similar to the coverage provided under the plan to similarly situated employees or family members.  The law requires that you be afforded the opportunity to maintain continuation coverage for 36 months unless you lost group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months.  This 18 months may be extended to 36 months if other events (such as a death, divorce, legal separation, or Medicare entitlement) occur during that 18-month period. If a second qualifying event occurs, you must make sure that the Plan Administrator is notified of the second qualifying event within 60 days of the second qualifying event.  Continuation coverage for medical reimbursement benefits is only available through the end of the Plan Year in which the qualifying event occurs.

The 18 months may be extended to 29 months for an individual, and his/her qualified dependents, if the individual is determined to be disabled (for Social Security disability purposes) at the time of the qualifying event or at any time during the first 60 days of continuation coverage, and the Plan Administrator is notified of that determination within 60 days of the date of the determination and before the end of the 18-month period. The affected individual must also notify the Plan Administrator within 30 days of any final determination that the individual is no longer disabled. In no event will

continuation coverage last beyond 3 years from the date of the event that originally made a qualified beneficiary eligible to elect coverage.

However, the law also provides that your continuation coverage may be terminated before the end of the maximum period for any of the following five reasons:

(1) The Company no longer provides group health coverage to any of its employees
(2) You do not pay the premium for your continuation coverage on time
(3) You become covered under another group health plan after the date of your COBRA election, unless that plan contains any exclusions or limitations with respect to any pre-existing conditions you or your covered dependents may have
(4) You become entitled to Medicare after the date of your COBRA election
(5) You extended coverage for up to 29 months due to your disability and there has been a final determination that you are no longer disabled.

You do not have to show that you are insurable to choose continuation coverage.

**In order to protect your family's rights, you should keep the Plan Administrator informed of any changes in the addresses of family members.** You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

## Maternity and Newborn Coverage

Your Plan provides maternity and newborn infant coverage. Federal law generally prohibits this Plan from restricting benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section. Federal law also generally prohibits the Plan from requiring that a Provider obtain authorization to prescribe a length of stay in excess of the above periods. Please refer to the Covered Services section of the BlueCross BlueShield of Tennessee Evidence of Coverage document for details.

## Qualified Medical Child Support Order

In accordance with section 609(a) of ERISA, the Plan will provide health benefit coverage to a child of a participant in accordance with the terms of any medical child support order that the Plan Administrator determines to be a "qualified medical child support order." A qualified medical child support order is a judgment, decree or order issued by a court, which provides for child support or health benefit coverage relating to benefits under the Plan and which meets certain requirements regarding substance and form. Medical child support orders should be submitted to the Plan Administrator, who will promptly notify the involved individuals of its receipt of the order and of the Plan's procedure for determining whether the order is a qualified order. You may request a copy of the Plan's procedure for determining whether an order is a qualified medical child support order from the Human Resources Department.

## Certificate of Creditable Coverage

A certificate of creditable coverage is a document that reports the period of time that you and/or a dependent have had medical benefits coverage under the Plan without a significant break in coverage.

A certificate of creditable coverage will be provided automatically when your coverage or your dependent's coverage under the Plan terminates. You or your dependent also have the right to request a certificate of creditable coverage from the Plan at any time, as long as your request is made within 24 months after your coverage or your dependent's coverage under the Plan terminates. Requests should be directed to the Human Resources Benefits Department at 1-800-670-1915.

## Medicaid-Eligible Individuals

In determining whether an individual is eligible for health benefit coverage and is making benefit payments, the Plan will not take into account the fact that an individual is eligible for or is covered by Medicaid.

In addition, the Plan will make benefit payments in accordance with any assignment of rights made by or on behalf of an individual as required by a state Medicaid program and in accordance with any state law which provides that the state has acquired rights to payment with respect to a participant.

## Mastectomy Benefit Coverage

Under Federal law, group health plans, insurance companies, and health maintenance organizations (HMOs) that provide coverage for medical and surgical benefits for mastectomy must also provide coverage for reconstructive surgery in a manner determined in consultation with the attending physician and the patient.

Required coverage includes reconstruction of the breast on which the mastectomy was performed, surgery and reconstruction of the other breast to produce a symmetrical appearance, and prostheses and treatment of physical complications at all stages of the mastectomy, including lymphedemas.  These benefits are subject to the normal deductible and coinsurance provisions that apply to other benefits under your coverage.

## Statement of Rights

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan participants be entitled to:

### Receive Information About Your Plan and Benefits.

Examine, without charge, at the Plan Administrator's office and at other specific locations all documents governing the Plan including insurance contracts and a copy of the latest annual report (Form 5500) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500) and updated summary plan description.  The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report.  The Plan Administrator is required by law to furnish you with a copy of this summary annual report.

### Continue Group Health Plan Coverage.

Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event.  You or your dependents may have to pay for such coverage.  Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage.

### Prudent Actions by Plan Fiduciaries.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other

Plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights.**
If your claim for a welfare benefit is denied or ignored, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court, provided that you have exhausted your administrative appeal rights. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees; for example, if it finds your claim is frivolous.

**Assistance With Your Questions.**
If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest Area Office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

<u>**Claims Procedures**</u>

Specific claim procedures for medical benefits are set forth in the medical Evidence of Coverage document. Specific claim procedures for long-term disability benefits, accidental death and dismemberment benefits and group term life insurance benefits are set forth in the certificates of insurance that describe those benefits. Specific claim procedures for dependent care assistance benefits and medical reimbursement benefits are set forth in the separate summary of those benefits. The following claim procedures apply to dental and vision benefit claims. References to the insurance carrier refer to Delta Dental Plan of Tennessee for dental benefits and VSP for vision benefits.

If you are required to obtain pre-approval from your insurance carrier as a prerequisite to obtaining a benefit, you should follow the pre-approval procedures established by the insurance carrier.

If you contact your insurance carrier to obtain pre-approval but you fail to follow the pre-approval procedure for filing a pre-service claim, the insurance carrier is required to notify you of this failure and the proper procedure for filing the pre-service claim. A pre-service claim is a benefit claim that requires some form of pre-approval by the insurance carrier. The notice is required to be provided to you as soon as possible but not later than 5 days after the failure, or, in the case of an

urgent care claim (see below), within 24 hours of the failure.  The notice may be given to you orally, unless you request a written notice.

You may designate a representative to act on your behalf in pursuing a benefit claim or appealing a denial of a benefit claim by contacting your insurance carrier.  Even if you have not formally designated a representative, your physician or licensed health care professional may act on your behalf as your authorized representative if the benefit claim is an urgent care claim (see below).

The period within which the insurance carrier is required to decide your claim depends upon the type of claim being made.  There are generally three types of claims that can be made under the Plan – a pre-service claim, an urgent care claim, and a post-service claim.

**Pre-Service Claim** – A pre-service claim is a claim for a benefit which requires some form of pre-approval by the insurance carrier.  The insurance carrier must decide a pre-service claim within 15 days.  This 15 day period may be extended for up to an additional 15 days if the insurance company determines the extension is necessary for reasons beyond its control.  The insurance carrier is required to notify a claimant in writing if there is an extension.

**Urgent Care Claim** – An urgent care claim is a pre-service claim where application of the normal period for deciding pre-service claims could jeopardize the life, health or ability to regain maximum function of the claimant, or would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is being claimed.  The insurance carrier is required to decide an urgent care claim within 72 hours.

**Post-Service Claim** – A post-service claim is any claim that is not a pre-service claim.  It would include a claim in which the medical procedure has already occurred and the claimant is seeking payment of it or reimbursement for it.  The insurance carrier is required to decide a post-service claim within 30 days.  This 30 day period may be extended for up to an additional 15 days if the insurance carrier determines the extension is necessary for reasons beyond its control.  The insurance carrier is required to notify a claimant in writing if there is an extension.

In addition, some special rules apply where the insurance carrier has already approved an ongoing course of treatment over a period of time or number of treatments.  First, if the insurance carrier reduces or terminates coverage for the course of treatment before it otherwise would have ended, that reduction or termination is a benefit denial.  The insurance carrier must notify the claimant sufficiently in advance of the reduction or termination to allow the claimant to appeal the decision (see Appealing a Claim below) and to obtain a decision on the appeal.  Second, if the claimant requests an extension of the course of treatment at least 24 hours before the course of treatment ends and it is an urgent care situation (see Urgent Care Claim above), the insurance carrier must notify the claimant within 24 hours of its decision on the extension request.

If your claim is allowed, the insurance carrier will notify you who has been paid and the amount that has been paid, or will be paid, in the case of a pre-service claim.  If your claim is denied in whole or in part, you will receive a written notice which must include the following information:

1.      The specific reason or reasons for the denial of all or any portion of the claim.

2.      The specific provisions of the coverage certificate, subscriber contract, the Plan and any other document, on which the denial is based.  If the decision to deny benefits is based, in whole or in part, on a specific internal rule, guideline, protocol or similar criteria, either a copy of the document will be provided to you or you may request a copy of such document from the insurance carrier at no charge.  If the decision to deny benefits is based, in whole or in part, on an exclusion or limitation that the treatment is experimental or investigational, or that the treatment is not medically necessary, either an explanation that applies the appropriate terms to your medical circumstances, and which details the

scientific or clinical judgment that led to the decision to deny benefits will be provided to you or you may request such an explanation from the insurance carrier at no charge.

3.  A description of any additional material or information necessary for you to complete the claim, and an explanation as to why such information or material is necessary.

4.  Information as to how you may submit the claim for review and the applicable time limits.

5.  A statement regarding your right to bring a civil suit under federal law should your appeal be denied.

In the case of an urgent care claim, the notice of denial may be provided to you orally within the 72 hour period, so long as a written notice is provided within 3 days thereafter.

You may appeal a claim denial by following the appeal procedure explained below.

### Appealing a Claim

If you do not agree with the denial or partial denial of your claim or if you have questions concerning your claim, you are encouraged to contact the insurance carrier handling your claim.

If you wish to appeal a claim denial, you may need to complete a form provided and required by your insurance carrier to file your appeal. In your appeal, you must state that you are requesting an official review of your claim and the reason(s) why you do not agree with the denial or partial denial of your claims and any additional information pertinent to the claim. You should contact the insurance carrier to bring an appeal.

Except in the case of urgent care claims, the insurance carrier need not consider any telephone inquiry as a request for an official review of a denied claim. However, if the claim which is denied is an urgent care claim, you can request an expedited appeal by calling the insurance carrier handling your claim.

If you want to appeal a denied claim, the insurance carrier must allow you at least 180 days after you receive notice of a denial or partial denial to file the appeal. During the 180 days (or any longer period the insurance carrier may allow), you or your representative may review and obtain from the insurance carrier copies of all documents, records and information relating to your claim. If you wish, you or your representative may submit written issues, comments and additional justification as to why the claim should be allowed. The insurance carrier is required to provide you with the name of each medical or vocational expert whose advice was obtained in connection with your denied claim, regardless of whether the advice was relied upon.

When the insurance carrier reviews a denied claim, it may not afford any deference to the initial decision. The review will be conducted by an individual, committee or department identified in your subscriber contract or coverage certificate. If the benefit denial is based in whole or in part on a medical judgment, such as whether the procedure is experimental or is not medically necessary, the person reviewing the claim at the insurance carrier is required to consult with a health care professional who has appropriate training and experience in the particular field of medicine relating to your claim. This health care professional will be someone who was not consulted on the initial claim denial.

The review of a claim denial is required to be done by the insurance carrier within the following time frames:

**Pre-Service Claim**  If the denied claim was a pre-service claim (other than an urgent care claim) the insurance carrier is required to decide your appeal within 30 days.

**Urgent Care Claim**   If the denied claim was an urgent care claim, the insurance carrier is required to decide your appeal within 72 hours.

**Post-Service Claim**   If the denied claim was a post-service claim, the insurance carrier is required to decide your appeal within 60 days.

The insurance carrier is required to provide you with a written notice of the determination on review. If the denial of your claim is upheld (in whole or in part) the notice is required to include the following information:

1.      The specific reason or reasons for the adverse determination.

2.      The specific provisions of the subscriber contract, certificate of coverage, the Plan and any other document on which the adverse determination is based.

3.      A statement that you may obtain, upon request and free of charge, reasonable access to and copies of all documents, records and other information relevant to your claim for benefits. If any internal rule, guideline, protocol or similar guideline was relied upon in making the adverse determination, the insurance carrier must either provide it to you with the written notice or provide you with a copy of it free of charge upon request. If the adverse determination is based on medical necessity, experimental treatment or a similar exclusion, the insurance carrier must either provide an explanation of the scientific or clinical judgment for the adverse determination to you with the written notice, or provide it to you free of charge upon request.

4.      If the insurance carrier has any voluntary appeal procedures, information regarding those procedures.

Should you have any questions regarding the claims procedure, please contact the Human Resources Benefits Department.

---

| | |
|---|---|
| **Name of Plan:** | U.S. XPRESS Enterprises, Inc.  Employee Benefit Plan |
| **Plan Sponsor:** | U.S. XPRESS Enterprises, Inc. |
| **Plan Administrator:** | U.S. XPRESS Enterprises, Inc. |
| **Address:** | 4080 Jenkins Road<br>Chattanooga, TN 37421 |
| **Telephone:** | 423-510-3000 |
| **Employer ID:** | 62-1378182 |
| **Plan #:** | 501 |

**Agent for Service of Legal Process**:  Vice President & General Counsel

| | |
|---|---|
| **Address:** | 4080 Jenkins Road<br>Chattanooga, TN 37421 |

18

**Service of Legal Process may be made on the Plan Administrator**.

**Plan Year:**            Calendar Year

**Type of Plan:** Welfare plan providing health (hospitalization, physician visits, prescription drugs, outpatient services and preventative services), dental, vision, long-term disability, AD&D and group term life, dependent care assistance benefits and medical reimbursement benefits. The Plan is also an Internal Revenue Code section 125 plan and an Internal Revenue Code section 129 plan.

**Funding:** Except for medical benefits, benefits are fully insured. Medical benefits are self-insured with claims paid from the general assets of the Company and employee contributions. Premiums for fully insured benefits are paid in whole or part by the Company out of its general assets and in part by the Employee's pre-tax or post-tax payroll deductions. The Plan Administrator provides a schedule of the applicable premiums during the initial and subsequent annual enrollment periods and on request for each of the component benefit programs, as applicable.

**Claims Administrators and Insurance Carriers:**

1.    Blue Cross Blue Shield of Tennessee, Inc.
      1 Cameron Hill Circle
      Chattanooga, TN  37402-2555
      (800) 565-9140

2.    PayFlex Systems USA, Inc.
      P.O. Box 3039
      Omaha, NE 68103-3039
      (800) 284-4885

3.    Delta Dental Plan of Tennessee
      240 Venture Circle
      Nashville, TN  37228
      (800) 223-3104

4.    Express Scripts.
      N 19 W24130 Riverwood Drive
      Waukesha, WI  53188
      800-721-3501

5.    VSP
      3091 Governors Lake Drive, Suite 240
      Norcross, GA  30071
      (800) 877-7195

6.    Unum
      1 Fountain Square
      Chattanooga, TN 37402
      (877) 281-1746

7.    Allstate Workplace Division
      1776 American Heritage Life Drive
      Jacksonville, FL 32224
      1-800-521-3535

# Medical Coverage

## 2014 Medical Benefits Quick Reference Guide

| Tier | Standard Plan | | Premium Plan | |
|------|------|------|------|------|
| **WEEKLY PREMIUMS** | | | | |
| | Weekly Rate | Non-Tobacco Discounted Rate | Weekly Rate | Non-Tobacco Discounted Rate |
| Employee Only | $47 | $27 | $103 | $83 |
| Employee + Child(ren) | $71 | $51 | $184 | $164 |
| Employee + Spouse* | $105 | $85 | $231 | $211 |
| Family* | $113 | $93 | $320 | $300 |
| **COVERAGE HIGHLIGHTS** | | | | |
| Physician Office Visits<br>Non-Specialists<br>Specialists | 100% after copay:<br>$35<br>$45 | | 100% after copay:<br>$30<br>$40 | |
| Preventive Care | No maximum for approved services<br>100% | | No maximum for approved services<br>100% | |
| Inpatient Hospital Services | 70% after deductible | | 80% after deductible | |
| Emergency Room | $475 copay, deductible & co-insurance | | $475 copay, deductible & co-insurance | |
| Outpatient Services | 70% after deductible | | 80% after deductible | |
| **DEDUCTIBLE** | | | | |
| Individual | $1,200 | | $600 | |
| Maximum/Family | $2,400 | | $1,200 | |
| **ANNUAL OUT-OF-POCKET MAXIMUM** | | | | |
| Individual | $6,000 | | $4,250 | |
| Maximum/Family | $9,000 | | $8,500 | |
| **ANNUAL LIMIT** | | | | |
| Individual | Unlimited | | Unlimited | |
| **PRESCRIPTION DRUGS** | *Prescription Drug Deductible $120* | | | |
| **At the Pharmacy** *(for to a 30-day supply)* | | | | |
| Generic | $10 copay | | $10 copay | |
| Preferred Brand | $35 copay | | $35 copay | |
| Non-Preferred Brand | $60 copay | | $60 copay | |
| Specialty | 10% up to $250 maximum copay | | | |
| **Through Mail-Order** *(for a 90-day supply)* | | | | |
| Generic | $25 copay | | $25 copay | |
| Preferred Brand | $87.50 copay | | $87.50 copay | |
| Non-Preferred Brand | $150 copay | | $150 copay | |

*Please remember that a spousal surcharge of $20 per week applies if your spouse has access to another employer-sponsored health plan, but chooses to remain on the U.S. Xpress medical plan.*

Please contact the Benefits Department for a complete copy of the Evidence of Medical Coverage.

**Delta Dental of Tennessee
Certificate of Coverage – Benefit Summary Page
Dual High Option Plan**

**Group Name:** US Xpress **Group Number:** 7496
**Provider Network:** Delta Dental PPO (Point-of-Service) **Benefit Year:** January 1 through December 31

**Deductible** - $50 Deductible per person total per Benefit Year limited to a maximum Deductible of $150 per family per Benefit Year. The deductible does not apply to oral exams, preventive, x-rays, sealants, periodontal maintenance, full mouth debridement, cephalometric films, diagnostic casts, photos, and orthodontics.

**Covered Services –**

| | PPO Dentist | Premier Dentist | Non-participating Dentist |
|---|---|---|---|
| | Plan Pays | Plan Pays | Plan Pays* |
| **Diagnostic & Preventive** | | | |
| **Diagnostic and Preventive Services** - exams, cleanings, fluoride, and space maintainers | 100% | 100% | 100% |
| **Sealants** - to prevent decay of permanent teeth | 100% | 100% | 100% |
| **Brush Biopsy** - to detect oral cancer | 100% | 100% | 100% |
| **Radiographs** - X-rays | 100% | 100% | 100% |
| **Periodontal Maintenance** - cleanings following periodontal therapy | 100% | 100% | 100% |
| **Basic Services** | | | |
| **Emergency Palliative Treatment** - to temporarily relieve pain | 90% | 80% | 80% |
| **Minor Restorative Services** - fillings | 90% | 80% | 80% |
| **Endodontic Services** - root canals | 90% | 80% | 80% |
| **Periodontic Services** - to treat gum disease | 90% | 80% | 80% |
| **Oral Surgery Services** - extractions and dental surgery | 90% | 80% | 80% |
| **Other Basic Services** - misc. services | 90% | 80% | 80% |
| **Adjustments and Repairs** - to bridges and dentures | 90% | 80% | 80% |
| **Major Services** | | | |
| **Crown Repair** - to individual crowns | 60% | 50% | 50% |
| **Major Restorative Services** - crowns | 60% | 50% | 50% |
| **Anesthesia Services** - when medically necessary | 60% | 50% | 50% |
| **Relines and Rebase** - to dentures | 60% | 50% | 50% |

Customer Service Toll-Free Number: 800-223-3104
www.DeltaDentalTN.com
August 1, 2013

| | | | |
|---|---|---|---|
| **Implant Repair** - implant maintenance, repair, and removal | 60% | 50% | 50% |
| **Prosthodontic Services** - bridges, implants, and dentures | 60% | 50% | 50% |
| **Orthodontic Services** | | | |
| **Orthodontic Services** - braces | 50% | 50% | 50% |
| **Orthodontic Age Limit** - | Up to age 19 | Up to age 19 | Up to age 19 |

* When you receive services from a Nonparticipating Dentist, the percentages in this column indicate the portion of Delta Dental's Nonparticipating Dentist Fee that will be paid for those services. The Nonparticipating Dentist Fee may be less than what your dentist charges and you are responsible for that difference.

➢ Oral exams (including evaluations by a specialist) are payable twice in any period of 12 consecutive months.
➢ Prophylaxes (cleanings) are payable twice in any period of 12 consecutive months.
➢ People with specific at-risk health conditions may be eligible for additional prophylaxes (cleanings) or fluoride treatment. The patient should talk with his or her dentist about treatment.
➢ Fluoride treatments are payable twice in any period of 12 consecutive months for people up to age 19.
➢ Space maintainers are payable once per area per lifetime for people up to age 15.
➢ Bitewing X-rays are payable once in any period of 12 consecutive months and full mouth X-rays (which include bitewing X-rays) are payable once in any three-year period, whether provided by a general dentist or specialist.
➢ Sealants are payable once per tooth per lifetime for the occlusal surface of first and second permanent molars up to age 16. The surface must be free from decay and restorations.
➢ Composite resin (white) restorations are Covered Services on posterior teeth.
➢ Implants and implant related services are payable once per tooth in any five-year period.

**Maximum Payment** - $2,000 per person total per Benefit Year on all services, except cephalometric film, photos, diagnostic casts, and orthodontics. $2,000 per person total per lifetime on cephalometric film, photos, diagnostic casts, and orthodontic services.

**Special Enrollment Notations** - Employees are eligible on the first of the month following 90 days of continuous employment.

Dependent Age Limit: 26

**Delta Dental of Tennessee**
**Certificate of Coverage – Benefit Summary Page**
**Dual Low Option Plan**

**Group Name:** US Xpress  **Group Number:** 7496
**Provider Network:** Delta Dental PPO (Point-of-Service)  **Benefit Year:** January 1 through December 31

**Deductible** - $50 Deductible per person total per Benefit Year limited to a maximum Deductible of $150 per family per Benefit Year. The deductible does not apply to oral exams, preventive, x-rays, sealants, periodontal maintenance, full mouth debridement, and cephalometric films.

**Covered Services –**

| | PPO Dentist | Premier Dentist | Non-participating Dentist |
|---|---|---|---|
| | Plan Pays | Plan Pays | Plan Pays* |
| **Diagnostic & Preventive** | | | |
| **Diagnostic and Preventive Services** - exams, cleanings, fluoride, and space maintainers | 100% | 100% | 100% |
| **Sealants** - to prevent decay of permanent teeth | 100% | 100% | 100% |
| **Brush Biopsy** - to detect oral cancer | 100% | 100% | 100% |
| **Radiographs** - X-rays | 100% | 100% | 100% |
| **Periodontal Maintenance** - cleanings following periodontal therapy | 100% | 100% | 100% |
| **Basic Services** | | | |
| **Emergency Palliative Treatment** - to temporarily relieve pain | 50% | 50% | 50% |
| **Minor Restorative Services** - fillings and crown repair | 50% | 50% | 50% |
| **Endodontic Services** - root canals | 50% | 50% | 50% |
| **Periodontic Services** - to treat gum disease | 50% | 50% | 50% |
| **Oral Surgery Services** - extractions and dental surgery | 50% | 50% | 50% |
| **Major Restorative Services** - crowns | 50% | 50% | 50% |
| **Other Basic Services** - misc. services | 50% | 50% | 50% |
| **Relines and Repairs** - to bridges, dentures, and implants | 50% | 50% | 50% |
| **Major Services** | | | |
| **Prosthodontic Services** - bridges, implants, and dentures | 50% | 50% | 50% |

Customer Service Toll-Free Number: 800-223-3104
www.DeltaDentalTN.com
August 1, 2013

23

\* When you receive services from a Nonparticipating Dentist, the percentages in this column indicate the portion of Delta Dental's Nonparticipating Dentist Fee that will be paid for those services. The Nonparticipating Dentist Fee may be less than what your dentist charges and you are responsible for that difference.

- Oral exams (including evaluations by a specialist) are payable twice in any period of 12 consecutive months.
- Prophylaxes (cleanings) are payable twice in any period of 12 consecutive months.
- People with specific at-risk health conditions may be eligible for additional prophylaxes (cleanings) or fluoride treatment. The patient should talk with his or her dentist about treatment.
- Fluoride treatments are payable twice in any period of 12 consecutive months for people up to age 19.
- Space maintainers are payable once per area per lifetime for people up to age 15.
- Bitewing X-rays are payable once in any period of 12 consecutive months and full mouth X-rays (which include bitewing X-rays) are payable once in any three-year period, whether provided by a general dentist or specialist.
- Sealants are payable once per tooth per lifetime for the occlusal surface of first and second permanent molars up to age 16. The surface must be free from decay and restorations.
- Composite resin (white) restorations are Covered Services on posterior teeth.
- Implants and implant related services are payable once per tooth in any five-year period.

**Maximum Payment** - $1,000 per person total per Benefit Year on all services.

**Special Enrollment Notations** - Employees are eligible on the first of the month following 90 days of continuous employment.

Dependent Age Limit: 26

## Dental Coverage

Dental coverage is an important part of the overall health care benefits that are available to you.

The plan pays for diagnostic and preventive services (with no deductible) when you use participating dentists and covers many additional procedures when more extensive care is needed.

The plan is administered by Delta Dental, which has more than 198,000 dentists in its national network. To locate a provider near you, log on to www.deltadentaltn.com (choose the DeltaPremier option) or call (800) 223-3104.

| Dental Benefits | Dual Plans | |
|---|---|---|
| | High Plan | Low Plan |
| Deductible: Individual Family Limit | $50 $150 | $50 $150 |
| Annual Maximum: Preventive Services included in Annual Maximum | $2,000 Yes | $1,000 Yes |
| | | |
| Type I: Preventive Care Type II: Basic Services Type III: Major Services Type IV: Orthodontics | 100% 80% after deductible 50% after deductible 50% | 100% 80% after deductible 50% after deductible None |
| Orthodontia Lifetime Maximum: | $2,000 | None |
| Child Orthodontia Age Limit: | Through 18 | N/A |
| Out-of-Network Reimbursement Schedule: | Delta's Max Allowable Fee | Delta's Max Allowable Fee |
| Where Endo, Perio, and Oral Surgery are covered: | Basic Services | Basic Services |
| Waiting Periods for Services: | None | None |
| | | |
| Employee Only Employee + Family | $8.35 $23.42 | $5.34 $11.42 |

25

## Vision Coverage

VSP is a single vision plan that offers you the savings of VSP's nationwide network as well as the flexibility to be reimbursed for services rendered at any eye care provider. With VSP's Open Access plan, you can be reimbursed for exams, frames, and lenses at ANY out of network provider up to the maximum reimbursement amounts listed below. For more information or to speak with a VSP representative, call (800) 877-7195.

After you enroll, watch for VSP ID cards to be sent to your home address on record.

| Vision Coverage | Description | Copay | Frequency |
|---|---|---|---|
| | **Your Coverage with a VSP Doctor** | | |
| WellVision Exam | • Focuses on your eyes and overall wellness | $20 | Every Calendar year |
| Prescription Glasses | | $20 | See frame and lenses |
| Frame | • $170 allowance for a wide selection of frames<br>• 20% off amount over your allowance | Included in Prescription Glasses | Every other calendar year |
| Lenses | • Single vision, lined bifocal, and lined trifocal lenses<br>• Polycarbonate lenses for dependent children | Included in Prescription Glasses | Every calendar year |
| Lens Options | • Scratch-resistant coating<br>• Standard progressive lenses<br>• Premium progressive lenses<br>• Custom progressive lenses<br>• Average 20-25% off other lens options | $0<br>$55<br>$95 - $105<br>$150 - $175 | Every calendar year |
| Contacts (instead of glasses) | • $150 allowance for contacts and contact lens exam (fitting and evaluation)<br>• 15% off contact lens exam (fitting and evaluation) | $0 | Every calendar year |
| Extra Savings and discounts | **Glasses and Sunglasses**<br>• 20% off additional glasses and sunglasses, including lens options, from any VSP doctor within 12 months of your last WellVision Exam<br><br>**Laser Vision Correction**<br>• Average 15% off the regular price or 5% off the promotional price; discounts only available from contracted facilities | | |
| Your Weekly Contribution | $1.74 Employee only          $2.63 Employee + 1          $4.58 Employee + family | | |
| | **Your Coverage with Other Providers** | | |

Visit vsp.com for details, if you plan to see a provider other than a VSP doctor.

Exam....................up to $65          Single Vision Lenses...........up to $53          Lined Trifocal Lenses...........up to $104          Contacts............up to $125
Frame....................up to $88          Lined Bifocal Lenses...........up to $76          Progressive Lenses..............up to $186

VSP guarantees coverage from VSP doctors only. Coverage information is subject to change. In the event of a conflict between this information and your organization's contract with VSP, the terms of the contract will prevail.



**Xpress Global Systems Employee Benefit Plan**

**Brief Summary of Basic Life, Supplemental Life & AD&D,
Long-Term Disability and Short-Term Disability Benefits for Office Employees**

## BASIC LIFE

Xpress Global Systems provides a benefit of $10,000 on the 91st day of full-time employment. The amount of Basic Life, Supplement Life and AD&D will be reduced to $6500, or 65%, of the pre-age amount at age 65 and shall be further reduced to $5000, or 50%, of the pre-age amount at age 70 and terminates at retirement.

## SUPPLEMENTAL LIFE & AD&D

- In addition to the Life insurance coverage provided for you by Xpress Global Systems, you have the option of purchasing additional amounts of Life Insurance for yourself and your family. Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment. If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period. The amount of Life, Supplement Life and AD&D will be reduced to 65% of the pre-age amount at age 65 and shall be further reduced to 50% of the pre-age amount at age 70 and terminates at retirement.

- You will be allowed to purchase coverage in increments of $10,000 up to the lesser of $500,000 or 5 times your salary on yourself. You may also purchase coverage on your Spouse in increments of $5,000 up to the lesser of $250,000 (proof of good health required for amounts over $50,000) or the amount of life insurance on yourself. You are also eligible to purchase coverage for your children in the increments of $2,500 up to a maximum of $10,000 for dependent child(ren). Please note that the maximum coverage amount from live birth up to age six months is $2,500. Children may be covered up to age 19 or to age 26 if full-time student.

- Accidental Death & Dismemberment (AD&D) insurance is available in $10,000 units up to $500,000 or 5 times your salary whichever is less on you and in $5,000 units for your spouse. AD&D is available for your dependent child(ren) in $2,500 units up to $10,000.

- If you decline coverage during the new hire process, and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

- Please refer to the Xpress Benefits Guide for pricing on these benefits.

## ADDITIONAL FEATURES INCLUDED

- Worldwide Emergency Travel
- Accelerated Death Benefit of 75% of Benefit Amount up to $500,000
- Waiver of Premium in Event of Total Disability
- Ability to port and/or convert supplementary life insurance plans within 30 days of leaving employment

## OFFICE SHORT TERM DISABILITY

- Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment. If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period provided an EOI form is completed by the employee and approved by Unum.

- Benefits payable for Physician covered Non-Occupational disabilities

- Benefits begin on the 15th day of disability for either Accident or Sickness

27

- Xpress Global Systems provides a company-paid $200 weekly benefit for Office employees.

- Employees can purchase coverage in increments of $50 to a weekly maximum of $950 not to exceed 60% of weekly earnings

- The benefit is based on the average gross income for the 12 weeks immediately preceding the date of disability.

- The benefit will be payable as long as you are disabled up to 13 weeks.

- Maternity is covered the same as any other disability.

- If you decline coverage during the new hire process and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

For exact cost for this plan, please refer to information contained in the Xpress Benefits Guide.

## OFFICE LONG TERM DISABILITY

- Upon enrollment in the new hire process, the effective date is the 91st day of full-time employment. If enrolling during the annual benefits enrollment process, the effective date of coverage is January 1 following the annual enrollment period provided an EOI form is completed by the employee and approved by Unum.

- Provides benefits for covered disabilities (Occupational and Non-Occupational)

- Eligible class: Office employees

- Benefit is available in increments of $50 starting from $200 to $1,150 of weekly benefit not to exceed 60% of your covered monthly earnings to a maximum monthly benefit of $4,984 ($8,307 of covered monthly earnings)

- The benefit is based on the average gross income for the 12 weeks immediately preceding the date of disability.

- Benefit is payable after 90 day elimination period is satisfied by a covered disability. This elimination period begins first day of disability and includes any time covered by Short-Term Disability.

- 6/12/24 Pre-Existing condition limitation

- Benefit is payable, as long as you are disabled, up to five years.

- Partial & Residual coverage included (total disability is never required)

- If you decline coverage during the new hire process and later decide you want coverage, you will be required to complete an Evidence of Insurability (EOI) form subject to approval by Unum.

- The lifetime cumulative maximum benefit period for all disabilities due to mental illness is 24 months. Only 24 months of benefits will be paid even if the disabilities:

  - are not continuous; and/or
  - are not related.

However, Unum will send you payments beyond the 24 month period if you meet one of these conditions:

1. If you are confined to a hospital or institution at the end of the 24 month period, Unum will continue to send you payments during your confinement.

If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2. If you are not confined to a hospital or institution but become confined for a period of at least 14 days within 90 days after the 24 month period for which you have received payments, Unum will send payments during the length of the confinement.

Under no circumstances will Unum pay beyond the maximum period of payment as indicated in the BENEFITS AT A GLANCE section of your policy.

Unum will not apply the mental illness limitation to dementia if it is a result of:
- stroke;
- trauma;
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

For exact cost for this plan, please refer to information contained in the Xpress Benefits Guide.

THIS IS NOT A CONTRACT. This summary is not intended as a complete description of Unum's insurance coverage. The controlling provisions are provided in the policy, and this summary does not modify those provisions or the insurance in any way.

Coverage provided by Unum under Policy Number 294727-002.

## FULL DESCRIPTIONS IN CERTIFICATE OF INSURANCE

This summary of benefits is not a complete description of the Basic Life, Supplemental Life & AD&D, Long-Term Disability and Short-Term Disability benefits under the Plan. Detailed descriptions are contained in the certificates of insurance for each benefit, which may be obtained from the Human Resources department by calling the Benefits Department at (800) 670-1915.

**Schedule 2.17(b)**

**<u>ERISA Affiliates</u>**

None.

Schedule 2.17(d)

## Noncompliance of Benefit Plans

None.

**Schedule 2.18(a)**

## Compliance with Legal Requirements

None.

**Schedule 2.18(b)**

**<u>Governmental Authorizations</u>**

- Motor Carrier authority issued by the Department of Transportation Federal Motor Carrier Safety Administration
- Broker authority issued by the Department of Transportation Federal Motor Carrier Safety Administration
- Hazardous Materials Certificate issued by the Department of Transportation Pipeline and Hazardous Materials Safety Administration
- Customs Bond issued by the Department of Homeland Security Bureau of Custom and Border Protection
- Certificate of Standard Carrier Alpha Code issued by the National Motor Freight Traffic Association. The Standard Carrier Alpha Code "XGSI" is designated by the National Motor Freight Traffic Association for the Company
- State authorities are issued for all 48 contiguous states.  These authorities allow the Company to conduct business and operate in each state. The authority is issued by the Secretaries of State for each state. Schedule 1.4(a)(i) of these Disclosure Schedules is incorporated by reference herein.
- Other Governmental Authorizations, including local city and county licenses, are listed on the attached documents.

See attached documents.

# FMCSA Motor Carrier

USDOT Number: **534817**
Docket Number: **MC188471**
Legal Name: **XPRESS GLOBAL SYSTEMS, INC.**

DBA (Doing-Business-As) Name



## Addresses

| | |
|---|---|
| Business Address: | **1537 NEW HOPE CHURCH ROAD** |
| | **TUNNEL HILL, GA 30755** |
| Business Phone: | **(800) 367-4416**   Business Fax:  **Fax: (423) 510-5900** |
| Mail Address: | **1537 NEW HOPE CHURCH RD** |
| | **TUNNEL HILL, GA 30755-9275** |
| Mail Phone: | Mail Fax:        Undeliverable Mail: **NO** |

## Authorities:

| | | | | | |
|---|---|---|---|---|---|
| Common Authority: | **ACTIVE** | Application Pending: | **NO** | | |
| Contract Authority: | **ACTIVE** | Application Pending: | **NO** | | |
| Broker Authority: | **ACTIVE** | Application Pending: | **NO** | | |
| Property: | **YES** | Passenger: | **NO** | Household Goods: | **NO** |
| Private: | **NO** | Enterprise: | **NO** | | |

## Insurance Requirements:

| | | | | | |
|---|---|---|---|---|---|
| BIPD Exempt: | **NO** | BIPD Waiver: **NO** | BIPD Required: | **$1,000,000** | BIPD on File: **$1,000,000** |
| Cargo Exempt: | **NO** | | Cargo Required: | **NO** | Cargo on File: **YES** |
| BOC-3: | **YES** | | Bond Required: | **YES** | Bond on File: **YES** |
| Blanket Company: | **UNITED STATES CORPORATION COMPANY** | | | | |

| Company Name | Jurisdiction | Description | Due Date | Month | Date Completed | Amount Sent | Check # | Method Filed/Mailed/Paid |
|---|---|---|---|---|---|---|---|---|
| XGS | MA | Annual Report | 3/15/2015 | 3 | 2/24/2015 | $ 109.00 | | |
| XGS | NM | Biennial Corporation Report | 3/15/2016 | 3 | NA | NA | | |
| XGS | CO | Annual Report | 3/31/2015 | 3 | 2/24/2015 | | | |
| XGS | WI | Foreign Corporation Annual Report | 3/31/2015 | 3 | 3/5/2015 | $ 10.00 | | |
| XGS | GA | Corporation Annual Registration/Annual Report | 4/1/2015 | 4 | 2/24/2015 | $ 65.00 | | |
| XGS | TN | Corporation Annual Report | 4/1/2015 | 4 | 2/24/2015 | $ 50.00 | | |
| XGS | KY | Annual Report | 4/1/2015 | 4 | 3/13/2015 | $ 22.25 | | |
| XGS | MO | Annual Report- biennial report odd year beginning 2013 | 4/30/2015 | 4 | 3/16/2015 | $ 15.00 | | |
| XGS | FL | Uniform Business Report/Annual Report | 5/1/2015 | 5 | | | | |
| XGS | TX | Annual Report | 5/15/2015 | 5 | | | | |
| XGS | MI | Foreign Corporation Information Update | 5/15/2015 | 5 | | | | |
| XGS | ND | Annual Report | 5/15/2015 | 5 | | | | |
| XGS | NYS | Biennial Report - even year | 5/31/2015 | 5 | | | | |
| XGS | WA | Profit Corporation License Renewal and Annual Report | 6/30/2015 | 6 | | | | |
| XGS | KY | Annual Report | 6/30/2015 | 6 | | | | |
| XGS | OK | Annual Certificate of Capital Invested in State | 7/18/2015 | 7 | | | | |
| XGS | AZ | Annual Report | 8/17/2015 | 8 | | | | |
| XGS | UT | Annual Report | 8/17/2015 | 8 | | | | |
| XGS | NJ | Annual Report | 8/31/2015 | 8 | | | | |
| XGS | LA | Annual Report | 4/1/2015 | 9 | | | | |
| XGS | IL | Annual Report | 9/1/2015 | 9 | | | | |
| XGS | OR | Annual Report | 12/4/2015 | 12 | | | | |
| XGS | CA | Statement of Information | 12/31/2015 | 12 | | | | |
| XGS | MN | Annual Registration | 12/31/2015 | 12 | | | | |

| ENTITY NAME | STATE | DOM | INC/QUAL | STATUS | STATE ID | ADDITIONAL DATA | INC. STATE | DOMESTIC DATE | LAST ANNUAL REPORT | Entity Name |
|---|---|---|---|---|---|---|---|---|---|---|
| XPRESS GLOBAL SYSTEMS, INC. | GA | D | 10/30/1985 | ACTIVE/ COMPLIANCE | J603981 | | GA | 10/30/1985 | 2-24-15 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | AL | F | 09/20/2010 | EXISTS | 945-181 | | GA | 10/30/1985 | INFORMATION NOT AVAILABLE TO THIRD PARTY | Xpress Global Systems, Inc. |
| XPRESS GLOBAL SYSTEMS, INC. | AR | F | 07/09/2009 | GOOD STANDING | 800159391 | | GA | 10/30/1985 | INFORMATION NOT AVAILABLE TO THIRD PARTY | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | AZ | F | 08/17/2001 | GOOD STANDING | F-0999729-4 | | GA | 10/30/1985 | 06/02/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | CA | F | 12/16/1987 | ACTIVE | 1603837 | | GA | 10/30/1985 | 8/27/14 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | CO | F | 01/22/1988 | GOOD STANDING | 19871770219 | | GA | 10/30/1985 | 2/24/15 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | FL | F | 06/03/1996 | ACTIVE | F96000002758 | | GA | 10/30/1985 | 04/24/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | IL | F | 09/04/2001 | ACTIVE | 61804021 | TAX HANDLES THIS ANNUAL REPORT | GA | 10/30/1985 | 9/09/14 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | KY | F | 02/02/2011 | ACTIVE / IN GOOD STANDING | 0783570 | | GA | 10/30/1985 | 3-18-15 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | LA | F | 04/19/1996 | ACTIVE | 34524810 F | | GA | 10/30/1985 | 10/17/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | MA | F | 03/19/2002 | ACTIVE | 621261669 | FISCAL YEAR END = DECEMBER | GA | 10/30/1985 | 2/24/15 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | MD | F | 08/20/2001 | ACTIVE/GOOD STANDING | F06431191 | | GA | 10/30/1985 | 04/15/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | MI | F | 03/06/2012 | ACTIVE | 60495K | | GA | 10/30/1985 | 04/24/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | MN | F | 05/14/2012 | ACTIVE / IN GOOD STANDING | 486608400026 | | GA | 10/30/1985 | 06/02/2014 | Xpress Global Systems, Inc. |
| XPRESS GLOBAL SYSTEMS, INC. | MO | F | 01/07/2002 | GOOD STANDING | F00504163 | | GA | 10/30/1985 | 04/24/2014 BIENNIAL | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | ND | F | 05/30/2012 | ACTIVE & GOOD STANDING | 317356000 | | GA | 10/30/1985 | 05/05/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | NJ | F | 08/28/2001 | ACTIVE | 0100859150 | | GA | 10/30/1985 | 06/02/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | NM | F | 02/23/2011 | ACTIVE | 4410213 | FISCAL YEAR END = DECEMBER | GA | 10/30/1985 | GOOD STANDING THRU 03/15/2016 | XPRESS GLOBAL SYSTEMS, INC. |

3/29/2015

| ENTITY NAME | STATE | DOM | INC/QUAL | STATUS | STATE ID | ADDITIONAL DATA | INC STATE | DOMESTIC DATE | LAST ANNUAL REPORT | Entity_Name |
|---|---|---|---|---|---|---|---|---|---|---|
| XPRESS GLOBAL SYSTEMS, INC. | NY | F. | 05/22/2002 | ACTIVE | 2770048 | | GA | 10/30/1985 | 05/12/2014 BIENNIAL | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | OK | F. | 07/18/1996 | ACTIVE | 2300570487 | | GA | 10/30/1985 | NOT REQUIRED | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | OR | F. | 12/04/1987 | ACTIVE | 097535-83 | | GA | 10/30/1985 | 11/03/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | PA | F. | 12/04/1987 | ACTIVE | 1010572 | | GA | 10/30/1985 | CURRENT | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | TN | F. | 02/13/2006 | ACTIVE | 000513446 | FISCAL YEAR END = DECEMBER | GA | 10/30/1985 | 3-13-15 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | TX | F. | 05/31/1996 | IN EXISTENCE | 11022306 | TAX HANDLES THIS ANNUAL REPORT 2014 TEXAS FILINGS MAY TAKE UP TO 6 MONTHS TO BE DISPLAYED ON THE STATE WEBSITE | GA | 10/30/1985 | 10/27/14 | Xpress Global Systems, Inc. |
| XPRESS GLOBAL SYSTEMS, INC. | UT | F. | 08/17/2001 | ACTIVE | 4972232-0143 | | GA | 10/30/1985 | 09/11/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | WA | F. | 06/03/1996 | ACTIVE | 601718414 | | GA | 10/30/1985 | 5/12/2014 | XPRESS GLOBAL SYSTEMS, INC. |
| XPRESS GLOBAL SYSTEMS, INC. | WI | F. | 07/20/2012 | INCORPORATED/QUALIFIED | X001895 | | GA | 10/30/1985 | 3/5/15 | XPRESS GLOBAL SYSTEMS, INC. |

3/29/2015

U.S. Xpress Enterprises, Inc.
State Authorities as of 3/29/2015

| | State | Bus. In State | State License | Date Qualified | State ID # / Tax # | Comments |
|---|---|---|---|---|---|---|
| Xpress Global Systems, Inc. | AL | | Y | 10/30/1985 | 945-181 | **Keeping due to Intrastate Req.** |
| | AR | Y | Y | 7/9/2009 | 800159391 | |
| | AZ | Y | Y | 8/17/2001 | F-0999729-4 | |
| | CA | Y | Y | 12/16/1987 | C1603837 | |
| | CO | Y | Y | 1/22/1988 | 19871770219 | |
| | FL | Y | Y | 6/3/1996 | F96000002758 | |
| | GA | Y | Y | 10/30/1985 | J603981 | |
| | IL | Y | Y | 9/4/2001 | 61804021 | |
| | KY | Y | Y | 2/2/11 | 0783570 | |
| | LA | N | Y | 4/19/1996 | 34524810 F | |
| | MA | Y | Y | 3/19/2002 | 621261869 | |
| | MD | Y | Y | 8/20/2001 | F06431191 | |
| | ME | | N | | | |
| | MI | Y | Y | 3/6/2012 | 60495K | |
| | MN | Driver Only | Y | 5/14/2012 | 486608400026 | |
| | MO | Y | Y | 1/7/2002 | F00504183 | |
| | ND | Driver Only | Y | 5/30/2012 | 031735600 | |
| | NJ | | Y | 8/28/2001 | 0100859150 | |
| | NM | Y | Y | 2/23/2011 | 4410213 | |
| | NY | Y | Y | 5/22/2002 | 2770048 | |
| | OK | Y | Y | 7/18/1996 | 2300570487 | |
| | OR | Y | Y | 12/4/1987 | 097535-83 | |
| | PA | Y | Y | 12/4/1987 | 1010572 | |
| | SD | Driver Only | N | | | No Intrastate Authority Needed for State per Tammy (4/11/12) at Dept of Revenue. |
| | TN | Y | Y | 2/13/2006 | 513446 | |
| | TX | Y | Y | 5/31/1996 | 11022306 | SOS Registration Date is 1/1/1996 |
| | UT | Y | Y | 8/17/2001 | 4972232-0143 | |
| | WA | Y | Y | 6/3/1996 | 601718414 | |
| | WI | Y | Y | 7/20/2012 | X001895 | No Intrastate Authority Needed for State per Dawn (4/10/12) at Dept of Financial Institutions |

Business City / County Licenses

# Xpress Global Systems, Inc.

Georgia  10/30/25  52-1261869

Contact: Kelly Janvrin

Legend:
- Application or Renewal Submitted
- Required License & Due
- Required License and not Due
- License not Required
- Closed / Moved
- Need to Update- Location Change

| XPRESS GLOBAL SYSTEMS | FED ID: 621261869 | DOT# 534817 | INTERSTATE COMMERCE COMMISSION ID: 188471 |
|---|---|---|---|
| PERMIT: | LICENSE # | EXPIRATION | VENDOR |
| CALIFORNIA HAZMAT | 119756 | 2/28/2016 | 11234 |
| CALIFORNIA OPERATING (INTRASTATE) | 0044015 | NON-EXPIRING | 11295 |
| COLORADO HAZMAT | HMP-03714 | 3/1/2015 | 16822 |
| 6A SSR | TRM061626 | REPLACED WITH 6A UCR | |
| IDAHO HAZMAT | 2791803 | 12/31/2015 | |
| INSURANCE RENEWAL | USX188121-14 | 9/1/2015 | |
| OHIO HAZMAT | UPM-0534817-OH | 7/1/2015 | 11001 |
| OHIO PUC (INTRASATE) | | | 11001 |
| OREGON PUC (INTRASTATE) | 029722 | 12/31/2015 | 30588 |
| SERVICE OF PROCESS AGENTS - BOC 3 | ACCT #   99178 contact Melissa Kell | | |
| TEXAS INTRASTATE | 005218138C | NON-EXPIRING | 14811 |
| UNIFIED CARRIER REGISTRATION SYSTEM | MUST RENEW ONLINE BEFORE | 12/31/2015 | 11346 |
| U S HAZMAT | 052914 551 038WY (HM Co ID 028800) **RENEWED FOR 3 YEARS ONLINE** | 6/30/2017 | 11622 |

# TENNESSEE MOTOR VEHICLE
# IDENTIFICATION CARD

Insured:   US XPRESS, INC., U.S. XPRESS LEASING, INC.
             XPRESS GLOBAL SYSTEMS, INC.
Address: 4080 JENKINS RD, CHATTANOOGA TN 37421
Policy No: USX188121-14
Effective Date: SEPTEMBER 1, 2014
Expiration Date: SEPTEMBER 1, 2015
Limits of Liability:    POLICY MEETS MINIMUM LIABILITY LIMITS
                          PRESCRIBED BY LAW
Description of Equipment:
   **FLEET POLICY COVERS ALL EQUIPMENT OWNED,**
   **OPERATED OR LEASED BY THE NAMED INSURED**

## MOUNTAIN LAKE RISK RETENTION
## GROUP, INC.

An insurance policy has been issued that meets requirements of Tennessee Financial Responsibility Law of 1977.

## Report Every Accident Immediately
## Phone Day or Night (800) 601-5500

By *Leigh Anne Battersby*
Authorized Representative

**THIS CARD MUST BE CARRIED IN THE INSURED**
**MOTOR VEHICLE FOR PRODUCTION UPON DEMAND.**

NAIC #13812

US XPRESS 2014-15 INSURANCE

PUBLIC UTILITIES COMMISSION
OF THE STATE OF COLORADO

PERMIT NO. <u>HMP-03714</u>

Xpress Global Systems Inc
1535 New Hope Church Road
Tunnel Hill, GA  30755

In compliance with the provisions of Section 42-20-202(b), C.R.S., the commission does grant authority
to transport hazardous materials subject to the limitations and provisions mentioned below.

1. A copy of the shipping papers as required by 49 C.F.R. 172.200 must be carried in the transporting
   motor vehicle.

2. This permit must be carried in the transporting motor vehicle.

3. This original permit is non-transferable and shall not be copied.

This permit does not authorize for-hire transportation requiring specific authority under Title 40,
Articles 13 & 16, C.R.S.

Full compliance with the laws of the State of Colorado and with the Rules and Regulations of the
Department of Public Safety is required under this permit.

This permit is valid from March 1, 2014 through March 1, 2015.

Dated at Denver, Colorado, February 6, 2014.



WITNESS MY HAND AND THE SEAL OF
THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF COLORADO

DOUG DEAN
DIRECTOR

# Alliance for Uniform HazMat Transportation Procedures
## Uniform Program Credentials

**ALLIANCE**
FOR UNIFORM
**HAZMAT**
TRANSPORTATION
PROCEDURES

XPRESS GLOBAL SYSTEMS INC
1535 NEW HOPE CHURCH RD.
TUNNEL HILL, GA 30755

| | | |
|---|---|---|
| USDOT Census # | 00534817 | |
| MC Docket # | N/A | |
| EPA Transporter ID # | N/A | 53096 |
| Intrastate Motor Carrier #: | N/A | 121490 |

| | |
|---|---|
| Phone Number to call in case of a accident or emergency: | 706-673-1224 |

| | | |
|---|---|---|
| Uniform Program ID: | UPM0534817OH | |
| Certified By: | Smith, Priscilla | |
| Issuance Date: | 13-May-2014 | Expiration Date:   01-Jul-2015 |
| Issuing Agency: | PUBLIC UTILITIES COMMISSION OF OHIO | |
| Agency Telephone: | (614) 466-3392 | |



1 of 1

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**



**HAZARDOUS MATERIALS
CERTIFICATE OF REGISTRATION
FOR REGISTRATION YEAR(S) 2014-2017**

**Registrant:**   XPRESS GLOBAL SYSTEMS INC
Attn: DIANA HALL
1537 NEW HOPE CHURCH ROAD
TUNNEL HILL, GA 30755

This certifies that the registrant is registered with the U.S. Department of Transportation as required by 49 CFR Part 107, Subpart G.

This certificate is issued under the authority of 49 U.S.C. 5108. It is unlawful to alter or falsify this document.

**Reg. No: 052914 551 038WY       Issued: 05/29/2014       Expires: 06/30/2017**

**HM Company ID: 028800**

---

**Record Keeping Requirements for the Registration Program**

The following must be maintained at the principal place of business for a period of three years from the date of issuance of this Certificate of Registration:

(1)  A copy of the registration statement filed with PHMSA; and
(2)  This Certificate of Registration

Each person subject to the registration requirement must furnish that person's Certificate of Registration (or a copy) and all other records and information pertaining to the information contained in the registration statement to an authorized representative or special agent of the U. S. Department of Transportation upon request.

Each motor carrier (private or for-hire) and each vessel operator subject to the registration requirement must keep a copy of the current Certificate of Registration or another document bearing the registration number identified as the "U.S. DOT Hazmat Reg. No." in each truck and truck tractor or vessel (trailers and semi-trailers not included) used to transport hazardous materials subject to the registration requirement. The Certificate of Registration or document bearing the registration number must be made available, upon request, to enforcement personnel.

For information, contact the Hazardous Materials Registration Manager, PHH-52, Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation, 1200 New Jersey Avenue, SE, Washington, DC 20590, telephone (202) 366-4109.

STATE OF CALIFORNIA BUSINESS, TRANSPORTATION AND HOUSING AGENCY

**DEPARTMENT OF MOTOR VEHICLES**
MOTOR CARRIER SERVICES BRANCH MS G875
P.O. BOX 932370 Sacramento, CA. 94232-3700

(916) 657-8153



12/03/2007



XPRESS GLOBAL SYSTEMS INC
1537 NEW HOPE CHURCH RD
ATTN: DIANA HALL
TUNNEL HILL, GA 30755

| | NON-EXPIRING MOTOR CARRIER PERMIT Combined Carrier | | | |
|---|---|---|---|---|
| DEPARTMENT OF MOTOR VEHICLES Motor Carrier Services Branch P.O. BOX 932370 Sacramento, CA. 94232-3700 | **Valid From:** | 01/01/2008 | **Valid Through:** | **Non-Expiring** |
| | **CA#:** | 0044015 | | |
| XPRESS GLOBAL SYSTEMS INC 1537 NEW HOPE CHURCH RD ATTN: DIANA HALL TUNNEL HILL, GA 30755 | The carrier named on this permit is subject to the Unified Carrier Registration Act (UCRA) of 2005, and is granted a non-expiring permit of the following classification:<br><br>**For Hire**<br>**Corporation** | | | |
| Pmt Date: N/A | Office #: 154 | **Not Valid for Intrastate Only Operations** | | |
| Account #: 24076 | Tech ID: TA | | | |
| Sequence #: 0045 | Amt Paid: No Fee | | | |

**!!!IMPORTANT REMINDERS!!!**

1. This non-expiring Motor Carrier Permit (MCP) will remain valid as long as you continue to conduct interstate operations. The Unified Carrier Registration Act (UCRA) of 2005 exempts combined carriers (carriers who operate both intra and interstate) from MCP requirements.
2. Federal Motor Carrier Safety Administration insurance requirements must be maintained.
3. If you commence intrastate only operations, you must renew your MCP.

California Relay Telephone Service for the deaf or hearing impaired from TDD Phones: 1-800-735-2929; from Voice Phones: 1-800-735-2922

DMV 2200 MCP (NEW 10/2007)                    *A Public Service Agency*



## Idaho Transportation Department



ABOUT US | TRAVELER SERVICES | DMV | PROJECTS | NEWS & INFO

**XPRESS GLOBAL SYSTEMS INC  #279180-3  [ Switch Accounts ]**

[ Review transactions ] [ Log out ]

### Hazmat Order Receipt

| Type of Endorsement | Quantity | $/Endorsement | Fee |
|---|---|---|---|
| New | 0 | $10.00 | $0.00 |
| Renewal | 8 | $10.00 | $80.00 |
| Change | 0 | $10.00 | $0.00 |
| Cancel | 0 | $0.00 | $0.00 |
| | | Subtotal: | $80.00 |
| | | Purchased through Idaho.gov Price: | $88.00 |

**Transaction: 6678520**

Authorized: 12/11/2014 09:46:40 AM MST

Billed To: USXPRESS USXPRESS

Cost: $88.00

Please Note: This charge will appear on your statement as "Idaho.gov" State of ID.

In order to improve our online services you may complete this DMV customer survey.

You will not be required to print endorsements from this service. You will not be required to carry endorsements in your vehicles if you purchase them through this service. Inquiries may be made by law enforcement to verify your purchase and the validity of your endorsements.

If you purchase endorsements through the mail or at an Idaho Port of Entry, you will be required to carry those endorsements in your vehicle.

| Pending Action | Endorsement # | Unit | VIN | Make | Year | Effective | Expires | Fee | |
|---|---|---|---|---|---|---|---|---|---|
| renew | 0562495 | 01634 | 1XP7D49X1AD103494 | PTRB | 2010 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0547565 | 01696 | 1XP7D49X8AD103556 | PTRB | 2010 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0562493 | 11423 | 1FUJGLDR5BLAV6720 | FRHT | 2011 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0562492 | 4753 | 1FUJA6CK96LU57844 | FRHT | 2006 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0562491 | 4759 | 1FUJA6CK46LU57850 | FRHT | 2006 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0500190 | 4763 | 1FUJA6CK16LU57854 | FRHT | 2006 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0562494 | 4767 | 1FUJA6CK96LU57858 | FRHT | 2006 | 1/01/2015 | 12/31/2015 | $10.00 | pending |
| renew | 0500191 | 4876 | 1FUJA6CK46LU58335 | FRHT | 2006 | 1/01/2015 | 12/31/2015 | $10.00 | pending |

**Division of Motor Vehicles**
**[M-F 8:00 am-5:00 pm Mountain Time]**
Administration: (208) 334-4443
Driver Services: (208) 334-8735
Motor Carrier: (208) 334-8611
Overlegal Permits: (208) 334-8420
Port of Entry: (208) 334-8688
Vehicle Registrations (Special Plates): (208) 334-8649
Vehicle Titles: (208) 334-8663
Vehicle/Vessel Dealer Licensing: (208) 334-8681
TDD/TTY: (208) 334-4458

About Us | Traveler Services | DMV | Projects | News And Info | Privacy & Security
**Idaho Transportation Department**
3311 W. State Street · P.O. Box 7129
Boise, ID 83707-1129

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
            CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

```
OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE              * * * * * * * * * * * * * *
SALEM, OR 97302-1166                        * RECEIPT NO: 2MK021OK    *
                                            * BASE STATE: OK          *
                                            * LICENSE NO: 2MK021      *
                                            *  EFFECTIVE: 01/01/2015  *
       XPRESS GLOBAL SYSTEMS INC            * EXPIRATION: 12/31/2015  *
       1535 NEW HOPE CHURCH RD              *    ISSUED: 11/18/2014   *
       TUNNEL HILL        GA 30755          *              06:32 AM   *
                                            *           PACIFIC TIME  *
                                            * * * * * * * * * * * * * *
```

```
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE: V  VIN: 1FUJA6CK06LU57845   FUEL CODE: D    UNIT #:      4754
CLASSES: 1A 4A         FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:       O M
OWNED:  X  LEASED:     FROM:
```

```
AUTHORIZED BY:  DIANA HALL              RECEIPT FEE (14)   $    8.00
        TITLE:                     REINSTATEMENT FEE (15)   $     .00
        PHONE:  (706) 673-1224        SUSPENSION FEE (19)   $     .00
                                   TOTAL AMOUNT PAID (FXV)   $    8.00
```

```
DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:
```

```
+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL      ---+
|                                                                        |
|                                                                        |
|                                                                        |
+---                                                                  ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

```
  ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
  ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **
```

OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166

```
* * * * * * * * * * * * *
* RECEIPT NO: 2GR676OK    *
* BASE STATE: OK          *
* LICENSE NO: 2GR676      *
*  EFFECTIVE: 01/01/2015  *
* EXPIRATION: 12/31/2015  *
*    ISSUED: 11/18/2014   *
*               06:32 AM  *
*             PACIFIC TIME *
* * * * * * * * * * * * *
```

XPRESS GLOBAL SYSTEMS INC
1535 NEW HOPE CHURCH RD
TUNNEL HILL          GA 30755

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE: V  VIN: 1FUJA6CK66LU57848    FUEL CODE: D      UNIT #:        4757
CLASSES: 1A 4A        FEE BASIS:  1 (MONTHLY MILEAGE)    ODOMTR:        O M
OWNED:  X   LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL              RECEIPT FEE (14)  $    8.00
       TITLE:                     REINSTATEMENT FEE (15)  $     .00
       PHONE:  (706) 673-1224        SUSPENSION FEE (19)  $     .00
                                  TOTAL AMOUNT PAID (FXV)  $    8.00

DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


```
+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL      ---+
|                                                                        |
|                                                                        |
|                                                                        |
+---                                                                  ---+
```
RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880    **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
             CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

```
OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE          * * * * * * * * * * * * *
SALEM, OR 97302-1166                    * RECEIPT NO: 2GR682OK    *
                                        * BASE STATE: OK          *
                                        * LICENSE NO: 2GR682      *
                                        *  EFFECTIVE: 01/01/2015  *
      XPRESS GLOBAL SYSTEMS INC         * EXPIRATION: 12/31/2015  *
      1535 NEW HOPE CHURCH RD           *    ISSUED: 11/18/2014   *
      TUNNEL HILL         GA 30755      *            06:32 AM     *
                                        *          PACIFIC TIME   *
                                        * * * * * * * * * * * * *
```

```
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK16LU57854    FUEL CODE: D      UNIT #:        4763
CLASSES: 1A 4A       FEE BASIS: 1 (MONTHLY MILEAGE)    ODOMTR:          0 M
OWNED:  X   LEASED:      FROM:
```

```
AUTHORIZED BY:  DIANA HALL                 RECEIPT FEE (14)  $     8.00
        TITLE:                       REINSTATEMENT FEE (15)  $      .00
        PHONE:  (706) 673-1224           SUSPENSION FEE (19)  $      .00
                                      TOTAL AMOUNT PAID (FXV)  $     8.00
```

```
DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:
```

```
+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL      ---+
|                                                                        |
|                                                                        |
|                                                                        |
+---                                                                  ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

     ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
     ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

```
                  OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
          CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

```
OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE          * * * * * * * * * * * * *
SALEM, OR 97302-1166                    * RECEIPT NO: 2SG263OK    *
                                        * BASE STATE: OK          *
                                        * LICENSE NO: 2SG263      *
                                        *  EFFECTIVE: 01/01/2015  *
      XPRESS GLOBAL SYSTEMS INC         * EXPIRATION: 12/31/2015  *
      1535 NEW HOPE CHURCH RD           *    ISSUED: 11/18/2014   *
      TUNNEL HILL         GA 30755      *              06:32 AM   *
                                        *            PACIFIC TIME *
                                        * * * * * * * * * * * * *
```

```
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK06LV94381    FUEL CODE: D      UNIT #:       4918
CLASSES: 1A 4A         FEE BASIS: 1 (MONTHLY MILEAGE)    ODOMTR:        0 M
OWNED:   X   LEASED:      FROM:
```

```
AUTHORIZED BY:  DIANA HALL               RECEIPT FEE (14)  $    8.00
       TITLE:                       REINSTATEMENT FEE (15)  $     .00
       PHONE:  (706) 673-1224          SUSPENSION FEE (19)  $     .00
                                    TOTAL AMOUNT PAID (FXV)  $    8.00
```

```
DECLARED WEIGHTS:  SOLO:         COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:
```

```
+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL     ---+
|                                                                        |
|                                                                        |
|                                                                        |
+---                                                                  ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

```
   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880    **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **
```

```
                 OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
          CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE          * * * * * * * * * * * * *
SALEM, OR 97302-1166                    * RECEIPT NO: 2SY3380K   *
                                        * BASE STATE: OK         *
                                        * LICENSE NO: 2SY338     *
                                        *  EFFECTIVE: 01/01/2015 *
       XPRESS GLOBAL SYSTEMS INC        * EXPIRATION: 12/31/2015 *
       1535 NEW HOPE CHURCH RD          *    ISSUED: 11/18/2014  *
       TUNNEL HILL        GA 30755      *            06:32 AM    *
                                        *          PACIFIC TIME  *
                                        * * * * * * * * * * * * *

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE: V  VIN: 1FUJA6CK66LV94384    FUEL CODE: D      UNIT #:        4921
CLASSES: 1A 4A        FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:        O M
OWNED:  X   LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL             RECEIPT FEE (14)  $     8.00
        TITLE:                   REINSTATEMENT FEE (15)  $      .00
        PHONE:  (706) 673-1224      SUSPENSION FEE (19)  $      .00
                                 TOTAL AMOUNT PAID (FXV) $     8.00

DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:



+--- INSTRUCTIONS/COMMENTS:  SENT TO: 190      PREPARED BY:  TOL     ---+
|                                                                      |
|                                                                      |
|                                                                      |
+---                                                                ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

    ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
    ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
            CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166

```
                                    * * * * * * * * * * * * *
                                    * RECEIPT NO: 2GZ841OK   *
                                    * BASE STATE: OK         *
                                    * LICENSE NO: 2GZ841     *
                                    *  EFFECTIVE: 01/01/2015 *
     XPRESS GLOBAL SYSTEMS INC      * EXPIRATION: 12/31/2015 *
     1535 NEW HOPE CHURCH RD        *     ISSUED: 11/18/2014 *
     TUNNEL HILL        GA 30755    *              06:32 AM  *
                                    *            PACIFIC TIME *
                                    * * * * * * * * * * * * *
```

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK56LV94389    FUEL CODE: D      UNIT #:        4926
CLASSES: 1A 4A        FEE BASIS:  1 (MONTHLY MILEAGE)    ODOMTR:        O M
OWNED:  X  LEASED:        FROM:

AUTHORIZED BY:  DIANA HALL               RECEIPT FEE (14)  $    8.00
       TITLE:                      REINSTATEMENT FEE (15)  $     .00
       PHONE:  (706) 673-1224          SUSPENSION FEE (19)  $     .00
                                   TOTAL AMOUNT PAID (FXV)  $    8.00

DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


```
+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190     PREPARED BY:   TOL     ---+
|                                                                       |
|                                                                       |
|                                                                       |
+---                                                                 ---+
```
RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
              CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES


OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE              * * * * * * * * * * * * *
SALEM, OR 97302-1166                       * RECEIPT NO: 2GZ8480K   *
                                           * BASE STATE: OK         *
                                           * LICENSE NO: 2GZ848     *
                                           *  EFFECTIVE: 01/01/2015 *
       XPRESS GLOBAL SYSTEMS INC           * EXPIRATION: 12/31/2015 *
       1535 NEW HOPE CHURCH RD             *    ISSUED: 11/18/2014  *
       TUNNEL HILL        GA 30755         *              06:32 AM  *
                                           *            PACIFIC TIME *
                                           * * * * * * * * * * * * *

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK26LV94396   FUEL CODE: D     UNIT #:         4933
CLASSES: 1A 4A       FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:        O M
OWNED:   X   LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL                   RECEIPT FEE (14)  $     8.00
         TITLE:                       REINSTATEMENT FEE (15)  $      .00
         PHONE:  (706) 673-1224          SUSPENSION FEE (19)  $      .00
                                       TOTAL AMOUNT PAID (FXV) $     8.00


DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:




+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190        PREPARED BY:  TOL      ---+
 |                                                                         |
 |                                                                         |
 |                                                                         |
+---                                                                    ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **
```

```
                   OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
            CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                      * * * * * * * * * * * * *
                                          * RECEIPT NO: 2GZ8530K      *
                                          * BASE STATE: OK            *
                                          * LICENSE NO: 2GZ853        *
       XPRESS GLOBAL SYSTEMS INC          *  EFFECTIVE: 01/01/2015    *
       1535 NEW HOPE CHURCH RD            * EXPIRATION: 12/31/2015    *
       TUNNEL HILL          GA 30755      *     ISSUED: 11/18/2014    *
                                          *              06:32 AM     *
                                          *            PACIFIC TIME   *
                                          * * * * * * * * * * * * *

ACCT NO: 029722   USDOT NO:  0534817   YEAR: 2006   MAKE: FRGHT
BODY STYLE:  V   VIN: 1FUJA6CK26LV94401   FUEL CODE: D     UNIT #:        4938
CLASSES: 1A 4A        FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:           O M
OWNED:   X    LEASED:       FROM:

AUTHORIZED BY:   DIANA HALL              RECEIPT FEE (14)   $      8.00
          TITLE:                  REINSTATEMENT FEE (15)   $       .00
          PHONE:   (706) 673-1224      SUSPENSION FEE (19)   $       .00
                                  TOTAL AMOUNT PAID (FXV)   $      8.00

DECLARED WEIGHTS:   SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


+--- INSTRUCTIONS/COMMENTS:     SENT TO: 190        PREPARED BY:   TOL    ---+
|                                                                           |
|                                                                           |
+---                                                                     ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166

```
* * * * * * * * * * * * *
* RECEIPT NO: 2HG417OK    *
* BASE STATE: OK          *
* LICENSE NO: 2HG417      *
*   EFFECTIVE: 01/01/2015 *
* EXPIRATION: 12/31/2015  *
*     ISSUED: 11/18/2014  *
*             06:32 AM    *
*           PACIFIC TIME  *
* * * * * * * * * * * * *
```

XPRESS GLOBAL SYSTEMS INC
1535 NEW HOPE CHURCH RD
TUNNEL HILL          GA 30755

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK36LV94424    FUEL CODE: D    UNIT #:        4961
CLASSES: 1A 4A        FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:        0 M
OWNED:  X    LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL
          TITLE:                         RECEIPT FEE (14)   $    8.00
          PHONE:  (706) 673-1224      REINSTATEMENT FEE (15) $     .00
                                        SUSPENSION FEE (19)  $     .00
                                    TOTAL AMOUNT PAID (FXV)  $    8.00

DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:

```
+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190       PREPARED BY:  TOL    ---+
|                                                                        |
|                                                                        |
+---                                                                  ---+
```

RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

  ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
  ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
            CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE                   * * * * * * * * * * * *
SALEM, OR 97302-1166                             * RECEIPT NO: 2HG418OK    *
                                                 * BASE STATE: OK          *
                                                 * LICENSE NO: 2HG418      *
        XPRESS GLOBAL SYSTEMS INC                *  EFFECTIVE: 01/01/2015  *
        1535 NEW HOPE CHURCH RD                  * EXPIRATION: 12/31/2015  *
        TUNNEL HILL        GA 30755              *    ISSUED: 11/18/2014   *
                                                 *             06:32 AM    *
                                                 *           PACIFIC TIME  *
                                                 * * * * * * * * * * * *
ACCT NO: 029722   USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  Z  VIN: 1FUJA6CK56LV94425    FUEL CODE: D      UNIT #:
CLASSES: 1A 4A         FEE BASIS:  1 (MONTHLY MILEAGE)   ODOMTR:        4962
OWNED:   X   LEASED:        FROM:                                     0 M

AUTHORIZED BY:  DIANA HALL
        TITLE:                        RECEIPT FEE (14)    $     8.00
        PHONE:  (706) 673-1224    REINSTATEMENT FEE (15)  $      .00
                                     SUSPENSION FEE (19)  $      .00
                                  TOTAL AMOUNT PAID (FXV) $     8.00

DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190       PREPARED BY:  TOL     ---+
|                                                                         |
|                                                                         |
+---                                                                   ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

```
                    OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
              CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE               * * * * * * * * * * * * *
SALEM, OR 97302-1166                         * RECEIPT NO: 2TP137OK    *
                                             * BASE STATE: OK          *
                                             * LICENSE No: 2TP137       *
    XPRESS GLOBAL SYSTEMS INC                *  EFFECTIVE: 01/01/2015   *
    1535 NEW HOPE CHURCH RD                  * EXPIRATION: 12/31/2015   *
    TUNNEL HILL        GA 30755              *    ISSUED: 11/18/2014    *
                                             *              06:32 AM    *
                                             *            PACIFIC TIME  *
                                             * * * * * * * * * * * * *
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK56LV94456    FUEL CODE: D     UNIT #:
CLASSES: 1A 4A        FEE BASIS: 1 (MONTHLY MILEAGE)    ODOMTR:          4993
OWNED:  X   LEASED:       FROM:                                          O M

AUTHORIZED BY:   DIANA HALL                  RECEIPT FEE (14)  $      8.00
         TITLE:                        REINSTATEMENT FEE (15)  $       .00
         PHONE:  (706) 673-1224            SUSPENSION FEE (19)  $       .00
                                       TOTAL AMOUNT PAID (FXV)  $      8.00

DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:



+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190        PREPARED BY:  TOL     ---+
|                                                                          |
|                                                                          |
+---                                                                       |
+---                                                                    ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
              OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
        CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                      * * * * * * * * * * * * *
                                          * RECEIPT NO: 2SA878OK    *
                                          * BASE STATE: OK          *
                                          * LICENSE NO: 2SA878      *
        XPRESS GLOBAL SYSTEMS INC         *   EFFECTIVE: 01/01/2015 *
        1535 NEW HOPE CHURCH RD           * EXPIRATION: 12/31/2015  *
        TUNNEL HILL        GA 30755       *     ISSUED: 11/18/2014  *
                                          *             06:32 AM    *
                                          *            PACIFIC TIME *
                                          * * * * * * * * * * * * *
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK96LV94461    FUEL CODE: D    UNIT #:      4998
CLASSES: 1A 4A       FEE BASIS: 1 (MONTHLY MILEAGE)    ODOMTR:        O M
OWNED:   X   LEASED:       FROM:

AUTHORIZED BY:  DIANA HALL                RECEIPT FEE (14)  $     8.00
        TITLE:                    REINSTATEMENT FEE (15)  $      .00
        PHONE:  (706) 673-1224        SUSPENSION FEE (19)  $      .00
                                  TOTAL AMOUNT PAID (FXV) $     8.00

DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL     ---+
|                                                                       |
|                                                                       |
|                                                                       |
+---                                                                 ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

  ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
  ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

```
                      OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
        CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                        * * * * * * * * * * * * *
                                            * RECEIPT NO: 2HJ784OK    *
                                            * BASE STATE: OK          *
                                            * LICENSE NO: 2HJ784      *
     XPRESS GLOBAL SYSTEMS INC              *  EFFECTIVE: 01/01/2015  *
     1535 NEW HOPE CHURCH RD                * EXPIRATION: 12/31/2015  *
     TUNNEL HILL        GA 30755            *     ISSUED: 11/18/2014  *
                                            *             06:32 AM    *
                                            *           PACIFIC TIME  *
                                            * * * * * * * * * * * * *
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CK06LV94462    FUEL CODE: D    UNIT #:        4999
CLASSES: 1A 4A        FEE BASIS:  1 (MONTHLY MILEAGE)    ODOMTR:         O M
OWNED:   X    LEASED:        FROM:

AUTHORIZED BY:  DIANA HALL
          TITLE:                              RECEIPT FEE (14)  $     8.00
         PHONE:  (706) 673-1224         REINSTATEMENT FEE (15)  $      .00
                                           SUSPENSION FEE (19)  $      .00
                                        TOTAL AMOUNT PAID (FXV)  $     8.00
DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:



+--- INSTRUCTIONS/COMMENTS:   SENT TO: 190      PREPARED BY:  TOL     ---+
|                                                                        |
|                                                                        |
+---                                                                     |
+---                                                                  ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

 ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
 ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
            OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
     CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166

```
                                  * * * * * * * * * * * * *
                                  * RECEIPT NO: 2HJ742OK      *
                                  * BASE STATE: OK            *
                                  * LICENSE NO: 2HJ742        *
     XPRESS GLOBAL SYSTEMS INC    * EFFECTIVE: 01/01/2015     *
     1535 NEW HOPE CHURCH RD      * EXPIRATION: 12/31/2015    *
     TUNNEL HILL        GA 30755  *    ISSUED: 11/18/2014     *
                                  *              06:32 AM     *
                                  *             PACIFIC TIME  *
                                  * * * * * * * * * * * * *
```

ACCT NO: 029722   USDOT NO:  0534817   YEAR: 2006  MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJA6CKX6LV94470    FUEL CODE: D   UNIT #:     D6008
CLASSES: 1A 4A          FEE BASIS: 1 (MONTHLY MILEAGE)   ODOMTR:       O M
OWNED:   X  LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL
         TITLE:                        RECEIPT FEE (14)   $     8.00
         PHONE:  (706) 673-1224    REINSTATEMENT FEE (15) $      .00
                                      SUSPENSION FEE (19)  $      .00
                                   TOTAL AMOUNT PAID (FXV) $     8.00

DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


```
+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190      PREPARED BY:  TOL    ---+
|                                                                       |
|                                                                       |
|                                                                       |
+---                                                                 ---+
```
RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

  ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
  ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
            OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
     CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES
```

```
OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                    * * * * * * * * * * * * *
                                        * RECEIPT NO: 2HJ771OK     *
                                        * BASE STATE: OK           *
                                        * LICENSE NO: 2HJ771       *
      XPRESS GLOBAL SYSTEMS INC         *  EFFECTIVE: 01/01/2015   *
      1535 NEW HOPE CHURCH RD           * EXPIRATION: 12/31/2015   *
      TUNNEL HILL        GA 30755       *    ISSUED: 11/18/2014    *
                                        *            06:32 AM      *
                                        *            PACIFIC TIME  *
                                        * * * * * * * * * * * * *
ACCT NO: 029722   USDOT NO:  0534817   YEAR: 2006  MAKE: FRGHT
BODY STYLE:  Z  VIN: 1FUJA6CK16LV94499    FUEL CODE: D     UNIT #:
CLASSES: 1A 4A       FEE BASIS:  1 (MONTHLY MILEAGE)   ODOMTR:        D6037
OWNED:   X  LEASED:      FROM:                                       O M

AUTHORIZED BY:  DIANA HALL                RECEIPT FEE (14)  $    8.00
          TITLE:                    REINSTATEMENT FEE (15)  $     .00
          PHONE:  (706) 673-1224       SUSPENSION FEE (19)  $     .00
                                    TOTAL AMOUNT PAID (FXV)  $    8.00

DECLARED WEIGHTS:  SOLO:        COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:
```

```
+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190       PREPARED BY:  TOL    ---+
|                                                                        |
|                                                                        |
|                                                                        |
+---                                                                  ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

```
              OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
       CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                    * * * * * * * * * * * * *
                                       * RECEIPT NO: 2RW721OK    *
                                       * BASE STATE: OK          *
                                       * LICENSE NO: 2RW721      *
       XPRESS GLOBAL SYSTEMS INC       * EFFECTIVE: 01/01/2015   *
       1535 NEW HOPE CHURCH RD         * EXPIRATION: 12/31/2015  *
       TUNNEL HILL        GA 30755     *    ISSUED: 11/18/2014   *
                                       *             06:32 AM    *
                                       *           PACIFIC TIME  *
                                       * * * * * * * * * * * * *

ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2010  MAKE: PTRB
BODY STYLE: V  VIN: 1XP7D49X8AD103556    FUEL CODE: D   UNIT #:
CLASSES: 1A 4A           FEE BASIS: 1 (MONTHLY MILEAGE)    ODOMTR:        01696
OWNED:  X  LEASED:       FROM:                                              0 M

AUTHORIZED BY:  DIANA HALL
           TITLE:                       RECEIPT FEE (14)   $      8.00
           PHONE:  (706) 673-1224  REINSTATEMENT FEE (15)  $       .00
                                     SUSPENSION FEE (19)   $       .00
                                  TOTAL AMOUNT PAID (FXV)  $      8.00

DECLARED WEIGHTS:  SOLO:           COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190        PREPARED BY:  TOL      ---+
 |                                                                          |
 |                                                                          |
 |                                                                          |
+---                                                                     ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

```
                     OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
              CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166                      * * * * * * * * * * * * * *
                                          * RECEIPT NO: 2RP2870K    *
                                          * BASE STATE: OK          *
                                          * LICENSE NO: 2RP287      *
       XPRESS GLOBAL SYSTEMS INC          *  EFFECTIVE: 01/01/2015  *
       1535 NEW HOPE CHURCH RD            * EXPIRATION: 12/31/2015  *
       TUNNEL HILL        GA 30755        *     ISSUED: 11/18/2014  *
                                          *               06:32 AM  *
                                          *             PACIFIC TIME *
                                          * * * * * * * * * * * * * *
ACCT NO: 029722  USDOT NO:  0534817  YEAR: 2010  MAKE: PTBT
BODY STYLE:  V  VIN: 1XP7D49X7AD103628   FUEL CODE: D    UNIT #:
CLASSES: 1A 4A        FEE BASIS: 1 (MONTHLY MILEAGE)  ODOMTR:         01768
OWNED:  X   LEASED:      FROM:                                         O M

AUTHORIZED BY:  DIANA HALL
         TITLE:                         RECEIPT FEE (14)   $     8.00
         PHONE:  (706) 673-1224   REINSTATEMENT FEE (15)   $      .00
                                     SUSPENSION FEE (19)   $      .00
                                  TOTAL AMOUNT PAID (FXV)  $     8.00

DECLARED WEIGHTS:  SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:


+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190       PREPARED BY:  TOL     ---+
 |                                                                         |
 |                                                                         |
 |                                                                         |
+---                                                                    ---+
RENEWAL DOCUMENT ISSUED: 11/18/2014
```

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

   ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
   ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM             **

OREGON WEIGHT RECEIPT AND TAX IDENTIFIER
CARRY THIS CREDENTIAL IN THE CAB OF THE POWER UNIT AT ALL TIMES

OREGON DOT, MCTD
3930 FAIRVIEW INDUSTRIAL DR SE
SALEM, OR 97302-1166

```
* * * * * * * * * * * *
* RECEIPT NO: 2144422IN  *
* BASE STATE: IN         *
* LICENSE NO: 2144422    *
*  EFFECTIVE: 01/01/2015 *
* EXPIRATION: 12/31/2015 *
*     ISSUED: 11/18/2014 *
*             06:32 AM   *
*           PACIFIC TIME *
* * * * * * * * * * * *
```

XPRESS GLOBAL SYSTEMS INC
1535 NEW HOPE CHURCH RD
TUNNEL HILL          GA 30755

ACCT NO: 029722   USDOT NO:  0534817   YEAR: 2013   MAKE: FRGHT
BODY STYLE:  V  VIN: 1FUJGLDR4DSBU5526    FUEL CODE: D      UNIT #:      641766
CLASSES: 1A 4A        FEE BASIS:  1 (MONTHLY MILEAGE)   ODOMTR:        0 M
OWNED:  X   LEASED:      FROM:

AUTHORIZED BY:  DIANA HALL
        TITLE:                              RECEIPT FEE (14)  $     8.00
        PHONE:  (706) 673-1224        REINSTATEMENT FEE (15)  $      .00
                                         SUSPENSION FEE (19)  $      .00
                                   TOTAL AMOUNT PAID (FXV)  $     8.00

DECLARED WEIGHTS:   SOLO:          COMBO:  80000   ADDITIONAL WEIGHTS & AXLES:

```
+--- INSTRUCTIONS/COMMENTS:    SENT TO: 190        PREPARED BY:  TOL      ---+
|                                                                           |
|                                                                           |
|                                                                           |
+---                                                                     ---+
```

RENEWAL DOCUMENT ISSUED: 11/18/2014

THIS RECEIPT IS VALID ONLY FOR THE IDENTIFIED VEHICLE.  IT IS NOT VALID IF
ALTERED OR WHEN BASE LICENSE PLATE OR VEHICLE INFORMATION CHANGES.  CONTACT
ODOT TO OBTAIN A NEW RECEIPT.

LIABILITY FOR WEIGHT-MILE TAX CONTINUES UNTIL THIS RECEIPT IS CANCELLED.
CONTACT ODOT TO CANCEL THIS RECEIPT.  CONFIRMATION WILL BE MAILED TO THE
CARRIER'S ADDRESS OF RECORD.

THIS RECEIPT IS A WEIGHT MILE TAX CREDENTIAL AND DOES NOT MEET OREGON
REGISTRATION REQUIREMENTS.  WITHOUT PROOF OF OREGON REGISTRATION, A HEAVY
MOTOR VEHICLE TRIP PERMIT MUST BE OBTAINED.

THIS RECEIPT DOES NOT AUTHORIZE OPERATION IN EXCESS OF LEGAL SIZE OR WEIGHT.
CHECK OREGON ROUTE MAPS 1 AND 7 FOR ALLOWABLE LENGTHS ON ROUTES TRAVELED
IN OREGON.

  ** CONTACT ODOT REGISTRATION @ 503-378-6699; OR BY FAX @ 503-378-6880   **
  ** VISIT ODOT TRUCKING ONLINE @ WWW.OREGONTRUCKINGONLINE.COM            **

**U**NIFIED
**C**ARRIER
**R**EGISTRATION **S**YSTEM

| UCR Home || Logout || Contact Us |

Home
    ›   Registration Home

**Unified Carrier Registration**

UCR registration is complete.
Please print this page for your records and close the browser window.
If you paid using a credit card on the internet, the charge will be reflected as 'UCR
Fees' on your statement.

| | |
|---|---|
| Receipt number: | 2015500022700 |
| Registration Year: | 2015 |
| Expiration Date: | 12/31/2015 |
| Legal Name: | XPRESS GLOBAL SYSTEMS INC |
| USDOT Number: | 534817 |
| MC Number: | 188471 |
| Telephone Number: | 8003674416 |
| Base State: | GA |
| Business Address: | 1537 New Hope Church Road |
| | Tunnel Hill , GA  30755 |
| Mailing Address: | 1537 New Hope Church Rd |
| | Tunnel Hill , GA  30755 |
| Classification: | Motor Carrier |

**Payment Details**

| Transaction Type | Total Vehicles | Certified By | Paid Date | Fee Paid | Other Fee |
|---|---|---|---|---|---|
| REGISTRATION | 277 | DIANA HALL | 12/31/2014 | $7511.00 | $6.75 |
| Total | 277 | | | $7511.00 | |

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# HAZARDOUS MATERIALS TRANSPORTATION LICENSE

CHP 360H (REV. 1/00) OPI 062

| CONTROL NUMBER | LICENSE NUMBER | ISSUE DATE | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|---|---|
| 213265 | 119756 | 1/5/2015 | | 2/28/2016 |
| CHP CARRIER NUMBER | LOCATION | | | |
| CA  44015 | | ☐ Duplicate | | ☐ Replacement |
| | | ☐ Initial | | ☑ Renewal |

## PROPERTY OF THE CALIFORNIA HIGHWAY PATROL (CHP)

The original valid license must be kept at the licensee's place of business as indicated on the license and a legible copy must be carried in any vehicle or combination transporting hazardous materials and must be presented to any CHP officer upon request. This license is NON-TRANSFERABLE and must be surrendered to the CHP upon demand or as required by law.  A majority change in ownership or control of the licensed activity shall require a new license. This license may be renewed by submitting an application and appropriate fee to the CHP. Persons whose licenses have expired or are otherwise no longer valid must immediately cease the activity requiring a license. THERE IS NO GRACE PERIOD.  For licensing information contact CHP, Commercial Vehicle Section at (916) 843-3400.

LICENSEE NAME AND PHYSICAL ADDRESS    *(only if different from below)*

XPRESS GLOBAL SYSTEMS, INC.

LICENSEE NAME AND MAILING ADDRESS

XPRESS GLOBAL SYSTEMS, INC.

1535 NEW HOPE CHURCH RD.
TUNNEL HILL  GA  30755

ATTENTION: DIANA HALL

This carrier is on the special routing/safe stopping place mailing lists as indicated below:

☐ (HMX)  Explosives subject to Division 14, California Vehicle Code (CVC).

☐ (HMPIH)  Poison Inhalation Hazard materials in bulk packagings subject to Division 14.3, CVC.

☐ (HRCQ) Highway Route Controlled Quanity radioactive materials subject to Division 14.5, CVC.

Any person who dumps, spills, or causes the release of hazardous materials or hazardous waste upon any highway shall immediately notify the CHP or the agency having jurisdiction for that highway. The minimum fine for failure to make the appropriate notification is $ 2,000.00. (CVC Section  23112.5)



# County of Sacramento
# General Business License



**XPRESS GLOBAL SYSTEMS INC**
**XPRESS GLOBAL SYSTEMS INC**
**P O BOX 24628**
**CHATTANOOGA, TN 37422**

License Number:       **GNB32011-51375**        Expiration Date:   **May 01, 2017**

Issue Date:           **May 03, 2011**

Owner Name:           **XPRESS GLOBAL SYSTEMS INC**

Business Name:        **XPRESS GLOBAL SYSTEMS INC**

Location:             **11255 PYRITES WY #200**
                      **RANCHO CORDOVA, CA 95670**

Business Activities:  **TRANSPORTATION**

This License is approved with the following conditions. Failure to comply with the following conditions may result in revocation of this license and civil or criminal penalties.

ALL COUNTY REGULATIONS APPLY.  THERE SHALL BE NO INFLATABLE/PORTABLE/A-FRAME SIGNS OR FLAGS.  ALL OUTDOOR DISPLAY OR BANNERS REQUIRE A SEPARATE USE PERMIT. ALL DEVELOPMENT STANDARDS INCLUDING PARKING, FENCING AND LANDSCAPING SHALL APPLY.  ENTIRE OPERATION MUST BE CONDUCTED WITHIN A COMPLETELY ENCLOSED BUILDING OR SCREEN FROM PUBLIC VIEW.

## License not transferable. Not Valid at any other location.
## Post in public view in a conspicuous place.

Julie Valverde

Director of Finance

Department of Finance, Tax Collection and Licensing
700 H Street, Room 1710, Sacramento, California 95814
phone (916) 874-6644 | fax (916) 874-8909 | www.finance.saccounty.net

OFFICE OF JOHN F. WARREN
COUNTY CLERK, DALLAS COUNTY, TEXAS



07/19/2012 02:51:49 PM

201200209383
ANINC 1/2

## ASSUMED NAME CERTIFICATE FOR AN INCORPORATED BUSINESS OR PROFESSION

NOTICE: "CERTIFICATES" ARE VALID NOT TO EXCEED 10 YEARS FROM THE DATE FILED IN THE
COUNTY CLERK'S OFFICE CHAPTER 71, SECT. 151(a), TITLE 5 BUSINESS AND COMMERCE CODE
THIS CERTIFICATE PROPERLY EXECUTED IS TO BE FILED IMMEDIATELY WITH THE COUNTY CLERK

**NAME UNDER WHICH BUSINESS OR PROFESSIONAL SERVICES IS OR WILL BE CONDUCTED:**

Xpress Global Services, Inc.

(Print or Type)

Address: 2402 Easters Blvd. (DFW Airport)

City: Dallas                    State: TX                    Zip Code: 77040

1. The name of the incorporated business or profession as stated in its Articles of Incorporation or comparable document is:
Xpress Global Services, Inc.

2. The state, country, or other jurisdiction under the laws of which it was incorporated is Georgia
and the address of its registered or similar office in that jurisdiction is:
3675 Crestwood Parkway, Suite 350, Duluth, GA 30096

3. The period, not to exceed ten years, during which this assumed name will be used is: 10 Years (perpetual)

4. The corporation is a (circle one) business operation, non-profit corporation, professional corporation, professional association
or other type of corporation (specify)

5. If the corporation is required to maintain a registered office in Texas, the address of the registered office is
16055 Space Center Blvd. Ste 235 , Houston, TX 77062                                                                and
the name of its registered agent at such address is National Registered Agents, Inc. . The address of
the principal office (if not the same as the registered office) is: 4080 Jenkins Road, Attn: Legal Affairs
Chattanooga, TN 37421

6. If the corporation is not required to or does not maintain a registered office in Texas, the office address in Texas is:
and if the corporation is not incorporated, organized or associated
under the laws of Texas, the address its place of business in Texas is: , and the office
address elsewhere is:

7. The county or counties where business or professional services are being or are to be conducted or rendered under such
assumed name are (if applicable, use the designation "all" or "all except all ").

8. If this instrument is executed by the attorney-in-fact, the attorney-in-fact hereby states that he has been duly authorized, in
writing, by his principal to execute and acknowledge this instrument.

_Signature Corp. Officer, representative
of attorney-in-fact of the corporation_

THE STATE OF ~~TEXAS~~ TENNESSEE, COUNTY OF ~~DALLAS~~ HAMILTON
BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Ray M. Harlin
Known to me to be the person(s) whose name(s) is/are the subscribed to the foregoing instrument and, under oath, acknowledged
to me that (s)he signed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on July 16 ,2012

JOHN F. WARREN, COUNTY CLERK
DALLAS COUNTY, TEXAS

By
Deputy County Clerk , or

Notary Public in and for ~~Dallas~~ County
Hamilton

Form No 4243(Rev. 02-10)

Filed and Recorded
Official Public Records
John F. Warren, County Clerk
Dallas County, TEXAS
07/19/2012 02:51:49 PM
$14.00



201200209383

# Gerard Rickhoff



COUNTY CLERK                                    BEXAR COUNTY

MAILING ADDRESS:                         LOCATION ADDRESS:
BEXAR COUNTY COURTHOUSE                   PAUL ELIZONDO TOWER
100 DOLOROSA ST. SUITE 104               101 W. NUEVA ST. SUITE 120
SAN ANTONIO, TEXAS 78205                 SAN ANTONIO, TEXAS 78205

# C E R T I F I C A T E

STATE OF TEXAS                 §
                               §
COUNTY OF BEXAR                §

      I, GERARD RICKHOFF, COUNTY CLERK OF BEXAR COUNTY, TEXAS, DO HEREBY CERTIFY THAT THE BELOW AND FOREGOING IS A TRUE AND CORRECT COPY OF THE ORIGINAL:

    [ __ ]        ASSUMED NAME CERTIFICATE

    [ ___ ]      ABANDONMENT OF ASSUMED NAME CERTIFICATE

WHICH IS FILED UNDER NUMBER 20120454792 AND APPEARS OF RECORD IN MY OFFICE IN THE OFFICIAL PUBLIC RECORDS OF GOVERNMENTAL, BUSINESS, AND PERSONAL MATTERS OF BEXAR COUNTY, TEXAS.

      IN TESTIMONY WHEREOF, WITNESS MY HAND AND OFFICIAL SEAL OF OFFICE GIVEN IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, ON THIS THE 26 DAY OF July A.D., 20 12.

                     GERARD RICKHOFF
                     COUNTY CLERK
                     BEXAR COUNTY, TEXAS

BY: _____ DEPUTY

# Gerard Rickhoff

Doc# 20120454782

 

| COUNTY CLERK | | BEXAR COUNTY |
|---|---|---|

## ASSUMED NAME CERTIFICATE

FOR INCORPORATED BUSINESS OR PROFESSION, LIMITED PARTNERSHIP,
REGISTERED LIMITED LIABILITY PARTNERSHIP, OR LIMITED LIABILITY COMPANY

PURSUANT TO THE PROVISIONS OF CHAPTER 71, BUSINESS AND COMMERCE CODE OF THE STATE OF
TEXAS, THE UNDERSIGNED CERTIFIES THE FOLLOWING:

1. THE NAME OF THE CORPORATION, LIMITED PARTNERSHIP, REGISTERED LIMITED LIABILITY
PARTNERSHIP, OR LIMITED LIABILITY COMPANY AS STATED IN ITS ARTICLES OF INCORPORATION,
ARTICLES OF ORGANIZATION, CERTIFICATE OF LIMITED PARTNERSHIP, APPLICATION, OR
COMPARABLE DOCUMENT IS:

   Xpress Global Systems, Inc.

2. THE ASSUMED NAME UNDER WHICH THE BUSINESS OR PROFESSIONAL SERVICE IS OR IS TO BE
CONDUCTED OR RENDERED IS:

   Xpress Global Systems, Inc.

3. THE STATE, COUNTY, OR OTHER JURISDICTION UNDER THE LAWS OF WHICH IT WAS INCORPORATED,
ORGANIZED, OR ASSOCIATED IS Georgia
AND THE ADDRESS OF ITS REGISTERED OR SIMILAR OFFICE IN THAT JURISDICTION IS:
   3675 Crestwood Parkway, Suite 350, Duluth, GA 30096

4. THE PERIOD, NOT TO EXCEED 10 YEARS, DURING WHICH THE ASSUMED NAME WILL BE USED IS:
   10 Years - Perpetual

5. THE ENTITY IS (please check one):
   A. X Business Corporation    B.___ Non-Profit Corporation    C.___ Professional Corporation
   D.___ Professional Association    E.___ Limited Partnership    F.___ Limited Liability Company
   G.___ Registered Limited Liability Partnership or some other type of incorporated business, Professional or other
   Association (specify):

6. IF THE ENTITY IS REQUIRED TO MAINTAIN A REGISTERED OFFICE IN TEXAS, THE ADDRESS OF THE
REGISTERED OFFICE IS: 16055 Space Center Blvd. Ste 235, Houston TX 77062
AND THE NAME OF THE REGISTERED AGENT AT SUCH ADDRESS IS: National Registered
Agents, Inc. . THE ADDRESS OF THE PRINCIPAL OFFICE (IF NOT THE SAME AS
THE REGISTERED OFFICE) IS:

7. IF THE ENTITY IS NOT REQUIRED OR DOES NOT MAINTAIN A REGISTERED OFFICE IN TEXAS, THE
OFFICE ADDRESS IN TEXAS IS:
AND IF THE ENTITY IS NOT INCORPORATED, ORGANIZED OR ASSOCIATED UNDER THE LAWS OF
TEXAS, THE ADDRESS OR ITS PLACE OF BUSINESS IN TEXAS IS 5108 Rittiman Road, San Antonio, Tx 78218
AND THE OFFICE ADDRESS ELSEWHERE IS 4080 Jenkins Road, Chattanooga, TN 37421 Attn: Legal Affairs

8. THE COUNTY OR COUNTIES WHERE BUSINESS OR PROFESSIONAL SERVICES ARE BEING OR ARE TO
BE CONDUCTED OR RENDERED UNDER SUCH ASSUMED NAME ARE (IF APPLICABLE, USE THE
DESIGNATION "ALL" OR "ALL EXCEPT"): Potentially ALL

   IN TESTIMONY WHEREOF, _____ HAVE
HEREUNTO SET _____ HAND(S) THIS THE _____ DAY OF _____, A.D. 20__

SIGNATURE OF OFFICER, GENERAL PARTNER
MANAGER, MEMBER, REPRESENTATIVE, OR
ATTORNEY-IN-FACT OF ENTITY

NOTE:   A CERTIFICATE EXECUTED AND ACKNOWLEDGED BY AN ATTORNEY-IN-FACT SHALL INCLUDE A
STATEMENT THAT THE ATTORNEY-IN-FACT HAS BEEN DULY AUTHORIZED IN WRITING BY HIS PRINCIPAL
TO EXECUTE AND ACKNOWLEDGE THE SAME.

STATE OF ~~TEXAS~~ Tennessee §

COUNTY OF ~~BEXAR~~ § Hamilton

CORPORATE ACKNOWLEDGEMENT

This instrument was acknowledged before me on the __16__ day of __July__, A.D., 20_12_

by __Ray M. Harlin__, __Assistant Secretary__
(Name of Officer / Partner / Attorney-in-Fact)           (Title)

Given under my hand and seal of office this __16__ day of __July__, A.D., 20_12_

GERARD RICKHOFF
COUNTY CLERK, BEXAR COUNTY TEXAS

BY: _____ DEPUTY

OR: _Jenice Houser_ Tennessee
NOTARY PUBLIC, STATE OF ~~TEXAS~~ Tennessee

JANICE HOUSER
STATE OF TENNESSEE
NOTARY PUBLIC
HAMILTON COUNTY



STATE OF ... CERTIFIED COPY CERTIFICATE
CERTIFIED COPY CERTIFICATE
The page to which this certificate is affixed may have
been lawfully altered to redact confidential personal
information but is otherwise a full, true and correct
copy of the original on file and of record in my office
ATTESTED:

JUL 26 2012

GERARD RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY: _____

Doc# 20120454782 Fees: $11.00
07/26/2012  9:36AM # Pages 2
Filed & Recorded in the Official
Public Records of  BEXAR COUNTY
GERARD C. RICKHOFF COUNTY CLERK

CERTIFICATE OF ASSUMED NAME

No. _____

NAME OF BUSINESS

Xpress Global Systems, Inc.

Doc# 20120454782

Gerard Rickhoff

COUNTY CLERK          BEXAR COUNTY

MAILING ADDRESS:
BEXAR COUNTY COURTHOUSE
100 DOLOROSA, STE. 104
SAN ANTONIO, TEXAS 78205

LOCATION ADDRESS:
PAUL ELIZONDO TOWER
101 W. NUEVA, STE. 120
SAN ANTONIO, TEXAS 78205

GERRY RICKHOFF, COUNTY CLERK
BEXAR COUNTY COURTHOUSE
100 DOLOROSA, STE. 108
SAN ANTONIO, TEXAS 78205-3083

233032009 23 FROIHWP 37421

U.S. Xpress Inc.
Legal Affairs
4080 Jenkins Rd
Chattanooga, Tn. 37421

RECEIVED JUL 3 0 2012

```
             Receipt# 1632184
---------------------------------------
        GERARD C. RICKHOFF
           COUNTY CLERK
           BEXAR COUNTY
       100 DOLOROSA SUITE 104
         SAN ANTONIO, TX
              78205
          (210) 335-2216
---------------------------------------
Doc#: 20120454782  Pgs: 2
Type: UNINCORPORATED
  COPIES                  $        2.00
  ASSUMED NAME            $        3.00
  RECORDS MANAGEMENT      $        5.00
  COURTHOUSE SECURITY     $        1.00


Total                    $       11.00
Check(s) Tendered        $       11.00
Balance                  $        0.00
---------------------------------------
  CHECK Number
  111129414              $       11.00
---------------------------------------
Total Documents: 1
Total Fees: 4
---------------------------------------
Client Name GENERAL PUBLIC
Filed By US XPRESS
Jul 26 2012  9:36:14 AM

Cashier: LILAHG
```

neopost
07/26/2012
US POSTAGE

FIRST-CLASS MAIL
$00.42⁴
ZIP 78205
011M11509050

**Schedule 2.19(a)**

**Legal Proceedings**

Member has Knowledge of potential claims against the Company asserted by (i) Anton Holmes, on behalf of himself and other employees of the Company, in a notification to the California Labor and Workforce Development Agency dated November 7, 2014 and (ii) drivers and dock workers employed by the Company as of the Effective Time at the Company's Fresno, CA location relating to missed meal periods and time worked off the clock.

**Schedule 2.19(c)**

## **Orders**

None.

## Schedule 2.20

## Absence of Certain Changes and Events

The Company extended its Lease Agreement dated June 15, 2006 by and between CRP-2 Mid South Industrial, LLC and the Company at 11417 Moog Drive, Maryland Heights, Missouri, for an additional five years at the current lease rate pursuant to that certain Third Amendment to Lease upon approval from Murad Karimi.

The Fourth Amendment to the Tunnel Hill Lease between XGS and Q&F was entered into May 12, 2014.

Contracts listed on Schedule 2.21(a) that have been entered into, amended, extended, or otherwise revised since January 1, 2014, are incorporated herein by this reference.

**Schedule 2.21(a)**

**Material Contracts**

(i):
- Confidential Transportation Agreement dated July 23, 2002 by and among Kennesaw Transportation and Dedicated Xpress Services and CSI/Crown, Inc.
- Confidential Transportation Agreement dated August 29, 2002 by and among Frost Trucking and Dedicated Xpress Services and CSI/Crown, Inc.
- Confidential Transportation Agreement dated November 15, 2002 by and among Danny Herman Trucking and Dedicated Xpress Services and CSI/Crown, Inc.
- Warehousing and Distribution Services Agreement dated February 1, 2014 by and between IVC US and Xpress Global Systems, Inc.
- Warehousing and Distribution Services Agreement dated April 1, 2014 by and between Kraus USA and Xpress Global Systems, Inc.

(ii): Schedule 2.11(a) and (d) of these Disclosure Schedules are incorporated by reference herein.

(iv):
- Master Lease Agreement dated May 15, 2008 by and between Navistar Leasing Company and U.S. Xpress Leasing, Inc., as amended from time to time, assumed by the Company pursuant to that certain Assignment and Consent Agreement by and between Navistar Leasing Company, U.S. Xpress Leasing, Inc. and the Company.
- Master Lease Agreement dated September 14, 2012 by and between GE TF Trust and U.S. Xpress Leasing, Inc., as amended from time to time, assumed by the Company pursuant to that certain Transfer and Assumption Agreement by and between U.S. Xpress Leasing, Inc., the Company, GE TF Trust and any guarantors party thereto.
- Master Lease Agreement dated August 1, 2011 by and among NMHG Financial Services, Inc. and U.S. Xpress Enterprises, Inc., as amended from time to time, assumed by the Company pursuant to that certain Transfer and Assumption Agreement by and among U.S. Xpress Enterprises, Inc. and the Company, and consented to by NMHG Financial Services, Inc.
- Master Agreement dated December 19, 2008 by and between GE Capital Information Technology Solutions, Inc. and U.S. Xpress Leasing, Inc., as amended from time to time, assumed by the Company pursuant to that certain Assumption Agreement by and between U.S. Xpress Leasing, Inc. and the Company, and consented to by GE Capital Information Technology Solutions, Inc.

(vii): Asset Purchase Agreement dated May 27, 2005 by and between Forward Air, Inc., Xpress Global Systems, Inc., and U.S. Xpress Enterprises, Inc.

(xi):
- Truckload Carrier Agreement dated March 27, 2006 by and between Xpress Global Systems, Inc. and Home Depot U.S.A., Inc., as amended.
- Asset Purchase Agreement dated May 27, 2005 by and between Forward Air, Inc., Xpress Global Systems, Inc., and U.S. Xpress Enterprises, Inc.

(xiv): Schedule 2.27 (excluding the last listed item) of these Disclosure Schedules is incorporated by reference herein.

**Schedule 2.21(b)**

**<u>Invalid/Unenforceable Contracts</u>**

None.

## Schedule 2.21(c)

## <u>Defaults or Conflicts under Material Contracts</u>

(i):  Schedules 2.8 and 2.21(a) of these Disclosure Schedules are incorporated by reference herein to the extent such Material Contract requires Consent of, notice to, ratification by, or filing with any Person in consummation of the Contemplated Transactions.

(ii):  None.

(iii):  Schedules 2.8 and 2.21(a) of these Disclosure Schedules are incorporated by reference herein to the extent such Material Contract requires Consent of, notice to, ratification by, or filing with any Person in consummation of the Contemplated Transactions.

**Schedule 2.22(a)**

**<u>Insurance Policies</u>**

See attached summary.

**XPRESS GLOBAL SYSTEMS, INC.**
**INSURANCE COVERAGES IN EFFECT AS OF 3/27/2015**

| Coverage Line | Insurance Carrier | Policy Number | Policy Period | Limits | Attaching | Deductible | Notes |
|---|---|---|---|---|---|---|---|
| Auto/Trucker Liability | Mountain Lake Risk Retention Group | USX188121-14 | 9/1/2014-8/31/2015 | $1,000,000 | Primary | $950,000 | Vermont licensed captive |
| Auto/Trucker Excess | Mountain Lake Risk Retention Group | USX-XS-188122-14 | 9/1/2014-8/31/2015 | $4,000,000 | $1,000,000 | N/A | Vermont licensed captive |
| Auto/Trucker Liability (NY) | Great West Casualty Company | GW98175BE | 9/1/2014-8/31/2015 | $1,000,000 | Primary | $1,000,000 | These policies provides admitted paper for those states and customers that will not accept the RRG. USX assumes full limits as deductible. |
| Auto/Trucker Liability (NY Excess) | Great West Casualty Company | CEP00114E | 9/1/2014-8/31/2015 | $1,000,000 | $1,000,000 | $1,000,000 | These policies provides admitted paper for those states and customers that will not accept the RRG. USX assumes full limits as deductible. |
| Umbrella | National Fire & Marine Insurance Company | 42-RLO-000322-01 | 9/1/2014-8/31/2015 | $5,000,000 | $5,000,000 | $5M Corridor | Attaches at $1M for GL and Business Auto. |
| Excess | National Union Fire Ins. Co. of Pittsburgh, PA | 19961615 | 9/1/2014-8/31/2015 | $25,000,000 | $10,000,000 | N/A | |
| Excess | Lexington Insurance Company | 15438201 | 9/1/2014-8/31/2015 | $15,000,000 | $35,000,000 | N/A | |
| Excess | Lexington Insurance Company | 17790006 | 9/1/2014-8/31/2015 | $50,000,000 | $50,000,000 | N/A | |
| Punitive Damage Excess Liability | Berkshire Hathaway International Insurance Ltd. | 641248 (WEL400657 Aon UK) | 9/1/2014-8/31/2015 | $5,000,000 | $5,000,000 | N/A | |
| Punitive Damage Excess Liability | American International Reinsurance Company Ltd. | 13630913 | 9/1/2014-8/31/2015 | $25,000,000 | $10,000,000 | N/A | |
| Punitive Damage Excess Liability | American International Reinsurance Company Ltd. | 13630912 | 9/1/2014-8/31/2015 | $15,000,000 | $35,000,000 | N/A | |
| Punitive Damage Excess Liability | American International Reinsurance Company Ltd. | 13630914 | 9/1/2014-8/31/2015 | $50,000,000 | $50,000,000 | N/A | |
| General Liability | Liberty Mutual Insurance Group | TB2-741-002062-024 | 9/1/2014-8/31/2015 | $1,000,000 | Primary | $25,000 | |
| Workers' Compensation (most states) | Liberty Mutual Insurance Group | WC7-74D-002062-144 | 9/1/2014-8/31/2015 | Statutory | Primary | $500,000 | Covers most states.  $1M limit for EL. |
| Business Auto (Company Cars) | Liberty Mutual Insurance Group | WC7-741-002062-154 | 9/1/2014-8/31/2015 | Statutory | Primary | $500,000 | Covers WY. |
| | Liberty Mutual Insurance Group | AS2-741-002062-044 | 9/2/2014-8/31/2015 | $1,000,000 | Primary | $1,000 | No deductible for liability; $1,000 deductible for collision. |
| Motor Truck Cargo | Traveler's Property Casualty Company of America | QT-660-477M7527-TIL-14 | 9/1/2014-8/31/2015 | $2,000,000 | N/A | $250,000 | Higher limits for scheduled locations |
| Physical Damage - Comprehensive & Collision | Great West Casualty Company | CLP968500 | 12/31/14-12/31/15 | Varies | $18,951,087 | $1500/incident | Insurance attaches when aggregate is reached.  Limits are $2M per incident, except at scheduled terminals. |
| Storage Tank Liability | Liberty Mutual Insurance Group | TXE-NY-103539-114 | 9/1/2014-8/31/2015 | $5,000,000 | N/A | $10,000 | XGS is an insured, but no XGS locations are named locations. |
| Aircraft Liability & Hull | United States Aircraft Insurance Group | SIHL 1-710W | 6/27/2014-6/27/2015 | $100,000,000 | Primary | N/A | Physical Damge has $1,500,000 Limit for Lear 31 and $8,250,000 limit for Lear 45 with no deductible. |
| Fiduciary Liability | Federal Insurance Company | 79503710 | 7/28/2014-7/28/2015 | $10,000,000 | Primary | $10,000 | |
| Crime | Federal Insurance Company | 82098785 | 7/28/2014-7/28/2015 | $3,000,000 | Primary | $100,000 | |
| Employment Practices Liability | Federal Insurance Company | 81278857 | 7/28/2014-7/28/2015 | $10,000,000 | Primary | $250,000 | $2,000,000 Mass/Class Deductible |
| Directors and Officer, Employed Lawyers, and Kidnap & Ransom | National Union Fire Ins. Co. of Pittsburgh, PA | 01-421-94-47 | 7/28/2014-7/28/2015 | $10,000,000 | Primary | $100,000 | Separate $1,000,000 limit for Employed Lawyers ($15,000 deductible) and for Kidnap & Ransom |
| Commercial Property, Inland Marine, PPO, and Business Interruption | Affiliated FM | GL969 | 11/1/2014-11/1/2015 | $150,000,000 with sublimits by location and line of coverage | Primary | Varies by location and line of coverage | Limits: $1M Earth Movement and Flood all locations except Jenkins Road ($5M); $20M Bus. Interruption Jenkins Road & Tunnel Hill; $100k all others; $5M PPO at % XGS locations (Hayward, Ca, Tunnel Hill, GA, Salt Lake City, UT, Hanover, MD, DFW Airport, TX, Anaheim, CA) and USX location at Broad St., Chattanooga, $51M at all others. |
| California Earthquake | Lloyd's of London (Western Re) | LLO01601 | 5/1/2014-5/1/2015 | $5,000,000 | $1,000,000 | $1,000,000 | |

**Schedule 2.22(b)**

## Agreements Reflecting the Allocation of Insurance

The Company has insurance policies and obligations to maintain insurance per provisions in its Contracts and Real Property leases. Schedules 2.8, 2.11(a), 2.11(d), 2.21(a), and 2.22(a) of these Disclosure Schedules are incorporated by reference herein.

The Company self-insures for physical damage to its tractors and trailers up to $18,951,087 for policy period.

The Company has an insurance reserve as set forth in the Financial Statements.

The Company has the limits and deductibles under its insurance policies, as set forth in Schedule 2.22(a).

42

**Schedule 2.23**

**Environmental Matters**

None.

## Schedule 2.24

## Employee Severance and Similar Agreements

None.

Schedule 2.25(a)

## Company Intellectual Property

- XGS Imaging: This Intellectual Property consists of an imaging system that scans and accepts documents into a computer program and automatically associates the document to existing orders when possible. When the system is unable to auto-associate scanned documents to existing orders, it provides a process for an employee to manually associate the document to an existing order. XGS Imaging allows users (both internal and external) to access imaged documents that are associated to specific orders or accounts. XGS Imaging was custom written by the Company's employees.

- XGS iSeries system: This Intellectual Property involved software that allows the Company to monitor and control its billing, freight movements, barcoding, over, short, and damaged (OS&D), customer service, pricing and rating and sales processes. This system runs on IBM hardware, but the software was custom written by the Company's employees.

- XGSI.com: This is the Company's external website. The website serves general website functions such as allowing potential customers to find the Company through internet searches and provides general company information to the public. The website also provides additional services to existing Company customers including allowing them to create a bill of lading and to create an order in the Company's system directly. Customers can track their freight, review their accounts receivable data, enter a pickup request, inquire into the Company's transit schedules, do rating inquires, view warehousing inventory information, request specific pricing on select shipments, and enter a claim on lost or damaged freight. The website was entirely custom written by the Company's employees.

- U.S. Trademark Serial No. 86-348,236 for MYXGS, published in the Official Gazette of the U.S. Patent and Trademark Office on December 23, 2014. See attached Notice of Publication dated December 3, 2014. This Trademark is subject to a Contribution Agreement that will be executed by the Parent and the Company at Closing.

45

LAW OFFICES

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
A PROFESSIONAL CORPORATION
6060 POPLAR AVENUE
SUITE 440
MEMPHIS, TENNESSEE 38119
(901) 579-3100

WENDY ROBERTSON, OF COUNSEL
Direct Dial: (901) 579-3128
Direct Fax: (901) 577-0783
E-Mail Address: wrobertson@bakerdonelson.com

December 10, 2014

Kelly Arnold
U.S. Xpress Enterprises, Inc.
4080 Jenkins Road
Chattanooga, TN 37421

Re:   **Publication of U.S. Trademark Serial No. 86/348,236 for MYXGS
      Our File No.: 2016317-000091**

Dear Kelly:

    We are pleased to inform you that the above-identified trademark application has been examined and passed for publication. The mark will be published in the Official Gazette of the U.S. Patent and Trademark Office on December 23, 2014. A copy of the publication notice is enclosed for your files.

    Any person who believes he would be damaged by the registration may oppose the same by filing notice of opposition in the Patent and Trademark Office within thirty days (30) after the publication of the mark. If no such notice of opposition is filed, the Commissioner will issue a Notice of Allowance in due course.

    Please feel free to contact me if you have questions regarding this mark.

                              Sincerely,

                              Wendy Robertson

Enclosure

M LRA 2558300 v1
2016317-000091  12/10/2014

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451
www.uspto.gov

Dec 3, 2014

## NOTICE OF PUBLICATION

1. Serial No.:
   86-348,236

2. Mark:
   MYXGS
   (STANDARD CHARACTER MARK)

3. International Class(es):
   42

4. Publication Date:
   Dec 23, 2014

5. Applicant:
   U.S. Xpress Enterprises, Inc.

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the *Official Gazette* on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a notice of allowance pursuant to section 13(b) of the Statute.

Copies of the trademark portion of the *Official Gazette* containing the publication of the mark may be obtained from:

The Superintendent of Documents
U.S. Government Printing Office
PO Box 371954
Pittsburgh, PA 15250-7954
Phone: 202-512-1800

By direction of the Commissioner.

**Email Address(es):**

trademarks@bakerdonelson.com



## BAKER
## DONELSON
BEARMAN, CALDWELL
& BERKOWITZ, PC

6060 POPLAR AVENUE
SUITE 440
MEMPHIS, TENNESSEE 38119
PHONE: 901.579.3100
FAX: 901.579.3111

www.bakerdonelson.com

WENDY ROBERTSON, OF COUNSEL
Direct Dial: 901.579.3128
Direct Fax: 901.577.0783
E-Mail Address: wrobertson@bakerdonelson.com

July 21, 2014

## PRIVILEGED AND CONFIDENTIAL/ATTORNEY-CLIENT
## COMMUNICATION/ATTORNEY WORK PRODUCT

Mr. Michael W. Vincent                                VIA EMAIL mvincent@usxpress.com
Vice President Sales and Marketing
Xpress Global Systems
4080 Jenkins Road
Chattanooga, TN 37421

        Re:    Full U.S. Trademark Search for MY XGS

Dear Mr. Vincent:

        Pursuant to instructions, we have conducted a U.S. trademark search for the mark shown above for use in association with transportation and logistics services and related software. The results of the search suggest that the proposed mark should be available for use and registration in the U.S.

        The most relevant marks revealed in the search appear in the chart below; however, we do not believe any of these marks should present obstacles to use or registration of your proposed mark given the differences in the marks themselves and/or the goods or services provided under the marks. We therefore provide information regarding these marks simply to give you a sense of the trademark landscape.

| TM/SN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner |
|---|---|---|---|
| XGS<br><br>**XGS**<br><br><br>SN:77-756860<br>RN:4,422,147 | Registered<br>October 22, 2013<br><br>Int'l Class: 9<br>First Use:<br>September 23, 2005<br>Filed: | (Int'l Class: 9)<br>Communication<br>network switches,<br>semiconductors,<br>integrated circuit | Broadcom Corporation<br>(California Corp.)<br>5300 California Avenue<br>Irvine, California 92617 |

M WLR1 2508331 v1
2016317-000091 07/21/2014

ALABAMA • GEORGIA • LOUISIANA • MISSISSIPPI • TENNESSEE • WASHINGTON, D.C.

July 21, 2014
Page 2

| TM/SN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner |
|---|---|---|---|
| | June 10, 2009<br>Published:<br>July 28, 2009<br>Allowed:<br>October 20, 2009 | | |
| XGS CORE<br><br>**XGS CORE**<br><br><br>SN:77-733121<br>RN:3,905,045 | Registered<br>January 11, 2011<br><br>Int'l Class: 9<br>First Use:<br>May 19, 2009<br>Filed:<br>May 8, 2009<br>Published:<br>March 30, 2010<br>Allowed:<br>May 25, 2010 | (Int'l Class: 9)<br>Computer hardware;<br>communication network<br>switches;<br>semiconductors;<br>integrated circuits;<br>computer chips | Broadcom Corporation<br>(California Corp.)<br>5300 California Avenue<br>Irvine, California 92617 |
| STRATAXGS<br><br>SN:76-410502<br>RN:2,803,292 | Renewed<br>January 6, 2014<br><br>Int'l Class: 9<br>First Use:<br>May 29, 2002<br>Filed:<br>May 21, 2002<br>Published:<br>November 12, 2002<br>Allowed:<br>February 4, 2003<br>Registered:<br>January 6, 2004 | (Int'l Class: 9)<br>Computer hardware;<br>integrated circuits; and<br>software for controlling<br>and using integrated<br>circuits | Broadcom Corporation<br>(California Corp.)<br>5300 California Avenue<br>Irvine, California 92617 |
| PGS and Design<br><br>**PGS**<br><br>SN:85-859170 | Registered<br>May 6, 2014<br><br>Int'l Class: 35, 39, 40<br>First Use:<br>April 11, 2013 | (Int'l Class: 35)<br>Business supply chain<br>management services,<br>namely, logistics and<br>reverse logistics of<br>goods of others; | Prime Global Solutions,<br>Inc., Formerly Prime<br>America Logistics, Inc.<br>(California Corp.)<br>11231 Jersey Blvd.<br>Rancho Cucamonga, |

M WLRJ 2508331 v1
2016317-000091  07/21/2014

July 21, 2014
Page 3

| TM/SN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner |
|---|---|---|---|
| RN:4,524,420 | In Commerce: June 2, 2013 Filed: February 25, 2013 Published: February 18, 2014 | warehousing and order fulfillment services; freight management services, namely, freight tracking for business purposes; freight logistics management (Int'l Class: 39) Supply chain logistics and reverse logistics services, namely, warehousing, storage, transportation and delivery of freight for others by air, rail ship or truck; logistics and reverse logistics, namely, warehousing and shipping of goods for others; freight forwarding and transportation services for others, namely, transportation and delivery of goods for others by air, rail, ship or truck (Int'l Class: 40) Grand format digital printing services for others | California 91730 |
| AGS LOGISTICS  AGS LOGISTICS  SN:77-037820 RN:3,412,196 Disclaimer: "LOGISTICS" | Registered 8 & 15 May 6, 2013  Int'l Class: 39 First Use: February 6, 2008 Filed: November 6, 2006 Published: June 19, 2007 Allowed: | (Int'l Class: 39) Courier services; transport by air; worldwide delivery of documents and parcels by truck, courier and air; pick-up, transportation, and delivery of documents, packages and freight by land and air; transportation and | Axis Global Systems, LLC (New York Limited Liability Company) |

July 21, 2014
Page 4

| TM/SN/RN/Disclaimer | Status/Key Dates | Full Goods/Services | Owner |
|---|---|---|---|
| | September 11, 2007 Registered: April 15, 2008 | delivery services, namely, same day shipment services | |

### Conclusion

This report is based upon the results of a search obtained from a third party source that we have found to be reliable. Due to the inherent limitations of such a search, however, the search may have failed to reveal some mark, which if known to me, might change my report. One of these limitations is a lag time of up to several weeks from the filing date of the application before it is placed into the Patent and Trademark Office's computer records and available to be found in a search. In addition, foreign entities may file an application under treaty and obtain an effective filing date retroactive to their foreign filing date, which can be up to six months prior to their U.S. filing date. Additionally, there is a federal statute, which provides protection of "famous marks" on unrelated or non-competing goods and services. Since this search is directed toward locating similar marks used on similar services, it may fail to reveal some mark which could be determined to be famous under the federal statute and perhaps constitute a bar to your use or registration of the proposed mark. Finally, our search included common law uses, such as general, business, and trade directories, magazines, the Internet and other marketplace sources. The search did not, however, include every conceivable common law use. It is possible, therefore, that other registrations, applications or common law uses exist that could raise issues about your ability to use the proposed mark.

We have a copy of the report for your review, if desired. Please contact me at your convenience so we can discuss how best to proceed.

Sincerely,

Wendy Robertson

M WLR1 2508331 v1
2016317-000091  07/21/2014

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 86348236
### Filing Date: 07/25/2014

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86348236 |
| **MARK INFORMATION** | |
| **\*MARK** | MYXGS |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | MYXGS |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | U.S. Xpress Enterprises, Inc. |
| **\*STREET** | 4080 Jenkins Road |
| **\*CITY** | Chattanooga |
| **\*STATE** (Required for U.S. applicants) | Tennessee |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 37421 |
| **PHONE** | 901-579-3128 |
| **EMAIL ADDRESS** | trademarks@bakerdonelson.com |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | corporation |
| **STATE/COUNTRY OF INCORPORATION** | Nevada |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| INTERNATIONAL CLASS | 042 |
|---|---|
| *IDENTIFICATION | Providing temporary use of a web-based software application for use in the transportation and logistics industries, namely, for tracking and tracing shipments, requesting rate quotes, creating bills of lading, requesting shipment pickups, viewing accounts payable and downloading shipment related documents |
| FILING BASIS | SECTION 1(b) |

## ATTORNEY INFORMATION

| NAME | Wendy Robertson |
|---|---|
| ATTORNEY DOCKET NUMBER | 2016317-000091 |
| FIRM NAME | Baker, Donelson, Bearman, Caldwell & Berkowitz, PC |
| INTERNAL ADDRESS | Suite 440 |
| STREET | 6060 Poplar Avenue |
| CITY | Memphis |
| STATE | Tennessee |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 38119 |
| PHONE | 901-579-3128 |
| EMAIL ADDRESS | trademarks@bakerdonelson.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## CORRESPONDENCE INFORMATION

| NAME | Wendy Robertson |
|---|---|
| FIRM NAME | Baker, Donelson, Bearman, Caldwell & Berkowitz, PC |
| INTERNAL ADDRESS | Suite 440 |
| STREET | 6060 Poplar Avenue |
| CITY | Memphis |
| STATE | Tennessee |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 38119 |

| PHONE | 901-579-3128 |
|---|---|
| EMAIL ADDRESS | trademarks@bakerdonelson.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 325 |
| *TOTAL FEE PAID | 325 |

## SIGNATURE INFORMATION

| SIGNATURE | /wrobertson/ |
|---|---|
| SIGNATORY'S NAME | Wendy Robertson |
| SIGNATORY'S POSITION | Attorney of record, Tennessee bar member |
| DATE SIGNED | 07/25/2014 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

### Serial Number: 86348236
### Filing Date: 07/25/2014

## To the Commissioner for Trademarks:

**MARK:** MYXGS (Standard Characters, see mark)
The literal element of the mark consists of MYXGS.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, U.S. Xpress Enterprises, Inc., a corporation of Nevada, having an address of
   4080 Jenkins Road
   Chattanooga, Tennessee 37421
   United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

   International Class 042: Providing temporary use of a web-based software application for use in the transportation and logistics industries, namely, for tracking and tracing shipments, requesting rate quotes, creating bills of lading, requesting shipment pickups, viewing accounts payable and downloading shipment related documents
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
   Wendy Robertson of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC

   Suite 440
   6060 Poplar Avenue
   Memphis, Tennessee 38119
   United States
The attorney docket/reference number is 2016317-000091.
The applicant's current Correspondence Information:
   Wendy Robertson
   Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
   Suite 440
   6060 Poplar Avenue
   Memphis, Tennessee 38119

901-579-3128(phone)

trademarks@bakerdonelson.com (authorized)

A fee payment in the amount of $325 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. Section 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant or the applicant's related company or licensee is using the mark in commerce on or in connection with the goods/services in the application, and such use by the applicant's related company or licensee inures to the benefit of the applicant; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. Section 1051(b), Section 1126(d), and/or Section 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

## Declaration Signature

Signature: /wrobertson/   Date: 07/25/2014
Signatory's Name: Wendy Robertson
Signatory's Position: Attorney of record, Tennessee bar member
RAM Sale Number: 86348236
RAM Accounting Date: 07/28/2014

Serial Number: 86348236
Internet Transmission Date: Fri Jul 25 13:56:36 EDT 2014
TEAS Stamp: USPTO/BAS-66.195.246.2-20140725135636400
692-86348236-500353032afe5a95fca3c4ec4f3
d23714a754c808fd95a2e8af481184a8c1088-CC
-168-20140725115942055140

# MYXGS

## ASSIGNMENT OF TRADEMARK

For good and valuable consideration, the receipt of which is hereby acknowledged, U.S. Xpress Enterprises, Inc., a Nevada corporation with its principal place of business at 4080 Jenkins Road, Chattanooga, TN 37421, hereby assigns to Xpress Global Systems, Inc., a Georgia corporation with its principal place of business at 1537 New Hope Church Road, Tunnel Hill, GA 30755, all right, title and interest in and to the intellectual property listed below:

| Trademark | Status | Serial No. |
|-----------|--------|------------|
| MYXGS | Pending | 86348236 |

Dated this _27_ day of _Mar_, 2015.


U.S. XPRESS ENTERPRISES, INC.


By:    Max L. Fuller
Title:  Chairman, VP, CEO and Secretary

**Schedule 2.25(b)**

**<u>Excepted Company Intellectual Property</u>**

None.

**Schedule 2.25(c)**

<u>**Employee Intellectual Property Agreements**</u>

The Company has not now, nor has it ever, required its employees to sign Intellectual Property Agreements. Therefore, the Company does not have any Intellectual Property Agreements signed by current or former employees of the Company that assign to the Company all rights to any inventions, improvements, discoveries or information and works of authorship prepared by such employee for the Company and relating to the Company's business.

**Schedule 2.26(a)**

**<u>Exception to Tractors and Trailers</u>**

None.

**Schedule 2.26(b)**

**<u>Tractors and Trailers</u>**

See attached.

| Vin | Year | Make | Model |
|---|---|---|---|
| 1XP7D49X7AD784695 | 2010 | Peterbilt | 387 |
| 1XP7D49X1AD103334 | 2010 | Peterbilt | 387 |
| 1XP7D49X5AD103451 | 2010 | Peterbilt | 387 |
| 1XP7D49X6AD103541 | 2010 | Peterbilt | 387 |
| 1XP7D49X8AD103556 | 2010 | Peterbilt | 387 |
| 1XP7D49X9AD103565 | 2010 | Peterbilt | 387 |
| 1XP7D49X7AD103628 | 2010 | Peterbilt | 387 |
| 1XP7D49XXAD103719 | 2010 | Peterbilt | 387 |
| 1XP7D49X3AD103786 | 2010 | Peterbilt | 387 |
| 1XP7D49X9AD103792 | 2010 | Peterbilt | 387 |
| 1XP7D49X4AD103800 | 2010 | Peterbilt | 387 |
| 1FUJGLDR7A5AR8682 | 2010 | Freightliner | Cascadia |
| 1FUJGLDR5A5AR8695 | 2010 | Freightliner | Cascadia |
| 1XP7D49X4BD103832 | 2011 | Peterbilt | 387 |
| 1XP7D49X2BD103926 | 2011 | Peterbilt | 387 |
| 1XP7D49X6BD103959 | 2011 | Peterbilt | 387 |
| 1XKFD48X7BJ279701 | 2011 | Kenworth | T660 |
| 1FUJGLDR5BLAV6720 | 2011 | Freightliner | Cascadia |
| 1FUJGLDR9BLAV6770 | 2011 | Freightliner | Cascadia |
| 1FUJGLDRXBLAV6843 | 2011 | Freightliner | Cascadia |
| 1FUJGLDR3BLAY4466 | 2011 | Freightliner | Cascadia |
| 1XP4D49X5CD132096 | 2012 | Peterbilt | 587 |
| 1XP4D49X2CD132279 | 2012 | Peterbilt | 587 |
| 1XP4D49X9CD132294 | 2012 | Peterbilt | 587 |
| 1XP4D49X9CD132537 | 2012 | Peterbilt | 587 |
| 1FUJGLBG2CLBC7631 | 2012 | Freightliner | Cascadia |
| 1FUJGLBG3CLBC8397 | 2012 | Freightliner | Cascadia |
| 3HSDJSJR2CN534062 | 2012 | International | Prostar |
| 3HSDJSJR4CN6D1731 | 2012 | International | Prostar |
| 3HSDJSJR0CN601791 | 2012 | International | Prostar |
| 3HSDJSJR8CN601831 | 2012 | International | Prostar |
| 4LMBB51184L014223 | 2003 | Capacity | TJS000 |
| 4LMBB51124L014234 | 2003 | Capacity | TJ5000 |
| 1XP4D49XXDD190660 | 2013 | Peterbilt | 587 |
| 11VA813E34A00D512 | 2004 | Ottawa | 30 |
| 4LMBF211X6L017291 | 2006 | Capacity | TJ5DD0 |
| 11VF813E8CA000008 | 2012 | Ottawa | 4X2 |
| 1FUJA6CK15LN65132 | 2005 | Freightliner | Columbia |
| 1HTMMAAL76H206367 | 2006 | International | 430D |
| 1FUJA6CK25LN65138 | 2005 | Freightliner | Columbia |
| 1FUJA6CK55LN65151 | 2005 | Freightliner | Columbia |
| 1FVACXDC16DW09368 | 2006 | Freightliner | M2 |
| 1FUJA6CK55LN65179 | 2005 | Freightliner | Columbia |
| 1FUJA6CK15LN65180 | 2005 | Freightliner | Columbia |
| 1FUJA6CK35LN65181 | 2005 | Freightliner | Columbia |
| 1FUJA6CK35LN88394 | 2005 | Freightliner | Columbia |
| 1FUJA6CK25LN88399 | 2005 | Freightliner | Columbia |
| 1FUJA6CK25LN88404 | 2005 | Freightliner | Columbia |
| 1FUJA6CK55LN88414 | 2005 | Freightliner | Columbia |
| 1FUJA6CK75LN88415 | 2005 | Freightliner | Columbia |
| 1FUJA6CK05LN88420 | 2005 | Freightliner | Columbia |

| | | |
|---|---|---|
| 1FUJA6CK56LU57730 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LU57731 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57732 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LU57738 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LU57826 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57827 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LU57828 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57830 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LU57831 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LU57832 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LU57833 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LU57834 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LU57840 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LU57838 | 2006 Freightliner | Columbia |
| 1FUJA6CK86LU57849 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LU57841 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LU57843 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57844 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LU57845 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LU57846 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LU57847 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LU57848 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LU57850 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LU57825 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LU57851 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LU57853 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LU57854 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LU57855 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LU57856 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57858 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57942 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LU57948 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LU57952 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LU57955 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU57956 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LU57957 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LU57958 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LU57959 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LU58209 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LU57963 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LU58069 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LU57839 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LU58222 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LU58331 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LU58334 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LU58336 | 2006 Freightliner | Columbia |
| 1FUJA6CK86LU58337 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LU58339 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LU57960 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LV94366 | 2006 Freightliner | Columbia |
| 1FUJA6CK86LV94371 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LV94374 | 2006 Freightliner | Columbia |

| | | |
|---|---|---|
| 1FUJA6CK76LV94376 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LV94379 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LV94381 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LV94384 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LV94357 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LV94389 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94394 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LV94396 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LV94401 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LV94402 | 2006 Freightliner | Columbia |
| 5PVNJ8JT362S50064 | 2006 Hino | 268 |
| 1FUJA6CK86LV94421 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LV94424 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LV94425 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LV94426 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94427 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94430 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LV94386 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LV94443 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LV94456 | 2006 Freightliner | Columbia |
| 1FUJA6CK76LV94460 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94461 | 2006 Freightliner | Columbia |
| 1FUJA6CK06LV94462 | 2006 Freightliner | Columbia |
| 1FVACWDC56HW75103 | 2006 Freightliner | M2 |
| 1FVACXDC17DX52421 | 2007 Freightliner | M2 |
| 1FUJA6CK07LX46385 | 2007 Freightliner | Columbia |
| 1FVACXDC77HX55851 | 2007 Freightliner | M2 |
| 1HT5CPEM7PH478192 | 1993 International | 470 |
| 1HSDJSJR5DH311140 | 2013 International | Prostar |
| 1HSDJSJR7DH311141 | 2013 International | Prostar |
| 1HSDJSJR9DH311142 | 2013 International | Prostar |
| 1HSDJSJR0DH311143 | 2013 International | Prostar |
| 1HSDJSJR2DH311144 | 2013 International | Prostar |
| 1HSDJSJR4DH311145 | 2013 International | Prostar |
| 1H5DJSJR6DH311146 | 2013 International | Prostar |
| 1HSDJSJR8DH311147 | 2013 International | Prostar |
| 1HSDJSJRXDH311148 | 2013 International | Prostar |
| 1H5DJSJR1DH311149 | 2013 International | Prostar |
| 1HSDJSJR7DH348612 | 2013 International | Prostar |
| 1HSDJSJR7DH348626 | 2013 International | Prostar |
| 1HSDJSJR9DH348627 | 2013 International | Prostar |
| 1HSDJSJR0DH348628 | 2013 International | Prostar |
| 1HSDJSJR2DH348629 | 2013 International | Prostar |
| 1HSDJSJR9DH348630 | 2013 International | Prostar |
| 1HSDJSJR0DH348631 | 2013 International | Prostar |
| 1HSDJSJR2DH348632 | 2013 International | Prostar |
| 1HSDJSJR4DH348633 | 2013 International | Prostar |
| 1HSDJSJR6DH348634 | 2013 International | Prostar |
| 1HSDJSJR8DH348635 | 2013 International | Prostar |
| 1HSDJSJRXDH348636 | 2013 International | Prostar |
| 1HSDJSJR1DH348637 | 2013 International | Prostar |
| 1HSDJSJR3DH348638 | 2013 International | Prostar |

| | | |
|---|---|---|
| 1HSDJSJR5DH348639 | 2013 International | Prostar |
| 3HSDJSNR9EN791149 | 2014 International | Prostar |
| 3HSDJSNR5EN791150 | 2014 International | Prostar |
| 3HSDJSNR7EN791151 | 2014 International | Prostar |
| 3HSDJSNR9EN791152 | 2014 International | Prostar |
| 3HSDJSNR4EN791141 | 2014 International | Prostar |
| 3HSDJSNR6EN791142 | 2014 International | Prostar |
| 3HSDJSNR8EN791143 | 2014 International | Prostar |
| 3HSDJSNRXEN791144 | 2014 International | Prostar |
| 3H5DJSNR1EN791145 | 2014 International | Prostar |
| 3HSDJSNR3EN791146 | 2014 International | Prostar |
| 3HSDJSNR1EN791176 | 2014 International | Prostar |
| 3HSDJSNR3EN791177 | 2014 International | Prostar |
| 3HSDJSNR5EN791178 | 2014 International | Prostar |
| 3HSDJSNR7EN791179 | 2014 International | Prostar |
| 3HSDJSNR3EN791180 | 2014 International | Prostar |
| 3HSDJSNR5EN791181 | 2014 International | Prostar |
| 3HSDJSNR7EN791182 | 2014 International | Prostar |
| 3HSDJSNR9EN791183 | 2014 International | Prostar |
| 3HSDJSNR0EN791184 | 2014 International | Prostar |
| 3HSDJSNR2EN791185 | 2014 International | Prostar |
| 3HSDJSNR8EN791191 | 2014 International | Prostar |
| 3HSDJSNR0EN791248 | 2014 International | Prostar |
| 3HSDJSNR2EN791249 | 2014 International | Prostar |
| 3HSDJSNR9EN791250 | 2014 International | Prostar |
| 3HSDJSNR2EN791252 | 2014 International | Prostar |
| 3HSDJSNR4EN791253 | 2014 International | Prostar |
| 3HSDJSNRXEN791256 | 2014 International | Prostar |
| 3HSDJSNR5EN791309 | 2014 International | Prostar |
| 3HSDJSNR8EN791255 | 2014 International | Prostar |
| 3HSDJSNR1EN791310 | 2014 International | Prostar |
| 3HSDJSNR0EN791251 | 2014 International | Prostar |
| 3H5DJSNR2EN791798 | 2014 International | Prostar |
| 3HSDJSNR4EN791799 | 2014 International | Prostar |
| 3HSDJSNR7EN791800 | 2014 International | Prostar |
| 3HSDJSNR9EN791801 | 2014 International | Prostar |
| 3HSDJSNR0EN791802 | 2014 International | Prostar |
| 3HSDJSNR0EN791296 | 2014 International | Prostar |
| 3HSDJSNR2EN791297 | 2014 International | Prostar |
| 3HSDJSNR4EN791298 | 2014 International | Prostar |
| 3HSDJSNR6EN791299 | 2014 International | Prostar |
| 3HSDJSNR9EN791300 | 2014 International | Prostar |
| 3HSDJSNR0EN791301 | 2014 International | Prostar |
| 3HSDJSNR2EN791302 | 2014 International | Prostar |
| 3HSDJSNR4EN791303 | 2014 International | Prostar |
| 3HSDJSNR6EN791304 | 2014 International | Prostar |
| 3HSDJSNR8EN791305 | 2014 International | Prostar |
| 3HSDJSNRXEN791306 | 2014 International | Prostar |
| 3HSDJSNR1EN791307 | 2014 International | Prostar |
| 3HSDJSNR3EN791308 | 2014 International | Prostar |
| 3HSDJSNR6EN791254 | 2014 International | Prostar |
| 3HSDJSNR1EN791257 | 2014 International | Prostar |

| | | |
|---|---|---|
| 3HSDJSNRXEN791337 | 2014 International | Prostar |
| 3HSDJSNR1EN791338 | 2014 International | Prostar |
| 3HSDJSNR3EN791339 | 2014 International | Prostar |
| 1FUJA6CK05LN88398 | 2005 Freightliner | Columbia |
| 1FUJA6CK46LU58075 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LV94369 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LV94464 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LV94467 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LV94470 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LV94472 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94489 | 2006 Freightliner | Columbia |
| 1FUJA6CK56LV94490 | 2006 Freightliner | Columbia |
| 1FUJA6CK96LV94492 | 2006 Freightliner | Columbia |
| 1FUJA6CK86LV94497 | 2006 Freightliner | Columbia |
| 1FUJA6CKX6LV94498 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LV94499 | 2006 Freightliner | Columbia |
| 1FUJA6CK46LV94500 | 2006 Freightliner | Columbia |
| 1FUJA6CK66LV94501 | 2006 Freightliner | Columbia |
| 1FUJA6CK16LV94504 | 2006 Freightliner | Columbia |
| 1FUJA6CK36LV94505 | 2006 Freightliner | Columbia |
| 1FUJA6CK26LV94530 | 2006 Freightliner | Columbia |
| 1FUJA6CK17LV91510 | 2007 Freightliner | Columbia |
| 1FUJA6CK97LV91514 | 2007 Freightliner | Columbia |
| 1FUJA6CK67LV91518 | 2007 Freightliner | Columbia |
| 1FUJA6CK47LV91520 | 2007 Freightliner | Columbia |
| 1FUJA6CK57LV91526 | 2007 Freightliner | Columbia |
| 1FUJA6CK07LV91529 | 2007 Freightliner | Columbia |
| 1FUJA6CK77LV91530 | 2007 Freightliner | Columbia |
| 1FUJA6CK97LV91531 | 2007 Freightliner | Columbia |
| 1FUJA6CKS7LV91638 | 2007 Freightliner | Columbia |
| 1FUJA6CK37LV91640 | 2007 Freightliner | Columbia |
| 1FUJA6CKS7LV91641 | 2007 Freightliner | Columbia |
| 1FUJA6CK87LV91651 | 2007 Freightliner | Columbia |
| 1FUJA6CK27LV91659 | 2007 Freightliner | Columbia |
| 1FUJA6AV17LV91746 | 2007 Freightliner | Columbia |
| 1FUJA6AV77LV91749 | 2007 Freightliner | Columbia |
| 1FUJA6AV37LV91750 | 2007 Freightliner | Columbia |
| 1FUJA6AV57LV91751 | 2007 Freightliner | Columbia |
| 1FUJA6AV57LV91846 | 2007 Freightliner | Columbia |
| 1FUJA6AV77LV91850 | 2007 Freightliner | Columbia |
| 1FUJA6AV07LV91950 | 2007 Freightliner | Columbia |
| 1FUJA6AV27LV91951 | 2007 Freightliner | Columbia |
| 1FUJA6AV47LV91952 | 2007 Freightliner | Columbia |
| 1FUJA6AV67LV91953 | 2007 Freightliner | Columbia |
| 1FUJA6AVX7LV91955 | 2007 Freightliner | Columbia |
| 1FUJA6AV17LV91956 | 2007 Freightliner | Columbia |
| 1FUJA6AV37LV91957 | 2007 Freightliner | Columbia |
| 1FUJA6AV57LV91958 | 2007 Freightliner | Columbia |
| 1FUJA6AV77LV91959 | 2007 Freightliner | Columbia |
| 1FUJA6AV27LV91965 | 2007 Freightliner | Columbia |
| 1FUJA6AV67LV91967 | 2007 Freightliner | Columbia |
| 1FUJA6AV87LV91968 | 2007 Freightliner | Columbia |

| | | |
|---|---|---|
| 1FUJA6AV07LV92239 | 2007 Freightliner | Columbia |
| 1FUJA6AV37LV92249 | 2007 Freightliner | Columbia |
| 1FUJA6AV77LV92254 | 2007 Freightliner | Columbia |
| 1FUJGEDR19LAH2754 | 2009 Freightliner | Cascadia |
| 1FUJGEDR89LAH2766 | 2009 Freightliner | Cascadia |
| 1FUJGEDR29LAH2794 | 2009 Freightliner | Cascadia |
| 1FUJGEDR89LAH2802 | 2009 Freightliner | Cascadia |
| 1FUJA6CK67LX46391 | 2007 Freightliner | Columbia |
| 1FVACXDC26DW02252 | 2006 Freightliner | M2 |
| 1FV6HJBA3YHF01337 | 2000 Freightliner | FL70 |
| 1XP7D49X8AD794796 | 2010 Peterbilt | 387 |
| 1XP7D49X7AD794823 | 2010 Peterbilt | 387 |
| 1FVACWDC26HW49445 | 2006 Freightliner | M2 |
| 1FUJGEDRX9LAH4521 | 2009 Freightliner | Cascadia |
| 2FZACGDC95AN65242 | 2005 Sterling | Acterra |
| 1FUJGEDR19LAH2737 | 2009 Freightliner | Cascadia |
| 1FUJGEDR99LAH2789 | 2009 Freightliner | Cascadia |

| Vin | Year | Make | Model | Length | Type |
|---|---|---|---|---|---|
| 1GRAA5619YS025208 | 2000 | Great Dane | Dry Van | 28 | Carpet |
| 1JJV532W31L765267 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W51L765304 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W71L765305 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W51L765366 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W41L765407 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W01L765419 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W81L765460 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W01L765534 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532WX1L765573 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W31L765592 | 2001 | Wabash | Dry Van | 53 | NonCarpet |
| 1DTV11Z23NA200845 | 1992 | Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z27NA200864 | 1992 | Dorsey | Dry Van | 48 | Carpet |
| 1H2E00814JA004509 | 1988 | Fruehauf | Dolly | | Dolly |
| 1H2E0081XJA004515 | 1988 | Fruehauf | Dolly | | Dolly |
| BLW510818 | 1975 | Hobbs | Dry Van | 28 | Carpet |
| 1GRAA561XFS099542 | 1985 | Great Dane | Dry Van | 28 | Carpet |
| 1GRAA9620J5004219 | 1988 | Great Dane | Dry Van | 48 | Carpet |
| 1H2V04828JC014626 | 1988 | Fruehauf | Dry Van | 48 | Carpet |
| 1GRFC962XES126107 | 1984 | Great Dane | Dry Van | 48 | Storage |
| 1511C8286KG310252 | 1989 | STRICK | Dry Van | 28 | Carpet |
| 1S11C8285KG310260 | 1989 | STRICK | Dry Van | 28 | Carpet |
| 1S11C8281KG310286 | 1989 | STRICK | Dry Van | 28 | Carpet |
| 1GRAA9621KS091310 | 1989 | Great Dane | Dry Van | 48 | Carpet |
| 1JJV532W03L766895 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766896 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W43L766897 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W43L766902 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766903 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W83L766904 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766907 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W53L766911 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W73L766912 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W93L766913 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766914 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W43L766916 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766917 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W83L766918 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX3L766919 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766920 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W13L766923 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766924 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W53L766925 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W73L766926 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W93L766927 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766928 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766931 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766934 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W83L766935 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX3L766936 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766938 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W53L766939 | 2003 | Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766941 | 2003 | Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W73L766943 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766945 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766946 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W43L766947 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766951 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX3L766953 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W93L766958 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766962 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766963 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX3L766967 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W13L766968 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766969 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W13L766971 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W33L766972 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W53L766973 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766976 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766977 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W43L766978 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W63L766982 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W83L766983 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W13L766985 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W53L766987 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W73L766988 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W93L766989 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W73L766991 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W93L766992 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W03L766993 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766994 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1GRAA0628L5042408 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0628L5042411 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0625LS042415 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0620LS042418 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0622L5042419 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA962XKS008506 | 1989 Great Dane | Dry Van | 48 | Carpet |
| M673102 | 1967 Brown | Dolly | | Dolly |
| 1GRAA9621KB061059 | 1989 Great Dane | Dry Van | 48 | Carpet |
| 1GRAA0626LS094913 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA9621LS020626 | 1990 Great Dane | Dry Van | 48 | Carpet |
| 1GRAA0625L5095003 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0629LS095005 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0624LS095008 | 1990 Great Dane | Dry Van | 53 | Carpet |
| 1H2V04821JC014645 | 1988 Fruehauf | Dry Van | 48 | Carpet |
| 1GRER131XHM003214 | 1987 Great Dane | Dolly | | Dolly |
| 1DTV11Z22NA200786 | 1992 Dorsey | Dry Van | 53 | Carpet |
| 1DTV11Z29NA200798 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z24NA200806 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z2XNA200812 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z26NA204274 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z20NA204299 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z26NA204307 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z28NA204339 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z29NA204351 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1DTV11Z27NA204364 | 1992 Dorsey | Dry Van | 48 | Carpet |
| 1PT07AAE1X9016029 | 1999 Trailmobile | Dry Van | 28 | Dry Van |

| | | | | |
|---|---|---|---|---|
| 1JJV532W64L864766 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L864769 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L864781 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L864826 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L864835 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L864872 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L864879 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L864905 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L864922 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L864925 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L864944 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L864949 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L864970 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L864985 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L865016 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L865038 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L865063 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L865066 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L865078 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L865085 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L865087 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L865095 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L865139 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L865150 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L865183 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L865196 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L865205 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L865206 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L865210 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L865231 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L865280 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L865294 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV281W94L868950 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L868951 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L868952 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L868953 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L868954 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W84L868955 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L868956 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L868957 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L868958 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L868959 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L868960 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L868961 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L868962 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L868963 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L868964 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L868965 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L868966 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L868967 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L868968 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W84L868969 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L868970 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L868971 | 2004 Wabash | Dry Van | 28 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV281W84L868972 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L868973 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L868974 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L868975 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L868976 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L868977 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L868978 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L868979 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L868980 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L868981 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L868982 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L868983 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L868984 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L868985 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W84L868986 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L868987 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L868988 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L868989 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L868990 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L868991 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L868992 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L868993 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L868994 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L868995 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L868996 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L868997 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L868998 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L868999 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L869000 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L869001 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L869002 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L869003 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L869004 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L869005 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W84L869006 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L869007 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L869008 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L869009 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L869010 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L869011 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W34L869012 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L869013 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L869014 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L869015 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W04L869016 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L869017 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L869018 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L869019 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W24L869020 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W44L869021 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W64L869022 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W84L869023 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281WX4L869024 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W14L869025 | 2004 Wabash | Dry Van | 28 | Carpet |

| VIN | Year/Make | Type | Length | Commodity |
|---|---|---|---|---|
| 1JJV281W34L869026 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W54L869027 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W74L869028 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV281W94L869029 | 2004 Wabash | Dry Van | 28 | Carpet |
| 1JJV532W64L871359 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L871398 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L871405 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L871435 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L871445 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L871455 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L871456 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L871462 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L871464 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L871472 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885017 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L885040 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885070 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L885087 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L885124 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L885128 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885146 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L885147 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885148 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L885150 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L885185 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L885195 | 2004 Wabash | Dry Van | 53 | Carpet |
| M63088 | 1975 Trailmobile | Dry Van | 28 | Carpet |
| 1JJV532W34L885218 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885230 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L885287 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885294 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885308 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV281CXHL109865 | 1987 Wabash | Dry Van | 28 | Carpet |
| 1JJV532W84L885330 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L885336 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L885346 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L885347 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885352 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L885353 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885473 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L885492 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L885498 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885514 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L885538 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L885547 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L885572 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885583 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885647 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L885656 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885657 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L885661 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L885689 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885691 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885697 | 2004 Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W54L885723 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L885740 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L885759 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885764 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L885790 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885805 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885845 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L885853 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L885855 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L885876 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L888104 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L888114 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L888115 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L888116 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L888119 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L888121 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L888122 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L888125 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L888127 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L888129 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L888146 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L888154 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L888163 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L888172 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L888175 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L888197 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L888211 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L888216 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L888220 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L888221 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L888225 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L888228 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L888230 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L888235 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L888240 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L888253 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L892215 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L892216 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L892296 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898175 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898182 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898200 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898203 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898210 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898218 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898226 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898244 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898245 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898246 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898251 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898261 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898266 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898270 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898275 | 2004 Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W94L898278 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898279 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898281 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898284 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898287 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898288 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898289 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898291 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898293 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898298 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898300 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898301 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898313 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898317 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898318 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898319 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898323 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898330 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898334 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898336 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898337 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898338 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898339 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898346 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898347 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898354 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898355 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1H2V02817EE006135 | 1984 Fruehauf | Dry Van | 28 | Carpet |
| 1JJV532W54L898357 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898358 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898360 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898361 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898362 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898365 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898371 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898372 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898375 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898378 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898380 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898383 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898384 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898390 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898392 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898394 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898395 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898400 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898405 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898406 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898407 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898413 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898418 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898421 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898422 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898423 | 2004 Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W94L898426 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898427 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898431 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898441 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898443 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898445 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898446 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898449 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898455 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898457 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898458 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898459 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898460 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898462 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898467 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898468 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898470 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898472 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898474 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898475 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898476 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898480 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898481 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898483 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898484 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898485 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898486 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898487 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898489 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898491 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898492 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898493 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898496 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898497 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898500 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898502 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898507 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L898511 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898515 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898516 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898519 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898522 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898529 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898531 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898535 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L898543 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898562 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898563 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898565 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898569 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898570 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898571 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898572 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L898576 | 2004 Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W84L898577 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898578 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1GRAA9620HS159928 | 1987 Great Dane | Dry Van | 48 | Carpet |
| 1GRAA90205B706412 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90225B706413 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90245B706428 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90295B706439 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X5B706434 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90235B706436 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90275B706438 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 7L68589005 | 1976 Utility | Dry Van | 28 | Carpet |
| 1GRAA90245B706445 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90226B700404 | 2006 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X6B700408 | 2006 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90276B700415 | 2006 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA9620F5114209 | 1985 Great Dane | Dry Van | | Carpet |
| 1DW1A4825K5594312 | 1989 Stoughton | Dry Van | 48 | Carpet |
| 1DW1A4829KS594314 | 1989 Stoughton | Dry Van | 48 | Carpet |
| 1DW1A4823K5594308 | 1989 Stoughton | Dry Van | 48 | Carpet |
| 1GRAA5617RB115202 | 1994 Great Dane | Dry Van | 28 | Dry Van |
| 1GRAA5612RB115205 | 1994 Great Dane | Dry Van | 28 | Dry Van |
| 1GRAA5614RB115206 | 1994 Great Dane | Dry Van | 28 | Dry Van |
| 1JJV532W55L893161 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX5L938644 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W85L938657 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W45L938672 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W25L938704 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W95L938845 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W05L938894 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX5L938899 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W65L938995 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W15L938998 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W35L939005 | 2005 Wabash | Dry Van | 53 | Carpet |
| 1GRAA56195K268934 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56105K268935 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56125K268936 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56145K268937 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56165K268938 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56185K268939 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56145K268940 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56165K268941 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56185K268942 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA561X5K268943 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56115K268944 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56135K268945 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56155K268946 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1GRAA56175K268947 | 2005 Great Dane | Dry Van | 28 | Carpet |
| 1DW1A5328MS703202 | 1991 Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5320NS747003 | 1992 Stoughton | Dry Van | 53 | Carpet |
| 1GRAA0626XS030909 | 1999 Great Dane | Dry Van | 53 | Carpet |
| 1DW1A5321PS826604 | 1993 Stoughton | Dry Van | 28 | Carpet |
| 1DW1A5322RS865205 | 1994 Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5326RS865207 | 1994 Stoughton | Dry Van | 53 | Carpet |
| 1GRAA0620RS105901 | 1994 Great Dane | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1DW1A5326XS258205 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5323XS258209 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5321XS258211 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5327XS258214 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5326XS258219 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5324XS258221 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5321XS258225 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5324X5329501 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A532XXS329504 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5327XS329508 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1DW1A5325XS329510 | 1999 | Stoughton | Dry Van | 53 | Carpet |
| 1GRAA0629XS031018 | 1999 | Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0623XS030902 | 1999 | Great Dane | Dry Van | 53 | Carpet |
| 1GRAA062XXS030802 | 1999 | Great Dane | Dry Van | 53 | Carpet |
| 1GRAA0625XS030819 | 1999 | Great Dane | Dry Van | 53 | Carpet |
| 1GRAA062XXS030914 | 1999 | Great Dane | Dry Van | 53 | Carpet |
| 1GRAA90207B702167 | 2007 | Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA96235D409209 | 2005 | Great Dane | Dry Van | 48 | Dry Van |
| 1GRAA96295D409215 | 2005 | Great Dane | Dry Van | 48 | Dry Van |
| 1GRAA96225D409217 | 2005 | Great Dane | Dry Van | 48 | Dry Van |
| 1GRAA962X5D409241 | 2005 | Great Dane | Dry Van | 48 | Dry Van |
| 1GRAA96215D409273 | 2005 | Great Dane | Dry Van | 48 | Dry Van |
| 1DTV11529TA244710 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11525TA244719 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11522TA247464 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11524TA248597 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11529TA248904 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV1152XTA248913 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11520TA249021 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11521TA249044 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11525TA249113 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11525TA249175 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11523TA249188 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11522TA249215 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11523TA249336 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11525TA252321 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11527TA252708 | 1996 | Dorsey | Dry Van | 53 | Carpet |
| 1DTV11527VA254784 | 1997 | Dorsey | Dry Van | 53 | Carpet |
| 1PTO1JAH5T9005332 | 1996 | Trailmobile | Dry Van | 48 | Dry Van |
| 1JJV532W87L048341 | 2007 | Wabash | Dry Van | 53 | Carpet |
| 1JJVS32WX4L885202 | 2004 | Wabash | Dry Van | 53 | Carpet |
| MAS444606 | 1974 | Fruehauf | Dry Van | 28 | Carpet |
| 1JJV482U8VL417579 | 1997 | Wabash | Dry Van | 48 | Dry Van |
| 1JJV482U4VL417580 | 1997 | Wabash | Dry Van | 48 | Dry Van |
| 1JJV482U6VL417581 | 1997 | Wabash | Dry Van | 48 | Dry Van |
| 1JJV482U1VL417584 | 1997 | Wabash | Dry Van | 48 | Dry Van |
| 1JJV482U7VL417587 | 1997 | Wabash | Dry Van | 48 | Dry Van |
| 1JJV532W84L885327 | 2004 | Wabash | Dry Van | 53 | Carpet |
| 1JJVS32WX4L888147 | 2004 | Wabash | Dry Van | 53 | Carpet |
| 57618631 | 1976 | Comet | Dry Van | 28 | Carpet |
| 2MN071AE221003225 | 2002 | Trailmobile | Dry Van | 28 | Dry Van |
| 2MN071AE821003228 | 2002 | Trailmobile | Dry Van | 28 | Dry Van |
| 1GRAA90244S700370 | 2004 | Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90284S700372 | 2004 | Great Dane | Dry Van | 45 | Dry Van |

| | | | | |
|---|---|---|---|---|
| 1GRAA80274S701250 | 2004 Great Dane | Dry Van | 40 | Dry Van |
| 1GRAA90284S701246 | 2004 Great Dane | Dry Van | 40 | Dry Van |
| 1GRAA902X4S701247 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90214S701248 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90244S701244 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90264S701245 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90224S701727 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90264S701729 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90254S702435 | 2004 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90205B701260 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90225B701261 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X5B701539 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90265B701540 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90285B701541 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X5B701542 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90215B701543 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90235B701544 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90255B701545 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90255B704347 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90285B702608 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X5B702609 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA90285B702611 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1GRAA902X5B702612 | 2005 Great Dane | Dry Van | 45 | Dry Van |
| 1JJV482W37L084907 | 2007 Wabash | Dry Van | 48 | Dry Van |
| 1JJV482W87L084921 | 2007 Wabash | Dry Van | 48 | Dry Van |
| 1JJV482W97L084930 | 2007 Wabash | Dry Van | 48 | Dry Van |
| 1JJV482W47L084950 | 2007 Wabash | Dry Van | 48 | Dry Van |
| 1GRAA80275B708524 | 2005 Great Dane | Lift Gate | 40 | Lift Gate |
| 1JJV532W71L765417 | 2001 Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W03L766847 | 2003 Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W04L864777 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L892276 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898436 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L898456 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W23L766901 | 2003 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W74L888123 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L888131 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898308 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W64L888212 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L888223 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532WX4L898290 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W34L898356 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L898410 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W94L898412 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898415 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898429 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898453 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898479 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L898517 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W44L898530 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W42L766395 | 2002 Wabash | Dry Van | 53 | NonCarpet |
| 1JJV532W04L888108 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W24L865137 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L865167 | 2004 Wabash | Dry Van | 53 | Carpet |

| | | | | |
|---|---|---|---|---|
| 1JJV532W54L865245 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W54L865262 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W14L865307 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W04L865315 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1JJV532W84L898322 | 2004 Wabash | Dry Van | 53 | Carpet |
| 1GRAA80255B708523 | 2005 Great Dane | Lift Gate | 40 | Carpet |
| 1JJV532W34L865177 | 2004 Wabash | Dry Van | 53 | Air |

Schedule 2.27

**Relationships with Related Persons**

The Company currently occupies the real property located at 1537 New Hope Church Road, Tunnel Hill, Georgia 30755. This property is leased pursuant to a lease by and between Q & F Realty, LLC, and the Company. Q & F is a Related Person.

The Company currently occupies the real property located at 2900 W. 166th Street, Markham, Illinois 60428. The Company does not have a formal lease agreement at this location because the facility is a Member location.

The Company currently subleases the real property located at 4402(b) S.W. 44th Street, Oklahoma City, Oklahoma 73149 to the Parent.

The Company currently subleases the real property located at 1210 East Hadley Street, Phoenix, Arizona, 85034 to the Parent.

The Company currently subleases certain parking spaces located at 2365 E. 19th Avenue, Aurora, Colorado 80019 to the Parent.

The Company uses certain parking spaces located across New Hope Road, which is adjacent to the Company's headquarters, under a License Agreement by and between U.S. Xpress, Inc. and Xpress Global Systems, LLC. The property where the parking spaces are located is owned by Parent.

Master Equipment Lease Agreement dated December, 2002 by and between U.S. Xpress Leasing, Inc. and the Company.

Insurance policies, benefit plans, bank accounts and other items provided as shared services are provided to the Company and other companies in the consolidated group.

The Company transacts with certain of the other members of its consolidated group, resulting in the creation of intercompany receivables and payables due to or from such other members of its consolidated group.

Bill of Sale by and between U.S. Xpress Leasing, Inc. and the Company.

Contribution Agreement by and between U.S. Xpress Enterprises, Inc. and the Company, pursuant to which certain intellectual property was contributed into the Company from U.S. Xpress Enterprises, Inc.

Sublease Agreement by and between Arnold Transportation Services, Inc. and Xpress Global Systems, Inc.

**Schedule 2.28**

**<u>Bank Accounts</u>**

The Company does not have its own checking or bank account.  All of the Company's funds are currently comingled with funds of the consolidated group that includes the Company and the Member.  The lockbox account (see attached document) accepts deposits, but the account transfers all funds into an account managed by the consolidated group that contains the comingled funds.

| Company | Type of Account | Name of Bank | Bank Address | Account Number |
|---|---|---|---|---|
| Xpress Global Systems, Inc. | Lock Box | Wells Fargo, N.A. | PO Box 933045 Atlanta, GA 31193-3045 | 933045 |

*This is a lockbox that is used for the collection of receivables. It is not a functioning bank account with check issuing capabilities.

**Schedule 2.29(a)**

**<u>Accounts Receivable</u>**

See attached accounts receivable run as of February 28, 2015.

| Account | Name | City | ST | | | 1 | 2 | 3 | 4 | 5 | 6 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0000222 | BARRON INTERNATIONAL | SAN DIEGO | CA | 01 | 01 | (38) | | | | | (1,252) | (38) |
| 0000238 | FARES SALVAGE CO INC | UNIONTOWN | PA | 01 | 01 | 94 | 45 | | | | | (1,252) |
| 0000251 | AFFORDABLE INTERIORS | INDIANA | PA | 01 | 01 | 148 | 45 | 54 | | 49 | | 49 |
| 0029296 | CRAFT FLOORS | WASHINGTON | PA | 01 | 01 | 188 | 54 | | | | | 103 |
| 0003314 | STEINBERGER FLOORS | CARNEGIE | PA | 01 | 01 | 863 | | | | | (675) | (675) |
| 0000339 | OBRIENS CARPET ONE | COLORADO SPRINGS | CO | 01 | 01 | 3,166 | 3,188 | | | | | (22) |
| 0003031 | CHUCK SMITH FLOORING | LEESBURG | PA | 01 | 01 | 96 | | | | (119) | | 97 |
| 0000621 | BISCUIT INC | EDMOND | OK | 01 | 01 | 513 | 358 | | | | | 398 |
| 0000747 | OUTRAGEOUS RUG INTERNATIONAL | SAN DIEGO | CA | 01 | 01 | 345 | 115 | | | | | 279 |
| 0000858 | BUTLER FLOOR & CARPET CO | BUTLER | PA | 01 | 01 | 722 | 66 | | | | | |
| 0000921 | BARCLAY VINES INTERIORS | PORTLAND | OR | 01 | 01 | 32 | 279 | 32 | | | | 32 |
| 0009056 | FOX OF STATEN ISLAND INC CCA GLOBAL | STATEN ISLAND | NY | 01 | 01 | 799 | 722 | 515 | | | | 799 |
| 0001004 | ENHANCE CARPET & MATTING SYSTEM INC | MARIETTA | GA | 01 | 01 | 109 | 515 | 32 | | | | 109 |
| 0000023 | COYOTE LOGISTICS LLC | CHATTANOOGA | TN | 01 | 01 | 3,164 | 109 | | | | | |
| 0000033 | TIERRA SOL | SEATTLE | WA | 01 | 01 | 1,600 | 3,330 | 3,164 | | | 1,600 | 1,600 |
| 0000035 | SMT/ANA ENTERPRISES LLC | CHARDON | OH | 01 | 01 | 90 | 3,845 | | | | | 90 |
| 0000239 | HOMESITES SERVICES | LIVERMORE | CA | 01 | 01 | 321 | 799 | 90 | | | | 321 |
| 0000059 | PLAYFIELD USA | TUCSON | AZ | 01 | 01 | 140 | | | | | (2,120) | (2,120) |
| 0000245 | ROB CARPENTERS CARPET WORLD | EL DORADO | AR | 01 | 01 | 616 | | 321 | | | 321 | 321 |
| 0000129 | RICKS WAREHOUSE CARPET | MONTICELLO | AR | 01 | 01 | 145 | | 140 | | | 140 | 140 |
| 0000244 | ARKANSAS CARPET | FORT SMITH | AR | 01 | 01 | 25 | | | 53 | 197 | 362 | 1,083 |
| 0001245 | GRANTS NEW & RENEW | EPHRATA | PA | 01 | 01 | (42) | | | | | 54 | 54 |
| 0000068 | QUALITY FLOOR COVERING | MELBOURNE | AR | 01 | 01 | 490 | | | | | 365 | 616 |
| 0001069 | DAMON'S FLOOR COVERING | ELLIJAY | GA | 01 | 01 | 72 | 91 | | | | | 365 |
| 0001250 | JAKAS CONSTRUCTION | PORTLAND | OR | 01 | 01 | 490 | | | | | 51 | 51 |
| 0001153 | K B K | SAN ANTONIO | TX | 01 | 01 | | | | | | 217 | 217 |
| 0001396 | CARPET SERVICES | KENT | WA | 01 | 01 | | 25 | | | | (109) | (109) |
| 0000356 | HAGGAR OF NEW YORK INC | NEW YORK | NY | 01 | 01 | 64 | 416 | 816 | (161) | | 65 | 25 |
| 0001396 | CHEVALIER | DEL MAR | CA | 01 | 01 | 312 | 95 | | | | | |
| 0000324 | UNIVERSAL TEXTILE TECHNOLOGIES | HOT SPRINGS | AR | 01 | 01 | 50 | 95 | | | | | 217 |
| 0009442 | JOBSONS CARPET MART | ATLANTA | GA | 01 | 01 | 1,244 | 1,244 | | (42) | | (42) | (42) |
| 0001459 | BRANDON CO | DALTON | GA | 01 | 01 | 782 | 782 | | | | | 25 |
| 0000474 | WESTGROUP SAN DIEGO ASSOC. LTD | JACKSON | MS | 01 | 01 | 637 | 212 | 212 | 212 | | | |
| 0000488 | QUALITY FLOOR2 & SUPPLY | SAN DIEGO | CA | 01 | 01 | 98 | | | | | 98 | 98 |
| 0001519 | G LITTLE INC | HEBER SPRINGS | AR | 01 | 01 | 135 | | | | | 135 | 135 |
| 0001534 | ELSTER METER | PORT TOWNSEND | WA | 01 | 01 | 2,028 | 182 | (216) | | | (216) | (216) |
| 0000390 | RUGSALE.COM | CARTERSVILLE | GA | 01 | 01 | (34) | | | | | 135 | 135 |
| 0001590 | STEPHEN BRADY | WEST HARTFORD | CT | 01 | 01 | 199 | | | | | | 199 |
| 0000583 | RYAN TRANSPORTATION SERVICE INC | DALTON | GA | 01 | 01 | 720 | 29,204 | | 595 | | | 763 |
| 0000616 | SHEEHAN TRANSPORTATION SERVICES INC | PADUCAH | KY | 01 | 01 | 29,967 | 720 | | | (162) | 330 | (854) |
| 0000620 | CARPET CENTER INC | OVERLAND PARK | KS | 01 | 01 | 789 | 43 | | 44 | | | 88 |
| 0000803 | MIKES CARPET | BIXBY | OK | 01 | 01 | 2,266 | 701 | 197 | (105) | | (83) | 2,741 |
| 0003883 | CHANTILLY | CHANTILLY | VA | 01 | 01 | 2,255 | | | | | | |
| 0001888 | KRAUS USA | CHANTILLY | VA | 01 | 01 | 272,204 | 176,894 | 42,861 | 362 | 208 | 2,741 | 45,350 |
| 0001326 | INFINITY FABRICS LLC | CLARION | PA | 01 | 01 | 823 | 4,745 | (30) | 208 | (822) | (83) | 208 |
| 0001945 | GEORGES FASHION FLOORS | DALTON | GA | 01 | 01 | (155) | (155) | | | | (3,893) | (3,893) |
| 0003526 | EMERALD CARPETS | BEL AIR | MD | 01 | 01 | (1,721) | 1,259 | 212 | | | (155) | (155) |
| 0001963 | 47TH PLACE CARPET & LINO | DALTON | GA | 01 | 01 | 130 | 130 | | (47) | (444) | (2,488) | (2,979) |
| 0001972 | MAVERX SOLUTIONS | SANTA ANA | CA | 01 | 01 | 525 | 455 | | | | | (2,488) |
| 0002013 | CITIZENS CARPET | MADERA | CA | 01 | 01 | 81 | 81 | | | | 70 | 70 |
| 0002072 | UNIVERSAL FURNITURE INSTALLATIONS | DENVER | CO | 01 | 01 | 2,100 | 600 | | | | | 1,500 |
| 0002074 | FIBREWORKS CORP | SAINT PETERS | MO | 01 | 01 | 57,559 | 43,416 | 13,941 | 679 | (112) | 900 | 14,143 |
| 0002075 | CLA-MAR | LOUISVILLE | KY | 01 | 01 | 392 | 167 | | | | (185) | (180) |
| 0002108 | C & D CARPET DIST | TOPEKA | KS | 01 | 01 | | | | | | 224 | 224 |
| 0002123 | C & D CARPET DIST | DYER | IN | 01 | 01 | (543) | (543) | (543) | | | (543) | (543) |
| 0002183 | LLG COMMERCIAL FLOORING | LOUISVILLE | KY | 01 | 01 | 1,516 | 202 | 265 | 1,061 | | (13) | 1,314 |

| File No. | Company | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0002195 | RHODES & CO INC | OCEAN SPRINGS | MS | 01 | 01 | 411 | 422 | | | (11) | (11) |
| 0002197 | FORT WORTH CARPET CO INC | FORT WORTH | TX | 01 | 01 | 49 | 49 | | | | |
| 0002201 | P P K M | CUMBERLAND | MD | 01 | 01 | 616 | 616 | | | 616 | 616 |
| 0002202 | SAFELANDINGS WORLDWIDE LLC | SELMA | TX | 01 | 01 | 50 | 50 | | | 50 | 50 |
| 0002127 | H & R CARPET & TILE | TULSA | OK | 01 | 01 | 61 | 61 | | | | |
| 0002226 | COMMERCIAL FLOOR SERVICES | DURANGO | CO | 01 | 01 | 109 | | | | | |
| 0002231 | MARABELLA INC | DALTON | GA | 01 | 01 | | | | | | |
| 0002237 | MODERN CARPETS | TEMPLE HILLS | MD | 01 | 01 | 42 | 42 | 83 | | 750 | 750 |
| 0002247 | LINOLEUM SHOP INC | SPOKANE | WA | 01 | 01 | (91) | (216) | (133) | | (216) | (133) |
| 0002277 | FLOOR MART | BROOKFIELD | WI | 01 | 01 | 1,735 | 1,832 | 423 | (480) | (57) | |
| 0002284 | FELIKAN BROS INC | PASADENA | CA | 01 | 01 | 1,151 | 528 | 545 | | | 633 |
| 0002307 | WAGGONERS CARPETS INC | CARROLLTON | GA | 01 | 01 | 152 | 214 | 88 | (61) | (62) | |
| 0002315 | MIDWEST OFFICE FURNITURE | SALT LAKE CITY | UT | 01 | 01 | 492 | 492 | (57) | | (57) | |
| 0002338 | GEORGIA CARPET INC | CARROLLTON | GA | 01 | 01 | 2,410 | 2,410 | | | | |
| 0002347 | JAMELL TILE | DOVER | GA | 01 | 01 | 22,730 | 14,880 | 8,318 | (540) | 85 | (75) |
| 0002379 | EMMIT PERRY & CO | HOUSTON | TX | 01 | 01 | 1,138 | 1,138 | 63 | | | |
| 0002380 | CARPETS & FURNITURE UNLIMITED | NAPA | CA | 01 | 01 | (666) | | | | (666) | |
| 0002517 | PARK RUG CO | LAUREL | MD | 01 | 01 | 417 | 283 | 134 | | 134 | |
| 0002605 | OHIO VALLEY FLOORING | CINCINNATI | OH | 01 | 01 | 51 | | 53 | | 53 | 53 |
| 0002620 | METROPOLITAN HARDWOOD | KENT | WA | 01 | 01 | 13,703 | 9,901 | 3,594 | 368 | (85) | 3,802 |
| 0002648 | WOODWARD FLOORING | HEBER SPRINGS | AR | 01 | 01 | 41 | 41 | | | (85) | (85) |
| 0002702 | DIAMOND CARPET DIST | SELDEN | NY | 01 | 01 | 73 | 73 | | | 136 | 136 |
| 0002738 | FLOORING OUTLET INC | MOUNTAIN HOME | AR | 01 | 01 | 548 | | 548 | 548 | 548 | 548 |
| 0002756 | MAGIC CARPET STORE | HAINES CITY | FL | 01 | 01 | 35 | | | | (35) | (35) |
| 0002779 | GLOBAL TEXTILES SERVICES | DALTON | GA | 01 | 01 | (494) | | | | (494) | (494) |
| 0002784 | STEELCITY WHOLESALE FLOORING | MURRYSVILLE | PA | 01 | 01 | (112) | | | | (112) | (112) |
| 0002816 | LIPPERTS CARPET ONE | GRANTS PASS | OR | 01 | 01 | 53 | 53 | | | 53 | 53 |
| 0002901 | BALTERIO US INC | DALTON | GA | 01 | 01 | 5,722 | 3,949 | 293 | 22 | 1,458 | 1,774 |
| 0002951 | KAREN KITOWSKI | DALLAS | TX | 01 | 01 | 78 | 78 | 78 | | | 78 |
| 0002954 | DIBYAN FAMILY FLOORS | HOT SPRINGS | AR | 01 | 01 | 446 | | | | | 446 |
| 0002967 | WASHAM SALVAGE INC | MAMMOTH SPRING | AR | 01 | 01 | 217 | 229 | | | (11) | (11) |
| 0003001 | NICHE GRAPHIC FLOORING | DALTON | GA | 01 | 01 | 2,888 | 793 | 2,120 | 366 | | (452) |
| 0003008 | NUTHERS BROTHERS INC | EAGLE RIVER | AK | 01 | 01 | 293 | 232 | | | 62 | 62 |
| 0003065 | LDB HOLDINGS, LLC | DENTON | TX | 01 | 01 | (8,799) | | | | (8,799) | (8,799) |
| 0003076 | UNIQUE HOME DESIGNS | GILBERT | AZ | 01 | 01 | (368) | | | | (368) | (368) |
| 0003119 | STEVE LABRUNA | IRVINE | CA | 01 | 01 | 1,494 | | 403 | | | 1,494 |
| 0003185 | MCM CUSTOM RUGS | BIG PINE | CA | 01 | 01 | 284 | 284 | | 114 | 497 | 479 |
| 0003192 | CARLA BERGDOLL | MOOREFIELD | WV | 01 | 01 | 97 | 42 | 55 | | | 284 |
| 0003222 | SERVICES BY BILL MACKLEY, INC. | KINGSVILLE | MD | 01 | 01 | 3,871 | 3,871 | 55 | | | 55 |
| 0003330 | SHEARAW OF CENTRAL CALIFORNIA INC | CLOVIS | CA | 01 | 01 | 844 | 982 | | | | (138) |
| 0003355 | ASTRO CARPET MILLS INC | CHATSWORTH | GA | 01 | 01 | 151 | 31 | | (138) | | (138) |
| 0003360 | CONTEMPO FLOOR COVERING | LOS ANGELES | CA | 01 | 01 | 12,603 | 8,281 | 2,886 | 1,583 | (147) | 4,322 |
| 0003390 | GRASS TURF FACTORY | ADAIRSVILLE | GA | 01 | 01 | 390 | 378 | 101 | | | 12 |
| 0003395 | ADVANCED GRASS LLC | VALENCIA | CA | 01 | 01 | 425 | 425 | | (89) | | (89) |
| 0003400 | TOM JANUARY FLOORS | FAYETTEVILLE | AR | 01 | 01 | 2,169 | 1,645 | 157 | 149 | 45 | 524 |
| 0003421 | USSA INC | IRVINE | CA | 01 | 01 | 91 | 91 | | | | 174 |
| 0003457 | M S INTERNATIONAL INC | ORANGE | CA | 01 | 01 | 46,218 | 48,391 | 1,640 | (1,650) | (605) | (94) |
| 0003498 | HAGEWOOD ENTERPRISES INC | SHERWOOD | AR | 01 | 01 | (723) | | | | | (1,650) |
| 0003509 | KRAUS USA INC | DALTON | GA | 01 | 01 | 471 | | | | | (4,132) |
| 0003512 | MILLIKEN & CO | SPARTANBURG | SC | 01 | 01 | 50,101 | | | 16,521 | 7,965 | 1,536 |
| 0003521 | J & R PUTTING GREENS | KENT | WA | 01 | 01 | 270 | | | (319) | (605) | 471 |
| 0003530 | INTERFACE FLOORING SYSTEM | SCOTTSDALE | AZ | 01 | 01 | 16,139 | 9,301 | | 16,521 | (94) | 33,961 |
| 0003550 | DEALERS SUPPLY NORTH INC | LAGRANGE | GA | 01 | 01 | (504) | 545 | | | | (723) |
| 0003552 | MCINEY LUMBER & SUPPLY LLC | LOCKBOURNE | OH | 01 | 01 | (145) | | | | | (730) |
| 0003556 | LUMBER ONE HOME CENTER | PRAIRIE VILLAGE / STUTTGART | KS / AR | 01 | 01 | (145) | | | | (1,049) | (145) |

| ID | Company | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0003575 | G S FLOOR DESIGNS INC | ARLINGTON HEIGHTS | IL | 01 | 7,404 | 7,304 | | 100 | | 100 | 100 |
| 0003611 | E FLOOR INC | DENHAM | MA | 01 | 693 | 693 | | | | 693 | 693 |
| 0003625 | AWARA GOLF | CARLSBAD | CA | 01 | 394 | 394 | | | | | |
| 0003633 | ATLANTIC FREIGHT SYSTEMS | ELIZABETH | NJ | 01 | (677) | | | | | (677) | (677) |
| 0003667 | CARPET KINGS | COLLINSVILLE | IL | 01 | 1,527 | 200 | | | | | |
| 0003657 | NELSON & PYLE WOODWORK | ROSEBURG | OR | 01 | 124 | 491 | | | | (377) | 113 |
| 0003747 | PROMO CARPET | CHATSWORTH | GA | 01 | 4,210 | 1,413 | | | | | |
| 0003742 | ALLEN'S COUNTRY FLOORING | RISON | GA | 01 | 1,289 | 124 | | | | 2,921 | 2,921 |
| 0003757 | RC FLOORING INC | DALTON | GA | 01 | 1,289 | 1,289 | | | | (25) | (25) |
| 0003751 | RISON | FARFAX | VA | 01 | (25) | | | | | (25) | (25) |
| 0003778 | WHOLESALE FLOOR COVERING | MINOT | ND | 01 | (1,068) | 1,552 | (351) | | | (1,068) | (1,068) |
| 0003791 | CARPETLAND | LAKE FOREST | CA | 01 | 1,200 | 124 | | | | (102) | (452) |
| 0003803 | HANSAIR LOGISTICS | CITY OF INDUSTRY | CA | 01 | 124 | 124 | 107 | | | 107 | 107 |
| 0003831 | WOMOTO INC | CLINTON | CA | 01 | 107 | | | | | (633) | (633) |
| 0003839 | WILHELM LANDSCAPING | TUKWILA | CA | 01 | (633) | | | | | 497 | 497 |
| 0003843 | GARY PACK LUMBER | SAN RAFAEL | CA | 01 | 497 | | | | | 193 | 193 |
| 0003870 | MACALPIN FLOOR & DESIGN | | AR | 01 | 323 | 130 | 193 | | | 196 | 196 |
| 0003875 | BEEBE CARPETS | BEEBE | CA | 01 | 196 | 186 | 5 | 5 | | 421 | 421 |
| 0003883 | FORESIGHT SPORTS | SAN DIEGO | CA | 01 | 421 | 421 | 5 | 5 | | 117 | 117 |
| 0003943 | R G PRESTIGE INC | SKOKIE | IL | 01 | 117 | 117 | | | | (322) | |
| 0003952 | JIMMIE LYLES CARPET | JACKSON | MS | 01 | 1,543 | 1,465 | 39 | | | 78 | 78 |
| 0003974 | CARPET WHOLESALE OUTLET | TUNNEL HILL | GA | 01 | (322) | 39 | | | | 39 | (322) |
| 0003076 | JACKS CARPET | HOUSTON | TX | 01 | 123 | 123 | | | | 123 | 123 |
| 0003074 | TONYS FLOOR COVERING | WHITE OAK | TX | 01 | 114 | 68 | | (17) | | (117) | (117) |
| 0004079 | EAGLE TRUCKING COMPANY | SHARON HILL | PA | 01 | 89 | 89 | | | | 46 | 46 |
| 0004088 | FOREVERLAWN SOUTHWEST LLC | NORTH CANTON | OH | 01 | (350) | | | 50 | (150) | (150) | (150) |
| 0004140 | ULSTER CARPET MILLS | MARIETTA | GA | 01 | 1,717 | 447 | | 89 | | 39 | 128 |
| 0004147 | SELECT SOURCE MARKET | ALBUQUERQUE | NM | 01 | 650 | 522 | | 45 | 875 | 300 | 6,001 |
| 0004200 | NORICON INDUSTRIES INC | PHOENIX | AZ | 01 | 10,251 | 4,250 | 4,782 | | | (23) | (23) |
| 0004296 | FLOOR | HOUSTON | TX | 01 | 8,906 | 8,829 | | | | (50) | |
| 0004390 | PRESOURCE OF SEATTLE | BOTHELL | WA | 01 | (104) | (104) | (54) | | | (104) | (104) |
| 0004440 | BUFOLCO INC | FINDLAY | OH | 01 | 25 | 25 | | | | | |
| 0004449 | DEAN TRADING CO | DALTON | GA | 01 | 82 | | | (17) | | (117) | (117) |
| 0004478 | COKER FLOOR CO | DALLAS | GA | 01 | 99 | 99 | | | | (117) | (117) |
| 0004484 | WILSON FLOOR COVERING | PENSACOLA | FL | 01 | 256 | 256 | | | | 256 | 256 |
| 0004510 | FIELAND FLOORS | MCMINNVILLE | TX | 01 | 70 | 70 | | | | 256 | 256 |
| 0004530 | WHITE HOUSE LOOM SHOP USA INC | EDMOND | OK | 01 | (910) | | | | | (910) | (910) |
| 0004534 | CALIFORNIA CARPETS LLC | SAN CARLOS | CA | 01 | 91 | 91 | | | | 91 | 91 |
| 0004547 | SILEGACY FLOOR FINISHING | SPARKS | NV | 01 | 228 | | | 119 | | 228 | 228 |
| 0004602 | DESIGNER CONCEPTS LLC | HOUSTON | TX | 01 | 1,098 | 1,238 | | | | (141) | (141) |
| 0004607 | FLOORING GALLERY | HOUSTON | KY | 01 | 143 | 143 | | | | 228 | 228 |
| 0004631 | PRO BUILD SHOW LOW | LOUISVILLE | KY | 01 | 3,765 | 3,460 | 305 | | | (141) | (141) |
| 0004651 | PRESTIGE REMODELING SERVICES | MANASSAS | VA | 01 | (639) | | | | | 305 | 305 |
| 0004665 | FOREVERLAWN BY THE BAY | SHOW LOW | AZ | 01 | (662) | | | | | (639) | (639) |
| 0004667 | JOHNSONS COMMERCIAL FLOORING | LEONARDTOWN | MD | 01 | 1,110 | 316 | 253 | 492 | | (662) | (662) |
| 0004727 | ROSS FLOOR COVERING | LOUISVILLE | KY | 01 | (205) | (205) | | 49 | (55) | (205) | (205) |
| 0004770 | MISCELLANEOUS SALVAGE SALES | BOLIVAR | MO | 01 | 383 | 639 | | | | 794 | 794 |
| 0004755 | AYRES CYNTHIA & COMPANY | HANOVER | MD | 01 | 514 | 514 | | | | (236) | (236) |
| 0004893 | R T MANCINI CO INC | LENEXA | KS | 01 | (306) | | | | | 514 | 514 |
| 0004898 | CARPET HEADQUARTERS | MILPITAS | CA | 01 | 942 | 928 | 14 | | | (306) | (306) |
| 0004904 | FLOOR GALLERY LLC | BELLEVILLE | MI | 01 | 45 | 45 | | | | 14 | 14 |
| 0004912 | CARPET DEALER INC | OCEAN CITY | CA | 01 | (707) | 105 | | | (732) | 45 | 45 |
| 0004923 | MILLER FLOOR STORE | WOODLAND | KY | 01 | 163 | 245 | | | | (80) | (812) |
| 0004973 | VOGELS CARPET AND DRAPERY | OKLAHOMA CITY | OK | 01 | 727 | 727 | | | | (82) | (82) |
| 0004961 | NORTH DALLAS WALLCOVERINGS INC | SEATTLE | OK | 01 | 13 | | | | | 13 | 727 |
| 0004964 | DESIGN LINE INTERIORS | DALLAS | WA | 01 | (49) | | | | | (49) | 13 |
| 0005006 | COUNTRYSIDE CARPETS & INTERIORS | DEL MAR | TX | 01 | (109) | | | | | (109) | 13 |
| 0005005 | | | CA | 01 | | | | | | | (49) |
| 0005011 | | O FALLON | MO | 01 | 967 | 967 | | | | | (109) |

| Acct | Company | City | ST | | | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0005102 | CLIFFS CARPET | LATROBE | PA | 01 | 01 | 557 | 393 | 171 | | | | (7) | 164 |
| 0005127 | CARPET WEAVERS | CHAMPAIGN | IL | 01 | 01 | (80) | | | | | | (80) | (80) |
| 0005133 | HERITAGE FLOORS INC | ALLEN | TX | 01 | 01 | 2,426 | 2,426 | | | | | | |
| 0005177 | LUMBER LIQUIDATORS/LL | POCATELLO | ID | 01 | 01 | 1,609 | 1,609 | | | | | | |
| 0005196 | BLAGE CORPORATION | EVERETT | WA | 01 | 01 | 1,154 | 1,154 | | | | | | |
| 0005197 | PROSOURCE OF BATON ROUGE | BATON ROUGE | LA | 01 | 01 | 44 | 44 | | | 44 | | 44 | 44 |
| 0005248 | KING OF CARPETS INC CCA GLOBAL | ROCKAWAY | NJ | 01 | 01 | 637 | | | | | | | |
| 0005258 | ARTIFICIAL TURF SUPPLY | PONTE VEDRA | FL | 01 | 01 | 289 | 289 | 248 | | 101 | | 348 | 348 |
| 0005308 | INTERIOR DESIGN SERVICES | SAN FRANCISCO | CA | 01 | 01 | 4,758 | 4,758 | | | | | | |
| 0005327 | SUMMER FLOORS & MORE INC | SUMNER | WA | 01 | 01 | 7,643 | 7,643 | | | | | | |
| 0005229 | MJK ELECTRICAL CORPORATION | BERLIN | NJ | 01 | 01 | 584 | 584 | | | | | | |
| 0005335 | HOM SOLUTIONS INC | DENVER | CO | 01 | 01 | (125) | | | | | | (125) | (125) |
| 0005335 | BLODGETT'S LINOLEUM | LAFAYETTE | IN | 01 | 01 | 5,187 | 6,627 | | | | | (1,440) | (1,440) |
| 0005335 | CAROOL HOME CENTER INC | MEMPHIS | TN | 01 | 01 | 447 | 447 | | | | | | |
| 0005399 | DXN - DIXIE GROUP | FLORISSANT | MO | 01 | 01 | 642 | | | | | | 642 | 642 |
| 0005453 | WINSOR CARPET SERVICE INC | DALTON | GA | 01 | 01 | 228,496 | 238,347 | 5,653 | 228 | 116 | | (14,070) | (9,851) |
| 0005466 | ECMH INC | CORSICANA | TX | 01 | 01 | 1,182 | 294 | 272 | 94 | 283 | | 193 | 888 |
| 0005483 | JAMES COX INC | PRUNEDALE | CA | 01 | 01 | 48,462 | 27,764 | 15,365 | 5,525 | (480) | (1,183) | (14,070) | 20,698 |
| 0005495 | TRI COUNTY FLOORING | FORT SMITH | AR | 01 | 01 | 1,031 | 167 | 791 | | 47 | | (192) | 864 |
| 0005505 | TURNQUIST CO INC | KINGSFORD | MI | 01 | 01 | 853 | 853 | | | 291 | | (38) | 291 |
| 0005503 | OLENS CARPET & KITCHEN MAR | SPOKANE | WA | 01 | 01 | 339 | | | | | | 339 | 339 |
| 0005508 | HOMETOWN FLOORING | KINGSFORD | AR | 01 | 01 | 244 | | 8 | 34 | | | 124 | 339 |
| 0005514 | THE CARPET LADY | MARYVALE | AR | 01 | 01 | 40 | 40 | | 38 | | | | 204 |
| 0005508 | FREEHOLD FURNITURE SALES INC | FREEHOLD | NJ | 01 | 01 | 216 | 216 | | | | | | 250 |
| 0005595 | HAZEL FLOORING LLC | REHOBOTH BEACH | DE | 01 | 01 | 149 | 149 | 250 | | | | 464 | 464 |
| 0005801 | SPIN DESIGN FLOORING | GRAPEVINE | TX | 01 | 01 | 399 | | | | | | 88 | 88 |
| 0005795 | RUBICON CAFE | FREDERICKSBURG | TX | 01 | 01 | 464 | | | | | | (90) | (90) |
| 0005801 | CAPSTONE CONSTRUCTION CO | DALTON | GA | 01 | 01 | 88 | | | | | | (765) | (765) |
| 0005858 | IMPERIAL FLOORING SRVS INC | SAINT PETERSBURG | FL | 01 | 01 | 90 | | | | | | 105 | 105 |
| 0005864 | CHUCKS WORLD OF CARPET | HOUSTON | TX | 01 | 01 | (765) | | | | | | 105 | 105 |
| 0005100 | GYIS | HOUSTON | TX | 01 | 01 | 105 | | | | | | 89 | 89 |
| 0005100 | SWANS ELITE FLOORING | HOUSTON | TX | 01 | 01 | 105 | 44 | | | | | (6) | (6) |
| 0006100 | TRACY FLOORING INC | HOUSTON | GA | 01 | 01 | (45) | | | | | | | |
| 0006104 | EL DORADO FLOOR & DESIGN | HOLLISTER | FL | 01 | 01 | (6) | 70 | | | | | | |
| 0006106 | INDEPENDENT FLOORING | HOLLISTER | CA | 01 | 01 | 70 | | | | | | 835 | 835 |
| 0006109 | BOENDER CUSTER LLC | FORSYTH | AR | 01 | 01 | 919 | 84 | 353 | 106 | 224 | 850 | (367) | 639 |
| 0006116 | CORPORATE FLOORS | SAINT LOUIS | MO | 01 | 01 | 84 | 391 | 533 | | | | | 8 |
| 0006101 | CORTERS CARPET CENTER INC CCA | NINE MILE FALLS | WA | 01 | 01 | 533 | | 8 | 8 | 8 | | 8 | 326 |
| 0006140 | TOTAL APPEARANCE EXHIBIT SERVICE | SAN DIEGO | CA | 01 | 01 | 1,030 | | 102 | | | | (215) | (215) |
| 0006140 | SADDLE CREEK LOGISTICS CORP OFFICE | SAN CARLOS | CA | 01 | 01 | 8 | | 204 | 224 | | | (133) | (447) |
| 0006151 | DESIGNER RUGS | ROSEVILLE | CA | 01 | 01 | 529 | | (189) | (133) | | | (101) | 127 |
| 0006152 | A TO Z FLOORING AMERICA | CABOT | AR | 01 | 01 | (215) | 162 | 162 | | | | (125) | 127 |
| 0006152 | CUSTOM RUG SOURCE | TRACY | CA | 01 | 01 | 204 | | | | | | 83 | 183 |
| 0006172 | SPECIFIES SURFACES | FOLSOM | CA | 01 | 01 | 102 | 106 | 15 | | 98 | | 155 | 155 |
| 0006186 | TOP STITCH RUGS | EAU CLAIRE | WI | 01 | 01 | 285 | 285 | | | | | | |
| 0006202 | FOLUK DECORATING COMPANY | GRAND RAPIDS | MI | 01 | 01 | 233 | 230 | 1,911 | | | | | |
| 0006232 | BETTY RUMPF INTERIORS INC | GRAPEVINE | CA | 01 | 01 | 106 | 1,750 | (13) | | 76 | (1,401) | (449) | (449) |
| 0006258 | CARPET USA | WILLIAMSPORT | TX | 01 | 01 | 155 | 155 | | | | | (13) | (13) |
| 0006307 | HOSNER CARPET & INTERIORS | PRESCOTT | PA | 01 | 01 | 102 | 230 | 861 | 876 | | | 152 | 152 |
| 0006314 | | LAKELAND | AZ | 01 | 01 | 2,355 | 46 | | | | | 2,355 | 2,355 |
| 0006343 | | OKLAHOMA CITY | FL | 01 | 01 | 412 | | | | | | 152 | 152 |
| | | ENID | OK | 01 | 01 | 33 | | | | | | (13) | (13) |
| | | WEBSTER | OK | 01 | 01 | 152 | 867 | 380 | | 65 | | 65 | 65 |
| | | PORTLAND | NY | 01 | 01 | 867 | | | | | | 380 | 380 |
| | | FLUSHING | OR | 01 | 01 | 65 | 184 | 389 | | 380 | | 184 | 184 |
| | | MEADVILLE | PA | 01 | 01 | 380 | 185 | | | | | 185 | 185 |
| | | TOLEDO | OH | 01 | 01 | 184 | 67 | | | | | 389 | 389 |
| | | CULVER CITY | OH | 01 | 01 | 575 | 67 | | | | | | |
| | | CANTON | OH | 01 | 01 | 7,432 | | 8,496 | | | | 8,496 | 8,496 |
| | | | | | | | | | | | | (64) | (64) |

| Acct | Company | City | State | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0006564 | WHOLESALE CARPETS OF FOX VALLEY | FOX RIVER GROVE | IL | 01 | 2,348 | 1,364 | 350 | | 545 | 984 |
| 0006508 | ALL PRO FLOORS | ARLINGTON | TX | 01 | 859 | 712 | 244 | | 89 | 147 |
| 0006381 | TONKA EXCAVATING/JIM PAP | ROSEBURG | OR | 01 | 224 | | | | 165 | |
| 0006503 | CARPET CRAFT INC | LOS ANGELES | CA | 01 | | | | | | |
| 0006485 | SPACES WAREHOUSE | BISMARCK | ND | 01 | 65 | 65 | | | (262) | (262) |
| 0006501 | TIMBERLINE FLOORING | | | 01 | | | | | 224 | 224 |
| 0006420 | NC US | HOUSTON | TX | 01 | 132 | | | | | 132 |
| 0006401 | COLUMBIA RUG LTD | DALTON | GA | 01 | (25) | | | | | |
| 0006422 | INTERIOR DESIGNS BY MARY KAY | PEORIA | IL | 01 | 83,515 | 44,352 | 39,306 | | | 39,562 |
| 0006434 | JOHN H BISCHOFF FLOORING | PITTSBURGH | PA | 01 | 1,675 | | 168 | (55) | | 657 |
| 0006542 | COLOR WHEEL DECORATING CENTER | LOUISVILLE | KY | 01 | 143 | | | | | 143 |
| 0006478 | SURFACEWORKS LLC | | | 01 | 657 | | | | | 657 |
| 0006501 | POTOMAC FLOOR COVERING INC | HANOVER | PA | 01 | (13) | | | | | (13) |
| 0006559 | LOLO ENTERPRISES INC | PORTLAND | OR | 01 | 2,343 | 1,143 | 424 | 396 | 413 | 1,199 |
| 0006572 | CARPET HANDLERS & SUPPLIES | CHANTILLY | VA | 01 | 87 | 133 | | | | (47) |
| 0006577 | ALEX CARPETS | | | 01 | 148 | 130 | | 90 | | 18 |
| 0006593 | KERN & CO INC | SAN ANTONIO | TX | 01 | (387) | | | | | (387) |
| 0006607 | CHESNEY CARPET | BRYAN | TX | 01 | 252 | | 169 | | | 83 |
| 0006659 | GARVE'S CARPET & VINYL EMPORIUM INC | MINERAL WELLS | TX | 01 | 1,406 | 1,406 | | | | 252 |
| 0006660 | THE PAD PLACE | DENVER | CO | 01 | 435 | 435 | 435 | | | 1,406 |
| 0006671 | INTERSTATE FLOORING CO | SOLANA BEACH | CA | 01 | 306 | | | | | 435 |
| 0006660 | MARY ELLENS FLOOR COVERING & DESIGN | SILOAM SPRINGS | AR | 01 | 50 | 448 | 448 | | | 306 |
| 0006691 | D M CARPET SERVICES | NORTHUMBERLAND | PA | 01 | 178 | | | | | 448 |
| 0006746 | KISERS FLOOR FASHION | SARASOTA | FL | 01 | 1,507 | 1,435 | 42 | | | 72 |
| 0006810 | FLOORS INC | PORTLAND | OR | 01 | 131 | | | | (47) | (47) |
| 0006887 | WAREHOUSE FLOORING | SHERWOOD | AR | 01 | (84) | | | | 30 | 72 |
| 0007120 | CARPET EXPRESS INC | SAN DIEGO | CA | 01 | 40 | | 10 | 10 | (84) | (84) |
| 0007163 | CORPORATE INTERIORS | MEMPHIS | TN | 01 | 18 | | 10 | 10 | 10 | 10 |
| 0007158 | ROYAL MOULDINGS LIMITED | GRAPEVINE | TX | 01 | 25 | 25 | | | 18 | 18 |
| 0007230 | EDS CARPET TILE & HARDWOOD INC | WILLISTON | FL | 01 | 98 | | | | (6) | 98 |
| 0007250 | BELL CARPET & FLOOR INC | DALTON | GA | 01 | 4,492 | 3,023 | 246 | 292 | 803 | 1,469 |
| 0007387 | FLOOR COVERING ASSOCIATES | SAINT LOUIS | MO | 01 | (49) | 75 | 44 | 44 | (124) | (124) |
| 0007332 | MISHA CARPET | MARION | VA | 01 | 10,240 | 8,982 | | | | 1,257 |
| 0007324 | MARYLAND CARPET & TILE INC | PLAISTOW | NH | 01 | 3,297 | 2,384 | 770 | 431 | 57 | 1,257 |
| 0007342 | ELLENDRO FLOORS | WICHITA | KS | 01 | 414 | | 313 | | | 313 |
| 0007360 | CUSTOM WHOLESALE FLOOR | MERRILLVILLE | IN | 01 | (85) | | | | (85) | (85) |
| 0007377 | BURTSCHELLS FLOOR COVERING | GAITHERSBURG | MD | 01 | 1,400 | 525 | 364 | 456 | (44) | 875 |
| 0007387 | ALL SOURCE COATINGS & TILE | NEW YORK | NY | 01 | 160 | 160 | 100 | | | 85 |
| 0007417 | L A H INC | | | 01 | 148 | | | 148 | 148 | 148 |
| 0007444 | R R WILLIAMS & ASSOC | | | 01 | 226 | | | | 226 | 226 |
| 0007496 | BLUE RIBBON DRAPERY | ELLENDRO | WV | 01 | 258 | 336 | | | 258 | 258 |
| 0007518 | CUSTOM DESIGNER GRAPHICS | JACKSONVILLE | FL | 01 | 162 | | | (46) | | |
| 0007550 | JIM STELLABUTOS EVERYTHING UNDERFOOT | CRESCENT CITY | CA | 01 | 937 | 533 | 404 | | 414 | 414 |
| 0007553 | AMERICAN CARPET DIST INC | SAN DIEGO | CA | 01 | 205 | 145 | 85 | | (175) | (175) |
| 0007559 | STORES FLOOR & CARPET INC | HOUSTON | TX | 01 | 91 | 91 | 91 | | 414 | 414 |
| 0007659 | NATIONAL TURF SUPPLY | HOUSTON | TX | 01 | 17,898 | 17,565 | 3,016 | | 313 | 313 |
| 0007660 | CARPET MART | VENTURA | CA | 01 | 1,071 | | | | (85) | (85) |
| 0007664 | CARPETS OF CABOT INC | DALTON | GA | 01 | 6,608 | 536 | | 115 | 148 | 148 |
| 0007739 | FLOORING ASSOCIATES LLC | DUBOIS | PA | 01 | 148 | 533 | | | 226 | 226 |
| | CARPET DIRECT OKLAHOMA | MEDIA | PA | 01 | 514 | 514 | | (212) | 333 | 333 |
| | QUALITY CARPETS | ELDORADO | AR | 01 | 337 | 337 | | | 91 | 91 |
| | ORCHARD SUPPLY HARDWARE | RANCHO DOMINGUEZ | CA | 01 | 779 | 779 | | | (2,529) | (2,529) |
| | DONS FLOOR GALLERY INC | DALLAS | TX | 01 | (156) | | | | 1,071 | 1,071 |
| | GENESIS FLOORS | IDAHO FALLS | ID | 01 | 137 | 551 | 272 | 2,093 | 941 | 6,092 |
| | | CABOT | AR | 01 | 267 | | 71 | | (386) | (386) |
| | | BARRINGTON | IL | 01 | 2,560 | 382 | 726 | (27) | | |
| | | TULSA | OK | 01 | 2,504 | 1,642 | 633 | | | |
| | | CLOVIS | CA | 01 | 160 | 160 | | 48 | 818 | 267 |
| | | SAN JOSE | CA | 01 | 775 | 775 | 151 | 1,813 | 1,245 | (935) |
| | | EDMOND | OK | 01 | 1,482 | 1,237 | | 53 | (11) | 52 |
| | | SYKESVILLE | MD | 01 | 220 | 220 | | | | 245 |

| ID | Company | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0007799 | CARPETS BY JAMISON LLC | WHEELING | WV | 01 | 01 | 480 | 84 | 99 | - | - | 53 | 396 |
| 0007854 | PHOENIX WHOLESALE | EARTH CITY | MO | 01 | 01 | 10,165 | 4,587 | 5,475 | - | - | 103 | 5,577 |
| 0007893 | PECORA FLOORING | NORTH HUNTINGDON | PA | 01 | 01 | 2,391 | 1,372 | - | - | - | - | 1,019 |
| 0007903 | SP FLOORS LLC | MCMURRAY | PA | 01 | 01 | 538 | 202 | 46 | - | - | 290 | 336 |
| 0007914 | VERSACUT LLC | DALTON | GA | 01 | 01 | 3,362 | 794 | 2,774 | - | 1,019 | (206) | 2,568 |
| 0007921 | KENWOOD ENTERPRISE | DEERPARK | NY | 01 | 01 | 20 | - | - | - | - | 20 | 20 |
| 0007952 | FLOORCRAFT FLOOR COVERINGS INC | CLINTON TOWNSHIP | MI | 01 | 01 | 159 | 501 | 576 | - | 1,875 | (59) | 2,376 |
| 0008046 | J J FLOORING OF KEYSTONE | KEYSTONE HEIGHTS | FL | 01 | 01 | 2,628 | 1,662 | 933 | (1,236) | - | (59) | 966 |
| 0008120 | ROBERT J CAUSTRIA | ONTARIO | CA | 01 | 01 | 576 | 576 | - | - | 1,058 | - | 59 |
| 0008194 | AMBASSADOR FLOOR CO | CHESTERFIELD | MO | 01 | 01 | 59 | 211 | - | - | - | - | 59 |
| 0008267 | BARRINGTON CARPET LLC | AKRON | OH | 01 | 01 | 1,382 | 581 | 725 | 26 | - | - | 800 |
| 0008279 | MOTOR CITY CARPET & FLOOR COVERING | WARREN | MI | 01 | 01 | 47,582 | 30,073 | 13,077 | 4,432 | 50 | 497 | 17,509 |
| 0008282 | DIVERSIFIED FLOORING SERVICES | MILLBRAE | CA | 01 | 01 | 497 | - | - | - | - | - | 497 |
| 0008299 | BO KIRBY CARPETS | MAGNOLIA | AR | 01 | 01 | 244 | 179 | 169 | - | - | 65 | 65 |
| 0008310 | FRED BUTLER & SONS | TORRANCE | CA | 01 | 01 | 531 | 362 | 169 | - | - | - | 169 |
| 0008334 | RUG WORKS INC | CITATI | CA | 01 | 01 | 362 | - | - | - | - | - | 1,222 |
| 0008343 | FARMINGDALE | FARMINGDALE | NJ | 01 | 01 | 2,662 | 1,459 | 824 | 450 | - | (52) | 1,222 |
| 0008347 | DREAM WEAVER CARPET LLC | CHATSWORTH | CA | 01 | 01 | 179,559 | 159,145 | 20,150 | 83 | 1,224 | (1,215) | 20,414 |
| 0008392 | RAINTOWN FLOORS BY DESIGN | SEFNER | FL | 01 | 01 | 6,562 | 5,133 | 1,029 | 133 | - | - | 1,029 |
| 0008409 | ROOMS TO GO | REDWOOD CITY | CA | 01 | 01 | (83) | - | - | - | - | (83) | (88) |
| 0008424 | HOLIDAY INN EXPRESS | BENTON | AR | 01 | 01 | 733 | 511 | 141 | 85 | - | (4) | 222 |
| 0008453 | CREATIVE CARPET | HEBER SPRINGS | AR | 01 | 01 | 167 | 167 | - | - | - | - | - |
| 0008472 | CREATIVE CARPETS & INTERIORS | MERRILLVILLE | IN | 01 | 01 | 153 | 153 | - | - | - | - | - |
| 0008480 | MASTER TILE INC | YPSILANTI | MI | 01 | 01 | 166 | 166 | - | - | - | - | - |
| 0008524 | BOLEN FLOORING INC | FLORHAM PARK | NJ | 01 | 01 | 2,590 | 2,394 | - | 234 | - | (14) | 196 |
| 0008526 | DSN ASSOCIATES LLC | JERICHO | NY | 01 | 01 | 902 | 902 | - | - | - | - | - |
| 0008527 | CRESCENT CARPET EMPORIUM INC | WOODBURY | NY | 01 | 01 | 2,187 | 691 | 500 | 175 | - | 33 | 1,496 |
| 0008587 | ON DECK SPORTS | ACTONVALE | QC | 01 | 01 | 10,560 | 9,085 | 2,012 | 821 | 137 | - | 1,475 |
| 0008590 | BEAULIEU CANADA | OAK HARBOR | WA | 01 | 01 | 10,187 | 9,052 | 1,105 | 15 | 30 | - | 1,134 |
| 0008602 | FLOORS PLUS CARPET ONE | CITY OF INDUSTRY | CA | 01 | 01 | 384 | 354 | 15 | 15 | - | - | 30 |
| 0008632 | JOHNSON HARDWOOD FLOORING | BILOXI | MS | 01 | 01 | (204) | - | (56) | - | - | (204) | (204) |
| 0008639 | RHODES CARPET & DRAPERIES INC | SAN JUAN CAPISTRANO | CA | 01 | 01 | 145 | 83 | 44 | 44 | - | 18 | 62 |
| 0008650 | CCD INTERIORS & FLOORS INC | TITUSVILLE | FL | 01 | 01 | 83 | 83 | - | - | - | (202) | (202) |
| 0008660 | FLOOR FACTORY OUTLET | RANCHO CUCAMONGA | CA | 01 | 01 | 20 | 20 | - | - | - | - | - |
| 0008756 | THREE WISE MEN | CHATTANOOGA | TN | 01 | 01 | 6,051 | 500 | 500 | - | (38) | 6,051 | 6,051 |
| 0008769 | LOGISTEK LLC | HOUSTON | TX | 01 | 01 | 715 | - | - | - | - | (285) | 215 |
| 0008800 | REDCO TOOL & FASTENER | ORO VALLEY | AZ | 01 | 01 | 455 | - | - | 151 | - | 455 | 455 |
| 0008845 | CDX COMMERCIAL FLOORING | CONCORD | CA | 01 | 01 | 151 | - | - | 114 | - | 151 | 151 |
| 0008861 | MONARCH CARPET SERVICE INC | BRUNSWICK | OH | 01 | 01 | 286 | - | 173 | - | - | 286 | 286 |
| 0008877 | AMERICAN CARPET SOUTH INC | PASSAIC | NJ | 01 | 01 | 55 | 55 | 55 | - | - | - | 55 |
| 0008945 | OLIVAS FLOORING | OCEANSIDE | CA | 01 | 01 | 2,323 | 2,323 | - | - | - | - | - |
| 0008975 | THE FLOOR STORE LLC | HOT SPRINGS | AR | 01 | 01 | (702) | 39 | - | - | - | (702) | (702) |
| 0009038 | UNITED FLOORING SOLUTIONS | TORRINGTON | CT | 01 | 01 | 119 | 79 | 79 | - | - | 79 | 79 |
| 0009081 | CONTRACT FLOORING CONSULTANTS | PORTLAND | OR | 01 | 01 | 1,538 | - | 252 | - | (38) | 1,538 | 1,538 |
| 0009093 | JUST CARPETS | SAN RAFAEL | CA | 01 | 01 | 7,014 | 9,885 | 252 | - | - | (2,834) | (2,871) |
| 0009115 | DIRT DESTROYERS | NORTH SIOUX CITY | SD | 01 | 01 | 7,217 | 6,965 | 252 | - | - | 252 | 252 |
| 0009133 | FLOORING SUPPLY CENTER | HARBOR CITY | CA | 01 | 01 | 139 | 139 | 61 | - | - | - | 139 |
| 0009177 | ABSTRACT CARPET DESIGN | LAWNDALE | CA | 01 | 01 | 275 | 214 | 61 | - | - | (161) | 61 |
| 0009194 | NDINS FLOORING & TILE CN | MIDDLETON | WI | 01 | 01 | 727 | 998 | 139 | (54) | (56) | (271) | 139 |
| 0009273 | CARPET WORLD INC - WALNUT RIDGE | WALNUT RIDGE | AR | 01 | 01 | 5,632 | 3,179 | 1,823 | (56) | 156 | 291 | 2,453 |
| 0009298 | IMRDDEN CARPET & INTERIORS | CONWAY | AR | 01 | 01 | 371 | 290 | 42 | - | - | 39 | 81 |
| | RUG & CARPET OUTLET INC | OAKLAHOMA CITY | OK | 01 | 01 | 263 | 165 | 144 | (45) | - | - | 99 |
| | BERNARD BUILDING CENTER | HALE | MI | 01 | 01 | 1,696 | 1,696 | - | - | - | - | - |
| | PS TARRANT INC | FORT WORTH | TX | 01 | 01 | 44 | 42 | (42) | - | (166) | (174) | 2 |
| | CARPET ALLEY | DALTON | GA | 01 | 01 | 263 | - | - | - | - | (53) | 263 |
| | RAINBOW BUILDERS INC | ANCHORAGE | AK | 01 | 01 | 1,350 | 288 | 10,304 | 115 | - | 1,350 | 1,350 |

| Account | Company | City | State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0009304 | DOLLAR FLOOR STORE LLC | TOLEDO | OH | 01 | 376 | | | | | | 376 |
| 0009334 | CD INC | MIAMI | FL | 01 | 11 | | | | | | 11 |
| 0009355 | LANDMARK FLOORING CONCEPTS | ALBANY | NY | 01 | 7,002 | 3,236 | | | | | 3,786 |
| 0009412 | O'MALLEY INTERESTS LTD | HUMBLE | TX | 01 | 361 | | | | | | |
| 0009423 | DIVISION 9 FLOORING | WOODINVILLE | WA | 01 | 411 | | | | | | |
| 0009425 | JEREMIAH GRAFF OFFICE | PLANO | TX | 01 | 168 | | 50 | | | | 50 |
| 0009473 | AMERI FLOORS | PLANO | TX | 01 | 137 | | | | | | |
| 0009494 | FOWLER CARPET SALES | CORPUS CHRISTI | TX | 01 | (38) | | | | | | (38) |
| 0009545 | BREESLIE BUILDING PRODUCTS | MOORE | OK | 01 | 1,939 | | | | | | |
| 0009554 | TALBOTS INC. | WICHITA FALLS | TX | 01 | 4,866 | 4,866 | 3,387 | | (21) | | 1,708 |
| 0009585 | CARROLL HOME CENTER INC | MANCHESTER | NH | 01 | 4,893 | | | | 48 | | 1,708 |
| 0009586 | H & R BLOCK | HOUSTON | TX | 01 | 2,087 | 1,708 | | | | | 412 |
| 0009629 | SUPER FLOORS | HOUSTON | MO | 01 | 412 | 379 | | | 412 | | 412 |
| 0009542 | EAGLE MAT & FLOOR | ALBUQUERQUE | NM | 01 | 33 | 33 | | | | | |
| 0009768 | ACS FLOORING GROUP INC | HAMPTON | NH | 01 | 168 | | | | | 11 | 376 |
| 0009780 | WOODARD CARPET | GAITHERSBURG | MD | 01 | 81 | 81 | | | | | |
| 0009880 | ATLAS CREATIVE CARPETS INC | HOUSTON | TX | 01 | 1,628 | 1,722 | 6,199 | 7,037 | 81 | | 13,197 |
| 0009897 | LH LLC | CLARKSVILLE | GA | 01 | 440 | 45 | (152) | | | | (152) |
| 0009941 | CONCEPT FLOORING WORKROOM | CHATSWORTH | CA | 01 | 988 | 330 | | | | | |
| 0009945 | RON PACK CARPET CENTER | LITTLE ROCK | AR | 01 | 863 | 863 | | | | (93) | (93) |
| 0009982 | BAREFOOT CARPET CO | PLAINVIEW | NY | 01 | 324 | 144 | 253 | 253 | 343 | (129) | 65 |
| 0010020 | ONE SOURCE LOGISTICS LLC | LITTLE ROCK | AR | 01 | 129 | 98 | | | 138 | (128) | 125 |
| 0010129 | P & N SHARP INC | LITTLE ROCK | AR | 01 | 458 | 276 | | | | 48 | 1,436 |
| 0010173 | CUSTOM TOUCH CARPET | SAINT LOUIS | MO | 01 | 108 | | | | | 324 | 324 |
| 0010178 | KIMBALL CARPETS LLC | MENDOTA HEIGHTS | MN | 01 | 110 | | | 297 | | 458 | 458 |
| 0010257 | DEBBIE AHLBORN | TUCSON | AZ | 01 | 266 | 266 | | | | 161 | 108 |
| 0010238 | SHABBICK CARPET LLC | BELLEVUE | WA | 01 | 468 | 468 | 468 | | | 110 | 110 |
| 0010474 | SURFACE TILE & CARPET | COEUR D ALENE | ID | 01 | 333 | 333 | | | | | 468 |
| 0010483 | SAVVIK | OWASSO | OK | 01 | 42 | 42 | 25 | | | | 42 |
| 0010496 | STEPHEN J TAPPERT | UNIONTOWN | PA | 01 | 253 | 253 | 253 | | | | 253 |
| 0010500 | COVINGTON CONSTRUCTION & RESTORATION | DEMING | NM | 01 | 13 | | | | | | 42 |
| 0010541 | LOUISVILLE HI TECH FLOOR COVERING | OAKLAND | CA | 01 | 1,271 | 1,263 | | 13 | 66 | 66 | 253 |
| 0010544 | NATIONAL BUSINESS SUPPLY INC | TROUTDALE | OR | 01 | 1,197 | 1,131 | | | 9 | 9 | 42 |
| 0010586 | WHOLESALE CARPET DESIGNS | SAN DIEGO | CA | 01 | 44 | 44 | | 13 | 66 | 66 | 66 |
| 0010676 | TRI WEST LTD | LOUISVILLE | KY | 01 | 99 | 231 | | | | 13 | 13 |
| 0010688 | CARPETMASTER | TROY | MI | 01 | 420 | 30 | | | | | |
| 0010670 | ROMANOFF FLOOR COVERING INC | VERNON HILLS | IL | 01 | 96 | 306 | 108 | | 20 | 27 | 114 |
| 0010733 | SUPREME FLOOR CO | SANTA FE SPRINGS | CA | 01 | 1,349 | 96 | | | | | 69 |
| 0010771 | ALEX'S WORKROOM | NORTH NORWICH | NY | 01 | 38,414 | 25,216 | | | | | 114 |
| 0010795 | AWESOME FLOOR LLC | SMYRNA | GA | 01 | (152) | (152) | (152) | | | (119) | (152) |
| 0010851 | REX FLOORING INC | HILLSBORO | KS | 01 | (100) | | | | | (100) | (100) |
| 0010856 | NATIONAL FLOOR COVERING CO | SAN RAFAEL | CA | 01 | 102 | 102 | | | | | |
| 0010890 | JDK CORPORATION INC | MURPHY | NC | 01 | 158 | 196 | | | (38) | | (38) |
| 0010965 | AFFORDABLE CARPETS & BLINDS, INC | CHANTILLY | VA | 01 | (60) | (60) | (60) | | | (60) | (60) |
| 0010974 | PROGRESSIVE FLOORING SERVICES | JENNINGS | MO | 01 | 220 | 220 | | | 270 | (50) | 220 |
| 0010976 | JONES BROS. INC. | HOUSTON | TX | 01 | 13 | | | | | | |
| 0010957 | CALIFORNIA CREATIVE SURFACEA | JACKSONVILLE | FL | 01 | 473 | 533 | | | | | |
| 0010830 | SYNTHETIC GRASS STORE OF CALIFORNIA | PATASKALA | OH | 01 | 53 | 13 | 53 | | | (60) | 53 |
| 0011033 | HDM FURNITURE | FAIRFIELD | CA | 01 | 13 | | (13) | | | (13) | (13) |
| 0011071 | NEXT FLOOR INC | NEWCASTLE | CA | 01 | 1,475 | 405 | 171 | 297 | 46 | 556 | 1,070 |
| 0011104 | CHOICE FLOORS | TUSTIN | CA | 01 | (750) | (750) | | | | (750) | (750) |
| 0011118 | HAMS HOME IMPROVEMENT | PLYMOUTH | MN | 01 | 1,110 | 1,110 | 64 | | | | 64 |
| | TAI PING CARPETS AMERICAS INC | WATERLOO | CA? | 01 | 456 | 391 | | | | | |
| | OKLAHOMA WHOLESALE FLOORING | COLORADO SPRINGS | CO | 01 | 837 | 837 | | | 270 | (60) | 220 |
| | RAYMOND A ALEXANDER | NILES | MI | 01 | 88 | | | | | (1,806) | 1,582 |
| | CARPETCO WHOLESALE.COM | CALHOUN | GA | 01 | 103 | 50,599 | 51 | 375 | 1 | 88 | 88 |
| | | GROVE | OK | 01 | | | | | | 52 | 103 |
| | | ROCHESTER | NY | 01 | | 870 | 2,279 | | | | 2,271 |
| | | REDMOND | OR | 01 | 3,141 | | | | | (489) | 2,271 |

| Account | Company | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0011141 | HALLMARK HARDWOODS INC | ONTARIO | CA | 01 | 01 | (1,113) | | | | (1,113) | (1,113) |
| 0011162 | WATSON SMITH | CHICAGO | IL | 01 | 01 | 443 | | | | (75) | 443 |
| 0011176 | RADICI USA INC | SPARTANBURG | SC | 01 | 01 | 179 | 322 | | | | (144) |
| 0011268 | CANTOR INC | CHELAN | WA | 01 | 01 | 371 | | | | | |
| 0011300 | J S FLOORING CENTER | ERIE | PA | 01 | 01 | 647 | 371 | | | | |
| 0011313 | EXTERIOR ADVANTAGE | PUEBLO | CO | 01 | 01 | 6,270 | 647 | 288 | 639 | 1,246 | 5,623 |
| 0011331 | FOREVER FLOORS | KENOSHA | WI | 01 | 01 | 1,075 | | | | 927 | 1,075 |
| 0011341 | G & W COMMERCIAL FLOORING INC | KENT | WA | 01 | 01 | 118 | | | | | 118 |
| 0011348 | CLICK ON FLOORS | SAN DIEGO | CA | 01 | 01 | 2,621 | 2,621 | | | | |
| 0011391 | FOAM BROTHERS | HOUSTON | TX | 01 | 01 | 233 | 233 | | | | |
| 0011414 | TEXAS CARPETS | GRAND PRAIRIE | TX | 01 | 01 | 150 | | | 150 | | 150 |
| 0011455 | T & A SUPPLY COMPANY | KENT | WA | 01 | 01 | 593 | 593 | | | | 593 |
| 0011501 | EAGLE TRUCKING CO | SHARON HILL | PA | 01 | 01 | (188) | | | | (188) | (188) |
| 0011505 | DFS FLOORING | DALTON | GA | 01 | 01 | 95 | 95 | | | | |
| 0011522 | TURF NATION INC | VAN NUYS | CA | 01 | 01 | 560 | 335 | 225 | | | 225 |
| 0011526 | KOHMNL INC | DALTON | GA | 01 | 01 | 335 | 50 | | | | |
| 0011597 | TEX PRO INC | SPOKANE | WA | 01 | 01 | 50 | | | | | |
| 0011599 | CARPET DEPOT LLC | DALTON | GA | 01 | 01 | 1,267 | | | | | 121 |
| 0011516 | BUILDERS FLOOR SERVICE INC | DALTON | GA | 01 | 01 | 896 | 896 | | | | 371 |
| 0011582 | S D SAGER INC | OKLAHOMA CITY | OK | 01 | 01 | 349 | 126 | 250 | | 222 | 222 |
| 0011527 | RIVERCITY COMPANIES INC | SPRINGFIELD | VA | 01 | 01 | 126 | | | | | |
| 0011717 | JMPDS INC | PETALUMA | CA | 01 | 01 | 75 | 75 | | | | |
| 0011732 | FLOOR CONCEPTS & DESIGN LLC | JACKSONVILLE | FL | 01 | 01 | (377) | | | | (377) | (377) |
| 0011752 | NATIONAL COMMERCIAL FLOORING | ERIE | PA | 01 | 01 | 4,707 | 2,158 | 2,160 | 556 | 334 | 2,549 |
| 0011759 | MACCHEYNES CARPETS PLUS INC | FAIRACRES | NM | 01 | 01 | 64 | 64 | | | 64 | 64 |
| 0011767 | FLAIR INTERIORS INC | WASHINGTON | DC | 01 | 01 | 1,760 | 610 | 1,150 | | | 1,150 |
| 0011901 | COLORADO FLOORWORKS INC | AUBURN | WA | 01 | 01 | 472 | 472 | | | 472 | 472 |
| 0011908 | SPECIALTY TEXTILE GROUP INC | AUBURN | WA | 01 | 01 | 167 | | | | 167 | 167 |
| 0011936 | CARPET CO-OP INC | DENVER | CO | 01 | 01 | 2,548 | 2,306 | 370 | 30 | (467) | |
| 0011939 | BARGAIN BOBS CARPETS INC | DALTON | GA | 01 | 01 | 547 | 148 | 172 | 80 | (238) | 399 |
| 0011993 | S & D FLOORING INSTALLATION INC | ANTIOCH | CA | 01 | 01 | (39) | | | 227 | (39) | (39) |
| 0012003 | J SCOTT ANDERSON INC | BELLE VERNON | PA | 01 | 01 | 161 | 161 | | | | 241 |
| 0012060 | ALLIANCE PUBLISHING & MKT | RIVIERA BEACH | FL | 01 | 01 | 84 | | | | | |
| 0012095 | STATEMENTS INC | LOUISVILLE | KY | 01 | 01 | 475 | 161 | 148 | 36 | | 221 |
| 0012205 | JOHN CHRISTIAN JACOBS INC | MURRAY | UT | 01 | 01 | 2,148 | 84 | | 37 | | |
| 0012216 | SPANKS OUTLET INC | CUMBERLAND | MD | 01 | 01 | 1,184 | 1,346 | | | 475 | 475 |
| 0012128 | STATEMENTS INC | SEATTLE | WA | 01 | 01 | 203 | 1,066 | 650 | 460 | 202 | 202 |
| 0012160 | CHASE CARPETS INC | ROCK SPRINGS | WY | 01 | 01 | 95 | | | | (993) | 117 |
| 0012165 | PEERLESS RUG CO | AKRON | OH | 01 | 01 | 156 | 95 | | | 203 | 203 |
| 0012196 | PROSOURCE OF NASSAU | PLAINVIEW | NY | 01 | 01 | 983 | 114 | 42 | | | |
| 0012298 | NOLAND SALES CORP | AUSTIN | TX | 01 | 01 | (240) | 567 | | | (240) | 42 |
| 0012277 | CREATIVE FLOORING RESOURCES INC | CHICAGO | IL | 01 | 01 | 567 | | | | 416 | 416 |
| 0012345 | FLOORING CONSULTANTS INC | CHICAGO | IL | 01 | 01 | 114 | | | | 416 | 416 |
| 0012359 | CASCADE GREENS LLC | WOOD DALE | IL | 01 | 01 | 488 | 488 | | | (240) | (240) |
| 0012387 | HERBERGERS #344 | HOUSTON | TX | 01 | 01 | 342 | | 342 | | | |
| 0012418 | [illegible] | PHOENIX | AZ | 01 | 01 | 409 | | | | | 342 |
| 0012462 | [illegible] | TANGENT | OR | 01 | 01 | 360 | 298 | | 32 | 156 | 111 |
| 0012466 | [illegible] | GRAND JUNCTION | CO | 01 | 01 | 941 | 983 | | | | 360 |
| 0012473 | WUFF EXT LTD | ADDISON | TX | 01 | 01 | 205 | 205 | | | | 360 |
| 0012487 | MOTION INDUSTRIES | BIRMINGHAM | AL | 01 | 01 | 15 | | 15 | | (42) | (42) |
| 0012523 | SUNCREST SUPPLY | RIVIERA BEACH | FL | 01 | 01 | 65 | 65 | | | 205 | 205 |
| 0012530 | CARPET SPECTRUM | MANHATTAN BEACH | CA | 01 | 01 | (20) | | | | 205 | 15 |
| 0012559 | GUY FERNANDES | RIVERVIEW | FL | 01 | 01 | 91 | 91 | | | (20) | (20) |
| 0012571 | NORTH FROST CENTER | SAN ANTONIO | TX | 01 | 01 | 898 | 387 | 43 | 195 | 273 | 511 |
| 0012605 | RIGZA INC | SULPHUR SPRINGS | TX | 01 | 01 | 26 | | | | 26 | 26 |
| 0012674 | THOMAS ANTHONY CARPET BROKER | ALBANY | NY | 01 | 01 | 3,584 | 1,970 | 1,736 | | (57) | |
| 0012840 | SYBELLE CARPET | SOUTHAMPTON | NY | 01 | 01 | 160 | 160 | | 83 | (122) | |
| 0012863 | HR REAL CONGLIN CORP | GLEN ELLYN | IL | 01 | 01 | 178 | 178 | | | | 1,614 |
| 0012864 | 24-7 FLOORS LLC | SARASOTA | FL | 01 | 01 | 178 | 178 | | | | |

| ID | Company | City | State | | | Amt 1 | Amt 2 | Amt 3 | Amt 4 | Amt 5 | Amt 6 | Total A | Total B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0012872 | G & M FLOORING | DEARBORN | MI | 01 | 01 | 721 | 125 | | | | | 1,387 | 591 |
| 0012875 | CARPET DELUXE LLC | DEARBORN HEIGHTS | MI | 01 | 01 | 5,302 | 1,155 | (25) | | (32) | 138 | 4,147 | 591 |
| 0012897 | TRACEY MORTON | RINGGOLD | GA | 01 | 01 | (25) | | | | | | (25) | |
| 0012909 | DWAINE MYER | MEDFORD | OR | 01 | 01 | 223 | | | | | | 223 | 223 |
| 0012915 | A & S FLOORS | BENICIA | CA | 01 | 01 | (744) | | | | | | (744) | (744) |
| 0022923 | PHILIPS FLOORING CENTER | LONGVIEW | TX | 01 | 01 | 481 | 519 | | | (38) | | (38) | (38) |
| 0013053 | MAJORS FLOOR COVERING | DANVILLE | KY | 01 | 01 | 285 | 285 | | | | | 285 | 285 |
| 0013068 | FLORIDA TILE | SEATTLE | WA | 01 | 01 | 2,839 | 1,561 | 649 | | | | 1,278 | 1,278 |
| 0013077 | ATKINSON CARPET INSTALLATION CO INC | HAVERHILL | MA | 01 | 01 | 143 | | 88 | | | | 143 | 143 |
| 0013080 | MANASSAS TEXTILES | ADAMSVILLE | GA | 01 | 01 | 978 | 526 | 143 | | | | 452 | 452 |
| 0013102 | SYSTEM PAVERS | REDMOND | WA | 01 | 01 | 25 | | | | | | 25 | 25 |
| 0013107 | ALETA INC | ETON | GA | 01 | 01 | 864 | | 205 | 205 | | | 864 | 864 |
| 0013127 | HOME SOURCE FURNITURE & FIRS | SPEARFISH | SD | 01 | 01 | 196 | 114 | 815 | 248 | | (191) | (191) | 82 |
| 0013158 | WAREHOUSE CARPETS INC | SPOKANE | WA | 01 | 01 | 84 | 84 | 194 | 239 | | (112) | (112) | 82 |
| 0013179 | T & C TILE & CARPET | TULSA | OK | 01 | 01 | 1,357 | 1,448 | | | (91) | | (91) | (91) |
| 0013222 | TUFENKIAN TIBETAN CARPETS | MOONACHIE | NJ | 01 | 01 | 30 | | 30 | 30 | | | 30 | 30 |
| 0013240 | GREEN CREATIONZ | GREENSBORO | NC | 01 | 01 | 146 | | | | | | 146 | 146 |
| 0013253 | AVANTI GARDE | WALDORF | MD | 01 | 01 | 132 | 132 | 93 | | (9) | | (9) | 84 |
| 0013325 | LEONARDS CARPET SERVICE INC | ANAHEIM | CA | 01 | 01 | 6,064 | 6,619 | | | | | | |
| 0013375 | MAX FLOORING LLC | PONTE VEDRA BEACH | FL | 01 | 01 | 993 | 993 | 132 | | | (139) | (139) | (139) |
| 0013377 | PATH TO PROSPERITY INC | SAN DIMAS | CA | 01 | 01 | 448 | | | | | (243) | (243) | (243) |
| 0013441 | ARKOMM INC | LAKEWOOD | WA | 01 | 01 | 272 | | | (312) | | (554) | (554) | (554) |
| 0013483 | STEVENS CARPET | WATONGA | OK | 01 | 01 | 409 | 409 | | | | (139) | (139) | (139) |
| 0013495 | EMPIRE TODAY LLC | NORTHLAKE | IL | 01 | 01 | 355 | | | | | 176 | 176 | 176 |
| 0013541 | SYNTEK ENTERPRISES INC | CALHOUN | GA | 01 | 01 | 18,580 | | | | | | 18,580 | 18,580 |
| 0013595 | SAVANNAH MILLS GROUP INC | DALTON | GA | 01 | 01 | 7,774 | | | 73 | | | 7,597 | 7,774 |
| 0013625 | FREE FREE USA INC | ONTARIO | CA | 01 | 01 | 73 | | | | | | 73 | 73 |
| 0013626 | VASHON FLOOR STORE | VASHON | WA | 01 | 01 | 1,911 | | | | | 1,911 | 1,911 | 1,911 |
| 0013644 | MATERIAL LOCATORS | HOUSTON | TX | 01 | 01 | 30 | | 30 | | | | (445) | (445) |
| 0013646 | DESIGNTEAM INC | SALT LAKE CITY | UT | 01 | 01 | (445) | | | | | 177 | (445) | (445) |
| 0013652 | HEIRLOOM FLOORING GALLERY | CARMICHAEL | CA | 01 | 01 | 1,636 | 978 | | | | | 657 | 657 |
| 0013657 | CREATIVE CARPET | MOKENA | IL | 01 | 01 | 672 | 761 | | | | | (89) | (89) |
| 0013706 | DALTON PARADISE CARPET MILLS INC | ROCKY FACE | GA | 01 | 01 | 2,627 | 2,798 | | | | | (68) | (68) |
| 0013370 | CS INTERIORS | LA MESA | CA | 01 | 01 | 151 | 151 | | (103) | | | (171) | (171) |
| 0013795 | FLOOR STYLES INC | SCOTTSDALE | AZ | 01 | 01 | 742 | 842 | | | | | (100) | (100) |
| 0013841 | PAINT & GLASS SUPPLY CO | DEVILS LAKE | ND | 01 | 01 | 64 | 64 | | | (203) | | (203) | (203) |
| 0013862 | JUST SPRINKLERS | ALBUQUERQUE | NM | 01 | 01 | 17 | 64 | | 73 | (203) | | | |
| 0013902 | SIMPLY FLOORS LLC | CINCINNATI | OH | 01 | 01 | (10) | | | | | | (10) | (10) |
| 0013952 | ARCHITECTURAL DESIGN CARPETS | SAN RAFAEL | CA | 01 | 01 | 970 | | | | | | (47) | (47) |
| 0013964 | WAREHOUSE ONE | DALTON | GA | 01 | 01 | | 714 | | | | | (119) | (119) |
| 0013969 | FUTURE FOAM | DALTON | GA | 01 | 01 | 75 | | | | | | 257 | 257 |
| 0013970 | HOPKINS TILE & LINOLEUM CENTER | HOPKINS | MN | 01 | 01 | | | | | | | (226) | (226) |
| 0013973 | DARREL WILCOX | EL DORADO HILLS | CA | 01 | 01 | 120 | 120 | 75 | | | | 75 | 75 |
| 0013998 | WM H MOLYNEAUX TILE CONTRACTING INC | VERONA | PA | 01 | 01 | 2,040 | | | | | 2,040 | 2,040 | 2,040 |
| 0014066 | GARY MARIYEGNA | BROCKPORT | NY | 01 | 01 | 6,648 | 3,560 | 3,173 | 3,173 | 149 | | (299) | |
| 0014099 | STAR LUMBER & SUPPLY CO | WICHITA | KS | 01 | 01 | 57 | 130 | 64 | | (73) | | (73) | (73) |
| 0014105 | FAIRFAX CARPET CO | LOS ANGELES | CA | 01 | 01 | 896 | | | | | | 1,433 | 1,794 |
| 0014125 | PINNACLE CONSTRUCTION INC | GLENWOOD | IA | 01 | 01 | 2,773 | 979 | 1,770 | 71 | (729) | 192 | (46) | 50 |
| 0014160 | DIRECT SALES INC | CASTRO VALLEY | CA | 01 | 01 | 63 | | 13 | 13 | (1) | 13 | (1) | 309 |
| 0014174 | MIKE DELLA PENNA FLOOR COVERING LLC | LAND O LAKES | FL | 01 | 01 | 391 | 82 | 249 | 13 | 13 | 13 | 60 | 60 |
| 0014199 | W C TINGLE CO | LEES SUMMIT | MO | 01 | 01 | (49) | | | | | | (49) | (49) |
| 0014211 | GRIFFIN INDUSTRIES | BUTLER | KY | 01 | 01 | 1,485 | 1,485 | | | | | | |
| 0014413 | APC CORK INC | POMPANO BEACH | FL | 01 | 01 | 560 | | 484 | 808 | | | (248) | |
| — | WORLDWIDE EXPRESS | DALLAS | TX | 01 | 01 | | | | | | | (131) | |
| 0014413 | HARBOR FLOOR PRODUCTS | DALLAS | GA | 01 | 01 | 3,976 | 3,622 | | | | | 264 | 353 |
| 0014424 | CALIFORNIA CUSHION & CARPET | ORANGE | CA | 01 | 01 | 264 | | | | | | 264 | 264 |

| Account | Vendor Name | City | ST | | | Amount |
|---|---|---|---|---|---|---|
| 0014455 | STEP AHEAD CARPET | SAN DIEGO | CA | 01 | 01 | 731 |
| 0014532 | PARAMOUNT HOTEL | PORTLAND | OR | 01 | 01 | 701 |
| 0014528 | LIGHT FOOT FLOOR COVERINGS LP | PALESTINE | TX | 01 | 01 | 836 |
| 0014558 | CONTRACT INTERIORS INC | SAINT PAUL | MN | 01 | 01 | (1,109) |
| 0014642 | CLASSIC TOUCH HOMES LLC | COLLEYVILLE | TX | 01 | 01 | 323 |
| 0014671 | C & C CARPET | NORTH LITTLE ROCK | AR | 01 | 01 | 222 |
| 0014676 | HOSPITALITY FREIGHT CORP LLC | LAS VEGAS | NV | 01 | 01 | (210) |
| 0014749 | RYCUS FLOORING | LANSING | MI | 01 | 01 | 30 |
| 0014784 | GEORGE F LANG CO | WILMINGTON | DE | 01 | 01 | 43 |
| 0014854 | SUPERIOR FLOOR COVERINGS | WILMINGTON | DE | 01 | 01 | 324 |
| 0014862 | INSIDE DESIGN, INC. | SANTA ROSA | CA | 01 | 01 | 768 |
| 0014863 | TEXAS FLOORS | WENATCHEE | WA | 01 | 01 | 58 |
| 0014866 | QUALITY CARPET INC | CYPRESS | TX | 01 | 01 | 96 |
| 0014880 | B J MESSNER CO INC | PITMAN | NJ | 01 | 01 | 30 |
| 0014936 | STEVE'S AMAZING CARPET & CLEANING LLC | ROCHESTER | NY | 01 | 01 | 4,030 |
| 0014928 | CARPETS WHOLESALE INC | WICHITA | KS | 01 | 01 | 867 |
| 0024937 | GLENNCOVE TOWN HOMES | BUFFALO | NY | 01 | 01 | 293 |
| 0024938 | CHARLES VAN GELDER DIST IMPORT | KINGSTON | NY | 01 | 01 | 1,930 |
| 0014905 | C MARKMANN AND SONS | TUNNEL HILL | GA | 01 | 01 | 601 |
| 0014920 | JOSEPH J MCCONNELL ENT | ANAHEIM | CA | 01 | 01 | 527 |
| 0014961 | STANDY CORPORATION | LAKELAND | FL | 01 | 01 | 2,309 |
| 0014921 | CARPET ONE CARPET GARAGE | LIVERPOOL | NY | 01 | 01 | 168 |
| 0014971 | FROST TRUCKING | CALHOUN | GA | 01 | 01 | 413 |
| 0024972 | TSE HOLDING/DEMAR | DENVER | CO | 01 | 01 | 168 |
| 0014973 | AZUVI | ORCHARD PARK | NY | 01 | 01 | 973 |
| 0014928 | ALLASEN CARPET CO | ALBANY | NY | 01 | 01 | 138 |
| 0024982 | SEAMLESS FLOORING LLC | BUFFALO | NY | 01 | 01 | 1,461 |
| 0024924 | PAUL TILE & CARPET CONT INC | CHINO | CA | 01 | 01 | 149 |
| 0014981 | EMCO COMMERCIAL CARPET INC | ROCHESTER | NY | 01 | 01 | 240 |
| 0015018 | FLOORMASTER #0269 | WILMINGTON | DE | 01 | 01 | 1,490 |
| 0015021 | FLOORING AMERICA | QUEENSBURY | NY | 01 | 01 | 2,271 |
| 0015024 | D & L MASSEY INC | FISHKILL | NY | 01 | 01 | 1,456 |
| 0015027 | HERITAGE CARPET | WATERTOWN | NY | 01 | 01 | 515 |
| 0015083 | HOLITERNRINKS INC | POUGHKEEPSIE | NY | 01 | 01 | 149 |
| 0015994 | JAY CARPET ONE | WATERLOO | NY | 01 | 01 | 190 |
| 0015112 | KENNY ENTERPRISES | ATHENS | PA | 01 | 01 | 444 |
| 0015123 | LA MAR FAW INTERIORS | BUFFALO | NY | 01 | 01 | 2,893 |
| 0015130 | WESTCO SERVICES INC | SEATTLE | WA | 01 | 01 | 1,259 |
| 0015152 | STE INC, CCA GLOBAL | STROUDSBURG | PA | 01 | 01 | (759) |
| 0015155 | CIRCA @ THE ELMS LLC | BELPRE | OH | 01 | 01 | (13) |
| 0015159 | MANCO DISTRIBUTORS | SYRACUSE | NY | 01 | 01 | 694 |
| 0015182 | METZGER INC | ORCHARD PARK | NY | 01 | 01 | 298 |
| 0015193 | DUROS FLOORSHOW INC | DUBOIS | PA | 01 | 01 | 87 |
| 0015203 | TIGER SPORTS AMERICAS INC | AUSTIN | TX | 01 | 01 | 87 |
| 0015209 | ONONDAGA DISCOUNT CARPET | SYRACUSE | NY | 01 | 01 | 36 |
| 0015230 | PRO CARPET | SPENCERPORT | NY | 01 | 01 | 45 |
| 0015234 | WESTCO SERVICES INC | BELLEVUE | NY | 01 | 01 | 299 |
| 0015235 | PROSOURCE OF ROCHESTER | ROCHESTER | NY | 01 | 01 | 203 |
| 0015264 | ROGERS CARPET WAREHOUSE | MORGANTOWN | WV | 01 | 01 | 453 |
| 0015265 | ROCHESTER LINOLEUM & CARPET | ROCHESTER | NY | 01 | 01 | 5,118 |
| 0015268 | RUG & CARPET OUTLET OF TROY | TROY | NY | 01 | 01 | 400 |
| 0015272 | ROYAL TILE & CARPET | HOLIDAYSBURG | PA | 01 | 01 | 1,398 |
| 0015278 | SCHENECTADY FLOOR COVERING, INC | SCHENECTADY | NY | 01 | 01 | 358 |
| 0015282 | CARPET CLASSIC | COEUR D ALENE | ID | 01 | 01 | 149 |
| 0015292 | CHIMERE THE IMPOSSIBLE FANCY | SAN CARLOS | CA | 01 | 01 | 4,843 |
| 0015202 | MARY'S FASHION CARPETS | TULSA | OK | 01 | 01 | 196 |
| 0015306 | TURF STORE DIRECT | PALM DESERT | CA | 01 | 01 | 2,299 |

| Account | Company | City | ST | | | Amount | Total |
|---|---|---|---|---|---|---|---|
| 0015318 | SHOP & SAVE | HAMBURG | NY | 01 | 01 | 4,696 | 198 |
| 0015227 | TEES FLOOR COVERING INC | ALBANY | NY | 01 | 01 | 98 | |
| 0015333 | HIETPAS ENTERPRISES INC | LEESBURG | FL | 01 | 01 | 127 | 127 |
| 0015533 | UNITED CARPET BROKERS INC | ROCHESTER | NY | 01 | 01 | 4,530 | 1,108 |
| 0015376 | VICTOR FURNITURE INC | PITTSFORD | NY | 01 | 01 | 464 | 464 |
| 0015371 | GREGORY J FLOORING & DESIGN CENTER | NASHUA | NH | 01 | 01 | 134 | 134 |
| 0015445 | FISCHER FURNITURE INC | RAPID CITY | SD | 01 | 01 | 4,644 | 134 |
| 0015472 | BGL | RIVERVIEW | FL | 01 | 01 | 26,791 | 11,542 |
| 0015481 | CARPET WORLD | BISMARCK | ND | 01 | 01 | 189 | 386 |
| 0015551 | FLOORS TODAY LLC | NORWOOD | MA | 01 | 01 | 119 | 119 |
| 0015551 | CARPET VALUE CENTER LTD | WOODBRIDGE | VA | 01 | 01 | 53 | 58 |
| 0015951 | LEMARS DOYLE | WEST FARGO | ND | 01 | 01 | 111 | 119 |
| 0015629 | DON MILLET | RANCHO CORDOVA | CA | 01 | 01 | 3,321 | (50) |
| 0015644 | CENTRAL TILE & TERRAZZO | BISMARCK | ND | 01 | 01 | 125 | 86 |
| 0015667 | CARROLLS CARPETS | KALAMAZOO | MI | 01 | 01 | 741 | 86 |
| 0015752 | MAGI TOUCH CARPET & FURNITURE | LEBANON | OH | 01 | 01 | 2,293 | 655 |
| 0015747 | ACT GLOBAL SPORTS TECHNOLOGY INC | CAHOKIA | IL | 01 | 01 | 8,393 | 4,680 |
| 0015752 | TRI STATE CARPET OUTLET | WILMINGTON | DE | 01 | 01 | 1,736 | 69 |
| 0015766 | CARPET DIRECT | CEDAR RAPIDS | IA | 01 | 01 | 135 | 135 |
| 0015767 | KMAF ASSOCIATES LLC | HARTFORD | CT | 01 | 01 | 2,303 | 1,283 |
| 0015799 | MIDSTATE FLOOR | BROOKINGS | SD | 01 | 01 | 1,452 | (52) |
| 0015806 | DUANES CARPET OUTLET | HURON | SD | 01 | 01 | 392 | 392 |
| 0015848 | SHAW INDUSTRIES DO NOT USE TO PLACE | DALTON | GA | 01 | 01 | (22,584) | (22,584) |
| 0015848 | INDEPENDENT FLOOR COVERING | FORT GRATIOT | MI | 01 | 01 | 729 | 614 |
| 0015863 | EARTHSTONE | REDDING | CA | 01 | 01 | 260 | 260 |
| 0015906 | BELLA SALA INTERIOR DESIG | GREENSBURG | PA | 01 | 01 | (65) | (65) |
| 0015909 | PITCO | BROOMALL | PA | 01 | 01 | 11,659 | 582 |
| 0015918 | CONSOLIDATED CARPET TRADE WORKMAN | CARLSTADT | NJ | 01 | 01 | (49) | (573) |
| 0015968 | JABRO FLOORCOVERINGS, INC. | SOUTHGATE | MI | 01 | 01 | 282 | 532 |
| 0015969 | UNIVERSAL CARPET DIST | ROSEDALE | MD | 01 | 01 | (1,100) | (356) |
| 0015974 | SCHUBERT'S CARPET ONE FLOOR & HOME | JAMESTOWN | ND | 01 | 01 | 363 | 817 |
| 0016082 | TOLLEFSONS RETAIL GROUP | MINOT | ND | 01 | 01 | (20) | (1,100) |
| 0016095 | FLOOR STORE | ENCINITAS | CA | 01 | 01 | 13 | (1,300) |
| 0016107 | MOLTERS INC | NORTH ROYALTON | OH | 01 | 01 | 285 | 285 |
| 0015169 | R P T | DALTON | GA | 01 | 01 | 707 | 308 |
| 0015136 | RED CARPET | BALTIMORE | MD | 01 | 01 | 540 | 308 |
| 0016196 | SYSTEM PAVERS | RANCHO CORDOVA | CA | 01 | 01 | 285 | 303 |
| 0015212 | RITE RUG CO | WHITEHALL | OH | 01 | 01 | 5,939 | 303 |
| 0016275 | M R Z CARPET | HARRISBURG | PA | 01 | 01 | 1,933 | 285 |
| 0016218 | KOCOM.COM | CLEARWATER | FL | 01 | 01 | 374 | 722 |
| 0016239 | MODERN FLOORS INC | WALLED LAKE | MI | 01 | 01 | 153 | 495 |
| 0016361 | SWANSEA DISTRIBUTION CENTER | SWANSEA | MA | 01 | 01 | 196 | 226 |
| 0016394 | DEVO CORPORATION | RUIDOSO | NM | 01 | 01 | (760) | 249 |
| 0016395 | BROCKS INTERIORS | POULSBO | WA | 01 | 01 | 100 | 153 |
| 0016416 | FARWAY CONSTRUCTION | RENO | NV | 01 | 01 | 1,204 | (760) |
| 0016466 | RICHARDSON | BELFIELD | ND | 01 | 01 | 3,234 | 100 |
| 0016475 | READERS WHOLESALE DISTRIBUTIONS | HOUSTON | TX | 01 | 01 | 1,837 | 353 |
| 0016477 | CARPETLAND USA | WEST ALLIS | WI | 01 | 01 | 189 | 793 |
| 0016498 | ORION CARPET/GROSSMANS | CHATSWORTH | GA | 01 | 01 | 51 | (59) |
| 0016503 | SLINGEVITY INC | OAKLAND | CA | 01 | 01 | 48 | (1,121) |
| 0016501 | DON OSETH & ASSOCIATES | BEAVERTON | OR | 01 | 01 | 584 | 33 |
| 0016505 | CARPET TECH INC | CORDOVA | TN | 01 | 01 | 1,530 | |
| 0016522 | DAVIDS CARPET & TILE | NORMAN | OK | 01 | 01 | 57 | |
| 0016523 | CANNON CARPETS INC | LOUISVILLE | KY | 01 | 01 | | 577 |
| 0016573 | OWENS CUSTOM RUGS | VERO BEACH | FL | 01 | 01 | | 57 |
| 0016608 | DORE CONTRACT DESIGN INC | ROCK ISLAND | WA | 01 | 01 | (565) | (565) |

| ID | Company | City | ST | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0016622 | EXQUISITE FLOORS & RUGS | KATY | TX | 01 | 01 | 56 | | 344 | | | | | | 56 |
| 0016638 | CARPET CONNECTION CAPPS | PROSPECT | KY | 01 | 01 | 274 | | (71) | | | | | | (71) |
| 0016656 | SIMPLY FLOORING LTD | UPPER SANDUSKY | OH | 01 | 01 | 919 | 251 | | | | | | | 669 |
| 0016673 | FLOOR COVERING DISTR | LOUISVILLE | KY | 01 | 01 | 509 | 509 | | | | | | | |
| 0016674 | FIRST STREET TILE & CARPET | ALAMOGORDO | NM | 01 | 01 | 1,792 | 1,067 | 725 | | 204 | | | | 725 |
| 0016671 | MIKES HOME SPECIALTIES INC | MENA | AR | 01 | 01 | 731 | 1,003 | | | | | | | |
| 0016788 | AA BEST CARPET & FLOOR | GREAT FALLS | VA | 01 | 01 | 206 | 206 | | | | | (68) | | (272) |
| 0016804 | VERNONS CARPET CO INC | RADCLIFF | KY | 01 | 01 | 141 | (754) | | | | | (272) | | (672) |
| 0016804 | HARBINS FLOOR COVERING | MT WASHINGTON | KY | 01 | 01 | 184 | 94 | 813 | | | | 82 | | 90 |
| 0016813 | GIANT FLOOR & WALL | WILKES BARRE | PA | 01 | 01 | 42 | | | | | | 206 | | 206 |
| 0016829 | DIMS INC | VALLEJO | CA | 01 | 01 | 53 | 53 | | | | | | | |
| 0016845 | FARHA CARPET & BLDG SUPPLY INC | WICHITA | KS | 01 | 01 | 1,629 | 1,629 | | | | | | | (39) |
| 0016928 | FLOOR STORE | LANCASTER | KY | 01 | 01 | 666 | 705 | | | | | 309 | 1,763 | (3,808) |
| 0016933 | ARMSTRONG WORLD INDUSTRIES | LOUISVILLE | KY | 01 | 01 | 44,414 | 46,167 | (17) | | | | | | (39) |
| 0016970 | KEY TRUCK LEASING INC | MT WASHINGTON | KY | 01 | 01 | 26 | 26 | | | | | | | |
| 0016993 | MARTINS FLOORING INC | DENVER | PA | 01 | 01 | 6,816 | 6,504 | | | | | | | |
| 0017006 | CARPETS BY DON | MITCHELL | IN | 01 | 01 | 156 | 176 | | 311 | | | | | 311 |
| 0017096 | ROSELI MOVING & STORAGE | ISLIP | NY | 01 | 01 | 667 | 667 | | | | | | | (20) |
| 0017149 | LINOLEUM DICKS INC | CAMPBELL | CA | 01 | 01 | 289 | 178 | | | | | | | |
| 0017150 | JOSEPH MADRIL FLOORING | OCEANSIDE | CA | 01 | 01 | 4,820 | 2,920 | 1,750 | | 100 | 50 | | | 1,900 |
| 0017201 | INTERIORS FINE FLOORING | LAGUNA NIGUEL | CA | 01 | 01 | 162 | 106 | | | | | | | 106 |
| 0017209 | TRINITY FLOORING | PORTLAND | OR | 01 | 01 | 20 | 20 | | | | | | | 200 |
| 0017213 | TRINITY FLOORING INC | PORTLAND | OR | 01 | 01 | 4,839 | 4,839 | | | | | | | 162 |
| 0017223 | NEW YORK COMMERCIAL FLOORING | ROCHESTER | NY | 01 | 01 | 84 | 84 | | 20 | | | 43 | | 4,813 |
| 0017232 | MILLER FLOORS INC | PORTLAND | OR | 01 | 01 | 417 | 417 | | | | | | | 84 |
| 0017235 | GAINES FAMILY CARPET CENTER, INC. | SEASIDE | OR | 01 | 01 | 126 | 83 | | | | | (41) | | 43 |
| 0017251 | COMMERCIAL INTERIOR | EL CAMPO | TX | 01 | 01 | 27 | 27 | | 84 | | | | | 27 |
| 0017291 | IPSNW INC | KENT | WA | 01 | 01 | 600 | 94 | | 27 | | 25 | | | 186 |
| 0017297 | ABBEY FLOORING | ELK GROVE | CA | 01 | 01 | 280 | 186 | | 25 | | | | | 600 |
| 0017407 | CIMARRON LUMBER & SUPPLY | ARNOLD | MO | 01 | 01 | 6,275 | | | | | | 6,275 | | 25 |
| 0017436 | MILLER FLOOR COVERING | KANSAS CITY | MO | 01 | 01 | 4,092 | 3,564 | 594 | 186 | | | (66) | | 550 |
| 0017479 | DESIGN MATERIALS | KANSAS CITY | KS | 01 | 01 | 15,937 | 15,500 | 297 | | | | (223) | | 6,275 |
| 0017483 | CARPETBAGGERS INC | INDIANAPOLIS | IN | 01 | 01 | 974 | 974 | | 73 | | 242 | | 49 | 528 |
| 0017581 | PS OF DENVER, INC | DENVER | CO | 01 | 01 | 1,130 | 1,130 | | | | | | | 438 |
| 0017589 | SUNSET PLAZA CARPET CO | LOS ANGELES | CA | 01 | 01 | 292 | 298 | 123 | | | | | | (41) |
| 0017606 | VENTURI CAPITAL INC | WACO | TX | 01 | 01 | 194 | | | | | | (129) | | 43 |
| 0017631 | ELLEN FITCHEN DESIGN, INC. | PORTLAND | OR | 01 | 01 | 89 | 89 | | | | 53 | 141 | | 27 |
| 0017672 | EMERY PARK CARPET | FREDONIA | NY | 01 | 01 | (74) | | | | | | (6) | | (6) |
| 0017675 | PUCCI CARPET & FURNITURE INC. | CALHOUN | GA | 01 | 01 | 1,342 | 1,342 | | | | | 194 | | 194 |
| 0017695 | RANEY PAINT CO INC | NOGALES | AZ | 01 | 01 | 1,094 | 1,094 | | | | (74) | | | (129) |
| 0017758 | ARVEL INTERNATIONAL | CHEBOYGAN | MI | 01 | 01 | (58) | (58) | | | | | (58) | | 141 |
| 0017766 | BERNARD BUILDING CENTER | HILLMAN | MI | 01 | 01 | 42 | 42 | | | | | (44) | | 53 |
| 0017767 | BERNARD BUILDING CENTER | FAIRFIELD | NJ | 01 | 01 | 18,749 | 14,974 | 2,830 | 608 | | 337 | | | (74) |
| 0017779 | JP SHEHADI LLC | TIGARD | OR | 01 | 01 | 11,704 | 10,951 | 1,221 | | | | (467) | | (58) |
| 0017841 | GMA CONSTRUCTION INC | RANCHO CORDOVA | CA | 01 | 01 | 83 | 208 | | | | | (66) | | (44) |
| 0017890 | GOLD RIVER FLOORS INC | PITTSBURGH | PA | 01 | 01 | 1,347 | | | | | | (127) | | 42 |
| 0017906 | BERNADETTE KOREY | DELRAY BEACH | FL | 01 | 01 | 175 | 175 | | | | | 1,347 | | 337 |
| 0017917 | CARPET DESIGNS UNLIMITED INC | WOODWARD | OK | 01 | 01 | 315 | | | | | | 68 | | 608 |
| 0017929 | CRESCENT CARPET IMPORTERS | PLAINVIEW | NY | 01 | 01 | (14) | (14) | | | (83) | (2,543) | (14) | | 49 |
| 0017966 | COLE & MURRAY INC | BELLMAWR | NJ | 01 | 01 | 4,726 | 5,046 | 2,778 | 386 | 315 | | 315 | | 1,347 |
| 0017890 | GENERAL FLOOR IND INC | TULSA | OK | 01 | 01 | 107 | 175 | 107 | | | | (940) | | (127) |
| 0017906 | REGAL FLOOR COVERING INC | GREENFIELD | WI | 01 | 01 | (299) | | | | | | (936) | | (936) |
| 0017917 | RAFFERTY ENTERPRISES INC | HOUSTON | TX | 01 | 01 | 257 | 637 | 167 | | | | 107 | | 167 |
| 0017929 | R & R FRENCH BROS | OAKLAND | CA | 01 | 01 | 3,747 | 4,289 | | 51 | 125 | (177) | (364) | | (542) |
| 0017966 | ALLEGRETTI RUG MASTERS CORP | EVANSTON | IL | 01 | 01 | 281 | | | | | | 106 | | 281 |

| ID | Name | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0038001 | DESIGN INTERIORS LTD | LEOLA | PA | 01 | 01 | (30) | - | - | - | - | (30) |
| 0038021 | ADVANCE MEDICAL DESIGNS INC | MARIETTA | GA | 01 | 01 | (625) | - | - | - | - | (625) |
| 0038078 | TOWN CENTER FLOORS LLC | COPPELL | TX | 01 | 01 | 322 | 322 | - | - | - | - |
| 0039079 | REGAL FLOORING | ENGLEWOOD | CO | 01 | 01 | 350 | 350 | - | - | - | - |
| 0038117 | JH FRIED | SAN DIEGO | CA | 01 | 01 | 1,048 | - | 698 | - | - | 698 |
| 0038133 | CAPITAL OPTS & FINE FLOOR | SAN DIEGO | CA | 01 | 01 | 3,573 | 2,471 | - | - | - | 1,102 |
| 0038158 | RUBY & QUIRI INC | JOHNSTOWN | NY | 01 | 01 | 60 | 1,008 | 64 | 30 | - | 60 |
| 0038236 | WRIGHT TOUCH | ROCHESTER | NY | 01 | 01 | 3,445 | 886 | - | - | - | 382 |
| 0038258 | ROCHESTER RUG MARKET | ATLANTA | GA | 01 | 01 | 1,626 | 249 | 382 | 160 | (52) | 1,642 |
| 0038262 | ABM COMMERCIAL FLOORING | ROSELLE | IL | 01 | 01 | (247) | 900 | 251 | - | - | (246) |
| 0038334 | PAULSON ENTERPRISES INC | TACOMA | WA | 01 | 01 | 4,447 | 490 | - | (1) | - | 280 |
| 0038377 | SHENS HOME INTERIORS | PRIEST RIVER | ID | 01 | 01 | 5,076 | 3,865 | 301 | - | - | 581 |
| 0038383 | KAYE BEASLEY INC | CARTERSVILLE | GA | 01 | 01 | 32 | 4,845 | 158 | - | - | 231 |
| 0038390 | KAGOME INC | LOS RAMOS | ID | 01 | 01 | (136) | 24 | 73 | - | - | 8 |
| 0038436 | RICHARD B STAFFORD | ROCHESTER | NY | 01 | 01 | 149 | 6,798 | 8 | - | - | (136) |
| 0038557 | PAX SALVAGE | FORT SMITH | AR | 01 | 01 | (14) | 149 | - | - | - | 1,076 |
| 0038646 | WILLS WALLPAPER & FLOORCOVERING | BATAVIA | NY | 01 | 01 | 95 | - | 1,684 | - | - | (14) |
| 0038473 | CARPET SHOPPE | SPRINGFIELD | MO | 01 | 01 | 2,650 | 55 | - | - | - | - |
| 0038509 | QW EXPRESS | BOLINGBROOK | IL | 01 | 01 | 103 | 2,650 | - | 1,193 | - | - |
| 0038522 | AIRPARK CARPET | GAITHERSBURG | MD | 01 | 01 | 137 | - | - | - | - | 103 |
| 0038527 | LANES FLOOR COVERING | NEW YORK | NY | 01 | 01 | 403 | 342 | - | - | - | 137 |
| 0038584 | MELIAN FLOORS INC | YORKVILLE | NY | 01 | 01 | 91 | 91 | - | 91 | - | 91 |
| 0038569 | DAVID TRUEITT ENTERPRISES INC | CANBY | OR | 01 | 01 | 2,529 | 2,529 | - | - | - | - |
| 0038637 | MCLARENS CARPET ONE | DALLAS | TX | 01 | 01 | 930 | 930 | - | - | - | - |
| 0038643 | EXCEL CARPET MILLS INC | CANBY | OR | 01 | 01 | 200 | 317 | 128 | 263 | - | 61 |
| 0038747 | DECORAMA FLOORING | DEARBORN | MI | 01 | 01 | 317 | 176 | - | - | - | 1,208 |
| 0038782 | BUSINESS FLOORING SPECIALISTS LP | FORT WORTH | TX | 01 | 01 | (132) | 261 | - | - | - | (117) |
| 0038797 | CHORBA ENTERPRISES | BLOOMSBURG | PA | 01 | 01 | 3,123 | 3,602 | - | - | - | 1,599 |
| 0038897 | DYNAMIC COMMERCIAL FLOORING SYSTEMS | NORTH HIGHLANDS | CA | 01 | 01 | 1,039 | 108 | 699 | - | (454) | 176 |
| 0038905 | IN TIME TRADING CO LLC | BLOOMSBURG | PA | 01 | 01 | 4,678 | 4,678 | 62 | - | (3) | (393) |
| 0038914 | TRINITY FLOOR CO | CENTENNIAL | CO | 01 | 01 | 576 | 373 | - | - | - | (479) |
| 0038918 | ORIENTAL WEAVERS USA INC | DALLAS | GA | 01 | 01 | 101 | 43 | 43 | 161 | - | 932 |
| 0038933 | VS WAY INC | DALTON | GA | 01 | 01 | 36,401 | 36,404 | 547 | - | (14) | 203 |
| 0038938 | FASHION FLOORING | WATERTOWN | WI | 01 | 01 | 1,599 | 581 | 413 | 103 | 55 | 59 |
| 0038952 | TIGR HOLDINGS INC | TAMPA | FL | 01 | 01 | 25 | 25 | - | - | 200 | 364 |
| 0038968 | TRAMMELL FLOORING | ORLANDO | FL | 01 | 01 | 282 | 423 | - | - | (121) | 302 |
| 0038975 | MCGROARTY FLOOR COVERING | WACO | TX | 01 | 01 | 25 | 25 | 25 | - | - | 1,038 |
| 0039051 | ALWAYS GREEN SYNTHETIC LAWNS | DODGE CITY | KS | 01 | 01 | 186 | 186 | (46) | - | (95) | 25 |
| 0039047 | MAZZAS CARPET AND TILE SHOP | SAN ANTONIO | TX | 01 | 01 | 21 | 21 | - | - | - | 141 |
| 0039077 | JILI FLOORCOVERING | JAMESTOWN | NY | 01 | 01 | (18) | 184 | - | - | - | 25 |
| 0039150 | ALLGREEN CONTRACT FLOOR | WINCHESTER | VA | 01 | 01 | 547 | 547 | - | - | (202) | 547 |
| 0039223 | AKIN BROTHERS FLOORING LLC | OKLAHOMA CITY | OK | 01 | 01 | 2,077 | 1,677 | 400 | 547 | - | 547 |
| 0039156 | AMERICAS FLOOR SOURCE LLC | COLUMBUS | OH | 01 | 01 | 164 | 164 | - | - | - | 400 |
| 0039243 | HUGHES FLOORING INC | VERONA | WI | 01 | 01 | 738 | 738 | - | - | 738 | 738 |
| 0039282 | CENTRAL OFFICE INTERIORS | NEW KENSINGTON | PA | 01 | 01 | 72 | 42 | - | - | - | - |
| 0039303 | CURRENT FLOORING LLC | SPERRY | OK | 01 | 01 | 371 | 207 | 165 | - | - | 165 |
| 0039325 | CASA VERDE DESIGNS | DAVIS | CA | 01 | 01 | 207 | - | - | - | - | - |
| 0039322 | GOLD STAR TILE & CARPET CO INC | DENISON | TX | 01 | 01 | (10) | - | - | (10) | - | 165 |
| 0039367 | JOHNS FLOOR COVERING | HERKIMER | NY | 01 | 01 | 1,260 | 1,259 | - | - | (45) | (54) |
| 0039377 | KARPET KING LLC | ROCKVILLE | MD | 01 | 01 | 60 | - | - | 60 | 60 | 99 |
| 0039394 | PULSKAMPS FLOORING PLUS | BATESVILLE | IN | 01 | 01 | 2,273 | 2,288 | - | 213 | (380) | (65) |
| 0039476 | JLJ FLOORCOVERING | PICO RIVERA | CA | 01 | 01 | 213 | - | - | - | - | 213 |
| 0039947 | A & J FLOORING | TURNERSVILLE | NJ | 01 | 01 | 416 | 416 | - | - | - | 416 |
| 0039457 | 364 GRANT ST INC | TONAWANDA | NY | 01 | 01 | 1,006 | 683 | - | - | - | 191 |
| 0039516 | BOB'S BINDING | MINNEAPOLIS | MN | 01 | 01 | 566 | 816 | - | - | - | 248 |
| 0039519 | GUIDE FLOOR COVERING, INC | PAINESVILLE | OH | 01 | 01 | 71 | 318 | 196 | - | 52 | 52 |
| 0039520 | | | | 01 | 01 | (45) | - | - | - | (112) | (112) |
| 0039574 | PK FLOORING INC | SAINT CLOUD | FL | 01 | 01 | 44 | 44 | - | - | (45) | (45) |

| Account | Name | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0015612 | SHAW INDUSTRIES | FORT MYERS | FL | 01 | 01 | 85,218 | 54,351 | 27,730 | 2,517 | 178 | 70 | 372 | 30,857 |
| 0015624 | H R & C SALES | DALTON | GA | 01 | 01 | 477 | 419 | 58 | | | | | 58 |
| 0015642 | CARPETLAND | CINCINNATI | OH | 01 | 01 | (117) | | | | | | | (117) |
| 0015657 | GLOBALTRANZ LLC | PHOENIX | AZ | 01 | 01 | 31,307 | 21,440 | 6,008 | 796 | 1,014 | 1,827 | 222 | 9,867 |
| 0015659 | LOUISVILLE LADDER INC | LIVERMORE | CA | 01 | 01 | 1,512 | 1,390 | 150 | 11 | 22 | 74 | (135) | 123 |
| 0020690 | RIVER CITY FLOOR COVERINGS INC | RED WING | MN | 01 | 01 | 330 | 330 | | | | | | |
| 0019935 | FISHERS CARPET FLOORING CCA GLOBAL | WEST CHESTER | PA | 01 | | | | | | | | | |
| 0019963 | TURNER BROOKS INC | MADISON HEIGHTS | MI | 01 | 01 | 252 | | | | | | | 1 |
| 0019990 | SCS CARPETS INC | LA PUENTE | CA | 01 | 01 | 534 | 459 | | | 56 | | | 56 |
| 0020004 | GREAT JONES | SEATTLE | WA | 01 | 01 | 13 | 13 | | | | | | |
| 0020038 | SYSTEM PAVERS | SEATTLE | WA | 01 | 01 | 50 | | | | | | 50 | 50 |
| 0020058 | PLAYTIME INC | CLERMONT | FL | 01 | 01 | | | | | | | | |
| 0020096 | SPRINGAY INC | STANLEY | ND | 01 | 01 | 1,932 | 1,163 | 379 | | 391 | | (3,296) | (3,296) |
| 0020205 | GSA | SEATTLE | WA | 01 | 01 | 204 | 204 | | | | | 770 | 770 |
| 0020210 | CARPET CABIN INC | FORT SMITH | AR | 01 | 01 | 75 | 75 | | | | | 75 | 75 |
| 0020235 | JAIPUR RUGS INC | NORCROSS | GA | 01 | 01 | 46 | 46 | | | | | | |
| 0020255 | SIMPLE FLOORS | SAN DIEGO | CA | 01 | 01 | 49 | | | 49 | 49 | | 49 | 49 |
| 0020312 | CELEBRITY GREENS LLC | SCOTTSDALE | AZ | 01 | 01 | | | | | | | | |
| 0020336 | CALIGULANG COMMERCIAL FLOOR COVERING | PORTLAND | OR | 01 | 01 | 86 | 86 | | | | | | |
| 0020353 | RETAIL TURF SOLUTIONS LLC | DALTON | GA | 01 | 01 | 470 | | 247 | | | | 247 | 247 |
| 0020407 | PAUL G WHITE TILE CO INC | PORTLAND | ME | 01 | 01 | 224 | | | | | | | |
| 0020416 | SAN ANTONIO CONVENTION CTR | SAN ANTONIO | TX | 01 | 01 | 1,326 | 1,417 | | (166) | | | (92) | (92) |
| 0022929 | LESTERS FURNITURE INC | CARLISLE | PA | 01 | 01 | 7,193 | | | | | (39) | (7) | (212) |
| 0020419 | CARPET TYME INC | TUNNEL HILL | GA | 01 | 01 | 261 | 261 | | | | | 92 | 92 |
| 0020471 | ORIENTAL RUG GALLERY | SCHENECTADY | NY | 01 | 01 | 1,488 | 526 | | 526 | | 269 | 962 | 962 |
| 0020487 | TOMASEK ASSOC LTD | TOLEDO | OH | 01 | 01 | 954 | 331 | 46 | 193 | 358 | | 623 | 623 |
| 0020064 | NANCY N DALLA | FALLBROOK | CA | 01 | 01 | 331 | | | | | | | |
| 0020051 | CARPET GALLERIA | PELLA | IA | 01 | 01 | 64 | 64 | | | 66 | (30) | 436 | 436 |
| 0020566 | PELLA CORPORATION | CONCORD | CA | 01 | 01 | 218 | 218 | | | | | (243) | (243) |
| 0020997 | CONTRACT FINISH FLOORS INC | DALTON | GA | 01 | 01 | 56 | 56 | | | | | (748) | (748) |
| 0020678 | WAREHOUSE CARPETS INC | DALLAS | TX | 01 | 01 | (217) | | 271 | (185) | | | (217) | (217) |
| 0020720 | CLASSIC FLOORS INC | FRANKLIN | TN | 01 | 01 | 28,453 | 28,694 | | | | | (297) | (241) |
| 0020735 | FERLMUTTER-FRELWALD | OCEAN CITY | MD | 01 | 01 | 65 | 65 | | | | | | |
| 0020747 | HOMEWORKS FLOOR COVERING INC CCA | ALGONQUIN | IL | 01 | 01 | 2,483 | 2,483 | | (234) | | | | |
| 0020740 | U SAVE FLOORING INC | GARLAND | TX | 01 | 01 | 136 | 136 | | (2,319) | | 256 | 52 | 308 |
| 0020748 | TRULY NOBEL SERVICES | BURLINGAME | CA | 01 | 01 | 450 | 141 | 43 | 132 | | | (30) | 144 |
| 0020758 | CARPET SYSTEMS | MILLERSVILLE | MD | 01 | 01 | 525 | 381 | 131 | | | | 103 | (103) |
| 0020775 | GDG ENTERPRISES INC | ATLANTA | GA | 01 | 01 | 794 | 897 | | | | | (1,123) | (1,123) |
| 0020848 | AAA COOPER | PORT ORCHARD | WA | 01 | 01 | 459 | 1,582 | | | 66 | | 1,131 | 1,131 |
| 0020884 | JESSEE COBB | SPOKANE | WA | 01 | 01 | | | | | | | 44 | 50 |
| 0020908 | GUNNIN INC | PORTLAND | OR | 01 | 01 | 50 | 46 | | | 52 | | 55 | 169 |
| 0020912 | JACK RAO | HOUSTON | TX | 01 | 01 | 216 | | 62 | | 25 | | 55 | 25 |
| 0020931 | HEPPNER-PRITT & ASSOCIATES | CANTON | OH | 01 | 01 | 25 | | | | | | (10) | 762 |
| 0020885 | AMERICAS RECYCLER | STOCKTON | CA | 01 | 01 | 132 | 132 | 772 | | | | 51 | 51 |
| 0021061 | CARPET SELECTIONS | LOUISVILLE | KY | 01 | 01 | | 7,836 | | | | | 132 | 25 |
| 0021066 | DENMAR CARPET | MIAMI | FL | 01 | 01 | 8,597 | | | | | | (547) | (547) |
| 0021084 | FLOORING CONCEPTS INC | SELLERSBURG | IN | 01 | 01 | 51 | 186 | 35 | | | | (517) | (517) |
| 0021107 | SMTHCO FLOORING | DALLAS | TX | 01 | 01 | 3,318 | | | | | | 3,318 | 3,318 |
| 0022131 | FOX THEATRE | SAINT LOUIS | MO | 01 | 01 | 571 | 536 | 814 | 55 | | | 409 | 35 |
| 0022213 | SYNTHETIC TURF INNOVATIONS | PATASKALA | OH | 01 | 01 | 536 | 1,496 | | | 25 | | | 1,961 |
| 0022260 | KIRIAN'S HOME SHOP INC | BOWLING GREEN | KY | 01 | 01 | 814 | 300 | 52 | | | | (216) | (216) |
| 0023130 | CARPET'S STORE | LOUISVILLE | KY | 01 | 01 | 2,775 | 300 | | | | | (55) | (55) |
| 0023450 | WARREN THEATRES | WICHITA | KS | 01 | 01 | 300 | | | | | | 52 | 52 |
| 0021520 | ALL IN ONE CARPET LLC | ATLANTA | GA | 01 | 01 | (216) | | 38 | | | | 38 | 38 |
| | NORTH AMERICAN COMMERCIAL INTERIORS | CLIFTON PARK | NY | 01 | 01 | 709 | 657 | | (550) | 907 | 65 | (968) | 773 |
| | SEATTLE'S BEST FLOORS | TUKWILA | WA | 01 | 01 | 76 | 38 | | 13 | 1,500 | | (550) | (550) |
| | | | | | | (55) | | | | | | | |
| | | | | | | 7,263 | 6,490 | 141 | | | | 7,263 | |
| | | | | | | 2,000 | 360 | 157 | | | | 2,000 | 1,640 |

| ID | Company | City | ST | | | V1 | V2 | V3 | V4 | V5 | V6 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0023542 | HARBOR FLOOR COVERING INC | BALTIMORE | MD | 01 | 01 | 156 | | | 156 | 156 | 156 |
| 0021569 | SURFACE BROKERS LLC | PORTLAND | OR | 01 | 01 | 1,181 | 150 | | | 615 | 1,031 |
| 0021691 | CAUWELLS & STVOE CONSTRUCTION | ALBUQUERQUE | NM | 01 | 01 | (634) | | | | (634) | (634) |
| 0021727 | BLUE SKY | PHOENIXVILLE | PA | 01 | 01 | 948 | | | | 948 | 948 |
| 0021806 | PBK INC | EAST HANOVER | NJ | 01 | 01 | (258) | | | | (258) | (258) |
| 0023838 | MACADAM FLOOR & DESIGN | PORTLAND | OR | 01 | 01 | | | | | | |
| 0023840 | TRACE MCGARTY INT'L | | OR | 01 | 01 | 362 | | | | | 362 |
| 0023859 | SUPERIOR CORP OF IL | ELK GROVE VILLAGE | IL | 01 | 01 | 20,756 | 20,113 | (1,240) | 35 | 3,734 | 643 |
| 0021883 | CONTRACT CARPET CORP | RIVERSIDE | CA | 01 | 01 | 12,547 | 2,412 | 1,740 | 2,754 | (395) | 10,135 |
| 0021959 | PRINTS & PAINTS | GALION | OH | 01 | 01 | (299) | | | | (299) | (299) |
| 0021988 | SONOMA COUNTY CARPET & BLINDS | ROHNERT PARK | CA | 01 | 01 | 47 | | | | 47 | 47 |
| 0022039 | CCA FLOORS & INTERIOR | ALEXANDRIA | VA | 01 | 01 | 790 | 207 | 167 | | 416 | 583 |
| 0022069 | ALADDIN FLOORS LLC | HOUSTON | TX | 01 | 01 | (1) | | | | | (1) |
| 0022072 | MERKEL BROS INC | CHELSEA | MI | 01 | 01 | 25 | | | | 25 | 25 |
| 0022104 | DREW MULLINS | BENTON | AR | 01 | 01 | (25) | | | | (25) | (25) |
| 0022114 | FURNITURE OUTLETS USA | SIOUX FALLS | SD | 01 | 01 | 396 | | | | 396 | 396 |
| 0022187 | FLOORMART INC | SPOKANE | WA | 01 | 01 | 55 | | | | 55 | 55 |
| 0022253 | WHOLESALE DECOR | SAINT LOUIS | MO | 01 | 01 | 1,015 | | | | 1,015 | 1,015 |
| 0023507 | SWIFT TRADING COMPANY LTD | CORPUS CHRISTI | TX | 01 | 01 | 116 | | | | | 116 |
| 0023172 | SYSTEM PAVE INC | TACOMA | WA | 01 | 01 | 6,031 | | | | 6,031 | 6,031 |
| 0022288 | TENCATE GRASS NORTH AMERICA | DAYTON | TN | 01 | 01 | 25 | | | | | 25 |
| 0022312 | BACKWOODS MANAGEMENT SERVICES LLC | APOLLO | PA | 01 | 01 | 350 | | | 350 | | 350 |
| 0022317 | NW RUGS | WILSONVILLE | OR | 01 | 01 | 219 | | | | 219 | 219 |
| 0022430 | CHOICE FLOORS INC | MADISON | WI | 01 | 01 | 189 | | | | 189 | 189 |
| 0022450 | DAVID COLLUM INT | BOERNE | TX | 01 | 01 | 127 | | | | 127 | 127 |
| 0022442 | M S FLOORING INC | FRANKLIN | OH | 01 | 01 | (57) | | | | (57) | (57) |
| 0022448 | FLOORING SOLUTIONS INC | LIVERMORE | CA | 01 | 01 | 7,459 | | | | 7,459 | 7,459 |
| 0022483 | HALL DISTRIBUTORS LLC | HEBRON | MD | 01 | 01 | 335 | 335 | | | | 335 |
| 0022525 | VENETIAN BLIND & FLOOR COVERING SHOP | HOUSTON | TX | 01 | 01 | 2,559 | 2,403 | 919 | 50 | 671 | 243 |
| 0022675 | DODSON FLOORS INC | GARLAND | TX | 01 | 01 | 673 | 491 | 182 | | | 182 |
| 0022658 | JARD'S ENTERPRISE INC | LIVERMORE | CA | 01 | 01 | 443 | 321 | 133 | | 123 | 123 |
| 0022746 | AMERICAN FLOORCRAFT | SAINT LOUIS | MO | 01 | 01 | 391 | 216 | | | 175 | 175 |
| 0022768 | DAVIS FLOOR COVERING | INVERNESS | FL | 01 | 01 | 338 | 140 | 105 | 42 | 43 | 8 |
| 0022805 | WILLIAMS FLOOR STORE | BLOOMINGTON | IN | 01 | 01 | 887 | 86 | 799 | 43 | 8 | 199 |
| 0022811 | MORIARTY FLOOR COVERING INC | | IN | 01 | 01 | 76 | | | | | 76 |
| 0022821 | COVER RITE INC | HIGHLAND | IN | 01 | 01 | 528 | 407 | 44 | 121 | | 120 |
| 0022831 | AFFORDABLE FLOORS | HOOD RIVER | OR | 01 | 01 | 476 | | 379 | 298 | 202 | 776 |
| 0022852 | VARELA'S CARPET | HEMET | CA | 01 | 01 | 340 | 68 | 43 | 43 | 118 | 272 |
| 0022860 | HEMET | | OR | 01 | 01 | 30 | | | | 25 | 30 |
| 0022911 | LOS ANGELES | | CA | 01 | 01 | 1,153 | 1,153 | | | | 30 |
| 0022947 | DESIGN MANUFACTURING | WARMINSTER | PA | 01 | 01 | 6,415 | 6,468 | 120 | | 521 | 325 |
| 0022723 | DISCOUNT CARPETS | ROCHESTER | NY | 01 | 01 | 658 | 333 | 325 | (174) | | (54) |
| 0023013 | TRACE MCGARTY INTERIORS | COLUMBUS | OH | 01 | 01 | 43 | 43 | | | | 325 |
| 0022906 | MACH 1 AIR SERVICES INC | TEMPE | AZ | 01 | 01 | (286) | | | | | (186) |
| 0023091 | SHIRLEY BRIMBERRY INC | OKLAHOMA CITY | OK | 01 | 01 | (122) | | | (122) | | (122) |
| 0023090 | FIELDTURF USA INC | MONTREAL | QC | 01 | 01 | 1,461 | | | | (105) | (105) |
| 0023091 | 8 BACK FLOORS LLC | SAINT LOUIS | MO | 01 | 01 | (105) | | | | | (105) |
| 0023110 | HOME DEPOT #0641 (INSTALLER) | BENICIA | CA | 01 | 01 | 443 | 443 | | | | 61 |
| 0023153 | S & J BREN INC | LOS ANGELES | CA | 01 | 01 | 287 | 226 | 61 | | | (1,711) |
| 0023229 | EAGLE FLOORING SOLUTIONS | GARDENA | CA | 01 | 01 | 187 | 187 | | | 74 | 74 |
| 0023172 | PREMIER FLOORING OF GERMANTOWN INC | GERMANTOWN | | 01 | 01 | (1,711) | | (1,597) | | (114) | (114) |
| 0023251 | YOUR FLOOR AND MORE | FREDERICKSBURG | VA | 01 | 01 | 25 | 25 | | | | (105) |
| 0023320 | AMERICAN DRAPERY BLIND & CARPET INC | EL CERRITO | CA | 01 | 01 | 2,441 | 2,366 | | (52) | | (186) |
| 0023843 | HARRY HARRISON | RENTON | WA | 01 | 01 | (52) | | | (52) | | (52) |
| 0023172 | SEELYE GROUP | COLORADO SPRINGS | CO | 01 | 01 | 1,524 | | | | 1,524 | 1,524 |
| 0023399 | ARIES IND INC | BROOKFIELD | WI | 01 | 01 | 309 | | | | 309 | 309 |
| 0023842 | FLORIDA WHOLESALE CPTS | CLEARWATER | FL | 01 | 01 | (134) | | | | (134) | (134) |
| 0023407 | WHOLESALE FLOORS INC | POMPANO BEACH | FL | 01 | 01 | 1,495 | 1,258 | 238 | | | 238 |

| Account | Name | City | State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0023414 | USA FLOOR COVERING | LIVONIA | MI | 01 | 01 | 320 | 320 | - | - | - | (265) |
| 0023468 | FREIGHTCENTER INC | PALM HARBOR | FL | 01 | 01 | 774 | 1,547 | - | - | - | 367 |
| 0023483 | CIRCUS FLOORS | LOS ALTOS | CA | 01 | 01 | 367 | 367 | - | - | - | 367 |
| 0023493 | PAT'S SALES OF OCALA LLC | OCALA | FL | 01 | 01 | - | - | - | - | - | - |
| 0024569 | K & L CARPET INC | HIGH RIDGE | MO | 01 | 01 | 79 | 79 | - | - | 185 | (766) |
| 0023635 | RTC INDUSTRIES | PALO ALTO | CA | 01 | 01 | 918 | - | - | - | - | 367 |
| 0023499 | STANFORD CARPET'S DRIVER COLLECT ACC | DALTON | GA | 01 | 01 | (79) | - | - | - | - | 20 |
| 0023507 | RUG SQUARE | DALTON | GA | 01 | 01 | 296 | 296 | (122) | - | (86) | (376) |
| 0023520 | PALOMAR FLOOR | SAN DIEGO | CA | 01 | 01 | 6,661 | 5,885 | - | - | 229 | 776 |
| 0023529 | DYNAMIC RUGS | FREDERICK | MD | 01 | 01 | 88 | 88 | (68) | - | 235 | (265) |
| 0023611 | CARPET & FLOORING DEPOT | SAN DIEGO | CA | 01 | 01 | 308 | - | (85) | 465 | - | 260 |
| 0023562 | JAMES KENDALL | SAN DIEGO | CA | 01 | 01 | (17) | 48 | - | 43 | - | (17) |
| 0023625 | YANCEY'S HOUSE OF CARPET | CEDAR LAKE | IN | 01 | 01 | 1,057 | 308 | (265) | - | - | 375 |
| 0023611 | HILLS FLOOR COVERING | OROFINO | ID | 01 | 01 | 516 | 707 | - | 89 | - | 516 |
| 0023671 | NATIONWIDE TURF | CALHOUN | GA | 01 | 01 | 10,878 | 3,503 | 3,713 | - | - | 7,375 |
| 0023704 | LINDE LTD | PORTLAND | OR | 01 | 01 | 25 | - | 1,046 | 2,615 | - | 25 |
| 0023946 | BAMBLIN CARPET ONE FLOOR & HOME | DOYLESTOWN | PA | 01 | 01 | (37) | 42 | - | 25 | - | 25 |
| 0023996 | J S FLOOR COVERING | EL CENTRO | CA | 01 | 01 | 158 | - | 42 | - | - | 158 |
| 0023946 | MOUTAIN OPERATION AND DEV | BOLTON VALLEY | VT | 01 | 01 | (466) | - | - | - | - | 158 |
| 0023969 | CARPET ONE OF THE HAMPTONS | SOUTHAMPTON | NY | 01 | 01 | 310 | 346 | - | - | - | (466) |
| 0023977 | HATLOES CARPET ONE FLOOR & HOME | EVERETT | WA | 01 | 01 | 240 | 240 | - | - | - | (310) |
| 0023969 | SOUTHAMPTON | HAMPTON | NH | 01 | 01 | 6,752 | 5,270 | 2,379 | 58 | 80 | (310) |
| 0024000 | FOSS MANUFACTURING CO LLC | NORTH BEND | OR | 01 | 01 | 422 | 422 | (812) | (812) | - | (106) |
| 0024000 | FOSS MANUFACTURING CO LLC | DALTON | GA | 01 | 01 | 10,769 | 9,276 | 874 | - | - | (223) |
| 0024039 | KNUTSONS CARPET HUT | OGDEN | UT | 01 | 01 | (413) | 675 | 1,646 | (3) | 65 | 1,482 |
| 0024063 | HEALTHIER CHOICE CARPETS & CUSHIONS | CORPUS CHRISTI | TX | 01 | 01 | 675 | 675 | (100) | (313) | - | 1,493 |
| 0024067 | LINC HOSPITALITY INC | LOUISVILLE | KY | 01 | 01 | 684 | - | - | - | - | (413) |
| 0024132 | M & D FLOORING | SALT LAKE CITY | UT | 01 | 01 | 75 | - | - | - | - | (1,090) |
| 0024181 | THOMPSONS CENTURY FLOOR | SPARTA | IL | 01 | 01 | 93 | 93 | 93 | - | - | 684 |
| 0024199 | CUSTOM FLOORS CO INC | SEATTLE | WA | 01 | 01 | 152 | 152 | - | - | 50 | 75 |
| 0024388 | JRB FLOORING | HILLSBORO | OR | 01 | 01 | 63 | - | - | - | 50 | 93 |
| 0024040 | SUPREME FLOOR CO | REDMOND | WA | 01 | 01 | 1,315 | 1,315 | 159 | - | - | 152 |
| 0024424 | SYSTEM PAVERS | NASH | TX | 01 | 01 | 47 | 402 | 159 | - | - | 50 |
| 0024429 | SOUTHERN CARPETS OF TEXAS | DEPEW | NY | 01 | 01 | 18 | 13 | - | - | - | 50 |
| 0024482 | CARPET GALLERY OF WNY INC | HOUSTON | TX | 01 | 01 | 18 | - | - | - | - | (355) |
| 0024489 | WAKASA CONSTRUCTION | CARROLL | IA | 01 | 01 | 2,029 | 1,850 | 192 | - | (69) | 18 |
| 0024242 | VARIETY FLOORS OF CARROLL INC | TAMPA | FL | 01 | 01 | 1,837 | 1,083 | 755 | - | - | (13) |
| 0024492 | HANOVER FLOORS INC | FORT SMITH | AR | 01 | 01 | 272 | 51 | 221 | - | - | 179 |
| 0024530 | DEANS DISCOUNT CARPETS INC | TULSA | OK | 01 | 01 | 3,823 | 2,988 | 835 | - | - | 755 |
| 0024556 | INTERIOR CONCEPTS INC | FOLSOM | CA | 01 | 01 | 150 | - | - | - | 150 | 221 |
| 0024559 | A DOG RESORT | DALTON | GA | 01 | 01 | 1,225 | 1,225 | - | - | - | 835 |
| 0024627 | RTC INDUSTRIES | AGOURA HILLS | CA | 01 | 01 | 173 | 173 | - | - | - | 150 |
| 0024722 | TURF GROUP LLC | CLEVELAND | OH | 01 | 01 | - | - | - | - | - | (355) |
| 0024863 | SHERWIN WILLIAMS | CONCORD | CA | 01 | 01 | 12,748 | 9,682 | 3,471 | - | 42 | 42 |
| 0024884 | MAJESTIC FLOORS | WAUKESHA | WI | 01 | 01 | 2,990 | 2,015 | 1,080 | (2) | (334) | 3,066 |
| 0024886 | BUILDING SERVICES INC | CLACKAMAS | OR | 01 | 01 | (188) | 137 | - | 352 | (456) | 976 |
| 0024920 | RESOURCE MAINTENANCE & FLOORING | SAN ANTONIO | TX | 01 | 01 | 36 | - | - | - | (456) | (456) |
| 0024945 | SEVEN HILLS | OKLAHOMA CITY | OK | 01 | 01 | (20) | - | - | 36 | (325) | (325) |
| 0024954 | PYRAMID CONSTRUCTION CO INC | CINCINNATI | OH | 01 | 01 | 321 | 321 | - | - | - | 36 |
| 0024999 | HARRY'S CORNER INC | WOBURN | MA | 01 | 01 | 1,168 | 1,168 | - | - | - | (20) |
| 0025024 | BUSINESS INTERIORS | PARKER | CO | 01 | 01 | (155) | 88 | - | (20) | - | (155) |
| 0025027 | CENTENNIAL AIRCRAFT | SAINT LOUIS | MO | 01 | 01 | (175) | - | - | - | - | (264) |
| 0025030 | J SEGOVIA PTY | JACKSONVILLE | FL | 01 | 01 | (300) | - | - | - | (300) | (300) |
| 0025074 | YAEGERS PAINT DECOR CENTER | RENO | NV | 01 | 01 | 882 | 882 | - | - | - | 36 |
| 0025075 | WILSON CARPET SERVICE INC | CHANTILLY | VA | 01 | 01 | 147 | 147 | - | - | - | (20) |
| 0025090 | TOP QUALITY FLOORS INC | LONGWOOD | FL | 01 | 01 | 437 | 437 | - | 437 | - | 437 |
| 0025110 | THADSON FLOORING LLC | SCHENECTADY | NY | 01 | 01 | 2,245 | 2,105 | - | 140 | - | 140 |
| 0025164 | T P L FLOORING INC | | | | | | | | | | |

| Acct | Company | City | ST | | | N1 | N2 | N3 | N4 | N5 | N6 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0025175 | EPIC FLOORING LLC | BOERNE | TX | 01 | 01 | 13 | | | | | | 13 |
| 0025185 | ALLWEINS FLOORING CENTER | ANNVILLE | PA | 01 | 01 | 418 | 487 | | | | | (69) |
| 0025387 | DAVIDS FLOOR COVERING | SILOAM SPRINGS | AR | 01 | 01 | (724) | 41 | | | | | (765) |
| 0025383 | ALLIANCE TEXTILES | CARTERSVILLE | GA | 01 | 01 | 1,545 | 851 | | 212 | | 74 | 694 |
| 0025194 | BWFNI BRAVO CARPET | DALTON | GA | 01 | 01 | 91 | | | | | | |
| 0025252 | DALLAS CARPET DESIGN INSTALL | DALLAS | TX | 01 | 01 | 71 | | | | | | |
| 0025210 | PRICES FLURNITUE | LAS VEGAS | NM | 01 | 01 | 372 | | | | | | 372 |
| 0025252 | COLONIAL FLOOR COVERING CCA GLOBAL | FEASTERVILLE TREVOS | PA | 01 | 01 | 94 | | | | | | 84 |
| 0025318 | BRYANS CARPETS | OKLAHOMA CITY | OK | 01 | 01 | 5,437 | 1,747 | | 42 | | | 3,690 |
| 0025342 | CRAMERS CARPET INC. CCA GLOBAL | MADISON | NJ | 01 | 01 | 880 | 694 | | 98 | 145 | 1,023 | 146 |
| 0025352 | MARC WATSON | SOUTH EASTON | MA | 01 | 01 | 348 | | | | | | 348 |
| 0025388 | FLOORTOWN INC | PARAMUS | NJ | 01 | 01 | (178) | | | | | | (178) |
| 0025398 | RELIANT HARDWOOD FLOORING | MEMPHIS | TN | 01 | 01 | 83 | | 83 | | | | 83 |
| 0025410 | LANCER ENTERPRISE INC | DALTON | GA | 01 | 01 | 182 | 152 | | 206 | (113) | | (951) |
| 0025423 | HAMILTON CARPETS & FLOOR COVERING | MASFETH | NY | 01 | 01 | 1,425 | 544 | 881 | | 2,522 | (841) | 951 |
| 0025464 | INTERIORS BY FIELDS INC CCA GLOBAL | AVON | NY | 01 | 01 | 182 | 42 | | | 175 | (35) | 239 |
| 0025494 | KUDZINSKI FLOOR CARE & INTERIOR LLC | LIVINGSTON | TX | 01 | 01 | 185 | 125 | | | 60 | | (35) |
| 0025499 | PROTEKTOR MODEL | GALFTON | TX | 01 | 01 | 239 | | | | | | 140 |
| 0025505 | PERRYS CARPET WAREHOUSE CCA GLOBAL | ARLINGTON | NY | 01 | 01 | 192 | 144 | | 245 | 102 | | 60 |
| 0025506 | THE FLOOR SOURCE & MORE | FRANKLIN SQUARE | PA | 01 | 01 | (12) | | | | | | 347 |
| 0025530 | LONG BEACH FLOORCOVERING | SIGNAL HILL | CA | 01 | 01 | 42 | | | | | | 192 |
| 0025566 | DESIGN SQUARED INC | SAN DIEGO | CA | 01 | 01 | (13) | 42 | | | | | (12) |
| 0025657 | QUALITY CARPET & RUG INC CCA GLOBAL | MANKASAS | VA | 01 | 01 | 139 | | | | | | (13) |
| 0025661 | BOBBY CAFFEE | LOUISVILLE | KY | 01 | 01 | 225 | | | | | | 139 |
| 0025678 | DANYARSGLOBAL | ATLANTA | GA | 01 | 01 | 20 | | | | | | 225 |
| 0025700 | TRU TURF | FRESNO | CA | 01 | 01 | 751 | 65 | | | | | 65 |
| 0025772 | DANIEL PRINCE | STURTEVANT | WI | 01 | 01 | 3 | 48 | | 45 | 20 | | 20 |
| 0025809 | A & S CARPET  CCA GLOBAL | NEWARK | NJ | 01 | 01 | (141) | | | | | | 751 |
| 0025816 | ALEX CARPETS CCA GLOBAL | LAKWOOD | CA | 01 | 01 | 162 | | | | | | 3 |
| 0025855 | SURYA CARPET INC | ANNAPOLIS | MD | 01 | 01 | 42,660 | 19,057 | 15,522 | (5) | 288 | 420 | 23,602 |
| 0025898 | DIVISION  ASSOCIATES INC | CALHOUN | NC | 01 | 01 | (9,739) | (888) | | (30) | | | (888) |
| 0025987 | PREGRA LLC | MORRISVILLE | GA | 01 | 01 | | | | | | | (9,739) |
| 0025992 | COKER FLOOR CO | CHATSWORTH | CA | 01 | 01 | 162 | 162 | | | | | (141) |
| 0026027 | CHRISTIE CARPETS | DALLAS | TX | 01 | 01 | | | | | | | (141) |
| 0026043 | TURF PRO | ROCHESTER | NY | 01 | 01 | 250 | | | | | 250 | 250 |
| 0026199 | WORLD IMPORT GALLERY | DALLAS | TX | 01 | 01 | 85 | 85 | | 85 | | 425 | 250 |
| 0026226 | RASKIN CARPET | SAN DIEGO | CA | 01 | 01 | 822 | 822 | | | | | 85 |
| 0026238 | NW FLOORING SOLUTIONS | WICHITA | KS | 01 | 01 | 869 | | | | | | 38 |
| 0026396 | K & L CRAWFORD INC | NEW YORK | NY | 01 | 01 | 38 | 38 | | | 38 | | 712 |
| 0026401 | TWIN CITY FURNITURE | VANCOUVER | WA | 01 | 01 | 157 | 157 | | | | | 8 |
| 0026440 | DISNEY YORK ASSOCIATES LLC | DIAMOND SPRINGS | CA | 01 | 01 | (530) | | | | | | (530) |
| 0026408 | CARPETLAND | KELLOGG | ID | 01 | 01 | 130 | 8 | | | | | (67) |
| 0026426 | MR CARPET | VIENNA | VA | 01 | 01 | 154 | 154 | 43 | | | | (23) |
| 0026431 | GLOBAL SYN TURF INC | BALTIMORE | MD | 01 | 01 | (65) | | | | | | (65) |
| 0026440 | JOHN A KRAUS CO | ESPANOLA | NM | 01 | 01 | 66,990 | 43,394 | 22,904 | 265 | | 398 | 23,567 |
| 0026455 | GENTILES INC | HAYWARD | CA | 01 | 01 | 178 | 571 | 180 | | | | 398 |
| 0026501 | ECOFINISHES LLC | NAUVOO | IL | 01 | 01 | 751 | 173 | | | | | |
| 0026517 | CHRISTIAN FLOORZ | ALBANY | NY | 01 | 01 | 633 | 267 | | 200 | 25 | 127 | 435 |
| 0026572 | ENGINEERED FLOORS/SHERWIN WILLIAMS | BALLSTON SPA | NY | 01 | 01 | 1,215 | 5,373 | | | | | 460 |
| 0026559 | PRO STAR LOGISTICS | ROCHESTER | GA | 01 | 01 | 7,003 | 46,133 | 1,637 | (83) | (49) | (62) | 948 |
| 0026672 | KRAVET FABRICS | DALTON | UT | 01 | 01 | 73,945 | | 27,812 | | | | 1,630 |
| 0026685 | CONTINENTAL INTERIORS | SALT LAKE CITY | NY | 01 | 01 | 85 | 85 | | | | | 27,812 |
| 0026687 | FLOOR FASHIONS | BETHPAGE | MI | 01 | 01 | 3,060 | 3,060 | | | | | 186 |
| | MONTGOMERY CARPET SERVICE | TROY | MI | 01 | 01 | 123 | | | | | | 85 |
| | BRIAN CORBELL | PERRY MAN | OH | 01 | 01 | 93 | 93 | | | | | 3,060 |
| | | CINCINNATI | OH | 01 | 01 | (300) | 25 | | | | 123 | 123 |
| | | LOS ANGELES | CA | 01 | 01 | | | | | | | (325) |

| Account | Name | City | State | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0026719 | TRADITIONS LIMITED | SIOUX FALLS | SD | 01 | 01 | 122 | | | | | 122 | 122 |
| 0026768 | RUGGERI FLOORING INC | CRANSTON | RI | 01 | 01 | 94 | 94 | | | | 94 | 94 |
| 0026952 | LARRY LESTER CARPET CO INC | LOS ANGELES | CA | 01 | 01 | (189) | (189) | | | | (189) | (189) |
| 0026870 | WAGNER HOME CENTER | NEW BRIGHTON | PA | 01 | 01 | (541) | (541) | | | | (541) | (541) |
| 0026883 | DOUBLE TREE BY HILTON | SAN ANTONIO | TX | 01 | 01 | 1,903 | | | | | 1,277 | 1,277 |
| 0026890 | QUALITY FLOOR COVERINGS I | PHOENIX | AZ | 01 | 01 | (91) | | | (91) | | (91) | (91) |
| 0026932 | VALENCA STONE & TILE | NATIONAL CITY | CA | 01 | 01 | 626 | | 493 | | 248 | 248 | |
| 0026939 | RANCHO BERNARDO INN | SAN DIEGO | CA | 01 | 01 | (230) | (230) | | | | (230) | (230) |
| 0026971 | PAM TRANSPORT | TONTITOWN | AR | 01 | 01 | 50 | 25 | 25 | | | | |
| 0026975 | JOBSITE STUD WELDING | DOWNEY | CA | 01 | 01 | 750 | 871 | 750 | | | 750 | 750 |
| 0026992 | BAREFOOT CARPET COMPANY | SAINT LOUIS | MO | 01 | 01 | 871 | | | | | | |
| 0027010 | COUNTRY CARPET LLC | OKLAHOMA CITY | OK | 01 | 01 | 282 | 282 | | | | | |
| 0027022 | PREMIER CARPETS & MORE | SELLERSBURG | IN | 01 | 01 | 151 | 319 | 237 | 323 | 1,733 | 64 | 151 |
| 0027040 | RADIANT GLOBAL LOGISTICS INC | MCGREGOR | IN | 01 | 01 | 2,553 | | | | | | 2,234 |
| 0027050 | FLOE INTERNATIONAL | BELLEVUE | WA | 01 | 01 | 369 | | | | | | 264 |
| 0027065 | BENSON COMPANY | AUSTIN | MN | 01 | 01 | 192 | 105 | 151 | | | | 151 |
| 0027637 | ETAGE WOOD, LLT | CEDAR FALL | IA | 01 | 01 | 42 | 192 | | | 1,270 | | |
| 0027631 | DALTON ENTERPRISES INC | DALTON | GA | 01 | 01 | 139 | 913 | 625 | (855) | | (40) | (97) |
| 0027110 | ENGINEERED FLOORS LLC | CHESHIRE | CT | 01 | 01 | 2,808 | | | | | 200 | 2,234 |
| 0027143 | BRITANNIA SERVICES | DALTON | GA | 01 | 01 | 52 | 52 | 12,619 | 8 | (368) | (1,573) | 9,831 |
| 0027224 | FLOORING WORLD OF NAPLES | WINTER PARK | FL | 01 | 01 | 89,148 | 79,316 | | | | | 1,895 |
| 0027253 | KM CARPETS INC-CCA GLOBAL | NAPLES | FL | 01 | 01 | 52 | 52 | | | | | 52 |
| 0027280 | HAMPTON INN | MILWAUKEE | WI | 01 | 01 | 206 | | | | | | |
| 0027315 | LONGVIEW FLOORING & DECORATING | BROOKINGS | SD | 01 | 01 | 48 | 68 | | (20) | | | (20) |
| 0027388 | ALPINE LINEN | LONGVIEW | TX | 01 | 01 | 488 | 488 | | | | | |
| 0027457 | COOPER FLOORING | BONNERS FERRY | ID | 01 | 01 | 226 | 226 | 226 | | 206 | 206 | 206 |
| 0027531 | INTERIOR CONSTRUCTION SERVICE | CARROLLTON | TX | 01 | 01 | 13 | 13 | | | | | |
| 0027556 | FIRE RECONSTRUCTION | SAINT LOUIS | MO | 01 | 01 | 21,016 | 17,160 | 3,408 | 182 | | 267 | 3,856 |
| 0027620 | FREEMAN | HOUSTON | TX | 01 | 01 | 2,277 | 2,277 | | | | | |
| 0027937 | BUSINESS ENVIRONMENTS | ANAHEIM | CA | 01 | 01 | (28) | | | (28) | | | (28) |
| 0027972 | MY CELL REPAIR | PARSIPPANY | NJ | 01 | 01 | 52 | 52 | | | | | |
| 0027836 | PIPER RUGS INC | SANTA ROSA | CA | 01 | 01 | 305 | 305 | | | | | |
| 0027829 | FLOORING FOUNDATION CORP | HOUSTON | TX | 01 | 01 | (79) | | | | | (79) | (79) |
| 0027824 | GREEN DEPOT LLC | BLOOMSBURY | NJ | 01 | 01 | 307 | 117 | | | | | |
| 0027753 | DEEP SOUTH DESIGNS LLC | SEATTLE | WA | 01 | 01 | 250 | 307 | | (68) | | (68) | (68) |
| 0028186 | BR CARPET COMPANY | JACKSONVILLE | FL | 01 | 01 | 130 | 120 | 13 | | | (211) | (211) |
| 0028177 | CIMAR INTERIORS | BLUE SPRINGS | MO | 01 | 01 | 3,111 | | | 510 | 450 | 1,398 | 741 |
| 0028147 | OSCAR ISERMAN | BOERNE | TX | 01 | 01 | 220 | 164 | 55 | | | | 56 |
| 0028204 | PAUL GRAHAM COMPANY | EVANSTON | IL | 01 | 01 | 1,148 | 431 | 667 | 49 | | | 717 |
| 0028396 | DELTA COMMERCE CORPORATION | LUBBOCK | TX | 01 | 01 | 394 | 275 | | 119 | | | 394 |
| 0028197 | ALEXANDRIA INTERNATIONAL | ANAHEIM | CA | 01 | 01 | (79) | | | 58 | | | (79) |
| 0028220 | BRANDON/WANN COMPANY INC | ADAIRSVILLE | GA | 01 | 01 | 2,768 | 2,473 | 120 | 76 | 160 | 193 | 295 |
| 0028286 | HOUSE OF CARPETS INC | MEMPHIS | TN | 01 | 01 | 160 | 160 | | | | | 160 |
| 0028391 | PSMI INC | MASTIC | NY | 01 | 01 | 534 | 534 | | | | (94) | (94) |
| 0028390 | NASSA CARPET | GRAND FORKS | ND | 01 | 01 | 239 | | | | | | 58 |
| 0028398 | XL FLOORING CO LTD | LANHAM | MD | 01 | 01 | 610 | 191 | 134 | 83 | | (135) | (236) |
| 0028419 | PATRICK DANEHY | NORTH VANCOUVER | BC | 01 | 01 | 408 | | | | | | (371) |
| 0028491 | CARPET COUNTRY | CENTENNIAL | CO | 01 | 01 | 4,782 | 3,084 | 1,657 | | 1,398 | | 217 |
| 0028543 | FLAG FLOORS OF BARNESVILLE | MONTROSE | CO | 01 | 01 | 405 | 405 | | | | | 1,697 |
| 0028547 | BUILDERS CARPET & DESIGN CTR | BARNESVILLE | CO | 01 | 01 | 381 | | | | | | 381 |
| 0028574 | TURF MASTERS | MCKINNEY | TX | 01 | 01 | 69 | 108 | | | | | (39) |
| 0028590 | RESOURCE FLOORS | PHOENIX | AZ | 01 | 01 | 83 | 83 | | | | | 381 |
| | MDCI LLC | SAN DIEGO | CA | 01 | 01 | 9,675 | 7,961 | 1,786 | 62 | | | 1,714 |
| | NORTH LITTLE ROCK CARPETS | DALLAS | TX | 01 | 01 | 2,582 | 2,422 | 642 | (51) | | | 160 |
| | CUSTOM CARPETS | NORTH LITTLE ROCK | AR | 01 | 01 | 692 | 471 | | | | | 221 |
| | BI DESIGN | EL DORADO HILLS | CA | 01 | 01 | 731 | 118 | | 189 | 181 | 23 | 613 |
| | SHERRICK CONSTRUCTION | BROOMFIELD | CO | 01 | 01 | 20 | 75 | | | | | (55) |
| | | | | | | 126 | | 126 | | | | 126 |

| Account | Creditor | City | State | Cl | Amt 1 | Amt 2 | Amt 3 | Amt 4 | Amt 5 | Amt 6 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0028694 | BMC FLOORING | DALTON | GA | 01 | 84 | 84 | | | | | |
| 0028897 | JC FRAMING | TEMECULA | CA | 01 | 2,909 | 1,473 | 1,436 | | | (248) | 1,436 |
| 0028705 | DAVIS & DAVIS RUGS INC | CHATTANOOGA | TN | 01 | 320 | | | | | | |
| 0028712 | DESIGN DECOR | BELLEVUE | WA | 01 | 568 | | | | | | |
| 0028732 | ABBEY CARPET #D356 | SANTA MARIA | CA | 01 | 118 | 118 | 118 | | | | 118 |
| 0028754 | INTERIOR SPECIALISTS INC | LAS VEGAS | NV | 01 | 111 | 111 | | | | | |
| 0028757 | CREATIVE SOLUTIONS 4 | | NV | 01 | 193 | 193 | | 193 | | | 193 |
| 0028780 | EAST BAY FLOOR COVERING | HAYWARD | CA | 01 | 1,914 | | | | | | |
| 0028803 | FAVORITE PRODUCTS | MADISON | WI | 01 | 1,815 | | 80 | | 18 | (248) | 98 |
| 0028924 | CONTRACTORS FLOORING OUTLET | MIROMAR LAKES | FL | 01 | 114 | | | | | | |
| 0028956 | CASCADE FLOORING LLC | ELGIN | IL | 01 | 557 | | 557 | | | | 557 |
| 0028958 | CARPET CENTER | BORING | OR | 01 | 84 | | 43 | | | | 43 |
| 0028968 | SHELBY TOWNSHIP | SHELBY TOWNSHIP | MI | 01 | 42 | | 25 | | | | 25 |
| 0028969 | REAL TURF & PUTTING GREEN | DALTON | GA | 01 | 43 | | | | | | |
| 0028873 | CARPET CLEARANCE OUTLET INC | WILKES BARRE | PA | 01 | 61 | | | | | | |
| 0029073 | VILLAGE FLOOR COVERING | SOUTH POINT | OH | 01 | 36 | | | | | | |
| 0029145 | CLAD'S PAINT & FLOORING | BUCYRUS | OH | 01 | 69 | | | | | | |
| 0029172 | HERITAGE CONTRACT FLOORING LLC | BUFFALO | NY | 01 | 25 | | | | | | |
| 0029169 | WALMART STORES INC | BENNTVILLE | SC | 01 | 177 | 177 | | | | | 177 |
| 0029303 | PD RESTORATION OF GREATER SACRAMENTO | RODEO | CA | 01 | 2,593 | 2,593 | 2,593 | | | | 2,593 |
| 0029245 | JOHN'S CARPET SERVICE | CORYDON | IN | 01 | 196 | 196 | | | | | |
| 0029329 | DEBBIE STOLLE INTERIORS | SAN ANTONIO | TX | 01 | 137 | 137 | | | | | |
| 0029340 | FLOORWORKS INC | SEATTLE | WA | 01 | 137 | | | | | | |
| 0029396 | INTERIORS ONE INC | TULSA | OK | 01 | 50 | 35 | | | | | 35 |
| 0029561 | D & G FLOORING INC | ANAHEIM | CA | 01 | 32 | (7) | | | (42) | | (42) |
| 0029438 | AMERICAN CLEAN | SYRACUSE | NY | 01 | 9,761 | 73 | | | | | 73 |
| 0029412 | CONTRACT CARPET SYSTEMS | BUTLER | WI | 01 | 23,152 | 23,152 | (1,118) | (193) | (498) | 174 | (13,378) |
| 0029565 | INTERMOUNTAIN INSTALLERS INC | BELTSVILLE | MD | 01 | (7) | | (10) | | | (10) | (10) |
| 0029585 | MERCHANT CARPETS | MURRAY | UT | 01 | 73 | | | | | | |
| 0029714 | EVAN MONTY INC | SACRAMENTO | CA | 01 | 401 | | | | | | |
| 0029743 | DAVE DEVOLING | RANCHO PALOS VERDES | CA | 01 | 66 | 66 | 110 | | | 76 | 335 |
| 0029749 | TRI STATE WHOLESALE FLOORING | PORTLAND | OR | 01 | 4,465 | 4,465 | 1,786 | 695 | 25 | 23 | 2,505 |
| 0029776 | SIGNATURE FLOORING AND DESIGN INC | SIOUX FALLS | SD | 01 | 195 | 195 | | | 25 | 25 | 25 |
| 0029791 | RANDY'S CARPET PLUS INC | FREMONT | CA | 01 | 141 | | | | | 141 | 141 |
| 0029800 | PRIORITY 1 | CONYERS | GA | 01 | 366 | 366 | | | | | 366 |
| 0029809 | FLOOR COVERING ASSOCIATES | NORTH LITTLE ROCK | AR | 01 | (1,043) | | (1,043) | (1,043) | (3) | (1,043) | (1,043) |
| 0029826 | LANDMARK HEALTHCARE | SHOREWOOD | IL | 01 | (3) | | | | (3) | | (3) |
| 0029936 | FABULOUS FLOORS INC | MENOMONEE FALLS | WI | 01 | 661 | 661 | 406 | 103 | | 125 | 125 |
| 0029834 | WOLFER'S CARPET MILL OUTLET INC | YORKSHIRE | NY | 01 | 325 | | | | | 103 | 103 |
| 0029994 | COMMERCIAL FLOORING SYSTEMS | CARROLLTON | OR | 01 | 103 | | | | | 406 | 406 |
| 0029930 | PHOENIX FLOORING WAREHOUS | SALT LAKE CITY | UT | 01 | 1,048 | | | 55 | | | 55 |
| 0029977 | OZARK CARPET COMPANY | WILLIS | TX | 01 | 89 | 89 | | | | | |
| 0029997 | THE CARPET GUYS LLC | OZARK | MO | 01 | 2,549 | 2,601 | 27 | | | | 27 |
| 0030066 | CRAGHEAD DEV CORP | TROY | MI | 01 | 4,007 | 2,257 | 283 | 45 | | 471 | 526 |
| 0030067 | SAMLING GLOBAL USA INC | AUSTIN | TX | 01 | 25 | 25 | 25 | 25 | | 25 | 25 |
| 0030111 | STUDIO W | CHESTERFIELD | MO | 01 | 3,576 | 3,050 | | | | 1,750 | 1,750 |
| 0030809 | FLOORING 101 | PHOENIX | AZ | 01 | 99 | 99 | | | | 1,422 | 1,422 |
| 0030113 | DESIGNER FLOORS OF TEXAS | OXNARD | TX | 01 | 9,343 | 9,343 | | | | | |
| 0030115 | B 8 BINDING | AUSTIN | TX | 01 | 985 | | | | 985 | | 985 |
| 0030127 | FOREVERLAWN | PALMYRA | NY | 01 | 572 | | | | | | 572 |
| 0030133 | SOUTHERN REF TRANSPORT | CLERMONT | FL | 01 | 2,455 | | | | | (52) | (52) |
| 0030189 | SEATTLE CARPET BROKERS | TEXARKANA | TX | 01 | 1,393 | 1,393 | 1,062 | | | (57) | 1,062 |
| 0030178 | CUSTOM FLOORS OF JACKSONVILLE | RENTON | WA | 01 | 55 | 55 | | | | 1,755 | 1,755 |
| 0030216 | STANLEY INC | JACKSONVILLE | FL | 01 | 83,794 | 57,471 | 16,697 | (6) | 4,505 | 3,372 | 26,323 |
| 0030306 | RE GARRISON TRUCKING | DALTON | GA | 01 | (2) | | | | | | |
| | HENDRICKSEN NATURALICH FLOORING | CULLMAN / SEBASTOPOL | AL / CA | 01 | 25 / 90 | 25 / 90 | | (79) | (87) | (544) | (87) |

| Claim # | Creditor | City | ST | | | Amt 1 | Amt 2 | Amt 3 | Amt 4 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 0030332 | DIAMOND PAVERS | SAN FRANCISCO | CA | 01 | 01 | 165 | - | - | - | 165 |
| 0030368 | CARPET WORKS | BALTIMORE | MD | 01 | 01 | 1,472 | - | - | 1,472 | 1,472 |
| 0030397 | PACIFIC GARDENS | PORTLAND | OR | 01 | 01 | 231 | - | 231 | - | 231 |
| 0030410 | PORTLAND | FONTANA | CA | 01 | 01 | 1,562 | - | - | 341 | 759 |
| 0030437 | ELEGANCE EXOTIC WOOD FLOORING | OAKLAND | CA | 01 | 01 | 1,098 | 418 | - | - | 1,472 |
| 0030484 | JMAR CARPET DISTRIBUTORS, INC. | OKLAHOMA CITY | OK | 01 | 01 | 803 | - | - | - | 759 |
| 0030490 | PERSONAL TOUCH | SPRINGFIELD | MO | 01 | 01 | 477 | - | - | - | 418 |
| 0030491 | GRACIELA'S RUTOWSKI INTERIOR DECORAT | SEATTLE | WA | 01 | 01 | 365 | 112 | - | - | 112 |
| 0030510 | CARPET EXCHANGE OF NORTH TEXAS | SEATTLE | WA | 01 | 01 | 112 | 63 | - | - | 63 |
| 0030516 | ARCHITECTURAL ELEMENTS LLC | DALLAS | TX | 01 | 01 | 65 | 639 | - | - | 638 |
| 0030545 | WES MARTIN INTERIORS | TUCSON | AZ | 01 | 01 | 1,237 | 599 | - | - | 112 |
| 0030545 | MANCHESTER FINANCIAL GROUP | DALLAS | TX | 01 | 01 | 599 | - | - | 298 | 638 |
| 0030571 | LEGENS FLOORING | WOOSTER | OH | 01 | 01 | 12,291 | 11,111 | 1,180 | - | 1,180 |
| 0030623 | ALL-TIMATE FLOORING INC | SAN DIEGO | CA | 01 | 01 | 494 | 494 | - | - | - |
| 0030625 | LOLOI RUGS | WALSENBURG | CO | 01 | 01 | 124 | 150 | (26) | - | (26) |
| 0030645 | W J ANDRIO'S LLC | GREEN BAY | WI | 01 | 01 | 100 | - | - | 100 | 100 |
| 0030647 | E C BARTON & COMPANY | DALLAS | TX | 01 | 01 | 137 | 137 | - | - | 137 |
| 0030669 | FIVE STAR FOOD SERVICE | SHELBYVILLE | KY | 01 | 01 | 6,651 | 6,114 | 626 | - | 537 |
| 0030695 | RICO II INC | STOUGHTON | MA | 01 | 01 | 1,629 | 461 | - | 166 | 1,168 |
| 0030695 | LOWES R0623 (INSTALLER) | CHATTANOOGA | TN | 01 | 01 | 626 | 763 | 239 | - | 537 |
| 0030717 | UNITED FLOORCOVERING & TILE | JACKSONVILLE | FL | 01 | 01 | 3,291 | 3,257 | 57 | 34 | 34 |
| 0030851 | GO WIRELESS INC | SANDY HOOK | CT | 01 | 01 | 1,795 | 1,795 | - | - | 1,795 |
| 0030904 | CONTRACT FLOORING & INTERIOR | SPOKANE | WA | 01 | 01 | 136 | 136 | - | - | - |
| 0030990 | BREITENSTEINS ENTERPRISES | LAS VEGAS | NV | 01 | 01 | 50 | 50 | - | - | - |
| 0030943 | AMERICAN FLOORS | PORTLAND | OR | 01 | 01 | 300 | 150 | 150 | 354 | 150 |
| 0030949 | FLOORING EFFECTS INC | LOUISVILLE | KY | 01 | 01 | 150 | - | - | - | 354 |
| 0031010 | STAR CARPET AND CLEANING | MARINA | CA | 01 | 01 | 354 | - | - | - | - |
| 0031025 | NW FLOORING SOLUTIONS | DALLAS | TX | 01 | 01 | 23,281 | 12,280 | 11,028 | (27) | 11,001 |
| 0031272 | RUBINS ENTERPRISES | LIMA | OH | 01 | 01 | 36 | 36 | - | - | - |
| 0031318 | WARREN CARPET & FLOOR CENTER | VANCOUVER | WA | 01 | 01 | 160 | - | 160 | - | 160 |
| 0031344 | M KAMBOURIAN SONS INC | HOUSTON | TX | 01 | 01 | 53 | 53 | - | - | - |
| 0031350 | WATER MITIGATION CONCEPTS LLC | NORTH TONAWANDA | NY | 01 | 01 | 219 | - | - | 190 | 219 |
| 0031370 | LIMA BARGAIN CENTER INC | RICHMOND | NC | 01 | 01 | 216 | 216 | 29 | - | 216 |
| 0033445 | ANN VANDERWAL | LAGUNA HILLS | CA | 01 | 01 | 212 | - | 212 | - | 212 |
| 0033446 | SUNRISE HOME | LIMA | OH | 01 | 01 | 3,103 | 1,320 | 1,254 | (37) | 1,782 |
| 0031046 | ALL PRO RESTORATION | KENT | WA | 01 | 01 | (808) | - | 565 | - | (808) |
| 0031597 | DOUBLE DR ENTERPRISES INC | SAN RAFAEL | CA | 01 | 01 | (659) | - | (808) | - | (659) |
| 0031608 | LARSON MANUFACTURING CO | KINGSVILLE | TX | 01 | 01 | 552 | 552 | (659) | - | 552 |
| 0031709 | BOSS CARPET ONE LLC CCA GLOBAL | PLANO | TX | 01 | 01 | (338) | - | - | (338) | (338) |
| 0031807 | ALL THE BEST CARPETS & BLINDS | ALBERT LEA | MN | 01 | 01 | 538 | 538 | 538 | - | 538 |
| 0031875 | HISCO INC | DIXON | IL | 01 | 01 | (438) | - | (438) | (438) | (438) |
| 0031875 | SACRAMENTO | SACRAMENTO | CA | 01 | 01 | 1,288 | 664 | 249 | 705 | 705 |
| 0031899 | F SCHUMACHER | ANAHEIM | CA | 01 | 01 | 2,230 | 2,230 | - | (208) | (208) |
| 0031906 | LEES FURNITURE INC | NEWARK | DE | 01 | 01 | 122,479 | 124,579 | 151 | (2,717) | 2,230 |
| 0031915 | WELCOME HOSPITALITY SUPPLIES | SAINT GEORGE | UT | 01 | 01 | 529 | 483 | 248 | 46 | 46 |
| 0031926 | M & H TEXTILES LLC | PORT ORANGE | FL | 01 | 01 | 30 | 30 | 55 | (2,099) | (2,099) |
| 0031942 | FOREVER/LAWN ORANGE COUNTY | DALTON | GA | 01 | 01 | 389 | 30 | - | 46 | 46 |
| 0031981 | SNYDERS FLOOR COVERING OUTLET LLC | TUSTIN | CA | 01 | 01 | 2,632 | 1,618 | 514 | (49) | 39 |
| 0032022 | BELKNAP WHITE GROUP | BETTSVILLE | OH | 01 | 01 | 880 | - | (81) | 1,264 | 1,264 |
| 0032099 | QUALITY FLOORS CONTRACT | MANSFIELD | OH | 01 | 01 | 922 | - | - | (539) | 652 |
| 0032094 | ALOHA FREIGHT FORWARDERS | CARROLLTON | TX | 01 | 01 | 254 | 1,461 | - | 652 | 922 |
| 0032099 | NORTHERN UTAH CARPETS INC | COMPTON | CA | 01 | 01 | 85 | 85 | - | - | 1,461 |
| 0032132 | CARPET OUTLET OF TEXAS | PROVIDENCE | RI | 01 | 01 | 292 | 292 | - | - | - |
| 0032143 | RPM LOGISTICS INC | MESQUITE | TX | 01 | 01 | 455 | 623 | 76 | (29) | 46 |
| 0032149 | CARPET DEPOT LLC | FULLERTON | CA | 01 | 01 | 669 | 455 | - | - | - |
| | NORTHERN UTAH CARPETS INC | PHOENIX | AZ | 01 | 01 | 2,241 | 2,241 | - | - | - |
| | CARPET DEPOT LLC | PADUCAH | KY | 01 | 01 | 223 | 223 | - | - | - |
| | BANYAN INN & SUITES | PHOENIX | AZ | 01 | 01 | 162 | 162 | - | 1,288 | 1,962 |
| | | | | 01 | 01 | 4,099 | 2,136 | 674 | (640) | (640) |
| | BANYAN INN & SUITES | PADUCAH | KY | 01 | 01 | (640) | - | - | 117 | 117 |
| | HI PERFORMANCE WHSE | FORT WORTH | TX | 01 | 01 | 117 | 117 | - | 249 | 249 |
| | | | | 01 | 01 | 249 | 249 | - | - | - |

| Account | Name | City | State | Term | Col1 | Col2 | Col3 | Col4 | Col5 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 0032171 | KENNETH J RHODES | WASHINGTON | PA | 01 | 45 | 45 | 45 | | | (65) |
| 0032196 | JABARA CARPET OUTLET | WICHITA | KS | 01 | 184 | 248 | | | | 2,719 |
| 0032219 | ANDERCO CARPET CARE CO | LOS ANGELES | CA | 01 | 2,719 | 2,719 | | | | 2,719 |
| 0032242 | A 1 FLOORING SERVICES INC | LAS VEGAS | NV | 01 | 269 | 203 | 66 | | | 66 |
| 0032257 | RENHILD FLOOR COVERING | SAINT LOUIS | MO | 01 | 44 | 44 | | | | |
| 0032258 | TOUCHSTONE MANAGEMENT LTD | CLEVELAND | OH | 01 | 1,365 | 541 | | | | |
| 0032299 | D & J VENTURES INC | LAWRENCE | OK | 01 | 2,646 | 2,226 | 240 | 192 | 632 | 824 |
| 0032337 | BAILEY FLOORING CO INC | NORMAN | OK | 01 | 545 | 545 | | | | 240 |
| 0032346 | MARTYS CONTRACT CARPET | ENCINITAS | CA | 01 | 2,700 | 2,304 | 566 | | | |
| 0032357 | COVER TRENDS LLC | LAKELAND | FL | 01 | 204 | 232 | | | (120) | 396 |
| 0032380 | FLOOR TECH CONTRACTING LLC | PUNTA GORDA | FL | 01 | 232 | 122 | | | (28) | (28) |
| 0032385 | KLEIN CONSTRUCTION | ALBUQUERQUE | NM | 01 | 122 | (25) | | | | |
| 0032419 | JC CUSTOM FLOORING | WICHITA | KS | 01 | (361) | 401 | | | (361) | (361) |
| 0032448 | FLOORING CONNEXION | LINCOLN | MI | 01 | 38 | 481 | 72 | 25 | | 72 |
| 0032456 | MISC STORAGE | MONROE | WA | 01 | 472 | 286 | 13 | | | 38 |
| 0032466 | DON HIL LLC | KENT | OK | 01 | 767 | (8) | | | 1,219 | 1,219 |
| 0032541 | CERTIFIED INSTALLERS OF FLORIDA | DURANT | FL | 01 | 25 | 12,005 | 286 | | | 286 |
| 0032554 | ALAMO FLOORING & CONSTRUCTION | POMPANO BEACH | TX | 01 | 32,201 | 2,375 | | 381 | 3,393 | 20,105 |
| 0032571 | PROGREEN INTERNATIONAL | SAN ANTONIO | WA | 01 | 13 | 13 | 13 | | | 13 |
| 0032600 | STEWART FELDT | SEATTLE | GA | 01 | 2,385 | 2,694 | (46) | | | 622 |
| 0032655 | BLACKSTONE CARPET | ATLANTA | CA | 01 | 716 | 80 | (264) | | | (310) |
| 0032684 | GALLEHER SANTA FE SPRINGS | DALLAS | CA | 01 | 74 | 74 | | | | 74 |
| 0032694 | SUNSET FLOORS INC | SANTA FE SPRINGS | NJ | 01 | 17,328 | 9,779 | 2,332 | 1,026 | 989 | 7,550 |
| 0032699 | NOURISON RUG CORP | EL SEGUNDO | GA | 01 | 409 | 96 | | 313 | 459 | 313 |
| 0032723 | ASTROTURF LLC | SADDLE BROOK | CA | 01 | 76 | 76 | | | | |
| 0032741 | ZEO FILL INC | DALTON | CA | 01 | 155 | 155 | 125 | | | |
| 0032743 | NOVA HARDWOODS | HESPERIA | GA | 01 | 155 | 155 | | | | |
| 0032789 | GOLDEN CARPETS INC | KENNESAW | GA | 01 | 130 | 130 | | | | |
| 0032791 | DALTON WHOLESALE FLOORS OF GORDON | TEMPLE CITY | CA | 01 | (246) | 119 | 176 | | (246) | (246) |
| 0032815 | RAINBOW CARPETS INC | ADAIRSVILLE | CA | 01 | 1,932 | 1,156 | | 176 | 771 | 776 |
| 0032827 | PS OXNARD | WATSONVILLE | TX | 01 | 995 | 995 | 127 | (291) | | (291) |
| 0032841 | CLASSIC STONE & TILE | OXNARD | NV | 01 | 283 | | | (105) | | (105) |
| 0032870 | SPANGLER FLOOR COVERING | PROSPER | CA | 01 | 104 | 104 | 104 | | | 104 |
| 0032927 | DEL DETWEILER | SPARKS | GA | 01 | 70 | 70 | | | | |
| 0032936 | DON L ENTERPRISES | RANCHO CORDOVA | NY | 01 | 992 | 184 | | 808 | | 808 |
| 0032959 | BANK OF AMERICA | DALTON | CA | 01 | 50 | 50 | 50 | | | |
| 0032942 | DAVIS & DAUGHTERS | AMITYVILLE | KY | 01 | (382) | 145 | (35) | | (113) | (526) |
| 0032950 | RIVER CITY FLOORING | WALNUT CREEK | NC | 01 | 520 | 520 | 25 | | | (35) |
| 0032962 | C & O WAREHOUSING CORP | LOUISVILLE | CO | 01 | 175 | 175 | 175 | | | 175 |
| 0033017 | CARPET CONNECTIONS | DURHAM | WA | 01 | (186) | (186) | | | | (186) |
| 0033072 | KASA-LA CORP OFFICE | AURORA | FL | 01 | 391 | 391 | 291 | | | 291 |
| 0033080 | SUNOCO LOGISTICS | SEATTLE | PA | 01 | 176 | 176 | | | | |
| 0033095 | D & N ENTERPRISES | ORLANDO | AR | 01 | 4,975 | 337 | 282 | 1,071 | 1,117 | 4,638 |
| 0033155 | CARPET CENTER INC | PENNSDALE | MD | 01 | 825 | 825 | | | | 151 |
| 0033159 | MERCER FLOORS INC CCA GLOBAL | CONWAY | AZ | 01 | 151 | 151 | 151 | | | 487 |
| 0033183 | NAVLIN INC | WESTMINSTER | IN | 01 | 1,319 | 832 | 310 | | | 388 |
| 0033238 | KATS KARPET INC | TUCSON | TX | 01 | 388 | 223 | 223 | | | 165 |
| 0033269 | SAFEGLADINGS WORLDWIDE LLC | TERRE HAUTE | AZ | 01 | 115 | 115 | 115 | | | 161 |
| 0033274 | FLOORS TO GO ROSELL | SAN ANTONIO | CA | 01 | 161 | | | | | 161 |
| 0033332 | MONARCH FLOORS | PHOENIX | CA | 01 | 25 | 25 | | | | |
| 0033360 | SHERRIE SWASS INTERIORS INC | LANCASTER | IL | 01 | 117,688 | 82,498 | 34,697 | | | 35,190 |
| 0033398 | ECHO GLOBAL LOGISTICS | CARMICHAEL | FL | 01 | 443 | 443 | | 398 | 366 | |
| 0033411 | CUBIK INC | CHICAGO | MD | 01 | 414 | | 233 | 181 | | 414 |
| | OLYMPIC CARPET & RUG | ORLANDO | TX | 01 | 139 | 139 | | | | |
| | RDW INVESTMENTS INC | SILVER SPRING | CA | 01 | 309 | 309 | 309 | 309 | | 309 |
| | LANTERN BAY CARPETS INC | MANSFIELD | | | | | | | | |
| | | DANA POINT | | | | | | | | |

| ID | Company | City | State | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0033507 | PUTTERS EDGE | ROLLING HILLS | CA | 01 | 01 | 100 | | | | | | 100 |
| 0033553 | NICE CARPET | NEWARK | OH | 01 | 01 | 262 | 241 | | | | | |
| 0033542 | LCR ENTERPRISES | OKLAHOMA CITY | OK | 01 | 01 | 469 | 51 | | | | | |
| 0033575 | ODELL ANDRES & SONS FLOORING | FLOYDS KNOBS | IN | 01 | 01 | 721 | | | 58 | | | 228 |
| 0033583 | THE CARPET GUYS LLC | MADISON HEIGHTS | MI | 01 | 01 | 522 | | | | | | (199) |
| 0033593 | FURER BUILDERS SYSTEM | HONOLULU | HI | 01 | 01 | 160 | 160 | | | | | |
| 0033619 | ALLIED BUILDERS SYSTEM | HONOLULU | HI | 01 | 01 | 2,274 | 2,274 | | | | 2,274 | 2,274 |
| 0033634 | BEN Z ENTERPRISES INC | TRENTON | NJ | 01 | 01 | 30 | 30 | | | | | 30 |
| 0033654 | RIVER RUN LOGISTICS | TUALATIN | OR | 01 | 01 | (56) | (56) | | | | (56) | (56) |
| 0033667 | PERSONAL PUTTING GREENS INC | MILLER PLACE | NY | 01 | 01 | 361 | 361 | 361 | | 361 | 361 | 361 |
| 0033670 | J HUGHES INDUSTRIES | REDMOND | WA | 01 | 01 | 1,518 | 1,043 | | | | 1,518 | 1,518 |
| 0033716 | GOLDEN STATE CARPET | CONCORD | CA | 01 | 01 | 912 | | | | | | (131) |
| 0033743 | ADS FLOORING | CITRUS HEIGHTS | CA | 01 | 01 | 10 | 10 | | | | | |
| 0033778 | SPECTRUM RUGS | SANTA ANA | CA | 01 | 01 | 790 | 790 | | | | | |
| 0033792 | F T OF REDDING INC | REDDING | CA | 01 | 01 | 2,304 | 2,304 | | | | | 2,304 |
| 0033802 | TERRYS FLOORING SERVICE | DINUBA | CA | 01 | 01 | 1,926 | | | | | 1,926 | 1,926 |
| 0033821 | RODRINKO'S INTERIOR INC | HANFORD | CA | 01 | 01 | (312) | | | | | (386) | (386) |
| 0033872 | MY FLOORING HANFORD LLC | HANFORD | CA | 01 | 01 | 53 | 53 | | | | | |
| 0033893 | BOBS QUALITY FLOORING LLC | LAKE WALES | FL | 01 | 01 | 265 | 265 | | | | | |
| 0033899 | MICHELLE WOODWARD | LAKE ISABELLA | CA | 01 | 01 | 265 | 265 | | | | | |
| 0033915 | CALIFORNIA SYNTHETIC TURF & LAWN | RIO LINDA | CA | 01 | 01 | 262 | 262 | | | | | |
| 0033927 | EVAN SANDERSON | CALHOUN | GA | 01 | 01 | 300 | 300 | | | | | |
| 0033946 | R C PUBLISHING INC | RIO RANCHO | NM | 01 | 01 | 25 | 25 | | | | | |
| 0033953 | HENRY BROWN INTERIORS | LAS VEGAS | NV | 01 | 01 | 62 | 62 | | | | | |
| 0033965 | DISTINCTIVE DOORS INC | PORTLAND | OR | 01 | 01 | 46 | 46 | | | | | |
| 0033997 | ROBERTS FLOORS INC | WYLIE | TX | 01 | 01 | 2,368 | 2,368 | | | | | 2,368 |
| 0034060 | BAKERSFIELD RUGS INC | HOUSTON | TX | 01 | 01 | 1,883 | 1,143 | 740 | | | 740 | 740 |
| 0034108 | FLOORS EXPRESS | FALLS CHURCH | VA | 01 | 01 | (485) | | | | | (485) | (485) |
| 0034114 | HANKS QUALITY FLOORING | JACKSONVILLE | FL | 01 | 01 | 631 | 631 | | | | | |
| 0034198 | CROSSFIT REFLEX | QUEENSBURY | NY | 01 | 01 | 360 | 360 | | | | | |
| 0034260 | MY FLOORING TEXAS LLC | SANTA MONICA | CA | 01 | 01 | 356 | 356 | | | | | |
| 0034297 | JEANIE SIMMONS ACCESSORIES INC | WEBSTER | CA | 01 | 01 | 274 | 274 | | | | 757 | 3,015 |
| 0034325 | HOME DEPOT #4608 (INSTALLER) | VISTA | VA | 01 | 01 | 7,258 | 4,244 | 1,647 | | 556 | | 2,325 |
| 0034388 | MID ATLANTIC INC | LORTON | VA | 01 | 01 | (9) | (9) | | 77 | | (9) | (9) |
| 0034427 | MECKLEY SERVICES | TOMS RIVER | NJ | 01 | 01 | 138 | 138 | | | | | 50 |
| 0034442 | PERFORMANCE COMMERCIAL FLOORING LLC | ALEXANDRIA | VA | 01 | 01 | 50 | 50 | | | | 50 | 50 |
| 0034502 | ROCKY FORD MOVING | RICHMOND | VA | 01 | 01 | 30 | 30 | | | | | |
| 0034560 | KYLE ZIMMERMAN | GRAPEVINE | TX | 01 | 01 | 4,039 | 4,039 | | | | | |
| 0034571 | TUFFGRASS INC | CLOVIS | CA | 01 | 01 | 207 | 207 | | | | | |
| 0034663 | PENN VALLEY | PENN VALLEY | CA | 01 | 01 | 1,325 | | 2,248 | | | | |
| 0034681 | EMMETSBURG LUMBER & SUPPLY | EMMETSBURG | IA | 01 | 01 | 4,244 | 4,244 | | | | | |
| 0034715 | ALLIANCE FLOOR COVERING | KENT | WA | 01 | 01 | 274 | 274 | | | | | |
| 0034735 | FURNITURE MALL | OLATHE | KS | 01 | 01 | 118 | 118 | (25) | | | | |
| 0034754 | WINSTREAM | ANDOVER | MA | 01 | 01 | 836 | 836 | | | | | |
| 0034774 | BELL FLOOR COVERING CO | PHILADELPHIA | PA | 01 | 01 | 189 | 189 | | | | | |
| 0034817 | SOUTHWEST FLOORING SUPPLY | AUSTIN | TX | 01 | 01 | (107) | | | | | (107) | (107) |
| 0034851 | COMMERCIAL FLOORING WAREHOUSE | GULFPORT | MS | 01 | 01 | 78 | 78 | | | | 91 | 91 |
| 0034860 | HOWLIN ON THE GREEN INC | DENVER | CO | 01 | 01 | 153 | 153 | | | | | |
| 0034984 | TIVIA FLOORS | CLEVELAND | OH | 01 | 01 | 794 | 794 | | | | 794 | 794 |
| | REED FLOORS INC | CARPINTERIA | CA | 01 | 01 | (91) | | | | | | (91) |
| | SUN VALLEY RUG & TILE | HAILEY | ID | 01 | 01 | 327 | | | 30 | 327 | | 327 |
| | SCHROCK CARPET | SOMERSET | PA | 01 | 01 | 195 | | 123 | | | | 123 |
| | J & S CUSTOM DECOR | BEAVERTON | OR | 01 | 01 | 72 | 72 | | | | | |
| | R D W INVESTMENTS INC | FRESNO | CA | 01 | 01 | 74 | 74 | | | | 74 | 74 |
| | 180 LLC | WESTMINSTER | MD | 01 | 01 | 197 | 197 | | | | | |
| | SUPERIOR HOME DESIGN | LOS ANGELES | CA | 01 | 01 | 690 | 690 | | | | | |
| | VORTEX ENTERPRISES INC | ADDISON | IL | 01 | 01 | (294) | | | | | (294) | (294) |
| | FLOORS TO GO GRANTS PASS | MEDFORD | OR | 01 | 01 | 133 | 133 | | 1,976 | | | 1,976 |
| | CARPET & WINDOW TRENDS | ERIE | PA | 01 | 01 | 9,670 | 7,593 | | | | | 69 |

| Account | Customer | City | ST | | | Balance |
|---|---|---|---|---|---|---|
| 0035997 | SOFT SURFACE INSTALLATION | ORLAND PARK | IL | 01 | 01 | 349 |
| 0035005 | CUSTOM AIR TRANS | HAWTHORNE | CA | 01 | 01 | 334 |
| 0035064 | EXEL/ NAL | DENVER | CO | 01 | 01 | 823 |
| 0035087 | REGIONAL FREIGHT SERVICES | SOUTH RICHMOND HILL | NY | 01 | 01 | 25 |
| 0035132 | COAST CARPET | FORT BRAGG | CA | 01 | 01 | 225 |
| 0035122 | CHANDRA RUGS | ADAIRSVILLE | GA | 01 | 01 | (166) |
| 0035143 | RUGMASTERS | SCARBORO | GA | 01 | 01 | 90 |
| 0035205 | THEO CHOCOLATE | SEATTLE | WA | 01 | 01 | 96 |
| 0035210 | FARRELL DISTRIBUTING CORP | ENDICOTT | NY | 01 | 01 | 1,885 |
| 0035217 | STEWART FELDT | KENT | WA | 01 | 01 | 335 |
| 0035253 | PROSOURCE OF OKLAHOMACITY | TAMPA | FL | 01 | 01 | 90 |
| 0035314 | GEMINI LOGISTICS | JACKSONVILLE | FL | 01 | 01 | 13 |
| 0035333 | RUSSELLS HOUSE OF FURNITURE | WATERFORD | WA | 01 | 01 | 129 |
| 0035357 | CARPET WEAVERS/FLOORING DEPOT | ALTOONA | PA | 01 | 01 | 1,029 |
| 0035358 | CARPET WAREHOUSE | CHAMPAIGN | IL | 01 | 01 | 95 |
| 0035377 | CARPET BARN INC | NORTH FORT MYERS | FL | 01 | 01 | 1,169 |
| 0035398 | COMMERCIAL FLOORING SYSTEMS | JACKSONVILLE | FL | 01 | 01 | 121 |
| 0035399 | IN 1 A FURNITURE | SHERMAN OAKS | CA | 01 | 01 | 489 |
| 0035417 | HOFFMAN & ALBERS INTERIOR | CINCINNATI | OH | 01 | 01 | 1,489 |
| 0035419 | JH INC | YORK | PA | 01 | 01 | 251 |
| 0035477 | BRIAN BARNARDS FLOORING AMERICA | TALLAHASSEE | FL | 01 | 01 | 251 |
| 0035489 | LOGISOURCE | MATTHEWS | NC | 01 | 01 | 163 |
| 0035570 | MILLER NASH LLP | PORTLAND | OR | 01 | 01 | 168 |
| 0035542 | KRISTINE DONOVICH INT DESIGN | SEATTLE | WA | 01 | 01 | (3) |
| 0035645 | BARNES DRAPERY & FLOORCOVERING | ORLANDO | FL | 01 | 01 | 3,345 |
| 0035686 | PLAZA CARPET CO | LOS ANGELES | CA | 01 | 01 | 272 |
| 0035703 | ALL TILE INC | ELK GROVE VILLAGE | IL | 01 | 01 | 150 |
| 0035706 | CONTROLLED PRODUCTS | DALTON | GA | 01 | 01 | 484 |
| 0035710 | PENNINGTONS FLOOR STORE | WHITE HALL | AR | 01 | 01 | 85 |
| 0035805 | J MISH INC | CARTERSVILLE | GA | 01 | 01 | 1,043 |
| 0035876 | FALLAS ARTIFICIAL GRASS CO LLC | LUBBOCK | TX | 01 | 01 | 16,918 |
| 0035886 | GULSSERMAN BROTHERS INC | SAN LEANDRO | CA | 01 | 01 | 272 |
| 0036003 | DANS CARPET & INSTALLATION | RANCHOS DE TAOS | NM | 01 | 01 | 2,118 |
| 0036016 | HATHAWAY CARPET SERVICES | CINCINNATI | OH | 01 | 01 | 115 |
| 0036074 | COVERALL INDUSTRIES INC | BEVERLY HILLS | CA | 01 | 01 | 705 |
| 0036157 | AMERICAN FIBER CUSHION | DALTON | GA | 01 | 01 | 1,310 |
| 0036271 | FLOORING SAN DIEGO | LA MESA | CA | 01 | 01 | 13,882 |
| 0036277 | LIPSEY LOGISTICS WORLDWIDE LLC | NORCROSS | GA | 01 | 01 | 60 |
| 0036372 | FLOORING SOLUTIONS BY RAINWATER LLC | LOUISVILLE | KY | 01 | 01 | (171) |
| 0036427 | WILLIAM J ZICKEL CO | FENTON | MO | 01 | 01 | 356 |
| 0036459 | DESIGN CARPETS | SCHAUMBURG | IL | 01 | 01 | 8 |
| 0035516 | COMMERCIAL SURFACES INC | SAN ANTONIO | TX | 01 | 01 | 456 |
| 0035580 | FOUR SEASONS DIV OF S M P | KANSAS CITY | MO | 01 | 01 | 1,329 |
| 0036616 | UNITED CARPET COMPANY | HAZELWOOD | MO | 01 | 01 | (389) |
| 0036649 | ALASKA FLOORING & CABINETS INC | WASILLA | AK | 01 | 01 | 645 |
| 0036691 | FLOOR WORKS INC | ROSEBURG | OR | 01 | 01 | 1,504 |
| 0036724 | DOUBLE S ENTERPRISES INC | JACKSONVILLE | FL | 01 | 01 | (179) |
| 0036800 | FOREVERLAWN MASSACHUSETTS | HANOVER | MA | 01 | 01 | 265 |
| 0036869 | TARKETT INC | CLEVELAND | OH | 01 | 01 | 48,755 |
| 0036894 | CARPET CARAVAN, INC. | NEEDHAM | MA | 01 | 01 | 2,133 |
| 0036977 | LEN-DAL CARPETS INC | CHATSWORTH | CA | 01 | 01 | 747 |
| 0036979 | CARPET COLLECTION | LOCKPORT | NY | 01 | 01 | 2,615 |
| 0037047 | PRAVADA FLOORS INC | SURREY | BC | 01 | 01 | 24,897 |
| 0037111 | HOME EMPORIUM | IMPERIAL | CA | 01 | 01 | 513 |
| | ANTI-FASHIONS INC | SAN ANTONIO | TX | 01 | 01 | 671 |

| Account | Name | City | State | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0037232 | HOLLOWAYS CARPET INC | MARSHALL | TX | 01 | 01 | 626 | 142 | 366 | | 57 | 61 | 484 |
| 0037651 | SCHONERS INTERIORS | BELLEVUE | WA | 01 | 01 | 666 | 533 | 133 | | | 133 | 133 |
| 0037289 | SIX FLAGS | VALLEJO | CA | 01 | 01 | (1,500) | | | | | (1,500) | (1,500) |
| 0037582 | ARCHITECTURAL FLOORS | HOUSTON | TX | 01 | 01 | 14,630 | 14,831 | 13 | | | (213) | (201) |
| 0037751 | GRIFFIN CARPET INC | SALINAS | CA | 01 | 01 | (514) | | | | | (514) | (514) |
| 0037665 | QUALITY FLOOR COVERING | HOUSTON | TX | 01 | 01 | (460) | | | (460) | | (460) | (460) |
| 0037676 | CONTRACT FLOORS INC | PHOENIX | AZ | 01 | 01 | 90 | 90 | | | | | |
| 0037683 | W E IMHOFF CO | BOISE | ID | 01 | 01 | 157 | | | | | | 157 |
| 0037733 | FEEZ IMPORT & EXPORT | AUSTIN | TX | 01 | 01 | 623 | | | | | 623 | 623 |
| 0037790 | M S ROUSE CO | DALLAS | TX | 01 | 01 | 5,143 | 4,989 | 463 | 132 | | 155 | 155 |
| 0037815 | J D STARON GALLERIES LTD | COMPTON | CA | 01 | 01 | 132 | | 132 | | | (309) | 132 |
| 0037850 | DESSO USA INC | STAMFORD | CT | 01 | 01 | 1,031 | 1,031 | | | 84 | (4,088) | (4,004) |
| 0037878 | RONDA DIVERS INT | DARIEN | CT | 01 | 01 | 403 | 436 | | | | (34) | (34) |
| 0038004 | ANDY GRONN | LAKE OSWEGO | OR | 01 | 01 | 66 | 66 | | | | (78) | (78) |
| 0038065 | G FRED CARPET INC | EL DORADO HILLS | CA | 01 | 01 | (12) | | | | | | |
| 0038058 | JACKS CARPET CO | WESTBURY | NY | 01 | 01 | 75 | 75 | | | | | |
| 0038086 | CHICAGO FLOOR SYSTEMS CORP | ASH FLAT | AR | 01 | 01 | 90 | 90 | | | | | |
| 0038058 | WELL FLOOR U | CHICAGO | IL | 01 | 01 | 612 | 636 | | | | | |
| 0038156 | HAMPTON BAYS | HAMPTON BAYS | NY | 01 | 01 | (711) | | | (711) | | (711) | (711) |
| 0038346 | INCLINE VILLAGE | INCLINE VILLAGE | NV | 01 | 01 | 145 | 145 | | | | (25) | (25) |
| 0038156 | SIMONIAN FLOORING | GOLDEN VALLEY | MN | 01 | 01 | (10) | | | | | | |
| 0038297 | KEITH ANDERSON | | | 01 | 01 | (876) | | | | | (10) | (10) |
| 0038235 | J MICHAEL & CO | | TX | 01 | 01 | 16,997 | 15,697 | 298 | | | (876) | (876) |
| 0038319 | NORTHWEST TRENDS OF SPOKANE | SPOKANE | WA | 01 | 01 | 863 | 503 | 90 | 1,006 | | (4) | (4) |
| 0038314 | AMERICARPET | CARROLLTON | | 01 | 01 | 7 | | 90 | 62 | | 1,300 | 1,300 |
| 0038413 | QUALITY FLOORING | MIAMI | FL | 01 | 01 | 1,252 | 1,316 | 52 | | | 360 | 360 |
| 0038416 | ROBERTS RESIDENTIAL CO | COLUMBIA | MS | 01 | 01 | 150 | | 90 | 90 | 90 | 90 | 7 |
| 0038421 | LARRYS LUMBER | OREGON CITY | OR | 01 | 01 | 552 | 552 | | (232) | | (63) | (63) |
| 0038431 | CCOINS FLOOR COVERING | WATERTOWN | SD | 01 | 01 | 993 | 896 | | | | 150 | 150 |
| 0038501 | ALLEN INTERIORS INC | ZANESVILLE | OH | 01 | 01 | 1,022 | 701 | 97 | | 25 | 169 | 97 |
| 0038595 | GULF COAST COMMERCIAL FLOORING INC | SAINT LOUIS | MO | 01 | 01 | 33 | 33 | 860 | | | 321 | 321 |
| 0038690 | GREAT RUG CO | LUTZ | FL | 01 | 01 | 33 | 33 | | (711) | | | |
| 0038702 | STERLING INTERIORS | HOUSTON | TX | 01 | 01 | 4,513 | 4,233 | 730 | (79) | (163) | (401) | |
| 0038703 | THAYER DECORATING CENTER | SAN DIEGO | CA | 01 | 01 | 1,734 | 1,039 | 156 | (20) | | (43) | (43) |
| 0038805 | YOUR "OTHER" WAREHOUSE | SHERMAN OAKS | CA | 01 | 01 | 323 | 305 | | | | 66 | 695 |
| 0038844 | HOLD AT DESTINATION DOCK | THAYER | MO | 01 | 01 | 469 | 121 | | (43) | (62) | 62 | 62 |
| 0038924 | DAN TAYLOR INTERIORS | AGOURA HILLS | CA | 01 | 01 | 36 | | 348 | | | 248 | 248 |
| 0039016 | FASHION CARPETS | | CA | 01 | 01 | 1,676 | 3,624 | 30 | | | 30 | 30 |
| 0039089 | LEADER CARPET | ELMHURST | IL | 01 | 01 | 853 | 74 | 369 | 35 | 65 | (2,417) | (1,947) |
| 0039188 | MIDWEST RUG CO | TUNNEL HILL | GA | 01 | 01 | 1,371 | 51 | 13 | | | 767 | 779 |
| 0039220 | MILLER & SONS FLOOR COVERING INC | BRIDGEVILLE | PA | 01 | 01 | 102 | | 669 | | | 669 | 669 |
| 0039294 | ALADDIN CARPET CO | GLENVIEW | IL | 01 | 01 | 4,522 | 4,522 | 102 | | | 102 | 102 |
| 0039298 | DECORATIVE CARPETS INC | NORWALK | CA | 01 | 01 | 53 | 53 | | | | | |
| 0039326 | DARIUS INC | SPRINGFIELD | MO | 01 | 01 | | | | | | | |
| 0039565 | H B FULLER CO | HEMET | CA | 01 | 01 | 581 | | | 581 | 581 | 581 | 581 |
| 0039593 | INNOVATIONS COMMERCIAL FLOORING | SAN ANGELO | TX | 01 | 01 | 4,493 | 2,952 | | | | 1,541 | 1,541 |
| 0039710 | NORTHERN FLOORING SPECIAL | BELLFLOWER | CA | 01 | 01 | 2,383 | 817 | 56 | | | 1,567 | 1,567 |
| 0039708 | CALIFORNIA TURF SOLUTIONS | HAGERSTOWN | MD | 01 | 01 | 171 | 171 | 221 | 519 | 519 | 135 | 581 |
| 0039732 | CONGRESS FLOORING CORP | EVANSVILLE | IN | 01 | 01 | 267 | | | | | 267 | 267 |
| 0039841 | NORTHERN FLOORING INC | PORTLAND | OR | 01 | 01 | 901 | 977 | | (37) | | (39) | (76) |
| 0039947 | RELIANT HARDWOOD FLOORING INC | COLUMBUS | OH | 01 | 01 | (178) | | | | | (178) | (178) |
| 0039870 | FLOOR MASTER INC | FRESNO | CA | 01 | 01 | 623 | | | | | 623 | 735 |
| 0039949 | LEXMARK CARPET MILLS INC | BROOK PARK | OH | 01 | 01 | (75) | | | (125) | 23 | (64) | (125) |
| 0039999 | HOUSE OF FLOORS | CHANDLER | AZ | 01 | 01 | 1,319 | 584 | 735 | | | 465 | 465 |
| 0040013 | BJORGSIANS | RANDOLPH | MA | 01 | 01 | 1,200 | 753 | 48 | | | (17) | (17) |
| | | PALATINE | IL | 01 | 01 | 1,172 | 1,189 | 735 | (75) | (94) | (64) | (64) |
| | | HOUSTON | TX | 01 | 01 | 1,168 | 1,168 | | | | (17) | (17) |
| | | DALTON | GA | 01 | 01 | 13,731 | 12,338 | | | | 12,338 | 12,338 |
| | | LONGWOOD | FL | 01 | 01 | 4,603 | 562 | 1,630 | 14 | 91 | (278) | 4,041 |
| | | FRESNO | CA | 01 | 01 | 2,385 | 1,207 | 835 | 980 | 194 | 339 | 1,777 |

| ID | Name | City | State | Code | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0040143 | PS OF SOUTHERN CALIFORNIA LLC | FULLERTON | CA | 01 | (415) | 818 | 252 | - | (1,251) | - | (133) | (1,233) |
| 0040174 | EASY GRASS LLC | MIAMI | FL | 01 | 1,722 | 1,963 | 4,384 | 8,073 | - | - | (493) | (241) |
| 0040255 | DESKMAKERS INC | COMMERCE | CA | 01 | 23,590 | 11,267 | 4,384 | - | 30 | - | (204) | 12,283 |
| 0040272 | KALEEN RUGS INC | DALTON | GA | 01 | 11,267 | 5,170 | 909 | (207) | 30 | - | 102 | 834 |
| 0040384 | VERTICAL CONNECTION INC CCA GLOBAL | COLUMBIA | MD | 01 | 6,004 | 668 | 81 | - | - | - | - | 81 |
| 0040634 | TIDAL WAVE POOL & SPA | EL PASO | TX | 01 | 749 | - | - | - | 224 | - | - | 224 |
| 0040634 | SHOWPLACE INTERIORS | SOLANA BEACH | CA | 01 | 224 | 168 | 72 | 77 | 47 | - | - | 195 |
| 0040040 | QEP CO INC | CARMEL | IN | 01 | 363 | - | - | 77 | (91) | - | (6,736) | (6,827) |
| 0040646 | A PLUS FLOORING | SAN ANTONIO | TX | 01 | 3,596 | 10,333 | - | - | - | - | - | 438 |
| 0040470 | JOHN JAMES INC | BRIDGEPORT | OH | 01 | 438 | - | - | - | - | - | - | 438 |
| 0040097 | SMITH'S CARPET | STEUBENVILLE | OH | 01 | 45 | - | - | - | - | - | - | 45 |
| 0040611 | DIRECTSOURCE INTERNATIONAL | BEAVERTON | OR | 01 | (166) | 343 | - | - | - | - | (509) | (509) |
| 0040621 | EASYCARE INC | VISTA | CA | 01 | 38 | 38 | - | - | - | - | - | - |
| 0040740 | BAILEY & ASSOCIATES LLC | CANTON | OH | 01 | 7,371 | 6,867 | - | - | (774) | - | (317) | 504 |
| 0040748 | T F ANDREW CARPET ONE FLOOR & HOM | NEW ROCHELLE | NY | 01 | 264 | 264 | 1,132 | 50 | - | - | 125 | (317) |
| 0040726 | FLOORING GALLERY OF ADDISON | PALATINE | IL | 01 | 1,791 | 484 | 184 | 0 | - | - | (164) | 51 |
| 0040877 | A & K FLOORING | MCALESTER | OK | 01 | 2,329 | 2,278 | - | 30 | - | - | 2,704 | 1,307 |
| 0040889 | GENERA FLOORING | SAN DIEGO | CA | 01 | 2,704 | 2,704 | - | - | - | - | 2,704 | 2,704 |
| 0040929 | PRESOURCE OF SPOKANE | SPOKANE | WA | 01 | 42 | - | 5 | - | - | - | (18) | 42 |
| 0040951 | WALSH CARPET & DRAPES | LAGUNA BEACH | CA | 01 | 398 | 3,651 | 95 | - | 55 | - | (280) | (34) |
| 0043085 | ENA MONTANA | PORT HADLOCK | WA | 01 | 134 | 298 | - | - | 170 | (19) | - | - |
| 0041112 | FAIRWAY FLOOR & DESIGN | POST FALLS | ID | 01 | 75 | 127 | - | - | - | - | 134 | 134 |
| 0041120 | ADVANCED CARPET | SAN ANTONIO | TX | 01 | (13) | (13) | - | - | - | - | (13) | (13) |
| 0041251 | SURFACING STRATEGIES LLC | ELLIJAY | GA | 01 | 169 | 199 | 3,350 | - | - | - | (53) | (53) |
| 0041301 | ROCKY MOUNTAIN FLOOR SYSTEMS | ASPEN | CO | 01 | 1,901 | 9,072 | 199 | - | - | - | (30) | 1,675 |
| 0041305 | SOLERAS LTD | BIDEFORD | ME | 01 | 160 | - | - | - | - | - | (1,575) | (669) |
| 0041236 | ATTILAS BAYSHORE ART | SAN FRANCISCO | CA | 01 | 297 | - | - | - | - | - | (669) | 1,901 |
| 0041258 | CARAMA HOME | MILL VALLEY | CA | 01 | 95 | 95 | - | - | - | - | 1,901 | 297 |
| 0044416 | CARPET KING CORP | SEATTLE | WA | 01 | 28,856 | 38,466 | - | (15) | - | (264) | (8,942) | (9,610) |
| 0041391 | CONVENTIONAL CARPET INC | STERLING HEIGHTS | MI | 01 | 439 | 439 | - | (15) | - | - | (122) | (122) |
| 0044416 | TRAEGER PELLET GRILLS LLC | PORTLAND | OR | 01 | 9,487 | 8,342 | 899 | - | 207 | - | 1,105 | 1,105 |
| 0041449 | CUSTOM CARPET & TILE INC | SEATTLE | WA | 01 | 30 | 30 | - | 30 | - | - | 30 | 30 |
| 0043450 | CALIFORNIA CARPET LLC | SAN CARLOS | CA | 01 | 98 | - | - | - | - | 23 | 98 | 98 |
| 0043454 | SOUTHEASTERN FREIGHT LINES INC | COLUMBIA | SC | 01 | 10,431 | 8,238 | 3,704 | - | - | - | 75 | 2,193 |
| 0041609 | BRAUNS EXPRESS | HOPEDALE | MA | 01 | (12) | - | - | - | - | - | (1,512) | (12) |
| 0041609 | BUICK DISTRIBUTORS CORP | BATON ROUGE | LA | 01 | 53 | 53 | - | - | - | - | (12) | - |
| 0041610 | OFF PRICE CARPET OUTLET | SAN JOSE | CA | 01 | 223 | 167 | - | - | - | - | 75 | 98 |
| 0041571 | U C INC | TROY | MI | 01 | 69 | 69 | - | - | - | - | 56 | 56 |
| 0041567 | EVANCREST LLC | BELLE VERNON | PA | 01 | 69 | 69 | 356 | - | - | - | 56 | 56 |
| 0041771 | PHASE FLOORING | PITTSBURGH | PA | 01 | 468 | 113 | - | - | - | - | - | - |
| 0042808 | PITTSBURGH | PITTSBURGH | PA | 01 | (1,000) | 980 | - | - | - | - | - | 356 |
| 0042808 | CARPET & FLOORING INC | MONTEREY | CA | 01 | 980 | - | 112 | - | - | - | (1,000) | (1,000) |
| 0043866 | CHAPMAN UNIVERSITY | ORANGE | CA | 01 | 53 | 53 | 112 | 53 | - | - | 53 | 53 |
| 0043869 | NEW TUBE LLC | CLERMONT | FL | 01 | (371) | (371) | - | (371) | - | - | (371) | (371) |
| 0043927 | SACCO CARPET | NEW YORK | NY | 01 | 112 | - | - | - | - | - | 112 | 112 |
| 0043943 | CASEY CARPETS | CLARKSBURG | WV | 01 | 648 | 648 | - | 648 | - | - | 648 | 648 |
| 0042005 | VIDLER CUSTOM HOMES | SORRENTO | LA | 01 | 35 | 44 | (5) | - | - | - | (4) | (9) |
| 0042020 | FLORIDA CARPET & INTERIOR | WEST PALM BEACH | FL | 01 | 25 | - | - | - | - | - | 25 | 25 |
| 0043975 | BEETLINE CARPETS INC | IRVING | TX | 01 | 201 | 201 | - | - | - | - | - | - |
| 0042262 | PITTSBURG SMITH FURNITURE | HOUSTON | TX | 01 | 25 | 122 | - | - | - | (67) | 92 | 1,194 |
| 0042274 | L & E REGISTERED INC | PITTSBURG | TX | 01 | 1,316 | 1,316 | 1,169 | - | - | - | - | 25 |
| 0042285 | MPF LLC | JOPLIN | MO | 01 | 25 | - | - | - | 25 | - | 25 | 25 |
| 0042257 | RED RIVER CARPET & TILE | PEARLAND | TX | 01 | 3,345 | 3,340 | - | (47) | 25 | - | 51 | 4 |
| 0042303 | PR IMPORTS | OKLAHOMA CITY | OK | 01 | 464 | 183 | - | - | - | - | 312 | 281 |
| 0042303 | C JAMES COLLECTION | MINDEN | NV | 01 | 38 | 13 | 13 | 13 | (126) | 95 | 312 | 25 |
| 0042525 | CARPET PALACE | PORT ORCHARD | WA | 01 | 2,022 | 2,022 | - | - | - | - | - | - |
| 0042552 | | | | | | | | | | | | |
| 0042620 | | BETHESDA | MD | 01 | 2,022 | 2,022 | - | - | - | - | - | - |

| Account | Company | City | ST | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0042666 | BANKTIARI INVESTMENTS | SAN RAFAEL | CA | 01 | 152 | 152 | | | | |
| 0092801 | ADVANCED FLOORING SOLUTIONS | DENVER | CO | 01 | 135 | 135 | | | | |
| 0042848 | JMC/WHEATLAND | ORMOND BEACH | FL | 01 | 1,450 | | | | | 1,450 |
| 0042850 | DICK'S WHOLESALE CPT WHSE INC | OAKLAND | CA | 01 | 52 | 52 | | | | |
| 0043571 | FRANCYS CORP CCA GLOBAL | FREDERICK | MD | 01 | 465 | 245 | 254 | | | |
| 0043180 | NO MFG CORPORATIONS | KENT | WA | 01 | 50 | 245 | | 45 | (45) | 50 |
| 0043195 | CONTOUR COUNTERTOPS | BLOOMSBURG | PA | 01 | 30 | 30 | | | | 20 |
| 0043197 | BLOOMSBURG CARPET | WICHITA | KS | 01 | 33,010 | 31,880 | 3,419 | (60) | (817) | (1,371) |
| 0043238 | MILL CREEK | BALTIMORE | MD | 01 | 57 | 57 | | | | 57 |
| 0043514 | RITA ST CLAIR | COLCORD | OK | 01 | 877 | | | (404) | | (404) |
| 0043555 | DESIGNER TILE | ORLANDO | FL | 01 | 877 | 2,551 | | 65 | | 877 |
| 0043669 | L & S LOGISTIC SERVICES INC | STILLWATER | OK | 01 | 3,636 | 48 | 1,218 | (398) | | (404) |
| 0043769 | BROONERS FLOOR CENTER INC | FIFE | WA | 01 | 48 | | | | | 1,085 |
| 0043798 | SUSTAINABLE FLOORS | SAN DIEGO | CA | 01 | (38) | (38) | | | (38) | (38) |
| 0043834 | BARNETTS CRENSHAW CARPET CENTER | LOS ANGELES | CA | 01 | 5 | | 5 | 5 | | |
| 0043878 | CARPET TILE & FLOORING DEPOT | BETHESDA | MD | 01 | 147 | 60 | | 87 | | 87 |
| 0043884 | C CUT & SON INC | TACOMA | WA | 01 | 2,552 | 2,336 | 216 | | | 216 |
| 0043918 | KIRSHAN CO ORIENTAL RUGS | SALEM | OR | 01 | (115) | | | | (115) | (115) |
| 0043978 | LEGISLATIVE ADMINISTRATION | ADA | OK | 01 | 120 | | | | | |
| 0042029 | JOHN P ENTERPRISES | BEDFORD | PA | 01 | 840 | 303 | | 291 | | 291 |
| 0044054 | BEDFORD CARPETS INC | SAN ANTONIO | TX | 01 | 549 | | | 91 | | 91 |
| 0044133 | WAGNER INTERIORS | COLORADO SPRINGS | CO | 01 | 83 | 84 | | | | 175 |
| 0044113 | PROSOURCE OF COLORADO SPRINGS | ALGONA | MN | 01 | 259 | 3,245 | 119 | | | |
| 0044167 | INTERIOR VISIONS | ROSEMOUNT | NY | 01 | 3,245 | 1,579 | | 1,352 | | 1,473 |
| 0044216 | MICHELANGELO PUTTING GREENS | HICKSVILLE | NY | 01 | 1,670 | 49 | | | | 91 |
| 0044256 | WEAVE TUFT CARPET | LOS ANGELES | CA | 01 | 1,473 | 697 | 1,303 | (543) | 113 | 822 |
| 0044406 | INTERNATIONAL FLOORING | SAINT LOUIS | MO | 01 | 871 | 15,962 | 302 | | (141) | 771 |
| 0044411 | KAIM KISNER SHOWROOM | KANSAS CITY | MO | 01 | 19,089 | 271 | 63 | | | 3,127 |
| 0044493 | FLOORS DIRECT OF KANSAS CITY | EUFAULA | OK | 01 | 494 | 132 | 41 | | | 223 |
| 0044500 | MURRY CARPETS INC | CITRUS HEIGHTS | CA | 01 | 173 | | | | | 41 |
| 0044657 | HORNER FLOORING & WINDOW COVERING | PORT WASHINGTON | NY | 01 | 130 | 130 | 130 | | | 130 |
| 0044600 | ABBEY CPT OF PORT WASHINGTON | KEASEY | NJ | 01 | 303 | 303 | | | | |
| 0044046 | FROMKIN BROTHERS INC | AZUSA | CA | 01 | 10 | 10 | | | | |
| 0044816 | MCWILLIAM & SON INC | CONROE | TX | 01 | (139) | | | (139) | | (139) |
| 0044979 | NORTHWEST INTERIORS INC | CRANSTON | RI | 01 | 846 | 1,647 | 846 | | (2,942) | (2,095) |
| 0044987 | KARPET KLINIC | CHESTERFIELD | MO | 01 | (449) | 370 | 264 | | | 264 |
| 0045040 | CROWN PACKAGING CORP | VAN NUYS | CA | 01 | 634 | 155 | | | | |
| 0045079 | NALCO INC | SANTA MONICA | CA | 01 | 155 | 48 | | | | |
| 0045119 | CARPET SHOWCASE | JACKSONVILLE | FL | 01 | 48 | | | | | |
| 0045146 | DAVE MILLER INC | CARLSBAD | CA | 01 | 941 | 941 | | | 941 | 941 |
| 0045159 | GRAND PACIFIC RESORTS | ALPHARETTA | GA | 01 | 56 | 56 | 56 | 6 | 6 | 56 |
| 0052658 | STARPRO GREENS INC | LITTLE ROCK | AR | 01 | 6 | | | | | 6 |
| 0045287 | CARPET MILLS | NICOMA PARK | OK | 01 | 128 | 128 | 128 | | | 128 |
| 0045299 | TOTAL FLOOR COVERING | WOBURN | MA | 01 | 248 | | | | | |
| 0045304 | PAVILION FLOORS INC | VANCOUVER | BC | 01 | (1,505) | 784 | 758 | 566 | 1,449 | (1,505) |
| 0045377 | COLIN CAMPBELL & SONS | HUMBLE | TX | 01 | 3,471 | | 566 | | | 2,587 |
| 0045328 | COLORBRITE CARPET INC | SACRAMENTO | CA | 01 | 1,080 | 131 | | | | (85) |
| 0045389 | STATEWIDE SUPPLY | TAMPA | FL | 01 | 208 | 4,545 | 77 | | | 1,080 |
| 0045382 | ONE WORLD HOME/REVOLUTION MILLS | VANCOUVER | WA | 01 | 4,748 | 97 | | | | 77 |
| 0045377 | BCC CARPET SALES & INSTALLATION | CITRUS HEIGHTS | CA | 01 | 385 | | | | | 202 |
| 0045426 | D & D AREA RUGS | AUSTIN | TX | 01 | 684 | 795 | 48 | | | 105 |
| 0045409 | BEAUMONT CARPET, INC | BEAUMONT | TX | 01 | 278 | 278 | | | | 385 |
| 0045449 | C & W CARPET HOUSE | SOUTH WILLIAMSON | KY | 01 | 3,002 | 1,724 | 544 | (65) | (465) | 385 |
| 0045550 | RITE CARPET & DECORATING | BRIDGEPORT | CT | 01 | 400 | 400 | | (13) | | (111) |
| 0045604 | STATEWIDE SUPPLY | CHARLES TOWN | WV | 01 | 150 | | | | | 150 |
| 0045529 | C T WALL & FLOORS | | WV | 01 | (20) | | 62 | | | (20) |
| 0045603 | MAJESTIC FLOORS & DESIGN INC | SALT LAKE CITY | UT | 01 | 188 | | | | | 188 |
| | | | | | 164 | 164 | | | | 1,278 |
| | | | | | 91 | 91 | 91 | | | 91 |
| | | | | | 551 | 551 | | | 551 | 551 |

| Account | Company | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0045650 | CARPETBAGGER, LTD | WILLISTON | VT | 01 | 01 | 1,542 | 302 | 540 | 245 | | 1,239 |
| 0045696 | FLOOR CONNECTION | ARROYO GRANDE | CA | 01 | 01 | 270 | 270 | 270 | | | 270 |
| 0045728 | OZARK FLOOR COMPANY | FAYETTEVILLE | AR | 01 | 01 | 56 | 57 | | | | (1) |
| 0045780 | BIG D FLOOR COMPANY | ALBUQUERQUE | NM | 01 | 01 | 768 | | | | (732) | (732) |
| 0045763 | H R A LLC | GLENWOOD SPRINGS | CO | 01 | 01 | 2,760 | 581 | 188 | (1) | | 188 |
| 0045762 | BUSINESS FLOORING | LITTLE ROCK | MO | 01 | 01 | 530 | 355 | 85 | | 50 | 175 |
| 0045764 | S E ARNOLD & COMPANY INC | LAUREL | AR | 01 | 01 | 1,213 | 769 | | 444 | | 444 |
| 0045813 | HARRY STREET CARPET & TILE | WICHITA | KS | 01 | 01 | 800 | 729 | 84 | | | 72 |
| 0045848 | LECHMERE RUG CO | CAMBRIDGE | MA | 01 | 01 | 144 | 173 | | | | 229 |
| 0045880 | CARPET DEPOT | LOVELAND | OH | 01 | 01 | 796 | 567 | | | | 43 |
| 0045931 | HAMADS TOUCH OF COLOR INC | HARRISBURG | PA | 01 | 01 | 61 | 244 | | | (12) | (12) |
| 0046006 | CARPET FACTORY INC | HARRISBURG | PA | 01 | 01 | 489 | 103 | 43 | | (29) | (29) |
| 0046005 | BAKERSFIELD FLOOR COVERING | MOUNTAIN HOME | AR | 01 | 01 | 25 | | | | (15) | (15) |
| 0046110 | CAMEO FLOOR COVERING | BAKERSFIELD | CA | 01 | 01 | (1,490) | 97 | 109 | 357 | (620) | 16 |
| 0046123 | EASTSIDE CARPET COMPANY | ORANGEVALE | CA | 01 | 01 | 328 | 312 | | 170 | | |
| 0046160 | POWERCOM AMERICAN INC | ANCHORAGE | AK | 01 | 01 | 284 | 25 | | | (1,490) | (1,490) |
| 0046077 | POWER CARPET ONE | ONTARIO | CA | 01 | 01 | (297) | | | | (297) | (297) |
| 0046262 | RG COSTUMES & ACCESSORIES INC | RANCHO MIRAGE | CA | 01 | 01 | 153 | 153 | | | | 16 |
| 0046271 | HD SUPPLY FACILITIES MAINTENANCE | COVINA | CA | 01 | 01 | 89 | 89 | | | | 48 |
| 0046324 | CARPET INC | SAN ANTONIO | TX | 01 | 01 | 622 | 279 | 54 | 319 | (30) | 343 |
| 0046098 | UNISHIPPERS ASSOCIATION INC | ORLANDO | FL | 01 | 01 | (51) | | | | (51) | (51) |
| 0046351 | MR DAVIDS CARPET SERVICE LTD | BEDFORD | NH | 01 | 01 | 24 | 24 | 48 | | | 48 |
| 0046279 | ALBANY TILE SUPPLY CO INC | CONCORD | CO | 01 | 01 | 1,334 | 1,334 | | | | 343 |
| 0046488 | GEORGE GOEDECKE & SON INC | PUEBLO | CO | 01 | 01 | 3,396 | 1,885 | 11,700 | 844 | 135 | 12,092 |
| 0046483 | SAMS CARPET ONE FLOOR & HOME INC | FREMONT | CA | 01 | 01 | 68,555 | 31,905 | 2,251 | 1,104 | 420 | 6,212 |
| 0046521 | PS WHOLESALE FLOORCOVERING/BAY AREA | SIOUX FALLS | SD | 01 | 01 | 249 | 148 | 48 | | (584) | 48 |
| 0046556 | POLY GRASS | HOUSTON | TX | 01 | 01 | 148 | 148 | | | (4) | 102 |
| 0046596 | MONTGOMERYS FURNITURE INC | LA PUENTE | CA | 01 | 01 | 281 | 281 | 18,795 | | | 37,050 |
| 0046598 | REXCO DISTRIBUTION LLC | COLVILLE | WA | 01 | 01 | (429) | | 25 | 77 | (242) | 1,511 |
| 0046610 | BENTLEY MILLS INC | HARRISON | AR | 01 | 01 | | 31,905 | 19,880 | 1,511 | (1,404) | 1,511 |
| 0046650 | GETTIS DISCOUNT FLOORING | ASHLAND | KY | 01 | 01 | 2,183 | 410 | 23 | | | (429) |
| 0046666 | WATTS & WEBB FLOORCOVERING INC | STREAMWOOD | IL | 01 | 01 | 360 | 360 | | 638 | 243 | 1,773 |
| 0046724 | HOMETOWN CARPET OUTLET | ALLEN | TX | 01 | 01 | 4,646 | 4,301 | 345 | 290 | | 290 |
| 0046705 | DARY CARPETS | EAST BRUNSWICK | NJ | 01 | 01 | 59 | 59 | | | (429) | (429) |
| 0046819 | RODENBAUGH'S, INC. | LOVELAND | CO | 01 | 01 | 4,298 | 1,063 | 824 | 579 | | 345 |
| 0046850 | THE GILLESPIE GROUP | OAK BROOK | IL | 01 | 01 | 318 | 318 | 20 | 212 | 1,543 | 3,236 |
| 0046857 | LOVELAND DESIGN CENTER INC | SAN ANTONIO | TX | 01 | 01 | (228) | | | 20 | 636 | 636 |
| 0046922 | FLOORING SOLUTIONS | ROCKVILLE | MD | 01 | 01 | 93 | 91 | | | (228) | (228) |
| 0046971 | SPS DESIGNS INC | SAINT MICHAELS | MD | 01 | 01 | 762 | 3,018 | 85 | 713 | | 12,899 |
| 0046989 | CARPET PALACE | DALTON | GA | 01 | 01 | 63 | 354 | 37 | 286 | (1,404) | 408 |
| 0046985 | HIGGINS & SPENCER INC | SAN ANTONIO | TX | 01 | 01 | 44,373 | 31,474 | 63 | | (2,738) | (2,025) |
| 0047002 | X-GRASS WORLDWIDE TURF SOLUTIONS | ROCHESTER | NY | 01 | 01 | 1,709 | 926 | 686 | 448 | (2,738) | (2,738) |
| 0047132 | CLASS COVERS AND COLOR | CARROLLTON | TX | 01 | 01 | 2,342 | 2,052 | 105 | (244) | | 290 |
| 0047139 | MADISON & DUNN INC | DALLAS | TX | 01 | 01 | 2,103 | 358 | 580 | | 884 | 1,745 |
| 0047162 | ADELTA | NORTH READING | MA | 01 | 01 | 851 | 466 | 385 | 576 | (289) | 290 |
| 0047212 | CLIFTON CARPETS | TORRANCE | CA | 01 | 01 | 771 | 729 | | | 5,558 | 1,745 |
| 0047296 | JULIE INDUSTRIES INC | GAITHERSBURG | MD | 01 | 01 | 1,598 | 1,627 | 65 | | 136 | 385 |
| 0047282 | BANNER CARPETS & DRAPES INC | FORT SMITH | AR | 01 | 01 | 82 | | | | 42 | 42 |
| 0047355 | ALFORDS HOUSE OF CARPETS, INC | BOYNTON BEACH | FL | 01 | 01 | 48 | 48 | | | (94) | (29) |
| 0047335 | ALADDIN CARPET & FLOORS | CORPUS CHRISTI | TX | 01 | 01 | 49 | | 49 | | 82 | 82 |
| 0047341 | CAPITOL CARPET INC | HUDSON | OH | 01 | 01 | | | | | | 385 |
| 0047353 | ALLISON CORPORATION | NORWICH | CT | 01 | 01 | | | | | (104) | 49 |
| 0047370 | CALLAHANS CARPET HOUSE INC | DALTON | GA | 01 | 01 | (194) | | | | | (194) |
| 0047393 | NEW ENGLAND CARPET KING & TILE INC | GRAPEVINE | TX | 01 | 01 | (104) | | | | | (104) |
| 0047138 | DYNASTY CARPET & RUG CO INC | | | 01 | 01 | | | | | | |
| 0047445 | AIR DELIVERY EXPRESS | | | 01 | 01 | | | | | | |

| ID | Creditor Name | City | ST | Code | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0047454 | IDEAL FLOOR COVERING INC | ROCHESTER | MI | 01 | 5,431 | 1,054 | 4,376 | . | . | . | 4,376 |
| 0047629 | FFO OCALA LLC | OCALA | FL | 01 | 94 | 94 | . | . | . | . | . |
| 0047670 | SIERRA SUNRISE LTD | AUBURN | CA | 01 | 134 | 134 | . | . | . | (126) | (126) |
| 0047713 | TEXAS FLOOR SERVICE LTD | HOUSTON | TX | 01 | 8 | . | . | . | . | (10) | (10) |
| 0047717 | FLOOR COVERINGS INTERNATIONAL LLC | CHINO | CA | 01 | 4,772 | 3,532 | 1,249 | . | . | . | 1,240 |
| 0047719 | STANZA INTERNATIONAL LLC | DALTON | GA | 01 | 360 | 360 | . | . | . | . | . |
| 0047739 | 0P SALES INC | SANTA YNEZ | CA | 01 | 7,159 | 705 | . | 860 | 1,192 | 2,336 | 7,159 |
| 0047764 | BRENT & JEFFS FLOORING | DALTON | GA | 01 | 924 | 401 | . | 182 | . | . | 522 |
| 0047788 | BEAR CARPET ONE FLOOR & HOME | SUGARCREEK | OH | 01 | 856 | 325 | . | 76 | . | 57 | 527 |
| 0047855 | CUNNINGHAMS CARPETS, INC. | ARDMORE | OK | 01 | 2,069 | 1,891 | 121 | . | . | . | 178 |
| 0047915 | CLOISTER FLOORING INC | EPHRATA | PA | 01 | 555 | 555 | . | . | . | . | . |
| 0047943 | DEATONS CARPET ONE | JACKSON | OH | 01 | 72 | 72 | . | . | . | . | . |
| 0048006 | BOTTOM PRICE FLOORING & SUPPLY | SAN DIEGO | CA | 01 | 167 | 167 | . | . | . | . | . |
| 0048161 | EWING IRRIGATION PRODUCTS INC | PHOENIX | AZ | 01 | (385) | . | . | . | . | (385) | (385) |
| 0048255 | PIONEER HOME SUPPLY | BELMONT | CA | 01 | 88 | . | 81 | . | . | . | (16) |
| 0048313 | BRADFORD CARPET ONE | SAUGUS | MA | 01 | 104 | . | (98) | . | . | . | . |
| 0048339 | INTERIOR TRADE CARTEL | SAN ANTONIO | TX | 01 | 285 | 159 | . | . | . | 127 | 127 |
| 0048386 | LR RESOURCES | DALTON | GA | 01 | 33 | 91 | . | . | . | (57) | (57) |
| 0048406 | DELSTAR | ROSWELL | GA | 01 | 240 | . | . | . | . | 240 | 240 |
| 0048412 | SKILLBUILDER INC | TULSA | OK | 01 | (286) | . | . | . | . | (286) | (286) |
| 0048424 | TROY WARD & ASSOCIATES INC | CALHOUN | GA | 01 | (87) | . | . | . | . | (87) | (87) |
| 0048431 | SPOTLINE INTERNATIONAL INC | NATIONAL CITY | CA | 01 | 200 | 200 | . | . | . | . | . |
| 0048435 | SHOWCASE INTERIORS | ELIZABETHTON | TN | 01 | 110 | 84 | . | . | . | . | 110 |
| 0048437 | EDENS BROTHERS MSR INC | FORT COLLINS | CO | 01 | 388 | 388 | . | . | . | . | . |
| 0048458 | EHEART INTERIOR SOLUTIONS | OCALA | FL | 01 | 3,641 | 3,641 | . | 835 | . | . | . |
| 0048464 | GILBERT FLOORING INC | TORRANCE | CA | 01 | 2,295 | 2,295 | 1,226 | 263 | . | . | 1,226 |
| 0048587 | DTM SERVICE INC | CROSSETT | AR | 01 | 209 | 209 | . | . | . | . | 209 |
| 0048633 | FINISHING TOUCH CARPET ONE FLOOR & | MONTROSE | CO | 01 | 1,483 | 1,068 | . | 1,227 | . | . | 1,227 |
| 0048632 | MONTROSE MARKETING INC | IRVING | TX | 01 | 492 | 257 | . | . | . | 492 | 492 |
| 0048633 | CARPET SERVICES INC | REXBURG | ID | 01 | 84 | 84 | . | . | . | . | . |
| 0048658 | A I C CONTRACTION INC | HAMILTON | OH | 01 | 110 | . | 53 | . | . | 57 | 57 |
| 0048687 | TRUCK AIR OF THE CAROLINAS | GREER | SC | 01 | 984 | 778 | . | . | . | . | . |
| 0048707 | NATIONAL CARPET MILL OUTLET | WOOSTER | OH | 01 | 3,838 | 461 | . | . | . | . | 206 |
| 0048735 | MAGNOLIA CARPET ONE INC | MAGNOLIA | AR | 01 | 4,051 | 176 | . | 45 | . | . | (213) |
| 0048775 | SAN MATEO CARPETS INC | SAN MATEO | CA | 01 | 185,462 | 158,953 | 21,313 | . | . | . | . |
| 0048862 | IVC US | DALTON | GA | 01 | 103 | 103 | . | 362 | 3,041 | 1,423 | 26,509 |
| 0048875 | L & R ENTERPRISES INC | HYATTSVILLE | MD | 01 | 1,019 | 1,022 | . | . | . | . | 370 |
| 0048881 | WOOLSHIRE CARPET MILLS INC | CALHOUN | GA | 01 | 103 | . | . | . | . | . | (3) |
| 0048890 | PROFUSION COSMETICS | POMONA | CA | 01 | 1,769 | 1,769 | . | 84 | . | 137 | 1,769 |
| 0048900 | FLOOR COVERING LABOR HOUSE LLC | VIENNA | VA | 01 | 8,070 | 880 | 440 | 201 | 880 | 960 | 7,190 |
| 0048907 | SOLARA FLOORING LLC | ANNAPOLIS JUNCTION | MD | 01 | (495) | (495) | . | . | . | . | (495) |
| 0049100 | WOLCOTTS FLOOR COVERING | HUTCHINSON | KS | 01 | 48 | 48 | . | . | . | . | (18) |
| 0049188 | PLATEAU FLOORS TO GO | ENUMCLAW | WA | 01 | (12) | 67 | . | . | . | . | (18) |
| 0049318 | MERKEL BROTHERS INC | CHELSEA | OK | 01 | 122 | 122 | . | 45 | . | . | (12) |
| 0049321 | FLOOR PARTNERS IN DESIGN | HALTOM CITY | TX | 01 | (48) | . | . | . | . | . | (48) |
| 0049331 | CARPET STORE LLC | BIG SPRING | TX | 01 | 248 | 248 | . | . | . | . | 268 |
| 0049516 | AUSTIN FINE FLOORS INC | AUSTIN | TX | 01 | (101) | . | . | . | (149) | . | (101) |
| 0049535 | LOWES CORPORATE OFFICE #7547/6 | NORTH WILKESBORO | NC | 01 | 11,878 | 488 | 2,880 | 275 | 83 | 273 | 2,205 |
| 0049629 | MARATHON BUILDING ENVIRONMENTS INC | COLUMBIA | MO | 01 | 488 | 488 | . | 48 | . | . | 5,716 |
| 0049659 | INTERIORS ONLY, INC. | CONWAY | AR | 01 | 45 | 45 | . | . | . | . | 45 |
| 0049674 | JR SALES REPS INC | LOGAN | UT | 01 | 2,326 | 1,849 | 477 | . | . | 4,910 | 2,205 |
| 0049730 | ABBEY CARPET | SAN CARLOS | CA | 01 | 361 | 295 | 66 | . | . | 268 | 66 |
| 0049740 | JONES CARPET MART INC | PENSACOLA | FL | 01 | 43 | . | 43 | . | . | (18) | 43 |
| 0049742 | BEE JAY CARPET INC/WALLPAPER STUDIO | LANSDALE | PA | 01 | 42 | 42 | . | . | . | (12) | 43 |
| 0049730 | AMERICAN WEST FLOORING | FOLSOM | CA | 01 | (793) | (793) | . | . | . | (300) | (793) |
| 0049740 | KIRKSVILLE CARPET ONE FLOOR & HOME | KIRKSVILLE | MO | 01 | 1,272 | 270 | . | 494 | 318 | 183 | 1,002 |
| 0049886 | MARVA FLOORS LLC | OWINGS | MD | 01 | 4,454 | 1,290 | . | . | 1,975 | 1,169 | 3,144 |

| Acct # | Company | City | ST | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0049964 | CARPETS BY PHILLIPS | OCEANSIDE | CA | 01 | 01 | 638 | | 64 | 114 | 285 | 176 | 638 |
| 0050029 | CARPET BROKERS INC | COLLEYVILLE | TX | 01 | 01 | 426 | | | | | 104 | 104 |
| 0050057 | DOCKERY KING INC | JOHNSON CITY | TN | 01 | 01 | 104 | | | | | 313 | 313 |
| 0050093 | A-1 FLOOR COVERING INC | AMARILLO | TX | 01 | 01 | 248 | 87 | | | | (167) | (79) |
| 0050123 | CARPET ONE GLENWOOD SPRINGS | GLENWOOD SPRINGS | CO | 01 | 01 | 319 | | 87 | | | 87 | 87 |
| 0050161 | ALDENS CARPETS | GLENWOOD SPRINGS | CO | 01 | 01 | 168 | | | | | | 359 |
| 0050214 | VEDA DESIGN LTD | LEXINGTON | KY | 01 | 01 | 406 | | | | | | 87 |
| 0050276 | ESTES EXPRESS | RICHMOND | VA | 01 | 01 | 359 | 141 | | | 73 | (363) | 359 |
| 0050281 | AREA FLOORS LLC | PORTLAND | OR | 01 | 01 | 264 | | (39) | 145 | | (324) | (363) |
| 0050312 | R & L CLASSIQUE FLOORS | PORTLAND | OR | 01 | 01 | (363) | | 421 | | | (108) | |
| 0050338 | M & M CARPET SHOWROOM | HOUSTON | TX | 01 | 01 | 1,346 | | | 25 | | | |
| 0050344 | GILL CARPET OF SOUTHAMPTON | SOUTHAMPTON | | 01 | 01 | 25 | | | | | (45) | 25 |
| 0050345 | ABSOLUTE FLOORING & INTERIORS | SANTA FE | NM | 01 | 01 | 758 | 803 | | | | (45) | (45) |
| 0050353 | ARIZONA HARDWOOD FLOOR SUPPLY INC | PHOENIX | AZ | 01 | 01 | 557 | 152 | 101 | | | (97) | |
| 0050483 | A & H HOME PRODUCTS | LAS CRUCES | NM | 01 | 01 | 712 | 407 | 332 | 49 | | 270 | 651 |
| 0050490 | ASPEN | ASPEN | CO | 01 | 01 | 1,059 | 1,288 | | | | | |
| 0050499 | FOREVERLAWN INC | ALBUQUERQUE | NM | 01 | 01 | 1,288 | | | | | 1,609 | 1,609 |
| 0050508 | ACTION DISCOUNT CARPET | ALBUQUERQUE | NM | 01 | 01 | 1,609 | 390 | 390 | | | 390 | 390 |
| 0050520 | ALL OF STATE CARPET & TILE | MIDLAND | TX | 01 | 01 | 390 | 1,200 | | | | 1,116 | 1,116 |
| 0050549 | CARPET WAREHOUSE OUTLET | LORAIN | OH | 01 | 01 | 1,326 | 111 | 122 | 122 | | 122 | 122 |
| 0050552 | SPAN ALASKA CONSOLIDATORS | AUBURN | WA | 01 | 01 | (166) | (370) | | | | (603) | (370) |
| 0050571 | BROADWAY CARPETS | SEASIDE | CA | 01 | 01 | 9,738 | 8,860 | 490 | 513 | | (166) | (166) |
| 0050622 | B & B CARPET CO INC | ALAMOGORDO | NM | 01 | 01 | 95 | 95 | 56 | | | (125) | 878 |
| 0050632 | RAVENNA INTERIORS INC | SEATTLE | WA | 01 | 01 | 713 | 503 | 154 | 25 | 34 | 125 | 210 |
| 0050656 | RAVE CARPET | RUIDOSO | NM | 01 | 01 | 175 | 25 | 25 | 25 | | 125 | 175 |
| 0050668 | BARNETT CARPETS INC | NORTH AURORA | IL | 01 | 01 | 2,071 | 2,071 | | | | | 210 |
| 0050683 | ASPEN TILE & BATH | FEASTERVILLE | PA | 01 | 01 | 83 | 83 | 390 | | | | |
| 0050688 | DOUGLAS CARPET ONE FLOOR & HOME | NEWHALL | CA | 01 | 01 | 6,591 | 2,283 | 1,335 | 877 | 2,232 | (137) | 4,307 |
| 0050706 | FLOOR ASSOCIATES INC | PUYALLUP | WA | 01 | 01 | 1,407 | 1,647 | | | | (240) | (240) |
| 0050710 | BRENTS CARPET ONE | DALTON | GA | 01 | 01 | 555 | 555 | | | | | |
| 0050732 | SIGNATURE CARPET | PHILADELPHIA | PA | 01 | 01 | 149 | | 157 | | 149 | 149 | 149 |
| 0050775 | CARPETING UNLIMITED | ADAIRSVILLE | GA | 01 | 01 | 396 | 239 | (48) | | 157 | 157 | 157 |
| 0050786 | INTERIORS NORTHWEST INC | GREEN BAY | WI | 01 | 01 | 751 | 765 | | 220 | (325) | (14) | (14) |
| 0050853 | DALTON | ESCANABA | MI | 01 | 01 | 2,048 | 2,373 | | 208 | 28 | (325) | (325) |
| 0050864 | BOS PALLETS INC | WOOD DALE | IL | 01 | 01 | 274 | 38 | | 242 | | | 236 |
| 0050923 | H J MARTIN & SON INC | CONCORD | | 01 | 01 | 220 | | 2,694 | | | | 220 |
| 0050951 | CARPET & DRAPERY SHOP | LITTLE ROCK | AR | 01 | 01 | 3,033 | 97 | | | | | 2,936 |
| 0051019 | KRAFTEX FLOOR | BRANDON | FL | 01 | 01 | 96 | 96 | | | | | |
| 0051037 | TOM DUFFY CO | MADISON | WI | 01 | 01 | 5,824 | 4,680 | 1,156 | | | (5,821) | (5,052) |
| 0051043 | LLOYDS CARPET WORLD INC | OXNARD | CA | 01 | 01 | 1,182 | 777 | 405 | (12) | | (29) | 27 |
| 0051048 | FOREVERLAWN OF TAMPA BAY | OXNARD | CA | 01 | 01 | 42 | 42 | | | | | 405 |
| 0051061 | HORTONS CARPETS | WEST HOLLYWOOD | CA | 01 | 01 | 6,731 | 11,783 | 769 | | 56 | 1,673 | 4,664 |
| 0051076 | SERGENHANS FLOORCOVERINGS | DALTON | GA | 01 | 01 | 27 | 421 | 558 | 713 | 1,204 | 829 | 829 |
| 0051077 | TNHKHL INC | HOUSTON | TX | 01 | 01 | 5,075 | 65 | 507 | | | (905) | (118) |
| 0051085 | ADVANCED SYNTEC | BOCA RATON | FL | 01 | 01 | 893 | 10,163 | 787 | 155 | | 89 | 1,076 |
| 0051116 | CARL MARIAS CARPET | DALTON | GA | 01 | 01 | 10,044 | 229 | 375 | | 279 | 390 | 669 |
| 0051117 | BECKLERS CARPET OUTLET | YUKON | OK | 01 | 01 | 1,304 | | | | (50) | (526) | (1,360) |
| 0051133 | BOATMAN FLOOR CO INC | TULSA | OK | 01 | 01 | 669 | 8,952 | (703) | (82) | | (20) | (20) |
| 0051140 | HOUSE OF FLOORS | DALTON | GA | 01 | 01 | 7,592 | 8,595 | | | 492 | 579 | 1,071 |
| 0051142 | CHALLENGER IND INC | TONTITOWN | AR | 01 | 01 | 1,104 | 1,124 | 177 | (1,114) | | (7,047) | (7,985) |
| 0051143 | DAVIS CARPET | DALTON | GA | 01 | 01 | 1,071 | | | | | | |
| 0051146 | CARROLLS COMMERCIAL FLOORS INC | BARTLESVILLE | OK | 01 | 01 | 610 | 116 | | | | | |
| 0051157 | M & M TILE CO INC | STRAATSBURG | NY | 01 | 01 | 116 | | (9) | 93 | | (103) | (112) |
| 0051170 | NORTHWEST CARPETS INC | SCOTT | AR | 01 | 01 | 2,596 | 2,596 | | | | 370 | |
| 0051157 | FOSTER FLOORING | | | 01 | 01 | 31 | | | | | | |
| 0051157 | DELTA FLOORING SYSTEMS INC | | | 01 | 01 | 2,117 | 143 | 1,559 | | | 365 | 365 |
| 0051170 | QUALITY HOUSE INTERIORS INC | DURANGO | CO | 01 | 01 | 365 | 365 | | | | | 1,982 |

| ID | Name | City | ST | 01 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0051177 | C H ROBINSON WORLDWIDE INC | CHICAGO | IL | 01 | 31,103 | 20,781 | 3,428 | 1,781 | 4,960 | (1,546) | 10,322 |
| 0051180 | LARRYS CARPET | FORT WORTH | TX | 01 | 298 | 298 | | | | | |
| 0051131 | CHRISTIAN WHOLESALE DISTRIBUTORS | DALLAS | TX | 01 | 1,355 | | | | | 1,355 | 1,355 |
| 0051196 | ARTISTIC FLOORCOVERING | LENEXA | KS | 01 | 397 | 397 | | | | | |
| 0051205 | RIVER RUN LOGISTICS | TRENTON | GA | 01 | (310) | | | | | (310) | (310) |
| 0051221 | CONKLIN BROS | SANTA ROSA | CA | 01 | 587 | 587 | | | | | |
| 0051223 | R & G FLOORING INC | CALIFORNIA | CA | 01 | 341 | 341 | | | | | |
| 0051237 | CONKLIN BROS | MEMPHIS | TN | 01 | 279 | 279 | | | | | |
| 0051253 | R & G FLOORING INC | SAN FRANCISCO | CA | 01 | 468 | 527 | | | | | |
| 0051279 | CONKLIN BROTHERS INC | CARROLLTON | TX | 01 | 46 | 46 | | | | | |
| 0051280 | COMMERCIAL INTERIOR FINISHES LLC | SEMMES | AL | 01 | 89 | 46 | | 43 | | | 43 |
| 0051290 | ALADDIN CARPET INC | MEMPHIS | AL | 01 | (49) | | | | | (49) | (49) |
| 0051299 | NATIONAL CARPET & FLOORS | MEMPHIS | TX | 01 | 2,277 | 1,979 | 198 | | | | |
| 0051306 | PERFECT TURF LLC | WOOD DALE | IL | 01 | 559 | 704 | | | (88) | | |
| 0051336 | CARLS FLOORING | PRYOR | OK | 01 | 102 | 102 | | | | (145) | (145) |
| 0051345 | SOONER CARPET | BARTLESVILLE | OK | 01 | 187 | 96 | 92 | | | 30 | 298 |
| 0051356 | FORT LEE | FORT LEE | NJ | 01 | 14,194 | 11,525 | 4,390 | 114 | | (1,636) | 2,669 |
| 0051359 | LUBBOCK CARPET WORLD 1 INC | LUBBOCK | TX | 01 | 179 | 107 | 71 | | | | 71 |
| 0051365 | L A CARPET BROKER INC | MOBILE | AL | 01 | 2,801 | 2,801 | | | | 2,801 | 2,801 |
| 0051397 | CONTRACT FLOORS | NORTH LITTLE ROCK | AR | 01 | 333 | 62 | 71 | | | | 71 |
| 0051406 | SHARP FLOORS | GARLAND | TX | 01 | 1,012 | 451 | 973 | | (26) | (335) | 561 |
| 0051407 | CARPET BARN INC | FALMOUTH | MA | 01 | 62 | 61 | 71 | | | | 71 |
| 0051419 | SOCAL SYNTHETIC LAWNS | VISTA | CA | 01 | 451 | 451 | | | | | |
| 0051427 | CORONADO PAINT & DECORATING | SANTA FE | NM | 01 | 4,634 | 3,451 | 2,522 | (6) | (34) | (39) | 1,183 |
| 0051434 | CROWN CARPET | GRESHAM | OR | 01 | 626 | 626 | | | | | |
| 0051445 | CARPET PILE OF TEXAS | EL PASO | TX | 01 | 2,418 | 2,418 | | | | | |
| 0051457 | WORKSPACE SOLUTIONS LLC | OKLAHOMA CITY | OK | 01 | 340 | 476 | (136) | | | (136) | (136) |
| 0051459 | DELTA SOUTHERN INC | RIDGELAND | MS | 01 | (207) | | | | | (207) | (207) |
| 0051462 | MANSCH ENTERPRISES INC | LOWELL | AR | 01 | 10 | 42 | | | | (32) | (32) |
| 0051469 | J CLANCY INC | SALEM | OR | 01 | 1,298 | 1,298 | | | | 1,298 | 1,298 |
| 0051481 | CARPETS AND FLOORING INC | SAGINAW | OR | 01 | (54) | (54) | | | | (74) | (74) |
| 0051498 | METRO CARPET & TILE | TULSA | TX | 01 | 69 | 49 | 132 | | (52) | (54) | (54) |
| 0051526 | PROSOURCE OF TULSA | TULSA | OK | 01 | 1,899 | 1,900 | | (5) | | (342) | (1) |
| 0051533 | DFW INC | MARIEVALE | OK | 01 | 121 | 42 | | | (11) | (186) | (74) |
| 0051539 | SUNDANCE FLOORS LLP | EL PASO | AR | 01 | (93) | | | | | (91) | (91) |
| 0051546 | AMERICAN CARPET SALES | MOBILE | TX | 01 | 42 | 363 | 642 | | | 121 | 121 |
| 0051551 | G & S SALES INC | TERRELL | AL | 01 | 4,578 | 519 | | 280 | (44) | (135) | (135) |
| 0051561 | CARPET VILLA INC | HOUSTON | TX | 01 | 451 | 519 | 221 | | 161 | 219 | 1,341 |
| 0051559 | INTERIORS UNLIMITED | JACKSONVILLE | TX | 01 | 363 | 160 | 232 | 39 | | 88 | 88 |
| 0051596 | CASEY CARPET OF LAS CRUCES INC | LAS CRUCES | NM | 01 | 740 | 1,331 | 221 | | | 221 | 221 |
| 0051626 | CARPET BROKERS | ANKERS | NM | 01 | 447 | 669 | | (55) | | 55 | 287 |
| 0051638 | PENN HILLS FLOOR & WALL | AMARILLO | TX | 01 | 160 | 298 | 142 | (5) | | 36 | 123 |
| 0051651 | CHARLOTTES | PENNSDALE | PA | 01 | 1,331 | 48 | | | | 375 | 370 |
| 0051661 | CALLAWAYS CARPET | EL PASO | TX | 01 | 669 | 44 | 132 | (5) | | (74) | (74) |
| 0051662 | FLOOR COVERING INTERIORS, INC. | ABILENE | TX | 01 | 298 | 347 | | | 356 | (524) | (524) |
| 0051666 | ASSOCIATED WAREHOUSES INC | ALBUQUERQUE | NM | 01 | 48 | 105 | 105 | | | 121 | 105 |
| 0051696 | CRENSHAW FLOORING INC | SEATTLE | WA | 01 | 44 | 864 | 342 | 13 | | 379 | 379 |
| 0051740 | METRO FLOORING | ODESSA | TX | 01 | 347 | 1,244 | | | | | |
| 0051755 | YOUNGS CARPET ONE | SAN DIEGO | CA | 01 | 105 | 264 | 55 | | (30) | (30) | 105 |
| 0051761 | CARPET REMNANT OUTLET | GRASS VALLEY | CA | 01 | 1,244 | 239 | (85) | | | (93) | 287 |
| 0051763 | WINDY CITY CARPET TIME | LOUISVILLE | KY | 01 | 264 | 441 | 232 | | | 221 | 221 |
| 0051773 | SOUTH ALABAMA CARPETS II INC | MOKENA | IL | 01 | 239 | 639 | | | | (237) | (237) |
| 0051787 | CARPET WAREHOUSE & FLOORING | MOBILE | AL | 01 | 441 | 406 | 406 | | 406 | 406 | 406 |
| 0051801 | GRAYS COLORISTIC CARPET | LONGVIEW | TX | 01 | 406 | 152 | | | | (178) | (178) |
| 0051827 | ALASKA MARINE LINES INC | TEXARKANA | TX | 01 | 152 | 1,393 | | | | (237) | (237) |
| 0051827 | CARPETS BY SONIA | SEATTLE | WA | 01 | 447 | | | | (89) | (89) | (89) |
| 0051827 | CARPETS BY SONIA | ALBUQUERQUE | NM | 01 | (28) | 62 | | | | (946) | (946) |
| 0051838 | EMO CARPETS LLC | EL PASO | TX | 01 | 35 | 35 | | | | (317) | (317) |
| | | | | | (317) | | | | | | 16,413 |
| | | | | | 439 | | | | | | 439 |

| Account | Name | City | State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0051853 | ERIC JOHNSON ENTERPRISES | LOUISVILLE | KY | 01 | 01 | 36 | 939 | – | – | – | 36 |
| 0051857 | DECORATORS CENTER INC | BIG SPRING | TX | 01 | 01 | 720 | 126 | 178 | 302 | 204 | (218) |
| 0051860 | DOMINGUEZ CARPET & TILE, INC. | SANTA FE | NM | 01 | 01 | 752 | 126 | – | – | 56 | (114) |
| 0051863 | DOMINGOS FLOOR COVERING | GALLUP | NM | 01 | 01 | 338 | 338 | – | – | – | 626 |
| 0051864 | CAP CARPET | WICHITA | KS | 01 | 01 | 101 | 101 | (1,044) | – | – | (20) |
| 0051872 | DALTON FLOORS INC | ABILENE | TX | 01 | 01 | 56 | 56 | – | – | – | 93 |
| 0051877 | CONCHO CARPET COMPANY | SAN ANGELO | TX | 01 | 01 | 426 | 336 | 93 | – | – | 93 |
| 0051897 | CARPETS & MORE | CLEARWATER | FL | 01 | 01 | 488 | 488 | – | – | – | 575 |
| 0051899 | ENCHANTMENT CARPETS | TULSA | OK | 01 | 01 | 428 | 208 | 480 | 95 | (3,787) | (3,691) |
| 0051915 | BITNERS LLC | ALBUQUERQUE | NM | 01 | 01 | 783 | 783 | – | 96 | (39) | 110 |
| 0051932 | TFC FLOORING INC | LOUISVILLE | KY | 01 | 01 | 148 | 44 | 149 | – | (3,031) | (2,946) |
| 0051999 | RIVERSIDE | WOODRIDGE | KY | 01 | 01 | 38 | 38 | 85 | – | – | 110 |
| 0051994 | UNIQUE CARPETS LTD | RIVERSIDE | CA | 01 | 01 | 3,234 | 6,380 | – | – | – | 6,376 |
| 0051955 | SOONER CARPET & FLOORCOVERING INC | CLAREMORE | OK | 01 | 01 | 313 | 313 | – | – | – | – |
| 0051972 | MARS CARPETS SALES & SERVICE | REDLANDS | CA | 01 | 01 | 189 | 313 | – | – | – | – |
| 0051977 | FLOORS TO GO | HOBBS | NM | 01 | 01 | 189 | 189 | 438 | – | – | 438 |
| 0051986 | DALTON UNLIMITED INC | FORT WALTON BEACH | FL | 01 | 01 | 1,331 | 894 | – | – | – | – |
| 0051996 | FREEWAY CARPETS | EL PASO | TX | 01 | 01 | 173 | 173 | – | – | – | – |
| 0051997 | PIXLEY LUMBER CO | CLAREMORE | OK | 01 | 01 | (73) | 28 | – | – | (101) | (101) |
| 0052007 | FASHION FLOORS | MIDLAND | TX | 01 | 01 | 28 | 173 | 110 | – | (150) | (150) |
| 0052011 | CARPET COMPANY | ALBUQUERQUE | NM | 01 | 01 | 1,268 | 1,268 | – | – | (101) | (101) |
| 0052015 | ACOUSTI ENGINEERING CO | ORLANDO | FL | 01 | 01 | 1,379 | 2,006 | 1,682 | 1,790 | 2,197 | 707 |
| 0052027 | ZEPHYRHILLS | ZEPHYRHILLS | FL | 01 | 01 | 150 | 824 | – | – | – | – |
| 0052048 | GALLOWAYS FLOORING WAREHOUSE INC | LAKELAND | FL | 01 | 01 | 8,383 | 635 | 520 | – | (315) | (140) |
| 0052065 | ACCENT CARPET & TILE | BROOKSVILLE | FL | 01 | 01 | 824 | 439 | – | – | – | (140) |
| 0052075 | PENN FLOOR COVERING | FORT MYERS | FL | 01 | 01 | 1,014 | 1,705 | 193 | – | – | – |
| 0052087 | TAYLOR CARPETS | OCALA | FL | 01 | 01 | 439 | 527 | 83 | – | – | 290 |
| 0052095 | 3Z/LUS MODERN FLOOR | RUSKIN | FL | 01 | 01 | 1,995 | 300 | 544 | (2) | – | 379 |
| 0052101 | ED SELDERS FLOOR COVERINGS, INC. | TAMPA | FL | 01 | 01 | 610 | 409 | 274 | – | – | 1,373 |
| 0052102 | WAREHOUSE CARPETS INC | LAKEWOOD | WA | 01 | 01 | 1,673 | 167 | – | – | – | 97 |
| 0053112 | BAY TO BAY/NAFFCO | AUBURNDALE | FL | 01 | 01 | 518 | 409 | – | (13) | – | 109 |
| 0053113 | S W FLA FLOORCRAFTERS INC | TAMPA | FL | 01 | 01 | 97 | 167 | 149 | – | (151) | (151) |
| 0052125 | ILAH ENT | TAMPA | FL | 01 | 01 | 167 | 1,140 | – | – | – | 7,067 |
| 0052129 | CARPET BARN | FORT MYERS | FL | 01 | 01 | 7,067 | 117 | – | – | (76) | 73 |
| 0052193 | RUG MART | TAMPA | FL | 01 | 01 | 1,213 | 84 | – | – | (10) | (10) |
| 0052283 | W H BARNES INC | OSPREY | FL | 01 | 01 | 106 | 2,152 | 832 | – | 2,066 | 3,777 |
| 0052285 | A & H FLOOR COVERING INC | CLERMONT | FL | 01 | 01 | 84 | 84 | – | 879 | (77) | (77) |
| 0052240 | ALDRICH RUG | CASSELBERRY | FL | 01 | 01 | 84 | 119 | – | (27) | – | 3,870 |
| 0052202 | BMK CAPITAL INC | BRADENTON | FL | 01 | 01 | 5,929 | 513 | 1,968 | 1,903 | (201) | (236) |
| 0052301 | DALTON INCORPORATED | SEBRING | FL | 01 | 01 | 52 | 742 | 154 | – | (344) | 154 |
| 0052344 | EDIS CARPET MART / M&M | ORLANDO | FL | 01 | 01 | 119 | 506 | – | – | (344) | (344) |
| 0052364 | HDEM & ASSOCIATES | CLEARWATER | FL | 01 | 01 | 513 | 154 | 701 | – | – | 701 |
| 0052368 | DCB FLOORING INC | SOUTH SAN FRANCISCO | CA | 01 | 01 | 742 | (344) | (66) | – | (36) | (102) |
| 0052370 | BRITTS | FORT MYERS | FL | 01 | 01 | 506 | 1,489 | 6,497 | 4,773 | – | 11,415 |
| 0053413 | MIKE BIERFREUND | FORT MYERS | FL | 01 | 01 | 154 | 5,236 | 901 | – | 145 | 1,531 |
| 0053424 | BREWER CARPET AND DESIGN CENTER INC | KISSIMMEE | FL | 01 | 01 | (344) | 43,741 | 363 | 333 | 297 | 200 |
| 0053425 | CARPET CRAFTERS RUG CO/EXCLUSIVES | OKLAHOMA CITY | OK | 01 | 01 | 1,489 | 363 | 359 | – | (159) | 462 |
| 0053427 | CARPET INN OF SARASOTA | TAMPA | FL | 01 | 01 | 5,236 | 1,892 | 6,166 | 96 | 5,962 | 11,335 |
| 0052429 | ROKER DIVERSIFIED INC | SARASOTA | FL | 01 | 01 | 43,741 | 270 | 378 | 868 | 441 | 1,687 |
| 0052454 | CARPET SHOWCASE OF TAMPA | LECANTO | FL | 01 | 01 | 363 | 462 | – | – | 395 | 395 |
| 0052457 | CORONADO CARPETS | LARGO | FL | 01 | 01 | 1,892 | 10,400 | – | – | (95) | 178 |
| 0052440 | CARPET DEPOT INC | BRADENTON | FL | 01 | 01 | 470 | 167 | 273 | – | (899) | (449) |
| 0052462 | CARPET FASHIONS | NEW SMYRNA BEACH | FL | 01 | 01 | 462 | 105 | 450 | – | – | – |
| 0052464 | CARPET CORNER | PALM BAY | FL | 01 | 01 | 21,732 | 167 | 54 | – | – | 54 |
| 0052462 | ESPINOZA ASSOC FLOORING | DELAND | FL | 01 | 01 | 1,854 | 1,210 | – | – | 640 | 640 |
| 0052464 | KETCHUM | KETCHUM | ID | 01 | 01 | 500 | 726 | – | – | (198) | (198) |
| 0052466 | ROYAL RANGE OF CALIFORNIA, INC | MIRA LOMA | CA | 01 | 01 | 345 | 228 | 312 | – | 257 | 569 |

| ID | Name | City | State | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0052470 | CHAPMAN CARPET | MELBOURNE | FL | 01 | 01 | 1,286 | 977 | 213 | (44) | | | 309 |
| 0052481 | CARPET DESIGN WAREHOUSE | NAPLES | FL | 01 | 01 | (26) | 209 | | 59 | | | (234) |
| 0052464 | CARPET CORNER CARPET ONE | HOLIDAY | FL | 01 | 01 | 973 | 796 | 129 | | | | 176 |
| 0052524 | HARTS RUG & CARPETS | COSTA MESA | CA | 01 | 01 | 947 | 1,046 | | | | | (99) |
| 0052355 | FRANK'S FLOOR COVERING | VISALIA | CA | 01 | 01 | 1,723 | 1,258 | | | | | 465 |
| 0052517 | KNIGHT FLOORING LLC | WINTER PARK | FL | 01 | 01 | 854 | 864 | 349 | | (359) | | 465 |
| 0052518 | CARPET CONCEPTS | CAPE CORAL | FL | 01 | 01 | 155 | 92 | 94 | | (10) | | (10) |
| 0052526 | CARPETS & MORE INC | CAPE CORAL | FL | 01 | 01 | 174 | 174 | | | (30) | | 63 |
| 0052527 | FLOOR COVERINGS OF TULSA | TULSA | OK | 01 | 01 | 6 | 53 | | | | | (107) |
| 0052535 | CARILLON RUG | SAND SPRINGS | OK | 01 | 01 | 280 | 60 | | | | | (64) |
| 0052537 | FLOOR FACTORS | TULSA | OK | 01 | 01 | 10,773 | 280 | 254 | | | | (100) |
| 0052545 | CARPET N DRAPES CARPET ONE FLOOR & H | CLEARWATER | FL | 01 | 01 | 4,190 | 9,726 | 263 | (397) | (73) | (6) | 1,047 |
| 0052568 | DEBORAH M THORNTON INC | PORTLAND | OR | 01 | 01 | 1,866 | 4,410 | 366 | | (3) | | 934 |
| 0052571 | NEBRASKA FURNITURE MART | JACKSONVILLE | FL | 01 | 01 | 181 | 932 | | | | | 569 |
| 0052580 | CARPET WORLD | VERO BEACH | FL | 01 | 01 | (396) | 181 | | | | | (73) |
| 0052601 | CRAZY DAVES | OMAHA | NE | 01 | 01 | 2,844 | 28 | | | | | (239) |
| 0052601 | TILE WAREHOUSE | BROOKSVILLE | FL | 01 | 01 | 189 | 189 | 163 | | | | (424) |
| 0052611 | NORTH LITTLE ROCK | AR | 01 | | 01 | 42 | 42 | | 705 | 902 | | 885 |
| 0052604 | VERO BEACH | FL | 01 | | 01 | 795 | 795 | | | | | (424) |
| 0052623 | CARPET SYSTEMS INC | TAMPA | FL | 01 | 01 | (385) | | | | | | 2,655 |
| 0052623 | FLORCRAFT INC | FAIRBANKS | AK | 01 | 01 | 767 | 452 | 89 | | | | (385) |
| 0052635 | CREATIVE FLOORS INC | CASSELBERRY | FL | 01 | 01 | 452 | 1,849 | 747 | | | | 316 |
| 0052648 | GREAT FLOORS | COEUR D ALENE | ID | 01 | 01 | 1,849 | 3,101 | | (420) | (659) | | (1,079) |
| 0052667 | FLOORCRAFT | SAN FRANCISCO | CA | 01 | 01 | 3,020 | | | (73) | | | (73) |
| 0052702 | FINE FLOORS | PLANO | TX | 01 | 01 | 135 | 1,253 | | | | | 135 |
| 0052720 | CARPET BARN | N FORT MYERS | FL | 01 | 01 | 2,669 | 1,431 | 330 | 384 | 703 | 232 | 1,416 |
| 0052734 | COVERINGS INC | ALTAMONTE SPRINGS | FL | 01 | 01 | 1,431 | | 75 | 186 | | | 1,431 |
| 0052737 | CARPETS & BLINDS BEAUTIFUL | ORLANDO | FL | 01 | 01 | 170 | 170 | | | | | 135 |
| 0052743 | ODUM'S FLOOR COVERING INC | TULSA | OK | 01 | 01 | 834 | 268 | 88 | | | | 88 |
| 0052763 | CREATIVE FLOORS OTV VERO BEACH INC | VERO BEACH | FL | 01 | 01 | 356 | 796 | | | | | 39 |
| 0052779 | DICK STARK CARPET SHOP INC | ORMOND BEACH | FL | 01 | 01 | 2,828 | 1,149 | (105) | 144 | | | 1,679 |
| 0052794 | DISCOUNT CARPET & TILE CENTER INC | LONGWOOD | FL | 01 | 01 | 1,230 | 465 | 409 | (10) | | | 225 |
| 0052798 | CARPET WHOLESALERS INC | HOLLY HILL | FL | 01 | 01 | 8,116 | 342 | 595 | 131 | | | 7,775 |
| 0052808 | DESIGNERS RUG CENTER | NAPLES | FL | 01 | 01 | 339 | 120 | | (185) | | | 765 |
| 0052877 | L & K CARPET ONE | POCATELLO | ID | 01 | 01 | 148 | | 220 | | | | 7,960 |
| 0052884 | DISCOUNT QUALITY FLOORING | HOLLY HILL | FL | 01 | 01 | (58) | 25 | | | | | 148 |
| 0052915 | DUFFY & LEE | FORT LAUDERDALE | FL | 01 | 01 | 636 | 523 | 113 | | | | 148 |
| 0052921 | ADDS LINOLEUM SHOP, INC | BELLFLOWER | CA | 01 | 01 | 166 | 52 | 114 | | | | 113 |
| 0052923 | E K FLOORING | ORLANDO | FL | 01 | 01 | (95) | | | | | | 114 |
| 0052926 | BLACKARD FLOOR COVERING | CLARKSVILLE | AR | 01 | 01 | 97 | 97 | | | | | (95) |
| 0052990 | FLOOR TECH | ORLANDO | FL | 01 | 01 | 583 | 272 | 42 | | | | 91 |
| 0052396 | FIRST FLOORS | DALLAS | TX | 01 | 01 | (71) | | 43 | 90 | 45 | | 311 |
| 0052937 | WALKER FLOORING & INTERIORS INC | BELLINGHAM | WA | 01 | 01 | 2,688 | 1,223 | 443 | | (71) | | 1,679 |
| 0052939 | FLORIDA BUSINESS INTERIORS-FBI | HOUSTON | TX | 01 | 01 | 32 | 32 | 56 | | | | 1,722 |
| 0052945 | HOUSTON RUG MART | BRADENTON | FL | 01 | 01 | 966 | 966 | | | | | 1,722 |
| 0052947 | COASTAL FLOORS | MELBOURNE | FL | 01 | 01 | 115 | | | | | | |
| 0052961 | FLORIDA CARPET OF BREVARD INC | PAWNEE | OK | 01 | 01 | (157) | 1,427 | (74) | 114 | (71) | (157) | (157) |
| 0052977 | SPEARS FURNITURE INC | CLEARWATER | FL | 01 | 01 | 1,239 | 115 | | | | | (188) |
| 0052987 | FLOOR DEPOT INC | CAPE CORAL | FL | 01 | 01 | 85 | 85 | | | | | 422 |
| 0052987 | BOSS CARPET | SAN FRANCISCO | CA | 01 | 01 | 71 | 71 | 801 | | (65) | | 177 |
| 0052998 | FLOORDESIGN, INC | NEW PORT RICHEY | FL | 01 | 01 | 3,722 | 2,808 | | | 58 | | 914 |
| 0052991 | ALAMEDA PROPERTIES CORNELL OAKS LLC | BEAVERTON | OR | 01 | 01 | 879 | 709 | | | | | 206 |
| 0052999 | FLOORING CENTER | ORLANDO | FL | 01 | 01 | 1,023 | 624 | 511 | | | | 265 |
| 0052006 | FOREVERLAWN | CLERMONT | FL | 01 | 01 | 998 | 511 | 925 | | | | 511 |
| | ATTARD DISTRIBUTORS INC | SOUTH SAN FRANCISCO | CA | 01 | 01 | 458 | 439 | 176 | (1) | (181) | (2,038) | (2,038) |
| | FLOOR CLUB DBA ABBEY CARPET OF MAPLE | BONITA SPRINGS | FL | 01 | 01 | 1,060 | 1,060 | | | 197 | (334) | 39 |
| | J R BRADY ACQUISITIONS CO INC | NAPLES | FL | 01 | 01 | 2,025 | 1,438 | 492 | | | 95 | 587 |
| | | | | | | | | | | | (1,572) | (1,572) |

| ID | Company | City | ST | | | | | | | | | |
|----|---------|------|----|--|--|--|--|--|--|--|--|--|
| 0053020 | FACTORY WAREHOUSE OF FLOORS, LLC | DELAND | FL | 01 | 01 | 239 | 26 | 147 | | | 65 | 212 |
| 0053028 | FLOOR STORE | LARGO | FL | 01 | 01 | 822 | 481 | 341 | | | 341 | 341 |
| 0053059 | ANDERSON RETAIL INC | HATTIESBURG | MS | 01 | 01 | 751 | 626 | 170 | | | 124 | 124 |
| 0053060 | FLOOR DESIGNS UNLIMITED, LLC | PITTSBURGH | PA | 01 | 01 | 79 | 83 | | | | (45) | 124 |
| 0053140 | B & P AYRO ME CARPET | OVIEDO | FL | 01 | 01 | 167 | 244 | | | | (5) | (5) |
| 0053143 | FLOORING USA | NEW PORT RICHEY | FL | 01 | 01 | (229) | | | (78) | (229) | (229) | |
| 0053151 | GREAT SOUTHEAST FLOORING AMERICA | MELBOURNE | FL | 01 | 01 | 644 | | 2,334 | 45 | | 1,737 | 1,737 |
| 0053153 | CARPET BROKERS INC | PANAMA CITY | FL | 01 | 01 | 1,003 | | | | 314 | (105) | (105) |
| 0053168 | CARPET REMNANT OUTLET INC | SPRINGDALE | AR | 01 | 01 | 2,041 | 2,042 | | (1) | | 239 | 239 |
| 0053173 | PRITCHARDS CARPET MILL OUTLET | MIAMI | FL | 01 | 01 | 249 | 249 | | | | 57 | 57 |
| 0053174 | GENESIS CARPET | CHIEFLAND | FL | 01 | 01 | 196 | | | | | 212 | 212 |
| 0053195 | STRINGCO/GA FLOORS DIRECT | GAINESVILLE | FL | 01 | 01 | 184 | 196 | | | | 1,344 | 1,344 |
| 0053198 | GREAT LAKES CARPET | LADY LAKE | FL | 01 | 01 | 156 | 156 | 27 | | | (563) | (563) |
| 0053200 | GEORGIA CARPET WORLD | ORLANDO | FL | 01 | 01 | 16 | 44 | | | | (1) | (1) |
| 0053207 | GRIBBLE INTERIOR GROUP | BRADENTON | FL | 01 | 01 | 4,439 | 2,702 | 2,334 | | | 44 | 44 |
| 0053253 | GRIFFINS CARPET MART | STERLING | FL | 01 | 01 | 122 | 1,397 | | | | 27 | 27 |
| 0053258 | BEAUVAIS CARPETS INC | NEW YORK | NY | 01 | 01 | 112 | 55 | 102 | 507 | (361) | (597) | (105) |
| 0053278 | FLORIDA OUTLETS OF JACKSONVILLE | JACKSONVILLE | FL | 01 | 01 | 55 | 547 | 293 | | | (268) | (105) |
| 0053288 | H J INTERIORS INC | GAINESVILLE | FL | 01 | 01 | 547 | 293 | | | | (46) | (46) |
| 0053295 | INSURANCE RESTORATION NETWORK | MURRIETA | CA | 01 | 01 | 171 | 171 | | | | (81) | (81) |
| 0053306 | HUDSON EVERLY COMMERCIAL | ORLANDO | FL | 01 | 01 | 4,477 | 3,133 | 1,332 | 45 | (25) | (8) | (1,062) |
| 0053316 | J & J INDUSTRIES | DALTON | GA | 01 | 01 | (323) | 239 | 499 | | | (323) | (563) |
| 0053322 | HOLADAY CARPETS | FORT MYERS | FL | 01 | 01 | 239 | | | | | (107) | (107) |
| 0053354 | MARQUIS CARPET MILLS | CHATSWORTH | GA | 01 | 01 | 1,840 | 2,428 | (159) | (5) | 12 | (42) | (36) |
| 0053365 | HADINGER CARPET | NAPLES | FL | 01 | 01 | (107) | | | (429) | | (589) | (589) |
| 0053367 | ALTON FLOORS PLUS | GIRAMBURY | GA | 01 | 01 | (284) | | | 146 | | (284) | (284) |
| 0053374 | INTEGRITY SERVICES | TAMPA | TX | 01 | 01 | (535) | 306 | | | 129 | (535) | (535) |
| 0053392 | UNIQUE INTERIORS GROUP INC | FARMINGTON | MO | 01 | 01 | 7,038 | 6,768 | 337 | 179 | | (165) | 270 |
| 0053394 | VIIZTUM DECORATING CENTER | HAYS | KS | 01 | 01 | 1,621 | 1,891 | | 93 | | (607) | (380) |
| 0053410 | INTERNATIONAL FLOORING | ORLANDO | FL | 01 | 01 | (180) | | | 512 | 286 | (180) | (380) |
| 0053413 | JBP INTERNATIONAL INC | SAINT PETERSBURG | FL | 01 | 01 | 695 | 122 | 93 | 44 | 65 | 573 | 573 |
| 0053415 | CASEYS TILE CARPET COMPANY | INVERNESS | FL | 01 | 01 | 13 | 302 | | 280 | 236 | 25 | 1,148 |
| 0053424 | JEANETTES INTERIORS | ABILENE | TX | 01 | 01 | 3,365 | 4,022 | | 43 | | (30) | 13 |
| 0053454 | JOES CARPET | TAMPA | FL | 01 | 01 | 1,246 | 1,283 | 182 | (72) | (158) | (158) | (158) |
| 0053455 | JBP INTERNATIONAL | OKEECHOBEE | FL | 01 | 01 | 562 | 562 | 163 | | (36) | (36) | (36) |
| 0053459 | PACKS DISCOUNT LUMBER INC | NORTH LITTLE ROCK | AR | 01 | 01 | 42 | 42 | | 3 | | 3 | 125 |
| 0053472 | J & J FLOOR COVERING | STUART | FL | 01 | 01 | 253 | 91 | | | | 163 | 163 |
| 0053476 | KOIW RUG INC | MERRITT ISLAND | FL | 01 | 01 | 91 | 72 | 225 | 133 | (3) | 46 | 88 |
| 0053518 | K & P CARPET.PL | STUART | FL | 01 | 01 | 72 | | 44 | (85) | | 99 | 2,243 |
| 0053525 | JOY CARPETS | FORT MYERS | GA | 01 | 01 | 225 | 225 | 2,101 | 623 | (361) | (69) | (69) |
| 0053538 | KENSINGTON CPT OUTLET | FORT OGLETHORPE | GA | 01 | 01 | 949 | 949 | | 43 | | (4,709) | (4,720) |
| 0053551 | M & M CAPITOL INC | PORT RICHEY | FL | 01 | 01 | 789 | 789 | (228) | | | (1,350) | (3,554) |
| 0053554 | LIVE OAK PAINT (ENTRY) WATSONS | LIVE OAK | FL | 01 | 01 | 720 | 4,480 | (2,164) | | 65 | 1,297 | 453 |
| 0053568 | FLOORING GROUP INC | FORT MYERS | FL | 01 | 01 | 3,192 | 3,031 | 33 | 146 | | 453 | 453 |
| 0053571 | MONTGOMERYS CARPET PLUS | SANTA BARBARA | CA | 01 | 01 | (524) | 158 | 2,041 | 61 | | (130) | 1,673 |
| 0053580 | JERRICO TILE & CARPET INC | VENICE | FL | 01 | 01 | 1,831 | 502 | | | | 1,887 | 1,887 |
| 0053625 | B & C CARPET CO INC | DEWEY | OK | 01 | 01 | 2,399 | 173 | | 485 | 54 | 539 | 539 |
| 0053631 | WRIGHT COMMERCIAL FLOORS LLC | OKLAHOMA CITY | OK | 01 | 01 | 859 | 330 | | | | 121 | 121 |
| 0053641 | JULIAN INTERIORS INC | COLUMBUS | OH | 01 | 01 | 394 | 394 | 318 | 136 | | (333) | (173) |
| 0053645 | MR CARPET | JULIAN | CA | 01 | 01 | 477 | 356 | 41 | | | (215) | (215) |
| 0053652 | KRC OF SOUTH FLORIDA | DELAND | FL | 01 | 01 | 39 | 212 | | | | (605) | (605) |
| 0053669 | DESIGN WORKS INC | SPOKANE | WA | 01 | 01 | 571 | 662 | 514 | | | (63) | (55) |
| 0053683 | LEVI TALBOT FLOOR COVERING | NAPLES | FL | 01 | 01 | 105 | 170 | 8 | | | (65) | (65) |
| 0053645 | NANCES FLOORING | COSTA MESA | CA | 01 | 01 | (55) | 252 | | | | (321) | (321) |
| 0053683 | ROCK STONE & TILE INC | SAN DIEGO | CA | 01 | 01 | (69) | | | | | (290) | (290) |
| 0053683 | LAKELAND | LAKELAND | FL | 01 | 01 | (290) | | | | | (832) | (832) |
| 0053699 | NEW CENTRAL CARPET SUPPLIES INC | SOUTHFIELD | MI | 01 | 01 | 124 | 956 | | | | (671) | (671) |

| Account | Company | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0053203 | WHOLESALE CARPET OUTLET | VANCOUVER | WA | 01 | 01 | 214 | 95 | 18 | | 76 | | 119 |
| 0053715 | ORLANDO CARPETS | ORLANDO | FL | 01 | 01 | 682 | | | | | | 682 |
| 0053772 | PROSOURCE OF PORT RICHEY - SKELTON | HUDSON | FL | 01 | 01 | 220 | 115 | 142 | | | | 105 |
| 0053727 | PROSOURCE OF FT MYERS | FORT MYERS | FL | 01 | 01 | 374 | | | | | | 374 |
| 0053797 | NW FLOORING SOLUTIONS | ORLANDO | FL | 01 | 01 | 1,559 | 627 | 115 | 44 | 221 | (44) | 932 |
| 0053818 | M & C ENTERPRISES OF SEBRING INC | | | 01 | 01 | (398) | 61 | | | 45 | | (259) |
| 0053827 | FLOORS YOUR WAY BY THE PAD PLACE | NAPLES | FL | 01 | 01 | 72 | 72 | | | | | 100 |
| 0053847 | PROFLOORS | SARASOTA | FL | 01 | 01 | 850 | 750 | | | | | 91 |
| 0053866 | PURCELLS DIST | CAPE CANAVERAL | FL | 01 | 01 | 343 | 252 | | | | | 37 |
| 0053873 | ER CAPITAL | ORLANDO | FL | 01 | 01 | 342 | 305 | (119) | | 44 | (2) | 62 |
| 0053883 | PROSOURCE OF BREVARD | MELBOURNE | FL | 01 | 01 | 366 | 103 | 263 | 18 | | (38) | 263 |
| 0053891 | TURFEVOLUTIONS INC | VANCOUVER | WA | 01 | 01 | 14,884 | 13,640 | 1,580 | | | (337) | 1,244 |
| 0053920 | REGAL FLOORING | TUNNEL HILL | GA | 01 | 01 | 391 | 391 | | | | | |
| 0053923 | GAMMON ENTERPRISES INC | OVIEDO | FL | 01 | 01 | 451 | 504 | | | | (53) | (53) |
| 0053929 | ROYAL PALM FLOORING | ORMOND BEACH | FL | 01 | 01 | 449 | 449 | | | | | |
| 0053936 | RAYS RUGS CARPET | ROYAL PALM BEACH | FL | 01 | 01 | 347 | 76 | 350 | | | (79) | 271 |
| 0053950 | SPECIALTY FLOOR DESIGNS | GAINESVILLE | FL | 01 | 01 | 300 | | | | | | 300 |
| 0053957 | GAINESVILLE CARPET & TILE | LAKE WALES | FL | 01 | 01 | 114 | | | | | | 300 |
| 0053970 | SPRAGGINS FLG CTR/ABBY CPT | SOUTH LAKE TAHOE | CA | 01 | 01 | 52 | | | | | (393) | (393) |
| 0053973 | LINOLEUM & CARPET CITY | POMPANO BEACH | FL | 01 | 01 | 497 | 221 | 209 | | | (38) | 482 |
| 0053976 | SURPLUS SHOP INC | TAMPA | FL | 01 | 01 | 396 | 396 | | | | | |
| 0053977 | SURFACES OF TAMPA INC | BELLEVIEW | FL | 01 | 01 | 4,507 | 101 | 36 | 50 | | 114 | 4,406 |
| 0053982 | RUG WORKS | SPOKANE | WA | 01 | 01 | 413 | 230 | | | | 189 | 189 |
| 0054002 | STEWARTS CARPET GALLERY | ORLANDO | FL | 01 | 01 | (30) | | | | | (30) | (30) |
| 0054020 | SURPLUS WORLD | GAINESVILLE | FL | 01 | 01 | 1,330 | 805 | 525 | | | | 525 |
| 0054033 | HARRY L MURPHY INC | SAN JOSE | CA | 01 | 01 | 177 | 177 | | | | | |
| 0054035 | SURPLUS CARPET | ORMOND BEACH | FL | 01 | 01 | 1,904 | 1,422 | | 319 | | 482 | 482 |
| 0054057 | AMERICANA OASIS LLC | WRIGHT CITY | MO | 01 | 01 | (393) | 237 | | | (36) | (38) | (393) |
| 0054088 | NORTH TEXAS SURFACES INC | GRAPEVINE | TX | 01 | 01 | 88 | 44 | 44 | | | 114 | 114 |
| 0054099 | SOUTHLAND FLOORS INC | POMPANO BEACH | FL | 01 | 01 | 437 | 388 | 44 | 50 | | 44 | 44 |
| 0054106 | M & M SERVICES CPT ONE OF SAN RAMON | SAN RAMON | CA | 01 | 01 | 58,251 | 62,851 | (2,584) | (1,141) | (66) | 8 | (4,500) |
| 0054112 | SETTERQUIST INC | NAPLES | CA | 01 | 01 | 74 | | | | | 74 | 74 |
| 0054118 | TILE & CARPET WORLD | PORT CHARLOTTE | FL | 01 | 01 | 88 | 88 | 43 | 39 | | 88 | 88 |
| 0054119 | DENMAT CO BROKERAGE | SEATTLE | WA | 01 | 01 | 1,629 | 1,070 | 124 | | | (818) | 353 |
| 0054129 | TOM'S CARPET DESIGNS | APOPKA | FL | 01 | 01 | 536 | 536 | | | | | 559 |
| 0054133 | TERRACE CARPETS | TAMPA | FL | 01 | 01 | 55 | | | | | | 55 |
| 0054139 | FLOORING AMERICA | WINTER HAVEN | FL | 01 | 01 | 1,289 | 614 | 733 | 168 | | | 675 |
| 0054142 | ULTIMATE FLOOR COVERING | DEBARY | FL | 01 | 01 | 125 | 125 | | | | (226) | |
| 0054151 | US DESIGN SOURCE | HUDSON | FL | 01 | 01 | 55 | | | | | | 55 |
| 0054162 | HUMBLE CARPET & TILE | ORLANDO | FL | 01 | 01 | 37 | 37 | 37 | (448) | | (448) | 37 |
| 0054167 | WHEELER A DIVISION OF J J HAINES | HUMBLE | TX | 01 | 01 | 898 | 898 | | | | | |
| 0054186 | WELL FLOOR U INC | GLEN BURNIE | MO | 01 | 01 | 8,362 | 7,206 | 375 | 375 | | 381 | 400 |
| 0054206 | FREEMAN FLOOR SERVICE LLC | STUART | FL | 01 | 01 | 574 | 725 | (10) | | | | (140) |
| 0054207 | FAYETTEVILLE | FAYETTEVILLE | AR | 01 | 01 | 7,413 | 1,211 | 152 | 1,030 | 801 | 414 | 3,805 |
| 0054215 | MILLERS INTERIORS INC | LYNNWOOD | FL | 01 | 01 | 203 | 92 | | | | 57 | 147 |
| 0054219 | WHOLESALE CARPET | SAINT PETERSBURG | FL | 01 | 01 | 1,069 | 720 | 296 | 97 | | | 197 |
| | WADSWORTH CARPETS | S DAYTONA BCH | FL | 01 | 01 | 605 | 298 | | | | | 203 |
| | FLOOR SOURCE INC | PLYMOUTH | MN | 01 | 01 | (51) | | | | | (86) | (86) |
| | WAYNE WILES CARPETS INC | FORT MYERS | FL | 01 | 01 | 957 | 722 | 34 | | 212 | 98 | 307 |
| | WELLS CARPET DIST INC | COCOA | FL | 01 | 01 | 224 | 84 | | | 92 | | (51) |
| | YEAGER & COMPANY | ODESSA | FL | 01 | 01 | 176 | 130 | | | | | (109) |
| | GRIGGS CARPET | LUBBOCK | TX | 01 | 01 | 1,211 | 125 | | 45 | | | 49 |
| | CARPET MILL OUTLET INC | SHAWNEE | OK | 01 | 01 | 130 | | 1,086 | | | | 141 |
| | MELROSE DISCOUNT CARPET | LOS ANGELES | CA | 01 | 01 | 799 | 829 | (30) | | | | 45 |
| | STURLA INC | SAN LEANDRO | CA | 01 | 01 | 612 | 329 | 349 | | | (66) | 1,086 |
| | | | | | | 3,313 | 2,052 | | | 738 | 259 | 264 |

| Acct | Name | City | ST | Dist | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0054256 | HOUSE OF FLOORS | ALBUQUERQUE | NM | 01 | 100 | 100 | . | . | . | 829 |
| 0054283 | HOUSE OF CARPETS INC | EL PASO | TX | 01 | 4,962 | 4,133 | 1,652 | 334 | 32 | 247 |
| 0054284 | HOSCH FLOOR COVERING | LUBBOCK | TX | 01 | (119) | (119) | . | . | . | (119) |
| 0054331 | HACIENDA CARPET & TILE INC | LAS CRUCES | NM | 01 | 3,254 | 876 | 2,379 | . | . | 2,379 |
| 0054312 | HARRISON CONTRACTING CO | ALBUQUERQUE | NM | 01 | 267 | 267 | . | . | . | . |
| 0054337 | MONARCH CARPET SERVICE | LOS ANGELES | CA | 01 | 248 | 248 | . | . | . | . |
| 0054338 | JOE LENTZ SUPPLY | GAINESVILLE | FL | 01 | 71 | 71 | . | . | . | 71 |
| 0054340 | | ODESSA | TX | 01 | 130 | 80 | 49 | . | . | 49 |
| 0054356 | | LITTLE SILVER | NJ | 01 | 424 | 132 | 293 | . | . | 293 |
| 0054372 | LOUIS J WEINSTEIN | | GA | 01 | (261) | 493 | 213 | . | . | (754) |
| 0054402 | WR INC | CHATSWORTH | GA | 01 | (698) | . | . | . | . | (698) |
| 0054413 | CLASSIC FLOOR DESIGNS | WASHINGTON | DC | 01 | 439 | . | . | . | . | 439 |
| 0054433 | JOHNS CARPET BARN | LOVINGTON | GA | 01 | 14,613 | . | . | . | 14,613 | 14,613 |
| 0054471 | SHELTON CARPET ENTERPRISES | DALTON | GA | 01 | 446 | 199 | 247 | . | . | 247 |
| 0054496 | A BETTER WAY FLOORS, INC | SELLERSBURG | IN | 01 | 939 | 245 | 735 | . | . | 693 |
| 0054498 | ACE CARPET & FLOOR | SCOTTSBURG | IN | 01 | 815 | 815 | . | 815 | (13) | 815 |
| 0054526 | AZTEC FLOORING INC | LOUISVILLE | IN | 01 | (403) | (403) | . | (28) | . | (935) |
| 0054533 | BRUCES FLOOR COVERING | FALL RIVER | MA | 01 | 564 | 564 | 373 | . | (1,308) | 470 |
| 0054534 | BRADLEYS CARPET OUTLET | CHARLESTOWN | IN | 01 | 926 | 455 | 341 | . | . | 1,923 |
| 0054545 | BAILEYS CARPET BARN | JEFFERSONVILLE | IN | 01 | (365) | 368 | . | . | (365) | (365) |
| 0054555 | L & L FLOORING INC | LEXINGTON | KY | 01 | 307 | 166 | 142 | . | (109) | 142 |
| 0054622 | CARROLL FLOOR COVERING | CALHOUN | GA | 01 | (129) | 205 | . | . | (365) | (344) |
| 0054623 | CARPET CORNER | VERSAILLES | KY | 01 | 8 | 22 | 36 | . | (21) | (14) |
| 0054634 | J CARNES CARPET GALLERY | NEW ALBANY | IN | 01 | 651 | 378 | 273 | . | . | 273 |
| 0054638 | CARPET CONTRACTING SERVICE | LOUISVILLE | KY | 01 | 35 | 35 | . | . | (313) | 35 |
| 0054658 | CSM CUSTOM RUGS | JEFFERSONVILLE | IN | 01 | (46) | . | . | . | (50) | . |
| 0054665 | CORVINS | LOUISVILLE | KY | 01 | 171 | 408 | . | . | (46) | (46) |
| 0054672 | CORVINS FURNITURE CARPET | ELIZABETHTOWN | KY | 01 | 772 | 171 | . | . | (577) | (577) |
| 0054681 | D & D CARPET | BARDSTOWN | KY | 01 | 58 | 790 | . | . | . | . |
| 0054687 | DENNY'S CARPET | BROOKS | KY | 01 | 89 | 58 | . | . | (19) | (19) |
| 0054698 | NEWPORT FLOOR COVERING INC | CORYDON | KY | 01 | 210 | 89 | . | . | 58 | 58 |
| 0054715 | M T DEARING CARPET CO INC | CORONA DEL MAR | CA | 01 | 250 | . | . | . | 89 | 89 |
| 0054722 | HIBERNIA WOOLEN MILLS LTD | JEFFERSONVILLE | CA | 01 | 644 | 644 | 162 | 88 | 74 | 250 |
| 0054726 | FLOOR SOURCE | WHITTIER | CA | 01 | 147 | 147 | . | . | 210 | 210 |
| 0054727 | GILFORD FLOOR COVERING | LAGRANGE | KY | 01 | 300 | 150 | . | 136 | . | . |
| 0054730 | HUBER CARPET & LINOLEUM | JEFFERSONVILLE | IN | 01 | (241) | (241) | . | . | (241) | 150 |
| 0054739 | HYATT REGENCY LOUISVILLE | LOUISVILLE | KY | 01 | 437 | 437 | . | 150 | . | (241) |
| 0054743 | NICKAUS LEE CARPET | LOUISVILLE | KY | 01 | 78 | 39 | 39 | . | . | 150 |
| 0054760 | NIELSEN BROTHERS | DALTON | GA | 01 | 566 | 566 | . | . | . | 39 |
| 0054768 | VALLEY FLOOR COVERING | EDMONDS | WA | 01 | 51 | 51 | . | . | . | 51 |
| 0054784 | HOLLANDS CONTRACT CARPETS | SANTEE | CA | 01 | 155 | 155 | . | . | . | . |
| 0054791 | ICC FLOORS | LEXINGTON | KY | 01 | 176 | 203 | . | . | . | . |
| 0054812 | JOE JBS FLOORING | INDIANAPOLIS | IN | 01 | 2,892 | 1,503 | 1,290 | (52) | (27) | 1,290 |
| 0054816 | KURHHAGE FLOOR COVERING | LOUISVILLE | KY | 01 | 228 | 228 | . | . | . | (27) |
| 0054831 | K V FLOORING INC | LOUISVILLE | KY | 01 | 172 | 172 | . | . | 369 | . |
| 0054834 | MAGIC CARPET | LOUISVILLE | KY | 01 | 660 | 217 | 74 | . | 37 | 443 |
| 0054837 | MILLIONS FLOOR CENTER | DANVILLE | KY | 01 | 1,530 | 658 | 759 | 143 | (67) | 872 |
| 0054882 | PLAZA CARPETS | SPRINGFIELD | KY | 01 | 6,474 | 575 | 494 | 591 | 937 | 5,899 |
| 0054885 | PAT SMITHS FLOORING | LEXINGTON | KY | 01 | 406 | 273 | . | . | 3,170 | 134 |
| 0054886 | PONTRICH FLOOR COVERING | LOUISVILLE | KY | 01 | 214 | 105 | 110 | . | 134 | 110 |
| 0054891 | TED MCCAIN | SHELBYVILLE | KY | 01 | 50 | . | . | . | . | 50 |
| 0054882 | NEALS CARPET & SUPPLY | LOUISVILLE | KY | 01 | 677 | 277 | 367 | 707 | 33 | 400 |
| 0054893 | RARO | ROLAND | OK | 01 | 46 | 98 | . | . | . | 50 |
| 0054932 | VILLA ROMANA INC | LOUISVILLE | KY | 01 | 195 | 195 | . | . | 50 | 134 |
| | CARPET PLACE THE | LOUISVILLE | KY | 01 | | | | | | |
| | LLOYDS CARPET | GAINESVILLE | NM | 01 | | | | | | (52) |
| | | FARMINGTON | NM | 01 | | | | | | |

| Account | Company | City | State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0054944 | RAY MC NUTT | EL PASO | TX | 01 01 | 231 | 231 | | | | 360 | 1,139 |
| 0054960 | COYOTE LOGISTICS LLC | CHATTANOOGA | TN | 01 01 | 10,698 | 9,558 | 780 | | | 153 | 512 |
| 0054964 | ANCHOR T GROUP | WACO | TX | 01 01 | 153 | | | | | 153 | 153 |
| 0054968 | SYNTHETIC LAWN SUPPLY INC | SAN DIEGO | CA | 01 01 | 303 | | | | | 303 | 303 |
| 0054845 | MESA FLOOR COVERINGS INC | GRANTS | NM | 01 01 | (185) | | | | | (186) | (186) |
| 0054983 | MALIK FLOORING INC | RICHARDSON | TX | 01 01 | 17,070 | 10,209 | 813 | | | | 11,021 |
| 0054985 | MALIK ACCEPTANCE CORP | MIDLAND | TX | 01 01 | 266 | 266 | | | | (3) | 266 |
| 0054967 | MOFFATT | | | 01 01 | | | | | | | 88 |
| 0055016 | MALOOLYS CARPET CITY | SAPULPA | OK | 01 01 | 2,167 | 2,078 | 91 | | | | 113 |
| 0055067 | LA FEVERS CARPET | LAS CRUCES | NM | 01 01 | 195 | 81 | | | 113 | 460 | 663 |
| 0055087 | FOREVERLAWN NEW MEXICO | OK | OK | 01 01 | 663 | | | | 203 | (123) | (123) |
| 0055101 | BUSINESS ENVIRONMENTS | ALBUQUERQUE | NM | 01 01 | 2,674 | 2,797 | | | | (123) | 100 |
| 0055119 | ACOUSTI ENGINEERING CO | ALBUQUERQUE | NM | 01 01 | 1,490 | 1,390 | | | 130 | (30) | 1,751 |
| 0055138 | AFFORDABLE CARPET & WOOD, INC | JACKSONVILLE | FL | 01 01 | 1,844 | 93 | | | | | 599 |
| 0055163 | CARPET TREE | JACKSONVILLE | FL | 01 01 | 958 | 359 | | | | | |
| 0055175 | CENTURY FLOORING DISTRIBUTORS | MIAMI | FL | 01 01 | 52 | 48 | 49 | | | 3 | 4 |
| 0055184 | MCALISTER PAINT & CARPET | JACKSONVILLE | FL | 01 01 | 43 | 43 | | | | (45) | |
| 0055196 | CARPET IMAGE SERVICES INC | NORWALK | CT | 01 01 | 700 | 700 | | | | | |
| 0055188 | CARPET KING | JACKSONVILLE | FL | 01 01 | 122 | 122 | | | | | |
| 0055241 | SOUDS QUALITY CARPET OUTLET | JACKSONVILLE | FL | 01 01 | 2,819 | | | | | 2,819 | 2,819 |
| 0055217 | CONTRACT FLOORS & MORE INC | JACKSONVILLE | FL | 01 01 | (122) | | | | | (122) | (122) |
| 0055249 | CARPET SQUARE INC DO NOT USE ACCT# | MARIETTA | GA | 01 01 | 589 | | | | | 589 | 589 |
| 0055246 | OM CARPET MILLS | NEWBERRY | FL | 01 01 | 2,637 | | | | | 2,637 | 2,637 |
| 0055282 | FLOORS BY GEORGE | PALATKA | FL | 01 01 | 17 | 8 | 8 | | | | |
| 0055292 | FLOOR STORE OF NEWBERRY THE | BROKEN ARROW | OK | 01 01 | 966 | 951 | 228 | | | (213) | 14 |
| 0055290 | FLOOR FACTORY OUTLET | SAINT AUGUSTINE | FL | 01 01 | (8) | | (8) | | | | 8 |
| 0055307 | HASTY CARPET COMPANY | JACKSONVILLE | FL | 01 01 | 1,106 | 1,106 | | | | | |
| 0055315 | HOUSE OF FLOORS OF JACKSONVILLE INC | JACKSONVILLE | FL | 01 01 | 46 | 46 | 50 | | | | 148 |
| 0055337 | JAMES MICHAEL HOWARD | DAYTONA BEACH | FL | 01 01 | 365 | 217 | 152 | | | | 152 |
| 0055338 | JXX BARGAIN CARPETS | SACRAMENTO | CA | 01 01 | 601 | 448 | 54 | | 44 | | 2,205 |
| 0055349 | PACIFIC FLOORING | JACKSONVILLE | FL | 01 01 | 2,630 | 426 | 2,236 | 80 | | | 343 |
| 0055381 | PARENT HOME DECORATING | PALATKA | FL | 01 01 | 343 | | 87 | | 144 | (111) | 112 |
| 0055405 | PALATKA FLOORING | PALM COAST | FL | 01 01 | 320 | | | | 320 | 112 | 226 |
| 0055409 | PALM COAST FLOORING OUTLET | PALM COAST | FL | 01 01 | 383 | | 226 | | | | |
| 0055413 | PATERSON FLOOR COVERINGS INC | REDWOOD CITY | CA | 01 01 | 49 | 49 | | | | | 279 |
| 0055417 | CARPET MAN | ORANGE PARK | FL | 01 01 | 279 | | | | | 100 | (463) |
| 0055439 | TEAL TILE & CARPET | STARKE | FL | 01 01 | 625 | 1,088 | 501 | | | (952) | 1,341 |
| 0055465 | VANNS ENTERPRISES | LAKE CITY | FL | 01 01 | 2,420 | 1,078 | 569 | (12) | | 783 | 4,820 |
| 0055478 | BRUMARK INC | ATLANTA | GA | 01 01 | 5,277 | 457 | | 435 | 771 | (26) | 2,829 |
| 0055501 | PINNER CARPETS | ODESSA | TX | 01 01 | 18,322 | 15,493 | 2,734 | | (10) | (78) | (114) |
| 0055504 | PINNER CARPETS INC | DALLAS | TX | 01 01 | (114) | | 2,622 | 284 | 905 | (114) | |
| 0055513 | PINNER TRANSPORTATION | JEFFERSONVILLE | IN | 01 01 | 622 | 622 | | | | 100 | 20,375 |
| 0055515 | CLARCOR AIR FILTRATION | STAFFORD | GA | 01 01 | 67 | 67 | 226 | | | | |
| 0055530 | RED CARPET INC | TACOMA | WA | 01 01 | 48,544 | 28,169 | 18,255 | 1,361 | 758 | (558) | 20,375 |
| 0055543 | CARTOZIAN FINE FLOORING | DURANGO | CO | 01 01 | 260 | 219 | | | | (27) | 260 |
| 0055544 | RITEWAY FLOORING AMERICA | ALBUQUERQUE | NM | 01 01 | 187 | | 559 | 599 | 89 | 125 | 187 |
| 0055550 | RAYS FLOORING SPECIALISTS INC | SAN RAFAEL | CA | 01 01 | 52 | 52 | | 1,979 | | | 2,101 |
| 0055576 | RAFAEL FLOOR COVERING | ALBUQUERQUE | NM | 01 01 | 10,012 | 4,213 | 4,996 | 436 | 771 | 905 | 4,820 |
| 0055602 | FIVE STAR FLOORCOVERING | CARLSBAD | NM | 01 01 | 2,153 | | 284 | | | 802 | 5,799 |
| 0055624 | RIO GRANDE FLOOR COVERING LLC | AMARILLO | TX | 01 01 | 99 | 103 | 357 | 553 | (1,442) | (73) | (1,515) |
| 0055616 | GABRIELS CARPETS WEST | EL PASO | TX | 01 01 | 10,706 | 1,614 | | | 65 | 4,102 | 10,706 |
| 0055616 | ROPERS DRAPERY & CARPET | IRVINE | CA | 01 01 | 2,769 | 103 | 157 | | | 2,734 | 2,769 |
| 0055623 | DEBORAH STUBBLEFIELD | ODESSA | TX | 01 01 | 3,072 | | | | 6,182 | 157 | 157 |
| 0055640 | SUN CARPET | | TX | 01 01 | 157 | | | | 35 | 2,962 | 3,072 |
| 0055652 | ROYALTY CARPET MILLS | IRVINE | CA | 01 01 | 1,295 | 1,295 | 157 | | 69 | (73) | 157 |
| 0055643 | SHOPPE DISTINCTION / WYLY BROWN | | NM | 01 01 | 39,388 | 42,042 | 2,407 | 739 | 846 | 110 | (2,654) |
| 0055543 | FUTUREVEST | FARMINGTON | NM | 01 01 | 7,624 | 3,632 | (396) | (213) | | 122 | (3,123) |

| Account | Name | City | ST | Period | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0055645 | EXPRESSIONS CARPET & FLOORING | JACKSONVILLE | FL | 01 01 | 154 | 41 | 236 | | | | (123) | 113 |
| 0055949 | FIKE BROTHERS CARPET | YEAGERTOWN | PA | 01 01 | 163 | 167 | 42 | | | | (46) | (4) |
| 0055555 | AXMINSTER CARPETS | NORWALK | CT | 01 01 | 1,031 | 1,788 | | | | | (887) | (751) |
| 0055753 | SYNSCAPES OF NEW MEXICO | ALBUQUERQUE | NM | 01 01 | 1,788 | 1,524 | 130 | | | | (572) | 672 |
| 0055701 | SUMMAR HOSPITALITY DESIGN | SOUTH PADRE ISLAND | TX | 01 01 | 2,196 | | | | | | (572) | (572) |
| 0055690 | SANTANA'S TILE DEPOT | EL PASO | TX | 01 01 | (937) | | | | | | (937) | (937) |
| 0055672 | SHOWCASE CARPET | ALAMOGORDO | NM | 01 01 | 66 | 66 | | | | | | |
| 0055570 | CUSTOM CARPET & TILE INC | FARMINGTON | NM | 01 01 | 55 | 55 | | | | | | |
| 0055714 | MANDARIN MEADOWS INC | JACKSONVILLE | FL | 01 01 | 1,703 | 394 | 874 | | 222 | | 213 | 1,309 |
| 0055727 | RUSMUR FLOORS INC | BRIDGEVILLE | PA | 01 01 | 299 | | | | | | 299 | 299 |
| 0055746 | NEW HOME DESIGN INC | IRVING | TX | 01 01 | 2,521 | 1,930 | 711 | | | | 591 | 591 |
| 0055763 | ARBOR CONTRACT CARPET INC | ROSEVILLE | CA | 01 01 | 5,094 | 908 | 1,444 | (955) | 761 | 1,091 | 891 | 4,386 |
| 0055779 | BACHMAN INC | IRVING | TX | 01 01 | 291 | 63 | 227 | | | | 227 | 227 |
| 0055895 | 3RD PARTY BILLING CENTER | FARGO | ND | 01 01 | 2,933 | 3,047 | 72 | | | 130 | (186) | (186) |
| 0055936 | SIR ENTERPRISES INC | ELLIJAY | GA | 01 01 | 1,378 | 1,378 | | | | | (114) | 227 |
| 0055952 | GREEN COUNTRY FLOOR COVERING | HOUSTON | TX | 01 01 | 284 | 2,764 | | | | | 225 | 225 |
| 0055996 | THE FLOOR STORE & DESIGN CENTER | TAHLEQUAH | OK | 01 01 | 2 | 284 | | | | | 225 | 225 |
| 0055968 | KAISER TRANSPORTATION INC | LITTLE ROCK | AR | 01 01 | 4,807 | 13 | | | | | (11) | (11) |
| 0055904 | S & G DISCOUNT OUTLET INC | STRYKER | OH | 01 01 | 2,642 | 3,597 | | | | | 4,807 | 4,807 |
| 0056008 | INTERIOR DECORATORS | SAN JOSE | CA | 01 01 | (38) | 13 | (13) | | | | (955) | (955) |
| 0056024 | BLAKELY PRODUCTS | GOLD RIVER | CA | 01 01 | 377 | 377 | | | | | (38) | (51) |
| 0056117 | PAY LESS CARPET | WARREN | | 01 01 | 248 | | 8 | | | | | 8 |
| 0056122 | AZTEC CUSTOM RUG AND CARPET SERVICE | SAN JOSE | CA | 01 01 | 30 | 248 | 8 | | | | 8 | 8 |
| 0056203 | SHAHEEN CARPET MILLS | DENVER | | 01 01 | 37,486 | 28,514 | 2,899 | | | | 30 | 30 |
| 0056228 | STEVES AND SONS | RESACA | GA | 01 01 | 1,046 | 795 | 159 | | 357 | 172 | 5,456 | 8,572 |
| 0056239 | HENNON CARPETS LLC | SAN ANTONIO | TX | 01 01 | 100 | | 88 | | | | 251 | 251 |
| 0056250 | CALIFORNIA RUG FINISHING | SACRAMENTO | CA | 01 01 | 2,754 | 293 | 91 | | | | 100 | 100 |
| 0056270 | GOLDEN PARK CARPET INC | DALTON | GA | 01 01 | 467 | 797 | 416 | 87 | 248 | 181 | 1,028 | 1,961 |
| 0056288 | McKINNEY & MARKUM CARPET ONE | RUIDOSO | NM | 01 01 | 2,566 | 2,676 | | | | | (330) | (330) |
| 0056290 | CARPET INTERIORS | MARSHALL | TX | 01 01 | (193) | | | | | | (311) | (311) |
| 0056307 | GLOBE CARPET DIST | OKLAHOMA CITY | OK | 01 01 | 300 | | | | | | (193) | (193) |
| 0056335 | ELDER BEERMAN STORES | DALTON | GA | 01 01 | 1,076 | 779 | 297 | 30 | | | 300 | 300 |
| 0056342 | BOWENS DISCOUNT CARPET | WHITEHALL | | 01 01 | 851 | 30 | | | | | 821 | 821 |
| 0056356 | RSI HOME PRODUCTS | TULSA | OK | 01 01 | 3,967 | 3,923 | 44 | | | | 791 | 297 |
| 0056359 | CARPET CORP OF AMERICA | ANAHEIM | CA | 01 01 | (46) | | | | | | (46) | (46) |
| 0056464 | HAGAMAN CARPET | ROME | GA | 01 01 | 93 | 93 | | | | | 46 | 46 |
| 0056537 | LARRYS INTERIORS INC | FORT OGLETHORPE | GA | 01 01 | (535) | | | | | (562) | (592) | (592) |
| 0056744 | SPECIALTY WOODWORKS | KILGORE | TX | 01 01 | 173 | | | | | | (535) | (535) |
| 0056734 | MR. LANCE McKINNOW | VAN BUREN | AR | 01 01 | 85 | | | | | | (173) | (173) |
| 0056759 | DIRECT CUTTING | EDNA | MN | 01 01 | (21) | | | | | | 85 | 85 |
| 0056764 | COUNTRY FLOORING LTD | CHATSWORTH | GA | 01 01 | 2,409 | 1,455 | 857 | | | | (21) | (21) |
| 0056799 | TRI CO FLOORS | FRESNO | CA | 01 01 | 76 | | | | | | 97 | 97 |
| 0056951 | ADAMS FINE FLOORS | MANHATTAN | | 01 01 | (250) | | | | | | 954 | 954 |
| 0056956 | T & B ASSOCIATED INC | EL CAJON | CA | 01 01 | 319 | 319 | | | | | 76 | 76 |
| 0056961 | CARPET COMPANY INC | DALLAS | TX | 01 01 | 1,391 | | | | | | (250) | (250) |
| 0057017 | ALBANY CARPET WAREHOUSE | LITTLE ROCK | AR | 01 01 | 170 | 26 | 358 | | 188 | 28 | 789 | 1,364 |
| 0057032 | BEAU MONDE | EUGENE | OR | 01 01 | 1,426 | 128 | 42 | | | | 26 | 26 |
| 0057098 | WILBOURN COMPANY FLOORING INC | ALBANY | | 01 01 | 2,782 | 1,011 | 1,705 | 409 | 383 | | 1,043 | 1,426 |
| 0057109 | WINNER CARPET ONE | BELMONT | | 01 01 | 4,104 | 2,507 | 1,978 | | | | 66 | 1,771 |
| 0057113 | YATES CARPET | ALBUQUERQUE | NM | 01 01 | 3,445 | 1,621 | 867 | | | 137 | (381) | 1,597 |
| 0057133 | NEW TEX DISTRIBUTORS INC | LUBBOCK | TX | 01 01 | 111 | | 111 | | | | 432 | 1,824 |
| 0057196 | LEXI INDUSTRIES LLC | EL PASO | TX | 01 01 | | | | | | | | |
| 0057249 | BEAULIEU OF AMERICA | DALTON | GA | 01 01 | 586,469 | 310,084 | 154,356 | 111,599 | 2,006 | 1,503 | 6,922 | 276,385 |
| 0057316 | CAPITAL CARPET & FLOORING SPECIALIST | WOREN | GA | 01 01 | 5,664 | 5,429 | 109 | | | | 123 | 231 |
| | AMERICAN BERBER INC | CALHOUN | GA | 01 01 | 8,022 | 5,592 | 1,831 | | 321 | (6) | 344 | 2,430 |

| Acct | Company | City | ST | Code | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0057357 | GO GREEN SYNTHETIC LAWN SOLUTIONS | TUNNEL HILL | GA | 01 | 10,167 | 7,934 | 2,762 | | | (529) | 2,233 |
| 0057363 | CARPET BARN | NORTH LITTLE ROCK | AR | 01 | 1,128 | 1,128 | | | | | |
| 0057630 | A CHALET FLOORING | CLEARWATER | FL | 01 | | | | | | (174) | (174) |
| 0057428 | VAN WHOLE HOME FURN | SEATTLE | WA | 01 | 38 | | | | | 25 | 38 |
| 0057423 | VALIANT PRODUCTS | DENVER | CO | 01 | (232) | | | | | (525) | (533) |
| 0057434 | KIRKWOOD FLOORING | SAINT LOUIS | MO | 01 | 317 | 301 | 92 | (8) | 13 | (45) | 47 |
| 0057543 | WESTWOOD CARPET CO | LOS ANGELES | CA | 01 | 157 | 271 | | | | (45) | 157 |
| 0057588 | ASPEN FLOORCOVERING INC | BASALT | CO | 01 | 82 | 82 | 157 | | | | |
| 0057584 | KEY FLOORS LLC | WARREN | MI | 01 | 7,633 | 7,484 | 818 | | (81) | | 149 |
| 0057602 | NIELSON FINE FLOORS | LINCOLN | NE | 01 | 25 | | | | | (45) | (13) |
| 0057617 | ACTION FLOORS INC | TAHLEQUAH | OK | 01 | 244 | 479 | | | | (235) | |
| 0057635 | VILLAGE CARPETS & INT INC | PAGOSA SPRINGS | CO | 01 | 228 | 228 | | | | (235) | (235) |
| 0057675 | MAJESTIC FLOORS | PORTLAND | OR | 01 | (12) | | | | | (162) | (12) |
| 0057702 | GRAPHIC LOOMS INC | ROCKY FACE | GA | 01 | 260 | 260 | 231 | 150 | | | |
| 0057721 | INTERIOR FLOORING INC | SANTA ROSA | CA | 01 | 1,813 | 1,582 | | | | | 231 |
| 0057767 | DON COX & ASSOC | DALLAS | TX | 01 | 5,606 | 5,510 | | | | | 96 |
| 0057167 | FLOORS & MORE | SAN DIEGO | CA | 01 | 138 | | | | | 138 | 138 |
| 0057821 | CARPET CONNECTION INC | BENTON | AR | 01 | 746 | 178 | 123 | 445 | | | 568 |
| 0057787 | WELDON INC CCA GLOBAL | BOCA RATON | FL | 01 | 532 | 532 | 561 | 62 | | | 568 |
| 0057890 | DESERT RUGS, INC | ALEXANDRIA | VA | 01 | 1,772 | 789 | 794 | 185 | 578 | (158) | 1,200 |
| 0057903 | ABBEY CARPET & COMMERCIAL COVERING | LANCASTER | CA | 01 | 1,610 | | | | | | 822 |
| 0057904 | FLOORING MILL INC | BENTONVILLE | AR | 01 | 111 | 173 | | 111 | 111 | (90) | 111 |
| 0057921 | BROWNSON CORP | FORT WORTH | TX | 01 | 83 | | | | | (90) | (90) |
| 0057955 | WHOLESALE CARPET OUTLET | BEAVERTON | OR | 01 | 404 | | | | | 404 | 404 |
| 0058028 | W D MATHEWS INC | WHITE HALL | WV | 01 | 466 | | | | | 466 | 466 |
| 0058207 | FANTASTIC FLOORS OF NE FLORIDA | CALHOUN | GA | 01 | 9,093 | 1,863 | 3,655 | 1,075 | 3,308 | (807) | 7,231 |
| 0058224 | BRADY FLOORCOVERING | ORANGE PARK | FL | 01 | 9,794 | 8,000 | 244 | 14 | 1,193 | 343 | 1,794 |
| 0058250 | PDL FLOOR DESIGNS INC | LOUISVILLE | KY | 01 | 99 | 99 | | | 55 | (274) | (164) |
| 0058281 | WHITE RIVER FLOORING INC | CARROLLTON | TX | 01 | 967 | 967 | 562 | | | | 138 |
| 0058292 | CARPET SOURCE INC | SEARCY | AR | 01 | 2,630 | 2,630 | 562 | | 49 | (157) | 405 |
| 0058482 | GOMEZ FLOOR COVERING | DANIA BEACH | FL | 01 | 3,035 | 3,035 | | | 49 | (157) | 148 |
| 0058421 | GODFREY HIRST USA | SAN ANTONIO | TX | 01 | 212 | 25 | | | | | |
| 0058493 | DRY WIZARD | ADAIRSVILLE | GA | 01 | 25 | | | | | | |
| 0058522 | CDW FLOORING | VALRICO | FL | 01 | 23,032 | 14,066 | 2,667 | 2,115 | 2,686 | (611) | 8,966 |
| 0058616 | ENVISION INC | ROCHESTER | NY | 01 | 92 | 52 | | | 2,109 | | |
| 0058633 | WOODSMAN KITCHENS & FLOORS INC | PORTLAND | OR | 01 | 52 | 52 | | | | | |
| 0058731 | GENERAL FLOORING | JACKSONVILLE | FL | 01 | 163 | 64 | 64 | 64 | 36 | 36 | 99 |
| 0058777 | SM BROTHERS FLOORING | TAMPA | FL | 01 | 936 | 936 | 18 | | 36 | (55) | 150 |
| 0058801 | STOLIVES CARPET | CHICAGO | IL | 01 | 150 | | | | | 150 | 150 |
| 0058837 | COLUMBIA | COLUMBIA | MO | 01 | 1,014 | 168 | 53 | 792 | | (274) | 845 |
| 0058853 | CARPET TOWN OF TRENTON INC | TRENTON | NJ | 01 | 104 | 104 | | | 99 | | |
| 0058857 | VILLAGE CARPET SHOP | MOUNTAIN HOME | AR | 01 | (7) | 33 | | | | (157) | 405 |
| 0058891 | NEVADA CARPET BROKERS | RENO | NV | 01 | 192 | 192 | | | | (41) | (41) |
| 0058980 | MICHAEL BALIAN INC | CATHEDRAL CITY | CA | 01 | 9,570 | 1,157 | 2,145 | 5,357 | 851 | 378 | 8,413 |
| 0059079 | ALEXANDER INTERIORS | LOUISVILLE | KY | 01 | 1,219 | 1,239 | | | | (318) | |
| 0059132 | BEL ETAGE CORP | FINDLAY | OH | 01 | (129) | | | | | (179) | (129) |
| 0059155 | BONITZ FLOORING GROUP INC | LOUISVILLE | KY | 01 | 1,040 | 526 | 336 | 178 | | | |
| 0059205 | JBM DESIGN | GLENCOE | IL | 01 | 99 | | | | | 99 | 99 |
| 0059224 | MCCOY-ROCKFORD INC | KNOXVILLE | TN | 01 | 4,761 | 4,745 | 95 | | | (78) | 514 |
| 0059348 | MILLER BUSINESS SOLUTIONS INC | HOUSTON | TX | 01 | 2,746 | 2,746 | | | | | 99 |
| 0059378 | CUSTOM DELIVERY | FORT WORTH | TX | 01 | 25 | | 13 | | | | 17 |
| 0059422 | FLOOR COLOR CENTER INC | SEATTLE | WA | 01 | 870 | 1,068 | 13 | | (12) | (1,000) | 13 |
| 0059424 | COMPETITIVE COMMERCIAL CARPETS LLC | SEMINOLE | FL | 01 | 7,055 | 6,667 | 972 | | (415) | (186) | (198) |
| 0059439 | C & F CARPET LLC | DALTON | GA | 01 | 1,858 | 599 | 591 | | | 225 | 388 |
| 0059421 | PS TRUCKING | LITTLE ROCK | AR | 01 | 300 | | | | | (394) | 300 |
| 0059476 | FLOOR USA | PORTLAND | OR | 01 | 300 | | | | 300 | 668 | 1,259 |
| | | LA PUENTE | CA | 01 | 1,695 | 1,695 | 1,695 | | | | 1,695 |

| Account | Company | City | ST | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0059551 | CONTRACT FURNISHINGS MART | PORTLAND | OR | 01 | 01 | 12,395 | 12,023 | | 29 | | | 142 | 172 |
| 0059079 | CARPET STUDIO | LOS ANGELES | CA | 01 | 01 | 362 | 95 | | | 267 | | | 267 |
| 0059095 | CONTRACT CARPET | WISCONSIN RAPIDS | WI | 01 | 01 | 222 | | | | | | 222 | 222 |
| 0059723 | CARPET HOUSE BY PAUL INC | MESQUITE | TX | 01 | 01 | 417 | 417 | | | | | | |
| 0059773 | CURRAN & ZACCHI LLC | SEATTLE | WA | 01 | 01 | 618 | 618 | | 259 | | 202 | | 685 |
| 0059744 | KELLBERG CARPET ONE FLOOR & HOME | BUFFALO | MN | 01 | 01 | 1,303 | | | | | | 225 | 139 |
| 0059749 | HOUSE OF FLOORS OF TAMPA INC | TAMPA | FL | 01 | 01 | 139 | | | | | | (3,002) | 685 |
| 0059754 | HOLLEE NAPPI LLC | PALM DESERT | CA | 01 | 01 | 114 | 2,241 | 875 | 875 | | (2,127) | (3,002) | (2,127) |
| 0059853 | DESIGN IDEAS INC | EARTH CITY | MO | 01 | 01 | 4,125 | 546 | 1,245 | 1,245 | 2,471 | 2,335 | 2,335 | 3,579 |
| 0059854 | ABC HOME FURNISHINGS INC | WEST PLAINS | MO | 01 | 01 | 331 | 453 | | | | (26) | (26) | (122) |
| 0059886 | CEDAR CREEK CARPET & TILE | SEVEN POINTS | TX | 01 | 01 | 148 | 203 | | (47) | | (54) | | (54) |
| 0060000 | OCALA CARPET & TILE INC | OCALA | FL | 01 | 01 | 280 | 280 | | | | | | |
| 0060019 | THOMAS KAY TEXTILES INC | SALEM | OR | 01 | 01 | 1,252 | 1,138 | | 94 | | 94 | | 94 |
| 0060048 | SAVE GRIGGS CARPET MAX | SAN DIEGO FLOOR STORE | FL | 01 | 01 | 1,146 | 1,146 | | | | | | |
| 0060049 | SAN DIEGO FLOOR STORE | COLUMBIA | MO | 01 | 01 | 433 | 458 | 185 | 185 | | (49) | (49) | |
| 0060135 | ABC HOME FURNISHINGS INC | BENTONVILLE | AR | 01 | 01 | (245) | | | | | (245) | (245) | (245) |
| 0060173 | CARPET & FURNITURE OUTLET INC | PINE BLUFF | AR | 01 | 01 | 206 | 206 | | | | 206 | 206 | 206 |
| 0060135 | SHOWCASE OF FLOORS | LIBERAL | KS | 01 | 01 | 504 | 541 | 271 | | | (37) | (37) | (37) |
| 0060186 | EATHERTONS FASHION FLOOR COVERING IN | SAINT LOUIS | MO | 01 | 01 | 83 | 83 | 129 | | | 350 | 750 | 750 |
| 0060200 | U S XPRESS | CHATTANOOGA | TN | 01 | 01 | 88 | 88 | | | | 206 | 206 | 206 |
| 0060211 | MIDWEST FLOOR COMPANY | SAINT LOUIS | MO | 01 | 01 | 2,004 | 2,004 | 448 | 10 | 117 | 782 | | 1,401 |
| 0060317 | CLASSIC CARPET COMPANY | FLORISSANT | MO | 01 | 01 | 1,692 | 290 | | | | | | |
| 0060323 | SILMAR FLOORING INC | PLEASANTON | CA | 01 | 01 | 144 | 144 | | | 43 | | | 43 |
| 0060346 | RANDOLPH FLOORING & CABINETRY | ROCKVILLE | MD | 01 | 01 | 1,013 | 1,232 | | | | (219) | (219) | (219) |
| 0060364 | KEY CARPET CORPORATION | OAK LAWN | IL | 01 | 01 | 4,752 | 1,865 | 210 | 290 | 2,034 | 373 | | 2,887 |
| 0060347 | HYATT REGENCY LA JOLLA | SAN DIEGO | CA | 01 | 01 | 1,966 | 571 | 146 | 440 | 517 | | | 1,396 |
| 0060404 | TITUS FLUX INC | CARTERSVILLE | GA | 01 | 01 | 999 | 999 | | | | | | |
| 0060921 | MANNINGTON CARPETS INC | NEW FREEDOM | PA | 01 | 01 | 68,383 | 42,629 | 10,384 | 14,007 | | (456) | (456) | 25,754 |
| 0060427 | BUTLER FLOORING SERVICES | DALTON | GA | 01 | 01 | (456) | 446 | 892 | | | 976 | | 657 |
| 0060469 | UCOPTEX MILLS | VOLANT | PA | 01 | 01 | 1,103 | 225,740 | 85,969 | 65,109 | 7,164 | (30,750) | 65,109 | |
| 0060477 | PS CLEVELAND INC | DALTON | GA | 01 | 01 | 290,848 | 107 | | 791 | | (444) | (399) | 657 |
| 0060507 | MYERS CARPET | POWAY | GA | 01 | 01 | 1,315 | 1,496 | 45 | 45 | | (135) | (181) | (181) |
| 0060532 | CARPET COUNTRY | PORTLAND | CA | 01 | 01 | 25 | 25 | | (46) | 25 | | 25 | 25 |
| 0060640 | TONY & MICHAEL LLC | FLAGSTAFF | OR | 01 | 01 | 25 | | | | | | | |
| 0060655 | CARPETS OF DALTON MILL OUTLET INC | SEATTLE | AZ | 01 | 01 | 4,533 | 834 | 615 | | | | | 3,699 |
| 0060675 | RUBENSTEINS CONTRACT | DULLEY | WA | 01 | 01 | 114,695 | 70,099 | 34,154 | 12,136 | 1,420 | 1,391 | (690) | 44,596 |
| 0060772 | DILLEY CARPET SERVICE | FT LAUDERDALE | CA | 01 | 01 | 123 | 108 | | | (204) | (202) | (1,289) | 123 |
| 0060811 | PALM BEACH CARPET INC | TULSA | FL | 01 | 01 | 11 | | | 963 | | | 123 | 123 |
| 0060847 | GRIGGS CARPET SHOWROOM | SEATTLE | OK | 01 | 01 | 2,483 | 2,449 | | | | | (97) | (97) |
| 0060864 | LATITUDES | GRANITE CITY | WA | 01 | 01 | 2,689 | | | | | 34 | 34 | 34 |
| 0060919 | CARPET CITY | DENVER | IL | 01 | 01 | 967 | 622 | | | | 345 | 345 | 345 |
| 0060945 | CARPET EXCHANGE | JACKSONVILLE | CO | 01 | 01 | (25) | | | | | (25) | (25) | (25) |
| 0060975 | INDUSTRIAL FABRICS INC | GRANITE BAY | FL | 01 | 01 | (70) | | | | | 117 | (70) | (70) |
| 0061002 | BEACHES FLOORING & DECOR | JACKSONVILLE | CO | 01 | 01 | 4,301 | | | | | | 4,301 | 4,301 |
| 0061027 | CARPET CLEARANCE WAREHOUSE INC | FORT WALTON BEACH | FL | 01 | 01 | (135) | 1,376 | | 1,935 | | | (135) | (135) |
| 0061101 | TNN WHOLESALE INC | FERNANDINA BEACH | FL | 01 | 01 | 1,376 | 1,376 | | | | 117 | 52 | 169 |
| 0061142 | FACTORY OUTLET NORTHSIDE | FESTUS | MO | 01 | 01 | 169 | 392 | 73 | | | | | 73 |
| 0061208 | ARTISTRY CARPET INC | JACKSONVILLE | FL | 01 | 01 | 466 | 180 | 215 | | | | | 215 |
| 0061254 | M J ROST ASSOCIATES | SAINT JAMES | FL | 01 | 01 | 395 | 522 | | | | | 169 | 169 |
| 0061260 | MERCURY CARPETS & INTERIORS | ROSWELL | MO | 01 | 01 | 522 | 3,873 | 2,755 | 290 | 440 | (216) | 2,539 | 2,539 |
| 0061266 | DONLEN INCORPORATED | SAINT LOUIS | GA | 01 | 01 | 6,412 | 74 | | | | | | |
| 0061295 | THOROUGHBRED WHOLESALE INTERIORS INC | JACKSONVILLE | MO | 01 | 01 | 74 | 74 | | | | | | |
| | LEXINGTON | LEXINGTON | KY | 01 | 01 | 287 | 362 | | | | | | |
| | CHESTERFIELD | CHESTERFIELD | MO | 01 | 01 | 188 | 188 | | | | | | |
| | LANDOVER | LANDOVER | MO | 01 | 01 | 701 | 701 | | | | (75) | (75) | (75) |
| | LAURIE | LAURIE | MO | 01 | 01 | 66 | 66 | | | | | | |
| | MORGAN COUNTY CPT | | MO | 01 | 01 | 620 | 490 | 130 | | | | | 130 |

| Acct | Company | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0063331 | DODD'S CARPET INC | CALHOUN | GA | 01 | 01 | 3,084 | 2,953 | 191 | 30 | | (60) | 131 |
| 0061387 | ROSS LANDERS INTERIORS | EL PASO | TX | 01 | 01 | 30 | 56 | | | | | 30 |
| 0061390 | FLOORING INTERIORS | COLUMBIA | IL | 01 | 01 | 264 | | 208 | | | 208 | 208 |
| 0061838 | CAROL PIPER RUGS | HOUSTON | TX | 01 | 01 | 107 | | | | | (107) | (107) |
| 0061506 | MALCHOW COMPANY INC | ABERDEEN | SD | 01 | 01 | 263 | 263 | 263 | | | | 263 |
| 0061441 | GUTHRIE'S FLOOR COVERING | DELTA | CO | 01 | 01 | (277) | | | | | (277) | (277) |
| 0063476 | KARPET KORNER LLC | BATESVILLE | AR | 01 | 01 | 899 | 772 | 127 | | | 80 | |
| 0061533 | CREATIVE FLOORING | MOUNT KISCO | NV | 01 | 01 | 922 | 392 | | 450 | | (218) | 529 |
| 0061608 | JAY HENGES ENTERPRISES, INC. | EARTH CITY | MO | 01 | 01 | 2,151 | 2,324 | | 45 | 624 | (218) | (218) |
| 0061538 | MCGARRAH CARPET | SPRINGDALE | AR | 01 | 01 | 2,395 | | 284 | | 255 | (173) | (173) |
| 0061278 | C & S CARPET DISTRIBUTION | DALTON | GA | 01 | 01 | (833) | 82 | | | | (833) | (833) |
| 0061825 | D & W PAPER TUBE | CHATSWORTH | GA | 01 | 01 | 78 | 78 | | | | | 78 |
| 0061886 | JENNINGS CARPET SPECIALTY | WARREN | AR | 01 | 01 | 113 | | 113 | | | | 113 |
| 0062006 | CALDWELL CARPET COMPANY | DALTON | GA | 01 | 01 | 1,081 | 1,081 | | | 590 | 20 | 610 |
| 0062016 | CARPET SPECIALIST OF ISHPEMING | ISHPEMING | MI | 01 | 01 | 610 | | | | | 20 | 284 |
| 0062184 | ILLINOIS VALLEY HARDWOOD | LIVERMORE | NY | 01 | 01 | 432 | 148 | | 209 | | (124) | (124) |
| 0062200 | ONE STOP FLOORING AMERICA INC | ALTON | CA | 01 | 01 | (1) | 24 | | | | (11) | (11) |
| 0062276 | GEORGE W UHMHOLTZ | SANTA BARBARA | IL | 01 | 01 | 816 | 154 | 453 | | | (11) | 662 |
| 0062335 | ROBBINS BROTHERS CARPET OUTLET | MOUNT VERNON | IL | 01 | 01 | (126) | | 209 | | | (126) | (126) |
| 0062459 | MITCHELLS CARPET | CALHOUN | GA | 01 | 01 | 52 | 52 | | 369 | | | 369 |
| 0062408 | PETER KLUJIAN CARPET CO | CLEBURNE | TX | 01 | 01 | (182) | | | | | (182) | (182) |
| 0062454 | INNOVATIVE FLOORING | CHICAGO | IL | 01 | 01 | 307 | 264 | 43 | 43 | | | 43 |
| 0062357 | C & K CORP | HOUSTON | TX | 01 | 01 | 208 | 208 | | | | (182) | (182) |
| 0062364 | LUTTOHANN FLOORING INC | WAYNE | PA | 01 | 01 | 2,130 | 1,777 | | 993 | | 48 | 353 |
| 0062707 | RICHARDET FLOOR COVERING | HIGHLAND | IL | 01 | 01 | 125,144 | 80,654 | | 54,873 | 1,903 | (13,278) | 44,490 |
| 0062771 | PARDUES FLOORING INC | PERRYVILLE | MO | 01 | 01 | 120 | 120 | 75 | 305 | | 48 | 43 |
| 0062942 | HOUSE OF CARPET | DALTON | GA | 01 | 01 | 556 | 385 | | | | (561) | 75 |
| 0062856 | ABBEY CPT OF LITCHFIELD | LITCHFIELD | IL | 01 | 01 | 185 | 185 | 202 | 202 | | (12) | 151 |
| 0062969 | S G SALES CO | ALPHARETTA | GA | 01 | 01 | 975 | 975 | | | | (12) | (12) |
| 0062959 | TEXAS GREENS BY DESIGN | AUSTIN | TX | 01 | 01 | 263 | 263 | | | | (348) | (44) |
| 0062931 | EMMAUN INC | RINGGOLD | GA | 01 | 01 | (12) | (12) | | | | | (12) |
| 0063079 | BIM COMPANY | PETALUMA | CA | 01 | 01 | 454 | 494 | 75 | 434 | | | 92 |
| 0063069 | FRESNO CUSTOM FLOORS | FRESNO | CA | 01 | 01 | 45 | 45 | | | | (19) | 248 |
| 0063081 | FISHMAN & SONS | BELTSVILLE | MD | 01 | 01 | 45 | 45 | | | | 224 | 29 |
| 0063082 | L & M FLOORING LLC | CANTON | MA | 01 | 01 | 308 | 494 | 308 | | (434) | (348) | (348) |
| 0063083 | PROGRESSIVE FLOORING SOLUTION | JESSUP | MD | 01 | 01 | 919 | 828 | 110 | | | | |
| 0063088 | FLORIDA FASHIONS | TAMPA | FL | 01 | 01 | 962 | 734 | 29 | | | 224 | |
| 0063093 | TRIANGLE TERRAZZO TILE | WABASSO | FL | 01 | 01 | 29 | 29 | | | | (19) | 29 |
| 0063110 | STEPHENS FLOOR COVERING | SANT LOUIS | MO | 01 | 01 | 12,884 | 4,102 | 3,050 | 4,321 | 879 | 533 | 8,782 |
| 0063138 | SENTINEL SALES | FUSTIS | FL | 01 | 01 | (343) | 69 | (58) | | | (412) | (412) |
| 0063153 | MANASOTA FLOORING INC | REDDING | CA | 01 | 01 | 434 | 492 | 306 | 434 | | 533 | 14 |
| 0063181 | CARPET STORE INC | SARASOTA | FL | 01 | 01 | 5,681 | 5,667 | 284 | | (277) | (412) | (412) |
| 0063159 | CARPET CONNECTION OF DALTON GA | ELIZABETHTOWN | KY | 01 | 01 | 416 | 132 | | | | (15) | 284 |
| 0063181 | CLASS A CARPETS INC | ORLANDO | FL | 01 | 01 | 609 | 594 | | | | (15) | 15 |
| 0063187 | BLUEGRASS FLOOR COV | LOUISVILLE | KY | 01 | 01 | 187 | 34 | 94 | 63 | | 15 | 157 |
| 0063210 | M & M CARPET & TILE INC | MELBOURNE | FL | 01 | 01 | 391 | 391 | 45 | 270 | | | 315 |
| 0063215 | TOTH CARPET INC | WEST MIFFLIN | PA | 01 | 01 | 1,322 | 1,007 | 140 | | | 37 | 37 |
| 0063231 | ED CO CORP | EL PASO | TX | 01 | 01 | 140 | | | | | 37 | 140 |
| | WORKHORSE INC | HOBBS | NM | 01 | 01 | 37 | | | | | | |
| | COMMERCIAL FLOOR COVERING | LUBBOCK | TX | 01 | 01 | (106) | 55 | | | | (161) | (161) |
| | DIRECT FLOORING | CAPE CORAL | FL | 01 | 01 | 56 | 408 | | | | (351) | (351) |
| | SAXON DISTRIBUTORS INC | DELRAY BEACH | FL | 01 | 01 | 277 | 79 | 159 | | | (351) | 199 |
| | DOVE CARPETS & INTERIORS, INC. | RUSKIN | FL | 01 | 01 | (30) | | 43 | | | (73) | (30) |

| Account | Name | City | ST | Code | Amount |
|---|---|---|---|---|---|
| 0062294 | MENKE INC | ABILENE | TX | 01 | 804 |
| 0063390 | LOWE'S #1380 (INSTALLER) | BLUE SPRINGS | MO | 01 | 512 |
| 0064505 | BELMONT CARPET | ANAHEIM | CA | 01 | 121 |
| 0064610 | CONAWAY FLOORING | WHEELING | WV | 01 | 103 |
| 0063425 | D M S FLOOR COVERING LLC | LOUISVILLE | KY | 01 | 64 |
| 0063521 | ACCENT CARPETS INC | NAPLES | FL | 01 | 78 |
| 0062354 | JERRY & DALE GARCIA SNSTN | GALLUP | NM | 01 | (8) |
| 0063542 | BAY AREA COMMERCIAL INTERIORS | CLEARWATER | FL | 01 | 1,029 |
| 0063599 | LEES HOUSE OF RUG REMNANTS | POMPANO BEACH | FL | 01 | 173 |
| 0062872 | EAST COAST FLOORING | POMPANO BEACH | FL | 01 | 121 |
| 0063673 | CATALINA CARPET MILLS INC | SANTA FE SPRINGS | CA | 01 | 121 |
| 0068681 | ATLAS FLOOR CO | SAN ANTONIO | TX | 01 | 19,081 |
| 0068744 | MCRAE SALES | SALT LAKE CITY | UT | 01 | 9,170 |
| 0063580 | CLARK BUILDING MATERIALS | COLUMBIA | AR | 01 | 94 |
| 0063840 | CARPET ONE COLUMBIA | COLUMBIA | MO | 01 | 108 |
| 0063898 | NASH FLOORS LLC | ROCKVILLE | MD | 01 | 95 |
| 0063912 | MERIDIAN ASSOCIATES LLC COMMERICAL | ROCHESTER | NY | 01 | 730 |
| 0063906 | CANTON FLOORS INC | MARION | IN | 01 | 210 |
| 0064019 | S P CARPET PROS | ORANGE | CA | 01 | 104 |
| 0064020 | BARRY NEAL CARPETS INC | BRIGHTON | CO | 01 | 182 |
| 0064024 | KMART # 8290 | SAINT CHARLES | MO | 01 | 75 |
| 0064095 | BAY FLOORING CO | AMARILLO | TX | 01 | 13 |
| 0064150 | ABBEY CARPET AMARILLO | AMARILLO | TX | 01 | 863 |
| 0064158 | INTERSPEC | SAN DIEGO | CA | 01 | 318 |
| 0064352 | BOWLAN CARPET | SACRAMENTO | CA | 01 | 387 |
| 0064394 | SIMAS FLOORCOVERING | SHAWNEE | OK | 01 | 589 |
| 0064437 | NATURAL CARPET COMPANY | BAINBRIDGE ISLAND | WA | 01 | (438) |
| 0064453 | H & R SALVAGE CARPET | WEST | TX | 01 | 334 |
| 0064470 | JERRYS WHOLESALE CPT & VI | CHATSWORTH | CA | 01 | 1,912 |
| 0064896 | KNIGHT CARPET CO | ABILENE | KS | 01 | (30) |
| 0065049 | CONSOLIDATED CARPET | MANHATTAN | NY | 01 | 23,550 |
| 0065120 | CONTEMPORARY FLOORS | NEW YORK | NY | 01 | (588) |
| 0065132 | MERIDIAN | PHOENIX | AZ | 01 | 146 |
| 0065153 | KING O TILE | BOSTON | MA | 01 | 227 |
| 0065166 | [illegible] | SAINT LOUIS | MO | 01 | 9,416 |
| 0065185 | SERRANO FAMILY FLOORING | MURRIETA | CA | 01 | 52 |
| 0065287 | LINDA C HOWELL & ASSOCIATES INC | OKLAHOMA CITY | OK | 01 | 49 |
| 0065279 | STOVER CARPET & DRAPERY | CAMDENTON | MO | 01 | 126 |
| 0065303 | PRESTIGE FLOORS | KELLER | TX | 01 | 370 |
| 0065451 | HM CARPET | GARDENA | CA | 01 | 281 |
| 0065466 | HALLMARK FLOOR CO | RIDGEWOOD | NJ | 01 | 1,131 |
| 0065478 | JOHNSON FLOOR COVERING INC | COUNTRYSIDE | IL | 01 | 157 |
| 0065496 | CARPET FAIR INC | BALTIMORE | MD | 01 | 442 |
| 0065584 | NEW VENTURES INC | SALEM | OR | 01 | 355 |
| 0065626 | COMMERCIAL FLOORING INC | CHEYENNE | WY | 01 | 2,799 |
| 0065620 | E J WELCH CO | EARTH CITY | MO | 01 | 346 |
| 0065699 | DIXIE CONTRACT CARPET | JACKSONVILLE | FL | 01 | 4,387 |
| 0065629 | CARPETERIA MARKARIAN CO | SAN DIEGO | CA | 01 | (823) |
| 0065701 | UNIVERSAL FLOORING SYSTEMS INC | HUNTINGTON BEACH | CA | 01 | 1,758 |
| 0065819 | MR G'S CARPETS | FORT WORTH | TX | 01 | 1,519 |
| 0065877 | DEGOL CARPET | DUNCANSVILLE | PA | 01 | 2,175 |

| Account | Name | City | ST | | | Values |
|---|---|---|---|---|---|---|
| 0065901 | SUNN CARPETS | SAN ANTONIO | TX | 01 | 01 | 61 · 61 · · · · · 61 |
| 0066012 | THE FLORIDA STORE LLC | JACKSONVILLE | FL | 01 | 01 | 283 · 348 · · 87 · · (65) |
| 0066040 | COLOR AGE STORES | NEW HYDE PARK | NY | 01 | 01 | (464) · 143 · · 238 · · (607) |
| 0066074 | WACO DISCOUNT CARPET CO | WACO | TX | 01 | 01 | 96 |
| 0066079 | SMITH CARPET & TILE CENTER INC | EDMOND | OK | 01 | 01 | 45 · 45 · · · 96 · 96 |
| 0066096 | EVENT SOLUTIONS | NORWOOD | GA | 01 | 01 | 45 · 45 · · · · · 45 |
| 0066129 | CONTEMPO FLOOR COVERINGS INC | JOHNS CREEK | GA | 01 | 01 | 1,892 · 1,859 · 84 · (50) · 34 |
| 0066178 | LESTER CARPET COMPANY | LOS ANGELES | CA | 01 | 01 | 1,469 · 1,829 · 56 · · · 140 |
| 0066214 | CARPET LADY LLC | LOS ANGELES | CA | 01 | 01 | 441 · 441 · · 376 · · 34 |
| 0066231 | WASHINGTON FLOORS INC | SHELBYVILLE | KY | 01 | 01 | 139 · 105 · 34 · · · 376 |
| 0066247 | ARCADE FLOORS CARPET ONE INC | MANSFIELD | OH | 01 | 01 | (146) · · · · · · (146) |
| 0066258 | DIVISION 9 CONTRACT FLOORING | BALTIMORE | MD | 01 | 01 | 1,234 · 315 · 169 · 312 · 341 · (146) |
| 0066273 | MICHAEL KAUTZ CARPETS & DESIGN | FLEETWOOD | PA | 01 | 01 | 1,124 · 1,124 · 164 · · · · (67) |
| 0066247 | STEVENS CARPET ONE | CARROLLTOWN | PA | 01 | 01 | 1,069 · 325 · (63) · 497 · · (79) |
| 0066288 | ART FLOOR & SCREEN | BROOKLYN | NY | 01 | 01 | 574 · 653 · 68 · 93 · · 744 |
| 0066326 | WESTERN STATES FLOORING | CHANDLER | AZ | 01 | 01 | 21,240 · 19,723 · 36 · (63) · (14) · 920 |
| 0066320 | ABBEY CARPET | CHANDLER | AZ | 01 | 01 | 3,661 · 618 · 857 · 42 · · 376 |
| 0066273 | CHATHAM CARPET CO | EL CERRITO | CA | 01 | 01 | 3,502 · 672 · · · · · 34 |
| 0066326 | EL CERRITO | EL CERRITO | CA | 01 | 01 | 447 · 447 · · · · · 225 |
| 0066409 | ANDERSON CARPET & LINOLEUM | OAKLAND | CA | 01 | 01 | 1,119 · 893 · 3,054 · · · 3,054 |
| 0066524 | BLAINES QUALITY CARPET INC | SANTE | CA | 01 | 01 | 5,077 · 4,931 · · 280 · 281 · 672 |
| 0066597 | FLAGSHIP CARPET INC | CALHOUN | GA | 01 | 01 | (395) · 182 · (51) · · · 1,517 |
| 0066631 | PIAZZA FLOORING | KETCHIKAN | AK | 01 | 01 | 627 · 634 · · (106) · · 146 |
| 0066680 | HADLEY'S WAREHOUSE CARPET SALES | CINCINNATI | OH | 01 | 01 | 2,239 · · · · (335) · (577) · (577) |
| 0066718 | SIERRA HARDSURFACES | CHATSWORTH | CA | 01 | 01 | 93 · 93 · · 197 · · (62) |
| 0066784 | ALDO CARPET INC | CARTERET | NJ | 01 | 01 | 13 · · 75 · · · 13 |
| 0066813 | KOECKRITZ RUG INC | ELK GROVE VILLAGE | IL | 01 | 01 | 1,885 · 1,417 · 468 · · 13 · 2,239 |
| 0066829 | ARTISTIC FLOORS & INTERIORS | NEW CANEY | TX | 01 | 01 | 456 · 456 · · · · · 13 |
| 0066892 | CUSTOM INSTALLATIONS | NORMAL | IL | 01 | 01 | 136 · · · · · · 468 |
| 0066945 | PROFESSIONAL FLOORING | NEW ALBANY | IN | 01 | 01 | (1,748) · 91 · (200) · (1,355) · (193) · 136 |
| 0066892 | FLOOR SOLUTIONS | EL PASO | TX | 01 | 01 | 1,574 · 1,737 · 1,388 · 94 · · (1,748) |
| 0066945 | SUN CITY CARPET DIST | SAN FRANCISCO | CA | 01 | 01 | 1,767 · 50 · · · · · 30 |
| 0066983 | T C MCMEEHEN INC | SYKESVILLE | MD | 01 | 01 | 28 · 28 · · · · · 30 |
| 0066996 | CARPET PALACE I INC | ROCKLEDGE | FL | 01 | 01 | 49 · 6,966 · (27) · (28) · (42) · (20) |
| 0067056 | HERNDONS CLASSIC WOOD FLR | AMARILLO | TX | 01 | 01 | 7,102 · 49 · · · · · 261 |
| 0067061 | J & R CARPET LLC | FARMINGDALE | NY | 01 | 01 | 372 · 372 · · · · · 133 |
| 0067253 | MONTAUK RUG & CARPET | RYE | NY | 01 | 01 | 29 · 207 · · · · (178) · (178) |
| 0067395 | CARPET TRENDS | CHARLOTTESVILLE | VA | 01 | 01 | 336 · 336 · · · · · 133 |
| 0067485 | FLOOR FASHIONS OF VA | HOUSTON | TX | 01 | 01 | 109 · 109 · (1,000) · · · (1,000) |
| 0067494 | WAYNES CARPET INC | ISSAQUAH | WA | 01 | 01 | (1,000) · 44 · · 52 · · 52 |
| 0067504 | LONGS FLOORING | DEERFIELD | IL | 01 | 01 | 97 · 1,041 · · · · · |
| 0067518 | ELRICK CORPORATION | MILLBRAE | CA | 01 | 01 | 1,041 · 147 · · · · · |
| 0067552 | HV WALKER CO INC | TAHLEQUAH | OK | 01 | 01 | 407 · 260 · · · 260 · 260 |
| 0067658 | DAVIS INTERIOR SURFACES | GILROY | CA | 01 | 01 | 14,645 · 14,645 · 158 · · · 158 |
| 0067697 | COTTAGE FLOORS INC | | OK | 01 | 01 | 356 · 239 · · · · · 158 |
| 0067782 | T & D FURNITURE | | MS | 01 | 01 | 30 · · · · · 30 · 30 |
| 0067807 | PEARL | PHILADELPHIA | PA | 01 | 01 | 419 · 419 · · · · · |
| 0067831 | PARK INC | MECHANICSBURG | PA | 01 | 01 | 147 · 147 · · · · (51) · (51) |
| 0067836 | ESSIG AND SONS INC CCA GLOBAL | EMMAUS | PA | 01 | 01 | 5,257 · 5,308 · (51) · · · (63) |
| 0067838 | EISENHARDS FLOOR & WALL COVERINGS, | SAINT LOUIS | MO | 01 | 01 | (21) · 42 · · · (63) · (353) |
| 0067915 | ANDRES CARPET SERVICE CO | SANTA BARBARA | CA | 01 | 01 | (353) · · · · · · 651 |
| 0067935 | FANCY FLOORS | CEDAR HILL | TX | 01 | 01 | 2,625 · 1,429 · · · 535 · 1,196 |
| 0067979 | E & D INVESTMENTS INC | TULSA | OK | 01 | 01 | 188 · 188 · · · 63 · 1,730 |
| 0068009 | MILL CREEK CARPET & TILE | HAYWARD | CA | 01 | 01 | 9,158 · 7,428 · 1,651 · 1,241 · 208 · 1,241 |
| 0068014 | HAWAIIAN EXPRESS | PITTSBURGH | PA | 01 | 01 | 3,165 · 1,924 · · 29 · · (221) |
| | FRANKLIN INTERIORS | MERRITT ISLAND | FL | 01 | 01 | (68) · · · · · (68) · (68) |
| | FLOORING OUTLET SUPERSTORE INC | NEVADA | MO | 01 | 01 | 489 · 194 · · · · · 489 |
| | TOMS FLOORCOVERING | | | | | 194 · 194 |

| Account | Company | City | ST | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0068093 | COOPER LIGHTING | COLUMBUS | OH | | 5,440 | 570 | | | | 5,440 |
| 0068123 | YESHUA INC | BROWNSVILLE | TX | | 570 | 5,242 | | | | |
| 0068143 | CRYSTAL PRODUCTS CO INC | DALTON | GA | | 4,906 | | | (3,356) | | |
| 0068205 | TYLER LOGISTICS | MISSION VIEJO | CA | | 319 | | | | 371 | 319 |
| 0068283 | RON'S CARPET SERVICE | KEWANNA | IN | | 165 | | | | | 165 |
| 0068283 | ADDISON DIGS CO INC | TAMPA | FL | | 228 | | 40 | (52) | (43) | (336) |
| 0068318 | MANOUKIAN BROTHERS INC | WASHINGTON | DC | | 565 | | | 165 | | 165 |
| 0068378 | ANDERSONS FLOOR COVERING INC CCA | REHOBOTH BEACH | DE | | 276 | | | | | |
| 0068385 | CARPET BARN & MORE INC | CLEARWATER | FL | | 850 | 639 | 212 | | 223 | (337) |
| 0068537 | JOHN TARR & ASSOCIATES | SAN ANTONIO | TX | | 223 | | | | | |
| 0068543 | BOONE ACTION TURF | ORANGE | CA | | (87) | | | | | (87) |
| 0068606 | STUDERS DECORATING CENTER | UVALDE | TX | | 3,214 | 173 | 765 | | 2,276 | 3,041 |
| 0068656 | MOREAU ENTERPRISES INC | COLLEGE STATION | TX | | 45 | 45 | | | | |
| 0068686 | AFS LOGISTICS | PITTSBURGH | PA | | 171 | 171 | | | | |
| 0068846 | KENNES INC. CCA GLOBAL | FREDERICK | MD | | (756) | | | | | (756) |
| 0068857 | BAY CARPETS INC CCA/GLOBAL | QUEENSTOWN | MD | | 153 | | 153 | | | 153 |
| 0068884 | MY DADS CARPETS INC | DOUGLASSVILLE | PA | | (2) | 44 | | | (46) | (46) |
| 0068913 | PRESTON BORG | MURPHY | TX | | 404 | 410 | | | (5) | (5) |
| 0068979 | KORBENS CARPETS & DRAPERIES | BEAVERTON | OR | | (10,292) | | | | (10,292) | (10,292) |
| 0069001 | MARK ARNESON INC | CHESTERFIELD | MO | | 337 | | | | 116 | 116 |
| 0069027 | SAMMAMISH FLOOR COVERING | BELLEVUE | WA | | 25 | 408 | | | (71) | (71) |
| 0069071 | ACQUISTI ENGINEERING CO | FORT MYERS | FL | | 713 | 713 | | | | |
| 0069089 | LIFESTYLE CARPETS INC | TAMPA | FL | | 59 | 59 | | | | |
| 0069159 | CARPET CITY INC | FARGO | ND | | 91 | 91 | | | | |
| 0069215 | CORPORATE FLOORS USA | ROCHESTER | NY | | (15) | | | | (106) | (106) |
| 0069302 | C & D FASHION FLOORS | VINITA | OK | | (788) | 752 | | | (1,520) | (1,520) |
| 0069382 | ABSOLUTE CARPET & UPHOLSTERY | PORTLAND | OR | | 752 | | | | | |
| 0069438 | CORINTHIAN RUG COMPANY | SAN DIEGO | CA | | 51 | 51 | | | | |
| 0069480 | COLES OF LA JOLLA INC | PITTSBURGH | PA | | 5,172 | 1,324 | 358 | 1,282 | 980 | 3,848 |
| 0069540 | REDSTONE ACOUSTICAL & FLOORING | RICHMOND | CA | | (1,715) | 252 | | | (1,967) | (1,967) |
| 0069541 | FLOOR STORE | ST AUGUSTINE | FL | | (161) | | | | (161) | (161) |
| 0069620 | CARPETS GALORE | GRAFTON | OH | | 850 | 850 | | | | |
| 0069786 | FLOORS BY GEORGE | WELLSVILLE | OH | | 5,207 | 5,32 | 304 | (69) | (299) | (225) |
| 0069823 | ALPINE FLOORING | ASHLAND | KY | | 968 | 893 | | | | 75 |
| 0069859 | FAMILY CARPET & DRAPES | LA MESA | CA | | 18 | 18 | | | (161) | (161) |
| 0069932 | LIBERTY CARPETS COMPANY | FAIRFAX | VA | | 543 | 101 | 127 | 105 | 75 | 75 |
| 0069995 | A & P FLOOR COMPANY INC | NORTH LITTLE ROCK | AR | | 101 | | | | 210 | 442 |
| 0069996 | RIVER CITY FLOORING INC | SACRAMENTO | CA | | (698) | | | | (698) | (698) |
| 0070320 | BROWN TRANSFER | KEARNEY | NE | | 3,639 | 2,405 | 1,688 | 247 | (2) | (719) |
| 0070320 | DALTON GEORGIA WHOLESALE | DALTON | GA | | 1,553 | 269 | 84 | 242 | 523 | 434 |
| 0070354 | A G LIQUIDATORS | TEMECULA | CA | | 83 | | | | | 83 |
| 0070155 | KUSKE CO | ESCONDIDO | CA | | 545 | 545 | 545 | | | 545 |
| 0070173 | ELDRIDGE FLOORCOVERING INC | SEBRING | FL | | 1,324 | 814 | 32 | (20) | 498 | 510 |
| 0070182 | CASCADE FLOORING UNLIMITED LLC | VANCOUVER | WA | | 814 | | | | | |
| 0070247 | SOVEREIGN DISTRIBUTORS INC | CHERRY HILL | NJ | | 543 | | | | | |
| 0070299 | O KENTS FLOORING COVERINGS | SAN ANTONIO | TX | | 1,614 | 1,113 | 122 | 308 | 543 | 543 |
| 0070353 | BATTLESON FLOORCOVERINGS | IDAHO FALLS | ID | | 601 | 601 | | | | 429 |
| 0070388 | TRILINK BIOTECHNOLOGIES | SAN DIEGO | CA | | 51 | | | 25 | | 25 |
| 0070405 | MCCRORIE INTERIORS INC | PORT ANGELES | WA | | 66 | 51 | | | | |
| 0070439 | VILLAGE CARPETS INC | WINNETKA | IL | | 6,283 | 6,283 | | | | |
| 0070459 | WELCO LUMBER CORP | BURNABY | BC | | 314 | 485 | (175) | | | (175) |
| 0070479 | ATTA FLOORING LLC CERTIFIED FUNDS | FOLSOM | CA | | 168 | 127 | | 99 | 41 | 41 |
| 0070485 | GOLETA CARPET | SANTA BARBARA | CA | | 715 | 715 | 170 | 721 | 103 | 715 |
| 0070518 | ERSKINE INTERIORS | HUDSON | CA | | 312 | 1,326 | 2,949 | 102 | 920 | 7,066 |
| 0070616 | SAMS FLOORING | SAINT THOMAS | PA | | 64 | 64 | | 2,657 | 312 | 312 |
| 0070646 | | | | | 154 | | | | | 154 |
| | | | | | 656 | 474 | 182 | | 154 | 182 |

| Account | Name | City | State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0070693 | REDWOOD SUPPLY CHAIN SOLUTIONS | LIVONIA | MI | 01 | 01 | 31,117 | 31,534 | | | | (416) | (416) |
| 0070609 | NEWELL RUBBERMAID INC | FREEPORT | IL | 01 | 01 | 51,976 | 46,861 | 115 | | | 1,212 | 5,115 |
| 0070778 | MANCHESTER CARPETS | HOUSTON | TX | 01 | 01 | 56 | 63 | | | | (6) | (6) |
| 0070758 | CARPET SHOPPE INC | HONOLULU | HI | 01 | 01 | (745) | | | | | (745) | (745) |
| 0072664 | PROSOURCE OF SALINAS | SALINAS | CA | 01 | 01 | 1,803 | 2,040 | | | | (237) | (237) |
| 0072786 | BEARDEN CARPET SUPPLY | SPRINGFIELD | MO | 01 | 01 | 198 | 258 | 58 | | | 57 | 57 |
| 0070821 | SISALCARPET.COM INC | SEATTLE | WA | 01 | 01 | 1,098 | 1,098 | 205 | | 3,223 | 78 | 283 |
| 0070835 | US INSTALLATION GROUP INC | BOCA RATON | FL | 01 | 01 | 60,099 | 60,099 | 24,283 | 26,113 | 5,357 | (59) | 35,815 |
| 0070969 | FLOORS GONE WILD | JACKSONVILLE | FL | 01 | 01 | 1,136 | 1,136 | | | | 1,124 | 1,136 |
| 0071048 | M & J CARPETS | DALTON | GA | 01 | 01 | (80) | (80) | | | | (80) | (80) |
| 0071093 | ADVANTAGE CARPETS | DALTON | GA | 01 | 01 | 192 | 395 | | | | 1,136 | 1,136 |
| 0071124 | POPULAR FLOOR CO | IOWA PARK | TX | 01 | 01 | 111 | 111 | | | | (203) | (203) |
| 0071165 | JENSEN KW CO | FREELAND | WA | 01 | 01 | 207 | 207 | | | | 207 | 207 |
| 0071231 | WILEY CO INC | ISSAQUAH | WA | 01 | 01 | 50 | 50 | 13 | | 13 | 25 | 38 |
| 0071251 | CAPITAL COMMERCIAL FLOORING | SACRAMENTO | CA | 01 | 01 | 131 | 65 | | 67 | | 67 | 67 |
| 0071327 | CREW 2 INC | MINNEAPOLIS | MN | 01 | 01 | 12,420 | 12,044 | | | | | |
| 0071386 | TRIUMPH USA | PORTLAND | OR | 01 | 01 | (244) | 357 | 513 | | | (137) | 376 |
| 0071393 | A HOWARD TILE & CARPET | ENID | OK | 01 | 01 | 1,477 | | | 373 | | (244) | (244) |
| 0071421 | EASTERN FLOORING CENTER | PALM COAST | FL | 01 | 01 | 473 | 470 | | | | 1,004 | 1,004 |
| 0073435 | ROYALTY CERAMICS | DALLAS | TX | 01 | 01 | 69 | 160 | | 202 | | 161 | 362 |
| 0073469 | CITY FLOORS INC | CAPITOL HEIGHTS | MD | 01 | 01 | 730 | 301 | | | | 730 | 730 |
| 0073511 | BARRYS CARPET | MACON | MO | 01 | 01 | 301 | 301 | | | | | 730 |
| 0071735 | REMNANT CARPET CO | OKLAHOMA CITY | OK | 01 | 01 | 1,786 | 1,774 | 358 | 804 | 469 | 86 | 1,786 |
| 0071756 | CARPET STORE | OKLAHOMA CITY | OK | 01 | 01 | 10,010 | 3,869 | 294 | 2,107 | 1,033 | 934 | 6,141 |
| 0073814 | DALTONIAN FLOORING, INC. | CALHOUN | GA | 01 | 01 | 357 | 357 | 69 | | | | |
| 0072837 | J & S MARATHON GLASS INC | APOLLO BEACH | FL | 01 | 01 | 880 | 776 | | 804 | | 86 | 67 |
| 0072806 | NORTH CITY'S WHOLESALE CARPET | OKLAHOMA CITY | OK | 01 | 01 | 53 | 40 | | 104 | | 13 | 13 |
| 0072802 | TEXAS CARPET OUTLET | WICHITA FALLS | TX | 01 | 01 | 2,822 | 50 | 13 | | | | 104 |
| 0072063 | BUSINESS CARPETS & FLOORING | MONKTON | MD | 01 | 01 | 577 | 303 | 1,307 | | 237 | 2,774 | 2,771 |
| 0072164 | LAKE FOREST INTERIOR DESIGN | HAYDEN | ID | 01 | 01 | 204 | 128 | 276 | 373 | | | 376 |
| 0072165 | CAPRILLA ENTERPRISES LLC | VERO BEACH | FL | 01 | 01 | (6) | | 77 | | | 77 | 77 |
| 0072201 | MISSION CARPET & FLOORS | | ID | 01 | 01 | 16 | 77 | | | | | |
| 0072350 | PERMANENT FLOORS | PARMA | OH | 01 | 01 | (88) | (88) | | | | (22) | (22) |
| 0072355 | COMMERCIAL CARPET CONSULTANT | MCALESTER | OK | 01 | 01 | 169 | 169 | 16 | | | (48) | (48) |
| 0072478 | PACK BUILDING MATERIALS & CARPET | ELMHURST | IL | 01 | 01 | 67 | 42 | | | | (88) | (88) |
| 0072569 | AG ENTERPRISES | POPLAR BLUFF | MO | 01 | 01 | 42 | 3,929 | 2,487 | | | 25 | 25 |
| 0072644 | WAGNER CARPET LAYING COMPANY | WESTOVER | WV | 01 | 01 | 6,416 | 173 | | | | 2,487 | 2,487 |
| 0072654 | COMMERCIAL WINDOW COVERINGS | SANTA ROSA | CA | 01 | 01 | 173 | 248 | | | | | |
| 0072805 | FINISHING TOUCH | TULSA | OK | 01 | 01 | 248 | 55 | | | | | |
| 0072850 | FLOORZ | LONG BEACH | CA | 01 | 01 | 55 | 2,971 | 2,487 | | | 2,971 | 2,971 |
| 0072896 | DECORATOR OUTLET INC | DENVER | CO | 01 | 01 | 2,971 | (50) | | | | (50) | (50) |
| 0073025 | KUEN FLOORING | WICHITA FALLS | TX | 01 | 01 | (50) | 1,780 | 685 | | | 794 | 1,479 |
| 0073037 | BEST WESTERN AIRPORT PLAZ | PARK CITY | TX | 01 | 01 | 3,259 | 314 | | | | | |
| 0073044 | TONY PRINCE CO INC. | SANTA CRUZ | CA | 01 | 01 | 314 | 314 | | | | | |
| 0073059 | BUFFALO CARPET COMPANY | SAINT LOUIS | MO | 01 | 01 | 275 | 275 | | | | | |
| 0073129 | DLS | HOUSTON | TX | 01 | 01 | (1,096) | (1,096) | | | | (1,096) | (1,096) |
| 0073157 | ACCENT CARPETS | LOS ANGELES | CA | 01 | 01 | 2,726 | 5,822 | 1,385 | 2,650 | | 1,005 | 2,390 |
| 0073232 | SUPERIOR CARPET SERVICE | TRACY | CA | 01 | 01 | 181 | 30 | 46 | | | | 90 |
| 0073267 | REMNANTS TO GO | CINCINNATI | OH | 01 | 01 | 80 | 91 | | | | (50) | |
| 0073281 | FRESNO CARPET GALLERY | BELLEVUE | WA | 01 | 01 | 126 | 126 | | | | 794 | |
| 0073322 | FLOORING ASSOC INC | FRESNO | CA | 01 | 01 | 116 | 116 | | | | 360 | 360 |
| 0073326 | CHATTANOOGA FLOORING CENTER LLC | CHATTANOOGA | TN | 01 | 01 | 360 | 360 | | | | | |
| 0073352 | CENTREX INC | NORTH RICHLAND HILL | TX | 01 | 01 | 200 | 200 | 400 | 312 | (65) | 64 | (1) |
| 0073326 | RUG RAT FLOORING | POCATELLO | ID | 01 | 01 | 3,191 | 2,479 | | 626 | | (200) | (200) |
| 0073352 | CONTEMPO FLOOR COVERINGS INC | LOS ANGELES | CA | 01 | 01 | (34) | (34) | | | | (34) | (34) |
| 0073382 | ARTURO MIRANDA | SCOTTS VALLEY | CA | 01 | 01 | 1,463 | 1,605 | 221 | 525 | 345 | (114) | 712 |

| Account | Creditor | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0073485 | PUTTING GREENS OF THE WEST | FRESNO | CA | 01 | 01 | 234 | | 838 | | | (2,146) | 234 |
| 0073453 | J W FLOOR COVERING | SAN DIEGO | CA | 01 | 01 | 41,513 | 42,843 | | | | | (1,330) |
| 0073434 | BEN E KEITH FOODS | SAN ANTONIO | TX | 01 | 01 | 122 | 122 | | | | | 122 |
| 0073635 | SMOOT CARPETS | TULSA | OK | 01 | 01 | | | | 166 | | (103) | 63 |
| 0073637 | HANKS CARPET | TUNNEL HILL | GA | 01 | 01 | 3,896 | 3,833 | | 28 | | (55) | (1,330) |
| 0073786 | PENINSULA FLOOR COVERINGS INC | PORT TOWNSEND | WA | 01 | 01 | 1,328 | 1,273 | | | | | 1,328 |
| 0073815 | COLOR CONCEPTS | ATLANTA | GA | 01 | 01 | 13 | 13 | | | | | 13 |
| 0073817 | J & D FLOORS | GREENSBURG | PA | 01 | 01 | 645 | 565 | 80 | | | | 80 |
| 0073844 | DECOR CARPET ONE FLOOR & HOME | RENTON | WA | 01 | 01 | (120) | | | | | (12) | (12) |
| 0073877 | HICKS COMPANY, INC. | SAN ANTONIO | TX | 01 | 01 | 66 | 122 | 368 | | | (1,046) | (679) |
| 0073878 | CARPET ART OF AMERICA INC | O FALLON | MO | 01 | 01 | (160) | (2) | | | | (280) | (280) |
| 0073903 | CARPETS UNLIMITED INC | SANTA MARIA | CA | 01 | 01 | 330 | 423 | | | | (93) | (93) |
| 0073920 | STR FABRICATION | DALTON | GA | 01 | 01 | 486 | | 627 | 82 | | | 709 |
| 0073935 | WOLFBERG CARPETS | CONSHOHOCKEN | PA | 01 | 01 | (63) | 230 | 293 | (293) | | | (293) |
| 0073993 | BILL'S CARPET | MT PROSPECT | IL | 01 | 01 | 602 | 309 | 293 | | | | 293 |
| 0074023 | MARSHALL CARPET ONE | MAYFIELD HEIGHTS | OH | 01 | 01 | 309 | 130 | | | | | |
| 0074412 | L B HALEYS FLOOR LLC | OKLAHOMA CITY | OK | 01 | 01 | 230 | 42 | | | | | 46 |
| 0074439 | ROBERT CAMPBELL'S SERVICE INC | PORT WASHINGTON | NY | 01 | 01 | 130 | 42 | 46 | | | 0 | 46 |
| 0074683 | ANDERSON CARPET INC | PONCA CITY | OK | 01 | 01 | 46 | | | | | (163) | (163) |
| 0074694 | HOME CARPET DIST | DALTON | GA | 01 | 01 | (163) | 1,269 | 187 | 1,538 | | 53 | 1,778 |
| 0074784 | NORMAN CARPETS CO INC CCA GLOBAL | BRKN MAWR | PA | 01 | 01 | 3,047 | 2,194 | | | | (182) | (182) |
| 0074785 | FAIRCHILD MANAGEMENT CORP | PORT ANGELES | WA | 01 | 01 | 2,012 | 75 | 597 | | | (66) | 531 |
| 0074809 | EAST WINDSOR FLOOR COVERING | EAST WINDSOR | NJ | 01 | 01 | (188) | 1,399 | | | | (66) | (6) |
| 0074820 | A JENANINE FEENEY INC | COCKEYSVILLE | MD | 01 | 01 | 1,930 | 468 | | | | (6) | 85 |
| 0074870 | SANDY DECOR | SANDY | OR | 01 | 01 | 462 | 86 | | | | | 85 |
| 0074913 | MOUNT VERNON CARPET CENTER LLC | MOUNT VERNON | WA | 01 | 01 | 86 | 85 | | | | | 85 |
| 0074995 | CALIFORNIA DESIGN CENTER | CITY OF INDUSTRY | CA | 01 | 01 | (20) | | | (20) | | (71) | (20) |
| 0075110 | MCCORMICKS FLOORING | SWARTZ CREEK | MI | 01 | 01 | 2,436 | 2,507 | 289 | 55 | | (71) | 2,507 |
| 0075367 | DISTINCTIVE CARPETS | DENVER | CO | 01 | 01 | 646 | 302 | 119 | | 288 | 344 | 344 |
| 0075548 | ALL AMERICAN FLOORING INC | LEWISVILLE | TX | 01 | 01 | 833 | 163 | | | 263 | 670 | 670 |
| 0075572 | FLOORS UNLIMITED | LEWISVILLE | TX | 01 | 01 | 916 | 966 | | | | (50) | 179 |
| 0075624 | CARPET WEAVERS | SHAWANO | WI | 01 | 01 | 1,272 | 1,248 | 24 | | | 179 | 179 |
| 0075871 | M & M FLOORING DISTRIBUTORS | DECATUR | IL | 01 | 01 | (262) | (262) | | | | (50) | 24 |
| 0075947 | LOUIS WEINSTEIN INC | MADISON | WI | 01 | 01 | 330 | 330 | | 330 | | (262) | 330 |
| 0075985 | NEFF FLOOR COVERING | LITTLE SILVER | NJ | 01 | 01 | 129 | 44 | | | | | 45 |
| 0076059 | RITTER TILE SHOP INC | WATERLOO | IL | 01 | 01 | 89 | 45 | 45 | | | 45 | 45 |
| 0076216 | BELLBRIDGE INC | SALINA | KS | 01 | 01 | 178 | 613 | | | | | 613 |
| 0076244 | ENGINEERED FLOORS | BENICIA | CA | 01 | 01 | 613 | | 154 | 133 | | 101 | 389 |
| 0076448 | CERTIFIED CARPET SERVICE | DALTON | GA | 01 | 01 | 3,357 | 2,968 | | | | (434) | (434) |
| 0076472 | YOUVERS HOUSE OF CARPETS & DRAPERIE | LANCASTER | PA | 01 | 01 | (410) | (410) | | | | (434) | (410) |
| 0076595 | YRC | TEMPE | AZ | 01 | 01 | 75 | 75 | | | | 94 | 94 |
| 0076658 | SPEARMINT RHINO | SAN DIEGO | CA | 01 | 01 | 94 | 94 | | | | 276 | 276 |
| 0076755 | MAYS LONESTAR FLOORING | SAN DIEGO | CA | 01 | 01 | 276 | 276 | | | | 1,200 | 1,200 |
| 0076757 | AMERICAN FLOORING DIRECT | SANTA MARIA | CA | 01 | 01 | 1,200 | 173 | | 1,995 | (179) | 1,200 | 1,200 |
| 0076922 | FLOOR COVERING RESOURCES, INC. | ATLANTA | GA | 01 | 01 | 173 | 173 | | 75 | 807 | | |
| 0077075 | WECKERS CARPET LLC | MANHAWKIN | NJ | 01 | 01 | 111 | 49 | | | | 154 | 206 |
| 0077097 | P G LONG FLOORCOVERING LLC | KENSINGTON | MD | 01 | 01 | 255 | 3,258 | 52 | | | (81) | (81) |
| 0077156 | AGGIELAND CUSTOM CARPETS & INTERIORS | YORK | PA | 01 | 01 | 159 | 3,177 | 6,815 | | | 6,875 | 6,875 |
| | C B FLOORING | PORTLAND | OR | 01 | 01 | 8,010 | 1,195 | | | | (68) | (68) |
| | DESIGN GALLERIA BY VALENTINE, INC. | COLLEGE STATION | TX | 01 | 01 | 3,177 | 227 | 555 | 75 | | 75 | 75 |
| | SURFACE ART INC | COLUMBIA | MD | 01 | 01 | 1,195 | 150 | | | | | |
| | CARPET IMPRESSIONS | SACRAMENTO | CA | 01 | 01 | 7,955 | 1,021 | | | | 3,357 | 3,357 |
| | MANNINGTON MILLS | SEATTLE | WA | 01 | 01 | 227 | 91 | | | | 75 | 75 |
| | BILL PEDERSON | SALEM | VA | 01 | 01 | 150 | 1,021 | | | | | |
| | DESIGNERS HOME GALLERY | MCLEAN | VA | 01 | 01 | 1,021 | 91 | | | (510) | (576) | (754) |
| | MANNINGTON MILLS | DENVER | CO | 01 | 01 | 91 | 71,859 | 1,452 | | 64 | (554) | (554) |
| | BILL PEDERSON | WICHITA | KS | 01 | 01 | 71,105 | 2,033 | | | | | |
| | BOMBERGERS STORE INC | LITITZ | PA | 01 | 01 | 516 | 516 | | | | | 1,516 |

| Account | Company | City | ST | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0077229 | CLASSIQUE FLOORS | PORTLAND | OR | 01 | 01 | 86 | 86 | 320 | | | 85 | 405 |
| 0077253 | PHIL WAGGONER CARPETS & DECORATING | WICHITA FALLS | TX | 01 | 01 | 749 | 344 | (44) | | | 132 | 132 |
| 0077402 | PROFESSIONAL RUG WORKS | TROY | MI | 01 | 01 | 64 | 108 | (44) | | | (44) | (44) |
| 0077472 | VON INTERPRISE | CATHEDRAL CITY | CA | 01 | 01 | 843 | | 433 | | | 410 | 843 |
| 0077429 | SOONER CONSTRUCTION CO OF | PONCA CITY | OK | 01 | 01 | (4) | | | | | (4) | (4) |
| 0077505 | NORTH COAST STONE | FORT BRAGG | CA | 01 | 01 | | | | | | | |
| 0077527 | CENTURY CARPET INC | FORT BRAGG | CA | 01 | 01 | | | | | | | |
| 0077562 | RICK LOVELADY CARPET | FARMINGDALE | NJ | 01 | 01 | 8,380 | 8,180 | | | | (8) | (8) |
| 0077760 | GREENSPRING CARPET INC | AMARILLO | TX | 01 | 01 | (131) | (131) | | | | | (131) |
| 0077992 | CLEVELAND CUSTOMER PUTTING GREEN | LUTHERVILLE TIMONIU | MD | 01 | 01 | 353 | 221 | 132 | | | | 132 |
| 0077993 | FOCUS COMMERCIAL CARPET | STRONGSVILLE | OH | 01 | 01 | (159) | | | | | (159) | (159) |
| 0078151 | HILEX POLY | RINGGOLD | GA | 01 | 01 | (15) | | | | | (606) | (335) |
| 0078151 | SK DESIGNS LLC | GREENSBORO | NC | 01 | 01 | 512 | 120 | 92 | | | 197 | 512 |
| 0078203 | DUBLIN CARPET, INC. | GREENSBORO | NC | 01 | 01 | 274 | 134 | 43 | | | | 140 |
| 0078229 | M33 INTEGRATED SOLUTIONS | DUBLIN | GA | 01 | 01 | 432 | 254 | 182 | | | | 512 |
| 0078233 | 90B SQUARED LLC | CALHOUN | GA | 01 | 01 | (169) | | | | | 179 | 179 |
| 0078337 | PIONEER HOME SUPPLY | BEAMONT | CA | 01 | 01 | 551 | 551 | | | | (169) | (169) |
| 0078387 | US FLOORS | DALTON | GA | 01 | 01 | 98 | 98 | | | | 98 | 98 |
| 0078399 | TURF BY DESIGN | DENVER | CO | 01 | 01 | 59,595 | 48,564 | 7,514 | 313 | (473) | 3,878 | 11,029 |
| 0078496 | JR FLOORING | BONITA | CA | 01 | 01 | 300 | 150 | 150 | | | | 150 |
| 0078591 | MICHAELS CARPET | MARIETTA | GA | 01 | 01 | 150 | | | | | | 150 |
| 0078652 | FLOOREXPO | CALHOUN | GA | 01 | 01 | (40) | | 110 | 313 | (40) | | 313 |
| 0078680 | CROCOS FLOORING | DALTON | GA | 01 | 01 | 2,313 | 2,000 | 64 | | | | 151 |
| 0078748 | USA CARPET INC | ROSEVILLE | OR | 01 | 01 | 151 | 151 | | | | 151 | 151 |
| 0078886 | LINOLEUM & CARPET CENTER | BEAVERTON | OR | 01 | 01 | 25 | 50 | 50 | | | 25 | 25 |
| 0078999 | VEGAS CARPET & BINDING | RAPID CITY | SD | 01 | 01 | 50 | 50 | | | | 64 | 64 |
| 0079250 | NATCO PRODUCTS CORP | LAS VEGAS | NV | 01 | 01 | 789 | 789 | 789 | | | | |
| 0079255 | A STEP ABOVE RUG & INSTL | CHELSEA | MA | 01 | 01 | 207 | | 32 | 207 | | | 207 |
| 0079337 | CTW FLOORING LLC | CINCINNATI | OH | 01 | 01 | 3,154 | 3,426 | | 156 | | (460) | (272) |
| 0079340 | FLOORQUEST LLC | MADISON | WI | 01 | 01 | 159 | 159 | | | | | 207 |
| 0079346 | STRAIGHT ARROW CARPET | FOND DU LAC | WI | 01 | 01 | 159 | | 124 | | | | 124 |
| 0079422 | SCS FLOORING SYSTEMS | COVINA | CA | 01 | 01 | 130 | 66 | 66 | | | | 25 |
| 0079429 | CARPETLAND | IRVINE | CA | 01 | 01 | 653 | 651 | 794 | 242 | | (6) | 1,030 |
| 0079446 | OREGON TILE & MARBLE | LAFAYETTE | IN | 01 | 01 | 3,593 | 2,563 | | 87 | | (74) | 651 |
| 0079534 | MACCOS FLOOR COVERING CENTER INC | SEATTLE | WA | 01 | 01 | 66 | | | 4,310 | | (2,421) | 1,975 |
| 0079555 | DELMARVA CARPET CO INC. CCA GLOBAL | GREEN BAY | WI | 01 | 01 | (331) | (331) | | | | (331) | (331) |
| 0079575 | ADAIR COMMERCIAL FLOORING | LUTHERVILLE TIMONIU | MD | 01 | 01 | 128 | 128 | | | | 128 | 128 |
| 0079586 | FLOORS BY ROBERTS | NEW BERLIN | WI | 01 | 01 | 6,207 | 3,870 | 1,001 | 381 | 184 | (2,421) | 2,338 |
| 0079587 | SUN PRAIRIE | APPLETON | WI | 01 | 01 | 1,354 | 951 | 179 | 184 | | 24 | 203 |
| 0079650 | ADVANCED CONSTRUCTION LLC | GREEN BAY | WI | 01 | 01 | (516) | 2,067 | 97 | | 530 | (2,680) | (2,583) |
| 0079650 | KOEHLER FLOORING | ALEXANDRIA | WI | 01 | 01 | 859 | 407 | | 152 | 300 | | 452 |
| 0079716 | HUNTS FLOORING | RACINE | WI | 01 | 01 | 727 | 377 | 350 | | | | 350 |
| 0079729 | GERRYS AT HOME CARPETS | WEST ALLIS | WI | 01 | 01 | 430 | 582 | | | | (152) | 350 |
| 0079738 | KUHNS CARPET & TILE | WEST BEND | WI | 01 | 01 | 2,757 | 2,757 | | | 1,675 | (152) | 2,757 |
| 0079976 | CARPET WORKS | CORAL SPRINGS | FL | 01 | 01 | 1,145 | 624 | 96 | 58 | (45) | 1,082 | 521 |
| 0080082 | EASTSIDE CARPET CORP | CHATSWORTH | GA | 01 | 01 | (274) | | | | | 412 | (274) |
| 0080039 | CREATIVE FLOOR BY MCDONALD | DALTON | GA | 01 | 01 | 646 | 646 | | | | 646 | 646 |
| 0080273 | SPECTRA CONTRACT FLOORING | KELSO | WA | 01 | 01 | (4) | (4) | | | | (4) | (4) |
| 0080096 | PEP BOYS | PHILADELPHIA | PA | 01 | 01 | 705 | 77 | 231 | | | 628 | 628 |
| 0080110 | PRODAN CUSTOM FLOORING | TILER HILL | PA | 01 | 01 | 843 | 843 | | 900 | | 612 | 920 |
| 0080397 | AMARI DESIGN RESOURCE | SOLANA BEACH | CA | 01 | 01 | 10,676 | 9,756 | 2,520 | | | (2,388) | 843 |
| 0083329 | MISC STORAGE | SPOKANE | WA | 01 | 01 | 119 | | | | | 119 | 119 |
| 0083345 | DH CASTERS | ONTARIO | CA | 01 | 01 | 504 | 504 | | | 2,000 | | 2,000 |
| 0083417 | STRAIGHT POINT LINE INC | HINGHAM | MA | 01 | 01 | 6,000 | 6,000 | | | | | |
| | | | | | | 25 | 25 | | 175 | | (12) | 213 |
| | | | | | | 738 | 525 | 50 | | | (112) | (112) |
| | | | | | | 173 | 286 | | | | | |
| 0080435 | | | | | | 21,103 | 15,688 | 4,416 | | | | 4,416 |

| Acct # | Customer | City | ST | | | C1 | C2 | C3 | C4 | C5 | C6 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0080466 | TURF AMERICA | TEMPE | AZ | 01 | 01 | 50 | | | | 50 | 50 |
| 0080659 | LARRY & SON TILE CO | CROCKER | MO | 01 | 01 | 157 | | | | | |
| 0080572 | ALL OUT CARPETING GREEN | FORT OGLETHORPE | | 01 | 01 | 134 | | | | | |
| 0080675 | SILVER CLOUD CARPET MILLS | WALNUT CREEK | CA | 01 | 01 | 800 | 536 | | | | 536 |
| 0090721 | BRUNOS CUSTOM FLOORING | BARNHART | MO | 01 | 01 | (2,831) | | | | (3,729) | (3,531) |
| 0090723 | PITTSBURGH LOGISTICS SYSTEMS INC | CRANBERRY TOWNSHIP | PA | 01 | 01 | (96) | | | | (190) | (96) |
| 0080814 | JAMES G PARKER INSURANCE | FRESNO | CA | 01 | 01 | (267) | | 45 | | (267) | (267) |
| 0080815 | BEAUTIFUL HOME INT | JEFFERSON CITY | MO | 01 | 01 | (680) | | | | (680) | (680) |
| 0080842 | JIM BUSH CARPET OUTLET | CINCINNATI | OH | 01 | 01 | (92) | | | | (92) | (92) |
| 0080938 | CONTINENTAL COMMERCIAL FLOORS | COLUMBUS | OH | 01 | 01 | 64 | | | | | 64 |
| 0080952 | FABULOUS FLOORS INC | ROLLA | KY | 01 | 01 | 1,304 | 160 | | 99 | | 1,144 |
| 0080976 | AVA FURNITURE | CRESTWOOD | OH | 01 | 01 | 539 | 157 | | | | 382 |
| 0081110 | BILLS DESIGN INC | COLUMBUS | OH | 01 | 01 | 157 | 329 | 27 | | | |
| 0081120 | SCHROEDER DESIGN ASSOCIATES INC | ABERDEEN | WA | 01 | 01 | 135 | 92 | | | 26 | |
| 0083172 | ROSEDALE TRANSPORT LTD | AUSTIN | TX | 01 | 01 | 238 | 136 | | | (93) | (93) |
| 0083205 | CARPET ONE OF SALEM INC | MISSISSAUGA | ON | 01 | 01 | 331 | | | | (36) | (36) |
| 0083216 | CRAFTSMAN FLOOR COVERINGS, INC. | SALEM | OR | 01 | 01 | 680 | | | | (36) | (36) |
| 0083279 | LIPPERT TILE CO | PETALUMA | CA | 01 | 01 | 130 | 823 | | 166 | 581 | 747 |
| 0083344 | BIG BOBS FLOORING OUTLET | MENOMONEE FALLS | WI | 01 | 01 | 575 | 519 | | | | 130 |
| 0083395 | VALUE CARPETS INC | AUBURN | MA | 01 | 01 | (876) | | | | | 203 |
| 0081600 | C F SALES INC | DALTON | GA | 01 | 01 | 519 | 1,311 | | | 56 | 1,662 |
| 0081869 | STANFORD CARPET | SEATTLE | WA | 01 | 01 | 2,974 | 851 | | | 802 | 4,060 |
| 0081900 | GRANITE BAY FLOORING & DESIGN | SAN JOSE | CA | 01 | 01 | 1,311 | 187 | | | 3,291 | 575 |
| 0081953 | HEH CARPETING INC | ROSEVILLE | CA | 01 | 01 | 4,060 | 214 | | | 269 | (187) |
| 0082089 | MAXWELL BROTHERS FLOORS INC | CAPE GIRARDEAU | MO | 01 | 01 | 1,426 | 395 | | | 306 | (214) |
| 0082099 | STEVENSON CARPET INC | DALTON | GA | 01 | 01 | 851 | | | | (32) | 187 |
| 0082154 | STONEWOOD FLOORING | LOMITA | CA | 01 | 01 | 187 | | | | | 203 |
| 0082198 | DAWSONS FLOOR FASHIONS | ALBUQUERQUE | NM | 01 | 01 | 214 | 356 | | 148 | 88 | 247 |
| 0082196 | RODNEY ENTERPRISES | PLACERVILLE | CA | 01 | 01 | 395 | | | | | 706 |
| 0082211 | FRIES PROPERTIES | FORNEY | TX | 01 | 01 | (71) | | | | (71) | (71) |
| 0082214 | STANTON CARPET CORP | SYOSSET | NY | 01 | 01 | 1,061 | 109 | | 121 | | 601 |
| 0082226 | CARTER CUSTOM CARPETS INC | FREMONT | CA | 01 | 01 | 395 | | | | | 109 |
| 0082276 | MATTRESS LIQUIDATORS INC | ROME | NY | 01 | 01 | 176 | 203 | | | (148) | 203 |
| 0082575 | TOTTENS CARPETS INC | CENTENNIAL | CO | 01 | 01 | (211) | | | (7) | | (211) |
| 0082596 | ALLIED FLOORS/SPOKANE BR. | LANCASTER | OH | 01 | 01 | 13 | | | | | (101) |
| 0082601 | VECTOR CONCEPTS INC | SEATTLE | WA | 01 | 01 | 447 | | | | | 176 |
| 0082595 | CREATIVE FLOORING CONCEPTS | IRVING | TX | 01 | 01 | 395 | | | | | (211) |
| 0082604 | WYNNESBORO DECORATING LTD CCA GLOBAL | PLAINVIEW | NY | 01 | 01 | 1,547 | 48,289 | 4,319 | | | (101) |
| 0082669 | CONKLIN RUGS OF SAN JOSE INC | WAYNESBORO | PA | 01 | 01 | 1,589 | | | | | (100) |
| 0082689 | BOB WAGNERS MILL CARPET | SAN JOSE | CA | 01 | 01 | 155 | 155 | 250 | 36 | | 4,168 |
| 0082690 | TURFSTONE.COM | DOWNINGTOWN | PA | 01 | 01 | 32 | 155 | | | | 155 |
| 0082694 | LATIMER PLASTERING | CALHOUN | GA | 01 | 01 | 3,892 | 32 | (43) | | (50) | 48 |
| 0082770 | THE PERFECT LAWN | BLACKFOOT | ID | 01 | 01 | 793 | 3,892 | | | | 1,589 |
| 0082817 | CT INTERIORS, LLC | FORT WORTH | TX | 01 | 01 | (197) | 793 | | (13) | 793 | 176 |
| 0082963 | CARPET REPLACEMENT SYSTEMS | GREENWOOD VILLAGE | CO | 01 | 01 | (523) | (197) | | | (197) | 793 |
| 0083034 | VISION FLOORS & MORE | FT LAUDERDALE | FL | 01 | 01 | (399) | (523) | (59) | | (124) | (124) |
| 0083045 | EVENTS CARPET | LAFAYETTE | IN | 01 | 01 | (195) | (399) | (323) | | (53) | (523) |
| 0083050 | NANCE CARPET & RUG CO | LAKE FOREST | IL | 01 | 01 | 5,634 | (195) | | | (202) | (202) |
| 0083079 | FABRICS WEST INTERIORS | EL PASO | TX | 01 | 01 | 2,818 | | 250 | | 48 | 48 |
| 0083172 | INTERIORS BY ROBIN | SPOKANE | WA | 01 | 01 | 2,987 | 1,499 | | | 1,553 | 1,589 |
| 0083192 | ALL AMERICAN FLOORING | DALLAS | TX | 01 | 01 | 30 | 447 | | | 175 | 175 |
| 0083231 | MARATHON GLASS | APOLLO BEACH | FL | 01 | 01 | (25) | 13 | | | | |
| 0083294 | CAPITOL INDUSTRIES INC | DALTON | GA | 01 | 01 | 392 | 88 | 102 | 415 | 819 | 2,665 |
| 0083322 | RUGS TO RICHES | CHINO | CA | 01 | 01 | 33 | 33 | (25) | | (195) | (507) |
| 0083366 | DREXEL INC | BROOKFIELD | WI | 01 | 01 | 131 | 216 | 102 | (20) | (65) | (85) |
| 0083379 | STACY & ASSOCIATES | DALLAS | TX | 01 | 01 | 36 | 65 | | | (29) | (29) |
| | | | | | | 48 | | | | 48 | 48 |

| ID | Company | City | State | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0086431 | DALYN RUG COMPANY | DALTON | GA | 01 | 01 | 230 | 230 | | | | 535 | 535 |
| 0086437 | M & R CARPET OUTLET INC | MARION | VA | 01 | 01 | 210 | 210 | | | | (220) | |
| 0083460 | CARPET WORKS | MADISON | WI | 01 | 01 | 543 | 543 | | | | | |
| 0083448 | SYNTHETIC GRASS WAREHOUSE | ANAHEIM | CA | 01 | 01 | 1,079 | | 9,646 | 915 | | | 10,342 |
| 0083356 | COUNTY FLOORING LLC | O'FALLON | MO | 01 | 01 | 33,776 | 23,433 | | | | (70) | 44 |
| 0083815 | PACIFIC DESIGN CENTER | PASADENA | CA | 01 | 01 | 124 | 80 | | | | (220) | (70) |
| 0083835 | CAROUSEL CARPET | PASADENA | CA | 01 | 01 | 44 | | | | | (70) | 44 |
| 0088885 | CAROUSEL CUSTOM FLOORS | BOWIE | MD | 01 | 01 | (70) | | | | | (70) | 18 |
| 0083906 | JAIN SAMAJ OF USA | WEST NEW YORK | NJ | 01 | 01 | 782 | 764 | | | | 136 | (341) |
| 0083911 | DREAM FLOORS BY GUS | VERO BEACH | FL | 01 | 01 | 116 | | | | | (341) | |
| 0083913 | R E CUDDIE CO | SAN JOSE | CA | 01 | 01 | (341) | | | | | | |
| 0083949 | CAWOOD FLOORING SYSTEMS | CINCINNATI | OH | 01 | 01 | 3,220 | 3,371 | | | | (150) | (150) |
| 0088021 | DENVER HARDWOOD CO INC | DENVER | CO | 01 | 01 | 222 | 222 | | | | (341) | (341) |
| 0088052 | WINCO INDUSTRIES | CERRITOS | CA | 01 | 01 | 116 | | | | | | |
| 0088016 | CARPET BARN | CLARION | PA | 01 | 01 | 3,371 | 3,371 | | | | (406) | (406) |
| 0088024 | ROCHESTER FLOORING RESOURCE | ROCHESTER | NY | 01 | 01 | (406) | 101 | 98 | | | 98 | 98 |
| 0088135 | OLA CARPET DISTRIBUTION | HAYWARD | CA | 01 | 01 | 200 | 86 | | | | | |
| 0088125 | CARPET DIRECT LIMITED | TULSA | OK | 01 | 01 | 86 | | | 75 | | 75 | 75 |
| 0088195 | FLOOR SOURCE OF FLORIDA LLC | BRADENTON | FL | 01 | 01 | 75 | | | | | 188 | 188 |
| 0088041 | WELHOUSE FLOORING | DE FOREST | FL | 01 | 01 | 188 | | | | | (30) | (30) |
| 0088231 | BCH CONSTRUCTION INC | RIO RANCHO | NM | 01 | 01 | (30) | | | | | | |
| 0088284 | SHERWIN WILLIAMS #1396 | MADISON | NM | 01 | 01 | 25 | 25 | | | | | |
| 0088265 | STEINBOK INTERIORS | CRESTWOOD | MO | 01 | 01 | 3,411 | 3,411 | | | 174 | (322) | (148) |
| 0088485 | SOUTH COAST FLOORING | SAN DIEGO | CA | 01 | 01 | 575 | 575 | | | | 327 | 327 |
| 0088487 | HOCKSTEINS INC | CAPITOL HEIGHTS | MD | 01 | 01 | (348) | | | | | (123) | (123) |
| 0088498 | NATURE COAST FLOORING INC | SPRING HILL | FL | 01 | 01 | 327 | 327 | | | | | |
| 0088760 | SAM KINNAIRDS FLOORING | LOUISVILLE | KY | 01 | 01 | 23 | | | | | | |
| 0088737 | ASPEN SERVICES INC | SPRING | TX | 01 | 01 | 25 | 25 | | | | | |
| 0088521 | CCA GLOBAL PARTNERS | EARTH CITY | MO | 01 | 01 | 145 | 145 | | | (7) | (2,052) | (2,838) |
| 0088212 | SIERRA PACIFIC GRASS | ROCKLIN | CA | 01 | 01 | 46 | | 885 | 46 | | 175 | 175 |
| 0088301 | SAN LORENZO FLOORS AND INTERIORS | OVIEDO | FL | 01 | 01 | 55,435 | 58,273 | | | | | |
| 0088335 | FAMILY FLOORS & FURNITURE | SANTA CRUZ | CA | 01 | 01 | 413 | 238 | 120 | | 83 | | |
| 0088368 | TURFEVOLUTIONS OF CA | SAN JUAN CAPISTRANO | CA | 01 | 01 | 238 | 38 | | | | | 83 |
| 0088559 | METRO FLOORING SERVICES | BRANDON | SD | 01 | 01 | 38 | 108 | | 442 | | (38) | 319 |
| 0088578 | GEHLING & ASSOCIATES | NEW BRAUNFELS | TX | 01 | 01 | (59) | | | | | (123) | (50) |
| 0088740 | COMAL FLOORING & INTERIORS | SUNBURY | OH | 01 | 01 | 427 | | | | | 76 | 101 |
| 0088770 | NACCO-HADINGER LLC | SAN DIEGO | CA | 01 | 01 | 101 | | | | | (194) | (194) |
| 0088311 | VETERAN SOLUTIONS INC | GREEN BAY | WI | 01 | 01 | (394) | | | | | 4 | 4 |
| 0083939 | QUEEN ANNE & MAGNOLIA | SEATTLE | WA | 01 | 01 | 4 | 772 | | | | 9 | 51 |
| 0085929 | CONNIES FLOORING SOLUTIONS | LOUISVILLE | WI | 01 | 01 | 823 | 25 | 42 | 25 | 83 | 25 | 25 |
| 0085980 | PACIFIC DESIGN GROUP | SACRAMENTO | CA | 01 | 01 | 25 | 729 | 72 | | 41 | 729 | 924 |
| 0086907 | GLINES CARPET ONE | YUBA CITY | CA | 01 | 01 | 924 | 124 | 20 | | | (6) | 89 |
| 0086133 | SOLAR ENERGY MGMT | PALM DESERT | CA | 01 | 01 | 124 | 35 | 75 | | 82 | | |
| 0086141 | PALM DESERT CARPET | TAMPA | FL | 01 | 01 | 35 | 118 | | | | (44) | (44) |
| 0086203 | SOLAR ENERGY MANAGEMENT | RIVERVIEW | FL | 01 | 01 | 118 | 237 | | 13 | | (129) | (129) |
| 0085203 | NUTRI PRO EQUINE LLC | DALTON | FL | 01 | 01 | 237 | 13 | 54 | | | 13 | 13 |
| 0086419 | PENTAL GRANITE & MARBLE INC | FIFE | WA | 01 | 01 | 1,649 | 1,073 | 57 | | 57 | 464 | 576 |
| 0088494 | PROSOURCE OF CLEVELAND | NEW CASTLE | PA | 01 | 01 | 1,673 | 1,805 | | | | (132) | 71 |
| 0088464 | DESIGN CENTER | PORTLAND | OR | 01 | 01 | 71 | | 71 | | | | |
| 0086507 | DESIGN CENTER | PORTLAND | OR | 01 | 01 | 50 | 10 | 20 | | 10 | 30 | 50 |
| 0086510 | WHOLESALE CARPET JOBBERS | HAZELWOOD | MO | 01 | 01 | 63 | | | | | 33 | 53 |
| 0083519 | WALL TO WALL CARPET & INTERI | BELOIT | KS | 01 | 01 | 191 | 191 | | | | | |
| 0086528 | JADE IND | CONSHOHOCKEN | PA | 01 | 01 | 237 | 237 | | | | (21) | (21) |
| 0086538 | SWANSONS COMMERCIAL FLOORS LLC | EAU CLAIRE | WI | 01 | 01 | 64 | 85 | | | | | |
| 0086649 | SOUTH FLORIDA FLOORING | NORTH HAVEN | CT | 01 | 01 | 3,092 | 2,746 | 345 | 76 | 103 | 606 | 873 |
| 0086638 | INFINIT FLOORING | DAYTON | GA | 01 | 01 | 969 | 96 | | | | 872 | 345 |
| 0086673 | BOB & PETES FLOORS INC | CANTON | OH | 01 | 01 | 1,322 | 53 | 78 | 915 | 41 | 1,011 | 1,269 |

| Account | Company | City | ST | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0086748 | ALLIED BUILDING PRODUCTS | GRAND JUNCTION | CO | 01 | 01 | 989 | | | | 989 | | 989 |
| 0086992 | INTERFACE SERVICES | ACWORTH | GA | 01 | 01 | (985) | | | | (985) | | (985) |
| 0087197 | FLOOR SHOW INC | OAK HARBOR | WA | 01 | 01 | 492 | 492 | | | | | 342 |
| 0087411 | LEWIS CARPET INC CCA GLOBAL | NORTHBROOK | IL | 01 | 01 | 600 | | | | 124 | | 1,761 |
| 0087453 | EXPOSITION FLOORING DESIGN CTR | CHICAGO | IL | 01 | 01 | 1,564 | 257 | 85 | | | | |
| 0087524 | ABS ENVIRORS RESTORATION LLC | PIGEON | MI | 01 | 01 | 63 | | | | | | |
| 0087528 | JK P INC | ANAHEIM | CA | 01 | 01 | 4,790 | | | | | | |
| 0087729 | NORTHEAST FLOOR COVERING | NEW YORK | NY | 01 | 01 | 657 | 657 | | | | | |
| 0087732 | HOODS DISCOUNT HOME CENTER | FESTUS | MO | 01 | 01 | 781 | 781 | | | | | |
| 0087777 | MARKETING ALLIANCE | SAINT LOUIS | MO | 01 | 01 | 242 | 242 | | | | | |
| 0087944 | JJS FLOORING | DALTON | GA | 01 | 01 | 44 | 44 | | | | | |
| 0087958 | MCGUIRE FLOORING | SAINT LOUIS PARK | MN | 01 | 01 | 104 | 104 | 710 | | (171) | | 539 |
| 0087948 | COLOR TILE INC | GALLOWAY | OH | 01 | 01 | (105) | | | (105) | | | (105) |
| 0088190 | TGR HOLDINGS INC | SAINT LOUIS PARK | MN | 01 | 01 | (644) | | | | (644) | | (644) |
| 0088303 | CLEAR | HIGHLANDS | NC | 01 | 01 | (104) | | | | (104) | | (104) |
| 0088311 | KINGDOM CARPETS | MILWAUKEE | WI | 01 | 01 | 531 | 531 | | | 531 | | 531 |
| 0088333 | TUFF FACTORY DIRECT LLC | MISSION VIEJO | CA | 01 | 01 | 313 | 313 | | | 313 | | 313 |
| 0088342 | ALTIMARA WOOD FLOORS | CALHOUN | GA | 01 | 01 | 19,608 | 13,015 | 6,593 | | 6,593 | | 6,593 |
| 0088429 | PORTLAND | PORTLAND | OR | 01 | 01 | 22 | | | 21 | 21 | | 21 |
| 0088559 | CAMBRIDGE FLOORING | CAMERON PARK | CA | 01 | 01 | 70 | 75 | | | (6) | | |
| 0088627 | WOODMONSTERS INC | EVERETT | WA | 01 | 01 | | | | | (53) | | |
| 0088678 | MY CARPET | VALLEY STREAM | NY | 01 | 01 | 4,445 | 4,498 | | | 482 | | 865 |
| 0088859 | ICONIC FLOORS LLC | BAINBRIDGE ISLAND | WA | 01 | 01 | 865 | 865 | | | 492 | | 492 |
| 0088846 | CHEROKEE CARPETS | DALTON | GA | 01 | 01 | 492 | 492 | | | | | |
| 0088911 | LEGENDARY TURF | CHANDLER | AZ | 01 | 01 | 373 | 373 | 589 | 856 | | | 589 |
| 0088933 | TAOC INC | PORT CHARLOTTE | FL | 01 | 01 | 36 | 36 | | | 36 | | 36 |
| 0089012 | HOUSE & EARTH | AUSTIN | TX | 01 | 01 | 13,894 | 13,858 | 822 | 807 | 1,453 | 1,562 | 5,500 |
| 0089055 | GNK INC | BUFFALO | NY | 01 | 01 | 693 | 705 | | | | | 865 |
| 0089064 | EXPLORING FLOORING INC | WARRENVILLE | IL | 01 | 01 | 1,310 | 1,310 | | | | | |
| 0089093 | KATHY HANSON INTERIORS | SAINT ANTHONY | MN | 01 | 01 | 59 | 104 | | | 59 | | 59 |
| 0089100 | 21ST CENTURY TILE INC | BUTLER | WI | 01 | 01 | 107 | 56 | 51 | | 51 | | 51 |
| 0089113 | GINAS DESIGN CORNER | SPOKANE | WA | 01 | 01 | 143 | 143 | | 114 | 307 | | 307 |
| 0089141 | LIMA CARPET CORP | PORTLAND | OR | 01 | 01 | 396 | 89 | | | | | |
| 0089176 | G W PAULSON CO | AVON | NY | 01 | 01 | 1,680 | 378 | 1,188 | | | | 1,302 |
| 0089224 | LONESOME OAK TRADING CO | PORTLAND | OR | 01 | 01 | (111) | (111) | | | (111) | | (111) |
| 0089362 | METROPLEX FLOORING | CHATSWORTH | CA | 01 | 01 | (128) | (128) | | | (128) | | (128) |
| 0089364 | THE GABY GROUP | PANTEGO | TX | 01 | 01 | 231 | 231 | | | (13) | | (13) |
| 0089415 | FLOOR & MOORE INC | CHATSWORTH | CA | 01 | 01 | 334 | 334 | (90) | | (103) | | (103) |
| 0089440 | CARPET BROS | SAINT JOHNS | FL | 01 | 01 | 1,770 | 1,770 | | | | | |
| 0089528 | JAMES KUNZ | ATHENS | TX | 01 | 01 | 52 | 52 | | | 52 | | 52 |
| 0089535 | BOSTON TRADE INTL INC | AURORA | OH | 01 | 01 | 88 | 88 | | | 88 | | 88 |
| 0089638 | SYSTEM PAVERS | DE FOREST | WI | 01 | 01 | 174 | 174 | | 86 | | | 86 |
| 0089818 | SHOW CARPET OUTLET | HUDSON | WI | 01 | 01 | 86 | | | | 86 | | 86 |
| 0089905 | CARLISLE TRANSPORTATION | DENVER | CO | 01 | 01 | 275 | | 69 | | 275 | | 275 |
| 0090006 | HANSAN CARPET | CHICAGO | IL | 01 | 01 | 15,355 | 15,309 | | | 47 | (9) | 47 |
| 0090055 | UNIVERSAL CARPET INC | ANCHORAGE | AK | 01 | 01 | (752) | | | | (932) | | (932) |
| 0090097 | TEXAS DESIGNER FLOORING | SAN JOSE | CA | 01 | 01 | 180 | 180 | | | (20) | | (20) |
| 0090111 | HAPPY FEET INT | SOUTH ELGIN | IL | 01 | 01 | (21) | | (21) | | (21) | | (21) |
| 0090041 | CARPET DIRECT | FORT WORTH | TX | 01 | 01 | 2 | 25 | | | (23) | | (23) |
| 0090241 | RINGGOLD | RINGGOLD | GA | 01 | 01 | 257 | 257 | 109 | | (58) | | (58) |
| | PORTLAND | WESTCLIFFE | CO | 01 | 01 | 5,578 | 107 | | | 35 | | 35 |
| | SHAWN ALHAPEES | PORTLAND | OR | 01 | 01 | 1,412 | 1,171 | | | 240 | 96 | 240 |
| | EURO TRUCKING | PHOENIX | AZ | 01 | 01 | (1,507) | 253 | | | 5,265 | | 5,471 |
| | TRUE LINE MOLD | SEGUIN | TX | 01 | 01 | (674) | | | | (674) | (1,760) | (1,760) |
| | ISAAC FLOORS INC | HEBRON | TX | 01 | 01 | 225 | | | | 225 | | (674) |
| | COMFORT INN & SUITES | WALNUT | CA | 01 | 01 | 499 | 499 | | | 499 | | 225 |
| | DESIGN GALLERY | FRIDLEY | MN | 01 | 01 | 4,442 | 4,442 | | | | | 499 |
| | TEXAS FLOORING & RENOVATION | HOUSTON | TX | 01 | 01 | 1,738 | 1,371 | 230 | 27 | | 111 | 367 |
| | CARPETS OF HIGHWOOD | CHICAGO | IL | 01 | 01 | 648 | 599 | 49 | | | | 49 |
| | | | | 01 | 01 | 152 | 139 | | | 152 | 24 | 152 |
| | | | | 01 | 01 | (30) | | | | (193) | | (193) |

| Acct | Name | City | ST | Code | Col1 | Col2 | Col3 | Col4 | Col5 | Col6 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0090312 | THOMAS TILE & CARPET | ADDISON | IL | 01 01 | 570 | 554 | | | | 15 | 15 |
| 0090357 | MCKINNEN'S HOME DECORATING INC | MADISON | WI | 01 01 | 156 | 156 | | | | | |
| 0093559 | JO ANN VETTER | MADISON | WI | 01 01 | (622) | | | | | (622) | (622) |
| 0093582 | JT FREIGHT AMERICA | PORTLAND | OR | 01 01 | (104) | | | | | (104) | (104) |
| 0093520 | U J FREIGHT AMERICA | SAN DIEGO | CA | 01 01 | 23,549 | 19,207 | 4,341 | | | | 4,341 |
| 0090409 | HOWARD'S RUG CO | PORTLAND | OR | 01 01 | 209 | 209 | | | | | |
| 0094465 | UNITED TILE | CONSHOHOCKEN | PA | 01 01 | 765 | 765 | | | | | |
| 0093530 | FACILITY SERVICES GROUP INC | DALTON | GA | 01 01 | 460 | 460 | | | | | |
| 0093541 | EARTHWEAVE | BRANSON | MO | 01 01 | 2,347 | 3,173 | 1,670 | 1,796 | | 922 | 1,382 |
| 0090564 | DALTON | DALTON | GA | 01 01 | 6,124 | | | | (214) | (302) | 2,950 |
| 0093054 | BRANSON | ONALASKA | WI | 01 01 | (259) | | | | | (259) | (259) |
| 0090611 | AMUSEMENT CONSTRUCTION CO | DALTON | GA | 01 01 | 749 | | | | | 749 | 749 |
| 0093611 | BRAND FLOORS | MONTEREY | CA | 01 01 | 13,627 | 4,381 | 4,705 | 3,910 | 1,130 | 9,245 | 9,245 |
| 0090612 | TANDUS FLOORING | VERNON HILLS | IL | 01 01 | (112) | | (112) | | | (112) | (112) |
| 0090630 | MONTEREY | SEATTLE | WA | 01 01 | 505 | | | 505 | | | 505 |
| 0090717 | AMERICAN HOTEL REGISTER | BREMEN | IN | 01 01 | 531 | | 2,780 | 531 | 531 | | 531 |
| 0093718 | BEREMAN CARPETS | BESSEMER | AL | 01 01 | 5,042 | 2,262 | 2,780 | | | 2,780 | 2,780 |
| 0093769 | FISHER SCIENTIFIC | ATLANTA | GA | 01 01 | 439 | 48 | | | | 392 | 392 |
| 0093883 | ALASKA TRAFFIC COMPANY | WINTERSVILLE | OH | 01 01 | 866 | | | | | 866 | 866 |
| 0090885 | BALLSTON CARPET & TILE LLC | CHATTANOOGA | TN | 01 01 | 2,467,538 | 2,466,435 | 504 | 1,323 | | 436 | 1,104 |
| 0093917 | FLOOR PLANS INC | OVERLAND PARK | KS | 01 01 | 471 | 6,720 | 1,784 | | | 1,654 | 1,654 |
| 0090948 | HOME DEPOT U S A | DALTON | GA | 01 01 | 223 | | 230 | | (7) | 223 | 223 |
| 0093948 | LOGISTICS MADE SIMPLE | WEST ALLIS | WI | 01 01 | (3,280) | | (296) | (94) | (250) | (307) | (2,333) |
| 0093148 | CARPET BROKER | ADDISON | IL | 01 01 | (253) | | | | | (253) | (253) |
| 0091145 | XPRESS GLOBAL SYSTEMS | BELLEVUE | WA | 01 01 | 1,268 | 1,268 | 1,059 | | (76) | 1,059 | 1,059 |
| 0093036 | NEO TURF SYSTEMS INC | LITTLE ROCK | AR | 01 01 | 1,466 | 407 | | | | (76) | (76) |
| 0091153 | COLDERS FURNITURE | POMFRET | CT | 01 01 | (76) | | | | | | |
| 0091147 | CREATIVE CARPETS OF WINTERSVILLE | WILMINGTON | DE | 01 01 | 1,701 | | | | | 1,701 | 1,701 |
| 0091236 | SNOWHITE TEXTILES INC | LAKEVILLE | MN | 01 01 | (245) | | (204) | | | (245) | (245) |
| 0091291 | CUSTOM TOUCH INTERIORS | DANVILLE | KY | 01 01 | (204) | | 379 | | | (204) | (204) |
| 0091399 | NATIONAL CONTRACT FLOORING | MENOMONEE FALLS | WI | 01 01 | 379 | 379 | 716 | | | 379 | 379 |
| 0093399 | C & C COMPLETE FLOORING | MENOMONEE FALLS | WI | 01 01 | 2,035 | 12 | | | | 716 | 716 |
| 0093240 | COVERDECK SYSTEMS | LAS VEGAS | NV | 01 01 | 12 | 2,776 | 210 | | | | |
| 0091392 | FLOOR TRANS INC | RANCHO CORDOVA | CA | 01 01 | 2,986 | 1,298 | | | | 210 | 210 |
| 0091148 | FOREVERLAWN MINNESOTA | RANCHO CORDOVA | CA | 01 01 | 1,209 | 204 | | | | (89) | (89) |
| 0093457 | HOWARD CARPENTER FLOOR COV | HUNTINGDON VALLEY | PA | 01 01 | 261 | 160 | | | | 57 | 57 |
| 0091482 | DEANALAN CONSTRUCTION SERVICES LLC | PARK HILLS | MO | 01 01 | 160 | 88 | 124 | | 21 | (13) | (2) |
| 0091483 | LIPPERT GROUP LLC | HENRIETTA | NY | 01 01 | 86 | | | | | | 124 |
| 0093483 | LAZY LAWN INTERNATIONAL INC | AMARILLO | TX | 01 01 | 124 | 591 | 124 | | | | |
| 0091533 | CP PRO LLC | CAIRO | MO | 01 01 | 542 | | | | | (50) | 385 |
| 0091550 | SUWINSKI FLOOR COVERING | FRIDAY HARBOR | WA | 01 01 | 385 | | | | (12) | (50) | 385 |
| 0093606 | FLOOR KONNECTION | SAN DIEGO | CA | 01 01 | 143 | 147 | | | | 143 | 143 |
| 0091674 | LAPLANTE CPT & ANTIQUE | NAPA | CA | 01 01 | 25 | 25 | 25 | 25 | 25 | (52) | 23 |
| 0091641 | GREENFIELD FLOORING LLC | COOS BAY | OR | 01 01 | 130 | | | | | | |
| 0093271 | AFFILIATED FOODS | POTTSTOWN | PA | 01 01 | 1,153 | 292 | 737 | 55 | 74 | 69 | 861 |
| 0091392 | WELLS FIRE & WATER | HARRISBURG | PA | 01 01 | 1,719 | 1,719 | | | | 1,719 | 1,719 |
| 0093025 | CARPET CONNECTION INC | FARMINGTON | NC | 01 01 | 1,363 | 1,289 | 413 | | | 160 | 574 |
| 0093248 | DINTEX DECORATION | BURLINGTON | NY | 01 01 | 574 | | | | | 60 | 60 |
| 0093066 | SCHMID CONSTRUCTION INC | CLIFTON PARK | TX | 01 01 | 60 | 855 | 2,904 | | | 4,295 | 4,295 |
| 0092078 | CARSTONS INTERIORS INC | GRAPEVINE | OR | 01 01 | 7,597 | | 272 | | | 1,403 | 107 |
| 0092106 | ARNOLD J THOMAS & SON INC | PORTLAND | FL | 01 01 | 962 | | | | | (493) | (493) |
| 0092136 | FRANKLIN FLOORING | CLERMONT | GA | 01 01 | 258 | | | (165) | | 258 | 258 |
| 0092078 | FLOORMAX DIRECT LLC | ATLANTA | GA | 01 01 | 75 | | | 75 | | 75 | 75 |
| 0092566 | MOHAWK INDUSTRIES INC | FORT MYERS | GA | 01 01 | 235 | 235 | 235 | 235 | | 235 | 235 |
| 0092701 | SAINT JOHNS ON THE LAKE | MILWAUKEE | WI | 01 01 | 278 | 351,610 | 20,097 | 14,460 | 12,768 | 12,980 | 64,298 |

| Account | Company | City | ST | | | Amt 1 | Amt 2 | Amt 3 | Amt 4 | Amt 5 | Amt 6 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0092727 | HESS FLOOR SERVICES | FORT WORTH | TX | 01 | 01 | 90 | | | | | 90 | 90 |
| 0092751 | SPECTRUM FLOORS INC | EL PASO | TX | 01 | 01 | 491 | | | | | (77) | (77) |
| 0092817 | SAMSUNG ELECTRONICS AMERICA INC | SAN DIEGO | CA | 01 | 01 | 32,735 | 21,387 | 3,676 | 3,984 | 987 | 346 | 11,349 |
| 0092942 | FLOOR MASTERS INC | ALBUQUERQUE | NM | 01 | 01 | 150 | | | | | 150 | 150 |
| 0092945 | RENOS FLOOR COVERING | NAPA | CA | 01 | 01 | 555 | 660 | | | | (105) | (105) |
| 0092948 | INTEGRITY FLOORS INC | ELLICOTT CITY | MD | 01 | 01 | 2,347 | 90 | | | 50 | 50 | 2,257 |
| 0092960 | SOMMERS FLOOR COVERING INT | ELLICOTT CITY | MD | 01 | 01 | 57 | 57 | | | | | 2,157 |
| 0092998 | SNO BIRD TRAILERS INC | JEFFERSON CITY | MO | 01 | 01 | 118 | | | | | 118 | 118 |
| 0093061 | MOMENI INC | SLINGER | WI | 01 | 01 | 8,575 | 4,001 | 2,587 | 1,988 | | 4,575 | 4,575 |
| 0093161 | CARLSTADT | CARLSTADT | NJ | 01 | 01 | 122 | | | | | 122 | 122 |
| 0093168 | M & D CARPETS | VACAVILLE | CA | 01 | 01 | 8,742 | 8,352 | 589 | | | (144) | 390 |
| 0093226 | AMERICAN CARPET WHOLESALERS OF GA | DALTON | GA | 01 | 01 | 26,881 | 20,601 | 810 | 5,457 | 311 | (223) | 6,280 |
| 0093274 | STARK CARPET | HICKSVILLE | NY | 01 | 01 | (175) | | | | | (55) | (75) |
| 0093292 | BOWMAN FLOORING | MARIETTA | GA | 01 | 01 | 45 | 45 | | | | (175) | (175) |
| 0093293 | INTEGRITY FLOORING LLC | DALTON | GA | 01 | 01 | 573 | 558 | | | | (57) | 15 |
| 0093328 | BROADWAY HOME CENTER | OKLAHOMA CITY | OK | 01 | 01 | 7,087 | 7,087 | 72 | | | | |
| 0093364 | LLOYDS DESIGN CORP | TYLER | TX | 01 | 01 | | | | | | | |
| 0093370 | GK FLOORING INC | NORTHRIDGE | CA | 01 | 01 | 3,164 | 2,944 | | | | 221 | 3,164 |
| 0093572 | SO CAL CARPET & SUPPLY | VAN NUYS | CA | 01 | 01 | (58) | | | | | (58) | (58) |
| 0093586 | MOHAWK VALLEY CARPETS | CHULA VISTA | CA | 01 | 01 | 2,249 | 227 | 2,022 | | | | 2,022 |
| 0093623 | WINDY CITY CARPET SERVICE | SCOTIA | NY | 01 | 01 | 3,520 | 32 | | 3,120 | | 102 | 3,488 |
| 0093627 | ABBOTT PAINT  CARPET | CHICAGO | IL | 01 | 01 | 149 | | | | | 149 | 149 |
| 0093751 | FANTASIA INTERIORS | BOYCEVILLE | WI | 01 | 01 | 266 | | | | | 266 | 266 |
| 0093802 | HERITAGE INN HAYWARD | ANGEL FIRE | NM | 01 | 01 | 150 | | | | | 150 | 150 |
| 0093917 | JEZARD FLOORING INC | HAYWARD | CA | 01 | 01 | (256) | | | | | (256) | (256) |
| 0093931 | PACESETTER | SOUTH EASTON | MA | 01 | 01 | 379 | 379 | | | | | |
| 0094021 | PCI FLOOR TECH INC | ORLANDO | FL | 01 | 01 | (225) | | | | | (225) | (225) |
| 0094031 | SENIOR RESOURCE GROUP LLC | ADDISON | IL | 01 | 01 | 4,455 | 2,720 | 342 | 400 | 96 | 896 | 1,735 |
| 0094081 | TC MCKACHEN INC | SOLANA BEACH | CA | 01 | 01 | (135) | | | | | (135) | (135) |
| 0094122 | KATHY HANSON INTERIORS | SAN FRANCISCO | CA | 01 | 01 | 102 | | | | | 102 | 102 |
| 0094125 | HARRY STREET CARPET | NEW BRIGHTON | MN | 01 | 01 | 78 | | | | | 78 | 78 |
| 0094180 | PERFECT CHOICE CONST & FLOORING INC | WICHITA | KS | 01 | 01 | (299) | | | | | (299) | (299) |
| 0094186 | FLOORS AND MORE OUTLET INC | POWAY | CA | 01 | 01 | 201 | 176 | | 25 | | | 25 |
| 0094309 | MISS BOOKER BROTHERS INC | NEVADA | MO | 01 | 01 | 393 | 393 | | | | | |
| 0094337 | COUNTRY CARPET AND FLOORING | SAN MARCOS | CA | 01 | 01 | (841) | | | | | (841) | (841) |
| 0094355 | COMMERCIAL FINISH SERVICES INC | PIERRE | SD | 01 | 01 | 141 | 141 | | | | | |
| 0094420 | BRENTWOOD HOTELS | STERLING | VA | 01 | 01 | 795 | 795 | | | | 625 | 625 |
| 0094454 | TOM DUFFY CO | CREVE COEUR | MO | 01 | 01 | 625 | | | | | 625 | 625 |
| 0094554 | JIM TILLEY STRG | CAMPBELL | CA | 01 | 01 | 96 | | | | | 96 | 96 |
| 0094571 | CDR BROWN ASSOCIATES LLC | FUQUAY VARINA | NC | 01 | 01 | 105 | | | | | 105 | 105 |
| 0094743 | COUNTRY CARPET DISTRIBUTORS INC | SALT LAKE CITY | UT | 01 | 01 | 14,153 | 9,150 | 2,573 | 1,437 | 361 | (144) | 5,003 |
| 0094846 | DELTA FLOORING SYSTEMS | SYOSSET | NY | 01 | 01 | 1,848 | 1,301 | 547 | | | 775 | 547 |
| 0094865 | LEWIS & LEWIS CARPETS | FAYETTEVILLE | AR | 01 | 01 | 140 | | | | | 140 | 140 |
| 0094895 | AVILA CENTER REMODEL PHS II | WALNUT CREEK | CA | 01 | 01 | 110 | 110 | | | | | |
| 0094932 | MURI DISTRIBUTORS INC | RANCHO CORDOVA | CA | 01 | 01 | 126 | 126 | | | | 126 | 126 |
| 0094947 | FORTUNE CONTRACT INC | DETROIT | MI | 01 | 01 | 685 | | | | | 685 | 685 |
| 0094992 | TOTALLY ENTERPRISES LLC | DALTON | GA | 01 | 01 | 230 | 230 | | | | | |
| 0095228 | DIVERSIFIED FLOORING | DALTON | GA | 01 | 01 | 219 | | | | | 219 | 219 |
| 0095233 | HART FLOOR COMPANY LLC | RIO VERDE | AZ | 01 | 01 | 2,395 | 2,395 | (61) | | | | (61) |
| 0095322 | STARFLOORS INC | LOGAN | UT | 01 | 01 | 784 | 845 | | | | 407 | 407 |
| 0095375 | GREER TILE CO | MENOMONEE FALLS | WI | 01 | 01 | 407 | | | | | | |
| 0095395 | BURRELL CO, THE | ORLANDO | FL | 01 | 01 | 1,275 | | | 1,275 | | | 1,275 |
| 0095414 | RETAIL CONSTRUCTORS INC | HOUSTON | TX | 01 | 01 | 200 | 200 | | | | 192 | 192 |
| 0095419 | ALCERRO ROVER & CO LLC | ALBUQUERQUE | NM | 01 | 01 | 192 | 200 | | | | 192 | 192 |
| 0095423 | HEMPFILL RUG & CARPETS | DENVER | CO | 01 | 01 | 4,124 | 4,124 | | | | 407 | 407 |
| 0095424 | C R CRAWFORD CONSTRUCTION | COSTA MESA | CA | 01 | 01 | 347 | 114 | 233 | | | (1,147) | 233 |
| 0095466 | MODA LLC | FAYETTEVILLE / IRVINE | AR / CA | 01 | 01 | 2,005 | 2,005 | | | | (1,147) | (1,147) |

| Account | Company | City | State | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0095455 | BEAR FLOOR COVERING CENTER | DOVER | OH | 01 | 01 | 941 | 941 | | | | | 941 |
| 0095523 | KERTILES | SCOTTSDALE | AZ | 01 | 01 | 259 | 259 | | | | | 259 |
| 0095531 | ALLIED FLOORING CENTER INC | KENMORE | NY | 01 | 01 | 3,084 | 3,084 | | | | | 3,084 |
| 0095545 | MOG FLOORING WHOLESALERS LTD | MEDINA | OH | 01 | 01 | 26 | 26 | | 71 | | | 26 |
| 0095573 | LAKE FOREST CARPETS INC | GREENVILLE | SC | 01 | 01 | (103) | | (45) | | | (103) | (103) |
| 0095699 | FLOOR SOLUTIONS LLC | GREENVILLE | OR | 01 | 01 | 4,267 | 4,884 | | | | | 183 |
| 0095704 | RISER AND ASSOCIATES | PORTLAND | OR | 01 | 01 | 765 | 765 | 219 | | | 765 | 765 |
| 0095806 | DIRECT SOLUTIONS LLC | DALLAS | TX | 01 | 01 | 1,363 | 1,363 | 219 | | | | 77 |
| 0095872 | MATWORKS CO LLC | BALTIMORE | MD | 01 | 01 | 1,390 | 6,935 | 3,751 | (541) | 2,963 | 482 | 5,908 |
| 0095919 | FLOORLAND OF TEXAS | FALL RIVER | MA | 01 | 01 | 12,844 | | | (157) | | | (1,287) |
| 0095950 | PLAN 5 PAINT & DEC CTR | HOUSTON | TX | 01 | 01 | (281) | (281) | | | (281) | | (281) |
| 0095958 | INTEGRITY FLOORING | EMPORIA | VA | 01 | 01 | (319) | (319) | | | | (319) | (319) |
| 0096013 | SUPER FLOORS INC | RIVERVIEW | MI | 01 | 01 | 23 | 23 | | | | 23 | 23 |
| 0096033 | EASTGREAN FLOORING | KENT | WA | 01 | 01 | 251 | 239 | 13 | | | | 13 |
| 0096046 | ITS YOUR FLOOR | CITY OF INDUSTRY | CA | 01 | 01 | 526 | 526 | | | 80 | 526 | 526 |
| 0096047 | FLOOR GALLERY | FORT WORTH | TX | 01 | 01 | 1,039 | 1,039 | | | | | 1,039 |
| 0096104 | MIDWEST HOSPITALITY & PROC | ROCKVILLE | MD | 01 | 01 | 302 | 216 | | 180 | 563 | 54 | 54 |
| 0096106 | FLOORING AUTHORITY | WARREN | OH | 01 | 01 | 54 | 54 | | | | | (678) |
| 0096167 | FLOORING SERVICES INC | AMSTERDAM | NY | 01 | 01 | (678) | (678) | | | | (678) | (678) |
| 0096194 | ROD CALDWELL PAINT SALES INC | PHOENIX | AZ | 01 | 01 | 407 | 407 | | | | | 407 |
| 0095255 | WALL BARGAIN CENTER & CPT | SANDY | UT | 01 | 01 | (0) | | | | | (0) | (0) |
| 0096293 | CARPET PLUS INC | PORT ANGELES | WA | 01 | 01 | 156 | 156 | 156 | | | 156 | 156 |
| 0096381 | BLINCCI | GUYMON | OK | 01 | 01 | 226 | 226 | | | | 359 | 359 |
| 0095422 | MOORMANS CARPETS INC | CEDAR HILL | MS | 01 | 01 | 107 | 107 | | | | 107 | 107 |
| 0096444 | CAVALIER CARPET INDUSTRIES | OLIVE BRANCH | MS | 01 | 01 | 148 | 148 | | | | | 563 |
| 0095493 | JOES GARAGE | DALTON | GA | 01 | 01 | 1,549 | 416 | 1,132 | | | 1,333 | 1,333 |
| 0096494 | JUG WAREHOUSE INC | OKLAHOMA CITY | OK | 01 | 01 | (140) | (140) | | | | (140) | (140) |
| 0096509 | SIGNATURE HOSPITALITY CARPETS | GRAND RAPIDS | MN | 01 | 01 | (74) | | (74) | | | (89) | (89) |
| 0096525 | EDWARD JONES | LOS ANGELES | CA | 01 | 01 | 19,824 | 12,090 | | 3,759 | | 3,976 | 7,735 |
| 0096537 | BERGHAMMER CONSTRUCTION | DALTON | GA | 01 | 01 | 186 | 186 | | | | 186 | 186 |
| 0096609 | GP LAND CORPORATION | MARSHFIELD | WI | 01 | 01 | 628 | 628 | | | | 628 | 628 |
| 0096625 | BROCKPORT | BUTLER | WI | 01 | 01 | 908 | 908 | | | | 908 | 908 |
| 0096729 | IDAHO FLOORING | IDAHO FALLS | ID | 01 | 01 | 319 | 319 | | | | 319 | 319 |
| 0096789 | MCKINNON UNLIMITED INC | TIOGA | ND | 01 | 01 | 297 | 297 | | | | 297 | 297 |
| 0096744 | K & N | TULSA | OK | 01 | 01 | 223 | 223 | | | | | 223 |
| 0096781 | OAKWOOD ACADEMY | LONG BEACH | CA | 01 | 01 | (180) | (180) | | | | (180) | (180) |
| 0096799 | B K & DIRECT FLOORS | MORGANTOWN | WV | 01 | 01 | 1,032 | 694 | 338 | | | | 338 |
| 0096930 | PS METRO INDIANAPOLIS LLC | INDIANAPOLIS | IN | 01 | 01 | 95 | 95 | | | | | |
| 0096960 | SIGNATURE FLOORS | LAKE PLACID | FL | 01 | 01 | 143 | 143 | | | | | |
| 0096991 | BIZMARKS FLOOR COVERING | SALISBURY | MD | 01 | 01 | 93 | 93 | | | 131 | 93 | 93 |
| 0097042 | FLOORING RESOURCES CORP | ELK GROVE VILLAGE | IL | 01 | 01 | 12,327 | 1,591 | 381 | | 3,645 | 6,178 | 10,335 |
| 0097196 | JC PENNEY CO | PLANO | TX | 01 | 01 | 299 | 299 | | | | 199 | 199 |
| 0097335 | CARPET PLANET LLC | AURORA | CO | 01 | 01 | 209 | | | | | 48 | 48 |
| 0097428 | WORLD OF FLOORS | COLORADO SPRINGS | CO | 01 | 01 | 156 | 156 | 66 | | | | |
| 0097469 | MGM FLOORING | TAMPA | FL | 01 | 01 | (127) | | | | | (127) | (127) |
| 0097534 | WATSON SMITH CHICAGO | DENVER | CO | 01 | 01 | (964) | | | | (159) | (964) | (964) |
| 0097556 | NUS METRO INDIANAPOLIS LLC | CHICAGO | IL | 01 | 01 | 681 | 681 | (86) | | 241 | | |
| 0097599 | HILTON HOTELS | LA JOLLA | CA | 01 | 01 | 546 | 525 | | | | | |
| 0097560 | WYNDHAM HOTEL TULSA | TULSA | OK | 01 | 01 | 138 | 138 | | | | | 155 |
| 0097655 | CORPUS CHRISTI TRANSFER CO | CORPUS CHRISTI | TX | 01 | 01 | 525 | 664 | | | | 407 | 407 |
| 0097664 | B & L FLOOR COVERING | SALISBURY | MD | 01 | 01 | 66 | | | | | 93 | 93 |
| 0097669 | CALIFORNIA FLOORING & DESIGN | SAN DIEGO | CA | 01 | 01 | (86) | (86) | | | | (136) | (136) |
| 0097676 | PERMALAWNS | WAUKESHA | WI | 01 | 01 | 664 | 25 | | | | 117 | 117 |
| 0097742 | TANGENT SYNERGY | BELLEVUE | WA | 01 | 01 | 25 | 117 | | | | 25 | 25 |
| 0097848 | HD BUTTERCUP | LOS ANGELES | CA | 01 | 01 | 117 | (161) | | | | (161) | (161) |
| 0097856 | PRIMERA INTERIORS | TEMPE | AZ | 01 | 01 | (161) | 908 | 785 | | | (321) | (321) |
| 0097953 | CUTTING EDGE ENTERPRISES | ROME | GA | 01 | 01 | 263 | 263 | 405 | | | 263 | 263 |

| ID | Name | City | State | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0098082 | SUPREME LEARNING | PEMBINA | ND | 01 | 05 | 140 | - | - | - | - | 140 | 140 |
| 0098098 | FLOORING ASSOCIATES | FORT WORTH | TX | 01 | 05 | 576 | - | - | - | - | 576 | 576 |
| 0098133 | DANIEL T GAUGER INC | LUTHERVILLE TIMONIU | MD | 01 | 05 | (42) | - | 146 | - | - | (10) | (10) |
| 0098141 | SURFACES NW LLC | SALEM | OR | 01 | 05 | 844 | - | - | - | - | 844 | 844 |
| 0098301 | KEATING INC FURNITURE WORLD | MINOT | ND | 01 | 05 | (170) | - | - | - | - | (167) | (167) |
| 0098156 | WOOL SOLUTIONS | NORWALK | CT | 01 | 05 | 207 | 374 | - | - | - | 844 | 844 |
| 0098309 | PRO PUTT SYSTEMS LLC | HUNTERSVILLE | NC | 01 | 05 | 125 | - | - | - | - | 125 | 125 |
| 0098315 | FLOORS BY DIANE | WARRENTON | MO | 01 | 05 | (241) | 128 | (87) | - | - | (241) | (241) |
| 0098336 | J SCOTT ANDERSON INC | SALT LAKE CITY | UT | 01 | 05 | (45) | - | - | - | - | (45) | (45) |
| 0098483 | AUBRY ANGELO | MINNEAPOLIS | MN | 01 | 05 | (56) | - | (85) | (109) | - | (56) | (56) |
| 0098605 | KCI CARPETS INC | SALEM | IN | 01 | 05 | (85) | - | - | - | - | (30) | (30) |
| 0098642 | AMAZING SYNTHETIC GREENS | SAN ANGELO | TX | 01 | 05 | 76 | - | - | - | - | 76 | 76 |
| 0098650 | ERNST INC | OCEANSIDE | CA | 01 | 05 | 36 | 36 | - | - | - | 76 | 76 |
| 0098676 | HENRY JAMES INC | DICKINSON | ND | 01 | 05 | 50 | - | - | - | - | 50 | 50 |
| 0098676 | C R FLOORING & CABINET | JAMESTOWN | ND | 01 | 05 | 774 | 642 | 132 | 387 | 613 | 132 | 132 |
| 0098921 | CLASSIC SAMPLES INC | DALTON | GA | 01 | 05 | 36 | - | - | - | - | 50 | 50 |
| 0098827 | FOREVER PUTTING GREENS | HAYWARD | CA | 01 | 05 | 132 | - | - | - | - | 132 | 132 |
| 0098851 | FLOORING ON 14TH | LIVERMORE | CA | 01 | 05 | 998 | - | - | - | 998 | 998 | 998 |
| 0098925 | RAMON FLOORING | WASHINGTON | DC | 01 | 05 | 435 | 435 | - | - | 221 | - | - |
| 0098958 | CDALTON FLOORING | RAMON | CA | 01 | 05 | 435 | - | - | - | - | 221 | 221 |
| 0098962 | RUG & REMNANT WORLD INC | NEW STANTON | PA | 01 | 05 | 221 | - | - | - | - | 221 | 221 |
| 0098984 | MCCRANN CARPET FINISHING | FERNDALE | WA | 01 | 05 | 15 | - | - | (15) | - | (15) | (15) |
| 0099049 | DORION CARPET INTERIORS INC | DOWNERS GROVE | IL | 01 | 05 | 78 | 78 | - | - | - | - | - |
| 0099080 | CARPET FAMILY | SHORWOOD | IL | 01 | 05 | (140) | - | - | (510) | 51 | (140) | (140) |
| 0099132 | CITY OF SAN ANTONIO | SAN ANTONIO | TX | 01 | 05 | 458 | 957 | - | - | 258 | (301) | (301) |
| 0099141 | SHORWOOD | SHORWOOD | WI | 01 | 05 | 554 | 313 | - | - | - | 554 | 554 |
| 0099154 | STANGES OF WAUPACA | WAUPACA | WI | 01 | 05 | 165 | 169 | - | 25 | - | 165 | 165 |
| 0099156 | A T PROUDIAN | GREENWICH | CT | 01 | 05 | (436) | - | - | - | - | (436) | (436) |
| 0099186 | AMTICO INTERNATIONAL | NEW FREEDOM | PA | 01 | 05 | 140 | 140 | - | - | 140 | 140 | 140 |
| 0099221 | STEELE TILE | HUNTINGTON BEACH | CA | 01 | 05 | (74) | - | (472) | (74) | - | (74) | (74) |
| 0099251 | FLOORING 101 | OXNARD | CA | 01 | 05 | (536) | (536) | - | (367) | - | (367) | (658) |
| 0099415 | ROSEVILLE FLOOR CENTER | ROSEVILLE | CA | 01 | 05 | 53 | 53 | 181 | - | - | - | - |
| 0099440 | STAR FLOORS INC | DALLAS | TX | 01 | 05 | 123 | 123 | - | - | - | - | - |
| 0099467 | MULLINS COMPLETE CARPET CARE | LOVELAND | OH | 01 | 05 | 4,672 | 4,672 | 2,903 | - | - | - | - |
| 0099496 | CITY CARPET & FURNITURE LLC | WASHINGTON | DC | 01 | 05 | 7,953 | 5,110 | 102 | (27) | (14) | - | - |
| 0099522 | POLLY REITER | MILLERSVILLE | MD | 01 | 05 | 5,110 | 605 | - | - | - | - | - |
| 0099552 | GRID TECH | LAKE ISABELLA | CA | 01 | 05 | 1,389 | 44 | - | - | - | - | - |
| 0099641 | FLOOR STORE | OR | OR | 01 | 05 | 44 | - | - | - | - | - | - |
| 0099658 | FIRST BAPTIST CHURCH | JOHN DAY | OR | 01 | 05 | 2,488 | 1,066 | - | - | - | 1,422 | 1,422 |
| 0099728 | JUDAH INC | EDNA | TX | 01 | 05 | 43 | 43 | - | - | - | - | - |
| 0099746 | FLOOR DESIGNS INC | NEWTOWN | PA | 01 | 05 | 132 | - | - | (60) | - | 132 | 132 |
| 0099765 | TESTA INTERIORS | HOUSTON | TX | 01 | 05 | 947 | - | 91 | - | - | 947 | 947 |
| 0099775 | TRU STAR FLOOR COVERING | GATHERSBURG | MD | 01 | 05 | (125) | 422 | - | - | - | (125) | (125) |
| 0099783 | CARPET CUSTOMIZER | MARCO ISLAND | FL | 01 | 05 | 513 | - | - | 50 | - | 91 | 91 |
| 0099864 | LOREAL | FREDERICK | MD | 01 | 05 | 50 | 50 | - | - | - | 50 | 50 |
| 0099866 | BEAUTY AVENUES INC | FRANKLIN | OH | 01 | 05 | 99 | 99 | - | - | - | 99 | 99 |
| 0099939 | RUG GALLERY INC | REYNOLDSBURG | OH | 01 | 05 | 240 | - | - | 59 | - | 187 | 187 |
| 0099833 | M GROSSMAN & CO INC | CINCINNATI | OH | 01 | 05 | 53 | 53 | (96) | 66 | 62 | 62 | 62 |
| 0100241 | SPECIFIED SURFACES | PHILADELPHIA | PA | 01 | 05 | 3,328 | - | - | - | - | (30) | (30) |
| 01D009842 | HOME CARPET INVESTMENT INC | NEW SMYRNA BEACH | FL | 01 | 05 | (30) | - | - | - | - | (30) | (30) |
| 0000700 | EASLEY TRANSPORTATION | CHULA VISTA | CA | 01 | 05 | 3,620 | 1,599 | 559 | 838 | 243 | (4,304) | (4,304) |
| 0001504 | ALLSTAR FREIGHT SERVICES LLC | MEMPHIS | TN | 01 | 05 | (4,304) | - | - | - | - | 232 | 2,021 |
| 0008467 | CONWAY TRANSPORTATION | SAINT ROSE | LA | 01 | 05 | 107 | 1,386 | (100) | 56 | 650 | 107 | 107 |
| 0009137 | US SPECIAL DELIVERY | NORTH RICHLAND HILL | TX | 01 | 05 | 232 | 66 | - | 89 | - | 232 | 1,942 |
| 0011505 | RACL TRANSPORT | TAOS | NM | 01 | 05 | 512 | - | - | 512 | - | 824 | 824 |
| 0012358 | EAGLE TRUCKING CO | SHARON HILL | PA | 01 | 05 | 89 | - | 792 | 788 | - | - | - |
| 0021424 | PULSE TRANSPORTATION | INDEPENDENCE | MO | 01 | 05 | 1,195 | 1,195 | - | - | - | 1,195 | 1,195 |
| | VIDMAR INC | SOLON | OH | 01 | 05 | 14 | - | - | - | 14 | 14 | 14 |
| | | | | | | 1,845 | 1,845 | - | 701 | - | 1,828 | 1,828 |
| | | | | | | 1,828 | - | - | - | - | 1,580 | 1,580 |
| | | | | | | 1,580 | - | - | - | - | 1,331 | 1,331 |
| | | | | | | 1,331 | - | - | 701 | - | 701 | 701 |
| | | | | | | 701 | - | - | - | - | 651 | 651 |
| | | | | | | 651 | - | - | - | 441 | 651 | 651 |

| Account | Company | City | ST | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0023149 | CENTRAL TRANSPORT | WARREN | MI | 01 | 05 | 2,712 | | | | | 2,712 |
| 0023610 | TP FREIGHT | TILLAMOOK | OR | 01 | 05 | 208 | | | | | 208 |
| 0026535 | AVERITT EXPRESS INC | COOKEVILLE | TN | 01 | 05 | | 787 | | | | 902 |
| 0026324 | ATLANTIC FREIGHT SYSTEMS | ELIZABETH | NJ | 01 | 05 | | 426 | 747 | | | 651 |
| 0026325 | SUREFAST DELIVERY | UNION | NJ | 01 | 05 | 250 | | | | | 250 |
| 0026371 | BROWN TRANSFER | KEARNEY | NE | 01 | 05 | 250 | | | | | 250 |
| 0027840 | SHEAVAN TRANSPORTATION | MOUND HOUSE | NV | 01 | 05 | 122 | | | | | 122 |
| 0028604 | DIAMOND LINE | MERIDIAN | ID | 01 | 05 | 1,974 | 769 | | 517 | 793 | 1,972 |
| 0032283 | TH SERVICE | EL PASO | TX | 01 | 05 | 8,142 | 187 | 1,995 | 675 | 626 | 7,955 |
| 0032823 | HOME DIRECT | DOWNERS GROVE | IL | 01 | 05 | 1,957 | 1,957 | 1,411 | | | 5,216 |
| 0044707 | A2Z FREIGHT SERVICES | HENDERSON | NV | 01 | 05 | 658 | | 1,223 | | | 658 |
| 0050276 | ESTES EXPRESS | RICHMOND | VA | 01 | 05 | 298 | 932 | | 40 | 398 | (634) |
| 0057196 | BEAULIEU OF AMERICA | DALTON | GA | 01 | 05 | 2,032 | | | | | 2,032 |
| 0059946 | CR ENGLAND | SALT LAKE CITY | UT | 01 | 05 | 78,042 | | 649 | 70,478 | | 71,127 |
| 0078387 | US FLOORS | DALTON | GA | 01 | 05 | 44 | 44 | | | | 953 |
| 0099862 | R & L CARRIERS | WILMINGTON | OH | 01 | 05 | 953 | | | | | 953 |
| 0095800 | HOME DIRECT MAIN OFFICE | HILLSIDE | IL | 01 | 05 | 2,017 | | | 2,017 | | 2,017 |
| 0028547 | CUSTOM CARPETS | NORTH LITTLE ROCK | AR | 01 | 05 | 24 | | | 24 | | 24 |
| 0088382 | TWO T'S GOLF | EASTON | PA | 02 | 04 | (193) | | | | | (193) |
| 0088888 | MILLENIUM SKATE WORLD | CAMDEN | NJ | 02 | 04 | (191) | | | | | (191) |

10,760,923

**Schedule 2.29(b)**

**<u>Status of Receivables</u>**

None.

**Schedule 2.30**

**<u>Inventory</u>**

8963 Carroll Way, Suite B
San Diego, CA 92121

**Schedule 4.3**

**<u>Funded Indebtedness</u>**

- Providence Term Loan Agreement
- Wells Fargo ABL Credit Agreement

Fulton County Superior Court
***EFILED***TV
Date: 2/27/2023 12:51 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

XGS Acquisition, LLC

)  Case
)  No.:   2023CV376796
)
)
**Plaintiff,**                )
)
**vs.**                          )
Allied World Surplus Lines Insurance Company  )
)
)
)
**Defendant**               )
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

Jason J. Carter, Bondurant Mixson & Elmore, LLP, One Atlantic Center Suite
3900, 1201 W. Peachtree Street, N.W., Atlanta, Georgia 30309

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____2/27/2023_____day of_____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By_____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***TV
Date: 2/27/2023 12:51 PM
Cathelene Robinson, Clerk

## General Civil and Domestic Relations Case Filing Information Form

☒ **Superior** or ☐ **State Court of** Fulton _____ **County**

| | |
|---|---|
| **For Clerk Use Only** | |
| 2/27/2023 | 2023CV376796 |
| **Date Filed** _____ | **Case Number** _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**

XGS Acquisition, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

Allied World Surplus    Lines Insurance Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Jason J. Carter _____   **State Bar Number** 141669 _____   **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☑ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____        _____
**Case Number**                         **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

## Case Information

2023CV376796 | XGS Acquisition, LLC VS. Allied World Surplus Line Insurance Company

| Case Number | Court | Judicial Officer |
|---|---|---|
| 2023CV376796 | EJ19 | GLANVILLE, URAL |
| File Date | Case Type | Case Status |
| 02/27/2023 | CONFIRMATION OF ARBIRATION AWARD | Open |

## Party

PLAINTIFF
XGS Acquisition, LLC

Address
1707 Mount Vernon Road
Suite C
Atlanta GA 30338

Active Attorneys ▾
Lead Attorney
JASON J. CARTER
Retained

Attorney
FREDRIC J. BOLD, Jr
Retained

Attorney
BEINER, ZOE M.
Retained

DEFENDANT
Allied World Surplus Lines Insurance Company

Address
425 West Capitol Avenue
Suite 1800
Little Rock AR 72201

## Events and Hearings

02/27/2023 PLAINTIFF'S ORIGINAL PETITION ▾

Petition

Comment
To Confirm Unanimous AAA Arbitration Award

02/27/2023 SUMMONS ▾

SUMMONS

Comment
FOR SERVICE

02/27/2023 CASE INITIATION FORM ▾

CASE INITIATION FORM

Comment
PETITION FOR UNIANIMOUS AAA ARBITRATION AWARD

03/14/2023 NOTICE OF FILING ▾

NOTICE OF FILING

Comment
Notice of Filing Affidavit of Service

## Financial

XGS Acquisition, LLC
Total Financial Assessment                                      $214.00

| | Total Payments and Credits | | | $214.00 |
|---|---|---|---|---|
| 2/27/2023 | Transaction Assessment | | | $214.00 |
| 2/27/2023 | Efile GA Electronic Payment | Receipt # 2023-305608 | XGS Acquisition, LLC | ($214.00) |

## Documents

Petition
SUMMONS
CASE INITIATION FORM
NOTICE OF FILING