United States Courts Southern
District of Texas
FILED

*September 19, 2022*

Nathan Ochsner, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. **4:22cv3359** |
| | ) |
| v. | ) |
| | ) **FILED UNDER SEAL** |
| MAURICIO CHAVEZ, | ) JURY TRIAL DEMANDED |
| GIORGIO BENVENUTO, and | ) **UNSEALED 9/29/2022** |
| CryptoFX, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CBT GROUP, LLC, | ) |
| | ) |
| Relief Defendant. | ) |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION,**
***EX PARTE* TEMPORARY RESTRAINING ORDER, ASSET FREEZE,**
**APPOINTMENT OF RECEIVER, AND OTHER ANCILLARY**
**EMERGENCY RELIEF, AND BRIEF IN SUPPORT**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i-ii

TABLE OF AUTHORITIES .........................................................................................iii-vi

INTRODUCTION...............................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

I.   Chavez Operates CryptoFX as a Crypto Learning Academy to Obtain Investor Funds ..........2

II.  Defendants Defrauded CryptoFX Investors...................................................................4

III. Defendants Misappropriated the Vast Majority of CryptoFX Investor Funds .........................5
   a.   Minimal Crypto Asset and Foreign Exchange Trading ...........................................5
   b.   More than $7 Million Went to the CBT Group for Undisclosed Purposes .............6
   c.   Most Investor Returns Were Actually Ponzi Payments.........................................7
   d.   Chavez Spent Nearly $2 Million in Personal Expenses.........................................7

IV.  Founders Circle Fraud....................................................................................................8

V.   Defendants Continue to Raise Investor Funds ...............................................................8

ARGUMENT ......................................................................................................................9

I.   The Court Should Issue an Ex Parte Temporary Restraining Order and a Preliminary
     Injunction to Halt the Ongoing Fraudulent Offering ................................................9

     A.   The Legal Standard Applicable to Temporary and Preliminary Relief Sought by the
          SEC ...............................................................................................................9

     B.   The Commission Is Likely to Succeed on the Merits of this Case .............................10

          1. The Defendants Are Violating the Antifraud Provisions of the Federal
             Securities Laws ............................................................................................10
             a. *Investments Pursuant to the CryptoFX Venture Agreement Are
                Securities*..................................................................................................11
             b. *Violations of Section 17(a)(2) and Section 10(b) and Rule 10-
                5(b)*..........................................................................................................12
             c. *Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and
                (c)*............................................................................................................14
             d. *Benvenuto Aided and Abetted Chavez's and CryptoFX's
                Violations* ...............................................................................................15

i

2. Defendants Are Violating the Securities Registration Provisions of the
Federal Securities Laws ................................................................................16

3. Chavez Violated Sections 206(1) and 206(2) of the Advisers Act ................17

C. The Defendants Are Reasonably Likely to Continue their Illegal Conduct ...............19

II. The Court Should Grant Additional Ex Parte Relief ...........................................................20

A. It Is Appropriate to Grant the Requested Relief on an Ex Parte Basis .......................20

B. An Asset Freeze Is Necessary .....................................................................................21

C. Appointment of Receiver .............................................................................................22

D. Other Necessary Ancillary Emergency Relief .............................................................23
   1. Accounting ...............................................................................................................23
   2. Document Preservation ............................................................................................24
   3. Expedited Discovery ................................................................................................24
   4. Alternative Service ...................................................................................................24

CONCLUSION ..................................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980) .................................................................................... 11, 14

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .................................................................................... 11, 13

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929, 961 (5th Cir. 1981) ...............................................................17

*CFTC v. Muller,*
    570 F.2d 1296 (5th Cir. 1978) ................................................................. 21, 22

*Esbitt v. Dutch-American Mercantile Corp.,*
    335 F. 2d 131 (2d Cir. 1964) ........................................................................22

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) .....................................................................................11

*In re San Vicente Med. Partners Ltd.,*
    962 F.2d 1402 (9th Cir. 1992) .....................................................................22

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) .....................................................................................14

*Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.,*
    916 F.3d 528 (5th Cir. 2019) .......................................................................12

*Long v. Shultz Cattle Co.,*
    881 F.2d 129 (5th Cir. 1989) .......................................................................12

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ............................................................................ 10, 14

*Newton & Co. v. Tex. Comm. Bank*
    630 F. 2d 1111 .............................................................................................13

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) .......................................................................................11

*SEC v. American Bd. Of Trade, Inc.,*
    830 F, 2d 431 (2d Cir. 1987) .......................................................................22

*SEC v. AmeriFirst Funding,*
    2007 WL 2192632 (N.D. Tex. July 31, 2007) ........................................... 22

*SEC v. Blatt,*
   583 F.2d 1325 (5th Cir. 1978) ................................................................. 9, 19, 20

*SEC v. Capital Gains Research Bureau, Inc.,*
   375 U.S. 180, 191-92 (1963) .........................................................................17

*SEC v. Carter,*
   2020 WL 6304889 (E.D. Tex. Oct. 28, 2020) ............................................. 14

*SEC v. Cavanagh,*
   155 F.3d 129 (2d Cir. 1998) ............................................................................ 9

*SEC v. Continental Tobacco Co. of S.C.,*
   463 F.2d 137 (5th Cir. 1972) ........................................................................16

*SEC v. Current Fin. Servs. Inc.,*
   783 F. Supp. 1441 (D.D.C. 1992) .................................................................23

*SEC v. First Fin. Group of Tex.,*
   645 F.2d 429 (5th Cir. 1981) ................................................................. 10, 22

*SEC v. Int'l Swiss Invs. Corp.,*
   895 F.2d 1272 (9th Cir. 1990) ................................................................... 247

*SEC v. Jackson,*
   908 F. Supp. 2d 834, 863-64 (S.D. Tex. 2012) ...........................................15

*SEC v. Manor Nursing Ctrs., Inc.,*
   458 F.2d 1082 (2d Cir. 1972) ....................................... 13, 14, 20, 22, 24

*SEC v. Materia,*
   745 F.2d 197 (2d Cir. 1984) ......................................................................... 20

*SEC v. Mgmt. Dynamics, Inc.,*
   515 F.2d 801 (2d Cir. 1975) ...........................................................................9

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers,*
   2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) ............................................... 17

*SEC v. Oxford Capital Secs., Inc.,*
   794 F. Supp. 104 (S.D.N.Y. 1992) .............................................................. 24

*SEC v. Reynolds, No. 3:08-CV-0438-B,*
   2008 WL 4561560 (N.D. Tex. Oct. 9, 2008) ............................................. 21

*SEC v. Ripple Labs, Inc.,*
   No. 1:20-cv-10832 (S.D.N.Y. 2020)..............................................................18

*SEC v. Sentinel Mgmt. Grp., Inc.,*
   2012 WL 1079961, at *13 (N.D. Ill. March 30, 2012) ...............................19

*SEC v. Steadman,*
    967 F.2d 636, 641-42 (D.C. Cir. 1992)................................................................17

*SEC v. Straub,*
    921 F.Supp.2d 244 (S.D.N.Y. 2013) ...................................................................17

*SEC v. Sullivan,*
    68 F. Supp. 3d 1367 (D. Colo. 2014) ..................................................................14

*SEC v. Treadway,*
    430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006)..........................................................15

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) ........................................................... 9, 21, 24

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ...........................................................................................11

*SEC v. Zale Corp.,*
    650 F.2d 718 (5th Cir. 1981) .............................................................................. 19

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ..............................................................................11

*Swenson v. Engelstad,*
    626 F.2d 421 (5th Cir. 1980) ..............................................................................16

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ................................................................................ 11, 13

*U.S. v. Elliott,*
    62 F.3d 1304, 1311 (11th Cir. 1996) ..................................................................18

*U.S. v. Lay,*
    612 F.3d 440, 446-47 (6th Cir. 2010) .................................................................18

*U.S. v. Miller,*
    833 F.3d 274, 282 (3d Cir. 2016)........................................................................18

*U.S. v. Ogale,*
    378 Fed. App'x 959, 960 (11th Cir. 2010) ....................................................17, 18

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) .............................................................................. 11

**Statutes**

**Securities Act of 1933**

Section 2 [15 U.S.C. § 77b] ................................................................................................ 11

Section 5(a) [15 U.S.C. § 77e(a)] .................................................................................... 2, 16

Section 5(c) [15 U.S.C. § 77e(c)] .................................................................................... 2, 16

Section 17(a) [15 U.S.C. § 77q(a)] .................................................................................. 2, 10

Section 20 [15 U.S.C. § 77t] ............................................................................................. 2, 9

Section 21 [15 U.S.C. § 77u] .............................................................................................. 9

**Securities Exchange Act of 1934**

Section 3 [15 U.S.C. § 78c] .............................................................................................. 11

Section 10(b) [15 U.S.C. § 78j] ...................................................................................... 2, 10

Section 21(d) [15 U.S.C. § 78u] ...................................................................................... 2, 9

**Advisers Act of 1940**

Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1)-(2)] ..................................................... 2, 17

Section 202(a)(11) [15 U.S.C. §§ 80b-2] ...................................................................... 18, 19

Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] ................................................. 2

**Rules**

Rule 10b-5 [17 C.F.R. §240.10b-5] ................................................................................. 2, 10

**Other**

Fed. R. Civ. P. 65 ..................................................................................................... 2, 9, 20, 21

Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission") submits this Motion for Preliminary Injunction, *Ex Parte* Temporary Restraining Order, Asset Freeze, Appointment of Receiver, and Other Ancillary Emergency Relief, and Brief in Support, to halt an ongoing securities fraud by Defendants Mauricio Chavez, Giorgio Benvenuto, CryptoFX, LLC ("CryptoFX"), and Relief Defendant CBT Group, LLC ("CBT Group") that is harming investors and dissipating investor funds, and to protect the ability to recover assets for harmed investors.

## INTRODUCTION

Since the beginning of 2020, the Defendants have raised at least $12 million from investors using repeated material misstatements of fact to solicit investments in crypto asset and foreign exchange trading. Chavez and CryptoFX used a purported crypto learning academy, in-person seminars, YouTube, and other social-media platforms to solicit investors. Chavez and CryptoFX engaged in general solicitation, offering to sell securities to mostly Latino-immigrant investors with whom Chavez had little or no preexisting, substantive relationships, including unaccredited investors, in multiple states. Benvenuto also personally solicited an investment in CryptoFX.

Instead of using investor funds to conduct crypto asset and foreign exchange trading as promised, Chavez and Benvenuto diverted the vast majority of the proceeds of these unregistered sales of securities to wholly unrelated purposes, including real estate development, personal expenditures, and Ponzi payments back to investors.

Because of Defendants' extensive fraud and misappropriation, and because the fraud is ongoing, the SEC seeks emergency relief in the form of an ex parte temporary restraining order, asset freeze, receivership order, and other emergency relief to halt the Defendants' fraudulent securities offering and to preserve assets for the benefit of investors.

*       *       *       *

1

Under Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(d)(1)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Congress has expressly authorized the Commission to seek "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Thus, to halt Defendants' ongoing violations, the Commission moves pursuant to this statutory authority and Rule 65(b) of the Federal Rules of Civil Procedure for the following *ex parte* orders:

(1) Entering a temporary restraining order, and thereafter a preliminary injunction, to restrain and enjoin, immediately and pending final adjudication on the merits, Defendants from violating Sections 5(a), 5(c) (Chavez and CryptoFX only), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)] (Chavez only); (2) Freezing Defendants' Assets; (3) Appointing a Receiver; (4) Requiring Defendants to provide an interim accounting; (5) Preventing the destruction of documents; (6) Authorizing expedited discovery; and (7) Authorizing service by alternative means.

## STATEMENT OF FACTS

**I.     Chavez Operates CryptoFX as a Crypto Learning Academy to Obtain Investor Funds**

Mauricio Chavez is the founder and CEO of CryptoFX. (Testimony of Mauricio Chavez[1]

---

[1] Chavez gave investigative testimony to SEC staff on February 10, 2022. After negotiating a second testimony date on June 8, 2022, Chavez's counsel told the Staff he would refuse to testify, citing his privilege against self-incrimination under the Fifth Amendment. He agreed to sign a declaration to that effect that included a list of the matters on which he would assert his privilege. (Declaration of Jillian Harris ("Harris Decl."), ¶ 8, APP. 003-004).

("Chavez Test."), 27:4, 32:6, APP. 019-020).[2] Since founding the company in early 2020, Chavez has marketed CryptoFX as a crypto asset learning academy, and has also used the company to obtain funds from investors who expected Chavez and CryptoFX to earn them investment returns through crypto asset and foreign exchange trading. (Harris Decl., ¶¶ 10, 11, APP. 004; Chavez Test., 37:19-38:19, APP. 021). Chavez is CryptoFX's sole trader of crypto assets. (*Id.*, ¶¶ 4, 11, APP. 002-004). Chavez and CryptoFX offered class packages ranging in cost from $499.99 to $1,499.99. (Harris Decl., Ex D, APP. 004, 099). Chavez used these classes to solicit further investments through CryptoFX from a pool of potential investors overwhelmingly made up of Latino immigrants. (Chavez Test., 46:7-10, APP. 023). As part of his pitch, Chavez told investors that he wanted to empower the common man and create wealth within the Latino community by providing passive income. (Benvenuto Test., 35:9-14, APP. 067).

Chavez and CryptoFX solicited investments both from CryptoFX students and those who did not enroll in the company's classes. (Harris Decl., ¶ 11, APP. 004; Chavez Test., 39:9-40:3, APP. 022). Since January 2020, CryptoFX raised at least $12 million from as many as 5,000 investors. (Declaration of Carol Hahn ("Hahn Decl."), ¶ 11, APP. 220; Chavez Test., 31:15-19, APP. 020). Chavez and CryptoFX signed up investors using short contracts, labeled Venture Agreements, that set forth the amounts contributed by investors and established a schedule under which CryptoFX would pay investors returns derived from the proceeds of CryptoFX's crypto asset and foreign exchange trading. (Harris Decl., ¶ 10, Ex. E, APP. 107-109). Before partnering with Chavez in the CBT Group, Benvenuto was a CryptoFX investor. (Benvenuto Test., 35:17-36:22, APP. 067-68). Benvenuto signed up for a six-month contract to be paid a return on Chavez's trading in the crypto markets. (*Id.*)

---

[2] Citations to the attached Appendix are referenced herein as "APP. ###."

Chavez and CryptoFX also used a two-tiered referral bonus system to boost investments in CryptoFX's Venture Agreements. (Harris Decl., ¶ 11, APP. 004; Chavez Test. 92:20-93:25, APP. 033.1). They encouraged CryptoFX investors to help solicit additional investments by offering "direct sponsor" payments of 7% of investments made by friends that they referred to CryptoFX. (*Id.*). Direct-sponsor investors could further benefit from downstream investment by referrals of their referred investors, earning 3% of all such second-level investments. (*Id.*).

Additionally, Chavez and CryptoFX offered a purported special tier of access called the Founders Circle. (Harris Decl., ¶¶ 17-20, APP. 006; Chavez Test. 49:9 *et seq.*, APP. 024, *et seq.*). According to Chavez, Founders Circle members would have an increased level of access to trades he personally executed. (*Id.*) Some Founders Circle members traded in their own crypto wallets using this information, and Chavez and CryptoFX also traded on behalf of Founders Circle members. (Chavez Test., 50:12-51:25). To deceive the Founders Circle members into believing they earned higher returns, Chavez deposited larger Ponzi payments into those investors' crypto wallets. (Harris Decl., ¶ 20, APP. 006; Chavez Test., 78:17-81:12; 82:13-83:21, APP. 031-033).

## II. Defendants Defrauded CryptoFX Investors.

While Chavez claimed to offer a path to self-improvement to the Latino community, he was actually victimizing a marginalized group with lies, omissions, and a deceptive scheme. Chavez used the following misrepresentations and omissions in soliciting and obtaining investments in CryptoFX's offerings:

- Chavez claimed to a crowd of potential investors at a Crowne Plaza hotel in Houston in or around August 2022, that CryptoFX had "literally achieved what nobody in the world has achieved in the crypto-economy industry," and that his small office had "literally made over five millionaires last year." (Harris Decl., Ex. L, APP. 0174). In truth, the returns paid to investors during that time were simply Ponzi payments recycling existing investor funds. (Hahn Decl., ¶¶ 16-26, APP. 021-026).

4

- At least as early as May 2020, Chavez and CryptoFX enrolled investors using Venture Agreements in which CryptoFX stated that investors "WILL BE RECEIVING REWARD FOR MY CONTRIBUTION IN THE FORM OF BITCOIN" with options of payments every one, three, six, or twelve months. (Harris Decl., Exs. E, G, APP. 107-109; 115-116). These Venture Agreements included the following guarantee: "IN THE EVENT THAT CRYPTOFX, LLC LOSES THE MONEY OR CANNOT CONTINUE TO FULFILL PAYMENTS, CRYPTOFX, LLC AGREES TO REPAY TOTAL PRINCIPAL AMOUNT CONTRIBUTED IN A PERIOD NO LATER THEN 24 – 36 MONTHS WHICH BOTH PARTIES HAVE AGREED TO BE SETTLED OUTSIDE OF ANY COURTS." (*Id.*) In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- At least in May 2021, Chavez and CryptoFX enrolled investors using Venture Agreements stating that "WE ARE TAKING YOUR MONEY AND INVESTING IT IN OUR BEHALF. IF WE RECEIVED ENOUGH RETURN ON CRYPTO CURRENCY, WE WILL REPAY THE STUDENT A PORTION OF THE TOTAL TUITION." In fact, the vast majority of investor funds actually went to purposes unrelated to crypto investing, including real estate investments, personal spending, and Ponzi payments. (*Id.*, ¶¶ 19-28, APP. 223-227).

- Soliciting investments in July 2020, Chavez and CryptoFX claimed to pay 20% profits *per month* on crypto asset investments. (Harris Decl., ¶ 10, APP. 004; Benvenuto Test., 23:6-9, 35:17-36:8, APP. 066.1-068). In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- CryptoFX used a PowerPoint presentation in live meetings with potential investors including a table of potential earnings that shows investors earning back nearly half of their investments as profit *every* three months and 90% *every* six months. (Harris Decl., Ex. D, APP. 101). While Chavez claims that these potential numbers are based on the previous performance of CryptoFX (Chavez Test. 91:18-92:12, APP. 033.1), in fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- The Defendants never disclosed that the vast majority of the funds contributed by investors were actually being used for unrelated purposes, personal spending, and Ponzi payments as described below. (Harris Decl., Exs. E, G, APP. 107-109; 115-116). Likewise, the Defendants never disclosed that less than 10% of investor funds was ever used in crypto asset or foreign exchange trading. (*Id.*).

- Benvenuto solicited an investor in November 2021 who invested $100,000 with CryptoFX. (Benvenuto Test., 190:16-22, APP. 088.1). Benvenuto immediately contacted Chavez and asked that the investor's investment be diverted to the CBT Group to fund real estate purchases unrelated to crypto asset or foreign exchange trading. (*Id.*, 190:16-191:192:3, APP. 088.1-088.3).

5

- At a CryptoFX seminar in Metairie, Louisiana on June 6, 2022, CryptoFX representatives claimed that Chavez would obtain incredible rates of return by trading in crypto assets, potentially doubling investors' money in six months. (Declaration of Omar Xavier ("Xavier Decl."), ¶ 7, APP. 234-235). In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

## III. Defendants Misappropriated the Vast Majority of CryptoFX Investor Funds

Rather than use investor funds to make crypto asset and foreign exchange trades, the Defendants used the vast majority of investor funds for undisclosed purposes.

### a. Minimal Crypto Asset and Foreign Exchange Trading

While the Venture Agreements only disclose that investor funds would be used in foreign exchange and crypto asset trading (Harris Decl., Ex. E, APP. 109), Chavez used less than 10% of the more than $12 million raised from investors for crypto asset and foreign exchange trading. (Hahn Decl., ¶ 18, APP. 223). For the small amount of crypto asset trading that they conducted, Chavez and CryptoFX used Coinbase, an online platform for buying selling, transferring, and storing cryptocurrencies. (*Id.*, ¶¶ 10, 17, 18, APP. 220, 222-223). Coinbase records reveal that Defendants only sent $488,855 of investor funds to Coinbase. (*Id.*, ¶ 18, APP. 223). Chavez and CryptoFX also sent a total of $416,500 to a third party for potential foreign exchange trading. (*Id.*). The total amount of investor funds used for crypto asset and foreign exchange trading – $905,355 – represents less than 8% of investor funds raised for those purposes. (*Id.*).

### b. More than $7 million Went to the CBT Group for Undisclosed Purposes

In or around November 2020, Chavez and Benvenuto began to misappropriate CryptoFX investor funds by transferring funds to the CBT Group, a real estate company that they owned and controlled. (Harris Decl., ¶ 13, APP. 005). CBT Group had no source of income except for CryptoFX investor funds or potential investor funds.[3] (Hahn Decl., ¶ 22, APP. 224-225). While

---

[3] While Benvenuto testified that all CBT Group funds came from CryptoFX, about $800,000 did not match the

Chavez has given conflicting testimony about whether investors knew their funds could be diverted, neither the CryptoFX presentation materials nor the Venture Agreements disclosed that Defendants would divert a substantial portion of investor funds to real estate purchases. (Harris Decl., ¶ 13, Ex. D, E, APP. 092, *et seq.*, 107-109). As Bevenuto used CryptoFX investor funds to purchase real estate through CBT Group, Benvenuto consistently urged Chavez to "funnel" investor funds to the CBT Group account that Benvenuto controlled. (*Id.*, ¶ 14, Ex. F, APP. 111-113). In addition, Benvenuto personally solicited a friend to invest in CryptoFX and, upon her investment of $100,000, he immediately contacted Chavez and instructed that he divert the investment to CBT Group to purchase real estate. (*Id.*, 190:16-191:192:3, APP. 088.1-088.3). In all, Chavez and Benvenuto poured at least more than $7 million in CryptoFX investor funds into the CBT Group. (Hahn Decl., ¶ 22, APP. 224-225).

Under the control of Chavez and Benvenuto, CBT Group used most of the diverted investor funds to acquire and develop real estate ($4,807,491) and to make Ponzi payments to CryptoFX investors ($1,268,000). (*Id.*). They also spent investor funds on legal fees ($826,188), loan payments for a bridge loan ($122,000), office rent ($90,000), furniture ($55,487), security services ($27,848), and retail purchases ($23,997). (*Id.*). Finally, Benvenuto received at least $260,150 from the CBT Group Bank Accounts. (*Id.*).

### c. Most Investor Returns Were Actually Ponzi Payments

While Chavez personally claimed that CryptoFX had minted several crypto trading millionaires, the vast majority of "profits" paid to investors were actually just recycled investor funds. (Hahn Decl., ¶ 18-19, APP. 223). Of the approximately $2.7 million in "returns" distributed by CryptoFX, about $1.5 million came from investor funds sitting in CryptoFX accounts and just

---

pattern of investor funds coming into the CBT Group.

under $1.3 million came from CBT Group accounts. (*Id.*). When a potential investor at a CryptoFX seminar confronted CryptoFX representatives about how the returns were generated and whether CryptoFX was a Ponzi scheme, the representatives were hostile to the potential investor's questions, kicked him out of the seminar, and followed him to his car. (Xavier Decl., ¶ 11, APP. 235).

### d. Chavez Spent Nearly $2 Million of Investor Funds on Personal Expenses

Chavez also spent at least $1,446,953 from CryptoFX investor funds on additional expenses unrelated to crypto asset and foreign exchange transactions, including $460,594 on cars, $267,623 in credit card payments, $196,513 on retail purchases (including $100,000 at luxury retailers such as Saks Fifth Avenue), $181,996 paid to the Post Oak Hotel (a luxury hotel that Chavez paid monthly), $110,358 on travel, $100,935 at restaurants, over $19,000 on jewelry, and over $15,000 at adult-entertainment establishments. (Hahn Decl., ¶ 21, APP. 224). In addition, Defendants appear to have paid $30,000 to purchase a hair salon in Houston and $540,000 to purchase a single-family home in the name of Chavez's wife. (*Id.*, ¶ 20-21, APP. 223-224). Defendants did not disclose to investors that their funds would be used in this manner.

## IV. Founders Circle Fraud

Starting in May 2020, Chavez formed the "elite" Founders Circle classes for select CryptoFX investors to allegedly teach students how to use Chavez's personalized trading strategies – and also trade on their behalf – to achieve greater returns. (Harris Decl., ¶ 17, APP. 006; Chavez Test. 49:2-50:22, APP. 024). But Chavez deceived these novice students. After teaching them how to open up digital wallets and execute trades in several crypto asset securities, Chavez deposited Ponzi payments into those wallets to give the appearance that his trading strategies produced greater returns. (*Id.*; Chavez Test., 170:21 - 171:20, APP. 043.1-044).

8

## V. Defendants Continue to Raise Investor Funds

Defendants continue to raise funds for purported investments in crypto assets and foreign exchange trading. CryptoFX continues to promote itself on social media outlets such as TikTok, Facebook, Twitter, and LinkedIn. (Harris Decl., ¶ 36, APP. 011). CryptoFX currently uses a live website to solicit new investors. (*Id.*, ¶ 37, APP. 011-012). CryptoFX is also holding live seminars soliciting investors in multiple cities and states across the country. (*Id.*, ¶ 33, 34, APP. 011).

### ARGUMENT

### I. The Court Should Issue an *Ex Parte* Temporary Restraining Order and a Preliminary Injunction To Halt the Ongoing Fraudulent Offering

#### A. The Legal Standard Applicable to Temporary and Preliminary Relief Sought by the SEC

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] expressly authorize the Commission to seek and a court to enter "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Federal courts have broad equitable powers enabling them to fashion appropriate remedies necessary to grant full relief, including injunctions and asset freezes. *See SEC v. Blatt*, 583 F.2d 1325, 1335-1336 (5th Cir. 1978). Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may grant an *ex parte* temporary restraining order to prevent immediate and irreparable injury, loss, or damage. FED. R. CIV. P. 65(b).

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable injury, the balance of equities weighing in its favor, or lack of an adequate remedy at law. *Id.; see also SEC*

9

*v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *see also* 15 U.S.C. §77t(b); 15 U.S.C. §77u(d). Thus, when the Commission establishes (i) a prima facie showing of violations and (ii) the likelihood that such violations will continue, issuance of a preliminary injunction is appropriate. *See SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 434-35 (5th Cir. 1981).

As demonstrated below, the Commission meets this burden because the evidence establishes that Defendants violated the antifraud and securities registration provisions of the federal securities laws and that they will likely continue to defraud investors absent the injunctive relief.

**B.    The Commission Is Likely to Succeed on the Merits of its Case**

1.    The Defendants Are Violating the
       Antifraud Provisions of the Federal Securities Laws

Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities, to (1) employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any material misstatement or omission; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act prohibits using a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). Rule 10b-5 thereunder makes it unlawful, in connection with the purchase or sale of a security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business

10

which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. In *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-102 (2019), the Supreme Court held that these antifraud provisions are "expansive" and "capture a wide range of conduct."

A violation of Section 17(a)(2) and Rule 10b-5(b) occurs if the misrepresented or omitted facts are material. Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in his or her investment decision, and would view it as having significantly altered the total mix of available information. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter, while Sections 17(a)(2) and (3) of the Securities Act require a showing of at least negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'") (citations omitted).

### a.      *CryptoFX Investments are Securities*

The investments that Defendants sold pursuant to the Venture Agreements are securities because they are investment contracts. *See* 15 U.S.C. §77b(a)(1); 15 U.S.C. §78c(a)(10). An investment contract qualifies as a security if it meets three requirements: "(i) an investment of money; (ii) in a common enterprise; and (iii) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99

(1946); *Williamson v. Tucker*, 645 F.2d 404, 417-418 (5th Cir. 1981). In applying these requirements, the Supreme Court has directed courts to disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). In the Fifth Circuit, courts considering the existence of a common enterprise use the "broad vertical commonality test" in which "the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)). Under the broad vertical commonality test, "the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise." *Long*, 881 F.2d at 141. Here, investors invested money and had no role in managing or controlling CryptoFX or Chavez. The investors' fortunes depended solely on the efforts and expertise of Chavez's trading. Therefore, broad commonality exists, and these investments are securities.

Because Defendants made the misstatements and participated in the fraudulent conduct described herein to induce investors to invest in CryptoFX securities, their misstatements and conduct were in connection with the purchase or sale of a security and in the offer or sale of a security.

   *b.*  *Violations of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b)*

Defendants have violated, and continue to violate, Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder because, as set forth above, they (i) made multiple misstatements, (ii) the misstatements were material, (iii) the misstatements were made in connection with the purchase or sale of a security (and in the offer or sale of a security), and (iv) acted with scienter.[4]

---

[4] Benvenuto is charged with violating Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, but not Section 17(a)(2) of the Securities Act.

Chavez and CryptoFX repeatedly claimed to be investing in the crypto asset and foreign exchange trading markets on behalf of their investors. Benvenuto personally raised $100,000 from a single CryptoFX investor – making sure that he would get the benefit of CryptoFX's referral-payment system. (Harris Decl., Ex. L, APP. 113.1-113.2). As demonstrated herein, they were actually using the vast majority of investor funds for completely unrelated purposes, including real estate acquisition and personal expenditures. Egregiously, the Defendants used a significant portion of investor funds to make Ponzi payments back to investors, enabling them to parade happy investors through their seminars to solicit more investments from other unsuspecting investors. While Defendants were claiming to have created millionaires in the Latino community, they were not actually creating market returns for their investors and they knew their reported results were grossly inflated. Chavez and CryptoFX also lied about their experience in the crypto industry, claiming on their website many years of experience.

The false and misleading statements that Defendants made are material. False claims about how investor funds were being used – and omissions about the massive diversion of funds – are critically important to a reasonable investor. *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citing *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976)). Further, reasonable investors would have considered it important to know the truth about the baselessness of Chavez's and CryptoFX's claims of success and their experience in the industry. Knowledge of the actual facts would have allowed investors to better evaluate CryptoFX's offerings.

The evidence shows that Defendants engaged in this conduct with scienter. Benvenuto and Chavez, and through him, CryptoFX, knew the truth—or were at least severely reckless in not knowing the truth—about: (1) the actual use of investor funds, (2) the prior results of CryptoFX trading, (3) the massive Ponzi scheme they were conducting, and (4) their own lack of experience

13

and training in the industry. Chavez and CryptoFX obtained money from the securities' sales in which these untrue and misleading statements were made, in violation of Section 17(a)(2). Because Chavez had ultimate authority over the untrue and misleading statements to investors, he violated Rule 10b-5(b). His scienter may be imputed to CryptoFX, which therefore is also liable for the violations. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096-97 n.16-18 (2d Cir. 1972). Because Chavez was acting on behalf of CryptoFX in making the statements, the company may likewise be held liable for violating Section 17(a)(2) under the theory of *respondeat superior*. See *Paul F. Newton & Co. v. Tex. Comm. Bank*, 630 F.2d 1111, 1115-19 (5th Cir. 1980) (recognizing doctrine of *respondeat superior* as a basis for an entity's vicarious liability under the securities laws). Likewise, because Benvenuto personally solicited a $100,000 investment in CryptoFX without disclosing that he was immediately diverting the funds to unrelated use by the CBT Group, he violated Rule 10b-5(b).

      c.    *Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)*

Defendants also violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by engaging in a fraudulent scheme, and in acts, practices, or a course of business that has operated as a fraud. Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), but at least negligence is sufficient for Section 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 691 & 697 (1980). The scienter of an officer acting on a company's behalf may be imputed to the company. *See, e.g., Manor Nursing Centers, Inc.*, 458 F.2d at 1096-97 nn.16-18. These provisions are "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). In *Lorenzo*, the Supreme Court held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement

14

for purposes of Rule 10b-5(b), as that term was defined in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Defendants' fraudulent course of conduct includes the making of material misrepresentations set forth above,[5] which, in addition to violating Section 17(a)(2) and Rule 10b-5(b), also constitute violations of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c). *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *SEC v. Carter*, No. 4:19-CV-100-SDJ, 2020 WL 6304889, at *5 (E.D. Tex. Oct. 28, 2020) (noting this reasoning applies to Section 17(a)(3) as well); *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1379 (D. Colo. 2014) (finding that generating false account statements provided to investors violated Section 17(a)(1) and (3) and Rule 10b-5(a) and (c)). Additionally, Defendants' repeated use of investor funds to make Ponzi payments to investors qualifies as deceptive conduct under the federal securities laws. As described above, this misconduct was material and undertaken with scienter.

### d. Benvenuto Aided and Abetted Chavez's and CryptoFX's Violations

In the alternative, Benvenuto aided and abetted Chavez and CryptoFX's primary fraud violations. Under Section 15(a) of the Securities Act and Section 20(e) of the Exchange Act, "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of [the antifraud provisions of the securities laws], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." To establish liability for aiding and abetting, the Commission must show: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) that the aider and abettor was at least reckless with regard to the commission of the primary violation; and

---

[5] See the following subsection I(B)(*d*) for a discussion of Benvenuto's state of mind, specifically.

(3) substantial assistance by the aider and abettor in the achievement of the primary violation. *See, e.g., SEC v. Jackson*, 908 F. Supp. 2d 834, 863-64 (S.D. Tex. 2012), citing *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006).

As demonstrated above, Benvenuto knew, or was at least reckless in not knowing, of Chavez's and CryptoFX's primary fraud violations, and substantially assisted those violations. Having been a CryptoFX investor himself, and having solicited investment in CryptoFX, Benvenuto knew that investors expected their funds to be used in crypto asset trades. Nevertheless, Benvenuto continuously requested that CryptoFX investor money be "funneled" to the CBT Group accounts, instructed Chavez on what to tell investors so their checks could be deposited at CBT, and then deposited individual CryptoFX investor checks into the CBT Group account that he controlled. Benvenuto also made Ponzi payments to CryptoFX investors from CBT Group accounts. In addition, Benvenuto recruited at least one investor to make a $100,000 "cryptocurrency investment" and deposited that check into the CBT Group account. Benvenuto then spent approximately $4.8 million of investor funds on real estate development through CBT Group.

> ### 2. Defendants Are Violating the Securities Registration Provisions of the Federal Securities Laws

Defendants have violated and continue to violate Sections 5(a) and 5(c) of the Securities Act by offering and selling securities to investors without registering those securities offerings with the Commission. *See* 15 U.S.C. §77e(a) and (c). Section 5 prohibits the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Because Section 5 is a strict liability statute, a defendant's intent is irrelevant. *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980). To establish a *prima facie* case of a violation of Sections 5(a) and 5(c), the Commission

need only prove that: (i) defendants, directly or indirectly, offered or sold securities; (ii) no registration statement was in effect or filed for the offer or sale of those securities; and (iii) interstate transportation or communication, or the mails, were used in connection with the offer or sale. *See* 15 U.S.C. §§ 77e(a) & 77e(c); *Cont'l Tobacco,* 463 F.2d at 155.  Once a *prima facie* case is established, the burden shifts to defendants to prove that the securities offerings fall within an exemption to Section 5. *Cont'l Tobacco,* 463 F.2d at 156.

The evidence establishes that Defendants offered and sold these securities in interstate commerce with no registration statement in effect.  All offers and sales of CryptoFX's securities were unregistered.  (Harris Decl., ¶ 4, APP. 002).  Accordingly, the Commission satisfies this element of a Section 5 claim.  Additionally, Defendants used the internet, including CryptoFX's website and social media, among other means, to find and communicate with potential investors. Defendants obtained funds from investors via wire transfers.  Defendants' investors are located in multiple states.  Thus, Defendants offered and sold securities through interstate commerce.  *See SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08CV1402 (KAM) JMA, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

### 3.     Chavez Violated Sections 206(1) and 206(2) of the Advisers Act.

Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud, or to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client.  Sections 206(1) and 206(2) impose a statutory fiduciary duty upon an investment adviser with respect to its clients. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963).  These

17

duties include the duty to act for the benefit of clients, the duty to exercise the utmost good faith in dealing with clients, the duty to disclose all material facts, and the duty to employ reasonable care to avoid misleading clients. *See id.* at 194. A violation of Section 206(1) requires proof of scienter, and a finding of severe recklessness satisfies this requirement. *See SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981) (Scienter may be established by proof of severe recklessness). A violation of Section 206(2) does not require a showing of scienter. *Steadman*, 967 F.2d at 647; *Capital Gains*, 375 U.S. at 195.

Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Chavez is an investment adviser, because he acts as CryptoFX's portfolio manager. Chavez has sole authority for trading CryptoFX's pooled assets, and is responsible for making its investments. *See e.g., United States v. Ogale*, 378 Fed. App'x 959, 960 (11th Cir. 2010) ("The exercise of control over what purchases and sales are made with investors' funds is considered to be investment advice for purposes of the [Advisers Act]."). Chavez traded investor funds in numerous crypto assets, determining what trades to make with investors' funds.

Chavez's conduct satisfies the compensation element of Section 202(a)(11) because he received compensation for his services as an investment adviser (*i.e.*, the misappropriated CryptoFX investor funds). *See United States v. Miller*, 833 F.3d 274, 282 (3d Cir. 2016) (finding that adviser compensation includes "any economic benefit" and holding that defendant who sold his firm's promissory notes to his clients met the compensation element of Section 202(a)(11) because the money clients provided "became [the defendant's] compensation—his "economic

18

benefit"—when he commingled investors' accounts and spent the money for his own purposes."); *Ogale*, 378 Fed. Appx. at 960-61 (finding that ill-gotten gains qualify as compensation under the Advisers Act); *United States v. Elliott*, 62 F.3d 1304, 1311 (11th Cir. 1996) (finding that adviser compensation includes "any economic benefit" including compensation from an economic relationship that involved providing investment advice as a primary aspect of the relationship).

Acting as an investment adviser, Chavez violated Sections 206(1) and 206(2) of the Advisers Act when he knowingly misappropriated CryptoFX's assets by using them to pay personal expenses and to fund an unrelated business as detailed above.

Chavez also established separate, individual adviser relationships based on his "mentorship" of the Founders Circle clients. Chavez told the Founders Circle clients that he would provide them with personalized advice and a specialized trading strategy, and then provided them with purportedly individualized trade recommendations to be implemented in their personal crypto asset wallets. *See, e.g., United States v. Lay*, 612 F.3d 440, 446-47 (6th Cir. 2010) (noting that Goldstein "did not hold that a hedge fund investor could never be a client of a hedge fund adviser"); *SEC v. Sentinel Mgmt. Grp.; Inc.*, 2012 WL 1079961, at *13 (N.D. Ill. March 30, 2012) (finding adviser owed fiduciary duty to investors where the relationship "contain[ed] several indicia of an adviser-investor relationship that [were] absent from the traditional hedge fund structure"). Chavez also violated his fiduciary duties when he misrepresented: (1) that he would provide these clients with personalized advice and trading strategies, when in fact their assets were invested in the same manner as the assets of all other investors; (2) that their investments were generating higher returns, when such higher payments were simply Ponzi payments that Chavez and CryptoFX deposited into the clients' digital wallets; and (3) his background as an experienced trader with expertise in crypto assets.

## C.     The Defendants Are Reasonably Likely to Continue their Illegal Conduct

Having made a substantial showing that it is likely to succeed on the merits of its claims, the Commission is also required to demonstrate that Defendants are likely to continue their illegal conduct. In the Fifth Circuit, the Commission makes this showing when "the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a reasonable likelihood of future transgressions." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981). To determine whether there is a "reasonable likelihood" of future violations, courts consider the "sum of the circumstances surrounding the defendant and his past conduct," including (i) the nature of the past violation, (ii) the defendant's present attitude, and (iii) objective constraints on (or opportunities for) future violations of the securities laws. *Id.* In this context, courts also consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of their conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. *Id.* (quoting *Blatt*, 583 F.2d at 1334 n.29).

Here, the evidence, when considered in light of the factors set forth above, points to a virtual certainty that Defendants will continue their illegal conduct unless enjoined. Defendants have conducted for multiple years, and continue to operate, a scheme through which they have obtained millions of dollars in investors' funds using false and misleading statements and deceptive acts and practices. Chavez's present attitude provides no assurance that he will refrain from future violations. For example, he claimed during testimony that CryptoFX's trading proceeds justified the claim that investors could earn 90% return every six months. (Chavez Test. 91:18-92:12, APP. 033.1). Chavez made this bold claim knowing that the only way CryptoFX had managed to pay *any* returns had been through extensive use of Ponzi payments. (Hahn Decl., ¶¶

20

17-19, APP. 222-223).  Because Defendants' Ponzi payments are the only thing giving them the veneer of success, it is highly likely that, unless immediately enjoined, they will continue to lure more investors into this scheme.

## II.    The Court Should Grant Additional *Ex Parte* Relief

In addition to a restraining order (and a preliminary injunction), the Commission also seeks an asset freeze, the appointment of a receiver, and orders requiring an accounting, prohibiting the destruction of documents, allowing expedited discovery, and permitting alternative service. Federal courts have broad equitable powers enabling them to fashion appropriate ancillary remedies necessary to grant relief.  *See Manor Nursing Centers*, 458 F.2d at 1103-04; *Blatt*, 583 F.2d at 1335-36.  "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

### A.    It Is Appropriate to Grant the Requested Relief on an *Ex Parte* Basis

Rule 65(b) of the Federal Rules of Civil Procedure authorizes courts to issue a temporary restraining order without notice to the adverse party if "specific facts in an affidavit for verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b).

Here, the evidence demonstrates that immediate and irreparable injury will result to the Commission and investors before Defendants can be heard.  The evidence establishes that Defendants' scheme is ongoing, that Defendants' only path forward is to continue to raise money from investors to pay purported profits/returns to investors, and that Defendants will further encumber investor-related assets and dissipate the investor funds received from the offering.

Further, the Rule 65 certification being submitted with this Motion sets forth experience in more than 100 cases since 1998 in which the Fort Worth Regional Office of the Commission has sought and obtained emergency and/or *ex parte* relief for the protection of defrauded investors, which is an additional basis for the Commission's belief that irreparable injury and loss will occur if the Court requires notice and a hearing.

### B.    An Asset Freeze Is Necessary

An asset freeze may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). The Commission need not show a reasonable likelihood of future violations, because an asset freeze only preserves the status quo. *See CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *Unifund SAL*, 910 F.2d at 1039. When there is evidence that a defendant might dissipate assets, a court need only find "some basis" to infer a violation of the securities laws to impose a freeze order and grant other ancillary relief. *See Unifund SAL*, 910 F.2d at 1041; *SEC v. Reynolds*, No. 3:08-CV-0438-B, 2008 WL 4561560, at *2 (N.D. Tex. Oct. 9, 2008); *SEC v. AmeriFirst Funding*, No. 3:07-CV-1188-D, 2007 WL 2192632, *3 (N.D. Tex. July 31, 2007).

The Commission's evidence of Defendants' past and ongoing illegal conduct justifies an asset freeze here. The evidence establishes that Defendants have engaged in egregious violations of the federal securities laws by raising millions of dollars misrepresenting the nature and outcome of their investments, and will engage in future violations unless enjoined. An asset freeze is therefore necessary to maintain the status quo by preventing further dissipation of investor funds and to facilitate the satisfaction of whatever equitable relief the Court may ultimately order, as

well as preventing further encumbrance of investors' assets.[6] *See, e.g.*, *Manor Nursing Ctrs.*, 458

F.2d at 1106; *Muller*, 570 F.2d at 1300; *AmeriFirst Funding*, 2007 WL 2192632, at *3.

### C.       Appointment of Receiver

The appointment of a receiver is a well-established equitable remedy in civil enforcement

proceedings for injunctive relief. *See, e.g., SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438

(5th Cir. 1981). Courts have wide discretion to order equitable relief in Commission actions. *In

re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992). Courts will appoint a

receiver where necessary to: (1) to preserve the *status quo* while various transactions are being

unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor

Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2nd Cir. 1972); (2) to protect "those who have already

been injured by a violator's actions from further despoilation of their property or rights," *Esbitt v.

Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation

of the defendant's assets pending further action by the court, *SEC v. Am. Bd. of Trade, Inc.*, 830

F.2d 431,436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring the

companies into compliance with the law, *Id.* at 437; or (5) to place hopelessly insolvent entities in

bankruptcy to effect their liquidation, *Id.* at 436.

"The Court may appoint a receiver on a prima facie showing of fraud and

mismanagement." *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992). As

discussed above, the Commission has made a strong *prima facie* showing of fraud. The

Defendants raised millions of dollars to conduct crypto asset and foreign exchange trading, and

then they used less than 10% of the investor funds to that purpose. Rather, Defendants spent wildly

on real estate and personal expenses, lulling investors – and even gaining more – through the use

---

[6] In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon, and civil
penalties.

of Ponzi payments. The appointment of a receiver will assist in preserving assets by preventing the Defendants who illegally obtained investor funds from disposing of, wasting, or further encumbering assets that would otherwise be available to satisfy a judgment against them, potentially for the benefit of the investors. Thus, a receiver is warranted.

The Commission staff has vetted receiver candidates to provide a recommendation to the Court, and has identified a candidate who possesses superior skill and experience in this area, agrees to the standard billing and reporting requirements, agrees to reduce professional fees, is located in the Houston area, where Defendants' and Relief Defendants' principal real assets are located, and has cleared conflicts. The Commission's proposed candidate is John Lewis of Shook Hardy & Bacon.

### D.     Other Necessary Ancillary Emergency Relief

#### 1.     Sworn Accounting

An order requiring Defendants to prepare sworn accountings is appropriate here because it will enable the Commission and a receiver to accurately determine the scope of the fraud and disposition of investor funds, as well as to identify all available assets to help ensure that funds and assets are frozen properly and preserved to satisfy any future order of disgorgement or civil penalties against Defendants. *See Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). *See SEC v. International Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *Manor Nursing Ctrs.*, 458 F.2d at 1105-06.

#### 2.     Document Preservation

An order prohibiting the movement, alteration, destruction, concealment, or disposing of books, records, accounts, electronic storage devices, and computers is necessary to protect records for discovery. Such orders are routinely granted to protect the integrity of the litigation. *See, e.g.,*

*Unifund SAL*, 910 F.2d at 1040, n.11. Specifically, in this case, it is critically important that Defendants preserve access to any storage devices that might contain the private key(s) to access digital wallets.

          3.   <u>Expedited Discovery</u>

An order providing for expedited discovery will allow the Commission to act quickly to obtain records necessary to identify and preserve assets for the benefit of investors, to depose Defendants, their employees, and others on short notice, and to seek other discovery on an expedited basis from Defendants and third parties prior to a hearing on the Commission's application for a preliminary injunction.

          4.   <u>Alternative Service</u>

Alternate service on Defendants and financial institutions by email and facsimile is appropriate here because the effectiveness of other relief the Commission seeks could be diminished by any delay in awaiting the formal service of process.

25

## CONCLUSION

Based on the foregoing, the Commission respectfully requests that the Court enter orders providing for the relief requested and such other and further relief as the Court may deem just and proper.

Dated:  September 19, 2022                    Respectfully submitted,


UNITED STATES SECURITIES AND
EXCHANGE COMMISSION


Matthew J. Gulde
Illinois Bar No. 6272325
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorney for Plaintiff*

26

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. **4:22CV3359** |
| ) | |
| v. ) | |
| ) | **FILED UNDER SEAL** |
| **MAURICIO CHAVEZ,** ) | JURY TRIAL DEMANDED |
| **GIORGIO BENVENUTO, and** ) | **UNSEALED 9/29/2022** |
| **CryptoFX, LLC,** ) | |
| ) | |
| Defendants, ) | |
| ) | |
| **CBT GROUP, LLC,** ) | |
| ) | |
| Relief Defendant. ) | |

**[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDERS: (1) FREEZING ASSETS; (2) PROHIBITING THE DESTRUCTION OF DOCUMENTS; (3) GRANTING EXPEDITED DISCOVERY; (4) REQUIRING SWORN ACCOUNTINGS; (5) PERMITTING ALTERNATIVE MEANS OF SERVICE, AND (6) SETTING HEARING DATE ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter came before the Court upon the *Ex Parte* Motion of Plaintiff U.S. Securities and Exchange Commission ("SEC") for a Preliminary Injunction, Temporary Restraining Order, Asset Freeze, Appointment of Receiver, and Other Emergency Relief and Brief in Support (the "TRO Application").

The Court, having considered the SEC's Complaint, the TRO Application, the supporting declarations and exhibits, and the other evidence and argument presented to the Court, finds that:

1.     This Court has jurisdiction over the parties to, and the subject matter of, this action, and the SEC is a proper party to bring this action seeking the relief sought in its Complaint, and its motion.

2.     The SEC has made a sufficient and proper showing in support of the relief granted

1

herein, as required by Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §

77t(b), and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §

78u(d), by evidence establishing a *prima facie* case and reasonable likelihood that Defendants

Mauricio Chavez, Giorgio Benvenuto and CrytoFX, LLC have engaged in, are engaging in, are

about to engage in, and unless restrained and enjoined will continue to engage in transactions,

acts, practices, and courses of business that constitute violations of Sections 5(a), 5(c), and 17(a)

of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)], Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and

(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

3.      Good cause exists to believe that Defendants and Relief Defendant used improper

and unlawful means to obtain investor funds and assets and that investor funds have been

misappropriated and misapplied, as described in the SEC's Complaint and in the TRO Application.

Good cause exists to believe that, unless restrained and enjoined by order of this Court,

Defendants and Relief Defendant will dissipate, conceal, or transfer assets that could be the

subject to an order directing disgorgement or the payment of civil money penalties in this action.

4.      There is good cause to believe that Defendants and Relief Defendant do not have

sufficient funds or assets to satisfy the relief that might be ordered in this action.

5.      There is good cause to believe that the assets, in whatever form they exist, that are

owned, controlled, or possessed by Defendants and Relief Defendant should be frozen to

preserve the status quo and to prevent any misappropriation, misapplication, dissipation, or other

action taken to the detriment of investors.

6.      Good cause exists to believe that requiring notice to the Defendants and Relief

Defendant of the SEC's motion for this Order would result in immediate and irreparable injury, loss,

or damage to the SEC and to investors. It is appropriate for the Court to issue, *ex parte*, a Temporary Restraining Order, an Asset Freeze, and the other orders, below, so that prompt service on appropriate financial institutions can be made, thus preventing the dissipation of assets.

7. Good cause exists to believe that an accounting of assets is necessary to determine the disposition of investor funds and to ascertain the total assets that should continue to be frozen.

8. Good cause exists to believe that, unless restrained and enjoined by order of this Court, Defendants and Relief Defendant may alter or destroy documents relevant to this action, and it is necessary to preserve and maintain the business records of the Defendants and Relief Defendant from destruction.

9. The timing restrictions of FED. R. CIV. P. 26(d), 26(f), 30, and 34 should not apply to this proceeding in light of the SEC's requested relief and its demonstration of good cause, and that expedited discovery is appropriate to permit a prompt and fair hearing on the SEC's motion for preliminary injunction.

The Court therefore grants the following relief without prejudice to any of the remaining relief requested by Plaintiff in its Motion for Preliminary Injunction, *Ex Parte* Temporary Restraining Order, Asset Freeze, Appointment of Receiver, and Other Ancillary Relief.

**IT IS THEREFORE ORDERED:**

**I.**

**Temporary Restraining Order**

10. Defendants are temporarily restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated

3

thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

11.    As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with any of the Defendants or with anyone described in (a).

12.    Defendants are temporarily restrained and enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

13.      As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with any of the Defendants or with anyone described in (a).

14.      Chavez and CryptoFX are temporarily restrained and enjoined from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)] by, directly or indirectly, in the absence of any applicable exemption:

(a)      Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)      Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)      Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

15.    As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Chavez's and CryptoFX's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Chavez or CryptoFX or with anyone described in (a).

16.    Chavez is temporarily restrained and enjoined from violating Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)], directly or indirectly, through the use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], by: (a) employing a device, scheme, or artifice to defraud a client or prospective client; and/or (b) engaging in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client.

17.    As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) Chavez's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Chavez or with anyone described in (a).

## II.

### Asset Freeze Order

18.    This Order shall not limit the powers or obligations bestowed upon a receiver appointed by this Court.

Case 4:23-cv-00399-DMF Document 61 Filed 09/24/04 TXSD Page 40 of 65

19.     Defendants and Relief Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds, incurring any additional liability (including, specifically, by advances on any line of credit and any charges on any credit card), or effecting any sale, gift, hypothecation or other disposition of any assets, securities, investments, digital currencies, virtual currencies, cryptocurrencies, or any other tangible or intangible assets pending provision of sufficient proof to the Court of sufficient funds or assets to satisfy all claims alleged in the SEC's Complaint, or the posting of a bond or surety sufficient to assure payment of any such claim.

20.     Any bank, trust company, broker-dealer, depository institution, third-party payment processor, coin exchange, or any other holder or custodian of any digital assets, digital currencies, virtual currencies, cryptocurrencies, or other depository institution holding accounts for or on behalf of any of the Defendants and Relief Defendant shall make no transactions in in funds, assets, securities, investments, digital currencies, virtual currencies, cryptocurrencies, or any other tangible or intangible assets (except liquidating transactions necessary to comply with a court order or to avoid wasting assets) and shall make no disbursements of assets, securities, investments, funds, digital currencies, virtual currencies, cryptocurrencies, or any other tangible or intangible assets (including extensions of credit or advances on existing lines of credit), including the honor of any negotiable instrument (including specifically, any check, draft, or cashier's check) purchased by or for Defendants or Relief Defendant pending further order of this Court.

21.     The SEC may cause a copy of this Order to be served on any bank, trust company, broker-dealer, depository institution, third-party payment processor, coin exchange, or any other

holder or custodian of any digital assets, digital currencies, virtual currencies, cryptocurrencies, or on any entity or individual either by United States mail, email, or facsimile as if such service were personal service, to restrain and enjoin any such institution, entity, or individual from disbursing assets, directly or indirectly, to or on behalf of Defendants or Relief Defendant, or any companies or persons or entities under their control.

22.     All other individuals, corporations, partnerships, limited liability companies and other entities are hereby restrained and enjoined from disbursing any funds, securities, or other assets or property obtained from Defendants or Relief Defendant without adequate consideration.

23.     All banks, savings and loan associations, savings banks, trust companies, broker dealers, commodities dealers, investment companies, other financial or depository institutions and investment companies, third-party payment processors, coin exchanges, any other holder or custodian of any digital assets, digital currencies, virtual currencies, cryptocurrencies, individuals, corporations, partnerships, limited liability companies, or other artificial entities that holds or has held, controls or has controlled, or maintains or has maintained custody of any of Defendants' or Relief Defendant's funds, securities, or other property at any time since January 1, 2020 shall:

A.     Prohibit Defendants or Relief Defendant and all other persons from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, or otherwise disposing of Defendants' and Relief Defendant's assets, except as directed by further Order of the Court;

B.     Deny Defendants or Relief Defendant and all other persons access to any safe deposit box that is: (i) owned, controlled, managed, or held by, on behalf of, or for

the benefit of Defendants or Relief Defendant, either individually or jointly; or (ii) otherwise subject to access by Defendants or Relief Defendant;

        C.     Provide counsel for the Commission, or any Receiver appointed in this matter, within five (5) business days of receiving a copy of this Order, a statement setting forth: (i) the identification number of each and every account or other asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants or Relief Defendant, either individually or jointly; (ii) the balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and (iii) the identification of any safe deposit box that is owned controlled, managed, or held by, on behalf of, or for the benefit of Defendants or Relief Defendant, either individually or jointly, or is otherwise subject to access by Defendants or Relief Defendant; and

        D.     Upon request by the Commission, or any Receiver appointed in this matter, promptly provide the Commission and the Receiver with copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, Internal Revenue Service Form 1099s, and safe deposit box logs.

## III.

### Document Preservation Order

24. Except as otherwise ordered by this Court, each of the Defendants and Relief Defendant be and hereby are temporarily restrained and enjoined from, directly or indirectly: destroying, mutilating, concealing, transferring, altering, or otherwise disposing of, in any manner, any documents, which includes all books, records, computer programs, computer files, computer printouts, contracts, emails, correspondence, memoranda, brochures, or any other documents of any kind in their possession, custody or control, however created, produced, or stored (manually, mechanically, electronically, or otherwise), and any accounts, account passwords, computer passwords, device PINs and passwords, cryptographic keys, or digital wallets, pertaining in any manner to Defendants and Relief Defendant.

25. As provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Order by personal service or otherwise: (a) officers, agents, servants, employees, and attorneys of either Defendant and Relief Defendant; and (b) other persons in active concert or participation with either of the Defendants or Relief Defendant or with anyone described in (a).

## IV.

### Sworn Accounting

26. Defendants and Relief Defendant shall provide a sworn accounting, under oath, within ten (10) days of the issuance of this Order or three (3) days prior to any hearing on the Commission's Motion for Preliminary Injunction and other relief, whichever is sooner. The accounting shall detail by amount, date, method and location of transfer, payee and payor, purpose of payment or transfer: (a) all investor monies and other benefits received, directly and

indirectly, from or as a result of the activities alleged in the Complaint or thereafter transferred;

(b) all monies and other assets received, directly or indirectly, from investors; (c) all of their

current assets wherever they may be located and by whomever they are being held, and their

current liabilities; and (d) all accounts with any bank, credit union, trust company, financial or

brokerage institution maintained for the Defendants or Relief Defendant at any point during the

period from January 1, 2020 to the present. The accounting shall be sufficient to permit a full

understanding of the flow of investor funds from the investor to its present location to the extent

known by the Defendants or Relief Defendant or within their power to learn. The accounting

and all documents reviewed in the course of the preparation thereof or otherwise pertaining

thereto shall be filed with the Court and delivered by email or overnight courier to:

Matthew J. Gulde
U.S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102

by the deadline set forth above. After completion of the accounting, each of the Defendants and

Relief Defendant shall produce to the SEC at a time agreeable to the SEC, all books, records, and

other documents supporting or underlying their accounting.

## V.

## Expedited Discovery

27. Commencing with the time and date of this Order, in lieu of the time periods,

notice provisions, and other requirements of Rules 26, 30, 33, 34, 36, and 45 of the Federal Rules

of Civil Procedure and the corresponding Local Rules of this Court, discovery shall proceed as

follows:

    A.    All parties shall comply with the provisions of Rule 45 of the Federal Rules

of Civil Procedure regarding issuance and service of subpoenas unless the person designated

11

to provide testimony or to produce documents or things agrees to provide the testimony or to produce the documents or things without the issuance of a subpoena and/or to do so at a place other than one at which testimony or production can be compelled.

      B.    Any party may notice and conduct depositions upon oral examination subject to minimum notice of 72 hours.

      C.    All parties shall produce for inspection and copying all documents and things that are requested within 72 hours of service of a written request for those documents and things.

      D.    All parties shall serve written responses to any other party's request for discovery within 72 hours. The documents, responses, and other things being produced in response to requests described above shall be sent to the SEC addressed as follows:

          Securities and Exchange Commission
          Fort Worth Regional Office
          Attention: Matthew J. Gulde
          Burnett Plaza, Suite 1900
          801 Cherry Street, Unit #18
          Fort Worth, TX 76102-6882
          Email: GuldeM@SEC.gov

The SEC's responses shall be sent to the other parties at such address(es) as may be designated by them in writing.

      E.    All discovery requests and responses may be served by the most expeditious means available, including by email and facsimile.

      F.    Written discovery propounded and depositions taken pursuant to this section of this Order shall not count against the limitations on the number or duration of written discovery and depositions set forth in the Federal Rules of Civil Procedure.

12

## VI.

### Alternative Means of Service

28.     The United States Marshal in any District in which the Defendants and Relief Defendant reside, transact business, or may be found, is hereby authorized and directed to make service of process at the request of the SEC or any duly-appointed agent of the Court in this case. Alternatively, if the U.S. Marshal is unavailable, any federal, state, county, or city law enforcement officer(s) is hereby authorized and directed to make service of process at the request of the SEC or any duly-appointed agent of the Court in this case.  Furthermore, the SEC is permitted to effect service upon the Defendants and Relief Defendant, their agents, or their attorneys of all pleadings and other papers, including the Summons, the Complaint, the emergency motion, supporting brief and appendix, and court orders, personally, by facsimile, by electronic mail, by overnight courier, by mail, or by any other alternative provision for service permitted by Rule 4 of the Federal Rules of Civil Procedure, or as this Court may direct by further order.

## VIII.

### Expiration of Temporary Restraining Order Only

29.     The portion of this Order that constitutes a temporary restraining order shall expire at _____ o'clock on _____, 2022, unless for good cause shown it is extended or the parties against whom it is directed consent that it may be extended for a longer period.  All other provisions of this Order, including the asset freeze, shall remain in full force and effect until specifically modified by further order of this Court.

## IX.

### Preliminary Injunction Hearing

30.    At _____ o'clock on _____, 2022, or as soon thereafter as the parties may be heard, the Defendants and Relief Defendant, and each of them, shall appear before the Honorable _____, Judge of the United States District Court for the Southern District of Texas, to show cause, if there be any, why this Court should not enter a preliminary injunction extending the asset freeze and other relief granted in this Order until a final adjudication on the merits may be had.  Any declarations, affidavits, points and authorities, or other submissions in support of, or in opposition to, the issuance of such an Order shall be filed with the Court and delivered to Matthew J. Gulde; U.S. Securities and Exchange Commission; Burnett Plaza, Suite 1900; 801 Cherry Street, Unit 18; Fort Worth, Texas 76102 and served via email, facsimile, or by hand to the offices of the Defendants or their attorneys no later than four full business days before the hearing.  Any reply papers shall be filed with the Court and served via email, facsimile, or by hand to opposing counsel no later than 24 hours before the hearing.

## X.

### Retention of Jurisdiction

31.    This Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

IT IS SO ORDERED.

Signed at _____ o'clock ____ a.m./p.m. on this _____ day of _____, 2022.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) |
| v. | ) **UNSEALED 9/29/2022** |
| | ) **FILED UNDER SEAL** |
| MAURICIO CHAVEZ, | ) JURY TRIAL DEMANDED |
| GIORGIO BENVENUTO, and | ) |
| CryptoFX, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CBT GROUP, LLC, | ) |
| | ) |
| Relief Defendant. | ) |
| | ) |

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon motion of the Plaintiff Securities

and Exchange Commission ("SEC," "Commission," or "Plaintiff") to appoint a receiver in the

above-captioned action; and

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment

of a receiver in this action is necessary and appropriate for the purposes of marshaling and

preserving all assets of the Defendants and Relief Defendant ("Receivership Assets"); and

**WHEREAS** this Court has subject matter jurisdiction over this action and personal

jurisdiction over the Defendants and Relief Defendant, and venue properly lies in this district.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**

**THAT:**

1.    This Court hereby takes exclusive jurisdiction and possession of the assets, of

whatever kind and wherever situated, of the following Defendants: Mauricio Chavez, Giorgio

Benvenuto, CryptoFX, LLC and Relief Defendant CBT Group, LLC (collectively, the "Receivership Defendants").

2.     Until further Order of this Court, _____ is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Defendants.

## I. Asset Freeze

3.     Except as otherwise specified herein, all Receivership Assets are frozen until further order of this Court. Accordingly, all persons and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets that are on deposit with financial institutions such as banks, brokerage firms, and mutual funds.

## II. General Powers and Duties of Receiver

4.     The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the entity Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed. R. Civ. P. 66.

5.     The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons

2

and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Receivership Defendants and shall pursue and preserve all of their claims.

6. No person holding or claiming any position of any sort with any of the Receivership Defendants shall possess any authority to act by or on behalf of any of the Receivership Defendants.

7. Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate and maintain the Receivership Estates and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Defendants;

F. To engage and employ persons in his discretion to assist him in carrying out

3

his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.    To issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.    To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.    To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and,

K.    To take such other action as may be approved by this Court.

### III. Access to Information

8.    The individual Receivership Defendants and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the entity Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

9.    Within 20 days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement, listing: (a) the identity, location and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of the

4

Receivership Defendants; and, (c) the names, addresses and amounts of claims of all known creditors of the Receivership Defendants.

10.     Within 30 days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the Commission a sworn statement and accounting, with complete documentation, covering the period from January 1, 2020 to the present:

A.      Of all Receivership Property, wherever located, held by or in the name of the Receivership Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

B.      Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendants;

C.      Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.      Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E.      Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G.      Of all expenditures exceeding $1,000 made by any of them, including those

5

made on their behalf by any person or entity; and

H.   Of all transfers of assets made by any of them.

11.   Within 20 days of the entry of this Order, the Receivership Defendants shall provide to the Receiver and the Commission copies of the Receivership Defendants' federal income tax returns for the years 2020 - 2021 with all relevant and necessary underlying documentation.

12.   The individual Receivership Defendants and the entity Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants.  In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities, the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.

13.   The Receivership Defendants are required to assist the Receiver in fulfilling his duties and obligations.  As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## IV. Access to Books, Records, and Accounts

14.   The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Defendants.  All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the

6

Receiver.

15.     The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents and/or employees.

16.     All banks, brokerage firms, financial institutions, crypto asset trading platforms, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

A.     Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

B.     Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.     Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D.     Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. Access to Real and Personal Property

17.     The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory,

media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies and equipment.

18. The Receiver is authorized to take immediate possession of and enter all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures, and all residences, dwellings, offices, warehouses, buildings, or other structures whatsoever owned, leased, controlled, or occupied by the Receivership Defendants. Upon receiving actual notice of this Order by personal service, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing or erasing anything on such premises.

19. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21.     Upon the request of the Receiver, the United States Marshal Service in any judicial district is hereby ordered to assist the Receiver in carrying out duties to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

## VI. <u>Notice to Third Parties</u>

22.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Defendants, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

23.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

24.     In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates.   All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

25.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the

9

benefit of, the Receivership Defendants. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Defendants, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

26. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII. Injunction against Interference with Receiver

27. The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

      A.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin,

10

execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.     Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property; or,

D.     Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

28.     The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

29.     The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VIII. Stay of Litigation

30.     As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

11

31.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

32.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.     Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX. **Managing Assets**

33.     For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

34.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Mauricio Chavez, Giorgio Benvenuto, CryptoFX, LLC and CBT Group, LLC" together with the name of the action.

35.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

36.     Subject to Paragraph 37, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary

and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

37.    Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

38.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

39.    The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable.

## X. **Investigate and Prosecute Claims**

40.    Subject to the requirement, in Section VII above, that leave of this Court is required to resume or commence certain litigation, the Receiver is authorized, empowered and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

41.    Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered and directed to investigate the manner in

13

which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order.  Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

42.     The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Defendants.

43.     The receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII. Bankruptcy Filing

44.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants.  If a Receivership Defendant is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendants and may therefore file and manage a Chapter 11 petition.

45.     The provisions of Section VIII above bar any person or entity, other than the

Receiver, from placing any of the Receivership Defendants in bankruptcy proceedings.

## XII. Liability of Receiver

46.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

47.     The Receiver and his agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

48.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

49.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIII. Recommendations and Reports

50.     The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

51.     Within 60 days of the entry date of this Order, the Receiver shall file a status report with the Court. The status report will include a summary of receivership activities to date. It will also include a proposed plan for administering the receivership going forward, as well as a proposed deadline by which the Receiver will submit the Liquidation Plan. The Receiver's fees—

including all fees and costs for the Receiver and others retained to assist in the administration and liquidation of the Receivership estate—are capped at $120,000 during the initial 60-day period.

52. Within 30 days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

53. The Quarterly Status Report shall contain the following:

    A.    A summary of the operations of the Receiver;

    B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

    C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

    D.    A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

    E.    A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

    F.    A list of all known creditors with their addresses and the amounts of their claims;

    G.    The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H.    The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

54.    On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIV. Fees, Expenses and Accountings

55.    Subject to Paragraphs 56-62 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

56.    Subject to Paragraph 57 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

57.    Subject to the limitations in Paragraph 56 above, the Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

58.    Within 45 days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications").  At least 30 days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete

17

copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

59.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

60.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

61.     Each Quarterly Fee Application shall:

    A.     Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

    B.     Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

62.     At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

IT IS SO ORDERED

_____
UNITED STATES DISTRICT JUDGE

18