# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 225
1100 E Main St
Richmond, VA 23219-2903

Date: September 13, 2022

Devon D Patillo

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you or your representative may submit written exceptions to the Appeals Council.  "Written exceptions" are your statements explaining why you disagree with my decision.  Please write the Social Security number associated with this case on any written exceptions you send.

Please send your written exceptions to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA 22041-3255**
>
> **Or Fax:  (833) 763-0406**

If you need help, you may file in person at any Social Security or hearing office.

**Time Limit To File Written Exceptions (30 Days)**

You must file your written exceptions with the Appeals Council **within 30 days** of the date you get this notice.  The Appeals Council assumes that you got this notice within 5 days after the date of the notice unless you show that you did not get it within the 5-day period.

If you need more time to file your written exceptions, you must file a written request with the Appeals Council.  You must file the request for an extension within 30 days of the date you get

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

this notice.  If you request more than 30 days, you must explain why you need the extra time.  The Appeals Council will decide whether to grant your request for more than a 30-day extension.

**How Written Exceptions Work**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  The Appeals Council's action may be more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

The Appeals Council may:

- Find that there is no reason to change my decision,
- Dismiss your case,
- Return your case to me or another administrative law judge for a new decision, or
- Issue its own decision.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council does not change my decision, my decision will become the final decision after remand.  Any future claim you file will not change a final decision on this claim if the facts and issues are the same.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not file written exceptions.  The Appeals Council will notify you within 60 days of the date of this notice if it decides to review your case.

**Filing An Action In Federal District Court**

If you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice.  After my decision becomes final, you will have 60 days to file a new civil action in Federal district court.  You will lose the right to a court review if you do not file a civil action during the 60-day period starting with the day my decision becomes final.  However, you can ask the Appeals Council to give you more time to file a civil action.  The Appeals Council will grant your request for more time only if you can show a good reason for needing more time.  We will not send you any more notices about your right to file in Federal district court.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as filing exceptions to my decision or filing a civil action in Federal court.  If you disagree with my decision and you file a new application instead of filing written exceptions or appealing to Federal court, you might lose some benefits or not qualify for benefits at all.  My decision could also be used to deny a new application for benefits if the facts and issues are the same.  If

See Next Page

Devon D Patillo (BNC#: 21A8245E71712)                              Page 3 of 3

you think my decision is wrong, you should file your exceptions within 30 days or file a new civil action between the 61st and 121st days after the date of this notice.

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (866) 964-4690.


                        Social Security
                        Suite 250
                        200 Chastain Center Bl
                        Kennesaw, GA 30144-9801

**How are we doing?** Go to www.ssa.gov/feedback to tell us.


                        Nicolas R Foster
                        Administrative Law Judge


Enclosures:
Decision Rationale


cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|

**CLAIM FOR**

Period of Disability and Disability Insurance
Benefits

Devon D Patillo
(Claimant)

21A8245E71712

(Wage Earner)

(Beneficiary Notice Control Number)
*Social Security Number removed for your protection*

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned Administrative Law Judge on remand from the Appeals
Council pursuant to a remand from the United States District Court for the Eastern District of
Virginia.  On July 13, 2022, the undersigned held a telephone hearing due to the extraordinary
circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic.  All
participants attended the hearing by telephone. The claimant agreed to appear by telephone
before the hearing, and confirmed such agreement at the start of the hearing (Exhibit 41E).  The
claimant is represented by Kathleen Flynn, an attorney.  Brian Bierley, an impartial vocational
expert, also appeared at the hearing.

Pursuant to the District Court remand order, Appeals Council has directed the undersigned to
further consider the treating source opinions of Dr. Chowdhury pursuant to 20 CFR 404.1527,
and explain the weight given to such opinion evidence; obtain evidence from a medical expert as
warranted; further evaluate the claimant's symptoms with rationale in accordance with Social
Security Ruling 16-3p; give further consideration to the claimant's maximum residual functional
capacity; obtain supplemental evidence from a vocational expert to clarify the effect of the
assessed limitations on the claimant's occupational base; consolidate any additional outstanding
claims; offer the claimant a new opportunity for a hearing; take any action needed to complete
the administrative record; and issue a new decision.

The claimant is alleging disability since December 2, 2012.  In accordance with the above order,
the undersigned notes that the claimant filed a subsequent Title II application on June 18, 2020.
That claim was addressed in an unfavorable decision by Judge Suzette Knight on March 31,
2021, and the Appeals Council denied the claimant's request for review on August 20, 2021.
That application is now vacated and the claims are consolidated to consider the entire period at
issue.

The claimant submitted or informed the Administrative Law Judge about all written evidence at
least five business days before the date of the claimant's scheduled hearing (20 CFR 404.935(a)).
Evidence was received and added to the record as Exhibits 35F-66F.

See Next Page

## ISSUES

The issue is whether the claimant is disabled under sections 216(i) and 223(d) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

There is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2022 (hereinafter "the date last insured").  Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the undersigned concludes the claimant was not under a disability within the meaning of the Social Security Act from December 2, 2012, through the date last insured.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574 and 404.1575).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522, Social Security

Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512 and 404.1560(c)).

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant last met the insured status requirements of the Social Security Act on March 31, 2022.**

**2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 2, 2012 through his date last insured of March 31, 2022 (20 CFR 404.1571 *et seq.*).**

The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity.  The record reflects earnings every year following the alleged onset date, but never exceeding $6,240.32 for the year (Exhibits 20D-22D).  The most recently updated records document earnings of $948 in the first quarter of 2022.  The undersigned will consider all reported earnings, in conjunction with the longitudinal evidence of record, in evaluating Mr. Patillo's functional capacity.  Nevertheless, the earnings do not reflect substantial gainful activity as defined by 20 CFR 404.1571.

**3.   Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, left ulnar neuropathy, obesity, anxiety with symptoms of depression, personality disorder  (20 CFR 404.1520(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

To be a severe impairment the medical evidence must establish more than a slight abnormality or combination of slight abnormalities which would have more than a minimal effect on an individual's ability to work. The impairment must significantly limit a person's physical or mental ability to do basic work activities for a continuous period of at least twelve months (20 CFR 404.1521 and 416.921; Social Security Ruling (SSR) 85-28).  The undersigned finds that the claimant's hypertension, asthma, alcohol use disorder, eczema, obstructive sleep apnea, and migraine headaches are not severe (20 CFR §§ 404.1520 (a) and(c) and 416.920(a) and (c)) in that they cause no more than minimally vocationally relevant limitations.  The claimant testified that migraines continue to recur every couple of months and can last for up to three days at one time.  However, the record reflects that the symptoms are effectively treated on a conservative and outpatient basis, as there is no clinical evidence of acute intracranial complications.  He has a 10% service connected disability for eczema with the Department of Veteran's Affairs, but there is no evidence this condition causes workplace functional restrictions as required by an assessment with the Social Security Administration.  There were concerns of an alcohol use disorder, but no more than conservative and outpatient treatment for symptoms (Exhibit 4F, page 85).  His apnea was effectively treated with PAP therapy (Exhibit 29F, page 130).  With all of the listed conditions, the record reflects that they are well controlled with medication and appropriate treatment, presenting no evidence of residual abnormalities that have more than a minimal effect on the claimant's ability to perform work activities on a regular and continuing basis.  In accordance with Social Security Administration policy and procedures, the non-severe conditions will be considered in conjunction with the aforementioned severe impairments in developing this residual functional capacity.

**4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed**

**impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

The claimant's obesity does not fall within the criteria of a listed impairment.  However, pursuant to Social Security Ruling 19-2p, it must be considered in conjunction with other related conditions.  The claimant's obesity and combined physical impairments do not effectively meet the requirements of any listing section in Appendix 1.

The claimant does not have a disorder of the skeletal spine resulting in a compromise of the nerve root documented by neuro-anatomic distribution of pain, paresthesias, or muscle fatigue; radicular distribution of neurological signs present during physical examination or diagnostic test evidenced by muscle weakness, nerve root irritation, sensory changes, or decreased deep tendon reflexes; findings on imaging consistent with compromise of the nerve root in the cervical or lumbar spine; and an impairment-related physical limitation of musculoskeletal functioning that has lasted or expected to last for a continuous period of at least 12 months and medical documentation of one of the following: a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements so as to effectively meet the combined requirements of listing section 1.15.

There is no evidence of lumbar spinal stenosis resulting in compromise of the cauda equine with symptoms manifested by non radicular distribution of pain, sensory loss, or neurogenic claudication in one or both lower extremities; non-radicular neurological signs present during physical examination or diagnostic test and evidenced by muscle weakness, sensory changes, or decreased deep tendon reflexes; findings on imaging or in an operative report consistent with compromise of the cauda equina with lumbar spinal stenosis; and an impairment-related physical limitation of musculoskeletal functioning that has lasted or expected to last for a continuous period of at least 12 months and medical documentation of one of the following: a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand so as to effectively meet the combined requirements of listing section 1.16.  With all of the claimant's spinal irregularities, the recurrent complaints of pain are chronic and well documented.  However, physical assessments otherwise document a grossly normal gait, station, and lower extremity strength (Exhibits 37F-66F).  The record does not support the need for a mobility device preventing the use of an upper extremity to independently initiate, sustain, and complete work-related activities as required by sections 1.15 or 1.16.  Even when accounting for the complications from obesity, the record does not reflect symptoms of such severity as to be medically equivalent to any listing section in Appendix 1.

See Next Page

The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06 and 12.08.  In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant had a mild limitation.  The record reflects mental health treatment that has been entirely conservative, routine, and outpatient.  Follow-up mental status evaluations have documented no evidence of acute thought content irregularities.  Furthermore, in spite of his symptoms, the record reflects some capacity to care for his personal needs without problems, wash laundry, vacuum, iron, use public transportation, shop for groceries and personal items in stores and by computer, handle his finances, watch television, travel, attend classes, and maintain appointments (Exhibit 7E).  During the period at issue, he eventually completed his college degree and unsuccessfully attempted to return to work.  He had previously testified to involvement with a hip hop artist including photoshoot, video, and interview prior to the artist's passing (Exhibit 6E, page 9).  Therefore, the undersigned finds no more than mild ongoing restrictions with this functional domain.

In interacting with others, the claimant had a moderate limitation.  Mr. Patillo described difficulty interacting with others while attending college classes in person, claiming that he was involved in a physical altercation that resulted in an arm break.  He claims that anxiety is exacerbated by loud noises and that he continues to have traumatic recollections of prior events.  Nevertheless, the record reflects a capacity to use public transportation, ride in a car, and maintain medical appointments with the Department of Veteran's affairs.  Therefore, the undersigned finds no more than moderate ongoing restrictions with this functional domain.

With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation.  The claimant endorsed limitations with memory, completing tasks, and concentration (Exhibit 7E, page 11).  Nevertheless, as noted above, the record otherwise reflects he is able to live independently, complete some household chores, maintain personal needs, pay bills, count change, and use a checkbook/money order (Exhibit 7E, page 9).  During the period at issue, he returned to school and completed his college degree.  Therefore, the undersigned finds no more than moderate ongoing restrictions with this functional domain.

As for adapting or managing oneself, the claimant had experienced a mild limitation.  The claimant endorsed limitations with handling stress, dealing with changes in routine, and managing fears appropriately.  He claims that he does not regularly leave the house aside from medical appointments, and that he gets friends to shop for groceries for him.  Nevertheless, he otherwise continues to live independently, care for personal needs, assist with household chores, maintain medical appointments, and care for his son every other weekend.  Therefore, the undersigned finds no more than mild ongoing restrictions with this mental functional domain.

See Next Page

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

The undersigned has also considered whether the "paragraph C" criteria were satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is no evidence of a "serious and persistent" mental disorder, existing for a period of at least two years and accompanied by both medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and marginal adjustment, that is a minimal capacity to adapt to changes in environment or to demands that are not already part of the claimant's daily life so as to effectively meet the "paragraph C" requirements of sections 12.04 or 12.06.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally climb ramps and stairs, kneel, crouch, crawl, balance, or stoop. He cannot climb ladders, ropes, or scaffolds, and he can have no exposure to vibration or workplace hazards. Sitting, standing, and walking is limited to one hour increments for each activity, and he would have the option to change positions after one hour. He can frequently handle, feel, or finger and occasionally push or pull. Mr. Patillo can understand, remember, and carry out simple instructions and make simple work-related decisions. He can work at consistent pace throughout the day but not at a production rate pace such as that found at an assembly line or conveyor belt. Finally, he can tolerate occasional interaction with co-workers, supervisors, and the public**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

See Next Page

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

Mr. Patillo recounted how he subsequently obtained his college degree in mass communications, and attempted to return to work at a facility that handles vehicle registration.  However, he claims that he was unable to continue for more than two weeks, as recollections of past trauma were preventing him from completing his employment responsibilities.   In his testimony and statements prepared for the record, the claimant asserts that he has remained disabled during the period at issue and unable to perform substantial gainful activity as a result of his physical irregularities, mental impairment symptoms, and the resulting restrictions on his day to day functioning.

Mr. Patillo testified that he has remained in constant pain since a motorcycle accident that he had after returning from serving overseas.  He has a history of wrist fractures and claims that he remains unable to grip effectively with his upper extremities.  The claimant's representative described how a lumbar spine hemangioma has increased in size and is causing him chronic pain, muscle spasms, and mobility issues.  In addition to his wrist and back, he has pain in his left knee and left foot accompanied by swelling.  The pain recurs for 6-8 hours per day, and he treats the symptoms with Motrin and a heating pad.  Mr. Patillo testified that is 5'6" and regularly weighs between 230-235 pounds.  In addition to his physical complaints, he continues to have recollections of past trauma, including military experiences and finding his father after he was murdered.  The anxiety remains triggered by noises, thinking about past trauma, and unpleasant subjects in the news.  His mood is depressed on a day to day basis, and he will forget things from time to time.  The prescribed medications somewhat alleviate but never fully relieve his symptoms.  The combined symptoms prevent him from regularly sleeping through the night.

As a result of his impairments, the claimant contends that his ability to lift, squat, bend, stand, reach, walk, climb stairs, remember, complete tasks, concentrate, and get along with others remains severely limited (Exhibit 7E, page 11).  Mr. Patillo testified that he can walk less than one mile, lift 5-10 pounds of weight due to the wrist fractures, stand for 3-5 minutes due to pain in his spine, and sit for no more than brief periods of time before needing to lie down with a heating pad.  The claimant contends that a lot of his college classes were online.  When he attended classes in person, he snapped and was involved in a physical confrontation with another classmate.  He continues to live independently and visit with his son every other weekend.  In a function report originally prepared for the record in 2015, the claimant reported that he was able to care for his personal needs without problems, wash laundry, vacuum, iron, use public transportation, shop for groceries and personal items in stores and by computer, handle his finances, watch television, travel, attend classes, and maintain appointments (Exhibit 7E).  At the hearing, the claimant testified that he has a friend shop for him, and that he only leaves the house twice weekly to attend appointments.

See Next Page

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The voluminous medical record in this case addresses the 10 year period at issue, beginning in 2012.  Prior to the period at issue, studies of his left foot noted degenerative changes without evidence of fracture or dislocation (Exhibit 4F, page 63).  The evidence documents the claimant's initial history of treatment for pain in his back and mid-back that was reported to be 7/10 in severity (Exhibits 1F-2F).  Clinical studies following his 2012 motor vehicle accident document thoracic degenerative disk disease T6-T10, with no evidence of a compression fracture old or new (Exhibit 1F, page 19).  Lumbar spine studies found mild L5-S1 disc degeneration, with evidence of an osteophyte complex protruding into the ventral epidural space.  There was a focal, posttraumatic collection within the dorsal epidural space with minimal impingement (Exhibit 1F, pages 20-21).  However, there was no evidence of a lumbar compression fracture (Exhibit 2F, page 41).  The claimant initially endorsed pain that was 8/10 in severity (Exhibit 10F).  Physical assessments noted evidence of decreased range of motion, but strength in his lower extremities remained 5/5, stability was normal, and there was no neurologic evidence of numbness, tingling, weakness, or giving out.  Peachtree Spine recommended conservative measures of care including outpatient management with medication, orthotics, and pain management therapy (Exhibit 10F).  He continued to follow up initially at the VA Medical Centers at both Atlanta and near Detroit (Exhibits 3F-6F).  When ibuprofen was not effectively controlling his pain, he was offered additional meloxicam.

Initially, follow-up assessments from later that month noted intact neurologic findings and patellar reflexes (Exhibit 10F, page 63).  In February of 2013, his pain was 3/10 and remained associated with numbness (Exhibit 2F, page 11).  Additional conservative measures including physical therapy and chiropractic care were offered.  Treatment records from the VA document outpatient management of anxiety accompanied by diagnosis of personality disorder, with symptoms that were under control with medication (Exhibits 3F, page 11 and 38F-39F).  His symptoms began several years prior to the alleged onset date, as the claimant endorsed symptoms of panic while serving in the military (Exhibit 3F, page 234).  Historic records note a GAF of 50, and grossly outpatient management of his symptoms.  Mr. Patillo described a distant prior psychiatric hospitalization in 1999 (Exhibit 38F, page 105).  Mental status evaluations repeatedly noted stiff posture and gait, orientation x4, attention and concentration within normal limits, no overt memory impairments, full affect, and linear and goal directed thought processes without acute evidence of irregularity (*See e.g.* Exhibit 3F, pages 16, 70, 208).  Initial staff recommendations were to limit his lifting to 30 pounds of weight and decreasing his hours to no more than seven per day (Exhibit 3F, page 45).  The undersigned gives these temporary assessments no more than limited weight, as the longitudinal evidence submitted with the hearing level application documents a sedentary exertional capacity with the aforementioned physical restrictions discussed above.

See Next Page

The claimant was offered behavioral sleep therapy to address reports of insomnia (Exhibit 3F, page 80).  Follow-up reports in 2014 noted reports of back pain, but stable anxiety and that the claimant was attending Ferris State University (Exhibit 5F, page 26).  An MRI of his lumbar spine found bulging discs at L4-5 and L5-S1 with some evidence of nerve impingements at these levels, and an adipose tissue mass at T10-T11 levels causing mild compression of the cord without myelopathy (Exhibit 6F, page 5).  Mental status evaluations continued to note linear and goal directed thought processes with some paranoia, fair judgment, orientation x4, and no acute thought content irregularities (Exhibits 6F, page 9 and 11F, page 19).

At a consultative mental status evaluation on October 26, 2016 with Dr. Herman J. Daldin, the claimant reported anxiety attacks triggered by racial conflicts and different temperaments (Exhibit 14F).  He denied a history of psychiatric hospitalization, violence, or aggression.  Mr. Patillo endorsed that his depression was improving, and he was continuing to meet with a therapist every two months at the VA medical center.  At the time of the assessment he was living at a dormitory at Ferris State University.  He was taking three classes, caring for his activities of daily living without issue, and maintaining medication compliance.  Dr. Daldin noted reports of depression, occasional anxiety attacks, and no flashbacks or nightmares.  His goals included obtaining an internet or radio show.  The claimant denied suicidal ideation, homicidal ideation, psychosis, or delusional thinking.  He endorsed feeling angry and irritable, but the symptoms were not consistent with a post-traumatic stress disorder, major depression, or disturbance of thought.  Dr. Daldin endorsed no restrictions with memory, cognitive functioning, or social interaction.  While supported by the lack of acute complications present at the time of the consultative evaluation, the undersigned gives the conclusions of Dr. Daldin only limited weight.  The remaining records are more consistent with the moderate limitations in social functioning, concentration, persistence, and pace present in the adopted residual functional capacity.  Specifically, the record notes persistent evidence of depression and anxiety that when complicated by pain are consistent with the moderate restrictions in social functioning, concentration, persistence, and pace in the adopted residual functional capacity.

At a similar consultative physical assessment on October 26, 2016 with DO Katherine H. Karo, the claimant indicated that his last appointment with physical therapy and chiropractic adjustments was in May of 2015.  He managed ongoing symptoms of pain with oral medications and heat.  He presented without the use of an assistive device, but stated that he could stand, sit, or walk for no more than 10 minutes at one time (Exhibit 15F).  There were no concurrent complaints of nausea, vomiting, diarrhea, constipation, chest pain, paresthesias, or focal muscle weakness.  The claimant had decreased range of motion of the lumbar spine, but strength was 5/5 through the bilateral upper and lower extremities, sensation was normal to light touch, reflexes were +2, and cranial nerves were intact (Exhibit 15F, pages 3-4).  Dr. Karo endorsed no limitations with sitting, standing, or walking, and found only bending, stooping, and squatting to be limited secondary to back pain.  Dr. Karo simultaneously endorsed lifting up to 100 pounds of weight, but no more than 10 minutes of sitting, standing, or walking at one time, and no more than 3 hours of each in an eight hour workday.  There were significant environmental limitations, and frequent to occasional postural and manipulative capabilities.  The undersigned similarly gives this assessment no more than limited weight, as the adopted restrictions are not even supported by the grossly normal clinical findings, with only pain and reduced range of lumbar motion observed as a deviation from normal.  The conclusions are similarly not entirely

consistent with the clinical findings noted throughout the record of persistent lumbar pain complicated by obesity and resulting in a capacity to perform sedentary work with the adopted postural, environmental, sit-stand, and manipulative restrictions in the adopted residual functional capacity discussed above.

Treatment records from the VA medical Centers continued to document outpatient physical therapy and medical management of symptoms (Exhibits 16F-18F, 21F). There remained mild compression of the spinal cord and some evidence of nerve impingements from bulging discs, but no myelopathy. The claimant endorsed left hand weakness, neck pain off and on, and tingling in his left hand when sleeping. Studies of his cervical spine noted mild bulging, minimal impingement, and no evidence of neurologic findings to correlate (Exhibit 17F, page 3). Electrodiagnostic studies were consistent with a left ulnar neuropathy, without carpal tunnel syndrome, radiculopathy, or brachial plexopathy (Exhibit 18F). Concurrent physical exams continued to note the claimant was neurologically intact, but walked with a stiff gait secondary to pain (Exhibit 23F). The thoracic mass was grossly unchanged in size and signal characteristics, as the findings remained non-specific and non-aggressive in appearance (Exhibit 26F). In early 2017, he was continuing to stay with "a bunch of friends" at a border house (Exhibit 24F, page 16).

Later that year, the claimant endorsed feeling discriminated by Ferris University. However, after transferring to a HBCU, he was excelling academically and was on the Dean's List (Exhibit 28F, page 13). The claimant stated that medication was helping him feel more stable and sleep regularly. He continued to attend outpatient psychotherapy while receiving treatment at the VA medical center (Exhibits 28F-30F). Neurosurgery consult was discussed after there was evidence of severe spinal canal stenosis at T10-11 (Exhibit 29F, page 15). In 2018, he endorsed 4/10 pain after stepping in a pothole and twisting his right ankle (Exhibit 29F, page 91). There was no sign of acute complication, and he was released to regular duties two days later (Exhibit 29F, page 97). A neurosurgical evaluation continued to note 5/5 strength in all upper and lower extremity groups with sensation that was intact and reflexes that were normal (Exhibit 30F, page 54).

Treatment records from early 2019 note reports of pain 8/10 in the spine and forearm. He arrived in no distress and walked with a normal gait (Exhibit 30F, page 38). Concurrent mental status evaluations noted memory, attention, and concentration remained intact, and there were no acute complaints of numbness, tingling, dizziness, or loss of consciousness (Exhibit 30F, page 40). The claimant expressed frustration that he was not granted medical retirement from the Navy (Exhibit 34F). Follow-up treatment records continued to note no extremity edema or focal deficits (Exhibit 35F, page 49). Mental status evaluations noted a mild dysthymic affect, but ongoing logical and goal directed thought processes, and no delusions, paranoia, flight of ideas, loose associations, or acute thought content irregularities (Exhibit 35F, page 75). Follow-up physical assessments from 2020-2021 noted ongoing complaints of pain, but 5/5 strength in all assessed extremities (Exhibit 50F, page 96). In late 2021, at a vocational assessment, the claimant indicated that he was planning on going on tour with an artist and would be interested in support when he returns, but only in his field of interest (Exhibit 53F, page 10). An MRI of his pelvis noted only benign prostate hypertrophy, with no evidence of malignancy (Exhibit 54F, page 127).

See Next Page

The most recent treatment history from 2022 notes the claimant continues to not meet the requirements for PTSD.  The claimant endorsed fears of future SI, interpersonal difficulties, housing needs, poor sleep, and nightmares regarding the murder of his father (Exhibit 36F, pages 118-119).  Mr. Patillo endorsed thoughts of harming the family members of the man who murdered his father, but the acute risk of harm was intermediate and not warranting immediate hospitalization.  Updated clinical studies of his cervical and lumbar spines found mild to moderate cervical degenerative disc disease with anterior osteophyte formation C4-C6 (Exhibit 36F, pages 182-191).  There was neural impingement C3-C4 with moderate to severe canal stenosis and mild to moderate right and mild left neuroforaminal narrowing.  The severe canal stenosis from the thoracic spine irregularity was not significantly changed since at least 2019, and lumbar spine studies noted minimal to mild diffuse disc bulges.

In analyzing the claimant's records, there is a 10 year history to consider, beginning with the alleged onset date and the injuries sustained in a motor cycle accident.  As noted above, clinical studies of his cervical, thoracic, and lumbar spines have documented irregularities.  The lumbar spine studies found no more than mild irregularities, and the updated clinical studies of his cervical spine found grossly mild to moderate cervical degenerative disk disease with moderate to severe canal stenosis at C3-C4.  Finally, there has remained a consistently documented abnormality of his thoracic spine causing severe spinal canal stenosis at T10-T11.  The claimant's pain has been reported grossly as 8/10 in severity, and there is evidence of reduced ranges of motion.  Nevertheless, electrodiagnostic studies were consistent with a left ulnar neuropathy, without carpal tunnel syndrome, radiculopathy, or brachial plexopathy (Exhibit 18F).  There is no evidence of further neurologic complications from the aforementioned spinal irregularities.  The updated records found the thoracic irregularity to be stable, with no significant changes from prior findings.  Furthermore, physical assessments continuously documented grossly normal gait, station, reflexes, sensation, and 5/5 strength in all assessed upper and lower extremities.

The assessment is not limited to the objective findings discussed throughout the medical history, and must evaluate the claimant's subjective symptom complaints in light of the treating source opinions and the provisions of Social Security Ruling 16-3p.  In spite of his symptomatic complaints, the record reflects treatment for his physical conditions that has remained entirely conservative, routine, and outpatient.  There is no evidence of acute complications requiring hospitalization or further evaluation with a specialist.  Similarly, while the record includes reference to a psychiatric hospitalization from prior to the alleged onset date, the mental health treatment during the period at issue was similarly conservative, routine, and outpatient.  There is no further evidence of a psychiatric hospitalization or a loss of adaptive functioning for a period of extended duration.

The ultimate issue to be addressed in a Social Security Assessment is the effect that the aforementioned functional limitations has on the claimant's daily activities.  In this case, as noted in the 2015 function report, the claimant reported that he was able to care for his personal needs without problems, wash laundry, vacuum, iron, use public transportation, shop for groceries and personal items in stores and by computer, handle his finances, watch television, travel, attend classes, and maintain appointments (Exhibit 7E).  Even when accounting for the additional

restrictions on driving and leaving his home reported at the hearing, he retains the capacity to live independently.  Furthermore, while limited by his symptoms, he retained the capacity to complete a college curriculum and he was preparing to engage in additional work for an artist. Therefore, to fully account for the claimant's pain the undersigned has limited Mr. Patillo to sedentary work.  The postural and environmental limitations are to account for his well-documented reports of pain, and the claimant is limited to one hour in any position before given the option to change.  He has frequent manipulative restrictions in accordance with the non-severe left ulnar neuropathy, and he is limited to jobs with simple instructions not performed at a production rate pace and do not have significant social interaction.  The claimant's allegations of greater restrictions are not entirely consistent with the adopted residual functional capacity, because they are not supported by the conservative and grossly outpatient treatment history during the period at issue, the clinical and examination findings of no acute complications, and Mr. Patillo's stated ongoing capabilities.

As for the remaining opinion evidence, 20 CFR §§ 404.1527(e) and 416.927(e)  require that the opinions of State agency medical and psychological consultants be treated as expert opinion evidence from nonexamining sources.  The undersigned is not bound by the conclusions of these nonexamining sources, but has considered their opinions and given them appropriate weight in rendering this decision.  At the initial level in April of 2015, the State agency examiner Dr. William Schirado and found moderate limitations only in social functioning, with mild restrictions in all other mental functional domains.  The undersigned gives this finding limited weight, as the voluminous record including 7 additional years of treatment records document consistent symptoms of anxiety and depression consistent with moderate limitations in concentration persistence and pace.  In conjunction with the complaints of pain, the limitations are consistent with the need for no more than occasional interaction and no production rate pace.

The opinion of a treating physician or psychologist concerning the nature and severity of an impairment is entitled to appropriate consideration, that is, if it is well-supported and not internally inconsistent or inconsistent with other pertinent clinical evidence.  However, speculation as to employability carries no valuable probative weight, and the ultimate determination of disability is specifically reserved to the Commissioner pursuant to 20 CFR §§ 404.1527(d) and 416.927(d).  The record includes temporary assessments precluding work activity for periods of less than 12 months, such as the opinion of Dr. Garcia in 2013 that the claimant is unable to return to work for one week (Exhibit 10F, page 47).  A similar assessment from the Department of VA limited his ability to lift to 10 pounds (Exhibit 10F, page 52).

On January 29, 2016, Dr. Ancuta Matel completed an assessment for the record that noted significant impulse control and anger issues (Exhibit 7F).  Dr. Matel endorsed a series of functional restrictions including no better than fair to poor capacity in all occupational functional categories, marked restrictions in social functioning, three to four episodes of decompensation, and an inability to maintain gainful employment (Exhibit 7F).  The undersigned gives the conclusions of Dr. Matel limited weight, as the severity of assessed restrictions are not supported by the entirely conservative mental health treatment history and the well documented history of no acute memory, concentration, or thought content irregularities.  Additionally, the conclusions are not consistent with the claimant's documented adaptive behaviors including his ongoing independence in daily living, his caring for some household chores, and his completion of his college degree and work on at least a part-time basis during the period at issue.

In a medical assessment of the claimant's ability to do work related activities prepared by Dr. Ancuta Matel first on January 29, 2016, the claimant was found to have fair to poor/none abilities in all aspects of workplace functioning (Exhibit 7F). Dr. Matel found significant impulse control, anger issues, marked limitations in social functioning, three to four episodes of decompensation, and symptoms of such severity they were consistent otherwise with a need for a highly structured mental health setting (Exhibit 7F, pages 3-6). Dr. Matel concluded that the claimant's condition was disabling and prevented him from engaging in gainful employment. In a separate assessment prepared in 2017, Dr. Matel clarified that the claimant does not have specific treatment for post-traumatic stress disorder (Exhibit 60F, page 68). Nevertheless, at this time, Dr. Matel endorsed marked restrictions in activities of daily living and social functioning, concluding the claimant was unable to work or function independently outside of his home (Exhibit 20F). The undersigned gives all referenced opinions of Dr. Matel limited weight. They are not supported by referenced clinical findings in the treatment history of such severity to endorse the severity of restrictions given. Additionally, they are not consistent with the grossly conservative routine and outpatient treatment history; the lack of mental health hospitalization or acute complication resulting in the loss of adaptive functioning; or Mr. Patillo's documented adaptive behaviors, including his ability to live independently, care for personal needs, socialize with friends and family members, attend college on at least a limited capacity and complete a degree, and work on at least a limited part-time capacity. Finally, employability remains an issue reserved for the commissioner of the Social Security Administration.

On April 20, 2016, Dr. Saraj Chowdhury completed an assessment of the claimant's pain, endorsing 8-9/10 regular pain that the claimant has had for the past three years (Exhibit 9F). Dr. Chowdhury opined that the claimant would frequently be off task (33-66% of the workday); he could sit, stand, or walk no more than one hour in an eight hour day; lift up to 20 pounds of weight; and that the pain would preclude eight hour per day of work for five days per week. On December 18, 2017, Dr. Chowdhury endorsed similar clinical findings, stating that the pain remained 8-9/10 in severity, it frequently interfered with attention and concentration, it limited him to 20 pounds of lifting, and it precluded more than 2 hours of sitting, standing, or walking total (Exhibit 27F). He continued to endorse pain would preclude full time work activity (Exhibit 27F, page 5). A similar VA assessment found a capacity to sit for four hours, stand and/or walk for two hours at one time, and stand and/or walk four hours in an eight hour day (Exhibit 59F, page 16). The undersigned gives these assessments limited weight, as an evaluation of the claimant's functional capacity during the period at issue. The severity of endorsed pain is just not supported by reference in the record to clinical findings, treatment complications, or the claimant's allegations at follow up appointments. Treatment for his pain complaints was entirely conservative, routine, and outpatient, and follow-up physical assessments routinely documented grossly normal gait, station, and strength. Similarly the findings are not consistent with the claimant's adaptive behaviors including his ability to live independently, care for his personal needs, assist with household chores, attend school on at least a partial basis, and work part-time. Finally, as noted above, employability remains an issue reserved for the commissioner.

On March 1, 2017. Dr. Neena Jamwal endorsed nerve root compression, limited motion of the spine, sensory/reflex loss, positive straight leg raise, chronic non-radicular pain and weakness,

and what she classified as severe burning or painful dysthesia resulting in the need to change position or posture more than once every two hours (Exhibit 19F). She noted that she had met with the claimant a total of six times. The undersigned gives these conclusions partial weight, as they have somewhat been adopted in the residual functional capacity limiting the claimant to two hours of standing and/or walking in an eight hour day and the need to change positions once per hour. The listing level severity of endorsed restrictions otherwise is not consistent with the grossly conservative and outpatient treatment history, the clinical and examination findings, or Mr. Patillo's stated ongoing capabilities, including his ability to live independently, attend college, and work on at least a part-time basis.

On May 9, 2019, Dr. Hassan Shah declined to endorse mental restrictions given the limited clinical contact with the claimant (Exhibit 32F). Dr. Shah found symptoms of both depression and anxiety, and otherwise declined to endorse functional restrictions. As the opinion does not address conclusions regarding Mr. Patillo's functional capacity, the undersigned gives the findings limited weight. On June 7, 2019, Ms. Elizabeth Bigelow completed a pain evaluation and physical capacities assessment, concluding that the claimant's thoracic and lumbar spine pain was consistently 8-9/10 in severity and frequently interfered with attention and concentration to perform even simple work tasks (34-66% of the day) (Exhibit 33F). Ms. Bigelow found the claimant could sit for 3 hours, and stand and/or walk for no more than one hour in an eight hour day. There were significant postural restrictions, prohibitions on pushing and pulling, and the pain would cause more than two absences per month, precluding full-time competitive work activity on a sustained basis. The undersigned continues to gives this assessment limited weight, as an evaluation of Mr. Patillo's ongoing functional capacity, as it is not consistent with concurrent physical examinations at the time of the evaluation which found 5/5 strength in all upper and lower extremity groups with sensation that was intact and reflexes that were normal (Exhibit 30F, page 54). It is also not supported by the entirely conservative, routine, and outpatient treatment history, the lack of acute complications requiring further evaluation with a specialist, and the claimant's stated ongoing capabilities, including Mr. Patillo's ability to live independently, handle some household chores, attend school, and work on at least a part-time basis.

The undersigned notes that pursuant to 20 CFR §404.1504, a decision by a nongovernmental agency or any other governmental agency is disabled or blind is based on its rules and does not bind the Social Security Administration into making a similar finding. Pursuant to Social Security Ruling 06-3p, a determination or decision of disability will consider all of the available evidence in the individual's case record. This includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other "non-medical sources" and decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind. In Bird v. Comm'r of Soc. Sec., 699 F.3d 337 (4th Cir. 2012), the Fourth Circuit stated such decisions deserve substantial weight unless there are good reasons for giving them less weight.

In this case, the Department of Veteran's Affairs applied their service connected disability standard to the claimant's medical history and found a 60% total disability on the basis of 50% panic disorder and 10% eczema. This was later raised to 90% while accounting for pain

disorder, migraine headaches, asthma, eczema, hypertension, and tinnitus (Exhibit 35F, page 3). While accounting for the findings in accordance with the aforementioned regulations and rulings, the undersigned nevertheless gives the conclusions limited weight.  In contrast to the Veteran's Affairs assessments, the Social Security Administration is exclusively interested in how one's ongoing impairments affect their functional capacity.  The claimant's eczema causes no more than minimal restrictions in functioning, and the panic disorder has been addressed by the moderate limitations in social functioning, concentration, persistence, and pace discussed above. The adopted limitations in the residual functional capacity otherwise account for the pain from the claimant's spine disorder and obesity.  However, even when limited to sedentary work, the restrictions from the claimant's impairments do not preclude substantial employment.  Therefore, even when accounting for the VA conclusions adopting a different standard of analysis, the undersigned gives the conclusions regarding employability limited weight.

Based on the entirety of the record, the undersigned concludes that the claimant retains the capacity to lift and/or carry no more than 10 pounds of weight on an occasional basis; stand and/or walk for two hours in an eight hour workday; and sit for six hours in an eight hour workday.  The claimant can occasionally climb ramps and stairs, kneel, crouch, crawl, balance, or stoop.  He cannot climb ladders, ropes, or scaffolds, and he can have no exposure to vibration or workplace hazards.  Sitting, standing, and walking is limited to one hour increments for each activity, and he would have the option to change positions after one hour.  He can frequently handle, feel, or finger and occasionally push or pull.  Mr. Patillo can understand, remember, and carry out simple instructions and make simple work-related decisions.  He can work at consistent pace throughout the day but not at a production rate pace such as that found at an assembly line or conveyor belt.  Finally, he can tolerate occasional interaction with co-workers, supervisors, and the public.  The residual functional capacity is supported by the medical evidence of record and the claimant's not entirely consistent testimony regarding his functional limitations.

**6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).**

The claimant had past relevant work as an airport utility worker and military crew member.  As required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period. The vocational expert testified that the claimant's past work as an airport utility worker, DOT# 912.663-010, and military crew member/engineer, DOT# 378.684-014, entailed heavy to very heavy exertion and was considered to be semi-skilled.  The vocational expert further testified that the occupations would not account for the adopted exertional and non-exertional restrictions in the residual functional capacity.  Accordingly, the claimant was unable to perform past relevant work as actually or generally performed.

**7.   The claimant was born on August 27, 1973 and was 48 years old, which is defined as a younger individual age 18-44, on the date last insured.  The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).**

**8.   The claimant has at least a high school education (20 CFR 404.1564).**

See Next Page

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Through the date last insured, if the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28 and Rule 201.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as final assembler, DOT# 713.687-018 (with approximately 18,000 jobs in the national economy); inspector, DOT# 669.687-014 (17,000 nationally); and machine tender, DOT# 726.685-066 (17,000 nationally).

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.  Where not addressed by the Dictionary of Occupational Titles, such as with changing positions and periods of being off task, the vocational expert testified that the testimony was consistent with his 35 years of experience.

Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed

Devon D Patillo (BNC#: 21A8245E71712)                     Page 18 of 18

in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from December 2, 2012, the alleged onset date, through March 31, 2022, the date last insured (20 CFR 404.1520(g)).**

## <u>DECISION</u>

Based on the application for a period of disability and disability insurance benefits protectively filed on November 20, 2014, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2022, the last date insured.


/s/ *Nicolas R Foster*
_____
Nicolas R Foster
Administrative Law Judge


September 13, 2022
_____
Date

# LIST OF EXHIBITS

### Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1N | 1A | Disability Determination Explanation-DIB PRT/MRFC William Schirado RFC Trina Williams SDM | | 2015-04-23 | 13 |
| T1N | 2A | Initial Disability Determination by State Agency, Title II | | 2015-04-28 | 1 |
| T1N | 3A | Explanation of Determination-Rationale DIB | | 2015-04-29 | 1 |
| X72 | 4A | ALJ Hearing Decision | | 2017-06-01 | 27 |
| X72 | 5A | AC Order | | 2018-05-21 | 6 |
| X72 | 9A | AC Order | | 2022-03-04 | 7 |
| X72 | 6A | ALJ Hearing Decision | | 2019-07-17 | 33 |
| X72 | 7A | AC Denial | | 2020-05-29 | 6 |
| X72 | 8A | Decision of U.S. District Court | | 2021-04-16 | 1 |

### Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1N | 1B | Representative Fee Agreement-Kathleen Flynn | | 2014-11-07 | 2 |
| T1N | 2B | Appointment of Representative-Kathleen Flynn | | 2014-11-07 | 2 |
| T1N | 3B | Authorized Representative Cover Letter | | 2014-11-20 | 2 |
| T1N | 4B | T2 Notice of Disapproved Claim | | 2015-04-28 | 10 |
| T1N | 5B | Request for Hearing by ALJ | | 2015-05-14 | 2 |

| | | | | |
|---|---|---|---|---|
| T1N | 6B | Request for Hearing Acknowledgement Letter | 2015-05-20 | 11 |
| T1N | 7B | Claimant's Change of Address Notification | 2015-11-03 | 1 |
| T1N | 8B | Claimant's Change of Address Notification | 2016-06-06 | 1 |
| X54 | 9B | Amended Notice of Hearing - response to Rep request for VTC | 2016-08-11 | 20 |
| X54 | 10B | Transfer Request for Hearing | 2016-06-21 | 6 |
| X54 | 11B | Hearing Notice | 2016-06-28 | 20 |
| X54 | 12B | Notice Of Hearing Reminder | 2016-09-15 | 6 |
| X54 | 13B | Notice Of Hearing Reminder | 2016-09-16 | 10 |
| X54 | 14B | Representative Fee Agreement | 2016-09-27 | 1 |
| X54 | 15B | Appointment of Representative | 2016-09-27 | 1 |
| X54 | 16B | Hearing Notice | 2017-01-20 | 21 |
| X54 | 17B | Outgoing ODAR Correspondence | | 3 |
| X54 | 18B | Withdrawal/Revocation of Representation-LaQuierra Harris Only(MAIN REP:FLYNN) | 2017-04-27 | 2 |
| LF8 | 19B | Request for Review of Hearing Decision/Order | 2017-06-26 | 1 |
| X72 | 20B | Request for Hearing Acknowledgement Letter | | 14 |
| X72 | 21B | Critical/Dire Need Request | 2018-06-28 | 5 |
| X72 | 22B | Claimant's Change of Address Notification | 2017-08-11 | 1 |
| X72 | 23B | Representative Correspondence-Rqst for Phone Hrg or VTC from Atlanta | 2019-05-20 | 1 |
| X72 | 24B | Hearing Notice | | 29 |

| X72 | 25B | Appointment of Representative- Brynne Holt | 2019-06-11 | 1 |
| X72 | 26B | Representative Fee Agreement- Brynne Holt | 2019-06-14 | 1 |
| LEB | 27B | Request for Review of Hearing Decision/Order | 2019-08-02 | 4 |
| X72 | 28B | Request for Hearing Acknowledgement Letter | | 15 |
| X72 | 29B | Outgoing ODAR Correspondence | 2022-03-18 | 16 |
| X72 | 30B | Claimant's Change of Address Notification | 2022-04-06 | 1 |
| X72 | 31B | Hearing Notice | 2022-04-19 | 20 |
| X72 | 32B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment | 2022-06-10 | 1 |
| X72 | 33B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment | 2022-06-14 | 1 |
| X72 | 34B | Notice Of Hearing Reminder | | 6 |
| X72 | 35B | Fee Agreement for Representation before SSA | 2022-07-07 | 1 |
| X72 | 36B | SSA-1696 - Claimant's Appointment of a Representative | 2022-07-07 | 1 |
| X72 | 37B | Claimant's Change of Address Notification | 2022-07-15 | 1 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| T1N | 1D | Application for Disability Insurance Benefits | | 2014-11-20 | 7 |
| T1N | 2D | Application for Disability Insurance Benefits | | 2014-12-03 | 9 |
| T1N | 3D | Wage Information | | 2015-02-18 | 5 |
| T1N | 4D | Detailed Earnings Query | | 2016-02-26 | 10 |

| T1N | 5D | Summary Earnings Query | 2016-02-26 | 1 |
|-----|-----|---|---|---|
| T1N | 6D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2016-02-29 | 3 |
| T1N | 7D | Certified Earnings Records | 2016-02-29 | 2 |
| X54 | 8D | Misc Non-Disability Development | 2016-09-27 | 3 |
| X54 | 9D | Detailed Earnings Query | 2016-09-27 | 8 |
| X54 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2016-09-27 | 2 |
| X54 | 11D | Certified Earnings Records | 2017-02-23 | 3 |
| X54 | 12D | Detailed Earnings Query | 2017-02-23 | 7 |
| X54 | 13D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2017-02-23 | 2 |
| X72 | 14D | Certified Earnings Records - DLI 12/2021 | 2018-08-11 | 3 |
| X72 | 15D | Detailed Earnings Query | 2018-08-11 | 5 |
| X72 | 16D | Summary Earnings Query | 2018-08-11 | 1 |
| X72 | 17D | New Hire, Quarter Wage, Unemployment Query (NDNH) - 3rd Qtr 2016-3rd Qtr 2017 | 2018-08-11 | 2 |
| X72 | 18D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2019-06-12 | 2 |
| X72 | 19D | Detailed Earnings Query | 2022-04-02 | 5 |
| X72 | 20D | Summary Earnings Query | 2022-04-02 | 1 |
| X72 | 21D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-04-02 | 1 |
| X72 | 22D | Certified Earnings Records | 2022-04-02 | 3 |

**Disability Related Development**

| Component | No. | Description | Received | Source | Dates | Pages |
|-----------|-----|-------------|----------|--------|-------|-------|

| | | | | | |
|---|---|---|---|---|---|
| T1N | 1E | Disability Report - Adult | | to 2014-12-03 | 10 |
| T1N | 2E | Disability Report - Field Office | | to 2014-12-03 | 3 |
| T1N | 3E | Report of Contact-Contact w/Rep | DDS MI Kalamazoo | to 2014-12-12 | 2 |
| T1N | 4E | Report of Contact-Modified Mailing | | to 2015-01-08 | 1 |
| T1N | 5E | Work Activity Report EE | | to 2015-01-10 | 12 |
| T1N | 6E | Report of Contact-Work Activity | | to 2015-02-23 | 1 |
| T1N | 7E | Function Report - Adult | Patillo, Devon D | to 2015-03-01 | 13 |
| T1N | 8E | Work History Report | Patillo, Devon D | to 2015-03-01 | 13 |
| T1N | 9E | Disability Report - Field Office | | to 2015-05-15 | 2 |
| T1N | 10E | Disability Report - Appeals | | to 2015-05-15 | 8 |
| T1N | 11E | Exhibit List to Rep PH2E | | to 2015-10-28 | 3 |
| T1N | 12E | Report of Contact-Modified Address | | to 2015-11-12 | 1 |
| T1N | 13E | Exhibit List to Rep PH2E | | to 2016-02-26 | 11 |
| T1N | 14E | SSA-823 Report of SGA Determination-For SSA Use Only | | to 2015-02-23 | 4 |
| X54 | 15E | Representative Correspondence | Kathleen Flynn | 2016-07-26 to 2016-07-26 | 1 |
| X54 | 16E | Vocational Consultant Case Analysis | Michael Rosko | to 2016-08-22 | 1 |
| X54 | 17E | Vocational Consultant Case Analysis | Michael Rosko | to 2016-08-26 | 2 |
| X54 | 18E | Resume of Vocational Expert | Michael Rosko | to 2016-09-27 | 2 |
| X54 | 19E | Representative Brief | La'quierra Harris | to 2016-09-28 | 4 |
| X54 | 20E | Vocational Consultant Case Analysis | Michael Rosko | to 2016-09-29 | 1 |
| X54 | 21E | Proffer Correspondence | | | 3 |

| | | | | | |
|---|---|---|---|---|---|
| X54 | 22E | Representative Correspondence | Kathleen Flynn | to 2016-11-16 | 2 |
| X54 | 23E | Representative Correspondence | Kathleen Flynn | to 2016-11-16 | 2 |
| X54 | 24E | Representative Correspondence | Kathleen Flynn | to 2016-11-16 | 12 |
| X54 | 25E | Representative Correspondence | | 2013-01-03 to | 6 |
| X54 | 26E | Representative Correspondence | | 2016-08-22 to | 12 |
| X54 | 27E | Resume of Vocational Expert | Mosley | to 2017-02-07 | 2 |
| X54 | 28E | Representative Correspondence | Kathleen Flynn | to 2017-02-02 | 1 |
| X54 | 29E | Vocational Consultant Case Analysis | Cheryl Mosley | to 2017-02-28 | 1 |
| X72 | 30E | Representative Brief | Kathleen Flynn (86088) - Attorney | to 2017-06-23 | 9 |
| X72 | 31E | Exhibit List to Rep PH2E | Richmond Va Oho | to 2018-08-11 | 11 |
| X72 | 32E | Resume of Vocational Expert | Capital Case Management | | 10 |
| X72 | 33E | Representative Correspondence-5 Day Ltr: Tomkowiak/PHOP | Kathleen Marie Flynn | to 2019-06-05 | 3 |
| X72 | 34E | Report of Contact-Rep Contact-Phone Hearing | Richmond Va Oho | to 2019-06-14 | 1 |
| X72 | 35E | Report of Contact-Rep Contact-Phone Hearing | Richmond Va Oho | to 2019-06-14 | 2 |
| LEB | 36E | Representative Brief | | | 10 |
| X72 | 37E | Exhibit List to Rep PH2E | Oho | to 2022-04-02 | 11 |
| X72 | 38E | Representative Correspondence | | to 2022-06-10 | 2 |
| X72 | 39E | Resume of Vocational Expert | Bierley | | 2 |
| X72 | 40E | Representative Correspondence | | to 2022-07-07 | 1 |
| X72 | 41E | Representative Correspondence | Kathleen Flynn | to 2022-07-07 | 1 |

**Medical Records**

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| T1N | 1F | Office Treatment Records | | Peachtree Spine Physicians Inc | 2012-12-02 to 2013-04-29 | 21 |
| T1N | 2F | Office Treatment Records | | Peachtree Spine Physicians Inc | 2012-12-02 to 2013-04-29 | 56 |
| T1N | 3F | Office Treatment Records | | Va Medical Center Atlanta | 2007-08-23 to 2014-01-23 | 236 |
| T1N | 4F | Office Treatment Records | | Va Medical Center Decatur | 2008-08-27 to 2014-10-24 | 366 |
| T1N | 5F | Office Treatment Records | | Va Medical Center Detroit | 2014-05-16 to 2015-04-16 | 74 |
| T1N | 6F | Office Treatment Records | | Va Medical Center Atlanta | to 2015-11-02 | 12 |
| T1N | 7F | Medical Source Statement -Mental | | Dr Matel | to 2016-01-29 | 8 |
| T1N | 8F | Hospital Records | | Dept Of Veterans Affairs Detc Neurosurgery | to 2016-03-04 | 2 |
| T1N | 9F | Office Treatment Records-Pain/PCE form | | Va Medical Center Detroit | to 2016-04-20 | 6 |
| T1N | 10F | Office Treatment Records | | Injury 2 Wellness Center | 2012-12-03 to 2013-01-14 | 70 |
| T1N | 11F | Progress Notes | | Detroit Vamc | 2016-01-29 to 2016-03-23 | 21 |
| X54 | 12F | Office Treatment Records | | Phenix Spine City | 2013-01-09 to 2013-01-11 | 5 |
| X54 | 13F | Hospital Records | | John Dingell Va Medical Center | 2016-04-20 to 2016-08-30 | 16 |
| X54 | 14F | Consultative Examination Report | | Sierra Medical Group/ Herman J Daldin PhD | to 2016-10-26 | 9 |

| | | | | | | |
|---|---|---|---|---|---|---|
| X54 | 15F | Consultative Examination Report | | Sierra Medical Group/ Katherine H Karo Do | to 2016-10-26 | 15 |
| X54 | 16F | Progress Notes | | John Dingell Va Medical Center | 2014-03-20 to 2016-11-21 | 27 |
| X54 | 17F | Progress Notes | | John Dingell Va Medical Center | 2016-11-18 to 2016-12-01 | 11 |
| X54 | 18F | Radiology Report | | John D. Dingell Va | to 2016-12-23 | 5 |
| X54 | 19F | Medical Evidence of Record | | Dr. Neena Jamwal | to 2017-03-01 | 3 |
| X54 | 20F | Medical Evidence of Record | | Dr. Ancuta Matei | to 2017-03-01 | 3 |
| X54 | 21F | Office Treatment Records | Subsequent to hearing | John D. Dingell Va | 2016-12-23 to 2017-02-22 | 5 |
| X54 | 22F | Progress Notes | Subsequent to hearing | John Dingell Va | 2016-12-01 to 2017-01-28 | 14 |
| X54 | 23F | Progress Notes | Subsequent to hearing | Va Ann Arbor | to 2017-03-27 | 2 |
| X54 | 24F | Progress Notes | Subsequent to hearing | Detroit Vamc | 2016-12-30 to 2017-03-01 | 27 |
| X54 | 25F | Progress Notes | Subsequent to hearing | Va Ann Arbor | 2016-11-18 to 2017-03-31 | 11 |
| X72 | 26F | Outpatient Hospital Records | | Va Ann Arbor Medical Center | to 2017-12-18 | 7 |
| X72 | 27F | Pain & Physical Capabilities Evaluation | | Dr. Saroj Chaudbury, Vamc | to 2017-12-18 | 5 |
| X72 | 28F | Progress Notes & Radiology Reports | | Atlanta Va Medical Center | 2016-01-21 to 2017-12-18 | 87 |
| X72 | 29F | Hospital Records | | Atlanta Va Medical Center | 2017-09-25 to 2018-09-20 | 172 |
| X72 | 30F | Hospital Records | | Hunter Holmes Mcguire Vamc | 2014-11-18 to 2019-02-21 | 100 |

| X72 | 31F | Hospital Records | | John D. Dingell Va Medical Center | 2017-03-06 to 2017-12-18 | 37 |
|---|---|---|---|---|---|---|
| X72 | 32F | Medical Assessment Mental Ability-Work Related Activities | | Hassan Shah Md | to 2019-05-09 | 6 |
| X72 | 33F | Treating Source Statement-Pain Evaluation & Physical Capabilities Evaluation | | Elizabeth Bigelow/Richmond Va Medical Center | 2019-05-16 to 2019-06-07 | 6 |
| X72 | 34F | Claimant Correspondence-contact with case manager | | Navy Outreach Program | 2019-01-09 to 2019-06-17 | 13 |
| X72 | 35F | Hospital Records | Subsequent to hearing | John D Dingell Va Medical Center | 2018-01-30 to 2022-02-02 | 142 |
| X72 | 36F | Office Treatment Records | Subsequent to hearing | Atlanta Va Medical Center | 2022-02-02 to 2022-07-11 | 211 |
| X72 | 37F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2007-08-23 to 2012-10-29 | 148 |
| X72 | 38F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2007-09-04 to 2012-12-27 | 151 |
| X72 | 39F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2012-10-10 to 2013-06-07 | 117 |
| X72 | 40F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 1998-12-07 to 2014-07-17 | 150 |
| X72 | 41F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 1998-08-10 to 2016-03-23 | 88 |
| X72 | 42F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2006-09-29 to 2017-10-13 | 117 |

| X72 | 43F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2002-08-13 to 2018-03-20 | 117 |
|-----|-----|------------------|------------------------|----------------------------------------------|--------------------------|-----|
| X72 | 44F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2003-07-29 to 2018-03-22 | 117 |
| X72 | 45F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 1998-08-06 to 2018-06-02 | 117 |
| X72 | 46F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2015-06-04 to 2018-07-31 | 351 |
| X72 | 47F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2017-09-20 to 2019-06-05 | 233 |
| X72 | 48F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2008-08-08 to 2019-06-26 | 117 |
| X72 | 49F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2006-05-01 to 2020-08-24 | 234 |
| X72 | 50F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2018-07-31 to 2021-01-11 | 234 |
| X72 | 51F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 1998-07-31 to 2021-01-12 | 233 |
| X72 | 52F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2020-06-01 to 2021-04-12 | 350 |
| X72 | 53F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 350 |

| X72 | 54F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 700 |
| X72 | 55F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 700 |
| X72 | 56F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 233 |
| X72 | 57F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 116 |
| X72 | 58F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 87 |
| X72 | 59F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 58 |
| X72 | 60F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 116 |
| X72 | 61F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 116 |
| X72 | 62F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 350 |
| X72 | 63F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 150 |
| X72 | 64F | Hospital Records | Subsequent to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 90 |

| X72 | 65F | Hospital Records | Subsequen t to hearing | Department Of Veteran Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 60 |
| X72 | 66F | Hospital Records | Subsequen t to hearing | Department Of Veterans Affairs Military Cfile | 2001-06-16 to 2021-10-28 | 59 |