IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LILLIAN REBECCA CLENDANIEL,

     Plaintiff,

v.

THE WALT DISNEY
CORPORATION,

     Defendant,

CIVIL ACTION NO.

**JURY TRIAL DEMANDED**

## **COMPLAINT**

COMES NOW, Plaintiff, LILLIAN REBECCA CLENDANIEL ("Lillian" or "Plaintiff") by and through the undersigned counsel and submits this Complaint against Defendant, The Walt Disney Corporation ("Disney") as follows:

1.

This is an action for intentional sex discrimination where Defendant's discriminated against Lillian based upon her gender and subjected her to a sexually hostile working environment which resulted in her constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended. Defendant further retaliated against Lillian because she engaged in legally protected opposition to her unlawful treatment. Defendant's conduct also subjects them to liability under Georgia law.

## PROCEDURAL BACKGROUND

2.

On June 15, 2022, Lillian submitted a Pre-Charge Inquiry to the Equal Employment Opportunity Office (" EEOC") via the EEOC's online portal system. In her Pre-Charge Inquiry, Lillian informed the EEOC that she had obtained legal counsel for her matter and listed Mr. Alex Devilliers, Esq ("Mr. Devilliers" or "Counsel") as her representative with his contact information. Lillian further asked the EEOC to direct or include Counsel in all future communications.

3.

After submitting her pre-charge inquiry, the EEOC portal did not allow Lillian to take any further steps to advance her case. Lillian could only edit her submitted pre-charge inquiry because an interview with the EEOC was required before any next-steps could take place.

4.

On Jun 21, 2022, Lillian received an email from the EEOC instructing her to schedule an interview appointment through the EEOC portal. Lillian found no timely interview dates available. Lillian then scheduled her EEOC interview for the earliest available date, January 4, 2023.

5.

Later that same day, on June 21, 2022, Lillian called the EEOC's Atlanta Office and spoke with an EEOC representative about scheduling a timely interview. The EEOC representative told Lillian that the EEOC could not schedule interviews over the phone, and she would have to use the EEOC portal. The EEOC representative told Lillian her claim would be escalated if the charge deadline drew near. The EEOC representative further informed Lillian that November 16, 2022 was the deadline for her to file a timely charge of discrimination, based on her pre-charge inquiry. Lillian was advised to regularly check the EEOC portal for appointment cancelations and openings, which Lillian did without success.

6.

On November 10, 2022, Counsel received a phone call from EEOC Representative, Derick Newton ("Mr. Newton") to reschedule Lillian's EEOC interview. Mr. Newton explained that he found Lillian's request to contact Counsel in her pre-charge inquiry. Lillian's interview was rescheduled to November 14, 2022, at 3:30 PM., and Mr. Newton emailed a Form 5A to Counsel directly for Lillian to fill out and sign.

7.

On November 14, at 12:45 PM, Counsel sent Mr. Newton Lillian's signed Form 5A. Mr. Newton told Counsel there was enough to file a charge of discrimination in

Lillian's case based on the Form 5A, but there was concern about the timeliness of Lillian's sexual harassment claim, since the events of her sexual harassment took place in April 2022.

8.

Counsel explained to Mr. Newton any timeliness issue could not be Lillian's fault, because Lillian could not secure an earlier interview time and the EEOC portal did not allow Lillian to do anything more in her case without first being interviewed by the EEOC. Further, Lillian had already been assured by an EEOC representative that her claims would remain timely if by November 16, 2022.

9.

On November 14, 2022, Mr. Newton interviewed Lillian via telephone. Lillian was joined by Counsel. Mr. Newton reiterated his concern about timeliness of the sexual harassment claim. Lillian informed Mr. Newton that she someone at the EEOC told that her claims would be timely by November 16, 2022. Mr. Newton asked Lillian to provide documentation (i.e., cell phone records) showing she spoke with the EEOC previously and stated that if she could provide such documents, he would address the timeliness issue by explanatory note or similar.

10.

During Lillian's interview, Mr. Newton indicated  all of Lillian's claims would be deemed timely if she could provide cell phone records showing her prior EEOC

conversation. Lillian and Counsel were both led to understand that, because Lillian submitted her Form 5A and interviewed with Mr. Newton, her all claims were timely limitations period was satisfied and her Right To Sue Notice would be issued upon Lillian providing the cell phone records Mr. Newton requested.

11.

Unbeknownst to Lillian, on November 15, 2022, the EEOC sent Lillian an Notice of Right to Sue Letter ("NRTS"). The NRTS Letter was addressed to Lillian's home address, but Lillian did not receive the NRTS Letter. She received no notice via email, phone, or any other means that a NRTS had been issued in her case, nor did Lillian's Counsel receive any such notice despite having been in direct contact with EEOC Representative  Newton via telephone and via email several times by this time.

12.

No further communications were received from the EEOC. Lillian provided cell phone records to the EEOC on February 15, 2023. She received no response.

13.

On March 2, 2023, co-counsel, John Meyers, Esq. of The JMeyers Group, LLC, grew concerned by the EEOC's non-responsiveness and contacted the EEOC directly via email to a generic EEOC email address. On March 7, 2023,  co-counsel Meyers received an email from EEOC Investigator, Jerome Locke, stating Lillian's charge was closed and her NRTS Letter was issued on November 15, 2022.

14.

Lillian received no communication or notice of any kind from the EEOC regarding her case after November 14, 2022.

## **JURISDICTION AND VENUE**

15.

Plaintiff's Title VII claims present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331. The Court also has jurisdiction over the Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3).

16.

This Court is an appropriate venue for Plaintiff's claims under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because all of the parties reside and/or conduct business within the Northern District of Georgia and  the unlawful employment practices giving rise to Plaintiff's claims occurred in this judicial district.

17.

Lillian filed a Form 5A and the EEOC issued a Notice of Right to Sue dated November 15th, 2022 encompassing all of the discriminatory and retaliatory conduct that is the subject of this Complaint. But for Lillian's non-receipt of the NRTS Letter through no fault of her own, Lillian's Complaint would have been filed within 90 days of the NRTS being issued.

18.

Lillian lives in Decatur, GA. During her employment with Defendant, when the unlawful conduct giving rise to this complaint occurred, Lillian was employed as a Health & Safety Monitor for Disney's upcoming TV-series, "Class of 09," ("C09"), the Atlanta film set of which is where the events giving rise to this Complaint occurred.

19.

Defendant Disney is a for-profit corporation that incorporated in California, is licensed to transact business in Georgia, and conducts regular, systemic, and ongoing business in Georgia. Lillian's employment with Disney was to be performed in Atlanta, Georgia, at Disney's Class of '09 film set in Atlanta, GA, which is where the events giving rise to this Complaint occurred. Disney is subject to this Court's jurisdiction as to all of Plaintiff's claims. Disney may be served with process via its registered agent, CSC of Stephens County, Inc., located at 597 Big A Road, Toccoa, GA, 30577, USA.

## **FACTUAL ALLEGATIONS**

20.

Starting January 24, 2022, Lillian began working as a Health & Safety Monitor for Disney's upcoming TV-series, "Class of 09," ("C09") in Atlanta, GA. While working on the set, She was clung to, stalked, and sexually harassed by

her Supervisor, Tim Richardson. Supervisor Richardson was the "Key Health & Safety Manager," for C09, which made Supervisor Richardson Lillian's direct supervisor and boss. Prior to C09, the only pre-existing familiarity between Supervisor Richardson and Lillian was that the two had briefly worked together for a total of two, non-consecutive weeks in early 2021 on a different production.

21.

Lillian never had a romantic relationship with Supervisor Richardson, nor ever was Lillian interested in a romantic relationship with Supervisor Richardson. . Almost immediately upon production of C09, however Supervisor Richardson made Lillian uncomfortable in the way he communicated their "relationship" to others on set. Supervisor Richardson told several of Lillian's co-workers that he and Lillian were much closer than they actually were.

22.

On set of C09, Disney maintained a COVID safety protocol in which crewmembers, including Lillian, were to remain in designated "lockup zones" during production. Supervisor Richardson rarely failed to insert himself into Lillian's workspace. Because of the COVID protocol, Lillian was not able to distance herself from Supervisor Richardson as she became more uncomfortable with his behavior. She tried to be friendly with Supervisor Richardson in the early days of production because of common sense wisdom to be kind with one's boss.

23.

Supervisor Richardson repeatedly told Lillian he was lonely and single. On several occasions Supervisor Richardson invited Lillian to join him for one-on-one hot tub "parties" in the self-tape audition room of his home. Supervisor Richardson repeatedly told Lillian he was a licensed masseuse and offered to massage her.

24.

Lillian declined every invitation to hot tub and massage and told him the invitations were inappropriate. Supervisor Richardson did not stop inviting Lillian to his hot tub or to personal massages. Lillian regularly caught Supervisor Richardson staring at her from across the production floor, and Lillian's co-workers also notice Supervisor Richardson staring at her.

25.

Supervisor Richardson would not leave Lillian alone, and Lillian did not want to be alone with him. Lillian tried to politely distance herself from Supervisor Richardson and set professional boundaries, but Supervisor Richardson persisted. Lillian reasonably feared being too confrontational with Richardson and did not want to anger him because he was her boss and in charge of her work scheduling.

26.

As part of C09's COVID protocol, the production set maintained "lock-up zones," which were designated areas that cast and crew were not supposed to leave,

maintained under the supervision of a C09 health & safety crew. Because Lillian was a health & safety set monitor tasked with monitoring her respective lock-up zone, if Lillian wanted to leave her lock-up zone to get away from Supervisor Richardson, she would have to ask Supervisor Richardson's permission and explain where she was going and why. These circumstances made constant interaction with Supervisor Richardson unavoidable for Lillian.

27.

Several of Lillian's coworkers voluntarily stepped in to give Lillian an excuse to step away from Richardson whenever they saw him making Lillian uncomfortable. Lillian resorted to changing her work and lunch habits to try and avoid being alone with Supervisor Richardson. Nonetheless, Supervisor Richardson singled Lillian out and publicly displayed special treatment for her on set.

28.

Lillian declined hugs, surprise lattes, and other performative tokens of favor, almost daily. These public displays of favoritism and pining for affection were overbearing and embarrassing on their own. Combined with the background context of his repeat hot tub invitations, offers to massage her, and constant staring, Supervisor Richardson's non-stop "niceties," were thinly veiled, unwelcome, and unnerving conduct towards Lillian. Lillian  dreaded coming to work every day and did her best to be polite and get through it.

29.

Disney jobs are coveted in the film industry and having a good relationship with the company is known to be a launching pad for those seeking a career in entertainment. It is common knowledge that Disney is an extremely powerful and influential company, and that losing the company's favor can get an employee blacklisted from a huge number of projects.

30.

On Friday, April 1, 2022, an intensely upsetting and invasive instance of obsessive behavior towards Lillian took place, where Supervisor Richardson hawked and fawned over Lillian as if he was her romantic partner while Lillian was being examined by C09 medical staff for feeling dizzy, afterwhich Lillian's co-worker, Abigail Wallis, pulled Lillian aside to warn her that she saw Supervisor Richardson had set his Apple watch background to a photo of Lillian's face.

31.

The photo of Lillian on Supervisor Richardson's Apple Watch was Lillian's ID card photo—the photo she submitted to Supervisor Richardson for HR purposes back in January 2022. Lillian had no idea Supervisor Richardson used the photo for anything other than creating her staff ID, let alone did she give Richardson permission to use her work photo for personal viewing. Lillian was horrified by this act, and thereafter believed she was unsafe around Supervisor Richardson.

32.

Lillian suffered a severe panic attack at work that Friday, April 1, 2022, because of Supervisor Richardson's conduct. She realized she was no longer safe around her supervisor whom she could not escape. On top of using Lillian's work photo for his own personal, private viewing, Supervisor Richardson had previously sent gifts to Lillian's home, which meant he knew where she lived. The full weight of recognizing how unsafe her environment was overwhelmed Lillian emotionally and physically, and caused her to suffer a severe panic attack at work.

33.

The next workday, Monday, April 4, 2022, Lillian returned to work and met with Matthew Bush ("Mr. Bush"), who was C09's Health and Safety Manager and Supervisor Richardson's superior.[1] Lillian complained to Mr. Bush about Supervisor Richardson's behavior. He told her to file a complaint to Human Resources ("H.R.") and that H.R. would "shoot it up the ladder and see what they said."

34.

Lillian submitted a formal complaint to her designated Disney Employee Relations representative, Jamie McFarlane ("Ms. McFarland"), that same April 4, 2022. Lillian did not know how long the H.R. investigation would take, and nobody

---

[1] To illustrate the C09 Health & Safety ("H&S") hierarchy, Lillian was an "H&S Monitor," under Supervisor Richardson, who was "Key H&S Officer," under Matthew Bush, "H&S Manager."

gave her any information about what to expect of the investigation process or timeline.

35.

Lillian tried to return to work, but she could not focus on work because she did not feel safe while Supervisor Richardson was still there. She asked Mr. Bush for time off of work on April 6th, 2022, to put distance between Supervisor Richardson and herself.

36.

On April 14th, Mr. Bush contacted Lillian to ask when she could return to work. Lillian told Mr. Bush she did not feel she could return to work while Supervisor Richardson was still there and Disney's investigation into her harassment was yet resolved. Mr. Bush was familiar with the circumstances and said he understood.

37.

On April 18th, 2022, Lillian contacted Ms. McFarland. Ms. McFarland still had not interviewed Supervisor Richardson and said the investigation was still ongoing. Lillian was given no answer or estimate for when the investigation would end so she could return to work.

38.

A few days later, Mr. Bush called Lillian to say there was still no update on the Supervisor Richardson's sexual harassment investigation. Mr. Bush further told Lillian that, if he were the one in charge of Lillian's situation, he would have fired Supervisor Richardson on the spot, but that "this is corporate America, and they have to send it up the ladder." Mr. Bush was aware that Supervisor Richardson's behavior at work made female crew members uncomfortable besides Lillian.

39.

Lillian did not resign from C09 during her harassment by Supervisor Richardson and the ensuing investigation because she feared her complaint against Supervisor Richardson would be dropped if she quit. So, Lillian continued to miss work, waiting for something or someone to tell her that it was safe to return to set.

40.

On Monday, May 16, 2022, forty-two days after she filed her complaint, Lillian received a short email from Disney Employee Relations that said the investigation completed and "concluded in a finding of a violation of company policy. As such, appropriate action was taken." The email did not say what the "appropriate action" was, or if Supervisor Richardson was still on set. Lillian received no further information about the investigation.

41.

By May 16, 2022, it was too late for Lillian to have an opportunity to return to work, because production on C09 concluded only 4 days later, on Friday, May 20, 2022. The final employee work schedule was already set, and Lillian was not on it.

42.

As a result of the hostile work environment Supervisor Richardson created, Lillian is an emotional wreck, was forced to leave work for fear of her own safety, and was constructively discharged.

## COUNT I – SEXUALLY HOSTILE WORKING ENVIRONMENT / SEXUAL HARASSMENT UNDER TITLE VII

43.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

44.

Defendant Disney was Plaintiff's employer within the meaning of 42 U.S.C. § 2000e(b) and is material to this Complaint and for all purposes of applying Title VII and its interpretive case law.

45.

Plaintiff was subjected to a sexually hostile and harassing working environment, for which Defendant Disney is liable. Defendant Disney knew or should

have known of the existence of a hostile work environment, but failed to take remedial action to protect Plaintiff.

46.

Defendant Disney allowed a sexually harassing and hostile work environment to exist, culminating in Plaintiff's constructive discharge. Moreover, Defendant Disney retaliated against Plaintiff for her opposition this unlawful conduct.

47.

Defendant's actions constitute unlawful intentional sex discrimination in violation of Title VII of the Civil Rights Act, as amended.

48.

Defendant Disney willfully and wantonly disregarded Plaintiff's rights, and Defendant Disney's discrimination against Plaintiff was undertaken in bad faith.

49.

As a result of Defendant Disney's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

## **COUNT II – RETALIATION UNDER TITLE VII**

50.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

51.

Defendant Disney was Plaintiff's employer within the meaning of 42 U.S.C. §
2000e(b) for purposes of applying Title VII and the interpretive case law to this action.

52.

On information and belief, Defendant Disney retaliated against Plaintiff for
engaging in the protected activity of complaining of and opposing her sexual
harassment, by dragging out its investigation of Supervisor Richardson until it became
too late for Plaintiff to resume work prior to the end of C09 production. Defendant's
actions in this regard constitute unlawful intentional retaliation in violation of Title
VII of the Civil Rights Act, as amended.

53.

On information and belief, Defendant Disney willfully and wantonly
disregarded Plaintiff's rights in favor being able to wrap production on C09
undisturbed.

54.

As a result of Defendant Disney's unlawful actions, Plaintiff has suffered lost
compensation and other benefits of employment, emotional distress, inconvenience,
loss of income, humiliation, and other indignities.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER GA STATE LAW

### 55.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

### 56.

Defendant Disney and its employee/agents, Supervisor Richardson and others, intentionally, maliciously, wantonly and in gross and reckless disregard for Plaintiff's health and safety, engaged in extreme and outrageous conduct when they subjected Plaintiff to embarrassment, humiliation, degradation and ridicule by harassing her in the presence of coworkers, and by (in conjunction with other of Disney's employees/ agents) constructively discharging Plaintiff, both by creating intolerable working conditions through their extreme and outrageous conduct, and by retaliating against Plaintiff for opposing Defendant's discriminatory, hostile, and harassing treatment of her, thereby causing Plaintiff to suffer a panic attack that required attention from C09 medical staff., severe emotional distress, mental anguish, loss of income, humiliation, and other indignities.

### 57.

Through Defendant's actual and constructive knowledge of the unlawful conduct directed toward Plaintiff, its active participation in carrying out this conduct,

their failure to intercede on Plaintiff's behalf, and their constructive termination of Plaintiff, Defendant condoned, adopted, and ratified the unlawful conduct, making Defendant liable for intentional infliction of emotional distress upon Plaintiff.

58.

Defendant Disney's refusal to discipline Supervisor Richardson and others, its refusal to take action to prevent the harassing and retaliatory actions against Plaintiff, and its own participation in the unlawful and retaliatory conduct toward Plaintiff, make Defendant Disney independently liable for its own intentional infliction of emotional distress of Plaintiff.

59.

The actions of the Defendant are incompatible with civilized society.

60.

As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, severe emotional distress, inconvenience, loss of income, humiliation and other indignities.

## COUNT IV – NEGLIGENT RETENTION UNDER GA STATE LAW

61.

Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

62.

Defendant Disney continued the employment of Supervisor Richardson and others when Disney actually or constructively knew of these agent/employees' discrimination, harassment, and extreme and outrageous conduct directed toward Plaintiff.

63.

Defendant Disney was negligent in its supervision of Supervisor Richardson and others, failed to intercede on Plaintiff's behalf, and negligently retained Supervisor Richardson in employment, thereby ratifying, condoning, and adopting his conduct, and making Disney liable for negligent supervision and retention.

64.

As a result of Defendant Disney's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

## PUNITIVE DAMAGES: ALL COUNTS

65.

As to each Count asserted herein, Defendant acted maliciously, willfully, wantonly, oppressively, and with the specific intent to injure Plaintiff and her federally protected rights and her rights under State law. Additionally and in the alternative, Defendant acted recklessly toward Plaintiff and her federally protected rights and her

rights under State law. Accordingly, Plaintiff is entitled to recover punitive damages as to all of her claims.

[Intentional page break]

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

(a)     a declaratory judgment that the Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act, as amended;

(b)     an injunction prohibiting the Defendant from engaging in unlawful employment practices in violation of Title VII of the Civil Rights Act;

(c)     full back pay from the date of Plaintiff's constructive termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)     reinstatement to Plaintiff's former position with Disney, or in the alternative, front pay to compensate Plaintiff for her lost future wages, benefits, and pension;

(e)     compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)     punitive damages in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant for their

conduct toward Plaintiff and deter Defendant from similar conduct in the future;

(g)    reasonable attorneys fees and costs pursuant to 42 U.S.C. § 1988;

(h)    other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted this 7th day of April, 2023.

*/s/ John F. Meyers, Esq.*
Georgia Bar No. 503692
E: john@jmeyersgroup.com
P: 404-597-1275

The JMeyers Group, LLC
1755 The Exchange SE, Suite 339
Atlanta, Georgia 30339

*/s/ James E. Voyles, Esq.*
Georgia Bar No. 729016
E: jvoyles@voyleslaw.com
P: 404-550-9673

*/s/ Alex C. Devilliers, Esq.*
Georgia Bar No. 729016
E: alex@voyleslaw.com
P: 205-908-1598

THE VOYLES LAW FIRM, P.C.
1755 The Exchange SE, Suite 339
Atlanta, Georgia 30339

*Attorneys for Plaintiff.*