**SPHERION® STAFFING, LLC**

**FRANCHISE AGREEMENT**

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Nature of Agreement | 6 |
| 3. | Ownership and Protection of the Marks and Copyrights | 7 |
| 4. | Area, Scope and Authorized Services | 9 |
| 5. | Restrictive Covenants | 11 |
| 6. | Duties and Obligations of Company | 13 |
| 7. | Duties and Obligations of Franchisee | 14 |
| 8. | Payroll/Billing and Management Information Services and Fees | 20 |
| 9. | Required Hardware and Software | 20 |
| 10. | Brand Awareness Program and Fees | 21 |
| 11. | Initial Franchise Fee | 21 |
| 12. | Franchisee Commission | 22 |
| 13. | Term; Renewal | 24 |
| 14. | Assignment | 25 |
| 15. | Disposition of the Franchised Business | 27 |
| 16. | Nonrenewal Right of Company | 29 |
| 17. | Termination by Parties | 30 |
| 18. | Rights and Obligations Upon Termination | 32 |
| 19. | Indemnification | 34 |
| 20. | Liability of Owners | 35 |
| 21. | Failure to Perform | 36 |
| 22. | System Changes | 36 |
| 23. | Compliance | 36 |
| 24. | Company's Right to Cure Defaults | 36 |
| 25. | Notice | 37 |
| 26. | Disclosure | 37 |
| 27. | Applicable Law; Mediation | 37 |
| 28. | Effect; Interpretation of Agreement | 39 |

# FRANCHISE AGREEMENT

AGREEMENT made and entered into as of the 23rd day of November, 2015 (the "Effective Date"), by and between **SPHERION STAFFING LLC**, a Delaware limited liability company, having its principal place of business at One Overton Park, 3625 Cumberland Blvd., Suite 600, Atlanta, GA 30339 (hereinafter referred to as "**Company**"), and Patrick A. Hart (hereinafter referred to as "**Franchisee**").

WHEREAS, Spherion Staffing, LLC owns and has the right to license others to use (i) certain proprietary plans, systems, procedures and methods, all of which constitute the unique and valuable SPHERION® System for recruiting and supplying personnel to provide temporary help and full-time placement services to others, and (ii) certain trademarks, service marks, trade names and other intellectual property, and the goodwill attached thereto, in the operation of the SPHERION System (collectively, the "**Intellectual Property**"); and

WHEREAS, Franchisee desires to acquire a franchise from Company to market and provide on behalf of Company those services which are specifically described herein, to use the applicable plans, systems, procedures and methods constituting a part of the SPHERION System, to use Company's trademarks, service marks and trade names authorized herein (or such other trademarks, service marks or trade names as Company shall authorize in addition to such trademarks, service marks or trade names, or in substitution of such trademarks, service marks or trade names), and to utilize Company's goodwill in connection therewith;

NOW THEREFORE, in consideration of the execution of this Agreement and of the covenants and conditions herein contained, it is mutually agreed and understood as follows:

1. **Definitions.**   As used in this Agreement:

    (a)    "**Accounting Period**" means one of twelve four, five, or six week periods approximately coinciding with the calendar months as shall be specifically determined by Company.

    (b)    "**Accounts Receivable Funding Fee**" means the dollar fee assessed Franchisee for accounts receivable over sixty (60) days as of the end of each Accounting Period.

    (c)    "**Area**" means the geographic area in which Franchisee is authorized to market and provide the services described herein, which is attached as **Schedule 1**, and made a part of this Agreement.

    (d)    A "**Competitive Business**" means a business that provides services from one or more office locations within the Area that are the same or substantially identical to those services described in **Schedule 2** to this Agreement.

    (e)    "**Computer System**" shall mean the computer system hardware, equipment and software, as specified by Company, for the operation of the front office of the Franchised Business (defined below).

    (f)    "**Customer(s)**" means existing and potential users of the services that are

authorized by this Agreement to be marketed and provided by Franchisee on behalf of Company.  To the extent applicable, Customers shall also include National Account Customers as defined below.

(g)  **"Direct Costs"** means the sum of:

(1)  the Temporary Employees' gross payroll and other direct labor costs with respect thereto (including, without limitation, payroll taxes, local, county, or state headcount taxes, and taxes based on sales or gross receipts which are not separately collected from Customers);

(2)  Company's accrued expenses (as determined by Company) relating to workers' compensation, liability, bonding or other insurance, deductibles or reserves, transportation, vacation, holiday or sick pay, profit sharing, health insurance or other fringe benefit costs, and any other tax or cost which is levied on or directly measured by headcount, Sales, hours or Temporary Employee wages paid or incurred by Company with respect to any Accounting Period or Fiscal Year as well as such deductions, surcharges, deductibles and other payments as are currently required from and charged to Franchisee under the Company's policies and procedures regarding worker's compensation, general liability, professional/fidelity liability, auto liability, employment practices liability and other liabilities, all as set forth from time to time in the Manuals and in other communications, including email communications and internet postings directed  from Company to Franchisee; and

(3)  the costs of any services, non-standard benefits, materials, equipment, products or other consumables Customers have agreed to pay and for which there is a separate charge on the invoice.

(h)  **"Fiscal Year"** means the twelve Accounting Periods currently beginning on or about January 1 of any year and ending on or about December 31 of such year, or such other period consisting of twelve Accounting Periods that Company may hereafter establish from time to time as its fiscal year.

(i)  **"Full-Time Placement"** means employer paid employment services for the full-time placement of employees and such related activities deemed by Company to fall within this Subsection as delineated from time to time in the Manuals (defined below).

(j)  **"Full-Time Placement Sales"** means the U.S. Dollar equivalent of all billings (whether collected or not) during an Accounting Period for all fees due from Full-Time Placements and retainer searches, including any liquidated damages and buy-outs relating to those Temporary Employees and excluding only sales taxes or other taxes which may be required by law to be collected from Customers in connection with the services described herein, and adjustments or refunds which have been authorized by Company.

(k)  **"Gross Profit"** means the difference between Sales and Direct Costs during any Accounting Period or Fiscal Year.

(l)    The "**SPHERION® System**" means all and each of the distinctive and proprietary, tangible and intangible properties developed by Company for the operation of a system of branch, licensed, and franchised temporary help and full-time placement businesses, including but not limited to:

    (1)    the Marks;

    (2)    the Manuals;

    (3)    the concepts, plans, practices, procedures, policies, methods, and strategies developed by Company for the recruitment of employees, the promotion and advertising of temporary help and/or full-time placement services and the operation of a temporary help and/or full-time placement business, including all written materials regardless of whether contained in the Manuals, and all other media such as forms, brochures, other printed materials, film, audio, video tape, CD's, DVD's and computer software which contain or are intended to be used in or as a part of the SPHERION System; and

    (4)    the advice, information, correspondence and assistance otherwise provided to Franchisee by Company and Company's agents, employees or contractors, whether provided orally, in writing or in any other form, which relates to the establishment or operation of the Franchised Business.

(m)    "**Franchised Business**" shall mean the business of marketing and providing the staffing services authorized by this Agreement and conducted by the Franchisee pursuant to this Agreement.

(n)    "**Franchisee**" means the individual(s) who execute(s) this Agreement, and any **entity** formed by such individual(s) for the operation of the business described herein and, as to each obligation, liability or duty imposed upon or assumed by Franchisee pursuant to this Agreement, the term Franchisee shall be deemed to include each of the shareholders or members of such corporation or limited liability company, except as otherwise limited herein.

(o)    "**Manuals**" means the confidential and proprietary publications now or hereafter developed by Company, whether maintained in the form of physical documents or in the form of on-line accessible electronic files and internet postings and related communications, and which contain policies and procedures related to the operation of the SPHERION System, together with confidential memoranda, bulletins and emails and internet postings that update, supplement, modify and explain the Manuals and the SPHERION System.

(p)    The "**Marks**" means the service mark "SPHERION®," the Spherion® logo including its 3-color matrix above the "i" (a copy of which is attached hereto and incorporated herein by reference as **Exhibit A**) and any other trade name, trademark, service mark, logo, design, name, words or slogan that may presently exist or may be created by Company and/or its affiliates and that Company now or hereafter licenses to Franchisee in writing to identify the services authorized by this Agreement.

(q) "**National Account Customers**" means Customers designated by the Company for whom services are performed or to be performed by the Company, its licensees or franchisees, at locations both within and outside the Area.

(r) "**Sales**" means the U.S. Dollar equivalent of all billings (whether collected or not) to Customers for goods sold or services rendered by Franchisee, including Temporary Sales, and Full-Time Placement Sales, and excluding only sales taxes or other taxes which may be required by law to be collected from Customers in connection with the provision of the services described herein, and adjustments or refunds which have been authorized by Company.

(s) "**Temporary Employees**" means the employees of Company who are provided to Customers by Franchisee on behalf of Company to perform any services authorized by this Agreement, irrespective of whether such employees are full-time, part-time or temporary.

(t) "**Temporary Gross Profit**" means the difference between Temporary Sales and Direct Costs associated with Temporary Sales during any Accounting Period or Fiscal Year.

(u) "**Temporary Sales**" means the U.S. Dollar equivalent of all billings (whether collected or not) to Customers for services rendered by Temporary Employees provided by the Franchisee on behalf of Company excluding only sales taxes or other taxes which may be required by law to be collected from Customers in connection with the provision of the services described herein, and adjustments or refunds which have been authorized by Company.

2. <u>**Nature of Agreement**</u>.

(a) This Agreement shall constitute the grant by Company, and the acceptance by Franchisee for the entire "Term", as defined in Section 13, within the Area and upon the terms, conditions and limitations herein set forth, of a license:

(1) to use the Marks strictly in accordance with the standards and requirements of this Agreement; and

(2) to adopt and use the SPHERION System and each and every component thereof in strict compliance with this Agreement;

for the purpose of operating, within the Area and as a limited agent of Company, a business that shall market and provide the services described in **<u>Schedule 2</u>** to this Agreement.

(b) This Agreement is personal to Franchisee, and may not be assigned by Franchisee other than as permitted by this Agreement.  Franchisee shall be permitted to assign this Agreement to a corporation or limited liability company (the "**Entity**") in which Franchisee is the owner of the majority of the outstanding voting securities of the Entity and the majority of outstanding equity interest in the Entity, and provided Franchisee remains the owner of at least the majority of the outstanding voting securities of the Entity and the majority of outstanding equity interest in the Entity throughout the Term of this Agreement

and any extensions or renewals of the right to operate the business franchised hereunder.  No person or entity other than Franchisee shall be permitted to own any voting security or other equity interest in the Entity without the prior written consent of Company.  The corporate name may not contain the word "Spherion" or be confusingly similar in any fashion with the mark "Spherion".  Company shall first approve the name of any corporate assignee of this Agreement.  Any such assignment to a corporation shall be accomplished by execution of the Company's Assignment of Spherion Franchise Agreement form by each individual Franchisee, by the Entity to which the Franchise Agreement is assigned and by the Company and no such assignment shall be valid under this Agreement in the absence of a fully executed Assignment of Spherion Franchise Agreement form.  The sale or issuance of any stock or other equity interest in such assignee Entity in violation of the provisions of this Section or Section 14 of this Agreement shall constitute a breach of this Agreement.  Within ten (10) days after the written request of Company, whether immediately upon or at any time after the execution of the Assignment of Spherion Franchise Agreement form, Franchisee shall provide Company with a copy of the Certificate of Incorporation or Articles of Organization of the assignee, a list of all shareholders or members (the "**Owners**"), and a certified copy of a resolution of the assignee accepting the assignment.  Each Owner of the assignee who is not a party to this Agreement shall, prior to the assignment of this Agreement or the issuance of any shares of stock in the assignee to such Owner, whichever occurs earlier, execute an agreement in form acceptable to Company for the purpose of being bound by Section 5 hereof.  Failure on the part of Franchisee to obtain such an agreement from each Owner of the assignee who is not a party to this Agreement and to provide an originally executed copy thereof to Company shall constitute a breach of this Agreement.

(c)     It is agreed that the relationship of the parties hereto is that of franchisee and franchisor as independent contractors, and that in no event shall Company and Franchisee be considered partners, joint or co-venturers, or employees of or for each other.  This Agreement is not intended to create a fiduciary relationship or to confer third party beneficiary rights upon either party.  Neither Company nor Franchisee shall make any express or implied agreements, warranties or representations, or incur any debt, in the name of or on behalf of the other or represent that their relationship is other than franchisee and franchisor, and neither Company nor Franchisee shall be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized hereunder.

(d)     Anything in this Agreement to the contrary notwithstanding, the parties hereto further acknowledge and agree that the Temporary Employees provided by Franchisee pursuant to this Agreement shall be the employees of either Company or a wholly-owned subsidiary of Company, full-time placement applicants shall be the applicants of either Company or a wholly-owned subsidiary of Company, and the Customers to whom services are provided pursuant to this Agreement shall be Customers of either Company or a wholly-owned subsidiary of Company, all at the sole option of Company.  The exercise of any or all of the options described above shall not affect the rights, duties or obligations of either party as otherwise set forth in this Agreement, and the performance of any obligation or

Spherion FA 4-15 ᵐᵠΩₐᵥᵠₐᵏ

duty required herein with respect to Temporary Employees, full-time placement applicants, or Customers by a wholly-owned subsidiary of Company, shall constitute the performance of such obligation or duty by Company.

3.      **Ownership and Protection of the Marks and Copyrights.**

(a)     Franchisee agrees that the Marks licensed hereunder are valid service marks and trademarks owned by Company and/or its affiliates, and that only Company, its affiliates and its designated licensees and franchisees shall have the right to use the Marks and such other copyrights as may presently exist or as may be created by Company and/or its affiliates and provided for use by Franchisee, along with all ancillary signs, symbols or other indicia or trade dress used in connection or conjunction with the SPHERION System.  Franchisee further agrees that valuable goodwill is attached to the Marks, Company's and/or its affiliates' copyrights and trade dress, and that Franchisee will use them only in the manner and to the extent specifically licensed hereunder.   Franchisee agrees that any and all goodwill associated with the Marks, copyrights, and trade dress, including any goodwill which might be deemed to have arisen through Franchisee's efforts or activities, inures directly and exclusively to the benefit of Company and/or its affiliates, except as otherwise provided herein or by applicable law.

(b)     Franchisee agrees that its franchise under this Agreement for the use of the Marks is nonexclusive, and that Company and its affiliates, in their sole discretion, shall have the right themselves, or to authorize others, to operate businesses under the Marks on any terms and conditions Company deems fit, subject to the provisions of Section 4 of this Agreement.  Franchisee agrees that during the Term of this Agreement, and after its expiration or termination for any reason, Franchisee shall not directly or indirectly contest or aid in contesting the validity, ownership, title, right or interest of Company and/or its affiliates in and to the SPHERION System, the Marks or Company's copyrights.

(c)     Franchisee shall promptly notify Company of the existence or assertion of any claim, demand, or suit based upon or arising from, or of any attempt by any other person or entity to use the Marks, or any proprietary marks, symbol, copyright, or colorable variation thereof, in which Company and/or its affiliates has a proprietary interest as well as any information or knowledge Franchisee may have with respect to any actual, threatened or suspected infringement of any of Company's trademarks, trade names or service marks.   If Company and/or its affiliates desire to undertake the defense or prosecution of any such litigation, Franchisee agrees to execute any and all documents and do such acts and things as may, in the opinion of Company's and/or its affiliates' counsel, be necessary to carry out such defense or prosecution, either in the name of Company, Company's affiliates or in the name of Franchisee, as Company shall elect.

(d)     Franchisee will not in any manner do, or fail to do anything which would prohibit or restrict Company or any existing or future licensee or franchisee of Company, whether in a business either similar or dissimilar to the business franchised hereunder, from using the names or the Marks described in Section 1(p), forming an Entity whose name includes such names or the Marks, or from filing any

service mark, trade name or fictitious name registration with respect to any business to be conducted outside the Area or any business inside the Area that is permitted by this Agreement. Franchisee agrees, immediately upon written demand by Company, to execute or cause to be executed, such instruments as may be required by any court or government authority, consenting to the filing, registration or use of the names or the Marks set forth in Section 1(p) hereof in connection with the operation of such businesses or otherwise. The failure or refusal of Franchisee to comply with such demand immediately upon the receipt thereof shall constitute a breach of this Agreement and shall thereupon vest in Company, through its designated officers, full power and authority in the name of and on behalf of Franchisee as its Attorney in Fact as fully as Franchisee might do itself, to execute any of the foregoing instruments required by any such government authority or court.

(e)     Franchisee shall follow all directives of the Company in connection with the use and display of the Marks. Only those advertising and promotional materials or items which are authorized by Company in writing prior to use shall be used, sold or distributed and no display or use of the Marks shall be made without the prior written approval of Company. All documents and materials on which the Marks are used must include the designation ® or such other designation as Company may specify.

(f)     Except to the extent that Company may, in its discretion, permit these activities by Franchisee, Franchisee agrees not to register any Internet address name under any Internet domain, class, or category that contains any of the Marks or any abbreviations, acronym or variation of the Marks. Franchisee also agrees not to use, publish, or in any way incorporate the Marks in any form of social media (including but not limited to blogging, Facebook®, Twitter®, LinkedIn®, Pinterest®, Instagram®, Google Places®, Google+®, Google Adwords®, Vimeo®, Tumblr®, MySpace® or YouTube®) whether or not such social media platform is used for commercial gain, except to the extent that such use of the Marks is approved by the Company. Company retains the sole right to advertise on the Internet and create a web site using any of the Marks or any variation of the Marks, except to the extent that Company may, in its discretion, permit these activities by Franchisee. To the extent that Company may permit or may have permitted any usage of the Marks with respect to the subject matter set forth above, Company reserves the right to adjust, modify or withdraw such approval to the extent reasonably necessary to protect the Marks and to enhance the uniformity of the Spherion System. Company retains the right to pre-approve Franchisee's use of linking and framing between Franchisee's web pages and all other websites. Franchisee shall, within five (5) days after a request by Company, dismantle any frames and links between Franchisee's web pages and any other websites. Franchisee agrees to comply with any and all policies related to the internet, social media policies and the use of the Marks in the public domain as established by Company in the Manual or as otherwise provided by Company to Franchisee. Company may, in its sole discretion, establish certain online social media pages for Franchisee's Business Unit, and Company may, in its sole discretion, provide Franchisee access to these social media pages to post content that complies at all times with any and all policies related to the internet, social media policies and the use of the Marks in the public domain as

established by Company in the Manual or otherwise provided to Franchisee. Company shall retain all rights in these social media pages and Company may, in its sole discretion, terminate any or all of these social media pages at any time and/or terminate Franchisee's access to post content to these pages.

4.    **Area, Scope and Authorized Services.**

(a)    Franchisee is hereby authorized to market and provide on behalf of Company, the services which are specified in **Schedule 2** hereto, within the Area identified in Section 1(c) of this Agreement, and only from an approved office location within the Area, and only to customers who are located within the Area.   In connection therewith, and only as authorized by this Agreement, Franchisee is authorized to use the SPHERION System.   Franchisee is not authorized to use the SPHERION System, or any component thereof:

(1)    outside of the Area;

(2)    with respect to the provision of temporary help or full-time placement services other than those specifically set forth in Schedule 2 to this Agreement;

(3)    to advertise for and recruit Customers, Temporary Employees and full-time placement applicants outside of the Area, provided, however, that nothing contained herein shall prevent Franchisee from using the internet, social media and other advertising vehicles for the purpose of recruiting and placing Temporary Employees and full time placement applicants with Customers who are located within the Area so long as the Franchisee's use of these vehicles does not, in the discretionary opinion of Company, create unnecessary or undesirable confusion with respect to the advertising and recruiting efforts of others who are utilizing the Spherion System; or

(4)    in connection with any business or enterprise whatsoever other than the Franchised Business.

Due to high risk of injury exposure and resulting increased insurance costs, Franchisee shall not assign Temporary Employees to perform the Restricted Tasks listed in Schedule 2 to this Agreement, and Company reserves the right from time to time to amend, add to or delete from such Restricted Tasks, with written notice to Franchisee.

(b)    The Area shall only be expanded if Company, in its sole discretion, agrees to do so by amendment to this Agreement.  In such event, Franchisee will be required to pay Company Six Thousand Dollars ($6,000) for each additional county or parish.

(c)    Franchisee acknowledges and agrees that, in regard to services other than those specifically set forth in Schedule 2 to this Agreement, Company shall have the sole and exclusive right to market and provide such services, to authorize others to market and provide such services, and to authorize others to operate an office or offices within the Area for the purpose of marketing and providing such

services, using the Marks and the SPHERION System, or otherwise.

(d)     Company agrees that, as long as Franchisee shall not be in default hereunder, it will not establish or maintain, or authorize any other person or firm to establish or maintain, an office location within the Area utilizing the trademarks, service marks or trade names which Franchisee is authorized to use pursuant to this Agreement for the purpose of providing the services set forth in Schedule 2 to this Agreement, except as set forth in this Subsection (d) and in Subsection (e) below.  In the event that Company, directly or through its parent, subsidiary, affiliate, successor or assignee, acquires, merges with, or is acquired by a Competitive Business, Company or its parent, subsidiary, affiliate, successor or assignee shall have the right, in its sole discretion, to do one or more of the following:

(1)     continue to operate the Competitive Business from one or more office locations within the Area, to open additional offices (the term "offices" to include "on-site" offices) of the Competitive Business within the Area, to close and relocate offices of the Competitive Business within the Area, to initiate operations of the Competitive Business and open new offices of the Competitive Business within the Area and to otherwise conduct the business operations of the Competitive Business both outside of and within the Area in the manner that it sees fit provided, however, that Company or its parent, subsidiary, affiliate, successor or assignee shall not utilize the trademarks, service marks or trade names which Franchisee is authorized to use pursuant to this Agreement in connection with the operation of such Competitive Business within the Area;

(2)     sell the Competitive Business conducted from such office locations within the Area to Franchisee, under terms and conditions to be negotiated between the parties; or

(3)     transfer the Competitive Business conducted from such office locations within the Area to Franchisee without charge.

In the event Company, or its parent, affiliate, successor or assignee exercises its right to sell the Competitive Business to Franchisee pursuant to (2) above, or to transfer the Competitive Business to Franchisee without charge pursuant to (3) above, then Franchisee shall assume the operation of the Competitive Business as of the effective date of the sale or transfer, and such Competitive Business shall thereafter be operated pursuant to the terms and conditions of this Agreement.  In connection with any such sale and/or transfer of a Competitive Business to Franchisee, the parties agree to execute an amendment to this Agreement containing such provisions as are deemed necessary by Company or its parent, subsidiary, affiliate, successor or assignee.

(e)     Company shall have the right, on behalf of itself and/or its other licensees and franchisees, to negotiate and enter into contracts with National Account Customers to provide temporary help or full-time placement services to multiple locations of such National Account Customers utilizing the trademarks, service marks or trade names which Franchisee is authorized to use pursuant to this Agreement, whether such locations are within or outside of the Area.

Spherion FA 4-15 ™ΩΩωⲟ϶ⲕ

Immediately following the Company's execution of a contract with or the acceptance of a contract or bid by a National Account Customer which contemplates the provision of such services utilizing the trademarks, service marks or trade names which Franchisee is authorized to use pursuant to this Agreement to one or more National Account Customer locations within the Area, Company may, at its option, provide a copy of the Customer requirements and/or specifications set forth in such contract or bid to Franchisee, and Franchisee shall thereafter, utilizing the trademarks, service marks or trade names which Franchisee is authorized to use pursuant to this Agreement, provide services to the National Account Customer within the Area pursuant to the terms and conditions of such contract or bid.   In that event, should Franchisee fail to provide such services to the National Account Customer in a manner that is both satisfactory to Company and the National Account Customer and in conformity with the contract, Company shall have the right, exercisable in its sole discretion to:

(1)     provide such services to the National Account Customer at location(s) within the Area on the terms and conditions contained in the contract between Company and the National Account Customer utilizing the Marks and the SPHERION System; and/or

(2)     contract with another party to provide such services to the National Account Customer within the Area on the terms and conditions contained in the contract between Company and the National Account Customer, utilizing the Marks, or any other trademarks, service marks or trade names.

Neither the direct provision by Company of such services to National Account Customers as authorized in (e) and in (e) (1) above, or Company's contracting with another party to provide such services as authorized in (e) and (e) (2) above (whether or not such party has an office within the Area), shall constitute a violation by Company of the terms and conditions contained in Subsection (d) above.

## 5.     **Restrictive Covenants.**

(a)     Franchisee, any Entity formed by Franchisee to operate the Franchised Business, each Owner of such Entity, and any subsequent assignee of any of such parties hereby agree that, except as otherwise provided herein, he, she or it shall not:

(1)     commencing with the execution of this Agreement and for the period extending throughout the Term of this Agreement and any extensions or renewals hereof or until termination of ownership in any Entity formed for the operation of the business described herein, whichever shall first occur, directly or indirectly,   within the Area which is served by Franchisee and within the "Area" of any other Spherion franchisee or licensee (as defined in their respective franchise or license agreements) and any county or parish which is contiguous thereto, individually or for any third party, without the prior written consent of Company, (i) own, engage in as a partner, officer, executive or manager, , guarantor,

director, shareholder (other than as owner of less than five percent (5%) of the issue and outstanding stock of a publicly owned corporation whose securities are traded on a nationally recognized stock exchange), consultant, recruiter or salesperson any Competitive Business or (ii) engage in activity that is the same as or substantially similar to that activity which Franchisee is conducting on behalf of the Franchised Business, or assist such business through activities which are the same as or substantially similar to those activities which Franchisee is conducting on behalf of the Franchised Business (iii) solicit, divert or appropriate (or attempt to do so), to or for any competitor, any person or entity which is or was a Customer of Company within the preceding twelve months, nor solicit, divert or hire away (or attempt to do so), to or for any competitor any full-time placement applicant or person employed by Company, whether such person is a Temporary Employee or full-time staff employee;

(2)     commencing with the execution of this Agreement and for the period extending throughout the Term of this Agreement and any extensions or renewals hereof, engage any sales, supervisory, management or executive employees, unless and until he, she, or it shall have first secured and delivered to Company a signed agreement from each such individual, in the form then in use and prescribed by Company and containing substantially the covenants and conditions set forth in this Section 5, restricting future employment and other activities which may be directly or indirectly competitive to the business of Company or Franchisee;

(3)     commencing upon the date of (i) termination of any ownership interest in any entity formed for the operation of the Franchised Business; (ii) expiration of this Agreement; (iii) termination of this Agreement (regardless of the cause for termination); (iv) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Section 5(a); or (v) any or all of the foregoing, and for a period of twelve (12) months thereafter, directly or indirectly, individually or for any third party,  within the Franchisee's Area (as now or hereafter defined) and any county or parish which is contiguous thereto, without the prior written consent of Company, (aa) own, engage in  as a partner, officer, executive or manager, guarantor, director, shareholder (other than as owner of less than five percent (5%) of the issue and outstanding stock of a publicly owned corporation whose securities are traded on a nationally recognized stock exchange), consultant, recruiter or salesperson any Competitive Business or (bb) engage in activity that is the same as or substantially similar to that activity which Franchisee conducted on behalf of the Franchised Business, nor assist such business through activities which are the same as or substantially similar to those activities which Franchisee conducted on behalf of the Franchised Business (cc) solicit, divert or appropriate (or attempt to do so), to or for any competitor, any person or entity which is or was a Customer of Company within the preceding

twelve months, nor solicit, divert or hire away (or attempt to do so), to or for any competitor any full-time placement applicant or person employed by Company, whether such person is an Employee or full-time staff employee;

(4)    at any time during the Term of this Agreement and any renewals or extensions thereof, or at any time after the expiration or termination of this Agreement for any reason, directly or indirectly make use of or disclose to any third party any Customer information or list or list of information concerning any Temporary Employees placed with any Customer by Franchisee in the operation of the Franchised Business or list of information concerning any Temporary Employees or other employees of Company, its parents, subsidiaries or affiliates, including those who are placed by other franchisees or licensees of the Company in the operation of their franchised or licensed business;

(5)    at any time during the Term of this Agreement and any renewals or extensions thereof, or after the expiration or termination of this Agreement for any reason, directly or indirectly make use of or disclose to any third party the details or provisions of the SPHERION System, or the existence or content of any written or oral contract or of any agreement between Franchisee or Company and any other firm or person, any statistical data, Customer, applicant or employee lists, sales, promotional or financial information, manual, form, plan, system, procedure or method or other proprietary or confidential information which may have been created by or on behalf of Franchisee or which may have been developed and provided by Company or which may otherwise have come to their attention or knowledge by reason of their association with Company or Franchisee; or

(6)    assign, sell or transfer by way of gift or otherwise, without the prior written consent of Company, any interest in this Agreement or any stock of any Entity formed for the operation of the Franchised Business, without first securing from each such assignee, purchaser, transferee or prospective Owner a signed copy of an agreement in form acceptable to Company containing substantially the above provisions, a copy of which shall be immediately furnished to Company.

(b)    The covenants and agreements contained above are of the essence of this Agreement, and each such covenant and agreement is reasonable and necessary to protect the interests and properties of Company. Each of such covenants and agreements is separate, distinct and severable from each other and from the other and remaining provisions of this Agreement, and the enforceability of any such covenant or agreement shall not affect the validity or enforceability of any other such covenant or agreement, or of any other provision of this Agreement. Since irreparable loss and damage will be suffered by Company should Franchisee breach any of the above covenants or agreements, Company shall be entitled, in addition to all other remedies available to it, to both full-time and temporary injunctive relief to prevent a breach or contemplated breach of any of such covenants or agreements by Franchisee.   Any breach of the above

covenants or agreements by Franchisee shall constitute a breach of this Agreement. Franchisee hereby acknowledges that, prior to execution of this Agreement, he or she had developed certain skills in occupations which are not related to recruiting or supplying personnel to perform the services authorized by this Agreement, and that accordingly, the noncompetition covenants contained in this Agreement will not jeopardize Franchisee's ability to earn a livelihood.

**6.     Duties and Obligations of Company.**

In consideration of and for this Agreement, Company hereby agrees to perform all of the following, at its expense:

(a)     Provide such training, instruction, confidential memoranda, manuals, and software, and other materials as Company deems necessary and proper for Franchisee's conduct of the Franchised Business. Company may make available for purchase by Franchisee from time to time optional training and instruction through third party providers.

(b)     Develop and/or make available for purchase and use by Franchisee such forms, supplies and printed materials as Company deems necessary for the provision of employment services to Customers as authorized by this Agreement, including payroll forms, employment applications, reference forms and other such forms required in the employment process and for the assignment of Temporary Employees and full-time placement applicants to Customers. Company shall provide Franchisee with an initial supply of such forms.

(c)     Develop and make available for purchase and use by Franchisee sales and promotional programs, campaigns and materials which, in Company's discretion, are appropriate to assist Franchisee to recruit and market the services authorized by this Agreement on behalf of Company. Company, at its expense, shall provide Franchisee with an initial supply of such materials.

(d)     List the office of Franchisee on advertising materials as deemed appropriate by Company.

(e)     Based upon information provided by Franchisee, pay all Temporary Employee payroll, all payroll taxes, workers' compensation, general liability, bonding, fringe benefit expense and other Direct Costs as set forth in Section 1(g) of this Agreement, and provide the Management Information Services referred to in Section 8 of this Agreement.

(f)     Provide advice and guidelines in handling collections in conjunction with Franchisee's responsibilities as set forth in Subsection 7(v) of this Agreement.

(g)     Arrange and pay for all bonding and insuring of Temporary Employees as deemed necessary and proper by Company.

(h)     Make available a mailing list of current and prospective Customers, full-time placement applicants and Temporary Employees, from information submitted by Franchisee, subject to a minimum and maximum number of names as deemed appropriate by Company.

7.   **Duties and Obligations of Franchisee.**

In consideration of and for this Agreement, Franchisee hereby agrees to perform all of the following, at Franchisee's expense:

(a)   Use Franchisee's best efforts to develop, maintain and promote the Franchised Business and public image of the SPHERION System and the Marks so as to achieve maximum sales of the services authorized by this Agreement.

(b)   Comply with all of the terms of this Agreement, the SPHERION System and the concepts, plans, practices, policies, procedures, strategies, systems and directives of Company now in effect or hereafter promulgated or modified, which shall include, but not be limited to, those policies, procedures, techniques, systems and directives set forth in the Manuals published and updated (whether the update is by physical documents for filing in a Manual or in the form of on-line accessible electronic files or in the form of email communications or internet postings) from time to time by Company, as well as confidential bulletins and memoranda issued from time to time by Company.  The Manuals and Company's confidential bulletins, memoranda and emails and internet postings which update, modify or explain such Manuals or the SPHERION System as presently existing and as hereafter amended, modified or supplemented, are hereby incorporated by reference in this Agreement as reasonable and necessary standards governing the performance of Franchisee's obligations under this Agreement.  The Manuals, confidential bulletins, memoranda, emails, internet postings and similar materials which set forth or update, modify or explain such Manuals or the SPHERION System are provided to Franchisee on a "loaned" basis and shall be and remain the sole property of Company and shall be returned to Company by Franchisee immediately upon Company's request or upon expiration or termination of this Agreement for any reason whatsoever.

(c)   Personally attend and successfully complete such initial and ongoing training as Company shall deem necessary.  Franchisee shall thereafter devote full time and best efforts to the management and operation of the Franchised Business, and Franchisee shall not own, operate or otherwise engage in any other business unless otherwise consented to in writing by Company.  Should Franchisee be permitted by Company to devote less than full time and effort to the business, Franchisee shall be required to hire (i) a full-time employee to act as a manager and have responsibility for the operation of the business authorized by this Agreement, and (ii) a full-time employee to serve as a client service representative.  The employees Franchisee hires pursuant to this Subsection shall be approved by Company and trained by Company (at Franchisee's expense) within sixty (60) days of the date Franchisee hires such employees.

(d)   Establish on or before the date which is no later than ninety (90) days from the Effective Date of this Agreement, which required date set forth in greater specificity in **Schedule 1** and maintain within the Area and throughout the Term of this Agreement and any extensions or renewals hereof, one or more offices properly identified as a SPHERION office.  The office hours shall be consistent with Company's practices concerning business hours and holidays, provided that Franchisee's services shall be available to Customers at all times on a 24-hour

per day basis. Each office shall be appropriately furnished and equipped, and kept open and operating in accordance with Company's standard procedures. The location, size, appearance and layout of each office shall be subject to the approval of Company, pursuant to standards established by Company, and must be appropriate to the services authorized by this Agreement.  Company shall have the right to inspect each office during normal business hours and request such changes as it in its business judgment deems appropriate and proper, and Franchisee shall comply with such requests as expeditiously as possible.  Only the Franchised Business shall be advertised or operated from such office without the prior written consent of Company.  Franchisee shall use its reasonable commercial efforts to see that each office lease executed by Franchisee coincident with or after the execution of this Agreement shall specifically provide that such lease shall be assignable to Company at Company's sole discretion, upon expiration or termination of this Agreement for any reason.  Within ten (10) days after the written request of Company, Franchisee agrees to submit a copy of its office leases to Company.

(e)  Provide and maintain a telephone service for the Franchised Business under the System, and utilize such telephone service only in a manner and for purposes that are consistent with furtherance of the Franchised Business.  Bills for such service, including installation and deposits shall be directed to and paid by Franchisee.  Franchisee agrees to assign such telephone number(s) to Company at Company's request, and Franchisee further agrees that it will execute, either before, during or after the Term of this Agreement, all documents considered by Company as necessary to affect the assignment of such telephone number(s) as provided for herein.   Only the Franchised Business shall be transacted or advertised using the telephone number(s) assigned by the telephone company to Franchisee in connection with the Franchised Business.

(f)  Provide and maintain suitable signs approved by Company identifying Franchisee's office as an office operating under the System, and advertise Franchisee's offices and services in conformity with Company's procedures and guidelines.

(g)  Employ and maintain such trained and competent sales and office personnel as required by law or necessary for the proper and successful operation of the Franchised Business, which shall require at least two full-time employees if Franchisee will not devote full time and efforts to the business as provided in Subsection (c) of this Section.  Franchisee shall enter into such agreements regarding the terms of employment with respect to Franchisee's employees as Franchisee sees fit, and Franchisee may also, at its election, obtain confidentiality and noncompetition agreement from such personnel on the standard form agreement provided by Company.  Company reserves the right to require, on reasonable advance notice to Franchisee, that Franchisee obtain the standard form confidentiality and noncompetition agreement from all persons who become employed by Franchisee after the date of receipt by Franchisee of such notice from the Company.   Executed copies of any such confidentiality and noncompetition agreements shall be forwarded to Company within ten (10) days following each employee's first date of employment.  Such employees shall complete all Company prescribed training programs at Franchisee's expense, and

Franchisee shall pay any and all charges associated with such continuing training programs as may be reasonably required by Company.  Further, if Franchisee's operations are such that it is deemed by Company to be necessary that Company send a Company representative to Franchisee's location to conduct compliance training for Franchisee and Franchisee's staff, Franchisee will be required to pay all travel, hotel and meal expenses associated with that representative's visit plus an additional training fee which is described in the Manual.

(h)     Recruit, screen, test, interview, hire, train, assign and supervise Temporary Employees and full-time placement applicants on behalf of Company, and in conformity with the SPHERION System, and do so in full compliance with all laws including equal employment opportunity laws and any affirmative action program of Company.  Franchisee shall acquire and provide any safety or other training programs or materials, and all employee testing materials or equipment and personal protective garments or equipment deemed necessary by Company or required by law for the Temporary Employees with respect to their activities under this Agreement.

(i)     Furnish the services set forth in **Schedule 2** to this Agreement in conformity with the procedures and systems of Company.  Franchisee shall not, without the prior written consent of Company, provide full-time placement applicants or Temporary Employees to Franchisee or to any organization in which Franchisee, a member of Franchisee's family or any entity wholly or partly owned by Franchisee, has a financial interest greater than 10%, or to a Customer which is delinquent in payment of sums due to Company, provided that Company has notified Franchisee of such delinquency.  Franchisee shall not accept orders for or make assignments in the Prohibited Occupations listed in **Schedule 2** to this Agreement.

(j)     Recruit Temporary Employees and full-time placement applicants, and solicit Customers on behalf of Company in each Accounting Period through the use of local advertising.  Local advertising expenditures, which shall include, without limitation, local Customer and Temporary Employee and full-time placement applicant recruitment advertising in various media, direct mail, appropriate Yellow Pages or similar advertising within and with respect to the Area and the production and distribution of recruitment and retention brochures and other collateral materials, shall be the sole responsibility of Franchisee.   Local advertising may be produced or purchased by Franchisee from Company or from Franchisee's own sources, provided that all local advertising and related materials not purchased from Company shall first be approved in writing by Company and shall conform in theme, design and content to the advertising utilized by Company.

(k)     Obtain, and maintain throughout the Term of this Agreement and any extensions or renewals hereof, all licenses and permits which are necessary or appropriate to the operation of the Franchised Business.  Such licenses and permits shall be obtained, where permissible and required by Company, in the joint names of Company and Franchisee, and all Franchisee's interest, rights and benefits thereunder shall be assigned to Company, at its option and where permissible by law, upon expiration or termination of this Agreement for any reason, except as

otherwise provided herein.

(l)     Follow all directives of the Company in connection with the use and display of the Marks.   Utilize in connection with the Franchised Business, only such business forms, advertising, brochures, promotional materials and similar materials that conform to the design and specifications of Company and that are either purchased from or approved in advance by Company as consistent with the SPHERION System.

(m)    Maintain an accounting and payroll system for the Franchised Business in accordance with Company's systems and procedures, and within ten (10) days following the end of each Accounting Period provide Company with sufficient information, in a form acceptable to Company, to enable Company to prepare monthly profit and loss statements for the Franchised Business.   The completeness and accuracy of such statements shall be solely dependent on the information supplied by Franchisee, and Company shall have no duty to independently obtain or investigate any such information or verify the statements prepared by it.   Company or its duly appointed representatives shall have the right to inspect and observe the operation of the Franchised Business and Franchisee's business premises and to inspect, audit and make copies of any and all books and records of Franchisee, as well as all supporting data related to the Franchised Business, at all reasonable times.

(n)     Supply such information as Company deems necessary to enable Company to prepare and maintain accurate mailing lists of current and prospective Customers, full-time placement applicants and Temporary Employees, and reimburse Company for the production and postage expense incurred by Company for any direct mailings to such lists as may be deemed reasonable and necessary by Company from time to time.

(o)     Maintain at all times such financial resources as Company in its business judgment shall deem necessary and proper to fulfill the obligations and responsibilities set forth in this Agreement.   Franchisee shall pay in a timely manner all bills and expenses of the Franchised Business, and shall pay all invoices for services and supplies purchased from Company, and other amounts due Company, on or before the tenth (10th) day of the month following the date of invoice.   Company shall have the absolute right, at any time, to deduct amounts due Company by Franchisee from Franchisee's monthly commission, including amounts due Company under any other franchise, license, or other agreement between Franchisee and Company or any affiliate of Franchisee. Franchisee further agrees to pay on behalf of and as directed by Company, all instant payments to Temporary Employees and to promptly report and account for such instant payments to Company.   Company agrees to reimburse Franchisee for instant payments made to Temporary Employees on the commission statement for the Accounting Period in which it receives appropriate instant pay information from Franchisee.

(p)     Keep and maintain in a confidential manner, or as otherwise directed by Company, without allowing any copies of same to be made, the Manuals, periodic newsletters, memoranda, correspondence, Customer lists and

requirements, Temporary Employee and full-time placement applicant lists, records and files, personnel records, mailing lists, financial information, computer software and similar trade secrets or confidential information, all of which are, and shall remain, the sole and exclusive property of Company.

(q)     Purchase and continuously maintain at Franchisee's expense the insurance coverage listed below, insuring Franchisee (and, when requested, naming Company as an additional insured for liability arising out of the operations of the Franchised Business with thirty-day notice of cancellation or material change), and furnish to Company a copy of each policy, required endorsements and loss runs (information on all claims or losses) as may reasonably be requested by Company:

(1)     WORKERS' COMPENSATION, including Employers Liability with a minimum limit of Five Hundred Thousand Dollars ($500,000).  A waiver of subrogation endorsement must be attached in favor of the Company;

(2)     COMMERCIAL/COMPREHENSIVE GENERAL LIABILITY ("CGL"), minimum limits of One Million Dollars ($1,000,000) including the following coverage:

-       Broad form Comprehensive General Liability
-
        A waiver of subrogation endorsement must be attached in favor of the Company and the Company must be named as an additional insured for liability arising out of the operations of the Franchised Business;

(3)     AUTOMOBILE LIABILITY, minimum limits of One Million Dollars ($1,000,000and includes:

-       Hired/Non-owned Automobiles
-       Owned Automobiles
        A Motor Vehicle Record needs to be obtained for all drivers;

-       A waiver of subrogation endorsement must be attached in favor of the Company and the Company needs to be named as an additional insured for liability arising out of the operations of the Franchised Business;

(4)     UMBRELLA LIABILITY, a minimum limit of One Million Dollars ($1,000,000) excess of the primary One Million Dollars ($1,000,000) limited required of CGL and Automobile Liability;

(5)     EMPLOYEE DISHONESTY COVERAGE OR FIDELITY BOND (deductible not to exceed Twenty-Five Hundred Dollars ($2,500) without prior written consent of Company) with a minimum limit of One Hundred Thousand Dollars ($100,000); and

(6)     EMPLOYMENT AGENCY ERRORS & OMISSIONS with a minimum limit of One Million Dollars ($1,000,000).  E & O Insurance cannot include

staffing exclusions for placement of employees.

The obligation of franchisee to maintain insurance is separate and distinct from its obligation to indemnify Company under the provisions of Section 19 ("Indemnification") of this Agreement. Nothing contained herein shall be, or be construed to be, an assumption of an obligation by Company to provide any insurance coverage for Franchisee, and the obligation shall be on Franchisee at all times to determine its needs with respect to any insurance coverage necessary or desirable for the Franchised Business. In the event Company makes available to Franchisee any of the foregoing or any other insurance coverage under either separate or master policies, such an undertaking by Company shall not be construed to be a continuing obligation of Company, and Company may at any time, with prior written notice to Franchisee, cancel or not renew any such insurance coverage, in which case Franchisee shall remain obligated to secure and maintain all such insurance coverage.

(r)     Forward, without delay, a copy of any incident report, claim for workers' compensation or unemployment compensation by a Temporary Employee, summons, subpoena, process or notice in which Company or any Temporary Employee is named or involved, to the appropriate insurance services vendor or the Company's Law Department at its principal place of business, in accordance with applicable Company policy and procedures, and to cooperate with Company, its attorneys and/or insurers as requested in relation thereto. Franchisee shall be solely responsible for the defense of any claim, suit or action brought against Franchisee or its employee(s), and for the payment of any and all attorney's fees, costs, judgments, fines or penalties rendered or assessed against Franchisee or its employees, and Company shall have no obligation in connection therewith.

(s)     Conduct the Franchised Business in accordance with all applicable laws, statutes, rules and regulations. Without limiting the generality of the foregoing, Franchisee shall comply with Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Equal Pay Act, the Americans with Disabilities Act, and the Immigration Reform and Control Act, as such laws now exist or are hereafter amended, in the operation of the Franchised Business.

(t)     Attain or surpass the Gross Profit Quota for each Fiscal Year, as set forth in **Schedule 3** to this Agreement, and for each Fiscal Year in which Franchisee fails for any reason to attain the Gross Profit Quota for such year, pay to Company an amount equal to the Company's percentage of the Gross Profit Quota for such year calculated in accordance with paragraph 12(a) hereof, less the Company's percentage of the actual Gross Profit for such year calculated in the same way. Company shall notify Franchisee in writing within sixty (60) days after the end of any Fiscal Year in which Franchisee fails to attain that year's Gross Profit Quota, and such notice shall specify the Gross Profit Quota, the Gross Profit attained by Franchisee, and the amount payable by Franchisee to Company for failure to meet its Gross Profit Quota, calculated pursuant to this Section. If Franchisee fails to pay the amount required by this Section within thirty (30) days of receiving such written notice thereof from Company, Franchisee shall be in default under this Agreement.

(u)     Provide to Company at its principal place of business , or at such other location as directed by Company, by method of delivery specified by Company, on or before the Monday next succeeding the week to that which such information pertains (or such other day and time as may be required by the payroll policies and procedures of the Company), in the form or formats required by Company, detailed information relating to the placement of full-time placement applicants and complete and accurate weekly payroll and billing information for Temporary Employees furnished to Customers.  Franchisee shall take all action necessary to install and utilize the electronic data processing services and equipment when permitted or required by Section 8 of this Agreement.  Additionally, Franchisee shall prepare, maintain and timely provide to Company all such records and reports as Company may require including, but not limited to, a business plan, records and reports on Sales, promotional activity, marketing, business development, employee census data, and copies of Franchisee's or, if Franchisee is an entity, the Entity's federal income tax and payroll tax returns, as well as monthly, quarterly and annual financial statements including balance sheet and profit and loss statement.

(v)     Assume full responsibility for the collection of unpaid Customer accounts and the financial loss resulting from nonpayment.  Customer accounts are owned by Company and any payments made by Customers shall be promptly remitted to Company.

(w)     Promptly file appropriate responses and, when requested by Company, defend on behalf of Company all claims for unemployment compensation in accordance with the policies, procedures and systems of Company.  Assist and cooperate with Company in the defense of any workers' compensation claim, general liability claim, professional/fidelity liability claim, auto claim, employment practices liability claim or other claim or suit by a Temporary Employee or by a Customer with respect to the acts, errors or omissions of a Temporary Employee or others and pay or be charged such deductible amounts and other amounts as are currently required under the Company's policies and procedures regarding worker's compensation, general liability, professional/fidelity liability, auto liability, employment practices liability, and other liabilities all as set forth from time to time in the Manuals and in other communications, including email communications, from Company to Franchisee, as well as to undertake such action and pay or be charged such amounts as are required under Section 19 (Indemnification) of this Agreement.

(x)     Abide by all applicable laws pertaining to the privacy of customer, employee, and transactional information ("Privacy Laws").  Additionally,

        (1)     Franchisee will comply with Company standards and policies pertaining to Privacy Laws.  If there is a conflict between Company standards and policies pertaining to Privacy Laws and actual applicable law, Franchisee will:

                (i)     comply with the requirements of applicable law;

                (ii)    immediately give Company written notice of said conflict; and

(iii)    promptly and fully cooperate with Company and Company's counsel in determining the most effective way, if any, to meet Company's standards and policies pertaining to Privacy Laws within the bounds of applicable law.

8.    **Payroll/Billing and Management Information Services and Fees.**

(a)    Based on payroll and billing information provided to Company by Franchisee, Company shall prepare and mail all weekly invoices and periodic statements to Customers, all weekly payroll to Temporary Employees, all required payroll tax returns and insurance contribution reports, shall prepare and provide Franchisee with Franchisee's monthly commission statement, and shall make available periodic copies of confidential Customer, full-time placement applicant and Temporary Employee lists, and any sales or management information reports deemed appropriate by Company (all of which are hereinafter referred to for convenience as "**Management Information Services**"). The Management Information Services and Technology Enhancement Fee ("**MISTEF**") payable by Franchisee as described below shall cover payroll and billing services described above, appropriate and applicable forms and supplies as determined by Company, line charges, and postage for invoices and payroll mailed or delivered by Company. Franchisee shall pay the costs of next day delivery of input data to Company, and any travel costs incurred to attend required training programs for using any on-line electronic data processing services. Franchisee shall pay for software, equipment and the updating of software and equipment as set forth below.

(b)    On-line electronic data processing services shall commence at the time of the opening of Franchisee's office.

(c)    The MISTEF shall equal 1.5% of the total gross payroll for Temporary Employees plus 1.5% of Full-Time Placement Sales in each Accounting Period, commencing with the opening of Franchisee's office.

The applicable MISTEF shall be paid to Company monthly for each Accounting Period during the Term of this Agreement and any renewals or extensions thereof. The MISTEF shall not be included in the computation of Gross Profits. Company may deduct the MISTEF from Franchisee's monthly commission, but such right shall not limit Franchisee's liability for the MISTEF if no such deduction is made, or if the MISTEF exceeds the amount of Franchisee's monthly commission.

**9.    Required Hardware and Software.**

(a)     Franchisee has been granted a license for use of the Company's proprietary software components of the Computer System pursuant to the terms and conditions of this Franchise Agreement. Franchisee shall also license any 3rd party software components of the Computer System as specified by Company. Franchisee shall pay Company a Computer System Support Fee of $200 per site per Accounting Period. Company shall provide maintenance and support of all the software components of the Computer System as follows:   user support services by telephone through a Customer Care Center as determined by the Company, and improvements, enhancements, modifications and updates to the software which are routinely deployed as part of the Company's Computer System.

(b)     Company will loan to Franchisee for the Term of this Agreement the router and switch necessary to connect to the Company's network. Franchisee shall purchase the hardware, equipment and other connectivity components of the Computer System as specified by Company and shall, at Franchisee's expense, install, maintain, upgrade and augment such hardware and equipment during the Term hereof as deemed necessary by the Company. Franchisee shall, at Franchisee's expense, do all things necessary to install and commence use of improvements, enhancements, modifications and updates to the Computer System software and the router and switch provided by the Company. Without limiting the foregoing, Franchisee will implement and periodically make upgrades and other changes to the Computer System and Required Software as Company may reasonably request in writing (collectively, "Computer Upgrades"). Franchisee will comply with all specifications issued by Company with respect to the Computer System and all required software, and with respect to Computer Upgrades.   Franchisee will also afford Company unimpeded access to Franchisee's Computer System and Required Software as Company may request, in the manner, form, and at the times requested by Company.

(c)     Company shall initially install and configure, at Franchisee's expense, the Computer System hardware and software at Franchisee's office location. Franchisee shall provide the network cabling and a suitable operating environment for the Computer System as uniformly specified by Company with respect to utilities, temperature, cabling, hardware and Internet access. Franchisee shall be responsible to convert any of its pre-existing files, databases and other information to be used with the Computer System.

(d)     Company shall provide Franchisee with Company's approved applicant testing application.  Franchisee shall maintain, upgrade and augment such software as deemed necessary by Company, and shall reimburse Company for any fees associated with such application.

(e)     Franchisee acknowledges and agrees that changes to technology are dynamic and not predictable within the term of this Agreement.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, Franchisee agrees that Company will have the right to establish, in writing, reasonable new standards for the implementation of technology in the System;

Spherion FA 4-15

and Franchisee agrees that Franchisee will abide by those reasonable new standards established by Company as if this sub-section (e) were periodically revised by Company for that purpose.

## 10.   **Brand Awareness Program and Fee.**

From time to time, Company, in its sole discretion, may engage in brand awareness advertising and similar advertising and promotional activities (which may include local media) to promote the services provided pursuant to the SPHERION System.  Franchisee agrees to pay Company monthly as a deduction from Franchisee's commission, or directly, if required by Company, an amount equal to .25% of Sales, as Franchisee's contribution to the cost of such brand awareness advertising and similar advertising and promotional activities ("Brand Awareness") Company shall match the contributions by Franchisee for national advertising, by spending for Brand Awareness costs an amount equal to that contributed by Franchisee.  Any amounts allocated or spent for Brand Awareness by or on behalf of Company's or its affiliates' branch offices shall be credited against Company's obligation to match Franchisee's contribution as set forth herein.  The funds contributed by Franchisee and Company may be commingled by Company, and may be used to purchase, rent or otherwise acquire media space or time for such advertising, or for production costs, or for branded promotional products and materials, contests, internet advertising, "marketing matches"  and other related advertising and promotional activities as may be determined by Company in its discretion, provided, however, that Company will not use the Brand Awareness monies for advertising that is principally a solicitation for the sale of franchises.  Company shall have complete and absolute discretion in when and whether to conduct, and in the planning and development of, Brand Awareness campaigns and other efforts and in the expenditure of all Brand Awareness funds, including those contributed by Franchisee.  Company may, in its sole discretion upon written notice to Franchisee, discontinue its Brand Awareness program and the Brand Awareness fee required by this Section, upon written notice to Franchisee.

## 11.   **Initial Franchise Fee.**

Franchisee shall pay to Company upon execution of this Agreement, as a nonrefundable initial franchise fee, the sum of twenty-five thousand dollars ($25,000).

## 12.   **Franchisee Commission.**

Commissions are paid to Franchisee as set forth in this Section 12.

(a)   <u>Temporary Sales</u>.  During the Term of this Agreement, for Temporary Sales Franchisee shall be paid a commission of 75% of Temporary Gross Profits and Company shall retain 25% of Temporary Gross Profits.

If the Franchisee's Temporary Sales are $3,000,000 or greater in a Fiscal Year and the Franchisee's average Gross Profit Percentage for the Fiscal Year exceeds the minimums set in the following chart, Franchisee shall be paid an additional commission amount ("Additional Commission") for Temporary Sales of either 1%, 2% or 3% of Temporary Gross Profit for that Fiscal Year depending on the average Gross Profit Percentage achieved.

Spherion FA 4-15 ᵐᵠΩℬⅈⅉℵ

| Gross Profit Percentage for the fiscal year | Additional Commission |
|---|---|
| If average Gross Profit Percentage for the Fiscal Year is equal to or greater than 20%; | 1% |
| If average Gross Profit Percentage for the Fiscal Year is equal to or greater than 21%; or | 2% |
| If average Gross Profit Percentage for the Fiscal Year is equal to or greater than 22% | 3% |

"Gross Profit Percentage" means the percent or fraction determined by dividing the Temporary Gross Profit by the Temporary Sales.

The Additional Commission will be paid with the Franchisee's December commission payment for the applicable Fiscal Year in accordance with Section 12(f) of this Agreement.

(b)   Full Time Placement.  Franchisee shall receive and retain, as its commission from Full-Time Placement services, eighty-eight percent (88%) of Full-Time Placement Sales in each Fiscal Year.  Company shall receive and retain as its compensation from Full-Time Placement services twelve percent (12%) of Full Time Placement Sales in each Fiscal Year.

(c)   Commission Statement.   Within thirty days following the last day of each Accounting Period, Company shall prepare and submit to Franchisee a franchisee commission statement setting forth, for the Area and the respective Accounting Period:  total Sales, appropriate adjustments to Sales (including, but not limited to, Customer guarantees, refunds, credits, correction of previous billing errors and discounts), Temporary Employee payroll, payroll taxes and all other Direct Costs, Gross Profit, Franchisee's commission and the deductions, additions and amounts payable to Company described in the following Subsections.

(d)   More than One Office.  If Franchisee operates more than one office under the terms of this Agreement, Commissions, the Gross Profit Percentage, and Cumulative Temporary Sales for the current Fiscal Year for the offices shall be consolidated and calculated as one office. If Franchisee has more than one Franchise Agreement with the Company, this Agreement stands on its own for the purposes of Commission calculations.

(e)   Company shall deduct from the aggregate gross commission payable to Franchisee:

(1)   an Accounts Receivable Funding Fee calculated by multiplying the accounts receivable over sixty (60) days from the date of the respective billing as of the end of each Accounting Period by one and one half (1½) percentage points over the Prime Rate quoted on the first business day of each Accounting Period in the Southeastern Edition of the Wall Street

Spherion FA 4-15 ᵐ⁽ᵠ⁾Ω⁰⁰⁰ᵡ

Journal with the result multiplied by 30/365. The Accounts Receivable Funding Fee will be charged and deducted for an entire Accounting Period notwithstanding that an account becomes more than sixty (60) days old on or before the last day of the Accounting Period, until the account receivable is deducted pursuant to Subsections (e)(2), (e)(3) or (e)(4) below;

(2)     the amount of previous billings (both Temporary Sales and Full-Time Placement sales) to a Customer that are determined to be uncollectible by Company prior to two hundred and seventy (270) days from the date of such billing (a bankruptcy or equivalent proceeding filed by or against a Customer shall cause all previous billings to that Customer to be automatically deemed uncollectible);

(3)     the amount of previous billings to a Customer which remain uncollected two hundred and seventy (270) days from the date of such billings, regardless of any agreement or evidence as to ultimate collectibility;

(4)     the amount by which any Customer account receivable over ninety (90) days exceeds the credit limit established pursuant to Company procedures for such Customer by either twenty-five percent (25%) or fifty thousand dollars ($50,000). This deduction from Franchisee's commission shall be made thirty (30) days after Company provides Franchisee with written notice of the amount to the deducted, unless the Customer account receivable is reduced to within the approved credit limit, or the credit limit is increased by Company prior to the deduction;

(5)     any Temporary Employee wages or other monies paid by Company which are subsequently determined to have been based on forged, fraudulent, erroneous or improper time slips or other authorizations;

(6)     the Management Information Services and Technology Enhancement Fee required by Section 8 of this Agreement;

(7)     the Brand Awareness Fee required by Section 10 of this Agreement;

(8)     all amounts due Company for materials and services purchased by Franchisee from Company or its affiliates; and

(9)     any other sums properly due to Company or its affiliates from Franchisee.

The amount of Franchisee's gross commission shall be increased by an amount equal to one hundred percent (100%) of the net recovery of any amounts previously deducted from Franchisee's commission by reason of Subsections (e)(2), (e)(3), (e)(4) or (e)(5) above.

(f)     Payment of Commissions. Franchisee's commission, net of the adjustments and deductions described in this Section, shall be paid monthly, within thirty (30) days following the end of each Accounting Period. If the net commission for any Accounting Period is less than zero (i.e., an amount due Company), such amount shall be paid by Franchisee to Company within thirty (30) days of receipt of the applicable commission statement, and if such amount remains unpaid, it may be

deducted from subsequent commission statements, or collected directly from Franchisee.

**13.** **Term; Renewal.**

    (a)    Subject to the provisions of this Agreement, and Franchisee's complete and continuing performance of all of its covenants and obligations hereunder, this Agreement shall remain in force and effect for an initial term of ten (10) years (the "**Term**") from the Effective Date.

    (b)    In the event Franchisee's right to operate the Franchised Business shall be in full force and effect upon the expiration of the initial or any renewal term of this Agreement, and provided Franchisee has not been in default under this Agreement (or, as applicable, a renewal Agreement) during the final year of such Term, Company, in its sole discretion, shall either:

        (1)    renew Franchisee's right to operate the Franchised Business for an additional renewal term of five (5) years; or

        (2)    exercise the nonrenewal right described in Section 16 of this Agreement.

    (c)    Company shall provide written notice to Franchisee of its decision to renew or not renew Franchisee's right to operate the Franchised Business at least one hundred and twenty (120) days prior to the expiration of the Term of this Agreement.  If Company's written notice is to renew Franchisee's right to operate the Franchised Business, Franchisee shall provide Company with its written acceptance of such renewal on or before sixty (60) days prior to the expiration of the term sought to be renewed.

    (d)    Any extension or renewal of the right to operate the Franchised Business shall be under the terms and conditions of the franchise agreement being utilized by Company for renewals on the date of such extension or renewal, which terms and conditions may include, but not be limited to, revised nonrenewal provisions, franchisee commissions, financing surcharges, fees for management information services or Brand Awareness, new gross profit or sales quotas, and other material revisions, additions or deletions, and it shall be a condition of renewal that Franchisee shall execute such new Franchise Agreement prior to the expiration of the Term sought to be renewed and, finally, it shall be a further condition of renewal that Franchisee execute, in a form satisfactory to Company, a general release of Company, its parents, subsidiaries and affiliates and their respective officers, directors, members, shareholders, agents, heirs, successors, representatives and employees.

**14.** **Assignment.**

    (a)    Company's rights under this Agreement shall inure to the benefit of its successors and assigns, and Company may assign this Agreement at its option, without the consent of Franchisee, provided that the assignee agrees to assume all of Company's obligations under this Agreement.

    (b)    Except as provided in Section 2(b) hereof, neither Franchisee nor any Owner

shall directly or indirectly sell, assign, sublicense, grant a security interest in or otherwise transfer this Agreement, the Franchised Business, any shares or other interest in the Entity, or any right or interest granted herein, or suffer or permit any such sale, assignment, sublicense, attachment of a security interest or other transfer to occur by operation of law or otherwise, without the prior written consent of Company.   Franchisee shall, however, have the right to sell Franchisee's entire interest under this Agreement and the Franchised Business, provided that Franchisee and the proposed purchaser have entered into a binding purchase agreement containing all of the terms and conditions applicable to such purchase prior to the date of exercise of Company's nonrenewal right described in Section 16, and provided further that Company shall thereafter have granted written approval of such purchaser and shall have waived its first right of refusal with respect to such purchase.   Immediately upon execution of such purchase agreement, Franchisee shall deliver to Company an executed copy of such purchase agreement, accompanied by a certified or cashier's check from the proposed purchaser payable to Company in the amount of Ten Thousand Dollars ($10,000).  Company shall have sixty (60) days from its receipt of such purchase agreement to, in its sole discretion, either approve or disapprove the proposed purchaser or notify Franchisee in writing of Company's exercise of its first right of refusal to become the purchaser.  If Company fails to take any of such actions within such sixty-day period, it shall be deemed to have waived its first right of refusal and to have approved the proposed purchaser, in which case the proposed purchase may be completed, but only pursuant to the terms and conditions of the purchase agreement delivered to Company.  If Company timely disapproves of the proposed purchaser the purchase shall not be completed.  If Company shall timely exercise its first right of refusal, it shall complete a closing of the purchase on the closing date set forth in the purchase agreement submitted to Company which shall be no less than sixty (60) days after Franchisee's receipt of Company's notice of exercise of its first right of refusal.  If Company approves, or is deemed to have approved the proposed purchaser, it shall retain the Ten  Thousand Dollars ($10,000) deposited by the proposed purchaser with Company as a nonrefundable franchise transfer fee, in lieu of the initial franchise fee required by Section 11 hereof and Franchisee shall pay its transfer fee to Company upon sale of the Franchised Business.  If Company disapproves the proposed purchaser or timely exercises its first right of refusal, it shall immediately return to the proposed purchaser the Ten Thousand Dollars ($10,000) deposited with Company pursuant to this Subsection.  If Company approves, or is deemed to have approved the proposed purchaser, Company shall have the right to require that the purchaser operate under the terms and conditions of the franchise agreement being utilized by Company on the date of the purchase, which terms and conditions may include, but not be limited to, revised nonrenewal provisions, franchisee commissions, financing surcharges, fees for management information services or Brand Awareness, new gross profit or sales quotas, and other material revisions, additions or deletions, and it shall be a condition of the purchase that the purchaser shall execute such new Franchise Agreement at the time of the purchase, such Franchise Agreement may, in Franchisor's discretion, reflect (i) the remaining Term under the selling Franchisee's Franchise Agreement or (ii) may reflect an initial ten year Term or (iii) may reflect a renewal five year term and it shall be a further condition of the purchase that both the selling Franchisee and the purchaser execute, in a form

satisfactory to Company, a general release of Company, its parents, subsidiaries and affiliates and their respective officers, directors, members, shareholders, agents, heirs, successors, representatives and employees.

(c)     Company's approval of a proposed purchaser shall not be unreasonably withheld, but may require the prior satisfaction of certain conditions determined solely within Company's discretion, which conditions may include but shall not be limited to the following:

(1)     the proposed purchaser must pay to a current status any outstanding obligation of Franchisee to Company, and must guarantee payment in full of all obligations of Franchisee arising out of the operation of the Franchised Business, to all other known creditors of the Franchised Business;

(2)     Franchisee must confirm to Company in a sworn statement, in a form acceptable to Company, that Franchisee has thoroughly informed the proposed purchaser of all relevant information regarding the income and expenses of Franchisee's operation, creditworthiness of clients, the current status of workers' compensation claims, and necessary technology upgrades and the costs thereof and similar material information;

(3)     the proposed purchaser must meet or exceed all requirements then required by Company of new franchisees, including but not limited to requirements with respect to the availability of sufficient capital, business experience, character, financial and managerial capability, and the absence of or limitations on other employment or business interests;

(4)     the proposed purchaser must complete and forward to Company the then-current franchisee application documents, and the proposed purchaser must provide Company with its federal and state tax returns for the past two (2) years;

(5)     the proposed purchaser must agree to participate in such training as is then required by Company of its new franchisees;

(6)     the proposed purchaser must not own, engage in, be employed by, or be a supplier or provider of services to a business which in Company's sole judgment is or may be competitive to or otherwise in conflict with the business of Company (including, but not limited to, those services franchised under this Agreement);

(7)     the proposed purchaser must agree to execute Company's then-current Franchise Agreement for the remaining Term of this Agreement, and such other documents of assumption of Franchisee's obligations related to the Franchised Business as shall be reasonably required by Company;

(8)     the proposed purchaser (or, if a corporation or limited liability company, its representatives) shall personally meet with representatives of Company at Company's principal place of business within fifteen (15)

days of entering into a purchase agreement with Franchisee and prior to the closing of any such purchase;

(9)     a copy of all documents for the sale, assignment or transfer shall be submitted to Company for Company's prior approval;

(10)    the new individual franchisee must reside in the Area and must agree to devote full time to the operation of the franchised business, unless otherwise consented to by Company.

(11)    the proposed transaction must, in Company's judgment, provide the proposed purchaser with an economically viable opportunity; provided, however that no such judgment on Company's part shall be deemed to be a representation upon which the proposed purchaser is intended to rely

(d)     If Franchisee is an Entity, Franchisee shall not, without the prior written consent of Company, issue any capital stock or securities of the Entity.

(e)     An Owner shall not, without the prior written consent of Company, transfer any stock or interest in the Entity.

(f)     Company's prior written consent required under Subsections (d) and (e) above shall be at Company's sole discretion and business judgment and the conditions of Company's consent shall, at a minimum, include:

(1)     Franchisee shall not be in default under this Agreement; and

(2)     Franchisee shall obtain Company's approval of each proposed Owner and each Owner must submit to Company all information required by Company's then-current approval process, including a personal interview at Company's principal place of business or the headquarters of the Franchise/License Division of the Company (at no expense to Company), as the case may be.

(g)     If Franchisee is an Entity, a change in voting control (by whatever means) of the Entity shall be considered a sale of Franchisee's entire interest in this Agreement and the Franchised Business and shall be subject to the provisions of Sections 14(b) and (c) above relating to that event.

## 15.   **Disposition of the Franchised Business.**

(a)     In the event that Franchisee elects to terminate this Agreement at any time after the initial Term pursuant to Subsection 17(a) hereof, Franchisee shall notify Company in writing at least one hundred and eighty (180) days prior to the proposed effective date of termination that:

(1)     Franchisee will, on the effective date of termination, discontinue its operation of the Franchised Business, and thereafter faithfully honor and abide by each of the terms and conditions set forth in Sections 5 and 18 of this Agreement; or

Spherion FA 4-15 ᵐᵠΩ₪₪ᵩᵻ

(2)     Company can exercise its option pursuant to Subsection 15(c) below.

(b)     If Franchisee notifies Company that Franchisee will discontinue its operation of the Franchised Business pursuant to Subsection 15(a)(1) above, then Franchisee shall, on the effective date of termination, discontinue its operation of the Franchised Business, and thereafter faithfully honor and abide by each of the terms and conditions set forth in Sections 5 and 18 of this Agreement.  Should Franchisee fail to comply with the provisions of this Subsection 15(b), Franchisor shall be entitled to either (i) pursue its rights at law and in equity for Franchisee's breach of contract which rights shall include, but not be limited to, all damages plus the right to require that Franchisee immediately discontinue its operation of the Franchised Business, and thereafter faithfully honor and abide by each of the terms and conditions set forth in Sections 5 and 18 of this Agreement, or (b) require that Franchisee pay to Company upon demand, as liquidated damages and not as a penalty, an amount equal to eight (8) times the Sales of the Franchised Business for the twelve (12) full Accounting Periods immediately preceding the date of expiration, or the effective date of termination, as applicable, of this Agreement multiplied by 9.5%.

(c)     The provisions of this Subsection 15(c) shall only be applicable in the event that Franchisee timely notifies Company, pursuant to Subsection 15(a)(2) above, that Company can exercise its option pursuant to this Subsection 15(c).  If Franchisee so notifies Company, then Company shall have the option, exercisable in its sole discretion, at any time after the thirtieth (30th) day from Company's receipt of such notice through the one hundred and eightieth (180th) day from Company's receipt of such notice, and specifically not subject to reversal by Franchisee, to either:

(1)     waive the provisions of Subsections 5(a)(1), (3) and (5), and 18(c), (d) and (e) of this Agreement, and consent to the continuation of the Franchised Business by Franchisee (subject to the remaining provisions of Sections 5 and 18 of this Agreement), in consideration of the payment to Company by Franchisee of an amount equal to four (4) times the Sales of the Franchised Business for the twelve (12) full Accounting Periods immediately preceding the date of expiration, or the effective date of termination, of this Agreement multiplied by 6.5% with a minimum purchase price and payment to Company of Seventy Five Thousand ($75,000 dollars).  The payment provided for herein shall be paid in four (4) equal annual payments, plus interest at a rate equal to the Prime Rate plus one percent (1%), and shall be secured by a pledge of Franchisee's trade receivables which grants a first lien to Company, and by the personal guarantee of Owners.   In connection with this option, exercisable only by Company, Franchisee shall execute such documents of purchase as are required by Company including but not limited to an asset purchase agreement, promissory note, security agreement and personal guarantee all in a form acceptable to the Company's attorney, in such attorney's discretion.  Such documents of purchase shall permit the Company to take all steps that it deems necessary to secure payment, including but not limited to the optional requirement that Customers continue to make payments directly to the Company until the purchase

price has been fully paid; without limiting the foregoing and for the purpose of removing doubt, upon the termination described in this subsection (c) (1) the continuation of the former Franchised Business shall be on a basis by which the former Franchisee will not be permitted to use any of the Marks licensed under this Agreement, the former Franchisee will no longer have any right of access to the Spherion system or to the computer systems associated therewith, the former Franchisee will have the right to contact any Temporary Employees placed with any Customer by former Franchisee in the operation of the Franchised Business over the previous three (3) years and any Customer for whom the former Franchisee placed Temporary Employees over the previous three (3) years, (except for National Accounts and Strategic Accounts as described below) provided, however that Company shall not be obligated to provide to the former Franchisee information greater than basic contact information regarding these persons and entities and provided further that any and all rights of the former Franchisee with respect to the Area shall terminate upon the termination of the Franchise Agreement, and provided finally that Company shall be free to redirect and service all National Accounts and Strategic Accounts in the manner which Company chooses, those receivables which are due and owing as of the effective date of the transaction shall be collected and split between Franchisee and Company in accordance with the provisions of the Franchise Agreement, and except as specifically described above, the former Franchisee shall remain fully subject to the remaining provisions of Sections 5 and 18 of this Agreement; or

(2)     purchase the Franchised Business from Franchisee at a purchase price equal to the lesser of either the Gross Profit of the Franchised Business for the six (6) full Accounting Periods immediately preceding the date of expiration or the effective date of termination of this Agreement, or fifty percent (50%) of the Gross Profit of the Franchised Business for the twelve (12) Accounting Periods immediately preceding the date of expiration or the effective date of termination of this Agreement. The assets of the Franchised Business which shall be transferred in such a transaction shall include all tangible and intangible assets of the Franchised Business, excluding only cash and accounts and notes receivable. Company shall assume no liabilities of the Franchised Business and all assets transferred shall be free from any and all liens or defects of title. Company may deduct from the purchase price any amounts owed to Company by Franchisee, and may deduct from the purchase price, and pay directly to creditors, any amounts necessary to satisfy any outstanding liens on the assets to be transferred. The purchase price shall be payable in eight (8) equal quarterly payments, plus interest at a rate equal to the Prime Rate plus one percent (1%). In the event Company elects the option set forth in this Subsection 15(c)(2), then each of the provisions of Sections 5, 18, and 19 of this Agreement shall remain in full force and effect for the longer of the period set forth therein, or the period during which the purchase price is payable.

(d)     Upon the exercise of either of the options set forth in Subsections 15(c)(1) or (2)

above, the parties shall execute and deliver such additional instruments of assignment and transfer, which shall include a general release by Franchisee of the Company, its parents, subsidiaries and affiliates and their respective officers, directors, members, shareholders, agents, heirs, successors, representatives and employees with respect to all actions, activities, omissions and other matters for the period prior to the exercise of the option and the parties shall take such other actions as may be reasonably requested in order to carry out the intent of the parties as set forth herein.

(e)     As used in this Section 15 and in Section 16:

**"Prime Rate"** means the prime rate of interest quoted in the Wall Street Journal (Southeastern Edition) on the first day of the month in which this Agreement is allowed to expire without renewal by Franchisee, or is terminated by Franchisee pursuant to Subsections 17 (a) or 17(c) hereof.

## 16.   <u>Nonrenewal Right of Company</u>.

Effective as of the expiration of any initial or renewal term of this Agreement and notwithstanding any renewal notice or intent to renew by Franchisee, Company shall have the right not to renew this Agreement for a payment equal to the lesser of:

(a)     the Gross Profit of Franchisee's operation for the six full Accounting Periods immediately preceding the date on which Company notifies Franchisee of its intention to not renew this Agreement; or

(b)     50% of the Gross Profit of Franchisee's operation for the twelve full Accounting Periods immediately preceding the date on which Company notifies Franchisee of its intention to not renew this Agreement.

Notification of Company's intent not to renew this Agreement as set forth above shall be provided to Franchisee in writing at least one hundred and twenty (120) days prior to the expiration of the Term of this Agreement. Closing shall be at the mutual convenience of Company and Franchisee, but in no event later than the expiration date of this Agreement. At the closing, the parties shall execute mutual releases with respect to any liability, duty or the performance of any covenant, condition or obligation under this Agreement, provided, however, that Company's release of Franchisee shall not include those covenants, conditions or obligations imposed upon Franchisee by Sections 5, 18, and 19 of this Agreement. The payment for nonrenewal is in part consideration for Franchisee's covenants and agreements in Sections 5, 18 and 19 of this Agreement and is expressly conditioned on Franchisee's compliance with those covenants and agreements. The payment for nonrenewal shall be made in eight (8) quarterly payments, plus interest at a rate equal to the Prime Rate plus one percent (1%). Company shall assume all ongoing liabilities relating to the operation of the franchised business commencing with the effective date of termination. Franchisee shall pay all liabilities which relate to the operation of the franchised business up to the effective date of termination, and Company shall be entitled to withhold any amounts due to Franchisee, pursuant to this Agreement or otherwise, pending receipt of proof of payment of all such liabilities. All commissions payable to Franchisee through the effective date of such termination (less any amounts properly due to Company from Franchisee) shall be paid in due course.

In the event Company exercises its right not to renew this Agreement as set forth

above, Franchisee agrees to abide by each of the terms and conditions set forth in Sections 5, 18 and 19.

## 17.   **Termination by Parties.**

Prior to the expiration of its Term, or any renewals or extensions thereof, and any other provisions of this Agreement to the contrary notwithstanding, this Agreement may only be terminated for the reasons stated and in the manner stated below:

(a)   By Franchisee without cause, but only during a renewal term and not during the initial Term of this Agreement, on the last day of the second full Accounting Period commencing after Company's receipt of Franchisee's written notice of Franchisee's intent to terminate this Agreement.  Any attempt by Franchisee to terminate this Agreement without cause other than pursuant to the provisions of this Subsection 17(a) or Subsection 17(c) shall constitute a breach of this Agreement.

(b)   By Company:

(1)   immediately upon Company's written notice to Franchisee of termination for any of the following causes:

(i)   if Franchisee becomes insolvent, or shall be declared, or files a petition to be declared, or if a petition is filed against Franchisee to be declared, bankrupt; or if Franchisee makes a general assignment for the benefit of creditors, or applies for or suffers the appointment of a receiver or trustee, and such receiver or trustee is not discharged within ten (10) days after the date of appointment; or

(ii)   if Franchisee or any Owner owning five percent (5%) or more of the Entity:  shall be convicted of a felony or any other criminal misconduct relevant to the operation of the Franchised Business; converts or embezzles funds of Company or others; in the sole judgment of Company allows his or her reputation for honesty, integrity, fair dealing or good moral character to become impaired through publicity or notoriety; allows the Franchised Business or office premises to be closed for a period of five (5) successive days or more; makes a willful material misrepresentation to Company, or fails to make a material disclosure to Company, as to matters involving or affecting the Franchised Business  or any person or organization related to the Franchised Business; competes with Franchisee or Company; or discloses to any person, firm or entity, without the prior written consent of Company, the confidential data, current or prospective Customer, full-time placement applicant or Temporary Employee lists, financial materials or other trade secrets furnished by and belonging to Company and used in connection with the Franchised Business;

(iii)   the occurrence of the third (3rd) default in payment pursuant to

Subsection 17(b)(3) or the third (3rd) breach or violation of the same or similar type pursuant to Subsection 17(b)(4) within any twelve (12) consecutive month period during the Term of this Agreement, without regard to any actual or proposed effort to cure such third (3rd) default, breach or violation.

(2)     immediately upon written notice from Company, upon a violation of any of the provisions of Section 14 of this Agreement relating to the sale or transfer of this Agreement, the Franchised Business, or any shares or other interest in any Entity formed by Franchisee for the operation of the Franchised Business;

(3)     on or after the tenth (10th) day following Company's written notice to Franchisee of termination for the failure on the part of Franchisee to pay any sums due and owing to Company, pursuant to this Agreement or any other agreement between Company and Franchisee, provided that Franchisee does not cure such violation by payment in full within such ten (10) day period.  Franchisee shall not be deemed to have cured a payment default if it incurs another payment default within the ten-day cure period;

(4)     on or after the thirtieth (30th) day following Company's written notice to Franchisee of termination for any breach or violation of this Agreement, or of any other agreement between Franchisee and Company, except as otherwise provided for herein, provided that Franchisee does not cure such breach or violation within such thirty (30) day period.  Franchisee shall not be deemed to have cured a default hereunder if it incurs another similar or different default within the thirty-day cure period;

(5)     on the last day of the second full Accounting Period following the date of death or the date of a physician's certification of the incapacity of Franchisee, or if this Agreement has been assigned to an Entity, the majority Owner of such Entity.  Incapacity on the part of Franchisee, or such majority Owner, for the purposes of this Agreement, shall be established upon the certification of a physician approved by Company that Franchisee, or such majority Owner, would be unable to participate actively in the operation of the business for a period of ninety (90) days or more.  Franchisee, or such majority Owner, agrees to notify Company should such party be unable to participate actively in the operation of the business for a period in excess of ten (10) days, and further agrees to be examined at Franchisee's expense within seven (7) days of such notification, by a physician approved by Company.  Company may exercise its option to terminate pursuant to this Subsection 17(c)(5) only if it pays Franchisee the payment described in Section 16.  If Company elects not to terminate this Agreement in the event of the death or incapacity of Franchisee or the majority Owner in the Entity, Franchisee, or the Personal Representative of Franchisee or the Owner may sell or assign its business and this Agreement, subject to full compliance with Section 14 of this Agreement; or

(6)    immediately upon receipt of written notice by Company determining that continuance, in whole or in part, of the Franchised Business in a normal, profitable manner is or will immediately become impaired for more than sixty (60) days because of union activity, legislative enactment (or regulations or interpretations relating thereto), or the actions of any civil or military authority, Act of God, war or civil disorder or similar circumstances.

(c)    By either Franchisee or Company:

(1)    on the last day of the second full Accounting Period commencing after Company's written notice to Franchisee that it has failed to achieve its Gross Profit Quota for any Fiscal Year, as set forth in **Schedule 3** to this Agreement, and Franchisee has failed to pay Company the amount due under Section 7(t);

(2)    immediately, if Company or Franchisee, after using their best efforts, are unable to obtain, maintain, or renew any license or permit required for the continuation of the Franchised Business described herein regardless of the cause or reason therefore, or in the event any insurance which Company deems necessary for the operation of the Franchised Business is no longer available with limits or at a price necessary for the Franchised Business to operate in a profitable manner.

Upon termination of this Agreement for any reason, Company shall be obligated to pay only the amounts due to Franchisee through the date of termination of this Agreement, which, less any amounts due to Company from Franchisee, shall be paid in due course.  Except as described in Section 15 or this Section 17, or where Company elects not to renew this Agreement and makes the payment described in Section 16 above, Company is not obligated to make any other payments to Franchisee upon, or as a result of, termination of this Agreement for any reason.  Upon any termination, Franchisee shall be obligated to pay all sums due to Company through the date of termination, to use Franchisee's best efforts to maintain the business up to the effective date of termination, to fully cooperate with Company in the transfer of Franchisee's interest to any successor, and to abide by each of the terms and conditions set forth in Section 18 below.

## 18.    **Rights and Obligations Upon Termination.**

Upon the expiration or termination of this Agreement for any reason, Franchisee's right to the use of the SPHERION System, the Manuals, publications, forms, equipment, plans, methods and procedures of Company together with the Marks, and any derivatives thereof, shall immediately cease, and upon such termination Franchisee shall immediately:

(a)    Cease and discontinue forever the use of the Marks and any other trade names, trademarks, service marks or slogans which were licensed to, furnished to or acquired by Franchisee pursuant to this Agreement, or otherwise, or which were developed or used by Franchisee in the operation of the Franchised Business. Franchisee shall cause any registration obtained by Franchisee of any such name, mark or slogan to be canceled, withdrawn or assigned to Company, as instructed by Company, and Franchisee agrees, upon written request by Company, to immediately execute any document necessary to assign or transfer

to Company or its successors or assigns the ownership of and right to use any such names, marks or slogans.

(b)    Cease using and thereafter not disclose to any person or entity, directly or indirectly, the details of any statistical data, marketing program, manual, form, technique, method, procedure or other confidential information or trade secret of Company whatsoever used by or made available to Franchisee in the course of the relationship contemplated herein.

(c)    Cease and forever discontinue the use of, and return freight prepaid to Company, all materials, writings and Company owned equipment provided by Company to Franchisee, or created by Franchisee in the operation of the Franchised Business, including but not limited to:  the Manuals; books, memoranda and instructions; Customer, full-time placement applicant and Temporary Employee lists, records and files; video and audio cassettes; computer software and documentation; operating forms; and all advertising or promotional materials and signs bearing any names, marks or slogans of Company.   Company shall reimburse Franchisee for any operating forms or supplies and advertising or promotional materials that conform to Company's standards and are in good condition and usable by Company or its other franchisees or licensees.   The price to be paid by Company shall be the Franchisee's cost of any such item, less ten percent (10%) and shipping costs, and Company shall have the right to credit the amount due for any such items against any amounts owed to Company by Franchisee.

(d)    Cease and abstain from using the telephone number(s) used in the operation of the Franchised Business, and, if so instructed by Company in writing at any time, and as Company determines:  either transfer and assign such telephone number(s) to Company or its designee for permanent future use, or cancel and withdraw from the use of such telephone number(s).  Franchisee shall, in addition, pay all amounts due any telephone company or telephone directory publisher for telephone service and equipment and for directory listings or advertisements up to the later of the date of termination of this Agreement or the expiration date for such services or equipment.

(e)    Assist Company in all necessary arrangements for the orderly transition of the Franchised Business, as requested by Company, and if so requested in writing by Company (which shall have no liability or obligation to do so), permit Company or its designee to place their employees upon the office premises of Franchisee for the purpose of continuing the operation of the Franchised Business for the benefit of Company or its designee.  If Company makes the election permitted by this Subsection, it shall be treated as an assignee of the lease(s) for Franchisee's office(s) and shall be liable for all amounts due under such lease(s) for periods commencing with the termination date of this Agreement, and in such event Franchisee agrees to execute and deliver any document necessary to effect such assignment.

(f)    Cease using and thereafter not disclose to any person or firm, directly or indirectly, the names or addresses of any Temporary Employees, full-time placement applicants or Customers; any details of any Customer relationship or

agreement between Company and any third party; the substance of any statistical data; marketing program; manual; form; technique; method; procedure or any other confidential information or trade secret of Company whatsoever that was used by or made available to Franchisee in the operation of the Franchised Business.

(g)     Not represent itself or allow itself to be identified as having been formerly or presently connected with Company, or its business operations.

(h)     Change its corporate name, if applicable, and execute and deliver appropriate documents evidencing such change, so that Franchisee's corporate name will thereafter no longer contain any of the Marks or any derivation thereof.

(i)     Pay to Company any and all money owing to Company by Franchisee, notwithstanding any contrary or inconsistent provision of this Agreement, any note, or any other document.

Franchisee hereby irrevocably constitutes and appoints Company and each of Company's officers as its attorneys-in-fact, each of whom may act separately, to execute all instruments and to do all things necessary for accomplishing those acts required of Franchisee under this Section 18 in the event Franchisee fails to perform those acts as required by this Agreement. Furthermore, upon demand Franchisee shall immediately pay to Company all costs and expenses, including reasonable attorney's fees, incurred by Company to accomplish such acts; and Company shall have the right to seek and obtain from any court of competent jurisdiction temporary, preliminary or permanent injunctions restraining Franchisee from any violation of this Agreement or compelling compliance by Franchisee with any obligation set forth in this Section 18 or elsewhere in this Agreement, and Franchisee agrees to pay the reasonable attorneys' fees and court costs incurred by Company in such proceedings.

## 19.   **Indemnification.**

(a)     Franchisee agrees to and will, at all times, indemnify and hold harmless to the fullest extent permitted by law, Company, its corporate parent and affiliates, successors and assigns and the respective directors, officers, employees, agents and representatives of each from all "Losses and Expenses" (as defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(1)     Franchisee's infringement, alleged infringement or any other violation or alleged violation of any trademark, copyright or other proprietary right owned or controlled by third parties;

(2)     (i)  Franchisee's violation, breach or alleged violation or breach  of any contract, federal, state or local law, regulation, ruling, standard or directive or (ii) arising out of Franchisee's business activities hereunder;

(3)     libel, slander or any other form of personal injury by Franchisee or arising out of Franchisee's business activities hereunder;

(4)     Franchisee's ownership or operation of the Franchised Business including all losses or damages and contractual liabilities to third persons arising out of or in connection with the ownership or operation of the Franchised Business; *provided, however*, that Company shall not seek to recover from franchisee any amount which may be due and owing under this indemnification to the extent that the claims associated with the indemnification are paid out by (i) the Company's insurance, or (ii) by funds created by deductions from payroll consistent with the Company's policies and procedures regarding deductions for general liability, auto liability, employment practices liability and other liabilities ("Funds") or a combination thereof, *but provided further* that nothing contained in the foregoing provision shall limit the right of the Company to recover the full indemnified amount in those circumstances in which any act, violation or omission by the franchisee is so egregious that it would, in Company's reasonable judgment, be unreasonable and unfair to the Spherion system, the Fund, and Spherion franchisees/licensees not to make the offending owner fully responsible for its own action, violation, breach, negligence, or omission.  Notwithstanding the foregoing, Franchisee shall be fully responsible for the payment of any deductible amount established under the policies associated with any and all of the Funds.   The provisions set forth immediately above relate solely to subsections (4) and (5) of Section 19(a) of this Agreement and are not intended to and shall not limit, modify or affect in any manner the Company's right to pursue and recover any claim or claims related to any other provision of this Agreement, including but not limited to any claim or claims which may be made under subsections (1-3) and (6-7) of Section 19(a) of this Agreement;

(5)     Claims related to the employment of either Franchisee's employees or the Temporary Employees including, but not limited to, claims of gender, race, ethnicity, or age discrimination,  claims relating to hiring or termination as well as  benefits and claims relating to wage and hours issues; *provided, however*, that Company shall not seek to recover from franchisee any amount which may be due and owing under this indemnification to the extent that the claims associated with the indemnification are paid out by (i) the Company's insurance, or (ii) by funds created by deductions from payroll consistent with the Company's policies and procedures regarding deductions for general liability, auto liability, employment practices liability and other liabilities ("Funds") or a combination thereof, *but provided further* that nothing contained in the foregoing provision shall limit the right of the Company to recover the full indemnified amount in those circumstances in which any act, violation or omission by the franchisee is so egregious that it would, in Company's reasonable judgment, be unreasonable and unfair to the Spherion system, the Fund, and Spherion franchisees/licensees not to make the offending owner fully responsible for its own action, violation, breach, negligence, or omission.  Notwithstanding the foregoing, Franchisee shall be fully responsible for the payment of any deductible amount established under the policies associated with any and all of the Funds.   The provisions set forth immediately above relate solely to subsections (4)

and (5) of Section 19(a) of this Agreement and are not intended to and shall not limit, modify or affect in any manner the Company's right to pursue and recover any claim or claims related to any other provision of this Agreement, including but not limited to any claim or claims which may be made under subsections (1-3) and (6-7) of Section 19(a) of this Agreement;

(6)     Franchisee's violation or breach of any warranty, representation, agreement or obligation in this Agreement; or

(7)     acts, errors or omissions of Franchisee or any of its agents, servants, employees, contractors, partners, affiliates, representatives or Temporary Employees.

(b)     Franchisee agrees to give Company notice of any such action, suit, proceeding, claim, demand, inquiry or investigation.  At the expense and risk of Franchisee, Company may elect to assume (but under no circumstance is obligated to undertake), the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation.  Such an undertaking by Company shall, in no manner or form, diminish Franchisee's obligations under this Section.

(c)     All Losses and Expenses incurred under this Section shall be chargeable to and paid by Franchisee pursuant to its obligations of indemnity under this Section, regardless of any actions, activity or defense undertaken by Company or the subsequent success or failure of such actions, activity or defense.   The indemnification of Company by Franchisee shall not be limited by the amount of insurance required under this Agreement.

(d)     As used in this Section, the phrase "**Losses and Expenses**" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, penalties, fines, charges, costs, expenses, lost profits, attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to Company's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matter described.

(e)     The persons or parties indemnified do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee may contract, regardless of the purpose.  Franchisee's hold harmless and indemnity obligation shall include all losses and expenses that may arise out of any acts, errors or omissions of these third parties.

(f)     Franchisee shall not be obligated to indemnify and hold Company harmless for any claim or liability to the extent such claim or liability is based on an act or omission by Company in its performance of the obligations specifically imposed on Company by this Agreement.

(g)     In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, Company may, at any time and without notice,

as it, in its judgment deems appropriate, order, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to any action, suit, proceeding, claim, demand, inquiry or investigation if, in Company's sole judgment, there are reasonable grounds to believe that:

(1)     any of the acts or circumstances enumerated in this Section have occurred; or

(2)     any act, error or omission of Franchisee may result directly or indirectly in damage, injury or harm to any person or any property.

## 20.    Liability of Owners.

(a)     If Franchisee is more than one person or a partnership, each such person, or each partner in such partnership, shall be jointly and severally liable for each of the duties, obligations and liabilities (including but not limited to the indemnification obligations) of Franchisee under this Agreement, and each such person shall execute this or a separate agreement for the purpose of becoming bound hereby.

(b)     If this Agreement is assigned to an Entity pursuant to Section 2(b) hereof, then the initial individual Franchisee(s) must be or become Owner(s) in such Entity, and such initial individual Franchisee(s), along with the Entity to which this Agreement is assigned, shall be collectively considered to be Franchisee hereunder.  Each initial individual Franchisee agrees to be bound personally by all of the terms and conditions of this Agreement, and each of them does hereby personally guarantee, jointly and severally, all of the obligations and liabilities (including but not limited to the indemnification obligations) of Franchisee under this Agreement and any other agreement between Company and Franchisee related to the performance of this Agreement.   Such initial individual Franchisee(s) shall execute this Agreement for the purpose of becoming bound hereby.

(c)     Each initial individual Franchisee and any corporate Franchisee who are, become, or are required to be parties to this Agreement shall be bound by the acts or conduct of each initial individual Franchisee and/or corporate Franchisee.  Each act or omission in breach of this Agreement shall be deemed a breach by all such parties, whether they are initial individual Franchisees or the corporate Franchisee, regardless of their lack of knowledge or participation.

## 21.    Failure to Perform.

Neither Franchisee nor Company shall be liable or responsible in any manner to the other for failure to perform, or for delay in performing, the terms of this Agreement when such failure or delay is due to, or is the direct or indirect result of, strikes, labor disputes, fire, flood, material shortage, mechanical or electrical failure, embargoes, energy allocation, any act, regulation or governmental order or any Act of God or similar causes.

## 22.    System Changes.

Company may change, alter, expand, de-emphasize or discontinue in whole or in part,

Spherion FA 4-15 ᵐᵠₒₒₒₒₒₒ

any line(s) of business or service contemplated hereunder, or any concept, plan, practice, policy, procedure, method or strategy forming a part of the SPHERION System which was previously provided or applicable to Franchisee, or substitute other trademarks, service marks or trade names for those authorized herein, or discontinue the use of any such trademark, service mark or trade name, without incurring any obligation or liability to Franchisee, provided that such change, alteration, expansion, de-emphasis or discontinuation is applied on a uniform and consistent basis to each   licensee or franchisee of Company, and Company notifies Franchisee in writing of such change, alteration, expansion, de-emphasis or discontinuation. Prior to the adoption or discontinuation of any line of business, trademark, service mark or trade name, Company will give Franchisee not less than sixty (60) days notice of such action.

## 23.   **Compliance.**

Franchisee does hereby acknowledge the right of Company to insist on full compliance with and the full performance of, the terms and conditions of this Agreement, and that the failure of Franchisee to fulfill or perform any of the obligations created by this Agreement shall constitute a material breach of this Agreement.  Company's failure in any instance to insist upon strict performance of any of the terms and conditions contained herein shall not be deemed a waiver of any rights or remedies that it may have, nor a waiver of future compliance with such or any other terms and conditions.   Whenever this Agreement requires Company's prior approval or consent, Franchisee shall make a timely written request therefor, and such approval, if granted, shall be in writing.  Company makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by granting any waiver, approval or consent to Franchisee, or by reason of any neglect, delay or denial of any request therefor.  Any waiver, approval or consent granted by Company to Franchisee shall be without prejudice to any other rights Company may have, will be subject to continuing review by Company and may be revoked in Company's sole discretion at any time and for any reason upon thirty (30) days prior written notice to Franchisee.

## 24.   **Company's Right to Cure Defaults.**

In addition to any and all other rights and remedies which it may have, if Franchisee shall default in the performance of, or breach any obligation or provision of, this Agreement or any other agreement between the parties, Company shall have the right, but not the obligation, immediately or at any time, without notice to Franchisee, and without waiving any default, breach or other claim which it may have, to cure such default on behalf of Franchisee and at Franchisee's expense, the cost of which shall immediately be due and payable on demand, and which may be deducted from commissions due Franchisee by Company.

## 25.   **Notice.**

Any written notice required herein may be given by regular mail, private overnight courier, hand delivery, or electronic facsimile transfer (confirmed by simultaneously dispatched regular mail), addressed, if to Franchisee, to the office required to be maintained by Franchisee pursuant to this Agreement, or if to Company, addressed to its principal place of business office.  Unless otherwise specified in this Agreement, written notice shall be presumed received by the addressee on the earliest of the date of hand delivery or electronic facsimile transfer, or one day after delivery to a private overnight courier or the date of the post office postmark.

**26.    Disclosure.**

Franchisee has conducted an independent investigation of the business contemplated by this Agreement and recognizes that it involves business risks that make the success of the venture largely dependent upon the business abilities of Franchisee and Franchisee's employees.  Company expressly disclaims the making of, and Franchisee acknowledges that he, she or it has not received or relied upon, any oral or written representation, warranty or guaranty, express or implied, as to potential revenues, profits or success of the business venture contemplated by this Agreement.  Franchisee acknowledges that he, she or it has no knowledge of any representations about this franchise by Company, or its officers, directors, Owners (including shareholders and members), employees or agents that are contrary to the terms of this Agreement or any offering circular or disclosure statement provided to Franchisee by Company, and further represents to Company, as an inducement to enter into this Agreement, that Franchisee has made no misrepresentations to Company.   Franchisee acknowledges the receipt of Company's Franchise Disclosure Document required by the Federal Trade Commission or any applicable state law, at least fourteen (14) full days prior to the execution hereof, as well as a copy of this Agreement with all changes therein at least seven (7) full days prior to the execution hereof.

**27.    Applicable Law; Mediation.**

(a)    This Agreement shall be interpreted and construed under the laws of the State of Georgia.  In the event of any conflict of law, the laws of Georgia shall prevail, without regard to, and without giving effect to, the application of Georgia conflict of law rules.   If, however, any provision of this Agreement would not be enforceable under the laws of Georgia, and if the Franchised Business is located outside of Georgia and such provision would be enforceable under the laws of the state in which the Franchised Business is located, then such provision shall be interpreted and construed under the laws of that state.   Nothing in this Subsection (a) is intended by the parties to subject this Agreement to any franchise or similar law, rule, or regulation of the State of Georgia or of any other state to which it would not otherwise be subject.

(b)    Except as otherwise provided in this Agreement, all controversies, disputes, and claims arising out of or related to this Agreement (including any claim that the Agreement or any of its provisions is invalid, illegal, or otherwise voidable or void), the relationship between Company and Franchisee, the relationship between Franchisee and Company's affiliates, or Franchisee's operation of the Franchised Business shall first be subject to non-binding mediation.   All controversies, disputes and claims not resolved by, or not subject to, the mediation process shall be resolved in accordance with the provisions in Subsections (a), (d), (e), (f), (g) and (h) of this Section.  Mediation shall not be required with respect to (i) any claim or dispute involving actual or threatened disclosure or misuse of Company's confidential information, (ii) any claim or dispute involving the ownership, validity, or use of the Marks, (iii) any claim or dispute involving the insurance or indemnification provisions of this Agreement, (iv) any action by Company to enforce the covenants set forth in Section 5 of this Agreement, or (v) if Franchisee is more than sixty (60) days past due in any of its payments to Company or its affiliates.   Nothing in this Section 27 shall prevent any party from instituting or pursuing litigation at any time to preserve

the status quo, protect the health or safety of the public, or avoid irreparable harm.

(c)  Mediation under this Section 27 is not intended to alter or suspend the rights or obligations of the parties under this Agreement or to determine the validity or effect of any provision of this Agreement, but is intended to furnish the parties an opportunity to resolve disputes amicably, expeditiously and in a cost-effective manner on mutually acceptable terms.

(1)  The non-binding mediation provided for hereunder shall be commenced by the party requesting mediation (the "**Complainant**") providing written notice of the request for mediation (the "**Request**") to the party with whom mediation is sought (the "**Respondent**").  The Request shall specify with reasonable particularity the matter or matters on which non-binding mediation is sought.  A copy of the Request shall be given by the Complainant simultaneously to Company if Company is not a Complainant or Respondent.

(2)  Non-binding mediation hereunder shall be conducted in the state in which Company has its principal place of business at the time of the mediation by a recognized mediator or mediation program designated by Company in writing (the "**Designation**").  Company shall send the Designation to Franchisee within a reasonable time after issuance of the Request.

(3)  Non-binding mediation hereunder shall be concluded within sixty (60) days of the issuance of the Request or such longer period as may be agreed upon by the parties in writing.  All aspects of the mediation process shall be treated as confidential, shall not be disclosed to others, and shall not be offered or admissible in any other proceeding or legal action whatever.  Complainant and Respondent shall each bear their own costs of mediation, and each shall bear one-half the cost of the mediator or mediation service.

(d)  Any legal action brought by Franchisee against Company shall be brought exclusively in the federal district court covering the location at which Company has its principal place of business at the time of the action; provided, however, that if the federal court would not have subject matter jurisdiction had the action been commenced in such court, then, in such event, the action shall be brought in the state court within the judicial district in which Company has its principal place of business at the time the action is commenced.  Any legal action brought by Company against Franchisee in any forum or court, whether federal or state, may be brought within the state and judicial district in which Company has its principal place of business at the time of the action.  Franchisee hereby waives all questions of personal jurisdiction or venue for the purpose of carrying out this provision, subject to state law.

(e)  No right or remedy conferred upon or reserved to Company or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy provided herein or permitted by law or equity, but each shall be cumulative of every other right or remedy.

(f)     Company and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action, proceeding, or counterclaim.  Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Company, the relationship between Franchisee and Company's affiliates, or Franchisee's operation of the Franchised Business, brought by either party hereto against the other shall be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, as evidenced by the filing of a claim in an legal action in accordance with Subsection (d) of this Section, or such claim or action shall be barred.

(g)     Company and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive, exemplary, or multiple damages against the other, subject to state law.

(h)     Nothing herein contained shall bar Company's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, including violations of the terms of Sections 3, 5, 7(p), and 18 of this Agreement, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

## 28.    **Effect; Interpretation of Agreement.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement shall become effective and binding only when accepted and approved by Company at its principal place of business, by the signature of one of its officers.   This Agreement shall be construed according to its fair meaning and not strictly against Company for having drafted it.  Any provisions which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and remain binding upon the parties.  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred upon appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.  It is mutually agreed that no change or erasure of any printed portion of this Agreement, except the filling in of specified blanks and lines, shall be valid or binding upon either party hereto unless initialed by both parties.  It is understood that this Agreement supersedes any and all prior or contemporaneous oral or written agreements and understandings between the parties relating to the subject matter hereof and, together with (a) any application and background information provided by Franchisee to Company and (b) any Franchisee Compliance Certification provided by Franchisee to Company in connection with this Agreement, constitute the entire agreement of the parties with respect to such subject matter.  The foregoing notwithstanding, nothing herein is intended to disclaim the representations Company made in the Franchise Disclosure Document furnished to Franchisee.  No prior or future verbal agreements of any nature relating to the subject matter hereof shall be valid, binding or relied upon by either party hereto.  This Agreement may not be amended or modified except by written agreement signed by both parties hereto.  If any provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity and enforceability of this Agreement as a whole, or any portion hereof which is not invalid or unenforceable.   Time is of the essence in this Agreement.

Spherion FA 4-15 ᵐᵘᵠ₰₥₥₥₥₥ᴋ

IN WITNESS WHEREOF, the parties have entered into and executed this Agreement as of the Effective Date.

**FRANCHISEE:  Patrick A. Hart**

Percentage of
Equity
Ownership in
Entity

(Signature)

**SPHERION STAFFING LLC**

By: 
(Signature)

Sandra K. Mazur
Division President

**SCHEDULE 1**
**DESCRIPTION OF AREA**

The Area shall be:  Autauga, Elmore, Lowndes and Montgomery Counties, Alabama (the "Montgomery Area"), as such area is constituted as of the Effective Date of this Franchise Agreement.

## SCHEDULE 2
## <u>AUTHORIZED SERVICES</u>

Franchisee shall be authorized to provide on behalf of Company:

(i)   full-time placement services for which no fees or other payments are charged to or collected from applicants and in which fees are collected only from employers; and

(ii)   temporary individual and group services of personnel;

in office, clerical, secretarial, marketing and light industrial occupations, as the same may be defined from time-to-time by Company.  This Franchise Agreement shall not authorize or permit Franchisee to provide any other full-time or temporary personnel services in the Restricted Jobs set forth below, or in any other occupation not described above (as defined by Company), including but not limited to nursing, health care, legal, paralegal, accounting, engineering, technical, management, scientific and heavy industrial occupations.   The right to provide personnel services in all such excluded occupations is specifically reserved to Company.

**RESTRICTED JOB LIST**
**MARCH 2014**

The list is not at all inclusive, caution and judgment must be exercised in determining other potentially hazardous work.   When in doubt or if you have questions on other types of exposures call Risk Management Department.   The Restricted Job List will be updated periodically whenever injury trends are observed at Company client work-sites.



**Restricted Job List**

There are certain positions in which Spherion Staffing Services should not place employees. It is your responsibility to become familiar with this list and accept only appropriate job orders.

Certain job tasks are known to produce a higher frequency of employee injuries. This list is not all inclusive; caution and judgment must be exercised in determining potentially hazardous work and unsafe environments. **You should consider all restricted tasks to be prohibited unless you have written pre-approval from Risk Management.** Most restricted tasks can be filled on a direct hire basis. If you have questions, please call the Risk Management Department for assistance.

**These positions should never be filled by Spherion Staffing Services:**

- Alcoholic beverage servers
- Amusement Parks (any job)
- Any job outside the continental US, including US possessions
- Asbestos (working with or around)
- Auto Mechanics
- Any position with exposure to Blood or Bodily Fluids
- Aviation flight operations (Serve & Support)
- Butchers
- Construction (Carpenters)
- Confined Spaces
- Cooks:
  - Restaurants, cafeterias, hotels, etc.
- Chemical Manufacturing or work involving hazardous/ toxic substance including working around ammonia and/or chlorine refrigeration units
- Crossing Guards
- Daycare (or any care of others)
- Disaster Recovery/Restoration Services
- Dock or Pier Workers (Longshoremen)
- Door-to-door sales/collectors
- Electrician
- Emergency Personnel (Police or Fire)
- Excavation & Earth Moving (including trench work)
- Field/Farm Labor
- Fireworks/Explosives Manufacturing
- Garbage Collectors
- Grain Mills
- Groundskeeper/Landscaper
- Janitorial
- Heavy Equipment Operators such as:
  - Bulldozer
  - Drop Forge Equipment
  - Crane
  - Tractor

- Housekeeping:
  - Hotel Rooms, Apartments
  - Assisted Living or Nursing Facilities
- Landfills
- Lifting:
  - Industrial: in excess of 50 pounds per person
  - Non-Industrial: in excess of 25 pounds per person
- Lifeguards
- Logging
- Maintenance Helpers
- Maintenance Mechanics
- Masonry Work
- Medical Care:
  - RN or LPN Positions, Hospital Orderlies
  - Dentist, Physicians, Chiropractors, Therapists
  - Any position with patient care
  - Any position with Bio-Hazard exposure
- Merchandisers (Retail stores/Multiple locations requiring driving)
- Movers/Moving Companies
- Non-Commercial Workplace:
  - Private homes, hotel rooms, door to door sales
- Personal Errands/cashing personal checks
- Pest Control, Exterminators
- Plumber
- Railroad Construction and Operations
- Recycling Centers
- Road Work:
  - flaggers/traffic directors
  - paving
  - cleanup beside the road
- Roofing/Salvage Work
- Sanitation
- Saws and Saw Mills
- Scaffolding Work, Elevated Platforms or Ladders
- Scissor Lift

- Security Guards
- Underground or Confined Spaces
- Teachers/Substitute Teachers
- Tree Trimming
- Traffic Control/Flagmen
- Veterinarian offices, kennels or zoos
- Workers on Ships, Barges or other Vessels
- Working 3 feet above floor or ground level without proper railing or from a ladder greater than 3 feet above ground level. Working greater than 3 feet below ground level is always restricted.
- Work in "point-of-operations" or "pinch-point" of a machine
- Working in freezers
- Working with Children/Minors

**These positions may be filled only with prior approval from Risk Management and if specified conditions are met:**

- Cash/Credit Card Handlers/Tellers ONLY with:
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement
  – Advanced Background is required, even if client does not require one

- Drivers or any position with driving responsibilities:
  – Class C ONLY
  – No transportation of passengers
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement
  – COI adding Spherion as additional insured under Auto
  – Advanced Background, Motor Vehicle Report and Drug Test are required, even if client does not require one

- Forklift operators ONLY with:
  – Powered Industrial Driver Release and Indemnification executed by the client and on file with Risk Management prior to placement
  – Proper certification confirmed by client
  – Proper certification of training confirmed by client
  – Employee must have 6 months forklift experience within the last 18 months

- Any non-teaching job at any school ONLY with:
  – Advanced Background & Sex Offender Search is required, even if client does not require one

- Jobs requiring Respirators

- Employee Travel:
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement

- Management/Supervisors:
  – Professional Services positions for managers or supervisors may be filled with risk management approval if the Spherion office has a professional services addendum in place. No high-level positions with final sign-off or final authority.
  – Industrial Practice: Management or Supervisor
  – Both Practices: High Level company management (i.e. CFO, CEO, VP)

- Work from Home with:
  – Client hold harmless
  – Use of work from home job code
  – Employee work from home agreement
  – Employee home inspection checklist

**SCHEDULE 3**
**GROSS PROFIT QUOTAS**

Fiscal Year 2015 (prorated) ........$76,022
Fiscal Year 2016 ......................$939,637
Fiscal Year 2017 ......................$967,826
Fiscal Year 2018 ......................$996,861
Fiscal Year 2019 ..................$1,026,767
Fiscal Year 2020 ..................$1,057,570
Fiscal Year 2021 ..................$1,089,297
Fiscal Year 2022 ..................$1,121,976
Fiscal Year 2024 ..................$1,155,635
Fiscal Year 2025 (prorated) ...$1,091,112

In determining whether Franchisee has met the Gross Profit Quota for the initial Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company were parties to a previous Franchise Agreement covering all or a portion of the Area.  In determining whether Franchisee has met the Gross Profit Quota for the final Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company are parties to a renewal Franchise Agreement covering all or a portion of the Area.

## EXHIBIT A

## SPHERION Logo



OR



## ASSIGNMENT OF SPHERION FRANCHISE AGREEMENT

The Assignors hereby assign to the Assignee, effective this day, all rights, title and interest in and to that certain Franchise Agreement between the Assignors and SPHERION STAFFING LLC, dated November 23, 2015 (the "Franchise Agreement"), and by the acceptance hereof the Assignee agrees to perform all of the covenants and conditions of the Franchise Agreement and all amendments thereto. The Assignors acknowledge and agree that they remain bound by and subject to each of the terms and conditions of the Franchise Agreement, pursuant to Section 20 thereof.

DATE:    November 23, 2015

ASSIGNOR:
Patrick A. Hart

_____
(Signature)

ACCEPTED (ASSIGNEE):

**HART & ASSOCIATES, LLC**

By: _____
(Signature)
Name: PATRICK A. HART
Title: OWNER/CEO

APPROVED:

SPHERION STAFFING LLC

By: _____
(Signature)
Name: Sandra K. Mazur
Title:  Division President

## OVERLAP ACKNOWLEDGEMENT AGREEMENT

This OVERLAP ACKNOWLEDGEMENT AGREEMENT (the "**Agreement**") is made and entered by and between SPHERION STAFFING LLC, a Delaware limited liability company (the "**Company**"), and Patrick A. Hart ("**Franchisee**"). This Agreement is entered into coincident with and as an integral part of the Franchise Agreement which the parties have entered into this day. All capitalized italicized words used herein shall have the same meaning in this Agreement as in the Franchise Agreement. This Agreement shall have the same Effective Date as the Effective Date of the Franchise Agreement.

WHEREAS, pursuant to the Franchise Agreement, the Company has granted Franchisee the right to use the licensed "*Mark*", specifically the Spherion® trademark, in connection with the provision of staffing services strictly in accordance with the limitations set forth in the Franchise Agreement;

WHEREAS, the Franchise Agreement grants to Franchisee certain exclusive rights, as specifically set forth in the Franchise Agreement, with respect to the provision of staffing services under the Spherion® trademark within the "*Area*";

WHEREAS, the parties recognize that the Franchise Agreement does **not** grant to Franchisee any exclusive rights within the *Area* or otherwise relating to the provision of staffing services under other trademarks or logos, including but not limited to those trademarks and logos (other than the Spherion® trademark) which may be owned or controlled by the Company, its parents, their subsidiaries or their affiliated companies;

WHEREAS, the Company is a wholly owned indirect subsidiary of Randstad North America, Inc. ("**Randstad**");

WHEREAS, a franchisee of Randstad's affiliate, Temp Force, LP (the "**Temp Force Franchisee**"), has been previously granted the right to provide general staffing or other staffing services under the AccuStaff® and eStaff brands and marks in two (2) counties within the *Area* (referred to herein as the "**Overlap Counties**"); and

WHEREAS, Franchisee recognizes that the Franchise Agreement which he is entering into on this date incorporates an *Area* which includes the Overlap Counties and Franchisee has nonetheless voluntarily and without duress entered into the Franchise Agreement and this Agreement.

NOW THEREFORE, in consideration of the execution of this Agreement and of the covenants and conditions herein contained, it is mutually agreed and understood as follows:

1. It is agreed that the "Whereas" clauses set forth above are true and accurate and are an integral part of this Agreement.

2. Franchisee hereby acknowledges his understanding that the Temp Force Franchisee, has been previously granted the right to provide general staffing or other staffing services under the AccuStaff® and eStaff brands and marks in two (2) counties within the Area, and further acknowledges his understanding and agreement that, after his entry into the Spherion Franchise Agreement, the Temp Force Franchisee will have the full and complete right to continue to provide staffing services and other services in each and every such Overlap County, may open an office in any Overlap County, and may provide additional and new and different staffing services within any Overlap County and, in general, that the Temp Force

Franchisee will continue to conduct its operations within the Overlap Counties in the manner the Temp Force Franchisee sees fit in its sole and complete discretion.

3. Franchisee hereby also acknowledges his understanding that the Company does not presently solicit and obtain National Account Customers independent of Randstad and that the Company currently relies upon Randstad to provide all business services related to "strategic accounts" and National Account Customers for the Company and for the Spherion® system. Franchisee understands and agrees that Randstad has the right to make decisions, in its discretion, regarding its strategic account and National Account efforts.   Franchisee acknowledges, understands and agrees that the right of the Temp Force Franchisee in the Overlap Counties will mean that Franchisee's access to strategic accounts and National Account Customers within the Overlap Counties may be affected.

4. Franchisee hereby also acknowledges his understanding that the Temp Force Franchisee may elect to compete with Franchisee in a number of commercial settings including, but not limited to, settings in which general staffing customers are obtained through a bidding or similar process.

5. This Agreement shall be considered and is an integral part of the Franchise Agreement which the parties have entered into this day.

IN WITNESS WHEREOF, the parties have entered into and executed this Agreement as of the Effective Date.

FRANCHISEE: Patrick A. Hart

_____

SPHERION STAFFING LLC

By: _____
Print Name: Sandra K. Mazur
Title: Division President

## SCOPE OF SERVICES ADDENDUM

This SCOPE OF SERVICES ADDENDUM is made and given this 23rd day of November, 2015, by and between Spherion Staffing LLC ("Company") and Patrick A. Hart ("Franchisee").

WHEREAS, Company and Franchisee entered into a Franchise Agreement dated November 23, 2015 (the "Franchise Agreement");

WHEREAS, Company and Franchisee desire to expand the scope of the services authorized as part of the franchised business under the Franchise Agreement to include certain professional and technical services;

NOW THEREFORE, Company and Franchisee agree as follows:

1.    Effect.   This Scope of Services Addendum is subject to and a part of the Franchise Agreement. Unless the provisions of the Franchise Agreement are expressly modified by this Scope of Services Addendum, they remain in full force and effect.

2.    Change in Scope of Services.   Schedule 2 to the Franchise Agreement is deleted in its entirety, and the Schedule 2 attached to this Scope of Services Addendum is substituted in its place as the new Schedule 2 to the Franchise Agreement. This revised Schedule 2 will add the following occupations: legal, paralegal, accounting, engineering, technical and management (the business of the added occupations being referred to herein as "Professional Services"); to those occupations within the scope of services permitted under the Franchise Agreement.

3.    Change in Minimum Quota Requirements.   Schedule 3 to the Franchise Agreement is amended to add a Gross Profit Quota for Professional Services for $75,000 for each Fiscal Year during the term, prorated based on the number of full Accounting Periods remaining in the Fiscal Year upon the execution of this Scope of Services Addendum. Company may at any time during the remainder of the term of the Franchise Agreement, upon notice to the Franchisee, further amend Schedule 3 to provide a reasonable separate quota for the Professional Services, provided that such quota may relate only to the calendar year following that in which the notice is given, and years thereafter. In the event of a failure to pay any deficiency in the Professional Services Gross Profit Quota under paragraph 7(t) of the Franchise Agreement the Company shall be entitled to all of its rights and remedies under the Franchise Agreement, except that the Company may terminate only this Scope of Services Addendum and all Franchisee's rights hereunder, and not the entire Franchise Agreement.

4.    Strict Adherence to Policies and Procedures Relating to Professional Services.   Because of the additional risks involved in Professional Services staffing, Franchisee agrees to strictly adhere to any and all Company policies, procedures and directives relating to Professional Services.   Notwithstanding the provisions of the Franchise Agreement relating to termination, upon a violation of the provisions of this Scope of Services Addendum by Franchisee, Company may terminate the Franchisee's rights to provide Professional Services pursuant to this Scope of Services Addendum upon notice of such breach, if the Franchisee does not cure such breach within ten (10) days following that notice.

5.    Franchisee's Additional Obligations.       Franchisee will employ at least one person who shall devote full time to providing the Professional Services (the "Professional Services Employee").   Franchisee will have six (6) months from the signing of this agreement to

hire the Professional Services Employee.  If at any time during the term of the Franchise Agreement the Professional Services Employee should leave the employ of the Franchisee, Franchisee must hire a replacement Professional Services Employee within 60 days.

a.   Franchisee shall provide the Professional Services Employee adequate office space, as shall be determined by the Company, sufficient equipment (including, without limitation, a telephone, computer equipment and software), as shall be determined by the Company, to provide these services.

b.   Franchisee and the Professional Services Employee(s) shall attend such training as may be required by the Company, in its sole discretion, to provide the Professional Services.

c.   Franchisee shall use only such names and marks as shall be designated by the Company for use by franchised offices in providing the Professional Services (the "Professional Services Names and Marks").  At the time of this Agreement, the Professional Services Names and Marks are the standard Spherion logo with the recruiting and staffing tagline.  The Company may in the future require the use of other Professional Services Names and Marks, and in that event Franchisee will obtain and install signage with the Professional Names and Marks meeting Company's standards and make other changes in its marketing materials as shall be required by the Company.

d.   Franchisee shall meet the Minimum Quota Requirements specified in any revised Schedule 3.

6.   <u>Non-exclusivity of Rights Added.</u>   The provisions of paragraph 4 of the Franchise Agreement notwithstanding, the rights to provide personnel in the Professional Services occupations (legal, paralegal, accounting, engineering, technical and management) shall not be exclusive to the Franchisee; that is, the Company, and *any* of its affiliates, may provide personnel in those Professional Services occupations in the Area under the Company's trademarks and service marks, whether through an office in the Area, or otherwise.

IN WITNESS WHEREOF, the parties have executed this Scope of Services Addendum to the Franchise Agreement as of the date and year first above written.

COMPANY:                                                    FRANCHISEE:

SPHERION STAFFING LLC                        Patrick A. Hart

By: _____              _____
(Signature)                                                   (Signature)
Name: Sandra K. Mazur
Title: Division President

## SCHEDULE 2
## AUTHORIZED SERVICES

Franchisee shall be authorized to provide on behalf of Company:

(i)      full-time placement services for which no fees or other payments are charged to or collected from applicants and in which fees are collected only from employers; and

(ii)     temporary individual and group services of personnel;

in office, clerical, secretarial, marketing and light industrial occupations, and legal, paralegal, accounting, engineering, technical and management occupations, as the same may be defined from time-to-time by Company. This Franchise Agreement shall not authorize or permit Franchisee to provide any other full-time or temporary personnel services in the Prohibited Occupations set forth below, or in any other occupation not described above (as defined by Company), including but not limited to nursing, health care, scientific and heavy industrial occupations. The right to provide personnel services in all such excluded occupations is specifically reserved to Company.

## PROHIBITED TASK LIST
## MARCH 2014

The list is not at all inclusive, caution and judgment must be exercised in determining other potentially hazardous work. When in doubt or if you have questions on other types of exposures call Risk Management Department. The Prohibited Task List will be updated periodically whenever injury trends are observed at Company client work-sites.



**Restricted Job List**

There are certain positions in which **Spherion Staffing Services should not place employees.** It is your responsibility to become familiar with this list and accept only appropriate job orders.

Certain job tasks are known to produce a higher frequency of employee injuries. This list is not all inclusive; caution and judgment must be exercised in determining potentially hazardous work and unsafe environments. **You should consider all restricted tasks to be prohibited unless you have written pre-approval from Risk Management.** Most restricted tasks can be filled on a direct hire basis. If you have questions, please call the Risk Management Department for assistance.

**These positions should never be filled by Spherion Staffing Services:**

- Alcoholic beverage servers
- Amusement Parks (any job)
- Any job outside the continental US, including US possessions
- Asbestos (working with or around)
- Auto Mechanics
- Any position with exposure to Blood or Bodily Fluids
- Aviation flight operations (Serve & Support)
- Butchers
- Construction (Carpenters)
- Confined Spaces
- Cooks:
  – Restaurants, cafeterias, hotels, etc.
- Chemical Manufacturing or work involving hazardous/ toxic substance including working around ammonia and/or chlorine refrigeration units
- Crossing Guards
- Daycare (or any care of others)
- Disaster Recovery/Restoration Services
- Dock or Pier Workers (Longshoremen)
- Door-to-door sales/collectors
- Electrician
- Emergency Personnel (Police or Fire)
- Excavation & Earth Moving (including trench work)
- Field/Farm Labor
- Fireworks/Explosives Manufacturing
- Garbage Collectors
- Grain Mills
- Groundskeeper/Landscaper
- Janitorial
- Heavy Equipment Operators such as:
  – Bulldozer
  – Drop Forge Equipment
  – Crane
  – Tractor

- Housekeeping:
  – Hotel Rooms, Apartments
  – Assisted Living or Nursing Facilities
- Landfills
- Lifting:
  – Industrial: in excess of 50 pounds per person
  – Non-Industrial: in excess of 25 pounds per person
- Lifeguards
- Logging
- Maintenance Helpers
- Maintenance Mechanics
- Masonry Work
- Medical Care:
  – RN or LPN Positions, Hospital Orderlies
  – Dentist, Physicians, Chiropractors, Therapists
  – Any position with patient care
  – Any position with Bio-Hazard exposure
- Merchandisers (Retail stores/Multiple locations requiring driving)
- Movers/Moving Companies
- Non-Commercial Workplace:
  – Private homes, hotel rooms, door to door sales
- Personal Errands/cashing personal checks
- Pest Control, Exterminators
- Plumber
- Railroad Construction and Operations
- Recycling Centers
- Road Work:
  – flaggers/traffic directors
  – paving
  – cleanup beside the road
- Roofing/Salvage Work
- Sanitation
- Saws and Saw Mills
- Scaffolding Work, Elevated Platforms or Ladders
- Scissor Lift

- Security Guards
- Underground or Confined Spaces
- Teachers/Substitute Teachers
- Tree Trimming
- Traffic Control/Flagmen
- Veterinarian offices, kennels or zoos
- Workers on Ships, Barges or other Vessels
- Working 3 feet above floor or ground level without proper railing or from a ladder greater than 3 feet above ground level. Working greater than 3 feet below ground level is always restricted.
- Work in "point-of-operations" or "pinch-point" of a machine
- Working in freezers
- Working with Children/Minors

**These positions may be filled only with prior approval from Risk Management and if specified conditions are met:**

- Cash/Credit Card Handlers/Tellers ONLY with:
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement
  – Advanced Background is required, even if client does not require one
- Drivers or any position with driving responsibilities:
  – Class C ONLY
  – No transportation of passengers
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement
  – COI adding Spherion as additional insured under Auto
  – Advanced Background, Motor Vehicle Report and Drug Test are required, even if client does not require one
- Forklift operators ONLY with:
  – Powered Industrial Driver Release and Indemnification executed by the client and on file with Risk Management prior to placement
  – Proper certification confirmed by client
  – Proper certification of training confirmed by client
  – Employee must have 6 months forklift experience within the last 18 months
- Any non-teaching job at any school ONLY with:
  – Advanced Background & Sex Offender Search is required, even if client does not require one
- Jobs requiring Respirators
- Employee Travel:
  – Indemnification and Hold Harmless executed by the client and on file with Risk Management prior to placement
- Management/Supervisors:
  – Professional Services positions for managers or supervisors may be filled with risk management approval if the Spherion office has a professional services addendum in place. No high-level positions with final sign-off or final authority.
  – Industrial Practice: Management or Supervisor
  – Both Practices: High Level company management (i.e. CFO, CEO, VP)
- Work from Home with:
  – Client hold harmless
  – Use of work from home job code
  – Employee work from home agreement
  – Employee home inspection checklist

## MUTUAL TERMINATION AGREEMENT

This MUTUAL TERMINATION AGREEMENT ("Termination Agreement") is made this 23rd day of November, 2015, by and between SPHERION STAFFING LLC, a Delaware limited liability company (hereinafter referred to as "Company"), and Patrick A. Hart and Hart & Associates, LLC (collectively referred to as "Franchisee").

### RECITALS:

As of the date of this Agreement, Angela L. Woodruff-Swarts ("Individual Licensee") and Interim Personnel of Augusta, Inc. ("Corporate Licensee") (Individual Licensee and Corporate Licensee are collectively referred to herein as "Assignor") assigned that certain License Agreement dated July 4, 2005 (as amended, supplemented, and assigned, the "Swarts License Agreement") to Franchisee and Franchisee assumed the Swarts License Agreement from Assignor;

Company and Franchisee are now parties to the Swarts License Agreement;

The Swarts License Agreement authorizes Franchisee to market and provide on behalf of Company certain services in Autauga, Elmore, Lowndes and Montgomery Counties, Alabama (the "Montgomery Area");

Company and Franchisee wish to terminate the Swarts License Agreement and enter into a new Franchise Agreement for the Montgomery Area for a ten year term.

NOW THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt, sufficiency, and adequacy of which is hereby acknowledged, it is mutually agreed and understood as follows:

1.      The Swarts License Agreement is hereby terminated effective as of 12:01 a.m. on November 23, 2015 (the "Effective Time") and shall be of no further force and effect as between Company and Franchisee.  For the avoidance of doubt, the covenants, conditions, restrictions, limitations, other agreements and obligations of Assignor under the Swarts License Agreement (including, without limitation, those set forth in Section 5, Section 18, and Section 19 of the Swarts License Agreement) shall continue to be in full force and effect with respect to Assignor and shall not be deemed to have been waived, released, or affected in any manner by this Termination Agreement.

2.      Company and Franchisee shall, concurrently with the execution of this Termination Agreement, execute a Spherion Franchise Agreement (the "Hart Franchise Agreement"), which grants to Franchisee the right and license to operate a Spherion Franchised Business within the Montgomery Area, pursuant to the terms and conditions contained therein, as of the Effective Date.  In accordance with the requirements of Section 14(b) of the Swarts License Agreement, Assignor and Franchisee have paid to Company the required $5,000 nonrefundable license transfer fee and, as a result, there shall be no initial fee under Section 11 of the Hart Franchise Agreement.

3.      This Termination Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. This Termination Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all counterparts when taken together shall constitute one and the same instrument. This Termination Agreement may be executed and transmitted by facsimile or other electronic signature which shall be as valid as original signature. This Termination Agreement shall be construed according to its fair meaning and not strictly against Company for having drafted it. Any provisions which impose an obligation after termination or expiration of this Termination Agreement shall survive the termination or expiration of this Termination Agreement and remain binding upon the parties. In any litigation to enforce the terms of this Termination Agreement, all costs and all attorneys' fees (including those incurred upon appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party. This Termination Agreement will be governed by and construed in accordance with the law of the state of Georgia. The paragraph titles used herein are not to be considered a substantive part of this Agreement, but are merely descriptive for identifying the paragraph to which they refer. Use of the masculine gender includes the feminine and neuter and vice versa, where necessary to impart contextual continuity. If any paragraph or provision herein is held invalid by a court of competent jurisdiction, all other paragraphs or severable provisions of this Termination Agreement shall not be affected thereby, but shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Termination Agreement on the date first written above.

COMPANY:                                          FRANCHISEE:

SPHERION STAFFING LLC, a Delaware                 HART & ASSOCIATES, LLC, an Alabama
limited liability company                         limited liability company

By: _____                     By: _____
Name: Sandra K. Mazur                             Name: PATRICK A. HART
Title: Division President                         Title: OWNER/CEO


                                                  Patrick A. Hart, INDIVIDUALLY

                                                  _____
                                                  Patrick A. Hart

## AMENDMENT TO FRANCHISE AGREEMENT

This Amendment to Franchise Agreement ("Amendment") is made and given this 20th day of January, 2016 by and between **Spherion Staffing LLC** ("Company") and Patrick A. Hart ("Franchisee"), with respect to that certain Franchise Agreement dated November 23, 2015 (as amended, supplemented and assigned, referred to herein as the "Franchise Agreement").

**WHEREAS,** Franchisee and Company have previously entered into the Franchise Agreement;

**WHEREAS,** the gross profit quotas set forth at Schedule 3 of the Franchise Agreement were inadvertently miscalculated; and

**WHEREAS,** Company and Franchisee now wish to amend the gross profit quotas set forth at Schedule 3 of the Franchise Agreement;

**NOW, THEREFORE**, for and in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby amend the Franchise Agreement as follows:

1.    Effective as of the Effective Date of the Franchise Agreement, Schedule 3 of the Franchise Agreement is hereby deleted in its entirety and is replaced by the new Schedule 3 attached to this Amendment.

2.    All other provisions of the Franchise Agreement remain in full force and effect and are hereby ratified and affirmed.

3.    This Amendment may be executed in counterparts, each of which shall be deemed to be an original, and all counterparts when taken together shall constitute one and the same instrument.  This Amendment may be executed and transmitted by facsimile or other electronic signature which shall be as valid as original signature.  It is expressly understood that this Amendment supersedes any and all prior or contemporaneous oral or written agreements and understanding between the parties relating to the subject matter hereof and contains the entire agreement of the parties with respect to such subject matter.  This Amendment will be governed by and construed in accordance with the law of the state of Georgia.

IN WITNESS WHEREOF, the parties have made this Amendment as of the date set forth above.

**SPHERION STAFFING LLC**

By: _____
Name: Sandra K. Mazur
Title: Division President

**FRANCHISEE:  Patrick A. Hart**

_____
(Signature)

**SCHEDULE 3**
**GROSS PROFIT QUOTAS**

Fiscal Year 2015 (prorated) ........$37,465
Fiscal Year 2016 ......................$463,067
Fiscal Year 2017 ......................$476,959
Fiscal Year 2018 ......................$491,268
Fiscal Year 2019 ......................$506,006
Fiscal Year 2020 ......................$521,186
Fiscal Year 2021 ......................$536,822
Fiscal Year 2022 ......................$552,926
Fiscal Year 2024 ......................$569,514
Fiscal Year 2025 (prorated) ......$537,716

In determining whether Franchisee has met the Gross Profit Quota for the initial Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company were parties to a previous Franchise Agreement covering all or a portion of the Area.  In determining whether Franchisee has met the Gross Profit Quota for the final Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company are parties to a renewal Franchise Agreement covering all or a portion of the Area.

## SECOND AMENDMENT TO FRANCHISE AGREEMENT

This SECOND AMENDMENT TO FRANCHISE AGREEMENT (the "Amendment") is made and entered into this 31st day of January, 2019 by and between SPHERION STAFFING, LLC, a Delaware limited liability company ("Company"), and Patrick A. Hart ("Individual Franchisee") and Hart & Associates LLC, an Alabama limited liability company ("Entity Franchisee") (Individual Franchisee and Entity Franchisee are hereinafter collectively referred to as "Franchisee").

WHEREAS, Individual Franchisee and Company entered into a Franchise Agreement dated November 23, 2015 (as amended, supplemented and assigned, referred to herein as the "Franchise Agreement") in connection with Franchisee's purchase of the Franchised Business (as that term is defined in the Franchise Agreement) from another Spherion franchisee, and which Franchise Agreement was subsequently assigned to Entity Franchisee;

WHEREAS, due to a change in business conditions relating to the Franchised Business, Franchisee has been unable to meet the Gross Profit Quotas set forth in the Franchise Agreement; and

WHEREAS, in order to support future activities and to encourage sales and growth of the Franchised Business, Company has agreed to amend the Gross Profit Quotas set forth at Schedule 3 of the Franchise Agreement, and Franchisee has in turn agreed to hire an employee to assist in the sales and growth of the Franchised Business;

NOW, THEREFORE, for and in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby amend the Franchise Agreement as follows:

1.      Schedule 3 (Gross Profit Quotas) of the Franchise Agreement is hereby deleted in its entirety and is replaced by the new Schedule 3 attached to this Amendment.

2.      Franchisee will employ at least one (1) salesperson who will devote full-time effort to supporting and growing sales of the Franchised Business.  Franchisee will have until March 31, 2019 to hire this salesperson, and if at any time during the Term of the Franchise Agreement the salesperson should leave the employ of Franchisee, Franchisee must hire a replacement within 60 days.

3.      All other provisions of the Franchise Agreement remain in full force and effect and are hereby ratified and affirmed.

4.      Individual Franchisee, together with his heirs, assigns, successors and representatives, and Entity Franchisee, along with its parents, subsidiaries, and affiliates, and their respective directors, officers, shareholders, partners, members, employees and agents (collectively, the "Releasing Parties"), each hereby jointly and severally release, remise, acquit and forever discharge Company and each and all of Company's directors, officers, shareholders, employees, agents and attorneys, and Company's parents, subsidiaries and affiliates and their respective directors, officers, shareholders, partners, members, employees, agents and attorneys,

and the predecessors, successors, heirs and assigns of any and all of them (collectively, the "Parties Released"), from and against any and all claims, demands, debts, expenses, costs, rights, actions, causes of action, loss, losses, damage, damages, liability and liabilities whatsoever, of any nature or kind, known or unknown, contingent or fixed, suspected or unsuspected, whether in tort, in contract, at law, in equity or otherwise, arising out of, asserted in, assertable in or in any way related to (i) the Franchise Agreement, (ii) any and all other agreements between the Parties Released and any Releasing Parties, and (iii) the business relationship between the Releasing Parties and any of the Parties Released, or any of them; including without limitation the registration, offer, and sale of the franchise granted under the Franchise Agreement; provided, however, that nothing contained herein shall operate to release Company from any current obligation to pay to Franchisee commissions which are currently due under the Franchise Agreement.  In the event any Releasing Party raises or asserts any claim, demand, right, action, or cause of action described in this Section 4, or alleges any debt, expense, cost, loss, losses, damage, damages, liability, or liabilities described in this Section5, this Section 4 shall be a complete and conclusive defense thereto.

5.      This Amendment may be executed in counterparts, each of which shall be deemed to be an original, and all counterparts when taken together shall constitute one and the same instrument.  This Amendment may be executed and transmitted by facsimile or other electronic signature which shall be as valid as original signature.  It is expressly understood that this Amendment supersedes any and all prior or contemporaneous oral or written agreements and understanding between the parties relating to the subject matter hereof and contains the entire agreement of the parties with respect to such subject matter.  This Amendment will be governed by and construed in accordance with the law of the state of Georgia.

IN WITNESS WHEREOF, the parties have entered into this Amendment as of the date set forth above.

**SPHERION STAFFING, LLC**

By: _____
Name: Sandra K. Mazur
Title: Division President

**INDIVIDUAL FRANCHISEE:**
Patrick A. Hart

_____
(Signature)

**ENTITY FRANCHISEE:**
Hart & Associates LLC

By: _____

Name: PATRICK HART

Title: OWNER

**SCHEDULE 3**
**GROSS PROFIT QUOTAS**

Fiscal Year 2019 ........................ $294,385
Fiscal Year 2020 ........................ $323,823
Fiscal Year 2021 ........................ $348,110
Fiscal Year 2022 ........................ $365,516
Fiscal Year 2023 ........................ $376,481
Fiscal Year 2024 ........................ $387,777
Fiscal Year 2025 (prorated) ....... $366,126

In determining whether Franchisee has met the Gross Profit Quota for the initial Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company were parties to a previous Franchise Agreement covering all or a portion of the Area.  In determining whether Franchisee has met the Gross Profit Quota for the final Fiscal Year set forth above, Franchisee's Gross Profits shall include Gross Profits made in any portion of such year during which Franchisee and Company are parties to a renewal Franchise Agreement covering all or a portion of the Area.