IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Carlos Eduardo Herrera de la Rosa, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | Civil Action File No. |
| Plaintiff, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | **COMPLAINT-CLASS ACTION** |
| SMART Alabama, LLC; and Total Employee Solution Support, LLC; | ) ) ) | |
| | ) | |
| Defendants. | ) ) ) | |
| | ) | |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff Carlos Eduardo Herrera de la Rosa ("Mr. Herrera" or "Plaintiff"), individually and on behalf of other similarly situated workers, by and through his counsel, bring this *Class Action Complaint* for damages against Defendants SMART Alabama, LLC ("SMART") and Total Employee Solution Support, LLC ("TESS") (collectively, "Defendants").

## I.    Introduction

1.    This case involves fraud against Plaintiff and other foreign workers who were exploited as part of a scheme for cheap labor in SMART's

automotive parts production factories.

2.      SMART associated with recruitment agency TESS for the
common purpose of recruiting foreign workers to secure Trade NAFTA ("TN")
visas for them to work as manual laborers on Defendant SMART's production
line.

3.      Defendants knew that TN visas would not and could not be
granted for manual labor positions such as the production line laborer
position that SMART wanted filled. This was because TN visas are available
only to high-skilled foreign workers to work in high-skilled and technical jobs.

4.      Defendants therefore hatched a scheme for the recruitment of
highly skilled Mexican engineers for invented high-skilled positions that
would qualify for the TN visa program.

5.      The plan was a bait and switch accomplished by fraud against
the foreign workers and the U.S. government: hire the high skilled Mexican
engineers for non-existent high-skilled jobs; assist these engineers with
securing the TN visas by submitting fraudulent documents to the U.S.
government; and when the foreign workers arrive to the United States,
switch the job to a low-skilled job with lower pay and excessive mandatory
work hours.

6.     Plaintiff Herrera was a victim of this scheme, having relied upon the fraudulent misrepresentations of Defendants to pay money for fraudulent visas, spend money to travel to the U.S. Consulate for interviews and move from Mexico to the United States for a job he believed was legal and would utilize his specialized education, experience, and skill.

7.     Plaintiff Herrera seeks to represent numerous other Mexican national employees who were similarly defrauded by Defendants.

8.     Defendants' conduct violated the federal and Georgia Racketeer Influenced and Corrupt Organizations Acts ("RICO").

9.     Plaintiff, on behalf of the Class (as defined below), seeks compensatory and trebled damages, as well as attorneys' fees and costs, for Defendants' violations of the federal and Georgia RICO.

## II.    <u>Jurisdiction and Venue</u>

10.     The Court has subject matter jurisdiction over the federal RICO claims because they arise under federal law.[1]

11.     The Court has pendent jurisdiction over Plaintiff's state law claims under RICO because they are part of the same case or controversy as their federal claims.[2]

---

[1] *See* 28 U.S.C. § 1331.
[2] *See* 28 U.S.C. § 1367.

12.     The Court has personal jurisdiction of Defendants because TESS resides in the State of Georgia, and SMART conducts systematic and continuous activity in this District, including through the RICO enterprise and the pattern of racketeering activity alleged below.

13.     Venue is proper in this District because:

    a.     all Defendants either reside, are found, have agents, or transact their affairs—including but not limited to the RICO enterprise and pattern of racketeering activity alleged below—in this District; and

    b.     "the ends of justice" require that all Defendants be brought before the Court.[3]

14.     Venue is also proper in this District under 28 U.S.C. § 1391 because Defendant TESS is a resident of this District, and a substantial part of the events and omissions giving rise to the claims alleged in this Complaint occurred within this District.

**III.     Parties**

*Plaintiff and the Putative Classes*

15.     Plaintiff Carlos Eduardo Herrera de la Rosa came to Alabama from Mexico on a TN visa on or about October 7, 2020 to work for SMART.

---

[3] *See* 18 U.S.C. §§ 1965 (a), (b), and (d).

16.    Mr. Herrera holds a Bachelor of Science in Mechatronics Engineering.

17.    Mr. Herrera currently resides in Mexico.

18.    Plaintiff and other similarly situated workers came to the U.S. on a TN visa to work for SMART.

19.    Plaintiff and other similarly situated workers are non-white Hispanic or Latino, citizens of Mexico and not United States citizens, and of Mexican national origin.

20.    At all relevant times, Plaintiff and other TN visa holders employed at SMART were each a "person" within the meaning of that term as defined by the Georgia and federal RICO.[4]

### *Defendants SMART and TESS*

21.    Defendant SMART is (a) a Delaware limited liability company; (b) registered with the Alabama Secretary of State as a foreign limited liability company; and (c) has as its principal address 401 Adams Avenue, Suite 780, Montgomery, AL 36104.

22.    According to SMART's website, it is "an automotive parts manufacturer… SMART currently produces stamped metal and robotic

---

[4] *See* 18 U.S.C. § 1961(3); O.C.G.A. § 16-14-6(c).

welded assemblies for 3 vehicles … for its customer, Hyundai Motor
Manufacturing Alabama (HMMA). SMART has a production capacity of
400,000 vehicles/year…."[5]

23.    Defendant SMART transacts business in Georgia and has
engaged in a persistent course of fraudulent conduct in Georgia through
TESS as its business associate, and co-conspirator.

24.    Defendant SMART regularly directed communications to, and
received communications from Defendant TESS through their Gwinnett
County, Georgia offices.

25.    Defendant TESS is a Georgia domestic limited liability company,
with its principal place of business at 2430 Green Mountain Drive, Braselton,
GA 30517, located in Gwinnett County.

26.    Defendant TESS directed communications to and received
communications from Plaintiff Herrera and other similarly situated workers
and Defendant SMART at TESS's Gwinnett County, Georgia address.

27.    According to TESS's website, it "is the most efficient recruiting
and staffing company in the market.  We provide TN-Visa workers and help

---

[5] *See* https://www.smart-alabama.com/about-us (last viewed March 25, 2022).

companies scale for growth. We have over 10 years of experience providing recruiting and staffing services."[6]

28.     According to TESS's Facebook page, it "operates 25,000 workers in over 20 cities around the USA."[7]

29.     Each Defendant is a "person" within the meaning of RICO, in that it is an individual or an entity capable of holding a legal or beneficial interest in property.[8]

## IV.   **Statement of Facts**

### a. **The TN visa Program**

30.     The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada.[9]

31.     The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to

---

[6] *See* https://tessus-mex.com/about-us/ (last viewed June 30, 2022).
[7] *See* https://www.facebook.com/TESS.LLC.USA/ (last viewed June 30, 2022).
[8] *See* 18 U.S.C. § 1961(3).
[9] *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

temporarily enter the United States for employment within their profession.[10]

32.    Engineers are among the categories of professionals permitted entry into the United States with TN visas.[11]

33.    A Mexican citizen applying for a TN visa:

must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization…The documentation shall fully affirm:

(A) The [TN] profession of the applicant;

(B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

(C) The anticipated length of stay;

(D) The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and

---

[10] *See* 8 C.F.R. § 214.6(a).
[11] *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

(D) The arrangements for remuneration for services to be rendered.[12]

34.     The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer."[13]

35.     Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years.[14]

36.     The TN visa is tied to the associated employer for the duration of the TN visa period unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers.[15]

37.     Since 1997, the number of TN visas issued has increased significantly every year, except for 2020 due to the COVID-19 pandemic. For example, in 1997, 287 TN visas were issued to Mexican nationals.[16] By 2007,

---

[12] *See* 8 C.F.R. § 214.6(d)(3)(ii).

[13] *See* 9 F.A.M. § 402.17-5(A).

[14] *See* 8 C.F.R. § 214.6(e).

[15] *See* 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker).

[16] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed March 25, 2022).

the number had increased to 4,060.[17] In 2017, it had grown to 15,993 visas.[18] In 2021, 24,881 TN visas were issued to Mexican nationals.[19]

38.    Oversight of TN visa holders' working conditions in the United States is largely unregulated. As a consequence, there have been multiple reports of abuses—including misrepresentations in employment contracts—of TN workers,[20] as well as several lawsuits.[21]

**b.  The RICO Fraud**

---

[17] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed March 25, 2022).

[18] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed March 25, 2022).

[19] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2021), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY21NIVDetailTable.pdf (last viewed Oct. 23, 2022).

[20] *See* Coerced under NAFTA: Abuses of Migrant Workers in the TN visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).

[21] *See, e.g., Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Castellanos v. Wordlwide Distribution Sys. USA, LLC,* No. 2:14-CV-12609, 2016 WL 11678220, at *8 (E.D. Mich. June 20, 2016)

     *a.   SMART Engages TESS to Recruit Foreign Laborers to Work on TN Visas*

39.    SMART and TESS associated with each other for the common purpose of recruiting Mexican engineers for and employing Mexican engineers on SMART's production line.

40.    SMART agreed with TESS for TESS to recruit foreign workers to work as laborers on SMART's production line.

41.    SMART and TESS knew that TN visas would not and could not be granted for workers working manual labor positions such as the production line laborer positions SMART wanted filled.

42.    SMART and TESS therefore hatched a scheme to recruit highly skilled Mexican engineers for invented high-skilled positions that would qualify for the TN visa program.

43.    The plan was a bait and switch: hire the high skilled Mexican engineers for non-existent high-skilled jobs so that they could secure a TN visa; but upon their arrival to the United States, switch the job to a low-skilled job with lower pay.

44.    As part of the scheme TESS, with SMART's authority, posted advertisements seeking Mexican engineers for claimed high-skilled jobs at SMART.

45.    Defendant TESS posted the job listing as the agent of SMART.

46.    TESS and SMART knew these positions did not exist.

47.    In May 2020, Plaintiff Herrera saw one of the job listings on LinkedIn for a Quality Engineer position at SMART.

48.    A few days after seeing the job listing, Plaintiff Herrera submitted an application for the position by completing a form on LinkedIn.

49.    On or about September 15, 2020, Plaintiff Herrera received his first response from TESS: an email from Daniela Espinosa, Assistant Manager at TESS, confirming receipt of his application and requesting additional information, such as his resume.

50.    Plaintiff Herrera provided the requested information via email, and over the next week, he and Ms. Espinosa and TESS Junior Specialist Marisol Montiel exchanged additional messages over email and WhatsApp.

51.    Among other things, Ms. Espinosa and Ms. Montiel told Plaintiff Herrera he was applying for a position as a Quality Engineer at SMART.

52.    Ms. Espinosa and Ms. Montiel knew SMART was not seeking to fill Quality Engineer positions.

53.    TESS, as an agent of SMART, made the same or substantially similar misrepresentations to many Mexican engineers beginning as early as January 2020.

54.     Plaintiff Herrera and other Mexican engineers moved forward with the application and immigration process in reliance on the false representations in these messages.

55.     On September 24, 2020, Ms. Espinosa sent Plaintiff Herrera an email informing him that he had been selected for a Skype interview with SMART the following day.

56.     Ms. Espinosa's email did not state Mr. Herrera would work as a production line laborer, rather than as a Quality Engineer.

57.     At the time Ms. Espinosa, acting as agent for SMART, sent Plaintiff Herrera the September 24, 2020 email, she knew SMART intended to hire Mr. Herrera as a production line laborer, rather than as a Quality Engineer.

58.     On September 25, 2020, Cynthia Rios, a SMART Employee Relations Specialist, and Gary Sport, SMART's Administration General Manager, interviewed Mr. Herrera over Skype.

59.     During the brief interview, Ms. Rios and Mr. Sport knew Plaintiff Herrera would be hired to work as a laborer on the production line alongside laborers with no technical training or prior technical experience.

60.     Despite this knowledge, Ms. Rios and Mr. Sport never disclosed that the job was as a production line laborer.

61.     Ms. Rios and Mr. Sport asked detailed questions about Mr. Herrera's education and professional work history, which would not be relevant if he was being hired as a production laborer.

62.     On September 26, 2020, TESS Assistant Manager Ms. Espinosa sent an email to Plaintiff Herrera attaching a job offer letter from SMART.

63.     The job offer was on SMART's letterhead, signed by Gary Sport, and dated September 26, 2020.

64.     The SMART offer letter delivered to Mr. Herrera from TESS stated:

> I am pleased to offer you an employment as Quality Engineer at SMART Alabama, LLC. I am confident that your academic background and professional knowledge will be a valuable asset to the growth of this company's business in the US. Per our agreement, the terms and conditions of your employment shall be as the following:
>
> • Job Title: Quality Engineer
> • Position: Up to 1 year from October 5, 2020, but contingent upon the approval of TN visa by the US consulate
> • Purpose: Annual salary of $38,000.00 (Full Time, based on the terms and conditions).

*See* Ex. A.

65.     At the time they provided the job offer letter, SMART and TESS knew that Plaintiff Herrera would not be hired as a Quality Engineer and that he instead would be hired as a SMART production line worker.

14

66.     At the time they provided the job offer letter to Plaintiff Herrera, SMART and TESS knew that Plaintiff Herrera would not be eligible for a TN visa for a position as a production line laborer.

67.     At the time SMART and TESS provided the job offer letter, they knew Plaintiff Herrera would work as an hourly, rather than a salaried, employee.

68.     At the time SMART and TESS provided the job offer letter, they knew Plaintiff Herrera would be paid much less than the $19.00 per hour hourly equivalent ($38,000 / 2000 annual hours = $19.00) of a full-time $38,000 per year salary.

69.     SMART and TESS provided the job offer letter making false promises to Plaintiff Herrera for the purpose of inducing him to apply for a TN visa and travel to the United States for a non-existent job.

70.     Defendant SMART drafted and signed the job offer letter and transmitted through the mail and/or wires the job offer letter to TESS.

71.     TESS, with the agreement of SMART, transmitted the offer letter to Plaintiff Herrera in Mexico by use of the mail and/or wires.

72.     Plaintiff Herrera relied on the written offer from SMART and delivered by TESS, signed the offer letter, and returned the offer letter to TESS.

15

73.     On September 30, 2020, Marisol Moniel, acting on behalf of SMART and TESS, sent Plaintiff Herrera an email providing a support letter ("Support Letter") for Plaintiff Herrera's TN visa application.

74.     The Support Letter is a submission required as part of any TN visa application pursuant to 8 C.F.R. 214.6(d)(3)(ii).

75.     The purpose of the Support Letter is to inform the United States government that the applicant and job position offered satisfy the strict criteria of the TN visa program. This substantiation of the job position is a strict requirement of the TN visa program. *Id.*

76.     The Support Letter provided by email to Plaintiff Herrera from TESS was signed by Gary Sport, Administration General Manager of SMART, dated September 15, 2020, and addressed to the U.S. Consulate General in Mexico City, Mexico.

77.     The Support Letter to the U.S. Consulate General stated that Plaintiff Herrera would hold the job title of "Maintenance Engineer as a full-time employee and receive an annual salary of $38,000.00 plus a standard employee benefits package."

78.     As required by federal law to secure a TN visa, the Support Letter described the purported position SMART claimed Plaintiff Herrera would have under the TN visa program.

16

79.    The Support Letter contained repeated false statements made for the purpose of securing Plaintiff Herrera's employment through the TN visa program.

80.    Among the false statements in the Support Letter were:

"The position offered is a professional and specialized in nature, and falls within the schedule of the permitted TN occupations - Engineers - authorized by NAFTA.

The Maintenance Engineer is a professional position requiring Bachelor's degree in engineering field. The person holding this position is responsible for electronic maintenance and engineering services for the automation robotic control systems for the stamping and welding assembly lines. The Maintenance Engineer performs installation, set-up, and trial run of new equipment as well as periodic diagnosis, on-site trouble shooting, and scheduled maintenance. The Maintenance Engineer also coordinates with other Production Engineers in regularly scheduled maintenance sessions."

*See* Ex. B.

81.    The Support Letter also falsely stated:

"To perform the responsibilities of the Maintenance Engineer, the person holding this position must have in-depth knowledge in electrical circuits, electrodynamics, electromagnetic spectrum, thermos dynamic, materials engineering, mechanical engineering, signal processing, power transmission, instrumentation, and computer engineering. He/she must be able to analyze manufacturing process and activities to assess efficiency and effectiveness of manufacturing activities; devise practical solutions to engineering issues and inconsistencies; and implement various maintenance instructions to obtain the desired

operation in our assembly equipment. Such advanced
knowledge and skills are typically attained through an
undergraduate program in Mechatronics Engineering,
Electrical Engineering, Mechanical Engineering, or other
engineering field.

As a Maintenance Engineer, Mr. Gómez Vega will utilize
his academic background in Mechatronics Engineering and
his professional background in the field of production and
maintenance engineering to improve production facilities,
reduce the incidence of costly breakdowns, and develop
strategies to improve overall reliability and safety of plant,
personnel and production processes of SMART ALABAMA,
LLC."

*See* Ex. B.[22]

82.    SMART's Support Letter also recited Plaintiff Herrera's

qualifications for a TN visa position—including that he obtained a bachelor's

degree in Mechatronics Engineering from the Universidad Tecnologica El

Retońo in Aguscalientes, Mexico, and had about five years of engineering

experience and related fields—in order to secure the TN visa.

83.    During the entirety of his employment, Plaintiff Herrera was

required to work on the production line, and his primary job was to

---

[22] As indicated in this paragraph, Plaintiff Herrera's TN Support Letter
refers to a "Mr. Gomez Vega" as the engineer applicant. This apparent
scrivener's error shows the TN Support Letter was a template SMART used
for other applicants.

repetitively place a metal part that makes up the door frame of a car into a factory jig so that it could be robot-welded onto a vehicle frame.

84.     SMART and TESS provided the fraudulent job offer and Support Letter to Plaintiff Herrera for the purpose of tricking Plaintiff Herrera into securing a TN visa and travelling to the United States for a job that did not exist and that did not qualify for the TN visa program.  Plaintiff Herrera accepted employment pursuant to the terms of the Support Letter.

85.     SMART and TESS provided the fraudulent Support Letter to the United States government for the purpose of tricking the government into issuing a TN visa to Mr. Herrera for work that was not permitted under the TN visa program.

86.     In contrast to SMART and TESS, Plaintiff Herrera had no knowledge that the statements in the Support Letter were false: the statements in the letter were consistent with Plaintiff Herrera's Job Offer (except that the former said he would be a "Quality Engineer" and the latter said "Maintenance Engineer").

87.     At the time Mr. Sport signed and Ms. Moniel transmitted the Support Letter to Plaintiff Herrera by email, they and other SMART and TESS management personnel who authorized the letters knew Plaintiff

Herrera and other Mexican engineers would not be employed at SMART as Maintenance Engineers. Rather, they knew:

      a.  Plaintiff Herrera would work on the production line as an assembly laborer;

      b.  Plaintiff Herrera would perform work that was identical to other employees with no engineering training or credentials; and

      c.  engineering training and credentials were not required or necessary to perform the assembly line work.

88.    The Support Letter signed by SMART and delivered by TESS to Plaintiff (for him to attach to his TN visa application) made material misrepresentations to the U.S. government and to Plaintiff.

89.    The Support Letters were drafted through a decision-making process between SMART and TESS in which representatives of both entities provided input.

90.    In reliance on the material misrepresentations of SMART and TESS, Plaintiff Herrera submitted a TN visa application and among other things (a) paid a visa processing fee to the United States government of $160; and (b) incurred expenses when travelling to the consulate as part of the TN visa application process.

91.    The U.S. government, relying on SMART's misrepresentations in the Support Letter and Plaintiff's interview (in which he truthfully relied on the job offer letter and Support Letter), issued a TN visa to Plaintiff Herrera.

92.    After receiving his TN visa, Plaintiff Herrera traveled from Mexico to Alabama to work at SMART based on the false representations set forth above.

93.    Plaintiff Herrera worked at SMART from October 2020 until February 2022.

94.    Plaintiff Herrera never worked as an engineer at SMART.

95.    During the entirety of his employment. Plaintiff Herrera was required to work on the production line.

96.    Contrary to the Support Letter, he never "analyze[d] manufacturing process and activities to assess efficiency and effectiveness of manufacturing activities; devise[d] practical solutions to engineering issues and inconsistencies;" never "implement[ed] various maintenance instructions to obtain the desire operation in our assembly equipment[,]" and never "utilize[d] his academic background in Mechatronics Engineering and his professional background in the field of production and maintenance engineering to improve production facilities, reduce the incidence of costly breakdowns, and develop strategies to improve overall reliability and safety

of plant, personnel and production processes of SMART ALABAMA, LLC."
*See* Ex. B.

97.     SMART did not pay Plaintiff Herrera a salary of $38,000 per year
for full time employment.

98.     Plaintiff Herrera suffered pecuniary losses that were directly and
proximately caused by Defendants' fraudulent scheme, including but not
limited to:

> a.     Travel costs to and from the U.S. consulate for the
>        mandated interview;
>
> b.     U.S. Government visa processing fees of $160 per visa;
>
> c.     Unreimbursed expenses for travel to the U.S. to work for
>        SMART;
>
> d.     Costs to purchase essential furniture and household goods
>        upon arrival at housing provided by SMART; and
>
> e.     Lower wages than what Defendants fraudulently promised
>        Plaintiff Herrera during the recruitment process.

99.     Defendants SMART and TESS engaged in hundreds of similar
separate fraudulent acts for the purpose of recruiting and employing dozens
of Mexican TN visa holders beginning as early as January 2020, and they
each suffered similar pecuniary damages.

100.   The fraudulent scheme described herein thus became a regular way of conducting the businesses of Defendants SMART and TESS.

## V.   **Federal and Georgia RICO Violations**

### a.  **RICO Enterprise**

101.   Defendants SMART and TESS were an enterprise ("RICO Enterprise") within the meaning of federal and state RICO in that they were associated in fact although not a legal entity.[23]

102.   The RICO Enterprise was an ongoing organization with a framework, either formal or informal, for carrying out its common purpose.

103.   The association comprising the RICO Enterprise began as early as January 2020 and has resulted in fraud upon Plaintiff Herrera, the U.S. government, and many other foreign workers recruited from Mexico to work for SMART.

---

[23] *See id.*

### i.   *Association-in-Fact*

104.   RICO Enterprise members associated with each other for the common purpose of recruiting Mexican engineers for and employing Mexican engineers on Defendant SMART's production line.

105.   SMART agreed with TESS for TESS to recruit foreign workers to work as laborers on SMART's production line.

106.   SMART and TESS knew TN visas would not and could not be granted for workers working manual labor positions such as the production line laborer position that SMART wanted filled.

107.   Knowing that TN visas would be granted only for highly skilled foreign workers for high-skilled job positions, SMART and TESS agreed that SMART and TESS would (1) recruit high skilled Mexican and Hispanic engineers that satisfied the TN visa requirements; and (2) misrepresent the production line labor positions (which did not qualify for TN visas) as high-skilled engineering job positions (which did qualify for TN visas).

108.   The plan continued with TESS qualifying and recruiting Plaintiff Herrera and other candidates and checking their educational background and engineering skills, and taking other steps to organize video teleconference interviews with SMART and the candidates.

109.   The plan continued with SMART during the interview confirming that Plaintiff Herrera and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job positions available for Plaintiff Herrera and other foreign workers.

110.   The plan continued with SMART and TESS providing fraudulent job offers to Plaintiff Herrera and other foreign workers that mispresented the job positions, duties, and pay.

111.   The purpose of the fraudulent job offers was to appear to meet the requirements for TN visas and to entice Plaintiff Herrera and other foreign workers to accept the fake job positions and apply for TN visas.

112.   The plan continued with SMART and TESS providing fraudulent TN visa Support Letters to Plaintiff Herrera and other foreign workers upon the acceptance of the job offers.

113.   At the time that SMART and TESS provided the fraudulent TN visa Support Letters to Plaintiff Herrera and other foreign workers, SMART and TESS knew that the letters included false descriptions of the job positions available for Plaintiff Herrera and other workers, false descriptions of the pay to Plaintiff Herrera and other foreign workers, and other false information.

114.   The fraudulent TN visa Support Letters were directed to the
United States consulate and were part of SMART's and TESS's scheme to
commit Visa Fraud.

### b. *Defendants Participated in the Operation and Management of the Enterprise's Affairs*

115.   SMART and TESS participated in the management of the RICO
Enterprise's affairs.

116.   SMART and TESS agreed through a mutual decision-making
process to post job announcements for positions of employment at SMART
which would, by reason of the education, experience, and skill required,
qualify the successful applicant to obtain a TN visa.

117.   TESS and SMART agreed to provide information concerning the
positions at SMART to individuals who responded to the announcements it
had posted for SMART.

118.   TESS developed a strategy to recruit foreign workers who may be
qualified for the TN visa, including by identifying appropriate websites and
other locations to post announcements for jobs at SMART that may be seen
and responded to by qualified Mexican nationals.

119.   TESS then executed that strategy, communicating with Plaintiff
Herrera and other potential targets of the fraud scheme to screen them for

employment with SMART, checking their educational background and engineering qualifications, and qualifying them for interviews.

120.   To facilitate the interviews with SMART personnel, TESS provided the candidates with specific information, including interview dates.

121.   SMART interviewed the candidates recruited by TESS and participated in deciding which candidates would be offered employment at SMART.

122.   After SMART decided which candidates to hire, SMART directed TESS to provide those candidates with job offers, which TESS did.

123.   SMART prepared Support Letters for candidates.

124.   TESS caused the Support Letters (prepared and signed by SMART) to be submitted to Plaintiff and other candidates, and the U.S. Consulate on behalf of TESS, SMART, and the hired candidates.

125.   SMART continued providing fraudulent offer letters and Support letters to prospective TN visa holders after well after SMART started employing other TN visa holders in production jobs.

### c.   *The Enterprise Undertook a Pattern of Continuous Coordinated Conduct*

126.   As shown by the fact that Plaintiff Herrera viewed an announcement for a job at SMART and received communications from

SMART and TESS in January 2020, the pattern of continuous coordinated conduct by RICO Enterprise began in January 2020, at the latest.

127.   SMART and TESS continued to recruit Mexican nationals to work at SMART with TN visas for at least two years after the January 2020 job posting Plaintiff Herrera viewed.

128.   SMART and TESS continue their illegal scheme by continuing to employ workers under the TN visa program that are highly skilled but employed in manual labor low-skilled positions and at lower pay than to the American workers.

129.   SMART and TESS continue to employ the workers whose TN visas were fraudulently procured and to participate in and profit from this illegal scheme.  The continued employment is for positions that do not qualify under the TN visa program.

130.   Upon information and belief, SMART and TESS recruited at least 40 foreign workers under the TN visa program under this scheme to advertise false job openings, make false job offers, submit false TN visa Support letters, induce the foreign workers to come to the United States for non-existent jobs, and require the foreign workers to work in manual labor positions for lower pay.

131.   The TN visa is tied to the associated employer for the duration of the TN visa period, unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers. 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker). SMART's continued employment of the TN visa holders threatens future fraud against the U.S. Government when these visas are renewed at the end of the three-year visa period.

132.   SMART continues to participate in the scheme by hiring and retaining Class members whose permission to work in the United States arises out of their TN visa, and by assigning them to positions that do not qualify for the TN visa program, all in continual violation of 18 U.S.C. § 1456.

### d.  *The Enterprise Engaged in Racketeering Activity through Numerous Predicate Acts of Fraud*

133.   As part of a scheme or artifice to defraud, Defendants SMART and TESS caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like Plaintiff Herrera for employment with SMART.

134.   The job announcements contained material misrepresentations upon which Plaintiff Herrera and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

135.   As part of a scheme or artifice to defraud, Defendants SMART and TESS caused to be transmitted by mail and/or wires the offer letters which offered employment with SMART to Plaintiff Herrera and others.

136.   The offer letters contained material misrepresentations upon which Plaintiff Herrera and others relied to their detriment, constituting a violation of 18 U.S.C. § 1341 and/or § 1343.

137.   As part of a scheme or artifice to defraud, Defendants SMART and TESS caused to be transmitted by mail and/or wires Support Letters to the U.S. Government regarding the jobs to be performed by Plaintiff Herrera and others.

138.   Defendants SMART and TESS made material misrepresentations in the Support Letters submitted to the U.S. Government, and the U.S. Government relied on those statements in issuing TN visas to Plaintiff Herrera and others, constituting violations of 18 U.S.C. § 1341, § 1343, and § 1546. [24]

139.   SMART and TESS, knowingly and with the intent to defraud, recruited, solicited, and hired Plaintiff Herrera and other foreign workers for purposes of employment by means of false and fraudulent pretenses,

---

[24] *See e.g., U.S. v. Wu*, 20-10273, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

including representations and promises regarding the employment, in
violation of 18 U.S.C. § 1351.

> **e. *Plaintiff Suffered Pecuniary Injuries that Were
> Directly and Proximately Caused by the Pattern
> of Racketeering Activity Engaged by the
> Enterprise***

140.   SMART and TESS induced Plaintiff Herrera and other foreign
workers to unknowingly pay for and apply for a fraudulent TN visa, to travel
to the United States for a job that did not exist, and to accept employment at
terms that were less than promised.

141.   SMART did not pay Plaintiff Herrera and others a salary of
$38,000 per year for full-time employment.

142.   Plaintiff Herrera and other TN visa foreign workers suffered
pecuniary losses that were directly and proximately caused by the fraudulent
job posting for a position with SMART, the application and related
information provided to them by Defendants SMART and TESS, the offer
letter provided to them by Defendants SMART and TESS the Support Letter
provided to them and the U.S. Consulate by Defendants SMART and TESS
and the resulting TN visas issued to them, including but not limited to:

> a.   Travel costs to and from the U.S. consulate for the mandated
> interview;

b.  U.S. Government visa processing fees of $160 per visa;

c.  Unreimbursed expenses for travel to the U.S. to work for
SMART;

d.  Costs to purchase essential furniture and household goods upon
arrival at housing provided by SMART; and

e.  Lost wages in the form of the difference between the wages
promised and the lower wages actually paid.

143.   Plaintiff Herrera and other TN visa holders would not have
suffered these pecuniary losses but for the material misrepresentations
Defendants made as part of the scheme to defraud Plaintiff Herrera, other
TN visa holders, and the U.S. Government about jobs that did not exist.

### b. RICO Conspiracy

144.   Plaintiff pleads the existence of a RICO Conspiracy.

145.   Defendants SMART and TESS agreed that TESS would post
multiple fraudulent job announcements using wires; that SMART and TESS
would send multiple fraudulent job offers to multiple different candidates;
and that SMART and TESS would send fraudulent Support Letters to
Plaintiff and others and the U.S. Government, which constitute multiple
predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341

32

and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, and misuse of visas in violation of 18 U.S.C. § 1546.

### c. Rule 23 Class Allegations

146.   Plaintiff brings the federal and Georgia RICO claims against Defendants SMART and TESS as a class action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of himself and a class of persons consisting of:

> All individuals who, between April 7, 2019 and the present, (1) were recruited by TESS, (2) received wages from SMART; and (3) were TN visa holders.

147.   Excluded from the Class are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the Class periods have had a controlling interest in any Defendant; and all persons who submit timely and otherwise proper requests for exclusion from the Classes.

### *Numerosity*

148.   Upon information and belief, there are over 40 individuals who would be members of the Class.

149.   The members of the Class are sufficiently numerous that joinder of all members is impractical.

### *Existence and Predominance of Common Questions*

150.    Common questions of law and fact exist as to Plaintiff and members of the Class and predominate over questions affecting only individual Class members.

151.    These common questions include:

a.  whether the Defendants—through the RICO Enterprise— committed a pattern of racketeering activity causing Plaintiff and other TN visa holders to suffer pecuniary losses;

b.  Whether Defendants conspired to violate the RICO;

c.  The nature and extent of class-wide injury and the measure of damages for the RICO violations;

d.  Whether, if Plaintiff sustained actual damages for RICO violations, Defendants acted with gross fraud, wantonness, maliciousness, and/or the willful disregard of the rights of others;

### *Typicality*

152.    Members of the Class have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

153.    Plaintiff and the Class members have the same statutory rights under RICO.

154.   Plaintiff and the Class were recruited and employed under the same or similar circumstances giving rise to the same claims.

155.   Plaintiff and the Class members suffered similar types of pecuniary damages.

156.   Plaintiff and the Class members suffered similar types of economic and non-economic compensatory damages.

157.   Plaintiff's claims are typical of the claims of the Class because, among other things, Plaintiff was a (1) TN visa holder; (2) Hispanic Mexican national, Mexican citizen, and non-U.S. citizen; and (3) an employee who worked for SMART and suffered the same violations as the Class members.

158.   Plaintiff's interests are co-extensive with the interests of the Class members. Plaintiff has no interest adverse to the Class members.

### ***Adequacy***

159.   Plaintiff will fairly and adequately represent the interests of the Class members. His interests do not conflict with the interests of the members of the Class he seeks to represent.

160.   Plaintiff understands that, as a Class representative, he assumes a responsibility to the Class to represent its interests fairly and adequately.

161.   Plaintiff has retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiff and his counsel will not vigorously pursue this matter.

### *Superiority*

162.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

163.   The damages suffered by each individual Class member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual control or prosecution of the litigation.  Plaintiff is unaware of any difficulties managing this lawsuit as a class action, and it is desirable to maintain this class action in the present forum.  Plaintiff is unaware of any litigation already begun concerning this controversy.

164.   Further, it would be difficult for members of the Class to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardships for members of the Class, the Court, and Defendants.

165.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

166.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

167.   This case does not present individualized factual or legal issues which would render a class action difficult.

168.   In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**Count I**

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68
(Class Claim)
(Against All Defendants)

169.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

170.   This Count sets forth claims by Plaintiff and other members of the Class against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

171.   Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

172.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

173.   The RICO Enterprise, as defined in paragraphs 101-145, *supra*, is an association-in-fact enterprises with the common purpose to recruit, contract, transport, and employ Mexican TN visa holders to work at SMART's business operations in Alabama.

174.   The RICO Enterprise is engaged in and affects interstate commerce.

175.   The RICO Enterprise functions as a continuing unit.

38

176.   Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprise, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

177.   Each of the Defendants also participated in the operation or management of the enterprise itself, directing the activity of the enterprise.

178.   Specifically, Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

     a.  Mail fraud in violation of 18 U.S.C. § 1341;

     b.  Wire fraud in violation of 18 U.S.C. § 1343;

     c.  Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351; and

     d.  Visa Fraud in violation of 18 U.S.C. § 1546.

<u>*Predicate Acts*</u>

<u>Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343</u>

179.  As set forth in the preceding paragraphs, Defendants, through the RICO Enterprise, made—and/or conspired to make—material misrepresentations to the U.S. government and to TN visa applicants

regarding the nature of Plaintiff's and other Class members' work, the hours they would work, and the wages they would receive.

180.   As set forth in the preceding paragraphs, the Defendants, though the RICO Enterprise, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

181.   These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351</u>

182.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiff and other Class members outside the United States—and/or conspired to do so—for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiff's and other Class members' work, the hours they would work, and the wages they would receive.

183.   These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Visa Fraud: 18 U.S.C. § 1546</u>

184.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, (a) knowingly subscribed as true multiple false statements with respect to material facts in the TN visa application materials required by immigration laws and regulations, and (b) knowingly presented the materials to Plaintiff Herrera, other workers, and U.S. visa-issuing authorities.

185.   The TN visas would not have been issued to Plaintiff and others but for the false statements concerning the work to be performed by Plaintiff and others at SMART.

186.   These willful, knowing, and intentional acts constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1546.

<u>*Pattern of Related Racketeering Acts*</u>

187.   The Defendants engaged in the racketeering activity described in this claim repeatedly in 2020 through the present.

188.   The pattern affected hundreds of individuals, actually accomplishing its fraudulent purposes on the U.S. Government and foreign workers who came to work for SMART on dozens of occasions during the period of the pattern of racketeering acts.

189.   The Defendants, through the RICO Enterprise, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

190.   The Defendants' racketeering acts have or had similar purposes: to profit from the fraud Defendants committed in the contracting, hiring, and employment of Plaintiff and other Class members.

191.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiff and other Class members, including underpayment of wages and lost employment opportunities.

192.   As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

193.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, directed their racketeering activities at similar individuals and entities: Plaintiff, other Class members, and federal government agencies.

194.   Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiff and other Class members.

*Injury and Remedies*

195.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiff and Class members have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses.

196.   Plaintiff and other Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

     a.   compensation for their injuries to their property;

     b.   trebling of the damages set forth in subparagraph (a), *supra*; and

     c.   attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

197.   Plaintiff is also entitled to recover their reasonable attorney's fees and costs of litigation.

## Count II

Georgia Racketeer Influenced and Corrupt Organizations Act
(Class Claim)
(Against All Defendants)

198.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

199.   This Count sets forth claims by Plaintiff and other members of the Class against all Defendants for damages resulting from Defendants' violations of Georgia RICO.

200.   Plaintiff is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

201.   Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, and therefore, Plaintiff has standing to sue pursuant to the Georgia RICO, O.C.G.A. § 16-14-6(c).

202.   Each Defendant is a legal entity, and therefore an enterprise, within the meaning of O.C.G.A. § 16-14-3(3).

203.   The RICO Enterprise is an association-in-fact enterprise with the common purpose of recruiting, contracting, transporting, and employing Mexican TN visa holders to work at SMART's business operations. O.C.G.A. § 16-14-3(6).

204.   Defendants acquired and/or maintained control of real and personal property, including land, buildings, motor vehicles, and property and money associated with the Defendants' recruiting, staffing, and manufacturing operations, through a pattern of numerous acts of racketeering activity in violation of O.C.G.A. § 16-14-4(a), related by their common purpose.

205.   Defendants were employed by or associated with the RICO Enterprise and conducted or participated in the RICO Enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b) and 16-14-4(c), related by their common purpose of recruiting foreign workers to secure TN visas for them to work as manual laborers on Defendant SMART's production line.

206.   Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO Violations set forth in the preceding paragraphs, pursuant to O.C.G.A. § 16-4-3(5)(c), are the following:

   a.  Mail fraud in violation of 18 U.S.C. § 1341;

   b.  Wire fraud in violation of 18 U.S.C. § 1343;

   c.  Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

   d.  Visa fraud in violation of 18 U.S.C. § 1546; and

45

e.  False Statements and Writing in violation of O.C.G.A. § 16-10-20.

### *Predicate Acts*

### Conduct Defined as "Racketeering" in the Federal RICO

207.  As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting, in violation of 18 U.S.C. §§ 1351; and visa fraud in violation of 18 U.S.C. and § 1546.

### False Statements and Writings: O.C.G.A. § 16-10-20

208.  As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, did or conspired to knowingly and willfully falsify material facts and make false, fictitious, or fraudulent statements or representations regarding the wages Plaintiff would receive, and the work Plaintiff would perform as detailed in the Support Letters provided to Plaintiff.

209.  These knowing and willful acts constituted false statements in violation of O.C.G.A. § 16-10-20.

*Pattern of Related Racketeering Acts*

210.   The Defendants committed multiple acts of racketeering activity in furtherance of the fraudulent scheme to recruit and employ Mexican engineers for non-existent jobs. O.C.G.A. § 16-14-3(4).

211.   The Defendants committed multiple acts of racketeering activity in furtherance of the fraudulent transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. *Id.*

212.   As set forth herein, these acts of racketeering activity, included, but are not limited to:

> a.   SMART directed TESS to post job offers for employment at SMART that contained fraudulent misrepresentations which Plaintiff and others relied upon;
>
> b.   TESS agreed to post job offers for employment at SMART that contained fraudulent misrepresentations which Plaintiff and others relied upon;
>
> c.   SMART and TESS interviewed Plaintiff and others using wires and made fraudulent misrepresentations to them for the purpose of enticing them to apply for employment at SMART

which did not exist and ultimately to perform jobs which were
not eligible for TN visas;

d.  SMART prepared and submitted through TESS fraudulent
Support Letters which falsely certified the nature of the jobs
being offered to Plaintiff and others at SMART;

e.  Defendants submitted the fraudulent Support Letters to the
U.S. Government for the purpose of defrauding the U.S.
Government and inducing it to issue TN visas to Plaintiff and
others for jobs that did not qualify for the TN visa program.

### *Injury and Remedies*

213.   As a direct and proximate result of the Defendants' willful,
knowing, and intentional acts discussed in this lawsuit and count, Plaintiff
and Class members have suffered injuries to their property, including but not
limited to visa processing fees, unreimbursed travel expenses, incidental
relocation expenses, wage underpayments, lost employment opportunities,
and/or other pecuniary losses.

214.   Plaintiff has sustained actual damages, and Defendants acted
with gross fraud, wantonness, maliciousness, and/or the willful disregard of
the rights of others, such that Plaintiff and the Class are entitled to punitive
damages.

215.   Plaintiff and other Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

    a.   Compensation for injuries to their property, including expenses for travel to U.S. Consulates for interviews, visa processing fees, expenses for travel to the United States and to purchase furniture and other living necessities, and lost economic opportunities to perform other work;

    b.   Punitive damages;

    c.   Trebling of the damages set forth in subparagraph (a) and (b) *supra*; and

    d.   Attorney's fees and costs and expert's fees and costs associated with this action as authorized by O.C.G.A. § 16-14-6(c).

## **Demand for Trial by Jury**

216.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by this Class Action Complaint.

## **Request for Relief**

WHEREFORE, Plaintiff requests that this Court enter an Order:

a.   assuming jurisdiction over this action;

b.   certifying this case as a class action under Fed. R. Civ. P.

49

23(b)(3), naming Plaintiff as Class Representative, and

appointing Plaintiff's attorneys as Class Counsel;

c.      declaring that Defendants violated the RICO;

d.      permanently enjoining Defendants from further violations of the

RICO;

e.      granting judgment to Plaintiff and other Class members, and

against all Defendants, on Plaintiff's and other Class members'

RICO claims and awarding them the trebled amount of their

pecuniary losses, compensatory damages, and punitive damages;

f.      Awarding Plaintiff and other Class members prejudgment and

post-judgment interest as allowed by law;

g.      Awarding Plaintiff and other Class members their costs,

expenses, and reasonable attorneys' fees; and

h.      Granting such further relief as the Court finds just.

Respectfully submitted this day: April 7, 2023.

/s/ Daniel Werner
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC

315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*/s/ Christopher B. Hall*
Christopher B. Hall
Georgia Bar No. 318380
chall@hallandlampros.com
HALL & LAMPROS, LLP
300 Galleria Parkway, Suite 300
Atlanta, GA 30339

Rachel Berlin Benjamin
Georgia Bar No. 707419
rachel@beal.law
Brian J. Sutherland
Georgia Bar No. 105408
brian@beal.law
BEAL SUTHERLAND BERLIN &
BROWN LLC
945 East Paces Ferry Rd NE
Suite 2000
Atlanta, GA 30326

*Attorneys for Plaintiff*

## L.R. 5.1(C) CERTIFICATE

This is to certify that on April 7, 2023, I prepared the foregoing in

Century Schoolbook, 13-point type in accordance with L.R. 5.1(C).

*/s/ Christopher B. Hall*
Christopher B. Hall
Attorney for Plaintiff