IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FIONA MCDERMOTT, | ) |
| | ) |
| Plaintiff, | ) Civil Action No: _____ |
| | ) |
| v. | ) |
| | ) |
| | ) JURY TRIAL DEMANDED |
| MARRIOTT INTERNATIONAL | ) |
| INC., d/b/a W ATLANTA | ) |
| DOWNTOWN, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

# COMPLAINT

Plaintiff Fiona McDermott ("Plaintiff" or "Ms. McDermott") brings this action for relief and damages against Defendant Marriott International Inc., d/b/a W Atlanta Downtown ("Marriott" or "Defendant") based on the following allegations and causes of action:

## NATURE OF THE ACTION

1. This action to correct unlawful employment practices by Defendant Piedmont Urgent Care arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.A. § 2000e-3(a). Plaintiff alleges that she engaged in

1

protected activity under Title VII by making internal complaints regarding a hostile work environment based on her gender and that she was subsequently terminated in retaliation for her complaints. Plaintiff seeks economic damages, including back pay, front pay, and lost benefits, as well as compensatory damages. Plaintiff also petitions the court for her attorneys' fees and costs of litigation.

## THE PARTIES

2. Ms. McDermott, during the time of the events alleged in this complaint, was employed at the W Atlanta Downtown, a Marriott brand hotel.

3. Marriott, which is headquartered in Bethesda, Maryland is one of the most recognized hospitality companies in the United States, operating and franchising prestige hotels in 5700 domestic locations.

## PERSONAL JURISDICTION

4. Marriott may be served with proper process through its registered agent on record with the Georgia Secretary of State, CT Corporation System, located at 289 S. Culver St., Lawrenceville, Georgia 30046.

## SUBJECT-MATTER JURISDICTION AND VENUE

5. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

6.      Venue is proper in this district under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendant resides in and conducts business in this district, and the events and omissions giving rise to the claim occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      Ms. McDermott filed a charge with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2022-03725 against Marriott on March 15 2022, alleging that she was retaliated against for opposing discriminatory sex-based harassment at her workplace. *See* Ex. A.

8.      Ms. McDermott received a Right-to-Sue letter from the EEOC on January 9, 2023. *See* Ex.B.

9.      Ms. McDermott timely files this action within 90 days of receiving her Right-to-Sue letter.

## FACTUAL ALLEGATIONS

10.     After nearly a decade working for domestic Marriott properties, Ms. McDermott was hired in 2018 as a banquet manager for the W Atlanta Downtown ("the W").

11. In October 2021, Ms. McDermott was promoted to the role of food and beverage manager at the W. Her duties included oversight of employees in the food preparation and culinary sections.

12. On January 31, 2022, Ms. McDermott learned that a sous chef in the W restaurant, Janice Nash, was spreading false rumors that Ms. McDermott, who is married, was involved in an ongoing sexual relationship with the chief executive chef.

13. According to the rumors, Ms. McDermott and the executive chef had been videotaped entering rooms together and had engaged in sexual activity while on the work premises. Nash also gossiped that Ms. McDermott was deliberately dressing in provocative outfits to attract attention from men.

14. Ms. McDermott sought to reach out to Nash to discuss the rumors that she learned Nash had been spreading. Nash reacted in a hostile manner, snidely remarking to Ms. McDermott that "You are having a midlife crisis."

15. Later on the 31st, Ms. McDermott reported the rumor-mongering to the W's human resources director Afaf Drief, who directed Ms. McDermott, Nash, and the chief executive chef to meet that same day to discuss the matter.

16. The meeting settled nothing. Nash, who was Ms. McDermott's subordinate, refused to take responsibility but claimed that the rumors were in wide circulation at the hotel.

17. Ms. McDermott reported to Drief that Nash had been unapologetic and defensive and in an email to Drief on February 3, Ms. McDermott conveyed her distress and made it clear that she was seeking Drief's help in addressing the situation with Nash.

18. Under the human resources guideline in place at Marriott properties, unwanted comments of a sexual nature are deemed to be a form of harassment, with no exception made for the gender of the harasser or for the content of the undesired references to sex. By any reasonable interpretations of Marriott's guidelines, spreading unfounded rumors of illicit sexual conduct was an actionable example of harassing behavior.

19. Because the remarks Ms. McDermott described to Drief clearly implicated Marriott's conduct policies, Drief was obligated to initiate an investigation in order to address and remedy the situation.

20. Marriott has touted its prioritization of immediate and diligent responses to complaints of workplace harassment. In consultation with human resources professionals and legal counsel, the company has developed a set of

protocols for harassment investigations: they include the expectations that human resources officers should obtain written statements from the parties to the allegation as well as witnesses, and that the parties should be separated during the course of the investigative period.

21. There is no evidence that Drief or her department followed Marriott's policies for conducting an internal investigation. Drief did convene a brief meeting between Ms. McDermott and Nash in which she communicated that their relationship should improve, but Drief ended the encounter by directing the two women to hug, which Ms. McDermott refused to do and found deeply inappropriate.

22. Drief and Ms. McDermott continued to have ongoing conversations about the rumors, which were repeated to Ms. McDermott approximately four to five times during February 2022. Drief told her at one point that she needed to be "less emotional", and to Ms. McDermott, Drief seemed increasingly uninterested in the subject.

23. When Drief made it clear that she had done as much as she intended, Ms. McDermott turned to Alexey Muravskiy, the director of hotel operations for the W. Muravskiy proceeded to tell her that she was an attractive woman and that she should receive the gossip as nothing more than jealousy.

24. On February 22, 2022, Ms. McDermott became involved in a threatening encounter with Nash. After Ms. McDermott questioned her about a routine work assignment, Nash responded angrily by raising her voice, and brandishing her kitchen knife at Ms. McDermott while saying, "There is going to be a serious problem if you don't leave right now."

25. After the episode, which left Ms. McDermott shaken, she discussed the matter with Drief and presented her a video of the episode that Ms. McDermott had recorded on her phone. At Drief's instruction, Ms. McDermott wrote an email describing the knife-pointing incident and provided additional information that the ongoing tensions at work had required her to seek therapy and that she believed she was being subjected to a hostile work environment.

26. As with the encounter a month earlier, what Drief specifically did to investigate Ms. McDermott's allegations is unclear. When they watched the video of Nash's actions, Drief was dismissive, telling Ms. McDermott "I didn't see you run", in an apparent effort to minimize a subordinate pointing a weapon at her supervisor.

27. Drief also rebuffed Ms. McDermott's request to transfer to another Marriott property, although it is a routine Marriott practice to transfer employees to

other company hotels for reasons related to convenience or personal preference, or in some instances when employees have been subject to harassment.

28.     Approximately two weeks later on March 7, Ms. McDermott was involved in yet another confrontation with Nash. This time, Nash angrily directed Ms. McDermott to put her phone away while Ms. McDermott was in the kitchen area, apparently out of concern that the phone was recording Nash. After a heated argument between the two that led to another employee reporting the incident, Drief finally initiated a formal investigation, a step she had declined to take after the previous times Ms. McDermott complained about Nash's behavior.

29.     The investigation proved to be short lived. On March 9, 2022, Ms. McDermott and Nash were issued written warnings for engaging in "unprofessional conduct".

30.     While ostensibly evenhanded, Drief knew that the dual write-ups had significantly different implications. Nash suffered no consequences beyond the documentation of a disciplinary event in her file, but because Ms. McDermott had received an earlier warning in January 2022 for being late for work and for failing to complete a training questionnaire online, her second writeup within a 12 month period exposed her to potential termination under Marriott's disciplinary policies.

31. While the second written warning policy does not provide for automatic termination, Marriott chose to terminate Ms. McDermott despite her successful 11 year record as a Marriott employee even though it was Nash who acted as the aggressor on March 7, as she had also done on February 22, when she brandished a knife at Ms. McDermott.

32. Marriott's handling of Ms. McDermott's complaints in January and February 2022 was inconsistent with Marriott's procedures for investigating harassment and stands in sharp contrast with the company's zealous and aggressive scrutiny when women allege harassment by men.

33. The ineffectual response by Marriott in Ms. McDermott's case depicts a blind eye toward harassment involving persons of the same gender and suggests that her complaints were perceived negatively. Ms. McDermott exercised her Title VII protected right to report sexually harassing behavior and was fired for doing so.

## COUNT I
### (Retaliatory termination in violation of 42 U.S.C.A. § 2000e-3(a)

34. Plaintiff incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

35. Plaintiff engaged in activity protected under Title VII by making internal complaints opposing discriminatory actions by a coworker in the form of sexually harassing behavior.

36. Plaintiff's complaints of sexually harassing behavior were a but-for cause of her termination by Defendant.

37. As a result of Defendant's termination of Plaintiff's employment based on retaliatory motives, Plaintiff has suffered both monetary damages, including but not limited to back pay, front pay, and the loss of benefits, and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II
### (Retaliatory mistreatment in violation of 42 U.S.C.A. § 2000e-3(a)

38. Plaintiff incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

39. Plaintiff engaged in activity protected under Title VII by making internal complaints opposing discriminatory actions by a coworker in the form of sexually harassing behavior.

40. As a result of Plaintiff's protected activity, she was subjected to materially adverse actions by Defendant that well might have dissuaded a reasonable worker from making or supporting a cause of discrimination, including

but not limited to the following: Defendant's failure to diligently investigate Plaintiff's claims of sexually harassing behavior, or to take effective steps to remedy the harassment of which Plaintiff complained.

41. Defendant's actions constituted retaliatory mistreatment.

42. As a result of Defendant's retaliatory mistreatment, Plaintiff has suffered noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## **PRAYER FOR RELIEF**

Wherefore, based on the above stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits;

B. Compensatory damages to the extent allowed by law;

C. Punitive damages, to the extent allowed by law;

D. Attorneys' fees and costs of litigation;

E. Pre-judgment and post-judgment interest at the highest lawful rate; and

F. Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted, the 10th day of April, 2023.

**HKM Employment Attorneys LLP**

Artur Davis[1]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

s/Jermaine "Jay" Walker
Jermaine "Jay" Walker
GA Bar No. 142044
3344 Peachtree Rd NE
Suite 800 Office 35
Atlanta, GA 30326
jwalker@hkm.com
Direct: 404-301-4020
**Attorneys for Plaintiff**
**Fiona McDermott**

---

[1]Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Mr. Davis is licensed in the state of Alabama and the District of Columbia.