**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MORGAN CRUTCHFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | File No.: |
| | ) | |
| PROMETHEAN, INC. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

COMES NOW, Plaintiff Morgan Crutchfield ("Plaintiff" or "Mrs. Crutchfield") and submits the following Complaint for Damages and Equitable Relief against Defendant Promethean, Inc. ("Defendant" or "Promethean") showing the Court as follows:

## INTRODUCTION

1.

This is an employment discrimination case arising from unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), and disability discrimination and retaliation in violation of the Americans with Disabilities Act Amendments Act ("ADAAA")

2.

Plaintiff herein claims (1) race discrimination and (2) retaliation in violation of Title VII, (3) race discrimination and (4) retaliation in violation of Section 1981, and (5) disability discrimination and (6) retaliation for engaging in protected activity in violation of the ADAAA.

3.

Plaintiff seeks injunctive and declaratory relief, back pay and lost benefits, reinstatement or front pay in lieu of thereof, liquidated damages, compensatory damages, punitive damages, and attorneys' fees and costs of litigation to remedy these civil rights violations.

**<u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>**

4.

Plaintiff has satisfied all administrative prerequisites to perfect her claims of race discrimination and retaliation under Title VII and disability discrimination and retaliation under the ADAAA. Plaintiff timely filed a Charge of Discrimination with the EEOC and has received a Notice of Right to Sue for her claims under Title VII and the ADAAA within the last ninety days.

## JURISDICTION AND VENUE

### 5.

Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

### 6.

This Court has personal jurisdiction over all the parties to this action.

### 7.

Venue is proper under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

## PARTIES

### 8.

Plaintiff Morgan Crutchfield was, at all relevant times, a resident of Georgia.

### 9.

Defendant Promethean is a foreign profit corporation registered with the Georgia Secretary of State to do business in Georgia.

### 10.

Defendant Promethean is subject to this Court's jurisdiction. Prometheus may be served by delivering a copy of the Complaint and summons to Corporation

Service Company at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092 in Gwinnett County.

## FACTS

11.

Morgan Crutchfield is an African American woman.

12.

Mrs. Crutchfield has a master's degree in education and is certified to teach in six subjects.

13.

In January 2019, Mrs. Crutchfield applied with Defendant Promethean for an Education Consultant ("EC") position that would cover Georgia and Tennessee.

14.

Defendant Promethean specializes in the sale of an interactive "smart" white board technology with a touch screen. The EC position involved training schools and teachers on how to use this interactive panel.

15.

Shortly after Mrs. Crutchfield applied, she interviewed in person with Matthew Barfield (white), Defendant's Head of Regional Professional Development.

16.

After Defendant offered Mrs. Crutchfield a position as an EC, she accepted the role and left her job as a Social Studies teacher at the Georgia Department of Juvenile Justice.

17.

Mrs. Crutchfield began working for Defendant Promethean on or about February 1, 2019.

18.

Throughout her employment, Mrs. Crutchfield's direct supervisor was Barfield.

19.

Following her hire, Mrs. Crutchfield learned that Barfield told at least one coworker that he only hired Mrs. Crutchfield "because she was Black, and they need a Black rep for Atlanta."

20.

Mrs. Crutchfield was subsequently warned to "watch out" for Barfield.

21.

At the time of her hire, only two out of Defendant's approximately twenty ECs were Black, including Mrs. Crutchfield.

22.

The other Black EC left in April 2020 as a result of racial tensions and discrimination by Defendant.

23.

Throughout her employment, Defendant subjected Mrs. Crutchfield to disparate treatment compared to white ECs.

24.

Unlike her white counterparts, Defendant never provided Mrs. Crutchfield with any training sessions or materials.

25.

Defendant provided interactive panels to its white ECs for use at their homes immediately after they began their employment.

26.

However, Defendant did not give Mrs. Crutchfield an interactive panel to use at home at the start of her employment.

27.

Instead, Mrs. Crutchfield learned how to use the interactive panel by driving to Defendant's Alpharetta headquarters, almost an hour from her home (or as much as an hour and 45 minutes with Atlanta traffic) and practicing there.

28.

Barfield often criticized Mrs. Crutchfield for her lack of knowledge; however, when she requested further training or feedback from Barfield, he refused Mrs. Crutchfield's requests or ignored her.

29.

Barfield also denied Mrs. Crutchfield repeated requests for an interactive panel for use at her home.

30.

In September 2019, a Southeast Education Consultant team meeting was held in Savannah, Georgia.

31.

On a team call prior to the meeting, Barfield encouraged everyone to bring swimsuits, but he also instructed the all-woman team not to wear swimsuits that were too provocative because he would be the only man present.

32.

When the group arrived at the Hilton Garden Inn's swimming pool in Savannah, Mrs. Crutchfield was the only woman not wearing a swimsuit. Mrs. Crutchfield did not feel comfortable wearing a swimsuit in the presence of her coworkers and boss.

33.

During the event, Barfield provided alcoholic beverages to everyone, and encouraged the women to consume all the drinks before they headed to dinner.

34.

Barfield approached Mrs. Crutchfield to ask why she chose not to enter the pool. He then asked her if it was because she could not swim. Mrs. Crutchfield informed him that she could.

35.

Barfield continued to pressure Mrs. Crutchfield to enter the pool, so she put her feet in. Barfield then began to passive-aggressively splash water in very close proximity to Mrs. Crutchfield, trying to get Mrs. Crutchfield wet.

36.

Later, as they were walking the streets of Savannah that evening, Barfield noted Mrs. Crutchfield's limp and asked her about it. Mrs. Crutchfield replied that she had had a serious accident and she would always walk with a slight limp because of her resulting disability.

37.

On November 8, 2019, Mrs. Crutchfield and Promethean's Sales Representative for Georgia sponsored a booth at the Georgia Educator Technology Conference.

38.

One of Mrs. Crutchfield's customers approached her to inform her about overhearing a Promethean Inside Sales Rep and a Marketing Rep speaking very negatively of how Mrs. Crutchfield chose to manage the logistics of the booth. Mrs. Crutchfield's customer also informed her that she heard the Inside Sales Rep call Mrs. Crutchfield a "bitch."

39.

In her most professional tone, Mrs. Crutchfield asked both of the Promethean representatives to mind their voice levels and professionalism, because a customer had complained about their behavior.

When the conference ended, Mrs. Crutchfield called Barfield to inform him of the unprofessional behavior displayed by her coworkers. He was not available.

40.

Mrs. Crutchfield then called Tanya Hague, the manager of the two employees who had made offensive remarks in the presence of Mrs. Crutchfield's customer. Ms.

Hague informed Mrs. Crutchfield that she would speak with the employees and that there would be consequences.

41.

When Barfield called Mrs. Crutchfield back that evening, she informed him of what had happened.

42.

Barfield became infuriated that Mrs. Crutchfield did not tell him first. In a very loud and aggressive tone, he scolded Mrs. Crutchfield for not ignoring the Promethean representatives' behavior.

43.

On November 11, 2019, Mrs. Crutchfield contacted Anna Rae Wooi (People & Culture Coordinator with Promethean) to report the incident at GAETC, as well as Barfield's conduct.

44.

Ms. Wooi forwarded Mrs. Crutchfield's complaint to Caitlin Wasilewski in Senior HR who subsequently met with Mrs. Crutchfield virtually to discuss her complaints.

45.

Ms. Wasilewski found Mrs. Crutchfield's complaints valid and attempted to reach out to Mr. Barfield, but he was on PTO.

46.

On November 15, 2019, Barfield emailed Mrs. Crutchfield while she was on PTO to schedule a follow-up call for November 18.

47.

On that call, which was recorded on Microsoft Teams, Barfield continued to scold Mrs. Crutchfield for not ignoring the behavior of her coworkers at GAETC.

48.

Barfield claimed that "drama" did not exist on the team until he hired her.

49.

Barfield presented Mrs. Crutchfield with statements he had solicited from the two Promethean representatives that Mrs. Crutchfield had reported.

50.

The statements falsely suggested that Mrs. Crutchfield was the one who was acting unprofessional.

51.

Mrs. Crutchfield asked Barfield why he had not asked her for a statement, to which he offered no valid response.

52.

That same day, following their call, Barfield emailed Mrs. Crutchfield his notes from their call, and warned her that "Next complaint sends you straight to HR."

53.

Barfield also noted that Mrs. Crutchfield should come to him before going to HR about any complaints.

54.

The next day, November 19, 2019, Ms. Wasilewski asked Mrs. Crutchfield how her call with Barfield had gone.

55.

Mrs. Crutchfield described the aggressive call and shared his summary email.

56.

Ms. Wasilewski disagreed with how Barfield had handled things and told Mrs. Crutchfield that she would follow up with him.

57.

The following day, Barfield gave Mrs. Crutchfield an insincere apology for how he had handled things.

58.

Several months later, in a group chat in May 2020—a few months into the COVID-19 pandemic—Barfield asked all the Southeast ECs to provide the serial number of their interactive panels.

59.

Everyone other than Mrs. Crutchfield, who had never been supplied with an interactive panel by Promethean, provided their serial number.

60.

Mrs. Crutchfield asked her team if she was the only one without an interactive panel, and Barfield responded, "Yes."

61.

Barfield then said he would work on getting Mrs. Crutchfield one after the pandemic.

62.

It was at that moment that Mrs. Crutchfield discovered that she was the only EC who had not been issued an interactive panel.

63.

Four out of eight of her coworkers (all of whom were white) were hired approximately six months later than Mrs. Crutchfield, and yet they were all provided with interactive panels.

64.

Multiple coworkers subsequently reached out to Mrs. Crutchfield to ask how she could possibly do her job without access to an interactive panel in her home.

65.

In June 2020, Barfield called a team meeting to address the Black Lives Matter movement.

66.

In this call Barfield said, "I've been tasked with addressing BLM, but we all know that all lives matter."

67.

In public discourse, the phrase "all lives matter" had become associated with opposition to the Black Lives Matter movement, calculated to downplay any concerns Black people had about race discrimination.

68.

On July 15, 2020, during the midst of a global pandemic, and after months of quarantining, Mrs. Crutchfield went to the Walker School in Marietta, Georgia, to train its staff on Promethean's interactive panels.

69.

Mrs. Crutchfield was not able to train them virtually, as her white peers would have done, because she had not been provided with an interactive panel she could use from her home.

70.

Just a few days later, Mrs. Crutchfield was diagnosed with pneumonia and tested positive for COVID-19.

71.

Mrs. Crutchfield's symptoms were so severe that she required admission to Emory University Hospital and was in Emory's Respiratory Center for five days.

72.

During Mrs. Crutchfield's recovery in the hospital, during a period of extreme illness, anxiety, and distress, Barfield contacted her several times to ask her to send emails and perform other job duties to help him cover her customer training.

73.

However, Mrs. Crutchfield's doctors instructed her not to return to work until August 17, 2020.

74.

Upon her return, Mrs. Crutchfield asked Barfield if she could get an interactive panel. Barfield replied joking, "Morgan, since you almost died, I guess we can get you a panel now."

75.

In September 2020, all ECs were asked to count all training they had conducted in their regions between March 2020 and September 2020.

76.

Barfield informed Mrs. Crutchfield that she was not able to count the trainings done in Georgia while she was on leave, because someone else did those for her.

77.

Most ECs were able to conduct more trainings during that time period than Mrs. Crutchfield because Mrs. Crutchfield did not have a Interactive panel to conduct virtual training, and because Mrs. Crutchfield was on medical leave for approximately a month due to her job- related exposure and resulting COVID-19 complications.

78.

Later that month, Mrs. Crutchfield was finally granted permission to order an interactive panel, which was delivered in early October.

79.

On October 12, 2020, Mrs. Crutchfield joined a Microsoft Teams meeting a few minutes early.

80.

She heard Barfield mention to three of her teammates that they should have their next Southeast team meeting in "redneck territory in Mississippi."

81.

When Barfield noticed Mrs. Crutchfield had joined, he quickly changed the subject.

82.

As the call progressed, Barfield mentioned that he thought it was so funny how people were calling women "Karen," because his boss's name was Karen.

83.

Barfield then looked at Mrs. Crutchfield and told her to smile and stop always looking so stressed out.

84.

Barfield appeared to have been under the influence during this call.

85.

On October 14, 2020, Mrs. Crutchfield called HR representative Taylor Coffield to report Barfield's racial discrimination, including his inappropriate comments during the team call.

86.

Mrs. Crutchfield told Ms. Coffield that she was very frustrated and concerned that Barfield could continue to get away with his discriminatory treatment toward her.

87.

Mrs. Crutchfield also mentioned that it was a known fact that other employees had made several complaints to HR about Barfield.

88.

Ms. Coffield told Mrs. Crutchfield that she believed Barfield needed more training, and that she would consult with her manager about it.

89.

Ms. Coffield also told Mrs. Crutchfield that she would have a conversation with Barfield.

90.

On October 18, 2020, Barfield texted Mrs. Crutchfield asking if she had seen a meeting invitation from his manager, Karen Adams, for the following morning.

91.

The next day, Mrs. Crutchfield received a call from Ms. Adams, which Mrs. Crutchfield assumed would be a follow-up to her report to HR regarding Barfield.

92.

Instead, Ms. Adams informed her that her position was being eliminated immediately due to low data for training in Georgia. – i.e., the reduced number of trainings Mrs. Crutchfield had completed from March to September, as a result of the company's refusal to provide her with an interactive panel (unlike her white peers), and because of her illness and hospitalization with COVID-19.

93.

On October 23, 2020, Mrs. Crutchfield emailed Taylor Coffield and asked if she could follow up on her complaints against Barfield, because Ms. Coffield had never followed up with her before she was laid off.

94.

On October 26, 2020, Ms. Coffield informed Mrs. Crutchfield that she would share her most recent complaints with her team.

95.

Mrs. Crutchfield continues to experience long-lasting medical symptoms related to her bout of COVID-19.

96.

Mrs. Crutchfield's lungs do not work as effectively as they used to, impacting her ability to breathe.

97.

Mrs. Crutchfield regularly gets out of breath easily when exerting herself. For example, she cannot go on a long walk without taking rest breaks to catch her breath.

## COUNT I
## Race Discrimination in Violation of Title VII

98.

Plaintiff incorporates paragraphs 1-97 of this Complaint by reference as if they were fully set forth herein.

99.

Plaintiff is a member of a protected class in that she is Black.

100.

At all relevant times, Plaintiff was an "employee" of Defendant Promethean as that term is defined by Title VII, 42 U.S.C. § 2000e *et seq*.

100.

At all relevant times, Defendant Promethean was an "employer" as that term is defined by Title VII, 42 U.S.C. § 2000e *et seq*.

102.

Defendant Promethean subjected Plaintiff to disparate treatment in the terms and conditions of employment and subjected her to adverse employment actions based on her race, including, but not limited to: (1) creating barriers to success based on Plaintiff's race that her white similarly situated colleagues are not subjected to; (2) making racially discriminatory comments to or about her; (3) terminating her employment.

103.

Defendant Promethean lacks any legitimate justification for subjecting Plaintiff to the disparate treatment and adverse employment actions complained of above, and/or any such purported justifications are mere pretext for race discrimination.

104.

Defendant Promethean's above-pled actions constitute race discrimination in

violation of Title VII of the Civil Rights Act of 1964.

105.

The actions of Defendant Promethean in subjecting Plaintiff to disparate treatment and the adverse actions complained of above were willful, deliberate, and intended to cause Plaintiff harm, and/or were committed with reckless disregard for the harm caused to Plaintiff and were in derogation of her federally protected rights.

106.

Plaintiff's race was a "motivating factor" in Promethean's decision(s) to subject her to discrimination on the basis of her race as pled above.

107.

As a direct and proximate result of Defendant Promethean's violations of Title VII, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

108.

As a result of the above-pled violations of Title VII, Plaintiff is entitled to recover her lost wages and economic benefits of her employment, compensatory damages for emotional distress, as well as front pay and other equitable relief, punitive damages and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

## COUNT II
### Retaliation in Violation of Title VII

109.

Plaintiff incorporates paragraphs 1-97 and 99-101 of this Complaint by reference as if they were fully set forth herein.

110.

Plaintiff engaged in statutorily protected activity by objecting to and complaining against race discrimination prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* including but not limited to, complaining to HR about her supervisor's racial discrimination.

111.

Title VII prohibits Defendant Promethean from retaliating against Plaintiff because she opposed, objected to, and complained against race discrimination prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

112.

Defendant Promethean subjected Plaintiff to retaliation because she opposed, objected to, and complained against illegal race and sex discrimination by taking various retaliatory actions against her including, but not limited to, terminating her employment.

113.

Defendant Promethean lacks any legitimate justification for subjecting Plaintiff to the adverse actions complained of above, and/or any such purported legitimate justifications are mere pretext for retaliation.

114.

Defendant Promethean's above-pled retaliatory conduct toward Plaintiff constitutes unlawful retaliation against Plaintiff in violation of Title VII.

115.

Defendant Promethean's actions were willful, wanton, and intentionally directed to harm Plaintiff.

116.

Defendant Promethean's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

117.

As a direct and proximate result of Defendant Promethean's retaliatory conduct, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

118.

Pursuant to Title VII, Plaintiff is entitled to damages in amount to be determined by the trier of fact, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, attorneys' fees and costs of litigation, and all other relief recoverable under Title VII and statutes providing for relief under Title VII.

## COUNT III
## Race Discrimination in Violation of Section 1981

119.

Plaintiff incorporates paragraphs 1-97 of this Complaint by reference as if they were fully set forth herein.

120.

Plaintiff and Defendant were parties to an employment agreement under which Plaintiff worked for Defendant and Defendant compensated Plaintiff for her work.

121.

Plaintiff performed her contractual obligations under her employment agreement.

122.

42 U.S.C. § 1981 prohibits Defendant from discriminating against Plaintiff on

the basis of race with regard to the making and enforcing of her employment agreement with Defendant.

123.

Defendant violated Plaintiff's rights under 42 U.S.C. § 1981 on the basis of her race by, *inter alia*, (1) creating barriers to success based on Plaintiff's race that her white similarly situated colleagues are not subjected to; (2) making racially discriminatory comments to or about her; (3) terminating her employment.

124.

Plaintiff's race was a but-for factor in Defendant's decision(s) to subject her to discrimination as pled above.

125.

As a direct and proximate result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

126.

Defendant's actions were willful, wanton, and intentionally directed to harm Plaintiff.

127.

Defendant's actions were reckless and were taken in willful disregard of the

probable consequences of its actions.

128.

Pursuant to 42 U.S.C. § 1981, Plaintiff is entitled to damages in an amount to be determined by the trier of fact, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages, punitive damages, and pursuant to 42 U.S.C. § 1988, attorneys' fees and costs of litigation, as well as all other relief recoverable under § 1981.

## COUNT IV
## Retaliation in Violation of Section 1981

129.

Plaintiff incorporates paragraphs 1-97 and 120-121 of this Complaint by reference as if they were fully set forth herein.

130.

42 U.S.C. § 1981 prohibits Defendant from retaliating against Plaintiff because she opposed, objected to, and complained against race discrimination prohibited by 42 U.S.C. § 1981.

131.

Plaintiff engaged in statutorily protected activity by objecting to and complaining against race discrimination prohibited by 42 U.S.C. § 1981, as well as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. by,

*inter alia*, complaining to HR about her supervisor's racial discrimination.

132.

Defendant subjected Plaintiff to retaliation because she opposed, objected to, and complained against illegal race discrimination by taking various retaliatory actions against her including, but not limited to terminating her employment.

133.

Defendant's above-pled retaliatory conduct toward Plaintiff constitutes unlawful retaliation against Plaintiff in violation of 42 U.S.C. § 1981.

134.

As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

135.

Defendant's actions were willful, wanton, and intentionally directed to harm Plaintiff.

136.

Defendant's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

137.

Plaintiff is entitled to damages in amount to be determined by the trier of fact, including back pay and lost benefits, front pay and/or reinstatement, compensatory damages and punitive damages. Pursuant to 42 U.S.C. §1988 Plaintiff is entitled to recover attorneys' fees and costs of litigation.

### COUNT V
### Disability Discrimination in Violation of the ADAAA

138.

Plaintiff incorporates paragraphs 1-97 of this Complaint by reference as if they were fully set forth herein.

139.

At all relevant times, Plaintiff was an individual with a "disability" as defined by the ADAAA, 42 U.S.C. § 12102(1), because she (a) suffered mental and/or physical impairments that substantially limited one or more major life activity, (b) had a record of such impairments, and/or (c) was regarded by Defendant as a person with such impairments.

140.

Plaintiff was at all relevant times a "qualified individual" as that term is defined by the ADAAA, 42 U.S.C. § 12111(8), because she was able to perform the essential functions of the job with or without a reasonable accommodation.

141.

Defendant discriminated against Plaintiff in violation of the ADAAA by taking adverse actions against her, including but not limited to interfering with her medical leave and treatment, and terminating her employment because of her disability.

142.

In so doing, Defendant knowingly and intentionally discriminated against Plaintiff in violation of the ADAAA.

143.

In taking these adverse actions against Plaintiff, Defendant unlawfully discriminated against her based on her disability in violation of the ADAAA.

144.

As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial.

145.

Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages,

remedies, and other relief available under the ADAAA and all federal statutes providing remedies for violations of the ADAAA.

146.

Defendant's actions were undertaken intentionally, willfully, and maliciously with respect to, or with reckless disregard for, Plaintiff's federally protected rights, and she is therefore entitled to punitive damages.

147.

In taking these adverse actions against Plaintiff, Defendant unlawfully discriminated against her based on her disability in violation of the ADAAA, 42 U.S.C. § 12112(b)(4).

## COUNT VI
## Retaliation in Violation of the ADAAA

148.

Plaintiff incorporates paragraphs 1-97 and 139-140 of this Complaint by reference as if they were fully set forth herein.

149.

Plaintiff engaged in statutorily protected activity by, among other things, exercising or attempting to exercise or enjoy her rights under the ADAAA, including but not limited to, requesting and taking protected medical leave.

150.

Defendant unlawfully retaliated against Plaintiff, including, but not limited to, terminating her employment two months after Plaintiff took protected leave.

### 151.

Defendant's actions, in subjecting Plaintiff to retaliation for engaging in protected activity constitute unlawful intentional retaliation in violation of the ADAAA.

### 152.

Defendant's actions amount to violations of the ADAAA, which prohibits employers from discriminating against an individual because she has opposed any act or practice made unlawful under the ADAAA, 42 U.S.C. § 12203(a), and also prohibits employers from coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of rights under the ADAAA on account of her having exercised or enjoyed or attempted to exercise or enjoy such rights, 42 U.S.C. § 12203(b).

### 153.

As a result of Defendant's unlawful actions, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other benefits, all in an amount to be established at trial as well as emotional distress, inconvenience, loss of income and benefits,

humiliation, and other indignities compensable under the ADAAA, for which Defendant is liable.

154.

Defendant violated the ADAAA willfully, wantonly, and intentionally to harm Plaintiff and her federally protected rights. Additionally, and in the alternative, Defendant acted with reckless disregard for Plaintiff and her federally protected rights and she is therefore entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

A. That this Court adjudicate and declare that Defendant has violated Plaintiff's federally protected rights as pled above;

B. That this Court permanently enjoin Defendant from committing similar violations in the future;

C. That this Court award Plaintiff back pay, all lost wages and benefits, pay increases Plaintiff would have received absent her unlawful termination, and all other benefits of employment reducible to a dollar value;

D. That this Court award Plaintiff pre-judgment and post-judgment

33

interest as required by law;

E.  That this Court award Plaintiff compensatory damages for emotional pain and suffering as determined by the enlightened conscience of a jury;

F.  That this Court award Plaintiff punitive damages pursuant to Title VII, Section 1981, the ADAAA, and all other applicable federal and state laws in an amount to be determined by the trier of fact;

G.  That this Court order Defendant to reinstate Plaintiff with all compensation and benefits made retroactive to her last day of employment or, in lieu of same, award front pay;

H.  That this Court award Plaintiff her reasonable attorneys' fees and expenses; and

I.  That this Court grant such additional relief as may be proper and just.

Respectfully submitted this 10th day of April 2023.

BUCKLEY BALA WILSON MEW LLP

By:  */s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@bbwmlaw.com
Alessandra T. Palazzolo
Georgia Bar No. 485399
apalazzolo@bbwmlaw.com

600 Peachtree Street, NE
Suite 3900
Atlanta, Georgia 30308
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

Counsel for Plaintiff