# EXHIBIT L

1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6    R.N NEHUSHTAN TRUST LTD.,              Case No. 22-cv-01832-WHO

7                  Plaintiff,
                                            **CLAIM CONSTRUCTION ORDER**
8          v.
                                            Re: Dkt. No. 70
9    APPLE INC.,

10                 Defendant.

11

12         Plaintiff R.N Nehushtan Trust Ltd. ("RNN Trust") and defendant Apple Inc. ("Apple")

13   seek construction of claim terms in two of RNN Trust's patents, which RNN Trust alleges that

14   Apple infringed upon. My construction of the disputed claim terms is set forth below.

15                                    **BACKGROUND**

16         RNN Trust holds the rights, title, and interest to U.S. Patent Nos. 9,642,002 ("the '002

17   Patent") and 9,635,544 ("the '544 Patent"). Compl. [Dkt. No. 1] ¶ 1. The patents are directed to a

18   "cellular communication security technology" preventing the cloning and hacking of devices. *See*

19   *id*. ¶¶ 8-9. RNN Trust accuses Apple of selling devices—including its well-known and widely

20   used iPhones, iPads, and Apple Watches—that directly infringe on "at least" Claim 17 of the '544

21   Patent and "at least" Claim 5 of the '002 Patent. *See id.* ¶¶ 15, 19.

22         Claim 17 of the '544 Patent claims:

23             A cellular communication device comprising a processor, a memory and a data
               mode, said data mode allowing reading and writing of data and changing of settings
24             on said cellular communication device by an active connection;

25             said settings comprising personal data, device configuration data and technical data
26             relating to said cellular communication device;

27             said cellular communication device further comprising an access restrictor to
               restrict use of said data mode in response to a cellular communication device
28

United States District Court
Northern District of California

unique security setting;

wherein said device unique security setting is obtained remotely and provided to the cellular communication device before use of the data mode; said data mode being usable for transfer of icons to the cellular communication device; and

wherein said cellular communication device is associated with a client program for managing a predetermined communication protocol, and carrying out one member of the group consisting of:

setting said cellular communication device into said data mode when said device unique security setting is correct; and

disabling said data mode when said active connection is no longer active.

'544 Patent [Dkt. No. 70-2] 23:45-24:2.

Claim 5 of the '002 Patent claims:

A cellular communication device comprising a processor, a memory and a data mode, said data mode allowing reading and writing of data in said memory and changing of settings on said cellular communication device, said settings comprising personal data, cellular communication device configuration data and technical data relating to the cellular communication device; wherein

said cellular communication device also comprises an access restrictor to restrict use of said data mode in accordance with a device unique security setting, the device unique security setting provided remotely to said cellular communication device using a predetermined security protocol;

said device unique security setting is obtained remotely and provided to the cellular communication device before the data mode is used;

said data mode permits actions comprising uploading, maintaining or replacing an operating system in said cellular communication device that are provided by a cellular provider using an active connection; the device further being configured to carry out one member of the group consisting of:

enabling said cellular communication device to use said data mode when it is determined that said device unique security setting is correct; and

disabling use of said data mode when said active connection is no longer active.

'002 Patent [Dkt. No. 70-1] 22:49-23:8.

## LEGAL STANDARD

Claim construction is a matter of law. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

2

*United States District Court*
*Northern District of California*

Claim terms are "generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. When determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Vitronics*, 90 F.3d at 1582. "A claim term used in multiple claims should be construed consistently." *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

"The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Claims speak to those skilled in the art," but "[w]hen the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "However, claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Med. Sys.,* 34 F.3d at 1054. "Thus, although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." *Id.* Conversely, "where . . . the claim language is unambiguous," the Federal

3

1   Circuit has "construed the claims to exclude all disclosed embodiments." *Lucent Techs., Inc. v.*

2   *Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008). "[T]he description may act as a sort of

3   dictionary, which explains the invention and may define terms used in the claims," and the

4   "patentee is free to be his own lexicographer," but "any special definition given to a word must be

5   clearly defined in the specification." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-80

6   (Fed. Cir. 1995).

7       That said, it is a fundamental rule that "claims must be construed so as to be consistent

8   with the specification." *Phillips*, 415 F.3d at 1316. "The construction that stays true to the claim

9   language and most naturally aligns with the patent's description of the invention will be, in the

10  end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243,

11  1250 (Fed. Cir. 1998).

12      The court may also consider the prosecution history of the patent, if in evidence.

13  *Markman*, 52 F.3d at 980. The prosecution history may "inform the meaning of the claim

14  language by demonstrating how the inventor understood the invention and whether the inventor

15  limited the invention in the course of prosecution, making the claim scope narrower than it would

16  otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371,

17  1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is

18  to exclude any interpretation that was disclaimed during prosecution.").

19      In most situations, analyzing this intrinsic evidence will resolve claim construction

20  disputes. *Vitronics*, 90 F.3d at 1583. However, "it is entirely appropriate . . . for a court to consult

21  trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent

22  file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in

23  the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309

24  (Fed. Cir. 1999). "Extrinsic evidence consists of all evidence external to the patent and

25  prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."

26  *Markman*, 52 F.3d at 980. All extrinsic evidence should be evaluated in light of the intrinsic

27  evidence. *Phillips*, 415 F.3d at 1319. Courts should not rely on extrinsic evidence in claim

28  construction to contradict the meaning of claims discernible from an examination of the claims,

United States District Court
Northern District of California

4

the written description, and the prosecution history. *Pitney Bowes*, 182 F.3d at 1308 (citing *Vitronics*, 90 F.3d at 1583). While extrinsic evidence may guide the meaning of a claim term, such evidence is less reliable than intrinsic evidence. *Phillips*, 415 F.3d at 1318-19.

## DISCUSSION

The parties sought construction of six terms. *See* Opening Brief [Dkt. No. 70] 1:16-2:19; Responsive Brief [Dkt. No. 71] 5:1-14:20.[1] At the *Markman* hearing, the parties accepted my tentative construction of four of those terms, noted in the chart below. *See* Dkt. No. 81. Because those terms are no longer disputed, this Order focuses on the two terms that remain at issue: "active connection" and "said . . . settings comprising personal data, configuration data and technical data" or "said settings comprising personal data, device configuration data and technical data."

| Term | RNN Trust's Construction | Apple's Construction | Court's Construction |
|---|---|---|---|
| "device unique security setting" | "a setting that includes or is created using at least one data item unique to a particular device and that, when received by a device, causes an access restrictor of the device to grant access to a data mode" | plain and ordinary meaning or, alternatively, "security setting unique to the device" | "a setting that includes or is created using at least one data item unique to a particular device and grants access to a data mode" |
| "personal data" | plain and ordinary meaning, which is "data relating to a person" | "information relating to an identified or identifiable individual" | "information relating to a particular person" |
| "provided by a cellular provider" | plain and ordinary meaning, which is "sent via a connection with a cellular network" | "supplied by a cellular provider" | "supplied by a cellular provider" |
| "settings" | plain and ordinary meaning, which is "a manner, position, and/or direction in which a device is set, | plain and ordinary meaning | plain and ordinary meaning, which is "a manner, position and/or direction in |

---

[1] RNN Trust initially sought the construction of a seventh term, "client program," but Apple stated in its opposition that it no longer requested its construction. *See* Opening Brief at 1:22-25; Responsive Brief at 1 n.1.

| | including but not limited to a password" | | which a device is set" |
| --- | --- | --- | --- |

## I. "active connection"

| RNN Trust's Construction | Apple's Construction | Court's Construction |
| --- | --- | --- |
| plain and ordinary meaning, which is "a communication link that is in operation" | "connection over which there is ongoing exchange of data" | "a communication link that is intermittently exchanging data" |

Claim 17 of the '544 Patent and Claim 5 of the '002 Patent both use the term "active connection." '544 Patent at 23:45-24:2; '002 Patent at 22:49-23:8. The parties agreed at the *Markman* hearing that "connection" refers to a "communication link." The dispute then focuses on what "active" means: whether it requires an "ongoing exchange of data" (as Apple proposes) or implies that the communication link is "in operation" (as RNN Trust contends). The answer lies in the middle. For the reasons that follow, I construe "active connection" to mean "a communication link that is intermittently exchanging data."

### i. Intrinsic Evidence

Neither party refers to the asserted claims to define "active connection." *See* Opening Brief 8:18-11:2; Responsive Brief 5:2-6:19; Reply [Dkt. No. 75] 1:11-2:24. However, "[t]he appropriate starting point [for claim construction] is always with the language of the asserted claim itself." *Comark*, 156 F.3d at 1186. And the plain language of the asserted claims, Claim 17 of the '544 Patent and Claim 5 of the '002 Patent, is informative.

In Claim 17 of the '544 Patent, "active connection" is introduced in a phrase describing "data mode": "said data mode allowing reading and writing of data and changing of settings on said cellular communication device by an active connection." '544 Patent at 23:46-48. Rephrased, this can be condensed to "said data mode allowing [data and settings transactions] by an active connection." This would imply to a person of ordinary skill in the art that the data mode in some circumstances, if not all, requires an active connection. The last phrase of the claim, "disabling said data mode when said active connection is no longer active," tells the reader that without an active connection, the data mode stops. *See id.* at 24:1-2. Read together, this asserted

6

claim would imply to a person of ordinary skill in the art that an active connection is the medium for the data mode to proceed on, and without this medium, the data mode ends. In other words, the data mode requires an active connection.

Claim 5 of the other patent-in-suit gives the same impression. The first mention of "active connection" is in the phrase, "said data mode permits actions comprising uploading, maintaining or replacing an operating system in said cellular communication device that are provided by a cellular provider using an active connection." *Id.* at 22:65-23:1. As before, this can be condensed to: "said data mode permits actions . . . that are provided by a cellular provider using an active connection." *See id.* Put plainly, the data mode uses an active connection. Claim 5 also ends with a phrase that is almost identical to the last phrase in the first asserted claim: "disabling use of said data mode when said active connection is no longer active." *Compare id.* at 23:7-8 *with* '544 Patent at 24:1-2. Each of the two asserted claims indicate that data mode requires an active connection, as shown by their plain language.

Unasserted claims provide more guidance. The Federal Circuit has repeatedly (and recently) explained that "because 'claim terms are normally used consistently throughout the patent,' other claims of the patent, both asserted and unasserted, can provide insight into the meaning of a claim term." *Evolusion Concepts, Inc. v. HOC Events, Inc.*, 22 F.4th 1361, 1365 (Fed. Cir. 2022) (quoting *Phillips*, 415 F.3d at 1314); *see also In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) ("[T]he principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if it is clear that the same phrase has different meanings in different claims.") (citation and quotation marks omitted).

Apple points to Claim 1 of the '544 Patent to support its construction that "active connection" requires an exchange of data. *See* Responsive Brief at 5:13-19. Apple relies on a phrase in this claim that appears almost verbatim in the asserted Claim 17: "disabling said data mode when said active connection is not active." *See id.* (quoting '544 Patent at 22:26-27).

Apple's reference is persuasive because the term "active connection" is mentioned in several unasserted claims of both patents (Claims 1, 4, 9, 10, 18, and 19 of the '544 Patent and Claims 1, 3, 13, 14, 23, and 24 of the '002 Patent) with consistent phrasing. *See* '544 Patent at

United States District Court
Northern District of California

1    21:65-25:15; *see also* '002 Patent at 22:13-25:7. [2] Like the asserted claims, the unasserted

2    independent claims include the phrase "disabling said data mode when said active connection is

3    not active" or "no longer active." '544 Patent at 21:65-25:8; '002 Patent at 22:13-24:52. A person

4    of ordinary skill in the art would read this consistently across the independent claims and conclude

5    that an "active connection" is required to maintain the "data mode." RNN Trust concedes as much

6    in its reply. *See* Reply at 2:3-6 ("The patents consider this intermittent data transfer an 'active

7    connection' because it maintains the data mode.") (citing Claim 1 of the '002 Patent). There is no

8    other meaning that can be derived from this phrase that is common to all claims.[3]

9           The plain language of the asserted and unasserted claims indicates that an "active

10    connection" is a medium for maintaining the data mode, and that a "data mode" is a set of data

11    exchanges. Read together, this would imply to a person of ordinary skill in the art that an active

12    connection requires at least some exchange of data. The parties also agree that the intrinsic

13    evidence shows that an active connection exchanges data. *See, e.g.*, Reply at 1:25-2:4 ("As Apple

14    points out, the specification explains that 'when a cellular device is connected to the client

15    program, a data packet is sent at regular intervals to prevent the cellular device from exiting DM

16    (Data Mode) and/or resetting.' . . . The patents consider this intermittent data transfer an 'active

17    connection' because it maintains the device in data mode.") (quoting in part '544 Patent at 20:18-

18    21); *see also* Responsive Brief at 5:14-17 ("The parties agree that when a cellular communication

19    device is in 'data mode' it functions in an 'operation state' that 'permits the reading and writing of

20    device data and the changing of device settings' over a connection. . . To put it another way,

21    while in data mode, an ongoing exchange of data occurs.") (quoting Joint Claim Construction

22

23    ───────────────────

24    [2] Of the unasserted claims mentioning "active connection" in the '544 Patent, Claims 5, 9 and 10
     are dependent on Claim 1, but the others are independent. *See* '544 Patent at 21:65-25:8. Of the
25    unasserted claims mentioning "active connection" in the '002 Patent, Claims 3, 13, 14, and 23 are
     dependent on Claim 1, but Claims 1 and 24 are independent. *See* '002 Patent at 22:13-24:52.

26    [3] Additional phrases used when mentioning "active connection" in some of these unasserted
     claims do not appear consistently like the "disabling" phrase does. *See, e.g.*, '544 Patent at 23:15-
27    17 (reciting an "active connection" that is "identified via said unique security setting"); '544
     Patent at 24:37-46 (reciting "a server using an active connection"). These additional and often-
28    unique phrases would not help a person of ordinary skill in the art to apply the principle of
     consistent interpretation to understand "active connection," especially in the asserted claims.

United States District Court
Northern District of California

Statement [Dkt. No. 60] at 2:8-9)). They only disagree as to the frequency of that exchange—whether it is "ongoing," as Apple argues, or "intermittent" but "in operation" as RNN Trust contends. *See* Responsive Brief at 5:12-22; Reply at 1:25-2:10.

Apple argues that "in operation" is too broad because it could encompass establishing a connection, which Apple contends is distinct from an "active connection." *See* Responsive Brief at 5:23-6:16. It first points to an excerpt from the prosecution history, which states in relevant part that "[w]hat is claimed is a new inventive technological way of establishing the connection in the first place prior to any transfer of data." *See id.*, Ex. 1 at 11-12. But there is no support in the claims themselves for distinguishing an "active connection" from "establishing a connection," as Apple contends this excerpt shows. *See id.* at 5:23-6:11. "Connection" is mentioned in the claims with the term "active connection," never without this modifier. *See, e.g.*, '544 Patent at 21:65-22:27 (mentioning "connection" only as "active connection" and doing so three times). There is no separate step claimed in either patent for establishing a connection.

Further, none of Apple's proffered specification excerpts support a distinction between establishing and maintaining an "active connection." Instead, they imply—like the claims—that an "active connection" is required for data mode. For example, Apple notes that because "the cellular device is only able to enter data mode when a connection is present to the given server," establishing a connection is separate from an active connection. *See* Responsive Brief at 5:24-6:2 (quoting '544 Patent at 8:5-7). But this statement from the specification creates no such distinction. Instead, it tells the reader only that a "connection" is required for "entering data mode;" "a connection is present" could include both establishing a connection and maintaining an active one. *See* '544 Patent at 8:5-7. Apple attempts to show that "active connection" requires "ongoing" data exchange with a false dichotomy between establishing and maintaining the connection that is not supported by the intrinsic evidence.

Importantly, both RNN Trust and Apple agree that the data exchange is at least intermittent. *See, e.g.*, Responsive Brief at 5:17-18 ("while in data mode, an ongoing exchange of data occurs"); *see also* Reply 2:1-10 ("The patents consider this intermittent data transfer an 'active connection' because it maintains the device in data mode."). However, a construction of

"active connection" that uses "in operation" would not resolve the disputed nature of the term because "in operation" could include both "intermittent" or "ongoing" data exchange. RNN Trust's use of the phrase "in operation" thus supports the very construction that it contends is not supported by the intrinsic evidence: Apple's construction of "active" to mean "ongoing" data exchange.

In sum, the intrinsic evidence would guide a person of ordinary skill in the art to understand an "active connection" to require an intermittent though not "ongoing" data exchange.

### ii.    Extrinsic Evidence

RNN Trust primarily uses dictionary definitions to support a "plain and ordinary" construction of "active connection" as "a communication link that is in operation." Opening Brief at 8:26-9:13. Though one of RNN Trust's definitions is inapplicable to the disputed term, a person of ordinary skill in the art would find some meaning for an "active connection" in the non-technical dictionaries that RNN Trust introduces that is consistent with the intrinsic evidence.

RNN Trust largely relies on Microsoft Computer Dictionary definitions to construct "active connection." *See id.* at 9:1-10. RNN Trust reads portions of these definitions—"active" meaning "currently operational" and "connection" meaning "[a]. . . link. . . between two or more communication devices"—to mean "a communication link that is in operation." *See id.* But RNN Trust's reliance on this particular dictionary is misplaced. Although the Federal Circuit has explained that extrinsic evidence can provide a person of ordinary skill in the art "widely held understandings in the pertinent technical field," computing and telecommunications are distinct fields. *See Pitney Bowes, Inc.*, 182 F.3d at 1309. The asserted technology is a "cellular device security apparatus and method," not a form of personal computing, which the Microsoft Computer Dictionary focuses on. *See* '544 Patent at 1. The image of a computer cursor is prominent on the dictionary's cover. *See* Opening Brief, Ex. C at 1. The cover also promises "[d]efinitive coverage of hardware, software, the Internet, and more." *See id.* This suggests that the dictionary was focused on computing rather than cellular device security. Moreover, the parties' primary disagreement is whether an "active connection" involves any or ongoing exchange of data, and whether such an exchange conforms with the claim and specification language. The Microsoft

United States District Court
Northern District of California

Computer Dictionary definitions do not shed light on this. *See Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1092 (Fed. Cir. 2009) (finding that a Microsoft Computer Dictionary definition "shed[] no light" on the disputed nature of the term, which was whether in an exercise monitoring system's recitation of "displaying real time data," "real-time" meant "'instantaneous' or, if not, how much of a delay is permissible").

For example, if I replaced "active connection" in the phrase "disabling said data mode when said *active connection* is no longer active" with RNN Trust's construction, "disabling said data mode when said *communication link that is in operation* is no longer active," the reader would not have a better understanding of the data exchange frequency during an active connection. *See* '002 Patent at 22:36-37 (emphasis added). The only definition of "active connection" that the claims make clear is that it is required for the data mode. In this light, the claim language modified using RNN Trust's construction is incongruent with its argument that the data exchange is intermittent and not ongoing; "in operation" would include both intermittent and ongoing data exchange. Separately, RNN Trust has not offered additional technical dictionaries to validate its reliance on Microsoft's. For these reasons, I do not find the Microsoft Computer Dictionary a useful extrinsic source for construing "active connection."

Moreover, RNN Trust's proposed construction does not impart any additional meaning to the word "active." If I again replace the claim language ("disabling said data mode when said *active connection* is no longer active") with RNN Trust's construction ("disabling said data mode when said *communication link that is in operation* is no longer active"), when the connection is no longer "active" the connection would cease to be "in operation," but a person of ordinary skill in the art has no understanding of what either of those broad terms mean in the context of this invention. A jury trying to understand the invention according to the claims would not be helped by RNN Trust's construction of "active" because "in operation" is synonymous to the point of not providing any meaning. *See, e.g.*, *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.")

However, the other extrinsic sources RNN Trust provides—nontechnical dictionaries—

United States District Court
Northern District of California

would help inform a person of ordinary skill in the art. RNN Trust also offers Webster's II Dictionary's definitions of "active" and "connection" in support of its construction. *See* Opening Brief at 9:10-15. RNN Trust relies on the eighth definition offered by Webster's II for "active," perhaps because it is marked as pertaining to "Computer Sci[ence]." *See id.* at Ex. D at 3. This defines "active" as "[r]elating to a file, device, or display that is currently operational and ready to receive input <an active window>[.]" *See id.* A person of ordinary skill in the art would understand that, in the context of the asserted patents, a "connection" is not a "file, device, or display" and that instead, an "active connection" is a kind of medium for data exchange. An ordinary artisan would thus be skeptical that this definition applies to the invention and instead place more weight on other Webster's II definitions of "active": (1) "In action; moving"; (2) "Capable of functioning"; (3) "Causing action or change"; (4) "Participating"; (5) "In a state of action"; (6) "Energetic; lively"; and (7) "Expressing action rather than a state of being." *See id.*[4]

Combining the common definitions from Webster's II, a person of ordinary skill in the art would understand "active connection" to mean "a communication link" that is "in action." But construing "in action" to mean "ongoing" or "in operation" would "contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history" discussed earlier. *See Pitney Bowes*, 182 F.3d at 1308 (citing *Vitronics*, 90 F.3d at 1583). As I have explained, the intrinsic evidence shows that an "active connection" is a medium that maintains the data mode, which the parties agree is, at minimum, a series of intermittent data exchanges.

If I replace "active connection" with "a communication link that is intermittently exchanging data" in the phrase, "disabling said data mode when said *active connection* is no longer active," the claim reads as "disabling said data mode when said *communication link that is intermittently exchanging data* is no longer active." *See* '002 Patent at 22:36-37 (emphasis added). This construction tells the reader that "active" means an intermittent data exchange, which is consistent with the intrinsic and extrinsic evidence. Therefore, I conclude that a person

---

[4] The ninth definition, "[b]eing on full military duty and full pay," is plainly inapplicable here. *See* Opening Brief, Ex. D at 3.

United States District Court
Northern District of California

of ordinary skill in the art would understand the term "active connection" to be "a communication link that is intermittently exchanging data."

**II.** "said . . . settings comprising personal data, configuration data and technical data" / "said settings comprising personal data, device configuration data and technical data"

| RNN Trust's Construction | Apple's Construction | Court's Construction |
|---|---|---|
| plain and ordinary meaning, when the terms personal data, configuration data/device configuration data and technical data are properly construed as set forth above, which constructions and supporting evidence is incorporated herein by reference[5] | plain and ordinary meaning, which is "said . . . settings including one each of personal data, configuration data, and technical data" or "said settings including one each of personal data, device configuration data, and technical data" | "said . . . settings including but not limited to personal data, configuration data and technical data" / "said settings including but not limited to personal data, device configuration data and technical data" |

In reciting what the data mode allows ("reading and writing of data in said memory and changing of settings on said cellular communication device"), Claim 5 of the '002 Patent uses the term "said settings comprising personal data, cellular communication device configuration data and technical data." *See* '002 Patent at 22:49-55. Claim 17 of the '544 Patent uses almost identical language: "said settings comprising personal data, device configuration data and technical data." *See* '544 Patent at 23:49-51. The parties dispute whether the settings must include "one each" of the three categories—personal data, configuration data (or cellular communication device configuration data), and technical data—or whether only one will do.

RNN Trust contends that the issue is with the word "comprising," which it argues is

---

[5] It appears that RNN Trust erroneously listed "technical data" twice in its proposed construction. *See* Opening Brief at 18:9-14. I have replaced the first "technical data" with "personal data" in accordance with the claim language.

Although the term "personal data" initially required construction, the parties agreed upon the construction of "configuration data/device configuration data" and "technical data," as alluded to in RNN Trust's proposed construction. *See* Joint Claim Construction Statement at 2:4-13. "Configuration data / device configuration data" is construed as "data relating to how a device is set up to operate." *Id.* "Technical data" is construed as "information relating to the technical features of the cellular communication device." *Id.*

13

1    "perhaps the most well-understood and least controversial term in all of patent law."  Opening

2    Brief at 18:16-20.  It then cites *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed.

3    Cir. 2007), where the Federal Circuit stated that "[i]n the patent claim context the term

4    'comprising' is well understood to mean 'including but not limited to.'"

5    Apple disagrees, arguing that the dispute turns on the word "and."  Responsive Brief at

6    12:6.  According to Apple, a person of ordinary skill in the art would understand that to infringe

7    the patents, "the cellular communication device must allow for the changing of *one of each* of the

8    three recited settings: personal data, device configuration data *and* technical data."  *Id.* at 12:6-8

9    (emphasis in original).  In support, it relies on the language of Claim 1 of the '002 Patent, along

10   with the specification.  *See id.* at 12:12.  If the scope of the claim language was intended to be

11   broad, Apple argues, it would have used "or" rather than "and."  *See id.* at 12:15-19 (citing

12   *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199 (Fed. Cir. 2013) ("The disjunctive 'or'

13   plainly designates that a series describes alternatives.")).  Apple then points to two portions of the

14   '544 Patent's specification, which it contends shows that the patent "is not directed to protecting

15   an individual type of information" but instead "multiple types of information on the device," and

16   that construing the term "to protect only one type of information would depart from the purpose of

17   the invention."  *See id.* at 12:19-13:2 (citing '544 Patent at 1:20-42, 2:51-67).

18   RNN Trust has the better argument, as evidenced by the claims' plain language and

19   supported by the specification.  "Comprising" is understood to be a broad term, one that is

20   "inclusive or open-ended and does not exclude additional, unrecited elements or  method steps."

21   *See CIAS*, 504 F.3d at 1360 (citing cases); *see also Sensor Elec. Tech., Inc. v. Bolb, Inc.*, No. 18-

22   CV-05194-LHK, 2019 WL 4645338, at *11 (N.D. Cal. Sept. 24, 2019) ("In patent law, it is

23   axiomatic that use of the word 'comprising' or derivatives thereof, like 'comprises,' in the

24   preamble of a patent claim 'is well understood to mean including but not limited to.'  A patent

25   claim using 'comprises' can explicitly disclose various claim elements, but does not preclude the

26   inclusion of additional, unrecited elements in the claim.") (citing *CIAS*, 504 F.3d at 1360).  The

27   Federal Circuit's comparison to the word "consisting" in *CIAS* is helpful in understanding the

28   meaning of "comprising."  There, the court distinguished the open-ended nature of "comprising"

United States District Court
Northern District of California

1    with "consisting of," which it described as "closed-ended" and conveying "limitation and

2    exclusion." *See CIAS*, 504 F.3d at 1361 (citing cases). The key distinction is that "comprising" is

3    broader than "consisting"; the former "does not exclude additional, unrecited elements," while the

4    latter "contains only what is expressly set forth in the claim." *See id*. at 1360-61 (citing cases).

5        Given the axiomatic understanding of "comprising" in patent law, a person of ordinary

6    skill in the art would understand it to mean "including but not limited to" when reading the

7    patents' claims. *See id*. at 1360. Claim 5 of the '002 Patent can be read as "said settings *including*

8    *but not limited to* personal data, cellular communication device configuration data and technical

9    data." *See* '005 Patent at 22:49-55 (emphasis added). Likewise, Claim 17 of the '544 Patent can

10   be read as "said settings *including but not limited to* personal data, device configuration data and

11   technical data." *See* '544 Patent at 23:49-51 (same). Had the patentee intended for the settings to

12   include one each of those listed, she would have used a closed-ended term that conveyed

13   limitation, such as "consisting." Asserted and unasserted claims in both patents use the term

14   "consisting," indicating that the patentee knew an alternative to "comprising" was available. *See,*

15   *e.g.,* '002 Patent at 22:65-23:8 ("the device further being configured to carry out one member of

16   the group consisting of" and then listing elements), 23:9-14 ("one member of the group consisting

17   of a software setting, a coding configuration for data read or data write instructions, a dynamic

18   password, and a one-time password"); *see also* '544 Patent at 23:61-24:2 ("carrying out one

19   member of the group consisting of" and then listing elements); 25:9-15 ("said predetermined

20   communication protocol comprising one member of the group consisting of: a specified sequence

21   of communication packets, and a specified structure of communication packets"). Although the

22   patentee could have reinforced the open-ended nature of "comprising" by using "or" rather than

23   "and," the alternatives indicated by the use of the word "or" are already found within

24   "comprising." *See SkinMedica*, 727 F.3d at 1199.

25        At the *Markman* hearing, Apple conceded that "comprising" means "including but not

26   limited to." It then argued that the term requires that all three settings be capable of being changed

27   while in data mode.

28        I am not convinced that this falls within the ambit of the disputed term. Apple essentially

United States District Court
Northern District of California

takes issue with *other* language in the asserted claims—essentially, the meaning of the term "said data mode allowing reading and writing of data . . . and *changing of settings* on said cellular communication device." *See* '002 Patent at 22:50-52; '544 Patent at 23:46-48 (emphasis added). Although the disputed term seeks to define what those settings are, it does not encompass what the *changing* of those settings entails. RNN Trust neatly summed up the problem at the hearing, in describing Apple's argument as "trying to go on the other side of the comma" in the language of the asserted claims.

As RNN Trust notes, "the claim language conspicuously excludes a requirement that personal data, device configuration data, and technical data must each be changeable." *See* Reply at 8:22-9:11. Reading that language, the data mode must allow the changing of settings on a cellular communication device, which include but are not limited to personal data, device configuration data (or cellular communication device configuration data), and technical data. *See* '005 Patent at 22:49-55; '544 Patent at 23:49-51. The claim language does not expressly state that one of each of these categories must be changed or capable of being changed. Commonsense supports this as well: if "comprising" means "including but not limited to" and "does not exclude additional, unrecited elements," as the Federal Circuit has stated, it does not follow that each of the enumerated examples must be capable of being changed. *See CIAS*, 504 F.3d at 1360-61.

According to Apple, the specification explains that the invention's purpose is to "prevent hacking a cellular device to obtain sufficient information to make a copy of a phone such that 'the destination device [is] identical to the source device with regards to the cellular network.'" *See* Responsive Brief at 12:19-22 (citing in part '544 Patent at 1:20-42). Apple then contends that the patent "is not directed to protecting an individual type of information," but "seeks to broadly protect multiple types of information on the device." *Id.* at 12:22-23. I agree. The common abstract states that "[a] cellular communication device has one or more access modes which allow reading and writing of data, for example, to change its settings, for example passwords and even the entire operating system." *See* '544 Patent at Abstract; '002 Patent at Abstract. A person of ordinary skill in the art would understand these examples of "settings" to be far-ranging, from passwords to the device's entire operating system. The problem is, if I were to adopt Apple's

1 construction, the settings (and information contained within) would be protected only if they

2 included "one each" of personal data, configuration data, and technical data. This inherently

3 limits the information protected; if personal data could be changed but configuration data could

4 not, under Apple's construction the settings would not be protected.

5      For these reasons, I reject Apple's proposed construction and adopt a modified version of

6 RNN Trust's. I construe "said . . . settings comprising personal data, configuration data and

7 technical data" or the alternative, "said settings comprising personal data, device configuration

8 data and technical data" to mean "said . . . settings *including but not limited to* personal data,

9 device configuration data and technical data." There is no requirement within this phrase that one

10 of each of these types of settings be changed.

### CONCLUSION

12      The claims are construed as stated above.

13      **IT IS SO ORDERED.**

14 Dated: April 4, 2023

_____
William H. Orrick
United States District Judge

*United States District Court*
*Northern District of California*