**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **BRANDIE WOITENA**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO._____ |
| | ) | |
| **KIA GEORGIA, INC**. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |

## COMPLAINT

Plaintiff Brandie Woitena ("Plaintiff") submits the following Complaint for damages under the Americans with Disabilities Act of 1990 ("ADA") as amended, under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. (the "FMLA"), under 42 U.S.C. § 1981 ("Section 1981"), and under Title VII of the Civil Rights Act of the 1964 as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII") against Defendant Kia Georgia, Inc. ("Kia" or "Defendant").

## JURISDICTION AND VENUE

1.     This action is for (1) ADA discrimination, (2) FMLA interference, (3) racial discrimination, (4) gender discrimination, and (5) retaliation.  Plaintiff seeks declaratory and injunctive relief, back pay, front pay, compensatory damages, punitive damages, liquidated damages and attorney's fees and costs.

1.

2.      This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331.

3.      Venue is appropriate in this Court as, upon information and belief, the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia, and upon information and belief, all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## **PARTIES**

4.      Kia is a foreign for-profit corporation registered to conduct business in the state of Georgia.

5.      Kia may be served through its registered agent if service of process is not waived:

Registered Agent Name: **THE CORPORATION COMPANY (FL)**

Physical Address: **106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA**

County: **Forsyth**

6.      This Court has personal jurisdiction over Defendant.

## JURISDICTION AND VENUE

7.      Plaintiff's ADA and FMLA claims present federal questions over which this Court has jurisdiction under 28 U.S.C. §§ 1331 *et seq.*, and this Court has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367.

8.      This Court is an appropriate venue for all of Plaintiff's claims under 28 U.S.C. § 1391(b) and (c) because all the parties reside within the Northern District of Georgia, and many events giving rise to Plaintiff's claims occurred in this judicial district.

## ADMINISTRATIVE PROCEEDINGS

9.      On April 18, 2022, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Kia and an Amended Charge of Discrimination on April 19, 2022.

10.     On January 12, 2023, the EEOC issued Plaintiff her notice of right to sue.

11.     Plaintiff has exhausted her administrative remedies prerequisite to the filing this suit pursuant to the ADA.

12.     Suit has been filed within 90 days of Plaintiff's receipt of her notice of right to sue.

## **STATEMENT OF FACTS**

13.    Plaintiff is a Caucasian.

14.    Plaintiff is female.

15.     Plaintiff is a former employee of Kia.

16.    Kia is a manufacturing site for Kia Motors Corporation located in West Point, Georgia.

17.    Kia's West Point GA. facility also houses functional teams in addition to its manufacturing side, including Procurement, the department in which Plaintiff worked.

18.    During all time relevant to this lawsuit, the Defendant employed approximately 2,500 employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

19.    Defendant is an entity covered by the ADA, FMLA, and Title VII.

20.     At the time of her leave, Plaintiff was an "eligible employee" within the meaning of the FMLA, 29 U.S.C. § 2601 *et seq*. in that she had been employed with Defendant for more than 12 months and worked more than 1250 hours in the 12 months preceding her serious health condition.

21.    Kia is an "employer" within the meaning of the FMLA, 29 U.S.C. § 2601 *et seq.* and the ADA, 42 U.S.C. § 12101 *et seq.*, as amended.

22.     Kia had more than 50 employees within a 75-mile radius of the location in which Plaintiff was employed in each of 20 or more consecutive calendar weeks during each of the years of Plaintiff's employment.

23.     Plaintiff began working for Kia on April 27, 2015.

24.     Plaintiff was a Specialist in the General Purchasing section of the Procurement department for Kia.

25.     Plaintiff was a good employee receiving "Meets Expectations" or higher marks for her performance between 2015 and 2021.

26.     Plaintiff suffers from hypertension and Inappropriate Sinus Tachycardia (hereinafter her "Disability").

27.     Plaintiff's Disability constitutes a chronic condition disability as defined by the ADA.

28.     Plaintiff's Disability also constitutes a serious health condition as defined by the FMLA.

29.     Defendant was made aware of Plaintiff's hypertension in 2016.

30.     In August 2019, Plaintiff was additionally diagnosed with Inappropriate Sinus Tachycardia.

31.     Shortly thereafter, Kia was made aware of Plaintiff's Inappropriate Sinus Tachycardia.

32.    Plaintiff continued to request and get approval for intermittent FMLA for 2018 through 2022 for both hypertension and Sinus Tachycardia.

33.    Plaintiff also requested a disability accommodation and provided a doctor's note in order to park closer to the building, but Defendant denied the request.

34.    In response to Plaintiff's request for disability accommodation, Defendant told Plaintiff that she could wait for a nurse to drive her back to her car each day.

35.    Plaintiff explained to Kia that this was not a viable option because Plaintiff may have to wait for a long period of time, and because of her need to care for her children, she did not have the flexibility to do that.

36.    Kia refused any other accommodation.

37.    Kia refused to engage in the deliberative process to accommodate Plaintiff as required by the ADA.

38.    However, a Korean employee who made a similar request was allowed to park closer to the building, showing the disparate treatment faced by Caucasian employees.

39.    In June 2020, employees on non-production teams were told that due to the labor shortage caused by Covid-19, they would need to be pulled to the production floor.

40.     Plaintiff voiced her concern to management about the impact on her health of going to the production floor.

41.     Plaintiff was told she needed to have a doctor's note excusing her from going to the production floor.

42.     Plaintiff obtained the medical note that Kia requested from her cardiologist.

43.     Upon sharing the note from her cardiologist, Plaintiff was told that Kia's medical department had to approve the note.

44.     Plaintiff argued to her manager, Ben Hunt, that her doctor's expertise and experience in treating her heart issues outweighed the Kia medical department.

45.     Again, Kia refused to engage in a deliberative process with Plaintiff or her doctor to resolve this dispute.

46.     In March 2021, Plaintiff's Korean colleague Sam Kim was promoted to Assistant Manager over Plaintiff, despite Plaintiff's seniority, experience level, and assistance in training Mr. Kim.

47.     Plaintiff questioned why she had been passed over despite her good performance reviews and the fact that she'd made management aware of her desire to advance in her career, but she did not receive any explanation.

48. Plaintiff immediately spoke to Natalie Tullberg in Team Relations and told Ms. Tullburg that she was concerned she hadn't been promoted because of her health issues and FMLA.

49. Plaintiff was also concerned that she was passed over for promotion because Korean employees were treated more favorably than Caucasian employees.

50. Joshua Kim, another Korean male, was promoted to an assistant manager position on the MRO side of the business over a Caucasian male, Sterling Carlisle.

51. Plaintiff became aware that Kia's Korean coordinator, Thomas Park, helped Mr. Kim and another employee, Joshua Kim, with their promotions. There was no similarly situated person assisting employees who were not Asian.

52. On March 26, 2021, Plaintiff met with her management team, consisting of Mercedes Hernandez, Sam Kim, and Greg Butler concerning her career development and letting them know that since she wasn't promoted to Assistant Manager, she wanted to be promoted to a Level 4.

53. Plaintiff completed all the mandatory training required for a promotion but was told by Mr. Butler that she would not be promoted despite that.

54. On August 3, 2021, Plaintiff received a message from Ms. Hernandez inviting her to a CTPAT audit, and Plaintiff responded that she would attend on August 5, 2021.

55.     However, on August 5, 2021, Plaintiff had issues with her hypertension and took a day of her approved FMLA leave.

56.     Plaintiff had conversations wherein Mr. Kim admitted that Ms. Hernandez gave Plaintiff a hard time and that Plaintiff had a heavier workload than others.

57.     Upon logging into her Success Factors on October 19, 2021, Plaintiff noticed that there was a historical matrix showing her as "meets expectations/low potential," even though no other team members she spoke to had anything listed in their historical matrix.

58.     On October 20, 2021, Plaintiff spoke with Marco Brown in Human Resources who told her that the historical matrix was an error and that he would look into it. Plaintiff also informed Mr. Brown again about the issues she was facing in her department.

59.     On October 25, 2021, Plaintiff reached out again to Mr. Brown about the historical matrix, but Mr. Brown never responded to Plaintiff.

60.     On October 26, 2021, Plaintiff received an email from Ms. Hernandez that the new sick policy was on a "case-by-case" basis. Plaintiff verified with Team Relations that sick policy was up to the department but that each team member should be treated the same.

61.    On November 15, 2021, Plaintiff was on her way to a dentist appointment during her lunch hour. She ran into Mr. Butler on her way out and asked him about the rule that said time lost due to doctor's appointments had to be made up.

62.    Mr. Butler replied that it was "case-by-case" and that Plaintiff had to make up any time past her given lunch hour.

63.    Plaintiff told Mr. Butler that she didn't think that was fair since people on the MRO side were allowed to take up to two hours for a doctor's appointment.

64.    On January 14, 2022, Plaintiff asked to be able to work from home because her child was sick. Mr. Kim told her she needed to ask Mr. Butler; Mr. Butler told her she needed to ask Mr. Kim.

65.    Plaintiff's child was also sick on January 28, 2022.

66.    Plaintiff ended up having to take PTO days because she could not get a response about working from home despite other team members, including Mr. Kim, being able to work from home.

67.    On January 25, 2022, Plaintiff met with Mr. Butler for her Core Values review and again voiced her concerns about being treated unfairly, specifically mentioning the work from home policy and concerns over the sick time policy.

68.    Plaintiff also told Mr. Butler that she had not received any coaching as promised.

69.    In January 2022, Plaintiff's colleague, Cleve Pounds, returned to the office after suffering a stroke the previous fall.

70.    Mr. Pounds had a difficult time adjusting and remembering processes and procedures.

71.    Plaintiff had to pick up the slack for Mr. Pounds in addition to her own workload.

72.    Plaintiff complained to Mr. Kim that she was having to go back and correct errors for Mr. Pounds because the customs broker was having trouble with Mr. Pounds remembering things.

73.    Mr. Kim told Plaintiff to let Mr. Pounds' errors go through.

74.    Mr. Pounds was often on his phone despite a department rule that phones should not be used at desks.

75.    Plaintiff continued to help Mr. Pounds, making sure to copy management on all emails so they could see that there were problems.

76.    Plaintiff again spoke with Mr. Kim about the issues with Mr. Pounds, and Mr. Kim said they knew he was having trouble with day-to-day processes and that maybe Mr. Pounds was watching TikTok videos because his doctor ordered him to.

77.     On January 31, 2022, Plaintiff was told by Mr. Kim that she needed to create a new training manual and that she would be expected to retrain all of her supervisors -- Ms. Hernandez, Mr. Pounds, and Mr. Kim.

78.     Plaintiff spoke to Mr. Butler again, stating that she was upset about being asked to retrain the department, specifically because she'd repeatedly asked for someone to help Mr. Pounds and because she'd been passed over for a promotion but was now expected to retrain her managers. Mr. Butler agreed that this was a management responsibility.

79.     Plaintiff was then called into a meeting with Ms. Hernandez and Mr. Kim who stated that Plaintiff missed an opportunity to show her leadership skills and that she should not have spoken to Mr. Butler.

80.     Plaintiff spoke with Mr. Butler again because the situation was causing her stress, which exacerbated her disabilities by causing her blood pressure to spike and heart rate to speed up.

81.     Mr. Butler said that Mr. Kim and Ms. Hernandez had been spoken to, and he didn't understand why they were escalating things.

82.     On March 4, 2022, Ms. Hernandez left Kia despite not giving Plaintiff her annual evaluation.

83.   On March 7, 2022, Plaintiff's evaluation was performed by Mr. Kim and Mr. Butler.

84.   Plaintiff received several "needs improvement" scores, despite never being given any documentation as to where her performance was lacking.

85.   Plaintiff was told she asked too many questions; however, many times, the emails were in Korean, and Plaintiff needed to ask questions to understand what was being said.

86.   Plaintiff was told that she did not collaborate. On the contrary, though, Plaintiff was the only team member to complete her project, which took working with other departments and external vendors.

87.   On March 8, 2022, Plaintiff met with Ms. Tullberg in Team Relations to discuss her evaluation. Plaintiff explained to Ms. Tullberg that Plaintiff felt she should not have received any areas marked "needs improvement" without proper documentation and counseling.

88.   Ms. Tullberg walked Plaintiff to HR, and Plaintiff was able to talk with Latesa Bailey in HR, expressing the same concerns. Ms. Bailey said that she would request a meeting with Mr. Butler and Mr. Kim and that she would follow up with Plaintiff.

89.    On March 10, 2022, Plaintiff requested a half day off, and while her time was approved, she was emailed directly and told she could not leave before noon, even though that wasn't true of others who requested a half day of PTO.

90.    On March 21, 2022, Plaintiff returned from using a week of her intermittent FMLA and tried to follow up with Ms. Bailey about her evaluation. Ms. Bailey told her that Plaintiff would need to talk to her management team since they were updating the evaluation.

91.     On March 24, 2022, Plaintiff had a second review with Mr. Kim and Mr. Butler, where here score was nominally raised from a 2.6 to a 2.7.

92.    As Mr. Butler tried to explain his scoring, Plaintiff began to write notes about what he was saying, which seemed to anger Mr. Butler.

93.    Mr. Butler told Plaintiff that one of her areas of needing improvement was "Challenge" because she had missed a CTPAT audit; however, Plaintiff was out on approved FMLA leave the day she agreed to attend the audit.

94.    Mr. Butler also argued that Plaintiff did not collaborate, despite evidence to the contrary that Plaintiff collaborated with other departments and external partners.

95.    Mr. Butler told Plaintiff he would not argue with her and that if she still had concerns, she should go back to HR and Team Relations.

96.    Plaintiff refused to sign the second performance evaluation.

97.    Plaintiff wrote a resignation letter and spoke to Mr. Brown in HR, who told her to meet with Robert Cameron in Team Relations.

98.    Mr. Cameron told Plaintiff that she should not have received a "needs improvement" on her evaluation without prior counseling and documentation.

99.    Mr. Cameron further asked Plaintiff to hold off on submitting her resignation until Ms. Tullberg was back in the office.

100.   Plaintiff told Mr. Cameron that she felt she was going in circles and requested a meeting for the following day.

101.   On March 25, 2022, Plaintiff met with Mr. Cameron, Mr. Brown, Team Relations, and HR and advised that she was felt she had no choice but to resign due to her unfair treatment, and the effects this unfair treatment was having on her health.

102.   Plaintiff specifically mentioned that she was given a "needs improvement" on her Challenge competency because of the missed CTPAT audit, even though Plaintiff was out on approved FMLA leave.

103.   Mr. Brown asked Plaintiff to give him until 5:00 P.M.

104.   Plaintiff texted Mr. Brown close to 5:00 P.M. to see if there was news.

105.   Mr. Brown texted Plaintiff back at 6:29 saying, "Hey. Not yet."

106.   On March 28, 2022, Plaintiff sent Mr. Brown an email asking for an update.

107.   Mr. Brown told Plaintiff that Ms. Bailey had met with Mr. Butler, who continued to say that Plaintiff had refused to go on a CTPAT audit and did not get along with her coworkers, despite Plaintiff's evidence to the contrary.

108.   Plaintiff tried to find Ms. Bailey to discuss but was unable to, meeting with Mr. Cameron instead. Mr. Cameron told Plaintiff that the only thing he could suggest was another meeting with HR.

109.   At this point, Plaintiff was out of options, and she wrote her final resignation letter.

110.   When Plaintiff gave Mr. Butler her letter, he said they needed to go straight to Team Relations because he was not going to let her work out her final two weeks, which is very unusual.

111.   At that time, Plaintiff was escorted to retrieve her things from her desk and her employment was terminated.

112.   During Plaintiff's employment, she requested many times to change departments and was never allowed to, despite the stress that her unfair treatment was causing her.

113.   Ms. Bailey in HR advised Plaintiff to continue applying for other internal positions, but Plaintiff was never considered for them.

114.   Plaintiff had no other choice but to resign because she was being punished for having a disability and using FMLA, she had repeatedly complained but Kia would not change, and the stress the retaliation was causing was greatly effecting Plaintiff's health.

115.   The workplace had become hostile and intolerable for Plaintiff, and she'd received clear messaging from Kia that she would not be considered for advancement and that her management team was trying to discredit her work, which meets the parameters for constructive termination.

116.   Throughout her employment, Plaintiff tried many times to meet with Mr. Brown and Ms. Bailey in HR about her concerns but was consistently told that they were out of the office or unavailable.

117.   Defendant's refusal to meet and confer with Plaintiff on her accommodation request was unreasonable and violates the ADA.

118.   Plaintiff was constructively discharged by Kia in violation of the ADA and in violation of the FMLA.

119.   Plaintiff was discriminated against due to her race and treated in a disparate manner from that of Korean employees in violation of 42 U.S.C. § 1981.

120.   Plaintiff was discriminated against due to her gender from that of male employees in violation of Title VII.

## COUNT I

## VIOLATION OF ADA

121.   Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

122.   Plaintiff has a disability as defined by the ADA.

123.   As detailed above, Plaintiff notified Defendant of her disability and her need for an accommodation.

124.   Defendant refused Plaintiff's accommodation suggestion and refused to engage in the deliberative process to come up with a reasonable accommodation.

125.   Defendant's actions violated the ADA.

126.   As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered damages, including but not limited to loss pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT II

## RETALIATION

127.   Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

128.  Plaintiff engaged in protected activity under the ADA, FMLA, Title VII, and Section 1981.

129.  In response, Defendant retaliated against Plaintiff.

130.  For example, Plaintiff was retaliated against (1) when her reasonable accommodations were denied, (2) when she was penalized for missing an audit while out on approved FMLA leave, and (3) when she was constructively terminated.

131.  Defendant's actions constitute unlawful retaliation in violation of the ADA, as amended.

132.  Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's retaliation against Plaintiff was undertaken intentionally and in bad faith.

133.  As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

## COUNT III

## INTERFERENCE FOR EXERCISE OF FMLA RIGHTS

134.   Plaintiff incorporates by reference the preceding Paragraphs as if fully restated herein.

135.   Plaintiff was an eligible employee with a serious health condition as that term is defined by the FMLA and the accompanying regulations.

136.   At all times relevant to this action, Defendant had more than 50 employees in twenty (20) or more workweeks in 2019-2020, and was engaged in commerce or were part of an industry affecting commerce, making it an "eligible employer" as defined by the FMLA, 29 U.S.C. § 2611(40(A).

137.   Plaintiff timely notified Defendant of her serious medical condition.

138.   Plaintiff used FMLA leave.

139.   As detailed above, Defendant interfered with Plaintiff's FMLA rights.

140.   For example, Plaintiff's FMLA rights were interfered with (1) when her reasonable accommodations were denied, (2) when she was penalized for missing an audit while out on approved FMLA leave, and (3) when she was constructively terminated.

141.   Defendant's actions in retaliating against Plaintiff for exercising her rights under the FMLA were committed with reckless disregard for Plaintiff's right to be

free from discriminatory treatment because of the exercise of her rights under the FMLA, specifically 29 U.S.C. § 2615(a)(1)(2).

142.   The effect of Defendant's actions has been to deprive Plaintiff of a job, as well as income in the form of wages, health insurance, prospective retirement benefits, social security, and other benefits due her solely because of her exercise of her rights under the FMLA.

143.   As a result, Plaintiff is entitled to both equitable and monetary relief for Defendant's violation of the FMLA, specifically 29 U.S.C. § 2617(a)(1)(A) and (B).

144.   Plaintiff is further entitled to liquidated damages for Defendant's willful violation of her rights under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii).

**COUNT IV**

**DISCRIMINATION ON THE BASIS OF RACE**

145.   Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

146.   Plaintiff and other Caucasian employees were treated unfavorably as compared to their Korean counterparts, including being passed over for promotions.

147.   Defendant's actions violated § 1981.

148.   As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished

employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

## DISCRIMINATION ON THE BASIS OF GENDER

149.   Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

150.   Plaintiff was treated unfavorably as compared to her male counterparts, including being passed over for promotions.

151.   Defendant's actions violated Title VII.

152.   As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

(a)   a declaratory judgment that Defendants have engaged in unlawful employment practices in violation of the ADA, FMLA as amended, § 1981, and Title VII;

(b)     an injunction prohibiting Defendants from engaging in unlawful employment practices in violation of the ADA, FMLA as amended, Section 1981, and Title VII;

(c)     full back pay from the date of Plaintiff's constructive termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)     front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)     liquidated damages and compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)     punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendants for its conduct toward Plaintiff and deter it from similar conduct in the future;

 (g)     reasonable attorney's fees and costs; and

 (h)     nominal damages and any other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of April, 2022.

*/s/ J. Stephen Mixon*

J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorneys for Plaintiff

THE MIXON LAW FIRM
1691 Phoenix Boulevard
Suite 150
Atlanta, Georgia 30349
Telephone: (770) 955-0100
Facsimile: (678) 999-5039