EXHBIIT F

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | |
|---|---|
| EUNICE LAMBERT, on behalf of decedent FELICIA LAMBERT, | |
| *Plaintiff,* | |
| v. | Case No. CV 121-111 |
| KENDALL PATIENT RECOVERY U.S., LLC, a Delaware limited liability corporation, | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| *Defendant.* | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Eunice Lambert, as Administratrix of the Estate of her daughter, Decedent Felicia Lambert, brings this First Amended Complaint and Demand for Jury Trial against Defendant Kendall Patient Recovery, U.S., LLC ("KPR") for the harm it caused to Decedent Felicia Lambert as a result of its emissions of toxic ethylene oxide. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, upon information and belief as to all other matters:

### INTRODUCTION

1.    KPR operates an industrial medical sterilization plant in Augusta, Georgia. As part of its sterilization process, KPR uses and emits harmful ethylene oxide ("EtO").

2.     While ethylene oxide has been recognized as a hazardous air pollutant since 1991, classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since, at least, the mid-1980s, KPR disregarded ethylene oxide's harmful properties and continues to release it into the surrounding community— entirely unbeknownst (until recently) to area residents and workers.

3.     Self-reported emission estimates from the KPR facility indicate high levels of ethylene oxide release. KPR has released as much as 110,000 pounds of ethylene oxide in a single year. While a portion of KPR's EtO is emitted through controlled and monitored points, the largest amount of these emission estimates are uncontrolled "fugitive emissions" that have been escaping, and continue to escape, the KPR facility.

4.     Early air modeling around the KPR facility shows ethylene oxide levels in excess of the U.S. Environmental Protection Agency's ("U.S. EPA") acceptable cancer risk and in excess of Georgia's Acceptable Ambient Concentration ("AAC") levels for EtO.

5.     As a result, and unbeknownst to them, individuals living and working near the KPR facility face some of the highest long-term cancer risks in the United States. These individuals have been unknowingly inhaling ethylene oxide on a routine and continuous basis for decades. Now they are

suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from their continuous exposure to ethylene oxide.

## PARTIES

6.     Plaintiff Eunice Lambert is a natural person and citizen of the State of South Carolina who is acting as Administratrix of the Estate of her daughter, Decedent Felicia Lambert.

7.      Defendant Kendall Patient Recovery U.S., LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017. Defendant KPR operates a medical sterilization facility located at 1430 Marvin Griffin Road, Augusta, Georgia 30913.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (i) the parties are citizens of different states, (ii) and the amount in controversy exceeds $75,000.

9.     This Court has personal jurisdiction over Defendant because it is registered to do business in this District and carries on a continuous and systematic part of its business throughout this District.

10.     Venue is proper because Defendant operates a facility in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

3

## COMMON FACTUAL ALLEGATIONS

### I.     Brief Overview of the Ethylene Oxide Industry

11.     Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial uses.

12.     Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment. While EtO's gaseous form is has industrial uses, like medical device sterilization, the average person does not use EtO for such uses.

13.     Since at least 1968, Defendant KPR has used and continues to use EtO in its industrial medical device sterilization process.

14.     Throughout the industrial processes, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

15.     As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades, all while KPR knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.     Health Effects of Ethylene Oxide Exposure

16.     Ethylene oxide is an odorless, colorless gas that is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

17.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of ethylene oxide.

18.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia

in line with increases of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased incidence of leukemia and other cancers.

19.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials containing ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

20.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

21.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and

increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

22.     As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the EPA's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by thirty (30) times. Critically, these classifications are not limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

23.     Exposure to ethylene oxide has been widely studied and its negative health effects well documented. Presently, there is evidence linking ethylene oxide exposure to an increased risk of lymphohematopoietic cancers, such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, the uterus, and the brain; and reproductive and developmental impairments, including an increased rate of miscarriages and infertility.

24.     Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding a different sterilization facility in Willowbrook, Illinois, Sterigenics, which has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;

- Pediatric lymphoma;

- Breast cancer;

- Prostate cancer;

- Pancreatic cancer;

- Ovarian cancer; and

- Bladder cancer.

25.     Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. EPA states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

### III.    KPR Knew That EtO Emissions Were Harmful

26.     By the early 1980s, ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. This means that, during the time KPR operated its facility it knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

27.     In October 1985 the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's cacogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional forty-seven (47) cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least

9

several hours, a sufficient length of time for a significant human exposure to occur."

28.    In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986 letter to various EtO users and emitters, including KPR. Ultimately, ethylene oxide was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

29.    In 1986 the U.S. EPA conducted a risk assessment for ethylene oxide emitters, including KPR's Augusta facility. The agency calculated maximum EtO concentrations from the KPR facility to be as high as 11.68 $\mu g/m^3$—or 584 times the current acceptable limit. The U.S. EPA also assigned a numeric risk score for individuals living and working in the area surrounding the KPR facility resulting from EtO emissions.

30.     By 1990 then, ethylene oxide users and emitters were aware of the dangers of the chemical and legal consequences of emissions. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of ethylene oxide alleging that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

31.     Thus, the potential dangers EtO emissions posed to nearby residents was known, or should have been known, to KPR when it operated its facility, and years in advance of Decedent's diagnosis.

## IV.   KPR Emits Harmful Levels of Ethylene Oxide

### a.   The U.S. EPA Estimates High Risks of Cancer Near KPR's Facility

32.     On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA")—a screening tool that estimated cancer risks based on emission data in 76,727 census tracts across the United States.

33.     The 2014 NATA identified the tract where the KPR facility is located in Augusta (13245010400) as having potential cancer risks of sixty-four (64) per one million from exposure to air toxics.

34.     The U.S. EPA "considers any exposure, however small, to a carcinogen to create some cancer risk." The U.S. EPA estimates the lifetime

risk of developing cancer due to air toxics in the tract in which the KPR facility is located to be *up to twice as high* as the average national cancer risk across the U.S. population.

**b.    The U.S. EPA's Cancer Risks are Understated**

35.    While the 2014 NATA reveals shockingly high risks of cancer surrounding the KPR facility, these risks are understated.

36.    The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate emission sources and potential public health risks. It notes several NATA shortcomings, such as the lack of direct measurements of pollutants and data gaps.

37.    The 2014 NATA is a model created on the assumed exposure of a facility's reported 2014 emissions. But the emissions from KPR have historically been greater than its reported emissions in 2014.

38.    The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals that pose a threat to human health and the environment.

39.    A review of TRI data from the U.S. EPA shows EtO emissions from the KPR facility in Augusta over the course of thirty years, with data beginning approximately twenty (20) years after the facility's opening. *See* Figures 1 and 2.



(**Figure 1**, showing emissions from KPR between 1998 and 2018**)**

| Year | Fugitive Emissions (in lbs.) | Stack Emissions (in lbs.) |
|---|---|---|
| 1988 | 0 | 54,990 |
| 1989 | 3,697 | 106,827 |
| 1990 | 21,000 | 83,000 |
| 1991 | 40,000 | 12,000 |
| 1992 | 32,000 | 13,000 |
| 1993 | 32,500 | 13,000 |
| 1994 | 28,845 | 13,966 |
| 1995 | 27,310 | 13,781 |
| 1996 | 16,100 | 14,800 |
| 1997 | 16,078 | 12,661 |
| 1998 | 14,334 | 11,188 |
| 1999 | 12,044 | 300 |
| 2000 | 11,320 | 292 |
| 2001 | 11,914 | 553 |
| 2002 | 7,977 | 542 |
| 2003 | 8,336 | 682 |
| 2004 | 8,348 | 664 |
| 2005 | 6,926 | 602 |
| 2006 | 6,065 | 580 |
| 2007 | 5,812 | 558 |
| 2008 | 5,534 | 493 |
| 2009 | 3,965 | 207 |
| 2010 | 2,929 | 200 |
| 2011 | 1,237 | 179 |
| 2012 | 1,264 | 182 |
| 2013 | 1,089 | 144 |

| 2014 | 250 | 72 |
| 2015 | 250 | 79 |
| 2016 | 250 | 73 |
| 2017 | 145 | 139 |
| 2018 | 137 | 122 |

**(Figure 2)**

40.     In 2014, KPR emitted approximately 322 pounds of carcinogenic ethylene oxide from its facility. These reported emissions, however, are overshadowed by KPR's emissions in previous years, but were not accounted for in the 2014 NATA Report. For example, KPR emitted more than 41,000 pounds of EtO in 1995; 104,000 pounds in 1990; and over 110,000 pounds in 1989.

41.     A significant portion of KPR's emissions include fugitive emissions from sources such as leaking valves and other equipment. These emissions are only based on an estimate due to their elusive nature.

42.     As a result of KPR's emissions of carcinogenic ethylene oxide into the air and the surrounding communities, people living and working in the surrounding communities have been unknowingly exposed to elevated concentrations of EtO.

c. **The Georgia Environmental Protection Division's Air Modeling**

43.     According to the Georgia Environmental Protection Division's ("GA EPD") air modeling, the KPR facility exceeds Georgia's annual Acceptable Ambient Concentration for ethylene oxide.

44.     The AAC is the maximum allowable air concentration of toxic air pollutants like ethylene oxide. The GA EPD calculated the annual AAC for ethylene oxide at 0.00033 µg/m³ based on the U.S. EPA's Integrated Risk Information System ("IRIS") and the Inhalation Unit Risk ("IUR") for EtO.

45.     The GA EPD's modeling revealed a maximum ground level concentration ("MGLC")—the concentration of a pollutant to which a human is normally exposed—in excess of the AAC. Specifically, the GA EPD found that the highest annual concentration of ethylene oxide around the facility was 0.0618 µg/m³, which is over 187 times the AAC.

46.     The full extent of KPR's EtO emissions throughout Augusta, Georgia will not be entirely known to those living and working in the area until after government agencies conduct and publish long-term air monitoring results that take into account changing wind patterns and measurements reflecting KPR's operation at full capacity.

## FACTS SPECIFIC TO PLAINTIFF AND DECEDENT

47.     Decedent Felicia Lambert lived less than 6 miles from the KPR facility in Augusta for most of her life. Between 1981 and 1982, Felicia lived 6.1 miles from the KPR facility. Between 1986 and 1990, Felicia lived 5 miles from the KPR facility. Between 1990 and 2015, Felicia lived 5.9 miles from the KPR facility. Between 2003 and 2008, Felicia also attended school 5 miles from the KPR facility.

48.     Felicia consistently inhaled air in and around her home, school, and in the Augusta area.

49.     As a result, Felicia was diagnosed with acute myelogenous leukemia in 2014 and passed away in 2015.

50.     At the time of her diagnosis, neither Plaintiff Eunice nor Decedent Felicia had notice that Felicia's medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide. Plaintiff did not begin to suspect that Defendant was emitting ethylene oxide, or that Defendant's ethylene oxide emissions were the cause of Felicia's medical condition, until approximately December of 2019.

51.     Decedent Felicia experienced significant pain and suffering for many months before she passed away, which increased as her acute myelogenous leukemia progressed. In the lead-up to her diagnosis and hospitalization, Felicia suffered from extreme fatigue, bleeding gums,

16

unexplained bruising, and bleeding cysts. After her diagnosis and hospitalization, Felicia suffered from all of her pre-diagnosis symptoms, in addition to an allergic reaction to antibiotics, an excruciating bone marrow procedure, chemotherapy, frequent blood transfusions, a stem cell procedure, painful full-body blisters, dialysis, loss of ability of communicate, bowel incontinence, and a heart attack.

52.　As a result of her leukemia, Decedent Felicia incurred significant unreimbursed medical expenses.

53.　In addition, Felicia's estate incurred funeral expenses.

### COUNT I
### Negligence
### (On Behalf of Plaintiff and Against Defendant KPR)

54.　Plaintiff incorporates the foregoing allegations as if fully set forth herein.

55.　At all times relevant, Defendant owed a duty to exercise reasonable care in the operation of its facility, including the emission of EtO.

56.　Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

a.　Emitting dangerous volumes of EtO into the air from its facility;

b.　Disregarding safe methods to adequately control EtO emissions from its facility;

c.　Failing to control and report fugitive emissions of EtO;

17

     d.     Failing to comply with Georgia's limits on EtO concentrations;

     e.     Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

     f.     Subjecting those who live and work nearby its facility to an elevated cancer risk.

57.     As a proximate result of one of the aforesaid negligent acts or omissions, Decedent suffered injuries of a personal and pecuniary nature.

**COUNT II**
**Willful and Wanton Misconduct**
**(On Behalf of Plaintiff and Against Defendant KPR)**

58.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

59.     At all times relevant, Defendant owed a duty to refrain from willful and wanton misconduct and/or conduct which exhibited an indifference and/or conscious disregard to the health, safety, and well-being of Decedent and those living and working in the area surrounding its facility.

60.     Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

     a.     Emitting dangerous volumes of EtO into the air from its facility;

     b.     Disregarding safe methods to adequately control EtO emissions from its facility;

     c.     Failing to comply with Georgia's limits on EtO concentrations;

d.    Failing to control and report fugitive emissions of EtO;

e.    Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

f.    Subjecting those who live and work nearby its facility to an elevated cancer risk.

61.    Defendant acted in a way that shows a conscious disregard for the known dangers its EtO posed to its neighbors. As explained in Paragraphs ¶¶ 26–31, KPR knew of the specific dangers associated with EtO exposure, knew of the regulatory regime built up around it because it was so noxious, but nevertheless emitted thousands of pounds of it into the air around Decedent's home. And, of course, despite being in a position of superior knowledge with regard to these facts, Defendant did not warn Decedent of the risks that she faced to contract the illness she was ultimately diagnosed with.

62.    Making matters worse, sterilization methods that did not use cancer-causing EtO, including but not limited to, heat sterilization, nitrogen dioxide sterilization, and ionizing radiation, were available to Defendant, but it chose to use EtO sterilization instead.

63.    As a proximate result of Defendant's willful and wanton acts or omissions, Decedent suffered injuries of a personal and pecuniary nature.

19

## COUNT III
## Private Nuisance
## (On Behalf of Plaintiff and Against Defendant KPR)

64.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.     The right of enjoyment of private property is an absolute right of every citizen.

66.     Defendant knew EtO to be hazardous and harmful to humans.

67.     Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of people living and working in the community.

68.     Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons breathing it.

69.     Defendant's operation, maintenance, and use of its sterilizing facility caused those who live and work in the area surrounding its facility to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

70.     Defendant's emissions of carcinogenic EtO interfered with Decedent's enjoyment of property and caused hurt, inconvenience, or damage

to Decedent, including her ability to breathe air on her property free of a carcinogenic toxin.

71.     As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, Decedent's right to breathe clean air without dangerous levels of carcinogens, such as EtO, was eliminated and/or severely diminished.

72.     As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, EtO continuously invaded and contaminated the areas surrounding KPR's facility, including Decedent's residence.

73.     As a proximate result of Defendant's use and emission of EtO, Decedent was exposed to and inhaled significant amounts of EtO.

74.     As a proximate result of Defendant's use and emission of EtO, Decedent sustained severe and permanent damage to her health due to the emission of EtO.

75.     As a proximate result of Decedent's inhalation of EtO from Defendant's facility, Decedent suffered injuries of a personal and pecuniary nature.

## COUNT IV
### Ultrahazardous Activity/Strict Liability
### (On Behalf of Plaintiff and Against Defendant KPR)

76.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

77.     Defendant's use and emission of EtO from its medical sterilization facility constitutes an ultrahazardous activity.

78.     Defendant's use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. Even exercising reasonable care, this risk cannot be eliminated. Due to its chemical makeup, EtO will always be carcinogenic and dangerous, no matter what quantity is emitted. Unless EtO's chemical makeup is modified, and thus it is turned into a different compound, EtO will always be inherently dangerous.

79.     Medical device sterilization is not an activity carried out by many people in the population.

80.     Defendant's use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which its facility is located, just around the corner from Decedent's former home and school.

81.     The activities, as conducted by Defendant, are exceedingly dangerous and offer little to no value to the surrounding community.

82.     Because Defendant's activities are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

83.     As a direct and proximate result of Defendant's ultrahazardous activities, Decedent was exposed to and inhaled great amounts of EtO.

84.    As a proximate result of Decedent's inhalation of EtO from Defendant's facility, Decedent suffered injuries of a personal and pecuniary nature.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court enter judgment in her favor and against Defendant as follows:

a.    An award of damages, including nominal and compensatory damages for, among other things, the pain and suffering experienced by Decedent and medical and funeral expenses as allowed by law and in an amount to be determined;

b.    An award of punitive damages as allowed by law and in an amount to be determined;

c.    An award of attorneys' fees and costs and litigation expenses;

d.    An award of prejudgment interest on all amounts awarded;

e.    An Order for injunctive and declaratory relief; and

f.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**EUNICE LAMBERT, on behalf of decedent FELICIA LAMBERT,**

By:  /s/ Benjamin H. Richman
One of Plaintiffs' Attorneys

Charles C. Bailey
charlie.bailey@cookconnelly.com
Sutton Connelly
sutton.connelly@cookconnelly.com
COOK & CONNELLY, LLC
750 Piedmont Ave. NE
Atlanta, GA 30308
Tel: 678.539.0680

Benjamin H. Richman*
brichman@edelson.com
Michael Ovca*
movca@edelson.com
EDELSON PC
350 North LaSalle, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370

*admitted *pro hac vice*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22, 2021, a copy of the foregoing ***First Amended Complaint and Demand for Jury Trial*** was filed with the Clerk of Court via its CM/ECF service, which will send notification of such filing to all counsel of record.

/s/ Benjamin H. Richman