EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| LORETTA BROWMAN, EVELYN ARMSTRONG, TIEESE SMITH, DEWAYNE WILLIAMS, VICTORIA SNOW, RONALD LAMPKIN, BARBARA BETTS, SHERRY HOLES, FELICIA LAMBERT, TERESSA TAYLOR, MICHAEL DUNN, ALOPECIA ARMSTRONG, PATRICIA BELL, BERNICE WILKINS, ANNIE WILLIAMS, CAROLYN WASHINGTON, SCHUYLER KNIGHT, CLARISSA COLEMAN, CHARLES JONES, MARK PUGH, SABRINA WATKINS, SUSAN DENICE KELLY, and ETHEL LENA EVANS, | |
| *Plaintiffs,* | |
| v. | Case No.   CV 121-112 |
| KENDALL PATIENT RECOVERY U.S., LLC, a Delaware limited liability corporation, | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| *Defendant.* | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Loretta Browman, Evelyn Armstrong, Tieese Smith,

Dewayne Williams, Victoria Snow, Ronald Lampkin, Barbara Betts, Sherry

1

Holes, Felicia Lambert, Teressa Taylor, Michael Dunn, Alopecia Armstrong, Patricia Bell, Bernice Wilkins, Annie Williams, Carolyn Washington, Schuyler Knight, Clarissa Coleman, Charles Jones, Mark Pugh, Sabrina Watkins, Susan Denice Kelly, and Ethel Lena Evans bring this Complaint and Demand for Jury Trial against Defendant Kendall Patient Recovery, U.S., LLC ("KPR") for the harm it caused to Plaintiffs as a result of its emissions of toxic ethylene oxide. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, upon information and belief as to all other matters.

## INTRODUCTION

1.      KPR operates an industrial medical sterilization plant in Augusta, Georgia. As part of its sterilization process, KPR uses and emits harmful ethylene oxide ("EtO").

2.      While ethylene oxide has been recognized as a hazardous air pollutant since 1991, classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since, at least, the mid-1980s, KPR disregarded ethylene oxide's harmful properties and continues to release it into the surrounding community— entirely unbeknownst (until recently) to area residents and workers.

2

3. Self-reported emission estimates from the KPR facility indicate high levels of ethylene oxide release. KPR has released as much as 110,000 pounds of ethylene oxide in a single year. While a portion of KPR's EtO is emitted through controlled and monitored points, the largest amount of these emission estimates are uncontrolled "fugitive emissions" that have been escaping, and continue to escape, the KPR facility.

4. Early air modeling around the KPR facility shows ethylene oxide levels in excess of the U.S. Environmental Protection Agency's ("U.S. EPA") acceptable cancer risk and in excess of Georgia's Acceptable Ambient Concentration ("AAC") levels for EtO.

5. As a result, and unbeknownst to them, individuals living and working near the KPR facility face some of the highest long-term cancer risks in the United States. These individuals have been unknowingly inhaling ethylene oxide on a routine and continuous basis for decades. Now they are suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from their continuous exposure to ethylene oxide.

## PARTIES

6. Plaintiffs Loretta Browman, Evelyn Armstrong, Tieese Smith, Dewayne Williams, Teressa Taylor, Ronald Lampkin, Barbara Betts, Sherry Holmes, Michael Dunn, Alopecia Armstrong, Patricia Bell, Bernice Wilkins,

Annie Williams, Carolyn Washington, Clarissa Coleman, Charles Jones, Mark Pugh, Sabrina Watkins, Susan Denice Kelly, and Ethel Lena Evans are natural persons and citizens of the State of Georgia.

7.     Plaintiffs Victoria Snow and Schuyler Knight are natural persons and citizens of the State of South Carolina.

8.     Defendant Kendall Patient Recovery U.S., LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017. Defendant KPR operates a medical sterilization facility located at 1430 Marvin Griffin Road, Augusta, Georgia 30913.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (i) the parties are citizens of different states, (ii) and the amount in controversy exceeds $75,000.

10.    This Court has personal jurisdiction over Defendant because it is registered to do business in this District and carries on a continuous and systematic part of its business throughout this District.

4

11.     Venue is proper because Defendant operates a facility in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     Brief Overview of the Ethylene Oxide Industry

12.     Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial uses.

13.     Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment. While EtO's gaseous form is has industrial uses, like medical device sterilization, the average person does not use EtO for such uses.

14.     Since at least 1968, Defendant KPR has used and continues to use EtO in its industrial medical device sterilization process.

15.     Throughout the industrial processes, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e.,

smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

16. As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades, all while KPR knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.    Health Effects of Ethylene Oxide Exposure

17. Ethylene oxide is an odorless, colorless gas that is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

18. In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of ethylene oxide.

19. In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new

evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with increases of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased incidence of leukemia and other cancers.

20.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials containing ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

21.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

7

22.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

23.     As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the EPA's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by thirty (30) times. Critically, these classifications are not limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that

8

use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

24. Exposure to ethylene oxide has been widely studied and its negative health effects well documented. Presently, there is evidence linking ethylene oxide exposure to an increased risk of lymphohematopoietic cancers, such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, the uterus, and the brain; and reproductive and developmental impairments, including an increased rate of miscarriages and infertility.

25. Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding a different sterilization facility in Willowbrook, Illinois, Sterigenics, which has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;

- Pediatric lymphoma;

9

- Breast cancer;

- Prostate cancer;

- Pancreatic cancer;

- Ovarian cancer; and

- Bladder cancer.

26. Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. EPA states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

## III.   KPR Knew That EtO Emissions Were Harmful

27. By the early 1980s, ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. This means that, during the time KPR operated its facility it knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

28. In October 1985 the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's cacogenic health effects. In this Notice, the U.S. EPA also

10

stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional forty-seven (47) cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to occur."

29.    In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986 letter to various EtO users and emitters, including KPR. Ultimately, ethylene oxide was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

11

30. In 1986 the U.S. EPA conducted a risk assessment for ethylene oxide emitters, including KPR's Augusta facility. The agency calculated maximum EtO concentrations from the KPR facility to be as high as 11.68 μg/m³—or 584 times the current acceptable limit. The U.S. EPA also assigned a numeric risk score for individuals living and working in the area surrounding the KPR facility resulting from EtO emissions.

31. By 1990 then, ethylene oxide users and emitters were aware of the dangers of the chemical and legal consequences of emissions. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of ethylene oxide alleging that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

32. Thus, the potential dangers EtO emissions posed to nearby residents was known, or should have been known, to KPR when it operated its facility, and years in advance of Plaintiffs' diagnoses.

## IV. KPR Emits Harmful Levels of Ethylene Oxide

### a. The U.S. EPA Estimates High Risks of Cancer Near KPR's Facility

33. On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA")—a screening tool that estimated cancer risks based on emission data in 76,727 census tracts across the United States.

12

34.     The 2014 NATA identified the tract where the KPR facility is located in Augusta (13245010400) as having potential cancer risks of sixty-four (64) per one million from exposure to air toxics.

35.     The U.S. EPA "considers any exposure, however small, to a carcinogen to create some cancer risk." The U.S. EPA estimates the lifetime risk of developing cancer due to air toxics in the tract in which the KPR facility is located to be *up to twice as high* as the average national cancer risk across the U.S. population.

**b.      The U.S. EPA's Cancer Risks are Understated**

36.     While the 2014 NATA reveals shockingly high risks of cancer surrounding the KPR facility, these risks are understated.

37.     The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate emission sources and potential public health risks. It notes several NATA shortcomings, such as the lack of direct measurements of pollutants and data gaps.

38.     The 2014 NATA is a model created on the assumed exposure of a facility's reported 2014 emissions. But the emissions from KPR have historically been greater than its reported emissions in 2014.

39.     The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities

using EtO and other toxic chemicals that pose a threat to human health and the environment.

40. A review of TRI data from the U.S. EPA shows EtO emissions from the KPR facility in Augusta over the course of thirty (30) years, with data beginning approximately twenty (20) years after the facility's opening. *See* Figures 1 and 2.



(**Figure 1**, showing emissions from KPR between 1998 and 2018)

| Year | Fugitive Emissions (in lbs) | Stack Emissions (in lbs) |
|------|------|------|
| 1988 | 0 | 54,990 |
| 1989 | 3,697 | 106,827 |
| 1990 | 21,000 | 83,000 |
| 1991 | 40,000 | 12,000 |
| 1992 | 32,000 | 13,000 |
| 1993 | 32,500 | 13,000 |
| 1994 | 28,845 | 13,966 |
| 1995 | 27,310 | 13,781 |
| 1996 | 16,100 | 14,800 |
| 1997 | 16,078 | 12,661 |
| 1998 | 14,334 | 11,188 |

| 1999 | 12,044 | 300 |
|------|--------|-----|
| 2000 | 11,320 | 292 |
| 2001 | 11,914 | 553 |
| 2002 | 7,977 | 542 |
| 2003 | 8,336 | 682 |
| 2004 | 8,348 | 664 |
| 2005 | 6,926 | 602 |
| 2006 | 6,065 | 580 |
| 2007 | 5,812 | 558 |
| 2008 | 5,534 | 493 |
| 2009 | 3,965 | 207 |
| 2010 | 2,929 | 200 |
| 2011 | 1,237 | 179 |
| 2012 | 1,264 | 182 |
| 2013 | 1,089 | 144 |
| 2014 | 250 | 72 |
| 2015 | 250 | 79 |
| 2016 | 250 | 73 |
| 2017 | 145 | 139 |
| 2018 | 137 | 122 |

**(Figure 2)**

41.     In 2014, KPR emitted approximately 322 pounds of carcinogenic ethylene oxide from its facility. These reported emissions, however, are overshadowed by KPR's emissions in previous years, but were not accounted for in the 2014 NATA Report. For example, KPR emitted more than 41,000 pounds of EtO in 1995; 104,000 pounds in 1990; and over 110,000 pounds in 1989.

42.     A significant portion of KPR's emissions include fugitive emissions from sources such as leaking valves and other equipment. These emissions are only based on an estimate due to their elusive nature.

43.     As a result of KPR's emissions of carcinogenic ethylene oxide into the air and the surrounding communities, people living and working in the surrounding communities have been unknowingly exposed to elevated concentrations of EtO.

### c. The Georgia Environmental Protection Division's Air Modeling

44.     According to the Georgia Environmental Protection Division's ("GA EPD") air modeling, the KPR facility exceeds Georgia's annual Acceptable Ambient Concentration for ethylene oxide.

45.     The AAC is the maximum allowable air concentration of toxic air pollutants like ethylene oxide. The GA EPD calculated the annual AAC for ethylene oxide at $0.00033$ µg/m$^3$ based on the U.S. EPA's Integrated Risk Information System ("IRIS") and the Inhalation Unit Risk ("IUR") for EtO.

46.     The GA EPD's modeling revealed a maximum ground level concentration ("MGLC")—the concentration of a pollutant to which a human is normally exposed—in excess of the AAC. Specifically, the GA EPD found

that the highest annual concentration of ethylene oxide around the facility was 0.0618 µg/m$^3$, which is over 187 times the AAC.

47.     The full extent of KPR's EtO emissions throughout Augusta, Georgia will not be entirely known to those living and working in the area until after government agencies conduct and publish long-term air monitoring results that take into account changing wind patterns and measurements reflecting KPR's operation at full capacity.

## FACTS SPECIFIC TO PLAINTIFF BROWMAN

48.     Plaintiff Loretta Browman has lived in Augusta for the majority of her life. Between 1966 and 1980, Loretta lived 3.1 miles from the KPR facility. Between approximately 1981 and 1985, Loretta lived 3.2 miles from the KPR facility. Between 1986 and 1999, Loretta lived in and around Augusta and near the KPR facility. Between approximately 2000 and 2003, Loretta lived 5.9 miles from the KPR facility. Between approximately 2004 and 2008, Loretta lived 4 miles from the KPR facility.

49.     Loretta consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the KPR facility.

50.     As a result, Loretta was diagnosed with breast cancer in 2011.

17

51.     At the time of her diagnosis, Loretta did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF ARMSTRONG

52.     Plaintiff Evelyn Armstrong has been a resident of Richmond County, Georgia since 1969. Since 1989, Evelyn has lived 5.5 miles from the facility. Evelyn worked near the facility from 1969 to 1997.

53.     Evelyn consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the KPR facility.

54.     As a result, Evelyn was diagnosed with breast cancer around 1999.

55.     At the time of her diagnosis, Evelyn did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF SMITH

56.     Plaintiff Tieese Smith has lived in Augusta her whole life and has continuously lived less than 5 miles from the KPR facility.

57. Tieese consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home and in the areas surrounding the KPR facility.

58. As a result, Tieese was diagnosed with Lymphoma in 2001.

59. At the time of her diagnosis, Tieese did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF WILLIAMS

60. Plaintiff Dewayne Williams has lived in Augusta since 2000. Between 2000 and 2007, Dewayne lived 3.4 miles from the KPR facility.

61. Dewayne consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his home and in the areas surrounding the KPR facility.

62. As a result, Dewayne was diagnosed with Acute Promyelocytic Leukemia (APL) in 2016.

63. At the time of his diagnosis, Dewayne did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF SNOW

64.    Plaintiff Victoria Snow lived 4.21 miles away from the KPR facility from 2002 to 2007. She worked less than 6 miles away from the KPR facility from 1998 to 2009, and again in 2014.

65.    Victoria consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the KPR facility.

66.    As a result, Victoria was diagnosed with breast cancer in 2018 and underwent chemotherapy, a mastectomy, and a hysterectomy.

67.    At the time of her diagnosis, Victoria did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF LAMPKIN

68.    Plaintiff Ronald Lampkin has lived and worked in Augusta, Georgia his entire life. Since 1978, Ronald has lived 2.1 miles from the KPR facility. Between 1976 and 2013, Ronald worked 5.2 miles from the KPR facility.

69.     Ronald consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his home, his work, and in the areas surrounding the KPR facility.

70.     As a result, Ronald was diagnosed with prostate cancer in 2008 and lymphoma in 2019.

71.     At the time of his diagnosis, Ronald did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF BETTS

72.     Plaintiff Barbara Betts was a resident of Augusta, Georgia for 14 years. Between 1996 and 2010, Barbara lived 1.5 miles from the KPR facility. Between approximately 1998 and 2000, Barbara worked 2.5 miles from the KPR facility.

73.     Barbara consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

74.     As a result, Barbara was diagnosed with breast cancer in 2000, which led to a mastectomy, two rounds of chemotherapy, and thirty-six (36) rounds of radiation.

21

75.     At the time of her diagnosis, Barbara did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF HOLMES

76.     Plaintiff Sherry Holmes has been a resident of Augusta, Georgia since 1967 and has continuously lived less than 3 miles from the KPR facility.

77.     Sherry consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

78.     As a result, Sherry was diagnosed with breast cancer in 1998 and required a hysterectomy in 2005.

79.     At the time of her diagnosis, Sherry did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF TAYLOR

80.     Plaintiff Teressa Taylor has been a resident of Augusta since 1986.

81.     Since 1986, Teressa has lived less than a mile from the KPR facility.

82.    Teressa consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home and in the areas surrounding the facility.

83.    As a result, Teressa had a miscarriage in 2019.

84.    At the time of her miscarriage, Teressa did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF DUNN

85.    Plaintiff Michael Dunn has lived and worked in Augusta, Georgia his entire life. Between 1977 and 2003, Michael lived less than 3 miles from the facility. Between 2003 and 2016, Michael lived 2.4 miles from the facility. Since 2016, Michael has lived 2.9 miles from the KPR facility.

86.    Michael consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his home, his work, and in the areas surrounding the facility.

87.    As a result, Michael was diagnosed with B-cell lymphoma in 2020.

88.     At the time of his diagnosis, Michael did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF ARMSTRONG

89.     Plaintiff Alopecia Armstrong has been a resident of Augusta for the majority of her life. Between 1990 and 1997, Alopecia worked at the KPR facility.

90.     Alopecia consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

91.     As a result, Alopecia was diagnosed with breast cancer in 2007, leading to more than four months of chemotherapy and radiation treatment.

92.     At the time of her diagnosis, Alopecia did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF BELL

93.     Plaintiff Patricia Bell worked in Augusta, Georgia for 20 years. Between 1982 and 1990, Patricia worked 5.2 miles from the KPR facility. Between 1990 and 2012, Patricia worked 5.3 miles from the KPR facility

94.     Patricia consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her work and in the areas surrounding the facility.

95.     As a result, Patricia had a miscarriage in approximately 1988.

96.     At the time of her miscarriage, Patricia did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF WILKINS

97.     Plaintiff Bernice Wilkins has been a resident of Augusta, Georgia and has continuously lived and worked around the KPR facility for 45 years.

98.     Between 1973 to 1996, Berenice lived less than 5 miles from the KPR facility. Between 1978 and 2019, Bernice worked approximately 5.1 miles from the KPR facility.

99.     Bernice consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

100.    As a result, Bernice was diagnosed with breast cancer in 2000 and ovarian cancer in 2019.

101. At the time of her diagnoses, Bernice did not have notice that her medical conditions were wrongfully caused or that they were caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF WILLIAMS

102. Plaintiff Annie Williams has lived in the Augusta area since 1984. Since 1984, Annie has lived 4.7 miles from the KPR facility.

103. Annie consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home and in the areas surrounding the facility

104. As a result, Annie was diagnosed with colon cancer in 2015.

105. At the time of her diagnosis, Annie did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF WASHINGTON

106. Plaintiff Carolyn Washington has lived 5 miles from the facility since 1984. Between 1974 and 2010, Carolyn worked 5.2 miles from the facility.

107. Carolyn consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility

108. As a result, Carolyn had a miscarriage in approximately 1988 and had a hysterectomy in 1994.

109. At the time of her diagnosis, Carolyn did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF KNIGHT

110. Plaintiff Schuyler Knight worked less than a mile from the KPR facility between 1984 and 2002.

111. Schuyler consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his work and in the areas surrounding the facility.

112. As a result, Schuyler was diagnosed with chronic lymphocytic leukemia in 2012.

113. At the time of his diagnosis, Schuyler did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF COLEMAN

114.   Plaintiff Clarissa Coleman has lived and worked in Augusta, Georgia her entire life. Since 1999, Clarissa has lived less than a mile from the KPR facility. Between 1980 and 1985, Clarissa worked 5.2 miles from the KPR facility.

115.   Clarissa consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

116.   As a result, Clarissa was diagnosed with breast cancer in 2010.

117.   At the time of her diagnosis, Clarissa did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF JONES

118.   Plaintiff Charles Jones has lived and worked in Augusta, Georgia since 2015. Between 2015 and until present, Charles lived and worked 4.1 miles from the KPR facility.

119.   Charles consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his home, his work, and in the areas surrounding the facility.

28

120.   As a result, Charles was diagnosed with myeloma in 2020.

121.   At the time of his diagnosis, Charles did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF PUGH

122.   Plaintiff Mark Pugh has lived or worked in Augusta, Georgia from 1967 to 2003. Between 1967 and 1989, Mark lived 3.1 miles from the KPR facility. Between 1990 and 1992, Mark lived 3.7 miles from the KPR facility. Between 1993 and 2003, Mark lived 3.1 miles from the KPR facility. Between November of 1986 and June of 1987, Mark less than a mile from the KPR facility.

123.   Mark consistently and without any knowledge that he was doing so, inhaled contaminated air in and around his home, his work, and in the areas surrounding the facility.

124.   As a result, Mark was diagnosed with Glioblastoma Multiforme— an aggressive type of brain cancer—in 2019.

125.   At the time of his diagnosis, Mark did not have notice that his medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF WATKINS

126.   Plaintiff Sabrina Watkins has lived and worked in Augusta, Georgia from 1982 to 2004. Between 1982 and 1998, Sabrina lived 3.1 miles from the KPR facility. Between 2000 and 2004, Sabrina worked in or around the KPR facility.

127.   Sabrina consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

128.   As a result, Sabrina had five miscarriages between 1999 to 2017.

129.   At the time of her miscarriages, Sabrina did not have notice that her medical conditions were wrongfully caused or that they were caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF KELLY

130.   Plaintiff Susan Kelly has lived and worked in Augusta for 48 years. Since 2004, Susan has lived 1.6 miles from the KPR facility. Between 1982 and 2004, Susan lived half a mile from the KPR facility. Between 1989 and 2003, Susan worked in or around the KPR facility.

131.   Susan consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home, her work, and in the areas surrounding the facility.

132.   As a result, Susan required a lump be removed from her right breast in 1997; was diagnosed with colon cancer in 2016 and a uterine tumor in 2020; and had two miscarriages.

133.   At the time of her diagnoses, Susan did not have notice that her medical conditions were wrongfully caused or that they were caused by the Defendant's emissions of ethylene oxide.

## FACTS SPECIFIC TO PLAINTIFF EVANS

134.   Plaintiff Ethel Evans has lived and worked in Augusta, Georgia since 1991. Since 2007, Ethel has lived 2.3 miles from the KPR facility. Between 2002 and 2007, Ethel lived 4.8 miles from the KPR facility. Between 1991 and 1996, Ethel lived 3.5 miles from the KPR facility. Between 2003 and 2006, she worked 1.9 miles from the KPR facility.

135.   Ethel consistently and without any knowledge that she was doing so, inhaled contaminated air in and around her home and in the areas surrounding the facility.

136.   As a result, Ethel was diagnosed with breast cancer in 2009.

137.  At the time of her diagnosis, Ethel did not have notice that her medical condition was wrongfully caused or that it was caused by the Defendant's emissions of ethylene oxide.

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and Against Defendant)

138.  Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.  At all times relevant, Defendant owed a duty to exercise reasonable care in the operation of its facility, including the emission of EtO.

140.  Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

a.  Emitting dangerous volumes of EtO into the air from its facility;

b.  Disregarding safe methods to adequately control EtO emissions from its facility;

c.  Failing to control and report fugitive emissions of EtO;

d.  Failing to comply with Georgia's limits on EtO concentrations;

e.  Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

f.  Subjecting those who live and work nearby its facility to an elevated cancer risk.

141.  As a proximate result of one of the aforesaid negligent acts or omissions, Plaintiffs suffered injuries of a personal and pecuniary nature.

## COUNT II
### Willful and Wanton Misconduct
### (On Behalf of Plaintiffs and Against Defendant)

142.  Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

143.  At all times relevant, Defendant owed a duty to refrain from willful and wanton misconduct and/or conduct which exhibited an indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and those living and working in the area surrounding its facility.

144.  Notwithstanding its duty, Defendant breached its duty in one or more of the following ways:

a.  Emitting dangerous volumes of EtO into the air from its facility;

b.  Disregarding safe methods to adequately control EtO emissions from its facility;

c.  Failing to comply with Georgia's limits on EtO concentrations;

d.  Failing to control and report fugitive emissions of EtO;

33

e.   Failing to warn or advise those who live or work in the community that they were being exposed to EtO; and

f.   Subjecting those who live and work nearby its facility to an elevated cancer risk.

145.   Defendant acted in a way that shows a conscious disregard for the known dangers its EtO posed to its neighbors. As explained in Paragraphs ¶¶ 17–32, KPR knew of the specific dangers associated with EtO exposure, knew of the regulatory regime built up around it because it was so noxious, but nevertheless emitted thousands of pounds of it into the air around Plaintiffs homes. And, of course, despite being in a position of superior knowledge with regard to these facts, Defendant did not warn Plaintiffs of the risks that they faced to contract the illnesses they were ultimately diagnosed with.

146.   Making matters worse, sterilization methods that did not use cancer-causing EtO, including but not limited to, heat sterilization, nitrogen dioxide sterilization, and ionizing radiation, were available to Defendant, but it chose to use EtO sterilization instead.

147.   As a proximate result of Defendant's willful and wanton acts or omissions, Plaintiffs suffered injuries of a personal and pecuniary nature.

## COUNT III
### Private Nuisance
### (On Behalf of Plaintiffs and Against Defendant)

148. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

149. The right of enjoyment of private property is an absolute right of every citizen.

150. Defendant knew EtO to be hazardous and harmful to humans.

151. Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of people living and working in the community.

152. Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons breathing it.

153. Defendant's operation, maintenance, and use of its sterilizing facility caused those who live and work in the area surrounding its facility to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

154. Defendant's emissions of carcinogenic EtO interfere with Plaintiffs' enjoyment of property and cause hurt, inconvenience, or damage to

35

Plaintiffs, including their ability to breathe air free of a carcinogenic toxin in the air on their property.

155. As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, Plaintiffs' right to breathe clean air without dangerous levels of carcinogens, such as EtO, was eliminated and/or severely diminished.

156. As a proximate result of Defendant's operation, maintenance, and use of its sterilizing facility, EtO continuously invaded and contaminated the areas surrounding KPR's facility, including Plaintiffs' residence.

157. As a proximate result of Defendant's use and emission of EtO, Plaintiffs were exposed to and inhaled significant amounts of EtO.

158. As a proximate result of Defendant's use and emission of EtO, Plaintiffs sustained and will continue to sustain severe and permanent damage to their health due to the emission of EtO.

159. As a proximate result of Plaintiffs' inhalation of EtO from Defendant's facility, Plaintiffs suffered injuries of a personal and pecuniary nature.

**COUNT IV**
**Ultrahazardous Activity/Strict Liability**
**(On Behalf of Plaintiffs and Against Defendant)**

160.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

161.   Defendant's use and emission of EtO from its medical sterilization facility constitutes an ultrahazardous activity.

162.   Defendant's use and emission of EtO created a high degree of risk to those who live and work in the surrounding area. Even exercising reasonable care, this risk cannot be eliminated. Due to its chemical makeup, EtO will always be carcinogenic and dangerous, no matter what quantity is emitted. Unless EtO's chemical makeup is modified, and thus it is turned into a different compound, EtO will always be inherently dangerous.

163.   Medical device sterilization is not an activity carried out by many people in the population.

164.   Defendant's use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which its facility is located, just around the corner from Plaintiffs' homes.

165.   The activities, as conducted by Defendant, are exceedingly dangerous and offer little to no value to the surrounding community.

166. Because Defendant's activities are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

167. As a direct and proximate result of Defendant's ultrahazardous activities, Plaintiffs were exposed to and inhaled great amounts of EtO.

168. As a proximate result of Plaintiffs' inhalation of EtO from Defendant's facility, Plaintiffs suffered injuries of a personal and pecuniary nature.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment in their favor and against Defendant as follows:

  a. An award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

  b. An award of punitive damages as allowed by law and in an amount to be determined;

  c. An award of attorneys' fees and costs and litigation expenses;

  d. An award of prejudgment interest on all amounts awarded;

  e. An Order for injunctive and declaratory relief; and

  f. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

**LORETTA BROWMAN, EVELYN ARMSTRONG, TIEESE SMITH, DEWAYNE WILLIAMS, DEBORAH BAIN, VICTORIA SNOW, RONALD LAMPKIN, BARBARA BETTS, SHERRY HOLES, FELICIA LAMBERT, TERESSA TAYLOR, MICHAEL DUNN, ALOPECIA ARMSTRONG, PATRICIA BELL, BERNICE WILKINS, ANNIE WILLIAMS, CAROLYN WASHINGTON, SCHUYLER KNIGHT, CLARISSA COLEMAN, CHARLES JONES, MARK PUGH, SABRINA WATKINS, SUSAN DENICE KELLY, and ETHEL LENA EVANS,**

By:/s/Charles C. Bailey
One of Plaintiffs' Attorneys

Charles C. Bailey
charlie.bailey@cookconnelly.com
Sutton Connelly
sutton.connelly@cookconnelly.com
COOK & CONNELLY, LLC
750 Piedmont Ave. NE
Atlanta, GA 30308
Tel: 678.539.0680

Benjamin H. Richman
brichman@edelson.com

Michael Ovca
movca@edelson.com
EDELSON PC
350 North LaSalle, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Loretta Browman, Evelyn Armstrong, Tiese Smith, Dewayne Williams, Victoria Snow, Ronald Lampkin, Barbara Betts, Sherry Holes, Felicia Lambert, Teressa Taylor, Michael Dunn, Alexandra Armstrong, Patricia Bell, Bernice Wilkins, Annie Williams, Carolyn Washington, Schuyler Knight, Clarissa Coleman, Charles Jones, Mark Pugh, Sabrina Watkins, Susan Deniece Kelly, and Ethel Lena Evans | KENDALL PATIENT RECOVERY U.S., LLC, a Delaware limited liability corporation |

**(b)** County of Residence of First Listed Plaintiff    Richmond Cty, GA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
COOK & CONNELLY, LLC
750 Piedmonte Ave. NE Atlanta, GA 30308
Tel: 678.539.0680 E-mail: charlie.bailey@cookconnelly.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government   Plaintiff
- ☐ 2   U.S. Government   Defendant
- ☐ 3   Federal Question    *(U.S. Government Not a Party)*
- ☒ 4   Diversity    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332, Medical Monitoring
Brief description of cause:
Medical Monitoring

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.  Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Loretta Browman, Evelyn Armstrong, Tieese Smith, Dewayne Williams, Victoria Snow, Ronald Lampkin, Barbara Betts, Sherry Holes, Felicia Lambert, Teressa Taylor, Michael Dunn, Alopecia Armstrong, Patricia Bell, Bernice Wilkins, Annie Williams, Carolyn Washington, Schuyler Knight, Clarissa Coleman, Charles Jones, Mark Pugh, Sabrina Watkins, Susan Denice Kelly, and Ethel Lena Evans

**(b)** County of Residence of First Listed Plaintiff    Richmond Cty, GA

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

COOK & CONNELLY, LLC
750 Piedmonte Ave. NE Atlanta, GA 30308
Tel: 678.539.0680 E-mail: charlie.bailey@cookconnelly.com

## DEFENDANTS

KENDALL PATIENTRECOVERYU.S., LLC, a Delaware limited liability corporation

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. § 1332, Medical Monitoring

Brief description of cause:
Medical Monitoring

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE 7/19/2021

SIGNATURE OF ATTORNEY OF RECORD   *Charlie A. Bailey*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____