UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **ADAEZE HOLMES,** | |
| **Plaintiff,** | |
| **vs.** | **CIVIL ACTION FILE NO.:** |
| **NATIONAL CREDIT SYSTEMS, INC.,** | |
| **Defendant.** | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1. This is an action for actual and statutory damages brought by Plaintiff Adaeze Holmes, an individual consumer, against Defendant National Credit Systems, Inc. for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. (Hereinafter "FDCPA"), which prohibits debt collectors from engaging in abusive, deceptive, and unfair practices.

### JURISDICTION

2. Jurisdiction of this court arises under 28 U.S.C. § 1337.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. Venue in this District is proper in that the Defendant transacts business here and the conduct complained of occurred here.

### PARTIES

3. Plaintiff Adaeze Holmes is a natural person residing in Atlanta, Fulton County, Georgia.

4. Defendant National Credit Systems, Inc. is a Georgia corporation engaged in the business of collecting debt in this State with its principal place of business located at 1775 The Exchange, SE, Suite 300, Atlanta, GA, 30339, USA. The principal purpose of Defendant is the collection of debts in this State. Defendant is engaged in the collection of debts from

consumers utilizing traditional debt collection methods. Defendant is a debt collector as defined by the FDCPA, 15 U.S.C. § 1692a(6).

FACTUAL ALLEGATIONS

5. On May 12, 2021, Ms. Holmes entered into a 12-month lease agreement for an apartment with 1295 West Apartments, an apartment complex located at 1295 Donnelly Ave, SW, Atlanta, GA 30310, and managed by First Communities Management (Hereinafter "Landlord"). (Ex. 1)

6. On July 27, 2021, Landlord filed for eviction against Ms. Holmes for nonpayment of rent in Fulton County Magistrate Court, Case No. 21ED189095. (Ex. 2)

7. On September 28, 2021, Ms. Holmes vacated the apartment and moved into My Sister's House, a homeless shelter located in Atlanta, GA. The leasing office was closed due to the COVID-19 pandemic, and only open by appointment. (Ex. 3)  Due to this closure, Ms. Holmes left her keys on the window sill of her unit and left the door of her unit wide open. Ms. Holmes provided notice to Landlord on September 27, 2021 of her plan to move-out. (Ex. 3)

8. A hearing was held on September 21, 2021, and judgment was issued in favor of Landlord. Ms. Holmes was found liable for $3,036.40 in past due rent, late fees, and utilities accruing from July 1, 2021 through September 28, 2021. (Ex. 4) The judgment did not grant accruing monthly rent beyond September 28, 2021 unless an appeal of the judgment was filed. The judgment did not grant Landlord liquidated damages nor remainder of rent through Ms. Holmes's lease term. Ms. Holmes did not file an appeal within the seven-day deadline, therefore, the judgment is final. O.C.G.A. § 44-7-56.

9.  Post-judgment interest is twelve percent according to the lease agreement. O.C.G.A. § 7-4-12(b); (Ex. 1) As of filing, the interest accrued on the judgment is $558.70. Ms. Holmes, therefore, owes a total of $3,595.10 to Landlord.

10. On October 9, 2021, Ms. Holmes was seen for a psychiatric evaluation in the emergency department of Grady Hospital after exhibiting concerning behavior at My Sister's House. Ms. Holmes was diagnosed with anxiety and high blood pressure.

11. In late October 2021, Ms. Holmes left My Sister's House and resided at a Salvation Army homeless shelter in Alabama.

12. In January 2022, Ms. Holmes left Alabama, and began residing at yet another homeless shelter, The Salvation Army in Atlanta, GA.

13. On February 25, 2022, while Ms. Holmes was still residing at the Salvation Army shelter, Ms. Holmes received an email from Landlord stating that they had not received the keys to her unit and that the sheriff had not come out to remove her from the property. The email stated that she was still being charged rent, insurance, and other fees. (Ex. 3)

14. On March 24, 2022, Ms. Holmes filed a letter in the eviction case asserting that she vacated the property on September 28, 2021 and that Landlord was attempting to collect rent through March 2022. (Ex. 5)

15. On March 28, 2022, an order was issued in the eviction case stating that Landlord was granted past due rent through September 28, 2021 *only*. (Ex. 6; emphasis added)

16. On March 30, 2022, Ms. Holmes emailed Landlord to dispute that she owed the additional rent because she had moved out September 28, 2021, left her keys, and sent notice to management of her move-out. (Ex. 3) Landlord sent a reply email stating that the debt had

3

been given over to a collections agency, Defendant, and to contact the agency if she had further questions about the debt. (Ex. 3)

17. Ms. Holmes called Defendant, but was informed that they did not have any information concerning the debt because it was a new account. She was told to wait until they contacted her again.

18. On April 12, 2022, a representative of Defendant called Ms. Holmes and told her they were collecting $9,912.36. Ms. Holmes told Defendant that she did not owe additional rent and had documents from the court and the homeless shelter to show that she vacated the property on September 28, 2021 and did not owe the additional amount they were trying to collect. Defendant verbally informed Ms. Holmes that she could dispute the debt and gave her the address to send the documents.

19. That same day, Defendant sent a debt collection email to Ms. Holmes with an attached letter (Hereinafter "April 12th letter") stating that she owed $9,912.36 to Landlord, that she may send payment in full to Defendant, and that Landlord had "previously validated this debt." (Exs. 7, 8). This letter did not include any of the consumer rights disclosures required by 15 U.S.C. § 1692g and 12 C.F.R. § 1006.34(c)(3). The email included a rent ledger from Landlord that listed rent and fees through March 14, 2022.

20. On April 29, 2022, Ms. Holmes sent via certified mail a letter with the March 28, 2022 court order and documentation showing that she moved into My Sister's House on September 28, 2021. (Exs. 9, 10)

21. On June 2, 2022, Ms. Holmes's undersigned attorney mailed a letter to Defendant stating that she represented Ms. Holmes and that she was writing to dispute the debt identified in the

April 12, 2022 letter. The letter requested that Defendant direct communication regarding the matter to Ms. Holmes's attorney directly. The undersigned enclosed the March 28, 2022 court order with the letter. This letter included typographical errors in the third and fourth paragraphs that misstated Ms. Holmes's last name and the original creditor. (Ex. 11)

22. On June 7, 2022, upon discovery of the typographical errors, the undersigned mailed another letter to Defendant which corrected these errors. The undersigned enclosed the September 29, 2021 and March 28, 2022 court orders with the letter. (Ex. 15)

23. On June 10, 2022, Defendant emailed a letter directly to Ms. Holmes that stated they were aware of her dispute of the debt. Defendant claimed to have investigated the dispute, but that they did not have sufficient evidence to validate Ms. Holmes's claims. The letter further stated that it was "an attempt to collect a debt". (Exs. 12, 13) Defendant enclosed the same rent ledger that was provided with the April 12, 2022 letter. (Ex. 13)

24. On June 14, 2022, Defendant mailed the undersigned a letter requesting that Ms. Holmes remit $9,912.36 to Defendant. The letter enclosed the rent ledger and Ms. Holmes's lease. (Ex. 14)

25. Ms. Holmes has suffered significant emotional distress, shame, and mental anguish as a result of Defendant's pursuit of a debt that she does not owe.

26. Ms. Holmes is currently renting a guest-room through Another Chance of Atlanta, a nonprofit organization that provides housing to homeless individuals. Ms. Holmes has been unable to secure permanent, stable housing due to her fear that Defendant will report the higher debt balance to prospective landlords or tenant screening agencies.

27. Ms. Holmes has been diagnosed with high blood pressure and anxiety as a result of living in homeless shelters. Ms. Holmes reasonably fears that she will remain homeless for a longer period of time because the higher amount claimed by Defendant will take longer to pay off.

28. Ms. Holmes fears that prospective employers will not hire her because a background check may show she owes a higher balance than she actually owes.

29. When Ms. Holmes became aware that Defendant was attempting to collect more than the court order stated she owed, she felt blindsided, confused, frantic, and hopeless. She believed that the issue of her eviction debt had been resolved on September 21, 2021 at her eviction hearing.

30. Ms. Holmes has felt hopeless because Defendant has refused to correct the amount that she owes despite court orders stating she does not owe the amount they claim.

<u>COUNT I: Violations of Regulation F Disclosure Requirements</u>

31. As previously stated, Defendant emailed a collection letter on April 12, 2022 regarding the alleged debt. This letter violated 12 C.F.R. § 1006.34(c).

32. Pursuant to 15 U.S.C. § 1692l(d) "Except as provided in section 1029(a) of the Consumer Financial Protection Act of 2010 (12 U.S.C. 5519(a)), the Bureau may prescribe rules with respect to the collection of debts by debt collectors, as defined in this subchapter."

33. Accordingly, the CFPB prepared and issued rules prescribed under 12 C.F.R. § 1006, commonly referred to as Regulation F.

34. The April 12th letter does not include the consumer rights disclosures that are required by Regulation F.

35. 12 C.F.R. § 1006.34(c) requires that debt collectors provide specific information to consumers about consumer protections.

36. The debt collector must disclose the date that the debt collector considers the end of the validation period, and a statement that, if the consumer notifies the debt collector in writing on or before that date that the debt, or any portion of the debt, is disputed, the debt collector must cease collection of the debt, or the disputed portion of the debt, until the debt collector sends the consumer either verification of the debt or a copy of a judgment. 12 C.F.R. § 1006.34(c)(3)(i).

37. The debt collector must include the end date of the validation period and a statement that, unless the consumer contacts the debt collector to dispute the validity of debt, or any portion of the debt, on or before that date, the debt collector will assume that the debt is valid. 12 C.F.R. § 1006.34(c)(3)(iii).

38. The debt collector, if validation notice is sent electronically, must include a statement explaining how a consumer can dispute the debt. 12 C.F.R. § 1006.34(c)(3)(v).

39. The debt collector must provide specific information on how the consumer can respond with response prompts. 12 C.F.R. § 1006.34(c)(4).

40. In a separate section from the disclosure statements located at the bottom of the notice under the headings, "How do you want to respond?" and "Check all that apply", the debt collector must include the following response prompts with the same or substantially similar phrasing:

  (A) "I want to dispute the debt because I think:"

  (B) "This is not my debt."

  (C) "The amount is wrong."

(D) "Other (please describe on reverse or attach additional information)." 12 C.F.R. § 1006.34(c)(4)

41. 12 CFR § 1006.34(d) further states that "The validation information required by paragraph (c) of this section must be clear and conspicuous."

42. 12 C.F.R.  § 1006.42 requires that the disclosures must be given in a manner that is reasonably expected to provide actual notice, and in a form that the consumer may keep and access later.

43. The April 12th letter failed to include the multiple disclosures, statements, and consumer response information described above.

44. The April 12th letter failed to inform Ms. Holmes of the validation period and her right to dispute the validity of the debt in violation of 12 CFR § 1006.34(c). Most concerning, the April 12th letter deceptively states that the debt has been "previously validated".

45. The April 12th letter failed to provide any of the specific dates required by 12 CFR § 1006.34(c)(3) and thus it failed to properly advise Plaintiff of the relevant information concerning consumer protections.

46. The April 12th letter further failed to provide the necessary consumer-response information required under 12 CFR § 1006.34(c)(4).

47. In addition to failing to provide all of the information required by the various subsections of 12 CFR § 1006.34(c), the April 12th letter also failed to clearly and conspicuously provide the validation information generally, in violation of 12 CFR § 1006.34(d).

48. Defendant also failed to provide the required disclosures in a manner that was reasonably expected to provide actual notice in violation of 12 CFR § 1006.42.

49. As a result of Defendant's failures, Ms. Holmes was unaware of her myriad consumer rights concerning the validation of a debt, which the CFPB determined was necessary to have a fully informed consumer.

50. As a result of Defendant's multiple FDCPA violations, Plaintiff was unable to evaluate her options of how to handle this debt.

51. Because of this, Plaintiff expended time, money, and effort in determining the proper course of action.

52. Defendant's omissions and misrepresentations cast a negative shadow over its debt collection practices in general.

53. When debt collectors go astray, they often introduce a tacit element of confusion into their dunning letters to leave the consumer uninformed. Indeed, as previously stated, Ms. Holmes has felt hopeless and confused because she believed she had no recourse to dispute the validity of the debt Defendant claims she owes.

54. This strategy helps debt collectors to achieve leverage over consumers by keeping key pieces of information away from them.

55. To that end, one important element of consumer protection revolves around keeping the consumer informed.

56. When a consumer has as much information as the debt collector, they are most capable of handling repayment in full or part, disputing the debt, or otherwise communicating with the debt collector on a more equal playing field.

57.  However, when a debt collector withholds key information about a debt from the consumer, they encourage rash decision-making and consumers are left without any power to face a debt collector in a meaningful way.

58. When a consumer is faced with something less than the total story behind owing a debt, they often give up and choose to pay an unwarranted debt to avoid further trouble.

59. Knowing these state of affairs in the debt collection industry, Congress passed laws to protect consumers and empowered the CFPB to promulgate rules for debt collectors to follow when attempting to collect a debt.

60.  As noted above, the CFPB set forth a series of rules under Regulation F, the primary purpose of such rules to ensure that the consumer is completely advised as to the status of the debt.

61. When a debt collector fails to effectively inform the consumer of their rights and legal status of their debts, in violation of statutory law, the debt collector has harmed the consumer.

62. Defendant's debt collection efforts with respect to this alleged debt caused Plaintiff to suffer concrete and particularized harm because the FDCPA provides Plaintiff with the legally protected right to not be misled or treated unfairly with respect to any action regarding the collection of any consumer debt.

63. Defendant's violations were material misrepresentations because they are likely to affect Plaintiff's choices regarding how to respond to an outstanding debt claim and are likely to mislead Plaintiff, who was acting reasonably under the circumstances.

64. Specifically, Defendant's careless, deceptive, misleading, and unfair representations and omissions in its April 12th letter were material misrepresentations that affected and frustrated Plaintiff's ability to intelligently respond to Defendant's collection efforts. Had Ms. Holmes

known that Defendant was required to send a copy of the judgment giving rise to the debt, Ms. Holmes may have pursued a different course of action.

65. Defendant's actions created an appreciable risk to Plaintiff of being unable to properly respond or handle Defendant's debt collection.

66. As a result of Defendant's deceptive, misleading, unfair, unconscionable, and false debt collection practices, Plaintiff has been damaged.

<u>COUNT II: Violations of Fair Debt Collection Practices Act</u>

67. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA is not only designed to protect consumers, but also to protect ethical debt collectors from losing a competitive edge by not engaging in abusive and unethical debt collection practices.

68. To enforce the FDCPA, Congress gave consumer debtors a private right of action against debt collectors who violate the FDCPA. <u>Owen v. I.C. Sys., Inc.</u>, 629 F.3d 1263, 1270 (11th Cir. 2011) Violators of the FDCPA are liable for actual damages, statutory damages up to $1,000, and reasonable attorney's fees and costs. <u>Id</u>.

69. As previously asserted, Defendant is a debt collector as defined by 15 U.S.C. § 1692a(6). Defendant's primary business is "providing collection services to…apartment owners and managers…throughout the U.S."[1]

---

[1] *Who is National Credit Systems (NCS?)*, https://www.nationalcreditsystems.com/NewCompany.aspx (last accessed Apr. 10, 2023).

70. Defendant's actions constitute attempts to collect a debt or were taken in connection with an attempt to collect a debt within the meaning of the FDCPA.

71. Defendant violated the FDCPA, specifically 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692f, 1692g, and 1692c(a)(2).

72. Defendant violated the sections 1692e, 1692e(2)(A), and 1692f when Defendant made false representations and misrepresented the character, amount, or legal status of the debt, and sought to collect an amount incidental to Ms. Holmes's principal obligation to Landlord that was not expressly authorized by agreement or permitted by law.

73. Defendant misrepresented the amount Ms. Holmes owes in its initial communications on April 12, 2022, in its letter to Ms. Holmes on June 10, 2022, and its letter to counsel on June 14, 2022.

74. Landlord, and by extension Defendant, was expressly forbidden by a court of law from seeking to collect rent and other fees accruing after September 28, 2021. Yet, Defendant continued to attempt to collect thousands of dollars incidental to Ms. Holmes's principal obligation including additional rent, late fees, and other charges.

75. Debt collectors are required to send a consumer a written notice within five days after the initial communication. 15 U.S.C. §1692g. The written notice must contain three disclosures that concern the consumer's rights:

    a. a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion therefor, the debt will be assumed to be valid by the debt collector;

b.  a statement that if the consumer notifies the debt collector, in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

c.  a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

76. Defendant's April 12th letter failed to inform Ms. Holmes of any of her dispute rights as required by 1692f. Defendant appeared to attempt to circumvent the disclosure requirements by stating the debt had been "previously validated" and enclosed a rent ledger. Defendant failed to enclose the September 29, 2021 judgment that gave rise to the debt, which would show that Ms. Holmes did not owe the amount they claimed.

77. Defendant violated 1692c(A)(2) when Defendant sent the June 10th letter directly to Ms. Holmes while she was represented by counsel.

78. As a result of Defendant's actions, Ms. Holmes was harmed and suffered injury. Defendant's misrepresentation of the debt has caused Ms. Holmes to be homeless and delayed her seeking stable, permanent housing. Ms. Holmes is anxious and fearful that she will be denied gainful employment if the inflated amount appears on her credit report.

79. As a result of the above violations, Ms. Holmes is entitled to actual damages, statutory damages of $1,000.00 per violation, attorney's fees, costs, and litigation expenses.

<u>COUNT III: Punitive Damages</u>

80. Despite Ms. Holmes's and the undersigned's repeated requests for Defendant to correct the balance claimed due, Defendant has continually refused to correct the balance. Defendant's conduct authorizes the award of punitive damages under O.C.G.A. § 51-12-5.1 because it shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.

<u>COUNT IV: Attorneys' Fees</u>

81. Defendant's refusal to correct the amount Ms. Holmes owes and attempts to collect have required Ms. Holmes to file this litigation to protect her rights, causing Ms. Holmes unnecessary trouble and expense.

82. Defendant's conduct shows bad faith by continually refusing to fix the balance of Ms. Holmes's account.

83. Pursuant to O.C.G.A. § 13-6-11, Ms. Holmes seeks her attorneys' fees.

WHEREFORE, Plaintiff respectfully prays for the following relief:

1) Actual and statutory damages under the FDPCA, attorneys' fees and costs;

2) Enter a declaratory judgment that Defendant is not entitled to charge rent, late fees and other charges accruing after September 28, 2021, and determining the correct balance due;

3) Judgment in favor of Plaintiff awarding punitive damages, costs, and litigation expenses;

4) A trial by jury as provided by law; and

Respectfully submitted this __11th__ day of __April__, 2023.

/s/Rebecca J. Wackym

Rebecca J. Wackym, Georgia Bar No. 613064
Attorney for Plaintiff

Atlanta Legal Aid Society
54 Ellis St NE
Atlanta, Georgia 30303
(404) 524-5811 (main)
(404) 614-3989 (direct)
(404) 614-3997 (fax)
bjwackym@atlantalegalaid.org

## Exhibit 1

**GEORGIA**
APARTMENT ASSOCIATION

**Apartment Rental Contract**

**FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY**

This Apartment Rental Contract is a lease between the Owner of the Apartment Community and the Residents who are leasing the apartment. The General Provisions of the lease which follow the signatures at the bottom of this page and any separate addenda signed by the parties are incorporated into and become part of this lease. Paragraph numbers on this page correspond to paragraph numbers in the General Provisions.

Lease Date: **May 12, 2021**

Management: **FLGA Investors LLC**
☒ Owner  ☐ Management Co. as agent for Owner

Apartment Community Name: **FLGA Investors LLC**

Apartment No: **345-A07**

Apartment Address: **1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310**

Residents/Tenants: **Adaeze Wanda Holmes**

Other Occupants
of Apartment:

Par. 1. Lease Term: **12** Months and _____ Days
 Beginning Date: **05/17/2021**  Ending Date: **05/16/2022**
Par. 3. Rent Due Monthly: $ **999.00**
 Pro Rated Rent Due at Lease Signing: $ **483.39**
 Dates of Prorated Rent: **05/17/2021** to **05/31/2021**
 Month to Month Fee: $ **100.00**
 Rent is Payable to: **1295 West**
Par. 4. Late Fees and Insufficient Funds Fees:
 Date on Which Rent is Late: **6**
 Amount of Late Fee: $ **60.00** or **10** % of Rent
 Returned or Insufficient Check Fee: ☒ Service Fee of $ **30.00** or ☐ 6% of Amount of Check plus ☐ Bank Service Fee of
 $ _____ (amount charged by bank to management for charge back)
Par. 5. Re-Key Lock Charge: $ **50.00**
 Non-refundable Lease Fee: $ **100.00**
 Security Deposit: $ **250.00**
 Bank Name: **Bank of America** _____ (Where Security Deposit Kept)
Par. 6. How Much Notice Required To Non-Renew Lease Prior To End of Initial Lease Term: **90** Days
 Renewal Period  ☒ Month to Month ( 1 month at a time) Renewal  ☐ Bi-Monthly (2 months at a time) Renewal
 Notice Required to End Renewal  ☒ 30 days to end Month to Month Renewal  ☐ 60 days to end Bi-Monthly Renewal
 Period:
Par. 7. Early Termination Option: Amount of Notice Required for Electing Early Termination: **60** Days Written Notice
Par. 9. Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy
 Name of Managing Agent or Owner: **First Communities Management Inc.**
 Address of Agent Authorized to
 ManageApartment Community: **1200 Lake Hearn Dr., Ste. 200, Atlanta, GA 30319**
 Name of Owner or Registered Agent
 Authorized to Receive Notices and Lawsuits: **Dana Miles,**
 Address of Owner or Registered Agent
 Authorized to Receive Notices and Lawsuits: **202 Tribble Gap Rd, Ste. 200, Cummings, GA 30040**
 Corporate Name of GREC Licensee: **First Communities Management Inc.**
 GREC Corporate License No,: **H-15679**
Par. 17. Flood Disclosure:  ☒ Not Applicable  ☐ Apartment has been flooded previously
Par. 34. Special Stipulations: **Money orders are not accepted.**

Signatures of Parties:
Management:

**FLGA Investors LLC**

Name of Owner or Management Company

By: **Kathleen Conley**
Signature of Owner or Management Company

As: **Community Manager** (Title)

Residents:

Resident: **Adaeze Wanda Holmes**
*Adaeze Wanda Holmes* _____ (Resident Signature)

Resident: _____ (Resident Signature)

Resident: _____ (Resident Signature)

Resident: _____ (Resident Signature)

Copyright © 2/2020 - Atlanta Apartment Association, Inc. . Form #1001
All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692   Page 1 of 9

**General Lease Provisions.**

The Owner is the landlord of the property, and the Resident is the tenant. The apartment community is managed for the Owner by its Managing Agent.

The lease is legally effective on the date it is signed, regardless of whether it was signed before or after the Resident moves into the apartment. There is no conditional three day right to rescind or void the contract once it is signed, and the Resident is legally bound to pay all rent, fees, and other charges that come due, regardless of whether the Resident continues to occupy the apartment. The Lease Date is the day on which the lease was signed and became effective as a contract.

The lease is a legally binding contract that creates the relationship of landlord and tenant for the full duration of the lease term at the rental rate stated above, Any addenda signed by the Owner and Resident are also part of this Apartment Rental Contract,

The Owner provides the apartment to the Resident in exchange for payment of monthly rent. The Resident's obligation to pay rent is independent of any other obligation of Landlord in the lease.

Listed above are important terms, conditions, and payment amounts. They are listed at the beginning of the lease to provide the parties with en easy reference. Each of the first page terms correspond to important lease provisions that follow below. Paragraph references on the first page correspond to the paragraph number of the General lease provisions that follow.

**Important Information About Ending The Lease and Management's Right to Increase the Rent During Any Extension Period.** This lease does not end automatically at the end of the initial lease term, The Resident must give a proper non-renewal notice to end the lease as provided in Par. 6, or the lease will be extended or renewed for an additional period of time stated in Par. 6. The lease continues to renew until the proper non-renewal notice is given. If the lease is renewed or extended, the Resident will be responsible for paying an additional Month-to-Month Fee and may also pay a higher rent than the rent specified in Par. 3, if Management gives notice of the higher rent amount.

The apartment shall only be occupied by Residents and the occupants listed on page 1, and any other occupants not listed above are unauthorized to live in the apartment.

1. **Term.** The initial lease term of the lease is for the number of months and days specified in Par. 1. The initial term of the lease begins and ends at noon on the days specified in Par. 1 but will be automatically renewed on either a month to month or bi-monthly basis as stated in Par. 6. RESIDENT MAY NOT TERMINATE THIS LEASE PRIOR TO THE END OF THE INITIAL TERM EXCEPT IN STRICT COMPLIANCE WITH PARAGRAPH 7 or as otherwise provided by law.

2. **Possession.** Rent shall abate until possession is granted to Resident. Resident may void or rescind this lease if possession is not granted within seven (7) days from the start of the lease term. Management is not liable for any delay in possession. Resident shall give Management written notice of his or her election to void or rescind the contract.

3. **Rent.** Resident shall pay rent in advance on the 1st day of each month at the management office as provided in Par. 3. The first month's prorated rent shall be due at the time this lease is signed as provided in Par. 3, If this lease is extended or renewed under Paragraph 6 without signing a new lease, Resident shall owe a month-to-month fee in addition to the monthly rent due during any extension or renewal period.

   CASH PAYMENTS WILL NOT BE ACCEPTED, AND NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO ACCEPT A CASH PAYMENT UNDER ANY CIRCUMSTANCES. RESIDENT MAY NOT RELY ON ANY STATEMENT MADE TO HIM BY A MANAGEMENT REPRESENTATIVE THAT CASH WILL BE ACCEPTED.

   All rent shall be paid by personal check, cashier's check, or money order. Management shall have the right to establish or provide for payment by credit card, debit card, electronic funds transfer, online payment portal, or designated online payment system and software, but Resident does not have the right to make payments by these means unless specifically authorized by Management. Management shall have the right to designate the specific manner or form of payment that will be accepted, and no other form of payment shall be acceptable than those specified by Management, Checks and money orders shall be made payable to the order of the business entity specified in Par. 3. Third party checks (those which are made payable to someone other than Management) and partial payments are not allowed. All other damages, utilities, fees, or charges owed by Resident and due under this lease are considered to be additional rent.

   The amount of rent specified in Par. 3 is the amount due each month unless Management has given the Resident a rental concession or discount from the rent, either in the Special Stipulations to this lease or in a separate addendum. If there are rental concessions granted, the Resident will or may lose them if in default or breach of this lease and will be obligated to pay the full amount of rent specified in Par. 3. If in default or breach of the lease, the Resident may have to repay the rental concessions under certain specified conditions.

4. **Late Payments and Checks with Insufficient Funds.** Time is of the essence. In Par. 4, late fees shall be due in the amount specified. After close of business on the last day of the grace period specified.

   Resident shall pay Management an insufficient funds check service for each returned or NSF check, plus an additional fee equal to the fee charged to Management by the bank. If no box is checked in Par. 4 that specifies the amount of the service fee, then the insufficient funds service fee is five per cent (5%) of the face amount of the check, plus the fee charged by the bank. At Management's option, all late rent, NSF checks, and future rents due after an NSF check must be paid by money order or certified funds from a bank. The parties agree that bank service, NSF, and late fees are reasonable compensation for delay, administrative costs, and time in collecting past due rent, are not penalties, and that such costs are difficult to estimate accurately,

5. **Lease Fees & Security Deposit.** Resident must pay the amounts specified in Par. 5 for re-keying locks, any non-refundable lease fees, or security deposits. A re-keying lock fee is due for each lock that must be re-keyed if all keys are not returned. The non-refundable lease fee is not a security deposit, is not refundable, and does not reduce Resident's liability for unpaid rent, damages exceeding normal wear and tear, or other charges that come due under the lease. Any security deposit will be refunded as provided by law but may be applied to any charges due under this lease. The deposit will either be protected by a surety bond on file with the Clerk of Superior Court or deposited in the bank specified in Par. 5. Interest earned on such deposits belongs to Management.

   Management shall have the right to apply any security deposit held to money or a debt owed by the Resident to Management. Management is not restricted to or limited in how the security deposit is applied if money is owed, and the deposit may applied to rent, damages exceeding normal wear and tear, unpaid utilities, or any other fee, charge, or debt owed by Resident. Management may apply a pet or animal deposit to unpaid rent or damages exceeding normal wear and tear that were not caused by a pet or animal,

   Resident shall have no right to use or designate a security deposit as payment of rent or other fees and charges which are due, as provided by O.C.G.A. 44-7-33(b). Resident agrees to cooperate with Management in scheduling and performing Move-In and Move-Out inspections and noting any existing damages or objecting to Management's list of damages exceeding normal wear and tear.

Copyright © 2/2020 - Atlanta Apartment Association, Inc.- Form 1-1/01
All Rights Reserved
Blue Moon eSignature Services Document ID: 264857692

**6. Renewal Term and Notice of Non-Renewal to End the Lease.** Either party may non-renew or terminate this lease at the end of the initial term by giving a written non-renewal notice prior to the end of the initial lease term. If such non-renewal notice is not given, then this lease will be extended as provided in Par. 6 on a either a Month-to-Month basis (one month at a time) until either party gives a proper 30 day notice; or on a Bi-Monthly basis (two months at a time) until either party gives a proper 60 day notice in writing that terminates the lease. Unless otherwise allowed by Landlord, the lease shall terminate at the end of a calendar month.

Management shall have the right to increase the rent due in any extension or renewal term by giving written notice at least 15 days prior to the date on which a non-renewal notice must be given in order to end the initial term or any subsequent renewal or extension period.

If not specified in Par. 6, then a 30 day written notice is required to end the initial term or any renewal or extension period as of the end of a calendar month.

Management employees are not authorized to accept a verbal notice of non-renewal or termination from the Resident, and the Resident has no right to rely on a Management employee's statement that a verbal notice is acceptable. Resident's non-renewal or termination notice must be in writing, dated, signed, and specify the move-out date. Resident should confirm Management's receipt of the notice with the authorized signature of a Management representative using Management's notice of intent to vacate form. Resident should keep a signed receipt of the non-renewal notice for his personal records in case of any dispute as to whether such notice was given and received. If Resident does not obtain a signed receipt of such notice from Management, or if Management does not have a signed original non-renewal notice from Resident, then it will be presumed that Resident failed to give a proper written notice.

**7. Resident's Early Termination Option.** Resident can end all liability for rent under this lease (but not liability for damages exceeding normal wear and tear, or liability for unpaid utilities) and vacate before the end of the initial lease term stated in Par. 7 only by doing all of the following things required in this paragraph. If all of the following conditions are not performed, then the lease remains in effect for the full term, and Resident shall be liable for breach of the rental agreement as provided in Paragraph 26. If Resident skips, abandons, or is evicted from the apartment without complying with this paragraph, then Resident is in default and responsible for rent and liquidated damages (if applicable) as provided under Paragraph 26, any other fees or charges due, and all damages and cleaning fees in excess of normal wear and tear. Management employees are not authorized to make a verbal statement that waives the notice and termination fees, and the Resident has no right to rely on a Management employee's statement that Resident will not have to pay such fees or comply with this provision in order to terminate the lease early. Any waiver of the notice or fees required under this provision must be in writing, dated, and signed by all parties. Resident's election to use or not use this provision is purely voluntary.

To end the lease early, Resident MUST do EACH of the following; 1) pay all monies currently due; 2) give written notice in the amount specified in Par. 7 of intent to vacate prior to the first day of the month and to take effect as of the last day of a calendar month; 3) pay all rent due through the notice period preceding the early termination date; 4) pay an additional early termination or lease cancellation fee equal to one month's rent as liquidated damages: vacate the leased premises on or before the specified termination date, remove all occupants end possessions, and physically hand the keys to a Management representative; and 5) abandon, waive, and release a claim to the return of any security deposit, which shall become Management's.

If the length of the Early Termination notice is not specified in Par. 7 on the first page, then a 30 day written notice is required. Resident can move-out earlier than the termination date following the notice period in Par. 7, but Resident must turn in all keys, remove all occupants and personal property, pay all rent due through the required non-renewal notice period, pay the one-month termination or lease cancellation fee, and comply with all other requirements. Keys must be physically handed to a representative of Management and may not be left in the apartment or a night rent drop box.

If Resident elects to exercise his or her right to Early Termination, Resident is not entitled to a refund of any rent, notice or termination fees, or security deposit, even if the apartment is re-let to a new Resident prior to the end of the notice period. Resident's election to exercise this early termination option either by giving proper notice and paying all sums due or by giving proper notice and signing an agreement to terminate early and pay the sums due at a later date are binding and shall not be reduced or set-off by any money or rent Management receives from re-letting the apartment to a new or subsequent Resident.

**Military Transfers end Lease Terminations.** A Resident (including a Resident's spouse) who is a service member on active duty or is called to active duty in the regular or reserve component of the U.S. Armed Forces, U.S. Coast Guard, or National Guard, shall have the right to end this Apartment Rental Contract early by giving a 30 day written notice, paying all rent due through the notice date, and providing a copy of the official military orders or written verification signed by the service member's commanding officer or by providing base housing orders as provided in O.C.G.A. Section 44-7-22, if the service member is:

1. Ordered to federal duty for a period of 90 days or longer;
2. Receives a permanent change of station orders to move at least 35 miles away from the rental housing;
3. Is released from active duty after leasing housing and must move 35 miles or more away from the service member's home of record prior to entering active duty;
4. After entering into this rental agreement, the service member becomes eligible to live in government quarters or the failure to move to government quarters will result in a forfeiture of the service member's basic allowance for housing;
5. Receives temporary duty orders or temporary change of station orders or state active duty orders for a period exceeding 60 days that is at least 35 miles away from the location of the rental housing; or
6. Receives orders after signing the lease but before taking possession of the rental housing.

**Domestic Violence and Lease Terminations.** A resident who is a victim of family violence shall have the right to end this Apartment Rental Contract by giving a 30-day written notice, paying all rent due through the notice date to protect resident or his or her minor child.

To terminate this lease early due to domestic violence, resident must return possession to Management by returning the keys and produce the following required documents to Management: 1) if Resident obtains a Temporary Protective Order (TPO) *ex parte*, then resident must also produce a copy of a police report to accompany the order; 2) if the TPO is not *ex parte* or the order is a permanent protective order, then resident must produce the order granting protection from family violence;

If resident obtains a family violence protective order for either themselves and/or their child, who may not be a tenant or a named occupant on the lease, resident may provide a 30-day written notice and terminate the tenancy, provided the required documents are given to Management and their keys are returned.

If resident vacates the premises immediately after giving proper notice to terminate the lease due to domestic violence and providing the required documents to Management, the resident remains liable for all rent, utilities, and other charges due for an additional 30 days from the date resident gives notice, produces the required documents, vacates, and returns the keys to Management; however, resident shall not be required to pay any termination fee or liquidated damage fee.

If resident executes this lease, but has not yet taken possession of the premises, then resident may terminate the lease prior to taking possession, by providing at least 14 days written notice and providing a copy of the family violence order and a copy of the police report, if the order was obtained *ex parte*.

Copyright © 2/2020  Atlanta Apartment Association, Inc. - Form # 1491  All Rights Reserved

Any Co-tenant and guarantor, who is the alleged aggressor or accused of family violence, shall ▬▬ liable to the terms of the lease even when the victim of family violence properly terminates the lease and vacates.

8. **No Assignment/Subletting.**   Resident may not sublet or assign the lease.

9. **Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy.**

The name and address of company or party authorized to manage the apartment community for the owner is specified in Par. 9. The name and address of the owner or owner's registered agent who is authorized to receive notices and lawsuits against the Landlord is specified in Par. 9. Lawsuits filed against the owner or Management shall be filed and served as provided by law or as contractually agreed to by Resident.

The Corporate Broker's Name of the Licensed Managing Agent and Broker's license number as required by the rules of the Georgia Real Estate Commission (Ga.R. & Reg. 520-1-.10) is specified in Par. 9.

Equal Housing Opportunity Policy. The apartment owner and Management provide equal housing opportunity for qualified applicants and do not discriminate on the basis of race, color, religion, sex, national origin, familial status, disability, or any other legally recognized status in the State of Georgia. It is the owner's and Management's policy to provide reasonable accommodations in the apartment community's operational policies and procedures and to permit the Resident to make reasonable modifications that are necessary for the Resident and related to the disability for persons with a demonstrated disability. The Resident must request and obtain permission from the owner or management for any accommodation or modification prior to implementing the same. In general, the cost or expense of physical modifications to the apartment or apartment community is the responsibility of the Resident, unless the applicable law requires the owner or Management to absorb or be responsible for the cost of such modifications. A Resident or occupant with a demonstrated disability is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal which has not been trained as a service animal unless the animal has a history of dangerous, vicious, or unsafe behavior. If the nature of the disability is not obvious or apparent or the manner in which the animal will provide assistance is not clear, Management has the right to request additional information regarding how the animal will assist with the resident's disability. The Resident does not have an absolute right to the specific accommodation or modification requested, and Management has the right to offer an substitute or alternate accommodation or modification with conditions that will provide adequate assurance for the safety, health, and well being of other Residents, occupants, social guests, invitees, and Management employees. No Additional Rent, Non-refundable Fee, or Animal Security Deposit is required from Residents or occupants who are disabled and have an approved service or assistance animal; however, the Resident is responsible for any and all damages and cleaning fees exceeding normal wear and tear caused by such animal.

10. **Utilities Are Resident's Responsibility.**   Resident is responsible for payment of all natural gas, electricity, water and sewer, telephone, cable, satellite or other utilities and services to the apartment unless specified otherwise in Paragraph 34 or in a utility addendum which is made a part of this lease. Resident gives Management the right to select any utility provider and change the same without notice. Resident shall promptly establish all utility and service accounts to be paid by Resident in his name at the start of the lease and shall not allow water and sewer, electricity, or natural gas to be shut off or billed to Management. Resident shall promptly pay any billing for utilities or other services charged to Management upon notification. Resident's failure to pay all utility services or to establish an account with a utility provider is a material breach of the lease for which Management has the right to terminate the right of occupancy or lease.

\*\*Important Disclosure Regarding Management's Right to Select the Natural Gas Marketer (Provider). Resident (the Tenant) authorizes Management (the Landlord) to act as Resident's agent for the limited purpose of selecting the Resident's natural gas marketer, to authorize the natural gas marketer to obtain credit information on the Resident, if required by the marketer, and to enroll the Resident on the marketer's standard variable price plan for which the Resident is eligible, unless the Resident chooses another price plan for which he or she is eligible.
Resident acknowledges that Management may have a business relationship with the natural gas marketer that may provide for a financial or other benefit to Management in exchange for the Resident's enrollment with the Marketer.

11. **Fire and Other Casualty.**   This lease will end if the apartment is uninhabitable due to fire as long as the fire was not caused by or the responsibility of Resident or Resident's occupants, family, or social guests. If Resident or his occupants, family, or social guests were responsible for the fire and the premises are uninhabitable, then Resident must vacate the apartment and will still remain liable for the rent and damages.

Management shall have the right to terminate the occupancy or lease of Resident if Resident or Resident's occupants, family, social guests, or invitees caused or were responsible for causing a fire to the apartment or any portion of the apartment community. Resident has no right to transfer to another apartment in the community or to remain in the apartment community if Resident or Resident's occupants, family, social guests, or invitees were responsible for or caused the fire. Resident may be eligible for transfer to another apartment in the apartment community if the Resident is qualified, there is a suitable apartment available, and Resident or Resident's occupants, family, social guests, and invitees did not cause the fire.

Resident is responsible for the cost of repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged by a fire which Resident or Resident's occupants, family, social guests, or invitees caused. Resident is liable to and shall indemnify, defend and hold harmless Management and the owner for any damages or repairs caused by a fire which was caused by Resident or Resident's occupants, family, social guests, and invitees.

This lease shall end if the premises are destroyed or otherwise rendered uninhabitable due to an Act of God or any other catastrophic event or casualty that was not the responsibility of Resident or Resident's occupants, family, social guests, or invitees.

The Resident shall not continue to occupy an apartment which is rendered uninhabitable due to fire, Act of God, or other catastrophic casualty and must remove all personal property and return possession to Management.

12. **Hold Over/Trespass.**   Resident must promptly vacate the apartment and deliver possession and all keys to Management upon any termination or non-renewal of this lease. Keys must be physically handed to a representative of Management and may not be left in the apartment or in the overnight rent drop box at the Management office. The apartment must be delivered to Management in clean condition and good repair.

If Resident does not vacate the premises and return possession to Management after termination, non-renewal, or expiration of the lease, then Resident shall pay to Management rent at two (2) times the current rental rate for each day held over past the termination date.

After termination, non-renewal, or expiration of the lease, Resident is a tenant at sufferance.

After vacating the premises based on non-renewal, termination, eviction, or upon receiving a criminal trespass notice under O.C.G.A. § 16-7-21 from Management, Resident shall not return to any portion of the apartment community. Resident shall not permit entry of any person as his social guest or invitee if notified that his guest's or visitor's presence in the apartment community is subject to criminal trespass under O.C.G.A. § 16-7-21. Management may terminate the lease or right of possession of any Resident who allows an unauthorized person access to his apartment or the community in violation of this provision or paragraph 14. Management's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's right of occupancy of the apartment.

Copyright© 2/2020 - Atlanta Apartment Association, Inc. - Form 14A
All Rights Reserved

**13. Right of Access.** Management may enter the apartment without notice during reasonable ho▬▬ inspect, maintain, and repair the premises. Management may enter the apartment at any time without notice to prevent injury or damage to persons or property. Resident authorizes Management to show the apartment to prospective Residents once Resident has given or received a notice of non-renewal or termination.

**14. Resident's Use of the Apartment and Conduct.** Resident shall use the apartment and apartment community only for residential purposes and not for business or commercial purposes.

Resident, all occupants, and Resident's family, social guests, and invitees must comply with all laws. No portion of the apartment or apartment community shall be used by Resident or Resident's occupants, family, social guests, or invitees for any disorderly, disruptive, abusive, or unlawful purpose. Nor shall they be used so as to disrupt the quiet enjoyment of any other Resident or their occupants, family, and social guests. Resident and Resident's occupants, family, social guests, and invitees shall not commit any crime in the apartment community.

Resident is liable for the conduct of and for any damages exceeding normal wear and tear caused by his family, occupants, social guests, and invitees. Resident shall not allow his occupants, family, social guests, and invitees to commit a crime or violation of the lease and addenda and must take affirmative, corrective action and notify Management of any such violation or misconduct.

The sale, manufacture, distribution, or possession of any illegal drugs in the apartment community is prohibited.

Resident must maintain the apartment in a clean and sanitary condition and must not cause or allow any damages exceeding normal wear and tear or infestation of vermin, insects, rodents, or other pests. Noxious or offensive smells are not permitted, and Resident shall be liable for damages exceeding normal wear and tear for the repair or replacement of any carpet, flooring, ceiling, or walls that are permeated with noxious or offensive odors, water, or mold. Resident shall not leave or dispose of trash, garbage, or other materials in hallways, breezeways, patios, balconies, or common areas of any portion of the apartment building or community. Resident shall promptly take trash, garbage, or refuse to the proper dumpster, compactor, or trash collection area and properly dispose of organic and inorganic material as provided by law and as provided by the community rules.

Resident and Resident's occupants, family, social guests, and invitees shall abide by and follow all community rules and regulations. Management shall have the right to prohibit smoking of cigarettes, pipes, cigars, or tobacco inside the apartment or any portion of the apartment community property under its community rules and regulations. Smoking of tobacco products in the apartment is prohibited unless expressly authorized and allowed by the community rules and regulations.

Resident shall operate all motor vehicles in a safe and lawful manner in the apartment community. Resident shall not violate any parking rules and regulations and shall not exceed 15 mph in any parking lot, street, exit, or entrance of the apartment community. Resident must park only in authorized spaces and places and shall not park at any place that obstructs traffic, is unsafe, or is prohibited. Resident shall not operate, park, or store, any illegal, unauthorized, or uninsured motor vehicle or equipment on any portion of the apartment community. Resident shall not abandon a motor vehicle in the apartment community. Resident shall not store, keep, or dispose of any substance or material on any portion of the apartment community that is hazardous to the health, safety, or welfare of any person. Resident shall not dispose of any batteries, chemicals, environmentally hazardous, or unsafe material in any trash receptacle, dumpster, compactor, or any portion of the apartment community.

Resident, and Resident's occupants, family, social guests and invitees, shall act and communicate with the apartment owner, Management, Management employees, Residents, business social guests of Management, and all other persons in a lawful, courteous, and reasonable manner. Any form of verbally or physically abusive, intimidating, or aggressive behavior directed at the apartment owner, Management, Management employees, or any other person is prohibited. Resident, his social guests and occupants shall not interfere with the daily business operations of the apartment community or job duties of Management or its employees. When notified by Management, Resident shall be prohibited from entering or contacting any Management or corporate office or employee and must conduct all further communications in writing.

Resident shall not distribute petitions, flyers, or solicitation notices to other Residents in any manner other than through lawful use of the United States mail. Resident is prohibited from committing business libel or slander or making untruthful, unfair, or misleading statements to others about the apartment owner, Management, Management employees, or the apartment community. Resident shall not commit waste to the apartment or apartment community and shall not commit any act nor fail to take any action that would endanger the life, health, safety, welfare or property of any other person in the apartment community. Resident must allow Management and vendors access to the apartment for the purpose of making repairs, performing service or maintenance, inspecting, and taking all other action related to the ongoing business operation of the apartment community.

Resident shall not cause or allow an infestation of bed bugs in the apartment. Resident shall not bring abandoned or discarded furniture, clothing, bedding, or other personal property into the apartment as it could introduce an infestation of pests and bed bugs.

Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the apartment or apartment community. Resident and Resident's occupants, family, social guests, and invitees shall not touch, damage, or trigger any automatic sprinkler head.

Resident and occupants shall not use the internet or cyberspace in any manner to disparage, defame, or injure the business or business reputation of the apartment owner or Management. Resident and occupants shall not use, misuse, or appropriate the use of the owner's or Management's corporate names, logos, slogans, images, photos, internet domain names, service marks, trademarks, copyrights, or trade names. Resident and occupants shall not publish, misuse, or use any photos or video of Management employees or the apartment community or signage. Owner and Management shall be entitled to injunctive relief and damages for compensation to prevent any unauthorized publication, use or misuse, whether in part or in whole, of the corporate name. trade name, internet domain name, likeness or identity of owner or Management.

Resident and occupants shall not make, post, or publish misleading, deceptive, untruthful, groundless, false, or unfair statements or commentary about the apartment community, the Management employees, the owner, or Management on or to any internet website or domain, internet blog, internet social media, newspaper, magazine, television, radio, or other news or social media. Resident is prohibited from making, publishing, stating, or posting any statement or communication that, while partially true, lacks or fails to disclose other material facts in such a way such as to mislead the listener, viewer, or reader, Management shall be entitled to terminate the right of occupancy or lease of any Resident or occupant who violates any portion of this Use and Conduct provision.

Resident and Resident's occupants, family, social guests, and invitees shall not store, use, or discharge any fireworks or consumer fireworks in the apartment or apartment community. Fireworks are defined as any combustible or explosive composition or any substance or combination of substances or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration or detonation, including but not limited to, blank cartridges, firecrackers, torpedoes. skyrockets, bombs, sparklers, roman candles and other combustibles and explosives of like construction.

Violation of this Resident's Use and Conduct provision is a material breach of this lease and constitutes a ground for terminating Resident's lease or right of possession, and Resident will be liable for any rent due through the remainder of the lease or liquidated damages (if applicable) as provided in Paragraph 26.

**15. Property Loss, Insurance, and Crime.** Management and the apartment owner shall not be liable for damage, theft, vandalism, or other loss of any kind to Resident's or his occupant's personal property, unless such is due to Management's negligence or intentional misconduct. Management and the apartment owner shall not be liable to Resident for crimes, injuries, loss, or damage due to criminal acts of other parties,

Copyright © 2/2010 - Atlanta Apartment Association, Inc. - Form 4-Mdt.
All Rights Reserved

Resident must purchase a renter's insurance policy that provides liability insurance for negligee━━accidental acts and omissions for which the Resident may be liable in causing injury or damage to the owner, Management, or others.

Resident should purchase property insurance for loss of or damage to Resident's own personal property. Manegament is not liable for any loss or damages to Resident's personal property due to theft, vandalism, bursting or leaking pipes, fire, windstorm, hail, flooding, rain, lightening, tornadoes, hurricanes, water leakage, snow, ice, running water, or overflow of water or sewage. Management shall not be liable for any injury or damage caused by such occurrences, and Resident agrees to look solely to his insurance carrier for reimbursement of for such events.

Management does not market, advertise, represent, offer, or provide security or law enforcement services which will prevent crime or protect Resident or Resident's personal property. Management and the owner do not represent or guarantee that the Resident is safe from crime in the neighborhood or from crime in the apartment or apartment community. Resident agrees to look solely to public law enforcement, emergency services, or fire services for police, emergency, fire , security, or protection services.

Resident acknowledges that he or she has an obligation to exercise due care for his or her own safety and welfare at all times and that Management is not liable to Resident for the criminal acts of other persons. Resident agrees that he or she will not and cannot rely on the existence or absence of security equipment or personnel as a representation of safety from crime and understands that he or she must be vigilant and exercise caution for their personal safety at all times. Resident waives and releases the apartment owner and Management for any liability, injury, loss, or damages related to crimes committed by other persons against Resident or related to allegations that the owner or Management were negligent or failed to provide security or protection to prevent crime.

**16. Lead Based Paint Notification (LBPN).**   If this apartment community was built prior to 1978, the LBPN addendum is incorporated by reference.

**17. Flood Disclosure.**   Management states that the apartment has not been damaged in any manner by flooding as defined in O.C.G.A. § 44-7-20 in 3 of the last 5 years unless noted otherwise in Par. 17.

**18. Pets.**   No animals or pets of any kind are permitted without a Pet, Service, or Assistive Animal Addendum. Management may enter the apartment at any time and remove any pet or animal which Management believes to be neglected, distressed, or endangered. Resident shall be liable for all costs of retrieving, caring for, and boarding of any pet or animal that is abandoned by Resident or removed by Management. Resident releases Management from liability of any kind when Management acts to retrieve or protect Resident's pets and animals which appear to be neglected, distressed, or endangered. Please see Par. 9 with respect to Management's policy on service, assistive and convenience animals for persons with disabilities.

**19. Indemnification.**   Resident agrees to indemnify, defend, and hold harmless the apartment owner and Management for any loss the apartment owner or Management incur due to Resident's breach of this agreement or due to the acts and omissions of Resident and Resident's occupants, family, social guests, or invitees.

**20. Failure to Act.**   Management has the right to insist on strict compliance with the terms of this lease at any time. even if it has previously delayed acting on Resident's breach of this lease. Management shall have sole discretion in granting and withholding permission or consent for Resident to perform his or her obligations under this lease in any manner that varies from the contractual requirements. Management at its option may condition, modify, or revoke any such permission or consent upon reasonable written notice and insist upon strict compliance with the lease terms.

**21. Fees and Expenses of Litigation.**   In a civil action or dispossessory proceeding for breach of this lease, the prevailing party shall be entitled to attorney's fees in the amount of fifteen percent (15%) of the principal and interest owing and all expenses of litigation, including, but not limited to, court costs and administrative filing fees for evictions. All sums due from Resident to Management which are in default shall bear interest at the rate of twelve percent (12%) per annum.

**22. Notices.**   All notices must be written, dated, and signed. The notice must be given personally or by certified mail, return receipt requested. Notice shall be sent to Resident at the apartment and to Management at the apartment community business office. See Par. 9 with regard to the proper address for service of lawsuits.

Resident shall send notices for repairs, service, maintenance, non-renewal, military transfers, and lease termination to the Management/leasing office located at the apartment community.

Resident shall provide Management with Resident's updated contact and address information and forwarding address at anytime requested during the lease and at the time of vacating the apartment. Resident shall provide Management with: the address of his or her new residence (where they are living); the mailing address for returning any security deposit or forwarding any notices or move-out inspection and estimate of damages and cleaning fees that exceed normal wear and tear; the name, address, and phone number of their employer; the name, address, and phone number of a person or family member who can provide updated contact information and the Resident's cell phone and e-mails. If Resident fails to provide his or her contact information and address at the time of vacating; conceals or attempts to conceal his or her address and location; moves from the State of Georgia; or cannot be located by Management, then the statute of limitation for collecting any account or money owed by Resident shall be tolled until such time as Resident provides proper notification of his address and other contact information requested.

RESIDENT'S NOTICE OF NON-RENEWAL UNDER PARAGRAPH 6 OR NOTICE OF INTENT TO VACATE AND TERMINATE THE LEASE EARLY UNDER PARAGRAPH 7 MUST BE IN WRITING AND MUST BE GIVEN SO THAT THE ENDING DATE IS ON THE LAST DAY OF A CALENDAR MONTH. VERBAL NOTICES ARE NOT EFFECTIVE AND MAY NOT BE RELIED UPON BY RESIDENT UNDER ANY CIRCUMSTANCES. MILITARY SERVICE MEMBERS MAY GIVE A NOTICE TO TERMINATE AS PROVIDED IN PAR. 7 AT ANY TIME OF THE MONTH. NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO VERBALLY OR UNILATERALLY WAIVE ANY NOTICE REQUIREMENT, AND RESIDENT MAY NOT RELY ON A VERBAL STATEMENT OF MANAGEMENT THAT PROPER WRITTEN NOTICE IS NOT NECESSARY. MANAGEMENT MAY, BUT IS NOT REQUIRED TO, WAIVE THE REQUIREMENT THAT NOTICES BE EFFECTIVE ONLY AS OF THE END OF A CALENDAR MONTH.

**23. Repairs.**   Resident accepts the apartment "as is" and in habitable condition suited for residential purposes. Resident accepts full control and responsibility of the apartment leased premises and agrees to maintain the apartment in a clean, safe, and sanitary condition. Management will make repairs to the apartment with reasonable promptness upon receipt of written notice from Resident. Management's repair obligations under Georgia landlord/tenant law only pertain to the apartment, and not to the common areas of the apartment community. Resident agrees and acknowledges that he or she only leased the apartment and that Resident's and Resident's occupants, family, and social guests access to amenities and common areas of the apartment community are only a permissive license to use such amenities and common areas.

Resident shall pay as additional rent for any cleaning or damages exceeding normal wear and tear to the premises caused by Resident or caused by Resident's occupants, family, social guests, invitees or licensees of the Resident and occupants that exceed normal wear and tear. Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the leased premises or apartment community, and Resident is responsible for the cost to repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged. Resident is liable to and shall indemnify, defend, and hold harmless Management and the apartment owner for any damages or repairs

caused by Resident or Resident's occupant, family, social guests, and invitees. Resident shall promptly pay as additional rent with the next month's rent the costs of any repairs, replacement, or damages caused by Resident or Resident's occupants, family, social guests, or invitees upon issuance of an invoice from Management.

Resident may not alter the interior or exterior structure of the apartment or apartment community in any manner without the express written consent of Management. Please see Par. 9 with regard to Management's policy on disability modification requests.

Resident must promptly report the need for any repairs to Management in writing before Management is obligated to make any repairs. Resident must promptly report any dampness, water leaks, or mold in the apartment to Management. Resident shall properly use the heating, ventilation, and air conditioning (HVAC) system to maintain temperate conditions so as to prevent freezing of water pipes in cold weather end to prevent mold growth or excessive humidity during warm weather. Resident is required to use air conditioning during June, July, August, and September and shall not turn off the air conditioning and open windows for purposes of cooling the apartment. Resident must inspect any fire alarm and fire extinguisher at least once per month to determine whether they are in proper working condition and report to Management the need for any need for repair or replacement. Resident shall promptly notify Management of any damage to or malfunction of any door or window locks or intrusion alarm.

Resident must promptly report any evidence, knowledge, or suspected presence of bed bugs in the apartment and cooperate with Management to allow inspection and treatment of the same. Adjoining or neighboring Residents to an apartment infested with bed bugs must cooperate with Management in inspection and treatment to prevent a possible cross infestation or migration.

**24. Abandonment.**   Resident shall not abandon the apartment, Resident's personal property, or motor vehicles. Title to any abandoned property (including, but not limited to, pets or animals) shall vest in Management. Management may store, sell, or dispose of abandoned property without notice.

If Resident abandons the apartment or his or her personal property contained therein, Management shall have the right to re-key, re-enter, and re-let the apartment without filing a dispossessory warrant or obtaining a writ of possession. Management is not required to file a dispossessory proceeding in order to recover an abandoned apartment or to dispose of any abandoned property found in an abandoned apartment. Management shall have sole discretion in determining whether the Resident has abandoned the apartment. Circumstances indicative of an abandonment include, but are not limited to, Resident's unexplained absence or failure to occupy the apartment; the overall appearance and condition of the apartment; Resident's statement that he or she is moving or leaving the apartment community; failure to pay rent or utilities; discontinuance of utility service; failure to respond to Management's notices, communications, or eviction proceedings; or removal of a substantial amount of Resident's personal property.

**25. Attornment, Sale, Foreclosure, Renovation, and Former Employees.**   Resident's rights, or, if applicable, his employment with Management, are subordinate to any deed to secure debt, sale, or contract for sale of the property.

In the event the apartment community or any portion or building of the community is foreclosed, sold, placed under contract to be sold, or scheduled for substantial renovation, rehabilitation, or demolition, either Management or the new owner shall have the right to terminate the lease on 30 days' written notice. In the event that Management elects to terminate the occupancy or lease under this provision, then during the 30 day period immediately preceding either the termination data of Resident's occupancy or the termination of the lease, the Resident's rent shall be reduced by fifty percent (50%); however, if the Resident shall hold over beyond the termination date, then Resident shall owe the full rent due for said 30 day notice period plus hold over rent as provided in paragraph 12.

If Resident is an employee of Management and his or her employment is terminated, then this employee lease shall also terminate, any employee rental discounts shall end, and the employee agrees to vacate the premises if requested. If permitted to stay, the former employee shall pay the current market rate rent as specified by Management at the time employment is terminated.

**26. Default by Resident.**   Resident's violation of this lease or any addenda constitutes a default. Violations constituting a default include, but are not limited to: unauthorized occupants: non-payment of rent; improper non-renewal or termination of the lease as required by paragraphs 6 or 7; abandonment of the apartment as prohibited in paragraph 24; providing false or misleading information in the rental application; failure to pay or continue utility service as required in paragraph 10; allowing unauthorized persons access in violation of paragraph 12; any unauthorized occupants or improper use or conduct in violation of paragraph 14; or causing damages or cleaning in excess of normal wear and tear.

Upon default, Management may terminate Resident's lease or right of possession by giving written notice and re-entering the apartment as provided by law. Notice to cure a default is not required but, if given, shall not waive Management's right to terminate on strict compliance. Resident shall surrender possession of the premises to Management promptly on the effective date of any termination notice, remove all possessions and persons occupying the apartment, return all keys to Management by personally handing them to a Management representative, and restore Management to quiet possession of the leased premises.

Notwithstanding Management's termination due to Resident's default, Resident shall remain liable for all rent, hold-over rent under paragraph 12, liquidated damages (if applicable) as provided below, unpaid utilities, rental concession, lost discounts or pay-backs, damages exceeding normal wear and tear, costs of eviction, attorney's fees and expenses of re-letting incurred by Management as a result of Resident's default.

Management, at its option, may obtain possession of the apartment through a dispossessory proceeding, either with or without first terminating the lease or right of possession. Management, at its option, may also recover possession of an abandoned apartment without filing a dispossessory proceeding by changing the locks and disposing of any abandoned property.

Notwithstanding termination of the lease, commencement of a dispossessory proceeding, issuance of a writ of possession, actual physical eviction, or recovery of the abandoned premises, Resident shall remain liable for all rent accrued through the date on which possession is obtained by Management: rent through the remainder of the lease term or liquidated damages (if applicable) as provided in this paragraph; damages exceeding normal wear and tear; unpaid utilities; rental concession, lost discounts or pay-backs; costs fees, and expenses. Neither issuance of a writ of possession, actual physical eviction, or retaking possession of the apartment shall relieve Resident of liability for rent through the end of the lease term or liquidated damages (if applicable) under this paragraph. All rent, fees, damages and liquidated damages (if applicable) shall be due immediately upon demand for payment.

In the event of a default by Resident, the Resident shall be liable to Management for rent through the remainder of the lease term as follows. Management may either allow the apartment to remain vacant and hold Resident liable for payment of rent through the remaining term of the lease; sue the Resident for breach of the lease and for each installment of rent as it comes due through expiration of the lease; or re-enter the premises as provided by law and re-let the apartment on Resident's behalf while holding the Resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until the re-letting. Management has the right, but not the obligation, to attempt to re-let the premises on Resident's behalf.

In the event that Resident has breached or defaulted the lease and failed to terminate the lease properly as provided by law or as provided for in Paragraphs 6 or 7 of this Apartment Rental Contract, then Resident shall be liable to Management for unpaid rent due through the remainder of the lease term under this paragraph (Par. 26), and not as provided in Paragraph 7, and Management is not entitled to collect any termination (cancellation) fee or notice fee.

Copyright © 2020 - Atlanta Apartment Association, Inc. - Form 1130<br>All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692

**Liquidated Damages In Lieu of Rent Through the Remainder of the Lease Term.** Management shall not be entitled to Liquidated damages unless the Liquidated Damages Addendum has been signed by Management and Resident to indicate that the parties desire to use liquidated damages in determining the amount of rent due through the remainder of the lease term in the event of Resident's default. In the event the parties have selected liquidated damages for determining Resident's liability due to Resident's breach, then the Liquidated Damages Addendum is incorporated herein by reference, and the parties shall execute the same as a separate addendum.

Management's re-entry to leased premises either under judicial process or by retaking possession after abandonment or surrender shall not relieve Resident of liability for payment of rent through the remainder of the lease term or liquidated damages (if applicable) that landlord is entitled to collect under the terms of this rental agreement.

Management shall have the right to terminate the lease or right of possession of any Resident or occupant of the apartment who is arrested, indicted, charged, or convicted of any felony, crime of violence, or threatened violence; robbery; theft; dishonesty; rape; child molestation; sexual offense; illegal sale, use, or possession of drugs; illegal use or possession of a weapon; stalking; arson; criminal damage to property; vandalism; issuance of bad checks; fraud; forgery; or any other crime which could adversely affect the health, safety, or welfare of other Residents or Management staff, regardless of whether the offense occurred on or off the apartment community premises and regardless of when the offense occurred. Management shall have the right to file a dispossessory action and obtain a writ of possession based on the Resident's or occupant's conduct which constitutes a criminal violation without waiting for a criminal adjudication, finding, or decision on the criminal charges.

Management shall have the right to terminate the lease of any Resident whose apartment is found to be infested with bed bugs; have a mold or water intrusion problem; be unfit for habitation; or constitute a hazard to health, safety, or welfare of any person, the apartment, the apartment community or management employees. Upon such termination, resident must promptly vacate, remove all personal property and possessions, and return possession of the apartment to Management.

27, **Privacy, Disclosure, and Consent.**   Resident agrees that information about him or her that is known to Management or contained in his or her Resident file is not confidential, privileged or private. Resident authorizes Management to disclose any information known or contained in the Resident file to any law enforcement agencies who request such information either with or without a subpoena; to prospective landlords or lenders who request such information in connection with approval of any rental application or home purchase; or to persons or parties who make a request for such information using discovery procedures in a civil action or subpoena in a criminal proceeding.

Resident agrees that the apartment owner and Management shall have the right to provide information from its account and business records to any Consumer Reporting Agency to be included in the Resident's consumer file and credit history, including, but not limited to, rental history, rental payments, unpaid balances, and other information. If the Resident disputes the accuracy of the information provided, the Resident shall notify the Consumer Reporting Agency and send written notice of the dispute to Management at the address specified in Par. 9. When giving notice to Management of any dispute as to the accuracy of adverse rental information, rental payments, disputed account balance, or other disputed information, Resident agrees to provide his or her correct names on the lease, the apartment number, complete apartment address, dates of occupancy, and clear details as to the basis of such dispute that the Consumer Reporting Agency and Management will have sufficient information to investigate, evaluate and respond to the dispute.

Resident agrees that Management shall have the right to pursue collection of any sums alleged due from Resident through employment of independent contractors as collectors and that such sums may be reported to any consumer reporting agency (credit bureau) and shown on Resident's credit report. Resident agrees that variances or inaccuracies in the amounts submitted for collection or reported to any credit bureaus do not constitute a violation of any federal or state laws pertaining to reporting or collection of such debts and that the amount alleged due may be amended or corrected at any time. Resident agrees that Management or any such collector or collection agency is expressly authorized to contact Resident by phone or mail to notify Resident of the debt or attempt collection of the same and to communicate with third parties regarding the existence of the debt, the location of the Resident, or the Resident's ability to pay the debt. Resident agrees that Management or any such collector is expressly authorized to obtain a consumer report (credit report) on Resident and to obtain information on Resident's location and employment in connection with the collection of any amounts claimed due under this lease. Management's and collector's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's occupancy of the apartment.

Resident(s), their occupants, family members, and social guests hereby authorize and grant Management, their contractor(s), employee(s), and or any third parties hired by Management, permission to take, use, and publish photographs and/or videos of Resident(s), their occupants and social guests, including but not limited to, their minor children, at events and/or activities in the common areas of the apartment community. Management is permitted to use such photographs or video for print, publication, copyright, online social media and video-based marketing materials, as well as any other form of publication or use at Management's sole discretion. Resident(s), their occupants and social guests, including their minor children, release and hold harmless Management from any reasonable expectation of privacy or confidentiality associated with the images and videos taken and used by Management. Resident(s) and their occupants, family members, and social guests acknowledge and agree they will not receive any type of financial compensation, ownership or royalties with the taking, use, marketing, or publication of any photographs or videos.

Resident(s) hereby expressly authorize Management, and its successors, assigns, agents, attorneys, insurers, representatives, employees, officers, shareholders, partners, parents, subsidiaries, affiliated entities, and all agents and representatives, including any collection agency or debt collector hired by any of the preceding persons or entities, and all corporations, persons, or entities in privity with any of them (hereinafter collectively referred to as the "Authorized Entities") to communicate with Resident(s) for any reason related to the services provided by them or services to be provided in the future by them, including collection of amounts owed for said services, using an automatic telephone dialing system or an artificial or prerecorded voice at the telephone number or numbers Resident(s) provide.

Resident(s) further expressly consent and authorize the Authorized Entities to communicate with Resident(s) at any phone number or email address or other unique electronic identifier or mode that Resident(s) provide to any Authorized Entity at any time, or to use any phone number or email address or other unique electronic identifier or mode that any Authorized Entity finds or obtains on its own which is not provided by Resident.

Any Authorized Entity may communicate with Resident(s) using any current or future means of communication, including, but not limited to, automated telephone dialing systems, artificial or pre-recorded voices, SMS text messages, other forms of electronic messages, electronic mail directed to any internet domain address, electronic mail directed at a mobile telephone service, cellular telephone services, internet or world wide web addresses including social and business networking internet sites, or electronic messages or mail otherwise directed to Resident(s) through any medium. Resident(s) authorize any and all of this communication methods described in this paragraph even if Resident(s) will incur a fee or a cost to receive such communications. Resident(s) further promise to immediately notify the Authorized Entities if any telephone number or email address or other unique electronic identifier or mode that Resident(s) provided to any Authorized Entity changes or is no longer used by Resident.

28. **Definitions.**   The term "Resident" includes all tenants or other persons who signed or are obligated under the lease. "His" shall also mean "her" when applicable. "Resident" refers to the tenant. The term "Management" may refer to the owner of the apartment community or to the managing agent who is under a Management contract to operate the apartment community on behalf of the owner. The legal ownership entity is different from the Management entity. The owner's managing agent may or may not have any ownership interest in the apartment community and may be an entirely independent contractor which operates the apartment community for the owner for a fee. "Occupants" are persons who are living in the apartment rental with the Resident and disclosed in the lease but have not signed the lease.

☑ Blue Moon eSignature Services Document ID: 264857692

The term "occupants" means persons who did not sign the lease but were disclosed and authorized to live in the apartment on a full time basis. Occupants could include family members of the Resident, but is not limited to family members, and includes roommates or other persons who are authorized to live in the apartment as disclosed in this lease. "NSF" means checks that are dishonored or returned by the bank unpaid, and is also referred to as "not sufficient funds." "Skip" means to vacate or abandon the leased premises in violation of this lease, either with or without turning in all keys and either with or without removing all personal property. "Notice period" refers to the length of time required in paragraph 6 or 7 or any other provision before a notice can take effect. The word "lease" means the Apartment Rental Contract which creates the relationship of landlord and tenant between the Resident and Management. "Leased premises" refers to the apartment Resident rented, and is also referred to as the "premises" or "lease premises," but does not include any of the common areas or other portions of the apartment community property. The term "leased premises" does not include any portions of the apartment community outside of the apartment rental unit as the Resident only has a permissive license to use the other areas and amenities of the apartment community in conjunction with the rental of the apartment. "Termination date" is the date following a notice period or the date on which Resident's lease or right of possession terminates as specified either in a non-renewal notice or a lease termination notice from Management based on Resident's default. A "social guest" is any person who is present in the Resident's apartment or on the apartment community property by express or implied invitation of the Resident or Resident's occupants, other social guests, or family members and includes anyone temporarily living or visiting Resident. The term "social guest" includes, but is not limited to, visitors and family members visiting or present in the apartment or apartment community. An "invitee" refers to a business guest or visitor who is present in the apartment or the apartment community with the express or implied invitation of the Resident for the purpose of conducting or soliciting business with or for the Resident, occupants, or social guests of the Resident. The "trade name" is the name of the apartment community and is the name or alias under which the legal owner of record does business and operates the apartment community. A "default" or "breach" of the lease and addenda means a violation of the lease provisions and gives Management the right to terminate the Resident's occupancy or lease. "GREC" means the Georgia Real Estate Commission.

29. **Usufruct.**   This lease only creates the relationship of landlord (Management) and tenant (Resident) and does not create any ownership or transferable rights in real estate. This lease is a "usufruct," and not an estate for years.

30. **Entire Agreement.**   This lease, any referenced addenda, and any addenda separately signed or referring to the lease or apartment shall constitute the entire agreement between the parties, and no prior negotiations, representations, or oral statements are binding. This lease may not be modified except with the express written consent of Management. The Resident is legally obligated under the terms and conditions of any addenda which he or she signed, and the same are part of and incorporated by reference into this lease.

31. **Joint and Several Liability.**   Each person, corporation, or roommate who signs this lease or any guarantor under a separate guarantor's agreement is jointly and severally liable for all rent or other charges which come due, Management may look to any Resident or guarantor for payment of all or a part of any obligation due without first suing or attempting to collect from any other responsible party. Management and the owner or any collection agency or attorney representing the owner or Management shall have the right to settle in whole or part all or a portion of any debt owed by one Resident without releasing or waiving its claim for the balance of the debt against another Resident, co-signor, or guarantor. Settlement or release of one Resident or Guarantor shall not release the other Resident or Guarantor from liability for the debt owed.

32. **Agency Disclosure.**   Management is acting on behalf of the owner of the apartment community in exchange for compensation.

33. **Know Your Neighbors.**   Certain individuals convicted of certain sex-related crimes are required to register their name and current address on an index maintained by the state or county in which they reside. You may access that index in order to determine whether any such individuals live in proximity to a certain location. The public may access the internet to view all sex offenders registered in Georgia. The Statewide Sex Offender Register can be obtained through the internet at http://gbi.georgia.gov/georgia-sex-offender-registry. The public may also contact the local Sheriff to view a list of the sex offenders listed in their county.

34. **Special Stipulations.**   Any special stipulations specified in Par. 34 shall control and supersede and control over conflicting provisions in the text of this lease.

Copyright © 2/2020 - Atlanta Apartment Association, Inc. - Form - 1401
All Rights Reserved



**GEORGIA**
APARTMENT ASSOCIATION

**EXTE===D SPECIAL STIPULATIONS ADDEND==**

**FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY**

Addendum Date: __May 12, 2021__, __FLGA Investors LLC__ _____ ["Management"] ☒ as Owner of

☐ as Agent for the Owner of __FLGA Investors LLC__

["Community Name"] enters into this Extended Special Stipulations Addendum to the Apartment Rental Contract ["the Lease"] with __Adaeze Wanda Holmes__

_____ ["Resident"], pertaining to

Apt. No. __345-A07__ located at __1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310__

[Address]. This addendum is part of the Apartment Rental Contract dated ____May 12, 2021____ [Date of Lease].

The following are e continuation of the Special Stipulations of the Apartment Rental Contract and are incorporated by reference into said apartment lease. These Special Stipulations have been added by Management or owner of the apartment community, and were not created by either the Georgia or Atlanta Apartment Associations as part of their standard leases, forms, and addenda.

Should the leaseholder(s) request a transfer-on-site before their lease expires, all leaseholder(s) must: a) agree to the transfer; b) provide 30 days' advance notice; c) sign and agree to the terms of the On-Site Transfer Agreement; and d) pay a transfer fee of $350.00 prior to the date of transfer. No transfer will occur until a)-d) have been satisfied. Also, all leaseholders must be in good standing and have an apartment inspection completed by Management before the transfer will be authorized to occur. In Apartment Owner's and/or Management's sole discretion, if Resident's renter's liability insurance policy does not meet all the requirements outlined in the Renter's Insurance Addendum to this Apartment Rental Contract for any reason (including a termination or lapse of such renter's insurance policy), Resident will be added to the Management's master renter's insurance policy immediately upon written notice to Resident, which Resident hereby accepts and consents to, and a charge of $11.00 per month will be added to Resident's ledger and due as additional rent for each month (or any portion of a month) that the master policy is in place for the Resident, until satisfactory proof of insurance coverage is provided by Resident to Landlord. NOTE: Resident's personal belongings are NOT covered or insured under this master insurance policy. You must not allow any utilities(other than cable TV) to be cut off or switched for any reason - including disconnection for non-payment - until the Lease Contract term or renewal period ends. If a utility is individually metered, it must be connected in your name and you must notify the utility provider of your move-out date so the meter can be timely read. If you delay getting utility service turned on in your name by lease commencement or cause it to be transferred back into our name before you surrender or abandon the unit, you'll be liable for a $50 fee plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. Pets are defined as dogs, cats, fish, birds and hamsters. Exotic pets or livestock are not permitted to live in our communities. Fish tanks are to be limited in size and can be no more than 24 gallons. The following dogs are not admitted to our communities unless they are a certified service animal (CSA) or an emotional support animal (ESA): Alaskan Malamute, Akita, American Bully, Bull Mastiff (Presa Canario), Chow, Doberman Pinscher, German Shepard, Husky, American Staffordshire Terrier, American Pit Bull Terrier and Staffordshire Bull Terriers also known as "Pit Bull", Rottweiler, Wolf Hybrid or any mix of the above breed. Any dangerous dog. A dog can be designated as "dangerous" if it makes an unprovoked attack on someone anywhere outside its normal enclosure, or an unprovoked act on someone leading that person to believe the dog would attack and cause injury.

**Signature of Parties:**
Management
FLGA Investors LLC
_____
Name of Management
By: *Kathleen Conley*
Signature of Management Representative Name
As: Community Manager _____ (Job Title)

Residents
*Adaeze Wanda Holmes* _____ (Resident Signature)
Printed Name of Resident: __Adaeze Wanda Holmes__

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

_____ (Resident Signature)
Printed Name of Resident: _____

Copyright © 5/2019 by Atlanta Apartment Association, Inc.
All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692





**GEORGIA**
APARTMENT ASSOCIATION

**Liquidated Damages Addendum**

**FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY**

Addendum Date: _____ **May 12, 2021** _____ **FLGA Investors LLC** _____ ["Management"] ☒ as Owner of
☐ as Agent for the Owner of **FLGA Investors LLC**

["Community Name"] enters into this Liquidated Damages Addendum to the Apartment Rental Contract with **Adaeze Wanda Holmes**

_____ ["Resident"], pertaining to

Apt. No. – **345-A07** located at **1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310**

[Address]. This addendum is part of the Apartment Rental Contract dated _____ **May 12, 2021** _____ [Date of Lease] and amends Paragraph 26.

In lieu of liability for the remainder of the lease term for breach of the lease (as provided in Paragraph 26 of the Apartment Rental Contract), the parties agree that Management may re-enter the premises as provided by law, *thereby terminating the lease and terminating resident's liability for rent after the date Management obtains possession of the apartment through the end of the lease term*, and Management shall be entitled to recover liquidated damages from Resident in the amount of $ **999.00** [not to exceed the amount of two month's rent] as the estimated rent that will come due after management obtains possession of the apartment through either the end of the lease term or the re-letting of the apartment to another resident. Said liquidated damages is based on the average number of days that apartments in the community are vacant and take to lease or re-let as of the date of entering into this apartment rental contract.

If the resident's breach of this lease is based on failure to give a proper non-renewal notice to end the lease and vacate the premises as provided in Paragraph 6 of the Apartment Rental Contract then said liquidated damages shall not exceed the amount of one (1) month's rent.

By selecting Liquidated Damages to determine the resident's liability for rent through the remainder of the lease term, the parties agree that they have evaluated the likelihood that the apartment may remain vacant for an unspecified or undeterminable period of time based on the average length of time that it takes to ready the apartment for re-rental, re-market the same, and obtain a new resident or occupant for the remainder of the lease term. The liquidated damages are intended as a reasonable estimate of the lost rent and other costs of re-letting due to resident's breach of the lease and liability for rent as it accrues over the remaining balance of the lease term. In this respect, the liquidated damages provision shall serve to limit resident's liability for future unaccrued rents. The amount of liquidated damages, if applicable, was estimated based on the apartment community's current market rents, estimated future rents, the current occupancy rate, the expected future occupancy rate, the estimated length of time it takes to re-let an apartment in this particular apartment community's market, current economic conditions, projected future economic conditions, and the relatively short length of the lease.

Based on the above factors, the parties have estimated that it will probably take longer than the estimated number of days the apartment will remain vacant before management is able to re-let the apartment after obtaining possession due to resident's breach. Both parties agree that there are many costs involved in readying the apartment for re-letting due to the expense of turn-keying the premises, advertising, marketing, and other sales and administrative costs. The election to use a liquidated damages provision in lieu of waiting for accrual of future rents is a convenience and benefit for both management and resident as it allows management to render a prompt statement of resident's liability for unaccrued rent through the balance of the lease and it allows the resident the certainty of knowing how much he or she will owe while limiting liability for future rents. Resident acknowledges that he or she has the option of voluntarily terminating the lease as provided in Paragraph 7 in order to avoid liability for unaccrued future rents and thereby avoid liability for future rents through the remaining term of the lease.

Said liquidated damages, if elected, shall be due in addition to any rent or hold-over rent or other fees and charges which have accrued or come due during the time the resident remains in possession of the apartment or which accrues prior to the time management finally obtains possession of the apartment. Said liquidated damages are in addition to, and not in lieu of, any damages or cleaning fees exceeding normal wear and tear, unpaid utilities, and rental concession pay-backs which are due. The parties agree that the amount of lost rent and cost of re-letting are uncertain and difficult to ascertain, as the length of time it takes to re-let may vary greatly based on the above recited conditions.

By electing to use liquidated damages as the measure of resident's liability for the remainder of the lease term, management agrees to forego its right to allow the apartment to remain vacant and hold resident liable for payment of each month's rent through the remaining term of the lease or to sue the resident for each month's installment of rent as it comes due through expiration of the lease or to re-enter the premises as provided by law and re-let the same on resident's behalf while holding the resident liable for any deficiency between the contract rent and rent due through the remaining term of the lease until the re-letting. However, management reserves and retains all other remedies afforded at law or in equity, whether statutory or contractual, which are not inconsistent with the right to liquidated damages. In the event any court should determine that the liquidated damages provided for herein ere unenforceable or illegal, then the court shall strike such portion of this addendum as is deemed unenforceable or illegal, and management shall be entitled to the remedy of re-entering the premises as provided by law and re-letting the apartment on resident's behalf while holding resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until re-letting of the apartment on resident's behalf.

The liquidated damages provided for herein, in the event that resident has breached the lease and failed to otherwise terminate the lease as provided by law or as provided in Paragraphs 6 and 7 of the Apartment Rental Contract, are in lieu of, not in addition to, any termination (cancellation) fee or notice fee provided for in Paragraph 7, and management is not entitled to collect any such termination (cancellation) fee or notice fee.

| **FLGA Investors LLC** | *Adaeze Wanda Holmes* |
|---|---|
| Name of Owner or Management Company | Resident's Signature |
| By: *Kathleen Conley* | |
| Signature of Management Representative | Resident's Signature |
| As: **Community Manager** _____ (Title) | |
| | Resident's Signature |
| | Resident's Signature |
| | Resident's Signature |

Copyright © 5/2019 by Atlanta Apartment Association, Inc. - Form #9401-LD
All Rights Reserved                    ☑ Blue Moon eSignature Services Document ID: 264857692

**Exhibit 2**

Fulton County Magistrate Court
***E-FILED***<<Initials>>
Date: 7/27/2021 2:07 PM
Cathelene Robinson, Clerk
21ED189095

266258

**MAGISTRATE COURT OF FULTON COUNTY, STATE OF GEORGIA**

PROCEEDING AGAINST TENANT HOLDING OVER

1295 West, First Communities Management

PO Box 451027
Atlanta GA 31145

PLAINTIFF'S NAME/ADDRESS/PHONE/EMAIL

V.

Adaeze Holmes and all others

1345 Donnelly Avenue
Atlanta GA 30310

DEFENDANT'S NAME & ADDRESS

Because of the global COVID-19 pandemic, you may be eligible for temporary protection from eviction under the laws of your State, territory, locality, or tribal area, or under Federal law.

Learn the steps you should take now:
- Visit www.cfpb.gov/eviction
- Or call a housing counselor at 800-569-4287

CASE # _____

attorney calendar ATTY/FHCW      #765209

PLAINTIFF'S ATTORNEY NAME/ADDRESS/PHONE/EMAIL

---

1. Defendant is in possession as tenant of premises at the address in Fulton County as stated above.
2. Affiant is the ☐ Owner   ☐ Attorney   ☒ Agent   ☐ Tenant of the owner of said premises.
3. Defendant   ☒ fails to pay the rent which is now past due.
   ☒ holds the premises over and beyond the term for which they rented to him.
   ☐ no longer has permission to remain in the premises.
   ☐ other grounds: _____
4. Plaintiff desires and has demanded possession of the premises.
5. Defendant has failed and refused to deliver possession of the premises.

**WHEREFORE**, Plaintiff DEMANDS
   (a) Possession of the premises.
   (b) Past due rent of $ 999.00 for the month(s) JUL
   (c) Rent accruing up to the date of judgement of vacancy at the rate of $ 999.00 per Month
   (d) Other: See attached

*By affixing this electronic verification, oath, or affidavit to the pleading(s) submitted to the court and attaching my electronic signature hereon, I do hereby swear or affirm that the statements set forth in the above pleading(s) are true and correct.*

/s/ Kathleen Conley                    7/27/2021
PLAINTIFF(S) or AFFIANT        DATE        PHONE NUMBER / EMAIL ADDRESS

---

**SUMMONS**

TO: THE MARSHAL of the Magistrate Court of Fulton County or his lawful deputies:

GREETINGS: The tenant must file either an online (www.AnswerDispo.com), oral or written Answer at Room TG100, 185 Central Avenue, SW, Atlanta, Georgia, 30303 between 8:30AM and 5:00PM within seven (7) days from the date of the actual service unless the seventh day is a Saturday, a Sunday, or a Court holiday, in which case the Answer may be made on the next day which is not a Saturday, a Sunday, or a Court holiday. If the Answer is oral, the substance thereof shall be endorsed on the dispossessory affidavit, The Answer may contain any legal or equitable defense or counterclaim. If no valid legal or factual Answer is filed, a writ of possession may be issued pursuant to O.C.G.A, § 44-7-53. If no Answer is made, a writ of possession shall issue instanter. WITNESS the Honorable Chief Judge of said Court. The above affidavit was sworn to and subscribed before the undersigned Deputy Clerk by affiant as provided by O.C.G.A. § 44-7-50 and summons issues pursuant thereto.      7/27/2021 2:07 PM

This _____ day of _____, _____      _____
                                    DEPUTY CLERK

---

**PRIVATE PROCESS SERVER AFFIDAVIT OF SERVICE**

I have served the foregoing Affidavit and Summons on the Defendant(s) by delivering a copy of same:
☐ PERSONALLY ☐ DEFENDANT NOT FOUND AT WITHIN ADDRESS ON SAID SUMMONS AND AFFIDAVIT
☐ NOTORIOUSLY (NAME) _____ Age _____ Wt. _____ Ht. _____
☐ TACK & MAIL. Posting a copy to the door of the premises and depositing a copy in the U.S. Mail, First Class in an envelope properly addressed after attempting personal service. Said copy containing notice to the Defendant(s) to answer at the hour and place in said summons.

DATE OF SERVICE: _____      DEFENDANT TO ANSWER ON OR BEFORE: _____

_____      _____
PROFESSIONAL PROCESS SERVER                    NOTARY

---

**ANSWER**

To file your answer online visit www.AnswerDispo.com and enter your case number.  All Answers must be electronically filed by 11:59PM on or before the last day to answer this summons. A service charge applies for online answers. No service charge applies to answers made written or orally at the courthouse.

Doc 1b

Other demands (from previous page):

```
Plaintiff Seeks Possession + $168.00 Filing Fee + $60.00 Late Fees + $42.00 Water & Sewer + $4.00
Pest Control
```

*By affixing this electronic verification, oath, or affidavit to the pleading(s) submitted to the court and attaching my electronic signature hereon, I do hereby swear or affirm that the statements set forth in the above pleading(s) are true and correct.*

/s/ Kathleen Conley                          7/27/2021

PLAINTIFF(S) or AFFIANT                    DATE          PHONE NUMBER / EMAIL ADDRESS

# **Exhibit 3**

**(This Exhibit has been redacted for privacy and privilege. The Court may contact**

**Defendant's counsel directly at bjwackym@atlantalegalaid.org or (404) 614-3989 for the**

**unredacted copy of this Exhibit.)**

4/10/23, 2:48 PM
Atlanta Legal Aid Society Mail - Fw: 6th Email Attempt - Follow up on account or move out
Case 1:23-mi-99999-UNA Document 1-136 Filed 04/10/23 Page 32 of 77



Becca J. Wackym <bjwackym@atlantalegalaid.org>

## Fw: 6th Email Attempt - Follow up on account or move out

**From:** Artrena Davis <adavis@FirstCommunities.com>
**Sent:** Wednesday, March 30, 2022 10:46 AM
**To:** Adaeze Holmes <adaeze2001@hotmail.com>
**Cc:** Tiana Harshaw <tharshaw@FirstCommunities.com>; Kathleen Conley <kconley@FirstCommunities.com>
**Subject:** Re: 6th Email Attempt - Follow up on account or move out

Hi Adaezes

Good Morning, Per your lease Contract, You must return your Keys to the office to a staff member which was not done, and several emails were sent by me with no response nor to Kathy who is the Manager.

The doors have been open since September 2021 By appointment only which was sent out to all residents and completely open since February 1$^{st,}$ 2022.

We never received any Notice in writing as your lease Contract states, and the Sherriff has completed the process this month and was sent to the collection which is National Credit

If you have any further questions, please call National Credit

*Trena Davis*
Assistant Manager | 1295 WEST
1295 Donnelly Ave. SW | Atlanta, GA 30310
Community Number: 404-755-6142
Email: adavis@firstcommunities.com
*"Creating relationships and meaningful moments with all who walk through our doors "*

**From:** Adaeze Holmes <adaeze2001@hotmail.com>
**Sent:** Wednesday, March 30, 2022 10:21 AM
**To:** Artrena Davis <adavis@FirstCommunities.com>
**Cc:** Tiana Harshaw <tharshaw@FirstCommunities.com>
**Subject:** Re: 6th Email Attempt - Follow up on account or move out

Eviction  21ED189095

This is a notice, I moved out of 1345 Donnelly Ave Unit A07 Atlanta, GA 30310 on September 28th, 2021. The staff does not open the office door and does not answer phone calls to the office.  I sent an email to office manager on September 27th, 2021.  I left the key on the out kitchen window seal and left the unit kitchen door open on September 28, 2021   I expect charges for the unit to cease on September 28, 2021  I have proof of moving into a women's shelter on September 28, 2021.


Adaeze Holmes
adaeze2001@hotmail.com

---

**From:** Artrena Davis <adavis@FirstCommunities.com>
**Sent:** Friday, February 25, 2022 12:19 PM
**To:** Adaeze Holmes <adaeze2001@hotmail.com>
**Cc:** Tiana Harshaw <tharshaw@FirstCommunities.com>
**Subject:** 6th Email Attempt - Follow up on account or move out

Hi Ms. Adeaze

We have not received keys nor has the Sherrif come out yet, You are still being charged for rent, insurance, and misc. items.

Please turn in keys or send back the response you have moved out to stop the charges from continuing.

*Trena Davis*
Assistant Manager | 1295 WEST
1295 Donnelly Ave. SW | Atlanta, GA 30310
Community Number: 404-755-6142
Email  adavi  @fir  tcomm  nities  com
*"Creating relationships and meaningful moments with all who walk through our doors."*

**<u>Exhibit 4</u>**

Fulton County Magistrate Court
***E-FILED***LNB
Date: 9/29/2021 1:43 PM
Cathelene Robinson, Clerk
21ED189095

## IN THE MAGISTRATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| 1295 WEST, <br> FIRST COMMUNITIES MANAGEMENT )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ADAEZE HOLMES, )<br>AND ALL OTHERS )<br>)<br>Defendant. )<br>) | CIVIL ACTION FILE <br> NO. 21ED189095 |

### ORDER AND JUDGMENT

This matter came before the Court without a jury and with Plaintiff, 1295 West, First

Communities Management ("Plaintiff"), appearing via Zoom and represented by counsel and

Defendant, Adaeze Holmes ("Defendant"), appearing *pro se* and in person. Having heard

testimony from the parties, presentation of evidence and the pleadings on file, argument and

consideration, the Court finds as follows:

1.

Plaintiff's request for a Writ of Possession is **GRANTED.** Plaintiff is entitled to a Writ of

Possession against Defendant effective September 28, 2021, due to Defendant's admitted failure

to pay rent for the months of July, August and September 2021 and termination of the lease.

2.

Judgment shall issue in favor of the Plaintiff and against Defendant in the amount of

$3,036.40 principal, which is comprised of rent, late fees and utilities accruing from July 1,

2021, through September 28, 2021.

3.

Defendant's Counterclaim is denied.

4.

In the event of appeal, to remain in possession of the subject premises, Defendant must

pay into the Court Registry when filing the Notice of Appeal the total past-due rent currently

owed to Plaintiff, in accordance with O.C.G.A. § 44-7-56. Defendant shall also pay rent of

$999.00 beginning October 5, 2021, and $999.00 by the fifth (5th) of each successive month

while the case is pending on appeal. Plaintiff may seek disbursement of rent payments during

the pendency of the appeal, if applicable. A Writ of Possession shall issue for Plaintiff and

against Defendant *instanter* upon application of Plaintiff, if Defendant defaults on any of the

aforementioned payments.

**IT IS SO ORDERED**, this 29th day of September 2021.


**The Honorable Judge Debbie-Ann Rickman**
**Magistrate Court of Fulton County**


**ORDER PREPARED AND**
**PRESENTED BY:**

 /s/ Lureece D. Lewis
Lureece D. Lewis
State Bar No. 520077
*Attorney for Plaintiff*
**Fowler, Hein, Cheatwood & Williams, P.A.**
2970 Clairmont Road, N.E., Suite 220
Atlanta, Georgia 30329
(404) 633-5114 (Ph.); (404) 325-9721 (Fax)
LLewis@ApartmentLaw.com

**<u>Exhibit 5</u>**

Fulton County Magistrate Court
***E-FILED***SS
Date: 3/24/2022 9:26 AM
Cathelene Robinson, Clerk
21ED189095

# MAGISTRATE COURT OF FULTON COUNTY

Case Number: 21ED189095

Dear Presiding Judge:

I am the:  ☐ Plaintiff/Landlord      ☒ Defendant/Tenant      ☐ Occupant

☐ None of the above

I followed the court order to vacate unit on September 28, 2021. I moved into a women's emergency shelter "My Sister's House" @ Howell Mill on 9-28-21 and have not lived at 1345 Donelly Ave Apt A7 Atlanta, GA 30313. The ~~people pleas~~ first Communities staff have sent me multiple emails about sheriff department did not come yet and I owe for October, November, December, January, February and in March, I have no attorney to represent myself and think the judge should be aware. Why is the property management waiting for sheriff when they saw me leave 9-28-21 and never came back to live there?

This 24 day of March , 20 22

PRINT NAME: Adaeze Holmes

SIGNATURE: Adaeze Holmes

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the opposing party in the foregoing matter with a copy of this pleading by depositing in the United States Mail a copy of same in a properly addressed envelope with adequate postage thereon.

This _____ day of _____, 20 ___.

_____
SIGNATURE

**<u>Exhibit 6</u>**

Fulton County Magistrate Court
***E-FILED***ATW
Date: 3/31/2022 5:00 PM
Cathelene Robinson, Clerk
21ED189095

# IN THE MAGISTRATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

**1295 West, First Communities Management**,
Plaintiff/Landlord,

v.

File No. 21ED189095

**Adaeze Holmes; all others**,
Defendant/Tenant.

## ORDER

  In the above-styled action, defendant filed a letter on March 24, 2022 asserting that she vacated the property on September 28, 2021 and does not owe rent for the period beyond September 28, 2021. The Court, having read and considered the pleadings, finds the following:

____ Motion/Request GRANTED

____ Motion/Request DENIED

____ Set Hearing.  Hearing scheduled for _____.

____ Writ Recalled

_X___ Other: The Court's Order and Judgment entered on September 29, 2021 granted the plaintiff past due rent through September 28, 2021 only.

  **SO ORDERED,** this 28th day of March, 2022.

_____
**Judge, Magistrate Court of Fulton County**

**Exhibit 7**



**P.O. Box 672288 Marietta, GA 30006   (800) 459-1539   (404) 629-2728**
**Monday - Thursday 8:00 a.m. - 7:00 p.m., Friday 8:00 a.m. - 5:00 p.m.**

_____

04/12/2022


Adaeze Wanda Holmes
469 MARIETTA STREET NW
Atlanta GA 30313


Current Creditor: Twelve Ninety Five West Apts
Client Account Number: 345-A07
NCS Account Number: 4795245

Balance:   $9,912.36

Enclosed you will find documentation regarding your account.

If a balance is remaining on your account (see above), you may send payment in full to National Credit Systems, Inc.

Otherwise, you may contact our office immediately at (404) 629-2728.

It is important to know that National Credit Systems, Inc. is a third party debt collection agency whose efforts are solely on behalf of the current creditor who has previously validated this debt.


Sincerely,

SABRINA HILL
Collection Representative
404-592-0235
10_E

**This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.**

**Disclosure for California consumers**:
As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. "The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov <http://www.ftc.gov>."

**Disclosure for Colorado consumers:**
FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE
<HTTPS://COAG.GOV/OFFICE-SECTIONS/CONSUMER-PROTECTION/CONSUMER-CREDIT-UNIT
/COLLECTION-AGENCY-REGULATION/>
Local Office:
1776 South Jackson Street, #900,
Denver, CO 80210
720-287-8669
A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.

**Disclosure for Massachusetts consumers:**
NOTICE OF IMPORTANT RIGHTS.
YOU HAVE THE RIGHT TO MAKE WRITTEN OR ORAL REQUEST THAT TELEPHONE CALLS REGARDING YOUR DEBT NOT BE MADE TO YOU AT YOUR PLACE EMPLOYMENT. ANY SUCH ORAL REQUEST WILL BE VALID FOR ONLY TEN DAYS UNLESS YOU PROVIDE WRITTEN CONFIRMATION OF THE REQUEST POSTMARKED OR DELIVERED WITHIN SEVEN DAYS OF SUCH REQUEST. YOU MAY TERMINATE THIS REQUEST BY WRITING TO THE DEBT COLLECTOR.

**Disclosure for Minnesota consumers:**
This collection agency is licensed by the Minnesota Department of Commerce.

**Dislcosure for North Carolina consumers:**
NORTH CAROLINA DEPARTMENT OF INSURANCE PERMIT NUMBER 119500338.

**Disclosure for Nevada consumers:**
Please note: If you choose to make a payment by credit card, a separate $15.00 convenience fee may apply. However, other payment options are available that are free of charge.

**Disclosure for New York City consumers:**
NYC Department of Consumer Affairs license 1277208

**Dislcosure for Tennessee consumers:**
This collection agency is licensed by the Collection Service Board of the Department of commerce and Insurance.

**Disclosure for Utah consumers:**
As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. We will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described above.

| 02/11/2022 | late fee | 02/2022 | late fee for Jan and Feb 2022 | 120.00 | | 9,020.00 | 38525238 |
|---|---|---|---|---|---|---|---|
| 03/01/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) | 4.00 | | 9,024.00 | 38748274 |
| 03/01/2022 | rent | 03/2022 | Rental Income (03/2022) | 999.00 | | 10,023.00 | 38748275 |
| 03/01/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) | 12.00 | | 10,035.00 | 38748277 |
| 03/01/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) | 42.00 | | 10,077.00 | 38748278 |
| 03/14/2022 | secdep | 03/2022 | :Security Deposit credit | (250.00) | | 9,827.00 | 38948300 |
| 03/14/2022 | rent | 03/2022 | Rental Income (03/2022) Credit 17 days | (547.84) | | 9,279.16 | 38948301 |
| 03/14/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) Credit 17 days | (23.03) | | 9,256.13 | 38948302 |
| 03/14/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) Credit 17 days | (2.19) | | 9,253.94 | 38948303 |
| 03/14/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) Credit 17 days | (6.58) | | 9,247.36 | 38948304 |
| 03/14/2022 | notice | 03/2022 | Forfeit Security Deposit | 250.00 | | 9,497.36 | 38948305 |
| 03/14/2022 | cleaning | 03/2022 | Cleaning Charges/ pictures | 200.00 | | 9,697.36 | 38948306 |
| 03/14/2022 | legal | 03/2022 | Legal Exp Reimbursement put out furniture | 115.00 | | 9,812.36 | 38949807 |
| 03/14/2022 | keys | 03/2022 | Keys/Locks Fee | 100.00 | | 9,912.36 | 38949811 |

# Resident Ledger

Date: 03/18/2022

| Code | t0594720 | | Property | dongard | Lease From | 05/17/2021 |
|---|---|---|---|---|---|---|
| Name | Adaeze Holmes | | Unit | 345-A07 | Lease To | 05/16/2022 |
| Address | 1295 Donnelly Ave., SW # 345-A07 | | Status | Past | Move In | 05/17/2021 |
| | | | Rent | 999.00 | Move Out | 03/14/2022 |
| City | Atlanta, GA 30310 | | Phone (H) | | Phone (W) | |

| Date | Chg Code | Post Month | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|---|---|
| 04/09/2021 | app | 04/2021 | Application Fee (Adaeze Holmes) | 65.00 | | 65.00 | 34463406 |
| 04/09/2021 | admin | 04/2021 | Administration Fee (Adaeze Holmes) | 100.00 | | 165.00 | 34463407 |
| 04/09/2021 | | 04/2021 | chk# 94265686 Debit Card On-Line Payment ; Mobile Web - Online Leasing | | 165.00 | 0.00 | 16024897 |
| 04/24/2021 | | 04/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700276000003 | | 250.00 | (250.00) | 16049465 |
| 05/10/2021 | | 05/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700277600014 | | 510.00 | (760.00) | 16146500 |
| 05/17/2021 | rent | 05/2021 | Rent for 15 days | 483.39 | | (276.61) | 34826044 |
| 05/17/2021 | water | 05/2021 | Water for 15 days | 18.87 | | (257.74) | 34826045 |
| 05/17/2021 | secdep | 05/2021 | Security Deposit | 250.00 | | (7.74) | 34826046 |
| 06/01/2021 | pestctrl | 06/2021 | Pest Control Fee (06/2021) 14 days | 1.87 | | (5.87) | 35092906 |
| 06/01/2021 | rent | 06/2021 | Rental Income (06/2021) | 999.00 | | 993.13 | 35092908 |
| 06/01/2021 | water | 06/2021 | Water Usage Reimb (INC) (06/2021) | 42.00 | | 1,035.13 | 35092910 |
| 06/04/2021 | | 06/2021 | chk# :WIPS WIPS Receipt Reference Number: SA150700280100022 | | 1,035.13 | 0.00 | 16255515 |
| 07/01/2021 | pestctrl | 07/2021 | Pest Control Fee (07/2021) | 4.00 | | 4.00 | 35453299 |
| 07/01/2021 | rent | 07/2021 | Rental Income (07/2021) | 999.00 | | 1,003.00 | 35453301 |
| 07/01/2021 | water | 07/2021 | Water Usage Reimb (INC) (07/2021) | 42.00 | | 1,045.00 | 35453303 |
| 07/07/2021 | late | 07/2021 | late fee | 60.00 | | 1,105.00 | 35555557 |
| 07/26/2021 | dispo | 07/2021 | Dispo Warrant Fee | 168.00 | | 1,273.00 | 35718967 |
| 08/01/2021 | pestctrl | 08/2021 | Pest Control Fee (08/2021) | 4.00 | | 1,277.00 | 35813170 |
| 08/01/2021 | rent | 08/2021 | Rental Income (08/2021) | 999.00 | | 2,276.00 | 35813172 |
| 08/01/2021 | water | 08/2021 | Water Usage Reimb (INC) (08/2021) | 42.00 | | 2,318.00 | 35813174 |
| 09/01/2021 | pestctrl | 09/2021 | Pest Control Fee (09/2021) | 4.00 | | 2,322.00 | 36218022 |
| 09/01/2021 | rent | 09/2021 | Rental Income (09/2021) | 999.00 | | 3,321.00 | 36218024 |
| 09/01/2021 | trash | 09/2021 | Trash Reimb (INC) (09/2021) | 12.00 | | 3,333.00 | 36218025 |
| 09/01/2021 | water | 09/2021 | Water Usage Reimb (INC) (09/2021) | 42.00 | | 3,375.00 | 36218027 |
| 09/20/2021 | late | 09/2021 | Late Fee | 60.00 | | 3,435.00 | 36411881 |
| 09/20/2021 | late | 09/2021 | sept late fee | 60.00 | | 3,495.00 | 36411886 |
| 10/01/2021 | pestctrl | 10/2021 | Pest Control Fee (10/2021) | 4.00 | | 3,499.00 | 36629558 |
| 10/01/2021 | rent | 10/2021 | Rental Income (10/2021) | 999.00 | | 4,498.00 | 36629560 |
| 10/01/2021 | trash | 10/2021 | Trash Reimb (INC) (10/2021) | 12.00 | | 4,510.00 | 36629562 |
| 10/01/2021 | water | 10/2021 | Water Usage Reimb (INC) (10/2021) | 42.00 | | 4,552.00 | 36629564 |
| 11/01/2021 | pestctrl | 11/2021 | Pest Control Fee (11/2021) | 4.00 | | 4,556.00 | 37088151 |
| 11/01/2021 | rent | 11/2021 | Rental Income (11/2021) | 999.00 | | 5,555.00 | 37088152 |
| 11/01/2021 | trash | 11/2021 | Trash Reimb (INC) (11/2021) | 12.00 | | 5,567.00 | 37088153 |
| 11/01/2021 | water | 11/2021 | Water Usage Reimb (INC) (11/2021) | 42.00 | | 5,609.00 | 37088154 |
| 12/01/2021 | pestctrl | 12/2021 | Pest Control Fee (12/2021) | 4.00 | | 5,613.00 | 37506981 |
| 12/01/2021 | rent | 12/2021 | Rental Income (12/2021) | 999.00 | | 6,612.00 | 37506982 |
| 12/01/2021 | trash | 12/2021 | Trash Reimb (INC) (12/2021) | 12.00 | | 6,624.00 | 37506983 |
| 12/01/2021 | water | 12/2021 | Water Usage Reimb (INC) (12/2021) | 42.00 | | 6,666.00 | 37506984 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,726.00 | 37664052 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,786.00 | 37664055 |
| 01/01/2022 | pestctrl | 01/2022 | Pest Control Fee (01/2022) | 4.00 | | 6,790.00 | 37912167 |
| 01/01/2022 | rent | 01/2022 | Rental Income (01/2022) | 999.00 | | 7,789.00 | 37912168 |
| 01/01/2022 | trash | 01/2022 | Trash Reimb (INC) (01/2022) | 12.00 | | 7,801.00 | 37912170 |
| 01/01/2022 | water | 01/2022 | Water Usage Reimb (INC) (01/2022) | 42.00 | | 7,843.00 | 37912172 |
| 02/01/2022 | pestctrl | 02/2022 | Pest Control Fee (02/2022) | 4.00 | | 7,847.00 | 38356032 |
| 02/01/2022 | rent | 02/2022 | Rental Income (02/2022) | 999.00 | | 8,846.00 | 38356033 |
| 02/01/2022 | trash | 02/2022 | Trash Reimb (INC) (02/2022) | 12.00 | | 8,858.00 | 38356034 |

# **Exhibit 8**

**(This Exhibit has been redacted for privacy and privilege. The Court may contact Defendant's counsel directly at bjwackym@atlantalegalaid.org or (404) 614-3989 for the unredacted copy of this Exhibit.)**



**Becca J. Wackym <bjwackym@atlantalegalaid.org>**

## Fw: Account ID: 4795245 Debt Verification Email

**From:** National Credit Systems <docrequest@nationalcreditsystems.com>
**Sent:** Tuesday, April 12, 2022 8:44 AM
**To:** adaeze2001@hotmail.com <adaeze2001@hotmail.com>
**Subject:** Account ID: 4795245 Debt Verification Email

The attached document file(s) contain the information that you have requested.

Click the link below to discontinue future email communication.

https://www.nationalcreditsystems.com/optout.aspx?subject=ID6283602&lastname=HOLMES

**2 attachments**

 **4795245-01 pdf**
73K

 **20220412_4795245_10_E.PDF**
63K

**Exhibit 9**

I Adaeze Holmes with NCS account
4795245 am disputing $9,912.36. See
enclosed is court document
asserting vacate premise September 28, 2021
and Twelve Ninety Five West may not
collect or charge beyond September 28, 2021.

April 29, 2021
Adaeze Holmes adaze Holmes
404-956-5892
469 Marietta St NW Atlanta, GA 30313

# **Exhibit 10**

**(This Exhibit has been redacted for privacy and privilege. The Court may contact**

**Defendant's counsel directly at bjwackym@atlantalegalaid.org or (404) 614-3989 for the**

**unredacted copy of this Exhibit.)**

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

Marietta, GA 30006

OFFICIAL USE

0054
07

| Certified Mail Fee | $3.75 | | |
|---|---|---|---|
| $ | | $0.00 | |

Extra Services & Fees *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy) $ $0.00
- ☐ Return Receipt (electronic) $ $0.00
- ☐ Certified Mail Restricted Delivery $ $0.00
- ☐ Adult Signature Required $ $0.00
- ☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage | $8.95

04/29/2022

Total Postage and Fees
$ | $12.70

Sent To National Credit Systems, Inc.

Street and Apt. No., or PO Box No. PO Box 672288

City, State, ZIP+4® Marietta, GA 30006

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

(Left margin, vertical): 7021 1970 0000 6734 5198

---

Tracking #:
7021197000067345198

| Total | $12.70 |
|---|---|

Grand Total: | $12.70

Debit Card Remitted | $12.70
Card Name: VISA
Account #: XXXXXXXXXXX
Approval #: 047100
Transaction #: 329
Receipt #: 031117
Debit Card Purchase: $12.70
AID: A0000000980840          Chip
AL: US DEBIT
PIN: Verified

************************************
Every household in the U.S. is now
eligible to receive a second set
of 4 free test kits.
Go to www.covidtests.gov
************************************

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You ma
visit www.usps.com USPS Tracking or call
1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing an
insurance claim go to
https://www.usps.com/help/claims.htm
or call 1-800-222-1811

# **Exhibit 11**

**(This Exhibit has been redacted for privacy and privilege. The Court may contact**

**Defendant's counsel directly at bjwackym@atlantalegalaid.org or (404) 614-3989 for the**

**unredacted copy of this Exhibit.)**



54 Ellis Street, NE • Atlanta, Georgia 30303 • 404-524-5811

Jun 2, 2022

National Credit Systems
ATTN: Sabrina Hill, Collection Representative
P.O. Box 672288
Marietta, GA 30006

   RE: Adaeze Holmes
      Account Number: 4795245

Dear Ms. Hill:

I represent Ms. Adaeze Holmes, a former tenant of 1295 West Apartments. I am writing to dispute the debt identified by you in a letter dated April 12, 2022. The disputed debt stems from Ms. Holmes tenancy 1295 West Apartments. The amount you identified that Ms. Holmes is incorrect.

Pursuant to the Fulton County Magistrate Court Order issued on September 29, 2021 in Case No. 21ED189095, Ms. Holmes only owes $3,036.40 to 1295 West Apartments. After you attempted to collect $9,912.36 from Ms. Holmes, Fulton County Magistrate Court issued an order on March 28, 2022 stating that Ms. Holmes does **not** owe rent beyond the amount ordered in the September 29th order.

Please direct your communication about this matter to me directly going forward. Please record that Ms. F disputes having any obligation for this debt. If you forward or return this debt to another company, please indicate to them that Ms. F is represented by legal counsel and this debt is disputed.

It is a violation of the Fair Debt Collections Practices Act to communicate credit information which is known or which should be known to be false. Reporting a debt to a credit bureau that is known or should be known to be false constitutes a violation of this federal law. You now have reason to know the debt M claims Ms. F owes is false. With that in mind, if you report this matter to a credit bureau, Ms. Holmes is prepared to seek enforcement of her rights under Fair Debt Collections Practice Act, which may include filing a complaint with the Federal Trade Commission and the Consumer Financial Protection Bureau, or filing a civil lawsuit.

Sincerely,

Becca Wackym
Attorney at Law

Cc: J. Mike Williams
   Adaeze Homes

# Exhibit 12

**(This Exhibit has been redacted for privacy and privilege. The Court may contact Defendant's counsel directly at bjwackym@atlantalegalaid.org or (404) 614-3989 for the unredacted copy of this Exhibit.)**



Becca J. Wackym <bjwackym@atlantalegalaid.org>

---

## Fw: Account ID: 4795245 Debt Investigated E-Mail

---

**From:** National Credit Systems ⬚adaeze2001@hotmail.com <docrequest@nationalcreditsystems.com>
**Sent:** Friday, June 10, 2022 3:28 PM
**To:** adaeze2001@hotmail.com <adaeze2001@hotmail.com>
**Subject:** Account ID: 4795245 Debt Investigated E-Mail

The attached document file( ) contain the information that you have reque ted

Click the link below to di  continue future email communication

http  //www nationalcredit y tem com/optout a p ?  ubject  ID6283602&la  tname  HOLMES

---

**2 attachments**

 **4795245-01.pdf**
56K

 **20220610_4795245_11_E.PDF**
58K

**<u>Exhibit 13</u>**



**National Credit Systems, Inc.**

*P.O. Box 672288 Marietta, GA 30006   (800) 459-1539   (404) 629-2728*
*Monday - Thursday 8:00 a.m. - 7:00 p.m., Friday 8:00 a.m. - 5:00 p.m.*

_____

06/10/2022


Adaeze Wanda Holmes
469 MARIETTA STREET NW
Atlanta GA 30313


Current Creditor: Twelve Ninety Five West Apts
Client Account Number: 345-A07
NCS Account Number: 4795245

Balance:   $9,912.36

We are aware of your dispute concerning the above referenced account.

Your dispute has been investigated; however, we have yet to find sufficient evidence to validate your claim(s).   It is very important that you provide our company with all relevant documentation and information supporting your position.

In the event that new information is obtained which places doubt on the validity of this debt, we will promptly update our records appropriately.   In addition, National Credit Systems, Inc. will revise or delete the information it may have reported to the three major credit bureaus, in full compliance with the provisions of The Fair Credit Reporting Act ,The Fair Debt Collections Practices Act and any state regulations that may be applicable.

It is important to know that National Credit Systems, Inc. is a third party debt collection agency whose efforts are solely on behalf of the current creditor who has previously validated this debt.

Enclosed you will find documentation provided to us by Twelve Ninety Five West Apts.



Sincerely,


Collection Representative
404-592-0235
11_E

**This is an attempt to collect a debt and any information obtained will be**
**used for that purpose. This communication is from a debt collector.**



**Disclosure for California consumers**:
As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. "The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use

false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov <http://www.ftc.gov>."

**Disclosure for Colorado consumers:**
FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE
<HTTPS://COAG.GOV/OFFICE–SECTIONS/CONSUMER–PROTECTION/CONSUMER–CREDIT–UNIT/COLLECTION–AGENCY–REGULATION/>
Local Office:
1776 South Jackson Street, #900,
Denver, CO 80210
720-287-8669
A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.

**Disclosure for Massachusetts consumers:**
NOTICE OF IMPORTANT RIGHTS.
YOU HAVE THE RIGHT TO MAKE WRITTEN OR ORAL REQUEST THAT TELEPHONE CALLS REGARDING YOUR DEBT NOT BE MADE TO YOU AT YOUR PLACE EMPLOYMENT. ANY SUCH ORAL REQUEST WILL BE VALID FOR ONLY TEN DAYS UNLESS YOU PROVIDE WRITTEN CONFIRMATION OF THE REQUEST POSTMARKED OR DELIVERED WITHIN SEVEN DAYS OF SUCH REQUEST. YOU MAY TERMINATE THIS REQUEST BY WRITING TO THE DEBT COLLECTOR.

**Disclosure for Minnesota consumers:**
This collection agency is licensed by the Minnesota Department of Commerce.

**Dislcosure for North Carolina consumers:**
NORTH CAROLINA DEPARTMENT OF INSURANCE PERMIT NUMBER 119500338.

**Disclosure for Nevada consumers:**
Please note: If you choose to make a payment by credit card, a separate $15.00 convenience fee may apply. However, other payment options are available that are free of charge.

**Disclosure for New York City consumers:**
NYC Department of Consumer Affairs license 1277208

**Dislcosure for Tennessee consumers:**
This collection agency is licensed by the Collection Service Board of the Department of commerce and Insurance.

**Disclosure for Utah consumers:**
As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. We will not submit a negative credit report to a credit reporting agency about this credit obligation until the expiration of the time period described above.

| 02/11/2022 | | | Late Fee for Jan and Feb 2022 | 12.00 | | 9,020.00 | 38525238 |
|---|---|---|---|---|---|---|---|
| 03/01/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) | 4.00 | | 9,024.00 | 38748274 |
| 03/01/2022 | rent | 03/2022 | Rental Income (03/2022) | 999.00 | | 10,023.00 | 38748275 |
| 03/01/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) | 12.00 | | 10,035.00 | 38748277 |
| 03/01/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) | 42.00 | | 10,077.00 | 38748278 |
| 03/14/2022 | secdep | 03/2022 | :Security Deposit credit | (250.00) | | 9,827.00 | 38948300 |
| 03/14/2022 | rent | 03/2022 | Rental Income (03/2022) Credit 17 days | (547.84) | | 9,279.16 | 38948301 |
| 03/14/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) Credit 17 days | (23.03) | | 9,256.13 | 38948302 |
| 03/14/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) Credit 17 days | (2.19) | | 9,253.94 | 38948303 |
| 03/14/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) Credit 17 days | (6.58) | | 9,247.36 | 38948304 |
| 03/14/2022 | notice | 03/2022 | Forfeit Security Deposit | 250.00 | | 9,497.36 | 38948305 |
| 03/14/2022 | cleaning | 03/2022 | Cleaning Charges/ pictures | 200.00 | | 9,697.36 | 38948306 |
| 03/14/2022 | legal | 03/2022 | Legal Exp Reimbursement put out furniture | 115.00 | | 9,812.36 | 38949807 |
| 03/14/2022 | keys | 03/2022 | Keys/Locks Fee | 100.00 | | 9,912.36 | 38949811 |

# Resident Ledger

Date: 03/18/2022

| Code | t0594720 | Property | dongard | Lease From | 05/17/2021 |
|---|---|---|---|---|---|
| Name | Adaeze Holmes | Unit | 345-A07 | Lease To | 05/16/2022 |
| Address | 1295 Donnelly Ave., SW # 345-A07 | Status | Past | Move In | 05/17/2021 |
| | | Rent | 999.00 | Move Out | 03/14/2022 |
| City | Atlanta, GA 30310 | Phone (H) | | Phone (W) | |

| Date | Chg Code | Post Month | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|---|---|
| 04/09/2021 | app | 04/2021 | Application Fee (Adaeze Holmes) | 65.00 | | 65.00 | 34463406 |
| 04/09/2021 | admin | 04/2021 | Administration Fee (Adaeze Holmes) | 100.00 | | 165.00 | 34463407 |
| 04/09/2021 | | 04/2021 | chk# 94265686 Debit Card On-Line Payment ; Mobile Web - Online Leasing | | 165.00 | 0.00 | 16024897 |
| 04/24/2021 | | 04/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700276000003 | | 250.00 | (250.00) | 16049465 |
| 05/10/2021 | | 05/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700277600014 | | 510.00 | (760.00) | 16146500 |
| 05/17/2021 | rent | 05/2021 | Rent for 15 days | 483.39 | | (276.61) | 34826044 |
| 05/17/2021 | water | 05/2021 | Water for 15 days | 18.87 | | (257.74) | 34826045 |
| 05/17/2021 | secdep | 05/2021 | Security Deposit | 250.00 | | (7.74) | 34826046 |
| 06/01/2021 | pestctrl | 06/2021 | Pest Control Fee (06/2021) 14 days | 1.87 | | (5.87) | 35092906 |
| 06/01/2021 | rent | 06/2021 | Rental Income (06/2021) | 999.00 | | 993.13 | 35092908 |
| 06/01/2021 | water | 06/2021 | Water Usage Reimb (INC) (06/2021) | 42.00 | | 1,035.13 | 35092910 |
| 06/04/2021 | | 06/2021 | chk# :WIPS WIPS Receipt Reference Number: SA150700280100022 | | 1,035.13 | 0.00 | 16255515 |
| 07/01/2021 | pestctrl | 07/2021 | Pest Control Fee (07/2021) | 4.00 | | 4.00 | 35453299 |
| 07/01/2021 | rent | 07/2021 | Rental Income (07/2021) | 999.00 | | 1,003.00 | 35453301 |
| 07/01/2021 | water | 07/2021 | Water Usage Reimb (INC) (07/2021) | 42.00 | | 1,045.00 | 35453303 |
| 07/07/2021 | late | 07/2021 | late fee | 60.00 | | 1,105.00 | 35555557 |
| 07/26/2021 | dispo | 07/2021 | Dispo Warrant Fee | 168.00 | | 1,273.00 | 35718967 |
| 08/01/2021 | pestctrl | 08/2021 | Pest Control Fee (08/2021) | 4.00 | | 1,277.00 | 35813170 |
| 08/01/2021 | rent | 08/2021 | Rental Income (08/2021) | 999.00 | | 2,276.00 | 35813172 |
| 08/01/2021 | water | 08/2021 | Water Usage Reimb (INC) (08/2021) | 42.00 | | 2,318.00 | 35813174 |
| 09/01/2021 | pestctrl | 09/2021 | Pest Control Fee (09/2021) | 4.00 | | 2,322.00 | 36218022 |
| 09/01/2021 | rent | 09/2021 | Rental Income (09/2021) | 999.00 | | 3,321.00 | 36218024 |
| 09/01/2021 | trash | 09/2021 | Trash Reimb (INC) (09/2021) | 12.00 | | 3,333.00 | 36218025 |
| 09/01/2021 | water | 09/2021 | Water Usage Reimb (INC) (09/2021) | 42.00 | | 3,375.00 | 36218027 |
| 09/20/2021 | late | 09/2021 | Late Fee | 60.00 | | 3,435.00 | 36411881 |
| 09/20/2021 | late | 09/2021 | sept late fee | 60.00 | | 3,495.00 | 36411886 |
| 10/01/2021 | pestctrl | 10/2021 | Pest Control Fee (10/2021) | 4.00 | | 3,499.00 | 36629558 |
| 10/01/2021 | rent | 10/2021 | Rental Income (10/2021) | 999.00 | | 4,498.00 | 36629560 |
| 10/01/2021 | trash | 10/2021 | Trash Reimb (INC) (10/2021) | 12.00 | | 4,510.00 | 36629562 |
| 10/01/2021 | water | 10/2021 | Water Usage Reimb (INC) (10/2021) | 42.00 | | 4,552.00 | 36629564 |
| 11/01/2021 | pestctrl | 11/2021 | Pest Control Fee (11/2021) | 4.00 | | 4,556.00 | 37088151 |
| 11/01/2021 | rent | 11/2021 | Rental Income (11/2021) | 999.00 | | 5,555.00 | 37088152 |
| 11/01/2021 | trash | 11/2021 | Trash Reimb (INC) (11/2021) | 12.00 | | 5,567.00 | 37088153 |
| 11/01/2021 | water | 11/2021 | Water Usage Reimb (INC) (11/2021) | 42.00 | | 5,609.00 | 37088154 |
| 12/01/2021 | pestctrl | 12/2021 | Pest Control Fee (12/2021) | 4.00 | | 5,613.00 | 37506981 |
| 12/01/2021 | rent | 12/2021 | Rental Income (12/2021) | 999.00 | | 6,612.00 | 37506982 |
| 12/01/2021 | trash | 12/2021 | Trash Reimb (INC) (12/2021) | 12.00 | | 6,624.00 | 37506983 |
| 12/01/2021 | water | 12/2021 | Water Usage Reimb (INC) (12/2021) | 42.00 | | 6,666.00 | 37506984 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,726.00 | 37664052 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,786.00 | 37664055 |
| 01/01/2022 | pestctrl | 01/2022 | Pest Control Fee (01/2022) | 4.00 | | 6,790.00 | 37912167 |
| 01/01/2022 | rent | 01/2022 | Rental Income (01/2022) | 999.00 | | 7,789.00 | 37912168 |
| 01/01/2022 | trash | 01/2022 | Trash Reimb (INC) (01/2022) | 12.00 | | 7,801.00 | 37912170 |
| 01/01/2022 | water | 01/2022 | Water Usage Reimb (INC) (01/2022) | 42.00 | | 7,843.00 | 37912172 |
| 02/01/2022 | pestctrl | 02/2022 | Pest Control Fee (02/2022) | 4.00 | | 7,847.00 | 38356032 |
| 02/01/2022 | rent | 02/2022 | Rental Income (02/2022) | 999.00 | | 8,846.00 | 38356033 |
| 02/01/2022 | trash | 02/2022 | Trash Reimb (INC) (02/2022) | 12.00 | | 8,858.00 | 38356034 |

**<u>Exhibit 14</u>**

**National**
**Credit Systems, Inc.**

*P.O. Box 672288 Marietta, GA 30006  (800) 459-1539  (404) 629-2728*
*Monday - Thursday 8:00 a.m. - 7:00 p.m., Friday 8:00 a.m. - 5:00 p.m.*

06/14/2022

Atty: Becca Wackym
54 ELLIS ST NE
Atlanta GA 30303

Our Client: Twelve Ninety Five West Apts
Client Account Number: 345-A07
NCS Account Number: 4795245

Re Your Client: Adaeze Wanda Holmes
Balance: $9,912.36

Enclosed you will find copies of the documentation on file with National Credit Systems, Inc.
pertaining to the above referenced account.

Please have your client remit payment on this account to National Credit Systems, Inc. at the
above address.

If you have any questions concerning this documentation or the above referenced account,
please contact our office immediately.

Sincerely,

Michelle Raburn
Collection Representative
404-629-2728 or
LTR 62

This communication from a debt collector is an attempt to collect a debt and any information
obtained will be used for this purpose.

## Resident Ledger

Date: 03/18/2022

| Code | t0594720 | Property | dongard | Lease From | 05/17/2021 |
|---|---|---|---|---|---|
| Name | Adaeze Holmes | Unit | 345-A07 | Lease To | 05/16/2022 |
| Address | 1295 Donnelly Ave., SW # 345-A07 | Status | Past | Move In | 05/17/2021 |
| | | Rent | 999.00 | Move Out | 03/14/2022 |
| City | Atlanta, GA 30310 | Phone (H) | | Phone (W) | |

| Date | Chg Code | Post Month | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|---|---|
| 04/09/2021 | app | 04/2021 | Application Fee (Adaeze Holmes) | 65.00 | | 65.00 | 34463406 |
| 04/09/2021 | admin | 04/2021 | Administration Fee (Adaeze Holmes) | 100.00 | | 165.00 | 34463407 |
| 04/09/2021 | | 04/2021 | chk# 94265686 Debit Card On-Line Payment ; Mobile Web - Online Leasing | | 165.00 | 0.00 | 16024897 |
| 04/24/2021 | | 04/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700276000003 | | 250.00 | (250.00) | 16049465 |
| 05/10/2021 | | 05/2021 | chk# :WIPS WIPS Receipt Reference Number: GA150700277600014 | | 510.00 | (760.00) | 16146500 |
| 05/17/2021 | rent | 05/2021 | Rent for 15 days | 483.39 | | (276.61) | 34826044 |
| 05/17/2021 | water | 05/2021 | Water for 15 days | 18.87 | | (257.74) | 34826045 |
| 05/17/2021 | secdep | 05/2021 | Security Deposit | 250.00 | | (7.74) | 34826046 |
| 06/01/2021 | pestctrl | 06/2021 | Pest Control Fee (06/2021) 14 days | 1.87 | | (5.87) | 35092906 |
| 06/01/2021 | rent | 06/2021 | Rental Income (06/2021) | 999.00 | | 993.13 | 35092908 |
| 06/01/2021 | water | 06/2021 | Water Usage Reimb (INC) (06/2021) | 42.00 | | 1,035.13 | 35092910 |
| 06/04/2021 | | 06/2021 | chk# :WIPS WIPS Receipt Reference Number: SA150700280100022 | | 1,035.13 | 0.00 | 16255515 |
| 07/01/2021 | pestctrl | 07/2021 | Pest Control Fee (07/2021) | 4.00 | | 4.00 | 35453299 |
| 07/01/2021 | rent | 07/2021 | Rental Income (07/2021) | 999.00 | | 1,003.00 | 35453301 |
| 07/01/2021 | water | 07/2021 | Water Usage Reimb (INC) (07/2021) | 42.00 | | 1,045.00 | 35453303 |
| 07/07/2021 | late | 07/2021 | late fee | 60.00 | | 1,105.00 | 35555557 |
| 07/26/2021 | dispo | 07/2021 | Dispo Warrant Fee | 168.00 | | 1,273.00 | 35718967 |
| 08/01/2021 | pestctrl | 08/2021 | Pest Control Fee (08/2021) | 4.00 | | 1,277.00 | 35813170 |
| 08/01/2021 | rent | 08/2021 | Rental Income (08/2021) | 999.00 | | 2,276.00 | 35813172 |
| 08/01/2021 | water | 08/2021 | Water Usage Reimb (INC) (08/2021) | 42.00 | | 2,318.00 | 35813174 |
| 09/01/2021 | pestctrl | 09/2021 | Pest Control Fee (09/2021) | 4.00 | | 2,322.00 | 36218022 |
| 09/01/2021 | rent | 09/2021 | Rental Income (09/2021) | 999.00 | | 3,321.00 | 36218024 |
| 09/01/2021 | trash | 09/2021 | Trash Reimb (INC) (09/2021) | 12.00 | | 3,333.00 | 36218025 |
| 09/01/2021 | water | 09/2021 | Water Usage Reimb (INC) (09/2021) | 42.00 | | 3,375.00 | 36218027 |
| 09/20/2021 | late | 09/2021 | Late Fee | 60.00 | | 3,435.00 | 36411881 |
| 09/20/2021 | late | 09/2021 | sept late fee | 60.00 | | 3,495.00 | 36411886 |
| 10/01/2021 | pestctrl | 10/2021 | Pest Control Fee (10/2021) | 4.00 | | 3,499.00 | 36629558 |
| 10/01/2021 | rent | 10/2021 | Rental Income (10/2021) | 999.00 | | 4,498.00 | 36629560 |
| 10/01/2021 | trash | 10/2021 | Trash Reimb (INC) (10/2021) | 12.00 | | 4,510.00 | 36629562 |
| 10/01/2021 | water | 10/2021 | Water Usage Reimb (INC) (10/2021) | 42.00 | | 4,552.00 | 36629564 |
| 11/01/2021 | pestctrl | 11/2021 | Pest Control Fee (11/2021) | 4.00 | | 4,556.00 | 37088151 |
| 11/01/2021 | rent | 11/2021 | Rental Income (11/2021) | 999.00 | | 5,555.00 | 37088152 |
| 11/01/2021 | trash | 11/2021 | Trash Reimb (INC) (11/2021) | 12.00 | | 5,567.00 | 37088153 |
| 11/01/2021 | water | 11/2021 | Water Usage Reimb (INC) (11/2021) | 42.00 | | 5,609.00 | 37088154 |
| 12/01/2021 | pestctrl | 12/2021 | Pest Control Fee (12/2021) | 4.00 | | 5,613.00 | 37506981 |
| 12/01/2021 | rent | 12/2021 | Rental Income (12/2021) | 999.00 | | 6,612.00 | 37506982 |
| 12/01/2021 | trash | 12/2021 | Trash Reimb (INC) (12/2021) | 12.00 | | 6,624.00 | 37506983 |
| 12/01/2021 | water | 12/2021 | Water Usage Reimb (INC) (12/2021) | 42.00 | | 6,666.00 | 37506984 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,726.00 | 37664052 |
| 12/07/2021 | late | 12/2021 | late fee | 60.00 | | 6,786.00 | 37664055 |
| 01/01/2022 | pestctrl | 01/2022 | Pest Control Fee (01/2022) | 4.00 | | 6,790.00 | 37912167 |
| 01/01/2022 | rent | 01/2022 | Rental Income (01/2022) | 999.00 | | 7,789.00 | 37912168 |
| 01/01/2022 | trash | 01/2022 | Trash Reimb (INC) (01/2022) | 12.00 | | 7,801.00 | 37912170 |
| 01/01/2022 | water | 01/2022 | Water Usage Reimb (INC) (01/2022) | 42.00 | | 7,843.00 | 37912172 |
| 02/01/2022 | pestctrl | 02/2022 | Pest Control Fee (02/2022) | 4.00 | | 7,847.00 | 38356032 |
| 02/01/2022 | rent | 02/2022 | Rental Income (02/2022) | 999.00 | | 8,846.00 | 38356033 |
| 02/01/2022 | trash | 02/2022 | Trash Reimb (INC) (02/2022) | 12.00 | | 8,858.00 | 38356034 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 02/11/2022 | late | 02/2022 | late fee for Jan and Feb 2022 | 120.00 | | 9,020.00 | 38525238 |
| 03/01/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) | 4.00 | | 9,024.00 | 38748274 |
| 03/01/2022 | rent | 03/2022 | Rental Income (03/2022) | 999.00 | | 10,023.00 | 38748275 |
| 03/01/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) | 12.00 | | 10,035.00 | 38748277 |
| 03/01/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) | 42.00 | | 10,077.00 | 38748278 |
| 03/14/2022 | secdep | 03/2022 | :Security Deposit credit | (250.00) | | 9,827.00 | 38948300 |
| 03/14/2022 | rent | 03/2022 | Rental Income (03/2022) Credit 17 days | (547.84) | | 9,279.16 | 38948301 |
| 03/14/2022 | water | 03/2022 | Water Usage Reimb (INC) (03/2022) Credit 17 days | (23.03) | | 9,256.13 | 38948302 |
| 03/14/2022 | pestctrl | 03/2022 | Pest Control Fee (03/2022) Credit 17 days | (2.19) | | 9,253.94 | 38948303 |
| 03/14/2022 | trash | 03/2022 | Trash Reimb (INC) (03/2022) Credit 17 days | (6.58) | | 9,247.36 | 38948304 |
| 03/14/2022 | notice | 03/2022 | Forfeit Security Deposit | 250.00 | | 9,497.36 | 38948305 |
| 03/14/2022 | cleaning | 03/2022 | Cleaning Charges/ pictures | 200.00 | | 9,697.36 | 38948306 |
| 03/14/2022 | legal | 03/2022 | Legal Exp Reimbursement put out furniture | 115.00 | | 9,812.36 | 38949807 |
| 03/14/2022 | keys | 03/2022 | Keys/Locks Fee | 100.00 | | 9,912.36 | 38949811 |

**GEORGIA** APARTMENT ASSOCIATION

**Apartment Rental Contract**

**FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY**

This Apartment Rental Contract is a lease between the Owner of the Apartment Community and the Residents who are leasing the apartment. The General Provisions of the lease which follow the signatures at the bottom of this page and any separate addenda signed by the parties are incorporated into and become part of this lease. Paragraph numbers on this page correspond to paragraph numbers in the General Provisions.

Lease Date: **May 12, 2021**
Management: **FLGA Investors LLC**
☒ Owner  ☐ Management Co. as agent for Owner
Apartment Community Name: **FLGA Investors LLC**
Apartment No: **345-A07**
Apartment Address: **1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310**
Residents/Tenants: **Adaeze Wanda Holmes**

Other Occupants of Apartment:

Par. 1. Lease Term: **12** Months and _____ Days
Beginning Date: **05/17/2021**  Ending Date: **05/16/2022**
Par. 3. Rent Due Monthly: $ **999.00**
Pro Rated Rent Due at Lease Signing: $ **483.39**
Dates of Prorated Rent: **05/17/2021** to **05/31/2021**
Month to Month Fee: $ **100.00**
Rent is Payable to: **1295 West**
Par. 4. Late Fees and Insufficient Funds Fees:
Date on Which Rent is Late: **6**
Amount of Late Fee: $ **60.00** or **10** % of Rent
Returned or Insufficient Check Fee: ☒ Service Fee of $ **30.00** or ☐ 5% of Amount of Check plus ☐ Bank Service Fee of $ _____ (amount charged by bank to management for charge back)
Par. 5. Re-Key Lock Charge: $ **50.00**
Non-refundable Lease Fee: $ **100.00**
Security Deposit: $ **250.00**
Bank Name: **Bank of America** (Where Security Deposit Kept)
Par. 6. How Much Notice Required To Non-Renew Lease Prior To End of Initial Lease Term: **90** Days
Renewal Period  ☒ Month to Month ( 1 month at a time) Renewal  ☐ Bi-Monthly (2 months at a time) Renewal
Notice Required to End Renewal Period:  ☒ 30 days to end Month to Month Renewal  ☐ 60 days to end Bi-Monthly Renewal
Par. 7. Early Termination Option: Amount of Notice Required for Electing Early Termination: **60** Days Written Notice
Par. 9. Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy
Name of Managing Agent or Owner: **First Communities Management Inc.**
Address of Agent Authorized to Manage Apartment Community: **1200 Lake Hearn Dr., Ste. 200, Atlanta, GA 30319**
Name of Owner or Registered Agent
Authorized to Receive Notices and Lawsuits: **Dana Miles**
Address of Owner or Registered Agent
Authorized to Receive Notices and Lawsuits: **202 Tribble Gap Rd, Ste. 200, Cummings, GA 30040**
Corporate Name of GREC Licensee: **First Communities Management Inc.**
GREC Corporate License No.: **H-15679**
Par. 17. Flood Disclosure:  ☒ Not Applicable  ☐ Apartment has been flooded previously
Par. 34. Special Stipulations: **Money orders are not accepted.**

Signatures of Parties:
Management:
**FLGA Investors LLC**
Name of Owner or Management Company
By: **Kathleen Conley**
Signature of Owner or Management Company
As: **Community Manager** (Title)

Residents:
Resident: **Adaeze Wanda Holmes**
*Adaeze Wanda Holmes* (Resident Signature)
Resident: _____ (Resident Signature)
Resident: _____ (Resident Signature)
Resident: _____ (Resident Signature)

Copyright © 2/2020 - Atlanta Apartment Association, Inc.. Form 1401. All Rights Reserved
☑ Blue Moon eSignature Services Document ID: 264857692
Page 1 of 9

**General Lease Provisions.**

The Owner is the landlord of the property, and the Resident is the tenant. The apartment community is managed for the Owner by its Managing Agent.

The lease is legally effective on the date it is signed, regardless of whether it was signed before or after the Resident moves into the apartment. There is no conditional three day right to rescind or void the contract once it is signed, and the Resident is legally bound to pay all rent, fees, and other charges that come due, regardless of whether the Resident continues to occupy the apartment. The Lease Date is the day on which the lease was signed and became effective as a contract.

The lease is a legally binding contract that creates the relationship of landlord and tenant for the full duration of the lease term at the rental rate stated above. Any addenda signed by the Owner and Resident are also part of this Apartment Rental Contract.

The Owner provides the apartment to the Resident in exchange for payment of monthly rent. The Resident's obligation to pay rent is independent of any other obligation of Landlord in the lease.

Listed above are important terms, conditions, and payment amounts. They are listed at the beginning of the lease to provide the parties with an easy reference. Each of the first page terms correspond to important lease provisions that follow below. Paragraph references on the first page correspond to the paragraph number of the General lease provisions that follow.

**Important Information About Ending The Lease and Management's Right to Increase the Rent During Any Extension Period.** This lease does not end automatically at the end of the initial lease term. The Resident must give a proper non-renewal notice to end the lease as provided in Par. 6, or the lease will be extended or renewed for an additional period of time stated in Par. 6. The lease continues to renew until the proper non-renewal notice is given. If the lease is renewed or extended, the Resident will be responsible for paying an additional Month-to-Month Fee and may also pay a higher rent than the rent specified in Par. 3, if Management gives notice of the higher rent amount.

The apartment shall only be occupied by Residents and the occupants listed on page 1, and any other occupants not listed above are unauthorized to live in the apartment.

1. **Term.**   The initial lease term of the lease is for the number of months and days specified in Par. 1. The initial term of the lease begins and ends at noon on the days specified in Par. 1 but will be automatically renewed on either a month to month or bi-monthly basis as stated in Par. 6. RESIDENT MAY NOT TERMINATE THIS LEASE PRIOR TO THE END OF THE INITIAL TERM EXCEPT IN STRICT COMPLIANCE WITH PARAGRAPH 7 or as otherwise provided by law.

2. **Possession.**   Rent shall abate until possession is granted to Resident. Resident may void or rescind this lease if possession is not granted within seven (7) days from the start of the lease term. Management is not liable for any delay in possession. Resident shall give Management written notice of his or her election to void or rescind the contract.

3. **Rent.**   Resident shall pay rent in advance on the 1st day of each month at the management office as provided in Par. 3. The first month's prorated rent shall be due at the time this lease is signed as provided in Par. 3. If this lease is extended or renewed under Paragraph 6 without signing a new lease, Resident shall owe a month-to-month fee in addition to the monthly rent due during any extension or renewal period.

   CASH PAYMENTS WILL NOT BE ACCEPTED, AND NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO ACCEPT A CASH PAYMENT UNDER ANY CIRCUMSTANCES. RESIDENT MAY NOT RELY ON ANY STATEMENT MADE TO HIM BY A MANAGEMENT REPRESENTATIVE THAT CASH WILL BE ACCEPTED.

   All rent shall be paid by personal check, cashier's check, or money order. Management shall have the right to establish or provide for payment by credit card, debit card, electronic funds transfer, online payment portal, or designated online payment system and software, but Resident does not have the right to make payments by these means unless specifically authorized by Management. Management shall have the right to designate the specific manner or form of payment that will be accepted, and no other form of payment shall be acceptable than those specified by Management. Checks and money orders shall be made payable to the order of the business entity specified in Par. 3. Third party checks (those which are made payable to someone other than Management) and partial payments are not allowed. All other damages, utilities, fees, or charges owed by Resident and due under this lease are considered to be additional rent.

   The amount of rent specified in Par. 3 is the amount due each month unless Management has given the Resident a rental concession or discount from the rent, either in the Special Stipulations to this lease or in a separate addendum. If there are rental concessions granted, the Resident will or may lose them if in default or breach of this lease and will be obligated to pay the full amount of rent specified in Par. 3. If in default or breach of the lease, the Resident may have to repay the rental concessions under certain specified conditions.

4. **Late Payments and Checks with Insufficient Funds.**   Time is of the essence. In Par. 4, late fees shall be due in the amount specified. After close of business on the last day of the grace period specified.

   Resident shall pay Management an insufficient funds check service for each returned or NSF check, plus an additional fee equal to the fee charged to Management by the bank. If no box is checked in Par. 4 that specifies the amount of the service fee, then the insufficient funds service fee is five per cent (5%) of the face amount of the check, plus the fee charged by the bank. At Management's option, all late rent, NSF checks, and future rents due after an NSF check must be paid by money order or certified funds from a bank. The parties agree that bank service, NSF, and late fees are reasonable compensation for delay, administrative costs, and time in collecting past due rent, are not penalties, and that such costs are difficult to estimate accurately.

5. **Lease Fees & Security Deposit.**   Resident must pay the amounts specified in Par. 5 for re-keying locks, any non-refundable lease fees, or security deposits. A re-keying lock fee is due for each lock that must be re-keyed if all keys are not returned. The non-refundable lease fee is not a security deposit, is not refundable, and does not reduce Resident's liability for unpaid rent, damages exceeding normal wear and tear, or other charges that come due under the lease. Any security deposit will be refunded as provided by law but may be applied to any charges due under this lease. The deposit will either be protected by a surety bond on file with the Clerk of Superior Court or deposited in the bank specified in Par. 5. Interest earned on such deposits belongs to Management.

   Management shall have the right to apply any security deposit held to money or a debt owed by the Resident to Management. Management is not restricted to or limited in how the security deposit is applied if money is owed, and the deposit may applied to rent, damages exceeding normal wear and tear, unpaid utilities, or any other fee, charge, or debt owed by Resident. Management may apply a pet or animal deposit to unpaid rent or damages exceeding normal wear and tear that were not caused by a pet or animal.

   Resident shall have no right to use or designate a security deposit as payment of rent or other fees and charges which are due, as provided by O.C.G.A. 44-7-33(b). Resident agrees to cooperate with Management in scheduling and performing Move-In and Move-Out Inspections and noting any existing damages or objecting to Management's list of damages exceeding normal wear and tear.

Copyright © 2020 - Atlanta Apartment Association, Inc. - Form 1100
All Rights Reserved

Blue Moon eSignature Services Document ID: 264857692

**6. Renewal Term and Notice of Non-Renewal to End the Lease.** Either party may non-renew/terminate this lease at the end of the initial term by giving a written non-renewal notice prior to the end of the initial lease term. If such non-renewal notice is not given, then this lease will be extended as provided in Par. 6 on a either a Month-to-Month basis (one month at a time) until either party gives a proper 30 day notice; or on a Bi-Monthly basis (two months at a time) until either party gives a proper 60 day notice in writing that terminates the lease. Unless otherwise allowed by Landlord, the lease shall terminate at the end of a calendar month.

Management shall have the right to increase the rent due in any extension or renewal term by giving written notice at least 15 days prior to the date on which a non-renewal notice must be given in order to end the initial term or any subsequent renewal or extension period.

If not specified in Par. 6, then a 30 day written notice is required to end the initial term or any renewal or extension period as of the end of a calendar month.

Management employees are not authorized to accept a verbal notice of non-renewal or termination from the Resident, and the Resident has no right to rely on a Management employee's statement that a verbal notice is acceptable. Resident's non-renewal or termination notice must be in writing, dated, signed, and specify the move-out date. Resident should confirm Management's receipt of the notice with the authorized signature of a Management representative using Management's notice of intent to vacate form. Resident should keep a signed receipt of the non-renewal notice for his personal records in case of any dispute as to whether such notice was given and received. If Resident does not obtain a signed receipt of such notice from Management, or if Management does not have a signed original non-renewal notice from Resident, then it will be presumed that Resident failed to give a proper written notice.

**7. Resident's Early Termination Option.** Resident can end all liability for rent under this lease (but not liability for damages exceeding normal wear and tear, or liability for unpaid utilities) and vacate before the end of the initial lease term stated in Par. 7 only by doing all of the following things required in this paragraph. If all of the following conditions are not performed, then the lease remains in effect for the full term, and Resident shall be liable for breach of the rental agreement as provided in Paragraph 26. If Resident skips, abandons, or is evicted from the apartment without complying with this paragraph, then Resident is in default and responsible for rent and liquidated damages (if applicable) as provided under Paragraph 26, any other fees or charges due, and all damages and cleaning fees in excess of normal wear and tear. Management employees are not authorized to make a verbal statement that waives the notice and termination fees, and the Resident has no right to rely on a Management employee's statement that Resident will not have to pay such fees or comply with this provision in order to terminate the lease early. Any waiver of the notice or fees required under this provision must be in writing, dated, and signed by all parties. Resident's election to use or not use this provision is purely voluntary.

To end the lease early, Resident MUST do EACH of the following: 1) pay all monies currently due; 2) give written notice in the amount specified in Par. 7 of intent to vacate prior to the first day of the month and to take effect as of the last day of a calendar month; 3) pay all rent due through the notice period preceding the early termination date; 4) pay an additional early termination or lease cancellation fee equal to one month's rent as liquidated damages: vacate the leased premises on or before the specified termination date, remove all occupants and possessions, and physically hand the keys to a Management representative; and 5) abandon, waive, and release a claim to the return of any security deposit, which shall become Management's.

If the length of the Early Termination notice is not specified in Par. 7 on the first page, then a 30 day written notice is required. Resident can move-out earlier than the termination date following the notice period in Par. 7, but Resident must turn in all keys, remove all occupants and personal property, pay all rent due through the required non-renewal notice period, pay the one-month termination or lease cancellation fee, and comply with all other requirements. Keys must be physically handed to a representative of Management and may not be left in the apartment or a night rent drop box.

If Resident elects to exercise his or her right to Early Termination, Resident is not entitled to a refund of any rent, notice or termination fees, or security deposit, even if the apartment is re-let to a new Resident prior to the end of the notice period. Resident's election to exercise this early termination option either by giving proper notice and paying all sums due or by giving proper notice and signing an agreement to terminate early and pay the sums due at a later date are binding and shall not be reduced or set-off by any money or rent Management receives from re-letting the apartment to a new or subsequent Resident.

**Military Transfers end Lease Terminations.** A Resident (including a Resident's spouse) who is a service member on active duty or is called to active duty in the regular or reserve component of the U.S. Armed Forces, U.S. Coast Guard, or National Guard, shall have the right to end this Apartment Rental Contract early by giving a 30 day written notice, paying all rent due through the notice date, and providing a copy of the official military orders or written verification signed by the service member's commanding officer or by providing base housing orders as provided in O.C.G.A. Section 44-7-22, if the service member is:

1. Ordered to federal duty for a period of 90 days or longer;
2. Receives a permanent change of station orders to move at least 35 miles away from the rental housing;
3. Is released from active duty after leasing housing and must move 35 miles or more away from the service member's home of record prior to entering active duty;
4. After entering into this rental agreement, the service member becomes eligible to live in government quarters or the failure to move to government quarters will result in a forfeiture of the service member's basic allowance for housing;
5. Receives temporary duty orders or temporary change of station orders or state active duty orders for a period exceeding 60 days that is at least 35 miles away from the location of the rental housing; or
6. Receives orders after signing the lease but before taking possession of the rental housing.

**Domestic Violence and Lease Terminations.** A resident who is a victim of family violence shall have the right to end this Apartment Rental Contract by giving a 30-day written notice, paying all rent due through the notice date to protect resident or his or her minor child.

To terminate this lease early due to domestic violence, resident must return possession to Management by returning the keys and produce the following required documents to Management: 1) if Resident obtains a Temporary Protective Order (TPO) *ex parte*, then resident must also produce a copy of a police report to accompany the order; 2) if the TPO is not *ex parte* or the order is a permanent protective order, then resident must produce the order granting protection from family violence;

If resident obtains a family violence protective order for either themselves and/or their child, who may not be a tenant or a named occupant on the lease, resident may provide a 30-day written notice and terminate the tenancy, provided the required documents are given to Management and their keys are returned.

If resident vacates the premises immediately after giving proper notice to terminate the lease due to domestic violence and providing the required documents to Management, the resident remains liable for all rent, utilities, and other charges due for an additional 30 days from the date resident gives notice, produces the required documents, vacates, and returns the keys to Management; however, resident shall not be required to pay any termination fee or liquidated damage fee.

If resident executes this lease, but has not yet taken possession of the premises, then resident may terminate the lease prior to taking possession, by providing at least 14 days written notice and providing a copy of the family violence order and a copy of the police report, if the order was obtained *ex parte*.

Copyright © 2/2020  Atlanta Apartment Association, Inc. - Form #1031.
All Rights Reserved

Any Co-tenant and guarantor, who is the alleged aggressor or accused of family violence, shall ▬▬ liable to the terms of the lease even when the victim of family violence properly terminates the lease and vacates.

8. **No Assignment/Subletting.** Resident may not sublet or assign the lease.

9. **Disclosure Notice of Owner or Managing Agent and Equal Housing Opportunity Policy.**

The name and address of company or party authorized to manage the apartment community for the owner is specified in Par. 9. The name and address of the owner or owner's registered agent who is authorized to receive notices and lawsuits against the Landlord is specified in Par. 9. Lawsuits filed against the owner or Management shall be filed and served as provided by law or as contractually agreed to by Resident.

The Corporate Broker's Name of the Licensed Managing Agent and Broker's license number as required by the rules of the Georgia Real Estate Commission (Ga.R. & Reg. 520-1-.10) is specified in Par. 9.

**Equal Housing Opportunity Policy.** The apartment owner and Management provide equal housing opportunity for qualified applicants and do not discriminate on the basis of race, color, religion, sex, national origin, familial status, disability, or any other legally recognized status in the State of Georgia. It is the owner's and Management's policy to provide reasonable accommodations in the apartment community's operational policies and procedures and to permit the Resident to make reasonable modifications that are necessary for the Resident and related to the disability for persons with a demonstrated disability. The Resident must request and obtain permission from the owner or management for any accommodation or modification prior to implementing the same. In general, the cost or expense of physical modifications to the apartment or apartment community is the responsibility of the Resident, unless the applicable law requires the owner or Management to absorb or be responsible for the cost of such modifications. A Resident or occupant with a demonstrated disability is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal to assist with the person's disability. A disabled Resident or occupant is allowed to have an assistance animal which has not been trained as a service animal unless the animal has a history of dangerous, vicious, or unsafe behavior. If the nature of the disability is not obvious or apparent or the manner in which the animal will provide assistance is not clear, Management has the right to request additional information regarding how the animal will assist with the resident's disability. The Resident does not have an absolute right to the specific accommodation or modification requested, and Management has the right to offer an substitute or alternate accommodation or modification with conditions that will provide adequate assurance for the safety, health, and well being of other Residents, occupants, social guests, invitees, and Management employees. No Additional Rent, Non-refundable Fee, or Animal Security Deposit is required from Residents or occupants who are disabled and have an approved service or assistance animal; however, the Resident is responsible for any and all damages and cleaning fees exceeding normal wear and tear caused by such animal.

10. **Utilities Are Resident's Responsibility.** Resident is responsible for payment of all natural gas, electricity, water and sewer, telephone, cable, satellite or other utilities and services to the apartment unless specified otherwise in Paragraph 34 or in a utility addendum which is made a part of this lease. Resident gives Management the right to select any utility provider and change the same without notice. Resident shall promptly establish all utility and service accounts to be paid by Resident in his name at the start of the lease and shall not allow water and sewer, electricity, or natural gas to be shut off or billed to Management. Resident shall promptly pay any billing for utilities or other services charged to Management upon notification. Resident's failure to pay all utility services or to establish an account with a utility provider is a material breach of the lease for which Management has the right to terminate the right of occupancy or lease.

**\*\*Important Disclosure Regarding Management's Right to Select the Natural Gas Marketer (Provider).** Resident (the Tenant) authorizes Management (the Landlord) to act as Resident's agent for the limited purpose of selecting the Resident's natural gas marketer, to authorize the natural gas marketer to obtain credit information on the Resident, if required by the marketer, and to enroll the Resident on the marketer's standard variable price plan for which the Resident is eligible, unless the Resident chooses another price plan for which he or she is eligible.
Resident acknowledges that Management may have a business relationship with the natural gas marketer that may provide for a financial or other benefit to Management in exchange for the Resident's enrollment with the Marketer.

11. **Fire and Other Casualty.** This lease will end if the apartment is uninhabitable due to fire as long as the fire was not caused by or the responsibility of Resident or Resident's occupants, family, or social guests. If Resident or his occupants, family, or social guests were responsible for the fire and the premises are uninhabitable, then Resident must vacate the apartment and will still remain liable for the rent and damages.

Management shall have the right to terminate the occupancy or lease of Resident if Resident or Resident's occupants, family, social guests, or invitees caused or were responsible for causing a fire to the apartment or any portion of the apartment community. Resident has no right to transfer to another apartment in the community or to remain in the apartment community if Resident or Resident's occupants, family, social guests, or invitees were responsible for or caused the fire. Resident may be eligible for transfer to another apartment in the apartment community if the Resident is qualified, there is a suitable apartment available, and Resident or Resident's occupants, family, social guests, and invitees did not cause the fire.

Resident is responsible for the cost of repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged by a fire which Resident or Resident's occupants, family, social guests, or invitees caused. Resident is liable to and shall indemnify, defend and hold harmless Management and the owner for any damages or repairs caused by a fire which was caused by Resident or Resident's occupants, family, social guests, and invitees.

This lease shall end if the premises are destroyed or otherwise rendered uninhabitable due to an Act of God or any other catastrophic event or casualty that was not the responsibility of Resident or Resident's occupants, family, social guests, or invitees.

The Resident shall not continue to occupy an apartment which is rendered uninhabitable due to fire, Act of God, or other catastrophic casualty and must remove all personal property and return possession to Management.

12. **Hold Over/Trespass.** Resident must promptly vacate the apartment and deliver possession and all keys to Management upon any termination or non-renewal of this lease. Keys must be physically handed to a representative of Management and may not be left in the apartment or in the overnight rent drop box at the Management office. The apartment must be delivered to Management in clean condition and good repair.

If Resident does not vacate the premises and return possession to Management after termination, non-renewal, or expiration of the lease, then Resident shall pay to Management rent at two (2) times the current rental rate for each day held over past the termination date.

After termination, non-renewal, or expiration of the lease, Resident is a tenant at sufferance.

After vacating the premises based on non-renewal, termination, eviction, or upon receiving a criminal trespass notice under O.C.G.A. § 16-7-21 from Management, Resident shall not return to any portion of the apartment community. Resident shall not permit entry of any person as his social guest or invitee if notified that his guest's or visitor's presence in the apartment community is subject to criminal trespass under O.C.G.A. § 16-7-21. Management may terminate the lease or right of possession of any Resident who allows an unauthorized person access to his apartment or the community in violation of this provision or paragraph 14. Management's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's right of occupancy of the apartment.

☑ Blue Moon eSignature Services Document ID: 264857692

**13. Right of Access.** Management may enter the apartment without notice during reasonable hours. Inspect, maintain, and repair the premises. Management may enter the apartment at any time without notice to prevent injury or damage to persons or property. Resident authorizes Management to show the apartment to prospective Residents once Resident has given or received a notice of non-renewal or termination.

**14. Resident's Use of the Apartment and Conduct.** Resident shall use the apartment and apartment community only for residential purposes and not for business or commercial purposes.

Resident, all occupants, and Resident's family, social guests, and invitees must comply with all laws. No portion of the apartment or apartment community shall be used by Resident or Resident's occupants, family, social guests, or invitees for any disorderly, disruptive, abusive, or unlawful purpose. Nor shall they be used so as to disrupt the quiet enjoyment of any other Resident or their occupants, family, and social guests. Resident and Resident's occupants, family, social guests, and invitees shall not commit any crime in the apartment community.

Resident is liable for the conduct of and for any damages exceeding normal wear and tear caused by his family, occupants, social guests, and invitees. Resident shall not allow his occupants, family, social guests, and invitees to commit a crime or violation of the lease and addenda and must take affirmative, corrective action and notify Management of any such violation or misconduct.

The sale, manufacture, distribution, or possession of any illegal drugs in the apartment community is prohibited.

Resident must maintain the apartment in a clean and sanitary condition and must not cause or allow any damages exceeding normal wear and tear or infestation of vermin, insects, rodents, or other pests. Noxious or offensive smells are not permitted, and Resident shall be liable for damages exceeding normal wear and tear for the repair or replacement of any carpet, flooring, ceiling, or walls that are permeated with noxious or offensive odors, water, or mold. Resident shall not leave or dispose of trash, garbage, or other materials in hallways, breezeways, patios, balconies, or common areas of any portion of the apartment building or community. Resident shall promptly take trash, garbage, or refuse to the proper dumpster, compactor, or trash collection area and properly dispose of organic and inorganic material as provided by law and as provided by the community rules.

Resident and Resident's occupants, family, social guests, and invitees shall abide by and follow all community rules and regulations. Management shall have the right to prohibit smoking of cigarettes, pipes, cigars, or tobacco inside the apartment or any portion of the apartment community property under its community rules and regulations. Smoking of tobacco products in the apartment is prohibited unless expressly authorized and allowed by the community rules and regulations.

Resident shall operate all motor vehicles in a safe and lawful manner in the apartment community. Resident shall not violate any parking rules and regulations and shall not exceed 15 mph in any parking lot, street, exit, or entrance of the apartment community. Resident must park only in authorized spaces and places and shall not park at any place that obstructs traffic, is unsafe, or is prohibited. Resident shall not operate, park, or store, any illegal, unauthorized, or uninsured motor vehicle or equipment on any portion of the apartment community. Resident shall not abandon a motor vehicle in the apartment community. Resident shall not store, keep, or dispose of any substance or material on any portion of the apartment community that is hazardous to the health, safety, or welfare of any person. Resident shall not dispose of any batteries, chemicals, environmentally hazardous, or unsafe material in any trash receptacle, dumpster, compactor, or any portion of the apartment community.

Resident, and Resident's occupants, family, social guests and invitees, shall act and communicate with the apartment owner, Management, Management employees, Residents, business social guests of Management, and all other persons in a lawful, courteous, and reasonable manner. Any form of verbally or physically abusive, intimidating, or aggressive behavior directed at the apartment owner, Management, Management employees, or any other person is prohibited. Resident, his social guests and occupants shall not interfere with the daily business operations of the apartment community or job duties of Management or its employees. When notified by Management, Resident shall be prohibited from entering or contacting any Management or corporate office or employee and must conduct all further communications in writing.

Resident shall not distribute petitions, flyers, or solicitation notices to other Residents in any manner other than through lawful use of the United States mail. Resident is prohibited from committing business libel or slander or making untruthful, unfair, or misleading statements to others about the apartment owner, Management, Management employees, or the apartment community. Resident shall not commit waste to the apartment or apartment community and shall not commit any act nor fail to take any action that would endanger the life, health, safety, welfare or property of any other person in the apartment community. Resident must allow Management and vendors access to the apartment for the purpose of making repairs, performing service or maintenance, inspecting, and taking all other action related to the ongoing business operation of the apartment community.

Resident shall not cause or allow an infestation of bed bugs in the apartment. Resident shall not bring abandoned or discarded furniture, clothing, bedding, or other personal property into the apartment as it could introduce an infestation of pests and bed bugs.

Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the apartment or apartment community. Resident and Resident's occupants, family, social guests, and invitees shall not touch, damage, or trigger any automatic sprinkler head.

Resident and occupants shall not use the internet or cyberspace in any manner to disparage, defame, or injure the business or business reputation of the apartment owner or Management. Resident and occupants shall not use, misuse, or appropriate the use of the owner's or Management's corporate names, logos, slogans, images, photos, internet domain names, service marks, trademarks, copyrights, or trade names. Resident and occupants shall not publish, misuse, or use any photos or video of Management employees or the apartment community or signage. Owner and Management shall be entitled to injunctive relief and damages for compensation to prevent any unauthorized publication, use or misuse, whether in part or in whole, of the corporate name, trade name, internet domain name, likeness or identity of owner or Management.

Resident and occupants shall not make, post, or publish misleading, deceptive, untruthful, groundless, false, or unfair statements or commentary about the apartment community, the Management employees, the owner, or Management on or to any internet website or domain, internet blog, internet social media, newspaper, magazine, television, radio, or other news or social media. Resident is prohibited from making, publishing, stating, or posting any statement or communication that, while partially true, lacks or fails to disclose other material facts in such a way such as to mislead the listener, viewer, or reader, Management shall be entitled to terminate the right of occupancy or lease of any Resident or occupant who violates any portion of this Use and Conduct provision.

Resident and Resident's occupants, family, social guests, and invitees shall not store, use, or discharge any fireworks or consumer fireworks in the apartment or apartment community. Fireworks are defined as any combustible or explosive composition or any substance or combination of substances or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration or detonation, including but not limited to, blank cartridges, firecrackers, torpedoes, skyrockets, bombs, sparklers, roman candles and other combustibles and explosives of like construction.

Violation of this Resident's Use and Conduct provision is a material breach of this lease and constitutes a ground for terminating Resident's lease or right of possession, and Resident will be liable for any rent due through the remainder of the lease or liquidated damages (if applicable) as provided in Paragraph 26.

**15. Property Loss, Insurance, and Crime.**  Management and the apartment owner shall not be liable for damage, theft, vandalism, or other loss of any kind to Resident's or his occupant's personal property, unless such is due to Management's negligence or intentional misconduct. Management and the apartment owner shall not be liable to Resident for crimes, injuries, loss, or damage due to criminal acts of other parties,

Resident must purchase a renter's insurance policy that provides liability insurance for negligent ==== accidental acts and omissions for which the Resident may be liable in causing injury or damage to the owner, Management, or others.

Resident should purchase property insurance for loss of or damage to Resident's own personal property. Manegament is not liable for any loss or damages to Resident's personal property due to theft, vandalism, bursting or leaking pipes, fire, windstorm, hall, flooding, rain, lightening, tornadoes, hurricanes, water leakage, snow, ice, running water, or overflow of water or sewage. Management shall not be liable for any injury or damage caused by such occurrences, and Resident agrees to look solely to his insurance carrier for reimbursement of such events.

Management does not market, advertise, represent, offer, or provide security or law enforcement services which will prevent crime or protect Resident or Resident's personal property. Management and the owner do not represent or guarantee that the Resident is safe from crime in the neighborhood or from crime in the apartment or apartment community. Resident agrees to look solely to public law enforcement, emergency services, or fire services for police, emergency, fire , security, or protection services.

Resident acknowledges that he or she has an obligation to exercise due care for his or her own safety and welfare at all times and that Management is not liable to Resident for the criminal acts of other persons. Resident agrees that he or she will not and cannot rely on the existence or absence of security equipment or personnel as a representation of safety from crime and understands that he or she must be vigilant and exercise caution for their personal safety at all times. Resident waives and releases the apartment owner and Management for any liability, injury, loss, or damages related to crimes committed by other persons against Resident or related to allegations that the owner or Management were negligent or failed to provide security or protection to prevent crime.

16. **Lead Based Paint Notification (LBPN).**   If this apartment community was built prior to 1978, the LBPN addendum is incorporated by reference.

17. **Flood Disclosure.**   Management states that the apartment has not been damaged in any manner by flooding as defined in O.C.G.A. § 44-7-20 in 3 of the last 5 years unless noted otherwise in Par. 17.

18. **Pets.**   No animals or pets of any kind are permitted without a Pet, Service, or Assistive Animal Addendum. Management may enter the apartment at any time and remove any pet or animal which Management believes to be neglected, distressed, or endangered. Resident shall be liable for all costs of retrieving, caring for, and boarding of any pet or animal that is abandoned by Resident or removed by Management. Resident releases Management from liability of any kind when Management acts to retrieve or protect Resident's pets and animals which appear to be neglected, distressed, or endangered. Please see Par. 9 with respect to Management's policy on service, assistive and convenience animals for persons with disabilities.

19. **Indemnification.**   Resident agrees to indemnify, defend, and hold harmless the apartment owner and Management for any loss the apartment owner or Management incur due to Resident's breach of this agreement or due to the acts and omissions of Resident and Resident's occupants, family, social guests, or invitees.

20. **Failure to Act.**   Management has the right to insist on strict compliance with the terms of this lease at any time, even if it has previously delayed acting on Resident's breach of this lease. Management shall have sole discretion in granting and withholding permission or consent for Resident to perform his or her obligations under this lease in any manner that varies from the contractual requirements. Management at its option may condition, modify, or revoke any such permission or consent upon reasonable written notice and insist upon strict compliance with the lease terms.

21. **Fees and Expenses of Litigation.**   In a civil action or dispossessory proceeding for breach of this lease, the prevailing party shall be entitled to attorney's fees in the amount of fifteen percent (15%) of the principal and interest owing and all expenses of litigation, including, but not limited to, court costs and administrative filing fees for evictions. All sums due from Resident to Management which are in default shall bear interest at the rate of twelve percent (12%) per annum.

22. **Notices.**   All notices must be written, dated, and signed. The notice must be given personally or by certified mail, return receipt requested. Notice shall be sent to Resident at the apartment and to Management at the apartment community business office. See Par. 9 with regard to the proper address for service of lawsuits.

Resident shall send notices for repairs, service, maintenance, non-renewal, military transfers, and lease termination to the Management/leasing office located at the apartment community.

Resident shall provide Management with Resident's updated contact and address information and forwarding address at anytime requested during the lease and at the time of vacating the apartment. Resident shall provide Management with: the address of his or her new residence (where they are living); the mailing address for returning any security deposit or forwarding any notices or move-out inspection and estimate of damages and cleaning fees that exceed normal wear and tear; the name, address, and phone number of their employer; the name, address, and phone number of a person or family member who can provide updated contact information and the Resident's cell phone and e-mails. If Resident fails to provide his or her contact information and address at the time of vacating; conceals or attempts to conceal his or her address and location; moves from the State of Georgia; or cannot be located by Management, then the statute of limitation for collecting any account or money owed by Resident shall be tolled until such time as Resident provides proper notification of his address and other contact information requested.

RESIDENT'S NOTICE OF NON-RENEWAL UNDER PARAGRAPH 6 OR NOTICE OF INTENT TO VACATE AND TERMINATE THE LEASE EARLY UNDER PARAGRAPH 7 MUST BE IN WRITING AND MUST BE GIVEN SO THAT THE ENDING DATE IS ON THE LAST DAY OF A CALENDAR MONTH. VERBAL NOTICES ARE NOT EFFECTIVE AND MAY NOT BE RELIED UPON BY RESIDENT UNDER ANY CIRCUMSTANCES. MILITARY SERVICE MEMBERS MAY GIVE A NOTICE TO TERMINATE AS PROVIDED IN PAR. 7 AT ANY TIME OF THE MONTH. NO MANAGEMENT EMPLOYEE IS AUTHORIZED TO VERBALLY OR UNILATERALLY WAIVE ANY NOTICE REQUIREMENT, AND RESIDENT MAY NOT RELY ON A VERBAL STATEMENT OF MANAGEMENT THAT PROPER WRITTEN NOTICE IS NOT NECESSARY. MANAGEMENT MAY, BUT IS NOT REQUIRED TO, WAIVE THE REQUIREMENT THAT NOTICES BE EFFECTIVE ONLY AS OF THE END OF A CALENDAR MONTH.

23. **Repairs.**   Resident accepts the apartment "as is" and in habitable condition suited for residential purposes. Resident accepts full control and responsibility of the apartment leased premises and agrees to maintain the apartment in a clean, safe, and sanitary condition. Management will make repairs to the apartment with reasonable promptness upon receipt of written notice from Resident. Management's repair obligations under Georgia landlord/tenant law only pertain to the apartment, and not to the common areas of the apartment community. Resident agrees and acknowledges that he or she only leased the apartment and that Resident's and Resident's occupants, family, and social guests access to amenities and common areas of the apartment community are only a permissive license to use such amenities and common areas.

Resident shall pay as additional rent for any cleaning or damages exceeding normal wear and tear to the premises caused by Resident or caused by Resident's occupants, family, social guests, invitees or licensees of the Resident and occupants that exceed normal wear and tear. Resident and Resident's occupants, family, social guests, and invitees shall not damage any portion of the leased premises or apartment community, and Resident is responsible for the cost to repair, replacement cost, and all expenses required to repair or replace the equipment, building, or property damaged. Resident is liable to and shall indemnify, defend, and hold harmless Management and the apartment owner for any damages or repairs

Copyright © 2/2020 - Atlanta Apartment Association, Inc. - Form 1/2021
All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692

caused by Resident or Resident's occu▊▊▊▊▊, family, social guests, and invitees. Resident sh━━omptly pay as additional rent with the next month's rent the costs of any repairs, replacement, or damages caused by Resident or Resident's occupants, family, social guests, or invitees upon issuance of an invoice from Management.

Resident may not alter the interior or exterior structure of the apartment or apartment community in any manner without the express written consent of Management. Please see Par. 9 with regard to Management's policy on disability modification requests.

Resident must promptly report the need for any repairs to Management in writing before Management is obligated to make any repairs. Resident must promptly report any dampness, water leaks, or mold in the apartment to Management. Resident shall properly use the heating, ventilation, and air conditioning (HVAC) system to maintain temperate conditions so as to prevent freezing of water pipes in cold weather end to prevent mold growth or excessive humidity during warm weather. Resident is required to use air conditioning during June, July, August, and September and shall not turn off the air conditioning and open windows for purposes of cooling the apartment. Resident must inspect any fire alarm and fire extinguisher at least once per month to determine whether they are in proper working condition and report to Management the need for any need for repair or replacement. Resident shall promptly notify Management of any damage to or malfunction of any door or window locks or intrusion alarm.

Resident must promptly report any evidence, knowledge, or suspected presence of bed bugs in the apartment and cooperate with Management to allow inspection and treatment of the same. Adjoining or neighboring Residents to an apartment infested with bed bugs must cooperate with Management in inspection and treatment to prevent a possible cross infestation or migration.

**24. Abandonment.**  Resident shall not abandon the apartment, Resident's personal property, or motor vehicles. Title to any abandoned property (including, but not limited to, pets or animals) shall vest in Management. Management may store, sell, or dispose of abandoned property without notice.

If Resident abandons the apartment or his or her personal property contained therein, Management shall have the right to re-key, re-enter, and re-let the apartment without filing a dispossessory warrant or obtaining a writ of possession. Management is not required to file a dispossessory proceeding in order to recover an abandoned apartment or to dispose of any abandoned property found in an abandoned apartment. Management shall have sole discretion in determining whether the Resident has abandoned the apartment. Circumstances indicative of an abandonment include, but are not limited to, Resident's unexplained absence or failure to occupy the apartment; the overall appearance and condition of the apartment; Resident's statement that he or she is moving or leaving the apartment community; failure to pay rent or utilities; discontinuance of utility service; failure to respond to Management's notices, communications, or eviction proceedings; or removal of a substantial amount of Resident's personal property.

**25. Attornment, Sale, Foreclosure, Renovation, and Former Employees.**  Resident's rights, or, if applicable, his employment with Management, are subordinate to any deed to secure debt, sale, or contract for sale of the property.

In the event the apartment community or any portion or building of the community is foreclosed, sold, placed under contract to be sold, or scheduled for substantial renovation, rehabilitation, or demolition, either Management or the new owner shall have the right to terminate the lease on 30 days' written notice. In the event that Management elects to terminate the occupancy of lease under this provision, then during the 30 day period immediately preceding either the termination data of Resident's occupancy or the termination of the lease, the Resident's rent shall be reduced by fifty percent (50%); however, if the Resident shall hold over beyond the termination date, then Resident shall owe the full rent due for said 30 day notice period plus hold over rent as provided in paragraph 12.

If Resident is an employee of Management and his or her employment is terminated, then this employee lease shall also terminate, any employee rental discounts shall end, and the employee agrees to vacate the premises if requested. If permitted to stay, the former employee shall pay the current market rate rent as specified by Management at the time employment is terminated.

**26. Default by Resident.**  Resident's violation of this lease or any addenda constitutes a default. Violations constituting a default include, but are not limited to: unauthorized occupants; non-payment of rent; improper non-renewal or termination of the lease as required by paragraphs 6 or 7; abandonment of the apartment as prohibited in paragraph 24; providing false or misleading information in the rental application; failure to pay or continue utility service as required in paragraph 10; allowing unauthorized persons access in violation of paragraph 12; any unauthorized occupants or improper use or conduct in violation of paragraph 14; or causing damages or cleaning in excess of normal wear and tear.

Upon default, Management may terminate Resident's lease or right of possession by giving written notice and re-entering the apartment as provided by law. Notice to cure a default is not required but, if given, shall not waive Management's right to terminate or insist on strict compliance. Resident shall surrender possession of the premises to Management promptly on the effective date of any termination notice, remove all possessions and persons occupying the apartment, return all keys to Management by personally handing them to a Management representative, and restore Management to quiet possession of the leased premises.

Notwithstanding Management's termination due to Resident's default, Resident shall remain liable for all rent, hold-over rent under paragraph 12, liquidated damages (if applicable) as provided below, unpaid utilities, rental concession, lost discounts or pay-backs, damages exceeding normal wear and tear, costs of eviction, attorney's fees and expenses of re-letting incurred by Management as a result of Resident's default.

Management, at its option, may obtain possession of the apartment through a dispossessory proceeding, either with or without first terminating the lease or right of possession. Management, at its option, may also recover possession of an abandoned apartment without filing a dispossessory proceeding by changing the locks and disposing of any abandoned property.

Notwithstanding termination of the lease, commencement of a dispossessory proceeding, issuance of a writ of possession, actual physical eviction, or recovery of the abandoned premises, Resident shall remain liable for all rent accrued through the date on which possession is obtained by Management: rent through the remainder of the lease term or liquidated damages (if applicable) as provided in this paragraph; damages exceeding normal wear and tear; unpaid utilities; rental concession, lost discounts or pay-backs; costs fees, and expenses. Neither issuance of a writ of possession, actual physical eviction, or retaking possession of the apartment shall relieve Resident of liability for rent through the end of the lease term or liquidated damages (if applicable) under this paragraph. All rent, fees, damages and liquidated damages (if applicable) shall be due immediately upon demand for payment.

In the event of a default by Resident, the Resident shall be liable to Management for rent through the remainder of the lease term as follows. Management may either allow the apartment to remain vacant and hold Resident liable for payment of rent through the remaining term of the lease; sue the Resident for breach of the lease and for each installment of rent as it comes due through expiration of the lease; or re-enter the premises as provided by law and re-let the apartment on Resident's behalf while holding the Resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until the re-letting. Management has the right, but not the obligation, to attempt to re-let the premises on Resident's behalf.

In the event that Resident has breached or defaulted the lease and failed to terminate the lease properly as provided by law or as provided for in Paragraphs 6 or 7 of this Apartment Rental Contract, then Resident shall be liable to Management for unpaid rent due through the remainder of the lease term under this paragraph (Par. 26), and not as provided in Paragraph 7, and Management is not entitled to collect any termination (cancellation) fee or notice fee.

Copyright © 2020 - Atlanta Apartment Association, Inc. - For ▊▊▊
All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692

**Liquidated Damages In Lieu of Rent Through the Remainder of the Lease Term.** Management shall not be entitled to Liquidated damages unless the Liquidated Damages Addendum has been signed by Management and Resident to indicate that the parties desire to use liquidated damages in determining the amount of rent due through the remainder of the lease term in the event of Resident's default. In the event the parties have selected liquidated damages for determining Resident's liability due to Resident's breach, then the Liquidated Damages Addendum is incorporated herein by reference, and the parties shall execute the same as a separate addendum.

Management's re-entry to leased premises either under judicial process or by retaking possession after abandonment or surrender shall not relieve Resident of liability for payment of rent through the remainder of the lease term or liquidated damages (if applicable) that landlord is entitled to collect under the terms of this rental agreement.

Management shall have the right to terminate the lease or right of possession of any Resident or occupant of the apartment who is arrested, indicted, charged, or convicted of any felony, crime of violence, or threatened violence; robbery; theft; dishonesty; rape; child molestation; sexual offense; illegal sale, use, or possession of drugs; illegal use or possession of a weapon; stalking; arson; criminal damage to property; vandalism; issuance of bad checks; fraud; forgery; or any other crime which could adversely affect the health, safety, or welfare of other Residents or Management staff, regardless of whether the offense occurred on or off the apartment community premises and regardless of when the offense occurred. Management shall have the right to file a dispossessory action and obtain a writ of possession based on the Resident's or occupant's conduct which constitutes a criminal violation without waiting for a criminal adjudication, finding, or decision on the criminal charges.

Management shall have the right to terminate the lease of any Resident whose apartment is found to be infested with bed bugs; have a mold or water intrusion problem; be unfit for habitation; or constitute a hazard to health, safety, or welfare of any person, the apartment, the apartment community or management employees. Upon such termination, resident must promptly vacate, remove all personal property and possessions, and return possession of the apartment to Management.

27, **Privacy, Disclosure, and Consent.**   Resident agrees that information about him or her that is known to Management or contained in his or her Resident file is not confidential, privileged or private. Resident authorizes Management to disclose any information known or contained in the Resident file to any law enforcement agencies who request such information either with or without a subpoena; to prospective landlords or lenders who request such information in connection with approval of any rental application or home purchase; or to persons or parties who make a request for such information using discovery procedures in a civil action or subpoena in a criminal proceeding.

Resident agrees that the apartment owner and Management shall have the right to provide information from its account and business records to any Consumer Reporting Agency to be included in the Resident's consumer file and credit history, including, but not limited to, rental history, rental payments, unpaid balances, and other information. If the Resident disputes the accuracy of the information provided, the Resident shall notify the Consumer Reporting Agency and send written notice of the dispute to Management at the address specified in Par. 9. When giving notice to Management of any dispute as to the accuracy of adverse rental information, rental payments, disputed account balance, or other disputed information, Resident agrees to provide his or her correct names on the lease, the apartment number, complete apartment address, dates of occupancy, and clear details as to the basis of such dispute that the Consumer Reporting Agency and Management will have sufficient information to investigate, evaluate and respond to the dispute.

Resident agrees that Management shall have the right to pursue collection of any sums alleged due from Resident through employment of independent contractors as collectors and that such sums may be reported to any consumer reporting agency (credit bureau) and shown on Resident's credit report. Resident agrees that variances or inaccuracies in the amounts submitted for collection or reported to any credit bureaus do not constitute a violation of any federal or state laws pertaining to reporting or collection of such debts and that the amount alleged due may be amended or corrected at any time. Resident agrees that Management or any such collector or collection agency is expressly authorized to contact Resident by phone or mail to notify Resident of the debt or attempt collection of the same and to communicate with third parties regarding the existence of the debt, the location of the Resident, or the Resident's ability to pay the debt. Resident agrees that Management or any such collector is expressly authorized to obtain a consumer report (credit report) on Resident and to obtain information on Resident's location and employment in connection with the collection of any amounts claimed due under this lease. Management's and collector's rights under this paragraph shall continue and survive independently beyond expiration or termination of the lease or Resident's occupancy of the apartment.

Resident(s), their occupants, family members, and social guests hereby authorize and grant Management, their contractor(s), employee(s), and or any third parties hired by Management, permission to take, use, and publish photographs and/or videos of Resident(s), their occupants and social guests, including but not limited to, their minor children, at events and/or activities in the common areas of the apartment community. Management is permitted to use such photographs or video for print, publication, copyright, online social media and video-based marketing materials, as well as any other form of publication or use at Management's sole discretion. Resident(s), their occupants and social guests, including their minor children, release and hold harmless Management from any reasonable expectation of privacy or confidentiality associated with the images and videos taken and used by Management. Resident(s) and their occupants, family members, and social guests acknowledge and agree they will not receive any type of financial compensation, ownership or royalties with the taking, use, marketing, or publication of any photographs or videos.

Resident(s) hereby expressly authorize Management, and its successors, assigns, agents, attorneys, insurers, representatives, employees, officers, shareholders, partners, parents, subsidiaries, affiliated entities, and all agents and representatives, including any collection agency or debt collector hired by any of this preceding persons or entitles, and all corporations, persons, or entitles in privity with any of them (hereinafter collectively referred to as the "Authorized Entitles") to communicate with Resident(s) for any reason related to the services provided by them or services to be provided in the future by them, including collection of amounts owed for said services, using an automatic telephone dialing system or an artificial or prerecorded voice at the telephone number or numbers Resident(s) provide.

Resident(s) further expressly consent and authorize the Authorized Entitles to communicate with Resident(s) at any phone number or email address or other unique electronic identifier or mode that Resident(s) provide to any Authorized Entity at any time, or to use any phone number or email address or other unique electronic identifier or mode that any Authorized Entity finds or obtains on its own which is not provided by Resident.

Any Authorized Entity may communicate with Resident(s) using any current or future means of communication, including, but not limited to, automated telephone dialing systems, artificial or pre-recorded voices, SMS text messages, other forms of electronic messages, electronic mail directed to any internet domain address, electronic mail directed at a mobile telephone service, cellular telephone services, internet or world wide web addresses including social and business networking internet sites, or electronic messages or mail otherwise directed to Resident(s) through any medium. Resident(s) authorize any and all of this communication methods described in this paragraph even if Resident(s) will incur a fee or a cost to receive such communications. Resident(s) further promise to immediately notify the Authorized Entitles if any telephone number or email address or other unique electronic identifier or mode that Resident(s) provided to any Authorized Entity changes or is no longer used by Resident.

28, **Definitions.**   The term "Resident" includes all tenants or other persons who signed or are obligated under the lease. "His" shall also mean "her" when applicable. "Resident" refers to the tenant. The term "Management" may refer to the owner of the apartment community or to the managing agent who is under a Management contract to operate the apartment community on behalf of the owner. The legal ownership entity is different from the Management entity. The owner's managing agent may or may not have any ownership interest in the apartment community and may be an entirely independent contractor which operates the apartment community for the owner for a fee. "Occupants" are persons who are living in the apartment rental with the Resident and disclosed in the lease but have not signed the lease.

Copyright © 2/2020 - Atlanta Apartment Association, Inc. - February 2019
All Rights Reserved

☑ Blue Moon eSignature Services Document ID: 264857692

The term "occupants" means persons who did not sign the lease but were disclosed and authorized to live in the apartment on a full time basis. Occupants could include family members of the Resident, but is not limited to family members, and includes roommates or other persons who are authorized to live in the apartment as disclosed in this lease. "NSF" means checks that are dishonored or returned by the bank unpaid, and is also referred to as "not sufficient funds." "Skip" means to vacate or abandon the leased premises in violation of this lease. either with or without turning in all keys and either with or without removing all personal property. "Notice period" refers to the length of time required in paragraph 6 or 7 or any other provision before a notice can take effect. The word "lease" means the Apartment Rental Contract which creates the relationship of landlord and tenant between the Resident and Management. "Leased premises" refers to the apartment Resident rented, and is also referred to as the "premises" or "lease premises," but does not include any of the common areas or other portions of the apartment community property. The term "leased premises" does not include any portions of the apartment community outside of the apartment rental unit as the Resident only has a permissive license to use the other areas and amenities of the apartment community in conjunction with the rental of the apartment. "Termination date" is the date following a notice period or the date on which Resident's lease or right of possession terminates as specified either in a non-renewal notice or a lease termination notice from Management based on Resident's default. A "social guest" is any person who is present in the Resident's apartment or on the apartment community property by express or implied invitation of the Resident or Resident's occupants, other social guests, or family members and includes anyone temporarily living or visiting Resident. The term "social guest" includes, but is not limited to, visitors and family members visiting or present in the apartment or apartment community. An "invitee" refers to a business guest or visitor who is present in the apartment or the apartment community with the express or implied invitation of the Resident for the purpose of conducting or soliciting business with or for the Resident, occupants, or social guests of the Resident. The "trade name" is the name of the apartment community and is the name or alias under which the legal owner of record does business and operates the apartment community. A "default" or "breach" of the lease and addenda means a violation of the lease provisions and gives Management the right to terminate the Resident's occupancy or lease. "GREC" means the Georgia Real Estate Commission.

29. **Usufruct.** This lease only creates the relationship of landlord (Management) and tenant (Resident) and does not create any ownership or transferable rights in real estate. This lease is a "usufruct," and not an estate for years.

30. **Entire Agreement.** This lease, any referenced addenda, and any addenda separately signed or referring to the lease or apartment shall constitute the entire agreement between the parties, and no prior negotiations, representations, or oral statements are binding. This lease may not be modified except with the express written consent of Management. The Resident is legally obligated under the terms and conditions of any addenda which he or she signed, and the same are part of and incorporated by reference into this lease.

31. **Joint and Several Liability.** Each person, corporation, or roommate who signs this lease or any guarantor under a separate guarantor's agreement is jointly and severally liable for all rent or other charges which come due. Management may look to any Resident or guarantor for payment of all or a part of any obligation due without first suing or attempting to collect from any other responsible party. Management and the owner or any collection agency or attorney representing the owner or Management shall have the right to settle in whole or part all or a portion of any debt owed by one Resident without releasing or waiving its claim for the balance of the debt against another Resident, co-signor, or guarantor. Settlement or release of one Resident or Guarantor shall not release the other Resident or Guarantor from liability for the debt owed.

32. **Agency Disclosure.** Management is acting on behalf of the owner of the apartment community in exchange for compensation.

33. **Know Your Neighbors.** Certain individuals convicted of certain sex-related crimes are required to register their name and current address on an index maintained by the state or county in which they reside. You may access that index in order to determine whether any such individuals live in proximity to a certain location. The public may access the Internet to view all sex offenders registered in Georgia. The Statewide Sex Offender Register can be obtained through the Internet at http://gbi.georgia.gov/georgia-sex-offender-registry. The public may also contact the local Sheriff to view a list of the sex offenders listed in their county.

34. **Special Stipulations.** Any special stipulations specified in Par. 34 shall control and supersede and control over conflicting provisions in the text of this lease.



**GEORGIA**
APARTMENT ASSOCIATION

**EXTENDED SPECIAL STIPULATIONS ADDENDUM**

**FORM VALID FOR
GEORGIA APARTMENT
ASSOCIATION
MEMBERS ONLY**

Addendum Date: __May 12, 2021__, __FLGA Investors LLC_____ ["Management"] ☒ as Owner of
☐ as Agent for the Owner of __FLGA Investors LLC__
["Community Name"] enters into this Extended Special Stipulations Addendum to the Apartment Rental Contract ["the Lease"] with __Adaeze Wanda Holmes__
_____ ["Resident"], pertaining to
Apt. No. __345-A07__ located at __1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310__
[Address]. This addendum is part of the Apartment Rental Contract dated ____ __May 12, 2021__ ____ [Date of Lease].

The following are e continuation of the Special Stipulations of the Apartment Rental Contract and are incorporated by reference into said apartment lease. These Special Stipulations have been added by Management or owner of the apartment community, and were not created by either the Georgia or Atlanta Apartment Associations as part of their standard leases, forms, and addenda.

Should the leaseholder(s) request a transfer-on-site before their lease expires, all leaseholder(s) must: a) agree to the transfer; b) provide 30 days' advance notice; c) sign and agree to the terms of the On-Site Transfer Agreement; and d) pay a transfer fee of $350.00 prior to the date of transfer. No transfer will occur until a)-d) have been satisfied. Also, all leaseholders must be in good standing and have an apartment inspection completed by Management before the transfer will be authorized to occur. In Apartment Owner's and/or Management's sole discretion, if Resident's renter's liability insurance policy does not meet all the requirements outlined in the Renter's Insurance Addendum to this Apartment Rental Contract for any reason (including a termination or lapse of such renter's insurance policy), Resident will be added to the Management's master renter's insurance policy immediately upon written notice to Resident, which Resident hereby accepts and consents to, and a charge of $11.00 per month will be added to Resident's ledger and due as additional rent for each month (or any portion of a month) that the master policy is in place for the Resident, until satisfactory proof of insurance coverage is provided by Resident to Landlord. NOTE: Resident's personal belongings are NOT covered or insured under this master insurance policy. You must not allow any utilities(other than cable TV) to be cut off or switched for any reason - including disconnection for non-payment - until the Lease Contract term or renewal period ends. If a utility is individually metered, it must be connected in your name and you must notify the utility provider of your move-out date so the meter can be timely read. If you delay getting utility service turned on in your name by lease commencement or cause it to be transferred back into our name before you surrender or abandon the unit, you'll be liable for a $50 fee plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. Pets are defined as dogs, cats, fish, birds and hamsters. Exotic pets or livestock are not permitted to live in our communities. Fish tanks are to be limited in size and can be no more than 24 gallons. The following dogs are not admitted to our communities unless they are a certified service animal (CSA) or an emotional support animal (ESA): Alaskan Malamute, Akita, American Bully, Bull Mastiff (Presa Canario), Chow, Doberman Pinscher, German Shepard, Husky, American Staffordshire Terrier, American Pit Bull Terrier and Staffordshire Bull Terriers also known as "Pit Bull", Rottweiler, Wolf Hybrid or any mix of the above breed. Any dangerous dog. A dog can be designated as "dangerous" if it makes an unprovoked attack on someone anywhere outside its normal enclosure, or an unprovoked act on someone leading that person to believe the dog would attack and cause injury.

**Signature of Parties:**
**Management**
**FLGA Investors LLC**
_____
Name of Management
By: *Kathleen Conley*
Signature of Management Representative Name
As: __Community Manager_____ (Job Title)

**Residents**
*Adaeze Wanda Holmes* _____ (Resident Signature)
Printed Name of Resident: __Adaeze Wanda Holmes__
_____ (Resident Signature)
Printed Name of Resident: _____
_____ (Resident Signature)
Printed Name of Resident: _____
_____ (Resident Signature)
Printed Name of Resident: _____
_____ (Resident Signature)
Printed Name of Resident: _____
_____ (Resident Signature)
Printed Name of Resident: _____

Copyright © 5/2019 by Atlanta Apartment Association, Inc.
All Rights Reserved
☑ Blue Moon eSignature Services Document ID: 264857692


**GEORGIA**
APARTMENT ASSOCIATION

**Liquidated Damages Addendum**

**FORM VALID FOR GEORGIA APARTMENT ASSOCIATION MEMBERS ONLY**

Addendum Date: _____May 12, 2021_____ **FLGA Investors LLC**_____ ["Management"] ☒ as Owner of
☐ as Agent for the Owner of **FLGA Investors LLC**

["Community Name"] enters into this Liquidated Damages Addendum to the Apartment Rental Contract with **Adaeze Wanda Holmes**

_____ ["Resident"], pertaining to

Apt. No. _**345-A07**_ located at **1295 Donnelly Ave., SW # 345-A, Atlanta, GA 30310**
[Address]. This addendum is part of the Apartment Rental Contract dated _____**May 12, 2021**_____ [Date of Lease] and amends Paragraph 26.

In lieu of liability for the remainder of the lease term for breach of the lease (as provided in Paragraph 26 of the Apartment Rental Contract), the parties agree that Management may re-enter the premises as provided by law, *thereby terminating the lease end terminating resident's liability for rent after the date Management obtains possession of the apartment through the end of the lease term,* and Management shall be entitled to recover liquidated damages from Resident in the amount of $ _**999.00**___ [not to exceed the amount of two month's rent] as the estimated rent that will come due after management obtains possession of the apartment through either the end of the lease term or the re-letting of the apartment to another resident. Said liquidated damages is based on the average number of days that apartments in the community are vacant and take to lease or re-let as of the date of entering into this apartment rental contract.

If the resident's breach of this lease is based on failure to give a proper non-renewal notice to end the lease and vacate the premises as provided in Paragraph 6 of the Apartment Rental Contract then said liquidated damages shall not exceed the amount of one (1) month's rent.

By selecting Liquidated Damages to determine the resident's liability for rent through the remainder of the lease term, the parties agree that they have evaluated the likelihood that the apartment may remain vacant for an unspecified or undeterminable period of time based on the average length of time that it takes to ready the apartment for re-rental, re-market the same, and obtain a new resident or occupant for the remainder of the lease term. The liquidated damages are intended as a reasonable estimate of the lost rent and other costs of re-letting due to resident's breach of the lease and liability for rent as it accrues over the remaining balance of the lease term. In this respect, the liquidated damages provision shall serve to limit resident's liability for future unaccrued rents. The amount of liquidated damages, if applicable, was estimated based on the apartment community's current market rents, estimated future rents, the current occupancy rate, the expected future occupancy rate, the estimated length of time it takes to re-let an apartment in this particular apartment community's market, current economic conditions, projected future economic conditions, and the relatively short length of the lease.

Based on the above factors, the parties have estimated that it will probably take longer than the estimated number of days the apartment will remain vacant before management is able to re-let the apartment after obtaining possession due to resident's breach. Both parties agree that there are many costs involved in readying the apartment for re-letting due to the expense of turn-keying the premises, advertising, marketing, and other sales and administrative costs. The election to use a liquidated damages provision in lieu of waiting for accrual of future rents is a convenience and benefit for both management and resident as it allows management to render a prompt statement of resident's liability for unaccrued rent through the balance of the lease and it allows the resident the certainty of knowing how much he or she will owe while limiting liability for future rents. Resident acknowledges that he or she has the option of voluntarily terminating the lease as provided in Paragraph 7 in order to avoid liability for unaccrued future rents and thereby avoid liability for future rents through the remaining term of the lease.

Said liquidated damages, if elected, shall be due in addition to any rent or hold-over rent or other fees and charges which have accrued or come due during the time the resident remains in possession of the apartment or which accrues prior to the time management finally obtains possession of the apartment. Said liquidated damages are in addition to, and not in lieu of, any damages or cleaning fees exceeding normal wear and tear, unpaid utilities, and rental concession pay-backs which are due. The parties agree that the amount of lost rent and cost of re-letting are uncertain and difficult to ascertain, as the length of time it takes to re-let may vary greatly based on the above recited conditions.

By electing to use liquidated damages as the measure of resident's liability for the remainder of the lease term, management agrees to forego its right to allow the apartment to remain vacant and hold resident liable for payment of each month's rent through the remaining term of the lease or to sue the resident for each month's installment of rent as it comes due through expiration of the lease or to re-enter the premises as provided by law and re-let the same on resident's behalf while holding the resident liable for any deficiency between the contract rent and rent due through the remaining term of the lease until the re-letting. However, management reserves and retains all other remedies afforded at law or in equity, whether statutory or contractual, which are not inconsistent with the right to liquidated damages. In the event any court should determine that the liquidated damages provided for herein ere unenforceable or illegal, then the court shall strike such portion of this addendum as is deemed unenforceable or illegal, and management shall be entitled to the remedy of re-entering the premises as provided by law and re-letting the apartment on resident's behalf while holding resident liable for any deficiency between the contract rent and rent received through the remaining term of the lease until re-letting of the apartment on resident's behalf.

The liquidated damages provided for herein, in the event that resident has breached the lease and failed to otherwise terminate the lease as provided by law or as provided in Paragraphs 6 and 7 of the Apartment Rental Contract, are in lieu of, not in addition to, any termination (cancellation) fee or notice fee provided for in Paragraph 7, and management is not entitled to collect any such termination (cancellation) fee or notice fee.

| | |
|---|---|
| **FLGA Investors LLC** | *Adaeze Wanda Holmes* |
| Name of Owner or Management Company | Resident's Signature |
| By: *Kathleen Conley* | |
| Signature of Management Representative | Resident's Signature |
| As: **Community Manager** _____ (Title) | |
| | Resident's Signature |
| | |
| | Resident's Signature |
| | |
| | Resident's Signature |

Copyright © 5/2019 by Atlanta Apartment Association, Inc. - Form #9401-LD
All Rights Reserved ☑ Blue Moon eSienature Services Document ID: 264857692

**Exhibit 15**



54 Ellis Street, NE • Atlanta, Georgia 30303 • 404-524-5811

Jun 7, 2022

National Credit Systems
ATTN: Sabrina Hill, Collection Representative
P.O. Box 672288
Marietta, GA 30006

      RE:    Adaeze Holmes
               Account Number: 4795245

Dear Ms. Hill:

I represent Ms. Adaeze Holmes, a former tenant of 1295 West Apartments. I am writing to dispute the debt identified by you in a letter dated April 12, 2022. The disputed debt stems from Ms. Holmes tenancy at 1295 West Apartments. The amount you identified that Ms. Holmes owes is incorrect.

Pursuant to the Fulton County Magistrate Court Order issued on September 29, 2021 in Case No. 21ED189095, Ms. Holmes only owes $3,036.40 to 1295 West Apartments. After you attempted to collect $9,912.36 from Ms. Holmes, Fulton County Magistrate Court issued an order on March 28, 2022 stating that Ms. Holmes does **not** owe rent beyond the amount ordered in the September 29th order.

Please direct your communication about this matter to me directly going forward. Please record that Ms. Holmes disputes having any obligation for this debt. If you forward or return this debt to another company, please indicate to them that Ms. Holmes is represented by legal counsel and this debt is disputed.

It is a violation of the Fair Debt Collections Practices Act to communicate credit information which is known or which should be known to be false. Reporting a debt to a credit bureau that is known or should be known to be false constitutes a violation of this federal law. You now have reason to know the debt 1295 West Apartments claims Ms. Holmes owes is false. With that in mind, if you report this matter to a credit bureau, Ms. Holmes is prepared to seek enforcement of her rights under Fair Debt Collections Practice Act, which may include filing a complaint with the Federal Trade Commission and the Consumer Financial Protection Bureau, or filing a civil lawsuit.

Sincerely,

Becca Wackym
Attorney at Law

Rebecca J. Wackym | (404) 614-3989 (direct) | bjwackym@atlantalegalaid.org