## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JOHN KENNEDY ALEXANDER, | Case No.: |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | **1. FCRA, 15 U.S.C. § 1681** *et seq.* |
| EXPERIAN INFORMATION SOLUTIONS, INC., and TRANS UNION LLC, | |
| Defendants. | |

## COMPLAINT

John Kennedy Alexander ("Plaintiff" or "Mr. Alexander") a living, breathing sixty-one-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian") and Trans Union LLC ("Trans Union") (collectively, the "Credit Bureau Defendants" or "Defendants") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal

Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be

2

applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his

knowledge and without reason. Shakespeare said, the loss of one's good
name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation

to determine whether information disputed by consumers is inaccurate and record

the current status of the disputed information, or delete the disputed information,

before the end of the 30-day period beginning on the date on which the CRA receives

the notice of dispute from the consumer. This mandate exists to ensure that consumer

disputes are handled in a timely manner and that inaccurate information contained

within a consumer's credit report is corrected and/or deleted so as to not prevent said

consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically

noted "a need to insure that [CRAs] exercise their grave responsibilities with

fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C.

§ 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other

third party that provides information about consumer to a CRA, upon notice, to

conduct a reasonable reinvestigation of all disputes with regard to the completeness

or accuracy of any information it provides to the CRAs regarding a consumer and

modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein Defendants Experian and Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.     Accordingly, Plaintiff brings claims against Defendants Experian and Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## **PARTIES**

14.     John Kennedy Alexander ("Plaintiff" or "Mr. Alexander") is a natural person residing in Auburn, Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Experian Information Solutions, Inc. ("Defendant Experian"

or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of Georgia, including within this District.

16.   Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

17.   Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Georgia, including within this District.

18.   Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

19.   This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

21.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

22.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

23.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

7

24.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

25.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### The Credit Bureau Defendants' Practices Concerning the Sale of Reports on the "Deceased"

26.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

27.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants Experian and Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants Experian and Trans Union, must maintain reasonable

procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

29.    The Credit Bureau Defendants routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

30.    The Credit Bureau Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

31.    The Credit Bureau Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

32.    The Credit Bureau Defendants do not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33.    The Credit Bureau Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that

consumer's report.

34.    In some cases, in order to assure accuracy, the Credit Bureau Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. The Credit Bureau Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

35.    The Credit Bureau Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But the Credit Bureau Defendants do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

36.    The Credit Bureau Defendants will only use the Death Master File to

sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

37.  The Credit Bureau Defendants fail to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

38.  Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

39.  Even in instances where the purportedly deceased consumer communicates directly with the Credit Bureau Defendants, the Credit Bureau Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

40.  Once a "deceased" mark is placed upon a consumer's report, the Credit Bureau Defendants will not calculate and will not provide a credit score for that consumer.

41.    Upon the Credit Bureau Defendants' reports with a "deceased" mark sold to third parties, the Credit Bureau Defendants never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

42.    The Credit Bureau Defendants know that third party credit issuers require a credit score in order to process a given credit application.

43.    The Credit Bureau Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

44.    The Credit Bureau Defendants know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

45.    The Credit Bureau Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Credit Bureau Defendants are inaccurately reporting them as "deceased" and without a credit score.

46.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants had erroneously marked them as "deceased" on their credit reports.

47.    The Credit Bureau Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing

of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

48.     Nevertheless, the Credit Bureau Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

49.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

50.     The Credit Bureau Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

51.     Nor do the Credit Bureau Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

52.     For years after a consumer's actual death, the Credit Bureau Defendants will continue to sell credit reports about that consumer.

53.     The Credit Bureau Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

54.     The Credit Bureau Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

55.     The Credit Bureau Defendants profit from the sale of reports on deceased consumers.

56.     The Credit Bureau Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

57.     The Credit Bureau Defendants know that truly deceased consumers do not apply for credit.

58.     The Credit Bureau Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Credit Bureau Defendants to be a common and major source of identity theft.

59.     The Credit Bureau Defendants know that identity theft and credit fraud

are serious and widespread problems in our society.

60.     The Credit Bureau Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

61.     The Credit Bureau Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

62.     The Credit Bureau Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

63.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Credit Bureau Defendants to sell their credit reports, absent a court order.

64.     The Credit Bureau Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly

15

deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Plaintiff Tries to Make a Payment on His Capital One Account

65.     On or prior to January 15, 2023, Plaintiff tried to make his monthly payment on his Capital One account.

66.     Plaintiff was a Capital One account holder.

67.     Plaintiff was attempting to make his payment in the same manner he had utilized before, without issue.

68.     On or prior to January 15, 2023, Plaintiff's attempts to make his Capital One payment were met with resistance – namely, he received an error stating that he was unable to complete the payment online.

69.     Capital One had revoked Plaintiff's online payment privileges.

70.     Confused and concerned about being late on his payment, Plaintiff called Capital One to make his monthly payment online and also to inquire as to why his online payment privileges had been revoked.

71.     After waiting on hold for some time, Plaintiff was able to connect with a Capital One representative.

72.     Plaintiff identified himself to the Capital One representative as well as his account at issue.

73.     Plaintiff explained that he attempted make his monthly payment online, as he had done so many times prior but encountered an error.  The Capital One representative told Plaintiff that the error was due to him being reported as deceased.

74.     Plaintiff was distressed at the news that he was reported deceased.  He had no idea how that had even come to be.

75.     Plaintiff vehemently disputed any deceased notation as he was clearly and very much alive.

76.     Further, the representative said he was unable to explain to Plaintiff who reported him as deceased, why, how, or when.

77.     Because Plaintiff was reported as deceased, Capital One refused to allow Plaintiff to make his monthly payment.

78.     The Capital One representative told Plaintiff that Capital One had to conduct its own investigation to verify that Plaintiff was in fact not deceased, despite the evidence that he was alive clearly established by his participation in the phone call.

79.     Upon information and belief, and on January 15, 2023, as part of its investigation to verify that Plaintiff was in fact *not* deceased but rather alive, Capital One ordered a credit report about Plaintiff from Experian and Trans Union.

80.     Upon information and belief, and on or about January 15, 2023,

Experian sold a consumer report to Capital One wherein it published that Plaintiff was deceased.

81.     Upon information and belief, and on or about January 15, 2023, Trans Union sold a consumer report to Capital One wherein it published that Plaintiff was deceased.

82.     Plaintiff continued to try to make his Capital One payment.  Each time Plaintiff called, Capital One refused to allow him to make a payment.  Plaintiff was very anxious, concerned and distressed that Capital One would report that he was delinquent on his account to the national CRAs.

83.     Not until Plaintiff's fourth attempt, did Capital One finally confirm to Plaintiff that he was not deceased and permitted him to make a payment.

84.     Unfortunately, this was too little too late.  By the time Capital One seemingly *verified* that Plaintiff was not deceased and allowed him to make a payment, the payment deadline had already passed.

85.     Despite Plaintiff's best efforts to avoid being late on his payment deadline, Capital One, Experian, and Trans Union frustrated Plaintiff's efforts to make his Capital One payment on time.

86.     Further, Capital One charged Plaintiff a late fee. To date, Capital One has not reversed the late payment fee it assessed against Plaintiff.

18

## Plaintiff Applies for Credit Card with Affirm

87.     After Capital One communicated to Plaintiff that the deceased notation was no longer affiliated with his account, Plaintiff thought that the entire ordeal was behind him.

88.     He was still very upset about the circumstances but determined to move on with his life and the use of his credit.

89.     On or about January 31, 2023, Plaintiff completed and submitted a credit application to Affirm. Plaintiff provided all of the necessary personal identifiers and information in support of his credit application.

90.     Plaintiff anticipated being approved for the requested credit.

91.     On or about January 31, 2023, Affirm obtained a copy of Plaintiff's credit file from Experian.

## Affirm Denies Plaintiff's Credit Application January 2023

92.     On or about January 31, 2023, Experian published to Affirm that Plaintiff was deceased.

93.     Experian's publication to Affirm that Plaintiff was deceased was inaccurate as Plaintiff was very much alive.

94.     As a result of Experian's inaccurate reporting of a deceased notation on Plaintiff's Experian credit file, Affirm unceremoniously denied Plaintiff's credit application.

19

95.     Plaintiff reasonably believes that one or more of his other applications to Affirm were similarly denied due to Experian's inaccurate reporting of a deceased notation on Plaintiff's credit file.

96.     Upon information and belief, Experian's inaccurate publication to third parties that Plaintiff was deceased caused or contributed to credit denials and/or led to reduced promotional offers of credit offered to Plaintiff.

97.     Ultimately, and much to Plaintiff's frustration, embarrassment and humiliation, he could not secure the credit he needed from Affirm.

**Plaintiff Obtains His Credit Reports and Confirms the Deceased Notation on His Credit Files**

98.     Frustrated with recent events, Plaintiff decided to review his Trans Union and Equifax credit files as well – for fear that they too were reporting that he was deceased.

99.     On or about February 1, 2023, Plaintiff obtained a copy of his Trans Union and Equifax credit files.

100.   Upon review, and much to his frustration, Plaintiff saw that there was a deceased notation on his Trans Union credit file.

101.   Notably, Equifax was *not* reporting that Plaintiff was deceased.

102.   Upon information and belief, Trans Union published consumer reports about Plaintiff to third parties wherein Trans Union included a deceased notation.

103.   Upon information and belief, Trans Union's inaccurate publication to third parties that Plaintiff was deceased caused or contributed to credit denials and/or led to reduced promotional offers of credit offered to Plaintiff.

104.   Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

105.   Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

106.   As a result of the "deceased" notation, the Defendants made it practically impossible for Plaintiff to continue to obtain credit.

107.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

108.   At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

109.   As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher, like Capital One here, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

110.   The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

111.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his

good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

112.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

113.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

114.   On numerous occasions, Defendants Experian and Trans Union prepared patently false consumer reports concerning Plaintiff.

115.   Despite actual and implied knowledge that Plaintiff is not dead, Defendants Experian and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

116.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

117.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

118.   As a result of Defendants' Experian and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

119.    Defendants Experian and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

120.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Dated: April 11, 2022

*/s/ Jenna Dakroub*
Jenna Dakroub, GA #385021
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
E: jdakroub@consumerattorneys.com
T: (602) 807-1525
F: (718) 715-1750
*Attorneys for Plaintiff*
*John Kennedy Alexander*