# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **HORSES OF CUMBERLAND ISLAND,** | ) | |
| **THE GEORGIA EQUINE RESCUE LEAGUE, LTD,** | ) | |
| **THE GEORGIA HORSE COUNCIL, INC.,** | ) | |
| **WILL HARLAN, AND CAROL RUCKDESCHEL** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | |
| **HON. DEB HAALAND, in her official capacity as** | ) | **FILE NO.** |
| **SECRETARY OF THE INTERIOR,** | ) | |
| **1849 C STREET, N.W.** | ) | |
| **WASHINGTON, D.C. 20240** | ) | |
| | ) | |
| **MARK FOUST, in his official capacity as** | ) | |
| **DIRECTOR** | ) | |
| **SOUTH ATLANTIC-GULF REGION** | ) | |
| **NATIONAL PARK SERVICE** | ) | |
| **DEPARTMENT OF THE INTERIOR** | ) | |
| **ATLANTA FEDERAL CENTER, 1924 BUILDING** | ) | |
| **100 ALABAMA STREET, S.W.** | ) | |
| **ATLANTA, GA 30303** | ) | |
| | ) | |
| **GARY INGRAM, in his official capacity as** | ) | |
| **SUPERINTENDENT,** | ) | |
| **CUMBERLAND ISLAND NATIONAL SEASHORE** | ) | |
| **NATIONAL PARK SERVICE** | ) | |
| **DEPARTMENT OF THE INTERIOR** | ) | |
| **101 WHEELER STREET** | ) | |
| **ST. MARYS, GEORGIA 31558** | ) | |
| | ) | |

MARK WILLIAMS, in his official capacity as   )
COMMISSIONER   )
GEORGIA DEPARTMENT OF   )
  NATURAL RESOURCES   )
2 MARTIN LUTHER KING JR. DR., S.E.   )
SUITE 1252   )
ATLANTA, GA 30334   )
  )
TYLER HARPER BLACK, in his official capacity as   )
COMMISSIONER   )
GEORGIA DEPARTMENT OF AGRICULTURE   )
19 MARTIN LUTHER KING, JR. DR., S.W.   )
ATLANTA, GA 30334   )
  )
          **DEFENDANTS.**   )

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

In this civil action, the Plaintiffs named above seek a permanent injunction directing the National Park Service and the State of Georgia to take all immediate action necessary to assure the overall well-being of Cumberland Island's horses and to protect Cumberland Island's natural and wilderness resources, including its endangered species and habitats.

### Introduction.

### 1.

This is a suit in the nature of a citizen suit seeking declaratory and injunctive relief pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*,

the Cumberland Island National Seashore Act, 16 U.S.C. §§ 459i – 459i-9, and its enabling rules and regulations, the Endangered Species Act (ESA), 16 U.S.C. §§ 1361 *et seq*, and the 1964 Wilderness Act, 16 U.S.C. §§ 1131 *et seq* (Wilderness Act).  Plaintiffs bring pendant state law claims pursuant to the Georgia Equine Act, *OCGA* § 4-4-110 *et seq.,* the Humane Care for Equines Act, OCGA § 4-13-1 *et seq.*, Georgia Coastal Marshland Protection Act, OCGA §12-5-280 *et seq.*, the Georgia Shore Protection Act, OCGA §12-5-230 *et seq.*, the Sea Oat Act, OCGA §12-5-310 *et seq.*, and the Georgia Coastal Management Act, OCGA §12-5-320 *et seq.*

2.

Plaintiffs bring this action to advance the health and wellbeing of the horses of Cumberland Island and to protect Cumberland Island's natural and wilderness resources.   For over a quarter century, Defendants – each of which have varying degrees of responsibility for management of Cumberland's natural resources and wildlife - have permitted less-than-humane conditions to be imposed on the Island's feral horses.  For over a quarter century, the Defendants have known of the destructive impacts to the island's resources caused by feral horses.  This action is directed against the refusal by the National Park Service (NPS) and the State of Georgia to fulfill their respective obligations to protect and promote the

well-being of both the Cumberland Island National Seashore and the horses of Cumberland Island.

3.

NPS and the State have inadequately managed and failed to remove the Island's feral horses by knowingly ignoring the laws, policies, rules, and regulations put in place to protect the Cumberland Island National Seashore and its resources. Defendants' failure to fulfill their collective obligations has inflicted serious harm to Cumberland's horses, requiring their removal from the Island, and has permitted the horses, in the natural course of their existence, to inflict serious harm to the Island's natural and wilderness resources.

4.

NPS and the State, by refusing to adequately manage the horses of Cumberland, have failed to provide the necessary food, water, veterinary services, and humane care that are specifically required by the Georgia Equine Act, *OCGA §§ 4-4-110 et seq.,* and the Humane Care for Equines Act, *OCGA §§ 4-13-1 et seq.* Their neglect of duty has resulted in a horse population that is ill, malnourished, and deprived of a normal life expectancy.

5.

This lawsuit seeks to compel the Secretary, the National Park Service, and the State to fulfill their duties under the Cumberland Island National Seashore Act, 16 U.S.C. §§ 459i – 459i-9, the Endangered Species Act (ESA), 16 U.S.C. 1361 *et seq.*, the 1964 Wilderness Act, 16 U.S.C. §§ 1131 *et seq* ( the Wilderness Act), the Administrative Procedure Act (APA), 5 USC §§ 701-706, the Georgia Equine Act, *OCGA* § 4-4-110 *et seq.,* the Humane Care for Equines Act, OCGA § 4-13-1 *et seq.*, the Georgia Coastal Marshland Protection Act, OCGA §12-5-280 *et seq.*, the Georgia Shore Protection Act, OCGA §12-5-230, *et seq.*, the Sea Oat Act, OCGA §12-5-310 *et seq.*, and the Georgia Coastal Management Act, OCGA §12-5-320 *et seq.* to affirmatively protect and promote the natural and wilderness resources of the Cumberland Island National Seashore and to assure the humane treatment and care of the horses of Cumberland Island.

**JURISDICTION AND VENUE**

6.

The jurisdiction of this Court is invoked pursuant to:

(a) 28 USC § 1331, this being an action arising under the Constitution and laws of the United States.

(b) 16 U.S.C. §§ 1540 (c) and (g), this being an action in which Plaintiffs seek declaratory and injunctive relief under the Endangered Species Act.

(c) 28 U.S.C. §2202 (injunctive relief), this being an action seeking injunctive relief.

(d)  28 U.S.C. §1367 (supplemental jurisdiction), this being an action asserting state law claims arising out of a common nucleus of operative facts with numerous federal law claims.

7.

This lawsuit invokes Section 10 of the Administrative Procedure Act (APA), 5 USC §§ 701-706, this being an action brought by persons suffering legal wrong because of agency action or adversely affected or aggrieved by agency action within the meaning of a relevant statute.

8.

On July 31, 2022, and again on January 13, 2023, Plaintiffs provided written notice to Defendants under 16 U.S.C. 1540 (g)(2)(A)(i) of Plaintiffs' intent to sue, including the Secretary of the Interior, Regional Director for the National Park Service, the Superintendent for the Cumberland Island National Seashore, the Commissioner for the Georgia Department of Natural Resources, and the

Commissioner for the Georgia Department of Agriculture for violating the Endangered Species Act. Letters attached as Exhibit A.

9.

Venue in this Court is proper under 28 U.S.C. §§1391(b) and (e), in that Defendants are officers, employees or divisions of the United States acting in their official capacity and a substantial part of the events giving rise to this claim occurred in this District.   The state Defendants also reside in this District.

**PARTIES**

10.

The feral horses of Cumberland Island number between 140 and 170 animals.   Feral horses were once domesticated but have reverted to a wild state and no longer receive human support for their survival. The horses receive no food, water, or veterinary care. They are considered a non-native (exotic) species. Cumberland Island does not have sufficient natural resources to support a herd of horses of this magnitude.   The horses of Cumberland Island have suffered and will continue to suffer injury in fact as the result of the Defendants' actions specified in this suit.   The horses have standing to bring a suit in their own right. *Loggerhead Turtle v. County Council of Volusia County Florida*, 896 F.Supp. 1170, 1177 (M.D.Fla. 1995).

11.

The Georgia Equine Rescue League, Ltd. (GERL) is a 501(c)(3) non-profit organization of 400 members with a stated mission to help horses in need.  GERL believes it is the responsibility of its members to help find solutions to the growing problem of starved, abused, and neglected equine in the state of Georgia.   GERL works through education, creating incentive programs for equine health, and working with the Georgia Department of Agriculture Equine Division and other law enforcement entities to reduce abuse and neglect of horses in Georgia.

12.

GERL's members would otherwise have standing to sue in their own right. GERL's membership includes persons who visit the Cumberland Island National Seashore (the "Seashore") and the Cumberland Island Wilderness for aesthetic, recreation, scientific research, solitude, wilderness and other purposes.

13.

Susan Gregory is an individual member of GERL who has visited Cumberland Island and has extensively studied the condition of the horses of Cumberland.    She has found the horses at Cumberland to be a particular challenge to her overall work as a member of GERL in bringing assistance to the state's abused and neglected horses.   Witnessing the inhumane condition of the horses at

Cumberland Island has had an immediate adverse impact on Ms. Gregory's aesthetic enjoyment of not only seeing healthy horses, but also of experiencing the natural wonders of Cumberland Island.  Her individualized work to bring assistance to Georgia's abused and neglected horses is being injured and impaired by Defendants' actions.

14.

GERL's members derive aesthetic pleasure from seeing healthy and thriving horses living under humane conditions, which unfortunately do not exist at Cumberland.   GERL's attempt to humanely remove the horses from Cumberland Island is central to its purpose of addressing the problem of starved, abused, and neglected horses in the state of Georgia.   Neither the claims being alleged nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.

15.

As the result of the defendants' failure to care for or remove the horses of Cumberland Island, GERL has been, and will be, forced to divert organizational resources away from activities to which they might otherwise have been allocated. Specifically, GERL has devoted personnel and monies toward helping to identify and address defendants' illegal activities in keeping Cumberland Island's horses in

inhumane living conditions.   GERL reasonably anticipates that it will have to devote increasing time, personnel, and monies towards not only supporting this litigation, but also, more importantly, toward defining and implementing an appropriate remedy that assures the humane treatment of the horses.   Those resources will be diverted from GERL's other activities throughout the state.  The expenditure of those resources in personnel, time, and money to counteract defendants' improper and illegal conduct constitutes the concrete injury necessary to confer standing.  GERL has suffered and will continue to suffer injury in fact as the result of Defendants' actions.

16.

The Georgia Horse Council ("Council") is a non-profit organization dedicated to promoting, educating, and unifying equine-interested persons, state horse organizations and state breed associations in Georgia.   The Council works diligently to meet the needs of its members by offering a variety of events and opportunities to advance Georgia's horse industry.    Horse welfare is a key component of this program.  As part of this effort, the Council informs its membership of issues affecting unwanted horses in Georgia and the rest of the nation.  The Georgia Horse Council's members derive aesthetic pleasure from seeing healthy and thriving horses living under humane conditions.   Defendants'

actions have caused and will continue to cause the Georgia Horse Council and its members to suffer injury in fact.

17.

Carol Ruckdeschel lives on Cumberland Island.   She has spent her adult life studying and documenting the various systems, communities and species that define Cumberland Island.    As an island resident, she has a unique understanding of the island's horses; how they impact the island; and how the island affects the horses.   Ms. Ruckdeschel has co-owned and cared for several horses on her island property. She is a long-standing advocate for the island's natural systems and biota.   She derives aesthetic pleasure from seeing healthy and thriving ecosystems on the island.   Ms. Ruckdeschel also derives aesthetic pleasure from seeing the horses at Cumberland living under humane conditions. Conversely, Ms. Ruckdeschel's overall enjoyment of the horses is greatly diminished, if not eliminated, from seeing malnourished and injured horses.   Ms. Ruckdeschel's aesthetic pleasure is diminished because of the adverse impacts on the horses as well as the island's ecosystems caused by Defendants' neglect.  She is adversely affected from observing the horses on Cumberland struggle to live in an unnatural environment.

18.

Defendants' failure to remove the feral horses from the island have not only injured and diminished Ms. Ruckdeschel's personal enjoyment of the island's natural and wilderness resources, but have also affected her professional and academic pursuits, including the overall welfare of Cumberland Island's horses.

19.

Will Harlan is a senior scientist and Southeast Director at the Center for Biological Diversity. Harlan lives in the mountains of western North Carolina with his family. Previously, he served as editor in chief of *Blue Ridge Outdoors Magazine* and was actively involved with several stories related to the protection of Cumberland Island's natural and wilderness resources. His book *Untamed: The Wildest Woman in America and the Fight for Cumberland Island* was a *New York Times* bestseller, winner of the Society of Environmental Journalists' Rachel Carson Book Award, and one of Amazon's Top 100 Books of the year. Harlan spent 19 years of his life writing the book and studying the island. He has also volunteered with the National Park Service on Cumberland Island.

20.

Mr. Harlan is a long-time and frequent visitor to Cumberland Island over the past 30 years.  He derives aesthetic pleasure from seeing healthy and thriving

ecosystems on the island and from observing native, rare, and imperiled species thriving within those ecosystems.  Mr. Harlan enjoys long solitary hikes into the Cumberland Wilderness.    This pleasure in otherwise pristine wilderness is negatively impacted both by the numerous piles of horse manure and the threat imposed by interloping and sometimes agitated feral horses.  Mr. Harlan worries about bringing his family to the island and subjecting them to the distressing, traumatic experience of witnessing a horse dying or suffering. Defendants' failure to remove the feral horses have not only injured and diminished Harlan's personal enjoyment of the island's natural and wilderness resources, but have also directly and adversely affected his professional and academic interests in preserving Cumberland Island's resources, including the protected species found on the Island.

21.

Plaintiffs are "persons" within the meaning of 16 U.S.C. §701(b)(2)(APA) and 16 U.S.C. §1540 (g)(1)(ESA).

22.

Plaintiffs are within the zone of interests intended to be protected by the statutes authorizing this action.

23.

Plaintiffs are, or will be, "adversely affected or aggrieved" within the meaning of 5 USC §702 (APA), by Defendants' management actions, particularly Defendants' failure to humanely remove the horses from the Seashore and the Cumberland Wilderness.

24.

Plaintiffs' injuries will be redressed by the Court's granting the requested mandatory injunctive relief.

25.

Defendant Deb Haaland is sued in her official capacity as Secretary of the Interior.  As Secretary, the Defendant is charged with the duty to carry out the requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*; the Cumberland Island National Seashore Act, 16 U.S.C. §§ 459i – 459i-9, and its enabling rules and regulations; the Endangered Species Act (ESA), 16 U.S.C. §§ 1361 *et seq*; and the 1964 Wilderness Act, 16 U.S.C. §§ 1131 *et seq* (Wilderness Act).  More specifically, the Secretary is required to act affirmatively to protect and promote the well-being of the natural and wilderness resources of Cumberland Island National Seashore and the Cumberland Wilderness Area.   As Secretary of

the Interior, Defendant Haaland has the ultimate responsibility for the activities of

the National Park Service, including those described in this suit.

26.

Defendant Regional Director Mark Foust is sued in his official capacity as

Director of the South Atlantic-Gulf Region, National Park Service, Department of

the Interior with its principal offices located at Atlanta Federal Center, 1924

Building, 100 Alabama St., S.W., Atlanta, GA 30303.  As Regional Director,

Defendant Foust is responsible for managing interpretation, use, protection,

maintenance, and environmental quality programs within the region's National

Parks, including the Cumberland Island National Seashore and Cumberland

Wilderness.   The Regional Director duties include managing programs to maintain

NPS standards and rules regarding Cumberland National Seashore's natural and

wilderness resources.   As Regional Director, Defendant Foust is responsible for

the activities of the National Park Service within his Region.

27.

Defendant Gary Ingram is sued in his official capacity as Superintendent,

Cumberland Island National Seashore, National Park Service, Department of the

Interior, with its principal offices located at 101 Wheeler Street, St. Marys, GA

31558.  As Superintendent, Defendant Ingram is responsible for supervising the

activities of the National Park Service at Cumberland Island National Seashore, including actions alleged in this Complaint.

28.

Defendant Mark Williams is sued in his official capacity as Commissioner, Department of Natural Resources, State of Georgia, with its principal offices being located at 2 Martin Luther King Jr. Dr., S.E., Suite 1252, Atlanta, GA 30334.  As Commissioner, Defendant Williams is responsible for protecting the state's natural resources, including its fish, wildlife, and coastal marshlands and dunes.

29.

Defendant Tyler Harper is sued in his official capacity as Commissioner, Department of Agriculture, State of Georgia, with its principal offices located at 19 Martin Luther King Jr. Dr., S.W., Atlanta, GA, 30334.   Among his other duties as Commissioner, Defendant Harper is responsible for assuring that the state's equine population is treated humanely by their individual owners (Humane Care for Equines Act) and is protected from disease (Georgia Equine Act).    He is responsible for supervising the activities of the Department that affect equines located within the state of Georgia.

## STATEMENT OF THE CASE

Plaintiffs incorporate the foregoing allegations.

### 30.

The current number of horses on Cumberland Island is estimated to be between 140 and 170 animals.

### 31.

Cumberland Island's horses are non-native feral horses and are deemed to be "exotic species" by the United States government.

### The Horses Negatively Impact the Island.

### 32.

The negative impact imposed by the horses on Cumberland Island is well-documented.

### 33.

The Cumberland Island horses' "grazing activity, including vegetation consumption and trampling, significantly reduces vegetative cover, growth, and reproduction in these habitats;" alters plant species composition, "likely increasing the vulnerability of dunes and salt marshes to erosion and storm damage;" and compacts wetland soils, thereby "disturbing vital soil-dwelling organisms."

*Natural Resources Condition Assessment for Cumberland Island National Seashore, 2018 (NRR).*

34.

"[W]astes produced by horses contribute to nutrient enrichment or eutrophication of wetlands and waterbodies . . . mak[ing] wetland habitats less favorable for native plants, fish, herpetofauna, and invertebrates."   *NRR.*

35.

The Island's marsh grasses are a key part of the Cumberland horses' food supply.   In addition to directly removing large amounts of marshland vegetation through grazing, the trampling impacts of the horses adversely affect other marshland species and alter the salt marsh ecosystem.

36.

Horses threaten the reproductive efforts of the protected loggerhead sea turtle, *Caretta caretta*, by disturbing nesting females; loss of "dune vegetation by overgrazing by livestock"; and "crushing of developing clutches [of eggs] from the hoofprints of feral animals."  Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia ("Management Plan"), Georgia Loggerhead Sea Turtle Protection and Management Committee, created

by Commissioner of the Georgia Dept. of Natural Resources,1995, attached hereto as Exhibit B.

37.

The horses compete with native white-tailed deer for forage on the island.

38.

The horses have also been known to trample shore bird nests.

**Conditions on the Island Negatively Impact the Horses' Wellbeing.**

39.

The island's harsh environmental factors reduce the life expectancy of the Island's horses to approximately one-third of that of a domestic horse.

40.

Cumberland Island lacks adequate food resources to sustain an equine population of any size.

41.

The horses' regular consumption of Spanish moss, smooth cordgrass, sea oats and sedge, all native to the island, provide marginal nutritional value.

42.

Horses typically require 8-10 gallons of fresh water per day for healthy functioning.

43.

Heat, exercise, and lactation can significantly increase a horse's need for fresh, clean water.

44.

The sources of fresh, clean water on Cumberland Island are limited.

45.

Those sources can be drastically reduced during periods of limited rainfall.

46.

Drinking brackish and salt water can increase the likelihood of diseases such as diarrhea, colic, and recumbency, as well as lead to abdominal pain, cramping, and other digestive complications.

47.

Ready and available access to fresh, clean water by the horses of Cumberland is far from certain.  On information and belief, it is likely that some horses have greater access to fresh, clean water than others.

48.

The Cumberland horses face hardships as ecological strangers to the barrier

island ecosystem.

49.

The horses face numerous stressors, including:

i) prescribed vegetation burns conducted by NPS throughout many parts of the Island;

ii) managed hunts for feral hogs and deer;

iii) various diseases, including encephalitis;

iv) a large island parasite population that can serve as disease vectors; and

v) tourists who can harass and further stress the horse population.

50.

The Cumberland Island horse herd's overall health is reflected in the horses'

low to middle-range body scores (an indicia of overall health).

51.

Yearlings, which no longer nurse, are challenged with gaining access to the

Island's scarce food resources.

52.

The fillies breed from their first heat and remain periodically pregnant their

entire lives, forcing them to forage for their nursing baby, the foal they carry, and

themselves.    This burden, together with the island's lack of adequate food sources, is reflected in body scores.

53.

NPS does not provide water, food, or veterinary care to the horses on Cumberland.

### NPS's Ongoing Inaction in Managing Cumberland's Horses

54.

Beginning in 1995, the NPS began to consider alternative means for managing the Island's horse population.

55.

In the summer of 1996, prior to NPS's implementation of a management plan for Cumberland's feral horse herd, United States Representative for the First District of Georgia, Jack Kingston, whose district includes Cumberland Island, intervened.   Congressman Kingston successfully attached a "rider" to an unrelated federal appropriations bill directing the NPS to immediately terminate any actions to manage or control the island's horses for the remainder of the fiscal year ending in 1997.

56.

Since 1996, NPS has taken no formal action to manage, care for, or otherwise control the Island's feral horses.

57.

In 2016 and 2023, NPS expressed the desire and need to manage the herd on Cumberland Island.

58.

- Despite the recognized need to manage the horses, NPS continues to only *consider* the necessity for managing the feral horses of Cumberland Island, including the removal of the horses from the island.

59.

NPS has neither initiated nor consummated a decision-making process on the management of the horses of Cumberland Island.

## COUNT ONE

## VIOLATION OF THE NATIONAL PARK SERVICE

## ORGANIC ACT OF 1916

Plaintiffs incorporate the allegations above.

60.

The Cumberland Island National Seashore is part of the National Park System and is subject to and governed by the *NPS Organic Act of 1916,* 16 U.S.C. § 1 et seq. (Organic Act).

61.

The U.S. Department of Interior and the NPS are to manage the Cumberland Island National Seashore (the Seashore) in a manner that will "conserve the scenery and the natural and historic objects and wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1, *NPS Organic Act of 1916*.

62.

Congress further charged NPS with the "absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system."  *The Redwood Act: An Act to amend the act of October 2, 1968, an act to establish a Redwood National Park in the State of California, and for other purposes; Pub. L. 95-250 H.R. 3813, 92 Stat. 166, enacted March 27, 1978.*

63.

NPS is obligated to protect the Seashore's resources and values from impairment "unless directly and specifically provided for by legislation or by the proclamation establishing the park."   NPS Management Policies 2006, Section 1.4.4.

64.

The horses of Cumberland are "exotic species" as defined by the NPS Management Policies 2006, Section 4.4.1.3.

65.

Where "exotic species" are deemed to have a substantial impact on park resources, the NPS shall give "high priority" to the removal of the exotic species from the park.  NPS Management Policies 2006, Section 4.4.4.2.

66.

50 C.F.R. §30.11 (a) provides "Feral animals, including horses, burros, cattle, swine, sheep, goats, reindeer, dogs, and cats, without ownership that have reverted to the wild from a domestic state may be taken by authorized Federal or State personnel or by private persons operating under permit in accordance with applicable provisions of Federal or State law or regulation."

67.

36 C.F.R. 2.60 (a) prohibits "[t]he running-at-large, herding, driving across, allowing on, pasturing or grazing of livestock of any kind" in the Seashore, subject to certain inapplicable exceptions.

68.

"[F]eral livestock having no known owner may [] be disposed of in accordance with 36 CFR 2.60" (establishing the process for impounding and disposing of livestock deemed to be trespassing on federal lands).  "Parks having shared jurisdiction with state fish and wildlife agencies should coordinate with their [state] counterparts . . .."  NPS Management Policies 2006, Section 8.6.8.3.

69.

Additionally, the horses of Cumberland Island are considered "invasive species" as defined pursuant to Executive Order 13112 on Invasive Species as Amended by Executive Order 13751, Fed. Reg., Vol. 81, No. 236, Dec. 5, 2016, meaning "with regard to a particular ecosystem, [they are a] non-native organism whose introduction causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health."  *Id*. Section 2, (e).

70.

The horses of Cumberland Island are "Non-native species" or "alien species," meaning "with respect to a particular ecosystem, [they are] an organism, including its seeds, eggs, spores, or other biological material capable of propagating that species, that occurs outside of its natural range."  Executive Order 13751, supra at Section 2, (f).

71.

In order to further promote and protect the environment by the removal and control of invasive species, NPS is required to undertake action(s) for "the prevention, eradication, and control of invasive species. . . ."   within the Seashore. Executive Order 13751, supra at Section 3, (a)(2)(vii).

72.

Feral horses "have had a significant impact on the CUIS [the Seashore] ecosystem." *Natural Resources Condition Assessment for Cumberland Island National Seashore,* 2018, (NRR); Natural Resource Report NPS/CUIS/NRR-2018/1773, at 19.

73.

The "maintenance of the feral horse herd causes unacceptable impacts to the park's wetland resources" *NRR* at 80.

74.

"Feral horses will continue to be a threat to the native mammals of the island as long as the population is left unmanaged." *NRR* at 127.

75.

"Threats to CUIS's freshwater water quality include feral horse [] activity." *NRR* at 189.

76.

The feral horses of Cumberland Island adversely affect and impair the Seashore's resources both now and for future generations.

**A.    NPS's Failure To Remove The Feral Horses As Non-Native Exotic Species And Livestock From The Seashore As Required By The National Park Service Organic Act Is An Agency Action Unlawfully Withheld Or Unreasonably Delayed.**

77.

NPS has the discrete nondiscretionary duty to remove the feral horses from the Seashore as a non-native exotic species and livestock. NPS Organic Act of 1916, 16 U.S.C. § 1 *et seq.; The Redwood Act: An Act to amend the act of October 2, 1968, an act to establish a Redwood National Park in the State of California, and for other purposes; Pub. L. 95-250 H.R. 3813, 92 Stat. 166, enacted March 27,*

*1978*; 36 C.F.R. 2.60; 50 C.F.R. §30.11; and those related rules, policies, directives, and executive orders.

78.

NPS's failure to remove the horses from the Seashore and to initiate the necessary rulemaking to adopt the requisite "agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule), constitutes "agency action".   5 U.S.C § 551 (13); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).

79.

NPS is obligated to act in an expeditious, prompt, and reasonable time to fulfill its duties and remove the horses.   5 U.S.C. § 706.

80.

NPS's delay of approximately 50 years in removing the horses is unreasonable.

81.

NPS's ongoing failure to remove the feral horses from the Seashore is an agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

**B.     NPS's Failure To Affirmatively Act To Remove Cumberland's Horses As A Non-Native Exotic Species And Livestock As Required By The National Park Service Organic Act And Its Enabling Rules And Regulations, Is Arbitrary And Capricious, An Abuse Of Discretion, And Unlawful.**

82.

Defendants' decision to take no action to manage, care for, or otherwise control the island's feral horses, including the decision to not remove the horses from the island, is an agency action. 5 U.S.C § 551 (13).

83.

It is fundamental that an agency is authorized to act only in accordance with applicable law, including its own rules and regulations.  Administrative Procedure Act, 5 U.S.C. § 706 (2)(A) & (C).

84.

Defendants' failure to comply with the NPS Organic Act of 1916, 16 U.S.C. § 1 *et seq.* and its enabling rules and regulations, which are meant to protect the Seashore's natural and wilderness resources from impairment by non-native exotic species such as Cumberland's feral horses, is arbitrary and capricious, an abuse of discretion, and otherwise unlawful, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706.

## COUNT TWO

## VIOLATION OF THE CUMBERLAND ISLAND NATIONAL SEASHORE ACT AND ITS ENABLING LAWS, PLANS, AND REGULATIONS.

Plaintiffs incorporate the foregoing allegations.

85.

By enacting the *Cumberland Island National Seashore Act* (the "*Seashore Act*") Congress mandated that "the seashore shall be permanently preserved in its primitive state" (with an inapplicable exception for certain public recreation activities). 16 U.S.C. § 459i-5(b).

86.

Accordingly, the *General Management Plan for Cumberland Island National Seashore* of *1982,* states that "[f]eral animals will be removed where they are detrimental to natural and cultural resources, and they will be transported to the mainland. . .. The feral horse population will be managed to insure a [h]ealthy representative herd. . .."

87.

Both Cumberland Island National Seashore's enabling legislation and NPS's management plans require NPS to "manage native wildlife populations [on Cumberland Island] so as to achieve a balanced eco-system free of interferences

created by man" and to "reduce the competitive impact on native wildlife by exotic animals and the deleterious effect on vegetation by exotic animals by the most effective, feasible means possible." *1990 Statement for Management for Cumberland Island National Seashore.*

88.

In the *Environmental Assessment for the Visitor Use Management Plan for the Cumberland Island National Seashore*, *(2022)* the NPS acknowledges "[t]he herd is not actively managed (no food, water, veterinary care, or population control is provided) and the horses are affected by all the natural stressors faced by native wildlife." *Id.* Appendix K. *Impact Topics Considered But Dismissed From Further Analysis.*

89.

The feral horses of Cumberland Island adversely affect and impair the Seashore's resources.

90.

The presence of the feral horses on Cumberland Island is incompatible with preserving the primitive state of the Seashore.

91.

The laws, policies, plans, and directives governing the Cumberland Island National Seashore create the legal duty upon the NPS to undertake the discrete act to remove the feral horses from the island.

92.

NPS's failure to remove the feral horses from Cumberland Island is a violation of the Seashore Act's mandate to permanently preserve the Seashore in its primitive state.

**A.    NPS's Failure To Remove The Feral Horses As Non-Native Exotic Species And Livestock From The Seashore As Required By The Cumberland Island National Seashore Act Is An Agency Action Unlawfully Withheld Or Unreasonably Delayed.**

93.

NPS's failure to act to remove the horses from the Seashore constitutes "agency action."   5 U.S.C § 551 (13).

94.

NPS has the discrete nondiscretionary legal duty to remove the feral horses from the Seashore as a non-native exotic species and livestock. *Cumberland Island National Seashore Act* (the "*Seashore Act*"), Public 92-536, 1972, 16 U.S.C. § 459i-5(b); *the General Management Plan for Cumberland Island National*

*Seashore,1982; the 1990 Statement for Management for Cumberland Island*

*National Seashore;* and other related rules, policies, and directives.

95.

NPS is obligated to act in an expeditious, prompt, and reasonable time

within which to fulfill its duties and remove the horses.   5 U.S.C. § 706.

96.

NPS's delay of approximately 50 years is unreasonable.

97.

Defendants' failure to remove the feral horses from the Seashore is an

agency action unlawfully withheld or unreasonably delayed in violation of 5

U.S.C. § 706(1).

**B.     NPS's Failure To Affirmatively Act to Remove Cumberland's Horses As A Non-Native Exotic Species And Livestock As Required By The Cumberland Island National Seashore Act And Its Enabling Rules And   Regulations, Is Arbitrary And Capricious, An Abuse Of Discretion, And Unlawful.**

98.

Defendants' decision to take no action to manage, care for, or otherwise

control the island's feral horses, including the decision to not remove the horses

from the island, is an "agency action".  5 U.S.C § 551 (13).

99.

It is fundamental that an agency is authorized to act only in accordance with applicable law, including its own rules and regulations.  Administrative Procedure Act, 5 U.S.C. § 706 (2)(A) & (C).

100.

Defendants' failure to comply with the Seashore Act, 16 U.S.C. § 459i-5(b), and the rules and regulations promulgated thereunder (meant to maintain the Seashore's natural and wilderness resources in their primitive state and to protect against impairment by non-native exotic species such as feral horses) is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, all in violation of the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706.

**COUNT THREE**

**VIOLATION OF THE WILDERNESS ACT, 16 U.S.C. § 1131, et seq.**

Plaintiffs incorporate the foregoing allegations.

**The Cumberland Island Wilderness Area.**

101.

The Cumberland Island Wilderness was created by Congress on September 8, 1982, under the Wilderness Act by designating 8,840 acres of Cumberland as

wilderness and 11,718 acres as "potential wilderness".   Pub. L. No. 97-250, § 2(a), 96 Stat. 709 ("Designating Act").

102.

A portion of Cumberland's marshlands is part of the Cumberland Island Wilderness Area and designated as a potential wilderness area.

103.

The 1964 Wilderness Act, 16 U.S.C. § 1131 et seq, seeks to preserve wilderness areas "*in their natural condition*" for their "use and enjoyment *as wilderness*." 16 U.S.C. § 1131(a) (*emphasis added*).

104.

In the Wilderness Act, Congress defines a

> wilderness, in contrast with those areas where man and his
> own works dominate the landscape, as an area where the
> earth and its community of life  are untrammeled by man,
> where man himself is a visitor who does not remain. An area
> of wilderness is further defined to mean in this chapter an
> area of undeveloped Federal land retaining its primeval
> character and influence, without permanent improvements or
> human habitation, which is protected and managed so as to

- 36 -

preserve its natural conditions and which (1) generally

appears to have been affected primarily by the forces of

nature, with the imprint of man's work substantially

unnoticeable; (2) has outstanding opportunities for solitude or

a primitive and unconfined type of recreation; (3) has at least

five thousand acres of land or is of sufficient size as to make

practicable its preservation and use in an unimpaired

condition; and (4) may also contain ecological, geological, or

other features of scientific, educational, scenic, or historical

value.

16 U.S.C. § 1131(c).

## 105.

An essential wilderness characteristic to be preserved and protected is the "natural condition" of the wilderness area.

## 106.

NPS has an affirmative duty to assure the "natural condition" wilderness characteristic of the Cumberland Island Wilderness.

107.

NPS has the authority and responsibility to protect the marshlands within the Cumberland Island National Seashore designated as potential wilderness.

108.

The Wilderness Act seeks to provide visitors with the opportunity for a primitive wilderness experience and to protect the wilderness resource(s) from physical impairment.

109.

Permitting feral horses to exist within the Cumberland Island Wilderness is directly contrary to NPS's duty to assure the "natural conditions" wilderness characteristic required by the Wilderness Act, 16 U.S.C. § 1131(a) and (c).

110.

Permitting feral horses, a non-native species, to exist within the Cumberland Island Wilderness is contrary to the values of the Wilderness Act.

111.

Non-native animal species such as feral horses are not allowed in wilderness areas. National Park Service, Director's Order #41: Wilderness Stewardship, Section 6.9, Non-native Invasive Species.

112.

The objective of the management of non-native animal species within wilderness areas is to remove the invasive species. National Park Service, Director's Order #41: Wilderness Stewardship, Section 6.9, Non-native Invasive Species.

## A.    NPS's Ongoing Failure To Remove The Feral Horses From The Cumberland Island Wilderness Is An Agency Action Unlawfully Withheld Or Unreasonably Delayed.

113.

NPS's ongoing failure to remove the horses from the Cumberland Island Wilderness constitutes a final agency action.

114.

NPS has the legal duty under the Wilderness Act and its specific enabling rules, orders, and directives to undertake the discrete act of removing the feral horses as a non-native exotic species from the Cumberland Island Wilderness.

115.

NPS's failure to remove the feral horses from the Cumberland Island Wilderness is an agency action unlawfully withheld or unreasonably delayed.  5 U.S.C. § 706(1).

**B.**     **NPS's Ongoing Failure to Affirmatively Act to Remove Cumberland's Horses As A Non-Native Exotic Species And Livestock From The Cumberland Island Wilderness Is Arbitrary And Capricious, An Abuse Of Discretion, Unlawful, And Contrary To NPS's Own Rules And Regulations Meant To Protect and Preserve the Cumberland Island Wilderness.**

## 116.

Defendants' decision to take no action to manage, care for, or otherwise control the island's feral horses, including the decision to not remove the horses from the island, is a final agency decision.

## 117.

It is fundamental that an agency is authorized to act only in accordance with applicable law, including its own rules and regulations.  Administrative Procedure Act, 5 U.S.C. § 706 (2)(A) & (C).

## 118.

Defendants' failure to comply with the Wilderness Act and its related rules, regulations, directives, and orders, which are meant to preserve and protect the Cumberland Island Wilderness in its natural condition against non-native exotic feral horses, is arbitrary and capricious, an abuse of discretion, and unlawful, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706.

# COUNT FOUR

## VIOLATION OF THE ENDANGERED SPECTIES ACT

## 16 U.S.C §1531 *ET SEQ.*

Plaintiffs incorporate the foregoing allegations.

### 119.

The Endangered Species Act (ESA), 16 U.S.C §1531, et seq., was enacted by Congress in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species ..." 16 U.S.C. §1531 (b).

### 120.

The ESA imposes three primary duties on NPS:

1. to avoid jeopardizing protected species, 16 U.S.C. 1536 (a)(2);

2. to refrain from "taking" protected species, 16 U.S.C. 1538 (a)(1)(b); and

3. to act affirmatively to restore protected species to a viable population, one not threatened with extinction.

### 121.

It is a violation of ESA for a federal agency to undertake any action that jeopardizes a protected species.   An action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02 (2023).

122.

It is a violation of ESA to "take" a protected species.  16 U.S.C. §1538 (a)(1)(b).

123.

The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.  16 U.S.C. §1532 (19).

124.

The term "harm" includes acts that kill or injure protected wildlife by causing significant modification to habitat and impairment of essential behavioral patterns, including breeding, feeding, and sheltering. "Harm" can also result from acts that prevent the recovery of a species by destroying critical habitat and

adversely affecting behavioral patterns essential to the species' survival. 50 C.F.R.
§17.3 (2023).

125.

Actions taken by an agency pursuant to its plans and policies can result in an
impermissible "take" of protected species.

Loggerhead Sea Turtle, *Caretta caretta*.

126.

The Northwest Atlantic Ocean distinct population segment (DPS) of
loggerhead sea turtles, *Caretta caretta*, nests primarily along the Atlantic coast of
Florida, South Carolina, Georgia, and North Carolina.

127.

The Northwest Atlantic Ocean population, of which *Caretta caretta* on
Cumberland Island is a part, is a protected species under the ESA. 50 C.F.R.
§17.11.

128.

The National Oceanographic and Atmospheric Administration (NOAA)
designated the entire eastern shore of Cumberland Island, including its northern

and southern tips, as critical habitat for the loggerhead because those areas are deemed essential to the success of *Caretta caretta's* breeding.

129.

Loss of critical nesting habitat, interference with female turtles' efforts to nest, and the direct loss of *Caretta caretta* eggs and hatchlings drastically interfere with *Caretta caretta*'s reproductive effort, thereby "jeopardizing" its continued existence.

130.

The loss of each egg and hatchling to trampling by a feral horse is an illegal "take" of *Caretta caretta.*

131.

The impairment of Cumberland Island's dynamic dune system caused by the grazing of the feral horses is a significant modification of the habitat critical to the breeding success of *Caretta caretta* and is an illegal "take" of *Caretta caretta*.

132.

A "take" of *Caretta caretta* necessarily jeopardizes its continued well-being.

133.

In 1995, finding "nesting of loggerheads in Georgia has declined despite enactment of conservation measures to protect sea turtles in the water," Defendant

NPS entered into a Memorandum of Agreement with the United States Fish and Wildlife Service (USFWS) and Defendant Georgia Department of Natural Resources adopting the comprehensive Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia ("Management Plan"), attached hereto as Exhibit C.

134.

Defendants are violating the Management Plan requiring Defendants to protect and manage *Caretta caretta's* nesting habitat, including the "beach," "bare sand surface," and the "dynamic dune field" as described and regulated in the Shore Protection Act (OCGA §12-5-230 to §12-5-248).

135.

Defendants are violating the Management Plan by failing to "protect dune vegetation from overgrazing by livestock," it being "the responsibility of the manager of each island to control hogs, horses, and other non-native grazers so that beach vegetation is not adversely impacted." Management Plan, Part II.E.

136.

The Management Plan specifically incorporates the United States Fish and Wildlife Service's Recovery Plan for U.S. Population of the Loggerhead Sea Turtle (1990) ("Loggerhead Recovery Plan").

137.

"Every clutch of eggs is important to the survival of a threatened or endangered species.  Management is required to maximize [*Caretta caretta's*] reproductive effort until such species can be down listed to a more stable management category."  Management Plan, Introduction.

138.

The adverse impacts feral horses have on *Caretta caretta* and their nesting habitat are abundantly documented.

139.

To emphasize the importance of controlling feral horses, the Management Plan provides: "*Management negligence resulting in the destruction of sea turtles, their eggs, young, nests or damage to critical habitat should be fully investigated and prosecuted to the extent of state and federal law.*" *Emphasis added.* Management Plan, I. B. 1.

140.

Feral horses, by trampling, consuming, and destroying fragile dune vegetation, significantly contribute to dune destabilization, making the primary dune system and *Caretta caretta's* critical nesting habitat more vulnerable to sea level rise, climate change, and extreme weather events.

Piping Plover, *Charadrius melodus melodus*.

141.

The piping plover is a small migratory shorebird that nests and feeds along coastal beaches in North America. There are three populations of piping plover: subspecies *C. m. circumcinctus* located on the shorelines of the Great Lakes; a second *circumcinctus* population that lives in the Northern Great Plains; and the subspecies *Charadrius melodus melodus* that lives along the Atlantic Coast.

142.

The Atlantic Coast population of *Charadrius*, of which *melodus melodus* on Cumberland Island is a part, is a protected species under the ESA. 50 C.F.R. 17.11; 50 FR 50726.

143.

Piping plovers are small birds approximately 7 inches (17 centimeters) long with a wingspan of 15 inches (38 centimeters). Piping plovers weigh between 1.4 to 2.3 ounces (40 to 65 grams).

144.

Piping plovers start arriving at breeding grounds in early April, followed by mating and nesting in mid-to-late April. Male plovers create a shallow depression in the ground that both adults line with small pebbles.  Incubation lasts 25 to 28

days and is shared between the sexes. Eggs hatch between late May and early June. Young birds leave the nest within hours and begin foraging immediately.  They start flying and living independently ("fledging") 25 to 35 days after hatching. Piping plovers leave breeding grounds as early as mid-July and generally raise one brood a season; but they may raise two broods under rare conditions.

145.

Piping plovers spend most of their time foraging. They feed on exposed beach surfaces by pecking for invertebrates that are ½ inch or less below the surface. They feed mostly during the day and eat insects, marine worms, crustaceans, and mollusks, as well as eggs and larvae of flies and beetles.

146.

Critical habitat for piping plovers was designated on July 10, 2001, for birds that nest along the Atlantic Coast.  66 FR § 36038 as amended.

147.

The northern, eastern, and southern shore of Cumberland Island—including 1,500 inland feet of dune and interdune habitat—is designated critical habitat for the piping plover.

148.

Piping Plover critical habitat for Cumberland Island (Unit GA-16) includes 3,595 acres, the majority of which are along the Cumberland Island Wilderness Area and Cumberland Island National Seashore. This Unit GA-16 incorporates the majority of the eastern Atlantic shoreline of Cumberland Island. It begins 0.50 kilometers north of the inlet at Long Point and continues south along the Atlantic Ocean shoreline before stopping 1.8 kilometers west of the southern tip of Cumberland Island National Seashore. It includes land from the Mean Lower Low Water (MLLW) to areas where densely vegetated habitat begins.  50 CFR §17; 66 FR §36038, 36070.

149.

Piping plovers live and forage on Cumberland Island during the non-breeding season, roughly the eight months lasting from August to March.

150.

The piping plover, *Charadrius melodus melodus* resides at Cumberland Island for most of the year. They are a medium-distance migrant that travels to the Northeast U.S. and the Great Lakes/Upper Midwest region to breed in the spring and early summer.

151.

Feral horses interfere with the essential behavioral patterns of the piping plover, including feeding, roosting, and sheltering in their critical habitat on Cumberland Island, resulting in the harassment and harming of the protected species in violation of the Endangered Species Act.

152.

Feral horses, by trampling, consuming, and destroying Cumberland Island's fragile dune vegetation, significantly contribute to dune destabilization, rendering the primary dune system, the sand-sharing system, and *Charadrius melodus melodus's* critical habitat more vulnerable to sea level rise, climate change, and extreme weather events.

153.

The interference by Cumberland Island's feral horses with the piping plover's essential behavior patterns and the negative impacts of their grazing activities on the critical habitat of Cumberland Island's dynamic dune system jeopardize the recovery success of *Charadrius melodus melodus* and is an illegal "take" of *Charadrius melodus melodus*.  16 U.S.C. 1536 (a)(2); 16 U.S.C. 1538 (a)(1)(b).

154.

A direct "take" of *Charadrius melodus melodus* necessarily jeopardizes its continued well-being.

**Irreparable and Immediate Harm.**

155.

Defendants' continuing refusal to protect *Caretta caretta* and *Charadrius melodus melodus* (the "protected species") by taking proactive measures to remove all feral horses from the Island, despite their being a "substantial likelihood" of harm to this protected species, constitutes an irreparable threat to the recovery and continued existence of this species.

156.

The *Natural Resources Condition Assessment for Cumberland Island National Seashore, 2018 (NRR)* and the 1995 Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia demonstrate the harm to *Caretta caretta* and *Charadrius melodus melodus* from feral horses. Defendants' continued refusal to control non-native feral horses demonstrates that the threat to the protected species is immediate and significant, creating an emergency by posing a significant risk to the survival of a protected species.

157.

Plaintiffs' interests are being irreparably injured and Plaintiffs have no remedy at law.

**The National Park Service's Policies and Practices Governing the Management and Control of Cumberland Island's Feral Horses Are "Jeopardizing" and "Taking" the Protected *Caretta Caretta* and *Charadrius Melodus Melodus* In Violation Of the Endangered Species Act.**

158.

Feral horses inhabit the entirety of Cumberland Island and frequently graze, forage, and shelter on Cumberland's beach and interdune areas, all of which are used by the protected species for nesting, resting, feeding, roosting, or sheltering.

159.

Despite NPS's ongoing expressed desire and need to manage the non-native horse herd on Cumberland Island, it has been the informal policy of the NPS since 1997 to undertake no formal action to manage, care for, or otherwise control the island's feral horses.

160.

NPS's policies and practices governing the management of Cumberland's feral horses have failed to protect *Caretta caretta* and *Charadrius melodus melodus* from feral horses.

161.

NPS has known since at least 1996 that its policies and practices dealing with feral horses have failed to protect *Caretta caretta*, *Charadrius melodus melodus*, and the critical habitats upon which these species depend.

162.

Defendants' continuing refusal to "rigorously control" feral horses by removing them from the island is causing the "destruction of sea turtles, their eggs, young, nests or damage to critical habitat," the disturbance of the piping plover's ability to feed, roost and shelter in its essential beach habitats, and impairment of its critical habitat are "jeopardizing" and "taking" *Caretta caretta* and *Charadrius melodus melodus* in violation of 16 U.S.C. §1536 (a)(2) and 16 U.S.C. §1538 (a)(1)(b), respectively.

**NPS's Refusal to Follow Its Own Rules and Regulations That Are Meant To Protect *Caretta Caretta* and *Charadrius Melodus Melodus* Is Arbitrary and Capricious, an Abuse Of Discretion, and Otherwise Not in Accordance With the Law.**

163.

It is fundamental that an agency is authorized to act only in accordance with applicable law, including its own rules and regulations.  Administrative Procedure Act, 5 U.S.C. § 706 (2)(A) & (C).

164.

Defendants' failure to comply with the Endangered Species Act (ESA), 16 U.S.C §1531, *et seq.,* and the regulations promulgated thereunder; the FWS's Recovery Plan for the Northwest Atlantic Population of Loggerhead Turtle, (*Caretta caretta)*, Second Revision, 2008 ("Loggerhead Recovery Plan"); the NPS 1984 General Management Plan for the Cumberland Island National Seashore; the NPS 1988 Management Policies; and the 1995 Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia, is an agency action unlawfully withheld or unreasonably delayed contrary to the Administrative Procedure Act, 5 U.S.C. § 706(1); and is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, and without observance of the procedures required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706.

## STATE LAW CLAIMS

## COUNT FIVE

## VIOLATION OF THE HUMANE CARE FOR EQUINES ACT

## OCGA §14-3-1, *et seq.*

Plaintiffs incorporate the foregoing allegations.

165.

A writ of Mandamus is appropriate in this action pursuant to OCGA §9-6-20, et seq., to compel the State Defendant officials to properly perform their duties.

166.

Defendant Commissioner of the Georgia Department of Agriculture has sworn to uphold the Constitution of the United States and the Constitution of the State of Georgia.

167.

Plaintiffs have an interest in having the laws properly administered and enforced, including the Georgia Humane Care for Equines Act (the "Act"), which is intended to assure that the horses of the State of Georgia, including the horses of Cumberland Island, are provided with adequate water, food, and humane care.

168.

The Humane Care for Equines Act makes it illegal for any person owning, having possession or custody of, or in charge of, any equine to fail to provide adequate food, water, and humane care to such equine. OCGA §§14-3-2; 14-13-3 (2); and 14-13-3 (3).

169.

The State of Georgia and the NPS are "persons" under the Humane Care for Equines Act. OCGA §14-13-2.

170.

The State of Georgia and the NPS are "Owners" of the horses on Cumberland and are "in custody or in charge" of the horses.   OCGA § 14-13-2.

171.

The horses on Cumberland do not receive adequate food and water, meaning food and water sufficient to prevent starvation, dehydration, or a significant risk to the equine's health from a lack of food or water.   OCGA § 14-13-2.

172.

The State of Georgia and the NPS have a duty to assure the horses on Cumberland are provided with humane care.   Humane Care for Equines Act, OCGA §§ 14-13-1, et seq.

173.

The State of Georgia and the NPS have failed to provide adequate food and water to the horses of Cumberland in violation of the Act.   OCGA § 14-13-3 (2).

174.

The State of Georgia and the NPS have failed to provide humane care to the horses of Cumberland in violation of the Act.   OCGA § 14-13-3 (3).

175.

By maintaining feral horses on the Cumberland barrier island without providing sufficient supplemental fresh water, food, or humane care, and thereby subjecting the horses to significant health risks, Defendants Commissioner of the Department of Agriculture and the NPS have acted arbitrarily and capriciously, and without legal authority, in direct violation of the Humane Care for Equines Act.   OCGA §14-13-1, *et seq.*

## COUNT SIX

## VIOLATION OF OCGA §4-3-1, *et seq.*,

## LIVESTOCK RUNNING AT LARGE OR STRAYING.

Plaintiffs incorporate the foregoing allegations.

176.

Horses are considered "livestock" under OCGA § 4-3-1, et seq.  OCGA §4-3-2.

177.

The free ranging of horses is prohibited under OCGA § 4-3-1, et seq.

OCGA §4-3-3.

178.

By allowing their feral horses to run "at large" throughout the entirety of

Cumberland Island, Defendants have acted arbitrarily and capriciously, and

without legal authority, in direct violation of OCGA §4-3-1, *et seq*.

**COUNT SEVEN**

**VIOLATION OF THE GEORGIA COASTAL MARSHLAND
PROTECTION ACT, OCGA §12-5-280, et seq.; GEORGIA SHORELINE
PROTECTION ACT, OCGA §12-5-230, *et seq.*; THE SEA OAT ACT, OCGA
§12-5-310, *et seq.*; AND THE GEORGIA COASTAL MANAGEMENT ACT,
OCGA §12-5-320, *et seq*.**

Plaintiffs incorporate the foregoing allegations.

179.

In drafting the Coastal Marshland Protection Act (CMPA), the Shoreline

Protection Act, the Sea Oat Act, and the Coastal Management Act, the Georgia

General Assembly emphasized that *the coastal marshlands, the sand-sharing*

*system, sea oats, and the coastal area* were critically important resources that are

essential to the continued well-being of the State's wildlife, fisheries, and citizenry,

- 58 -

and are to "*be regulated to ensure that the values and functions of the [coastal area] are not impaired and to fulfill the responsibilities of each generation as public trustees of the coastal [area] for succeeding generations*."

180.

The General Assembly, in the Coastal Marshland Protection Act, in language mirrored in the Shoreline Protection Act and the Coastal Management Act, stated:

The General Assembly finds and declares that the coastal marshlands of Georgia comprise a vital natural resource system. It is recognized that the estuarine area of Georgia is the habitat of many species of marine life and wildlife and, without the food supplied by the marshlands, such marine life and wildlife cannot survive. The General Assembly further finds that intensive marine research has revealed that the estuarine marshlands of coastal Georgia are among the richest providers of nutrients in the world. Such marshlands provide a nursery for commercially and recreationally important species of shellfish and other wildlife, provide a great buffer against flooding and erosion, and help control and disseminate pollutants. Also, it is found that the coastal marshlands provide a natural recreation

resource which has become vitally linked to the economy of Georgia's coastal zone and to that of the entire state. The General Assembly further finds that this coastal marshlands resource system is costly, if not impossible, to reconstruct or rehabilitate once adversely affected by man related activities and *is important to conserve for the present and future use and enjoyment of all citizens and visitors to this state*. The General Assembly further finds that the coastal marshlands are a vital area of the state and are essential to maintain the health, safety, and welfare of all the citizens of the state. Therefore, the General Assembly declares that the management of the coastal marshlands has more than local significance, is of equal importance to all citizens of the state, is of state-wide concern, and consequently is properly a matter for regulation under the police power of the state. *The General Assembly further finds and declares that activities and structures in the coastal marshlands must be regulated to ensure that the values and functions of the coastal marshlands are not impaired and to fulfill the responsibilities of each generation as public trustees of the coastal marshlands for succeeding generations.*

Emphasis Supplied.  Coastal Marshland Protection Act, OCGA §12-5-281.

181.

The State of Georgia holds the coastal marshlands, the sand-sharing system (including the sea oats), and the entirety of the natural resource system supporting the coastal area in public trust for the current and future use of the citizens of the State of Georgia.

182.

As public trustee, the State of Georgia, including the Commissioner of Natural Resources, has the legal duty to assure the values and functions of Georgia's natural resources are not impaired for current and future generations of Georgians.

183.

The feral horses of Cumberland Island adversely affect and impair the Seashore's coastal marshlands and sand-sharing system.

184.

The presence of feral horses on Cumberland Island is incompatible with preserving the State's coastal marshlands and sand-sharing system on Cumberland Island for current and future generations.

185.

The Coastal Marshland Protection Act, the Shoreline Protection Act, the Sea Oat Act, and the Coastal Management Act create a legal duty upon the State of Georgia to undertake the discrete act to remove the feral horses from Cumberland Island.

186.

The failure by the State of Georgia to remove the feral horses (owned by the State and the NPS as feral livestock running at large) from Cumberland Island is a violation of the Coastal Marshland Protection Act, the Shoreline Protection Act, the Sea Oat Act, and the Coastal Management Act, each of which require the State to permanently preserve and protect the coastal marshlands and sand-sharing systems within the boundaries of the Seashore.

## **RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs seek a judgment from this Court against Defendants as follows:

1.  A declaration that the Department of the Interior and the National Park Service violated the National Park Service Organic Act including its implementing rules and regulations; the Cumberland Island National Seashore Act and its

enabling laws, plans, and regulations; the Wilderness Act; the Endangered Species Act; and the Administrative Procedure Act by failing to remove the feral horses as non-native exotic species and livestock from the Cumberland Island National Seashore and the Cumberland Wilderness.

2.  A declaration that the Department of the Interior, the National Park Service, and the State of Georgia violated the Humane Care for Equines Act; the Prohibition against Livestock Running at Large Act; the Georgia Coastal Marshland Protection Act; the Georgia Shoreline Protection Act; the Sea Oat Act; and the Georgia Coastal Management Act by permitting the free ranging of horses on Cumberland Island to the detriment of both the health of the horses and the island's coastal marshlands and sand-sharing systems.

3.  An injunction requiring NPS to immediately remove all feral horses from the Cumberland Island Wilderness, including potential Wilderness Area.

4.  An injunction prohibiting NPS from maintaining feral horses within the Cumberland Wilderness Area, including potential Wilderness Area.

5.  An injunction requiring NPS to immediately remove all feral horses from within the Cumberland Island National Seashore pending the issuance of a Categorical Exclusion, or if necessary, an Environmental Assessment and/or an

Environmental Impact Statement, all in compliance with the National

Environmental Protection Act (NEPA).

6.   An injunction prohibiting NPS from maintaining feral horses within the

Cumberland Island National Seashore pending the issuance of a Categorical

Exclusion, or if necessary, an Environmental Assessment and/or an Environmental

Impact Statement, all in compliance with the National Environmental Protection

Act (NEPA).

7.   An injunction requiring the NPS, in cooperation with the Georgia Department

of Agriculture, Equine Division, to take all steps necessary to assess the health and well-

being of the feral horse herd on Cumberland Island and provide the needed water, food,

and care to bring the herd to the level of care consistent with Georgia's Humane Care for

Equines Act, OCGA § 4-13-1, et seq.   Also, an injunction requiring the Georgia

Department of Agriculture, Equine Division, to assure the humane care of the horses on

Cumberland until the horses are removed from the island.

8.   An order that the Plaintiffs recover the costs and reasonable attorneys'

fees they have incurred and will continue to incur in connection with this action, as

provided for under the Endangered Species Act and the Equal Access to Justice

Act, 28 U.S.C.  §2412(d), and other applicable law.

9.  Such other and further relief as the Court may deem just and proper.

Respectfully submitted this 12th day of April, 2023.

**ATTORNEYS FOR PLAINTIFFS**

**Hal Wright Attorney at Law, LLC**

*/s/Howell Franklin Wright.*
Howell Franklin Wright
State Bar of Georgia Number 778109

260 Southview Drive
Athens, GA 30605
(404) 694-7789
hwrightathenslaw@gmail.com

**DuBose Law Group llc**

*/s/ C. Wilson DuBose*
C. Wilson DuBose
State Bar of Georgia Bar Number 231450

1511 Eatonton Road, Suite 200
Madison, Georgia 30650
(706) 342-7900
wdubose@duboselawgroup.net