**HAL WRIGHT**
**ATTORNEY AT LAW, LLC**
260 SOUTHVIEW DRIVE
ATHENS, GEORGIA  30605

HOWELL F. WRIGHT

(404) 694-7789
hwrightathenslaw@gmail.com

January 13, 2023

Deb Haaland
Secretary of the Interior
Department of the Interior
1849 C Street, N. W.
Washington, DC 20240

Charles F. Sams III
Director
National Park Service
1849 C Street, N. W.
Washington, D.C.  20240

Mark Foust
Regional Director
Southeast Region
National Park Service
Atlanta Federal Center
1924 Building
100 Alabama St., S.W.
Atlanta, GA 30303

Gary Ingram
Superintendent
Cumberland Island National Seashore
National Park Service
101 Wheeler St.
St. Marys, GA 31558

Martha Williams
Director
U. S. Fish and Wildlife Service
1849 C. Street, N. W.
Washington, DC   20240


**RE: 60 Day Notice of Violations of the Endangered Species Act**

Dear Ladies and Gentlemen:

This firm represents the horses of Cumberland Island, the Georgia Equine Rescue League, Ltd., the Georgia Horse Council, Inc., Will Harlan, and Carol Ruckdeschel in the matter of the ongoing presence of the horses on Cumberland Island, Georgia. To succinctly state the essence of these parties' concerns:  the horses are not good for Cumberland Island, and Cumberland Island is not good for the horses.

More specifically, on behalf of the above parties and on behalf of *Caretta caretta* (loggerhead sea turtle), *Charadrius melodus melodus* (piping plover), and *Mycteria americana* (wood stork), you are hereby notified, pursuant to 16 U.S.C. §1540 (g) (2), that the National Park Service (NPS) is violating its duties under the Endangered Species Act, 16 U.S.C. §§1531 et seq. (ESA) and the Administrative Procedures Act, 5 U.S.C.  §§ 551 et seq, (APA).   As detailed below, the NPS has failed to fulfill its obligations under the Endangered Species Act to act affirmatively to protect and promote the well-being of these protected species.   In fact, NPS, through its management practices and policies relating to the management and control of the island's feral horses, has chosen to ignore its obligations under ESA as well as its own rules and regulations promulgated for the protection of *Caretta caretta, Charadrius melodus melodus, and Mycteria americana*.  The result has been the programmatic destruction of these species and their designated critical habitat on the Cumberland Island National Seashore.

## CUMBERLAND ISLAND'S PROTECTED SPECIES OF CONCERN

**Loggerhead sea turtle (*Caretta caretta*)**

Cumberland Island National Seashore is one of the most important nesting sites for the loggerhead sea turtle (*Caretta caretta*). The island's 18-mile undeveloped beach accounts for 25 to 30 percent of the state of Georgia's sea turtle nesting total.

Loggerhead turtles are found worldwide with nine distinct population segments (DPS) listed under the Endangered Species Act. In the United States, the Northwest Atlantic Ocean DPS of loggerhead turtles nest primarily along the Atlantic coast of Florida, South Carolina, Georgia, and North Carolina and along the Florida and Alabama coasts in the Gulf of Mexico. It is the second-largest loggerhead turtle nesting population in the world.

Loggerhead turtles have large heads with powerful jaws. The carapace is slightly heart-shaped and reddish-brown in adults and sub-adults, while the plastron is generally a pale yellowish color. Unlike freshwater turtles and tortoises, loggerhead turtles and all sea turtles cannot withdraw their head or flippers into their shells. Loggerhead turtles are marine reptiles and must come to the surface to breathe air.

Loggerhead sea turtles can live 70 to 80 years or more. Female loggerheads reach maturity at about 35 years of age. Every 2 to 3 years they mate in coastal waters and return to nest on a beach in the general area where they hatched decades earlier. Tagging of loggerhead sea turtles on Cumberland Island has recorded beach fidelity for nesting females across decades.

For the Northwest Atlantic population, mating occurs in late March to early June and females lay eggs between late April and early September. Loggerheads are solitary, night-time nesters, and they generally prefer beaches with stable, intact dunes for nesting.

Adult females lay three to five nests, sometimes more, two weeks apart during a single nesting season. Each nest contains about 100 eggs. The sex of hatchlings is determined by the temperature of the sand—cooler temperatures produce males and warmer temperatures produce females. After about two months incubating in the warm sand, the eggs hatch and the hatchlings make their way to the water. Newly hatched loggerhead turtles are susceptible to predators.

Loggerhead hatchlings and juveniles spend the first 7 to 15 years of their lives in the open ocean. Then they migrate to nearshore coastal areas where they will forage and continue to grow for several more years. Adult loggerhead turtles migrate hundreds to thousands of kilometers from their foraging grounds to their nesting beaches.

Loggerheads are carnivores, only occasionally consuming plant material. During their open ocean phase, they feed on a wide variety of floating items. Unfortunately, trash and other debris discarded by humans also tends to accumulate in their habitat. Juveniles and adults in coastal waters eat mostly

bottom dwelling invertebrates such as whelks, other mollusks, horseshoe crabs, and other crabs. Their powerful jaws are designed to crush their prey.

<u>Endangered Species Act Status</u>   On July 28, 1978, the Fish and Wildlife Service and National Marine Fisheries Service issued a final rule listing the loggerhead sea turtle as threatened throughout its worldwide range. On September 22, 2011, the Service determined that the loggerhead sea turtle is composed of 9 distinct population segments (DPS) and listed four DPSs as threatened and five DPSs as endangered under the ESA. The Northwest Atlantic Ocean DPS that nests on Cumberland Island is designated as threatened.

<u>Critical Habitat</u>.  On July 10, 2014, NOAA designated critical habitat for the Northwest Atlantic Ocean DPS of the loggerhead sea turtle.   The entire eastern shore of Cumberland Island including its northern and southern tips are designated critical habitat for the loggerhead.

The primary constituent elements of loggerhead designated critical habitat include the following:

i.      Suitable nesting beach habitat that has (a) relatively unimpeded near shore access from the ocean to the beach for nesting females and from the beach to the ocean for both post-nesting females and hatchlings; and (b) is located above mean high water to avoid being inundated frequently by high tides.

ii.     Sand that (a) allows for suitable nest construction, (b) is suitable for facilitating gas diffusion conducive to embryo development, and (c) can develop and maintain temperatures and moisture content conducive to embryo development.

iii.    Suitable nesting beach habitat with sufficient darkness to ensure: (a) nesting turtles are not deterred from emerging onto the beach, (b) post-nesting females reorient back to the sea, and (c) emerging hatchlings orient correctly towards the sea.


**Piping Plover (*Charadrius melodus melodus*)**

The piping plover is a small migratory shorebird that nests and feeds along coastal beaches in North America. There are three populations of piping plover: subspecies *C. m. circumcinctus* located on the shorelines of the Great Lakes; a

second *circumcinctus* population that occurs in the Northern Great Plains; and the subspecies *C. m. melodus* that occurs along the Atlantic Coast.

Piping plovers are small birds approximately 7 inches (17 centimeters) long with a wingspan of 15 inches (38 centimeters). Piping plovers weigh between 1.4 to 2.3 ounces (40 to 65 grams).

Piping plovers are sandy grayish brown in color and have white underparts. Adult breeding plumage includes a single black breast band, which is often incomplete, and a black bar across the forehead. During the late summer or early fall, the black bands fade to gray, leg color fades from orange to pale yellow and the orange-and-black bill turns to mostly black. Juveniles, from July through September, look like non-breeding adults. Most adults begin a molt into breeding plumage before initiating the northward migration and complete the molt before arriving at breeding sites, as noted in the draft revised recovery plan in 2015.

Although piping plovers have been documented to live as long as 11 years, with a 78 to 80% adult survival rate. The average life span is approximately five to six years,

Piping plovers start arriving on breeding grounds in early April, followed by courtship and nesting in mid-to-late April. Male plovers create a shallow depression on the ground which both adults line with small pebbles. Incubation lasts 25 to 28 days and is shared between the sexes. Eggs hatch between late May and early June. Young leave the nest within hours and begin foraging immediately. Fledging occurs 25 to 35 days after hatching. Piping plovers leave breeding grounds as early as mid-July and generally raise one brood a season but may raise two broods under rare conditions.

Piping plovers spend most of their time foraging. They feed on exposed beach surfaces by pecking for invertebrates that are 1/2 inch or less below the surface. They feed mostly during the day and eat insects, marine worms, crustaceans, and mollusks as well as eggs and larvae of flies and beetles.

Piping plovers are threatened by destruction and degradation of habitat, shoreline erosion, human disturbance, and predation. Activity on beaches displaces piping plovers from preferred areas and can result in increased energy expenditure. In wintering sites, disturbance has been shown to limit local piping plover abundance. Disturbance also reduces the time piping plovers spend foraging contributing to overall the long-term decline of migrating shorebirds at staging areas.

Piping plovers live and forage on Cumberland Island the during the non-breeding season, roughly from August to March. Cumberland Island is not just a stopover point for the piping plover—it's their home for most of the year. They are a medium-distance migrant that travels to the Northeast U.S. and the Great Lakes/Upper Midwest region to breed in the spring and early summer.

The primary constituent elements of critical habitat are those physical or biological features essential to the conservation of the species. The primary constituent elements for piping plover wintering habitat are those habitat components that support foraging, roosting, and sheltering, and including the physical features necessary for maintaining the natural processes essential for supporting these habitat components. These elements are found in dynamic coastal areas such as Cumberland Island that support intertidal beaches and flats and associated dune systems above annual high tide.

<u>Endangered Species Act Status</u>. On December 11, 1985, the Atlantic Coast populations of the piping plover were listed as threatened (50 FR 50626). The piping plover is also listed as threatened by the state of Georgia.

In 1988, a recovery plan was written for the Atlantic Coast population which was revised in 1996. A third revision to the piping plover recovery plan was drafted in 2015.

<u>Critical Habitat</u>.  Critical habitat for piping plovers was designated on July 10, 2001, for birds that nest along the Atlantic Coast (66 Fed. Reg. 36038).

The northern, eastern, and southern shore of Cumberland Island—including 1,500 inland feet of dune and interdune habitat—is designated critical habitat for the piping plover.

Piping Plover critical habitat for Cumberland Island (Unit GA-16) includes 3,595 acres.  Most of the unit is along the Cumberland Island Wilderness Area and Cumberland Island National Seashore. This unit includes most of the eastern Atlantic shoreline of Cumberland Island. It begins 0.50 kilometers north of the inlet at Long Point, continues south along the Atlantic Ocean shoreline stopping 1.8 kilometers west of the southern tip of Cumberland Island National Seashore. It includes land from the Mean Lower Low Water (MLLW) to where densely vegetated habitat begins (FR 50 CFR 17 – 36070).

The draft revised recovery plan of 2015 also noted that increases in invasive species also has negative impacts to piping plovers.

**Wood Stork (*Mycteria americana*)**

The wood stork is a large, long-legged wading bird with white plumage, iridescent black primary and secondary wing feathers, and a short black tail. The wood stork flies with necks and legs extended. Adult wood storks have an un-feathered black head, bill, and neck, dark legs, and pinkish feet. the legs are dark, and the feet are dull pink. Immature wood storks have yellowish bills.

The wood stork is the only species of stork that regularly occurs in the United States.  It may once have bred in all the southeastern coastal states from Texas to South Carolina, but today the wood stork breeds only in Florida, Georgia, and coastal South Carolina.

Wood storks are a native species to Cumberland Island. They previously nested on the island. Dry conditions on the island and increased vegetative cover in areas has allowed predators to access former nesting areas that were previously protected by open water.

According to the National Park Service, "The freshwater marsh, swamps, lagoons, ponds, and brackish wetland habitat of the island are still used as foraging grounds throughout the year."

The National Park Service also acknowledges that wood stork declines are due primarily to loss of suitable feeding habitat. Other factors include loss of nesting habitat, prolonged drought, flooding, raccoon predation on nests, and human disturbance of rookeries.

Wood storks roost communally during the non-breeding season on Cumberland, often in large congregations near freshwater wetlands, ponds, lakes, saltwater marshes, and tidal creeks. Bryan et. al. found that wood storks on Cumberland Island were most frequently found at freshwater wetlands or upland/salt marsh interfaces. Feral horses are also commonly found at freshwater wetlands since access to freshwater is limited and unreliable for much of the year. Horses also congregate at the upland/salt marsh interface to graze and to escape the heat and insects. Feral horses' disturbance of key wood stork foraging and roosting sites has

contributed to the loss of nesting wood storks and the decline of foraging and roosting wood stork colonies on the island.

**Endangered Species Status.**   The wood stork was listed as an endangered species in 1984.  At that time, loss of wetland habitat had reduced wood stork populations by nearly 70% in 50 years. The total population in the southeastern United States declined from an estimated 15,000-20,000 pairs in the 1930s to between 4,500 and 5,700 pairs in most years between 1977 and 1980. This decline was accompanied by a major shift in breeding abundance from southern Florida to a much more dispersed distribution northward into coastal Georgia. After Florida's populations sharply declined, coastal Georgia's wood storks have become increasingly important to the survival and recovery of wood storks.

Wetland preservation and restoration, protection of nesting areas, and management of water flows began with the approval of the wood stork's first recovery plan in 1986. The plan was revised in 1997 and augmented with a Wood Stork Recovery Action Plan in 2009.


# LEGAL FRAMEWORK

## The Endangered Species Act.

The Endangered Species Act (ESA), 16 U.S.C §1531 et seq., was enacted by Congress in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species ..." 16 U.S.C. §1531 (b).  The National Park Service (NPS) has failed to meet this charge.

The ESA imposes three primary duties on NPS:

    1)    to avoid jeopardizing protected species; 16 U.S.C.A. §1536 (a)(2)[section 7]; see *TVA v. Hill*, 437 U.S. 153 (1978) ("One would be hard pressed to find a statutory provision whose terms were any plainer than those in section 7 of the Endangered Species Act.  It's very words affirmatively command all of federal agencies 'to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species or 'result in the destruction or modification of habitat of such species . . ..' This language admits of no exception." *Id*. at 173 (citation omitted, emphasis in the original));

2)  to refrain from "taking" protected species ("It is unlawful for any person subject to the jurisdiction of the United States to take any [protected] species within the United States. . .." 16 U.S.C.A. §1538 [section 9] (a)(1)(b) (1992)); and

3)  to act affirmatively to restore protected species to a viable population, one not threatened with extinction.  *Defenders of Wildlife v. Andrus*, 428 F.Supp. 167, 170 (D.D.C. 1977)(The concept of conservation duties is of sufficiently broad scope to compel the Secretary to do "far more than merely avoid the elimination of a protected species."); *Carson-Truckee Water Conservation District v. Watt*, 549 F. Supp. 704 (E.D. Cal. 1983), *aff'd*, 741 F.2d 257 (9th Cir. 1984)(the administering agency has a clear duty to conserve a listed species, especially when the agency has already embarked on a program outwardly aimed at conserving that species.).

Agency actions resulting in a prohibited "takings" under section 9 also implicate section 7 because such actions necessarily "jeopardize" the species within the meaning of ESA, 16 U.S.C. § 1536(a)(2).  The term "jeopardy" as defined by C.F.R. 402.02 speaks clearly of actions "that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species . . . by reducing the reproduction [or] numbers . . . of that species.   Thus, once a section 9 "taking" has been factually established, the Secretary's non-discretionary duty to prevent "jeopardy" to the species is clear.  "[A] conclusion that a taking has occurred necessarily includes a finding that such conduct also jeopardizes the species."  *Sierra Club v. Lyng*, 694 F.Supp. 1269, 1272 (E.D. Tex. 1988).

Section 7(a)(2) of the Act requires Federal agencies, in consultation with and with the assistance of the Secretaries of the Interior and Commerce, to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species (16 U.S.C. §1536(a)(2)).   The Act defines "critical habitat" as the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the Act, on which are found those physical or biological features (1) essential to the conservation of the species and (2) which may require special management considerations or protection, as well as specific areas outside the geographical area occupied by the species at the time it is listed should such areas be determined by the Secretary to be essential for the conservation of the species (16 U.S.C. 1532(5)(A)).

The Act defines "conservation" as meaning to use and the use of all methods and procedures that are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary (16 U.S.C. §1532(3)). The Act does not define ''destruction or adverse modification.''

The Services carry out the Act via regulations in title 50 of the Code of Federal Regulations (CFR).  50 CFR 402.02 was recently amended changing the definition of "destruction or adverse modification" to read as follows:

> *Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

Interagency Cooperation—Endangered Species Act of 1973, as Amended; Definition of Destruction or Adverse Modification of Critical Habitat; 50 CFR Part 402; 81 Fed. Reg. 7214 (February 11, 2016).

In revising the above definition, the Secretary clarified the intent of the Act to conserve species through protecting the broader physical and biological features essential to their recovery, a measure separate and apart from avoiding the more direct actions jeopardizing of the species.    See *N. N.M. Stockman's Ass'n v. U.S. Fish &amp; Wildlife Serv.,* 30 F.4th 1210 (10th Cir. 2022).

As affirmed by the 11th Circuit in *Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231 (11th Cir. 1998), "some activities--especially those relating to land use--are more likely to result in 'jeopardy' than a 'take.'..."  *Id.* at 1246 (citing *Bruce Babbitt, Secretary of the Interior, et al., Petitioners, v. Sweet Home Chapter of Communities for a Great Oregon, et al.*, 115 S.Ct. 2407, at 2415 (1995); "Section 7 [16 U.S.C. § 1536] imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9 [16 U.S.C. § 1539] does not replicate, and § 7 does not limit its admonition to habitat modification that actually kills or injures wildlife.").

Similarly, Section 9 of the ESA, 16 U.S.C.A. §1538, makes it "unlawful for any person subject to the jurisdiction of the United States to take any [protected] species within the United States. . .." 16 U.S.C.A. §1538 (a) (1) (b) (1992).  "Take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532 (20).

"To "take" a species includes to "harm" it. Id. § 1532(19). "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3(c) (2006). *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013).


## National Park Service Policy

The "wild" horses on Cumberland Island are viewed by the federal government as feral domestic animals.    50 C.F.R. §30.11 (a) provides "Feral animals, including horses, burros, cattle, swine, sheep, goats, reindeer, dogs, and cats, without ownership that have reverted to the wild from a domestic state may be taken by authorized Federal or State personnel or by private persons operating under permit in accordance with applicable provisions of Federal or State law or regulation."   See also. Testimony of Greg Siekaniec, Acting Deputy Director, U.S. Fish and Wildlife Service, Dept. of the Interior, before the House Committee on Natural Resources, Subcommittee on Fisheries, Wildlife, Oceans, and Insular Affairs; on H.R. 306 The Corolla Wild Horses Protection Act, given April 7, 2011 ("The [Fish and Wildlife] Service views wild horses, as defined in 50 CFR 30.11(a), as feral domestic animals.").


NPS policy on the issue of feral animals in NPS units is clear: "Management of populations of exotic plant and animal species, up to and including eradication, will be undertaken wherever such species threaten park resources or public health and when control is prudent and feasible" (National Park Service, U.S. Department of the Interior, 1988. Management Policies, Ch. 4:12).  The Management Policies specifically prohibit exotic species from "interfering with natural processes and the perpetuation of natural features or native species (especially those that are endangered, threatened, or otherwise unique)" Emphasis added. (*Id.*).

NPS Management Policies addressing exotic animals were further refined in NPS' Natural Resources Management Guideline (National Park Service, U.S. Department of the Interior, 1991. Natural Resources Management Guideline.):

> Control or eradication will be undertaken, where feasible, if exotic species threaten to alter natural ecosystems; seriously restrict, prey on, or compete with native populations; present a hazard to human health or safety; cause a major scenic or aesthetic intrusion; disrupt the integrity of an historic site; damage archeological resources; disturb or displace historic cultivars; extensively modify geophysical

processes, such as sand deposition on beaches; or threaten resources or cause a health hazard outside the park. (Natural Resources Management Guideline,1991, Chapter 2, p. 289.).

The Natural Resources Management Guideline recommends an "ecosystem level approach to exotic species control" (Management Guideline, Chapter 2, p.290) and notes that "[e]xotic species control programs require long-term commitments." (*Id.*).

## Federal Authorizing Legislation for Cumberland Island National Seashore and the Cumberland Island Wilderness.

Cumberland Island National Seashore was created by Congress on October 23, 1972, in Public Law 92-536.  The legislation establishing the park provides that "the seashore shall be permanently preserved in its primitive state, and no development of [a] project or plan for the convenience of visitors shall be undertaken which would be incompatible with the preservation of the unique flora and fauna" of the island (Pub. Law 92-536, Sec. 6(b)).

The Cumberland Island Wilderness was created by Congress on September 8, 1982, in Public Law 97-250.  This act directs the NPS to administer the Cumberland Island Wilderness in accordance with the provisions of the federal Wilderness Act.

## Cumberland Island National Seashore Management Plans.

NPS' management plans for Cumberland Island are unequivocal in directing that feral animals be managed and removed from Cumberland Island when necessary to protect the park's resources.   In 1984, NPS prepared a General Management Plan for Cumberland Island National Seashore (GMP).  National Park Service, 1984. General Management Plan, Cumberland Island National Seashore, Georgia.   The GMP lists among its Management Objectives "[t]o manage wildlife in a manner that restores and enhances the natural ecosystem of the island environment" and "[t]o the greatest extent possible, remove feral hogs from the seashore lands" (GMP, p. 16).  These objectives are later amplified in the plan:

Feral animals will be removed where they are detrimental to natural and cultural resources, and they will be transported to the mainland. This policy will necessitate the complete removal of feral hogs . . . .  (GMP, p. 22).

In a 1990 Statement for Management for Cumberland Island National Seashore, NPS lists among its long-term management objectives to "manage native wildlife populations so as to achieve a balanced eco-system free of interferences created by man," and to "reduce the competitive impact on native wildlife by exotic animals and the deleterious effect on vegetation by exotic animals by the most effective, feasible means possible" (National Park Service, 1990. Statement for Management, Basic Operations Statement, Cumberland Island National Seashore, p. 20).

In 1995, finding "nesting of loggerheads in Georgia has declined despite enactment of conservation measures to protect sea turtles in the water", NPS, together and in consultation with the United States Fish and Wildlife Service (USFWS), entered into a Memorandum of Agreement with the Georgia Department of Natural Resources adopting the comprehensive Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia ("Management Plan").  The Management Plan found that "[e]very clutch of eggs is important to the survival of a threatened or endangered species.  Management is required to maximize [*Caretta caretta's*] reproductive effort until such species can be down listed to a more stable management category."

Cumberland Island's 1990 Statement for Management for Cumberland Island National Seashore directs the NPS to "manage native wildlife populations so as to achieve a balanced eco-system free of interferences created by man" and to "reduce the competitive impact on native wildlife by exotic animals and the deleterious effect on vegetation by exotic animals by the most effective, feasible means possible."

## VIOLATIONS OF THE ENDANGERED SPECIES ACT AND THE ADMINISTRATIVE PROCEDURES ACT

**A.  The National Park Service's policy and practices to forego the management and removal of Cumberland Island's feral horses is "jeopardizing" and "taking" the protected *Caretta caretta, Charadrius melodus melodus, and Mycteria americana* in violation of the Endangered Species Act.**

Cumberland Island is composed of multiple interrelated ecosystems and habitats upon which numerous species depend.     *Caretta caretta* (loggerhead sea turtle),

*Charadrius melodus melodus* (piping plover), and Mycteria americana (wood stork) (hereinafter "the protected species") inhabit Cumberland Island and are dependent upon the island's diverse resources for food, rest, shelter, nesting, and breeding habitat.   Cumberland Island is considered critical habitat for these protected species.

Ongoing changes brought about by alterations in global climate patterns as well as increasing pressures on the island's various habitats from direct human activities such as increased development pressures, expansion of automobile and bicycle use, and prescribed burning threaten the islands biodiversity, including and especially these protected species, with adverse habitat modifications.   Cumberland's horses are an additional, direct, and unnecessary contributor to the degradation of the island's habitats, from the saltwater marshlands to the dune systems, from the interdune wetlands to the island's freshwater resources.  The horses are known to directly interfere with nesting shorebirds as well as turtle nestlings.

The plans and policies adopted by NPS and referenced above are meant to protect and preserve the loggerhead sea turtle, the piping plover, and the wood stork in accordance with the ESA and the three primary duties imposed thereby.   NPS's failure to follow these plans and policies, especially regarding the control and/or removal of feral horses is resulting in the "take" of these protected species in violation of ESA, section 9.  *See*.  *Sierra Club v. Yeutte*r, 926 F. 2d 429 (5th Cir. 1991).

Over the past twenty-five years NPS has turned a blind eye to managing, controlling or removing Cumberland's horses as required by the General Management Plan for Cumberland Island National Seashore, Georgia, (1984); the Statement for Management, Basic Operations Statement, Cumberland Island National Seashore (1990); or the Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia, (1995).

In fact, it has been the constructive policy and practice of NPS to adopt a plan of non-action regarding the management of the horses.  NPS's policy of indifference towards this island's horses is totally inadequate where affirmative action is required to assure the well-being of the subject protected species, including their designated critical habitats.

As outlined below, NPS's management policies and practices on Cumberland Island National Seashore related to feral horses are "jeopardizing" Cumberland Island's protected species and resulting in a "take" of the protected species in

violation of ESA, 16 U.S. C. §§1531 et seq., particularly §§1536 [section 7] (a)(2);1538 [section 9] (a)(1)(b); and §1531 (b). *See. Loggerhead Turtle (Caretta caretta) et al. v. County Council of Volusia County,* 148 F.3d 1231 (11th Cir. 1998); *Sierra Club v. Lyng*16 U.S.C. s 1532 (20), 694 F.Supp.1260 (E.D. Texas 1988); *Defenders of Wildlife v. Administrator, EPA.,* 882 F. 2d 1294 (8th Cir. Minn. 1989); *National Wildlife Federation v. Hodel*, 23 Env't. Rep. Cas. (BNA) 1089, 1092-93 (E.D. Cal. 1985); and *U.S. v. Glenn-Colusa Irrigation District*, 788 F. Supp. 1126 (E.D. Cal. 1992).

1. NPS's failure to manage and remove Cumberland Island's feral horses has resulted in the "take" of the protected loggerhead sea turtles.

*i. Feral horses cause the take of loggerhead sea turtles by trampling and harming nests.*

Feral horses and their hoofprints, tracks, and feces are frequently documented at loggerhead sea turtle nesting sites each year.

Often, loggerhead nests are within 12 inches of the surface, and an adult horse can easily break through the nest.  Even if they don't break through nests, their feces can pollute the site and adversely impact the hatchling eggs.

Upon emergence, hatchlings encountering piles of feral horse feces are unable to reach the surface or crawl to the ocean. Hatchlings in nests compacted by feral horses may also be unable to reach the surface.

The soil compaction and feces deposition from feral horses affects nest temperature and oxygen exchange rates. The semipermeable eggshells and membranes enable hatchings to respirate while beneath the sand. However, piles of smothering feces or heavily compacted sand above the nest can reduce oxygen exchange within the nest. Sand compaction and feces deposition by feral horses also reduces carbon dioxide transportation away from the nest. Sea turtles' gas concentrations are determined by the rate at which air can move through the sand and into the egg. Restricted air movement through the sand results in anoxia and eventual death for hatchlings below.

*ii. Feral horses cause the take of loggerhead sea turtles by trampling emergent hatchlings and creating tracks that impede hatchlings' ability to reach the ocean.*

Feral horse hoof prints create depressions in the sand up to five centimeters deep. For an emerging loggerhead hatchling, the depression is equivalent to its body size. Horse tracks create significant barriers to hatchlings trying to reach the ocean. Hatchlings have been observed trapped in the deep depressions of horse tracks in the dunes and on the beach.

In rare instances, horses have trampled emerging hatchlings in the dunes and on the beach. Horses are active on the island at all hours, including at night and at dawn and dusk, when hatches most frequently occur.

*iii. Feral horses interfere with nesting of loggerhead sea turtles.*

Horses are often more active at night than the day, and their activity often coincides with loggerhead sea turtle nesting and hatchling emergence. As nonnative species on Cumberland Island not adapted to the heat, humidity, and insects, feral horses tend to be more active at night during hot summer months, and they often congregate on the beach where temperatures are coolest, and winds are strongest.

Horses' night activity on the beach coincides with the highest activities of loggerhead sea turtle nesting. Loggerhead sea turtles crawl ashore mainly at night between May and September on Cumberland Island. Female loggerheads crawling ashore to lay eggs will return to the ocean without nesting if they encounter horses or other unnatural disturbances during their crawls. Loggerhead sea turtles will also abort their nests if they are startled or disturbed by a feral horse during any part of the nest digging and laying process.

The above consequences from feral horses "harm" the loggerhead sea turtle by significantly impairing its essential behavioral pattern of breeding in violation of the ESA.     16 U.S.C.A. §1538 (a) (1) (b) (1992); 16 U.S.C. §1532 (19); 50 C.F.R. § 17.3(c) (2006).  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013).

<u>2.  NPS's failure to manage and remove Cumberland Island's feral horses has adversely modified the critical habitat of loggerhead sea turtles thereby jeopardizing this protected species.</u>

Feral horses consume sea oats and dune vegetation where loggerhead sea turtles nest, destabilizing and destroying one of the most important dune nesting systems in the country for loggerhead sea turtles.

The primary dunes of Cumberland Island are stabilized primarily by sea oats (*Uniola paniculata*). Sea oats are slow-growing perennials growing along the primary dunes of Cumberland Island. Sea oats grow to six feet at maturity, with an extensive root system that holds dunes together, even during extreme weather events. Sea oats also build dunes by catching and trapping windborne sand.

Sea oats produce large leaves that can grow to 60 centimeters in length, and they also produce panicles with large seed heads. Feral horses especially target sea oats as a preferred food source on Cumberland Island.  Many of the islands' feral horse herds graze on the island's sea oats.

The importance of sea oats is widely recognized across coastal communities and the National Park System. Destroying sea oats on Cumberland Island National Seashore is a federal crime. It is a first-degree misdemeanor punishable by a sentence of up to a year in jail and fines up to $1,000. Feral horses on Cumberland Island routinely consume, trample, and destroy sea oats with impunity.

Sea oats are essential to securing the primary dunes where loggerhead sea turtles nest. Areas of Cumberland Island devoid of sea oats are also lacking stable, intact dunes—and as a result, have fewer loggerhead turtle nests.

Feral horses' impact to sea oats and primary dunes makes the island—and loggerhead sea turtle nesting habitat—even more vulnerable to sea level rise, climate change, and extreme weather events. By trampling, consuming, and destroying fragile dune vegetation, feral horses significantly contribute to dune destabilization. Feral horses exacerbate the impacts of climate change on loggerhead sea turtle nesting habitat and allow rising tides to erode, scour, and destroy nesting dunes more easily. Feral horse activity leads to the destruction of loggerhead turtle habitat and the inundation of nests.

NPS's failure to remove Cumberland's feral horses is promoting the direct or indirect alteration of the primary dune system including the sand sharing system, appreciably diminishing the value of this critical habitat for the conservation of the loggerhead sea turtle in violation of the ESA, section 7.   Such alterations to the primary dune system and sand sharing system alter both the physical and biological features of the habitat essential to the conservation of the loggerhead sea turtle.   16 U.S.C. §1536(a)(2); 50 CFR 402.02

3. NPS's failure to manage and remove Cumberland Island's feral horses has resulted in the "take" of the protected piping plover.

*i. Feral horses harm and harass federally protected piping plovers in their critical habitat.*
*ii. Feral horses disturb and scatter piping plover flocks resting and feeding in their critical habitat.*

Cumberland's feral horses "harm" the protected piping plover by significantly interfering with and impairing its essential behavioral patterns of resting and feeding in violation of the ESA.     16 U.S.C.A. §1538 (a) (1) (b) (1992); 16 U.S.C. §1532 (19); 50 C.F.R. § 17.3(c) (2006).  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013).

4.  NPS's failure to manage and remove Cumberland Island's feral horses has adversely modified the critical habitat of the piping plover thereby jeopardizing this protected species.
*i. Feral horses trample and adverse modify piping plover critical habitat.*

NPS's failure to remove Cumberland's feral horses is promoting the direct or indirect alteration of the primary dune system including the sand sharing system, appreciably diminishing the value of this critical habitat for the conservation of the piping plover in violation of the ESA, section 7.   Such alterations to the primary dune system and sand sharing system alter both the physical and biological features of the habitat essential to the conservation of the piping plover.   16 U.S.C. §1536(a)(2); 50 CFR 402.02

5.  NPS's failure to manage and remove Cumberland Island's feral horses has adversely modified the critical habitat of the wood stork thereby jeopardizing this protected species.

*i. Feral horses adversely affect the limited freshwater resources on which wood storks depend.*

Wood storks depend on Cumberland Island's freshwater marshes, swamps, and lagoons as well as brackish wetlands for foraging. Wood storks have previously nested near Lake Whitney, the largest body of freshwater on Cumberland Island, and Sweetwater Lakes, the second-largest source of freshwater on the island.

Wood storks are especially dependent on freshwater habitat. Freshwater is the limiting resource on Cumberland Island for wood storks and other native species. Feral horses have serious and significant impacts on the island's limited freshwater resources. Feral horses consume significant amounts of freshwater, reducing its availability for wood storks. Diminished freshwater available in island ecosystems adversely modifies wood stork habitat and has resulted in the harm of federally listed wood storks.

Feral horses also trample native freshwater vegetation and degrade water quality through their deposition of feces in and near limited freshwater resources. Degraded water quality has adversely modified wood stork habitat and resulted in the harm of federally listed wood storks.

*ii. Horses degrade and destroy the saltwater marshes on which the wood storks depend.*

Feral horses' grazing and trampling of the marshes adversely affect the habitat critical to the wood stork by degrading the food resources of the wood stork, resulting in direct harm to the wood stork and in diminished foraging and breeding efficacy.

Bryan *et al.* observed that most wood storks roost within 100 meters of the saltwater marsh on Cumberland Island. According to the Wood Stork Recovery Action Plan, wood storks forage in shallow water where prey concentrations are high enough to ensure successful feeding. Limiting factors include loss of feeding habitat, water level manipulations, predation and /or nest tree regeneration, and disturbance.

According to a 2002 Georgia Southern University study of feral horse impacts on Cumberland Island, horses grazed saltmarsh cordgrass (*Spartina alterniflora)* in 29% of the high marsh and 72% of the low marsh: "Horses removed S. alterniflora throughout the island…Grazed height remained uniform across the island. Impacts

based on percent tissue removal were observed throughout the island and were greatest in the north."

Salt marsh exclosure analyses revealed horses significantly reduced the growth and reproduction of *S. alterniflora* in areas where grazing occurs frequently.

The study concludes that the horses' heavy removal of saltmarsh cordgrass from the salt marsh causes negative impacts to the island and related species.

Marshes and wetlands on Cumberland Island are regularly and incessantly browsed, trampled, and degraded by feral horses. The reduced vegetative cover dries out marshes and wetlands, reducing the viability of habitat and availability of prey.

Wood storks demonstrate high site fidelity for roosting and foraging habitat. However, they are quick to abandon foraging sites when the sites are altered or disturbed.

Wood storks also depend on high concentrations of prey for their tactilocation feeding. Feral horses scatter and disperse prey through their removal and trampling of native freshwater and saltwater vegetation. Horses also degrade the aquatic environment through their consuming and trampling of native vegetation in marshes.

Cumberland's feral horses directly degrade wood stork habitat and reduce foraging success threatening the wood stork's persistence and recovery.

NPS's failure to remove Cumberland's feral horses is promoting the direct or indirect alteration of the island's saltwater marshes and freshwater wetlands, appreciably diminishing the value of this critical habitat for the conservation of the wood stork in violation of the ESA, section 7.   Such alterations to the saltwater marsh and freshwater wetlands alter both the physical and biological features of the habitat essential to the conservation of the wood stork.    16 U.S.C. §1536(a)(2); 50 CFR 402.02

6. NPS has failed to implement the Recovery Action Plan for the Wood Stork on Cumberland Island.

The Wood Stork Recovery Action Plan identifies four recovery objectives: 1) protect currently occupied habitat; 2) restore and enhance habitat; 3) conduct applied research; and 4) increase public awareness.

Objective 1.2 of the Wood Stork Recovery Action Plan specifically requires NPS to prioritize wood stork habitat, and Objective 1.5 requires NPS to protect critical habitat sites from disturbance.

On Cumberland Island, the National Park Service has not attempted to meet any of the recovery objectives for the wood stork. Instead, it has allowed feral horses to degrade currently occupied and used habitat. The Park has actively increased public awareness for feral horses but not for this federally listed species.

Section 7 (a)(1) imposes an obligation upon all agencies including the NPS to carry out programs for the conservation of endangered and threatened species. See 16 U.S.C. § 1536(a)(1) ("All other Federal agencies shall ... utilize their authorities ... by carrying out programs for the conservation of endangered species and threatened species ...."). *Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008).   To that end, the Secretary is required to develop a recovery plan for an endangered species, 16 U.S.C. § 1533(f)(1), which plan shall include "objective, measurable criteria," id. § 1533(f)(1)(B)(ii).   Additionally, as long as a species is listed as threatened or endangered, the agency is obligated to work toward the goals as set forth in its recovery plan. *Friends of Blackwater v. Salazar*, 691F.3d 428 (D.C. Cir. 2012).   NPS has failed in its obligations.

**B. NPS's failure to control and remove Cumberland's feral horses in direct contradiction to its own rules and regulations meant to protect the loggerhead sea turtle, the piping plover, and the wood stork is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.**

It is fundamental that an agency is authorized to act only in accordance with the law including its own rules and regulations.  Administrative Procedures Act, 5 U.S.C. § 706 (2)(A) & (C); *Mc Donnell Douglas Corp. V. Widnall*, 57 F.3d 1162 (U.S. App. D.C. 1995) (agency action may be challenged under 5 USC 706(2)(A) if it is contrary to the

law); *Clouser v. Espy*, 42 F.3d 1522 (C.A. 9,1994)(agency action must be consistent with governing statutes and regulations).

Over the past twenty-five years NPS has failed to implement any portion of those plans and policies directing (whether implicitly or explicitly) the control, management, and removal of the island's feral horses towards protecting the island's protected and endangered species and habitats to wit: the General Management Plan for Cumberland Island National Seashore, Georgia, (1984); the Statement for Management, Basic Operations Statement, Cumberland Island National Seashore (1990); the Management Plan for the Protection of Nesting Loggerhead Sea Turtles and Their Habitat in Georgia, (1995); or the Wood Stork Recovery Action Plan.

## DEMAND FOR REMEDIATION

NPS has chosen not to act to manage Cumberland's horses for a quarter century.   All the actions described above are threatening Cumberland Island's natural resources, including and specifically its protected species.    For all the reasons recited above, this is a demand the NPS immediately begin to undertake the following affirmative steps to remedy the harm caused by NPS's decision to forego the management of the horses of Cumberland and to compensate the parties for any expenses associated with this matter.


1.   The NPS and the State of Georgia should immediately begin to improve the well-being of the horses on Cumberland.   The NPS in cooperation with the Georgia Department of Agriculture, Equine Division, shall take all steps necessary to assess the health and well-being of the horse herd on Cumberland Island and provide the needed additional water, food, and care to bring the herd to the level of care consistent with Georgia's Humane Care for Equines Act, OCGA § 4-13-1 et seq.   The Georgia Department of Agriculture, Equine Division, shall assure the humane care of the horses on Cumberland and be continually involved with the management of the horses on Cumberland until the horses are removed from the island.

2. The NPS, together with the State of Georgia, shall commit to remove all horses from the island over a period of no longer than eight (8) years through a program of applying contraceptives to the mares of the herd through darting (used in other parks).   The NPS is to manage and implement the program to control reproduction.  It is suggested food sources be used strategically to assist in locating (and acclimating) the horses for easier

contraceptive application.   The costs of the program will be shared between the NPS and the State of Georgia.

3. On information and belief, a small number of feral horses also are present on Little Cumberland Island.  For purposes of managing horses on Cumberland Island, it is intended any plan and or actions enacted pursuant to this agreement or otherwise specifically include and incorporate the island known as Little Cumberland Island which island is within the boundary of the Cumberland Island National Seashore.   References made in this letter to Cumberland, Cumberland Island, or the "island" shall be deemed to also include the island of Little Cumberland Island unless specifically noted otherwise.

4.   In order to facilitate the removal of the horses and to bring earlier relief to the horse herd, every effort should be made to gather the younger horses and directly remove them from the island whereupon they can be adopted to suitable owners.   The NPS, the Georgia Department of Agriculture, Equine Division, and the Georgia Equine Rescue League will work cooperatively to create and implement a system whereby yearlings and weanlings can be gathered, appropriately processed, and adopted out.   The initial gathering is anticipated for the fall of 2023 where it is estimated approximately twenty (20) to thirty (30) "rescues" will be removed from the island.

5.   Time is of the essence in initiating and completing efforts to humanely manage and remove the horses from Cumberland Island.   Twenty-five years have elapsed since Congressman Kingston ordered NPS to cease management of the Cumberland horse herd for a period of a year.   During that time, NPS has taken no further action.   Climate driven change and alterations in environmental conditions and systems on the island require a sustained and timely removal of the horses from this island to allow for increased system resilience to change.   This is essential to begin and strengthen the recovery of the loggerhead sea turtle, the piping plover, and the wood stork.  To that end, the following targeted removal numbers will be used to measure the ongoing effectiveness of the program:

>After year one (1): 25% reduction in the herd (primarily from rescues)
>After year five (5): 75% reduction in the herd
>After year eight (8): 100% reduction in the herd

6.   A panel will be created to oversee the implementation of the removal of the horses and the interim care of the horses in a humane fashion (See Number 1. above.).   The panel will consist of a representative of each of the National Park Service, the Georgia Department of Agriculture, Equine Division, the Georgia Horse Council, Inc., the Georgia Equine Rescue League, Ltd., and Carol Ruckdeschel.   Will Harlan will serve on this panel to assure appropriate measures are taken to further the recovery of the

loggerhead sea turtle, the piping plover, and the wood stork.   The panel is free to appoint additional members as it deems fit.

7.  The NPS will be responsible for providing all logistical support necessary for the successful implementation and conclusion of the plan including transportation to and from the island of all necessary personnel and supplies, transportation on the island, food and lodging as needed, and other technical and communication support.

8.  The parties recognize the Cumberland Wilderness Area comprises a significant portion of the total area of Cumberland Island.   On information and belief, most of the Cumberland Island horses are believed to inhabit the area of the island outside the Cumberland Wilderness in the general area of Stafford Field and the in southern portion of the island near the Dungeness Ruins.    However, horses do inhabit the Cumberland Wilderness.    In keeping with the idea of "wilderness" embraced in the Wilderness Act of 1964 as "an area where the earth and its community of life are untrammeled by man," which "generally appears to have been affected primarily by the forces of nature," and as an area "retaining its primeval character and influence", the *NPS Management Policies, 2006, Chapter 4* defines natural conditions as, "the condition of resources that would occur in the absence of human dominance over the landscape."   NPS has recently recommended and approved, <u>Guidelines for Evaluating Ecological Intervention Proposal in National Park Service Wilderness</u>, for inclusion in NPS Reference Manual 41, Wilderness Stewardship.    As in the case of evaluating the plan to remove the horses from the Cumberland Wilderness, "proposed interventions would need to address the degradation of indigenous natural resources, processes, systems, and values that is caused by past or ongoing human actions."    The guidelines suggest 8 factors to consider in judging a project's potential wilderness impacts: 1) Cause of Degradation; 2) Timing of Degradation; 3) Origin of Degradation; 4) Urgency of Degradation; 5) Sustainability of Intervention; 6) Outcome of Intervention; 7) Intensity of Intervention; and 8) Experience with Intervention.   A brief review of these factors suggests the plan as generally proposed favors intervention as necessary into the Cumberland Wilderness to remove the horses from Cumberland Island and the Cumberland Wilderness, including the use of feeding stations to localize the horses. All effort should be made to undertake only those activities as are required to be undertaken in the Cumberland Wilderness and to act to minimize the impacts to the Cumberland Wilderness in accordance with the Wilderness Act and the Director's Order 41, Wilderness Stewardship.

9.   A Categorical Exclusion (CE) from performing an environmental assessment is warranted in this case.   CE 3.4 E (3), <u>Actions Related to Resource Management and Protection</u>, is appropriate.   CE 3.4 E (3) states:

> Removal of individual members of a non-threatened/endangered species or populations of pests and exotic plants that pose an imminent danger to visitors or an immediate threat to park resources.

A review of the environmental screening form indicates no environmental issues are created by the project.  In fact, just the opposite occurs, major ongoing environmental harms are remedied by removal of the horses.  There exist no exceptional circumstances which suggest the likelihood of a measurable negative impact to the environment from the proposed plan (although some negative effects on certain portions of the public can be expected).   Additionally, the removal of the horses of Cumberland as proposed should be viewed as a single discrete program (not a series of actions) that has no potential to impact the human environment.   As stated above in Paragraph 5, time is of the essence. The parties view obtaining CE 3.4 E (3) to be critical to resolving this matter and to bringing the needed assistance to Cumberland Island's natural and Wilderness resources and to Cumberland's horses.

10.   The fact NPS continues to do nothing to address the harm being caused by the horses to the island's protected species including their designated critical habitats despite having direct knowledge such harm is occurring and despite the knowledge the existence of the horses as a non-native species is directly contrary to NPS policy and their effects contrary to the Endangered Species Act, NPS will almost certainly have attorney's fees awarded against it.  To date, the attorney for GERL, the Georgia Horse Council, Will Harlan, and Carol Ruckdeschel has worked a total of 68.3 hours.   At applicable market rates for experienced litigators, this fee totals $20,490.00. (Hal Wright. 68.3 hours at $300.00 per hour = $20,490.). Additionally, Mr. Wright's assistant has worked a total of 12.5 hours on this matter to date for a total of expense of $500.00.   (Rachel Gomez. 12.5 hours at $40.00 per hour = $500.00.).   The parties have also incurred $297.63 in additional administrative and/or expert witness expenses. Given that this work should not have been necessary and is solely the result of NPS's actions in failing to manage Cumberland's horse population, the parties demand reimbursement for such fees and expenses in the total amount of $21,287.63.

This letter and demand for action by your client are being provided to allow the parties to avoid additional litigation and the time, costs and expenses that would be

associated with such litigation, including associated public relations issues.  Not only must the horses be removed from the island, but immediate steps must be implemented, and a plan devised, to assure the remaining tenure of the horses on Cumberland is a humane one.   In addition, the necessary steps must be undertaken to begin to recover the critical habitat designated on the island. We respectfully request a response indicating your willingness to satisfy the demands stated herein within sixty (60) days after receipt of this letter.

Should you fail to agree to satisfy these requests, the parties will be left with no choice but to pursue the available legal remedies briefly discussed above, which we anticipate involving the filing of an action in the appropriate United States District Court.   Such an action would certainly include a claim for recovery of attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, which is highly likely to be granted as the NPS's position in this matter lacks any substantial justification.

Respectfully,


**HAL WRIGHT, ATTORNEY AT LAW, LLC**



Howell Franklin Wright



cc:

Via Email Only

Georgia Equine Rescue League, Ltd.:  gerlpatty@yahoo.com
Georgia Horse Council. LLC.:  gerlpatty@yahoo.com
Will Harlan: harlanwill@gmail.com
Carol Ruckdeschel: cturtleshell@gmail.com

**HAL WRIGHT**
**ATTORNEY AT LAW, LLC**
260 SOUTHVIEW DRIVE
ATHENS, GEORGIA  30605

HOWELL F. WRIGHT

(404) 694-7789
hwrightathenslaw@gmail.com

August 31, 2022

Deb Haaland
Secretary of the Interior
Department of the Interior
1849 C Street, N. W.
Washington, DC 20240

Charles F. Sams III
Director
National Park Service
1849 C Street, N. W.
Washington, D.C.  20240

Mark Foust
Regional Director
Southeast Region
National Park Service
Atlanta Federal Center
1924 Building
100 Alabama St., S.W.
Atlanta, GA 30303

Gary Ingram
Superintendent
Cumberland Island National Seashore
National Park Service
101 Wheeler St.
St. Marys, GA 31558

Martha Williams
Director
U. S. Fish and Wildlife Service
1849 C. Street, N. W.
Washington, DC   20240

Mark Williams
Commissioner
Georgia Department of Natural Resources
2 Martin Luther King Jr. Drive, SE,
Suite 1252
Atlanta, GA 30334

Doug Haymans
Director
Georgia Coastal Resources Division
One Conservation Way
Suite 300
Brunswick, GA  31520-8687

Gary Black
Commissioner
Georgia Department of Agriculture
19 Martin Luther King, Jr. Dr., S.W.
Atlanta, Georgia 30334

**RE: 60 Day Notice of Intent to Bring Legal Action for Failure to Manage
Cumberland Island's Feral Horses.**

Dear Ladies and Gentlemen:

This firm represents the horses of Cumberland Island, the Georgia Equine Rescue League,
Ltd., the Georgia Horse Council, Inc., and Carol Ruckdeschel in the matter of the
ongoing presence of the horses on Cumberland Island, Georgia.   To succinctly state the
essence of these parties' concerns:  the horses are not good for Cumberland Island, and
Cumberland Island is not good for the horses.   This letter serves as a 60-day notice of
our intent to bring legal action against the National Park Service and the State of Georgia
for their failures to properly manage the horses on Cumberland Island should an

2

agreement not be reached as proposed herein.  The parties expressly hope and intend that during this 60-day period this matter can be timely resolved in a collaborative manner and without having to involve the court system.

## PARTIES INITIATING THIS ACTION

The following entities, organizations, and individuals are the initial parties with interests in this matter who are incurring expenses in time and money to bring this important issue to the attention of the appropriate governmental entities.   Should this matter proceed to court, additional parties may be added as necessary.   These parties have legal standing to bring a suit concerning the horses of Cumberland due to their past and ongoing interests in horse welfare and the overall protection of the island's natural and Wilderness resources.

Horses of Cumberland Island.     The horses on Cumberland have been well studied. The current number is estimated at between 140 and 170 individual animals.   The horses are feral, meaning even though they were once domesticated they are no longer considered so as they have reverted to a wild state and no longer depend on human support for their survival.   The horses receive no food, water, or veterinary care.    The horses are considered a non-native (exotic) species.


Unfortunately, there are not sufficient resources on Cumberland Island to support a herd of horses.   The horses of Cumberland suffer from malnourishment, increased parasite loading, limited water sources, gut and teeth issues caused by the ingestion of sand, natural accidents, confined habitat conditions (increasing the probability of natural accidents), and increased disease such as Eastern Equine Encephalitis and West Nile Virus.   The horses of Cumberland's life expectancy is believed to be but 8 to 9 years, well below that of a domestic horse which is expected to live between 25 to 30 years. This discrepancy is due to the harsh and inhumane living conditions these horses must endure.   The horses have standing to bring a suit in their own right.

The Georgia Equine Rescue League, Ltd.     Georgia Equine Rescue League, Ltd. (GERL) is a non-profit organization of 400 members with 501 (c) (3) status which mission is to help horses in need.     GERL believes it is the responsibility of its members to help find solutions to the growing problem of starved, abused, and neglected equine in the state of Georgia.   GERL believes through education, incentive programs for equine health, and working with the Georgia Department of Agriculture Equine Division and other law enforcement entities, positive steps can

be taken to help reduce and eventually eliminate horses from being abused and neglected in Georgia.

The Georgia Horse Council, Inc.    The Georgia Horse Council is a non-profit organization dedicated to promoting, educating, and unifying equine-interested people, state horse organizations and state breed associations in Georgia.

The Georgia Horse Council has worked diligently to meet the needs of its members by offering a variety of events and opportunities to advance and unify Georgia's horse industry.   Horse welfare is a key component of this program.  As part of this effort, the Georgia Horse Council keeps its membership informed about Georgia's and the Country's unwanted horse issues and horse welfare issues in general.

The Georgia Horse Council is a member organization of the American Horse Council.

Carol Ruckdeschel.    Ms. Ruckdeschel has spent her adult life studying and documenting the various systems, communities and species which define Cumberland Island.   As an island resident, Carol has a unique understanding of the island's horses; how they impact the island and how the island affects the horses.   She is a perpetual advocate for the island's natural systems and biota as well as for the humane treatment of Cumberland's horses.

## FACTUAL BACKGROUND

### Horses' Impact on the Island.

The horses' negative impacts on the island have been well documented and do not need to be set forth in detail here.   Briefly, and as was noted in the NPS's *Natural Resources Condition Assessment for Cumberland Island National Seashore, 2018 (NRR)*, studies of Cumberland's horses have documented the horses' "grazing activity, including vegetation consumption and trampling, significantly reduces vegetative cover, growth, and reproduction in these habitats"; alters plant species composition, "likely increasing the vulnerability of dunes and salt marshes to erosion and storm damage"; and compacts wetland soils thereby "disturbing vital soil-dwelling organisms".   The NRR also points out "wastes produced by horses contribute to nutrient enrichment or eutrophication of wetlands and waterbodies . . . mak[ing] wetland habitats less favorable for native

4

plants, fish, herpetofauna, and invertebrates." The horses' impacts on the is-
land's saltmarshes are well established as well. See Draft Horse Management
Plan, 1995. The horses depend on the marsh grasses for part of their food
supply. In addition to directly removing marshland vegetation through grazing,
the trampling impacts of the horses directly impact other marshland species and
otherwise alter the saltmarsh ecosystem. Turner, M. G. 1987. *Effects of Graz-
ing by Feral Horses, Clipping, Trampling, and Burning on a Georgia Salt
Marsh*, Estuaries vol. 10, no. 1, March 1987, pp. 54-60; Turner, M. G. 1986. *Ef-
fects of Grazing by Feral Horses, Clipping, Trampling, and Burning on a
Georgia Salt Marsh*, Univ. Ga., Coop. Park Stud. Unit Tech. Report No. 23.
43pp.; National Park Service. 1996. *Draft Environmental Assessment. Alterna-
tives for Managing the Feral Horse Herd on Cumberland Island National Sea-
shore*. March 6, 1996. pp.30. The horses compete with the native white-tailed
deer for forage on the island. The horses have also been known to trample
shore bird nests.


## Island's Impact on the Horses.

The island's impact on the wellbeing of the horses is less formally documented but
nevertheless well established. The island's harsh environmental factors reduce the life
expectancy for a herd member to approximately a third of that of a domestic horse.
Horses require one percent (1%) of their body weight in forage material per day. At least
twelve percent (12%) of the forage material needs to be of the type and quality to meet
the protein requirements of an individual horse. This amount could be greater depending
on the horse's age and sex. Cumberland Island lacks adequate food resources to sustain
an equine population of any number. The Cumberland horses consume Spanish moss,
smooth cordgrass, sea oats and sedge, all native to the island and of marginal nutritional
value. The horses are occasionally trapped in the marsh mud attempting to graze on the
marsh vegetation where they succumb to drowning, starvation, or dehydration.

Horses need eight to ten (8-10) gallons of fresh water per day for normal functioning.
Heat, exercise, and lactation can significantly increase the demand for fresh clean water.
Brackish or salt water is not a substitute for clean fresh water and in fact is detrimental
and potentially lethal to horses. As with almost all mammals, drinking salt water will
cause dehydration, can result in severe sickness, and interfere with the horse's digestion
system and processing of essential nutrients. Drinking brackish and salt water can
increase the likelihood of diseases such as diarrhea, colic, and recumbency, as well as
lead to abdominal pain, cramping, and other digestive complications. While

Cumberland Island has locations where artesian water is available, these areas are few and scattered throughout the island.  It is not at all certain exactly which horses are accessing these water sources and which are having to look elsewhere for water.   The issue of access to clean fresh water can become acute during periods of drought.

In addition to struggling to survive in an environment to which it is an ecological stranger, the Cumberland horses also face several other major stressors which impact their well-being.   These stressors include prescribed burns conducted by NPS throughout many parts of the island; managed hunts for feral hogs and deer; various diseases including Encephalitis; a large island parasite population which can serve as disease vectors; and tourists which can serve to harass and further stress the horse population.

The Cumberland Island horses' body scores (indicia of overall health) are the telltale sign of the herd's health.    These scores are estimated to be in the low to middle range for a horse's health.   The yearlings, those no longer nursing, are challenged with gaining access to the scarce food resources the island has to offer.   The fillies are bred from their first heat and remain pregnant their entire lives, foraging for their nursing baby, the foal they carry, and themselves.   This hardship together with the island's lack of adequate food sources is generally reflected in these females' low body scores.

**Previous NPS Horse Management Action (proposed Management Plan).**

NPS conducted a public scoping process in 1995 to gauge the public's sentiment for accommodating the feral horses on Cumberland Island and to explore the possible alternative means for managing the island's horse population.   In March of 1996 NPS released the Draft Environmental Assessment (EA) titled "Alternatives for Managing the Feral Horse Herd on Cumberland Island National Seashore".   Written comments were submitted by the public and public meetings were conducted by the NPS to receive further public input on the plan.

In the summer of 1996, prior to NPS initiating action to implement the management plan for Cumberland's feral horse herd, United States Representative for the First District of Georgia, Jack Kingston, whose district includes Cumberland Island, intervened.   Congressman Kingston attached a "rider" to an unrelated federal appropriations bill directing the NPS to immediately cease any actions to manage or control the island's horses for the remainder of the fiscal year ending in 1997.

Congress passed the appropriation bill with the horse management rider intact. NPS was forbidden and unable to take any action during the next year to manage Cumberland's feral horses. Representative Kingston's rider expired in 1997. Since that time, NPS has taken no further steps to manage, care for, or otherwise control the island's feral horses.

# ANALYSIS AND CLAIMS

The GERL, the Georgia Horse Council, and Ms. Ruckdeschel have spent years interacting with horses, including the horses on Cumberland Island.   GERL has rescued horses in all sections of the State of Georgia from a wide variety of threats and ongoing conditions.   GERL, the Council, Ms. Ruckdeschel, together with veterinarians and other experts in the field have taken a close look at the circumstances involving the horses on Cumberland over the past several months.   Several conclusions were reached.  First, the horses, as a non-indigenous species, do not belong on the barrier Cumberland Island. Second, the horses should be removed from the island.    Third, the removal of the horses from Cumberland Island should be accomplished in the "best" way possible considering: 1) the overall well-being of the horses; 2) the protection of the island's natural and Wilderness resources; 3) the overall protection of the state's equine population from potential diseases in the Cumberland horse population; and 4) the time sensitivity of the project.

Following in Part I is a brief discussion of the Cumberland horses' current physical situation establishing the horses are living in inhumane conditions in violation of Georgia law.    Part II summarizes how the horses are adversely affecting the natural and Wilderness resources of the island contrary to the spirit and letter of the laws establishing the Seashore and the Cumberland Wilderness.   Finally, in Part III, a plan is outlined for how to best remove the horses over time in a humane and timely manner to the betterment of the horses and the island.    It is strongly suggested this plan serve as the core course of action for moving forward to addressing this matter and as the alternative to litigation.

## I.  The NPS and State of Georgia[1] are Failing to Provide Appropriately Healthy Conditions for the Horses of Cumberland in Violation of the Laws of the State of Georgia.

The Humane Care for Equines Act, OCGA §4-13-1 et seq, mandates all horses in Georgia receive "adequate food and water" and "humane care" as not to cause death "in a cruel or inhumane manner".   OCGA §4-13-3.     The Commissioner of the Department of Agriculture is given the responsibility and broad and far-reaching authority to enforce these mandates.   Coexistent with this authority is the Commissioner's authority to control diseases among the equine population by assuring the horses are being maintained in "good and healthy conditions".   See. OCGA § 4-4-110 *et seq.* (the "Georgia Equine Act").   Moreover, the laws and policies of the State of Georgia prohibit the release and abandonment of any livestock, including horses, onto public lands.   OCGA § 4-3-1 *et seq.*; OCGA § 4-11-15.1.

As outlined above in the discussion under the section on the "Island's Impact on the Horses", Cumberland Island is not conducive to the well-being of horses.   The horses suffer a wide range of stressors from insufficient food resources to heavy parasitic loads to an increasingly hostile island environment.  The result is a horse herd characterized by severely marginalized body health scores.  For the horses on Cumberland, their existence on the island is anything but humane.  Put simply, the horses of Cumberland are horses being kept in violation of Georgia's Humane Care for Equines Act, OCGA § 4-13-1, *et seq.*, and the Georgia Equine Act, OCGA § 4-4-110 *et seq.*

## II.  The NPS is Failing to Manage the Cumberland Horses in Violation of its Own Rules and Procedures, The Endangered Species Act, the 1964 Wilderness Act, and Georgia State Law.

The "wild" horses on Cumberland Island are viewed by the federal government as feral

---

[1]  The National Park Service, Dept of Interior, and the State of Georgia entered a *Memorandum of Agreement for Concurrent Jurisdiction* over all land and waters within the external boundaries of Cumberland Island National Sea-shore on May 29, 1986, incorporating the previous agreement dated December 14, 1982.  The original Concurrent Jurisdiction Agreement, Paragraph 12., provides in part: "Both the United States and the State of Georgia by this Agreement express their mutual interest in Park Lands.  The responsibilities and obligations of the National Park Service will be undertaken and assumed in such a manner and to the extent that this interest will assure the general public with a program of recreational opportunities together with the protection of natural resources.  The State shall cooperate with the National Park Service in the performance of this responsibility in a manner consistent with state law."

domestic animals.      50 C.F.R. §30.11 (a) provides "Feral animals, including horses, burros, cattle, swine, sheep, goats, reindeer, dogs, and cats, without ownership that have reverted to the wild from a domestic state may be taken by authorized Federal or State personnel or by private persons operating under permit in accordance with applicable provisions of Federal or State law or regulation."    See also. Testimony of Greg Siekaniec, Acting Deputy Director, U.S. Fish and Wildlife Service, Dept. of the Interior, before the House Committee on Natural Resources, Subcommittee on Fisheries, Wildlife, Oceans, and Insular Affairs; on H.R. 306 The Corolla Wild Horses Protection Act, given April 7, 2011 ("The [Fish and Wildlife] Service views wild horses, as defined in 50 CFR 30.11(a), as feral domestic animals.").


The laws and policies governing the Cumberland Island National Seashore require the removal of the feral horses from the island.  These laws and policies include but certainly are not limited to:  The Cumberland Island National Seashore Act (requiring the Seashore be "permanently preserved in its primitive state. . . .." with no project or plan being undertaken "which would be incompatible with the preservation of the unique flora and fauna" of the island); General Management Plan for Cumberland Island National Seashore, 1982 ("[f]eral animals will be removed where they are detrimental to natural and cultural resources, and they will be transported to the mainland. . .. The feral horse population will be managed to insure a [h]ealthy representative herd. . .."); 1990 Statement for Management for Cumberland Island National Seashore ("manage native wildlife populations so as to achieve a balanced eco-system free of interferences created by man" and to "reduce the competitive impact on native wildlife by exotic animals and the deleterious effect on vegetation by exotic animals by the most effective, feasible means possible"); Executive Order 13112 on Invasive Species as Amended by Executive Order 13751, Dec. 5, 2016; Section 1 ("[i]t is the policy of the United States to prevent the introduction, establishment, and spread of invasive species, as well as to eradicate and control populations of invasive species that are established"); Natural Resources Condition Assessment for Cumberland Island National Seashore, 2018 (NRR)(Natural Resource Report NPS/CUIS/NRR— 2018/1773) (Feral horses (together with feral hogs) "have had a significant impact on the CUIS ecosystem" at 19; "maintenance of the feral horse herd causes unacceptable impacts to the park's wetland resources" at 80;  "Feral horses will continue to be a threat to the native mammals of the island as long as the population is left unmanaged." at 127;  "Threats to CUIS's freshwater water quality include feral horse [] activity." at 189.).

<u>The Administrative Procedure Act</u>.

As I am sure you are aware, persons, such as the parties initiating this action, who are aggrieved by federal agency action (or agency inaction) may seek judicial review of the agency's action (or seek to compel the action withheld or delayed) under the federal Administrative Procedure Act, 5 U.S.C. §*702 et seq.*   5 U.S.C. § 706(1), declares that reviewing courts shall "compel agency action unlawfully withheld or unreasonably delayed."   As in this case, when a plaintiff raises a claim under § 706(1), she is challenging an agency's failure to take an action or render a decision even though the law requires the agency to do so.     To be successful, a plaintiff seeking to have the court to "compel agency action ... unreasonably delayed" under § 706(1) "must pinpoint an agency's failure to take an action that is *both* discrete *and* mandatory." *Center for Biological Diversity v. Zinke*, 260 F.Supp.3d 11, 21 (D. D.C. 2017) (citing *Norton v Southern Utah Wilderness Alliance*, 542 U.S. 55, 64, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (2004)).


In this case, NPS does not manage the horses on Cumberland Island.  On information and belief, the NPS ceased all "management actions" concerning the horses on Cumberland in the summer of 1996 when Congressman Kingston directed the NPS to immediately cease any actions to manage or control the island's horses.   Currently, the parties challenge NPS's specific failure to manage the Cumberland horses as to remove them from the island consistent with the directives and purposes of The Cumberland Island National Seashore Act, *16 U.S.C. §§ 459i – 459i-9*, and its enabling rules and regulations. The parties contend both the State of Georgia and the NPS have failed to act in violation of the specific directives of the Georgia Equine Act, *OCGA § 4-4-110 et seq.,* and the Humane Care for Equines Act, *OCGA § 4-13-1 et seq.*   Finally, it is contended NPS's failure to act to remove the Cumberland horses from the island and the Cumberland Wilderness violates the Wilderness Act of 1964, 16 *U.S.C. § 1131 et seq.* and the Endangered Species Act*, 16 U.S.C. §1531 et seq*.   Should the parties not be able to resolve this matter, these contentions will be fully developed and presented in the appropriate legal forum.


While the parties believe NPS has simply not acted to meet its specific duty to remove the horses from Cumberland Island as mandated pursuant to numerous laws, regulations, and the NPS's own policies and determinations, the parties alternative-

10

ly contend the NPS made a decision to not manage the horses, and to not provide the horses with water, food or appropriate care, i.e., a decision to allow the horses as a non-native species to remain on Cumberland Island under inhumane conditions. *"Courts may set aside a final agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.' 5 U.S.C. §706(2)(A), (C) [cite omitted]. A decision is arbitrary and capricious when, among other flaws, 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.' [Cites omitted]". High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1194 (11th Cir. 2017).

It is believed there is no true "administrative record" associated with any NPS decision related to the horses on Cumberland Island, whether to remove them, or how best to manage the horses during the interim period until they are removed from the island. However, it is generally contended, in keeping with the same thought process associated with the claim under 5 U.S.C. § 706(1), the NPS' decision(s) are simply not supported by the law and are otherwise arbitrary and capricious. The decision to maintain the horse herd on Cumberland, whether implicit or explicit, is directly contrary to NPS's own studies, the recommendations of its experts, and to its own policies and directives; therefore, the parties are more than assured that should this matter go to court they would prevail on their claim pursuant to 5 U.S.C. §706(2).

The Endangered Species Act.

The Endangered Species Act (ESA) was enacted by Congress in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species ..." 16 U.S.C. §1531 (b).

The ESA, Section 7, provides: "Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat . . . determined . . . to be critical . . .. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." 16 U.S. C. § 1536 (a) (2).

As affirmed by the 11th Circuit in *Loggerhead Turtle v. County Council of Volusia*

11

*County, Fla.*, 148 F.3d 1231 (11th Cir. 1998), "some activities--especially those relating to land use--are more likely to result in 'jeopardy' than a 'take.'..."  *Id.* at 1246 (citing *Bruce Babbitt, Secretary of the Interior, et al., Petitioners, v. Sweet Home Chapter of Communities for a Great Oregon, et al.*, 115 S.Ct. 2407, at 2415 (1995); "Section 7 [16 U.S.C. § 1536] imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9 [16 U.S.C. § 1539] does not replicate, and § 7 does not limit its admonition to habitat modification that actually kills or injures wildlife.")

Similarly, Section 9 of the ESA, 16 U.S.C.A. §1538 2, makes it "unlawful for any person subject to the jurisdiction of the United States to take any [protected] species within the United States. . . ." 16 U.S.C.A. §1538 (a) (1) (b) (1992). "Take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532 (20).

"To "take" a species includes to "harm" it. Id. § 1532(19). "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3(c) (2006).  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535 (11th Cir. 2013).

It is well settled that an agency's management policies and practices can and often do result in a "take" of protected species. See *Defenders of Wildlife v. Administrator, E.P.A.*, 882 F.2d 1294, 1301 (8th Cir. 1989) ( "EPA's decision to register pesticides containing strychnine or to continue these registrations was critical to the resulting poisonings of endangered species" and constituted a taking); *Palila v. Hawaii Dep't of Land & Natural Resources*, 639 F.2d 495, 497 (9th Cir.1981) (state's maintenance of sheep and goats in critical habitat of an endangered species, causing destructive impact on that species, constituted a taking by state under the ESA); *Sierra Club v. Lyng*, 694 F.Supp. 1260, 1268-72 (E.D.Tex.1988) (United States Forest Service tree-cutting practices harmed habitat of an endangered species and thus constituted a taking).

Cumberland Island is composed of multiple interrelated ecosystems and habitats upon which numerous species depend.      Protected species include the logger-head sea turtle, the wood stork, Wilson's plover, piping plover, American oyster-catcher, and several other species of shore bird which use the Seashore in migra-tion.   There are recognized data gaps in the Seashore's species diversity and well-

being as well as habitat conditions.   On information and belief, there also exists protected species of plants on the island which have not yet been identified and there very well could be species of bats and amphibians which are protected, or soon could receive protected status. Much of the data related to the Seashore's natural resources is decades old.

Ongoing changes brought about by alterations in global climate patterns as well as increasing pressures on the island's various habitats from direct human activities such as increased development pressures, expansion of automobile and bicycle use, and prescribed burning threaten the islands biodiversity, including its protected species, with adverse habitat modifications.   Cumberland's horses are an additional and unnecessary contributor to the degradation of the island's habitats, from the saltwater marshlands to the dune systems, to the interdune wetlands, to the island's freshwater resources.  The horses have also been known to directly interfere with nesting shorebirds as well as turtle nestlings.

The Wilderness Act.

At the recommendation of the Park Service, the Cumberland Island Wilderness was created by Congress on September 8, 1982, under the Wilderness Act by designating 8,840 acres of Cumberland as wilderness and 11,718 acres as "potential wilderness" until such time as prohibited uses of that land ceased and it would become wilderness.   Act of Sept. 8, 1982, Pub. L. No. 97-250, § 2(a), 96 Stat. 709 ("Designating Act").   A portion of Cumberland's marshlands are part of the Cumberland Island Wilderness, designated as a potential wilderness area. *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1191 (11th Cir. 2017).

The 1964 Wilderness Act, 16 U.S.C. § 1131 et seq, "seeks to preserve wilderness areas "in their natural condition" for their "use and enjoyment as wilderness." 16 U.S.C. § 1131(a) (emphasis added). The Act promotes the benefits of wilderness "for the American people," especially the "opportunities for a primitive and unconfined type of recreation." Id. at § 1131(c). Thus, the statute seeks to provide the opportunity for a primitive wilderness experience as much as to protect the wilderness lands themselves from physical harm. See also National Park Service, Reference Manual 41 at 14 ("In addition to managing these areas for the preservation of the physical wilderness resources, planning for these areas must ensure that the wilderness character is likewise preserved.")". *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1093 (11th Cir. 2004)

As the 11th Circuit highlighted in *High Point, supra* at 1197: "The Act further

instructs that the agency assigned to manage such protected areas shall manage the property in its charge in a manner designed to preserve the "wilderness character" of the area:

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and *shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.*

*Id. at 1197*

As the Courts have repeatedly declared, the National Park Service has an affirmative duty to protect the resources within the Cumberland Island Wilderness as wilderness; See. *High Point*, *supra* at 1200 (Court affirming NPS's "authority and responsibility to protect the marshlands within Cumberland Island National Seashore as wilderness.").   NPS is obligated to "preserve" and to "restore" the Cumberland Island Wilderness' wilderness character and natural conditions.   This necessarily includes the removal of the feral horses as a non-native species having significant negative impacts on the environment.

# DEMAND FOR REMEDIATION

NPS has chosen not to act to manage Cumberland's horses for a quarter century.   All the actions described above are threatening Cumberland Island's natural and wilderness resources.   Cumberland's horses are suffering.   For all the reasons recited above, this is a demand the NPS immediately begin to undertake the following affirmative steps to remedy the harm caused by NPS's decision to forego the management of the horses of Cumberland and to compensate the parties for any expenses associated with this matter.

1.   The NPS and the State of Georgia should immediately begin to improve the well-being of the horses on Cumberland.   The NPS in cooperation with the Georgia Department of Agriculture, Equine Division, shall take all steps necessary to assess the health and well-being of the horse herd on Cumberland Island and provide the needed additional water, food, and care to bring the herd to the level of care consistent with Georgia's Humane Care for Equines Act, OCGA § 4-13-1 et seq.   The Georgia Department of Agriculture, Equine Division, shall assure the humane care of the horses

14

on Cumberland and be continually involved with the management of the horses on Cumberland until the horses are removed from the island.

2. The NPS, together with the State of Georgia, shall commit to remove all horses from the island over a period of no longer than eight (8) years through a program of applying contraceptives to the mares of the herd through darting (used in other parks).   The NPS is to manage and implement the program to control reproduction.   It is suggested food sources be used strategically to assist in locating (and acclimating) the horses for easier contraceptive application.   The costs of the program will be shared between the NPS and the State of Georgia.

3. On information and belief, a small number of feral horses also are present on Little Cumberland Island.  For purposes of managing horses on Cumberland Island, it is intended any plan and or actions enacted pursuant to this agreement or otherwise specifically include and incorporate the island known as Little Cumberland Island which island is within the boundary of the Cumberland Island National Seashore.   References made in this letter to Cumberland, Cumberland Island, or the "island" shall be deemed to also include the island of Little Cumberland Island unless specifically noted otherwise.

4.   In order to facilitate the removal of the horses and to bring earlier relief to the horse herd, every effort should be made to gather the younger horses and directly remove them from the island whereupon they can be adopted to suitable owners.   The NPS, the Georgia Department of Agriculture, Equine Division, and the Georgia Equine Rescue League will work cooperatively to create and implement a system whereby yearlings and weanlings can be gathered, appropriately processed, and adopted out.   The initial gathering is anticipated for the fall of 2023 where it is estimated approximately twenty (20) to thirty (30) "rescues" will be removed from the island.

5.   Time is of the essence in initiating and completing efforts to humanely manage and remove the horses from Cumberland Island.   Twenty-five years have elapsed since Congressman Kingston ordered NPS to cease management of the Cumberland horse herd for a period of a year.   During that time, NPS has taken no further action.   Climate driven change and alterations in environmental conditions and systems on the island require a sustained and timely removal of the horses from this island to allow for increased system resilience to change.   To that end, the following targeted removal numbers will be used to measure the ongoing effectiveness of the program:

> After year one (1): 25% reduction in the herd (primarily from rescues)
> After year five (5): 75% reduction in the herd
> After year eight (8): 100% reduction in the herd

15

6.   A panel will be created to oversee the implementation of the removal of the horses and the interim care of the horses in a humane fashion (See Number 1. above.).   The panel will consist of a representative of each of the National Park Service, the Georgia Department of Agriculture, Equine Division, the Georgia Horse Council, Inc., the Georgia Equine Rescue League, Ltd., and Carol Ruckdeschel.   The panel is free to appoint additional members as it deems fit.

7.  The NPS will be responsible for providing all logistical support necessary for the successful implementation and conclusion of the plan including transportation to and from the island of all necessary personnel and supplies, transportation on the island, food and lodging as needed, and other technical and communication support.

8.  The parties recognize the Cumberland Wilderness Area comprises a significant portion of the total area of Cumberland Island.   On information and belief, most of the Cumberland Island horses are believed to inhabit the area of the island outside the Cumberland Wilderness in the general area of Stafford Field and the in south-ern portion of the island near the Dungeness Ruins.    However, horses do inhabit the Cumberland Wilderness.    In keeping with the idea of "wilderness" embraced in the Wilderness Act of 1964 as "an area where the earth and its community of life are untrammeled by man," which "generally appears to have been affected primarily by the forces of nature", and as an area "retaining its primeval character and influence", the *NPS Management Policies, 2006, Chapter 4* defines natural conditions as, "the condition of resources that would occur in the absence of hu-man dominance over the landscape."   NPS has recently recommended and ap-proved, Guidelines for Evaluating Ecological Intervention Proposal in National Park Service Wilderness, for inclusion in NPS Reference Manual 41, Wilderness Stewardship.   As in the case of evaluating the plan to remove the horses from the Cumberland Wilderness, "proposed interventions would need to address the degra-dation of indigenous natural resources, processes, systems, and values that is caused by past or ongoing human actions."   The guidelines suggest 8 factors to consider in judging a project's potential wilderness impacts: 1) Cause of Degrada-tion; 2) Timing of Degradation; 3) Origin of Degradation; 4) Urgency of Degrada-tion; 5) Sustainability of Intervention; 6) Outcome of Intervention; 7) Intensity of Intervention; and 8) Experience with Intervention.   A brief review of these factors suggests the plan as generally proposed favors intervention as necessary into the Cumberland Wilderness to remove the horses from Cumberland Island and the Cumberland Wilderness, including the use of feeding stations to localize the hors-es. All effort should be made to undertake only those activities as are required to

16

be undertaken in the Cumberland Wilderness and to act to minimize the impacts to the Cumberland Wilderness in accordance with the Wilderness Act and the Director's Order 41, Wilderness Stewardship.

9.   A Categorical Exclusion (CE) from performing an environmental assessment is warranted in this case.   CE 3.4 E (3), <u>Actions Related to Resource Management and Protection</u>, is appropriate.   CE 3.4 E (3) states:

> Removal of individual members of a non-threatened/endangered species or populations of pests and exotic plants that pose an imminent danger to visitors or an immediate threat to park resources.

A review of the environmental screening form indicates no environmental issues are created by the project.  In fact, just the opposite occurs, major ongoing environmental harms are remedied by removal of the horses.  There exist no exceptional circumstances which suggest the likelihood of a measurable negative impact to the environment from the proposed plan (although some negative effects on certain portions of the public can be expected).   Additionally, the removal of the horses of Cumberland as proposed should be viewed as a single discrete program (not a series of actions) that has no potential to impact the human environment.   As stated above in Paragraph 5, time is of the essence. The parties view obtaining CE 3.4 E (3) to be critical to resolving this matter and to bringing the needed assistance to Cumberland Island's natural and Wilderness resources and to Cumberland's horses.

10.  The fact NPS continues to do nothing to address the harm being caused to the island's natural and wilderness resources by the horses despite having direct knowledge such harm is occurring and despite the knowledge the existence of the horses as a non-native species is directly contrary to NPS policy and to the Wilderness Act, and despite NPS accepts the fact the horses of Cumberland are living in an inhumane condition contrary to State of Georgia law and good conscious, NPS will almost certainly have attorney's fees awarded against it.  To date, the attorney for GERL, the Georgia Horse Council, and Carol Ruckdeschel has worked a total of 68.3 hours.   At applicable market rates for experienced litigators, this fee totals $20,490.00.  (Hal Wright. 68.3 hours at $300.00 per hour = $20,490.).   Additionally, Mr. Wright's assistant has worked a total of 12.5 hours on this matter to date for a total of expense of $500.00.   (Rachel Gomez. 12.5 hours at $40.00 per hour = $500.00.).   The parties have also incurred $297.63 in additional administrative and/or expert witness expenses. Given that this work should not have been necessary and is solely the result of NPS's actions in failing to manage

17

Cumberland's horse population, the parties demand reimbursement for such fees and expenses in the total amount of $21,287.63.

This letter and demand for action by your client are being provided to allow the parties to avoid additional litigation and the time, costs and expenses that would be associated with such litigation, including associated public relations issues. Not only must the horses be removed from the island, but immediate steps must be implemented, and a plan devised, to assure the remaining tenure of the horses on Cumberland is a humane one. We respectfully request a response indicating your willingness to satisfy the demands stated herein within sixty (60) days after receipt of this letter.

Should you fail to agree to satisfy these requests, the parties will be left with no choice but to pursue the available legal remedies briefly discussed above, which we anticipate involving the filing of an action in the United States District Court for the Southern District of Georgia. Such an action would certainly include a claim for recovery of attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, which is highly likely to be granted as the NPS's and the State of Georgia's position in this matter lacks any substantial justification.

As currently understood, NPS's current position in this matter is that it is simply fulfilling the public's wishes in not removing the horses. NPS holds this position despite the NPS's previous position to the contrary that it is best the horses be removed from the island. NPS cannot dispute it is operating in direct contradiction to all governing laws and rules concerning the horses on Cumberland Island. NPS has made no effort at an attempt to manage the horses in the past 25 years. This lack of action on the part of NPS reinforces the argument that NPS has shown an overall indifference to the consequences of its actions and the effect such inaction has had on the horses themselves and Cumberland Island's natural and Wilderness resources – resources entrusted to the care of the NPS. Therefore, we firmly believe NPS and the State of Georgia will both be held accountable by the court including the likely award of our client's attorney's fees, should this matter proceed to litigation. Our goal is to resolve this matter without getting to that point. We look forward to exploring how best to work cooperatively in bring relief to both the horses and the island.

Respectfully,

**HAL WRIGHT, ATTORNEY AT LAW, LLC**


Howell Franklin Wright


cc:

Via Email Only

Georgia Equine Rescue League, Ltd.:  gerlpatty@yahoo.com
Georgia Horse Council. LLC.:  gerlpatty@yahoo.com
Carol Ruckdeschel: cturtleshell@gmail.com