# GEORGIA LOGGERHEAD SEA TURTLE PROTECTION AND MANAGEMENT COMMITTEE

Hon. Ogden Doremus
Ms. Deborah Harris
Mr. Royce Hayes

Mr. Charles Maley
Mr. Larry McSwain
Dr. James Richardson
Mr. David White

Mr. John Robinette
Mr. J. Owens Smith
Mr. Newton Sikes

15 December 1994

Mr. Joe Tanner, Commissioner
Georgia Department of Natural Resources
205 Butler St., S.E., Suite 1252
Atlanta, Georgia 30334

Dear Commissioner Tanner:

Thank you for the opportunity to contribute to the conservation and recovery of Georgia's loggerhead sea turtles. Each member of the Loggerhead Protection Committee approached the tasks you initiated with considerable zeal and thoughtfulness. It is with satisfaction that the Committee now presents the plan you requested.

The Committee has addressed a variety of factors that impact nesting sea turtles in Georgia and offers recommendations to best protect this resource. These recommendations are outlined in the "Management Plan for the Protection of Nesting Loggerheads and Their Habitat in Georgia." The Plan will make the task easier for wildlife managers in the state who must give substance and action to the concepts mandated by the Endangered Species Act and the federal Recovery Plan for Loggerhead Sea Turtles.

There are three issues that the Committee feels require the attention of the Department of Natural Resources. The first is the need for clarification of management responsibility for controlling feral hogs which are known predators of sea turtle nests. This issue becomes acute when hogs on private lands visit turtle nesting areas or other regulated lands in the public trust.

Secondly, there is no present mechanism in the Shore Protection Act to prevent construction activities in the "dynamic dune field," including accreted lands. Allowing structures to be built on accreted beaches results in armoring to protect these structures. The armoring causes erosion of nesting beaches. Therefore a continuing conflict with nesting sea turtles is inevitable under this system.

We recommend a prohibition on the placement of structures in the "dynamic dune field," including accreted lands, using the language in the Act that describes the July 1, 1979 Pre-Act delineations of the "dynamic dune field." The Committee also recommends changing the language that defines the "dynamic dune field" by deleting or changing "trees 20 feet or taller,"

Letter to Commissioner Tanner
pg. 2

which in effect gives permission to build on aforementioned accreted lands. A component of a dynamic dune field is young pines in excess of 20 feet, which may be as young as 6 years, and do not reflect any level of stability within the dynamic dune field. Naturally established hardwood species more than 20 feet tall may be a more realistic indicator to define boundaries of the "dynamic dune field."

Thirdly, the Committee recommends that the Board of Natural Resources adopt rules for beach nourishment and construction projects that will provide additional protection for sea turtle habitat. The Plan contains our recommendations in this area.

This management plan has the unanimous endorsement of the committee, which placed the best interests of the resource at the center of its deliberations. The coordination of appropriate actions by management agencies, as outlined in the enclosed plan, will enhance the recovery of Georgia's loggerhead sea turtles. We submit it now for your approval.

Thank you again for this unique chance to contribute to loggerhead sea turtle protection and recovery.

Sincerely,

Charles Maley - Coordinator
Loggerhead Protection Committee

_____
Hon. Ogden Doremus

_____
Mr. Larry McSwain

_____
Mr. John Robinette

_____
Ms. Deborah Harris

_____
Dr. James Richardson

_____
Mr. J. Owens Smith

_____
Mr. Royce Hayes

_____
Mr. David White

_____
Mr. Newton Sikes

Exhibit A
Management Plan For The
Protection of Nesting Loggerhead Sea Turtles and Their Habitat
in Georgia

The Recovery Plan for U.S. Population of LOGGERHEAD TURTLE *Caretta caretta* (1991) was prepared by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service and outlines the actions which are believed to be required to recover and/or protect this threatened species. Elements of the plan are subject to modification as dictated by new findings, changes in species status, and completion of recovery tasks throughout the range of the species. Any plan for management and protection of sea turtles and their habitat in Georgia should be in concert with the overall federal recovery plan.

Georgia has a "significant assemblage" of nesting turtles, and genetic studies by Bowen et al. (1993) demonstrate that loggerheads of Georgia and South Carolina are a unique breeding stock, and the declining numbers of nesting turtles in this region are not subject to revitalization by Florida populations of loggerheads. There is a growing consensus among sea turtle biologists that the progressive and continuing decline in numbers of nesting Georgia and South Carolina loggerheads is sufficient evidence for up-listing these animals from threatened to endangered status under the Endangered Species Act.

Because of these data and concerns about specific factors that may be negatively impacting the Georgia population, Commissioner Joe Tanner of the Georgia Department of Natural Resources impaneled a committee of experts in November 1993 and asked them to recommend overall management strategies for loggerhead turtles on Georgia's nesting beaches. The Georgia Loggerhead Recovery and Habitat Protection Plan is the committee's response to Commissioner Tanner's charge and is intended to be a comprehensive plan for all barrier islands in the state. It is based on the U.S. Fish and Wildlife/National Marine Fisheries Service Plan, but addresses issues of particular interest to the Georgia population and provides guidelines for further protection as warranted by existing conditions at each study site. The plan is designed to work within existing laws and regulations governing activities that affect nesting loggerheads and their habitat.

The goal of the committee is to see the plan accepted by Commissioner Tanner, then advocated by the Department as appropriate for adoption by all agencies and entities with management responsibility for Georgia's beach habitats.

Conservation of nesting sea turtles must be a concern on all Georgia beaches, even though not all of these beaches support the same intensity of nesting effort. Understanding that it is not possible to provide all Georgia beaches with the same level of management protection, the Committee asserts that management efforts for threatened sea turtles on beaches with low nesting density will not be abandoned.

Every clutch of eggs is important to the survival of a threatened or endangered species. Management is required to maximize reproductive effort until such species can be down-listed to a more stable management category. Regardless of management efforts, not all sea turtle clutches will survive to term. Reasonable steps to maximize reproductive success follow.

I. Protect and manage nesting sea turtles

    A.    Monitor nesting trends: GDNR will coordinate Annual Index Beach Nesting surveys of all barrier islands in the state. Island management plans should be submitted for GDNR Nongame Section review by 20 April.

        1.    Surveys will be conducted daily at first light to record all sea turtle activity as outlined in the Protocol for Index Beach Nesting Surveys, GDNR/USFWS, 1989. (Attachment 1)

            a.    Surveys on Federally managed lands will be supervised and conducted by federal personnel or volunteers.
            b.    State personnel or supervised volunteers will conduct surveys on State managed lands.
            c.    St. Catherines Island Foundation, the City of Tybee Island, Sea Island Co., Little St. Simons Island, LTD., and Little Cumberland Homeowners Assoc. will be responsible for surveys at their respective islands.
            d.    Glynn County will provide for surveys at St. Simons Island.
            e.    Smaller, isolated beach units will be subject of loggerhead reproduction assessment to determine need for nest protection.
                (1)    Little Tybee - GDNR
                (2)    Pelican Spit - GDNR
                (3)    Wolf Island - FWS

    B.    Protect Nests: Each management authority or permitted research group listed in I. A. 1. above will be responsible for nest protection and development of a protection plan. Protection plans, including predator control measures will be submitted for GDNR Nongame review by 20 April each year. Technical assistance for nest protection will be provided by GDNR Nongame and USFWS. In all cases the least manipulative protection method available shall be employed to avoid interfering with known or unknown natural biological processes. Recovery goal: hatching success greater than 60% "wild" eggs and 80% relocated eggs.

        1.    Excessive water at the nest level causes mortality of developing embryos. This may be caused by tidal inundation, groundwater saturation, excessive rainfall or erosion. Nests threatened by these condition(s) will be moved to a safer location when possible.

    a.    Preseason survey will identify optimal and substandard nesting habitat.
    b.    Nests judged by field workers to be threatened by these conditions will be moved according to accepted guidelines to safer locations on the foredune nearby, or to an approved hatchery.
    c.    Tidal inundation events will be noted by field technicians to refine the decision process.

The negative impact of feral hogs on sea turtles and their nesting habitat has been abundantly documented. The management responsibility for depredation by feral hogs needs to be clarified and enforced. Rigorous control of hogs is necessary on the barrier islands, with zero hogs on the beach and adjacent habitats a mandatory objective. Management negligence resulting in the destruction of sea turtles, their eggs, young, nests or damage to critical nesting habitat should be fully investigated and prosecuted to the extent of state and federal law. Depredation by raccoons is another threat to sea turtle reproduction in Georgia. Selective trapping and removal of beach-foraging raccoons has proven highly successful in reducing predation.

2. Natural and introduced predators: Depredation of eggs or destruction of nesting habitat by raccoons and feral hogs can result in 100% loss of reproductive effort. Rooting by hogs or grazing by horses and cattle can destroy entire dune systems utilized for nesting. Hogs, raccoons and other predators will not be allowed to prey on nests.

    a.    Managers of islands with raccoons and feral hogs will remove these from the beach areas before the nesting season, to continue through the season. A State permit, pursuant to O.C.G.A 27-2-12, will be obtained for control of raccoons.
    b.    Hatcheries are not an alternative to predator control or habitat protection, but can offer additional protection to nests moved because of erosion. These enclosures will be designed to allow hatchlings unimpeded access to the ocean upon emergence from the nest. Predator invasion will be eliminated using one or more techniques:

        (1)    electrified fence
        (2)    welded wire or chain link fence
        (3)    ghost crab traps
        (4)    barriers 40cm in height on landward walls to shield hatchlings from artificial light.

    c.    where removal and other control measures have not effectively removed the threat of raccoon predation, managers shall utilize screening methods approved by the DNR Nongame section.

3. Evidence of poaching will be forwarded to GDNR Law Enforcement and USFWS agents immediately. Plans for investigations into poaching events

will be in place before the start of the nesting season.

C. Evaluate Nest Success: Every nest at participating beaches will be marked by field technicians to facilitate season-long monitoring and post-hatch analysis. Warning signs and informational bulletins will be placed at public access beaches.

1. Two days after hatching, or 65 days after date of deposition of the eggs, nests will be excavated to determine nest hatchability. Environmental factors may lengthen incubation time(s).

   a. This process will allow release of stragglers left in the nest cavity following the major emergence, or trapped by encroachment of plant roots, sand compaction or protective measures.
   b. This 65-day interval is 5-7 days longer than average natural incubation and emergence time, yet ensures that viable hatchlings may be released if present.
   c. Excavation and analyses will be used to evaluate nest protection measures in recovery guideline 1-B.

2. Daily surveys and subsequent nest monitoring will reveal emergence date, and hatchling crawl marks will indicate relative success of seaward orientation of hatchlings.

D. Monitor population trends

1. Continue Little Cumberland, Wassaw, Blackbeard and Jekyll Island nesting population studies, including tagging studies.

   a. Assess disturbance potential of field methods
   b. Standardize data gathering
   c. Publish latest results of tagging study
   d. Assess need for expansion or reduction of tagging study for all barrier islands

II. Protect and manage nesting habitat. Nesting habitat for loggerheads includes the "beach," "bare sand surface," and generally the primary and secondary seaward "sand dunes," all located within the "dynamic dune field" described and regulated in the Shore Protection Act (O.C.G.A. 12-5-230 to 12-5-248). Erosion and accretion are sand transport processes driven by wind and waves that constantly rearrange the components and proportions of the dynamic dune field. Georgia's undeveloped islands (Wassaw, Ossabaw, St. Catherines, Blackbeard, Sapelo, Little St. Simons, Little Cumberland and Cumberland and several smaller islands) provide natural nesting habitat along their entire length. Not all portions of natural nesting habitats are viable for nesting at any one time. Loggerhead sea turtles need a well drained dune of clean beach sand for successful development of the eggs, and the nesting turtle must have access to and from the nest site unimpeded by barriers. An eroding section of beach may be temporarily non-viable, but

sometimes a secondary dune exposed by a receding shoreline can provide favorable nesting habitat. Similarly, an accreting or stable beach with developed dunes usually provides viable nest sites, but a young, rapidly accreting beach may be too flat for well drained nesting substrate.

Nesting habitat on Georgia's four developed islands (Tybee, Sea, St. Simons and Jekyll) is significantly compromised by the presence of beach armoring devices (riprap, sea walls, etc.). However, important viable nesting habitat does occur on each of these islands where accretion has occurred, occasionally in front of an existing stabilization structure. This is ephemeral nesting habitat but of great importance to sea turtles while present. Similarly, a renourished beach may be expected to provide viable nesting habitat for a number of years until erosion again removes the beach back to a pre-existing seawall.

A. Secure nesting habitat. Recovery goal: At least 25% of nesting beaches are in public ownership, encompassing 50% of the nesting activity within the state. This recovery goal is accomplished in Georgia.

   1. 65.5% of barrier island beaches are in public hands:
      a. 29.4% State
      b. 36.1% Federal

   2. 65%-71.5% of nesting occurs on beaches in public hands:
      a. 25.3%-26.6% State
      b. 38.5%-46.6% Federal

B. Beach construction: The Shore Protection Act (Attachment 2) authorizes the Shore Protection Committee to determine whether or not the granting of a permit and completion of an applicant's proposal for shoreline construction, land alteration, or shoreline engineering activities within the dynamic dune fields or submerged shorelines of the state "unreasonably interferes with the conservation of marine life, wildlife or other resources." The Loggerhead Committee advocates the preservation of existing turtle nesting habitat, and recommends that the following guidelines be adopted as rules by the Board of Natural Resources for use by the Shore Protection Committee to preserve loggerhead nesting habitat:

[PROPOSED RULES]

   1. Shoreline stabilization: The placement of rock revetments, construction of seawalls or other hard structures can prevent access by turtles and degrade or eliminating viable nesting habitat by blocking the dynamic sand sharing system of the beach/dune community.

      a. No permits for shoreline stabilization structures of any kind shall be allowed on Georgia's undeveloped islands, except under the most unusual of emergency situations, such as protection of an historical structure of great significance to the citizens of Georgia.

    b.    No permits for shoreline stabilization structures parallel to the shore shall be issued in areas seaward of existing seawalls or similar armoring structures on Georgia's developed islands. Dunes forming in front of existing sea walls are ephemeral, yet they provide important nesting habitat that must not be stabilized. Repair of existing structures may be authorized as needed, as provided for in the Shore Protection Act.

    c.    Failing erosion control structures (i.e. groins) causing erosion of existing beaches shall be removed from the beach.

    d.    Alternatives to armoring shall be explored as options to all permit requests for shoreline stabilization.

2.    Beach nourishment projects conducted for recreational enhancement or storm protection can provide nesting opportunities for loggerheads, by enhancing existing habitat or creating additional habitat. However, to address sea turtle protection, renourishment projects should employ reasonable and prudent measures to ensure safety of loggerhead nests which may be affected by these activities. To protect the reproduction of loggerhead sea turtles, beach nourishment projects shall adhere to the following:

    a.    Construction shall only be allowed outside of the nesting season and hatching season (May - October), except under the following conditions:

        (1)    Projects may be approved on beaches or portions of beaches during the nesting season when the combined projects to be allowed affect an area that accounts for less than 5% of the state total nesting, based on a 5-yr average of statewide nesting data collected annually by GDNR.

            (a)    For purposes of calculating the 5% of statewide nesting, a "portion" of a nesting beach shall not be less than one half the total length of the beach on which the portion is located.

    b.    Nest survey and relocation activities must begin 65 days prior to beach construction activities. They need not begin before 1 May or continue after 31 August. Nests shall be relocated to a secure setting between sunrise and 10 a.m. each day.

        (1)    Personnel responsible for these duties must have prior experience and training in nest survey and relocation procedures, and possess a Sea Turtle Cooperator's permit issued by GDNR.

    c.    Sand used for renourishment will be compatible with existing beaches to ensure the nesting conditions (laying, clutch development and dispersal of hatchlings to the sea) will be equal to or better than conditions on naturally occurring, viable nesting habitat.

    (1)    Sampling and testing of sand source must precede application for permitting of project by not more than 90 days. Samples and results of testing will accompany permit request.

    (2)    A qualified observer must monitor pumped sediments to ensure deposition of appropriate material, and to verify take of turtles by the dredge.

    (3)    Annual testing for excessive compaction must follow pumping each February for 3 years; if the average sand compaction measures greater than 500 cone penetrometer units (cpu) at the 6, 12, or 18 inch test depth, beaches will be tilled to a depth of 92 cm. Tilling will be repeated for two years in March or April if the average compaction exceeds 500 cpu at the 6, 12, or 18 inch test depths.

    (4)    Escarpments in excess of 18 inches extending more than 100 feet in length and exceeding an average 500 cpu at the 6, 12, or 18 inch test depths must be mechanically levelled to the natural beach contour prior to May 1. If levelling is needed, nest relocation procedures must be followed as described above. Escarpments in excess of these criteria that reform in the two subsequent nesting seasons must be levelled to the natural beach contour.

c.    Renourishment permits shall include plans for sand fencing and dune plantings to enhance nesting habitat. Fencing must be placed so as not to deter turtles' access to nesting areas, and arranged to prevent trapping nesting turtles. GDNR Nongame must provide guidelines for habitat enhancement.

d.    Renourishment permits must provide for monitoring and protection of nests subsequently deposited in the project area for a period of at least three (3) years.

[END OF PROPOSED RULES]

C.    Limit disturbance on all natural and viable nesting beaches and dunes. Nesting females will be driven from a nesting beach if by disturbed by people, feral animals and excessive predators. Developing clutches are vulnerable to being crushed by people, tires, and the hoofprints of feral animals. Hatchlings seeking the ocean may be attracted by flashlights, campfires, etc. and their path to the sea may be blocked by tire track furrows, parked vehicles, or beach recreation equipment.

    1.    Provide raised walkways for beach access across viable nesting habitat. Restrict or prohibit foot traffic within the dune environment, as needed.

    2.    Limit or prohibit driving on the beach. The Shore Protection Act makes it unlawful to operate any motorized vehicle on, over, or across the dynamic dune field or beaches without permission from the permit issuing

authority. An exception is provided for government vehicles used for beach maintenance or research.

    a. The Ecological Services Section will notify residents of undeveloped barrier islands of the need to acquire permits to drive on the beach. Notice will also be given that the following factors will be considered in granting permits:

        (1) GDNR will weigh the value and credibility of the research used to request a waiver on driving restrictions against the potential damage from disturbance of nesting turtles and habitat.

        (2) Nighttime driving will be prohibited from 1 May-31 October.

        (3) Beach driving will be restricted to the intertidal zone except for designated access points.

        (4) Driving will be prohibited above the current high tide line (HTL) on dunes, foredunes, and the area of bare sand immediately above the HTL identified as the berm.

        (5) Driving permission will be subject to revocation for non-compliance with these conditions.

D. Prevent obstruction of nesting habitat by improper storage of marine craft. The Shore Protection Act O.C.G.A. 12-5-248 (a) (2) prohibits the storage of sailboats, or other recreational or commercial marinecraft in any dynamic dune field. The Ecological Services Section has responsibility to enforce this act.

E. Protect dune vegetation from overgrazing by livestock or harvest by persons. Grazing of dune stabilizing plants (sea oats, beach panic grass or beach elder) can cause "blowout" of dune systems, resulting in loss of habitat.

    1. O.C.G.A 12-5-311 prohibits the harvest of sea oats from any public property lands or from private lands without the consent of the landowner.

    2. It will be the responsibility of the manager on each island to control hogs, horses, and other non-native grazers so that beach vegetation is not adversely impacted.

F. Minimize the effects of artificial lighting on nesting turtles and hatchlings.

    1. Enforce existing lighting ordinances.

        a. Conduct lighting survey of developed beaches (Jekyll, St. Simons, Sea and Tybee Islands. Survey to be conducted jointly by Local Official, GDNR Nongame biologist, and FWS biologist.

        b. Owners of problem lights identified in the survey will be contacted in writing by the local government.

        c. A follow-up survey will be conducted to determine compliance. Additional measures will be taken if necessary.

        d. The orientation of hatchling emergences will be recorded during regular beach monitoring to determine if problems are occurring.

    e. Existing ordinances will be reviewed and modifications considered if disorientation problems are revealed by nest monitoring.

  G. Enhance Nesting Habitat Where Needed
    1. Planting of native dune building species in areas lacking these can improve habitat for nesting loggerheads.

III. Education: Inform the public of sea turtle nesting issues, especially when conservation measures conflict with human activities such as beach development, and public use of nesting beaches.

  A. Slide programs, lectures and informational leaflets on sea turtle conservation are available from NPS, USFWS, GDNR, and Center for Marine Conservation for the general public.
  B. Develop brochure on recommended lighting modifications or measures to reduce hatchling disorientation.
    1. Georgia Power brochure, light switch labels and bumper stickers
    2. Center for Marine Conservation literature
  C. Develop Public Service Announcements (PSA's) regarding the sea turtle/artificial lighting conflict, and disturbance of nesting activities by public nighttime beach activities.
  D. Develop standard criteria and recommendations for sea turtle nesting interpretive walks.
  E. Post information signs at public access points on important nesting beaches
  F. Georgia Fishermen's Association can help in turtle conservation awareness.

IV. Enforcement: GDNR will coordinate the implementation of the provisions of the plan.

  A. The enforcement of the provisions of the plan is the responsibility of the management entity with direct control of the island parcel, with ultimate responsibility maintained by USFWS.
    1. Cumberland - National Park Service
    2. Little Cumberland Island - LCI Homeowners Association, GDNR
    3. Jekyll - Jekyll Island State Park Authority, GDNR
    4. St. Simons, Sea Island - Glynn County, Sea Island Co., GDNR
    5. Little St. Simons Island - GDNR
    6. Sapelo, Ossabaw, Little Tybee Island - GDNR
    7. Blackbeard, Wassaw, Pine, Little Wassaw - USFWS
    8. Tybee Island - City of Tybee, GDNR
    9. St. Catherines Island - SCI Foundation, GDNR

  B. Local governments may at any time enact rules or regulations more restrictive than State or Federal codes.

V. Each cooperator will submit a summary report at the close of each season

A.  GDNR will circulate a standard form with the data criteria:
    1. # Nests, % hatch, # depredated
    2. Hatchery success
    3. Duration of season and dates of nesting activity
    4. Summary of predator control efforts
    5. Summary of beach nourishment mitigation plans
    6. Summary of artificial light control efforts

B.  GDNR and USFWS will review summary reports, evaluating management actions and results. These reports will be a source of valuable information, and management changes brought about by the evaluation process will strengthen the program for protecting the loggerhead turtle.

Bowen, B., J. C. Avise, et al. 1993. Population Structure of Loggerhead Turtles (Caretta caretta) in the Northwestern Atlantic Ocean and Mediterranean Sea. Conservation Biology Vol. 7 No. 4 pgs 834-844

Murphy, T.M., and S.R. Hopkins. 1984. Aerial and ground surveys of marine turtle nesting beaches in the southeast region, United States. Final Report to NMFS-SEFC, 73 p.

National Marine Fisheries Service and U.S. Fish and Wildlife Service. 1991. Recovery Plan for U.S. Population of Loggerhead Turtle. National Marine Fisheries Service, W00ashington, D.C.