**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| HAHNAH WILLIAMS, as Administrator of the Estate of Matthew Zadok Williams and CHRIS ANN LEWIS, as surviving parent and heir to the Estate of Matthew Zadok Williams, | * * * * * | |
| | * | Civil Action No.: |
| Plaintiffs, | * * | **Jury Trial Demanded** |
| v. | * * | |
| SGT. DEVON PERRY, OFC. MIKHAIL MORGAN, OFC. MICHAEL WALKER, OFC. VANESSA LAMY, and LT. AARON JAMES, | * * * * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

Plaintiffs HAHNAH WILLIAMS, as Administrator of the Estate of Matthew Zadok Williams, and CHRIS ANN LEWIS, as surviving parent and heir to the Estate of Matthew Zadok Williams, file this Complaint for Damages against Defendants SGT. DEVON PERRY, OFC. MIKHAIL MORGAN, OFC. MICHAEL WALKER, OFC. VANESSA LAMY, and LT. AARON JAMES, pursuant to 42 U.S.C. §§ 1983 and 1988. In support of their Complaint, Plaintiffs show the following:

## INTRODUCTION

This is a civil action asserting claims under federal and Georgia law for Defendants' deprivation of federal constitutional rights of Matthew Zadok Williams. Plaintiffs demand a jury trial and seek an award of economic, compensatory, and punitive damages, as well as an award of attorneys' fees and costs.

1

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiffs are residents of Georgia. Hahnah Williams is the duly appointed Administrator of the Estate of Matthew Zadok Williams. Chris Ann Lewis is the mother of Matthew Zadok Williams and the heir to his Estate.

2.

Defendants are residents of the State of Georgia and are subject to personal jurisdiction in this Court. Defendants are officers of the DeKalb Police Department ("DKPD").

3.

Plaintiffs' state law claims arise from the same transaction and controversy as Plaintiffs' federal claims and seek recovery for wrongful death, aggravated assault, aggravated battery, simple battery, criminal trespass, and intentional infliction of emotional distress.

4.

This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, specifically 42 U.S.C. §§ 1983 and 1988.

5.

Venue is proper in this district.

## FACTUAL ALLEGATIONS

6.

This lawsuit arises from an incident on April 12, 2021, when Defendant Perry shot and killed the homeowner of a townhome located at 2557 Terrace Trail Decatur, DeKalb County, Georgia, while attempting to take him into custody.

7.

When Perry shot him to death, the homeowner, Matthew Zadok Williams ("Zadok"), was having a mental health crisis. As later proven by toxicology reports, Zadok was not on drugs but was having an episode of mental illness.

8.

Matthew Zadok Williams was the youngest, and the only son, of six siblings. His family called him by his middle name, "Zadok," an Old Testament Biblical name meaning "Righteous" and "Justice."

9.

This fatal incident began when Zadok was locked outside his townhome that he purchased in 2009.

10.

While locked outside of his home, Zadok had rubber gloves, a bucket, and a blue plumber's knife with him.

11.

DKPD Officers Morgan and Lamy initially responded to the scene. They found Zadok sitting on his deck.

12.

Morgan attempted to speak with Zadok, but Zadok was not responsive because he was experiencing a mental-health crisis.

13.

Morgan had responded less than a month earlier on March 16, 2021, when Zadok called police to the same address while having another mental-health crisis.

3

14.

When Morgan responded to the April 12, 2021 incident, he remembered having responded to the March 16, 2021 incident; but he did not call on his radio to verify who owned the property.

15.

Zadok's ownership of the townhome was a readily verifiable matter of public record.

16.

Morgan told Zadok that if he didn't live there, he would have to leave the property.

17.

Zadok began following Morgan, but then ran towards him with the knife. Morgan stumbled, and Zadok ran away.

18.

Lamy fired a shot at Zadok as he was fleeing.

19.

Zadok subsequently re-entered his townhome by breaking a window.

20.

Lamy and Morgan called for backup. Sgt. Perry and Officer Walker were dispatched to the scene.

21.

After being dispatched, it took Perry over 10 minutes to arrive on the scene.

22.

Prior to Perry's arrival Zadok was locked in his home.

23.

For over 10 minutes prior to Perry's arrival the DKPD officers at the scene waited for Perry to arrive and did not attempt to enter the townhome.

24.

For over 10 minutes prior to Perry's arrival Zadok did not attempt to leave his home.

25.

For over 10 minutes prior to Perry's arrival Zadok did not make any verbal threats.

26.

For over 10 minutes prior to Perry's arrival Zadok did not make any threatening gestures.

27.

For over 10 minutes prior to Perry's arrival and after his arrival, the officers at the scene expressed no concerns that Zadok had any hostages or anyone else in the townhome with him.

28.

For over 10 minutes prior to Perry's arrival and after his arrival, the officers at the scene expressed no concerns that Zadok had a firearm.

29.

In fact, prior to the shooting, Morgan told Perry that Zadok had a knife and "apparently nothing else."

30.

By the time Perry arrived, Zadok had re-entered his townhome by breaking a window. The door to the townhome was locked, and officers had the front and back doors covered.

31.

At this point, Zadok was a "barricaded individual," and DKPD policy required the officers on the scene to call SWAT so that a team with proper tactical and negotiation training could respond.

32.

Perry was the senior and commanding officer at the scene when he arrived.

33.

Prior to Perry arriving on the scene Zadok's townhome was surrounded by DKPD police officers.

34.

DKPD officers had every door of Zadok's home guarded.

35.

When Perry arrived on the scene, Defendants had no reason to believe that any officer's life was in imminent danger.

36.

When Perry arrived on the scene, Defendants had no reason to believe that any third party's life was in imminent danger.

37.

In fact, prior to the shooting, both Morgan and Perry described Zadok's townhome as being "vacant."

38.

Zadok was locked in the home and did not pose a threat of immediate bodily harm to the officers or anyone else.

39.

Upon Perry's arrival, Morgan debriefed Perry, describing the incident as a "Signal 22" which is DKPD's signal code for "Demented Person."

40.

Perry called his superior officer, Lieutenant James, who authorized Perry to force entry to the townhome.

41.

Perry's stated reason for making forcible entry was to see if Zadok had been injured by Lamy's shot and needed medical assistance.

42.

Neither Lieutenant James nor Perry called for medical assistance at this time.

43.

James and Perry did not discuss the possibility that Zadok was a "barricaded individual," as defined by the International Association of Chiefs of Police ("IACP") and DKPD policy.

44.

James and Perry did not discuss the DKPD requirement to activate SWAT for a barricaded individual prior to deciding to make a forcible entry.

45.

Perry came on Zadok's porch and made verbal contact with him through the locked door.

46.

After making verbal contact with Zadok, Perry determined that Zadok was refusing to come out of his home.

47.

Zadok was a "barricaded individual" as defined by the International Association of Chiefs of Police ("IACP") and DKPD policy.

48.

Because Zadok was a "barricaded individual," DKPD policy required Perry to activate SWAT and engage a trained negotiator.

49.

 Perry had time and opportunity to activate SWAT, which would have been safer both for Zadok and for the officers at the scene.

50.

Perry had time and opportunity to obtain a warrant while waiting for SWAT.

51.

Perry never asked Zadok his name.

52.

Though Perry was aware that Zadok had a knife in his possession, Zadok was never physically close enough to Perry or any other officers for the knife to be an imminent threat.

53.

Perry knew that Zadok was not an imminent threat to any officer if a closed door was in between Zadok and the officers.

54.

Perry approached Zadok's door with his gun drawn.

55.

Perry ordered Morgan to "go non-lethal." Morgan drew his Taser.

56.

Perry ordered Officer Walker to "go lethal." Walker drew his gun.

57.

Sgt. Perry, Officer Morgan, and Officer Walker pointed their weapons at Zadok's closed front door and advanced toward the door.

58.

Sergeant Perry announced himself.

59.

One officer knocked on the door, and Zadok responded by asking for a search warrant.

60.

Sergeant Perry then ordered Walker to kick open the door.

61.

Upon the door being kicked open, Zadok immediately dropped to the floor on his knees and used an ottoman to hide and shield himself from the officers.

62.

Zadok reached out with his hand and swiped the door closed.

63.

Walker kicked the door back open, and Perry fired his first shot at Zadok.

64.

Perry could see that Zadok had moved a piece of furniture to block the door.

65.

Perry could see that Zadok had moved from behind the ottoman to a spot behind the wall next to the door, where he could more easily reach to shut the door.

66.

Walker kicked open the door again, and again Zadok closed it by reaching his arm out beyond the wall and using his hand to close the door.

67.

Defendants kicked the door open a third time, and a fourth. Morgan fired his Taser at Zadok, but the Taser probes did not make an effective connection.

68.

Zadok did not threaten the officers, but he closed the door each time that the officers kicked it open.

69.

Zadok asked the officers to lower their guns so he could speak with them "cordially."

70.

Zadok told the officers that he was defending his property.

71.

At no point did Zadok, yell, raise his voice, curse, or threaten the officers.

72.

Instead, Zadok, in the midst of his mental-health crisis, called the officers "sir" and asked to speak with them "cordially."

73.

In response, Perry yelled to Zadok, "you don't have to die tonight."

74.

At this point in the encounter, Defendants did not believe that Zadok had been hit by any of the previous shots.

75.

There was no immediate need to provide Zadok with medical care.

76.

Defendants had no reason to believe that anyone other than Zadok was in the townhome.

77.

Defendants had no reason to believe that Zadok would destroy any evidence of crime.

78.

Defendants could have called on the radio to determine who owned the townhome, but they did not do so.

79.

Defendants had time to obtain a warrant, but they did not do so.

80.

Defendants continued with their plan of forcible entry.

81.

On Walker's fifth kick, the door swung open. Zadok attempted to close the door a fifth time.

82.

Zadok did not come through the door to threaten the officers.

83.

Zadok continued to shield himself behind the wall next to the door.

84.

Zadok reached out his arm to close the door again.

85.

As Zadok reached to close the door, Sergeant Perry fired three shots through the door as the door was closing.

86.

Zadok was hit but succeeded in closing the door as he had done each of the previous times.

87.

After Perry fired the three shots at Zadok through the closing door, Perry ordered his subordinate officers to "back off."

88.

Morgan, Walker, and Lamy remained on Zadok's porch in a non-defensive position with guns holstered.

89.

Perry walked down the steps of Zadok's townhome and called Lieutenant James to tell him what had occurred.

90.

Lieutenant James did not immediately call SWAT. Instead, he first called the Criminal Investigation Division and Internal Affairs, while Zadok lay bleeding, suffering, and dying on his own floor.

91.

When James finally called for SWAT assistance, Captain Corey Swain of the SWAT team told James he was more than an hour away and asked if Zadok was "in there bleeding out."

92.

Swain reminded James and Perry that they were required to provide medical assistance if Zadok was shot. Specifically, Swain said, "If he's in there bleeding out, it's on us."

93.

At the time Perry shot Zadok, Emergency Medical Services ("EMS") personnel were already on the premises for another incident and offered to provide medical assistance to Zadok, but James refused the offer saying, "He's [*i.e.*, Zadok] the only one hurt."

94.

While James and Perry were waiting for SWAT to arrive, Zadok died from bleeding out, losing twenty-five percent of his blood volume as a result of being shot by Perry.

95.

The day after the incident, DeKalb County falsely stated on Twitter that Zadok had been shot because he "lung[ed] at the officers . . . causing one of them to discharge his firearm."

96.

In contrast, Perry admitted in his post-incident interview that Zadok never lunged at him or any of the other officers during Perry's time on the scene.

**Count One – Violation of the Fourth Amendment**

**(Against Defendants Perry, Morgan, and Walker)**

97.

At all relevant times, Defendants Perry, Morgan, and Walker acted jointly and in concert.

98.

Defendants Perry, Morgan, and Walker violated Zadok's Fourth Amendment rights by breaking in his door without a warrant.

13

99.

Defendants lacked exigent circumstances to excuse their lack of a warrant.

100.

Defendant Perry seized Zadok within his home by shooting him.

101.

Defendants Walker and Morgan assisted Perry in breaking into Zadok's home with the intent to seize Zadok.

102.

Defendant Walker seized Zadok within his home by shooting him with the Taser, although the Taser probes did not make sufficient contact to complete a circuit and conduct electricity.

103.

At the time he was seized within his home, Zadok was not trying to escape.

104.

At the time he was seized within his home, Zadok did not pose an imminent threat.

105.

Zadok's possession of a knife while inside his own home did not constitute an imminent threat of harm to anyone.

106.

After watching Zadok shut the door repeatedly when Defendants kicked it open, it was foreseeable to Defendants that he might respond the same way if they kicked it open again.

107.

Zadok told Defendants Perry, Walker, and Morgan that he was defending his home.

14

108.

Defendants did not take reasonable steps under the circumstances to determine whether
Zadok was in his own home.

109.

As a foreseeable result of Defendants' violation of his Fourth Amendment rights, Zadok
suffered personal injury, pain and suffering, and death.

110.

Defendants are liable to Plaintiff for compensatory damages resulting from their violation
of Zadok's Fourth Amendment rights, to include damages for personal injuries, pain and
suffering, and wrongful death.

**Count Two – Deliberate Indifference to Serious Medical Needs**

**(Against All Defendants)**

111.

After Perry fired the three shots, Perry ordered Walker and Morgan to "back off."

112.

Perry, Walker, Morgan, and Lamy all believed, correctly, that at least one of Perry's shots
had struck Zadok.

113.

DKPD Policy states that appropriate first aid shall be rendered whenever possible after
any use of force (either rendered by the officer, or summoning EMS, etc.).

114.

None of the Defendants provided Zadok with medical care.

15

115.

After the shooting, Walker, Morgan, and Lamy stood on Zadok's front deck with guns holstered as Zadok lay bleeding, suffering, and dying on the other side of the door.

116.

DeKalb County EMS was already on scene for another incident, but Defendants Perry and James refused to allow them to enter the townhome to provide medical assistance to Zadok.

117.

When Sergeant Perry called Lieutenant James after shooting Zadok, he told Lieutenant James that he believed Zadok was hit.

118.

Lieutenant James did not immediately make any arrangements for Zadok to receive medical attention, despite knowing that Zadok likely had been shot. Instead, James first called the Criminal Investigation Division and Internal Affairs.

119.

When James finally called for SWAT assistance, Captain Swain of the SWAT team told James he was more than an hour away and asked if Zadok was "in there bleeding out."

120.

Swain reminded James and Perry that they were required to provide medical assistance if Zadok was shot. Specifically, Swain said, "If he's in there bleeding out, it's on us."

121.

Even after being told this, James did not arrange for Zadok to receive medical attention.

122.

After being shot by Perry, Zadok's need for medical aid was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

123.

All of the Defendants knew that Zadok likely had been shot and that his wounds posed a risk of serious harm, including death.

124.

All of the Defendants knew that a delay in treatment likely would pose a substantial risk of serious harm to Zadok.

125.

Walker, Morgan, and Lamy made no effort to obtain medical assistance for Zadok.

126.

At the time Perry shot Zadok, Emergency Medical Services personnel were already on the premises for another incident and offered to provide medical assistance to Zadok, but James refused the offer saying, "He's [*i.e.*, Zadok] the only one hurt."

127.

While Defendants were waiting for SWAT to arrive, Zadok died from blood loss as a result of Perry's gunshot.

128.

As a foreseeable result of Defendants' deliberate indifference to Zadok's need for medical assistance after being shot, Zadok suffered personal injury, pain and suffering, and death.

129.

Defendants are liable to Plaintiff for compensatory damages resulting from their deliberately indifferent failure to provide medical care, to include damages for personal injuries, pain and suffering, and wrongful death.

### Count Three: Wrongful Death Under Georgia Law

### (Against All Defendants)

130.

When Sgt. Perry arrived on the incident scene, Zadok was a barricaded individual under DKPD policy.

131.

Sgt. Perry had a ministerial duty under DKPD policy to activate the SWAT team at that time.

132.

Had Perry activated SWAT, trained negotiating and tactical personnel would have responded to the scene, and lethal force more likely than not would have been avoided.

133.

Instead, Perry failed to activate SWAT and attempted forcible entry on his own.

134.

While attempting forcible entry, Sgt. Perry wrongfully shot Zadok, inflicting a life-threatening injury.

135.

As as foreseeable result of Perry's failure to activate SWAT, Zadok did not have the opportunity to have trained negotiating and tactical personnel respond to the scene, which resulted in unlawful lethal force being used.

136.

Sgt. Perry and Lt. James refused to permit EMS to provide medical aid to Zadok.

137.

All Defendants knew that Perry more likely than not had shot Zadok.

138.

DKPD Policy states that appropriate first aid shall be rendered whenever possible after any use of force (either rendered by the officer, or summoning EMS, etc.).

139.

Pursuant to this policy, all Defendants had a ministerial duty to provide Zadok with medical aid once they knew that, more likely than not, Zadok had been shot.

140.

None of the Defendants took timely action to provide Zadok with medical aid.

141.

As a foreseeable result of Perry's wrongful shooting and all Defendants' failure and refusal to render medical aid, Zadok experienced pain and suffering, and death.

142.

Chris Ann Lewis, the surviving parent of Matthew Zadok Williams, may recover from all Defendants the full value of his life pursuant to O.C.G.A. Section 51-4-2, without any deduction for necessary or other personal expenses that would have been incurred by him had he lived.

19

**Count Four: Pain and Suffering Under Georgia Law**

**(Against All Defendants)**

143.

Perry's gunshot caused Zadok pain and suffering.

144.

All Defendants prolonged and increased Zadok's pain and suffering by failing to ensure that Zadok received timely medical aid.

145.

Hahnah Williams, as Administrator of the Estate of Matthew Zadok Williams, is entitled to an award of damages for the pain and suffering Zadok experienced as a result of being shot and not receiving timely medical aid.

**Count Five: Punitive Damages**

**(Against All Defendants)**

146.

Because of Defendants' deliberate indifference to Zadok's need for life-saving medical attention, Defendants are liable for punitive damages in an amount sufficient to punish and deter such wrongful conduct.

**Attorneys' Fees and Expenses of Litigation**

**(Against All Defendants)**

147.

Because of Defendants' violations of Zadok's rights as described above, Plaintiffs are entitled to an award of costs and reasonable attorneys' fees under 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs respectfully request the following relief:

(a)     That the Court award Plaintiffs compensatory and punitive damages against the Defendants in an amount to be determined by the enlightened conscience of an impartial jury;

(b)     That the Estate recover for Matthew Zadok Williams' physical and mental pain and suffering, loss of enjoyment of life, and emotional distress in an amount to be determined by the enlightened conscience of the jury;

(c)     That the Court grant Plaintiffs their reasonable costs and attorneys' fees in bringing this action in an amount to be determined at trial;

(d)     That the Court award such other and further relief to which the Plaintiffs are legally entitled, whether explicitly pleaded or not, and as this Court deems just and equitable.

(d)     That Plaintiffs be granted a trial by jury on all issues so triable; and

(e)     That Plaintiffs be granted such other and further relief as this Court deems just and proper.

This 12th day of April, 2023.

Respectfully submitted,

*s/Mawuli M. Davis*
Mawuli M. Davis
Georgia Bar No. 212029

*s/Harold W. Spence*
Harold W. Spence
Georgia Bar No. 671150

THE DAVIS BOZEMAN LAW FIRM, PC
4153-C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
404.244.2004

21

mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com

*s/ Leighton Moore*
LEIGHTON MOORE
Georgia Bar No. 520701

**THE MOORE LAW FIRM, PC**
1819 Peachtree Street NE
Suite 403
Atlanta, Georgia 30309
Phone: 404-285-5724
Email: leighton@moorefirmpc.com

*Attorneys for Plaintiffs*