JAMS ARBITRATION

CHARLES RANDALL,

    Claimant,

           vs.

MORGAN STANLEY PRIVATE BANK,
N.A.,

    Respondent

**JAMS Case No. 1440006508**
**Terrence Lee Croft, Arbitrator**

## FINAL AWARD

On July 14, 2022, Interim Order No. 10 was entered in this matter setting forth the findings and conclusions upon which Claimant prevailed in his claims against Respondent for compensatory damages in the amount of $373,180, punitive damages of $250,000, and his reasonable attorneys' fees, costs and expenses incurred in this matter. These were to be determined, promptly. Interim Order No. 10 is ratified and incorporated in this Final Award as if set out in full.

Claimant's original request for fees was $740,556; his request for expenses and costs was $29,840. In addition, he requested his fees incurred in presenting his original fee petition in the sum of $39,773.

Claimant notes that where a party has obtained excellent results, his attorney should recover a fully compensatory sum for fees and expenses. Claimant's counsel submits in detail the qualifications of his associates and professional support staff members, as well as their daily hours worked, the details of their work, and costs incurred. He requests a nearly current rate for himself ($550/hour); and requests what he shows reasonable and accepted rates for his associates ($350/hour) and staff ($100/hour). Claimant cites persuasive authority for the use of these rates which are compelling, here, where the arbitration has taken years, not months, and was very hard fought on both sides.

It should be noted that both sides were well represented by diligent and competent counsel who battled over nearly every issue. Such a level of litigiousness is expensive.

Claimant requests an additional sum of $198,671 for his fees since filing his initial fee petition on August 19, 2022. He also requests an upward adjustment of the lodestar amount, which is denied. After objection by Respondent, Claimant has withdrawn $5,916 from support staff fees

and has withdrawn $4,192 from costs, for computerized research. These withdrawals total $10,108.

Respondent raises a multitude of other objections to the fee petition as amended. These include too many hours on the same day, by unnecessary people, at rates above those stated in the years old retainer agreements, which are too high. It objects to the form of the bills (block billing) and billing for purely non-legal, clerical work. Respondent suggests that Claimant should not recover for fees and costs more than the total sum of $499,342.

I find that the hours and rates of $550, $350 and $100 requested by Claimant are reasonable in this case and the form and substance of the invoices do not prevent a reasonableness review.

Thus, in addition to the compensatory damages for being terminated, wrongfully, and being out of work for more than 20 months ($373,180), and the punitive damages stated above ($250,000), I find that Claimant is also entitled to recover from Respondent for fees, costs and expenses the sum of $998,732. ($740,556 fees, $29,840 costs, $39,773 petition fees, $198,671 post 8/19/22 fees and supplementary petition fees, less $10,108 fees and costs withdrawn.) Claimant is entitled to interest at the legal rate from today until paid in full.

This constitutes the FINAL AWARD in this arbitration and is intended to resolve all disputes raised by either party.

So ORDERED, this 10th day of April 2023.

DocuSigned by:

_Terrence Croft_
E4C242B1A0954DJ...
Terrence Lee Croft, Arbitrator

## SERVICE LIST

| | | | |
|---|---|---|---|
| **Case Name:** | <u>Randall, Charles vs. Morgan Stanley Private Bank, NA</u> | **Hear Type:** | Arbitration |
| **Reference #:** | 1440006508 | **Case Type:** | Employment |
| **Panelist:** | Croft, Terrence Lee, | | |

---

### Anthony Dellasala

Bressler Amery & Ross PC

Anthony Dellasala
2001 Park Place
Suite 1500
Birmingham, AL  35203
ADellasala@bressler.com
Assistant's Emails: KReynolds@bressler.com

Respondent
Phone: 205-719-0400
Fax: 205-719-0500

**Party Represented:**
Morgan Stanley Private Bank, NA

### Lorrie L. Hargrove

Bressler Amery & Ross PC

Lorrie L. Hargrove
2001 Park Place
Suite 1500
Birmingham, AL  35203
lhargrove@bressler.com

Respondent
Phone: 205-719-0400
Fax: 205-719-0500

**Party Represented:**
Morgan Stanley Private Bank, NA

### Carole G. Miller

Bressler Amery & Ross PC

Carole G. Miller
2001 Park Place
Suite 1500
Birmingham, AL  35203
cmiller@bressler.com
Assistant's Emails: EOtis@bressler.com

Respondent
Phone: 205-719-0400
Fax: 205-719-0500

**Party Represented:**
Morgan Stanley Private Bank, NA

### Joshua R. Van Kampen

Van Kampen Law, PC

Joshua R. Van Kampen
225 East Worthington Ave
Charlotte, NC  28203
josh@vankampenlaw.com
Assistant's Emails: nikki@vankampenlaw.com

Claimant
Phone: 704-247-3245
Fax: 704-749-2638

**Party Represented:**
Charles Randall

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Randall, Charles vs. Morgan Stanley Private Bank, NA
Reference No. 1440006508

I, Nykesha Potts, not a party to the within action, hereby declare that on  April 13, 2023, I served the attached Final Award on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Atlanta, GEORGIA, addressed as follows:

Mr. Joshua R. Van Kampen
Van Kampen Law, PC
225 East Worthington Ave
Charlotte, NC   28203
Phone: 704-247-3245
josh@vankampenlaw.com
   Parties Represented:
   Charles Randall

Carole G. Miller Esq.
Mr. Anthony Dellasala
Lorrie L. Hargrove Esq.
Bressler Amery & Ross PC
2001 Park Place
Suite 1500
Birmingham, AL   35203
Phone: 205-719-0400
cmiller@bressler.com
ADellasala@bressler.com
lhargrove@bressler.com
   Parties Represented:
   Morgan Stanley Private Bank, NA

I declare under penalty of perjury the foregoing to be true and correct. Executed at Atlanta, GEORGIA on  April 13, 2023.

*Nykesha Potts*
_____
Nykesha Potts
nykeshapotts@jamsadr.com

JAMS ARBITRATION

CHARLES RANDALL,

    Claimant,

        vs.

MORGAN STANLEY PRIVATE BANK,
N.A.,

    Respondent

**JAMS Case No. 1440006508**
**Terrence Lee Croft, Arbitrator**

### INTERIM ORDER NO.  10

This Interim order is not the Final Award, which will not be entered until the issues relating to Claimant's claim for reasonable attorneys' fees, costs and expenses are resolved.

Morgan Stanley ("MS" or "Respondent") consists of multiple business units, including the Morgan Stanley Wealth Management Business Unit ("Wealth Management"). Under the Wealth Management umbrella are multiple divisions, including the Field Operations Division and the Private Bank Division. Although the Private Bank Division exists as a separate legal entity (Morgan Stanley Bank, N.A.), it is an "in house bank" that does not have its own balance sheet; its revenues flow directly to Wealth Management. This bank sells banking and lending ("B&L") products to the Field Operations Division, which provides financial investment services to private clients. The Field Operations Division is broken into regional complexes that are led by Complex

1

Managers ("CMs") and Assistant Complex Managers ("ACMs"), who oversee branches within their territories; those branches are led by Branch Managers ("BMs"), who supervise Financial Advisors ("FAs") and Financial Advisor Associates. CMs are compensated in part on B&L revenues (mainly balance growth and net balances revenues), which flow into their complex. The FAs report to the BMs and ultimately to the CMs; they have no accountability to Private Bankers ("PBs"). Consequently, it is critical for PBs to have active engagement from their CMs and BMs.

Lead PBs like Claimant, PBs, and Associate Private Bankers ("APBs") were among the "specialists" MS assigned to complexes. On paper, PBs and APBs reported to Regional Managers ("RMs") or Assistant Regional Managers ("ARMs"), who reported to a National Sales Manager. However, the PBs worked daily for, and at the direction of, the CMs. As a practical matter, the PBs ultimately served at the pleasure of their respective CMs.

In 2012, Kristin Sario's superiors recruited her for a "special project" – a film for the annual "national managers' meeting." It was a spoof where Morgan Stanley writes a script and kind of makes light of some of the things that have happened throughout the year or some of the leaders. It was shot at MS's headquarters in its green screen rooms. In the scripted film, Sario's character states to a male colleague, "They can't spare me, but they'll have somebody in your desk on Monday." Later in the video, Sario kills two white males (both appearing to be over 40), while Sario's character, an African American female, and an Asian American female survive. Sario delivered these lines and performed these violent actions without objection.

DocuSign Envelope ID: B9487Z8A-CBA0-42B5-8A58-4325D2718CC5

This video presents rare smoking gun evidence of a cultural bias in favor of women. Given the stated purpose of making light of "things that happen," the logical conclusion is that Sario's scripted comment was an acknowledgement of the reality at MS – women are special and older, white males are expendable.

MS utilizes a diversity bonus compensation plan applicable to its CMs and BMs that incentivized discrimination in favor of females, Latinos, and African Americans (the "DBP"). MS offered two types of diversity-based bonuses: (i) a formulaic metrics-based diversity award (the "Metrics Bonus"); and (ii) a "Supplemental Diversity Award" tied to the level of engagement and the quality of the [manager's] efforts toward African Americans, Latinos, and females. In 2017, MS went further and added a "punitive" component wherein the manager lost money for not attaining the assigned Diversity Metrics. Movements up and down in these demographics were tracked monthly and memorialized in diversity score cards that were reviewed monthly with a diversity officer.

The Metrics Bonus did not just incentivize hirings of diverse candidates, it also incentivized retaining diverse candidates. Where a diverse candidate was lost, it created a loss of a diverse position that needed to be filled with a diverse candidate to maintain the status quo metric. If there was no natural attrition in roles, managers could not achieve their assigned gain. In that scenario, managers were incentivized to "manage out" non-diverse employees to make way for diverse employees.

The "Supplemental Diversity Award" involved a more qualitative analysis; tracking the "level of engagement and the quality of the [manager's] efforts toward

African Americans, Latinos, and females." Managers were required to assign themselves qualitative goals, such as funneling diverse candidates into management. If the manager was not demonstrating activities designed to hit the metrics, then the discretionary bonus would lower. Managers reported their qualitative efforts and accomplishments in the diversity cards that the diversity officer then reviewed.

For quantitative and qualitative diversity bonuses, MS effectively created a parallel diversity evaluation process that traced its standard mid-year and year-end evaluations process. MS required managers to submit diversity self-evaluations through Diversity Metric attainment and qualitative activities. MS engineered its diversity evaluation forms such that the manager did not have the option to indicate "no progress," "no updates," or "no success so far."

MAKERS is a global organization that recognizes industry groundbreakers and innovators. At MS, the MAKERS Award is extremely prestigious. Since 2013, MS has utilized the MAKERS Award "to recognize women across Wealth Management …" MS's partnership with the MAKERS organization "is a testament to [its] commitment to being the firm of choice for women employees and investors." Some female MS MAKERS have referred to it as a "sisterhood." Males were excluded until 2018, the year Claimant filed with the EEOC. MS's deliberate decision to exclude males for such an award on company-wide basis evinces a bias in favor of women and against men.

MS created a Holistic Equal Representation Score ("H.E.R.S.") to measure the financial benefit of gender diversity in its workforce. The firm created a video featuring its female Head of Global Sustainability Research. MS's research determined that the

most gender diverse firms outperformed the least gender diverse firms by 3.1%, every year, and gender diversity at the executive and manager levels made the biggest difference on returns. The video proclaimed there "is a lot of work left to be done" in promoting women at those levels.

Sario was a rising performer at MS since joining as an FA in 2006. In November 2015, Sario took a significant leap in responsibility when she was promoted to CM of the Carolina Complex (the "Complex") at age 36, purportedly the youngest CM at the time.

Diversity Metrics and qualitative activities took on added significance to Sario as CM, because the Complex's performance in several other key performance indicators ("KPIs") was poor. In her first year, several KPIs were in the bottom half. Yet, she still received a "meets expectations" evaluation grade. Sario's subsequent evaluations conspicuously stopped listing KPIs, and omitted negative 360 comments. According to McNeil, who had KPI metrics, the Complex was often dead last in 2017.

Sario distinguished herself as one of the best in the firm on diversity. In 2017, the Complex was rated "Top 5 in diversity [nationally] with momentum to continue to increase into 2018," and half of her hires were diverse. Sario was extremely thorough in listing minute details of her qualitative diversity activities in her diversity evaluations. Sario described in detail <u>unsuccessful</u> attempts to recruit diverse individuals because that activity was "absolutely" relevant to her diversity evaluation.

Sario's diversity evaluations, as BM and CM, show a disproportionate level of activity toward women, compared to Latinos and African Americans. Indeed, Sario recognized she reported a lot of activity around females, and that there were times she did

not have any African American FAs or FAAs, noting that recruiting African Americans was a "challenging space [for her]."

Sario's personnel decisions demonstrate she considered the impact of such decisions on her diversity performance. Sario hired two unqualified diverse candidates into management roles, which was one of her stated qualitative diversity objectives. She selected REDACTED to be ACM despite REDACTED having never worked as an FA, or in wealth management in general, and despite lacking the required series 9 and 10 licenses. REDACTED was "totally unqualified," and "not a good candidate for the job." Despite the foregoing lack of experience and REDACTED s negative impact, Sario transitioned her to a FAA role, thereby boosting her diversity metrics. Sario also hired REDACTED (African American, under 40) to be Lake Norman's producing BM, even though REDACTED lacked the required Series 9 and 10 licenses and had never supervised FAs before. Ultimately, REDACTED was unable to pass a required test and could not remain in the role. Yet, REDACTED was allowed to remain as an FA (which benefited Sario's diversity numbers) until he became her Business Development Manager ("BDM"). Sario replaced REDACTED with REDACTED (African American, female), who was the Business Services Manager supervising administrative staff. Though she had never been an FA, Sario promoted her to a non-producing BM role supervising FAs.

Sario also showed leniency by not terminating female FAs, which would have caused a loss in her diversity metrics. Claimant informed Sario that REDACTED was complicit in a customer misrepresenting his employment status on a loan application, which is a federal crime, but Sario took no action. REDACTED also had a range of other

document conduct issues that could have given rise to termination. Sario chose not to fire REDACTED; she transitioned her to an FA role, consistent with her handling of REDACTED and REDACTED. Even as an FA REDACTED continued to have IIR issues with no consequences. Sario also refused to fire a female FA in the Charleston branch, REDACTED . In addition to REDACTED only coming into the office twice a month, McNeil caught REDACTED successfully soliciting "several" clients to take security-based loans to invest in her boyfriend's SEC-registered mold company, which is a violation of MS policy. McNeil wanted to terminate REDACTED, but Sario would not support it, because REDACTED is female and might file a lawsuit.

In contrast, the only evidence offered at the hearing regarding ACM REDACTED and BM REDACTED shows that both men believed they were being targeted by Sario, that Sario was biased in favor of women, and they both subsequently exited her organization due to those concerns. Sario inherited REDACTED as her ACM. REDACTED was "excellent," effective, and well liked. The natural progression for an ACM is to a non-producing manger or complex manager role. REDACTED told Claimant that Sario undermined his advancement while blaming others. Sario admits she did not recommend REDACTED for advancement and did nothing to retain him. REDACTED told McNeil that he was "concerned about keeping his job" and that he resigned before Sario could fire him. REDACTED s texts further show his belief that Sario was biased in favor of women, and he warned Claimant to watch out for the "girl power." Sario replaced REDACTED with REDACTED.

REDACTED also told McNeil that he felt Sario, and her complex team treated him differently and that Sario had recruited him "under false pretenses." REDACTED told

DocuSign Envelope ID: B948778A-58A0-42B5-BA58-4325D2718CC5

Claimant that Sario's "all women management team made it very difficult for him to complete his goals and initiatives;" he talked about women being given more preferential treatment; and he mentioned getting representation or going to HR to try to get out from under Kristen …" REDACTED, REDACTED, and Claimant's common accounts of being targeted by Sario are consistent with Sario's own 2017 self-evaluation:

> I spent the last 12 to 18 months watching for themes and gaps in our leadership team. My skill set this year has been around managing the leadership team in (sic) inherited up or out. That is something new to me with the help of HR and the region and I feel confident I can recognize poor performance sooner and be more efficient in execution of a plan of action or managing an individual out where needed.

PBs are accountable for six core metrics: (1) Percent to Goal in Loan Origination: how many dollars in loans were opened compared to the stated goal which fluctuates annually ("PTG"); (2) Balance Growth: how much clients with loans actually borrowed such that MS earned any revenues on the booked loans; (3) Product Mix; (4) Units; (5) FA Penetration; and (6) Premier Cash Management. While PTG is an important performance metric, it is considered in concert with the other metrics for purposes of evaluating bankers. In fact, the "2017 Private Banker Compensation" document lists: gross balances and net new balance growth (how much money was outstanding after accounting for loans being paid off) before PTG (which does not indicate actual revenues). Valletta acknowledged, "they are all important … that is why they are on there." Units, which involves a tremendous amount of work, are "among the most meaningful metrics." Because that "velocity" shows how active the banking business is overall in the market and reflects a lending culture among FAs broadly.

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

Claimant started as PB in the Long Island Complex in 2010. His manager issued him a "meets expectations evaluations and was complimentary about Claimant. His 2011 evaluation illustrated continued success. Claimant's 2012 evaluations were even more positive. Claimant received a "meets expectations" mid-year review that touted him as able to "present effectively in front of UHNW clients," and having "done a great job building trust with FA's and local management team." Claimant finished the year at 200% PTG and earned high praise from his new Regional Manager.

On June 17, 2013, Southeast Regional Manager, REDACTED , offered Claimant a PB position in the Carolina Complex. REDACTED told Claimant it was a market that needed help and that the previously assigned bankers washed out, but Claimant viewed it as an opportunity to prove himself. When Claimant took over, it was ranked as one of the worst complexes nationally and had an average loan size of approximately $300,000. Claimant's second Regional Manager, Alex Dunlap, described the Complex as a "dead market." It was also one of the most geographically challenging in the Region. Upon arrival, there were six branches (two in Charlotte and one each in Lake Norman, Columbia, Hilton Head, and Savannah) and approximately 120 FAs. Claimant ended with fourteen branches covering approximately 16,000 square miles, one of the largest territories in the firm. Furthermore, given the prevalence of smaller cities in his territory (like Spartanburg and Anderson, SC), there were fewer "Chairman Club FAs," which were the best sources for Ultra High Net Worth ("UHNW").

Carolina Complex was under-resourced compared to other complexes. The Complex was originally staffed by two PBs and two APBs. When Claimant arrived, he

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

worked alone with a single APB and at other times no APB. One of Claimant's APBs, REDACTED , had performance issues and was on the verge of being terminated. Claimant was allotted four PBAAs, but these future FAs were still learning about banking. In 2015 and 2016, Claimant was assigned two new APBs but there were issues with their performance. In 2015, MS hired REDACTED , but he was not showing up to work. Similarly, Jared Bush, was late, unprepared, and did not follow up well. Both REDACTED and Bush had no commercial lending experience, and required training before being fully deployed.

According to Dunlap, Claimant had "the highest FA:PB ration among his peers," meaning he had more FAs per capita than other PBs. According to a 2016 heat sheet, Claimant had 207 FAs. Many PBs had fewer than 100 FAs, including REDACTED (Southwest Florida Complex, 93 FAs), REDACTED (Alabama, 89 FAs), REDACTED (Alabama, 124 FAs), REDACTED (West Palm Beach, 116 FAs), and REDACTED (who is Latino and under 40) (North Florida, 111 FAs). The Complex was assigned one of the highest production goals per banker in the Region. The 2016 heat sheet showed Claimant's goal to be $405,852, which exceeded the goals assigned to every single female or minority PB: REDACTED s ($222,353), REDACTED s ($200,890), REDACTED s ($229,189), REDACTED s ($292,720), and REDACTED s ($245,000). Over 4.5 years, Claimant also had to overcome having three different RMs, CMs, and ACMs.

In contrast, PBs like Cucuzza (Atlanta Perimeter Complex), who was promoted to ARM, were seemingly positioned for success - Cucuzza's complex was staffed with a lead PB, a PB and an APB; covered a smaller geography (suburbs of Atlanta); had fewer

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

FAs (160 v. 207); more Chairman Club FAs; the same Complex Manager the entire time; and yet had a lower goal to hit ($330,158 vs. $405,852).

Claimant's first boss in the Carolinas Complex, REDACTED , issued Claimant a favorable evaluation:

> Relocated from NJ one office, 3 man team, to covering wide market with dedicated APB, immediate impact to units in region 1st qtr., penetration and production numbers are mediocre because new to market and averaged with previous market, established great relationships with CM, BM and the key FAs in the market, adopted to market type very well, positive energy on team, team player …. Team player, shows great leadership potential, creates sales and presentation ideas, partners with other PB in regions well, amazing job of adoption and culture change for new region, adjusted to different market type very quickly and well, immediate adoption of CM, strategic FA, very strategic and tactical on driving business.

Claimant was 71% PTG at $324M, and REDACTED told him "great job."

In May 2014, Dunlap became Claimant's RM, and issued Claimant two favorable evaluations and considered him for promotion. In September 2014, Dunlap issued Claimant an "Exceeds" 2014 Performance Summary that recognized Claimant's "leadership traits" and noted:

> While Chip is relatively new to Carolina's complex, he has had a big impact in short period of time. His strong product and process knowledge has delivered a level of comfort to the FAs in market that encourages their participation. He is quickly accelerating production, showing large % increase in both tonnage and units in Q2, though just shy of goal. Even though he just missed Q2 goal at 99.7%, chip is an exceeds due to his can-do attitude and collaborative approach to regional team initiatives. Although Chip's coverage territory is one of the most challenging in the region with 200+ advisors and 14 offices between 3 states, he is still quick to action and takes any changes of coverage in stride. Chip should continue to hustle and drive business in market, but also step back to take a tactical approach to UHNW opportunities. He has the skill set and knowledge to execute on Tailored

> Lending UHNW opportunities ….

(Emphasis added). Claimant's 2014 yearend evaluation was also positive:

> Chip had a solid 2014 production year with $316MM in commitments
> and 476 units. Up 55% and 53% respectively with both the SBL and
> mortgage businesses increasing a great pace. Chip grew his market at a
> rate that outraced his peers, despite having additional offices added to
> his coverage territory on two separate occasions through the year.
> Without complaint, Chip runs towards the opportunity to showcase his
> talents, despite the increased geography and goal – his attitude is
> consistently positive with a can-do approach that has won him an FA
> following … Overall, Chip has generated a lot of production with little
> resources (lacking ACM, CBDM for most of the year). I am encouraged
> with the right team in place, Chip can take on a mentor and market
> leader role to drive the business to new levels. Chip is a consistent
> contributor to teams calls and always willing to share best sales
> practices. In 2015 I look to Chip to be one of the SE region's peer
> leaders. His willingness to always learn and improve is a lesson for the
> broader team.

In 2014, Claimant also received the "Big Hitter" award.

Claimant had another successful year in 2015, but had a slow start in PTG, which

culminated in a performance warning dated August 4, 2015. However, Dunlap expressly

noted mitigating circumstances in an April 13, 2015 email. In the remaining five months,

Claimant's performance spiked. He finished Q4 at 147.25% (#3 that quarter). By year

end, Claimant reached 88% PTG, was #2 in the nation for unit production, and he booked

the largest UHNW loan in the Region and fourth largest nationally. Dunlap emailed

Valletta and National Sales Leader Chad Johnson:

> Another triumph is Chip Randall, struggling this year, eclipsed our
> quarterly unit record-booked 162 deals for 86M despite performance
> managing out an APB [REDACTED } in this market. Chip wins the
> hustle award for the region.

Claimant Ultimately received a $50,000 bonus. That year was also notable because the

Complex jumped two other complexes. Alabama (REDACTED  ) and Central North Florida (REDACTED   ).

Claimant's 2015 360 Review ("360") a critical part of the evaluation process, included positive comments by REDACTED       , Sario's predecessor: "[Chip] demonstrates his dedication to the needs of the Complex, our FAs and clients by way of this connectivity to the branches and management teams… Chip has willingness to partner with management to get the job done, making himself available at any time to deliver a message or work with an FA."

Claimant's year end evaluation was also favorable:

> A slow start to the year put Chip in a difficult position for 2015. Changes in advisory management and the loss of an APB resource added ongoing production headwinds; however, Chip, with resilient attitude, adjusted his business model several times through the year and the back half of 2015 shows improvement. Q1 results show 59 SBL units booked, Q3 nearly doubled that volume 114. Chip has the highest individual unit production of any PB in the region; however, he also has the lowest average ticket size. This evidences he has the ability to manage a significant amount of deal flow, but needs to focus upstream on larger clientele and larger deals to ensure success. Reflecting on current engagement pitch and ensuring his brand reflects HNW Private Banker would serve him well. Given high FA population and broad geography, managing resources is paramount to success. Chip has a unique opportunity to leverage four PBAAs in his market to assist in driving the platform. This could prove to be a beneficial addition in managing smaller ticket deal flow and allowing Chip to focus on up-market approach to HNW client segment.

> Chip is resilient and maintains a positive attitude in the face of adversity. He is genuine in his desire to his business partners succeed and is proven to be developing as a mentor. His creative thinking has led to several best practices and he is constantly developing new ideas and fostering a sharing environment with the team. Chip is a team player and always available to assist his peers.

13

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

Dunlap also testified favorably about Claimant, describing him as: (i) having a positive attitude and being a good teammate; (ii) giving a good sales presentation; (iii) being generous with other PBs; (iv) showing leadership; (v) being good with client facing and relationship building; (vi) being experienced in MS's culture and model; (vii) "genuinely wanting to succeed in the business"; (viii) being someone who always had a new idea and being a good deal guy; and (ix) being steady, insightful, and persistent.

In November 2015, Sario became Claimant's CM. Sario had positive things to say about Claimant in his 360 Review: she described him as "committed, responsive, credible, friendly and reliable." And being "creative and collaborative approach to growing business" and a "valued business partner."

In September 2016, Barbara Power became Claimant's RM. Power was a disengaged manager. She met with Claimant only a handful of times in the approximately fifteen months she managed him. She provided him minimal, if any, one-on-one coaching She canceled trips with Claimant to visit branches and she failed to show up at an important dinner and baseball game with her boss Jerry Valletta, Claimant, and his two APBs. Claimant's testimony regarding Power's disengagement is corroborated by her 2018 performance warning, which required immediate improvement with respect to: good judgment, honoring work commitments, refraining from regularly canceling meetings, and "being upfront and transparent [her] management team at all times and avoid[ing] making misrepresentations." Valletta also issued Power a needs improvement evaluation, criticizing Power's judgment and noting she had "no impact on banking success," possessed an "inability to establish relationships," and had a lack of visibility

resulting in part from her chronic practice of canceling meetings. Notably, Valletta found Power to have been dishonest with him about a company trip and he questioned more broadly why she had the largest personal expenses of any banker nationally.

On January 9, 2017, Power issued Claimant a positive meets/meets evaluation after conducting due diligence that included conferring with Dunlap. Power took a broad view of Claimant's performance and was not focused solely on PTG, which was 72.92% for the year. Power's evaluation comments were complimentary, describing Claimant as steady, insightful, realistic, persistent, and knowledgeable. Her 2017 evaluation of Claimant likewise recognized his "solid relationships with WM teammates" referring to FAs and complex leadership. Power was "very pleased" that Claimant was second in the nation in units, missing by only two loans to a highly respected national banker, and she was aware Claimant earned the top spot in units nationally in 2014. Claimant's 360 was favorable and included comments from four critical stakeholders:

> Bob Hatala (Charlotte BM): knowledgeable, approachable, sense of humor, professional, balanced/Financial advisors are very welcoming to Chip speaking and meeting with their UHNW clients. Quite a compliment toward his professionalism and knowledge.
>
> REDACTED    (UHNW Specialist): steady, insightful, realistic, persistent, knowledgeable/Chip brings a calm to situations that foster an environment of professional thinking rather than emotional decision-making.
>
> REDACTED    (Mortgage Specialist): professional, efficient, bright, confident and sociable/ Chip is very adept at seeing the big picture and always looking for ways to improve processes and create efficiencies.
>
> REDACTED (ARMr): committed, responsive, credible, friendly, reliable/Chip has distinguished himself with is sales skills, organization skills, and detail-oriented talents by creating a culture and network of

Advisors across wide and difficult territory, all of whom that have adopted the mortgage and SBL platform utilization for their clientele with consistency and effectiveness. His reach extends well beyond his daily presence.

The emails from Sario and Power from February through September 2017 were overwhelmingly positive about Claimant. On February 17, Power was bullish, telling Claimant, "this is your year my man." Following a meeting with Claimant and Valletta, Power emailed on April 21 stating, "I left re-energized around the work you and your team have on the plan. I know you will execute." Valletta echoed this optimism. Sario was also upbeat, emailing Power on March 8 "so much momentum with my banking team."

In March 2017, Cucuzza was promoted to ACM, joining REDACTED. Cucuzza was assigned six complexes, including the Carolinas Complex. Cucuzza's job was to work with the PBs in those complexes to grow their businesses; he was not specifically assigned to Claimant. Cucuzza had positive things to say about Claimant, including that he was: an expert in B&L; personable, dedicated, steady, insightful, resilient, persistent, and creative; a good problem solver; a good presenter; highly engaged with client management and FA issues and questions; and adept at seeing the big picture and looking for ways to improve process and create efficiencies. Cucuzza was in the market more than Power and was not advocating major course corrections for Claimant. Instead, Cucuzza was giving Claimant ideas and emphasizing things Claimant could concentrate on more, as memorialized in an informal action plan that was not HR directed or disciplinary.

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

Cucuzza's emails regarding Claimant were positive. On June 21, 2017, Cucuzza was reporting "really good momentum" and stating, "overall we are seeing very good results this quarter." Similarly, on July 5, Cucuzza informed Power: "Chip and team had a fantastic quarter … we've got a good story to tell there. I think Kristen will jump on the momentum and help us drive business." Power likewise agreed with Cucuzza's assessment, and she understood Claimant was responding well to his coaching and she was optimistic about Claimant's future. Cucuzza did not meet with Claimant until early June, so he did not take credit for Claimant's fantastic quarter.

Cucuzza and Power were excited with Claimant's progress on this plan, thought his teamwork with Sario looked good, and the Complex would continue to improve. For example, on August 9, 2017, Power emailed: "[I]mpressive Chip. This teamwork with Kristen is exciting. I am pleased to see how much you are actively working with she [sic] and her team. Nice!" Cucuzza added, "this looks really good." On August 18, 2017, Power emailed, "nice work … keep it up. You are ensuring that Carolina's is on the map." Then, on August 23, Power added "I am very excited about what changes I am seeing Chip. Keep it up." And on August 31, Cucuzza wrote: "I've seen all the hard work you, Jared and REDACTED are putting into this, and I'm glad to see the results are following. I really like the way you've partnered with Kristen and how she's holding each branch manager accountable," to which Power responded, "I could not agree more." Power acknowledged that Claimant was working hard to partner with Sario, even as late as September.

Mid-year evaluations are required by MS; their purpose is to examine how PBs are

trending, and to notify them of any deficiency so they have an opportunity to improve. In 2017, Claimant prepared a self-assessment, but the evidence shows Power did not issue Claimant a mid-year review.

Similarly, emails from Power and Sario to Claimant into early September were positive: on September 5, 2017, Power wrote "fantastic work Kristen and Randall. Keep the momentum going and finish strong" and Sario emailed Claimant, "Whoa!! Doing a happy dance;" on September 9, 2017, Sario emailed "happy feet are doing a little jam right now" in response to Claimant and the complex being #2 in the nation on CD stack; and on September 18, 2017, Sario emailed "incredible!" in response to a Claimant update. Power and Sario were equally positive in verbal feedback too.

In 2017, McNeil noticed a "cataclysmic shift" in Sario. With the Complex last in KPIs, on a public dashboard, Sario pronounced that diversity was the easiest needle to move and that she and her department would focus on that. In her complex manager meetings, Sario also discussed the numeric goals that MS assigned for the three groupings, and she told BMs directly "[they] needed to hire so many people and x number of them need to be diverse." Sario was disgruntled and voiced displeasure to McNeil when McNeil hired the most qualified candidates (4 white males and 1 female), which did not "help Sario's diversity numbers."

Claimant testified credibly that Sario also made several comments indicating her view that there were too many older white men in her organization. For example, on or around September 20, 2017, during a car ride with Claimant and Francesca Maines, Sario discussed the Greenville, South Carolina branch (which was exclusively all white men)

and stated "how do we get diversity in this branch. It doesn't look the way we want it to look. We need to get it younger in there, we need to get women in there, how do we do it." In a complex leadership team meeting in November 2017, Sario said, "diversity is the number one goal, number one focus" for 2018. She again brought up the "Greenville problem," when REDACTED asked what the problem was. Members of Sario's female leadership team chimed in: "too old, too white and too male" and laughed about it. Sario made similar comments about older BMs during car rides with Claimant, questioning whether they had enough "energy," including Will McMaster (who stepped down from BM) and Martha McNeil.

Beyond her words, Sario's activities within her complex reflected a youthful culture. Sario emphasized "fun and games" in meetings, as well as more youthful physical activities, such as her attempt to hold a meeting at the Whitewater Rafting Center where she planned to have attendees zipline, renting a church van to play music together on a trip to Atlanta, cajoling Growth Summit attendees to do the "football game wave" for her boss, and handing out high school like awards (such as "biggest clown") in pink bags. Ultimately, McNeil concluded, "I know that the Disney look is important. And I think she translated that look as being important to her complex. She showed a preference for younger people. She hired only attractive people."

Sario also publicly expressed her desire to have an all-female complex leadership team. Once attained with the hirings of REDACTED and Francesca Maines, she marketed it. For example, on December 11, 2017, Sario held a tea party directed to only female FA recipients, inviting them to mingle "with other women and our all-female

complex leadership team." This invitation was "worrisome" and "surprising" to McNeil, a Regional Diversity Award and former MS Diversity Council member. McNeil testified, "I can't imagine somebody receiving an invitation that says, come mingle with your all-male management team."

The aforementioned bias evidence occurs against the backdrop of Sario's 2017 nomination for MS's female-only MAKERS Award. Sario considered the MAKERS Award to be a crowning achievement of her career.

A sudden and significant change in Sario's relationship with Claimant began on September 12, 2017, when Sario initiated a 30-minute call with Power, in which she effectively portrayed Claimant as a useless banker. Power took notes of the call but shredded them. Sario memorialized her complaints in a 20-point email (the "bullet point email"), which is the first documentary evidence of Sario being unhappy with Claimant. Sario had not conveyed anything negative to Claimant, nor had Power informed Claimant that there were any issues with Sario. The bullet point email was not substantiated by a single document. Power failed to speak with any BMs or FAs to verify Sario's criticisms or confirm her depictions of complaints coming from them; nor did she ask Sario to provide documents showing she conveyed her misgivings to Claimant.

On September 19, 2017, Power suddenly lumped Claimant in with Lead PB REDACTED . While Claimant was surging in his performance, REDACTED failed to improve in 2017. On July 5, in the same email where Cucuzza praised Claimant, he stated, "The opposite happened in ACC. They are the last in the region in FA participation, percent to goal, balance growth and PCM. I can't find one positive thing happening there." While

Power gave Claimant a favorable Talent Ranking in June 2017, she rated REDACTED as "low potential and below average performance."

Nevertheless, Power had Cucuzza prepare Action Plans for both on September 19. That same day Power emailed HR about performance managing REDACTED , REDACTED , and Claimant – all three white males, over 50. The Action Plan does not focus on Claimant's performance metrics or indicate he was not on track; it simply identified Complex partnership activities. There is no proof the action plan was ultimately issued.

Instead, on October 12, during a lunch meeting with Claimant and Bush, Power bluntly conveyed "you've got a problem with Kristen Sario." Power pulled out documents incorrectly portraying the Complex's performance, which Bush and Claimant contested. After meeting privately with only Bush, Power met with Claimant, said positive things about him, stated she wanted to make sure he was "happy in [his] role," inquiring if he wanted to work directly with Dunlap or as a trainer. Claimant conveyed his desire and need to remain in the role. Power denied she was disciplining him and expressed optimism about making things work. However, Power told Claimant that he could not meet alone with Sario, only with Bush, and Bush confided in Claimant that Power told him "Randall's out, he's finished" and said he needed to prove himself if he wanted the role. Though Power notates material personnel conversations and creates business review PowerPoints for banker meetings, Power could not identify any notes or emails establishing she previously informed Claimant of Sario issues.

On October 16, Power emailed Claimant a performance warning backdated to October 12 and asked him to sign it. The issuance of the performance warning is

problematic. Power issued it after telling Claimant he would not be disciplined and skipped over a verbal warning, the first step in MS's progressive discipline policy. Power excluded Cucuzza entirely. Power emailed Claimant the warning on the same day she praised him for having increased to 95% of plan and expressing confidence in him. Power also violated the terms of the performance warning by not meeting weekly with Claimant.

On November 2, a Q4 Action Plan with new goals was created. Respondent exaggerates the significance of this plan, which is of little evidentiary significance because: the objectives were defined as "stretches" and not marks Claimant needed to hit; Cucuzza admitted some of the goals were unattainable; and it was issued with one-third of the quarter over.

A "rattled" Claimant called Valletta. Sario had never told Claimant there was a problem in their relationship. Claimant told Valletta that on the surface he and Sario seem to have a great relationship, contrary to the performance warning's depiction. Claimant also told Valletta that Power had forbidden him from talking with Sario; Valletta instructed him to speak to Sario.

On November 2, 2017, Power informed Sario of Claimant's call to Valletta and asked that they talk "ear to ear" about it. On November 6, Power met with Claimant attempted to get him to admit that he knew he had a problem with Sario – contrary to what he told Valletta. Claimant suggested they talk to Sario together; Power refused.

On November 7, Power emailed Sario a blow-by-blow of the meeting, including Claimant's contention that Sario never communicated any problems directly to him. Sario

pivoted to two <u>new</u> angles of attack, (i) asserting for the first time that Claimant had a broader relationship problem with her Complex Leadership Team, including Vicki Strine, REDACTED, and Francesca Maines; and (ii) that the Claimant "lacked self-awareness" in his denials because she had "expressed concerns and constructive feedback on multiple occasions" about his relationship with the broad Complex and had "past and recent discussions regarding Randall's alleged other shortcomings." Although Sario provided no dates of when she allegedly conveyed her concerns to Claimant or when her team allegedly complained about Claimant, no one asked her to provide any further details or copies of the notes she referenced. Rather, Sario's conclusory statements were simply accepted as true with Claimant being labeled as lacking self-awareness.

When Claimant disclosed to Sario that Valletta and Power informed him about the bullet-point email, Sario acknowledged sending an email to Power, but told him to it was "nothing serious." During this conversation, Claimant pleaded that he needed the job as the sole breadwinner of his family and Sario assured him "nobody is getting fired. You're on my team for 2018. Don't worry about it."

Thereafter, Sario disengaged with Claimant. For example, they were scheduled to have individual book reviews with FAs in Columbia, but Sario only sat in on one partial meeting and then claimed she had to leave early for her yoga class.

Contemporaneous emails show that Sario was the impetus for Claimant's termination and that Power ultimately relinquished the decision to Sario. At the outset, Power did not go to Valletta and suggest Claimant be put on a performance warning, let alone be terminated, before the bullet point email was sent on September 25, 2017.

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

Rather, on December 19, 2017, Power wrote to Sario: "If Randall has not improved in his relationship with you and your team (based on your assessment and mine), I will be asking personnel to support a final written notice of termination. If he has improved, Andrew and I will continue to work with him on sustaining his performance." Then, after speaking with Sario on December 19, Power emailed Sario the next day stating: "following our discussion, I met with my personnel team to share your feedback as well as mine. Given the lack of improvement and unwillingness to embrace the feedback, I am recommending termination." (emphasis added). And on January 4, 2018, Power – a "good communicator who tries to be as accurate as possible in emails" – further emailed, "I hate that you and I have gotten to this point with Randall, but I know our decision to terminate Randall is the right one." (emphasis added). Even Power acknowledged a plain reading of her initial reference to "you and I' and "our decision" would lead a reasonable reader to conclude "our decision" referred to her and Sario. In the email, Power also assured Sario she would share the "talking points and details once I close the loop with legal," leaving little doubt of Sario's preeminent role. Within hours of Claimant being terminated, Sario emailed Power and Cucuzza asking "do I need to do anything from my seat to terminate Randall in the system or open the PB position?"

Power admitted she would have continued to employ Claimant had Sario not sent the bullet point email.

The termination script similarly corroborates that Claimant was terminated because of Sario, not PTG. It states: "I have noticed you've been making an effort, but that effort isn't converting into positive results, in particular you haven't been able to

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4385D2718CC5

establish a positive relationship with the complex." The script also states, "lets add a few brief references to the nature of the deficiencies," but there is no reference to Claimant's objective performance on his core metrics. Like the performance warning, the monocular focus is the relationship with "the complex." Power went off script and acknowledged that Claimant had decent performance metrics, but that he was nonetheless terminated because he "managed to lose the confidence of the wealth management partners." After the meeting, Claimant called Carriere and asked her what loss of confidence of wealth management partners meant. She responded, "Kristen [Sario]."

On December 19, Cucuzza emailed Power the ways Claimant was collaborating with Sario and her team. Cucuzza believed Claimant embraced his coaching, was diligently trying to improve and dedicated to the Complex's needs, and never indicated otherwise to Power. Even Power understood that Claimant was working hard to save his job and going above and beyond.

Though Cucuzza was most familiar with Claimant's progress, Power did not ask Cucuzza's opinion or seek his recommendation as to whether Claimant should be terminated. Power did not even alert Cucuzza that Claimant had received a positive 2017 360 review. Cucuzza never suggested that Claimant should be terminated, let alone put on a performance warning. Sario knew about Claimant's termination before Cucuzza. Power likely excluded Cucuzza either because he was an advocate for Claimant's continued employment and/or because Sario was the decision maker and his opinion inconsequential.

Carriere abdicated a compliance role typical of a human resource professional. She

did not conduct or direct any investigation to determine if Sario's allegations against Claimant were valid. She did not review Claimant's previous evaluations or 360s. Carriere could not identify anything she did to vet whether the motive behind terminating Claimant was discriminatory. Carriere could provide no details about meeting with Power regarding the termination decision or her role *writ large*. Carriere did not broach lesser progressive discipline options. Carriere could not identify any other situations where a banker had been terminated for performance without having been issued a needs improvement evaluation. However, even that anomaly apparently did not raise a red flag for her. She had no explanation for why Claimant was not terminated in-person.

Valletta's role in the termination was minimal. Valletta operated at a "30,000 foot level" looking at the "big picture" across 200 private bankers and a $50B national business, including personnel matters. No documents show Valletta contemplated terminating Claimant. MS's privilege log does not indicate Valletta's involvement until January 3, 2018; the decision was made before the 2017 holidays. Valletta is not referenced in any of the termination emails. Valletta could not identify any notes corroborating when he was consulted. Power testified that Valletta was not advocating for termination.

Valletta did not independently investigate the allegations levied against Claimant. Valletta did not speak with Sario directly about Claimant and did not recall being shown any texts or emails corroborating that Sario had told Claimant she was unhappy with him. Valletta never asked Power or Sario to provide any documents, emails, or texts to substantiate that they previously conveyed to Claimant any displeasure. Valletta never

circled back with Claimant and allowed him to respond to Sario and Power's unsubstantiated claims or permitted him to show emails and texts showing he was receiving positive feedback from Sario. Valletta allegedly just concluded, without evidence, that Claimant had been dishonest with him.

Valletta was in the dark on critical points that he admitted would have been significant to know in evaluating whether Claimant should be terminated. He was unaware that Power gave him a meets/meets evaluation in 2016, or that Power failed to issue Claimant a mid-year review and failed to meet weekly with Claimant as directed in the performance warning. Power also did not apprise Valletta of the positive feedback she received from the three BMs. She did not tell Valletta that Cucuzza wanted to give Claimant more time; had he known, Valletta would have delved further into it. Valletta also lacked understanding of the Complex being a "dead market" before Claimant, the many mitigating circumstances that plagued it, or Claimant's upward trajectory overall.

Unlike Power, who was given paid leave to look for a job and permitted to step down to a PB role (an option Cucuzza suggested for Claimant as an alternative to termination), Claimant was summarily terminated without warning and without even the option to resign. MS was only willing to give Claimant the "soft landing" of working through the end of the month, if he signed a waiver and release.

MS acted to replace Claimant "as soon as possible," but the position remained open for eight months. Sario played a much more active role in filling the position than Power. When Power informed Sario of Claimant's termination, Power immediately solicited Sario for candidates. Thereafter, Sario was actively involved in recruiting

candidates to replace Claimant. The very same day Claimant was terminated, Sario solicited candidates internally. Sario also advertised Claimant's job on her LinkedIn account stating: "Charlotte Carolina's Complex Private Banker Position available. Please message me … Looking for an excited individual to join our team at Morgan Stanley." Sario had never previously used LinkedIn to recruit. In contrast, Power testified that she did not do any recruiting herself.

Although members of Sario's team recommended REDACTED (a male under 40), Sario advanced a female candidate, REDACTED . Sario "felt very highly" of REDACTED and conveyed her "positive view" to Power and Cucuzza. Ultimately, there were only three candidates passed on to Power to interview: REDACTED, Bush, and REDACTED. Cucuzza's email about REDACTED s candidacy clearly reveals it was a three-way hiring decision: "I think the three of us should circle up on where things stand." On March 7, 2020, Power and Cucuzza interviewed REDACTED; both found REDACTED to be a poor fit and thought she was at most a candidate to be an APB.

Bush's ultimate replacement of Claimant is not material because of inconsistency and irregularities in the replacement process. Power and Valletta had no intention of inserting Bush or REDACTED in the role initially. Sario expressed concerns about Bush to Power – the same concerns Sario would later list in Bush's 2018 "360 Review." MS contends that Valletta and Power offered the position to Bush in mid-to-late March 2018, but then revoked it because Valletta allegedly approved Bush's promotion without clearance from Johnson, who denied it. In contrast, Claimant testified that Cucuzza told him it was not filled for that long because Sario was pushing unqualified female

candidates, so they told her there was a hiring freeze in place. It is implausible that Valletta would act out of turn in offering the position given his twenty plus years of experience. It is plausible that the position would not be filled because Sario was advancing unqualified female candidates: Sario did so with REDACTED , one of three finalists. Furthermore, Sario also advocated for another female banker, REDACTED    , to be promoted to lead PB, who was unqualified and promoted to a PB instead.

The delay was also likely informed by litigation considerations. The Legal Department was consulted within days of the bullet point email – a full month before Claimant was even issued the performance warning – and was involved in drafting talking points. If it was unclear if Claimant would take legal action, it was resolved when Claimant did not return the release by the end of January 2018. By the time Bush was promoted, Claimant's EEOC charge had been filed.

MS dubiously points to Bush's record in 2018 and 2019 to suggest Claimant was the sole reason for the Complex's not hitting PTG. However, the comparison bolsters Claimant's case. At the outset, Claimant was more experienced and qualified to be a Lead PB than Bush. Bush had a fraction of Claimant's experience, arriving with zero commercial lending experience. According to his 2018 and 2019 talent review, he was just "average" and middle of the pack as an APB and not earmarked for promotion.

Once Claimant was terminated, Bush struggled in the role. The Complex was on an upward trajectory by the end of 2017, but the Complex experienced a substantial contraction in Bush's first year. In 2017, gross new balances increased 22.45% from 81M to 99M (#13 nationally); in 2018 they contracted by 25% from 99M to 74M (#57

29

nationally). In 2017, lending production increased by 30% from 295M to 383M (#15 nationally); in 2018 it decreased by almost 2% from 377M to 369M (#28 nationally). The only reason Bush hit PTG was because the goal was lowered, a goal Claimant would have reached as well. Unlike Claimant, Bush also missed "on several key metrics" in 2018.

Sario and others expressed serious concerns about Bush in his 2018 360. According to Sario, Bush's struggles were fundamental. She also called out his lack of follow up. Hatala stated Bush needed to work on establishing trustful relationships, something he never said in Claimant's 360.

Bush's 2019 360 was even more negative. The first three adjectives Sario chose were: "overwhelmed, inconsistent, lacks follow up." Hatala led his adjective selection with "overwhelmed," and another reviewer described Bush as "lax." Though Hatala always provided five adjectives to describe Claimant, he used only three for Bush in 2018 and 2019. According to Hatala, Bush needed to be "more proactive reaching out to FAs with pending loan situations in an effort to keep them updated on status," and he acknowledged there were frustrations with Bush's productivity and responsiveness. The feedback from the reviewers also portrayed fundamental deficiencies. REDACTED , whom Sario claimed was one of Claimant's detractors, twice gave Claimant a more favorable 360 review than she did Bush. Her recommendation for Claimant to improve effectiveness was a criticism of his APBs (Bush and REDACTED at the time). In contrast, every reviewer in every 360 review was favorable about Claimant. Respondent's witnesses pointed to major increase in lending production in 2020 and beyond, which is to be

expected given the market conditions, and is not considered as evidence that Claimant was a poor banker.

Sario was primary decisionmaker in Claimant's termination and otherwise wielded more than sufficient influence under a "Cat's Paw" theory. There are ten points of evidence establishing that Sario was effectively "the" decisionmaker or, at minimum, a joint decision maker with Power:

1. There was an asymmetrical power dynamic between Sario and Power;

2. Power failed to defend Claimant in any way once Sario began expressing displeasure with Claimant in September 2017, despite Power's knowledge that Claimant was having his best year;

3. Power admitted she would not have terminated Claimant absent Sario's bullet point email;

4. Power expressly relied on Sario's opinion;

5. Power's January 4, 2018 email to Sario stating: "I hate that you and I have gotten to this point with Randall, but I know our decision to terminate Randall is the right one.";

6. Respondent's Answer (referring to "Sario, the Complex Manager and decision-maker");

7. Power's efforts to apprise Sario of every step of Claimant's performance management process, and HR/Legal consultations;

8. Power immediately conferred with Sario after the Valletta call seeking more evidence in support of termination;

9. Sario's email to Power and Cucuzza asking "do I need to do anything from my seat to terminate Randall in the system or open the PB position?"; and

10. Sario's immediate and predominant involvement in the replacement process.

Even assuming arguendo Sario is not a decisionmaker, the ten points of evidence

exceed what is required to prevail on this point under the "Cat's Paw" theory. *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). In *Staub*, the Court held that, under the "Cat's Paw" theory, an employer can be held liable for discriminatory actions even if the ultimate decisionmaker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus. The Fourth Circuit held in *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision."

Applying the holdings in both *Staub* and *Hill*, Sario undoubtedly influenced Power for the reasons above, and Power never asked Sario to substantiate her many complaints against Claimant, let alone undertake any investigation of her own. Valletta's involvement was minimal at best and in line with a classic rubber stamp role because: (i) no evidence suggests he deviated from his pattern of remaining at a high altitude on personnel matters; (ii) he is not mentioned in anyway in the termination emails and appears in the privilege log after the termination decision was made; (iii) he conducted no investigation, nor did he ask Sario or Power to substantiate the bases for the termination; (iv) he admitted he was in the dark on critical information; and (v) he lacked even a basic understanding about the mitigating circumstances with the Complex.

The Court's decision in *Bostock v. Clayton Cnty., Georgia* lays out Claimant's evidentiary burden under Title VII and the ADEA. 140 S. Ct. 1731, 1739 (2020). Under

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

*Bostock*, the seminal question is whether 50.001% of the evidence establishes that he would not have been terminated had he been a woman and/or substantially younger. *Id.,* at 1739. Under *Bostock*, Claimant need not prove that his sex and age were the only reasons he was terminated; in fact, other "but for" factors (like PTG or relationship issues) can exist as "but for" causes of the termination and Claimant still prevails. The Court also emphasized that Title VII "works to protect individuals of both sexes from discrimination, and does so equally." *Id.* at 1741. In reaching this determination, Claimant's evidence must be assessed in totality, not in isolation.

Use of the *McDonnell-Douglas* burden shifting model is disfavored for use at trial in the Fourth Circuit and many other circuits.

In the instant case, *McDonnell-Douglas* is particularly ill suited because of the nature of the evidence presented – multi-faceted evidence of a biased culture writ large in the organization (including a facially discriminatory policy appliable to the primary decisionmaker) and a myriad of manifestations of individual bias by the decisionmaker. Preoccupation with the prima facie elements like meeting "legitimate expectations" or "replacement by someone outside the protected class" as fatal evidentiary requirements would create an artificial evidentiary vacuum that would violate the purpose of the prima face case, which is "to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'"

Regardless, Claimant has marshaled more than sufficient credible evidence to establish his prima facie case. Claimant would have surpassed his "non onerous" burden of showing that he was (more likely than not) meeting legitimate expectations. Claimant

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

had his best year on PTG and dramatically improved performance over 2016, when he also received a favorable review. Respondent skipped Claimant's mid-year review, which undermines Respondent's standing to credibly challenge this factor. In any event, the 2017 talent review and voluminous emails show Claimant was succeeding in 2017, including in October when Power lauded Claimant being at 95% PTG.

Here, Claimant has presented four categories of evidence that taken cumulatively show that if he had been female he would, more likely than not, still be working in the Carolina's Complex or potentially moved into another role: (A) corporate culture evidence; (B) individual bias evidence by the primary decisionmaker; and (C) pretext evidence. Claimant marshaled multi-layered credible evidence establishing that MS maintained a corporate culture that elevated women over men based on Respondent's:

1. Facially discriminatory Diversity Bonus Plan that incentivized the advancement of women over men;

2. Corporate sponsored Margin Games video (parodying the Hunger Games) starring Sario that supports Claimant's underlying theory that he and other males were targeted and expendable, while females were protected;

3. Decision to limit the prestigious MAKERS Award to women only; and

4. Corporate commissioned study – H.E.R.S. – promulgating research concluding that advancing women generated more profit.

In any event, the Margin Games video in combination with the H.E.R.S. Score and discriminatory use of the MAKERS Award was sufficient to establish corporate culture steeped on giving women preferential treatment.

Claimant marshaled credible and convincing evidence that Sario embodied the aforementioned corporate culture in favor of women, and that she consistently manifested

the same discrimination within her Complex. Sario's bias in favor of women was illustrated in several ways: (i) her disproportionate attention to women compared to Latinos and African Americans; (ii) unqualified hirings that backfired but boosted her diversity attainment; (iii) her pronouncement that diversity was the easiest needle to move, direction to BMs to hire x numbers of diverse candidates, and negative reaction to McNeil when McNeil hired three males and only one female; (iv) her discriminatory statements observed by Claimant; (v) leniency shown to female FAs and her consistent pattern of offering females demotions or re-assignments that bolstered her Diversity Metrics; (vi) the juxtaposition of her treatment of REDACTED and REDACTED; and (vii) her stated desire to have an all female complex leadership team and marketing its achievement in a female only event and in a photo in the MAKERS video.

This evidence cumulatively establishes a pattern of behavior by Sario exhibiting bias in favor of women over men, which dovetails with the institutional evidence to present a compelling case that had Claimant been a female, he more likely than not would have been treated much more favorably. Claimant presented multifaceted and credible pretext evidence that supports a showing of discrimination.

An employer's inability to corroborate its reasons for termination with supporting documents is valid grounds to find pretext. Power, Valletta, and Sario are reasonably expected to document personnel matters either in notes, emails or memos. Yet, Respondent's testimony justifying Claimant's termination lacks any meaningful documentary support, as discussed more specifically below. Particularly troubling, Sario and Power could not provide a single note regarding Claimant despite their practice to

take notes of material personnel related conversations. Where Power did take notes, she shredded them.

Respondent's position on the roles Sario and Valletta played in the termination decision were inconsistent, belied by documentary evidence and otherwise not credible. With respect to Sario, Respondent's original Answer referred to Sario as the "Carolina Complex Manager and decision-maker …" Respondent's claim that Sario is not a decisionmaker, nor an influencer under the *Cat's Paw*, are not only implausible but untrue based on emails discussing termination.

Respondent introduced no documentary evidence showing Valletta approved or decided to terminate Claimant. Valletta debuts in the legal documents in Respondent's Summary Judgment Brief: "Valletta had to approve the discharge decision"; even there, Respondent does not contend Valletta did approve it. Respondent's exclusion of Cucuzza as ARM from the decision-making process for both the performance warning and termination also undermines the basis for termination. Cucuzza was a proponent for Claimant's continued employment and the manager most familiar with Claimant's performance. Respondent offered no explanation for why he was not involved. Accordingly, his conspicuous exclusion from the decision is further grounds for disbelieving Respondent's basis for termination.

The contemporaneous record evidence shows that MS's story for terminating Claimant was alleged poor relationship with Sario and her leadership team. The only specific basis for termination laid out in the termination script is Claimant being "[un]able to establish a positive relationship with the Complex." The script prompts for

more: "let's add a few brief references to the nature of deficiencies," but nothing is included related to performance on core metrics whatsoever. Consistent with the script, Claimant credibly testified that Power acknowledged he had decent performance metrics, but that he was nonetheless terminated because he "managed to lose the confidence of the wealth management partners." Carriere also indicated in a call that Claimant had a "Kristen Problem."

It was only _after_ Claimant filed his EEOC Charge on July 9, 2018, that Respondent pivoted to historical PTG performance as a termination rationale. The first indication is on September 6, 2018, when Cucuzza wrote an email to a _redacted_ individual summarizing Claimant's PTG history back to 2014. The historical performance argument then debuts into Respondent's EEOC Statement of Position filed that very same month and carried through to trial.

The most persuasive evidence are the contemporaneous emails and termination script, which uniformly point to Sario's relationship as the termination cause. Accordingly, it is more likely than not that PTG was not an actual reason for the termination. Defendant's _post hoc_ advancement of new reasons for termination strongly supports an inference of discriminatory motive. An employer's shifting and inconsistent explanations can be inferred as pretext because they are often developed over time to counter evidence suggesting discrimination.

In addition to being post hoc, the fact that Respondent cherry-picked Claimant's weakest metric (PTG) among the six core metrics it tracks for PBs also supports an inference of discrimination. An employer seeking to obscure an illicit motive for a

termination would be expected to focus on the targeted employee's weakest metric to the exclusion of others, which is what happened here. PTG is one of six core metrics Respondent tracked to assess PBs, but there is no evidence that any of the factors were considered. Furthermore, the record also shows that PTG (though important) was not a make it or break it metric for PBs. Claimant received several favorable evaluations despite being below 100% PTG, including when he was at 71%. Moreover, Cucuzza was promoted to ARM despite his complex hitting PTG only once between 2013 and 2017: 2013 85.97%; 2014 104%; 2015 90.2%; and 2016 93.8%. PTG should have been even less important because MS moved away from the metric driven formulaic bonus, and directed bankers to take a more "consultative" approach.

MS considered "mitigating circumstances" when addressing performance management with [REDACTED]; however, Respondent did not consider any mitigating circumstances with the Claimant, of which there were many more. MS's disparate treatment of Claimant in this regard is still another reason to disbelieve Respondent's contention that PTG was a real reason for the termination.

Claimant had his best PTG year in 2017, continuing an upward trend dating back to 2013 (52%), 2014 (82.97%), 2015 (87.54%), 2016 (72%), and 2017 (92%). Claimant likewise achieved national-level growth in three other core metrics: (i) loan origination (which ties directly into PTG), went from 295M to 383M (a 29.9% increased from 2016 levels, #15 nationally), (ii) gross new balances (which shows revenue from loans) increased by 22.45%, #13 nationally, and (iii) net balances (which measures ow much in loans were outstanding) he increased by 15.94%, #9 nationally). Claimant ranked as high

as #2 nationally on an important CD promotion in Q3, which pertains directly to the Premier Cash Management metric.

Claimant's 2017 360 review was also extremely positive. Claimant received a "meets expectations" score from Power based on these 2016 figures and a similar 360, so drastic improvement on these metrics (including PTG) reasonably should have projected an improved evaluation score, but Power instead issued him a "double needs improvement" evaluation and Claimant was terminated.

That Respondent terminated Claimant notwithstanding this drastic improvement, casts serious doubt on Respondent's reasons for termination and supports an inference of discrimination. Prior satisfactory performance evaluations can be evidence that a more recent claim of poor performance is pretext for discrimination.

Claimant's evaluations and 360 reviews consistently point to his strengths in building relationships with everyone, including FAs, CMs and the complex leadership team. Even Sario's 360 of Claimant described him as having a "creative and collaborative approach to growing the business" and being a "valued business partner." BMs McNeil, McMaster, and Crowley also praised Claimant in this area.

In contrast, while Sario, Valletta, Hatala, and Power attempted to portray the exact opposite in their testimony, they did not point to a single note or single email to prove this alleged groundswell of complaints from FAs and complex leadership members. Not a single FA testified at trial. Hatala's attempt to reverse from his 360 comments to portray FA problems was not credible. Furthermore, Respondent only identified a handful of FAs

by name that allegedly complained about Claimant, but produced no corroborating FA testimony.

Based on the asymmetry of evidence on this point and volume of Claimant's credible evidence, it is more likely than not that Claimant's documented positive skills at relationship building continued into 2017, as reflected in Claimant's 2017 360 review. Accordingly, Respondent's attempt to depict a sudden collapse in this thoroughly documented area of strength is deemed false and pretextual.

Deviations from company policy or procedure also serve as compelling evidence of pretext. The performance warning that was issued is beset with procedural problems. Power issued the performance warning without first issuing him a verbal warning consistent with ordinary policy, failed to obtain Claimant's signature, and then failed to meet weekly with Claimant as indicated. Power had Cucuzza prepare 60-day action plan and then never issued it. Power deviated from procedures with respect to the 2017 annual review in that she (a) canceled the meeting she set up to issue Claimant's 2017 annual evaluation (thereby depriving Claimant of an opportunity); (b) prepared the evaluation on the same day Claimant was terminated (and then did not give it to him); and (c) inserted a negative adjective into the review that was not listed in the 360, which she admitted was a procedure departure.

Taken cumulatively, these deviations make it more likely than not that claimant was being take through the paces of performance management, rather than being given an opportunity to save his job, as would be expected if decisions were being made for non-discriminatory reasons. The deviations also discredit the factual bases undergirding those

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4385D2718CC5

documents. Given the magnitude of institutional and individual bias and pretext evidence these many deviations cannot be chalked up to negligence or mistake and are given full evidentiary force for pretext purposes.

Where, as here, an employer claims that it fired an employee for poor performance, yet replaced that employee with an even worse performer, the validity of its termination justification is impugned and constitutes further evidence of pretext. Had performance been the authentic motivation for Claimant's termination, MS should have selected his replacement, carefully. Instead, Respondent selected Bush to replace Claimant despite Bush's having a fraction of Claimant's experience, and numerous red flags with his performance as indicated in his 360 review.

Respondent treated Claimant more harshly than it did Power, REDACTED, REDACTED, REDACTED, and REDACTED which seriously undermines the believability of Respondent's reasons for termination.

> **Barbara Power**: Valletta's performance warning and "double needs improvement" evaluation of Power are a condemning indictment of Power in almost every facet of her job, including personal integrity concerns. They dwarf the reasons for Claimant's termination. Despite all this, Valletta had no plans to demote or terminate Power before she resigned and, in fact, afforded her paid time off to look for another job, and supported her transition to a lead PB role.

> **Lead Private Banker** REDACTED **(Southwest Florida)**: REDACTED s 2015 talent review was negative. It states, "something that should take 30 seconds took REDACTED 5 minutes," her basic communication skills were questioned, and she had a "needed improvement" in her business results. When it became apparent REDACTED could not be successful as a lead PB, she was moved to PB within her complex, with HR note even being consulted.

> **Lead Private Banker** REDACTED **(Alabama) and PB** REDACTED: In 2014, REDACTED was rated in the bottom 10 percent. The 2016

talent ranking listed <sup>REDACTED</sup> as "C2 performance improvement required" and being in the bottom 20%; likewise, <sup>REDACTED</sup> was in the bottom 10% and given a "needs improvement." In 2016, Power gave <sup>REDACTED</sup> a "needs improvement" score for Performance and Contributions. Despite these substantial performance issues, Valletta and Power only had verbal conversations with <sup>REDACTED</sup>, as did Dunlap.

**Lead Private Banker** REDACTED **(Central North Florida)**: REDACTED s complex was also toward the bottom on PTG: 2014 84.19% (2nd worst in complex, 8th worst in nation); 2015 at 74.49% (2nd worst in complex, 19th worst in nation); 2016 69.64% (2nd worst in complex, 19th worst in the nation). <sup>REDACTED</sup> was the worst banker in the region in PTG in 2015, and in Q1 of 2016 he was at 45.7%. Yet, <sup>REDACTED</sup> was not issued a performance warning, let alone terminated. It was not until <sup>REDACTED</sup> was caught for fraud related issue that he was terminated.

Claimant has produced sufficient evidence to prove he more likely than not would have been retained had he been substantially younger. First, Claimant finds evidentiary support in the Margin Games video because the only two individuals killed in the film appear to be males over 40. The individual evidence of Sario's preference for younger workers is also evident. Sario's comments about viewing older employees as problems that needed to be fixed certainly shows a bias and negative opinion of them. Sario went even further professing "that we need to get younger," showing a preference for younger employees in the Greenville branch. That the rest of her team would chime in and laugh about the Greenville branch being "too old, too white, and too male" shows the bias more than likely permeated her team. Claimant's age discrimination evidence is further bolstered by McNeil's testimony describing Sario's youthful activities and approach; her preferences for hiring younger attractive people; and most poignantly, McNeil's decision to retire early in fear Sario would manage her out as an "old irrelevant failure."

Claimant has established it is more likely than not that he would have been

retained if he were substantially younger. Claimant satisfies the legitimate expectations prong. Claimant also establishes the fourth prong by pointing to his eventual replacement by Bush and Respondent's preferential treatment of REDACTED who: (i) Claimant beat on PTG in 2015 and 2016, (ii) who was rated a C2 needs improvement (bottom 10%) while Claimant was listed a solid performer; and (iii) who received a needs improvement evaluation on contributions (which Claimant never was until the day of his termination). Moving to pretext, Respondent's reasons for termination are just as discredited and unpersuasive, such that an inference of age discrimination is supported especially when coupled with Sario's individual bias evidence.

Claimant's Wrongful Discharge in violation of North Carolina Public Policy based violations of the North Carolina Equal Employment Practices Act (NCEEPA) claim is governed by the same standards applicable to Title VII and the ADEA. For the reasons set forth above, Claimant prevails under this parallel tort based on age and sex discrimination.

Claimant seeks to recover compensatory damages, consisting of back pay, front pay, emotional distress and interest, and punitive damages, as well as attorneys' fees, costs and expenses. Claimant lost back pay from his wrongful termination on January 8, 2018, until he obtained comparable compensation and benefits from a new job starting September 3, 2019, in the total sum of $460,937; but he mitigated $203,007, for a difference of $257,930, plus expenses of $42,000 to obtain the mitigation compensation resulting in a net pay loss of $299,930, which Claimant is entitled to recover from Respondent.

DocuSign Envelope ID: B948778A-C8A0-42B5-BA58-4325D2718CC5

Claimant is also entitled to recover for the bonus he was denied by Respondent due to the wrongful termination. Claimant's most recent bonus was 2016 in the sum of $73,250. This provides a fair amount for the 2017 bonus of which he was deprived. Thus, Claimant's recovery for compensatory damages rises to $373,180.

I decline to award Claimant any amounts for interest or emotional distress; but I do award Claimant $250,000 for punitive damages for the institutional bias and discrimination to which he was subjected by Respondent. Moreover, Respondent is ordered to pay Claimant's reasonable attorneys' fees, costs and expenses incurred in this matter; and Claimant is ordered to submit a verified Petition for those fees, costs and expenses within 21 days of receipt of this Interim Order. Respondent may have 14 days thereafter in which to respond.

So ORDERED, this 14th day of July 2022.

Terrence Lee Croft, Arbitrator

## SERVICE LIST

| | | | |
|---|---|---|---|
| **Case Name:** | Randall, Charles vs. Morgan Stanley Private Bank, NA | **Hear Type:** | Arbitration |
| **Reference #:** | 1440006508 | **Case Type:** | Employment |
| **Panelist:** | Croft, Terrence Lee, | | |

### Anthony Dellasala

Bressler Amery & Ross PC

Anthony Dellasala            Respondent
2001 Park Place              Phone: 205-719-0400
Suite 1500                   Fax: 205-719-0500
Birmingham, AL  35203
ADellasala@bressler.com

Assistant's Emails: KReynolds@bressler.com

**Party Represented:**
  Morgan Stanley Private Bank, NA

### Carole G. Miller

Bressler Amery & Ross PC

Carole G. Miller             Respondent
2001 Park Place              Phone: 205-719-0400
Suite 1500                   Fax: 205-719-0500
Birmingham, AL  35203
cmiller@bressler.com

Assistant's Emails: EOtis@bressler.com

**Party Represented:**
  Morgan Stanley Private Bank, NA

### Joshua R. Van Kampen

Van Kampen Law, PC

Joshua R. Van Kampen         Claimant
225 East Worthington Ave     Phone: 704-247-3245
Charlotte, NC  28203         Fax: 704-749-2638
josh@vankampenlaw.com

Assistant's Emails: nikki@vankampenlaw.com

**Party Represented:**
  Charles Randall

## PROOF OF SERVICE BY E-Mail

Re: Randall, Charles vs. Morgan Stanley Private Bank, NA
Reference No. 1440006508

I, Nykesha Potts, not a party to the within action, hereby declare that on  July 22, 2022, I served the attached Interim Order No. 10 on the parties in the within action by electronic mail at Atlanta, GEORGIA, addressed as follows:

Mr. Joshua R. Van Kampen
Van Kampen Law, PC
225 East Worthington Ave
Charlotte, NC   28203
Phone: 704-247-3245
josh@vankampenlaw.com
    Parties Represented:
    Charles Randall

Carole G. Miller Esq.
Mr. Anthony Dellasala
Bressler Amery & Ross PC
2001 Park Place
Suite 1500
Birmingham, AL   35203
Phone: 205-719-0400
cmiller@bressler.com
ADellasala@bressler.com
    Parties Represented:
    Morgan Stanley Private Bank, NA

I declare under penalty of perjury the foregoing to be true and correct. Executed at Atlanta, GEORGIA on  July 22, 2022.

*Nykesha Potts*

Nykesha Potts
JAMS
nykeshapotts@jamsadr.com