# <u>**EXHIBIT 1**</u>

# AMERICAN DELI INTERNATIONAL, INC.
# FRANCHISE AGREEMENT

| | |
|---|---|
| **Franchisee:** | **Global Deli Network, Inc., an Alabama corporation** |
| **Controlling Principal(s):** | **Haresh Patel, President, Secretary/Treasurer, Director** |
| | **Pareshkumar ("Paresh") M. Patel, General Manager (Store Manager/Store Supervisor)** |
| **Date:** | ~~September~~ __, 2015 |
| | *October 2, 2015* |
| **Notice Address:** | **6213 Taylor Ridge Road** |
| | **Montgomery, AL 36116** |
| | **Tel: 334-590-8601** |
| | **Fax: 800-975-5309** |
| | **Email: globaldelinetwork@gmail.com** |
| **Initial Franchise Fee:** | **$10,000.00** |
| **Location:** | **405 Highland Avenue** |
| | **Selma, AL 36701** |
| **Assigned Area:** | **2-mile radius** |
| **Site Selection Area:** | _____ |
| **Opening Date:** | _____ |

**Statement of Ownership Interests:**

| Name | Percentage of Ownership/Nature of Interest |
|---|---|
| Haresh Patel | 100% |
| _____ | _____ |

**Franchisee's Principal(s)**
**(other than Controlling**
**Principals):** _____
_____

| **Franchise Type:** | ☒ New | ☐ Renewal | ☐ Transfer |
|---|---|---|---|

# TABLE OF CONTENTS

Page

ARTICLE I.  GRANT ............................................................................................................. 2
   1.1  Grant ........................................................................................................................ 2
   1.2  Location ................................................................................................................... 2
   1.3  Assigned Area .......................................................................................................... 2
   1.4  Variations ................................................................................................................. 3
ARTICLE II.  SITE SELECTION, PLANS AND CONSTRUCTION ................................. 3
   2.1  Franchisee's Responsibility .................................................................................... 3
   2.2  Site Selection. .......................................................................................................... 3
   2.3  Zoning and Permits .................................................................................................. 4
   2.4  Plans and Specifications .......................................................................................... 4
   2.5  Construction. ............................................................................................................ 5
   2.6  Opening .................................................................................................................... 5
ARTICLE III.  TERM AND RENEWAL ............................................................................. 6
   3.1  Initial Term .............................................................................................................. 6
   3.2  Renewal .................................................................................................................... 6
ARTICLE IV.  FEES .............................................................................................................. 7
   4.1  Franchise Fee ........................................................................................................... 7
   4.2  Royalty ..................................................................................................................... 7
   4.3  Gross Sales ............................................................................................................... 9
ARTICLE V.  FRANCHISOR'S OBLIGATIONS ................................................................ 9
   5.1  Franchisor Services .................................................................................................. 9
   5.2  Responsibilities of Area Representative ................................................................ 10
ARTICLE VI.  FRANCHISEE'S AGREEMENTS, REPRESENTATIONS, WARRANTIES AND
       COVENANTS ........................................................................................................... 10
   6.1  Optimum Sales ...................................................................................................... 10
   6.2  Entity Representations ........................................................................................... 11
   6.3  Operating Principal ................................................................................................ 13
   6.4  General Manager .................................................................................................... 14
   6.5  Training .................................................................................................................. 15
   6.6  Compliance with Laws .......................................................................................... 16
   6.7  Notification of Proceedings ................................................................................... 16
   6.8  Power-of-Attorney ................................................................................................. 16
ARTICLE VII.  FRANCHISE OPERATIONS ................................................................... 16
   7.1  Standards Compliance ........................................................................................... 16
   7.2  Maintenance of Restaurant .................................................................................... 17
   7.3  Upgrade of Restaurant ........................................................................................... 17
   7.4  Sourcing ................................................................................................................. 17
   7.5  Operational Requirements ..................................................................................... 18
   7.6  Computer Systems ................................................................................................. 19
   7.7  Internet and Website .............................................................................................. 20
   7.8  Recipes ................................................................................................................... 20
   7.9  Advertising Materials ............................................................................................ 20
   7.10  Complaints ........................................................................................................... 21
   7.11  Vehicles ............................................................................................................... 21
ARTICLE VIII.  ADVERTISING AND RELATED FEES ................................................ 21
   8.1  Advertising Programs ............................................................................................ 21
   8.2  Local Advertising .................................................................................................. 21
   8.3  Marketing Fund. .................................................................................................... 22

8.4 Advertising Cooperative. .............................................................................................23
8.5 Total Advertising Contribution .....................................................................................24
8.6 Yellow Pages .................................................................................................................24
8.7 Approval of Advertising ................................................................................................24
8.8 Prices   25
ARTICLE IX.  MARKS .............................................................................................................25
9.1 Grant   25
9.2 Acknowledgements .......................................................................................................25
9.3 Agreements ...................................................................................................................26
9.4 Infringement .................................................................................................................26
9.5 Nonexclusive License ...................................................................................................27
ARTICLE X.  CONFIDENTIALITY AND NONCOMPETITION COVENANTS .................27
10.1 Manuals ........................................................................................................................27
10.2 Confidential Information. .............................................................................................28
10.3 Noncompetition Covenants ..........................................................................................29
10.4 Injunctive Relief ..........................................................................................................31
ARTICLE XI.  BOOKS AND RECORDS .................................................................................32
11.1 Books and Records .......................................................................................................32
11.2 Reports .........................................................................................................................32
11.3 Review and Inspection .................................................................................................32
11.4 Mistakes .......................................................................................................................33
11.5 Release of Information ..................................................................................................33
11.6 Power-of-Attorney .......................................................................................................96
ARTICLE XII.  INSURANCE ....................................................................................................33
12.1 Insurance Policy ...........................................................................................................33
12.2 Coverage .......................................................................................................................33
12.3 Deductibles ...................................................................................................................34
12.4 Builder's Risk ...............................................................................................................34
12.5 No Limitation ...............................................................................................................34
12.6 Additional Insured ........................................................................................................34
12.7 Certificates of Insurance ..............................................................................................34
12.8 Failure to Maintain. ......................................................................................................34
ARTICLE XIII.  DEBTS AND TAXES .....................................................................................35
13.1 Payment ........................................................................................................................35
13.2 No Deduction ...............................................................................................................35
13.3 Dispute .........................................................................................................................35
ARTICLE XIV.  TRANSFER OF INTEREST ...........................................................................35
14.1 Transfer by Franchisor .................................................................................................35
14.2 Transfer by Franchisee .................................................................................................35
14.3 Transfer to Affiliate ......................................................................................................38
14.4 Right of First Refusal ....................................................................................................38
14.5 Death and Permanent Disability. ..................................................................................38
14.6 No Waiver .....................................................................................................................39
14.7 Public Offering .............................................................................................................39
14.8 Review of Offering Materials .......................................................................................39
14.9 Transfers by Franchisee's Principals ............................................................................40
ARTICLE XV.  RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION .................40
15.1 Relationship ..................................................................................................................40
15.2 Notice to Public ............................................................................................................40
15.3 No Authority .................................................................................................................40
15.4 Employment Policies ....................................................................................................40

15.5  Indemnification..................................................................................................41
ARTICLE XVI.  DEFAULT AND TERMINATION ......................................................41
16.1  Default and Automatic Termination ...............................................................41
16.2  Default with No or Limited Right to Cure ......................................................41
16.3  Default and Right to Cure ..............................................................................42
16.4  Additional Remedies.......................................................................................44
ARTICLE XVII.  POST-TERMINATION......................................................................44
17.1  Cease Operation ..............................................................................................44
17.2  Cease Use of Marks ........................................................................................44
17.3  Cancel Assumed Names ..................................................................................44
17.4  No Imitation ....................................................................................................45
17.5  Payment of Monetary Obligations ..................................................................45
17.6  Payment of Damages ......................................................................................45
17.7  Return of Manuals ..........................................................................................45
17.8  Confidentiality and Noncompetition ..............................................................45
17.9  Advertising Materials ......................................................................................45
17.10  Signs and Menu Boards .................................................................................46
17.11  Assignment of Leases ....................................................................................46
17.12  Right to Purchase...........................................................................................46
17.13  Closing of Purchase .......................................................................................47
17.14  Assignment of Options ..................................................................................47
17.15  Assignment of Telephone Numbers ...............................................................48
ARTICLE XVIII.  MISCELLANEOUS...........................................................................48
18.1  Notices .............................................................................................................48
18.2  Entire Agreement ............................................................................................48
18.3  Amendments ....................................................................................................49
18.4  No Waiver ........................................................................................................49
18.5  Approvals or Consents.....................................................................................49
18.6  No Warranties ..................................................................................................49
18.7  Force Majeure ..................................................................................................49
18.8  MEDIATION. ..................................................................................................50
18.9  ARBITRATION. ..............................................................................................50
18.10  GOVERNING LAW AND VENUE .............................................................52
18.11  MUTUAL BENEFIT .....................................................................................52
18.12  PERFORMANCE IN RIVERDALE, GEORGIA ........................................52
18.13  DISPUTE RESOLUTION PROGRAM ........................................................52
18.14  WAIVER OF CERTAIN DAMAGES ...........................................................53
18.15  Counterparts....................................................................................................53
18.16  Headings .........................................................................................................53
18.17  Survival...........................................................................................................53
18.18  Severability .....................................................................................................53
18.19  Construction....................................................................................................54
18.20  Remedies.........................................................................................................54
18.21  Franchisee's Principals and Controlling Principals .......................................54
18.22  Legal Entities .................................................................................................54
18.23  No Third-Party Beneficiaries .........................................................................54
18.24  Delegation by Franchisor...............................................................................54
ARTICLE XIX.  ACKNOWLEDGMENTS.....................................................................55
19.1  Independent Investigation ...............................................................................55
19.2  Review and Understanding..............................................................................55
19.3  Receipt of Documents......................................................................................55

ATTACHMENT A - CONTROLLING PRINCIPALS GUARANTY AND COVENANT

ATTACHMENT B - COLLATERAL ASSIGNMENT OF LEASE

ATTACHMENT C - CONFIDENTIALITY AGREEMENT AND ANCILLARY COVENANTS NOT TO COMPETE

ATTACHMENT D - LEASE ADDENDUM

## AMERICAN DELI INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "Agreement") is dated as of the date set forth on the cover page of this Agreement (the "Effective Date") by and between American Deli International, Inc., a Delaware corporation ("Franchisor"), and the person(s) or entity set forth as the Franchisee on the cover page of this Agreement ("Franchisee").

### WITNESSETH:

Franchisor, as the result of the expenditure of time, skill, effort and money, has developed and owns a unique and distinctive system ("System") relating to the establishment and operation of quick service restaurants ("Restaurants") that feature chicken wings, philly cheese steak and other sandwiches, other freshly prepared, grilled or fried items, beverage items and promotional items;

The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme, and furnishings; proprietary products and ingredients; proprietary recipes and special menu items; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

Franchisor identifies the System by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "American Deli" and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by Franchisor in writing) for use in connection with the System (hereinafter referred to as "Marks");

Franchisor continues to develop, use and control the use of such Marks to identify for the public the source of services and products marketed hereunder and under the System, and to represent the System's high standards of quality, appearance and service;

Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearance and service and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications; and

Franchisee desires to use the System in connection with the operation of a Restaurant at the location specified on the cover page of this Agreement, as well as to receive the training and other assistance provided by Franchisor in connection therewith.

NOW, THEREFORE, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

## ITEM 1  GRANT

1.1    Grant.  Franchisor hereby grants to Franchisee, upon the terms and conditions in this Agreement, the right and license, and Franchisee hereby accepts the right and obligation, to operate a Restaurant under the Marks and the System in accordance with this Agreement (the "franchised business").  Franchisee and the Controlling Principals (as defined in Section 18.21) have represented to Franchisor that they have entered this Agreement with the intention to comply fully with the obligations to construct a Restaurant hereunder and not for the purpose of reselling the rights to develop the Restaurant hereunder.  Franchisee and the Controlling Principals understand and acknowledge that Franchisor has granted such rights in reliance on the business skill, financial capacity, personal character of, and expectations of performance hereunder by Franchisee and the Controlling Principals and that this Agreement and the rights and obligations hereunder may not be transferred until after the Restaurant is open for business to the public and in accordance with Section 2.6.

1.2    Location.  The specific street address of the Restaurant location consented to by Franchisor shall be set forth on the cover page of this Agreement (the "Location").  If the Location has not been identified at the time this Agreement is executed, Franchisee must identify a site approved by Franchisor within the "Site Selection Area" set forth on the cover page to this Agreement.  The Site Selection Area shall not be exclusive to Franchisee for any purpose.  Franchisee shall not relocate the Restaurant without the prior written consent of Franchisor, which consent shall not unreasonably be withheld.  This Agreement does not grant to Franchisee the right or license to operate the Restaurant or to offer or sell any products or services described under this Agreement at or from any other location.  If Franchisee is unable to continue the operation of the Restaurant at the Location because of the occurrence of a force majeure event (as described in Section 16.2(e)), then Franchisee may request the consent of Franchisor to relocate the Restaurant to another location in the Assigned Area.  If Franchisor consents to Franchisee's request to relocate the Restaurant, then Franchisee shall comply with the site selection and construction procedures set forth in Article II.

1.3    Assigned Area.  After determination of the Location for the Restaurant, Franchisee will be assigned a primary area of operation ("Assigned Area") that will also be set forth on the cover page of this Agreement.  Franchisee shall make all commercially reasonable efforts to advertise and promote the franchised business in the Assigned Area in accordance with Article VIII.  Except as provided in this Agreement, and subject to Franchisee's and the Controlling Principals' full compliance with this Agreement, any other agreement among Franchisee or any of its affiliates (defined as any entity that is controlled by, controlling or under common control with such other entity) and Franchisor or any of its affiliates, neither Franchisor nor any affiliate shall establish or authorize any other person or entity, other than Franchisee, to establish a Restaurant in the Assigned Area during the term of this Agreement.  Franchisee acknowledges and understands that the rights granted hereunder pertain only to the establishment of a Restaurant.  Notwithstanding the above, Franchisor, any franchisee and any other authorized person or entity shall have the right, at any time, to advertise and promote the System, and fill customer orders by providing catering and delivery services in the Assigned Area.  Franchisee acknowledges and agrees that Franchisor operates Restaurants under the Marks, and further agrees and acknowledges that the license granted hereby is only for the operation of one Restaurant.  Accordingly, in the Assigned Area, Franchisor and its affiliates may also offer and sell (and may authorize others to offer and sell):  (i) collateral products under the Marks, at or

from any location, such as pre-packaged food products and memorabilia; (ii) food and beverage services under the Marks at or through any other distribution system or food service facility (other than a Restaurant); and (iii) any products or food and beverage services under any other names and marks.

1.4    Variations.    Franchisee acknowledges that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its sole discretion and as it may deem in the best interests of all concerned in any given circumstance, to vary standards for any System franchisee based upon the peculiarities of the particular site or circumstance, business potential, trade area, existing business practices or any other condition that Franchisor deems to be of importance to the successful operation of such franchisee's business.  Franchisee shall not be entitled to require Franchisor to disclose or grant to Franchisee a like or similar variation hereunder.

## ITEM 2  SITE SELECTION, PLANS AND CONSTRUCTION

2.1    Franchisee's Responsibility.    Franchisee assumes all cost, liability, expense and responsibility for locating, obtaining and developing a site for the Restaurant and for constructing and equipping the Restaurant at such site.  Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for the Restaurant unless the site is accepted as set forth below.  While Franchisor may render assistance to Franchisee in the selection of a site, Franchisee has sole responsibility for locating, selecting, procuring and developing a site for the Restaurant and Franchisee may and is encouraged to consult with real estate and other professionals of Franchisee's choosing in discharging such responsibility.    Franchisee acknowledges that Franchisor's consent to a prospective site is permission only, does not constitute a representation, promise, warranty or guarantee, express or implied, by Franchisor that the Restaurant operated at that site will be profitable or otherwise successful, and cannot create a liability for Franchisor.    Franchisee shall hold Franchisor harmless with respect to Franchisee's selection of the site for the Restaurant.

2.2    Site Selection.

(a)    Consent to Site.  Prior to acquiring by lease or purchase a site for the Restaurant, Franchisee shall locate a site for the Restaurant that satisfies the site selection guidelines provided to Franchisee by Franchisor pursuant to Section 5.1 and shall submit to Franchisor in the form specified by Franchisor a description of the site, including evidence satisfactory to Franchisor demonstrating that the site satisfies Franchisor's site selection guidelines, together with such other information and materials as Franchisor may reasonably require, including, but not limited to, a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the site.  Recognizing that time is of the essence, Franchisee shall submit such information and materials for the proposed site to Franchisor for its consent no later than one hundred eighty (180) days after the execution of this Agreement.  Franchisor shall have thirty (30) days after receipt of this information and materials to consent, in its sole discretion, to the proposed site as the location for the Restaurant.  No site may be used for the location of the Restaurant unless it is consented to in writing by Franchisor.

(b)     Acquisition of Site.   If Franchisee purchases the premises for the Restaurant, Franchisee shall submit a copy of the proposed contract of sale to Franchisor for its written consent prior to its execution and furnish to Franchisor a copy of the executed contract of sale within ten (10) days after execution.  If Franchisee occupies the premises of the Restaurant under a lease, Franchisee must incorporate the lease addendum terms required by Franchisor (as set forth in Attachment D to this Agreement) into such lease and shall submit a copy of the lease to Franchisor for written consent prior to its execution and furnish to Franchisor a copy of the executed lease within ten (10) days after execution.  No lease for the Restaurant premises shall be consented to by Franchisor unless a collateral assignment of lease, in substantially the form attached as Attachment B, is executed by Franchisee and delivered to Franchisor.  Franchisor shall have fifteen (15) days after receipt of the lease or the proposed contract of sale to consent to such documentation prior to its execution.  Within forty-five (45) days after Franchisor has consented to the site for the Restaurant (or such longer period as Franchisor consents to in writing), Franchisee shall acquire such site by purchase or lease.  Failure by Franchisee to acquire the site for the Restaurant within the time and in the manner required herein shall constitute a material event of default under this Agreement.

(c)     Description of Site.  After a location for the Restaurant is consented to by Franchisor and acquired by Franchisee pursuant to this Agreement, the location shall be forth on the cover page of this Agreement.

2.3     Zoning and Permits.  Franchisee shall be responsible for obtaining all zoning classifications and clearances that may be required by state or local laws, ordinances or regulations or that may be necessary as a result of any restrictive covenants relating to the Restaurant premises.  Prior to beginning the construction of the Restaurant, Franchisee shall (a) obtain all permits, licenses and certifications required for the lawful construction or remodeling and operation of the Restaurant, and (b) certify in writing to Franchisor that the insurance coverage specified in Article XII is in full force and effect and that all required approvals, clearances, permits and certifications have been obtained.  Upon request, Franchisee shall provide to Franchisor additional copies of Franchisee's insurance policies or certificates of insurance and copies of all such approvals, clearances, permits and certifications.

2.4     Plans and Specifications.  Franchisee must obtain any architectural, engineering and design services it deems necessary for the construction of the Restaurant at its own expense from an architectural design firm designated by Franchisor in the Operations Manual or otherwise.   Franchisee shall adapt the prototypical architectural and design plans and specifications for construction of the Restaurant provided to Franchisee by Franchisor in accordance with Section 5.1(c) as necessary for the construction of the Restaurant and shall submit such adapted plans to Franchisor or its designated representative for review.   If Franchisor or its representative determines, in its sole discretion, that any such plans are not consistent with the best interests of the System, Franchisor may prohibit the implementation of such plans, and in this event will notify Franchisee of any objection(s) within thirty (30) days of receiving such plans.  If Franchisor or its representative fails to notify Franchisee of an objection to the plans within this time period, Franchisee may use such plans.  If Franchisor or its representative objects to any such plans, Franchisor or its representative shall provide Franchisee with a reasonably detailed list of changes necessary to make the plans acceptable.  Within twenty (20) days of receiving such objections, Franchisee shall incorporate the requested changes into such plans and resubmit them to Franchisor or its representative for review.  Franchisor or its

representative shall notify Franchisee within fifteen (15) days of receiving the resubmitted plans whether the plans are acceptable. If Franchisor or its representative fails to notify Franchisee of any objection within such time period, Franchisee may use the resubmitted plans. Franchisee acknowledges that Franchisor's or its representative's review of such plans relates only to compliance with the System and that acceptance by Franchisor of such plans does not constitute a representation, warranty, or guarantee, express or implied, by Franchisor or its representative that such plans are accurate or free of error concerning their design or structural application.

2.5   Construction.   Franchisee must use Franchisor's designated contractor for the construction of the Restaurant as set forth in the Operations Manual or otherwise. Franchisee's construction of the Restaurant is its own expense. If Franchisee does not use Franchisor's designated contractor, then Franchisee must pay a construction visit fee of $500 per visit by Franchisor, or by Franchisor's representative, plus all costs of travel, wages, lodging and expenses.

(a)   Commencement.   Franchisee shall not commence construction or remodeling of the Restaurant until Franchisor has consented to the use of plans in accordance with Section 2.4. Upon Franchisor's consent to the use of the plans, Franchisee, through Franchisor's designate contractor, shall commence and diligently pursue construction or remodeling (as applicable) of the Restaurant. Commencement of construction shall be defined as the time at which any site work is initiated by or on behalf of Franchisee at the location accepted for the Restaurant. Site work includes, without limitation, paving of parking areas, installing outdoor lighting and sidewalks, extending utilities, demising of interior walls and demolishing of any existing premises.

(b)   Reports and Inspections.   During the time of construction or remodeling, Franchisee shall provide Franchisor or its designated representative with such periodic reports regarding the progress of the construction or remodeling as may be reasonably requested by Franchisor or its representative. In addition, Franchisor or its representative shall make such on-site inspections as it may deem reasonably necessary to evaluate such progress. Franchisee shall notify Franchisor of the scheduled date for completion of construction or remodeling no later than thirty (30) days prior to such date. Within a reasonable time after the date of completion of construction or remodeling, Franchisor or its representative may, at its option, conduct an inspection of the completed Restaurant. Any such inspections shall be at no cost to Franchisee, except as otherwise expressly provided herein.

(c)   Authorization to Open.   Franchisee acknowledges and agrees that it will not open the Restaurant for business without the written authorization of Franchisor and that authorization to open shall be conditioned upon Franchisee's strict compliance with this Agreement.

2.6   Opening.   Franchisee acknowledges that time is of the essence. Subject to Franchisee's compliance with the conditions stated below, Franchisee shall open the Restaurant and commence business within ninety (90) days after Franchisee has obtained possession of the Location, unless Franchisee obtains an extension of such time period from Franchisor in writing. The date the Restaurant opens for business to the public as provided herein ("Opening Date") shall be set forth on the cover page of this Agreement. Prior to opening, Franchisee shall complete all exterior and interior preparations for the Restaurant, including installation of

equipment, fixtures, furnishings and signs, in accordance with the plans and specifications consented to by Franchisor, and shall comply with all other pre-opening obligations of Franchisee, including, but not limited to, those obligations described in Article VI, to Franchisor's satisfaction. If Franchisee fails to comply with any of such obligations, Franchisor shall have the right to prohibit Franchisee from commencing business. Franchisee's failure to open the Restaurant and commence business in accordance with the foregoing shall be deemed a material event of default under this Agreement.

## ITEM 3  TERM AND RENEWAL

3.1     Initial Term.  Unless sooner terminated as provided in Article XVI, the term of this Agreement shall begin on the Effective Date and shall expire on the earlier of (a) ten (10) years from the Opening Date or (b) the expiration or termination of Franchisee's right to possess the Restaurant premises.

3.2     Renewal.  Franchisee may, at its option, renew the rights under this Agreement for additional two consecutive terms of five (5) years each, subject to any or all of the following conditions that must, in Franchisor's discretion, be met prior to and at the time of renewal:

(a)     Notice.  Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than three (3) months nor more than six (6) months prior to the end of the initial term or first renewal term, as applicable;

(b)     Improvements.     Franchisee shall refurbish, repair or replace, at Franchisee's cost and expense, all equipment, point of sale systems, computer systems, signs, interior and exterior decor items, fixtures, furnishings, menu boards, catering or delivery vehicles, if applicable, supplies and other products and materials required for the operation of the Restaurant as Franchisor may reasonably require and shall otherwise upgrade the Restaurant to reflect the then-current standards and image of the System;

(c)     No Defaults.  Franchisee shall not be in default of any provision of this Agreement, or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates; and Franchisee shall have substantially and timely complied with all the terms and conditions of such agreements during the terms thereof;

(d)     Monetary Obligations.  Franchisee shall have timely satisfied all monetary obligations owed to Franchisor and its affiliates under this Agreement and any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates;

(e)     Possession of Premises.  Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the Restaurant premises or obtain Franchisor's consent to a new site for the operation of the Restaurant for the duration of the renewal term of this Agreement;

(f)     Renewal Franchise Agreement.  Franchisee and/or Controlling Principals, as applicable, shall execute Franchisor's then-current form of renewal franchise agreement, including attachments, which agreement shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty fee; however, same shall not increase over the prior royalty fee by

more than five (5%) percent, advertising contribution or expenditure requirement; provided, however, that Franchisee shall pay to Franchisor, in lieu of an initial franchise fee, a renewal fee representing fifty percent (50%) of Franchisor's then-current initial franchise fee, or $10,000.00, whichever is less;

(g)   Release.  Franchisee and the Controlling Principals shall execute a general release of any and all claims against Franchisor and its affiliates, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or under federal, state or local laws, rules, regulations or orders; and

(h)   Qualification and Training.  Franchisee shall comply with Franchisor's then-current qualification and training requirements.

## ITEM 4 FEES

4.1   Franchise Fee.  Franchisee shall pay to Franchisor an initial franchise fee in the amount set forth on the cover page of this Agreement upon execution of this Agreement.  The amount of the initial franchise fee when so paid shall be deemed fully earned and nonrefundable in consideration of the administrative and other expenses incurred by Franchisor in granting the franchise hereunder and for its lost or deferred opportunity to grant such franchise to any other party.

4.2   Royalty.

(a)   Royalty Fee.  Franchisee shall pay to Franchisor, in partial consideration for the rights herein granted, a continuing royalty fee of three percent (3%) of Gross Sales.  Such royalty fee shall be due and payable on the 25th of each month (or next business day if the 25th of the month is not a business day) based on the Gross Sales for the preceding month so that it is received by Franchisor by electronic fund transfer ("EFT").  A business day for the purpose of this Agreement means any day other than Saturday, Sunday or a national holiday. Each calendar month is referred to herein as an "Accounting Period."

(b)   Royalty Report.  Each such royalty fee payment shall be preceded by a royalty report itemizing the Gross Sales for the preceding Accounting Period ("Royalty Report") and any other reports required hereunder. Franchisee shall provide Franchisor with such Royalty Report by the 20th of each month (or next business day if the 20th of the month is not a business day) by email or by facsimile transmission or such other method of delivery as Franchisor may reasonably direct.

(c)   Electronic Funds Transfer.  Franchisee agrees that Franchisor shall have the right to withdraw funds from Franchisee's designated bank account each Accounting Period by EFT in the amount of the royalty fee described above.  Such withdrawals shall be drawn on the 25th of each month for the amount of the royalty due with respect to Franchisee's Gross Sales for the preceding Accounting Period, as evidenced by the Royalty Report.  If the Royalty Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the royalty for the subject Accounting Period based on (i) information regarding Franchisee's Gross Sales for the preceding Accounting Period obtained by Franchisor

in the manner contemplated by Section 7.6, or (ii) the most recent Royalty Report provided to Franchisor by Franchisee; provided that if a Royalty Report for the subject Accounting Period is subsequently received and reflects (A) that the actual amount of the royalty due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (B) that the actual amount of the royalty due was less than the amount of the EFT by Franchisor, then Franchisor shall, at its option, return the excess amount to Franchisee or credit the excess amount to the payment of Franchisee's future royalty obligations.  Upon execution of this Agreement and at any time thereafter at Franchisor's request, Franchisee shall execute such documents or forms as Franchisor deems necessary for Franchisor to process EFTs from Franchisee's designated bank account for the payments due hereunder.  Should any EFT not be honored by Franchisee's bank for any reason, Franchisee shall be responsible for that payment plus a service charge applied by Franchisor and the bank, if any.  Franchisee shall at all times maintain in the designated bank account funds sufficient to pay all royalty and required Fund contributions when due.  If royalty payments are not received when due, interest may be charged by Franchisor in accordance with Section 4.2(d).  Upon written notice to Franchisee, Franchisee may be required to pay such royalty fees directly to Franchisor in lieu of EFT at Franchisor's sole discretion.

(d)     Interest.  Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder.  Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue.  Time is of the essence with respect to all payments to be made by Franchisee to Franchisor.  All unpaid obligations under this Agreement shall bear interest from the date due until paid at the lesser of (i) eighteen percent (18%) per annum; or (ii) the maximum rate allowed by applicable law.  Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall require the payment or permit the collection of interest in excess of the maximum rate allowed by applicable law.  If any excess of interest is provided for herein, or shall be adjudicated to be so provided in this Agreement, the provisions of this paragraph shall govern and prevail, and neither Franchisee nor its Principals shall be obligated to pay the excess amount of such interest.  If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder then such excess shall be repaid to the party that paid such interest.

(e)     Late Fee.  If the payments or reports are not received by Franchisor as required by this Section, Franchisee shall pay to Franchisor, in addition to the overdue amount, a fee of fifty dollars ($50) per day for each day that the royalty is unpaid or the report is not received.  This fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay royalties and/or submit reports in accordance with the terms of this Agreement.  If for any reason the fee of fifty dollars ($50) is deemed to be interest charged, required or permitted, in excess of the maximum rate allowed by applicable law, any such excess shall be applied as a payment and reduction of any other amounts that may be due and owing hereunder, and if no such amounts are due and owing hereunder, then such excess shall be repaid to the party that paid such amount.

4.3     Gross Sales.  For the purposes of this Agreement, "Gross Sales" shall mean the total selling price of all services and products and all income of every other kind and nature related to the Restaurant (including, without limitation, income related to catering and delivery activities, and any sales or orders of food products or food preparation services provided from or related to the Restaurant), whether for cash or credit and regardless of collection in the case of credit.  In the event of a cash shortage, the amount of Gross Sales shall be determined based on the records of the point of sale system and any cash shortage shall not be considered in the determination.  Gross Sales shall expressly exclude the following:

        (a)     Sums representing sales taxes collected directly from customers, based upon present or future laws of federal, state or local governments, collected by Franchisee in the operation of the Restaurant, and any other tax, excise or duty that is levied or assessed against Franchisee by any federal, state, municipal or local authority, based on sales of specific merchandise sold at or from the Restaurant, provided that such taxes are actually transmitted to the appropriate taxing authority;

        (b)     Proceeds from isolated sales of trade fixtures not constituting any part of Franchisee's products and services offered for resale at the Restaurant nor having any material effect upon the ongoing operation of the Restaurant required under this Agreement; and

        (c)     Other items authorized by Franchisor in writing to be excluded from Gross Sales.  Any such authorization may be revoked or withdrawn at any time in writing by Franchisor in its discretion.

## ITEM 5  FRANCHISOR'S OBLIGATIONS

5.1     Franchisor Services.  Franchisor and/or its designated representative will provide the services described below with regard to the Restaurant:

        (a)     Site Selection Guidelines.  Written site selection guidelines and such site selection assistance as Franchisor may deem advisable.

        (b)     On-Site Evaluation.  At Franchisor's discretion, such on-site evaluation as Franchisor may deem necessary on its own initiative or in response to Franchisee's reasonable request for site evaluation; provided, however, that Franchisor shall not provide an on-site evaluation for any proposed site prior to the receipt of all required information and materials concerning such site prepared pursuant to Article II. If on-site evaluations are deemed appropriate by Franchisor, or upon Franchisee's reasonable request, Franchisor reserves the right to charge a reasonable fee for performing each such evaluation and a fee representing the reasonable expenses incurred by Franchisor (or its designee) in connection with such on-site evaluation, including, without limitation, the cost of travel, lodging, meals and wages.

        (c)     Plans and Specifications.  On loan, a set of prototypical architectural and design plans and specifications for a Restaurant.  Franchisee shall independently, and at Franchisee's expense, have such architectural and design plans and specifications adapted for construction of the Restaurant in accordance with Article II.

(d)   Manuals.  On loan, one (1) set of Confidential Operations Manuals and such other manuals and written materials as Franchisor shall have developed for use in the franchised business (as the same may be revised by Franchisor from time to time, the "Manuals"), as more fully described in Section 10.1.

(e)   Visits.  Visits to the Restaurant and evaluations of the products sold and services rendered therein from time to time as reasonably determined by Franchisor, as more fully described in Section 7.5(g).

(f)   Advertising Materials.  Samples or camera ready artwork of certain advertising and promotional materials and information developed by Franchisor from time to time for use by Franchisee in marketing and conducting local advertising for the Restaurant.

(g)   Operating Techniques.   Advice and written materials concerning techniques of managing and operating the Restaurant from time to time developed by Franchisor, including new developments and improvements in Restaurant equipment and food products and the packaging and preparation thereof.

(h)   Merchandise.  From time to time and at Franchisor's discretion, at a reasonable cost make available for resale to Franchisee's customers, certain merchandise identifying the System, such as pre-packaged food products and memorabilia, in sufficient amounts to meet customer demand.  Similarly, Franchisor may make available from time to time certain Restaurant equipment and decor items at a reasonable cost.

(i)   List of Suppliers.  A list of approved suppliers as described in Section 7.4 from time to time as Franchisor deems appropriate.

(j)   Training.   An initial training program for Franchisee's Operating Principal, General Manager and other Restaurant personnel and other training programs in accordance with the provisions of Section 6.5.

(k)   Marketing Fund.  Administration of a marketing fund and/or, if and when established, advertising cooperatives in accordance with Article VIII.

5.2   Responsibilities of Area Representative.  Franchisor reserves the right to retain the services of an area representative ("Area Representative") in the geographic area in which Franchisee's Restaurant is or will be located.  In such event, the Area Representative, on behalf of Franchisor, will perform certain sales, site assistance, training, and/or supervisory services directed by Franchisor.  Franchisee hereby agrees to any such delegation and assignment by Franchisor of any portion or all of Franchisor's obligations and rights under this Agreement.  Franchisee also acknowledges and agrees that it is not a third party beneficiary of any Area Representative Agreement or other agreement between Franchisor and any Area Representative.

## ITEM 6  FRANCHISEE'S AGREEMENTS, REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1   Optimum Sales.  Each of Franchisee and the Controlling Principals covenants and agrees that it shall make all commercially reasonable efforts to operate the Restaurant so as to achieve optimum sales.

6.2     Entity Representations.  If Franchisee is a corporation, partnership, limited liability company, or other legal entity, Franchisee and the Controlling Principals represent, warrant and covenant that:

(a)     Due Formation.  Franchisee is duly organized and validly existing under the state law of its formation;

(b)     Qualification.  Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(c)     Single Purpose.  Franchisee's organizational documents shall at all times provide that the activities of Franchisee are confined exclusively to the operation of the Restaurant, unless otherwise consented to in writing by Franchisor;

(d)     Power and Authority.  The execution of this Agreement and the consummation of the transactions contemplated hereby are within Franchisee's power and have been duly authorized by Franchisee;

(e)     Organizational Documents.  Copies of Franchisee's organizational documents, other governing documents, resolutions or consents of the governing board authorizing entry into and performance of this Agreement, and any certificates, buy-sell agreements or other documents restricting the sale or transfer of equity interests in Franchisee, and any other documents as may be reasonably required by Franchisor shall be furnished to Franchisor prior to the execution of this Agreement;

(f)     Ownership Interests.  The ownership interests in Franchisee are accurately and completely described on the cover page of this Agreement.  Franchisee shall immediately provide a copy of the updated list of all owners to Franchisor upon the occurrence of any change of ownership and otherwise make its list of owners available to Franchisor upon request;

(g)     Restriction on Transfer.  If Franchisee is a corporation, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate representing stock of the corporation shall have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section shall not apply to the transfer of equity securities of a publicly-held corporation.  For purposes of this Agreement, a publicly-held corporation is a corporation registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15(d) of such Act.  If Franchisee is a partnership or limited liability company, its written partnership or limited liability company agreement shall provide that ownership of an interest in such entity is held subject to all restrictions imposed upon assignments by this Agreement;

11

(h)     Financial Statements.  Franchisee and, at Franchisor's request, each of the Controlling Principals, have provided Franchisor with the most recent financial statements of Franchisee and such Controlling Principals.  Such financial statements present fairly the financial position of Franchisee and each of the Controlling Principals, as applicable, at the dates indicated therein and with respect to Franchisee, the results of its operations and its cash flow for the years then ended.  Franchisee shall maintain at all times sufficient working capital to fulfill its obligations under this Agreement.  Each of the financial statements mentioned above shall be certified as true, complete and correct and shall have been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the applicable notes, applied on a consistent basis.  No material liabilities, adverse claims, commitments or obligations of any nature exist as of the date of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise, that are not reflected as liabilities on the financial statements of Franchisee or the Controlling Principals;

(i)     Franchisee's Principals.  If, after the execution of this Agreement, any person ceases to qualify as one of Franchisee's Principals (as defined in Section 18.21) or if any individual succeeds to or otherwise comes to occupy a position that would, upon designation by Franchisor, qualify him as one of Franchisee's Principals, Franchisee shall notify Franchisor within ten (10) days after any such change and, upon designation of such person by Franchisor as one of Franchisee's Principals or as a Controlling Principal, as the case may be, such person shall execute such documents and instruments (including, as applicable, this Agreement) as may be required by Franchisor to be executed by others in such positions;

(j)     Execution of Documents.  Franchisee's Principals shall each execute and bind themselves to the confidentiality and noncompetition covenants set forth in the Confidentiality Agreement and Ancillary Covenants Not to Compete in the form of Attachment C to this Agreement (see Sections 10.2(b) and 10.3(g).  The Controlling Principals shall, jointly and severally, guarantee Franchisee's performance of all of Franchisee's obligations, covenants and agreements hereunder, and shall otherwise bind themselves to the terms of this Agreement as stated herein, pursuant to the terms and conditions of the Controlling Principals Guaranty and Covenant in the form of Attachment A to this Agreement, and shall otherwise bind themselves to the terms of this Agreement as stated herein and in the Controlling Principals Guaranty and Covenant; and

(k)     Continuing Obligations.  Franchisee and the Controlling Principals acknowledge and agree that the representations, warranties and covenants set forth in this Section are continuing obligations of Franchisee and the Controlling Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement.  Franchisee and the Controlling Principals shall cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

6.3     Operating Principal.

(a)     Designation.  Upon the execution of this Agreement, Franchisee shall designate and retain an individual to serve as the Operating Principal of the Restaurant (the "Operating Principal").  If Franchisee is an individual, Franchisee shall be the Operating Principal.

(b)     Guaranty.  The Operating Principal shall execute the Controlling Principals Guaranty and Covenant in the form of Attachment A to this Agreement as one of the Controlling Principals, and shall be individually, jointly and severally, bound by all obligations of Franchisee, the Operating Principal and the Controlling Principals hereunder and under the Controlling Principals Guaranty and Covenant.

(c)     General Manager.  The Operating Principal must, at its option, either serve as the General Manager (as defined in Section 6.4) or, subject to the approval of Franchisor, designate another individual to serve as the General Manager; which designated individual shall also perform the duties and obligations of Operating Principal described herein; provided that Operating Principal shall take all necessary action to ensure that such designee conducts and fulfills all of Operating Principal's obligations in accordance with the terms of this Agreement and Operating Principal shall remain fully responsible for such performance.

(d)     Qualifications.  The Operating Principal shall, during the entire period he serves as Operating Principal, meet the following qualifications:

(i)     The Operating Principal must maintain a direct or indirect ownership interest in Franchisee.  Except as may otherwise be provided in this Agreement, the Operating Principal's interest in Franchisee shall be and shall remain free of any pledge, mortgage, hypothecation, lien, charge, encumbrance, voting agreement, proxy, security interest or purchase right or options.

(ii)     The Operating Principal (and any such designee) shall meet Franchisor's standards and criteria for such individual, as set forth in the Manuals or otherwise in writing by Franchisor, and shall be an individual otherwise acceptable to Franchisor in its sole discretion.

(iii)     The Operating Principal (or his designee, if applicable) shall devote substantial full time and best efforts to the supervision and conduct of the franchised business, and may not engage in any other business activity without the Franchisor's consent.

(iv)     The Operating Principal (or his designee, if applicable) shall satisfy the training requirements set forth in Section 6.5.

(e)     Replacement.  If the Operating Principal or any designee is not able to continue to serve in the capacity of Operating Principal or no longer qualifies to act as such in accordance with this Section, Franchisee shall promptly notify Franchisor and designate a replacement within thirty (30) days after the Operating Principal or such designee ceases to serve or be so qualified, such replacement being subject to the same qualifications and restrictions listed above.  Franchisee shall provide for interim management of the activities contemplated under this Agreement until such replacement is so designated, such interim management to be conducted in accordance with this Agreement.  Any failure to comply with the requirements of this Section shall be deemed a material event of default under this Agreement.

6.4     General Manager.

(a)     Designation.  Franchisee shall designate and retain at all times a general manager ("General Manager") to direct the operation and management of the Restaurant. Franchisee shall designate its General Manager prior to attending the initial training program. The General Manager shall be responsible for the daily operation of the Restaurant.  The General Manager may be one of the Controlling Principals.

(b)     Qualifications.  The General Manager shall, during the entire period he serves as General Manager, meet the following qualifications:

(i)     The General Manager shall meet Franchisor's standards and criteria for such individual, as set forth in the Manuals or otherwise in writing by Franchisor, and shall be an individual otherwise acceptable to Franchisor in its sole discretion.

(ii)     The General Manager shall devote full time and best efforts to the supervision and management of the Restaurant, and may not engage in any other business activity without the Franchisor's consent.

(iii)     The General Manager shall satisfy the training requirements set forth in Section 6.5.

(c)     Replacement.  If the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section, Franchisee shall promptly notify Franchisor and designate a replacement within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above (including completing all training and obtaining all certifications required by Franchisor).  Franchisee shall provide for interim management of the Restaurant until such replacement is so designated, such interim management to be conducted in accordance with the terms of this Agreement.  Any failure to comply with the requirements of this Section shall be deemed a material event of default under this Agreement.  If Franchisee fails to have a replacement General Manager satisfactorily complete Franchisor's training or certified as meeting such requirements, in lieu of termination, Franchisor may charge Franchisee an additional support fee until such General Manager is properly trained or certified in accordance with Franchisor's requirements.  Such support fee shall be in the amount of one hundred dollars ($100) per week, and shall be withdrawn from Franchisee's designated bank account in accordance with Section 4.2(c) at the same time Franchisor withdraws the royalty fee.

6.5     Training.  Franchisee agrees that it is necessary to the continued operation of the System and the Restaurant that Franchisee's Operating Principal and General Manager receive such training as Franchisor may require, and accordingly agrees as follows:

(a)     Initial Training.   Not later than thirty (30) days prior to the date the Restaurant commences operations, Franchisee's Operating Principal and General Manager shall attend and complete, to Franchisor's satisfaction, Franchisor's initial training program.  Training of such persons shall be conducted by Franchisor or its designee at a Franchisor-operated Restaurant or such other location designated by Franchisor, if the Restaurant is the first Restaurant developed by Franchisee.  Franchisor shall provide instructors and training materials for the initial training of the initial Operating Principal and General Manager at no charge to Franchisee; provided that Franchisor shall have the right to charge a reasonable fee for such training of any additional managers or Restaurant personnel.

(b)     Replacement Training.  Franchisor shall determine, in its sole discretion, whether the Operating Principal and General Manager have satisfactorily completed initial training.  If the initial training program is not satisfactorily completed by the Operating Principal or General Manager, or if Franchisor in its reasonable business judgment based upon the performance of the Operating Principal or General Manager, determines that the training program cannot be satisfactorily completed by any such person, Franchisee shall designate a replacement to satisfactorily complete such training.   Any Operating Principal or General Manager subsequently designated by Franchisee shall also receive and complete such initial training.  Franchisor reserves the right to charge a reasonable fee for any initial training provided by Franchisor to any initial General Manager or any other Restaurant personnel for any Restaurant subsequently developed by Franchisee and otherwise for any initial training provided to a replacement or successor General Manager, if Franchisee is not approved by Franchisor to provide such training.  Franchisee shall be responsible for any and all expenses incurred by Franchisee or Franchisee's Operating Principal, General Manager and other Restaurant personnel in connection with any initial training program, including, without limitation, costs of travel, lodging, meals and wages.

(c)     Additional Training.  Franchisee's Operating Principal, General Manager and such other Restaurant personnel as Franchisor shall designate shall attend such additional training programs as Franchisor may offer from time to time, if Franchisor requires such attendance.  For all such programs, Franchisor will provide the instructors and training materials.  However, Franchisor reserves the right to impose a reasonable fee for such additional training programs that are not mandatory.  Franchisee shall be responsible for any and all expenses incurred by Franchisee or its Operating Principal, General Manager and other Restaurant personnel in connection with such additional training, including, without limitation, costs of travel, lodging, meals, and wages.

(d)   On-Site Remedial Training.  Upon the reasonable request of Franchisee or as Franchisor shall deem appropriate, Franchisor shall, during the term hereof, subject to the availability of personnel, provide Franchisee with additional trained representatives who shall provide on-site remedial training and assistance to Franchisee's Restaurant personnel.   For additional training and assistance requested by Franchisee, Franchisee shall pay the per diem fee then being charged to franchisees under the System for the services of such trained representatives, plus their costs of travel, lodging, meals, and wages.  The per diem fee will not be charged if such assistance is provided based on Franchisor's determination that such training and assistance is necessary; however, Franchisor reserves the right to charge for its reasonable expenses incurred in connection with such training and assistance.

(e)   Annual Meetings and Conference Calls.  Franchisee's Operating Principal must attend, at Franchisee's expense, all annual and other meetings and conference calls of franchisees that Franchisor determines are mandatory for all franchisees, or groups of franchisees as designated by Franchisor, such as franchisees within a particular geographic region. Franchisor reserves the right to impose a reasonable fee for such meetings.  Franchisor may impose a charge for Franchisee's Operating Principal's failure to attend such meetings and conference calls.

6.6    Compliance with Laws.  Franchisee shall comply with all federal, state and local laws, rules and regulations and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the franchised business, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, fire clearances, health permits, certificates of occupancy and any permits, certificates or licenses required by any environmental law, rule or regulation.

6.7    Notification of Proceedings.  Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit or proceeding and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the franchised business.

6.8    Power-of-Attorney.

(a)   Telephone and Internet.  Upon the execution of this Agreement and at any time thereafter upon Franchisor's request, Franchisee shall execute such forms and documents as Franchisor deems necessary to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor upon the termination or expiration of this Agreement, as required under Section 17.15, all rights to the telephone numbers of the Restaurant and all related Yellow Pages, White Pages and other business listings, and all Internet listings, domain names, Internet accounts, advertising on the Internet or World Wide Web, websites, listings with search engines, electronic mail addresses or any other similar listing or usages related to the Franchised Business.

## ITEM 7 FRANCHISE OPERATIONS

7.1    Standards Compliance.  Franchisee understands the importance of maintaining uniformity among all of the Restaurants and the importance of complying with all of

16

Franchisor's standards and specifications relating to the operation of the Restaurant.  To protect the reputation and goodwill of Franchisor and to maintain the high standards of operation under the Marks, Franchisee shall conduct its business in accordance with the Manuals, other written directives which Franchisor may issue to Franchisee from time to time, and any other manuals and materials created or approved for use in the operation of Restaurants.

(a)     Franchisee shall pay to Franchisor the sum of $100 per day for each day Franchisee remains noncompliant after (i) Franchisor's written notice of non-compliance with the operational or system standards of the Restaurant and (ii) the expiration of a reasonable cure period.  The non-compliance fee shall be in addition to all other remedies permitted Franchisor under this Agreement.

7.2     Maintenance of Restaurant.  Franchisee shall maintain the Restaurant in a high degree of sanitation, repair and condition, and shall make such additions, alterations, repairs and replacements as may be required for that purpose, including, without limitation, such periodic repainting or replacement of signs, furnishings, decor, and equipment (including, but not limited to, point of sale systems and computer systems) as Franchisor may reasonably direct.  Franchisee shall also obtain, at Franchisee's cost and expense, any new or additional equipment, fixtures, supplies and other products and materials that Franchisor may reasonably require for Franchisee to offer and sell new menu items from the Restaurant or to provide the Restaurant services by alternative means.  Except as may be expressly provided in the Manuals, no alterations or improvements or changes of any kind in design, equipment, signs, interior or exterior decor items, fixtures or furnishings shall be made in or about the Restaurant or its premises without Franchisor's prior written approval.

7.3     Upgrade of Restaurant.  Upon Franchisor's request, Franchisee shall make such improvements to the Restaurant to conform it to Franchisor's then-current standards and specifications.   Without limitation of the foregoing, Franchisee shall make any capital improvements required by this Section if requested by Franchisor on or after the fifth anniversary of the Opening Date, or at such other time that a majority of the Restaurants then operated by Franchisor or its affiliates have made or are utilizing best efforts to make such improvements or modifications.

7.4     Sourcing.  Franchisee shall comply with all of Franchisor's standards and specifications relating to the purchase of all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including point of sale systems and computer systems) and other products used or offered for sale at the Restaurant.  Except as provided in Sections 7.8 and 7.9 with respect to certain materials bearing the Marks and proprietary products, and Section 7.11 with respect to vehicles used in the operation of the Restaurant, Franchisee shall obtain such items from suppliers (including manufacturers, distributors and other sources) who continue to demonstrate the ability to meet Franchisor's then-current standards and specifications for food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment and other items used or offered for sale at Restaurants and who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier; and who have not thereafter been disapproved by Franchisor.  If Franchisee desires to purchase, lease or use any products or other items from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval, or shall request the supplier itself to do

17

so. Franchisee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing if reasonable evidence exists of a violation of this provision. A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier if the results confirm a violation hereof. Franchisor reserves the right, at its option, to re-inspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier.

7.5     Operational Requirements. Franchisee shall operate the Restaurant in strict conformity with Franchisor's methods, standards and specifications as set forth in the Manuals and as from time to time otherwise prescribed in writing. Without limitation of the foregoing, Franchisee agrees:

(a)     Distribution Method. To sell or offer for sale all menu items, products and services required by Franchisor and in the method, manner and style of distribution prescribed by Franchisor, including, but not limited to, dining-in, carry-out, catering or delivery services, only as expressly authorized by Franchisor in writing in the Manuals or otherwise. Franchisee agrees to comply with the terms of any such distribution program and in connection therewith to execute such documents or instruments that Franchisor may deem necessary to such program.

(b)     Menu Items. To sell and offer for sale only the menu items, products and services that have been expressly approved for sale in writing by Franchisor; to discontinue selling and offering for sale any menu items, products or services and any method, manner or style of distribution that Franchisor may, in its sole discretion, disapprove in writing at any time; and to refrain from deviating from Franchisor's standards and specifications.

(c)     Inventory. To maintain in sufficient supply and to use and sell at all times only such food and beverage items, ingredients, products, materials, supplies and paper goods that conform to Franchisor's standards and specifications; to prepare all menu items in accordance with the recipes and procedures for preparation contained in the Manuals or other written directives, including, but not limited to, using the brand and/or type of ingredients required by Franchisor and the prescribed measurements of ingredients; and to refrain from deviating from Franchisor's standards and specifications by the use or offer of non-conforming items or differing amounts of any items.

(d)     Testing. To permit Franchisor or its agents, at any reasonable time, to remove samples of food or non-food items from the Restaurant, without payment therefor, in amounts reasonably necessary for testing by Franchisor or an independent laboratory to determine whether such samples meet Franchisor's then-current standards and specifications. In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing if the supplier of the item has not previously been approved by Franchisor or if the sample fails to conform with Franchisor's specifications.

(e)     Gift Certificates.  To participate in any gift certificate or card program established by Franchisor, Franchisee shall purchase and maintain a minimum inventory of gift certificates or cards, shall offer such gift certificates or cards for sale and shall honor any such gift certificates or cards presented at the Restaurant for the purchase of food or beverage items. Franchisee may not create or issue its own gift certificates or cards and shall only sell gift certificates or cards approved by Franchisor.

(f)     Equipment.  To purchase or lease and install, at Franchisee's expense, all fixtures, furnishings, equipment (including point of sale systems and computer systems), decor items, digital menu board, signs, and related items as Franchisor may reasonably direct from time to time in the Manuals or otherwise in writing; and to refrain from installing or permitting to be installed on or about the Restaurant premises, any fixtures, furnishings, equipment, decor items, signs, games, vending machines or other items not previously approved as meeting Franchisor's standards and specifications.

(g)     Inspections.  To grant Franchisor and its agents the right to enter upon the Restaurant premises and, in Franchisor's discretion, to examine any motor vehicle used in connection with Restaurant operations at any time for the purpose of conducting inspections; to cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, to take such steps as may be necessary to correct immediately any deficiencies detected during an inspection.  Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, any obligation to do so) to correct such deficiencies and charge Franchisee a reasonable fee for Franchisor's expenses in so taking the corrective action (including, without limitation, any necessary re-inspection).  Any such fee is payable by Franchisee immediately upon demand.

(h)     Staff.  To maintain a competent, conscientious, trained staff and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe.

7.6     Computer Systems.  Franchisee shall install and maintain the point of sale systems, digital menu boards and computer hardware and software (including, without limitation, point of sale software) Franchisor requires for the operation of the Restaurant and shall follow the procedures related thereto that Franchisor specifies in the Manuals or otherwise in writing. Among other things, Franchisor may require that Franchisee install and maintain systems that permit Franchisor or its representatives to access and retrieve electronically any information stored in Franchisee's point of sale, digital menu boards and computer systems, including, without limitation, information concerning Restaurant Gross Sales, at the times and in the manner that Franchisor may specify from time to time.  Upon Franchisor's request, Franchisee shall execute such documents as Franchisor deems necessary to permit Franchisor or its representative to access and retrieve electronically all information stored on any point of sale system or computer system used in connection with the Restaurant. Franchisor also may require Franchisee to enter into software license agreements in the form that Franchisor requires for software Franchisor develops or acquires for use in the System.  All information contained in and collected by any such computer program shall be the sole and exclusive property of Franchisor.

7.7     Internet and Website. Franchisee shall have and maintain adequate hardware and software in order to access the Internet at the bit speed required by Franchisor from time to time. Franchisee shall maintain an electronic mail account with an Internet service provider acceptable to Franchisor. Franchisee shall read the electronic mail for the franchised business on a daily basis and shall accept and acknowledge receipt of all electronic mail sent by Franchisor. Franchisee shall not establish any website or other listing on the Internet except as provided herein.

(a)     Franchisor has established an Internet Website that provides information about the System and the products and services offered by Restaurants. Franchisor has sole discretion and control over the Website (including timing, design, contents and continuation). Franchisor may use part of the Fund monies it collects under this Agreement to pay or reimburse the costs associated with the development, maintenance and update of the Website.

(b)     Franchisor may (but is not required to) include at the Website an interior page containing information about Franchisee's Restaurant. If Franchisor includes such information on the Website, Franchisor may require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

(c)     Franchisor has established an Intranet through which Franchisor and its franchisees can communicate by electronic mail or similar electronic means. Franchisee shall use the facilities of the Intranet in strict compliance with the standards, protocols and restrictions that Franchisor includes in the Manual (including, without limitation, standards, protocols and restrictions relating to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements). The amount of the Intranet access fee may be modified from time to time to reflect Franchisee's prorata share of any increased cost in maintaining the Intranet with the Intranet provider. Franchisee shall be provided with at least thirty (30) days prior written notice of any change in such fee.

7.8     Recipes. Franchisor has and may continue to develop for use in the System certain products that are prepared from Franchisor proprietary recipes and that bear the Marks. Because of the importance of quality and uniformity of production and the significance of such products in the System, it is to the mutual benefit of the parties that Franchisor closely controls the production and distribution of such products. Accordingly, Franchisee agrees that with respect to such products, whether or not such products are proprietary, Franchisee shall use only products manufactured by or on behalf of Franchisor, and shall purchase solely from Franchisor or from a source designated by Franchisor or, with respect to products manufactured by or on behalf of Franchisor, from a seller of such products, all of Franchisee's requirements for such products. Franchisee further agrees to purchase from Franchisor or from a source designated by Franchisor for resale to Franchisee's customers certain merchandise identifying the System as Franchisor shall require, such as pre-packaged food products and memorabilia and promotional products, in amounts sufficient to satisfy Franchisee's customer demand.

7.9     Advertising Materials. Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the franchised business), and other items that may be designated by Franchisor to bear the Marks in the form, color, location and manner prescribed by Franchisor.

7.10    Complaints.   Franchisee shall process and handle all consumer complaints connected with or relating to the Restaurant, and shall promptly notify Franchisor by telephone and in writing of all:   (a) food related illnesses, (b) safety or health violations, (c) claims exceeding One Thousand Dollars ($1,000.00), and (d) any other material claims against or losses suffered by Franchisee.   Franchisee shall maintain any communications with governmental authorities affecting the Restaurant during the term of this Agreement and for one (1) year after the expiration or earlier termination hereof.

7.11    Vehicles.   Any vehicle used by Franchisee in connection with the operation of the Restaurant shall meet Franchisor's image and other standards.   Franchisee shall place such signs and decor items on the vehicle as Franchisor requires and shall at all times keep such vehicle clean and in good working order.   Franchisee shall not permit anyone to operate a vehicle used in connection with the Restaurant who is under the age of eighteen (18) years or who does not possess a valid driver's license under the laws of the state in which the Restaurant is located. Franchisee shall require each such person who operated a vehicle used in connection with Restaurant operations to comply with all laws, regulations and rules of the road and to use due care and caution in the operation and maintenance of motor vehicles.   Except as noted above, Franchisor does not set forth any standards or exercise control over any motor vehicle utilized by Franchisee.

## ITEM 8  ADVERTISING AND RELATED FEES

Recognizing the value of advertising and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

8.1    Advertising Programs.   Franchisor may from time to time develop and administer advertising and sales promotion programs designed to promote and enhance the collective success of all Restaurants operating under the System.   Franchisee shall participate in all such advertising and sales promotion programs in accordance with the terms and conditions established by Franchisor for each program.   In all aspects of these programs, including, without limitation, the type, quantity, timing, placement and choice of media, market areas and advertising agencies, the standards and specifications established by Franchisor shall be final and binding upon Franchisee.

8.2    Local Advertising.   In addition to the ongoing advertising contributions set forth herein and, subject to any allocation of Franchisee's expenditures for local advertising to the Cooperative as described in Section 8.4, or Fund as described in Section 8.3, if requested by Franchisor, Franchisee shall spend, annually throughout the term of this Agreement, not less than one percent (1%) of the Gross Sales of the Restaurant on advertising for the Restaurant in its Assigned Area ("Local Advertising").   Franchisee shall submit to Franchisor annually an advertising expenditure report accurately reflecting such expenditures for the preceding period on or before the 1st day of February following the end of each calendar year.   If that day is not a business day, then such report shall be due on the next business day.   In addition to the restrictions set forth below, costs and expenditures incurred by Franchisee in connection with any of the following shall not be included in Franchisee's expenditures on Local Advertising for purposes of this Section, unless approved in advance by Franchisor in writing:

(a)     Incentive programs for employees or agents of Franchisee, including the cost of honoring any coupons distributed in connection with such programs;

(b)     Research expenditures;

(c)     Salaries and expenses of any employees of Franchisee, including salaries or expenses for attendance at advertising meetings or activities;

(d)     Charitable, political or other contributions or donations;

(e)     In-store materials consisting of fixtures or equipment; and

(f)     Seminar and educational costs and expenses of employees of Franchisee.

8.3     Marketing Fund.

(a)     Establishment.  Franchisor has established a marketing fund (the "Fund") on behalf of the System for advertising and marketing.  Franchisor will, from time to time, designate a percentage of the Gross Sales of the Restaurant to be contributed to the Fund and Franchisee agrees to contribute that amount at the same time and in the same manner as the corresponding royalty fee is paid; provided that Franchisee will not be required to contribute to the Fund more than two percent (2%) of the Gross Sales of the Restaurant.  Franchisor may require Franchisee to allocate to the Fund, all or any portion of Franchisee's required contributions to a Cooperative as described in Section 8.4 or expenditures for Local Advertising as described in Section 8.2.  In reviewing and establishing or modifying the marketing fee, Franchisor shall consider the level of advertising and marketing expenditures by Restaurants operated by Franchisor and by competitors of the System, media costs, available marketing resources, population changes, changes in market conditions, the degree of market penetration of the System, and such other factors as Franchisor deems relevant to the operation of the Fund. Franchisee shall be provided with thirty (30) days prior written notice of any such change in the marketing fee.

(b)     Administration.  Franchisor or its designee will administer the Fund as follows:

(i)     Franchisor shall direct all advertising and marketing programs and shall have sole discretion to approve or disapprove the creative concepts, materials and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Marks and enhance the collective success of all Restaurants operating under the System.

(ii)     Franchisor shall, with respect to Restaurants operated by Franchisor, contribute to the Fund generally on the same basis as Franchisee.

(iii)     Franchisor may use the Fund to satisfy any and all costs of developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, promotional and public relations materials, programs, campaigns, sales and marketing seminars and training programs of every kind

and nature, through media now existing or hereafter developed (including, without limitation, the cost of preparing and conducting television, radio, magazine, newspaper and electronic advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; conducting marketing research, employing advertising agencies to assist therein; developing and maintaining an Internet website; and personnel and other departmental costs for advertising that Franchisor internally administers or prepares).

(iv)   The Fund will be operated solely as a conduit for collecting and expending the advertising contributions for the System. The Fund will not be used to defray any of Franchisor's general operating expenses, except for reasonable administrative costs and overhead that Franchisor may incur in activities related to the administration and direction of the Fund, generally not to exceed 20% per year. The Fund and its earnings shall not otherwise inure to Franchisor's benefit.

(v)   Franchisor will prepare an annual statement of the Fund's operations and will make it available to Franchisee upon request. In administering the Fund, Franchisor undertakes no obligation to make expenditures for Franchisee that are equivalent or proportionate to Franchisee's contribution or to ensure that any particular franchisee benefits directly or pro rata from the production or placement of advertising.

(vi)   Although the Fund is intended to be of perpetual duration, Franchisor may terminate it. Franchisor will not terminate the Fund, however, until all monies in the Fund have been spent for advertising or promotional purposes or returned to contributors, without interest, on the basis of their respective contributions.

8.4   Advertising Cooperative.

(a)   Establishment. Franchisee agrees that Franchisor shall have the right, in its sole discretion, to designate any geographic area in which two (2) or more Restaurants are located as a region for purposes of establishing an advertising cooperative ("Cooperative"). The members of the Cooperative for any area shall, at a minimum, consist of all Restaurants located in such area. Each Cooperative shall be organized and governed in a form and manner, and shall commence operation on a date, determined in advance by Franchisor in its sole discretion. Each Cooperative shall be organized for the exclusive purposes of administering advertising programs and developing, subject to Franchisor's approval pursuant to Section 8.7, promotional materials for use by the members in Local Advertising. If at the time of the execution of this Agreement a Cooperative has been established for a geographic area that encompasses the Restaurant, or if any such Cooperative is established during the term of this Agreement, Franchisee shall execute such documents as are required by Franchisor immediately upon the request of Franchisor and shall become a member of the Cooperative pursuant to the terms of those documents.

(b)   Participation. Franchisee shall participate in the Cooperative as follows:

(i)   Subject to any allocation of Franchisee's contribution to a Cooperative to the Fund as described in Section 8.3, Franchisee shall contribute to the Cooperative such amounts required by the documents governing the Cooperative; provided, however, Franchisee will not be required to contribute more than one percent

(1%) of Franchisee's Gross Sales during each Accounting Period to the Cooperative unless, subject to Franchisor's approval, the members of the Cooperative agree to the payment of a larger fee. Notwithstanding the above, the payment of any such Cooperative fee shall be applied toward satisfaction of the Franchisee's Local Advertising requirement set forth in Section 8.2;

        (ii)    Franchisee shall submit to the Cooperative and to Franchisor such statements and reports as may be required by Franchisor or by the Cooperative. All contributions to the Cooperative shall be maintained and administered in accordance with the documents governing the Cooperative. The Cooperative shall be operated solely as a conduit for the collection and expenditure of the Cooperative fees for the purposes outlined above; and

        (iii)    No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without the prior consent of Franchisor or its representative. All such plans and materials shall be submitted to Franchisor in accordance with the procedure set forth in Section 8.7.

    8.5    <u>Total Advertising Contribution</u>. Regardless of whether Franchisor establishes a Fund under Section 8.3 applicable to the Restaurant, or a Cooperative is established under Section 8.4 applicable to the Restaurant, the total required advertising contributions or payments by Franchisee under this Article (i) to a Fund, (ii) to a Cooperative, and (iii) for Local Advertising, shall not exceed two percent (2%) of Franchisee's Gross Sales.

    8.6    <u>Yellow Pages</u>. Franchisee shall also place and pay the cost of a Yellow Pages trademark or other business listings in the local market area. Any amount paid by Franchisee for such Yellow Pages trademark or other business listings may not be applied by Franchisee toward satisfaction of its Local Advertising requirement.

    8.7    <u>Approval of Advertising</u>. All advertising and promotion by Franchisee in any medium shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals or otherwise. Franchisee shall submit to Franchisor for its approval samples of all advertising and promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic or computerized form, or in any form of media now or hereafter developed (e.g., materials to be made available through a computer or telecommunications network such as the Internet), that have not been either provided or previously approved by Franchisor. Franchisor shall approve or disapprove such plans and materials within fifteen (15) business days of Franchisor's receipt thereof. Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor, and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor. Franchisee shall not advertise or use the Franchisor's Marks in any fashion on the Internet, World Wide Web or via other means of advertising through telecommunication, or establish any website listing on the Internet or World Wide Web, without the express written consent of Franchisor. Any advertising, marketing or sales concepts, programs or materials proposed or developed by Franchisee for the Restaurant and approved by Franchisor may be used by other System Restaurants without any compensation to Franchisee.

8.8     Prices.  With respect to the offer and sale of all menu and beverage items, Franchisor may from time to time offer guidance with respect to the selling price for such goods, products and services. Franchisee is in no way bound to adhere to any such recommended or suggested price.  Franchisee shall have the right to sell its products and provide services at any price that Franchisee may determine. If Franchisee elects to sell any or all its products or merchandise at any price recommended by Franchisor, Franchisee acknowledges that Franchisor has made no guarantee or warranty that offering such products or merchandise at the recommended price will enhance Franchisee's sales or profits.

8.9     Volume Rebates.  If Franchisor receives any cash rebates, volume discounts, concessions, advertising allowances, or discount bonuses (collectively "Discounts"), whether by way of cash, kind or credit, from any manufacturer or supplier designated by Franchisor, whether or not on account of purchases made (i) by Franchisor for its own account or for Franchisee's account, or franchisees generally, or (ii) by Franchisee directly for its own account, Franchisor shall be entitled to retain the whole of the amount or any part of such Discounts.

## ITEM 9  MARKS

9.1     Grant.  Franchisor grants Franchisee the right to use the Marks during the term of this Agreement in accordance with the System and related standards and specifications.

9.2     Acknowledgements.  Franchisee expressly understands and acknowledges that:

(a)     Ownership.  American Deli Plus, Inc. an affiliate of the Franchisor, is the record owner of the Mark "American Deli", and the Franchisor is licensed to the Marks, American Deli.  As between Franchisor and Franchisee, Franchisor is the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them.

(b)     No Interference.  Neither Franchisee nor any Controlling Principal shall take any action that would prejudice or interfere with the validity of Franchisor's rights with respect to the Marks.  Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Marks or any of Franchisor's service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the System in accordance with the terms and conditions of this Agreement for the operation of the Restaurant and only at or from its Location or in approved advertising related to the Restaurant.

(c)     Goodwill.  Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Marks and the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Marks.

(d)     Validity.  Franchisee shall not contest the validity of or Franchisor's interest in the Marks or assist others to contest the validity of or Franchisor's interest in the Marks.

(e)    Infringement.  Franchisee acknowledges that any unauthorized use of the Marks shall constitute an infringement of Franchisor's rights in the Marks and a material event of default hereunder.  Franchisee shall provide Franchisor with all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Marks.

(f)    Substitution.  Franchisor reserves the right to substitute different Marks for use in identifying the System and the Restaurant if the current Marks no longer can be used by Franchisor, or if Franchisor, in its sole discretion, determines that substitution of different Marks will be beneficial to the System.  In such event, Franchisor may require Franchisee, at Franchisee's expense, to discontinue or modify Franchisee's use of any of the Marks or to use one or more additional or substitute Marks.

9.3    Agreements.  With respect to Franchisee's franchised use of the Marks pursuant to this Agreement, Franchisee further agrees that:

(a)    Exact Use.  Unless otherwise authorized or required by Franchisor, Franchisee shall advertise the Restaurant only under the Mark "American Deli," without prefix or suffix.  Franchisee shall not use the Marks as part of its corporate or other legal name, and shall obtain the Franchisor's approval of such corporate or other legal name prior to filing it with the applicable state authority.

(b)    Identification.  Franchisee shall identify itself as the owner of the Restaurant in conjunction with any use of the Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Restaurant or any catering or delivery vehicle as Franchisor may designate in writing.

(c)    Debt.  Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

(d)    Trade Names.  Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

9.4    Infringement.  Franchisee shall notify Franchisor immediately by telephone and thereafter in writing of any apparent infringement of or challenge to Franchisee's use of any Mark, of any claim by any person of any rights in any Mark, and Franchisee and the Controlling Principals shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim.  Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or Patent and Trademark Office or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Mark.  Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of

Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any other person or entity in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Marks. .

9.5    Nonexclusive License.  The right and license of the Marks granted hereunder to Franchisee is nonexclusive and Franchisor thus has and retains the following rights, among others, subject only to the limitations of Article I:

(a)    Other Licenses.  To grant other licenses for use of the Marks, in addition to those licenses already granted to existing franchisees;

(b)    Other Systems.  To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to Franchisee; and

(c)    Production and Distribution.  To engage, directly or indirectly, through its employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (1) the production, distribution, license and sale of products and services, and (2) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

## ITEM 10  CONFIDENTIALITY AND NONCOMPETITION COVENANTS

10.1    Manuals.

(a)    Restaurant.  Franchisor has provided to Franchisee on loan a current copy of the Manuals. The Manuals may be in hard copy or they may be made available to Franchisee in digital, electronic or computerized form or in some other form now existing or hereafter developed that would allow Franchisee to view the contents thereof.  If the Manuals (or any changes thereto) are provided in a form other than paper copy, Franchisee shall pay any and all costs to retrieve, review, use or access the Manuals.  To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals as they may from time to time be modified by Franchisor, other written directives that Franchisor may issue to Franchisee from time to time whether or not such directives are included in the Manuals, and any other manuals and materials created or approved for use in the operation of the franchised business.

(b)    Confidential.  Franchisee and the Controlling Principals shall at all times treat the Manuals, any written directives of Franchisor, and any other manuals and materials, and the information contained therein, as confidential and shall maintain such information as trade secret and confidential in accordance with this Article.  Franchisee and the Controlling Principals shall divulge and make such materials available only to such of Franchisee's employees as must have access to it in order to operate the Restaurant.  Franchisee and the Controlling Principals shall not at any time copy, duplicate, record or otherwise reproduce these materials, in whole or in part, or otherwise make the same available to any person other than those authorized above.

(c)     Property of Franchisor.  The Manuals, written directives, other manuals and materials and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor.  Franchisee shall maintain the Manuals at all times in a safe and secure location, shall take all reasonable measures to prevent unauthorized access thereto, whether any attempted unauthorized access takes the form of physical access or access via computer or telecommunications networks or otherwise and shall report the theft or loss of the Manuals, or any portion thereof, immediately to Franchisor.  At a minimum, Franchisee shall, in the case of computer and telecommunications networks, use the latest available firewall and similar technology to prevent unauthorized access.  Franchisee shall return the Manuals to Franchisor immediately upon request or upon termination or expiration of this Agreement.

(d)     Supplement to Agreement.  The Manuals, any written directives, and any other manuals and materials issued by Franchisor and any modifications to such materials shall supplement this Agreement.

(e)     Revisions.  Franchisor may from time to time revise the contents of the Manuals and other manuals and materials created or approved for use in the operation of the franchised business.  Franchisee expressly agrees to comply with each new or changed standard.  Franchisee shall at all times ensure that the Manuals are kept current and up to date.  In the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's corporate office shall control.  Franchisee shall remove and return to Franchisor all pages of the Manual that have been replaced or updated by Franchisor.

(f)     Replacement Fee.  Franchisor will charge a replacement fee of One Thousand Dollars ($1,000) for any replacement Manual requested by Franchisee.

10.2    Confidential Information.

(a)     Confidential.  Neither Franchisee nor any Controlling Principal shall, during the term of this Agreement and thereafter, communicate or divulge to, or use for the benefit of, any other person or entity, and, following the expiration or termination of this Agreement, they shall not use for their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the franchised business that may be communicated to them or of which they may be apprised in connection with the operation of the Restaurant under the terms of this Agreement ("Confidential Information").  Franchisee and the Controlling Principals shall divulge such Confidential Information only to Franchisee's employees who must have access to it in order to operate the Restaurant.  Any and all information, knowledge, know-how, techniques and any materials used in or related to the System that Franchisor provides to Franchisee in connection with this Agreement shall be deemed Confidential Information for purposes of this Agreement.  Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce such Confidential Information, in whole or in part, nor otherwise make the same available to any unauthorized person.  The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

28

(b)   Covenants.  Franchisee shall require and obtain the execution of covenants similar to those set forth in Section 10.2(a) from its General Manager and all other personnel of Franchisee who have received or will have access to Confidential Information.  Such covenants shall be substantially in the form set forth in Attachment C.  All of Franchisee's Principals not required to sign this Agreement as a Controlling Principal also must execute such covenants.

(c)   New Concepts.  If Franchisee or the Controlling Principals develop any new concept, process, product, recipe, or improvement in the operation or promotion of the Restaurant, Franchisee is required to promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation.  Franchisee and the Controlling Principals acknowledge that any such concept, process product, recipe, or improvement will become the property of Franchisor, and Franchisor may use or disclose such information to other franchisees or developers as it determines to be appropriate.

10.3   Noncompetition Covenants.

(a)   In-Term Covenants.   Franchisee and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Franchisee and the Controlling Principals will receive valuable training, trade secrets and Confidential Information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the System that are beyond the present skills and experience of Franchisee and the Controlling Principals and Franchisee's managers and employees.   Franchisee and the Controlling Principals acknowledge that such specialized training, trade secrets and Confidential Information provide a competitive advantage and will be valuable to them in the development and operation of the Restaurant, and that gaining access to such specialized training, trade secrets and Confidential Information is, therefore, a primary reason why they are entering into this Agreement.  In consideration for such specialized training, trade secrets, Confidential Information and rights, Franchisee and the Controlling Principals covenant that with respect to Franchisee, during the term of this Agreement (or with respect to each of the Controlling Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of "Controlling Principals" as described in Section 18.21), except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person or entity:

(i)   Divert, or attempt to divert, any business or customer of the franchised business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(ii)   Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in a legal entity), advise, assist or make loans to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Marks or operates or licenses others to operate a business under the same or similar Marks, which business is of a character and concept similar to the Restaurant, including a business that offers and sells as a menu item any one or more of chicken wings or philly cheese steak sandwiches; provided,

however, that this Section 10.3(a)(ii) shall not apply to any Krispy Krunchy Chicken restaurant ("KKC Restaurant") owned or operated by Franchisee or any of the Controlling Principals as of the date hereof and as specified on Schedule A attached hereto ("Existing KKC Restaurants").  During the term of this Agreement, if any of Franchisee or the Controlling Principals elects to own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in a legal entity), advise, assist or make loans to, any new KKC restaurant in addition to the Existing KKC Restaurants ("New KKC Restaurant"), each of Franchisee and the Controlling Principals covenants that any such New KKC Restaurant shall not be located within a 3 mile radius of any of the location of any Restaurant then in existence or under construction.

      (b)   <u>Post-Term Covenants</u>.  In consideration for the specialized training, trade secrets, Confidential Information and rights described in Section 10.3(a), Franchisee and Controlling Principals covenant that with respect to Franchisee, and for a continuous uninterrupted period commencing upon the expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement (or, with respect to each of the Controlling Principals, commencing upon the earlier of: (1) the expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement or (2) the time such individual or entity ceases to satisfy the definition of "Controlling Principals" as described in Section 18.21) and continuing for three years thereafter, except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, directly or indirectly, for themselves, or through, on behalf of or in conjunction with any person or entity:

      (i)   Divert, or attempt to divert, any business or customer of the franchised business hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

      (ii)   Employ, or seek to employ, any person who is at that time or was within the preceding ninety (90) days employed by Franchisor, any of its affiliates or by any other franchisee or developer of Franchisor, or otherwise directly or indirectly induce such person to leave that person's employment, except as may be permitted under any existing development agreement or franchise agreement between Franchisor and Franchisee.

      (iii)   Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in a legal entity), advise, assist or make loans to, any business that is of a character and concept similar to the Restaurant, including a business that offers and sells as a menu item any one or more of chicken wings or philly cheese steak sandwiches and salads, which business is, or is intended to be, located within the Assigned Area or within a twenty-five (25)-mile radius (or in the case of a KKC Restaurant, a three (3)-mile radius) of the location of any Restaurant in existence or under construction as of the date (as applicable) of expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement or the time such individual or entity ceases to satisfy the definition of Controlling Principals; provided, however, that this Section 10.3(b)(iii) shall not apply to any KKC Restaurant owned or operated by Franchisee or any of the Controlling Principals in strict compliance with Section 10.3(a)(ii) above as of the date (as applicable) of expiration or termination of, or transfer

of all of Franchisee's interest in, this Agreement or the time such individual or entity ceases to satisfy the definition of Controlling Principals.

(c)    <u>Public Company</u>.   Section 10.3(a)(ii) and (b)(iii) shall not apply to ownership of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly-held corporation.

(d)    <u>Reasonableness</u>.   The parties acknowledge and agree that each of the covenants contained in this Section are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.   The parties agree that each of these covenants shall be construed as independent of any other covenant or provision of this Agreement.   If all or any portion of a covenant in this Section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee and the Controlling Principals expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

(e)    <u>Reduction of Scope</u>.   Franchisee and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without their consent, effective immediately upon notice to Franchisee; and Franchisee and the Controlling Principals agree that they shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 18.3.

(f)    <u>No Defense</u>.   Franchisee and the Controlling Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.

(g)    <u>Covenants of Managers and Franchisee's Principals</u>.   Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon the termination of a person's employment with Franchisee) from its General Manager and all other management level personnel of Franchisee who have received or will have access to training from Franchisor.   Such covenants shall be substantially in the form set forth in <u>Attachment C</u>.   All of Franchisee's Principals not required to sign this Agreement as a Controlling Principal also must execute such covenants.   Notwithstanding the foregoing, Franchisor reserves the right, in its sole discretion, to decrease the period of time or geographic scope of the noncompetition covenant set forth in <u>Attachment C</u> or eliminate such noncompetition covenant altogether for any party that is required to execute such agreement under this Section.

10.4    <u>Injunctive Relief</u>.   Failure to comply with the requirements of this Article shall constitute a material event of default under this Agreement.   Franchisee and the Controlling Principals acknowledge that a violation of the terms of this Article would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee and the Controlling Principals accordingly consent to the issuance of an injunction prohibiting any

conduct by Franchisee or the Controlling Principals in violation of the terms of this Article. Franchisee and the Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in connection with the enforcement of this Article, including payment of all costs and expenses for obtaining specific performance of, or an injunction against violation of, the requirements of this Article.

## ITEM 11  BOOKS AND RECORDS

11.1    Books and Records.  Franchisee shall maintain during the term of this Agreement, and shall preserve for at least five (5) years from the dates of their preparation, full, complete and accurate books, records and accounts, including, but not limited to, sales slips, coupons, purchase orders, payroll records, check stubs, bank statements, sales tax records and returns, cash receipts and disbursements, journals and ledgers, records of EFT transactions, and backup or archived records of information maintained on any computer system in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manual or otherwise in writing.

11.2    Reports.  In addition to the remittance reports required by Articles IV and VIII, Franchisee shall comply with the following reporting obligations:

(a)    Monthly Statements.  Franchisee shall, at Franchisee's expense, submit to Franchisor, in the form prescribed by Franchisor, profit and loss statement for each of the Accounting Periods designated by Franchisor (the "Statement Period") (which may be unaudited) for Franchisee within fifteen (15) days after the end of each Statement Period during the term hereof.  Each such statement shall be signed by Franchisee's treasurer or chief financial officer or comparable officer attesting that it is true, complete and correct;

(b)    Annual Statements.  Franchisee shall, at its expense, provide to Franchisor a complete annual financial statement (which may be unaudited) for Franchisee prepared by the entity hired by Franchisee for such purposes  within ninety (90) days after the end of each fiscal year of Franchisee during the term hereof, showing the results of operations of Franchisee during such fiscal year; Franchisor reserves the right to require the financial statements described above to be audited by an independent Certified Public Accountant; and

(c)    Additional Reports.  Franchisee shall also submit to Franchisor, for review or auditing, such other forms, reports, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in writing.

11.3    Review and Inspection.  Franchisor or its designees shall have the right at all reasonable times to review, audit, examine and copy any or all of the books and records of Franchisee as Franchisor may require at the Restaurant.  Franchisee shall make such books and records available to Franchisor or its designees immediately upon request.  If any required royalty payments to Franchisor are delinquent, or if an inspection should reveal that such payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount overdue or understated upon demand with interest determined in accordance with the provisions of Section 4.2(d).  If an inspection discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition, reimburse Franchisor for

all costs and expenses connected with the inspection (including, without limitation, reasonable accounting and attorneys' fees). These remedies shall be in addition to any other remedies Franchisor may have at law or in equity.

11.4   Mistakes. Franchisee understands and agrees that the receipt or acceptance by Franchisor of any of the statements furnished or royalties paid to Franchisor (or the cashing of any royalty checks or processing of any electronic fund transfers) shall not preclude Franchisor from questioning the correctness thereof at any time and, if any inconsistencies or mistakes are discovered in such statements or payments within two (2) years of the date of such inconsistencies or mistakes, they shall immediately be rectified by the Franchisee and the appropriate payment shall be made by the Franchisee.

11.5   Release of Information. Franchisee hereby authorizes (and agrees to execute any other documents deemed necessary to effect such authorization) all banks, financial institutions, businesses, suppliers, manufacturers, contractors, vendors and other persons or entities with which Franchisee does business to disclose to Franchisor any requested financial information in their possession relating to Franchisee or the Restaurant. Franchisee authorizes Franchisor to disclose data from Franchisee's reports, if Franchisor determines, in its sole discretion, that such disclosure is necessary or advisable, which disclosure may include disclosure to prospective or existing franchisees or other third parties.

## ITEM 12 INSURANCE

12.1   Insurance Policy. Franchisee shall procure, upon execution of this Agreement, and shall maintain in full force and effect at all times at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor and its affiliates, successors and assigns, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Restaurant.

12.2   Coverage. Such policy or policies shall be written by a responsible carrier or carriers reasonably acceptable to Franchisor and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified by Franchisor from time to time), in accordance with standards and specifications set forth in writing, the following:

(a)   Comprehensive General Liability Insurance, including broad form contractual liability, broad form property damage, personal injury, advertising injury, completed operations, products liability and fire damage coverage, in the amount equal to the greater of (i) One Million Dollars ($1,000,000) combined single limit or (ii) such amount as required under the lease.

(b)   "All Risks" coverage for the full cost of replacement of the Restaurant premises and all other property in which Franchisor may have an interest with no coinsurance clause for the premises.

(c)   Automobile liability coverage, including coverage of owned, non-owned and hired vehicles, with coverage in amounts not less than One Million Dollars ($1,000,000) combined single limit.

(d)     Worker's compensation insurance in statutory amounts on all employees of Franchisee and employer's liability insurance in amounts not less than One Million Dollars ($1,000,000) per accident/disease or in such amounts as required by applicable law.

(e)     Such other insurance as may be required by the state or locality in which the Restaurant is located and operated.

12.3     <u>Deductibles</u>.  Franchisee may, with the prior written consent of Franchisor, elect to have reasonable deductibles in connection with the coverage required under this Section. Such policies shall also include a waiver of subrogation in favor of Franchisor, its affiliates and the respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them.

12.4     <u>Builder's Risk</u>.  In connection with any construction, renovation, refurbishment or remodeling of the Restaurant, Franchisee shall maintain Builder's Risks/Installation insurance in forms and amounts, and written by a carrier or carriers, reasonably satisfactory to Franchisor.

12.5     <u>No Limitation</u>.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance that may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Article XV.

12.6     <u>Additional Insured</u>.  All required insurance policies shall name Franchisor and its affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, as additional insureds, and shall include a waiver of subrogation in favor of the additional insureds.  All such insurance policies shall provide that any interest of the additional insureds therein shall not be affected by any breach by Franchisee of any policy provisions.  All public liability and property damage policies shall contain a provision that the additional insureds, although named as insureds, shall nevertheless be entitled to recover under such policies on any loss occasioned to them by reason of the negligence of Franchisee or its servants, agents or employees.

12.7     <u>Certificates of Insurance</u>.  Upon execution of this Agreement, and thereafter in accordance with Article II and thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor Certificates of Insurance evidencing the existence and continuation of proper coverage with limits not less than those required hereunder.  In addition, if requested by Franchisor, Franchisee shall deliver to Franchisor a copy of the insurance policy or policies required hereunder.  Further, all insurance policies required hereunder shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Franchisor in the event of a material alteration to or cancellation of the policies.

12.8     <u>Failure to Maintain</u>.  Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in writing, Franchisor shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice.  The foregoing remedies shall be in addition to any other remedies Franchisor may have at law or in equity.

## ITEM 13  DEBTS AND TAXES

13.1     Payment.  Franchisee shall promptly pay when due all Taxes (as defined below), levied or assessed, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the franchised business under this Agreement.  Without limiting the provisions of Article XV, Franchisee shall be solely liable for the payment of all Taxes and shall indemnify Franchisor for the full amount of all such Taxes and for any liability (including penalties, interest and expenses) arising from or concerning the payment of Taxes, whether Taxes were correctly or legally asserted or not.  Franchisee shall submit a copy of all tax filings sent to federal, state and local tax authorities to Franchisor within ten (10) business days after such filing has been made with the appropriate taxing authority.

13.2     No Deduction.  Each payment to be made to Franchisor hereunder shall be made free and clear and without deduction for any Taxes.  The term "Taxes" means any present or future taxes, levies, imposts, duties or other charges of whatsoever nature, including any interest or penalties thereon, imposed by any government or political subdivision of such government on or relating to the operation of the franchised business, the payment of monies, or the exercise of rights granted pursuant to this Agreement, except Taxes imposed on or measured by Franchisor's net income.

13.3     Dispute.  In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law. However, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant or attachment by a creditor, to occur against the premises of the franchised business or any improvements thereon.

## ITEM 14  TRANSFER OF INTEREST

14.1     Transfer by Franchisor.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity without Franchisee's consent.  Specifically, and without limitation to the foregoing, Franchisee agrees that Franchisor may sell its assets, and may sell or license the Marks or the System to a third party; may offer its securities privately or publicly; may merge, acquire other corporations or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages against Franchisor arising from or related to the transfer of the Marks (or any variation thereof) or the System from Franchisor to any other party.  Nothing contained in this Agreement shall require Franchisor to offer any services or products, whether or not bearing the Marks, to Franchisee, if Franchisor assigns its rights in this Agreement.

14.2     Transfer by Franchisee.

(a)     Consent of Franchisor.   Franchisee and the Controlling Principals understand and acknowledge that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted rights under this Agreement in reliance on the business skill, financial capacity and personal character of Franchisee and the Controlling

Principals and with the expectation that the duties and obligations contained in this Agreement will be performed by Franchisee and those Controlling Principals signing this Agreement. Accordingly, neither Franchisee nor any Controlling Principal, nor any successor or assign of Franchisee or any Controlling Principal, shall sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in this Agreement, in the Restaurant or in Franchisee without the prior written consent of Franchisor, which consent shall not unreasonably be withheld. Any purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement shall be null and void and shall constitute a material event of default under this Agreement.

(b)    Conditions.  If Franchisee wishes to transfer all or part of its interest in the Restaurant or this Agreement or if a Controlling Principal wishes to transfer any ownership interest in Franchisee, transferor and the proposed transferee shall apply to Franchisor for its consent.  Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee, in the Restaurant or in this Agreement.  Franchisor may, however, in its sole discretion, require any or all of the following as conditions of its consent to any such transfer:

(i)    Monetary Obligations.  All of the accrued monetary obligations of Franchisee and its affiliates and all other outstanding obligations to Franchisor and its affiliates arising under this Agreement or any other agreement shall have been satisfied in a timely manner and Franchisee shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner;

(ii)    No Default.  Franchisee and its affiliates shall not be in default of any provision of this Agreement, or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates, and Franchisee shall have substantially and timely complied with all the terms and conditions of such agreements during the terms thereof;

(iii)    Release.  The transferor and its principals (if applicable) shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, its affiliates, their respective partners and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and regulations;

(iv)    Satisfaction of Criteria.  The transferee shall demonstrate to Franchisor's satisfaction that transferee meets the criteria considered by Franchisor when reviewing a prospective franchisee's application for a license, including, but not limited to, Franchisor's educational, managerial and business standards; transferee's moral character, business reputation and credit rating; transferee's aptitude and ability to conduct the franchised business (as may be evidenced by prior related business experience or otherwise); transferee's financial resources and capital for operation of the business; and the geographic proximity and number  of other Restaurants owned or operated by transferee;

(v)     Written Assumption.   The transferee shall enter into a written agreement, in a form satisfactory to Franchisor, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements of the transferor contained in this Agreement; and, if transferee is an entity, transferee's owners shall execute such agreement as transferee's principals and guarantee the performance of all such obligations, covenants and agreements;

(vi)    New Agreement.   If requested by Franchisor, the transferee shall execute, for a term ending on the expiration date of this Agreement and with such renewal terms as may be provided by this Agreement, the standard form franchise agreement then being offered to new System franchisees and other ancillary agreements as Franchisor may require for the Restaurant, which agreements shall supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty fee, advertising contribution or expenditure requirement; provided, however, that the transferee shall not be required to pay any initial franchise fee; and, if transferee is an entity, transferee's owners shall execute such agreement as transferee's principals and guarantee the performance of all such obligations, covenants and agreements;

(vii)   Improvements.   The transferee, at its expense, shall renovate, modernize and otherwise upgrade the Restaurant and, if applicable, any catering or delivery vehicles to conform to the then-current standards and specifications of the System, and shall complete the upgrading and other requirements within the time period reasonably specified by Franchisor;

(viii)  Liability for Prior Acts.   The transferor shall remain liable for all of the obligations to Franchisor in connection with the Restaurant incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability; provided, however, that with respect to monetary obligations of Franchisee and its affiliates to Franchisor and its affiliates incurred prior to the effective date of transfer, the transferor's liability under this Section 14.2(b)(viii) shall be limited to such obligations for which claims are made within three (3) years after the effective date of the transfer;

(ix)    Training.   At the transferee's expense, the transferee, the transferee's operating principal, general manager (as applicable) and/or any other applicable Restaurant personnel shall complete any training programs then in effect for franchisees of Restaurants upon such terms and conditions as Franchisor may reasonably require;

(x)     Transfer Fee.   The transferee shall pay to Franchisor a transfer fee of Ten Thousand Dollars ($10,000) and shall reimburse Franchisor for its reasonable costs and expenses associated with the transfer, including, without limitation, training costs and legal and accounting fees and costs; provided, however, in the event of a transfer of any ownership interest in Franchisee, no transfer fee shall be due and payable

as long as Haresh Patel retains greater than 50% of direct ownership interest in Franchisee; and

(xi)   Entity Representations.  If the transferee is an entity, the transferee shall provide to Franchisor evidence satisfactory to Franchisor that the representations, warranties and covenants of Section 6.2 have been satisfied and are true and correct on the date of transfer.

(c)   Reasonableness.  Franchisee acknowledges and agrees that each condition that must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

(d)   Security Interest.  Franchisee shall not grant a security interest in the Restaurant or in any of Franchisee's assets without Franchisor's prior written consent, which shall not be unreasonably withheld.  In connection therewith, the secured party will be required by Franchisor to agree that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option to be substituted as obligor to the secured party and to cure any default of Franchisee.

14.3   Transfer to Affiliate.   If Franchisee desires to transfer any interest in this Agreement to an entity formed solely for the convenience of ownership or affiliated with Franchisee, Franchisor's consent may be conditioned upon any of the requirements in Section 14.2(b), except that the requirements in Sections 14.2(b)(iii), (iv), (vi), (vii), (ix) and (x) shall not apply, but Franchisee shall reimburse Franchisor for its reasonable costs and expenses associated with the transfer, including, without limitation, legal and accounting fees and costs.  With respect to a transfer to an entity formed for the convenience of ownership or affiliated with Franchisee, Franchisee or the existing holders of an ownership interest in Franchisee, as applicable, shall be the holders of all ownership interests of such entity, and Franchisee or each existing holder of an ownership interest in Franchisee, as applicable, shall have the same proportionate ownership interest in such entity as he had in Franchisee prior to the transfer.

14.4   Reserved.

14.5   Death and Permanent Disability.

(a)   Death.  Upon the death of Franchisee (if Franchisee is a natural person) or any Controlling Principal who is a natural person (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall transfer such interest to a third party in accordance with the conditions described in this Article within twelve (12) months after the death.  If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor.  If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within twelve (12) months after the death of the Deceased.

(b)   Permanent Disability.  Upon the permanent disability of Franchisee (if Franchisee is a natural person) or any Controlling Principal who is a natural person, Franchisor may, in its sole discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Article within six (6) months after notice to Franchisee.

38

"Permanent disability" shall mean any physical, emotional or mental injury, illness or incapacity that would prevent a person from performing the obligations set forth in this Agreement or in the Controlling Principals Guaranty and Covenant attached as <u>Attachment A</u> to this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician selected by Franchisor, upon examination of the person; or if the person refuses to submit to an examination, then such person automatically shall be deemed permanently disabled as of the date of such refusal for the purpose of this Section. The costs of any examination required by this Section shall be paid by Franchisor.

(c)      <u>Notice</u>.  Upon the death or claim of permanent disability of Franchisee or any Controlling Principal, Franchisee or a representative of Franchisee must notify Franchisor of such death or claim of permanent disability within thirty (30)  days of its occurrence.  Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Article for any inter vivos transfer.  If an interest is not transferred upon death or permanent disability as required in this Section, then such failure shall constitute a material event of default under this Agreement.

14.6    <u>No Waiver</u>.  Franchisor's consent to a transfer of any interest described herein shall not constitute a release under this Agreement of the transferring party, nor a waiver of any claims that Franchisor may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

14.7    <u>Public Offering</u>.  Securities in Franchisee may be offered to the public (a "public offering") only with the prior written consent of Franchisor, which consent may be withheld in its sole discretion.  As a condition of its consent to such offering, Franchisor may, in its sole discretion, require that immediately after such offering that the Controlling Principals retain a controlling interest in Franchisee.  For the purpose of this Agreement, "controlling interest" shall mean that the Controlling Principals, either individually or cumulatively, are entitled, under the entity's organizational documents to cast a sufficient number of votes to require such entity to take or omit to take any action that such entity is required to take or omit to take under this Agreement.

14.8    <u>Review of Offering Materials</u>.  All materials required for a public offering by federal or state law shall be submitted to Franchisor for a limited review as discussed below prior to being filed with any governmental agency; and any materials (including any private placement memoranda) to be used in any exempt offering or private placement shall be submitted to Franchisor for such review prior to their use.  No Franchisee offering (public or private) shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance or offering of securities of Franchisee or Franchisor, and Franchisor's review of any offering materials shall be limited solely to the subject of the relationship between Franchisee and Franchisor and its affiliates.  Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitations described in the preceding sentence.  Franchisee, its Controlling Principals and the other participants in the offering must fully indemnify Franchisor and its affiliates, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in connection with the offering.  For each proposed public or private

offering, Franchisee shall pay to Franchisor a non-refundable fee of Ten Thousand Dollars ($10,000), or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section.

14.9   <u>Transfers by Franchisee's Principals</u>.  If any person holding an interest in Franchisee, this Agreement or the Restaurant (other than Franchisee or a Controlling Principal, which parties shall be subject to the provisions set forth above) transfers such interest, then Franchisee shall promptly notify Franchisor of such proposed transfer in writing and shall provide such information relative thereto as Franchisor may reasonably request prior to such transfer.  Such transferee may not be a competitor of Franchisor.  Such transferee will be a Franchisee's Principal and as such will have to execute a confidentiality agreement and ancillary covenants not to compete in the form then required by Franchisor, which form shall be in substantially the form attached hereto as <u>Attachment C</u> (see Sections 10.2(b) and 10.3(g). Franchisor also reserves the right to designate the transferee as one of the Controlling Principals.

## ITEM 15  RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION

15.1   <u>Relationship</u>.  The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other for any purpose.

15.2   <u>Notice to Public</u>.  Franchisee shall hold itself out to the public as an independent contractor conducting its Restaurant operations pursuant to the rights granted by Franchisor. Franchisee agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place on the Restaurant premises established for the purposes hereunder or on any catering or delivery vehicle and on all letterhead, business cards, forms, and as further described in the Manuals. Franchisor reserves the right to specify in writing the content and form of such notice.

15.3   <u>No Authority</u>.  Franchisee understands and agrees that nothing in this Agreement authorizes Franchisee or any of the Controlling Principals to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and that Franchisor shall in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action, or for any act or omission of Franchisee or any of the Controlling Principals or any claim or judgment arising therefrom.

15.4   <u>Employment Policies</u>.  Franchisor does not exercise any direction or control over the employment policies or employment decisions of Franchisee.  All employees of Franchisee are solely employees of Franchisee, not Franchisor.  Franchisee is not Franchisor's agent for any purpose in regard to Franchisee's employees or otherwise.

15.5   Indemnification.  Franchisee shall and hereby does indemnify and shall defend at its own cost and save harmless Franchisor, its affiliates, their officers and employees, and their respective successors and assigns, from and against all losses, costs, liabilities, damages, claims and expenses arising out of any third-party claim, of every kind and description, however caused, including allegations of negligence by Franchisee or its employees and agents, whether such negligence be sole, joint or concurrent, or active or passive, and including reasonable attorneys' fees, directly or indirectly arising out of or resulting from the construction, operation, alteration, repair or use of the franchised business or the Restaurant premises, including the sale of any food or beverage products, service or merchandise by the franchised business or the operation of any motor vehicle, or of any other business conducted on or in connection with the franchised business by the Franchisee, or because of any act or omission of the Franchisee or anyone associated with, employed by, or affiliated with Franchisee.  Franchisee shall promptly give written notice to Franchisor of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing.  Franchisor shall in any event have the right, through counsel of its choice at Franchisee's expense, to control the defense or response to any such action if it could affect the interests of Franchisor, and such undertaking by Franchisor shall not, in any manner or form, diminish Franchisee's obligations to Franchisor hereunder.  Under no circumstances shall Franchisor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnification and against Franchisee, and the failure of Franchisor to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by Franchisor from Franchisee.  The obligations of Franchisee under this Section shall survive the termination, expiration or transfer of this Agreement, or any interest herein for a period of three (3) years thereafter.

## ITEM 16  DEFAULT AND TERMINATION

16.1   Default and Automatic Termination.  Franchisee shall be deemed to be in material default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if Franchisee files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof, or admits in writing its inability to pay its debts when due; or if Franchisee is adjudicated a bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedes bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Restaurant premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of Franchisee's Restaurant shall be sold after levy thereupon by any sheriff, marshal or constable.

16.2    <u>Default with No or Limited Right to Cure</u>.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon notice to Franchisee, upon the occurrence of any of the following events.

(a)    <u>Unauthorized Location</u>.  If Franchisee operates the Restaurant or sells any products or services authorized by Franchisor for sale at the Restaurant at a location, which has not been approved by Franchisor.

(b)    <u>Failure to Acquire Location</u>.  If Franchisee fails to acquire a Location for the Restaurant within the time and in the manner specified in Article II.

(c)    <u>Failure to Construct</u>.  If Franchisee fails to construct or remodel the Restaurant in accordance with the plans and specifications provided to Franchisee under Section 5.1(c) as such plans may be adapted with Franchisor's approval in accordance with Section 2.5.

(d)    <u>Failure to Open</u>.  If Franchisee fails to open the Restaurant for business within the period specified in Section 2.6.

(e)    <u>Cease to Operate</u>.  If Franchisee at any time ceases to operate or otherwise abandons the Restaurant, or loses the right to possession of the premises, or otherwise forfeits the right to do or transact business in the jurisdiction where the Restaurant is located; provided, however, that this provision shall not apply in cases of Force Majeure (acts of God, strikes, lockouts or other industrial disturbances, war, riot, epidemic, fire or other catastrophe or other forces beyond Franchisee's control), if through no fault of Franchisee, the premises are damaged or destroyed by an event as described above, provided that Franchisee applies within thirty (30) days after such event, for Franchisor's approval to relocate or reconstruct the premises (which approval shall not be unreasonably withheld) and Franchisee diligently pursues such reconstruction or relocation.

(f)    <u>Conviction</u>.  If Franchisee or any of the Controlling Principals is convicted of, or has entered a plea of nolo contendere to, a felony or indictable offense, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interests therein.

(g)    <u>Threat to Public Health</u>.  If a threat or danger to public health or safety results from the construction, maintenance or operation of the Restaurant.

(h)    <u>Failure to Maintain Operating Principal or General Manager</u>.  If Franchisee fails to designate a qualified replacement or successor Operating Principal (or his designee, as applicable) or General Manager within the time required under Section 6.3(e) and 6.4(c), respectively.

(i)    <u>Transfer Without Consent</u>.  If Franchisee or any of the Controlling Principals purports to transfer any rights or obligations under this Agreement or any interest in Franchisee or the Restaurant to any third party without Franchisor's prior written consent or without offering Franchisor a right of first refusal with respect to such transfer, contrary to the terms of Article XIV.

(j)     Monetary Default.  If Franchisee or any of its affiliates fails, refuses, or neglects promptly to pay when due any monetary obligation owing to Franchisor, or any of its affiliates or vendors, under this Agreement or any other agreement, or to submit the financial or other information required by Franchisor under this Agreement and does not cure such default within five (5) days following notice from Franchisor (or such other cure period specified in such other agreement, unless no cure period is stated or such period is less than five (5) days, in which case the five (5) day cure period shall apply).

(k)     Noncompetition.  If Franchisee or any of the Controlling Principals fails to comply with the in-term covenants in Section 10.3 or Franchisee fails to obtain execution of the covenants and related agreements required under Section 10.3(g) within thirty (30) days after being requested to do so by Franchisor.

(l)     Confidential Information.  If, contrary to the terms of Section 10.2(a), Franchisee or any of the Controlling Principals discloses or divulges any Confidential Information provided to Franchisee or the Controlling Principals by Franchisor, or fails to obtain execution of covenants and related agreements required under Section 10.2(b) within thirty (30) days after being requested to do so by Franchisor.

(m)     Transfer Upon Death or Disability.  If an approved transfer upon death or permanent disability of Franchisee or any Controlling Principal is not affected within the time period and in the manner prescribed by Section 14.5.

(n)     False Books.  If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor.

(o)     Breach of Certain Covenants.  If Franchisee or any of the Controlling Principals breaches in any material respect any of the covenants set forth in Section 6.2 or has falsely made any of the representations or warranties set forth in Section 6.2.

(p)     Failure to Maintain Insurance.  If Franchisee fails to procure and maintain such insurance policies as required by Article XII and Franchisee fails to cure such default within seven (7) days following notice from Franchisor.

(q)     Fraud or Conduct Affecting the Marks.  If Franchisee or any of the Controlling Principals commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill association with the Marks.

(r)     Misuse of Marks.  If Franchisee misuses or makes any unauthorized use of the Marks, fails to follow Franchisor's directions and guidelines concerning use of the Marks, or otherwise materially impairs the goodwill associated therewith or with the System or Franchisor's rights therein; and does not cure such default within twenty-four (24) hours following notice from Franchisor.

(s)     Default Under Lease.  If Franchisee fails to comply with any of the requirements imposed by the lease for the Restaurant premises or the related collateral assignment of lease in favor of Franchisor, and does not cure such default within the cure period, if any, specified in the lease or assignment.

(t)     Reserved.

(u)     Multiple Defaults.  If Franchisee and/or the Controlling Principals commit three (3) or more events of default under this Agreement in any 24 month period, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by Franchisee after notice by Franchisor.

16.3    Default and Right to Cure.  Except as provided in Sections 16.1 and 16.2 of this Agreement, upon any default by Franchisee that is susceptible of being cured, Franchisor may terminate this Agreement by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination.  However, Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the thirty (30)-day period and by promptly providing proof thereof to Franchisor.  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30)-day period or such longer period as applicable law may require.  Defaults that are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(a)     If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by Franchisor, or fails to carry out the terms of this Agreement in good faith.

(b)     If Franchisee fails to maintain or observe any of the standards, specifications or procedures prescribed by Franchisor in this Agreement or otherwise in writing.

(c)     If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement.

16.4    Additional Remedies.  If Franchisee is in default of this Agreement, Franchisor may, in addition to any other remedies it may have, suspend Franchisee's participation in any advertising or other program Franchisor offers, including any web page for the Restaurant maintained on Franchisor's web site, for so long as Franchisee remains in default.

## ITEM 17  POST-TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

17.1    Cease Operation.  Franchisee shall immediately cease to operate the Restaurant under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

17.2    Cease Use of Marks.  Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, computer software, procedures, and techniques associated with the System; the mark "American Deli"; and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms and any other articles, which display the Marks.

17.3   Cancel Assumed Names.   Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration that contains the mark "American Deli" or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

17.4   No Imitation.   Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, that is likely to cause confusion, mistake, or deception, or that is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin or description or representation that falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

17.5   Payment of Monetary Obligations.   Franchisee and its Controlling Principals shall promptly pay all sums owing to Franchisor and its affiliates.   Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of any default by Franchisee, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, fixtures, and inventory owned by Franchisee and on the premises operated hereunder at the time of default.

17.6   Payment of Damages.   Franchisee and the Controlling Principals shall pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining any remedy available to Franchisor for any violation of this Agreement and, subsequent to the termination or expiration of this Agreement, in obtaining injunctive or other relief for the enforcement of any provisions of this Article.

17.7   Return of Manuals.   Franchisee shall immediately deliver to Franchisor all Manuals, records, files, instructions, correspondence, all materials related to operating the Restaurant, including, without limitation, agreements, invoices, and any and all other materials relating to the operation of the Restaurant in Franchisee's possession or control, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents that Franchisee reasonably needs for compliance with any provision of law.

17.8   Confidentiality and Noncompetition.   Franchisee and the Controlling Principals shall comply with the restrictions on Confidential Information contained in Article X and shall also comply with the non-competition covenants contained in Article X.   Any other person required to execute similar covenants pursuant to Article X shall also comply with such covenants.

17.9   Advertising Materials.   Franchisee shall also immediately furnish Franchisor an itemized list of all advertising and sales promotion materials bearing the Marks or any of Franchisor's distinctive markings, designs, labels, or other marks thereon, whether located on Franchisee's premises or under Franchisee's control at any other location. Franchisor shall have the right to inspect these materials. Franchisor shall have the option, exercisable within thirty

(30) days after such inspection, to purchase any or all of the materials at Franchisee's cost, or to require Franchisee to destroy and properly dispose of such materials.  Materials not purchased by Franchisor shall not be utilized by Franchisee or any other party for any purpose unless authorized in writing by Franchisor.

17.10   Signs and Menu Boards.   Upon execution of this Agreement, in partial consideration of the rights granted hereunder, Franchisee acknowledges and agrees that all right, title and interest in the signs and menu boards used at the Restaurant are hereby assigned to Franchisor, and that upon termination or expiration of this Agreement, neither Franchisee nor any lien holder of Franchisee shall have any further interest therein.

17.11   Assignment of Leases.   If Franchisee operates the Restaurant under a lease for the Restaurant premises with a third party or, with respect to any lease for equipment used in the operation of the franchised business, then, Franchisee shall, at Franchisor's option, assign to Franchisor any interest that Franchisee has in any lease for the premises of the Restaurant or any equipment related thereto.  Franchisor may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement.  If Franchisor does not elect to exercise its option to acquire the lease for the Restaurant premises or does not have such option, Franchisee shall make such modifications or alterations to the Restaurant premises as are necessary to distinguish the appearance of the Restaurant from that of other Restaurants operating under the System and shall make such specific additional changes as Franchisor may reasonably request.   If Franchisee fails or refuses to comply with the requirements of this Section, Franchisor shall have the right to enter upon the premises of the franchised business, without being guilty of trespass or any other crime or tort, to make or cause to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

17.12   Right to Purchase.

(a)   Personal Property.   Except as provided in Section 17.9, 17.10 and 17.11, Franchisor shall have the option, to be exercised within thirty (30) days after termination or expiration of this Agreement, to purchase from Franchisee any or all of the furnishings, equipment (including any point of sale system or computer systems), signs, fixtures, motor vehicles, supplies, and inventory of Franchisee related to the operation of the Restaurant, at Franchisee's cost or fair market value, whichever is less.  Franchisor shall be purchasing Franchisee's assets free and clear of any liens, charges, encumbrances or security interests and shall be assuming no liabilities whatsoever, unless otherwise agreed to in writing by the parties. If the parties cannot agree on the fair market value within thirty (30) days of Franchisor's exercise of its option, fair market value shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding.  In the event of such appraisal, each party shall bear its own legal and other costs and shall split the appraisal fees equally.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off (i) all fees for any such independent appraiser due from Franchisee, (ii) all amounts due from Franchisee to Franchisor or any of its affiliates and (iii) any costs incurred in connection with any escrow arrangement (including reasonable legal fees), against any payment therefor and shall pay the remaining amount in cash.

(b)   Real Property.   In addition to the options described above and if Franchisee owns the Restaurant premises, then, Franchisor shall have the option, to be exercised at or within thirty (30) days after termination or expiration of this Agreement, to purchase the Restaurant premises including any building thereon, if applicable, for the fair market value of the land and building.   Franchisor shall purchase assets free and clear of any liens, charges, encumbrances or security interests and shall assume no liabilities whatsoever, unless otherwise agreed to in writing by the parties.   If Franchisee does not own the land on which the Restaurant is operated and Franchisor exercises its option for an assignment of the lease, Franchisor may exercise this option for the purpose of purchasing the building if owned by Franchisee and related assets as described above.   If the parties cannot agree on fair market value within thirty (30) days of Franchisor's exercise of its option, fair market value shall be determined in accordance with appraisal procedure described above.

(c)   Assignments.   With respect to the options described in Sections 17.11 and 17.12(a) and (b), Franchisee shall deliver to Franchisor in a form satisfactory to Franchisor, such warranties, deeds, releases of lien, bills of sale, assignments and such other documents and instruments that Franchisor deems necessary in order to perfect Franchisor's title and possession in and to the properties being purchased or assigned and to meet the requirements of all tax and government authorities.   If, at the time of closing, Franchisee has not obtained all of these certificates and other documents, Franchisor may, in its sole discretion, place the purchase price in escrow pending issuance of any required certificates or documents.

17.13   Closing of Purchase.   The time for closing of the purchase and sale of the properties described in Section 17.12(a) and (b) shall be a date not later than thirty (30) days after the purchase price is determined by the parties or the determination of the appraisers, or such date Franchisor receives and obtains all necessary permits and approvals, whichever is later, unless the parties mutually agree to designate another date.   The time for closing on the assignment of the lease described in Section 17.11 shall be a date no later than ten (10) days after Franchisor's exercise of its option thereunder unless Franchisor is exercising its options under either Section 17.12(a) or (b), in which case the date of the closing shall be on the same closing date prescribed for such option.   Closing shall take place at Franchisor's corporate offices or at such other location as the parties may agree.

17.14   Assignment of Options.   Franchisor shall be entitled to assign any and all of its options in this Section to any other party, without the consent of Franchisee.

17.15    Assignment of Telephone Numbers. Franchisee, at the option of Franchisor, shall assign to Franchisor all rights to the telephone numbers of the Restaurant and any related Yellow Pages trademark listing or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time to transfer such service and numbers to Franchisor. Further, Franchisee shall assign to Franchisor all Internet listings, domain names, Internet Accounts, advertising on the Internet or World Wide Web, websites, listings with search engines, electronic mail addresses or any other similar listing or usage related to the Franchised Business. Notwithstanding any forms and documents that may have been executed by Franchisee under Section 6.8, Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. This power of attorney shall survive the expiration or termination of this Agreement. Franchisee shall thereafter use different telephone numbers, electronic mail addresses or other listings or usages at or in connection with any subsequent business conducted by Franchisee.

## ITEM 18  MISCELLANEOUS

18.1    Notices. Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or sent by prepaid facsimile or electronic mail (provided that the sender confirms the facsimile or electronic mail by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission) to the respective parties at the following address for Franchisor and at the address set forth on the cover page of this Agreement for Franchisee and Controlling Principals unless and until a different address has been designated by written notice to the other party:

|  |  |
|---|---|
| Notices to Franchisor: | American Deli International, Inc. |
|  | 2716 Northeast Expressway |
|  | Atlanta, Georgia 30345 |
|  | Attention: President |
|  | Facsimile: (770) 674-2765 |
|  | Email: info@iloveamericandeli.com |

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile or electronic mail, upon transmission (provided confirmation is sent as described above) or, in the case of expedited delivery service or registered or certified mail, three (3) business days after the date and time of mailing.

18.2    Entire Agreement. This Agreement, the documents referred to herein, and the Attachments hereto, constitute the entire, full and complete agreement between Franchisor and Franchisee and the Controlling Principals concerning the subject matter hereof and shall supersede all prior related agreements between Franchisor and Franchisee and the Controlling Principals. Notwithstanding the foregoing, nothing in this Agreement, the documents referred to herein or the Attachments hereto is intended to disclaim the representations made by Franchisor in the Franchise Disclosure Document provided to Franchisee in connection with this Agreement.

18.3   <u>Amendments</u>.  Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

18.4   <u>No Waiver</u>.  No delay, waiver, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising out of any breach or default by Franchisee or the Controlling Principals under this Agreement shall constitute a waiver by Franchisor to enforce any such right, option, duty or power against Franchisee or the Controlling Principals, or as to a subsequent breach or default by Franchisee or the Controlling Principals.  Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee or the Controlling Principals of any terms, provisions, covenants or conditions of this Agreement.

18.5   <u>Approvals or Consents</u>.  Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor, and such approval or consent shall be obtained in writing.

18.6   <u>No Warranties</u>.   Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

18.7   <u>Force Majeure</u>.   If a Force Majeure event shall occur, then Franchisee shall continue to be obligated to pay to Franchisor any and all amounts that it shall have duly become obligated to pay in accordance with the terms of this Agreement prior to the occurrence of any Force Majeure event and the Indemnitees shall continue to be indemnified and held harmless by Franchisee in accordance with Article XV.  Except as provided in Section 16.2(e) and the immediately preceding sentence herein, none of the parties hereto shall be held liable for a failure to comply with any terms and conditions of this Agreement when such failure is caused by an event of Force Majeure.  Upon the occurrence of any event of the type referred to herein, the party affected thereby shall give prompt notice thereof to the other parties, together with a description of the event, the duration for which the party expects its ability to comply with the provisions of this Agreement to be affected thereby and a plan for resuming operation under this Agreement, which the party shall promptly undertake and maintain with due diligence.  Such affected party shall be liable for failure to give timely notice only to the extent of damage actually caused.

18.8    Mediation.  The parties agree to submit any claim, controversy or dispute arising out of or relating to this Agreement (and attachments) or the relationship created by this Agreement to non-binding mediation prior to bringing such claim, controversy or dispute in a court or before any other tribunal.  The mediation shall be conducted through either an individual mediator or a mediator appointed by a mediation services organization or body, experienced in the mediation of disputes between Franchisors and Franchisees, agreed upon by the parties and, failing such agreement within a reasonable period of time after either party has notified the other of its desire to seek mediation of any claim, controversy or dispute (not to exceed fifteen (15) days), by the American Arbitration Association in accordance with its rules governing mediation, at Franchisor's corporate headquarters in Atlanta, Georgia.  The costs and expenses of mediation, including compensation and expenses of the mediator (and except for the attorneys' fees incurred by either party), shall be borne by the parties equally.  If the parties are unable to resolve the claim, controversy or dispute within ninety (90) days after the mediator has been chosen, then the matter shall be submitted to arbitration in accordance with Section 18.9 to resolve such claim, controversy or dispute unless such time period is extended by written agreement of the parties.  Notwithstanding the foregoing, either party  may bring an action (1) for monies owed, (2) for injunctive or other extraordinary relief, or (3) involving the possession or disposition of, or other relief relating to, real property in a court having jurisdiction and in accordance with Section 18.10, without first submitting such action to mediation or arbitration.

18.9    Arbitration.

(a)    Procedure.  Except as provided in this Agreement, Franchisor, Franchisee and the Controlling Principals agree that any claim, controversy or dispute arising out of or relating to the franchise, Franchisee's establishment or operation of any Restaurant under this Agreement (and any amendments thereto) including, but not limited to, any claim by Franchisee, or any of the Controlling Principals, or persons claiming on behalf of Franchisee or the Controlling Principals, concerning the entry into, the performance under or the termination of this Agreement, or any other agreement between Franchisor, or its affiliates, and Franchisee, any claim against a past or present officer, director, employee or agent of Franchisor, including those occurring subsequent to the termination of this Agreement, that cannot be amicably settled among the parties or through mediation shall, except as specifically set forth herein and in Section 18.10, be referred to arbitration.   The arbitration shall be conducted through an organization or body experienced in the arbitration of disputes between Franchisors and Franchisees agreed upon by the parties.  If the parties fail to designate an organization or body within a reasonable time after the dispute has been referred for arbitration (not to exceed fifteen (15) days), arbitration shall be conducted by the American Arbitration Association in accordance with the rules of the American Arbitration Association, as amended, except that the arbitrator shall apply the federal rules of evidence during the conduct of the hearing sessions with respect to the admissibility of evidence.  If such rules are in any way contrary to or in conflict with this Agreement, the terms of this Agreement shall control.  Only claims, controversies or disputes involving Franchisee and the Controlling Principals may be brought hereunder.  No claim for or on behalf of any other Franchisee or supplier, or class, representative or association thereof, may be brought by Franchisee or the Controlling Principals hereunder.

(b)    Arbitrator.  The parties shall agree on an arbitrator within fifteen (15) days of the filing of arbitration.  If the parties cannot agree on a single arbitrator, Franchisor and Franchisee (or Controlling Principal, as applicable) shall each select one arbitrator.  If the party upon whom the demand for arbitration is served fails to select an arbitrator within fifteen (15) days after the receipt of the demand for arbitration, then the arbitrator so designated by the party requesting arbitration shall act as the sole arbitrator to resolve the controversy at hand.  The two arbitrators designated by the parties shall select a third arbitrator.  If the two arbitrators designated by the parties fail to select a third arbitrator within fifteen (15) days, the third arbitrator shall be selected by the organization agreed upon or the American Arbitration Association or any successor thereto, upon application by either party.  All of the arbitrators shall be experienced in the arbitration of disputes between Franchisors and Franchisees.  The arbitration shall take place at Franchisor's corporate offices.  The award of the arbitrators shall be final and judgment upon the award rendered in arbitration may be entered in any court having jurisdiction thereof.  The costs and expenses of arbitration may be entered in any court having jurisdiction thereof.  The arbitrators shall be required to submit written findings of fact and conclusions of law within thirty (30) business days following the final hearing session of the arbitration.  The costs and expenses of arbitration, including compensation and expenses of the arbitrators, shall be borne by the parties as the arbitrators determine.

(c)    Exceptions.  Notwithstanding the above, the following shall not be subject to arbitration:

(i)    Disputes and controversies arising from the Sherman Act, the Clayton Act or any other federal or state antitrust law;

(ii)    Disputes and controversies based upon or arising under the Lanham Act, as now or hereafter amended, relating to the ownership or validity of the marks;

(iii)    Disputes and controversies relating to actions to obtain possession of the premises of the Restaurant under lease or sublease; and

(iv)    Actions by Franchisor for money

(d)    Specific performance.  If Franchisor shall desire to seek specific performance or other extraordinary relief including, but not limited to, injunctive relief under this Agreement, and any amendments thereto, or to collect monies due, then any such action shall not be subject to arbitration and Franchisor shall have the right to bring such action as described in Section 18.10.

(e)    Limits on arbitrator.  In proceeding with arbitration and in making determinations hereunder, the arbitrators shall not extend, modify or suspend any terms of this Agreement or the reasonable standards of business performance and operation established by Franchisor in good faith.  Notice of or request to or demand for arbitration shall not stay, postpone or rescind the effectiveness of any termination of this Agreement.  The arbitrators shall apply Georgia law and the terms of this Agreement in reaching their decision.

18.10   <u>Governing law and venue</u>.  With respect to any claims, controversies or disputes that are not finally resolved through mediation or arbitration, or as otherwise provided above, Franchisee and the Controlling Principals hereby irrevocably submit themselves to the jurisdiction of the state courts of DeKalb County, Georgia and the federal district court for the Northern District of Georgia.  Franchisee and the Controlling Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.  Franchisee and the Controlling Principals hereby agree that service of process may be made upon any of them in any proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Georgia or federal law.  Franchisee and the Controlling Principals further agree that venue for any proceeding relating to or arising out of this Agreement shall be DeKalb County, Georgia; provided, however, with respect to any action (1) for monies owed, (2) for injunctive or other extraordinary relief or (3) involving possession or disposition of, or other relief relating to, real property, Franchisor may bring such action in any state or federal district court that has jurisdiction.  With respect to all claims, controversies, disputes or actions, related to this Agreement or the relationship created thereby, this Agreement and any such related claims, controversies, disputes or actions shall be governed, enforced and interpreted under Georgia law (except for Georgia choice of law rules).

18.11   <u>Mutual benefit</u>.    Franchisee, the Controlling Principals and Franchisor acknowledge that the parties' agreement regarding applicable state law and forum set forth in Section 18.10 provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement.  Each of Franchisee, the Controlling Principals and Franchisor further acknowledges the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated for in good faith and are part of the benefit of the bargain reflected by this Agreement.

18.12   <u>Performance in Atlanta, Georgia</u>.   Franchisee, the Controlling Principals and Franchisor acknowledge that the execution of this Agreement and acceptance of the terms by the parties occurred in Atlanta, Georgia, and further acknowledge that the performance of certain obligations of Franchisee arising under this Agreement, including, but not limited to, the payment of monies due hereunder and the satisfaction of certain training requirements of Franchisor, shall occur in Atlanta, Georgia.

18.13   <u>Dispute resolution program</u>.  Without limiting any of the foregoing, Franchisor reserves the right, at any time, to create a dispute resolution program and related specifications, standards, procedures and rules for the implementation thereof to be administered by Franchisor or its designees for the benefit of all Franchisees conducting business under the system.  The standards, specifications, procedures and rules for such dispute resolution program shall be made part of the manuals and if made part of the manuals, on either a voluntary or mandatory basis, Franchisee shall comply with all such standards, specifications, procedures and rules in seeking resolution of any claims, controversies or disputes with or involving Franchisor or other Franchisees, if applicable under the program.  If such dispute resolution program is made mandatory, then Franchisee and Franchisor agree to submit any claims, controversies or disputes arising out of or relating to this Agreement (and attachments) or the relationship created by this Agreement for resolution in accordance with such dispute resolution program prior to seeking resolution of such claims, controversies or disputes in the manner described in Sections 18.8 – 18.10 (provided that the provisions of Section 18.10 concerning Franchisor's right to seek relief

in a court for certain actions including for injunctive or other extraordinary relief shall not be superseded or affected by this Section) or if such claim, controversy or dispute relates to another Franchisee, Franchisee agrees to participate in the program and submit any such claims, controversies or disputes in accordance with the program's standards, specifications, procedures and rules, prior to seeking resolution of such claim by any other judicial or legally available means.

18.14  <u>WAIVER OF CERTAIN DAMAGES</u>.  FRANCHISEE AND THE CONTROLLING PRINCIPALS HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST FRANCHISOR, ITS AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREES THAT IN THE EVENT OF A DISPUTE, FRANCHISEE AND THE CONTROLLING PRINCIPALS SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.  IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

18.15  <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

18.16  <u>Headings</u>.  The captions used in connection with the sections and subsections of this Agreement are inserted only for purpose of reference.  Such captions shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof nor shall such captions otherwise be given any legal effect.

18.17  <u>Survival</u>.  Any obligation of Franchisee or the Controlling Principals that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of Franchisee or the Controlling Principals therein shall be deemed to survive such termination, expiration or transfer.

18.18  <u>Severability</u>.  Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, this shall not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms or provisions of this Agreement that may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties; the invalid portions, sections, parts, terms or provisions shall be deemed not to be part of this

Agreement; and there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any law or regulation.

18.19   Construction.   All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.   Without limiting the obligations individually undertaken by the Controlling Principals under this Agreement, all acknowledgments, promises, covenants, agreements and obligations made or undertaken by Franchisee in this Agreement shall be deemed, jointly and severally, undertaken by all of the Controlling Principals.

18.20   Remedies.   All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies that are provided for herein or that may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates.   The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.   The expiration, earlier termination or exercise of Franchisor's rights pursuant to Article XVI shall not discharge or release Franchisee or any of the Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

18.21   Franchisee's Principals and Controlling Principals.   The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any entity that controls Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee, and any other person or entity controlling, controlled by or under common control with Franchisee.   The initial Franchisee's Principals shall be listed on the cover page of this Agreement.   The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder.   The initial Controlling Principals shall be listed on the cover page to this Agreement.

18.22   Legal Entities.   Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of any other entity.

18.23   No Third-Party Beneficiaries.   Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors and personnel and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, authorized by Article XIV), any rights or remedies under or as a result of this Agreement.

18.24   Delegation by Franchisor.   From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents or affiliates of Franchisor or Area Representatives or independent contractors with which Franchisor has contracted to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations under this Agreement.  Franchisee acknowledges and agrees that this Agreement may not be modified by any Area Representative and that Franchisor will not be bound by any purported modification of this Agreement by any Area Representative.   Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Representatives does not assign or confer any rights under this Agreement upon Area Representatives and that Area Representatives are not third party beneficiaries of this Agreement.

## ITEM 19  ACKNOWLEDGMENTS

19.1   Independent Investigation.   Franchisee acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that the success of this business venture involves substantial business risks and will largely depend upon the ability of Franchisee.   Franchisor expressly disclaims making, and Franchisee acknowledges that it has not received or relied on, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

19.2   Review and Understanding.   Franchisee acknowledges that it has received, read and understands this Agreement and the related Attachments and agreements and that Franchisor has afforded Franchisee sufficient time and opportunity to consult with advisors selected by Franchisee about the potential benefits and risks of entering into this Agreement.

19.3   Receipt of Documents.   Franchisee acknowledges that it received a complete copy of this Agreement and all related Attachments and agreements at least seven (7) calendar days prior to the date on which this Agreement was executed.  Franchisee further acknowledges that it has received the Franchise Disclosure Document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least fourteen (14) calendar days prior to the date on which this Agreement was executed.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first above written.

FRANCHISOR:

AMERICAN DELI INTERNATIONAL, INC.

By: _____

Name: Hee Sung Park
Title: Vice President

FRANCHISEE:

GLOBAL DELI NETWORK, INC.

By: _____

Name: Haresh Patel
Title: President

Attachment A

## CONTROLLING PRINCIPALS GUARANTY AND COVENANT

This Controlling Principals Guaranty and Covenant (this "Guaranty") is given by each of the undersigned (each a "Guarantor") on _____, 20__ to American Deli International, Inc., a Delaware corporation ("Franchisor"), in order to induce Franchisor to enter into that certain Franchise Agreement dated of even date herewith (the "Franchise Agreement") with _____ ("Franchisee").

Guarantor acknowledges that Guarantor has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this Guaranty and the undertakings of the Controlling Principals herein and in the Franchise Agreement are in partial consideration for, and a condition to the granting of, the rights granted in the Franchise Agreement, and that Franchisor would not have granted these rights without the execution of this Guaranty by Guarantor.

Guarantor acknowledges that Guarantor is included in the term "Controlling Principals" as described in Section 18.21 of the Franchise Agreement.

Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement. Additionally, if Guarantor is designated as the Operating Principal, Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the covenants, representations, warranties and agreements of the Operating Principal set forth in the Franchise Agreement.

Guarantor does hereby guaranty to Franchisor the prompt payment and performance when due of any and all liabilities and obligations arising under or evidenced by the Franchise Agreement, any promissory note or other credit instruments, and any other liabilities, obligations and indebtedness of Franchisee and/or any of it assignees or affiliates to Franchisor and/or any of its assignees or affiliates, of every kind and description, now existing or hereafter incurred or arising, matured or unmatured, direct or indirect, absolute or contingent, due or to become due, and any renewals, consolidations and extensions, including any future advances from Franchisor to Franchisee (collectively, the "Guaranteed Obligations"). Guarantor shall perform and/or make punctual payment to Franchisor of the Guaranteed Obligations in accordance with the terms of the Franchise Agreement or other applicable document forthwith upon demand by Franchisor.

This Guaranty is irrevocable and unlimited. This Guaranty is an absolute and unconditional continuing guaranty of payment and performance of the Guaranteed Obligations. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, the suffering of any indulgence to any debtor, extension of time of payment thereof, nor the discharge of Franchisee by bankruptcy, operation of law or otherwise. Presentment, demand, protest, notice of protest and dishonor, notice of default or nonpayment and diligence in collecting any obligation under any agreement between Franchisee and Franchisor are each and all waived by Guarantor and/or acknowledged as inapplicable. Franchisor shall not be required to pursue any remedy on said Guaranteed Obligations as a condition of the obligation hereunder of Guarantor. Guarantor waives notice of amendment of any agreement between Franchisee and Franchisor and notice of demand for payment by Franchisee. Guarantor further agrees to be bound by any and all amendments and changes to any agreement between Franchisee and Franchisor.

Guarantor agrees to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out

of or in connection with any failure by Franchisee to perform any obligation of Franchisee under any agreement between Franchisee and Franchisor.

Guarantor waives any and all notice of the creation, renewal, extension, accrual, modification, amendment, release, or waiver of any of the Guaranteed Obligations and notice of or proof of reliance by Franchisor upon this Guaranty or acceptance of this Guaranty. The Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified or waived, in reliance upon this Guaranty and all dealings between Franchisor and Guarantor shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guaranty. Franchisor may pursue its rights against Guarantor without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.

If other guarantors have guaranteed any and or all of the Guaranteed Obligations, their liability shall be joint and several to that of Guarantor.

Until all of the Guaranteed Obligations have been paid in full and/or performed in full, Guarantor shall not have any right of subrogation, unless expressly given to Guarantor in writing by Franchisor.

No change in the name, objects, share capital, business, membership, directors' powers, organization or management of the Franchisee shall in any way affect Guarantor in respect of the Guaranteed Obligations either with respect to transactions occurring before or after any such change, it being understood that this Guaranty is to extend to the person(s) or entity(ies) for the time being and from time to time carrying on the business now carried on by the Franchisee, notwithstanding any change(s) in the name or shareholders of the Franchisee, and notwithstanding any reorganization or its amalgamation with another or others or the sale or disposal of its business in whole or in part to another or others.

All Franchisor's rights, powers and remedies hereunder and under any other agreement now or at any time hereafter in force between Franchisor and Guarantor shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Franchisor by law.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall remain effective.

This Guaranty shall extend to and inure to the benefit of Franchisor and its successors and assigns and shall be binding on Guarantor and its successors and assigns.

IN WITNESS WHEREOF, Guarantor has signed this Guaranty as of the date set forth above.

GUARANTOR

Printed Name:*  _____

Printed Name:  _____

\*     Denotes individual who is Franchisee's Operating Principal

Attachment B

## COLLATERAL ASSIGNMENT OF LEASE

This Collateral Assignment of Lease (this "Assignment") is made this ____ day of _____, 20__ by _____ ("Franchisee"), in favor of American Deli International, Inc., a Delaware corporation ("Franchisor").

**RECITALS**

Franchisor and Franchisee are parties to that certain Franchise Agreement dated _____, 20__ (the "Franchise Agreement");

Franchisee is a tenant under that certain lease (the "Lease") dated _____, 20__ for space located at _____ (the "Leased Premises") with _____ ("Landlord");

In consideration of Franchisor's consent to operate the Leased Premises under the Franchise Agreement, and as security for Franchisee's obligations under the Franchise Agreement, a collateral assignment is made of Franchisee's interest in, to, and under the Lease; to be exercised, if at all, upon the occurrence of an event of default under, or termination or expiration of, the Franchise Agreement; and

Franchisee is willing to assign its rights, privileges, powers and interests in, to and under the Lease (including all deposits paid by or for the benefit of Franchisee) to Franchisor upon the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Franchisee hereby agrees for the benefit of Franchisor as follows:

     1.    As collateral security for Franchisor, Franchisee hereby assigns all of its rights, powers, privileges and interests in, to and under the Lease to Franchisor, fully intending that Franchisor shall have the rights and powers and be entitled to the benefits thereunder to the same degree and extent as though the Lease had been made between the Landlord and Franchisor, subject, however, to the conditions hereof.

     2.    This Assignment is executed only as collateral security for Franchisee's obligations under the Franchise Agreement, and the execution and delivery hereof shall not subject Franchisor to or in any way affect or modify the liability of Franchisee under the Lease, and all obligations of Franchisee under the Lease shall be and remain enforceable. Franchisor will not exercise its rights hereunder except upon the occurrence of an event of default under, or termination or expiration of, the Franchise Agreement. Notwithstanding the foregoing, until written notice is sent to Franchisee that an event of default or termination has occurred, Franchisee is granted a license to maintain its rights and the benefits under the Lease.

     3.    So long as (a) no event of default under the Franchise Agreement exists, (b) the Franchise Agreement remains in effect, and (c) Franchisee is not in default of any of its obligations hereunder or under the Lease, Franchisor agrees not to enforce or seek to enforce any of the rights, powers and privileges transferred to Franchisor pursuant to this Assignment.

4.      Franchisee hereby agrees to provide prompt written notice to Franchisor of any default by either party to the Lease.  If Franchisor exercises its rights under this Assignment, Franchisee shall continue to be fully liable and responsible for all undischarged obligations or liabilities of Franchisee under the Lease, and Franchisor shall have the right, but not the obligation, to perform each of Franchisee's obligations under the Lease.

5.      Franchisee agrees that Franchisor shall not be obligated to perform or discharge any obligation, duty or liability under the Lease by reason of this Assignment, and that this Assignment and Franchisor's performance hereunder or under the Lease shall not release Franchisee from any liability under the Lease.

6.      Franchisee represents that, as of the date hereof, Franchisee is not in breach of the Lease.  Franchisee agrees not to do, or suffer to be done, any of the following acts without obtaining the prior written consent of Franchisor, which may be granted or withheld in the sole discretion of Franchisor:  (a) cancel the Lease; (b) surrender the Lease; (c) assign the Lease or any deposit paid by or for the benefit of Franchisee thereunder or any portion thereof; or (d) fail to perform any obligation in accordance with the provisions of the Lease. Any of said acts, if done or suffered to be done without Franchisor's prior written consent, shall constitute a default hereunder.

7.      In the event of any default by Franchisee under the Lease, this Assignment, or the Franchise Agreement, Franchisor shall have the right, but not the obligation, until such default is cured, to cure such default, and take any action, including taking possession of the Leased Premises, to preserve Franchisee's rights under the Lease and Franchisor's rights under this Assignment and the Franchise Agreement, and Franchisee and Landlord have granted to Franchisor the right of access to the Leased Premises for this purpose, if such action is necessary.

8.      Franchisee hereby represents and warrants to Franchisor that it has not executed any prior assignment of the Lease nor has it performed any acts or executed any other instrument which might prevent Franchisor from operating under any of the terms and conditions of the Lease or this Assignment, or which would limit Franchisor in such operation. Franchisee further represents and warrants to Franchisor that it will not execute or grant any modification whatsoever of the Lease, either orally or in writing, without Franchisor's prior written consent.

9.      Any notice or communication hereunder must be in writing, and must be given as provided in the Franchise Agreement.

10.     Franchisee hereby irrevocably appoints Franchisor as Franchisee's attorney-in-fact to exercise any or all of Franchisees' rights in, to, or under the Lease from and after the occurrence of an event of default under the Franchise Agreement or the Lease, to execute deeds and other conveyance documents, to give appropriate receipts, releases, and satisfactions on behalf of Franchisee in connection with Franchisee's performance under the Lease from and after the occurrence of any such event of default, and to do any or all other acts from and after the occurrence of any such event of default, in Franchisee's name or in Franchisor's own name, that Franchisee could do under the Lease with the same force and effect as if this Assignment had not been made. This power of attorney is coupled with an interest. Nothing contained in this Assignment shall limit any rights or remedies of the Franchisor under the Franchise Agreement.

11.   All the covenants and agreements hereinabove contained on the part of Franchisee and Franchisor shall inure to the benefit of and bind their successors and assigns, respectively, including any purchaser at a foreclosure sale.  Franchisor may assign its rights hereunder without Franchisee's consent.

12.   This Assignment shall be governed by and construed in accordance with the laws of the State of Georgia.

13.   This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Franchisee has caused this Assignment to be executed as of the date first above written.

FRANCHISEE:

_____

By: _____
Name: _____
Title: _____

Attachment C

## CONFIDENTIALITY AGREEMENT AND
## ANCILLARY COVENANTS NOT TO COMPETE

This Agreement is made and entered into this _____ day of _____, 20__, among American Deli International, Inc., a Delaware corporation ("Franchisor"), _____ ("Franchisee") and _____ ("Covenantor") in connection with a Franchise Agreement dated _____, 20__ between Franchisor and Franchisee (the "Franchise Agreement"). Initially capitalized terms used, but not defined in, this Agreement has the meanings ascribed thereto in the Franchise Agreement.

### RECITALS

Franchisor has the right to use and license the use of a System for the establishment and operation of an American Deli.

The System is identified by certain Marks including, the mark "American Deli" and includes certain Confidential Information which provides economic advantages to Franchisor and licensed users of the System.

Franchisor has granted Franchisee the right to operate an American Deli pursuant to the Franchise Agreement.

In connection with his or her duties, it will be necessary for Covenantor to have access to some or all of the Confidential Information.

Franchisor and Franchisee have agreed on the importance of restricting the use, access and dissemination of the Confidential Information, Franchisee therefore has agreed to obtain from Covenantor a written agreement protecting the Confidential Information and further protecting the System against unfair competition.

Covenantor acknowledges that receipt of and the right to use the Confidential Information constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

A.   Confidentiality Agreement

    1.   Covenantor shall, at all times, maintain the confidentiality of the Confidential Information and shall use such Confidential Information only in the course of his or her employment by or association with Franchisee in connection with the operation of an American Deli under the Franchise Agreement.

    2.   Covenantor shall not at any time make copies of any documents or compilations containing some or all of the Confidential Information without Franchisor's express written permission.

    3.   Covenantor shall not at any time disclose or permit the disclosure of the Confidential Information except to other employees of Franchisee and only to the limited extent necessary to train or assist other employees of Franchisee in the operation of the Restaurant.

4.      Covenantor shall surrender any material containing some or all of the Confidential Information to Franchisee or Franchisor, upon request, or upon termination of employment by Franchisee.

5.      Covenantor shall not at any time, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the System.

6.      Covenantor acknowledges that all Manuals are loaned by Franchisor to Franchisee for limited purposes only and remain the property of Franchisor.  Covenantor agrees that no Manuals may be reproduced, in whole or in part, without Franchisor's written consent.

B.     <u>Covenants Not to Compete</u>

1.      In order to protect the goodwill and unique qualities of the System, and in consideration for the disclosure to Covenantor of the Confidential Information, Covenantor further agrees and covenants as follows:

a.      Not to divert, or attempt to divert, directly or indirectly, any business, business opportunity, or customer of the Franchisee's Restaurant to any competitor of the Restaurant.

b.      Not to employ, or seek to employ, any person who is at the time or was within the preceding ninety (90) days employed by Franchisor, or any of its affiliates or any franchisee or developer of Franchisor, or otherwise directly or indirectly induce such person to leave that person's employment except as may occur in connection with Franchisee's employment of such person if permitted under the Franchise Agreement.

*c.      Except for the Restaurant described in the Franchise Agreement, not to directly or indirectly, for himself or through, on behalf of, or in conjunction with any person or entity, without the prior written consent of Franchisor, own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in any legal entity), advise, assist or make loans to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Marks or operates or licenses others to operate a business under the same or similar Marks, which business is of a character and concept similar to the Restaurant, including a business that offers and sells as a primary menu item any one of more of chicken wings or philly cheese steak sandwiches.

2.      In further consideration for the disclosure to Covenantor of the Confidential Information and to protect the uniqueness of the System, Covenantor agrees and covenants that for three (3) years following the earlier of the expiration or termination of, or transfer of all of Franchisee's interest in, the Franchise Agreement or the termination of his association with or employment by Franchisee, Covenantor will not without the prior written consent of Franchisor:

a.      Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of the Restaurant to any competitor.

b.      Employ, or seek to employ, any person who is at the time or was within the preceding ninety (90) days employed by Franchisor, any of its affiliates or any franchisee or developer of Franchisor, or otherwise directly or indirectly induce such persons to leave that person's employment.

*c.       Directly or indirectly, for himself or through, on behalf of or in conjunction with any person or entity, own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in any legal entity), advise, assist or make loans to, any business that is of a character and concept similar to the Restaurant, including a business that offers and sells as a menu item any one or more of chicken wings or philly cheese steak sandwiches, which business is, or is intended to be, located within the Assigned Area or within a twenty-five (25)-mile radius of the location of any Restaurant in existence or under construction as of the date (as applicable) of expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement or the termination of Covenantor's association with or employment by Franchisee.

C.      Miscellaneous

1.      Franchisee shall make all commercially reasonable efforts to ensure that Covenantor acts as required by this Agreement.

2.      Covenantor agrees that in the event of a breach of this Agreement, Franchisor would be irreparably injured and be without an adequate remedy at law.  Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, Franchisor shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies that are made available to it at law or in equity, including the right to terminate the Franchise Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.      Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by Franchisor and Franchisee in enforcing this Agreement.

4.      Any failure by Franchisor or the Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

5.      THIS AGREEMENT SHALL BE INTERPRETED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA, WITHOUT REFERENCE TO GEORGIA CHOICE OF LAW PRINCIPLES.   COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF DEKALB COUNTY, GEORGIA AND THE FEDERAL DISTRICT COURTS FOR THE NORTHERN DISTRICT OF GEORGIA.  COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY GEORGIA OR FEDERAL LAW.    COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE DEKALB COUNTY, GEORGIA; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION THAT INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE THAT HAS JURISDICTION.

---

* May be deleted if Franchisor does not require Franchisee to obtain the execution of this covenant by Covenantor. See Section 10.3(g) of the Franchise Agreement.

6.     The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Covenantor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.     This Agreement contains the entire agreement of the parties regarding the subject matter hereof.  This Agreement may be modified only by a duly authorized writing executed by all parties.

8.     All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile or electronic mail (provided that the sender confirms the facsimile or electronic mail by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to Franchisor, the notice shall be addressed to:

American Deli International, Inc.
2716 Northeast Expressway
Atlanta, Georgia 30345 Attention:  President
Facsimile:  (770) 674-2765
Email:  info@iloveamericandeli.com

If directed to Franchisee, the notice shall be addressed to:

_____
_____
Attention: _____
Facsimile: (\_\_\_) _____
Email: _____

If directed to Covenantor, the notice shall be addressed to:

_____
_____
Attention: _____
Facsimile: (\_\_\_) _____
Email: _____

Any notices sent by personal delivery shall be deemed given upon receipt.  Any notices given by facsimile or electronic mail shall be deemed given upon transmission, provided confirmation is made as provided above.  Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing.  Any change in the foregoing addresses shall be effected by giving written notice of such change to the other parties.  Business day for the purpose of this Agreement excludes Saturday, Sunday and national holidays.

9.      The rights and remedies of Franchisor under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective affiliates, successors and assigns.   The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of Franchisor.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

FRANCHISOR:

AMERICAN DELI INTERNATIONAL, INC.


By: _____
Name: _____
Title: _____


FRANCHISEE:


_____

By: _____
Name: _____
Title: _____


COVENANTOR:


_____
Name: _____

Attachment D

**LEASE ADDENDUM**

(1)     Rights of Franchisor.

(a)     _____ ("Landlord")   acknowledges   that
_____ ("Tenant") is a franchisee of AMERICAN DELI INTERNATIONAL INC., a
Delaware corporation ("Franchisor"), and that the American Deli restaurant (the "Restaurant") located at
_____ ("Premises") is operated under
the system developed by Franchisor for establishing and operating American Deli restaurants (the
"American Deli System"), pursuant to a franchise agreement ("Franchise Agreement") between Tenant
and Franchisor.  Landlord consents to Tenant's use at the Premises of such marks and signs, decor items,
color schemes and related components of the American Deli System as Franchisor may prescribe for the
Restaurant.   During the term of the Franchise Agreement, the Premises may be used only for the
operation of the Restaurant.

(b)     Landlord agrees to furnish to Franchisor copies of any and all letters and notices
sent to Tenant pertaining to the lease for the Premises ("Lease") and the Premises at the same time that
such letters and notices are sent to Tenant.  Without limiting the foregoing, in the event of any default by
Tenant, Landlord shall give Franchisor written notice of such default.  If Tenant has failed to cure such
default at the expiration of the applicable cure period, Landlord shall give Franchisor further written
notice of such failure ("Franchisor Notice").  Following Franchisor's receipt of the Franchisor Notice,
Franchisor shall have the right (but not the obligation) to cure Tenant's default before Landlord shall
exercise any of Landlord's remedies arising as a consequence of Tenant's default.  Any such cure shall be
effected within fifteen (15) days following Franchisor's receipt of the Franchisor Notice.  Such cure by
Franchisor shall not be deemed to be an election to assume the terms, covenants, obligations and
conditions of the Lease.

(c)     If Franchisor cures Tenant's default, or if Franchisor notifies Landlord that the
Franchise Agreement has been terminated (which termination shall constitute a non-curable default
pursuant to the Lease upon Landlord's receipt of Franchisor's notice thereof), Landlord agrees, upon
Franchisor's written request, to cooperate with Franchisor with respect to any and all rights that Landlord
may have under the Lease to remove and evict Tenant from the Premises in order to pursue such action to
a conclusion.

(d)     If Franchisor cures Tenant's default or notifies Landlord of the termination of the
Franchise Agreement, Franchisor shall have the right and option, upon written notice to Landlord, to do
the following:

1.     Undertake to perform the terms, covenants, obligations and conditions of
the Lease on behalf of the Tenant (notwithstanding any removal or eviction of Tenant) for a period not to
exceed six (6) months from the first (1st) date of any cure by Franchisor; or

2.     At any time within or at the conclusion of such six (6) month period,
assume the terms, covenants, obligations and conditions of the Lease for the remainder of the term,
together with any applicable renewal options.  In such event, Landlord and Franchisor shall enter into an
agreement to document such assumption.  Franchisor is not a party to the Lease and shall have no liability
under the Lease unless and until said Lease is assigned to, and assumed by, Franchisor as herein provided.

(e)     If, during the six (6) month period set forth in Section (d)(1) above or at any time after the assignment contemplated in Section (d)(2), Franchisor shall notify Landlord that the franchise for the Restaurant is being granted to another American Deli franchisee, Landlord shall permit the assignment of the Lease to said franchisee, without any further consent of Landlord being required as a condition thereto and without the payment of any fee or other cost requirement.  Thereafter, Franchisor shall be released from any and all further liabilities under the Lease.  The parties agree to execute any commercially reasonable documents in furtherance of this section.

(f)     Tenant will not assign the Lease or renew or extend the term thereof without the prior written consent of Franchisor, nor shall Landlord and Tenant amend or otherwise modify the Lease in any manner that could materially affect any of the foregoing requirements without the prior written consent of Franchisor.

(g)     Franchisor shall have the right to enter the Premises to make any modification or alteration necessary to protect the American Deli System and marks or to cure any default under the Franchise Agreement or under the Lease, without being guilty of trespass or any other crime or tort.  Landlord shall not be responsible for any expenses or damages arising from any such action by Franchisor.  Tenant hereby releases, acquits and discharges Franchisor and Landlord, their respective subsidiaries, affiliates, successors and assigns and the officers, directors, shareholders, partners, employees, agents and representatives of each of them, from any and all claims, demands, accounts, actions and causes of action, known or unknown, vested or contingent, which any of them may have, ever had, now has, or may hereafter have by reason of any event, transaction or circumstance arising out of or relating to the exercise of Franchisor's rights pursuant to this Addendum.

(h)     All notices sent pursuant to this Addendum shall be sent in the manner set forth in the Lease, and delivery of such notices shall be effective as of the times provided for in the Lease.  For purposes of notice under the Lease, Franchisor's mailing address shall be 2716 Northeast Expressway, Atlanta, Georgia 30345, which address may be changed by written notice to Landlord in the manner provided in the Lease.

(2)     <u>Tenant's Exclusive.</u>  Tenant shall have the exclusive right to operate a deli-style restaurant (the "Exclusive Right") within the land, buildings, Common Areas and improvements commonly known as the [NAME OF SHOPPING CENTER] ("Shopping Center").  During the term of the Lease, no part of the Shopping Center may be leased, sold, used or occupied for the Exclusive Right other than (a) the Premises; or (b) any portion of the Shopping Center leased and/or occupied by another tenant or Shopping Center user of Landlord whose existing lease or right of possession was executed or entered into prior to the date of this Lease and expressly permitted such use or such tenant has the right to change its use without consent of the Landlord.

(3)     <u>Tenant's Signs.</u>  Tenant may install, maintain and replace the signs ("Tenant's Signs") in the color, size and other specifications set forth in the Signage Criteria attached to this Lease as [Exhibit "__"], subject to the Tenant's compliance with applicable laws and governmental regulations.  Tenant may designate the contractor for the fabrication and installation of Tenant's Signs.  Landlord will maintain the structural portions of any monument or pylon signage in good condition and will illuminate them daily from dusk to the time Tenant closes it restaurant for the day.  Tenant shall have a first priority right to install its sign panels on the Shopping Center pylon sign.  After the expiration or earlier termination of the Lease, Tenant may remove all of Tenant's Signs at its cost and Tenant must repair any damage caused by its removal thereof.  Tenant shall have the right to place temporary "Now Hiring" and "Grand Opening" banners outside of the Premises.

(4)     <u>Parking</u>.  Tenant may mark and reserve up to [____] parking spaces in the immediate vicinity of the Premises for the exclusive use of its "take-out" customers.

68

(5)     Landlord's Representations.  Landlord represents and warrants to Tenant that, to the best of its knowledge, (a) the Shopping Center complies with all applicable laws, rules and regulations; (b) it is the owner of the real property and improvements in the Shopping Center; (c) it has the full right and authority to enter into the Lease without any subsequent action and the execution of the Lease, and the performance of Landlord's obligations therein, do not violate any agreement binding on Landlord; (d) as of the date of the Lease, there are no restrictions (including pre-existing tenant exclusives) except those disclosed in writing to Tenant prior to the date of the Lease that would prevent Tenant from operating a deli-style restaurant within the Premises.  If Landlord breaches any of these representations and warranties then, in addition to any other remedy, Landlord agrees to indemnify, save and hold Tenant harmless from any loss, cost, expense or damage (including reasonable attorney's fees and court costs) that Tenant may incur as a result of such breach by Landlord.

(6)     Common Area Maintenance Costs.  Common Area Maintenance Costs ("CAM"), if any, shall not include the depreciation of any buildings or equipment, leasing commissions, legal expenses related to the making or enforcement of other leases, mortgages, ground rents or increases thereof, Landlord's executive salaries, the cost of constructing replacing or improving any part of the Shopping Center or the Common Areas or any other cost properly chargeable to the capital account under generally accepted accounting principles.  Tenant's pro-rata share of CAM, tax and insurance costs will be based on the total leasable square footage of the Shopping Center, whether or not leased.  In no event shall CAM increase by more than five (5%) percent in any year over the prior Lease Year.  If Tenant is paying CAM monthly based upon anticipated actual costs such monthly payments shall be based upon the prior year's actual costs with reasonable increases for anticipated costs.  Such estimated monthly costs shall be compared to the actual costs for any applicable Lease Year and appropriate remittance for any underpayment or refund for overpayment shall be made within fifteen (15) days after calculation, as the case may be.

Tenant shall have the right to audit and inspect Landlord's books and records with respect to CAM upon thirty (30) days prior written notice.  Such audit and inspection shall be made at Landlord's offices and Landlord shall make such books and records and any reasonably appropriate supporting documentation available for Tenant's review.  In the event that Tenant's audit or inspection shall reveal an error in the calculation of CAM, then adjustment shall be made by appropriate payment or refund within fifteen (15) days after such audit or inspection results shall be delivered to Landlord.  Landlord agrees to credit to Tenant's obligation to pay rent under the Lease to Tenant, upon written notice with supporting documentation, the reasonable cost of its audit or inspection if an error was discovered as a consequence requiring adjustment, as herein provided.

(7)     Leasing Restriction.  No part of the Shopping Center shall be leased, sold or used for a restaurant (other than the Premises) or [_____].

(8)     Landlord Agreements.  Landlord, on behalf of itself and its successors and assigns, covenants and agrees that:

(a)     Landlord and its employees, agents or contractors shall not engage in any action that would materially (i) obstruct the visibility of the Premises or Tenant's Signs; (ii) reduce the number of parking spaces available to Tenant's customers in the immediate vicinity of the Premises as shown on the site plan which is attached as [Exhibit "__"] to this Lease; or (iii) restrict or prohibit access to the Premises.

(b)     Regardless of any designated Shopping Center business hours, only Franchisor shall have the right to diminish or extend Tenant's business hours, which are initially Sunday through

69

Thursday, [_____] AM to [_____] PM and Friday and Saturday, [_____] AM to [_____] PM.  Tenant may close on national holidays or other observed holidays applicable to the location.

        (c)    Landlord shall, at all times, maintain a policy of commercial general liability insurance in an amount of not less than [_____ Dollars ($_____)] together with an "all risks" policy of casualty insurance covering the Shopping Center for not less than the full replacement cost thereof, and all such policies shall be underwritten with companies having at least an "A-" rating in Best's Insurance Guide.

        (d)    Landlord shall not add or diminish the area of the Shopping Center or the Common Areas thereof if such action would increase the Tenant's obligations under the Lease or diminish its rights thereunder.

        (e)    Landlord shall assist Tenant in order to facilitate Tenant's securing of all necessary permits and governmental approvals for the operation of its business at the Premises, including any signage permitted under this Lease and this Addendum.

    (9)    Tenant Financing.  Tenant may grant a mortgage or other security interest in all or part of the Tenant's property ("Tenant Property") located within the Premises (including Tenant's trade fixtures).  Landlord agrees that any lien that it may have against Tenant's Property (whether by statute or under the terms of the Lease or otherwise) will be subject and subordinate to the security interest of Tenant's lender.  Landlord shall execute and deliver to Tenant any commercially reasonably subordination documents requested by Tenant's lenders within ten (10) days after Landlord receives the documents.

    (10)    Landlord's Financing.  Landlord shall obtain and deliver to Tenant within thirty (30) days after the date of the Lease a commercially reasonable agreement ("Non-Disturbance Agreement") with the holder of any existing mortgage, deed of trust, ground lease or other security interest (any one or more, an "Encumbrance") affecting the Shopping Center containing the following provisions (the "Non-Disturbance Provisions"):  (i) the Lease and Tenant's rights under the Lease shall not be disturbed by any foreclosure or termination action so long as Tenant is not in default under the Lease beyond all applicable notice and opportunity to cure periods; (ii) Tenant will not be joined in any foreclosure or termination actions related to the Encumbrance; (iii) the Lease will automatically become a direct lease between any successor to Landlord's interest, as landlord, and Tenant.  In addition, the Lease will not become subordinate to any subsequent Encumbrance affecting the Shopping Center unless and until Landlord obtains from the holder of the Encumbrance an agreement containing such Non-Disturbance Provisions.

[SIGNATURES ON FOLLOWING PAGE]

70

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

**FRANCHISOR:**

AMERICAN DELI INTERNATIONAL INC.,
a Delaware corporation

By:_____

    Name:_____
    Title:_____
    Date:_____

**TENANT:**

_____

By:_____

    Name:_____
    Title:_____
    Date:_____

By:_____

    Name:_____
    Title:_____
    Date:_____

**LANDLORD:**

_____

By:_____

    Name:_____
    Title:_____
    Date:_____

## CONTROLLING PRINCIPALS GUARANTY AND COVENANT

*October 2, 2015*

This Controlling Principals Guaranty and Covenant (this "Guaranty") is given by each of the undersigned (each a "Guarantor") on ~~September~~ , 2015 to American Deli International, Inc., a Delaware corporation ("Franchisor"), in order to induce Franchisor to enter into that certain Franchise Agreement dated of even date herewith (the "Franchise Agreement") with Global Deli Network, Inc. ("Franchisee").

Guarantor acknowledges that Guarantor has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this Guaranty and the undertakings of the Controlling Principals herein and in the Franchise Agreement are in partial consideration for, and a condition to the granting of, the rights granted in the Franchise Agreement, and that Franchisor would not have granted these rights without the execution of this Guaranty by Guarantor.

Guarantor acknowledges that Guarantor is included in the term "Controlling Principals" as described in Section 18.21 of the Franchise Agreement.

Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement. Additionally, if Guarantor is designated as the Operating Principal, Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the covenants, representations, warranties and agreements of the Operating Principal set forth in the Franchise Agreement.

Guarantor does hereby guaranty to Franchisor the prompt payment and performance when due of any and all liabilities and obligations arising under or evidenced by the Franchise Agreement, any promissory note or other credit instruments, and any other liabilities, obligations and indebtedness of Franchisee and/or any of it assignees or affiliates to Franchisor and/or any of its assignees or affiliates, of every kind and description, now existing or hereafter incurred or arising, matured or unmatured, direct or indirect, absolute or contingent, due or to become due, and any renewals, consolidations and extensions, including any future advances from Franchisor to Franchisee (collectively, the "Guaranteed Obligations"). Guarantor shall perform and/or make punctual payment to Franchisor of the Guaranteed Obligations in accordance with the terms of the Franchise Agreement or other applicable document forthwith upon demand by Franchisor.

This Guaranty is irrevocable and unlimited. This Guaranty is an absolute and unconditional continuing guaranty of payment and performance of the Guaranteed Obligations. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, the suffering of any indulgence to any debtor, extension of time of payment thereof, nor the discharge of Franchisee by bankruptcy, operation of law or otherwise. Presentment, demand, protest, notice of protest and dishonor, notice of default or nonpayment and diligence in collecting any obligation under any agreement between Franchisee and Franchisor are each and all waived by Guarantor and/or acknowledged as inapplicable. Franchisor shall not be required to pursue any remedy on said Guaranteed Obligations as a condition of the obligation hereunder of Guarantor. Guarantor waives notice of amendment of any agreement between Franchisee and Franchisor and notice of demand for payment by Franchisee. Guarantor further agrees to be bound by any and all amendments and changes to any agreement between Franchisee and Franchisor.

Guarantor agrees to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under any agreement between Franchisee and Franchisor.

Guarantor waives any and all notice of the creation, renewal, extension, accrual, modification, amendment, release, or waiver of any of the Guaranteed Obligations and notice of or proof of reliance by Franchisor upon this Guaranty or acceptance of this Guaranty. The Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended, modified or waived, in reliance upon this Guaranty and all dealings between Franchisor and Guarantor shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guaranty. Franchisor may pursue its rights against Guarantor without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.

If other guarantors have guaranteed any and or all of the Guaranteed Obligations, their liability shall be joint and several to that of Guarantor.

Until all of the Guaranteed Obligations have been paid in full and/or performed in full, Guarantor shall not have any right of subrogation, unless expressly given to Guarantor in writing by Franchisor.

No change in the name, objects, share capital, business, membership, directors' powers, organization or management of the Franchisee shall in any way affect Guarantor in respect of the Guaranteed Obligations either with respect to transactions occurring before or after any such change, it being understood that this Guaranty is to extend to the person(s) or entity(ies) for the time being and from time to time carrying on the business now carried on by the Franchisee, notwithstanding any change(s) in the name or shareholders of the Franchisee, and notwithstanding any reorganization or its amalgamation with another or others or the sale or disposal of its business in whole or in part to another or others.

All Franchisor's rights, powers and remedies hereunder and under any other agreement now or at any time hereafter in force between Franchisor and Guarantor shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Franchisor by law.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall remain effective.

This Guaranty shall extend to and inure to the benefit of Franchisor and its successors and assigns and shall be binding on Guarantor and its successors and assigns.

IN WITNESS WHEREOF, Guarantor has signed this Guaranty as of the date set forth above.

GUARANTOR

Printed Name:* Haresh Patel

GUARANTOR

Printed Name: Pareshkumar M. Patel

\*          Denotes individual who is Franchisee's Operating Principal

## CONFIDENTIALITY AGREEMENT AND
## ANCILLARY COVENANTS NOT TO COMPETE

This Agreement is made and entered into this __ day of September 2015, among American Deli International, Inc., a Delaware corporation ("Franchisor"), Global Deli Network, Inc. ("Franchisee") and Haresh Patel ("Covenantor") in connection with a Franchise Agreement dated ~~September~~ , 2015 between Franchisor and Franchisee (the "Franchise Agreement"). Initially capitalized terms used, but not defined in, this Agreement has the meanings ascribed thereto in the Franchise Agreement. _October 2, 2015_

### RECITALS

Franchisor has the right to use and license the use of a System for the establishment and operation of an American Deli.

The System is identified by certain Marks including, the mark "American Deli" and includes certain Confidential Information which provides economic advantages to Franchisor and licensed users of the System.

Franchisor has granted Franchisee the right to operate an American Deli pursuant to the Franchise Agreement.

In connection with his or her duties, it will be necessary for Covenantor to have access to some or all of the Confidential Information.

Franchisor and Franchisee have agreed on the importance of restricting the use, access and dissemination of the Confidential Information, Franchisee therefore has agreed to obtain from Covenantor a written agreement protecting the Confidential Information and further protecting the System against unfair competition.

Covenantor acknowledges that receipt of and the right to use the Confidential Information constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

A.      Confidentiality Agreement

1.      Covenantor shall, at all times, maintain the confidentiality of the Confidential Information and shall use such Confidential Information only in the course of his or her employment by or association with Franchisee in connection with the operation of an American Deli under the Franchise Agreement.

2.      Covenantor shall not at any time make copies of any documents or compilations containing some or all of the Confidential Information without Franchisor's express written permission.

3.      Covenantor shall not at any time disclose or permit the disclosure of the Confidential Information except to other employees of Franchisee and only to the limited extent necessary to train or assist other employees of Franchisee in the operation of the Restaurant.

4.      Covenantor shall surrender any material containing some or all of the Confidential Information to Franchisee or Franchisor, upon request, or upon termination of employment by Franchisee.

5.      Covenantor shall not at any time, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the System.

6.      Covenantor acknowledges that all Manuals are loaned by Franchisor to Franchisee for limited purposes only and remain the property of Franchisor.  Covenantor agrees that no Manuals may be reproduced, in whole or in part, without Franchisor's written consent.

B.      <u>Covenants Not to Compete</u>

1.      In order to protect the goodwill and unique qualities of the System, and in consideration for the disclosure to Covenantor of the Confidential Information, Covenantor further agrees and covenants as follows:

a.      Not to divert, or attempt to divert, directly or indirectly, any business, business opportunity, or customer of the Franchisee's Restaurant to any competitor of the Restaurant.

b.      Not to employ, or seek to employ, any person who is at the time or was within the preceding ninety (90) days employed by Franchisor, or any of its affiliates or any franchisee or developer of Franchisor, or otherwise directly or indirectly induce such person to leave that person's employment except as may occur in connection with Franchisee's employment of such person if permitted under the Franchise Agreement.

c.      Except for the Restaurant described in the Franchise Agreement, not to directly or indirectly, for himself or through, on behalf of, or in conjunction with any person or entity, without the prior written consent of Franchisor, own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in any legal entity), advise, assist or make loans to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Marks or operates or licenses others to operate a business under the same or similar Marks, which business is of a character and concept similar to the Restaurant, including a business that offers and sells as a primary menu item any one of more of chicken wings or philly cheese steak sandwiches; provided, however, that this B.1(c) shall not apply to any Krispy Krunchy Chicken restaurant ("KKC Restaurant") owned or operated by Franchisee or the Covenantor as of the date hereof and as specified on Schedule A attached to the Franchise Agreement ("Existing KKC Restaurants").  During the term of this Agreement, if any of Franchisee or the Covenantor elects to own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in a legal entity), advise, assist or make loans to, any new KKC restaurant in addition to the Existing KKC Restaurants ("New KKC Restaurant"), each of Franchisee and the Covenantor covenants that any such New KKC Restaurant shall not be located within a 3 mile radius of any of the location of any Restaurant then in existence or under construction.

2.      In further consideration for the disclosure to Covenantor of the Confidential Information and to protect the uniqueness of the System, Covenantor agrees and covenants that for three (3) years following the earlier of the expiration or termination of, or transfer of all of Franchisee's interest in, the Franchise Agreement or the termination of his association with or employment by Franchisee, Covenantor will not without the prior written consent of Franchisor:

a.      Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of the Restaurant to any competitor.

b.    Employ, or seek to employ, any person who is at the time or was within the preceding ninety (90) days employed by Franchisor, any of its affiliates or any franchisee or developer of Franchisor, or otherwise directly or indirectly induce such persons to leave that person's employment.

c.    Directly or indirectly, for himself or through, on behalf of or in conjunction with any person or entity, own, maintain, operate, engage in or have any financial or beneficial interest in (including any interest in any legal entity), advise, assist or make loans to, any business that is of a character and concept similar to the Restaurant, including a business that offers and sells as a menu item any one or more of chicken wings or philly cheese steak sandwiches, which business is, or is intended to be, located within the Assigned Area or within a twenty-five (25)-mile radius (or in the case of KKC Restaurant, a three (3)-mile radius) of the location of any Restaurant in existence or under construction as of the date (as applicable) of expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement or the termination of Covenantor's association with or employment by Franchisee; provided, however, that this B.2(c) shall not apply to any KKC Restaurant owned or operated by Franchisee or the Covenantor in strict compliance with Section B.1(c) above as of the date (as applicable) of expiration or termination of, or transfer of all of Franchisee's interest in, this Agreement or the termination of Covenantor's association with or employment by Franchisee.

C.    Miscellaneous

1.    Franchisee shall make all commercially reasonable efforts to ensure that Covenantor acts as required by this Agreement.

2.    Covenantor agrees that in the event of a breach of this Agreement, Franchisor would be irreparably injured and be without an adequate remedy at law.  Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, Franchisor shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies that are made available to it at law or in equity, including the right to terminate the Franchise Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

3.    Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by Franchisor and Franchisee in enforcing this Agreement.

4.    Any failure by Franchisor or the Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

5.    THIS AGREEMENT SHALL BE INTERPRETED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA, WITHOUT REFERENCE TO GEORGIA CHOICE OF LAW PRINCIPLES.  COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF DEKALB COUNTY, GEORGIA AND THE FEDERAL DISTRICT COURTS FOR THE NORTHERN DISTRICT OF GEORGIA. COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY GEORGIA

OR FEDERAL LAW. COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE DEKALB COUNTY, GEORGIA; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION THAT INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE THAT HAS JURISDICTION.

6.      The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Covenantor expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

7.      This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

8.      All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid, facsimile or electronic mail (provided that the sender confirms the facsimile or electronic mail by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to Franchisor, the notice shall be addressed to:

> American Deli International, Inc.
> 2716 Northeast Expressway
> Atlanta, Georgia 30345
> Attention: President
> Facsimile: (770) 674-2765
> Email: info@iloveamericandeli.com

If directed to Franchisee, the notice shall be addressed to:

> Global Deli Network, Inc.
> 6213 Taylor Ridge Road
> Montgomery, AL 36116
> Attention: Haresh Patel
> Email: globaldelinetwork@gmail.com

If directed to Covenantor, the notice shall be addressed to:

> Haresh Patel
> 6213 Taylor Ridge Road
> Montgomery, AL 36116
> Email: globaldelinetwork@gmail.com

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by facsimile or electronic mail shall be deemed given upon transmission, provided confirmation is made as provided above. Any notice sent by expedited delivery service or registered or certified mail shall be deemed given three (3) business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving written notice of such change to the other parties. Business day for the purpose of this Agreement excludes Saturday, Sunday and national holidays.

9.     The rights and remedies of Franchisor under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective affiliates, successors and assigns. The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of Franchisor.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

FRANCHISOR:

AMERICAN DELI INTERNATIONAL, INC.

By: _____
Name: Hee Sung Park
Title: Vice President

FRANCHISEE:

GLOBAL DELI NETWORK, INC.

By: _____
Name: Haresh Patel
Title:  President

COVENANTOR:

_____
Name: Haresh Patel