## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF GEORIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GOUN HANNA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | _____ |
| | ) | |
| ECHELON HOMEOWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| JOEL D. STALLO, | ) | |
| DIANA KAIFAS, | ) | |
| KELLI GOODELL, | ) | |
| DENISE DONOHUE, & | ) | |
| MICHAEL B. DUICH, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW**, Goun Hanna ("Plaintiff") and files this, his Complaint,

against Echelon Homeowners Association, Inc. ("Defendant Echelon"), Joel D.

Stallo ("Defendant Stallo"), Diana Kaifas ("Defendant Kaifas"), Kelli Goodell

("Defendant Goodell"), Denise Donohue ("Defendant Donohue"), and Michael B.

Duich ("Defendant Duich"), collectively, ("Defendants"), showing this Honorable

Court as follows:

1.

Defendant Echelon is a Georgia Corporation with its principal place of

business located at 2180 West Sr. 434 Ste. 5000, Longwood, FL, 32779.  Service

of process may be effected upon its registered agent, Sentry Management, Inc., located at 400 Northridge Road, Ste. 1250, Atlanta, GA, 30350, or as otherwise allowed by applicable law.

2.

Defendant Stallo is a Georgia resident who resides at 271 Traditions Drive, Alpharetta, GA 30004. Service of process may be effected upon Defendant Stallo as allowed by applicable law.

3.

Defendant Kaifas is a Georgia resident who resides at 295 Traditions Drive, Alpharetta, GA 30004. Service of process may be effected upon Defendant Stallo as allowed by applicable law.

4.

Defendant Goodell is a Georgia resident who resides at 287 Traditions Drive, Alpharetta, GA 30004. Service of process may be effected upon Defendant Goodell as allowed by applicable law.

5.

Defendant Donohue is a Georgia resident who resides at 707 Founders Court, E, Alpharetta, GA 30004. Service of process may be effected upon Defendant Donohue as allowed by applicable law.

6.

Defendant Duich is a Georgia resident who resides at 505 Founders Drive, E, Alpharetta, GA 30004.  Service of process may be effected upon Defendant Duich as allowed by applicable law.

7.

Defendants are subject to the jurisdiction of this Court as this case is an action for breach of contract and racial discrimination pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964), as amended by the Civil Rights Act of 1991.

8.

Venue is conferred on this court pursuant to U.S.C. § 1331.

9.

Beginning in 2016, Plaintiff purchased several lots within the Echelon community, many of which he has built homes on and subsequently sold to other residents of Echelon.  Plaintiff is currently in the process of building more homes within the Echelon community.

10.

Plaintiff currently resides at 310 Traditions Court, Alpharetta, GA 30004 which is located within Echelon.

11.

From 2018 to 2022, Plaintiff was a member of Defendant Echelon's Architectural Review Committee ("ARC").  In addition, Defendant has previously served on Defendant Echelon's Board of Directors.

12.

On or about April 29, 2021, Plaintiff's company, Alexandria Holdings Group, Inc., and Joe Wytanis entered into a contract in which Plaintiff agreed to build a home for Mr. Wytanis at 314 Traditions Court, Alpharetta, Georgia 30004.

13.

Prior to commencing construction, Plaintiff deposited a $5,000.00 security deposit with Defendant Echelon, and thereafter received approval from the Architectural Review Committee to begin construction.

14.

On July 5, 2022, after completing the construction of the home for Mr. Wytanis, Mr. Coleman, a member of the Architectural Review Committee, completed a walk though of the home to ensure that everything was in compliance with Defendant Echelon's requirements.

15.

After conducting the walkthrough, Mr. Coleman confirmed the home was built in compliance with Defendant Echelon's requirements and released the $5,000.00 security deposit to Plaintiff in full.

16.

In August 2022, Defendant Echelon elected a new Board of Directors, consisting of Defendant Stallo, Defendant Kaifas, Defendant Goodell, Defendant Donohue, and Defendant Duich.

17.

At the time of the election of the new Board of Directors, Plaintiff was a member of the ARC.

18.

Shortly after the new Board of Directors was elected, the current ARC was abolished.  As a result, all members of the ARC, including Plaintiff were removed from the committee.

19.

Thereafter, upon revival of the ARC, Plaintiff applied to serve as a member of the ARC.

20.

Additionally, two African American residents also applied to serve as members of the ARC.

21.

However, the Board of Directors hand-picked all Caucasian individuals to serve on the ARC, many of whom never applied to serve on the ARC. Furthermore, the Board of Directors selected the ARC members without any input or solicitation from residents of the Echelon community, and in a manner that was not in the Association's best interests.

22.

Plaintiff, who is of Egyptian nationality was prohibited from doing so due to no fault of his own.

23.

Continuing their discriminatory and harassing behavior towards Plaintiff, on or about December 22, 2022, Defendant Echelon had its counsel send written correspondence to Plaintiff, informing Plaintiff that he was in violation of the Covenants related to the building of the home for Mr. Wytanis, and that if Plaintiff did not reimburse Mr. Wytanis the sum of $6,391.20 within ten (10) days, Plaintiff would be fined $75.00 per day until paid. A copy of the Correspondence dated December 22, 2022, is enclosed herein as Exhibit "1".

24.

Knowing that he was not in violation of the Covenants, Plaintiff had his counsel respond to Defendant Echelon's written correspondence, dated December 30, 2022, in which Plaintiff made Defendant Echelon aware of his position that he was not in violation of the Covenants, and of Plaintiff's demand for a hearing with Defendant Echelon's Board of Directors pursuant to Section 3.20 of the Bylaws. A copy of the Correspondence dated December 30, 2022, is enclosed herein as Exhibit "2".

25.

Thereafter, in an effort to hide their discriminatory behavior towards Plaintiff, the Board of Directors, on about January 11, 2023, voted to approve changes to the ARC's Guidelines.  Specifically, the Board of Directors was now prohibiting anyone who is a builder and who is currently building in Echelon from joining the ARC.  When adopting this change, the Board of Directors knew it would prohibit Plaintiff from serving on the Architectural Review Committee.  A copy of the Board Meeting Minutes dated January 11, 2023, is enclosed herein as Exhibit "3."

26.

Contrarily, Defendant's By-Laws provides:

(a) **All Lot Owners are eligible to serves as committee members**; however, no Owner shall be eligible to serve on a committee if he or she

is more than thirty (30) days past due in the payment of any assessment or other charge owed to the Association.

(b) **All committee members must be Lot Owners with the exception of the Architectural Review Committee which may have one or more member who do not own a Lot in the Community, such as a builder, architect or landscape architect; provided, however, at least one Owner who resides at a Lot shall be a member of the Architectural Review Committee**. The builder, architect and landscape architect committee members) may be compensated for their service as determined by the Board.

A copy of the Amended and Restated Declaration of Covenants, Conditions, and Restrictions For Echelon ("Covenants") is enclosed herein as Exhibit "4."

27.

Additionally, Section 12.11 of the Declaration provides:

"No action shall be taken by the Association or the Board of Directors which would discriminate against any person on the basis of race, creed, color, national origin, religion sex, familial status, disability or sexual orientation."

28.

At no time prior to January 11, 2023, had any builder been specifically prohibited from serving on the Architectural Review Committee.

29.

On February 8, 2023, Defendant Echelon acknowledged Plaintiff's demand for a hearing regarding the alleged fines to be assessed against Plaintiff relating to the construction of the home for Mr. Wytanis, and ultimately determined a hearing would not be necessary and Plaintiff could challenge the proposed fines without having a hearing in front of Defendant Echelon's Board of Directors.

30.

Additionally, on February 23, 2023, Defendants held a Board of Directors meeting to vote on the proposed budget for 2023, in violation of the Covenants.

31.

Specifically, Section 4.3 of the Covenants provides:

> It shall be the duty of the Board to prepare a budget covering the estimated costs of operating the Association during the coming year, which may include a capital contribution or reserve in accordance with a capital budget separately prepared. The Board shall cause the budget and the annual assessment to be levied against each Lot for the year to be delivered to each member at least thirty (30) days prior to the due date of such annual assessment.

32.

However, residents of the Echelon did not receive proper notice of the proposed budget.

## COUNT I
## BREACH OF COVENANTS AND BY-LAWS

### 33.

Plaintiff hereby incorporates by reference his allegations set forth in Paragraphs 1 through 32 above.

### 34.

When building the home for Mr. Wytanis, Plaintiff complied with all terms and conditions of the Covenants.

### 35.

However, despite Plaintiff's compliance, Defendant Echelon is in breach of the Covenants by attempting to improperly fine Plaintiff at a rate of $75.00 per day.

### 36.

As a result of Defendant Echelon's breach of the Covenants, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT II
## DISCRIMINATION AND HARASSMENT– TITLE VII OF THE CIVIL RIGHTS ACT OF 1965

### 37.

Plaintiff hereby reincorporates by reference his allegations set forth in paragraphs 1 through 36 above.

38.

Pursuant to the Declaration, Section 12.11 provides:

"No action shall be taken by the Association or the Board of Directors which would discriminate against any person on the basis of race, creed, color, national origin, religion sex, familial status, disability or sexual orientation."

39.

Plaintiff resides and is a member of the Echelon community and belongs to a racial minority.

40.

Plaintiff has been denied access to serve on the ARC committee due to his nationality.

41.

Defendants have acted in a discriminatory manner towards Plaintiff in an effort to cause damage to Plaintiff.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

42.

Plaintiff hereby reincorporates by reference his allegations set forth in paragraphs 1 through 41 above.

43.

The actions of Defendant Stallo, Defendant Kaifas, Defendant Goodell, Defendant Donohue, and Defendant Duich amount to a breach of fiduciary duty.

44.

Specifically, there exists a contractual relationship between Plaintiff and Defendants.  Furthermore, Defendant Stallo, Defendant Kaifas, Defendant Goodell, Defendant Donohue, and Defendant Duich were agents of Defendant Echelon.

45.

Defendants breached their fiduciary duty by implementing improper requirements as it relates to the ARC, which in turn, will negatively impact the financial well-being of Defendant Echelon and its members.

46.

Plaintiff has been damaged by actions of Defendants in an amount to be proven at trial.

## COUNT IV
## PUNITIVE DAMAGES AS TO DEFENDANTS

47.

Plaintiff hereby reincorporates by reference his allegations set forth in paragraphs 1 through 46 above.

48.

The conduct of Defendants as it relates to Plaintiff is such that it is clear that their actions arose to the level of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

49.

As a result of the Defendants' conduct, Plaintiff should be awarded punitive damages in an amount to be determined at trial.

## COUNT V
## EXPENSES OF LITIGATION

50.

Plaintiff hereby reincorporates by reference his allegations set forth in paragraphs 1 through 49 above.

51.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense.

52.

Pursuant to O.C.G.A § 13-6-11, and based on Defendants' actions, Plaintiff is entitled to reasonable attorney's fees and expenses of litigation.

## PRAYER

**WHEREFORE**, Plaintiff respectfully prays that he be granted judgment in hid favor and against Defendant, for:

a.  all damages and expenses incurred by Plaintiff as a result of Defendant's breach of the Covenants and By-Laws;

b.  all damages and expenses incurred by Plaintiff as a result of Defendant's Discrimination;

c.  all damages and expenses incurred by Plaintiff as a result of Defendants' breach of fiduciary duty;

d.  punitive damages;

e.  all reasonable attorney's fees and expenses of litigation incurred by Plaintiff pursuant to O.C.G.A. § 13-6-11; and

f.  any and all other relief deemed just by this Court.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted this 13th day of April 2023.

**WEINSTEIN & BLACK, LLC**

/s/Michael B. Weinstein
Michael B. Weinstein
Georgia Bar No. 746386
Ashley S. Lewis
Georgia Bar No. 564034
3050 Amwiler Road, Suite 200-C
Atlanta, GA 30360
(404) 228-2629 (O)
mike@wblegal.net
ashley@wblegal.net

*Attorneys for Plaintiff*

# EXHIBIT "1"

## EXHIBIT "2"

**<u>EXHIBIT "3"</u>**

# EXHIBIT "4"

**<u>EXHIBIT "1"</u>**



VIA CERTIFIED MAIL NO. 7022 2410 0000 6909 7551
RETURN RECEIPT REQUESTED, FIRST CLASS U.S. MAIL AND
ELECTRONIC MAIL TO: jounhanna@gmail.com

December 22, 2022

Alexandria Holdings Group, Inc.
c/o Joun Hanna
879 Roxholly Lane
Buford, Georgia 30518

      Re:    Echelon Homeowners Association, Inc.
             314 Traditions Court, Alpharetta, Georgia 30004

Dear Mr. Hanna:

This law firm represents the Echelon Homeowners Association, Inc. ("Association"). I am writing to you on behalf of the Board of Directors ("Board") of the Association regarding a violation associated with the above-addressed Lot in the Echelon Community which you built. You and the Lot are subject to the Amended and Restated Declaration of Covenants, Conditions and Restrictions for Echelon, recorded in Deed Book 12858, Page 1, *et seq.*, of the Cherokee County, Georgia land records (hereinafter and as may be supplemented and/or amended from time to time the "Declaration"). It is my understanding that, despite agreeing to install the proper Orenco pump for the STEP system tie-in, you did not replace the unapproved pump which resulted in damage to the new Owners of the residence.

Article 6, Section 6.1 of the Declaration provides in pertinent part:

> No exterior construction, alteration or addition of any improvements of any nature whatsoever including, without limitation, staking, clearing, excavating, grading, filling, construction of impervious surfaces, building, exterior alteration of existing improvements, changing the exterior color of any existing improvement, adding permanent exterior lighting… and planting and removing landscaping materials… shall be commenced or placed upon any part of the Community unless, approved in accordance with this Article, or otherwise expressly permitted under the Declaration.

Moreover, Article 6, Section 6.2 of the Declaration provides in pertinent part:

> Except as provided above, no exterior construction, addition, or modification shall be made unless and until plans and specifications shall

**Dorough & Dorough, LLC**
Suite 650, 160 Clairemont Avenue
Decatur, Georgia 30080

*telephone:* 4 0 4 - 6 8 7 - 9 9 7 7
*facsimile:* 4 0 4 - 6 8 7 - 0 0 1 1
www.dorough.com

Joun Hanna
December 22, 2022
Page **2** of **2**

      have been submitted in writing to and approved by the Architectural
      Review Committee…

      It is my understanding that you failed to get the initially installed pump approved in violation of the provisions above.  I also understand that, on or around April 27, 2022, you agreed to install the correct Orenco pump in return for the Association refunding the $5,000.00 construction deposit held by the Association.  Finally, it is the Association's understanding that you did not honor this agreement and, instead, the new owner was forced to install the pump at the cost of $6,391.20.  In order to cure this violation, you must reimburse the current Owner the cost of installation of the Orenco pump which you had entered into an agreement with the Association to provide.

      The purpose of this letter is to notify you that if you fail to correct the foregoing violation as provided herein within ten (10) days of the date of this letter, the Association will impose a fine of $75.00 per day until you cure the violation as noted above.  Any such fines imposed will be treated as an assessment against any Lots owned by you in the community and will give rise to lien rights by the Association.  Please note, all costs to cure the violation shall be assessed against you and collected in the same manner as assessments.  The Association may also choose to file suit for injunctive relief, for money damages, or both if the violations are not cured.

      You may, within ten (10) days of the notice of the foregoing sanctions, request a hearing before the Board of Directors regarding the fines to be imposed.  Please forward any written request to the Board c/o Benjamin Ost, 160 Clairemont Avenue, Suite 650, Decatur, Georgia 30030, by email at bpo@dorough.com, or by telephone at (404) 687-9977.  If a request is submitted in a timely manner, the Board of Directors will schedule the hearing. At this hearing, you may produce statements, witnesses, or evidence regarding the violation, the imposition of fines and/or other sanctions. All rights to have the violation or fine reconsidered are waived if a hearing is not requested within 10 days of the date of this letter.

      We hope that you will voluntarily comply with the Declaration and that no further enforcement action will be necessary.  **This letter is being sent by Certified Mail, Return Receipt Requested and First Class U.S. Mail to ensure delivery.**

                    Sincerely,

                    Benjamin Ost

Cc:  Board of Directors

**<u>EXHIBIT "2"</u>**



December 30, 2022

Mr. Benjamin Ost
Dorough & Dorough, LLC
160 Clairmont Avenue, Suite 60
Decatur, Georgia 30030

  Re: Jon Hanna v Echelon Homeowners Association, Inc.

Dear Mr. Ost:

Please be advised that I have been retained by Mr. Joun Hanna as it relates to the property located at 314 Traditions Court, Alpharetta, Georgia 30004.  Accordingly, please direct all correspondence regarding this matter to my attention.

I am in receipt of your letter dated December 20, 2022, in which you allege that Mr. Hanna is in violation of the Amended And Restated Declaration of Covenants, Conditions, and Restrictions For Echelon (the "Covenants").  Please be advised that Mr. Hanna denies being in violation of the Covenants, and in fact, it is Mr. Hanna's position that he is the subject of unfair harassment and discrimination.  Accordingly, and pursuant to Section 3.20 of the Bylaws of Echelon Homeowners Association, Inc. (the "Bylaws"), Mr. Hanna requests a hearing with the Board of Directors.

By sending this correspondence, Mr. Hanna is not waiving any rights or remedies he may have pursuant to the Declaration, the Bylaws, and applicable law, with the same being expressly reserved.

In the interim, this letter shall serve as formal notice of the Association's ongoing legal duty to preserve any and all information relevant to the facts surrounding this matter.  This duty to preserve evidence extends, but is not necessarily limited, to the following: (1) business records, (2) paper, digital, and electronic files, including but not limited to, e-mails and text messages, (3) data generated by and/or stored on computers and storage media, and (4) all other electronic data. Violations of the legal duty described in this notice can result in significant sanctions imposed by a court of law for spoliation of actual evidence and/or potential evidence.

Thank you for your time and attention.  If you would like to discuss this matter, I may be reached at (404) 228-2629.

Sincerely,

Michael B. Weinstein


CC:    Mr. Jon Hanna

# EXHIBIT "3"

Board Meeting Minutes
January 11, 2023

**Call to order:**
Joel Stallo called the meeting to order at 8:35am.  All the board members were present at the meeting.

**Approval of Minutes:**
The board unanimously voted to approve the minutes from the last meeting held on November 10, 2022.

**Open Issues:**

Budget – it was brought up that the community needed to vote on the budget per the CC&Rs for the neighborhood.  A neighborhood board meeting was set up to be held at the clubhouse on February 22, 2023, at 6:30pm.  A vote for the proposed budget will be held at the meeting as well as via email prior to the meeting.  We made a note to contact Kirk at Sentry to send out an email letting neighbors know of the issue and to hold off paying their 2023 dues.

STEP System – ongoing maintenance issues are present that will need to be addressed.  Since the scope of the repairs is still in discovery mode, we will continue meeting with the company helping us to get detailed estimates for repair. For some time, EMS has strongly advised that we replace the existing controller for the STEP operation. It is obsolete and could potentially shut us down if/when it fails. The estimate for replacing the controller is $80k. Knowing this, we discussed moving money from the General Reserves to the STEP Reserves in anticipation of having to replace the controller. A vote was taken by the HOA Board members (on January 20) where it was approved by a vote of 5-0.

Entrance Gate – the gate actuators were just replaced within the budget tentatively set for the gate maintenance for 2023.

**New Items of Business:**

ARC Committee – the board held a vote to approve changes to the ARC Guidelines.  These included language prohibiting anyone who is building in Echelon to be an ARC committee member, reinstating a professional architect to review plans, add the original pattern book to the guidelines, change the side setback to the original 20 ft., change the wording for secondary front facing garages, adding wording to protect trees on lots with a tree preservation report, adding language requiring streets being cleaned of debris and dirt daily with a noncompliance fine, allowing signs to include builders name on plans box, increasing the new construction deposit to $10,000, increasing the fee for non-compliance of construction sites to $200 and if not corrected, $200/day.  The Board will review once the wording for these changes is finalized.

The board agreed to add additional fines to the Construction Fee Schedule.   These were cutting trees without approval at $1,000 fee per tree and any lot clearing or grading without approval at $25,000 fee.

Landscaping:  The board discussed holding the golf course more accountable for the maintenance in the neighborhood as they are required in the community cost share agreement.  Kelli has put together a detailed RFQ to distribute to landscape contractors. The goal is to improve the appearance of the neighborhood and at the best cost.

**Adjournment:**   Joel Stallo adjourned the meeting at 11:30am.

## EXHIBIT "4"

Deed Book **12858** Pg **1**
Filed and Recorded 5/21/2014 3:48:53 PM
28-2014-013407

Patty Baker
Clerk of Superior Court Cherokee Cty, GA

| | |
|---|---|
| UPON RECORDING RETURN TO: | CROSS REFERENCE: Deed Book:    7322 |
| The Abram Law Group, LLC | Page:    124 |
| 1200 Ashwood Parkway, Suite 560 | |
| Atlanta, GA 30338 | |
| 770/349-0120 | |

---

## AMENDED AND RESTATED

## DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS

## FOR

## ECHELON

---

THIS INSTRUMENT SUBJECTS THE MANDATORY MEMBERSHIP HOMEOWNERS ASSOCIATION AND PROPERTY DESCRIBED HEREIN TO THE PROVISIONS OF THE GEORGIA PROPERTY OWNERS' ASSOCIATION ACT, O.C.G.A. SECTION 44-3-220, *ET SEQ.*

AMENDED AND RESTATED

DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

FOR

ECHELON

- TABLE OF CONTENTS -

Page Number

**ARTICLE 1  DEFINITIONS** .................................................................................................................................3

1.1  "ACT" .................................................................................................................................................................3
1.2  "ARCHITECTURAL GUIDELINES" ...........................................................................................................................3
1.3  "ARTICLES OF INCORPORATION" ...........................................................................................................................3
1.4  "ASSOCIATION" ...................................................................................................................................................3
1.5  "BOARD OF DIRECTORS" OR "BOARD" ...................................................................................................................3
1.6  "BYLAWS" ...........................................................................................................................................................3
1.7  "CHEROKEE COUNTY, GEORGIA" ..........................................................................................................................3
1.8  "COMMON PROPERTY" ..........................................................................................................................................4
1.9  "COMMUNITY" .....................................................................................................................................................4
1.10  "COMMUNITY-WIDE STANDARD" .........................................................................................................................4
1.11  "EASEMENT AND COST SHARING AGREEMENT" .....................................................................................................4
1.12  "GOLF CLUB" .....................................................................................................................................................4
1.13  "GOLF CLUB OWNER" .........................................................................................................................................4
1.14  "LOT" ...............................................................................................................................................................4
1.15  "MORTGAGE" .....................................................................................................................................................4
1.16  "MORTGAGEE" ...................................................................................................................................................4
1.17  "OCCUPANT" ......................................................................................................................................................4
1.18  "OWNER" ...........................................................................................................................................................5
1.19  "PERSON" ..........................................................................................................................................................5
1.20  "SUPPLEMENTARY DECLARATION" .......................................................................................................................5
1.21  "TOTAL ASSOCIATION VOTE" ..............................................................................................................................5

**ARTICLE 2  PROPERTY SUBJECT TO THIS DECLARATION** ............................................................................5

2.1  PROPERTY HEREBY SUBJECTED TO THIS DECLARATION ...........................................................................................5
2.2  ANNEXATION BY ASSOCIATION ..............................................................................................................................5
2.3  OTHER ANNEXATION ............................................................................................................................................5
2.4  UNILATERAL ANNEXATION BY GOLF CLUB OWNER .................................................................................................6

**ARTICLE 3  ASSOCIATION MEMBERSHIP AND VOTING RIGHTS** ..................................................................6

3.1  MEMBERSHIP .......................................................................................................................................................6
3.2  VOTING ...............................................................................................................................................................6

**ARTICLE 4  ASSESSMENTS** ..............................................................................................................................7

4.1  PURPOSE OF ASSESSMENTS ....................................................................................................................................7
4.2  CREATION OF THE LIEN AND PERSONAL OBLIGATION FOR ASSESSMENTS .................................................................7
4.3  BUDGET ..............................................................................................................................................................8
4.4  ANNUAL ASSESSMENTS .........................................................................................................................................8
4.5  SPECIAL ASSESSMENTS .........................................................................................................................................8
4.6  SPECIFIC ASSESSMENTS .........................................................................................................................................9
4.7  SUBORDINATION OF LIENS TO MORTGAGES .............................................................................................................9

4.8   REMEDIES OF THE ASSOCIATION ..................................................................................................... 9
4.9   DATE OF COMMENCEMENT OF ASSESSMENTS ........................................................................... 11
4.10  FAILURE TO ASSESS ..................................................................................................................... 11
4.11  ESTOPPEL CERTIFICATE .............................................................................................................. 11
4.12  WORKING CAPITAL CONTRIBUTION ........................................................................................... 11

ARTICLE 5  MAINTENANCE RESPONSIBILITY: COMMON PROPERTY AND LOTS ............................ 12

5.1   ASSOCIATION'S MAINTENANCE RESPONSIBILITY ........................................................................ 12
5.2   OWNER'S RESPONSIBILITY ........................................................................................................... 13
5.3   PARTITION .................................................................................................................................... 14
5.4   CONDEMNATION .......................................................................................................................... 14
5.5   LIABILITY ..................................................................................................................................... 14
5.6   GATED COMMUNITY ..................................................................................................................... 14

ARTICLE 6  ARCHITECTURAL STANDARDS ................................................................................................. 16

6.1   GENERAL ...................................................................................................................................... 16
6.2   GUIDELINES AND PROCEDURES .................................................................................................... 16
6.3   ARCHITECTURAL GUIDELINES ..................................................................................................... 17
6.4   LIMITATION OF LIABILITY ........................................................................................................... 17
6.5   NO WAIVER ................................................................................................................................. 18
6.6   VARIANCES .................................................................................................................................. 18
6.7   ENFORCEMENT ............................................................................................................................. 18
6.8   ARCHITECTURAL REVIEW COMMITTEE ....................................................................................... 19

ARTICLE 7  USE RESTRICTIONS AND RULES .............................................................................................. 19

7.1   RULES AND REGULATIONS ........................................................................................................... 19
7.2   RESIDENTIAL USE ........................................................................................................................ 19
7.3   SIGNS ........................................................................................................................................... 19
7.4   VEHICLES; PARKING .................................................................................................................... 19
7.5   ANIMALS AND PETS ..................................................................................................................... 21
7.6   NUISANCE .................................................................................................................................... 21
7.7   UNSIGHTLY OR UNKEMPT CONDITIONS ....................................................................................... 22
7.8   ANTENNAE ................................................................................................................................... 22
7.9   TREE REMOVAL ........................................................................................................................... 22
7.10  DRAINAGE ................................................................................................................................... 22
7.11  SIGHT DISTANCE AT INTERSECTIONS ........................................................................................... 22
7.12  GARBAGE CANS, WOODPILES, ETC. ............................................................................................. 23
7.13  SUBDIVISION OF LOT ................................................................................................................... 23
7.14  SPORTS EQUIPMENT ..................................................................................................................... 23
7.15  FENCES AND WALLS .................................................................................................................... 23
7.16  HEATING AND AIR-CONDITIONING UNITS .................................................................................... 24
7.17  LIGHTING ..................................................................................................................................... 24
7.18  ENERGY CONSERVATION EQUIPMENT .......................................................................................... 24
7.19  ARTIFICIAL VEGETATION, GARDENS, EXTERIOR SCULPTURE, WATER FEATURES AND SIMILAR ITEMS ......... 24
7.20  MAILBOXES .................................................................................................................................. 24
7.21  CLOTHESLINES ............................................................................................................................. 24
7.22  OUTBUILDINGS AND SIMILAR STRUCTURES ................................................................................. 24
7.23  WINDOW TREATMENTS ................................................................................................................ 24
7.24  SWIMMING POOLS ........................................................................................................................ 25
7.25  FLAGS .......................................................................................................................................... 25
7.26  LEASING ....................................................................................................................................... 25
7.27  STREAM BUFFER AREAS ............................................................................................................... 26

**ARTICLE 8  GOLF COURSE** .................................................................................................. **26**

8.1   GENERAL ............................................................................................................... 26
8.2   CONVEYANCE OF GOLF CLUB ............................................................................... 28
8.3   GOLF CLUB EASEMENTS ....................................................................................... 28
8.4   ASSUMPTION OF RISK AND INDEMNIFICATION ....................................................... 30
8.5   USE OF LOTS ADJACENT TO GOLF CLUB ............................................................... 31

**ARTICLE 9  INSURANCE AND CASUALTY LOSSES** .......................................................... **31**

9.1   INSURANCE OBTAINED BY ASSOCIATION ................................................................ 31
9.2   INSURANCE OBTAINED BY OWNERS ...................................................................... 32
9.3   DAMAGE AND DESTRUCTION -- INSURED BY ASSOCIATION .................................... 32
9.4   DAMAGE AND DESTRUCTION -- INSURED BY OWNERS ........................................... 33

**ARTICLE 10  EASEMENTS** ...................................................................................................... **33**

10.1   GENERAL .............................................................................................................. 33
10.2   EASEMENTS FOR USE AND ENJOYMENT ............................................................... 33
10.3   EASEMENTS FOR ENTRY ...................................................................................... 34
10.4   EASEMENTS FOR UTILITIES .................................................................................. 34
10.5   EASEMENTS FOR WALKS, TRAILS AND SIGNS ....................................................... 35
10.6   EASEMENTS FOR ROAD RIGHT-OF-WAY .............................................................. 35
10.7   EASEMENTS FOR ASSOCIATION ........................................................................... 35
10.8   EASEMENT FOR MAINTENANCE ............................................................................ 35
10.9   ENVIRONMENTAL EASEMENT ............................................................................... 36
10.10  EASEMENTS FOR ENCROACHMENT ....................................................................... 36
10.11  EASEMENT FOR CONSTRUCTION ........................................................................... 36
10.12  EASEMENT FOR PRIVATE STREETS, SIDEWALKS AND SIGNS ................................ 36

**ARTICLE 11  DISPUTE RESOLUTION AND LIMITATION ON LITIGATION** ....................... **37**

11.1   AGREEMENT TO AVOID COSTS OF LITIGATION AND TO LIMIT RIGHT TO LITIGATE DISPUTES ....... 37
11.2   EXEMPT CLAIMS .................................................................................................. 37
11.3   MANDATORY PROCEDURES FOR ALL OTHER CLAIMS ............................................ 37
11.4   ALLOCATION OF COSTS RESOLVING CLAIMS ........................................................ 38
11.5   ENFORCEMENT OF RESOLUTION ........................................................................... 38

**ARTICLE 12  GENERAL PROVISIONS** ................................................................................... **39**

12.1   ENFORCEMENT ..................................................................................................... 39
12.2   OCCUPANTS BOUND ............................................................................................ 39
12.3   SELF-HELP ........................................................................................................... 39
12.4   DURATION ............................................................................................................ 39
12.5   AMENDMENT ........................................................................................................ 40
12.6   GENDER AND GRAMMAR ...................................................................................... 41
12.7   SEVERABILITY ...................................................................................................... 41
12.8   CAPTIONS ............................................................................................................. 41
12.9   PREPARER ............................................................................................................. 41
12.10  NOTICES ............................................................................................................... 41
12.11  NO DISCRIMINATION ............................................................................................ 41
12.12  INDEMNIFICATION ................................................................................................ 41
12.13  NOTICE OF SALE OR ACQUISITION ........................................................................ 42
12.14  AGREEMENTS ....................................................................................................... 42
12.15  VARIANCES ........................................................................................................... 42
12.16  LITIGATION .......................................................................................................... 42
12.17  SECURITY ............................................................................................................. 43
12.18  RECIPROCAL RIGHTS TO USE NAME ..................................................................... 43

**ARTICLE 13  GEORGIA PROPERTY OWNERS' ASSOCIATION ACT** ............................... **43**

EXHIBIT "A"   -   PROPERTY SUBJECT TO THE DECLARATION

EXHIBIT "B"   -   BYLAWS OF ECHELON HOMEOWNERS ASSOCIATION, INC.

AMENDED AND RESTATED

DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

FOR

ECHELON

**THIS AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS FOR ECHELON** (hereinafter called the "Declaration") is made by **ECHELON ADMINISTRATION, LLC**, a Georgia limited liability company (hereinafter referred to as "Echelon Administration" or "Declarant") and **ECHELON HOMEOWNERS ASSOCIATION, INC.**, a Georgia nonprofit corporation (hereinafter called the "Association").

## W I T N E S S E T H

**WHEREAS**, The Georgia Tech Club by Melrose, LLC, a Georgia limited liability company ("The Georgia Tech Club"), as "Declarant", executed that certain Declaration of Covenants, Conditions, and Restrictions for The Heritage, which was recorded on August 25, 2004 at Deed Book 7322, Page 124, *et seq*., Cherokee County, Georgia land records; as amended by that certain First Amendment to Declaration of Covenants, Conditions and Restrictions for The Heritage, recorded February 14, 2005 at Deed Book 7703, Page 341, *et seq*., aforesaid records (which amendment changed the name of the community from The Heritage to Echelon); as further amended by that certain Second Amendment to Declaration of Covenants, Conditions and Restrictions for Echelon, recorded April 19, 2012 at Deed Book 11794, Page 53, *et seq*., aforesaid records; as further amended by that certain Third Amendment to Declaration of Covenants, Conditions and Restrictions for Echelon, recorded September 18, 2012 at Deed Book 12005, Page 186, *et seq*., aforesaid records; and as amended by that certain Fourth Amendment to the Declaration of Covenants, Conditions and Restrictions for Echelon, recorded September 18, 2012 at Deed Book 12005, Page 222, *et seq*., aforesaid records (hereinafter as supplemented and/or amended from time to time, hereinafter collectively referred to as the "Original Declaration"); and

**WHEREAS**, MIC-GOBI, LLC, a Minnesota limited liability company ("MIC-GOBI") succeeded to all rights of The Georgia Tech Club as the Declarant pursuant to that certain Deed Under Power of Sale, recorded at Deed Book 10638, Page 58, aforesaid records; and

**WHEREAS**, MIC-GOBI assigned all of its rights, title, interest, powers, privileges and immunities as Declarant arising under the Declaration to Echelon Atlanta Holdings, LLC, a Georgia limited liability company ("Atlanta Echelon Holdings") pursuant to that certain Assignment of Declarant Rights, recorded September 18, 2012 at Deed Book 12005, Page 218, *et seq*., aforesaid records; and

**WHEREAS**, Echelon Atlanta Holdings assigned all of its rights, title, interest, powers, privileges and immunities as Declarant arising under the Declaration to Echelon Administration

pursuant to that certain Assignment of Declarant rights, recorded ~~may 21~~ , 2014 at Deed Book 2857 , Page ~~444~~, *et seq.*, aforesaid records; and

**WHEREAS,** the Board of Directors of the Association adopted the Bylaws of Echelon Homeowners Association, Inc., a copy of which is attached as Exhibit "B" hereto and by this reference incorporated herein; and

**WHEREAS,** Article XIII, Section 13.02 of the Original Declaration provides that during any period in which Declarant retains the right to appoint and remove any directors and officers of the Association, Declarant may amend the Original Declaration by filing an instrument in writing filed and recorded in the Cherokee County, Georgia land records without the approval of any Owner or Mortgagee; provided however, (i) in the event that such amendment materially and adversely alters or changes any Owner's right to the use and enjoyment of his Lot or the Common Areas or adversely affects the title to any Lot, such amendment shall be valid only upon the written consent thereto by a majority in number of the then existing Owners affected thereby; and (ii) in the event that such amendment would materially and adversely affect the security title and interest of any Mortgagee, such amendment shall be valid only upon the written consent thereto of all Mortgagees affected; and

**WHEREAS,** Article XIII, Section 13.02 of the Original Declaration further provides that no amendment to the Original Declaration which will materially affect the ownership or operations of the golf course, Golf Club Property or the Golf Club Owner shall be effective without the written approval of the Golf Club Owner; and

**WHEREAS,** the right of the Declarant to appoint and remove the directors and officers of the Association has not expired as provided in Article XIII, Section 13.01 of the Original Declaration; and

**WHEREAS,** this Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Echelon does not: (a) materially and adversely alter or change any Owner's right to the use and enjoyment of his Lot or the Common Areas; (b) adversely affect the title to any Lot; or (c) materially and adversely affect the security title and interest of any Mortgagee, all as provided in Article XIII, Section 13.02 of the Original Declaration; and

**WHEREAS,** Echelon Hospitality Group, LLC, a Georgia limited liability company, as the Golf Club Owner, hereby consents to this Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Echelon, as evidenced by the signature attached hereto and by this reference incorporated herein; and

**WHEREAS,** from and after the date of recording of this Declaration in the Cherokee County, Georgia land records all rights, powers and obligations of the Declarant arising under the Original Declaration shall cease and be of no further force an effect, except for those rights expressly reserved for the benefit of the Golf Club Owner, as defined herein; and

**WHEREAS,** Declarant desires to amend the Original Declaration as provided herein, as evidenced by the signature attached hereto and by this reference incorporated herein;

2

**NOW THEREFORE,** Declarant hereby amends the Original Declaration by deleting the same in its entirety and in its place adopting this Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Echelon, hereby declaring that all of the property described on Exhibit "A" attached hereto, which includes the property encumbered by the Original Declaration, shall be held, sold, transferred, conveyed, used, occupied, mortgaged and otherwise encumbered subject to the covenants, conditions, restrictions, easements, assessments and liens, hereinafter set forth, which are for protecting the value and desirability of and which shall run with the title to, the real property hereby and hereafter made subject hereto and shall be binding on all persons having any right, title or interest in all or any portion of the real property now and hereafter made subject hereto, their respective heirs, legal representatives, successors, successors-in-title and assigns and shall inure to the benefit of each Owner of all or any portion thereof, as follows:

Article 1
Definitions

The following words, when used in this Declaration or in any Supplementary Declaration, shall have the following meanings:

1.1 "Act" means the Georgia Property Owners' Association Act, O.C.G.A. § 44-3-220, *et seq.*, as may be amended from time to time.

1.2 "Architectural Guidelines" means the architectural, design, construction and/or landscaping guidelines promulgated by the Architectural Review Committee, as more particularly set forth in Article 6 hereof.

1.3 "Articles of Incorporation" means the Articles of Incorporation of Echelon Homeowners Association, Inc., filed with the Georgia Secretary of State and incorporated herein by this reference, as may be amended from time to time.

1.4 "Association" means Echelon Homeowners Association, Inc., a Georgia nonprofit corporation, its successors and assigns.

1.5 "Board of Directors" or "Board" means the appointed or elected body of the Association, vested with the authority to operate and manage the affairs of the Association under the Georgia Nonprofit Corporation Code, O.C.G.A. § 14-3-101, *et seq.*

1.6 "Bylaws" means the Bylaws of Echelon Homeowners Association, Inc., attached to this Declaration as Exhibit "B" and incorporated herein by this reference, as may be amended from time to time.

1.7 "Cherokee County, Georgia" shall also include any future municipality in which the Community is located.

1.8  "Common Property" means any and all real and personal property, including, without limitation, easements and other interests therein, and the facilities and improvements located thereon such as the guard house and Gate System, now or hereafter owned by the Association for the common use and enjoyment of the Owners.

1.9  "Community" refers to that certain real property described in Exhibit "A", attached hereto, and such additions thereto as may be made by Supplementary Declaration as provided herein.

1.10  "Community-Wide Standard" means the standard of conduct, maintenance or other activity generally prevailing in the Community.  Such standard may be more specifically determined by the Architectural Review Committee and may be delineated in part by the rules and regulations of the Association and the Architectural Guidelines.

1.11  "Easement and Cost Sharing Agreement" means that certain Easement and Cost Sharing Agreement between the Association and the Golf Club Owner, recorded or to be recorded in the Cherokee County, Georgia land records, which sets forth the maintenance of the Septic Tank Effluent Pump System ("STEP System") serving the Community and Golf Club, the private roads and such other services, amenities and items as may be shared between the Association and the Golf Club Owner and the shared costs for maintaining the same, upon such terms and conditions as more particularly set forth therein.

1.12  "Golf Club" means that certain real property containing an eighteen hole golf course, practice areas, driving range, pitching and putting areas, tennis courts, lake cottage and future clubhouse, which is located adjacent to the Community and is owned and operated by the Golf Club Owner.

1.13  "Golf Club Owner" means Echelon Hospitality Group, LLC, a Georgia limited liability company and any successor or successor-in-title to the Golf Club.

1.14  "Lot" means any plot of land within the Community, whether or not improvements are constructed thereon, which constitutes a single-family dwelling site, as shown on the subdivision plat(s) for the Community recorded in the land records of Cherokee County, Georgia.  The ownership of each Lot shall include, and there shall pass with the title to each Lot as an appurtenance thereto, whether or not separately described, all of the rights and interests of an Owner in the Common Property, as herein provided, together with membership in the Association.

1.15  "Mortgage" means any and all instruments used for the purpose of encumbering real property in the Community as security for the payment or satisfaction of an obligation, including, without limitation, any mortgage, deed to secure debt or deed of trust.

1.16  "Mortgagee" means the holder of a Mortgage.

1.17  "Occupant" means any Person occupying all or any portion of a Lot for any period of time, regardless of whether such Person is a tenant of the Owner of such property.

1.18  "Owner" means the record owner, whether one or more Persons, of the fee simple title to any Lot located within the Community, excluding, however, any Person holding such interest merely as security for the performance or satisfaction of any obligation.

1.19  "Person" includes any individual, individual acting in a fiduciary capacity, corporation, limited partnership, limited liability company, general partnership, joint stock company, joint venture, association, company or other organization, recognized as a separate legal entity under Georgia law.

1.20  "Supplementary Declaration" means a supplement to this Declaration which subjects additional property to this Declaration.

1.21  "Total Association Vote" means the votes attributable to the entire membership of the Association as of the record date for such action, but specifically excludes the votes of any Owners whose voting rights have been suspended as provided herein, whether or not such members are present or represented at the meeting, if any, where such votes are to be cast.  If, for example, and without limitation, two-thirds (2/3) of the Total Association Vote is required to approve a matter, such matter must receive at least two-thirds (2/3) of the votes attributable to all existing members of the Association as of the record date for such action (excluding the votes of any Owners whose voting rights have been suspended as provided herein), whether or not such members are present or represented at the meeting, if any, where such votes are to be cast.

Article 2
Property Subject To This Declaration

2.1  Property Hereby Subjected To This Declaration.  The real property which is, by the recording of this Declaration, subject to the covenants, conditions, restrictions and easements hereinafter set forth and which, by virtue of the recording of this Declaration, shall be held, transferred, sold, conveyed, used, occupied and encumbered subject to this Declaration is described in Exhibit "A" attached hereto and by this reference made a part hereof.  The property encumbered by the Original Declaration is a portion of the property described on Exhibit "A."  Notwithstanding the foregoing, the Declaration shall not encumber the Golf Club.

2.2  Annexation by Association.  Upon the written consent of: (a) the owner(s) thereof; and (b) the Owners of at least two-thirds (2/3) of the Lots, the Association may annex real property to the provisions of this Declaration and the jurisdiction of the Association by filing for record in the Cherokee County, Georgia land records, a Supplementary Declaration which: (x) is executed on behalf of the Association by the President of the Association whose signature shall be attested by the Secretary of the Association; (y) is executed by the owner of the property to be annexed; and (z) describes the property to be annexed.  The annexation shall be effective only upon the filing for record of such Supplementary Declaration, unless a later effective date is provided therein.

2.3  Other Annexation.  The Owner(s) of any Lot which is intended to be a part of the Community, but has not been previously subjected to the provisions of this Declaration and the

jurisdiction of the Association, may, without the consent of any other Owners and with the consent of the Association, annex such Lot to the provisions of this Declaration and jurisdiction of the Association by filing a Supplementary Declaration describing the property to be annexed with the Clerk of the Superior Court of Cherokee County, Georgia. Any such Supplementary Declaration shall be signed by the Owner(s) of the Lot being annexed and shall be executed on behalf of the Association by the President of the Association whose signature shall be attested by the Secretary of the Association. Any such Supplementary Declaration shall be effective upon the filing for record, unless a later effective date is provided therein.

2.4 <u>Unilateral Annexation by Golf Club Owner.</u> Golf Club Owner shall have the unilateral right to annex any additional property that it owns as of January 1, 2014 to the covenants, conditions and restrictions set forth herein and to the jurisdiction of the Association by filing a Supplementary Declaration describing such property in the Cherokee County, Georgia land records. Notwithstanding the foregoing, any property owned by the Golf Club Owner which may be annexed to the provisions of the Declaration and the jurisdiction of the Association shall not exceed fifteen (15) Lots and such Lots shall be no less than one (1) acre in size and must front Founders Court East (50' R/W), Club Drive (50' R/W), Founders Drive East (50' R/W) and Traditions Drive (50' R/W), all as identified on the recorded subdivision plat for the Community. Golf Club Owner shall annex such Lots prior to the commencement of any construction located thereon and the construction of any improvements or structures on such Lots shall require the prior written approval of the Architectural Review Committee as provided in Article 6 hereof. Golf Club Owner shall notify the Association within ten (10) days of executing and recording a Supplementary Declaration and shall provide the Association with a copy of any recorded Supplementary Declaration upon receipt thereof. Any such Supplementary Declaration shall be effective upon the filing for record, unless a later effective date is provided therein.

Article 3
Association Membership and Voting Rights

3.1 <u>Membership.</u> Every Person who is the record owner of a fee or undivided fee interest in any Lot that is subject to this Declaration shall have a membership in the Association. The foregoing is not intended to include Persons who hold an interest merely as security for the performance of an obligation, and the giving of a security interest shall not terminate an Owner's membership. No Owner, whether one (1) or more Persons, shall have more than one (1) membership per Lot. Membership shall be appurtenant to and may not be separated from ownership of a Lot. The rights and privileges of membership, including the right to hold office, may be exercised by a member or the spouse of a member, but in no event shall more than one (1) office be held. This Section is not intended to prohibit the same individual from being both an officer and a director of the Association.

3.2 <u>Voting.</u> Members shall be entitled to one (1) vote for each Lot owned. When more than one (1) Person holds an ownership interest in a Lot, the vote for such Lot shall be exercised as those Owners themselves determine and advise the Secretary prior to any meeting or referendum. The vote attributable to a Lot shall be suspended in the event more than one (1) Person seeks to exercise it. The Board of Directors may suspend the voting rights of an Owner

for any period during which any past due assessment against any Lot of the Owner remains unpaid; and for a reasonable period of time for an infraction of the Declaration, Bylaws, rules and regulations, use restrictions or Architectural Guidelines.

Article 4
Assessments

4.1  Purpose of Assessments.  The assessments provided for herein shall be used for the general purposes of promoting the recreation, health, safety, welfare, common benefit, and enjoyment of all of the Lot Owners, including, without limitation, the maintenance of real and personal property, all as may be more specifically authorized from time to time by the Board of Directors.

4.2  Creation of the Lien and Personal Obligation for Assessments.  Each Owner of a Lot, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, covenants and agrees to pay to the Association: (a) annual assessments; (b) special assessments; and (c) specific assessments.  All sums lawfully assessed by the Association against any Lot Owner or Lot, whether for the share of the common expenses pertaining to that Lot, for fines, or otherwise, including without limitation, late charges (not in excess of the greater of Ten and No/100 Dollars ($10.00) or ten percent (10%) of the amount due, or such higher amount as may be authorized by the Act from time to time), interest (at a rate not in excess of ten percent (10%) per annum on the principal amount due, or such higher amount as may be authorized by the Act from time to time), costs of collection, reasonable attorneys' fees actually incurred and, if the Board so elects, the fair rental value of the Lot, and all reasonable charges made to any Lot Owner or Lot for materials furnished or services rendered by the Association at the Owner's request to or on behalf of the Lot Owner or Lot, shall, from the time the same become due and payable, be the personal obligation of the Person who was the Owner of the Lot at the time the assessment fell due and constitute a continuing lien in favor of the Association on the Lot prior and superior to all other liens whatsoever except: (x) liens for ad valorem taxes on the Lot; (y) the lien of any first priority mortgage covering the Lot and the lien of any Mortgage recorded prior to the recording of this Declaration; and (z) the lien of any secondary purchase money mortgage covering the Lot, provided that neither the grantee nor any successor grantee on the Mortgage is the seller of the Lot.

Pursuant to the Act, the recording of this Declaration shall constitute record notice of the existence of the lien and no further recordation of any claim of lien shall be required.  Each Owner shall be personally liable for the portion of each assessment coming due while the Owner of a Lot, and each grantee shall be jointly and severally liable for such portion thereof as may be due and payable at the time of conveyance; provided, however, the liability of a grantee for the unpaid assessments of the grantor shall not apply to any first Mortgagee taking title through foreclosure proceedings.  No Owner may waive or otherwise be exempt from liability for the assessments provided for herein, including, by way of illustration, but not limitation, abandonment of the Lot or nonuse of the Common Property.  No diminution or abatement of any assessment shall be claimed or allowed by reason of any failure of the Association to take some action or perform some function required to be taken or performed by the Association, the

7

obligation to pay assessments being a separate and independent covenant on the part of each Owner.

All payments shall be applied first to costs, then to late charges, then to interest and then to delinquent assessments. As provided in O.C.G.A. Section 44-3-232, the obligation for the payment of assessments and fees arising hereunder shall also include costs of collection, which shall include, without limitation, reasonable attorney's fees actually incurred, and the award of attorneys' fees shall not be construed in accordance with the provisions of O.C.G.A. Section 13-1-11(a)(2).

4.3 Budget. It shall be the duty of the Board to prepare a budget covering the estimated costs of operating the Association during the coming year, which may include a capital contribution or reserve in accordance with a capital budget separately prepared. Costs incurred pursuant to the Easement and Cost Sharing Agreement shall be included as a line item in the Association's annual budget. The Board shall cause the budget and the annual assessment to be levied against each Lot for the year to be delivered to each member at least thirty (30) days prior to the due date of such annual assessment. The budget and the annual assessment shall become effective unless disapproved at a meeting duly called and held by a majority of the Total Association Vote. Notwithstanding the foregoing, however, in the event the membership disapproves the proposed budget or the Board fails for any reason to determine the budget for any period, then and until such time as a budget has been determined, as provided herein, the budget in effect shall automatically increase ten percent (10%) beyond the budget for the previous year.

4.4 Annual Assessments. Annual assessments shall be levied equally on all similarly situated Lots and shall be paid in such manner and on such dates as may be fixed by the Board of Directors, which may include, without limitation, acceleration, upon ten (10) days' written notice for delinquents. Unless otherwise provided by the Board, the assessment shall be paid in one (1) annual installment. Annual assessments include any sums the Board determines necessary for the continued ownership, operation and maintenance of the Common Property, operating expenses of the Association, payment for any items of betterment and the establishment of reserve funds as the Board shall deem proper. Annual assessments may include, without limitation, expenses for the following: (a) sums for property taxes for the Common Property; (b) insurance premiums; (c) legal and accounting fees; (d) management fees; (e) costs incurred pursuant to the Easement and Cost Sharing Agreement; provided, however, costs associated with the STEP System shall be a specific assessment as provided herein; (f) costs to maintain the Gate System, as defined in Section 5.6 hereof; (g) landscape maintenance; (h) costs to maintain any Community entry features including irrigation and lighting associated therewith; and (i) expenses and liabilities incurred as provided herein and in the Articles of Incorporation and Bylaws for the indemnification of officers and directors and in connection with the enforcement of rights and duties of the Association against Owners and others.

4.5 Special Assessments. In addition to the annual assessments, the Association, acting through the Board, may levy against all Owners in any assessment year, special assessments to cover any unbudgeted or unanticipated expenses or expenses in excess of those budgeted. Special assessments shall be paid as determined by the Board. The Board may permit a special

8

assessment to be paid in installments extending beyond the fiscal year in which the special assessment is imposed.

4.6  Specific Assessments.  The Board shall have the power to levy specific assessments against specific Lots as provided herein.  Failure of the Board to exercise its authority under this Section shall not be grounds for any action against the Association and shall not constitute a waiver of the Board's right to exercise its authority under this Section in the future with respect to any expenses, including an expense for which the Board has not previously exercised its authority under this Section.  Specific assessments shall include, but not be limited to, the following: (a) fines levied pursuant to this Declaration; (b) costs incurred to maintain the STEP System that serves Lots in the Community as set forth in the Easement and Cost Sharing Agreement; (c) the cost of maintenance performed by the Association for which an Owner is responsible; and (d) the working capital contribution as provided in Section 4.12 hereof.

The Board of Directors may also specifically assess Owners for Association expenses as follows: (a) expenses of the Association which benefit less than all of the Lots may be specifically assessed equitably among all of the Lots which are benefited according to the benefit received; (b) expenses of the Association which benefit all Lots, but which do not provide an equal benefit to all Lots, may be specifically assessed equitably among all Lots according to the benefit received; and (c) expenses incurred by the Association which are attributable to the conduct of a particular Owner or the Occupants, guests, invitees or licensees of such Owner may be specifically assessed against the Lot of said Owner.

4.7  Subordination of Liens to Mortgages.  The lien of all assessments authorized herein is hereby made subordinate to the lien of any first Mortgage placed on a Lot if, but only if, all assessments and charges with respect to such Lot authorized herein having a due date on or prior to the date of the Mortgage as filed of record have been paid.  The lien hereby subordinated is only such lien as relates to assessments and charges authorized hereunder having a due date subsequent to the date such Mortgage is filed of record and prior to the satisfaction, cancellation or foreclosure of such Mortgage or the sale or transfer of the Lot pursuant to any proceeding in lieu of foreclosure or the sale or transfer of the Lot pursuant to a sale under power contained in such Mortgage.  Such subordination is merely a subordination and shall not relieve the Owner of the Lot of the personal obligation to pay all assessments coming due during such period of ownership; shall not relieve such Lot from the lien provided for herein (except to the extent a subordinated lien is extinguished as a result of such subordination as against a Mortgagee or such Mortgagee's assignee or transferee by foreclosure or by sale under power); and no sale or transfer of such Lot to the Mortgagee or to any other Person pursuant to a decree of foreclosure, or pursuant to any other proceeding in lieu of foreclosure or pursuant to a sale under power, shall relieve any existing or previous Owner of such Lot of any personal obligation or relieve such Lot or the then Owner of such Lot from liability for any assessment authorized hereunder that becomes due after such sale and transfer.

4.8  Remedies of the Association.  Any assessments or installments thereof which are not paid when due shall be delinquent.  In addition to the lien rights, the personal obligation of the then Owner to pay such assessments shall remain such Owner's personal obligation and shall also pass to such Owner's successors-in-title.  Such Owner shall nevertheless remain as fully

9

obligated as before to pay to the Association any and all amounts which such Owner was obligated to pay immediately preceding the transfer; and as provided in the Act, such Owner and such successors-in-title shall be jointly and severally liable with respect thereto, notwithstanding any agreement between such Owner and such successors-in-title creating any indemnification of the Owner or any relationship of principal and surety as between themselves. Any assessment or installment thereof delinquent for a period of more than thirty (30) days shall incur a late charge (not in excess of the greater of Ten and No/100 Dollars ($10.00) or ten percent (10%) of the amount due, or such higher amount as may be authorized by the Act from time to time), interest (at a rate not in excess of ten percent (10%) per annum on the principal amount due, or such higher amount as may be authorized by the Act from time to time) and costs of collection, including, without limitation, reasonable attorney's fees actually incurred. As provided in O.C.G.A. Section 44-3-232, the obligation for the payment of assessments and fees arising hereunder shall also include costs of collection, which shall include, without limitation, reasonable attorney's fees actually incurred, and the award of attorneys' fees shall not be construed in accordance with the provisions of O.C.G.A. Section 13-1-11(a)(2).

The Association may cause a notice of delinquency to be given to any Owner who has not paid within ten (10) days following the due date. In the event that the assessment remains unpaid after sixty (60) days, the Association may institute suit to collect such amounts and/or to foreclose its lien. The Association may file a claim of lien with the Office of the Clerk of Superior Court of Cherokee County, Georgia, but no such claim of lien shall be required to establish or perfect the lien for unpaid assessments. Each Owner, by acceptance of a deed, vests in the Association the right and power to bring all actions against such Owner personally, for the collection of such charges as a debt or to foreclose the lien. The lien provided for in this Declaration shall be in favor of the Association and shall be for the benefit of all Owners. As provided in the Act, the Association shall have the power to bid on the Lot at any foreclosure sale and to acquire, hold, lease, mortgage and convey the same.

In the event any assessment, fine or other charge, or any portion or installment thereof, is delinquent for ninety (90) days or more, in addition to all other rights provided in this Declaration, the Association shall have the right, upon ten (10) days written notice, subject to the suspension standards and notice requirements imposed on the institutional providers providing such services to the Community, if any, to suspend any utility or service (including the STEP System), the cost of which is paid for by the Association as a common expense, including costs incurred pursuant to the Easement and Cost Sharing Agreement, until such time as the delinquent assessments and all costs permitted under this Section, including, without limitation, reasonable attorney's fees actually incurred and any reasonable utility provider charges or other reasonable costs incurred in suspending and/or restoring such services, are paid in full. Said utility or service shall not be required to be restored until such delinquent assessments and costs, including, without limitation, any reasonable utility or service provider charges or other reasonable costs incurred in suspending and/or restoring such services, are paid in full. An Owner whose utility or service has been suspended shall not be entitled to use any such utility or service paid for as a common expense from any source and any such unauthorized use shall be considered a theft of services under O.C.G.A. Section 16-8-5. All Association expenses for terminating and/or restoring any services pursuant to this Section, including reasonable attorneys' fees actually incurred, shall be a specific assessment and shall be collected as provided

herein for the collection of assessments. The notice requirement of this paragraph shall be deemed complied with if the notice is sent by certified mail, return receipt requested, to the address of the Lot and to any other address the Owner of the Lot has designated in writing to the Association. Enforcement under this Section is not dependent upon or related to other restrictions and/or other actions, except as provided herein.

The Association may also suspend the membership rights of the delinquent Owner, including the right to vote, the right of use and enjoyment in and to the Common Property and the right to receive and enjoy such services and other benefits as may then be provided by the Association, which may include the deactivation of any card access system, gate code or other method used in connection with the Gate System (as defined in Section 5.6 hereof), which limits or restricts vehicular access to the Community. Any suspension shall not affect an Owner's obligation to pay assessments coming due during the period of such suspension and shall not affect the permanent lien on such Lot in favor of the Association.

4.9  Date of Commencement of Assessments. Assessments shall commence as to all Lots when the Board of Directors first determines a budget and levies assessments. Assessments shall be due and payable in a manner and on a schedule as the Board of Directors may provide.

4.10  Failure to Assess. Notwithstanding anything herein to the contrary, the omission or failure of the Board to fix the assessment amounts or rates or to deliver or mail to each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments. In such event, each Owner shall continue to pay assessments on the same basis as for the last year for which an assessment was made, if any, until a new assessment is made, at which time any shortfalls in collections may be assessed retroactively by the Association.

4.11  Estoppel Certificate. Any Owner, Mortgagee, or a Person having executed a contract for the purchase of a Lot, or a lender considering a loan to be secured by a Lot, shall be entitled, upon written request, to a statement from the Association or its managing agent setting forth the amount of assessments past due and unpaid, including any late charges, interest, fines, or other charges against that Lot. Such request shall be delivered to the registered office of the Association, and shall state an address to which the statement is to be directed. The Association shall respond in writing within five (5) business days of receipt of the request for a statement; provided, however, the Association may require the payment of a reasonable fee not to exceed Ten and No/100 Dollars ($10.00), or such higher amount as may be authorized by the Act, as a prerequisite to the issuance of such a statement. Such written statement shall be binding on the Association as to the amount of assessments due on the Lot as of the date specified therein.

4.12  Working Capital Contribution. Upon each and every conveyance of title to a Lot in the Community, a working capital contribution in an amount determined by the Board from time to time, but not to exceed the amount of the annual assessment applicable to the Lot for the year of such conveyance, shall be collected from the new Owner at the closing of such transaction and disbursed to the Association; or if not collected at closing, shall be paid immediately upon demand to the Association. The working capital contribution shall constitute a specific assessment against the Lot, shall be in addition to, not in lieu of, the annual assessment and shall

not be considered an advance payment of such assessment. The working capital contribution may be used by the Association for any purpose which provides a direct benefit to the Community, including, without limitation, for the payment of operating expenses of the Association and other expenses incurred by the Association pursuant to the provisions of this Declaration.

Notwithstanding the foregoing, the working capital contribution shall not apply to the holder of any first Mortgage on a Lot who becomes the Owner of a Lot through foreclosure or any other means pursuant to the satisfaction of the indebtedness secured by such Mortgage, but shall apply to the Owner acquiring title to the Lot from the foreclosing Mortgagee.

Article 5
Maintenance Responsibility: Common Property and Lots

5.1 Association's Maintenance Responsibility. The Association shall maintain and keep in good repair the Common Property, which shall include, without limitation, the maintenance, repair and replacement of all landscaping and improvements situated thereon. The Association shall also maintain (whether or not constituting Common Property) the following: (a) all Community entry features, including entry area landscaping, signage and monuments regardless of whether the same are located on a Lot, Common Property or public right-of-way and any irrigation system and/or lighting system, if any, provided to such Community entry features; (b) landscaping improvements located on the Common Property, if any; (c) the storm water detention/retention pond(s) and storm water drainage facilities located on the Common Property, if and to the extent such facilities are not maintained on an on-going basis by a government entity or third party or the Golf Club Owner pursuant to the Easement and Cost Sharing Agreement; provided, however, each Owner shall be responsible for the maintenance, repair and replacement of any storm water drainage facilities or any storm water pipes, wires or conduits which are located on and exclusively serve a Lot; (d) the Gate System as provided in Section 5.6 hereof; (e) all private Community streets, street signs and directional signs; (f) landscaping located within the any public right-of-way at the entrance to the Community, if and to the extent the same is not maintained on an ongoing basis by a governmental authority or third party; and (g) landscaping to those Lots which have not been improved with a dwelling for which a certificate of occupancy has been issued; provided, however, upon the issuance of a building permit for such Lot the Owner of such Lot shall be responsible for all maintenance thereto; and provided, further, the costs associated with such maintenance shall be a specific assessment against such Lots as provided in Section 4.6 hereof.

The Board of Directors may authorize the officers of the Association to enter into contracts with any Person or Persons to perform maintenance hereunder on behalf of the Association. In addition, the Association shall have the right, but not the obligation, to maintain other property not owned by the Association, whether within or outside of the Community and to enter into easements and covenant to share costs agreements regarding such property where the Board has determined that such maintenance would benefit Owners. In the event that the Association determines that the need for maintenance, repair, or replacement, which is the responsibility of the Association hereunder, is caused through the willful or negligent act of an Owner, or the Occupants, family, guests, lessees or invitees of an Owner, then the Association

may perform such maintenance, repair or replacement and all costs thereof, not paid for by insurance, shall be assessed against the Lot of Owner as a specific assessment.

5.2   Owner's Maintenance Responsibility.

(a)   General.  All maintenance of the Lot and all structures, landscaping, and other improvements located thereon shall be the sole responsibility of the Owner thereof, who shall maintain such Lot in a manner consistent with the Community-Wide Standard, this Declaration and any rules and regulations adopted by the Board or applicable Architectural Guidelines.  The obligation of a Lot Owner hereunder shall include, without limitation, the following: (i) prompt removal of all litter, trash, refuse, and waste; (ii) keeping improvements and exterior lighting clean, attractive and in good repair and working order; (iii) keeping driveways, walkways and other concrete improvements in good repair; (iv) complying with all governmental health and police requirements; (v) maintaining the grading and storm water drainage as originally established on the Lot; (vi) repairing exterior damages to structures and other improvements; (vii) all maintenance, repair and replacement to the residential dwelling located on the Lot, including, periodic painting and/or pressure washing as needed; and (viii) all maintenance, repair and replacement to the septic tank and all related equipment and appurtenances related thereto located on such Lot, except to the extent that such Lot is served by the STEP System as provided in the Easement and Cost Sharing Agreement.

(b)   Landscaping Responsibility. Except for those Lot which have been not been issued with a building permit by the applicable governmental agency as provided in Section 5.1 above and in addition to the maintenance responsibilities set forth in subsection (a) above, Lot Owners shall be responsible for all landscaping and lawn maintenance to a Lot, which shall include, but not be limited to, the following: (i) lawn mowing on a regular basis; (ii) tree and shrub pruning; (iii) watering landscaped areas; and (iv) keeping lawn and garden areas alive and free of weeds such that it is consistent and complies with all community. In addition to the foregoing, Owners of Lots fronting any roadway within the Community shall maintain and irrigate, at such Owner's expense, (i) in the event a sidewalk exists, landscaping between the Lot boundary and the sidewalk and the landscaping between the sidewalk and the nearest pavement edge of the roadway; or (ii) in the event no sidewalk exists, landscaping between the Lot boundary and the nearest pavement edge of the roadway.

(c)   Failure to Maintain.  In the event that the Board of Directors determines that any Owner has failed or refused to discharge properly any of such Owner's obligations with regard to the maintenance, repair or replacement of items for which such Owner is responsible hereunder, the Association shall, except in an emergency situation, give the Owner written notice of the Association's intent to provide such necessary maintenance, repair or replacement.  The notice shall set forth with reasonable particularity the maintenance, repair or replacement deemed necessary.  The Owner shall have ten (10) days after receipt of such notice within which to complete such maintenance, repair or replacement, or, in the event that such maintenance, repair or replacement is not capable of completion within a ten (10) day period, to commence such work which shall be completed within a reasonable period of time.  If an Owner does not comply with the provisions hereof, the Association may provide such maintenance, repair or replacement to the Lot and all costs thereof shall be assessed against the Lot as a specific assessment.

5.3 <u>Partition</u>. The Common Property shall remain undivided and no Owner shall bring any action for partition or division of the whole or any part thereof without the written consent of: (a) all Owners of all portions of the property located within the Community; and (b) all Mortgages encumbering any portion of the property, including, but not limited to, the Lots located within the Community.

5.4 <u>Condemnation</u>. In the event of a taking by eminent domain of any portion of the Common Property on which improvements have been constructed, the Association, if reasonably possible, shall restore or replace such improvements on the remaining Common Property, unless within sixty (60) days after such taking, an alternative plan is approved by at least seventy-five percent (75%) of the Total Association Vote. The provisions of this Declaration applicable to the replacement or restoration of damaged improvements on the Common Property shall also apply to and govern the actions to be taken in the event that the improvements are not restored or replaced after a condemnation.

5.5 <u>Liability</u>. Owners, Occupants and their guests shall use the common areas maintained by the Association and all other Common Property and all portions of the Community not contained within a Lot at their own risk and shall assume sole responsibility for their personal belongings used or stored thereon. All Owners and Occupants shall have an affirmative duty and responsibility to inspect the Common Property and all portions of the Community not contained within a Lot for defects, perils or other unsafe conditions relating to the use and enjoyment thereof. The Association and its officers, directors, employees, representatives and agents shall not be held liable for: (a) personal injury to any person occurring on the Common Property or any other portion of the Community; or (b) loss or damage, by theft or otherwise, to personal belongings or any other property used or stored on the Common Property or any other portion of the Community.

The Association shall not be liable for injury or damage to any Person or property: (a) caused by the elements or by an Owner or any other Person; (b) resulting from any rain or other surface water which may leak or flow from any street, pipe, plumbing, drain, conduit, appliance, equipment, security system, or utility line or facility, the responsibility for the maintenance of which is that of the Association or from any portion of the Common Property; or (c) caused by any street, pipe, plumbing, drain, conduit, appliance, equipment, security system, or utility line or facility, the responsibility for the maintenance of which is that of the Association, becoming out of repair.

5.6 <u>Gated Community</u>. A mechanical system has been constructed and installed to limit vehicular access to the private streets within the Community from Mountain Road (a.k.a. King Road Apparent) (50' R/W) (the "<u>Gate System</u>"). By accepting a deed to a Lot, each Owner shall be deemed to acknowledge and agree to the following:

(a) The Board of Directors shall determine when the Gate System will be operational; provided, however, the Gate System shall remain open during the day (sun-up to sun-down) unless otherwise agreed in writing by the Board and the Golf Club Owner.

14

(b) Neither the Golf Club Owner nor the Association shall be responsible for the security of Owners, Occupants or their family members, guests, invitees or licensees. The purpose of the Gate System shall be to provide some degree of restriction of vehicular access onto the private Community streets. NEITHER THE GOLF CLUB OWNER, THE ASSOCIATION NOR ANY OWNER GUARANTEES OR ASSURES TO ANY OTHER OWNER NOR ANY OTHER PARTY WHOMSOEVER THAT THE GATE SYSTEM WILL IN ANY MANNER WHATSOEVER PROVIDE PERSONAL PROTECTION OR SECURITY TO ANY OWNER OR OCCUPANT, THEIR PERSONAL POSSESSIONS OR TO GUESTS OR INVITEES, OR TO ANY OTHER PERSON, AND EACH OWNER, BY THE ACCEPTANCE OF A DEED, SHALL HAVE ASSUMED THE ENTIRE RISK AS BETWEEN SUCH OWNER AND GOLF CLUB OWNER OR THE ASSOCIATION FOR ANY LOSS OR DAMAGE TO PERSON OR PROPERTY WITHIN THE COMMUNITY ARISING FROM ANY DEFICIENCY, FAILURE OR DEFECT IN THE GATE SYSTEM OR OTHERWISE. NEITHER THE GOLF CLUB OWNER, THE ASSOCIATION NOR ANY OWNER SHALL BE LIABLE FOR ANY LOSS OR DAMAGE TO PERSONS OR PROPERTY OCCASIONED BY THE ACT OR ACTS OF ANY PERSON OR PERSONS WHO IS OR ARE ALLOWED ADMITTANCE THROUGH THE GATE SYSTEM BY THE GOLF CLUB OWNER, THE ASSOCIATION, AN OWNER OR ANY AGENT, GUEST OR RELATIVE OF THE GOLF CLUB OWNER, THE ASSOCIATION OR AN OWNER.

(c) All governmental authorities shall have access to the Community for law enforcement, safety and emergency purposes. Each Owner shall look solely to the applicable governmental authority for the provision of law enforcement and police protection.

(d) The Gate System is not intended to replace or to serve in lieu of individual alarm systems or other measures to provide security at a residence or within any Lot. Each Owner is encouraged to install personal security devices upon and within such Owner's Lot to the same extent that would be prudent if the Gate System did not exist.

(f) THE ASSOCIATION DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WHATSOEVER REGARDING THE GATE SYSTEM, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR THE PURPOSES FOR WHICH IT WAS DESIGNED. The Association does not guarantee that the Gate System will avert or prevent occurrences or consequences which the Gate System is designed to avert or prevent.

(g) The Gate System shall be owned, operated, and maintained by the Association at its sole cost and expense; provided, however, the costs associated with such maintenance, repair and replacement shall be shared between the Association and the Golf Club Owner as provided in the Easement and Cost Sharing Agreement.

(h) Each Owner shall use the Gate System in the proper manner and in accordance with the rules and regulations relating thereto as may be adopted from time to time by the Board of Directors.

Article 6
Architectural Standards

Except to the extent the same may be a violation of any provision of the Original Declaration, any alterations, changes or modifications to architecture or landscaping originally installed on Lots or any improvements or structures existing on a Lot as of the date this Declaration is recorded in the Cherokee County, Georgia land records shall be deemed an approved change pursuant to this Article.

6.1 General. No exterior construction, alteration or addition of any improvements of any nature whatsoever including, without limitation, staking, clearing, excavating, grading, filling, construction of impervious surfaces, building, exterior alteration of existing improvements, changing the exterior color of any existing improvement, adding permanent exterior lighting (except for reasonable seasonal decorative lights displayed during the usual and common season, as the same may be determined from time to time by the Architectural Review Committee), and planting and removing landscaping materials (except for seasonal planting and landscaping approved under applicable Architectural Guidelines), shall be commenced or placed upon any part of the Community unless, approved in accordance with this Article, or otherwise expressly permitted under this Declaration. Any Owner may remodel, paint or redecorate the interior of structures on the Lot without approval hereunder. However, modifications to the interior of porches, patios and similar portions of a structure visible from outside the Lot shall be subject to approval. No approval shall be required to rebuild in accordance with originally approved plans and specifications. This Article shall not apply to improvements made to the Common Property by or on behalf of the Association.

6.2 Guidelines and Procedures. Except as provided above, no exterior construction, addition, alteration or modification shall be made unless and until plans and specifications shall have been submitted in writing to and approved by the Architectural Review Committee. Such plans and specifications shall be of sufficient detail to allow the Architectural Review Committee to make its review and to the extent required by the Architectural Review Committee shall show the nature, kind, shape, height, materials and location of the proposed improvement and comply with such additional requirements as may be set forth in the Architectural Guidelines. The Architectural Review Committee shall be the sole arbiter of such plans and may withhold approval for any reason, including, without limitation, purely aesthetic considerations, and it shall be entitled to stop any construction in violation of these restrictions. If the Architectural Review Committee fails to approve or to disapprove submitted plans and specifications within thirty (30) days after receipt of all required plans and specifications, such approval shall be deemed to have been given. If construction does not commence on a project for which plans have been approved within six (6) months of such approval, such approval shall be deemed withdrawn, and it shall be necessary for the Owner to resubmit the plans to the Architectural Committee for reconsideration unless the Owner has applied for and received in writing an extension from the Architectural Review Committee. All construction must be completed within a reasonable period of time as determined by the Board in its sole discretion and as more particularly set forth in the Architectural Guidelines. As a condition of approval under this Article, each Owner, on behalf of such Owner and such Owner's successors-in-interest, shall assume all responsibilities for maintenance, repair, replacement and insurance to and on any

16

improvement, change, modification, addition or alteration. In the discretion of the Architectural Review Committee, an Owner may be required to verify such condition of approval by a recordable written instrument acknowledged by such Owner on behalf of such Owner and such Owner's successors-in-interest.

The Board of Directors and its representatives shall have the right, during reasonable hours and after reasonable notice, to enter upon any property in the Community to determine whether or not these restrictive covenants have been or are being complied with and such Persons shall not be deemed guilty of trespass by reason of such entry; provided, however, nothing herein shall be construed as prohibiting the Association from entering into a single family dwelling located on a Lot without the consent of the Owner.

6.3 Architectural Guidelines. The Architectural Review Committee, with the consent of the Board, shall have the authority to prepare and amend, from time to time at its sole discretion, architectural guidelines, construction guidelines, landscaping guidelines, fencing guidelines and any application and review procedures applicable to the Community, which may provide for payment of any fees and/or deposits associated with the review of submitted plans and specifications (collectively the "Architectural Guidelines"). The Architectural Review Committee shall make the Architectural Guidelines available to Owners who seek to engage in construction upon all or any portion of the Community and such Owners and builders shall conduct their operations strictly in accordance therewith. Notwithstanding anything to the contrary herein, the Architectural Guidelines shall be distributed to all Owners prior to the date that they are to become effective and shall thereafter be binding upon all Owners and Occupants until and unless overruled, canceled or modified by a majority of the Total Association Vote.

6.4 Limitation of Liability. Plans and specifications are not approved for engineering or structural design, quality of materials or for compliance with permitting requirements, zoning conditions, building codes or other local laws and ordinances governing construction in the Community and it shall be the responsibility of the Owner to secure any necessary permits or approvals prior to commencing any construction activity on a Lot in the Community. The Association, the Architectural Review Committee and the Board assume no liability or responsibility by approving any plans or specifications or for any defect in any structure constructed from such plans and specifications or for violations of permitting requirements, zoning conditions, building codes or other local laws or ordinances governing construction in the Community. Neither the Association, nor its officers, directors, members, employees and agents or any member of the Architectural Review Committee shall be liable in damages to anyone submitting plans and specifications for approval or to any Owner of property affected by these restrictions by reason of mistake in judgment, negligence or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such plans or specifications. Every Person who submits plans and specifications and every Owner agrees that such Person or Owner will not bring any action or suit against the Association, the Architectural Review Committee or its officers, directors, members, employees and agents to recover any damages and hereby releases, remises, quitclaims and covenants not to sue for all claims, demands and causes of action arising out of or in connection with any judgment, negligence or nonfeasance and hereby waives the provisions of any law which provides that a

17

general release does not extend to claims, demands and causes of action not known at the time the release is given.

6.5 <u>No Waiver</u>. The approval of the Architectural Review Committee of any proposals or plans and specifications or drawings for any work done or proposed, or in connection with any other matter requiring the approval or consent of Architectural Review Committee shall not be deemed to constitute a waiver of any right to withhold approval or consent as to any similar proposals, plans and specifications or drawings or matters whatever subsequently or additionally submitted for approval or consent.

6.6 <u>Variances</u>. Notwithstanding anything to the contrary contained herein, the Architectural Review Committee, with the consent of the Board, shall be authorized to grant individual variances from any of the provisions of this Declaration and the Architectural Guidelines if it determines that waiver of application or enforcement of the provision in a particular case is dictated by unique circumstances, such as, but not limited to, topography, natural obstructions, hardship, aesthetic considerations or environmental considerations. No variance shall: (a) be effective unless in writing; (b) be inconsistent with the overall scheme of development for the Community; or (c) estop the Architectural Review Committee from denying a variance in other similar circumstances. For purposes of this provision, the inability to obtain approval of any governmental agency or the issuance of any permit, or the terms of any financing shall not be considered a hardship warranting a variance.

6.7 <u>Enforcement</u>. Any structure, improvement or landscaping improvement placed or made in violation of this Article, including, without limitation, the Architectural Guidelines, shall be deemed to be nonconforming. Upon written request from the Board of Directors, Owners shall, at their own cost and expense, remove such nonconforming structure or improvement and restore the land to substantially the same condition as existed prior to the nonconforming work. Should an Owner fail to remove and restore as required, the Board and its agents shall have the right to enter the property, remove the nonconforming structure or improvement, and restore the property to substantially the same condition as previously existed. All costs, including, without limitation, reasonable attorney's fees actually incurred, may be assessed against the Lot as a specific assessment. Any contractor, subcontractor, agent, employee or other invitee of an Owner who fails to comply with the terms and provisions of this Article or the Architectural Guidelines may be excluded by the Board of Directors from the Community, subject to any applicable notice and hearing procedures contained in the Bylaws. Neither the Association nor its officers, directors, members, employees and agents or any member of the Architectural Review Committee shall be held liable to any Person for exercising the rights granted by this Section, including, without limitation, claims for damages resulting from the removal of the nonconforming structure or improvement in accordance with the procedures set forth herein. In the event of noncompliance with this Article, the Board may record in the appropriate land records a notice of violation hereunder naming the violating Owner. The Board of Directors shall also have the authority and standing to pursue any and all remedies available at law and equity to enforce the provisions of this Article, including, without limitation the right to levy and collect fines as provided herein, subject to any applicable notice provisions.

6.8 <u>Architectural Review Committee.</u>  The Architectural Review Committee shall be composed of three (3) or more members appointed by the Board of Directors, provided, however, there shall always be an odd number of members on the Architectural Review Committee.  The affirmative vote of a majority of the members of the Architectural Review Committee shall be required in order for the Architectural Review Committee to approve or deny any plans and specifications submitted by an Owner for review and approval as provided herein and the decision of the Architectural Review Committee shall be final and binding.

Article 7
Use Restrictions and Rules

7.1 <u>Rules and Regulations.</u>  The Board of Directors may, from time to time and without a vote of the members, promulgate, modify or delete reasonable rules and regulations applicable to the Community.  Such rules and regulations shall be distributed to all Owners prior to the date that they are to become effective and shall thereafter be binding upon all Owners and Occupants until and unless overruled, canceled or modified by a majority of the Total Association Vote.  Notwithstanding the foregoing, the rules and regulations promulgated by the Board pursuant to this Section 7.1 shall not be applied in a manner which would prohibit or restrict the development or operation of the Golf Club or adversely affect the interest of the Golf Club Owner.

7.2 <u>Residential Use.</u>  Each Lot shall be used for residential purposes exclusively.

7.3 <u>Signs.</u>  No sign of any kind shall be erected or displayed within the Community without the prior written approval of the Architectural Review Committee, except that the following may be erected or displayed without approval: (a) one (1) professional security sign consistent with the Community-Wide Standard not to exceed four inches (4") by four inches (4") in size; (b) such signs as may be required by legal proceedings; (c) one (1) professionally lettered "For Sale" sign for "For Rent" sign displayed in connection with a Lot being offered for sale or for rent and consistent with the Community-Wide Standard and any applicable Architectural Guidelines; and (d) such other signs as may be permitted by the Architectural Guidelines.  Notwithstanding the foregoing, the Board shall have the right to erect reasonable and appropriate signs on behalf of the Association and adopt reasonable rules and regulations governing the display of signs in the Community, which may include reasonable time, place and manner restrictions.  Notwithstanding anything to the contrary herein, the provisions of this Section shall not apply to any Mortgagee in possession due to foreclosure of a first Mortgage or as grantee pursuant to any deed in lieu of such foreclosure.

7.4 <u>Vehicles; Parking.</u>

(a) <u>General.</u>  Vehicles shall be parked only in the garages or in the driveways serving the Lots or in the appropriate spaces or designated areas in which parking may be assigned, and then subject to such reasonable rules and regulations adopted by the Association.  No vehicles shall be parked on streets and roads within the Community or within the Common Property, except as may be otherwise permitted by this Declaration or in accordance with any rules and regulations promulgated by the Board.  There shall be no outside storage or overnight parking upon any Lot

19

or within any portion of the Common Property of any mobile home, trailer, (either with or without wheels), motor home, tractor, truck (other than standard size or compact pick-up trucks), camper, motorized camper, or trailer, boat or other watercraft, boat trailer, or any other related forms of transportation devices.

(b) Disabled and Stored Vehicles. No vehicle may be left upon any portion of the Community, except if in an enclosed garage, if it is not licensed or if it is in a condition such that it is incapable of being operated upon the public highways. No towed vehicle, boat, personal watercraft, recreational vehicle, motor home, trailer, motorcycle, minibike, scooter, go-cart, golf cart, commercial vehicle, camper, bus, or mobile home shall be regularly stored in the Community or temporarily kept in the Community, except if kept in an enclosed garage or other area out of view from neighboring Lots, the Golf Course and streets or other area designated by the Board, if any, for a period of longer than twenty-four (24) hours (the temporary removal of such vehicle to break the continuity of the twenty-four (24) hour period shall not be sufficient to establish compliance with this restriction). Trucks with mounted campers which are used as a primary means of transportation shall not be considered recreational vehicles provided they are used on a regular basis for transportation and the camper is stored out of public view upon removal.

(c) Commercial Vehicles. Commercial vehicles are prohibited from being parked for more than twenty-four consecutive hours in the Community (the temporary removal of such vehicle to satisfy the twenty-four hour provision shall not be sufficient to establish compliance with this restriction), except in an enclosed garage or if such commercial vehicle is parked or stored within an adequately screened area as determined by the Architectural Review Committee. This specifically includes, but is not limited to, all types of commercial vans, trucks, pick-up trucks and other vehicles which are not primarily used for the transportation of passengers. Commercial vehicles shall be permitted for such reasonable period of time as may be reasonably necessary to make a delivery or provide service to a Lot in the Community.

(d) Association Remedies for Noncompliance. If any vehicle is parked on any portion of the Common Property or on any landscaped or grassy area in violation of this Section or in violation of the Association's rules and regulations, the Board or agent of the Association may place a notice on the vehicle specifying the nature of the violation and stating that after twenty-four (24) hours the vehicle may be towed. The notice shall include the name and telephone number of the person or entity that will do the towing and the name and telephone number of a person to contact regarding the alleged violation. If twenty-four (24) hours after such notice is placed on the vehicle the violation continues or thereafter occurs again within six (6) months of such notice, the Board or agent of the Association may have the vehicle towed in accordance with the notice, without further notice to the Owner or user of the vehicle. If a vehicle located on the private Community streets or any other portion of the Common Property is parked in a fire lane, is blocking another vehicle, is obstructing the flow of traffic, is parked on any grassy or landscaped area, or otherwise creates a hazardous condition, no notice shall be required and the Board or agent of the Association may have the vehicle towed immediately. If a vehicle is towed in accordance with this Section, the Association and its affiliates, and any its directors, officers, employees or agents or any member of the Architectural Review Committee shall not be liable to any Person for any claim of damage resulting from the towing activity. The Board of Directors

may exercise any and all remedies available for a violation of this Section, including, without limitation, the right to levy a fine against a non-complying Owner or Occupant, which remedies shall be in addition to not in lieu of its authority to remove the violating vehicle.

7.5 <u>Animals and Pets.</u> No animals, livestock or poultry of any kind may be raised, bred, kept or permitted on any Lot, provided that up to three (3) generally recognized household pets (not including tropical fish, which may be kept in reasonable number) may be kept on any Lot. No pets shall be kept, bred or maintained for any commercial purpose. No dog runs, runners, or exterior pens for household pets shall be erected or maintained on any Lot unless approved in accordance with the provisions of Article 6 hereof. Dogs shall at all times when outside the dwelling on a Lot or on the Common Property be supervised and be kept on a leash or otherwise under the physical control of a responsible person. All pets shall be registered, licensed and inoculated if and as required by law. An Owner shall not allow any animal waste to remain on any portion of a Lot or any other portion of the Community. Pet waste deposited on a Lot or any other portion of the Community must be immediately removed and disposed of by the owner of the pet or the person responsible for the pet. The Association may adopt reasonable rules and regulations regarding animals and pets within the Community.

All Owners must control their pets at all times, whether or not such Owner is present, in a manner that will prevent any pet from: (a) making noise at objectionable sound levels for extended periods of time, whether continuously or intermittently; (b) endangering the health or safety of other Owners, their families, guests or invitees or creating fear in other Owners as to the safety of themselves, their families, guests or invitees; or (c) otherwise constituting a nuisance or inconvenience to the Owner(s) or Occupant(s) of any other Lot; all of the foregoing as determined by the Association in its sole discretion. The Association may require that an Owner remove any animal that presents an actual threat to the health or safety of residents and require abatement of any nuisance or unreasonable source of annoyance. In the event that the Owner fails to remove an animal as provided herein, the Association shall have the right to institute legal action to have the animal removed and all costs associated therewith shall be a specific assessment against the Lot of such Owner.

7.6 <u>Nuisance.</u> It shall be the responsibility of each Owner and Occupant to prevent the development of any unclean, unhealthy, unsightly or unkempt condition on a Lot. No Lot shall be used for the storage of anything that will cause such Lot to appear to be in an unclean or untidy condition or that will be obnoxious to the eye; nor shall any substance, thing or material be kept that will emit foul or obnoxious odors or that will cause any noise or other condition that will or might disturb the peace, quiet, safety, comfort or serenity of the occupants of surrounding property. No noxious or offensive activity shall be carried on within the Community, nor shall anything be done tending to cause embarrassment, discomfort, annoyance or nuisance to any Person using any property within the Community. No plants, animals, device or thing of any sort shall be maintained in the Community whose activities or existence is in any way noxious, dangerous, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of the Community by other Owners and Occupants. Without limiting the generality of the foregoing, no horns, whistles, sirens, bells, alarms, amplifiers or other sound devices, mechanical or otherwise, which create or produce excessively loud sounds (except such devices as may be used exclusively for security purposes) screaming, shouting, excessively loud talking, fighting,

21

raucous behavior, insobriety, playing loud music or television, use of any alarm, equipment or device, vibrations or any other conduct which creates any noxious or offensive odors outside a home shall be permitted, located, used, placed, installed or maintained on any Lot, or any portion thereof. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable person as determined in a particular instance by the Board.

7.7 <u>Unsightly or Unkempt Conditions.</u> The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles, airplanes, boats and other mechanical devices, which might tend to cause disorderly, unsightly or unkempt conditions, shall not be pursued or undertaken in any part of the Community except within an enclosed garage located on a Lot or other area designated by the Board, if any.

7.8 <u>Antennae.</u> No exterior antenna, receiving dish or similar apparatus of any kind for receiving or transmitting audio or video signals shall be placed, allowed or maintained upon any portion of the Community, including any Lot and the dwelling located thereon, unless approved in accordance with the provisions of Article 6 hereof or otherwise permitted under applicable Architectural Guidelines; provided, however, no such approval shall be necessary to install the following on a Lot: (a) antennae designed to receive direct broadcast satellite services, including direct-to-home satellite services or antennae designed to receive or transmit fixed wireless signals via satellite that are one meter or less in diameter; (b) antennae designed to receive video programming services via multi-point distribution services or antennae designed to receive or transmit fixed wireless signals other than via satellite that are one meter or less in diameter or diagonal measurement; or (c) antennae that are designed and intended to receive television broadcast signals. Owners shall install any permitted antennae in such location so that it is screened from view of neighboring Lots or Common Property and, unless an acceptable quality signal cannot otherwise be obtained, on the rear of the residential dwelling located on the Lot. Any permitted antennae shall be installed and maintained only in accordance with Federal Communication Commission ("FCC") rules and the Architectural Guidelines, both as may be amended from time to time; provided, however, that to the extent that the Architectural Guidelines may conflict with the rules and regulations of the FCC, the applicable rules and regulations of the FCC shall control.

7.9 <u>Tree Removal.</u> The Association and Owners shall comply with all zoning conditions and local ordinances applicable to tree removal.

7.10 <u>Drainage.</u> Catch basins, retention ponds, detention ponds, drainage easement areas and related drainage facilities are for the purpose of controlling the natural flow of water only. No obstructions or debris shall be placed in these areas. No Owner may obstruct or alter drainage flow after the location and installation of catch basins, retention ponds, detention ponds, drainage swales, storm sewers or storm drains without approval in accordance with the provisions of Article 6 hereof.

7.11 <u>Sight Distance at Intersections.</u> All property shall be landscaped so as to permit safe sight across street intersections, driveways, curves and hills. No fence, wall, hedge, shrub or

other planting or thing shall be placed or permitted to remain where, in the opinion of the Board of Directors, it would create an unsafe condition.

7.12   Garbage Cans, Woodpiles, Etc.   All garbage cans, recycling bins, woodpiles, filters and related equipment, and other similar items shall, to the extent reasonably practicable, be kept in the garage or located or screened so as to be concealed from view from streets, the Golf Course and adjacent Lots. All rubbish, trash, garbage, recycling materials and yard waste shall be regularly removed and shall not be allowed to accumulate. Trash, garbage, construction waste, yard waste, or other organic or non-organic waste matter of any kind may not be burned within the Community. No garbage, trash, yard waste or other debris shall be placed on the Common Property, temporarily or otherwise. All Owners and Occupants shall comply with any applicable Cherokee County, Georgia ordinances and regulations regarding collection of garbage, recycling materials and yard waste; and garbage, recycling and yard waste collection shall also be subject to such reasonable rules and regulations as the Board of Directors may adopt from time to time, including, without limitation, rules regarding the time period in which trash receptacles and recycling receptacles may be placed at the curb for pick-up.

7.13   Subdivision of Lot.   No Lot shall be subdivided or its boundary lines changed except with the prior written approval in accordance with the provisions of Article 6 hereof.

7.14   Sports Equipment.   Sports equipment may not be installed unless approved by the Architectural Review Committee, in its sole discretion, as follows:

(a)   Temporary or portable basketball goals shall be permitted with the approval of the Architectural Review Committee provided that they are located such that the base and rim are entirely within the Lot and not in the road or hardscape area adjacent to the Lot. Such hoops may be used between the hours of 9:00 a.m. and dusk. Basketball hoops and backboards shall be permitted by the Architectural Review Committee only if such items are aesthetically compatible, if such nuisances to adjoining Lots are minimized and if approved by the Architectural Review Committee.

(b)   Play sets, swing sets, jungle gyms, playhouses, sand boxes or other play equipment may installed upon the approval of the Architectural Review Committee provided they are: (i) screened, fully landscaped and blocked from view of neighboring homes, streets, the Golf Course and adjacent Lots; (ii) located in the backyard or rear portion of the Lot; (iii) less than eight feet (8') in height; and (iv) specifically approved as to location, screening, size, shape, color, materials, and other relevant factors as determined by the Architectural Review Committee in its sole discretion. All bicycles, tricycles, scooters, skateboards and other play equipment, wading pools, baby strollers and similar items shall be stored so as to be not visible from the streets, the Golf Course or adjacent Lots. No such items shall be allowed to remain on any Common Property or Lots so as to be visible from streets, the Golf Course and adjacent Lots when not in use.

7.15   Fences and Walls.   No fence or wall or fencing-type barrier or wall-type barrier of any kind shall be placed, erected, allowed or maintained upon any Lot without prior written approval in accordance with the provisions of Article 6 hereof. Guidelines detailing acceptable

fence and/or wall styles or specifications may be set forth in the Architectural Guidelines, but in no event shall a chain link, hog wire or barbed wire fence be approved; provided, however, the Association may erect any type of fence or wall on the Common Property or elsewhere within the Community as it may deem appropriate or as necessary to satisfy the requirements of any law, regulation or governmental entity or for the health and safety of Owners and Occupants.

7.16  Heating and Air-Conditioning Lots.  No window heating and/or air conditioning units may be installed in a residential dwelling located on a Lot.

7.17  Lighting.  Exterior lighting on any Lot visible from the street shall not be permitted, except for: (a) approved lighting as originally installed on a Lot; (b) street lights in conformity with an established street lighting program for the Community; (c) reasonable seasonal decorative lights displayed during the usual and common season(s), as the same may be determined from time to time by the Board of Directors; or (d) other lighting approved under and pursuant to Article 6 hereof or otherwise consistent with the Architectural Guidelines.

7.18  Energy Conservation Equipment.  No solar energy collector panels or attendant hardware or other energy conservation equipment shall be constructed or installed unless as an integral and harmonious part of the architectural design of a structure, as determined in the sole discretion of the Board of Directors and unless approved in accordance with the provisions of Article 6 hereof.

7.19  Artificial Vegetation, Gardens, Exterior Sculpture, Water Features and Similar Items.  No artificial vegetation shall be permitted on the exterior of any property.  No vegetable garden, hammock, statuary, exterior sculpture, fountains or water features may be erected on any Lot, without prior written approval in accordance with the provisions of Article 6 hereof or as may otherwise be permitted by the Architectural Guidelines.

7.20  Mailboxes and Posts.  All mailboxes and mailbox posts shall be of the same type and color existing on a Lot as of the date this Declaration is recorded in the Cherokee County, Georgia land records or as otherwise approved by the Architectural Review Committee.  Any modification to or change in mailboxes or mailbox posts shall require the prior written approval of the Board pursuant to Article 6 hereof.

7.21  Clotheslines.  Outdoor clotheslines must be screened by approved landscaping or fencing, or placed in a location not readily visible from any street or adjoining property.

7.22  Outbuildings and Similar Structures.  No structure, including, without limitation, any trailer, tent, shack, carport, garage, barn or other outbuilding, shall be erected or allowed to remain on any Lot without prior written approval in accordance with the provisions of Article 6 hereof; and no trailer, camper, shack, tent, carport, garage, barn or other outbuilding or structure may be used as a residence, either temporarily or permanently.

7.23  Window Treatments.  Any window treatment visible from outside the Lot shall be white or off-white in color or natural wood or shutters, unless otherwise approved in accordance with Article 6 hereof or otherwise consistent with applicable Architectural Guidelines.  No foil

or other reflective materials shall be used on any windows for sunscreens, blinds, shades or for any other purpose. Bed sheets, blankets, towels, black plastic, paper and similar type items shall not be used as window treatments.

7.24 <u>Swimming Pools.</u>  No swimming pool shall be constructed, erected or maintained upon any Lot without prior written approval pursuant to Article 6 and in no event shall any above-ground swimming pool be permitted; provided, however, portable wading pools designed for use by small children in accordance with the Architectural Guidelines shall be permitted on a Lot so long as the same is stored out of view from the streets and neighboring property when not in use.

7.25 <u>Flags.</u>  No flags may be displayed on any Lot without prior written approval in accordance with the provisions of Article 6 hereof or otherwise in accordance with applicable Architectural Guidelines; provided, however no approval shall be required to display the flag of the United States of America and the current flag of the State of Georgia on a Lot in accordance with the provisions of the U.S. Flag Code (36 US Code 10) and usual and customary practice. The Board of Directors may promulgate reasonable rules and regulations regarding the display of flags in the Community, including, without limitation, regulating the size of flags and flag poles that may be displayed and imposing reasonable time, place and manner restrictions; provided, however, the Association shall not enact any rule or regulation which has the effect of prohibiting any Owner from displaying the flag of the United States of America on a Lot in the Community in contravention of the Freedom to Display the American Flag Act of 2005.

7.26 <u>Leasing.</u>  Lots may be leased for residential purposes. All leases shall be in writing. Lots may be leased only in their entirety; no fraction or portion may be leased without prior written Board approval. Unless otherwise provided by the Board of Directors, all leases shall have a minimum term of at least one (1) year. The Owner must provide the lessee with copies of the Declaration, Bylaws, the rules and regulations of the Association and Architectural Guidelines and the lease shall provide that the Owner has made available to the lessee copies of the Declaration, Bylaws, the rules and regulations and Architectural Guidelines. Each Owner covenants and agrees that any lease of a Lot shall contain the following language and agrees that if such language is not expressly contained therein, then such language shall be incorporated into the lease by existence of this covenant, and the lessee, by occupancy of the Lot, agrees to the applicability of this covenant and incorporation of the following language into the lease:

(a) <u>Compliance with Declaration, Bylaws, Rules and Regulations and Architectural Guidelines.</u>  Lessee shall abide by and comply with all provisions of the Declaration, Bylaws, rules and regulations and Architectural Guidelines adopted pursuant thereto and shall control the conduct of all other Occupants and guests of the leased Lot in order to ensure such compliance. Owner agrees to cause all Occupants of his or her Lot to comply with the Declaration, Bylaws, the rules and regulations and Architectural Guidelines adopted pursuant thereto and is responsible for all violations caused by such Occupants, notwithstanding the fact that such Occupants of the Lot are fully liable and may be sanctioned for any violation of the Declaration, Bylaws, rules and regulations and Architectural Guidelines adopted pursuant thereto. In the event that the lessee or a person living with the lessee violates the Declaration, Bylaws, or a rule, regulation or Architectural Guideline for which a fine is imposed, notice of the violation shall be

given to the Owner and the lessee, and such fine may be assessed against the lessee in accordance with the provisions contained herein. If the fine is not paid by the lessee within the time period set by the Board of Directors, the Owner shall pay the fine upon notice from the Association of the lessee's failure to pay the fine. Unpaid fines shall constitute a lien against the Lot.

(b) Notice. Within ten (10) days after executing a lease agreement for the lease of a Lot, the Owner shall provide the Board with the following information: (i) a copy of the fully executed lease agreement; (ii) the name of the lessee and all other Occupants of the Lot; (iii) the email address, cell phone number and landline number (if applicable) of the lessee; (iv) the Owner's email address, cell phone number and mailing address (other than at the Lot); and (v) such other information as the Board may reasonably require.

(c) Use of Common Property. The Owner transfers and assigns to the lessee, for the term of the lease, any and all rights and privileges that the Owner has to use the Common Property.

(d) Liability for Assessments. If an Owner who is leasing his or her Lot fails to pay any general, special or specific assessment or any other charge owed to the Association for a period of more than thirty (30) days after it is due and payable, then the delinquent Owner hereby consents to the assignment of any rent received from the lessee during the period of delinquency, and, upon request by the Board of Directors, lessee shall pay to the Association all unpaid general, special and specific assessments and other charges payable during and prior to the term of the lease and any other period of occupancy by lessee. However, lessee need not make such payments to the Association in excess of, or prior to the due dates for, monthly rental payments unpaid at the time of the Board of Director's request. All such payments made by lessee shall reduce, by the same amount, lessee's obligation to make monthly rental payments to lessor. If lessee fails to comply with the Board of Director's request to pay assessments or other charges, lessee shall pay to the Association all amounts authorized under the Declaration as if lessee were an Owner. The above provision shall not be construed to release the Owner from any obligation, including the obligation for assessments, for which he or she would otherwise be responsible.

7.27 Stream Buffer Areas. The Community contains certain buffer areas as identified on the recorded subdivision plat(s) for the Community. Land disturbing activities shall not be conducted within any buffer area, as shown on the recorded subdivision plats for the Community, except with prior written approval under Article 6 hereof and in compliance with Georgia law, including without limitation, the Control of Erosion and Sedimentation Act, O.C.G.A. Section 12-7-1, *et seq*., as amended from time to time.

## Article 8
## Golf Course

8.1 General. The Golf Club shall be owned and operated by the Golf Club Owner and except for the easement rights set forth herein shall not be subject to the provisions of this Declaration. Access to and use of the Golf Club is strictly subject to the rules and procedures of the Golf Club Owner. The Association and Owners shall have no right, title or interest in the

Golf Club, which shall include, but not be limited to, equity rights, prescriptive easements, use rights to use the improvements located thereon.  Neither membership in the Association nor ownership or occupancy of a Lot shall confer any ownership interest in or right to use the Golf Club.  Rights to use the Golf Club will be granted only to such Persons, and on such terms and conditions, as may be determined from time to time by the Golf Club Owner.  The Golf Club Owner shall have the right, from time to time in its sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of the Golf Club, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the terms of any written agreements with their respective members.

(a)  By acceptance of a deed to a Lot, Owners acknowledge that all lakes adjacent to or in the vicinity of the Community and access thereto or improvements thereon are part of the Golf Club.  Access to and use of such facilities is strictly subject to the rules and procedures of the Golf Club Owner.  Further, one or more of the lakes within the Golf Course are subject to an easement in favor of the Federal Soil Conservation Service and an easement in favor of Limestone Valley Conservation District.

(b)  All Owners and Occupants hereby acknowledge that use of the Golf Club shall be at the risk of those individuals using such facilities and not at the risk of the Association, Golf Club Owner or any other Person.

(c)  Golf Club Owner and the Association do not guarantee or represent that any view over and across the Golf Club from a Lot adjacent thereto will be preserved without impairment.  The Golf Club Owner shall have no obligation to prune or thin trees or other landscaping, and shall have the right, in its sole and absolute discretion, to add or remove trees and other landscaping to the Golf Club from time to time.  In addition, the Golf Club Owner may, in its discretion, change the location, configuration, size and elevation of the trees, bunkers, fairways and greens from time to time.  Any such additions or changes may diminish or obstruct any view of the Lot and any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.

(d)  Golf Club Approval Required.  The Architectural Review Committee shall obtain the Golf Club Owner's approval of any landscape plan submitted for a Lot that is adjacent to the Golf Course. The Golf Club Owner's approval shall pertain to the portion of the Lot between the Golf Course and the residential dwelling located thereon.  The Architectural Review Committee shall give the Golf Club Owner at least fifteen (15) days prior written notice of its intent to approve the landscape plan together with copies of the request and all other documents and information submitted in such regard.  The Golf Club Owner shall have fifteen (15) days to respond in writing approving or disapproving the landscape plan, which approval shall not be unreasonably withheld.  The failure of the Golf Club Owner to respond to the notice within the fifteen (15) day period shall constitute a waiver of the Golf Club Owner's right to object to the matter.  This subsection shall not apply to improvements made by the Association to the Common Property.

27

(e) <u>Architectural Review Committee Approval.</u> The Golf Club Owner hereby agrees that the exterior finishes of any clubhouse located on the Golf Club shall be consistent with the exterior surfaces of the homes located and existing on Lots in the Community as of the date this Declaration is recorded in the Cherokee County, Georgia land records.

(f) <u>Quiet Enjoyment.</u>  Golf Club Owner shall not undertake any non-golf activities which may interfere with the quiet enjoyment of the Lots within the Community unless otherwise approved by the Board, which approval shall not be unreasonably withheld.

(g) <u>Easement for Access.</u>  As provided in the Original Declaration, there is hereby established for the benefit of the Golf Club and their members (regardless of whether such members are Owners), guests, invitees, employees, agents, contractors, and designees, a right and nonexclusive easement of access and use over all roadways located within the Community reasonably necessary to travel between the entrance to the Community and the Golf Club Property and over those portions of the Community (whether Common Property or otherwise) reasonable necessary to the operation, maintenance, repair and replacement of the Golf Club. Without limiting the generality of the foregoing, members of the Golf Club and guests and invitees of the Golf Club shall have the right to park their vehicles on the roadways located within the Community at reasonable times before, during and after tournaments and other similar functions held by or at the Golf Club to the extent that the Golf Club Property has insufficient parking to accommodate such vehicles.

(h) <u>Amendments.</u>  In recognition that the provisions of this Section are for the benefit of the Golf Club and the Golf Club Owner, no amendment to this Section or any other provision of the Declaration which affects the rights of the Golf Club or the Golf Club Owner shall be effective unless also consented to in writing by the Golf Club Owner.

8.2. <u>Conveyance of Golf Club.</u>  All Persons, including all Owners, are hereby advised that no representations or warranties have been or are made by Golf Club Owner, the Association or by any Person acting on behalf of any of the foregoing, with regard to the acquisition or assumption of operation of the Golf Club, and no purported representation or warranty in such regard, either written or oral, shall be effective unless specifically set forth in a written instrument executed by the Golf Club Owner.  All Persons, including all Owners, are advised that the Golf Club currently is a privately held golf course.  The course is currently open to the public and also offers private memberships. The status of the Golf Club may change at any time.

8.3 <u>Golf Club Easements.</u>

(a) <u>General.</u>  As provided in the Original Declaration, there is hereby established for the benefit of the Golf Club and its members (regardless of whether such members are Owners and Occupants hereunder), guess, invitees, employees, agents, contractors, and designees, a right and nonexclusive easement of access and use over all roadways located within the Community reasonably necessary to travel between the entrance to the Community and the Golf Club and over those portions of the Community reasonably necessary to the operation, maintenance, repair, and replacement of the Golf Club.  Without limiting the generality of the foregoing, members of the Golf Club and guests and invitees shall have the right to park their vehicles on

the roadways located in the Community at reasonable times before, during, and after tournaments and similar functions held by or at the Golf Club to the extent that the Golf Club has insufficient property to accommodate such vehicles.

(b) Golf Club Drainage Easement. As provided in the Original Declaration, a non-exclusive easement shall exist for the benefit of the Golf Club over, across and upon the Community for drainage and water management purposes. An easement for ingress, egress and access shall exist for the Golf Club Owner, or its agents or assigns, to enter upon and over any portion of the Community (including Lots) in order to maintain, inspect, record data on, monitor, test, or repair, as necessary, any water management areas and facilities thereon and appurtenances thereto. No structure, landscaping, or other material shall be placed or permitted to remain which may damage or interfere with the drainage or irrigation of the Community and/or installation or maintenance of utilities or which may obstruct or retard the flow of water through the Community and/or water management areas and facilities or otherwise interfere with any drainage, irrigation and/or easement provided for in this Section.

(c) Golf Club Paths. As provided in the Original Declaration, there is hereby reserved for the benefit of the Golf Club a nonexclusive easement for the purpose of construction, maintenance, repair, and replacement of golf cart paths over and across portions of the Lot and Common Property as may be designated on one or more recorded subdivision plats for the Community to provide ingress and egress by and between portions of the Golf Club. The Golf Club Owner shall maintain the easements reserved herein in a safe and orderly manner. Further, the Golf Club Owner shall have the right to install, replace, maintain and repair directional and safety signage within the easements granted herein, as deemed reasonably necessary.

(d) Golf Cart and Maintenance Vehicle Easement. As provided in the Original Declaration, there is hereby reserved for the benefit of the Golf Course, a nonexclusive easement to the members of the Golf Club to operate golf carts, operate machinery, equipment and maintenance vehicles used in connection with the operation and maintenance of the Golf Club over and across all easements reserved in this Section, roads, streets, and rights-of-ways within the Community, if any.

(e) Golf Course Play Easement. As provided in the Original Declaration, there is hereby reserved to the Golf Club Owner, along with the members of the Golf Club, a nonexclusive easement over and across the Common Property and Lots for the following purposes:

(i) Retrieval, but not play, of golf balls, including the right to enter on any Lot for that purpose, provided the right to retrieve golf balls shall only extend to non-enclosed portions of the Lots, and the person(s) retrieving the golf ball shall do so in a reasonable manner and will repair any damage caused by entry onto the Lot to retrieve the golf ball;

(ii) Flight of golf balls over, across and upon the Common Property and Lots;

(iii) Doing every act necessary and incident to the playing of golf and swim and tennis activities on the Golf Club, including the creation of usual and common noise levels associated with such recreational activities; and

(iv)  Creation of noise related to the normal maintenance and operation of the Golf Club, including, but not limited to, the operation of mowing and spraying equipment.  Such noise may occur from sun up to sun down every day.

(f)  <u>Golf Club Corridor Easement.</u>  As provided in the Original Declaration, a permanent, exclusive easement is hereby reserved for the benefit of the Golf Club in, on, upon, over and through all areas designated as golf course easements on the subdivision plat(s) for the Community.  The easements reserved herein shall be for the following purposes:

(i)  The planting, replanting, maintenance, irrigation, repair and removal or trimming of vegetation, the spraying of herbicides, fungicides, pesticides, insecticides, and fertilizers, and all other activities necessary for the maintenance and operation of the Golf Club;

(ii)  The right to utilize easements for typical golf course play, including every act necessary and proper to the playing of golf.  These acts shall include, but not be limited to, the placement and maintenance of out of bounds signs or markers, the construction, maintenance and repair of golf cart paths, retrieval of golf balls, the flight of golf balls over and upon the easements, the use of necessary and usual equipment to maintain and operate the Golf Club, the usual and common noise level created by playing the game of golf and the operation of equipment incidental thereto, and all other common and usual activity associated with playing the game of golf and operating and maintaining a golf course;

(iii)  The right to utilize easements as an area for observation by tournament galleries, and the further right to utilize easements for the installation of temporary above ground utility lines for use solely in conjunction with tournaments and special events on the Golf Club.  Any installations made in connection with the reservation of the easements set forth in this sub-paragraph shall be removed by the Golf Club Owner, at its sole cost and expense, and all damage repaired promptly upon conclusion of such tournament or special event; and

Notwithstanding anything to the contrary in this Section 8, Golf Club Owner shall not have more than one major golf tournament on the Golf Club in one year unless otherwise approved by the Board in writing.  By way of explanation and not limitation, major tournaments shall include tournaments sponsored by the Professional Golfers' Association, Ladies Professional Golfers' Association, wWeb.com Tour, Seniors Tour or other national entity whose primary purpose is to sponsor golf tournaments.

(iv)  The right to landscape and make use of the easements as set forth in this paragraph shall be exclusive to the Golf Club Owner and its members.  Owners of Lots burdened by easements shall make no improvements of any kind, including landscaping, in, upon, over or across the easement without the prior written consent of the Golf Club Owner.

8.4  <u>Assumption of Risk and Indemnification.</u>  **Each Owner, upon the acquisition of title to a Lot in the Community, acknowledges the inherent dangers associated with living in proximity to the Golf Club and hereby expressly assumes the risk of personal injury, property damage, or other loss caused by maintenance, operation, and general use of the**

Golf Club, including, without limitation: (a) noise from maintenance equipment; (b) noise caused by golfers; (c) use of pesticides, herbicides, and fertilizers; (d) view restrictions caused by maturation of trees and shrubbery, the construction of berms, or the regrading of the Golf Club; (e) use of effluent in the irrigation of the Golf Club; (f) reduction in privacy caused by constant golf traffic on the Golf Club or the removal or pruning of shrubbery or trees on the Golf Club; (g) errant golf balls and golf clubs; and (h) design or redesign of the Golf Club.

Each such Owner agrees that neither the Association, the Golf Club Owner or their respective successors, successors-in-title, or assigns, officers, directors or partners, any entity leasing, managing, or operating the Golf Club; or any organizer or sponsor of any tournament or special event (collectively, for purposes of this Section 8.4, the **"Released Parties"**) shall be liable to any Owner claiming any loss, injury, or damage based upon, due to, arising from, directly or indirectly, or otherwise related to the proximity of such Owner's Lot to the Golf Club, the management of the Golf Club, or the exercise of the easement rights set forth in this Article 8, unless such loss, damage, or injury is caused in whole or in part by the negligence of any of the Released Parties.

8.5   Use of Lots Adjacent to Golf Club.   Owners of Lots adjacent to the Golf Club, as well as their families, Occupants, guests, tenants and invitees, shall be obligated to refrain from any actions which would reasonably distract from the playing qualities of the golf course.  Such prohibited activities shall include, but not be limited to, permitting dogs or other pets to interfere with golf course play due to their loud barking or other actions, running, bicycling or walking on the golf cart paths and fairways, picking up balls, or like interference with play.

Article 9
Insurance and Casualty Losses

9.1   Insurance Obtained by Association.   The Association shall obtain the insurance coverage necessary to satisfy the requirements of the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the U.S. Department of Veterans Affairs, and the U.S. Department of Housing and Urban Development, as applicable to the Community. Accordingly, the Board of Directors shall obtain casualty insurance for all insurable improvements, whether or not located on the Common Property, which the Association is obligated to maintain.  Notwithstanding the foregoing, nothing in this Section 9.1 shall be construed as obligating the Association to obtain or maintain insurance on a Lot or any structures or improvements located thereon or a Lot Owner's or Occupant's personal property.  Insurance obtained and maintained by the Association shall provide, at a minimum, fire and extended coverage and shall be in an amount sufficient to cover the full replacement cost of any repair or reconstruction in the event of damage or destruction from any such hazard.  The Board of Directors shall obtain a public liability policy applicable to the Common Property covering the Association and its members for all damage or injury caused by the negligence of the Association or any of its members or agents, and, if reasonably available, directors' and officers' liability insurance.  The public liability policy shall have a combined single limit of at least One Million and No/100 Dollars ($1,000,000.00).  Policies may contain a reasonable deductible as determined by the Board of Directors.

31

In addition to the other insurance coverage required by this Section, the Board of Directors shall obtain workers compensation insurance, if and to the extent necessary to satisfy the requirements of applicable law, and, if available at reasonable cost, as determined in the sole discretion of the Board, a fidelity bond or employee dishonesty coverage covering directors, officers, employees and other Persons handling or responsible for the Association's funds. The amount of fidelity or employees dishonesty coverage, if obtained, shall be determined in the director's best business judgment and shall satisfy local, state or federal requirements for such coverage, if any. Such coverage, if obtained, shall contain a waiver of all defenses based upon the exclusion of Persons serving without compensation and shall not be subject to cancellation, nonrenewal or substantial modification without at least ten (10) days' prior written notice to the Association. The Association shall also obtain construction code endorsements, steam boiler coverage and flood insurance, if and to the extent necessary to satisfy the applicable requirements of the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.

9.2  Insurance Obtained by Owners. By virtue of taking title to a Lot subject to the terms of this Declaration, each Owner acknowledges that the Association has no obligation to provide any insurance for any portion of individual Lots and each Owner covenants and agrees with all other Owners and with the Association that each Owner shall obtain and maintain the following: (a) all-risk casualty insurance on the Lot and all structures, dwellings and improvements located or constructed thereon, which shall cover loss or damage by fire and other hazards commonly insured under an all-risk policy, if reasonably available and shall be in an amount sufficient to cover the full replacement cost of any repair or reconstruction in the event of damage or destruction from any such hazard; (b) insurance covering an Owner's or Occupant's personal property; and (c) a liability policy covering damage or injury occurring on a Lot. The policies required hereunder shall be in effect at all times.

9.3  Damage and Destruction -- Insured by Association. Immediately after damage or destruction by fire or other casualty to any portion of any improvement covered by insurance written in the name of the Association, the Board of Directors or its duly authorized agent shall proceed with the filing and adjustment of all claims arising under such insurance and obtain reliable and detailed estimates of the cost of repair or reconstruction of the damaged or destroyed property. Repair or reconstruction, as used in this Section, means repairing or restoring the property to substantially the same condition and location that existed prior to the fire or other casualty, allowing for any changes or improvements necessitated by changes in applicable building codes. Any damage or destruction to property covered by insurance written in the name of the Association shall be repaired or reconstructed unless, within sixty (60) days after the casualty, a proposal not to repair or reconstruct such property is approved by at least seventy-five percent (75%) of the Total Association Vote. If for any reason either the amount of the insurance proceeds to be paid as a result of such damage or destruction, or reliable and detailed estimates of the cost of repair or reconstruction, or both, are not made available to the Association within such period, then the period shall be extended until such information shall be made available; provided, however, such extension shall not exceed sixty (60) days. If the damage or destruction for which the insurance proceeds are paid is to be repaired or reconstructed and such proceeds are not sufficient to defray the cost thereof, the Board of

Directors shall, without the necessity of a vote of the members of the Association, levy a special assessment against the Owner of each Lot. Additional assessments may be made in like manner, as necessary, at any time during or following the completion of any repair or reconstruction. If the funds available from insurance exceed the costs of repair or reconstruction or if the improvements are not repaired or reconstructed, such excess funds shall be deposited to the benefit of the Association. In the event that it should be determined by the Association in the manner described above that the damage or destruction shall not be repaired or reconstructed and no alternative improvements are authorized, the property shall thereafter be maintained by the Association in a neat and attractive condition consistent with the Community-Wide Standard and this Declaration.

9.4  Damage and Destruction -- Insured by Owners.  The damage or destruction by fire or other casualty to all or any portion of any structure or improvement on a Lot shall be repaired or reconstructed by the Owner thereof in a manner consistent with the original construction or such other plans and specifications as are approved in accordance with Article 6 of this Declaration. Said repair or reconstruction shall be completed within seventy-five (75) days after such damage or destruction occurred or, where repairs cannot be completed within seventy-five (75) days, they shall be commenced within such period and shall be completed within a reasonable period of time thereafter. Alternatively, the Owner of the Lot may elect to demolish all improvements on the Lot and remove all debris and ruins therefrom within seventy-five (75) days after such damage or destruction occurred and thereafter maintain the Lot in a neat and attractive, landscaped condition consistent with the Community-Wide Standard and this Declaration. The Owner shall pay all costs which are not covered by insurance proceeds.

Article 10

Easements

10.1  General.  Each Lot shall be subject to those easements, if any, shown or set forth on the recorded subdivision plat(s) for the Community, as amended from time to time, those easements established in the Original Declaration, as well as the easements now or hereafter established by the Association in this Declaration or by any other documents recorded in the Office of Clerk of Superior Court of Cherokee County, Georgia.

10.2  Easements for Use and Enjoyment.  Every Owner of a Lot shall have a right and easement of ingress and egress, use and enjoyment in and to the Common Property which shall be appurtenant to and shall pass with the title to each Lot, subject to the following provisions:

(a)  the right of the Association to borrow money for the purpose of improving the Common Property, or any portion thereof, or for constructing, repairing or improving any facilities located or to be located thereon and, upon the affirmative vote of the Owners of at least two thirds (2/3) of the Lots, to give as security for the payment of any such loan a Mortgage conveying all or any portion of the Common Property; provided, however, the lien and encumbrance of any such Mortgage given by the Association shall be subject and subordinate to any rights, interests, options, easements and privileges herein reserved or established for the benefit of any Owner, or the holder of any Mortgage encumbering any Lot or other property located within the Community (regardless of any contrary provision in this Declaration or in any

33

such Mortgage given by the Association, the exercise of any rights by the holder of such Mortgage in the event of a default thereunder shall not cancel or terminate any rights, easements or privileges herein reserved or established for the benefit of any Owner or the holder of any Mortgage encumbering any Lot or other property located within the Community);

(b) the right of the Association, acting through the Board of Directors and without a vote of the members, to dedicate or grant licenses, permits, easements and rights-of-way over, under and through the Common Property;

(c) the right of the Association to dedicate, transfer or convey all or any portion of the Common Property upon the approval of the Owners of at least two thirds (2/3) of the Lots;

(d) all other rights of the Association, Owners and Occupants or other Persons set forth in this Declaration, any Supplementary Declaration or in any deed conveying Common Property to the Association; and

(e) all encumbrances and other matters shown by the public records affecting title to the Common Property.

10.3 <u>Easements for Entry</u>.  In addition to the right of the Board to exercise self-help as provided herein, the Board shall have the right, but shall not be obligated, to enter upon any property within the Community for emergency, security and safety reasons, which right may be exercised by the manager and all policemen, firemen, ambulance personnel and similar emergency personnel in the performance of their respective duties.  Except in an emergency situation, entry shall only be during reasonable hours and after notice to the Owner, and the entering party shall be responsible for any damage caused.  This right of entry shall include the right of the Board to enter to cure any condition which may increase the possibility of a fire, slope erosion or other hazard in the event an Owner or Occupant fails or refuses to cure the condition upon request by the Board.  Notwithstanding the foregoing, nothing in this Section 10.3 shall authorize entry onto the dwelling of any Lot without the consent of the owner thereof.

10.4 <u>Easements for Utilities</u>.  As provided in the Original Declaration, there is hereby reserved for the benefit of the Association, and its respective successors and assigns, the alienable, transferable, and perpetual right and easement, as well as the power to grant and accept easements to and from any public authority or agency, public service district, public or private utility, or other Person, upon, over, under and across: (a) all of the Common Property; (b) all land within easement areas as shown on the recorded subdivision plat(s) for the Community; (c) all land located along the interior of and within five feet (5') of each boundary of all Lots, such lands to be bounded by the exterior boundaries of such Lots and by lines in the interior of such Lots which are exactly five feet (5') from such exterior boundaries for the purpose of installing, repairing, replacing and maintaining all utilities, including, but not limited to, storm sewers and drainage systems and electrical, gas, telephone, cable television, water, sewer, advanced water treatment and irrigation lines.  Such easements may be granted or accepted by the Board of Directors.  To the extent practicable, all utility lines and facilities serving the Community and located therein shall be located underground.  By virtue of any such easement, it shall be expressly permissible for the providing utility company or other supplier or servicer, with respect

34

to the portions of the Community so encumbered: (w) to erect and maintain pipes, lines, manholes, pumps and other necessary equipment and facilities; (x) to cut and remove trees, bushes or shrubbery; (y) to grade, excavate or fill; or (z) to take any other similar action reasonably necessary to provide economical and safe installation, maintenance, repair and replacement and use of such facilities and systems.

10.5 <u>Easement for Walks, Trails and Signs</u>. As provided in the Original Declaration, there is hereby reserved for the benefit of the Association and its respective successors and assigns the alienable, transferrable and perpetual right and easement upon, over and across all land located along the interior of and within ten feet (10') of each boundary located adjacent to streets and roads, such lands to be bounded by such exterior boundaries adjacent to streets and roads and by lines in the interior of such Lots which are exactly ten feet (10') from such exterior boundaries for the installation, construction, maintenance and use of sidewalks, jogging trails, bike paths, traffic directional signs, and related improvements.

10.6 <u>Easements for Road Right-of-Way</u>. As provided in the Original Declaration, there is hereby reserved for the benefit of the Association and its members, the perpetual right and easement upon, over and across certain road right-of-ways located within certain Lots as depicted on Lots 86 through 90, as shown on the recorded subdivision plat(s) for the Community. These reserved easements shall be deemed Common Property and the cost and expense of the maintenance of the paved wearing surface and landscape features therein shall be a common expense and included as part of the annual assessment. Owners of Lots burdened by these right-of-way easements shall make no improvements of any kind, including landscaping, in, upon, over or across the road right-of-ways without the prior written consent of the Architectural Review Committee.

10.7 <u>Easements for Association</u>. As provided in the Original Declaration, there is hereby reserved a general right and easement for the benefit of the Association, its directors, officers, agents and employees, including, but not limited to, any manger employed by the Association and any employee of such manager, to enter upon any Lot or any portion thereof in the performance of their respective duties. Except in the event of emergencies, this easement is to be exercised only during normal business hours and then, whenever practicable, only upon advance notice to and with the permission of the Owner or Occupant of the Lot directly affected thereby.

10.8 <u>Easement for Maintenance</u>. As provided in the Original Declaration, there is hereby reserved for the benefit of the Association and its respective agents, employees, successors, and assigns, an alienable, transferable, and perpetual right and easement to enter upon any Lot for the purpose of mowing, removing, clearing, cutting or pruning underbrush, weeds, stumps, or other unsightly growth and removing trash, so as to maintain reasonable standards of health, fire safety, and appearance within the Community, subject to any applicable notice requirements as may be set forth in this Declaration and the Bylaws. Furthermore, there is hereby reserved for the benefit of the Association, and its agents, employees, successors and assigns, an alienable, transferrable, and perpetual right and easement, but not the obligation to enter any Lot which is located within thirty feet (30') from the water's edge of any lake, pond or other body within the Community for the purpose of mowing such area and keeping the same

clear and free from unsightly growth and trash, in the event that an Owner shall fail to maintain such area as required pursuant to Article 5 hereof.

10.9  Environmental Easement.  As provided in the Original Declaration, there is hereby reserved for the benefit of the Association and its respective agents, employees, successors, and assigns, an alienable, transferable, and perpetual right and easement on, over and across all Lots for the purpose of taking any action necessary to effect compliance with environmental rules, regulations, procedures from time to time promulgated by any governmental entity, such easement to include, without limitation, the right to implement erosion control procedures and practices, the right to drain standing water, and the right to dispense pesticides and herbicides.

10.10  Easements for Encroachments.  As provided in the Original Declaration, there is hereby an easement for encroachment in the event any improvements upon the Common Property encroach onto a Lot, or in the event that any dwelling located on a Lot encroaches onto the Common Property or upon another Lot, as a result of minor inaccuracies in survey, construction, reconstruction, or due to settlement or movement or otherwise to a distance of not more than three feet (3'), as measured from an point on the common boundary along a line perpendicular to such boundary. The encroaching improvements shall remain undisturbed as long as the encroachment exists.  This easement for encroachment shall also include an easement for the maintenance and use of the encroaching improvements.  In no event shall an easement for encroachment exist if such encroachment occurred due to the willful and knowing conduct on the part of, or with the knowledge and consent of, an Owner, Occupant or the Association.

10.11  Easement for Construction.  As provided in the Original Declaration, the Owner of each Lot shall have an easement of access over and upon adjoining Lots, and the Common Property for the purpose of allowing such Owners to: (a) maintain, repair or replace roofs, walls, and fences; (b) paint the exterior of the Owner's fence and wall; (c) construct, maintain, repair or paint a residential dwelling located on a Lot in the event of loss or destruction; or (d) maintain, repair and replace air-conditioning compressors, air conditioning equipment, meters and other equipment servicing such Owner's Lot which may be located on such adjoining Lots and/or the Common Property.  Except in the event of emergencies, this easement is to be exercised only during normal business hours and then only upon advance notice to and with the permission of the Owner affected thereby.  The Owner shall be solely responsible for all maintenance, repair or maintenance obligations.

10.12  Easements for Private Streets Easement for Private Streets, Sidewalks and Signs. The Association hereby grants, conveys, declares, creates, imposes and establishes a perpetual, non-exclusive right-of-way easement for vehicular and pedestrian access, ingress and egress over and across the private streets located within the Community.  The right-of-way easement herein granted shall permit joint usage of such easement by (a) the Owners and Occupants, (b) the legal representatives, successors and assigns of the Owners, and (c) invitees and licensees of the Owners and Occupants.  The Association hereby expressly reserves for itself, its successors and assigns, all rights and privileges incident to the ownership of the fee simple estate of any right-of-way easement area which are not inconsistent with the rights and privileges herein granted, including, without limitation, the right to maintain one or more proprietary signs on the easement area and the right to grant additional non-exclusive easements to third parties, over, under and

across the easement area. There is hereby reserved for the benefit of the Association as Common Property, the perpetual nonexclusive right and easement upon, over and across those utility easement areas and private streets and roads for the installation, maintenance, and use of such streets and roads, sidewalks, traffic directional signs, grading for proper drainage of said streets and roads, and related activities and improvements.

Article 11
Dispute Resolution and Limitation on Litigation

11.1  Agreement to Avoid Costs of Litigation and to Limit Right to Litigate Disputes. The Association, all Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who agrees to submit to this Article (collectively, "Bound Parties") agree to encourage the amicable resolution of disputes in order to avoid the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees that all claims, grievances or disputes between such Bound Party and any other Bound Party, including, without limitation, claims, grievances or disputes arising out of or relating to the interpretation, application or enforcement of this Declaration, the Bylaws, the Association rules, or the Articles (collectively "Claim"), except for those Claims authorized in Section 11.2, shall be resolved using the procedures set forth in Section 11.3 in lieu of filing suit in any court or initiating proceedings before any administrative tribunal seeking redress or resolution of such claim.

11.2  Exempt Claims.  The following Claims ("Exempt Claims") shall be exempt from the provisions of section 11.3:

(a)  any suit by the Association against any Bound Party to enforce the provisions of Article 4 (Assessments);

(b)  any suit by the Association to obtain a temporary restraining order (or equivalent emergency equitable relief), injunctive relief and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve the Association's ability to enforce the provisions of the Declaration;

(c)  any suit between Owners, which does not include the Association as a party, if such suit asserts a Claim which would constitute a cause of action independent of the Declaration, Bylaws or rules and regulations of the Association; and

(d)  any suit in which any indispensable party is not a Bound Party.

11.3  Mandatory Procedures for All Other Claims.  All Claims other than Exempt Claims shall be resolved using the following procedures:

(a)  Notice. Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent"), other than an Exempt Claim, shall notify each Respondent in writing of the Claim (the "Notice"), stating plainly and concisely:

(i) the nature of the Claim, including date, time, persons involved, and Respondent's role in the Claim;

(ii) the basis of the Claim (i.e. the provisions of this Declaration, the Bylaws, the Articles or rules or other authority out of which the Claim arises);

(iii) what Claimant wants Respondent to do or not do to resolve the Claim; and

(iv) that Claimant wishes to resolve the Claim by mutual agreement with Respondent and is willing to meet in person with Respondent at a mutually agreeable time and place to discuss in good faith ways to resolve the Claim.

(b) Final and Binding Arbitration. The Bound Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation. If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Bound Parties in resolving the dispute by negotiation. The Bound Parties may by agreement submit the claim to mediation, which may continue as long as the Bound Parties shall agree.

If the Bound Parties do not agree in writing to a settlement of the Claim within fifteen (15) days of the Notice or such additional time as they shall agree, the Claimant shall submit the Claim to arbitration with the American Arbitration Association, or if such agency is unavailable, in accordance with the Rules of Arbitration or such rules as may be required by the agency providing the arbitrator. If not timely submitted to arbitration or if the Claimant fails to appear for the arbitration proceeding, the Claim shall be deemed abandoned, and Respondent shall be released and discharged from any and all liability to Claimant arising out of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to Persons other than Claimant.

This subsection (b) is an agreement to arbitrate and is specifically enforceable under the applicable arbitration laws of the State of Georgia. The arbitration award (the "Award") shall be final and binding, and judgment may be entered upon it in any court of competent jurisdiction to the fullest extent permitted under the laws of the State of Georgia.

11.4  Allocation of Costs Resolving Claims. Prior to arbitration, each Bound Party shall bear its own costs, including any attorneys fees incurred, and each Bound Party shall share equally all charges rendered by any mediator(s). Any arbitration Award shall include all of the prevailing party's arbitration costs, filing fees and other expenses.

11.5  Enforcement of Resolution. After resolution of any Claim, if any Bound Party fails to abide by the terms of any agreement or Award, then any other Bound Party may file suit or initiate administrative proceedings to enforce such agreement or Award without the need to comply with the procedures set forth in section 12.3. In such event, the Bound Party taking action to enforce the agreement or Award shall be entitled to recover from the non-complying Party (or if more than one non-complying Party, from all such Parties pro rata) all costs incurred

in enforcing such agreement or Award, including, without limitation, attorneys' fees and court costs.

## Article 12
### General Provisions

12.1  Enforcement.  Each Owner and Occupant shall comply strictly with the Bylaws, rules and regulations and use restrictions, as amended or modified from time to time, the Architectural Guidelines and with the covenants, conditions, easements and restrictions set forth in this Declaration, the recorded subdivision plat(s) for the Community and in the deed to such Owner's Lot, if any.  The Board of Directors may impose fines or other sanctions for violations of the foregoing, which shall be collected as provided herein for the collection of assessments and the Board may count each day a violation continues after notice thereof as a separate violation.  Failure to comply with this Declaration, the Bylaws or the rules and regulations shall be grounds for an action to recover sums due for damages or injunctive relief or both, including, without limitation, reasonable attorney's fees actually incurred, maintainable by the Association or an aggrieved Owner.  Failure by the Association or any Owner to enforce any of the foregoing shall in no event be deemed a waiver of the right to do so thereafter.  The Association shall have the right to record in the appropriate land records a notice of violation of the Declaration, Bylaws, rules and regulations, use restrictions or Architectural Guidelines and to assess the cost of recording and removing such notice against the Lot of the Owner who is responsible (or whose Occupants are responsible) for violating the foregoing.

12.2  Occupants Bound.  All provisions of the Declaration, Bylaws, rules and regulations, use restrictions and Architectural Guidelines which govern the conduct of Owners and which provide for sanctions against Owners shall also apply to all Occupants and the guests and invitees of Owners and Occupants.  The Owner shall be responsible for insuring that the Occupants, the guests, invitees and licensees of the Owner and  strictly comply with all provisions of the Declaration, Bylaws, rules and regulations, use restrictions and the Architectural Guidelines. Fines may be levied against Owners or Occupants.  If a fine is first levied against an Occupant and is not timely paid, the fine may then be levied against the Owner.

12.3  Self-Help.  In addition to any other remedies provided for herein, the Association, acting through the Board of Directors or their respective duly authorized agents shall have the power to enter upon any Lot or any other portion of the Community to abate or remove any structure, improvement, thing or condition which violates this Declaration, the Bylaws, the rules and regulations, the use restrictions or the Architectural Guidelines.  Unless an emergency situation exists, the violating Owner shall be given ten (10) days' written notice of the intent to exercise self-help.  Notwithstanding the foregoing, vehicles may be towed after giving any notice required by law and by this Declaration.  All costs of self-help, including, without limitation, reasonable attorney's fees actually incurred, shall be assessed against the violating Owner as a specific assessment.

12.4  Duration.  The covenants, conditions, restrictions and easements contained in this Declaration shall run with and bind the Community, and shall inure to the benefit of and shall be enforceable by the Association and any Owner, their respective legal representatives, heirs,

successors, and assigns, perpetually to the extent provided by law; provided, however, if and to the extent that, Georgia law limits the period during which covenants restricting land to certain uses may run, any provisions of this Declaration affected thereby shall run with and bind the land so long as permitted by such law, after which time, any such provision(s) shall be (a) automatically extended for successive periods of twenty (20) years (or the maximum period allowed by applicable law, if less), unless a written instrument signed by the then Owners of at least two-thirds (2/3) of the Lots has been recorded within the year immediately preceding the beginning of a twenty (20) year renewal period agreeing to change such provisions, in whole or in part, or to terminate the same, in which case this Declaration shall be modified or terminated to the extent specified therein; or (b) extended, renewed, modified or terminated as otherwise provided herein or by applicable law.

12.5  Amendment.

(a)  By the Board.  The Association, acting through the Board of Directors and without any further consent or action on the part of the members, may amend this Declaration for the following purposes: (i) those specific purposes permitted under Georgia law, including, without limitation, if such amendment is necessary to bring any provision hereof into compliance with the provisions of the Georgia Property Owners' Association Act, O.C.G.A. § 44-3-220, *et seq.*; (ii) if such amendment is necessary to bring any provision hereof into compliance with any applicable governmental statute, rule or regulation or judicial determination which shall be in conflict therewith; (iii) if such amendment is necessary to enable any reputable title insurance company to issue title insurance coverage with respect to the Lots subject to this Declaration; (iv) if such amendment is required by an institutional or governmental lender or purchaser of mortgage loans, including, without limitation, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, to enable such lender or purchaser to make or purchase Mortgage loans on the Lots subject to this Declaration; or (v) if such amendment is necessary to enable any governmental agency or private insurance company, including without limitation, the U.S. Department of Housing and Urban Development and the U.S. Department of Veterans Affairs, to insure or guarantee Mortgage loans on the Lots subject to this Declaration; provided, however, no such amendment set forth in this subsection (a) shall adversely affect the title to any Lot unless the Owner of such Lot consents thereto in writing.

(b)  By the Association.  In addition, this Declaration may be amended upon the affirmative vote or written consent, or any combination of affirmative vote or written consent, of members of the Association holding at least two-thirds (2/3) of the Total Association Vote.  The consent of the requisite number of Owners to any amendment shall be evidenced by the execution of the amendment by said Owners, or, in the alternative, the sworn statement of the President or any Vice President or the Secretary of the Association attached to or incorporated in the amendment, which sworn statement states unequivocally that the consent of the required number of Owners was obtained and that any notices required by this Declaration, the Bylaws, the Articles of Incorporation and Georgia law were given.  The amendments authorized by this Section may be of uniform or non-uniform application and Owners shall be deemed to have agreed that the Declaration may be amended as provided herein and that any rule of law requiring unanimous approval of amendments having a non-uniform application shall not apply.

Amendments to this Declaration shall become effective upon recordation unless a later effective date is specified therein.

Notwithstanding the foregoing, no amendment which materially alters or changes the rights of the Golf Club Owner shall be effective unless consented to, in writing, by the Golf Club Owner.

12.6  Gender and Grammar.  The singular, wherever used herein, shall be construed to mean the plural, when applicable, and the use of the masculine or feminine pronoun shall include the neuter, masculine and feminine.

12.7  Severability.  Whenever possible, each provision of this Declaration shall be interpreted in such manner as to be effective and valid, but if the application of any provision of this Declaration to any Person or to any property shall be prohibited or held invalid, such prohibition or invalidity shall not affect any other provision or the application of any provision which can be given effect without the invalid provision or application and, to this end, the provisions of this Declaration are declared to be severable.

12.8  Captions.  The captions of each Article and Section hereof, as to the contents of each Article and Section, are inserted only for convenience and are in no way to be construed as defining, limiting, extending or otherwise modifying or adding to the particular Article or Section to which they refer.

12.9  Preparer.  This Declaration was prepared by Rachel E. Conrad, Dorough & Dorough, LLC, Attorneys at Law, 160 Clairemont Avenue, Suite 650, Decatur, Georgia 30030.

12.10  Notices.  Notices provided for in this Declaration or the Articles or Bylaws shall be in writing, and shall be addressed to an Owner at the address of the Lot or to the Association at the address of its registered agent on file with the Georgia Secretary of State.  Any Owner may designate a different address for notices to such Owner by giving written notice to the Association.  Owners shall keep the Association advised of their current address and phone numbers where they can be reached.  Notices addressed as above shall be mailed by United States Registered or Certified Mail, return receipt requested, postage paid, or delivered in person, including delivery by Federal Express or other reputable courier service.  The time period in which a response to any such notice must be given or any action taken with respect thereto, shall commence to run from the date of personal delivery or date of receipt shown on the return receipt.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice sent.

12.11  No Discrimination.  No action shall be taken by the Association or the Board of Directors which would discriminate against any person on the basis of race, creed, color, national origin, religion, sex, familial status, disability or sexual orientation.

12.12  Indemnification.  To the fullest extent allowed by the Georgia Nonprofit Corporation Code, and in accordance therewith, the Association shall indemnify every current and former officer, director and committee member against any and all expenses, including, but

41

not limited to, attorney's fees, imposed upon or reasonably incurred by any officer, director or committee member in connection with any action, suit or other proceeding (including settlement of any suit or proceeding, if approved by the then Board of Directors) to which such officer, director or committee member may be a party by reason of being or having been an officer, director or committee member. The officers, directors and committee members shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct or bad faith. The officers, directors and committee members shall have no personal liability with respect to any contract or other commitment made by them, in good faith, on behalf of the Association and the Association shall indemnify and forever hold each such officer, director and committee member free and harmless against any and all liability to others on account of any such contract or commitment. Any right to indemnification provided for herein shall not be exclusive of any other rights to which any officer, director or committee member, or former officer, director or committee member, may be entitled. The Association shall maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such coverage is reasonably available.

12.13 <u>Notice of Sale or Acquisition</u>. Prior to the sale of a Lot, the Owner shall provide the Association with written notice of the name of the purchaser and such other information as the Board may reasonably require. Upon acquisition of a Lot, each new Owner shall provide the Association with written notice of the name and mailing address of the Owner and such other information as the Board may reasonably require. All Owners shall keep the Association apprised of any change in name, address or telephone number.

12.14 <u>Agreements</u>. All agreements and determinations, including settlement agreements regarding litigation involving the Association, lawfully authorized by the Board of Directors, shall be binding upon all Owners, their heirs, legal representatives, successors, assigns and others having an interest in the Community or the privilege of possession and enjoyment of any part of the Community.

12.15 <u>Variances</u>. Notwithstanding anything to the contrary contained herein, the Board of Directors shall be authorized to grant individual variances from any of the provisions of this Declaration, the Bylaws and any rule, regulation, use restriction or Architectural Guideline promulgated pursuant thereto, if it determines that waiver of application or enforcement of the provision in a particular case is warranted and would not be inconsistent with the overall scheme of development for the Community.

12.16 <u>Litigation</u>. No judicial or administrative proceeding shall be commenced or prosecuted by the Association unless approved by at least two-thirds (2/3) of the Total Association Vote. This Section shall not apply to: (a) actions brought by the Association to enforce the provisions of this Declaration (including, without limitation, the foreclosure of liens); (b) the imposition and collection of assessments as provided herein; (c) proceedings involving challenges to *ad valorem* taxation; (d) counterclaims brought by the Association in proceedings instituted against it; or (e) actions brought by the Association against any contractor, vendor, or supplier of goods or services arising out of a contract for goods or services to which the Association is a party. This Section shall not be amended unless such amendment is made as

provided herein or is approved by the percentage votes necessary to institute proceedings as provided above.

12.17 <u>Security</u>. ALL OWNERS, OCCUPANTS, GUESTS, LICENSEES, AND INVITEES, AS APPLICABLE, ACKNOWLEDGE THAT THE ASSOCIATION AND ITS BOARD OF DIRECTORS AND ANY COMMITTEE OF THE BOARD DO NOT REPRESENT OR WARRANT THAT ANY SAFETY OR SECURITY MEASURES WILL BE IMPLEMENTED IN THE COMMUNITY OR, IF IMPLEMENTED, THAT SUCH SAFETY OR SECURITY MEASURES MAY NOT BE COMPROMISED OR CIRCUMVENTED, OR THAT ANY SUCH SAFETY OR SECURITY MEASURES WILL IN ALL CASES PROVIDE THE DETECTION OR PROTECTION FOR WHICH THEY ARE DESIGNED. EACH OWNER, OCCUPANT, GUEST, LICENSEE, OR INVITEE, AS APPLICABLE, ACKNOWLEDGES AND UNDERSTANDS THAT THE ASSOCIATION, THE BOARD OF DIRECTORS AND ANY COMMITTEE OF THE BOARD ARE NOT INSURERS OR PROVIDERS OF SAFETY OR SECURITY AND SHALL HAVE NO DUTY TO PROVIDE ANY SAFETY OR SECURITY ON THE COMMON PROPERTY OR ANY OTHER PORTION OF THE COMMUNITY; AND THAT EACH OWNER, OCCUPANT, GUEST, LICENSEE, AND INVITEE ASSUMES ALL RISKS OF PERSONAL INJURY AND PROPERTY DAMAGE AND FURTHER ACKNOWLEDGES THAT THE ASSOCIATION, THE BOARD OF DIRECTORS AND ANY COMMITTEE OF THE BOARD HAVE MADE NO REPRESENTATIONS OR WARRANTIES, NOR HAS ANY OWNER, OCCUPANT, GUEST, LICENSEE, OR INVITEE RELIED UPON ANY REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE RELATIVE TO ANY SAFETY OR SECURITY MEASURES IMPLEMENTED OR APPROVED.

12.18 <u>Reciprocal Rights To Use Name</u>. The Golf Club Owner and the Association agree that each may use the names "Echelon" and "Echelon Living" in all forms of communication, including electronic media. The Golf Club Owner may include a link on its web page to the Association web page and the Association may include a link on its web page to the Golf Club web page.

Article 13
<u>Submission to Georgia Property Owners'</u>
<u>Association Act; Conflict</u>

The property now or hereafter subject to the Declaration shall be held, conveyed, encumbered, used, occupied and improved subject to the Georgia Property Owners' Association Act, O.C.G.A. 44-3-220, *et seq.* (as amended from time to time, the "<u>Act</u>"). In the event of a conflict between the provisions of this Declaration and the provisions of the Act then to the extent that the provisions of the Act cannot be waived by agreement, the Act shall control.

IN WITNESS WHEREOF, the Declarant hereby executes this instrument under seal, this 15th day of May, 2014.

DECLARANT:     **ECHELON ADMINISTRATION, LLC,** a Georgia limited liability company

By: _____(SEAL)

Jeff Peltz, Manager

Signed, sealed and delivered in the presence of:

_____

WITNESS

NOTARY PUBLIC

My Commission Expires:

[AFFIX NOTARY SEAL]

IN WITNESS WHEREOF, the Association hereby acknowledges and consents to this Amended and Restated Declaration under seal, this 15th day of May, 2014.

ASSOCIATION:     **ECHELON HOMEOWNERS ASSOCIATION, INC.,** a nonprofit corporation

By:

Jeff Peltz, President

Signed, sealed and delivered
in the presence of:

[AFFIX SEAL]

WITNESS

NOTARY PUBLIC

My Commission Expires:

[AFFIX NOTARY SEAL]

CONSENT OF GOLF CLUB OWNER

IN WITNESS WHEREOF, the undersigned Golf Club Owner hereby consents to the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Echelon and executes this instrument under seal, this 15th day of May, 2014.

GOLF CLUB
OWNER:        **ECHELON HOSPITALITY GROUP,**
             **LLC,** a Georgia limited liability company

By:        _____(SEAL)
           Jeff Peltz, Manager

Signed, sealed and delivered
in the presence of:

_____
WITNESS

_____
NOTARY PUBLIC

My Commission Expires:

[AFFIX NOTARY SEAL]

EXHIBIT "A"

ALL THOSE CERTAIN PIECES, PARCELS OR TRACTS OF LAND lying and being in Cherokee County, Georgia, being Tract I, that portion of Tract III lying south and east of State Route No. 372 (Birmingham Highway), and Tract V, as shown and described on that certain Minor Subdivision Plat prepared for MIC-Gobi, LLC, by Precision Planning, Inc., filed and recorded on April 3, 2012, in Plat Book 107, Page 132, Cherokee County, Georgia records. The foregoing plat is incorporated herein and made a part hereof by reference for a complete description of such excluded tracts.

AND:

ALL THOSE CERTAIN PIECES, PARCELS OR TRACTS OF LAND situate, lying and being in Land Lots 119 and 170 of the 2nd District, 2nd Section, Cherokee County, Georgia, containing 7.842 acres, more or less, as shown on the Final Plat for The Georgia Tech Club by Melrose, LLC (Units 1 & 1A), prepared by Precision Planning, Inc., dated June 6, 2004, and being more particularly described as follows:

COMMENCING at the intersection of the land lot line common to Land Lots 170 and 171 and the right-of-way of King Road; thence leaving said intersection and traveling along said right-of-way in a northwesterly direction 475.32 feet to a point at the intersection of said right-of-way and the westerly 50 foot private road easement of Traditions Drive; thence leaving said right-of-way of King Road and continuing along said 50 foot private road easement of Traditions Drive 438.25 feet to a point on the southeasterly 50 foot private road easement of Traditions Court; thence continuing along said 50 foot private road easement of Traditions Court 427.59 feet to a point on the said southerly private road easement, said point being the TRUE POINT OF BEGINNING; thence from said POINT OF BEGINNING, leaving said private road easement of Traditions Court, South 00 degrees 20 minutes 50 seconds West, a distance of 84.12 feet to a point on the aforesaid northerly right-of-way of King Road (right-of-way varies); thence continuing along said right-of-way the following thirteen (13) courses and distances: North 45 degrees 05 minutes 59 seconds West, a distance of 170.31 feet to a point; thence North 45 degrees 05 minutes 59 seconds West, a distance of 114.46 feet to a point; thence along a curve to the left. having a radius of 2,894.79 feet, an arc length of 4.79 feet, a chord bearing of North 45 degrees 08 minutes 50 seconds West, a distance of 4.79 feet to a point; thence along a curve to the left having a radius of 2,894.79 feet, an arc length of 53.60 feet, a chord bearing of North 45 degrees 43 minutes 30 seconds West, a distance of 53.60 feet to a point; thence North 44 degrees 40 minutes 16 seconds East, a distance of 13.33 feet to a point; thence North 45 degrees 19 minutes 44 seconds West, a distance of 20.00 feet to a point; thence South 44 degrees 40 minutes 16 seconds West, a distance of 20.00 feet to a point; thence along a curve to the left having a radius of 2,894.79 feet, an arc length of 11.96 feet, a chord bearing of North 46 degrees 46 minutes 11 seconds West, a distance of 11.96 feet to a point; thence North 46 degrees 53 minutes 17 seconds West, a distance of 31.39 feet to a point; thence North 46 degrees 53 minutes 17 seconds West, a distance of 117.27 feet to a point; thence North 46 degrees 53 minutes 17 seconds West, a distance of 115.78 feet to a point; thence North 46 degrees 53 minutes 17 seconds West, a distance of 90.77 feet to a point; thence along a curve to the right having a radius of 468.22 feet, an arc length of 367.20 feet, a chord bearing of North 24 degrees 25 minutes 16 seconds West, a distance of 357.86 feet to a point; thence leaving said right-of-way

North 36 degrees 55 minutes 02 seconds East, a distance of 193.81 feet to a point; thence South 54 degrees 31 minutes 36 seconds East, a distance of 256.79 feet to a point; thence South 69 degrees 25 minutes 33 seconds East, a distance of 376.74 feet to a point; thence South 00 degrees 20 minutes 50 seconds West, a distance of 518.16 feet to a point on the northerly 50 foot private road easement of Traditions Court; thence leaving said northerly 50 foot private road easement of Traditions Court, South 00 degrees 20 minutes 50 seconds West, a distance of 103.66 feet to the POINT OF BEGINNING.

AND:

ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND situate, lying and being in Land Lot 119 of the 2nd District, 2nd Section, Cherokee County, Georgia, containing 4.870 acres, more or less, as shown on the Final Plat for The Georgia Tech Club by Melrose, LLC (Units 1 & 1A), prepared by Precision Planning, Inc., dated June 6, 2004, and being more particularly described as follows:

COMMENCING at the intersection of the land lot line common to Land Lots 170 and 171 and the right-of-way of King Road; thence leaving said intersection and traveling along said right-of-way in a northwesterly direction 475.32 feet to a point at the intersection of said right-of-way and the westerly 50 foot private road easement of Traditions Drive; thence leaving said right-of-way of King Road and continuing along said private road easement of Traditions Drive 384.51 feet to a point on the westerly 50 foot private road easement of Traditions Drive; thence North 12 degrees 39 minutes 43 seconds East, a distance of 110.32 feet to a point on the westerly 50 foot private road easement of Traditions Drive; thence continuing along said private road easement of Traditions Drive in a northeasterly direction 522.86 feet to a point on the westerly 50 foot private road easement of Club Drive; thence leaving said westerly private road easement of Traditions Drive and continuing along the westerly private road easement of Club Drive 263.61 fed to a point on the southerly 50 foot private road easement of Founders Drive E; thence leaving said private road easement of Club Drive and continuing along the southerly private road easement of Founders Drive E 606.85 feet to a point, said point being the TRUE POINT OF BEGINNING; thence from said POINT OF BEGINNING continuing along said southwesterly 50 foot permanent road easement (said permanent road easement being common to the boundary) the following three (3) courses and distances:  North 56 degrees 11 minutes 00 seconds West, a distance of 100.84 feet to a point; thence North 56 degrees 11 minutes 00 seconds West, a distance of 196.34 feet to a point; thence North 56 degrees 11 minutes 03 seconds West, a distance of 45.26 feet to a point; thence leaving said permanent road easement North 56 degrees 11 minutes 03 seconds West, a distance of 126.97 feet to a point; thence North 56 degrees 15 minutes 30 seconds West, a distance of 469.07 feet to a point; thence North 26 degrees 53 minutes 07 seconds East, a distance of 84.42 feet to a point; thence South 78 degrees 28 minutes 01 seconds East, a distance of 465.32 feet to a point; thence South 47 degrees 48 minutes 43 seconds East, a distance of 40.23 feet to a point; thence South 48 degrees 03 minutes 25 seconds East, a distance of 194.29 feet to a point; thence South 48 degrees 03 minutes 25 seconds East, a distance of 199.71 feet to a point; thence South 48 degrees 03 minutes 25 seconds East, a distance of 187.74 feet to a point; thence South 09 degrees 47 minutes 35 seconds East, a distance of 151.17 feet to a point; thence North 73 degrees 16 minutes 52 seconds West, a distance of 84.19 feet to a point on the northwesterly 50 foot private road easement of Founders

Drive E; thence leaving said northwesterly private road easement, North 73 degrees 16 minutes 52 seconds West, a distance of 127.02 feet to the POINT OF BEGINNING.

AND:

ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND situate, lying and being in Land Lots 99, 118 and 119 of the 2nd District, 2nd Section, Cherokee County, Georgia, containing 15.015 acres as shown on the Final Plat for The Georgia Tech Club by Melrose, LLC (Units 1 & 1A) prepared by Precision Planning, Inc., dated June 6, 2004, and being more particularly described as follows:

COMMENCING at the intersection of the land lot line common to Land Lots 170 and 171 and the right-of-way of King Road; thence leaving said intersection and traveling along said right-of-way in a northwesterly direction 475.32 feet to a point at the intersection of said right-of-way and the westerly 50 foot private road easement of Traditions Drive; thence leaving said right-of-way of King Road and continuing along said private road easement of Traditions Drive 384.51 feet to a point on the westerly 50 foot private road easement of Traditions Drive; thence leaving said westerly private road easement North 12 degrees 39 minutes 43 seconds East, a distance of 110.32 feet to a point on the westerly 50 foot private road easement of Traditions Drive; thence continuing along said private road easement of Traditions Drive in a northeasterly direction 632.86 feet to a point on the easterly 50 foot private road easement of Club Drive; thence leaving said westerly private road easement of Traditions Drive and continuing along the westerly private road easement of Club Drive 296.67 feet to a point on the southerly 50 foot private road easement of Founders Drive E; thence leaving said private road easement of Club Drive and continuing along the southerly private road easement of Founders Drive E 403.16 feet to a point, said point being the TRUE POINT OF BEGINNING; thence from said POINT OF BEGINNING North 58 degrees 40 minutes 20 seconds West, a distance of 60.82 feet to a point on the westerly 50 foot private road easement; thence North 87 degrees 13 minutes 22 seconds West, a distance of 36.63 feet to a point; thence South 83 degrees 20 minutes 45 seconds West, a distance of 239.46 feet to a point; thence South 14 degrees 18 minutes 13 seconds West, a distance of 0.73 feet to a point; thence North 47 degrees 47 minutes 52 seconds West, a distance of 253.05 feet to a point; thence North 47 degrees 47 minutes 52 seconds West, a distance of 255.33 feet to a point; thence North 47 degrees 47 minutes 52 seconds West, a distance of 252.26 feet to a point; thence South 89 degrees 34 minutes 34 seconds East, a distance of 559.63 feet to a pipe; thence North 02 degrees 18 minutes 51 seconds East, a distance of 335.35 feet to a point; thence North 69 degrees 15 minutes 53 seconds East, a distance of 64.14 feet to a point; thence North 69 degrees 15 minutes 53 seconds East, a distance of 98.86 feet to a point; thence South 17 degrees 54 minutes 55 seconds East, a distance of 138.01 feet to a point; thence South 87 degrees 59 minutes 30 seconds East, a distance of 253.43 feet to a point; thence North 23 degrees 23 minutes 18 seconds East, a distance of 189.93 feet to a point; thence South 72 degrees 21 minutes 40 seconds East, a distance of 87.27 feet to a point; thence South 72 degrees 21 minutes 40 seconds East, a distance of 83.36 feet to a point; thence South 14 degrees 49 minutes 00 seconds West, a distance of 304.68 feet to a point; thence South 03 degrees 04 minutes 52 seconds West, a distance of 145.91 feet to a point; thence South 03 degrees 04 minutes 52 seconds West, a distance of 153.45 feet to a point; thence South 03 degrees 04 minutes 52 seconds West, a distance of 147.50 feet to a point; thence South 03 degrees 04 minutes 52

seconds West, a distance of 156.47 feet to a point; thence North 87 degrees 46 minutes 39 seconds West, a distance of 259.15 feet to the POINT OF BEGINNING.

AND:

ALL THOSE CERTAIN PIECES, PARCELS OR LOTS OF LAND situate, lying and being in Land Lots 43, 44, 99, 100, 101, 102, 116, 117, 118, 119, 120 and 170 of the 2nd District, 2nd Section, Cherokee County, Georgia, designated as Lot Numbers 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85 and 110, ECHELON, together with those certain private roads designated as Traditions Court, Traditions Drive, Club Drive, Founders Drive East and Founders Court and being more particularly shown and described on the plat prepared by Precision Planning, Inc., dated June 23, 2004, and recorded in the Cherokee County, Georgia records in Plat Book 83 at Page 96, which plat is incorporated herein and by reference made a part hereof.

EXHIBIT "B"

BYLAWS

OF

ECHELON HOMEOWNERS ASSOCIATION, INC.

Prepared By:
Rachel E. Conrad
DOROUGH & DOROUGH, LLC
Attorneys at Law
160 Clairemont Avenue
Suite 650
Decatur, Georgia 30030
(404) 687-9977

BYLAWS

OF

ECHELON HOMEOWNERS ASSOCIATION, INC.

- TABLE OF CONTENTS -

Page Number

**ARTICLE 1 NAME, MEMBERSHIP, APPLICABILITY AND DEFINITIONS** .............................................. 1

  1.1  NAME.............................................................................................................................................. 1
  1.2  MEMBERSHIP ................................................................................................................................. 1
  1.3  DEFINITIONS .................................................................................................................................. 1

**ARTICLE 2 ASSOCIATION: MEETINGS, QUORUM, VOTING, PROXIES** ................................... 1

  2.1  PLACE OF MEETINGS.................................................................................................................... 1
  2.2  ANNUAL MEETINGS ..................................................................................................................... 1
  2.3  SPECIAL MEETINGS ...................................................................................................................... 1
  2.4  RECORD DATE ............................................................................................................................... 2
  2.5  NOTICE OF MEETINGS .................................................................................................................. 2
  2.6  WAIVER OF NOTICE ..................................................................................................................... 2
  2.7  ADJOURNMENT OF MEETINGS ..................................................................................................... 2
  2.8  MEMBERSHIP LIST ........................................................................................................................ 2
  2.9  VOTING......................................................................................................................................... 3
  2.10 PROXIES........................................................................................................................................ 3
  2.11 QUORUM....................................................................................................................................... 3
  2.12 ACTION WITHOUT A FORMAL MEETING ..................................................................................... 3

**ARTICLE 3 BOARD OF DIRECTORS: NUMBER, POWERS, MEETINGS** .................................... 4

  3.1  GOVERNING BODY; COMPOSITION............................................................................................... 4
  3.2  NUMBER OF DIRECTORS............................................................................................................... 4
  3.3  NOMINATION OF DIRECTORS........................................................................................................ 4
  3.4  ELECTION AND TERM OF OFFICE.................................................................................................. 4
  3.5  REMOVAL OF DIRECTORS ............................................................................................................ 5
  3.6  VACANCIES ................................................................................................................................... 5
  3.7  ORGANIZATION MEETINGS .......................................................................................................... 5
  3.8  REGULAR MEETINGS.................................................................................................................... 5
  3.9  SPECIAL MEETINGS...................................................................................................................... 5
  3.10 WAIVER OF NOTICE ..................................................................................................................... 6
  3.11 QUORUM OF BOARD OF DIRECTORS ........................................................................................... 6
  3.12 COMPENSATION............................................................................................................................ 6
  3.13 OPEN MEETINGS........................................................................................................................... 6
  3.14 EXECUTIVE SESSION..................................................................................................................... 6
  3.15 ACTION WITHOUT A FORMAL MEETING ..................................................................................... 6
  3.16 TELEPHONIC PARTICIPATION ...................................................................................................... 6
  3.17 POWERS........................................................................................................................................ 6
  3.18 MANAGEMENT AGENT.................................................................................................................. 8
  3.19 BORROWING ................................................................................................................................. 8
  3.20 FINING PROCEDURE...................................................................................................................... 8

**ARTICLE 4 OFFICERS** ..................................................................................................................... 9

  4.1  OFFICERS ...................................................................................................................................... 9

4.2  ELECTION, TERM OF OFFICE, AND VACANCIES .................................................................................................. 9
4.3  ADDITIONAL OFFICERS AND AGENTS ............................................................................................................. 9
4.4  SALARIES ........................................................................................................................................................ 9
4.5  REMOVAL ........................................................................................................................................................ 9
4.6  PRESIDENT ...................................................................................................................................................... 9
4.7  VICE PRESIDENT ............................................................................................................................................. 9
4.8  SECRETARY ..................................................................................................................................................... 9
4.9  TREASURER ..................................................................................................................................................... 10
4.10 RESIGNATION .................................................................................................................................................. 10

ARTICLE 5 COMMITTEES ........................................................................................................................................ 10

5.1 ADVISORY COMMITTEES .................................................................................................................................. 10
5.2 COMMITTEE MEMBERS .................................................................................................................................... 10

ARTICLE 6 MISCELLANEOUS .................................................................................................................................. 11

6.1  FISCAL YEAR .................................................................................................................................................. 11
6.2  PARLIAMENTARY RULES ................................................................................................................................. 11
6.3  CONFLICTS ...................................................................................................................................................... 11
6.4  ELECTRONIC RECORDS, SIGNATURES AND DOCUMENTS .................................................................................. 11
6.5  AMENDMENT .................................................................................................................................................. 11

BYLAWS

OF

ECHELON HOMEOWNERS ASSOCIATION, INC.

### Article 1
### Name, Membership, Applicability and Definitions

1.1  Name.  The name of the corporation shall be Echelon Homeowners Association, Inc. (hereinafter sometimes referred to as the "Association").

1.2  Membership.  The Association shall have one class of membership, as is more fully set forth in that certain Amended and Restated Declaration of Covenants, Conditions and Restrictions for Echelon (such Declaration, as amended, supplemented, renewed, or extended from time to time, is hereinafter sometimes referred to as the "Declaration"), the terms of which pertaining to membership are specifically incorporated by reference herein.

1.3  Definitions.  The words used in these Bylaws shall have the same meaning as set forth in the Declaration, unless the context shall prohibit, or the meanings given in the Georgia Property Owners' Association Act, O.C.G.A. §44-3-220, et seq. (the "Act") or in the Georgia Nonprofit Corporation Code, O.C.G.A. Section 14-3-101, et seq. (the "Nonprofit Code"). Statutory references shall be construed as meaning the referenced statute or portion thereof as the same may exist from time to time.

### Article 2
### Association:  Meetings, Quorum, Voting, Proxies

2.1  Place of Meetings.  Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the members as may be designated by the Board of Directors, either in the Community or as convenient thereto as possible and practical.

2.2  Annual Meetings.  There shall be an annual meeting of the members at such date, place and time as the Board of Directors shall determine to receive the reports of the outgoing Board of Directors, to install directors for the ensuing year and to transact such other business as may come before the meeting.

2.3  Special Meetings.  The President or the Board of Directors may call special meetings.  In addition, it shall be the duty of the President to call a special meeting of the Association upon the delivery of a petition signed and dated by members entitled to cast at least twenty-five percent (25%) of the Total Association Vote and describing the purpose or purposes for which it is to be held.  The notice of any special meeting shall state the date, time, and place of such meeting and the purpose(s) thereof.  No business shall be transacted at a special meeting, except those matters that are within the purpose or purposes described in the notice.

2.4 <u>Record Date.</u>  The Board of Directors shall fix in advance a record date for a determination of members entitled to notice of and to vote at any meeting of members or any adjournment thereof, or to make a determination of members for any other purpose, such date to be not more than seventy (70) days before the date on which the particular action requiring such determination of members is to be taken.

2.5 <u>Notice of Meetings.</u>  Written notice of each meeting of the members shall be given by, or at the direction of, the Secretary or person authorized to call the meeting at least twenty-one (21) days in advance of any annual or regularly scheduled meeting, and at least (7) seven days in advance of any other meeting and shall state the time, place and, for any special meeting, the purpose of such meeting.  Such notice shall be delivered personally or sent by United States mail, postage prepaid, statutory overnight delivery, or issued electronically in accordance with Chapter 12 of Title 10 of the Official Code of Georgia Annotated, the "Georgia Electronic Records and Signatures Act," to all members of record at such address or addresses as any of them may have designated, or, if no other address has been so designated, at the address of their respective Lots.

2.6 <u>Waiver of Notice.</u>  Waiver of notice of a meeting of the members shall be deemed the equivalent of proper notice.  Any member may, in writing or by electronic transmission signed by the member entitled to notice and delivered to the Association for inclusion in the minutes for filing with the Association's records, waive notice of any meeting of the members, either before or after such meeting.  Attendance at a meeting by a member, whether in person or by proxy, shall be deemed waiver by such member of lack of notice or defective notice, unless such member specifically objects to lack of proper notice at the time the meeting is called to order.

2.7 <u>Adjournment of Meetings.</u>  If any meeting of the Association cannot be held because a quorum is not present, a majority of the members who are present at such meeting, either in person or by proxy, may adjourn the meeting to a time not less than five (5) nor more than thirty (30) days from the time the original meeting was called. At such adjourned meeting at which a quorum is present, any business which might have been transacted at the meeting originally called may be transacted without further notice.

2.8 <u>Membership List.</u>  After the record date for any meeting is established by the Board of Directors, the Secretary shall prepare an alphabetical list of the names and addresses of all of the members who are entitled to notice of the meeting.  Beginning at least two (2) business days after notice is given of the meeting for which the list was prepared, the list of members shall be available for inspection by any member or a member's agent or attorney: (1) on a reasonably accessible electronic network, provided that the information required to gain access to such list is included with the notice of the meeting or upon request; or (2) during ordinary business hours at the Association's principal office or at such other reasonable place as may be specified in the notice in the city where the meeting will be held.  In the event that the Association makes the list available on an electronic network, the Association may take reasonable steps to ensure that such

information is available only to members of the Association. In addition, the list shall be available for inspection at the meeting or any adjournment thereof.

2.9 <u>Voting.</u> The voting rights of the members shall be as set forth in the Articles of Incorporation and the Declaration, and such voting rights are specifically incorporated herein.

2.10 <u>Proxies.</u> At all meetings of members, each member may vote in person or by proxy. All proxy appointment forms shall be in writing, signed either personally or by an electronic transmission, dated, and filed with the Secretary before the appointed time of each meeting. An electronic transmission must contain or be accompanied by information from which it can be determined that the member, the member's agent, or the member's attorney-in-fact authorized the electronic transmission. Proxies may be delivered to the Board of Directors by personal delivery, U.S. mail or electronic transmission to the Secretary or other officer or agent authorized to tabulate votes. Every proxy shall be revocable and shall automatically cease upon: (a) receipt of notice by the Secretary of the death or judicially declared incompetence of a member; (b) receipt by the Secretary or other officer or agent authorized to tabulate votes of written revocation signed by the member; (c) receipt by the Secretary or other officer or agent authorized to tabulate votes of a subsequent appointment form signed by the member; (d) attendance by the member and voting in person at any meeting; or (e) the expiration of eleven (11) months from the date of the proxy appointment form.

2.11 <u>Quorum.</u> The presence, in person or by proxy, of members entitled to cast at least twenty-five percent (25%) of the Total Association Vote shall constitute a quorum at all meetings of the Association. The members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough members to leave less than a quorum.

2.12 <u>Action Without A Formal Meeting.</u> In the Board's discretion, any action that may be taken by the Association members at any annual, regular, or special meeting may be taken without a meeting if the Board delivers a consent form or a ballot in writing or by electronic transmission to every member entitled to vote on the matter.

(a) <u>Ballot.</u> A ballot in writing or by electronic transmission shall set forth each proposed action and provide an opportunity to vote for or against each proposed action. Approval by ballot in writing or by electronic transmission shall be valid only when the vote cast by ballot equals or exceeds the quorum required to be present at a meeting authorizing the action, and the approval vote equals or exceeds the amount of the vote that would be required to approve the matter at a meeting at which the total vote cast was the same as the amount of vote cast by ballot.

All solicitations for votes by ballot in writing or by electronic transmission shall: (1) indicate the number of responses needed to meet the quorum requirements; (2) state the percentage of approvals necessary to approve each matter other than the election of directors; and (3) specify the time by which a ballot must be received by the Association in order to be counted. A ballot in writing or by electronic transmission may not be revoked. The Association shall maintain such ballots in its file for at least three (3) years.

(b) <u>Written Consent.</u>  Approval by consent in writing or by electronic transmission shall be valid only when the vote represented by consent in writing or by electronic transmission equals or exceeds the requisite majority of the voting power for such action.  Executed consents in writing or by electronic transmission shall be included in the minutes or filed with the Association's records.  No consent in writing or by electronic transmission signed pursuant to the Georgia Nonprofit Corporation Code shall be valid unless: (1) the consenting member has been furnished the same material that, pursuant to the Georgia Nonprofit Corporation Code, would have been required to be sent to members in a notice of a meeting at which the proposed action would have been submitted to the members for action; or (2) the written consent contains an express waiver of the right to receive the material otherwise required to be furnished.  If an action of the members is approved by consent in writing or by electronic transmission hereunder, the Board shall issue written notice of such approval to all members who did not sign written consents.  Membership approval shall be effective ten (10) days after written notice is issued; provided, however, if the consent is to an amendment to the Declaration or Bylaws which must be recorded, the effective date shall be no earlier than the date of recording of such amendment.

Article 3
Board of Directors:  Number, Powers, Meetings

3.1  <u>Governing Body; Composition.</u>  The affairs of the Association shall be governed by a Board of Directors.  Directors shall be natural persons who are eighteen (18) years of age or older.  Each director must reside in the Community and be a member or the spouse of a member; provided, however, no Person may serve on the Board at the same time with such Person's designee, spouse or any co-Owner or Occupant of such Person's Lot.

3.2  <u>Number of Directors.</u>  The Board shall consist of five (5) directors, who shall be elected as provided in Section 3.4 below.

3.3  <u>Nomination of Directors.</u>  Elected directors may be nominated from the floor, if a meeting is held for the election of directors and may also be nominated by a nominating committee, if established by the Board.  All candidates shall have a reasonable opportunity to communicate their qualifications to the members and to solicit votes.

3.4  <u>Election and Term of Office.</u>  The members shall elect the members of the Board of Directors at the first annual meeting of the Association following the adoption of these Bylaws.  The five (5) candidates receiving the most votes shall be elected.  Three (3) of the directors shall serve an initial term of two (2) years and the remaining two (2) directors shall serve an initial term of one (1) year.  At annual meetings thereafter (or pursuant to Section 2.12 in lieu of a meeting), directors shall be elected as necessary to fill vacant seats on the Board and shall serve for a term of two (2) years.  All eligible members of the Association may vote on all directors to be elected, and the candidates receiving the most votes shall be elected. Notwithstanding anything herein to the contrary, the members of the Board of Directors shall continue in office until their respective successors shall have been elected and take office.

No member shall be eligible to serve on the Board of Directors if he or she is more than thirty (30) days past due in the payment of any assessment or other charge owed to the Association or if he or she is in violation of any provision of the Declaration, Bylaws, Architectural Guidelines or any rule or regulation promulgated by the Board.

3.5 <u>Removal of Directors.</u>  At any annual, regular or special meeting of the Association, any one (1) or more of the members of the Board of Directors elected by the members may be removed, with or without cause, by a majority of the Total Association Vote and a successor may then and there be elected to fill the vacancy thus created.  The notice of the meeting shall state that the purpose or one of the purposes, of the meeting is removal of a director.  A director whose removal by the members has been proposed shall be given an opportunity to be heard at the meeting.  Additionally, any director who has three (3) consecutive unexcused absences from Board meetings, who is delinquent in the payment of an assessment for more than thirty (30) days, or who is in violation of any provision of the Declaration, Bylaws, Architectural Guidelines or any rule or regulation promulgated by the Board of Directors for more than thirty (30) days after notice thereof in accordance with Section 3.20 hereof, may be removed by a majority vote of the remaining directors.

3.6 <u>Vacancies.</u>  Vacancies in the Board of Directors caused by any reason, excluding the removal of a director by vote of the Association, shall be filled by a vote of the majority of the remaining directors.  Each Person so selected shall serve the unexpired portion of the term.

3.7 <u>Organization Meetings.</u>  The first meeting of a newly elected Board of Directors shall be held within ten (10) days after the election at such time and place as the directors may conveniently assemble.

3.8 <u>Regular Meetings.</u>  Regular meetings of the Board of Directors may be held at such time and place as shall be determined from time to time by the Board, provided that at least four (4) such meetings shall be held during each fiscal year with at least one (1) per quarter.  Notice of the regular schedule shall constitute sufficient notice of such meetings.

3.9 <u>Special Meetings.</u>  Special meetings of the Board of Directors shall be held when requested by the President, Vice President or by any two (2) directors.  The notice shall specify the date, time and place of the meeting and the nature of any special business to be considered.  The notice shall be given to each director by one of the following methods:  (a) by personal delivery (including commercial delivery service) to such director's home or office; (b) written notice by first class mail, postage prepaid; (c) by telephone communication (including facsimile), either directly to the director or to the director's home or office; or (d) issued electronically in accordance with the Nonprofit Code, if the director has consented in writing to such method of delivery and has provided the Board with an address regarding the same.  All such notices shall be given or sent to the director's address or telephone number as shown on the records of the Association.  Notices sent by first class mail shall be deposited with the U.S. Postal Service at least four (4) days before the time set for the meeting.  Notices given by personal delivery, electronic transmission or telephone shall be given at least two (2) days before the day set for the meeting.

3.10  Waiver of Notice.  The business transacted at any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice, if (a) a quorum is present, and (b) either before or after the meeting, each of the directors not present signs a written waiver of notice, a consent to holding the meeting, or an approval of the minutes either in writing or by electronic transmission which is included in the minutes or filed with the official records of the Association.  The waiver of notice or consent need not specify the purpose of the meeting.  Notice of a meeting shall also be deemed given to any director who attends the meeting without protesting before or at its commencement about the lack of adequate notice.

3.11  Quorum of Board of Directors.  At all meetings of the Board of Directors, a majority of the directors shall constitute a quorum for the transaction of business, and the votes of a majority of the directors present at a meeting at which a quorum is present shall constitute the decision of the Board of Directors.

3.12  Compensation.  No director shall receive any compensation from the Association for acting as such.

3.13  Open Meetings.  All meetings of the Board shall be open to all members, but members other than directors may not participate in any discussion or deliberation unless expressly so authorized by the Board.

3.14  Executive Session.  The Board may adjourn a meeting and reconvene in executive session to discuss and vote upon personnel matters, litigation in which the Association is or may become involved, and orders of business of a similar nature.  The nature of any and all business to be considered in executive session shall first be announced in open session.

3.15  Action Without A Formal Meeting.  Any action required or permitted to be taken at a meeting of the directors may be taken without a meeting if one or more consents, in writing or by electronic transmission, setting forth the action so taken, shall be signed by a majority of the directors and delivered to the Association for inclusion in the minutes for filing in the corporate records.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

3.16  Telephonic Participation.  One or more directors may participate in and vote during any meeting of the Board by telephone conference call or any other means of communication by which all directors participating may simultaneously hear each other during the meeting.  Any such meeting at which a quorum participates shall constitute a meeting of the Board.

3.17  Powers.  The Board of Directors shall be responsible for the affairs of the Association and shall have all of the powers and duties necessary for the administration of the Association's affairs and, as provided by law, may do all acts and things as are not by law, the Declaration, the Articles of Incorporation of the Association, or these Bylaws directed to be done and exercised by the members.  In addition to the duties imposed by these Bylaws or by any

resolution of the Association that may hereafter be adopted, the Board of Directors shall have the power to and be responsible for the following, in way of explanation, but not limitation:

(a) preparing and adopting an annual budget in which there shall be established the contribution of each member to the common expenses;

(b) making assessments to defray the common expenses and establishing the means and methods of collecting such assessments;

(c) providing for the operation, care, upkeep, and maintenance of all areas which are the maintenance responsibility of the Association;

(d) designating, hiring, and dismissing the personnel necessary for the operation of the Association and, where appropriate, providing for the compensation of such personnel and for the purchase of equipment, supplies, and material to be used by such personnel in the performance of their duties;

(e) collecting the assessments, depositing the proceeds thereof in a bank depository which it shall approve, and using the proceeds to administer the Association;

(f) making and amending rules and regulations;

(g) opening bank accounts on behalf of the Association and designating the signatories required;

(h) enforcing by legal means the provisions of the Declaration, these Bylaws, and the rules and regulations adopted by it, and bringing any proceedings which may be instituted on behalf of or against the members concerning the Association. Such enforcement power shall include, without limitation, the power to levy and collect fines as provided herein and in the Declaration in such amounts as from time to time the Board of Directors may deem proper in the circumstances, counting each day a violation continues after notice from the Board of Directors as a separate violation;

(i) obtaining and carrying insurance against casualties and liabilities, as provided in the Declaration, and paying the premium cost thereof;

(j) keeping books with detailed accounts of the receipts and expenditures of the Association and the actions thereof, and specifying the maintenance and repair expenses and any other expenses incurred; and

(k) authorizing contracts on behalf of the Association.

3.18 <u>Management Agent.</u> The Board of Directors may employ for the Association a professional management agent or agents at a compensation established by the Board of Directors to perform such duties and services as the Board of Directors shall authorize. The term of any management agreement shall not exceed one (1) year and shall be subject to termination by either party, without cause and without penalty, upon ninety (90) days' written notice.

3.19 <u>Borrowing.</u> The Board of Directors shall have the power to borrow money without the approval of the members of the Association; provided, however, except as otherwise provided in the Declaration, the Board shall obtain membership approval in the same manner as for special assessments, in the event that the total amount of such borrowing exceeds or would exceed ten percent (10%) of the annual budget of the Association.

3.20 <u>Fining Procedure.</u> The Board shall not impose a fine (a late charge shall not constitute a fine) unless and until the following procedure is followed:

(a) Written notice shall be delivered to the member by first-class or certified mail sent to the address of the member shown on the Association's records, specifying:

(1) the nature of the violation, the fine to be imposed and the date, not less than ten (10) days from the date of the notice, that the fine will take effect;

(2) that the violator may, within ten (10) days from the date of the notice, request a hearing, in writing, regarding the fine imposed;

(3) the name, address and telephone number of a person to contact to challenge the fine;

(4) that any statements, evidence, and witnesses may be produced by the violator at the hearing; and

(5) that all rights to have the fine reconsidered are waived if a hearing is not requested within ten (10) days of the date of the notice.

(b) If a hearing is requested, it shall be held before the Board in executive session, and the violator shall be given a reasonable opportunity to be heard. The minutes of the meeting shall contain a written statement of the results of the hearing. No fine shall be imposed prior to the date that is five (5) days after the date of the hearing.

(c) Notwithstanding anything herein to the contrary, if twenty-four (24) hours after notice under the Section is given the violation continues or thereafter occurs again within six (6) months of such notice, the Board may impose a fine in accordance with the notice, without further notice to the member.

Article 4
Officers

4.1  Officers.  The officers of the Association shall be a President, two (2) Vice Presidents, Secretary, and Treasurer.  The officers shall be elected from among the members of the Board of Directors.

No officer shall be eligible to serve on the Board of Directors if he or she is more than thirty (30) days past due in the payment of any assessment or other charge owed to the Association.

4.2  Election, Term of Office, and Vacancies.  The officers of the Association shall be appointed annually by the Board of Directors at the first meeting of the Board of Directors following the election of directors.  A vacancy in any office arising because of death, resignation, removal, or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

4.3  Additional Officers and Agents.  The Board of Directors may appoint such other officers, including assistant secretaries, assistant treasurers and agents as it shall deem necessary.  Such officers and agents shall hold their respective offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

4.4  Salaries.  The officers shall receive no compensation.

4.5  Removal.  Any officer may be removed, with or without cause, by the Board of Directors upon a majority vote of the Board; provided, however, in order to effectuate such removal at least two directors must vote in favor of said removal.

4.6  President.  The President shall be the chief executive officer of the Association and shall preside at all meetings of the members and directors.  The immediate supervision of the affairs of the Association shall be vested in the President.  It shall be the President's duty to attend to the business of the Association and maintain strict supervision over all of its affairs and interests.  The President shall keep the Board of Directors fully advised about the affairs and conditions of the Association, and shall manage and operate the business of the Association pursuant to and in accordance with such policies as may be prescribed from time to time by the Board of Directors.

4.7  Vice President.  The Vice President(s), if any, shall act in the President's absence or disability and shall have all powers, duties, and responsibilities provided for the President when so acting, and shall perform such other duties as shall from time to time be imposed upon any Vice President by the Board or delegated to a Vice President by the President.

4.8  Secretary.  The Secretary shall keep the minutes of all meetings of the members and of the Board of Directors; notify the members and directors of meetings as provided by these

–9–

Bylaws and Georgia law; have custody of the seal of the Association; affix such seal to any instrument requiring the same; attest the signature or certify the incumbency or signature of any officer of the Association; and perform such other duties as the President, or the Board of Directors may prescribe.  The Secretary shall perform the duties of the Treasurer of the Association in the absence or disability of the Treasurer.

4.9  Treasurer.  The Treasurer shall keep, or cause to be kept, the financial books and records of the Association, and shall faithfully account for the Association's funds, financial assets, and other assets entrusted to the Treasurer's care and custody.  The Treasurer shall make such reports as may be necessary to keep the President and the Board of Directors informed at all times as to the financial condition of the Association, and shall perform such other duties as the President, or the Board of Directors may prescribe.  The Treasurer shall maintain the money and other assets of the Association in the name and to the credit of the Association in such depositories as may be designated by the Board of Directors.  The Treasurer may provide for the investment of the money and other assets of the Association consistent with the needs of the Association to disburse such money and assets in the course of the Association's business.  The Treasurer shall perform the duties of the Secretary of the Association in the absence or disability of the Secretary.

4.10  Resignation.  Any officer may resign at any time by giving written notice to the Board of Directors.  Such resignation shall take effect on the date of the receipt of such notice or at any later time specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

### Article 5
### Committees

5.1  Advisory Committees.  Advisory committees to perform such tasks and to serve for such periods as may be designated by the Board or as provided in the Declaration are hereby authorized.  Each advisory committee shall be composed and shall operate in accordance with the terms of the Declaration or resolution of the Board of Directors designating the committee or with rules adopted by the Board of Directors.  An advisory committee shall not be authorized to exercise any authority of the Board under the Articles of Incorporation of the Association, the Declaration, these Bylaws or the Nonprofit Code.

5.2  Committee Members.

(a)  All Lot Owners are eligible to serves as committee members; however, no Owner shall be eligible to serve on a committee if he or she is more than thirty (30) days past due in the payment of any assessment or other charge owed to the Association.

(b)  All committee members must be Lot Owners with the exception of the Architectural Review Committee which may have one or more member who do not own a Lot in the Community, such as a builder, architect or landscape architect; provided, however, at least one Owner who resides at a Lot shall be a member of the Architectural Review Committee.  The

builder, architect and landscape architect committee member(s) may be compensated for their service as determined by the Board.

## Article 6
## Miscellaneous

6.1 <u>Fiscal Year</u>. The fiscal year of the Association shall be the calendar year unless otherwise determined by resolution of the Board.

6.2 <u>Parliamentary Rules</u>. *Roberts Rules of Order* (current edition) shall govern the conduct of all Association proceedings, when not in conflict with Georgia law, the Articles of Incorporation of the Association, the Declaration or these Bylaws.

6.3 <u>Conflicts</u>. If there are conflicts or inconsistencies between the provisions of Georgia law, the Articles of Incorporation of the Association, the Declaration and these Bylaws, the provisions of Georgia law, the Declaration, the Articles of Incorporation of the Association and the Bylaws (in that order) shall prevail.

6.4 <u>Electronic Records, Signatures and Documents</u>  To the extent permitted by Georgia law, the Declaration and these Bylaws, the Association and its members, officers, directors, Owners and Occupants may perform any obligation or exercise any right by use of any technological means providing sufficient security, reliability, identification and verifiability, which technological means have been approved by the Board of Directors in its sole discretion.

6.5 <u>Amendment</u>. The Association, acting through the Board of Directors and without any further consent or action on the part of the members, may amend this Declaration for those specific purposes permitted under Georgia law, including, without limitation, if such amendment is necessary to bring any provision hereof into compliance with the provisions of the Georgia Property Owners' Association Act, O.C.G.A. § 44-3-220, *et seq*. In addition, these Bylaws may be amended upon the affirmative vote, written consent, or any combination thereof, of Owners holding at least two-thirds (2/3) of the total eligible Association vote. Amendments to these Bylaws shall become effective upon recordation unless a later effective date is specified therein.

P:\Clients\4218\Bylaws.v2.docx