# EXHIBIT A

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-01155-S1**
**2/21/2023 2:22 PM**
TIANA P. GARNER, CLERK

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of _Gwinnett State Court_ County

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | Case Number _23-C-01155-S1_ |
| **MM-DD-YYYY** | |

| **Plaintiff(s)** | **Defendant(s)** |
|---|---|
| Hopkins, Cassandra | Cach, LLC |

| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Mandarich Law Group, LLP | | | | |

| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**Plaintiff's Attorney** _Sam Mullman_       **State Bar Number** _456630_       **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☒ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____        _____
**Case Number**                        **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-01155-S1**
**2/21/2023 2:22 PM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY

### STATE OF GEORGIA

**CASSANDRA HOPKINS**
_____

_____   _____
_____

PLAINTIFF

VS.

**CACH, LLC**
_____

_____
_____

DEFENDANT

CIVIL ACTION   23-C-01155-S1
NUMBER:_____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Samuel A. Mullman, Wellborn, Wallace & Mullman, LLC
1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318
sam@wellbornlaw.com

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 20____.
          22nd day of February, 2023

Tiana P. Garner
Clerk of State Court

By _____
          **Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-01155-S1**
**2/21/2023 2:22 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

**CASSANDRA HOPKINS**
_____

_____

_____

PLAINTIFF

CIVIL ACTION 23-C-01155-S1
NUMBER:_____

VS.

**Mandarich Law Group, LLP**
_____

_____

_____

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Samuel A. Mullman, Wellborn, Wallace & Mullman, LLC
1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318
sam@wellbornlaw.com

**an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.**

**This _____ day of _____, 20_____.**
22nd day of February, 2023

**Tiana P. Garner,**
**Clerk of State Court**

**By _____**
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

**SC-1 Rev. 2011**

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-01155-S1**

**2/21/2023 2:22 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| CASSANDRA HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 23-C-01155-S1 |
| v. | ) | Civil Action File No. _____ |
| | ) | |
| MANDARICH LAW GROUP, LLP, | ) | |
| and CACH, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT FOR DAMAGES**

Plaintiff Cassandra Hopkins ("**Plaintiff**" or "**Ms. Hopkins**") files this Complaint for Damages (this "**Complaint**") against Defendants Mandarich Law Group, LLP ("**Mandarich Law**") and Cach, LLC ("**Cach**") (collectively the "**Defendants**") and shows as follows.

## **NATURE OF THE CASE**

1.

Cach and Mandarich Law are debt collectors.

2.

This present matter arises from repeated instances of actionable conduct commencing in 2017 by debt collector/law firm Mandarich Law for or on behalf of Cach. Among other laws and prohibitions, Defendants violated the Fair Debt Collection Practices Act ("**FDCPA**"), 15 U.S.C. § 1692 *et seq.* and the Georgia Fair Business Practices Act ("**FBPA**"), O.C.G.A. § 10-1-390 *et seq.* The wrongful acts undertaken by Cach and Mandarich Law were carried out willfully, maliciously, and in bad faith with the specific intent of harming, punishing, and harassing Ms. Hopkins.

3.

Mandarich Law is a recidivist offender and has been named as a defendant in over one-hundred and fifty (150) federal court cases. Most, if not all, of these are for actions and conduct during their collection practice.

4.

Cach is a recidivist offender and has been named as a defendant in over nine hundred (900) federal court cases. Most, if not all, of these are for actions and conduct during their collection practice.

5.

As detailed below, Defendants were fully aware and had complete knowledge at all pertinent times that:

(a) the collection-related lawsuit filed on behalf of Cach against Ms. Hopkins on August 29, 2017 (hereinafter referred to as the "**Underlying Action**") fully and finally settled on November 13, 2017;

(b) for nearly two years immediately following that November 2017 settlement (the "Settlement"), Ms. Hopkins faithfully carried out her payment obligations under the terms of that Settlement by mailing a check made out to Cach to William C. Grossman Law, PLLC ("**Grossman Law**"), the firm that filed suit against Ms. Hopkins and negotiated the Settlement on behalf of Cach.

6.

In October 2019, upon the final payment becoming due, Ms. Hopkins reached out to Grossman Law to confirm the balance due of her final payment. Upon calling Grossman Law, Ms. Hopkins encountered Mandarich Law, however she could not speak to a live person and her

2

e-mails to Grossman Law bounced back as undeliverable.

7.

On October 29, 2019, Ms. Hopkins sent a letter to Mandarich Law's California office seeking validation of the debt afraid she was a victim of fraud. The following day, Ms. Hopkins filed a complaint with the Consumer Financial Protection Bureau ("**CFPB**") seeking guidance on who to make the last payment to. Ms. Hopkins did not receive any correspondence in response from either Mandarich Law or the CFPB.

8.

Nonetheless, on April 5, 2021, Nicole Simpson ("**Ms. Simpson**"), an attorney at Mandarich Law, filed a Motion for Default Judgment claiming liquidated damages. As evidence for the amount due, Mandarich Law attached the billing statement for the entire debt that was sued on. Mandarich Law made no statement to the Court about the Settlement, the payments made for nearly two years under the Settlement, or Ms. Hopkins' October 2019 letter to Mandarich Law seeking assurances on where to send payment. In fact, Ms. Simpson attached an Affidavit to the Motion where she swore under oath subject to the laws of perjury that this matter "is not one ex delicto and does not involve un-liquidated damages." Despite this, the Proposed Order was for $3,416.61. The State Court of Fulton County denied this Motion due to a standing issue.

9.

Eight days later, Ms. Simpson of Mandarich law filed a Motion for Summary Judgment. Again, Mandarich Law stated the damages were liquidated in this matter. Despite seeking judgment for $3,416.61 on April 5, 2021, Mandarich Law sought judgment for $5,628.81 principal and $317.41 in court costs. Summary Judgment was granted.

10.

None of these filings were sent to Ms. Hopkins.

11.

On May 18, 2021, Alexander Silpa ("**Mr. Silpa**"), another attorney from Mandarich Law, filed a Continuing Garnishment in Gwinnet County. Attached to the garnishment is the Order procured by fraud on the State Court of Fulton County.

12.

Ms. Hopkins, an officer of a bank, had her paycheck garnished on four separate occasions. Dealing with this caused a great deal of embarrassment, shame, sleepless nights, and anxiety for Ms. Hopkins.

13.

Ms. Hopkins retained counsel to figure out what occurred leading to the judgment and the garnishment and at all times Mandarich Law refused to accommodate Ms. Hopkins and her counsel despite knowledge of the October 29, 2019 letter seeking assurances and the wrongfully procured judgment amount. As of the date of filing, Ms. Hopkins does not have the funds back in her possession that were subject to the garnishment.

## **JURISDICTIONAL ALLEGATIONS**

### **Personal Jurisdiction**

14.

Ms. Hopkins is an individual residing in Apollo Beach, Florida.

15.

Mandarich Law is a California limited liability partnership with a principal place of business at 6300 Canoga Avenue, Suite 1700, Woodland Hill, California 91367. Mandarich Law

4

is authorized to transact business in Georgia and may be served upon its registered agent,

National Registered Agents, Inc. at 289 S. Culver St., Lawrenceville, Georgia 30046.

16.

Cach is a Colorado limited liability company with a principal place of business at 355 S.

Main Street, Suite 300-B, Greenville, SC 29601. Cach may be served pursuant to O.C.G.A. § 9-

10-94 upon its registered agent, Corporation Service Company at 1900 W. Littleton Boulevard,

Littleton, Colorado 80120.

17.

Cach does business in Georgia via the purchase from third-party creditors of overdue

receivables owed by Georgia debtors and via efforts thereafter to collect all or some portion of

that newly-purchased debt, including, but not limited to, suing Georgia residents in Georgia

courts.

18.

Mandarich Law is a law firm that represents creditors and has offices across the United

States. Mandarich Law transacts business in Georgia at 125 Townpark Drive NW, Kennesaw,

GA 30144.

19.

Cach and Mandarich Law carried out and committed the tortious and violative conduct

complained of herein in Georgia in relation to their collection efforts in the Georgia State Court

against Ms. Hopkins, a Georgia citizen at that time.

20.

Cach and Mandarich Law have purposefully availed themselves of the right to do

business in the State of Georgia.  Mandarich Law's and Cach's misconduct involved substantial,

systematic, and continuous contacts with Georgia. The tortious acts giving rise to this matter were committed in Georgia against a Georgia debtor by one or more Georgia attorneys at Mandarich Law working on Cach's behalf in relation to a Georgia lawsuit.

21.

Cach is subject to personal jurisdiction pursuant to, among other sources, the Georgia Long-Arm Statute O.C.G.A. § 9-10-91, including, but not limited to, sub-sections (1), (2), and (3).

22.

Mandarich Law is subject to personal jurisdiction pursuant to, among other sources, the Georgia Long-Arm Statute O.C.G.A. § 9-10-91, including, but not limited to, sub-sections (1), (2), and (3) and its appointment of a registered agent in Georgia, which represents Mandarich Law's consent to Georgia jurisdiction.

## **Subject Matter Jurisdiction**

23.

This Court has subject matter jurisdiction over all claims presented in this Complaint because Defendants' acts violated Georgia statutes and Defendants' acts occurred in Georgia.

24.

Specifically, the State Court of Gwinnett County has subject matter jurisdiction pursuant to GA. CONST., art. VI, § I, para. I; art. VI, §III, para. I; and O.C.G.A. § 15–7–4(a)(2).

## **Venue**

25.

This Cout has venue pursuant to GA. CONST. art. VI, §II, para. IV; art. VI, § II, para. VI; and O.C.G.A. §§ 9-10-31 and 9-10-93.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A. Cach and Mandarich Law

26.

Cach is a debt buyer that manages a portfolio of third-party debt that it purchases.

27.

Until mid-2017, Cach was a wholly owned subsidiary of SquareTwo Financial Corporation ("**SquareTwo**"). In a public SEC 10-K filing in 2014, Cach was one of seven debt collection companies owned by SquareTwo Financial. That same document stated that SquareTwo owned over $9 billion in debt with expected gross cash proceeds of $785.5 million.

28.

A similar filing from 2016 shows the numbers slightly lower with over $7 billion in owned debt with expected gross cash proceeds of $482.6 million.

29.

In March 2017, SquareTwo filed bankruptcy. The public filings for Cach show that in March 2017, it had between $100,000,001.00 and $500,000,000.00 in assets and the same in liabilities.

30.

In June 2017, SquareTwo sold for $264 million to Resurgent Capital Services, LP ("**Resurgent**"). This sale included all of Cach.

31.

Upon information and belief, Resurgent's annual revenue is between $64,000,000.00 and $140,200,000.00 however, it may be as much as $500,000,000.00.

7

32.

Mandarich Law is a debt collection law firm with offices all over the United States. Mandarich Law files suits for Cach and similarly situated collection companies.

33.

Mandarich Law is Cach's law firm in Georgia for many of its debt collection related lawsuits, including the one at-issue against Ms. Hopkins.

**B. Debt Purchase**

34.

Ms. Hopkins was previously the holder of a bank of America Visa Signature credit card with an account ending in 9248 (the "**9248 Account**").

35.

By early 2013, Ms. Hopkins was behind on her payments on the 9248 Account. In February 2013, Bank of America charged off the account.

36.

The consideration, advances, and services that Ms. Hopkins received from Bank of America in relation to the underlying debt on the Bank of America 9248 Account were solely for her personal, family, and/or household purposes.  Ms. Hopkins was and is a "consumer" as that term is defined at 15 U.S.C § 1692(a)(3).

37.

On or about February 28, 2013, Cach purchased a portfolio of accounts from FIA Card Services, N.A. Ms. Hopkins' 9248 Account was part of the debt purchased by Cach on that date.

38.

Cach thereafter began "servicing" the newly acquired accounts and otherwise coordinated

8

and executed all collection-related activities involving Ms. Hopkins.

**C. State Court of Fulton County Collection Action**

39.

At some point between March 2013 and April 2016, Cach hired Grossman Law to support its collection-related activities involving Ms. Hopkins.

40.

On April 5, 2013, Grossman Law, by and through Darya A. Yashina and Harold Scherr, filed the Underlying Action against Ms. Hopkins in the State Court of Fulton County.

41.

The Underlying Action was styled *Cach, LLC vs. Cassandra Hopkins*, Civil Action No. 17EV004140, State Court of Fulton County (2017).

42.

The Underlying Action's complaint alleges that Cach was seeking $5,718.81 in principal amount due under the 9248 Account.

43.

Ms. Hopkins does not dispute that, at that time, this was a correct recitation of Ms. Hopkins' Bank of America Accounts-related debt. Ms. Hopkins was unable to pay at that time.

44.

The Complaint and Summons were served on Ms. Hopkins on September 9, 2017.

45.

Ms. Hopkins would have been in default on October 10, 2017, the thirty-first day after service of the Complaint in the Underlying Action.

9

**D.  The Settlement**

46.

On November 13, 2017, Ms. Hopkins executed the Settlement with Cach.[1] The

Settlement stated the amount due was $6,029.00 with a reduced settlement amount of $4,400.00.

The first of nine (9) monthly payments in the amount of $90.00 was due on November 15, 2017,

with fourteen (14) $122.22 payments until October 15, 2019, when a final payment of $1,878.92

was due and payable.

47.

All payments under the Settlement were to be made to Cach, LLC and delivered to Law

Offices of William Grossman, 5965 Transit Rd., Suite 500, East Amherst, NY 14051.

48.

In the event Ms. Hopkins defaulted on the Settlement the entire amount due on the

Account, $6,029.00, less payments actually received would become due. Among other things,

the Settlement stated each party was responsible for its own attorneys' fees, costs and expenses

arising out of the Lawsuit without any recourse to the other party and the Settlement

extinguished attorney's fees, costs, and related interest under the principal amount due.

49.

From November 2017 through September 2019, Ms. Hopkins made timely payments.

50.

In October 2019, Ms. Hopkins called Grossman Law to discuss the last payment that was

due. The phone line for Grossman Law was forwarded to Mandarich Law. Ms. Hopkins was

---

[1] A true and correct copy of the Settlement is attached as Exhibit A in redacted form. Plaintiff's
counsel will hand deliver a non-redacted copy to the Court subject to the confidentiality
provision contained therein.

unable to speak to a live person as the voice recording did not transfer to an operator or connect her with an attorney or customer service representative.

51.

Ms. Hopkins also emailed Grossman Law, however, all of the emails were returned to her as sender stating they were undeliverable.

52.

Thinking she was the victim of fraud, Ms. Hopkins sent a letter on October 29, 2019 to Mandarich Law at the address she found online: 9200 Oakdale Avenue, #601, Chatsworth, California 91311.[2] This letter sought validation of the debt and information related to the transfer of the debt from Grossman Law to Mandarich Law. Ms. Hopkins also wanted to confirm her prior payments from the past two years were properly credited to her account.

53.

The following day, Ms. Hopkins also reached out to the CFPB stating she did not know who to make her final payment to, she did not know if any of her payments were received, she did not know if Grossman Law was out of business, and she did not know who Mandarich Law was or if it was real.[3]

54.

Ms. Hopkins never received any correspondence from Mandarich Law or CFPB related to her October 2019 correspondence seeking assurances that (1) her prior payments had been received and (2) where to make her final payment.

---

[2] A true and correct copy of Ms. Hopkins October 29, 2019 Letter is attached as Exhibit B.
[3] A true and correct copy of Ms. Hopkins October 30, 2010 CFPB Complaint is attached as Exhibit C.

**E.  The Fraudulent Filings and Misrepresentation to the State Court of Fulton County**

55.

On April 5, 2021, Cach and Mandarich Law, by and through Ms. Simpson, filed a Motion for Default Judgment against Ms. Hopkins in the Underlying Action.[4] In that Motion, Ms. Simpson states that the damages are liquidated going so far as providing an affidavit stating the same. Further, Cach and Mandarich Law state the "liquidated damages" Cach is owed can be calculated with a reasonable degree of certainty from the "affidavits and a final statement from the original creditor to establish the amount of liquidated damages they are seeking so long as they are included in the record."

56.

Exhibit A to the Motion for Default Judgment is the final statement from Bank of America showing a balance due of $5,718.81.

57.

Also attached to the Motion for Default Judgment is Ms. Simpson's Affidavit stating "[t]he action is not one ex delicto and does not involve un-liquidated damages."

58.

The Certificate of Service to the Motion for Default Judgment states it was served on an Al Suto at 550 Frederica Rd. Unit 2207, Saint Simons Island, GA 31522. Mr. Suto never appeared in the litigation and was not a proper individual for service.

59.

Further, the Motion for Default Judgment was not actually served on that individual because Mr. Suto had vacated that office in April 2017, four months before the Underlying

---

[4] A true and correct copy of the Motion for Default Judgment is attached as Exhibit D.

Action was initiated.

60.

The motion neither mentions the Settlement nor the payments made under the Settlement for nearly two years.

61.

Further, the motion does not disclose the letter Ms. Hopkins wrote to Mandarich Law in October 2019.

62.

The Proposed Order for the Default Judgment states $3,416.61 was due with court costs in the amount of $317.42.

63.

It is unknown what the figure $3,416.61 represents.

64.

That same day, April 5, the State Court of Fulton County denied the Motion for Default Judgment due to a standing error from the chain of custody of the debt.

65.

On April 13, 2021, Cach and Mandarich Law filed a Request for the Court to take Judicial Notes of certain facts related to the assignment to Cach.

66.

That same day, Cach and Mandarich Law, by and through Ms. Simpson, filed a Motion for Summary Judgment.[5] In that Motion, Ms. Simpson again states that the damages are liquidated. Further, Cach and Mandarich Law state the "liquidated damages" Cach is owed can

---

[5] A true and correct copy of the Motion for Summary Judgment is attached as Exhibit E.

be calculated with a reasonable degree of certainty from the "affidavits and a final statement from the original creditor to establish the amount of liquidated damages they are seeking so long as they are included in the record." To this end Mandarich Law again attached the charge-off statement showing a balance of $5,718.81.

67.

The Certificate of Service to the Motion for Summary Judgment states it was served on an Al Suto at 550 Frederica Rd. Unit 2207, Saint Simons Island, GA 31522. Mr. Suto never appeared in the litigation and was not a proper individual for service.

68.

Further, the Motion for Summary Judgment was not actually served on that individual because Mr. Suto had vacated that office in April 2017, four months before the Underlying Action was initiated.

69.

The Proposed Order for the Summary Judgment states $5,628.81 was due with court costs in the amount of $317.42 and any post judgment interest allowed.

70.

Under the Settlement, Cach was not entitled to any court costs or interest. Despite this, they sought $317.42 in costs and any post-judgment interested allowed in the Summary Judgment Proposed Order.

71.

It is unknown what the figure $5,628.81 represents.

72.

It is unknown why the Default Judgment Proposed Order requested $3,416.61 and the

14

Summary Judgment Proposed Order requested $5,628.81.

73.

The motion neither mentions the Settlement nor the payments made under the Settlement for nearly two years.

74.

Further, the motion does not disclose the letter Ms. Hopkins wrote to Mandarich Law in October 2019.

75.

On May 18, 2021, Judge Mather of the State Court of Fulton County granted Cach's Summary Judgment Motion in the amount of $5,718.81, the amount in the charge-off statement attached to the Summary Judgment Motion at Exhibit A, and all post judgment interest.[6]

**F. Gwinnett County Garnishment Action**

76.

On September 22, 2022, Cach and Mandarich Law, by and through Mr. Silpa, filed a Continuing Garnishment in Gwinnett County (hereafter referred to as the "**Garnishment Action**") against Huntington Equipment Finance, Inc., Ms. Hopkins employer.[7] The Garnishment Action is styled as *Cach, LLC v. Cassandra Hopkins v. Huntington Equipment Finance, Inc.*, Civil Action No. 22-GM-18007, Magistrate Court of Gwinnett County (2022).

77.

The Garnishment Action sought $3,416.61 in Principal, $283.31 in post judgment interest, and $361.97 in prejudgment interest, attorney's fees, or costs.

---

[6] A true and correct copy of the Order is attached as Exhibit F.
[7] A true and correct copy of the Continuing Garnishment is attached as Exhibit G.

78.

Attached to the Continuing Garnishment is the Order from the State Court of Fulton County procured by Fraud.

79.

Ms. Hopkins is the Managing Director, Senior Vice President of Huntington Distribution Finance, Inc., a wholly owned subsidiary of Huntington National Bank.

80.

By serving Huntington National Bank with the Garnishment Action, Ms. Hopkins suffered severe embarrassment and shame regarding the debt, the judgment, and the garnishment as an officer of a bank that dealt with creditors on a daily basis.

81.

Ms. Hopkins has also suffered from daily anxiety due to the unknown consequences of being a judgment debtor while an officer at the bank. It is unknown whether Ms. Hopkins could lose her job. It is also unknown what superiors at the bank know about the debt, judgment, and garnishment causing Ms. Hopkins a great deal of embarrassment, anxiety, and worry on a daily basis.

### G. <u>Cach's/Mandarich Law's Refusal to Remedy Fraud and Misconduct</u>

82.

On October 31, 2022, a payment of $1,523.70 was garnished from Ms. Hopkins' paycheck.

83.

On October 31, 2022, Ms. Hopkins obtained counsel to determine what the garnishment related to. Ms. Hopkins retained the firm of Wellborn, Wallace & Mullman, LLC (**"WWM"**),

16

also present counsel in this litigation.

84.

WWM began corresponding with Cach and Mandarich Law about the October 29, 2019 letter sent to it by Ms. Hopkins and the corresponding CFPB complaint. If, for whatever reason, Mandarich Law did not know about the prior settlement and payments prior to this date, they became aware at this time.

85.

Also at that time, Ms. Hopkins agreed to allow Cach and Mandarich Law to keep the amount garnished on October 31, 2022 in exchange for dismissal of the garnishment and the Underlying Action **before** a second garnishment occurred.

86.

Cach and Mandarich Law stated they would not dismiss the garnishment until they received the funds from the Court's registry.

87.

On November 15, 2022, Ms. Hopkins' paycheck was garnished a **second** time in the amount of $1,517.45. WWM corresponded with Cach and Mandarich Law demanding a check be overnighted for $1,517.45, the amount of the second garnishment.

88.

That same day, Cach and Mandarich Law stated it would not receive a disbursement from the court until November 29, 2022, and it could not dismiss the garnishment because the funds would be released to the garnishee at that point. Cach and Mandarich Law then **demanded another payment** of $1,523.70 from Ms. Hopkins via check in order to settle the garnishment.

17

89.

WWM expressed Ms. Hopkins' dissatisfaction and surprise that Cach and Mandarich Law would consider asking for another payment via check from her when they had already garnished her paycheck twice after fraudulently procuring the judgment. Despite this, Cach and Mandarich Law refused to dismiss the garnishment proceeding and the Underlying Action.

90.

Later that day, Cach and Mandarich Law doubled down and offered to dismiss the garnishment again if Ms. Hopkins would write a check for $1,523.70.

91.

On November 21, 2022, WWM told Cach and Mandarich Law that Ms. Hopkins would not be writing another check to Cach/Mandarich Law.

92.

Cach and Mandarich Law responded that it would retain the sum of $1,523.70 once the court disbursed funds from the garnishment answer, after which it would dismiss the garnishment action and satisfy the judgment. Essentially, this was the same offer that Ms. Hopkins rejected on the date of the first garnishment, October 31.

93.

WWM pointed out to Cach and Mandarich Law that by the time they dismissed all the matters pursuant to Mandarich Law's plan, a third garnishment would have been procured against Ms. Hopkins for the full amount of the garnishment. This was not satisfactory considering the fact that Ms. Hopkins had showed that the judgment and garnishment had been procured by fraud.

18

94.

Cach and Mandarich Law then made another offer where they would dismiss the garnishment and have Ms. Hopkins write a check to them to satisfy the Settlement. To this end, WWM responded on November 21, 2022 that Ms. Hopkins was not going to write another check and did not want to have to go through the hassle of getting funds back from her company after the Court released them to the corporate office. WWM reminded Cach and Mandarich Law that the funds that had already been garnished were being held by the Gwinnett County clerk, which was required by statute to disburse the funds to Mandarich Law (i.e., Mandarich Law was guaranteed to get its funds with no Answer or Traverse having been filed).

95.

On November 22, 2022, WWM offered for Cach and Mandarich Law to keep the first garnishment funds if they agreed to write a check to Ms. Hopkins for the remainder amount. Again, WMM reiterated that Ms. Hopkins refused to go through the human resources of her company to undue the garnishment disbursements.

96.

Despite WWM having told Cach and Mandarich Law twice that the money should not be returned to Huntington, Mandarich Law ignored Ms. Hopkins demands and dismissed the garnishment matter on November 22, 2022, with no agreed terms in place between the parties.

97.

WWM then reminded Cach and Mandarich Law that it had ignored Ms. Hopkins demands and needed to file a document with the Gwinnet County Court to send the proceeds of the garnishment to Ms. Hopkins' new address in Florida.

19

98.

Cach and Mandarich Law refused to do so.

99.

On November 30, 2022, a **third** garnishment in the amount of $1,076.74 was deducted from Ms. Hopkins' paycheck.

100.

On December 12, 2022, Ms. Hopkins filed a Motion to Set Aside Judgment in the Underlying Matter.

101.

On December 29, 2022, a **fourth** garnishment in the amount of $2,594.12 was deducted from Ms. Hopkins' paycheck.

102.

To date, Ms. Hopkins has not received any funds.

103.

On January 3, 2023, Ms. Hopkins sent the statutory notice under O.C.G.A. 10-1-399(b).

**H. Cach's/Mandarich Law's Bad Faith, Malice, and Willful Intent**

104.

In relation to their wrongful acts described above and to each and every count set forth below, Cach and Mandarich Law acted with willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which necessarily raises a presumption of conscious indifference to the consequences of their actions.

105.

Cach and Mandarich Law knew and intended that their bad faith misconduct would cause

20

substantial harm to Ms. Hopkins.  Cach and Mandarich Law intended the consequences of their

actions. The express goal of Cach's and Mandarich Law's wrongful acts was willful, illicit

financial gain for their own benefit.

**I.  Purpose of Cach's/Mandarich Law's Fraud and Misconduct**

106.

There exists substantial financial incentive for debt collectors like Cach and Mandarich

Law to engage in the exact category of fraud detailed above (i.e., move for default judgment or

summary judgment after a settlement agreement has been entered into by the parties without

disclosing to the Court that such a settlement agreement exists or that payments were made

thereunder).

107.

Upon information and belief, the average claimed value (i.e., the entire amount prayed

for in the complaint) of a state court case involving the collection of consumer credit card debt

by a debt collector is relatively small as compared to other types of state court civil actions.

108.

Upon information and belief, in cases in which a state court plaintiff achieves some

monetary recovery (whether by judgment or settlement), the ratio of "relief originally prayed

for" to "relief actually recovered" is relatively low in cases involving collection of consumer

debt by a debt collector when compared to that same ratio in other types of civil actions.

109.

When the plaintiff debt collector purchases the relevant consumer debt (as is the case

herein), the debt collector incurs an expense corresponding to the purchase price paid to the

original creditor or other debt seller.

21

110.

In relation to the filing and prosecution of a collection action, a plaintiff debt collector incurs expenses corresponding to both legal representation (whether performed by in-house counsel or outside counsel) and litigation-related out-of-pocket costs.

111.

The cost to file a Motion for Default Judgment or Motion for Summary Judgment is dependent on the time it takes the attorney to draft such a legal document. When a party seeks liquidated damages, an affidavit and account statement is sufficient. When a party seeks unliquidated damages, a hearing is required under Georgia Law (even when a party is in default).

112.

It is in a plaintiff's best interest to keep all costs down. If a plaintiff is receiving legal services under a contingency arrangement, it is in the law firm's best interest to keep time down to a minimum to maximize the return on its contingency interest. Therefore, it favors a plaintiff and a law firm to state a claim is for liquidated damages if they are able to.

113.

Accordingly, in a typical debt collector/debt collection action, in light of: (1) the amount claimed; (2) the cost of purchasing the underlying debt; (3) the anticipated recovery or amounts paid under a settlement; and (4) the attorney fees or salaries and out-of-pocket lawsuit-related costs, payments by the plaintiff debt collector for future attorney fees in relation to an alleged breached settlement (whether actually breached or not) and subsequently disclosing that settlement, disclosing payments made under that settlement, and preparing for and conducting a damages hearing is a substantial expense that often significantly impacts the debt collector's bottom line (i.e., the ultimate amount of profit of loss) in relation to a particular sued-upon debt.

22

114.

In the context of a collection action where a plaintiff creditor has a settlement agreement against a defendant in default and whereby that plaintiff creditor alleges a breach of that settlement, there exists substantial financial motivation for a plaintiff debt collector to avoid disclosing that settlement or the payments made under that settlement and, instead, continue to seek judgment in the case via default and claim liquidated damages of the entire amount of the account balance pre-settlement terms. The motion put forward is therefore a sham vehicle to obtain a quick judgment and pursue a greater amount against the debtor defendant on the most favorable terms possible for the debt collector (i.e., for an amount they are not entitled to) in the least amount of time (i.e., without a hearing).

115.

Once a judgment is obtained, the plaintiff creditor can use any one of Georgia's statutory mechanisms to collect the amount in the judgment, including via garnishment, which requires a valid judgment.

116.

This is true in specific relation to the Underlying Action and the Garnishment Action that was filed by Cach and Mandarich Law against Ms. Hopkins.

117.

In illegally and fraudulently moving for Summary Judgment in the Underlying Action without disclosing the existence of the Settlement and the payments made thereunder, rather than disclosing such facts and having a hearing on damages, Cach and Mandarich Law were banking on the substantial likelihood that, once summary judgment was granted for a higher amount, they could move to collecting on that judgment in amounts they were not entitled to (i.e., principle

amounts separate from the settlement amount, including interest and fees that were expressly prohibited under the Settlement) and collect more money from a defendant debtor likely not sophisticated enough to seek legal counsel and move to set aside the judgment or, as in this instance, file suit for the fraud.

118.

Fraudulent misconduct such as this is, in essence, the cost of doing business for collection agencies like Cach and Mandarich Law where 9,999 out of every 10,000 debtors do not seek legal guidance once such a fraud has occurred. Unfortunately for Cach and Mandarich Law, Ms. Hopkins was the 1 out of 10,000 who did.

**J.   Cach's/Mandarich Law's History of Misconduct and Violations**

119.

As the United States Congress has expressly stated, there is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors.

120.

Cach and Mandarich Law have used, are using, and, in the absence of any meaningful deterrent, will continue intentionally and in bad faith to use these abusive, deceptive, and unfair debt collection practices.

121.

As Congress has specifically stated, abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

122.

As Congress has specifically stated, means other than misrepresentation and/or other

24

abusive debt collection practices are available for the effective collection of debts.

123.

As Congress has stated, abusive debt collection practices are carried on to a substantial extent in interstate commerce and through means and instrumentalities of such commerce. Even where abusive debt collection practices are purely intrastate in character, they nevertheless directly affect interstate commerce.

124.

Cach's and Mandarich Law's record of non-compliance with federal and state laws governing their collection efforts is substantial.

125.

Even in an industry (collections) unfortunately populated by numerous bullies and cheats, Cach and Mandarich Law stand out as particularly egregious examples. Constant, intentional, and egregious violations of the FDCPA are, for Cach and Mandarich Law, nothing more than business-as-usual.

126.

These illegal collection tactics have garnered myriad complaints and thousands of meritorious lawsuits against Cach and Mandarich Law.

127.

Cach and Mandarich Law depend upon the economic reality that, notwithstanding the egregious nature and the inarguable illegality of their unlawful tactics, the facts and circumstances underlying collection from a single given debtor in a single given matter all but guarantee the economic infeasibility of a judicial action by the debtor to hold Cach, Mandarich Law, and their employees legally accountable for collection-related violations in that particular

25

matter.  In short, the financial fruits of Cach's and Mandarich Law's illegal conduct exceeds the cost to them of the illegal conduct.

## **SPECIFIC CAUSES OF ACTION**

### **COUNT I**
### **FAIR DEBT COLLECTION PRACTICES ACT VIOLATION**
### **(Against Cach and Mandarich Law)**

128.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

129.

Among other wrongful and legally-prohibited acts, in filing the Motion for Summary Judgment with the State Court of Fulton County, Cach and Mandarich Law:

(a) falsely represented to the Court that the damages in the matter were the full amount due from the account charge-off;

(b) falsely represented to the Court that the damages in the matter were liquidated;

(c) falsely represented to the Court that they were entitled to interest;

(d) falsely represented to the Court that they were entitled to costs and expenses;

(e) intentionally omitted the fact that Cach and Ms. Hopkins had entered into a settlement regarding the Underlying Action;

(f) intentionally omitted the fact that Ms. Hopkins made payments under the Settlement for nearly two years prior to Cach and Mandarich Law moving for Summary Judgment.

130.

All of the above-described wrongful and legally-prohibited acts were necessary in Cach's and Mandarich Law's continuation of the fraud and misconduct against Ms. Hopkins whereby

26

Cach and Mandarich Law subsequently filed the Garnishment Action with the fraudulently procured Judgment attached thereto in a new amount with new expenses, costs, and interest included.

131.

In violation of 15 U.S.C. § 1692d, Cach and Mandarich Law have engaged in conduct the natural consequence of which was and is to harass, oppress, and/or abuse Ms. Hopkins in connection with Cach's and Mandarich Law's fraudulent and illegal efforts to collect the Hopkins-related debt purchased from Bank of America.

132.

In violation of 15 U.S.C. §1692e(2)(A), Cach and Mandarich Law have used false, deceptive, and misleading representations or means in connection with the collection of a debt relating to the character, amount, or legal status of the debt. (See the various specific misrepresentations and fraudulent assertions detailed above, including the assertion that the damages in the matter were liquidated and included the full amount due from the account charge-off.)

133.

In violation of 15 U.S.C. §1692e(2)(B), Cach and Mandarich Law have used false, deceptive, and misleading representations or means in connection with the collection of a debt regarding the compensation that Cach and Mandarich Law were legally entitled to receive from Ms. Hopkins. (See the various specific misrepresentations and fraudulent assertions detailed above, including the assertion in the Motion for Summary Judgment and Continuing Garnishment regarding expenses and interest that Cach and Mandarich Law could recover despite the Settlement prohibiting such recovery.)

27

134.

In violation of 15 U.S.C. §1692e(5), Cach and Mandarich Law have used false, deceptive, and/or misleading representations or means in connection with the collection of a debt. Specifically, Cach and Mandarich Law have taken and have threatened to take actions that cannot legally be taken. (See the various specific illegal acts detailed above, all relating to the fraudulent use of Judgment procured on misrepresentations and omissions and subsequently initiating the Garnishment Action against Ms. Hopkins on the fraudulent Judgment.)

135.

In violation of 15 U.S.C. §1692e(10), Cach and Mandarich Law have used false, deceptive, and/or misleading representations or means in connection with the collection of a debt. (See the various specific illegal acts detailed above, all relating to the fraudulent use of a Judgment procured on misrepresentations and omissions against Ms. Hopkins, and subsequent reliance on such Judgment to initiated the Garnishment Action against Ms. Hopkins.)

136.

In violation of 15 U.S.C. 1692f(1), Cach and Mandarich Law have used unfair and unconscionable means to attempt to collect a debt. (See the various specific misrepresentations and fraudulent assertions detailed above, including the assertion in the Motion for Summary Judgment and Continuing Garnishment regarding expenses and interest that Cach and Mandarich Law could recover despite the Settlement prohibiting such recovery and the various differing amounts owed in principal.)

***Damages***

137.

Cach's and Mandarich Law's illegal acts and violations and their fraudulent collection

efforts detailed above were undertaken intentionally, in bad faith, and with full knowledge and intent of the harm that would result to Ms. Hopkins.

138.

Cach's and Mandarich Law's illegal acts and violations and their fraudulent collection efforts did not result from any bona fide error.  Even had the wrongful acts detailed herein been unintentional, Cach and Mandarich Law failed completely and intentionally to maintain procedures reasonably adopted to prevent any such error.

139.

In relation to each and every violation by Cach and Mandarich Law of the FDCPA, pursuant to 15 U.S.C. § 1692k(a)(1), Ms. Hopkins is entitled to monetary recovery from Cach and Mandarich Law in an amount that includes her actual damages.

140.

In relation to each and every violation by Cach and Mandarich Law of the FDCPA, pursuant to 15 U.S.C. § 1692k(a)(2)(a), Ms. Hopkins is also entitled to, among other damages, additional statutory damages from Cach and Mandarich Law in an amount equal to $1,000.00.

141.

In relation to each and every violation by Cach and Mandarich Law of the FDCPA, pursuant to 15 U.S.C. § 1692k(a)(3), Ms. Hopkins is also entitled to monetary recovery from Cach and Mandarich Law in an amount equal to her costs and reasonable attorney fees in the present court action and the reasonable attorney fees and expenses she incurred in relation to the Garnishment Action.

//////////

//////////

29

## COUNT II
## GEORGIA FAIR BUSINESS PRACTICE ACT VIOLATION
### (Against Cach and Mandarich Law)

142.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

143.

The purpose of the FBPA is to protect consumers from unfair and/or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. O.C.G.A. § 10-1-391.

144.

O.C.G.A. § 10-1-391 directs that the FPBA is to be interpreted and applied liberally and in harmony with the Federal Trade Commission Act, 15 U. S.C. § 45(a)(1), which implements the FDCPA.

145.

O.C.G.A. § 10-1-393(a) of the GFBPA broadly prohibits unfair and/or deceptive business practices.

146.

Cach and Mandarich Law intentionally engaged in unfair and deceptive business practices, as set forth herein, in an effort to collect a consumer debt.

147.

Cach's and Mandarich Law's conduct has implications for the consuming public in general.

30

148.

Cach's and Mandarich Law's conduct negatively impacts the consumer marketplace.

149.

Upon information and belief, Cach does not maintain a place of business in Georgia and has no assets in Georgia, thus relieving Ms. Hopkins of the Notice and Demand requirements of O.C.G.A. § 10-1-399(b) related to Cach.

150.

The Notice and Demand pursuant to O.C.G.A. § 10-1-399(b) was sent to Mandarich Law on December 30, 2022 via email and USPS.

151.

As a result of Cach's and Mandarich Law's violations of O.C.G.A. § 10-1-393(a), Ms. Hopkins is entitled to recover general damages pursuant to O.C.G.A. § 10-1-399(a).

152.

As a result of Cach's and Mandarich Law's intentional violations of O.C.G.A. § 10-1-393(a), Ms. Hopkins is entitled to recover exemplary damages pursuant to O.C.G.A. § 10-1-399(a).

153.

As a result of Cach's and Mandarich Law's intentional violations of O.C.G.A. § 10-1-393(a), Ms. Hopkins is entitled to recover treble damages pursuant to O.C.G.A. § 10-1-399(c).

154.

Ms. Hopkins is entitled to recover reasonable attorney's fees and expenses of litigation pursuant to O.C.G.A. § 10-1-399(d).

31

## COUNT III
## FRAUD AND INTENTIONAL MISREPRESENTATION
## (Against Cach and Mandarich Law)

155.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

156.

Among other wrongful and legally-prohibited acts, Cach and Mandarich Law fraudulently represented to Judge Mather and the State Court of Fulton County that Cach was entitled to judgment in a liquidated amount representing the entire balance of the Bank of America debt. In so doing, Cach and Mandarich Law intentionally omitted the fact that the parties had entered into the Settlement and that Ms. Hopkins had made payments under the Settlement for nearly two years.

157.

In carrying out the Motion for Summary Judgment against Ms. Hopkins Judge Mather and the State Court of Fulton County relied actually, reasonably, and detrimentally upon this fraudulent misrepresentation and omissions by Cach and Mandarich Law.

158.

Cach's and Mandarich Law's intentional misrepresentations and omissions were made knowingly by Cach and Mandarich Law to deceive Judge Mather and the State Court of Fulton County in relation to material facts.  Cach and Mandarich Law intended that Judge Mather and the State Court of Fulton County rely and act upon these material misrepresentations and omissions (i.e., that Judge Mather and the State Court of Fulton County would believe that Cach was entitled to judgment in the liquidated amount of the entire Bank of America debt despite the

32

Settlement and payments thereunder).

159.

Judge Mather and the State Court of Fulton County detrimentally relied upon the intentional misrepresentations, omissions, and fraud of Cach and Mandarich Law and, erroneously believing the facts in the Motion for Summary Judgment to be true, granted that motion and entered judgment against Hopkins in the charged-off debt amount.

160.

As a direct result of the intentional misrepresentations, omissions, and fraud of Cach and Mandarich Law upon Judge Mather and the State Court of Fulton County and the subsequent judgment rendered from that Court, Ms. Hopkins suffered substantial damages in an amount to be proved at trial.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Cach and Mandarich Law)**

161.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

162.

Cach's and Mandarich Law's conduct in relation to their above-detailed fraudulent and illegal collection-related efforts was intentional and/or reckless.

163.

Cach's and Mandarich Law's conduct in relation to their above-detailed fraudulent and illegal collection-related efforts was extreme and outrageous.

164.

Cach's and Mandarich Law's above-detailed wrongful actions are so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.  This is especially true given the heightened standards of ethics applicable to lawyers.  These acts are atrocious and utterly intolerable in a civilized community.

165.

Cach's and Mandarich Law's conduct arising from and constituting their fraudulent and illegal collection-related efforts was and is the actual, legal, and proximate cause of Ms. Hopkins' emotional distress.

166.

Ms. Hopkins' emotional distress resulting from Cach's and Mandarich Law's misconduct was and is severe.

167.

Cach and Mandarich Law are liable to Ms. Hopkins for intentional infliction of emotional distress in an amount to be proved at trial.

### COUNT V
### NEGLIGENCE
### (Against Cach and Mandarich Law)

168.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

169.

Cach and Mandarich Law owed and owe Ms. Hopkins the duty to use due care and diligence in carrying out their collection-related duties in relation to the debts they purchased

34

from Bank of America.

170.

In committing the acts and omissions described above, Cach and Mandarich Law breached their duty of care and were therefore negligent.

171.

As a direct and proximate result of Cach's and Mandarich Law's negligence, Ms. Hopkins has suffered substantial damages in an amount to be proved at trial.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (Against Cach and Mandarich Law)

172.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

173.

Among other wrongful and legally-prohibited acts, in filing the Motion for Summary Judgment with the State Court of Fulton County, Cach and Mandarich Law:

(g) falsely represented to the Court that the damages in the matter were the full amount due from the account charge-off;

(h) falsely represented to the Court that the damages in the matter were liquidated;

(i) falsely represented to the Court that they were entitled to interest;

(j) falsely represented to the Court that they were entitled to costs and expenses;

(k) intentionally omitted the fact that Cach and Ms. Hopkins had entered into a settlement regarding the Underlying Action; and

(l) intentionally omitted the fact that Ms. Hopkins made payments under the Settlement for

35

nearly two years prior to Cach and Mandarich Law moving for Summary Judgment.

174.

At all times relevant to Cach's and Mandarich Law's representations and omissions described in the immediately preceding paragraphs and elsewhere above, Cach and Mandarich Law knew or should have known those representations and statements to be both false and material.

175.

At all times relevant to Cach's and Mandarich Law's representations described in the immediately preceding paragraphs and elsewhere above, Cach and Mandarich Law knew or should have known that these false statements would mislead the State Court of Fulton County regarding these material issues.

176.

In granting the Motion for Summary Judgment filed by Cach and Mandarich Law, the State Court of Fulton County relied actually, reasonably, justifiably, and detrimentally upon the above-described false representations by Cach and Mandarich Law.

177.

As a result of the negligent misrepresentations of Cach and Mandarich Law and the State Court of Fulton County's reliance thereon, Ms. Hopkins has suffered substantial damages in an amount to be proved at trial.

## COUNT VII
## BREACH OF CONTRACT (Florida Law Applied)
## (Against Cach)

178.

Ms. Hopkins realleges and incorporates by reference the allegations contained in

paragraphs 1 through 127 above as if the same were set forth herein in full.

179.

As a result of the acts and omissions described above, Cach breached the express and unambiguous terms of the Settlement.

180.

Ms. Hopkins has suffered damages as a result of Cach's breach.

181.

Ms. Hopkins is entitled to recover from Cach actual and consequential damages caused by Cach's breaches, which damages shall be proved at trial and which specifically include her reasonable attorney fees and expenses caused by that breach.

## COUNT VII
### ATTORNEY'S FEES PURSUANT TO O.C.G.A. § 13-6-11
### (Against Cach and Mandarich Law)

182.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

183.

In relation to their wrongful acts described above and to each and every count set forth above, Cach and Mandarich Law have acted in bad faith and have caused Ms. Hopkins unnecessary trouble and expense. As detailed above, Cach and Mandarich Law intentionally and in bad faith engaged in prohibited conduct with full knowledge of the harm that would result to Ms. Hopkins.

184.

Pursuant to O.C.G.A. § 13-6-11, Ms. Hopkins is entitled to recover all expenses and fees

37

(including the reasonable attorney fees expended herein by Ms. Hopkins) arising from Cach's and Mandarich Law's illegal and improper acts and omissions.

185.

Ms. Hopkins is also entitled to recover prejudgment interest on her costs and fee-related damages.

**COUNT IX**
**PUNITIVE DAMAGES PURSUANT TO O.C.G.A. § 51-12-5.1**
**(Against Cach and Mandarich Law)**

186.

Ms. Hopkins realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if the same were set forth herein in full.

187.

Cach and Mandarich Law are "active tort-feasors" as that term is used in O.C.G.A. § 51-12-5.1(f).

188.

In relation to each and every wrongful act described herein, Cach and Mandarich Law acted with the specific intent to cause harm to Ms. Hopkins.

189.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed willful misconduct.

190.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed malice.

191.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed fraud.

192.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed wantonness.

193.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed oppression.

194.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed an entire want of care.

195.

In relation to each and every wrongful act described herein, Cach's and Mandarich Law's actions showed a conscious indifference to the consequences of those acts.

196.

In relation to each and every wrongful act described herein, Cach and Mandarich Law acted with the specific intent to cause harm to Ms. Hopkins.

197.

Given the egregious and intentional nature of Cach's and Mandarich Law's conduct, Ms. Hopkins is entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1(f) to punish and penalize Cach and Mandarich law, to deter Cach and Mandarich Law from similar future misconduct, and to deter other persons and entities similarly situated to Cach and

Mandarich Law from engaging in similar future misconduct.

198.

Any award of punitive damages against Cach and Mandarich Law of less than one million dollars ($1,000,000.00) would be so slight and inconsequential as compared to Cach's and Mandarich Law's overall income and profits that it would guarantee that Cach, Mandarich Law, and similarly-situated third parties will deem such conduct to be economically advantageous (i.e., "worth the cost") and will therefore continue to engage intentionally in bad faith, illegal collection-related practices and misconduct with relative financial and penal impunity.

199.

Ms. Hopkins is therefore entitled to an award of punitive damages in an amount not less than one million dollars ($1,000,000.00) pursuant to O.C.G.A. § 51-12-5.1(f).

200.

In the alternative, should the trier of fact somehow determine – despite the evidence regarding the willful and intentional nature of Cach's and Mandarich Law's wrongful acts – that Cach and Mandarich Law did not act with the specific intent to harm Ms. Hopkins, then Ms. Hopkins is entitled to an award of punitive damages in the amount of two hundred and fifty thousand dollars ($250,000.00) pursuant to O.C.G.A. § 51-12-5.1(g).

## DEMAND FOR JURY TRIAL

Ms. Hopkins hereby demands trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Cassandra Hopkins prays for judgment against Cach and Mandarich Law that includes:

40

(a)     Special and general damages an amount to be proven at trial of not less than one hundred

thousand ($100,000.00), including, but not limited to, damages for Hopkins' actual

damages and emotional distress, attorney fees and expenses incurred by Ms. Hopkins in

the Garnishment Action in specific relation to Cach's and Mandarich Law's post-

Settlement fraud, and other actual damages;

(b)     Punitive and exemplary damages in an amount to be proven at trial, but in no event less

than one million dollars ($1,000,000.00);

(c)     Ms. Hopkins attorney fees and expenses incurred in the present matter in an amount to be

proved at trial;

(d)     The trebling of all damages pursuant to Hopkins' FBPA-related claims; and

(e)     Such other and further relief as this Court deems just and proper.

Respectfully submitted this 21st day of February 2023.

**WELLBORN, WALLACE & MULLMAN, LLC**

1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318

Phone:   (404) 352-3990
Fax:      (404) 352-3995
E-mail:   sam@wellbornlaw.com
            pete@wellbornlaw.com
            kelly@wellbornlaw.com

*/s/ Samuel A. Mullman*
Samuel A. Mullman
Georgia Bar No. 456630
Paul F. Wellborn III
Georgia Bar No. 746720
Kelly O. Wallace
Georgia Bar No. 734166

*Attorneys for Plaintiff Cassandra Hopkins*

41

## INDEX TO EXHIBITS

| EXHIBIT NAME: | DOCUMENT: |
|---|---|
| EXHIBIT A | Settlement Agreement |
| EXHIBIT B | Ms. Hopkins October 29, 2019 Letter |
| EXHIBIT C | Ms. Hopkins October 30, 2010 CFPB Complaint |
| EXHIBIT D | Motion for Default Judgment |
| EXHIBIT E | Motion for Summary Judgment |
| EXHIBIT F | Summary Judgment Order |
| EXHIBIT G | Gwinnett County Garnishment |

# EXHIBIT A

## SETTLEMENT AGREEMENT & MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made by and between CACH, LLC ("Plaintiff"), and Defendant, CASSANDRA HOPKINS ("Defendant", and collectively the "Parties"), in order to fully resolve any and all claims arising out of the lawsuit styled as *CACH, LLC v Cassandra Hopkins*, in the State Court Fulton County, Georgia, Case No. _____ (hereinafter the "Lawsuit").

### RECITALS

WHEREAS, the Parties to this Agreement agree to extinguish any and all claims related to the at-issue Bank of America (original creditor) credit card account no. ████████9248 (the "Account"), as well as all other claims contained within the Lawsuit, including but not limited to monetary damages, attorney's fees, costs and related interest;

WHEREAS, the Parties desire to avoid further expense, time, effort and uncertainty in regard to the Lawsuit and the collection of monies due thereunder;

NOW THEREFORE, in consideration of the foregoing and the mutual promises and releases contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, the Parties agree as follows:

1.   Purpose and Scope.  The purpose of this Agreement is to resolve any and all claims arising out of the Lawsuit and mutually release each other from any past debts, obligations or other monies owed.

2.   Settlement Terms.  The current balance due on the Account is Six Thousand Twenty Nine and 00/100 Dollars ($6,029.00).  The Parties have agreed on a reduced amount to settle the account, to wit: Four Thousand Four Hundred Dollars ($4,400.00), to be paid in the following manner: Nine (9) monthly payments of Ninety and 00/100 Dollars ($90.00), with the first of said payments due on November 15, 2017, and on the fifteenth day of each consecutive month thereafter; then fourteen (14) monthly payments of One Hundred Twenty Two and 22/100 Dollars ($122.22) thereafter on the fifteenth day of each consecutive month until October 15, 2019, when a final payment in the amount of One Thousand Eight Hundred Seventy Eight and 94/100 Dollars (1,878.92) shall be due and payable.  Payments should be made payable to 'CACH, LLC' and delivered to Law 2Offices of William Grossman, 5965 Transit Rd., Suite 500, East Amherst, NY 14051.  Plaintiff shall file a Voluntary Dismissal with Prejudice of the Lawsuit within thirty (30) days from receipt of all of the above-referenced payments.  In the event Defendant defaults in its obligations hereunder the entire amount due on the Account, to wit: $6,029.00, less payments actually received, if any, shall remain fully due and payable and Plaintiff shall be entitled to submit to the court an affidavit of nonpayment to obtain a Final Judgment for the outstanding balance then due.

*Handwritten margin note: Hopkins have a ten (10) day grace period before being late on a payment (X)*

The Parties agree that each party is solely responsible for its own attorneys' fees, costs and expenses arising out of the Lawsuit without recourse to the other Party.

3.   Mutual Releases.  Subject to the full performance of this Agreement by the Parties, the Parties release and forever discharge each other, and any respective directors, officers, managers, representatives, employees, agents, heirs, executors, predecessors, successors and assigns from any and all claims, demands, obligations, and actions or causes of action of any kind arising out of the Lawsuit.

4.   No Admissions.  This Agreement is the result of a compromise and settlement between the Parties with regard to the Lawsuit.  The Parties agree that this Agreement is not, and shall not be

construed as, an admission or concession of liability, obligation, responsibility or wrongdoing by any party to this Agreement.

5.     _Confidentiality_.   The Parties agree that the terms and amounts of this Agreement shall remain confidential unless disclosure is required by local, state or federal law.  However, the Parties may disclose this agreement to their attorneys and financial advisors.

6.     _Binding Effect_.   This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors and assigns.

7.     _Execution_.  This Agreement may be executed in duplicate counterparts, including by facsimile or portable document format ("PDF"), each of which together shall be deemed an original, with the same effect as if the signatures thereto were on the same instrument, and all such counterparts shall constitute a single Agreement.  The persons executing this Agreement represent and warrant that they have received and possess specific representative authority to enter into this Agreement.

8.     _Headings_.  Paragraph headings contained herein are for purposes of organization only and shall not constitute a part of this Agreement.

9.     _Entire Agreement_.   This Agreement is an integrated agreement, containing the entire understanding between the Parties hereto with respect to the matters addressed herein and, except as set forth in this Agreement, no representations, warranties or promises have been made or relied upon by the Parties to this Agreement.  This Agreement shall prevail over prior communications regarding the matters contained herein.

10.    _Severability_.  If any provision of this Agreement is declared void, or otherwise unenforceable, that provision shall be deemed to have been severed from this Agreement, which shall otherwise remain in full force and effect.

11.    _Governing Law, Jurisdiction and Venue_.  This Agreement shall in all respects be construed with and governed by the State of Florida.  In the event any action is brought claiming a breach of any terms, conditions, or promises contained in this Agreement, the prevailing party shall recover all costs and expenses including actual attorneys' fees and costs incurred in connection with said action.

**CACH, LLC**                                                    **CASSANDRA HOPKINS**

By: _____

Date: _____                Date: _____

Print Name: _____              CASSANDRA HOPKINS

Title: _____

ATLANTA, GA 30309

EXHIBIT A - Page 2 of 2

# EXHIBIT B

**CASSANDRA HOPKINS**



0779

October 29, 2019

To: William C. Grossman Law, PLLC          Mandarich Law Group, LLP
5965 Transit Road                                      9200 Oakdale Avenue
Suite 500                                                   # 601
East Amherst, New York  14051                 Chatsworth, CA 91311

In Re: CACH, LLC

To Whom It May Concern:

Be advised I have been making payments per our Agreement. I have a final payment due.

However, be advised that when I called the telephone number for William C. Grossman Law, PLLC (888-201-6643) the phone is answered by another law firm named "Mandarich Law Group".

I have some very serious questions regarding my account, and the manner in which it was handled. More specifically, it is imperative that we discuss potential FDCPA violations, and more particularly, complaints with the CFPB.

I have never been contacted by Mandarich Law Group, and I do not know who this is.

Upon receipt of this letter, I am requesting a validation of the balance of my debt, and with whom it is now placed. I would also request when this debt was placed, and copies of all communications that I received advising me of the change in Law Firms. Finally, please provide me a list of all payments received, and the balance due.

Thank you for your cooperation in this matter.

Cassandra Hopkins

Cc/Attorney General State of Georgia
    Attorney General State of New York
    Attorney General State of California
    CFPB/Via Consumer on line portal

EXHIBIT B - Page 1 of 1

# EXHIBIT C



Consumer Financial
Protection Bureau

(https://www.consumerfinance.gov/)

Submit a complaint  / Complaint filed

# Your complaint

## Complaint Number 191030-4507258

## Step 1

### What product or service is your complaint about?

**PRODUCT OR SERVICE**
Debt collection

**TYPE**
Credit card debt

## Step 2

### What type of problem are you having?

**ISSUE**
Written notification about debt

**HAVE YOU ALREADY TRIED TO FIX THIS PROBLEM WITH THE COMPANY?**
Yes

**TYPE OF ISSUE**
Didn't receive enough information to verify debt

## Step 3

### What happened?

I entered into a settlement agreement with William C. Grossman Law, PLLC 5965 Transit Road, Suite 500, East Amherst, NY 14051. I have been making monthly payments to Mr. Grossman and CACH, LLC beginning in November of 2017. It is now time for my final payment. I contacted Mr. Grossman, and they seem to be out of business. Another law firm named: Mandarich Law Group, LLP 9200 Oakdale Avenue, #601, Chatsworth, CA 91311 answers the phone with a voice recording. NOBODY EVER RESPONDS, THEY PUT YOU ON HOLD THEN ADVISE NOBODY IS AVAILABLE. Mr. Grossman's email are returned undelivered. Originally, I was sued on this account with CACH, LLC. Therefore, the final payment is crucial so that this matter can be removed from my credit report. I was NEVER notified that Mr. Grossman's office was closing. Therefore; 1. Who received my payments ? 2. Why wasn't I notified if Mr. Grossman's office closed ? 3. Mandarich Law Group, LLP does not answer the phone, and who are they. Please help me to have this removed off of my credit report immediately. Thank you.

☑ **I want the CFPB to publish this description on consumerfinance.gov so that others can learn from my experience.**

The CFPB will take steps to remove my personal information from this description but someone may still be able to identify me. Learn how it works. I consent to publishing this description after the CFPB has taken these steps.

### What would be a fair resolution to this issue?

Someone needs to respond to me and this needs to be removed from my credit report ASAP. I need to know who to pay the final payment to, and what the amount is. I need to know that ALL payments were credited appropriately. Thank you.

## Step 4

### What company is this complaint about?

**COMPANY INFORMATION**

WILLIAM C. GROSSMAN LAW, PLLC./MANDARICH LAW GROUP, LLP

EXHIBIT C  Page 2 of 4

**INVOLVEMENT**

Debt Collector

**SOCIAL SECURITY NUMBER (LAST FOUR DIGITS)**

██████

**OTHER INFORMATION ABOUT THIS COMPANY**

5965 Transit Road, Suite 500, East Amherst, NY 14051

East Amherst, New York 14051

**COMPANY WHERE THE DEBT ORIGINALLY CAME FROM**

BANK OF AMERICA CREDIT CARD

**INVOLVEMENT**

Creditor

**SOCIAL SECURITY NUMBER (LAST FOUR DIGITS)**

██████

**OTHER INFORMATION ABOUT THIS COMPANY**
**COMPLAINT ALSO SUBMITTED TO THIS COMPANY?**

true

**ATTEMPTED TO FIX WITH THIS COMPANY?**

Yes

# Step 5

What people are involved?

**YOUR CONTACT INFORMATION**

Cassandra Hopkins

████████████0779

EXHIBIT C - Page 3 of 4

## About us

The CFPB is an independent federal agency built to protect consumers. We write and enforce rules that keep banks and other financial companies operating fairly. We also educate and empower consumers, helping them make more informed choices to achieve their financial goals.

**HAVE A QUESTION? ¿PREGUNTAS?**

(855) 411-2372

Privacy Act Statement

OMB #3170-0011

Have a question? ¿Preguntas?

(855) 411-2372

An official website of the United States Government

EXHIBIT C - Page 4 of 4

# EXHIBIT D

State Court of Fulton County
**E-FILED**
17EV004140
4/5/2021 11:00 AM
Christopher G. Scott, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

CACH, LLC
      PLAINTIFF,

vs.

CASSANDRA HOPKINS

      DEFENDANT

CIVIL ACTION
FILE NO.  17EV004140

## MOTION FOR DEFAULT JUDGMENT

COMES NOW, the Plaintiff in the above-styled case, and moves that this Honorable court enter a Default Judgment on behalf of the Plaintiff against the Defendant, based upon the pleadings filed by the parties. Plaintiff further shows that to date Defendant has failed to file an Answer or other defensive pleading as shown by court records, and it further appearing that both the thirty (30) days allowed for filing and answer and the fifteen (15) day default period have terminated.

Plaintiff has the burden of proof of showing this Court how the damages sought and plead for in the Compliant were calculated within a reasonable degree of certainty. *Ezeoke v. FIA Card Services*, N.A., 320 Ga. App. 73, 74 (2013), citing *Alexander v. Wachovia Bank, Nat., Assn,* 305 Ga App. 641, 642 (2010). A party may use affidavits and final statement from the original creditor to establish the amount of liquidated damages they are seeking so long as they are included in the record. Id at 76; *Melman v. FIA Card Services N.A.,* 312 Ga. App. 270 (2011). Plaintiff has satisfied the holdings in *Ezeoke* and *Melman* by demonstrating to this Court through the attached billing statement (Exhibit "A") that the damages have been calculated within a reasonable degree of accuracy and are thus liquidated. *Ezeoke* 320 Ga. App at 74; *Melman* 312 Ga. App. At 271.

Plaintiff can also meet the burden of establishing that he is the rightful and current owner of the debt in question. Attached hereto and marked as Exhibit "B" is a true copy of the Bill of Sale and Account list to the Bill of Sale. Accordingly, Plaintiff has satisfied the requirements

EXHIBIT D - Page 1 of 43

under Georgia law by providing a clear chain of assignment of Defendant's account from the

original creditor to Plaintiff and respectfully prays this Court to grant judgment in his favor.

Respectfully submitted this _____1st_____ day of ~~March,~~ 2021. Apr.1

**Mandarich Law Group, LLP**

_____
NICOLE SIMPSON, ESQ.
State Bar No. 925927
nicoles@mandarichlaw.com
Attorney for Plaintiff

125 Townpark Dr
Suite 300
Kennesaw, Georgia 30144
(888) 201-6643

**EXHIBIT D - Page 2 of 43**

**EXHIBIT A**

**BankAmericard** | **Power Rewards**

**Bank of America**

Visa Signature®

CASSANDRA HOPKINS
Account Number: ████████ 9248
February 20 - March 21, 2013

**Account Information:**
www.bankofamerica.com

**Mail billing inquiries to:**
Bank of America
P.O. Box 982235
El Paso, TX 79998-2235

**Mail payments to:**
Bank of America
P.O. Box 851001
Dallas, TX 75285-1001

**Customer Service:**
1.800.421.2110

(1.800.346.3178 TTY)

| | |
|---|---|
| New Balance Total | $0.00 |
| Current Payment Due | $0.00 |
| Total Minimum Payment Due | $0.00 |
| Payment Due Date | 4/17/13 |

**Late Payment Warning:** If we do not receive your Total Minimum Payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APRs may be increased up to the Penalty APR of 29.99%.

| | |
|---|---|
| Previous Balance | $5,718.81 |
| Payments and Other Credits | -5,718.81 |
| Purchases and Adjustments | 0.00 |
| Fees Charged | 0.00 |
| Interest Charged | 0.00 |
| New Balance Total | $0.00 |
| Total Credit Line | $0.00 |
| Cash Credit Line | $1,600.00 |
| Statement Closing Date | 3/21/13 |
| Days in Billing Cycle | 30 |

| Transaction Date | Posting Date | Description | Reference Number | Account Number | Amount | Total |
|---|---|---|---|---|---|---|
| | | **Payments and Other Credits** | | | | |
| | 02/28 | CHARGE-OFF ADJUSTMENT | | | -5,718.81 | |
| | | | | | | −$5,718.81 |
| | | **Interest Charged** | | | | |
| 03/21 | 03/21 | Interest Charged on Purchases | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Balance Transfers | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Dir Dep&Chk CashAdv | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Bank Cash Advances | | | 0.00 | |
| | | TOTAL INTEREST FOR THIS PERIOD | | | | $0.00 |

| | |
|---|---|
| Total fees charged in 2013 | $70.00 |
| Total interest charged in 2013 | $126.06 |



BANK OF AMERICA
P.O. BOX 851001
DALLAS, TX 75285-1001

Account Number: ████████ 9248

| | |
|---|---|
| New Balance Total | $0.00 |
| Total Minimum Payment Due | 0.00 |
| Payment Due Date | 04/17/13 |

Enter payment amount  $

CASSANDRA HOPKINS
████████
ACWORTH GA  30101-2502

☐ Check here for a change of mailing address or phone numbers.
Please provide all corrections on the reverse side.
Mail this coupon along with your check payable to: Bank of America

**IMPORTANT INFORMATION ABOUT THIS ACCOUNT**  USE/11 Rev. 06/11

#### CUSTOMER TIPS FOR DISPUTED ITEMS

Many times disputed charges are legitimate charges that customers may not recognize or remember. Before disputing a charge, we recommend that you verify a few things and make every effort to resolve the dispute with the merchant. Often the merchant can answer your questions and easily resolve your dispute. The merchant's phone number may be located on your receipt or billing statement.

- **Has a credit posted to your account?**
  Please allow up to 30 days from the date on your credit voucher or acknowledgement letter for the merchant credit to post.

- **Is the charge or amount unfamiliar?**
  Check with other persons authorized to use the account to make sure they did not make the charge. It is possible that the merchant's billing names and store names are different or amounts can easily be confused with similar charges or include tips.

One way to check for the credits or to view transaction details is to look at your account statements online. If you are not enrolled in Online Banking, it is easy to enroll using the web address on the front of your statement or give us a call.

Please remember: If you find an error on your bill, you must notify us no later than 60 days after we sent your first statement on which the error or problem appeared to preserve your billing rights.

**ONLINE**
Online Banking is available 24 hours a day, 7 days a week and allows you to view the most recent activity on your account.

**PHONE**
1.866.266.0212
For prompt service, please have the merchant reference number(s) available for the charge(s) in question.



**MAIL**
Attn: Billing Inquiries  PO Box 982235, El Paso, TX 79998
When writing, please include Your Name, Account Number, the Disputed Amount, Merchant Name, Transaction Date, and reference number of the disputed item and specific details regarding your dispute, including dates of contact with the merchant and the merchant's response in each instance. Please include all supporting documentation, including sales and credit vouchers, contract and postage return receipts as proof of any returns.

#### PAYING INTEREST

We will not charge interest on Purchases on the next statement if you pay the New Balance Total in full by the Payment Due Date, and you had paid in full by the previous Payment Due Date. We will begin charging interest on Balance Transfers and Cash Advances on the transaction date.

**CALCULATION OF BALANCES SUBJECT TO INTEREST RATE**

*Average Daily Balance Method (including new Purchases):*
We calculate separate Balances Subject to an Interest Rate for Purchases and for each Introductory or Promotional Offer balance consisting of Purchases. We do this by: (1) calculating a daily balance for each day in the billing cycle; (2) adding all the daily balances together; and (3) dividing the sum of the daily balances by the number of days in the billing cycle.

To calculate the daily balance for each day in this statement's billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) add new Purchases, new Account Fees, and new Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

*Average Balance Method (including new Balance Transfers and new Cash Advances):*
We calculate separate Balances Subject to an Interest Rate for Balance Transfers, Cash Advances, and for each Introductory or Promotional Offer balance consisting of Balance Transfers or Cash Advances. We do this by: (1) calculating a daily balance for each day in this statement's billing cycle; (2) calculating a daily balance for each day prior to this statement's billing cycle that had a "Pre-Cycle balance" — a Pre-Cycle balance is a Balance Transfer or a Cash Advance with a transaction date prior to this statement's billing cycle but with a posting date within this statement's billing cycle; (3) adding all the daily balances together; and (4) dividing the sum of the daily balances by the number of days in this statement's billing cycle.

To calculate the daily balance for each day in this statement's billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) add new Balance Transfers, new Cash Advances and Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

To calculate a daily balance for each day prior to this statement's billing cycle that had a Pre-Cycle balance: (1) we take the beginning balance attributable solely to Pre-Cycle balance (which will be zero on the transaction date of the first Pre-Cycle balance); (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) and add only the applicable Pre-Cycle balances and their related Transaction Fees. We exclude from this calculation all transactions posted in previous billing cycles.

#### PAYMENTS

We credit mailed payments as of the date received, if the payment is (1) received by 5 p.m. local time at the address shown on the remittance slip on the front of your monthly statement; (2) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (3) sent in the return envelope with only the remittance portion of your statement accompanying it. Payments received by mail after 5 p.m. local time at the remittance address on any day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Payments made online or by phone will be credited as of the date of receipt if made by 5 p.m. Central. Credit for any other payments may be delayed up to five days.

No payment shall operate as an accord and satisfaction without the prior written approval of one of our Senior Officers.

We process most payment checks electronically by using the information found on your check. Each check authorizes us to create a one-time electronic funds transfer (or process it as a check or paper draft). Funds may be withdrawn from your account as soon as the same day we receive your payment. Checks are not returned to you. For more information or to stop the electronic funds transfers, call us at the number listed on the front.

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop payment, your letter must reach us at least three business days before the automatic payment is scheduled to occur.

#### TOTAL INTEREST CHARGE COMPUTATION

Interest Charges accrue and are compounded on a daily basis. To determine the Interest Charges we multiply each Balance Subject to Interest Rate by its applicable Daily Periodic Rate and result is multiplied by the number of days in the billing cycle. To determine the total Interest Charge for the billing cycle, we add the Periodic Rate Interest Charges together. A Daily Periodic Rate is calculated by dividing an Annual Percentage Rate by 365.

**HOW WE ALLOCATE YOUR PAYMENTS**

If your account has balances with different APRs, we will allocate the amount of your payment equal to the Total Minimum Payment Due to the lowest APR balances first (including transactions made after this statement). Payment amounts in excess of your Total Minimum Payment Due will be applied to balances with higher APRs before balances with lower APRs.

**IMPORTANT INFORMATION ABOUT PAYMENTS BY PHONE**

When using the optional Pay-by-Phone service, you authorize us to initiate an electronic payment from your account at the financial institution you designate. You must authorize the amount and timing of each payment. For your protection, we will ask for security information. A fee may apply for expedited service. To cancel, call us before the scheduled payment date. Same-day payments cannot be edited or canceled.

**YOUR CREDIT LINES**

The Total Credit Line is the amount of credit available for the account; however, only a portion of that is available for Bank Cash Advances. The Cash Credit Line is that amount you have available for Bank Cash Advances. Generally, Bank Cash Advances consist of ATM Cash Advances, Over the Counter (OTC) Cash Advances, Same-Day Online Cash Advances, Overdraft Protection Cash Advances, Cash Equivalents, Returned Payments, and applicable transaction fees.

**MISCELLANEOUS**

**Promotional Rate End Date**: This date is based on a future statement closing date. If you change your payment due date, this date could change. Transactions must meet offer conditions in order to qualify for the promotional rate.

For the complete terms and conditions of your account, consult your Credit Card Agreement. FIA Card Services is a tradename of FIA Card Services, N.A. This account is issued and administered by FIA Card Services, N.A.

If your billing address or contact information has changed, or if your address is incorrect as it appears on this bill, please provide all corrections here.

Address 1 _____

Address 2 _____

City _____

State _____  Zip _____

Area Code &
Home Phone _____

Area Code &
Work Phone _____

**BankAmericard** | Power Rewards®

**Bank of America** 〰️

Visa Signature®

████████ 9248
February 20 - March 21, 2013
Page 3 of 4

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| | Annual Percentage Rate | Promotional Transaction Type | Promotional Offer ID | Promotional Rate Until | Balance Subject to Interest Rate | Interest Charges by Transaction Type |
|---|---|---|---|---|---|---|
| Purchases | 0.00% | | | | $1,525.01 | $0.00 |
| Balance Transfers | 0.00% | | | | $ 0.00 | $0.00 |
| Direct Deposit and Check Cash Advances | 0.00% | | | | $ 0.00 | $0.00 |
| Bank Cash Advances | 0.00% | | | | $ 0.00 | $0.00 |

EXHIBIT D - Page 6 of 43

# Platinum Plus®

### The new standard

## CASSANDRA HOPKINS

This document outlines important information about your Bank of America© credit card account, including the Privacy Policy, Annual Percentage Rates (APRs) for different types of transactions, and the fees and other terms of this account. Please read this carefully and keep it for your records.

### CREDIT CARD AGREEMENT

### CONTENTS (Selected Sections)

| | |
|---|---|
| • BANK OF AMERICA PRIVACY POLICY FOR CONSUMERS 2009 | 2 |
| • YOUR CONTRACT WITH US | 6 |
| • WORDS USED OFTEN IN THIS AGREEMENT | 6 |
| • ANNUAL PERCENTAGE RATES | 7 |
| • ACCOUNT FEES | 10 |
| • PAYMENTS ON YOUR ACCOUNT | 12 |
| • WE MAY AMEND THIS AGREEMENT | 13 |
| • UNAUTHORIZED USE OF YOUR CARD | 15 |
| • ARBITRATION AND LITIGATION | 15 |
| • YOUR BILLING RIGHTS | 16 |

CREDIT CARD AGREEMENT

## BANK OF AMERICA PRIVACY POLICY FOR CONSUMERS 2009

To learn more about how Bank of America manages Customer Information and what actions you can take, please continue reading.

This document includes information about:
1. **Making the security of information a priority**
2. **Collecting your information**
3. **Managing information about you**
4. **Honoring your preferences**
5. **Actions you can take**
6. **Guarding your own information**
7. **Other privacy commitments**
8. **Bank of America companies**

This policy covers Customer Information, which means personally identifiable information about a consumer or a consumer's current or former customer relationship with Bank of America. The Bank of America Privacy Policy for Consumers is provided to you as required by law and applies to our companies identified in Section 8, *Bank of America companies*. This policy applies to consumer customer relationships established in the United States and is effective January 1, 2009.

### 1. Making the security of information a priority
Keeping financial information secure is one of our most important responsibilities. We maintain physical, electronic and procedural safeguards to protect Customer Information. Appropriate employees are authorized to access Customer Information for business purposes only. Our employees are bound by a code of ethics that requires confidential treatment of Customer Information and are subject to disciplinary action if they fail to follow this code.

### 2. Collecting your information
We collect and use various types of information about you and your accounts to service your accounts, save you time and money, better respond to your needs and manage our business and risks.
Customer Information is categorized in the following six ways:
**A. Identification Information** - information that identifies you, such as name, address, telephone number and Social Security number.
**B. Application Information** - information you provide to us on applications and through other means that will help us determine if you are eligible for products you request. Examples include assets, income and debt.
**C. Transaction and Experience Information** - information about transactions and account experience, as well as information about our communications with you. Examples include account balances, payment history, account usage and our inquiries and our responses.
**D. Consumer Report Information** - information from a consumer report. Examples include credit score and credit history.
**E. Information from Outside Sources** -information from outside sources regarding employment, credit and other relationships that will help us determine if you are eligible for products you request. Examples include employment history, loan balances, credit card balances, property insurance coverage and other verifications.
**F. Other General Information** - information from outside sources, such as data from public records, that is not assembled or used for the purpose of determining eligibility for a product or service.
As required by the USA PATRIOT Act, we also collect information and take actions necessary to verify your identification.

### 3. Managing information about you
**Managing information within Bank of America**
Bank of America is made up of a number of companies, including financial service providers, such as our brokerage company and credit card company, and nonfinancial companies, such as our operations and servicing subsidiaries. Bank of America may share any of the categories of Customer Information among our companies. For example, sharing information allows us to use information about your ATM, credit card and check card transactions to identify any unusual activity and then contact you to determine if your card has been lost or stolen.
We occasionally receive medical or health information from a customer if, for example, a customer applies for insurance from us. We also may obtain information from insurance support organizations not affiliated with Bank of America that prepare and provide reports to others as well as to us. We do not share medical or health information among our companies, except to maintain or collect on accounts, process transactions, service customer requests or perform insurance functions to the extent permitted by law.
**Managing information with companies that work for us**
We may share any of the categories of Customer Information with companies that work for us, including companies located outside the United States. All nonaffiliated companies that act on our behalf and receive Customer

Information from us are contractually obligated to keep the information we provide to them confidential, and to use the Customer Information we share only to provide the services we ask them to perform. These companies may include financial service providers, such as payment processing companies, and nonfinancial companies, such as check printing and data processing companies.

In addition, we may share any of the categories of Customer Information with companies that work for us in order to provide marketing support and other services, such as a service provider that distributes marketing materials. These companies may help us to market our own products and services or other products and services that we believe may be of interest to you. Please note that some of our own companies may provide marketing support and other services for us as well.

**Sharing information with third parties (for customers with credit cards and Sponsored Accounts)**

We may share Identification Information, Transaction and Experience Information, as well as Other General Information we collect about each of your (1) Bank of America credit card account(s) and (2) Sponsored Accounts at Bank of America, with selected third parties.

1. Credit card account information, whether co-branded or not, may be shared with third parties ;
2. Sponsored Account information may be shared with third parties. Sponsored Accounts are non-credit card accounts or services provided by Bank of America that are also endorsed, co-branded or sponsored by other organizations. Examples of these organizations include colleges, sporting teams, retailers and other affinity organizations, such as charities. Sponsored Accounts may include deposit accounts or other banking services provided by Bank of America, such as a savings account co-branded with a baseball team. You will know whether an account is a Sponsored Account by the appearance of the name or logo of the sponsoring organization on account materials, such as statements and marketing materials. ;
3. If you are unsure whether any of your accounts are Sponsored Accounts, please contact 1.888.341.5000. .

We may share information about credit cards and Sponsored Accounts with selected third parties, including:

- Financial services companies (such as insurance agencies or companies and mortgage brokers and organizations with whom we have agreements to jointly market financial products);
- Nonfinancial companies (such as retailers, travel companies and membership organizations); and
- Other companies (such as nonprofit organizations).

The sharing of information, as described in this section, is limited to credit card and Sponsored Account information. Please see Section 4, *Honoring your preferences* to learn how you may choose to opt out of this sharing.

**Disclosing information in other situations**

We also may disclose any of the categories of Customer Information to credit bureaus and similar organizations and when required or permitted by law. For example, Customer Information may be disclosed in connection with fraud prevention or investigation, risk management and security, and recording mortgages in public records.

**4. Honoring your preferences**

You have choices when it comes to how Bank of America shares and uses information.

Sharing information with third parties (for customers with credit cards and Sponsored Accounts)

If you have a Bank of America credit card or Sponsored Account, you may request that we not share information about these accounts with third parties. If you request that we not share information with third parties, we may still share information:

- Where permitted or required by law as discussed in Section 3 under *Disclosing information in other situations*;
- With our service providers as discussed in Section 3 under *Managing information with companies that work for us*; and
- With other financial companies with whom we have joint marketing agreements.

If you have multiple credit cards or Sponsored Accounts, you will need to express your preference for each account separately. When any customer on a joint account requests that we not share with third parties, that preference is applied to the entire account.

**Sharing among Bank of America companies**

You may request that Application Information, Consumer Report Information and Information from Outside Sources not be shared among Bank of America companies.

For sharing among Bank of America companies, each customer may tell us his or her preferences individually, or you may tell us the preferences for any other customers who are joint account holders with you.

**Direct marketing**

You may choose not to receive direct marketing offers - sent by postal mail, telephone and/or e-mail - from Bank of America. These preferences apply to all marketing offers from us and from companies working for us. To minimize the amount of telephone solicitation our customers receive, Bank of America does not offer nonfinancial products and services through telephone solicitations. Direct marketing offers from us may include information about products and services we believe may be of interest to you.

If you elect not to receive direct marketing offers by postal mail, telephone and/or e-mail, please note that we may continue to contact you as necessary to service your account and for other nonmarketing purposes. You may also be contacted by your client relationship manager or assigned account representative, if applicable. Bank of America may also continue to provide marketing information in your regular account mailings and statements, including online and ATM communications.

**EXHIBIT D - Page 10 of 43**

Each customer may opt out of each direct marketing option individually. Since marketing programs may already be in progress, it may take up to 12 weeks for your postal mail opt-out to be fully effective. When you opt out of direct marketing by postal mail or telephone, your opt-out will last for five (5) years. After that, you may choose to renew your opt-out for another five-year period.

**5. Actions you can take**

You can tell us your preferences by:

- Notifying us at bankofamerica.com/privacy and entering your information on our secure Web site
- Calling us toll free at 1.888.341.5000
- Talking to a customer representative at a banking center or to your client relationship manager

You can make sure information is accurate by:

- Accessing your account information (for example, on a statement or in response to specific requests)
- Telling us if it is incorrect by calling or writing to us at the telephone number or appropriate address for such changes on your statement or other account materials

**6. Guarding your own information**

Bank of America recommends that you take the following precautions to guard against the disclosure and unauthorized use of your account and personal information:

- Review your monthly account statements and report any suspicious activity to us immediately.
- Do not respond to e-mails requesting account numbers, passwords or PINs. Call the institution to verify the legitimacy of the e-mail.
- Memorize PINs and refrain from writing PINs, Social Security numbers, debit or credit card numbers where they could be found.
- Shred documents containing any sensitive information before discarding, e.g. bank statements.
- Confirm that an Internet site is secure by checking that the URL (Web address) begins with "https".
- Review your credit report at least once every year to make sure all information is up to date. For a free copy of your credit bureau report, contact www.annualcreditreport.com or call 1.877.322.8228.
- If you think you have been a victim of identity theft or fraud, you may contact the Federal Trade Commission (FTC) to report any incidents and to receive additional guidance on steps you can take to protect yourself. Contact the FTC at www.FTC.gov/idtheft or 1.877.438.4338.
- For additional information on protecting your information, please visit bankofamerica.com/privacy.

**Keeping up to date with our Privacy Policy**

We may make changes to this policy at any time and will inform you of changes, as required by law. To receive the most up-to-date Privacy Policy, you can visit our Web site at: bankofamerica.com/privacy or call us at 1.888.341.5000.

**7. Other privacy commitments**

This notice constitutes the Bank of America Do Not Call Policy under the Telephone Consumer Protection Act for all consumers and is pursuant to state law. When you talk with Bank of America by telephone your conversation may be monitored or recorded by us.

For information on our Online Practices Privacy Policy please visit www.bankofamerica.com/onlinepolicy.

You may have other privacy protections under state laws, such as Vermont and California. To the extent these state laws apply, we will comply with them with regard to our information practices.

**For Nevada residents only.** We are providing you this notice pursuant to state law. You may be placed on our internal Do Not Call List by following the directions in the Section titled "Actions you can take". Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number- 702.486.3132; e-mail: BCPINFO@ag.state.nv.us. Bank of America, PO Box 25118, FL1-300-02-07, Tampa, FL 33633-0900; Phone number- 888.341.5000; email: Click on "Contact Us" at bankofamerica.com/privacy

**For Vermont and California residents only.** The information sharing practices described above are in accordance with federal law. Vermont and California law place additional limits on sharing information about Vermont and California residents so long as they remain residents of those states.

**Vermont:** In accordance with Vermont law, Bank of America will not share information we collect about Vermont residents with companies outside of Bank of America, except as permitted by law, such as with the consent of the customer, to service the customer's accounts or to other financial institutions with which we have joint marketing agreements. Bank of America will not share Application Information, Consumer Report Information and Information from Outside Sources about Vermont residents among the Bank of America companies except with the authorization or consent of the Vermont resident.

**California:** In accordance with California law, Bank of America will not share information we collect about California residents with companies outside of Bank of America, except as permitted by law, such as with the consent of the customer, to service the customer's accounts, or to fulfill on rewards or benefits. We will limit sharing among our

**EXHIBIT D - Page 11 of 43**

companies to the extent required by applicable California law.

**8. Bank of America companies**
This Privacy Policy applies to the following Bank of America companies that have consumer customer relationships:

**Banks and Trust Companies**
Bank of America, N.A.
U.S. Trust Company of Delaware
**Credit Card**
Bank of America Consumer Card Services, LLC
Bank of America
Fleet Credit Card Services, L.P.
**Brokerage and Investments**
BACAP Alternative Advisors, Inc.
Bank of America Capital Advisors LLC
Banc of America Finance Services, Inc.
Banc of America Investment Advisors, Inc.
Banc of America Investment Services, Inc.
Banc of America Securities LLC
Columbia Management Advisors, LLC
Columbia Management Distributors, Inc.
Columbia Wanger Asset Management, L.P.
U.S. Trust Hedge Fund Management, Inc.
UST Securities Corp.

White Ridge Investment Advisors LLC
**Insurance and Annuities**
BA Agency, Inc.
BA Insurance Services, Inc.
Banc of America Agency, LLC
Banc of America Agency of Nevada, Inc.
Banc of America Agency of Texas, Inc.
Banc of America Insurance Services, Inc.,
dba Banc of America Insurance Agency of New York
Banc of America Corporate Insurance Agency, LLC
General Fidelity Insurance Company
General Fidelity Life Insurance Company
**Real Estate**
HomeFocus Services, LLC
HomeFocus Tax Services, LLC
NationsCredit Financial Services Corporation
**Administrative Services**
LaSalle Healthcare Administrative Services, LLC

For a current list of Bank of America companies that have consumer customer relationships and to which this policy applies, please visit our Web site at bankofamerica.com/privacy.
Estas normas están disponibles en español a través de la sucursal bancaria de su localidad.
©2008 Bank of America Corporation.

## YOUR CONTRACT WITH US

***We reserve the right to change the terms of this Agreement at any time, as further described in the section titled: We May Amend This Agreement.***

Your Agreement with us consists of this Credit Card Agreement and any changes we make to it from time to time. The terms of this Agreement apply to you if any of you applied for and were granted an account, used the account, maintained the account, and/or otherwise accepted the account. You agree to the terms and conditions of this Agreement.

## WORDS USED OFTEN IN THIS AGREEMENT

"Access check" means a check we provide to you to obtain credit on your account.

"Agreement" or "Credit Card Agreement" means this document and any changes we make to this document from time to time.

"APR" means the corresponding Annual Percentage Rate. The APR corresponds to the Daily Periodic Rate ("DPR") which is calculated by dividing the corresponding APR by 365.

"Card" means all the credit cards we issue to you and to any other person with authorization for use on this account pursuant to this Agreement.

"Default Rate" means the APR(s) which may be applied to Balance Transfers, Cash Advances, and Purchases without further notice in certain instances of your default, as described in the section titled, *Annual Percentage Rates.*

"Foreign Transaction" means any transaction made in a foreign currency, and as of June 1, 2009 any transaction made in U.S. dollars if the transaction is made or processed outside of the United States. Foreign transactions include, for example, online purchases from foreign merchants.

"Grace Period" means the period of time during a billing cycle when you will not accrue Periodic Rate Finance Charges on certain transactions or balances.

"New Balance Total" means the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement. To determine the New Balance Total, we start with the total balance at the beginning of the billing cycle, which is the "Previous Balance." Then we subtract payments and credits. Then we add Cash Advances, Balance Transfers, Purchases and Adjustments and finance charges.

"Pay in Full" or "Paid in Full" means payments and credits in a billing cycle totaling at least your previous billing cycle's New Balance Total. In general, Pay in Full must be made by the Payment Due Date in order to get a Grace Period.

"Promotional Offer" means limited time introductory or promotional offers on certain Balance Transfers, Cash Advances or Purchases at APRs that are lower than the Standard Rates for those features ("Promotional Rates") and may be subject to other conditions. Promotional Offers may also include limited time introductory or promotional transaction fees ("Promotional Fees") which may be higher or lower than the standard fees provided in the section titled *Transaction Fee Finance Charges.*

"Standard Rate" means the APR(s) normally in effect for Balance Transfers, Cash Advances, and Purchases.

"We", "us", "our", and "FIACS" means FIA Card Services, N.A., also known as Bank of America.

"You" and "your" mean each and all of the persons who are granted, accept or use an account we hold. "You" and "your" also mean any other person who has guaranteed payment of this account, when used in the sections titled, *Your Contract With Us, We May Monitor And Record Telephone Calls,* and *Arbitration And Litigation,* and when used in each of the sections relating to payment of this account (e.g., *Your Promise To Pay,* and *How We Allocate Your Payments*).

## OTHER TERMINOLOGY

We will use the definitions described under the section heading *Words Used Often In This Agreement* or as otherwise defined in this Agreement. If we use a capitalized term in this document but we do not define the term in this document, the term has the meaning as used in your monthly statement.

We use section headings (e.g., *Words Used Often In This Agreement*) to organize this Agreement. The headings

## EXHIBIT D - Page 13 of 43

are for reference purposes only.

## HOW TO USE YOUR ACCOUNT

You may obtain credit in the form of Balance Transfers, Cash Advances, and Purchases by using cards, access checks, your account number, or other credit devices.

"Balance Transfer" means a transfer of funds to another creditor initiated by us at your request. A Balance Transfer does not include a transaction that is otherwise a Cash Advance. Balance Transfers include Transaction Fees and adjustments associated with any Balance Transfer.

"Cash Advance" means the use of your account for a loan obtained:

1. at an automated teller machine ("ATM Cash Advance") ;
2. by a transfer of funds to a deposit account initiated by us at your request. ("Direct Deposit"). A Direct Deposit does not include an Overdraft Protection Cash Advance or a same day online funds transfer ;
3. at any financial institution (e.g., to obtain cash, money orders, wire transfers, or travelers checks), by a same day online funds transfer to a deposit account, and at any non-financial institution (to obtain cash) ("Bank Cash Advance") ;
4. as part of an Overdraft Protection Program – a transfer of funds to a deposit account pursuant to an overdraft protection program ("Overdraft Protection Cash Advance") ;
5. to buy "Cash Equivalents" (i.e., foreign currency, money orders or travelers checks from a non-financial institution, or person to person money transfers, bets, lottery tickets, casino gaming chips, or bail bonds) with your card ;
6. by an access check you sign as drawer ("Check Cash Advance") ;
7. for any payment you make to us that is returned to us unpaid for any reason, including the related finance charges ("Returned Payment") .

"Cash Advance" includes Transaction Fees and adjustments associated with any Cash Advance.

"Purchase" means the use of your card or account number to:

1. buy or lease goods or services ;
2. buy wire transfers from a non-financial institution ("Wire Transfer Purchase") ;
3. make a transaction that is not otherwise a Cash Advance .

"Purchase" includes Account Fees, as well as Transaction Fees and adjustments associated with any Purchase.

## ANNUAL PERCENTAGE RATES

This section provides the Standard Rates, Default Rates and Promotional Offers applicable to your account.

**Balance Transfers:** The Standard Rate for Balance Transfer balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 9.99 percentage points; this currently results in a corresponding **ANNUAL PERCENTAGE RATE of 13.24%** (0.036274% DPR).

**Cash Advances:** The Standard Rate for Cash Advance balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 15.99 percentage points; this currently results in a corresponding **ANNUAL PERCENTAGE RATE of 19.24%** (0.052712% DPR).

**Purchases:** The Standard Rate for Purchase balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 9.99 percentage points; this currently results in a corresponding **ANNUAL PERCENTAGE RATE of 13.24%** (0.036274% DPR).

**Default Pricing:** Default Rates are up to a corresponding **ANNUAL PERCENTAGE RATE** of 29.99% (0.082164% DPR). We may increase the APRs on all new and outstanding Balance Transfer, Cash Advance, and Purchase balances up to the Default Rate, without giving you additional notice, each time any two of the following default events occur in any consecutive twelve month period: (1) we do not receive the Total Minimum Payment Due by its Payment Due Date; or (2) your total outstanding balance exceeds your credit limit on any statement Closing Date. Each such increase will be effective as of the first day of that billing cycle. We may elect to set your APRs for Balance Transfer, Cash Advance and Purchase balances to different Default Rates. Default Pricing does not use a variable rate formula.

**Promotional Offers:**

From time to time we may make Promotional Offers on certain new Balance Transfers, Cash Advances, and Purchases. When a Promotional Offer ends, its Promotional Rates will terminate. Any Balance Transfer, Cash Advance, or Purchase balance subject to that Promotional Offer will return to its respective Standard Rate or Default Rate as applicable.

Check Cash Advances and Direct Deposits are Cash Advances. However, if Check Cash Advances or Direct Deposits are identified in the Promotional Offer as "posting as a Balance Transfer" and qualify for the Promotional Offer, then the resulting promotional balances will be included in the Balance Transfer balance and will get the Balance Transfer Standard Rate or, if applicable, the Balance Transfer Default Rate when the Promotional Offer ends, instead of the Cash Advance Rate. In addition, these transactions will get the Balance Transfer transaction fee if they qualify for the Promotional Offer.

**Promotional Offer ID BV8Z6CJXN:** The Promotional Rate for this Promotional Offer is a corresponding **ANNUAL PERCENTAGE RATE** of **1.90%** (0.005205% DPR).

This Promotional Offer applies to Balance Transfers, Direct Deposit Cash Advances, Check Cash Advances and Purchases (each an "eligible transaction" for this Promotional Offer).  This Promotional Offer will not apply to Check Cash Advances bearing an Offer ID that qualify as eligible transactions  for a separate Promotional Offer.

This Promotional Offer applies to eligible transactions posting to your account through your statement Closing Date in December 2009. This Promotional Offer ends on your statement Closing Date in December 2009. Check Cash Advances and Direct Deposits which get this Promotional Offer will post to your account as Balance Transfers.

This Promotional Offer may end at any time if there is a "promotion turn-off event." A promotion turn-off event means: (1) that any Total Minimum Payment Due is not received by its Payment Due Date; or (2) that your total outstanding balance exceeds your credit limit on any statement Closing Date. If a promotion turn-off event occurs, then this Promotional Offer will end as of the first day of that billing cycle. This means that this Promotional Rate will not be in effect in that billing cycle.

### VARIABLE RATE INFORMATION

**Variable Standard Rate formula:**
Variable Standard Rates are calculated by adding together an index and a margin. The applicable margins are disclosed above in the section titled, Annual Percentage Rates.

This index is the highest U.S. Prime Rate as published in the "Money Rates" section of The Wall Street Journal on the last publication day of each month. The index used to calculate these variable rates is **3.25%** and was published on **April 30, 2009.**

An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month in which the index is published. An increase in the index means that you will pay higher periodic rate finance charges and have a higher Total Minimum Payment Due. If The Wall Street Journal does not publish the U. S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may, in our sole discretion, substitute another index.

**Variable Promotional Rate formula:**
Variable Promotional Rates are calculated by adding together an index and a margin. The applicable margins are disclosed above in the section titled, Annual Percentage Rates.

This index is determined on the last business day of each month ("determination date") and is the highest U.S. Prime Rate as published in the "Money Rates" section of The Wall Street Journal at any time within the immediately preceding three months, including the month in which the index was determined.

An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month as the determination date. An increase in the index means that you will pay higher periodic rate finance charges and have a higher Total Minimum Payment Due. If The Wall Street Journal does not publish the U.S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may, at our sole discretion, substitute another index.

### CALCULATION OF  PERIODIC  RATE FINANCE CHARGES
We calculate Periodic Rate Finance Charges by multiplying each Balance Subject to Finance Charge by its applicable DPR and that result by the number of days in the billing cycle. When Periodic Rate Finance Charges accrue on a Balance Transfer, Cash Advance or Purchase balance, those finance charges become part of that respective Balance Transfer, Cash Advance, or Purchase balance.

### BILLING CYCLE
Your billing cycle ends each month on a Closing Date determined by us. Each billing cycle begins on the day after the Closing Date of the previous billing cycle. Each monthly statement reflects a single billing cycle.

EXHIBIT D - Page 15 of 43

**WHEN PERIODIC RATE FINANCE CHARGES BEGIN TO ACCRUE**

Each new Balance Transfer and Cash Advance begins to accrue Periodic Rate Finance Charges on its transaction date. Balance Transfer and Cash Advance balances remaining from previous billing cycles accrue Periodic Rate Finance Charges from the first day of the billing cycle. The transaction date for Check Cash Advances and Balance Transfers made by check is the date the check is first deposited or cashed. The transaction date for a Returned Payment is the date that the corresponding payment posted to your account.

Unless subject to a Grace Period, each new Purchase begins to accrue Periodic Rate Finance Charges on its transaction date or the first day of the billing cycle, whichever date is later. Unless subject to a Grace Period, Purchase balances remaining from previous billing cycles accrue Periodic Rate Finance Charges from the first day of the billing cycle.

When applicable, Periodic Rate Finance Charges accrue daily and compound daily on new balances, and balances remaining from previous billing cycles. Periodic Rate Finance Charges will continue to accrue even though you have paid the full amount of any related balances because we include any accrued but unpaid finance charges in the calculation of each Balance Subject to Finance Charge.

Your Payment Due Date will be at least 20 days from your statement Closing Date.

**GRACE PERIOD**

You do not have a Grace Period for Balance Transfers or Cash Advances. You will have a Grace Period on new Purchases, in a billing cycle in which you Pay in Full, from the day after the Pay in Full date until the end of that billing cycle. You will have a Grace Period for an entire billing cycle on new Purchases and on Purchase balances remaining from previous billing cycles if you Pay in Full by the Payment Due Date in that billing cycle and if during the previous billing cycle you Paid in Full.

**CALCULATION OF BALANCES SUBJECT TO FINANCE CHARGE**

**Average Balance Method (including new Balance Transfers and new Cash Advances):** We calculate separate Balances Subject to Finance Charge for Balance Transfers, Cash Advances, and for each Promotional Offer balance consisting of Balance Transfers or Cash Advances by: (1) calculating a daily balance for each day in the current billing cycle; (2) calculating a daily balance for each day prior to the current billing cycle that had a "Pre-Cycle balance" –a Pre-Cycle balance is a Balance Transfer or a Cash Advance with a transaction date prior to the current billing cycle but with a posting date within the current billing cycle; (3) adding all the daily balances together; and (4) dividing the sum of the daily balances by the number of days in the current billing cycle.

To calculate the daily balance for each day in the current billing cycle, we take the beginning balance, add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, add new Balance Transfers, Cash Advances and Transaction Fees, and subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

To calculate a daily balance for each day prior to the current billing cycle that had a Pre-Cycle balance, we take the beginning balance attributable solely to a Pre-Cycle balance (which will be zero on the transaction date associated with the first Pre-Cycle balance), add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, and add only the applicable Pre-Cycle balances, and their related Transaction Fees. We exclude from this calculation all transactions posted in previous billing cycles.

**Average Daily Balance Method (including new Purchases):** We calculate separate Balances Subject to Finance Charge for Purchases and for each Promotional Offer balance consisting of Purchases by: (1) calculating a daily balance for each day in the current billing cycle; (2) adding all the daily balances together; and (3) dividing the sum of the daily balances by the number of days in the current billing cycle.

To calculate the daily balance for each day in the current billing cycle, we take the beginning balance, add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, add, unless subject to a Grace Period, new Purchases, new Account Fees, and new Transaction Fees, and subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero. If in the current billing cycle you Pay in Full, then on the day after that Pay in Full date, we exclude from the beginning balance new Purchases, new Account Fees, and new Transaction Fees which posted on or before the Pay in Full date.

We include the costs for credit card debt cancellation or credit insurance purchased through us in calculating the beginning Purchase balance for the first day of the billing cycle after the billing cycle in which such costs are billed.

**TRANSACTION FEE FINANCE CHARGES**

We will assess the following Transaction Fees to your Account in the same balance category to which the

EXHIBIT D - Page 16 of 43

transaction is posted.

If you obtain an ATM Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Cash Advance (Fee: Min. **$10.00**).

If you obtain a Bank Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Cash Advance (Fee: Min. **$10.00**).

If you obtain a Cash Equivalent, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Cash Advance (Fee: Min. **$10.00**).

If you make a Foreign Transaction, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Foreign Transaction. This is in addition to any other applicable transaction fees.

If you obtain an Overdraft Protection Cash Advance, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Cash Advance (Fee: Min. **$10.00**).

If you make a Wire Transfer Purchase, we will assess a transaction fee (**FINANCE CHARGE**) equal to **3.00%** of the U.S. dollar amount of each such Purchase (Fee: Min. **$10.00**).

**ACCOUNT FEES**
The following fees are assessed as Purchases in the Billing Cycle in which the fees accrue:

An Overlimit Fee in each billing cycle when your total outstanding balance exceeds your credit limit. The Overlimit Fee will be assessed even if fees or finance charges assessed by us cause your total outstanding balance to exceed your credit limit. The Overlimit Fee will be assessed as of the first day in the billing cycle that your total outstanding balance was over your credit limit. No more than one Overlimit Fee will be charged in each billing cycle.

If your Previous Balance exceeds your credit limit at the beginning of a billing cycle, you will have an opportunity to avoid an Overlimit Fee in that billing cycle. To avoid an Overlimit Fee in that billing cycle, your total outstanding balance must be less than or equal to your credit limit on the 20th day of the billing cycle and must remain below the credit limit for the rest of that billing cycle. If your total outstanding balance exceeds your credit limit on the 20th day of that billing cycle you will be assessed an Overlimit Fee as of the 20th day. If your total outstanding balance is less than your credit limit on the 20th day of that billing cycle but exceeds your credit limit on any day after the 20th day, you will be assessed an Overlimit Fee as of the first day after the 20th day in which your total outstanding balance exceeds your credit limit.

The amount of the Overlimit Fee is based on the amount of your total outstanding balance on the date as of which the Overlimit Fee is assessed and is as follows:
- if the total outstanding balance is $500.00 or less, the Overlimit Fee will be $15.00;
- if the total outstanding balance is greater than $500.00 but $1,000.00 or less, the Overlimit Fee will be $29.00;
- if the total outstanding balance is greater than $1,000.00, the Overlimit Fee will be $39.00.

A Late Fee, if the Total Minimum Payment Due shown on your monthly statement is not received by us on or before its Payment Due Date. On the Late Fee transaction date:
- if the total outstanding balance is $100.00 or less, the Late Fee will be $15.00;
- if the total outstanding balance is greater than $100.00 but $250.00 or less, the Late Fee will be $29.00;
- if the total outstanding balance is greater than $250.00, the Late Fee will be $39.00.

A Returned Payment Fee of $39.00 if a payment on your account is returned for insufficient funds or for any other reason, even if it is paid upon subsequent presentment (if we elect to re-present the payment).

A Returned Access Check Fee of **$39.00** if we return an access check unpaid for any reason, even if the access check is paid upon subsequent presentment.

A Copy Fee of $5.00 for each copy of a monthly statement or sales draft, except that the six most recent monthly statements and one sales draft will be provided for free.

An Abandoned Property Fee equal to any costs incurred by us for complying with state abandoned property laws, unless prohibited by applicable law.

**OVERDRAFT PROTECTION**
If your checking account with Bank of America is linked to this account, this overdraft protection feature will allow funds to be transferred ("overdraft protection transfers") from this account into your designated checking account

with Bank of America ("checking account") when transactions occur on your checking account, such as checks or other debits, that if paid would cause the checking account to be overdrawn ("overdraft transactions"). Overdraft protection transfers include automatic transfers to cover checking account fees. Overdraft protection transfers are processed after close of business Monday through Friday and are treated as Overdraft Protection Cash Advances. Each day's overdraft transactions will be totaled and rounded to the next $100 ($25 if you opened your checking account in Washington or Idaho; $50 if your checking account is opened with Military Bank) increment up to your available credit limit, regardless of who initiated the overdraft transactions. For example, if your checking account has a balance of $1.00 and a check or other debit item for $125 is presented for payment, which if paid would cause your checking account to be overdrawn, an overdraft protection transfer of $200 will be made to your checking account and an Overdraft Protection Cash Advance of $200 will post to this account. The amount of available credit on this account must be sufficient to cover the total amount of overdraft transactions (received by Bank of America that day) rounded to the next $100 increment (but excluding any overdraft protection fee); otherwise one or more of the overdraft transactions for that day will be rejected. However, if the available credit on this account is greater than the overdraft transaction amount, but the available credit is insufficient for the overdraft transaction amount to be rounded to the next $100 increment, then the amount of the overdraft transaction will be rounded to the highest whole dollar amount of your available credit. (And in such an event, the accrued finance charges may result in an Overlimit Fee.) We may permit or refuse to permit any overdraft protection transfer that would cause you to exceed the credit limit on this account; but if we permit it, you may be assessed an Overlimit Fee during the billing cycle in which the transfer occurs. This overdraft protection feature will automatically be cancelled if this account is closed by either you or us, or at any time upon your request. Your overdraft transactions remain subject to the terms of your checking account with Bank of America, any related enrollment agreement, and this Agreement.

## SIGN YOUR CARD
You should sign your card before you use it.

## WE MAY MONITOR AND RECORD TELEPHONE CALLS
You consent to and authorize Bank of America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies. Where you have provided a cell phone number directly to us, or placed a cell phone call to us, you consent and agree to accept collection calls to your cell phone from us. For any telephone or cell phone calls we place to you, you consent and agree that those calls may be automatically dialed and/or use recorded messages.

## CREDIT REPORTING AGENCIES; COLLECTING AND SHARING INFORMATION
You authorize us to collect information about you in order to conduct our business and deliver the top quality service you expect, including information we receive about you, information we receive from third parties such as credit reporting agencies and information about your transactions with us and other companies. You authorize us to share such information about you or your account with our affiliates and others. You may have the right to opt out of some information sharing. For more details, please refer to our Privacy Policy.

> If you believe we have furnished inaccurate or incomplete information about you or your account to a credit reporting agency, write to us at: FIA Card Services, N.A., Credit Reporting Agencies, P.O. Box 17054, Wilmington, DE 19884-7054. Please include your name, address, home phone number, and account number, and explain what you believe is inaccurate or incomplete.

## PURPOSES FOR USING YOUR ACCOUNT
You may use your account for personal, family, or household purposes. You may not use your account for business or commercial purposes. You may not use a Balance Transfer, or Check Cash Advance, or any other Cash Advance, to make a payment on this or any other credit account with us or our affiliates. You may not use or permit your account to be used to make any illegal transaction. You will only use your account for transactions that are legal where you conduct them. For example, Internet gambling transactions may be illegal in your state. Display of a payment card logo by an online merchant does not mean that an Internet transaction is legal where you conduct it. We may charge your account for such transactions. We will not be liable if you engage in an illegal transaction. We may deny authorization of any transactions identified as Internet gambling.

## PERSONS USING YOUR ACCOUNT
If you permit any person to use your card, access checks, account number, or other credit device with the authorization to obtain credit on your account, you may be liable for all transactions made by that person including transactions for which you may not have intended to be liable, even if the amount of those transactions causes your credit limit to be exceeded. Authorized users of this account may have the same access to information about the account and its users as the account holders. We may send account materials (cards, statements and notices) to any liable party, and that person will be responsible for delivering those materials to the other liable parties and authorized users. Notice to any of you will be considered notice to all of you. You may allow authorized users on your account in the following ways: (1) by notifying us that you want someone added to your account as an

authorized user; (2) by lending your card or account number to another; or (3) by any other ways in which you would be legally considered to have allowed another to use your account or to be legally prevented from denying that you did so. You must think carefully before you allow anyone to become an authorized user. By doing so, you authorize the person to use your account to the same extent you can, including but not limited to making any purchases, cash advances, balance transfers and allowing others to use your account. Your account does not permit you to limit the nature or amount of authority you give to any authorized user and you will not attempt to do so. An authorized user's authority will continue until you both notify us that you are terminating the authority and you physically retrieve the card. If you cannot retrieve the card, you will remain liable for any transactions that we cannot prevent after you notify us.

## YOUR PROMISE TO PAY
You promise to pay us the amounts of all credit you obtain, which includes all Purchases, Cash Advances, and Balance Transfers. You also promise to pay us all the amounts of finance charges, fees, and any other transactions we charge to your account. If a bank branch or office sponsors your account, you promise to pay it any unpaid account balance it pays us within 30 days.

## PAYMENTS ON YOUR ACCOUNT
You must pay each month at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. Your Payment Due Date may vary from month to month. Payments must conform to the requirements set out on that monthly statement; these requirements may vary without prior notice. You may pay the entire amount you owe us at any time. Payments made in any billing cycle that are greater than the Total Minimum Payment Due will not affect your obligation to make the next Total Minimum Payment Due. If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts. We will reject payments that are not drawn in U.S. dollars and those drawn on a financial institution located outside of the United States. We reserve the right to reject any payment if your account has a credit balance as of the day we receive that payment. Payment of your Total Minimum Payment Due may not avoid the assessment of Overlimit Fees. Generally, credits to your account, such as those generated by merchants or by person-to-person money transfers, are not treated as payments and will not reduce your Total Minimum Payment Due.

## ACH PAYMENTS
We process most payment checks electronically. We use the information on your check to create an electronic funds transfer. Each time you send a check, you authorize a one-time electronic funds transfer. You also authorize us to process your check as a check or paper draft, as necessary. Funds may be withdrawn from your account as soon as the same day we receive your payment. You will not receive your cancelled check because we are required to destroy it. We will retain an electronic copy. For more information or to stop the conversion of your checks into electronic funds transfers, call us at the phone number listed on the front of your monthly statement. You may also write to us at: P.O. Box 15019, Wilmington, DE 19850-5019.

## TOTAL MINIMUM PAYMENT DUE
You may pay your total outstanding balance at any time. Each billing cycle, you must pay at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. The Total Minimum Payment Due is the sum of all past due amounts plus the Current Payment.

The Current Payment for each billing cycle includes three amounts: (1) 1.00% of your balance (your New Balance Total except for any new Periodic Rate Finance Charges, and Late Fee), and (2) new Periodic Rate Finance Charges, and (3) new Late Fee. Generally, the lowest it will be is $15.00. We round the payment amount down to the nearest dollar. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Total Minimum Payment Due for the billing cycle in which the payment was originally credited.

## WHEN YOUR PAYMENT WILL BE CREDITED TO YOUR ACCOUNT
We credit payments as of the date received, if the payment is: (1) received by 5 p.m. Eastern time; (2) received at the address shown in the upper left-hand corner of the front of your monthly statement; (3) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (4) sent in the return envelope with only the top portion of your statement accompanying it. Payments received after 5 p.m. Eastern time on any day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Credit for any other payments may be delayed up to five days.

## HOW WE ALLOCATE YOUR PAYMENTS
We will allocate your payments in the manner we determine. In most instances, we will allocate your payments to balances (including transactions made after your latest statement) with lower APRs before balances with higher APRs. This will result in balances with lower APRs (such as new balances with promotional APR offers) being paid before any other existing balances.

## PROMISE TO PAY APPLIES TO ALL PERSONS

**EXHIBIT D - Page 19 of 43**

All persons who initially or subsequently request, accept, guarantee or use the account are individually and together responsible for any total outstanding balance. If you and one or more persons are responsible to pay any total outstanding balance, we may refuse to release any of you from liability until all of the cards, access checks, and other credit devices outstanding under the account have been returned to us and you repay us the total outstanding balance owed to us at any time under the terms of this Agreement.

## DEFAULT
You will be in default of this Agreement if: (1) you fail to make any required Total Minimum Payment Due by its Payment Due Date; (2) your total outstanding balance exceeds your credit limit; or (3) you fail to abide by any other term of this Agreement. Our failure to exercise any of our rights when you default does not mean that we are unable to exercise those rights upon later default.

## WHEN WE MAY REQUIRE IMMEDIATE REPAYMENT
If you are in default, then in addition to our other remedies under this Agreement, we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law and except as otherwise provided under the *Arbitration and Litigation* section of this Agreement, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee.

## OTHER PAYMENT TERMS
We can accept late payments, partial payments, or payments with any restrictive writing without losing any of our rights under this Agreement. This means that no payment, including those marked with "paid in full" or with any other restrictive words, shall operate as an accord and satisfaction without the prior written approval of one of our senior officers. You may not use a postdated check to make a payment. If you do postdate a payment check, we may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## PAYMENT HOLIDAYS AND REDUCED PAYMENT OFFERS
We may allow you, from time to time, to omit a monthly payment or make a reduced payment. We will notify you when these options are available. If you omit a payment or make a reduced payment, finance charges, applicable fees, and other regular transactions, if any, will accrue on your account balances in accordance with this Agreement. The reduced payment amount may be less than your finance charges. You must make the reduced payment on time to avoid a late fee. You must resume making your regular Total Minimum Payment Due each month following a payment holiday or reduced payment offer.

## YOUR CREDIT LIMIT
Your credit limit is disclosed to you when you receive your card and, generally, on each monthly statement. We may change your credit limit from time to time. The amount shown on your monthly statement as Cash or Credit Available does not take into account any Purchases, Cash Advances, Balance Transfers, finance charges, fees, any other transactions, or credits which post to your account after the Closing Date of that monthly statement. Such transactions could result in your credit limit being exceeded and result in the assessment of Overlimit Fees, loss of Promotional Offers, and Default Pricing.

## WHAT WE MAY DO IF YOU ATTEMPT TO EXCEED YOUR CREDIT LIMIT
The total outstanding balance on your account plus authorizations at any time must not be more than your credit limit. If you attempt a transaction which results in your total outstanding balance (plus authorizations) exceeding your credit limit, we may: (1) permit the transaction without raising your credit limit; (2) permit the transaction and treat the amount of the transaction that is more than the credit limit as immediately due; or (3) refuse to permit the transaction.

If we refuse to permit the transaction, we may advise the person who attempted the transaction that it has been refused. If we refuse to permit a Check Cash Advance or Balance Transfer, we may do so by advising the person presenting the Check Cash Advance or Balance Transfer that credit has been refused, that there are insufficient funds to pay the Check Cash Advance or Balance Transfer, or in any other manner.

If we have previously permitted you to exceed your credit limit, it does not mean that we will permit you to exceed your credit limit again. If we decide to permit you to exceed your credit limit, which could trigger a promotion turn-off event, we may also charge an Overlimit Fee and/or apply Default Pricing as provided in this Agreement.

## WE MAY AMEND THIS AGREEMENT
We may amend this Agreement at any time. We may amend it by adding, deleting, or changing provisions of this Agreement. We may increase or decrease any or all of your APRs. We may increase any or all of your APRs to rates which exceed the Default Rate. When we amend this Agreement we will comply with the applicable notice

requirements of federal and Delaware law that are in effect at that time. The amended Agreement (including any higher rate or other higher charges or fees) will apply to the total outstanding balance, including the balance existing before the amendment became effective. If an amendment gives you the opportunity to reject the change, and if you reject the change in the manner provided in such amendment, we may terminate your right to receive credit and may ask you to return all credit devices as a condition of your rejection. We may replace your card with another card at any time.

**WE MAY SUSPEND OR CLOSE YOUR ACCOUNT**
We may suspend or close your account or otherwise terminate your right to use your account. We may do this at any time and for any reason. Your obligations under this Agreement continue even after we have done this. You must destroy all cards, access checks or other credit devices on the account when we request.

**YOU MAY CLOSE YOUR ACCOUNT**
You may close your account by notifying us in writing or by telephone, and destroying all cards, access checks or other credit devices on the account. Your obligations under this Agreement continue even after you have done this.

**TRANSACTIONS AFTER YOUR ACCOUNT IS CLOSED**
When your account is closed, you must contact anyone authorized to charge transactions to your account, such as internet service providers, health clubs or insurance companies. These transactions may continue to be charged to your account until you change the billing. Also, if we believe you have authorized a transaction or are attempting to use your account after you have requested to close the account, we may allow the transaction to be charged to your account.

**REFUSAL TO HONOR YOUR ACCOUNT**
We are not liable for any refusal to honor your account. This can include a refusal to honor your card or account number or any check written on your account. We are not liable for any retention of your card by us, any other financial institution, or any provider of goods or services.

**HOW YOU MAY STOP PAYMENT ON AN ACCESS CHECK**
You may request a stop payment on an access check by providing us with the access check number, dollar amount, and payee exactly as they appear on the access check. Oral and written stop payment requests on an access check are effective for six months from the day that we place the stop payment.

**YOU MAY NOT POSTDATE AN ACCESS CHECK**
You may not issue a postdated access check on your account. If you do postdate an access check, we may elect to honor it upon presentment or return it unpaid to the person that presented it to us for payment, without in either case waiting for the date shown on the access check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

**TRANSACTIONS MADE IN FOREIGN CURRENCIES**
If you make a transaction in a foreign currency, the transaction will be converted by Visa International or MasterCard International, depending on which card you use, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.

**BENEFITS**
We may offer you certain benefits and services with your account. Any benefits or services are not a part of this Agreement, but are subject to the terms and restrictions outlined in the benefits brochure and other official documents provided to you from time to time by or on behalf of Bank of America. While any benefits or services described in the previous sentence are not a part of this Agreement, any claim or dispute related to any such benefit or service shall be subject to the *Arbitration and Litigation* section of this Agreement. We may adjust, add, or delete benefits and services at any time and without notice to you.

**WE MAY SELL YOUR ACCOUNT**
We may at any time, and without notice to you, sell, assign or transfer your account, any sums due on your account, this Agreement, or our rights or obligations under your account or this Agreement to any person or entity. The person or entity to whom we make any such sale, assignment or transfer shall be entitled to all of our rights and/or obligations under this Agreement, to the extent sold, assigned or transferred.

**YOU MUST NOTIFY US WHEN YOU CHANGE YOUR ADDRESS**
We strive to keep accurate records for your benefit and ours. The post office and others may notify us of a change to your address. When you change your address, you must notify us promptly of your new address.

**WHAT LAW APPLIES**
This Agreement is made in Delaware and we extend credit to you from Delaware. This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws.

**THE PROVISIONS OF THIS AGREEMENT ARE SEVERABLE**
If any provision of this Agreement is found to be invalid, the remaining provisions will continue to be effective.

**OUR RIGHTS CONTINUE**
Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

**UNAUTHORIZED USE OF YOUR CARD**
Please notify us immediately of the loss, theft, or possible unauthorized use of your account at 1-800-789-6701.

**ARBITRATION AND LITIGATION**
This Arbitration and Litigation provision applies to you unless you were given the opportunity to reject the Arbitration and Litigation provisions and you did so reject them in the manner and timeframe required. If you did reject effectively such a provision, you agreed that any litigation brought by you against us regarding this account or this Agreement shall be brought in a court located in the State of Delaware.

Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief), shall, upon election by either you or us, be resolved by binding arbitration. The arbitrator shall resolve any Claims, including the applicability of this Arbitration and Litigation Section or the validity of the entire Agreement or any prior Agreement, except for any Claim challenging the validity of the Class Action Waiver, which shall be decided by a court.

In addition, we will not choose to arbitrate an individual Claim that you bring against us in small claims court or an equivalent court, if any. But if that Claim is transferred, removed or appealed to a different court, we then have the right to choose arbitration.

Arbitration shall take place before a single arbitrator and on an individual basis without resort to any form of class action. Arbitration may be selected at any time unless a judgment has been rendered or the other party would suffer substantial prejudice by the delay in demanding arbitration.

The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, **www.arb-forum.com**, or P.O. Box 50191, Minneapolis, Minnesota 55405; telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, administrative and hearing fees which you are required to pay to pursue a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. If you file a claim against us, in no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the Claim had been resolved in a state court with jurisdiction.

Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury or may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim submitted to arbitration (Class Action Waiver). The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from this agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver.

**The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

This Arbitration and Litigation Section applies to all Claims now in existence or that may arise in the future. This Arbitration and Litigation Section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this Arbitration and Litigation Section, "we" and "us" means FIA Card Services, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of their officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.

**YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT, OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS. EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION IF YOU OR WE ELECT TO ARBITRATE.**

**YOUR BILLING RIGHTS**
**Keep This Notice for Future Use:** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill:** If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet (or use a copy of the form provided on your bill) at Bank of America Corporation, P.O. Box 15026, Wilmington, DE 19850. Write to us as soon as possible. Do not send the notice on or with your payment. We must hear from you no later than 60 days after we sent you the first bill on which the transaction or error appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information: (1) your name and account number; (2) the dollar amount of the suspected error; (3) the posting date of the transaction in question; and (4) a description of the error and an explanation, if you can, of why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice:** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we did not make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within twenty-five (25) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we report you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases:** If you have a problem with the quality of the property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(1) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(2) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

©2007 Bank of America Corporation. All rights reserved.

**EXHIBIT B**

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared SIGNE ESPINOZA who, being by me duly sworn, upon his/her oath deposed and stated as follows:

"My name is ___SIGNE ESPINOZA___ I am over the age of 18, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

I am an authorized representative and custodian of the records of CACH, LLC ("CACH, LLC"), and I am also familiar with the processes of CACH, LLC regarding its purchase of accounts. On or about March 28, 2013, CACH, LLC purchased a portfolio of accounts from FIA CARD SERVICES, N.A. (the "Seller"). I have reviewed the Bill of Sale and Assignment of Loans between CACH, LLC and the Seller dated March 28, 2013 governing this transaction, including the account schedule identified as an Exhibit thereto (collectively, "Bill of Sale"). Pursuant to the Bill of Sale, the Seller assigned all right, title and interest in the accounts listed in the Exhibit to the Bill of Sale to CACH, LLC.

Attached hereto is a true and correct copy of the aforesaid Bill of Sale. The Bill of Sale is kept by CACH, LLC in the regular course of business, and it was part of the regular course of business of CACH, LLC for a representative of CACH, LLC with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and, the record was made at or near the time or reasonably soon thereafter.

The records attached hereto are exact duplicates of the originals. It is CACH, LLC's regular practice to redact the Exhibit to the Bill of Sale before providing it to agencies and law firms for use in collection on an account, in order to protect potentially confidential information of the defendant and information relating to other debtors' accounts listed thereon.

Signed this ___ day of __APR 1 2 2016__, 2016.

*Signe Espinoza*

Denver

SWORN TO AND SUBSCRIBED before me in the County of _____, State of Colorado, on the ____ day of _____, 2016.
APR 1 2 2016

_____
[Signature of Notary Public]

_____KATARZYNA STRAHAN_____
[PRINTED Name of Notary Public]

Notary Public in and for State of Colorado

My commission expires:

_____

KATARZYNA D. STRAHAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20074069100
MY COMMISSION EXPIRES MARCH 18, 2019

[Affix Seal]





## EXHIBIT C

### BILL OF SALE AND ASSIGNMENT OF LOANS

**THIS BILL OF SALE AND ASSIGNMENT OF LOANS** is made and entered into between CACH, LLC ("Purchaser") and **FIA CARD SERVICES, N.A.** ("Seller"), pursuant to the Loan Sale Agreement dated March 18, 2013 (the "Agreement") entered into between Purchaser and Seller. Capitalized terms not defined herein, shall have the same meaning as defined in the Agreement.

(a)      In consideration of the payments made pursuant to the Agreement and such other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby sell, transfer, convey, assign and deliver to Purchaser all of Seller's right, title and interest in and to each and all of the Loans, as included on the electronic file referenced in Schedule 1 of the Loan Agreement as BAC Fresh SqTwo Sale File 0313 Final.xlsx, without recourse and without representation or warranty of any type, kind, character or nature, express or implied, except as specifically provided in the Agreement, and subject to Buyer's and Seller's repurchase rights as set forth in the Agreement.

(b)      Purchaser hereby accepts such sale, transfer, conveyance, assignment, and delivery of the Loans, including without limitation the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans.

(c)      Nothing in this Bill of Sale and Assignment of Loans shall be deemed to modify, limit or amend any of the rights or obligations of Purchaser or Seller under the Agreement. This Bill of Sale and Assignment of Loans shall inure to the benefit of, and be binding upon, the respective, permitted successors and assigns of Seller and Purchaser and shall be governed by and construed and interpreted in accordance with the Agreement and the laws of the State of Delaware, without regard to such state's principles of conflicts of law.

(d)      This Bill of Sale and Assignment of Loans may be executed by facsimile or electronic transmission in multiple counterparts, each of which shall be an original, but together shall constitute one and the same instrument.

        **IN WITNESS WHEREOF**, each party, through its duly authorized officer, has caused this Bill of Sale and Assignment of Loans to be executed in their name this 28th day of March, 2013:

**SELLER/ASSIGNOR:**                          **BUYER/ASSIGNEE:**

**FIA CARD SERVICES, N.A.**                  **CACH, LLC**

By: _____               By: _____
Name:  Debra L Pellicciaro.                Name:  Brian W. Twitt
Title:    Vice President                   Title:      EVP

_____

Fax: 302.458.0438
Bank of America, Asset Sales
Deerfield III, 635 Paper Mill Road, Newark, DE 19711

Recycled Paper

# SCHEDULE 1



| Cut Off Date | Charge Off Account Nu | Charge Off Date | Original Account Numb | Primary Name - Title Fi | Secondary Name - Title | Secondary Name - Soc |
|---|---|---|---|---|---|---|
| 03/25/2013 | ▮▮▮▮5466 | 2/28/2013 | ▮▮▮▮0248 | CASSANDRA HOPKINS | | |

EXHIBIT D - Page 30 of 43



| Address Line 1 | Address Line 2 | City | State or Country Code | Zip or Postal Code | Social Security Number | Phone 1 |
|---|---|---|---|---|---|---|
| | | ACWORTH | GA | 30101 | xxxxx4099 | |

EXHIBIT D - Page 31 of 43



| Phone 2 | Current (Sale) Balance | Charge Off Balance | Last Pay Amount | Last Pay Date | Open Date | Interest Rate | First Delc Date |
|---|---|---|---|---|---|---|---|
| | 55,718.81 | 5718.81 | 120 | 7/16/2012 | 5/19/2009 | 13.24 | 9/19/2012 |



| Birth Date | Affinity | Conversion Account Nu | Fee Portion of C/O Bal | Interest Portion of C/O | Legacy | B_ID | R_RCVR |
|---|---|---|---|---|---|---|---|
| 1963 | BANK OF AMERICA | | 245 | 472.5 | BAC | | |

EXHIBIT D - Page 33 of 43

Account Number

EVNT_N

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

CACH, LLC
      Plaintiff,
vs.

CASSANDRA HOPKINS
    Defendant.

CIVIL ACTION
FILE NO: 17EV004140

### AFFIDAVIT

PERSONALLY APPEARED before me, the undersigned attesting Officer NICOLE SIMPSON, ESQ., who, after being sworn, deposes and says on oath as follows, to wit:

1.

Affiant is the attorney-of-record for Plaintiff in the above-captioned matter.

2.

The Complaint in this action was filed in this Court and the Defendant herein was served Notoriously on 09/08/2017 as listed in the return of service which is the most recent known place of abode.

3.

There have been no defensive pleadings filed from the party against which judgment is sought within the time allowed by law, as shown by court records; said case became in default on the thirty-first day after service; and said default was not opened as a matter of right by the filing of such defenses within the fifteen (15)-days of default and upon the payment of cost; and the Court has not allowed said default to be opened for any reason and said case remains in default.

4.

The action is not one ex delicto and does not involve un-liquidated damages.

5.

If plaintiff alleged in the initial complaint that it was entitled to an award of attorney's fees,

such an award is appropriate pursuant to the terms of the agreement between the parties (copy of provision attached to complaint).The written notice requirements of O.C.G.A. 13-1-11 has been met by the notice set forth in the original complaint.

6.

The Affiant declares under the penalty of perjury that the Defendant is currently Not Active Military Duty according to the Department of Defense Manpower Data Center Military Status Report (attached here as Exhibit "C") . This Affidavit is executed pursuant to the Soldiers and Sailors Relief Act. 50 U.S.C. App. 520 as required before any default judgment may be entered by the court.

This ___15ᵗ___ day of ___Apr.l___, 20_21_

NICOLA SIMPSON, ESQ.

State Bar No 925927
nicoles@mandarichlaw.com

Sworn to and subscribed before me
This 15ᵗ day of Apr.l , 2021

Notary Public

Department of Defense Manpower Data Center

Results as of : Mar-30-2021 09:05:25 AM

SCRA 5.7



Status Report
Pursuant to Servicemembers Civil Relief Act

SSN:              XXX-XX-
Birth Date:                 1963
Last Name:       HOPKINS
First Name:      CASSANDRA
Middle Name:
Status As Of:    Mar-30-2021
Certificate ID:  6ZDG4PTZ76HH63T

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

CACH, LLC
   Plaintiff,
vs.

CASSANDRA HOPKINS
   Defendant.

CIVIL ACTION
FILE NO: 17EV004140

## AFFIDAVIT PURSUANT TO U.S.C.R 15

PERSONALLY APPEARED before me, the undersigned attesting Officer NICOLE SIMPSON, ESQ., who, after being sworn, deposes and says on oath as follows, to wit:

1.

Affiant is the attorney-of-record for Plaintiff in the above-captioned matter.

2.

The Marshall/Sheriff or Private Process Server's Entry of Service in this action was filed on 10/16/2017 and the Defendant herein was served Notoriously on 09/08/2017 as listed in the return of service which is the most recent known place of abode.

3.

A response was due on 03/29/2021. There have been no defensive pleadings filed from the party against which the complaint is sought within the time allowed by law, as shown by court records; said case becomes in default on the forty-sixth date after service.

This _15th_ day of _Aprl_, 20_21_.

            _____
            NICOLE SIMPSON, ESQ.
            State Bar No. 925927
            nicoles@mandarichlaw.com

Sworn to and subscribed before me
This 15th day of _Aprl_, 2021.

_____
NOTARY PUBLIC

State Court of Fulton County
*E-FILED
17EV004140
10/6/2017 8:40 AM
LeNora Ponzo, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
### STATE OF GEORGIA

CACH LLC

          Plaintiff(s),

vs.

CASSANDRA HOPKINS

          Defendant(s).

Case No.: 17EV004140
Case Filed Date: 08/29/2017

AFFIDAVIT OF SERVICE

Personally appeared before me, the undersigned officer duly authorized to administer oaths, William Letts, who, first being duly sworn, on oath deposes and states that he/she is a citizen of the United States and 18 years of age or older and is a party having no interest in the above-styled case. Affiant further states that on **September 08, 2017 at 8:30 AM**, I served **CASSANDRA HOPKINS** at his/her usual place of abode located at **3334 PEACHTREE RD NE APT 703, ATLANTA, GA 30326** with the following: **SUMMONS AND COMPLAINT**. Service was effected by leaving a copy(ies) thereof with some person of suitable age and discretion then residing therein:

NAME: ROY MULLMAN        TITLE/RELATION: Resident

Description of person process was left with:

Sex: **Male** - Skin: **White** - Hair: **Brown** - Age: **50** - Height: **5ft6in** - Weight: **180**

        I declare under penalty of perjury that the foregoing is true and correct.

        Executed on _9/14/17_

Signed and sworn to before me on
this _14_ day of ___Oct___, 20_17_
by an affiant who is personally known to me
or produced identification.

_____
Notary Public



William Letts
MLQ Attorney Services
2000 Riveredge Parkway, Suite 885
Atlanta, GA 30328
770-984-7007/800-446-8791

William C. Grossman Law, PLLC - Collection
120019431860

EXHIBIT D - Page 40 of 43

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

CACH, LLC
      Plaintiff,
vs.

     CIVIL ACTION
     FILE NO: 17EV004140

CASSANDRA HOPKINS
      Defendant.

### DEFAULT JUDGMENT

    The above matter having come before me and it appearing that pursuant to
O.C.G.A. 9-11-4 (d), Defendant was served with a copy of Plaintiff's Complaint
Notoriously on 09/08/2017 and it appearing that to date Defendant has failed to file an
Answer or other defensive pleading as shown by court records, and it further appearing
that both the thirty (30) days allowed for filing and answer and the fifteen (15) day default
period have terminated, it is hereby ordered that Plaintiff have judgment against Defendant
for the principal sum of **$3,416.61**, accrued interest in the amount of **$0.00**, pursuant to
O.C.G.A. 7-4-2, attorneys fees in the amount of **$0.00**, post-judgment interest at the
statutory rate as allowed by O.C.G.A. 7-4-12; and court cost in the amount of **$317.42**.

IT IS SO ORDERED, this _____ day of _____, _____.

_____
              JUDGE

SUBMITTED BY:

BY: _____

NICOLE SIMPSON, ESQ.
State Bar No. 925927
125 Townpark Dr
Suite 300
Kennesaw, Georgia 30144
(770) 590-3894

EXHIBIT D - Page 41 of 43

## CERTIFICATE OF SERVICE

I hereby certify that I this day served the parties listed below with a copy of the *DEFAULT JUDGMENT* by depositing same in the United States Mail with sufficient postage to ensure delivery addressed as follows:

C/O AL SUTO
550 FREDERICA RD. UNIT 2207
SAINT SIMONS ISLAND GA  3152-2

C/O AL SUTO
550 FREDERICA RD. UNIT 2207
SAINT SIMONS ISLAND GA  3152-2

This __1st__ day of ~~March~~ April, 2021.

Mandarich Law Group, LLP

NICOLE SIMPSON, ESQ.
State Bar No. 925927
nicoles@mandarichlaw.com
Attorney for Plaintiff

125 Townpark Dr
Suite 300
Kennesaw, Georgia 30144
(770) 590-3894

**General Civil and Domestic Relations Case Disposition Information Form**

☐ Superior or ☐State Court of  FULTON                          County

---

**For Clerk Use Only**

Date Disposed_____          Case Number _____

　　　　MM-DD-YYYY

Case Style _____

---

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CACH, LLC | | | | | HOPKINS, CASSANDRA | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Reporting Party** Nicole Simpson, Esq.

**Plaintiff's Attorney** Nicole Simpson, Esq.          **Bar Number** 925927          **Self-Represented** ☐

**Defendant's Attorney**_____          **Bar Number**_____          **Self-Represented** ☐

---

**Manner of Disposition**
**Check Only One**

☐　Jury Trial
☐　Bench/Non-Jury Trial
☐　Non-Trial Disposition

---

☐　Check if any party was self-represented at any point during the life of the case.

☐　Check if the court ordered an interpreter for any party, witness, or other involved individual.

☐　Was the case referred/ordered to a court-annexed alternative dispute resolution (ADR) process?

Version 1.1.18

EXHIBIT D - Page 43 of 43

# EXHIBIT E

State Court of Fulton County
**E-FILED**
17EV004140
4/13/2021 11:09 AM
Christopher G. Scott, Clerk
Civil Division

### IN THE STATE COURT OF FULTON COUNTY
### STATE OF GEORGIA

CACH, LLC,
       **Plaintiff,**

vs.

CASSANDRA HOPKINS,
       **Defendant.**

**CIVIL ACTION FILE**
NO. <u>17EV004140</u>

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff and moves the Court pursuant to O.C.G.A. § 9-11-56 for Summary Judgment in favor of the Plaintiff against Defendant on the grounds that there is no general issue as to any material fact and Plaintiff is entitled to Judgment as a matter of law as appears from all the pleadings and Plaintiff's Motion for Summary Judgment.

Respectfully submitted this <u>13th</u> day of <u>APRIL</u>, <u>2021</u>.

                        **MANDARICH LAW GROUP, LLP**

125 Townpark Drive
Suite 300
Kennesaw, Georgia 30144
(678) 346-7023

                        NICOLE SIMPSON
                        State Bar No. 1925927
                        nicoles@mandarichlaw.com
                        Attorney for Plaintiff

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| CACH, LLC,<br>　　　　Plaintiff,<br><br>vs.<br><br>CASSANDRA HOPKINS<br>　　Defendant. | CIVIL ACTION FILE<br>NO. 17EV004140 |

## PLAINTIFF'S BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff CACH, LLC, and hereby files this Brief in Support of their Motion for Summary Judgment, showing this Court there are no genuine issues of material fact and that Plaintiff is entitled to Judgment.

### INTRODUCTION

Defendant entered into a valid contractual agreement with Bank of America, N.A., by specifically opening and making use of a credit card on or about May 19, 2009. Defendant's account went into delinquency on or about February 28, 2013 and the last payment made on the account to Bank of America, N.A. was on or about July 16, 2012. The account was charged off on or about February 28, 2013, at which time there was due and payable $5,718.81. Defendant's account was then validly and completely assigned for value in the ordinary course of business to Plaintiff and Plaintiff was assigned all rights, title, and interest to the contract and account.

Plaintiff filed the initial suit on August 29, 2017 in this Court and Defendant was served with the Summons and Complaint on or about September 8, 2017. Defendant to date has not filed an answer to the Complaint and has not responded to Plaintiff's requests for admission, which were served to Defendant at the same time as the Complaint. Plaintiff filed a Motion for Default Judgment which this Court denied on or about April 5, 2021. Plaintiff now files this Motion for

Summary Judgment, contemporaneously with Plaintiff's Request to Take Judicial Notice that Bank of Amierica, N.A. and FIA Card Services, N.A.. are the same entity.

<u>**THEORIES OF RECOVERY AND MEMORANDUM OF LAW**</u>

Pursuant to O.C.G.A. § 9-11-56, a party may move for judgment by showing the court there is no genuine issue of material fact.  When a party makes a *prima facie* showing of entitlement to judgment, it is then incumbent upon the other side to come forward with specific facts showing there is genuine issue for trial. *Concept-Nation, Inc. v. Dimattina Supply, Inc.*, 147 Ga. App. 865, (1978).  When ruling on a motion for summary judgment, the Court must give the opposing party the benefit of all reasonable doubt, and the inferences and conclusions must be construed most favorable toward the party opposing the motion. *Rhone v. Bolden*, 270 Ga. App. 712, 717 (2004).

No genuine issues of material fact exist in this matter as Plaintiff can satisfy each element required to prove its claim in the Compliant filed against Defendant. These three elements include: 1) that there is an original agreement Defendant entered into with the original creditor and then subsequently breached; 2) that there is admissible evidence proving the liquated damages Plaintiff is seeking; and 3) admissible evidence demonstrating a clear chain of title between the original creditor and Plaintiff. *Green v. Cavalry Portfolio Services, LLC*, 305 Ga. App. 843 (2010); *Wirth v. CACH, LLC*, 300 Ga. App. 488 (2009); *Hutto v. CACV of Colorado, LLC*, 707 S.E.2d 872 (2011).

Further, pursuant to O.C.G.A. § 9-11-36(a)(2), any requests for admission not responded to within 30 days are deemed admitted.

**I.   DEFENDANT ENTERED INTO AN AGREEMENT WITH THE ORIGINAL CREDITOR AND THEN DEFAULTED ON SAID AGREEMENT**

In *Melman v. FIA Card Services, N.A.*, FIA submitted a sworn affidavit of an operation analyst, a credit card statement with the name "Bank of America" at the top, and a copy of a form

credit card agreement. 312 Ga. App. 270, 718 S.E.2d 107 (2011). The court held that these documents were <u>sufficient</u> to grant summary judgment in favor of FIA, concluding specifically "A copy of the credit application was not required." *Id.* at 273. Similarly, in *Davis v. Discover Bank*, the court found that "Discover need not produce a copy of Davis's contract to establish the existence of a valid credit card debt." 277 Ga. App. 864 at 865, 627 S.E.2d 819 (2006). Retention of the card by Defendant and thereafter making use of the card is sufficient to create a formal and binding contract between Defendant and Wells Fargo Bank. *Hill v. American Express*, 289 Ga. App. 576, 578-579, (2008). Here, Defendant made use of the credit card, thereby creating a contract, and then breached this agreement by failing to make the required payments. Plaintiff now seeks a judgment in their favor.

## II.   PLAINTIFF CAN PROVE THE AMOUNT OF DAMAGES SEEKING FROM THE DEFENDANT FOR BREACH OF CONTRACT

Plaintiff has the burden of proof of showing this Court how he calculated the damages he is seeking within a reasonable degree of certainty. *Ezeoke v. FIA Card Services, N.A.*, 320 Ga. App. 73, 74 (2013), citing *Alexander v. Wachovia Bank, Nat. Assn.*, 305 Ga. App. 641, 642 (2010). A party may use affidavits and a final statement from the original creditor to establish the amount of liquidated damages they are seeking so long as they are included in the record. *Id.* at 76; *Melman, 312 Ga. App.* at 272.

Similarly, Plaintiff in this case has provided a charge-off statement, showing a balance of $5,718.81 on Defendant's account. (Attached hereto as Exhibit "A" is a true and correct copy of the charge-off statement which was attached to the Complaint). Although Plaintiff has not provided a complete set of statements since Defendant opened the account, under *Melman*, the final statement showing the balance on the account is sufficient.

## III.   THERE IS NO BREAK IN THE CHAIN OF TITLE FOR THE ASSIGNMENT FROM THE ORIGINAL CREDITOR TO PLAINTIFF CACH, LLC

Plaintiff can demonstrate that is has clear standing to bring this claim. Under Georgia law, the only required assignment documents necessary in this matter are those between Bank of America N.A. to CACH, which have been produced, as this is the one and only assignment that occurred in this matter.

It is well established in Georgia that a third party debt purchaser must produce a clear chain of assignment in writing. This element is examined in *Nyankojo v. Northstar Capital Acquisition*, 298 Ga. App. 6 (2009); *Benson v. Asset Acceptance, LLC*, 310 Ga. App. 1 (2011); *Green*, 305 Ga. App. at 844; *Wirth*, 300 Ga. App. at 490-91; *Hutto*, 707 S.E.2d at 874. The court in *Wirth* specifically found that the Bill of Sale and Exhibit to the Bill of Sale satisfies this requirement.

Plaintiff can show a proper assignment and meet the same burden as FIA in *Melman*. The *Hutto v. CACV of Colorado, LLC*, case clarifies the assignment requirements in Georgia by specifically identifying that the Bill of Sale and Exhibit to the Bill of Sale are necessary for a third party debt purchaser to demonstrate a clear chain of assignment in writing of the subject account from the original creditor. 707 S.E.2d at 873. Plaintiff again meets this burden by attaching the Bill of Sale and Exhibit to the Bill of Sale which clearly refers to Defendant's account as being party of the purchase and assignment from Bank of America, N.A. to the Plaintiff CACH. (Attached hereto as Exhibit "B" are true and correct copies of the Bill of Sale and Exhibit to the Bill of Sale evidencing Defendant's account which were also attached to Plaintiff's Complaint). As discussed in Plaintiff's Request to Take Judicial Notice that was filed contemporaneously with this Motion for Summary Judgment, FIA Card Services, N.A. . and Bank of America, N.A. are the same entity as the two merged in 2006. Thus, the Bill of Sale and the Exhibit to the Bill of Sale are documents which specifically show that Defendant's account was properly assigned, with all the same rights provided to the original creditor, to Plaintiff CACH, LLC. More importantly, the *Hutto* matter does not reference any additional assignment documents or agreements that need be produced to satisfy the assignment requirement. 707 S.E.2d at 873. Therefore, Plaintiff can satisfy

the assignment threshold in *Hutto*, *Wirth*, and *Nyankojo* as it is not merely relying solely on an affidavit of sale, but rather produced the pertinent written agreement sections identifying itself, Defendant's account, and the original creditor.

## IV.    DEFENDANT FAILED TO RESPOND TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Pursuant to O.C.G.A. § 9-11-36(a)(2), any requests for admission not responded to within 30 days are deemed admitted. Defendant has failed to respond to Plaintiff's Request for Admissions that were attached to the Complaint and served to Defendant on September 8, 2017.

WHEREFORE, all of the aforementioned statements of facts are not in dispute as Defendant has failed to answer Plaintiff's Request for Admissions and Plaintiff can satisfy its burden of showing a judgment is appropriate in this matter and, therefore, Plaintiff's Motion for Summary Judgment should be GRANTED.

Respectfully submitted _____ day of APRIL, 2021.


**Mandarich Law Group, LLP**


Nicole Simpson
State Bar No. 925927
nicoles@mandarichlaw.com
Attorney for Plaintiff

125 Townpark Drive
Suite 300
Kennesaw, Georgia 30144
(678) 346-7023

EXHIBIT E - Page 6 of 34

**BankAmericard** | Power Rewards

**Bank of America**

Visa Signature

CASSANDRA HOPKINS
Account Number: XXXXXXXXXXXX 9248
February 20 - March 21, 2013

**Account Information:**
Mail billing inquiries to:
Bank of America
P.O. Box 982235
El Paso, TX 79998-2235.

Mail payments to:
Bank of America
P.O. Box 851001
Dallas, TX 75285-1001

Customer Service:
1-800-421-2110

1-800-283-1787 (Y)

### Payment Information

| | |
|---|---|
| New Balance Total | $0.00 |
| Current Payment Due | $0.00 |
| | |
| Total Minimum Payment Due | $0.00 |
| Payment Due Date | 4/17/13 |

Late Payment Warning: If we do not receive your Total Minimum Payment by the date listed above, you may have to pay a late fee of up to $35.00 and your APRs may be increased up to the Penalty APR of 29.99%.

### Account Summary

| | |
|---|---|
| Previous Balance | $5,718.81 |
| Payments and Other Credits | −5,718.81 |
| Purchases and Adjustments | 0.00 |
| Fees Charged | 0.00 |
| Interest Charged | 0.00 |
| New Balance Total | $0.00 |
| | |
| Total Credit Line | $0.00 |
| Cash Credit Line | $1,000.00 |
| Statement Closing Date | 3/21/13 |
| Days in Billing Cycle | 30 |

### Transactions

| Transaction Date | Posting Date | Description | Reference Number | Account Number | Amount | Total |
|---|---|---|---|---|---|---|
| | 02/28 | Payments and Other Credits<br>CHARGE-OFF ADJUSTMENT | | | −5,718.81 | |
| | | | | | | −$5,718.81 |
| 03/21 | 03/21 | Interest Charged<br>Interest Charged on Purchases | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Balance Transfers | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Dir Dep&Chk CashAdv | | | 0.00 | |
| 03/21 | 03/21 | Interest Charged on Bank Cash Advances | | | 0.00 | |
| | | TOTAL INTEREST FOR THIS PERIOD | | | | $0.00 |

### 2013 Totals Year-to-Date

| | |
|---|---|
| Total fees charged in 2013 | $70.00 |
| Total interest charged in 2013 | $126.06 |

# EXHIBIT

A

BANK OF AMERICA
P.O. BOX 851001
DALLAS, TX 75285-1001

Account Number: XXXXXXXXXXXX 9248

| | |
|---|---|
| New Balance Total | $0.00 |
| Total Minimum Payment Due | 0.00 |
| Payment Due Date | 04/17/13 |

CASSANDRA HOPKINS
ACWORTH GA  30101-2502

Enter payment amount   $

☐ Check here for a change of mailing address or phone numbers.
Please provide all corrections on the reverse side.
Mail this coupon along with your check payable to: Bank of America




EXHIBIT E - Page 7 of 34

**IMPORTANT INFORMATION ABOUT THIS ACCOUNT**

USE711 Rev. 06/11

### CUSTOMER TIPS FOR DISPUTED ITEMS

Many times disputed charges are legitimate charges that customers may not recognize or remember. Before disputing a charge, we recommend that you try every idea and make every effort to resolve the dispute with the merchant. Often the merchant can answer your questions and easily resolve your dispute. The merchant's phone number may be located on your receipt or billing statement.

- **Has a credit posted to your account?**
  Please allow up to 30 days from the date on your credit voucher or acknowledgement letter for the merchant credit to post.

- **Is the charge or amount unfamiliar?**
  Check with other persons authorized to use the account to make sure they did not make the charge. It is possible that the merchants' billing names and store names are different or amounts can easily be confused with similar charges or include tips.

One way to check for the credits or to view transaction details is to look at your account statements online. If you are not enrolled in Online Banking, it is easy to enroll using the web address on the front of your statement or give us a call.

Please remember: If you find an error on your bill, you must notify us no later than 60 days after we sent your first statement on which the error or problem appeared to preserve your billing rights.


**ONLINE**
Online Banking is available 24 hours a day, 7 days a week and allows you to view the most recent activity on your account.


**PHONE**
1.800.266.0212
For prompt service, please have the merchant reference number(s) available for the charge(s) in question.


**MAIL**
Attn: Billing Inquiries PO Box 982235, El Paso, TX 79998
When writing, please include Your Name, Account Number, the Disputed Amount, Merchant Name, Transaction Date, and reference number of the disputed item and specific details regarding your dispute, including dates of contact with the merchant and the merchant's response in each instance. Please include all supporting documentation, including sales and credit vouchers, contract and postage return receipts as proof of any returns.

---

### PAYING INTEREST

We will not charge interest on Purchases on the next statement if you pay the New Balance Total in full by the Payment Due Date, and you had paid in full by the previous Payment Due Date. We will begin charging interest on Balance Transfers and Cash Advances on the transaction date.

### CALCULATION OF BALANCES SUBJECT TO INTEREST RATE

Average Daily Balance Method (including new Purchases):
We calculate separate Balances Subject to an Interest Rate for Purchases and for each Introductory or Promotional Offer balance consisting of Purchases. We do this by: (1) calculating a daily balance for each day in the billing cycle; (2) adding all the daily balances together; and (3) dividing the sum of the daily balances by the number of days in the billing cycle.

To calculate the daily balance for each day in this statement's billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) add new Purchases, new Account Fees, and new Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

Average Daily Balance Method (including new Balance Transfers and new Cash Advances):
We calculate separate Balances Subject to an Interest Rate for Balance Transfers, new Cash Advances, and for each Introductory or Promotional Offer balance consisting of Balance Transfers or Cash Advances. We do this by: (1) calculating a daily balance for each day in this statement's billing cycle; (2) calculating a daily balance for each day prior to this statement's billing cycle that had a "Pre-Cycle balance" — a Pre-Cycle balance is a Balance Transfer or Cash Advance with a transaction date prior to this statement's billing cycle but with a posting date within this statement's billing cycle; (3) adding all the daily balances together; and (4) dividing the sum of the daily balances by the number of days in this statement's billing cycle.

To calculate the daily balance for each day in this statement's billing cycle, we: (1) take the beginning balance; (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) add new Balance Transfers, new Cash Advances and Transaction Fees; and (4) subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

To calculate a daily balance for each day prior to this statement's billing cycle that had a Pre-Cycle balance: (1) we take the beginning balance attributable solely to Pre-Cycle balance (which will be zero on the transaction date of the first Pre-Cycle balance); (2) add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance; (3) add only the applicable Pre-Cycle balances and their related Transaction Fees. We exclude from this calculation all transactions posted in previous billing cycles.

### PAYMENTS

We credit mailed payments as of the date received, if the payment is: (1) received by 5 p.m. local time at the address shown on the remittance slip on the front of your monthly statement; (2) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (3) sent in the return envelope with only the remittance portion of your statement accompanying it. Payments received by mail after 5 p.m. local time at the remittance address on a day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Payments made online or by phone will be credited as of the date of receipt if made by 5 p.m. Central. Credit for any other payments may be delayed up to five days.

No payment shall operate as an accord and satisfaction without the prior written approval of one of our Senior Officers.

We process most payment checks electronically by using the information found on your check. Each check authorizes us to create a one-time electronic funds transfer or process it as a check or paper draft). Funds may be withdrawn from your account as soon as the same day we receive your payment. Checks are not returned to you. For more information or to stop the electronic funds transfers, call us at the number listed on the front.

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop payment, your letter must reach us at least three business days before the automatic payment is scheduled to occur.

### TOTAL INTEREST CHARGE COMPUTATION

Interest Charges accrue and are compounded on a daily basis. To determine the Interest Charges we multiply each Balance Subject to Interest Rate by its applicable Daily Periodic Rate and that result is multiplied by the number of days in the billing cycle. To determine the total Interest Charge for the billing cycle, we add the Periodic Rate Interest Charges together. A Daily Periodic Rate is calculated by dividing an Annual Percentage Rate by 365.

### HOW WE ALLOCATE YOUR PAYMENTS

If your account has balances with different APRs, we will allocate the amount of your payment equal to the Total Minimum Payment Due to the lowest APR balances first (including transactions made after the statement). Payment amounts in excess of your Total Minimum Payment Due will be applied to balances with higher APRs before balances with lower APRs.

### IMPORTANT INFORMATION ABOUT PAYMENTS BY PHONE

When using the optional Pay-by-Phone service, you authorize us to initiate an electronic payment from your account at the financial institution you designate. You must authorize the amount and timing of each payment. For your protection, we will ask for security information. A fee may apply for expedited service. To cancel, call us before the scheduled payment date. Same-day payments cannot be edited or canceled.

### YOUR CREDIT LINES

The Total Credit Line is the amount of credit available for the account; however, only a portion of that is available for Bank Cash Advances. The Cash Credit Line is that amount you have available for Bank Cash Advances. Generally, Bank Cash Advances consist of ATM Cash Advances, Over the Counter (OTC) Cash Advances, Same-Day Online Cash Advances, Overdraft Protection Cash Advances, Cash Equivalents, Returned Payments, and applicable transaction fees.

### MISCELLANEOUS

**Promotional Rate End Date:** This date is based on a future statement closing date. If you change your payment due date, this date could change. Transactions must meet offer conditions in order to qualify for the promotional rate.

For the complete terms and conditions of your account, consult your Credit Card Agreement. FIA Card Services is a tradename of FIA Card Services, N.A. This account is issued and administered by FIA Card Services, N.A.

If your billing address or contact information has changed, or if your address is incorrect as it appears on this bill, please provide all corrections here.

Address 1 _____

Address 2 _____

City _____

State _____   Zip _____

Area Code &
Home Phone _____

Area Code &
Work Phone _____

BankAmericard | Power Rewards

Bank of America

Visa Signature

VISA █████████ 9246
February 20 - March 21, 2013
Page 3 of 4

**Interest Charged**

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| | Annual Percentage Rate | Promotional Transaction Type | Promotional Offer ID | Promotional Rate Until | Balance Subject to Interest Rate | Interest Charges by Transaction Type |
|---|---|---|---|---|---|---|
| Purchases | 0.00% | | | | $1,525.01 | $0.00 |
| Balance Transfers | 0.00% | | | | $ 0.00 | $0.00 |
| Direct Deposit and Check Cash Advances | 0.00% | | | | $ 0.00 | $0.00 |
| Bank Cash Advances | 0.00% | | | | $ 0.00 | $0.00 |

# Platinum Plus®

### The new standard

## CASSANDRA HOPKINS

This document outlines important information about your Bank of America® credit card account, including the Privacy Policy, Annual Percentage Rates (APRs) for different types of transactions, and the fees and other terms of this account. Please read this carefully and keep it for your records.

## CREDIT CARD AGREEMENT

### CONTENTS (Selected Sections)

| | |
|---|---|
| • BANK OF AMERICA PRIVACY POLICY FOR CONSUMERS 2009 | 2 |
| ° YOUR CONTRACT WITH US | 6 |
| • WORDS USED OFTEN IN THIS AGREEMENT | 6 |
| • ANNUAL PERCENTAGE RATES | 7 |
| • ACCOUNT FEES | 10 |
| • PAYMENTS ON YOUR ACCOUNT | 12 |
| • WE MAY AMEND THIS AGREEMENT | 13 |
| • UNAUTHORIZED USE OF YOUR CARD | 15 |
| • ARBITRATION AND LITIGATION | 15 |
| • YOUR BILLING RIGHTS | 16 |

1

# CREDIT CARD AGREEMENT

## BANK OF AMERICA PRIVACY POLICY FOR CONSUMERS 2009

To learn more about how Bank of America manages Customer Information and what actions you can take, please continue reading.
This document includes information about:
1. Making the security of information a priority
2. Collecting your information
3. Managing information about you
4. Honoring your preferences
5. Actions you can take
6. Guarding your own information
7. Other privacy commitments
8. Bank of America companies

This policy covers Customer Information, which means personally identifiable information about a consumer or a consumer's current or former customer relationship with Bank of America. The Bank of America Privacy Policy for Consumers is provided to you as required by law and applies to our companies identified in Section 8, *Bank of America companies*. This policy applies to consumer customer relationships established in the United States and is effective January 1, 2009.

### 1. Making the security of information a priority
Keeping financial information secure is one of our most important responsibilities. We maintain physical, electronic and procedural safeguards to protect Customer Information. Appropriate employees are authorized to access Customer Information for business purposes only. Our employees are bound by a code of ethics that requires confidential treatment of Customer Information and are subject to disciplinary action if they fail to follow this code.

### 2. Collecting your information
We collect and use various types of information about you and your accounts to service your accounts, save you time and money, better respond to your needs and manage our business and risks.
Customer Information is categorized in the following six ways:
A. **Identification Information** - information that identifies you, such as name, address, telephone number and Social Security number.
B. **Application Information** - information you provide to us on applications and through other means that will help us determine if you are eligible for products you request. Examples include assets, income and debt.
C. **Transaction and Experience Information** - information about transactions and account experience, as well as information about our communications with you. Examples include account balances, payment history, account usage and your inquiries and our responses.
D. **Consumer Report Information** - information from a consumer report. Examples include credit score and credit history.
E. **Information from Outside Sources** - information from outside sources regarding employment, credit and other relationships that will help us determine if you are eligible for products you request. Examples include employment history, loan balances, credit card balances, property insurance coverage and other verifications.
F. **Other General Information** - information from outside sources, such as data from public records, that is not assembled or used for the purpose of determining eligibility for a product or service.
As required by the USA PATRIOT Act, we also collect information and take actions necessary to verify your identification.

### 3. Managing information about you
**Managing information within Bank of America**
Bank of America is made up of a number of companies, including financial service providers, such as our brokerage company and credit card company, and nonfinancial companies, such as our operations and servicing subsidiaries. Bank of America may share any of the categories of Customer Information among our companies. For example, sharing information allows us to use information about your ATM, credit card and check card transactions to identify any unusual activity and then contact you to determine if your card has been lost or stolen.
We occasionally receive medical or health information from a customer if, for example, a customer applies for insurance from us. We also may obtain information from insurance support organizations not affiliated with Bank of America that prepare and provide reports to others as well as to us. We do not share medical or health information among our companies, except to maintain or collect on accounts, process transactions, service customer requests or perform insurance functions to the extent permitted by law.
**Managing information with companies that work for us**
We may share any of the categories of Customer Information with companies that work for us, including companies located outside the United States. All nonaffiliated companies that act on our behalf and receive Customer

2

EXHIBIT E - Page 11 of 34

Information from us are contractually obligated to keep the information we provide to them confidential, and to use the Customer Information we share only to provide the services we ask them to perform. These companies may include financial service providers, such as payment processing companies, and nonfinancial companies, such as check printing and data processing companies.

In addition, we may share any of the categories of Customer Information with companies that work for us in order to provide marketing support and other services, such as a service provider that distributes marketing materials. These companies may help us to market our own products and services or other products and services that we believe may be of interest to you. Please note that some of our own companies may provide marketing support and other services for us as well.

**Sharing Information with third parties (for customers with credit cards and Sponsored Accounts)**
We may share Identification Information, Transaction and Experience Information, as well as Other General Information we collect about each of your (1) Bank of America credit card account(s) and (2) Sponsored Accounts at Bank of America, with selected third parties.

1. Credit card account information, whether co-branded or not, may be shared with third parties ;
2. Sponsored Account information may be shared with third parties. Sponsored Accounts are non-credit card accounts or services provided by Bank of America that are also endorsed, co-branded or sponsored by other organizations. Examples of these organizations include colleges, sporting teams, retailers and other affinity organizations, such as charities. Sponsored Accounts may include deposit accounts or other banking services provided by Bank of America, such as a savings account co-branded with a baseball team. You will know whether an account is a Sponsored Account by the appearance of the name or logo of the sponsoring organization on account materials, such as statements and marketing materials. ;
3. If you are unsure whether any of your accounts are Sponsored Accounts, please contact 1.888.341.5000. .

We may share information about credit cards and Sponsored Accounts with selected third parties, including:
- Financial services companies (such as insurance agencies or companies and mortgage brokers and organizations with whom we have agreements to jointly market financial products);
- Nonfinancial companies (such as retailers, travel companies and membership organizations); and
- Other companies (such as nonprofit organizations).

The sharing of information, as described in this section, is limited to credit card and Sponsored Account information. Please see Section 4, *Honoring your preferences* to learn how you may choose to opt out of this sharing.

**Disclosing Information in other situations**
We also may disclose any of the categories of Customer Information to credit bureaus and similar organizations and when required or permitted by law. For example, Customer Information may be disclosed in connection with fraud prevention or investigation, risk management and security, and recording mortgages in public records.

**4. Honoring your preferences**
You have choices when it comes to how Bank of America shares and uses information.
Sharing information with third parties (for customers with credit cards and Sponsored Accounts)
If you have a Bank of America credit card or Sponsored Account, you may request that we not share information about these accounts with third parties. If you request that we not share information with third parties, we may still share information;
- Where permitted or required by law as discussed in Section 3 under *Disclosing Information in other situations*;
- With our service providers as discussed in Section 3 under *Managing Information with companies that work for us*; and
- With other financial companies with whom we have joint marketing agreements.

If you have multiple credit cards or Sponsored Accounts, you will need to express your preference for each account separately. When any customer on a joint account requests that we not share with third parties, that preference is applied to the entire account.

**Sharing among Bank of America companies**
You may request that Application Information, Consumer Report Information and Information from Outside Sources not be shared among Bank of America companies.
For sharing among Bank of America companies, each customer may tell us his or her preferences individually, or you may tell us the preferences for any other customers who are joint account holders with you.

**Direct marketing**
You may choose not to receive direct marketing offers - sent by postal mail, telephone and/or e-mail - from Bank of America. These preferences apply to all marketing offers from us and from companies working for us. To minimize the amount of telephone solicitation our customers receive, Bank of America does not offer nonfinancial products and services through telephone solicitations. Direct marketing offers from us may include information about products and services we believe may be of interest to you.

If you elect not to receive direct marketing offers by postal mail, telephone and/or e-mail, please note that we may continue to contact you as necessary to service your account and for other nonmarketing purposes. You may also be contacted by your client relationship manager or assigned account representative, if applicable. Bank of America may also continue to provide marketing information in your regular account mailings and statements, including online and ATM communications.

3

EXHIBIT E - Page 12 of 34

Each customer may opt out of each direct marketing option individually. Since marketing programs may already be in progress, it may take up to 12 weeks for your postal mail opt-out to be fully effective. When you opt out of direct marketing by postal mail or telephone, your opt-out will last for five (5) years. After that, you may choose to renew your opt-out for another five-year period.

**5. Actions you can take**
You can tell us your preferences by:
- Notifying us at bankofamerica.com/privacy and entering your information on our secure Web site
- Calling us toll free at 1.888.341.5000
- Talking to a customer representative at a banking center or to your client relationship manager

You can make sure information is accurate by:
- Accessing your account information (for example, on a statement or in response to specific requests)
- Telling us if it is incorrect by calling or writing to us at the telephone number or appropriate address for such changes on your statement or other account materials

**6. Guarding your own information**
Bank of America recommends that you take the following precautions to guard against the disclosure and unauthorized use of your account and personal information:
- Review your monthly account statements and report any suspicious activity to us immediately.
- Do not respond to e-mails requesting account numbers, passwords or PINs. Call the institution to verify the legitimacy of the e-mail.
- Memorize PINs and refrain from writing PINs, Social Security numbers, debit or credit card numbers where they could be found.
- Shred documents containing any sensitive information before discarding, e.g. bank statements.
- Confirm that an Internet site is secure by checking that the URL (Web address) begins with "https".
- Review your credit report at least once every year to make sure all information is up to date. For a free copy of your credit bureau report, contact www.annualcreditreport.com or call 1.877.322.8228.
- If you think you have been a victim of identity theft or fraud, you may contact the Federal Trade Commission (FTC) to report any incidents and to receive additional guidance on steps you can take to protect yourself. Contact the FTC at www.FTC.gov/idtheft or 1.877.438.4338.
- For additional information on protecting your information, please visit bankofamerica.com/privacy.

**Keeping up to date with our Privacy Policy**
We may make changes to this policy at any time and will inform you of changes, as required by law. To receive the most up-to-date Privacy Policy, you can visit our Web site at: bankofamerica.com/privacy or call us at 1.888.341.5000.

**7. Other privacy commitments**

This notice constitutes the Bank of America Do Not Call Policy under the Telephone Consumer Protection Act for all consumers and is pursuant to state law. When you talk with Bank of America by telephone your conversation may be monitored or recorded by us.

For information on our Online Practices Privacy Policy please visit www.bankofamerica.com/onlinepolicy.

You may have other privacy protections under state laws, such as Vermont and California. To the extent these state laws apply, we will comply with them with regard to our information practices.

**For Nevada residents only.** We are providing you this notice pursuant to state law. You may be placed on our internal Do Not Call List by following the directions in the Section titled "Actions you can take". Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number- 702.486.3132; e-mail: BCPINFO@ag.state.nv.us. Bank of America, PO Box 25118, FL1-300-02-07, Tampa, FL 33633-0900; Phone number- 888.341.5000; email: Click on "Contact Us" at bankofamerica.com/privacy

**For Vermont and California residents only.** The information sharing practices described above are in accordance with federal law. Vermont and California law place additional limits on sharing information about Vermont and California residents so long as they remain residents of those states.

**Vermont:** In accordance with Vermont law, Bank of America will not share information we collect about Vermont residents with companies outside of Bank of America, except as permitted by law, such as with the consent of the customer, to service the customer's accounts or to other financial institutions with which we have joint marketing agreements. Bank of America will not share Application Information, Consumer Report Information and Information from Outside Sources about Vermont residents among the Bank of America companies except with the authorization or consent of the Vermont resident.

**California:** In accordance with California law, Bank of America will not share information we collect about California residents with companies outside of Bank of America, except as permitted by law, such as with the consent of the customer, to service the customer's accounts, or to fulfill on rewards or benefits. We will limit sharing among our

4

companies to the extent required by applicable California law.

**8. Bank of America companies**
This Privacy Policy applies to the following Bank of America companies that have consumer customer relationships:

**Banks and Trust Companies**
Bank of America, N.A.
U.S. Trust Company of Delaware
**Credit Card**
Bank of America Consumer Card Services, LLC
Bank of America
Fleet Credit Card Services, L.P.
**Brokerage and Investments**
BACAP Alternative Advisors, Inc.
Bank of America Capital Advisors LLC
Banc of America Finance Services, Inc.
Banc of America Investment Advisors, Inc.
Banc of America Investment Services, Inc.
Banc of America Securities LLC
Columbia Management Advisors, LLC
Columbia Management Distributors, Inc.
Columbia Wanger Asset Management, L.P.
U.S. Trust Hedge Fund Management, Inc.
UST Securities Corp.

White Ridge Investment Advisors LLC
**Insurance and Annuities**
BA Agency, Inc.
BA Insurance Services, Inc.
Banc of America Agency, LLC
Banc of America Agency of Nevada, Inc.
Banc of America Agency of Texas, Inc.
Banc of America Insurance Services, Inc.,
 dba Banc of America Insurance Agency of New York
Banc of America Corporate Insurance Agency, LLC
General Fidelity Insurance Company
General Fidelity Life Insurance Company
**Real Estate**
HomeFocus Services, LLC
HomeFocus Tax Services, LLC
NationsCredit Financial Services Corporation
**Administrative Services**
LaSalle Healthcare Administrative Services, LLC

For a current list of Bank of America companies that have consumer customer relationships and to which this policy applies, please visit our Web site at bankofamerica.com/privacy.
Estas normas están disponibles en español a través de la sucursal bancaria de su localidad.
©2008 Bank of America Corporation.

5

## YOUR CONTRACT WITH US

*We reserve the right to change the terms of this Agreement at any time, as further described in the section titled: We May Amend This Agreement.*

Your Agreement with us consists of this Credit Card Agreement and any changes we make to it from time to time. The terms of this Agreement apply to you if any of you applied for and were granted an account, used the account, maintained the account, and/or otherwise accepted the account. You agree to the terms and conditions of this Agreement.

## WORDS USED OFTEN IN THIS AGREEMENT

"Access check" means a check we provide to you to obtain credit on your account.

"Agreement" or "Credit Card Agreement" means this document and any changes we make to this document from time to time.

"APR" means the corresponding Annual Percentage Rate. The APR corresponds to the Daily Periodic Rate ("DPR") which is calculated by dividing the corresponding APR by 365.

"Card" means all the credit cards we issue to you and to any other person with authorization for use on this account pursuant to this Agreement.

"Default Rate" means the APR(s) which may be applied to Balance Transfers, Cash Advances, and Purchases without further notice in certain instances of your default, as described in the section titled, *Annual Percentage Rates*.

"Foreign Transaction" means any transaction made in a foreign currency, and as of June 1, 2009 any transaction made in U.S. dollars if the transaction is made or processed outside of the United States. Foreign transactions include, for example, online purchases from foreign merchants.

"Grace Period" means the period of time during a billing cycle when you will not accrue Periodic Rate Finance Charges on certain transactions or balances.

"New Balance Total" means the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement. To determine the New Balance Total, we start with the total balance at the beginning of the billing cycle, which is the "Previous Balance." Then we subtract payments and credits. Then we add Cash Advances, Balance Transfers, Purchases and Adjustments and finance charges.

"Pay In Full" or "Paid In Full" means payments and credits in a billing cycle totaling at least your previous billing cycle's New Balance Total. In general, Pay In Full must be made by the Payment Due Date in order to get a Grace Period.

"Promotional Offer" means limited time introductory or promotional offers on certain Balance Transfers, Cash Advances or Purchases at APRs that are lower than the Standard Rates for those features ("Promotional Rates") and may be subject to other conditions. Promotional Offers may also include limited time introductory or promotional transaction fees ("Promotional Fees") which may be higher or lower than the standard fees provided in the section titled *Transaction Fee Finance Charges*.

"Standard Rate" means the APR(s) normally in effect for Balance Transfers, Cash Advances, and Purchases.

"We", "us", "our", and "FIACS" means FIA Card Services, N.A., also known as Bank of America.

"You" and "your" mean each and all of the persons who are granted, accept or use an account we hold. "You" and "your" also mean any other person who has guaranteed payment of this account, when used in the sections titled, *Your Contract With Us, We May Monitor And Record Telephone Calls,* and *Arbitration And Litigation,* and when used in each of the sections relating to payment of this account (e.g., *Your Promise To Pay,* and *How We Allocate Your Payments*).

## OTHER TERMINOLOGY

We will use the definitions described under the section heading *Words Used Often In This Agreement* or as otherwise defined in this Agreement. If we use a capitalized term in this document but we do not define the term in this document, the term has the meaning as used in your monthly statement.

We use section headings (e.g., *Words Used Often In This Agreement*) to organize this Agreement. The headings

8

are for reference purposes only.

## HOW TO USE YOUR ACCOUNT

You may obtain credit in the form of Balance Transfers, Cash Advances, and Purchases by using cards, access checks, your account number, or other credit devices.

"Balance Transfer" means a transfer of funds to another creditor initiated by us at your request. A Balance Transfer does not include a transaction that is otherwise a Cash Advance. Balance Transfers include Transaction Fees and adjustments associated with any Balance Transfer.

"Cash Advance" means the use of your account for a loan obtained:
1. at an automated teller machine ("ATM Cash Advance") ;
2. by a transfer of funds to a deposit account initiated by us at your request. ("Direct Deposit"). A Direct Deposit does not include an Overdraft Protection Cash Advance or a same day online funds transfer ;
3. at any financial institution (e.g., to obtain cash, money orders, wire transfers, or travelers checks), by a same day online funds transfer to a deposit account, and at any non-financial institution (to obtain cash) ("Bank Cash Advance") ;
4. as part of an Overdraft Protection Program – a transfer of funds to a deposit account pursuant to an overdraft protection program ("Overdraft Protection Cash Advance") ;
5. to buy "Cash Equivalents" (i.e., foreign currency, money orders or travelers checks from a non-financial institution, or person to person money transfers, bets, lottery tickets, casino gaming chips, or bail bonds) with your card ;
6. by an access check you sign as drawer ("Check Cash Advance") ;
7. for any payment you make to us that is returned to us unpaid for any reason, including the related finance charges ("Returned Payment") .

"Cash Advance" includes Transaction Fees and adjustments associated with any Cash Advance.

"Purchase" means the use of your card or account number to;
1. buy or lease goods or services ;
2. buy wire transfers from a non-financial institution ("Wire Transfer Purchase") ;
3. make a transaction that is not otherwise a Cash Advance .

"Purchase" includes Account Fees, as well as Transaction Fees and adjustments associated with any Purchase.

## ANNUAL PERCENTAGE RATES

This section provides the Standard Rates, Default Rates and Promotional Offers applicable to your account.

Balance Transfers: The Standard Rate for Balance Transfer balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 9.99 percentage points; this currently results in a corresponding ANNUAL PERCENTAGE RATE of 13.24%(0.036274% DPR).

Cash Advances: The Standard Rate for Cash Advance balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 15.99 percentage points; this currently results in a corresponding ANNUAL PERCENTAGE RATE of 19.24%(0.052712% DPR).

Purchases: The Standard Rate for Purchase balances is a variable rate calculated using the Variable Standard Rate formula with a margin of 9.99 percentage points; this currently results in a corresponding ANNUAL PERCENTAGE RATE of 13.24%(0.036274% DPR).

Default Pricing: Default Rates are up to a corresponding ANNUAL PERCENTAGE RATE of 29.99% (0.082164% DPR). We may increase the APRs on all new and outstanding Balance Transfer, Cash Advance, and Purchase balances up to the Default Rate, without giving you additional notice, each time any two of the following default events occur in any consecutive twelve month period: (1) we do not receive the Total Minimum Payment Due by its Payment Due Date; or (2) your total outstanding balance exceeds your credit limit on any statement Closing Date. Each such increase will be effective as of the first day of that billing cycle. We may elect to set your APRs for Balance Transfer, Cash Advance and Purchase balances to different Default Rates. Default Pricing does not use a variable rate formula.

Promotional Offers:
From time to time we may make Promotional Offers on certain new Balance Transfers, Cash Advances, and Purchases. When a Promotional Offer ends, its Promotional Rates will terminate. Any Balance Transfer, Cash Advance, or Purchase balance subject to that Promotional Offer will return to its respective Standard Rate or Default Rate as applicable.

Check Cash Advances and Direct Deposits are Cash Advances. However, if Check Cash Advances or Direct Deposits are identified in the Promotional Offer as "posting as a Balance Transfer" and qualify for the Promotional Offer, then the resulting promotional balances will be included in the Balance Transfer balance and will get the Balance Transfer Standard Rate or, if applicable, the Balance Transfer Default Rate when the Promotional Offer ends, instead of the Cash Advance Rate. In addition, these transactions will get the Balance Transfer transaction fee if they qualify for the Promotional Offer.

Promotional Offer ID BV8Z6CJXN: The Promotional Rate for this Promotional Offer is a corresponding ANNUAL PERCENTAGE RATE of 1.90% (0.005205% DPR).

This Promotional Offer applies to Balance Transfers, Direct Deposit Cash Advances, Check Cash Advances and Purchases (each an "eligible transaction" for this Promotional Offer). This Promotional Offer will not apply to Check Cash Advances bearing an Offer ID that qualify as eligible transactions for a separate Promotional Offer.

This Promotional Offer applies to eligible transactions posting to your account through your statement Closing Date in December 2009. This Promotional Offer ends on your statement Closing Date in December 2009. Check Cash Advances and Direct Deposits which get this Promotional Offer will post to your account as Balance Transfers.

This Promotional Offer may end at any time if there is a "promotion turn-off event." A promotion turn-off event means: (1) that any Total Minimum Payment Due is not received by its Payment Due Date; or (2) that your total outstanding balance exceeds your credit limit on any statement Closing Date. If a promotion turn-off event occurs, then this Promotional Offer will end as of the first day of that billing cycle. This means that this Promotional Rate will not be in effect in that billing cycle.

VARIABLE RATE INFORMATION

Variable Standard Rate formula:
Variable Standard Rates are calculated by adding together an index and a margin. The applicable margins are disclosed above in the section titled, Annual Percentage Rates.

This index is the highest U.S. Prime Rate as published in the "Money Rates" section of The Wall Street Journal on the last publication day of each month. The index used to calculate these variable rates is 3.25% and was published on April 30, 2009.

An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month in which the index is published. An increase in the index means that you will pay higher periodic rate finance charges and have a higher Total Minimum Payment Due. If The Wall Street Journal does not publish the U. S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may, in our sole discretion, substitute another index.

Variable Promotional Rate formula:
Variable Promotional Rates are calculated by adding together an index and a margin. The applicable margins are disclosed above in the section titled, Annual Percentage Rates.

This index is determined on the last business day of each month ("determination date") and is the highest U.S. Prime Rate as published in the "Money Rates" section of The Wall Street Journal at any time within the immediately preceding three months, including the month in which the index was determined.

An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month as the determination date. An increase in the index means that you will pay higher periodic rate finance charges and have a higher Total Minimum Payment Due. If The Wall Street Journal does not publish the U.S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may, at our sole discretion, substitute another index.

CALCULATION OF PERIODIC RATE FINANCE CHARGES
We calculate Periodic Rate Finance Charges by multiplying each Balance Subject to Finance Charge by its applicable DPR and that result by the number of days in the billing cycle. When Periodic Rate Finance Charges accrue on a Balance Transfer, Cash Advance or Purchase balance, those finance charges become part of that respective Balance Transfer, Cash Advance, or Purchase balance.

BILLING CYCLE
Your billing cycle ends each month on a Closing Date determined by us. Each billing cycle begins on the day after the Closing Date of the previous billing cycle. Each monthly statement reflects a single billing cycle.

8

EXHIBIT E - Page 17 of 34

## WHEN PERIODIC RATE FINANCE CHARGES BEGIN TO ACCRUE

Each new Balance Transfer and Cash Advance begins to accrue Periodic Rate Finance Charges on its transaction date. Balance Transfer and Cash Advance balances remaining from previous billing cycles accrue Periodic Rate Finance Charges from the first day of the billing cycle. The transaction date for Check Cash Advances and Balance Transfers made by check is the date the check is first deposited or cashed. The transaction date for a Returned Payment is the date that the corresponding payment posted to your account.

Unless subject to a Grace Period, each new Purchase begins to accrue Periodic Rate Finance Charges on its transaction date or the first day of the billing cycle, whichever date is later. Unless subject to a Grace Period, Purchase balances remaining from previous billing cycles accrue Periodic Rate Finance Charges from the first day of the billing cycle.

When applicable, Periodic Rate Finance Charges accrue daily and compound daily on new balances, and balances remaining from previous billing cycles. Periodic Rate Finance Charges will continue to accrue even though you have paid the full amount of any related balances because we include any accrued but unpaid finance charges in the calculation of each Balance Subject to Finance Charge.

Your Payment Due Date will be at least 20 days from your statement Closing Date.

## GRACE PERIOD

You do not have a Grace Period for Balance Transfers or Cash Advances. You will have a Grace Period on new Purchases, in a billing cycle in which you Pay in Full, from the day after the Pay in Full date until the end of that billing cycle. You will have a Grace Period for an entire billing cycle on new Purchases and on Purchase balances remaining from previous billing cycles if you Pay in Full by the Payment Due Date in that billing cycle and if during the previous billing cycle you Paid in Full.

## CALCULATION OF BALANCES SUBJECT TO FINANCE CHARGE

Average Balance Method (Including new Balance Transfers and new Cash Advances): We calculate separate Balances Subject to Finance Charge for Balance Transfers, Cash Advances, and for each Promotional Offer balance consisting of Balance Transfers or Cash Advances by: (1) calculating a daily balance for each day in the current billing cycle; (2) calculating a daily balance for each day prior to the current billing cycle that had a "Pre-Cycle balance" –a Pre-Cycle balance is a Balance Transfer or a Cash Advance with a transaction date prior to the current billing cycle but with a posting date within the current billing cycle; (3) adding all the daily balances together; and (4) dividing the sum of the daily balances by the number of days in the current billing cycle.

To calculate the daily balance for each day in the current billing cycle, we take the beginning balance, add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, add new Balance Transfers, Cash Advances and Transaction Fees, and subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero.

To calculate a daily balance for each day prior to the current billing cycle that had a Pre-Cycle balance, we take the beginning balance attributable solely to a Pre-Cycle balance (which will be zero on the transaction date associated with the first Pre-Cycle balance), add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, and add only the applicable Pre-Cycle balances, and their related Transaction Fees. We exclude from this calculation all transactions posted in previous billing cycles.

Average Daily Balance Method (including new Purchases): We calculate separate Balances Subject to Finance Charge for Purchases and for each Promotional Offer balance consisting of Purchases by: (1) calculating a daily balance for each day in the current billing cycle; (2) adding all the daily balances together; and (3) dividing the sum of the daily balances by the number of days in the current billing cycle.

To calculate the daily balance for each day in the current billing cycle, we take the beginning balance, add an amount equal to the applicable Daily Periodic Rate multiplied by the previous day's daily balance, add, unless subject to a Grace Period, new Purchases, new Account Fees, and new Transaction Fees, and subtract applicable payments and credits. If any daily balance is less than zero we treat it as zero. If in the current billing cycle you Pay in Full, then on the day after that Pay in Full date, we exclude from the beginning balance new Purchases, new Account Fees, and new Transaction Fees which posted on or before the Pay in Full date.

We include the costs for credit card debt cancellation or credit insurance purchased through us in calculating the beginning Purchase balance for the first day of the billing cycle after the billing cycle in which such costs are billed.

## TRANSACTION FEE FINANCE CHARGES

We will assess the following Transaction Fees to your Account in the same balance category to which the

0

transaction is posted:

If you obtain an ATM Cash Advance, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Bank Cash Advance, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you obtain a Cash Equivalent, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you make a Foreign Transaction, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Foreign Transaction. This is in addition to any other applicable transaction fees.

If you obtain an Overdraft Protection Cash Advance, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $10.00).

If you make a Wire Transfer Purchase, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. dollar amount of each such Purchase (Fee: Min. $10.00).

## ACCOUNT FEES
The following fees are assessed as Purchases in the Billing Cycle in which the fees accrue:

An Overlimit Fee in each billing cycle when your total outstanding balance exceeds your credit limit. The Overlimit Fee will be assessed even if fees or finance charges assessed by us cause your total outstanding balance to exceed your credit limit. The Overlimit Fee will be assessed as of the first day in the billing cycle that your total outstanding balance was over your credit limit. No more than one Overlimit Fee will be charged in each billing cycle.

If your Previous Balance exceeds your credit limit at the beginning of a billing cycle, you will have an opportunity to avoid an Overlimit Fee in that billing cycle. To avoid an Overlimit Fee in that billing cycle, your total outstanding balance must be less than or equal to your credit limit on the 20th day of the billing cycle and must remain below the credit limit for the rest of that billing cycle. If your total outstanding balance exceeds your credit limit on the 20th day of that billing cycle you will be assessed an Overlimit Fee as of the 20th day. If your total outstanding balance is less than your credit limit on the 20th day of that billing cycle but exceeds your credit limit on any day after the 20th day, you will be assessed an Overlimit Fee as of the first day after the 20th day in which your total outstanding balance exceeds your credit limit.

The amount of the Overlimit Fee is based on the amount of your total outstanding balance on the date as of which the Overlimit Fee is assessed and is as follows:
- if the total outstanding balance is $500.00 or less, the Overlimit Fee will be $15.00;
- if the total outstanding balance is greater than $500.00 but $1,000.00 or less, the Overlimit Fee will be $29.00;
- if the total outstanding balance is greater than $1,000.00, the Overlimit Fee will be $39.00.

A Late Fee, if the Total Minimum Payment Due shown on your monthly statement is not received by us on or before its Payment Due Date. On the Late Fee transaction date:
- if the total outstanding balance is $100.00 or less, the Late Fee will be $15.00;
- if the total outstanding balance is greater than $100.00 but $250.00 or less, the Late Fee will be $29.00;
- if the total outstanding balance is greater than $250.00, the Late Fee will be $39.00.

A Returned Payment Fee of $39.00 if a payment on your account is returned for insufficient funds or for any other reason, even if it is paid upon subsequent presentment (if we elect to re-present the payment).

A Returned Access Check Fee of $39.00 if we return an access check unpaid for any reason, even if the access check is paid upon subsequent presentment.

A Copy Fee of $5.00 for each copy of a monthly statement or sales draft, except that the six most recent monthly statements and one sales draft will be provided for free.

An Abandoned Property Fee equal to any costs incurred by us for complying with state abandoned property laws, unless prohibited by applicable law.

## OVERDRAFT PROTECTION
If your checking account with Bank of America is linked to this account, this overdraft protection feature will allow funds to be transferred ("overdraft protection transfers") from this account into your designated checking account

10

with Bank of America ("checking account") when transactions occur on your checking account, such as checks or other debits, that if paid would cause the checking account to be overdrawn ("overdraft transactions"). Overdraft protection transfers include automatic transfers to cover checking account fees. Overdraft protection transfers are processed after close of business Monday through Friday and are treated as Overdraft Protection Cash Advances. Each day's overdraft transactions will be totaled and rounded to the next $100 ($25 if you opened your checking account in Washington or Idaho; $50 if your checking account is opened with Military Bank) increment up to your available credit limit, regardless of who initiated the overdraft transactions. For example, if your checking account has a balance of $1.00 and a check or other debit item for $125 is presented for payment, which if paid would cause your checking account to be overdrawn, an overdraft protection transfer of $200 will be made to your checking account and an Overdraft Protection Cash Advance of $200 will post to this account. The amount of available credit on this account must be sufficient to cover the total amount of overdraft transactions (received by Bank of America that day) rounded to the next $100 increment (but excluding any overdraft protection fee); otherwise one or more of the overdraft transactions for that day will be rejected. However, if the available credit on this account is greater than the overdraft transaction amount, but the available credit is insufficient for the overdraft transaction amount to be rounded to the next $100 increment, then the amount of the overdraft transaction will be rounded to the highest whole dollar amount of your available credit. (And in such an event, the accrued finance charges may result in an Overlimit Fee.) We may permit or refuse to permit any overdraft protection transfer that would cause you to exceed the credit limit on this account; but if we permit it, you may be assessed an Overlimit Fee during the billing cycle in which the transfer occurs. This overdraft protection feature will automatically be cancelled if this account is closed by either you or us, or at any time upon your request. Your overdraft transactions remain subject to the terms of your checking account with Bank of America, any related enrollment agreement, and this Agreement.

### SIGN YOUR CARD
You should sign your card before you use it.

### WE MAY MONITOR AND RECORD TELEPHONE CALLS
You consent to and authorize Bank of America, or its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies. Where you have provided a cell phone number directly to us, or placed a cell phone call to us, you consent and agree to accept collection calls to your cell phone from us. For any telephone or cell phone calls we place to you, you consent and agree that those calls may be automatically dialed and/or use recorded messages.

### CREDIT REPORTING AGENCIES; COLLECTING AND SHARING INFORMATION
You authorize us to collect information about you in order to conduct our business and deliver the top quality service you expect, including information we receive about you, information we receive from third parties such as credit reporting agencies and information about your transactions with us and other companies. You authorize us to share such information about you or your account with our affiliates and others. You may have the right to opt out of some information sharing. For more details, please refer to our Privacy Policy.

> If you believe we have furnished inaccurate or incomplete information about you or your account to a credit reporting agency, write to us at: FIA Card Services, N.A., Credit Reporting Agencies, P.O. Box 17054, Wilmington, DE 19884-7054. Please include your name, address, home phone number, and account number, and explain what you believe is inaccurate or incomplete.

### PURPOSES FOR USING YOUR ACCOUNT
You may use your account for personal, family, or household purposes. You may not use your account for business or commercial purposes. You may not use a Balance Transfer, or Check Cash Advance, or any other Cash Advance, to make a payment on this or any other credit account with us or our affiliates. You may not use or permit your account to be used to make any illegal transaction. You will only use your account for transactions that are legal where you conduct them. For example, Internet gambling transactions may be illegal in your state. Display of a payment card logo by an online merchant does not mean that an Internet transaction is legal where you conduct it. We may charge your account for such transactions. We will not be liable if you engage in an illegal transaction. We may deny authorization of any transactions identified as Internet gambling.

### PERSONS USING YOUR ACCOUNT
If you permit any person to use your card, access checks, account number, or other credit device with the authorization to obtain credit on your account, you may be liable for all transactions made by that person including transactions for which you may not have intended to be liable, even if the amount of those transactions causes your credit limit to be exceeded. Authorized users of this account may have the same access to information about the account and its users as the account holders. We may send account materials (cards, statements and notices) to any liable party, and that person will be responsible for delivering those materials to the other liable parties and authorized users. Notice to any of you will be considered notice to all of you. You may allow authorized users on your account in the following ways: (1) by notifying us that you want someone added to your account as an

authorized user; (2) by lending your card or account number to another; or (3) by any other ways in which you would be legally considered to have allowed another to use your account or to be legally prevented from denying that you did so. You must think carefully before you allow anyone to become an authorized user. By doing so, you authorize the person to use your account to the same extent you can, including but not limited to making any purchases, cash advances, balance transfers and allowing others to use your account. Your account does not permit you to limit the nature or amount of authority you give to any authorized user and you will not attempt to do so. An authorized user's authority will continue until you both notify us that you are terminating the authority and you physically retrieve the card. If you cannot retrieve the card, you will remain liable for any transactions that we cannot prevent after you notify us.

## YOUR PROMISE TO PAY

You promise to pay us the amounts of all credit you obtain, which includes all Purchases, Cash Advances, and Balance Transfers. You also promise to pay us all the amounts of finance charges, fees, and any other transactions we charge to your account. If a bank branch or office sponsors your account, you promise to pay it any unpaid account balance it pays us within 30 days.

## PAYMENTS ON YOUR ACCOUNT

You must pay each month at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. Your Payment Due Date may vary from month to month. Payments must conform to the requirements set out on that monthly statement; these requirements may vary without prior notice. You may pay the entire amount you owe us at any time. Payments made in any billing cycle that are greater than the Total Minimum Payment Due will not affect your obligation to make the next Total Minimum Payment Due. If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts. We will reject payments that are not drawn in U.S. dollars and those drawn on a financial institution located outside of the United States. We reserve the right to reject any payment if your account has a credit balance as of the day we receive that payment. Payment of your Total Minimum Payment Due may not avoid the assessment of Overlimit Fees. Generally, credits to your account, such as those generated by merchants or by person-to-person money transfers, are not treated as payments and will not reduce your Total Minimum Payment Due.

## ACH PAYMENTS

We process most payment checks electronically. We use the information on your check to create an electronic funds transfer. Each time you send a check, you authorize a one-time electronic funds transfer. You also authorize us to process your check as a check or paper draft, as necessary. Funds may be withdrawn from your account as soon as the same day we receive your payment. You will not receive your cancelled check because we are required to destroy it. We will retain an electronic copy. For more information or to stop the conversion of your checks into electronic funds transfers, call us at the phone number listed on the front of your monthly statement. You may also write to us at: P.O. Box 15019, Wilmington, DE 19850-5019.

## TOTAL MINIMUM PAYMENT DUE

You may pay your total outstanding balance at any time. Each billing cycle, you must pay at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. The Total Minimum Payment Due is the sum of all past due amounts plus the Current Payment.

The Current Payment for each billing cycle includes three amounts: (1) 1.00% of your balance (your New Balance Total except for any new Periodic Rate Finance Charges, and Late Fee), and (2) new Periodic Rate Finance Charges, and (3) new Late Fee. Generally, the lowest it will be is $15.00. We round the payment amount down to the nearest dollar. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Total Minimum Payment Due for the billing cycle in which the payment was originally credited.

## WHEN YOUR PAYMENT WILL BE CREDITED TO YOUR ACCOUNT

We credit payments as of the date received, if the payment is: (1) received by 5 p.m. Eastern time; (2) received at the address shown in the upper left-hand corner of the front of your monthly statement; (3) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (4) sent in the return envelope with only the top portion of your statement accompanying it. Payments received after 5 p.m. Eastern time on any day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Credit for any other payments may be delayed up to five days.

## HOW WE ALLOCATE YOUR PAYMENTS

We will allocate your payments in the manner we determine. In most instances, we will allocate your payments to balances (including transactions made after your latest statement) with lower APRs before balances with higher APRs. This will result in balances with lower APRs (such as new balances with promotional APR offers) being paid before any other existing balances.

## PROMISE TO PAY APPLIES TO ALL PERSONS

12

All persons who initially or subsequently request, accept, guarantee or use the account are individually and together responsible for any total outstanding balance. If you and one or more persons are responsible to pay any total outstanding balance, we may refuse to release any of you from liability until all of the cards, access checks, and other credit devices outstanding under the account have been returned to us and you repay us the total outstanding balance owed to us at any time under the terms of this Agreement.

## DEFAULT

You will be in default of this Agreement if: (1) you fail to make any required Total Minimum Payment Due by its Payment Due Date; (2) your total outstanding balance exceeds your credit limit; or (3) you fail to abide by any other term of this Agreement. Our failure to exercise any of our rights when you default does not mean that we are unable to exercise those rights upon later default.

## WHEN WE MAY REQUIRE IMMEDIATE REPAYMENT

If you are in default, then in addition to our other remedies under this Agreement, we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law and except as otherwise provided under the *Arbitration and Litigation* section of this Agreement, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee.

## OTHER PAYMENT TERMS

We can accept late payments, partial payments, or payments with any restrictive writing without losing any of our rights under this Agreement. This means that no payment, including those marked with "paid in full" or with any other restrictive words, shall operate as an accord and satisfaction without the prior written approval of one of our senior officers. You may not use a postdated check to make a payment. If you do postdate a payment check, we may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## PAYMENT HOLIDAYS AND REDUCED PAYMENT OFFERS

We may allow you, from time to time, to omit a monthly payment or make a reduced payment. We will notify you when these options are available. If you omit a payment or make a reduced payment, finance charges, applicable fees, and other regular transactions, if any, will accrue on your account balances in accordance with this Agreement. The reduced payment amount may be less than your finance charges. You must make the reduced payment on time to avoid a late fee. You must resume making your regular Total Minimum Payment Due each month following a payment holiday or reduced payment offer.

## YOUR CREDIT LIMIT

Your credit limit is disclosed to you when you receive your card and, generally, on each monthly statement. We may change your credit limit from time to time. The amount shown on your monthly statement as Cash or Credit Available does not take into account any Purchases, Cash Advances, Balance Transfers, finance charges, fees, any other transactions, or credits which post to your account after the Closing Date of that monthly statement. Such transactions could result in your credit limit being exceeded and result in the assessment of Overlimit Fees, loss of Promotional Offers, and Default Pricing.

## WHAT WE MAY DO IF YOU ATTEMPT TO EXCEED YOUR CREDIT LIMIT

The total outstanding balance on your account plus authorizations at any time must not be more than your credit limit. If you attempt a transaction which results in your total outstanding balance (plus authorizations) exceeding your credit limit, we may: (1) permit the transaction without raising your credit limit; (2) permit the transaction and treat the amount of the transaction that is more than the credit limit as immediately due; or (3) refuse to permit the transaction.

If we refuse to permit the transaction, we may advise the person who attempted the transaction that it has been refused. If we refuse to permit a Check Cash Advance or Balance Transfer, we may do so by advising the person presenting the Check Cash Advance or Balance Transfer that credit has been refused, that there are insufficient funds to pay the Check Cash Advance or Balance Transfer, or in any other manner.

If we have previously permitted you to exceed your credit limit, it does not mean that we will permit you to exceed your credit limit again. If we decide to permit you to exceed your credit limit, which could trigger a promotion turn-off event, we may also charge an Overlimit Fee and/or apply Default Pricing as provided in this Agreement.

## WE MAY AMEND THIS AGREEMENT

We may amend this Agreement at any time. We may amend it by adding, deleting, or changing provisions of this Agreement. We may increase or decrease any or all of your APRs. We may increase any or all of your APRs to rates which exceed the Default Rate. When we amend this Agreement we will comply with the applicable notice

13

EXHIBIT E - Page 22 of 34

requirements of federal and Delaware law that are in effect at that time. The amended Agreement (including any higher rate or other higher charges or fees) will apply to the total outstanding balance, including the balance existing before the amendment became effective. If an amendment gives you the opportunity to reject the change, and if you reject the change in the manner provided in such amendment, we may terminate your right to receive credit and may ask you to return all credit devices as a condition of your rejection. We may replace your card with another card at any time.

## WE MAY SUSPEND OR CLOSE YOUR ACCOUNT
We may suspend or close your account or otherwise terminate your right to use your account. We may do this at any time and for any reason. Your obligations under this Agreement continue even after we have done this. You must destroy all cards, access checks or other credit devices on the account when we request.

## YOU MAY CLOSE YOUR ACCOUNT
You may close your account by notifying us in writing or by telephone, and destroying all cards, access checks or other credit devices on the account. Your obligations under this Agreement continue even after you have done this.

## TRANSACTIONS AFTER YOUR ACCOUNT IS CLOSED
When your account is closed, you must contact anyone authorized to charge transactions to your account, such as internet service providers, health clubs or insurance companies. These transactions may continue to be charged to your account until you change the billing. Also, if we believe you have authorized a transaction or are attempting to use your account after you have requested to close the account, we may allow the transaction to be charged to your account.

## REFUSAL TO HONOR YOUR ACCOUNT
We are not liable for any refusal to honor your account. This can include a refusal to honor your card or account number or any check written on your account. We are not liable for any retention of your card by us, any other financial institution, or any provider of goods or services.

## HOW YOU MAY STOP PAYMENT ON AN ACCESS CHECK
You may request a stop payment on an access check by providing us with the access check number, dollar amount, and payee exactly as they appear on the access check. Oral and written stop payment requests on an access check are effective for six months from the day that we place the stop payment.

## YOU MAY NOT POSTDATE AN ACCESS CHECK
You may not issue a postdated access check on your account. If you do postdate an access check, we may elect to honor it upon presentment or return it unpaid to the person that presented it to us for payment, without in either case waiting for the date shown on the access check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## TRANSACTIONS MADE IN FOREIGN CURRENCIES
If you make a transaction in a foreign currency, the transaction will be converted by Visa International or MasterCard International, depending on which card you use, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.

## BENEFITS
We may offer you certain benefits and services with your account. Any benefits or services are not a part of this Agreement, but are subject to the terms and restrictions outlined in the benefits brochure and other official documents provided to you from time to time by or on behalf of Bank of America. While any benefits or services described in the previous sentence are not a part of this Agreement, any claim or dispute related to any such benefit or service shall be subject to the *Arbitration and Litigation* section of this Agreement. We may adjust, add, or delete benefits and services at any time and without notice to you.

## WE MAY SELL YOUR ACCOUNT
We may at any time, and without notice to you, sell, assign or transfer your account, any sums due on your account, this Agreement, or our rights or obligations under your account or this Agreement to any person or entity. The person or entity to whom we make any such sale, assignment or transfer shall be entitled to all of our rights and/or obligations under this Agreement, to the extent sold, assigned or transferred.

## YOU MUST NOTIFY US WHEN YOU CHANGE YOUR ADDRESS
We strive to keep accurate records for your benefit and ours. The post office and others may notify us of a change to your address. When you change your address, you must notify us promptly of your new address.

EXHIBIT E - Page 23 of 34

**WHAT LAW APPLIES**
This Agreement is made in Delaware and we extend credit to you from Delaware. This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws.

**THE PROVISIONS OF THIS AGREEMENT ARE SEVERABLE**
If any provision of this Agreement is found to be invalid, the remaining provisions will continue to be effective.

**OUR RIGHTS CONTINUE**
Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

**UNAUTHORIZED USE OF YOUR CARD**
Please notify us immediately of the loss, theft, or possible unauthorized use of your account at 1-800-789-6701.

**ARBITRATION AND LITIGATION**
This Arbitration and Litigation provision applies to you unless you were given the opportunity to reject the Arbitration and Litigation provisions and you did so reject them in the manner and timeframe required. If you did reject effectively such a provision, you agreed that any litigation brought by you against us regarding this account or this Agreement shall be brought in a court located in the State of Delaware.

Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief), shall, upon election by either you or us, be resolved by binding arbitration. The arbitrator shall resolve any Claims, including the applicability of this Arbitration and Litigation Section or the validity of the entire Agreement or any prior Agreement, except for any Claim challenging the validity of the Class Action Waiver, which shall be decided by a court.

In addition, we will not choose to arbitrate an individual Claim that you bring against us in small claims court or an equivalent court, if any. But if that Claim is transferred, removed or appealed to a different court, we then have the right to choose arbitration.

Arbitration shall take place before a single arbitrator and on an individual basis without resort to any form of class action. Arbitration may be selected at any time unless a judgment has been rendered or the other party would suffer substantial prejudice by the delay in demanding arbitration.

The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, administrative and hearing fees which you are required to pay to pursue a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. If you file a claim against us, in no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the Claim had been resolved in a state court with jurisdiction.

Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury or may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim submitted to arbitration (Class Action Waiver). The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from this agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver.

15

**EXHIBIT E - Page 24 of 34**

The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.

This Arbitration and Litigation Section applies to all Claims now in existence or that may arise in the future. This Arbitration and Litigation Section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this Arbitration and Litigation Section, "we" and "us" means FIA Card Services, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of their officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.

YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT, OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS. EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION IF YOU OR WE ELECT TO ARBITRATE.

YOUR BILLING RIGHTS
Keep This Notice for Future Use:This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

Notify Us in Case of Errors or Questions About Your Bill: If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet (or use a copy of the form provided on your bill) at Bank of America Corporation, P.O. Box 15028, Wilmington, DE 19850. Write to us as soon as possible. Do not send the notice on or with your payment. We must hear from you no later than 60 days after we sent you the first bill on which the transaction or error appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information: (1) your name and account number; (2) the dollar amount of the suspected error; (3) the posting date of the transaction in question; and (4) a description of the error and an explanation, if you can, of why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

Your Rights and Our Responsibilities After We Receive Your Written Notice: We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we did not make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within twenty-five (25) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we report you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

Special Rule for Credit Card Purchases: If you have a problem with the quality of the property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

10

EXHIBIT E - Page 25 of 34

(1) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(2) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

©2007 Bank of America Corporation. All rights reserved.

1400100002073GC1D23M320050G3380





## EXHIBIT C

### BILL OF SALE AND ASSIGNMENT OF LOANS

**THIS BILL OF SALE AND ASSIGNMENT OF LOANS** is made and entered into between CACH, LLC ("Purchaser") and FIA CARD SERVICES, N.A. ("Seller"), pursuant to the Loan Sale Agreement dated March 18, 2013 (the "Agreement") entered into between Purchaser and Seller. Capitalized terms not defined herein, shall have the same meaning as defined in the Agreement.

(a)    In consideration of the payments made pursuant to the Agreement and such other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller does hereby sell, transfer, convey, assign and deliver to Purchaser all of Seller's right, title and interest in and to each and all of the Loans, as included on the electronic file referenced in Schedule 1 of the Loan Agreement as BAC Fresh SqTwo Sale File 0313 Final.xlsx, without recourse and without representation or warranty of any type, kind, character or nature, express or implied, except as specifically provided in the Agreement, and subject to Buyer's and Seller's repurchase rights as set forth in the Agreement.

(b)    Purchaser hereby accepts such sale, transfer, conveyance, assignment, and delivery of the Loans, including without limitation the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans.

(c)    Nothing in this Bill of Sale and Assignment of Loans shall be deemed to modify, limit or amend any of the rights or obligations of Purchaser or Seller under the Agreement. This Bill of Sale and Assignment of Loans shall inure to the benefit of, and be binding upon, the respective, permitted successors and assigns of Seller and Purchaser and shall be governed by and construed and interpreted in accordance with the Agreement and the laws of the State of Delaware, without regard to such state's principles of conflicts of law.

(d)    This Bill of Sale and Assignment of Loans may be executed by facsimile or electronic transmission in multiple counterparts, each of which shall be an original, but together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, each party, through its duly authorized officer, has caused this Bill of Sale and Assignment of Loans to be executed in their name this 28ᵗʰ day of March, 2013.

SELLER/ASSIGNOR:                          BUYER/ASSIGNEE:

FIA CARD SERVICES, N.A.                    CACH, LLC

By: _____               By: _____
Name: Debra L. Pellitclaro                Name: _____
Title: Vice President                     Title: _____

EXHIBIT

B

Fax 302.458.0433

Bank of America, Asset Sales
Deerfield III, 255 Paper Mill Road, Newark, DE 19711

Recycled Paper

Fresh 3/10/13.



| Cut Off Date | Charge Off Account Nu | Charge Off Date | Original Account Numb | Primary Name - Title Fi | Secondary Name - Title | Secondary Name - Sec |
|---|---|---|---|---|---|---|
| 03/25/2013 | ░░░░░░░░░8466 | 2/28/2013 | ░░░░░░░░░248 | CASSANDRA HOPKINS | | |

EXHIBIT E - Page 28 of 34



| Address Line 1 | Address Line 2 | City | State or Country Code | Zip or Postal Code | Social Security Number | Phone 1 |
|---|---|---|---|---|---|---|
| ████ | | ACWORTH | GA | 30101 | xxxxx4099 | ████ |

EXHIBIT E - Page 29 of 34



| Phone 2 | Current (Sale) Balance | Charge Off Balance | Last Pay Amount | Last Pay Date | Open Date | Interest Rate | First Delq Date |
|---|---|---|---|---|---|---|---|
| | $5,718.81 | 5718.81 | 120 | 7/16/2012 | 5/19/2008 | 13.24 | 9/19/2012 |

EXHIBIT E - Page 30 of 34

| Birth Date | Affinity | Conversion Account Nt | Fee Portion of C/O Bal | Interest Portion of C/O | Legacy | B_ID | R_RCVR |
|---|---|---|---|---|---|---|---|
| /1963 | BANK OF AMERICA | | 245 | 472.5 | BAC | | |

EXHIBIT E - Page 31 of 34

EVNT_N          Account Number

EXHIBIT E - Page 32 of 34

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

CACH, LLC,
      Plaintiff,

vs.

CASSANDRA HOPKINS
    Defendant.

CIVIL ACTION FILE
NO. 17EV004140

## ORDER AND JUDGMENT

The Plaintiff's Motion for Summary Judgment having been read and considered, and the Court having determined that there is no genuine issue as to any material fact and that the Plaintiff is entitled to Judgment as a matter of law pursuant to O.C.G.A. § 9-11-56, it is hereby:

ORDERED AND ADJUDICATED that the Plaintiff's Motion be GRANTED and that the Plaintiff shall have Judgment against the Defendant in the principal sum of $5,628.81, court costs in the amount of $317.41, and any post judgment interest as provided by O.C.G.A. §7-4-12(a).

This _____ day of _____, 2021.

_____
JUDGE, STATE COURT OF FULTON COUNTY

Presented by:
MANDARICH LAW GROUP, LLP
Attorneys for Plaintiff

BY: _____
NICOLE SIMPSON
State Bar No. 925927
125 Townpark, Suite 300
Kennesaw, Georgia 30144
(678) 326-7023

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

CACH, LLC,
          Plaintiff,

vs.

CASSANDRA HOPKINS
         Defendant.

CIVIL ACTION FILE
NO. 17EV004140

## RULE 5.2 CERTIFICATE OF SERVICE

COMES NOW, Counsel for Plaintiff, in the above-styled action and, pursuant to State Court Uniform Rule 5.2, notifies the Court that Plaintiff served Defendant with a copy of *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S REQUEST TO TAKE JUDICIAL NOTICE* by depositing same in the United States Mail with sufficient postage to ensure delivery addressed as follows:

**AL SUTO
550 FREDERICA RD
UNIT 2207
SAINT SIMONS ISLAND GA 3152-2**

This 13ᵗʰ day of APRIL, 2021.

                        MANDARICH LAW GROUP, LLP

                        _____

125 Townpark Drive             NICOLE SIMPSON
Suite 300                    State Bar No. 925927
Kennesaw, Georgia 30144     Nicoles@mandarichlaw.com
(678) 346-7023             Attorney for Plaintiff

# EXHIBIT F

IN THE STATE COURT OF FULTON COUNTY

STATE OF GEORGIA

**State Court of Fulton County**
\*\*\*EFILED\*\*\*
**File & ServeXpress**
Transaction ID: 66608887
Case Number: 17EV004140
Date: May 18 2021 01:50AM
Christopher G. Scott, Chief Clerk
Civil Division

CACH, LLC,
    Plaintiff,

v.

CASSANDRA HOPKINS,
    Defendant,

)
)
)
)
)
)
)

CIVIL ACTION FILE

NO. 17 EV 004140

### ORDER

The above styled action came regularly before the Court on Plaintiff's *Motion For Summary Judgment*. Only Plaintiff was represented by counsel. After considering the entire record, the Court hereby issues the following Order:

In this action upon an allegedly unpaid account, Plaintiff moves presently for summary judgment relying on an affidavit establishing Plaintiff's standing and unanswered requests for admission to establish liability and damages. There has been no response to the requests for admission and no response to the present motion.

As the record is sufficient to establish Plaintiff's entitlement, summary judgment is hereby GRANTED in favor of Plaintiff with judgment entered in the liquidated amount of $5,718.81 in principal with costs of court and post-judgment interest to accrue as provided by law.

**IT IS SO ORDERED** this the 17th day of MAY 2021

                s/John Mather
                Judge John R. Mather
                State Court of Fulton County

# EXHIBIT G

**MAGISTRATE**   **COURT OF GWINNETT COUNTY**
**STATE OF GEORIGA**
PO Box 568 Lawrenceville, GA 30046-568
(770) 822-8100   www.gwinnettcourts.com

| Garnishment Case No. |
| --- |
| 22-GM-18007 |

| | |
| --- | --- |
| Plaintiff: | CACH, LLC |
| Address: | 175 Townpark Dr., Suite 100<br>Kennesaw, GA 30144 |
| Phone # | 877.285.4918 |
| Email address: | georgia@mandarichlaw.com |
| Plaintiff's Attorney & Bar#: | |
| **VS** | |
| Defendant: | Cassandra Hopkins |
| Address: | ▮▮▮▮▮▮▮▮▮▮<br>Atlanta GA 30326-6811 |
| Garnishee: | HUNTINGTON EQUIPMENT FINANCE, INC.<br>RA: C T CORPORATION SYSTEM |
| Address: | 289 S CULVER ST<br>LAWRENCEVILLE GA 30046-4805 |

**AFFIDAVIT OF CONTINUING GARNISHMENT**

Do not use this form for a continuing garnishment for support or alimony.

See O.C.G.A. § 18-4-73

E-FILED IN OFFICE JC
CLERK OF MAGISTRATE COURT
GWINNETT COUNTY, GEORGIA
22-GM-18007
9/22/2022 9:47 AM
TIANA P. GARNER, CLERK

## AFFIDAVIT OF CONTINUING GARNISHMENT

Personally appeared ___ALEXANDER SILPA___ who on oath says:
(Print Name)

1.    I am the ☐(Plaintiff) ☒(Attorney at Law for Plaintiff) ☐(Agent for Plaintiff). **[Check One]**

2.    The Plaintiff obtained a Judgment against the Defendant in Case Number ___17EV004140___ ,in the
___State___ Court of ___FULTON___ County, ___Georgia___ **[State]**
and no agreement requires forbearance from the garnishment which is applied for currently.

3.    $ 4,061.89 ___ is the balance due, which consists of the sum of:
$ 3,416.61 ___ Principal;
$ 283.31 ___ Post Judgment Interest; and
$ 361.97 ___ Other (e.g., prejudgment interest, attorney's fees, costs [exclusive of the costs of this action]).

4.    Upon the Affiant's personal knowledge or belief, the sum stated herein is unpaid.

5.    The Affiant believes that the Garnishee is an employer of or under periodic obligations for payment of funds to the Defendant.

This _22nd_ day of _September_, 20_22_

_____
Affiant (Signature)

___ALEXANDER SILPA___
Affiant (Printed Name)

Sworn to and subscribed before me this _22nd_ day
of _September_, 20_22_

_____
Notary Public or Deputy Clerk of Court

*[Notary seal: TRACY MOUCHAKKAA, NOTARY PUBLIC, COBB COUNTY, GEORGIA]*

EXHIBIT G, Page 1 of 6

**MAGISTRATE : COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**
**PO Box 568 Lawrenceville, GA 30046-568**
**(770) 822-8100   www.gwinnettcourts.com**

| | |
|---|---|
| **Garnishment Case No.** | **22-GM-18007** |

**Summons of Continuing Garnishment**

**See O.C.G.A. § 18-4-78**

| Plaintiff: | CACH, LLC |
|---|---|
| Address: | 175 Townpark Dr., Suite 100 Kennesaw, GA 30144 |
| Phone # | 877.285.4918 |
| Email address: | georgia@mandarichlaw.com |
| Plaintiff's Attorney & Bar#: | |
| **VS** | |
| Defendant: | Cassandra Hopkins |
| Address: | ████████████ Atlanta GA 30326-6811 |
| Garnishee: | HUNTINGTON EQUIPMENT FINANCE, INC. RA: C T CORPORATION SYSTEM |
| Address: | 289 S CULVER ST LAWRENCEVILLE GA 30046-4805 |

**\*DO NOT USE THIS FORM CONTINUING GARNISHMENT FOR SUPPORT OR ALIMONY (SEE O.C.G.A §§ 18-4-73 and 18-4-80)**

E-FILED IN OFFICE JC
CLERK OF MAGISTRATE COURT
GWINNETT COUNTY GEORGIA
22-GM-18007
9/22/2022 9:47 AM
TIANA P. GARNER, CLERK

**SUMMONS OF CONTINUING GARNISHMENT**

**TO THE ABOVE-NAMED GARNISHEE:**

| Total amount claimed due by the Plaintiff | $ 4,061.89 |
|---|---|
| Plus court costs due this summons | $ 56.00 |
| Total garnishment claim | $ 4,117.89 |

**GARNISHMENT CASE NO.**
**To be included on answer(s) & payment(s):**  22-GM-18007

**ORIGINAL COURT OF JUDGMENT:**  State Court of Fulton County
**ORIGINAL JUDGMENT CASE NO. :**  17EV004140

**YOU ARE HEREBY COMMANDED** to immediately hold all money, including wages, and other property, except what is known to be exempt, belonging to the Defendant or obligations owed to the Defendant named above beginning on the day of service of this summons and including the next 1,095 days. You are **FURTHER COMMANDED** to file your answer, in writing, no later than 45 days from the date you were served with this summons, with the Clerk of this Court and serve a copy of your answer upon the Plaintiff or Plaintiff's Attorney named above and the Defendant named above, or the Defendant's Attorney, if known, at the time of making such answer. Your answer shall state what money, including wages, or other property, except what is known to be exempt, belonging to the Defendant or obligations owed to the Defendant you hold or owe beginning on the day of service of this summons and between the time of such service and the time of making your first answer. Thereafter, you are required to file further answers no later than 45 days after your last answer. Every further answer shall state what money, including wages, and other property, except what is known to be exempt, belonging to the Defendant or obligations owed to the Defendant you hold or owe at and from the time of the last answer to the time of the current answer. You must file additional answers until the sooner of; the payment of the balance shown on the summons of garnishment, the expiration of 1,095 days, or the termination of any relationship between garnishee and defendant which includes periodic payment obligations from garnishee to defendant. Money, including wages, or other property admitted in an answer to be subject to continuing garnishment must be sent or delivered to the Court concurrently with each answer.

Should you fail to file a Garnishee Answer as required by this summons, a judgment by default will be rendered against you for the amount remaining due on the judgment as shown in the Plaintiff's Affidavit of Continuing Garnishment.

**WITNESS,** the Honorable Kristina Hammer Blum, Judge of said Court.

Tiana P. Garner, Clerk of Court

This ___ day of ___ 9/22/2022 ___, 20___.

Clerk or Deputy Clerk, Magistrate Court





State Court of Fulton County
***EFILED***
File & ServeXpress
Transaction ID: 66608887
Case Number: 17EV004140
Date: May 18 2021 01:50AM
Christopher G. Scott, Chief Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY

STATE OF GEORGIA

CACH, LLC,
    Plaintiff,

v.

CASSANDRA HOPKINS,
    Defendant,

)
)
)
)
)
)
)

CIVIL ACTION FILE

NO. 17 EV 004140

## ORDER

The above styled action came regularly before the Court on Plaintiff's *Motion For Summary Judgment.* Only Plaintiff was represented by counsel. After considering the entire record, the Court hereby issues the following Order:

In this action upon an allegedly unpaid account, Plaintiff moves presently for summary judgment relying on an affidavit establishing Plaintiff's standing and unanswered requests for admission to establish liability and damages. There has been no response to the requests for admission and no response to the present motion.

As the record is sufficient to establish Plaintiff's entitlement, summary judgment is hereby GRANTED in favor of Plaintiff with judgment entered in the liquidated amount of $5,718.81 in principal with costs of court and post-judgment interest to accrue as provided by law.

**IT IS SO ORDERED** this the 17th day of MAY 2021

              s/John Mather
              Judge John R. Mather
              State Court of Fulton County

MAY 2 4 2021

EXHIBIT G - Page 3 of 6

**MAGISTRATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**
**PO Box 568 Lawrenceville, GA 30046-568**
**(770) 822-8100   www.gwinnettcourts.com**

| | | Garnishment Case No. |
|---|---|---|
| | | **22-GM-18007** |

E-FILED IN OFFICE JC
CLERK OF MAGISTRATE COURT
GWINNETT COUNTY GEORGIA
22-GM-18007
9/22/2022 9:47 AM
TIANA P. GARNER, CLERK

| Plaintiff: | CACH, LLC |
|---|---|
| Address: | 175 Townpark Dr., Suite 100 Kennesaw, GA 30144 |
| Phone #: | 877.285.4918 |
| Email address: | georgia@mandarichlaw.com |
| Plaintiff's Attorney & Bar#: | |
| **VS** | |
| Defendant: | Cassandra Hopkins |
| Address: | ███████████ Atlanta GA 30326-6811 |
| Garnishee: | HUNTINGTON EQUIPMENT FINANCE, INC. RA: C T CORPORATION SYSTEM |
| Address: | 289 S CULVER ST LAWRENCEVILLE GA 30046-4805 |

### NOTICE TO DEFENDANT OF RIGHT AGAINST GARNISHMENT OF MONEY, INCLUDING WAGES, AND OTHER PROPERTY

You received this notice because money, including wages, and other property belonging to you have been garnished to pay a court judgment against you.  HOWEVER, YOU MAY BE ABLE TO KEEP YOUR MONEY, INCLUDING WAGES, OR OTHER PROPERTY. **READ THIS NOTICE CAREFULLY.**

State and federal law protects some money, including wages, from garnishment even if it is in a bank.  Some common exemptions are benefits from social security, supplemental security income, unemployment, workers' compensation, the Veterans' Administration, state pension, retirement funds, and disability income.  This list of exemptions does not include all possible exemptions.  A more detailed list of exemptions is available at the Clerk of Court's office located at Magistrate Court of Gwinnett County, 75 Langley Drive, Lawrenceville, Georgia  30046, and on the website for the Attorney General (http://law.ga.gov/garnishment-exemption).

Garnishment of your earnings from your employment is limited to the lesser of 25 percent of your disposable earnings for a week or the amount by which your disposable earnings for a week exceed $217.50.  More than 25 percent of your disposable earnings may be taken from your earnings for the payment of child support or alimony or if a Chapter 13 bankruptcy allows a higher amount.

### TO PROTECT YOUR MONEY, INCLUDING WAGES, AND OTHER PROPERTY FROM BEING GARNISHED, YOU MUST:

1. Complete the Defendant's Claim Form as set forth below; and
2. File this completed claim form with the Clerk of Court's office located at the Magistrate Court of Gwinnett County, 75 Langley Drive, Lawrenceville, Georgia  30046 or mail to PO BOX 568 Lawrenceville GA 30046.
FILE YOUR COMPLETED CLAIM FORM AS SOON AS POSSIBLE.  You may lose your right to claim an exemption if you do not file your claim form within 20 days after the Garnishee's Answer is filed or if you do not mail or deliver a copy of your completed claim form to the Plaintiff and the Garnishee at the addresses listed on this notice.

The Court will schedule a hearing within ten days from when it receives your claim form.  The Court will mail you the time and date of the hearing at the address that you provide on your claim form.  You may go to the hearing with or without an attorney.  You will need to give the Court documents or other proof that your money is exempt.

The Clerk of Court cannot give you legal advice.  IF YOU NEED LEGAL ASSISTANCE, YOU SHOULD SEE AN ATTORNEY.  If you cannot afford a private attorney, legal services may be available.



**MAGISTRATE  COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**
PO Box 568 Lawrenceville, GA 30046-568
(770) 822-8100   www.gwinnettcourts.com

| Garnishment Case No. |
| --- |
| 22-GM-18007 |

### DEFENDANT'S CLAIM FORM

**I CLAIM EXEMPTION from garnishment. Some of my money or property held by the garnishee is exempt because it is: (check all that apply)**

☐ 1. Social Security benefits.

☐ 2. Supplemental security income benefits.

☐ 3. Unemployment benefits.

☐ 4. Workers' compensation.

☐ 5. Veterans' benefits.

☐ 6. State pension benefits.

☐ 7. Disability income benefits.

☐ 8. Money that belongs to a joint account holder.

☐ 9. Child support or alimony.

☐ 10. Exempt wages, retirement, or pension benefits.

☐ 11. Exemptions for taxes due on income or earnings not subject to employer withholding.

☐ 12. Other exemptions as provided by law.

 Explain: _____

_____

_____

I further state: (check all that apply)

☐ 1. The Plaintiff does not have a judgment against me.

☐ 2. The amount shown due on the Plaintiff's Affidavit of Garnishment is incorrect.

☐ 3. The Plaintiff's Affidavit of Garnishment is untrue or legally insufficient.

Send the notice of the hearing on my claim to me at:
Address: _____
Phone Number: _____
Email Address: _____

The statements made in this claim form are true to the best of my knowledge and belief.

_____     _____, 20____
Defendant's signature                                      Date

_____
Print name of Defendant

### CERTIFICATE OF SERVICE

This is to certify that I have this day served the **Plaintiff or Plaintiff's Attorney** <u>and</u> the **Garnishee** in the foregoing matter with a copy of this pleading by depositing it in the United States Mail in a properly addressed envelope with adequate postage thereon.

This _____ day of _____, 20___.     _____
                                                                              Defendant or Defendant's Attorney & Bar #

**MAGISTRATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**
**PO Box 568 Lawrenceville, GA 30046-568**
**(770) 822-8100   www.gwinnettcourts.com**

| | |
|---|---|
| **Garnishment Case No.** | 22-GM-18007 |

| | |
|---|---|
| Plaintiff: | CACH, LLC |
| Address: | 175 Townpark Dr., Suite 100 Kennesaw, GA 30144 |
| Phone # | 877.285.4918 |
| Email address: | georgia@mandarichlaw.com |
| Plaintiff's Attorney & Bar#: | |
| **VS** | |
| Defendant: | Cassandra Hopkins |
| Garnishee: | HUNTINGTON EQUIPMENT FINANCE, INC. |

**GARNISHEE ANSWER TO CONTINUING GARNISHMENT**
**O.C.G.A §18-4-86**

Do Not Include SSN on Answer or Payment.

Include garnishment case number on answer and payment.

Make check payable to the Magistrate Court and mail to the above address.

## Garnishee Answer to Continuing Garnishment

1. From the time of service of the Summons of Continuing Garnishment, if this is the first Garnishee Answer to such summons, otherwise from the time of the last Garnishee Answer to the Summons of Continuing Garnishment until the time of this Garnishee Answer, the Garnishee had in the Garnishee's possession the following described property of the Defendant:

2. From the time of service of the Summons of Continuing Garnishment, if this is the first Garnishee Answer to such summons, otherwise from the time of the last Garnishee Answer to the Summons of Continuing Garnishment until the time of this Garnishee Answer, all obligations accruing from the Garnishee to the Defendant are in the amount of:   $_____

3.   $_____ of the amount named in paragraph 2 were wages earned at the rate of  $_____ per _____ for the period beginning _____ (Date) through the time of making this Garnishee Answer. The amount of wages which is subject to this garnishment is computed as follows:

    $_____ Gross earnings
    $_____ Total social security and withholding tax and other mandatory deductions required by law
    $_____ Total disposable earnings
    $_____ Amount of wages subject to garnishment

4.   $_____ is the amount herewith paid into court

5.   ☐ Check this box if the Defendant is not presently employed by or owed periodic payments by the Garnishee.

6.   ☐ Check this box if the Defendant was employed by or owed periodic payments by the Garnishee on or after service of Summons of Continuing Garnishment but was terminated as of _____ (date)

7.   ☐ Check this box if this is the last Garnishee Answer this Garnishee is required to file to the presently pending Summons of Garnishment in the above-styled case.

8. The Garnishee further states: _____

This _____ day of _____, 20___.

_____
Garnishee, Garnishee's Attorney, or Officer or Employee of an entity Garnishee

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the Plaintiff or the Plaintiff's Attorney and the Defendant, or Defendant's Attorney, in the foregoing matter with a copy of this pleading by depositing it in the United States Mail in a properly addressed envelope with adequate postage thereon.

This _____ day of _____, 20___.

_____
Garnishee, Garnishee's Attorney, or Officer or Employee of an entity Garnishee

EXHIBIT G - Page 6 of 6



**SERVING WITH INTEGRITY**

# ARAPAHOE ★ SHERIFF
*SINCE 1858*

## Civil Unit - Return of Service

E-FILED IN OFFICE - MB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

23-C-01155-S1

4/3/2023 1:57 PM
TIANA P. GARNER, CLERK

13101 E. Broncos Parkway | Centennial, Colorado 80112

ACCIV2301936
Docket Number: 23-C-01155-S1

IN THE COUNTY COURT OF THE STATE OF GEORGIA

IN AND FOR THE COUNTY OF GWINNETT

| | |
|---|---|
| PLAINTIFF ) | CASSANDRA HOPKINS |
| ) | |
| VS ) | |
| ) | |
| DEFENDANT ) | |

CIVIL ACTION NO.:  23-C-01155-S1

RETURN OF SERVICE ON:  CACH LLC

| | |
|---|---|
| STATE OF COLORADO | ) |
| | ) ss |
| COUNTY OF ARAPAHOE | ) |

   I **Steffa, Trent 02017** being first duly sworn on oath, depose and say; that I am a citizen of the United States and a resident of the State of Colorado, over the age of twenty-one years. That I am not a party to, nor interested in the above entitled action; that I am a Deputy Sheriff in the County of Arapahoe, State of Colorado; that I received the SUMMONS on 03/15/2023, and personally served the same on the **16** day of **March 2023**, at **10:53 AM** by handing to and leaving with **COLE STENDER FOR CORPORATION SERVICE COMPANY**, CLERK, at  1900 W LITTLETON BLVD, LITTLETON, ARAPAHOE COUNTY, COLORADO 80120, a true copy thereof, together with copy of: GENERAL CIVIL AND DOMESTIC RELATIONS CASE FILING INFORMATION FORM, COMPLAINT FOR DAMAGES, EXHIBITS A-G attached thereto.

Dated: March 17, 2023

Comments: REGISTERED AGENT FOR CACH LLC

TYLER S. BROWN, SHERIFF
ARAPAHOE COUNTY, COLORADO

STEFFA, TRENT 02017 - DEPUTY SHERIFF

Subscribed and sworn before me this

_28_ day of March 2023

Notary Public for the State of Colorado

ILIANA CARRASQUILLO CRUZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 200224005404
MY COMMISSION EXPIRES FEBRUARY 8, 2026

SHERIFF'S ENTRY OF SERVICE

Civil Action No. 23-C-01155-S1

| | |
|---|---|
| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☒ | Probate Court ☐ |
| Juvenile Court ☐ | |

Date Filed 2/21/23

Georgia, GWINNETT                COUNTY

Cassandra Hopkins

Attorney's Address

Wellborn, Wallace & Mullman, LLC

1218 Menlo Dr. NW, Suite E

Atlanta, Georgia 30318

Name and Address of Party to Served

Mandarich Law Group

c/o National Registered Agents, Inc.

289 S. Culver St., Lawrenceville, GA 30046

_____ Plaintiff

VS.

Mandarich Law Group, LLP

Cach , LLC

_____ Defendant

_____ Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy
of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a
copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION**
Served the defendant *Mandarich Law Group* a corporation
by leaving a copy of the within action and summons with *Jane Richardson*
in charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice
to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This 10 day of March, 2023.

_____
DEPUTY

Sgt. Collin, SO 500

**CLERK'S COPY**

# Gwinnett County Sheriff's Office

## Cover Sheet



**Sheriff #:**  23008256

**Person Served:**  MANDARICH LAW GROUP LLP
289 SOUTH CULVER STREET
C/O NATIONAL REGISTERED AGENTS INC
LAWRENCEVILLE GA 30046
PHONE:

## Process Information:

Date Received:  03/09/2023

Assigned Zone:  289 S. Culver                Court Case #:  23-C-01155-S1

Expiration Date:                             Hearing Date:

Paper Types:  COMPLAINT FOR DAMAGES

Notes/Alerts:

## Notes:

_____

_____

_____

_____

_____

_____

_____