## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SHARIS McCRARY and** ) | |
| **DARNETTA TYUS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action File No: _____** |
| **v.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CITY OF COLLEGE PARK,** ) | |
| **GEORGIA,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiffs **Sharis McCrary** ("McCrary" or "Plaintiff McCrary") and **Darnetta Tyus** ("Tyus" or "Plaintiff Tyus") (collectively referred to as "Plaintiffs") bring this civil employment action for relief and damages against Defendant **City of College Park, Georgia** ("College Park" or "Defendant") based on the following factual allegations and causes of action.

## NATURE OF THE ACTION

1.    This action to correct unlawful employment practices by a municipality arises under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C.A. § 2000e *et seq*., and the Equal Protection Clause of the United States Constitution, pursuant to 42 U.S.C.A. § 1983.  Plaintiff McCrary alleges that her gender was a motivating factor in College Park's failure to appoint her to the position of Chief of Police in November 2022, while Plaintiff Tyus similarly alleges that the termination of her contract as City Manager in June 2022 was motivated by her gender. McCrary brings an additional claim of retaliation under Title VII. Plaintiffs seek economic damages of back pay, front pay, and lost benefits.  Additionally, Plaintiffs seek compensatory damages for emotional distress and mental anguish, as well as their attorneys' fees and costs of litigation. Plaintiffs also petition the court for injunctive and declaratory relief as appropriate.

## THE PARTIES

2.     Plaintiff McCrary, an African-American female, is a resident of the state of Georgia, and during the time of the relevant events alleged in this complaint, she was employed by the Police Department of College Park as interim Chief of Police.

3.     Plaintiff Tyus, an African-American female, is a resident of the state of Georgia, and during the time of the relevant events alleged in this complaint, she was employed as City Manager of College Park.

2

4.      College Park is a municipal entity created by the laws of the state of Georgia, and it is an entity subject to suit Under Title VII and § 1983.

## PERSONAL JURISDICTION

5.      College Park may be served with process at its City Hall address at 3667 Main St., College Park, Georgia 30337.

## SUBJECT-MATTER JURISDICTION AND VENUE

6.      Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§1331 and 1343.

7.      Venue is proper in this district and division under 28 U.S.C.A. §1391(b)(1)-(2), as Defendant resides in and conducts business in this district and division and the acts or omissions giving rise to the claim occurred in the same venue.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      McCrary filed a charge of discrimination against College Park with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 415-2023-03403, on November 22, 2022.  A copy is attached as Exhibit A.

9. Tyus filed a charge of discrimination against College Park with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 415-2022-08392, on August 8, 2022. A copy is attached as Exhibit B.

10. McCrary subsequently received a right-to-sue letter from the EEOC on March 2, 2023. A copy is attached as Exhibit C.

11. Tyus subsequently received a right-to-sue letter from the EEOC on March 2, 2023. A copy is attached as Exhibit D.

12. McCrary and Tyus timely file this action within 90 days of receiving their respective right-to-sue letters, and all administrative remedies have been exhausted prior to the filing of this civil action.

## FACTUAL ALLEGATIONS

### College Park's governing structure

13. College Park is a municipality of approximately 14,000 located near the Hartsfield-Jackson Atlanta International Airport in Fulton County, Georgia. The city is over 80% African-American.

14. College Park is governed by a city charter that establishes a four member city council elected by geographic districts. The city's Mayor is a part-time position elected city-wide.

15.     Under the terms of its charter, the City Council is the sole policy-making entity for College Park. The City Manager possesses the final decision-making authority over the appointment or termination of all municipal department heads, subject to ratification by the Council.

16.     At all times relevant to this Complaint, the four member City Council in College Park consists of two white men, Ambrose Clay and Ken Allen, and two black men, Joe Carn and Roderick Gay. Bianca Motley Broom was elected in 2019 as the first black person and the first woman to hold the position of Mayor in the history of College Park.

17.     The charter further establishes a City Manager, appointed and subject to termination by the Council, who is responsible for the daily operational functions of College Park, including oversight of each municipal department, and enterprise and liability risk management. The City Manager, who has no policymaking duties, is authorized to make appointments for department head positions, subject to ratification by the Council.

18.     The Chief of Police in College Park, under the terms of the charter, reports directly to the City Manager but exercises broad control of the daily management of the police department.

19.    The city has enacted a set of standard operating procedures to regulate the Chief's administration of personnel duties. Termination, discipline, and denial of promotions decisions are subject to a grievance review process run by the Department of Human Resources with input by the City Manager. But prior to the events alleged in this lawsuit, it has been the long-settled custom and practice in College Park that the Chief's personnel authority is to be exercised independent of direction or interference from the elected City Council.

### McCrary's appointment as interim-Chief of Police

20.    McCrary is a twenty year employee of the College Park police department, rising through the ranks from patrol officer to selection as Deputy Chief in 2018. McCrary, until late November 2022, was the highest ranked woman in the Department's history.

21.    Speculation emerged in 2019 and 2020 that McCrary was on a path to become College Park's first black female Police Chief. Several local advocates circulated a petition urging McCrary's appointment as Chief in the spring of 2020, when community concerns over diversity in the ranks of police leadership were rising in College Park and nationally.

22.     As sentiment for McCrary intensified, to McCrary's surprise, newly elected Mayor Broom asked her to make a public statement to certain community activists that she had no ambition to become Chief of Police.

23.     McCrary declined to make a statement renouncing interest in the Chief's position and made it clear to Broom that the job was an eventual ambition of hers and that she believed she was a viable candidate, to which Broom tersely responded "that is not going to happen." McCrary was taken aback by the remark, which she perceived was a commentary on the all male council's resistance to appointing a female, or black female, chief.

24.     In April 2021, Ferman Williford, who since 2018 had been interim Chief and then Chief, was suddenly ordered to resign by then interim-City Manager Mercedes Miller.

25.     For a period lasting over 20 years, upon the resignation or termination of a Chief, the Deputy Chief in College Park has been elevated to the role of interim Chief until an official search and hiring process could be conducted.

26.     Rather than promote McCrary, the first female second in command, to the interim position, College Park departed from its standard practice and reached outside the department to install a white male, Thomas Kuzniacki, as interim chief. Kuzniacki had served as assistant Chief prior to his retirement in 2011.

27.    McCrary was given no explanation for College Park's break from tradition, which immediately produced a backlash within the city's overwhelmingly black population. Various community organizations began to voice concern on social media and at neighborhood meetings about Kuzniacki's appointment. Multiple council members claimed at community gatherings that McCrary had been passed over because she "was not interested in becoming Chief", a statement they knew was false.

28.    In the late spring of 2021, McCrary sent a confidential letter to Mayor Broom and the four member council asking for an explanation of why she was not selected as interim Chief given College Park's long-standing pattern of elevating the Deputy Chief to fill a vacancy.

29.    McCrary received no response from the Council, but Mayor Broom approached her to discuss the email, and as in 2020 McCrary found the conversation with Broom disconcerting. The Mayor suggested that McCrary should be content with "sharing her vision" from the vantage point of the Deputy Chief's role and once again, Mayor Broom hinted that the all-male Council was hesitant to permit McCrary to ascend to the Chief's position, even on an interim basis.

30.    In September 2021, roughly six weeks in advance of the November City Council election, McCrary was finally appointed as interim Chief. In conjunction with her appointment, the city announced that it would be launching a "nationwide search" to fill the Chief's position.

**Tyus' tenure as City Manager**

31.    For the next six months, the search process for a Chief was put on hold as College Park shifted its focus to finding a new City Manager, a job that Mercedes Miller, an African-American woman, had been holding on an interim basis since the resignation of Terrance Moore, an African-American male, in early 2021.

32.    In February 2022, Darnetta Tyus, a black female with a record of success in senior municipal leadership roles in several cities including Petersburg, Virginia and the District of Columbia, was named City Manager. Tyus was given a three year contract.

33.    Tyus was immediately tasked by the Council with reviving the search for a Police Chief; within a month of her appointment, Tyus hired an Atlanta based black female executive search consultant, Dele Lowman-Smith, to lead the search process for a new Chief.

34.     Tyus, from the start of her appointment, encountered obstacles from the all-male Council. While the city charter provides for no operational input from the Council in the city's administrative functions, the council became increasingly aggressive about inserting themselves into daily municipal operations.

35.     For example, council members began to directly engage the various heads of the municipal departments, bypassing Tyus; and during briefing sessions with the Council, Tyus was even instructed not to speak when councilmen questioned the department heads, who were her subordinates.

36.     Tyus began to receive input from female staffers and department heads that the Council's interactions with her differed substantially from the deferential approach they had taken with the last non-interim City Manager Terrance Moore. To crystallize the unique pressures on Tyus, one council member bragged to her that "I get folks fired, you need to understand me."

### Rising discontent from female municipal employees

37.     At the exact time that Tyus faced increasing resistance, McCrary began to experience various forms of interference in her interim Chief's role. While other interim male chiefs had been accorded the same professional deference as non-interim chiefs, McCrary was openly diminished. Several councilmen pushed her to demote certain higher-ranking officers and to replace

them with council allies in the police department, a direct intrusion in personnel matters that had not occurred under McCrary's male predecessors.

38.     McCrary experienced other slights that undermined her professionally. Council members routinely referred to her as "Sharis" in the presence of city officials, a breach of the military style of deference afforded senior police personnel and a break from the rank-only manner in which the same councilmen had referred to male Chiefs.

39.     In one particularly humiliating episode, a council member brought a high-ranking officer to McCrary's office and asked him in her presence, "What kind of job do you think she is doing?" The same councilman then admonished McCrary in front of her subordinate, saying to her that "you need to step it up if you want to keep this job."

40.     At least one councilman bluntly remarked to McCrary that he was not inclined to support the appointment of a female Police Chief because "look at what happened the last time" a woman was placed in the role of running a public safety department, an apparent reference to the unsuccessful tenure of a female fire chief.

41.     In the spring of 2022, numerous female staffers in College Park's city hall observed the unprecedented disrespect leveled at both Tyus and McCrary and

confided to both of them that they believed the culture in City Hall was rife with belittling and demeaning behavior toward women who worked in city government.

42.     For example, one female department head was told by a councilman that she was "stupid." Another was told that she needed to lose weight and that she was "too big." Yet another was instructed by a councilman that "you need to do something with your hair."

43.     Mayor Broom herself was hardly immune from the sexist culture at City Hall. During a public council session, the audience was stunned when one councilman blurted out at Broom during an exchange with her, "Bianca, do you get off on interrupting me? If you don't stop…I'm going to take you downtown" (slang for sexual activity and physically beating someone).

**Tyus' termination and its aftermath**

44.     In the final week of May, 2022, Tyus notified the Council that she was about to review the search consultant's list of top ranked candidates for Police Chief and that by mid June she would present the Council a final list of four candidates for interviews and vetting.

45.     Within approximately a week, on June 6, Tyus was notified by Mayor Broom that during an executive session earlier that day, the Council had voted to

terminate Tyus' contract after approximately four months on the job. Tyus was provided no explanation.

46.    Tyus' tenure was punctuated by successes. She facilitated an 11.5 million dollar bond issue for an economic development project in a struggling neighborhood; successfully completed a budget process that raised the pay of municipal employees and police officers without raising taxes; and secured funding for much needed capital equipment.

47.    On the  early evening of June 6, Tyus was informed by the City Attorney that in keeping with College Park's protocol for higher ranking terminations, she would be presented with an option of resigning with a severance package before the council vote was announced. But within hours, social media and late evening newscasts reported that Tyus had been fired, a development that College Park's spokesperson confirmed, which effectively ended the resignation option.

48.    As the City Attorney had acknowledged, a public termination in lieu of resignation is yet another deviation from College Park's standard protocols, once again to the detriment of a female official.

49.    Within weeks of Tyus' termination, and subsequent EEOC charge, a councilmember confronted McCrary, telling her that, in his phrasing, Tyus was

trying to recruit plaintiffs for a "girl's lawsuit" and that Mayor Broom was instigating Tyus' efforts behind the scenes. The councilman directly warned McCrary to steer clear of the litigation if she had any hopes of being appointed Chief.

50.    Shortly after Tyus' firing, the city severed its relationship with the black female executive search consultant Tyus had retained. Responsibility for the search was placed in the hands of Jackson Myers, a white male, whom the Council named as Interim City Manager. Myers promptly discarded Lowman-Smith's work product and in effect restarted the search from scratch, this time hiring a white male Alpharetta, Georgia based consultant, Warren Hutmacher, to advise the search effort.

51.    Myers himself had faced allegations of discriminatory and harassing behavior by the former City Engineer for College Park, Loretta Washington, who filed a charge of sex discrimination with the EEOC in 2021 based in part on Myers' conduct.

### McCrary's opposition to discriminatory conduct

52.    McCrary, who reported to Myers in his interim role, immediately encountered difficulties in dealing with Myers that persisted over the next six months. Myers was often inaccessible to requests from McCrary for support from

the City Manager's office; he delayed or ignored leave requests, and he refused payments for leadership training invoices that had been routinely approved for her predecessors.

53.   In meetings with city personnel, Myers was openly dismissive of McCrary, incessantly interrupting presentations she conducted.

54.   In late summer 2022, McCrary lodged an internal complaint with the City Council and the Mayor regarding Myers' conduct toward her. She also on multiple occasions discussed Myers' behavior with several councilmen, making it clear that she believed Myers' disrespect was rooted in her gender. Their response was that she needed to "take it" if she wished to be selected as Chief.

55.   In the summer and fall of 2022, city officials in College Park were in turmoil over the aftermath of Tyus' EEOC charge and its overt reference to an ongoing hostile environment for other female employees. After McCrary's internal complaint, rumors swirled that she was contemplating legal action if she were not selected as Police Chief.

56.   In early fall of 2022, McCrary was approached by a white senior officer, Colonel David Block, who informed her that he had been authorized by the Council to offer McCrary a deal to obtain the Chief's appointment. Under its proposed terms, McCrary would agree to a power-sharing arrangement in which

McCrary would appoint Block Deputy Chief with the implicit understanding that he would be the department's primary contact with the Council, and would be the principal behind-the-scenes decisionmaker while McCrary served as the public face of the Department.

57.    Block also threatened McCrary that if she declined the deal, the Council would offer the same proposal to another black female contender. According to Block, in the council's view, the selection of a black female Chief would make it impossible for McCrary to pursue a viable legal claim.

58.    McCrary declined the deal floated by Block, which she viewed as a fundamental encroachment on the role of Police Chief, and which she strongly believed would never have been imposed on a male Chief.

**The selection of a Police Chief**

59.    In the fall of 2022, Myers formally resumed the now 14 months long selection process for Chief by appointing a search committee of three males and one female.

60.    On November 1, 2022, McCrary was formally interviewed by Myers' search committee.

61.    Approximately two weeks later, McCrary was told by a female city official that she had been offered a slot on the search committee by Myers but with

the caveat that she would commit that she would not support McCrary. This individual declined the appointment.

62.     On November 21, 2022, McCrary was informed by email that she had not been selected for the Chief's position. The next day, the deputy chief of South Fulton, Connie Rogers, a former lieutenant in College Park, was announced as the Chief of Police. McCrary also filed her EEOC charge on November 22.

63.     Rogers is an African-American female. Within days of the appointment, true to Block's threat, Rogers sought input from several high ranking officers about Block's potential elevation to the Deputy Chief's position.

64.     After media coverage of McCrary's EEOC charge in early December 2022 featured descriptions of the scheme of appointing a black female chief as a figurehead and installing Block as deputy, Rogers found it untenable to follow through with Block's appointment.

65.     But in the past five months, Chief Rogers has announced that she is conducting an ongoing assessment of the Police Department's leadership structure. While McCrary has returned to her prior role of Deputy Chief, she has been consistently excluded from sensitive decisions around departmental policy.

66.     At least one contact in another metropolitan Atlanta area police department has warned McCrary that based on information he has heard from

sources in College Park, her position in the police department is fragile and that it would be in her best interests to depart.

67.     In February 2023, Councilman Roderick Gay stated in an interview with the Atlanta Journal-Constitution that he has raised his own internal complaints about College Park's culture of marginalizing and mistreating female employees, and that as a result of his complaints, his colleagues on the Council rejected his appointment to the position of Mayor Pro Tem and refused to reappoint him to a position on the city's economic development authority. *See* "College Park Councilman Joins Complaints, Says Harassment, Retaliation Take Place at City", *Atlanta Journal Constitution*, February 23, 2023.

## CAUSES OF ACTION

## COUNT I

### Plaintiff Sharis McCrary

**(Sex and race discrimination in violation of the motivating factor provision of Title VII)**

68.     Plaintiff McCrary incorporates by reference the preceding paragraphs of this complaint as though set forth fully and separately herein.

69.     In November 2022, Defendant College Park failed to appoint Plaintiff McCrary to the position of Chief of Police, a job for which she was fully qualified, for reasons at least partly motivated by her sex, and by her status as a black female,

in violation of the motivating factor provision of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C.A. § 2000e-2(m).

70.    As a result of College Park's discriminatory conduct, Plaintiff McCrary has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II
**Plaintiff Sharis McCrary**
**(Retaliation in violation of Title VII)**

71.    Plaintiff McCrary  incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

72.    Plaintiff McCrary engaged in protected activity by opposing acts or practices made unlawful under Title VII, in that she made internal complaints of sex-based discriminatory conduct by the interim City Manager and rejected a power-sharing arrangement that she reasonably believed would have placed restrictions on the role of Police Chief that would have never been imposed on a male Chief.

73.    College Park retaliated against Plaintiff McCrary for engaging in protected activity by failing to appoint Plaintiff McCrary to the position of Police

Chief, a job for which she was fully qualified, in violation of 42 U.S.C.A. § 2000e-3(a).

74.    As a result of College Park's retaliatory conduct, Plaintiff has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT III

### Plaintiff Sharis McCrary

### (Sex discrimination in violation of the Equal Protection Clause of the U.S. Constitution)

75.    Plaintiff McCrary incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

76.    Plaintiff McCrary was at all times relevant to this complaint an employee of a municipality created by the municipal laws of the state of Georgia.

77.    In November 2022, while acting under color of state law, Defendant College Park failed to appoint Plaintiff McCrary to the position of Chief of Police, a job for which she was fully qualified, for reasons at least partly motivated by her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C.A. § 1983.

78.     College Park's unlawful discriminatory actions were executed by its legislative body, the City Council of College Park, which pursuant to its municipal charter, exercised final decision-making authority over the appointment of a Chief of Police.

79.     College Park's unlawful discriminatory actions intentionally deprived Plaintiff McCrary of a federally protected right, i.e, the right to be free from discrimination motivated by her sex.

80.     As a result of College Park's unlawful conduct, Plaintiff has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT IV
### Plaintiff Darnetta Tyus
### (Sex discrimination in violation of the motivating factor provision of Title VII)

81.     Plaintiff Tyus incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

82.     In June 2022, Defendant College Park terminated Plaintiff Tyus from her position as City Manager for reasons at least partly motivated by her sex, in

violation of the motivating factor provision of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C.A. § 2000e-2(m).

83.　　As a result of College Park's discriminatory conduct, Plaintiff Tyus has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## **COUNT V**

### **Plaintiff Darnetta Tyus**

### **(Sex discrimination in violation of the Equal Protection Clause of the U.S. Constitution)**

84.　　Plaintiff Tyus incorporates by reference all the preceding paragraphs of this complaint as though set forth fully and separately herein.

85.　　Plaintiff Tyus was at all times relevant to this complaint an employee of a municipality created by the municipal laws of the state of Georgia.

86.　　In June 2022, while acting under color of state law, Defendant College Park terminated Plaintiff Tyus from her position as City Manager, for reasons at least partly motivated by her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment to United States Constitution, pursuant to 42 U.S.C.A. § 1983.

87.     College Park's unlawful discriminatory actions were executed by its legislative body, the City Council of College Park, which pursuant to its municipal charter, exercised final decision-making authority over the appointment, or subsequent termination, of a City Manager.

88.     College Park's unlawful discriminatory actions intentionally deprived Plaintiff Tyus of a federally protected right, i.e., the right to be free from discrimination motivated by her sex.

89.     As a result of College Park's unlawful conduct, Plaintiff Tyus has suffered monetary damages, including but not limited to back pay and front pay, and loss of benefits; and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## **PRAYER FOR RELIEF**

Wherefore, based on the above stated claims, Plaintiffs demand a trial by jury and that the following relief be granted:

   A. Back pay, front pay, and lost benefits.

   B. Compensatory damages to the extent allowed by law.

   C. Attorneys' fees and costs of litigation.

   D. Pre-judgment and post-judgment interest at the highest lawful rate.

E.  Such other equitable and monetary relief as the court deems just and proper.

F.  A declaratory judgment that Defendant's actions violated Plaintiff's statutory and constitutional rights, and that Defendant shall refrain from future unlawful discriminatory conduct in its employment practices.

Respectfully submitted, the 18th day of April, 2023.

**HKM Employment Attorneys LLP**

_s/Artur Davis_
Artur Davis[1]
ASB-3672-D56A
2024 3rd Ave. North Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

_s/Jermaine "Jay" Walker_
Jermaine "Jay" Walker
GA Bar No. 142044
3344 Peachtree Road. NE Suite 800
Office #35
Atlanta, GA 30326
Direct: 404-301-4020
jwalker@hkm.com

**Counsels for Plaintiffs**

---

[1] Artur Davis will promptly file for admission _pro hac vice_ as an attorney of record in this action.  Davis is licensed in the state of Alabama and the District of Columbia.