**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| AARON BOOTERBAUGH,<br><br>    *Plaintiff*,<br><br>    vs.<br><br>CITY OF MORROW, MAYOR JOHN LAMPL, in his individual and official capacities, and CITY MANAGER JEFF BAKER, in his individual and official capacities<br><br>    *Defendants*. | **JURY TRIAL DEMANDED**<br><br>CIVIL ACTION NO. _____ |

## <u>COMPLAINT</u>

In July 2022, Plaintiff Aaron Booterbaugh was blocked from the City of Morrow's Facebook Page after making comments critical of its public officials. Booterbaugh brings this action against Defendants City of Morrow, Mayor John Lampl, and City Manager Jeff Baker under 42 U.S.C. § 1983; the First and Fourteenth Amendments of the United States Constitution; and the Georgia Open Records Act, O.C.G.A. § 50-18-70, *et seq.* Booterbaugh seeks declaratory and equitable relief and damages.

1

## PARTIES

1.      Plaintiff Aaron Booterbaugh ("Booterbaugh" or "Plaintiff") is a politically engaged citizen who participates in constitutionally protected speech in the designated or limited public forums for citizens created by the City of Morrow on its social media pages.

2.      Defendant City of Morrow ("The City" or "City") is located in Clayton County, Georgia. The City is a municipal entity capable of both suing and being sued.

3.      Defendant John Lampl ("Mayor Lampl") is the Mayor of the City of Morrow. As Mayor, Defendant Lampl presides over all City Council meetings and acts as the City's chief executive officer.

4.      Defendant Jeff Baker ("Manager Baker") is the City Manager of the City of Morrow. As City Manager, Defendant Baker oversees the City's day-to-day operations and serves as the City's chief administrative officer. The City Manager is appointed by the City Mayor and City Council.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.      This Court has supplemental jurisdiction over the asserted state law claims under 28 U.S.C. § 1367.

8.      This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and O.C.G.A. § 50-18-73.

9.      Venue in the Northern District of Georgia (Atlanta Division) is proper under 28 U.S.C. § 1391(b) because the City of Morrow is located within this district and division, and this is where the events giving rise to the asserted claims occurred.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

### *City of Morrow's Social Media Presence*

10.     The City of Morrow maintains a Facebook page ("City's Page" or "the Page"), located at https://www.facebook.com/cityofmorrow.

11.     The City posts content on the Page concerning official City initiatives, policies, activities, and events.

12.     The Page allows users to interact with its content by reacting to or commenting on the City's posts, leaving reviews, and privately messaging the Page administrators.

13.     The interactive sections of the Page constitute a designated or limited public forum for speech established by the City.

14.     The City has the ability to moderate users' speech on the Page in several ways.

15.     First, the Page administrators can hide or delete comments that users write in response to the City's posts.[1]

16.     When deleted, a comment is no longer visible to anyone viewing the Page.[2]

17.     When hidden, a comment is still visible to the person who wrote it and any of their friends on Facebook. However, the comment is hidden from all other users' view.[3]

---

[1] *See* Facebook, *Pages: Hide a comment from a post on your Facebook page*, Help Center, https://www.facebook.com/help/297845860255949 (last accessed Apr. 13, 2023); *See also* Facebook, *Pages: Delete a comment from a post on your Facebook page*, Help Center, https://www.facebook.com/help/841213946569182/?helpref=uf_share (last accessed Apr. 13, 2023).

[2] *See* Facebook, *Pages: Delete a comment from a post on your Facebook page*, *supra*, note 1.

[3] *See* Facebook, *Pages: Hide a comment from a post on your Facebook page*, *supra,* note 1.

18.     Second, the City can moderate content by limiting which users can comment on which specific posts or on the Page generally.[4]

19.     If the Page Administrator limits a user's ability to comment, the Administrator must determine which of the Page's posts, if any, the user is allowed to comment on. If restricted from commenting, the user may still engage with other interactive features of the Page, such as "liking" or sharing a post, but cannot join in the discussion about the post (or the entire Page) they are barred from commenting on.[5]

20.     Third, Page Administrators can also control whether users can post text, videos, and photos directly on the Page.[6]

21.     Finally, the City has the ability to block users altogether from accessing the Page.[7]

---

[4] *See* Facebook, *Choose who can comment on your Facebook Page's posts*, Help Center, https://www.facebook.com/help/369765040737128 (last accessed Apr. 13, 2023).

[5] *See* Facebook, *Choose who can comment on your Facebook Page's posts*, *supra*, note 4.

[6] *See* Facebook, *Pages: Control what visitors can post on your Facebook Page*, Help Center, https://www.facebook.com/help/174120789433365/?helpref=uf_permalink&parent_cms_id=248844142141117 (last accessed Apr. 13, 2023).

[7] *See* Facebook, *Pages: Ban or Block profiles from your Facebook Page,* Help Center,

22.     Blocking a user from a Facebook Page prevents that user from being able to see the Page.[8]

23.     The blocked user cannot receive the information on the Page, and also cannot re-post content from the Page or interact with the Page's content by posting comments or emojis. The blocked user also cannot interact with other users who are viewing or commenting on the Page.[9]

### *Background on Mayor Lampl and Manager Baker*

24.     In 2011, both Mayor Lampl and Manager Baker were the subject of separate criminal investigations and indictments.

### *Mayor John Lampl*

25.     Prior to becoming mayor, John Lampl was Morrow's City Manager for 17 years before then becoming Director of the Morrow Downtown Development Authority.[10]

---

https://www.facebook.com/help/185897171460026/?helpref=uf_permalink&parent_cms_id=248844142141117 (last accessed Apr. 13, 2023).

[8] *Id.*

[9] *Id.*

[10] Rhonda Cook, *Former Morrow Official Barred from City Property Except Streets*, Atl. J. Const. (Jan. 12, 2012), https://www.ajc.com/news/local/former-morrow-official-barred-from-city-property-except-streets/iOrR6FO1HeGMxWPGYyNgSN/.

26.     In these roles, Lampl advocated for and oversaw a $12.3 million real estate development project called "Olde Towne Morrow."[11]

27.     Olde Towne Morrow was conceived as a mixed-use special shopping district to drive tourism to the City.[12]

28.     The development was completed in November 2009 and was operated by the City for 13 months.[13]

29.     In March 2010, Lampl secured a seat on the Morrow City Council in a special election.[14]

---

[11] Chelsea Prince, *Former Morrow Official John Lampl Pleads No Contest to Wrongdoing in Failed Olde Towne Morrow Project*, Clayton News-Daily.com (Apr. 4, 2017), https://www.news-daily.com/news/former-morrow-official-john-lampl-pleads-no-contest-to-wrongdoing-in-failed-olde-towne-morrow/article_3913f984-7da4-5000-baf8-d32591cbcb65.html#:~:text=JONESBORO%20%E2%80%94%20Former%20Morrow%20city%20manager,battle%20involving%20Georgia's%20high%20court.

[12] Josh Green, *Will the abandoned Olde Towne Morrow be revived?*, Atl. Mag. (March 9, 2017), https://www.atlantamagazine.com/news-culture-articles/will-abandoned-olde-towne-morrow-revived/.

[13] Leon Stafford, *Morrow hopes to sell – instead of bulldozing – Olde Towne Morrow*, Atl. J. Const. (May 19, 2019), https://www.ajc.com/news/local/morrow-hopes-sell-instead-bulldozing-olde-towne-morrow/XgI6Wn8zggjnsHu5B1e8SK/.

[14] Curt Yeomans, *Lampl wins Morrow City Council seat*, Clayton News-Daily.com (Mar. 15, 2010), https://www.news-daily.com/news/lampl-wins-morrow-city-council-seat/article_05485406-cd8e-5df8-8723-c603867ed78d.html.

30.     Olde Town Morrow was ultimately shut down in December 2010 due to non-compliance with the City's fire codes.[15]

31.     In May of 2011, Lampl was removed from City Council due to a complaint from the City of Morrow's then-finance director that Lampl created a "hostile work environment."[16]

32.     On September 14, 2011, a grand jury in Clayton County indicted Lampl on charges of conspiracy in restraint of free and open competition, false statements and writings, and perjury in connection with the development of Olde Towne Morrow. *See State v. Lampl*, 750 S.E.2d 685, 686-87 (Ga. Ct. App. 2013).

33.     In March of 2017, Lampl pled no contest to five of the eight counts he was charged with. The Court dismissed the other three charges.[17]

34.     Lampl's sentence required him to pay restitution to both the City of Morrow and the Clayton County Board of Commissioners.[18]

35.     After 30 days of probation without new violations, the rest of Lampl's 6-month probation sentence was commuted, and the case was discharged.[19]

---

[15] *See* Prince, *supra*, note 11.
[16] *See* Cook, *supra*, note 10.
[17] *See* Prince, *supra*, note 11.
[18] *Id.*
[19] *Id.*

*City Manager Jeff Baker*

36.     Morrow City Manager Jeff Baker was previously the chief of the Morrow Police Department from 2006 to 2011.

37.     In November 2011, a City police officer found Baker asleep behind the steering wheel of a City-owned vehicle while stopped at a green light.[20]

38.     Baker was subsequently charged with driving under the influence of alcohol, running a red light, impeding traffic, driving with an open container, driving too fast for conditions, making an improper lane change, and failure to obey a person directing traffic.[21]

39.     In December of 2011, Baker resigned from his position as chief after being arrested and charged with a DUI.[22]

40.     At the time of Baker's resignation, the then-City Manager of Morrow was investigating him for violations of city policy related to his DUI arrest, including possession of alcohol in a City-owned vehicle, using a City-owned

---

[20] Curt Yeomans, *Jeff Baker Resigns as Morrow's Police Chief*, Clayton News-Daily.com (Dec. 1, 2011), https://www.news-daily.com/news/jeff-baker-resigns-as-morrows-police-chief/article_f3e9a55b-1e93-56ef-a032-b1388128fdab.html.
[21] *Id.*
[22] *Id.*

vehicle for personal use, not following a law enforcement officer's commands, and "discredit to the city."[23]

41.    Prior to his resignation as police chief, Baker had been cited in 2008 by the Georgia Peace Officers Standards and Training (POST) Council.

42.    That year, the POST Council investigated Baker and accused him of falsifying firearm training documents. The Council cited Baker after he refused to take a polygraph test to provide evidence of his participation in the mandatory training.[24]

*City of Morrow Blocked Plaintiff from the City's Facebook Page Because of His Viewpoint*

43.    On July 13, 2022, Plaintiff Aaron Booterbaugh made a series of comments and a post on the City of Morrow's Facebook Page.

44.    First, Booterbaugh commented on a post announcing the retirement of the outgoing Major of the Morrow Police Department, Keo Senghamphong. He wrote: "Congratulations Keo!!"

45.    Second, Booterbaugh posted directly on the Page:

---

[23] *Id.*
[24] *Id.*



46.   The City has since disabled viewers of the Page from being able to create original posts.

47.   Third, Booterbaugh commented on the City's post regarding the issuance of arson warrants after several buildings were set ablaze in Olde Towne Morrow.

48.     Booterbaugh's comment provided critical commentary on the controversial backdrop surrounding Olde Towne Morrow and its questionable financial ties to Mayor Lampl.

49.     Booterbaugh's comment read: [see next page]



**Aaron Booterbaugh**
I wonder if it will ever occur to any of the public that this entire place was a death trap! None of these bldgs was a home at this point, they were all intended to be commercial businesses. None of the bldgs were ever finished to "code". Rebuilding would at least mean the area would be rebuilt to code for commercial use and not a collection of fire hazards.

That is IF we watch lampl and baker like hawks while they spend the city taxpayer's money on this commercial real estate developer's stubborn dream. lampl is supposed to be the Mayor of Morrow, not a self-serving real estate developer!

This is lampl's baby! He cost the city $21 million the first time he built it and it's NEVER cleared a single dollar in profit, never has been fully operational. Thank goodness none of it was occupied. It should be clear to everybody that it was a death trap.

The tiny city of Morrow, GA shouldn't be involved with developing real estate! Especially not in an area that is dying to begin with. The Mall itself is barely hanging on, why would anybody think this little developement on it's perimeter could thrive. They couldn't even fill the little shop front spaces there in all the time it was operational. The Bridge is built on property that doesn't belong to the city. The retaining pond is Interstate runoff, NOT a spring feed pond! And nobody knows what's buried there, it was the dump area from when the mall was built. There is NO space for a parking lot. lampl depends on the Mall to provide the parking area, to which the mall owners have never agreed. lampl always refused to pay common area fees due to the Mall, making the city's relationship with the Mall adversarial.

Clear the entire site of the bldgs that are left there, that are also not to code. Make it a city park or a business incubator area. Leave the RE development to commercial interests and not the taxpayers!

I found the above post on the Morrow GA Citizens for a Better Government Facebook page for reference.

This is a First Amendment Audit.

Federal Fourth Circuit Court of Appeals Davidson V. Randal. January 7, 2019.

Like   **Reply**   28w

13

50.     Fourth, Booterbaugh commented on the City's post about City Manager Baker and Mayor Lampl's attendance at the Georgia Municipal Association's annual conference. Booterbaugh's comment included a link to an article detailing the circumstances of Manager Baker's resignation as Morrow Police Chief (see screenshots below).





51.     Finally, Booterbaugh commented on the City's post of a previously live-streamed video from the City of Morrow's July 3, 2022 Freedom Fest. Booterbaugh's comment included a link to a news story that again addressed Mayor Lampl's fitness to serve as Mayor.



52.     On or about July 13, 2022, the City blocked Booterbaugh from the City's Page without prior warning or notice.

53.     The City blocked Booterbaugh from its Facebook Page in retaliation for his critical viewpoint expressed in his July 13, 2022 comments.

54.     The City blocked Booterbaugh from its Facebook Page for the purpose of preventing his future critical speech.

*City Refused to Unblock Plaintiff*

55.     On July 20, 2022, Booterbaugh emailed the City requesting that he be unblocked from the City's Page.

56.     The City did not respond to Booterbaugh's request.

57.     On November 1, 2022, Booterbaugh's counsel sent a letter to the City, explaining that blocking him from the City's Page was a First Amendment violation and again requesting that he be unblocked.

58.     On November 22, 2022, the City's attorney responded that the City had not violated Booterbaugh's First Amendment rights.

59.     On January 17, 2023, several media outlets reported that the United States District Court for the Northern District of Georgia had entered a default judgment against former Georgia State Representative Vernon Jones for blocking a constituent on Facebook.[25]

---

[25] *See* Bill Rankin, *Vernon Jones Ordered to Pay $45K for Blocking Man on Facebook Page*, Atl. J. Const. (Jan. 17, 2023), https://www.ajc.com/politics/georgia-state-legislature/vernon-jones-ordered-to-pay-45k-for-blocking-man-on-facebook-page/62HSYMZNUJB4FNHLN5B7WZMWBM/; *see also* Charisma Madarang, *Pro-Trump Former Lawmaker Ordered to Pay $45,000 for Blocking Man on Facebook*, Rolling Stone (Jan. 17., 2023), https://www.rollingstone.com/politics/politics-news/vernon-jones-ordered-pay-45000-facebook-blocking-man-1234662741/.

60.     On or about January 19, 2023, Booterbaugh was quietly unblocked by the City of Morrow's Facebook page without notification.

61.     The City remains free to block Booterbaugh from its Facebook Page at any time.

62.     Booterbaugh's speech is chilled for fear of being blocked from the City's Page again.

63.     Moreover, as described below, the City continues to hide, delete, and limit Booterbaugh and other users from viewing, commenting, and posting on the City's Page in an arbitrary, and often viewpoint-based, manner.

64.     This regulation of speech by the City interferes with Booterbaugh's right to receive the speech of others on the Page.

*The City's Social Media Policies*

65.     On August 27, 2013, the City adopted a social media policy (the "2013 Policy") governing the use and maintenance of its social media pages. This 2013 Policy is attached hereto as Exhibit A.

66.     The 2013 Policy was in effect at the time Booterbaugh was blocked from the City Page in July 2022.

67.     The 2013 Policy makes clear that the City Manager is the final authority for the City's social media pages: "The City Manager with the direction

of the City of Morrow Council has the *sole authority* to determine when and what social media platforms will be utilized by the City. No guidelines listed here limit the ability to add or reduce the uses of social Media [sic] by the City Manager at any time deemed appropriate." Ex. A, § (II)(A) (emphasis added).

68.     Under the 2013 Policy, social media pages created by the City "allow a forum for comments and . . . create a space for commenting by interested third parties." Ex. A, § (II)(E)(4).

69.     The 2013 Policy allowed removal of comments violating any law, "obscene" comments, and comments "promot[ing] or perpetuat[ing] discrimination." Ex. A, § (II)(E)(7).

70.     Additionally, the 2013 Policy "strongly discouraged" posts containing "[p]ersonal attacks, vulgar language . . . or inflammatory posts," and indicated that posts of that variety "may be removed." Ex. A, § (II)(E)(7).

71.     Concepts like "personal attacks," "vulgar," and "inflammatory" mean different things to different people, resulting in subjective interpretation based on the individual sensitivities and biases of the enforcers of the 2013 Policy.

72.     Under the 2013 Policy, an "[a]dministrator" of any City social media page was authorized to "monitor all comments [on the page] to determine if

follow-up or removal is warranted in accordance to [sic] this policy." Ex. A, §
(II)(E)(4).

73.     If an administrator determined that removal of a comment was
"appropriate," the 2013 Policy required the administrator to "have the removal
communicated with the City Manager in a reasonable time frame." Ex. A, §
(II)(E)(4).

74.     The 2013 Policy specified that "[i]naccurate information posted may
be addressed and corrected on a factual basis only." Ex. A, § (II)(E)(7).

75.     The foregoing provision of the 2013 Policy signified that "inaccurate"
posts which otherwise did not violate the Policy would not be removed, but rather
would be corrected by the page administrator.

76.     The 2013 Policy also featured Facebook-specific directives, which
included a "standard reply" that an administrator may use to "address heated,
sensitive or complex issues." Ex. A at 7.

77.     The standard reply stated: "*The City of Morrow is very interested in
the insights, opinions and concerns expressed here. However, complex topics
typically are not effectively resolved in forums such as this. Please contact the City
Manager at 770-961-4002 if you wish to discuss your concerns further or obtain
additional information.*" Ex. A at 7.

78. The Facebook-specific directives in the 2013 Policy also included a generalized warning that "[t]he absence of listing an item in the policy does not mean the post is automatically acceptable," granting the City Manager unfettered discretion to regulate public comments on City social media pages. Ex. A at 8.

79. At its work session on November 22, 2022, the Morrow City Council ("City Council") reviewed and adopted a revised social media policy titled Resolution 2022-06 ("2022 Policy"), attached hereto as Exhibit B.

80. November 22, 2022 was the same day that the Morrow City attorney stated to Booterbaugh's counsel that the City had not violated his First Amendment rights by blocking him from the City Page.

81. At the work session, City Manager Baker described the 2022 Policy as necessary due to the age of the 2013 Policy and the City's switching its internet domain from "cityofmorrow.com" to "morrowga.gov."[26]

82. One portion of the 2022 Policy states that "off-topic comments or contents may be deleted under the guidance of City legal counsel" on City social media sites that "under guidelines or policies [] limit the site to a particular topic[.]" Ex. B, § 5. Absent additional guidelines or policies, though, the 2022

---

[26] *See* Morrow City Council Work Session Nov. 22, 2022, (00:03:30), available at: https://www.youtube.com/watch?v=hKyNtJJUDfA.

Policy states that "Moderators may not delete or modify comments that are posted or otherwise sent or shared by outside parties[.]" *Id.*

83.     Neither the 2022 Policy, nor the City Facebook Page contain "guidelines or policies that limit" the Page "to a particular topic." *Id.*

84.     It would therefore follow that, per Section 5 of the 2022 Policy, moderators of the City Facebook Page may not delete or hide comments on the Page under the 2022 Policy.

85.     But the 2022 Policy goes on to contradict itself.

86.     Under Section 7 of the 2022 Policy, the City "reserves the right, without notification and at our sole discretion, to remove any objectionable content posted by the public." Ex. B, § 7.

87.     The 2022 Policy then includes a non-exhaustive list of "objectionable content" that the City may remove "at [its] sole discretion" ("Objectionable Content Provision"). This list includes "personal attacks and harassment of any kind" and "language that is considered . . . vulgar, hateful or racist[.]" Ex. B, § 7.

88.     Concepts like "personal attack," "harassment," "vulgar," "hateful," and "racist" mean different things to different people, resulting in subjective interpretation based on the individual sensitivities and biases of the enforcers of the 2022 Policy.

89.     By virtue of the 2022 Policy's vague and overly broad definition of what constitutes removable "objectionable content," the Policy grants the City virtually unlimited discretion to censor and restrict public speech on the City Page based on viewpoint.

90.     Another 2022 Policy provision allows the City to "delete comments that are . . . clearly 'off topic'" ("Off-Topic Provision"). Ex. B, § 7.

91.     But as noted above, the Policy does not define what topics may be discussed on the City Page or what constitutes an "off topic" comment. Users therefore have no way of knowing what topics they can discuss on the Page and what topics will be removed.

92.     The 2022 Policy further allows the City to remove "[c]omments that make unsupported accusations" ("Unsupported Accusations Provision"). Ex. B, § 7.

93.     But the term "unsupported accusations" is not defined, leaving enforcers of the Policy free to interpret and apply it according to their individualized subjective assessments.

94.     Thus, the Unsupported Accusations Provision grants the City unfettered discretion to determine what constitutes an "unsupported accusation" that may be removed.

95.     The 2022 Policy further allows the City not only to remove content, but also to block users who violate the Policy, including the Objectionable Content Provision, the Off-Topic Provision, and the Unsupported Accusations Provision. This allows for further unfettered discretion and viewpoint-based retaliation against, and censorship of, users—like Booterbaugh—who engage in critical speech on the City Page.

96.     City Manager Baker introduced this 2022 Policy to the City Council for review and vote just one week after he characterized Booterbaugh as using Georgia Open Record Act requests "to harass city staff," and the same day that the Morrow City attorney stated to Booterbaugh's counsel that the City had not violated Booterbaugh's First Amendment rights by blocking him from its Facebook Page.

97.     At least one Morrow City Council member raised concerns during the November 22, 2022, work session that the 2022 Policy ran afoul of the First Amendment.

98.     Undeterred by these concerns, the City Council passed Resolution 2022-06 without modifications, thereby enacting the 2022 Policy.

99.     The City of Morrow also posts on its webpage a "Social Media Policy" at https://www.morrowga.gov/socialmediapolicy ("Web Policy"), attached hereto as Exhibit C1.

100.    This same Web Policy had appeared on the City of Morrow's prior internet domain, before the City adopted the 2022 Policy. See http://www.cityofmorrow.com/socialmediatermsofservice.asp, attached hereto as Exhibit C2.

101.    The Web Policy states that "City of Morrow social media pages are managed as a limited public forum" and "these pages are intended to create an open, productive forum for discussion."

102.    Whether the City intended for the 2022 Policy to replace the Web Policy, or to exist in addition to the Web Policy, the Web Policy has similarly problematic provisions as the 2022 Policy.

103.    The Web Policy authorizes the City "to remove and/or block anyone who posts inappropriate material as determined by the City of Morrow" ("Inappropriate Provision").

104.    The Web Policy does not define "inappropriate."

105.    As "inappropriate" means different things to different people, enforcement of this term will necessarily result in subjective interpretation based

on the individual sensitivities and biases of the enforcers, allowing the City unlimited discretion to censor and restrict public speech on the City Page based on viewpoint.

106.    The Web Policy also states that the City "reserve[s] the right to restrict comments that: are threatening, discriminatory, graphic, . . . profane, or hateful." Again, these terms mean different things to different people. Enforcement of these terms will turn on the subjective sensitivities and biases of the enforcers, facilitating restriction of public speech on the City Page based on viewpoint.

107.    Additionally, terms like "discriminatory" and "hateful" are, on their face, descriptions of a type of viewpoint. Enforcement of these terms will therefore, in every application, constitute viewpoint-based regulation of speech.

108.    The Web Policy additionally states that the City "reserve[s] the right to restrict comments that . . . contain information that reasonably could compromise the . . . well-being, or reputation of any person or organization, including personal attacks."

109.    The terms "compromise," "well-being," "reputation," and "personal attacks" are subjective, undefined terms that grant the City unfettered discretion to use these concepts to censor broad swaths of speech, including valid critiques and criticisms of City of Morrow agencies and officials.

27

110.    The Web Policy further states that the City "reserve[s] the right to restrict comments that . . . are off-topic or repetitive."

111.    But as noted above, the Policy does not define what constitutes an "off topic" comment, nor define the threshold for what will be deemed "repetitive." Users therefore have no way of knowing what topics they can discuss on the Page or how often, without risking their comments being removed.

### *The City's Arbitrary Enforcement of the 2022 Policy and Web Policy*

112.    As of February 23, 2023, the City of Morrow continues to limit public comments on its Facebook Page, including comments by Booterbaugh, in an arbitrary and often viewpoint-based manner. The City accomplishes this capricious speech-regulation by, without limitation: (1) hiding all comments on certain City posts; (2) hiding only some comments on certain City posts; (3) deleting some comments on certain City posts; and (4) limiting who can comment on specific City posts.

113.    For example, and without limitation, Facebook indicates there are 44 comments on the City Page's "Black History Month" post from February 9, 2023 (see screenshot below), but when a user tries to click and open the comments section, a message pops up indicating that there are "no visible comments."

28



114.    The above screenshot shows that, although users can comment on the post, the City exercises unfettered discretion to censor those comments by hiding them from public view on the City's Page.

115.    As a further example, and again without limitation, the City of Morrow arbitrarily regulates speech in a viewpoint-based manner when it deletes comments on its posts, or makes only some of the comments on a post visible.

116.    This can be seen on the City Page's "Black History Fashion Show" post from January 30, 2023, where there are 21 comments, but only two comments are visible—one from an admirer of the performer and the City's reply to that admirer (see screenshots below).

117.    The City censored the discourse expressed in the other 19 comments by hiding them from public view (see screenshots below).[27]

---

[27] The City has since deleted this post and all related comments from its Page.





118.     The City's Page also censors the comments of particular users. For

example, the City hid from public view Booterbaugh's comment on its January 16,

2023, MLK Day post that linked to a video criticizing a controversial arrest made

by the Morrow Police Department that resulted in public backlash.

119.     Although Booterbaugh's comment still appears when Booterbaugh

views the City's page (see first screenshot below), his comment is invisible to other

users (see second screenshot below).





120.    The City's arbitrary regulation of users' comments on its Facebook Page is the result of unfettered discretion that enables viewpoint-based content moderation, including of comments made by Booterbaugh.

*Plaintiff's Open Records Requests*

121.    After the City blocked Booterbaugh from accessing its Facebook Page in July 2022, Booterbaugh submitted several Open Records Requests to the City via email.

122.    On August 30, 2022, Booterbaugh requested "all files, records, and other documents in your possessions that refer, reflect, or relate to the City of Morrow Facebook Blocked Users."

123.    Booterbaugh also requested the list of users blocked from accessing the City's Page.

124.    After Booterbaugh requested the list of blocked users, the City Attorney replied that there were no documents responsive to his request.

125.    The following day, September 2, 2022, Booterbaugh emailed the City Attorney a link from the Facebook Help Center providing guidance on how to access the list of users blocked from the City's Page.

126.    That same day, the City Attorney responded to Booterbaugh that "no further action" would be taken in regards his August 30, 2022 Open Records

35

Request because "[t]he City is not the holder of the [Blocked Facebook Users List], the social media platform is."

127.    Contrary to the City's claim, the identities of the users who are blocked from the City's Page is electronically stored data associated with the City's Facebook account that is readily accessible to the City.

128.    On December 2, 2022, Booterbaugh, through his counsel, submitted another Open Records Request to the City requesting all documents and communications regarding the City's revised social media policy (the 2022 Policy) and regarding Booterbaugh's being blocked from the City's Facebook Page.

129.    In response, the City Attorney insisted on pre-payment of $114.00 to the Morrow City Clerk before any search for the requested records would be conducted.

130.    Neither Booterbaugh nor his counsel had, at any time prior to December 2022, failed to pay for records requested from the City of Morrow.

131.    Nonetheless, the City Attorney adhered to insisting on pre-payment of $114.00, even after being put on notice by Booterbaugh's counsel that this was contrary to guidance issued by the Georgia State Attorney General's Office.

## CLAIMS FOR RELIEF

## COUNT I

### *Violation of Plaintiff's First Amendment Rights – Social Media Blocking*

*(Against City of Morrow, John Lampl, and Jeff Baker
in their individual and official capacities)*

132.   Count I incorporates by reference the factual allegations set forth above in paragraphs 1 through 120.

133.   The United States Supreme Court recognizes two categories of public fora: "traditional public forums" and "limited (or designated) public forums[.]" *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45-48 (1983).

134.   Social media sites, like Facebook, are analogous to traditional public forums, due to their resembling a "modern public square[,]" allowing private citizens to "make [their] voice[s] heard[.]" *Packingham v. N.C.*, 582 U.S. 98, 107 (2017).

135.   Courts further recognize government-operated, interactive social media pages to be designated or limited public forums. *See Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1178-79 (9th Cir. 2022) (finding Twitter page controlled by school board trustee to be "a designated public forum"); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (finding former president's Twitter account to be "a public forum"), *cert. granted*, *vacated as moot*

37

*sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021); *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (finding that interactive component of county board chairwoman's Facebook page "amounts to a public forum").

136.    In determining whether the government has created a public forum, courts look to the "policy and practice of the government" and "the nature of the property and its compatibility with expressive activity" to determine the government's intent. *Cornelius v. NAACP Legal Def. and Educ. Fund*, 473 U.S. 788, 802 (1985).

137.    The City of Morrow characterized its social media pages, which include the City Facebook Page, as "forums" for comment in its 2013 Policy, which was the operative policy when Booterbaugh was blocked from the City's Facebook Page.

138.    The City of Morrow's Web Policy, on both its current and prior internet domain, states that its social media pages "are managed as a limited public forum," and "are intended to create an open, productive forum for discussion."

139.    Consistent with this, on its Facebook Page, the City includes a comment bar on its posts, and its 2013 and 2022 Policies recognize that citizens will be responding directly to City posts.

38

140.    Therefore, the interactive sections of the City Page constitute a public forum. *See Biedermann v. Ehrhart*, Civ. A. No. 1:20-CV-01388-JPB, ECF 48 at 20 (N.D. Ga. Mar. 7, 2023) (finding substantial likelihood that Plaintiff will establish that official, interactive Facebook page operated by Georgia State Rep. Ginny Ehrhart is a designated or limited public forum).

141.    Regardless of the type of forum (traditional, designated/limited, or even nonpublic), the government may not restrict speech in that forum based on viewpoint. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

142.    Indeed, even in limited public forums, where speech may be restricted by speaker or subject matter, restrictions must be "reasonable in light of the forum's purpose" and may not discriminate based on viewpoint. *Good News Club v. Milford Cent. Sch.*, 555 U.S. 98, 99 (2001).

143.    Here, Booterbaugh engaged in constitutionally protected speech by questioning Defendants Lampl and Baker's fitness for office when he posted and commented on the City's Facebook Page on July 13, 2022.

144.    In retaliation for Booterbaugh's expressing criticism of Lampl and Baker's fitness for office, he was blocked from the Page. *See Dingwell v. Cossette*, 327 F.Supp. 3d 462, 471 (D. Conn. 2018) (finding that social media blocking is a

form of retaliation "because the blocking of Facebook access is by its nature an injury").

145.    The Page was and is under the management and direction of Mayor Lampl, as "chief executive officer of the city" under the City's charter, and Manager Baker, as the final authority on City social media pages.

146.    Upon information and belief, both Mayor Lampl and Manager Baker were personally involved in the decision to block Booterbaugh.

147.    Blocking Booterbaugh from the City Facebook Page constituted an adverse action that would deter or chill a person of ordinary firmness from expressing criticism of the City or its officials.

148.    Blocking Booterbaugh from the City Facebook Page censored his prior posts and comments on the Page by rendering them no longer visible to others viewing the Page.

149.    Blocking Booterbaugh from the City Facebook Page silenced him from speaking on the Page for the duration of the approximately six months that he was blocked, constituting a prior restraint on speech. *See Robinson v. Hunt Cnty.*, 921 F.3d 440, 450 (5th Cir. 2019) (reinstating prior-restraint claim where citizen was banned from sheriff office's Facebook page without due process).

150.    Blocking Booterbaugh from the City Facebook Page interfered with his First Amendment right to petition the government for grievances, which includes allowing "citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011).

151.    Blocking Booterbaugh also prohibited him from viewing and receiving the speech of the City and other users on the Page. *Stanley v. Ga.*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.").

152.    Booterbaugh was damaged by being blocked from the City Facebook Page, which prevented him from engaging in the protected First Amendment activities of speaking, petitioning, and receiving the speech of others on the Page.

153.    Booterbaugh was further damaged by the censorship of his prior comments and posts on the Page, which were no longer visible to others once he was blocked. *Miko v. Rep. Vernon Jones*, Case No. 1:20-cv-02147-SDG, ECF 38 at 6 (N.D. Ga. Jan. 17, 2023) (awarding damages to Plaintiff who was blocked from Georgia State Rep. Vernon Jones' Facebook page).

154.    After more than six months of being blocked, Booterbaugh's access to the City Facebook Page was quietly restored, without notification to Booterbaugh.

155.    Defendants could revoke Booterbaugh's access to the City Page at any time if he expresses a point of view they dislike or disagree with.

156.    Additionally, Booterbaugh continues to suffer the First Amendment injury of having his comments on the City Page hidden from public view based on viewpoint.

157.    Booterbaugh continues to suffer the chilling effects of the Defendants' retaliation against his speech, as he now sometimes refrains from public comment due to fear of being re-blocked or of having his comments hidden or deleted.

## COUNT II

### *Violation of Plaintiff's First Amendment Rights – Vagueness and Overbreadth of 2022 Social Media Policy*
### *(Against City of Morrow)*

158.    Count II incorporates by reference the factual allegations set forth above in paragraphs 1 through 120.

159.    A provision banning unprotected speech is considered overbroad when it also chills or prohibits a substantial amount of protected speech. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). In other words, "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech." *Id.*

160.    Additionally, in the First Amendment context, a statute may be considered vague and therefore facially invalid when it is "unclear whether it

regulates a substantial amount of protected speech," since such provisions rely on "wholly subjective judgments" and invite discriminatory enforcement. *See U.S. v. Williams*, 553 U.S. 285, 304-06 (2008).

161.    Vague regulations raise "special First Amendment concerns" due to their creating "obvious chilling effect[s]" on constitutionally protected speech. *Reno v. ACLU*, 521 U.S. 844, 845 (1997).

162.    Three separate provisions of the City's 2022 Policy that are applicable to Booterbaugh present issues of unconstitutional overbreadth and vagueness, as do multiple provisions of the City's Web Policy.[28]

163.    First, the 2022 Policy's Objectionable Content Provision, which gives the City "sole discretion" to remove "objectionable content," is vague and overbroad.

---

[28] Multiple provisions of the 2022 Policy also unconstitutionally infringe the speech rights of City of Morrow employees. For instance, the Policy prohibits employees from posting "unsuitable or inappropriate content **on any** social media or networking site," on pain of "appropriate disciplinary action." Ex. B, §§ 4.m, 4.o (emphasis added). The Policy then defines "[i]nappropriate content" for employees to post to include, without limitation: "comments that are profane, abusive, threatening, harassing, intimidating, hateful . . . content considered to be disrespectful or insulting to City officials, staff, or representatives . . . religious and political messages . . . inappropriate jokes, slurs, or innuendoes . . ." *Id.*, § 4.m. As Booterbaugh is not a City employee, he lacks standing to challenge these far-overreaching provisions that unconstitutionally trample the free speech rights of Morrow City employees. Booterbaugh's lack of standing makes these violations no less concerning.

164.    The term "objectionable content" is subjectively defined to include "personal attacks and harassment of any kind" and "language that is considered . . . vulgar, hateful or racist." Ex. B, § 7. This subjectivity prevents citizens from understanding what content will be censored, leading them to self-censor to avoid transgressing the provision. This subjectivity also vests Defendants with unfettered discretion to apply the provision in a viewpoint-based manner.

165.    The same constitutional flaws articulated above with respect to the 2022 Policy's Objectionable Content Provision also inure to the Inappropriate Provision of the Web Policy, as well as to the provisions of the Web Policy that permit the City to censor "threatening, discriminatory, graphic, . . . profane, or hateful" comments, or comments that include "personal attacks." Exs. C1 & C2. These subjective, undefined terms -- several of which, like "discriminatory" and "hateful," on their face prohibit a particular viewpoint -- afford the City the unfettered discretion to regulate speech on the Page in a viewpoint-based manner.

166.    Second, the 2022 Policy's Unsupported Accusations Provision presents similar issues of overbreadth and vagueness.

167.    Due to the Policy's failure to define what is meant by "unsupported accusations," the Policy leaves open to subjective interpretation how this provision will be applied and enforced, including whether it will be used to censor or punish

various forms of protected speech because of dislike or disagreement with its expressed viewpoint.

168.    For instance, "accusations" may be readily interpreted to mean criticism of City officials, in which case this provision sweeps up and prohibits wide swaths of political speech and opinion that occupy the highest rung of First Amendment protection.

169.    The same is true for the portion of the City's Web Policy that allows for City censorship of comments containing "information that reasonably could compromise the . . . reputation of any person or organization, including personal attacks." This provision may readily be interpreted to censor First Amendment-protected criticism of the City, its agencies, or its officials.

170.    Additionally, to the extent that "unsupported" in the phrase "unsupported accusations" in the 2022 Policy is meant to prevent merely false speech, this also runs afoul of the First Amendment. *See U.S. v. Alvarez*, 567 U.S. 709, 722 (2012) (declining to recognize "false statements" as "a new category of unprotected speech").

171.    Third, the 2022 Policy's Off-Topic Provision and the Web Policy's "off-topic and repetitive" clause fare no better.

172.     Neither the 2002 Policy nor the Web Policy define what topics are allowed to be discussed on the City Facebook Page or what the City considers to be "off topic." An ordinary user, therefore, lacks the ability to predict what the City may deem "off topic" and subject to removal, resulting in self-censorship ("chilled speech") to avoid violating the Off-Topic prohibitions.

173.     Additionally, by failing to specify what is considered "off topic," the 2022 Policy and Web Policy allow for the discretionary removal of a substantial amount of protected speech when such removal is not reasonably related to the purpose of the City Facebook Page forum.

174.     Moreover, the Web Policy fails to specify a threshold requirement for what constitutes "repetitive" comments that would be subject to removal. Th ordinary user therefore lacks the ability to predict how often or frequently they may comment on any given topic without risking their comments being removed. This results in users self-censoring to avoid violating the prohibition on "repetitive" comments.

175.     In sum, users' speech on the City Page has been and will be chilled for fear of running afoul of the overbroad and vaguely-worded Objectionable Content, Unsupported Accusations, and Off-Topic Provisions of the 2022 Policy, and the similar provisions included in the Web Policy.

176.    These same Provisions in the 2022 Policy and similar provisions in the Web Policy also vest Defendants with unfettered discretion to remove speech they do not like, including criticism of themselves or other City officials, based on viewpoint. For example, Booterbaugh's comment linking to a video criticizing the Morrow Police Department was hidden from public view.

177.    The 2022 Policy and the Web Policy are therefore unconstitutional, both facially and as applied to Booterbaugh.

## COUNT III

### *Violation of Plaintiff's Rights under Georgia's Open Records Act, O.C.G.A. § 50-18-70, et seq.*

(*Against City of Morrow*)

178.    Count III incorporates by reference the factual allegations set forth above in paragraphs 121 through 131.

### List of Users Blocked from City Page

179.    Under the Georgia Open Records Act ("ORA"), "[a]gencies shall produce for inspection all records responsive to a request within a reasonable amount of time not to exceed three business days of receipt of a request." O.C.G.A. § 50-18-71(b)(1)(A).

180.    In August 2022, Booterbaugh requested the existing list of users blocked from accessing the City Facebook Page, and the City responded that the "[t]he City is not the holder of the [list of users blocked from accessing the City's Page], the social media platform is."

181.    Yet the City is, in fact, the holder of, and can readily access, this electronically stored data associated with its Facebook account, as evidenced by the Facebook Help Center's guidance to account holders on how they can access a list of blocked users.

182.    The ORA designates "computer based or generated information" as "public records" under the Open Records Act. O.C.G.A. § 50-18-70(b)(2).

183.    The ORA further provides that "[a]gencies shall produce . . . printouts of electronic records or data from data base fields that the agency maintains using the computer programs that the agency has in its possession." O.C.G.A. § 50-18-71(f). Moreover, "[a]n agency shall not refuse to produce such electronic records, data, or data fields on the grounds that exporting data . . . will require inputting range, search, filter . . . or similar command or instructions into an agency's computer system . . ." *Id.* Thus, the City violated the ORA by refusing to input the commands into its Facebook account that would export the data on blocked users.

184.    Additionally, even under the City's theory that Facebook is the holder of the blocked-users data, such data would constitute a record "prepared and maintained by a private . . . entity [Facebook] in the performance of a service or function [hosting a social media account] for or on behalf of an agency [the City]." O.C.G.A. § 50-18-70(b)(2). Therefore, the list of blocked users qualifies as a "public record" that must be produced upon request, even if it is held by Facebook. *See id.*; *Hackworth v. Bd. of Educ. for City of Atlanta*, 214 Ga. App. 17, 19 (1994) (determining if a record qualifies as a public record under the ORA focuses on, not the private entity that holds the record, but on the "particular discrete function performed by the [private] actor.").

<u>Insistence on Pre-Payment</u>

185.    In response to Booterbaugh's December 2022 Open Records Request, the Morrow City Attorney insisted that $114 be prepaid before the City conducted a search for the requested records.

186.    This insistence on pre-payment violated O.C.G.A. § 50-18-71(d) which allows agencies to require pre-payment only if "the estimated costs for production of the records exceeds $500," or if the requester has previously failed to pay for the cost of requested records. Neither of these circumstances applied to Booterbaugh's December 2022 Open Records Request.

49

187.    After the City Attorney was informed that her position was contrary to guidance issued by the Georgia Attorney General's Office, the City Attorney continued to improperly insist on pre-payment.

188.    Thus, in connection with both the list of blocked users and the insistence on prepayment, the City negligently, and willfully, violated the ORA under O.C.G.A. § 50-18-74(a), and did so without substantial justification under O.C.G.A. § 50-18-73(b).

## **REQUEST FOR RELIEF**

WHEREFORE, on the basis of the foregoing, Booterbaugh respectfully requests that this Court:

a.      Assume jurisdiction over this action;

b.      Hold a trial by jury on all issues so triable;

c.      Declare unconstitutional Defendants' viewpoint-based exclusion and censorship of Booterbaugh from the City of Morrow Facebook Page for the time period of approximately on or about July 13, 2022, until approximately on or about January 19, 2023;

d.      Enjoin Defendants from engaging in viewpoint-based exclusion or censorship of Booterbaugh or other individuals on any interactive City social

media page, including by blocking them, deleting or hiding their comments, or restricting them from being able to comment;

e.      Declare unconstitutional the City's 2022 Policy and enjoin Defendants from enforcing it.

f.      Declare unconstitutional the City's Web Policy and enjoin Defendants from enforcing it.

g.      Declare Defendant City of Morrow to have Booterbaugh violated the Georgia Open Records Act and enjoin the City from committing similar future violations;

h.      Award civil penalties under the Georgia Open Records Act, see O.C.G.A. § 50-18-74(a);

i.      Award general and special compensatory damages to Booterbaugh in an amount determined by the enlightened conscience of fair and impartial jurors for Defendants viewpoint-based exclusion of Booterbaugh from the City's Page;

j.      Award punitive damages against Defendants Lampl and Baker in their official capacities;

k.      Award reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988, Ga. Code Ann., § 13-6-11, O.C.G.A. § 50-18-73, and other applicable law; and

l.      Award such other and further relief as this Court deems just and proper.

Respectfully submitted this 21 day of April, 2023.

*/s/ Clare Norins*
Clare Norins, Director
Georgia Bar No.  575364
cnorins@uga.edu
Lindsey Floyd
Georgia Bar No. 538989
lindsey.floyd@uga.edu
FIRST AMENDMENT CLINIC*
University of Georgia School of Law
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419 (phone)
(706) 369-5794 (fax)


*Many thanks to First Amendment Clinic students Jennifer Danker, Delaney Davis, and Warren Schmitt, and Clinic Fellow Allyson Veile for their contributions to this pleading.